Exhibit H



Español

**GDB**

| Home | About GDB | Investor Resources | Economy | Banking | Municipalities | Communications |

# Investor Resources

**Investor Resources**

Home > Investor Resources > Tax-Exempt Securities by Issuer > Puerto Rico Sales Tax Financing Corporation

< go back

- Introduction
- Tax-Exempt Securities by Issuer
- ▼ Publications & Reports
  - ▶ GDB Annual Report
  - ▶ Commonwealth CAFR
  - ▶ Commonwealth Financial Information and Operating Data Report
  - ▶ Commonwealth Cash Flow Projection
  - ▶ General Fund Net Revenues
  - ▶ General Fund Cash Flow Projection
  - ▶ Sales And Use Tax Collections
- ▶ Investor Presentations
- ▶ Governor's Messages
- ▶ Relevant Legislative Measures
- ▶ Other Documents
- ▶ Puerto Rico Stock Index (PRSI)

## Puerto Rico Sales Tax Financing Corporation (COFINA)



### Credit Ratings

|  | Moody's | Standard & Poor's | Fitch |
|---|---|---|---|
| **Sales Tax Revenue Bonds:** |  |  |  |
| - **Senior Lien** | Caa3 | CCC- | CC |
| - **First Subordinate Lien** | Ca | CCC- | CC |

### Credit Rating Reports on COFINA



Go to Commonwealth section to access other credit rating reports affecting COFINA debt

Standard & Poor's – October 1, 2013

View prior reports from Credit Rating Agencies

### Sales and Use Tax Data Center

Monthly Distribution of Total SUT Collections

### Security

COFINA issued Puerto Rico Sales Tax Revenue Bonds to provide funds for the Commonwealth of Puerto Rico to repay certain debt obligations to the GDB and PFC. The bonds, issued under resolutions adopted by COFINA's board of directors will be payable from and secured by a security interest created by the Resolution in a specified portion of the newly created sales tax ("Pledged Sales Tax"). Legislation enacted in 2006 approved for the first time in Puerto Rico a sales and use tax of 5.5% for the benefit of the central government and a separate 1.5% for the benefit of municipalities of Puerto Rico. Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by COFINA separate and apart from the central government's General Fund, and provided, among other things, that each fiscal year the first receipts of the Commonwealth's Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund and applied to the payment of the Sales Tax Revenue Bonds.

### Functions

The Puerto Rico Sales Tax Financing Corporation (by its Spanish acronym, COFINA) is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended, for the specific purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, which were payable to the GDB and the Puerto Rico Public Finance Corporation (PFC) and were previously payable solely from government budgetary appropriation. COFINA provided a definite and secure repayment mechanism of some $6.8 billion in debt that previously lacked a source of repayment.

*Trustees Under the Trust Indenture:*

*Bank of New York*

*Financial Statements Audited by:*
*KPMG LLP*

Exhibit H

## AUDITED FINANCIAL STATEMENTS

▶ June 30, 2014

## Opinions

▶ **Opinion from Bond Counsel in connection with COFINA Issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

▶ **Opinion from Underwriters' Counsel in connection with COFINA Issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

▶ **Opinion of Secretary of Justice of the Commonwealth in connection with COFINA Issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

## Official Statements

▶ **Puerto Rico Sales Tax Financing Corporation - $91,155,000**
Sales Tax Revenue Bonds, Senior Series 2011D
December 1, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $1,006,474,702**
Sales Tax Revenue Bonds, Senior Series 2011C
December 1, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $45,620,000**
Sales Tax Revenue Bonds, First Subordinate Series 2011B
November 16, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $734,795,573.95**
Sales Tax Revenue Bonds, First Subordinate Series 2011A
$397,758,386.20 Series 2011A-1
$337,037,187.75 Series 2011A-2
November 16, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $182,190,000**
$89,435,000 Sale Tax Revenue Bonds, First Subordinate Series 2010D
$92,755,000 Sale Tax Revenue Bonds, First Subordinate Series 2010E
June 24, 2010

▶ **Puerto Rico Sales Tax Financing Corporation - $1,619,404,596.60**
Sale Tax Revenue Bonds, First Subordinate Series 2010C
June 24, 2010

▶ **Puerto Rico Sales Tax Financing Corporation - $1,823,757,271.30**
Sale Tax Revenue Bonds, First Subordinate Series 2010A
January 28, 2010

▶ **Puerto Rico Sales Tax Financing Corporation $1,217,915,799.20**
Sales Tax Revenue Bonds
First Subordinate 2009B
June 19, 2009

▶ **Puerto Rico Sales Tax Financing Corporation $237,875,000**
Sales Tax Revenue Bonds
Senior Series 2009C
June 10, 2009

▶ **Puerto Rico Sales Tax Financing Corporation $4,118,153,700**
Sales Tax Revenue Bonds
First Subordinate Series 2009A
June 10, 2009

▶ **Puerto Rico Sales Tax Financing Corporation - $737,046,992.35**
Sales Tax Revenue Bonds

Series 2008A
June 25, 2008

▶ **Puerto Rico Sales Tax Financing Corporation - $499,996,627.90**
Sales Tax Revenue Bonds
Series 2007C
December 18, 2007

▶ **Puerto Rico Sales Tax Financing Corporation - $1,333,101,779.90**
Sales Tax Revenue Bonds
Series 2007B
July 17, 2007

▶ **Puerto Rico Sales Tax Financing Corporation - $2,667,603,572.60**
Sales Tax Revenue Bonds

Series 2007A
July 13, 2007

## BOND RESOLUTIONS

☐ **Eighteenth Supplemental Sales Tax Revenue Bond Resolution, authorizing Sales Tax Revenue Bonds, First Subordinate Series 2011A, consisting of First Subordinate Series 2011-A1 and First Subordinate Series 2011A-2, Resolution 2011-07, Adopted on November 16, 2011**

☐ **Amended and Restated *Sales Tax Revenue Bond Resolution*, Adopted on July 13, 2007, as amended on June 10, 2009**

☐ **First Supplemental Sales Tax Revenue Bond Resolution, authorizing Sales Tax Revenue Bonds Series 2007A, Adopted on July 13, 2007**

**GDB Contact**
Ana E. Torres
Vice President
Director of General Obligations Financing
General Obligations Department
Tel. (787) 722-2525 x-15262
Fax (787) 721-0540
Email: Ana.E.Torres@bgf.gobierno.pr

**COFINA Contact**
Melba Acosta Febo
Executive Director, COFINA
Tel. (787) 722-2525 x-15401/15403
Fax (787) 723-7388

Go to top

Copyright © 2008-2015 Government Development Bank for Puerto Rico. All Rights Reserved.
Site Map | Legal Notice | Contact Us

1/1/2019 Case:17-03283-LTS Doc#:4606-7 Government Development Bank for Puerto Rico (GDB) 16:23:38 Desc: H R to the Peter Hein Declaration Page 4 of 447

Exhibit I

Home

# Investor Resources

**Investor Resources**

## Puerto Rico Sales Tax Financing Corporation (COFINA)



### Credit Ratings

|                          | Moody's | Standard & Poor's | Fitch |
|--------------------------|---------|-------------------|-------|
| **Sales Tax Revenue Bonds:** |     |                   |       |
| - Senior Lien            | Ca      | D                 | D     |
| - First Subordinate Lien | Ca      | D                 | D     |

### Credit Rating Reports on COFINA

| ▶ Go to Commonwealth section to access other credit rating reports affecting COFINA debt |
|---|
| |
| ▶ Fitch – July 3, 2017 |
| ▶ Standard & Poor's – October 1, 2013 |

View prior reports from Credit Rating Agencies

### Security

COFINA issued Puerto Rico Sales Tax Revenue Bonds to provide funds for the Commonwealth of Puerto Rico to repay certain debt obligations to the GDB and PFC. The bonds, issued under resolutions adopted by COFINA's board of directors will be payable from and secured by a security interest created by the Resolution in a specified portion of the newly created sales tax ("Pledged Sales Tax"). Legislation enacted in 2006 approved for the first time in Puerto Rico a sales and use tax (SUT) of 5.5% for the benefit of the central government and a separate 1.5% for the benefit of municipalities of Puerto Rico. Act 91 also created a Dedicated Sales Tax Fund, to be held and owned by COFINA separate and apart from the central government's General Fund, and provided, among other things, that each fiscal year the first receipts of the Commonwealth's Sales Tax, in the amount specified in the law, be deposited in this special Dedicated Fund and applied to the payment of the Sales Tax Revenue Bonds. On July 1, 2015, the total SUT was increased to 11.5%.

### Functions

The Puerto Rico Sales Tax Financing Corporation (by its Spanish acronym, COFINA) is an independent instrumentality of the Commonwealth of Puerto Rico, created by Act No. 91 of May 13, 2006, as amended, for the specific purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, which were payable to the GDB and the Puerto Rico Public Finance Corporation (PFC) and were previously payable solely from government budgetary appropriation. COFINA provided a definite and secure repayment mechanism of some $6.8 billion in debt that previously lacked a source of repayment.

Bank of New York

**Financial Statements Audited by:**
KPMG LLP

## AUDITED FINANCIAL STATEMENTS

▶ **June 30, 2014**

## Opinions

▶ **Opinion from Bond Counsel in connection with COFINA issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

▶ **Opinion from Underwriters' Counsel in connection with COFINA issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

▶ **Opinion of Secretary of Justice of the Commonwealth in connection with COFINA issuance of Sales Tax Revenue Bonds, Senior Series 2011C and 2011D**
December 13, 2011

## Official Statements

▶ **Puerto Rico Sales Tax Financing Corporation - $91,155,000**
Sales Tax Revenue Bonds, Senior Series 2011D
December 1, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $1,006,474,702**
Sales Tax Revenue Bonds, Senior Series 2011C
December 1, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $45,620,000**
Sales Tax Revenue Bonds, First Subordinate Series 2011B
November 16, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $734,795,573.95**
Sales Tax Revenue Bonds, First Subordinate Series 2011A
$397,758,386.20 Series 2011A-1
$337,037,187.75 Series 2011A-2
November 16, 2011

▶ **Puerto Rico Sales Tax Financing Corporation - $182,190,000**
$89,435,000 Sale Tax Revenue Bonds, First Subordinate Series 2010D
$92,755,000 Sale Tax Revenue Bonds, First Subordinate Series 2010E
June 24, 2010

▶ **Puerto Rico Sales Tax Financing Corporation - $1,619,404,596.60**
Sale Tax Revenue Bonds, First Subordinate Series 2010C
June 24, 2010

▶ **Puerto Rico Sales Tax Financing Corporation - $1,823,757,271.30**
Sale Tax Revenue Bonds, First Subordinate Series 2010A
January 28, 2010

▶ **Puerto Rico Sales Tax Financing Corporation $1,217,915,799.20**
Sales Tax Revenue Bonds
First Subordinate 2009B
June 19, 2009

▶ **Puerto Rico Sales Tax Financing Corporation $237,875,000**
Sales Tax Revenue Bonds
Senior Series 2009C
June 10, 2009

▶ **Puerto Rico Sales Tax Financing Corporation $4,118,153,700**
Sales Tax Revenue Bonds
First Subordinate Series 2009A
June 10, 2009

▶ **Puerto Rico Sales Tax Financing Corporation - $737,046,992.35**
Sales Tax Revenue Bonds

June 25, 2008

▶ **Puerto Rico Sales Tax Financing Corporation - $499,996,627.90**
Sales Tax Revenue Bonds
Series 2007C
December 18, 2007

▶ **Puerto Rico Sales Tax Financing Corporation - $1,333,101,779.90**
Sales Tax Revenue Bonds
Series 2007B
July 17, 2007

▶ **Puerto Rico Sales Tax Financing Corporation - $2,667,603,572.60**
Sales Tax Revenue Bonds

Series 2007A
July 13, 2007

## BOND RESOLUTIONS

▶ **Eighteenth Supplemental Sales Tax Revenue Bond Resolution, authorizing Sales Tax Revenue Bonds, First Subordinate Series 2011A, consisting of First Subordinate Series 2011-A1 and First Subordinate Series 2011A-2, Resolution 2011-07, Adopted on November 16, 2011**

▶ **Amended and Restated Sales Tax Revenue Bond Resolution, Adopted on July 13, 2007, as amended on June 10, 2009**

▶ **First Supplemental Sales Tax Revenue Bond Resolution, authorizing Sales Tax Revenue Bonds Series 2007A, Adopted on July 13, 2007**

Go to top

Copyright © 2008-2018 Government Development Bank for Puerto Rico. All Rights Reserved.

Exhibit J



COMMONWEALTH OF
PUERTO RICO
Government Development Bank
for Puerto Rico

 

## CONFERENCE CALL ABOUT COFINA LEGAL OPINIONS
Hosted by **Government Development Bank for Puerto Rico** through Telspan
Date and Time: 10/31/2013 2pm ET
Length of Call: 45mins
Transcript

*Operator:* Good morning, and welcome to the Government Development Bank for Puerto Rico conference call. My name is Kellen and I will be your conference operator today. A replay of the call will be available on the GDB website as soon as possible after the call ends. All lines have been placed on mute to prevent any background noise.

Once the presentation concludes there will be a Questions and Answers session. Questions that have been sent in advance will be answered.

If you are having technical problems with the audio, press *0 for technical support.

On behalf of all of us at the Government Development Bank for Puerto Rico, I would like to welcome everyone to this call. The participants for today's call will be: José Pagán, Interim President of the GDB, José Coleman-Tió, Executive Vice President and General Counsel of the GDB, Virginia Wong, Jim Montes, John Bove, Arthur McMahon, Ken Lind, all partners at Nixon Peabody, and Manuel Pietrantoni, Manuel Rodríguez Boissen, and Eduardo Arias, all partners at Pietrantoni Méndez & Álvarez.

I will now turn the call over to the Interim President of the GDB, José Pagán for the opening remarks.

*José Pagán:* Good afternoon. The Government Development Bank for Puerto Rico and the Puerto Rico Sales Tax Financing Corporation, which most of you know as COFINA, welcome you to this conference call. We truly appreciate the time everyone has taken to join.

As announced in the investor webcast held by the Commonwealth on October 16, 2013, GDB is taking affirmative actions to improve its disclosure practices and increase the amount of information available to investors. In particular, GDB will begin holding an investor webcast at least once per quarter and will update the Commonwealth Report on a quarterly basis. The Department of the Treasury and the Office of Management and Budget will also continue to provide revenue and expense updates at least once per month. The Commonwealth and GDB are committed to observing best disclosure practices and improving our relationship with our investor base. As a further step in this direction, in response to specific investor requests, GDB and COFINA made available last week the legal opinions delivered in connection with COFINA's last public transaction. These legal opinions, delivered by the Puerto Rico Secretary

of Justice, Nixon Peabody as U.S.-based Bond Counsel and Pietrantoni Mendez & Alvarez LLC as P.R.-based Underwriters' Counsel, are now available at our website: bgfpr.com.

As a further testament to our commitment to transparency, today we take the unprecedented step of holding a conference call with the outside legal advisors that authored these legal opinions. We hope that you find this call informative.

As stated during our webcast, COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth. U.S.-based Bond Counsel, P.R.-based Underwriters' Counsel and the Puerto Rico Secretary of Justice have provided, for each COFINA transaction (and we count 13 in total), opinions concluding that the Sales and Use Tax allocated to COFINA is not subject to "claw back" by GO bondholders under the PR Constitution.

Importantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in Puerto Rico: four Secretaries of Justice, serving three different administrations (of alternating political parties), have issued opinions that the SUT allocated to COFINA is not subject to "claw back".

While no new COFINA transaction has been announced, I want to emphasize that no such transaction would be completed unless opinions reaching the same legal conclusion as those being discussed today are again delivered at closing by the Secretary of Justice and each of the firms acting as Bond Counsel and Underwriters' Counsel in the particular transaction.

I now leave you with José Coleman, GDB's Executive Vice-President and General Counsel.

*José Coleman:* Thanks, José. I want to welcome you all to this conference call and provide you with additional information about the focus and purpose of the call.

As previously announced, this conference call is being held to discuss the COFINA legal opinions, dated December 13, 2011, provided by external legal counsel in connection with the issuance of the Senior Series 2011C and Senior Series 2011D Bonds. The opinions, which were provided by Nixon Peabody LLP, as Bond Counsel, and Pietrantoni Méndez & Álvarez LLC, as Underwriters' Counsel, were posted on GDB's website on October 23, 2013. We hope that everyone on the call has had an opportunity to review them.

We want to thank Nixon Peabody and PMA for making themselves available to answer questions related to their respective opinions. Nixon Peabody and PMA will each begin by providing a brief overview of the legal analysis underpinning their opinion. We will then proceed to answer questions submitted to GDB prior to this call.

As stated in GDB's press release, the purpose of this call is solely to address questions related to these legal opinions. As such, questions determined to be unrelated to the opinions will not be addressed. All participants are also advised that none of GDB, COFINA or the law firms participating in this call are providing legal advice of any nature whatsoever to the call

participants, that the information provided and discussed during the call is for informational purposes only, that only the parties to whom the opinions are addressed may rely thereon, and that participants should consult their own legal advisors with respect to any matter discussed in the opinions or this call. Furthermore, we emphasize that the COFINA legal opinions are subject to all of the qualifications and assumptions set forth therein. We strongly encourage all call participants to read the legal opinions in their entirety.

It is important to stress that an opinion of counsel is not a prediction of what a particular court [that reached] an issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law.

I want to add that a recording of this call will be made available as soon as possible on GDB's website. A notice will be posted on EMMA in order to provide notice to the market that the replay has been made available.

Finally, we want to make clear that the information provided in this call is not an offer to sell or the solicitation of an offer to buy any securities. I now leave you with Virginia Wong, partner at Nixon Peabody who acted as bond counsel for COFINA Senior Series 2011 C and Senior Series 2011 D bonds.

*Virginia Wong:* Thank you, José, and thank you for the opportunity to discuss our opinion.

The opinion that was posted on the GDB website as a note concludes that if the issues addressed by it are properly presented for judicial decision, a court would find that Act 91 validly transferred the Pledge Sales tax, including the right to receive the tax, to COFINA; the Pledge Sales tax does not constitute available resources for purposes of the Puerto Rico Constitutional Debt Priority Provision, and that Act 91 validly provides that the Pledge Sales Tax is not available for use by the Secretary of the Treasury. These conclusions were based on our analysis, review and consideration of several factors, including various cases decided by other jurisdictions, including those that are specifically referenced in our opinion and those cases that analyze legislative provision that divert revenues from State treasuries and dedicate them without annual appropriations to a specific purpose.

We also reviewed COFINA's act, as amended as of the date of the 2011 opinion, in our analysis of the structure of COFINA's act in light of what other courts typically considered in deciding whether similar legislation had violated a state's constitutional appropriation provision. We focused on the facts identified by those courts as important, including the fact that the legislation was designed specifically to comply with the well-recognized Special Fund Doctrine.

The Special Fund Doctrine holds that legislation that is enacted due to an urgent need impresses the revenues with a trust for a particular beneficiary, requires the revenues to be deposited into a special fund—and provides that that special fund be dedicated exclusively to certain purposes—provides that the revenues not be received on the account of the state but rather on the account of

the entity created to accomplish the specified purpose, that the legislation set forth limitations and conditions governing the disbursement of revenues, provides for a monetary cap on the amount of revenues that can be diverted from the state treasury, and finally provides that any debt secured by revenues shall not constitute a debt of the state. That is the Special Fund Doctrine and courts have held that entities that are created following the majority of those factors, those types of transaction will be upheld.

We reviewed the various opinions issued by the Secretary of Justice of Puerto Rico to COFINA, including the opinion relating to the 2011 C and D bonds. Those opinions conclude that the Pledge Sales Tax does not constitute available resources of the Commonwealth for purposes of the Constitution nor would they be available for use by the Secretary of the Treasury of the Commonwealth.

Finally, we reviewed the conclusions of PMA as to certain matters under Puerto Rico law on which we relied including the fact that there are no controlling precedents in Puerto Rico and that the Puerto Rico Supreme Court generally defers to acts of the legislature and opinions of the Secretary of Justice. I think that summarizes the factors that we analyzed and reached in our opinion.

*José Coleman:* I would like to thank Nixon Peabody for providing an overview of the opinion. We hope that you find that informative and I now leave you with Manuel Pietrantoni, a partner with PMA, who acted as underwriters' counsel for the COFINA Senior Series 2011 Cs and Ds.

*Manuel Pietrantoni:* Good afternoon everyone and thank you, José, for this opportunity to discuss our opinion.

I'd like to reiterate that the opinion for the Series 2011C and 2011D bonds, which are the opinions being discussed, was rendered to the COFINA and the underwriters' representative.

Let me review the elements of the analysis underlying the conclusion in our opinion that the Pledge Sales Tax would not constitute and I quote "available resources including surplus" for purposes of the priority provisions of the Commonwealth general obligation bonds and notes included in section 2 of article 6 of the Constitution or for purposes of section 8 of article 6 of the Constitution. Those elements are: as to the standard of review, first, the substantial deference provided to the Legislative Assembly's judgment, especially matters involving the use of public funds and regulation of the economy. Second, the presumption of constitutionality that attaches to every statute approved by the Legislative Assembly, and third, the persuasive weight afforded to the Secretary of Justice opinions as the highest executive of the Commonwealth charged with the administration of Justice. As mentioned before in this call, several Secretaries of Justice have provided favorable opinions as to "no claw back".

As to substantive matters, first, precedents from other jurisdictions that provide support to the legality of the COFINA structure in the face of no controlling precedent in Puerto Rico. Second, nothing in the Puerto Rico constitution provides that a specific source of revenues be available,

or creates a lien on any revenues for the payment of general obligation bonds, nor is there any evidence in the records of the Puerto Rico Constitutional Convention that this was considered. Third, nothing in the Puerto Rico Constitution restricts the Commonwealth authority to sell or transfer its assets. Fourth, Constitutions of other jurisdictions of the United Sates which were in effect at the time the Puerto Rico Constitution was approved included clauses that limited a state's ability to earmark or dedicate revenues for a specific purpose, and those provisions were not included in the Puerto Rico Constitution. Fifth, the safeguards included in the COFINA act to limit the amount of bonds that may be issued. And sixth and finally, the structure created in the COFINA act keeps the assigned revenues from becoming part of the Commonwealth General Fund. As I said at the outset, these are the elements that underlie our analysis.

*José Coleman:* Thank you, Manuel, for your remarks. I think that we can turn now to the questions we have received. The operator can provide those.

*Operator:* Thank you. We received various questions regarding the possibility of having the Puerto Rico Supreme Court address the "claw back" issue and thereby create controlling precedent in Puerto Rico. We chose the following question to address this matter: "The final official statement for the COFINA Senior Series 2011D Bonds indicates, under 'Risk Factors', that the Supreme Court of Puerto Rico has never ruled whether the sales tax pledged as payment for COFINA bonds constitutes 'available resources' of the Commonwealth for purposes of the Constitutional Debt Priority Provisions. Please address, and this question comes from Gregory A. Clark, why the Court has never been asked to address this issue and whether there are any plans to have it do so now."

*Manuel Pietrantoni:* The short answer for this question is that under Puerto Rico's jurisdictional requirement, parties cannot bring a test case or seek an advisory opinion from the courts. The leading case in this matter involved an instrumentality of the Commonwealth of Puerto Rico that provided assistance to the plaintiff in the creation of a case or controversy in order to provide certainty to certain federal agencies and bondholders as to the validity of a housing assistance program. In that case, the court held that it could not exercise jurisdiction with a claim because no real case or controversy existed. In light of this, COFINA has not sought a ruling of this nature because unless there was a real case or controversy, the court would not have jurisdiction to rule on this matter.

*Virginia Wong:* Manuel, it is fair to say, right, that that is not even a path that is available. Several of the questions that we received cited what other jurisdictions have done in terms of seeking declaratory judgment or having a court provide an advisory opinion with respect to certain legislative acts, but Puerto Rico law doesn't provide for that procedure, right? So, no such request can be made. Is that fair to say?

*Manuel Pietrantoni:* That's fair to say.

*Virginia Wong:* The next question?

*Operator:* Thank you! The next question we have is, "Both bond opinions cite Quirk in NY State. Can you expand your views on this statement, 'A different case would be presented if, realistically, the city were stripped of all sources of revenue, other than the real estate tax, and its outcome would be, at this time, unpredictable (cf. Mobile v Watson, 116 U.S. 289, 305).' As COFINA issues more debt and captures an increased share of general fund revenues, what level of resource shifting would cause concern?" This comes from Brian Dubin from Meehan Combs.

*John Bove:* My name is John Bove and I am partner at Nixon Peabody. I have been asked to address this question, I think in part because I was present at the creation of the controversy. I was an assistant counsel to the Governor of the state of New York at the time the governor proposed and the legislature enacted the legislation that was at issue in the Quirk case. So, I am very familiar with both the origin and its ultimate outcome.

I think it's important to put the quote that is both in our opinion and in the question in the context of the issue the court was addressing when it made that statement. The background of the case was that legislation was being enacted by the New York State in 1975 and afterwards to address the very severe fiscal crisis of the city of New York that the state became aware of in 1975 and continued on to the '70s and into the early '80s.

As part of the legislative solutions to the city's fiscal problems was to create a new public benefit corporation or public authority that would have the power to do a number of things to ease the city's problems and one was to fund out cumulative deficits, to fund for a few years current year deficits that were projected to continue, and ultimately through another eight or nine years to fund long-term capital needs for the city of New York as it was locked out of the capital market at the time. In order to give that entity, the Municipal Assistance Corporation for the city of New York, a revenue stream in order to service its debt, they stripped the city of New York through legislation of its Sales and Use Taxes and Stop Transfer taxes and instead dedicated those taxes to the Municipal Assistance Corporations to service its debt.

That legislation was challenged by the clerk [sic] who was challenged as a tax payer on a number of grounds. The ground that is relevant to the quote that is in the opinions and in the question is a state constitutional ground charging that the stripping of the Sales and Use Taxes and the Stop Transfer taxes from the city deprived bondholders of the right to have those taxes set aside and applied to the payment of general obligation bonds of the city if general obligation bonds became due and were not paid. New York state constitution contains a provision that obligates that first revenues be set aside to pay unpaid general obligation debt.

The court, in going through this analysis, ultimately concluded that this was a constitutional enactment. It noted in particular that the constitution does not give a right to general obligation bondholders to insist upon any particular existing tax to be maintained or impose new ones to produce the required revenues to pay the general obligation bonds. The analysis was predominantly based on the fact that what was being stripped of the city was only a portion of the revenues that would otherwise have been available for the set aside.

The language in the quote in the question and, both, in the opinion essentially said we might have reached a different conclusion if substantially more of the revenues had been stripped from

the city. In fact, the actual quote is "If they were stripped of all sources of revenues other than the real property taxes". We in the governor's counsel's office view that as an admonition going forward as to what we can do and what we can't do in helping solve the city's financial crisis.

The facts of that case are substantially the same as we have here in COFINA. The Commonwealth has been stripped of only a portion of one source of revenue available to it and to which the set aside provision of the constitution applied. All of the other sources remain available to general obligation bondholders under the Set Aside provision. I think we are entirely on all fours with the conclusion of the court in the court case.

*José Coleman:* Thank you, John! I think we can go to our next question.

*Operator:* Thank you. Our next question is, "What would it take to have the Supreme Court rule on the question of whether the sales tax revenue was subject to the claim of GO bonds having first claim on available revenue?" This comes from Joe Rosenblum, Alliance Bernstein.

*Manuel Pietrantoni:* Yes, as I stated in our response to the first question, there would need to be a real case or controversy, as well as certain other jurisdictional elements would have to be present in order for this to happen... in order for the court to have jurisdiction to address this type of claim.

*José Coleman:* I think it goes to the point that has been raised in a couple of questions which is, "Can you go on and have some sort of advisory opinion?" The answer is that in Puerto Rico, different from other jurisdictions, you simply cannot do that. We can go to the next question.

*Operator:* Thank you. Our next question is, "Have there been any updates to caselaw or legislative or administrative actions relevant to the cases reviewed or jurisdictions referenced in the opinions? If so, do any of these updates or actions change the opinions of Nixon Peabody, Pietrantoni Méndez & Álvarez or the Secretary of Justice? This comes from Ben Herbert, Lord, Abbett & Co. LLC.

*Manuel Pietrantoni:* The opinions alluded to address the facts and circumstances surrounding the issuance of the Series 2011C and 2011D bonds and, as stated in the opinion, the firms do not have an obligation to update the opinions. We note however that in April 2013 we issued an opinion reaching the same conclusion in connection with certain junior lien bond anticipation notes sold to Barclays Capital. And there were no updates to the relevant caselaw or legislation that would have changed the opinions.

*Virginia Wong:* Right, and I think as it was mentioned that Nixon Peabody as bond counsel on that issuance also delivered an opinion... [speaking off the microphone] similar... to the 2011 opinion. We see no reason... we saw no reason at the time that there had been no changes in caselaw around the country that would change the conclusions that we reached in our opinion.

*José Coleman:* We can go to the next question.

*Operator:* Thank you. And our next question comes from Elan Daniels from Stone Lion Capital

Partners, and his question is, "Would the same opinions be offered again today? If not, what other qualifications or analysis now would be included?"

*Virginia Wong:* As Manuel just said, the opinions addressed the facts and the circumstances and the state of the law that were in effect at the time that the 2011C and the 2011D bonds were issued.

Obviously, there's no new COFINA transaction on the table right now, but we have been tracking the legislation, the COFINA legislation and the changes that have been made, and we don't see any reason currently that we would change the conclusion of our opinions. The state of the law remains the same. There have been no new cases around the country that have dealt with this issue. The legislative changes increasing the percentage of sales tax revenues that are available to COFINA wouldn't cause us to change our conclusion in any way.

So, you know, while we're not being asked to deliver an opinion today, we don't see any reason why our opinion would change in any significant way or material way from what we delivered in 2011 or from what we delivered in April of 2013.

*José Coleman:* And this is José Coleman from GDB, I want to add that as noted by the GDB President, while no new COFINA transaction has been announced, no such transaction would be completed without the delivery of opinions from the Puerto Rico Secretary of Justice, and each of the firms acting as bond counsel and underwriters' counsel on such deal, that reach exactly the same conclusions as the opinions being discussed today. And we are confident that opinions reaching the same conclusion would be delivered in connection with any new issuance.

Unless somebody has anything else to add, we can go to the next question.

*Operator:* Thank you. And our next question is, "Is there any legislation being contemplated or discussed that would provide bondholders with additional security in light of the lack of any applicable caselaw/testing in the courts of Act 91, COFINA?" This comes from Melissa Haskell from MFS Investment Management.

*José Coleman:* This is José Coleman from GDB. Now, none of the Commonwealth, GDB or COFINA are currently contemplating specific legislation of this nature. We feel comfortable with the structure as is.????27:30

*Operator:* Thank you. And our next question is, "Could you please tell us how the flow of funds works specifically? How the money is allocated, how it is deposited, and how it is protected from being deposited into the general fund prior to payment of debt service?" This comes from Cynthia Brown Manulife Asset Management.

*Manuel Pietrantoni:* Yes, what I'm about to explain is discussed in greater detail in the Official Statement for the series 2011C and 2011D bonds. The entities authorized by the Secretary of the Treasury received the sales and use tax monthly returns and the amount of sales tax due thereunder. These amounts are then deposited into the sales tax account, which is a joint GDB and COFINA account held at Banco Popular de Puerto Rico. On a daily basis, Banco Popular

sweeps amounts and deposits in this sales tax account—other than sales and use taxes, which are allocated to the municipalities under the law—they sweep this into the dedicated sales tax fund, which is held by Banco Popular's Trust Department in the name of COFINA. Banco Popular's Trust Department then sends all amounts in the dedicated sales tax fund to the COFINA trustee until such amounts reach the pledge sales tax base amount. Thereafter, the amounts of the Commonwealth sales and use tax are allocated to COFINA and the Treasury Department according to their corresponding percentages, which are established in the COFINA law. Pledged sales tax revenues are not comingled with general fund revenues. I repeat, for more detail regarding this flow of funds, please review the description thereof in the official statement.

*José Coleman:* I think the fundamental point here is they are not comingled with general fund revenues, and that is an important factor in each of these opinions.

One thing I wanted to add is, you know, for the [sic], this flow of funds applies also to all revenues. It applies to all revenues received by COFINA and it includes any new revenues directed to COFINA arising from the expansion of the SUT allocated to COFINA that was basically just legislated in October. I think we can go to the next question.

*Operator:* Thank you. Our next question is, "Also is the increased allocation already being set aside? The increase from 2.5 percent to the 3.75 percent." This comes from Cynthia Brown, again, Manulife Asset Management.

*José Coleman:* This goes a little bit with a previous question, you know, just discussed, the increased allocation is currently being set aside and will be subject to a flow of funds that Manuel described in the previous question. I think that this began occurring when the legislation was passed. I would like to clarify, though; I think that the question says the increase from 2.50 to 3.75. The recent expansion of the SUT allocated to COFINA was from 2.75 to 3.50, not 2.50 to 3.75. In fact, we should know that the recent COFINA expansion is the smallest expansion of the COFINA program in percentage terms, and the original 2007 pledge was of one full percentage point, and the 2009 expansion was 175 basis points. The latest one, it was only 75 basis points for, you know, purposes of reference. So, I think with that we can go to the next question.

*Operator:* Thank you. And the next question is, "Can you post copies of the COFINA indentures (in addition to the prospectuses) on the GDB website? And this comes from Brian Dubin, Meehan Combs.

*José Coleman:* Again, this is José Coleman from the GDB. Yes, we will post copies. In fact, as José Pagán, the president of the Bank, referred, there's a renewed commitment to observe best disclosure practices and improve our relationship with our investor base. And to that end we will begin to post on our website copies of all indentures related to outstanding bonds, of the Commonwealth and its instrumentalities, including COFINA. Obviously, given the heightened market interest in outstanding COFINA bond issuances, we will give priority to COFINA related indentures. Those should be up shortly.

*Virginia Wong:* Yeah, I think it's just worth mentioning that there have been a number of

amendments, and so what we need to do is do an amended and restated indenture that incorporates all those amendments into one single document. I think that will facilitate the review for investors rather than have them try to put together an indenture on a piecemeal basis.

*José Coleman:* A piecemeal basis, yeah. Okay.

*Operator:* Thank you. And out next question is, "Some in the market have speculated that a future legislature could theoretically repeal Act 91 and thus the entire COFINA structure. Our understanding is that both parties have been in power at times when COFINA legislation has successfully been passed, and, more importantly, that all of the COFINA bonds were issued with a non-impairment covenant. This covenant stipulates that if the COFINA structure is materially altered, there must be a substituted like or comparable security, which needs to be confirmed by the rating agencies and the various legal opinions. Thus, given seemingly limited alternatives for similarly strong security, are we correct to assume that risk of materially negatively altering the COFINA structure via legislative action is very low? And this comes from Jon Pruchansky, Arrowgrass Capital Partners.

*Virginia Wong:* The straightforward answer is yes. There's a very low risk to a legislative change to the COFINA act that would be materially adverse to bondholders. Given the Commonwealth non-impairment covenant, any legislative action that takes security away from bondholders without providing a comparable substitute and rating confirmation would violate both the COFINA Resolution and the COFINA Act. Now, there's nothing we can do that would [currently] future legislatures. Future legislatures could take action if deemed appropriate. However, given the strong statutory and resolution covenants, any such action, if it was an impairment, violative of those covenants, would give rise to the exercise of remedies by bondholders under the resolution.

*José Coleman:* Yeah, and something, you know, to add, you know, the person who asked the question is correct that both Puerto Rico's main political parties have been in power when COFINA legislation has been successfully passed. And we see that with the Secretary of Justice's opinions. In fact, the COFINA program was created by the administration of then Governor Aníbal Acevedo Vilá, who was Governor from 2005 to 2008. And this is done in collaboration with a then PNP "statehood controlled" legislature. In other words, the COFINA program has really been bipartisan since its inception. As many people know, this is a very rare and precious thing in Puerto Rico.

As people well know, the PNP affiliated Fortuño administration implemented the largest expansion of the COFINA program during the 2009-2012 term. The current PDP administration legislated a new, more limited expansion to the COFINA program.

*Virginia Wong:* And I think it's probably worth also mentioning that with respect to impairment of the structure, the COFINA structure, it's really no different than you would see for any other revenue backed issuer around the country. You know, New York State [Thruway] has the same provisions. It's a very common structure. There's no greater risk inherent in COFINA with respect to the non-impairment covenants that you would see anywhere else.

*José Coleman:* I think we can go to the next question.

*Operator:* Thank you. And our next question is, "In addition to the opinions of the Secretary of Justice, bond counsel and underwriters' counsel, has the GDB provided any independent, outside legal opinions to the rating agencies regarding the validity of the assignment to COFINA of the Commonwealth's portion of the Sales and Use Tax? If so, please describe." And this comes from Robert A. Meyer from SMC Fixed Income Management, LP.

*José Coleman:* This is José Coleman from GDB. The answer is no. The rating agencies have only been provided with the opinions delivered in connection with the issuance of the bonds, such as the opinions being discussed today. No other opinions have been requested by or provided to the rating agencies. I don't know...

*Virginia Wong:* That's fair.

*José Coleman:* ...that's... I think we can go to the next question.

*Operator:* Thank you. And our next question is, "In the last 5 years, has the Supreme Court ruled any law enacted by the Puerto Rico legislature to be unconstitutional? If so, please discuss the cases." Again, from Robert A. Meyer, SMC Fixed Income Management, LP.

*José Coleman:* This is José Coleman from GDB. To my knowledge, and you know I haven't done a thorough checking of this, there have only been I think two recent instances where the Puerto Rico Supreme Court declared a law unconstitutional. I think one instance involved certain 14th Amendment rights of a particular person, and the other one involved a law that attempted to restrict the Puerto Rico Supreme Court's jurisdiction.

I think one thing to bear in mind in this, as Manuel Pietrantoni from PMA stated in his presentation and also in the opinion, there is substantial deference provided to a legislative assembly's judgment, particularly by the Supreme Court, especially in matters involving the use of public funds and regulation of the economy. There's obviously also the general presumption of constitutionality that attaches to every statute approved by the legislative assembly. I don't think we've seen anything out of the ordinary from the Supreme Court either historically or in the past couple of years. Unless anyone else has something to add to that... Next question.

*Operator:* Thank you. Our next question is, "Do COFINA's legal opinions cover the accuracy of the economic and financial data used as the basis for COFINA's sales tax projections?" Again, from Robert A. Meyer, SMC Fixed Income Management, LP.

*Virginia Wong:* This is Virginia. No, and in accordance with established opinion practice, the opinions, our opinions, PMA's opinions, do not address or pass judgment upon the accuracy of any economic or financial data that's used as the basis for COFINA's sales tax provision. Would you say, Manuel, that...?

*Manuel Pietrantoni:* That's absolutely right. Typically the role of the opinion is not to speculate or pass judgment on the economic or financial data, or any other data which is underlying the

opinion.

*Virginia Wong:* And there are certificates delivered at closing that provide comfort on that information.

*José Coleman:* Thanks, Virginia. I think we can go to the next question.

*Operator:* Thank you. And our next questions is, "According to page 4 of 9, the Supreme Court of Puerto Rico traditionally shown substantial deference to the Legislature's judgment and has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislature. The Supreme Court of Puerto Rico has reiterated that when the constitutionality of a statute is questioned, the Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy. Since there is no controlling precedent, please provide more details or the extent to which the court would weigh?" from Michael Ginestro, Bel Air Investment Advisors.

*Manuel Pietrantoni:* This is Manuel Pietrantoni. The answer is that we would expect the Puerto Rico Supreme Court to follow an analysis similar to the analysis that is described in the opinions, the elements of which I discussed in the introduction to my remarks. Those we think would be the elements that the Supreme Court would weigh in reaching its conclusion.

*José Coleman:* And as we've stated, those elements include the standard of review that's a substantial deference in certain particular matters. I think we can go to the next question.

*Operator:* Thank you. Our next question is, "If bond counsel believes the pledged revenues would not be subject to claw back, why did bond counsel and underwriters' counsel issue a "would hold" opinion versus a "should hold" opinion?" This comes from Steve Hong, HIMCO.

*Virginia Wong:* For purposes of opinion practice, the American Bar Association Legal Opinions Committee and the Tri-Bar Opinions Committee has taken a position that "should" and "would" are synonymous. So there's really no distinction between the two and there was no distinction intended between the "would" and "should" in our opinions. It's a distinction without difference and it's important for participants to understand that the opinions are reasoned opinions in large part due to the fact that no precedent exists in Puerto Rico. And as such, these opinions are each firm's opinion as to the proper result to be reached by a court applying existing legal rules and principles to the facts as properly found after appropriate briefing and argument. So, we just don't want... there was no intentional choice between "should" and "would", we were just following established opinion practice and there was no distinction intended.

*José Coleman:* I don't know if, Manuel, you want to add something to that?

*Manuel Pietrantoni:* No that's exactly... We agree with that.

*José Coleman:* We can go to the next question.

*Operator:* Thank you. And our final question, "Is there an ability to appeal any Puerto Rico Supreme Court ruling related to claw back to the US Supreme Court? And this is coming from Ben Herbert, Lord, Abbett & Co. LLC.

*Manuel Pietrantoni:* The answer is that rulings of the Puerto Rico Supreme Court may be appealed to the United States Supreme Court to the extent that a matter of Federal Law is in question. And as you know, this appeals process would work in the same manner as any other appeal to the United States Supreme Court from a decision of the highest court of any state. In that regard Puerto Rico is no different.

*José Coleman:* I think we've had this question a couple of times, and people don't know, and I think it's important to emphasize that Puerto Rico's Supreme Court decisions are appealable to the U.S. Supreme Court.

*Operator:* Thank you. And at this time I would now turn the call back over to Mr. Coleman-Tió for any closing remarks.

*José Coleman:* We want to thank everyone for their attention. We hope this call has been informative. Again, a replay of it will be posted to the GDB website soon, and thank you again, and have a good afternoon.

*Operator:* Thank you all for your attention. This concludes today's conference call. All participants may now disconnect.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LEX CLAIMS, LLC, *et al.*, | |
| *Plaintiffs*, | Civil No. 16-2374 (FAB) |
| -v- | |
| ALEJANDRO GARCÍA PADILLA, *et al.*, | |
| *Defendants*. | |

### FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO'S MOTION TO STAY THE ACTION PENDING APPEAL OR IN THE ALTERNATIVE FOR AN EXTENSION OF TIME TO FILE A RESPONSIVE PLEADING

### TO THE HONORABLE COURT:

COMES NOW the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), through its undersigned attorneys, and respectfully alleges and prays:

### PRELIMINARY STATEMENT

After weeks of negotiations, on March 13, 2017, the Oversight Board certified the Commonwealth's amended fiscal plan, a necessary and important first step towards resolving the immediate and imminent fiscal crisis facing the Commonwealth and its citizens. The Oversight Board has approximately 45 days left before the PROMESA stay will end and, absent a Title III filing, the Commonwealth will then be inundated with creditor lawsuits. The Oversight Board requests that it be given these six weeks to negotiate with the Commonwealth and its creditors and, therefore, asks the Court to stay this action pending the Oversight Board's appeal of the Court's February 17, 2017, Opinion and Order (the "Decision") denying the Oversight Board's and the Commonwealth Defendants' motions to enforce the PROMESA stay or issue a separate litigation stay covering all of Plaintiffs' claims. (Dkt. No. 184.) Concurrently with this motion,

the Oversight Board filed its merits brief and a motion for an expedited briefing schedule and

consideration of its appeal with the Court of Appeals.

The Oversight Board deserves every chance to see if it can fulfill its mandate

before the expiration of the PROMESA stay. As Congress found and as the Court has observed,

allowing creditor lawsuits to proceed will undermine PROMESA by forcing the Oversight Board

and the Commonwealth to concentrate on costly creditor lawsuits instead of on negotiations with

those same creditors. The Oversight Board has strong arguments on appeal that this litigation

should have been stayed in its entirety pursuant to Section 405(b) of PROMESA and it should be

given the opportunity to pursue those arguments without this litigation hanging over its head.

On the other hand, the Plaintiffs will suffer no harm if this litigation is stayed

pending appeal. For instance, although a portion of the sales and use tax revenues to which the

Plaintiffs claim priority will have gone to other uses (*i.e.*, other than debt service) while the stay

is in place, as they have since 2006 when this revenue stream was first transferred to COFINA,

the sales and use tax revenues are perpetual and will remain available even if efforts to negotiate

a consensual fiscal plan fail and the Plaintiffs are ultimately able to establish their priority

claims. Plaintiffs' damages derive from the delay in payment, not from the elimination of the

source of payment.

In sum, the pendency of the appeal, the absence of any prejudice or harm to

Plaintiffs, the compelling public interest, and the balance of the equities favor the imposition of a

stay on all further proceedings in this action pending appeal. Alternatively, the Oversight Board

requests that the Court extend the Oversight Board's current litigation deadlines from

March 20, 2017, to May 19, 2017. Such an extension would serve the public interest underlying

PROMESA and its automatic stay provisions and prevent the unnecessary expenditure of

resources on the part of both the Court and the parties to this action pending a decision by the

Court of Appeals.

## BACKGROUND

Plaintiffs originally asserted a single substantive cause of action, alleging a breach

of Section 204(c)(3) of PROMESA, which prohibits the Commonwealth from enacting certain

laws prior to the full appointment of the Oversight Board, and Section 207 of PROMESA, which

prohibits the Commonwealth from issuing, guaranteeing, repurchasing, exchanging, modifying,

or redeeming, debt without the Oversight Board's consent.[1]  On September 2, 2016, the Court

held that Section 405(b)(1) of PROMESA did not stay prosecution of the amended complaint

because (1) "Plaintiffs could not have commenced [the] lawsuit before PROMESA's enactment

because their claims are to enforce provisions of PROMESA by challenging conduct that

occurred after PROMESA's enactment," and (2) "[P]laintiffs do not seek to recover a right to

payment that arose before PROMESA's enactment." (Dkt. No. 32 at 2–3.)

Plaintiffs later moved for leave to file a second amended complaint that asserted

11 new causes of action and named four new defendants (the "Second Amended Complaint").

Plaintiffs conceded that nine of the 13 causes of action were stayed by PROMESA, but sought to

pursue their other four causes of action which – according to Plaintiffs – were not subject to the

PROMESA stay.  The Commonwealth Defendants objected to this piecemeal approach to the

litigation and moved to stay the entire action, arguing that all claims were stayed by

Section 405(b) of PROMESA and, in the event the Court held they were not, that the Court

---

[1] The original complaint only asserted a claim under Section 204(c)(3) of PROMESA.  In their first amended complaint, Plaintiffs added a claim under Section 207 of PROMESA.  Both complaints also asserted an alternative cause of action seeking relief from the automatic stay in the event the Court held that the action was stayed under Section 405(b) of PROMESA.

should nonetheless exercise its discretion to stay the entire action.[2]  The Oversight Board

intervened on behalf of the Commonwealth Defendants and separately moved for a stay of the

entire action so that the Oversight Board could focus on the tasks it is required by PROMESA to

perform – to negotiate and certify fiscal plans that restructure the Commonwealth's crushing

debt and to take steps to ensure the Commonwealth's reentry into capital markets.

On February 17, 2017, the Court issued its Decision granting the Oversight Board

leave to intervene in this action, but denying the motions of the Commonwealth Defendants, the

COFINA Defendants, and the Oversight Board to stay the action.  (Dkt. No. 184.)  The Court

also entered a separate order directing the Oversight Board to file a pleading setting out the

"claims or defenses for which intervention is sought" by March 20, 2017, and directing that

"[a]ll parties may file any motion they may deem appropriate to file, including any dispositive

motion, by that date."  (Dkt. No. 185.)

On March 3, 2017, the Oversight Board timely filed its notice of appeal of the

Court's denial of the motions to stay the action.  (Dkt. No. 193.)  On March 15, 2017, the

Oversight Board filed its merits brief and a separate motion requesting an expedited briefing

schedule and consideration of its appeal by the Court of Appeals.  A copy of the Oversight

Board's merits brief is attached as Exhibit A.

---

[2]  For purposes of this Motion, the Oversight Board refers to the Commonwealth, the Governor of the
Commonwealth, the Secretary of the Treasury of the Commonwealth, and the Director of the Office of Management
and Budget of the Commonwealth collectively as the "Commonwealth Defendants."  The Puerto Rico Sales Tax
Financing Corporation ("COFINA"), the Executive Director of COFINA, and the Bank of New York Mellon are
referred to collectively as the "COFINA Defendants."

## ARGUMENT

## I.   THE COURT SHOULD STAY ENFORCEMENT OF ITS DECISION PENDING THE OVERSIGHT BOARD'S APPEAL

In deciding whether to grant a stay pending appeal, courts apply the traditional four-part test applicable to a preliminary injunction: (1) whether the applicant has made a strong showing of success on the merits; (2) whether the applicant will be irreparably harmed absent injunctive relief; (3) whether issuance of the stay will injure other parties; and (4) where the public interest lies. *Nken v. Holder*, 556 U.S. 418, 434 (2009). As the Supreme Court has observed, the first two factors "are the most critical." *Id.*; *see also Acevedo-Garcia v. Vera-Monroig*, 296 F.3d 13, 16 (1st Cir. 2002) (per curiam) (quoting *Weaver v. Henderson*, 984 F.2d 11, 12 (1st Cir. 1993)). Thus, "[w]hat matters . . . is not the raw amount of irreparable harm [a] party might conceivably suffer, but rather the risk of such harm in light of the party's chance of success on the merits . . . ." *Elias v. Sumski (In re Elias)*, 182 Fed. Appx. 3, 4 (1st Cir. 2006) (citations omitted). The circumstances of this case demonstrate that a stay pending appeal is warranted.

### A.   The Oversight Board Has a Strong Chance of Succeeding on Its Appeal

In its Decision denying the motions to stay this action, the Court properly recognized that, in analyzing whether Plaintiffs' first, second, third and twelfth causes of action (the "PROMESA Claims") should be stayed, the Court should look to how other courts have interpreted the virtually identical automatic stay provisions of Section 362 of the Bankruptcy Code. In addition, the Court acknowledged that the automatic stay is self-executing upon filing of a petition for bankruptcy and "'is extremely broad in scope,' applying 'to almost any type of formal or informal action taken against the debtor.'" (Dkt. No. 184 at 13 (internal citations omitted).) Despite recognizing the breadth of the PROMESA stay provisions, the Court

-5-

interpreted them narrowly and applied them piecemeal, allowing what is in essence a collection action to proceed.[3] As a result, the Decision has undermined the PROMESA process.

The Oversight Board believes that the Court erred in allowing Plaintiffs to prosecute the PROMESA Claims and that it has a substantial likelihood of winning on appeal. The Oversight Board's arguments are more fully set forth in the Oversight Board's merits brief. They are summarized here for the Court's convenience.

First, although Plaintiffs concede that the vast majority of the claims in the Second Amended Complaint could have been brought before the enactment of PROMESA and are, therefore, stayed, the Court incorrectly held that Section 405(b) of PROMESA applied to individual claims instead of to the entirety of the "action or proceeding." (Dkt. No. 184 at 14–15.) Plaintiffs' proposed piecemeal resolution of the claims in this action is contrary to both the letter of PROMESA (it applies to an entire "action or proceeding") and the spirit of PROMESA (Congress intended that the Commonwealth be given a breathing spell to concentrate on negotiations, not costly creditor lawsuits). *See* 48 U.S.C. § 2194(b)(1), (m), (n)(2).

Second, the Court incorrectly held that Section 405(b)(1) of PROMESA does not stay Plaintiffs' second cause of action. That cause of action, although ostensibly challenging Executive Order 30-2016, is premised on the alleged unlawfulness (*i.e.*, unconstitutionality) of the COFINA enabling act. It has nothing to do with PROMESA, and could have been brought long before enactment of PROMESA.

---

[3] The Oversight Board also questions whether the Court continues to have jurisdiction over this case while the Oversight Board's appeal is pending. As the Supreme Court has recognized, "[t]he filing of a notice of appeal is an event of jurisdictional significance – it confers jurisdiction on the court of appeals and divests the district court of its control over those aspects of the case involved in the appeal." *Griggs v. Provident Consumer Disc. Co.*, 459 U.S. 56, 58 (1982) (per curiam); *United States v. George*, 841 F.3d 55, 71 (1st Cir. 2016). Here, it cannot be denied that continued prosecution of this case would involve aspects of this case that are implicated in the Oversight Board's appeal (*e.g.*, the applicability of the PROMESA stay to the very claims being pursued), and under these circumstances, the upcoming March 20, 2017, pleading deadline should be deemed moot.

Third, the Court incorrectly held that Plaintiffs assertion of the PROMESA Claims, which seek injunctive and declaratory relief that would have the effect of freezing Government assets, garnishing them from third parties, and attaching or segregating them for the eventual payment of Plaintiffs' bonds, is not an "act to collect" that is stayed pursuant to Section 405(b)(6) of PROMESA. Although the PROMESA Claims if granted would not result in the immediate repayment of their outstanding bonds, these acts are the first step in collecting on the money judgments that Plaintiffs will eventually seek. In the bankruptcy context, "[e]ventual, or even planned, collection of a debt may constitute a violation of § 362(a)(6)." *Trevino v. HSBC Mortg. Servs., Inc. (In re Trevino)*, 535 B.R. 110, 149 (Bankr. S.D. Tex. 2015).

Fourth, the Court incorrectly held that assertion of the PROMESA Claims is not an act to exercise control over property of the Government of Puerto Rico that is stayed by Section 405(b)(3) of PROMESA. Section 405(b)(3) of PROMESA, like the other stay sections, is broad, and applies to requests for declaratory and injunctive relief insofar as they prevent the Commonwealth from using its assets or otherwise have an effect on Commonwealth property. There can be no question that the relief requested by Plaintiffs would interfere with the Commonwealth's ability to use its assets.

Fifth, the Court incorrectly held that Plaintiffs' assertion of the PROMESA Claims is not an act to create, perfect, or enforce a lien against property of the Government of Puerto Rico that is stayed by Sections 405(b)(4) and 405(b)(5) of PROMESA. Plaintiffs are either asking the Court to declare their alleged lien on SUT revenue superior to the COFINA bondholders' lien and to enter an injunction freezing, garnishing, attaching, or segregating funds for Plaintiffs' benefit (acts to enforce a lien), or seeking a *de facto* judicial attachment of Commonwealth or COFINA property (an act to create or perfect a lien). In either case, the

-7-

requested relief falls squarely within the conduct prohibited by Sections 405(b)(4) and 405(b)(5) of PROMESA.

Finally, the Court incorrectly held that PROMESA foreclosed the Court's ability to stay any claims that it found were not specifically covered by Sections 405(b)(1)–(b)(6) of PROMESA. This holding is inconsistent with well-established case law, which authorizes a bankruptcy court to extend the automatic stay in appropriate circumstances to claims and parties that would otherwise be outside of the purview of the bankruptcy stay, and contradicted by PROMESA itself, which expressly authorizes the Oversight Board to intervene in an action and seek a stay of litigation. The Court was required to balance the equities and determine whether a stay was appropriate, but failed to do so.

**B. Allowing this Case to Proceed Will Interfere with the PROMESA Process**

The unprecedented fiscal crisis facing the Commonwealth and Congress' clear intention in staying litigation against the Commonwealth, its instrumentalities, and its public officials for a short period of time to allow for a "breathing spell" are well documented and not in dispute. *See* 48 U.S.C. § 2194(m), (n). Ongoing litigation has been and continues to be a major distraction that interferes with the Oversight Board's congressional mandate to oversee a "fair and orderly" restructuring of the Commonwealth's debt. That is especially so now that the negotiation process has reached a critical point. On March 13, 2017, the Oversight Board certified the Commonwealth's amended fiscal plan, and the parties now need to focus their energies on negotiations against the backdrop of that fiscal plan. These last few weeks of the PROMESA stay will be extremely intense and pressing times for the parties. The Oversight Board believes that its and the Commonwealth's limited resources are better spent working together and negotiating with creditors rather than defending this case during the last 45 days of the PROMESA stay. Moreover, allowing this litigation to proceed could moot the Oversight

-8-

Board's appeal. The Oversight Board deserves to have the chance to present its arguments to the

Court of Appeals, especially since Plaintiffs' first cause of action, which seeks to invalidate

Executive Order 30-2016 pursuant to Sections 204(c)(3) and 207 of PROMESA, directly

implicates the Oversight Board's authority to review and repeal or approve Commonwealth

legislation and debt modifications.

## C.   Plaintiffs Will Not Be Harmed by a Stay

In contrast to the manifest harm that continued litigation will have on the

PROMESA process, Plaintiffs would not suffer irreparable harm or prejudice if the action were

stayed pending appeal. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989)

("[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable.").

There are multiple provisions in PROMESA that protect the Plaintiffs' interests during the

duration of any stay. *See* 48 U.S.C § 2194(k), (l), 2195(a); *Brigade Leveraged Capital*

*Structures Fund Ltd. v. Garcia-Padilla*, No. 16- 1610 (FAB), 2016 U.S. Dist. LEXIS 158046, at

\*49 (D.P.R. Nov. 15, 2016) ("Any financial loss sustained over the next few months could also

be handled through certain remedial provisions found within PROMESA, provisions that were

built into the statute precisely to offer greater 'protection of creditors' from the unlawful transfer

of their interests.").

Currently-due payments will not be made now, but the SUT revenue stream

(allegedly $51 billion over the next 40 years (*see* Dkt. No. 127 at 15)) that Plaintiffs claim

secures their general obligation bonds will still be available for future payments under potential

future modifications to the certified fiscal plan or in future proceedings under PROMESA.

*See Peaje Invs. LLC v. Garcia-Padilla*, 845 F.3d 505, 512 (1st Cir. 2017) (affirming this Court's

finding that the existence of a constantly replenishing revenue stream constitutes "adequate

protection"); *Brigade Leveraged Capital Structures Fund Ltd*, at \*48–49 (noting that any

"financial harm could effectively be dealt with through the voluntary negotiations process fostered by PROMESA and supervised by the Oversight board, or through future title III restructuring proceedings.").

### D.    Staying the Litigation Is in the Public Interest

As discussed above, the Oversight Board needs these last 45 days to focus on negotiations with the Commonwealth and its creditors against the backdrop of the Commonwealth's recently–approved fiscal plan. Staying this litigation pending the Oversight Board's appeal is in the public interest because it puts the Oversight Board in the best position to make progress towards restructuring Puerto Rico's outstanding public debt and facilitating the Commonwealth's reentry into the public capital marketplace and outweighs any potential monetary harm the Plaintiffs may suffer as a result of a stay. *See Landis v. N. Am. Co.*, 299 U.S. 248, 256 (1936) ("Especially in cases of extraordinary public moment, the individual may be required to submit to [a limited] delay . . . if the public welfare or convenience will thereby be promoted."). As the Court recognized in the *Brigade* case, allowing Plaintiffs to pursue their claims now "would, in essence, permit them to 'jump to the front of the line' to protect their own interests before other creditors have had the opportunity to defend theirs," would "work against a comprehensive restructuring that is fair and equitable to all stakeholders," and would "frustrate Congress' intent in designing PROMESA." *Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *55, *57 n.11.

### II.    ALTERNATIVELY, THE COURT SHOULD EXTEND THE OVERSIGHT BOARD'S DEADLINE TO FILE A RESPONSIVE PLEADING

It is beyond cavil that the Court has the power to control its own docket and to set deadlines and grant extension of those deadlines. *See, e.g., Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154 (1st Cir. 1992). Moreover, Federal Rule of Civil Procedure 6 authorizes a court to extend

any party's time to file a pleading for "good cause." Fed. R. Civ. P. 6(b)(1)(A). Courts have

explained that "good cause" is not difficult to show, and extensions of time should generally be

granted absent bad faith on the part of the requesting party or prejudice to the adverse party.

*See, e.g., Ahanchian v. Xenon Pictures, Inc.*, 624 F.3d 1253, 1259–60 (9th Cir. 2010). The

Oversight Board can easily meet this standard.

As discussed more fully above, the Oversight Board believes that the last 45 days

of the PROMESA stay will be critical, and defending ongoing litigation will interfere with the

Oversight Board's ability to negotiate with the Commonwealth and its creditors. No party to this

litigation will be prejudiced by extending the Oversight Board's March 20, 2017, deadlines to

May 19, 2017, and extending the deadlines will allow the parties to litigate all of the claims at

the same time, which will conserve the parties' and the Court's resources. Accordingly, if the

Court does not stay the litigation, the Oversight Board believes that good cause exists to extend

the Oversight Board's time to file a responsive pleading to May 19, 2017.

## CONCLUSION

For the foregoing reasons, the Oversight Board requests that the Court enter an

order (i) staying this action in its entirety pending resolution of the Oversight Board's appeal of

the Decision or, in the alternative, extending the Oversight Board's deadline to file a responsive

pleading from March 20, 2017, to May 19, 2017, and (ii) granting such other and further relief as

the Court deems just and proper.

**WE HEREBY CERTIFY** that on March 15, 2017, we electronically filed the foregoing

with the Clerk of the Court using the CM/ECF system, which will send notification of such filing

to counsel for all parties.

**RESPECTFULLY SUBMITTED.**

In San Juan, Puerto Rico this 15th day of March, 2017.

/s/ Luis F. del Valle-Emmanuelli
LUIS F. DEL VALLE-EMMANUELLI
USDC NO. 209514
P.O. Box 79897
Carolina, Puerto Rico 00984-9897
Tel. 787.977.1932
Fax 787.722.1932
dvelawoffices@gmail.com

Of counsel for
Bufete Adames-Soto
434 Hostos Avenue
San Juan, Puerto Rico 00918
Tel. 787.751.6764/763.0565
Fax 787.763.8260
eadames@adameslaw.com
mrodriguez@adameslaw.com

- and -

/s/ Michael Luskin
Michael Luskin*
Stephan E. Hornung*
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
Tel. 212.597.8200
Fax 212.974.3205
luskin@lsellp.com
hornung@lsellp.com
*Admitted *pro hac vice*

*Attorneys for the Financial Oversight and
Management Board for Puerto Rico*

## EXHIBIT A

[The Oversight Board's Appellate Brief]

# United States Court of Appeals

*for the*

# First Circuit

---

### Case No. 17-1241

LEX CLAIMS, LLC, JACANA HOLDINGS, LLC, JACANA HOLDINGS II,
LLC, JACANA HOLDINGS III, LLC, JACANA HOLDINGS IV, LLC,
JACANA HOLDINGS V, LLC, MPR INVESTORS, LLC, ROLSG, LLC,
RRW I LLC, SL PUERTO RICO FUND II, L.P.,

*Plaintiffs-Appellees,*

– against –

ALEJANDRO GARCIA PADILLA, JUAN C. ZARAGOZA-GOMEZ, LUIS G.
CRUZ-BATISTA, THE PUERTO RICO SALES TAX FINANCING
CORPORATON, a/k/a Cofina, JUAN VAQUER, BANK OF NEW YORK
MELLON CORP., THE COMMONWEALTH OF PUERTO RICO,

*Defendants-Appellees,*

FINANCIAL OVERSIGHT AND MANAGEMENT BOARD,

*Intervenor-Appellant.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

---

## BRIEF FOR INTERVENOR-APPELLANT FINANCIAL
## OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO

---

MICHAEL LUSKIN
STEPHAN HORNUNG
LUSKIN, STERN & EISLER LLP
Eleven Times Square
New York, New York 10036
(212) 597-8200

*Attorneys for Intervenor-Appellant*
*Financial Oversight and*
*Management Board*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, the Financial

Oversight and Management Board for Puerto Rico (the "Oversight Board") states

that it is a governmental entity of the Commonwealth of Puerto Rico created under

Section 101 of the Puerto Rico Oversight, Management, and Economic Stability

Act, Pub. L. No. 114-187 ("PROMESA"), 48 U.S.C. § 2121.  On August 31, 2016,

the President of the United States appointed seven members to serve on the

Oversight Board:  José B. Carrión III, Andrew G. Biggs, José R. González, Ana J.

Matosantos, Carlos M. García, Arthur J. González, and David A. Skeel Jr.  Elías

Sánchez serves on the Oversight Board *ex officio* pursuant to Section 101(e)(3) of

PROMESA, 48 U.S.C. § 2121(e)(3).

# TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ................................................................1

JURISDICTIONAL STATEMENT ..........................................................2

STATEMENT OF THE ISSUES ON APPEAL .......................................5

STATEMENT OF THE CASE....................................................................6

    A.    The Moratorium Act and the Executive Order .....................6

    B.    PROMESA and the Automatic Stay .....................................7

    C.    The Oversight Board ...........................................................12

    D.    The Original and Amended Complaints .............................13

    E.    Plaintiffs' Motion to Amend Their Complaint and for Partial Relief from the Automatic Stay ..........................................16

    F.    The Second Amended Complaint .......................................18

    G.    The District Court's Decision .............................................20

STANDARD OF REVIEW ......................................................................24

SUMMARY OF THE OVERSIGHT BOARD'S ARGUMENT............................25

ARGUMENT ...........................................................................................28

I.    Section 405(b) of PROMESA Should Be Interpreted Broadly in Accordance with Congressional Intent to Advance PROMESA's Stated Objectives ............................................................................28

II.    The District Court Incorrectly Held That the First, Second, Third and Twelfth Causes of Action Were Not Stayed by Section 405(b) of PROMESA ............................................................................30

    A.    PROMESA Stays the Entirety of an "Action or Proceeding" ............30

**TABLE OF CONTENTS**
**(continued)**

Page

B.    Plaintiffs' Second Cause of Action Is a 10-year Old
      Constitutional Claim Unrelated to PROMESA That Could
      Have Been Brought Prior to Its Enactment..........................................33

C.    Plaintiffs' Request to Freeze, Garnish, Attach, and Segregate
      Government Assets for Their Benefit Is an Act to Collect That
      Is Stayed by Section 405(b)(6) of PROMESA ...................................37

D.    Plaintiffs' Request to Freeze, Garnish, Attach, and Segregate
      Government Assets Is an Act to Exercise Control Over
      Government Assets That Is Stayed by Section 405(b)(3)
      of PROMESA......................................................................................44

E.    Plaintiffs' Requests to Establish the Priority of Their Alleged
      Lien and to Freeze, Garnish, Attach, and Segregate SUT Revenue
      Are Acts to Create, Perfect, or Enforce a Lien That Are Stayed
      by Sections 405(b)(4) and (b)(5) of PROMESA................................47

III.   The District Court Improperly Denied the Oversight Board's
       Motion to Stay the Entire Action....................................................52

CONCLUSION.......................................................................................57

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Amplifier Research Corp. v. Hart,*
    144 B.R. 693 (E.D. Pa. 1992) ........................................................................ 46, 47

*Arthurs v. Stern,*
    560 F.2d 477 (1st Cir. 1977) ................................................................................ 25

*Austin v. Unarco Indus., Inc.,*
    705 F.2d 1 (1st Cir. 1983) .................................................................................... 55

*B.F. Goodrich Emps. Fed. Credit Union v. Patterson (In re Patterson),*
    967 F.2d 505 (11th Cir. 1992) ........................................................................ 48, 49

*Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla,*
    No. 16-1610 (FAB), 2016 U.S. Dist. LEXIS 158046,
    (D.P.R. Nov. 15, 2016) ................................... 29, 30, 33, 43, 44, 52, 53, 54, 56, 57

*Citizens Bank of Md. v. Strumpf,*
    516 U.S. 16 (1995) ......................................................................................... 40, 41

*Cohen v. Beneficial Indus. Loan Corp.,*
    337 U.S. 541 (1949) ............................................................................................. 3

*Divane v. A and C Elec. Co., Inc.,*
    193 B.R. 856 (N.D. Ill. 1996) .............................................................................. 39

*Eddleman v. U.S. Dep't of Labor,*
    923 F.2d 782 (10th Cir. 1991) ............................................................................... 3

*Houston Pipeline Co. LP v. Bank of Am., N.A.,*
    213 S.W.3d 418 (Tex. Ct. App. 2006) ........................................................ 44, 45, 50

*I.C.C. v. Holmes Transp., Inc.,*
    931 F.2d 984 (1st Cir. 1991) ................................................................................ 28

*In re Bellman Farms, Inc.,*
    86 B.R. 1016 (Bankr. D.S.D. 1988) ..................................................................... 49

*In re Guinn,*
   102 B.R. 838 (Bankr. N.D. Ala. 1989) ................................................37

*In re Holland,*
   21 B.R. 681 (Bankr. N.D. Ind. 1982) ................................................38

*In re Jefferson Cty.,*
   484 B.R. 427 (Bankr. N.D. Ala. 2012) ................................................45

*In re Nat'l Cattle Cong., Inc.,*
   179 B.R. 588 (Bankr. N.D. Iowa 1995)................................................45

*In re Weidenbenner,*
   521 B.R. 74 (Bankr. S.D.N.Y. 2014)............................................ 40, 44

*Jeffries v. Browning (In re Reserves Dev. Corp.),*
   78 B.R. 951 (W.D. Mo. 1986) ........................................................ 49, 51

*JPMorgan Chase Bank, N.A. v. Kingman Holdings, LLC,*
   No. 5:15-CV-144-DAE, 2015 U.S. Dist. LEXIS 169253
   (W.D. Tex. Dec. 17, 2015) ................................................ 37, 48, 49, 50

*Kansas City S. Ry. Co. v. United States,*
   282 U.S. 760 (1931).......................................................................52

*K-Mart Corp. v. Oriental Plaza, Inc.,*
   875 F.2d 907 (1st Cir. 1989)...............................................................54

*Knowles v. Bayview Loan Servicing, LLC (In re Knowles),*
   442 B.R. 150 (B.A.P. 1st Cir. 2011)............................................ 41, 42

*Landis v. N. Am. Co.,*
   299 U.S. 248 (1936).................................................................. 52, 55

*Landmark v. Schaefbauer,*
   41 B.R. 766 (Bankr. D. Minn. 1984) ................................................49

*Larami Ltd. v. Yes! Entm't Corp.,*
   244 B.R. 56 (D.N.J. 2000) ................................................................47

*Luckerman v. Narragansett Indian Tribe,*
   787 F.3d 621 (1st Cir. 2015).............................................................3, 4

*Maintainco, Inc. v. Mitsubishi Caterpillar Forklift Am., Inc.*
   *(In re Mid-Atl. Handling Sys., LLC),*
   304 B.R. 111 (Bankr. D.N.J. 2003) ........................................................32

*Mari. Elec. Co. v. United Jersey Bank,*
   959 F.2d 1194 (3d Cir. 1991) ........................................................ 31, 32

*Marquis v. F.D.I.C.,*
   965 F.2d 1148 (1st Cir. 1992)................................................................52

*Monarch Life Ins. Co. v. Ropes & Gray,*
   65 F.3d 973 (1st Cir. 1995).....................................................................55

*Morgan Guar. Trust Co. of N.Y. v. Am. Sav. & Loan Ass'n.,*
   804 F.2d 1487 (9th Cir. 1986) ...............................................................42

*Negron-Almeda v. Santiago,*
   528 F.3d 15 (1st Cir. 2008)....................................................................25

*Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc.*
   *(In re Palmdale Hills Prop., LLC),*
   654 F.3d 868 (9th Cir. 2011) .......................................................... 24, 25

*Peaje Invs. LLC v. García-Padilla,*
   845 F.3d 505 (1st Cir. 2017)..................................................................33

*Pereira v. 397 Realty LLC (In re Heavey),*
   549 B.R. 1 (Bankr. E.D.N.Y. 2016) ......................................................48

*Pinpoint IT Servs., LLC v. Rivera (In re Atlas IT Exp. Corp.),*
   761 F.3d 177 (1st Cir. 2014).....................................................................3

*Rosas v. Monroe Cty. Tax Claim Bureau (In re Rosas),*
   323 B.R. 893 (Bankr. M.D. Pa. 2004) ............................................ 37, 38

*Southside Leasing Co. v. Merchs. Plaza, Inc. (In re Merchs. Plaza, Inc.),*
   35 B.R. 888 (Bankr. E.D. Tenn. 1983)..................................................45

*Thompson v. GMAC, LLC,*
   566 F.3d 699 (7th Cir. 2009) .......................................................... 44, 45

*Torres-Rivera v. O'Neill-Cancel,*
   524 F.3d 331 (1st Cir. 2008)..................................................................25

*Trevino v. HSBC Mortg. Servs., Inc. (In re Trevino),*
   535 B.R. 110 (Bankr. S.D. Tex. 2015) ..................................................39

*United States v. Gold (In re Avis),*
   178 F.3d 718 (4th Cir. 1999) ...............................................................49

*United States v. Inslaw, Inc.,*
   932 F.2d 1467 (D.C. Cir. 1991)...........................................................47

*United States v. Ron Pair Enters., Inc.,*
   489 U.S. 235 (1989)......................................................................... 30, 31

*Watman v. Groman (In re Watman),*
   458 F.3d 26 (1st Cir. 2006)..................................................................24

**Constitutional Provisions and Statutes**

P.R. Const. art. VI, § 8 ............................................................................ 34, 35

13 L.P.R.A. § 11a(b)......................................................................................34

13 L.P.R.A. § 12 ............................................................................................34

11 U.S.C. § 362........................................................................ 21, 25, 29, 48

11 U.S.C. § 362(a) ......................................................... 29, 31, 32, 42, 47

11 U.S.C. § 362(a)(3)......................................................................... 44, 45

11 U.S.C. § 362(a)(4)......................................................................... 48, 49

11 U.S.C. § 362(a)(5)......................................................................................49

11 U.S.C. § 362(a)(6)......................................... 22, 37, 39, 40, 41, 42

11 U.S.C. § 362(a)(7)......................................................................................40

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ...........................................................................................2

42 U.S.C. § 1983 ................................................................................... 19, 39

48 U.S.C. § 2104(7) .......................................................................................8

48 U.S.C. § 2104(11) ...................................................................................46

48 U.S.C. § 2104(18) .....................................................................................8

48 U.S.C. § 2121(a) .......................................................................................8

48 U.S.C. § 2121(b)(1) .................................................................................................... 8

48 U.S.C. § 2121(d)(1)(A) ............................................................................................ 8, 9

48 U.S.C. § 2121(e)(1)(A) ............................................................................................... 8

48 U.S.C. § 2126(a) ......................................................................................................... 2

48 U.S.C. § 2126(b) ......................................................................................................... 3

48 U.S.C. § 2141 ......................................................................................................... 8, 12

48 U.S.C. § 2142 ......................................................................................................... 8, 12

48 U.S.C. § 2143 .............................................................................................................. 8

48 U.S.C. § 2144 .............................................................................................................. 8

48 U.S.C. § 2144(c)(3) .................................................................................................... 53

48 U.S.C. § 2144(c)(3)(A) .............................................................................................. 14

48 U.S.C. § 2147 ......................................................................................................... 8, 14

48 U.S.C. § 2151 .............................................................................................................. 8

48 U.S.C. § 2152(a) ..................................................................................................... 8, 9

48 U.S.C. § 2152(b) ......................................................................................................... 9

48 U.S.C. § 2152(b)(1) .................................................................................................... 56

48 U.S.C. § 2161 .............................................................................................................. 8

48 U.S.C. § 2164 ............................................................................................................ 12

48 U.S.C. § 2177 .............................................................................................................. 8

48 U.S.C. § 2194(a)(1) ............................................................................................... 10, 11

48 U.S.C. § 2194(a)(2)(B) .......................................................................................... 10, 11

48 U.S.C. § 2194(b)(1) .......................................................................................... 9, 30, 33

48 U.S.C. § 2194(b)(3) ............................................................................................... 9, 44

48 U.S.C. § 2194(b)(4) ............................................................................................... 9, 47

48 U.S.C. § 2194(b)(5) .................................................................................................... 47

48 U.S.C. § 2194(b)(6) ............................................................................................... 9, 37

48 U.S.C. § 2194(d) ................................................................................................11

48 U.S.C. § 2194(e)(1) ............................................................................................2, 3

48 U.S.C. § 2194(i)(1) ................................................................................................9

48 U.S.C. § 2194(k) ..................................................................................................54

48 U.S.C. § 2194(l) ...................................................................................................54

48 U.S.C. § 2194(m) ...........................................................................................33, 53

48 U.S.C. § 2194(m)(4) .......................................................................................7, 8, 30

48 U.S.C. § 2194(m)(5) ............................................................................................10

48 U.S.C. § 2194(m)(5)(A) .......................................................................................10

48 U.S.C. § 2194(n) ..................................................................................................53

48 U.S.C. § 2194(n)(1) ..............................................................................................33

48 U.S.C. § 2194(n)(2) ...................................................................................10, 30, 33

48 U.S.C. § 2195(a) ..................................................................................................54

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016 § 103(l) ................................................................................7

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016 § 103(m) ..............................................................................7

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016 § 201(a) ................................................................................7

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016 § 201(b) ................................................................................7

Puerto Rico Emergency Moratorium and Financial Rehabilitation Act,
    Public Act 21-2016 § 201(d)(ii) ...........................................................................7

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 106(a),
    130 Stat 549 (2016) ..............................................................................................2

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 106(b),
    130 Stat 549 (2016)..................................................................................................3

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 204(c)(3),
    130 Stat 549 (2016)..................................................... 13, 14, 15, 18, 19

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 204(c)(3)(A),
    130 Stat 549 (2016)........................................................................ 14, 53

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 204(c)(3)(B),
    130 Stat 549 (2016)................................................................................53

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 207,
    130 Stat 549 (2016).......................................................... 14, 15, 18, 19

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 212,
    130 Stat 549 (2016)................................................................................56

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 212(a),
    130 Stat 549 (2016)..................................................................................8

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 303(1),
    130 Stat 549 (2016)................................................................ 18, 19, 43

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 303(3),
    130 Stat 549 (2016).............................................. 5, 18, 19, 33, 35, 43

Puerto Rico Oversight, Management, and Economic Stability Act,
    Pub. L. No. 114-187, § 405(a)(1),
    130 Stat 549 (2016)................................................................................10

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(a)(2)(B),
  130 Stat 549 (2016)...................................................................................................10

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b),
  130 Stat 549 (2016)............................................................................................ *passim*

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b)(1),
  130 Stat 549 (2016)................................................. 5, 16, 21, 22, 26, 28, 30, 33, 34

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b)(3),
  130 Stat 549 (2016).................................................................... 6, 23, 27, 28, 44, 46

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b)(4),
  130 Stat 549 (2016)........................................................ 6, 23, 27, 28, 47, 48, 49, 51

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b)(5),
  130 Stat 549 (2016)........................................................ 6, 23, 27, 28, 47, 48, 49, 51

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(b)(6),
  130 Stat 549 (2016).......................................... 5, 22, 23, 27, 28, 37, 38, 39, 40, 42

Puerto Rico Oversight, Management, and Economic Stability Act,
  Pub. L. No. 114-187, § 405(e)(1),
  130 Stat 549 (2016)..................................................................................................2

**Other Authorities**

H.R. Rep. No. 114-602 (2016)..............................................................................9, 10

## PRELIMINARY STATEMENT

This appeal arises out of the District Court's Opinion and Order

(the "Decision") denying the motions of the Commonwealth Defendants[1] and the

Oversight Board to stay this action pursuant to Section 405(b) of PROMESA and

the District Court's inherent power to control its own docket. The District Court

improperly ruled that the PROMESA stay applied piecemeal – to some but not all

of the claims in the complaint – rather than to the entire action. It also improperly

analyzed the four claims it ruled are not stayed by PROMESA and failed to

characterize them for what they are: efforts by Plaintiffs to enforce their rights and

to ensure payment on the general obligation bonds they hold at some time in the

future. The declaratory and injunctive relief Plaintiffs seek is akin to prejudgment

relief that any plaintiff would seek in a collection action when acting aggressively

to enforce its rights under a contract or financial instrument, and had the District

Court properly seen Plaintiffs' claims for what they are, it would have had no

choice but to rule that the PROMESA stay applies and that all of Plaintiffs' claims

are stayed. This was clear error of law. In addition, the District Court abused its

---

[1] For purposes of this appeal, the Oversight Board refers to the Commonwealth, the Governor of the Commonwealth, the Secretary of the Treasury of the Commonwealth, and the Director of the Office of Management and Budget of the Commonwealth collectively as the "Commonwealth Defendants." The Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Executive Director of COFINA, and the Bank of New York Mellon Corp. are referred to collectively as the "COFINA Defendants."

discretion by failing to grant the Oversight Board's separate motion for a stay of

the entire action – a stay wholly separate from the automatic stay under

PROMESA but nevertheless a stay that was well within the District Court's

discretion to grant pursuant to its inherent power.

    As a result of the District Court's improper ruling, the Oversight Board and

other parties face litigation deadlines to file pleadings and dispositive motions

(the current deadline is March 20, 2017), and are engaged in precisely the kind of

activity that is supposed to be on hold during the pendency of the PROMESA stay.

Instead of being in a quiet period for negotiation of the fiscal plans required to

resolve Puerto Rico's financial crisis, which is what Congress intended when it

enacted PROMESA, the parties will have to battle in public.  This will not create

consensus; it will destroy it.  Given the short period of time left for the parties to

reach a consensual plan (the PROMESA stay currently expires on May 1, 2017),

there would be no prejudice to anyone if the PROMESA stay were properly

applied and this action was stayed in its entirety.  It is hard to imagine

circumstances where the public interest is so clear and the decision below is so

wrong.

## JURISDICTIONAL STATEMENT

    The District Court had jurisdiction over this action pursuant to 28 U.S.C.

§ 1331 and Sections 106(a) and 405(e)(1) of PROMESA.  48 U.S.C. §§ 2126(a),

2194(e)(1). This Court has jurisdiction under 28 U.S.C. § 1291 and Section 106(b) of PROMESA. 48 U.S.C. § 2126(b).

In the bankruptcy context, an order granting relief from the automatic stay is an immediately appealable final order. *See Pinpoint IT Servs., LLC v. Rivera (In re Atlas IT Exp. Corp.)*, 761 F.3d 177, 182 (1st Cir. 2014) ("Orders granting stay relief are orders 'disposing of a discrete dispute' and so are final and appealable as of right — on this point every circuit (including this one) that has considered the question agrees."). The District Court's decision here – finding that the automatic stay was inapplicable – had the exact same effect as an order lifting the stay, and therefore is final for purposes of appellate jurisdiction. *See Eddleman v. U.S. Dep't of Labor*, 923 F.2d 782, 785 (10th Cir. 1991) (order determining the applicability of the bankruptcy stay is an appealable final order).

Alternatively, the District Court's Decision finding that the action was not stayed by Section 405(b) of PROMESA is appealable pursuant to the collateral order doctrine. *See Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 545–47 (1949). The collateral order doctrine allows the immediate appeal of an order that, while not technically final, nonetheless ought to be considered by the appellate court. To be considered a collateral order, the order must involve:

> (1) an issue essentially unrelated to the merits of the main dispute, capable of review without disrupting the main trial; (2) a complete resolution of the issue, not one that is 'unfinished' or 'inconclusive'; (3) a right incapable of vindication on appeal from final judgment;

-3-

and (4) an important and unsettled question of controlling law, not
merely a question of the proper exercise of the trial court's discretion.

*Luckerman v. Narragansett Indian Tribe*, 787 F.3d 621, 623 (1st Cir. 2015). The

District Court's Decision easily meets this standard.

First, there is no question that the District Court's Decision conclusively

determined whether the PROMESA stay applied to Plaintiffs' claims. Second, the

applicability of the stay is important and wholly separate from the merits of

Plaintiffs' underlying challenges to the COFINA enabling act, the Executive

Orders, and the Moratorium Act (as defined below), and it can be reviewed without

disrupting or unduly delaying an eventual trial on the merits. Third, because the

PROMESA stay will expire by its terms in less than two months, the District

Court's decision would be unreviewable on an appeal from a final judgment.

Fourth, the interpretation of the extent of the PROMESA stay is an important legal

question, and not merely a question of the trial court's proper exercise of

discretion. PROMESA was enacted under unique circumstances to address the

imminent fiscal crisis facing the Commonwealth and its citizens. It is a one-of-a-

kind statute, and without appellate review now, the scope of the PROMESA stay

may never be reviewed.

-4-

On March 3, 2017, the Oversight Board timely filed its notice of appeal.
A481–82.[2]

**STATEMENT OF THE ISSUES ON APPEAL**

This appeal presents six issues:

1.     Where eight of 13 causes of action are admittedly stayed pursuant to Section 405(b) of PROMESA, did the District Court err in holding that the remaining four could proceed and that the entire action was not stayed pursuant to Section 405(b)(1) of PROMESA?

2.     Where Plaintiffs' second cause of action alleging preemption pursuant to Section 303(3) of PROMESA is premised on the unconstitutionality of the COFINA enabling act passed in 2006, did the District Court err in holding that Plaintiffs' second cause of action could not have been brought prior to PROMESA's enactment?

3.     Did the District Court err in holding that Plaintiffs' request to freeze Commonwealth assets, garnish them from third parties, and attach or segregate them for the eventual payment of Plaintiffs' bonds is not an act to collect that is stayed pursuant to Section 405(b)(6) of PROMESA?

4.     Did the District Court err in holding that Plaintiffs' request to freeze Commonwealth assets, garnish them from third parties, and attach or segregate

---

[2] All citations to "A__" are to the Oversight Board's Appendix.

them for the eventual payment of Plaintiffs' bonds is not an act to obtain possession of property or exercise control over property of the Government of Puerto Rico that is stayed pursuant to Section 405(b)(3) of PROMESA?

    5.    Did the District Court err in holding that Plaintiffs' request to freeze Commonwealth assets, garnish them from third parties, and attach or segregate them for the eventual payment of Plaintiffs' bonds is not an act to create, perfect, or enforce a lien that is stayed pursuant to Sections 405(b)(4) and 405(b)(5) of PROMESA?

    6.    Did the District Court err in holding that the terms of PROMESA prohibited the District Court from exercising its discretion to stay the action in its entirety?

## STATEMENT OF THE CASE

### A.    The Moratorium Act and the Executive Order

On April 6, 2016, the Governor signed Public Act 21-2016, the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (as amended by Public Act 40-2016, the "Moratorium Act"), into law. Among other things, the Moratorium Act:

- Authorizes the Governor to issue executive orders (1) declaring a "state of emergency" with respect to the Commonwealth or its instrumentalities, and (2) suspending payment of principal and interest on

-6-

"covered obligations" during any state of emergency through
January 31, 2017, extendable to March 31, 2017. Moratorium Act §§ 103(l),
(m), 201(a).

• Permits the Governor to (1) "expropriat[e] property or rights in
property interests" and (2) suspend or modify any statutory or other
obligation (defined as an "enumerated obligation") to transfer money for the
payment of, or to secure, any covered obligation, so that instrumentalities
subject to the Moratorium Act are able to pay for "essential services."
Moratorium Act § 201(b), (d)(ii).

Pursuant to the authority granted to him under the Moratorium Act, the
Governor issued several executive orders, among them Executive Order 30-2016
("Executive Order 30"), which is the one at issue in this case. Pursuant to
Executive Order 30, issued on June 30, 2016, the Governor suspended "the
Commonwealth's obligation to make payments on any bonds or notes issued or
guaranteed by the Commonwealth," other than payments to the Government
Development Bank for Puerto Rico (the "GDB"). A121–24.

## B.   PROMESA and the Automatic Stay

On June 30, 2016, the President of the United States signed PROMESA into
law. PROMESA was intended to provide "[a] comprehensive approach to [Puerto
Rico's] fiscal, management, and structural problems and adjustments . . . involving

-7-

independent oversight and a Federal statutory authority for the Government of
Puerto Rico to restructure debts in a fair and orderly process." 48 U.S.C.
§ 2194(m)(4). Specifically, PROMESA established a seven-member Oversight
Board that was intended "to provide a method for [Puerto Rico] to achieve fiscal
responsibility and access to the capital markets." 48 U.S.C. § 2121(a), (b)(1),
(e)(1)(A).

PROMESA grants the Oversight Board broad authority over Puerto Rico
and its instrumentalities to ensure fiscal responsibility. The Oversight Board is
empowered to, among other things, approve territorial and instrumentality fiscal
plans and budgets, 48 U.S.C. §§ 2141–42; enforce budget and fiscal plan
compliance, 48 U.S.C. §§ 2143–44; approve the territorial government's issuance
and guarantee of debts or modifications or similar transactions with respect to its
debts, 48 U.S.C. § 2147; analyze pensions, 48 U.S.C. § 2151; and file petitions to
adjust debts through procedures similar to chapter 9 of the United States
Bankruptcy Code (governing municipal bankruptcies). 48 U.S.C. §§ 2161–77.

In addition, Section 212(a) of PROMESA authorizes the Oversight Board to
intervene as of right in any litigation filed against the Government of Puerto Rico
or any "covered territorial instrumentality." 48 U.S.C. §§ 2104(7), 2104(18),

2121(d)(1)(A), 2152(a).[3]  PROMESA specifically authorizes the Oversight Board
to seek injunctive relief in any action in which it intervenes.  48 U.S.C. § 2152(b).

Importantly, Section 405(b) of PROMESA also imposes an automatic stay
of certain litigation against the Commonwealth, any instrumentalities, and any
elected and appointed officials, directors, officers, or employees acting in their
official capacities on behalf of the Government of Puerto Rico.  48 U.S.C.
§ 2194(b)(1), (i)(1).  In particular, PROMESA stays, "with respect to a Liability
. . . the commencement or continuation . . . of a judicial . . . action or proceeding
against the Government of Puerto Rico [or its instrumentalities] that was or could
have been commenced before the enactment of [PROMESA]."  48 U.S.C.
§ 2194(b)(1).  PROMESA also automatically stays the commencement or
continuation of a judicial proceeding "to recover a 'Liability Claim' against the
Government of Puerto Rico that arose before the enactment of [the] Act."  *Id.*  The
PROMESA stay also prohibits acts "to collect," "to exercise control" over
Commonwealth property, and to "create, perfect or enforce" a lien against
Commonwealth property.  48 U.S.C. § 2194(b)(3), (4)–(6).

Congress believed that "an immediate—but temporary—stay is essential to
stabilize the region for the purposes of resolving" the Commonwealth's fiscal

---

[3] The Oversight Board has, so far, designated 63 "covered" instrumentalities.

crisis. 48 U.S.C. § 2194(m)(5). The automatic stay was intended to "allow[] the

Oversight Board the opportunity to establish its foundational structure and begin its

monumental task of ensuring Puerto Rico regains access to capital markets," H.R.

REP. NO. 114-602, at 52 (2016), and to provide the Oversight Board a short period

of time "to determine whether to appear or intervene on behalf of the Government

of Puerto Rico in any litigation." 48 U.S.C. § 2194(m)(5)(A). The automatic stay

was also intended to "allow the Government of Puerto Rico a limited period of

time during which it can focus its resources on negotiating a voluntary resolution

with its creditors instead of defending numerous, costly creditor lawsuits." 48

U.S.C. § 2194(n)(2).

> Section 405(a)(1) of PROMESA defines a "Liability" as follows:
>
> The term "Liability" means a bond, loan, letter of credit, other
> borrowing title, obligation of insurance, or other financial
> indebtedness for borrowed money, including rights, entitlements, or
> obligations whether such rights, entitlements, or obligations arise from
> contract, statute, or any other source of law related to such a bond,
> loan, letter of credit, other borrowing title, obligation of insurance, or
> other financial indebtedness in physical or dematerialized form, of
> which—
>
>> (A) the issuer, obligor, or guarantor is the Government of
>> Puerto Rico; and
>>
>> (B) the date of issuance or incurrence precedes the date of
>> enactment of this Act.

48 U.S.C. § 2194(a)(1).

Section 405(a)(2)(B) of PROMESA defines a "Liability Claim," in relevant

part, as follows:

> The term "Liability Claim" means, as it relates to a Liability . . . .
> (B) [The] right to an equitable remedy for breach of performance if
> such breach gives rise to a right to payment, whether or not such right
> to an equitable remedy is reduced to judgment, fixed, contingent,
> matured, unmatured, disputed, undisputed, secured, or unsecured.

48 U.S.C. § 2194(a)(2)(B).

For purposes of the PROMESA stay, it makes no difference whether

Plaintiffs' asserted right to relief arises under Plaintiffs' bonds themselves, or some

other source of law, such as the Constitutions or statutes of the United States or

Puerto Rico. The statute specifies that a "Liability" includes "rights, entitlements,

or obligations . . . related to . . . a bond," regardless of "whether such rights,

entitlements, or obligations arise from contract, statute, or any other source of

law." 48 U.S.C. § 2194(a)(1).

The PROMESA stay remains in effect until the earlier of

(1) February 15, 2017, with a possible extension of 60 or 75 days, and (2) with

respect to the Commonwealth or any of its instrumentalities, the date on which the

Oversight Board files a petition on behalf of the Government of Puerto Rico or any

of its instrumentalities to commence debt-adjustment proceedings pursuant to

Title III of PROMESA. 48 U.S.C. § 2194(d). On February 14, 2017, the

Oversight Board exercised its discretion under PROMESA and extended the

PROMESA stay until May 1, 2017. ADD7, n.3.[4]

### C.   The Oversight Board

On August 31, 2016, the President of the United States appointed seven

members to the Oversight Board. Since its appointment, the Oversight Board has

been working diligently to fulfill the tasks it is required to perform under

PROMESA – to develop and certify fiscal plans, negotiate consensual restructuring

agreements where appropriate or, failing consensus, to institute proceedings under

Title III of PROMESA in order to relieve the Commonwealth's current financial

distress and to take steps to ensure the Commonwealth's reentry into capital

markets. 48 U.S.C. §§ 2141–42, 2164.

The Oversight Board and its counsel have been meeting with representatives

of the parties to this action and many of the other similar actions and have made

information requests of the Governor and the Commonwealth officials and

advisors. The Oversight Board has worked with the Commonwealth to establish

information sharing and expense review protocols applicable to all covered

instrumentalities. The PROMESA process now is well under way. The Oversight

Board has retained advisors and is working with the Commonwealth to develop

fiscal plans and with creditors to negotiate consensual restructuring agreements as

---

[4] All citations to "ADD__" are to the Addendum attached to this brief.

-12-

required under PROMESA. A469, A476. As has been well publicized, the
Commonwealth has submitted multiple drafts of its proposed fiscal plan, and the
Oversight Board has commented on them. These efforts culminated on March 13,
2017, when the Oversight Board approved the Commonwealth's amended fiscal
plan.[5]

### D.    The Original and Amended Complaints

Plaintiffs are beneficial owners of bonds that are protected by the
Puerto Rico Constitution. These bonds fall into two categories: (1) the
Commonwealth's general obligation bonds ("GO Bonds"), which were issued by
the Commonwealth and secured by a pledge of the Commonwealth's good faith,
credit, and taxing power and (2) bonds issued by certain of the Commonwealth's
public corporations and guaranteed by the same pledge by the Commonwealth (the
"GO-Guaranteed Bonds" and together with the GO Bonds, "GO Debt" or
"Constitutional Debt"). A340.

On July 20, 2016, Plaintiffs filed a complaint asserting a single substantive
cause of action,[6] alleging a breach of Section 204(c)(3) of PROMESA, which

---

[5] Copies of the Governor's Fiscal Plan, the Oversight Board's certification, and
other key documents are available at the Oversight Board's website:
www.oversightboard.pr.gov.

[6] The complaint also asserted an alternative cause of action seeking relief from the
automatic stay in the event the District Court held that the action was stayed by
Section 405(b) of PROMESA.

prohibits the Commonwealth from enacting certain laws prior to the full
appointment of the Oversight Board.[7] A46, Dkt. No. 1.

On August 15, 2016, Plaintiffs filed an amended complaint alleging that in
addition to a breach of Section 204(c)(3) of PROMESA, the "Commonwealth
Officer Defendants" (at the time, the only defendants were officers of the
Commonwealth)[8] also violated Section 207 of PROMESA, which prohibits the
Commonwealth from issuing, guaranteeing, repurchasing, exchanging, modifying,
or redeeming debt without the Oversight Board's consent. A79, A88, A90.

The amended complaint sought a declaration that (1) Executive Order 30,
(2) Puerto Rico's Fiscal Year 2017 budget, and (3) Act 74-2016 (which authorized
the GDB to restructure loans owed to the GDB by the Commonwealth and its

---

[7] Section 204(c)(3)(A) of PROMESA provides that after PROMESA's enactment
and before the complete appointment of the Oversight Board, the Commonwealth
"shall not enact new laws that either permit the transfer of any funds or assets
outside the ordinary course of business or that are inconsistent with the constitution
or laws of the territory." 48 U.S.C. § 2144(c)(3)(A).

Section 207 of PROMESA states that "[f]or so long as the Oversight Board
remains in operation, no territorial government may, without the prior approval of
the Oversight Board, issue debt or guarantee, exchange, modify, repurchase,
redeem, or enter into similar transactions with respect to its debt." 48 U.S.C.
§ 2147.

[8] The Commonwealth Officer Defendants are Alejandro García-Padilla, Juan
Zaragoza Gómez, and Luis Cruz Batista.

-14-

instrumentalities) violated Sections 204(c)(3) and 207 of PROMESA. A71–72, A89–91, A94.

In addition to declaratory relief, Plaintiffs also sought an injunction:

(1)     requiring the Commonwealth Officer Defendants to segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back under contractual and legal provisions expressly acknowledging that those funds are subject to turnover for purposes of paying GO Bonds or GO-Guaranteed Bonds;

(2)     prohibiting the Commonwealth Officer Defendants from making certain transfers to the public employee pension funds contemplated in the Fiscal Year 2017 budget and limiting the Commonwealth to the contribution it made in Fiscal Year 2016;

(3)     prohibiting the Commonwealth Officer Defendants from transferring $250 million to the GDB as contemplated by the Fiscal Year 2017 budget; and

(4)     prohibiting the Commonwealth Officer Defendants from making certain additional transfers to the GDB authorized by Act 74-2016. A89–95.

On August 22, 2016, the Commonwealth Officer Defendants filed a notice of stay, arguing that the case was automatically stayed by Section 405(b) of

-15-

PROMESA. A136–41. At the District Court's direction, Plaintiffs filed a response

on August 25, 2016. A47, Dkt. Nos. 27, 28.

By order dated September 2, 2016, the District Court held that Section

405(b)(1) of PROMESA did not stay prosecution of the amended complaint

because (i) "Plaintiffs could not have commenced [the] lawsuit before

PROMESA's enactment because their claims are to enforce provisions of

PROMESA by challenging conduct that occurred after PROMESA's enactment,"

and (ii) "[P]laintiffs do not seek to recover a right to payment that arose before

PROMESA's enactment." A198–99.

On September 7, 2016, the Commonwealth Officer Defendants filed a

motion for reconsideration requesting that the District Court reconsider its notice

of stay. A48, Dkt. No. 34. On November 4, 2016, the District Court denied the

motion for reconsideration. A52, Dkt. No. 75.

### E.     Plaintiffs' Motion to Amend Their Complaint and for Partial Relief from the Automatic Stay

On October 7, 2016, Plaintiffs filed a motion for leave to file a second

amended complaint (the "Second Amended Complaint") and for partial relief from

the automatic stay. A200–87. The proposed Second Amended Complaint asserted

11 new substantive causes of action and named four new defendants: The

Commonwealth, the Puerto Rico Sales Tax Financing Corporation (a/k/a

COFINA), Juan Vaquer, in his official capacity as Executive Director of COFINA,

-16-

and Bank of New York Mellon Corp., as trustee for certain COFINA bonds.

However, Plaintiffs sought to pursue only four of the 13 causes of action (the first,

second, third, and twelfth, the "PROMESA Claims") while the PROMESA stay

remained in place with respect to the other causes of action. Plaintiffs argued that

they could pursue the four claims based upon the provisions of PROMESA

because they could not possibly have been brought prior to the enactment of

PROMESA. A201–02. Plaintiffs said they were asserting the other eight

substantive causes of action "as a protective measure" to ensure that these claims

were not lost "under the doctrine of claim preclusion." A212–13.

On October 24, 2016, the Commonwealth Officer Defendants filed their

response. The Commonwealth Officer Defendants objected to Plaintiffs' proposed

piecemeal approach to the litigation, arguing that all of the claims were stayed by

Section 405(b) of PROMESA and, to the extent they were not, that the entire

action should nonetheless be stayed pursuant to the District Court's inherent power

to control its own docket. A288–306.

On October 28, 2016, the Oversight Board moved to intervene. A307–12.

In the proposed pleading attached to its intervention motion, the Oversight Board

opposed Plaintiffs' motion for leave to amend and for partial relief from the

PROMESA stay, adopting the Commonwealth Officer Defendants' papers in their

entirety, and moved, in the event the District Court determined that one or more of

-17-

the causes of action was not subject to the PROMESA stay, to stay the action in its

entirety based upon the District Court's inherent power to control its own docket.

A314–24.

On November 4, 2016, the District Court granted Plaintiffs leave to file the

Second Amended Complaint and stated that it would determine whether Plaintiffs

could prosecute the PROMESA Claims in due course. A52, Dkt. No. 76.

Plaintiffs filed the Second Amended Complaint the same day. A52, Dkt. No. 78.

## F. The Second Amended Complaint

Plaintiffs sought to pursue only four of the 13 causes of action asserted in

the Second Amended Complaint which, they argued, were not subject to the

PROMESA stay:

(1)     The First Cause of Action, which alleges that the

Commonwealth's post-PROMESA enactments violate Section 204(c)(3) and

Section 207 of PROMESA;

(2)     The Second Cause of Action, which alleges that Executive

Order 30 is preempted by Section 303(3) of PROMESA;

(3)     The Third Cause of Action, which alleges that the Moratorium

Act is preempted by Section 303(1) of PROMESA; and

-18-

(4)    The Twelfth Cause of Action, which seeks relief under

42 U.S.C. § 1983, insofar as it is based on the Commonwealth's alleged

violations of Sections 204(c)(3), 207, 303(1), and 303(3) of PROMESA.

A383–89, A400–01.

In addition to the injunctive relief Plaintiffs sought in their amended

complaint, Plaintiffs also sought, for the first time, an injunction:

(1)    prohibiting the diversion of revenues arising from collection of

the sales and use tax ("SUT") (or any substitute revenues) to COFINA and

requiring the Commonwealth Defendant officers, in their official capacities

as officers of the Commonwealth, and the COFINA Defendants to direct

such funds to Puerto Rico's Treasury;

(2)    directing the COFINA Defendants to transfer any revenues

received from the collection of the Commonwealth's sales and use tax in

their possession or held on behalf of COFINA to the Commonwealth;

(3)    directing the Commonwealth Officer Defendants to segregate

and preserve such funds arising from collection of the sales and use tax or

transferred from the COFINA Defendants; and

(4)    prohibiting the enforcement of the Moratorium Act and

Executive Order 30 as applied to the so-called Constitutional Debt.

A402–405.

On November 7, 2016, the Commonwealth Officer Defendants filed a notice

of automatic stay, which reiterated many of the same arguments the

Commonwealth Officer Defendants made in their opposition to Plaintiffs motion

for leave to amend.  A408–426.  On November 16, 2016, the District Court entered

a docket text order stating that it would treat the "notice" as a motion to stay the

action.  A55.  On the same day, the Commonwealth Officer Defendants filed a

motion to stay the action, which incorporated by reference its "notice."  A427–432.

The COFINA Defendants joined the Commonwealth Officer Defendants' motion

to stay.  A58, Dkt. No. 134; A63, Dkt. No. 163.

### G.    The District Court's Decision

On February 17, 2017, the District Court issued its Decision granting the

Oversight Board leave to intervene in this action, but denying the motions of the

Commonwealth Defendants, the COFINA Defendants, and the Oversight Board to

stay the action.  ADD40–41.[9]  The District Court also entered a separate order

directing the Oversight Board to file a pleading setting out the "claims or defenses

for which intervention is sought" by March 20, 2017, and directing that "[a]ll

parties may file any motion they may deem appropriate to file, including any

dispositive motion, by that date."  A479.

---

[9] In its Decision, the Court also addressed additional intervention motions filed by
several groups of COFINA bondholders, granting intervention to some and
denying intervention to others.  ADD32–41.

-20-

In its Decision, the District Court properly recognized that, in analyzing whether the PROMESA Claims should be stayed, the District Court should look to how other courts have interpreted the virtually identical automatic stay provisions of Section 362 of the Bankruptcy Code. In addition, the District Court acknowledged that the automatic stay is self-executing upon filing of a petition for bankruptcy and "'is extremely broad in scope,' applying 'to almost any type of formal or informal action taken against the debtor.'" ADD13 (internal citations omitted). Nevertheless, the District Court, after recognizing the breadth of both the bankruptcy stay and the PROMESA stay, determined that Plaintiffs were entitled to pursue the PROMESA Claims.

### 1.    Section 405(b)(1) of PROMESA

Although Plaintiffs concede that the vast majority of the claims in the Second Amended Complaint could have been brought before the enactment of PROMESA and are therefore stayed, the District Court rejected Defendants' argument that the plain language of Section 405(b)(1) of PROMESA imposing an automatic stay of an "action or proceeding" applies to all of Plaintiffs' causes of action in this case. ADD14–15. Instead, relying on two factually inapposite cases from the Third Circuit, the District Court addressed the PROMESA Claims separately. ADD15.

-21-

With respect to Plaintiff's first cause of action, the District Court relied on
its previous ruling that "[p]laintiffs could not have commenced this lawsuit before
PROMESA's enactment because their claims are to enforce provisions of
PROMESA by challenging conduct that occurred after PROMESA's enactment"
and that "count one did not assert a right to recover a 'Liability Claim' inasmuch as
it did 'not seek to recover a right to payment that arose before PROMESA's
enactment.'" ADD14.

With respect to the second and third causes of action, the District Court
agreed with the Commonwealth that those claims "implicate the lawfulness of the
Commonwealth's assignment of [SUT] revenues to COFINA," which occurred
well before the enactment of PROMESA, but nonetheless concluded those claims
fell outside of Section 405(b)(1) of PROMESA because "the asserted legal
premise" is based on PROMESA. ADD16.

### 2. Section 405(b)(6) of PROMESA

The District Court acknowledged that Section 362(a)(6) of the Bankruptcy
Code, on which Section 405(b)(6) was modeled, is very broad. However, the
District Court ruled that Section 362(a)(6) – and therefore Section 405(b)(6) – does
not apply to "any non-harassing, non-coercive act to ensure eventual payment from
the debtor or the debtor's estate." ADD17. The District Court found no evidence
that Plaintiffs "brought this action to coerce or harass any defendant." ADD19. In

-22-

addition, the District Court concluded that the PROMESA Claims do not constitute

a "Liability Claim" that arose before the enactment of the statute "notwithstanding

the fact that the GO Bondholders now [in counts two and three] also seek

injunctions that, *inter alia*, prohibit the diversion of [SUT] revenues to COFINA,

and direct the COFINA defendants to transfer revenues held on behalf of COFINA

to the Commonwealth." ADD19–20. The District Court concluded that because

the PROMESA Claims "are not aimed at confiscating any property of, or obtaining

any form of payment from, the Commonwealth" they are not stayed by

Section 405(b)(6) of PROMESA. ADD21.

### 3. Section 405(b)(3) of PROMESA

The District Court properly recognized that to exercise control is to exercise

"'restraining or directing influence over' or 'to have power over,'" but nonetheless

determined that the injunctive relief sought by Plaintiffs here (garnishment,

attachment, and segregation of revenues) "would not permit [Plaintiffs] to have

any possession, influence, or power over any asset, much less any asset of the

Commonwealth." Accordingly, the District Court held that Section 405(b)(3) of

PROMESA did not apply to the PROMESA Claims. ADD21–23.

### 4. Sections 405(b)(4) and 405(b)(5) of PROMESA

The District Court held that if the Plaintiffs have a valid first lien on

resources of the Commonwealth as they allege, the lien has already been perfected

-23-

by operation of the Puerto Rico Constitution. If Plaintiffs' alleged lien is not valid, the District Court held that the PROMESA counts "do nothing to create or perfect any lien." Further, the District Court held that the "mere assertion of the PROMESA counts, which at this juncture does nothing to affect the Commonwealth's interests in its property," is not an "act" to create or perfect a lien. Finally, the District Court held that neither the assertion of the PROMESA counts nor the injunctive relief sought in those counts was an act "to enforce a lien." ADD24–26.

### 5. The Court's Inherent Authority to Stay the Action

Finally, having concluded that the PROMESA Claims fell outside of the PROMESA stay, the District Court declined to exercise its discretion and balance the equities to determine whether a stay was nonetheless appropriate. Even though PROMESA explicitly authorizes the Oversight Board to seek a stay of litigation, the District Court concluded that because "Congress intended PROMESA to stay only certain types of claims, and not others," it would be inappropriate to extend the stay to the PROMESA Claims. ADD26–27.

### STANDARD OF REVIEW

On appeal, this Court reviews a district court's "conclusions of law *de novo* and its factual findings for clear error." *Watman v. Groman (In re Watman)*, 458 F.3d 26, 31 (1st Cir. 2006). The scope or applicability of the PROMESA

automatic stay is a question of law to be reviewed *de novo*. *See Palmdale Hills Prop., LLC v. Lehman Commer. Paper, Inc. (In re Palmdale Hills Prop., LLC)*, 654 F.3d 868, 875 (9th Cir. 2011) ("We review de novo the scope or applicability of the automatic stay under the Bankruptcy Code, 11 U.S.C. § 362, because it is a question of law.").

This Court reviews a district court's decision denying a party's motion to stay for abuse of discretion. *Arthurs v. Stern*, 560 F.2d 477, 479–80 (1st Cir. 1977). A district court abuses its discretion "if it fails to consider a significant factor . . . , if it relies on an improper factor . . . , or if it considers all the appropriate factors but makes a serious error in judgment." *Negron-Almeda v. Santiago*, 528 F.3d 15, 21–22 (1st Cir. 2008) (quoting *Torres-Rivera v. O'Neill-Cancel*, 524 F.3d 331, 335–36 (1st Cir. 2008)). An error of law is a *per se* abuse of discretion. *Id.* at 22.

## SUMMARY OF THE OVERSIGHT BOARD'S ARGUMENT

The PROMESA framework was a *sui generis* response to the unprecedented fiscal crisis that is facing the Commonwealth and its citizens. The PROMESA stay was, among other things, designed to protect the Commonwealth from costly creditor lawsuits, and was supposed to give the Commonwealth a breathing spell so that it could concentrate on negotiating with creditors and working with the Oversight Board towards extricating the Commonwealth from its crippling debt.

The PROMESA stay, thus, can be given meaning only by reference to the circumstances facing the Commonwealth, and should be interpreted broadly in accordance with PROMESA's intent. Despite recognizing the breadth of the PROMESA stay provisions, the District Court interpreted them narrowly and applied them piecemeal, allowing what is in essence a collection action to proceed. As a result, the decision has undermined the PROMESA process. The Court should reverse.

First, the District Court incorrectly held that Section 405(b) of PROMESA applies to individual claims asserted by Plaintiffs instead of to the entirety of the "action or proceeding." Plaintiffs' and the District Court's proposed piecemeal resolution of the claims in this action is contrary to both the letter and the spirit of PROMESA.

Second, the District Court incorrectly held that Section 405(b)(1) of PROMESA does not stay Plaintiffs' second cause of action. That cause of action, although ostensibly challenging Executive Order 30, is premised on the alleged unlawfulness (*i.e.*, unconstitutionality) of the COFINA enabling act. It has nothing to do with PROMESA, and could have been brought long before enactment of PROMESA.

Third, the District Court incorrectly held that assertion of the PROMESA Claims, which seek injunctive and declaratory relief that would have the effect of

-26-

freezing government assets, garnishing them from third parties, and attaching or

segregating them for the eventual payment of Plaintiffs' bonds, is not an act to

collect that is stayed pursuant to Section 405(b)(6) of PROMESA. Although, if

sustained, Plaintiffs' claims would not result in immediate repayment of their

outstanding bonds, these acts are the first step in collecting on the money

judgments that Plaintiffs will eventually seek; these claims are akin to a request for

a pre-judgment attachment, which clearly would be stayed.

Fourth, the District Court incorrectly held that assertion of the PROMESA

Claims is not an act to exercise control over property of the Government of Puerto

Rico that is stayed pursuant to Section 405(b)(3) of PROMESA. Section 405(b)(3)

of PROMESA, like the other sections, is broad and applies to requests for

declaratory and injunctive relief insofar as they prevent the Government from

using its assets or otherwise have an effect on Government property.

Fifth, the District Court incorrectly held that the assertion of the PROMESA

Claims is not an act to create, perfect, or enforce a lien against property of the

Government of Puerto Rico that is stayed pursuant to Sections 405(b)(4) and (b)(5)

of PROMESA. To the extent Plaintiffs already have a first lien on the SUT

revenue assigned to COFINA, the requested relief constitutes an act to enforce a

lien. To the extent Plaintiffs do not have a lien on the SUT revenues, Plaintiffs are

attempting to create a *de facto* judicial lien.  In either case, the requested relief falls

within the broad purview of Section 405(b)(3) of PROMESA.

Finally, the District Court incorrectly held that PROMESA foreclosed the

District Court's ability to stay any claims that it found were not specifically

covered by Sections 405(b)(1)–(6) of PROMESA.  This holding is inconsistent

with well-established case law, which allows a court to extend the automatic stay

to actions that are otherwise beyond the automatic stay where their continued

prosecution would interfere with a debtor's ability to reorganize, and is

contradicted by PROMESA itself, which expressly authorizes the Oversight Board

to seek a stay of litigation.

## ARGUMENT

**I.**     **Section 405(b) of PROMESA Should Be Interpreted Broadly in
         Accordance with Congressional Intent to Advance PROMESA's Stated
         Objectives**

In the bankruptcy context,

> [t]he automatic stay is designed to effect an immediate freeze of the
> status quo at the outset of the chapter 11 proceedings, by precluding
> and nullifying most post-petition actions and proceedings against the
> debtor in non-bankruptcy fora, judicial or nonjudicial, as well as most
> extrajudicial acts against the debtor, or affecting property in which the
> debtor, or the debtor's estate, has a legal, equitable or possessory
> interest.

*I.C.C. v. Holmes Transp., Inc.*, 931 F.2d 984, 987 (1st Cir. 1991).

The District Court properly observed that Section 405(b) of PROMESA was modeled after Section 362(a) of the Bankruptcy Code, and that cases interpreting Section 362(a), therefore, provide guidance in determining whether the PROMESA stay applies to Plaintiffs' causes of action. ADD13. The District Court also properly observed that Section 362 of the Bankruptcy Code "is extremely broad in scope" and applies "to almost any type of formal or informal action taken against the debtor." *Id.* However, after observing the breadth of the bankruptcy stay and the PROMESA stay provisions, the District Court then proceeded to apply them narrowly to the claims asserted in this case.

Although Section 362 is a useful starting point, context matters, and blind reference to Section 362 alone ignores fundamental differences between the two statutes, "the lack of a 'one-to-one' relationship between section 405 of PROMESA and Section 362 of the Bankruptcy Code," and the need to be "mindful of the specific Congressional findings and the enumerated purposes of PROMESA's automatic stay contained within Section 405 . . . [which] offer valuable insight into Congress' basic motive in including the stay provision and [which] have no counterpart in Section 362 of the Bankruptcy Code." *Brigade Leveraged Capital Structures Fund Ltd. v. Garcia-Padilla*, No. 16-1610 (FAB), 2016 U.S. Dist. LEXIS 158046, at *27–28 (D.P.R. Nov. 15, 2016).

PROMESA embodies "[a] comprehensive approach to fiscal, management, and structural problems and adjustments." 48 U.S.C. § 2194(m)(4). A central purpose of the statute is to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits." 48 U.S.C. § 2194(n)(2). This Court should analyze the asserted claims and the relief sought against this backdrop, and this Court's interpretation of the stay provisions "should advance the larger, overarching purposes for which PROMESA was enacted." *Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *28. This Court should interpret the PROMESA stay broadly to cover the actions pursued and the relief sought by Plaintiffs.

## II. The District Court Incorrectly Held That the First, Second, Third and Twelfth Causes of Action Were Not Stayed by Section 405(b) of PROMESA

### A. PROMESA Stays the Entirety of an "Action or Proceeding"

Section 405(b)(1) of PROMESA stays the commencement or continuation of an "action or a proceeding against the Government of Puerto Rico." 48 U.S.C. § 2194(b)(1). Under ordinary principles of statutory interpretation, the stay, then, applies to the entirety of an action or proceeding, and not just to a portion of it. *See United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989) ("[W]here, as here, the statute's language is plain, the sole function of the courts is to enforce it

-30-

according to its terms." (internal quotes and citations omitted)). Thus, the
PROMESA stay applies not only to the nine causes of action that Plaintiffs
concede are stayed, but to all 13 causes of action – that is, the entire action.

Notwithstanding the clear language of PROMESA, the District Court
concluded that it must examine each of Plaintiffs' claims separately to determine
whether each individual claim was stayed by PROMESA. Reasoning that the
PROMESA Claims were not explicitly covered by the stay, the District Court held
that Plaintiffs could pursue those claims even though the other causes of action
were admittedly stayed. In support of its erroneous conclusion, the District Court
relied on two cases from the Third Circuit. However, in neither of those cases did
the court separately analyze individual claims asserted against a debtor, and,
therefore, neither of those cases supports the District Court's decision to do so
here.

In *Maritime Electric Company v. United Jersey Bank*, 959 F.2d 1194 (3d
Cir. 1991), there was no dispute that Section 362(a) applied to all claims asserted
*against* the debtor. At issue was whether Section 362(a) also stayed the
prosecution of claims asserted *by* the debtor. *Id.* at 1205. The Third Circuit
observed that where there are claims, cross-claims, and counter-claims, the Court
must "disaggregate[]" the claims and analyze them separately to determine "which
of [the] respective *proceedings* are subject to the bankruptcy stay." *Id.* at 1204–05

-31-

(emphasis added). The court continued, "[t]hus, within one case, actions *against* a debtor will be suspended even though closely related claims asserted *by* the debtor may continue." *Id.* at 1205 (emphasis in original).[10] Based upon the plain language of Section 362(a) of the Bankruptcy Code, the Third Circuit held that while all claims against the Debtor were stayed, the claims asserted by the debtor clearly were not. *Id.* The Third Circuit did not decide whether Section 362(a) might stay fewer than all claims asserted against a debtor such that some claims may proceed against a debtor, while others may not.

The issue in *Maintainco, Inc. v. Mitsubishi Caterpillar Forklift America, Inc. (In re Mid-Atl. Handling Sys., LLC)*, 304 B.R. 111, 128 (Bankr. D.N.J. 2003), was whether the bankruptcy stay extended to claims asserted against a non-debtor co-defendant. On this sole issue, the bankruptcy court – relying on *Maritime Electric* – analyzed claims asserted by and against a debtor separately and concluded that Section 362(a) did not stay claims asserted against a non-debtor co-defendant, and allowed the claims against the co-defendant to proceed. *Id.* at 128–29. As in *Maritime Electric*, the bankruptcy court did not analyze causes of action asserted against a debtor individually and did not hold that doing so was appropriate.

---

[10] Indeed, the issue in each of the seventeen cases cited by the Third Circuit in *Maritime Electric* was whether the automatic stay applied to claims asserted by the debtor against non-debtors. *Id.* at 1205–06.

-32-

To allow Plaintiffs to split their claims and to pursue this litigation piecemeal would undermine explicit Congressional intent that the Commonwealth be given a short period of time to concentrate on negotiations instead of defending creditor lawsuits so that it and the Oversight Board can address the "immediate . . . and imminent" fiscal crisis facing the Commonwealth and its citizens. 48 U.S.C. § 2194(m), (n)(1), (n)(2); *see Peaje Invs. LLC v. García-Padilla*, 845 F.3d 505, 513 (1st Cir. 2017). And it would undoubtedly "harm the PROMESA process by undermining the comprehensive, consolidated restructuring approach that the statute was ultimately designed to facilitate." *Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *54. "All stakeholders, including the Oversight Board, collectively deserve the chance to avoid [a] piecemeal approach to resolving Puerto Rico's fiscal emergency and to allow the PROMESA process to function as designed." *Id.* at *55–56.

### B. Plaintiffs' Second Cause of Action Is a 10-year Old Constitutional Claim Unrelated to PROMESA That Could Have Been Brought Prior to Its Enactment

Plaintiffs second cause of action is stayed under Section 405(b)(1) of PROMESA for the independent reason that it could have been brought long before the enactment of PROMESA. *See* 48 U.S.C. § 2194(b)(1). While Plaintiffs ostensibly challenge Executive Order 30 because they claim it is preempted by Section 303(3) of PROMESA, the substance of the claim is that Plaintiffs seek to

-33-

invalidate the COFINA enabling act because it violates the Puerto Rico

Constitution. This claim has nothing to do with PROMESA; it could have been

brought years before and, accordingly, is stayed pursuant Section 405(b)(1) of

PROMESA.

The Commonwealth Legislative Assembly established COFINA in 2006.

The COFINA enabling act was designed to retire Commonwealth debt obligations

payable solely from government budgetary appropriations. Among other things, it

authorizes COFINA to "issu[e] bonds and utilize[e] other financing mechanisms."

13 L.P.R.A. § 11a(b). The COFINA enabling act dedicates a certain percentage of

the Commonwealth's SUT revenue to COFINA to repay debts. 13 L.P.R.A. § 12.

COFINA bonds are non-recourse bonds secured by a statutory lien against pledged

SUT revenue. Importantly, the COFINA enabling act makes clear that SUT

income does not constitute a resource "available" to the Commonwealth.

13 L.P.R.A. § 12. This "availability" of resources is a direct reference to Article

VI, Section 8 of the Puerto Rico Constitution, which provides:

> In case the ***available revenues*** including surplus for any fiscal year
> are insufficient to meet the appropriations made for that year, interest
> on the public debt and amortization thereof shall first be paid, and
> other disbursements shall thereafter be made in accordance with the
> order of priorities established by law.

P.R. Const. art. VI, § 8 (emphasis added). COFINA's bond offering documents accordingly disclose that SUT revenue is not an "available resource" for purposes of satisfying the public debt priority. *See* A49, Dkt. No. 50 at 9.

Plaintiffs insist that the second cause of action challenging the lawfulness of Executive Order 30 is not stayed by PROMESA. More specifically, Plaintiffs contend that SUT revenue is an available resource for purposes of Article VI, Section 8 of the Puerto Rico Constitution. Plaintiffs argue that because Executive Order 30 *did not* claw back SUT money from COFINA to service the Commonwealth's GO Debt, it is "unlawful" and thus preempted by Section 303(3) of PROMESA. A337–407, ¶¶ 2, 13, 20, 92, 95, 99, 107–10.

Plaintiffs' claim is a thinly-veiled attempt to pursue their constitutional claims now, ahead of other creditors and without being required to establish cause to lift the PROMESA stay. The fundamental fact, which Plaintiffs do not attempt to – and indeed cannot – escape, is that their second cause of action depends on the District Court's answer to one fundamental question: Are the SUT carve-outs assigned to COFINA pursuant to the COFINA enabling act "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution? At their core, Plaintiffs' constitutional challenges to Executive Order 30 are just that– constitutional challenges.

Plaintiffs do not dispute this. Indeed, their own arguments prove that the "unlawful" conduct Plaintiffs seek to challenge is the establishment of the COFINA structure itself and the assignment of SUT revenues to COFINA in the first instance, not Executive Order 30 or any other post-PROMESA action taken by the Commonwealth. In the District Court, Plaintiffs conceded that the constitutionality of the COFINA structure "must be resolved" as part of their claims. A457; *see also* A441 (arguing that "resolution of [P]laintiffs' claims" will determine whether the COFINA structure is valid); A442 ("[T]he assignment of core tax revenue to COFINA—purportedly rendering those revenues not 'available resources' of the Commonwealth available for payment of Constitutional Debt and other expenditures—is not 'lawful.' The COFINA structure in fact violates the Puerto Rico Constitution in numerous respects."). If Plaintiffs are correct that the COFINA structure is unlawful, then any unlawful action occurred at the time the COFINA enabling act was passed in 2006, *see* A344–45, and Plaintiffs' claims "could have been commenced" prior to PROMESA's enactment – or at any time over the last 10 years.

The District Court acknowledged and then proceeded to ignore this fact, placing talismanic significance on "the asserted legal premise underlying" Plaintiffs' claims. ADD16. Since Plaintiffs' asserted claims are allegedly premised on PROMESA itself, the District Court reasoned that Plaintiffs could not

-36-

possibly have raised them before PROMESA was passed. *Id.* However, Plaintiffs should not be permitted to do an end-run around the automatic stay through artifices of pleading. It is entirely appropriate for a court to look beyond the face of a claim to the "objective" of the relief sought to determine whether an action is stayed. *See JPMorgan Chase Bank, N.A. v. Kingman Holdings, LLC*, No. 5:15-CV-144-DAE, 2015 U.S. Dist. LEXIS 169253, at *3–4 (W.D. Tex. Dec. 17, 2015) (staying case where plaintiff's "objective" was to obtain a declaration that its lien was superior). Here, the objective of Plaintiffs' second cause of action is to invalidate the COFINA enabling act, which, not coincidentally, is exactly the relief Plaintiffs seek in their fourth and fifth causes of action. *See* A389–91. Everyone agrees that those claims are stayed and so too should this claim be stayed.

## C. Plaintiffs' Request to Freeze, Garnish, Attach, and Segregate Government Assets for Their Benefit Is an Act to Collect That Is Stayed by Section 405(b)(6) of PROMESA

Section 405(b)(6) of PROMESA stays "any act to collect, assess, or recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of [PROMESA]." 48 U.S.C. § 2194(b)(6). Courts interpreting the reach of Section 362(a)(6) of the Bankruptcy Code have noted that "the word 'collect' is not to be given a narrow, legal-action type of meaning." *In re Guinn*, 102 B.R. 838, 842 (Bankr. N.D. Ala. 1989). "The language in Section 362(a)(6) is extremely broad in scope and encompasses any act to collect a pre-petition claim

-37-

from a debtor" or "any act to collect a claim . . . against the debtor, or against property of the debtor." *Rosas v. Monroe Cty. Tax Claim Bureau (In re Rosas)*, 323 B.R. 893, 898 (Bankr. M.D. Pa. 2004); *In re Holland*, 21 B.R. 681, 687 (Bankr. N.D. Ind. 1982).

In connection with their first cause of action, Plaintiffs request that the Commonwealth "segregate and preserve all funds clawed back, to be clawed back, or available to be clawed back" for the benefit of GO Bondholders. A404. Plaintiffs also seek orders prohibiting the Commonwealth from implementing certain transfers to government entities pursuant to the approved Commonwealth budget for Fiscal Year 2016-2017 and contemplated by PR Act No. 74-2016, to preserve funds for the payment of Plaintiffs' bonds. A404–05. These forms of injunctive relief, which are designed to freeze government assets, garnish funds from third parties, and attach or segregate them for the eventual payment of Plaintiffs' bonds, are "acts to collect" under Section 405(b)(6) of PROMESA.

The same is true of Plaintiffs' second and third causes of action, through which Plaintiffs seek an injunction:

> 1.      prohibiting the diversion of revenues arising from collection of the SUT (or any substitute revenues) to COFINA and requiring the Commonwealth Officer Defendants, in their official capacities as Commonwealth Officers, and the COFINA Defendants to direct such funds to Puerto Rico's Treasury;

-38-

2. directing the COFINA Defendants to transfer any revenues received from the collection of the Commonwealth's SUT in their possession or held on behalf of COFINA to the Commonwealth;

3. directing the Commonwealth Officer Defendants to segregate and preserve such funds arising from collection of the SUT or transferred from the COFINA Defendants; and

4. prohibiting the enforcement of the Moratorium Act and [Executive Order 30] as applied to the Constitutional Debt.

A403–04.[11]

That the funds will not immediately be turned over to Plaintiffs for repayment of their bonds does not take these actions outside the scope of Section 405(b)(6) of PROMESA. "Eventual, or even planned, collection of a debt may constitute a violation of § 362(a)(6)." *Trevino v. HSBC Mortg. Servs., Inc. (In re Trevino)*, 535 B.R. 110, 149 (Bankr. S.D. Tex. 2015); *see also Divane v. A and C Elec. Co., Inc.*, 193 B.R. 856, 860 (N.D. Ill. 1996) ("Section 362(a)(6) . . . does not require that the creditor take some action to obtain possession of or to exercise control over the debtor's property . . . . That is because the aim of Section 362(a)(6) is *not* the protection of the debtor's property as such but rather the protection of the debtor itself." (emphasis in original)). There can be little doubt

---

[11] Plaintiffs' twelfth cause of action pursuant to 42 U.S.C. § 1983 is not a freestanding independent claim against Commonwealth officials, but rather the vehicle by which Plaintiffs seek relief for purported violations of PROMESA, the United States Constitution, and the Puerto Rico Constitution. To the extent the first, second, and third causes of action are stayed, so too must this claim be stayed.

that Plaintiffs will seek to have the attached funds applied to their outstanding bonds as soon as they are able to do so.

The District Court began its analysis by observing that Section 362(a)(6) of the Bankruptcy Code upon which Section 405(b)(6) of PROMESA is based is "very broad," but then proceeded to interpret it narrowly, holding that Section 405(b)(6) did not prohibit Plaintiffs' attempts to freeze, garnish, and attach the sales and use tax revenues at issue in this case, because the District Court found there was no evidence that Plaintiffs sought to "coerce or harass any defendant." ADD17, 19. In support of its erroneous holding, the District Court cited three cases, but none of those cases supports the District Court's interpretation.

*Citizens Bank of Maryland v. Strumpf*, 516 U.S. 16 (1995), is a decision about whether placing an administrative hold on a bank account while the bank seeks relief from the automatic stay to effect a setoff in and of itself constitutes a "setoff" in violation Section 362(a)(7) of the Bankruptcy Code.[12] To the extent *Strumpf* is relevant beyond that specific fact pattern, the Supreme Court's holding with respect to Section 362(a)(6) of the Bankruptcy Code was premised on the fact

---

[12] Numerous courts have questioned whether *Strumpf* has any applicability beyond the narrow "bank dilemma" fact pattern that was before the Supreme Court. *See, e.g.*, *In re Weidenbenner*, 521 B.R. 74, 81 (Bankr. S.D.N.Y. 2014) (noting that "[o]n its face, *Strumpf* is clearly limited to setoff rights" and collecting cases noting its limited application).

that the contents of the debtor's bank account did not actually belong to the debtor. *Id.* at 21. Rather, the Supreme Court observed that the relationship "consists of nothing more or less than a promise to pay, from the bank to the depositor," and the administrative hold was, therefore, "merely a refusal to perform its promise." *Id.* The Supreme Court recognized that if the "bank account [had] consisted of money belonging to the depositor and held by the bank" its decision might well be different. *Id.* Ultimately, the Supreme Court concluded that it could not give an interpretation of Section 362(a)(6) that would proscribe conduct – a temporary refusal of a creditor to pay a debt that is subject to a setoff against a debt owed by the debtor – that is specifically authorized in other places in the Bankruptcy Code. *Id.* No setoff rights are implicated here and the relationship is not one of bank-depositor; Plaintiffs are attempting to gain control over Government assets for future payment on their debt, and *Strumpf* has no relevance to this case.

Equally irrelevant is the court's observation in *Knowles v. Bayview Loan Servicing, LLC (In re Knowles)*, 442 B.R. 150, 160 (B.A.P. 1st Cir. 2011), that a "mere request for payment does not violate the [automatic] stay." The issue in *In re Knowles*, was whether providing a "payoff statement" requested by the debtor, sending a copy of an annual tax statement, or filing of a proof of claim violated the automatic stay. *Id.* Here, Plaintiffs' lawsuit and attempts to have money set aside for eventual payment on their bonds extend far beyond any of the actions – done

-41-

either at the plaintiff's request or in accordance with applicable bankruptcy and tax laws – found to be acceptable in *In re Knowles*.

Finally, at issue in *Morgan Guaranty Trust Company of New York v. American Savings & Loan Association.*, 804 F.2d 1487 (9th Cir. 1986), was whether a note by a bankrupt maker presented for payment by a holder in due course violated Section 362(a)(6) of the Bankruptcy Code. The Ninth Circuit held that "[t]he mere act of presentment does not interfere with orderly administration of the estate, the debtor's 'breathing spell,' or the status quo." *Id.* at 1491. The court refused to characterize presentment as "harassment" where the creditor presented the notes to the payor bank and not the debtor. *Id.*[13] To the extent *Morgan Guaranty Trust Company of New York* is relevant at all, it actually supports application of Section 405(b)(6) of PROMESA to the facts of this case. Plaintiffs cannot deny that Defendants must affirmatively act to defend this action or risk losing the ability to control the use of the SUT revenues. *See id.* (noting that Section 362(a) of the Bankruptcy Code prohibits activities that "require the debtor to act affirmatively to protect its interests").

---

[13] The Ninth Circuit was also influenced by the fact that the Bankruptcy Code was amended to codify case law holding that presentment of negotiable instruments is exempt from the bankruptcy stay. *Id.* at 1490–92.

The District Court was evidently swayed by Plaintiffs' purported

"disclaime[r] [of] any attempt to collect" from the Commonwealth, *see* ADD19,

but Plaintiffs' actions speak louder than their words. It is not surprising that

Plaintiffs do not seek payment now because such a request would squarely fall

within the scope of the PROMESA stay. Instead, Plaintiffs seek to have money set

aside so that it can eventually be used to repay the GO Bonds they hold, but the

delay in payment does not make it any less an "act to collect."

Notably, the District Court previously rejected nearly identical arguments

made by plaintiffs in another PROMESA-stay related case. *See Brigade*

*Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *13,

*70. In *Brigade*, plaintiffs requested declaratory and injunctive relief, alleging,

among other things, that the Moratorium Act and Executive Order 30 are

preempted by Sections 303(1) and 303(3) of PROMESA. The *Brigade* plaintiffs

argued that granting such relief would not diminish the assets available to other

creditors, but the District Court "reject[ed] plaintiffs' attempts to pull the wool

over its eyes" and denied relief from the stay in the consolidated actions. *Id.* at *56

n.11. The District Court explained that "the true harm resulting to plaintiffs from

the continued existence of the challenged provisions of the Moratorium Act and

related Executive Orders is largely (if not purely) pecuniary in nature." *Id.* at *46.

Accordingly, the District Court concluded, plaintiffs' "ultimate aim [was] to obtain

-43-

money judgments against their borrowers or 'to gain an advantage in anticipated

restructuring proceedings.'" *Id.* at *57 n.11. That is exactly the situation that was

before the District Court here.

### D.   Plaintiffs' Request to Freeze, Garnish, Attach, and Segregate Government Assets Is an Act to Exercise Control Over Government Assets That Is Stayed by Section 405(b)(3) of PROMESA

Section 405(b)(3) of PROMESA stays "any act to obtain possession of

property of the Government of Puerto Rico or of property from the Government of

Puerto Rico or to exercise control over property of the Government of Puerto

Rico." 48 U.S.C. § 2194(b)(3). As several courts have observed, and as the

District Court properly found, "[t]o 'exercise control' is 'to exercise restraining or

directing influence over' or 'to have power over.'" *In re Weidenbenner*, 521 B.R.

74, 79–80 (Bankr. S.D.N.Y. 2014) (quoting *Thompson v. GMAC, LLC*, 566 F.3d

699, 702 (7th Cir. 2009)). "Holding onto an asset, refusing to return it, and

otherwise prohibiting a debtor's beneficial use of an asset all fit within this

definition, as well as within the commonsense meaning of the word." *Thompson*,

566 F.3d at 702.

Courts have held that a broad range of actions violate the provisions of

Section 362(a)(3) of the Bankruptcy Code. *See, e.g., In re Weidenbenner*, 521

B.R. 74, 79 (Bankr. S.D.N.Y. 2014) (placing administrative freeze on debtor's

bank account); *Houston Pipeline Co. LP v. Bank of Am., N.A.*, 213 S.W.3d 418,

-44-

427–28 (Tex. Ct. App. 2006) (court order which had the effect of barring creditor from asserting security interest in estate property was an act to exercise control over estate property); *In re Nat'l Cattle Cong., Inc.*, 179 B.R. 588, 597–98 (Bankr. N.D. Iowa 1995) (attempted revocation of debtor's dog racing license); *Southside Leasing Co. v. Merchs. Plaza, Inc. (In re Merchs. Plaza, Inc.)*, 35 B.R. 888, 893–94 (Bankr. E.D. Tenn. 1983) (service of post-petition notices of default, cancellation, and termination of debtor's lease); *see also Thompson*, 566 F.3d at 703 ("[T]he act of passively holding onto an asset constitutes 'exercising control' over it . . .").

It matters not that a party seeks only declaratory or injunctive relief. *In re Jefferson Cty.*, 484 B.R. 427, 446–447 (Bankr. N.D. Ala. 2012) (noting that "[a]ny action that affects property of the debtor in a manner within the automatic stay's sphere, including a declaratory judgment action, is subject to § 362(a)(3)."). "A declaratory judgment action against a debtor is an 'act to . . . exercise control over property of the estate' insofar as it seeks to affect . . . estate property." *Houston Pipeline Co. LP*, 213 S.W.3d at 427 (internal citations omitted).

Here, Plaintiffs seek an order (1) freezing "clawed back" funds and SUT revenues; (2) prohibiting certain transfers pursuant to the budget of the Commonwealth; (3) prohibiting the transfer of funds to COFINA; and (4) requiring COFINA to transfer SUT revenues back to the Commonwealth for Plaintiffs'

-45-

benefit. A404–05. The District Court's unsupported conclusion that an injunction

of this ilk "would not permit [Plaintiffs] to have any possession, influence, or

power over any asset, much less any asset of the Commonwealth" cannot be

reconciled with the allegations in the Second Amended Complaint. ADD23.

If the SUT revenues are property of the Commonwealth as Plaintiffs allege,

Plaintiffs' attempt to attach, garnish, freeze, and segregate those revenues for their

benefit is an act to exercise control over them.[14] Such an injunction would restrain

or direct influence over, have power over, prohibit the beneficial use of, or at a

minimum, have an effect on Government assets, and would interfere with the

Commonwealth's ability to operate during this fiscal crisis, which is precisely what

PROMESA sought to prevent. Regardless of the merits of Plaintiffs' claims, the

mere assertion of these claims is an "act" to exercise control over property of the

Commonwealth that is stayed pursuant to Section 405(b)(3) of PROMESA.

None of the cases relied on by the District Court is analogous to the facts of

this case (*see* ADD23–24), and none supports the District Court's conclusion that

Plaintiffs' claims are not acts to exercise control over the Commonwealth's

property. In *Amplifier Research Corporation v. Hart*, 144 B.R. 693, 695 (E.D. Pa.

---

[14] The same would be true if the SUT revenues are property of COFINA, as the
PROMESA stay applies to COFINA and any act to exercise control over its
property. *See* 48 U.S.C. § 2104(11).

-46-

1992), at issue was whether the bankruptcy stay prevented prosecution of a defamation action, which sought to enjoin further publication of an allegedly libelous report. In *Larami Limited v. Yes! Entertainment Corporation*, 244 B.R. 56, 59–60 (D.N.J. 2000), the district court found that a post-petition patent infringement action was not stayed by Section 362(a) of the Bankruptcy Code, reasoning that the suit sought to enjoin the patent infringing activity, not exercise control over any property. Finally, the issue in *United States v. Inslaw, Inc.*, 932 F.2d 1467, 1471 (D.C. Cir. 1991), was whether the post-petition use of intangible trade secrets in the non-debtor's possession and whose ownership was in dispute amounted to an exercise of control over property of the estate. None of these cases dealt with a situation where a plaintiff was attempting to attach, freeze, garnish, and segregate funds for future application to a pre-petition debt.

**E.    Plaintiffs' Requests to Establish the Priority of Their Alleged Lien and to Freeze, Garnish, Attach, and Segregate SUT Revenue Are Acts to Create, Perfect, or Enforce a Lien That Are Stayed by Sections 405(b)(4) and (b)(5) of PROMESA**

Section 405(b)(4) of PROMESA stays "any act to create, perfect, or enforce any lien against property of the Government of Puerto Rico," and Section 405(b)(5) stays "any act to create, perfect, or enforce against property of the Government of Puerto Rico any lien to the extent that such lien secures a Liability Claim that arose before the enactment of this Act." 48 U.S.C. § 2194(b)(4), (b)(5). The District Court concluded that neither the "injunctive relief sought" nor the

-47-

"mere assertion of the PROMESA counts" constituted an act prohibited by Sections 405(b)(4) and 405(b)(5) of PROMESA. ADD25–26. This is reversible error.

In this case, Plaintiffs are either asking the District Court to declare their alleged lien on SUT revenue superior to the COFINA bondholders' lien and to enter an injunction freezing, garnishing, attaching, or segregating funds for Plaintiffs' benefit (acts to enforce a lien), or seeking a *de facto* judicial attachment of property of the Government of Puerto Rico (an act to create or perfect a lien). In either case, the requested relief falls squarely within the conduct prohibited by Sections 405(b)(4) and (b)(5) of PROMESA.

In interpreting the analogous provisions in Section 362 of the Bankruptcy Code, courts have interpreted the term "act" broadly, finding that freezing assets, seeking a declaration of lien priority, attempting to obtain an attachment, or even, in appropriate circumstances, inaction may be considered an act. *See, e.g., Pereira v. 397 Realty LLC (In re Heavey)*, 549 B.R. 1, 10 (Bankr. E.D.N.Y. 2016) ("For purposes of § 362 the Second Circuit has interpreted 'act' broadly, and it is well established that an 'act' for purposes of a § 362(a)(4) violation need not be significant, or even be an "act" at all."); *JPMorgan Chase Bank, N.A.*, 2015 U.S. Dist. LEXIS 169253, at *3–4 (action to obtain a declaration that its lien in the debtor's real property was superior to that held by another party); *B.F. Goodrich*

-48-

*Emps. Fed. Credit Union v. Patterson (In re Patterson)*, 967 F.2d 505, 512 (11th

Cir. 1992) (freezing of assets by a creditor); *Jeffries v. Browning (In re Reserves*

*Dev. Corp.)*, 78 B.R. 951, 957–58 (W.D. Mo. 1986) (prejudgment attachment); *In*

*re Bellman Farms, Inc.*, 86 B.R. 1016, 1020 (Bankr. D.S.D. 1988) (even where no

procedure required for state to create or perfect tax lien other than delivery of tax

list to county treasurer with warrant of county auditor, lien is prohibited by

Section 362(a)(4)).

A broad reading of "act" under Sections 362(a)(4) and (a)(5) of the

Bankruptcy Code – and, by extension, Sections 405(b)(4) and (b)(5) of PROMESA

– is essential to ensure that creditors are not able to use the judicial process to

obtain an advantage over other similarly situated creditors. *See United States v.*

*Gold (In re Avis)*, 178 F.3d 718, 722–23 (4th Cir. 1999) (broad interpretation of

"act" for purposes of § 362(a)(5) appropriate; "chief aim of § 362(a)(5) . . . is to

prevent the post-petition perfection of interests in a debtor's bankruptcy estate.");

*Landmark v. Schaefbauer*, 41 B.R. 766, 768 (Bankr. D. Minn. 1984) ("Congress's

main concern in enacting Section 362(a)(4) was to prevent the post-petition

creation of liens against property of the estate, so the status quo of creditors'

security and priority would be preserved pending administration of the bankruptcy

estate and allowance of the debtors' claim of exemption.").

-49-

Plaintiffs allege – and Defendants dispute – that Plaintiffs have a "first lien" and priority over all Commonwealth expenditures. All of Plaintiffs' claims are premised on the alleged constitutional priority of their purported lien over "available resources" which, Plaintiffs contend, includes the SUT revenue. Thus, to grant Plaintiffs the relief they request, the District Court must determine the extent of that alleged lien and whether it extends to the SUT revenue that has been assigned to COFINA. (*See* A447 (arguing that "clarifying that the SUT revenues purportedly assigned to COFINA remain 'available resources' would establish that these funds are subject to the Constitutional Debt's constitutional lien and first-priority claim, and that—at the very least—any interest COFINA may have in these funds is junior to that of holders of the Constitutional Debt.").) Seeking such a determination of its lien priority is unquestionably an act to enforce a lien. *See JPMorgan Chase Bank, N.A.*, 2015 U.S. Dist. LEXIS 169253, at \*3–4 (seeking declaration of lien priority in estate property stayed pursuant to Section 362(a)(5) of the Bankruptcy Code); *Houston Pipeline Co. LP*, 213 S.W.3d at 428 (holding that a determination as to the priority of security interests in estate property was an act to enforce a lien).

Moreover, Plaintiffs also ask the District Court to freeze "clawed back" funds and certain funds slated for transfer pursuant to the Commonwealth's 2017 budget, and seek an order attaching or garnishing SUT revenues received by

-50-

COFINA and directing that those revenues be turned over to the Commonwealth's treasury and segregated for the payment of Plaintiffs' bonds. To the extent Plaintiffs have an existing first priority lien on SUT revenues and other funds, their request that Commonwealth assets be turned over to the Commonwealth's Treasury or garnished, frozen, or segregated so that Plaintiffs can eventually liquidate their security interest is an act to enforce their lien.

To the extent Plaintiffs do not have a lien on SUT revenues, which pursuant to applicable law are ordinarily transferred to third parties for the eventual payment of COFINA bonds, Plaintiffs' attempt to attach or garnish these funds, in which COFINA may have an interest, and hence gain a priority interest over them, is "an act to 'create' or 'perfect' a lien on this property." *See In re Reserves Dev. Corp.*, 78 B.R. at 958 (holding that "[t]he net effect of [a prejudgment] attachment would be to create a lien on the property and give appellants a priority interest over any intervening creditor pending the outcome of the pending state court action.").

The District Court's conclusion that the mere assertion of the PROMESA Claims does not affect the Commonwealth's property interest "at this juncture" misses the point of Sections 405(b)(4) and (b)(5). What is important is what Plaintiffs are attempting to do: Obtain a declaration that determines Plaintiffs' alleged lien priority in the SUT revenues and an injunction that freezes, garnishes, attaches, and segregates those revenues for their benefit. If successful, those

-51-

attempts would unquestionably affect the Commonwealth's property interests, and they are, therefore, acts to create, perfect, or enforce a lien.[15]

## III. The District Court Improperly Denied the Oversight Board's Motion to Stay the Entire Action

It is well established that "federal district courts possess the inherent power to stay pending litigation." *Marquis v. F.D.I.C.*, 965 F.2d 1148, 1154 (1st Cir. 1992). In deciding whether to stay a case, a district court must analyze and balance the competing interest of the parties to determine whether a stay is appropriate. *See Landis v. N. Am. Co.*, 299 U.S. 248, 254–55 (1936); *Kansas City S. Ry. Co. v. United States*, 282 U.S. 760, 763–64 (1931). The District Court, however, did not perform this careful balancing test. Instead, the District Court denied the Oversight Board's and the Commonwealth Defendants' stay motions based solely on the fact that, in its view, four of the causes of action were not explicitly covered by Section 405(b) of PROMESA. ADD26–27. This was an abuse of the District Court's discretion.

---

[15] Equally misplaced is the District Court's conclusion that Plaintiffs' PROMESA Claims "do not seek any form of payment from the Commonwealth." ADD26. In fact, that is exactly what they seek, albeit in the future. As the District Court recognized in another context, a creditor's "ultimate aim is to obtain money judgments against their borrowers or 'to gain an advantage in anticipated restructuring proceedings.'" *Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *57 n.11.

The unprecedented fiscal crisis facing the Commonwealth and Congress'
clear intention in staying litigation against the Commonwealth, its
instrumentalities, and its public officials for a short period of time to allow for a
"breathing spell" are well documented and not in dispute. *See* 48 U.S.C.
§§ 2194(m), (n). Ongoing litigation has been and continues to be a major
distraction that interferes with the Oversight Board's congressional mandate to
oversee a "fair and orderly" restructuring of the Commonwealth's debt.[16] That is
especially so now that, after weeks of negotiations, the Oversight Board has
certified the Commonwealth's fiscal plan. The parties may now focus their
energies on negotiations against the backdrop of that fiscal plan. These last few
weeks of the PROMESA stay will be extremely intense and pressing times for the
parties. The Oversight Board believes that its and the Commonwealth's limited

---

[16] Moreover, allowing Plaintiffs to proceed under Section 204(c)(3)(A) of
PROMESA would also interfere with the Oversight Board's ability to do its job.
The Oversight Board is now up and running, and should be given the opportunity
to exercise its sole discretion to review and, if appropriate, rescind any offending
laws pursuant to Section 204(c)(3)(B) of PROMESA. 48 U.S.C. § 2144(c)(3);
*see Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS
158046, at *62 (noting that the Oversight Board may "unilaterally dismantle" any
offending provisions of the Moratorium Act and the challenged executive orders
"by exercising its 'sole discretion' to rescind any law that 'alters pre-existing
priorities of creditors in a manner outside the ordinary course of business or
inconsistent with the territory's constitution or the laws of the territory.'").

resources are better spent working together and negotiating with creditors, rather than defending this case.

None of the Plaintiffs would suffer irreparable or even material harm if the action were stayed in its entirety. *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989) ("[I]f money damages will fully alleviate harm, then the harm cannot be said to be irreparable."). There are multiple provisions in PROMESA that protect Plaintiffs' interests during the duration of any stay. *See* 48 U.S.C. §§ 2194(k), (l), 2195(a); *Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *49 (observing that PROMESA contains provisions designed to protect creditors during the pendency of the PROMESA stay).

Currently-due payments will not be made now, but the SUT revenue stream (allegedly $51 billion over the next 40 years (*see* A465)) that Plaintiffs claim secures their GO Bonds will still be available for future payments under potential future modifications to the certified fiscal plan or in future proceedings under PROMESA. *See Brigade Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at *48–49 (noting that any "financial harm [to plaintiffs] could effectively be dealt with through the voluntary negotiations process fostered by PROMESA and supervised by the Oversight Board, or through future title III restructuring proceedings.").

Allowing the Oversight Board to undertake its statutory duty is in the public interest and outweighs any potential monetary harm the Plaintiffs may suffer as a result of the stay. *See Landis v. N. Am. Co.*, 299 U.S. at 256 ("Especially in cases of extraordinary public moment, the individual may be required to submit to [a limited] delay . . . if the public welfare or convenience will thereby be promoted."). The District Court should have exercised its inherent power to stay this entire action so that the Oversight Board could concentrate on fiscal plans and capital market strategy instead of on this litigation.

Even if the District Court were correct that the PROMESA Claims are technically not covered by the explicit terms of PROMESA, this would not be an impediment to the District Court exercising its inherent discretion. Indeed, in the bankruptcy context, courts routinely use their discretionary power to extend the automatic stay to actions that are expressly not covered by the automatic stay. *See, e.g., Monarch Life Ins. Co. v. Ropes & Gray*, 65 F.3d 973, 978–79 (1st Cir. 1995) (noting a bankruptcy court's power to enjoin actions proceeding against non-debtors); *Austin v. Unarco Indus., Inc.*, 705 F.2d 1, 5 (1st Cir. 1983) (noting the Court's authority to "stay . . . proceedings in the interest of judicial economy and fairness to the parties"), *cert. dismissed*, 463 U.S. 1247 (1983).

Moreover, Congress clearly envisioned that the District Court might be called upon to determine if cases that fall outside of the strict confines of Section

-55-

405(b) of PROMESA nonetheless ought to be stayed. Section 212 of PROMESA

specifically authorizes the Oversight Board to seek "a stay of litigation."

48 U.S.C. § 2152(b)(1). That Section 212 of PROMESA does not create an

independent basis to grant a stay of litigation simply means that the District Court

must balance the equities to determine whether a stay is appropriate.

Here, the District Court failed to conduct the required balancing test.

Indeed, it does not appear that the District Court even considered the Oversight

Board's arguments with respect to the disruption that this litigation has had and

will continue to have on the Oversight Board and the Commonwealth. The District

Court held that allowing the litigation to proceed would not "spurn" congressional

intent, but in other PROMESA-stay related litigation, the District Court agreed that

the creditors' "ultimate aim is to obtain money judgments against their borrowers

or 'to gain an advantage in anticipated restructuring proceedings.'" *Brigade*

*Leveraged Capital Structures Fund Ltd.*, 2016 U.S. Dist. LEXIS 158046, at \*57

n.11. Allowing Plaintiffs to pursue their claims now "would, in essence, permit

them to 'jump to the front of the line' to protect their own interests before other

creditors have had the opportunity to defend theirs," would "work against a

comprehensive restructuring that is fair and equitable to all stakeholders," and

would "frustrate Congress' intent in designing PROMESA." *Id.* at \*55, \*57 n.11.

## CONCLUSION

For the foregoing reasons, the Court should reverse the Decision and stay the

action.

Dated:       March 15, 2017             Respectfully submitted,

                                        LUSKIN, STERN & EISLER LLP

                                        /s/ Michael Luskin
                                        Michael Luskin (Bar # 1177315)
                                        Stephan E. Hornung (Bar # 1177316)
                                        Eleven Times Square
                                        New York, New York 10036
                                        Phone:  (212) 597-8200
                                        Fax:  (212) 974-3205
                                        luskin@lsellp.com
                                        hornung@lsellp.com

                      *Attorneys for Intervenor-Appellant*
          *Financial Oversight and Management Board for Puerto Rico*

## CERTIFICATE OF COMPLIANCE

1.    This brief complies with the type-volume limitation provided in Federal Rule of Appellate Procedure 32(a)(7)(B) . The brief contains 12,980 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f).

2.    This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type styles requirement of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman type.

Executed:    New York, New York
               March 15, 2017

                            /s/ Michael Luskin
                            Michael Luskin

                            *Attorney for Intervenor-Appellant*
                            *Financial Oversight and Management Board*
                            *for Puerto Rico*

# ADDENDUM

# TABLE OF CONTENTS

**Page**

Opinion and Order of the Honorable Francisco A. Besosa, filed
February 17, 2017 .......................................................................... ADD1

The Puerto Rico Oversight, Management, and Economic Stability
Act, Pub. L. No. 114-187, § 405, 48 U.S.C. § 2194 ...................... ADD42

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 105 of 447 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 1 of 41

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

LEX CLAIMS, LLC, *et al.*,

    **Plaintiffs,**

        **v.**

ALEJANDRO GARCIA-PADILLA, *et al.*,

    **Defendants.**

**Civil No.** 16-2374 (FAB)

### OPINION AND ORDER

BESOSA, District Judge.

    This action arises from the Commonwealth of Puerto Rico (the "Commonwealth")'s default on general obligation bonds ("GO bonds"). Plaintiffs ("GO Bondholders") are beneficial owners of GO bonds. The GO Bondholders filed suit against the Commonwealth, the Governor of the Commonwealth, the Secretary of the Treasury of the Commonwealth, the Director of the Office of Management and Budget of the Commonwealth, the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Executive Director of COFINA, and the

ADD1

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 2 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 2 of 41

---

Civil No. 16-2374 (FAB)                                                    2

---

Bank of New York Mellon Corporation (collectively "defendants").[1]
Among other things, the GO Bondholders seek declaratory and
injunctive relief pursuant to the Puerto Rico Oversight
Management, and Economic Stability Act ("PROMESA"). 48 U.S.C. §
2121 *et seq*.

Before the Court are six motions: (1) the Commonwealth and
COFINA defendants' motion to stay the action in its entirety
pursuant to section 405 of PROMESA (Docket No. 106);[2] (2) the
Financial Oversight and Management Board for Puerto Rico
("Oversight Board")'s motion to intervene pursuant to PROMESA and
Fed.R.Civ.P. 24 (Docket No. 62); (3) Ambac Assurance Corporation
("Ambac")'s motion to intervene as a defendant pursuant to
Fed.R.Civ.P. 24, and to stay this action pursuant to PROMESA
(Docket No. 55); (4) the COFINA Senior Bondholders motion to

---

[1] The Court will refer to the Commonwealth, the Governor of the
Commonwealth, the Secretary of the Treasury, and the Director of
the Office of Management and Budget as the "Commonwealth
defendants." COFINA, the Executive Director of COFINA, and the
Bank of New York Mellon will together be referred to as the "COFINA
defendants." Furthermore, the second amended complaint named
"Bank of New York Mellon Corporation" as defendant. (Docket.
No. 78.) The Court granted Bank of New York Mellon's uncontested
motion to change the captioned name to "The Bank of New York
Mellon, as indenture trustee" ("BNYM Trustee"). (Docket Nos. 118
and 135.)

[2] BNYM Trustee moved to join the Commonwealth defendant's motion
to stay. (Docket No. 134.) The Court granted the motion to join.
(Docket No. 135.)

ADD2

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-... Document 184 ... Filed 02/17/17 Page 3 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 3 of 41

Civil No. 16-2374 (FAB)                                            3

intervene pursuant to Fed.R.Civ.P. 24 (Docket No. 50); (5) Puerto

Rico-based funds (the "Puerto Rico Funds")'s motion to intervene

pursuant to Fed.R.Civ.P. 24 (Docket No. 95); and (6) the Major

COFINA    Bondholders'    motion    to    intervene    pursuant    to

Fed.R.Civ.P. 24 (Docket No. 113).  The GO Bondholders have opposed

all motions (Docket Nos. 87, 93, 110, 127, 145, 146, 155 and 166)

and each movant, except the Oversight Board, has filed a reply

(Docket Nos. 94, 133, 157, 159 & 170.)

     The Court has considered the submissions filed in support of,

and in opposition to, each of the pending motions.  For the reasons

set forth below, the Court **DENIES** the defendants' motion to stay

(Docket No. 106), and the Senior COFINA Bondholder's motion to

intervene (Docket No. 50), and **GRANTS** the motions to intervene of:

the Oversight Board (Docket No. 62), Ambac (Docket No. 55), the

Puerto Rico Funds (Docket No. 95), and the Major COFINA Bondholders

(Docket No. 113).

**I.    BACKGROUND**

     The GO Bondholders are "beneficial owners" of GO bonds.

(Docket No. 78 at p. 4.)  GO bonds are issued by the Commonwealth

and backed by a pledge of the Commonwealth's good faith, credit,

and taxing power.  Id.  The GO Bondholders define GO bonds as

"constitutional debt" because Article VI, Section 8 of the Puerto

Rico Constitution declares that if "available resources" are

ADD3

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 189 of 85 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 4 of 41

Civil No. 16-2374 (FAB)                                                    4

insufficient to finance the Commonwealth's obligations, "interest
on the public debt and amortization thereof shall first be paid,
and other disbursements shall thereafter be made in accordance
with the order of priorities established by law." Id. (citing
P.R. Const. Art. VI, Sec. 8.)

According to the GO Bondholders, the Commonwealth's
obligation to pay GO bonds takes precedence over competing
financial obligations, including obligations on bonds issued by
COFINA, an instrumentality of the Commonwealth government. Id. at
p. 8. These COFINA bonds are secured by, and payable from, a
percentage of the revenues the Commonwealth collects from its Sales
and Use Tax, known in Spanish as the Impuesto sobre Ventas y Uso
("IVU"). Id. The GO Bondholders allege that because IVU revenues
constitute "available resources" within the meaning of Article VI,
Section 8, these revenues must first satisfy GO Bond obligations,
not COFINA bond obligations. Id.

**A.    PROMESA**

On June 30, 2016, President Obama signed PROMESA into
law. PROMESA seeks to address the dire fiscal emergency in Puerto
Rico, and sets forth "[a] comprehensive approach to [Puerto Rico's]
fiscal, management and structural problems and [. . .] a Federal
statutory authority for the Government of Puerto Rico to
restructure debts in a fair and orderly process." PROMESA

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 190 of 447 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 5 of 41

Civil No. 16-2374 (FAB)                                                        5

§ 405(m)(4).  PROMESA establishes a seven-member Oversight Board
for Puerto Rico.  Id. §§ 101(b)(1), (e)(1)(A).  "The purpose of
the Oversight Board is to provide a method for [Puerto Rico] to
achieve fiscal responsibility and access to the capital markets."
Id. § 101(a).  The Oversight Board operates as an entity within
the Government of Puerto Rico, id. § 101(c), and is given broad
authority over the Commonwealth and any of its instrumentalities
that the Board designates as "covered" instrumentalities, id.
§ 101(d)(1).  For instance, the Oversight Board has the authority
to develop, review, and approve territorial and instrumentality
fiscal plans and budgets, id. §§ 201-202; to enforce budget and
fiscal plan compliance, id. §§ 203-204; to seek judicial
enforcement of its authority to carry out its responsibilities
under PROMESA, id. § 104(k); and to intervene in any litigation
filed against the Commonwealth or its instrumentalities, id.
§ 212.  All members of the Oversight Board were appointed on
August 31, 2016.

        Among PROMESA'S provisions is an automatic stay of all
debt-related litigation against the Commonwealth, which was or
could have been commenced before the statute's enactment.  PROMESA
§ 405(b).  Congress deemed that component of the legislation
"essential to stabilize the region for the purposes of resolving"
the Commonwealth's financial crisis.  Id. § 405(m)(5).  The stay

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 6 of 41 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 6 of 41

Civil No. 16-2374 (FAB)                                                      6

is designed to "allow the Government of Puerto Rico a limited
period of time during which it can focus its resources on
negotiating a voluntary resolution with its creditors instead of
defending numerous, costly creditor lawsuits." Id. § 405(n)(2).
The stay also helps "to ensure all creditors have a fair
opportunity to consensually renegotiate terms of repayment" and
allows the Oversight Board time "to determine whether to appear or
intervene on behalf of the Government of Puerto Rico in any
litigation." Id. § 405(m)(5)(B), (A). Congress indicated that by
serving these important purposes, PROMESA's automatic stay was
ultimately intended to "benefit the lives of 3.5 million American
citizens living in Puerto Rico." Id. § 405(n)(5).

The automatic stay, however, is "limited in nature,"
PROMESA § 405(m)(5)(B), and remains in effect until the earlier of
(1) February 15, 2017, with a possible extension of sixty or
seventy-five days, or (2) the date on which the Oversight Board
files a petition on behalf of the Government of Puerto Rico or any
of its instrumentalities to commence debt-adjustment proceedings

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 192 of 841 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 7 of 41

Civil No. 16-2374 (FAB)                                                    7

pursuant to Title III of PROMESA.[3] Id. § 405(d). The Court may,

however, grant relief from the stay to "a party in interest" either

"for cause shown," or "to prevent irreparable damage" to the

party's interest in property. Id. § 405(e)(2), (g).

### B.    The Moratorium Act and Executive Order 30

On April 6, 2016, the Commonwealth enacted the Puerto

Rico Emergency Moratorium and Financial Rehabilitation Act

("Moratorium Act").[4]   The Commonwealth acknowledged that the

ongoing financial crisis had been brought to a "perilous tipping

point." Moratorium Act, Stmt. of Motives. § A.  The Moratorium

Act aims to provide the Commonwealth with the "tools" it needs "to

continue providing essential services to the people" of the

Commonwealth despite insufficient "resources to comply with debt

service obligations as originally scheduled." Id.  To that end,

the Moratorium Act empowers the Governor to issue executive orders

---

[3] PROMESA's automatic stay expires by its own terms on the earlier
of those dates.  On February 14, 2017 the Oversight Board extended
the stay for an additional 75 days.  Letter From the Board to
Governor Ricardo Rossello Regarding the Extension of PROMESA Stay,
February 14, 2017, https://juntasupervision.pr.gov/index.php/en/
documents/ (last visited Feb. 17, 2017).  The stay will remain in
effect until May 1, 2017.

[4] On January 27, 2017 Governor Ricardo Rosello signed the Puerto
Rico Financial Emergency and Fiscal Responsibility Act of 2017.
This legislation repeals the "emergency periods" that initiated
the debt moratorium and litigation stay set forth in the previous
administration's Moratorium Act. Stmt. of Intent p. 41.

(1) declaring a "state of emergency" with respect to the
Commonwealth or its instrumentalities, and (2) suspending payment
of principal and interest on "covered obligations," during a
"covered period" through January 31, 2017.  Moratorium Act §§
103(m), 201(a). It also authorizes the Governor to "expropriat[e]
property or rights in property interests" and to suspend or modify
any statutory or other obligation to transfer money for the payment
of, or to secure, any covered obligation, so that instrumentalities
subject to the Moratorium Act are able to pay for "essential
services." Id. §§ 201(b), (d)(ii).

Immediately following the enactment of PROMESA, former
Governor of Puerto Rico Alejandro Garcia-Padilla issued Executive
Order 2016-30 ("Executive Order 30") pursuant to the authority
invested in him by the Moratorium Act. (Docket No. 78 at p. 5.)
In fact, on the same day of PROMESA's enactment, Executive Order 30
suspended the Commonwealth's obligation to make payments on bonds
or notes issued or guaranteed by the Commonwealth, other than
payments to the Government Development Bank ("GDB"). Id.
Essentially, Executive Order 30 halted payments on GO bonds. Id.

On July 1, 2016, the Commonwealth defaulted on $817
million in GO bond payments (Docket No. 78 at p. 26.)  The GO
Bondholders commenced this case on July 20, 2016 by filing a

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 9 of 41 Entry ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 9 of 41

complaint (Docket No. 1), which they subsequently amended twice
(Docket Nos. 25 and 78.)

### C. The Second Amended Complaint

The first two renditions of the GO Bondholders'
complaint set forth two causes of action arising under PROMESA to
challenge Executive Order 30, the Commonwealth's failure to
allocate funds for future GO bond obligations, and legislation
diverting funds to the GDB.[5] (Docket Nos. 1 and 25.) The GO
Bondholders alleged that the Commonwealth defendants violated
sections 204(c)(3) and 207 of PROMESA.[6] Id. The Commonwealth
defendants filed a motion to stay pursuant to section 405 of
PROMESA. (Docket No. 26.) The Court denied this motion. (Docket
No. 32.) The Commonwealth defendants then filed a motion for

---

[5] The complaint and the amended complaint asserted only one
substantive cause of action. The second count of the complaint
and the amended complaint simply sought relief from the debt-
litigation stay.

[6] Section 204(c)(3) of PROMESA provides that after PROMESA's
enactment and before the complete appointment of the Oversight
Board, the Commonwealth "shall not enact new laws that either
permit the transfer of any funds or assets outside the ordinary
course of business or that are inconsistent with the constitution
or laws of the territory." Section 207 of PROMESA states that
"[f]or so long as the Oversight Board remains in operation, no
territorial government may, without the prior approval of the
Oversight Board, issue debt or guarantee, exchange, modify,
repurchase, redeem, or enter into similar transactions with
respect to its debt."

ADD9

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:3:16-cv-02374-FAB Document 221 Filed 03/15/17 Page 195 of 385 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 10 of 41

Civil No. 16-2374 (FAB)                                                    10

reconsideration, which the Court also denied. (Docket Nos. 34 and 75.)

        With the Court's leave, the GO Bondholders later filed a second amended complaint. (Docket No. 78.) The second amended complaint set forth an additional twelve counts, and named additional defendants, including the COFINA defendants. (Docket No. 78.) The GO Bondholders concede that with the exception of the first, second, third, and twelfth counts (the "PROMESA counts"), the second amended complaint is subject to the section 405 debt-litigation stay of PROMESA. (Docket No. 39 at p. 2.)

        The first count of the second amended complaint is substantively the same as that of the amended complaint, and names only the Commonwealth defendants. The second, third and twelfth counts assert causes of action against both the Commonwealth and the COFINA defendants pursuant to various provisions of PROMESA.

        The second count alleges that Executive Order 30 is preempted by § 303(3) of PROMESA, which states:

>        [U]nlawful executive orders that alter, amend, or modify rights of holders of any debt of the territory or territorial instrumentality, or that diverts funds from one territorial instrumentality to another or to the territory, shall be preempted by this Act.

        After PROMESA's enactment and pursuant to Executive Order 30, the Commonwealth defaulted on payments to GO Bondholders. (Docket No. 78 at 51.) The Commonwealth, however, continued to

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 11 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 11 of 41

---

Civil No. 16-2374 (FAB)                                                11

fund COFINA with IVU revenues. Id. In so doing, the GO Bondholders

allege the Commonwealth "impair[ed] their right to receive payment

before the Commonwealth may use funds for any other purpose." Id.

The GO Bondholders request that the Court declare that Executive

Order 30 is unlawful, and grant injunctive relief.[7] Id. at p. 67.

The third count challenges the legality of the

Commonwealth's Moratorium Act pursuant to section 303(1) of

PROMESA. Id. at p. 52. Section 303(1) states that:

> A territory law prescribing a method of composition
> of indebtedness or a moratorium law, but solely to the
> extent that it prohibits the payment of principal or
> interest [. . .] may not bind any creditor of a covered
> territory that does not consent to the composition or
> moratorium.

Because the Moratorium Act "purports to prohibit the

payment" on GO bonds without first obtaining creditor consent, the

GO Bondholders allege that the Moratorium Act runs afoul of

section 303(1). Id. The GO Bondholders request a declaration

---

[7] The forms of injunctive relief the GO Bondholders seek in
connection with the PROMESA counts include: (1) a prohibition of
the enforcement of Executive Order 30 and the Moratorium Act; (2)
a prohibition of the diversion of IVU revenues to COFINA; (3) a
requirement that COFINA transfer IVU revenues to the Commonwealth;
(4) a requirement that the Commonwealth preserve and segregate
funds transferred from COFINA; (5) a prohibition of the
implementation of "outsized transfers" to public employee pension
funds, and the diversion of funds to the GDB; and (6) a requirement
that the Commonwealth segregate and preserve "all funds clawed
back, to be clawed back, or available to be clawed back" for the
purpose of paying Constitutional debt. (Docket No. 78 at pp. 49-
50, 66-69.)

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:Doc:16-ent:004747544544 document:214 file:date:04/10/06/103/Page:197 of 285 y ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 12 of 41

Civil No. 16-2374 (FAB)                                    12

that the Moratorium Act cannot bind them without their consent,
and injunctive relief. Id. at p. 67.

          Lastly, the twelfth count alleges that the Commonwealth
and COFINA defendants have violated 42 U.S.C. § 1983[8] insofar as
they have deprived the GO Bondholders "of rights, privileges, and
immunities secured by the laws of the United States," namely,
PROMESA.

          The Court will first address whether the debt-litigation
stay pursuant to section 405 of PROMESA is applicable, and will
then address the pending motions to intervene.

## II.  The Motion to Stay Pursuant to Section 405 of PROMESA

          Section 405(b) of PROMESA stays lawsuits that are "with
respect to a Liability" if those lawsuits fall within one of the
categories listed in subsections (b)(1) through (b)(7). PROMESA
§ 405(b).  Here, defendants argue that the PROMESA Counts are
stayed by sections 405(b)(1), (b)(6), (b)(3), (b)(4) and (b)(5) of
PROMESA.

---

[8] 42 U.S.C. 1983 provides that "[e]very person who, under color of
any statute, ordinance, regulation, custom, or usage of any [. . .]
Territory [. . .] subjects, or causes to be subjected, any citizen
of the United States or other person within the jurisdiction
thereof to the deprivation of any rights, privileges, or immunities
secured by the Constitution and laws, shall be liable to the party
injured in an action at law, suit in equity, or other proper
proceeding for redress."

Case:17-03283-LTS  Doc#:4606-7  Filed:01/02/19  Entered:01/02/19 16:23:38  Desc: H
Case: 17-1241Case:3:16-cv-02374-FABe:Document 184tionFiled:02/17/17 Page 13 of 415y ID: 6076220

Case 3:16-cv-02374-FAB  Document 184  Filed 02/17/17  Page 13 of 41

Civil No. 16-2374 (FAB)                                                    13

        Section 405 of PROMESA was patterned on the automatic stay
provision of the United States Bankruptcy Code, 11 U.S.C. § 362.
Indeed, the two provisions are nearly identical.  Thus, the Court
looks to how courts have interpreted section 362 in the bankruptcy
context for guidance in deciding whether the PROMESA counts are
stayed by section 405.

        In  the  bankruptcy  context,  the  automatic  stay  becomes
operative  upon  the  filing  of  a  bankruptcy  petition,  and  "is
extremely broad in scope," applying "to almost any type of formal
or  informal  action  taken  against  the  debtor."    Montalvo  v.
Autoridad  de  Acueductos  y  Alcantarillados,  537  B.R.  128,  140
(Bankr. D.P.R. 2015) (citing Alan N. Resnick & Henry J. Sommer, 3
Collier on Bankruptcy ¶ 362.03 (16th ed. 2015)).  The automatic
stay,  however,  "is  not  all  encompassing."    E.g.,    Rodriguez  v.
Biltoria Realty LLC, 203 F. Supp. 2d 290, 291 (E.D.N.Y. 2002)
(holding that automatic stay did not preclude victims from suing
manufacturer for claims stemming from a post-petition accident).
For instance, "proceedings or claims arising post-petition are not
subject to the automatic stay."   In re Gull Air, Inc., 890 F.2d
1255, 1263 (1st. Cir. 1989) (action to reallocate airport arrival
slots  not  subject  to  section  362  stay  because  the  claims  arose
post-petition).

ADD13

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-rev-DOCT48 13ef-FArdocumentage 33ation Filed: 0381415/130 Fage 199 of Entry ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 14 of 41

Civil No. 16-2374 (FAB)                                                      14

With this framework in mind, the Court now turns to the merits of defendants' arguments in support of a stay.

**A.    Section 405(b)(1) of PROMESA**

Section 405(b)(1) of PROMESA stays "actions or proceedings against the Government of Puerto Rico that w[ere] or could have been commenced before the enactment of [PROMESA]." It also stays judicial actions "to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of [PROMESA]." Id.

In an earlier opinion, the Court held that count one of the amended complaint, which is substantively identical to count one of the second amended complaint, does not fall into either of the two types of judicial actions stayed by section 405(b)(1) of PROMESA. (See Docket No. 32.) In relevant part, the Court reasoned that "[p]laintiffs could not have commenced this lawsuit before PROMESA's enactment because their claims are to enforce provisions of PROMESA by challenging conduct that occurred after PROMESA's enactment." Id. The Court further reasoned that count one did not assert a right to recover a "Liability Claim" inasmuch as it did "not seek to recover a right to payment that arose before PROMESA's enactment." Id.

The Commonwealth and COFINA defendants now argue that because the GO Bondholders have asserted numerous causes of action

ADD14

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cv-02374-FAB Document 237 Filed 02/17/17 Page 100 of 185 ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 15 of 41

Civil No. 16-2374 (FAB)                                                 15
_____

in the second amended complaint which they concede are stayed,

this entire action should be stayed because section 405(b)(1) of

PROMESA does not stay particular causes of action, but "actions or

proceeding[s]." (See Docket No. 84.) The Court is not persuaded.

        Courts interpreting section 362 of the Bankruptcy Code

have observed that each claim in an action must be analyzed

separately for purposes of determining whether that particular

claim is subject to an automatic stay. See, e.g., Mar. Elec. Co.

v. United Jersey Bank, 959 F.2d 1194, 1204 (3d Cir. 1991)

("Multiple claim and multiple party litigation must be

disaggregated so that particular claims [. . .] are treated

independently when determining which of their respective

proceedings are subject to the bankruptcy stay."); In re Mid-Atl.

Handling Sys., LLC, 304 B.R. 111, 128 (Bankr. D.N.J. 2003)

("Especially in multiple claim and multiple party litigation, it

is the function of the court to analyze each claim independently

in determining whether the automatic stay should apply to that

particular claim."). Interpreting section 405(b)(1) of PROMESA in

a manner consistent with how other courts have interpreted the

analogous stay provision of the Bankruptcy Code compels the Court

to conclude that merely because some counts in the second amended

complaint are stayed, it does not necessarily follow that all

counts in the second amended complaint are stayed.

ADD15

Civil No. 16-2374 (FAB)                                                    16

      Invoking section 405(b)(1) of PROMESA, defendants further argue that counts two and three are stayed "for the independent reason that they could have been brought long before the enactment of PROMESA." (Docket No. 84 at 7.) In so doing, they argue that these counts do not actually arise under PROMESA, but present a constitutional challenge to COFINA because resolution of these claims would ultimately require a determination as to whether IVU revenues assigned to COFINA constitute "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution. (Docket No. 84 at pp. 7-8.) Defendants' argument is unpersuasive because it is based on a misinterpretation (or mischaracterization) of what the GO Bondholders have actually pled.

      While counts two and three certainly implicate the lawfulness of the Commonwealth's assignment of IVU revenues to COFINA, the asserted legal premise underlying these counts is that Executive Order 30 and the Moratorium Act are preempted by sections 303(1) and 303(3) of PROMESA. The GO Bondholders could not have possibly raised these claims prior to the enactment of PROMESA because they seek to enforce a specific provision of PROMESA. Accordingly, there is no basis to hold that counts two and three are stayed pursuant to section 405(b)(1) of PROMESA.

Civil No. 16-2374 (FAB)                                                    17

**B.    Section 405(b)(6) of PROMESA**

Section 405(b)(6) of PROMESA stays "any act to collect,
assess, or recover a Liability Claim against the Government of
Puerto Rico that arose before" PROMESA's enactment.  A Liability
Claim is defined as a "right to payment" or "right to an equitable
remedy for breach of performance if such breach gives rise to a
right to payment."  PROMESA § 405(a)(2).  According to defendants,
the PROMESA counts are stayed by section 405(b)(6) because the
forms of injunctive relief which the GO Bondholders seek through
the PROMESA counts "are designed to freeze government assets,
garnish the same from third parties, and attach or segregate them
for the eventual payments of plaintiffs' bonds."  (Docket No. 84
at pp. 9-10.)  Thus, defendants assert that the forms of injunctive
relief sought in these claims "are 'acts to collect.'"  Id.  The
Court disagrees.

Section 362(a)(6) of the Bankruptcy Code, the provision
after which section 405(b)(6) of PROMESA was modeled, "is very
broad."  E.g., In re Claudio, No. 11-02792, Adv. No. 11-00237,
2012 Bankr. LEXIS 5041, at *8 (D.P.R. Oct. 25, 2012) (Godoy, J.).
Its breadth, however, extends only to a creditor's acts to
"collect, assess, or recover" a prepetition debt, not to any non-
harassing, non-coercive act to ensure eventual payment from the
debtor or the debtor's estate.  11 U.S.C. § 326(a)(6); see also

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case:16-cv-02374 FAB Document 184 Filed 02/17/17 Page 1 of 185 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 18 of 41

Civil No. 16-2374 (FAB)                                                18

Citizens Bank v. Strumpf, 516 U.S. 16, 21 (1995) (holding that
bank's placing an administrative hold on a bankruptcy debtor's
account did not violate sections 362(a)(3) or 362(a)(6) because
the administrative hold did not take something from the bankruptcy
debtor, or exercise dominion over property that belonged to the
bankruptcy debtor); In re Knowles, 442 B.R. 150, 160-61 (B.A.P.
1st Cir. 2011) (observing that "a 'mere request for payment' does
not violate the stay unless it is coercive or harassing," and
holding that "the filing of the proof of claim is not an act
against property of the debtor."); Morgan Guar. Trust Co. v.
American Sav. & Loan Ass'n., 804 F.2d 1487, 1491 (9th Cir. 1986)
(observing that "[t]he activities that are specifically prohibited
[by 11 U.S.C. § 362(a)(6)] all involve attempts to confiscate the
debtor's property or require the debtor to act affirmatively to
protect its interests.")

        To support their overly broad interpretation of section
362(a)(6), defendants cite numerous cases which involve either
coercive or harassing conduct on the part of a creditor, or a
creditor's direct efforts to collect on a claim from a debtor.
See Divane v. A & C Elec. Co., 193 B.R. 856, 861 (N.D. Ill. 1996)
(holding that health benefit plan's act of sending notice to
employees that debtor employer was delinquent in making payments
to the plan constituted "harassment or coercion," and was therefore

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cr-B2874-F-84 Document Page 201 ati Filed 08/151763/Page 104 of 135y ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 19 of 41

Civil No. 16-2374 (FAB)                                    19

a violation of section 362(a)(6)); <u>In re Hellums</u>, 772 F.2d 379

(7th Cir. 1985) (holding that credit union violated section

362(a)(6) in applying automatic deductions from bankruptcy

debtor's wages to loan repayment); <u>In re Guinn</u>, 102 B.R. 838

(Bankr. N.D. Ala. 1989) (holding that credit union's refusal to

accept mortgage payments from debtor violated section 362(a)(6)

because this refusal constituted an effort to collect payment of

unsecured debts discharged in bankruptcy); <u>In re Trevino</u>, 535 B.R.

110, 149 (Bankr. S.D. Tex. 2015) (holding that debtors had stated

a viable claim pursuant to 362(a)(6) in light of their allegation

that creditor sent a letter that "threatened to bill them on

account of a pre-petition claim after they had obtained a

bankruptcy discharge if they did not provide proof of payment.").

　　　　Indeed, the cases defendants cite are inapposite because

the GO Bondholders, unlike the creditors involved in those cases,

have explicitly "disclaimed any attempt to collect." (Docket

No. 27 at 9.) What is more, the Court has no basis to find that

the GO Bondholders have brought this action to coerce or harass

any defendant, and defendants have raised no argument to the

contrary.

　　　　As the Court previously concluded in holding that count

one of the amended complaint was not stayed, "this is not an action

to recover a liability claim against the government of Puerto Rico"

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cv-02374 Document 184 Filed 02/17/17 Page 20 of 41 ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 20 of 41

Civil No. 16-2374 (FAB)                                                20

that arose before the enactment of PROMESA because the GO

Bondholders seek only declaratory and injunctive relief. See

Docket No. 28 at 2. The additional PROMESA counts asserted in the

second amended complaint do not alter this conclusion

notwithstanding the fact that the GO Bondholders now also seek

injunctions that, *inter alia*, prohibit the diversion of IVU

revenues to COFINA, and direct the COFINA defendants to transfer

revenues held on behalf of COFINA to the Commonwealth.

        In suggesting that section 405(b)(6) would extend even

to the GO Bondholders' claims against the COFINA defendants and

BNYM Trustee, defendants point out that courts have stayed actions

seeking recovery of a debtor's post-petition transfers or payments

to third parties. See Docket 84 at 11-12. The cases defendants

cite for this proposition, however, all involve actions to recover

money from third parties to satisfy the pre-petition debts of a

bankruptcy debtor. See In re Teleservices Grp., Inc., 463 B.R.

28, 35 (Bankr. W.D. Mich. 2012) (holding that section 362(a)(6)

stayed a creditor's unjust enrichment claim seeking money from

third-party bank that had received fraudulent transfers from the

debtor, which were traceable to the creditor); In re Colonial

Realty Co., 980 F.2d 125, 132 (2d Cir. 1992) (holding that the

bankruptcy stay applied to creditor's action against third-party

to recover funds that had allegedly been fraudulently conveyed by

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 106 of 135 ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 21 of 41

Civil No. 16-2374 (FAB)                                                    21

debtor); In re Saunders, 101 B.R. 303 (Bankr. N.D. Fla. 1989)

(holding that bankruptcy stay applied to creditor's action against

a third-party "to recover assets allegedly transferred [by debtor]

in fraud of creditors."). None of these cases involve actions

seeking only declaratory and injunctive relief.

        Indeed, the GO Bondholders' PROMESA counts are not aimed

at confiscating any property of, or obtaining any form of payment

from, the Commonwealth. Thus, the PROMESA claims are not stayed

by section 405(b)(6).

   **C.   Section 405(b)(3) of PROMESA**

        Section 405(b)(3) of PROMESA stays "any act to obtain

possession of property of the Government of Puerto Rico or of

property from the Government of Puerto Rico or to exercise control

over property of the Government of Puerto Rico." Courts have

defined the exercise of control as "restraining or directing

influence over' or 'to have power over.'" In re Weidenbenner, 521

B.R. 74, 79 (Bankr. S.D.N.Y. 2014) (quoting Thompson v. GMAC, LLC,

566 F.3d 699, 702 (7th Cir. 2009)). Put differently, "to exercise

control" over something without actually possessing it is to have

"constructive possession." In re Weidenbenner, 521 B.R. at 79

(observing that, "at some point, 'control' over another's property

becomes constructive possession."); See Black's Law Dictionary

(10th ed. 2014) (defining "constructive possession" as "[c]ontrol

ADD21

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124Case:16-cv-02374-FAB Document 184 Filed 01/02/19 16:23:38 Desc: H ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 22 of 41

Civil No. 16-2374 (FAB)                                                    22

or dominion over a property without actual possession or custody
of it").

          Defendants do not argue that the PROMESA counts seek to
obtain possession from, or the property of, the Commonwealth.  On
the contrary, defendants argue only that the GO Bondholders seek
to exercise control over the Commonwealth's property through the
PROMESA counts.   To support this argument, defendants emphasize
that the injunctive relief sought in the PROMESA counts would:
(1) require the segregation and preservation of certain funds, (2)
prohibit certain transfers pursuant to the Commonwealth's budget;
(3) prohibit the transfer of IVU revenues to COFINA; and (4)
require COFINA to transfer IVU revenues to the Commonwealth.
(Docket No. 84 at p. 13.)    In essence, defendants' argument is
reduced to this:  the GO Bondholders' request for injunctive relief
amounts to an act to exercise control over the Commonwealth's
property because, if the GO Bondholders prevail on the PROMESA
counts, the Commonwealth will be not be at complete liberty to
dispose of its assets as it deems fit.

          To support their contention that the GO Bondholders seek
to exercise control over the Commonwealth's property, defendants
rely on two cases, both of which involve taking affirmative steps
to control a debtor's assets.  See In re Weidenbenner, 521 B.R. at
79-80 (holding that bank's freezing the funds in debtor's account

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 8cl6 rev 82874 FR948 Dlc inega 29 Bati 5 Dato 89 4512 73/2 840 108 of 135 y ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 23 of 41

Civil No. 16-2374 (FAB)                                               23

while unilaterally determining who would have access to those funds
amounted to "control over property of the estate"); In re
Patterson, 967 F.2d 505, 511-12 (11th Cir. 1992) (holding that
credit union's act of freezing debtor's funds "constituted an act
to exercise control over the property of the bankruptcy estate in
violation of Section 362(a)(3)" because the freeze deprived the
debtors "of any control of those funds and invested exclusive
control in the [c]redit [u]nion.").

        Unlike the acts determined to constitute "exercises of
control" in Weidenbenner and Patterson, the injunctive relief the
GO Bondholders seek would not permit them to have any possession,
influence, or power over any asset, much less any asset of the
Commonwealth.   Rather, the injunctive relief the GO Bondholders
seek would, if the GO Bondholders ultimately prevail, preclude the
Commonwealth from dissipating its assets in a manner that violates
PROMESA.   Consequently, the Court holds that the PROMESA counts
are not stayed by section 405(b)(3).  See, e.g., Amplifier Research
Corp. v. Hart, 144 B.R. 693, 695 (E.D. Pa. 1992) (concluding that
section 362(a)(3) "protects interests in a debtor's property, not
tortious uses of that property by the debtor."); Larami Ltd. v.
Yes! Entm't Corp., 244 B.R. 56, 60 (D.N.J. 2010) ("Section
362(a)(3) was intended to prevent interference with a bankruptcy
court's orderly disposition of the property of the estate, it was

ADD23

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 24 of 41

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 24 of 41

not intended to preclude post-petition suits to enjoin unlawful

conduct."); United States v. Inslaw, Inc., 932 F.2d 1467, 1473

(D.C. Cir. 1991) ("The object of the automatic stay provision is

essentially to solve a collective action problem -- to make sure

that creditors do not destroy the bankrupt estate in their scramble

for relief. Fulfillment of that purpose cannot require that every

party who acts in resistance to the debtor's view of its rights

violates § 362(a) . . .") (citation omitted).

### D.   Sections 405(b)(4) and 405(b)(5) of PROMESA

Sections 405(b)(4) and 405(b)(5) of PROMESA stay "any

act to create, perfect, or enforce any lien against property of

the Government of Puerto Rico."    Defendants suggest that the

PROMESA counts are stayed by sections 405(b)(4) and 405(b)(5)

because the injunctive relief sought in connection with these

counts "is clearly an act to create, perfect, or enforce a lien."

(See Docket No. 84 at 16.)   This argument lacks merit.

As defendants acknowledge in their motion to stay, the

second amended complaint alleges that the GO Bondholders have a

first lien on available resources of the Commonwealth — resources

which the GO Bondholders allege include IVU revenues and certain

Commonwealth expenditures — pursuant to Article VI of the Puerto

Rico Constitution.   See Docket Nos. 84 at p. 16; 78 at p. 5.   If

the GO Bondholders are correct, their liens already exist and have

---

Civil No. 16-2374 (FAB)                                                    25

---

been perfected by operation of the Puerto Rico Constitution. If

the GO Bondholders are incorrect, the PROMESA counts will do

nothing to create or perfect any lien, and the GO Bondholders will

simply not be entitled to the relief they seek. Regardless, the

mere assertion of the PROMESA counts, which at this juncture does

nothing to affect the Commonwealth's interests in its property,

does not constitute an act to create or perfect any lien on

property of the Commonwealth.

Additionally, it would be improper to characterize the

GO Bondholders' assertion of the PROMESA counts as an act "to

enforce" a lien. Arguing otherwise, defendants contend that the

GO Bondholders' request that IVU revenues be transferred to the

Commonwealth's treasury is "an act to enforce a lien." (Docket

No. 84 at 16.) To support this proposition, defendants cite In re

Reserves Dev. Corp., a case that is inapposite because it does not

even address what constitutes an act to enforce a lien. 78 B.R.

951, 958 (W.D. Mo. 1986) (holding that act of attaching "the

debtors' coalwashing unit for the purpose of securing the payment

of past-due wage claims" amounted to "an act to 'create' or

'perfect' a lien on this property" and thus was an act falling

within the scope of Section 362(a)(4)).

If the GO Bondholders ultimately prevail on their

claims, their requested relief would have the effect of precluding

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 0816 rev 3 2014 FRB 45 Document 298 ati 5 Teck 05 te 01 203 R age 171 of 135 ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 26 of 41

| Civil No. 16-2374 (FAB) | 26 |
|---|---|

the Commonwealth from continuing to spend and transfer its assets
in a manner that violates PROMESA. In light of this, the Court is
not convinced that the injunctive relief sought in connection with
the PROMESA counts constitutes an act to "enforce" a lien,
particularly because these claims do not seek any form of payment
from the Commonwealth.

### D.    The Court's Inherent Authority to Stay this Action

Defendants argue that even if the Court disagrees that
the entire case is stayed pursuant to Section 405(b) of PROMESA,
the Court should nonetheless exercise its inherent authority to
stay this case in its entirety to avoid piecemeal litigation in
contravention of the purpose of the PROMESA stay. Defendants argue
that a stay is appropriate to give effect to PROMESA's purpose of
allowing the Commonwealth time to restructure its debts in an
orderly way. To do otherwise, defendants suggest, "would spurn
Congress's express objectives in passing PROMESA." (Docket No. 84
at p. 14.) The Court disagrees.

If Congress had intended to stay all claims against the
Commonwealth for a particular period of time, it could have
included language to this effect in PROMESA. That Congress did
not do so indicates that Congress intended PROMESA to stay only
certain types of claims, and not others. See Connecticut Nat.
Bank v. Germain, 503 U.S. 249, 253-54 (1992) ("[C]ourts must

ADD26

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-124 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 27 of 41 y ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 27 of 41

Civil No. 16-2374 (FAB)                                              27

presume that a legislature says in a statute what it means and
means in a statute what it says there.").

Because the Court has held that the PROMESA counts are
not stayed by the express provisions of PROMESA enacted by
Congress, the Court disagrees that staying these counts would
"spurn Congress's express objectives." Accordingly, the Court
will not stay the PROMESA claims in the exercise of its inherent
authority.

### III. Motions to Intervene[9]

Having determined that the PROMESA counts are not stayed, the
Court turns to the merits of the five pending motions to intervene
filed by: (1) the Oversight Board; (2) Ambac, which provides the
Commonwealth with financial guaranty insurance on billions of
dollars in debt, including insurance on $800 million for
outstanding bonds issued by COFINA, (Docket No. 55 at p. 1); and
(3) the COFINA Senior Bondholders, the Puerto Rico Funds, and the

---

[9] In their respective motions to intervene, Ambac, the COFINA
Senior Bondholders, and the Oversight Board raise arguments in
support of an automatic stay.   To the extent these motions to
intervene also request a stay, the motions are denied for the
reasons the Court already set forth in determining that the PROMESA
counts are not stayed.

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 28 of 41 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 28 of 41

Major COFINA Bondholders, all of whom own COFINA bonds in differing amounts.[10]

### A.   Rule 24 Standard

Federal Rule of Civil Procedure 24 ("Rule 24") provides two avenues by which a party may successfully intervene: intervention by right and permissive intervention. Fed.R.Civ.P. 24.

A party is entitled to intervene by right if "it is given an unconditional right to intervene by a federal statute." Fed.R.Civ.P. 24(a)(1). If no federal statute grants an unconditional right to intervene, the Court is nonetheless required to grant a party's motion to intervene if that party has "demonstrate[d] that: (1) its motion is timely; (2) it has an interest relating to the property or transaction that forms the foundation of the ongoing action; (3) the disposition of the action threatens to impair or impede its ability to protect this interest; and (4) no existing party adequately represents its interest."

---

[10]   Senior COFINA Bondholders include Jose Rodriguez and institutional holders who together own approximately $2 billion dollars of senior secured bonds issued by COFINA. (Docket No. 50 at p. 4.)   Puerto Rico Funds are institutional holders of approximately $435 million in senior secured COFINA bonds and $210 million in subordinate COFINA bonds.   (Docket No. 95 at p. 2.) Major COFINA Bondholders are mutual funds that hold $748,214 in senior bonds and $2,893,748 in subordinate bonds issued by COFINA. (Docket No. 113 at p. 5.)

Ungar v. Arafat, 634 F.3d 46, 50 (1st Cir. 2011) "Failure to satisfy any one of the four requirements defeats intervention by right." Students for Fair Admissions v. Fellows of Harvard College, 807 F.3d 472, 474 (1st Cir. 2015). Determining whether a proposed intervener has fulfilled these requirements "calls for discretion in making a series of judgment calls, a 'balancing of factors that arise in highly idiosyncratic factual settings.'" Id. (quoting Arafat, 634 F.3d at 50; see also R&G Mortg. Corp. v. Fed. Home Loan Mortg. Corp., 584 F.3d 1, 8 (1st Cir. 2009) ("[E]ven in the case of a motion to intervene as of right, the district court's discretion is appreciable.").

Even if a proposed intervener is not entitled to intervene as of right, it may request permissive intervention. Pursuant to Rule 24(b), the Court may allow a party to intervene when that party's "claim or defense and the main action have a question of law or fact in common." Daggett v. Comm'n on Governmental Ethics & Election Practices, 172 F.3d 104, 108 (1st Cir. 1999). The Court "can consider almost any factor rationally relevant" and "enjoys very broad discretion" in granting or denying a motion for permissive intervention. Id. at 113.

Whether moving for intervention by right or for permissive intervention, a motion to intervene must "state the grounds for intervention and be accompanied by a pleading that

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02374 ... Page 2 of ... ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 30 of 41

sets out the claim or defense for which intervention is sought."
Fed.R.Civ.P. 24(c).[11]

### 1. The Oversight Board

The Oversight Board's motion to intervene satisfies
the requirements set forth in Rule 24(a), permitting intervention
when a party "is given an unconditional right to intervene by a
federal statute." See Peaje Invs. LLC v. García-Padilla, 845 F.3d
505, 516 (1st Cir. 2017) (noting that "PROMESA appears to grant
the Board" the right to intervene in bondholder litigation pursuant
to Section 212(a) of PROMESA). In drafting PROMESA, Congress
specifically stated that the Oversight Board "may intervene in any

[11] The Court finds that all pending motions to intervene are timely
and place no undue prejudice on the existing parties. This case
is in the initial stages, when "the balance of prejudices … weigh
heavily in favor of the [proposed intervener]." P.R. Tel. Co. v.
Sistema de Retiro de los Empleados del Gobierno y la Judicatura,
637 F.3d 10, 16 (1st Cir. 2011), citing Zurich Capital Markets,
Inc. v. Coglianese, 236 F.R.D. 379, 384-85 (N.D. Ill. 2006) (motion
to intervene filed over two years after proposed intervener was
placed on notice found timely where plaintiff could show no
prejudice from the delay). The COFINA Senior Bondholders, Ambac,
and the Oversight Board filed motions to intervene before the GO
Bondholders filed the second amended complaint. (Docket Nos. 50,
55 & 62.) The Puerto Rico Funds and the Major COFINA Bondholders
filed motions to intervene the same month that the GO Bondholders
filed the second amended complaint. (Docket Nos. 95 & 113.)
Notably, the GO Bondholders neither dispute that the motions to
intervene are timely, nor do they argue that intervention will
result in undue prejudice.

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:06-cv-08374 F AB45-2 blu Page: 201 Filed D 03/08/18 03:29:00116 of 85 ry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 31 of 41

Civil No. 16-2374 (FAB)                                            31

litigation filed against the territory."[12] PROMESA § 212(a). The

second amended complaint names as a defendant the Commonwealth of

Puerto Rico. (Docket No. 78.) Accordingly, the text of PROMESA

compels the Court to allow the Oversight Board to intervene as of

right pursuant to Rule 24(a).

        The Oversight Board failed to attach a pleading to

its motion to intervene. In fact, the GO Bondholders' sole

argument opposing intervention is based on this procedural defect.

(Docket No. 110 at p. 5.) While Rule 24(c) does, indeed, demand

"a pleading that sets out the claim or defense for which

intervention is sought," failure to comply with this requirement

does not necessarily preclude intervention. See, e.g., City of

Bangor v. Citizens Commc'ns Co., 532 F.3d 70, 95 n.11 (1st Cir.

2008) (no abuse of discretion where Court excused failure to file

a pleading with motion to intervene). As the First Circuit Court

of Appeals recently held, "denial of a motion to intervene based

solely on the movant's failure to attach a pleading, absent

prejudice to any party, constitutes an abuse of discretion."

Peaje, 845 F.3d at 515.

        In this case, there is no basis to find that the

Oversight Board's failure to attach a pleading to its motion to

---

[12] According to section 5(20) of PROMESA, the term "territory"
includes Puerto Rico.

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 32 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 32 of 41

Civil No. 16-2374 (FAB)                                                 32

intervene has caused prejudice to the GO Bondholders.  Nor have
the GO Bondholders identified any such prejudice.  Following
binding precedent, the Court will avoid an "overly technical
reading[] of Rule 24(c)," and will excuse the Oversight Board's
failure to attach a pleading.  Id.  Because the Oversight Board is
statutorily entitled to intervene in this action, its motion to
intervene is granted.

         **2.   Ambac**

         In support of its motion to intervene, Ambac claims
a direct interest in this litigation because it insures over $800
million of COFINA bonds, and will have to make payments to COFINA
bondholders should COFINA default on its obligations.  (See Docket
No. 55 at pp. 8-10.)  Ambac further argues that the disposition of
this case could impair its interests insofar as there is a
"realistic and practical threat that Ambac would have to pay
claims" if the GO Bondholders prevail.  Id. at p. 10.  For instance,
if the GO Bondholders prevail, a possible hold on the transfer of
IVU revenues to COFINA may result in COFINA's inability "to make
its debt payments in a timely manner."  Id.

         The GO Bondholders do not specifically contest that
Ambac has an interest in this litigation, or that its disposition
could potentially impair Ambac's legitimate interest in avoiding
having to pay insurance claims on COFINA bonds.  Rather, the GO

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 33 of 41 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 33 of 41

Civil No. 16-2374 (FAB)                                               33

Bondholders raise two arguments to support the contention that the contract by which Ambac has agreed to insure bonds issued by COFINA (the "Ambac Insurance Policy") divests Ambac of any "legally cognizable" interest in this case, and specifically bars Ambac from intervening.

        As to their first argument, the GO Bondholders argue that Ambac lacks any interest in this litigation because the Ambac Insurance Policy allows Ambac to become subrogated to the rights of the COFINA bondholders only to the extent that it makes payment of principal of or interest on insured COFINA bonds. (Docket No. 93 at p. 7.) The GO Bondholders' argument does not persuade the Court.

        The subrogation provision of the Ambac Insurance Policy to which the GO Bondholders make reference merely states that if Ambac pays a claim on an insured bond, it will be subrogated to the rights of the bondholders. (See Docket No. 93-1, at Ex. B, at 12.) Nothing in this provision, however, either limits Ambac's right to intervene in an action pursuant to Rule 24, or otherwise limits the scope of the interests Ambac may seek to protect.

        The GO Bondholders' second argument posits that even if Ambac were subrogated to the rights of the COFINA bondholders, Ambac's intervention would nevertheless be foreclosed because the COFINA Bondholders contractually delegated any right

ADD33

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 34 of 41

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 34 of 41

they may have had to participate in this action to BNYM Trustee,

the trustee for their bonds. (Docket No. 93 at 8-11.)

Specifically, Ambac points to language on the COFINA bonds stating

that COFINA bondholders

> "have no right to enforce the provisions of this
> Resolution, to institute action to enforce the
> provisions of the Resolution or to institute, appear in
> or defend any suit or other proceeding with respect
> thereto, except as provided in the Resolution."

(Docket No. 93 at 8.) The GO Bondholders proceed

to cite the no-action provision of the Resolution referenced on

the Ambac-insured COFINA bonds, which allows bondholders to "step

into the shoes of the Trustee and 'institute [a] suit . . . or

other proceeding'" only if certain prerequisites are satisfied.

Id. at 10.

The GO Bondholders' second argument does not

convince the Court that Ambac is contractually barred from

intervening in this action for two reasons. First, insofar as the

language on the COFINA bonds limits COFINA Bondholders' rights to

"appear in or defend" suits, it does so only with respect to the

"provisions of the Resolution." (Docket No. 93-1, at Ex. A, at 2.)

Because this case does not stem from any alleged violation of the

ADD34

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-03283-LTS Document 184 Filed Page 35 of 41 Entry ID: 6076220

Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 35 of 41

Civil No. 16-2374 (FAB)                                                    35

"provisions of the Resolution," the language from the COFINA bonds

which the GO Bondholders reference is not dispositive.[13]

            Second, the selected provisions of the Resolution

that the GO Bondholders reference, read in context, make clear

that they set forth procedures bondholders must follow to pursue

claims pursuant to the Resolution.  To illustrate, the complete,

relevant language of section 1106 of the Resolution that the GO

Bondholders cite states:

> No owner of any Bond shall have any right to institute
> any suit, action, mandamus or other proceeding in equity
> or at law hereunder, or for the protection or enforcement
> of any right under this  Resolution, unless [. . . .]

---

[13] It bears emphasis that the GO Bondholders acknowledge that they
are not parties to the Resolution, (Docket No. 93 at p. 9), but
nonetheless seek enforcement of the no-action clause, relying on
cases of the Delaware Court of Chancery allowing non-parties to
enforce no-action clauses.  Feldbaum v. McCrory Corp., Civ. No.
11186, 1992 WL 119095 (Del. Ch. June 2, 1992); In re Enron Corp.
Sec., Deriv. & ERISA Litig., Civ. No. H-01-3624, 2008 WL 744823
(S.D. Tex. Mar. 19, 2008).  Even if the Court were to agree with
the GO Bondholders' interpretation of the Resolution, the Court
would not allow the GO Bondholders to enforce the provisions of
the Resolution because the overwhelming weight of authority
supports the conclusion that a non-party to a contract cannot
generally enforce the provisions of that contract.  See, e.g.,
Rajamin v. Deutsche Bank Nat'l Trust Co., 757 F.3d 79, 86 (2d Cir.
2014) (observing "that the terms of a contract may be enforced
only by contracting parties or intended third-party beneficiaries
of the contract."); Aho v. Bank of Am., N.A., Civ. No. 15-cv-128-
JL, 2015 U.S. Dist. LEXIS 169357, at *8 (D.N.H. Dec. 18, 2015)
(observing that under New York law, "a non-party lacks standing to
enforce a contract unless the contract contains a clear indication
of an intent to allow it."); Davidson v. Yihai Cao, 211 F. Supp.
2d 264, 283 (D. Mass. 2011) (observing that under Illinois law
"[t]here is a strong presumption that a non-party to a contract
cannot enforce the contract.").

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 36 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 36 of 41

Civil No. 16-2374 (FAB)                                      36

Because Ambac's motion to intervene is unrelated to the Resolution, the Court fails to see how the Ambac insurance policy precludes Ambac from intervening.[14]

As Ambac has filed a timely motion to intervene, and established that it has an interest in this litigation, the disposition of which could impair its interests, the Court is satisfied that Ambac is entitled to intervene pursuant to Fed.R.Civ.P. 24(a)(2).

### 3. COFINA Senior Bondholders

The COFINA Senior Bondholders filed a motion to intervene for the limited purpose of seeking enforcement of the

---

[14] Although the GO Bondholders have not specifically argued otherwise, the Court notes that Ambac has made the required "minimal showing that the representation afforded by a named party would prove inadequate." B. Fernandez & Hnos., Inc. v. Kellogg USA, Inc., 440 F.3d 541, 545 (1st Cir. 2006). This is so because, unlike the other named defendants, there is a reasonable likelihood that Ambac would suffer direct economic harm if the GO Bondholders are ultimately successful in this case. To illustrate, the transfer of IVU revenues from COFINA to the Commonwealth's treasury could potentially deplete COFINA's assets, resulting in COFINA defaulting on its bond obligations. Consequently, Ambac would have to pay insurance claims to COFINA Bondholders. By contrast, the Commonwealth's treasury will only grow larger if the GO Bondholders prevail, as IVU revenues would be transferred from COFINA to the Commonwealth. In light of the potential for this litigation to have a disparately adverse impact on Ambac than on other defendants, the Court is satisfied that Ambac has made a showing of inadequate representation. See, e.g., Kellogg USA, 440 F.3d at 547 (holding that a showing that "the potential for … litigation to have a greater adverse impact on [the potential intervenor] is sufficient to establish that a named party is an inadequate representative.").

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-B2374-FAB4520 bte Pagec2102 tiFiledRegistel970 3Page0122 of E85y ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 37 of 41

Civil No. 16-2374 (FAB)                                      37

PROMESA stay (Docket No. 50.)  Subsequently, the GO Bondholders

filed the second amended complaint, in addition to a response in

opposition to the COFINA Senior Bondholder's motion.  (Docket

Nos. 78 & 87.)  With the Court's permission, the COFINA Senior

Bondholders then filed a reply in which they reiterated their

request for intervention for the limited purpose of enforcing the

PROMESA stay.  (Docket No. 94.)

        Courts may deny motions to intervene when the

underlying purpose for which intervention is sought is non-

existent.  See 4MVR, LLC v. Hill, 2015 U.S. Dist. LEXIS 81904, at

*25 (D. Mass 2015) (motion to intervene for the purpose of opposing

leave to amend denied as moot after the Court denied underlying

motion to amend).  The COFINA Senior Bondholder's motion to

intervene is moot in light of the Court's conclusion that the

PROMESA counts are not stayed.  Consequently, the COFINA Senior

Bondholders' motion to intervene is denied.

### 4.  Puerto Rico Funds and Major COFINA Bondholders

        The Puerto Rico Funds and the Major COFINA

Bondholders' respective motions to intervene raise similar

arguments as to why each should be permitted to intervene as of

right.  Specifically, both the Puerto Rico Funds and the Major

COFINA Bondholders argue that they have an interest in the IVU

revenues that back the COFINA bonds which they hold.  See Docket

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 38 of 41 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 38 of 41

Civil No. 16-2374 (FAB)                                                     38

Nos. 95 at p. 10 & 113 at p. 5. They also argue that the
disposition of this litigation threatens to impair their interests
insofar as the GO Bondholders seek to divert IVU revenues to the
Commonwealth's treasury for the purpose of prioritizing payments
to the GO Bondholders at the expense of COFINA Bondholders. See
Docket Nos. 95 at pp. 5-6 & 113 at 11. Finally, the Puerto Rico
Funds and the Major COFINA Bondholders assert that no existing
party to this action can adequately represent their respective
interests. See Docket Nos. 113 at 6-8 & 95 at 11. It is only
this last point which the GO Bondholders contest in opposing the
Puerto Rico Funds and the Major COFINA bondholders' respective
motions to intervene.[15] (Docket Nos. 146 & 155.)

According to the GO Bondholders, COFINA Bondholders
"contractually delegated any right they may have had to participate
in this lawsuit to BYN[M] [Trustee], the trustee for their bonds."
(Docket Nos. 146 at p. 6 & 115 at p. 7.) Thus, the GO Bondholders

---

[15] It is apparent to the Court that the COFINA bonds owned by the
Puerto Rico Funds and the Major COFINA Bondholders represent a
legitimate interest related to the subject matter of this case,
the disposition of which could potentially impair the Puerto Rico
Funds and the Major COFINA Bondholders' interest in the value of
their bonds. Indeed, the GO Bondholders tacitly concede this
point, acknowledging that "[t]o the extent that the Court holds
that the Commonwealth's actions [with respect to IVU revenues]
violate federal and Puerto Rico law, [the Puerto Rico Funds and
the Major COFINA Bondholders] will have to surrender their . . .
privileged position among the Commonwealth's creditors." (Docket
Nos. 146 at pp. 3-4 & 155 at p. 3.)

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 39 of 41
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 39 of 41

contend, BNYM Trustee adequately represents the interests of all COFINA Bondholders, including the Puerto Rico Funds and the Major COFINA Bondholders. See Docket Nos. 146 at pp. 6-11 & 155 pp. 6-13.

The GO Bondholders' argument mirrors the failed argument they raised in opposition to Ambac's motion to intervene, relying on language set forth on the COFINA bonds and the Resolution these bonds cross-reference. As previously discussed, the COFINA bonds and the Resolution generally restrict COFINA Bondholders' ability to litigate disputes stemming from the Resolution. They do not, however, pose an absolute bar to their ability to defend against actions that have nothing to do with a dispute arising from the Resolution.

In any event, the Court is satisfied that the Puerto Rico Funds and the Major COFINA Bondholders have met their modest burden of showing that there is a possibility that no named defendant may adequately represent their interests. Conservation Law Found., Inc. v. Mosbacher, 966 F.3d 39, 44 (1st Cir. 1992) ("An intervenor need only show that representation may be inadequate, not that it is inadequate."). They have met this burden, if for no other reason, than that BNYM Trustee — the named defendant the GO Bondholders allege adequately represents the interests of the Puerto Rico Funds and the Major COFINA

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 40 of 41 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 40 of 41

Civil No. 16-2374 (FAB)                                                40

Bondholders—has moved to dismiss the second amended complaint on grounds that could result in BNYM Trustee being dismissed as a defendant. See Docket No. 162. Should BNYM Trustee prevail on its motion to dismiss, no COFINA Bondholder representative would remain as a litigant in this case unless the Court permits intervention.[16]

Because the Puerto Rico Funds and the Major COFINA Bondholders have satisfied each of the four requirements to intervene as of right, the Court will must allow them to intervene pursuant to Fed.R.Civ.P. 24(a)(2).[17]

**V. Conclusion**

For the reasons set forth above, the Court **DENIES** the Commonwealth Defendants' motion to stay (Docket No. 106), and the

---

[16] In deciding whether the Puerto Rico Funds and the Major COFINA Bondholders have made a showing of inadequate representation, the Court has not considered the extent to which either party could adequately represent the other's interest. This is so because neither the Puerto Rico Funds nor the Major COFINA Bondholders were named parties at the time they filed their respective motions to intervene. See Kellogg, 440 F.3d at 546 (observing that relevant inquiry as to whether a proposed intervenor has shown inadequate representation is limited to whether its interests are adequately represented by a "named party.").

[17] Even if the Puerto Rico Funds and the Major COFINA Bondholders were not entitled to intervene as of right pursuant to Fed.R.Civ.P. 24(a)(2), the Court would nonetheless permit them to intervene pursuant to Fed.R.Civ.P. 24(b) because their interest in COFINA bonds implicates at least one legal question shared in common with this litigation, namely, whether the use of IVU revenues to secure COFINA bonds is unlawful. See Fed.R.Civ.P. 24(b)(2)(B).

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case 3:16-cv-02374-FAB Document 213 Filed 03/15/17 Page 126 of 85 Entry ID: 6076220
Case 3:16-cv-02374-FAB Document 184 Filed 02/17/17 Page 41 of 41

Civil No. 16-2374 (FAB)                                                    41

COFINA Senior Bondholders motion to intervene (Docket No. 50).

The Court **GRANTS** the motions to intervene of the Oversight Board

(Docket No. 62), Ambac (Docket No. 55), the Puerto Rico Funds

(Docket No. 95), and the Major COFINA Bondholders (Docket No. 113).

To the extent the Oversight Board and Ambac have requested a stay

of this action in their respective motions, the motions are **DENIED**.

**IT IS SO ORDERED.**

San Juan, Puerto Rico, February 17, 2017.

                                   s/ Francisco A. Besosa
                                   FRANCISCO A. BESOSA
                                   United States District Judge

ADD41

PUBLIC LAW 114–187—JUNE 30, 2016    130 STAT. 587

(1) the Bureau of the Census should conduct a study to determine the feasibility of expanding data collection to include Puerto Rico and the other United States territories in the Current Population Survey, which is jointly administered by the Bureau of the Census and the Bureau of Labor Statistics, and which is the primary source of labor force statistics for the population of the United States; and

(2) if necessary, the Bureau of the Census should request the funding required to conduct this feasibility study as part of its budget submission to Congress for fiscal year 2018.

**SEC. 405. AUTOMATIC STAY UPON ENACTMENT.**

48 USC 2194.

(a) DEFINITIONS.—In this section:

(1) LIABILITY.—The term "Liability" means a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness for borrowed money, including rights, entitlements, or obligations whether such rights, entitlements, or obligations arise from contract, statute, or any other source of law related to such a bond, loan, letter of credit, other borrowing title, obligation of insurance, or other financial indebtedness in physical or dematerialized form, of which—

(A) the issuer, obligor, or guarantor is the Government of Puerto Rico; and

(B) the date of issuance or incurrence precedes the date of enactment of this Act.

(2) LIABILITY CLAIM.—The term "Liability Claim" means, as it relates to a Liability—

(A) right to payment, whether or not such right is reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, legal, equitable, secured, or unsecured; or

(B) right to an equitable remedy for breach of performance if such breach gives rise to a right to payment, whether or not such right to an equitable remedy is reduced to judgment, fixed, contingent, matured, unmatured, disputed, undisputed, secured, or unsecured.

(b) IN GENERAL.—Except as provided in subsection (c) of this section, the establishment of an Oversight Board for Puerto Rico (i.e., the enactment of this Act) in accordance with section 101 operates with respect to a Liability as a stay, applicable to all entities (as such term is defined in section 101 of title 11, United States Code), of—

(1) the commencement or continuation, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was or could have been commenced before the enactment of this Act, or to recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this Act;

(2) the enforcement, against the Government of Puerto Rico or against property of the Government of Puerto Rico, of a judgment obtained before the enactment of this Act;

(3) any act to obtain possession of property of the Government of Puerto Rico or of property from the Government of Puerto Rico or to exercise control over property of the Government of Puerto Rico;

ADD42

130 STAT. 588        PUBLIC LAW 114–187—JUNE 30, 2016

(4) any act to create, perfect, or enforce any lien against property of the Government of Puerto Rico;

(5) any act to create, perfect, or enforce against property of the Government of Puerto Rico any lien to the extent that such lien secures a Liability Claim that arose before the enactment of this Act;

(6) any act to collect, assess, or recover a Liability Claim against the Government of Puerto Rico that arose before the enactment of this Act; and

(7) the setoff of any debt owing to the Government of Puerto Rico that arose before the enactment of this Act against any Liability Claim against the Government of Puerto Rico.

(c) STAY NOT OPERABLE.—The establishment of an Oversight Board for Puerto Rico in accordance with section 101 does not operate as a stay—

(1) solely under subsection (b)(1) of this section, of the continuation of, including the issuance or employment of process, of a judicial, administrative, or other action or proceeding against the Government of Puerto Rico that was commenced on or before December 18, 2015; or

(2) of the commencement or continuation of an action or proceeding by a governmental unit to enforce such governmental unit's or organization's police and regulatory power, including the enforcement of a judgment other than a money judgment, obtained in an action or proceeding by the governmental unit to enforce such governmental unit's or organization's police or regulatory power.

*Deadline. Time periods.*

(d) CONTINUATION OF STAY.—Except as provided in subsections (e), (f), and (g) the stay under subsection (b) continues until the earlier of—

(1) the later of—

(A) the later of—

(i) February 15, 2017; or

(ii) six months after the establishment of an Oversight Board for Puerto Rico as established by section 101(b);

*Certification.*

(B) the date that is 75 days after the date in subparagraph (A) if the Oversight Board delivers a certification to the Governor that, in the Oversight Board's sole discretion, an additional 75 days are needed to seek to complete a voluntary process under title VI of this Act with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities; or

*Determination.*

(C) the date that is 60 days after the date in subparagraph (A) if the district court to which an application has been submitted under subparagraph 601(m)(1)(D) of this Act determines, in the exercise of the court's equitable powers, that an additional 60 days are needed to complete a voluntary process under title VI of this Act with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities; or

(2) with respect to the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities, the date on which a case is filed by or on behalf of the government of the Commonwealth of Puerto Rico or any of its territorial instrumentalities, as applicable, under title III.

(e) JURISDICTION, RELIEF FROM STAY.—

ADD43

PUBLIC LAW 114–187—JUNE 30, 2016     130 STAT. 589

(1) The United States District Court for the District of Puerto Rico shall have original and exclusive jurisdiction of any civil actions arising under or related to this section.

(2) On motion of or action filed by a party in interest and after notice and a hearing, the United States District Court for the District of Puerto Rico, for cause shown, shall grant relief from the stay provided under subsection (b) of this section.

(f) TERMINATION OF STAY; HEARING.—Forty-five days after a request under subsection (e)(2) for relief from the stay of any act against property of the Government of Puerto Rico under subsection (b), such stay is terminated with respect to the party in interest making such request, unless the court, after notice and a hearing, orders such stay continued in effect pending the conclusion of, or as a result of, a final hearing and determination under subsection (e)(2). A hearing under this subsection may be a preliminary hearing, or may be consolidated with the final hearing under subsection (e)(2). The court shall order such stay continued in effect pending the conclusion of the final hearing under subsection (e)(2) if there is a reasonable likelihood that the party opposing relief from such stay will prevail at the conclusion of such final hearing. If the hearing under this subsection is a preliminary hearing, then such final hearing shall be concluded not later than thirty days after the conclusion of such preliminary hearing, unless the thirty-day period is extended with the consent of the parties in interest or for a specific time which the court finds is required by compelling circumstances.

*Time periods.*
*Notice.*
*Courts.*

(g) RELIEF TO PREVENT IRREPARABLE DAMAGE.—Upon request of a party in interest, the court, with or without a hearing, shall grant such relief from the stay provided under subsection (b) as is necessary to prevent irreparable damage to the interest of an entity in property, if such interest will suffer such damage before there is an opportunity for notice and a hearing under subsection (e) or (f).

*Courts.*

(h) ACT IN VIOLATION OF STAY IS VOID.—Any order, judgment, or decree entered in violation of this section and any act taken in violation of this section is void, and shall have no force or effect, and any person found to violate this section may be liable for damages, costs, and attorneys' fees incurred in defending any action taken in violation of this section, and the Oversight Board or the Government of Puerto Rico may seek an order from the court enforcing the provisions of this section.

(i) GOVERNMENT OF PUERTO RICO.—For purposes of this section, the term "Government of Puerto Rico", in addition to the definition set forth in section 5(11) of this Act, shall include—

*Definition.*

(1) the individuals, including elected and appointed officials, directors, officers of and employees acting in their official capacity on behalf of the Government of Puerto Rico; and

(2) the Oversight Board, including the directors and officers of and employees acting in their official capacity on behalf of the Oversight Board.

(j) NO DEFAULT UNDER EXISTING CONTRACTS.—

(1) Notwithstanding any contractual provision or applicable law to the contrary and so long as a stay under this section is in effect, the holder of a Liability Claim or any other claim (as such term is defined in section 101 of title 11, United States Code) may not exercise or continue to exercise any

130 STAT. 590          PUBLIC LAW 114–187—JUNE 30, 2016

remedy under a contract or applicable law in respect to the Government of Puerto Rico or any of its property—

(A) that is conditioned upon the financial condition of, or the commencement of a restructuring, insolvency, bankruptcy, or other proceeding (or a similar or analogous process) by, the Government of Puerto Rico, including a default or an event of default thereunder; or

(B) with respect to Liability Claims—

(i) for the non-payment of principal or interest; or

(ii) for the breach of any condition or covenant.

Definition.

(2) The term "remedy" as used in paragraph (1) shall be interpreted broadly, and shall include any right existing in law or contract, including any right to—

(A) setoff;

(B) apply or appropriate funds;

(C) seek the appointment of a custodian (as such term is defined in section 101(11) of title 11, United States Code);

(D) seek to raise rates; or

(E) exercise control over property of the Government of Puerto Rico.

(3) Notwithstanding any contractual provision or applicable law to the contrary and so long as a stay under this section is in effect, a contract to which the Government of Puerto Rico is a party may not be terminated or modified, and any right or obligation under such contract may not be terminated or modified, solely because of a provision in such contract is conditioned on—

(A) the insolvency or financial condition of the Government of Puerto Rico at any time prior to the enactment of this Act;

(B) the adoption of a resolution or establishment of an Oversight Board pursuant to section 101 of this Act; or

(C) a default under a separate contract that is due to, triggered by, or a result of the occurrence of the events or matters in paragraph (1)(B).

(4) Notwithstanding any contractual provision to the contrary and so long as a stay under this section is in effect, a counterparty to a contract with the Government of Puerto Rico for the provision of goods and services shall, unless the Government of Puerto Rico agrees to the contrary in writing, continue to perform all obligations under, and comply with the terms of, such contract, provided that the Government of Puerto Rico is not in default under such contract other than as a result of a condition specified in paragraph (3).

(k) EFFECT.—This section does not discharge an obligation of the Government of Puerto Rico or release, invalidate, or impair any security interest or lien securing such obligation. This section does not impair or affect the implementation of any restructuring support agreement executed by the Government of Puerto Rico to be implemented pursuant to Puerto Rico law specifically enacted for that purpose prior to the enactment of this Act or the obligation of the Government of Puerto Rico to proceed in good faith as set forth in any such agreement.

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
Case: 17-1241 Case:16-cv-02070-LTS-DBP Document 219 Filed: 05/20/2019 Page: 131 of Entry ID: 6076220

(l) PAYMENTS ON LIABILITIES.—Nothing in this section shall be construed to prohibit the Government of Puerto Rico from making any payment on any Liability when such payment becomes due during the term of the stay, and to the extent the Oversight Board, in its sole discretion, determines it is feasible, the Government of Puerto Rico shall make interest payments on outstanding indebtedness when such payments become due during the length of the stay.

(m) FINDINGS.—Congress finds the following:

(1) A combination of severe economic decline, and, at times, accumulated operating deficits, lack of financial transparency, management inefficiencies, and excessive borrowing has created a fiscal emergency in Puerto Rico.

(2) As a result of its fiscal emergency, the Government of Puerto Rico has been unable to provide its citizens with effective services.

(3) The current fiscal emergency has also affected the long-term economic stability of Puerto Rico by contributing to the accelerated outmigration of residents and businesses.

(4) A comprehensive approach to fiscal, management, and structural problems and adjustments that exempts no part of the Government of Puerto Rico is necessary, involving independent oversight and a Federal statutory authority for the Government of Puerto Rico to restructure debts in a fair and orderly process.

(5) Additionally, an immediate—but temporary—stay is essential to stabilize the region for the purposes of resolving this territorial crisis.

(A) The stay advances the best interests common to all stakeholders, including but not limited to a functioning independent Oversight Board created pursuant to this Act to determine whether to appear or intervene on behalf of the Government of Puerto Rico in any litigation that may have been commenced prior to the effectiveness or upon expiration of the stay.

(B) The stay is limited in nature and narrowly tailored to achieve the purposes of this Act, including to ensure all creditors have a fair opportunity to consensually renegotiate terms of repayment based on accurate financial information that is reviewed by an independent authority or, at a minimum, receive a recovery from the Government of Puerto Rico equal to their best possible outcome absent the provisions of this Act.

(6) Finally, the ability of the Government of Puerto Rico to obtain funds from capital markets in the future will be severely diminished without congressional action to restore its financial accountability and stability.

(n) PURPOSES.—The purposes of this section are to—

(1) provide the Government of Puerto Rico with the resources and the tools it needs to address an immediate existing and imminent crisis;

(2) allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with its creditors instead of defending numerous, costly creditor lawsuits;

130 STAT. 592          PUBLIC LAW 114–187—JUNE 30, 2016

(3) provide an oversight mechanism to assist the Government of Puerto Rico in reforming its fiscal governance and support the implementation of potential debt restructuring;

(4) make available a Federal restructuring authority, if necessary, to allow for an orderly adjustment of all of the Government of Puerto Rico's liabilities; and

(5) benefit the lives of 3.5 million American citizens living in Puerto Rico by encouraging the Government of Puerto Rico to resolve its longstanding fiscal governance issues and return to economic growth.

(o) VOTING ON VOLUNTARY AGREEMENTS NOT STAYED.—Notwithstanding any provision in this section to the contrary, nothing in this section shall prevent the holder of a Liability Claim from voting on or consenting to a proposed modification of such Liability Claim under title VI of this Act.

### SEC. 406. PURCHASES BY TERRITORY GOVERNMENTS.

The text of section 302 of the Omnibus Insular Areas Act of 1992 (48 U.S.C. 1469e), is amended to read as follows: "The Governments of the Commonwealth of Puerto Rico, Guam, American Samoa, the Commonwealth of the Northern Mariana Islands, and the United States Virgin Islands are authorized to make purchases through the General Services Administration.".

48 USC 2195.

### SEC. 407. PROTECTION FROM INTER-DEBTOR TRANSFERS.

(a) PROTECTION OF CREDITORS.—While an Oversight Board for Puerto Rico is in existence, if any property of any territorial instrumentality of Puerto Rico is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property.

(b) ENFORCEABILITY.—A creditor may enforce rights under this section by bringing an action in the United States District Court for the District of Puerto Rico after the expiration or lifting of the stay of section 405, unless a stay under title III is in effect.

### SEC. 408. GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.

Section 15 of the Small Business Act (15 U.S.C. 644) is amended by adding at the end the following new subsection:

"(t) GAO REPORT ON SMALL BUSINESS ADMINISTRATION PROGRAMS IN PUERTO RICO.—Not later than one year after the date of enactment of this subsection, the Comptroller General of the United States shall submit to the Committee on Small Business of the House of Representatives and the Committee on Small Business and Entrepreneurship of the Senate a report on the application and utilization of contracting activities of the Administration (including contracting activities relating to HUBZone small business concerns) in Puerto Rico. The report shall also identify any provisions of Federal law that may create an obstacle to the efficient implementation of such contracting activities.".

ADD47

## CERTIFICATE OF FILING AND SERVICE

I, Robyn Cocho, hereby certify pursuant to Fed. R. App. P. 25(d) that, on March

15, 2017 the foregoing Brief for Intervenor-Appellant Financial Oversight and

Management Board for Puerto Rico was filed through the CM/ECF system and

served electronically on parties in the case.

Mark T. Stancil
Gary A. Orseck
Ariel N. Lavinbuk
Donald Burke
ROBBINS, RUSSEL, ENGLERT, ORSECK UNTEREINER & SAUBER LLP
1801 K Street, NW
Washington, D.C. 20006

*Counsel to Plaintiffs-Appellees Lex Claims, LLC Lex Claims, LLC, Jacana
Holdings I LLC, Jacana Holdings II LLC, Jacana Holdings III LLC, Jacana
Holdings IV LLC, Jacana Holdings V LLC, MPR Investors LLC, ROLSG, LLC,
RRW I LLC, and SL Puerto Rico Fund II, L.P.*

Erin E. Murphy
Michael F. Williams
Peter A. Farrell
KIRKLAND & ELLIS LLP
655 Fifteenth Street NW
Washington, DC 20005

*Counsel to Defendants-Appellees, the Commonwealth of Puerto Rico, Alejandro
García-Padilla , Juan Zaragoza Gómez, and Luis Cruz Batista*

Christopher M. Mason
Robert N. H. Christmas
Christopher J. Fong
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022

Giselle López Soler
LAW OFFICES OF GISELLE LÓPEZ SOLER
PMB 257
Rd. 19 1353
Guaynabo, PR 00966

*Counsel to Defendants-Appellees Puerto Rico Sales Tax Financing Corporation
and the Honorable Juan Vaquer*

Eric A. Schaffer
Luke A. Sizemore
REED SMITH LLP
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222

Lee Sepulvado Ramos
Albéniz Couret-Fuentes
SEPULVADO & MALDONADO, PSC
252 Ave. Ponce de León, Suite 1900
Citibank Tower San Juan, PR 00918

*Counsel to Defendant-Appellee Bank of New York Mellon Corp.*

Susheel Kirpalani
Eric Winston
Daniel Salinas
Eric Kay
Brant Duncan Kuehn
QUINN EMANUEL URQUHART
& SULLIVAN LLP
51 Madison Avenue, 22nd Floor
New York, NY 10010

Rafael Escalera
Sylvia M. Arizmendi
Carlos R. Rivera-Ortiz
REICHARD & ESCALERA
255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, PR 00917-1913

*Counsel to Intervenors-Appellants, the COFINA Senior Bondholders*

Required paper copies will be sent to the court upon the court's approval.

/s/ Robyn Cocho
Robyn Cocho

## Exhibit F

**English Version of the New Bond Legislation**

Exhibit L

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 156 of 447

34

## "ENGLISH VERSION OF THE PUERTO RICO SALES TAX FINANCING

## CORPORATION ACT:

### STATEMENT OF MOTIVES

Puerto Rico faces an unprecedented fiscal and economic crisis. This bill, as well as the restructuring agreement reached with the creditors of Government Development Bank for Puerto Rico, will enhance Puerto Rico's credibility. With this agreement, we will achieve significant adjustments in the repayment of the government's debts incurred by other administrations, but that it is now our responsibility to resolve. This way, we ensure that the Government is able to continue operating and serving the people of Puerto Rico.

The positions assumed and actions taken by the prior administration caused Puerto Rico to lose access to the capital markets and precipitated the collapse of our public finance system. These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico to the United States mainland.

The prior administration developed a hostile relationship with participants of the financial markets, including tens of thousands of residents of Puerto Rico that invested their savings trusting the good name and credit of the Commonwealth and that of its public corporations. This hostile environment towards Puerto Rico also pervaded the United States Congress due to the lack of transparency and honesty, while generating consistently negative news coverage for Puerto Rico at the local, national and global level.

Misguided decisions of the prior administration led to the bankruptcy of the Commonwealth of Puerto Rico and its need to gather its resources to address and provide essential services to the people of Puerto Rico. This, in turn, acted as a catalyst for a controversy that challenged the structure pursuant to which the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym) issued its bonds. In particular, certain parties asserted claims arguing, among other things, that (i) COFINA's issuance of its bonds violated the Puerto Rico Constitution and (ii) the portion of the sales and use tax imposed by the Commonwealth at a rate of 5.5% (the "SUT") and transferred to COFINA constituted "available resources" of the Commonwealth pursuant to Article VI, Section 8, of the Puerto Rico Constitution and must be used for the payment of the Commonwealth's "public debt." Certain creditors also challenged the scope of the Puerto Rico Constitution based on the whether the Spanish term "recursos disponibles" or the English term "available revenues, plus surplus" was used. On May 5, 2017, the Financial Oversight and Management Board ("Oversight Board") created pursuant to the provisions of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") commenced a proceeding as representative of COFINA under Title III.

Case:17-03283-LTS  Doc#:4606-7  Filed:01/02/19  Entered:01/02/19 16:23:38  Desc: H
- R to the Peter Hein Declaration  Page 157 of 447

35

The Commonwealth's and COFINA's various stakeholders sought an orderly process to resolve the disputes relating to COFINA and the ownership of the SUT (collectively, the "Commonwealth-COFINA Dispute"). To that end, on August 10, 2017, the Title III Court entered a stipulation and order appointing the Commonwealth's Official Committee of Unsecured Creditors to act as agent for the Oversight Board in its capacity as representative of the Commonwealth (the "Commonwealth Agent") and Bettina M. Whyte to act as agent for the Oversight Board in its capacity as representative of COFINA (the "COFINA Agent") in an effort to facilitate a settlement of the Commonwealth-COFINA Dispute.

On June 5, 2018, the Commonwealth Agent and the COFINA Agent announced that they had reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the "Agreement in Principle"). The Agreement in Principle was premised on splitting the fixed amount of the SUT transferred to COFINA each fiscal year (the "PSTBA") between the Commonwealth and COFINA beginning in fiscal year 2019, with COFINA receiving 53.65% of the yearly scheduled PSTBA and the Commonwealth receiving 46.35% of the yearly scheduled PSTBA plus all other revenues collected on account of the SUT.

Consistent with the public policy implemented by the Governor of Puerto Rico, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and various creditors and insurers of COFINA bonds executed a plan support agreement (as amended and restated on September 21, 2018, the "Plan Support Agreement"), which incorporates the Agreement in Principle's PSTBA split and provides for the settlement of the Commonwealth-COFINA Dispute pursuant to a plan of adjustment for COFINA under Title III of PROMESA (the "COFINA Plan").

The Legislative Assembly is now called upon to implement the agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the provisions of Act No. 91, which created COFINA and authorized it to issue bonds. These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government of Puerto Rico to better serve and provide for its citizens. By implementing the Plan Support Agreement, this legislation also puts an end to the costly litigation between the agents appointed by the Oversight Board and settles the claims of COFINA's bondholders, while also making clear the original legislative intent of Act 91-2006, as amended. Moreover, as a result of this implementing legislation, we will be saving the Government of Puerto Rico approximately $437.5 million per year, which will now be available to the Government for the benefit of the people of Puerto Rico.

Equally important, this legislation shows that the Legislative Assembly is determined to take the steps necessary to enable Puerto Rico's return to the capital

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 158 of 447

36

markets. As one of the steps required to implement the Plan Support Agreement, this legislation will allow for the restructuring of the COFINA debt under Title III of PROMESA, act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy, reduce costly litigation, and accelerate termination of the Oversight Board in accordance with PROMESA.

This Act demonstrates the Legislative Assembly's continued public policy commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets, and achieve economic certainty and debt sustainability for Puerto Rico.

1    *CHAPTER 1. – TITLE AND DEFINITIONS*

2    *Article 1.1.-Title.*

3    *This Act shall be known as the "Puerto Rico Sales Tax Financing Corporation Act."*

4    *Article 1.2.-Definitions.*

5    *The following terms shall have the meanings stated below:*

6    *(a)    "AAFAF"– means the Puerto Rico Fiscal Agency and Financial Advisory*

7    *Authority.*

8    *(b)    "Act"– means Act 91-2006, as amended, also known as the "Puerto Rico Sales Tax*

9    *Financing Corporation Act".*

10    *(c)    "Ancillary Agreements"– means the Bond Indenture, the Settlement Agreement,*

11    *and any other agreement or instrument entered into by the Corporation or the Indenture Trustee*

12    *in connection with, or in furtherance of, the Restructuring Transaction and in accordance with,*

13    *or in furtherance of, the Corporation Plan of Adjustment.*

14    *(d)    "Authorized Activities"– means the activities authorized to be carried out by the*

15    *Corporation under Article 2.4 of this Act.*

16    *(e)    "Board of Directors"– means the Board of Directors of the Corporation.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 159 of 447

37

1  (f)  *"Bond Indenture"– means one or more trust agreements, bond indentures and any*

2 *supplements or amendments thereto, or similar contracts or agreements, entered into by the*

3 *Corporation and the Indenture Trustee pursuant to which Plan of Adjustment Bonds are issued,*

4 *and establishing the rights and responsibilities of the Corporation and of the holders of Plan of*

5 *Adjustment Bonds issued thereunder.*

6  (g)  *"Chair" – means the chairperson of the Board of Directors.*

7  (h)  *"COFINA Revenues" – means the First Funds up to an amount equal to fifty-three*

8 *and sixty-five one hundredths percent (53.65%) of the Fixed Income for each Fiscal Year and all*

9 *legal and equitable rights, title and interest thereto (including the right to receive the First Funds*

10 *as set forth under Article 4.1 of this Act).*

11  (i)  *"COFINA Revenues Fund" – means the segregated fund or funds owned by the*

12 *Corporation into which the COFINA Revenues are deposited (1) which account shall be held in*

13 *the name of the Indenture Trustee for the benefit of the holders of the Plan of Adjustment Bonds,*

14 *(2) may not be owned or controlled in any way by the Government of Puerto Rico or any*

15 *Government Entity other than the Corporation, and (3) is maintained in one or more mainland*

16 *U.S. banks.*

17  (j)  *"Corporation" – means the Puerto Rico Sales Tax Financing Corporation created*

18 *by this Act.*

19  (k)  *"Corporation Plan of Adjustment" – means the plan of adjustment consummated*

20 *in connection with the Corporation's case under Title III of PROMESA, including the order of*

21 *the District Court confirming such plan of adjustment.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 160 of 447

38

1      *(l)*      *"District Court" – means the United States District Court for the District of*
2 *Puerto Rico.*

3      *(m)*      *"Effective Date" – means the date on which the Corporation Plan of Adjustment*
4 *becomes effective in accordance with its terms.*

5      *(n)*      *"Financing Costs" – means all costs associated with the Restructuring*
6 *Transaction, including the costs, fees and expenses to (1) issue, service, repay or refinance the Plan*
7 *of Adjustment Bonds, whether such costs are incurred upon issuance of such Plan of Adjustment*
8 *Bonds or over the term of the Plan of Adjustment Bonds, (2) make payments as required by the*
9 *Ancillary Agreements, (3) pay any stamp, issuance or similar taxes and other charges related to*
10 *the Restructuring Transaction, provided, that this provision does not limit in any way the*
11 *exemption from taxes set forth in Article 2.8 hereof, (4) prepare for and enter into the*
12 *Restructuring Transaction, and (5) perform all ongoing activities relating to the Restructuring*
13 *Transaction. For the avoidance of doubt, Financing Costs also includes pre-closing and post-*
14 *closing administrative fees and expenses incurred in connection with all Ancillary Agreements,*
15 *but does not include payments of principal and interest on the Plan of Adjustment Bonds.*

16      *(o)*      *"First Funds" – means the first funds comprising the Pledged Taxes in any Fiscal*
17 *Year as described in Article 4.1 of this Act.*

18      *(p)*      *"Fiscal Year" – means the fiscal year of the Government of Puerto Rico, which*
19 *begins on July 1 and ends on June 30.*

20      *(q)*      *"Fixed Income" – means, for Fiscal Year 2018-2019, seven hundred eighty-three*
21 *million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251)*
22 *and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four percent*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 161 of 447

39

1     *(4%) of such Fixed Income, up to the Maximum Amount. The Fixed Income for each Fiscal Year*

2     *shall be funded from the first revenues collected of the Pledged Taxes.*

3     *(r)*     *"Government Entity" – means any agency, department, office, public corporation,*

4     *trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the*

5     *Government of Puerto Rico.*

6     *(s)*     *"Government of Puerto Rico"– means the Commonwealth of Puerto Rico and the*

7     *government thereof.*

8     *(t)*     *"Indenture Trustee"– means the Person designated as trustee or indenture trustee*

9     *under the Bond Indenture, including any successor trustee or indenture trustee under the Bond*

10     *Indenture.*

11     *(u)*     *"Maximum Amount" – means One Billion Eight Hundred and Fifty Million*

12     *dollars ($1,850,000,000.00).*

13     *(v)*     *"Oversight Board" – means the Financial Oversight and Management Board for*

14     *Puerto Rico established pursuant to Article 1.1 of PROMESA.*

15     *(w)*     *"Person" – means any natural person or legal entity, including, but not limited to,*

16     *the Government of Puerto Rico, any Government Entity, or any firm, partnership, joint venture,*

17     *trust, estate, limited liability company, corporation of individuals, association, or public or private*

18     *corporation, organized or existing under the laws of Puerto Rico, the United States of America,*

19     *any state or any other jurisdiction, or any state, municipality, political subdivision, taxing*

20     *authority, agency or instrumentality of the United States of America, any state or any other*

21     *jurisdiction, or any combination thereof.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 162 of 447

40

1         *(x)    "Plan of Adjustment Bonds" – means any Restructuring Bonds and any*
2  *Refunding Bonds.*

3         *(y)    "Pledged Taxes" – means, subject to the provisions of Article 3.3 hereof, (1) the*
4  *present and future revenues and collections generated by the portion of the Sales Tax that*
5  *corresponds to a tax rate of five and one-half percent (5.5%), and (2) the Substituted Collateral, if*
6  *any.*

7         *(z)    "PROMESA" – means the "Puerto Rico Oversight, Management, and Economic*
8  *Stability Act", Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.*

9         *(aa)    "Refunding Bonds" – means the bonds issued by the Corporation pursuant to the*
10  *Act and the Ancillary Agreements, on a pari passu basis with the Restructuring Bonds, to retire,*
11  *refinance or defease any Plan of Adjustment Bonds.*

12        *(bb)    "Restructuring Bonds" – means the bonds issued by the Corporation pursuant to*
13  *this Act, the Corporation Plan of Adjustment, and the Ancillary Agreements, having terms that*
14  *conform to, and that are authorized, determined to be valid, and distributed in accordance with,*
15  *the Corporation Plan of Adjustment.*

16        *(cc)    "Restructuring Resolution" – means one or more resolutions of the Board of*
17  *Directors authorizing: (1) the issuance of Plan of Adjustment Bonds and describing the terms*
18  *thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the*
19  *Corporation Plan of Adjustment.*

20        *(dd)    "Restructuring Transaction" – means the transactions contemplated by, or in*
21  *furtherance of, the Corporation Plan of Adjustment.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 163 of 447

41

1   (ee)  *"Sales Tax" – means the sales and use taxes imposed by the Government of Puerto*

2 *Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended,*

3 *known as the Internal Revenue Code for a New Puerto Rico.*

4   (ff)  *"Settlement Agreement" – means the Settlement Agreement, dated as of October*

5 *[15], 2018, between the Oversight Board, on behalf of the Government of Puerto Rico, and the*

6 *agent for the Corporation appointed by the Oversight Board to settle or litigate the dispute between*

7 *the Government of Puerto Rico and the Corporation regarding the ownership of the Sales Tax.*

8   (gg)  *"Substituted Collateral" – means all or a portion of a tax of general applicability*

9 *throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise*

10 *constitutes like or comparable security for the Plan of Adjustment Bonds.*

11   (hh)  *"Substitution Requirements" – means (1) the enactment of legislation providing*

12 *for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal*

13 *to the COFINA Revenues has been irrevocably transferred to and is owned solely and exclusively*

14 *by the Corporation to the full extent provided under Article 2.2 of this Act, (B) that, following*

15 *such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not,*

16 *and shall not constitute, "available resources" or "available revenues" of the Government of*

17 *Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as*

18 *otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or*

19 *English version of the Puerto Rico Constitution), (C) for a lien on such Substituted Collateral in*

20 *favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds to the full*

21 *extent provided for under Article 3.2 of this Act, and (D) that the Government of Puerto Rico and*

22 *the Government Entities shall continue to provide the covenants set forth in Article 3.3 of this Act*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 164 of 447

42

1     *with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted*

2     *Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect*

3     *to the Substituted Collateral.*

4     *CHAPTER 2. - THE PUERTO RICO SALES TAX FINANCING CORPORATION*

5     *Article 2.1. - Creation and Separate Legal Existence of the Corporation.*

6     *There is created a public corporation and instrumentality of the Government of Puerto*

7     *Rico, which constitutes a corporate and political entity independent and separate from the*

8     *Commonwealth of Puerto Rico to be known as the Puerto Rico Sales Tax Financing Corporation.*

9     *The Corporation, which was created pursuant to the provisions of this Act, is and shall be*

10     *recognized for all purposes as an independent and separate legal entity from the Government of*

11     *Puerto Rico and any other Government Entity. It shall be operated independently, and its business*

12     *and affairs shall be governed by or under the direction of its Board of Directors.*

13     *Article 2.2. - Ownership of the COFINA Revenues.*

14     *(a)    Any and all ownership interests and rights to the COFINA Revenues were, have*

15     *been or are hereby transferred to the Corporation.*

16     *(b)    The transfer described in (a) above is an absolute transfer of all legal and equitable*

17     *right, title and interest, and not a pledge or other financing.*

18     *(c)    The Corporation is and will be the sole and exclusive owner of the COFINA*

19     *Revenues until such time as the Plan of Adjustment Bonds, together with any interest thereon,*

20     *and all amounts and obligations under all Ancillary Agreements, have been completely paid in*

21     *cash in full or have otherwise been discharged in accordance with their terms.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 165 of 447

43

1     *(d)    Persons designated as withholding agents for purposes of the imposition and*

2 *collection of the Sales Tax pursuant to the Act 1-2011, as amended, also known as the Internal*

3 *Revenue Code for a New Puerto Rico, shall be deemed to collect any portion of the Sales Taxes in*

4 *which the Corporation has an ownership interest on behalf of the Corporation. Any such*

5 *withholding agent will continue to be subject to any and all obligations and responsibilities*

6 *imposed by the Internal Revenue Code for a New Puerto Rico, on withholding agents in relation*

7 *to the imposition and collection of the Sales Tax.*

8     *(e)    The COFINA Revenues do not constitute "available resources" or "available*

9 *revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico*

10 *Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant*

11 *to the Spanish or English version of the Puerto Rico Constitution).*

12     *Article 2.3.-Purpose of the Corporation.*

13     *On and after the Effective Date, the Corporation's purpose will be to (a) issue the Plan of*

14 *Adjustment Bonds, (b) own and administer the COFINA Revenues, and (c) issue any other bonds,*

15 *notes or evidence of indebtedness of the Corporation as may be permitted by the Corporation Plan*

16 *of Adjustment and the Ancillary Agreements and which will be payable from such sources as may*

17 *be provided for by the Legislative Assembly.*

18     *Article 2.4.-The Corporation's Activities.*

19     *The Corporation's activities shall be limited to the following Authorized Activities:*

20     *(a)    receiving and owning the COFINA Revenues and such other revenues or property*

21 *as may be provided or transferred to the Corporation;*

22     *(b)    adopting the Restructuring Resolution;*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 166 of 447

44

1    (c)    *issuing, from time to time, Plan of Adjustment Bonds and any bonds, notes or*

2    *evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act;*

3    (d)    *entering into and performing the Ancillary Agreements;*

4    (e)    *to pay any bonds, notes or evidences of indebtedness the issuance of which is*

5    *authorized by Article 2.3 of this Act by pledging, on a basis subordinate in all respects to the lien*

6    *established in Article 3.2 of this Act, (1) any amounts remaining of the COFINA Revenues after*

7    *the payment of principal and interest on the Plan of Adjustment Bonds or (2) any other funds or*

8    *property that may be allocated to the Corporation after the Effective Date; and*

9    (f)    *taking any and all other actions as may be necessary or appropriate to effectuate the*

10    *Restructuring Transaction and the Corporation Plan of Adjustment, including making*

11    *amendments to, exchanging and/or canceling bonds issued by the Corporation prior to the*

12    *Effective Date and amending and restating agreements of the Corporation relating thereto.*

13    *Article 2.5.-Ancillary Powers.*

14    *In order to carry out the Authorized Activities, without limiting the foregoing, the*

15    *Corporation shall have the power to:*

16    (a)    *sue and be sued in any Commonwealth court or the District Court;*

17    (b)    *adopt, alter and use a seal;*

18    (c)    *formulate, adopt, amend and revoke rules for the administration and management*

19    *of its affairs, and such standards, rules and regulations that may be necessary or convenient to*

20    *exercise and perform the Authorized Activities;*

21    (d)    *open and maintain bank accounts, including the COFINA Revenues Fund;*

22    (e)    *acquire, hold, lease, sell and otherwise transfer property;*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 167 of 447

45

1    *(f)*    *have complete legal and equitable dominion over its properties (including the*

2  *COFINA Revenues), subject to the statutory lien established under Article 3.2 of this Act;*

3    *(g)*    *make, execute and amend contracts and all other instruments necessary or*

4  *convenient to perform the Authorized Activities;*

5    *(h)*    *appoint and remove officers, agents, employees and contractors, establish their*

6  *compensations, powers and duties, in each case, in accordance with the Ancillary Agreements;*

7    *(i)*    *pay its operating expenses and the Financing Costs;*

8    *(j)*    *procure insurance, including insurance covering the Corporation's directors and*

9  *officers, against loss in connection with its activities, properties or assets;*

10    *(k)*    *invest funds and establish and maintain reserves as required by, and pursuant to*

11  *standards set forth in, the Ancillary Agreements;*

12    *(l)*    *indemnify the members of the Board of Directors, its officers, agents, employees,*

13  *contractors and other third parties for conduct that does not constitute gross negligence, willful*

14  *misconduct or fraud;*

15    *(m)*    *exercise such other powers, not inconsistent herewith, as may be necessary to carry*

16  *out the Authorized Activities;*

17    *(n)*    *take any action or measure necessary or convenient to carry out its purposes and*

18  *exercise the powers expressly granted in this Article;*

19    *(o)*    *delegate to its officers, agents, employees or contractors authority to take actions in*

20  *furtherance of this Act; and*

21    *(p)*    *execute, file and amend any relevant returns, forms, elections or statements with*

22  *any governmental authority.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 168 of 447

46

1       *Article 2.6.-Prohibited Activities.*

2       *While the Plan of Adjustment Bonds are outstanding, the Corporation shall not be*

3       *authorized to:*

4           *(a)     merge or consolidate, directly or indirectly, with any Person;*

5           *(b)     incur, guarantee or otherwise become obligated to pay any debt or other obligations*

6       *other than the Plan of Adjustment Bonds, operating costs, the Financing Costs and any bond, note*

7       *or evidence of indebtedness permitted under Article 2.3 hereof;*

8           *(c)     pledge, create or record liens on any of its properties (including the COFINA*

9       *Revenues), other than (1) the pledge to secure the payment of Plan of Adjustment Bonds created*

10      *pursuant to Article 3.2 of this Act or (2) any pledge or lien to secure any bond, note or evidence of*

11      *indebtedness permitted under Article 2.3 hereof but only to the extent such pledge or lien is*

12      *subordinate in all respects to the lien established in Article 3.2 of this Act;*

13          *(d)     engage in business activities other than as expressly authorized in this Act;*

14          *(e)     dissolve, liquidate, sell or, except as permitted by Article 2.4(e), otherwise transfer*

15      *any or all of its properties (including the COFINA Revenues); and*

16          *(f)     take any other action that is inconsistent with the Corporation's purpose set forth*

17      *in this Act or ancillary thereto.*

18      *Article 2.7.-Board of Directors.*

19      *The powers of the Corporation shall be exercised by the Board of Directors.*

20          *(a)     Composition of the Board of Directors.*

21      *The Board of Directors shall be composed of three (3) members, who shall meet the*

22      *requirements set forth in Article 2.7 (b)(iii) of this Act and shall be appointed by the Governor of*

Case:17-03283-LTS   Doc#:4606-7   Filed:01/02/19   Entered:01/02/19 16:23:38   Desc:  H
- R to the Peter Hein Declaration   Page 169 of 447

47

1    *Puerto Rico; provided, that, pursuant to the provisions of the Ancillary Agreements, certain*

2    *holders of Plan of Adjustment Bonds may submit up to three (3) recommendations for the*

3    *Governor's consideration of the initial appointment of the Corporation's directors but the*

4    *Governor shall be under no obligation to appoint any such recommended persons.*

5        *(b)      General Provisions regarding the Board of Directors.*

6            *(i)      Each member of the Board of Directors shall be appointed for a term of three*

7    *(3) years and may serve consecutive terms as an appointed member; provided, that the*

8    *Governor may remove any member prior to the expiration of their term if such member*

9    *fails to uphold the responsibilities set forth in this Act or for gross negligence, willful*

10    *misconduct or fraud;*

11            *(ii)      each member of the Board of Directors shall be entitled to one (1) vote;*

12            *(iii)      each member of the Board of Directors shall satisfy the independence and*

13    *qualification standards (including that no member of the Board of Directors may be an*

14    *officer, employee or director of any Government Entity other than the Corporation) set*

15    *forth in the Ancillary Agreements;*

16            *(iv)      all decisions and actions of the Board of Directors shall require the*

17    *affirmative vote of the majority of the members of the Board of Directors at the time serving;*

18    *provided, that, the Corporation's bylaws may require a higher approval threshold for*

19    *particular matters described therein; and*

20            *(v)      the members of the Board of Directors shall select a Chair from among*

21    *themselves.*

22    *(c)      Vacancies.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 170 of 447

48

1    *In the event of a vacancy in the office of a member of the Board of Directors by death,*

2    *removal, resignation or otherwise, a successor member who meets the requirements set forth in*

3    *Article 2.7 (b)(iii) of this Act shall be appointed by the Governor of Puerto Rico subject to Article*

4    *2.7(b)(i) hereof.*

5    *(d)    Compensation.*

6    *Members of the Board of Directors shall receive such compensation as is authorized*

7    *pursuant to the Ancillary Agreements.*

8    *(e)    Adoption and Amendment of Rules.*

9    *As soon as practicable after the appointment of all members and appointment of the Chair,*

10   *the Corporation shall adopt rules and procedures governing its activities under this Act. The Board*

11   *of Directors shall be entitled to amend such rules and procedures from time to time.*

12   *(f)    Quorum.*

13   *A majority of the members of the Board of Directors at the time serving shall constitute a*

14   *quorum to make decisions or exercise any power or function of the Corporation. Any one or more*

15   *members may participate in a meeting of the Board of Directors by teleconference or similar*

16   *communications equipment. Participation by such means shall constitute presence in person at*

17   *the meeting. Any action necessary or allowed in any meeting of the Board of Directors shall be*

18   *authorized with no need for a meeting, if all the members of the Board of Directors give their*

19   *written consent concerning such action.*

20   *(g)    Delegation.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 171 of 447

49

1    *The Board of Directors may delegate to one or more of the members, or to the Corporation's*

2    *officers, agents and employees, such powers and duties as the Board of Directors may deem*

3    *appropriate.*

4    *Article 2.8.-Tax Exemption.*

5    *(a)    It is hereby found and declared that the activities of the Corporation are for a public*

6    *purpose. As a result, the Corporation shall be totally exempt from, and shall not be required to pay*

7    *any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the*

8    *Government of Puerto Rico or any Government Entity upon any of the property that the*

9    *Corporation owns, possesses, holds or uses or on its activities, or upon any income, payment or*

10   *gain derived therefrom.*

11   *(b)    The Plan of Adjustment Bonds, including, but not limited to, any payments or*

12   *income with respect to the Plan of Adjustment Bonds and the transfer of the Plan of Adjustment*

13   *Bonds, shall, at all times, be totally exempt from all kinds of taxes, assessments, licenses, stamps,*

14   *fees and other charges levied by the Government of Puerto Rico or any Government Entity.*

15   *Holders and beneficial owners of the Plan of Adjustment Bonds shall not be subject to any tax*

16   *return filing or any other tax reporting or similar requirement in respect of the Government of*

17   *Puerto Rico or any Government Entity by reason of holding, owning or transferring the Plan of*

18   *Adjustment Bonds.*

19   *Article 2.9.-Inapplicability of Certain Laws.*

20   *The following laws or provisions shall not apply to the Corporation notwithstanding that*

21   *they may appear to apply to the Corporation:*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 172 of 447

50

1     (a)    *Chapters 4 and 6 of Act 26-2017, as amended, known as the "Fiscal Plan*

2  *Compliance Act";*

3     (b)    *Act 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of*

4  *2011";*

5     (c)    *Act 103 of May 25, 2006, as amended, known as the "Act for the Fiscal Reform of*

6  *the Government of the Commonwealth of Puerto Rico of 2006";*

7     (d)    *Act 8-2017, as amended, known as the "Act for the Transformation of the*

8  *Government's Human Resources";*

9     (e)    *Act 237-2004, as amended, known as the "Act to Establish Uniform Parameters*

10  *for Contracting Professional and Consulting Services by Agencies and Instrumentalities of the*

11  *Government of Puerto Rico";*

12     (f)    *Act 197-2002, as amended, known as the "Act to Regulate the Transition Process*

13  *of the Government of Puerto Rico";*

14     (g)    *Act 78-2011, as amended, known as the "Electoral Code of Puerto Rico for the XXI*

15  *Century";*

16     (h)    *Act 38-2017, known as the "Uniform Administrative Procedures Act of the*

17  *Government of Puerto Rico";*

18     (i)    *Plan 3-2011, as amended, known as "General Services Reorganization Plan";*

19     (j)    *Act 230 of July 23, 1974, as amended, known as the "Government Accounting*

20  *Act";*

21     (k)    *Act 3-2017, known as the "Law to Address the Economic, Fiscal and Budgetary*

22  *Crisis and Ensure the Functioning of the Government of Puerto Rico"; and*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 173 of 447

51

1 *(l) Act 14 of April 17, 1972, as amended.*

2 *CHAPTER 3. - THE RESTRUCTURING TRANSACTION*

3 *Article 3.1.–Issuance of Plan of Adjustment Bonds.*

4 *(a) From and after the Effective Date, the Corporation shall be authorized to issue Plan*
5 *of Adjustment Bonds, from time to time, pursuant to the Corporation Plan of Adjustment and the*
6 *terms and conditions authorized by the Corporation and set forth in the applicable Restructuring*
7 *Resolution and the Ancillary Agreements.*

8 *(b) Plan of Adjustment Bonds shall be dated, shall bear interest at such rates and shall*
9 *mature at such time or times as may be determined by the Corporation and authorized in the*
10 *applicable Restructuring Resolution in accordance and consistent with the Corporation Plan of*
11 *Adjustment. The Corporation shall determine the form of Plan of Adjustment Bonds and the*
12 *manner of execution of Plan of Adjustment Bonds, and shall fix the denomination or*
13 *denominations of Plan of Adjustment Bonds and the place or places of payment of principal thereof*
14 *and interest thereon, the terms of redemption and purchase in lieu of redemption and the other*
15 *terms thereof, all in accordance and consistent with the Corporation Plan of Adjustment. Such*
16 *Plan of Adjustment Bonds may be sold at public or private sale for such price or prices as the*
17 *Corporation shall determine, or issued in exchange for existing bonds of the Corporation in*
18 *accordance with the Plan of Adjustment.*

19 *(c) Plan of Adjustment Bonds shall be payable solely from the COFINA Revenues in*
20 *accordance with the terms of this Act and the Ancillary Agreements.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 174 of 447

52

1      *(d)      The Corporation may purchase bonds issued by the Corporation on the terms and*

2    *in accordance with the Corporation Plan of Adjustment and applicable Ancillary Agreements at*

3    *a price not exceeding the redemption price thereof. All bonds so purchased shall be cancelled.*

4      *(e)      Neither the members of the Board of Directors nor any natural Person executing*

5    *such bonds shall be liable personally on the bonds or be subject to any personal liability or*

6    *accountability by reason of the issuance thereof.*

7      *(f)      Plan of Adjustment Bonds shall not constitute a debt of the Government of Puerto*

8    *Rico or of any Government Entity other than the Corporation. This statement shall be included in*

9    *the Plan of Adjustment Bonds, the Bond Indenture and the disclosure documentation relating to*

10    *such bonds.*

11    *Article 3.2.-Statutory Lien.*

12    *Plan of Adjustment Bonds shall automatically, upon the issuance of such Plan of*

13    *Adjustment Bonds, be secured by a statutory first lien on all of the Corporation's right, title and*

14    *interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract*

15    *rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of*

16    *the holders of Plan of Adjustment Bonds. Such statutory first lien shall occur automatically and*

17    *shall automatically attach and be perfected, valid and binding from and after the Effective Date,*

18    *without any further act or agreement by any Person. No instrument needs to be executed or*

19    *delivered or recorded in any official record or in any government registry or office in order to*

20    *perfect or continue such statutory first lien or to establish or maintain the priority thereof. No*

21    *commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other*

22    *Government Entity or any other Person shall limit, defeat, impair or interfere with such statutory*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 175 of 447

53

1     *lien. Such lien shall be valid, binding, perfected and enforceable against all Persons having claims*

2     *of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of*

3     *whether such Persons have notice of such lien.*

4     *Article 3.3.-Covenants Regarding Plan of Adjustment Bonds and the Restructuring*

5     *Transaction.*

6     *The Government of Puerto Rico, with the intent of being contractually bound, hereby*

7     *agrees and covenants with the Corporation and each Person that holds Plan of Adjustment Bonds,*

8     *and authorizes the Corporation to include such covenant in the Bond Indenture for the benefit of*

9     *the holders of Plan of Adjustment Bonds, that it will not, and no Government Entity shall be*

10     *authorized to, until the Plan of Adjustment Bonds, together with the interest thereon, and all*

11     *amounts and obligations under all Ancillary Agreements, have been completely paid in cash in*

12     *full or otherwise discharged in accordance with their terms:*

13     *(a)     take any action that would (A) impair the Corporation's right to receive the*

14     *COFINA Revenues, (B) limit or alter the rights vested in the Corporation in accordance with the*

15     *Corporation Plan of Adjustment to fulfill the terms of any agreements with the holders of Plan of*

16     *Adjustment Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any*

17     *Fiscal Year, or (D) impair the rights and remedies of the holders of the Plan of Adjustment Bonds*

18     *or the collateral security established under Article 3.2 of this Act;*

19     *(b)     reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless,*

20     *in connection with such reduction, the credit rating and other requirements set forth in the*

21     *Ancillary Agreements are satisfied; provided, however, that, notwithstanding the foregoing, until*

22     *all obligations with respect to the Plan of Adjustment Bonds have been paid or satisfied in full in*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 176 of 447

54

1   *accordance with their terms, if the rate of the Pledged Taxes is reduced below three percent (3%),*

2   *then, in connection with such reduction, the Government of Puerto Rico must comply with the*

3   *Substitution Requirements;*

4   *(c)    impair, limit, restrict, rescind, delay or modify the rights or powers of the*

5   *Corporation, the Indenture Trustee or the holders of Plan of Adjustment Bonds under this Act or*

6   *relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to its*

7   *bondholders;*

8   *(d)    amend this Act to impair, limit, restrict, rescind, delay or modify any obligation or*

9   *commitment of the Corporation to the holders of Plan of Adjustment Bonds; and*

10  *(e)    limit or restrict the rights or powers of the appropriate officers of the Government*

11  *of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing*

12  *shall not preclude the Government of Puerto Rico from exercising its power, through a change in*

13  *law, replace the portion of the Sales Tax that corresponds to a tax rate of five and one half percent*

14  *(5.5%) with Substituted Collateral in accordance with the Substitution Requirements.*

15  *CHAPTER 4. - FUNDING OF THE CORPORATION; DEPOSITS AND DISBURSEMENTS.*

16      *Article 4.1.-First Dollars Funding of COFINA Revenues.*

17  *(a)    Each Fiscal Year, the first funds comprising the Pledged Taxes shall be transferred*

18  *to, and deposited with, the Corporation, or any account or fund (including the COFINA Revenues*

19  *Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture*

20  *pursuant to which obligations were incurred in accordance with this Act and the Ancillary*

21  *Agreements) designated by the Corporation, until such time as the Corporation has received an*

22  *amount equal to the COFINA Revenues for such Fiscal Year. The requirement that the first funds*

Case:17-03283-LTS  Doc#:4606-7  Filed:01/02/19  Entered:01/02/19 16:23:38  Desc: H
- R to the Peter Hein Declaration  Page 177 of 447

55

1    *comprising the Pledged Taxes up to the COFINA Revenues be deposited with the Corporation or*

2    *in any account or fund (including the COFINA Revenues Fund or an account or fund controlled*

3    *by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were*

4    *incurred in accordance with this Act and the Ancillary Agreements) designated by the*

5    *Corporation may not be modified; provided, that the Bond Indenture may contain provisions*

6    *allowing for the quarterly distribution of the Pledged Taxes between the Corporation and the*

7    *Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture*

8    *and consistent with the Corporation Plan of Adjustment. The Corporation shall have the rights*

9    *set forth in this Article 4.1 until such time as the Plan of Adjustment Bonds, together with any*

10   *interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in*

11   *cash in full or have otherwise been discharged in accordance with their terms.*

12   *(b)    During each Fiscal Year, the Indenture Trustee or such other Person as may be*

13   *designated in the Bond Indenture shall determine, on a monthly basis, if the Corporation has*

14   *received the COFINA Revenues. Once the Indenture Trustee or such other Person determines*

15   *that the COFINA Revenues have been deposited with the Indenture Trustee (or that portion of the*

16   *COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution*

17   *referenced in Article 4.1(a) above is in effect), all revenues of the Pledged Taxes received after such*

18   *determination shall be transferred to the Government of Puerto Rico.*

19   *(c)    No Person who collects or holds the Pledged Taxes shall have any legal or equitable*

20   *right, title or interest thereto solely by virtue of the fact that it collects or holds the Pledged Taxes.*

21   *Article 4.2.-Excess Funding.*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 178 of 447

56

1    *The amounts deposited with the Corporation each Fiscal Year in excess of the amounts*

2    *required to pay principal and interest on the Plan of Adjustment Bonds then due and payable*

3    *(including the principal and interest due and payable on any past due Plan of Adjustment Bonds),*

4    *satisfy obligations assumed pursuant to the Bond Indenture or other Ancillary Agreements then*

5    *due and payable, pay its Financing Costs or operating expenses as provided in the Ancillary*

6    *Agreement, or make any other payment related to other obligations incurred by the Corporation,*

7    *will be transferred to the Corporation, free and clear of the lien established by Article 3.2 of this*

8    *Act and any other lien established by the Bond Indenture or other Ancillary Agreement.*

9    *CHAPTER 5. - MISCELLANEOUS PROVISIONS.*

10   *Article 5.1. -Severability.*

11   *This Act shall be interpreted in a manner to render it valid to the extent practicable in*

12   *accordance with the Puerto Rico Constitution and the U.S. Constitution. If any clause, paragraph,*

13   *subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter,*

14   *subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order*

15   *to such effect will neither affect nor invalidate the remainder of this Act. The effect of such an order*

16   *shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision,*

17   *section, subsection, title, chapter, subchapter, heading, or part of this Act so annulled or declared*

18   *unconstitutional. If the application to a Person or circumstance of any clause, paragraph,*

19   *subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter,*

20   *subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order*

21   *to such effect will neither affect nor invalidate the application of the remainder of this Act to such*

22   *Persons or circumstances to which it may be validly applied. It is the express and unequivocal*

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 179 of 447

57

1     *intent of this Legislative Assembly that the courts of law enforce the provisions and application of*

2     *this Act to the greatest possible extent, even if any of its parts is annulled, invalidated, affected or*

3     *declared unconstitutional, or even if the application thereof to any Person or circumstance is*

4     *annulled, invalidated or declared unconstitutional. This Legislative Assembly would have passed*

5     *this Act regardless of the ruling on severability that a Court may issue.*

6     *Article 5.2.- Language Conflict.*

7     *This Act shall be adopted both in English and Spanish. If in the interpretation or*

8     *application of this Act any conflict arises as between the English and Spanish texts, the English*

9     *text shall govern."*

10     Sección 26.- Se derogan los Artículos 2 y 4 de la Ley 116-2013, según enmendada.

11     Sección 27.- Se enmienda el Artículo 25-A de la Ley 44 del 21 de junio de 1988,

12  según enmendada, para que lea en su totalidad como sigue:

13     "(a)...

14     ...

15     (k) Durante el período comprendido entre la fecha de aprobación de esta Ley y el

16  31 de diciembre de 2012, la Autoridad habrá de disponer de los activos depositados en la

17  Cuenta del Corpus de la siguiente manera:

18     (i) ...

19     (ii) el remanente, permanecerá en la Cuenta del Corpus y se utilizará para

20     comprar un bono de apreciación de capital emitido por la Corporación para

21     el Fondo de Interés Apremiante de Puerto Rico con un vencimiento no

22     menor de 30 años ni mayor de 40 años y a una tasa de interés de no menos

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H - R to the Peter Hein Declaration Page 180 of 447

58

1      de 7.00%. El Sistema de Retiro de Empleados del Estado Libre Asociado de

2      Puerto Rico y la Autoridad para el Financiamiento de la Infraestructura de

3      Puerto Rico no podrán disponer voluntariamente del bono de la

4      Corporación del Fondo de Interés Apremiante de Puerto Rico, a menos que

5      dicha disposición sea autorizada por *la Autoridad de Asesoría Financiera y*

6      *Agencia Fiscal de Puerto Rico* **[el Banco Gubernamental de Fomento para**

7      **Puerto Rico y en el caso del bono depositado en la Cuenta del Corpus,**

8      **aprobada mediante Resolución Conjunta por la Asamblea Legislativa].**"

9      Sección 28.- Separabilidad.

10      Esta Ley se interpretará de tal manera para hacerla válida, en la medida que sea

11  factible, de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados

12  Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra,

13  artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de

14  esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no

15  afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden

16  quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo,

17  disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma

18  que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona

19  o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra,

20  artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de

21  esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o

22  sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H
- R to the Peter Hein Declaration Page 181 of 447

59

1  Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la

2  voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan

3  cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque

4  se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus

5  partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a

6  alguna persona o circunstancia. Esta Asamblea Legislativa hubiera aprobado esta Ley sin

7  importar la determinación de separabilidad que el Tribunal pueda hacer.

8      Sección 29.- Supremacía.

9      Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición

10  general o específica de cualquier otra ley o reglamento del Gobierno de Puerto Rico que

11  sea inconsistente con esta Ley.

12      Sección 30.- Vigencia.

13      Esta Ley comenzará a regir en la Fecha de Efectividad, según dicho término está

14  definido en la Ley 91-2016, según enmendada por esta Ley.

**NEW ISSUE - BOOK-ENTRY ONLY**              **RATINGS:**   Moody's: **A3**

See "Book-Entry Only System" under THE BONDS     **See RATINGS**     Fitch: **BBB+**

                                                                   S&P: **BBB**

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

**$602,105,000**

**COMMONWEALTH OF PUERTO RICO**

**$304,000,000**    **Public Improvement Bonds of 2011**

**$52,190,000**    **Public Improvement Refunding Bonds, Series 2011 D**

**$245,915,000**    **Public Improvement Refunding Bonds, Series 2011 E**

**(General Obligation Bonds)**

**Dated: Date of Delivery**                                           **Due: July 1, as shown on the inside cover**

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 and whole multiples thereof and will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book Entry Only System" under THE BONDS. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on January 1, 2012. The Bonds are subject to redemption prior to maturity as set forth herein, the earliest possible date of redemption being July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041).

The scheduled payment of principal of and interest on the Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

**The Bonds are general obligations of the Commonwealth. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about July 12, 2011.

**J.P. Morgan**                                                       **Barclays Capital**

| | | | |
|---|---|---|---|
| **BMO Capital Markets** | **BofA Merrill Lynch** | **Citi** | **Goldman, Sachs & Co.** |
| **Jefferies & Company** | **Morgan Stanley** | **Ramirez & Co. Inc.** | **Raymond James** |
| **RBC Capital Markets** | **UBS Financial Services Incorporated of Puerto Rico** | | **Wells Fargo Securities** |

BBVAPR MSD   FirstBank Puerto Rico Securities   Oriental Financial Services   Popular Securities   Santander Securities   Scotia MSD   VAB FINANCIAL

June 29, 2011

**$602,105,000**
**Commonwealth of Puerto Rico**

$304,000,000   **Public Improvement Bonds of 2011**
$52,190,000   **Public Improvement Refunding Bonds, Series 2011 D**
$245,915,000   **Public Improvement Refunding Bonds, Series 2011 E**
**(General Obligation Bonds)**

### Public Improvement Bonds of 2011

$304,000,000   5.75% Term Bonds due July 1, 2041   Yield – 5.95%   CUSIP[*] 74514LYW1

### Public Improvement Refunding Bonds, Series 2011 D

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2013 | $ 470,000 | 3.000% | 1.80% | 74514LYX9 |
| 2014 | 485,000 | 3.000 | 2.24 | 74514LYY7 |
| 2015 | 500,000 | 3.000 | 2.83 | 74514LYZ4 |
| 2016 | 515,000 | 3.125 | 100.00 | 74514LZA8 |
| 2017 | 530,000 | 3.500 | 3.55 | 74514LZB6 |
| 2018 | 550,000 | 3.875 | 3.90 | 74514LZC4 |
| 2019 | 15,000,000 | 5.000 | 4.26[†] | 74514LZH3 |
| 2019 | 8,870,000 | 4.250 | 4.26 | 74514LZF7 |
| 2019[‡] | 5,900,000 | 3.875 | 100.00 | 74514LZD2 |
| 2020 | 10,000,000 | 5.000 | 4.50[†] | 74514LZJ9 |
| 2020 | 4,870,000 | 4.500 | 100.00 | 74514LZG5 |
| 2020[‡] | 4,500,000 | 4.125 | 100.00 | 74514LZE0 |

### Public Improvement Refunding Bonds, Series 2011 E

| Maturity July 1 | Amount | Interest Rate | Price or Yield | CUSIP[*] |
|---|---|---|---|---|
| 2029 | $70,315,000 | 6.000% | 5.070%[†] | 74514LZK6 |
| 2030 | 60,255,000 | 5.375 | 5.610 | 74514LZL4 |
| 2031 | 35,970,000 | 5.500 | 5.680 | 74514LZM2 |
| 2032 | 38,435,000 | 5.625 | 5.750 | 74514LZN0 |
| 2033 | 40,565,000 | 5.625 | 5.800 | 74514LZP5 |
| 2034 | 375,000 | 5.625 | 5.830 | 74514LZQ3 |

---

[*]   Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

[†]   Priced at the stated yield to the July 1, 2016 optional redemption date at a redemption price of 100%. See *Redemption* under THE BONDS.

[‡]   Insured by Assured Guaranty Municipal Corp.

# Government of Puerto Rico

### Governor

LUIS G. FORTUÑO

### Members of the Cabinet

MARCOS RODRÍGUEZ-EMA
*Chief of Staff*

KENNETH D. MCCLINTOCK
*Secretary of State*

GUILLERMO SOMOZA COLOMBANI
*Secretary of Justice*

JESÚS F. MÉNDEZ
*Secretary of the Treasury*

JESÚS RIVERA SÁNCHEZ
*Secretary of Education*

MIGUEL ROMERO LUGO
*Secretary of Labor and
Human Resources*

DR. LORENZO GONZÁLEZ
*Secretary of Health*

JAVIER RIVERA AQUINO
*Secretary of Agriculture*

RUBÉN A. HERNÁNDEZ GREGORAT
*Secretary of Transportation
and Public Works*

JOSÉ R. PÉREZ-RIERA
*Secretary of Economic
Development and Commerce*

YANITSIA IRIZARRY
*Secretary of Family Affairs*

MIGUEL HERNÁNDEZ VIVONI
*Secretary of Housing*

DANIEL J. GALÁN KERCADÓ
*Secretary of Natural and
Environmental Resources*

LUIS G. RIVERA MARÍN
*Secretary of
Consumer Affairs*

HENRY NEUMANN ZAYAS
*Secretary of Sports and Recreation*

CARLOS M. MOLINA RODRÍGUEZ
*Secretary of Corrections
and Rehabilitation*

---

*Legislative Officers*

THOMAS RIVERA SCHATZ
President, Senate

JENNIFFER GÓNZALEZ COLÓN
Speaker, House of
Representatives

*Fiscal Officers*

JUAN CARLOS PAVÍA
Director, Office of
Management and Budget

JUAN CARLOS BATLLE
President,
Government Development
Bank for Puerto Rico

ii

No dealer, broker, sales representative or other person has been authorized by the Commonwealth or the Underwriters to give any information or to make any representations other than those contained herein and, if given or made, such other information or representations must not be relied upon as having been authorized by the Commonwealth or any Underwriter. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such an offer, solicitation or sale. The information set forth herein has been obtained from the Commonwealth and other official sources that are believed to be reliable. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of this Official Statement nor any sale made hereunder shall, under any circumstances, create any implication that there has been no change in the affairs of the Commonwealth since the date hereof. The Underwriters have provided the following sentence and paragraph for inclusion in this Official Statement. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

**In connection with offering of the Bonds, the Underwriters may effect transactions which stabilize or maintain the market prices of the Bonds and the Commonwealth's outstanding general obligation bonds at levels above those which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time.**

Assured Guaranty Municipal Corp. ("AGM") makes no representation regarding the Insured Bonds or the advisability of investing in the Insured Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE and *Appendix III - Specimen Municipal Bond Insurance Policy*.

**Certain statements contained in this Official Statement reflect not historical facts but forecasts and "forward-looking statements." These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Commonwealth. In this respect, the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions are intended to identify forward-looking statements. All projections, forecasts, assumptions, expressions of opinions, estimates and other forward-looking statements are expressly qualified in their entirety by this cautionary statement: actual results may differ materially from those expressed or implied by forward-looking statements.**

**The projections set forth in this Official Statement were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.**

**TABLE OF CONTENTS**

Page

INTRODUCTORY STATEMENT .................................................................................................................. 1
OVERVIEW .................................................................................................................................................... 3
RECENT DEVELOPMENTS ......................................................................................................................... 4
    Commonwealth's Fiscal Imbalance ........................................................................................................... 4
    Fiscal Year 2012 Government Budget ....................................................................................................... 5
    Preliminary Results for the First Ten Months of Fiscal Year 2011 ........................................................... 6
    Tax Reform ................................................................................................................................................. 7
    Financial Condition of Retirement Systems .............................................................................................. 9
    Local Incentives for Rum Producers ....................................................................................................... 11
    Recent Rating Actions ............................................................................................................................. 12
PLAN OF FINANCING ............................................................................................................................... 13
    Sources and Uses of Funds ...................................................................................................................... 14
THE BONDS ................................................................................................................................................. 14
    General ...................................................................................................................................................... 14
    Book-Entry Only System ......................................................................................................................... 14
    Discontinuance of the Book-Entry Only System ..................................................................................... 17
    Authorization ........................................................................................................................................... 17
    Redemption .............................................................................................................................................. 18
    Notice of Redemption; Effect of Redemption ......................................................................................... 18
    Security .................................................................................................................................................... 19
    Payment Record ....................................................................................................................................... 21
    Debt Limitation ........................................................................................................................................ 21
    Maturity Limitation ................................................................................................................................. 24
BOND INSURANCE .................................................................................................................................... 24
    Bond Insurance Policy ............................................................................................................................. 24
    Assured Guaranty Municipal Corp. ......................................................................................................... 24
    Bond Insurance Provisions under the Bond Resolution ........................................................................... 26
PUBLIC SECTOR DEBT OF THE COMMONWEALTH .......................................................................... 27
    Public Sector Debt ................................................................................................................................... 27
    Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt ........... 28
TAX MATTERS ........................................................................................................................................... 29
    Discount Bonds ........................................................................................................................................ 30
    Premium Bonds ....................................................................................................................................... 30
LEGAL MATTERS ...................................................................................................................................... 31
LEGAL INVESTMENT ............................................................................................................................... 31
VERIFICATION OF MATHEMATICAL COMPUTATIONS ..................................................................... 31
UNDERWRITING ........................................................................................................................................ 31
GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO ............................................................. 34
RATINGS ..................................................................................................................................................... 34
CONTINUING DISCLOSURE ..................................................................................................................... 35
    Continuing Disclosure Undertaking ........................................................................................................ 35
    Prior Continuing Disclosure Non-Compliance ....................................................................................... 38
MISCELLANEOUS ...................................................................................................................................... 39

Appendix I – Commonwealth of Puerto Rico Financial Information and Operating Data Report,
        dated April 30, 2011 ..................................................................................................................... I-1

Appendix II – Proposed Form of Opinion of Bond Counsel ...................................................................... II-1

Appendix III – Specimen Municipal Bond Insurance Policy ..................................................................... III-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

**$602,105,000**
**Commonwealth of Puerto Rico**
**$304,000,000  Public Improvement Bonds of 2011**
**$52,190,000  Public Improvement Refunding Bonds, Series 2011 D**
**$245,915,000  Public Improvement Refunding Bonds, Series 2011 E**
**(General Obligation Bonds)**

### INTRODUCTORY STATEMENT

This Official Statement of the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico"), which includes the cover page, the inside cover page, the table of contents and the appendices, provides certain information in connection with the sale of $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011 (the "2011 Bonds"), $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D (the "Series D Bonds") and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E (the "Series E Bonds" and together with the Series D Bonds, the "Refunding Bonds"). The 2011 Bonds and the Refunding Bonds are collectively referred to herein as the "Bonds."

The 2011 Bonds are being issued under the provisions of Act No. 79 of the Legislative Assembly of Puerto Rico, approved on June 1, 2011 ("Act 79"), and pursuant to a resolution authorizing the issuance of the 2011 Bonds (the "2011 Bond Resolution") adopted in accordance with Act 79 by the Secretary of the Treasury of the Commonwealth of Puerto Rico (the "Secretary of the Treasury") and approved by the Governor of Puerto Rico on June 29, 2011.

The Refunding Bonds are being issued under the provisions of Act No. 33 of the Legislative Assembly of Puerto Rico, approved on December 7, 1942, as amended ("Act 33"), and pursuant to a resolution authorizing the issuance of the Refunding Bonds (the "Refunding Bond Resolution") adopted in accordance with Act 33 by the Secretary of the Treasury and approved by the Governor of Puerto Rico on June 29, 2011.

The scheduled payment of principal of and interest on the Refunding Bonds maturing July 1, 2019 bearing interest at a rate of 3.875% and July 1, 2020 bearing interest at a rate of 4.125% (the "Insured Bonds"), when due will be guaranteed under an insurance policy to be issued concurrently with the delivery of the Insured Bonds by Assured Guaranty Municipal Corp., as indicated on the inside cover of this Official Statement.

Under Act 79 and Act 33, the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources.

This Official Statement includes the Commonwealth's Financial Information and Operating Data Report, dated April 30, 2011 (the "Commonwealth Report"), attached hereto as *Appendix I*, and the Comprehensive Annual Financial Report of the Commonwealth for the fiscal year ended June 30, 2010, prepared by the Department of the Treasury of the Commonwealth (the "Commonwealth's Annual Financial Report"), which is incorporated by reference herein.

The Commonwealth Report includes important operating and financial information about the Commonwealth, including information about its economy, historical revenues and expenditures of its General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report was filed on May 1, 2011 by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through the Electronic Municipal Market Access System ("EMMA") (http://emma.msrb.org). The Commonwealth Report should be read in its entirety and in conjunction with RECENT DEVELOPMENTS herein.

The Commonwealth's Annual Financial Report includes the basic financial statements of the Commonwealth as of and for the fiscal year ended June 30, 2010, together with the independent auditors' report thereon (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Retirement Systems whose fair values have been estimated in the absence of readily determinable fair values and the Retirement Systems' unfunded actuarial accrued liabilities and funded ratios as of June 30, 2010), dated April 27, 2011, of Deloitte & Touche LLP, certified public accountants. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units separately identified in its report. Those financial statements were audited by other auditors whose reports have been furnished to Deloitte & Touche LLP, and its opinion as to the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors. The Commonwealth's Annual Financial Report was filed on April 29, 2011 by the Commonwealth with the MSRB through EMMA (http://emma.msrb.org).

Any appendix of an Official Statement of the Commonwealth or of any instrumentality of the Commonwealth containing any revision to the Commonwealth Report or to the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, or any new or revised Commonwealth Report or Commonwealth Annual Financial Report or other document containing information that modifies or supersedes the information contained in the Commonwealth Report or in the Commonwealth's Annual Financial Report that is filed with the MSRB through EMMA, in each case after the date hereof, shall be deemed to be incorporated by reference into this Official Statement and to be part of this Official Statement from the date of filing of such document. Any statement contained in the Commonwealth's Annual Financial Report shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any such subsequently filed document modifies or supersedes such statement. Any statement contained in the Commonwealth Report or elsewhere herein shall also be deemed to be modified or superseded to the extent that a statement contained in any such subsequently filed document modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

The Commonwealth has entered into a number of continuing disclosure undertakings required under Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC") in connection with previously issued bonds. Under its existing continuing disclosure undertakings, the Commonwealth is obligated to file on or before May 1 in

2

each year updates of its financial, operational and macroeconomic information through the end of the prior fiscal year. The Commonwealth complies with this continuing disclosure undertaking by filing updates of the Commonwealth Report and by filing the Commonwealth's Annual Financial Report for the preceding fiscal year. During the past five years, the Commonwealth has not complied in all material respects with its obligations under such continuing disclosure undertakings. In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. For more information regarding the Commonwealth's compliance with its continuing disclosure obligation, see "Prior Continuing Disclosure Non-Compliance" under CONTINUING DISCLOSURE.

The Commonwealth will provide without charge to any person to whom this Official Statement is delivered, on the written or oral request of such person, a copy of the Commonwealth Report or the Commonwealth's Annual Financial Report incorporated herein by reference. Requests should be directed to Executive Vice President, Government Development Bank for Puerto Rico, 135 West 50th Street, 22nd Floor, New York, New York 10020, telephone number (212) 333-0364, or to Vice President - General Obligations Division, Government Development Bank for Puerto Rico, P.O. Box 42001, San Juan, Puerto Rico 00940, telephone number (787) 722-7060.

A copy of the Commonwealth's Annual Financial Report and the Commonwealth Report may also be obtained through EMMA at http://emma.msrb.org (but only for filings made after June 30, 2009) or by visiting the Government Development Bank's website at www.gdbpr.com. No additional information on the Government Development Bank's website is deemed to be part of or incorporated by reference in this Official Statement.

## OVERVIEW

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress. The relationship between the United States and Puerto Rico is referred to as commonwealth status.

The United States and the Commonwealth share a common defense, market, currency and citizenship. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

Puerto Rico has a diversified economy with manufacturing and services comprising its principal sectors. Puerto Rico's economy is closely linked to the United States economy. In fiscal year 2010 (which ended on June 30, 2010), the Commonwealth's gross national product (preliminary, in current dollars) was $63.3 billion, and personal income per capita (preliminary, in current dollars) was $15,203.

The Constitution of Puerto Rico limits the amount of general obligation debt that the Commonwealth can issue. The Commonwealth's policy has been and continues to be to prudently manage the level of such debt within the constitutional limitation. See "Debt Limitation" under THE BONDS.

Fiscal responsibility for the Commonwealth is shared among the Department of the Treasury, the Office of Management and Budget ("OMB") and Government Development Bank for Puerto Rico ("Government Development Bank"). The Department of the Treasury is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and contributing to the preparation of the budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. Government Development Bank is the fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and coordinates the management of public finances.

Additional information about the Commonwealth can be found in the Commonwealth Report attached hereto as *Appendix I*, including information about the economy, historical revenues and expenditures of the Commonwealth's General Fund, the year-end results of fiscal year 2010, the budget for fiscal year 2011, the proposed budget for fiscal year 2012, the debt of the Commonwealth's public sector, the financial situation of the Government's retirement systems and certain litigation involving the Commonwealth. The Commonwealth Report should be read in its entirety.

## RECENT DEVELOPMENTS

This section supplements the information appearing in the Commonwealth Report and should be read in conjunction therewith.

### Commonwealth's Fiscal Imbalance

Since 2000, the Commonwealth has experienced an imbalance between recurring government revenues and total expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. The current administration has implemented certain expense reduction measures that, together with various temporary and permanent revenue raising measures, have allowed the Commonwealth to reduce the deficit. For fiscal year 2010, total expenditures of $10.369 billion exceeded total revenues (excluding other financing sources) of $7.593 billion by $2.775 billion; if debt service amounts that were refinanced during fiscal year 2010 are excluded, however, total expenditures were approximately $9.691 billion and exceeded total revenues (excluding other financing sources) by $2.098 billion. It is estimated that the deficit for fiscal year 2011 will be

4

approximately $1.0 billion. See "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I.*

In order to address the fiscal imbalance, the Government of Puerto Rico (the "Government") has taken multiple steps, including the implementation of a multi-year Fiscal Stabilization Plan (the "Fiscal Plan"). The Fiscal Plan included operating expense reduction measures (which the Government estimates have resulted in annual savings of approximately $837 million), tax revenue enforcement measures, temporary and permanent revenue raising measures (which the Government estimates will result in additional revenues of $420 million during fiscal year 2011) and financial measures. The principal financial measure taken has been the bond issuance program of the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of the sales and use tax. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds of the COFINA bond issuance program (which are deposited in an account referred to as the "Stabilization Fund" managed by Government Development Bank) have been used to repay existing government debt (including debts with Government Development Bank), finance operating expenses for fiscal years 2008 through 2011 (including costs related to the implementation of the expense reduction measures of the Fiscal Plan), and fund an economic stimulus plan. Another financial measure has been the restructuring of a portion of the Commonwealth's debt service. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest due in such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest due in such fiscal year on the Commonwealth guaranteed bonds issued by Public Buildings Authority ("PBA"). During fiscal year 2011 to date, the Commonwealth has refinanced $490.9 million of principal and interest due in such fiscal year on the Commonwealth's general obligation bonds. The Government expects to refinance approximately $537.4 million and $153.8 million of debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds, respectively, during fiscal year 2012. The Fiscal Plan is discussed in more detail in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY in *Appendix I.*

### Fiscal Year 2012 Government Budget

On April 12, 2011, the Governor of Puerto Rico, Luis G. Fortuño (the "Governor"), presented the proposed budget for fiscal year 2012 to the Legislature of Puerto Rico. The proposed budget provides for total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of bond issues made by COFINA, which proceeds are deposited in the Stabilization Fund.

The principal changes in General Fund revenues under the proposed fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 of October 25, 2010, as amended ("Act No. 154") (discussed below under "Tax Reform") (up $969.0 million), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes

on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 proposed budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues available in the Stabilization Fund. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA Bonds which are expected to be refinanced during fiscal year 2012, as previously discussed. The budgeted total expenditures for fiscal year 2012 are 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1,109.0 million, or 12.0%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 proposed budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $79 million), education (up $148.3 million), economic development (up $117.6 million), transportation (up $12.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $26.0 million), and decreases in debt service (down $58.4 million), welfare (down $24.0 million), health (down $212.7 million), and governmental management (down $61.4).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

### Preliminary Results for the First Ten Months of Fiscal Year 2011

Preliminary General Fund net revenues for the first ten months of fiscal year 2011 (from July 1, 2010 to April 30, 2011) were $6.406 billion, an increase of $125 million, or 2.0%, from $6.281 billion of net revenues for the same period in the prior fiscal year, and an increase of $105 million from the revised estimate of net revenues, which takes into account the effect of the tax reform discussed below.

The increase in General Fund net revenues is mainly due to an increase of $111 million in withholdings from non-residents and the collection of $407 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 in October 2010 as part of the tax reform. This increase was partially offset by a decrease of $245 million, $69 million, and $84.8 million in collections from income tax on individuals, income tax on corporations, and miscellaneous non-tax revenues, respectively. This decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. The Government expects that the decrease in General Fund net revenues as a result of the implementation of the tax reform will be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. The first three monthly excise tax payments due in February, March and April 2011 amounted to approximately $108.7 million, $125.8 million and $172.5 million, respectively, which is consistent with the Government's projection of collections from the excise tax.

The Treasury Department also reported that preliminary sales and use tax collections for the first eleven months of fiscal year 2011 were $1.031 billion, an increase of $31.8 million, or 3.2%, from the sales and use tax collections for the same period in the prior fiscal year. Sales and use tax preliminary collections for May 2011 were $89.2 million, an increase of 4.3% compared to May 2010. A portion of the sales and use tax is allocated to COFINA and, thus, is not available to the General Fund. See "Security" under THE BONDS and "Major Sources of General Fund Revenues — Sales and Use Taxes" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

For more information on the tax reform and Act No. 154, see "Tax Reform" below and "Overview of Economic and Fiscal Condition — Fiscal Condition" under INTRODUCTION in *Appendix I*.

**Tax Reform**

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) the Puerto Rico Office of Management and Budget ("OMB") certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as

7

effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The Treasury Department recently announced that preliminary collections for the first four monthly excise tax payments (from February through May 2011) were $108.7 million, $125.8 million, $172.5 million and $130.2 million, respectively. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. Therefore, it is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending

issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform, the expansion of the income tax source rules to certain nonresident alien individuals, foreign corporations and foreign partnerships, and the new temporary excise tax, see "Major Sources of General Fund Revenues — Tax Reform" and "Major Sources of General Fund Revenues — Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES in *Appendix I*.

**Financial Condition of Retirement Systems**

One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with Government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $7.8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest preliminary actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending

on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the retirement systems, see RETIREMENT SYSTEMS in *Appendix I*.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly that seek to address the retirement systems' financial condition. One of such bills, which was enacted as Act No. 96 of June 16, 2011, provides for an immediate contribution of $162.5 million to the Employees Retirement System from funds currently on deposit in the Corpus Account of the Puerto Rico Infrastructure Fund, which would be invested in a capital appreciation bond issued by COFINA with a maturity of at least thirty years, but not to exceed forty years, and bearing interest at a rate of 7%. The principal amount of the COFINA bond, which would grow to approximately $1.2 billion in thirty years, would be available to pay certain pension obligation bonds and other obligations of the Employees Retirement System.

10

House Bill 3407 ("HB 3407") proposes to increase employer contributions to the Employee Retirement System and the Teachers Retirement System by 1% in each of the next five fiscal years and by 1.25% in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. HB 3407 would also divide the Employees Retirement System into three separate systems: the Government Employee System, the Municipal Employee System and the Public Corporation Employee System, which would divide the actuarial liability among the three systems. There can be no assurance that HB 3407 will be enacted or, if enacted, will be enacted in the form proposed.

**Local Incentives for Rum Producers**

Under current federal law, federal excise taxes imposed and collected by the United States on shipments of rum from Puerto Rico to the United States mainland are returned ("covered-over") each month to the Commonwealth. Under the cover-over program, originally established by Congress in 1917, the Commonwealth receives a refund of $10.50 from the $13.50 that is imposed upon the distilled spirit tax collected per proof gallon. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the amount refunded to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI Inc. ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Destilería Serrallés, Inc. ("Serrallés") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serrallés during calendar year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serrallés is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to maintain the local rum industry, as a result of the threat posed by the USVI's agreement with Diageo, and preserve or increase the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, the Governor signed Act No. 178 of December 1, 2010 ("Act No. 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund

11

will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act No. 178 and contains identical provisions.

As permitted under Act No. 1, the Government has entered into a definitive agreement with one rum producer and is currently in negotiations with two others to provide them a series of subsidies and incentives by allowing such companies to benefit from the cover-over program rebate. These agreements are expected to promote and encourage the export of rum produced in Puerto Rico. As a result of these agreements, during fiscal year 2012 the Treasury Department expects to disburse approximately $72 million of General Fund revenues from the federal excise tax on rum shipments for these subsidies and incentives. This amount is expected to be partially offset by the economic activity generated by the increased investment in Puerto Rico by these rum producers.

**Recent Rating Actions**

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth unenhanced general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook and assigned such rating to the bonds issued by the Commonwealth. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measures that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years, in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's unenhanced general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's unenhanced general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's unenhanced general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems.

On May 3, 2011, Moody's placed the "A3" general obligation rating of the Commonwealth on watchlist for possible downgrade citing the weak funding ratio of the Commonwealth's retirement systems and the significant strain that their future funding requirements will likely exert on the Commonwealth's financial condition. In its May 3 announcement, Moody's stated that it expected to conclude its review within 90 days.

## PLAN OF FINANCING

The net proceeds of the 2011 Bonds will be deposited in the Public Improvements Fund of 2011 established under the Act. The proceeds of the Bonds will be used to carry out certain capital improvements programs authorized by the Legislative Assembly in Act 79 and the refunding of bond anticipation notes issued under Act 79 to finance, on an interim basis, portions of certain such capital improvement programs.

The net proceeds of the Refunding Bonds will be used to: (i) refund in full certain other general obligation bonds and notes of the Commonwealth set forth in the Bond Resolution (the "Refunded Bonds") as set forth below, (ii) fund termination payments under certain interest rate swap agreements and a debt service deposit agreement entered into in connection with the issuance of the Refunded Bonds, (iii) pay capitalized interest on the Refunding Bonds, and (iv) pay the expenses related to the issuance and sale of the Refunding Bonds.

| Series of Bonds | Original Principal Amount | Principal Amount or Amortization Requirement Refunded | Interest Rate | Maturity Date (July 1) | Redemption Date |
|---|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2000 | $29,200,000 | $29,200,000 | 5.625% | 2019 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2000 | 22,635,000 | 22,635,000 | 5.700 | 2020 | August 11, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 60,525,000 | 60,525,000 | Variable | 2029 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 50,900,000 | 50,900,000 | Variable | 2030 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 30,700,000 | 30,700,000 | Variable | 2031 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 31,850,000 | 31,850,000 | Variable | 2032 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 32,625,000 | 32,625,000 | Variable | 2033 | July 14, 2011 |
| Public Improvement Refunding Bonds, Series 2011 B | 67,950,000 | 300,000 | Variable | 2034 | July 14, 2011 |

The Secretary of the Treasury will deposit the net proceeds of the Refunding Bonds to be utilized to pay the Refunded Bonds into an escrow fund (the "Escrow Fund") with an escrow agent to be selected by the Commonwealth (the "Escrow Agent"). The net proceeds of the Refunding Bonds deposited in the Escrow Fund will be invested either in cash or in noncallable direct obligations of the United States ("Government Obligations"), the principal of and interest on which will be sufficient to pay the Refunded Bonds on the redemption dates set forth above.

The sufficiency of the amount so deposited, with investment earnings thereon, to pay the Refunded Principal, will be verified by Causey, Demgen & Moore, Inc. (the "Verification Agent").

**Sources and Uses of Funds**

Sources:

| | |
|---|---|
| Principal amount of the Bonds | $602,105,000.00 |
| Net Original Issue Discount | 8,774,359.30 |
| Total sources | $593,330,640.70 |

Uses:

| | |
|---|---|
| Deposit into the Public Improvement Fund of 2011 | $267,337,500.00 |
| Refunding of Bond Anticipation Notes | 162,971.69 |
| Deposit into the Escrow Fund | 259,957,441.67 |
| Capitalized Interest | 25,197,444.89 |
| Underwriting discount and other financing expenses* | 40,675,282.45 |
| Total uses | $593,330,640.70 |

---

\*   Includes the cost to the Commonwealth of terminating interest rate swap agreements entered into in connection with the issuance of the Refunded Bonds (approximately $34,698,000), the partial termination of a debt service deposit agreement (approximately $137,000), bond insurance premium, legal, printing and other financing expenses.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, will receive a portion of the proceeds from this offering in connection with the termination of such swap agreements. See UNDERWRITING.

## THE BONDS

### General

The Bonds will be dated, bear interest at such rates, be payable at such times, and mature on the dates and in the principal amounts set forth on the cover and inside cover page of this Official Statement. Certain of the Bonds are subject to redemption at the times and at the prices set forth below in "Redemption." Banco Popular de Puerto Rico will serve as paying agent and registrar (the "Registrar") for the Bonds.

### Book-Entry Only System

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

14

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating: AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Bonds documents. For example, Beneficial Owners of Bonds may wish to ascertain that the nominee holding the Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Commonwealth as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Commonwealth or the Registrar on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Registrar, or the Commonwealth, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Commonwealth or the Registrar, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Commonwealth believes to be reliable, but the Commonwealth takes no responsibility for the accuracy thereof.

The Commonwealth cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that

16

DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

NONE OF THE COMMONWEALTH, THE REGISTRAR OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

**Discontinuance of the Book-Entry Only System**

DTC may discontinue providing its services as depository with respect to the Bonds at any time by giving reasonable notice to the Commonwealth or the Registrar. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Commonwealth may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

In the event that such book-entry only system is discontinued or terminated, the following provisions will apply: (i) payment of the principal of and the interest on the Bonds will be made in lawful money of the United States of America; (ii) payment of the principal will be made at the corporate office of the Registrar in San Juan, Puerto Rico; (iii) interest on the Bonds will be paid by check mailed to the respective addresses of the registered owners thereof as of the fifteen day of the month immediately preceding the interest payment date as shown on the registration books of the Commonwealth maintained by the Registrar; (iv) the Bonds will be issued only as registered bonds without coupons in authorized denominations; and (v) the transfer of the Bonds will be registrable and the Bonds may be exchanged at the corporate office of the Registrar in San Juan, Puerto Rico upon the payment of any taxes or other governmental charges required to be paid with respect to such transfer or exchange.

**Authorization**

Section 2 of Article VI of the Constitution of the Commonwealth provides that the power of the Commonwealth to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly. Pursuant to this power, the Legislative Assembly enacted the Act, which authorizes the Secretary to issue the Bonds pursuant to one or more resolutions adopted by the Secretary and approved by the Governor. In accordance with the Act, the Secretary adopted and the Governor approved the Bond Resolution.

**Redemption**

The Bonds maturing on or after July 1, 2017 are subject to redemption prior to maturity as described below.

*Optional Redemption.* At the option of the Secretary of the Treasury and upon at least 30 days' prior notice, the Bonds are subject to redemption, from any moneys that may be available for that purpose (other than from moneys set aside in respect of an amortization requirement), prior to maturity, commencing on July 1, 2016 (July 1, 2021 in the case of the Bonds maturing on July 1, 2030, 2031 and 2041), either in whole or in part (and if in part, in such order of maturity as directed by the Secretary), on any date, at a redemption price of par, plus accrued interest to the date fixed for redemption.

*Mandatory Redemption.* The 2011 Bonds are subject to redemption to the extent of the respective amortization requirements therefor set forth below (less the amount applied to the purchase of any such 2011 Bonds and otherwise subject to adjustment as described below), commencing on July 1, 2038, and on July 1 of each year thereafter as set forth below at a redemption price of par, plus accrued interest to the dates fixed for redemption:

| Year | Term Bonds Maturing July 1, 2041 |
|------|-------------------------------|
| 2038 | $ 14,395,000 |
| 2039 | 15,225,000 |
| 2040 | 65,960,000 |
| 2041 | 208,420,000* |

* Maturity

If the amount of the 2011 Bonds purchased or redeemed in any fiscal year exceeds the amount of the amortization requirement due on such 2011 Bonds for such fiscal year, the amortization requirement for such 2011 Bonds may be decreased for such subsequent fiscal years and in such amounts aggregating the amount of such excess as the Secretary of the Treasury shall determine.

**Notice of Redemption; Effect of Redemption**

Any redemption of the Bonds, either in whole or in part, shall be made upon at least a 30-day prior notice to DTC or, if the book-entry only system described above has been discontinued, by registered or certified mail, postage prepaid, to all registered owners of the Bonds to be redeemed in the manner and under the terms and conditions provided in the Bond Resolution. On the date designated for redemption, notice having been given as provided in the Bond Resolution and moneys for payment of the principal of and accrued interest on the Bonds or portions thereof so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue.

Each notice of redemption shall contain, among other things, the particular Bonds (or portions thereof) being called for redemption, the redemption date and price and the address at which such Bonds are to be surrendered for payment of the redemption price. Any defect in such

notice or the failure so to mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date.

If less than all the Bonds of any maturity are called for redemption, the particular Bonds so called for redemption shall be selected by the Registrar by such method as it deems fair and appropriate, except that so long as the book-entry only system shall remain in effect, in the event of any such partial redemption, DTC shall reduce the credit balances of the applicable DTC Participants in respect of the Bonds and such DTC Participants shall in turn select those Beneficial Owners whose ownership interests are to be extinguished by such partial redemption, each by such method as DTC or such DTC Participant, as the case may be, in its sole discretion, deems fair and appropriate.

**Security**

*Provision for Payment of Public Debt*

The Act provides that the good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the bonds issued under the provisions of the Act. The Secretary of the Treasury is authorized and directed under the Act to pay the principal of and interest on the Bonds as the same become due and payable from any funds available for such purpose at the Department of the Treasury in the fiscal year in which such payment is due. The Act provides that the provisions contained therein with respect to the payment of the principal of and interest on the Bonds shall be considered to be a continuous appropriation for the Secretary of the Treasury to make such payments, even though no specific appropriations are made for such purposes. The payments under the Act are required to be made pursuant to the provisions of the laws of the Commonwealth that regulate the disbursement of public funds.

Section 8 of Article VI of the Constitution of Puerto Rico provides that public debt of the Commonwealth will constitute a first claim on available Commonwealth resources. Public debt includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities.

The Commonwealth has allocated certain motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees to Puerto Rico Highways and Transportation Authority (the "Highways Authority"). The amounts so allocated, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but

19

only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Since fiscal year 1989, the Commonwealth has pledged to Puerto Rico Infrastructure Financing Authority certain federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned to the Commonwealth. The amounts so pledged, however, are subject to first being applied to payment of the principal of and interest on the Commonwealth public debt, but only if and to the extent that all other available revenues of the Commonwealth are insufficient for that purpose. The Commonwealth has never had to apply such amounts to the payment of its public debt.

Act No. 91 of May 13, 2006, as amended ("Act No. 91"), allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA for the purpose of, among other things, paying or financing certain obligations of the Commonwealth, paying or financing a portion of the Commonwealth's operational expenses, and funding the Puerto Rico Economic Stimulus Fund, the Commonwealth Emergency Fund and the Economic Cooperation and Public Employees Alternatives Fund. Act No. 91 provides that the Dedicated Sales Tax Fund created by Act No. 91, the funds on deposit therein and Commonwealth the sales and use tax pledged to COFINA do not constitute "available Commonwealth resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds.

The Constitution expressly empowers a holder of bonds and notes evidencing public debt to bring suit against the Secretary to require application of available resources, including surplus, to the payment of principal of and interest on public debt when due.

*Special Fund for the Bonds (General Obligation) Debt Service*

Act No. 83 of the Legislative Assembly of Puerto Rico, approved on August 30, 1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Commonwealth Debt Redemption Fund (the "Redemption Fund"), for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on May 13, 1976, as amended ("Act No. 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its full faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by Government Development Bank. Act No. 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the

20

amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. During fiscal years 2010 and 2011, the Commonwealth entered into loan agreements with Government Development Bank the proceeds of which were used to fund deposits to the Redemption Fund. The Commonwealth expects to enter into loan agreements with Government Development Bank the proceeds of which would be used to fund deposits to the Redemption Fund during fiscal years 2012 and 2013. Unless authorizing legislation permitting borrowings to finance debt service is extended, the Commonwealth will not be able to borrow from Government Development Bank to fund deposits to the Redemption Fund after June 30, 2013. On June 15, 2011, the amount on deposit in the Redemption Fund was $446.7 million, which was the required amount.

Act No. 39 expressly relates to direct obligations of the Commonwealth. It does not apply to the payment of bonds and other obligations of public corporations guaranteed by the Commonwealth issued after the date of its adoption.

**Payment Record**

The Commonwealth has never defaulted on the payment of principal of or interest on any of its debt.

**Debt Limitation**

*Constitutional Debt Limitation*

Section 2 of Article VI of the Constitution of Puerto Rico provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the Treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales and use taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highways Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the sales and use tax allocated to COFINA is also not included as internal revenues consistent with the legislation creating COFINA, which legislation transfers ownership of such portion of the sales and use tax to COFINA and provides that such portion is not "available Commonwealth resources" under the above cited Constitutional provisions relating to public debt.

21

*Variable Rate Bonds and Swap Agreements*

Joint Resolution No. 2104 of the Legislative Assembly of Puerto Rico, approved on September 30, 2004 ("Joint Resolution No. 2104"), authorized the Commonwealth to enter into interest rate exchange agreements with respect to the Commonwealth's $447,875,000 Public Improvement Refunding Bonds, Series 2004B (the "Series 2004B Bonds"), which were issued as variable rate bonds. Joint Resolution No. 2104 allows the Commonwealth to calculate the 15% constitutional debt limitation using (i) the fixed rate it is required to pay under any interest rate exchange agreement entered into by the Commonwealth in connection with the Series 2004B Bonds, and (ii) the lesser of (A) the maximum interest rate allowed by law, and (B) the maximum interest rate set forth in the resolution approving the bonds, if any, in connection with the Commonwealth's $279,240,000 Public Improvement Refunding Bonds, Series 2004A (the "Series 2004A Bonds") and any Series 2004B Bonds for which no interest rate exchange agreement is executed. In November 2004, the Commonwealth entered into two interest rate exchange agreements with respect to the Series 2004B Bonds.

Act No. 39 of the Legislative Assembly of Puerto Rico, approved on August 1, 2005, as amended ("Act No. 39 of 2005") authorizes the Commonwealth to enter into interest rate exchange agreements with respect to its general obligation bonds, subject to certain conditions, including that the agreements are entered into to reduce certain financial risks associated with issuing variable rate obligations. The Secretary is also authorized to pledge the full faith, credit and taxing power of the Commonwealth for the payment of the obligations incurred under such interest rate exchange agreements. Act No. 39 of 2005 allows the Commonwealth to calculate the constitutional debt limit in a manner identical to that utilized in Joint Resolution No. 2104.

In August 2006, the Commonwealth issued its $500,000,000 Public Improvement Bonds of 2006, Series A, a portion of which bonds bear interest at a rate that will change periodically based on changes in the United States consumer price index. In connection with such consumer price index floating rate bonds (the "2006 CPI Bonds"), the Commonwealth entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In August and September 2006, the Commonwealth entered into interest rate exchange agreements, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect of a portion of the Commonwealth's $1,018,245,000 Public Improvement Refunding Bonds, Series 2003C (said portion, the "2003C Swap Bonds") and whose payments commenced on July 1, 2008, the end of the initial fixed rate period on the 2003C Swap Bonds.

In October 2007, the Commonwealth issued its $926,570,000 Public Improvement Refunding Bonds, Series 2007 A, a portion of which bonds bear interest at a variable rate and, in connection with said bonds (said portion, the "2007 Swap Bonds") entered into an interest rate exchange agreement, the effect of which will economically enable the Commonwealth to pay a fixed rate of interest in respect thereof.

In May 2008, the Commonwealth issued its $173,975,000 Public Improvement Refunding Bonds, Series 2008B (the "2008 Swap Bonds"), which bear interest at a variable rate, for the

22

purpose of refunding a portion of the Series 2004B Bonds, and, in connection therewith, continued the swap related to such refunded Series 2004B Bonds.

In March 2011, the Commonwealth issued its $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (the "Series 2011 Swap Bonds"), which bear interest at a variable rate, for the purpose of refunding the 2008 Swap Bonds and a portion of the 2007 Swap Bonds.

In addition, the Commonwealth has also executed under the authority granted in Act No. 39 of 2005, interest rate exchange agreements in which the Commonwealth is making payments on $1,698,370,000 notional amount of public improvement bonds based on a short-term interest rate index published by Securities Industry and Financial Markets Association ("SIFMA") and is receiving from its counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate index (the "basis swap").

See "Interest Rate Exchange Agreements" under DEBT in *Appendix I* for a list of the Commonwealth's outstanding interest rate exchange agreements and their mark-to-market value as of March 31, 2011.

After giving effect to the issuance of the Bonds, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $981,295,893 in the fiscal year ending June 30, 2015 (based on the assumption that (i) the Series 2004A Bonds bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) the outstanding 2003C Swap Bonds, Series 2004B Bonds, 2006 CPI Bonds, 2007 Swap Bonds and the 2011 Swap Bonds, bear interest at 12% per annum and (iii) the public improvement bonds to which the basis swap relates bear interest at their stated interest rates rather than the rates set forth in the basis swap). This amount ($981,295,893) plus the amount paid by the Commonwealth in the preceding fiscal year on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $991,787,196, is equal to 13.53% of $7,333,246,000, which is the average of the adjusted preliminary internal revenues for the fiscal years ended June 30, 2009 and 2010. If the interest on the outstanding bonds described in clause (ii) above is calculated using the fixed rate paid by the Commonwealth under the interest rate exchange agreements executed in connection with such bonds, the percentage referred to in the preceding sentence would be 12.20%. Any potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (which is based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Debt service for the Puerto Rico Aqueduct and Sewer Authority ("PRASA") guaranteed bonds of approximately $30 million was paid by PRASA during the last two fiscal years and, thus, is not included in the calculation of the 15% constitutional debt limitation. See "Other Public Corporations – Aqueduct and Sewer Authority" under Public Corporations in Appendix I. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund and such debt service would, to the extent paid by the Commonwealth, be included in the calculation of the 15% debt limitation.

As of May 31, 2011, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $212.9 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal years 2010 and 2011 to date, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million and $16.5 million, respectively. See "Commonwealth Guaranteed Debt" under Debt in *Appendix I*.

**Maturity Limitation**

The Constitution provides that no bonds or notes of the Commonwealth shall mature later than 30 years from their date of issue, except bonds or notes for housing facilities, which shall mature in no more than 40 years.

## BOND INSURANCE

**Bond Insurance Policy**

Concurrently with the issuance of the Insured Bonds, AGM will issue its Municipal Bond Insurance Policy (the "Policy") for the Insured Bonds. The Policy guarantees the scheduled payment of principal of and interest on the Insured Bonds when due as set forth in the form of the Policy included as *Appendix III* to this Official Statement.

The Policy is not covered by any insurance security or guaranty fund established under New York, California, Connecticut or Florida insurance law.

**Assured Guaranty Municipal Corp.**

AGM is a New York domiciled financial guaranty insurance company and a wholly owned subsidiary of Assured Guaranty Municipal Holdings Inc. ("Holdings"). Holdings is an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure and structured finance markets. No shareholder of AGL, Holdings or AGM is liable for the obligations of AGM.

AGM's financial strength is rated "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of AGM in its sole discretion. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of any security guaranteed by AGM. AGM does not guarantee the market price of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

*Current Financial Strength Ratings*

On June 13, 2011, S&P issued a release stating that it had affirmed the "AA+" financial strength rating of AGM, with a stable outlook. Reference is made to the release, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On January 24, 2011, S&P published a Request for Comment: Bond Insurance Criteria (the "Bond Insurance RFC") in which it requested comments on its proposed changes to its bond insurance ratings criteria. In the Bond Insurance RFC, S&P notes that it could lower its financial strength ratings on existing investment-grade bond insurers (including AGM) by one or more rating categories if the proposed bond insurance ratings criteria are adopted, unless those bond insurers (including AGM) raise additional capital or reduce risk. Reference is made to the Bond Insurance RFC, a copy of which is available at www.standardandpoors.com, for the complete text of S&P's comments.

On December 18, 2009, Moody's issued a press release stating that it had affirmed the "Aa3" insurance financial strength rating of AGM, with a negative outlook. Reference is made to the press release, a copy of which is available at www.moodys.com, for the complete text of Moody's comments.

There can be no assurance as to any further ratings action that Moody's or S&P may take with respect to AGM.

For more information regarding AGM's financial strength ratings and the risks relating thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2010, which was filed by AGL with the Securities and Exchange Commission (the "SEC") on March 1, 2011, and AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011, which was filed by AGL with the SEC on May 10, 2011.

*Capitalization of AGM*

At March 31, 2011, AGM's consolidated policyholders' surplus and contingency reserves were approximately $3,058,791,206 and its total net unearned premium reserve was approximately $2,285,987,748, in each case, in accordance with statutory accounting principles.

Incorporation of Certain Documents by Reference

Portions of the following document filed by AGL with the SEC that relate to AGM are incorporated by reference into this Official Statement and shall be deemed to be a part hereof:

(i)      the Annual Report on Form 10-K for the fiscal year ended December 31, 2010 (which was filed by AGL with the SEC on March 1, 2011); and

(ii)     the Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2011 (which was filed by AGL with the SEC on May 10, 2011).

All information relating to AGM included in, or as exhibits to, documents filed by AGL pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, after the

filing of the last document referred to above and before the termination of the offering of the Bonds shall be deemed incorporated by reference into this Official Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request to Assured Guaranty Municipal Corp.: 31 West 52nd Street, New York, New York 10019, Attention: Communications Department (telephone (212) 826-0100).

Any information regarding AGM included herein under the heading *Assured Guaranty Municipal Corp.* under BOND INSURANCE or included in a document incorporated by reference herein (collectively, the "AGM Information") shall be modified or superseded to the extent that any subsequently included AGM Information (either directly or through incorporation by reference) modifies or supersedes such previously included AGM Information. Any AGM Information so modified or superseded shall not constitute a part of this Official Statement, except as so modified or superseded.

AGM makes no representation regarding the Bonds or the advisability of investing in the Bonds. In addition, AGM has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information regarding AGM supplied by AGM and presented under the heading BOND INSURANCE.

**Bond Insurance Provisions under the Bond Resolution**

Under the Bond Resolution, AGM shall be deemed to be the sole holder of the Insured Bonds for the purpose of giving any consent or direction or taking any other action that the holders of the Insured Bonds are entitled to take pursuant to the provisions of the Bond Resolution.

# PUBLIC SECTOR DEBT OF THE COMMONWEALTH

## Public Sector Debt

The following table presents a summary of the public sector debt of the Commonwealth outstanding as of March 31, 2011. The table also shows the public sector debt as adjusted for the issuance of the Bonds and the refunding of the Refunded Bonds. The table should be read in conjunction with the information set forth under DEBT in *Appendix I.*

### Commonwealth of Puerto Rico
### Public Sector Debt*
### (in millions)

| | March 31, 2011 | As Adjusted by the Bonds and the refunding of the Refunded Bonds |
|---|---|---|
| **GENERAL FUND RELATED DEBT** | | |
| Direct full faith and credit obligations | $9,681 | $10,025 |
| Puerto Rico guaranteed debt[1] | 4,287 | 4,287 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,642 | 3,642 |
| Tax and Revenue Anticipation Notes[3] | 900 | 900 |
| Pension Obligation Bonds[4] | 2,948 | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $21,458 | $21,802 |
| Sales and Use Tax (COFINA) debt | $13,437 | $13,437 |
| Public corporations and agencies | 24,031 | 24,031 |
| Municipal Debt | 3,409 | 3,409 |
| Limited Obligations/non-recourse debt[5] | 2,410 | 2,410 |
| TOTAL PUBLIC SECTOR DEBT | $64,745 | $65,089 |

---

\*   Totals may not add due to rounding.

[1]   Consists of $598 million of bonds issued by Aqueduct and Sewer Authority, $406 million of State Revolving Fund Loans incurred under various federal water laws, $212.7 million of bonds issued by Port of the Americas Authority and $3.070 billion of bonds issued by Public Buildings Authority. Excludes $267 million of Government Development Bank bonds payable from available moneys of Government Development Bank.

[2]   Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes bonds issued by Public Finance Corporation.

[3]   Includes related short-term financings.

[4]   Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5]   Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

## Debt Service Requirements for Commonwealth General Obligation Bonds and Certain Guaranteed Debt

The following table presents the debt service requirements for (i) Commonwealth general obligation bonds outstanding on June 29, 2011 (after giving effect to the refunding of the Refunded Bonds); (ii) the Bonds; and (iii) total debt service on Commonwealth general obligation bonds. Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

**Commonwealth of Puerto Rico**
**Debt Service Requirements\***
**(in thousands)**

| Fiscal Year Ending June 30 | Outstanding Bonds Total Debt Service[1] | The Bonds Principal | The Bonds Interest | Grand Total |
|---|---|---|---|---|
| 2011[2] | $ 486,345 | - | - | $ 486,345 |
| 2012[3] | 833,638 | - | $ 15,764 | 849,402 |
| 2013[3] | 836,797 | $ 470 | 25,489 | 862,756 |
| 2014 | 824,282 | 485 | 33,727 | 858,494 |
| 2015 | 838,357 | 500 | 33,712 | 872,570 |
| 2016 | 838,211 | 515 | 33,697 | 872,423 |
| 2017 | 763,812 | 530 | 33,681 | 798,023 |
| 2018 | 748,010 | 550 | 33,662 | 782,223 |
| 2019 | 788,307 | 29,770 | 33,641 | 851,718 |
| 2020 | 832,253 | 19,370 | 32,286 | 883,909 |
| 2021 | 704,768 | - | 31,381 | 736,149 |
| 2022 | 615,424 | - | 31,381 | 646,805 |
| 2023 | 568,523 | - | 31,381 | 599,904 |
| 2024 | 568,827 | - | 31,381 | 600,207 |
| 2025 | 557,378 | - | 31,381 | 588,758 |
| 2026 | 548,476 | - | 31,381 | 579,857 |
| 2027 | 548,480 | - | 31,381 | 579,861 |
| 2028 | 548,881 | - | 31,381 | 580,262 |
| 2029 | 421,207 | 70,315 | 31,381 | 522,903 |
| 2030 | 430,086 | 60,255 | 27,162 | 517,503 |
| 2031 | 454,442 | 35,970 | 23,923 | 514,335 |
| 2032 | 289,603 | 38,435 | 21,945 | 349,983 |
| 2033 | 217,248 | 40,565 | 19,783 | 277,596 |
| 2034 | 251,643 | 375 | 17,501 | 269,520 |
| 2035 | 304,513 | - | 17,480 | 321,993 |
| 2036 | 304,509 | - | 17,480 | 321,989 |
| 2037 | 299,567 | - | 17,480 | 317,047 |
| 2038 | 188,529 | 14,395 | 17,480 | 220,404 |
| 2039 | 188,526 | 15,225 | 16,652 | 220,403 |
| 2040 | 138,665 | 65,960 | 15,777 | 220,401 |
| 2041 | - | 208,420 | 11,984 | 220,404 |
| Total | $15,939,307 | $602,105 | $782,734 | $17,324,146 |

---

\* Totals may not add due to rounding. Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1] Since fiscal year 1997, the Commonwealth had been paying approximately $30 million annual debt service on PRASA bonds and other obligations guaranteed by the Commonwealth. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making such payments and PRASA resumed making all payments due on and after such date from its net revenues. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantees from the General Fund. The amounts shown in this column do not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

[2] Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.10.

[3] The figures for interest and total debt service have been reduced by the interest that was capitalized through the issuance of the 2011 Bonds in the following amounts: approximately $16.9 million due during fiscal year 2012 and $8.3 million due during fiscal year 2013.

Sources: Government Development Bank and Department of the Treasury

## TAX MATTERS

The Internal Revenue Code of 1986, as amended (the "Code"), includes requirements which the Commonwealth must continue to meet after the issuance of the Bonds in order that interest on the Bonds not be included in gross income for federal income tax purposes. The Commonwealth's failure to meet these requirements may cause interest on the Bonds to be included in gross income for federal income tax purposes retroactive to their date of issuance. The Commonwealth has covenanted in the Bond Resolution to comply, to the extent permitted by the Constitution and the laws of the Commonwealth, with the requirements of the Code in order to maintain the exclusion from gross income for federal income tax purposes of interest on the Bonds. Bond Counsel is not aware of any provision of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

In the opinion of Bond Counsel, subject to continuing compliance by the Commonwealth with the tax covenant referred to above, under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, interest on the Bonds will not be included in gross income for federal income tax purposes. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth and local income taxation.

Ownership of tax-exempt obligations such as the Bonds may result in collateral federal income tax consequences to certain taxpayers, including, without limitation, financial institutions, property and casualty insurance companies, certain foreign corporations, certain S Corporations with excess passive income, individual recipients of Social Security or Railroad Retirement benefits, taxpayers who may be deemed to have incurred or continued indebtedness to purchase or carry tax-exempt obligations, and taxpayers who may be eligible for the earned income tax credit.

Ownership of tax-exempt obligations may also result in collateral income tax consequences under Puerto Rico law to financial institutions doing business in Puerto Rico.

Prospective purchasers of the Bonds should consult their tax advisors as to their specific taxation circumstances and the applicability and impact of any collateral consequences.

Legislation affecting municipal securities is constantly being considered by the United States Congress. There can be no assurance that legislation enacted after the date of issuance of the Bonds will not have an adverse effect on the tax-exempt status of the Bonds. Legislative or regulatory actions and proposals may also affect the economic value of tax exemption or the market price of the Bonds.

**Discount Bonds**

Under the Code, the difference between the principal amount of the Bonds maturing July 1 of the years 2017, 2018, 2019 bearing interest at a rate of 4.25%, 2030 through 2034 and 2041 (collectively, the "Discount Bonds") and the initial offering price to the public (excluding bond houses and brokers) at which price a substantial amount of such Discount Bonds was sold is original issue discount. Original issue discount on the Discount Bonds represents interest which is not includable in federal gross income. A portion of such interest that accrues to the Beneficial Owners of such Discount Bonds in each year, as described below, is, however, included in the distribution requirements of certain regulated investment companies and may result in some of the collateral federal income tax consequences described above under the caption TAX MATTERS in the year of accrual. Consequently, Beneficial Owners of Discount Bonds should be aware that the accrual of original issue discount in each year may result in additional distribution requirements or other collateral federal income tax consequences although the Beneficial Owner may not have received cash in such year. Original issue discount on Discount Bonds will accrue over the terms of such Bonds based on the constant yield method, compounded semiannually (or over a shorter permitted compounding interval selected by the Beneficial Owner). Original issue discount accruing during the period a Beneficial Owner holds such Discount Bond will increase the adjusted basis in such Discount Bond by the amount of such accruing discount for purposes of determining taxable gain or loss on the sale or other disposition of such Discount Bond. The accrual of original issue discount and its effect on the redemption, sale or other disposition of Discount Bonds which are not purchased in the initial offering at the initial offering price may be determined according to rules which differ from those described above. Beneficial Owners of Discount Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of interest accrued upon sale, redemption or other disposition of Discount Bonds and with respect to the state and local tax consequences of owning and disposing of Discount Bonds.

**Premium Bonds**

The difference between the amount payable at maturity of the Bonds maturing July 1 of the years 2013 through 2015, 2019 bearing interest at a rate of 5.00%, 2020 bearing interest at a rate of 5.00% and 2029 (collectively, the "Premium Bonds") and the tax basis of Premium Bonds to a purchaser (other than a purchaser who holds Premium Bonds as inventory, stock in trade or for sale to customers in the ordinary course of business) is "bond premium." Bond Premium is amortized over the period to maturity of a Premium Bond, based on the yield to maturity of that Premium Bond (or, in the case of a Premium Bond callable prior to its stated maturity, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on that Premium Bond), compounded semiannually (or over a shorter permitted corresponding interval selected by the Beneficial Owner). No portion of that bond premium is deductible by the Beneficial Owner of a Premium Bond. For purposes of determining the Beneficial Owner's gain or loss on the sale, redemption (including redemption at maturity) or other disposition of a Premium Bond, the Beneficial Owner's tax basis in the Premium Bond is reduced by the amount of bond premium that accrues during the period of ownership. As a result, a Beneficial Owner may realize taxable gain for federal income tax purposes from the sale or other disposition of a Premium Bond for an amount equal to or less than the amount paid by the Beneficial Owner of that Premium Bond. A purchaser of a Premium Bond in the initial public

offering at the price for that Premium Bond stated on the cover of this Official Statement who holds that Premium Bond to maturity (or, in the case of a callable Premium Bond, to its earlier call date that results in the lowest yield on that Premium Bond) will realize no gain or loss upon the retirement of that Premium Bond. Beneficial Owners of Premium Bonds should consult their tax advisors with respect to the precise determination for federal income tax purposes of the treatment of bond premium upon sale, redemption or other disposition of Premium Bonds and with respect to the state and local tax consequences of owning and disposing of Premium Bonds.

## LEGAL MATTERS

The proposed form of opinion of Greenberg Traurig LLP, Boston, Massachusetts, Bond Counsel, is set forth in *Appendix II* to this Official Statement. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico.

## LEGAL INVESTMENT

The Bonds will be eligible for deposit by banks in Puerto Rico to secure public funds and will be approved investments for insurance companies to qualify them to do business in Puerto Rico, as required by law.

## VERIFICATION OF MATHEMATICAL COMPUTATIONS

Causey Demgen & Moore, Inc. will verify from the information provided to them the mathematical accuracy as of the date of the delivery of the Bonds of (1) the computations contained in the provided schedules to determine that the anticipated receipts from the securities and cash deposits listed in such schedules, to be held in escrow, will be sufficient to pay, when due, the Refunded Bonds, and (2) the computations of yield on both the securities and the Bonds contained in such schedules used by Bond Counsel in its determination that the interest on the Bonds is excluded from gross income for federal income tax purposes. The verification agent will express no opinion on the assumptions provided or as to the exemption from taxation of the interest on the Bonds.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase the Bonds from the Commonwealth at an aggregate discount of $3,585,168.85 from the initial offering prices of the Bonds set forth or derived from information set forth on the inside cover hereof. The obligation of the Underwriters to purchase the Bonds is subject to certain conditions precedent, and they will be obligated to purchase all the Bonds if any Bonds are purchased. The Underwriters may offer to sell the Bonds to certain dealers (including dealers depositing the Bonds into unit investment trusts, certain of which may be sponsored or managed by the Underwriters) and others at prices lower than the initial public offering prices. The offering prices may be changed from time to time by the Underwriters.

The Underwriters and their respective affiliates are financial institutions engaged in various activities, which may include securities trading, commercial and investment banking, financial advisory, investment management, principal investment, hedging, financing and

brokerage activities. Certain of the Underwriters and their respective affiliates have, from time to time, performed, and may in the future perform, various investment banking services for the Commonwealth and/or its instrumentalities, for which they received or will receive customary fees and expenses.

In the ordinary course of their various business activities, the Underwriters and their respective affiliates may make or hold a broad array of investments and actively trade debt and equity securities (or related derivative securities) and financial instruments (which may include bank loans and/or credit default swaps) for their own account and for the accounts of their customers and may at any time hold long and short positions in such securities and instruments. Such investment and securities activities may involve securities and instruments of the Commonwealth and/or its instrumentalities.

The Commonwealth intends to use a portion of the proceeds from this offering to pay the costs of terminating certain swap agreements. An affiliate of Goldman, Sachs & Co., an underwriter for this offering, is counterparty to three swap agreements being terminated and, as a result, an affiliate of Goldman, Sachs & Co. will receive approximately $29,550,000 of the proceeds from this offering in connection with the termination of the swap agreements between the Commonwealth and an affiliate of Goldman, Sachs & Co.

J.P. Morgan Securities LLC ("JPMS"), one of the Underwriters of the Bonds, has entered into a negotiated dealer agreement (the "Dealer Agreement") with Charles Schwab & Co., Inc. ("CS&Co.") for the retail distribution of certain securities offerings, including the Bonds, at the original issue prices. Pursuant to the Dealer Agreement, CS&Co. will purchase Bonds from JPMS at the original issue price less a negotiated portion of the selling concession applicable to any Bonds that CS&Co. sells. JPMS has also entered into an agreement with FirstBank Puerto Rico Securities Corp. to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the agreement and in compliance with applicable rules, compensation with respect to the underwriting of such municipal securities will be allocated between the parties.

Pershing LLC, a subsidiary of The Bank of New York Mellon Corporation, and Barclays Capital Inc. established a strategic alliance in May of 2009, which enables Pershing LLC to participate as a selling group member and a retail distributor for all new issue municipal bond offerings underwritten by Barclays Capital Inc., including the Bonds offered hereby. Pershing LLC will receive a selling concession from Barclays Capital Inc. in connection with its distribution activities relating to the Bonds.

BMO Capital Markets GKST Inc. has entered into an alliance agreement (the "Alliance Agreement") with VAB Financial LLC, under which the parties shall provide services and advise each other in matters related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the Alliance Agreement and in compliance with any applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

BMO Capital Markets is the trade name for certain capital markets and investment banking services of Bank of Montreal and its subsidiaries, including BMO Capital Markets GKST Inc., which is a direct, wholly-owned subsidiary of Harris Financial Corp. which is itself a wholly-owned subsidiary of Bank of Montreal.

Citigroup Inc. and Morgan Stanley, the respective parent companies of Citigroup Global Markets Inc. ("Citigroup") and Morgan Stanley & Co. LLC ("Morgan Stanley"), each an underwriter of the Bonds, have entered into a retail brokerage joint venture. As part of the joint venture each of Citigroup and Morgan Stanley will distribute municipal securities to retail investors through the financial advisor network of a new broker-dealer, Morgan Stanley Smith Barney LLC. This distribution arrangement became effective on June 1, 2009. As part of this arrangement, each of Citigroup and Morgan Stanley will compensate Morgan Stanley Smith Barney LLC for its selling efforts in connection with their respective allocations of Bonds.

Goldman, Sachs & Co. and UBS Financial Services Incorporated of Puerto Rico have entered into an agreement relating to structuring and coordinating the marketing and execution of bond offerings in the United States and global capital markets for the Commonwealth's governmental entities and other municipal bond issuers. For each issuance of municipal securities for which both parties act as managers, the parties will be entitled to receive a portion of each other's revenues from the underwriting in consideration for their professional services.

Popular Securities, Inc. has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley, under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds as consideration for their professional services.

Oriental Financial Services Corp. ("Oriental") and Raymond James & Associates, Inc. ("Raymond James") have entered into an agreement under which the parties provide services and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, Oriental and Raymond James share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

BBVAPR División de Valores Municipales ("BBVAPR MSD") and RBC Capital Markets, LLC ("RBC") have entered into an agreement under which the parties provide services

and advice to each other to assist the Commonwealth and its issuers in the structuring and execution of their municipal securities offerings. As part of the agreement, BBVAPR MSD and RBC share in the risk from the underwriting of the Bonds as part of the consideration for their professional services.

Wells Fargo Securities, LLC has entered into a joint underwriting agreement with Scotia MSD to assist the Commonwealth, its public corporations, agencies, instrumentalities, and municipalities in structuring and facilitating the issuance of certain municipal securities. Pursuant to the terms of the joint underwriting agreement and in compliance with applicable rules, compensation with respect to the underwriting of the applicable securities will be allocated between the firms. Wells Fargo Securities is the trade name for certain capital markets and investment banking services of Wells Fargo & Company and its subsidiaries, including Wells Fargo Securities, LLC, member NYSE, FINRA, and SIPC.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As required by Act No. 272 of the Legislative Assembly of Puerto Rico, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Commonwealth in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank.

## RATINGS

The Bonds have been assigned ratings of "A3" by Moody's, "BBB+" by Fitch, and "BBB" by S&P. For more information regarding rating action affecting the Commonwealth, see "Recent Rating Actions" under RECENT DEVELOPMENTS. The Insured Bonds are expected to be assigned insured ratings of "AA+" (stable outlook) by S&P and "Aa3" (negative outlook) by Moody's, based upon the understanding that, upon delivery of the Insured Bonds, the Policy will be issued by AGM.

Ratings reflect only the respective views of the rating agencies and an explanation of the significance of each rating may be obtained only from the respective rating agency. Such rating agencies were provided with materials relating to the Commonwealth and the Bonds and other relevant information, and no application has been made to any other rating agency for the purpose of obtaining a rating on the Bonds.

There is no assurance that such expected ratings will be the final rating issued or, if issued, that they will remain in effect for any given period of time or that they will not be revised downward or withdrawn entirely by either or both of such rating agencies, if in the judgment of either or both, circumstances so warrant. Any such downward revision or withdrawal of such ratings, or either of them, may have an adverse effect on the market prices of the Bonds.

## CONTINUING DISCLOSURE

**Continuing Disclosure Undertaking**

In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission ("SEC"), the Commonwealth has covenanted in the Bond Resolution for the benefit of the Beneficial Owners (as defined in the Bond Resolution) as follows:

1.   to file, within 305 days after the end of each fiscal year commencing with the fiscal year ending June 30, 2010, with the MSRB through EMMA, core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and its revenues, expenditures, financial operations and indebtedness, in each case generally found in this Official Statement; and

2.   to file in a timely manner, not in excess of ten business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

   a.   principal and interest payment delinquencies;

   b.   non-payment related defaults, if material;

   c.   unscheduled draws on debt service reserves reflecting financial difficulties;

   d.   unscheduled draws on credit enhancements reflecting financial difficulties;

   e.   substitution of credit or liquidity facility providers, or their failure to perform;

   f.   adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

   g.   modifications to rights of the holders (including Beneficial Owners) of the Bonds, if material;

   h.   Bond calls, if material;

   i.   defeasances;

   j.   release, substitution, or sale of property securing repayment of the Bonds, if material;

   k.   rating changes;

l.       tender offers;

m.     bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

n.     the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

o.     the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

Events 2 (c), (j), (m) and (n) are not applicable to the Bonds or the Commonwealth.

In addition, with respect to the following events:

Event (h). The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in this Official Statement under "Redemption" in THE BONDS, the only open issue is which Bonds will be redeemed in the case of a partial redemption, notice of redemption is given to the Bondholders as required under the terms of the Bonds, and public notice of the redemption is given pursuant to Securities Exchange Act of 1934 Release No. 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or purchases of Bonds.

Event (m). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Commonwealth expects to provide the information described in paragraph 1 above by filing its first bond official statement that includes such information for the preceding

fiscal year or, if no such official statement is issued by the 305-day deadline, by filing a separate document containing such information.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule described above is intended to be for the benefit of the Beneficial Owners of the Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Commonwealth's obligations thereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time. All Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan, Puerto Rico for the equal benefit of all Beneficial Owners of the outstanding Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of any of the Covenants at issue. Moreover, Proceedings filed by Beneficial Owners against the Commonwealth may be subject to the sovereign immunity provisions of Section 2 and 2A of Act No. 104, approved June 29, 1955, as amended, which governs the scope of legal actions against the Commonwealth, substantially limits the amount of monetary damages that may be awarded against the Commonwealth and provides certain notice provisions, the failure to comply with which may further limit any recovery.

The Covenants may only be amended if:

(1)     the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of Beneficial Owners, as determined by persons unaffiliated with the Commonwealth; or

(2)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenants shall be deemed amended accordingly.

The Commonwealth has further agreed that the annual financial information containing any amended operating data or financial information will explain, in narrative form, the reasons

for the amendment and the impact of the change in the type of operating data or financial information being provided.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

**Prior Continuing Disclosure Non-Compliance**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1(ii) above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for that Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

In 2011, the Commonwealth complied with its continuing disclosure undertaking relating to fiscal year 2010. As of the date of this Official Statement, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal

resources to (a) assist the Central Accounting Division at Treasury in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between Treasury, OMB and Government Development Bank for the coordination of all financial statement related tasks and the designation of Government Development Bank, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of Treasury and Government Development Bank personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## MISCELLANEOUS

The foregoing summaries of or references to the Act, the Bonds, the Bond Resolution and the summaries of or references to the various acts contained in the Commonwealth Report, are made subject to all the detailed provisions thereof to which reference is hereby made for further information and do not purport to be complete statements of any or all of such provisions.

Appended to and constituting a part of this Official Statement are the Commonwealth Report (*Appendix I*), the proposed form of opinion of Bond Counsel (*Appendix II*), and the specimen of the municipal bond insurance policy to be issued by AGM (*Appendix III*).

The information set forth in this Official Statement and incorporated herein by reference, except for information pertaining to DTC, and the information appearing in BOND INSURANCE and UNDERWRITING, was supplied by certain officials of the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was supplied by DTC. The information contained under the heading BOND INSURANCE was obtained from materials provided by AGM. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**COMMONWEALTH OF PUERTO RICO**

By: _____ /s/ Jesús F. Méndez _____
Secretary of the Treasury

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX I**

# COMMONWEALTH OF PUERTO RICO
## Financial Information and Operating Data Report
### April 30, 2011

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

Page

INTRODUCTION ............................................................................................................................1

    General........................................................................................................................................1
    Forward-Looking Statements.....................................................................................................1
    Overview of Economic and Fiscal Condition............................................................................1
    Geographic Location and Demographic Trends.......................................................................10
    Relationship with the United States..........................................................................................10
    Governmental Structure............................................................................................................11
    Principal Officers Responsible for Fiscal Matters...................................................................11
    Political Trends.........................................................................................................................12

THE ECONOMY............................................................................................................................13

    General......................................................................................................................................13
    Fiscal Stabilization and Economic Reconstruction..................................................................18
    Employment and Unemployment.............................................................................................27
    Economic Performance by Sector.............................................................................................28
    Higher Education.......................................................................................................................42
    Tax Incentives..........................................................................................................................44

DEBT..............................................................................................................................................47

    Public Sector Debt....................................................................................................................47
    Debt Service Requirements for Commonwealth General Obligation Bonds ...................50
    Interest Rate Exchange Agreements.........................................................................................51
    Variable Rate Bonds and Mandatory Tender Bonds ................................................................54
    Ratings of Commonwealth General Obligation Bonds ............................................................56
    Commonwealth Guaranteed Debt............................................................................................56
    Trends of Public Sector Debt....................................................................................................58

PUBLIC CORPORATIONS............................................................................................................59

    Government Development Bank for Puerto Rico.....................................................................60
    Other Public Corporations .......................................................................................................63

INSURANCE MATTERS................................................................................................................73

RETIREMENT SYSTEMS .............................................................................................................73

POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS ............................................94

COMMONWEALTH AUDITED FINANCIAL STATEMENTS.................................................95

    General......................................................................................................................................95
    Prior Non-Compliance with Continuing Disclosure Obligations .........................................96

PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES..................................97

    Summary and Management's Discussion of General Fund Results...................................97
    Major Sources of General Fund Revenues ...........................................................................101

i

Measures to Increase Collections of Income, Sales, and Excise Taxes and
Property Taxes ...................................................................................................111
Transfers to General Obligation Redemption Fund...........................................................113
Components of General Fund Expenditures .......................................................................114

BUDGET OF THE COMMONWEALTH OF PUERTO RICO .................................................116

Office of Management and Budget.....................................................................................116
Budgetary Process..............................................................................................................116
Financial Control and Adjustment Procedures ..................................................................117
Appropriations ...................................................................................................................118
Budget for Fiscal Year 2011 .............................................................................................120
Proposed Budget for Fiscal Year 2012 .............................................................................122
Differences between Budget and Basic Financial Statements...........................................123

LITIGATION................................................................................................................................124

## INDEX OF DEFINED TERMS

1998 Tax Incentives Act ..............................44
Act 1 ...........................................................22
Act 1 Participants .......................................73
Act 104 .....................................................124
Act 117 .....................................................107
Act 132 .......................................................24
Act 154 ..................................................7, 31
Act 178 .....................................................111
Act 29 .........................................................25
Act 3 .....................................................22, 69
Act 447 .......................................................73
Act 447 Participants ...................................73
Act 7 ...........................................................2
Act 70 .........................................................5
Act 71 .......................................................113
Act 82 .....................................................6, 61
Act 83 .....................................................6, 45
Act 91 .........................................................22
Act 91 of 1966 .........................................117
Act 91 of 2004 ...........................................74
Act No. 1 ..............................................7, 101
AFICA ...................................................49, 68
AMT..........................................................104
ARRA .........................................................1
basic swaps.................................................52
Basic System Pension Benefits...................76
basis annuity...............................................52
BEA............................................................15
Budgetary Fund........................................117
CAFR .........................................................96
Capital Fund...............................................63
CFCs ...........................................................46
CMI.............................................................84
COFINA.......................................................2
Commonwealth.............................................1
Commonwealth Sales Tax ........................107
constant maturity swap ..............................52
Corpus Account .........................................22
credit/liquidity facilities.............................54
CRIM ........................................................109
DEDC..........................................................24
Development Fund.......................................63
Diageo.......................................................110
District........................................................26
DOH............................................................64

Economic Plan ........................................... 18
Electric Power Authority Retirement
   System ..................................................... 73
Emergency Fund ...................................... 117
EMMA ....................................................... 96
Employees Retirement System ................. 73
EPA ............................................................ 64
FAA ............................................................ 39
FDIC ........................................................... 35
Federal Stimulus ........................................ 23
FINRA ........................................................ 35
Fiscal Board ............................................... 21
Fiscal Plan .................................................. 18
Fitch ....................................................... 9, 64
GASB 34 .................................................... 96
GDB ............................................................. 2
Green Energy Incentives Act .................... 45
Household Survey ...................................... 14
Housing Finance Authority ........................ 62
IBEs ........................................................... 35
internal revenues ....................................... 47
IRS .............................................................. 8
IVU Loto .................................................. 112
Judiciary Retirement System.................... 73
LIBOR........................................................ 52
Local Stimulus ........................................... 23
Mandatory Tender Bonds........................... 55
MFA ........................................................... 69
Moody's ....................................................... 9
MSCHE....................................................... 72
MSRB.......................................................... 96
Municipal Sales Tax................................. 107
NIPA ........................................................... 15
non-career employees................................. 19
notes ........................................................... 47
OCFI ........................................................... 35
OMB............................................................ 12
PAA ............................................................ 69
Payroll Survey ........................................... 27
PBA ............................................................ 70
Perpetual Trust .......................................... 61
PFC............................................................. 63
Planning Board............................................. 1
POA Guaranteed Bonds ............................. 48
Port ............................................................. 69

Ports Authority..............................................70
PPP Authority ...............................................25
PPPs ............................................................25
PR Code .....................................................101
PRCDA .......................................................38
PREPA .................................................52, 65
PRHTA ........................................................66
PRIDCO.......................................................67
PRIFA ...................................................22, 68
Program.....................................................113
Puerto Rico.....................................................1
remarketing date..........................................54
Retirement System .......................................73
Retirement Systems .....................................73
S&P ...............................................................8
Sales Tax....................................................107
Section 936 Corporations.............................46
Serralles......................................................110
SIFMA .........................................................52
Stabilization Fund .........................................3
synthetic fixed rate swap..............................52
System 2000................................................73
System 2000 Participants.............................73
System Administered Pension Benefits......76
TDF ..............................................................62
Teachers Retirement System........................73
TEU..............................................................69
Tourism Development Act............................45
Treasury Department ...................................11
U.S. Code ....................................................31
University.....................................................71
University Retirement System ....................73
USVI ..........................................................110
VRDO Bonds ..............................................54

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**April 30, 2011**

## INTRODUCTION

### General

The financial and operating information about the Commonwealth of Puerto Rico (the "Commonwealth" or "Puerto Rico") included in this Report has been updated as of December 31, 2010, except as otherwise provided herein. The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a particular fiscal year are to the year in which such fiscal year ends.

### Forward-Looking Statements

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the U.S. government or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's responsible officers, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be relied upon as being necessarily indicative of future results, and readers of this Official Statement are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors,

nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Official Statement, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

### Overview of Economic and Fiscal Condition

*Economic Condition*

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006. Although Puerto Rico's economy is closely linked to the United States economy, for fiscal years 2007, 2008, 2009 and 2010 Puerto Rico's real gross national product decreased by 1.2%, 2.9%, 4.0% and 3.8%, respectively, while the United States real gross domestic product grew at a rate of 1.9% and 2.0% during fiscal years 2007 and 2008, respectively, contracted during fiscal year 2009 at a rate of 2.8%, and grew by 0.7% in fiscal year 2010. According to the Puerto Rico Planning Board's (the "Planning Board") latest projections made in March 2011, which take into account the preliminary results for fiscal year 2010, the economic impact of the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), and other economic factors, the real gross national product for fiscal year 2011 is forecasted to contract by 1.0%. The real gross national product for fiscal year 2012, however, is forecasted to grow by 0.7%.

*Fiscal Condition*

*Structural Budget Imbalance.* Since 2000, the Commonwealth has experienced a structural imbalance between recurring government revenues and total expenditures. The table set forth below shows recurring revenues[*], total expenditures and the ensuing deficit for each fiscal year of the past decade. The deficit shown in this table for each fiscal year, however, does not include certain unbudgeted additional expenditures incurred by the Commonwealth in various fiscal years. Thus, the actual structural imbalance is underestimated in this table.

**Historical Deficit**
Fiscal Years ended June 30,
(in millions)

|      | Recurring Revenues | Total Expenditures | Deficit    |
|------|--------------------|--------------------|------------|
| 2000 | $7,003             | $7,576             | $  (573)   |
| 2001 | 6,872              | 8,123              | (1,250)    |
| 2002 | 7,186              | 9,126              | (1,940)    |
| 2003 | 7,341              | 8,043              | (702)      |
| 2004 | 7,834              | 8,923              | (1,089)    |
| 2005 | 8,603              | 9,717              | (1,114)    |
| 2006 | 8,423              | 10,397             | (1,974)    |
| 2007 | 8,718              | 9,707              | (989)      |
| 2008 | 8,207              | 9,324              | (1,117)    |
| 2009 | 7,583              | 10,890             | (3,306)    |

---

[*]  Recurring revenues are revenues from taxes, licenses and other internal or external sources received on a recurring basis by virtue of existing laws. Non-recurring revenues include revenues from financings and other one shot measures described in this section.

Prior to fiscal year 2009, the government bridged the deficit resulting from the structural imbalance through the use of non-recurring measures, such as borrowing from Government Development Bank for Puerto Rico ("GDB") or in the bond market, postponing the payment of various government expenses, such as payments to suppliers and utilities providers, and other one time measures such as the use of derivatives and borrowings collateralized with government owned real estate. Since March 2009, the government has taken multiple steps to address and resolve this structural imbalance. These steps are discussed below in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Results for Fiscal Year 2009.* Total General Fund revenues for fiscal year 2009 were $7.583 billion, representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of $9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the current administration also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, provides for approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of bond issues made by Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym) and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan described below. See "Fiscal Stabilization and Economic Reconstruction – Fiscal Stabilization Plan" under THE ECONOMY.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion, representing an increase of $9.8 million from fiscal year 2009 revenues and of $45.3 million from revised budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act. No. 7 of March 9, 2009, as amended ("Act 7"), discussed below. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were approximately $10.369 billion (which includes approximately $216 million of expenditures related to the Government's local stimulus program described below in "Fiscal Stabilization and Economic Reconstruction – Economic Reconstruction Plan" under THE ECONOMY), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded total General Fund revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal

year 2010 were approximately \$9.691 billion and exceeded total General Fund revenues (excluding other financing sources) by \$2.098 billion, or 27.6%. Approximately \$2 billion of this amount is related to (i) transitory expenses related to the implementation of the expense-reduction measures included in the Fiscal Plan (\$1 billion) and (ii) additional expenses (\$1 billion) incurred only in fiscal year 2010 (these expenses, which will not be incurred in subsequent fiscal years, are a result of the expense reduction plan being implemented under Act 7). The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Preliminary Results for the First Eight Months of Fiscal Year 2011.* Preliminary General Fund revenues for the first eight months of fiscal year 2011 (from July 1, 2010 to February 28, 2011) were \$4.305 billion, a decrease of \$175.6 million, or 3.9%, from \$4.481 billion of revenues for the same period in the prior fiscal year and a decrease of \$16 million, or 0.4%, from the original estimate of revenues of \$4.321 billion made for budget purposes.

The decline in General Fund revenues is mainly due to a decrease of \$93.5 million, \$84.8 million, \$48 million and \$77.8 million in collections from income tax on individuals, income tax on corporations, withholding on non-residents and other non-tax revenues, respectively. These declines were partially offset by collections from the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted in October 2010 as part of the tax reform discussed below. The decrease in individual and corporate income taxes is due to the tax relief provided to individual and corporate taxpayers as part of the tax reform and to current economic conditions. For more information regarding the tax reform, see "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

The deficit for fiscal year 2011 is estimated to be approximately \$1.0 billion, as discussed below.

*Fiscal Stabilization Plan.* In January 2009, the administration, which gained control of the Executive and Legislative branches of government in the November 2008 elections, began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth. The fiscal stabilization plan, which was generally contained in Act 7, sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) a bond issuance program through COFINA. The proceeds from the COFINA bond issuance program (such proceeds are held by GDB in an account referred to herein as the "Stabilization Fund") have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and may be used for fiscal year 2012, to the extent included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with government appropriations. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.834 billion, $7.058 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liabilities will continue to increase significantly, with a corresponding decrease in the funded ratios, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liabilities. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System is expected to be approximately $749 million, $274 million and $8 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems.

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three government retirement systems, in February 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010. The individual recommendations made by the members of the special commission, which included increasing the amount of the employer and employee annual contributions and changing the benefits structure, are being analyzed with the intent of presenting a comprehensive, consensus legislation package during 2011. The Secretary of Labor, who chaired the special commission, is evaluating, in particular, proposing additional employer contributions to improve the funding ratio, the impact of special laws that have provided additional retirement benefits, and the impact on the system's cash flow of previously approved increases in the amount that members may borrow from the systems under various loan programs.

On July 2, 2010, the Government enacted Act No. 70 ("Act 70"), which is designed to reduce government expenditures by providing an early retirement window for eligible employees (who opted to retire by January 14, 2011) under a formula that results in a positive actuarial impact for the government's retirement systems. Employees that elected to participate in the program will receive retirement benefits based on a lower salary and a lower pension rate than what they would otherwise have been entitled to if they had continued in their employment until full vesting, but at a higher rate than what they would be entitled to based on their current years of service. Approximately 2,398 employees opted for early retirement under Act 70.

Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures. For more information regarding the financial condition of the retirement systems and the Government's efforts to address the unfunded pension and non-pension benefit obligations and cash flow shortfalls of the retirement systems, see RETIREMENT SYSTEMS.

*Economic Reconstruction Plan*

In fiscal year 2009, the administration began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in

education, healthcare and infrastructure, among others. As of March 31, 2011, the Commonwealth had disbursed $4.795 billion in ARRA funds, or 68.2%, of awarded funds.

The administration has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The administration has also developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the administration enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The administration also enacted Acts No. 82 and 83 of July 19, 2010, which provide for a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the administration adopted a comprehensive tax reform that takes into account the Commonwealth's current financial situation. See "Tax Reform" below.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the administration engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the administration published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The administration has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the administration has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marin International Airport.

The administration has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

The fiscal stabilization plan, the economic reconstruction plan, and the long-term economic development plan are described in further detail below in "Fiscal Stabilization and Economic Reconstruction" under THE ECONOMY.

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at promoting economic growth and job

creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform is intended to be revenue positive.

The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), is projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to Puerto Rico's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed at a declining rate (from 4% for 2011 to 1% for 2016) on certain acquisitions from related parties, and (iv) an expansion of taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships that are members of controlled groups that have members that are engaged in manufacturing or production or manufacturing services in Puerto Rico. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154 of October 25, 2010, as amended ("Act 154"). In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

Preliminary collections for the first two monthly excise tax payments, which were due on February 15, 2011 and March 15, 2011, were $108.9 million and $125.1 million, respectively. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

For a summary of the principal provisions of the tax reform and Act 154, see "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

*Ratings of Commonwealth General Obligation Bonds*

On March 7, 2011, Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. ("S&P"), raised its rating on the Commonwealth's general obligation bonds to "BBB" with a stable outlook from "BBB–" with a positive outlook. In taking this rating action, S&P stated the upgrade reflects the Commonwealth's recent revenue performance and continued efforts to achieve fiscal and budgetary balance. S&P noted, however, that other medium-term

budget pressures, such as the Commonwealth's retirement benefit obligations, remain a limiting credit factor. S&P's stable outlook is based on the Commonwealth's recent implementation of significant expenditure controls and revenue enhancement measure that could help restore balance within the next two years. S&P also stated that it would raise the rating if over the upcoming two years in conjunction with an improvement in the Commonwealth's economic performance, budget controls remain in place and there is continued progress toward achieving balance between ongoing revenues and expenditures as well as in addressing the Commonwealth's unfunded retirement benefit obligations.

On January 19, 2011, Fitch, Inc. ("Fitch") assigned a "BBB+" rating to the Commonwealth's general obligation and appropriation debt with a stable outlook. In assigning the rating, Fitch stated that, while it recognized the Commonwealth's historic budget deficits, overestimation of revenues, reliance on borrowings to meet budgetary gaps, and the low level of pension funding, the successful implementation of the dramatic steps taken by the government to restructure fiscal operations and stimulate the economy was a positive credit factor.

On April 19, 2010, Moody's Investors Service ("Moody's") announced the results of the recalibration of certain U.S. municipal bond issues and issuers in order to enhance the comparability of credit ratings across its portfolio of rated securities. As a result of this recalibration, the Commonwealth's general obligation debt is now rated "A3" by Moody's, which is three categories above the previous "Baa3" rating. On August 10, 2010, Moody's assigned a negative outlook to the Commonwealth's general obligation debt and related credits primarily as a result of the low funding levels of the Commonwealth's retirement systems. See RETIREMENT SYSTEMS.

*Budget for Fiscal Year 2011*

On July 2, 2010, the Governor signed the Commonwealth's central government budget for fiscal year 2011. The approved budget provides for total resources of $15.8 billion and total General Fund revenues of $8.134 billion, compared to General Fund revenues of $7.593 billion for fiscal year 2010. The budgeted General Fund revenues of $8.134 billion included base revenues of $7.691 billion, $302.5 million from tax enforcement and compliance measures, $110 million in expected revenues from the implementation of the property tax appraisal provisions included in Act. No. 71 of July 2, 2010 and $30 million in additional revenues from casinos. The approved fiscal year 2011 budget provides for total expenditures of $9.134 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.0 billion that are expected to be covered from moneys deposited in the Stabilization Fund funded with the proceeds of a COFINA bond issue completed in June 2010. The budgeted total expenditures for fiscal year 2011 are $557 million, or 5.75%, lower than total expenditures of $9.691 billion for fiscal year 2010 (excluding the debt service amounts that were refinanced), and $1.756 billion, or 16%, lower than total expenditures of $10.890 billion for fiscal year 2009.

*Proposed Budget for Fiscal Year 2012*

On April 12, 2011, the Governor submitted to the Legislative Assembly a proposed budget for fiscal year 2012. The proposed budget provides for total General Fund revenues of $8.650 billion, compared to estimated General Fund revenues of $8.134 billion for fiscal year

2011. The proposed fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The proposed total expenditures for fiscal year 2012 are $8.650 million, or 1.21%, higher than budgeted total expenditures of $9.134 billion for fiscal year 2011.

**Geographic Location and Demographic Trends**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

**Relationship with the United States**

Puerto Rico's constitutional status is that of a territory of the United States, and, pursuant to the territorial clause of the U.S. Constitution, the ultimate source of power over Puerto Rico is the U.S. Congress.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government, Congress enacted Public Law 600, which provided that the existing political, economic and fiscal relationship between Puerto Rico and the United States would remain the same, but Puerto Rico would be authorized to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the U.S. Congress, and subsequently approved by the President of the United States.

The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner that has a voice in the House of Representatives but no vote (except in House committees and sub-committees to which he belongs). Most federal taxes, except those such as Social Security taxes, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries. Income earned by Puerto Rico residents from sources outside of Puerto Rico, however, is subject to federal income tax.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the Supreme Court of the United States under the same conditions as decisions from state courts. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officers Responsible for Fiscal Matters**

*Luis G. Fortuño* was sworn in as Governor of Puerto Rico on January 2, 2009. From 2005 until becoming Governor, Mr. Fortuño was Puerto Rico's elected Resident Commissioner in the U.S. House of Representatives. Mr. Fortuño was an attorney in private practice from 1985 to 1993, and again from 1997 to 2003. Mr. Fortuño was the Executive Director of the Tourism Company from 1993 to 1996. From 1994 to 1996, Mr. Fortuño served as the first Secretary of the Department of Economic Development and Commerce. Mr. Fortuño holds a Bachelor's Degree from the Edmund A. Walsh School of Foreign Service at Georgetown University and a Juris Doctor from the University of Virginia School of Law.

*Jesús F. Méndez* was designated as Secretary of the Department of the Treasury (the "Treasury Department") on January 7, 2011 and confirmed by the Senate of Puerto Rico on January 24, 2011. Before his appointment as Secretary of the Treasury Department, Mr. Méndez served as Executive Vice President and Director of Administration, Operation and Controllership of GDB and as Executive Director of the Public Buildings Authority. From 2005 to 2008, Mr. Méndez held the position of President and Chief Executive Officer of Tresamici Management, Inc., a closely held corporation dedicated to the administration of assisted living facilities. From 1996 to 2004, he held several senior management positions within Banco Santander S.A. operating entities in Puerto Rico, including President of Santander Asset Management and First Senior Vice President and Trust Officer of Banco Santander Puerto Rico and Managing Director of Santander Securities Corporation. Prior to joining Santander Securities, Mr. Méndez served as Chief Financial Officer and Managing Director of BP Capital Markets. He also worked for Credit Suisse First Boston (Puerto Rico, Inc.) as Vice President and Deloitte & Touche as Senior Auditor. In addition, Mr. Méndez also held the position of Assistant Bank Examiner at the Federal Deposit Insurance Corporation in New York City. Mr. Méndez has a Bachelor's Degree in Business Administration from the University of Puerto Rico and is a Certified Public Accountant.

*Juan Carlos Pavía* was appointed Director of the Office of Management and Budget of the Government of Puerto Rico ("OMB") on February 16, 2011. Prior to being named Director of the OMB, Mr. Pavía was Executive Vice President and Fiscal Agent of GDB as well as Executive Director of the Fiscal Stabilization and Reconstruction Board, where he was responsible for the compliance, oversight and economic studies areas of GDB. Before being named Executive Vice President and Fiscal Agent of GDB, he was a senior advisor to the President of GDB and Deputy Advisor to the Governor. Prior to entering public service, Mr. Pavía was employed in the commercial banking field. Mr. Pavía earned a bachelor's degree in Business Administration from The George Washington University in Washington D.C.

*Juan Carlos Batlle* was appointed President of GDB effective March 2, 2011. Before entering public service, Mr. Batlle served 14 years as a top executive for Santander Group in Puerto Rico. As part of the Investment Banking Group of Santander Securities Corporation, he served consecutively as Assistant Vice President in 1999, Vice President in 2001, and Senior Vice President and Director in 2003. In 2005, Mr. Batlle was named First Senior Vice President of Banco Santander Puerto Rico and President and Chief Executive Officer of Santander Asset Management Corporation. In 2008, Mr. Batlle was named Managing Director of Santander Securities Corporation. Prior to joining Santander in 1997, Mr. Batlle was employed by Popular Securities, Inc. Mr. Batlle has also been a member of the Boards of Directors of Santander Securities Corporation, Santander Asset Management Corporation and the First Puerto Rico Family of Funds. In addition, he has been a member of the Boards of Directors of the Puerto Rico Tourism Company, the Convention Center District Authority and the Hotel Development Corporation. He holds a degree in Economics from the College of Literature, Science and the Arts of the University of Michigan.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring statehood, represented by the New Progressive Party, and the other favoring the existing commonwealth status, represented by the Popular Democratic Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

|  | 1992 | 1996 | 2000 | 2004 | 2008 |
|---|---|---|---|---|---|
| New Progressive Party | 49.9% | 51.1% | 45.7% | 48.2% | 52.8% |
| Popular Democratic Party | 45.9% | 44.5% | 48.6% | 48.4% | 41.3% |
| Puerto Rico Independence Party | 4.2% | 3.8% | 5.2% | 2.7% | 2.0% |
| Others, Blank or Void | - | 0.5% | 0.5% | 0.6% | 3.9% |

With the results of the 2008 election, the New Progressive Party gained control of the Executive Branch and retained control of the Legislative Branch. The current membership of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| New Progressive Party | 21 | 37 |
| Popular Democratic Party | 8 | 17 |
| Total | 29 | 54 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2012.

## THE ECONOMY

### General

The Commonwealth in the past has established policies and programs directed principally at developing the manufacturing sector and expanding and modernizing the Commonwealth's infrastructure. Domestic and foreign investments have historically been stimulated by selective tax exemptions, development loans, and other financial and tax incentives. Infrastructure expansion and modernization have been to a large extent financed by bonds and notes issued by the Commonwealth, its public corporations, and municipalities. Economic progress has been aided by significant increases in the levels of education and occupational skills of the population.

Puerto Rico's economy experienced a considerable transformation during the second half of the twentieth century, from an agriculture economy to an industrial one. Factors contributing to this transformation included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing. In some years, these factors were aided by a significant rise in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. Nevertheless, the significant oil price increases experienced from January 2002 to June 2008, the continuous contraction of the manufacturing sector, and the budgetary pressures on government finances triggered a general contraction in the economy.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2008 and 2009, the real gross national product contracted by 2.9% and 4.0%, respectively. For fiscal year 2010, preliminary reports indicate that the real gross national product contracted by 3.8%. The Planning Board projects a decrease in real gross national product of 1.0% for fiscal year 2011 and a slight increase of 0.7% for fiscal year 2012.

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2010. In fiscal year 2010, aggregate personal income was $60.4 billion ($47.9 billion at 2005 prices) and personal income per capita was $15,203 ($12,592 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $16.0 billion in

fiscal year 2010 ($14.0 billion in fiscal year 2009).  Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.4 billion, or 65% of the transfer payments to individuals in fiscal year 2010 ($9.8 billion, or 70.1%, in fiscal year 2009).  The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

Total average annual employment (as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey") decreased during the last decade.  From fiscal year 2000 to fiscal year 2010, total employment decreased at an average annual rate of 0.4% to 1,102,680.  A steep decline in total employment began in fiscal year 2008 and has continued in fiscal year 2010 due to the current recession.

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services.  The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment.  The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, has played a major role in the economy.  It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2010.

## Commonwealth of Puerto Rico
## Gross National Product
## Fiscal Years Ended June 30,

|  | 2006 | 2007 | 2008 | 2009 | 2010 [1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $56,732 | $59,521 | $61,665 | $62,678 | $63,292 |
| Real gross national product – $ millions (2005 prices) | $54,027 | $53,400 | $51,832 | $49,775 | $47,898 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 0.5% | (1.2)% | (2.9)% | (4.0)% | (3.8)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 2.8% | 1.8% | 2.7% | (3.0)% | 0.9% |

---

[1]  Preliminary.
[2]  In current dollars.

*Sources:*  Puerto Rico Planning Board and Global Insight Inc.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy.  These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.  During fiscal year 2010, approximately 68.1% of Puerto

Rico's exports went to the United States mainland, which was also the source of approximately 53.3% of Puerto Rico's imports. In fiscal year 2010, Puerto Rico experienced a positive merchandise trade balance of $22.4 billion.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2011 and 2012.



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2011).
\*\* Estimate for U.S. from IHS Global Insight (Apr-2011).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2010 shown in this Report

I-16

are preliminary until the revised figures for fiscal year 2010 and the preliminary figures of fiscal year 2011 are released and the forecast for fiscal year 2012 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index, a coincident indicator of ongoing economic activity. This index, shown in the following table and published by GDB since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product.



*Economic Forecast for Fiscal Years 2011 and 2012*

On March 2011, the Planning Board released its revised gross national product forecast for fiscal year 2011 and its gross national product forecast for fiscal year 2012. The Planning Board revised its gross national product forecast for fiscal year 2011 from a projected growth of 0.4% to a contraction of 1.0%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2011 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of ARRA funds, the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic

conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2012 projects an increase in gross national product of 0.7% in constant dollars. The Planning Board's forecast for fiscal year 2012 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

*Fiscal Year 2010*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.8% (an increase of 1.0% in current dollars) over fiscal year 2009. Nominal gross national product was $63.3 billion in fiscal year 2010 ($47.9 billion in 2005 prices), compared to $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices). Aggregate personal income increased from $58.6 billion in fiscal year 2009 ($49.8 billion in 2005 prices) to $60.4 billion in fiscal year 2010 ($50.0 billion in 2005 prices), and personal income per capita increased from $14,786 in fiscal year 2009 ($12,558 in 2005 prices) to $15,203 in fiscal year 2010 ($12,592 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the West Texas Intermediate oil barrel (WTI) increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of previous years were still felt in fiscal year 2009. Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand. On the other hand, the continuation of the difficulties associated with the financial crisis has kept short-term interest rates at historically low levels, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2009*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 4.0% (an increase of 1.6% in current dollars) over fiscal year 2008. Nominal gross national product was $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices), compared to $61.7 billion in fiscal year 2008 ($51.8 billion in 2005 prices). Aggregate personal income increased from $56.1 billion in fiscal

year 2008 ($49.6 billion in 2005 prices) to $58.6 billion in fiscal year 2009 ($49.7 billion in 2005 prices), and personal income per capita increased from $14,217 in fiscal year 2008 ($12,557 in 2005 prices) to $14,786 in fiscal year 2009 ($12,558 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% compared to 1,217,500 for fiscal year 2008. At the same time, the unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

**Fiscal Stabilization and Economic Reconstruction**

In January 2009, the administration began to implement a multi-year Fiscal Stabilization Plan (the "Fiscal Plan") and Economic Reconstruction Plan (the "Economic Plan") that sought to achieve fiscal balance and restore economic growth. The Fiscal Plan was central to safeguarding the Commonwealth's investment-grade credit rating and restoring Puerto Rico's economic growth and development. As of December 31, 2010, the Legislative Assembly had enacted thirteen bills providing for the implementation of the Fiscal Plan and the Economic Plan.

In addition, the administration designed and began to implement the *Strategic Model for a New Economy*, a series of economic development initiatives which aim to enhance Puerto Rico's competitiveness and strengthen specific industry sectors. These economic development initiatives were intended to support the prospects of long-term and sustainable growth.

*Fiscal Stabilization Plan*

The Fiscal Plan had three main objectives: (i) stabilize the short-term fiscal situation, (ii) safeguard and strengthen the Commonwealth's investment-grade credit rating, and (iii) achieve budgetary balance. The Fiscal Plan, which was generally contained in Act 7, included operating expense-reduction measures, tax revenue enforcement measures, temporary and permanent revenue raising measures, and financial measures, as discussed below.

*Expense Reduction Measures.* A significant portion of Puerto Rico's budget deficit is attributable to the accumulated effect of high operating expenses in the government. The Fiscal Plan sought to reduce the government's recurring expense base to make it consistent with the level of government revenues. The Fiscal Plan established a government-wide operating expense-reduction program aimed at reducing operating expenses, including payroll.

Payroll expense is the most significant component of the government's recurring expense base. The reduction in payroll expenses contemplated by the Fiscal Plan was implemented in three phases and included certain benefits conferred to participating employees, as follows:

- *Phase I: Incentivized Voluntary Resignation and Voluntary Permanent Workday Reduction Programs:* The Incentivized Voluntary Resignation Program offered public employees a compensation incentive based on the time of service in the government. The Voluntary Permanent Workday Reduction Program was available to public employees with 20 or more years of service. The Workday Reduction Program consisted of a voluntary reduction of one regular workday every fifteen calendar days, which is equivalent to approximately a 10% reduction in annual workdays. Phase I commenced in March 2009 and public employees had until April 27, 2009 to submit the required information to participate in the voluntary programs available under Phase I and be eligible for the Public Employees Alternatives Program. Under Phase I, 2,553 employees resigned under the Incentivized Voluntary Resignation Program and 27 employees took advantage of the Voluntary Permanent Workday Reduction Program. Based on the number of employees who agreed to participate in these programs, the administration estimates that expenses for fiscal year 2010 were reduced by $90.9 million.

- *Phase II: Involuntary Layoff Plan:* As provided in Act 7, Phase II went into effect because the objective of reducing $2 billion in expenses was not achieved after implementation of Phase I and Phase III (see below). Under Phase II, subject to certain exceptions, employees with transitory or non-permanent positions were terminated. As a result, 1,986 positions were eliminated, representing an estimated savings of $44.6 million annually. In addition, Phase II provided for one or more rounds of involuntary layoffs and applied to most central government public employees unless excluded pursuant to Act 7, strictly according to seniority in public service, starting with employees with the least seniority. The plan excluded certain employees providing "essential" services, certain employees paid by federal funds, those on military leave, and political appointees and their trust employees (political appointees and their trust employees, who do not hold a permanent or career position in the government, are referred to herein as "non-career employees"). Employees in Phase II received a severance package that included health coverage payment for up to a maximum of six months or until the former public employee became eligible for health insurance coverage at another job. As of September 30, 2010, total government employees dismissed under Phase II (excluding the 1,986 transitory or non-permanent positions eliminated) was approximately 12,505, representing an estimated savings of $322.8 million annually. This amount excludes approximately 1,784 employees rehired by the Department of Education as a result of an agreement with the union providing for certain salary and workday reductions and the inclusion of additional service requirements, among other things. The negotiation of this agreement by the administration resulted in annual savings of $51 million, an increase of $25 million over the estimated savings achievable through the termination of such employees.

I-20

- *Phase III: Temporary Suspension of Certain Provisions of Laws, Collective Bargaining Agreements, and Other Agreements:* Phase III went into effect on March 9, 2009 and imposed a temporary freeze on salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. Phase III remained in effect for a period of two years. The administration estimates that savings from the implementation of these measures was approximately $186.9 million for fiscal year 2010.

- *Public Employees Alternatives Program:* The employees that elected to participate in the Incentivized Voluntary Resignation Program under Phase I or that were subject to involuntary layoffs under Phase II, were eligible to participate in the Public Employees Alternatives Program. This program assists public employees in their transition to other productive alternatives, and offers vouchers for college education, technical education, and professional training, as well as for establishing a business and for relocation.

Act 7 extended the term of collective bargaining agreements with public employees that had expired at the time of its enactment or that expire while it is in effect for a period of two years (until March 9, 2011) and provided that during this period such collective bargaining agreements may not be renegotiated or renewed.

The following table summarizes the amount of employees affected by the workforce and labor related expense reduction measures included in Act 7 and the expected annual savings in operational expenses from the implementation of Phases I through III of the Fiscal Plan. The implementation of the workforce and labor related expense reduction measures included in Act 7 concluded on June 30, 2010.

| Phase | Affected Employees | Savings (in millions) |
|---|---|---|
| Phase I: Voluntary Resignation | 2,553 | $90.9 |
| Phase II: Involuntary Layoffs | | |
| Termination of transitory and non-permanent employees | 1,986 | 44.6 |
| Layoffs (as of April 30, 2010) | 12,505 | 322.8 |
| Phase III: Suspension of Certain Benefits | - | 186.9 |
| Total | 17,044 | $645.2 |

On April 13, 2009, a group of government employees and labor organizations filed a complaint in the U.S. District Court for the District of Puerto Rico challenging the constitutionality of Act 7 and seeking to enjoin the enforcement of Act 7. The Governor of Puerto Rico and several agency heads are defendants in the action. The complaint alleges that Act 7 violates the United States and Puerto Rico constitutions because, among other reasons, the statute substantially impairs certain statutory and contractual rights of government employees including those contained in their collective bargaining agreements with Commonwealth agencies. On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. On December 15, 2009, the plaintiffs appealed the District Court's decision to the U.S. Court of Appeals for the First Circuit and, on January 27, 2011, the District Court's decision was affirmed. See LITIGATION.

The second element of the expense-reduction measures, which pertains to other operating expenses, was conducted through an austerity program in combination with other expense reduction measures. The austerity program mandated a 10% reduction in other operational expenses, including cellular phone use, credit cards, and official vehicles.

In July 2010, the Governor renewed an executive order issued in September 2009 requiring all agencies and public corporations to reduce, modify or cancel service contracts to achieve a cost reduction of at least 15%. The executive order covers advertising, consulting, information technology, accounting, legal and other services (except for direct services to the public), and grants the Fiscal Restructuring and Stabilization Board created under Act 7 (the "Fiscal Board") the power to monitor agencies and public corporations in order to ensure the required 15% minimum cost reduction. Each agency or public corporation had 30 days to report the following to the Fiscal Board: (i) all service contracts currently in effect, (ii) all canceled and/or modified contracts and the corresponding savings, (iii) justification for any remaining contracts in light of the mission of the agency or public corporation, and (iv) the reasonableness of the fees or compensation terms for each remaining contract.

In July 2010, the Governor also renewed another executive order issued in September 2009 requiring all agencies and public corporations to report the following to the Fiscal Board within 30 days: (i) all lease contracts currently in effect, (ii) the uses of leased premises, (iii) the needs for such premises, (iv) the terms and conditions of each lease, and (v) budgeted amounts for rent and other related expenses. During fiscal year 2010, the administration achieved savings by, among other things, consolidating operations of one or more agencies or public corporations and renegotiating leases to obtain more favorable terms. The administration expects to achieve annual savings of at least 15% of rent and related expenses, or approximately $22 million, in future fiscal years.

As of September 30, 2010, the administration had already reduced operating expenses through expense reduction measures other than Phase I through III of the Fiscal Plan by $150 million, and professional service contracts and lease agreements by $42 million through the implementation of the executive orders referred to above.

*Tax Revenue Enforcement Measures.* The Fiscal Plan also sought to increase tax revenues by implementing a more rigorous and ongoing tax enforcement and compliance strategy. Specific tax enforcement initiatives included: (i) enhancements to the administration of federal grants and fund receipts, (ii) stronger collections and auditing efforts on Puerto Rico's sales and use tax, and (iii) a voluntary tax compliance program.

*Revenue Raising Measures.* The goal of achieving fiscal and budgetary balance required a combination of measures that included the introduction of permanent and temporary tax increases. The Fiscal Plan included six temporary and four permanent revenue increasing measures. The temporary revenue increasing measures consisted of: (i) a 5% surtax on income of certain individuals, (ii) a 5% surtax on income of certain corporations, (iii) a 5% income tax on credit unions (commonly known as "cooperativas" in Puerto Rico), (iv) a 5% income tax on Puerto Rico international banking entities, (v) a special property tax on residential and commercial real estate, and (vi) a moratorium on certain tax credits. The temporary measures are to be in effect for up to three fiscal years beginning in fiscal year 2010. The permanent

measures include (i) modifications to the alternative minimum tax for individuals and corporations, (ii) an increase in the excise tax on cigarettes, (iii) a new excise tax on motorcycles, and (iv) an increase in the excise tax on alcoholic beverages. The total revenues from these temporary and permanent measures for fiscal year 2010 are \$428 million. The total estimated revenues from these temporary and permanent measures for fiscal year 2011 are \$420 million.

*Financial Measures.* The administration has also carried out several financial measures designed to achieve fiscal stability throughout the Fiscal Plan implementation period. These measures included, among others, (i) a financing or bond issuance program, the proceeds of which were used to bridge the structural budgetary imbalance during the Fiscal Plan implementation period and fund some of the Economic Plan initiatives, (ii) the restructuring of the securities held in the Corpus Account of the Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of PRIFA (see "Infrastructure Financing Authority" under PUBLIC CORPORATIONS for a description of the Corpus Account), and (iii) the restructuring of a portion of the Commonwealth's debt service.

These financial measures were anchored on the bond-issuance program of COFINA. Act 7, in conjunction with Act No. 91 of May 13, 2006, as amended ("Act 91"), and Act No. 1 of January 14, 2009 ("Act 1"), allocated to COFINA, commencing on July 1, 2009, 2.75% (one-half of the tax rate of 5.5%) of the sales and use tax imposed by the central government, thus increasing COFINA's financing capacity and allowing the Commonwealth to achieve fiscal stability throughout the implementation period of the Fiscal Plan.

During fiscal years 2009 and 2010, COFINA issued approximately \$5.6 billion and \$3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. The proceeds from these bond issues have been used for, among other uses, paying approximately \$1.9 billion of Commonwealth obligations that did not have a designated source of repayment, paying or financing approximately \$4.8 billion of operational expenses constituting a portion of the Commonwealth's deficit, and funding the Local Stimulus Fund (described below) and the Stabilization Fund for fiscal year 2011 with approximately \$500 million and \$1.0 billion, respectively.

Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to, among other things, make a deposit to the General Fund of approximately \$319 million, which was applied to cover a portion of the Commonwealth's budget deficit and make a transfer to GDB of approximately \$159 million as a capital contribution. The gross proceeds resulting from the sale were approximately \$884 million.

The Fiscal Plan has provided more fiscal stability, thereby safeguarding and strengthening Puerto Rico's credit. The fiscal structure resulting from the full implementation of the plan will be sustainable and conducive to economic growth and development.

*Economic Reconstruction Plan*

To balance the impact of the Fiscal Plan, the administration developed and is implementing an economic reconstruction program designed to stimulate growth in the short term and lay the foundation for long-term economic development. The Economic Plan consists of two main components: (i) two economic stimulus programs, and (ii) a supplemental stimulus plan.

*Economic Stimulus Programs.* The cornerstone of Puerto Rico's short-term economic reconstruction plan was the implementation of two economic stimulus programs aimed at reigniting growth and counterbalancing any adverse effects associated with the Fiscal Plan. The economic stimulus programs consisted of Puerto Rico's participation in ARRA (also referred to herein as the "Federal Stimulus") and a local plan (the "Local Stimulus") designed to complement the Federal Stimulus.

- *Federal Stimulus Program:* Puerto Rico was awarded $6.8 billion in stimulus funds from ARRA. The funds are distributed in four main categories: relief to individuals, budgetary and fiscal relief, taxpayers' relief, and capital improvements. In terms of government programs, the Federal Stimulus allocates funds to education, agriculture and food assistance, health, housing and urban development, labor, and transportation, among others. As of September 2010, PRIFA, which is responsible for the administration of ARRA in Puerto Rico, reported that approximately $3.6 billion in ARRA funds had been disbursed.

- *Local Stimulus Program:* The administration formulated the Local Stimulus to supplement the Federal Stimulus and address specific local challenges associated with the local mortgage market, the availability of credit, and the infrastructure and construction sectors. Despite the fact that the Local Stimulus amounted to a $500 million investment by the government, it is estimated that its effect would be greater due to certain lending programs, which are being coordinated in collaboration with commercial banks in Puerto Rico. The administration has been disbursing funds under the $500 million local stimulus program. Most municipalities have received disbursements earmarked to pay outstanding debts and fund local projects. The administration has also disbursed funds allocated towards job training programs, a strategic water distribution project in a southern municipality and the revamping of the Puerto Rico permits system. In addition, $399 million of Local Stimulus funds will be used mainly to promote infrastructure projects.

*Supplemental Stimulus Plan.* The Supplemental Stimulus Plan was designed to provide investment in strategic areas with the objective of laying the foundations for long-term growth in Puerto Rico. The coordinated implementation of the Supplemental Stimulus Plan is expected to reinforce continuity in reigniting economic growth while making key investments for long-term development.

The Supplemental Stimulus Plan is being conducted through a combination of direct investments and guaranteed lending. Specifically, the Supplemental Stimulus Plan targets critical

areas such as key infrastructure projects, public capital improvement programs, private-sector lending to specific industries, and the export and research-and-development knowledge industries. The Supplemental Stimulus Plan takes into account the strategic needs that Puerto Rico must fulfill in order to become a more competitive player in its region and in the global economy.

On September 1, 2010 the Governor signed Act No. 132, also known as the Real Estate Market Stimulus Act of 2010 ("Act 132"), which provides certain incentives to help reduce the existing housing inventory. The incentives provided by Act 132 will be effective from September 1, 2010 through June 30, 2011. See "Economic Performance by Sector—Construction" below.

*Economic Development Program*

The Department of Economic Development and Commerce ("DEDC"), in coordination with other government agencies, is in the process of implementing the *Strategic Model for a New Economy*, which consists of a comprehensive, long-term, economic development program aimed at improving Puerto Rico's overall global relevance, competitiveness, and business environment, and increasing private-sector capital formation and participation in the economy. These initiatives are centered on the dual mission of fostering multi-sector growth while reducing costs and barriers to business and investment, and are a medium-to-long-term counterpart to the Economic Plan and the Supplemental Stimulus Plan described above.

The administration is emphasizing the following initiatives to enhance Puerto Rico's competitive position: (i) overhauling the permitting process, (ii) reducing energy costs, (iii) reforming the tax system, (iv) promoting the development of various projects through public-private partnerships, (v) implementing strategic initiatives targeted at specific economic sectors, and (vi) promoting the development of certain strategic/regional projects.

*Permitting Process.* The first initiative, the reengineering of Puerto Rico's permitting and licensing process, has already been achieved. On December 1, 2009, the Governor signed into law Act No. 161, which overhauls the existing permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. In the short term, this restructuring is focused on eliminating the significant backlog of unprocessed permits that are currently in the pipeline of various government agencies. Longer term, this law seeks to significantly reduce the number of inter-agency processes and transactions currently required by creating a centralized, client-focused system that simplifies and shortens the permitting process for applicants. On December 1, 2010, a new permitting agency created under Act No. 161, which centralized permitting processes previously carried out by various agencies, commenced operations.

*Energy Policy.* On July 19, 2010, the Governor signed Acts No. 82 and 83, providing for, among other things, the adoption of a new energy policy, which is critical for Puerto Rico's competitiveness. Presently, fluctuations in oil prices have a significant effect on Puerto Rico's overall economic performance. Act No. 82 focuses on reducing Puerto Rico's dependence on fossil fuels, particularly oil, through the promotion of diverse, renewable-energy technologies. This new energy policy seeks to lower energy costs, reduce energy-price volatility, and establish environmentally sustainable energy production through a reduction in ecologically harmful

emissions. This legislation also is expected to facilitate the development of several initiatives, including the wheeling of energy, conservation efforts, and the installation of new renewable generation capacity, among others. Moreover, Act No. 83 created a green energy incentives program to promote the development of renewable energy projects as well as a Renewable Portfolio Standards Program. These initiatives are expected to address energy prices in Puerto Rico and provide a means of attracting investment in the energy sector.

*Tax Reform.* In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. Legislation to implement the first and second phases of the tax reform was enacted as Act No. 171 of November 15, 2010 and Act No. 1, respectively. See "Major Sources of General Fund Revenues—Tax Reform" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES for a summary of the principal provisions of the tax reform.

*Public-Private Partnerships.* The administration believes that Public-Private Partnerships ("PPPs") represent an important tool for economic development, particularly in times of fiscal difficulties. PPPs are contracts between government and non-governmental entities—such as private companies, credit unions, and municipal corporations—to develop infrastructure projects, manage government assets or provide government services. The non-governmental partner takes on certain responsibilities and risks related to the development and/or operation of the project in exchange for certain benefits.

PPPs provide the opportunity for the government to lower project development costs, accelerate project development, reduce financial risk, create additional revenue sources, establish service quality metrics, and re-direct government resources to focus on the implementation of public policy. Puerto Rico has opportunities for the establishment of PPPs in the areas of toll roads, ports, public schools, water provision, correctional facilities, and energy, among others.

On June 8, 2009, the Legislative Assembly approved Act No. 29 ("Act 29"), which established a clear public policy and legal framework for the establishment of public-private partnerships in Puerto Rico to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. Act 29 created the Public-Private Partnerships Authority (the "PPP Authority"), the entity tasked with implementing the Commonwealth's public policy regarding public-private partnerships. On December 19, 2009, the PPP Authority approved regulations establishing the administrative framework for the procurement, evaluation, selection, negotiation and award process for public-private partnerships in Puerto Rico.

During fiscal year 2010, the PPP Authority engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the PPP Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The PPP Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the PPP Authority has made

substantial progress in the preparation of a PPP procurement for the Luis Muñoz Marin International Airport.

*Sector Initiatives.* The administration will complement the previously mentioned initiatives with specific strategic initiatives with the objective of creating jobs and increasing economic activity across various sectors of the Puerto Rico economy. The Commonwealth has natural or structural competitive advantages in several areas, such as pharmaceutical and biotechnology manufacturing. These advantages provide opportunities for the development of regional clusters in high-tech manufacturing, research and development, tourism, renewable energy, international trade and professional services. The specific initiatives will be designed to promote sustainable economic growth while accelerating to a knowledge-based and innovation driven economy, focused mainly in the development of human capital and intellectual property, thus diversifying Puerto Rico's economic base.

*Strategic/Regional Projects.* The administration has also targeted strategic/regional projects that will generate investments in various regions of the Island in order to foster balanced economic development. One of the strategic projects for the northern region is called the Urban Bay (formerly known as the Golden Triangle), an urban redevelopment project that incorporates the areas of Old San Juan, Puerta de Tierra, Isla Grande, including the Puerto Rico Convention Center District (the "District"), and Condado, as well as other communities in the vicinity of historic San Juan Bay. The aim of the Urban Bay project is to develop San Juan Bay into a major tourism, recreation, commercial and residential sector which serves the local community and becomes a major attraction for leisure and business travelers, both local and external. Also in the northern region, Science City represents a critical part of the administration's efforts to move Puerto Rico to the forefront of the science, technology and research and development. It seeks to leverage the significant competitive advantages in the knowledge-based sectors that put Puerto Rico in an ideal position to undertake this type of development.

In the eastern region, the Caribbean Riviera entails the redevelopment of the old Roosevelt Roads navy facility in Ceiba and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. This tourist complex will include hotels, casinos, eco-tourist attractions, international airport, retail, yacht marina, and cruise ship ports.

In the western region, the administration is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub.

**Employment and Unemployment**

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2010 averaged 1,102,700, a decrease of 5.6% compared to previous fiscal year; and the unemployment rate averaged 16.0%. During the first nine months of fiscal year 2011, total employment averaged 1,079,700, a decline of 2.6% with respect to the same period of the prior year; and the unemployment rate remained virtually unchanged at 16.0%.

The following table presents annual statistics of employment and unemployment for fiscal year 2006 through fiscal year 2010, and the average figures for the first nine months of fiscal year 2011. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2010.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over, in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2006 | 1,422 | 1,266 | 156 | 11.0 |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011[3] | 1,285 | 1,080 | 205 | 16.0 |

[1]   Totals may not add due to rounding.
[2]   Unemployed as percentage of labor force.
[3]   Average figures for the first nine months of fiscal year 2011 (July through March 2011).

*Source:*  Department of Labor and Human Resources – Household Survey

**Economic Performance by Sector**

From fiscal year 2007 to fiscal year 2010, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | | |
| --- | --- | --- | --- | --- |
| | **2007** | **2008** | **2009** | **2010**[1] |
| Manufacturing | $37,637 | $40,234 | $44,019 | $44,641 |
| Service[2] | 40,190 | 41,372 | 40,333 | 41,472 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,276 |
| Agriculture | 430 | 519 | 506 | 553 |
| Construction[4] | 2,027 | 2,032 | 1,818 | 1,658 |
| Statistical discrepancy | (464) | (312) | (512) | (340) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,211 | $96,261 |
| Less: net payment abroad | (28,884) | (30,941) | (32,534) | (32,969) |
| Total gross national product[5] | $59,521 | $61,665 | $62,678 | $63,292 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

Traditionally, the Government has presented the industrial distribution of production in Puerto Rico using gross domestic product because the Planning Board had not published such a distribution using real gross national product as a base measurement. Recently, the Planning Board presented an industrial distribution of production based on real gross national product, which shows significant differences in the importance of the manufacturing sector to the Puerto Rico economy:

**Commonwealth of Puerto Rico**
**Gross National Product by Sector**
**(at current prices, in millions)**

| | Fiscal Years Ended June 30, | | | |
|---|---|---|---|---|
| | 2007 | 2008 | 2009 | 2010[1] |
| Service[2] | $35,443 | $36,127 | $35,429 | $36,252 |
| Manufacturing | 12,570 | 13,556 | 15,282 | 15,769 |
| Government[3] | 9,529 | 9,757 | 10,167 | 9,411 |
| Construction[4] | 2,013 | 2,018 | 1,805 | 1,646 |
| Agriculture | 430 | 520 | 507 | 553 |
| Statistical discrepancy | (464) | (312) | (12) | (340) |
| Total gross national product[5] | $59,520 | $61,665 | $62,678 | $63,292 |

[1]   Preliminary.
[2]   Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3]   Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4]   Includes mining.
[5]   Totals may not add due to rounding.

*Source:* Planning Board

The service sector's (which includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services) share appears significantly higher than manufacturing when compared to the industrial distribution of production in Puerto Rico based on gross domestic product. This variance occurs because manufacturing activity is principally carried out by non-resident entities whose income is not accounted for in Puerto Rico's real gross national product.

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on NAICS for fiscal years 2006 to 2010.

## Commonwealth of Puerto Rico
## Non-Farm, Payroll Employment by Economic Sector[1]
## (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | 2006 | 2007 | 2008 | 2009 | 2010[2] |
| Natural resources and construction | 65,492 | 64,700 | 59,675 | 49,067 | 35,917 |
| Manufacturing | | | | | |
|    Durable goods | 46,350 | 45,417 | 43,100 | 39,242 | 34,792 |
|    Non-durable goods | 66,233 | 62,442 | 60,950 | 57,483 | 53,483 |
| Sub-total | 112,583 | 107,858 | 104,050 | 96,725 | 88,275 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,992 | 33,267 | 33,717 | 33,267 | 32,533 |
|    Retail trade | 137,358 | 133,750 | 130,883 | 127,492 | 126,242 |
|    Transportation, warehouse, and utilities | 17,433 | 16,992 | 16,742 | 15,692 | 14,550 |
|      Sub-total | 188,783 | 184,008 | 181,342 | 176,450 | 173,325 |
| | | | | | |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,767 |
| Finance | 49,767 | 49,108 | 48,483 | 48,492 | 45,883 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,333 | 102,492 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,992 | 111,108 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,933 | 70,850 |
| Other services | 20,567 | 18,242 | 17,367 | 16,667 | 15,750 |
| Government[3] | 302,492 | 298,125 | 297,742 | 300,708 | 277,333 |
|    Total non-farm | 1,047,742 | 1,032,275 | 1,020,208 | 992,583 | 939,700 |

---

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2010 manufacturing generated $44.6 billion, or 46.4%, of gross domestic product. Manufacturing, however, only generated $15.8 billion, or 24.9%, of real gross national product in fiscal year 2010. During fiscal year 2010, payroll employment for the manufacturing sector was 88,275, a decrease of 8.7% compared with fiscal year 2009. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2010, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.6% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity. See "Tax Incentives—Incentives under the U.S. Code" under THE ECONOMY and "Major Sources of General Fund Revenues—Tax Reform" and "Major Sources of General Fund Revenues—Income Taxes," respectively, under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2010.

## Commonwealth of Puerto Rico
## Gross Domestic Product by Manufacturing Sector
### (at current prices, in thousands)

| | Fiscal Years Ended June 30, | | | |
| | 2007 | 2008 | 2009 | 2010[1] |
|---|---|---|---|---|
| Food | $1,083,300 | $822,008 | $ 1,018,486 | $ 1,040,339 |
| Beverage and Tobacco Products | 924,900 | 1,243,200 | 1,197,325 | 1,203,142 |
| Textile Mills | 2,200 | 1,295 | 975 | 791 |
| Textile Product Mills | 13,200 | 13,438 | 12,072 | 12,418 |
| Apparel | 200,700 | 252,062 | 270,251 | 296,192 |
| Leather and Allied Products | 17,000 | 19,982 | 22,052 | 21,997 |
| Wood Products | 23,600 | 22,011 | 18,809 | 20,228 |
| Paper | 70,600 | 66,066 | 66,233 | 69,664 |
| Printing and Related Support Activities | 124,400 | 118,525 | 111,416 | 109,457 |
| Petroleum and Coal Products | 370,900 | 94,986 | 355,598 | 353,757 |
| Chemical | 27,016,500 | 29,338,802 | 31,013,076 | 31,384,322 |
| Plastics and Rubber Products | 121,700 | 117,556 | 111,835 | 119,614 |
| Nonmetallic Mineral Products | 284,900 | 218,469 | 198,717 | 197,925 |
| Primary Metals | 101,900 | 150,693 | 138,708 | 139,063 |
| Fabricated Metal Products | 239,200 | 247,860 | 227,572 | 209,446 |
| Machinery | 217,500 | 234,410 | 196,456 | 213,689 |
| Computer and Electronic Products | 4,217,200 | 4,462,560 | 6,308,916 | 6,384,137 |
| Magnetic and Optical | - | - | - | - |
| Electrical Equipment, Appliances and Components | 510,900 | 657,298 | 639,313 | 593,777 |
| Transportation Equipment | 78,000 | 77,560 | 66,111 | 61,243 |
| Furniture and Related Products | 65,500 | 56,439 | 47,045 | 47,761 |
| Miscellaneous | 1,955,500 | 2,018,693 | 1,998,060 | 2,162,405 |
| Total gross domestic product of manufacturing sector[2] | $37,636,600 | $40,233,913 | $44,019,025 | $44,641,368 |

[1] Preliminary.
[2] Totals may not add due to rounding.

*Source:* Planning Board

I-33

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2006 to 2010.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group*
### (persons age 16 years and over)

| Industry group | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2006** | **2007** | **2008** | **2009** | **2010**[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 4,100 | 3,825 | 3,758 | 3,058 | 2,500 |
| Cement and concrete products manufacturing | 3,533 | 3,300 | 3,367 | 2,833 | 2,225 |
| Fabricated metal products | 5,775 | 5,675 | 5,375 | 4,908 | 4,042 |
| Computer and electronic | 10,808 | 10,092 | 8,600 | 7,042 | 5,708 |
| Electrical equipment | 6,842 | 6,617 | 6,658 | 5,867 | 5,058 |
| Electrical equipment manufacturing | 4,700 | 4,508 | 4,383 | 3,917 | 3,575 |
| Miscellaneous manufacturing | 11,258 | 12,292 | 11,967 | 11,975 | 11,675 |
| Medical equipment and supplies manufacturing | 10,533 | 11,575 | 11,342 | 11,442 | 11,158 |
| Other durable goods manufacturing | 7,567 | 6,917 | 6,742 | 6,392 | 5,808 |
| Total – durable goods | 46,350 | 45,417 | 43,100 | 39,242 | 34,792 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,650 | 12,183 | 11,725 | 11,383 | 11,592 |
| Beverage and tobacco products manufacturing | 3,392 | 3,258 | 3,267 | 3,133 | 3,275 |
| Apparel manufacturing | 8,258 | 7,708 | 9,633 | 9,825 | 8,808 |
| Cut and sew apparel manufacturing | 8,017 | 7,075 | 8,617 | 8,975 | 8,833 |
| Chemical manufacturing | 32,317 | 30,467 | 27,900 | 25,042 | 22,392 |
| Pharmaceutical and medicine manufacturing | 28,017 | 26,375 | 24,033 | 21,500 | 19,058 |
| Plastics and rubber products | 2,325 | 2,200 | 1,983 | 1,967 | 1,867 |
| Plastics product manufacturing | 2,133 | 2,025 | 1,850 | 1,825 | 1,758 |
| Other non-durable goods manufacturing | 7,292 | 6,625 | 6,442 | 6,133 | 5,550 |
| Total – non-durable goods | 66,233 | 62,442 | 60,950 | 57,483 | 53,483 |
| | | | | | |
| Total manufacturing employment | 112,583 | 107,858 | 104,050 | 96,725 | 88,275 |

---

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 29,000 from fiscal year 2005 to fiscal year 2010. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009 and 2010, manufacturing employment decreased by 4.2%, 3.5%, 7.0% and 8.7%, respectively. For the first nine months of fiscal year 2011, the sector lost an average of 3,900 jobs, or 3.9%, compared to the same period of the previous year. Given that this sector used to pay, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2010, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 1.4% between fiscal years 2007 and 2010. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2010, the service sector generated $41.5 billion, or 43.1%, of gross domestic product, while it generated $36.3 billion, or 57.3%, of real gross national product. Trade, information services, education and health services, finance, insurance and real estate and rentals experienced growth in fiscal year 2010, as measured by

gross domestic product and by gross national product at current prices.    Transportation, professional and technical, and management services experienced a contraction in fiscal year 2010, as measured by gross domestic product and gross national product at current prices. Service-sector employment decreased from 566,725 in fiscal year 2006 to 538,175 in fiscal year 2010 (representing 54.4% of total, non-farm, payroll employment).   The average service-sector employment for fiscal year 2010 represents a decrease of 1.4% compared to the prior fiscal year. For the first nine months of fiscal year 2011, average service-sector employment was 538,778, an increase of 0.5% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system.  As of December 31, 2010, there were eleven commercial banks operating in Puerto Rico.  Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI").  The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of December 31, 2010 were $75.6 billion, as compared to $89.6 billion as of December 31, 2009.  On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver.  On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits.  To date, the amount of jobs lost as a result of these consolidations has not been significant.    The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico.  According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $6.0 billion as of December 31, 2010, up from $3.3 billion on December 31, 2009.  Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry.  Local mutual funds are organized as investment companies and recorded assets under management of $14.2 billion as of December 31, 2010, up from $13.9 billion as of December 31, 2009 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*).  IBEs are licensed financial businesses that conduct offshore banking transactions.  As of December 31, 2010, there were 32 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $40.6 billion, a decrease from $42.1 billion in total assets as of December 31, 2009.  Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.5 billion in assets as of December 31, 2010, a slight increase from $7.2 billion as of December 31, 2009.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | | |
| | 2007 | 2008 | 2009 | 2010[1] |
|---|---|---|---|---|
| Wholesale trade | $ 2,751.6 | $ 2,950.9 | $ 2,934.8 | $ 2,984.0 |
| Retail trade | 4,471.4 | 4,569.4 | 4,614.5 | 4,723.7 |
| Transportation and warehousing | 968.3 | 978.5 | 908.6 | 891.0 |
| Utilities | 2,214.4 | 2,118.0 | 1,971.9 | 1,943.8 |
| Information | 2,466.5 | 2,363.1 | 2,306.4 | 2,359.2 |
| Finance and insurance | 6,694.3 | 7,120.4 | 5,174.7 | 5,543.2 |
| Real Estate and rental | 11,685.7 | 12,064.2 | 13,030.8 | 13,318.3 |
| Professional and business | 3,112.5 | 3,183.6 | 3,132.0 | 3,246.5 |
| Education and health | 3,592.5 | 3,786.2 | 4,125.7 | 4,278.5 |
| Leisure and hospitality | 1,861.5 | 1,874.7 | 1,783.3 | 1,828.1 |
| Other services | 371.6 | 119.3 | 112.3 | 115.9 |
| Total | $40,190.3 | $41,371.9 | $40,333.2 | $41,471.8 |

*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2006 to 2010.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| | 2006 | 2007 | 2008 | 2009 | 2010[1] |
|---|---|---|---|---|---|
| Wholesale trade | 33,992 | 33,267 | 33,717 | 33,267 | 32,533 |
| Retail trade | 137,358 | 133,750 | 130,883 | 127,492 | 126,242 |
| Transportation, warehouse and utilities | 17,433 | 16,992 | 16,742 | 15,692 | 14,550 |
| Information | 22,675 | 22,642 | 21,442 | 20,217 | 18,767 |
| Finance | 49,767 | 49,108 | 48,483 | 48,492 | 45,883 |
| Professional and business | 106,517 | 108,800 | 108,150 | 103,333 | 102,492 |
| Educational and health | 103,650 | 105,225 | 108,550 | 109,992 | 111,108 |
| Leisure and hospitality | 74,767 | 73,567 | 73,408 | 70,933 | 70,850 |
| Other services | 20,567 | 18,242 | 17,367 | 16,667 | 15,750 |
| Total | 566,725 | 561,592 | 558,742 | 546,083 | 538,175 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2010, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,804,100, an increase of 5.6% over the number of persons registered during fiscal year 2009. The average occupancy rate in tourist hotels during fiscal year 2010 was 69.0%, compared to 66.2% in fiscal year 2009. The average number of rooms available in tourist hotels increased by 3.9% to 10,880 rooms from fiscal year 2009 to fiscal year 2010.

During the first six months of fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 906,000, an increase of 4.2% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during the first six months of fiscal year 2011 was 65.3%, a decrease of 2.5% from the prior fiscal year. Also, during the first six months of fiscal year 2011, the average number of rooms available in tourist hotels increased by 7.6% to 11,798 rooms compared to the same period of fiscal year 2010.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. Nevertheless, employment in this sector has shown a slight recovery during the first nine months of fiscal year 2011. For fiscal year 2010, employment in hotels and other lodging facilities was reduced by 6.5% to 12,400 jobs. For the first nine months of fiscal year 2011, the average decrease in employment in hotels and other lodging facilities was 2.7% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 70,900 for fiscal year 2010, a decrease of 0.1% over employment for fiscal year 2009. For the first nine months of fiscal year 2011, employment has increased by 0.2% to 70,800 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2010 and the first six months of fiscal year 2011.

## Commonwealth of Puerto Rico
### Tourism Data[1]

### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 ......................................... | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 ......................................... | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 ......................................... | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 ......................................... | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |
| 2010[5] ...................................... | 1,347,487 | 1,193,549 | 2,331,393 | 4,872,429 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 ......................................... | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 ......................................... | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 ......................................... | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009 ......................................... | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |
| 2010[5] ...................................... | 1,546.1 | 168.6 | 1,883.5 | 3,598.2 |

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2010, the government (state and local) accounted for $8.3 billion, or 8.6%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 260,700 workers (state, including public corporations, and local), or 27.7% of total, non-farm, payroll employment in fiscal year 2010. From fiscal year 2006 to fiscal year 2009, state and municipal government employment averaged approximately 285,000. During fiscal year 2010, state and municipal government employment decreased by 24,900 jobs, or 8.7%. According to the payroll survey, the distribution of these job reductions was 20,600 jobs in the state government and 4,200 jobs in municipal government.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment, collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees may not be renegotiated or renewed. Certain individuals and labor organizations have challenged in court the validity of some of the provisions of Act 7. See "Litigation."

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-

private partnership. The PPP Authority expects to issue a request for qualifications by the third quarter of fiscal year 2011.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. During the first half of fiscal year 2011, the PPP Authority commenced the procurement process for the establishment of a concession for toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. Since its peak in fiscal year 2000, real construction investment has declined at an average annual growth rate of 8.7%. Such rates of interest started to decrease significantly in fiscal year 2005, as a consequence of the current contraction of the local economic activity. During the last four fiscal years (from fiscal year 2007 to 2010) real construction investment decreased at an average annual rate of 17.0%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%.

Public investment has been an important component of construction investment. During fiscal year 2010, approximately 49.3% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment

compared to 37.9% in fiscal year 2000. The total value of construction permits decreased 29.2% in fiscal year 2010 as compared to fiscal year 2009, and total sales of cement decreased by 26.3% between 2009 and 2010, the largest decline registered since 1959. Average payroll employment in the construction sector during fiscal year 2010 was 35,900, a reduction of 26.8% from fiscal year 2009. During the first nine months of fiscal year 2011, payroll employment in the construction sector averaged 29,200, a further reduction of 20.8% for the same period in fiscal year 2010 and the second lowest level of construction sector employment in a decade.

Total construction investment for fiscal year 2010 decreased in real terms by 18.8%, following a 22.2% real decline in fiscal year 2009. The Planning Board expects a further construction investment decrease of 7.8% in real terms for fiscal year 2011. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010, reaching levels not seen in almost three decades. During the first nine months of fiscal year 2011, cement sales decreased by 6.7% from the previous fiscal year.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided under Act No. 132 will be available from September 1, 2010 to June 30, 2011. Certain permanent incentives are also available for rental housing.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2010, gross income from agriculture was $822 million, an increase of 3.8% compared with fiscal year 2009.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income

from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
### Trend in College Enrollment

| | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| Academic Year | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,539,000 | 50.5% |
| 2000 | 428,893[2] | 176,015 | 41.0% | 27,143,454[2] | 14,791,000 | 54.5% |
| 2001 | 429,366[3] | 184,126 | 42.9% | 28,001,302[3] | 15,312,298 | 54.7% |
| 2002 | 425,479[3] | 190,776 | 44.8% | 28,488,500[3] | 15,927,986 | 55.9% |
| 2003 | 420,074[3] | 199,842 | 47.6% | 28,912,095[3] | 16,611,710 | 57.5% |
| 2004 | 414,098[3] | 206,791 | 49.9% | 29,285,846[3] | 16,911,486 | 57.7% |
| 2005 | 406,548[3] | 208,032 | 51.2% | 29,404,797[3] | 17,272,043 | 58.7% |
| 2006 | 400,529[3] | 209,547 | 52.3% | 29,540,873[3] | 17,487,481 | 59.2% |
| 2007 | 396,056[3] | 225,402 | 56.9% | 29,733,951[3] | 17,758,872 | 59.7% |
| 2008 | 395,503[3] | 227,546 | 57.5% | 30,090,148[3] | 18,248,133 | 60.6% |
| 2009 | 394,800[3] | 235,618 | 59.7% | 30,412,035[3] | 19,102,814 | 62.8% |

[1]   Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2]   Based on census population as of April 1 of the stated year.
[3]   Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2009-2010 was approximately 65,699 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

**Tax Incentives**

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico

financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale. The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies. In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares of an exempted business by its shareholders during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. Several of these initiatives could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

# DEBT

## Public Sector Debt

Public sector debt comprises bonds and notes of the Commonwealth, its municipalities, and public corporations ("notes" as used in this section refers to certain types of non-bonded debt regardless of maturity), subject to the exclusions described below.

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by full faith and credit bonds or notes shall not be issued if the amount of the principal of and interest on such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter "internal revenues") in the two fiscal years preceding the fiscal year of such proposed issuance. Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% limitation is not exceeded through payments by the Commonwealth on such guaranteed debt. Internal revenues consist principally of income taxes, property taxes, sales taxes and excise taxes. Certain revenues, such as federal excise taxes on offshore shipments of alcoholic beverages and tobacco products and customs duties, which are collected by the United States Government and returned to the Treasury Department, and motor vehicle fuel taxes, crude oil and derivative products excise taxes and license fees, which are allocated to the Highway and Transportation Authority, are not included as internal revenues for the purpose of calculating the debt limit, although they may be available for the payment of debt service. In addition, the portion of the Sales Tax (as defined under "Major Sources of General Fund Revenues—Sales and Use Taxes" under "Puerto Rico Taxes, Other Revenues, and Expenditures" below) allocated to COFINA is not included as internal revenues since the legislation that created COFINA transferred ownership of such portion of the Sales Tax to COFINA and provided that such portion was not "available resources" under the Constitutional provisions relating to full faith and credit bonds.

As of March 31, 2011, future maximum annual debt service for the Commonwealth's outstanding general obligation debt is $957,900,517.25 in the fiscal year ending June 30, 2015 (based on the assumption that the (i) Public Improvement Refunding Bonds, Series 2004 A, which are variable rate bonds, bear interest at their actual rate per annum through July 1, 2012 and thereafter at 12% per annum, (ii) Public Improvement Refunding Bonds, Series 2004 B and the Public Improvement Refunding Bonds, Series 2008 B, which are variable rate bonds, bear interest at 12% per annum, and (iii) portion of each of the Public Improvement Refunding Bonds, Series 2003 C, Public Improvement Bonds of 2006, Series A, and Public Improvement Refunding Bonds, Series 2007 A that are variable rate bonds, bear interest at 12% per annum). This amount ($957,900,517.25) *plus* the amount paid by the Commonwealth in fiscal year 2010 on account of bonds or notes guaranteed by the Commonwealth ($10,491,303), for a total of $968,391,820.25, is equal to 13.21% of $7,333,246,000, which is the average of the adjusted internal revenues for the fiscal years ended June 30, 2009 and June 30, 2010. If the interest on the outstanding bonds described in items (i) through (iii) above was calculated using the effective fixed interest rate payable by the Commonwealth under the interest rate exchange agreements

entered into in respect thereof, the percentage referred to in the preceding sentence would be 11.95% and future maximum annual debt service for the Commonwealth's outstanding general obligation debt (excluding guaranteed bonds or notes) would be $865,713,983 in the fiscal year ending June 30, 2020. The potential termination payment (which is a full faith and credit obligation of the Commonwealth) payable by the Commonwealth (based on the then applicable mark-to-market value) upon termination of the above mentioned swap agreements is not included in the calculation of the 15% constitutional debt limitation.

Except as set forth below, annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation. In the event any of the public corporations issuers of guaranteed bonds are unable to make any portion of the future debt service payments on its guaranteed bonds, the Commonwealth would be required to make such payments under its guarantee from the General Fund, and such debt service would be included in the calculation of the 15% constitutional debt limitation.

As of December 31, 2010, Port of the Americas Authority had outstanding bonds guaranteed by the Commonwealth (the "POA Guaranteed Bonds"), representing a $250 million GDB financing with an outstanding principal amount of $209 million. The Commonwealth has begun to make payments of debt service on the POA Guaranteed Bonds and expects to make all payment on the POA Guaranteed Bonds under the full faith and credit guarantee of the Commonwealth. During fiscal year 2010, the Commonwealth made payments under its guaranty of the POA Guaranteed Bonds of $10.5 million. See "Commonwealth Guaranteed Debt" below.

The Commonwealth's policy has been and continues to be to prudently manage such debt within the constitutional limitation. Debt of municipalities, other than bond anticipation notes, is supported by real and personal property taxes and municipal license taxes. Debt of public corporations, other than bond anticipation notes, is generally supported by the revenues of such corporations from rates charged for services or products. See "Public Corporations." However, certain debt of public corporations is supported, in whole or in part, directly or indirectly, by Commonwealth appropriations or taxes.

Direct debt of the Commonwealth is issued pursuant to specific legislation approved in each particular case. Debt of the municipalities is issued pursuant to ordinances adopted by the respective municipal legislatures. Debt of public corporations is issued in accordance with their enabling statutes. GDB, as fiscal agent of the Commonwealth and its municipalities and public corporations, must approve the specific terms of each issuance.

The following table presents a summary of public sector debt as of December 31, 2010. This table includes debt not primarily payable from either Commonwealth or municipal taxes, Commonwealth appropriations or rates charged by public corporations for services or products, some of which debt is set forth in footnote 6 below. Excluded from the table is debt the inclusion of which would reflect double counting including, but not limited to, $1.0 billion of outstanding bonds (as of December 31, 2010) issued by Municipal Finance Agency to finance its purchase of bonds of Puerto Rico municipalities, and $1.6 billion of obligations of Public Finance Corporation issued to purchase certain Commonwealth public sector debt.

## Commonwealth of Puerto Rico
## Public Sector Debt*
### (in millions)

|  | December 31, 2010 |
|---|---|
| GENERAL FUND RELATED DEBT |  |
| Direct full faith and credit obligations | $ 9,193 |
| Puerto Rico guaranteed debt[1] | 4,281 |
| Debt supported by Puerto Rico appropriations or taxes[2] | 3,470 |
| Tax and Revenue Anticipation Notes[3] | 900 |
| Pension Obligation Bonds[4] | 2,948 |
| TOTAL GENERAL FUND RELATED DEBT | $20,792 |
| | |
| Sales Tax debt | $13,437 |
| Public corporations and agencies[5] | 23,914 |
| Municipal Debt | 3,331 |
| Limited Obligations/non-recourse debt[6] | 2,410 |
| TOTAL PUBLIC SECTOR DEBT | $63,884 |

---

\* Totals may not add due to rounding.

[1] Consists of $601 million of bonds issued by Aqueduct and Sewer Authority, $401 million of State Revolving Fund Loans incurred under various federal water laws, $209 million of bonds issued by Port of the Americas Authority and $3.070 billion of Public Buildings Authority bonds. Excludes $267 million of GDB bonds payable from available moneys of GDB.

[2] Represents bonds and notes payable from the Commonwealth General Fund and Public Improvement Fund. Includes Public Finance Corporation.

[3] Includes related short-term financings.

[4] Represents Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth and its instrumentalities after the issuance of the bonds.

[5] Excludes the Electric Power Authority's $218,225,000 Power Revenue Refunding Bonds issued in October 2010 and $355,730,000 Power Revenue Bonds, Series EEE (Issuer Subsidy Build America Bonds) issued in December 2010.

[6] Includes the following: $1.3 billion of Children's Trust bonds, which are payable solely from the payments to be received pursuant to the tobacco litigation settlement; $180 million of Housing Finance Authority bonds, which are payable from Puerto Rico Housing Administration's annual allocation of Public Housing Capital Funds from the United States Department of Housing and Urban Development; $151.0 million of Special Facilities Revenue Bonds issued by Highways and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge; $155 million of Special Facilities Bonds issued by Ports Authority, which are solely payable from the pledge of certain payments made by a private corporation under a special facilities agreement; $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA"), which are payable from rent payments made by the University of Puerto Rico; and approximately $75.7 million of bonds issued by AFICA to finance the construction of various government infrastructure projects, which are payable from rent payments made by various government entities.

*Source:* Government Development Bank for Puerto Rico

No deductions have been made in the table above for deposits on hand in debt service funds and debt service reserve funds. The table above and the amounts shown throughout this section as representing outstanding debt include outstanding capital appreciation bonds at their respective original principal amounts and do not include any accretion thereon.

On February 17, 2011, the Commonwealth issued $356,520,000 of its Public Improvement Refunding Bonds, Series 2011 A (General Obligation Bonds) (the "Series 2011 A Bonds") and terminated approximately $231 million of synthetic fixed rate swaps associated to the general obligation bonds refunded by the Series 2011 A Bonds. On March 2, 2011, the Commonwealth issued $274,550,000 of its Public Improvement Refunding Bonds, Series 2011 B (General Obligation Bonds) (the "Series 2011 B Bonds"). The Series 2011 B Bonds were directly purchased by an institutional investor and the proceeds were used to refund on a current basis the Commonwealth's Public Improvement Refunding Bonds, Series 2007A-8, Series 2007A-9 and Series 2008 B. On March 17, 2011, the Commonwealth issued $442,015,000 of its Public Improvement Refunding Bonds, Series 2011 C (General Obligation Bonds) (the "Series 2011 C Bonds"). The proceeds of the Series 2001 C Bonds were used to repay advances made to the Commonwealth under a GDB line of credit used to make deposits to the Commonwealth's Redemption Fund for the payment of interest (but not principal) due during fiscal year 2011 on certain general obligation bonds and notes. The public sector debt tables as of December 31, 2010 in this Report have not been adjusted to reflect the issuance of the Series 2011 A Bonds, Series 2011 B Bonds and the Series 2011 C Bonds, and the refunding of the bonds refunded by the Series 2011 A Bonds and the Series 2011 B Bonds.

**Debt Service Requirements for Commonwealth General Obligation Bonds**

The following table presents the debt service requirements for Commonwealth general obligation bonds outstanding on April 15, 2011. This table, however, does not include payments made by the Commonwealth on the POA Guaranteed Bonds, which are paid from General Fund budgetary appropriations determined in consultation with GDB, as holder of the POA Guaranteed Bonds. The amounts paid by the Commonwealth under the POA Guaranteed Bonds for the prior fiscal year, however, are taken into account in the determination of the constitutional debt limit.

In addition, in respect of certain variable rate general obligation bonds, as to which the Commonwealth has entered into interest rate exchange agreements, the interest in the table is calculated by using the respective fixed rates of interest that the Commonwealth is paying under said agreements.

Debt service requirements for each fiscal year, as shown in the following table, include principal and interest due on July 1 immediately following the close of such fiscal year.

### Puerto Rico Debt Service Requirements*
### (In thousands)

| Fiscal Year Ending June 30 | Outstanding Bonds | | |
|---|---|---|---|
| | Principal | Interest | Total |
| 2011[1] | $252,605 | $240,955 | $493,560 |
| 2012 | 362,335 | 485,097 | 847,432 |
| 2013 | 387,005 | 463,523 | 850,528 |
| 2014 | 374,613 | 463,433 | 838,045 |
| 2015 | 406,765 | 445,356 | 852,120 |
| 2016 | 426,790 | 425,183 | 851,974 |
| 2017 | 373,392 | 404,247 | 777,638 |
| 2018 | 376,110 | 385,632 | 761,742 |
| 2019 | 479,356 | 351,250 | 830,606 |
| 2020 | 546,400 | 319,314 | 865,714 |
| 2021 | 421,540 | 292,069 | 713,609 |
| 2022 | 351,420 | 272,147 | 623,567 |
| 2023 | 321,255 | 255,411 | 576,666 |
| 2024 | 336,215 | 240,754 | 576,969 |
| 2025 | 340,610 | 224,910 | 565,520 |
| 2026 | 349,280 | 207,339 | 556,619 |
| 2027 | 367,005 | 189,618 | 556,623 |
| 2028 | 386,340 | 170,197 | 556,537 |
| 2029 | 339,095 | 150,748 | 489,843 |
| 2030 | 352,240 | 134,726 | 486,966 |
| 2031 | 371,395 | 117,908 | 489,303 |
| 2032 | 224,545 | 99,992 | 324,537 |
| 2033 | 163,245 | 87,491 | 250,736 |
| 2034 | 172,615 | 79,028 | 251,643 |
| 2035 | 233,700 | 70,813 | 304,513 |
| 2036 | 247,115 | 57,394 | 304,509 |
| 2037 | 256,790 | 42,777 | 299,567 |
| 2038 | 160,675 | 27,854 | 188,529 |
| 2039 | 170,105 | 18,421 | 188,526 |
| 2040 | 130,450 | 8,215 | 138,665 |
| | $9,681,005 | $6,731,801 | $16,412,806 |

---

\*   Totals may not add due to rounding.  Includes the effective fixed rate on certain variable rate general obligation bonds as to which the Commonwealth has entered into interest rate exchange agreements.

[1]   Excludes the payment of interest by the Commonwealth on January 1, 2011 in the amount of $231,893,100.

*Sources*:  Government Development Bank for Puerto Rico and Treasury Department

## Interest Rate Exchange Agreements

*General.*   The Commonwealth and various public corporations are party to various interest rate exchange agreements or swaps.  Except for the basis swaps discussed below, the purpose of all of the interest rate exchange agreements currently in place is to hedge the Commonwealth's variable rate debt exposure and the interest rate risks associated therewith. When the Commonwealth or a public corporation has issued variable rate bonds, it has entered into an interest rate exchange agreement with a counterparty pursuant to which the Commonwealth or the public corporation agrees to pay the counterparty a fixed rate and the counterparty agrees to pay the Commonwealth or public corporation a variable rate intended to

match the variable rate payable on the bonds (a "synthetic fixed rate swap"). In theory, the variable rate payments received by the Commonwealth under the swap off-set the variable rate payments on the bonds and, thus, the Commonwealth or the public corporation is left with a net fixed rate payment to a counterparty. The intention of these swaps was to lower the all-in cost of borrowing below what could have been achieved by issuing fixed rate bonds.

*Basis Swap.* The Commonwealth and the Puerto Rico Electric Power Authority ("PREPA") are also party to agreements ("basis swaps" ), entered into in June 2006 and March 2008, respectively, pursuant to which they are making payments on a specified notional amount based on a short-term interest rate index published by the Securities Industry and Financial Markets Association ("SIFMA") and are receiving from their counterparties payments on the same notional amount based on the published three-month London Interbank Offered Rate ("LIBOR") plus a specified fixed rate payment (the "basis annuity"). For fiscal year 2010 and the first nine months of fiscal year 2011, the Commonwealth received $6.9 million and $5.4 million, respectively, from its counterparties under the basis swap, net of the Commonwealth's payments to the counterparties, and PREPA received $9.5 million and $7.1 million, respectively, from its counterparty under the basis swap, net of PREPA's payments to the counterparty.

*Risks.* By using derivative financial instruments, the Commonwealth exposes itself, among other risks, to credit risk (based on the counterparty's ability to perform under the terms of the agreement), market risk (based on the changes in the value of the instrument resulting from changes in interest rates and other market factors) and, in the case of basis swaps, basis risk (based on changes to the correlation between different indexes used in connection with a derivative and the variable rate debt they hedge). GDB, as fiscal agent, regularly monitors the exposure of the Commonwealth and the public corporations under the interest rate exchange agreements and attempts to minimize the risks. To minimize some of the credit risk, the Commonwealth and the public corporations enter into agreements with counterparties that have good credit ratings. The outstanding interest rate exchange agreements are with eleven different counterparties, all of which are rated in one of the three highest rating categories by either Moody's or S&P. In addition, all of the agreements contain requirements of posting collateral by the counterparties based on certain valuation thresholds and credit ratings.

During fiscal years 2009 and 2010, in order to reduce the risks associated with the swaps portfolio, the Commonwealth and the public corporations terminated approximately $2.0 billion of swaps. In May and September 2009, the Commonwealth terminated a swap with an $850 million notional amount pursuant to which the Commonwealth was making payments based on the published short-term SIFMA municipal swap rate and was receiving payments based on the 10-year SIFMA (the "constant maturity swap") at an aggregate gain of approximately $24.8 million. Besides the basis swaps, the constant maturity swap was the only other interest rate exchange agreement that did not hedge specific variable rate debt of the Commonwealth. The aggregate notional amount of the swaps for the Commonwealth and the public corporations has decreased from $9.2 billion as of June 30, 2008, to $7.9 billion as of June 30, 2009 and $6.9 billion as of March 31, 2011, an aggregate decrease of 24.8%.

*Notional Amounts.* The table below shows the aggregate notional amount as of March 31, 2011 of synthetic fixed rate swaps and basis swaps of the Commonwealth and the public corporations.

**Swap Portfolio Breakdown**
**Notional Amount**
(as of March 31, 2011)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $1,302,700,000 | $1,698,370,000 | $3,001,070,000 |
| Electric Power Authority | 411,825,000 | 1,375,000,000 | 1,786,825,000 |
| Highways and Transportation Authority | 647,025,000 | — | 647,025,000 |
| Ports Authority | 411,705,000 | — | 411,705,000 |
| Sales Tax Financing Corporation | 1,043,000,000 | — | 1,043,000,000 |
| Total | $3,816,255,000 | $3,073,370,000 | $6,889,625,000 |

*Market Value.* Generally, the interest rate exchange agreements may be terminated by the Commonwealth or the public corporations at any time at their then current market values. The agreements may also be terminated upon the occurrence of certain credit events. If a termination occurs due to a credit event, the Commonwealth or the public corporations may be obligated to pay to the applicable swap counterparty an amount based on the terminating swap's market value, which may be substantial, or vice versa, with other termination costs being paid by the defaulting party. The mark-to-market value of the swaps fluctuates with interest rates and other market conditions. The Commonwealth's obligations under the interest rate exchange agreements are secured by the full faith, credit and taxing power of the Commonwealth.

The following table shows, as of March 31, 2011, the net mark-to-market value of all outstanding interest rate exchange agreements. Since the mark-to-market value of all swaps was negative as of March 31, 2011, the Commonwealth or the public corporations, as applicable, would owe money to the counterparties if any of the agreements had been terminated as of that date.

**Swap Portfolio Mark-to-Market Valuation**
(as of March 31, 2011)

| | Synthetic Fixed | Basis Swaps | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $(150,020,616) | $(35,227,774) | $(185,248,390) |
| Electric Power Authority | (44,143,867) | (14,636,678) | (58,780,545) |
| Highways and Transportation Authority | (84,004,382) | — | (84,004,382) |
| Ports Authority | (43,134,090) | — | (43,134,090) |
| Sales Tax Financing Corporation | (174,238,498) | — | (174,238,498) |
| Total | $(495,541,452) | $(49,864,452) | $(545,405,904) |

*Collateral Requirements.* Under the majority of the interest rate exchange agreements, the Commonwealth and the public corporations are required to deliver collateral to the counterparties to guarantee their performance under the agreements based on the credit ratings of the Commonwealth and the public corporations and certain contractual mark-to-market value thresholds. During the fourth quarter of 2008, as a result of the U.S. financial market crisis, the Commonwealth and the public corporations were required to post collateral of approximately $251.8 million and $82.5 million, respectively, to their counterparties on certain interest rate exchange agreements. Based on an improvement in the mark-to-market value of the swap portfolio since then, the Commonwealth and the public corporations had no collateral posted as

of March 31, 2011. However, if the mark-to-market value of the swaps portfolio deteriorates or the credit ratings of the Commonwealth or the public corporations are lowered, the collateral posting obligations contained in the agreements may require deliveries of collateral.

**Variable Rate Bonds and Mandatory Tender Bonds**

*Variable Rate Bonds.* The Commonwealth and various public corporations have outstanding variable rate bonds, consisting of variable rate demand bonds which are subject to mandatory tender for purchase prior to their maturity on certain interest rate reset dates and upon expiration of an associated credit or liquidity facility ("VRDO Bonds") and other bonds and notes where the interest rate changes periodically based on the LIBOR rate or a particular index but that are not subject to tender prior to their maturity. The Commonwealth and the public corporations have hedged their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers with respect to all variable rate bonds. Pursuant to these agreements, the Commonwealth and the public corporations receive a variable rate payment expected to approximate the interest cost of the variable rate bonds, and pay a fixed rate. See "Interest Rate Exchange Agreements."

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of April 1, 2011.

### Variable Rate Debt Breakdown
(as of April 1, 2011)

|  | VRDO Bonds | Other Variable Rate Debt | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | $491,450,000 | $ 742,660,000 | $1,234,110,000 |
| Electric Power Authority | — | 411,825,000 | 411,825,000 |
| Highways and Transportation Authority | 200,000,000 | 447,025,000 | 647,025,000 |
| Ports Authority | — | 411,705,000 | 411,705,000 |
| Sales Tax Financing Corporation | — | 136,000,000 | 136,000,000 |
| Total | $691,450,000 | $2,149,215,000 | $2,840,665,000 |

The VRDO Bonds bear a floating interest rate adjusted at specified intervals, such as daily or weekly (each, a "remarketing date") and provide investors the option to tender or put the bonds at par on each remarketing date. The tendered bonds are then resold by a remarketing agent in the secondary market to other investors. Most of the VRDO Bonds are secured by letters of credit or other liquidity or credit facilities ("credit/liquidity facilities") that provide for the payment of the purchase price payable upon the tender of the bonds. The credit/liquidity facilities expire prior to the final maturity of the bonds. If upon the expiration or termination of any credit/liquidity facility with respect to a series of VRDO Bonds the Commonwealth or the applicable public corporation is unable to renew or replace such facility with an alternate credit/liquidity facility, the VRDO Bonds of such series are subject to mandatory tender for purchase by the credit/liquidity facility provider and generally become subject to higher interest rates and accelerated amortization schedules pursuant to the terms of each expiring credit/liquidity facility.

The recent U.S. financial market crisis has resulted in a significant reduction in the availability of credit/liquidity facilities to support VRDO Bonds, and a related increase in the price of these facilities when they can be obtained. Thus, if the Commonwealth and the public corporations are not able to renew or rollover the expiring credit/liquidity facilities with respect to VRDO Bonds, or are not able to do so at an acceptable price, the Commonwealth and the public corporations would have to refinance the VRDO Bonds or otherwise obtain financing for such bonds in order to avoid the higher interest rates and accelerated amortization schedules set forth in the expiring credit/liquidity facility.

In addition, since there are interest rate exchange agreements with respect to all VRDO Bonds, if the Commonwealth or the applicable public corporation cannot renew or replace a credit/liquidity facility upon its expiration or remarket the related series of bonds successfully upon their mandatory tender as variable rate bonds, the Commonwealth or the applicable public corporation may have to terminate the interest rate exchange agreements associated with such series of VRDO Bonds. Termination of the applicable interest rate exchange agreement may result, depending on then current interest rate levels and market conditions, in the payment of a termination amount, which may be substantial, by the Commonwealth to compensate the counterparty for its economic losses. As of March 31, 2011, the mark-to-market value of all the interest rate exchange agreements with respect to VRDO Bonds was negative $61.4 million for the Commonwealth and negative $27.8 million for the public corporations. See "Interest Rate Exchange Agreements – Market Value."

The following table shows, by fiscal year, the amount of VRDO Bonds subject to mandatory tender upon expiration of the applicable credit/liquidity facilities.

**VRDO Bonds Rollover**
(by Fiscal Year)

| | 2011 | 2012 | Total |
|---|---|---|---|
| Commonwealth (General Obligation) | — | $491,450,000 | $491,450,000 |
| Highways and Transportation Authority | $200,000,000 | — | 200,000,000 |
| Total | $200,000,000 | $491,450,000 | $691,450,000 |

*Mandatory Tender Bonds.* As of April 1, 2011, the Commonwealth and the public corporations also had outstanding bonds bearing interest at a fixed rate but subject to mandatory tender for purchase prior to maturity, payable from the remarketing of the bonds, on certain specified dates (the "Mandatory Tender Bonds"). After the mandatory tender date, the Commonwealth or the applicable public corporation may from time to time change the method of determining the interest on the Mandatory Tender Bonds, which may be a fixed or variable rate. The Commonwealth and the public corporations have not provided any liquidity facility for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If the Commonwealth or the applicable public corporation cannot remarket the Mandatory Tender Bonds, they would have to obtain other funds in order to provide for the purchase price of these bonds.

The following table shows, as of April 1, 2011, the breakdown of the Mandatory Tender Bonds of the Commonwealth and the public corporations and the respective dates when such bonds are subject to mandatory tender for purchase.

## Mandatory Tender Bonds Breakdown
(as of April 1, 2010)

| | Mandatory Tender Bonds | Mandatory Tender Date |
|---|---|---|
| Commonwealth (General Obligation) | $279,240,000 | July 1, 2012 |
| Public Finance Corporation | 1,206,130,000 | February 1, 2012 |
| Public Buildings Authority | 464,880,000 | July 1, 2012 ($335,580,000) |
| | | July 1, 2017 ($129,300,000) |
| Total | $1,950,250,000 | |

The Commonwealth has entered into forward starting interest rate exchange agreements with respect to approximately $69.2 million of its Mandatory Tender Bonds. COFINA has also entered into forward starting interest rate exchange agreement with respect to approximately $907 million of Mandatory Tender Bonds of Public Finance Corporation. The forward starting interest rate exchange agreements assume that the Commonwealth Mandatory Tender Bonds will be remarketed as variable rate bonds after their mandatory tender date and that COFINA will issue variable rate bonds to refund the Public Finance Corporation Mandatory Tender Bonds on their mandatory tender date. If the Commonwealth and COFINA cannot remarket or issue these bonds as variable rate bonds at that time, they may have to terminate their respective forward starting interest rate exchange agreements, which may result in the payment of a termination amount. As of March 31, 2011, the mark-to-market value of these forward starting swaps to the Commonwealth and COFINA was negative $6.9 million and negative $141.2 million, respectively, which are the amounts the Commonwealth and COFINA would have been required to pay to terminate the swaps on that date.

### Ratings of Commonwealth General Obligation Bonds

The Commonwealth's general obligation and appropriation debt is currently rated "A3" with a negative outlook by Moody's, "BBB+" with a stable outlook by Fitch, and "BBB" with a stable outlook by S&P.

### Commonwealth Guaranteed Debt

As of December 31, 2010, $3.070 billion of Commonwealth guaranteed bonds of the Public Buildings Authority were outstanding. Maximum annual debt service on these bonds is $258.8 million in fiscal year 2011, with their final maturity being July 1, 2039. No payments under the Commonwealth guaranty have been required to date for these bonds.

As of December 31, 2010, $267 million of Commonwealth guaranteed bonds of GDB were outstanding. No payments under the Commonwealth guaranty have been required for these bonds.

As of December 31, 2010, GDB held approximately $209.2 million of the Port of the Americas Authority's outstanding bonds, which are guaranteed by the Commonwealth. The Authority is authorized to issue and GDB is authorized to purchase its bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port of the Americas. Payments of $38.1 million under the Commonwealth guaranty have been required to pay interest and

principal on these bonds. See "Other Public Corporations—Port of the Americas Authority" under "Public Corporations" below.

As of December 31, 2010, the aggregate outstanding principal amount of obligations of PRASA guaranteed by the Commonwealth was $1.002 billion. This amount consisted of $284.8 million in revenue bonds sold to the public, $316.6 million in bonds issued to the United States Department of Agriculture, Rural Development, and $401.0 million of loans by the State Revolving (Clean Water and Safe Drinking Water Act) Funds for the benefit of PRASA. From January 1997 through fiscal year 2005, the Commonwealth made debt service payments under its guaranty. Beginning with the debt service payment due January 1, 2006, the Commonwealth stopped making guarantee payments on these obligations and PRASA resumed making payment on this debt. In the event PRASA is unable to make any portion of the future debt service payments on its guaranteed obligations, the Commonwealth would be required once more to make such payments from the General Fund under its guarantee. See "Other Public Corporations—Puerto Rico Aqueduct and Sewer Authority" under "Public Corporations" below.

**Trends of Public Sector Debt**

    The following table shows the growth rate of short-term and long-term public sector debt and the growth rate of gross national product (in current dollars) for the five fiscal years ended June 30, 2010 and for the first six months of the fiscal year 2011. As of December 31, 2010, outstanding short-term debt, relative to total debt, was 8.4%.

**Commonwealth of Puerto Rico**
**Public Sector Debt and Gross National Product**
**(dollars in millions)\***

| June 30, | Public Sector | | | | | Gross National Product[1] | |
|---|---|---|---|---|---|---|---|
| | Long Term[2] | Short Term[3] | Total | Short Term as % of Total | Rate of Increase | Amount | Rate of Increase |
| 2006 ............................ | 37,313 | 2,620[4][5] | 39,933 | 6.6 | 8.8 | 56,732 | 5.5 |
| 2007 ............................ | 39,492 | 3,326[4] | 42,818 | 7.8 | 7.2 | 59,521 | 4.9 |
| 2008 ............................ | 43,663 | 3,269[4] | 46,932 | 7.0 | 10.0 | 61,527 | 3.4 |
| 2009 ............................ | 48,332 | 4,648[4] | 52,980 | 8.8 | 13.0 | 62,759 | 2.0 |
| 2010 ............................ | 53,351 | 3,472 | 56,823 | 6.1 | 7.3 | 63,866 | 1.8 |
| December 31, 2010 ..... | 53,572 | 4,954 | 58,526 | 8.4 | 2.9 | - | - |

---

\*   Totals may not add due to rounding.
[1]   In current dollars.
[2]   Does not include the (i) Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4, and (ii) bonds identified in footnote 6, of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt," which would have been issued and outstanding at the time, all of which would be considered long-term debt.
[3]   Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.
[4]   Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.
[5]   Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:* Government Development Bank for Puerto Rico

The following table shows the trend of public sector debt by major category for the five fiscal years ended June 30, 2010 and for the first six months of the fiscal year 2011.

## Commonwealth of Puerto Rico
## Public Sector Debt by Major Category
### (dollars in millions)*

| June 30, | Commonwealth[1] | | | Municipalities | | | Public Corporation[2] | | | Total | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total | Long Term | Short Term[3] | Total |
| 2006 | 9,841 | 552[4][5] | 10,393 | 2,037 | 293 | 2,330 | 25,435 | 1,775 | 27,210 | 37,313 | 2,620 | 39,933 |
| 2007 | 10,335 | 224[4] | 10,559 | 2,164 | 299 | 2,463 | 26,993 | 2,803 | 29,796 | 39,492 | 3,326 | 42,818 |
| 2008 | 9,273 | 519[4] | 9,792 | 2,507 | 313 | 2,820 | 31,633 | 2,437 | 34,070 | 43,413 | 3,269 | 46,682 |
| 2009 | 9,382 | 557[4] | 9,939 | 2,691 | 306 | 2,997 | 36,259 | 3,785 | 40,044 | 48,332 | 4,648 | 52,980 |
| 2010 | 10,033 | 270 | 10,303 | 2,905 | 326 | 3,231 | 40,413 | 2,876 | 43,289 | 53,351 | 3,472 | 56,823 |
| December 31, 2010 .. | 9,852 | 1,268 | 11,120 | 3,038 | 293 | 3,331 | 40,683 | 3,393 | 44,075 | 53,572 | 4,954 | 58,526 |

\*   Totals may not add due to rounding.

[1]  Does not include the Senior Pension Funding Bonds, Series A, B, and C issued by the Employees Retirement System, which are payable solely from employer contributions made to the Employees Retirement System by the Commonwealth, its municipalities and participating public corporations after the issuance of the bonds, identified in footnote 4 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[2]  Includes Commonwealth guaranteed debt; does not include the bonds identified in footnote 6 of the table above entitled "Commonwealth of Puerto Rico—Public Sector Debt."

[3]  Obligations (other than bonds) issued with an original maturity of three years or less and lines of credit with a remaining maturity of three years or less are considered short-term debt.

[4]  Does not include the tax and revenue anticipation notes that were outstanding at the close of the indicated fiscal years because prior to the end of said fiscal years sufficient funds had been set aside for the payment of such notes in full.

[5]  Includes a $368 million line of credit from GDB to the Secretary of the Treasury, the proceeds of which were applied to pay debt service on general obligation bonds.

*Source:*  Government Development Bank for Puerto Rico

## PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government to perform generally a single function or a limited number of related functions. Most public corporations obtain revenues from rates charged for services or products, but many are subsidized to some extent by the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are attached to departments of the central government. Capital improvements of most of the larger public corporations are financed by revenue bonds issued under trust agreements or bond resolutions, or by notes issued under loan agreements. The following table presents the outstanding bonds and notes of certain of the public corporations as of December 31, 2010 ("notes" as used in this section refers primarily to certain types of non-bonded debt regardless of maturity). Debt of certain other public corporations is excluded from this table because such debt is payable primarily from funds or grants provided by the federal government, is payable from sources other than Commonwealth appropriations or taxes or revenues of public corporations, or is payable from revenues derived from private sector services or products, such as industrial development bonds. Also excluded from this table is debt of certain public corporations the inclusion of which would reflect double counting. No deductions have been made in the table for debt service funds and debt service

reserve funds. More detailed information about the major public corporations is presented in the following sections.

**Commonwealth of Puerto Rico**
**Outstanding Debt of Public Corporations**
**December 31, 2010**
**(in thousands)**

| | Bonds | | | Notes | | | Total Bonds and Notes | | |
|---|---|---|---|---|---|---|---|---|---|
| | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total | With Guaranty | Without Guaranty | Total |
| Aqueduct and Sewer Authority | $ 601,339 | $ 1,338,650 | $ 1,939,989 | $401,052 | $1,131,816 | $1,532,868 | $ 1,002,391 | $ 2,470,466 | $ 3,472,857 |
| Convention Center District Authority | - | 447,160 | 447,160 | - | 147,782 | 151,076 | - | 594,942 | 594,942 |
| Electric Power Authority | - | 7,780,890 | 7,780,890 | - | 170,212 | 170,212 | - | 7,951,102 | 7,951,102 |
| Highway and Transportation Authority | - | 6,119,949[1] | 6,119,949 | - | 1,126,689 | 1,126,689 | - | 7,246,638 | 7,246,638 |
| Housing Finance Authority[2] | - | 306,059 | 306,059 | - | 66,704 | 66,704 | - | 372,763 | 372,763 |
| Industrial Development Company | - | 241,195 | 241,195 | - | 89,075 | 89,075 | - | 330,270 | 330,270 |
| Infrastructure Financing Authority[3] | - | 1,840,308 | 1,840,308 | - | 7,854 | 7,854 | - | 1,848,162 | 1,848,162 |
| Port of the Americas Authority | 209,220 | - | 209,220 | - | - | - | 209,220 | - | 209,220 |
| Ports Authority | - | 46,326[4] | 46,326 | - | 683,741 | 683,741 | - | 730,067 | 730,067 |
| Public Buildings Authority | 3,069,539 | - | 3,069,539 | - | 254,380 | 254,380 | 3,069,539 | 254,380 | 3,323,919 |
| Public Finance Corporation | - | 1,618,284[5] | 1,618,284 | - | - | - | - | 1,618,284 | 1,618,284 |
| P.R. Sales Taxes Financing Corp. (COFINA) | - | 13,437,045 | 13,437,045 | - | - | - | - | 13,437,045 | 13,437,045 |
| University of Puerto Rico | - | 554,289[6] | 554,289 | - | 37,994 | 37,994 | - | 592,283 | 592,283 |
| Others[7] | - | - | - | - | 2,347,801 | 2,347,801 | - | 2,347,801 | 2,347,801 |
| Total[8] | $3,880,098 | $33,730,155 | $37,610,253 | $401,052 | $6,064,048 | $6,465,100 | $4,281,150 | $39,794,203 | $44,075,353 |

[1] Excludes $151 million of Special Facilities Revenue Bonds issued by the Highway and Transportation Authority, which are payable from net toll revenues collected from the Teodoro Moscoso Bridge.

[2] Excludes the $180 million of Housing Finance Authority bonds, which are payable solely from Puerto Rico Public Housing Administration's annual allocation of Public Housing Capital Funds from the U.S. Department of Housing and Urban Development.

[3] Includes $42.2 million of Mental Health Infrastructure Revenue Bonds, 2007 Series A (MEPSI Campus Project), which bonds are limited obligations of the Infrastructure Financing Authority payable solely from the pledge of certain payments made by a governmental entity under a lease agreement.

[4] Excludes $155 million of Special Facilities Bonds issued by the Ports Authority, which bonds are payable solely from the pledge of certain payments made by a private corporation under a special facilities agreement.

[5] Payable primarily from Commonwealth appropriations.

[6] Excludes $76.3 million of Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) issued by AFICA, which bonds are payable from rent payments made by the University of Puerto Rico.

[7] Includes lines of credit with GDB.

[8] Excludes accretion of interest from the respective issuance dates on capital appreciation bonds. Also excludes $1.3 billion original principal amount of Children's Trust Tobacco Settlement Asset-Backed Bonds, Series 2002, which bonds will be repaid from payments made by certain tobacco companies under a master settlement agreement. See "Children's Trust" under "Other Public Corporations" below.

*Source:* Government Development Bank for Puerto Rico

### Government Development Bank for Puerto Rico

The principal functions of GDB are to act as financial advisor to and fiscal agent for the Commonwealth, its municipalities and public corporations in connection with the issuance of bonds and notes, to make loans and advances to public corporations and municipalities, and to promote the economic development of Puerto Rico. As part of its role as fiscal agent, during fiscal years 2009, 2010 and 2011, GDB entered into fiscal oversight agreements with the

Aqueduct and Sewer Authority, Electric Power Authority, Highway and Transportation Authority, Ports Authority, Health Insurance Administration and Medical Services Administration. As part of these agreements, GDB imposed certain conditions on the extension of credit to these entities and continually monitors their finances, among other things.

As of December 31, 2010, GDB had total assets of $13.3 billion and total liabilities of $11.6 billion. GDB's total capital as of such date was $1.7 billion and its total capital ratio was 11.69%. GDB's debt is currently rated A3 and BBB by Moody's and S&P, respectively, with a stable outlook.

As of December 31, 2010, $4.8 billion of bonds and notes of GDB (excluding its subsidiaries) were outstanding, consisting of $267 million in Commonwealth guaranteed bonds and $4.6 billion of medium term senior notes. Act No. 12 of May 9, 1975, as amended, provides that the payment of principal of and interest on specified notes and other obligations of GDB, not exceeding $550 million, may be guaranteed by the Commonwealth, of which $267 million were outstanding as of December 31, 2011. As of said date, GDB also had approximately $7.8 billion in loans outstanding to the central government of the Commonwealth and its public corporations and municipalities.

Act No. 82 of June 16, 2002 ("Act 82") amended GDB's Charter to authorize GDB to transfer annually to the General Fund, beginning with fiscal year 2001, up to 10% of its audited net income or $10,000,000, whichever is greater. GDB is not required by Act 82 to transfer any funds. GDB made payments to the General Fund of $11.6 million for fiscal year 2003 and $18.4 million for fiscal year 2004. GDB has not made any payment to the General Fund under Act 82 since fiscal year 2004.

Under Act No. 271 of November 21, 2002, GDB made a required special capital contribution to the Special Communities Perpetual Trust (the "Perpetual Trust") of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred to the Perpetual Trust were deposited in two investment accounts held by GDB for the benefit of the Perpetual Trust. As of December 31, 2010, the Perpetual Trust had repaid $131.8 million of its line of credit and had an outstanding balance of $368.4 million and no interest due. The line of credit is payable from legislative appropriations.

As part of its role as lender and promoter of the economic development of Puerto Rico, GDB provides financing to the Commonwealth, its public corporations and municipalities. This financing includes interim loans to finance the capital expenditures of the Commonwealth in anticipation of the issuance of bonds and notes, and loans to cover operational deficits of those government entities. GDB generally does not provide financing to any governmental entity of the Commonwealth unless GDB reasonably believes that the borrower governmental entity will have sufficient resources, including the ability to issue bonds or notes or otherwise borrow funds, to repay such loan. GDB, however, has provided financing in the past and may continue to provide financing to governmental entities that do not have sufficient independent resources to cover operating expense, to the extent permitted by law. A material increase in the amount of loans to the public sector, coupled with continued deterioration of the public sector's fiscal situation and financial condition may have an adverse effect on GDB's financial condition and liquidity.

GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority.* Puerto Rico Housing Finance Authority ("Housing Finance Authority") (formerly known as Housing Finance Corporation) was created to provide needed rental housing units and stimulate the construction industry under federally subsidized programs. Effective February 8, 2002, Housing Finance Corporation became the Housing Finance Authority and the Housing Bank and Finance Agency was dissolved and its powers transferred to the Housing Finance Authority. Housing Finance Authority provides financing for rental housing units, stimulates the construction industry under federally subsidized programs and provides interim financing for low-income housing projects and single-family homeownership programs. It is also engaged in insuring and servicing mortgages originated by the former Housing Bank and Finance Agency. As of December 31, 2010, Housing Finance Authority's total outstanding principal balance of loans to the private sector for development of housing projects targeted to low and moderate income families were $120.7 million. The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $100.4 million as of the same date.

Housing Finance Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of Housing Finance Authority payable solely from revenues collected from such housing units, with certain exceptions. As of December 31, 2010, $787 million of these bonds were outstanding.

As of December 31, 2010, the Housing Finance Authority had total notes and bonds outstanding of $1,047.1 million (including $107.3 million of debt outstanding under GDB lines of credit and $839.8 million in bonds issued to fund certain payments under its mortgage subsidy programs for low and moderate income families). As of December 31, 2010, Housing Finance Authority had total unrestricted net assets of $283.3 million.

*Puerto Rico Tourism Development Fund.* Puerto Rico Tourism Development Fund ("TDF") was created in November 1993 to facilitate the development of Puerto Rico's hotel and tourism industry. TDF works with private sector financial institutions to structure financings for new hotel projects. TDF is also authorized to make capital investments in tourism related projects. As of December 31, 2010, TDF had outstanding direct loans in an aggregate principal amount of $410.9 million, and outstanding guarantees and letters of credit issued in the amount of $333.6 million (with a maximum commitment amount of guarantees and letters of credit of $546.9 million). In addition, TDF has a $50 million preferred equity investment in a tourism-related project.

Since 1993, TDF has made payments under its guarantees and letters of credit in the aggregate amount of approximately $210 million with respect to several projects. Of the total amount disbursed, TDF has been able to recover approximately $156 million from the borrowers.

As of December 31, 2010, the unrestricted net assets of TDF were approximately $176.2 million and its allowances for losses on loans and guarantees and letters of credit were approximately $81.7 million.

*Government Development Bank for Puerto Rico Capital Fund.* Government Development Bank for Puerto Rico Capital Fund (the "Capital Fund") was created in November 1992 for the purpose of investing and trading in debt obligations and publicly traded shares of domestic and foreign corporations separate from GDB's general investment operations. On June 30, 2010, the Capital Fund transferred to the Tourism Development Fund, on behalf of GDB, $72.1 million representing all the investments in the Capital Fund portfolio. As of December 31, 2010, the Capital Fund had assets of $261,621, consisting principally of money market investments.

*Puerto Rico Development Fund.* Puerto Rico Development Fund (the "Development Fund") was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. On December 31, 2010, the Development Fund acquired for $8.5 million a commercial loan from a private commercial bank, secured by a first mortgage over a 2.34 acre parcel of land in the Convention Center District. As of December 31, 2010, the Development Fund had assets of $35.4 million, including investments of $17.6 million in loans to private entities, $11.9 million in an interest bearing account, and $5.8 million in preferred shares of various private entities.

*Puerto Rico Public Finance Corporation.* Puerto Rico Public Finance Corporation ("PFC") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health and the Aqueduct and Sewer Authority, among others. All such bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay the notes held by the bond trustees. As of December 31, 2010, PFC had $1.6 billion aggregate principal amount of limited obligation bonds outstanding.

A description of certain other affiliates of GDB is provided in "Other Public Corporations" below.

**Other Public Corporations**

*Aqueduct and Sewer Authority.* PRASA owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 58% of the Commonwealth's population, respectively.

PRASA reported an operating loss of $58.3 million for fiscal year 2010, compared to operating losses of $63.7 million and $101.2 million for fiscal years 2009 and 2008, respectively. In order to improve its financial condition, PRASA adopted a comprehensive plan to increase its revenues and reduce its expenses.

As of December 31, 2010, PRASA's total debt was $3.5 billion, including approximately $888.6 million of outstanding indebtedness with GDB. PRASA's senior debt is rated Baa1, BBB- and BBB by Moody's, S&P and Fitch Ratings ("Fitch"), respectively. On November 9, 2010, Moody's affirmed PRASA's rating but revised its outlook to negative from stable. The negative outlook reflects PRASA's continued reliance on GDB and the Commonwealth for financial support, as well as the operational challenges it faces to reduce the significant amount of water lost through its Systems.

The Commonwealth guarantees the principal and interest payments on the outstanding revenue refunding bonds, 2008 Series A and 2008 Series B, any bonds issued on or before June 30, 2015 to the Rural Utilities Service of the United States Department of Agriculture, and the loans granted on or before June 30, 2015 by the Puerto Rico Water Pollution Control Revolving Fund and the Puerto Rico Safe Drinking Water Revolving Fund to PRASA. In the event that PRASA is unable to make all or any portion of the future debt service payments on these guaranteed debts, the Commonwealth will be responsible for covering such payments.

During fiscal year 2011, PRASA received a $105 million assignment from the OMB in Commonwealth appropriations and other Commonwealth available funds. According to the provisions of PRASA's trust agreement, these moneys are taken into account for purposes of determining its revenues and its compliance with certain covenants therein.

On April 28, 2006, the Authority entered into a consent decree with the U.S. Environmental Protection Agency ("EPA") that requires the Authority to implement system wide remedial measures at all of the wastewater treatment plants operated by the Authority. The EPA consent decree establishes deadlines for the compliance with the conditions set forth therein and stipulates penalties for violation of any of those deadlines.

On December 15, 2006, a settlement agreement was signed between the Authority and the Department of Health of the Commonwealth ("DOH") relating to violations of the Safe Drinking Water Act. The settlement agreement was preliminarily approved by the supervising court on March 15, 2007, and was amended and finally approved by that court on June 20, 2008. The Authority agreed to implement a work plan to remediate the violations, establish preventive and mitigation measures, and execute a preventive maintenance program for the purpose of meeting the requirements of the Safe Drinking Water Act.

PRASA needs to make a substantial investment in infrastructure and a major overhaul of its operations to maintain the viability of the Systems, to finance its expansion for new users and to implement remedial measures required by a consent decree between PRASA and the EPA and a settlement agreement with the DOH. Funds for this investment will be provided through a combination of revenues from PRASA, financing transactions, federal grants and other sources. PRASA has established a 15-year capital improvement program with a total investment of $2.2 billion in order to comply with the consent decree and the settlement agreement. PRASA has committed an investment of $1.2 billion to comply with the EPA consent decree and $1.0 billion to comply with the DOH settlement agreement.

*Children's Trust.* Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to Children's

Trust all of its rights, title and interest under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under the Master Settlement Agreement.

Children's Trust issued $397 billion Tobacco Settlement Asset-Backed Bonds in November 2002. The proceeds were used to pay certain capital expenditures, to fund the Liquidity Reserve account and certain costs of issuance. On June 30, 2005, Children's Trust issued $108.2 million subordinate Tobacco Settlement Asset-Backed Bonds to pay working capital expenses of the Commonwealth. On May 1, 2008, Children's Trust issued an additional $195.9 million of subordinate Tobacco Settlement Asset-Backed Bonds to make grants to third parties, pay certain expenses of the Commonwealth and cost of issuance. As of December 31, 2010, Children's Trust had outstanding bonds in the principal amount of $1.3 billion. These bonds and any, other additional senior bonds issued by Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement. To date, all principal and interest payments required to be made by Children's Trust on its outstanding bonds have been made on a timely basis from contribution payments made by the participating cigarette manufacturers under the Master Settlement Agreement.

*Convention Center District Authority.* Convention Center District Authority was created to own, develop, finance, plan, design, build, operate, maintain, administrate and promote the Dr. Pedro Rosselló González Convention Center, a new convention center, and designated private parcels located within the Convention Center District in San Juan. The convention center opened in November 17, 2005. Convention Center District Authority also owns a multipurpose coliseum in San Juan, known as the José Miguel Agrelot Coliseum. As of December 31, 2010, Convention Center District Authority's debt was $447.2 million in outstanding bonds issued in March 2006 to finance the Convention Center and payable from a portion of a hotel room tax. As of December 31, 2010, Convention Center District Authority also had outstanding indebtedness to GDB of approximately $147.8 million related to the financing of the Coliseum.

*Electric Power Authority.* Puerto Rico Electric Power Authority ("PREPA") owns and operates Puerto Rico's electric power system.

PREPA reported net operating income of $359.5 million and $362.6 million during fiscal years 2010 and 2009 respectively. The total debt of PREPA was $8.0 billion as of December 31, 2010. This debt includes outstanding bonds of $7.8 billion and interim financing for operations of $170.2 million. PREPA's debt is rated A3, BBB+ and BBB+ by Moody's, S&P and Fitch, respectively.

As a means of reducing its dependency on oil, PREPA has entered into long-term power purchase agreements with private operators of two co-generation plants that use fuels other than oil. Currently, these two co-generation plants provide approximately 31% of PREPA's energy needs. PREPA has also commenced developing plans for the conversion of its main oil-fired units into natural gas and clean-coal fired units.

*Health Insurance Administration.* The Health Insurance Administration was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents. Under this system, the government selects, through a bidding system, one private health insurance company in each of eight designated regions of the island and pays such insurance company the insurance premium for each eligible beneficiary within such region. The health insurance system covers the entire island, and approximately 1.5 million persons were covered by the system during fiscal year 2010.

The Commonwealth has entered into various contracts with several Medicare Advantage organizations for the provision of health coverage to approximately 200,000 eligible beneficiaries. Pursuant to these agreements, the Commonwealth pays each Medicare Advantage organization a premium difference to cover services not included in their contracts with the Center for Medicaid and Medicare Services.

The total cost of the health insurance program for the current fiscal year December 31, 2010 was $975 million, $1.962 billion for fiscal year 2010 and $1.861 billion for fiscal year 2009. For fiscal year 2011, the General Fund covered $715 million of the total cost of the health insurance program. The remaining $260 million will be paid from federal, municipal, internal and other sources.

On October 1, 2010, the administration implemented "Mi Salud," which is the health program that replaced the government's Health Reform program. The principal differences between "Mi Salud" and the Health Reform are the use of a preferred-provider network organization rather than independent practice associations, an increase of benefits and services and an expansion of eligible participants. During the implementation of the program's second phase, eligibility requirements will also be expanded to include small to medium businesses. The estimated cost for "Mi Salud" during fiscal year 2012 is $2.068 billion. The General Fund is expected to cover $945 million, while the remaining $1.123 billion will be paid from federal, municipal and other sources. This projection, however, does not take into account increases in the enrollment of new beneficiaries, which could affect this estimate.

Recently, the Governor signed into law a bill that authorizes the Health Insurance Administration to borrow approximately $186 million from GDB in order to pay amounts owed to its suppliers, including premiums owed to certain insurance companies for services rendered under the Health Reform program.

*Highways and Transportation Authority.* Puerto Rico Highways and Transportation Authority ("PRHTA") is responsible for highway construction in Puerto Rico. Such construction is financed by debt (interim notes and revenue bonds), revenues of PRHTA, and federal and Commonwealth grants.

PRHTA reported a net operating loss of $445.3 million for fiscal year 2010, compared to the net operating loss of $492.0 million of fiscal year 2009 and $448.7 million for fiscal year 2008. As of December 31, 2010, PRHTA's total debt was $7.3 billion, including $1.1 billion from GDB's financings.

Debt service on PRHTA's revenue bonds constitutes a first lien on its gross revenues, which consist currently of all the proceeds of the tax on gasoline, one-half of the proceeds of the tax on gas oil and diesel oil, all the proceeds of the excise taxes on crude oil, unfinished oil and derivative products, up to $120 million per fiscal year, highway toll revenues and the gross receipts of $15.00 per vehicle per year from certain motor vehicle license fees. Such revenues (except for toll revenues) may be applied first to the payment of debt service on general obligation bonds and notes of the Commonwealth and to payments required to be made by the Commonwealth under its guarantees of bonds and notes, to the extent that no other revenues are available for such purpose. The Commonwealth has never applied such revenues for such payment.

PRHTA's Highway Revenue Bonds are rated A2 and BBB+ by Moody's and S&P, respectively, and the Senior Transportation Revenues Bonds are rated A3 and BBB by Moody's and S&P, respectively.

PRHTA has a mass transit system, known as Tren Urbano, serving a portion of metropolitan San Juan. It was constructed under several design/build contracts and is being privately operated under a five-year contract with an additional five-year option at PRHTA's election. The cost of the project was $2.4 billion, which cost was financed by federal Transit Administration grants, other federal funding sources and PRHTA's own resources, including revenue bonds. Tren Urbano commenced operations in June 2005. The operation of the Tren Urbano generated a loss of $51.7 million, $64.5 million, and $62.5 million in fiscal years 2010, 2009, and 2008, respectively.

PRHTA is a party to a concession agreement under which a private company designed, constructed and currently is operating a toll bridge spanning the San José Lagoon. The toll bridge was financed with special facility revenue bonds of PRHTA, payable by the private operator of the bridge principally from toll revenues. The concession is for a term of 35 years, subject to earlier termination or extension. The bridge opened for traffic in February 1994. In certain circumstances described in the concession agreement, including where toll revenues are insufficient to generate certain rates of return to the private operator, the private operator may require PRHTA, among other things, to assume the operator's obligations with respect to the special facility revenue bonds. Some of those circumstances, including lower than projected toll revenues, exist at this time, but PRHTA does not currently anticipate that the operator will exercise its remedy against PRHTA.

During the second quarter of fiscal year 2011, PRHTA and PPP Authority commenced a procurement process intended to lead to the establishment of a concession agreement for the operation of two toll roads, i.e. PR-22 and PR-5. Future procurement processes will lead to the establishment of concession agreements for the principal toll roads in Puerto Rico.

*Industrial Development Company.* Puerto Rico Industrial Development Company ("PRIDCO") participates in the Commonwealth-sponsored economic development program by providing physical facilities, general assistance, and special incentive grants to manufacturers. PRIDCO reported consolidated net operating losses of $10.3 million for fiscal year 2010, compared to consolidated net operating losses of $6.0 million for fiscal year 2009 and consolidated net income of $6.1 million for fiscal year 2008. Rentals derived from the leasing of

specified facilities of PRIDCO are pledged to the payment of PRIDCO's revenue bonds. As of December 31, 2010, PRIDCO's total debt was $411.4 million, including approximately $89.1 million from GDB financings and the outstanding debt of Puerto Rico Industrial Investment Corporation, a subsidiary of PRIDCO. PRIDCO's debt is rated Baal and BBB- by Moody's and S&P, respectively.

During fiscal years 2006 and 2007 PRIDCO entered into a company reorganization plan establishing an early retirement plan and a voluntary separation plan with the objective of reducing workforce and to achieve expense reductions. This plan was financed by a line of credit from GDB, which had an outstanding balance of $45.7 million as of December 31, 2010.

*Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority.* The Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority ("AFICA") was created to finance (through the issuance of its revenue bonds) industrial, tourist, educational, medical, and environmental control facilities in Puerto Rico for the use of private companies, non-profit entities, or government agencies. The bonds are payable solely from payments to be made to AFICA by such private companies, non-profit entities, or government agencies, and do not constitute a debt of the Commonwealth or any of its other public corporations or municipalities. As of December 31, 2010, approximately $1.3 billion of AFICA's bonds were outstanding. In addition, as of December 31, 2010, AFICA has a $67 million line of credit with GDB with a principal outstanding balance of $59.1 million used for the acquisition of assets from PREPA.

*Infrastructure Financing Authority.* Puerto Rico Infrastructure Financing Authority ("PRIFA") was created to provide financial, administrative, consulting, technical, advisory, and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities (collectively, "Benefited Entities") authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by Benefited Entities.

As of December 31, 2010, PRIFA's total debt was $1.85 billion. This debt includes bonds outstanding of $1.84 billion and interim financing for capital improvements of $7.9 million. PRIFA's debt is rated Baa3 and BBB+ by Moody's and S&P, respectively.

PRIFA oversees the Puerto Rico Infrastructure Fund, which is being funded annually thru fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the United States Internal Revenue Code of 1986, as amended. See "Major Sources of General Fund Revenues – Revenues from Non-Commonwealth Sources" under PUERTO RICO TAXES, OTHER REVENUES AND EXPENDITURES. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned to the Treasury Department. The Authority is using these funds to pay debt service of bonds issued to finance various infrastructure projects.

PRIFA also has custody and control of the Infrastructure Development Fund and its Corpus Account, a perpetual account established under Act No. 92 of June 24, 1998 that was funded with $1.2 billion of the proceeds of the sale of Puerto Rico Telephone Company. The interest earned on the securities held in the Corpus Account were being used by PRIFA to pay debt service on its $1.1 billion Series 2000 A and B Bonds. Act No. 3, approved by the Legislative Assembly of the Commonwealth on January 14, 2009 ("Act 3"), authorized the sale of the securities held in the Corpus Account. PRIFA sold the securities in January 2009 and used the proceeds to: (i) make a deposit into an escrow account in an amount sufficient to retire the Series 2000 A and B Bonds on October 1, 2010, (ii) make a deposit to the General Fund which was applied to cover a portion of the Commonwealth's budget deficit, (iii) make a transfer to GDB as a capital contribution, and (iv) make a deposit to the Corpus Account to be invested in a long-term investment agreement with GDB.

Pursuant to Act No. 8 of March 9, 2009, PRIFA is responsible for implementing in the Commonwealth the applicable provisions of ARRA. One of its main responsibilities regarding ARRA is to maximize the flow of funds from the Federal Government for the appropriate investment in qualified projects and activities. PRIFA also has responsibility for the receipt, administration and disbursement of such funds and monitoring those governmental agencies and entities that receive ARRA funds.

*Municipal Finance Agency.* Puerto Rico Municipal Finance Agency ("MFA") is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date no such payments have been required. As of December 31, 2010, MFA had $1.0 billion of bonds outstanding.

*Port of the Americas Authority.* Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas (the "Port"), a deep draft port on the south coast of Puerto Rico.

PAA is authorized to issue bonds guaranteed by the Commonwealth in a maximum aggregate principal amount of $250 million. The proceeds from these bonds will be used to continue the development of the Port. Currently, GDB is authorized by law to purchase bonds of PAA in an aggregate principal amount not to exceed $250 million. As of December 31, 2010, GDB held approximately $209.2 million of PAA's outstanding bonds, which are guaranteed by the Commonwealth.

The first phase of the Port was completed in fiscal year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. The second phase of the Port was completed during the first quarter of calendar year 2009. This phase, which was designed to provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU") per year, included (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet, (ii) reconstructing the container terminals,

(iii) commencing certain required environmental risk mitigation procedures, and (iv) preparing final construction schematics.

A third phase, which provides for the expansion of the Port's capacity, was initiated in August 2008. This phase includes, among other improvements, (i) infrastructure improvements related to access roads, (ii) relocation of the storm sewer channel. (iii) relocation of the server, water and power distribution systems, (iv) additional dredging at certain pier locations, (v) the expansion of the container terminal, and (vi) additional mitigation at Coffin Island. The first expansion under this phase will provide sufficient capacity to process 500,000 TEU annually. This phase is expected to be finished in the second half of calendar year 2011.

*Ports Authority.* Puerto Rico Ports Authority ("Ports Authority") owns and operates the major airport and seaport facilities in Puerto Rico. Ports Authority derives revenues from a variety of sources, including charges on airplane fuel sales, air terminal space rentals, landing fees, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Ports Authority reported operating losses of $38.7 million and $46.7 million during fiscal years 2010 and 2009, respectively. As of December 31, 2010, the Ports Authority had $730.1 million in debt, including approximately $146.0 million from GDB financings.

As of December 31, 2010, the outstanding balance of the credit facilities for capital improvements with private financial institutions was $151.0 million, which is guaranteed by GDB.

*Public Buildings Authority.* Puerto Rico Public Buildings Authority ("PBA") is authorized to construct, purchase or lease office, school, health, correctional and other facilities for lease to departments, public corporations, and instrumentalities of the Commonwealth. Bonds that have been issued by PBA to finance such facilities (through retirement of interim notes or otherwise) are payable from lease payments, which are largely derived from legislative appropriations and are secured by the Commonwealth's guaranty. PBA is authorized by law to have outstanding at any one time up to $4.3 billion of bonds guaranteed by the Commonwealth. As of December 31, 2010, $3.07 billion of such bonds of PBA were outstanding (not including accretion of interest from the respective issuance dates on capital appreciation bonds). As of December 31, 2010, PBA's line of credit with GDB had an outstanding balance of $254.4 million. PBA debt is rated A3 and BBB– by Moody's and S&P, respectively.

*Public-Private Partnerships Authority.* PPP Authority is an independent governmental instrumentality of the Commonwealth created by Act No. 29 of June 8, 2009. The Authority is tasked with implementing the Commonwealth's public policy regarding public-private partnerships to further the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs. As of April 2010, the Authority had engaged various financial advisors to assist it in the evaluation of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Authority published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. The Authority has short-listed proponents for the toll roads and school infrastructure projects. Moreover, the Authority has made substantial progress in the preparation of a public-private partnership procurement for the Luis Muñoz Marin International Airport. As of September 30, 2010, the

Authority has a $20 million revolving line of credit with GDB with an outstanding balance of $3.3 million.

*Sales Tax Financing Corporation.*     COFINA is an independent governmental instrumentality of the Commonwealth created by Act 91. COFINA was originally created for the purpose of financing the payment, retirement, or defeasance of certain appropriation-backed debt outstanding as of June 30, 2006, payable to GDB and PFC.

In 2009, the Legislative Assembly of Puerto Rico expanded the purposes for which COFINA was created and, correspondingly, increased its revenues by increasing from 1% to 2.75% (one-half of the tax rate of 5.5%) the portion that is transferred to COFINA of the sales and use tax imposed by the central government. As a result, COFINA was authorized to issue bonds for the following additional purposes: (i) to pay, in whole or in part, the debt of the Secretary of the Treasury with GDB in the amount of $1 billion, the proceeds of which were used to cover the budgetary deficit for fiscal year 2009, (ii) to pay, in whole or in part, certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iii) to pay, in whole or in part, the accounts payable to suppliers of the Commonwealth, (iv) to pay or finance operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) to pay or finance operational expenses of the Commonwealth for fiscal year 2012, which would have to be included in the annual budget of the Government of Puerto Rico, (vi) to fund the Puerto Rico Economic Stimulus Fund, (vii) to fund the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) to generate moneys to fund the Economic Cooperation and Public Employees Alternatives Fund. As of December 31, 2010, COFINA had approximately $13.4 billion outstanding of its Sales Tax Revenue Bonds (excluding all accretion on capital appreciation bonds). COFINA's Sales Tax Revenue Bonds are rated Aa2, AA- and AA- by Moody's, S&P and Fitch, respectively, and the Sales Tax Revenue Bonds, First Subordinate Series are rated A1, A+ and A+ by Moody's, S&P and Fitch, respectively.

*Special Communities Perpetual Trust.*     The Perpetual Trust is a public corporation created by law to be an irrevocable and permanent trust. Perpetual Trust's principal purpose is to fund development projects that address the infrastructure and housing needs of underprivileged communities. GDB has made a special capital contribution to Perpetual Trust of $500 million and provided the Perpetual Trust with a $500 million, non-revolving, line of credit. The amounts transferred by GDB were deposited in two investment accounts held by GDB for the benefit of Perpetual Trust, of which $888.7 million has been disbursed to the Perpetual Trust as of December 31, 2010. As of December 31, 2010, Perpetual Trust's line of credit with GDB had an outstanding balance of $368.4 million. The line of credit is payable from legislative appropriations.

*University of Puerto Rico.*     The University of Puerto Rico (the "University"), with approximately 62,342 students at the beginning of academic year 2010-2011, is by far the largest institution of higher education on the Island. Government appropriations are the principal source of University revenues, but additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. University capital improvements

have been financed mainly by revenue bonds. As of December 31, 2010, the University's total debt was $592.3 million (excluding $19.4 million owed by the University's Medical Services). The University's debt is rated Baa2 and BBB- by Moody's and S&P, respectively.

In 2000, AFICA issued its $86,735,000 Educational Facilities Revenue Bonds, 2000 Series A (University Plaza Project) for the purpose of financing the construction of additional student housing and parking and office space for the University. The project was built, is being operated by Desarrollos Universitarios, Inc., a Puerto Rico not-for-profit corporation, and is leased to the University for a term equal to the term of the bonds, with University lease payments being sufficient to pay debt service on said bonds as they become due. These bonds are not included in the University's total debt or outstanding revenue bonds set forth in the prior paragraph.

In June 2007, the Board of Trustees of the University approved Certification No. 60 establishing a new policy and methodology for tuition fees structure. This new structure covers the tuition fees to be charged to new students until academic year 2012-2013. This policy was adopted to pursue continued development and financial stability of the University.

In June 2010, the Board of Trustees of the University approved Certification No. 146 establishing a $400 stabilization fee to be charged each semester to all students in addition to tuition charges and other fees already in place at the University. This stabilization fee was imposed to address the University's fiscal difficulties and is expected to increase annual revenues by approximately $40 million.

As a result of a student-led strike that lasted approximately two months, on June 26, 2010, the Middle States Commission on Higher Education ("MSCHE"), the regional accreditation entity of the eleven units that comprise the University system, placed on probation ten of the University's units for lack of evidence of compliance with two of fourteen accreditation standards. This action was prompted by a student stoppage that interrupted the operations of these units for up to 62 days, but less in most cases. The ten affected units will remain fully accredited while on probation. After a Monitoring Report submitted by the ten affected units in September 2010 and a subsequent evaluation visit, the Commission lifted probation over one of the questioned standards and added an additional standard, thereby continuing the review over two of the fourteen accreditation standards.

A second Monitoring Report was submitted to the Commission by the ten affected units on March 1, 2011 to further substantiate compliance with these two standards. Evaluation visits to the eleven units of the University were conducted between March and April 2011 as a follow up to the probationary process as well as the regular decennial re-accreditation review for some of the units. Following these visits, the evaluation teams reported that they intend to inform the Commission that 95% of all accreditation standards evaluated throughout the system were found in compliance, and significant progress was evidenced in the remaining 5%. The Commission will make its final determination at its June 2011 meeting. The University anticipates that probation will be lifted for all units after said meeting.

*Other public corporations.* Public corporations not described above have outstanding debt in the aggregate amount of $1.522 billion as of September 30, 2010. Debt service on $725

million of such outstanding debt is being paid from legislative appropriations. The Commonwealth is not, however, obligated to make any such appropriations. Additional legislative appropriations are made to enable certain of such corporations to pay their operating expenses.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by Electric Power Authority and Puerto Rico Aqueduct and Sewer Authority, whose properties are insured through arrangements and policies obtained by the respective Authorities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

## RETIREMENT SYSTEMS

*General.* Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Employees Retirement System of the Government of the Commonwealth (the "Employees Retirement System"), the Puerto Rico System of Annuities and Pensions for Teachers (the "Teachers Retirement System"), the Commonwealth Judiciary Retirement System (the "Judiciary Retirement System"), the Retirement System of the University of Puerto Rico (the "University Retirement System") and the Employees Retirement System of Puerto Rico Electric Power Authority (the "Electric Power Authority Retirement System"). The Employees Retirement System and the Teachers Retirement System are the largest plans, both in number of active members and retirees and in the amount of their actuarial accrued liabilities.

The University Retirement System and the Electric Power Authority Retirement System covers employees of the University of Puerto Rico and Electric Power Authority, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally mandated legislative appropriations. The discussion that follows only covers the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System (each a "Retirement System" and, collectively, the "Retirement Systems").

The Employees Retirement System is a trust created by Act No. 447 of May 15, 1951 ("Act 447") and is a hybrid defined benefit plan consisting of different benefit structures. Members who entered the Employees Retirement System on or before December 31, 1999 generally participate in a defined benefit program. Members participating in the defined benefit program prior to April 1, 1990 ("Act 447 Participants") are entitled to the highest benefits structure, while those who became members on or after April 1, 1990 ("Act 1 Participants") are subject to a longer vesting period and a reduced level of benefits.

In 1999, Act 447 was amended to close the defined benefit program and, prospectively, establish a new benefit structure similar to a cash balance plan (this new benefit structure is referred to as "System 2000"). Members who entered the Employees Retirement System on or after January 1, 2000 ("System 2000 Participants") participate solely in System 2000. Under the

System 2000 benefits structure, a participant is entitled to receive a lump-sum payment, which may be received in full or used to purchase an annuity from a third party, based solely on the amounts contributed by such participant. System 2000 Participants receive periodic account statements similar to those of defined contribution plans showing their accrued balances. System 2000 Participants do not benefit from any employer contributions. Instead, employer contributions with respect to System 2000 Participants are used to reduce the accumulated unfunded pension benefit obligation of the Employees Retirement System.

System 2000 is not a separate plan as there are no separate accounts for System 2000 Participants. Contributions received from System 2000 Participants are pooled and invested by the Employees Retirement System together with the assets corresponding to the defined benefit structure. Thus, future benefit payments under the original defined benefit structure and System 2000 will be paid from the same pool of assets of the Employees Retirement System.

The Teachers Retirement System is a trust created by Act No. 91 of March 29, 2004 ("Act 91 of 2004"), which superseded Act No. 218 of May 6, 1951, and is a defined benefit pension plan. The Judiciary Retirement System is a trust created by Act No. 12 of October 19, 1954 and is also a defined benefit pension plan.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

*Covered Employees.* The Employees Retirement System covers substantially all employees of the departments and agencies of the Commonwealth, all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico or the Electric Power Authority) and municipalities, except for those employees that are covered by the other two Retirement Systems. The Judiciary Retirement System only covers judges.

The Teachers Retirement System covers public school teachers and certain private school teachers, as well as teachers working in administrative positions. Act 91 of 2004 establishes that: (i) the Teachers Retirement System's active employees as of March 29, 2004 (not public school teachers or other Department of Education employees) have the option to participate in the Teachers Retirement System or in the Employees Retirement System; (ii) persons hired by the Teachers Retirement System after the approval of the new law may only become members of the Teachers Retirement System, (iii) active teacher employees of the Department of Education are members of the Teachers Retirement System, and (iv) licensed teachers working in private schools or other educational organizations may elect to become members of the Teachers Retirement System as long as the required employer and employee contributions are satisfied. Currently, there are no teachers from private schools or other educational institutions participating in the Teachers Retirement System.

The following table shows the number of active members, retired members, disabled members and beneficiaries and terminated vested members for each of the Retirement Systems as of June 30, 2010, the date of the latest actuarial valuations for the Retirement Systems.

## Participant Data
### (as of June 30, 2010)

|  | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **Employees Retirement System** |  |  |  |  |  |  |
| Act 447 Participants | 34,079 | 75,100 | 16,521 | 12,157 | - | 137,857 |
| Act 1 Participants | 51,284 | 2,428 | 318 | 14 | - | 54,044 |
| System 2000 Participants | 55,279 | - | - | - | - | 55,279 |
| Total | 140,642 | 77,528 | 16,839 | 12,171 | - | 247,180 |
| **Teachers Retirement System** | 44,679 | 28,799 | 2,061 | 2,744 | 769 | 79,052 |
| **Judiciary Retirement System** | 362 | 333 | 0 | 61 | 45 | 801 |

---

[1] Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon. There are terminated vested members of the Employees Retirement System, but the Employees Retirement System does not possess reliable data on the amount of such members.

The Commonwealth central government (consisting of department and agencies) is not the only employer participating in the Employees Retirement System. The municipalities and most public corporations participate as employers as well with respect to their employees. However, the assets contributed by the Commonwealth central government and all other employers are invested together and not otherwise segregated. As of June 30, 2010, the central government was responsible for making contributions with respect to 85,643 active members of the Employees Retirement System, or 60.9% of total active members (consisting of 22,074 Act 447 Participants, 34,343 Act 1 Participants and 29,226 System 2000 Participants). Municipalities were responsible for 32,310, or 23.0%, active members, and public corporations were responsible for 22,689, or 16.1%, active members.

*Funding Requirements.* The Commonwealth central government is responsible for approximately 64% of total employer contributions to the Employees Retirement System, and the other 36% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% and 99% of total employer contributions to the Judiciary and Teachers Retirement Systems, respectively. Retirement and related benefits provided by the Retirement Systems and required contributions to the Retirement Systems by employers and employees are determined by law rather than by actuarial requirements.

For the Employees Retirement System, the statutory employer contribution is at least 9.275% of covered payroll. Covered payroll is the compensation regularly paid to active employees on which contributions to the retirement systems are computed and is generally equivalent to their annual salary. The current employer contribution rate has been in effect since February 1990; prior to that date, Commonwealth departments, agencies and public corporations were required to make employer contributions of at least 8% of their covered payroll, while municipalities were required to make employer contributions of at least 7% of their covered payroll. Required employee contributions for the Employees Retirement System vary according

to how the individual employee's retirement benefits are coordinated with social security benefits. Act 447 requires that employer contributions cover the difference between (i) the benefits provided by the System, plus administrative costs, and (ii) the contributions that employees are required to make to the System. This requirement, however, has not been adhered to and the level of employer contributions has been limited to the minimum statutory rate.

For the Teachers Retirement System, the statutory employer contribution is 8.5% of covered payroll and 9.0% for the employees. For the Judiciary Retirement System, the employer contribution is 30.34% of covered payroll and 8% for the employees. The employer contribution rate for the Judiciary Retirement System increased from 20.0% to 30.34% of payroll as of July 1, 2008. The Commonwealth is also ultimately responsible for any funding deficiency in the Teachers Retirement System and the Judiciary Retirement System.

*Benefits and Special Benefits.* Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "Basic System Pension Benefits"). Each also administers benefits granted under various special laws that have provided additional benefits for the retirees and beneficiaries (collectively referred to herein as "System Administered Pension Benefits"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and summer and Christmas bonuses. See Note 20 to the Commonwealth's audited financial statements for fiscal year 2010 included in the CAFR for a summary of the benefits provided by each of the Retirement Systems.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporation and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been received by the Retirement Systems in full and on a timely basis from the Commonwealth and the participating public corporations and municipalities.

Through June 30, 2004, the Teachers Retirement System had paid $119.6 million from its resources to cover System Administered Pension Benefits that should have been received from the Commonwealth through annual appropriations. On May 31, 2004, the Teachers Retirement System made a claim to OMB to collect this amount. OMB disputed the Teachers Retirement System's interpretation of certain System Administered Pension Benefit laws to the effect that the Commonwealth is required to reimburse the Teachers Retirement System for such benefits paid. During 2009, the Department of Education paid $12.2 million that was part of the amounts claimed to OMB. On April 23, 2010, OMB and the Teachers Retirement System settled the remaining claim for $53.8 million, to be paid in five equal installments of $10.8 million during the next five fiscal years, starting in fiscal year 2011. In July 2010, the Teachers Retirement System received the first installment.

The Employees Retirement System is also seeking reimbursement from the Commonwealth, the municipalities and public corporations in the amount of $79.2 million, $30.5 million and $62.1 million, respectively, for cumulative System Administered Pension Benefits paid to its beneficiaries through June 30, 2010. As of June 30, 2010, the Teachers Retirement System was also seeking reimbursement from the Commonwealth of $491,000 (excluding the aforementioned $53.8 million) on account of System Administered Pension Benefits paid.

*Composition and Market Value of Investment Portfolios.* As of June 30, 2010, the market value of the Employees Retirement System's investment portfolio was $4.138 billion, compared to $4.219 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 36.3% of U.S. domestic and international equity investments, 14.8% of fixed-income securities, 29.7% of internally managed mortgage and personal loans portfolio, 17.8% of short-term cash equivalents and 1% of other investments. As of December 31, 2010, the market value of the Employees Retirement System's investment portfolio was $4.176 billion. The decrease in the value of the investment portfolio since June 30, 2009 principally reflects the continued use of investment portfolio assets to pay current benefits, as discussed below.

As of June 30, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.157 billion, compared to $2.136 billion as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 60.4% of U.S. domestic and international equity investments, 19.1% of fixed-income securities, 19.2% of internally managed mortgage and personal loans portfolio, 0.30% of short-term cash equivalents and 1% of other investments. As of December 31, 2010, the market value of the Teachers Retirement System's investment portfolio was $2.425 billion.

As of June 30, 2010, the market value of the Judiciary Retirement System's investment portfolio was $80.5 million, compared to $71.5 million as of June 30, 2009. As of June 30, 2010, the investment portfolio was comprised of approximately 63.9% of U.S. domestic and international equity investments, 34.8% of fixed-income securities, 1% of internally managed mortgage and personal loans portfolio and 0.40% of short-term cash equivalents. As of December 31, 2010, the market value of the Judiciary Retirement System's investment portfolio was $66.5 million.

*Actuarial Valuations of the Retirement Systems.* Historically, each of the Retirement Systems has conducted an actuarial valuation as of the end of every two fiscal years. However, due to the deterioration of the funding status of the Retirement Systems, as discussed below, each of the Retirement Systems began conducting annual actuarial valuations effective June 30, 2009. The latest actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries, as of June 30, 2010.

Informational copies of the actuarial valuation reports of the Employees Retirement System and the Judiciary Retirement System as well as other financial information are available on the website of the Administration of the Retirement Systems at http://www.asr.gobierno.pr. Informational copies of the actuarial valuation report of the Teachers Retirement System as well as other financial information are available at the website of the Teachers Retirement System at http://www.srm.gobierno.pr. No information contained on these websites is deemed incorporated herein by reference.

The purpose of an actuarial valuation is to calculate the actuarial accrued liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the actuarial accrued liability with the actuarial value of assets and any excess of that liability over the assets represents an unfunded actuarial accrued liability ("UAAL") of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the actuarial value of assets is equal to the market value of assets (net of liabilities). An actuarial valuation will also express the percentage that a Retirement System is funded through a "Funded Ratio" which represents the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. An actuarial valuation will also state an actuarially recommended contribution rate, which is a recommended rate of covered payroll that consists of two components: (1) normal cost, which generally represents the portion of the present value of retirement benefits that are allocable to active members' current year service, and (2) an amortized portion of the UAAL. The amount that the Commonwealth and other participating entities actually contribute to the Retirement Systems is determined by statute and does not follow the recommendations of the actuaries, as discussed above. If additional employer contributions were to be made, they would have to be included in the Governor's budget request and approved by the Legislature.

To calculate the actuarial accrued liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the UAAL of the Retirement Systems may increase or decrease to the extent of any variances. As discussed below, the actual return of assets of each of the Retirement Systems during fiscal year 2009 was significantly lower than the assumed investment return utilized to prepare the actuarial accrued liability. The actual return of assets of each of the Retirement Systems for fiscal year 2010, however, was higher than the assumed investment return utilized to prepare the actuarial accrued liability.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the UAAL. For fiscal year 2009, the annual rates of return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was negative 10.0%, negative 16.0% and negative 18.2%, respectively, contributing to the increase in the UAAL of the Retirement Systems between fiscal year 2007 and fiscal year 2009. For fiscal year 2010, the year-end return of the assets of the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was 8.7%, 12.5% and 12.7%, respectively.

The June 30, 2010 actuarial valuations of the Employees Retirement System and Judiciary Retirement System were completed in accordance with the "projected unit credit" method and assumed an investment return of 7.5% per year and yearly salary increases of 3% per year. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases, and the projected benefit is attributed to each year of service using straight proration based on projected service to each assumed retirement age. The plan's normal cost is the sum of the present value of the portion of each active participant's projected benefit attributable to the current year of service.

The June 30, 2010 actuarial valuation of the Teachers Retirement System was completed in accordance with the "entry age normal" method and assumed an investment return of 8% per year and yearly salary increases of 3.5%. Under this method, a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits.

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Systems.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

The following tables set forth, according to the actuarial valuations of the Retirement Systems, the actuarial value of assets, actuarial accrued liability, UAAL, funded ratio, covered payroll and UAAL as a percentage of covered payroll. The ratio of the UAAL to covered payroll is a measure of the significance of the UAAL relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the UAAL to covered payroll for each of the Retirement Systems shows a significant deterioration in their financial strength.

## Funding Status
### Actuarial Valuations as of June 30, 2010
### (in millions)

| | Actuarial Value of Assets[1] | Actuarial Accrued Liability[2] | Unfunded Actuarial Accrued Liability[3] | Funded Ratio[4] | Covered Payroll[5] | UAAL as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| Employees Retirement System | $1,667 | $19,502 | $17,834 | 8.5% | $3,818 | 467.1% |
| Teachers Retirement System | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| Judiciary Retirement System | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| Total | $3,944 | $29,120 | $25,175 | 13.5% | $5,220 | 482.3% |

[1] The actuarial value of assets of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The actuarial accrued liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The UAAL of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the actuarial accrued liability of a Retirement System over its actuarial value of assets. The indicated amounts reflect the UAAL as calculated pursuant to the requirements of the Government Accounting Standards Board ("GASB") for purposes of presentation in the CAFR.

[4] The Funded Ratio of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the actuarial value of assets of the Retirement System by the actuarial accrued liability of the Retirement System. The indicated percentages reflect the Funded Ratio as calculated pursuant to the requirements of GASB for purposes of presentation in the CAFR.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made.

[6] The UAAL as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the UAAL of the Retirement System by the covered payroll of the Retirement System.

Source: Actuarial valuation reports as of June 30, 2010 for each of the Retirement Systems.

## Historical Funding Status[1]
### Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2005 | $2,328 | $13,969 | $11,641 | 16.7% | $4,126 | 282.2% |
| 2007 | 2,892 | 16,770 | 13,878 | 17.2 | 4,246 | 326.8 |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 19,502 | 17,834 | 8.5 | 3,818 | 467.1 |
| **Teachers Retirement System** | | | | | | |
| 2004 | $2,403 | $4,702 | $2,299 | 51.1% | $1,294 | 177.7% |
| 2007 | 3,163 | 7,756 | 4,593 | 40.8 | 1,370 | 335.3 |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| **Judiciary Retirement System** | | | | | | |
| 2005 | $70 | $174 | $105 | 40.0% | $29 | 356.8% |
| 2007 | 81 | 259 | 177 | 31.5 | 31 | 566.6 |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |

[1] Please refer to the footnotes of the immediately preceding table for an explanation of the categories set forth in the columns of this table.

Source: Actuarial valuation reports as of June 30 of the fiscal years indicated above for each of the Retirement Systems.

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for each of the Retirement Systems' last three fiscal years and the current fiscal year.

## Schedule of Employer Contributions
## to Retirement Systems
## (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $1,191 | $581 | $610 | 48.8% |
| 2009 | 1,259 | 595 | 664 | 47.2 |
| 2010 | 1,460 | 534 | 926 | 36.6 |
| 2011 | 1,547 | 542 | 1,005 | 35.0 |
| **Teachers Retirement System** | | | | |
| 2008 | $341 | $159 | $182 | 46.6% |
| 2009 | 394 | 173 | 221 | 43.9 |
| 2010 | 477 | 166 | 311 | 34.9 |
| 2011 | 528 | 165 | 363 | 31.3 |
| **Judiciary Retirement System** | | | | |
| 2008 | $20 | $7 | $13 | 36.7% |
| 2009 | 22 | 11 | 11 | 50.0 |
| 2010 | 28 | 11 | 17 | 39.1 |
| 2011 | 30 | 11 | 19 | 36.1 |
| **Total** | | | | |
| 2008 | $1,553 | $748 | $805 | 48.1% |
| 2009 | 1,675 | 778 | 897 | 46.4 |
| 2010 | 1,965 | 710 | 1,255 | 36.1 |
| 2011 | 2,105 | 718 | 1,387 | 34.1 |

---

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the statutory employer contribution plus the expected pay-as-you-go contributions for System Administered Pension Benefits, as set forth in the actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

Source: Information regarding the actuarially recommended contributions was derived from the June 30, 2010 actuarial valuation reports for the Retirement Systems. Information regarding the actual contributions for the Retirement Systems was provided by the Retirement Systems.

Based on the current funding requirements of the Retirement Systems, the UAAL of the Retirement Systems will continue to increase indefinitely into the future instead of being amortized and future scheduled contributions at the current funding rates will not be sufficient to make future benefit payments when due. Additional funding from the Commonwealth will ultimately be necessary to cover such unfunded obligation. It is estimated that the Commonwealth would be responsible for approximately 64% of any such funding deficiency of the Employees Retirement System and approximately 74% of the combined funding deficiency of the Retirement Systems, with the balance being the responsibility of the municipalities and participating public corporations.

*Funding Shortfalls.* For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding

shortfalls." The funding shortfalls, however, do not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities. One type of investment that has particularly contributed to the deterioration of the Retirement Systems' actual cash position has been the increase in personal loans to their members, as discussed below under "*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.*"

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. In some fiscal years, the funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting the funded status.

Besides using investment income to cover benefit payments, the Employees Retirement System has covered some of its historical funding shortfalls with the sale of investment portfolio assets and proceeds of loans from the Treasury Department or other financial institutions, some of which have been collateralized with the System's assets. During 2008, the Employees Retirement System issued approximately $2.9 billion of Senior Pension Funding Bonds (the "Pension Bonds"), for which repayment the Employees Retirement System pledged all employer contributions made after the issuance of the bonds. The Pension Bonds increased the funds of the Employees Retirement System currently available to pay pension benefits. Although the original expectation was that the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds would exceed the cost of the debt, as further discussed below, the Employees Retirement System's investment earnings on the proceeds of the Pension Bonds have in fact been lower than the cost of the Pension Bonds. As a result of market declines since the issuance of the Pension Bonds, the market value of some of the investments made with Pension Bonds proceeds is below their original cost. Thus, to date, the Pension Bonds transactions have negatively affected the UAAL of the Employees Retirement System.

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

### Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall |
|---|---|---|---|
| **Employees Retirement System** | | | |
| 2006 | $741.4 | ($803.5) | ($62.1) |
| 2007 | 713.2 | (823.1) | (109.9) |
| 2008 | 726.4 | (1,011.3) | (284.9) |
| 2009 | 762.4 | (1,190.3) | (427.9) |
| 2010 | 726.5 | (1,269.0) | (542.5) |
| **Teachers Retirement System** | | | |
| 2006 | $248.7 | ($355.1) | ($106.4) |
| 2007 | 244.1 | (387.9) | (143.7) |
| 2008 | 244.6 | (439.9) | (195.2) |
| 2009 | 261.5 | (468.0) | (206.6) |
| 2010 | 248.0 | (498.1) | (250.1) |
| **Judiciary Retirement System** | | | |
| 2006 | $9.7 | ($13.5) | ($3.8) |
| 2007 | 9.5 | (14.7) | (5.3) |
| 2008 | 9.8 | (15.4) | (5.6) |
| 2009 | 13.1 | (16.5) | (3.4) |
| 2010 | 13.1 | (17.8) | (4.7) |

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits.
[2] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2008, 2009 and 2010 in the amounts of $47 million, $187 million and $188 million, respectively.
Source: Information obtained from each of the Retirement Systems.

The Employees Retirement System anticipates that, based on the current contributions and benefit structure, its future cash flow needs for disbursement of benefits to participants are likely to continue to exceed the sum of the employer and employee contributions received and its investment and other recurring income. Based on the actuarial valuation report as of June 30, 2010, the Employees Retirement System expects to have a funding shortfall (after payment of debt service on the Pension Bonds) of $749 million for fiscal year 2011 and this negative trend is expected to continue. Based on the Employees Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being rapidly disfunded and projects that its net assets (total assets minus the Pension Bonds and other liabilities) will be depleted by fiscal year 2014 and its gross assets will be depleted by fiscal year 2019. This means that during the period from fiscal year 2014 through fiscal year 2019, benefits are expected to be paid from the proceeds of the Pension Bonds, and that after depletion of the gross assets, there would be no funds remaining to pay pension benefits or debt service on the pension obligation bonds.

The Teachers Retirement System has also covered funding shortfalls during the prior five fiscal years through the sale of investment portfolio assets. Based on the actuarial valuation

report as of June 30, 2010, the Teachers Retirement System expects to have a funding shortfall of approximately $274 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Teachers Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being gradually disfunded and projects that its net and gross assets will be depleted by fiscal year 2020.

The Judiciary Retirement System has also experienced funding shortfalls during the last five fiscal years and has used investment income to cover some of these shortfalls. Based on the actuarial valuation report as of June 30, 2010, the Judiciary Retirement System expects to have a funding shortfall of approximately $7.7 million for fiscal year 2011, and this negative trend is expected to continue. Based on the Judiciary Retirement System's current funding and disbursement projections (which reflect continued funding shortfalls) and other assumptions, the actuarial valuation as of June 30, 2010 states that the System is being disfunded and projects that its net and gross assets will be depleted by fiscal year 2018.

The estimated years for depletion of the assets stated above could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the Retirement Systems.

The consulting actuaries have recommended that the funding requirements of the Retirement Systems be significantly increased in light of (i) the expected negative net cash flows and exhaustion of plan assets, (ii) the forecasted decrease in funded status, and (iii) the actuarially recommended contributions which significantly exceed actual employer contributions.

*Factors That Have Contributed to Deterioration in Financial Solvency of the Employees Retirement System.* On June 30, 2010, the Employees Retirement System and GDB, as fiscal agent, retained Conway MacKenzie, Inc ("CMI"), a financial advisory firm, to identify and analyze key events and decisions that have contributed to the current financial crisis of the Employees Retirement System, including the deterioration of its funded ratio. CMI issued its report in October 2010. In its report, CMI identified the following five factors as fundamental in the deterioration of the financial health of the Employees Retirement System: (i) historical inadequate funding procedures, (ii) special laws, (iii) early retirement programs, (iv) personal loans, and (v) the 2008 issuances of Pension Bonds.

The report reviews the historical funding levels of the Employees Retirement System and concludes that the Employees Retirement System has been underfunded since its inception in 1951, essentially as a result of statutory funding rates that fall below actuarially determined contribution rates. In addition to inadequate annual contributions, CMI notes that investment returns and other recurring income have been insufficient to cover annual benefit payments and operating expenses, resulting in cash flow shortfalls that have forced the Employees Retirement System to liquidate plan assets.

CMI also identified the enactment of numerous special laws, which have granted incremental retirement benefits to participants beyond those provided by Act 447 and Act 1, as having exacerbated the deteriorating financial condition of the Employees Retirement System.

Many special laws were adopted without the Government securing a viable, long-term source of funding for such additional benefits, including the adoption of special laws during periods when the Government was incurring in budgetary deficits. As a result, the Employees Retirement System was forced to fund the benefits granted under these special laws, resulting in significant past-due receivables from the Commonwealth and participating public corporations and municipalities.

The adoption of several early retirement programs is also identified as having affected the financial solvency of the Employees Retirement System. These programs were adopted in order to reduce the size of the public workforce and thereby decrease payroll costs. These programs, however, were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Employees Retirement System as the System funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality. In addition, the CMI report notes that it appears that many of these programs did not ultimately result in their intended goals of reducing the size of the public workforce.

Another factor identified by CMI as having contributed to the deterioration of the Employees Retirement System is the adoption in 2007 of an increase in the maximum loan balance for personal loans to members, from $5,000 to $15,000. This increase has resulted in a significant cash flow drain to the Employees Retirement System, amounting to approximately $600 million during the last four fiscal years. Although the loans are secured by the employee contributions and collected through payroll withholdings, the significant cash flow to provide personal loans has required the liquidation of plan assets. As a result, a significant percentage of the Employees Retirement System's assets are now invested in personal loans that are illiquid investments.

The CMI report also addressed the 2008 issuances of approximately $2.9 billion in Pension Bonds. The Pension Bonds were issued with the intent of increasing the funds available to the Employees Retirement System to pay benefit obligations and to reduce the UAAL. The Employees Retirement System expected to achieve these goals by investing the proceeds of the Pension Bonds at a higher return than the cost of the debt, thereby achieving a positive arbitrage. However, CMI found that potential risks were not thoroughly or properly analyzed. In fact, the investment of the Pension Bonds proceeds have resulted in a negative arbitrage as the Pension Bonds are currently costing the System more than what it is earning on the investment proceeds. Thus, to date, the transactions have worsened the funded ratio of the Employees Retirement System.

Finally, the CMI report addresses governance deficiencies and states that many of the measures described above, and in particular the issuances of Pension Bonds, were adopted and implemented without conducting any rigorous analysis of their impact on the financial condition of the Employees Retirement System and the risks associated with the measures. The report concludes that immediate and dramatic changes to the structure of the Employees Retirement System are necessary to avoid full depletion of the System's net assets in the near future, as discussed above.

*Efforts to Address Cash Flow Shortfall and Improve Funding Ratio.* The Retirement Systems and the current administration are evaluating measures to improve the financial solvency of the Retirement Systems. In order to maintain the long-term fiscal integrity of the Retirement Systems and their ability to pay required benefits to their members, a combination of some or all of the following will be required: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems. Because of the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems.

In March 2010, the Governor of Puerto Rico established a special commission to make recommendations for improving the financial solvency of the Retirement Systems. The Commission issued its report on October 21, 2010. The Commission's report does not make a consensus set of recommendations for addressing the financial solvency of the Retirement Systems, but rather discusses the principal recommendations made by different members of the Commission in the following areas: (i) employer and employee contributions, (ii) benefit structure, (iii) retirement age, (iv) benefits under special laws, (v) early retirement programs, (vi) mortgage loans and personal loans, and (vii) governance structure. All members of the Commission agreed that there has to be an increase in employer contributions, while some members also recommended an increase in employee contribution rates. One of the proposals is that employer contribution rates be increased by 1% of payroll per year for the next 10 to 15 years. In the benefits areas, the recommendations include various proposals to reduce or limit benefits, such as eliminating merit pensions, establishing caps on benefits, increasing the retirement age in order to receive full benefits and modifying or eliminating some benefits granted under special laws. Some members of the Commission also recommended prohibiting all future early retirement programs unless they are actuarially positive to the Retirement Systems. In order to address the liquidity position of the Retirement Systems, various members of the Commission recommended eliminating the loan programs or restricting their use. Various members also commented that improvements to the governance structure of the Retirement Systems was necessary, as it appeared that in the past governance had not been as rigorous as it should have been. Other recommendations included increasing penalties for late payments by participating employers and creating other dedicated revenue sources for the Retirement Systems, such as a special lottery drawing or a special tax on government contractors.

The administration has assigned to a task force headed by the Secretary of Labor the evaluation of the Commission's recommendations in order to determine which of its recommendations or other alternatives will be formally proposed. The implementation of most of the recommendations or other alternatives will require adopting legislation, which the administration expects to submit during 2011. At this time, there can be no assurance as to which changes, if any, to the Retirement Systems will be proposed and adopted. Because of the Commonwealth's current budgetary constraints and the significant underfunding of the Retirement Systems discussed above, however, improving the financial solvency of the Retirement Systems will require the adoption of several of the measures mentioned above and it will take several years before a significant improvement is achieved. In the short-term, the financial situation of the Retirement Systems may have an adverse impact on the Commonwealth's budgetary situation.

On July 2, 2010, the Government enacted Act 70, which is designed to reduce Government expenditures by providing a voluntary early retirement window for central government employees. At the same time, Act 70 is expected to have a positive actuarial impact on the UAAL of the Employees Retirement System and the Teachers Retirement System. Under Act 70, central government employees meeting certain years of service criteria who opted for early retirement by January 14, 2011 receive a higher pension benefit rate than they would otherwise be entitled to receive based on their current years of service, but such pension rate is lower than what they would have been entitled to if they had waited to meet the full vesting requirements. Pursuant to Act 70, the Commonwealth, as employer, will continue making the applicable employer contributions to the Employees Retirement System and the Teachers Retirement System, as well as make payments to cover the annuity payments to the employees opting for the early retirement window, until both the years of service and age requirements for full vesting would have occurred, at which time the applicable Retirement System will continue making the annuity payments. The Government expects approximately 2,398 employees to participate of the benefits provided by Act 70.

*Impact of Funding Shortfall on the Commonwealth.* The Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the Retirement Systems. The depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover such funding deficiency. However, due to the multi-year fiscal imbalances mentioned above, the Commonwealth is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

*Statements of Plan Net Assets and Changes in Plan Net Assets.* The following tables present the Statement of Plan Net Assets and Statement of Changes in Plan Net Assets of each of the Retirement Systems for fiscal years 2008, 2009 and 2010 and as of and for the six months ended in December 31, 2010.

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| ASSETS | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| CASH AND SHORT TERM INVESTMENTS | | | | |
| Deposits at Commercial Banks | 47,935 | $ 54,175 | $ 21,792 | $ 84,439 |
| Deposits with Treasury Department | 196,487 | 110,931 | 103,527 | 23,099 |
| Deposits with GDB: | | | | |
| Unrestricted | 40,198 | 51,446 | 79,500 | 54,438 |
| Restricted | 357,117 | 741,082 | 1,028,878 | 1515,042 |
| Restricted Cash Bonds | 233,960 | 172,226 | 193,537 | -- |
| Total Cash and Short Term Investment | 875,697 | 1,129,860 | 1,427,234 | 1,677,018 |
| SECURITIES LENDING, COLLATERAL INVESTED | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 586,656 | 563,454 | 565,366 | 547,414 |
| Stocks | 1,851,790 | 1,492,386 | 1,477,945 | 2,018,090 |
| Master Repo | | -- | -- | -- |
| Private Equity Investments | 57,779 | 55,307 | 34,922 | 42,294 |
| Total Investments | 2,496,225 | 2,111,147 | 2,078,233 | 2,607,798 |
| LOANS TO PLAN MEMBERS | | | | |
| Mortgage | 144,849 | 141,588 | 128,365 | 116,022 |
| Personal | 1,042,582 | 1,018,498 | 916,934 | 771,367 |
| Cultural Trips | 67,030 | 63,729 | 50,317 | 38,344 |
| PEC | 3,163 | 2,340 | 1,827 | 1,098 |
| Total Loans to Plan Members | 1,257,624 | 1,226,155 | 1,097,443 | 926,831 |
| Investment in PRTA Holdings | | -- | -- | -- |
| Total cash, investments and loans to plan members | 4,629,546 | 4,467,162 | 4,602,910 | 5,211,647 |
| RECEIVABLES: | | | | |
| Employers | 231,645 | 273,139 | 289,427 | 246,167 |
| General Fund | 8,278 | 11,222 | 7,833 | 854 |
| Judiciary Retirement System | 224 | 19,138 | 17,942 | 16,714 |
| Investment Sales | 9,025 | 12,189 | 24,509 | 9,800 |
| Accrued Interest | 6,291 | 6,597 | 6,939 | 3,279 |
| Dividend Receivable | | -- | -- | -- |
| Other | 10,646 | 3,893 | 5,081 | 58,210 |
| Total Receivables | 266,109 | 326,178 | 351,731 | 335,024 |
| CAPITAL ASSETS | 8,686 | 8,964 | 9,171 | 9,839 |
| OTHER ASSETS | 6,880 | 7,224 | 8,892 | 8,292 |
| Prepaid Bond Cost | 33,267 | 33,267 | 34,363 | 35,462 |
| Total assets | 4,944,488 | 4,842,795 | 5,007,067 | 5,600,264 |
| LIABILITIES | | | | |
| Book overdraft | | 22,933 | 37,961 | -- |
| Short Term Obligations | | -- | -- | -- |
| Payables for securities lending | | 110,931 | 103,527 | -- |
| Funds of Mortgage Loans and Guarantee Insurance Reserve for Loans | 11,148 | 6,597 | 6,372 | 3,863 |
| Investment Purchases | 1,942 | 5,277 | 13,926 | 12,694 |
| Accounts Payable and Accrued Liabilities | 8,948 | 12,250 | 14,228 | 9,310 |
| Line of Credit | | -- | -- | -- |
| Bonds Payable | 2,981,775 | 2,981,775 | 2,961,359 | 2,942,183 |
| Other Liabilities | 112,935 | 21,798 | 13,675 | 12,946 |
| Bonds Interest Payable | 13,876 | 13,876 | 13,876 | 12,182 |
| Total Liabilities | 3,130,624 | 3,175,437 | 3,164,924 | 2,993,178 |
| Net Assets Held in Trust for Pension Benefits | $1,813,864 | $1,667,358 | $1,842,143 | $2,607,086 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Employees' Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | 178,926 | $ 381,243 | $ 400,405 | $ 374,394 |
| Participating employees | 163,036 | 345,265 | 362,040 | 338,791 |
| Other Special Laws | 149,928 | 171,842 | 175,254 | |
| Early Retirement | 4,054 | 3,399 | 47,146 | 69,097 |
| Special Laws 127 | 17,000 | 188,843 | 17,000 | 17,000 |
| Total Contributions | 512,944 | 918,750 | 1,001,845 | 799,282 |
| | | | | |
| Investment (loss) Income: | | | | |
| Realized Gain or Loss | 10,657 | 148,173 | (152,583) | 74,304 |
| Unrealized Gain or Loss | 350,691 | 67,838 | (405,969) | 289,881 |
| Dividend Income | 4,586 | 10,663 | 15,774 | 14,494 |
| Interest Income | 85,544 | 179,586 | 198,734 | 68,231 |
| Total | 451,478 | 406,259 | (344,044) | 446,910 |
| | | | | |
| Less Investment Expense | (287) | (7,649) | (7,589) | (12,940) |
| Insurance Premium | | | | 2,441 |
| Other Income | 7,733 | 31,783 | 35,878 | 17,431 |
| Net Investment Income | 458,924 | | 430,393 | (315,755) |
| | | | | |
| Total Additions | 971,868 | 1,349,143 | 686,090 | 1,253,124 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 513,048 | 1,047,695 | 970,843 | 793,883 |
| Special Laws 127 | 17,000 | 17,000 | 17,000 | 17,000 |
| Benefits under Special Laws | 149,928 | 171,842 | 175,254 | |
| Death Benefits | 5,032 | 12,968 | 11,532 | 13,872 |
| Refunds of Contributions: | | | | |
| Employers | 469 | 1,469 | 2,013 | 5,296 |
| Participating Employees | 46,386 | 43,677 | 32,517 | 28,009 |
| Personal Loans Adjustment | | -- | -- | -- |
| Insurance Claims on Loans | | | | |
| Other Expenses | 7,028 | 7,888 | 22,415 | 13,569 |
| Administrative Expenses | 14,719 | 33,063 | 32,590 | 29,207 |
| Interest on Bonds | 69,385 | 188,055 | 186,869 | -- |
| | | | | |
| Total Deductions | 882,995 | 1,523,928 | 1,451,033 | 902,954 |
| | | | | |
| Net (decrease) Increase | 148,873 | (174,785) | (764,943) | 350,170 |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 1,664,991 | 1,842,143 | 2,607,086 | 2,541,331 |
| End of Year | $1,813,864 | $1,667,358 | $1,842,143 | $2,891,501 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Cash: | | | | |
| Cash and cash equivalents | $ 91,593 | $ 72,692 | $ 65,885 | $ 324,846 |
| Cash with fiscal agent | - | - | 450 | 297 |
| Cash restricted | - | - | - | - |
| Cash deposited with Government Development Bank for Puerto Rico | 3,289 | 3,288 | 3,276 | 3,255 |
| Total Cash | 94,882 | 75,980 | 69,611 | 328,398 |
| Investments, at fair value: | | | | |
| Bonds and notes | 365,881 | 397,109 | 425,911 | 490,007 |
| Stocks | 1,621,792 | 1,295,232 | 1,259,169 | 1,796,817 |
| Total investment at fair value | 1,987,673 | 1,692,341 | 1,685,080 | 2,286,824 |
| Other investments: | | | | |
| Mortgage notes acquired from third parties | | | | |
| Private equity investments | 26,683 | 26,683 | 26,139 | 37,630 |
| Total investments | 2,014,356 | 1,719,024 | 1,711,219 | 2,324,454 |
| Loan to plan members: | | | | |
| Mortgage | 123,899 | 119,937 | 109,508 | 103,759 |
| Personal | 279,547 | 288,463 | 288,410 | 271,510 |
| Cultural trips | 1,470 | 1,481 | 1,462 | 1,355 |
| Total loans to plan members | 404,916 | 409,881 | 399,380 | 376,624 |
| Total investments and loans | 2,419,272 | 2,128,905 | 2,180,210 | 3,029,476 |
| Accounts receivable: | | | | |
| Receivable for investments sold | 626 | 332 | 23,231 | 4,693 |
| Accrued interest and dividends receivable | 4,065 | 4,584 | 5,445 | 6,395 |
| Other | 45,315 | 56,085 | 2,930 | 15,141 |
| Total accounts receivable | 50,006 | 61,001 | 31,606 | 26,229 |
| Property and equipment, net | 22,774 | 22,970 | 26,167 | 26,223 |
| Other assets | 759 | 832 | 876 | 451 |
| Total Assets | 2,587,693 | 2,289,688 | 2,238,859 | 3,082,379 |
| **LIABILITIES** | | | | |
| Investments purchased | 581 | 2,722 | 18,981 | 7,952 |
| Payable for securities lending | 65,795 | 48,673 | 46,751 | 274,372 |
| Cash overdraft in cash with fiscal agent | 55,904 | 2,199 | - | - |
| Accounts payable | 1,152 | 1,476 | 4,188 | 3,688 |
| Obligation under capital lease | - | - | - | 12 |
| Accrued expenses | 6,187 | 6,184 | 5,925 | 5,361 |
| Line of credit | - | - | - | - |
| Escrow fund of mortgage loans and guarantee insurance reserve for loans to plan members | 5,873 | 5,763 | 4,580 | 4,641 |
| Bonds payable | - | - | - | - |
| Other liabilities | 726 | 694 | 841 | 1,007 |
| Total liabilities | 136,218 | 67,711 | 81,266 | 297,033 |
| **Net Assets Held in Trust for Pension Benefits** | $2,451,477 | $2,221,977 | $2,157,593 | $2,785,346 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

I-91

**The Commonwealth of Puerto Rico**
**Teachers Retirement System**
**Statements of Changes in Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Participating Employees | $60,656 | $129,888 | $136,305 | $127,566 |
| Employer | 55,013 | 118,127 | 125,165 | 117,065 |
| Contributions transferred from other systems** | | 1,265 | 1,479 | 4,181 |
| Special | 51,026 | 46,572 | 75,548 | 68,085 |
| Total contributions | 166,695 | 295,852 | 338,497 | 316,897 |
| Investment Income: | | | | |
| Interest income | 28,936 | 61,303 | 66,927 | 67,825 |
| Dividend Income | 2,468 | 10,111 | 13,194 | 15,629 |
| Net appreciation (depreciation) in fair value of investments | 355,237 | 203,265 | (518,862) | (276,573) |
| | 386,641 | 274,679 | (438,741) | (193,119) |
| Less investment expense | 2,233 | 4,735 | 4,660 | 6,847 |
| Net investment income | 384,408 | 269,944 | (443,401) | (199,966) |
| Other income | 969 | 53,771 | 2,444 | 1,735 |
| **Total additions** | $ 552,072 | $ 619,567 | ($ 131,794)) | $ 118,666 |
| **DEDUCTIONS:** | | | | |
| Benefit paid to participants: | | | | |
| Annuities and death benefits | 264,251 | 470,683 | 442,542 | 414,334 |
| Special benefits | 41,716 | 47,870 | 51,951 | 49,742 |
| Refunds of contributions | 4,792 | 7,847 | 5,313 | 6,427 |
| Administrative expenses | 11,813 | 28,783 | 25,485 | 25,537 |
| **Total deductions** | 322,572 | 555,183 | 525,291 | 496,040 |
| Net increase in net assets held in trust for pension benefits | 229,500 | 64,384 | (627,753) | (377,374) |
| **Net assets held in trust for pension benefits** | | | | |
| Beginning of year | 2,221,977 | 2,157,593 | 2,785,346 | 3,162,720 |
| **End of year** | $2,451,477 | $2,221,977 | $2,157,593 | $2,785,346 |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Plan Net Assets***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010****
**(in thousands)**

| ASSETS | December 31, 2010** | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| Cash and Investments: | | | | |
| Cash and Cash Equivalents | 3,547 | $ 4,008 | $ 3,985 | $ 2,519 |
| Cash Deposited with GDB or Treasury Department: | 6,076 | 28 | 2,353 | 267 |
| Collateral from Securities Lending | | 1 | 1,482 | |
| Total Cash | 9,623 | 4,037 | 7,820 | 2,786 |
| | | | | |
| Receivables: | | | | |
| Accrued Interest | 277 | 271 | 215 | 237 |
| Investment Sales | 21 | 41 | 117 | 196 |
| Other | 27 | 27 | 28 | 25 |
| Total receivables | 325 | 339 | 360 | 458 |
| | | | | |
| Marketable Securities: | | | | |
| Notes and Bonds | 26,428 | 25,973 | 22,805 | 22,169 |
| Stocks | 35,383 | 50,275 | 44,634 | 61,377 |
| Total Investments | 61,811 | 76,248 | 67,439 | 83,546 |
| | | | | |
| Loans and Interest Receivable from Members: | | | | |
| Mortgage | 10 | 20 | 8 | 8 |
| Personal | 760 | 702 | 462 | 394 |
| Cultural Trips | 58 | 47 | 60 | 45 |
| Total Loans to Plan Members | 828 | 769 | 530 | 448 |
| | | | | |
| Total cash, investments and loans to plan members | 72,587 | 81,393 | 76,149 | 87,239 |
| | | | | |
| LIABILITIES | | | | |
| Due to Treasury Department | 6,283 | 5,842 | 4,513 | -- |
| Due to the Employee's Retirement System of the Government of Puerto Rico | 224 | 19,138 | 17,942 | 16,714 |
| Collateral from Securities ending | | | 1,482 | |
| Escrow Funds to plan Members and Guarantee Insurance | 63 | 63 | 59 | 56 |
| Investment Purchases | | 868 | 867 | 345 |
| Other Liabilities | 2,020 | 72 | 720 | 812 |
| Total Liabilities | 8,590 | 25,983 | 25,583 | 17,927 |
| | | | | |
| Net Assets Held in trust for Pension Benefits | $63,997 | $ 55,410 | $ 50,566 | $ 69,311 |

* Totals may not add due to rounding.
** Preliminary, unaudited numbers.

I-93

**The Commonwealth of Puerto Rico**
**Judiciary Retirement System**
**Statements of Changes in Plan Net Assets\***
**As of June 30, 2008, 2009, and 2010 and December 31, 2010\*\***
**(in thousands)**

|  | December 31, 2010\*\* | 2010 | 2009 | 2008 |
|---|---|---|---|---|
| **ADDITIONS:** | | | | |
| Contributions: | | | | |
| Employer | $4,949 | $10,021 | $9,970 | $6,705 |
| Participating employees | 1,334 | 3,104 | 3,138 | 3,076 |
| Special Laws | 629 | 629 | 691 | |
| Total Contributions | 6,912 | 13,754 | 13,799 | 9,781 |
| | | | | |
| Investment Income: | | | | |
| Realized Gain or Loss | 4,483 | 5,644 | (3,158) | 1,031 |
| Unrealized Gain | 5,988 | 1,741 | (13,582) | (8,988) |
| Dividend Income | 132 | 211 | 218 | 267 |
| Interest Income | 656 | 1,284 | 1,313 | 1,553 |
| | | | | |
| Total | 11,259 | 8,880 | (15,209) | (6,137) |
| Less Investment Expense | | 164 | (170) | (197) |
| Other Income | 10 | 804 | 50 | -- |
| Net Investment Income | 11,269 | 9,520 | (15,329) | (6,333) |
| | | | | |
| Total Additions | 18,181 | 23,274 | (1,530) | 3,448 |
| | | | | |
| **DEDUCTIONS:** | | | | |
| Annuities | 8,728 | 17,268 | 15,538 | 14,419 |
| Benefits Under Special Laws | 629 | 629 | 691 | |
| Refunds to Participating Employees | | -- | -- | 169 |
| Administrative Expenses | 237 | 533 | 986 | 1,022 |
| Total Deductions | 9,594 | 18,430 | 17,215 | 15,610 |
| | | | | |
| Net Increase | 8,587 | 4,844 | (18,745) | (12,162) |
| | | | | |
| Net Assets Held in Trust for Pension Benefits: | | | | |
| Beginning of the Year | 55,410 | 50,566 | 69,311 | 81,473 |
| | | | | |
| **End of Year** | **$63,997** | **$55,410** | **$50,566** | **$69,311** |

\* Totals may not add due to rounding.
\*\* Preliminary, unaudited numbers.

## POST-EMPLOYMENT BENEFITS OTHER THAN PENSIONS

In addition to the pension benefits, the Commonwealth provides non-pension post-employment benefits that consist of a medical insurance plan contribution for retired employees meeting the service credit eligibility requirements. These benefits are administered by the Retirement Systems. The medical insurance plan contribution is a payment of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member.

The Commonwealth funds these post-employment benefits on a "pay-as-you-go" basis from the General Fund, which means that the Commonwealth does not pre-fund, or otherwise establish a reserve or other pool of assets against the medical insurance plan contribution expenses that the Commonwealth may incur in future years. For fiscal year 2010, the Commonwealth paid $114.2 million for these benefits for the eligible retirees of the Retirement Systems (including retirees of public corporations and municipalities, which are also paid for by the Commonwealth). For fiscal year 2011, these benefits are expected to amount to $122.2 million.

In accordance with the provisions of GASB Statement No. 45, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The most recent actuarial valuation reports of these benefits are dated as of June 30, 2010. Many of the actuarial assumptions used to project the actuarial accrued liability for these benefits are the same as those used to determine the accrued actuarial liabilities of the Retirement Systems. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, UAAL, covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### Actuarial Valuations as of the Indicated Fiscal Years
### (in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **Employees Retirement System** | | | | | | |
| 2007 | - | $1,557 | $1,557 | 0% | $4,246 | 36.7% |
| 2009 | - | 1,633 | 1,633 | 0 | 4,293 | 38.0 |
| 2010 | - | 1,646 | 1,646 | 0 | 3,818 | 43.1 |
| **Teachers Retirement System** | | | | | | |
| 2007 | - | $652 | $652 | 0% | $1,370 | 47.6% |
| 2009 | - | 750 | 750 | 0 | 1,418 | 52.9 |
| 2010 | - | 694 | 694 | 0 | 1,370 | 50.7 |
| **Judiciary Retirement System** | | | | | | |
| 2007 | - | $5 | $5 | 0% | $31 | 15.0% |
| 2009 | - | 6 | 6 | 0 | 31 | 18.5 |
| 2010 | - | 6 | 6 | 0 | 32 | 18.1 |

---

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

The following table shows the actuarially recommended contributions, actual employer contributions and resulting amount unfunded and percent contributed for the post-employment benefits other than pensions administered by each of the Retirement Systems' for the last three fiscal years and the current fiscal year.

### Schedule of Employer Contributions to Retirement Systems on Account of Post-Employment Benefits Other Than Pensions (in millions)

| Fiscal Year Ending June 30, | Actuarially Recommended Contributions[1] | Actual Employer Contributions[2] | Amount Unfunded[3] | Percent Contributed |
|---|---|---|---|---|
| **Employees Retirement System** | | | | |
| 2008 | $111 | $80 | $31 | 72.1% |
| 2009 | 112 | 87 | 25 | 77.7 |
| 2010 | 128 | 85 | 43 | 66.6 |
| 2011 | 128 | 90 | 38 | 70.3 |
| **Teachers Retirement System** | | | | |
| 2008 | $37 | $26 | $11 | 70.6% |
| 2009 | 38 | 28 | 10 | 73.1 |
| 2010 | 42 | 28 | 14 | 66.7 |
| 2011 | 40 | 32 | 8 | 80.7 |
| **Judiciary Retirement System** | | | | |
| 2008 | $0.4 | $0.2 | $0.2 | 55.4% |
| 2009 | 0.4 | 0.3 | 0.1 | 62.0 |
| 2010 | 0.5 | 0.3 | 0.2 | 61.5 |
| 2011 | 0.5 | 0.3 | 0.2 | 60.4 |
| **Total** | | | | |
| 2008 | $148.4 | $106.2 | $42.2 | 71.6% |
| 2009 | 150.4 | 115.3 | 35.1 | 76.7 |
| 2010 | 170.5 | 113.3 | 57.2 | 66.5 |
| 2011 | 168.5 | 122.3 | 46.2 | 72.6 |

[1] The actuarially recommended contributions are based on the information contained in the actuarial valuations for the Retirement Systems as of June 30, 2010.

[2] The actual employer contributions for fiscal year 2011 are based on the expected pay-as-you-go amounts for the post-employment benefits other than pensions, as set forth in the actuarial valuations as of June 30, 2010.

[3] Represents the difference between the actuarially recommended pension contribution and the actual contribution from the participating employers.

## COMMONWEALTH AUDITED FINANCIAL STATEMENTS

### General

For fiscal year 2010, the basic financial statements of the Commonwealth were audited by Deloitte & Touche LLP. Deloitte & Touche LLP did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated April 27, 2011 (which report expresses an unqualified opinion and includes emphasis of matter paragraphs regarding investments held by the Pension Trust Funds whose fair values have been estimated in the absence of readily determinable fair values and the Pension Trust Funds' unfunded actuarial accrued liability and funded ratio as of June 30, 2010). Those financial statements were audited by other independent auditors whose reports were furnished to Deloitte & Touche LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic

financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The Comprehensive Annual Financial Report of the Commonwealth ("CAFR") for fiscal year 2010, which includes the basic financial statements of the Commonwealth for fiscal year 2010, was filed by the Commonwealth with the Municipal Securities Rulemaking Board ("MSRB") through its Electronic Municipal Markets Access System ("EMMA") on April 29, 2011.

**Prior Non-Compliance with Continuing Disclosure Obligations**

The Commonwealth has made similar continuing disclosure undertakings in connection with prior bond issuances, and has complied with all such covenants, except as hereinafter noted.

The Commonwealth's audited financial statements for the fiscal year ended June 30, 2002 were filed after the Commonwealth's filing deadline of May 1, 2003 because of delays in finalizing such financial statements resulting from the implementation of GASB Statement No. 34 ("GASB 34"). The Commonwealth's audited financial statements for the fiscal year ended June 30, 2003 were also filed after the Commonwealth's filing deadline of April 30, 2004, because of delays in finalizing the financial statements of certain of the Commonwealth's reporting units due to the implementation of GASB 34. The Commonwealth's audited financial statements for the fiscal years ended June 30, 2004, 2006, 2007 and 2008 were also filed after the Commonwealth's respective filing deadlines of May 1, 2005, 2007, 2008 and 2009, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the Commonwealth's audited financial statements. The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was also filed after the Commonwealth's filing deadline of May 1, 2010 due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units. The Commonwealth's audited financial statements for fiscal years ended June 30, 2004, 2006, 2007 and 2008 were filed by the end of the first quarter of the following fiscal year, while the Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 was filed on October 25, 2010.

The Commonwealth Report for the fiscal year ended June 30, 2008 containing the information described in paragraph 1 above, was filed after the Commonwealth's filing deadline of May 1, 2009. Such Commonwealth Report was filed on June 1, 2009. Except for such Commonwealth Report, the Commonwealth has timely filed the Commonwealth Report for all other fiscal years.

As of the date of this Report, the Commonwealth is in compliance with its continuing disclosure filing requirements related to its outstanding general obligation bonds.

The Commonwealth has established new policies and procedures that it believes will ensure full and timely compliance with all continuing disclosure obligations in the future. Such new policies and procedures include: (i) the assignment of additional resources from local and international audit firms to those component units whose financial statements have not been

timely provided to the Commonwealth; (ii) the assignment of dedicated external and internal resources to (a) assist the Central Accounting Division at the Treasury Department in the preparation of complex financial information that has historically delayed the audit and (b) provide periodic and consistent follow up on component unit financial statement deliverables and deadlines; (iii) the execution of a memorandum of understanding between the Treasury Department, OMB and GDB for the coordination of all financial statement related tasks and the designation of GDB, in its role as fiscal agent, to review and monitor the progress of certain component units; and (iv) the establishment of an Audit Oversight Committee comprised of the Treasury Department and GDB personnel in order to continuously monitor the status of the audit and the Commonwealth's financial statements.

## PUERTO RICO TAXES, OTHER REVENUES, AND EXPENDITURES

The Secretary of the Treasury has custody of the funds of the central government and is responsible for the accounting, disbursement and investment of such funds. Central government funds are grouped into three major categories or "types" of funds, as follows: (i) Governmental Fund Types, which include the General, Special Revenue, Debt Service (also referred to herein as Redemption), and Capital Project Funds; (ii) Proprietary Fund Types, which include the Enterprise and Internal Service Funds; and (iii) Fiduciary Fund Types, which include the Trust and Agency Funds. These funds do not include funds of the municipalities, because the municipalities are governmental entities with independent treasuries. The Special Revenue Fund is incorporated into the General Fund for financial reporting purposes (but not for budgetary purposes).

The General Fund is the primary operating fund of the Commonwealth. General Fund revenues are broadly based and include revenues raised internally as well as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. The primary expenditures of the Commonwealth through the General Fund are for grants and subsidies, and personal and other services.

### Summary and Management's Discussion of General Fund Results

The following table presents the actual revenues and expenditures of the General Fund on a cash basis for fiscal years 2006, 2007, 2008, 2009 and the estimated revenues and expenditures for fiscal year 2010. Once the audited financial statements have been completed, the Commonwealth will provide the General Fund revenue and expenditure data for fiscal year 2010. The numbers for fiscal year 2010 have not been audited and are subject to audit related adjustments.

The amounts shown in the following table as expenditures may be different than those reflected in the budget or in the Commonwealth's financial statements because the table shows only cash disbursements, while the budget includes all authorized expenditures, regardless of when the related cash is actually disbursed. In addition, transfers to the Redemption Fund (used to pay debt service on the Commonwealth's bonds), which are included in the budget under "debt service," are shown as a deduction from total revenues in calculating "adjusted revenues" in the table and are not included under "expenditures." Finally, certain expenditures incurred in

excess of budgeted amounts may not be reflected in the table as expenditures to the extent they are paid from reserve funds, such as moneys in the Budgetary Fund. A discussion of the budget for fiscal years 2010 and 2011 appears below under "Budget of the Commonwealth of Puerto Rico."

Amounts listed under "Other Income" represent recurring General Fund revenues not appropriately attributable to other revenue line items, such as repayment of General Fund advances to municipalities and government agencies and funds. "Other Expenditures" represent recurring General Fund expenditures not appropriately attributable to other expenditures line items, such as advances to government agencies and municipalities, which advances are to be reimbursed to the General Fund by law. Amounts listed under "Capital Outlays and Other Debt Service" represent debt service on obligations and capital expenditures for which the Legislative Assembly has by resolution agreed to appropriate funds. General Fund revenues, expenditures, and transfers as presented in the table differ from the General Fund revenues, expenditures, and transfers as presented in the financial statements of the Commonwealth, as the financial statements reflect an expanded General Fund entity in accordance with generally accepted accounting principles.

**Commonwealth of Puerto Rico**
**General Fund Revenues, Expenditures, and Changes in Cash Balance**
**(in thousands)**

| | 2006 | 2007 | 2008 | 2009 | 2010 |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | 3,087,748 | 3,071,655 | 2,759,305 | 2,648,261 | 2,593,598 |
| Corporations | 1,872,458 | 2,002,718 | 1,565,534 | 1,375,596 | 1,682,321 |
| Partnerships | 2,787 | 2,960 | 1,942 | 1,839 | 1,688 |
| Withheld from non-residents | 921,260 | 933,728 | 1,087,782 | 1,081,739 | 830,352 |
| Tollgate taxes | 27,396 | 25,083 | 21,610 | 19,372 | 15,034 |
| Interest | 11,536 | 12,112 | 13,657 | 11,738 | 9,902 |
| Dividends | 66,721 | 138,859 | 59,770 | 48,663 | 29,774 |
| Total income taxes | 5,989,906 | 6,187,115 | 5,509,600 | 5,187,208 | 5,162,669 |
| Sales and use tax | - | 582,560 | 911,000 | 797,194 | 540,348 |
| **Commonwealth excise taxes:** | | | | | |
| Alcoholic beverages | 292,180 | 279,028 | 268,094 | 277,401 | 284,796 |
| Cigarettes | 135,267 | 132,399 | 119,124 | 129,429 | 182,501 |
| Motor vehicles | 533,957 | 396,667 | 366,341 | 310,920 | 350,764 |
| Other excise taxes | 682,477 | 314,340 | 110,014 | 86,874 | 77,978 |
| Total Commonwealth excise taxes | 1,643,881 | 1,122,434 | 863,573 | 804,624 | 896,039 |
| Property taxes | 1,106 | 800 | 219 | 1,011 | 227,812 |
| Inheritance and gift taxes | 9,466 | 4,663 | 6,600 | 5,064 | 3,617 |
| Licenses | 91,310 | 97,610 | 87,690 | 96,423 | 95,768 |
| **Other:** | | | | | |
| Lottery | 62,729 | 73,014 | 46,636 | 51,480 | 42,826 |
| Electronic lottery | 55,212 | 71,815 | 105,298 | 75,213 | 80,006 |
| Miscellaneous non-tax revenues | 431,803[6] | 330,064 | 466,741 | 284,436 | 314,754 |
| Total Other | 549,744 | 474,893 | 618,675 | 411,129 | 770,843 |
| Total revenues from internal sources | 8,285,413 | 8,470,075 | 7,997,357 | 7,302,653 | 7,363,839 |
| **Revenues from non-Commonwealth sources:** | | | | | |
| Federal excise taxes[1] | 346,272 | 377,872 | 356,827 | 404,265 | 352,301 |
| Customs | 9,553 | 14,504 | 4,846 | 3,269 | - |
| Total revenues from non-Commonwealth sources | 355,825 | 392,376 | 361,673 | 407,534 | 352,301 |
| Total revenues | 8,641,238 | 8,862,451 | 8,359,030 | 7,710,187 | 7,716,140 |
| Other Income (refunds)[2] | 76,085 | (8,335) | (10,797) | 148,966 | (57,241)[8] |
| (Transfer) Refunding to Redemption Fund[3] | (484,812) | (512,197) | (202,954) | (607,305) | (447,312) |
| Proceeds of notes and other borrowings[4] | 4,115,897[7] | 1,872,096 | 2,710,000 | 3,982,893 | 2,375,000 |
| Repayment of notes and other borrowings[5] | (3,005,838) | (1,926,273) | (2,580,764) | (3,858,393) | (2,698,818) |
| Receipt of COFINA Bond Proceeds | - | - | - | 3,051,008 | 2,501,053[9] |
| Adjusted revenues | 9,342,570 | 8,287,742 | 8,274,515 | 10,427,356 | 9,388,822 |
| **Expenditures:** | | | | | |
| Grants and subsidies | 3,944,349 | 3,387,199 | 3,471,922 | 3,117,817 | 3,581,751 |
| Personal services | 4,796,382 | 4,590,962 | 4,563,192 | 5,273,590 | 4,355,111 |
| Other services | 525,377 | 594,345 | 685,112 | 859,323 | 822,019 |
| Materials and supplies | 50,227 | 79,186 | 99,486 | 109,386 | 85,906 |
| Equipment purchases | 19,378 | 27,965 | 49,498 | 51,204 | 44,381 |
| Capital outlays and other debt service | 49,789 | 21,576 | 11,222 | 211,499 | 110,850 |
| Prior year disbursements | - | 92,770 | - | - | - |
| Total expenditures | 9,385,503 | 8,794,003 | 8,880,432 | 9,622,818 | 9,000,018 |
| Adjusted revenues less expenditures | (42,933) | (506,261) | (605,917) | 804,538 | 388,804 |
| Ending cash balance | 0 | (506,261) | (1,112,178) | (307,640) | 81,164 |

(1) Excludes transfers to the Conservation Trust Fund and amounts deposited into a separate account for the promotion of Puerto Rico rums in foreign markets.
(2) Consists of net revenues from the General Fund's non-budgetary funds plus a reserve for future tax refunds reduced by estimated tax refunds.
(3) Consists of amounts to pay principal of and interest on general obligation bonds and notes of the Commonwealth.  Does not include amounts deposited directly into the Redemption Fund from non-General Fund revenues.
(4) Consists of proceeds of borrowings from GDB and a syndicate of commercial banks, and proceeds from Commonwealth's Tax and Revenue Anticipation Notes.
(5) Consists of repayments of borrowings from GDB and a syndicate of commercial banks, and repayments of Commonwealth's Tax and Revenue Anticipation Notes.
(6) Includes proceeds of $100 million generated by the issuance of the Commonwealth's Public Improvement Refunding Bonds, Series 2006 A, which were privately placed.
(7) Includes $50 million from the Emergency Fund used for operating expenses.
(8) Includes $201 million transferred to the Commonwealth from the sale of securities in PRIFA's Corpus Account.
(9) Represents the COFINA bond proceeds deposited in the Stabilization Fund

*Source:* Treasury Department

*General Fund Revenues for Fiscal Year 2010 Compared to Fiscal Year 2009.*

General Fund total revenues for fiscal year 2010 were $7.716 billion, representing an increase of $133 million from fiscal year 2009 revenues and an increase of $47 million from budgeted revenues for fiscal year 2010. The principal changes in sources of revenues from fiscal year 2009 include a decrease in the sales and use tax received by the General Fund of $256.8 million due to the increased allocation of this tax to COFINA, as discussed in "Major Sources of General Fund Revenues – Sales and Use Taxes" below. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $226.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan under Act 7. See "Major Sources of General Fund Revenues – Income Taxes" below. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total General Fund expenses (on a cash basis) for fiscal year 2010 amounted to $9.447 billion, which was composed of $9.0 billion of operational expenses and $447.3 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2010 of $1.3 billion was covered principally by proceeds from a COFINA bond issue.

*General Fund Revenues for Fiscal Year 2009 Compared to Fiscal Year 2008*

General Fund total revenues for fiscal year 2009 were $7.710 billion, representing a decrease of $648.8 million, or 7.8%, from fiscal year 2008 revenues. The major changes from fiscal year 2008 were: (i) decreases in income taxes from individuals of $111 million and in corporate income taxes of $189.9 million, (ii) a decrease of $58.9 million in excise taxes, (iii) a decrease of $182.3 million in miscellaneous non-tax revenues, and (iv) a decrease of $113.8 million in the sales and use tax revenues due primarily to a one-time change in the manner sales and use tax collections are reported by the Treasury Department. Please refer to "Major Sources of General Fund Revenues – Sales and Use Taxes" below further information regarding this reporting change. The decreases in revenues in these categories for fiscal year 2009 as compared to fiscal year 2008 reflect the acceleration of the economic recession during that fiscal year.

Total General Fund expenses (on a cash basis) for fiscal year 2009 amounted to $10.230 billion, which were composed of $9.623 billion of operational expenses and $607 million transferred to the redemption fund. The difference between revenues and expenses for fiscal year 2009 of $2.5 billion was covered principally by proceeds from COFINA bond issues.

*Fiscal Year 2008 Compared to Fiscal Year 2007*

Total General Fund revenues for fiscal year 2008 were $8.359 billion, representing a decrease of $234.4 million, or 2.7%, from actual revenues for fiscal year 2007 (excluding the collection of $269 million from special temporary tax measures in fiscal year 2007). The major changes from fiscal year 2007 were: (i) decreases in income taxes from individuals of $312.4 million and in corporate income taxes of $437.2 million, (ii) a decrease of $258.9 million in excise taxes, and (iii) an increase of $328.4 million in the sales and use tax revenues, which had

only been in effect for seven and a half months during fiscal year 2007. The decrease in 2008 revenues was principally due to the ongoing economic recession and high oil prices, which directly affected income and excise tax collections.

Total General Fund expenses (on a cash basis) for fiscal year 2008 amounted to $9.083 billion, which were composed of $8.880 billion of operational expenses and $203 million transferred to the redemption fund. The difference between adjusted revenues and expenses for fiscal year 2008 of $605.9 million was covered principally by cash-management procedures such as delaying payments to certain vendors and a GDB loan of $190 million.

*Fiscal Year 2007 Compared to Fiscal Year 2006*

General Fund total revenues for the fiscal year 2007 were $8.862 billion, an increase of $221 million, or 2.6%, from fiscal year 2006. This amount includes (i) $5.074 billion in individual and corporate income taxes, (ii) $934 million in non-resident withholding taxes, (iii) $1.122 billion in excise taxes, (iv) $583 million of sales and use tax revenues, and (v) $269 million from special temporary tax measures. A decrease of $521 million in excise taxes was offset by revenues from the sales and use tax, as the repeal of the general excise tax on imported goods and goods manufactured in Puerto Rico was replaced with the sales and use tax commencing on November 15, 2006.

Total General Fund expenses (on a cash basis) for fiscal year 2007 were $9.306 billion. This amount does not include $522 million of debt service payments on a portion of the Commonwealth's outstanding appropriation debt, which debt service was excluded from the budget based on the provisions of Act 91, which created the Dedicated Sales Tax Fund to service in part the repayment of such appropriation debt.

The difference between revenues and expenses for fiscal year 2007 of $444 million was covered by a $240 million transfer of funds from GDB that was originally set aside from General Fund appropriations to cover a portion of debt service payments on the Commonwealth's appropriation debt, which set-aside was no longer needed on account of the passage of Act 91. The remaining shortfall was covered principally by cash-management procedures such as delaying payments to certain vendors (carrying over into fiscal year 2008).

**Major Sources of General Fund Revenues**

*Income Taxes*

The historical revenue data presented in this Report is based on collections realized or accrued under the provisions of the Internal Revenue Code of 1994, as amended (the "PR Code"), which applied to taxable years beginning after June 30, 1995 and ending before January 1, 2011. The PR Code was replaced by the Internal Revenue Code for a New Puerto Rico, Act No. 1 of January 31, 2011, which will apply for taxable years commencing after December 31, 2010 ("Act No. 1"). See "Tax Reform" below. Many of the provisions of Act No. 1 are identical to the equivalent provisions of the PR Code. Thus unless otherwise noted, the discussion below refers to the provisions of both the PR Code and Act No. 1.

The PR Code imposed a tax on the income of individual residents of Puerto Rico, trusts, estates, and domestic and foreign (if engaged in a trade or business in Puerto Rico) corporations and partnerships at graduated rates. A flat tax was imposed on certain payments made to non-residents of Puerto Rico, which was collected through an income tax withholding.

*Individuals.* Resident individuals are subject to tax on their taxable income from all sources. The PR Code had four tax brackets for individuals with tax rates of 7%, 14%, 25%, and 33%. The highest income tax bracket applicable to individuals under the PR Code was $50,000. Under Act No. 1, the highest income tax bracket gradually increases every year for the next six years from $60,000 to $121,500. For taxable years starting before January 1, 2016, the income tax rates applicable to individuals remain unaltered under Act No. 1. After January 1, 2016, the top individual rate is lowered to 30%. See "Tax Reform" below for certain requirements that must be satisfied in order for tax benefits under Act No. 1 to enter into effect for taxable years starting after December 31, 2013. Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 10%.

Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than six months, is taxed at an income tax rate of 10%.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at an income tax rate of 10%; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for an income tax rate of 10%.

*Corporations and Partnerships.* Puerto Rico corporations and partnerships are subject to tax on income from all sources; foreign corporations and partnerships that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation or partnership qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "Tax Incentives" under "The Economy" above), it is subject to tax at graduated rates.

In general, the PR Code provided for six income tax brackets for corporations and partnerships, with the highest rate (39%) applicable to net taxable income in excess of $300,000. Gains realized from the sale or exchange of a capital asset, if held for more than six months, were taxed at a maximum regular income tax rate of 15%. Under Act No. 1, for taxable years commencing after December 31, 2010, the highest corporate income tax rate is lowered to 30% for net taxable income in excess of $1,750,000 (it will be reduced to 25% for taxable years starting after December 31, 2013 subject to the satisfaction of certain conditions) and the alternative minimum tax is also reduced from a rate of 22% to the greater of (i) the amount produced by applying a minimum rate of 20% to the alternative minimum net income or, (ii) subject to certain exceptions, the amount produced by applying a 1% excise tax on the purchase from related parties of tangible personal property to be used in a Puerto Rico trade or business applicable to persons with gross sales of $50 million or more during any of three preceding taxable years. Dividends received by Puerto Rico corporations and partnerships from foreign corporations and partnerships engaged in trade or business in Puerto Rico are subject to general

income tax rates. A dividends received credit may be available when the corporation or partnership making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to corporations and partnerships qualifies for a special tax rate of 10%.

In general, corporations and partnerships operating under a new grant of tax exemption issued under the Economic Incentives Act are subject to a maximum income tax rate of 4% during their basic exemption period. Corporations and partnerships covered by the Tourism Development Act are subject to a maximum tax rate of 39% on their taxable income after applying the 90% exemption granted under the Tourism Development Act, which results in a maximum effective tax rate of 3.9% on their net tourism development income. Under Act No. 1, the net income of corporations and partnerships covered under the Tourism Development Act is subject generally to a maximum effective tax rate of 3%.

The PR Code generally imposes a branch profits tax on resident foreign corporations whose gross income qualifies as income effectively connected with a Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules.

Interest from Puerto Rico sources paid to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and the Green Energy Incentives Act are not subject to Puerto Rico income tax. However, royalty payments made by corporations covered under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

Subject to certain exceptions, payments in excess of $1,500 during a calendar year made by the Commonwealth and persons engaged in a trade or business in Puerto Rico in consideration of the receipt of services rendered in Puerto Rico are subject to a 7% income tax withholding.

*Act No. 7 – Special Tax Measures Implemented as part of the New Administration's Fiscal Stabilization Plan.* Act 7 was enacted as part of the new administration's Fiscal Plan, and sought, among other things, to increase the tax revenues of the Puerto Rico government by imposing certain permanent and temporary tax increases.

With respect to income taxes, Act 7 included the following temporary measures that are applicable for taxable years commenced after December 31, 2008 and before January 1, 2012:

(i)     taxable corporations and individuals whose adjusted gross income equal or exceeds $100,000 (for single individuals) or $150,000 (in the case of married persons filing jointly) are subject to a surtax of 5% on their total tax liability (for

taxable years commencing after December 31, 2010, Act No. 1 eliminates this surtax);

(ii)    international banking entities that do not operate as bank units will be subject to a 5% income tax on their entire net income computed in accordance with the PR Code (international banking entities operating as bank units are subject to this 5% tax on their net income that does not constitute excess net income);

(iii)    credit unions, their subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7), however, if the Government of Puerto Rico collects $690 million prior to January 1, 2012, the 5% tax will not be applicable for the remaining period;

(iv)    the Cooperative Bank, its subsidiaries, and affiliates are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7);

(v)    insurance cooperatives are subject to a 5% tax on the amount of net taxable income in excess of $250,000 (these entities were totally exempt before the enactment of Act 7); and

(vi)    international insurers and holding companies of international insurers are subject to a 5% tax on their net income (these entities were totally exempt before the enactment of Act 7).

Act 7 also provided as a permanent measure a change in the method of computing the net income subject to alternative minimum tax ("AMT") in the case of individuals by including in the computation various categories of exempt income and income subject to preferential tax rates under the PR Code, such as: (a) long-term capital gains, which enjoy a preferential tax rate of 10% under the PR Code; (b) dividends that are taxable at the rate of 10% under the PR Code; (c) interest on bank deposits and individual retirement accounts subject to the special 10% and 17% preferential income tax rates, respectively; and (d) interest from notes or bonds eligible for the special 10% tax rate provided by the PR Code.

Another change introduced by Act 7, for taxable years commenced after December 31, 2008 and before January 1, 2012 was an adjustment to the calculation of the net income subject to the AMT in the case of entities taxed as corporations that denies a deduction for expenses paid or accrued for services rendered outside of Puerto Rico by a related party. Lastly, different income tax credits awarded to investors under certain special laws for activities such as revitalization of urban centers (only in part), venture capital, solid waste, housing infrastructure, and rehabilitation of social-interest housing (only projects without qualification certifications as of March 9, 2009), among others, may not be claimed or granted for taxable years commenced after December 31, 2008 and before January 1, 2012. Tax credits associated to manufacturing, tourism, and cinematographic projects, however, were not affected by Act 7.

*Tax Reform*

In February 2010, the Governor named a committee to review the Commonwealth's income tax system and propose a tax reform directed at reducing personal and corporate income tax rates. The committee presented its findings to the Governor and on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform. The tax reform consists of two phases focused on providing tax relief to individual and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion. The tax reform is projected to provide taxpayers aggregate annual savings of $1.2 billion for each of the next six fiscal years, commencing on taxable year 2011.

The first phase, enacted as Act No. 171 of November 15, 2010, applies to the 2010 tax return and provides a tax credit to each individual and corporate taxpayer. The tax credit applicable to individuals and determined by reference to the tax liability ranges from 7% for those taxpayers in higher brackets to 15% for taxpayers in the lowest bracket. Corporate taxpayers will also be entitled to a 7% tax credit determined by reference to the tax liability; provided, that such taxpayer paid the statutorily required Christmas bonus for 2010. Also, the corporate net operating loss carryforward is extended from 7 years to 10 years. This first phase is expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010.

The second phase, enacted as Act No. 1, (i) promotes employment by doubling the earning income credit and increasing the maximum applicable income to qualify for such credit; (ii) provides a $400 tax credit to individuals over 65 years of age with an income below $15,000; (iii) significantly reduces individual income tax rates and only allow the following five deductions (a) mortgage interest up to 30% of adjusted gross income, (b) charitable contributions up to 50% of adjusted gross income, (c) medical expenses in excess of 6% of adjusted gross income, (d) interest on student loans, and (e) contributions to retirement plans and accounts, including individual retirement accounts, health savings accounts and education savings accounts; and (iv) significantly reduces corporate income tax rates.

The reduction in income tax revenues resulting from the implementation of the tax reform is expected to be offset by the additional revenues produced by (i) an expanded income tax source rule and a new excise tax imposed on entities that purchase products manufactured in Puerto Rico by their affiliates under the provisions of Act 154, discussed below, (ii) enhanced enforcement efforts, including the statutorily required reporting of certain client information by financial institutions to the Treasury Department, and (iii) increased economic activity produced by the tax relief measures. The combined effect of the tax reform measures and the revenue and enforcement measures is expected to be revenue positive. Act No. 1 conditions the implementation of the tax reductions applicable to individuals and corporations after fiscal year 2014 on the Commonwealth's ability to continue its path towards fiscal stability. Specifically, the tax relief provisions for individuals and corporations for taxable years 2014 through 2016 will only be implemented if (i) OMB certifies that the expense control target has been met, (ii) the Treasury Department certifies that General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product. There is no

assurance that sufficient revenues will be collected to partially offset the reduction in income tax revenues expected from the implementation of the tax reform.

*Act 154 – Expanded Income Taxation and New Excise Tax.* Act 154, approved on October 25, 2010, as amended, seeks, among other things, to balance the tax burden among the taxpayers and increase the tax revenues of the Government. Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships (each a taxpayer) by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and the act imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. Act 154 applies to income realized and acquisitions occurring after December 31, 2010.

The Act provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico and taxable in Puerto Rico with respect to a portion of taxpayer's income where the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of seventy-five million dollars or more in any of the last three years and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, will instead be subject to the excise tax in lieu of any income tax. The excise tax will apply for a period of six years. The excise tax is based on the value of the personal property or services acquired and will be 4% for calendar year 2011, declining to 3.75% in 2012, 2.75% in 2013, 2.5% in 2014, 2.25% in 2015 and 1% in 2016. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act 154 and $5.6 billion for the six year period that the excise tax is in place.

While the Government expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their U.S. federal income tax liabilities, it is uncertain how this new tax will affect each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

Preliminary collections for the first two monthly excise tax payments, which were due on February 15, 2011 and March 15, 2011, were $108.9 million and $125.1 million, respectively. This amount is consistent with the Government's projection of annual collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act 154 are reasonable. However, since such taxes only became effective on

January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the IRS issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court; consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

*Sales and Use Taxes*

Act No. 117 of July 4, 2006 ("Act 117") amended the PR Code to provide, among other things, for a general sales and use tax of 5.5% to be imposed by the central government (the "Commonwealth Sales Tax"). Act 117 also authorized each municipal government to impose a municipal sales and use tax of 1.5% (the "Municipal Sales Tax" and, together with the Commonwealth Sales Tax, the "Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth Sales Tax. Act 117 also provides certain income tax reductions to address the regressive effect of the Sales Tax on taxpayers in lower income tax brackets.

The Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, and (ix) local sales of goods to be used as content in a manufactured good, whether or not bound for export.

I-108

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Sales Tax.

The Sales Tax became effective on November 15, 2006 and the effective date of the repeal of the 5% general excise tax was October 16, 2006. Municipalities were authorized to implement the Municipal Sales Tax starting on July 1, 2006. The revenues derived from the Sales Tax are distributed as follows: 5.5% goes to the central government and 1.5% to Puerto Rico's municipalities. One half of the 5.5% Commonwealth Sales Tax is transferred to the Dedicated Sales Tax Fund, created by Act 91, as amended, and the balance goes to the General Fund. The 1.5% Municipal Sales Tax is divided as follows: (i) 1% goes to the municipalities, and (ii) 0.5% goes to the Municipal Improvements Fund. The increase in revenues generated by the Sales Tax has been partly offset by the elimination of the 5% general excise tax and the effect of the income tax reduction measures included in Act 117.

The Treasury Department has reported and recorded Commonwealth Sales Tax revenues on a "modified cash basis." This means that the figures for each month represent the sales taxes corresponding to sales made by merchants and retailers and sales tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month.

Effective fiscal year 2010, the Treasury Department began reporting Commonwealth Sales Tax revenues on a cash basis in order to report these revenues on the same basis and at the same time as it reports all other tax revenues. Accordingly, for fiscal year 2010, Commonwealth Sales Tax revenues were reported in the month in which such revenues were received by the Treasury Department. The new reporting method became effective as of July 1, 2009. Thus, the figures for sales tax collections previously reported in June 2009 were transferred to July 2009.

The Sales Tax generated total annual gross revenues for the General Fund of approximately $539 million for fiscal year 2010.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7 require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid on merchandise acquired for resale that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

*Excise Taxes*

The PR Code imposes an excise tax on certain articles and commodities, such as cigarettes, alcohol, sugar, cement, motor vehicles and certain petroleum products, which are taxed at different rates.

Under Act 7, the excise tax was increased on certain articles (cigarettes and certain alcoholic beverages) and was expanded with respect to others (motor vehicles). With respect to cigarettes, the increase was approximately 81% per taxable unit. For certain alcoholic beverages, the increase ranges between $0.30 and $0.70 per standard gallon. Motor vehicles, motorcycles, all terrain vehicles and "scooters," which used to be subject to the Sales Tax, are now subject to an excise tax of 10%.

*Property Taxes*

Personal property, which accounts for approximately 46% of total collections of taxable property, is self-assessed. Real property taxes are assessed based on 1958 property values. No real property reassessment has been made since 1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in 1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $150,000 of assessed valuation in owner-occupied residences is available.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("CRIM"), a government instrumentality of the Commonwealth. However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is used for purposes of paying the Commonwealth's general obligation debt and is deposited in the Commonwealth's Redemption Fund.

One of the amendments incorporated in Act 7 was that, for fiscal years 2010 through 2013, the appraisal values of real property in Puerto Rico were increased tenfold and the real personal property tax rates applicable to such values were reduced tenfold so as to offset any increased tax that would have otherwise been applicable due to the increase in appraisal values. This temporary amendment, which is expected to be revenue neutral, was intended to increase the borrowing capacity of Puerto Rico's municipalities.

Act 7 did impose, however, an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax will apply during fiscal years 2010, 2011 and 2012, or until $690 million is collected. The additional real property tax, to be collected by the Treasury Department, will be equal to 0.591% of such properties' appraised value as determined by CRIM. Act No. 1 eliminated this additional real property tax for fiscal year 2012.

The following table presents the assessed valuations and real and personal property taxes collected for fiscal years 2005 to 2010.

### Commonwealth of Puerto Rico
### Assessed Valuations and Real and Personal Property Taxes
### (Commonwealth and Municipalities Combined)
### (in thousands)

| Fiscal Years Ended June 30, | Assessed Valuations[1] | Taxes Levied | Collections of Current Year | Collections of Previous Years | Total Collections[2] |
|---|---|---|---|---|---|
| 2005 | 25,277,795 | 899,893 | 738,074 | 50,751 | 788,825 |
| 2006 | 25,606,121 | 925,618 | 801,497 | 70,908 | 872,405 |
| 2007 | 26,898,519 | 982,400 | 813,700 | 79,720 | 893,420 |
| 2008 | 27,941,285 | 1,031,277 | 788,364 | 119,062 | 907,426 |
| 2009 | 28,903,996 | 1,032,570 | 634,040 | 244,411 | 878,451 |
| 2010 | 175,025,782 | 1,093,769 | 666,429 | 269,857 | 936,286 |

[1] Valuation set as of July 1 of each fiscal year.
[2] During fiscal year 2004 a property tax amnesty was approved by the Legislative Assembly and implemented by CRIM. In addition to the amounts shown, under the amnesty program a total of $105.3 million was collected in fiscal year 2004 and $21.1 million in fiscal year 2005.

*Source:* Municipal Revenues Collection Center.

### *Other Taxes and Revenues*

Motor vehicle license plate and registration fees comprise the major portion of license tax receipts.

Non-tax revenues consist principally of lottery proceeds, documentary stamps, permits, fees and forfeits, proceeds of land sales and receipts from public corporations in lieu of taxes.

### *Revenues from Non-Commonwealth Sources*

Revenues from non-Commonwealth sources include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned ("covered over") to the Commonwealth. Since 1999, however, the U.S. Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon. For fiscal year 2010, the total excise taxes on rum shipments returned to the Commonwealth was $352.3 million.

In June 2008, the Government of the United States Virgin Islands (the "USVI") signed an agreement with Diageo USVI, Inc ("Diageo") for the construction and operation of a new rum distillery in St Croix, USVI, that will manufacture Captain Morgan branded products to be sold in the United States beginning in January 2012. Currently, all rum used in Captain Morgan products sold in the United States is procured through a supply contract with Serralles Destillery ("Serralles") in Puerto Rico which expires on December 31, 2011. The Government estimates that the exports of Captain Morgan rum produced in Puerto Rico by Serralles during calendar

year 2009 were 9,403,224 proof gallons. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serralles and Diageo, it is expected that after 2011, the income received by the Commonwealth from the federal excise tax on rum shipments will decrease unless Serralles is able to find other clients in the United States for the volume of bulk rum previously purchased by Diageo for its Captain Morgan products or new rum distilleries are established in Puerto Rico.

In an effort to maintain the local rum industry and preserve or increase the amount of federal excise taxes on rum shipments returned to Puerto Rico under the cover-over program, the Governor of Puerto Rico signed Act No. 178 of December 1, 2010 ("Act 178"), which increases from 10% to 25% the portion of the monies from the federal excise tax that the Government of Puerto Rico may invest to provide incentives to and promote the Puerto Rican rum industry. The law also authorizes the Governor of Puerto Rico to increase this percentage up to 46% after December 31, 2011, through an Executive Order. In order to promote the Puerto Rican rum industry in general, the amount received from such refund will be transferred to a special account of the General Fund, which may be used for marketing, production and infrastructure investment incentives. Effective January 1, 2011, Act No. 1 replaced Act 178 and contains identical provisions.

The Government of Puerto Rico is in discussions with certain rum producers to provide them a series of subsidies and incentives, as permitted under Act No. 1, in order to promote the production of rum in Puerto Rico. If such discussions culminate in definitive agreements, this would allow such companies to benefit from the cover-over program rebate and would promote and encourage the export of rum produced in Puerto Rico.

**Measures to Increase Collections of Income, Sales, and Excise Taxes and Property Taxes**

The Treasury Department has elaborated a strategic plan designed to improve tax collections. The plan includes initiatives to foster tax compliance, implement effective enforcement measures, and attack tax evasion. To promote taxpayers' compliance, the Treasury Department has liberalized the procedures to enter into payment plans, offers-in-compromise agreements, and encouraged voluntary disclosures agreements.

In addition, the Treasury Department has developed initiatives focused on effective enforcement methods, such as improving the efficiency of its audit selection process, the creation of technological solutions to improve collections, and the establishment of cooperation agreements with federal and local governmental agencies. The Treasury Department is also integrating its databases and establishing a tax intelligence project to identify tax evasion and improve its audit selection process.

Specifically, the Treasury Department has developed various initiatives directed towards increasing collections of income taxes and the Commonwealth sales tax through the implementation of various enforcement and compliance programs. Among these initiatives is a voluntary disclosure program, which began on July 1, 2009 and has since then allowed for the review of more than 130 cases and collection of approximately $32.1 million, by providing certain taxpayers the opportunity to pay taxes and interest owed on past income taxes and sales

transactions and to avoid the payment of surcharges and penalties. During May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, in March 2011, the Treasury Department sent 1,000 additional letters as a second notice to taxpayers that did not respond to the first letter of May 2010.

Other programs are geared towards the use of technology to detect noncompliance. For example, the Treasury Department is also in process of integrating its general computer systems with the sales tax database in order to better detect non-compliance and has implemented a program whereby officers from the Treasury Department use hand held scanning devices to cross-check merchant licenses with sales tax receipts. The Treasury Department has also created a specialized unit to implement a tax intelligence program that aims to detect tax evasion through the application of economic models and algorithms to the taxpayer information in the Treasury Department's database.

On September 28, 2010, the Treasury Department signed an agreement with Evertec, Inc. and Softek for the implementation of a new point of sale system to strengthen its sales tax enforcement efforts (the "IVU Loto"). The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets. The Treasury Department will implement this new point of sale system in two phases. The first phase was a pilot program with 200 businesses. The same concluded in December 31, 2010 and was approved by the Treasury Department. The second phase started in January 2011 with the business certification program followed by the full scale implementation. The implementation of this new system is expected to increase sales tax collections by $200 million during the first year.

The IVU Loto pilot program started on December 1, 2010. Two hundred merchants in the municipality of Ponce were selected to participate in the program. As of March 31, 2011, the IVU Loto devices captured 2,007,982 transactions which resulted in sales of $48,186,649 and state and municipal sales and use tax withholdings of $1,632,449 and $323,050, respectively. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants acquire and use an IVU Loto device on or prior to April 30, 2011.

In addition, the Treasury Department established "IVU Alerta" in order to enhance compliance of sales and use tax. The "IVU Alerta" is a hotline that receives complaints through internet and telephone made by customers and merchants related to violations of the Sales Tax. This initiative started in November 29, 2010 and has since then received 553 complaints, which 294 have been investigated resulting in $1,177,500 fines imposed. Another initiative has focused on strengthening the Treasury Department's enforcement workforce. It has equipped a call center staffed by 125 tax collection agents, which began operations on February 24, 2010 and has produced approximately $31.9 million in collections. The Treasury Department has also increased staffing levels in its Enforcement and Compliance Bureaus by approximately 366 employees, therefore allowing an increase in unannounced field audits of businesses and merchants. The Treasury Department currently makes approximately 2,000 visits per month.

Other initiatives include the establishment of tax liens pursuant to the procedures of Act No. 12 of January 20, 2010, which enables the creation of tax liens through an expedited process. Since the enactment of Act No. 12, the Treasury Department has established 11,292 liens in favor of the Commonwealth over approximately $494.5 million in assets. The Treasury Department is also enforcing a provision of Act 7 that allows the Treasury Department to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month. Also, the Treasury Department will begin to seize the assets of businesses that are delinquent on their sales tax payments. In addition, the Treasury Department has entered into agreements with various municipalities to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts as the ones described above.

With respect to property taxes, Act 71 of July 2, 2010 ("Act 71") established a 120 day amnesty program available from August 16, 2010 until December 13, 2010, in which taxpayers may pay outstanding property tax debts with a discount of 100% of any penalties, interest and surcharges (the "Program"). Pursuant to Act 71 and CRIM's Administrative Order No. 2010-05, the Program is available with respect to taxable year 2008-2009 and previous years in the case of real property taxes, and for taxable year 2008 and previous years with respect to personal property taxes. To benefit from the Program the taxpayer must: (i) have paid property taxes for fiscal year 2009-2010 and the first semester of 2010-2011 in the case of real property taxes, and tax year 2009 in the case of personal property taxes; and (ii) certify to the CRIM that it will pay real and personal property taxes related to fiscal year 2010-2011.

Act No. 172 of November 15, 2010, established that taxpayers which apply for a voluntary disclosure program on or before April 15, 2011 will be eligible for a 20% flat income tax rate on the gross amounts reported and will not be subject to interest, surcharges and penalty fees. This legislation extends the benefits of the program to municipal license tax declarations for which taxpayers will pay principal on the municipal tax determined, but will not be subject to interest, surcharges and penalty fees. Declarations by taxpayers must relate to tax years commenced after July 1, 2003 and ending on or before December 31, 2009, and payment of tax determined under the program must be paid no later than June 30, 2011. Recently, the Governor signed Act No. 64 of April 19, 2011, which extended the disclosure period until June 30, 2011.

The Treasury Department has also implemented a temporary measure to collect on payroll and employer withholding debts. This measure allows employers to enter into payment plans with the Treasury Department, subject to employer making a down payment of 25%, in the case of payroll debts, and 40%, in the case of employer withholding debts, of the total outstanding debt. The payment plans do not provide for the abatement of interest, surcharges and penalties and the same must be initiated on or before June 30, 2011.

**Transfers to General Obligation Redemption Fund**

These consist of transfers from the General Fund to the Redemption Fund for the amortization of the principal of and interest on general obligation bonds and notes of the Commonwealth.

**Components of General Fund Expenditures**

*Grants and Subsidies*

This category includes grants and contributions to municipalities, public corporations with independent treasuries, and charitable institutions. It also includes items for or included in court awards, damage awards for personal injury or property damage, and payment of taxes and payments in lieu of taxes.

*Personal Services*

This category includes compensation paid for personal services rendered to the Commonwealth and its public instrumentalities by individuals or firms in the form of salaries, wages, per diems, fees, commissions, or other forms of compensation.

*Other Services*

This category includes compensation for services other than the services referred to above, including advertising, printing, communications, legal expenses, utilities, building and equipment rental and maintenance expenses, insurance premiums and miscellaneous services.

*Materials and Supplies*

This category includes all articles that ordinarily have a short life and durability, lose their characteristic identity in the process of use, have only nominal value ($25 or less), or are not otherwise chargeable as equipment.

*Equipment Purchases*

This category includes items that have three special characteristics distinguishing them from materials: durability, long useful life, and high unit cost. In addition, these items are subject to centralized inventory control as fixed assets.

*Capital Outlays and Other Debt Service*

Capital outlays are made primarily for land acquisition or interests in land, construction of buildings, roads, bridges and other structures, and permanent improvements and additions. Other debt service includes payments on notes held by GDB to be paid from the General Fund and payments for the amortization of the principal of and interest on non-general obligation debt payable from Commonwealth appropriations.

*Transfers to Agencies*

These transfers include the repayment of loans and advances to other funds, certain refunds, advances from other funds and other receipts, repayment of advances from other funds, grants and contributions to other funds under the custody of the Secretary of the Treasury and other items. The major portion of grants and contributions in recent fiscal years has consisted of transfers to cover the costs of health reform and advances to the municipalities.

*Other Expenditures*

This category represents recurring General Fund expenditures not appropriately attributable to other expenditure line items, such as advances to government agencies and municipalities, which advances are by law reviewed to be reimbursed to the General Fund.

*Federal Grants*

Puerto Rico receives grants under numerous federal programs. Federal grants to the agencies and instrumentalities of the Commonwealth government are estimated to be $4.784 billion for fiscal year 2012, a decrease of $111 million, or 2%, from fiscal year 2011. This decrease in federal grants is due to the termination of the ARRA program. The following table presents revenues from federal grants by broad program areas, which are accounted in the central accounting system of the Treasury Department. The figures for fiscal years 2008 through 2010 are actual figures. The figures for fiscal years 2011 and 2012 are the amounts included in the approved and proposed budget, respectively.

Puerto Rico expects to receive a total of approximately $6.873 billion in stimulus funds from ARRA, of which $1.720 billion and $1.387 billion were disbursed by the government during fiscal years 2009 and 2010, respectively. The amount of $301 million and $21.4 million are expected to be disbursed by the government during fiscal years 2011 and 2012. The table below only included the portion of these funds disbursed by agencies whose accounting systems are centralized in the Treasury Department.

### The Commonwealth of Puerto Rico
### Federal Grants*
### (in thousands)

| | 2008 | 2009 | 2010 | 2011[1] | 2012[2] |
|---|---|---|---|---|---|
| Education | $992,087 | $1,813,455 | $1,377,389 | $1,254,959 | $1,128,176 |
| Social Services | 2,054,897 | 2,453,605 | 2,484,920 | 2,440,457 | 2,437,661 |
| Health | 465,466 | 583,190 | 655,060 | 482,524 | 502,744 |
| Labor and Human Resources[3] | 140,186 | 277,127 | 138,425 | 109,391 | 109,391 |
| Crime | 20,319 | 64,155 | 29,459 | 29,900 | 24,819 |
| Housing[4] | 363,589 | 416,667 | 534,987 | 425,940 | 424,413 |
| Drug and Justice | 19,394 | 53,067 | 23,175 | 21,730 | 24,813 |
| Agriculture and Natural Resources | 11,054 | 114,920 | 26,886 | 14,466 | 14,661 |
| Contributions to Municipalities | 49,543 | 47,656 | 60,559 | 52,087 | 52,087 |
| Other | 15,782 | 67,017 | 72,875 | 63,574 | 65,506 |
| TOTAL | $4,132,317 | $5,890,859 | $5,403,735 | $4,895,028 | $4,784,271 |

---

*   Does not include grants received by agencies whose accounting systems are not centralized at the Treasury Department.
[1]   Approved budget.
[2]   Estimated.
[3]   Amounts include grants to the Right to Work Administration and the Occupational Development and Human Resources Council.
[4]   Amounts include grants to the Public Housing Administration.

*Source: Office of Management and Budget*

## BUDGET OF THE COMMONWEALTH OF PUERTO RICO

### Office of Management and Budget

OMB's predominant mission is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies, and procedures, assesses competing funding demands among agencies, and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

### Budgetary Process

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of revenues, capital improvements, and operating expenses of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted, and (ii) legislative measures proposed by the Governor and submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenses until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes are prepared by the Treasury Department, except for estimates of federal grants, which are prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised at least quarterly during the fiscal year. Fiscal control over expenditures is exercised by the Governor, through the Director of OMB, and the Secretary of the Treasury.

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "Budgetary Fund"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund net revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last two fiscal years, the Legislative Assembly approved joint resolutions to halt temporarily the deposit of funds into the Budgetary Fund, and such funds were used instead to cover the budgetary deficits. As of April 26, 2011, the balance in the Budgetary Fund was $844,925.

An Emergency Fund was created by Act No. 91 of June 21, 1966 ("Act 91 of 1966"), as amended (the "Emergency Fund"), to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. The Emergency Fund is capitalized annually with an amount totaling no less than one percent of the General Fund net revenues of the preceding fiscal year. Act No. 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act No. 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding

for emergency and disaster needs. As of April 26, 2011, the balance in the Emergency Fund was $1.4 million and $0.5 million was available to be borrowed from GDB.

**Appropriations**

Appropriations in the central government budget of Puerto Rico consist of the following:

(i) *General Fund appropriations for recurring ordinary operating expenses of the central government and of the Legislative Assembly.* These are made by a single annual law known as the Joint Resolution of the General Budget.

(ii) *General Fund appropriations for special operating expenses, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch, and for capital expenditures.* These are authorized by separate law.

(iii) *Disbursements of Special Funds for operating purposes and for capital improvements.* For the most part, these do not require annual legislative authorization, because they are authorized by previous legislation or by the United States Congress. Federal grants constitute the major part of the resources of the Special Funds.

(iv) *Bond Fund appropriations for capital expenditures financed by bonds.* Expenditures of these funds occur in one or more years.

In Puerto Rico, the central government performs many functions, which in the fifty states are the responsibility of local governments, such as providing public education, police and fire protection. The central government also provides significant annual grants to the University of Puerto Rico and to the municipalities. In addition, the Commonwealth appropriates annually to the Judicial Branch an amount equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years. This percentage may be increased upon review, with scheduled reviews every five years.

For fiscal year 2011, approximately 25% of the General Fund is committed to the payment of fixed charges such as municipal subsidies, grants to the University of Puerto Rico, mandated funding for the Judicial Branch, rent payments to the Public Buildings Authority, and debt service on the direct debt of the Commonwealth. This proportion is expected to remain at 25% for fiscal year 2012.

For fiscal year 2009, over 64% of the controllable funds portion of the General Fund was committed for the payment of the central government payroll (not including the University of Puerto Rico and the Judicial Branch). In fiscal year 2011 and 2012, the Commonwealth decreased this proportion to an average of 56% due mainly to the savings in operational expenses from the implementation of the Fiscal Plan. The following table shows a breakdown between controllable and non-controllable General Fund expenses for fiscal years 2009 through 2012.

## Expenses Breakdown for the General and Stabilization Funds
### (in millions)

| | 2009 | 2010 | 2011[1] | 2012[2] |
|---|---|---|---|---|
| **Non-Controllable Expenses** | | | | |
| Mandated Expenses (Formula) | | | | |
|    Contributions to Municipalities | 368 | 335 | 355 | 380 |
|    University of Puerto Rico | 835 | 729 | 691 | 704 |
|    Judicial Branch | 348 | 348 | 348 | 328 |
| Rent Payments to Public Buildings Authority | 206 | 299 | 217 | 215 |
| General Obligation Debt Service | 288 | 289 | 201 | 179 |
| Other Debt Service | 105 | 373 | 517 | 492 |
|    Total of Non-Controllable Expenses | 2,150 | 2,000 | 2,329 | 2,298 |
|    Percent of Total General Fund Expenses | 23% | 20% | 25% | 25% |
| **Controllable Expenses** | | | | |
| Payroll and Related Costs[3] | 7,334 | 8,170 | 6,821 | 6,962 |
|    Payroll as a Percentage of Controllable Expenses | 4,695 | 3,785 | 3,789 | 3,863 |
| | 64% | 46% | 56% | 55% |
| **Total General Fund Expenses** | 9,484 | 10,170 | 9,150 | 9,260 |
| **Other Expenses** | | | | |
| Total Non-Budgeted Expenses | 1,406 [4] | 0 | 0 | 0 |
| **Total Expenses** | 10,890 | 10,170 | 9,150 | 9,260 |

[1]   Preliminary.
[2]   Estimated.
[3]   Excludes University of Puerto Rico and Judicial Branch.
[4]   Represents non-budgeted operating expenses that have been identified and that were paid for with proceeds of COFINA bond issues.

*Source:  Office of Management and Budget*

**Budget for Fiscal Year 2011**

The following table presents a summary of the Commonwealth's central government budget for the fiscal year ending June 30, 2011.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2011**
**(in thousands)\***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| **Revenues from internal sources:** | | | | |
| Property taxes | $238,000 | - | $115,743 | $353,743 |
| Personal income taxes | 2,348,000 | - | - | 2,348,000 |
| Retained non-resident income tax | 951,500 | - | - | 951,500 |
| Corporate income taxes | 1,566,000 | - | - | 1,566,000 |
| Partnership income taxes | 3,000 | - | - | 3,000 |
| Tollgate taxes | 9,000 | - | - | 9,000 |
| 17% withholding tax on interest | 8,000 | - | - | 8,000 |
| 10% withholding tax on dividends | 27,000 | - | - | 27,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 555,000 | - | - | 555,000 |
| **Excise taxes:** | | | | |
| Alcoholic beverages | 289,000 | - | - | 289,000 |
| Foreign (Act 154) | 609,000 | - | - | 609,000 |
| Motor vehicles and accessories | 369,000 | - | - | 369,000 |
| Cigarettes | 210,000 | - | | 210,000 |
| Other (excise taxes) | 79,000 | - | 637,625 | 716,625 |
| Licenses | 77,000 | - | | 77,000 |
| **Miscellaneous non-tax revenues:** | | | | |
| Contributions from lottery fund | 43,000 | - | - | 43,000 |
| Electronic lottery | 79,000 | - | - | 79,000 |
| Registration and document certification fees | 152,000 | - | - | 152,000 |
| Other | 175,000 | - | 340,978 | 515,978 |
| Total revenues from internal sources | 7,792,500 | | 1,094,346 | 8,886,846 |
| | | | | |
| **Revenues from non-Commonwealth sources:** | | | | |
| Federal excise taxes on off-shore shipments | 337,000 | | - | 337,000 |
| Federal grants[1] | 0 | - | 4,895,028 | 4,895,028 |
| Customs | 4,000 | - | - | 4,000 |
| Total revenues from non-Commonwealth sources | 341,000 | - | 4,895,028 | 5,236,028 |
| Total revenues | 8,133,500 | - | 5,989,374 | 14,122,874 |
| **Other:** | | | | |
| Balance from previous year | 0 | - | 1,805,803 | 1,805,803 |
| COFINA Stabilization Fund | 1,016,000 | - | 0 | 1,016,000 |
| Bonds authorized | - | - | | 0 |
| Total other sources | 1,016,000 | - | 1,805,803 | 2,821,803 |
| Total resources | 9,149,500 | - | 7,795,177 | 16,944,671 |
| **Appropriations:** | | | | |
| **Current expenses:** | | | | |
| General government | 883,215 | - | 55,125 | 938,340 |
| Education | 2,945,862 | - | 1,847,992 | 4,793,854 |
| Health | 1,576,377 | - | 611,249 | 2,187,626 |
| Welfare | 466,677 | - | 2,781,594 | 3,248,271 |
| Economic development | 253,021 | - | 103,305 | 356,326 |
| Public safety and protection | 1,443,594 | - | 125,785 | 1,569,379 |
| Transportation and communication | 140,374 | - | 34,701 | 175,075 |
| Housing | 20,526 | - | 402,118 | 422,644 |
| Contributions to municipalities | 367,132 | - | 6,766 | 373,898 |
| Special pension contributions | 334,553 | - | 0 | 334,553 |
| Debt service | 200,813 | - | 115,743 | 316,556 |
| Other debt service (appropriations) | 517,156 | - | 659,435 | 1,176,591 |
| Total appropriations – current expenses | 9,149,300 | - | 6,743,813 | 15,893,113 |
| Capital improvements | 200 | - | 192,686 | 192,886 |
| Total appropriations | 9,149,500 | - | 6,936,499 | 16,085,999 |
| Year-end balance | 0 | - | 858,678 | 858,678 |
| Total appropriations and year-end balance | 9,149,500 | - | 7,795,177 | 16,944,677 |

---

\*   Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources: Treasury Department and Office of Management and Budget*

The budget for fiscal year 2011 provides for total resources of $16.9 billion and total General Fund revenues of $9.150 billion, compared to General Fund revenues of $10.191 billion for fiscal year 2010. The budgeted General Fund revenues of $9.150 billion include base revenues of $7.525 billion, $609 million from tax enforcement and compliance measures and $1.016 billion in additional revenues from COFINA Stabilization Fund.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2010 budget are accounted mainly by projected increases in new temporary excise tax under Act 154 (up $609.0 million), retained non-resident income taxes (up $121.2 million), excise taxes on motor vehicles and accessories (up $24.6 million), cigarettes taxes (up $27.5 million), sales and use taxes (up $16.1 million) and property taxes (up $10.5 million) and projected decreases in federal excise taxes on offshore shipments (down $15.3 million), corporate income tax (down $111.7 million) and personal income taxes (down $226.8 million).

The fiscal year 2011 budget provides for total expenditures of $9.150 billion, consisting of General Fund expenditures of $8.134 billion and additional expenditures of $1.016 billion that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2011 are $9.150 billion, or 10%, lower than budgeted total expenditures of $10.170 billion for fiscal year 2010, and $1.740 billion, or 16%, lower than total expenditures of $10.890 billion for fiscal year 2009.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $16.1 billion, a decrease of $1,043.8 million from fiscal year 2010 budgeted appropriations. The principal changes in General Fund expenditures by program areas in fiscal year 2011 compared to the fiscal year 2010 budget are mainly due to increases in other debt service appropriations (up $144.0 million), economic development (up $59.9 million), and special pension contributions (up $20.9 million) and decreases in general government (down $834 million), welfare (down $5.2 million), public safety and protection (down $37.9 million), general obligation bonds debt service (down $88.9 million), health (down $102.4 million) and education (down $120.8 million).

## Proposed Budget for Fiscal Year 2012

The following table presents a summary of the Commonwealth's central government proposed budget for the fiscal year ending June 30, 2012.

**Commonwealth of Puerto Rico**
**Summary of Central Government Annual Budget**
**Fiscal Year Ending June 30, 2012**
**(in thousands)***

| | General and Stabilization Fund | Bond Fund | Special Funds | Total |
|---|---|---|---|---|
| Revenues from internal sources: | | | | |
| Property taxes | $   76,000 | - | $ 116,321 | $  192,321 |
| Personal income taxes | 2,109,000 | - | - | 2,109,000 |
| Retained non-resident income tax | 980,000 | - | - | 980,000 |
| Corporate income taxes | 1,515,000 | - | - | 1,515,000 |
| Partnership income taxes | 2,000 | - | - | 2,000 |
| Tollgate taxes | 5,000 | - | - | 5,000 |
| 17% withholding tax on interest | 8,000 | - | - | 8,000 |
| 10% withholding tax on dividends | 28,000 | - | - | 28,000 |
| Inheritance and gift taxes | 5,000 | - | - | 5,000 |
| Sales and use taxes | 680,000 | - | - | 680,000 |
| Excise taxes: | | - | - | |
| Alcoholic beverages | 298,000 | - | - | 298,000 |
| Foreign (Act 154) | 1,578,000 | - | - | 1,578,000 |
| Motor vehicles and accessories | 361,000 | - | - | 361,000 |
| Cigarettes | 210,000 | - | - | 210,000 |
| Other (excise taxes) | 78,000 | - | 724,573 | 802,573 |
| Licenses | 79,000 | - | - | 79,000 |
| Miscellaneous non-tax revenues: | | - | - | |
| Contributions from lottery fund | 45,000 | - | - | 45,000 |
| Electronic lottery | 83,000 | - | - | 83,000 |
| Registration and document certification fees | 154,000 | - | - | 154,000 |
| Other | 85,000 | - | 423,978 | 508,978 |
| Total revenues from internal sources | 8,379,000 | - | 1,264,872 | 9,643,872 |
| Revenues from non-Commonwealth sources: | | | | |
| Federal excise taxes on off-shore shipments | 271,000 | - | - | 271,000 |
| Federal grants[1] | 0 | - | 4,784,271 | 4,784,271 |
| Customs | 0 | - | - | 0 |
| Total revenues from non-Commonwealth sources | 271,000 | - | 4,784,271 | 5,055,271 |
| Total revenues | 8,650,000 | - | 6,049,143 | 14,699,143 |
| Other: | | | | |
| Balance from previous year | 0 | - | 858,678 | 858,678 |
| COFINA Stabilization Fund | 610,000 | - | - | 610,000 |
| Bonds authorized | 0 | - | - | 0 |
| Total other sources | 610,000 | - | 858,678 | 1,468,678 |
| Total resources | 9,260,000 | - | 6,907,821 | 16,167,821 |
| Appropriations: | | | | |
| Current expenses: | | | | |
| General government | 821,799 | - | 61,252 | 883,051 |
| Education | 3,094,207 | - | 1,728,895 | 4,823,102 |
| Health | 1,363,697 | - | 541,763 | 1,905,460 |
| Welfare | 442,723 | - | 2,685,719 | 3,128,442 |
| Economic development | 370,643 | - | 110,088 | 480,731 |
| Public safety and protection | 1,522,577 | - | 104,387 | 1,626,964 |
| Transportation and communication | 152,561 | - | 38,107 | 190,668 |
| Housing | 18,814 | - | 402,647 | 421,461 |
| Contributions to municipalities | 393,085 | - | 5,643 | 398,728 |
| Special pension contributions | 420,312 | - | 0 | 420,312 |
| Debt service | 179,359 | - | 116,321 | 295,680 |
| Other debt service (appropriations) | 480,223 | - | 735,181 | 1,215,404 |
| Total appropriations – current expenses | 9,260,000 | - | 6,530,003 | 15,790,003 |
| Capital improvements | 0 | - | 153,123 | 153,123 |
| Total appropriations | 9,260,000 | - | 6,683,126 | 15,943,126 |
| Year-end balance | 0 | - | 224,695 | 224,695 |
| Total appropriations and year-end balance | $9,260,000 | - | $6,907,821 | $16,167,821 |

---

*   Totals may not add due to rounding.
(1) Does not include grants received by agencies whose accounting systems are not centralized in the Treasury Department.
*Sources:  Treasury Department and Office of Management and Budget*

The proposed budget provides for total resources of $16.2 billion and total General Fund revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes base revenues of $7.072 billion, $1.578 billion from tax enforcement and compliance measures and $610.0 million in additional revenues from COFINA Stabilization Fund.

The principal changes in budgeted General Fund revenues compared to the fiscal year 2011 budget are accounted mainly by the projected collections from the new temporary excise tax under Act 154 (up $969.0 billion), sales and use taxes (up $125.0 million), retained non-resident income taxes (up $28.5 million), alcoholic beverage (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 proposed budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA deposited in the Stabilization Fund. The budgeted total expenditures for fiscal year 2012 are $9.260 billion, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $910.0 million, or 8.9%, lower than total expenditures of $10.170 billion for fiscal year 2010.

Budgeted expenses and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations. The principal changes in General Fund expenditures by program in fiscal year 2012 compared to the fiscal year 2011 budget are mainly due to increases in education (up $148.3 million), economic development (up $117.6 million), special pension contributions (up $85.8 million), contributions to municipalities (up $25.9 million) public safety and protection (up $79.0 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $24.0 million), other debt service appropriations (down $36.9 million) and health (down $212.7 million).

**Differences between Budget and Basic Financial Statements**

Revenues and expenditures, as reported by the Treasury Department in its Basic Financial Statements, may differ substantially from resources and appropriations in the annual budget for a number of reasons, including the following:

(i)     The budgetary accounts are on a cash basis, while financial statements prepared by the Treasury Department include accruals and other adjustments as required by government accounting standards.

(ii)     Expenditures for current purposes in a particular fiscal year may include amounts appropriated for earlier periods but not previously expended or amounts not budgeted for a particular fiscal year, but expended during that year, and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.

(iii)     Bonds are authorized by the Commonwealth in accordance with a four-year capital improvement program. Since bond sales are determined by bond market conditions and other factors, the amounts of bonds sold for these improvements are financed by advances from

the General Fund to the Capital Projects Fund, which are later reimbursed from proceeds of bond or notes sales.

## LITIGATION

*General.* The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of routine governmental operations. Under Act No. 104 of June 25, 1955, as amended ("Act 104"), persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act No. 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under the Act in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation, excluding the litigation mentioned in the following paragraphs, as of June 30, 2010, the Commonwealth has included in its financial statements reported liabilities of approximately $421 million for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed exceed $7 billion; however, the ultimate liability cannot be presently determined. The Commonwealth believes that the claims are excessive and that the ultimate liability in excess of amounts provided in the financial statements, if any, would not be significant.

*Constitutionality of Act 7.* On April 13, 2009, a group of government employees along with labor organizations that represent governmental employees filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor of Puerto Rico and several agency heads. In the complaint, the plaintiffs challenge the constitutionality of Act 7 and seek, among other relief, an injunction to stop the Government of Puerto Rico from implementing the cost-cutting provisions of Act 7, described above in "Fiscal and Economic Reconstruction—Expense Reduction Measures" under THE ECONOMY.

On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. Plaintiffs have appealed the Court's decision. On August 5, 2009, the U.S. District Court for the District of Puerto Rico denied the requested preliminary injunction and, on December 14, 2009, the court dismissed the complaint. On December 15, 2009, the plaintiffs appealed the District Court's decision to the U.S. Court of Appeals for the First Circuit and, on January 27, 2011, the

District Court's decision was affirmed. The Supreme Court of Puerto Rico previously upheld the constitutionality of the provisions of Act 7 relating to employee dismissals.

*Recovery of Medicaid Funds.* The Commonwealth is a defendant in two lawsuits filed, one in Commonwealth court and one in the U.S. District Court for the District of Puerto Rico, by certain Federally Qualified Health Centers ("FQHC") seeking to recover from the Commonwealth approximately $800 million in Medicaid wraparound payments which the Department of Health failed to make since 1997. In June 2004, the Superior Court of the Commonwealth in San Juan determined that the Commonwealth must make Medicaid "wraparound" payments to the health centers to cover the difference between the reimbursement they are owed and what they are paid by managed care organizations. The Court of Appeals of Puerto Rico, however, upheld a partial ruling allowing the Commonwealth to deduct from the payments due to the FQHCs certain grants received by these centers from the federal government. Currently, attorneys in the case filed in Commonwealth court are trying to determine the amounts due to FQHCs thereunder.

With respect to the federal case, in February 2005, the U.S. Court of Appeals (First Circuit) upheld a preliminary injunction issued by the U.S. District Court for the District of Puerto Rico requiring the Commonwealth to make Medicaid "wraparound" payments to the health centers. In December 2008, the U.S. Court of Appeals determined that the U.S. District Court erred when it vacated the preliminary injunction entered against two of the FQHCs and determined that the Department of Health had met its obligations to establish and implement a payment system for FQHCs in compliance with the federal Medicaid statute. The U.S. Court of Appeals reversed the District Court's order vacating the preliminary injunction and remanded the case for further proceedings.

Recently, the Court entered a preliminary injunction as to the remaining 15 health centers, and granted a request by the Department of Health for Eleventh Amendment sovereign immunity. The plaintiff FQHCs immediately filed an appeal regarding the issue of Eleventh Amendment.

Meanwhile, the Department of Health filed a counter appeal regarding the Court's interpretation of certain components of the wraparound formula that must be used under the preliminary injunction to calculate wraparound payments owed to the plaintiffs. The Department has already made approximately $8 million in uncontested wraparound payments owed under the injunction. However, the Court granted the Department's request for a stay pending appeal regarding payment of an additional $14.5 million that are owed under the Court's wraparound formula.

As of June 30, 2010, the Commonwealth accrued $280 million in its financial statements for this legal contingency.

*Special Education Students.* The Commonwealth is also a defendant in a class action presented in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be

provided. Since December 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January 2006. In February 8, 2010, the court issued a resolution advancing its intention to establish a new scheme of fines ranging from $0.25 to $0.75 daily per registered student. As of February 2010, there were 121,339 students registered in the Special Education Program. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate 2 experts) in 6 areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are the claims for damages regarding the failure to provide adequate services. In 2005, the Court of First Instance denied damages for the class as a whole. The plaintiffs appealed the decision and, in October 2005, the Court of Appeals decided that there could be no general damages award, but that every member of the class must come forward and prove their individual damages within this case. Assuming the Court grants damages to the plaintiffs, the Commonwealth estimates that each plaintiff could receive at least $5,000. Based on a current enrollment of 120,000 students, the total award could amount to at least $600 million. The Commonwealth plans to defend vigorously each case.

The plaintiffs approached the Commonwealth to inquire about its disposition to reach a settlement agreement regarding the damages phase. At the Commonwealth's request, the plaintiffs submitted a settlement offer. Settlement conversations stopped after the parties reached an impasse during negotiations.

As of June 30, 2010, the Commonwealth had accrued $600 million in its financial statements for this legal contingency.

*Other*. The Commonwealth and various component units are defendants in other lawsuits alleging violations of civil rights, breach of contract, and other damage claims. Preliminary hearings and discovery proceedings are in progress. No provision for any liability that may result upon adjudication of these lawsuits has been recognized by the Commonwealth. The Commonwealth believes that the ultimate liability, if any, would not be significant.

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX II

## PROPOSED FORM OF OPINION OF BOND COUNSEL

**GT GreenbergTraurig**

[Closing Date]

Secretary of the Treasury of the
  Commonwealth of Puerto Rico
Department of the Treasury
San Juan, Puerto Rico

RE:    $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011, $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E

Dear Mr. Secretary:

      We have acted as bond counsel to the Commonwealth of Puerto Rico (the "Commonwealth") in connection with the issuance of $304,000,000 Commonwealth of Puerto Rico Public Improvement Bonds of 2011 (the "2011 Bonds"), and $52,190,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 D and $245,915,000 Commonwealth of Puerto Rico Public Improvement Refunding Bonds, Series 2011 E (together the "Refunding Bonds," and collectively with the 2011 Bonds, the "Bonds"). In such capacity we have examined Act No. 79 of the Legislative Assembly of Puerto Rico, approved June 1, 2011 ("Act No. 79"), Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended ("Act No. 33," and together with Act No. 79, the "Acts"), and such other law and such certified proceedings and other documents as we have deemed necessary to render this opinion, including a resolution adopted by the Secretary of the Treasury of the Commonwealth (the "Secretary") and approved by the Governor of the Commonwealth on June 29, 2011 (the "Bond Resolution"). We also have examined one of the Bonds of each series as executed and authenticated.

      The 2011 Bonds are issued pursuant to Act No. 79 and the Bond Resolution and the Refunding Bonds are issued pursuant to Act No. 33 and the Bond Resolution. The Bonds mature on July 1 of the years and in such principal amounts and bearing interest at the rates, all as set forth in the Bond Resolution. The Bonds are issuable as registered Bonds without coupons in the manner and in accordance with the terms and conditions of the Bond Resolution.

      Regarding questions of fact material to our opinion, we have relied on representations of the Secretary contained in the Bond Resolution, and the certified proceedings and other certifications of public officials and others furnished to us without undertaking to verify the same by independent investigation.

      Based on the foregoing, we are of opinion that, under existing law:

    1.     The Acts are valid.

2. Said proceedings have been validly and legally taken.

3. The Acts and such proceedings and certifications show lawful authority for the issuance and sale of the Bonds, and the Bonds constitute valid and binding general obligations of the Commonwealth for the payment of the principal of and the interest on the Bonds, to which the good faith, credit and taxing power of the Commonwealth are pledged.

4. Under the provisions of the Acts of Congress now in force and under existing regulations, rulings and court decisions, (i) subject to compliance with the covenant referred to below and requirements of the Internal Revenue Code of 1986, as amended (the "Code"), and the Resolution regarding the use, expenditure and investment of Bond proceeds and the timely payment of certain investment earnings to the Treasury of the United States, if required, interest on the Bonds is not includable in gross income for federal income tax purposes, and (ii) the Bonds and the interest thereon are exempt from state, Commonwealth, and local income taxation.

Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations. However, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. The Code contains other provisions that could result in tax consequences, upon which we express no opinion, as a result of (i) ownership of Bonds, or (ii) the inclusion in certain computations of interest that is excluded from gross income.

The Commonwealth has covenanted to comply with the requirements of the Code, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds will remain exempt from federal income taxes to which it is not subject on the date of issuance of the Bonds. We are not aware of any provisions of the Constitution or laws of the Commonwealth which would prevent the Commonwealth from complying with the requirements of the Code.

The opinions expressed herein are for the benefit of the addressees only and may not be quoted, circulated, assigned or delivered to any other person or for any other purpose without our prior written consent. The opinions expressed herein are based on an analysis of existing laws, including regulations, rulings, official interpretations of law issued by the United States Internal Revenue Service, and court decisions on or prior to the date hereof. Such opinions may be adversely affected by actions taken or events occurring, including a change in law, regulation or ruling (or in the application or official interpretation of any law, regulation or ruling) after the date hereof. We have not undertaken to determine, or to inform any person, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

Respectfully submitted,

Greenberg Traurig, LLP

**APPENDIX III**



**MUNICIPAL BOND
INSURANCE POLICY**

ISSUER:

Policy No:     -N

BONDS:   $ in aggregate principal amount of

Effective Date:

Premium: $

     ASSURED GUARANTY MUNICIPAL CORP. ("AGM"), for consideration received, hereby UNCONDITIONALLY AND IRREVOCABLY agrees to pay to the trustee (the "Trustee") or paying agent (the "Paying Agent") (as set forth in the documentation providing for the issuance of and securing the Bonds) for the Bonds, for the benefit of the Owners or, at the election of AGM, directly to each Owner, subject only to the terms of this Policy (which includes each endorsement hereto), that portion of the principal of and interest on the Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

     On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which AGM shall have received Notice of Nonpayment, AGM will disburse to or for the benefit of each Owner of a Bond the face amount of principal of and interest on the Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by the Issuer, but only upon receipt by AGM, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in AGM. A Notice of Nonpayment will be deemed received on a given Business Day if it is received prior to 1:00 p.m. (New York time) on such Business Day; otherwise, it will be deemed received on the next Business Day. If any Notice of Nonpayment received by AGM is incomplete, it shall be deemed not to have been received by AGM for purposes of the preceding sentence and AGM shall promptly so advise the Trustee, Paying Agent or Owner, as appropriate, who may submit an amended Notice of Nonpayment. Upon disbursement in respect of a Bond, AGM shall become the owner of the Bond, any appurtenant coupon to the Bond or right to receipt of payment of principal of or interest on the Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Bond, to the extent of any payment by AGM hereunder. Payment by AGM to the Trustee or Paying Agent for the benefit of the Owners shall, to the extent thereof, discharge the obligation of AGM under this Policy.

     Except to the extent expressly modified by an endorsement hereto, the following terms shall have the meanings specified for all purposes of this Policy. "Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or the Insurer's Fiscal Agent are authorized or required by law or executive order to remain closed. "Due for Payment" means (a) when referring to the principal of a Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless AGM shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on a Bond, payable on the stated date for payment of interest. "Nonpayment" means, in respect of a Bond, the failure of the Issuer to have provided sufficient funds to the Trustee or, if there is no Trustee, to the Paying Agent for payment in full of all principal and interest that is Due for Payment on such Bond. "Nonpayment" shall also include, in respect of a Bond, any payment of principal or interest that is Due for Payment made to an Owner by or on behalf of the Issuer which    has    been    recovered    from    such    Owner    pursuant    to    the

Page 2 of 2
Policy No. -N

United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction. "Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Trustee or the Paying Agent to AGM which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment. "Owner" means, in respect of a Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof, except that "Owner" shall not include the Issuer or any person or entity whose direct or indirect obligation constitutes the underlying security for the Bonds.

AGM may appoint a fiscal agent (the "Insurer's Fiscal Agent") for purposes of this Policy by giving written notice to the Trustee and the Paying Agent specifying the name and notice address of the Insurer's Fiscal Agent. From and after the date of receipt of such notice by the Trustee and the Paying Agent, (a) copies of all notices required to be delivered to AGM pursuant to this Policy shall be simultaneously delivered to the Insurer's Fiscal Agent and to AGM and shall not be deemed received until received by both and (b) all payments required to be made by AGM under this Policy may be made directly by AGM or by the Insurer's Fiscal Agent on behalf of AGM. The Insurer's Fiscal Agent is the agent of AGM only and the Insurer's Fiscal Agent shall in no event be liable to any Owner for any act of the Insurer's Fiscal Agent or any failure of AGM to deposit or cause to be deposited sufficient funds to make payments due under this Policy.

To the fullest extent permitted by applicable law, AGM agrees not to assert, and hereby waives, only for the benefit of each Owner, all rights (whether by counterclaim, setoff or otherwise) and defenses (including, without limitation, the defense of fraud), whether acquired by subrogation, assignment or otherwise, to the extent that such rights and defenses may be available to AGM to avoid payment of its obligations under this Policy in accordance with the express provisions of this Policy.

This Policy sets forth in full the undertaking of AGM, and shall not be modified, altered or affected by any other agreement or instrument, including any modification or amendment thereto. Except to the extent expressly modified by an endorsement hereto, (a) any premium paid in respect of this Policy is nonrefundable for any reason whatsoever, including payment, or provision being made for payment, of the Bonds prior to maturity and (b) this Policy may not be cancelled or revoked. THIS POLICY IS NOT COVERED BY THE PROPERTY/CASUALTY INSURANCE SECURITY FUND SPECIFIED IN ARTICLE 76 OF THE NEW YORK INSURANCE LAW.

In witness whereof, ASSURED GUARANTY MUNICIPAL CORP. has caused this Policy to be executed on its behalf by its Authorized Officer.



ASSURED GUARANTY MUNICIPAL CORP.


By _____
                Authorized Officer

Form 500NY (5/90)

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

Case:17-03283-LTS Doc#:4606-7 Filed:01/02/19 Entered:01/02/19 16:23:38 Desc: H R to the Peter Hein Declaration Page 369 of 447



Printed by: ImageMaster

Exhibit N

United States District Court for the District of Puerto Rico / Tribunal de Distrito de los Estados Unidos para el Distrito de Puerto Rico

| Fill in this information to identify the case (Select only one Debtor per claim form). / Llene esta información para identificar el caso (seleccione sólo un deudor por formulario de reclamación). | | |
|---|---|---|
| ☐ Commonwealth of Puerto Rico<br>El Estado Libre Asociado de Puerto Rico | Case No. 17-bk-03283 | Petition Date:<br>May 3, 2017 |
| ☒ Puerto Rico Sales Tax Financing Corporation (COFINA)<br>La Corporación del Fondo de Interés Apremiante de Puerto Rico | Case No. 17-bk-03284 | Petition Date:<br>May 5, 2017 |
| ☐ Puerto Rico Highways and Transportation Authority<br>La Autoridad de Carreteras y Transportación de Puerto Rico | Case No. 17-bk-03567 | Petition Date:<br>May 21, 2017 |
| ☐ Employees Retirement System of the Government of the<br>Commonwealth of Puerto Rico<br>El Sistema de Retiro de los Empleados del Gobierno del Estado<br>Libre Asociado de Puerto Rico | Case No. 17-bk-03566 | Petition Date:<br>May 21, 2017 |
| ☐ Puerto Rico Electric Power Authority<br>La Autoridad de Energía Eléctrica de Puerto Rico | Case No. 17-bk-04780 | Petition Date:<br>July 2, 2017 |

**RECEIVED**

MAY 0 4 2018

PRIME CLERK LLC

Modified Official Form 410 / Formulario Oficial 410 Modificado

# Proof of Claim / Evidencia de reclamación

04/16

Read the instructions before filling out this form. This form is for making a claim for payment in a Title III case. Do not use this form to make a request for payment of an administrative expense, other than a claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9). Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy or subject to confidentiality on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

Lea las instrucciones antes de completar este formulario. Este formulario está diseñado para realizar una reclamación de pago en un caso en virtud del Título III. No utilice este formulario para solicitar el pago de un gasto administrativo que no sea una reclamación que reúna los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b) (9) del U.S.C. Ese tipo de solicitud debe realizarse de conformidad con el Título 11 § 503 del U.S.C.

Quienes presenten la documentación deben omitir o editar información que reúna los requisitos para ser tratada con privacidad o confidencialidad en este formulario o en cualquier otro documento adjunto. Adjunte copias editadas de cualquier otro documento que respalde la reclamación, tales como pagarés, órdenes de compra, facturas, balances detallados de cuentas en funcionamiento, contratos, resoluciones judiciales, hipotecas y acuerdos de garantías. No adjunte documentos originales, ya que es posible que los documentos adjuntos se destruyan luego de analizarlos. En caso de que los documentos no estén disponibles, explique los motivos en un anexo.

Fill in all the information about the claim as of the Petition Date.

Complete toda la información acerca de la reclamación a la fecha en la que se presentó el caso.

☑ Date Stamped Copy Returned
☐ No Self-Addressed Stamped Envelope
☐ No Copy Provided

| **Part 1 / Parte 1** | Identify the Claim / Identificar la reclamación |
|---|---|

1. Who is the current creditor?

   ¿Quién es el acreedor actual?

   Peter C. Hein

   Name of the current creditor (the person or entity to be paid for this claim)
   Nombre al acreedor actual (la persona o la entidad a la que se le pagará la reclamación)

   Other names the creditor used with the debtor
   Otros nombres que el acreedor usó con el deudor _____

Exhibit N


170328380002731

Claim 3

| 2. | Has this claim been acquired from someone else?

¿Esta reclamación se ha adquirido de otra persona? | ☒ No / No<br>☐ Yes. From whom?<br>SI. ¿De quién? _____ |

| 3. | Where should notices and payments to the creditor be sent?

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

¿A dónde deberían enviarse las notificaciones al acreedor?

Norma federal del procedimiento de quiebra (FRBP, por sus siglas en inglés) 2002(g | Where should notices to the creditor be sent?<br>¿A dónde deberían enviarse las notificaciones al acreedor?

Peter C. Hein
Name / Nombre

101 Central Park West 14E
Number / Número      Street / Calle

New York, New York 10023
City / Ciudad     State / Estado     ZIP Code / Código postal

(212) 403-1237
Contact phone / Teléfono de contacto

peterchreinsr@gmail.com
Contact email / Correo electrónico de contacto | Where should payments to the creditor be sent? (if different)<br>¿A dónde deberían enviarse los pagos al acreedor? (En caso de que sea diferente)

Name / Nombre

Number / Número      Street / Calle

City / Ciudad     State / Estado     ZIP Code / Código postal

Contact phone / Teléfono de contacto

anne.farley@gmail.com
Contact email / Correo electrónico de contacto |

| 4. | Does this claim amend one already filed?

¿Esta reclamación es una enmienda de otra presentada anteriormente? | ☒ No / No<br>☐ Yes. Claim number on court claims registry (if known) _____<br>SI. Número de reclamación en el registro de reclamaciones judiciales (en caso de saberlo) _____<br>Filed on / Presentada el _____ (MM /DD/YYYY) / (DD/MM/AAAA) |

| 5. | Do you know if anyone else has filed a proof of claim for this claim?

¿Sabe si alguien más presentó una evidencia de reclamación para esta reclamación? | ☒ No / No<br>☐ Yes. Who made the earlier filing?<br>SI. ¿Quién hizo la reclamación anterior? _____ |

**Part 2 / Parte 2:**    Give Information About the Claim as of the Petition Date
Complete toda la información acerca de la reclamación desde la fecha en la que se presentó el caso.

| 6. | Do you have a claim against a specific agency or department of the Commonwealth of Puerto Rico?

¿Tiene una reclamación en contra de algún organismo o departamento específico del Estado Libre Asociado de Puerto Rico? | ☐ No / No<br>☒ Yes. Identify the agency or department and contact name. (A list of Commonwealth of Puerto Rico agencies and departments is available at: https://cases.primeclerk.com/puertorico/.)<br>SI. Identifique el organismo o departamento y nombre del representante. (Una lista de agencias y departamentos del Estado Libre Asociado de Puerto Rico está disponible en: https://cases.primeclerk.com/puertorico/).

See attachment - Items 6 and 9 |

| 7. | Do you supply goods and / or services to the government?

¿Proporciona bienes y / o servicios al gobierno? | ☐ No / No<br>☐ Yes. Provide the additional information set forth below / SI. Proporcionar la información adicional establecida a continuación:

Vendor / Contract Number | Número de proveedor / contrato: _____

List any amounts due after the Petition Date (listed above) but before June 30, 2017:
Anote la cantidad que se le debe después de la fecha que se presentó el caso (mencionados anteriormente), pero antes del 30 de junio de 2017 $ _____

See attachment - Items 7 and 9 |

| 8. How much is the claim? | $ 513,437.50 | Does this amount include interest or other charges? ¿Este importe incluye intereses u otros cargos? |
|---|---|---|
| ¿Cuál es el importe de la reclamación? | | ☐ No / No |
| | | ☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| | | Sí. Adjunte un balance con intereses detallados, honorarios, gastos u otros cargos exigidos por la Norma de Quiebras 3001(c)(2)(A). |
| See attachment, including Item 8 and accompanying documents | | |

| 9. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c). Limit disclosing information that is entitled to privacy, such as health care information. |
|---|---|
| ¿Cuál es el fundamento de la reclamación? | Por ejemplo: Venta de bienes, préstamo de dinero, arrendamiento, prestación de servicios, lesiones personales u homicidio culposo, o tarjetas de crédito. Adjunte copias editadas de cualquier documento que respalde la reclamación conforme a lo exigido por la Norma de Quiebras 3001(c). Limite la divulgación de información que reúne los requisitos para ser tratada con privacidad, tal como información sobre atención médica. |
| | See attachment Item 9 and accompanying documents |

**10. Is all or part of the claim secured?**

¿La reclamación está garantizada de manera total o parcial?

☐ No / No
☒ Yes. The claim is secured by a lien on property.
　　Sí. La reclamación está garantizada por un derecho de retención sobre un bien.

　　　　Nature of property / Naturaleza del bien:
　　　　☐ Motor vehicle / Vehículos

　　　　☒ Other. Describe:
　　　　　Otro. Describir:　　See attachment Items 9 and 10, and accompanying documents

　　　　Basis for perfection / Fundamento de la realización de pasos adicionales: _____

　　　　Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

　　　　Adjunte copias editadas de documentos, si los hubiere, que demuestre la realización de pasos adicionales para hacer valer un derecho de garantía (por ejemplo, una hipoteca, un derecho de retención, un certificado de propiedad, una declaración de financiamiento u otro documento que demuestre que se ha presentado o registrado un derecho de retención.)

　　　　Value of property / Valor del bien:　　　$_____

　　　　Amount of the claim that is secured /
　　　　Importe de la reclamación que está garantizado: $_____

　　　　Amount of the claim that is unsecured /
　　　　Importe de la reclamación que no está garantizado: $_____
　　　　(The sum of the secured and unsecured amounts should match the amount in line 7.)
　　　　(La suma del importe garantizado y no garantizado debe coincidir con el importe de la línea 7.)

　　　　Amount necessary to cure any default as of the Petition Date /
　　　　Importe necesario para compensar toda cesación de pago a la fecha que se presentó el caso : $_____

　　　　Annual Interest Rate (on the Petition Date)
　　　　Tasa de interés anual (cuando se presentó el caso)_____%
　　　　☐ Fixed / Fija
　　　　☐ Variable / Variable

**11. Is this claim based on a lease?**

¿Esta reclamación está basada en un arrendamiento?

☐ No / No
☐ Yes. Amount necessary to cure any default as of the Petition Date.
　　Sí. Importe necesario para compensar toda cesación de pago a partir de la que se presentó el caso$ _____

See attachment - Items 9 and 10

| | |
|---|---|
| 12. Is this claim subject to a right of setoff?<br><br>¿La reclamación está sujeta a un derecho de compensación? | ☒ No / No<br><br>☐ Yes. Identify the property /<br>Sí. Identifique el bien: _____ |

| | |
|---|---|
| 13. Is all or part of the claim entitled to administrative priority pursuant to 11 U.S.C. § 503(b)(9)?<br><br>¿La reclamación, total o parcial, cumple los requisitos para ser tratada como prioridad administrativa conforme al Título 11 § 503(b)(9) del U.S.C.? | ☒ No / No<br><br>☐ Yes. Indicate the amount of your claim arising from the value of any goods received  $ _____<br>by the debtor within 20 days before the Petition Date in these Title III case(s), in which the goods have been sold to the debtor in the ordinary course of such debtor's business. Attach documentation supporting such claim.<br><br>Sí. Indique el importe de la reclamación que surge del valor de cualquier bien recibido por el deudor dentro de los 20 días anteriores a la fecha de inicio en estos casos del Título III, en el que los bienes se han vendido al deudor en el transcurso normal de los negocios del deudor. Adjunte la documentación que respalda dicha reclamación. |

## Part 3 / Parte 3:

**Sign Below / Firmar a continuación**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

La persona que complete esta evidencia de reclamación debe firmar e indicar la fecha. FRBP 9011(b).

Si presenta esta reclamación de manera electrónica, la FRBP 5005(a)(2) autoriza al tribunal a establecer normas locales para especificar qué se considera una firma.

*Check the appropriate box / Marque la casilla correspondiente:*

☒ I am the creditor. / Soy el acreedor.

☐ I am the creditor's attorney or authorized agent. / Soy el abogado o agente autorizado del acreedor.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004. / Soy el síndico, el deudor o su agente autorizado. Norma de quiebra 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005. / Soy el garante, fiador, endosante u otro codeudor. Norma de quiebra 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

Comprendo que una firma autorizada en esta *Evidencia de reclamación* se considera como un reconocimiento de que al calcular el importe de la reclamación, el acreedor le proporcionó al deudor crédito para todo pago recibido para saldar la deuda

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

He leído la información en esta *Evidencia de reclamación* y tengo motivos razonables para suponer que la información es verdadera y correcta.

I declare under penalty of perjury that the foregoing is true and correct. / Declaro bajo pena de perjurio que lo que antecede es verdadero y correcto.

Executed on date / Ejecutado el  05/03/2018 (MM/DD/YYYY) / (DD/MM/AAAA)

Signature / Firma

Print the name of the person who is completing and signing this claim / Escriba en letra de imprenta el nombre de la persona que completa y firma esta reclamación:

| Name | Peter C. Hein | | |
|---|---|---|---|
| | First name / Primer nombre | Middle name / Segundo nombre | Last name / Apellido |

Title / Cargo _____

Company / Compañía _____
Identify the corporate servicer as the company if the authorized agent is a servicer.
Identifique al recaudador corporativo como la compañía si el agente autorizado es un recaudador.

| Address / Dirección | 101 Central Park West Apt 14E | | |
|---|---|---|---|
| | Number / Número  Street / Calle | | |
| | New York | NY | 10023 |
| | City / Ciudad | State / Estado | ZIP Code / Código postal |

Contact phone / Teléfono de contacto (212) 403 - 1237  Email / Correo electrónico  petercheinsr@gmail.com
anne.farley@gmail.com

3129977
5/2/2018

## Attachment to Proof of Claim of Peter C. Hein – Claim 3

**Debtor:** Puerto Rico Sales Tax Financing Corporation (COFINA) – Case No. 17-bk-03284

This attachment supplies additional or more specific information in response to the items on the proof of claim form to which this attachment is attached. The claims of Peter C. Hein and Anne Farley (who are married) are sequentially number beginning "Claim 1". Pages in each claim may also be sequentially numbered.

1.   Creditor: Peter C. Hein (hereinafter "Creditor")

2.   This claim has not been acquired from someone else.

3.   Notices and payments to the creditor should be sent to:

Peter C. Hein
101 Central Park West, Apt. 14E
New York, NY 10023

Contact phone: (212) 403-1237
Contact email: petercheinsr@gmail.com
Second contact email: anne.farley@gmail.com

4.   This claim does not amend one already filed.

5.   Creditor does not know if anyone else has filed a proof of claim for this claim.

6.   In addition to debtor, as described in item 9 below, claim is asserted against all agencies or departments with responsibility for, or liability on, the claim.

7.   Creditor purchased bonds at the original offering price.

8.   Current amount of claim is $513,437.50.

Claim is also made for all unpaid interest as well as any other fees, expenses or charges for which Creditor is entitled to recover.

Principal amount of the bonds is $500,000.

The approximate interest owed to date but not paid as required is $13,437.50.

In addition claim is made for all additional interest that has, will, or should accrue, or has, will, or should be paid, under the terms of the bonds or otherwise.

3129977v3                    5

9.   Basis of the claim:  Creditor purchased the bonds at the original offering price, which was at par or close to par for the current interest bonds issued in June 2010.  Attached as Exhibit A are copies of purchase confirmation(s), including the name of the original purchaser and current beneficial holder (some broker-age confirmations were issued on a "household" mailing basis:  Peter C. Hein and Anne Farley are married, and some "household" mailings may come ad-dressed to Anne Farley even if Peter C. Hein is the actual purchaser; for confi-dentiality reasons, in accordance with the instructions, account numbers are re-dacted and thus the name of the purchaser and beneficial holder is specified in-stead of account numbers).

The bonds were rated as investment grade investments at the time of issuance (and of the purchases) by the major rating agencies to rate them.  One premise of the bond purchases – like other purchases of investment grade municipal bonds – is that the issuer will comply with contractual, legal and Constitutional obligations in effect at the time the issuer sells the bonds and accepts the pur-chaser's money, and that the administrative, legislative, executive and judicial authorities will adhere to, and enforce, the rule of law and the United States Constitution.  Claimant asserts and reserves all rights and claims, including all rights and claims under applicable law, including but not limited to the United States Constitution and the Puerto Rico Constitution, relating to the failure of the issuer, as well as Puerto Rican and United States administrative, legislative, executive and judicial authorities, to adhere to, and to enforce, the rule of law, including but not limited to all rights and claims to the return of monies paid by Claimant.  Attached as Exhibit B are illustrative and non-exhaustive discussions of the failure to adhere to, and to enforce, the rule of law by such authorities.

Claimant also asserts and reserves all rights and claims asserted in these pro-ceedings by other holders of the type of bonds purchased and held by Claimant.  Claimant asserts and reserves the right to amend or supplement this claim.  This claim is asserted against not only debtor but also any and all agencies or de-partments with responsibility for, or liability on, the claim; and any and all per-sons and entities who have received or hold or direct or control funds that should have been used to repay the money provided to the issuer by Claimant.

10.  Claimant believes the claim is fully secured.  Reference is made to information and descriptions of security for the bonds provided in the offering statements for the bonds, the bond indentures (or similar documents), statements of the issuer and other Commonwealth agencies and departments (including the GDB) and other documentation and materials, including documentation and materials ref-erenced in the offering statements or bond indentures (or similar documents) or in other statements of the issuer and other Commonwealth agencies and depart-ments.

11.  See response to item 10 above.

6

12. Claim is not subject to a right of set-off.

**MORGANSTANLEY SMITHBARNEY LLC**
1030 BROAD STREET
3RD FLOOR
SHREWSBURY NJ 07702

Morgan Stanley
SmithBarney

Account Number:
Financial Advisor:     John Caracappa
                      732-389-5130

Page 1 of 1

175ND121 008145

PETER C HEIN                    #4,259
101 CENTRAL PARK WEST
APT. 14E
NEW YORK NY 10023-4250

| | |
|---|---|
| Summary For Settlement Date | 06/30/2010 |
| Total Purchases | $ 248,750.00 |
| Net Amount | $ 248,750.00 Debit |

---

You Bought 250,000 at a price of 99.50000

PUERTO RICO SALES TAX FING
CORP SALES TAX REV FIRST
B/E REV OID D6/30/10 F/C2/1/11
YTM    5.411
 5.3750% FA-01 DUE 08/01/2036
NEXT CALL:08/01/20 AT 100.000
CALLABLE
WHEN, AS AND IF ISSUED
ORIGINAL ISSUE DISCOUNT
OID YLD  5.410%/ 99.500 PRICE
REVENUE
SEE CORP/MUNI BONDS NOTE BELOW

| | |
|---|---|
| Gross Amount | $ 248,750.00 |
| Amount | $ 248,750.00 |
| Settlement Date | 06/30/2010 |

Trade Date: 06/24/2010        CUSIP#: 74529J-LH-6        Solicited Order
Market: Underwriting          Security#: 2701453         Cash Acct.        HOLD SECURITIES
                                                         Ref #: 1399431

Morgan Stanley Smith Barney LLC acted as principal in this transaction.

---

Please note that a copy of the Official Statement for the above referenced security can be obtained directly from www.emma.msrb.org or by calling 1-866-830-8180.

Corp/Muni Bonds
Bonds can be called prior to maturity, which may reduce yield. Ordinary call information is above. Other call features may exist. Bond prices fluctuate reflecting market interest rates and the issuer's credit status.

Exhibit A

Account carried by Citigroup Global Markets Inc. Member SIPC. Morgan Stanley Smith Barney LLC. Member SIPC.
As a reminder, payment for securities purchased, or delivery of securities sold, must be deposited by Settlement Date.
See reverse for further details. Keep this document for your records. Thank you for your business.

06/24/2010   XO-005279-L

**Merrill Lynch**
Bank of America Corporation
Wealth Management

**Merrill Lynch**
**Office Serving Your Account**
1251 AVE OF THE AMERICAS
24 TH FL NY NY 10020
(212) 382-8500

PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023

XN 000000  819 493 011567 #@01 AT 0.365

TO THE HOUSEHOLD OF

101 CENTRAL PARK WEST #14E
NEW YORK NY 10023-4250

TRADE CONFIRMATIONS FOR THE FOLLOWING ACCOUNTS INCLUDED IN THIS PACKAGE:

PETER C HEIN
101 CENTRAL PARK W # 14E
NEW YORK NY 10023

Account Number

# TRADE CONFIRMATION

Date:  November 16, 2011

*We confirm the following transaction(s) subject to the agreement below.*

**BOUGHT** *PUERTO RICO SALES TAX FING CORP SALES TAX REV FIRST DD11/11  SER A-2*
*6.5% CI SUBSER*

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Quantity | 250000 | Price | 14.970000 | Amount | 37425.00 | Trade Date | 11/16/11 |
| Processing Fee | | | | | | Settle Date | 11/23/11 |
| Transaction Fee | | | | | | ML Symbol | |
| Accrued Interest/Dividends | | | | | | Security # | RHDR9 |
| | | | | | | Cusip # | 74529JMB8 |
| NET AMOUNT | | | | | 37425.00 | FA # | 7982 |

0 PCT 8/01/2041   YIELD 6.50% @ $14.97 8/01/41 NON CALLABLE.   INTEREST FROM
11/23/11. NO PERIODIC INTEREST PAYMENTS.  UNSOLICITED ORDER. BOOK ENTRY ONLY.

ML ACTED AS PRINCIPAL

**Payment for securities or other investment instruments purchased, and delivery of securities or other investment instruments sold,
are due not later than SETTLEMENT DATE unless otherwise indicated by a DATE DUE. Please preserve this confirmation for income
tax purposes. If submitting a check, money order or correspondence, please write your account number, forward to "Merrill Lynch
Office Serving your Account", shown at the top of the page above your account number. If you have moved or plan to move notify
your Financial Advisor of your new address.**

Merrill Lynch Wealth Management makes available products and services offered by Merrill Lynch, Pierce, Fenner & Smith
Incorporated (MLPF&S) and other subsidiaries of Bank of America Corporation. MLPF&S is a registered broker-dealer, member
Securities Investor Protection Corporation (SIPC) and a wholly owned subsidiary of Bank of America Corporation. Investment
products:

| Are Not FDIC Insured | Are Not Bank Guaranteed | May Lose Value |
|---|---|---|

Account Number:              Date:  11/16/2011                Page 1 of 2

9

| ISSUER | DUE DATE | FACE AMT | INT RATE | BROKER | ANN INTEREST | Semi An Int | 17-Aug | 18-Feb | Default to date |
|---|---|---|---|---|---|---|---|---|---|
| Puerto Rico Sales Tax Fing Corp Sales Tax Rev First B/E/ Rev OID D6/30/10 | 8/1/1936 | $ 250,000 | 5.375% | MS | $ 13,437.50 | $ 6,718.75 | $ 6,718.75 | $ 6,718.75 | $ 13,437.50 |



Source content from
**orrick**

hosted by
**THE BOND BUYER**

DATE: APRIL 19, 2018  TIME: 1 PM ET/ 10 AM PT

# THE BOND BUYER

≡
The Latest (0/5)

# Commentary Puerto Rico: Hard Case, Destabilizing Decisions

By Len Weiser-Varon , William Kannel
Published March 21 2018, 4:10pm EDT

More in Bankruptcy, PROMESA, Puerto Rico

Print

The economic and storm-related woes of Puerto Rico are of a scale that regrettably ensures plenty of human and financial pain for the foreseeable future. Under the best of circumstances, participants in our financial systems sometimes elevate short-term results or tactics over longer-term consequences; stressed situations, including large scale financial meltdowns, can exacerbate such tendencies. The battles among Puerto Rico officials and various creditor groups to maximize their respective slices of Puerto Rico's depleted resources already have yielded several decisions with legal implications that are not salutary for the market as a whole. Some of the legal precedents potentially being set, whether or not technically binding outside Puerto Rico or the 1st Circuit, erode the expectations and good

Exhibit B

order of the municipal bond marketplace that finances the activities of states and municipal instrumentalities nationwide.

## William Kannel, Mintz Levin



It is unsurprising that creditors and Puerto Rico officials would employ all available legal tactics to achieve what they perceive as an outcome that makes the best of a bad situation for their respective interests. Federally-established institutions such as the financial oversight management board for Puerto Rico (FOMB) and the federal district court to which Puerto Rico's Title III insolvency proceedings have been assigned, in contrast, should be expected to balance the legitimate, and legally-founded, interests and expectations of Puerto Rico and its creditors. It is unsettling, therefore, that the FOMB and the federal district court are at the center of decisions which market participants perceive as circumventing or disregarding inconvenient, to Puerto Rico, provisions of both Puerto Rico and federal bankruptcy law.

These developments in the Puerto Rico bond battles have led some market participants to question whether the rule of law is a meaningful concept in such meltdowns, never a healthy

development for a market involving investment of trillions of dollars. The list of particulars below is illustrative:

ADVERTISING

inRead invented by Teads

**FOMB challenges Puerto Rico's own bond structure**

After years of unchallenged use by Puerto Rico of the COFINA securitization structure to access the bond market at lower interest rates, and years of Puerto Rico Justice Department opinions as to the validity of the COFINA structure, the FOMB, representing the Puerto Rico debtor instrumentalities, has instituted a legal challenge to the validity, under Puerto Rico law, of the transfer to COFINA of a portion of sales tax revenues that is the only source of payment for over $16 billion in currently outstanding COFINA bonds. This legal challenge claims that

3

the Puerto Rico statute transferring the relevant sales taxes to COFINA is invalid under the Puerto Rico constitution and/or does not effectively transfer to COFINA the revenues the legislation explicitly says it transfers.

## Len Weiser-Varon, Mintz Levin



The FOMB is an odd duck legally. Created by federal law (PROMESA) and appointed by the U.S. President, the board is the representative of Puerto Rico and its instrumentalities as debtors in PROMESA Title III insolvency proceedings. Per PROMESA, the FOMB is "created within the [Puerto Rico] government."

As the federally-constituted voice of Puerto Rico, the FOMB is sponsoring an argument over the validity and effectiveness of Puerto Rico law. In order to be somewhat less overt in the undermining of Puerto Rico's own financing structure, the FOMB, speaking for Puerto Rico and COFINA, has deputized "agents" tasked with litigating against each other over whether the sales taxes statutorily transferred to COFINA belong to COFINA or the Commonwealth's General Fund. The FOMB's, and therefore Puerto Rico's, "agents" in this litigation are Bettina

Whyte, a restructuring specialist from the private sector (advocating for the transfer being effective) and the unsecured creditors committee in the Commonwealth's PROMESA Title III bankruptcy (advocating against the transfer being effective).

The FOMB, while purportedly neutral on the outcome, has (a) agreed essentially to sue itself in order to "resolve" a "dispute" between The Commonwealth of Puerto Rico and COFINA and (b) filed briefs stating that there are "powerful" arguments on either side of such "dispute.," The briefs include questions such as "Does a law providing the [sales] taxes cannot be used by the Commonwealth frustrate Congressional intent that the Oversight Board restore the Commonwealth to fiscal responsibility by requiring certain types of fiscal plans and budgets?" These are leading questions that appear to signal an oxymoronic position by the FOMB that Puerto Rico's "fiscal responsibility" might be promoted by invalidating "frustrating" Puerto Rico laws that induced bondholders to lend to Puerto Rico. The appointment of "agents" to litigate the "dispute" reflects FOMB's conflicted status as representative of both the Commonwealth of Puerto Rico and COFINA; however, the "agented" Commonwealth vs. COFINA adversary proceeding fails to acknowledge or resolve the conflict, indeed unsavoriness, inherent in the Commonwealth of Puerto Rico attacking the validity of its own law.

There is no duty that compels a government to impugn its own law. If creditors of the Commonwealth wished to challenge the COFINA arrangement, they should have been permitted to do so (subject to applicable standing requirements) with Puerto Rico, or its representatives, defending the validity of the COFINA statute under Puerto Rico law as any sovereign that has enacted laws to encourage investment normally would. Instead, the FOMB, on behalf of Puerto Rico, at a minimum has washed its hands on the question of whether the COFINA statute is valid under Puerto Rico law. What's more, despite its purported neutrality, the FOMB has suggested reasons why the federal court should rule against the COFINA statute's validity. Just as it would be legal hypocrisy for Puerto Rico, after a decade of assuring the bond market that the COFINA structure is valid, to question the legality under Puerto

Rico's own laws of the COFINA structure, it is legal hypocrisy for the FOMB, representing Puerto Rico, to lend its name and "questions" to a process premised on alleged ambiguity as to whether the COFINA structure is valid.

The FOMB has attempted to justify its support of litigation in its own name over the validity of Puerto Rico law that has stood unchallenged for a decade, while billions of general obligation and COFINA bonds were issued, by asserting that settlement discussions cannot proceed while there remain unresolved allegations by certain Commonwealth creditors that the COFINA statute is invalid under Puerto Rico's constitution. Even if expediting settlement discussions were a justification for the FOMB's endorsement of a process for expedited resolution of creditor claims that the COFINA statute is invalid or ineffective, it does not justify the FOMB, as Puerto Rico's voice, taking a position that Puerto Rico has not itself expressly promoted, namely that Puerto Rico has no view on the validity under Puerto Rico law of a Puerto Rico statute under which it borrowed billions of dollars. The FOMB, by permitting its "agent", and thereby Puerto Rico's "agent," to argue against the validity of a Puerto Rico statute promoted as valid by Puerto Rico for a decade, and by contributing its non-neutral commentary on the "dispute" it has facilitated, is participating in the debasing of the bond market's ability to rely on the legal underpinnings of municipal bond issuance.

A Puerto Rico government that stands behind its laws and financing structures would not be a participant, whether directly or through "agents," in any attempt to blow up those laws and invalidate the COFINA financing structure. The FOMB, by lending its authority to efforts to topple the COFINA structure instead of backing its validity, invites serious questions about whether it is using its statutory appointment as Puerto Rico's representative to take inappropriate legal shortcuts. It is opening a Pandora's box that creates a new risk of statutory validity challenges, no matter how long a statute has been in effect, as a deleveraging strategy for municipal issuers or their federally-appointed overseers.

**The federal district court's special revenues ruling**

If any federal judge deserves sympathy for having to drink continuously out of the proverbial firehose, it is Judge Swain, who is faced with an ongoing barrage of complex decisions involving Puerto Rico's highly convoluted debt structure and multiple debtors and insolvency proceedings. Particularly of late, however, the federal district court to which the Puerto Rico Title III proceedings have been assigned has issued a series of opinions dismissing creditor complaints in a manner that is disruptive of market understandings of legal protections available for municipal bonds in bankruptcy scenarios.

A notable example is the court's ruling in the Puerto Rico Highway Transportation Authority (PRHTA) Title III proceeding that holders of special revenue bonds are not entitled to pursue relief to compel the debtor bond issuer to apply the net special revenues (after deduction of reasonable operating expenses) securing the bonds to the payment of debt service due on the bonds. Section 922(d) of the Bankruptcy Code expressly exempts from the bankruptcy stay "the application of special revenues ... to payment of indebtedness secured by such revenues." In its PRHTA opinion, the federal court went where no court has gone before, opining that the Section 922(d) exception does not authorize actions to compel the debtor to apply the net special revenues to debt service. The court's decision ignores legislative history indicating that Section 922(d) was intended to avoid impairment of special revenue bonds in bankruptcy, asserts that Section 922(d)'s purpose was to permit the debtor to apply special revenues to debt service in order to preserve future market access (nothing in PROMESA precludes such voluntary application by the debtor, so Section 922(d) is unnecessary for such purpose), and claims that a contrary opinion by Judge Bennett in the Jefferson County Chapter 9 proceeding is not contrary when it manifestly is. The federal court ruling is not only suspect but highly disruptive of market understanding that special revenue bonds are entitled to payment from available net special revenues during and after a municipal bankruptcy proceeding.

**The federal district court's Section 305 ruling**

In a series of opinions, the federal district court entrusted with the Puerto Rico Title III cases has read Section 305 of PROMESA in an implausibly broad manner so as to virtually read out of the statute the right of creditors to obtain relief from stay. Section 305, which is modeled on Section 904 of Chapter 9, states in relevant part that the district court "may not, by any stay, order or decree, in the case or otherwise, interfere- … with any of the property or revenues of the debtor." The district court's opinions suggest that it interprets Section 305 as precluding a federal court from granting relief from stay so that a creditor can pursue relief (in territorial court, by self-help or otherwise) for the debtor's misapplication of its revenues or funds. Section 305, which like Section 904 is driven by federalism concerns, has no application to actions by a <u>creditor</u>; the "interference" with debtor decision-making and actions it precludes is interference by the <u>federal court</u>.

The district court's interpretations ignore the actual text of Section 305 and a contrary ruling in the Jefferson County Chapter 9 proceeding, as well as provisions of the Bankruptcy Code expressly incorporated into PROMESA permitting the lifting of the bankruptcy stay for cause, including for lack of adequate protection. Lifting the stay so that a creditor can seek to protect its interests simply leaves the debtor in the same position it would be in absent the stay; it does not "interfere" with any of the debtor's operations or use of property. The federal court's propensity to interpret Section 305 in a manner that precludes a creditor from exercising self-help when its security or source of payment is adversely impacted or obstructed by debtor action appears unfounded and disruptive of market understanding.

**The federal district court's contract impairment ruling**

In an adversary proceeding in PRHTA's Title III case, the federal district court dismissed creditor claims alleging that moratorium legislation and fiscal plan compliance legislation

enacted by Puerto Rico effected an impairment of contract in violation of the "contracts clause" of the U.S. Constitution. The challenged legislation precludes certain transfers of revenues for the payment of debt service. The district court, citing 1st Circuit precedent, correctly noted that the "contracts clause" has been judicially construed to apply only if state legislation causes a "substantial impairment" of contractual rights and that, even then, there is no constitutional "impairment" if the legislation is "reasonable and necessary to fulfill an important government purpose." Curiously, the district court's opinion did not reference the portion of the same 1st Circuit opinion which quotes U.S. Supreme Court precedent stating that "where the state is alleged to have impaired a public contract to which it is a party, 'less deference to a legislative determination of reasonableness and necessity is required, because the State's self-interest is at stake.'"

The district court assumed in its decision that the creditors in the PRHTA case had adequately alleged a substantial impairment of their contractual rights by the moratorium and fiscal compliance legislation. However, the court quoted references to a "fiscal emergency" in both the moratorium legislation and PROMESA, and found insufficient the creditors' allegation that Puerto Rico has sufficient cash to pay debt service and provide "essential services." According to the court, "[p]laintiff's narrow focus on the feasibility of GO and revenue bond debt service is inconsistent with the breadth of the fiscal, public health, safety, welfare and recovery concerns that combine to form the crisis the [Puerto Rico legislation] purports to address."

The court further stated that "[p]laintiff has not pled facts that support an inference that a 'more moderate course of action' to marshaling revenue than 'the sweep[ing] [of] vast sums of money from across the Commonwealth' would have both served the stated purposes of addressing the critical public health, safety and welfare aspects of the crisis, as well as restoring the Commonwealth's, and its instrumentalities', access to the capital markets." Although it is possible that more specific pleading of why Puerto Rico's fiscal emergency does not require or justify current cessation of all debt service payments might receive a better

reception in other contexts, the wording of the federal district court's opinions, as well as the court's rulings on adequate protection, special revenues and Section 305, raise the prospect that no matter what legal argument is made, the district court will find that Puerto Rico's approach to addressing its fiscal troubles overrides creditor interests, versus striving for a compromise between the respective interests.

The role of legal protections in municipal insolvencies should neither be overstated nor understated. Sometimes investors, even municipal bond investors, make what turn out to be unfortunate investments. Legal protections cannot rectify overleveraging, revenue shortages or expense proliferation due to unforeseen circumstances, and both for societal good order and the enlightened self-interest of creditors, governmental entities and their instrumentalities must be permitted to continue servicing their citizens, taxpayers and ratepayers. But just as taxes are the price we pay for a civilized society, so are laws. It is short-sighted for government officials and judges to engage in results-oriented shortcutting of legal principles. Erosion of trust in principles and statutes specifically written to address situations of financial distress may impact both governments and investors in discouraging the leap of faith inherent in lending money to municipal issuers in the expectation of future repayment, and the impact may be felt not only by Puerto Rico when it attempts a return to the bond market for financing, but also by other municipal issuers.



Print        Reprint

*Len Weiser-Varon a member of Mintz Levin's Public Finance practice with a specialty in workouts and restructurings.*

Peter C. Hein
101 Central Park West, Apt 14E
New York, NY 10023

petercheinsr@gmail.com
anne.farley@gmail.com
(212) 403-1237

May 3, 2018

**VIA FEDEX**

Commonwealth of Puerto Rico
Claims Processing Center
c/o Prime Clerk, LLC
850 Third Avenue, Suite 412
Brooklyn, NY 11232

### Re: **Request for Confirmation That Proofs of Claims Have Been Filed**

TO WHOM IT MAY CONCERN:

Six proofs of claims with attachments are enclosed as follows.

I am requesting a confirmation of filing of each of these six claims.

An extra copy of this letter and each of the six claims is also enclosed stamped "copy".

Claim 1.   Proof of Claim of Peter C. Hein re Commonwealth of Puerto Rico

Claim 2.   Proof of Claim of Peter C. Hein re Puerto Rico Electric Power Authority

Claim 3.   Proof of Claim of Peter C. Hein re Puerto Rico Sales Tax Financing Corporation (COFINA)

Claim 4.   Proof of Claim of Peter C. Hein re Puerto Rico Highways and Transportation Authority

Claim 5.   Proof of Claim of Anne Farley re Commonwealth of Puerto Rico

Claim 6.   Proof of Claim of Anne Farley re Puerto Rico Electric Power Authority

A stamped self-addressed envelope addressed to:  Peter C. Hein, 101 Central Park West, Apt. 14E, New York, NY 10023, is also enclosed.

Commonwealth of Puerto Rico
Page 2

Please acknowledge receipt of the above listed claims by stamping or signing this letter and returning it in the enclosed envelope.  Also, you can confirm receipt of our claims by emailing us at petercheinsr@gmail.com and anne.farley@gmail.com.

Thank you for your assistance.

Sincerely

Peter C. Hein

_____
Above claims are received

PS|Ship – FedEx Label

Page 1 of 2



**FOLD on this line and place in shipping pouch with bar code and delivery address visible**

1. Fold the first printed page in half and use as the shipping label.
2. Place the label in a waybill pouch and affix it to your shipment so that the barcode portion of the label can be read and scanned.
3. Keep the second page as a receipt for your records. The receipt contains the terms and conditions of shipping and information useful for tracking your package.

*Legal Terms and Conditions*
Tendering packages by using this system constitutes your agreement to the service conditions for the transportation of your shipments as found in the applicable FedEx Service Guide, available upon request. FedEx will not be responsible for any claim in excess of the applicable declared value, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the applicable FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of 100 USD or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is 500 USD, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see applicable FedEx Service Guide. FedEx will not be liable for loss or damage to prohibited items in any event or for your acts or omissions, including, without limitation, improper or insufficient packaging, securing, marking or addressing, or the acts or omissions of the recipient or anyone else with an interest in the package. See the applicable FedEx Service Guide for complete terms and conditions. To obtain information regarding how to file a claim or to obtain a Service Guide, please call 1-800-GO-FEDEX (1-800-463-3339).



**BNY MELLON**

The Bank of New York Mellon

December 4, 2018

## NOTICE TO HOLDERS OF

## PUERTO RICO SALES TAX FINANCING CORPORATION

## SALES TAX REVENUE BONDS

### SENIOR SERIES 2007A, 2007B, 2007C, 2008A, 2009C, 2011C, 2011D

### FIRST SUBORDINATE SERIES 2009A, 2009B,
### 2010A, 2010C, 2010D, 2010E, 2011A, 2011B

### CUSIP NOS.[1]

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 74529JAF2 | 74529JBF1 | 74529JEM3 | 74529JFV2 | 74529JHN8 | 74529JKD6 | 74529JLJ2 | 74529JMJ1 |
| 74529JAG0 | 74529JBG9 | 74529JEN1 | 74529JFW0 | 74529JHP3 | 74529JKE4 | 74529JLK9 | 74529JMK8 |
| 74529JAH8 | 74529JBH7 | 74529JEP6 | 74529JGU3 | 74529JHR9 | 74529JKF1 | 74529JLL7 | 74529JML6 |
| 74529JAJ4 | 74529JBJ3 | 74529JEQ4 | 74529JND3 | 74529JHS7 | 74529JKG9 | 74529JLM5 | 74529JMM4 |
| 74529JAK1 | 74529JBK0 | 74529JER2 | 74529JGW9 | 74529JHT5 | 74529JKH7 | 74529JLN3 | 74529JMN2 |
| 74529JAL9 | 74529JBL8 | 74529JES0 | 74529JNE1 | 74529JHU2 | 74529JKJ3 | 74529JLP8 | 74529JME2 |
| 74529JAM7 | 74529JAE5 | 74529JFF7 | 74529JGY5 | 74529JNL5 | 74529JKK0 | 74529JLQ6 | 74529JMF9 |
| 74529JAN5 | 74529JDY8 | 74529JFG5 | 74529JGZ2 | 74529JGP4 | 74529JKL8 | 74529JLR4 | 74529JNM3 |
| 74529JAP0 | 74529JDZ5 | 74529JFH3 | 74529JNF8 | 74529JGR0 | 74529JKM6 | 74529JLD5 | 74529JNN1 |
| 74529JAQ8 | 74529JEA9 | 74529JFJ9 | 74529JHB4 | 74529JHY4 | 74529JKN4 | 74529JLE3 | 74529JNP6 |
| 74529JAR6 | 74529JEB7 | 74529JFK6 | 74529JNG6 | 74529JHW8 | 74529JKP9 | 74529JLX1 | 74529JNQ4 |
| 74529JAS4 | 74529JEC5 | 74529JFL4 | 74529JHD0 | 74529JHX6 | 74529JKQ7 | 74529JLY9 | 74529JNR2 |
| 74529JBB0 | 74529JED3 | 74529JFM2 | 74529JHE8 | 74529JGQ2 | 74529JKR5 | 74529JLZ6 | 74529JNS0 |
| 74529JAA3 | 74529JEE1 | 74529JFN0 | 74529JHF5 | 74529JHV0 | 74529JKS3 | 74529JMA0 | 74529JNT8 |
| 74529JBC8 | 74529JEF8 | 74529JFP5 | 74529JHG3 | 74529JJX4 | 74529JKT1 | 74529JMC6 | 74529JPD1 |
| 74529JAB1 | 74529JEG6 | 74529JFQ3 | 74529JHH1 | 74529JJY2 | 74529JKU8 | 74529JMD4 | 74529JPE9 |
| 74529JBD6 | 74529JEH4 | 74529JFR1 | 74529JNH4 | 74529JJZ9 | 74529JKV6 | 74529JMB8 | 74529JPF6 |
| 74529JBE4 | 74529JEJ0 | 74529JFS9 | 74529JNJ0 | 74529JKA2 | 74529JLF0 | 74529JMP7 | 74529JPG4 |
| 74529JAC9 | 74529JEK7 | 74529JFT7 | 74529JHL2 | 74529JKB0 | 74529JLG8 | 74529JMG7 | 74529JPH2 |
| 74529JAD7 | 74529JEL5 | 74529JFU4 | 74529JHM0 | 74529JKC8 | 74529JLH6 | 74529JMH5 | 74529JNW1 |
| 74529JNU5 | 74529JNX9 | 74529JNV3 | 74529JNY7 | 74529JNZ4 | 74529JPA7 | 74529JPB5 | 74529JPC3 |
| 74529JPJ8 | 74529JPK5 | 74529JPL3 | | | | | |

---

[1]  No representation is made as to the correctness or accuracy of any CUSIP numbers, which are included
solely for the convenience of the Bondowners.

**THIS NOTICE CONTAINS IMPORTANT INFORMATION THAT IS OF INTEREST
TO THE BENEFICIAL OWNERS OF THE SUBJECT BONDS. ALL DEPOSITORIES,
CUSTODIANS, AND OTHER INTERMEDIARIES RECEIVING THIS NOTICE ARE
REQUESTED TO EXPEDITE RETRANSMITTAL TO SUCH BENEFICIAL OWNERS
IN A TIMELY MANNER.**

The Bank of New York Mellon (the "Trustee") serves as trustee under the Amended and
Restated Sales Tax Revenue Bond Resolution (as amended and supplemented from time to time,
the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing
Corporation ("COFINA"), pursuant to which COFINA issued the above-referenced senior and
subordinate sales tax revenue bonds (the "Bonds"). Capitalized terms used but not defined in
this notice have the meanings given in the Resolution.

**Title III Proceeding and Interpleader Action**

The Trustee previously advised Bondowners that, on May 5, 2017, The Financial Oversight and
Management Board for Puerto Rico (the "Oversight Board") filed a petition for relief on behalf
of COFINA under title III of the Puerto Rico Oversight, Management, and Economic Stability
Act, 48 U.S.C. § 2101 *et seq.* ("PROMESA"), in the United States District Court for the District
of Puerto Rico (the "Court"). COFINA's title III proceeding is being administered jointly on the
docket of the United States Bankruptcy Court for the District of Puerto Rico at Case No. 17-BK-
03283-LTS.[2]

The Trustee also previously advised Bondowners that, pursuant to the *Order Granting
Interpleader, Staying Pending and Future Litigation Against The Bank of New York Mellon, as
Trustee, Pursuant to 28 U.S.C. § 2361, and Granting Related Relief* (the "Interpleader Order")
entered by the Court in Adv. Proc. No. 17-AP-00133-LTS, the Trustee will not make any
payment on the Bonds from the Pledged Sales Tax received by the Trustee until the Court enters
a further order directing the timing of distributions and identifying the recipients of such funds.
Pending direction from the Court, the Trustee holds funds in the existing accounts on behalf of
the party or parties ultimately determined by the Court to be entitled to them.[3] Pursuant to the
procedures order (the "Procedures Order") entered by the Court on July 24, 2018, the Trustee is
required to account separately for the Pledged Sales Tax received (i) on or before June 30, 2018,
(ii) on or after July 1, 2018, through the end of the Abeyance Period (as defined in the
Procedures Order), and (c) after the Abeyance Period.

Consistent with the Interpleader Order and the Procedures Order, the balance of each debt
service account as of December 3, 2018, is set forth on the chart attached to this notice as
**Annex A.**

---

[2] To the extent of any discrepancy between this notice and the documents filed with the Court, the filed
documents control.

[3] The Trustee takes no position with respect to the record date of any payments made at the Court's
direction.

**Material Developments**

Solicitation of Votes on Plan of Adjustment: On November 29, 2018, the Court entered an order
[No. 17-03283-LTS, Doc. No. 4382] (the "Disclosure Statement Approval Order") approving the
*Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto
Rico Sales Tax Financing Corporation* [No. 17-03283-LTS, Doc. No. 4364] (the "Disclosure
Statement"). The Disclosure Statement Approval Order authorizes COFINA to solicit votes to
accept or reject the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax
Financing Corporation* [No. 17-03283-LTS, Doc. No. 4392] (the "Plan"). The Court has not yet
confirmed the Plan.

The Disclosure Statement provides certain information regarding COFINA, the Bonds, and the
Plan, including a series of questions and answers on pages i through xxii thereof, to enable
holders of beneficial interests in the Bonds that are eligible to vote on, or make an election under,
the Plan to make an informed judgment as to whether to vote to accept or reject the Plan and/or
to make an election of the form of distribution to be received under the Plan. The Trustee cannot
vote on, or make an election under, the Plan on your behalf, and the Trustee provides no advice
with regard to any voting or election.

The Plan provides for the adjustment of COFINA's debts and sets forth the manner in which
claims against COFINA, including the claims that the Trustee filed on behalf of itself and the
Bondowners for principal, interest, and other amounts due on account of the Bonds and under the
Resolution, will be treated if the Court confirms the Plan and the Plan becomes effective. As
more fully set forth therein, the Plan provides that the claims on account of the Senior Bonds are
deemed allowed in the aggregate amount of $7,760,871,398.36, and the claims on account of the
Subordinate Bonds are deemed allowed in the aggregate amount of $9,876,235,996.34. The Plan
treats claims on account of the Senior Bonds and the Subordinate Bonds in seven different
classes: Class 1: Senior COFINA Bond Claims; Class 2: Senior COFINA Bond Claims
(Ambac); Class 3: Senior COFINA Bond Claims (National); Class 4: Senior COFINA Bond
Claims (Taxable Election); Class 5: Junior COFINA Bond Claims; Class 6: Junior COFINA
Bond Claims (Assured); and Class 7: Junior COFINA Bond Claims (Taxable Election). The
provisions governing the treatment of each class of claims on account of the Bonds are contained
in Articles V-XI of the Plan.

The Plan contains certain releases, injunctions, and exculpations relating to COFINA and the
Bondowners' claims.

***The Trustee encourages Bondowners to review the Plan, the Disclosure Statement, the
Disclosure Statement Approval Order, and all solicitation materials carefully. These
documents contain important information that materially affect your rights as Bondowners. If
the Plan is confirmed and becomes effective, it will be binding on all Bondowners regardless
of whether they voted to accept or reject the Plan.***

Additional information regarding the solicitation procedures and copies of the Plan, the
Disclosure Statement, and the Disclosure Statement Approval Order may be obtained by visiting
the website maintained by COFINA's claims and noticing agent in the PROMESA Title III
cases, https://cases.primeclerk.com/puertorico/; by sending a request to Prime Clerk LLC, at

- 3 -

(844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoinfo@primeclerk.com, or, for a fee, from the Court's website, https://www.prd.uscourts.gov/.

<u>Important Dates and Deadlines</u>: The Disclosure Statement Approval Order and other Court orders establish the following important dates and deadlines with respect to voting on the Plan and the confirmation process.

- The record date for purposes of determining creditors entitled to vote on the Plan is **November 20, 2018**.

- Objections to confirmation of the Plan must be filed with the Court and served pursuant to the Disclosure Statement Approval Order, so as to be *actually received* on or before **January 2, 2019, at 5:00 p.m. (Atlantic Standard Time)**.

- Ballots accepting or rejecting the Plan must be submitted to the Debtor's balloting agent, Prime Clerk LLC, in accordance with the Disclosure Statement Approval Order, so that they are *actually received* on or before **January 8, 2019, at 6:00 p.m. (Atlantic Standard Time)**.

- The deadline for holders of eligible claims that have the right to make an election of the form of distributions under the Plan to make such election is **January 8, 2019, at 6:00 p.m. (Atlantic Standard Time)**.

- A hearing to consider confirmation of the Plan is scheduled to take place before the Honorable Laura Taylor Swain on **January 16, 2019, at 9:30 a.m. (Atlantic Standard Time)**, and continue, if necessary, on **January 17, 2019, at 9:30 a.m. (Atlantic Standard Time)**, convened at the United States District Court for the District of Puerto Rico, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918, at a courtroom to be determined later.

**Direction from Bondowners**

Pursuant to sections 1102 and 1105 of the Resolution, Bondowners holding the requisite percentage in principal amount of the outstanding Bonds may direct the Trustee with respect to the exercise of rights and remedies and the method of conducting any remedial proceedings with respect to the Bonds. The Trustee has no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Bondowners without first receiving security or indemnity satisfactory to the Trustee against the costs, expenses, and liabilities which might be incurred by it in compliance with such request or direction.

**Retention of Counsel**

The Trustee has retained the law firm of Reed Smith LLP and, specifically, Eric A. Schaffer and Luke A. Sizemore, to represent the Trustee in connection with the Resolution and COFINA's

title III proceeding. The Trustee's counsel may be contacted by mail at Reed Smith LLP, Attn: Eric A. Schaffer, 225 Fifth Avenue, Suite 1200, Pittsburgh, PA 15222, or by email at eschaffer@reedsmith.com.

The Trustee has incurred and will continue to incur fees, expenses, and disbursements, including professional fees, expenses, and disbursements, from time to time. As of October 31, 2018, the Trustee had incurred unpaid fees and expenses, including professional fees and expenses, in connection with the performance of the Trustee's powers and duties under the Resolution in the amount of $421,208.74. Pursuant to the Interpleader Order and section 804 of the Resolution, the Trustee intends to pay such fees and expenses from the Disputed Funds. The Trustee reserves its rights under the Interpleader Order, the Resolution (including, without limitation, sections 505, 804, and 1103), and any other applicable statute, order, or agreement for reimbursement of any additional unpaid fees and expenses, including the Trustee's professional fees, expenses, and disbursements, prior to payment of the Bonds.

**Further Information**

Questions concerning this notice may be directed to the Trustee by contacting Mr. Alex Chang at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286, or by email at alex.chang@bnymellon.com.

The Trustee may conclude that a specific response to particular inquiries from individual Bondowners is not consistent with equal and full dissemination of significant information to all Bondowners or parties in interest. In such event, the Trustee may decline to provide a response to a particular inquiry when presented in favor of sending a notice to all Bondowners setting forth such specific response.

Bondowners should not rely on the Trustee as their sole source of information. The Trustee makes no recommendations and gives no legal, investment, accounting, financial, or tax advice as to the above matters or the Bonds generally. Bondowners should consult with their own professionals regarding matters relating to the Bonds.

> **THE BANK OF NEW YORK MELLON,**
> as Trustee

**ANNEX A**

Market Value as of December 3, 2018

| Account Name | Pre-July 1, 2018 Funds | Abeyance Period Funds |
|---|---|---|
| COFINA Series 2009C Tax Exempt Debt Service Account | 27,044,000.57 | 7,150,530.68 |
| RPF Debt Service Interest Sub Account Tax Exempt Senior Bonds | 71,455,808.16 | 19,747,159.38 |
| RPF Debt Service Interest Sub Account Taxable Senior Bonds | 263,460,522.63 | 86,449,341.09 |
| PF Debt Service Interest Tax Exempt 1st Sub Account | 344,875,840.64 | 247,054,428.98 |
| PF Debt Service Interest Taxable 1st Sub Account | 122,553,220.01 | 52,138,329.97 |
| PF First Subordinate 2010A Tax Exempt Interest FD | 121,951,019.46 | 73,561,753.87 |
| PF First Subordinate 2010C Tax Exempt Interest FD | 116,839,839.37 | 73,887,742.10 |
| PF First Subordinate 2010D Taxable Interest FD | 6,124,008.89 | 3,811,725.50 |
| PF First Subordinate 2010E Taxable Interest FD | 6,025,076.86 | 3,805,126.76 |
| COFINA 2011A 1 Debt Service Tax Exempt | 25,804,199.22 | 16,318,184.17 |
| COFINA 2011B Debt Service Tax Exempt | 3,251,919.94 | 1,940,561.84 |
| COFINA 2011C Senior Tax Exempt Debt Service Sub Account | 90,359,684.88 | 23,891,424.51 |
| COFINA 2011D Senior Tax Exempt Debt Service Sub Account | 6,777,628.88 | 2,700,571.12 |
| TOTAL | 1,206,522,769.51 | 612,456,879.97 |

Exhibit P



GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

# Summary of Bank Account Balances for the Government of Puerto Rico and its Instrumentalities

*Information as of October 31, 2018*

Exhibit

P

**November 30, 2018**

# Disclaimer

- This presentation was prepared and is being published by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") as part of the ongoing evaluation of financial matters of the Government of Puerto Rico, including certain of its public corporations and its instrumentalities (the "Government"). The information contained herein provides the cash balances of Government accounts as of the dates indicated but is not intended to provide an analysis of the source of these funds or their adequacy to satisfy the Government's liquidity needs. Government creditors and other third parties should not rely on this information to make any investment decision regarding securities issued by the Government or any instrumentality thereof.

- The account balances included herein are based on information AAFAF obtained from governmental instrumentalities and financial institutions as of the dates indicated as part of an ongoing review of the bank accounts and balances of the Government and its instrumentalities. AAFAF has not validated all the information received and, as a result, cannot and does not assume any responsibility for the accuracy of such information. As additional information becomes available and the validation process is completed, there could be material changes to the information contained herein.

- The account balances included herein are provided to show the cash position as of specific dates, and this presentation does not purport to provide, nor take into consideration, any changes since such dates. Such balances are expected to change, potentially materially, on a day to day basis based on, among other things, the financial needs of the Government and its instrumentalities, as well as judicial determinations regarding such funds.

- The information contained herein regarding the restricted or unrestricted nature of any cash balance is preliminary and subject to further analysis.

- The account balances included herein have not been confirmed through an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. This document does not constitute an audit of compliance with any federal law, rule, or regulation.

# Disclaimer (cont'd.)

- Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- AAFAF, the Government, and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government, the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein, and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including, without limitation, consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of or reliance upon this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms described in the "Disclaimer" slides.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined.

- The Parties do not undertake any duty to update the information contained herein.

# Executive Summary



**Key takeaways**:

1. Overall **balance** of reported accounts **increased by approximately $531M** from September 28th to October 31st.

2. Increase is mainly **driven by**:

   a) +**$271.6M** increase in central Government's Treasury Single Account balance ("TSA")

   b) +**$133.9M** increase in Restricted Accounts and/or subject to Title III Proceedings

   c) +**$48.5M** in Public Corporations and Legally Separate Entities

   d) +**$39.2M** increase in Central Gov't Non-TSA Accounts.

   e) +**$37.9M** increase in Pension Related Accounts.

Non-TSA Central Government balances are concentrated in the Department of Labor - PR Unemployment Trust Fund at the US Treasury (36%), Public Housing Administration (28%), lotteries related funds (11%), other funds at the Department of Labor (8%), and the Child Support Administration (3%).

---

[1] Includes TSA Sweep Accounts.

[2] Refer to the footnotes on Slide 19 - Appendix A, pertaining to revised balances and newly identified accounts as of 9/28

[3] The Puerto Rico Unemployment Trust Fund at the US Treasury, from the Department of Labor and Human Resources, was incorporated into the scope of the inventory; $612M as of 10/31.

* Refer to the groupings, 'G', as they summarize the current classifications presented in detail on Slide 8.

4

# Executive Summary (cont'd.)

- AAFAF started its efforts to identify government bank accounts and their balances to obtain a comprehensive view of the cash position of the Government. Requests were sent to governmental instrumentalities, the Office of the Commissioner of Financial Institutions ("OCIF") and various commercial banks.

- Based on the information obtained, AAFAF prepared an inventory of bank accounts across governmental instrumentalities, including those outside the scope of the fiscal plans submitted to the Financial Oversight and Management Board for Puerto Rico ("FOMB").

- The exercise and the inventory described in this presentation, which had not been conducted by prior administrations, obtained information on +800 bank accounts.  AAFAF now has centralized access to bank account information for most of the Government.

- AAFAF has conducted this process in consultation with the FOMB and its advisors, and has been providing periodic reports to the FOMB since July 2017.

- On October 31, 2017, AAFAF commenced publishing weekly cash flow reports for the TSA on its website and EMMA.  On December 18, 2017, AAFAF commenced reporting on month-end cash balance position of the bank accounts included in this presentation to provide additional transparency.

- AAFAF has designed a five-step process to evaluate the cash position of the Government, as described herein.  AAFAF has completed the first step of this process and will continue with the other steps to arrive at a comprehensive cash model.

- On December 18, 2017, the FOMB announced that it would conduct an independent forensic investigation of the information on Government bank accounts published by AAFAF. On February 6, 2018, the FOMB announced the retention of Duff & Phelps, LLC ("D&P") to conduct this forensic analysis. D&P and AAFAF have participated in discussions to coordinate this process.

- The information presented excludes certain funds as set forth in the "Excluded Funds" slide.

# Process to Evaluate the Cash Position of the Government

| Steps | | Overview |
|---|---|---|
| 1. | Procure and validate complete set of bank accounts | ■ AAFAF instructed banks, agencies and public corporations to provide inventory of bank accounts.<br>■ Programmed list of bank accounts, in private financial institution web based platforms, which provide access to bank account detail. |
| 2. | Conduct an independent evaluation of the source of funds in non-TSA bank accounts | ■ Engage an independent firm to conduct an evaluation of the cash inflows and outflows into all governmental bank accounts. |
| 3. | Perform a legal analysis to determine the restricted or unrestricted nature of funds at non-TSA bank accounts | ■ Legal review of the results of the independent evaluation to confirm legal restrictions relative to funds deposited in the bank accounts. |
| 4. | Determine potential excess cash available in non-TSA governmental bank accounts, if any | ■ Determine operating cash needs at major component units.<br>■ Assess reliance on appropriations from the TSA.<br>■ Determine excess cash available across the bank accounts, if any. |
| 5. | Evaluate and establish path to legally accessing excess cash at non-TSA instrumentalities, if any | ■ Establish legal mechanism and process to access excess cash, if any. |

6

## Excluded Funds

| Agency | Description |
|---|---|
| **Legislative Branch** | ▪ The Puerto Rico Legislative Assembly receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. |
| **Judicial Branch** | ▪ The Puerto Rico Judicial Branch receives monthly transfers from the General Fund to fund its operations based on budgetary appropriations. The Judicial Branch also holds funds in custody related to legal proceedings. |
| **Municipal Funds** | ▪ Municipal funds include funds of Puerto Rico municipalities, the Municipal Revenue Collections Center and the Puerto Rico Municipal Finance Agency. |
| **Government Development Bank** | ▪ Includes deposits on GDB's balance sheet for government agencies and instrumentalities, public corporations and municipalities.  Such deposits have been extinguished pursuant to the terms of the Qualifying Modification for GDB, which went effective on November 29, 2018. |
| **Investment Accounts** | ▪ Various investment accounts are included for certain instrumentalities (e.g. ERS, TRS, JRS, State Insurance Fund Corporation and Automobile Accident Compensation Administration, UPR). |

7

# Bank Account Balances for the Government and its Instrumentalities

| | $ in millions | Balance as of[1] | | |
|---|---|---|---|---|
| | Revised Grouping | 9/28/2018 | 10/31/2018 | Notes |
| G5 | TSA | 3,452.1 | 3,720.1 | ▪ Reported on a weekly basis on AAFAF's website. |
| G5 | TSA Sweep | 55.7 | 59.3 | ▪ Accounts that collect income and completely pass through to TSA on a daily basis. |
| G3 | Pension Related | 545.7 | 583.6 | ▪ Includes employee withholdings mostly for defined contribution retirement accounts ($350M), and repayment of employee loans issued by the retirement system ($233M). |
| G2 | Central Gov't Non-TSA | 1,647.8 | 1,686.9 | ▪ $612M at US Treasury pertaining to the PR Unemployment Trust Fund from the Department of Labor<br>▪ $475M federal funds administered by the Public Housing Authority.<br>▪ $190M lottery related funds. |
| G1 | COFINA | 1,570.1 | 1,691.7 | ▪ Balance on deposit at BNYM and subject to COFINA interpleader and Title III proceedings. Amounts on deposit are also subject to confirmation of the COFINA Plan of Adjustment in accordance with the Plan Support Agreement entered into by the FOMB, COFINA, AAFAF and certain COFINA creditors on September 20, 2018. The FOMB filed the COFINA Plan of Adjustment and the accompanying disclosure statement with the United States District Court for the District of Puerto Rico on October 19, 2018. At a hearing on November 20, 2018, the District Court approved the disclosure statement, subject to certain modifications and the inclusion of supplemental information. A hearing to confirm the Plan of Adjustment is scheduled for January 16, 2019. |
| G1 | Other Restricted Title III Accounts | 811.4 | 800.6 | ▪ ERS related accounts ($385M), GO Redemption Fund ($268M), and clawback funds ($147M). |
| G1 | PREPA | 370.3 | 367.8 | ▪ No significant change in balances. Refer to the PREPA slide for breakdown of classified accounts. |
| G4 | PRASA | 534.8 | 551.6 | ▪ No significant change in balances. Refer to the PRASA slide for breakdown of classified accounts. |
| G1 | HTA | 364.6 | 390.0 | ▪ The increase is primarily due to transfers from federal accounts. |
| G4 | UPR | 407.7 | 414.2 | ▪ No significant change in balances. Refer to the UPR slide for breakdown of classified accounts. |
| | ASES | 473.9 | 440.2 | ▪ State and federal funds used mainly for payments of health insurance premiums and claims. |
| G4 G4 | Other Public Corps & Legally Separate Entities | 1,383.0 | 1,441.4 | ▪ Government entities with autonomous fiscal authority established by law.<br>▪ Slide 21 includes an overview of the entities and balances. |
| | TOTAL | $1,617 | $12,147 | |

[1] Except for accounts with an aggregate balance of $24.5M, which have not been updated as of the indicated dates.

[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

* Refer to the groupings, 'G', as they are summarized on Slide 4.

8

## TSA, TSA Sweep and Pension Related Accounts

| $ in millions | Balance as of | | |
|---|---|---|---|
| Grouping Subcategory | 9/28/2018 | 10/31/2018 | Notes |
| TSA | 3,452.1 | 3,720.1 | ▪ The TSA is the Government's main operational bank account in which a majority of receipts from governmental funds are deposited and from which most expenses are disbursed.<br>▪ It includes tax collections, charges for services, intergovernmental collections, the proceeds of prior short and long term debt issuances held in custody by the Secretary of Treasury for the benefit of Government fiduciary funds, and other receipts. |
| **TOTAL** | **$3,452** | **$** | |

**TSA Sweep Accounts[1]:**

| | | | |
|---|---|---|---|
| General Collection Posts | 39.4 | 37.6 | ▪ Account used for Government receipts from all the collection posts Island wide and the web based platform, known by its Spanish name as *Colecturía Virtual*. Receipts in collections posts account occur approximately two business days prior to being deposited into the TSA. |
| SUT | 9.8 | 19.0 | ▪ Account used for consolidated receipts of Sales and Use Tax. Balances are swept on a daily basis into accounts held by the trustee of the COFINA bonds, the General Fund and/or the Municipal Administration Fund. |
| Agency Collection Posts | 6.4 | 2.6 | ▪ Account used to receive amounts collected by collection officers at the agencies mainly for charges for services and fees. Receipts in collections posts account occur approximately two business days prior to being deposited into the TSA. |
| **TOTAL** | **$56** | **$59** | |

**Pension Related:**

| | | | |
|---|---|---|---|
| Employee Withholding | 545.7 | 583.5 | ▪ Custody bank accounts which balances represent employees/participants withholdings for specific purposes as follows: (i) $350M for individual defined contribution retirement account, (ii) $233M repayment of employee loans issued by the ERS, TRS and JRS. |
| Pay-go charges | - | - | ▪ Pay-go charges include balances from payments made by municipalities and public corporations in connection with benefits paid to retirees. These Pay-Go related charges are being deposited in a separate specific account, and now programmed to sweep back to the TSA account for reimbursement of pension payments pertaining to Municipalities and Public Corporations. |
| **TOTAL** | **$546** | **$584** | |

[1] Includes Zero Balance Accounts which are accounts used for disbursements of vendors payments, payroll and pensions. These accounts make disbursements and are automatically replenished from the TSA account.

## Central Government – Non-TSA

| $ in millions | Balance as of[1] | | Notes |
|---|---|---|---|
| **Central Government Entity** | *9/28/2018* | *10/31/2018* | |
| Public Housing Administration | 478.3 | 475.6 | • PHA accounts include grants of federal funds received to finance public housing programs and their operations. |
| Other Treasury Custody Accounts | 216.0 | 235.0 | • Other Treasury Custody Accounts include balances from the Lotteries in the amount of $190M. |
| Department of Labor and Human Resources | 742.9 | 749.9 | • DLHR accounts include operational accounts and other funds as follows:<br>– PR Unemployment Trust Fund at US Treasury ($612M)<br>– Work Opportunity Incentive Fund ($78M) to finance an incentive program to promote job creation.<br>– Contribution Trust Fund ($8.1M) from employers' receipts used to pay claims to employees.<br>– Act No. 15 ($9.6M) special revenues for operations. |
| Child Support Administration | 52.3 | 51.0 | • Custody bank account containing child support payments from non-custodial parents. |
| Puerto Rico Police | 21.0 | 30.5 | • Bank account used to process Police Department payroll funded through budget appropriations. |
| Department of Housing | 7.3 | 9.8 | • DOH accounts include grants of federal funds received to finance public housing programs and their operations. |
| DDEC | 14.2 | 14.6 | • DDEC accounts include operational accounts from General Fund appropriations and internally generated revenues ($3.5M), Act No. 22-2012 ($5.0M), film program ($1.9M) and federal funds. |
| 9-1-1 Services | 16.7 | 17.5 | • 9-1-1 Services account represents their operational account from special revenues (Act 144-1994). |
| Other Non-TSA Entities | 98.9 | 103.2 | • Description included in Appendix B. |
| **TOTAL** | **$1,648** | **$1,687** | |

[1] Except for accounts with an aggregate balance of $3M, which have not been updated as of the indicated dates.

[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

# Restricted Accounts Subject to Title III Proceedings - COFINA

$ in millions

| | Balance as of | |
|---|---|---|
| **Grouping** | **9/28/2018** | **10/31/2018** |
| COFINA Debt Service and Federal Subsidy Accounts at BNYM[3] | $1,570.1 | $1,691.4 |



- The Puerto Rico Sales Tax Financing Corporation ("COFINA") was created pursuant to Act No. 91-2006, as amended, and has issued bonds payable solely from a portion of the sales and use tax imposed by the Government on qualified transactions.

- Sales and use tax collections are consolidated at an account at Banco Popular de Puerto Rico ("BPPR").

- Amounts are swept on a daily basis into corresponding accounts at BNYM, as trustee for the COFINA bondholders, the Puerto Rico Treasury Department and/or the Municipal Administration Fund.

- BNYM applies the funds received from BPPR pursuant to the waterfall set forth in the Sales Tax Revenue Bond Resolution. BNYM also receives certain funds from the Federal Government in connection with certain bonds issued by COFINA that receive a federal interest subsidy. The funds on deposit at BNYM may solely be used to pay COFINA bonds and obligations.

- Currently restricted pursuant to the court order issued by the United States District Court for the District of Puerto Rico in Adversary Proceeding No. 17-133-LTS and 17-257-LTS in COFINA's Title III proceeding under PROMESA.

- The COFINA Pledged Sales Tax Base Amount deposit requirement for FY18 was satisfied on February 16, 2018. Further allocations of the 5.5% Sales and Use Tax transferred through June 30th, 2018 to the Commonwealth General Fund.

- A Plan Support Agreement to settle the dispute between the Commonwealth and COFINA was entered into on August 29, 2018, and was awarded and restated on September 20, 2018. It allocates 53.65% of the Pledged Sales Tax Base Amount to COFINA, and the remainder to the Commonwealth. The FOMB filed a COFINA Plan of Adjustment and a related disclosure statement with the United States District Court for the District of Puerto Rico on October 19, 2018. At a hearing on November 20, 2018, the District Court approved the disclosure statement. A hearing to confirm the Plan of Adjustment is scheduled for January 16, 2019.

[1] First revenues up to the "Pledged Sales Tax Base Amount" for the particular fiscal year are deposited with Bank of New York Mellon, as COFINA Trustee. Then, an amount equal to the amount deposited with the COFINA Trustee is transferred to the Government's General Fund. All other amounts after the Government has received such amount are divided equally between COFINA and the Government.

[2] Corresponds to the 4.5% sales and use tax surcharge.

[3] The Sales Tax waterfall was revised to take out the 1.0% pertaining to COFIM as it does not enter the Unified Internal Revenue System at the Point of Sale, and does not flow into the Sales Tax Account at Banco Popular.

## Restricted Accounts Subject to Title III Proceedings

| $ in millions | *Balance as of*[1] | | |
|---|---|---|---|
| *Grouping Subcategory* | *9/28/2018* | *10/31/2018* | *Notes* |
| ERS Related Accounts | 396.7 | 385.9 | ■ $89M for operational purposes.<br>■ $109M relating to proceeds from sale of investments.<br>■ $93M corresponding to a Post-petition Segregated Account created as part of a stipulation entered into as part of the Title III proceedings. |
| GO Redemption Funds | 268.0 | 268.0 | ■ $268.0M in revenues from the 1.03% property tax collected since fiscal year 2017 and deposited in the Public Debt Redemption Fund, the use of which is currently restricted to the payment of general obligation debt. |
| Clawbacks | 146.6 | 146.6 | ■ $147M corresponding to revenues retained (or "clawed-back") by the Government in fiscal year 2016 pursuant to Executive Order 2015-46 for the payment of General Obligation debt. |
| **TOTAL** | **$811** | **$801** | |

*The aforementioned funds are held in segregated accounts and most of them are subject to various claims under the Title III proceedings. The ultimate use of the funds may be subject to court determination.*

[1] Except for accounts with an aggregate balance of $20.3M, which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

## Restricted Accounts / Subject to Title III Proceedings - PREPA

| $ in millions | Balance as of | | |
| --- | --- | --- | --- |
| *Grouping Subcategory* | *9/28/2018* | *10/31/2018* | *Notes* |
| Operating | 282.5 | 281.3 | ▪ No significant change from prior month; positive operating cash flow offset by timing of emergency spend related reimbursements |
| Segregated | 0.0 | 0.0 | ▪ No significant change from prior month |
| FEMA | 4.8 | 3.4 | ▪ No significant change from prior month |
| Insurance (Restricted) | 50.4 | 50.4 | ▪ No significant change from prior month |
| Construction & Other Restricted | 32.6 | 32.7 | ▪ No significant change from prior month |

| | | | |
| --- | --- | --- | --- |
| **TOTAL** | **$370** | **$368** | |

## PRASA

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| **Grouping Subcategory** | **9/28/2018** | **10/31/2018** | **Notes** |
| Debt Service Accounts | 59.7 | 78.1 | ▪ Payment of principal and interest on senior and senior sub indebtedness due on 1/1/19.<br>▪ Funding for the Commonwealth Guaranteed Debt and Commonwealth Supported Obligations |
| Debt Service Reserve | 93.6 | 93.6 | ▪ Debt service required as requested by the MAT for 2008 Series A&B Bonds |
| Operating Reserve | 84.0 | 87.2 | ▪ To cover the operating reserve fund for current expenses as required per the MAT. Increase considers deposits made by PRASA following requirements under the MAT. |
| Current Expense Fund | 97.9 | 107.8 | ▪ For payment of operational expenses. |
| Revenue Fund | 4.2 | 4.2 | ▪ To fund trust reserves with amounts held in deposit following the MAT priority schedule (Sr Debt Service, Sr Sub Debt Service, Current Expense Fund, Operating Reserve, Capital Improvement Fund and the Commonwealth Payment Fund. June increase is related of government payments received. |
| Capital Improvement | 30.9 | 40.4 | ▪ Balance to pay for capital improvement investments deposited on a fund held by the Trust |
| Construction Fund | 64.7 | 61.9 | ▪ To pay cost of improvements, payment of the costs of issuance of bonds, and interests during construction. |
| Disaster Recovery | 98.5 | 77.1 | ▪ Proceeds in accounts for Disaster Recovery Efforts. Moneys including advancements on Insurance proceeds and FEMA Public Assistance Program |
| Compliance Escrow | 1.2 | 1.2 | ▪ Established through Consent Decree and Transactional Agreements with the Department of Health. |
| **TOTAL** | **$535** | **$552** | |

# Restricted Accounts / Subject to Title III Proceedings - HTA

| $ in millions | Balance as of | | |
|---|---|---|---|
| Grouping Subcategory | 9/28/2018 | 10/31/2018 | Notes |
| Operational | 39.7 | 32.3 | ▪ Includes construction and operational accounts. This bank account is the main deposit account for HTA. Funds from this account are commonly transferred to other HTA bank accounts to cover operational expenses, including payroll accounts for payroll, payroll taxes, and discounts. The decrease (-$7.4M) is primarily due to the net effect of operating and intra-government receipts (+$10.0M) less operating expenses other than payroll (-$22.5M) offsetting net effect of transfers from/to payroll and other accounts (-$1.8M) during the month. |
| Payroll | 2.0 | 5.6 | ▪ Related to payroll and payroll taxes. The increase (+$3.6M) is due to payroll and payroll taxes for the month of October (-$5.7M) offsetting transfers from the Operational Account (+$5.6M). |
| Federal Funds | 10.5 | 10.7 | ▪ HTA receives federal funds from the Federal Highway Administration ("FHWA") and the Federal Transit Administration ("FTA") and uses those funds to spend on FHWA and FTA earmarked infrastructure projects. The increase (+$0.2M) is primarily due to net effect during the month of federal capex spending (-$6.4M) and transfers from/to other accounts (-$1.0M) approx. offsetting FHWA and FTA inflows (+$6.7M). |
| Reserve | 312.3 | 341.4 | ▪ Consists of restricted/reserved funds for operational and construction contracts. The increase (+$29.1) is primarily due to transfers from federal accounts (+$12.6M). |
| TOTAL | $365 | $390 | |

## ASES

| $ in millions | Balance as of | | Notes |
|---|---|---|---|
| Grouping Subcategory | 9/28/2018 | 10/31/2018 | |
| Premium Payments Account | 409.9 | 377.4 | ▪ Premium Payments account receives federal and state funding, and makes disbursements for Managed Care Organizations ("MCO") premiums. |
| Control Account | 63.4 | 60.3 | ▪ The Control Account receives monies from the Rebates and Operational accounts, and makes disbursements for MCO premiums, and general overhead and payroll expenses.<br>▪ The monthly reduction is a timing variance related to receipt of offsetting federal funds related to the federal Bipartisan Budget Agreement, incremental to the approved FY18 federal funds budget, and the related discontinuation of Commonwealth funds to ASES. |
| Rebates and Operational Accounts | .5 | 2.4 | ▪ The Operational account receives monies from appropriations of approximately $4M per month and additional $4M to $5M from federal administrative reimbursements.<br>▪ Each day cash is swept into the control accounts, which brings balance to zero in Operational Account. The Rebate Account operates the same way in that monies are swept from it to Control Account. |
| TOTAL | $474 | $440 | |

# UPR

| $ in millions | Bank Balances as of | | Notes |
|---|---|---|---|
| Grouping Subcategory | 9/28/2018 | 10/31/2018 | |
| Operational Accounts[1] | 309.4 | 314.6 | ■ Increase of $5.2M in operational account balances is primarily due to increase in short-term money market investment accounts.<br><br>■ Approximately $305.2M, or 97.0% of UPR operational funds are held in five (5) accounts managed by Central Administration, $22.6M of which are restricted:<br> ▪ $157.5M market value of a securities account (unrestricted)[1],<br> ▪ $132.1M in a money market account ($15.5M[2] restricted),<br> ▪ $8.5M in concentration account (unrestricted),<br> ▪ $3.8M in hurricane insurance proceeds account (restricted),<br> ▪ $3.3M in research account at Recinto de Mayaguez at UBS (restricted).<br><br>■ Approximately $9.0M is in thirty four (39) active Banco Popular bank accounts managed by UPR, or it's units, which typically contain deposits of federal student aid ($9.0M restricted).[3] |
| Component Units Accounts | 34.0 | 33.5 | ■ Only a nominal overall decrease of $0.5M in component unit account balances mainly due to decrease in Retirement System accounts.<br><br>■ $15.6M in 4 accounts at *Servicios Médicos Universitarios, Inc. ("SMU")* ($8.3M restricted),<br>■ $15.2M in 12 accounts at *DUI* ($15.1M restricted),<br>■ $1.8M in 2 restricted accounts at *University of Puerto Rico Parking System Inc.*,<br>■ $0.5M in 2 restricted accounts related to Retirement Systems,<br>■ $0.4M in 2 accounts at *Materials Characterization Center, Inc.* ($0.1M restricted). |
| Bond Sinking Fund Accounts | 63.6 | 66.0 | ■ Three restricted US Bank accounts related to debt service obligations on UPR revenue bonds. |
| TOTAL | $407 | $414 | • As of 9/30/18: $133.2M Restricted ($43.1M operational; $26.5M CUs; $63.6M bonds), or 33%.<br>• As of 10/31/18: $123.8M Restricted ($32.0M operational; $25.8M CUs; $66.0M bonds), or 30%. |

*In general, the unrestricted account balances in operational accounts are used as working capital for payments of the ordinary obligations of the University, which are not subsidized by other sources. For example, accounts payable, budget deficits (including those related to UPR's Retirement System), and needs resulting from spend/reimbursement timing and uninsured portions for 2017 hurricane damages.*

1 UPR purchased T-Bills with monies from the BPPR money market account in three trades, each $50M - with maturities of only 30, 60 and 90 days, thus considered unrestricted cash equivalents available for operations.
2 Building and Facilities (Molecular Sciences/Plant Nursery): $7.8M; Endowment Fund: $6.2M; Perkins Federal Program: $1.0M; Donations: $0.5M.
3 Overall balance also includes restricted funds totaling $0.4M in a donation account at Banco Santander.
4 Confirming whether there are other legally separate entities, under the UPR structure that could have additional bank accounts. Will continue to update disclosure as information is available and validated.

## Other Public Corporations and Legally Separate Entities

| $ in millions | Balance as of[1] | | |
|---|---|---|---|
| PC or Legally Separate Entity | 9/28/2018 | 10/31/2018 | Notes |
| State Insurance Fund Corporation | 264.8 | 267.8 | ▪ Almost all of the balances include unrestricted operational accounts for premium collections and concentration purposes. The remaining balance consists of reserve and operational pass-through accounts. |
| Automobile Accident Compensation Administration | 125.9 | 123.0 | ▪ The majority of these funds represent investment reserves for the purposes of meeting future benefit payments, a standard operating procedure of insurance providers. The remaining amounts are mostly used for operational expenses. |
| Tourism Company | 96.9 | 98.3 | ▪ $54.7M in debt service reserve accounts, $4.9M related to room tax revenues and the rest are funds in operational accounts. |
| Agricultural Enterprises Development Administration | 52.2 | 59.0 | ▪ The majority of the balances include operational accounts including sweep and deposit accounts. The remaining balances consist of restricted/reserve accounts. |
| Housing Financing Authority | 61.1 | 51.6 | ▪ A portion of the balances are composed of restricted accounts including debt service, escrow, and federal funds. The remaining accounts are unrestricted operational accounts. |
| Industrial Development Company | 104.3 | 100.8 | ▪ Most of these funds are deposited for specific uses including, but not limited to, debt service reserves, incentive payments established by law, and capital expenditures. Remaining funds are mostly used for PRIDCO and Rums of PR operating expenses. |
| Other Public Corporations[2] | 677.7 | 740.3 | ▪ Description included in Appendix C. |
| TOTAL | $1,383 | $1,440 | |

[1] Except for accounts with an aggregate balance of $.2M which have not been updated as of the indicated dates.
[2] Refer to the footnotes on Slide 19 for Appendix A, on revised, reclassified and newly incorporated accounts.

# **Appendix A**: Reconciliations and Revisions of Reported Balances to Date

Detail of Updated Balances vs. September 28th disclosure
*(9/28/2018 balances reported on October, $ in millions)*

| $ in M | TSA | TSA Sweep | Pension related | Central Government - Non TSA | COFINA DSR | Other Restricted Title III Accounts | PREPA | PRASA | HTA | UPR | ASES | Other Public Corp's. | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Reported 9/28 Balances | 3,452 | 56 | 546 | 1,007 | 1,570 | 811 | 370 | 535 | 365 | 407 | 474 | 1,369 | 10,962 |
| Account Reclassifications | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| Revisions to Balances | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| Incorporated Accounts | - | - | - | 640[1] | - | - | - | - | - | - | - | 14[2] | 654 |
| Removed Accounts | - | - | - | - | - | - | - | - | - | - | - | - | 0 |
| Revised 9/28 Balances | 3,452 | 56 | 546 | 1,648 | 1,570 | 811 | 370 | 535 | 365 | 407 | 474 | 1,383 | 11,616 |

[1] Newly incorporated accounts for 'Central Government – Non-TSA' pertain to the PR Unemployment Fund ($612M), and two additional accounts, also from the Department of Labor at The Northern Trust ($28M).
[2] Newly incorporated accounts for 'Other Public Corporations' include an account identified and pertaining to PRITA ($14M), and various other accounts pertaining to HFA ($200K).

19

# Appendix B: Central Government – Non TSA

*$ in '000s*

| Agency Name | Balance as of | | DELTA |
|---|---|---|---|
| | 8/28/2018 | 10/31/2018 | 8/31/2018 |
| PR Investment Fund | 33,807.6     - | 33,813.8 | 6.3 |
| Department of Education | 21,287.3 | 24,501.2 | 3,214.0 |
| Telecommunication's Regulatory Board | 10,488.1 | 11,103.6 | 615.5 |
| Office of Government Ethics | 9,105.1 | 9,133.2 | 28.1 |
| Office of the Comptroller | 6,519.6 | 6,422.4 | (97.2) |
| Institute of Forensic Sciences | 4,725.1 | 4,469.1 | (256.0) |
| Puerto Rico Education Council | 3,099.6 | 3,617.4 | 517.8 |
| Institute of Statistics | 3,013.6 | 2,996.4 | (17.3) |
| OCAM - OGP | 2,512.5 | 2,512.5 | - |
| Department of Correction and Rehabilitation | 1,594.5 | 1,511.9 | (82.6) |
| Administration for Socioeconomic Development of the Family | 168.8 | 667.9 | 499.1 |
| Environmental Quality Board | 870.6 | 621.9 | (248.7) |
| Families and Children Administration | 519.2 | 502.0 | (17.2) |
| Department of Natural Resources | 407.5 | 407.5 | 0.0 |
| Office of Socioeconomic Development | 348.6 | 349.4 | 0.8 |
| Department of Consumer Affairs | 238.1 | 220.2 | (17.9) |
| Commonwealth Election Commission | 210.8 | 164.5 | (46.3) |
| Department of Justice | 12.9 | 12.9 | - |
| Office of the Governor | 9.9 | 9.9 | 0.0 |
| Puerto Rico National Guard | 5.3 | 4.9 | (0.4) |
| Industrial Commission | - | - | - |
| **Total** | **98,945** | **103,043** | **4,098** |

# Appendix C: Other Public Corporations and Legally Separate Entities

*$ in '000s*

| | Balance as of | | DELTA |
|---|---|---|---|
| **Agency Name** | **9/28/2018** | **10/31/2018** | **8/31/2018** |
| Public Private Partnership Authority | 17,379.7 | 113,280.0 | 95,900.2 |
| Economic Development Bank | 108,316.1 | 106,104.0 | (2,212.1) |
| Infrastructure Financing Authority | 92,586.2 | 90,134.8 | (2,451.4) |
| Public Buildings Authority | 108,803.7 | 86,813.8 | (21,989.9) |
| Fiscal Agency and Financial Advisory Authority | 35,617.7 | 37,762.9 | 2,145.2 |
| Medical Services Administration | 38,634.8 | 34,613.8 | (4,021.0) |
| Ports Authority | 34,459.2 | 30,485.1 | (3,974.0) |
| Convention Center District Authority | 23,942.5 | 30,027.3 | 6,084.8 |
| Comprehensive Cancer Center | 28,143.6 | 28,408.9 | 265.3 |
| Integrated Transport Authority | 26,505.1 | 24,528.8 | (1,976.3) |
| Financial Oversight Board | 21,032.6 | 20,567.9 | (464.6) |
| Land Authority | 15,512.2 | 15,323.3 | (188.9) |
| Puerto Rico Trade and Export Company | 14,626.2 | 14,713.3 | 87.2 |
| Government Employee and Judiciary Retirement System Administration | 13,336.5 | 13,349.1 | 12.6 |
| Solid Waste Authority | 12,426.6 | 12,378.6 | (48.0) |
| Other | 15,155.4 | 11,849.3 | (3,306.1) |
| Teacher's Retirement System | 12,264.7 | 10,836.6 | (1,428.2) |
| Land Administration | 10,071.1 | 10,672.7 | 601.6 |
| Puerto Rico and the Caribbean Cardiovascular Center Corporation | 11,849.1 | 10,099.0 | (1,750.1) |
| Energy Commission | 7,593.6 | 7,829.8 | 236.3 |
| Musical Arts and Stagecraft Corporation | 5,682.1 | 5,588.0 | (94.1) |
| National Guard Institutional Trust | 5,419.9 | 5,549.5 | 129.6 |
| Farm Insurance Corporation | 5,371.8 | 4,949.4 | (422.4) |
| Institute of Puerto Rican Culture | 2,582.4 | 4,650.2 | 2,067.8 |
| Fine Arts Center Corporation | 3,386.8 | 3,645.1 | 258.3 |
| Authority for the Redevelopment of the land and facilities of the Roosevelt Roads Naval Station | 1,709.4 | 1,715.6 | 6.2 |
| Conservatory of Music | 1,577.7 | 1,554.5 | (23.3) |
| Center for Research, Education and Medical Services for Diabetes | 918.1 | 886.9 | (31.2) |
| Company for the Integral Development of Cantera's Peninsula | 878.6 | 801.8 | (76.7) |
| School of Plastic Arts | 932.3 | 785.5 | (146.8) |
| Public Broadcasting Corporation | 647.1 | 322.9 | (324.2) |
| Port of the Americas Authority | 159.5 | 163.4 | 3.9 |
| Culebra Conservation and Development Authority | 95.7 | 109.2 | 13.5 |
| Bosque Modelo de PR | 60.0 | 75.8 | 15.9 |
| Martín Peña Canal ENLACE Project Corporation | 63.7 | 63.7 | - |
| **Total** | **677,742** | **740,641** | **62,899** |

21

Case:17-03283-LTS   Doc#:4606-7   Filed:01/02/19   Entered:01/02/19 16:23:38   Desc:  H
- R to the Peter Hein Declaration   Page 420 of 447

Exhibit Q



**Puerto Rico Fiscal Agency and Financial Advisory Authority**

## *Puerto Rico Department of Treasury*

*Treasury Single Account ("TSA") FY 2019 Cash Flow*

*As of December 7, 2018*

Exhibit Q

## Disclaimer

- The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.

- The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

- This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Nor does this document constitute an audit of compliance with any other federal law, rule, or regulation. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

- Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

- By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

- This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.

**Glossary**

| Term | Definition |
|---|---|
| AACA | - Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | - Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI / PRIFA | - Infrastructure Financing Authority. |
| Agency Collections | - Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| ASC | - Compulsory Liability Insurance, private insurance company. |
| BBA | - BBA refers to the Bipartisan Budget Act of 2018 passed by the United States Congress on 2/9/2018.  The BBA includes provisions for additional disaster relief funding for Puerto Rico in addition to incremental federal funds to support Puerto Rico's public health care costs (Medicaid funding) for two years. |
| General Collections | - All Gross tax collections received and deposited into the TSA from all Hacienda Collection Posts and/or through the Hacienda Colecturia Virtual (online). |
| COFINA | - Puerto Rico Sales Tax Financing Corporation. |
| DTPR | - Department of the Treasury of Puerto Rico. |
| General Fund | - General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| DTPR Collection System | - This is the software system that DTPR uses for collections. |
| HTA | - Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| JRS | - Judiciary Retirement System means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| Liquidity Plan | - The FY 2019 TSA Liquidity Plan is under development. Following the development of the FY 2019 TSA Liquidity Plan, this package will include a comparison of FY19 actual TSA cash flow data to the FY 2019 TSA Liquidity Plan along with the relevant commentary. |
| Net Payroll | - Net payroll is equal to gross payroll less tax withholdings and other deductions. |
| NAP | - NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Pension PayGo | - Pension PayGo- Puerto Rico pension system that is funded through a pay-as-you-go system.  Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PREPA | - Puerto Rico Electric Power Authority. |
| PRHA | - Puerto Rico Housing Authority. |
| Retained Revenues | - Revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts.  The largest of these pass-through accounts consist of (i) AACA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, (iv) HTA toll revenues. |
| SIFC | - State Insurance Fund Corporation. |
| Special Revenue Funds | - Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. |
| TSA | - Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

3

## Introduction

- Enclosed is the weekly Treasury Single Account ("TSA") cash flow report and supporting schedules with weekly actual results YTD FY19. The FY 2019 TSA Liquidity Plan is under development. Following the development of the FY 2019 TSA Liquidity Plan, this package will include a comparison of FY19 actual TSA cash flow data to the FY 2019 TSA Liquidity Plan along with the relevant commentary. Until that time, FY18 actual TSA results will be presented for comparison purposes and variance analysis. Note that on September 6, 2017 Hurricane Irma made landfall on Puerto Rico, followed by Hurricane Maria on September 20, 2017. Variances driven by differences in September and October in the comparable period in FY18 are largely driven by the DTPR's limited ability to make disbursements and collect receipts immediately following the hurricanes.

- TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.

- Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.

- Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

- Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"), and transferred to the TSA only after admissible disbursements (per approved Project Worksheets) have been made.

- Data for TSA inflows/outflows is reported from various systems within the Department of Treasury of Puerto Rico ("DTPR"):
    Cash Flow Actual Results - Source for the actual results is the TSA Cash Flow.
    Schedule A - Collections - Source for collections information is the DTPR collections system.
    Schedule B - Central Government Live Web Portal AP Aging

- Data limitations and commentary:
    The government has focused on cash transaction information for which access to reliable, timely, and detailed data is readily available. The government continues to work with DTPR and other parties to access additional reliable data that would help to provide additional detail in the future.

4

**Puerto Rico Department of Treasury | AAFAF**                                                                                                     **As of December 7, 2018**

*Executive Summary - TSA Cash Flow Actual Results FY19 YTD vs. FY18 YTD (a)*

| $3,634M | $335M | ($431M) | ($96M) | $536M |
|---|---|---|---|---|
| Bank Cash Position | Weekly Cash Receipts | Weekly Cash Disbursements | Weekly Cash Flow | YTD Cash Flow |

| | Cash Flow line item | Variance ($M) | Comments |
|---|---|---|---|
| 1 | Inflow - Collections | $ 557 | 1.) Variance is largely driven by improved FY19 collections with outperformance attributable to Corporate Income Taxes (+$157M), Individual Income Taxes (+$159M), & Motor Vehicles fees (+$108M) stemming from positive impact of post-hurricane recovery efforts. Additionally, a portion of positive variance is driven by the timing of Act 154 collections (+$14M) and Non Resident Withholding receipts (+$46M). |
| 2 | Inflow - Sales and Use Tax | 127 | 2.) Variance is primarily due to depressed FY2018 sales and use tax collections following the hurricanes in addition to certain tax exemptions extended to small businesses and on the sales tax typically applied to prepared foods. |
| 3 | Inflow - Pension Inflows | (226) | 3.) Variance is primarily due to FY2018 Pension Asset sales of $390M which occurred in July of 2017. |
| 4 | Inflow - Federal Fund Receipts (b) | 2,288 | 4.) Variance is mainly driven by increased federal funding for the Medicaid Program, Nutritional Assistance, the Department of Public Housing, federal funds received for the pass through of Employee Retention Credits (ERC), and funds received for federally-reimbursable vendor disbursements. |
| 5 | Inflow - PREPA Loan | 153 | 5.) Puerto Rico Central Government loaned $300M to PREPA pursuant the Superpriority Post-petition Revolving Credit Loan Agreement (The Agreement) in February of FY2018.  Offsetting inflows relate to mandatory loan repayments based on PREPA revenues and cash balance in FY2019. |
| 6 | Outflow - ASES Appropriations | (230) | 6.) Total increase in outflows to ASES (Medicaid funds) is the net result of: (1) increase in FY2019 federal funds used for Medicaid provided for in the BBA (-$576M); and (2) decrease in FY2019 general fund dollars needed to fund Medicaid (+$346M) since the additional federal funding via the BBA eliminates the need to utilize the General Fund for Medicaid spending. |
| 7 | Outflow - HTA Appropriations | (109) | 7.) Unfavorable variance due to carry over capital expenditure related funding from FY18 (-$80M), for which HTA is administering those funds on behalf of the Dept. of Transportation; and (-$29M) due to timing. |
| 8 | Outflow - Vendor Disbursements | (1,171) | 8.) Increase in vendor payments is mainly driven by FEMA Cost Share payments (-$135M), Title III disbursements (-$100M), federally reimbursable payments for the Department of Public Housing relating to the prior budget period  (-$445M), and increases in all other federally-reimbursable payments related to the prior budget period (-$281M), with the remaining difference largely attributable to the slow-down in vendor payments in the weeks following Hurricanes María and Irma in FY2018. |
| 9 | Outflow - Tax Refunds | (232) | 9.) Tax refunds variance is mainly driven by the payment of employee retention credits in FY2019 (-$295M).  Remaining positive offsetting variance is mostly due to past-due refunds paid in the first quarter of FY2018. |
| 10 | Outflow - NAP Appropriations | (521) | 10.) Increase in outflows for NAP corresponds to the increase in Federal Fund Receipts for the Nutritional Assistance Program provided for in the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017. |
| | All Other | 168 | |
| | **Total YTD Variance** | **$ 805** | |

**Footnotes:**

(a)  *For comparison purposes, YTD figures for the week ended 12/8/2017 are used above for the prior year due to calendar year differences between FY2018 to FY2019.*

(b)  *The total YTD FY19 vs. YTD FY18 federal funds receipt inflows variance (+$2,288M) is offset by corresponding federal funds outflows variances: (1) ASES Medicaid outflows variance (-$576M); (2) a portion of the vendor disbursements variance (-$726M); (3) NAP outflows variance (-$521M); and (4) federal funds received for Employee Retention Credits (-$295M) that are paid through tax refunds cash flow line item.  The sum of these four offsetting outflow variances is (-$2,118M). Remaining federal funds outflow variance offsets includes payroll disbursements and others.*

**Puerto Rico Department of Treasury | AAFAF**

**As of December 7, 2018**

*TSA Cash Flow Actual Results for the Week Ended December 7, 2018*

| *(figures in $000s)* | Schedule | 12/7 | FY19 YTD | FY18 YTD (l) | Variance YTD |
|---|---|---|---|---|---|
| | | | | | |
| **General & Special Revenue Funds Inflows** | | | | | |
| 1  Collections (a) | A | $109,841 | $3,366,949 | $2,809,961 | $556,988 |
| 2  Agency Collections | | 6,475 | 193,031 | 152,037 | 40,994 |
| 3  Sales and Use Tax | | 23,649 | 524,765 | 397,844 | 126,922 |
| 4  Excise Tax through Banco Popular | | — | 236,224 | 229,923 | 6,301 |
| 5  Rum Tax | | — | 143,291 | 130,452 | 12,839 |
| 6  Electronic Lottery | | — | 30,869 | 30,887 | (17) |
| 7  Subtotal - General & Special Revenue Funds Inflows | | $139,965 | $4,495,128 | $3,751,103 | $744,025 |
| | | | | | |
| **Retirement System Inflows** | | | | | |
| 8  Contributions From Pension Systems (b) | | $3,266 | $164,094 | $390,480 | ($226,386) |
| 9  Subtotal - Retirement System Inflows | | $3,266 | $164,094 | $390,480 | ($226,386) |
| | | | | | |
| **Other Inflows** | | | | | |
| 10  Federal Fund Receipts (c) | | $182,797 | $4,329,474 | $2,041,217 | $2,288,257 |
| 11  Loans and Tax Revenue Anticipation Notes (d) | | — | 153,211 | — | 153,211 |
| 12  Other Inflows (e) | | 9,410 | 226,560 | 157,341 | 69,219 |
| 13  Subtotal - Other Inflows | | $192,206 | $4,709,245 | $2,198,558 | $2,510,688 |
| | | | | | |
| 14  **Total Inflows** | | **$335,438** | **$9,368,467** | **$6,340,141** | **$3,028,326** |
| | | | | | |
| **Payroll Outflows** | | | | | |
| 15  Net Payroll (f) | | ($49,443) | ($733,753) | ($732,571) | ($1,182) |
| 16  Other Payroll Related Costs - (SSA, SIFC, Health Insurance) (g) | | (53,875) | (556,672) | (586,247) | 29,575 |
| 17  Gross Payroll - PR Police Department (h) | | (28,815) | (295,143) | (305,386) | 10,243 |
| 18  Subtotal - Payroll and Related Costs | | ($132,133) | ($1,585,568) | ($1,624,204) | $38,636 |
| | | | | | |
| **Pension Outflows** | | | | | |
| 19  Pension Benefits | | ($25,915) | ($907,901) | ($889,365) | ($18,536) |
| 20  Pension Paygo Outlays on Behalf of Public Corporations | | — | — | — | — |
| 21  Subtotal - Pension Related Costs | | ($25,915) | ($907,901) | ($889,365) | ($18,536) |
| | | | | | |
| **Appropriations - All Funds** | | | | | |
| 22  Health Insurance Administration - ASES | | — | ($1,260,817) | ($1,030,917) | ($229,900) |
| 23  University of Puerto Rico - UPR | | (51,451) | (304,905) | (334,161) | 29,256 |
| 24  Muni. Revenue Collection Center - CRIM | | (13,916) | (93,908) | (104,554) | 10,646 |
| 25  Highway Transportation Authority - HTA | | — | (186,243) | (77,738) | (108,505) |
| 26  Public Buildings Authority - PBA | | (9,080) | (54,478) | (38,692) | (15,786) |
| 27  Other Government Entities | | (29,409) | (221,581) | (200,088) | (21,494) |
| 28  Subtotal - Appropriations - All Funds | | ($103,856) | ($2,121,932) | ($1,786,150) | ($335,782) |
| | | | | | |
| **Other Disbursements - All Funds** | | | | | |
| 29  Vendor Disbursements (i) | | ($111,115) | ($2,182,304) | ($1,011,274) | ($1,171,030) |
| 30  Other Legislative Appropriations (j) | | (24,563) | (161,491) | (175,270) | 13,779 |
| 31  Tax Refunds | | (14,983) | (471,795) | (239,980) | (231,815) |
| 32  Nutrition Assistance Program | | (44,951) | (1,368,511) | (847,824) | (520,687) |
| 33  Other Disbursements | | 26,197 | (33,118) | (35,093) | 1,975 |
| 34  Loans and Tax Revenue Anticipation Notes | | — | — | — | — |
| 35  Subtotal - Other Disbursements - All Funds | | ($169,415) | ($4,217,219) | ($2,309,440) | ($1,907,778) |
| | | | | | |
| 36  **Total Outflows** | | **($431,319)** | **($8,832,621)** | **($6,609,160)** | **($2,223,461)** |
| | | | | | |
| 37  **Net Cash Flows** | | **($95,881)** | **$535,847** | **($269,019)** | **$804,865** |
| | | | | | |
| 38  Bank Cash Position, Beginning (k) | | 3,729,739 | 3,098,010 | 1,798,997 | |
| | | | | | |
| 39  Bank Cash Position, Ending (k) | | $3,633,857 | $3,633,857 | $1,529,979 | |

**Note:** *Refer to the next page for footnote reference descriptions.*

**Puerto Rico Department of Treasury | AAFAF**                                  **As of December 7, 2018**

*FY19 TSA Cash Flow Actual Results - Footnotes*

Footnotes:

(a) Represents gross tax collections received and deposited from all Hacienda Collection Posts and/or through the Hacienda Colecturia Virtual (online).

(b) FY19 amount represents Paygo charges to municipalities and public corporations collected at the TSA. FY18 amount represents Pension System Asset Sales.

(c) Federal funds receipts include disaster relief which are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"), and transferred to the TSA only after admissible disbursements (per approved Project Worksheets) have been made. These inflows to the TSA are captured in Federal Funds Receipts.

(d) Puerto Rico Central Government loaned $300M to PREPA pursuant the Superpriority Post-petition Revolving Credit Loan Agreement (The Agreement) in February of FY2018. Inflows / loan repayments relate to mandatory loan repayments based on PREPA revenues and cash balance in FY2019 as defined within The Agreement. Note that on July 1, 2018 the full loan amount ($300M) was outstanding. To date, PREPA has repaid $153M per the aforementioned agreement, and the loan outstanding as of the date of this report is $147M.

(e) Includes inflows related to the Department of Health, Department of Labor and Human Resources, the Commissioner of Financial Institutions, and others.

(f) Payroll is paid twice per month on the 15th and 30th (or last day of the month, whichever comes sooner). The week ended 12/7 was an exception to this, as central government Christmas Bonus payroll was paid on 12/5/2018.

(g) Related to employee withholdings, social security, insurance, and other deductions.

(h) Police payroll is reflected individually because it is paid through a separate bank account. The Puerto Rico Police Department disburses its own payroll & related benefits, and outflows for Police Payroll relate to requested payroll advances to the central government (TSA), in agreement with DTPR and the approved budget for Police Payroll.

(i) Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.

(j) Refers to General Fund appropriations to non-TSA entities such as Legislative Assembly, Correctional Health, Comprehensive Cancer Center, and others.

(k) Excludes DTPR account with Banco Popular of Puerto Rico Account containing a balance of approximately $147M.

(l) For comparison purposes, YTD figures for the week ended 12/8/2017 are used for the prior year due to calendar year differences between FY2018 to FY2019.

7

**Puerto Rico Department of Treasury | AAFAF**
*Schedule A: Collections Detail - Weekly Actual Results*

As of December 7, 2018

| *(figures in $000s)* | 9/28 YTD | 10/5 | 10/12 | 10/19 | 10/26 | 11/2 | 11/9 | 11/16 | 11/23 | 11/30 | 12/7 | FY19 YTD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **General Fund** | | | | | | | | | | | | |
| 1 Individuals | $527,208 | $46,082 | $51,476 | $50,108 | $34,362 | $41,762 | $43,949 | $46,856 | $21,481 | $35,842 | $40,819 | $939,945 |
| 2 Corporations | 410,581 | 9,254 | 96,570 | 63,827 | 12,132 | 5,811 | 11,544 | 25,074 | 2,413 | 6,366 | 15,017 | 658,589 |
| 3 Non Residents Withholdings | 159,073 | 3,517 | 51,769 | 4,292 | 979 | 1,698 | 4,191 | 34,592 | 501 | 733 | 1,690 | 263,034 |
| 4 Act 154 (a) | 435,152 | 323 | 46,651 | 23,903 | – | 317 | 13,855 | 64,602 | – | 348 | 884 | 586,036 |
| 5 Alcoholic Beverages | 70,821 | 5,725 | 6,490 | 3,096 | 3,275 | 8,133 | 4,390 | 8,847 | 1,289 | 9,948 | 2,092 | 124,105 |
| 6 Cigarettes | 51,215 | 3,198 | 6,270 | 3,261 | 3,089 | 3,114 | 3,805 | 5,741 | 67 | 3,186 | 213 | 83,160 |
| 7 Motor Vehicles | 126,626 | 14,126 | 17,218 | 10,664 | 7,735 | 11,101 | 15,243 | 8,746 | 8,459 | 12,687 | 11,476 | 244,080 |
| 8 Other General Fund | 47,400 | 4,068 | 4,887 | 2,430 | 1,568 | 2,218 | 4,419 | 4,475 | 586 | 1,899 | 1,480 | 75,429 |
| 9 **Total General Fund Portion of General Collections** | **$1,828,077** | **$86,293** | **$281,331** | **$161,581** | **$63,138** | **$74,154** | **$101,395** | **$198,932** | **$34,796** | **$71,009** | **$73,671** | **$2,974,376** |
| **Retained Revenues (b)** | | | | | | | | | | | | |
| 10 AACA Pass Through | $18,544 | $2,519 | $846 | $896 | $1,174 | $2,692 | $1,458 | $768 | $445 | $1,894 | $2,806 | $34,043 |
| 11 AFI Pass Through | 641 | – | 6 | 0 | – | 145 | 2 | 208 | 5 | 0 | – | 1,009 |
| 12 ASC Pass Through | 14,161 | 1,264 | 614 | 691 | 877 | 1,298 | 825 | 519 | 302 | 1,253 | 900 | 22,704 |
| 13 HTA Pass Through | 147,946 | 4,565 | 36,363 | 2,146 | 2,629 | 5,195 | 24,258 | 14,675 | 1,079 | 3,796 | 5,062 | 247,714 |
| 14 Total Other Retained Revenues | 24,694 | 2,264 | 2,388 | 1,223 | 1,200 | 1,580 | 2,693 | 977 | 425 | 1,676 | 1,226 | 40,345 |
| 15 **Total Retained Revenues Portion of General Collections** | **$205,986** | **$10,612** | **$40,218** | **$4,957** | **$5,880** | **$10,910** | **$29,236** | **$17,147** | **$2,256** | **$8,619** | **$9,994** | **$345,814** |
| 16 **Total Collections from DTPR Collections System** | **$2,034,063** | **$96,905** | **$321,549** | **$166,537** | **$69,019** | **$85,064** | **$130,630** | **$216,079** | **$37,052** | **$79,627** | **$83,665** | **$3,320,191** |
| 17 Timing-related unreconciled TSA Collections (c) | 21,351 | (1,599) | (175,442) | 166,811 | 10,404 | (6,187) | (30,556) | (12,537) | 64,355 | (16,018) | 26,176 | 46,759 |
| 18 **Total General Collections** | **$2,055,414** | **$95,306** | **$146,107** | **$333,348** | **$79,423** | **$78,878** | **$100,074** | **$203,542** | **$101,407** | **$63,609** | **$109,841** | **$3,366,949** |

*Source: DTPR*

Footnotes:

(a) Collections presented only include Act 154 Collections received into the Collections Post Account (CPA). Additional Act 154 Collections are received into a separate account and cash flow line item, shown on page 6 in line 4: Excise Tax through Banco Popular. Total Act 154 Collections are therefore the sum of these two amounts.

(b) Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts, the majority of which include (i) ACAA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, and (iv) HTA toll revenues.

(c) Receipts in collections post account occur approximately two business days prior to being deposited into the TSA.

**Puerto Rico Department of Treasury | AAFAF**　　　　　　　　　　　　　　As of December 7, 2018

*Schedule B: Central Government - Live Web Portal AP Aging (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued…*

| ID | Agency Name | 3rd Party Payables | Intergovernmental Payables | Total |
|----|-------------|-------------------:|---------------------------:|------:|
| 071 | Department of Health | $   73,929 | $   40,800 | $   114,729 |
| 078 | Department of Education | 105,656 | 5,248 | 110,904 |
| 081 | Department of Housing | 52,842 | 2,820 | 55,662 |
| 049 | Department of Transportation and Public Works | 18,309 | 12 | 18,321 |
| 016 | Office of Management and Budget | 17,864 | 9 | 17,873 |
| 137 | Hacienda (entidad interna - fines de contabilidad) | 15,280 | 245 | 15,525 |
| 040 | Department of Correction and Rehabilitation | 15,185 | 19 | 15,204 |
| 095 | Commonwealth Election Commission | 10,104 | 1,635 | 11,739 |
| 025 | Mental Health and Addiction Services Administration | 10,942 | 432 | 11,375 |
| 127 | Families and Children Administration | 8,549 | 247 | 8,796 |
| 038 | Puerto Rico Police | 8,511 | 116 | 8,627 |
| 024 | Adm. for Socioeconomic Development of the Family | 7,156 | 179 | 7,334 |
| 028 | Department of Justice | 6,670 | 78 | 6,748 |
| 050 | Department of Natural and Environmental Resources | 3,820 | 2,277 | 6,097 |
| 123 | Department of the Treasury | 5,354 | 160 | 5,514 |
| 122 | General Services Administration | 5,174 | 59 | 5,233 |
| 031 | Department of the Family | 4,672 | 103 | 4,775 |
| 055 | Industrial Commission | 4,718 | 1 | 4,719 |
| 043 | Department of Labor and Human Resources | 3,771 | 531 | 4,301 |
| 126 | Administration for Integral Development of Childhood | 4,177 | 3 | 4,181 |
| 021 | Emergency Management and Disaster Adm. Agency | 3,617 | 65 | 3,682 |
| 067 | Child Support Administration | 2,866 | 493 | 3,359 |
| 014 | Highway and Transportation Authority | 2,265 | 351 | 2,616 |
| 124 | Puerto Rico National Guard | 2,428 | 133 | 2,561 |
| 241 | Environmental Quality Board | 380 | 1,648 | 2,028 |
| 087 | Department of Sports and Recreation | 1,802 | 119 | 1,920 |
| 015 | Office of the Governor | 1,009 | 46 | 1,055 |
| 220 | General Court of Justice | 962 | - | 962 |
| 105 | Elderly and Retired People Advocate Office | 712 | 230 | 942 |
| 266 | Office of the Financial Institutions Commissioner | 579 | 194 | 772 |
| 120 | State Historic Preservation Office | 752 | 2 | 755 |
| 045 | Department of Agriculture | 614 | - | 614 |
| 022 | Emergency Medical Services Corps | 604 | 3 | 607 |
| 290 | Veterans Advocate Office | 597 | - | 597 |
| 221 | State Energy Office of Public Policy | 459 | 16 | 475 |
| 152 | Planning Board | 253 | 42 | 295 |
| 018 | Office of the Commissioner of Insurance | 269 | 1 | 270 |
| 141 | Telecommunication's Regulatory Board | 223 | - | 223 |
| 023 | Cooperative  Development Commission | 176 | 16 | 191 |
| 065 | Firefighters Corps | 172 | 0 | 172 |
| 155 | Department of State | 126 | - | 126 |

**Puerto Rico Department of Treasury | AAFAF**                                    **As of December 7, 2018**

*Schedule B: Central Government - Live Web Portal AP Aging (a) (b)*
*All Agencies*

*(figures in $000s)*
*Continues and Continued...*

| ID | Agency Name | 3rd Party Payables | Intergovernmental Payables | Total |
|----|-------------|-------------------:|---------------------------:|------:|
| 089 | Department of Public Security | 110 | - | 110 |
| 042 | Horse Racing Industry and Sport Administration | 102 | 1 | 103 |
| 096 | Women's Advocate Office | 90 | 3 | 93 |
| 139 | Office of Public Security Affairs | 92 | - | 92 |
| 273 | Public Services Commission | 77 | 5 | 82 |
| 035 | Health Advocate Office | 60 | 1 | 62 |
| 037 | Correctional Health | 51 | - | 51 |
| 075 | Advocacy for Persons with Disabilities of the Commonw< | 50 | - | 50 |
| 281 | Permit Management Office | 42 | - | 42 |
| 231 | Citizen's Advocate Office (Ombudsman) | 40 | - | 40 |
| 069 | Industrial Tax Exemption Office | 38 | - | 38 |
| 226 | Civil Rights Commission | 35 | - | 35 |
| 153 | Joint Special Counsel on Legislative Donations | 28 | - | 28 |
| 060 | Parole Board | 17 | 6 | 23 |
| 224 | Energy Affairs Administration | 20 | - | 20 |
| 062 | Department of Consumer Affairs | 16 | - | 16 |
| 034 | Office of the Commissioner of Municipal Affairs | 10 | - | 10 |
| 030 | University Pediatric Hospital | 10 | - | 10 |
| 098 | Office of Adm. and Transformation of HR in the Govt. | 3 | - | 3 |
|  | Other | 6,569 | 2,299 | 8,868 |
|  | **Total (c)** | **$ 411,012** | **$ 60,645** | **$ 471,657** |
|  | Total Unmatched Invoices (c) |  |  | $60,944 |

Footnotes:
(a) *Data presented above represents the Central Government live AP Web Portal repository of third party and intergovernmental invoices by agency, implemented for FY2019. The full transition to managing central government payables through the web portal is not yet complete and therefore the table above may not represent all Central Government AP. Ongoing efforts with the largest agencies to implement the appropriate processes and controls needed to fully transition to the web portal and realize improvements in reporting and efficiency continue as of the date of this report.*

(b) *On a go-forward basis, vendors submit invoices for approval through the live AP Web Portal where they are logged electronically, matched with the appropriate purchase order or other relevant documentation, and approved / vouchered at the agency level through the online interface.*

(c) *The total of Unmatched Invoices presented shows the amount of payables maintained outside the web portal system. Unmatched invoices are tracked in manual ledgers as the process is still ongoing to validate these invoices have (i) been paid / not yet paid; or (ii) are appropriately included in the AP Web Portal.*

Exhibit R

Exhibit R



**Puerto Rico Department of Treasury**

*Treasury Single Account ("TSA") FY 2018 Cash Flow*

*As of June 29, 2018*

*Disclaimer*

- *The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties.*

- *The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.*

- *This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Nor does this document constitute an audit of compliance with any other federal law, rule, or regulation.  Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.*

- *Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.*

- *By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.*

- *This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.*

- *The report dated January 19, 2018, "Summary of Bank account Balances for Puerto Rico Governmental Instrumentalities As of December 31 2017," (the "Bank Account Balance Report") disclosed the balance of Other Puerto Rico Treasury Custody Accounts of $580 million as of December 31, 2017. This balance was further segmented into $374M in pension-related funds (Employee Withholdings and Pay-Go Charges), $142M in Central Government non-TSA funds (lottery-related funds and other funds held and administered by central government agencies), and $64M held TSA Sweep Accounts that collect income and completely pass through to TSA on a daily basis (includes General Collections Posts, Agency Collections Posts, and SUT). As further set forth in the Bank Account Balance Report, processes are currently in place to continue evaluating the accounts, including analyzing the cash inflows and outflows and reviewing legal restrictions relative to funds deposited into the bank accounts.*

*Glossary*

| Term | | Definition |
|---|---|---|
| AACA | - | Automobile Accident Compensation Administration, or Administración de Compensaciones por Accidentes de Automoviles, is a component unit of the Commonwealth of Puerto Rico. |
| Act 154 | - | Act 154 means Act No. 154-2010, which, inter alia, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2027. |
| AFI/RBC | - | Infrastructure Financing Authority. |
| Agency Collections | - | Collections made by central government agencies at collection posts for services rendered by the agencies as well as fees, licenses, permits, fines and others. |
| Approved FY 2018 Budget | - | Consolidated Budget for Fiscal Year 2018 approved by the Puerto Rico Legislative Assembly on July 13, 2017. |
| ASC | - | Compulsory Liability Insurance, private insurance company. |
| ASSMCA | - | Administración de Servicios de Salud Mental y Contra la Adicción, or Mental Health and Addiction Services Administration, is an agency of the Commonwealth of Puerto Rico. |
| Bank Checks Paid | - | A report provided by the bank that is utilized to determine vendor payments. |
| BPPR | - | Banco Popular de Puerto Rico. |
| Budget Reserves | - | Non-cash reserves for budgeting purposes.  Consist of a Liquidity Reserve ($190M), OMB Reserve ($446M), Budgetary Reserve ($85M), Other Income Reserve ($84M), and Emergency Fund ($30M). |
| Checks in Vault | - | Refers to checks issued but physically kept in vault. |
| Collections | - | Collections made by the Department of the Treasury (Treasury) at collection posts and/or the Treasury revenue collection systems, such as income taxes, excise taxes, fines and others. |
| COFINA | - | Puerto Rico Sales Tax Financing Corporation. |
| COFINA SUT Collections | - | In accordance with a sales tax finance agreement between the government of Puerto Rico and COFINA, throughout FY2018 the first 5.5% (of total 10.5%) of gross SUT collections are reserved for and deposited into the COFINA bank account held at BNY Mellon until a $753M cap has been reached on total SUT collections remitted to COFINA. |
| DTOP | - | Department of the Transportation and Public Works |
| DTPR | - | Department of the Treasury of Puerto Rico. |
| ERS | - | Employees Retirement System means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, a statutory trust created by Act No. 447 of May 15, 1951, as amended, to provide pension and other benefits to retired employees of the Commonwealth, its public corporations and municipalities. ERS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| General Fund | - | General Fund (Operating Fund) means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process. |
| DTPR Collection System | - | This is the software system that DTPR uses for collections. |
| HTA | - | Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico. |
| JRS | - | Judiciary Retirement System means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| Liquidity Plan | - | The FY 2018 Treasury Single Account Liquidity Plan was prepared at the beginning of the fiscal year based on the approved FY 2018 Budget, was projected monthly through June 2018, and is used as the benchmark against which results are measured.  As a result of material economic and operational changes stemming from Hurricanes Irma and Maria, DTPR is in the process of developing a reforecast of TSA cash flows to year-end.  Until then, the original TSA forecast will continue to serve as the measure for cash flow |
| Net Payroll | - | Net payroll is equal to gross payroll less tax withholdings and other deductions. |
| Nutrition Assistance Program | - | NAP, or the Nutrition Assistance Program, also known as PAN, or Programa de Asistencia Nutricional is a federal assistance nutritional program provided by the United States Department of Agriculture (USDA) solely to Puerto Rico. |
| Pension PayGo | - | Pension PayGo- Puerto Rico pension system that is funded through a pay-as-you-go system.  Retirement benefits expenses of government employers are paid by the central government and reimbursed by the employers, with such funds received by the TSA. |
| PRASA | - | Puerto Rico Aqueducts and Sewers Authority. |
| PREMA | - | Puerto Rico Emergency Management Agency. |
| PREPA | - | Puerto Rico Electric Power Authority. |
| PRHA | - | Puerto Rico Housing Authority. |
| PRIFAS | - | Puerto Rico Integrated Financial Accounting System. |
| Reconciliation Adjustment | - | Reserve account in DTPR cash flow, related to E&Y's Expense Reconciliation Adjustment (RA) as per the Fiscal Plan certified on March 13, 2017. |
| Retained Revenues | - | Revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts.  The largest of these pass-through accounts consist of (i) AACA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, (iv) HTA toll revenues. |
| RHUM System | - | This is the software system that DTPR uses for payroll. |
| SIFC | - | State Insurance Fund Corporation. |
| Special Revenue Funds | - | Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. |
| SSA | - | Social Security Administration. |
| TRS | - | Teachers Retirement System means the Puerto Rico System of Annuities and Pensions for Teachers, a statutory trust created to provide pension and other benefits to retired teachers of the Puerto Rico Department of Education and to the employees of the Teachers Retirement System. TRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements. |
| TSA | - | Treasury Single Account, the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.  Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. |

*Introduction*

- *Enclosed is the weekly Treasury Single Account ("TSA") cash flow report, supporting schedules and Liquidity Plan to actual variance analysis.*

- *TSA is the Commonwealth's main operational bank account (concentration account) in which a majority of receipts from Governmental funds are deposited and from which most expenses are disbursed.*

- *Beginning April 2016, TSA receipts are deposited in a commercial bank account rather than the Government Development Bank for Puerto Rico ("GDB").*

- *Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances held in custody by the Secretary of Treasury for the benefit of the Government fiduciary funds, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA.*

- *Disbursements from the TSA include payroll and related costs, vendor and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.*

- *Federal funds related to disaster relief for hurricanes Irma and Maria are deposited in a separate bank account overseen by the Government Authorized Representative ("GAR"), and transferred to the TSA only after admissable disbursements (per approved Project Worksheets) have been made. These inflows to the TSA will be captured on the Federal Funds Receipts (Schedule C); outflows will be captured on the Vendor Payments (Schedule E).*

- *Data for TSA inflows/outflows is reported from various systems within the Department of Treasury of Puerto Rico ("DTPR"):*
    *Cash Flow Actual Results - Source for the actual results is the TSA Cash Flow.*
    *Schedule A - Collections - Source for collections information is the DTPR collections system.*
    *Schedule B - Agency Collections - Source for the agency collections is DTPR.*
    *Schedule C - Federal Fund Receipts - Source for the federal funds receipts is DTPR.*
    *Schedule D - Net Payroll - Source for net payroll information is the DTPR Rhum Payroll system.*
    *Schedule E - Vendor Payments - The source for vendor payments is the Bank checks paid report and a report from the DTPR PRIFAS system.*
    *Schedule F - Other Legislative Appropriations - Source for the other legislative appropriations is DTPR.*
    *Schedule G - Central Government - Partial Inventory of Known Short Term Obligations - Sources are DTPR.*
    *Schedule H - Budget Allocation of the Reconciliation Adjustment for the Central Government Loan to PREPA - Source is the Office of Management and Budget*

- *Data limitations and commentary:*
    *The government has focused on the seven schedules above for which access to reliable, timely, and detailed data is available to support these items. The government continues to work with DTPR and other parties to access additional reliable data that would help us provide detail in the future for other line items in the Cash Flow.*

4

*FY 2018 TSA Forecast Key Assumptions*

- *The FY 2018 Treasury Single Account cash flow forecast Liquidity Plan was prepared at the beginning of the fiscal year based on the approved FY 2018 Budget, was projected monthly through June 2018, and is used as the benchmark against which weekly results and variances are measured.  As a result of material economic and operational changes stemming from Hurricanes Irma and Maria, DTPR is in the process of developing a reforecast of TSA cash flows to year-end.  Until then, the original TSA forecast will continue to serve as the measure for weekly cash flow variances.*

- *Forecast collections and disbursements through the General Fund and Federal Fund are consistent with the approved FY 2018 Budget, with the exception of payroll outlays which were forecast based on run-rate cash disbursement trends, and budget reserves which are non-cash and do not impact the TSA direct cash flows.*

- *TSA General Fund inflows are "gross" (i.e. include accrued Tax Refunds in 2018) and therefore higher than presented in the approved FY 2018 Budget, which considers General Fund revenues net of current year tax refunds.  Repayment of deferred tax refunds (from CY 2016 and prior) total $292mm; reserve for current year tax refunds (excluding garnishments) total $456mm.*

- *Payroll outlays are based on FY 2017 run-rate disbursements, less savings measures, representing a $298mm favorable adjustment to the approved FY 2018 Budget for the full fiscal year.  Payroll is presented inclusive of segregated employee contributions ($349M for the year).  Payroll is disbursed through the TSA on a bi-weekly basis, approximately on the 15th and 30th of each month.*

- *Pensions reflect the implementation of the pay-as-you-go model in FY 2018. Retirement system inflows represent deposits from municipalities and corporations net of administrative expenses. Figures also include ERS / TRS / JRS asset sales ($390M), which occured in July 2017.*

- *The Liquidity Plan assumes collections and outlays of Federal Funds are equal in FY 2018 (zero net cash impact), excluding potential timing impact.*

- *Clawback funds set aside prior to June 2016 (approx. $146mm held at BPPR accounts and $144mm held at GDB) are considered restricted cash and therefore excluded from the projected cash balance.*

- *The Liquidity Plan assumes $592mm of Reconciliation Adjustment as per the approved FY 2018 Budget and March 13 certified Fiscal Plan, which is projected separately from supplier payments and distributed evenly over 12 months.  No further provision has been made for potential contingent liabilities against the government.*

- *The Liquidity Plan assumes that beginning November 2017, COFINA SUT collections flow to the General Fund and are available to the TSA for operational purposes, totaling approx. $316mm in incremental collections in the forecast.  However, these funds flowed to the COFINA bank account (BNY Mellon), which created a permanent variance of -$316mm against the Liquidity Plan.*

**Puerto Rico Department of Treasury | AAFAF**                                      **As of June, 29 2018**

*Executive Summary - TSA Cash Flow Actual Results for the Week Ended June 29, 2018*





**Weekly Cash Flow Variance ($152M):**

Weekly variance mainly due to: (1) -$149M PREPA draw upon Revolving Credit Agreement (permanent); (2) -$95M in vendor disbursements (permanent); and (3) +$35M of federal fund receipts (permanent); and (4) ASES Appropriations (temporary). All other line items have a total weekly variance of +$5M.

**YTD Net Cash Flow Variance $702M:**

The primary drivers of the +$702M YTD variance are: (1) Net cash benefit from additional Medicaid Funding due to the Bipartisan Budget Act of 2018 (+$679M, permanent); (2) Net cash benefit of RA less cash reapportionment +$306M (permanent, see 5ch.H); (3) Net cash benefit of lower disbursements of tax refunds than forecast (+$117M, permanent); (4) Rum Tax Collections (+$99M, permanent); (5) Net cash impact of lower vendor disbursements and subsequent lower federal fund receipts for federally reimbursable payments (-$134M, mostly permanent) (6) Sales & Use Tax Collections (-$316M, permanent); and (7) All others (-$50M).

<u>*Footnotes:*</u>
*(a) Variances represent actual results vs. FY2018 Liquidity Plan.  Additional detail and commentary on weekly and YTD variances is provided on pages 7 and 8 of this report.*

**Puerto Rico Department of Treasury | AAFAF**
*Key Takeaways - TSA Cash Flow Actual Results*

As of June 29, 2018



| | Key Figures as of 06/29/2018 | | | |
|---|---|---|---|---|
| $3.10bn | ($266M) | ($152M) | $1299M | $702M |
| Bank Cash Position | Weekly Cash Flow | Weekly Variance [a] | YTD Net Cash Flow | YTD Net Cash Flow Variance [a] |

**Notable variances [a] for the week ended June 29, 2018:**

| | | |
|---|---|---|
| -$149M | Outflow - PREPA Loan | (Permanent) Due to liquidity needs at PREPA, the entity drew down the remaining allowable amount on the Superpriority Post-petition Revolving Credit Loan Agreement on 6/29 to end the year with the original $300M loan amount outstanding. |
| -$95M | Outflow - Vendor Disbursements | (Permanent) Variance is permanent and primarily driven by $56M in Central Government disbursements to PRASA for accounts payable in arrears. Remaining variance was mostly due to $57M disbursed on behalf of the Department of Education, the second highest in a single week throughout FY2018. |
| +$35M | Inflow - Federal Fund Receipts | (Temporary) Variance is due to the incremental receipt of federal funds for the Nutritional Assistance Program and the subsequent pass-through due to additional funding provided for in the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017. |
| +$51M | Outflow - ASES Appropriations | (Temporary) Variance is due to the timing of federal funds received for the Medicaid Program and the subsequent pass-through appropriation to ASES, and will be offset next fiscal year. |
| +$5M | All Other Inflows & Outflows | Includes Electronic Lottery (-$41M), Nutritional Assistance Program Outflows (-$15M), PayGo Inflows (+$33M), Tax Refunds (+$22M), and others (+$6M). |

**Notable YTD variances [a] as of June 29, 2018:**

| | | |
|---|---|---|
| -$338M | Inflow - Sales & Use Tax | (Mostly Permanent) YTD permanent variance is driven by: (1) Liquidity Plan assumed $316M of COFINA funds would flow to the General Fund but instead, the funds were deposited in the COFINA account; (2) lower than anticipated collections due to lost revenues from Hurricane Maria's impact on economic activity; (3) temporary sales tax exemption on prepared foods and items sold by small and medium merchants (exemptions expired on 1/7 and 12/31, respectively). Additionally, various other offsetting and competing drivers have influenced gross SUT month to month, including a shift in buying mix from smaller, less SUT compliant stores to larger, more SUT compliant retailers. |
| -$300M | Outflow - Net PREPA Loan | (Permanent) $300M in funds relating to a loan from the Central Government were transferred to PREPA from the TSA on February 23, 2018. |
| -$52M | Inflow - General Collections | (Mostly Permanent) Principally due to the negative impacts caused by Hurricane Maria. Significant YTD collections variances are -$129M in Act 154 collections, -$56M in Nonresident Withholdings, -$82M in Individual Income tax collections, partially offset by +$245M in Corporate Income Taxes, +$170M in HTA Pass Through collections (Petroleum & Gas Tax collections constitutes the majority of the favorable YTD variance) and others. |
| +$354M | Inflow - Federal Fund Receipts | (Temporary) YTD variances in federal fund receipts are the result of: <br><br> (1) Additional federal funds received for federal programs (net +$714): Disbursements for the Nutritional Assistance Program (+$282M offsetting variance) and ASES pass-through Medicaid funds (+$432M offsetting variance) represent permanent differences, as additional federal funds incremental to the Liquidity Plan were unlocked for Nutritional Assistance and Medicaid. The Bipartisan Budget Act of 2018 provided for additional Medicaid funding that was not considered in the original Liquidity Plan. Furthermore, the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017 provided for additional Nutritional Assistance funding that was not considered in the original Liquidity Plan. <br><br> (2) Lower vendor disbursements (net -$488M):-$595M lower-than-projected federal reimbursements for vendor payments, partially offset by disaster-related federal reimbursements for vendor payments not considered in the Liquidity Plan (+$107M offsetting variance); <br><br> (3) Other (net +$128M): Lower federally-funded payroll disbursements as a percent of total payroll versus the Liquidity Plan (-$56M variance); and an additional +$184M of timing variance. |
| +$592M | Outflow - Reconciliation Adj. | (Offset by Reapportionments) Of the $592M total FY2018 budgeted Reconciliation Adjustment (RA), $562M has been offset by reapportionments of the RA for other budgetary needs: (1) $300M loan to PREPA; (2) $80M for the Department of Transportation; (3) $11M for the OMB; (4) $78M for the creation of the Emergency Municipal Assistance Fund; (5) $39M for the Police Department; (6) $38M for ASEM; (7) $15M for PREMA; and (8) $30M for the payment of Central Government accounts payable in arrears owed to PRASA. Actual cash offsets to the $592M YTD RA variance total -$465M. Refer to Schedule H for additional detail. |
| +$330M | Outflow - Vendor Disbursements | (Partially Temporary) +$488M of YTD variance is related to federally-reimbursable disbursements, approximately 65% of which the Liquidity Plan projected would relate to budget period 2017. Remaining variance mostly due to offsetting permanent variances, including: (1) the creation of the Emergency Municipal Assistance Fund and subsequent $1M disbursements to each of the 78 Puerto Rico Municipalities to cover operational and administrative costs in light of any declines in collections resulting from Hurricanes Irma and Maria; (2) $107M in disaster-related vendor payments not considered in the Liquidity Plan that will be or have been reimbursed by federal funds; and (3) $56M in Central Government disbursements to PRASA for accounts payable in arrears. |
| +$97M | All Other Inflows & Outflows | Largest variances included are Agency Collections (-$81M), outflows for the Nutritional Assistance Program (-$282M), Pension Related Costs (+$151M), appropriations to ASES (+$248M), Rum Tax collections (+$84M) and others (-$48M). |

**Puerto Rico Department of Treasury | AAFAF**

*TSA Cash Flow Actual Results for the Week Ended June 29, 2018*

As of June 29, 2018

| | Schedule | Prior Variance YTD 6/22 | Forecast 6/29 | Forecast 6/29 | Variance 6/29 | 6/29 | Forecast YTD 6/29 | Variance YTD 6/29 |
|---|---|---|---|---|---|---|---|---|
| *(figures in $000s)* | | | | | | | | |
| **General & Special Revenue Fund Inflows** | | | | | | | | |
| 1  Collections (a) | A | (532,353) | 576,937 | 596,629 | (19,692) | 3,073,476 | 3,105,522 | (32,046) |
| 2  Agency Collections | B | (74,894) | 10,210 | 15,839 | (5,628) | 464,511 | 545,033 | (80,523) |
| 3  Sales and Use Tax | | (315,504) | 48,277 | 71,132 | (22,855) | 1,640,047 | 1,978,406 | (338,359) |
| 4  Excise Tax through Banco Popular | | (5,830) | – | 686 | (686) | 609,803 | 616,339 | (6,516) |
| 5  Rum Tax | | 99,338 | – | 15,700 | (15,700) | 239,138 | 155,500 | 83,638 |
| 6  Electronic Lottery | | (16,526) | – | 40,649 | (40,649) | 105,380 | 162,675 | (57,294) |
| 7  Subtotal - General & Special Revenue Fund Inflows | | (525,870) | 135,424 | 240,655 | (105,230) | 11,132,375 | 11,563,475 | (431,100) |
| **Retirement System Inflows** | | | | | | | | |
| 8  Contributions From Pension Systems (b) | | (69,615) | 48,938 | 16,101 | 32,837 | 349,653 | 386,431 | (36,778) |
| 9  Pension System Asset Sales | | – | – | – | – | 390,480 | 390,480 | – |
| 10  Subtotal - Retirement System Inflows | | (569,515) | 48,938 | 16,101 | 32,837 | 740,133 | 776,911 | (36,778) |
| **Other Inflows** | | | | | | | | |
| 11  Federal Fund Receipts (c) | C | 338,641 | 115,622 | 80,201 | 35,421 | 5,604,721 | 5,250,659 | 354,062 |
| 12  Other Inflows (d) | | 97,191 | 9,289 | 3,539 | 5,750 | 420,812 | 317,871 | 102,941 |
| 13  Interest earned on Money Market Account | | 4,193 | – | – | – | 4,193 | – | 4,193 |
| 14  GDB Transactions | | (28,766) | – | – | – | – | 28,766 | (28,766) |
| 15  Loans and Tax Revenue Anticipation Notes (l) | | 149,064 | – | – | – | 149,064 | – | 149,064 |
| 16  Subtotal - Other inflows | | 540,324 | 124,911 | 83,741 | 41,170 | 6,178,790 | 5,597,296 | 581,494 |
| 17  **Total Inflows** | | 144,859 | 309,273 | 340,497 | (31,223) | 18,051,298 | 17,937,682 | 113,616 |
| **Payroll Outflows** | | | | | | | | |
| 18  Net Payroll (e) | D | 7,504 | (68,568) | (66,750) | (1,818) | (1,693,435) | (1,699,121) | 5,686 |
| 19  Other Payroll Related Costs - SSA, SIFC, Health Insurance) (f) | | 9,295 | (20,218) | (1,905) | (18,313) | (1,317,152) | (1,308,135) | (9,018) |
| 20  Gross Payroll - PR Police Department (g) | | (50,617) | – | – | – | (681,100) | (630,483) | (50,617) |
| 21  Subtotal - Payroll and Related Costs | | (533,818) | (88,786) | (68,655) | (20,131) | (3,691,687) | (3,637,737) | (553,950) |
| **Pension Outflows** | | | | | | | | |
| 22  Pension Benefits | | 59,182 | (82,490) | (87,958) | 5,468 | (2,089,640) | (2,154,290) | 64,650 |
| 23  Pension PayGo Outlays on Behalf of Public Corporations | | 79,325 | – | (7,211) | 7,211 | – | (86,536) | 86,536 |
| 24  Subtotal - Pension Related Costs | | 138,507 | (82,490) | (95,169) | 12,679 | (2,089,640) | (2,240,826) | 151,186 |
| **Appropriations - All Funds** | | | | | | | | |
| 25  Health Insurance Administration - ASES | | 197,359 | (34) | (50,776) | 50,742 | (2,272,595) | (2,520,695) | 248,100 |
| 26  University of Puerto Rico - UPR | | 0 | (10,000) | – | (10,000) | (678,321) | (668,321) | (10,000) |
| 27  Muni. Revenue Collection Center - CRIM | | (2,650) | – | (16,013) | 16,013 | (256,376) | (260,730) | 13,354 |
| 28  Highway Transportation Authority - HTA | | (147,730) | – | (11,817) | 11,817 | (296,719) | (160,806) | (135,913) |
| 29  Public Buildings Authority - PBA | | 9 | (9) | – | (9) | (69,811) | (69,811) | 0 |
| 30  Other Government Entities | | 15,231 | (17,589) | (22,612) | 5,023 | (569,459) | (589,713) | 20,254 |
| 31  Subtotal - Appropriations - All Funds | | 562,210 | (27,632) | (101,217) | 73,585 | (4,143,281) | (4,279,015) | 135,795 |
| **Other Disbursements - All Funds** | | | | | | | | |
| 32  Vendor Disbursements (h) | E | 424,839 | (159,864) | (65,066) | (94,798) | (2,949,286) | (3,279,328) | 330,042 |
| 33  Other Legislative Appropriations (i) | F | 2,305 | (947) | (1,251) | 305 | (370,412) | (373,021) | 2,609 |
| 34  Tax Refunds | | 137,311 | (11,014) | (33,298) | 22,284 | (704,099) | (843,695) | 139,595 |
| 35  Nutrition Assistance Program | | (166,003) | (55,575) | (40,166) | (15,409) | (2,288,971) | (2,006,659) | (282,312) |
| 36  Other Disbursements | | 22,922 | – | – | – | (65,844) | (88,766) | 22,922 |
| 37  Reconciliation Adjustment | H | 542,667 | – | (49,333) | 49,333 | – | (592,000) | 592,000 |
| 38  Loans and Tax Revenue Anticipation Notes | | (300,000) | (149,064) | – | (149,064) | (449,064) | – | (449,064) |
| 39  Subtotal - Other Disbursements - All Funds | | 543,141 | (376,464) | (189,114) | (187,350) | (56,827,677) | (57,183,468) | 355,791 |
| 40  **Total Outflows** | | 730,039 | (575,372) | (454,155) | (121,217) | (16,752,285) | (17,341,107) | 588,822 |
| 41  **Net Cash Flows** | | 854,878 | (266,099) | (113,659) | (152,440) | 1,299,013 | 596,575 | 702,438 |
| 42  Bank Cash Position, Beginning (i) | | – | 3,364,109 | 2,509,231 | 854,878 | 1,798,997 | 1,798,997 | – |
| 43  **Bank Cash Position, Ending (i)** | | 854,878 | 3,098,010 | 2,395,573 | 702,438 | 3,098,010 | 2,395,573 | 702,438 |

Net Loan Outstanding to PREPA (sum of lines 15 & 38): (150,936) | (149,064) | – | (149,064) | (300,000) | – | (300,000)

*Footnotes :*

(a) *Includes reserve for tax returns ($456 million) and Special Revenue Fund portion of passed collections.*

(b) *Paygo charges to municipalities and public corporations collected at the TSA.*

(c) *As of the date of this report, includes $107M in federal funded account balances transferred to the TSA that relate to disaster relief.*

(d) *Inflows related to the Department of Health, Department of Labor and Human Resources, the Commissioner of Financial Institutions, and others.*

(e) *Payroll is paid bi-weekly on the 15th and 30th (or last day of the month, whichever comes sooner).*

(f) *Related to employee withholdings, social security, insurance, and other deductions.*

(g) *Police payroll is paid through a separate bank account. Also, the police payroll line item shown in the TSA cash flow is gross (i.e. inclusive of Other Payroll Related items).*

(h) *Includes payments to third-party vendors as well as intergovernmental payments to agencies with separate Treasuries.*

(i) *This refers to General fund appropriations to non-TSA entities such as Legislative Assembly, Correctional Health, Comprehensive Cancer Center, and others.*

(j) *Excludes Banco Popular of Puerto Rico Account with balance of approximately $146mm; Amounts deposited in GDB subject to GDB restructuring.*

(k) *Unless otherwise stated, variances are either not material in nature or are expected to reverse in the short term.*

(l) *Section 2.6(b)(ii) of the Superpriority Post-petition Revolving Credit Loan Agreement (The Agreement) specifies that upon PREPA's receipt of any revenues in excess of amounts necessary to (i) pay budgeted expenses for ineligible Uses provided for in the Budget (inclusive of the Ineligible Uses Variance) and other allowable expenses for Ineligible Uses, or any FEMA reimbursable expense for contracts that have been obligated to FEMA and approved by the Oversight Board and (ii) maintain a maximum cash balance of up to $300M PREPA shall apply such Revenues to the repayment of the outstanding Revolving Credit Loans. The criteria that result in any aforementioned repayment may be triggered due to the seasonality of PREPA operations. Depending on the timing of PREPA receipts and disbursements, additional repayments may occur over the next several weeks, though additional draw downs may also occur before fiscal year-end.*

**Comments (k)**

1. Collections were lower than Liquidity Plan by 20% for the week ended 6/29, mainly due to lower than projected Alcoholic Beverage tax collections (-$6M), Motor Vehicles (-$6M), Petroleum & Gas taxes (-$8M), and others. Significant: YTD collections variances are -$129M in Act 154 collections, -$56M in Nonresident Withholdings, -$82M in Individual income taxes, partially offset by +$245M in Corporate Income Taxes, +$170M in Petroleum & Gas taxes.

2. YTD variance mainly due to -$35M lower in Department of Health collections and -$30M lower in Treasury collections, with the remaining variance spread across 40+ other agencies. The majority of YTD variance (-$62M of total) is due to collections shortfall in September and October following Hurricane Maria.

3. YTD variance is mostly permanent, due to -$316M in CORINA SUT collections flowing to the CORINA bank account that were not considered in the Liquidity Plan, lost revenues from Hurricane Maria's impact on economic activity, temporary sales tax exemptions on prepared foods and items sold by small and medium merchants (exemptions expired on 1/7 and 12/31, respectively), and various other competing drivers such as a shift in buying mix from smaller, less SUT compliant stores to larger, more SUT compliant retailers.

4. YTD variance is assumed to be permanent as stronger Rum Tax collections are a result of (1) higher than projected volume of exports; and (2) increase of Rum Tax per unit to $13.25 per proof gallon from $10.50 per proof gallon, effective as of January 2018.

5. YTD variance is a function of lower Electronic Lottery Collections due to the impact of Hurricanes Irma and Maria, and this variance is assumed to be permanent.

6. Variance partially offsets previous YTD variance, as Paygo payments are transferred to the TSA at the end each month as opposed to the bi-weekly transfers projected in the Liquidity Plan. The majority of YTD variance is due to not yet receiving PayGo payments from PRASA and other public corporations & municipalities.

12. YTD variances in federal fund receipts are the result of: (1) Lower-than-projected federal reimbursements for vendor payments (-$595M variance); (2) disaster related federal reimbursements for vendor payments not considered in the Liquidity Plan (+$107M variance); (3) greater disbursements for the Nutritional Assistance Program (+$282M variance); (4) ASES pass-through Medicaid appropriations (+$432M variance); (5) lower federally-funded portion of payroll disbursements versus the Liquidity Plan (-$56M variance); and an additional +$184M of timing variance. Note the Bipartisan Budget Act of 2018 provided for additional Medicaid funding that was not considered in the Liquidity Plan. As such, federal funds received after 3/31 for the Medicaid Program, and for the remainder of the year, are incremental to the amount projected in the Liquidity Plan and will result in permanent positive variances. Furthermore, the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017 provided for additional Nutritional Assistance funding than was considered in the Liquidity Plan. The Commonwealth began to use these funds as of March 1, and additional resources will remain available to Puerto Rico until September 30th, 2019.

12. YTD variance mainly due to +$54M higher in Petroleum import tax collections and +$15M in a one-time transfer from the Puerto Rico Tourism Company, with remaining variance due to higher non-recurring inflows across various programs and agencies, all of which are assumed to be permanent variances against the Liquidity Plan.

14. YTD variance is offset by GDB Transactions (relates to legacy debt service deposit agreement) variance in line 36.

19. Variance due to the timing of various payments to financial service providers on behalf of public employees and for insurance providers.

20. Weekly variance due to timing and will be offset later this month. -$55M of the YTD variance is offset by +$55M of the YTD variance in line 23, as distributions to the Police Department for payment of employer contributions to their retirement system is included in the line 23 YTD forecast.

23. Variances in this line item are permanent as this line item was not utilized this fiscal year. +$55M of the YTD variance offsets -$55M of the YTD variance in line 20, as distributions to the Police Department for payment of employer contributions to their retirement system was included in the line 23 forecast but are disbursed through line 20. Remaining YTD variance is offset by a reduction in Contributions From Pension Systems in line 8.

25. Variance is due to the timing of federal funds received for the Medicaid Program and the subsequent pass-through appropriation to ASES, and will be offset next fiscal year.

28. YTD variance largely due to additional transfers in funds to support capital expenditures and congestion management initiatives for HTA, consistent with the Revised Fiscal Plan.

32. Vendor disbursements exceeded Liquidity Plan by $95M for the week ended 6/29 mainly due to $56M in Central Government disbursements to PRASA for accounts payable in arrears. Remaining variance was mostly due to $57M disbursed on behalf of the Department of Education, the second highest in a single week throughout FY2018. The largest portion ($467M) of YTD variance is related to federally-reimbursable disbursements, approximately 65% of which the Liquidity Plan projected would relate to budget period 2017. This variance is offset by various disbursements that were not forecast in the Liquidity Plan, including $7M to Municipalities for emergency recovery and $107M in other disaster-related disbursements.

35. Weekly and YTD variances are most likely permanent and are offset by increases in federal funds received for the Nutritional Assistance Program due to additional funding provided for by the Additional Supplemental Appropriations for Disaster Relief Requirements Act of 2017.

34. YTD variance offsets GDB Transactions (relates to legacy debt service deposit agreement) variance in inflows (line 14), with remaining variance due to timing.

37. $300M of the YTD variance is offset by the Net Loan outstanding to PREPA. The $300M original loan repurposed portions of the Reconciliation Adjustment (RA) that is budgeted at the agency level. The remaining YTD variance is offset by various other reapportionments from the RA including $80M in funds for DTOP, $78M for Municipal Recovery, and others (see Schedule H of this report for additional details).

15, 38  YTD variance due to excess revenues collected by PREPA that were applied to the repayment of outstanding Revolving Credit Loans, in accordance with Section 2.6(b)(ii) of the Superpriority Post-petition Revolving Credit Loan Agreement[l]. Due to the timing of PREPA receipts and disbursements, various repayments occurred since the Loan was originally drawn upon, though PREPA drew down the remaining allowable amount on 6/29 to end the year with the original $300M loan amount outstanding.

8

**Puerto Rico Department of Treasury | AAFAF**                                                 As of June 29, 2018

*Schedule A: Collections Detail - Actual Results vs. Forecast (a)*

| (figures in $000s) | Actual | Forecast | Variance | | Forecast | Variance |
|---|---|---|---|---|---|---|
|  | 6/29 | 6/29 | 6/29 | YTD | YTD | YTD |
| **General Fund** | | | | | | |
| 1  Individuals | $29,902 | $27,697 | $2,205 | $2,242,922 | $2,325,000 | ($82,078) |
| 2  Corporations | $9,804 | 5,625 | 4,179 | 1,793,817 | 1,549,000 | 244,817 |
| 3  Non Residents Withholdings | $24,489 | (1,791) | 26,280 | 634,059 | 690,356 | (56,297) |
| 4  Act 154 (b) | – | (6,101) | 6,101 | 1,306,908 | 1,435,661 | (128,752) |
| 5  Alcoholic Beverages | $10,224 | 16,005 | (5,781) | 263,766 | 286,028 | (22,262) |
| 6  Cigarettes | $5,837 | 11,850 | (6,013) | 224,453 | 229,009 | (4,556) |
| 7  Motor Vehicles | $9,238 | 6,690 | 2,548 | 414,268 | 318,000 | 96,268 |
| 8  Other General Fund | $1,974 | 20,575 | (18,602) | 176,857 | 463,000 | (286,143) |
| 9  **Total General Fund Portion of General Collections** | **$91,468** | **$80,550** | **$10,918** | **$7,057,049** | **$7,296,053** | **($239,004)** |
| **Retained Revenues (c)** | | | | | | |
| 10  AACA Pass Through | $2,175 | 2,547 | (372) | 78,532 | 79,952 | (1,420) |
| 11  AFI/RBC Pass Through | – | (46) | 46 | 7,496 | 26,135 | (18,639) |
| 12  ASC Pass Through | $1,848 | (416) | 2,264 | 79,763 | 97,874 | (18,111) |
| 13  HTA Pass Through | $4,263 | 12,286 | (8,023) | 640,940 | 470,874 | 170,066 |
| 14  Total Other Retained Revenues | $1,430 | 1,708 | (278) | 74,488 | 134,634 | (60,146) |
| 15  **Total Retained Revenues Portion of General Collections** | **$9,716** | **$16,079** | **($6,363)** | **$881,218** | **$809,469** | **$71,749** |
| 16  **Total Collections from DTPR Collections System** | **$101,184** | **$96,629** | **$4,555** | **$7,938,267** | **$8,105,522** | **($167,255)** |
| 17  **Timing-related unreconciled TSA Collections (d)** | ($24,247) | – | ($24,247) | $135,209 | – | $135,209 |
| 18  **Total General Collections** | **$76,937** | **$96,629** | **($19,692)** | **$8,073,476** | **$8,105,522** | **($32,046)** |

*Source: DTPR, collection system*

Footnotes:

*(a) Figures in forecast period correspond to original TSA liquidity plan projections, which was developed in July 2017 based on the Approved Budget, General Fund Revenue projections, and other input from the DTPR and AAFAF teams.*

*(b) Collections presented only include Act 154 Collections received into the Collections Post Account (CPA). Additional Act 154 Collections are received into a separate account and cash flow line item, shown on page 8 in line 4: Excise Tax through Banco Popular. Total Act 154 Collections are therefore the sum of these two amounts: $1.3bn received into the CPA and $609M through Banco Popular, for a total of $1.9bn in Act 154 Collections throughout FY2018.*

*(c) Retained Revenues are revenues conditionally assigned to certain public corporations and the collections of those revenues are through accounts referred to as "pass through" accounts, the majority of which include (i) ACAA auto insurance, (ii) AFI/RBC petroleum tax, (iii) ASC personal injury insurance, and (iv) HTA toll revenues.*

*(d) Due to timing. Receipts in collections post account occur approximately two business days prior to being deposited into the TSA.*

**Puerto Rico Department of Treasury | AAFAF**          **As of June 29, 2018**
*Schedule B: Agency Collections Detail*

|   | *(figures in $000s)* | 6/29 | YTD FY18 |
|---|---|---|---|
|   | **Agency** | | |
| 1 | Department of Health | $2,428 | $114,058 |
| 2 | Funds under the Custody of the Department of Treasury | 2,382 | 59,349 |
| 3 | Office of the Commissioner of Insurance | 321 | 51,668 |
| 4 | Office of the Financial Institution Commissioner | 146 | 50,227 |
| 5 | Department of Labor and Human Resources | 193 | 37,469 |
| 6 | Department of Justice | 448 | 19,312 |
| 7 | Department of State | 345 | 15,459 |
| 8 | Department of Treasury | 124 | 13,023 |
| 9 | Department of Education | 2,021 | 8,375 |
| 10 | Department of Natural and Environmental Resources | 129 | 8,164 |
| 11 | Mental Health and Drug Addiction Services Administration | 363 | 8,015 |
| 12 | Medical Emergencies Service | 1 | 7,290 |
| 13 | General Services Administration | 131 | 6,708 |
| 14 | Department of Correction and Rehabilitation | 190 | 6,508 |
| 15 | Department of Recreation and Sport | 15 | 5,508 |
| 16 | Puerto Rico Police Department | – | 5,337 |
| 17 | Department of Housing | 253 | 4,882 |
| 18 | Administration for the Horse Racing Sport and Industry | 107 | 4,648 |
| 19 | Deposits non-identified (a) | 1 | 3,569 |
| 20 | Others (b) | 612 | 34,940 |
| 21 | **Total** | **$10,210** | **$464,511** |

*Source: DTPR*

Footnotes:
*(a) Includes transfers to other agencies in addition to unreconciled agency collections.*
*(b) Inflows related to Department of Transportation and Public Works, Firefighters Corps,*
*Environmental Quality Board, Department of Agriculture, and others.*

10

**Puerto Rico Department of Treasury | AAFAF**          As of June 29, 2018
*Schedule C: Federal Funds Receipts Detail*

| | *(figures in $000s)* | 6/29 | FY18 |
|---|---|---|---|
| | **Agency** | | |
| 1 | Adm. Socioeconomic. Dev. Family | $57,265 | $2,344,191 |
| 2 | Health | 4,979 | 2,076,162 |
| 3 | Department of Education | 36,155 | 787,797 |
| 4 | Vocational Rehabilitation Adm. | 1,021 | 34,328 |
| 5 | Puerto Rico National Guard | 11,423 | 29,036 |
| 6 | Mental Health and Drug Addiction Services Adm. | 65 | 24,871 |
| 7 | Families and Children Adm. | – | 17,767 |
| 8 | Department of Labor and Human Resources | 153 | 15,790 |
| 9 | Department of Justice | 0 | 14,141 |
| 10 | Department of Natural and Environmental Resources | – | 10,454 |
| 11 | Environmental Quality Board | 154 | 8,224 |
| 12 | Department of Family | 4 | 5,980 |
| 13 | Others (a) | 4,403 | 129,320 |
| 14 | Fema - Disaster Spend Reimbursement (b) | – | 106,661 |
| 15 | **Total** | **$115,622** | **$5,604,721** |

*Source: DTPR*

Footnotes:
*(a) Inflows related to the Women's Affairs Commission, the Municipal Affairs*
*Commission, Office of Elderly Affairs, and others.*
*(b) Represents reimbursement transfers to the TSA for various agencies' disaster related*
*spend.*

**Puerto Rico Department of Treasury | AAFAF**          **As of June 29, 2018**

*Schedule D: Net (a) Payroll Detail*

|  |  | Actual | YTD |
|---|---|---|---|
| | *(figures in $000s)* | **6/29** | **FY18** |
| | **General Fund** | | |
| 1 | Education (d) | $28,236 | $642,168 |
| 2 | Correction and Rehab | 7,715 | 139,334 |
| 3 | Health | 2,340 | 53,881 |
| 4 | All Other Agencies (b) | 18,420 | 436,607 |
| 5 | **Total General Fund** | **$56,711** | **$1,271,991** |
| | **Special Revenue Funds** | | |
| 6 | Education (d) | $42 | 335 |
| 7 | Correction and Rehab | – | – |
| 8 | Health | 505 | 14,662 |
| 9 | All Other Agencies (b) | 2,817 | 68,530 |
| 10 | **Total Special Revenue Funds** | **$3,363** | **$83,527** |
| | **Federal Funds** | | |
| 11 | Education (d) | $8,709 | $194,700 |
| 12 | Correction and Rehab | 3 | 191 |
| 13 | Health | 1,696 | 44,926 |
| 14 | All Other Agencies (b) | 2,809 | 69,996 |
| 15 | **Total Federal Funds** | **$13,217** | **$309,812** |
| 16 | **Total Net Payroll from Payroll System** | **$73,291** | **$1,665,330** |
| 17 | Timing-related unreconciled Net Payroll (c) | ($4,723) | $28,105 |
| 18 | **Total Net Payroll** | **$68,568** | **$1,693,435** |

*Source: DTPR, RHUM system*

Footnotes:
*(a) Net payroll data provided by DTPR allows for a reliable break down analysis.  Note that net payroll is equal to gross payroll less tax withholdings and other deductions.*
*(b) Includes Firefighter Corps, National Guard, Public Housing Administration, Natural Resources*
*(c) Due to timing and reconciliation between RHUM payroll system and cash activity data.*

**Puerto Rico Department of Treasury | AAFAF**          **As of June 29, 2018**
*Schedule E: Vendor Disbursements Detail*

| | (figures in $000s) | Actual 6/29 | D FY18 |
|---|---|---|---|
| | **General Fund** | | |
| 1 | Education | $6,766 | $365,872 |
| 2 | General Court of Justice | – | 110,481 |
| 3 | Health | 264 | 110,806 |
| 4 | Other Agencies | 68,563 | 748,286 |
| 5 | **Total General Fund** | **$75,593** | **$1,335,445** |
| | **Special Revenue Funds** | | |
| 6 | Education | 365 | 51,967 |
| 7 | General Court of Justice | 960 | 16,663 |
| 8 | Health | 1,207 | 163,194 |
| 9 | Other Agencies | 7,948 | 409,624 |
| 10 | **Total Special Revenue Funds** | **$10,480** | **$641,448** |
| | **Federal Funds** | | |
| 11 | Education | 3,969 | 240,986 |
| 12 | General Court of Justice | – | 303 |
| 13 | Health | 939 | 189,959 |
| 14 | Other Agencies | 8,886 | 383,758 |
| 15 | **Total Federal Funds** | **$13,794** | **$815,006** |
| 16 | **Total Vendor Disbursements from System** | **$99,867** | **$2,791,899** |
| 17 | Timing-related unreconciled Vendor Disbursements (b) | $59,997 | $157,387 |
| 18 | **Total Vendor Disbursements** | **$159,864** | **$2,949,286** |

*Source: DTPR's Bank checks paid report and PRIFAS system*

Footnotes:
(a) Includes ASSMCA, Firefighters Corps, Emergency Medical Corps, Natural Resources Administration, and
(b) Unreconciled vendor disbursements is timing variance pending reconciliation between bank systems and
DTPR systems.

13

**Puerto Rico Department of Treasury | AAFAF**          **As of June 29, 2018**

*Schedule F: Other Legislative Appropriations Detail*

| | (figures in $000s) | Actual 6/29 | YTD FY18 |
|---|---|---|---|
| | **Agency** | | |
| 1 | Correctional Health | $947 | $58,646 |
| 2 | House of Representatives | – | 45,949 |
| 3 | Puerto Rico Senate | – | 40,932 |
| 4 | Office of the Comptroller | – | 37,359 |
| 5 | Comprehensive Cancer Center | – | 23,000 |
| 6 | Legislative Donations Committee | – | 20,000 |
| 7 | Superintendent of the Capitol | – | 15,148 |
| 8 | Institute of Forensic Sciences | – | 14,614 |
| 9 | Authority of Public-Private Alliances (projects) | – | 14,263 |
| 10 | Martín Peña Canal Enlace Project Corporation | – | 10,941 |
| 11 | Legislative Services | – | 10,475 |
| 12 | Housing Financing Authority | – | 9,337 |
| 13 | All Others (a) | – | 69,748 |
| 14 | **Total Other Legislative Appropriations** | **$947** | **$370,412** |

*Source: DTPR*

<u>Footnotes:</u>
*(a) Includes the Solid Waste Authority, Public Broadcasting Corporation, Musical Arts
Corporation, and several other agencies.*

14

**Puerto Rico Department of Treasury | AAFAF**　　　　　　　　　　　　　　　　　　　　　　　　**As of June 29, 2018**

*Central Government - Partial Inventory of Known Short Term Obligations (a)*

*(figures in $000s)*

| Obligation Type | Recorded Invoices (b) |
|---|---|
| **3rd Party Vendor Invoices** | $ 29,907 |
| **Intergovernmental Invoices** | $ 38,557 |
| **Total** | $ 68,464 |

Source: DTPR

Footnotes:

*(a) The numbers presented represent a bottom-up build of invoices at the government agency level, which should not be considered to be indicative of total Accounts Payable for the central government. This is due to issues surrounding invoice entry that has hindered the timely cadence of recording invoices, which was made worse by the impact of the Hurricanes.*

*(b) Recorded invoice data was unavailable for the weeks ended 4/27 to 6/29, and as such the data presented above refers to invoices/vouchers approved for payment by the agencies but checks not released as of 4/20.*

| Obligation Type | Additional Invoices (c) |
|---|---|
| **3rd Party Vendor Invoices** | $ 266,042 |
| **Intergovernmental Invoices** | 115,489 |
| **Total** | $ 381,530 |

Source: BDO

Footnotes:

*(c) The data presented above represents additional invoices identified outside of DTPR main system for the following agencies as of 5/4:*

- *Police Department*
- *Department of Education*
- *Department of Justice*
- *Department of Correction and Rehabilitation*
- *Department of Transportation and Public Works*
- *Mental Health and Drug Addiction Services Administration*
- *Socio Economic Development Administration*
- *Administration for Children and Families*
- *Child Support Administration*
- *Environmental Quality Board*
- *Department of Health*
- *Department of Housing*
- *Department of Labor*
- *Department of Sports and Recreation*
- *Department of Natural Resources*
- *Administration for the Care and Development of Children*
- *Puerto Rico Fire Department*
- *Department of Family*
- *Department of Treasury*

| Obligation Type | Pre-recorded Invoices (d) |
|---|---|
| **3rd Party Vendor Invoices** | $ 18,545 |
| **Intergovernmental Invoices** | $ 5,750 |
| **Total** | $ 24,295 |

Source: Compiled by BDO, data provided by agencies.

Footnotes:

*(d) Pre-recorded AP is related to other agencies out of scope of BDO that independently enters invoice data into a Live AP module prior to invoices being approved for payment.*

15

**Puerto Rico Department of Treasury | AAFAF**   As of June 29, 2018

*Central Government - Partial Inventory of Known Short Term Obligations by agency (a)*

*(figures in $000s)*

### Consolidated Inventory Invoices

| Description | Checks In Vault (b) | As of June 30, 2017 | | | As of September 8, 2017 | | | As of June 29, 2018 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | Recorded AP (c) | Additional AP (d) | Total | Recorded AP (c) | Additional AP (d) | Total | Recorded AP (c) | Additional AP (d) | Pre-recorded AP (e) | Total |
| Department of Education | $ 3,535 | $ 66,640 | 165,459 | $ 235,633 | $ 28,009 | 161,824 | $ 189,833 | $ 22,889 | 115,867 | - | $ 138,756 |
| Department of Health | - | 15,432 | 132,856 | 148,288 | 8,996 | 130,760 | 139,756 | 14,427 | 120,061 | - | 134,488 |
| Mental Health and Drug Addiction Services Administration | - | 2 | 1,940 | 1,942 | 353 | 6,086 | 6,439 | 3,800 | 10,958 | - | 14,758 |
| Environmental Quality Board | - | 716 | 6,229 | 6,945 | 793 | 7,194 | 7,987 | 177 | 5,233 | - | 5,410 |
| Department of Correction and Rehabilitation | - | 7,582 | 40,215 | 47,796 | 271 | 36,746 | 37,018 | 37 | 19,555 | - | 19,592 |
| Department of Labor | - | 903 | 19,619 | 20,521 | - | 23,556 | 23,556 | 220 | 27,081 | - | 27,301 |
| Administration For Children and Families | - | 143 | 15,123 | 15,266 | 2,818 | 22,254 | 25,073 | 25 | 5,352 | - | 5,377 |
| Other Agencies | 1,170 | 77,368 | 43,059 | 121,597 | 23,808 | 63,883 | 87,691 | 26,889 | 77,424 | 24,295 | 128,609 |
| Total | $ 4,705 | $ 168,786 | 424,500 | $ 597,990 | $ 65,048 | 452,304 | $ 517,352 | $ 68,464 | 381,530 | 24,295 | $ 474,289 |

### 3rd Party Vendor Payables

| Description | | As of June 30, 2017 | | | As of September 8, 2017 | | | As of June 29, 2018 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Department of Education | $ - | $ 39,845 | 132,341 | $ 172,187 | $ 14,166 | 91,806 | $ 105,972 | $ 8,818 | 99,678 | - | $ 108,496 |
| Department of Health | - | 14,395 | 92,876 | 107,271 | 8,320 | 93,580 | 101,900 | 11,325 | 62,746 | - | 74,071 |
| Mental Health and Drug Addiction Services Administration | - | 2 | 1,581 | 1,584 | 353 | 5,605 | 5,958 | 2,231 | 9,991 | - | 12,223 |
| Environmental Quality Board | - | 395 | 4,452 | 4,846 | 353 | 5,114 | 5,467 | 18 | 3,104 | - | 3,122 |
| Department of Correction and Rehabilitation | - | 3,603 | 13,196 | 16,799 | 256 | 7,448 | 7,704 | 37 | 16,519 | - | 16,555 |
| Department of Labor | - | 211 | 10,875 | 11,086 | - | 11,023 | 11,023 | 220 | 12,425 | - | 12,645 |
| Administration For Children and Families | - | 143 | 13,844 | 13,988 | 41 | 20,025 | 20,065 | 25 | 2,079 | - | 2,104 |
| Other Agencies | - | 29,046 | 22,116 | 51,161 | 16,005 | 41,724 | 57,728 | 7,233 | 59,499 | 18,545 | 85,278 |
| Total | $ - | $ 87,639 | 291,282 | $ 378,921 | $ 39,494 | 276,324 | $ 315,818 | $ 29,907 | 266,042 | 18,545 | $ 314,494 |

### Intergovernmental Payables

| Description | | As of June 30, 2017 | | | As of September 8, 2017 | | | As of June 29, 2018 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Department of Education | $ 3,535 | $ 26,795 | 33,117 | $ 63,447 | $ 13,842 | 70,019 | $ 83,861 | $ 14,071 | 16,188 | - | $ 30,259 |
| Department of Health | - | 1,037 | 39,980 | 41,017 | 676 | 37,181 | 37,856 | 3,102 | 57,314 | - | 60,417 |
| Mental Health and Drug Addiction Services Administration | - | - | 359 | 359 | - | 481 | 481 | 1,568 | 967 | - | 2,535 |
| Environmental Quality Board | - | 321 | 1,777 | 2,098 | 440 | 2,080 | 2,520 | 159 | 2,129 | - | 2,287 |
| Department of Correction and Rehabilitation | - | 3,979 | 27,018 | 30,997 | 15 | 29,298 | 29,313 | - | 3,037 | - | 3,037 |
| Department of Labor | - | 692 | 8,744 | 9,435 | - | 12,533 | 12,533 | - | 14,656 | - | 14,656 |
| Administration For Children and Families | - | - | 1,279 | 1,279 | 2,778 | 2,230 | 5,007 | - | 3,273 | - | 3,273 |
| Other Agencies | 1,170 | 48,323 | 20,944 | 70,436 | 7,803 | 22,159 | 29,962 | 19,657 | 17,925 | 5,750 | 43,331 |
| Total | $ 4,705 | $ 81,146 | 133,218 | $ 219,069 | $ 25,554 | 175,979 | $ 201,534 | $ 38,557 | 115,489 | 5,750 | $ 159,795 |

Footnotes:

(a) The numbers presented represent a bottom-up build of invoices at the government agency level, which should not be considered to be indicative of total Accounts Payable for the central government. This is due to issues surrounding invoice entry that has hindered the timely cadence of recording invoices, which was made worse by the impact of the Hurricanes.

(b) Refers to checks issued but kept in vault. Due to control processes implemented this fiscal year, it is uncommon for there to be a material checks in vault balance, as now the Department of Treasury has greater control over the approval and authorization of checks before they are issued. Data is sourced from Puerto Rico Department of Treasury.

(c) Refers to invoices/vouchers approved for payment by the agencies but checks not released. Data is sourced from Puerto Rico Department of Treasury. Recorded invoice data was unavailable for the weeks ended 4/27 to 6/29, and as such the data Recorded invoice data is updated as of 4/20.

(d) Represents additional invoices identified outside of DTPR main system for the 19 agencies below. Data is sourced from BDO.

   -Police Department
   -Department of Education                      -Department of Health
   -Department of Justice                          -Department of Housing
   -Department of Correction and Rehabilitation     -Department of Labor
   -Department of Transportation and Public Works   -Department of Sports and Recreation
   -Mental Health and Drug Addiction Services Administration   -Department of Natural Resources
   -Socio Economic Development Administration     -Administration for the Care and Development of Children
   -Administration for Children and Families     -Puerto Rico Fire Department
   -Child Support Administration             -Department of Family
   -Environmental Quality Board            -Department of Treasury

(e) Pre-recorded AP is related to other agencies out of scope for BDO that independently enter invoices into a Live AP module prior to invoice payment approval. The data is sourced from the agencies themselves, compiled by BDO, and validated to ensure there is no overlap with other AP categories.

**Puerto Rico Department of Treasury | AAFAF**
*Central Government - Partial Inventory of Known Short Term Obligations (a)*
*All Agencies*

As of June 29, 2018

*(figures in $000s)*

| Description | Recorded AP (b) | | Additional AP (c) | | Pre-Recorded AP (d) | | Total |
|---|---|---|---|---|---|---|---|
| | 3rd Party Payables | Intergovernmental Payables | 3rd Party Payables | Intergovernmental Payables | 3rd Party Payables | Intergovernmental Payables | |
| Department of Education | $8,818 | $14,071 | $99,678 | $16,188 | $0 | $0 | $138,756 |
| Department of Health | 11,325 | 3,102 | 62,746 | 57,314 | - | - | 134,488 |
| Department of Labor and Human Resources | 220 | - | 12,425 | 14,656 | - | - | 27,301 |
| Department of Transportation and Public Works | 290 | - | 18,335 | 1,765 | - | - | 20,389 |
| Department of Correction and Rehabilitation | 37 | - | 16,519 | 3,037 | - | - | 19,592 |
| Mental Health and Addiction Services Administration | 2,231 | 1,568 | 9,991 | 967 | - | - | 14,758 |
| Puerto Rico Police | 204 | - | 10,629 | 2,999 | - | - | 13,833 |
| Department of Justice | 3,612 | 46 | 8,002 | 779 | - | - | 12,438 |
| Highway and Transportation Authority | - | 10,000 | - | - | - | 1,663 | 11,663 |
| Hacienda (entidad interna - fines de contabilidad) | 0 | 5,956 | - | - | 3,950 | 420 | 10,325 |
| Department of Natural and Environmental Resources | - | - | 5,438 | 4,163 | - | - | 9,601 |
| Administration for Socioeconomic Development of the Family | - | - | 4,269 | 2,966 | - | - | 7,235 |
| Department of Housing | - | - | 5,315 | 106 | - | - | 5,421 |
| Environmental Quality Board | 18 | 159 | 3,104 | 2,129 | - | - | 5,410 |
| General Services Administration | - | - | - | - | 4,979 | 420 | 5,399 |
| Families and Children Administration | 25 | - | 2,079 | 3,273 | - | - | 5,377 |
| Department of the Family | - | - | 3,618 | 1,543 | - | - | 5,161 |
| Child Support Administration | - | - | 1,670 | 3,335 | - | - | 5,005 |
| Commonwealth Election Commission | - | 491 | - | - | 1,884 | 2,619 | 4,994 |
| Institute of Puerto Rican Culture | - | 2,904 | - | - | - | - | 2,904 |
| Department of the Treasury | 2,065 | 18 | 45 | 14 | - | - | 2,143 |
| Department of Sports and Recreation | - | - | 1,880 | 252 | - | - | 2,132 |
| Office of Management and Budget | - | - | - | - | 1,411 | - | 1,411 |
| Puerto Rico National Guard | 147 | 17 | - | - | 712 | 389 | 1,266 |
| Vocational Rehabilitation Administration | 177 | 10 | - | - | 1,037 | 13 | 1,237 |
| General Court of Justice | 685 | - | - | - | - | - | 685 |
| Industrial Commission | - | - | - | - | 528 | 58 | 586 |
| Veterans Advocate Office | - | - | - | - | 555 | - | 555 |
| Office of the Governor | 0 | - | - | - | 475 | 11 | 487 |
| State Historic Preservation Office | - | - | - | - | 444 | - | 444 |
| Department of State | - | - | - | - | 361 | 11 | 372 |
| Emergency Management and Disaster Administration Agency | - | - | - | - | 289 | 67 | 356 |
| Firefighters Corps | 4 | 200 | 100 | - | - | - | 304 |
| Elderly and Retired People Advocate Office | - | - | - | - | 206 | 25 | 232 |
| Telecommunication's Regulatory Board | - | - | - | - | 222 | - | 222 |
| Planning Board | - | - | - | - | 216 | - | 216 |
| Administration for Integral Development of Childhood | 0 | - | 199 | 3 | - | - | 202 |
| Emergency Medical Services Corps | 21 | - | - | - | 158 | 16 | 195 |
| State Energy Office of Public Policy | - | - | - | - | 177 | - | 177 |
| Office of the Electoral Comptroller | - | - | - | - | 124 | 33 | 157 |
| Office of the Commissioner of Insurance | - | - | - | - | 109 | 0 | 109 |
| Permit Management Office | - | - | - | - | 103 | 0 | 104 |
| Joint Special Counsel on Legislative Donations | - | - | - | - | 78 | - | 78 |
| Department of Agriculture | - | - | - | - | 72 | - | 72 |
| Office of the Financial Institutions Commissioner | 11 | - | - | - | 49 | - | 60 |
| Women's Advocate Office | - | - | - | - | 50 | - | 50 |
| Citizen's Advocate Office (Ombudsman) | - | - | - | - | 49 | - | 49 |
| Civil Rights Commission | - | - | - | - | 46 | - | 46 |
| Public Services Commission | - | - | - | - | 45 | - | 45 |
| Department of Public Security | - | - | - | - | 41 | - | 41 |
| Horse Racing Industry and Sport Administration | 1 | - | - | - | 35 | - | 37 |
| Industrial Tax Exemption Office | - | - | - | - | 31 | - | 31 |
| Cooperative Development Commission | - | - | - | - | 23 | 5 | 27 |
| Correctional Health | - | - | - | - | 24 | - | 24 |
| Office of Public Security Affairs | - | 15 | - | - | 8 | - | 23 |
| Health Advocate Office | - | - | - | - | 17 | - | 17 |
| Parole Board | - | - | - | - | 16 | - | 16 |
| University Pediatric Hospital | 14 | - | - | - | - | - | 14 |
| Advocacy for Persons with Disabilities of the Commonwealth | - | - | - | - | 5 | - | 5 |
| Energy Affairs Administration | - | - | - | - | 5 | - | 5 |
| Office of the Commissioner of Municipal Affairs | - | - | - | - | 2 | - | 2 |
| Office of Administration and Transformation of HR in the Govt. | 0 | - | - | - | 2 | - | 2 |
| Department of Consumer Affairs | - | - | - | - | 2 | - | 2 |
| Investigation, Prosecution and Appeals Commission | 1 | - | - | - | 0 | - | 1 |
| Corrections Administration | - | - | - | - | 1 | - | 1 |
| Joint Commission Reports Comptroller | - | - | - | - | 1 | - | 1 |
| Other | - | - | - | - | 1 | - | 1 |
| Total | $29,907 | $38,557 | $266,042 | $115,489 | $18,545 | $5,750 | $474,289 |

Footnotes:
(a) The numbers presented represent a bottom-up build of invoices at the government agency level, which should not be considered to be indicative of total Accounts Payable for the central government. This is due to issues surrounding invoice entry that has hindered the timely cadence of recording invoices, which was made worse by the impact of the Hurricanes.
(b) Refers to invoices/vouchers approved for payment by the agencies but checks not released. Data is sourced from Puerto Rico Department of Treasury. Recorded invoice data was unavailable for the weeks ended 4/27 to 6/29 and as such the data Recorded invoice date is updated as of 4/20.
(c) Represents additional invoices identified outside of DTPR main system. Data is sourced from BDO, who compiles this information for the 19 agencies included in its scope of work.
(d) Pre-recorded AP is related to other agencies out of scope for BDO that independently enter invoices into a Live AP module prior to invoice payment approval. The data is sourced from the agencies themselves, compiled by BDO, and validated to ensure there is no overlap with other AP categories.

**Puerto Rico Department of Treasury | AAFAF**    As of June 29, 2018

Schedule H: Budget Allocation of the Reconciliation Adjustment

| (figures in $000s) Agency | Original Budgeted Amount | Allocation to PREPA Loan (a) | Allocation to DTOP (b) | Allocation for GMS (c) | Allocation for Municipalities (d) | Allocation to the Police Department (e) | Allocation to ASEM (f) | Allocation to PRFMA (g) | Allocation to pay GPR AP to PRASA (h) | Total (a to h) | Remaining |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 Department of Health | $146,000 | $80,367 | $21,431 | $3,077 | $20,895 | – | $10,126 | $4,018 | $6,085 | $146,000 | – |
| 2 Department of Treasury | 90,000 | 49,541 | 13,211 | 1,897 | 12,881 | – | 6,242 | 2,477 | 3,751 | 90,000 | – |
| 3 Department of Education | 75,000 | 41,284 | 11,009 | 1,581 | 10,734 | – | 5,202 | 2,064 | 3,126 | 75,000 | – |
| 4 OMB Funds | 47,000 | – | – | – | – | 38,926 | – | – | 7,074 | 46,000 | 1,000 |
| 5 Adm Child Care & Development | 40,000 | 22,018 | 5,872 | 843 | 5,725 | – | 2,774 | 1,101 | 1,667 | 40,000 | – |
| 6 Authority of Public Private Alliances | 36,000 | 19,817 | 5,284 | 759 | 5,152 | – | 2,497 | 991 | 1,500 | 36,000 | – |
| 7 Corp Service Medical Center | 30,000 | 16,514 | 4,404 | 632 | 4,294 | – | 2,081 | 826 | 1,250 | 30,000 | – |
| 8 Mental Health and Drug Addiction Services Administration | 30,000 | 16,514 | 4,404 | 632 | 4,294 | – | 2,081 | 826 | 1,250 | 30,000 | – |
| 9 PR Police Department | 25,000 | 13,761 | 3,670 | 527 | 3,578 | – | 1,734 | 688 | 1,042 | 25,000 | – |
| 10 Transportation & Public Works | 25,000 | 13,761 | 3,670 | 527 | 3,578 | – | 1,734 | 688 | 1,042 | 25,000 | – |
| 11 Administration for the Development of Agricultural Enterprises | 25,000 | 13,761 | 3,670 | 527 | 3,578 | – | 1,734 | 688 | 1,042 | 25,000 | – |
| 12 Department of Corrections | 15,000 | 8,257 | 2,202 | 316 | 2,147 | – | 1,040 | 413 | 625 | 15,000 | – |
| 13 Department of Justice | 4,000 | 2,202 | 587 | 84 | 572 | – | 277 | 110 | 167 | 4,000 | – |
| 14 Firefighters | 3,000 | 1,651 | 440 | 63 | 429 | – | 208 | 83 | 125 | 3,000 | – |
| 15 Highway Transportation Authority | 1,000 | 550 | 147 | 21 | 143 | – | 69 | 28 | 42 | 1,000 | – |
| 16 Total | $592,000 | $300,000 | $80,000 | $11,486 | $78,000 | $38,926 | $37,800 | $15,000 | $29,788 | $581,000 | $1,000 |
| 17 Net Cash Utilized | | ($300,000) | – | – | ($78,000) | ($18,961) | ($37,800) | – | ($29,788) | ($464,549) | |
| 18 Remaining Cash Available | $1,000 | – | $80,000 | $11,486 | – | $19,965 | – | $15,000 | – | $126,451 | $127,451 |

Source: Office of Management and Budget

Footnotes:
(a) Following a Federal Court Ruling on February 19, 2018 that approved a loan request in the amount of $300M to PREPA from the TSA (funds transferred to PREPA on 2/23), $300M was repurposed from the Reconciliation Adjustment budgeted at the agency level, and use of approved budgeted amounts for the Reconciliation Adjustment from among 14 agencies provided the funding for this loan to PREPA. Refer to the above schedule for the detailed budget allocation by agency. Subsequently, due to excess revenues collected by PREPA that were applied to the repayment of outstanding Revolving Credit Loans, separate payments totaling $149M YTD were made to the TSA from PREPA (see Net Inflow PREPA on page 7 of this report). However, the total $300M reapportioned amount is considered permanent variance to the FY2018 Liquidity Plan, as additional funds repaid to the TSA may subsequently be re-drawn by PREPA if necessary.
(b) The Transportation and Public Works Department (DTOP) requested and was granted authorization to transfer $80M from the Reconciliation Adjustment (General Fund accounts 111, 141), to its capital improvement program (concept 081), to execute an intensive initiative commencing May 26th, 2018. Though the project will commence in FY2018, there are not expected to be any actual cash outlays until the next fiscal year.
(c) The Office of Management and Budget (OMB) requested and was granted authorization to reapportion $11M from the Reconciliation Adjustment for the purpose of acquiring Microsoft Grant Management Solutions (GMS). The implementation of GMS will permit the OMB, and up to five other government agencies, to monitor, assess, and manage allocation programs of federal funds.
(d) Law 96-2018, approved on May 8, 2018, provided for the creation of the Emergency Municipal Assistance Fund, through which $1M in funding is assigned to each of the 78 Puerto Rico Municipalities to cover operational and administrative costs in light of any declines in collections resulting from Hurricanes Irma and Maria. $78M was thus repurposed from agencies' budgeted Reconciliation Adjustment to provide for the creation of the aforementioned Emergency Municipal Assistance Fund.
(e) The Puerto Rico Police Department requested and was granted authorization to transfer $40M from the Reconciliation Adjustment (General Fund Account 141, a single amount under the custody of OMB) to cover June Payroll, Law 70 payments and overtime payments prior to the fiscal year end.
(f) OMB granted authorization for the transfer and allocation of $38M from the Reconciliation Adjustment to ASEM in order to augment their current appropriations from Central Government and support ongoing liquidity needs at this Component Unit of the Commonwealth.
(g) OMB granted authorization for the transfer and allocation of $15M from the Reconciliation Adjustment to the Puerto Rico Emergency Management Agency (PREMA) to pay for the extension of a professional services contract that is FEMA-reimbursable.
(h) $30M was repurposed from the Reconciliation Adjustment to provide for the pay down of Government of Puerto Rico (GPR) agencies' accounts payable in arrears that were owed to PRASA.

18