**HEARING DATE: JAN. 16, 2019 AT 9:30 A.M. (ATLANTIC STANDARD TIME)**
**RESPONSE DEADLINE: JAN. 9, 2019 AT 4:00 P.M. (ATLANTIC STANDARD TIME)**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re* <br><br> THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br> as representative of <br><br> THE COMMONWEALTH OF PUERTO RICO, *et al.*, <br><br> Debtors.[1] | PROMESA <br> Title III <br><br><br> No. 17 BK 3283-LTS <br><br> (Jointly Administered) |
| *In re* <br><br> THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, <br><br> as representative of <br><br> PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), <br><br> Debtor. | PROMESA <br> Title III <br><br><br> No. 17 BK 3284-LTS |

*Caption Continued on Following Page*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, as Trustee,<br><br>                                Plaintiff,<br><br>      v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION, WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>                                Defendants. | Adv. Pro. No. 17-00133-LTS |

**MEMORANDUM OF AMBAC ASSURANCE CORPORATION IN RESPONSE TO DECLARATIONS OF THE BANK OF NEW YORK MELLON PURSUANT TO SECTION 19.5 OF COFINA'S AMENDED TITLE III PLAN OF ADJUSTMENT**

To the Honorable United States District Judge Laura Taylor Swain:

Ambac Assurance Corporation ("Ambac"), pursuant to Section 19.5 of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation (the "Plan") and the Court's Scheduling Order entered on December 19, 2018 [ECF No. 394], respectfully submits this memorandum in response to the declarations of Daniel P. Goldberg [ECF No. 412-1] (the "Goldberg Declaration") and Robert M. Fishman [ECF No. 413-1] (the "Fishman Declaration," and jointly, the "BNYM Declarations") submitted on behalf of The Bank of New York Mellon, as Trustee ("BNYM").[2]

**PRELIMINARY STATEMENT**

1.     Ambac, in its *Amended Memorandum of Law Pursuant to Section 19.5 of COFINA's Amended Title III Plan of Adjustment* [ECF No. 422] ("Ambac Opening Mem."), has

---

[2]     Docket citations are to Case No. 17 BK 3284-LTS unless otherwise noted. Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Plan.

already offered to assume COFINA's indemnification obligations to BNYM in connection with the Ambac Action (and *only* the Ambac Action) under certain conditions: (i) only insofar as COFINA was so obligated; (ii) with respect to legal fees incurred post-Effective Date; (iii) where such legal fees are actually incurred and determined by the Court to be reasonable and owing; and (iv) if BNYM prevails with a final judgment in its favor. Ambac has made this offer in the interest of the success of the Plan even though it has no legal obligation to do so.

2. What Ambac has not offered, however, is to bear greater indemnity responsibility than COFINA ever had under Section 804 of the COFINA Amended and Restated Sales Tax Revenue Bond Resolution (the "Resolution") [ECF No. 4599-1 in Case No. 17-03283-LTS], or to provide collateral in an amount far in excess of what BNYM may reasonably incur in its defense of the Ambac Action going forward. But that is precisely what BNYM is seeking. Its declarants, Mr. Goldberg and Mr. Fishman, contend that BNYM will spend *$25-40 million* in its defense of the Ambac Action and Whitebox Actions (collectively, "Ambac and Whitebox Actions" or "Actions"), an amount far in excess of a reasonable amount under the circumstances.

3. Ambac submits again that BNYM had no lien with respect to defense costs vis-à-vis COFINA under Resolution Section 804, and Ambac should not therefore be required to provide replacement security in the form of a bond or holdback in connection with the Ambac Action. In the event the Court concludes otherwise, however, the appropriate form of security would be a bond (not a holdback) in a reasonable amount that Ambac would post at each stage of litigation, *i.e.*, at (i) motion to dismiss; (ii) answer, discovery, and summary judgment; (iii) trial; and (iv) appeal.[3] There is no equitable basis to require Ambac *ex ante* to provide security for contingent, future stages of litigation that may never materialize.

