Hearing Date: **January 16, 2019 at 9:30 a.m. (Atlantic Standard Time)**
Response Deadline: **January 9, 2019 at 4:00 p.m. (Atlantic Standard Time)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>This filing relates to COFINA only |

## MEMORANDUM OF LAW OF THE BANK OF NEW YORK MELLON, AS TRUSTEE, REGARDING COMPLIANCE WITH SECTION 19.5 OF THE PLAN

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the  Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID:  3747).

# **TABLE OF CONTENTS**

**Page**

INTRODUCTION ................................................................................................. 1

ARGUMENT ....................................................................................................... 5

I. COFINA'S OBLIGATIONS AND BNYM'S RIGHTS SHOULD BE SATISFIED FROM A RESERVE ESTABLISHED UNDER SECTION 19.5 OF THE PLAN............ 5

II. COFINA'S OBLIGATIONS AND BNYM'S RIGHTS SHOULD BE DETERMINED AND PROTECTED IN ACCORDANCE WITH THE PLAIN MEANING OF THE RESOLUTION AS INFORMED BY PUBLIC POLICY. .................................................. 9

III. COFINA'S OBLIGATION TO PROVIDE THE INDUBITABLE EQUIVALENT OF BNYM'S SECURED CLAIM MUST BE SATISFIED BY THE ESTABLISHMENT OF A RESERVE....................................................................................................... 13

    A. BNYM Is Entitled To Payment Of Reasonable Compensation And Expenses.... 13

    B. BNYM Is Entitled To Indemnification For Expenses Other Than For Its Demonstrated Gross Negligence And Willful Misconduct. ................................ 15

    C. BNYM's Claims Are Secured By A First Priority Lien. ...................................... 19

    D. Applicable Law And Section 19.5 Mandate That BNYM Receive The Indubitable Equivalent Of Its Secured Claim. ......................................................... 20

IV. BNYM'S RIGHT TO PAYMENT PRIOR TO BONDOWNERS MUST BE SATISFIED BY THE ESTABLISHMENT OF A RESERVE............................................................. 23

    A. BNYM's Fees And Expenses Are Entitled To Priority Of Payment................... 24

    B. BNYM Is Entitled To Withhold A Reserve For Fees And Expenses.................. 26

    C. BNYM's Lien And Payment Priorities Are Enforceable Under Section 510(a) Of The Bankruptcy Code. ........................................................................... 28

V. CASES CITED BY THE OPPOSITION PARTIES DO NOT SUPPORT A DIFFERENT RESULT. ............................................................................................................. 31

CONCLUSION.................................................................................................... 34

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

<u>AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.</u>,
11 N.Y.3d 146 (N.Y. 2008) ...................................................................................11

<u>Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's</u>,
136 F.3d 82 (2d Cir. 1998)......................................................................................9

<u>ASR Levensverzekering v. Breithorn ABS Funding</u>,
958 N.Y.S.2d 380 (N.Y. App. Div. 1st Dep't 2013) .............................................11

<u>Barbagallo v. Marcum</u>,
No. 11-CV-1358, 2012 WL 1664238 (E.D.N.Y. May 11, 2012) ...........................19

<u>Barnes v. New York City Hous. Auth.</u>,
841 N.Y.S.2d 379 (N.Y. App. Div. 2d Dep't 2007) ..............................................16

<u>Becker v. Bank of New York Mellon, N.A.</u>,
172 F. Supp. 3d 777 (E.D. Pa. 2016) ...............................................................32, 33

<u>Bernkopf Goodman LLP v. Sheepshead Landing LLC</u>,
No. 27062/2008, 2011 WL 7989431 (N.Y. Sup. Ct. June 27, 2011) ....................14

<u>Biggs v. Lyng</u>,
644 F. Supp. 998 (E.D.N.Y. 1986) ........................................................................17

<u>Bluebird Partners, L.P. v. First Fid. Bank, N.A., N.J.</u>,
671 N.Y.S.2d 7 (N.Y. App. Div. 1st Dep't 1998) ................................................20

<u>BOKF, N.A. v. Wilmington Sav. Fund Soc'y, FSB (In re MPM Silicones, L.L.C.)</u>,
No. 15-2280-NSR, 2018 WL 6324842 (S.D.N.Y. Nov. 30, 2018)....................9, 29

<u>In re Boston Generating, LLC</u>,
440 B.R. 302 (Bankr. S.D.N.Y. 2010) ..............................................................29, 30

<u>In re Briscoe Enters., Ltd., II</u>,
994 F.2d 1160 (5th Cir. 1993) ...............................................................................22

<u>CFIP Master Fund, Ltd. v. Citibank, N.A.</u>,
738 F. Supp. 2d 450 (S.D.N.Y. 2010).....................................................................17

<u>Cortlandt St. Recovery Corp. v. Bonderman</u>,
31 N.Y.3d 30 (N.Y. 2018) .....................................................................................10

Cuellar v. City of New York,
  32 N.Y.S.3d 292 (N.Y. App. Div. 2d Dep't 2016) ................................................................16

Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Future Holdings
  Corp.),
  546 B.R. 566 (Bankr. D. Del. 2016) ....................................................................................30

Dresser-Rand Co. v. Ingersoll Rand Co.,
  No. 14-7222 (KPF), 2015 WL 4254033 (S.D.N.Y. July 14, 2015)........................................31

Elliott Assocs. v. J. Henry Schroder Bank & Trust Co.,
  838 F.2d 66 (2d Cir. 1988).............................................................................................10, 11

In re Envirodyne Indus., Inc.,
  161 B.R. 440 (Bankr. N.D. Ill. 1993), aff'd, 29 F.3d 301 (7th Cir. 1994)..............................28

In re First Baldwin Bancshares, Inc.,
  No. 13-00027, 2013 WL 5429844 (Bankr. S.D. Ala. 2013)...................................................26

In re Flight Transp. Corp. Sec. Litig.,
  874 F.2d 576 (8th Cir. 1989) ..............................................................................................20

In re Hart Ski Mfg. Co.,
  5 B.R. 734 (Bankr. D. Minn. 1980) ....................................................................................29

Hooper Assocs. v. AGS Computers,
  74 N.Y.2d 487 (N.Y. 1989) ...........................................................................................32, 33

HSBC Bank USA v. Branch (In re Bank of New England Corp.),
  364 F.3d 355 (1st Cir. 2014)...............................................................................................29

In re Inv. Co. of Sw., Inc.,
  341 B.R. 298 (B.A.P. 10th Cir. 2006) .................................................................................22

In re Ion Media Networks, Inc.,
  419 B.R. 585 (Bankr. S.D.N.Y. 2009).............................................................................29, 31

J.P. Morgan Sec., Inc. v. Vigilant Ins. Co.,
  21 N.Y.3d 324 (N.Y. 2013) ................................................................................................19

In re Keller,
  157 B.R. 680 (Bankr. E.D. Wash. 1993) .............................................................................22

Lansuppe Feeder, LLC v. Wells Fargo Bank, NA,
  No. 15-7034-LTS, 2016 WL 5477741 (S.D.N.Y Sept. 29, 2016)......................................9, 31

MacKay Shields v. Sea Containers,
  751 N.Y.S.2d 485 (N.Y. App. Div. 1st Dep't 2002) .............................................................30

Meckel v. Cont'l Res. Co.,
  758 F.2d 811 (2d Cir. 1985)......................................................................10, 11

Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc.,
  84 N.Y.2d 430 (N.Y. 1994) ..............................................................................9

Meyerson v. Tullman,
  721 N.Y.S.2d 517 (N.Y. App. Div. 1st Dep't 2001) ......................................16

In re MPM Silicones, LLC,
  531 B.R. 321 (S.D.N.Y. 2015)........................................................................26

Estate of Nasser v. Port Auth. of N.Y. & N.J.,
  546 N.Y.S.2d 626 (N.Y. App. Div. 1st Dep't 1989) ......................................16

PIMCO Absolute Return Strategy 3d Offshore Fund Ltd. v. Wells Fargo Bank,
  Nat'l Ass'n,
  No. 654743/2017 (N.Y. Sup. Ct. Nov. 13, 2017) ...........................................17

In re Ponce de Leon, 1403, Inc.,
  523 B.R. 349 (Bankr. D.P.R. 2014).................................................................22

Pub. Serv. Mut. Ins. Co. v. Goldfarb,
  53 N.Y.2d 392 (N.Y. 1981) .............................................................................19

Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A.,
  14 N.Y.3d 419 (N.Y. 2010) .............................................................................11

Rake v. Wade,
  508 U.S. 464 (1993).........................................................................................27

Repsol, S.A. v. Bank of New York Mellon,
  No. 652653/2012, 2014 WL 468910 (N.Y. Sup. Ct. Feb. 4, 2014).................30

Rishell v. Med. Card Sys., Inc.,
  925 F. Supp. 2d 211 (D.P.R. 2013)..................................................................31

In re River East Plaza, LLC,
  669 F.3d 826 (7th Cir. 2012) ...........................................................................23

Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.,
  No. 17-cv-5916 (AJN), 2018 WL 3849840 (S.D.N.Y. Aug. 10, 2018)......17, 18

Royal Park Invs. SA/NV v. HSBC Bank USA, Nat'l Ass'n,
  No. 17-cv-7684 (VEC), Doc. No. 64 (S.D.N.Y. Aug. 2, 2018).................17, 18

Royal Park Invs. SA/NV v. U.S. Bank Nat'l Ass'n,
  No. 14-cv-2590 (VM), 2018 WL 6920768 (S.D.N.Y. Nov. 30, 2018) .......17, 18

Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.,
    No. 17-cv-6687 (KPF), Doc. No. 37 (S.D.N.Y. Jan. 22, 2018)..............................17

In re Sagendorph,
    562 B.R. 545 (D. Mass. 2017) ...................................................................22

In re Salem Suede, Inc.,
    219 B.R. 922 (Bankr. D. Mass. 1998) ......................................................22

In re SCC Kyle Partners, Ltd.,
    No. 12-11978-HCM, 2013 WL 2903453 (Bankr. W.D. Tex. June 14, 2013).......................22

In re Sepco, Inc.,
    36 B.R. 279 (Bankr. D.S.D. 1984)..............................................................28

Sharon Steel Corp. v. Chase Manhattan Bank, N.A.,
    691 F.2d 1039 (2d Cir. 1982)..........................................................9, 11, 12

Shawmut Bank, N.A. v. Kress Assoc.,
    33 F.3d 1477 (9th Cir. 1994) ..................................................................11

Silver Point Fin., LLC v. Deutsche Bank Trust Co. Ams. (In re K-V Discovery
    Solutions, Inc.),
    496 B.R. 330 (Bankr. S.D.N.Y. 2013).......................................................29

Spokeo, Inc. v. Robins,
    136 S. Ct. 1540 (2016)............................................................................30