---

[3] BNYM should have no right to draw down on any such bond on a current basis. It did not have any such right under Section 804 of the Resolution and should not have that right going forward. (See Ambac Opening Mem. ¶¶ 11-14).

- 2 -

4. With respect to the amount of any such bond, the estimates of BNYM's declarants are inflated, unsupported by fact, and should not be credited. Their hypothetical estimates are flawed for many reasons, including: they (a) ignore the substantial litigation in which the parties have already engaged, including a summary judgment motion that BNYM has contended is substantially dispositive of the Actions; (b) contemplate redundant efforts by at least thirteen lawyers at Reed Smith LLP ("Reed Smith"), BNYM's chosen counsel; and (c) are based on the erroneous assumption "that BNYM has but a single opportunity, in advance, to set a holdback" to establish the security contemplated in Section 19.5 of the Plan. To the contrary, Section 19.5 provides this Court with the discretion to direct the form of security as a bond, which could be staged at each phase of litigation. Such a bond would provide adequate protection to BNYM without unduly penalizing Ambac for asserting a valid claim against BNYM.[4]

**ARGUMENT**

**A.   A Staged Bond Is the Appropriate Form of Security**

5. In fashioning an equitable remedy, courts are guided toward the least restrictive means of accomplishing the intended ends. Indeed, an "equitable remedy must not itself work an inequity," and such relief should not "be disproportionate in its harm to defendant and its assistance to plaintiff." Van Wagner Advert. Corp. v. S & M Enters., 67 N.Y.2d 186, 195 (N.Y. 1986) (citations omitted). Here, the intended remedy is to ensure that BNYM's reasonable defense costs in connection with the Ambac Action are borne by Ambac only if BNYM prevails.

---

[4] Given the purely hypothetical nature of the presentation in the BNYM Declarations, and the absence of any factual presentation by BNYM as to its actual defense costs, Ambac has elected not to offer counter-expert testimony at the Confirmation Hearing. Absent facts as to BNYM's actual defense costs, any testimony from an Ambac witness would necessarily be likewise hypothetical and would not aid the Court in determining an appropriate bond amount. Ambac reserves the right to present experts at such time as BNYM seeks approval and reimbursement of any fees *actually incurred* in connection with the Ambac Action.

- 3 -

A bond is the accepted form of security in a variety of litigation settings. See, e.g., Fed. R. App. P. 7 (bonding costs for appeal); Fed. R. Civ. P. 65(c) (preliminary injunctions and temporary restraining orders); see also Adsani v. Miller, 139 F.3d 67, 79 (2d Cir. 1998) (affirming the district court's order for appellant to post a bond pursuant to Fed. R. App. P. 7); Buffalo S. R.R. Inc. v. Vill. of Croton-on-Hudson, 434 F. Supp. 2d 241, 256 (S.D.N.Y. 2006) ("The setting of a bond requires little or no explanation. Fed. R. Civ. P. 65(c) provides, 'No restraining order or preliminary injunction shall issue except upon the giving of security by the applicant, in such sum as the court deems proper.'").

6. Ambac should not be required to bond contingent phases of litigation that may never occur if Ambac fails to clear preceding hurdles. For example, if BNYM prevails on a motion to dismiss, it will not face the costs of discovery, summary judgment, trial or appeal. There is thus no equitable purpose in causing Ambac to forfeit the time-value of its capital in the form of a bond (or a holdback) for subsequent phases of litigation that may never occur.