Springwell Nav. Corp. v. Sanluis Corporacion, S.A.,
    849 N.Y.S.2d 34 (N.Y. App. Div. 1st Dep't 2007) ...................................30

Theodore v. TD Ameritrade, Inc.,
    No. 11760–2007, 2008 WL 465281 (N.Y. Sup. Ct. Feb. 11, 2008).......................30

UMB Bank, N.A. v. Sanofi,
    No. 15-8725 (GBD), 2016 WL 4938000 (S.D.N.Y. Sept. 8, 2016) ....................33

UniCredito Italiano SPA v. JPMorgan Chase Bank,
    288 F. Supp. 2d 485 (S.D.N.Y. 2003)......................................................31

Wilson v. Nat'l Med. Health Card, IPA, Inc.,
    No. 06-2250, 2009 WL 10701804 (E.D.N.Y. May 5, 2009)..................................16

In re Worldwide Direct, Inc.,
    334 B.R. 112 (Bankr. D. Del. 2005) .........................................................20

**Statutes**

11 U.S.C. § 510(a) ....................................................................................29

11 U.S.C. § 1124.................................................................................................21

11 U.S.C. § 1129(b)(2)(A)...................................................................................21

P.R. Laws Ann. Title 13, §§ 11a-16.....................................................................21

P.R. Laws Ann. Title 13, § 13(b).........................................................................21

Trust Indenture Act § 302(a), 15 U.S.C. § 77bbb(a)(1).......................................10

**Other Authorities**

Black's Law Dictionary (5th ed.)..........................................................................17

Black's Law Dictionary (10th ed. 2014)...............................................................14

https://www.merriam-webster.com (4 Jan 2019)............................................14, 27

Pursuant to the *Order Granting Urgent Consensual Motion for Entry of Order Establishing Procedures Regarding Section 19.5 of the COFINA Plan of Adjustment* [Doc. No. 4518] (the "Procedures Order"), The Bank of New York Mellon ("BNYM"), as trustee under the Amended and Restated Sales Tax Revenue Bond Resolution (as amended and supplemented, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), hereby files its memorandum of law regarding BNYM's entitlement to withhold amounts from distributions to or require amounts to be posted by Whitebox and Ambac (the "Opposition Parties") in accordance with section 19.5 of the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Doc. No. 4392] (as amended or supplemented, the "Plan")[2] and in response to the *Amended Memorandum of Law of Ambac Assurance Corporation Pursuant to Section 19.5 of COFINA's Amended Title III Plan of Adjustment* [Doc. No. 4633] (the "Ambac Brief") and the *Amended Memorandum of Law of Whitebox Multi-Strategy Partners, L.P. and Certain of Its Affiliates Pursuant to Section 19.5 of COFINA's Amended Title III Plan of Adjustment* [Doc. No. 4646] (the "Whitebox Brief").[3]

## INTRODUCTION[4]

BNYM is a secured creditor.  It has an unliquidated secured claim against COFINA for potential fees and expenses relating to the Ambac Action and the Whitebox Actions (together, the "Lawsuits").

---

[2]    Prior to January 2, 2019, the Oversight Board and BNYM reached agreement on certain modifications to the Plan, to be incorporated in a third amended Plan to be filed on or before January 9, 2019.  References to the Plan assume those modifications have been made.

[3]    The Title III Court set a January 2, 2019, deadline for the Opposition Parties to file their memoranda. Without leave of the Title III Court, Ambac filed an amended memorandum on January 4, 2019, and Whitebox filed an amended memorandum in the evening on January 8, 2019—hours before the deadline for BNYM's response.

[4]    BNYM incorporates by reference as if fully set forth herein the factual background contained in the *Reservation of Rights of The Bank of New York Mellon, as Trustee, Regarding Section 19.5 of the Second Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the

COFINA treats BNYM's claim in section 19.5 of the Plan.  This section provides that the Title III Court shall determine the amount to be withheld from distributions to the Opposition Parties or posted by the Opposition Parties as security for the reimbursement of fees and expenses that may be incurred by BNYM in connection with the Lawsuits, and whether such amounts shall be paid on a current basis.  The Title III Court's determination must "satisfy in full any obligations of COFINA and any rights of BNYM under the Resolution and applicable law with respect to payment of BNYM's fees and expenses and indemnification arising from or relating to" the Lawsuits.  Plan § 19.5.  This section provides for satisfaction of (i) COFINA's obligations to BNYM *and* (ii) BNYM's rights under the Resolution and applicable law by a determination of the amount of a reserve from trust funds that otherwise would be distributed to the Opposition Parties in absence of the Lawsuits.

COFINA's obligation to BNYM under the Resolution and applicable law is to provide BNYM the indubitable equivalent of its secured claim for payment of (i) compensation and expenses and (ii) indemnification.  Separate and apart from *COFINA's* obligation, BNYM's rights *as against the Opposition Parties* include lien and payment priorities that are determined in accordance with the intercreditor agreement set forth in section 1103 of the Resolution.  Full satisfaction of COFINA's obligations to BNYM and preservation of BNYM's rights against the Opposition Parties, as required by section 19.5, entitle BNYM to withhold an amount equal to the fees and expenses that may arise from and after the Effective Date as a result of, or on account of, the claims, causes of action, and damages being asserted, or which could have been

"Reservation of Rights"), filed with the Title III Court on January 2, 2019, at Document No. 4599.  A copy of the Resolution was attached to the Reservation of Rights as Exhibit A.  For convenience of the Title III Court, relevant excerpts from the Resolution and the Plan are set forth in **Appendix A** attached hereto.  Capitalized terms used but not defined in this memorandum have the meanings given in the Plan.  All docket numbers cited in this memorandum refer to Case No. 17 BK 3283-LTS, unless otherwise specified.

asserted, in the Lawsuits (collectively, the "Potential Litigation Expenses"), from which funds BNYM may draw down on a current basis, for three separate and independent reasons.

*First*, section 804 of the Resolution entitles BNYM to current payment from COFINA of reasonable compensation for all services and all reasonable expenses, including those of its attorneys, incurred in and about the performance of their powers and duties under the Resolution. The Potential Litigation Expenses are compensable because the Lawsuits relate to the performance of BNYM's duties and BNYM has the power to defend itself against the Lawsuits. The Opposition Parties admit that COFINA's obligations under this sentence are secured by a "lien prior to that of the Bondowners and other Beneficiaries . . . on any and all funds at any time held by [BNYM] under the Resolution" (the "Charging Lien"). Resolution § 804; see Whitebox Br. ¶ 13; Ambac Br. ¶ 8. Title III and the Bankruptcy Code entitle BNYM to receive no less than the indubitable equivalent of its secured claim, and Section 19.5 provides for satisfaction of COFINA's obligation to provide the indubitable equivalent by establishing a reserve from trust funds that, but for BNYM's lien and payment priorities, would be payable to the Opposition Parties. COFINA's obligation to BNYM and compliance with BNYM's lien and payment priorities are thereby satisfied in a manner that does not affect other beneficial holders.

*Second*, section 804 of the Resolution also entitles BNYM to current payment from COFINA of any expenses arising in connection with the administration of the trusts under the Resolution, other than for its own demonstrated gross negligence or willful misconduct. The Potential Litigation Expenses are compensable under this sentence because the Lawsuits arise out of BNYM's administration of the trusts. COFINA's indemnification obligations to BNYM are secured by the lien granted in section 501.1 of the Resolution. Resolution § 501.1. BNYM is entitled to receive no less than the indubitable equivalent of its secured claim against COFINA

for indemnification, and section 19.5 of the Plan provides for BNYM to receive the indubitable equivalent from funds otherwise payable to the Opposition Parties.

*Third*, wholly apart from COFINA's obligations to BNYM, sections 1103.1 and 1103.3 of the Resolution entitle BNYM to set aside funds prior to distributions to Bondowners and Beneficiaries sufficient to ensure payment of any Potential Litigation Expenses on a current basis. BNYM's intercreditor payment priority is secured by a first priority lien on the COFINA Pledged Taxes. See Resolution § 501.1. BNYM's lien and payment priorities are enforceable against the Bondowners and Beneficiaries under section 510(a) of the Bankruptcy Code. Section 19.5 of the Plan makes the Opposition Parties responsible for satisfaction of BNYM's intercreditor lien and payment priorities.

Reading these sections in the context of the Resolution as a whole, the intent of the parties to the Resolution is to ensure regular payments to BNYM for all reasonable expenses, except those that are determined to result from its own gross negligence or willful misconduct, before the Bondowners receive distributions. By providing multiple layers of protection— COFINA's payment and indemnification obligations *and* lien and payment priorities ahead of Bondowners—the Resolution ensures that BNYM never goes out of pocket in defending litigation challenging its performance. Sophisticated investors, like the Opposition Parties, were aware of these provisions before they invested and they should not be heard to complain now.

Arguments that BNYM is not entitled to ***any*** holdback or substitute collateral on account of its secured claim against COFINA or as a result of its lien and payment priorities ahead of the Bondowners are contrary to the plain language of the Resolution and applicable New York law, including five recent decisions of the New York courts.[5] The Opposition Parties' focus on

---

[5] Whitebox's argument that it has not assumed COFINA's obligation to indemnify BNYM is irrelevant. BNYM does not assert that the Opposition Parties have a direct contractual

BNYM's right to indemnification in the second sentence of section 804 glosses over COFINA's payment obligations in the first sentence of section 804 and BNYM's intercreditor lien and payment priorities in section 1103.1.  Even were BNYM not entitled to current payment based on COFINA's indemnification obligations, but see infra § III.B., BNYM still is entitled to current payment of the Potential Litigation Expenses based on the Charging Lien and enforcement of its independent intercreditor lien and payment priorities.

Assuming confirmation of the Plan, the Title III Court should enforce section 19.5 by authorizing BNYM to withhold from distributions to the Opposition Parties an amount equal to the Potential Litigation Expenses and to permit BNYM to draw down on a current basis.[6]  This is the only means to safeguard BNYM's legitimate expectations, to compensate BNYM for the value of its secured claim, and to insure the integrity of its collateral position.

## ARGUMENT

## I.    COFINA'S OBLIGATIONS AND BNYM'S RIGHTS SHOULD BE SATISFIED FROM A RESERVE ESTABLISHED UNDER SECTION 19.5 OF THE PLAN.

The Lawsuits are premised upon allegations that BNYM breached duties to the Opposition Parties by failing to declare defaults under the Resolution prior to April 29, 2017.  As a consequence of the Opposition Parties' retention of the Lawsuits, BNYM has (i) an unliquidated secured claim against COFINA for reasonable compensation and expenses relating

---

indemnification obligation to BNYM.  It is the Plan that obligates the Opposition Parties to provide collateral sufficient to satisfy COFINA's indemnification obligations.  See Plan § 19.5.  This objection is to the terms of the Plan and it can be raised only in that context.