7. The BNYM Declarations ignore even the possibility of Ambac posting a bond; they assume that "BNYM has but a single opportunity, in advance, to set a holdback." (Goldberg Decl. ¶ 38; Fishman Decl. ¶ 5 ("As set forth in section 19.5 of the Plan, one of the principal unresolved issues, and the issue that this report will address, is the amount of funds that the Trustee is entitled to reserve . . . from funds otherwise distributable to beneficial holders of the Bonds for the purpose of protecting the Trustee's right to reimbursement of its costs and expenses . . . .")). But, Section 19.5 of the Plan provides for this Court to set a bond *or* a holdback.[5]

---

[5] Section 19.5 states: "the Title III Court shall determine (a) what amount, if any, shall be either (i) withheld by the Disbursing Agent or BYNM as trustee for the Existing Securities or (ii) posted by Ambac and Whitebox as collateral for the reimbursement of fees and expenses which may be incurred by

8. A staged bond, as opposed to the speculative $25-40 million holdback proposed by BNYM, would sufficiently protect BNYM's interests, and at the same time not penalize Ambac for asserting a valid claim. Mr. Fishman admits that the BNYM cost estimate takes into account "a sufficient margin of error to account for the most expensive, most contested, most complex potential aspects of the Anticipated Litigation." (Fishman Decl. ¶ 38). A staged bond would obviate the need to withhold from Ambac the excessive "margin of error" that pervades the BNYM estimate.

9. Further, it is only fair that the Court not impose a punitive burden on Ambac given its voluntary release of its ordinary negligence claims against BNYM (which COFINA would have been obligated to indemnify under the Resolution), and its offer to indemnify BNYM for its reasonable costs to defend the Ambac Action as set forth above. No other party has agreed to take on such obligations. In fact, under the proposed Third Amended Plan (circulated in draft on Jan. 7, 2019), Reorganized COFINA itself has undertaken, on a post-confirmation basis, to indemnify BNYM for any bondholder claims other than those claims asserted by Ambac and Whitebox.

### B. The Estimated Cost of Pre-Answer Litigation Phases Is Overstated and Fails to Account for BNYM's Prior Work

10. Mr. Goldberg claims that BNYM's attorneys at Reed Smith — 8 partners, 4 associates, and a special counsel — could reasonably spend between $1 to $2.25 million

---

BNYM." Plan § 19.5. Ambac's position is that the choice between holdback or bond is intended to give Ambac the option, and the provision cannot be read equitably any other way.

- 5 -

(1,400-2,700 hours) on "case assessment, development and administration." (Goldberg ¶ 63).[6] He also states he "would expect BNYM" to file a motion to dismiss the complaint, and estimates that BNYM will incur an additional $1.5 to $1.8 million (1,829-2,270 hours) for that task. (Goldberg Decl. ¶ 78; Goldberg Decl. Ex. C). Thus, he estimates that before the case even requires an Answer, BNYM will already have incurred $2.5 to $4 million of defense costs.

11. Mr. Goldberg's estimate, however, is seriously flawed, in that it fails to account for the fact that much of the work required for any case assessment and/or motion to dismiss has already been completed in the context of BNYM's summary judgement pleadings in the Interpleader Action. Specifically, BNYM filed a *Motion for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56* in the Interpleader Action (ECF No. 435 in Case No. 17-00133-LTS ("Partial Summary Judgment Motion")) arguing that, as to the 2017 Events of Default[7] that are alleged in the Ambac Action, "the material facts are not in genuine dispute," and that the parties, including Ambac and Whitebox, disagree only on the application of the law. (Id. at 12). Even more recently, BNYM filed a *Motion to Reinstate its Motion for Partial Summary Judgment* (ECF No. 519 in Case No. 17-00133-LTS ("Motion to Reinstate")), arguing to the Court that "reinstatement and determination of the [Partial] Summary Judgment Motion could simply and efficiently resolve a fundamental dispute—whether an Event of Default occurred