[6]   On January 2, 2019, BNYM submitted declarations of expert Daniel P. Goldberg and Robert M. Fishman.  See Doc. Nos. 4600 and 4601.  Mr. Goldberg opined that his estimate to a reasonable degree of certainty of the reasonable range of the Potential Litigation Expenses would be between approximately $25 million and $40 million.  Goldberg Decl. ¶ 1.  Mr. Fishman opined that BNYM's proposed holdback for the Potential Litigation Expenses of between approximately $25 million and $40 million is reasonable, and there exists effective protections for the Opposition Parties even if the Potential Litigation Expenses exceed the amount of fees and expenses actually to be paid.  Fishman Decl. ¶ 42.

to the Lawsuits and for indemnification, and (ii) a contractual priority ahead of the Bondowners

for payment of its litigation expenses.

In order to confirm a plan, COFINA must treat BNYM's claims and give effect to the

Trustee Rights relating to the Lawsuits in a manner consistent with the confirmation standards of

Title III and the Bankruptcy Code.  This is complicated by the Opposition Parties' retention of

claims that have been or may be asserted against BNYM in the Lawsuits for gross negligence,

willful misconduct, and intentional fraud.  See Plan § 2.1(c).  COFINA recognized that

Beneficial Holders should not be penalized for the Opposition Parties' insistence on pursuing the

Lawsuits despite an otherwise global settlement—no other party in interest asserts such claims—

and sought to assure that payment of BNYM's claims or exercise of the Trustee Rights would

not affect distributions to others.[7]  With this in mind, COFINA addressed the requirements of the

Bankruptcy Code by creating a mechanism to ensure that BNYM receives everything to which it

is entitled under the Resolution and applicable law and that the financial burden of the Lawsuits

is borne solely by the two disaffected claimants.[8]

Indeed, the Plan recognizes BNYM's rights to payment, lien priority, and payment

priority with respect to all of its claims before and after the Effective Date.  Section 19.13

provides for payment of all pre-Effective Date Trustee Claims and payment of post-Effective

Date Trustee Claims (except the Potential Litigation Expenses) in the ordinary course.  Section

19.6 preserves the right to payment of the Trustee Claims and the Trustee Rights after the

---

[7]   See Tr. of Omnibus Hrg. ("Dec. 19, 2018 Tr."), 58:5-9 (B. Rosen:  "And the plan provides for a
mechanism so that [the Lawsuits] could continue if those parties so desire, but not have it in any way
impact the distributions that would otherwise be made to any of the holders of COFINA Bonds, either
senior or subordinated.").

[8]   See Dec. 19, 2018 Tr. 59:1-7 (B. Rosen:  "So that if the Court determines to confirm the plan, we can
go forward right away with the effectiveness of the plan and have the concerns of Bank of New York
Mellon with respect to those two litigations reserved or at least taken into account by the money
either being in cash set aside or by a bond being posted by [the Opposition Parties].").

Effective Date.  Section 19.5 provides generally that "all distributions are subject to the Trustee

Rights."  In short, COFINA does not contest the Trustee Claims or the Trustee Rights.

COFINA created the holdback mechanism in section 19.5 to ensure that satisfaction of

BNYM's claims does not reduce distributions to Beneficial Holders other than the Opposition

Parties.  This mechanism starts with the proposition that "all distributions are subject to the

Trustee Rights," but with two provisos.  *First*, exercise of the Trustee Rights on account of the

Potential Litigation Expenses is prohibited.  This first proviso impairs the Trustee Rights.

*Second*, with respect to the Potential Litigation Expenses, the Title III Court must determine:

> (a) what amount, if any, shall be either (i) withheld by the
> Disbursing Agent or BNYM as trustee for the Existing Securities
> from distributions to be made to Ambac and Whitebox or (ii) posted
> by Ambac and Whitebox as collateral for the reimbursement of fees
> and expenses which may be incurred by BNYM in connection with
> the defense of the Ambac Action and the Whitebox Actions, and (b)
> whether BNYM shall be reimbursed by Ambac and Whitebox for
> the incurrence of any such fees and expenses from either the
> holdback amount or collateral posted and referred to in the
> preceding subsection (a) on a current basis or upon entry of a Final
> Order in connection with the Ambac Action and the Whitebox
> Actions, in each case, such determination and the fulfilment of any
> obligations of Ambac and Whitebox as a result thereof shall satisfy
> in full any obligations of COFINA and any rights of BNYM under
> the Bond Resolution and applicable law with respect to the payment
> of BNYM's fees and expenses and indemnification arising from or
> relating to the Ambac Action or the Whitebox Actions.

Plan § 19.5.  In order to provide BNYM with the indubitable equivalent of Trustee Rights

impaired in the first proviso, the second proviso states that COFINA's obligation to provide the

indubitable equivalent and BNYM's lien and payment priorities will be satisfied from funds that

(but for BNYM's lien and payment priorities) would be distributed to the Opposition Parties.

Section 19.5 calls upon the Title III Court (a) to determine what BNYM is entitled to receive

under the Resolution and in accordance with the confirmation standards of Title III and the

Bankruptcy Code and (b) to enforce those rights by having BNYM withhold funds from distributions to the Opposition Parties or by compelling them to post equivalent collateral.

Whitebox's argument that it is not obligated to indemnify BNYM and it never assumed COFINA's indemnity obligations is a red-herring. *First*, this argument has no impact on BNYM's lien and payment priorities vis-à-vis Bondowners, which mandate that Potential Litigation Expenses be paid before any distributions to the Bondowners. *Second*, this argument ignores the plain text of section 19.5, which mandates application of the mechanism to "satisfy in full any obligations of COFINA . . . under the Bond Resolution and applicable law" with respect to the Potential Litigation Expenses. Plan § 19.5. Establishment of a reserve *before* funds are distributed to the Opposition Parties renders Whitebox's argument that it has not assumed COFINA's affirmative payment obligations irrelevant.

Whitebox presumably did not object to confirmation formally because it wants the benefits of the Plan, including payment of the Consummation Costs in accordance with section 3.3 of the Plan. Yet it objects to the mechanism established under section 19.5. The Title III Court should not countenance this *sub rosa* objection in which Whitebox tries to read section 19.5 out of the Plan. Whitebox cannot have it both ways. Either Whitebox is objecting to section 19.5, in which case it may lose its entitlement to the Consummation Costs and other benefits of the Plan, or Whitebox is not objecting, in which case it is bound by all terms, including any indubitable equivalent ordered by the Title III Court to satisfy COFINA's obligations to BNYM through section 19.5.[9]

---

[9] Although Ambac originally joined Whitebox in this argument, it subsequently admitted that it, indeed, had agreed to assume COFINA's obligations to BNYM, and it disassociated itself with arguments that challenged the terms or enforceability of the Plan. See Ambac Br. ¶ 7. Ambac apparently concedes that the focus of section 19.5 is not on Ambac's obligations to COFINA, but on COFINA's obligations to BNYM. Objections to the Plan itself may breach the Plan Support Agreement and, as such, deprive the objecting party of a right to share in Consummation Costs.

## II.   COFINA'S OBLIGATIONS AND BNYM'S RIGHTS SHOULD BE DETERMINED AND PROTECTED IN ACCORDANCE WITH THE PLAIN MEANING OF THE RESOLUTION AS INFORMED BY PUBLIC POLICY.

Analysis of BNYM's contractual rights begins with the plain meaning of the Resolution. "Interpretation of indenture provisions is a matter of basic contract law.  In interpreting a contract under New York law, words and phrases should be given their plain meaning, and the contract should be construed to give full meaning and effect to all of its provisions." Lansuppe Feeder, LLC v. Wells Fargo Bank, NA, No. 15-7034-LTS, 2016 WL 5477741, *3 (S.D.N.Y Sept. 29, 2016) (citing Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1049 (2d Cir. 1982)).  Any theoretical ambiguity must be "assessed objectively by a reasonably intelligent person who has examined *the context of the entire integrated agreement* and who is cognizant of the customs, practices, usages and terminology as generally understood *in the particular trade or business*."  BOKF, N.A. v. Wilmington Sav. Fund Soc'y, FSB (In re MPM Silicones, L.L.C.), No. 15-2280-NSR, 2018 WL 6324842, *9 (S.D.N.Y. Nov. 30, 2018) (quoting Alexander & Alexander Servs., Inc. v. Certain Underwriters at Lloyd's, 136 F.3d 82, 86 (2d Cir. 1998)) (emphasis in original).[10]  "A court will endeavor to give the [contract] construction most equitable to both parties instead of the construction which will give one of them an unfair and unreasonable advantage over the other."  Metro. Life Ins. Co. v. Noble Lowndes Int'l, Inc., 84 N.Y.2d 430, 438 (N.Y. 1994).

Consistent with these principles, BNYM's rights and COFINA's obligations must be understood within the broader context of BNYM's role as indenture trustee and the overall

---

[10]   New York law is applicable because, pursuant to section 1211 of the Resolution, "the rights, duties, privileges and immunities of [BNYM] . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," see Resolution § 1211, and BNYM's corporate trust office is located in New York.  The Opposition Parties do not dispute application of New York law.  See Whitebox Br. ¶ 7 n.7; Ambac Br. ¶ 6 n.6.

structure of the Resolution.  The Resolution, as a trust indenture, is a contract among the issuer,

the indenture trustee, and the registered owners of the securities issued by the issuer.  Landau and

Peluso, Corporate Trust Administration and Management, 35, 42 (6th ed. 2008); Resolution

§§ 103, 801.  The role of the indenture trustee developed "[a]s a partial solution to the collective-

action problem presented by a fluctuating group of securities-holders with diverse interests."

Cortlandt St. Recovery Corp. v. Bonderman, 31 N.Y.3d 30, 39 (N.Y. 2018).  It was inefficient

for holders of securities (who often were dispersed geographically and who individually might

own only a small number of securities) to monitor the issuer's performance and pursue remedies

separately, and it was burdensome for the issuer to deal with multiple and perhaps conflicting

demands made by individual holders.  Centralizing the exercise of remedies in an indenture

trustee, directed by a majority of holders, serves issuers and holders.  Courts and Congress have

recognized this "essential role" of trust indentures and trustees in servicing corporate and public

debt and protecting the "national public interest and the interest of investors" in bonds.[11]

In view of these important public interests, "it is no surprise that [courts] have

consistently rejected the imposition of additional duties on the trustee in light of the special

relationship that the trustee already has with both the issuer and the debenture holders under the

indenture."  Elliott Assocs. v. J. Henry Schroder Bank & Trust Co., 838 F.2d 66, 71 (2d Cir.