---

[6] The top-heavy ratio of senior lawyers to junior lawyers is a standalone basis to discredit Mr. Goldberg's fee estimate. See, e.g., Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 53, 57 (S.D.N.Y. 2015) (30 percent reduction in fee application principally due to partner-intensive staffing of the case); Plummer v. Chem. Bank, 592 F. Supp. 1168, 1172 (S.D.N.Y. 1984) (50 percent reduction because of numerous inefficiencies, including "partners doing work easily and ordinarily performed by junior associates"); Beech Cinema, Inc. v. Twentieth Century Fox Film Corp., 480 F. Supp. 1195, 1197 (S.D.N.Y. 1979) (decreasing weighted billing rate used to calculate fee award where there was a "disproportionate ratio of partners' to associates' time" considering that "[m]any of the functions performed by the partners could have been satisfactorily accomplished by associates, with a considerable saving in fees"), aff'd, 622 F.2d 1106 (2d Cir. 1980).

[7] "Event of Default" has the same definition as provided by the Resolution.

under the Resolution, and if so, when—that could alleviate the need for extensive litigation over a broader array of issues." (Motion to Reinstate ¶ 1). BNYM also argued that "the [Partial] Summary Judgment Motion should be reinstated because a decision on the merits would resolve live disputes between BNYM, on the one hand, and Whitebox and Ambac, on the other." (Motion to Reinstate ¶ 6). BNYM has thus assessed the case, identified and pleaded its defenses, and has contended in a recent pleading to be entitled to judgment as a matter of law without any further document production, depositions or motion practice.

### C. Mr. Goldberg Fails to Provide Any Proof of the Actual Fee Arrangement for the Ambac and Whitebox Actions

12. The hypothetical legal fee estimate provided by Mr. Goldberg should be rejected for the simple reason that there is a complete failure of proof regarding BNYM's actual fee arrangement with Reed Smith for the Ambac and Whitebox Actions.

13. In his declaration, Goldberg acknowledges that in the ordinary course, a client and its law firm agree to a fee arrangement and a case budget at the outset of the representation. (Goldberg Decl. ¶ 5). In estimating BNYM's defense costs for the Ambac and Whitebox Actions, Goldberg assumes that Reed Smith has undertaken the representation on a standard, hourly basis. (Goldberg Decl. ¶ 49 ("I have been asked to assume that the anticipated hourly billing rates and Reed Smith team members are as follows . . . .")). But Goldberg fails to provide any details regarding the actual fee arrangement agreed to between BNYM and Reed Smith. For example, nowhere is it disclosed whether Reed Smith has taken on the representation of BNYM in the Ambac and Whitebox Actions on an hourly basis or pursuant to a non-standard

- 7 -

fee arrangement.[8]  If the representation is on an hourly basis, it is also undisclosed whether Reed Smith has agreed to any sort of discount to its typical hourly rates for the defense of the Ambac and Whitebox Actions.  Mr. Goldberg also fails to acknowledge that any actual budget Reed Smith has prepared for the Actions (the original as well as any estimate of post-Effective Date legal fees) would obviously be the best evidence of the costs that BNYM can expect to incur going forward.  Instead of attempting to defend Reed Smith's actual budget, BNYM's declarants have offered up an exaggerated and purely hypothetical, worst case scenario that includes a "margin of error to account for the most expensive, most contested, most complex potential aspects of the Anticipated Litigation." (Fishman Decl. ¶ 38).

### D. BNYM's Estimate Fails to Account for Substantial Work Already Completed

14.     Mr. Goldberg consistently fails to account for BNYM's prior work in the Interpleader Action.  A number of the more glaring examples follow.

#### 1. Prior Discovery Work

15.     Mr. Goldberg estimates that the Discovery phase will cost BNYM $8.25 to $12.75 million (13,000-20,000 hours).  (Goldberg Decl. ¶ 97).  This estimate fails to account for the substantial fact development that has already been undertaken in the Interpleader Action, which ultimately led to the filing of summary judgment motions by five separate groups.  For example, Mr. Goldberg does not account for the fact that BNYM:

- drafted requests for production to various parties, including Ambac;
- responded to requests for production from various parties including Ambac;

---

[8]  Mr. Goldberg himself raises the possibility of a non-standard fee arrangement.  Specifically, he explains that in his role as managing partner at Holwell Shuster & Goldberg: "I review, negotiate, and approve every non-standard fee arrangement entered into by the firm.  Part of that process entails analyzing what a litigation would cost if the engagement were on a standard hourly fee arrangement."  (Goldberg Decl. ¶ 5).