1988) (citations omitted).  Indeed, because the indenture trustee's duties are purely contractual,

not fiduciary, the word "trustee" is something of a misnomer.  "Unlike the ordinary trustee, who

---

[11]   See Meckel v. Cont'l Res. Co., 758 F.2d 811, 815 (2d Cir. 1985) ("[t]rust indentures are important
mechanisms for servicing corporate debt and banks play an essential role in the process that brings
corporate financings to the public market."); Trust Indenture Act § 302(a), 15 U.S.C. § 77bbb(a)(1)
(declaring "that the national public interest and the interest of investors in notes, bonds, [and]
debentures . . . which are offered to the public, are adversely affected . . . when the obligor fails to
provide a trustee to protect and enforce the rights and to represent the interests of such
investors . . . .").

has historic common-law duties imposed beyond those in the trust agreement, *an indenture trustee is more like a stakeholder whose duties and obligations are exclusively defined by the terms of the indenture agreement*." Id. (original emphasis) (quoting Meckel, 758 F.2d at 816).[12] If courts failed to enforce the provisions of indenture agreements as drafted, indenture trustees would be exposed to additional and unforeseeable liabilities, which would lead to uncertainties in the markets and increased borrowing costs. Sharon Steel Corp. v. Chase Manhattan Bank, N.A., 691 F.2d 1039, 1048 (2d Cir. 1982) (cautioning against creating "uncertainties" in the context of trust indentures, which "would vastly increase the risks and, therefore, the costs of borrowing with no offsetting benefits either in the capital market or in the administration of justice").

The Resolution confirms the limited nature of BNYM's role as trustee. BNYM has no implied obligations; it is required to perform only those duties expressly set forth in the Resolution. Resolution § 802. BNYM has no duty to exercise any discretionary function, and BNYM is not liable for any action taken or omitted in good faith. See id. BNYM is not required to perform any act which would involve it in expense (or liability) or to institute or defend any suit in respect of the Resolution, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. Id. As compensation for performing its limited, ministerial duties under the Resolution, BNYM is paid an annual administration fee of only $2,000.00 for each series of Existing Securities.[13]

---

[12]   See also Racepoint Partners, LLC v. JPMorgan Chase Bank, N.A., 14 N.Y.3d 419, 425 (N.Y. 2010) (indenture trustee exercises "limited, 'ministerial' functions" ); AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co., 11 N.Y.3d 146, 156-58 (N.Y. 2008) (noting that the indenture trustee "has very little in common with the ordinary trustee . . . [and] has his [or her] rights and duties defined, not by the fiduciary relationship, but exclusively by the terms of the agreement.") (citations omitted); ASR Levensverzekering v. Breithorn ABS Funding, 958 N.Y.S.2d 380, 381 (N.Y. App. Div. 1st Dep't 2013); Shawmut Bank, N.A. v. Kress Assoc., 33 F.3d 1477, 1491 (9th Cir. 1994) ("The duty which is imposed under an indenture of trust is not a traditional fiduciary duty.").

[13]   BNYM is compensated separately on an hourly basis for any services performed relative to the Resolution by members of its Default Administration Group.

Consistent with BNYM's limited role and nominal compensation, the Resolution includes expansive protections against any type of financial liability except for BNYM's own demonstrated gross negligence and willful misconduct.  BNYM has no obligation "to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution." Resolution § 804.  Similarly, BNYM is not required to take any action at the direction of Bondowners unless they first offer "security or indemnity satisfactory" to BNYM.  Id. § 802. Additionally, COFINA indemnifies BNYM against any losses, liabilities, or expenses incurred in connection with the acceptance or administration of the trusts under the Resolution.  Id. § 804. BNYM's rights to payment of compensation and expenses and COFINA's indemnification obligations survive termination of the Resolution.  Id.  Were there any doubt regarding the centrality and scope of BNYM's financial protections, section 802 states unequivocally: "Whether or not therein expressly so provided, *every* provision of this Resolution relating to the conduct or affecting the liability of or affording protection to [BNYM] shall be subject to the provisions of this Article VIII," including all protections in section 802 and BNYM's rights to payment and its lien prior to that of the Bondowners in section 804.  Id. § 802 (emphasis added). These financial protections confirm BNYM's limited role as indenture trustee.

The plain language of the compensation, indemnification, lien priority, and payment priority provisions of the Resolution leaves no doubt as to the intent to protect the trustee and, as part of this, to ensure that the trustee suffers no out-of-pocket expenses unless and until it is found to have acted with gross negligence or willful misconduct.  The broad compensation and indemnification provisions of the Resolution as well as BNYM's lien and payment priorities vis-à-vis the Bondowners must be understood in this context.

III.    **COFINA'S OBLIGATION TO PROVIDE THE INDUBITABLE EQUIVALENT OF BNYM'S SECURED CLAIM MUST BE SATISFIED BY THE ESTABLISHMENT OF A RESERVE.**

Section 804 of the Resolution entitles BNYM to current payment from COFINA of (i) BNYM's reasonable compensation and expenses and (ii) indemnification for any expenses other than for its own demonstrated gross negligence and willful misconduct.  These components independently require payment of the Potential Litigation Expenses.  As discussed below, COFINA's obligations are secured by a first priority lien.  Under the applicable provisions of Title III and the Bankruptcy Code, BNYM is entitled to receive the indubitable equivalent of its secured claim against COFINA—that is, cash collateral in the amount of the Potential Litigation Expenses from which BNYM may draw on a current basis.

A.    **BNYM Is Entitled To Payment Of Reasonable Compensation And Expenses.**

The first sentence of section 804 of the Resolution obligates COFINA to compensate BNYM for services rendered and to reimburse BNYM for expenses incurred on a current basis.  This section provides that COFINA:

> **shall** pay to [BNYM] *from time to time* reasonable compensation for *all* services rendered under the Resolution . . . and also *all* reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and [BNYM] shall have a *lien prior to that of the Bondowners and other Beneficiaries* therefor on *any and all* funds at any time held by it under the Resolution.

Resolution § 804 (emphasis added).  The intent of this provision is unambiguous.  Use of the word "shall" means that payment is mandatory, and payments are due "from time to time," meaning that payments must be made on a periodic, current basis.  COFINA must compensate BNYM for "all" services rendered and reimburse BNYM for "all" expenses incurred "in and

about" the performance of its "powers and duties."[14]  Because the Lawsuits are in or about the

performance of BNYM's duties (*e.g.*, in making payments to the Bondowners) and BNYM has

the legal right or "power" to defend itself, the Potential Legal Expenses are payable on a current

basis and, as a result of the Charging Lien, ahead of the Bondowners.  The only limitation on

COFINA's obligation to pay is that BNYM's compensation and expenses must be "reasonable."

The Opposition Parties admit that COFINA's obligations under the first sentence of

section 804 are secured.  See Whitebox Br. ¶ 13; Ambac Br. ¶ 8.  Their effort to exclude counsel

fees incurred in defense of claims against BNYM has no support in the plain language of this

section, and it is contrary to the Resolution as a whole.  Indeed, both components of section

804—compensation and reimbursement, and indemnification—entitle BNYM to recover counsel

fees.[15]  See Resolution § 804.  Attempts to constrict BNYM's rights under the Resolution

contravene the clear command that "each and every [BNYM] remedy shall be cumulative and

shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in

equity or by statute."  Resolution § 1108.  The Title III Court previously recognized BNYM's

right to current payment of reasonable fees and expenses in the Interpleader Action.

Notwithstanding the Opposition Parties' unproven allegations of misconduct, the Title III Court

overruled objections and ordered:  "From time to time, BNYM shall be entitled to reserve for, or

pay, its reasonable fees and expenses, whether or not due and owing, from the Disputed

---

[14]   The ordinary meaning of the term "power" includes "legal or official authority, capacity, or right."
"Power." *Merriam-Webster.com*. 2019. https://www.merriam-webster.com (4 Jan 2019); see Black's
Law Dictionary (10th ed. 2014) ("[t]he ability to act or not act" and "[t]he legal right or authorization
to act or not act").

[15]   The Opposition Parties' citation to Bernkopf Goodman LLP v. Sheepshead Landing LLC, is
inapposite because in that case, unlike under the Resolution, the phrase "legal fees" did not appear in
both the compensation and indemnification sections.  No. 27062/2008, 2011 WL 7989431, *3 (N.Y.
Sup. Ct. June 27, 2011) (indemnitees cannot recover for legal fees under a section that omitted the
phrase "legal fees").

Funds."[16]  Nothing in the Resolution alters or impairs BNYM's right to payment post-

confirmation.  To the contrary, COFINA's obligations "survive the satisfaction and discharge of

the [Existing Securities], the termination for any reason of the Resolution or the earlier

resignation or removal of [BNYM]."  Resolution § 804; see Plan § 19.6 (BNYM's payment

rights survive Effective Date).

> **B.**     **BNYM Is Entitled To Indemnification For Expenses Other Than For Its Demonstrated Gross Negligence And Willful Misconduct.**

In addition to COFINA's obligation to pay compensation and expenses, COFINA agreed

to indemnify and save BNYM harmless.  In the second sentence of section 804, COFINA:

> *further* agrees to indemnify and save [BNYM] harmless against *any*
> loss, liability or expenses . . . *arising out of or in connection with*
> the acceptance or administration of the trust or trusts [under the
> Resolution], including the costs and expenses of defending itself
> against  *any*  claim  (whether  asserted  by  [COFINA]  or  any
> Bondowner or any other Person) or liability in connection with the
> exercise or performance of *any* of its powers and duties . . . except
> to the extent that such loss, damage, claim, liability or expense is
> due to its own gross negligence or willful misconduct.

Resolution § 804 (emphasis added).  Use of the word "further" demonstrates that the

indemnification provision is by no means a limitation on COFINA's other payment obligations.

Again, COFINA's indemnification obligations survive under the Resolution.  Id.

The Opposition Parties do not dispute that COFINA's indemnification obligation extends

to BNYM's fees and expenses incurred in defending claims.  See Whitebox Br. ¶ 2; Ambac Br.

¶ 7.  Rather, the Opposition Parties would have the Title III Court hold that, merely because they

allege gross negligence or willful misconduct, COFINA is absolved of its duty to indemnify

BNYM.  See id. ¶ 3.  Mere allegations of tortious behavior, however, do not nullify a contractual

---

[16]   *Order Granting Interpleader, Staying Pending and Future Litigation Against The Bank of New York Mellon, as Trustee, Pursuant to 28 U.S.C. § 2361, and Granting Related Relief* (the "Interpleader Order"), Adv. Pro. No. 17-133-LTS (D.P.R.), Doc. No. 110, at ¶ 9.

indemnity.  Wilson v. Nat'l Med. Health Card, IPA, Inc., No. 06-2250, 2009 WL 10701804,

*11-12 (E.D.N.Y. May 5, 2009) (where indemnity agreement excluded costs that arose out of

gross negligence or willful misconduct, indemnitor "is only absolved from indemnifying

National for its costs when there is a finding, not an unsupported claim, that National has acted

willfully or with gross negligence") (report and recommendation), adopted by 2009 WL

10701803 (E.D.N.Y. May 27, 2009).[17]  Were the law otherwise, plaintiffs might routinely

deprive defendants of indemnification, as a litigation tactic, through conclusory assertions of

intentional misconduct.  The clear language of the Resolution demonstrates that an exception

arises only after a determination "that such loss, damage, claim, liability or expense *is due* to its

own gross negligence or willful misconduct."  Resolution § 804 (emphasis added).  This

exception becomes applicable, if ever, only upon an actual judicial finding of "gross negligence

or willful misconduct."