- collected, preserved, and reviewed documents in response to those requests for production;

- actually produced documents in response to those requests for production (20,000 pages of documents);

- reviewed the document productions made by the other parties in the Interpleader Action;

- performed a case assessment at least with regard to the 2017 events that Ambac contends were Events of Default; and

- identified various legal defenses as to why it was not obligated to declare an Event of Default and/or accelerate the COFINA bonds.

(See, e.g., Interpleader Action Scheduling Order at 3-4 (ECF No. 154 in Case No. 17-cv-00133-LTS; Order on Parties' Informative Motion Regarding Discovery Disputes at 4 (ECF No. 273 in Case No. 17-cv-00133-LTS) (resolving BNYM's discovery dispute with Ambac); BNYM's Statement of Undisputed Material Facts at ¶¶ 66-67 (ECF No. 436 in Case No. 17-cv-00133-LTS (citing as exhibits various documents produced during discovery)).

16.     Goldberg attempts to disregard the Interpleader Action's discovery process by noting that the "certain limited discovery . . . did not address the alleged 2015 and 2016 Events of Default." (Goldberg Decl. ¶ 102). BNYM, however, found the discovery sufficient to submit its Partial Summary Judgment Motion and declare that "the material facts are not in genuine dispute" for the 2017 Events of Default in question. (Partial Summary Judgment Motion at 12). Accord Am. Lung Ass'n v. Reilly, 144 F.R.D. 622, 628 (E.D.N.Y. 1992) (disallowing attorneys' fees for discovery requests where the plaintiffs filed their motion for summary judgment prior to receiving any answers to the discovery requests because "the plaintiffs represented that there were no genuine issues of material fact" so "[t]he discovery requests must have been irrelevant to the filing of the motion").

17. Moreover, BNYM submitted its Partial Summary Judgment Motion despite not taking a single deposition in the Interpleader Action. Mr. Goldberg contends, however, that BNYM now expects that *40 depositions* will be needed in the Ambac and Whitebox Actions to develop the facts as to the remaining Events of Default. (Goldberg Decl. ¶ 111). Notably, Mr. Goldberg identifies neither a single witness by name nor office; nor does he opine why the facts surrounding the 2017 Events of Default were sufficiently developed for summary judgment without a deposition, but that is not the case for the 2015 and 2016 Events of Default. (Goldberg Decl. ¶ 111).

### 2. BNYM Already Prepared and Filed Summary Judgment Papers for the 2017 Events of Default

18. Goldberg estimates that the summary judgment motion stage will cost BNYM $1.8 million to $2.9 million (2,260-3,580 hours). (Goldberg Decl. Exhibit C). Once again, this estimate fails to properly account for BNYM's Partial Summary Judgment Motion, which covers the 2017 Events of the Default alleged in the Ambac Action. In its Motion to Reinstate, BNYM stated that the Ambac and Whitebox Actions involve "the same foundational dispute that has been presented to the Court as part of the [Partial] Summary Judgment Motion." (Motion to Reinstate ¶ 6 (emphasis removed)). Mr. Goldberg's estimate that a mean of *3,000* additional hours of attorney time are required to present a summary judgment motion as to the other Events of Default simply cannot be credited in light of BNYM's prior statements to the Court. Indeed, BNYM has already:

- drafted and filed the Partial Summary Judgment Motion (ECF No. 435);

- prepared and submitted a Statement of Undisputed Facts for the 2017 Events of Default (ECF No. 436); and

- prepared and filed an Omnibus Response to four other groups' summary judgment motions (ECF No. 470).