COFINA must pay BNYM's fees and expenses on a current basis when invoices are

presented.  Under New York law, the "duty to indemnify [a party] for attorneys' fees and costs

[i]s triggered when claims [a]re presented."  Cuellar v. City of New York, 32 N.Y.S.3d 292, 294

(N.Y. App. Div. 2d Dep't 2016); see Barnes v. New York City Hous. Auth., 841 N.Y.S.2d 379,

382 (N.Y. App. Div. 2d Dep't 2007) (A finding of liability "is not necessary to trigger the

subject indemnification clause," because it is "triggered when claims were presented alleging

that [defendant's conduct] was a cause of the underlying fire and injuries.").  Current payment of

fees and expenses cannot be considered "advancements," which are the receipt of monies in

---

[17]   See also Meyerson v. Tullman, 721 N.Y.S.2d 517, 517 (N.Y. App. Div. 1st Dep't 2001)
("unsubstantiated allegations of fraud and misconduct are insufficient to bar indemnification"); Estate
of Nasser v. Port Auth. of N.Y. & N.J., 546 N.Y.S.2d 626, 627 (N.Y. App. Div. 1st Dep't 1989)
(rejecting argument that indemnification was unavailable because a "complaint alleged negligence on
behalf of the [indemnitee]").

payment of a debt *before* it is due.  See <u>Biggs v. Lyng</u>, 644 F. Supp. 998, 1006 n.4 (E.D.N.Y.

1986), <u>rev'd</u> <u>on</u> <u>other</u> <u>grounds</u>, 823 F.2d 15 (2d Cir. 1987); Black's Law Dictionary (5th ed.)

("advance" is "[t]o pay money . . . before it is due").[18]

Considering the same arguments that the Opposition Plaintiffs make here, the Court in

<u>PIMCO Absolute Return Strategy 3d Offshore Fund Ltd. v. Wells Fargo Bank, Nat'l Ass'n</u>, No.

654743/2017 (N.Y. Sup. Ct. Nov. 13, 2017) (transcript available as Ex. 1), permitted an

indenture trustee to establish a reserve of more than $57 million to pay anticipated legal

expenses.  The Court observed that the indemnification provision was "broad" and that, for the

misconduct exception to apply, plaintiffs would "have to allege and ***prove*** that [the trustee's]

activities fall within the purview of the carveout" for willful misconduct before they could

challenge the trustee's establishment and use of the reserve.  Ex. 1 at 18:2-5; 20:9-15 (emphasis

added).  The Court found that there was no harm to plaintiffs because the trustee is "going to be

around if [plaintiffs] succeed" on the merits of the underlying action.  <u>Id.</u> at 18:18-21.

Within the past year, four different judges in the United States District Court for the

Southern District of New York similarly rejected a plaintiff's attempt to delay indemnity rights

of four indenture trustees until after the merits were determined.[19]  In *each* of these cases, the

plaintiffs challenged the trustee's payment of its legal fees and expenses based upon allegations,

---

[18]   BNYM's immediate right to indemnification is particularly appropriate in light of BNYM's otherwise
modest compensation, which one court described in similar circumstances as mere "pocket change in
comparison to all other economic aspects of [the] transaction."  <u>CFIP Master Fund, Ltd. v. Citibank,</u>
<u>N.A.</u>, 738 F. Supp. 2d 450, 474 (S.D.N.Y. 2010).

[19]   <u>Royal Park Invs. SA/NV v. Wells Fargo Bank, N.A.</u> ("<u>RPI v. Wells Fargo</u>"), No. 17-cv-6687 (KPF),
Doc. No. 37 (S.D.N.Y. Jan. 22, 2018) (Failla, J.) (Ex. 2); <u>Royal Park Invs. SA/NV v. U.S. Bank Nat'l
Ass'n</u> ("<u>RPI v. U.S. Bank</u>"), No. 14-cv-2590 (VM), 2018 WL 6920768 (S.D.N.Y. Nov. 30, 2018)
(Marrero, J.); <u>Royal Park Invs. SA/NV v. Deutsche Bank Nat'l Trust Co.</u> ("<u>RPI v. Deutsche</u>"), No.
17-cv-5916 (AJN), 2018 WL 3849840 (S.D.N.Y. Aug. 10, 2018) (Nathan, J.); <u>Royal Park Invs.
SA/NV v. HSBC Bank USA, Nat'l Ass'n</u> ("<u>RPI v. HSBC</u>"), No. 17-cv-7684 (VEC), Doc. No. 64
(S.D.N.Y. Aug. 2, 2018) (Caproni, J.) (Ex. 3).

in ongoing earlier actions, that the trustee's conduct fell within an exception to otherwise broad

indemnity provisions.  In *each* case, the court stayed the plaintiffs' challenge to payment and

permitted the trustee to pay its fees from trust funds on a current basis pending final

determinations in the underlying litigation.  Most recently, in <u>RPI v. U.S. Bank</u>, Judge Marrero

rejected the argument that payment of the trustee's fees on a current basis should be barred due

to an "exception to the indemnification clauses for expenses incurred as a result of [the trustee's]

alleged willful malfeasance."  <u>RPI v. U.S. Bank</u>, 2018 WL 6920768 at *8.  Judge Marrero held

that such arguments are premature and must await such time, if any, that the trustee "is ***found*** to

have acted grossly negligently."  <u>Id.</u> at *8-9 (emphasis added); <u>see also</u> Interpleader Order ¶ 9

(authorizing payment of fees and expenses notwithstanding pending allegations of gross

negligence and willful misconduct).

   A common refrain throughout these cases is the courts' understanding that there is no real

harm in permitting continued payment of trustees' legal fees during the pendency of the

underlying litigation because the trustees have sufficient funds to cover any adverse ruling.  On

this point, Judge Nathan explained:

> The only prejudice Royal Park purports to identify in its briefing is
> Deutsche Bank's continued billing of the trusts for its legal fees and
> expenses.  However, even assuming *arguendo* that the Court were
> to conclude that this billing were impermissible – that is, even if the
> Court were to ***ultimately decide*** in Royal Park's favor – Royal Park
> does not allege that Deutsche Bank would be unable to repay the
> Covered Trusts if the Court ordered such repayment.

<u>RPI v. Deutsche</u>, 2018 WL 3849840 at *2 (staying action pending resolution of underlying case)

(emphasis added, citation omitted); <u>see also</u> <u>RPI v. U.S. Bank</u>, 2018 WL 6920768 at *9 (no harm

from continuing current payments where trustee "is part of one of the largest banks in the United

States, and it maintains sufficient coffers to reimburse all legal expenses charged to the trusts if

necessary"); <u>RPI v. HSBC</u>, Doc. No. 64 ("Defendant is a sizeable entity with 'deep pockets'

from which Plaintiff would undoubtedly be able to recover a judgment should it prevail in this

action at some point in the future").

The only case cited by the Opposition Parties on this point, <u>Barbagallo v. Marcum</u>, No.

11-CV-1358, 2012 WL 1664238 (E.D.N.Y. May 11, 2012), is simply inapposite.  That case

implemented New York's public policy against indemnity for intentional torts intended to cause

harm.  <u>Id.</u> *1-2 (accountant did not have to indemnify new employer accused of abetting

accountant's breach of non-compete clause).  The New York Court of Appeals subsequently

emphasized that this public policy exception "is a narrow one" requiring not only that the

indemnitee "acted intentionally, but, further, that it acted with the intent to harm or injure

others."  <u>J.P. Morgan Sec., Inc. v. Vigilant Ins. Co.</u>, 21 N.Y.3d 324, 335 (N.Y. 2013).  It has long

been New York law that "gross negligence, recklessness or wantonness" do not fall within this

exception to indemnity coverage.  <u>Pub. Serv. Mut. Ins. Co. v. Goldfarb</u>, 53 N.Y.2d 392, 400

(N.Y. 1981).  Based on their own allegations, the Opposition Parties will have no recourse to this

public policy exception.

Against the weight of these cases, the Opposition Parties' arguments fail.  They have not

demonstrated an entitlement now to the ultimate finding they seek in the Lawsuits—that BNYM

is liable for gross negligence or willful misconduct.  Unless and until they obtain such a finding,

BNYM is entitled to indemnity for fees and expenses on a current basis.

### C.    BNYM's Claims Are Secured By A First Priority Lien.

COFINA pledged the COFINA Pledged Taxes to BNYM as security for payment of the

Bonds.  Resolution § 501.1.  This pledge is "subject to Section 804 . . . and subject to the

provisions of the Resolution permitting the application of the [COFINA Pledged Taxes] for the

purposes and on the terms and conditions set forth in the Resolution."  <u>Id.</u>  Stated differently, this

lien is subject and subordinate in all respects to (i) BNYM's rights to payment of compensation

and expenses and indemnification under section 804 of the Resolution, including the Charging

Lien, and (ii) section 1103.1 of the Resolution which, as discussed below, directs application of

the COFINA Pledged Taxes to BNYM's reasonable expenses, liabilities incurred, and advances

prior to any distribution to Bondowners.  The effect of this provision is that BNYM's claims

under section 804 and its priority of payment under section 1103.1 are secured by a first priority

lien on the COFINA Pledged Taxes.  See Bluebird Partners, L.P. v. First Fid. Bank, N.A., N.J.,

671 N.Y.S.2d 7, 12 (N.Y. App. Div. 1st Dep't 1998) (holding trustee had first priority lien for

compensation and hold-harmless provisions).

### D.   Applicable Law And Section 19.5 Mandate That BNYM Receive The Indubitable Equivalent Of Its Secured Claim.

In accordance with Title III and the Bankruptcy Code, section 19.5 of the Plan entitles

BNYM to receive no less than the indubitable equivalent of its secured claim against COFINA.

These statutes protect BNYM's entitlement under the Resolution to current (i) payment of

reasonable compensation and expenses and (ii) indemnification for any losses, liabilities, and

expenses other than for its own demonstrated gross negligence and willful misconduct.