- 10 -

### 3. BNYM Has Already Analyzed Legal Issues that its Declarants Include in Their Estimated Fees

19. Mr. Goldberg's estimate for the Case Assessment, Development, and Administration Stage ($1 to $2.25 million and 1,400-1,700 hours) includes amounts budgeted for "complex choice of law questions" that "might" have to be assessed. (Goldberg Decl. ¶ 63, ¶ 68). He estimates that BNYM would expend anywhere from $288,000 to $480,000 in order for "[t]he trial team . . . to analyze, strategize, and potentially address through briefing what law applies—to the case overall and, as applicable, to discrete issues." (Goldberg Decl. Ex. C; Goldberg Decl. ¶ 68).

20. BNYM has previously been comfortable, however, in its assessment that only New York law applies to disputes regarding its conduct. (Partial Summary Judgment Motion at 12-13 n.10 ("the Trustee's rights, duties, privileges, and immunities are governed by the laws of the State of New York. Resolution § 1211.")).

### 4. BNYM Accounts for Costs Associated with Counterclaims that BNYM Has No Right to Bond, and Third-Party Claims that BYNM Has No Right to Pursue

21. Mr. Goldberg assumes that BNYM will assert counterclaims against Ambac and Whitebox, as well as third-party claims against unidentified non-parties. (Goldberg Decl. ¶ 83 ("I have been asked to assume that BNYM might assert counterclaims and/or third party claims.")). According to Mr. Goldberg, it is reasonable to further assume that Ambac, Whitebox, and the non-parties would move to strike or dismiss these claim, which may require BNYM to incur costs for "significant original research and analysis," several rounds of briefing, and oral argument in response. (Goldberg Decl. ¶ 84).

22. But Mr. Goldberg's analysis fails to recognize that BNYM had no right under the Resolution, and has no right under Section 19.5 or any other Plan provision, for

- 11 -

security in connection with affirmative claims for relief. See Plan § 19.5 (contemplating security to cover "the reimbursement of fees and expenses which may be incurred by BNYM in connection *with the defense of* the Ambac Action"). Additionally, Mr. Goldberg fails to recognize that BNYM has no right under the Plan to pursue third-party claims against recipients of prior distributions from BNYM/COFINA because such claims are released by the Plan. See Plan § 30.2(d).

## CONCLUSION

Ambac respectfully requests that the Court reject the BNYM Declarations, and grant the relief requested by Ambac herein.

Dated: January 9, 2019
      San Juan, Puerto Rico

| | |
|---|---|
| **CURTIS, MALLET-PREVOST,<br>  COLT & MOSLE LLP** | **FERRAIUOLI LLC** |
| By: /s/ *Gabriel Hertzberg*<br>  Michael J. Moscato<br>  (admitted *pro hac vice*)<br>  Gabriel Hertzberg<br>  (admitted *pro hac vice*)<br>  101 Park Avenue<br>  New York, NY 10178<br>  Telephone: (212) 696-6000<br>  Facsimile: (212) 697-1559<br>  Email: mmoscato@curtis.com<br>        ghertzberg@curtis.com | By: /s/ *Roberto Cámara-Fuertes*<br>  Roberto Cámara-Fuertes<br>  (USDC-PR No. 219002)<br>  Sonia Colón<br>  (USDC-PR No. 213809)<br>  221 Ponce de León Avenue, 5th Floor<br>  San Juan, PR 00917<br>  Telephone: (787) 766-7000<br>  Facsimile: (787) 766-7001<br>  Email: rcamara@ferraiuoli.com<br>        scolon@ferraiuoli.com |

*Attorneys for Ambac Assurance Corporation*

**CERTIFICATE OF SERVICE**

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all CM/ECF participants in this case.

/s/ *Roberto Cámara-Fuertes*
Roberto Cámara-Fuertes (USDC-PR No. 219002)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

33856878