BNYM's rights to reasonable compensation and expenses and indemnification give

BNYM a Claim, as that term is defined in the Plan and section 502 of the Bankruptcy Code.[20]

The Plan deems holders of Existing Securities "secured to the extent of the Pre-FY2019 BNYM

Deposits," net of certain amounts, and "the COFINA FY2019 BNYM Deposits and the COFINA

---

[20]   See In re Flight Transp. Corp. Sec. Litig., 874 F.2d 576, 583 (8th Cir. 1989) (holding that indenture trustee's "contractual right to payment for its services and to reimbursement of its expenses, including its attorney's fees . . . arose when the Indenture Agreement was executed" and constituted a claim under section 502); see also In re Worldwide Direct, Inc., 334 B.R. 112, 129 (Bankr. D. Del. 2005) (indenture trustee "is entitled to reimbursement of its expenses, including attorneys' fees, in accordance with the terms of the indenture.").  BNYM filed timely master proofs of claim on behalf of itself and all Bondowners and Beneficial Holders for principal, interest, and other amounts due under the Existing Securities and related documents, including BNYM's compensation, reimbursement, and indemnification.  See Proof of Claim Nos. 16760 and 16284.

Portion." Plan § 2.1(d). If the Bondowners' claims are secured, then so too are the claims of

BNYM. See Resolution §§ 501.1, 804, 1103.1; see also Act No. 91 of May 13, 2006 (as

amended and supplemented and codified at P.R. Laws Ann. tit. 13, §§ 11a-16).[21]

      BNYM's secured claim is impaired because the Plan alters BNYM's legal, equitable, and

contractual rights in several respects: (i) it does not provide for payment by COFINA of the

Potential Litigation Expenses; (ii) it deprives BNYM of its lien on funds held under the

Resolution by compelling distribution prior to satisfaction in full of the Potential Litigation

Expenses; and (iii) it deprives BNYM of its lien and payment priorities vis-à-vis all Bondowners

other than the Opposition Parties. See 11 U.S.C. § 1124.[22] BNYM agreed not to object to

confirmation because the third amended Plan provides that the Court's determination under

section 19.5 must "satisfy in full any obligations of COFINA and any rights of BNYM under the

Resolution and applicable law with regard to the payment of BNYM's fees and expenses and

indemnification arising from or relating to" the Lawsuits. Plan § 19.5. In other words, the

mechanism in section 19.5 mandates satisfaction of the requirements for nonconsensual

confirmation, or "cramdown," set forth in section 1129(b) of the Bankruptcy Code. Under the

"fair and equitable" standard of section 1129(b), BNYM must realize the "indubitable

equivalent" of its secured claim. See 11 U.S.C. § 1129(b)(2)(A)(iii).[23]

---

[21]   BNYM's security interests were perfected automatically by statute. See P.R. Laws Ann. tit. 13, § 13(b). In the alternative, UCC-1 financing statements and continuation statements were filed with the Department of State of the Commonwealth of Puerto Rico. See Proof of Claim Nos. 16760 and 16284, ¶ 21. The Charging Lien also is perfected by possession.

[22]   Section 1124 and the other provisions of the Bankruptcy Code cited herein are made applicable to this Title III Case by section 314(b)(1) of PROMESA.

[23]   Section 1129(b)(2)(A) provides three options for satisfying the "fair and equitable" standard. The first option, under section 1129(b)(2)(A)(i), is not applicable because the Plan does not ensure that BNYM will retain its liens or receive cash payments totaling at least the allowed amount of its secured claim. Rather, the amount of collateral determined by the Title III Court to be retained or received by BNYM may or may not ultimately be sufficient to pay the Potential Litigation Expenses in full. The second option, under section 1129(b)(2)(B)(ii), is not applicable because the Plan does not contemplate the sale of BNYM's collateral free and clear of its liens. Accordingly, this

"Indubitable equivalent" is a term of art that means, "in essence, that the treatment afforded to the secured creditor must be adequate to both compensate the secured creditor for the value of its secured claim and also insure the integrity of the creditor's collateral position."  In re Ponce de Leon, 1403, Inc., 523 B.R. 349, 390 (Bankr. D.P.R. 2014).  Requiring the indubitable equivalent "safeguards creditors' rightful contractual expectations."  In re Sagendorph, 562 B.R. 545, 549 (D. Mass. 2017).   When a "plan proposes to satisfy an allowed secured claim with anything other than the secured creditor's collateral, a court must examine (1) whether the substituted collateral is completely compensatory and (2) the likelihood that the secured creditor will be paid."  In re Keller, 157 B.R. 680, 683–84 (Bankr. E.D. Wash. 1993).  Where substitute collateral is to be provided, "two attributes of the substituted collateral—its value and the degree of risk that it imposes on the secured creditor—determine whether the new collateral is sufficiently 'safe' and 'completely compensatory.'"  In re Inv. Co. of Sw., Inc., 341 B.R. 298, 319 (B.A.P. 10th Cir. 2006) (substituted collateral cannot "increase the creditor's exposure to risk"); see In re Salem Suede, Inc., 219 B.R. 922, 935 (Bankr. D. Mass. 1998) (requiring that "there [be] no reasonable doubt that [the subject creditor] will receive the full value of what it bargained for") (internal citation omitted).  The Opposition Parties, standing in the shoes of COFINA for purposes of section 19.5 of the Plan, "must show that [BNYM] will receive the indubitable equivalent of its claims by a preponderance of the evidence."  In re Briscoe Enters., Ltd., II, 994 F.2d 1160, 1165 n. 26 (5th Cir. 1993); In re SCC Kyle Partners, Ltd., No. 12-11978-HCM, 2013 WL 2903453, *25 (Bankr. W.D. Tex. June 14, 2013) (same).

BNYM bargained for the right to current payment of the Potential Litigation Expenses secured by cash collateral in BNYM's possession.  The Opposition Parties' offer of nothing

---

memorandum focuses on the third option under section 1129(b)(2)(A)(iii)—the realization of the indubitable equivalent.

certainly is not the indubitable equivalent.[24]  The indubitable equivalent of BNYM's secured

claim is cash collateral in the amount of the Potential Litigation Expenses from which BNYM

may draw on a current basis.  This is the only means to safeguard BNYM's legitimate

expectations, to compensate BNYM for the value of its secured claim, and to insure the integrity

of its collateral position.

## IV.   BNYM'S RIGHT TO PAYMENT PRIOR TO BONDOWNERS MUST BE SATISFIED BY THE ESTABLISHMENT OF A RESERVE.

As a separate and additional layer of financial protection, section 1103.1 of the

Resolution provides that, after an event of default, BNYM's reasonable expenses and liabilities

incurred, and advances made by BNYM, may be paid prior to any distributions to the

Bondowners and Beneficiaries.  Where expenses are anticipated after an event of default, the

intercreditor agreement in section 1103 gives BNYM broad discretion to determine the timing of

any distributions and to set aside funds sufficient to make provision for and ensure current

payment of any Potential Litigation Expenses.  BNYM's payment priority also is secured by a

first priority lien on the COFINA Pledged Taxes.  See supra at III.C.  BNYM's lien and payment

priorities function together as a seamless intercreditor agreement, enforceable against

Bondowners and Beneficiaries under section 510(a) of the Bankruptcy Code.

---

[24]   The offer of a bond would be insufficient because substituting anything other than cash for BNYM's
cash collateral creates a different risk profile and, consequently, fails to provide BNYM with the
indubitable equivalent of the rights for which it contracted.  BNYM can draw from cash collateral
monthly as the Potential Litigation Expenses become due.  Payments on a bond are conditional.  A
bond could be completely illiquid during its term, potentially forcing BNYM to wait until the end of
the Lawsuits to be paid.  See, e.g., In re River East Plaza, LLC, 669 F.3d 826, 831-33 (7th Cir. 2012)
(30-year Treasury bonds, which supposedly would be worth full amount of claim in 30 years, were
not indubitable equivalent of creditor's security interest in real estate that could be sold upon default).

### A.      BNYM's Fees And Expenses Are Entitled To Priority Of Payment.

Section 1103 ensures that BNYM is never exposed as a result of COFINA's failure or

inability to meet its payment obligations.  It provides that, "after the occurrence of an Event of

Default," and "subject to Section 804," the "funds held by [BNYM]" and "any other moneys

received or collected by [BNYM] and any moneys or other property distributable in respect of

[COFINA's] obligations under the Resolution" are paid to Bondowners or Beneficiaries only:

> ***after making provision for*** [i] the payment of any reasonable
> expenses of [BNYM] and its agents and attorneys necessary in the
> opinion of [BNYM] to protect the interests of the Owners of the
> [Existing Securities] and the other Beneficiaries, and [ii] for the
> payment of the reasonable charges and expenses and liabilities
> incurred and advances made by [BNYM] and its agents and
> attorneys in the performance of their duties under the Resolution.

Resolution § 1103.1 (emphasis added).  Under this section, distributions to Bondowners are

subordinate in all respects to payment of the Potential Litigation Expenses.

The section 1103.1 prerequisite of an event of default is satisfied.  Ambac and BNYM

separately notified COFINA in early May 2017 that defaults occurred under sections 705 and

706 of the Resolution.  Pursuant to section 1101.1(ii), these defaults became events of default on

July 5, 2017.  See *Informative Motion of The Bank of New York Mellon, as Trustee Regarding*

*Acceleration of COFINA Bonds*, No. 17-00133-LTS (D.P.R.), Doc. No. 300 (prepetition defaults

became events of default as a result of passage of time without cure).  The Opposition Parties do

not contest that the post-event of default waterfall in section 1103.1 is applicable.

Because the entire default waterfall is subject to section 804, BNYM's claims for fees,

expenses, and losses that are compensable or indemnifiable under section 804 are senior to all

other claims.  The argument that "subject to section 804" is a limitation, such that BNYM's

payment priority extends only to fees and expenses that are compensable under the first sentence

of section 804, contravenes rules of construction and common sense.  See Whitebox Br. ¶ 15 n.9;

Ambac Br. ¶ 10 n.7.[25]  Such a limitation, while still entitling BNYM to payment of its Potential

Litigation Expenses, see supra III.A., would render the remainder of the payment priority

language in section 1103.1—essentially the next five lines of text—entirely superfluous.  Section

1103.1 begins by stating:  "Subject to Section 804 *and* after making provision for the payment of

any reasonable expenses of [BNYM] and its agents and attorneys necessary in the opinion of

[BNYM] to protect the interests of the Owners of the [Existing Securities] and the other

Beneficiaries, *and* for the payment of the reasonable charges and expenses and liabilities

incurred and advances made . . . ."  The conjunction "and" means that this section does not

merely provide priority of payment for fees, expenses, and losses that are compensable or

indemnifiable under section 804; it also provides priority of payment for two entirely distinct

categories of expenses, including, broadly, "liabilities incurred."  Accordingly, BNYM's priority

of payment goes far beyond the expenses compensable under the first sentence of section 804.

Under section 1103, the Potential Litigation Expenses have priority over payments to

Bondowners for four independent reasons:  (i) they are encompassed within the fees and

expenses compensable under and secured by the Charging Lien in section 804; (ii) they are

encompassed within the losses indemnifiable under section 804 and secured by section 501.1;

(iii) they are expenses necessary in the opinion of BNYM to protect the interests of the

Bondowners; and (iv) they are expenses incurred in the performance of BNYM's duties under

the Resolution.  The latter two categories apply, *inter alia*, because the Opposition Parties allege

that BNYM improperly made payments to owners of subordinate Existing Securities after events

of default instead of reserving them for owners of senior Existing Securities.  These allegations

directly relate to BNYM's performance of its duties under the Resolution and they implicate the

---

[25]   It is telling that the Opposition Parties refer to section 1103.1 to a footnote.

integrity of the Resolution, the existence of an event of default, and the rights of and relationship between Bondowners. And, "in the opinion" of BNYM, defending the Lawsuits is necessary to protect the interests of the Bondowners that are not bringing such specious claims. If the Title III Court determines that the Potential Litigation Expenses fall in any one of these four categories, BNYM is entitled to priority of payment.[26]

### B.    BNYM Is Entitled To Withhold A Reserve For Fees And Expenses.

Absent the mechanism in section 19.5 of the Plan, BNYM could have objected to confirmation on the basis that the Plan required BNYM to distribute the entire $1.8 billion now held subject to BNYM's prior lien, notwithstanding BNYM's likely incursion of substantial litigation expenses in connection with the Lawsuits. In such circumstances, section 1103.3 of the Resolution would entitle BNYM to withhold the Potential Litigation Expenses.

Section 1103.3, read in conjunction with the Resolution, establishes BNYM's right to withhold distributions to Bondowners as a reserve to ensure payment of anticipated future fees and expenses. This section states in pertinent part:

> Whenever moneys are to be applied by [BNYM] pursuant to [the waterfall], such moneys shall be applied by [BNYM] at such times, and from time to time, as provided above. The deposit of such moneys with [BNYM], or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by [BNYM] and [BNYM] shall incur no liability whatsoever to [COFINA], to any Bondowner[,] to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as [BNYM] acts without gross negligence and willful misconduct. Whenever [BNYM] shall exercise such discretion in applying such moneys, it shall fix the date . . . upon which such application is to be

---

[26]    The result would be the same were BNYM's claim for Potential Litigation Expenses unsecured. See In re First Baldwin Bancshares, Inc., No. 13-00027, 2013 WL 5429844, *8 (Bankr. S.D. Ala. 2013) (holding that payment to secured noteholder may be subordinated to unsecured bondholders by intercreditor agreement), aff'd sub. nom. Pilot v. Alesco, No. 13-0638, 2014 WL 1900668 (S.D. Ala. 2014), and cited with approval in In re MPM Silicones, LLC, 531 B.R. 321, 328 (S.D.N.Y. 2015), aff'd in part, rev'd in part and remanded sub nom., Matter of MPM Silicones, L.L.C., 874 F.3d 787 (2d Cir. 2017).

made and upon such date interest on the amounts of principal (or
Compounded Amount, if any) to be paid on such date shall cease to
accrue.

Resolution § 1103.3.  Under this section, BNYM has discretion to apply monies after an event of

default "at such times, and from time to time, as provided above."  Id.  BNYM may make

periodic distributions as appropriate and, as directed by section 1103.1, only "after making

provision" for payment to BNYM.[27]  Id.; see generally Rake v. Wade, 508 U.S. 464, 473-74

(1993) ("provides for" is "most natural[ly]" read and is "commonly understood" to mean "make

a provision for" or "deal with").  Establishment of a reserve for the Potential Litigation Expenses

prior to making distributions to the Opposition Parties is required to "provide for" the "payment

of" BNYM's fees and expenses.  "[S]etting aside" moneys held in trust for the "proper purpose"

constitutes "proper application" of those funds for which BNYM shall incur "no liability

whatsoever."  Resolution § 1103.3.  Consistent with its lien and payment priorities, and in the

context of the Resolution as a whole and public policy, ensuring payment of BNYM's reasonable

fees and expenses is a proper purpose.

The Resolution unambiguously evidences the intent to permit BNYM to set aside funds

after an event of default so that BNYM is assured of payment.  In this case, where the trusts are

being terminated and proceeds are being distributed, BNYM's right to payment for known,

ongoing expenses can be protected only if trust assets are retained in the amount of estimated

future expenses.[28]  Because BNYM would have no ability to enforce its payment rights as

---

[27]  Merriam-Webster defines "provision," in part, as "the fact or state of being prepared beforehand" and
"a measure taken beforehand to deal with a need or contingency."  "Provision." Merriam-
Webster.com. 2019. https://www.merriam-webster.com (4 Jan 2019).

[28]  BNYM reserves its right under section 1106.2 of the Resolution to seek an order requiring, in any suit
against BNYM, that any party litigant in such suit, file an undertaking to pay the reasonable costs of
such suit.  See Resolution § 1106.2.  Given the nature, location, and financial status of the Opposition
Parties, this is not an adequate substitute for a holdback.

against COFINA or enforce its lien and payment priorities against Bondowners after the

Effective Date absent a holdback, construing the Resolution to prohibit a holdback would

contravene the Resolution's directive that BNYM "shall not be required to expend any of its own

funds in the execution of its duties pursuant to the provisions of the Resolution." Id. § 804.

      **C.**      **BNYM's Lien And Payment Priorities Are Enforceable Under Section 510(a)
Of The Bankruptcy Code.**

      BNYM's lien and payment priorities as against non-debtor Bondowners, unlike BNYM's

contractual rights to payment from COFINA, as a Title III debtor, cannot be modified without

BNYM's consent.  These provisions function as an intercreditor subordination agreement.  See

In re Sepco, Inc., 36 B.R. 279, 285 (Bankr. D.S.D. 1984) ("[a] subordination agreement is

nothing more than a contract where one party agrees to subordinate his claim against a debtor in

favor of the claim of another creditor").

      Pursuant to sections 501.1, 804, and 1103.1 of the Resolution, the Bondowners agreed to

subordinate the lien of the Resolution and to subordinate payment on account of the Existing

Securities to payment of BNYM's reasonable compensation, expenses, liabilities incurred, and

advances made in its capacity as trustee.  "The very purpose of subordination clauses is to allow

holders of senior indebtedness to recover if the debtor cannot meet its obligations.  In other

words, in the case of a bankruptcy or a reorganization, the senior debt holders bargained to insure

that they would recover on their claim before any junior debt holder could recover on their

claim."  See In re Envirodyne Indus., Inc., 161 B.R. 440, 448 (Bankr. N.D. Ill. 1993), aff'd, 29

F.3d 301 (7th Cir. 1994) (overruling objection to chapter 11 plan seeking to limit scope of

subordination provision of indenture).  Under the Resolution, BNYM holds senior indebtedness,

entitled to first priority payment, and the Bondowners hold junior indebtedness, entitled to

payment only after provision is made for payment of BNYM.

Pursuant to section 510(a) of the Bankruptcy Code, made applicable to this proceeding by section 301 of PROMESA, "[a] subordination agreement is enforceable in [this Title III Case] to the same extent that such agreement is enforceable under applicable nonbankruptcy law." 11 U.S.C. § 510(a); see In re Boston Generating, LLC, 440 B.R. 302, 318-19 (Bankr. S.D.N.Y. 2010) ("The Intercreditor Agreement is an enforceable agreement under section 510(a) of the Bankruptcy Code to the extent that it is a subordination agreement."); In re Ion Media Networks, Inc., 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (same).  "The intent of [the Bankruptcy Code] is to allow the consensual and contractual priority of payment to be maintained between creditors among themselves in bankruptcy proceedings."  In re MPM Silicones, L.L.C., 2018 WL 6324842, *25 (quoting In re Hart Ski Mfg. Co., 5 B.R. 734, 735 (Bankr. D. Minn. 1980)).

The First Circuit has enforced subordination provisions in an indenture as "subordination clauses, pure and simple" for purposes of section 510(a).  See HSBC Bank USA v. Branch (In re Bank of New England Corp.), 364 F.3d 355, 366 (1st Cir.), cert. denied, 543 U.S. 926 (2004); see generally Silver Point Fin., LLC v. Deutsche Bank Trust Co. Ams. (In re K-V Discovery Solutions, Inc.), 496 B.R. 330 (Bankr. S.D.N.Y. 2013) (applying section 510(a) to subordination clauses in indenture).  In that context, the Court of Appeals noted that "section 510(a) means that the enforcement of subordination provisions is no longer a matter committed to the bankruptcy courts' notions of what may (or may not) be equitable." HSBC, 364 F.3d at 362.  BNYM is entitled to enforcement of its priority of payment rights such that the Opposition Parties do not receive any distribution until BNYM's fees and expenses have been paid in full (or fully provided for) under section 1103.1.  See HSBC, 364 F.3d at 361 ("subordination alters the normal priority of the junior creditor's claim so that it becomes eligible to receive a distribution only after the claims of the senior creditor have been satisfied").  The Title III Court cannot

interpret the Resolution in such a way that re-drafts or re-negotiates the secured parties' bargained-for rights.  In re Boston Generating, 440 B.R. at 318-19; see also Delaware Trust Co. v. Wilmington Trust, N.A. (In re Energy Future Holdings Corp.), 546 B.R. 566, 577 (Bankr. D. Del. 2016) (subordination agreement enforced according to plain meaning).

The Opposition Parties' failure to question BNYM's superior rights under section 1103.1 is perhaps unsurprising because they lack standing to do so.  The agreement is among BNYM, the Bondowners (i.e., the registered owners of the Existing Securities), and the Beneficiaries. See Resolution §§ 103, 305.2, 801, 1103.1, 1205.  As a Beneficial Holder, Whitebox is neither a Bondowner nor a Beneficiary and, as a result, has no standing to challenge BNYM's rights under the Resolution.  See Repsol, S.A. v. Bank of New York Mellon, No. 652653/2012, 2014 WL 468910 (N.Y. Sup. Ct. Feb. 4, 2014) (dismissing claims against trustee based on lack of standing because plaintiff was not an "Owner" as defined in the indenture).[29]  As a Beneficial Holder, Ambac lacks standing for the same reason.  And as a Beneficiary, Ambac lacks standing because it cannot demonstrate any injury-in-fact.[30]  Ambac has no present claim against COFINA because nothing is due on the Ambac Insured Bonds until 2047 and, under the Plan, Ambac is not entitled to receive any distributions of funds held in trust.  See generally Plan Art. VI.

---

[29]  See also Springwell Nav. Corp. v. Sanluis Corporacion, S.A., 849 N.Y.S.2d 34, 34 (N.Y. App. Div. 1st Dep't 2007) (holding beneficial holder of note lacked standing to sue under indenture agreement where agreement specifically reserved that right to the registered holder of the note); MacKay Shields v. Sea Containers, 751 N.Y.S.2d 485, 486 (N.Y. App. Div. 1st Dep't 2002) (dismissing claim because alleged beneficial holder lacked standing to sue on indentures where such right was reserved to "holder," defined as one in whose name note is registered); Theodore v. TD Ameritrade, Inc., No. 11760–2007, 2008 WL 465281, *3 (N.Y. Sup. Ct. Feb. 11, 2008) (dismissing claims of beneficial holder of bonds where indenture conferred rights on "the record holder, not the beneficial holder").

[30]  See Spokeo, Inc. v. Robins, 136 S. Ct. 1540, 1547-48 (2016), as revised (May 24, 2016) ("Injury in fact is a constitutional requirement [for standing] . . . .  To establish injury in fact, a plaintiff must show that he or she suffered an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'") (internal citations omitted).

Even if the Opposition Parties had standing, any challenge to the intercreditor agreement in section 1103 would fail.  As sophisticated parties that had the ability to negotiate for more favorable terms (Ambac) or to engage in due diligence before investing (Ambac and Whitebox), the Opposition Parties cannot escape the subordination agreement contained in the Resolution. See UniCredito Italiano SPA v. JPMorgan Chase Bank, 288 F. Supp. 2d 485, 499 (S.D.N.Y. 2003) ("Sophisticated parties such as Plaintiffs are held to the terms of their contracts."); see also Ion Media Networks, Inc. v. Cyrus Select Opportunities Master Fund Ltd. (In re Ion Media Networks, Inc.), 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009).  Altering the priorities of the intercreditor agreement, by permitting distributions to the Opposition Parties with no holdback for BNYM, would improperly penalize BNYM—denying it the protections of the Resolution— and reward those subordinated in the waterfall.  Conversely, distribution of the trust funds pursuant to the agreed-upon waterfall of the Resolution "honors [the Opposition Parties'] legitimate investment choices and [BNYM's] legitimate contractual expectations, and thus produces a more equitable result."  See Lansuppe, 2016 WL 5477741, *5.

For these reasons, the intercreditor agreement that ensures payment of BNYM's claims prior to payment of the Bondowners and Beneficiaries must be enforced by authorizing BNYM to withhold from distributions to the Opposition Parties an amount equal to the Potential Litigation Expenses from which BNYM may draw on a current basis.

## V.   CASES CITED BY THE OPPOSITION PARTIES DO NOT SUPPORT A DIFFERENT RESULT.

Cases cited by the Opposition Parties generally support BNYM's argument that the language of the contract governs.  See Dresser-Rand Co. v. Ingersoll Rand Co., No. 14-7222 (KPF), 2015 WL 4254033 (S.D.N.Y. July 14, 2015) (construing contract that conditioned current fee reimbursement on "entitlement to indemnification," which was "not evident"); Rishell v.

- 31 -

Med. Card Sys., Inc., 925 F. Supp. 2d 211, 217-18 (D.P.R. 2013) (construing unambiguous

bylaws that "provide[d] prepayment of expenses only to current" directors/officers); Hooper

Assocs. v. AGS Computers, 74 N.Y.2d 487, 492 (N.Y. 1989) (contract provisions precluded

inference of indemnity).  These cases, involving language individually different from the

Resolution and lacking any equivalent to section 19.5 of the Plan, do not alter the analysis above.

The Opposition Parties' reliance on Becker v. Bank of New York Mellon, N.A., 172 F.

Supp. 3d 777 (E.D. Pa. 2016), for the propositions that Whitebox cannot be forced to assume

COFINA's obligations, that the Charging Lien does not secure BNYM's defense costs, and that

BNYM is not entitled to current payment of defense costs, is misplaced for several reasons.  See

Whitebox Br. ¶¶ 2, 10, 15, 17; Ambac Br. ¶¶ 10, 12.  First, responsibility for COFINA's

obligations arises under section 19.5 of the Plan, not the Resolution.  Accord Ambac Br. ¶ 7.

Becker is inapposite because the plan of reorganization there had no corollary to section 19.5 of

the Plan.  Second, with respect to exercise of the Charging Lien, Becker is instructive only

insofar as it mandates a close inspection of the specific language of each indenture.  The Court in

Becker limited the trustee's charging lien based on specific language in the indenture limiting the

trustee's charging lien to monies received as a result of the exercise of defined remedies, which,

the Court found, excluded monies received in bankruptcy distributions.  Becker, 172 F. Supp. 3d

at 800.  The Resolution contains no such limitation.  See Resolution §§ 804, 1103.1.  Third,

Becker is procedurally very different.  It arose after the subject indenture had been cancelled and

plaintiffs had presented extensive record evidence.  Here, by contrast, BNYM's protections

under the Resolution remain extant and before the Title III Court, and the underlying litigation

still is in the pleadings stage.  Fourth, Becker is not a basis to reject the many recent cases under

applicable New York law holding that mere allegations of gross negligence and willful

- 32 -

misconduct will not prevent trustees from drawing upon trust funds to pay legal expenses pending the outcome of the underlying litigation. See supra at III.B. *Finally*, even with all these differences, the Court in Becker still permitted the trustee to hold these funds because triable disputes remained. Becker, 172 F. Supp. 3d at 802.

The Opposition Parties' citation to UMB Bank, N.A. v. Sanofi, No. 15-8725 (GBD), 2016 WL 4938000 (S.D.N.Y. Sept. 8, 2016), for the proposition that a prevailing party may not collect attorneys' fees from the loser unless an award is authorized by agreement, statute, or court rule, is equally unavailing. Sanofi involved litigation between two contract counterparties in which one litigant, the trustee, sought payment of ongoing litigation expenses directly from its adversary. The Court held that, absent an express waiver of the American Rule, the trustee was not entitled to payment unless and until it prevailed in litigation. In this proceeding, by contrast, BNYM is not relying upon any contract between it and the Opposition Parties. Rather, it is relying upon section 19.5 of the Plan, which provides a mechanism to satisfy *COFINA's* obligations to BNYM on account of third-party litigation claims. BNYM also is relying separately upon its intercreditor lien and payment priorities directing payment to BNYM before payment to Bondowners (let alone Beneficial Holders, such as the Opposition Parties). The American Rule is inapplicable because the Resolution expressly provides BNYM with lien and payment priorities ahead of Bondowners. Section 19.6 preserves those rights, and section 19.5 provides a mechanism to satisfy them.[31]

---

[31] Even were the American Rule implicated, the Resolution's indemnity provision applies to any claim "whether asserted by [COFINA], any Bondowner or any other Person," Resolution § 804, thus, making "unmistakably clear" that BNYM's indemnity applies no matter who is asserting the claim. See Hooper, 74 N.Y.2d at 492 (American Rule prevails only where contract does not "clearly" permit indemnity).

Cases cited by the Opposition Parties do not change BNYM's entitlement under the Resolution and applicable law, as implemented through section 19.5, to withhold from distributions to the Opposition Parties an amount equal to the Potential Litigation Expenses from which BNYM may draw on a current basis.

Hearkening back to the five recent New York decisions cited above, enforcing the Resolution and applicable law will not prejudice the Opposition Parties. *First*, BNYM agrees to refund any amounts that ultimately are not utilized for BNYM's fees and expenses. *Second*, BNYM agrees that the Opposition Parties may, subject to appropriate procedures with respect to privilege, appropriate timing, and other relevant issues, challenge the reasonableness of BNYM's fees and expenses. *Third*, if the Opposition Parties ultimately prevail in the Lawsuits, they may seek a judicial determination that BNYM must disgorge any fees and expenses to which it was not entitled as a result of a theoretical determination that it acted with gross negligence or willful misconduct. With these protections, and as held in PIMCO and the Royal Park decisions, see supra at III.B., there is no harm to the Opposition Parties from BNYM retaining funds to pay the Potential Litigation Expenses on a current basis in accordance with the terms of the Resolution.

## CONCLUSION

The Title III Court's determination under section 19.5 of the Plan, as to what amount shall be withheld from trust funds (before disbursement to the Opposition Parties) and whether such amounts shall be paid on a current basis, must "satisfy in full" (i) any obligations of COFINA *and* (ii) any rights of BNYM under the Resolution and applicable law with respect to payment of the Potential Litigation Expenses. For three separate reasons, the Resolution and applicable law entitle BNYM to withhold from distributions to the Opposition Parties an amount equal to the Potential Litigation Expenses, from which funds BNYM may draw on a current

basis.  *First*, establishing a reserve is necessary to satisfy COFINA's obligation to provide the indubitable equivalent of BNYM's secured claim for litigation expenses under the first sentence of section 804 of the Resolution.  *Second*, such reserve is necessary to satisfy COFINA's obligation to provide the indubitable equivalent of BNYM's secured claim for indemnification under the second sentence of section 804 of the Resolution.  *Third*, such a reserve is necessary to satisfy BNYM's right to payment of its fees and expenses prior to any distributions to Bondowners and Beneficiaries.  The Title III Court's determination in favor of BNYM on any one of these three bases entitles BNYM to the relief it seeks.  Establishing a reserve from trust funds otherwise payable to the Opposition Parties in the full amount of the Potential Litigation Expenses is the mechanism that (a) satisfies BNYM's right to the indubitable equivalent of its secured claims under section 1129 of the Bankruptcy Code and (b) enforces BNYM's intercreditor lien and payment priorities as required by section 510(a) of the Bankruptcy Code.

*[The remainder of this page was intentionally left blank.]*

Dated:  January 9, 2019            Respectfully submitted,
      San Juan, Puerto Rico

SEPULVADO, MALDONADO & COURET    REED SMITH LLP

*/s/ Albéniz Couret-Fuentes*         */s/ Eric A. Schaffer*
Elaine Maldonado-Matías         Eric A. Schaffer
USDC-PR Bar No. 217309         Luke A. Sizemore
Albéniz Couret-Fuentes         225 Fifth Avenue, Suite 1200
USDC-PR Bar No. 222207         Pittsburgh, PA 15222
José Javier Santos Mimoso        Telephone: (412) 288-3131
USDC-PR Bar No. 208207         Facsimile :  (412) 288-3063
304 Ponce de León Ave. – Suite 990   Email :  eschaffer@reedsmith.com
San Juan, PR 00918          Email :  lsizemore@reedsmith.com
Telephone: (787) 765-5656
Facsimile:  (787) 294-0073       Louis M. Solomon
Email: emaldonado@smclawpr.com    C. Neil Gray
Email:  acouret@smclawpr.com     599 Lexington Avenue
Email:  jsantos@smclawpr.com     New York, NY 10022
                        Telephone:  (212) 521-5400
                        Facsimile:  (212) 521-5450
                        Email:  lsolomon@reedsmith.com
                        Email:  cgray@reedsmith.com

                        Kurt F. Gwynne
                        1201 N. Market Street, Suite 1500
                        Wilmington, DE 19801
                        Telephone: (302) 778-7550
                        Facsimile:  (302) 778-7575
                        Email: kgwynne@reedsmith.com

*Counsel to The Bank of New York Mellon,*
*as indenture trustee*