# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## OMNIBUS REPLY OF PUERTO RICO SALES TAX FINANCING CORPORATION TO OBJECTIONS TO SECOND AMENDED TITLE III PLAN OF ADJUSTMENT

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board
as Representative for COFINA in its Title III Case*

Dated: January 9, 2019

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ...................................................................................1

BACKGROUND ........................................................................................................4

    A.     A GENERAL MISPERCEPTION PERMEATES THE OBJECTIONS.................4

    B.     VARIOUS OBJECTORS LACK STANDING TO OBJECT TO THE PLAN ...........................................................................................................19

    C.     THE CONSTITUTIONAL CHALLENGES TO THE PLAN ARE WITHOUT MERIT. ...................................................................................21

         1.    <u>Contracts Clause</u>. ...................................................................21

         2.    <u>Takings Clause</u> .........................................................................25

         3.    <u>Privileges and Immunities Clause</u> ...........................................29

         4.    <u>Dormant Commerce Clause</u> .....................................................31

         5.    <u>Due Process Clause</u> .................................................................31

         6.    <u>Equal Protection Clause</u> ..........................................................34

         7.    <u>Free Speech and Vote</u> ..............................................................35

         8.    <u>Appointments Clause</u> ..............................................................35

    D.     OMNIBUS REPLY TO THE OBJECTIONS .......................................35

## TABLE OF AUTHORITIES

**Page(s)**

CASES

*Ambac Assurance Corp. v. Commonwealth of Puerto Rico*
   *(In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
   297 F. Supp. 3d 269 (D.P.R. 2018)........................................................................22

*Armstrong v. United States*,
   364 U.S. 40 (1960)........................................................................26

*Ass'n of Retired Emps. of City of Stockton v. City of Stockton*
   *(In re City of Stockton)*,
   478 B.R. 8 (Bankr. E.D. Cal. 2012)........................................................................22

*Bank of New York Mellon v. Puerto Rico Sales Tax Fin. Corp.*
   *(In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*,
   301 F. Supp. 3d 306 (D.P.R. 2017)........................................................................20

*Buffalo Teachers Fed'n v. Tobe*,
   464 F.3d 362 (2d Cir. 2006)........................................................................25, 28

*Comptroller of Treasury of Md. v. Wynne*,
   135 S. Ct. 1787 (2015)........................................................................31

*Connolly v. Pension Benefit Guar. Corp.*,
   475 U.S. 211 (1986)........................................................................28, 29

*Diaz-Diaz v. Fortuño-Burset*,
   2012 WL 2498912 (D.P.R. June 27, 2012)........................................................................24

*Energy Reserves Grp., Inc. v. Kansas Power & Light Co.*,
   459 U.S. 400 (1983)........................................................................23

*First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,
   18 B.R. 868 (Bankr. D. Colo. 1982)........................................................................27

*Hodel v. Va. Surface Mineral & Reclamation Ass'n*,
   452 U.S. 264 (1981)........................................................................32

*In re City of Detroit*,
   504 B.R. 191 (Bankr. E.D. Mich. 2013)........................................................................22

*In re Fin. Oversight & Mgmt. Bd. for Puerto Rico*,
   318 F. Supp. 3d 537 (D.P.R. 2018)........................................................................28

*In re Lifeco Inv. Grp., Inc.,*
   173 B.R. 478 (Bankr. D. Del. 1994) ...................................................20

*Katz v. Pershing, LLC,*
   672 F.3d 64 (1st Cir. 2002) ...........................................................20

*Keystone Bituminous Coal Ass'n v. DeBenedictis,*
   480 U.S. 470 (1987) ...................................................................29

*Lingle v. Chevron U.S.A., Inc.,*
   544 U.S. 528 (2005) ...............................................................28, 29

*Louisville Joint Stock Land Bank v. Radford,*
   295 U.S. 555 (1935) ...................................................................26

*Lyda v. City of Detroit (In re City of Detroit),*
   841 F.3d 684 (6th Cir. 2016) ........................................................34

*McAndrews v. Fleet Bank of Mass., N.A.,*
   989 F.2d 13 (1st Cir. 1993) ..........................................................29

*Neblett v. Carpenter,*
   305 U.S. 297 (1938) ...................................................................32

*New Haven Inclusion Cases,*
   399 U.S. 392 (1970) ...................................................................29

*Nollan v. Cal. Coastal Comm'n,*
   483 U.S. 825 (1987) ...................................................................27

*Pa. Coal Co. v. Mahon,*
   260 U.S. 393 (1922) ...................................................................27

*PBGC v. R.A. Gray & Co.,*
   467 U.S. 717 (1984) ...................................................................22

*Penn Cent. Transp. Co. v. City of New York,*
   438 U.S. 104 (1978) ...............................................................28, 29

*Saenz v. Roe,*
   526 U.S. 489 (1999) ...................................................................30

*Toomer v. Witsell,*
   334 U.S. 385 (1948) ...................................................................30

*U.S. Fire Ins. Co. v. Corporación Insular de Seguros,*
   853 F. Supp. 47 (D.P.R. 1994) ......................................................34

*Union de Trabajadores de la Industria Electrica y Riego, Inc. v. Puerto Rico Elec. Power Auth.*,
(D.P.R. Sept. 26, 2018) ..................................................................................21, 22, 23

*United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño*,
633 F.3d 37 (1st Cir. 2011) ......................................................................2, 21, 23, 24

*United States v. Kras*,
409 U.S. 434 (1973) ...............................................................................................34

*United States v. Security Industrial Bank*,
459 U.S. 70 (1982) .................................................................................................26

*United Student Aid Funds, Inc. v. Espinosa*,
559 U.S. 260 (2010) ...............................................................................................32

*Wood v. United States (In re Wood)*,
866 F.2d 1367 (11th Cir. 1989) ..............................................................................34

*Wright v. Union Cent. Life Ins. Co.*,
311 U.S. 273 (1940) .........................................................................................25, 27

## STATUTES

11 U.S.C. § 544(a)(1) .....................................................................................................10

11 U.S.C. § 547(b) .........................................................................................................10

11 U.S.C. § 548 ..............................................................................................................10

11 U.S.C. § 549 ..............................................................................................................10

11 U.S.C. § 552 .......................................................................................................10, 26

PROMESA § 2(b)(2), 48 U.S.C. § 2101(b)(2) ..............................................................25

PROMESA § 101, 48 U.S.C. § 2121 ......................................................................22, 28

PROMESA § 315(b), 48 U.S.C. § 2175(b) .....................................................................1

PROMESA § 405(a), 48 U.S.C. § 2194(a) ......................................................................6

## OTHER AUTHORITIES

P.R. Const. art VI, § 8 ......................................................................................................4

U.S. Const. amend. V .....................................................................................................32

U.S. Const. amend. XIV § 1 .....................................................................................32, 34

U.S. Const. art. I, § 10, cl. 1...............................................................................................21

The Puerto Rico Sales Tax Financing Corporation ("COFINA"), as Title III

debtor in the above-captioned Title III cases (the "Debtor") under the *Puerto Rico Oversight,*

*Management, and Economic Stability Act* ("PROMESA"), by and through the Financial

Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtor's

representative pursuant to section 315(b) of PROMESA,[1] respectfully submits this omnibus reply

("Reply") to objections to the *Second Amended Title III Plan of Adjustment of Puerto Rico Sales*

*Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 380] (as may be modified further,

the "Plan").[2]  This Reply is being submitted in conjunction with the *Brief in Support of Puerto*

*Rico Sales Tax Financing Corporation's Second Amended Title III Plan Of Adjustment* (the

"Brief").[3]

## PRELIMINARY STATEMENT[4]

1.     Confirmation of the Plan and consummation of the transactions contemplated

therein will be a bellwether for the resurgence of the Commonwealth and place the island on the

road to economic recovery.  The COFINA restructuring, while significant in its own right,

illustrates that many parties understand the magnitude of the complexities associated with the

financial situation of Puerto Rico and are determined to rectify such issues and move forward to

create a viable, feasible, and ultimately vibrant, Puerto Rico economy.  This is most clear by the

---

[1]  PROMESA is codified at 48 U.S.C. §§ 2101–2241.

[2]  Concurrent with this Reply, the Oversight Board has filed the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 436].

[3]  Capitalized terms used but not otherwise defined herein shall have those meanings ascribed to them below or in the Brief, as appropriate.

[4]  While the parties to the A&R Plan Support Agreement support confirmation of the Plan, positions taken with respect to specific legal issues in this Reply should not be attributed to parties to the A&R Plan Support Agreement other than the Oversight Board.

fact that every class entitled to vote on the Plan has accepted the Plan and the treatments afforded thereunder.[5]

2.      Notwithstanding such progress and overwhelming support, certain parties continue to misread the provisions of the Plan, PROMESA, and the Bankruptcy Code, misunderstand the issues associated with the Commonwealth-COFINA Dispute, or blithely disregard the facts and legal issues attendant to confirmation of the Plan.   In that regard, objections (collectively, the "Objections") to confirmation were interposed by (a) Stephen Mangiaracina, (the "Mangiaracina Objections") (b) Peter C. Hein (the "Hein Objections"),[6] (c) PROSOL-UTIER (the "PROSOL-UTIER Objection"), (d) Mark Elliott (the "Elliott Objection"), (e) SEIU-UAW (the "Unions Objection"), (f) Manuel Natal-Albelo, et al. (the "Natal Objection"), (g) GMS Group, LLC (the "GMS Objection"), (h) Lawrence B. Dvores (the "Dvores Objection"), and (i) certain Puerto Rico credit unions (the "Cooperativas Objection").[7]

---

[5]  Based on unaudited results at the time of this filing.

[6]  Hein's response to COFINA's 13th Omnibus Objection, which included an objection to Hein's proof of claim, Hein Objection at 35 (defined below), will be dealt with separately in connection with the claims administration process (*i.e.*, it is not a Plan confirmation issue).

[7]  The complete list of Objections is as follows:

a)   **The Mangiaracina Objections**: *Objections To The Plan Of Adjustment And The Adequacy Of The COFINA Disclosure Statement And The Relief Requested In The Disclosure Statement With Reservation Of Rights* [ECF No. 4215]; *Objections to the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation with Reservation of Rights* [ECF No. 4481];

b)   **The Hein Objections**: *Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [ECF No. 4585] (the "Hein Objection"); *Supplement to Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan Scheduled for Hearing January 16, 2019, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [ECF No. 4595] (the "Hein Supplemental Objection");

c)   **The PROSOL-UTIER Objection**:  *Objection of PROSOL-UTIER to Confirmation of the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation ("COFINA") [Case No. 17-3284, Docket Entry No. 380]* [ECF No. 4592] (the "PROSOL-UTIER Objection");

d)   **The Elliott Objection**: *First Amended Objection of Mark Elliott, Individually and d/b/a Elliott Asset Management, to Entry of an Order Approving the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 4598] (the Elliot Objection was originally filed at ECF No. 4597);

3.    While the Debtor appreciates the Court's desire to listen to the voices of Puerto Rico residents, it must be noted that many of the Objections have been interposed by parties that are not creditors of COFINA, and therefore, lack standing to raise any such objection. With respect to others, there is a general conflation of the procedural aspects and the issues before the Court—failing to consider the pendency of the multiple litigations, the risks attendant to junior bondholder claims, and the compromise and settlement of the Commonwealth-COFINA Dispute—and, therefore, provide a misapplication of the law. Similarly, several of the objectors inappropriately claim the Plan and the issuance of the COFINA Bonds will violate the Puerto Rico Constitution. Others apply a shotgun approach asserting miscellaneous objections that are inconsistent with PROMESA, the Bankruptcy Code, and the terms and provisions of the Plan. The Debtor submits that all of the Objections should be overruled and the Plan should be confirmed. In support thereof, herein, the Debtor provides context for the Court regarding

---

e)  **The Unions Objection**: *Objection of Service Employees International Union and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) to COFINA Plan of Adjustment* [ECF No. 4556];

f)  **The Natal Objection**: *Objection to Confirmation of the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation and Joinder of Objection By PROSOL-UTIER* [ECF No. 4607];

g)  **The GMS Objection**: *Amended Objection of the GMS Group, LLC to Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation and Request for Evidentiary Hearing* [ECF No. 4564]; *Joinder by the GMS Group, LLC to Objection, of Individual COFINA subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [17-3283, ECF No. 4587]; *Joinder by and Supplement of the GMS Group, LLC to Supplemental Objection, of Individual COFINA subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [ECF No. 4605] (the "GMS Supplemental Objection") (the GMS Objection was originally filed at ECF No. 4577 and was withdrawn at ECF No. 4563). The GMS Group, LLC also filed the *Motion Submitting Declaration of Timothy Donahue and Peter Hein in Support of Objection of the GMS Group, LLC to Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [ECF No. 4606];

h)  **The Dvores Objection**: *Objection of Lawrence B. Dvores, Individual Investor and Owner of Uninsured Junior Lien COFINA Bonds to the Confirmation of the Proposed [sic] Plan of Adjustment for Puerto Rico Sales Tax Financing Corporation Bonds and in Support of and for Joinder with Objections Filed by the GMS Group and Peter C. Hein, Pro Se* [ECF No. 4613]; and

i)  **The Cooperativas Objection**: *Objection to the Confirmation of the Second Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 415].

outstanding litigations and their proposed resolution, addresses the lack of standing of certain parties, and responds to various constitutional arguments raised.  Additionally, annexed hereto as **Exhibit A** is an omnibus reply chart responding to the various objections noted above, organized by subject matter.

## BACKGROUND

### A.  A GENERAL MISPERCEPTION PERMEATES THE OBJECTIONS

4.     A common theme runs through the various Objections:  that the original transfer of certain SUTs to COFINA is valid, the junior bondholders should be paid in full, and that, if the SUT transfer were determined to be invalid, both senior and junior bondholders should share the pain equally, with an equivalent treatment being meted out under the Plan.  Such telling oversimplifies the issues that were prompted by multiple parties and required months of litigation to develop and the herculean efforts of the Court-appointed Mediation Team to resolve before the Plan could even be proposed.  A thorough review of the procedural and legal posture better elucidates why this is not the case and, accordingly, why the Plan is in the best interests of creditors, including the junior COFINA bondholders, and must be confirmed.

5.     The Commonwealth-COFINA Dispute is Born.  On November 6, 2016—six months prior to COFINA's Title III petition being filed—holders of GO Debt commenced the *Lex Claims Litigation* challenging, among other things, the transfer of the SUT to COFINA. Therein, the plaintiffs asserted that the Puerto Rico Constitution required the Commonwealth to pay the GO Debt ahead of any other expenditure.  They contended that Article VI, Section 8 of the Puerto Rico Constitution, which provides that, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, section 8.  They further asserted that the

4

Pledged Sales Tax is an "available resource" and COFINA was created and issued bonds solely in an attempt to evade the claim of holders of GO Debt on "available resources" and related constitutional limitation on the quantity of public debt the Commonwealth was permitted to issue.   COFINA filed an answer generally denying the allegations and asserting various affirmative defenses.

6.     Holders and insurers of the Existing Securities, permitted to intervene in the *Lex Claims Litigation*, countered that the Pledged Sales Tax was legislatively rendered property of COFINA from its inception, thereby eliminating any possibility that such tax may be property or "available resources" of the Commonwealth.   They claimed that Act 91 provides that the Pledged Sales Tax "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary."   Act 91, section 2.   They further asserted that COFINA was essential in permitting the Commonwealth to access the capital markets on favorable terms.

7.     In response to uncertainty surrounding the transfer of the SUT, and contending that an event of default had already occurred under the Existing Bond Resolution, Ambac and Whitebox commenced separate litigations against BNYM, the trustee under the Existing Bond Resolution, alleging various causes of action, each premised upon allegations that an event of default occurred prior to April 29, 2017, and that BNYM breached its alleged duties by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate" Existing Securities.   If such creditors were correct, then, in their view, the subordination provisions attendant to the Existing Securities would apply and no payments to holders of "First Subordinate" Existing Securities would have been permissible.

5

8.      BNYM responded that the Ambac Action and Whitebox Actions, including any claims and causes of action for gross negligence, willful misconduct, or intentional fraud, lacked merit and should be dismissed with prejudice.  BNYM claimed, and Whitebox and Ambac disagreed, that such actions should fail for a variety of reasons, including, without limitation: (i) there were no defaults or events of default under the Existing Bond Resolution prior to April 29, 2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request or direction of bondowners, unless the bondowners offered BNYM security or indemnity satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred; and (iii) a failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond Resolution.

9.      COFINA attempted to negotiate a resolution of the above issues with its creditor constituencies.  However, it was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation going forward.  At the beginning of May 2017, the automatic stay imposed by PROMESA section 405(a) expired, and numerous creditors threatened to file or pursue litigation against COFINA.  On May 2, 2017, certain COFINA bondholders commenced an action for declaratory and injunctive relief against COFINA, AAFAF, GDB, Governor Rosselló and certain other governmental officials. Accordingly, on May 5, 2017, the Oversight Board commenced COFINA's Title III Case, which gave rise to a further stay to protect COFINA.

10.     Following the filing of COFINA's Title III petition, BNYM, as trustee for the Existing Securities, was in possession of hundreds of millions of dollars for the benefit of holders of both junior and senior Existing Securities, but without clarity to whom to make distributions.

Therefore, BNYM filed the Interpleader Action, seeking a court order determining competing claims to the Disputed Funds by certain holders of beneficial interests in the Existing Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA.  On May 30, 2017, the Title III Court granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action.

11.     From June to September 2017, several parties, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, Rothschild, the Commonwealth, AAFAF, and the Oversight Board.  The subpoenaed entities and individuals produced documents, depositions were taken of Banco Popular, and AAFAF, COFINA, the Commonwealth, and the Oversight Board each stipulated to binding statements of facts in lieu of depositions.  Interpleader Action, ECF Nos. 415, 420.

12.     The implications of the Interpleader Action cannot be overlooked in the context of the Plan.  As mentioned above, if an event of default under the Existing Bond Resolution had occurred, the senior bondholders may have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Specifically, independent of the validity of the transfer of the SUT to COFINA, such acceleration might require the senior bondholders to be paid in full prior to junior bondholders being able to declare an event of default, accelerate junior bonds, and exercise remedies.  In short, the Interpleader Action revolves around a dispute between junior and senior COFINA creditors about their payments rights and priorities vis-à-vis each other, which is what is being settled pursuant to the Plan.

13.     The Oversight Board's Steps to Resolve the Commonwealth-COFINA Dispute. In light of the disputes regarding ownership of the Pledged Sales Taxes, shortly following the commencement of COFINA's Title III Case, and while the above-referenced discovery was being undertaken, the Oversight Board sought to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which involved the appointment of independent agents of the Oversight Board to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute.  On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-3284, ECF No. 303] (the "Commonwealth-COFINA Dispute Procedures Motion").    On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.

14.     The Oversight Board worked with Chief Bankruptcy Judge Houser and creditors to formulate procedures agreeable to the interested parties.  On July 21, 2017, the Oversight Board filed the *Revised Motion of Debtors for Order Approving Stipulation Providing Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 718] seeking approval of a stipulation establishing a protocol to address the Commonwealth-COFINA Dispute, including appointing an agent for the Oversight Board as debtor representative for the Commonwealth and an agent for the Oversight Board as debtor representative for COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the Agents to

8

consult with creditors and their respective debtors.  Appropriate notice was given of this motion, and no objections were made by the objectors as to process, and the powers given to the Agents or the powers reserved by the Oversight Board.

15.  On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").  The Procedures Order also expressly acknowledges that the Oversight Board retained its authority to separately develop a settlement of the Commonwealth-COFINA Dispute and propose plans of adjustment for the Commonwealth and COFINA.  Specifically, the Procedures Order provides as follows:

> [T]he Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute developed by the Agents or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute . . . .

Procedures Order ¶ 4(n) (emphasis added).

16.  Commencement of the Adversary Proceeding.  On September 8, 2017, the Commonwealth Agent commenced an adversary proceeding[8] to prosecute the Commonwealth-

---

[8]  *Official Committee of Unsecured Creditors v. Whyte*, Adv. Proc. No. 17-00257 (the "Adversary Proceeding").

COFINA Dispute, and, in its complaint (the "Complaint"), sought declaratory judgments that, among other things, (a) Act 91 did not transfer present ownership of future SUT revenues to COFINA, (b) Act 91 did not assign to COFINA any "right to receive" future SUT revenues, (c) the transfer language in Act 91 was, at most, an unsecured promise of a future transfer that can be breached or otherwise rejected in Title III, (d) COFINA has no enforceable security interest in future SUT revenues, (e) any unperfected security interest in SUT revenues is avoidable under sections 544(a)(1) and 547(b) of the Bankruptcy Code, (f) in the event that any security interest is not avoidable under section 544(a)(1) or section 547(b) any transfer made within two years of the petition date is still avoidable as a fraudulent transfer pursuant to section 548(a)(1)(B), (g) any post-petition transfer is avoidable under section 549(a), (h) any security interest held by COFINA is subordinate to rights of the Oversight Board acting as trustee/lien creditor; (i) any security interest was "cut off" by the commencement of the Title III case pursuant to section 552(a), as post-petition SUT revenues are after-acquired property, (j) any post-petition transfers are not governed by the Uniform Commercial Code and avoidable because they were incomplete at the time the Title III petition was filed, (k) any post-petition transfer of SUT revenues to non-Commonwealth entities violates the automatic stay, (l) Act 91 is unconstitutional because it evades the debt provisions of the Commonwealth Constitution, and (m) the COFINA structure is unconstitutional because Act 91 was enacted in violation of the balanced budget clause of the Commonwealth Constitution.  Adversary Proceeding, ECF No. 1.

17.    The Commonwealth Agent further asserted in the Complaint that the Pledged Sales Taxes are property of the Commonwealth because (a) the COFINA enabling legislation (including Act 91) did not grant COFINA a right to future revenues, merely an unsecured promise that such revenues would be transferred to COFINA in the future and, even if there were

a security interest, it is unperfected and therefore avoidable under Title III and the Bankruptcy Code, and (b) the COFINA structure is unconstitutional because the result of the enabling legislation was to violate the debt limit, priority of payment to public debtholders, and balanced budget provisions of the Commonwealth Constitution.  Adversary Proceeding, ECF No. 1.

18.    On September 15, 2017, the COFINA Agent filed her answer to the Complaint (as amended on October 30, 2017, the "Answer and Counterclaims"), vigorously disputing the Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory judgments that, among other things: (a) the COFINA enabling legislation is constitutional and thereby made the Pledged Sales Taxes transferred to COFINA and the fund into which it was deposited property of COFINA and not "available resources" of the Commonwealth, or in the alternative, COFINA has a perfected unavoidable lien in the Pledged Sales Taxes; (b) the Commonwealth's misappropriation of the Pledged Sales Taxes and COFINA's account violates the United States and Commonwealth Constitutions; (c) the Fiscal Plan Act violates PROMESA; (d) Act No. 84-2016, which purportedly amended the COFINA enabling legislation to decrease the amount of first revenues of the SUT that COFINA receives from 6% to 5.5%, violates PROMESA, and COFINA is entitled to 6% of the first revenues of the SUT until the Pledged Sales Tax Base Amount is reached each year; (e) the Resolution constitutes a contract among COFINA, BNYM and the COFINA creditors, and the Commonwealth committed tortious interference with respect to such contract; (f) to the extent the Commonwealth prevails on its theories that the COFINA structure violates the Commonwealth's Constitution, the Commonwealth fraudulently induced COFINA creditors to invest in COFINA bonds; and (g) any non-COFINA debt, including GO Bonds, issued in violation of the debt limit provisions in the Commonwealth Constitution are not entitled to priority under the Commonwealth

11

Constitution's debt priority provisions.  <u>Adversary Proceeding</u>, ECF No. 27.  The Answer and Counterclaims also sought injunctive relief, including that: (y) the Court impose a constructive trust in COFINA's favor over the Pledged Sales Taxes in order to prevent the Commonwealth's alleged tortious interference and fraud with respect to such revenues; and (z) the Court enter an order permanently enjoining the Commonwealth from, among other things, diverting or transferring the Pledged Sales Taxes away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues.  *Id.*

19.     In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO Debt bondholders, as well as other parties that had been permitted to intervene in the Adversary Proceeding, filed counterclaims and cross-claims regarding ownership of the Pledged Sales Taxes.  <u>Adversary Proceeding</u>, ECF Nos. 88, 90, 94.

20.     On December 21, 2017, the Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims and counterclaims as outside the scope of the Commonwealth-COFINA Dispute, as well as several claims asserted by the intervening parties (the "<u>Dismissed Claims</u>").  <u>Adversary Proceeding</u>, ECF No. 167 (the "<u>Scope Order</u>").  The Court found that the scope of the dispute, as defined in the Procedures Order, is confined to whether the Commonwealth or COFINA owns the Pledged Sales Taxes. The Dismissed Claims, the Court found, were outside the scope of the Commonwealth-COFINA Dispute because they presumed either the Commonwealth or COFINA's ownership of the Pledged Sales Taxes or addressed other issues that were not antecedent to the ownership question.

21.     Following entry of the Court's Scope Order and subsequent order permitting the Commonwealth Agent to amend the Complaint, the remaining claims asserted by the Commonwealth Agent are that:  (a) Act 91 did not transfer present ownership of future SUT revenues to COFINA, (b) Act 91 did not assign to COFINA any right to receive future SUT revenues, and (c) the COFINA enabling act was designed to, and did, violate the debt and balanced budget provisions of the Commonwealth Constitution.  The remaining claims asserted by the COFINA Agent are that the COFINA enabling legislation is constitutional and the Pledged Sales Taxes and Dedicated Sales Tax Fund are COFINA's property.

22.     On February 21, 2018, the Agents and several of the intervening parties filed cross-motions for summary judgment.  The Commonwealth Agent asserted that (a) Act 91 did not transfer to COFINA a present property interest in potential future tax revenues because no such property exists to be transferred; (b) there was no "true sale" of future tax revenues to COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Commonwealth Constitution.  Adversary Proceeding, ECF Nos. 321, 322, 323, 324.  The intervening parties which filed cross-motions in favor of the Commonwealth asserted, among other things, that:  (a) the scope of the Adversary Proceeding is limited to ownership of post-

13

petition and future SUT revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT revenues is not an asset that can be transferred; (d) the Pledged Sales Taxes remain property of the Commonwealth because they are "available resources" under the Commonwealth Constitution; and (e) Act 56 did not transfer ownership of the Pledged Sales Taxes to COFINA. Adversary Proceeding, ECF Nos. 300, 314.

23.    Conversely, in her motion for summary judgment, the COFINA Agent asserted, among other things, that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Taxes to COFINA through Act 91 and that the tax revenue stream and the account into which it is deposited are not "available resources" of the Commonwealth.    Adversary Proceeding, ECF Nos. 312, 316, 317.  The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged Sales Taxes to COFINA was valid under the Commonwealth Constitution, (b) the Pledged Sales Taxes are not "available resources" under the Commonwealth Constitution, (c) it is not "legally impossible" to transfer future SUT revenues, and (d) the plain terms of COFINA's enabling legislation clearly transferred ownership of the Pledged Sales Taxes to COFINA. Adversary Proceeding, ECF Nos. 307, 318, 320, 325.  The Court heard argument on the cross-motions for summary judgment on April 10, 2018.

24.    On February 26, 2018, the COFINA Agent filed the *Motion and Incorporated Memorandum of Law of the COFINA Agent to Certify Questions Under Puerto Rico Law to the Supreme Court of Puerto Rico*, Adversary Proceeding, ECF No. 329 (the "Certification

Motion"),[9] seeking an order certifying certain questions under Puerto Rico law to the Supreme Court of Puerto Rico (the "PR Supreme Court").   Specifically, the COFINA Agent sought to certify the following questions to the PR Supreme Court (among others):

> *Whether Act 56, which amended Act 91, transferred ownership to COFINA of the Dedicated Sales Tax Fund (as defined in Act 91) and all future Pledged Sales Taxes.*
>
> *Whether the Puerto Rico Legislative Assembly's transfer of ownership to COFINA of the Dedicated Sales Tax Fund and the Pledged Sales Taxes in return for bond proceeds was invalid as a matter of law (as alleged by the Commonwealth Agent) because the COFINA enabling legislation violates certain provisions of the Commonwealth Constitution.*
>
> *Whether the enactment of the COFINA enabling legislation as a means to finance the repayment of the Commonwealth's outstanding debt or the amendment of Act 91 in 2009 to expand the permitted uses of proceeds of the Existing Securities were invalid because they violated the Commonwealth Constitution.*
>
> *Whether the Puerto Rico Legislative Assembly's enactment of the COFINA enabling legislation, which provided that the Dedicated Sales Tax Fund and Pledged Sales Taxes transferred to COFINA shall not be resources available to the Commonwealth, was invalid as a matter of law (as alleged by the Commonwealth Agent) because the COFINA enabling legislation violates certain provisions of the Puerto Rico Constitution.*

Certification Motion ¶¶ 1–5.

25.   A number of parties, including the Oversight Board, the Commonwealth Agent, and AAFAF, opposed the Certification Motion, asserting, among other things, that the proposed questions are not proper for certification because they involve issues of federal law, the proposed questions will not resolve the Commonwealth-COFINA Dispute, certification is an improper attempt at forum shopping and not in the best interest of the Debtors, including COFINA, and certification would delay resolution of the Commonwealth-COFINA Dispute.   Adversary Proceeding, ECF Nos. 339, 421, 437, 438.   Ambac and National also filed a limited objection to

---

[9]   The COFINA Senior Bondholders' Coalition filed a statement in support of, and joinder to, the Certification Motion.   Adversary Proceeding, ECF No. 332.   The Mutual Fund Group and the Puerto Rico Funds filed a similar motion adopting and incorporating the arguments in the Certification Motion.   Adversary Proceeding, ECF No. 331.

the Certification Motion, while seeking, in the alternative, to certify an alternative formulation of the questions in the Certification Motion. Adversary Proceeding, ECF No. 421, at 7–9.

26. On May 24, 2018, the Court denied the Certification Motion, holding that certification is unwarranted because (a) the issues underlying the Commonwealth-COFINA Dispute, as defined in the Procedures Order, present a mixed question of federal and Puerto Rico law, and (b) certification would delay resolution of the Commonwealth-COFINA Dispute. Adversary Proceeding, ECF No. 483.

27. Concurrent Mediation of Commonwealth-COFINA Dispute. While the Commonwealth-COFINA Dispute continued to be litigated in the Adversary Proceeding, various parties to the dispute simultaneously engaged in mediation. In the weeks following the conclusion of arguments in connection with the cross-motions for summary judgment, and with the specter of a determination looming, the Agents recommenced court-sanctioned mediation in the hope of resolving the Commonwealth-COFINA Dispute. Through the auspices of the mediation team, the Agents reached an understanding set forth in that certain Agreement in Principle, (the "Agreement in Principle"). On June 5, 2018, the Agents jointly moved to hold the Court's decision on the pending cross-motions for summary judgment in abeyance for sixty (60) days due to their agreement, a period deemed necessary to definitively document the understanding developed. Adversary Proceeding, ECF No. 484 (the "Abeyance Motion"). The Agents publicly announced the terms of the Agreement in Principle on June 7, 2018. Adversary Proceeding, ECF No. 486-1. At its core, the Agreement in Principle provides for the allocation of the Pledged Sales Taxes between the Commonwealth (46.35%) and COFINA (53.65%), respectively, and for SUT revenues collected on or after July 1, 2018 to be deposited into an escrow account pending approval by the Court of the settlement contemplated in the Agreement

16

in Principle. However, various parties, including the Oversight Board and AAFAF, asserted that, among other things, the Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures Order by attempting to, among other things, dictate terms of plans of adjustment in the Title III Cases and limit the availability and use of funds. Adversary Proceeding, ECF Nos. 487, 488, 489, 490, 491.

28.    On February 1, 2018, the Oversight Board and the Agents filed a joint motion seeking to expand the authority, and the coverage of orders relating to immunity protection and compensation of the Agents and their professionals, in connection with the mediation of the Dismissed Claims, Adversary Proceeding, ECF No. 274, which the Court granted pursuant to an order entered on February 10, 2018, Adversary Proceeding, ECF No. 284.

29.    COFINA Plan Mediation. Beginning in July, and building upon the Agreement in Principle, the Oversight Board engaged in over two weeks of mediation among interested parties on a COFINA plan of adjustment and the attendant issues that needed to be resolved for a viable plan to be proposed, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action and which are preliminarily addressed by such bondholders in connection with the negotiation of the Agreement in Principle. As a result of the mediation, on August 8, 2018, the Oversight Board announced that it had reached an agreement with certain holders and insurers of Existing Securities on the economic treatment of Existing Securities and the terms of new exchange securities for a proposed COFINA plan of adjustment consistent with the Oversight Board's authority pursuant to PROMESA and the Procedures Order.[10]

---

[10]  Financial Oversight and Management Board, Press Release, *Oversight Board Reaches Deal with COFINA Bondholders* (Aug. 8, 2018).

30.     The Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del Patio, Inc. (collectively, the "Settlement Parties") entered into that certain Plan Support Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that contemplates, among other things, (a) terms to the compromise and settlement of the Commonwealth-COFINA Dispute developed by the Oversight Board and consistent with the terms of the Agreement in Principle, which, among other things, allocates an amount up to fifty-three and sixty five one-hundredths percent (53.65%) of the annual Pledged Sales Tax Base Amount to COFINA, and confirms that COFINA is the sole owner of the amounts held at BNYM as of June 30, 2018, and (b) terms of the treatment between junior and senior Existing Securities to resolve the dispute between holders of junior and senior Existing Securities regarding whether or not a default had been triggered under the Existing Bond Resolution.

31.     After further mediation, on September 20, 2018, the Settlement Parties amended and restated the Original Plan Support Agreement (the "A&R Plan Support Agreement") to include additional holders of Existing Securities, all of whom also hold significant amounts of GO Bonds and were among the plaintiffs in the *Lex Claims Litigation*.

32.     The Plan Resolves All of the Issues Which Led to the Title III Petition, Not Merely the Commonwealth-COFINA Dispute.  The Plan resolves the two major precipitators of COFINA's Title III Petition:  (1) the dispute between Commonwealth creditors Debt and holders of Existing Securities regarding COFINA's entitlement to receive the SUT; and (2) the *intra*-COFINA dispute between holders of junior and senior Existing Securities regarding whether or not a default had been triggered under the Existing Bond Resolution.  This global settlement resolves all issues relating to the COFINA structure and possible defaults thereunder, including

the dismissal of the Interpleader Action, with prejudice, except for claims by Ambac and Whitebox against BNYM for gross negligence, willful misconduct, or intentional fraud.

33.     The objectors' myopic focus on the Commonwealth-COFINA Dispute ignores the settlement of the myriad other issues relating to COFINA's Title III Case.  Accordingly, to intimate that the options for all COFINA bondholders under the Plan are bimodal—either both junior and senior holders get paid in full, or are wiped out entirely—falls well short of understanding the complexity and interrelation of the issues being compromised pursuant to the Plan.  Likewise, to attempt to apply applicable law without consideration of these resolutions is inappropriate and misleading.  The Debtor submits that when the aforementioned facts are taken into account, the Court must reach the conclusion that the Plan complies with all applicable requirements under PROMESA and the Bankruptcy Code, and should be confirmed.

**B.  VARIOUS OBJECTORS LACK STANDING TO OBJECT TO THE PLAN**

34.     Various asserted creditors of the Commonwealth, none of whom are COFINA creditors, have filed Objections to the Plan, including (a) the Unions Objection (filed by two labor unions that represent certain employees of the Commonwealth and its instrumentalities (exclusive of COFINA)); (b) the PROSOL-UTIER Objection (filed by a labor organization representing certain employees and retirees of the Commonwealth and its instrumentalities (exclusive of COFINA)); and (c) the Natal Objection (filed by (i) René Pinto Lugo (a purported creditor of the Commonwealth), (ii) VAMOS (an organization providing educational and logistical support to community based organizations), and (iii) various labor unions that represent certain employees of the Commonwealth and its instrumentalities (exclusive of COFINA), (collectively, the "Commonwealth Creditors").  As explained below, these entities or persons are creditors of the Commonwealth, not COFINA, and, therefore, lack prudential standing.

19

35.     The Commonwealth Creditors Lack Prudential Standing to Object to the Plan.  To
have prudential standing, a party must demonstrate its claims are "premised on [their] own legal
rights (as opposed to those of a third party)."  *Katz v. Pershing, LLC*, 672 F.3d 64, 72 (1st Cir.
2002) (internal citations omitted).  This Court has already held a party lacked prudential standing
to appear and be heard in an action where it sought to assert the rights of another.  *Bank of New
York Mellon v. Puerto Rico Sales Tax Fin. Corp. (In re Fin. Oversight & Mgmt. Bd. for Puerto
Rico)*, 301 F. Supp. 3d 306 (D.P.R. 2017).  Therein, the Ad Hoc Group of General Obligation
Bondholders in the Commonwealth's Title III proceedings (the "GO Group") sought to intervene
in the Interpleader Action filed by the Bank of New York Mellon against COFINA.  The Court
denied intervention, however, ruling that members of the GO Group lacked prudential standing
to intervene in such Interpleader Action because they are creditors of a creditor and, thus, have
no direct claim over the interpleaded funds at issue.  *Id.* at 311–12.  Furthermore, the Court flatly
rejected the GO Group's argument that the Adversary Proceeding against COFINA would
impact their property rights because of the possibility of "the Commonwealth's failure to prevail
on its claims vis-á-vis COFINA, or the failure by the CW as the prevailing party to apply
sufficient funds to cover its outstanding obligations on GO Bonds."  *Id.*

36.     The Commonwealth Creditors fail to explain how denial of confirmation of the
Plan will redress their alleged injuries, which purportedly stem from actions of the
Commonwealth, including entering into the Settlement.  *See, e.g.*, PROSOL-UTIER Objection at
5 ("The Commonwealth's Fiscal Plan certified by the FOMB, on its face, does not comply with
such requirement [to define "essential services" as required by section 201 of PROMESA] . . .").

Any claims regarding ownership of the SUT are claims of the Commonwealth, which were asserted by the Commonwealth Agent.[11]

37.     Accordingly, as mere creditors of a creditor, if at all, the Commonwealth Creditors lack prudential standing to raise their objections. *See also In re Lifeco Inv. Grp., Inc.*, 173 B.R. 478, 487 (Bankr. D. Del. 1994) ("I find no statutory or judicial support to conclude that a creditor of a creditor has standing in a bankruptcy case. Indeed, numerous cases state the contrary."). The Commonwealth Creditors had the opportunity to object to the Settlement Motion in the Commonwealth's Title III Case, and any timely filed objections will be heard in connection therewith.

### C.  THE CONSTITUTIONAL CHALLENGES TO THE PLAN ARE WITHOUT MERIT.

#### 1.  Contracts Clause.

38.     The Hein Objection asserts that approval of the Plan violates the Contract Clause because the Plan will be "implemented through actions of the Puerto Rico legislature" and allegedly impairs bondholders' rights. *See* Hein Objection at 18. This argument is mistaken.

39.     The Contract Clause provides that "[n]o *State* shall . . . pass any . . . Law impairing the Obligation of Contracts…." U.S. Const. art. I, § 10, cl. 1 (emphasis added). Thus, to potentially implicate the Contract Clause, the challenged conduct must involve *legislative* action, *see, e.g.*, *United Auto., Aerospace, Agric. Implement Workers of Am. Int'l Union v. Fortuño*, 633 F.3d 37, 41 (1st Cir. 2011) ("UAW"), by a state or territorial legislature, *see, e.g.*, *Union de Trabajadores de la Industria Electrica y Riego, Inc. v. Puerto Rico Elec. Power Auth.*, Case No. 17-0229 in Case No. 17-BK-4780-LTS, ECF No. 62, slip op. at 24 (D.P.R. Sept. 26,

---

[11] Accordingly, confirmation of the Plan will bind the Commonwealth and other parties, like the Commonwealth Creditors, who assert injuries arising from the Commonwealth's actions.

21

2018) (the "UTIER Decision") ("The Contracts Clause, by its terms, applies only to measures that are state laws.").

40.    Approval and confirmation of the Plan, however, will be done by a court (not a legislature) pursuant to PROMESA, a federal (not a state) law.  The Contract Clause does not apply to federal laws, *see, e.g.*, *PBGC v. R.A. Gray & Co.*, 467 U.S. 717, 733 (1984) (Contract Clause not applicable to federal government and not part of Fifth Amendment due process), or to non-legislative action, *see, e.g.*, *UTIER* Decision, slip op. at 25 (Oversight Board's fiscal plans are not state legislation).  Moreover, a court's approval of a reorganization plan under federal law cannot violate the Contract Clause because the very nature of any bankruptcy or reorganization plan involves the impairment of contracts and creditor relationships.  *See, e.g.*, *In re City of Detroit*, 504 B.R. 191, 231 (Bankr. E.D. Mich. 2013) (calling argument "frivolous"); *Ass'n of Retired Emps. of City of Stockton v. City of Stockton (In re City of Stockton)*, 478 B.R. 8, 15 (Bankr. E.D. Cal. 2012).

41.    To the extent the Hein Objection contends that the Contract Clause is implicated by any actions of the Oversight Board, which is deemed an entity within the Commonwealth government under PROMESA § 101(c), that contention is similarly unavailing.  The Oversight Board is not a legislative actor.  Indeed, the Court has already rejected Hein's argument [at 19] that the Oversight Board's fiscal plans are "laws" for purposes of the Contract Clause.  *UTIER* Decision, slip op. at 25; *Ambac Assurance Corp. v. Commonwealth of Puerto Rico (In re Fin. Oversight & Mgmt. Bd. for Puerto Rico)*, 297 F. Supp. 3d 269, 285 (D.P.R. 2018).

42.    To the extent the Hein Objection focuses on the New Bond Legislation (attached as Ex. F to Disclosure Statement), rather than on the Plan, as the predicate for any alleged Contract Clause violation, his argument is misguided for multiple reasons.  First, Hein has filed

22

an Objection to the Plan, not to the statute.   Plenty of other creditors have filed adversary
proceedings challenging Commonwealth statutes, but Hein chose not to do so.   The statute here
is merely referenced in the Plan that is the basis for Hein's Objection, and any approval of the
Plan is not subject to the Contract Clause for the reasons discussed above.   Second, the statute
itself does not impair Hein's alleged contractual rights, because it does not take effect unless and
until this Court confirms the Plan.  *See, e.g.*, New Bond Legislation art. 1.2(m) (defining statute's
Effective Date as "the date on which the [COFINA] Plan of Adjustment becomes effective").
Thus, any alleged impairment would be effected by a federal court under federal law, not by a
territorial statute.   Third, as the New Bond Legislation makes clear, the statute embodies a
settlement of a federal lawsuit—a resolution to which COFINA and multiple other parties
agreed.  *See, e.g.*, *id.* at 3 ("The Legislative Assembly is now called upon to implement the
agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the
provisions of Act No. 91").   COFINA's agreement to settle the Commonwealth-COFINA
Dispute (the "Settlement") is not legislative action subject to the Contract Clause.

43.   Moreover, even if the New Bond Legislation could be analyzed in isolation under
the Contract Clause without regard to the litigation settlement and the Plan, it still would not be
unconstitutional because the Contract Clause's "prohibition must be accommodated to the
inherent police power of the State to safeguard the vital interests of its people." *Energy Reserves
Grp., Inc. v. Kansas Power & Light Co.*, 459 U.S. 400, 410 (1983) (internal quotations omitted).
To establish a claim, a plaintiff must demonstrate not only an allegedly substantial contractual
impairment, but also that the alleged impairment was not "'reasonable and necessary to serve an
important government purpose.'"   *UTIER* Decision, slip op. at 26 (quoting *UAW*, 633 F.3d at
41).   Even when a government impairs its own contracts, the legislature's choices are still

23

entitled to "meaningful deference."  *UAW*, 633 F.3d at 44; *accord, e.g.*, *Diaz-Diaz v. Fortuño-Burset*, 2012 WL 2498912, at *3 (D.P.R. June 27, 2012).

44.     Here, the Legislature enacted the law in the context of "an unprecedented fiscal and economic crisis" in Puerto Rico, and the law was designed to "enhance Puerto Rico's credibility" with the financial markets and other constituents.  New Bond Legislation at 1.  The Legislature was faced with a choice between (i) the risk that the Commonwealth or COFINA would lose one hundred percent (100%) of SUT revenues to which it claimed to be entitled, while also incurring extensive litigation costs, and (ii) a compromise that allocated 53.65% of those revenues to COFINA and 46.35% to the Commonwealth, provided funds to the Commonwealth to address essential services, preserved the COFINA structure, and ended the incurrence of significant litigation expenses.  Faced with these difficult decisions, the Legislature chose to enact a law that "puts an end to the costly litigation between the agents appointed by the Oversight Board and settles the claims of COFINA's bondholders, while also making clear the original legislative intent of [the 2006 COFINA legislation]."  *Id.* at 2.  The Legislature also viewed the law as "necessary to enable Puerto Rico's return to the capital markets."  *Id.* at 2–3.

45.     These measures were reasonable and necessary to serve important governmental purposes, and Hein has not met his burden of pleading otherwise, particularly in light of the meaningful deference owed to the Legislature's policy choices.   Hein's main proposed "alternative" [at 28–29]—that restructuring of COFINA's debt is not necessary in the first place because COFINA's structure is constitutional and COFINA therefore owns all the tax revenues—is not an alternative.  It is a legal argument which the Commonwealth Agent fiercely disputed—and which both Agents ultimately chose to settle to avoid the risk of total loss.  Other "alternatives" [at 29–32]—that Puerto Rico actually does not bear too much debt and that its

24

residents actually are not overtaxed—once again do not propose specific, alternative means to address what the Legislature and virtually everyone else in the United States (including members of Congress) perceive to be enormous problems.  The remaining alternatives [at 32—35]—cut spending and raise more money—are the kinds of vacuous generalities that courts have routinely rejected.  *See, e.g.*, *UAW* 633 F.3d at 47 (obtaining "federal aid to help offset [Puerto Rico's] deficit" does not meet the pleading burden); *see also Buffalo Teachers Fed'n v. Tobe*, 464 F.3d 362, 372 (2d Cir. 2006) (rejecting argument that tax increases or cuts to other programs were "alternatives" to challenged contractual impairment).

### 2. Takings Clause

46.     Several Objections complain that the Plan effectuates a taking of property without just compensation by eliminating subordinate bondholder liens.  *See* Hein Objection at 20–21; Elliott Objection at 6–8; GMS Objection at 14.  This objection falls short.

47.     The Plan does not eliminate liens.  It provides the junior bondholders with a right to payment commensurate with the actual value of what they claim is their property.  As the Court is well aware, that is all the Takings Clause requires.  *See Wright v. Union Cent. Life Ins. Co.*, 311 U.S. 273, 278 (1940) (upholding bankruptcy statute where "[s]afeguards were provided to protect the rights of secured creditors, throughout the proceedings, to the extent of the value of the property" as "[t]here is no constitutional claim of the creditor to more than that.").  Objectors may be disappointed that the Plan provides them with less than 100% recovery, but that consequence flows from an objective assessment of underlying facts and law at issue in the Commonwealth-COFINA Dispute and the Interpleader Action, and the risks the objectors face.  Had the COFINA Agent litigated and lost—or had junior COFINA creditors litigated and lost— the Plan would not have provided Objectors with any recoveries at all.

48.     Cases cited by objectors are inapposite.  *United States v. Security Industrial Bank*, 459 U.S. 70, 81 (1982), holds only that a bankruptcy law should not be construed to apply retroactively to destroy property rights absent "an explicit command from Congress."  Here, such an "explicit command" exists in PROMESA § 2(b)(2); *see FOMB v. Altair Global Credit Opportunities Fund (A), LLC*, Adv. Proc. No. 17-213-LTS in Case No. 17 BK 3566-LTS, ECF No. 215 (Aug. 17, 2018) at 26–27 (distinguishing *Security Industrial* because Congress clearly intended PROMESA to apply retroactively).  In addition, the challenged statute in *Security Industrial* would have resulted in a "complete destruction of the property right" at issue, 459 U.S. at 75.  Again, here, although not even a statute, assuming the Settlement and the Plan are approved, COFINA bondholders would still retain a significant interest in their alleged rights to the Pledged Sales Taxes.

49.     Moreover, the Plan itself does not eliminate any property rights that survive the resolution of the Commonwealth-COFINA Dispute.  *Louisville Joint Stock Land Bank v. Radford*, 295 U.S. 555, 594-95 (1935), which *Security Industrial* cites, holds only that bankruptcy legislation that forced a creditor to accept a steep discount from the value it could realize on its collateral at a foreclosure sale, and completely eliminated other creditor protections, violated the Takings Clause.  But, that is not the case here—again.  Objectors' disappointment is not caused by the Plan or PROMESA, but rather by the compromise and settlement of the complex issues underlying the Commonwealth-COFINA Dispute and the Interpleader Action.

50.     *Armstrong v. United States*, 364 U.S. 40, 48 (1960), holds that the forced transfer of all work and materials on certain personal property was a taking of the materialmen's liens thereon; again, the Plan does not do this.  The remaining "Takings" cases cited are likewise

inapposite.  *See Nollan v. Cal. Coastal Comm'n*, 483 U.S. 825, 835 (1987) (forcing coastal

property owners to grant easement to public constituted a taking); *Pa. Coal Co. v. Mahon*, 260

U.S. 393, 415 (1922) (regulation that destroyed existing right to mine real property constituted a

taking).

51.    Furthermore, the bondholders do not have a "takings" claim because they have no

property interest in future SUT revenues and only have a property interest after such revenues

come into existence.   One court explained that because "after-acquired property is not in

existence at the time of the agreement," the most a creditor "could have acquired . . . was a

vested interest, which, had the property ever come into existence, would have become a vested

property right."   *First Nat'l Bank of Colo. Springs v. Hamilton (In re Hamilton)*,

18 B.R. 868, 870 (Bankr. D. Colo. 1982).  The Plan does not effect a "taking" of the COFINA

bondholders' property because a property interest does not arise until SUT revenues come into

existence and the bondholders' liens attach.

52.    Additionally, certain objectors contend that PROMESA violates the Takings

Clause because bondholders bought the bonds when Puerto Rico and its instrumentalities were

ineligible for bankruptcy and, therefore, could not have expected a bankruptcy law to apply to

them.  *See* GMS Objection at 13.  This is not the case.

53.    First, as previously discussed, no property is being taken; junior bondholders are

protected "to the extent of the value of the property," which was determined by the Settlement,

not by the Plan.  *Wright*, 311 U.S. at 278.  Second, the notion that bondholders bought COFINA

bonds in reliance on the inability of the Commonwealth and its instrumentalities to obtain

Chapter 9 or similar protection is unreasonable (as well as speculative).  The Commonwealth had

that ability before 1984, and, by enacting PROMESA, Congress merely corrected an anomaly in

the law, which had inexplicably discriminated against Puerto Rico.  That correction could have

been expected sooner or later—especially in the context of a territory, over which Congress has

absolute authority under the Territories Clause.  *See, e.g.*, *In re Fin. Oversight & Mgmt. Bd. for*

*Puerto Rico*, 318 F. Supp. 3d 537, 545–47 (D.P.R. 2018), *appeal pending*, No. 18-___ (1st Cir.);

*see also Connolly v. Pension Benefit Guar. Corp.*, 475 U.S. 211, 227 (1986) ("Those who do

business in the regulated field cannot object if the legislative scheme is buttressed by subsequent

amendments to achieve the legislative end.").  Indeed, in enacting PROMESA, Congress chose

to exercise its Territories Clause powers, *see* PROMESA § 101(b)(2), rather than its Bankruptcy

Clause authority.

54.     But, even if a further Takings Clause analysis were appropriate, there is no

"taking" here.  Courts have identified two classes of takings:  *per se* takings and regulatory

takings.  *Lingle v. Chevron U.S.A., Inc.*, 544 U.S. 528, 538 (2005).  *Per se* takings are limited to

cases where the "government requires an owner to suffer a permanent physical invasion of her

property," or its regulations "completely deprive an owner of '*all* economically beneficial us[e]'

of her property."  *Id.* (citation omitted).  Neither scenario applies here:  the Plan does not require

or contemplate any "physical invasion" of any property, and it does not completely deprive any

bondholder of all of its allegedly relevant "property" interest.  *See Connolly*, 475 U.S. at 224–25

(analyzing claim of "taking" of contractual right as a regulatory taking); *Buffalo Teachers Fed'n*

*v. Tobe*, 464 F.3d 362, 374 (2d Cir. 2006) (same).

55.     The analysis therefore must proceed under the three-part *Penn Central* inquiry for

regulatory takings, which requires consideration of (i) "the economic impact of the regulation on

the claimant," (ii) "the extent to which the regulation has interfered with distinct investment-

backed expectations," and (iii) "the character of the governmental action."  *Penn Cent. Transp.*

*Co. v. City of New York*, 438 U.S. 104, 124 (1978); *see also Lingle*, 544 U.S. at 538–39; *Connolly*, 475 U.S. at 225; *McAndrews v. Fleet Bank of Mass., N.A.*, 989 F.2d 13, 18-19 (1st Cir. 1993). The party alleging a regulatory taking bears a "heavy burden." *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470, 493 (1987).

56.     Applied here, these factors show there has been no "taking." First, the economic impact on the junior bondholders due to the Plan itself (or PROMESA)—as opposed to the Settlement and the underlying law and facts—is minimal. Second, as explained above, COFINA bondholders had no justification to base their "expectations" on the belief that Commonwealth instrumentalities would always be treated anomalously as to eligibility for bankruptcy protection. Moreover, investors in bonds sold by issuers with duties to the public always "assume[] the risk that in any depression or any reorganization the interests of the public would be considered as well as theirs." *New Haven Inclusion Cases*, 399 U.S. 392, 491–92 (1970) (citation omitted) (rejecting Takings challenge to railroad reorganization statute). Third, the character of the government action here is not self-serving or in the service of a special interest. Rather, it is a necessary part of a comprehensive effort to address an indisputable fiscal crisis.

57.     And, even if confirmation of the Plan could otherwise be regarded as a taking, junior bondholders are receiving "just compensation," because the value of their claims has been diminished for the reasons already discussed: the resolution of the hotly disputed claims in the Commonwealth-COFINA Dispute, in which COFINA bondholders risked receiving nothing at all if they lost.

### 3.  Privileges and Immunities Clause

58.     Various Objections assert that approval of the Plan violates the Privileges and Immunities Clause because the Plan includes a financial incentive for Puerto Rico residents to

elect taxable treatment without giving non-residents a similar incentive.  *See* Hein Objection at 21–22; Hein Supplemental Objection at 4–5.  No such violation has occurred.

59.     The Privileges and Immunities Clause "is not an absolute."  It does bar discrimination against citizens of other States where there is no substantial reason for the discrimination beyond the mere fact that that they are citizens of other States.  But, it does not preclude disparity of treatment in the many situations where there are perfectly valid independent reasons for it." *Toomer v. Witsell*, 334 U.S. 385, 396 (1948).  Here, the incentive for Puerto Rico residents merely compensates for the fact that they normally do not pay federal taxes, and, without the incentive, they may not elect taxable treatment.  By giving Commonwealth residents an incentive to elect the taxable bonds, the Plan attempts to make the limited number of tax-exempt bonds more readily available to non-Puerto Rico creditors who are obligated to pay federal taxes.  The incentive thus is not disparate treatment of residents of different states, but a response to the disparity that already exists between the rights of territorial and state residents, respectively.  And, the incentive actually helps non-Puerto Rico creditors by enhancing their ability to receive tax-exempt (triple tax-free) bonds.

60.     Cases cited by Objectors are wholly inapposite because they deal with state action that actually discriminated, without justification, based on residence.  *See, e.g.*, *Saenz v. Roe*, 526 U.S. 489, 501 (1999) (striking a California law limiting AFDC benefits for new residents who came to California from states with lower benefits).  Here, there is no discrimination or burden on the ability to relocate, merely a recognition of the different tax status that already exists for Puerto Rico residents under federal law—and an attempt to help non-residents by giving Commonwealth residents an incentive to accept more taxable bonds, thereby enhancing recoveries for non-residents.

### 4. **Dormant Commerce Clause**

61.     Hein also argues the Plan violates the dormant Commerce Clause because it includes an incentive for Puerto Rico residents to elect taxable treatment.  Hein Supplemental Objection at 9.  It does not.

62.     The dormant Commerce Clause prohibits certain state action that burdens interstate commerce.  *See Comptroller of Treasury of Md. v. Wynne*, 135 S. Ct. 1787, 1794 (2015).  "By prohibiting States from discriminating against or imposing burdens on interstate commerce without congressional approval, it strikes at one of the chief evils that led to the adoption of the Constitution, namely, state tariffs and other laws that burdened interstate commerce."  *Id.*  Here, however, as explained above, the incentive does not discriminate against non-Puerto Rico residents.  It merely recognizes the different tax status that already exists for Puerto Rico residents under federal law and attempts to equalize that situation by giving residents a rationale to permit additional tax-exempt (*i.e.*, triple tax-free bonds) to be distributed to non-residents.

### 5. **Due Process Clause**

63.     Hein makes the additional argument (along with Dvores) that Plan approval deprives junior bondholders of due process because they have not unanimously consented to it, did not participate in the mediation, and did not have enough time to formulate objections to the Plan.  Hein Objection at 22–25; Dvores Objection at 5.  However, consideration of the Plan has not violated the due process of any bondholder.  On the contrary, all actions were taken under the auspices of the Court and the mediation team and strict adherence to the Disclosure Statement Order and applicable laws and rules.

64.     The Due Process Clause provides that "[n]o person shall be . . . deprived of life, liberty, or property, without due process of law . . . ."  U.S. Const. amend. V; *see also id.*

31

amend. XIV § 1.   While theories of both substantive and procedural due process exist, the objectors raise only procedural issues.

65.   Procedural due process requires only "an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Hodel v. Va. Surface Mineral & Reclamation Ass'n*, 452 U.S. 264, 299 (1981) (citation omitted).  In bankruptcy, creditors "have no constitutional right to a particular form of remedy." *Neblett v. Carpenter*, 305 U.S. 297, 305 (1938).  In the plan-confirmation context, due process is met by affording interested parties notice and an opportunity to present their objections.  *See United Student Aid Funds, Inc. v. Espinosa*, 559 U.S. 260, 272 (2010).  Title III of PROMESA provides such an opportunity by incorporating into proceedings for the adjustment of debts the relevant procedural framework of the Bankruptcy Code and Rules.  *See* PROMESA §§ 301–317, 48 U.S.C. §§ 2161–2177.

66.   The junior bondholders are not being deprived of a significant property interest, for the reasons discussed in the Takings section above.  But, even if such a deprivation were to occur, the bondholders are receiving an opportunity to be heard.  Pursuant to the court orders, the Court (i) established January 2, 2019, at 5:00 p.m. (Atlantic Standard Time) as the Confirmation Objection Deadline, *id.* at 10, (ii) established January 8, 2019 at 6:00 p.m. (Atlantic Standard Time) as (a) the Voting Deadline, and (b) the Election Deadline,[12] *id.* at 13, and (iii) scheduled the Confirmation Hearing on January 16, 2019 at 9:30 a.m. (Atlantic Standard Time) [Case No. 17 BK 3284, ECF No. 302].  Thereafter, in accordance with the Disclosure Statement Order, the Debtor, by and through Prime Clerk, distributed Solicitation Packages to all holders of Claims entitled to vote under the Plan, which contained:  (i) the Confirmation Hearing Notice; (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order

---

[12] The Court later extended the Election Deadline to January 11, 2019 at 6:00 p.m. (Atlantic Standard Time) [ECF No. 400].

(without the exhibits hereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) the appropriate Elections Notice, if any; and (v) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating to distributions under the Plan; with each of the foregoing accompanied by its Spanish-language translation. *See Certificate of Service of Solicitation Materials*, dated December 12, 2018 [Case No. 17 BK 3284, ECF No. 387], at 1–3.  The Disclosure Statement Order further provided the Plan Supplement would be filed on or before December 31, 2018.

67.     Here, the objectors have submitted objections to the Plan, and the Court will hear and rule on those objections.  Additionally, the objectors have presented no authority (and there is none) suggesting they, as creditors, had a due-process right to participate in a mediation between their debtor (COFINA) and a third party.  Accordingly, Hein's objection that "rigid procedures for objections" should not be enforced because there was not enough time to formulate objections, Hein Objection at 22–23, should be overruled.  Similarly, the GMS Group's contention that the timing of the filing of the Plan Supplement denied creditors due process to evaluate such materials, GMS Supplemental Objection at 6, is misplaced.  The Debtor filed the Plan Supplement on December 31, 2018, in compliance with the Disclosure Statement Order.  Plan supplements are routinely filed prior to confirmation, and here, the Debtor filed the Plan Supplement prior to the closure of voting to provide creditors an opportunity to review it. In any event, the time to object to the timing of the filing of the Plan Supplement has passed.

6. **Equal Protection Clause**

68.     Hein and Dvores additionally argue that Plan approval would deprive junior bondholders of equal protection because the Plan includes an incentive for Puerto Rico residents to elect taxable treatment.  Hein Supplemental Objection at 8; Dvores Objection at 4.

69.     No matter how many different constitutional provisions the objectors cite, the incentive is simply a rational recognition that (i) "on-island" bondholders generally do not pay federal taxes, (ii) nonresident bondholders generally do pay federal taxes, and (iii) to increase the availability of tax-exempt bonds for nonresidents, some type of incentive would be needed to steer "on-island" residents toward the taxable bonds.  This structure does not raise any equal-protection issues under the Constitution.

70.     The Equal Protection Clause provides that "[n]o State shall . . . deny to any person within its jurisdiction the equal protection of the laws."   U.S. Const. amend. XIV § 1. "[B]ankruptcy legislation is in the area of economics and social welfare" and, as such, is upheld if supported by a merely "rational justification."  *United States v. Kras*, 409 U.S. 434, 446 (1973); *see also Lyda v. City of Detroit (In re City of Detroit)*, 841 F.3d 684, 701 (6th Cir. 2016) (rejecting equal-protection challenge under rational-basis analysis); *Wood v. United States (In re Wood)*, 866 F.2d 1367, 1370–71 (11th Cir. 1989) (classification in bankruptcy withstands equal-protection challenge if "any set of facts reasonably may be conceived to justify it").  "Whether an economic or social regulation violates the Equal Protection Clause is decided by determining whether the government classification is rationally related to a legitimate government interest." *U.S. Fire Ins. Co. v. Corporación Insular de Seguros*, 853 F. Supp. 47, 49 (D.P.R. 1994) (citing *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 440 (1985)).  "Courts review the kind of regulation involved, the criteria used in creating the classification and the nature of the government interest."  *Id.*  The Plan, including the incentives for Puerto Rico Investors and

34

Puerto Rico Institutions to elect taxable treatment, easily has a rational basis:  encouraging residents to choose the taxable bonds so that more "triple tax-free" bonds would be available for off-island residents.

### 7.  Free Speech and Vote

71.     The Natal Objection complains that the New Bond Legislation was enacted in violation of his "rights to free speech and to vote set forth in the Constitution of the Commonwealth of Puerto Rico and the Constitution of the United States of America."  Natal Objection at 3.  However, he alleges no facts and provides no legal basis for a right to be heard which would demonstrate that the Puerto Rico House of Representatives—which did not prevent him from speaking—violated any of his rights under either the Puerto Rico Constitution or the United State Constitution.

72.     Further, there are no facts to support Natal-Albelo's complaint that his constitutional right to vote was violated.  His vote was counted when determining if the New Bond Legislation passed in the Puerto Rico House of Representatives; that it was not on the prevailing side does not a constitutional violation make.

### 8.  Appointments Clause

73.     Hein asserts that the Oversight Board was appointed in violation of the Appointments Clause, so everything it has done is void.  Hein Objection at 25.  However, the Court has already rejected the Appointments Clause challenge, as the Objection acknowledges. Absent a reversal by the First Circuit, the issue has been adjudicated, and the challenge cannot be the basis for an objection.

### D.  OMNIBUS REPLY TO THE OBJECTIONS

74.     With respect to the Objections to the Plan not addressed above, the omnibus reply chart, attached hereto as **Exhibit A**, sets forth the reasons such Objections should be overruled.

Further attached hereto as **<u>Exhibit B</u>** is a certified translation of the relevant portions of the

Regulations of the Puerto Rico House of Representatives, cited in omnibus reply chart.


*[Remainder of page intentionally left blank]*

**WHEREFORE** the Debtor respectfully requests the Court overrule the objections, confirm the Plan, and grant any other relief to the Debtor as is just and proper.

Dated: January 9, 2019
      San Juan, Puerto Rico

Respectfully submitted,

*/s/  Martin J. Bienenstock*

Martin J. Bienenstock
Brian. S. Rosen
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

*/s/  Hermann D. Bauer*

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

**Exhibit A**

**Omnibus Reply Chart**

| **I.    The Plan Violates 11 U.S.C. § 1129(a)(3) Because it was Not Proposed in Good Faith** | |

| **Objection** | **Response** |
|---|---|
| 1.   Junior bondholders were excluded from negotiations and/or should have had their own representatives. | 1.   Junior bondholders were adequately represented in the negotiations of the Settlement and the Plan. |
| a.   "The sham collusion between COFINA and Puerto Rico is nothing more than a naked attempt to strip the junior bondholders of their lien protections for the benefit of creditors who do not have liens. . . . junior bondholders [were] excluded [from negotiations]."  GMS Objection ¶ 50.  *See also* Second Mangiaracina Objection at 5–6; Elliott Objection Section V.<br><br>b.   "The Oversight Board manipulatively controll[ed] both sides of the same dispute[.]"  GMS Objection ¶ 50. | The path to the proposal of the COFINA Plan involved two significant milestones that resolved issues necessary to the viability of the Plan.  First, shortly following the commencement of the Commonwealth and COFINA Title III Cases, the Oversight Board sought to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which involved the appointment of independent agents of the Oversight Board to serve separately as the respective representatives of the Commonwealth and COFINA.  Following entry of the Procedures Order, the Commonwealth Agent initiated the Adversary Proceeding.  Thereafter, the Commonwealth Agent, the COFINA Agent, and various interested parties engaged in mediation under the auspices of the Court-appointed mediation team.  The Oversight Board did not participate in this mediation nor did it have any control over the parties who could participate.  This independent process to resolve the critical issue of whether the disputed sales and use taxes are property of the Commonwealth or COFINA under applicable law ultimately culminated in the Agreement in Principle between the Commonwealth Agent and the COFINA Agent, which provided for the 53.65% / 46.35% allocation of the disputed sales and use taxes between COFINA and the Commonwealth, respectively.  The Oversight Board cannot be said to have "manipulatively controll[ed] both sides of the same dispute" (GMS Objection ¶ 50), when the resolution of the Commonwealth-COFINA Dispute derived from a process involving separate, independent agents representing the Commonwealth and COFINA and was overseen by a court-appointed mediation team—a process in which the Oversight Board had no involvement.<br><br>Second, building upon the Agreement in Principle, the Oversight Board engaged in over two weeks of mediation among interested parties to resolve, among other things, issues regarding the relative rights of senior and junior COFINA bondholders that led to the commencement of the Interpleader Action.  Namely, if an event of default under the Existing Bond Resolution had occurred, the senior bondholders would have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Furthermore, senior bondholders could have established an entitlement to the face value of their bond and a "make-whole" provision before the junior bondholders received any distributions.  Independent of the validity of the transfer of certain sales and use taxes to COFINA, |

1

such acceleration would require the senior bondholders to be paid in full prior to junior bondholders being paid a penny.[1]

This mediation, again, was led by the court-appointed mediation team, and involved various COFINA creditor constituencies, including those representing significant junior COFINA bondholder interests. Indeed, Assured, an insurer of approximately $274 million in "First Subordinate" Existing Securities, is completely aligned with the economic interest of the junior COFINA bondholders and has no exposure, either through insurance coverage or beneficial ownership, to senior COFINA bonds. Assured participated in plan mediation and was a party to the A&R Plan Support Agreement. Additionally, retail COFINA bondholders were represented throughout the process by retail or mutual funds, representing the interests of mainland and "on-island" bondholders, and Bonistas, advocating for the interests of Puerto Rico resident bondholders, all signatories to the A&R Plan Support Agreement that included terms for the treatment of senior and junior COFINA bondholders to settle the issues of the relative rights between the senior and junior COFINA bondholders. This settlement was subsequently incorporated into the Plan. The good faith of the entire process is illustrated in many instances, perhaps most salient being the multitude of creditors that executed the A&R Plan Support Agreement. Cumulatively, such parties hold, own, beneficially own, or insure approximately an aggregate $5.6 billion in senior COFINA bonds, and $3.7 billion in junior COFINA bonds.

In the context of chapter 9 cases, courts consider the following factors to determine whether a plan was proposed in good faith: (i) "[an] almost complete level of consensus in support of the plan among the [debtor's] major creditor groups[,]" see *In re City of Detroit*, 524 B.R. at 249, (ii) a commitment and ability to implement the plan, *see id.*, and similarly-situated creditors sharing the pain equally. *See In re City of San Bernardino, California*, Case No. 12-28006-MJ, at 18–19 (Bankr. C.D. Cal. Feb. 7, 2017) [ECF No. 2164]. All such factors are present in COFINA's Plan. All of COFINA's major creditor groups accept the Plan, and the Plan has been accepted by every single class other than Class 10 (Section 510(b) Subordinated Claims), which was deemed to reject the Plan. There is no question COFINA has the commitment and ability to implement the Plan given, among other things, the enactment of the New Bond Legislation and all of the documentation incorporated into the Plan Supplement that provides for the means of implementation of the Plan. Lastly, all of COFINA's creditors are sharing the pain according to their respective legal entitlements.

The Plan represents the culmination of months of intensive negotiations and discussions among all parties in interest in an independently driven process by the court-appointed mediation team, and the Plan was proposed with the legitimate and honest purpose of maximizing the value for all

---

[1] See paragraphs 5-12 of the Reply for a more detailed description of the Interpleader Action.

| | |
|---|---|
| | creditors of COFINA. All of the parties involved in the formulation of the Plan have acted in good faith, and the Plan has been proposed in good faith. Accordingly, the Plan satisfies Bankruptcy Code section 1129(a)(3). |
| 2. <u>The Settlement and Plan authorize the attack of taxes the Commonwealth itself authorized.</u><br><br>a. "[T]o allow the Commonwealth and COFINA to contest the Statutory Lien would be contrary to the doctrine of one's own acts ('doctrina de actos proprios') . . . . "[T]he Plan violates the doctrine of one's own acts ('doctrina de actos proprios') that Puerto Rico itself has established, *see Vivoni Farage, supra*, 179 DPR 990 (2010)." GMS Objection ¶¶ 37, 51-52. | 2. <u>Neither the Oversight Board nor COFINA is violating its own acts.</u><br><br>The compromise and settlement of the Commonwealth-COFINA Dispute resolves the issue of the ownership of certain sales and use taxes purportedly pledged by COFINA to secure debt. This issue arose prior to the commencement of the COFINA Title III Case in actions *commenced by GO Bondholders*, with holders and insurers of Existing Securities participating in such litigation. Namely, on July 20, 2016, certain holders of GO Bonds filed a complaint with the Court arguing, among other things, that the Commonwealth Constitution requires the Commonwealth to pay GO Debt ahead of any other expenditure. *Lex Claims, LLC v. Garcia-Padilla*, Case No. 16-2374-FAB (D.P.R. July 20, 2016). They allege the Pledged Sales Taxes are an "available resource" and COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on available resources and related constitutional limitations on the quantity of public debt the Commonwealth was permitted to issue.<br><br>The GMS Objection misunderstands the nature of the Commonwealth-COFINA Dispute, which involves the ownership of certain sales and use taxes purportedly pledged by COFINA to secure its debt. |
| 3. <u>The Senior Bondholders have not acted in good faith.</u><br><br>a. "The large institutional investors who make up the Senior Coalition took advantage of the depressed bond market (that they fraudulently created). These investors now stand to benefit because of their own self-dealing. . . . As if not conflicted enough, the Senior Coalition also has a position in GO bonds. . . . For all practical purposes the Plan as proposed, which favors Senior bondholders at the expense of Juniors, is a product of the Senior Coalition's conflicted negotiating position" Elliott Objection ¶¶ 60-61, 68. | 3. <u>Bald allegations of fraudulent acts cannot be sustained.</u><br><br>Elliott makes no specific allegations as to what actions the Senior Coalition took to "fraudulently create[]" the depressed bond market. Further, while it is true that certain members of the Senior Coalition, and also holders of junior Existing Securities, have a position in GO bonds, many of the members do not. *See* Seventh Supplemental Verified Statement of the COFINA Senior Bondholders' Coalition Pursuant to Federal Rule of Bankruptcy Procedure 2019 [ECF No. 4332] (only 5 out of 18 entities are listed as holding GO bonds). As described above, all constituencies were adequately represented in the negotiation of the Settlement and the Plan, and the process set forth by the Mediation Team was designed to reach a fair resolution of the Commonwealth-COFINA Dispute. |

| | |
|---|---|
| 4.   The Plan relies on unrealistic financial projections. | 4.   The Plan's financial projections are realistic. |
| a.   "According to [our expert witness] Dr. Alameda's study, the Fiscal Plans and the COFINA Plan are fundamentally flawed and do not reflect the scientific standards applicable and necessary to achieve PROMESA's goals according to Sections 201 and 314.  The assumptions and projections of the Fiscal Plans and the COFINA Plan are unrealistic, unreliable, extremely optimistic and totally out of phase; therefore, totally incompatible or discordant."  PROSOL-UTIER Objection ¶ 38. | This "good-faith" objection is more appropriately construed as an objection to (1) the Plan's feasibility, and (2) the Plan's consistency with the COFINA Fiscal Plan, which are separate plan confirmation requirements under PROMESA.  *See* PROMESA sections 314(b)(6) and (b)(7).  As described below, the Plan is both feasible and consistent with the COFINA Fiscal Plan.

Further, the position paper of Dr. Alameda must be heavily discounted given his inherent conflict of interest.  Dr. Alameda is a professor at the University of Puerto Rico ("UPR") and, therefore, is more economically aligned with the Commonwealth than COFINA.  The longevity of UPR along with the retirement benefits of UPR's professors is better served if the Commonwealth benefits at COFINA's expense with respect to the Commonwealth-COFINA Dispute.  Dr. Alameda's concerns, however, are misplaced given the resolution of the Commonwealth-COFINA Dispute has been approved by countless parties in interest and creditors of both the Commonwealth and COFINA, and the PROSOL-UTIER Objection was interposed against confirmation of the Plan, and not the Settlement Motion. |

| | |
|---|---|
| II.    The Consummation Costs Violate 11 U.S.C. § 1123(a)(4) | |
| **Objection** | **Response** |
| 1.   The Consummation Costs are an unlawful payoff of the Consummation Cost Parties. | 1.   The Consummation Costs are appropriately granted as administrative expense claims, and do not violate Bankruptcy Code section 1123(a)(4), and in the alternative, can be paid in the discretion of the Debtor. |
| a.   "[T]the $332,000,000 Consummation Cost, which is the subject of  the Objection, is intended as a payoff to buy the votes of institutional bondholders and insurers, who participated in the negotiating, and have the nonparticipating retail COFINA junior bondholders pay for something against their interest."  Second Mangiaracina Objection at 3. | The Second Mangiaracina Objection claims the fees reimbursing certain parties for their consummation costs (the "Consummation Costs") violate Bankruptcy Code section 1123(a)(4), although a specific basis for the objection is not supplied.  Bankruptcy Code section 1123(a)(4), made applicable to COFINA's Title III Case pursuant to PROMESA section 301(a), requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest."  11 U.S.C. § 1123(a)(4).

As set forth in the Brief, the Consummation Costs can be paid (a) as administrative expenses pursuant to Bankruptcy Code section 503(b), or (b) in COFINA's discretion, to parties who significantly contributed to the Plan. |

| III.     The Taxable Election Provision of the Plan Violates 11 U.S.C. § 1123(a)(4) | |
|---|---|
| **Objection** | **Response** |
| 1.  The Plan violates Bankruptcy Code section 1123(a)(4) by discriminating between on-island and mainland bondholders.<br><br>    a.  "It is fundamentally unlawful and unfair to separate out some holders - based on residence - from others and give them additional and different consideration.  The discrimination effected by the proposed COFINA plan not only violates 11 U.S.C. § 1123(a)(4) and PROMESA, but also violates (i) basic principles of fairness that should govern a federal court adjudicating matters involving residents of different locales in the United States, and (ii) the constitutional and statutory rights of individual bondholders in the 50 states by discriminating against some individuals, in their treatment under the Plan, based on their place of residence within the United States."  Hein Objection at 13. | 1.  All members of each class are treated the same.<br><br>Bankruptcy Code section 1123(a)(4) requires that a plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).  Here, after all elections of distribution have been made, the Plan provides the <u>same</u> treatment to all claims within each of the 10 Classes.  *See* Plan Articles V through XIV.  More specifically, the Plan provides that all holders of claims in Class 1 shall receive, on account of their allowed claims, a pro rata share of "the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary."  Plan § 5.1.  Meanwhile, all holders of claims in Class 4 shall receive, on account of their allowed claims, a pro rata share of "(a) the Senior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) the Taxable Election Cash."  Plan § 8.1.  Similarly, all holders of claims in Class 5 shall receive, on account of their allowed claims, a pro rata share of "the Junior COFINA Bond Distribution consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary."  Plan § 9.1.  And, all holders of claims in Class 7 shall receive, on account of their allowed claims, a pro rata share of "(a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if, and to the extent that a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) the Taxable Election Cash."  Plan § 7.1.  Accordingly, the Plan provides "the same treatment for each claim . . . <u>of a particular class</u> . . . ." as required by Bankruptcy Code section 1123(a)(4).  *See In re Multiut Corp.*, 449 B.R. 323, 336 (Bankr. N.D. Ill. 2011) ("Section 1123(a)(4) 'does not require that claims legitimately classified in separate classes receive the same treatment. Whether it is appropriate for a proposed plan to provide different treatment to claims which are legitimately classified in separate classes will arise, if at all, in the context of cramdown.' *Dow Corning*, 244 B.R. at 666.").<br><br>    2.  Even assuming Classes 1 and 5 are analyzed pre-election for purposes of a section 1123(a)(4) analysis, the small disparity in treatment within such Classes serves to benefit all claimholders within each Class.<br><br>In the alternative, there can be no violation of Bankruptcy Code section 1123(a)(4) where the slightly different treatment of claims within a class serves to benefit all claims within such class. |

*See In re Multiut Corp.*, 449 B.R. at 336 ("The 'same treatment' does not mean 'identical treatment' and other circuits have 'approved settlements where the class members received different percentages of recovery to take into account different factors so long as the settlement terms are rationally based on legitimate consideration[s].' *In re Hibbard Brown & Co.*, 217 B.R. 41, 47 (Bankr. S.D.N.Y. 1998)."). Here, recoveries for mainland investors are enhanced because of the taxable election available to on-island investors.

As a result of the pending IRS ruling, there may be a certain amount of taxable bonds to be issued by COFINA on the Effective Date. Accordingly, recoveries for <u>all</u> bondholders are enhanced if on-island bondholders, who generally are not subject to U.S. federal income taxation, elect to be treated in Classes 4 or 7 and, thereby receiving taxable bonds. When on-island bondholders elect taxable treatment, the ability of mainland bondholders to receive a higher proportion, and potentially even all, of their distribution in tax-exempt COFINA bonds is enhanced, thereby enhancing recoveries for mainland bondholders.

If mainland bondholders were to receive their allocated proportion of taxable bonds (*i.e.*, assuming the Plan did not provide on-island bondholders with the option to elect taxable treatment), the recovery for such mainland bondholders would be lower than what their current recovery is projected to be under the Plan. Providing the taxable election only to on-island bondholders ensures that both local and mainland investors receive reasonably equivalent treatment in respect of their claims.

| **IV.    PSA Creditors Are Insiders Who Acquired Large Portions of COFINA Junior Bonds To Gain Control of the Voting Process** |
|---|

| <u>Objection</u> | <u>Response</u> |
|---|---|
| 1.  <u>The votes of PSA Creditors should not be counted because they are insiders.</u><br><br>    a.  "This major change of position [Tilden Park Capital Management's purchase of] COFINA Subordinate bonds by an insider to these secret negotiations is a compelling reason for the Court to conduct a thorough investigation of all purchase and sales transactions made by insiders during the period of these negotiations to protect the voting process from insider rigging and manipulation as well as to prevent unjust | 1.  <u>The mediation parties are not statutory insiders and voted to accept the Plan in good faith</u>.<br><br>While the Dvores Objection is not clear, the objection appears to request that the votes of PSA Creditors, such as Tilden Park Capital Management, either be (a) deemed votes of "insiders" and excluded for purposes of determining if an impaired class accepted the Plan under Bankruptcy Code section 1129(a)(10), or (b) designated as having not been cast or procured in good faith pursuant to Bankruptcy Code section 1126(e).<br><br>First, the definition of "insider" under Bankruptcy Code section 101(31), assuming the debtor is a municipality, generally includes affiliates of the debtor, elected officials of the debtor, or managing agents of the debtor. The PSA Creditors plainly do not qualify as insiders pursuant to |

| | |
|---|---|
| enrichment by insiders trading on confidential information." Dvores Objection at 6–7. | the Bankruptcy Code and, therefore, their votes count for purposes of a Bankruptcy Code section 1129(a)(10) analysis.<br><br>Further, the purchase and sale of claims during the pendency of a bankruptcy case, across multiple layers in the capital structure, is a commonplace occurrence. The existence of any trading activity by PSA Creditors during COFINA's Title III Case, without more, does not nearly rise to a level of "bad faith" necessary for the Court to designate votes pursuant to Bankruptcy Code section 1126(e). |

<table>
<tr><td colspan="2" align="center"><b>V.     The Plan Violates 11 U.S.C. § 1129(b)(1) With Respect to Class 5</b></td></tr>
<tr><td align="center"><b><u>Objection</u></b></td><td align="center"><b><u>Response</u></b></td></tr>
<tr>
<td>

1. <u>The Plan is unfair and inequitable with respect to Class 5</u>

    a.   "[T]he Plan is unfair and inequitable. Either the Statutory Lien is a statutory lien or it is not. If it is, then each of GMS and each other subordinated bondholder is secured and should not be treated less favorably than senior bondholders. If the Statutory Lien is not a lien, then both the senior bondholders and the subordinated bondholders are unsecured, and there is no basis for treating one class more favorably as if secured." GMS Objection ¶ 65. *See also* Hein Objection at 26.

</td>
<td>

1. <u>Class 5 voted to accept the Plan, so COFINA does not need to establish that the Plan is fair and equitable with respect to Class 5.</u>

The fair and equitable standard under Bankruptcy Code section 1129(b)(1) must only be met with respect to an impaired class of creditors that rejects the plan. As Class 5 voted to accept the Plan, any objection pursuant to section 1129(b)(1) with respect to Class 5 must be overruled. *See, e.g., Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton)*, 542 B.R. 261, 283 (B.A.P. 9th Cir. 2015) ("The bankruptcy court noted Franklin's contrary vote but found that the general unsecured creditor class, Class 12, voted in favor of the Plan. Franklin is merely a dissenting creditor in the accepting class of general unsecured creditors. In these circumstances, 'cramdown' analysis under § 1129(b) is not required, and we do not consider further Franklin's 'unfair discrimination' argument based on § 1129(b)."); *see also In re City of Colorado Springs Spring Creek Gen. Imp. Dist.*, 187 B.R. 683, 690 (Bankr. D. Colo. 1995) (holding "[i]n Chapter 9, dissenting creditors in an accepting class are bound by the accepting vote of the other members . . . . Because all classes have accepted the Plan, the unfair discrimination analysis of § 1129(b) does not apply.").

Furthermore, the Hein Objection is based on the mistaken assumption that Act 91 (the COFINA enabling legislation) created a statutory lien securing the Existing Securities. Hein does not provide support for the proposition Act 91 created a statutory lien—only by the New Bond Legislation (which amends Act 91 and is not effective until the occurrence of the Effective Date of the Plan) will a statutory lien be created to secure the new bonds to be issued pursuant to the Plan.

</td>
</tr>
</table>

| | |
|---|---|
| 2.   The Plan unfairly discriminates against Class 5 | 2.   Class 5 voted to accept the Plan, and the unfair discrimination test is inapplicable. |
| a.   "This discrimination in favor of Puerto Rico institutional and individual investors and against United States citizens residing in the 50 states enhances the value of the recovery to Puerto Rico investors and is unfair to subordinate bondholders in the 50 states." Hein Objection at 9. | As with the fair and equitable standard discussed above, the unfair discrimination test under Bankruptcy Code section 1129(b)(1) only applies with respect to an impaired class of creditors that rejects the plan.  As Class 5 voted to accept the Plan, any objection pursuant to section 1129(b)(1) with respect to Class 5 must be overruled. |

| VI.       The Debtor is Prohibited by Law From Taking Actions Necessary to Carry Out the Plan in Violation of PROMESA § 314(b)(3) | |
|---|---|
| **Objection** | **Response** |
| 1.   The Plan violates the United States Constitution, and accordingly, violates PROMESA section 314(b)(3). | 1.   PROMESA section 314(b)(3) addresses actions COFINA must take post-confirmation, not impairments that occur prior to or at confirmation. |
| a.   The Plan violates the Contracts Clause, and unfairly discriminates against "subordinate bondholders in the 50 states and in favor of "on-island" investors."  Hein Supplemental Objection at 12.  *See also* Hein Objection at 25-26 (asserting a violation hereunder in summary fashion). | PROMESA section 314(b)(3) considers what COFINA must do once the Plan is confirmed and has gone effective.  Here, once the Plan is confirmed, there will be no more contracts to impair or debt obligations to discharge.  Accordingly, even if the impairment of COFINA Existing Securities were unconstitutional (which it is not), from and after the Confirmation Date, no law will prevent COFINA from carrying out the Plan.  *See In re Sanitary & Improv. Dist., No.7*, 98 B.R. 970, 973–75 (Bankr. D. Neb. 1989) (allowing for the impairment of a bond claim in a plan and the alteration of the principal amount, interest rate, and term of the bonds notwithstanding the existence of state law requiring payment in full, but finding the plan unconfirmable under Bankruptcy Code section 943(b)(4) [which contains identical language to PROMESA section 314(b)(3)] because the new bonds issued under the plan had a call provision that permitted payment at less than the par amount of the new notes, and such call provision was "prohibited by state law[.]"). |
| 2.   The New Bond Legislation was enacted in violation of the Puerto Rico Constitution and the Regulations of the Puerto Rico House of Representatives, and is therefore unconstitutional. | 2.   The New Bond Legislation was not enacted in violation of the Puerto Rico Constitution nor the Regulations of the Puerto Rico House of Representatives. |
| a.   The New Bond Legislation was enacted in violation of the "constitutional right recognized by the constitutions set forth | The Puerto Rico House Regulations (as amended as of October 17, 2017) provide that, "[w]hen a representative wishes to make use of the word to intervene in the discussion or any matter, [she/he] will stand up and address the Speaker.  The Speaker will respond… The Representative could then make use of the word and address the House."  *See* Section 35.1 of the House Regulations (all translations from Spanish unofficial).  Section 35.2 states that the Speaker "will |

8

herein, and by the regulations of the House, to participate in the legislative process, and in particular in the debate that was supposed to take place prior to the vote[,]" and is therefore "unconstitutional and null and void." Natal Objection at 4.

b.   The Supreme Court of Puerto Rico could rule that the New Bond Legislation, being challenged in the Natal-Albelo complaint, is unconstitutional, or was unconstitutionally enacted. PROSOL-UTIER Objection at 27.

recognize the representatives that will participate in a debate, granting the use of the word."

Section 35.3, however, provides that the Speaker and the Chair of the Commission informing the bill "will have the right to open or close the debate." Under Section 35.8, no representative can interrupt another representative during his turn to "use the word" except "(a) when a question of order is raised." In turn, Section 41.1 defines "question of order" as a "motion presented by a representative that raises any aspect related to the application, compliance or interpretation of these Regulations." "Questions of order" may be raised at any time that a "situation related to the application, compliance or interpretation of the Regulations" emerges. *See* Section 41.2. Under Section 41.3 "questions of order" must be submitted to the Speaker. The Speaker will issue a ruling immediately or may reserve his decision for 48 hours (such 48 hour period may be extended if requested by the Speaker). Pursuant to Section 41.4, the Speaker need not allow a debate regarding a "question of order." The representatives have a right to appeal to the House any decision of the Speaker regarding questions of order. "The appeal will be requested by the representative that raised the question of order immediately after learning the ruling" of the Speaker.

Accordingly, the House Regulations expressly set forth (a) a legislative procedure for how a Representative may participate in a debate, (b) the Speaker's authority to regulate such debate, and (c) a process for a Representative to appeal the Speaker's legislative procedure decisions to the full House.

The Natal Objection does not plead that Representative Natal followed the legislative procedure to appeal the Speaker's decision. Further, even if such objection had pled Natal-Albelo followed the legislative procedures to appeal his grievance regarding his ability to participate in the debate on the New Bond Legislation, neither this Court nor any other court has jurisdiction to entertain it.

As a general rule, the courts in Puerto Rico will not entertain controversies regarding the "interpretation or the application of parliamentary practices of a legislative body with the necessary authority to create internal regulations." *Hon. Noriega Rodríguez v. Hon. Jarabo*, 136 D.P.R. 497, 520 (1994) (internal unofficial translation). The Supreme Court of Puerto Rico has further declared that it is not proper for the courts to decide on the validity of internal regulation approved by the House of Representatives unless the regulation is unconstitutional, "infringes fundamental individual rights or [no] reasonable relationship exists between the method and the result it seeks." *Id.* at 521. After all, the "Legislature has *absolute discretion* to decide the manner in which it will carry out its proceedings and comply with the constitutional requirements." *Id.* at 520 (emphasis added).

Since *Silva v. Hernández Agosto*, 118 D.P.R. 45, 18 P.R. Offic. Trans. 55 (1986), the Supreme Court of Puerto Rico has followed the test set forth in *Baker v. Carr*, 369 U.S. 186, 217 (1962), to

| | |
|---|---|
| | determine whether or not a controversy is justiciable or if it is a political question.  The political question doctrine limits the judiciary's power to intervene in controversies that are inherent to the political branches of the government.<br><br>Section 9 of Article III of the Constitution of the Commonwealth of Puerto Rico provides that "[e]ach house… shall adopt rules for its own proceedings appropriate to legislative bodies."  The power of the House of Representatives to approve internal regulation is corollary of its power to control its proceedings.  *Silva*, 18 P.R. Offic. Trans. at 67.<br><br>The courts in Puerto Rico "cannot become arbitrators of all internal disputes among the legislators regarding the interpretation and application of internal legislative regulation related to purely parliamentarian proceedings." *Rodriguez*, 136 D.P.R.. at 533–34.  The power to intervene in controversies related to the House of Representative's regulations can only be exerted "when the action of other branches of the government present clear constitutional problems and not merely procedural or interpretative disputes." *Id.* at 534.<br><br>Balancing the political question doctrine and the constitutional power granted to the legislature to approve internal regulations, the Supreme Court has held that judicial review will only be available if the controversy "affects individual constitutional rights… [and] judicially appropriate standards for settling the controversy exist." *Id.* at 518.  If, on the other hand, the rights allegedly affected are the ones of a legislator, then, "the internal legislative regulations will be judicially reviewable if the legislator cannot obtain a remedy from other legislators by approving, revoking or amending the law or regulation." *Id.*<br><br>Therefore, the claims raised in the Natal-Albelo Objection are clearly political questions that are barred from judicial review according to Puerto Rico case law.  The only remedy available to Natal-Albelo is one through the processes set forth in the House Regulations.  Accordingly, the New Bond Legislation was validly enacted under Commonwealth Law and is in full force and effect pursuant to its terms. |
| 3.  <u>Act 91, and all subsequent amendments, including the New Bond Legislation, are unconstitutional under Puerto Rico law.</u><br><br>a.   Sections 2 and 7 of Article VI of the Puerto Rico Constitution demonstrate that "[Act 91] and each and every one of its subsequent amendments . . . all violate the provisions of the Constitution of Puerto Rico regarding the scope and extent to which the | 3.   <u>The New Bond Legislation is constitutional under Puerto Rico law.</u><br><br>*<u>The New Bond Legislation complies with Section 2 of Article VI of the Puerto Rico Constitution</u>*.  The Natal-Albelo Objection claims, without explaining why, that the COFINA Enabling Act violates the Puerto Rico Constitution's debt limit set forth in Section 2 of Article VI of the Puerto Rico Constitution.  Section 2 provides that:<br><br>**no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall** |

10

| | |
|---|---|
| Commonwealth of Puerto Rico may borrow money and issue and sell bonds, for how much, and for how long can the debt be payable." Natal-Albelo Objection at 4. | **be issued by the Commonwealth** if the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts **paid by the Commonwealth** in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes **guaranteed by the Commonwealth**, shall exceed 15 percent of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year; [....] and the Commonwealth shall not guarantee any obligations evidenced by bonds or notes if the total of the amount payable in any fiscal year on account of principal of and interest on all the direct obligations referred to above theretofore issued by the Commonwealth and then outstanding and the amounts referred to in item (ii) above shall exceed 15 percent of the average of the total amount of such annual revenues.

P.R. Const. Art. VI, § 2.  Public debt includes Commonwealth general obligations issued or guaranteed by the Commonwealth for which the good faith, credit and taxing power of the Commonwealth are pledged (collectively, "GO Bonds").  "Public debt" does not include other obligations of the Commonwealth to which the good faith, credit, and taxing power of the Commonwealth are not pledged, or obligations of public corporations or municipalities that are not guaranteed by the Commonwealth (such as bonds issued by COFINA).  Moreover, both Act 91 and Act 241 expressly set forth that the COFINA bonds do not constitute debt of the Commonwealth.  *See* 13 L.P.R.A. 13(d); Act 241, § 3.1(e).

Because the COFINA bonds are neither issued nor guaranteed by the Commonwealth, Section 2 does not apply to the issuance of such bonds.  Therefore, the debt service on COFINA bonds is not included as part of the Section 2 debt limit calculation.  (Along similar lines, the COFINA portion of the sales and use tax has likewise been excluded from Commonwealth revenues for purposes of the debt limit calculation.)

The complaint filed by the objectors in the Puerto Rico court alleges that the COFINA Enabling Act violates the prohibition established in Section 2 against issuing bonds or notes with a maturity in excess of 30 years.  However, as explained above, Section 2 only applies to GO Bonds and does not apply to debts issued by COFINA.  Therefore, the maturity limitation on GO Bonds issued by the Commonwealth is irrelevant with respect to COFINA bonds and confirmation of the COFINA Plan.

To the extent the complaint also alleges that the New Bond Legislation violates Section 7 of Article VI of the Puerto Rico Constitution, the Natal-Albelo Objection does not explain why. |

| | Nonetheless, the enactment of the New Bond Legislation is an essential component of the Settlement of the very issues Natal complains of with respect to the validity of the COFINA Enabling Act. |
|---|---|

## VII.     The Plan Has Not Received All Governmental Approvals to Carry Out the Plan as Required By PROMESA § 314(b)(5)

| **Objection** | **Response** |
|---|---|
| 1.   <u>The New Bond Legislation may be unconstitutional.</u><br><br>   a.   "[T]he COFINA enabling Act, although formally approved, suffers from uncertainty or potential annulment of its provisions. This requires the Honorable Court to deny the confirmation of the plan until the dispute over the validity of [the New Bond Legislation] is finally decided."  PROSOL-UTIER Objection ¶¶ 8, 61. | 1.   <u>All necessary approvals have been obtained to carry out the Plan.</u><br><br>As discussed above, the New Bond Legislation has been enacted and is constitutional.  Indeed, the unrevoked enactment of the New Bond Legislation is a condition precedent to the Effective Date of COFINA's Plan of Adjustment, which condition has been satisfied.  *See* Plan of Adjustment § 25.1(e) ("The occurrence of the Effective Date and the substantial consummation of the Plan are subject to satisfaction of the following conditions precedent: . . . (e) All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to impellent and effectuate the Plan, including, without limitation, the New Bond Legislation, have been obtained or enacted and not revoked . . . .").  No other governmental approvals are necessary to carry out the transactions contemplated by the Plan.  *See* Plan § 25.1(e). |

## VIII.     The Plan is Not in the Best Interests of Creditors as Required By PROMESA § 314(b)(6)

| **Objection** | **Response** |
|---|---|
| 1.   <u>If the COFINA structure is valid, COFINA bonds could be paid in full, and therefore the plan is not in the best interest of creditors.</u><br><br>   a.   Available remedies under "the non-bankruptcy laws and constitution of Puerto Rico – as well as the U.S. Constitution – would result in a greater recovery . . . for all COFINA bondholders."  Hein Objection at 26.<br><br>   b.   "To date, no Court has ruled that what the Oversight Board itself described as 'a statutory lien against pledged SUT revenues' | 1.   <u>The Plan satisfies the best interests test.</u><br><br>The objections' fatal flaw is that they presume the only alternative outside of Title III is that the Commonwealth-COFINA Dispute will be resolved in COFINA's favor, and the sales and use taxes purportedly pledged to secure COFINA's debt would therefore belong to COFINA. However, the objections fail to recognize that, outside of Title III, the Commonwealth-COFINA Dispute would continue to be litigated, carrying the attendant risks of litigation.<br><br>The complex, novel issues involved, demonstrated by the extensive briefing in the Adversary Proceeding and the myriad parties involved and the numerous other actions filed, show that both the Commonwealth and COFINA bear significant risks in litigating the Commonwealth-COFINA Dispute.  Therefore, outside of Title III, the dispute would likely be resolved by settlement, and the best interest analysis is properly analyzed in the context of a settlement of the Commonwealth-COFINA Dispute, rather than a winner-take-all outcome.  Indeed, outside of Title III, if the |

| | |
|---|---|
| or the COFINA structure is invalid . . . ." Hein Objection at 27.<br><br>c.   "There is a valid and fair alternative to the Plan . . . GO bondholders should not share in the SUT."  Elliot Objection ¶¶ 18-19. | Commonwealth-COFINA Dispute were settled, the senior COFINA bondholders would be entitled to a 100% recovery before the junior COFINA bondholders received any distribution, assuming an event of default existed under the Bond Resolution.<br><br>The objections also fail to recognize that, if the Commonwealth-COFINA Dispute were litigated to its conclusion, the Commonwealth may prevail in the dispute, and COFINA bondholders would receive nothing, which creditors of the Commonwealth have asserted.<br><br>Lastly, the objections fail to recognize the risks of litigating the Interpleader Action.  Namely, if an event of default under the Existing Bond Resolution had occurred, the senior bondholders could have had repayment of their bonds accelerated, all to the detriment of the junior bondholders. Independent of the validity of the transfer of certain sales and use taxes to COFINA, such acceleration could require the senior bondholders to be paid in full prior to junior bondholders being paid a penny.<br><br>As demonstrated in the Brief, the Plan satisfies the best interest test. |

<table>
<tr><td colspan="2"><strong>IX.     The Plan is Not Feasible as Required by PROMESA § 314(b)(6)</strong></td></tr>
<tr><td><strong>Objection</strong></td><td><strong>Response</strong></td></tr>
<tr><td>1.   <u>The Plan is not feasible.</u><br><br>a.   "The Plan is not feasible and in the best interests of creditors because the Debtor cannot make payments under the Plan and provide future public services at the level necessary to its viability as a municipality." PROSOL-UTIER Objection at 17.<br><br>b.   The Oversight Board has not defined what "essential services" are, so there is no reliable determination of what essential functions of the government must be preserved under the Commonwealth Fiscal Plan, the COFINA Fiscal Plan, and the Plan.</td><td>1.   <u>Discussion of "essential services" is not relevant to the confirmation of the Plan.</u><br><br>a.   The PROSOL-UTIER Objection and the Natal-Albelo Objection discuss "essential services" in context of services provided by the Commonwealth. However, the Plan restructures the debt of COFINA, and accordingly, a plan of adjustment with respect to the Commonwealth is not before the Court.<br><br>b.   Furthermore, COFINA is a statutory instrumentality of the Commonwealth and was created by Act No. 91-2006 as an independent corporation for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006.  Accordingly, COFINA does not provide any services.</td></tr>
</table>

13

| | |
|---|---|
| PROSOL-UTIER Objection ¶ 43; Natal-Albelo Objection at 7. | |
| 2. The Plan does not comply with PROMESA section 701<br><br>    a.  The Oversight Board is supposed to comply with PROMESA section 701, which provides that "it is the sense of the Congress that any durable solution of Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms . . . ."  Natal-Albelo Objection at 7. | 2. PROMESA Section 701 is not relevant to confirmation of the Plan pursuant to PROMESA section 314.<br><br>    a.  PROMESA section 314(b)(2) provides that the Court shall confirm a plan if, among other things, "the plan complies with the provisions of this title. . . ." |
| 3. The report by Dr. Alameda demonstrates that the COFINA Plan is not feasible.<br><br>    a.  The people of Puerto Rico assume all the risks of the Plan according to the Alameda Report:  PROSOL-UTIER Objection pp. 19-22. | 3. Dr. Alameda's Report Makes Extremely Pessimistic Assumptions and Misconstrues the Provisions of the Plan<br><br>Dr. Alameda assumes that Puerto Rico's population will precipitously decline every year until at least 2050.  See PROSOL-UTIER Objection, Exhibit A, at 52 (Graph 16).  Specifically, Dr. Alameda projects the population of Puerto Rico to decrease from approximately 3.3 million in 2019 to approximately 2 million in 2050.  Coupled with this very negative outlook on the Commonwealth's population decline, Dr. Alameda forecasts the Commonwealth's 10.5% SUT to be $2.2 billion in FY 2019 and to steadily drop to $2.1 billion by FY 2050.  See PROSOL-UTIER Objection, Exhibit A, at 57 (Table 14).<br><br>Such projections are extraordinarily pessimistic.  The COFINA Fiscal Plan forecasts the Commonwealth's 10.5% SUT to be $2.73 billion in FY 2019 and to grow to $3.17 billion by FY 2023.  See COFINA Fiscal Plan, at 23 (Exhibit 12).  Indeed, the 5.5% SUT alone, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, is projected to be $1.4 billion in FY 2019 and to grow to more than $2.5 billion by FY 2058.  See COFINA Fiscal Plan, at 28 (Exhibit 19).  There is simply no basis to adopt the catastrophic economic outlook underlying Dr. Alameda's Report.<br><br>Further, Dr. Alameda fails to appreciate a critical provision in the Plan.  Section 1.69 of the Plan makes it clear that all of the 5.5% SUT, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, reverts back to the Commonwealth after FY 2058 when all the COFINA Bonds and any COFINA Parity Bonds have been paid in full.  The Commonwealth is not forfeiting a portion of its SUT permanently.  To the contrary, COFINA is receiving 53.65% of the |

| | PSTBA (COFINA was receiving 100% of the PSTBA) every fiscal year until 2058, after which the Commonwealth will receive the entire PSTBA going forward. |
|---|---|

| **X.    The Plan Is Inconsistent With COFINA's Fiscal Plan in Violation of PROMESA § 314(b)(7)** | |
|---|---|
| <u>**Objection**</u> | <u>**Response**</u> |
| 1.  <u>The COFINA Fiscal Plan introduces too much uncertainty for the Plan to be consistent in later years.</u><br><br>   a.  "The Fiscal Plans focused on their projections narrowly (through 2023) despite that the COFINA Agreement to Bondholders in which the COFINA Plan is based ranged a longer timeframe up to FY 2058.  The COFINA Fiscal Plan skipped relevant circumstances beyond the year 2024, among many, especially that most of the Federal Funds for Disaster Relief will be exhausted by that time."  PROSOL-UTIER Objection ¶ 66.<br><br>   b.  Longer time-frames introduce greater uncertainty in economic and financial projections.  PROSOL-UTIER Objection ¶ 67. | 1.  <u>This argument conflates the Plan's feasibility with the Plan's consistency with the Fiscal Plan.</u><br><br>To the extent the PROSOL-UTIER Objection challenges confirmation of the Plan pursuant to PROMESA section 314(b)(7), which requires that the Plan be "consistent with the applicable Fiscal Plan certified by the Oversight Board under subchapter II," the Debtor will demonstrate at the Confirmation Hearing that the Plan is consistent with the COFINA Fiscal Plan, because debt service contemplated pursuant to the Plan does not exceed the COFINA portion of the PSTBA under the debt sustainability analysis contained in the COFINA Fiscal Plan.  The debt sustainability analysis contained in the COFINA Fiscal Plan extends to the life of the bonds contemplated to be issued pursuant to the Plan (FY 2058).  Accordingly, the Plan does not provide for greater expenditures than that allowed by the debt sustainability analysis contained in the COFINA Fiscal Plan.<br><br>To the extent the PROSOL-UTIER Objection challenges the feasibility of the Plan pursuant to PROMESA section 314(b)(6) because of the purported reliability of the COFINA Fiscal Plan projections and timeframe of such projections, the Debtor will demonstrate at the Confirmation Hearing that there is a substantial debt service coverage ratio such that feasibility is plainly established.  In FY 2019, the 5.5% SUT, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, is projected to be $1.4 billion and COFINA only has debt service in FY 2019 of $420 million.  Even Dr. Alameda reports that the 5.0% SUT is more than sufficient to sustain debt service.  As a result, COFINA has a very healthy debt service coverage ratio of 3.33x in FY 2019.  While the debt service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the 40-year average coverage ratio is still a robust 2.46x.  *See* COFINA Fiscal Plan, at 27 (Exhibit 18).  Further, the PSTBA reaches a plateau in FY 2041 and never increases after that point, so any subsequent increase in the 5.5% SUT after FY 2041 will necessarily improve the debt service coverage ratio.  In short, assuming there is no catastrophic decline in Commonwealth sales and use tax collections that fails to normalize, the feasibility of the COFINA Plan is plainly established. |

| XI.   The Settlement Should Impact Both Junior and Senior Bondholders Equally | |
| --- | --- |
| **Objection** | **Response** |
| 1.  <u>Any issue over the validity of the COFINA structure and lien to be compromised should affect senior and subordinate bondholders equally.</u><br><br>    a.  "While the senior bondholders may have a first right of payment if there are insufficient revenues to COFINA from the sales tax, the fact is the SUT revenues are and continue to be more than sufficient to cover the full debt service on both senior and subordinate COFINA bonds alike"; accordingly, the compromise should affect both juniors and seniors equally. Hein Objection at 16.<br><br>    b.  "The Plan Treats Senior and Junior Bondholders Differently, Even Though There Is Adequate Pledged Security to Repay Fully Both Classes." Elliott Objection at 8. | 1.  <u>This is an objection to the Settlement, not the Plan.</u><br><br>This objection complains that the Settlement is unfair and should be rejected. However, assuming the Settlement were approved, which is a prerequisite for confirmation of the Plan, the Plan's effectuation of the Settlement cannot be a bar to the Plan.<br><br>2.  <u>The contractual subordination of the junior COFINA bondholders to the senior COFINA bondholders includes the risk that the amount of SUT available to bondholders is compromised.</u><br><br>The original bargained-for agreement between junior and senior COFINA bondholders includes the possibility that, if monies available to COFINA bondholders are reduced, senior bondholders shall be satisfied first.[2] This contractual subordination is not just related to the risk the SUT revenues are less than projected, but covers all possible reasons for a reduction in revenues. One risk was that an event of default occurred, and the acceleration provision in the Bond Resolution was triggered, such that only senior COFINA bondholders received cash flows thereunder.[3] The senior-subordinate relationship and payment waterfall entitle seniors to payment in full before subordinate bondholders receive any recovery. Enforcement of strict priority following an event of default could result in senior bondholders receiving a par recovery plus post-petition interest and other payments under the Bond Resolution. In such a situation, subordinate bondholders would not receive any recovery for many years and the present value of any such recovery would be substantially less than the recovery subordinate bondholders will receive under the Plan. |

---

[2]  *See* Resolutions §§ 101 (definition of "Class Priority"), 1101.2 ("In the event that the Corporation shall issue one or more Classes of Subordinate Bonds . . . the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution."), 1103.1 (Priority of Payments After Event of Default).

[3]  *See supra* note 2.

|  | A settlement regarding the validity of the COFINA structure and the ability of the SUT to flow into COFINA was also a potential risk to COFINA bondholders, even when the bondholders first loaned money to COFINA.  The Settlement alleviates junior bondholders of these risks.<br><br>Additionally, the senior COFINA bondholders are receiving less than par on their bonds (approximately 93% recovery is projected for Class 1), while the junior bondholders are being paid.  Had an event of default occurred, or the SUT revenues been insufficient to satisfy all bondholders outside of this settlement, junior bondholders would bear the risk of not receiving any monies prior to senior bondholders being paid in full.[4] |
|---|---|

**XII.     GO Bondholders Have No Basis to Challenge the Lien On SUT Revenue**

| <u>Objection</u> | <u>Response</u> |
|---|---|
| 1.  <u>The legislation creating COFINA, and powers granted to COFINA, are legitimate and trump GO Bondholders' ability to reach SUT revenues securing the Existing Securities.</u><br><br>   a.  The Puerto Rico Constitution gave its legislature the power and authority to enact legislation to deal with grave emergencies that clearly imperil the public health safety or essential services.  Elliot Objection ¶ 77.<br><br>   b.  Puerto Rico's financial crisis, beginning long before the recent natural disasters, qualifies as a "grave emergency."  Elliot Objection ¶ 79.<br><br>   c.  Because of such "grave emergency," COFINA was created in order to gain access to the capital markets at an affordable rate.  Elliot Objection ¶ 80. | 1.  <u>The objection oversimplifies the issues being resolved in the Plan.</u><br><br>Elliott's arguments relate to the merits of the Commonwealth-COFINA Dispute, which is being settled and compromised pursuant to the Plan and the Settlement Agreement.<br><br>Furthermore, Elliott's objection ignores the many complex and novel issues involved in resolving the Commonwealth-COFINA Dispute, which is evidenced by the extensive briefing by various parties to the Adversary Proceeding, and numerous related actions, including actions filed one year before the commencement of COFINA's Title III case. |

---

[4] *See supra* note 2.

| XIII.   The Plan Should Not Be Confirmed Because It Will Have Grave Consequences for the Bond Market | |
|---|---|
| **Objection** | **Response** |
| 1.   Impairment of COFINA bondholder debt will adversely affect United States bond markets.<br><br>   a.  If COFINA is allowed to impair its bonds, "Interest rates have and will continue to increase, municipal bankruptcies will increase, and government borrowing costs have and will continue to rise, endangering their ability to provide and maintain essential services, leading to tax increases and/or reductions in services, not just in the Commonwealth but throughout the United States." Elliot Objection at 14. | 1.   The Plan restores faith in COFINA debt, and in any event, speculation about the Plan's impact on broader municipal debt markets is irrelevant to the requirements for confirmation.<br><br>Elliott's objection ignores the many complex and novel issues involved in the Commonwealth-COFINA Dispute, which is evidenced by the extensive briefing by various parties to the Adversary Proceeding, and numerous related actions, including actions filed years before the commencement of COFINA's Title III case.  Through the Plan, the Commonwealth-COFINA Dispute is being compromised and settled.<br><br>Importantly, Elliott fails to establish how its argument is relevant to any requirement for confirmation pursuant to PROMESA section 314(b). |

| XIV.   The Potential Effects and Treatment of the Claims Detailed in Adversary Proceeding No. 18-00028 are Missing | |
|---|---|
| **Objection** | **Response** |
| 1.   The Plan fails to comply with PROMESA section 314(b) and Bankruptcy Code section 1129(a)(3).<br><br>   a.  The Plan does not mention the existence and ongoing prosecution of the Cooperativa Action, but includes various actions in the definitions of "Actions" and "Adversary Proceeding."  Cooperativa Objection ¶¶ 12-13.<br><br>   b.  The Plan does not provide an adequate description of the Cooperativas' claims and treatment of their claims.  *Id.* ¶ 14. | 1.   The Plan complies with the requirements of section 1129(a)(3).<br><br>The Debtor is not required to specifically name each action to which it is a party in a plan of adjustment, and that the Plan specifically references actions related to the Commonwealth-COFINA Dispute does not change that requirement.  Indeed, the Cooperativas fail to provide any legal support that the Cooperativa Action must be specifically mentioned in the Plan, instead, providing a cursory reference to PROMESA section 314(b) and Bankruptcy Code section 1129(a)(3).<br><br>The Plan provides for treatment of the Cooperativas' claims arising from the Cooperativa Action. To the extent that the Cooperativas seek in the Cooperativa Action recovery of principal and interest on their Existing Securities, their claims are treated pursuant to Classes 1 or 5, as appropriate.  To the extent that the Cooperativas seek damages arising from the issuance or purchase of the Existing Securities in the Cooperativa Action, the Debtor has objected to the Cooperativas' proofs of claim, and sought to, among other things, subordinate the Cooperativas' |

| | claims pursuant to Bankruptcy Code section 510(b). *See* ECF Nos. 4520, 4521, 4522, 4523.  The Plan provides that claims subordinated pursuant to Bankruptcy Code section 510(b) will be treated pursuant to Class 10. |
|---|---|

| XV.     The Disclosure Statement Inaccurately States the Recoveries of Class 5 | |
|---|---|
| <u>Objection</u> | <u>Response</u> |
| 1.   <u>The Plan should not be confirmed because the projected recoveries are fundamentally erroneous</u>.<br><br>a.   "The Plan states, 'Class 5 – Junior Cofina Bond holders. … Projected Recovery under the Plant [sic] of Adjustment – No Taxable Election: 56.64%." GMS Supplemental Objection ¶ 8.<br><br>b.   The projected recovery depends on the interest rate and maturity date of each Existing Security.<br><br>c.   It does not appear unpaid interest due on August 1, 2017 and February 1, 2018 was included in the calculation of the projected recovery. | 1.   <u>The Court has already approved the Disclosure Statement, which contained the estimated recoveries GMS believes are erroneous</u>.<br><br>The Plan does not include projected recoveries for any class of claims.  The GMS Supplemental Objection appears to claim that the projected recoveries in the *Disclosure Statement* are erroneous.<br><br>GMS had ample opportunity to object to the adequacy of the information contained in the Disclosure Statement, but failed to do so.  The Disclosure Statement was filed on October 19, 2018 [ECF No. 4073], and any objections to the adequacy of the Disclosure Statement were to be filed by November 13, 2018 [ECF No. 4062].  GMS did not interpose an objection to the Disclosure Statement within that time.<br><br>In addition, the projected recoveries contained in the Disclosure Statements are estimates, and are not binding.  Nonetheless, the Debtor stands by such projected recoveries.<br><br>GMS's arguments ignore that the claims arising from the Existing Securities are valued, based solely on the outstanding principal amount and accrued interest and/or accreted capital appreciation, as of the day before the commencement of the COFINA Title III Case for purposes of distributions pursuant to the Plan.  The value of claims for purposes of distributions under the Plan are not affected by the varying interest rates and maturities on the Existing Securities. |

| XVI.     Objections to the Plan are Predicated on Objections to the Settlement | |
|---|---|
| <u>Objection</u> | <u>Response</u> |
| 1.   <u>The Plan should not be confirmed because the Settlement should not be approved</u>. | 1.   <u>The Settlement should be approved, and in any case, the SEIU and UAW lack standing to object to confirmation of the Plan</u>. |

| | |
|---|---|
| a.   "SEIU and UAW object to the Plan to the extent it is predicated on the terms of the settlement of the Commonwealth-COFINA dispute, and object to it on the same grounds as set forth in their [Settlement Motion Objection.]"  Unions Objection at 2. | COFINA incorporates by reference the Commonwealth's reply in support of the Settlement Motion.  *See* [ECF No. 4434].<br><br>SEIU and UAW also lack standing to object to the confirmation of the Plan, as further explained in the Reply. |

| XVII.      The Releases, Injunctions, and Exculpation Provisions in the Plan are Inappropriate |
|---|

| Objection | Response |
|---|---|
| 1.   The Plan improperly releases non-Debtors.<br><br> a.   "[T]he claims proposed to be released under the Settlement Agreement and the Plan include claims of GMS (a creditor) against non-debtor parties" by releasing "claims 'in any way related to the COFINA structure (as it relates to the COFINA Pledged Taxes up to the COFINA Portion), the COFINA Pledged Taxes up to the COFINA Portion, or the Pre-FY2019 BNYM Deposits.'"  GMS Objection at 18.<br><br> b.   "[A]ny release of the non-debtor parties is improper."  Hein Objection at 25. | 1.   The Plan's non-debtor releases are appropriate as mutual releases.<br><br>In exchange for COFINA's release, COFINA and Reorganized COFINA have agreed to release "the Released Parties [including the PSA Creditors] from any and all Claims or Causes of Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future."  *See* Plan § 30.5.  While the GMS Group complains that "the claims proposed to be released under the Settlement Agreement and the Plan include claims of GMS (a creditor) against non-debtor parties[,]" they do not give any examples of any such claims they would like to bring.  Further, any claims against the Released Parties (for example, one of the PSA Creditors) are property of the Debtor, and any rights the GMS Group or any other claimholder has thereto is merely derivative of COFINA's right.  *See Sec. Inv'r Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284, 299 (Bankr. S.D.N.Y. 2016), *aff'd sub nom. In re Bernard L. Madoff Inv. Sec. LLC*, 565 B.R. 510 (S.D.N.Y. 2017), *aff'd*, 739 F. App'x 679 (2d Cir. 2018) ("Derivative claims arise from harm done to the estate, seek relief against third parties that pushed the debtor into bankruptcy, are based upon a secondary effect from harm done to the debtor . . . Non-derivative claims arise from an injury that can be directly traced to the third party's conduct." (citations, quotations, and alterations omitted); *see also In re Buccaneer Res., L.L.C., (Merdian Capital Cis Fund v. Burton)*, Case No. 18-40003, ECF No. 00514782840, slip op. at 4 (5th Cir., Jan. 4, 2019) ("To pursue a claim on its own behalf, a creditor must show this direct injury is not dependent on injury to the estate."); *In re Granite Partners, L.P.*, 194 B.R. 318, 324 (S.D.N.Y. 1996) ("If the cause of action belongs to the estate, the trustee has exclusive standing to assert it; conversely, if the cause of action belongs solely to the shareholders or creditors, the trustee has no standing to assert it.") (citing *Schertz-Cibolo-Universal City, Indep. Sch. Dist. v. Wright (In re Educators Grp. Health Tr.)*, 25 F.3d 1281, 1284 (5th Cir. 1994)).  Claimholders retain any non-derivative claims they may have. |

| | |
|---|---|
| | COFINA has the authority to release its claims as part of a settlement and compromise, *see In re Midway Gold US, Inc.*, 575 B.R. 475, 507 (Bankr. D. Colo. 2017) (providing for the "settlements of claims belonging to the Debtors or to the Estates as well as derivative claims against the Released Parties on behalf of the Debtors or the Estates" pursuant to section 1123(b)(3)(A) of the Bankruptcy Code [incorporated by PROMESA]), and creditors cannot maintain a right to bring a derivative claim in light of such compromise.  *See Meridian Capital CIS Fund v. Burton*, No. 6:16-CV-039, 2017 WL 6209915, at *3 (S.D. Tex. Dec. 6, 2017) (noting a creditor could not bring a claim post-confirmation if such claim was a derivative claim owned by the Debtor released in a chapter 11 settlement agreement); *see also In re Waco Town Square Partners, LP*, 536 B.R. 756, 763 (S.D. Tex. 2015) (requiring a creditor to remove derivative claims in a post-confirmation action where it also brought non-derivative claims because the derivative claims were released pursuant to the plan).  Accordingly, the release of the Released Parties is a *consensual* release that COFINA is providing, and, as demonstrated above and in the Brief, is an appropriate exercise of the Debtor's authority. |
| 2.   The Plan improperly releases third-parties.<br><br>  a.   "A blind release and discharge of non-debtor participants in this bankruptcy case in instances in which there is no identity of interests between the debtor and all the third party to be released or a showing as to the potential depletion of assets of the estate or that these parties have contributed substantial assets to the reorganization is contrary to the reorganization procedures adopted in this judicial system. *Class Five Nevada Claimants v. Dow Corning Corp. (In re Dow Corning Corp.)* 280 F.3d 648, 47 C.B.C.2d 1158 (6th Cir. 2002).  A claimant has a constitutional right to final judgment from an Article III judge on any such traditional private-rights claim involving "the liability of one individual to another under the law as defined." *Stern v. Marshall*, 564 U.S. 462 (2011) at 489.  In summary, a ruling confirming a "Plan of Adjustment" which includes such broad relief provisions will simply deprive the appearing parties of their rights to prosecute their causes of action | 2.   The Plan's limited nonconsensual third-party releases are justified and necessary for the Plan to be consummated.<br><br>The Plan provides for nonconsensual third-party releases in two instances:  (1) for the Commonwealth, from all "Claims and Causes of Action held by any Creditor, solely in such capacity[,]"  *see*  Plan § 30.2(f); and (2) for "BNYM, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions[,]" *see* Plan § 30.2(d).<br><br>The objectors to the releases do not specify any claims they would like to bring, or which particular third-party releases they object to.  In any event, the nonconsensual third-party releases are appropriate and can be approved pursuant to the Plan, as set forth in the Brief.<br><br>In particular, the release granted in favor of the Commonwealth, extending to claims creditors of COFINA or its assets may have against the Commonwealth, is justified because the Commonwealth is agreeing to settle the Commonwealth-COFINA Dispute and the Interpleader Action, which provides the groundwork for the formulation of the Plan.  The release granted to the Commonwealth would be meaningless if creditors of COFINA could assert the same claims against the Commonwealth that COFINA is releasing pursuant to the Plan, and the Commonwealth would otherwise not have agreed to settle the Commonwealth-COFINA Dispute and Interpleader Action. |

21

| | |
|---|---|
| existing as of petition date." Cooperativas Objection at 7–8. | BNYM's release is justified, as COFINA cannot achieve fiscal responsibility if the indenture trustee (BNYM) refuses to make distributions for fear of litigation risk. |
| 3. <u>The Plan Improperly Releases the Debtor.</u><br><br>a. "[A]ny release of the debtor is improper here, particularly until all monies the debtor obtained from me are repaid, including accrued but not paid interest." Hein Objection at 25. | 3. <u>The Plan's discharge of the Debtor is appropriate.</u><br><br>Section 944 of the Bankruptcy Code, made applicable to COFINA's Title III case by PROMESA section 301, discharges the Debtor "from all debts as of the time when the plan is confirmed[.]" 11 U.S.C. § 944(b)(1).  Accordingly, the Plan's discharge of COFINA and Reorganized COFINA is appropriate, and will bind any creditor "whether or not such creditor has accepted the plan.  *See* 11 U.S.C. § 944(a)(3); *see also In re City of San Bernardino*, No. 5:17-CV-345-ODW, 2018 WL 317798, at *2 (C.D. Cal. Jan. 4, 2018) (appeal pending).  The release of COFINA's officers and directors is likewise appropriate.  *See Wilson v. City of Vallejo*, No. 2:12-CV-00547-JAM, 2013 WL 4780742, at *2 (E.D. Cal. Sept. 5, 2013) ("Claims against a municipality or its officers in their official capacities that arise from conduct occurring before confirmation of the bankruptcy plan are barred [under 11 U.S.C. section 944].");  *V.W. ex rel. Barber v. City of Vallejo*, No. CIV. S-12-1629, 2013 WL 3992403, at *2 (E.D. Cal. Aug. 2, 2013) ("Accordingly the claims against the City, and against defendant in his official capacity-which arose after commencement of the bankruptcy, but before the confirmation date-are barred."). |
| 4. <u>The injunctions and exculpation provisions in the Plan are inappropriate.</u><br><br>a. "[These] provisions cannot properly mandate the release or relinquishment of my rights and claims under the Constitution over my objection (including my claims under the Constitution against the debtor)[.]"  Hein Objection at 25. | 4. <u>The injunctions and exculpation provisions are appropriate.</u><br><br>The Hein Objection provides no basis for his assertion that the injunctions and exculpation provisions in the Plan are inappropriate, other than his desire to be paid in full.  As forth in the Brief, the injunctions and exculpation provisions are appropriate. |
| 5. <u>The Plan improperly releases certain claims.</u><br><br>b. "[T]he conflicting discharge and release provisions inserted in the "Plan of Adjustment" not only disregards the ongoing litigation pending in Adversary Complaint docketed as case no. 18-00028 but actually derails the proprietary fundamental rights of the appearing parties to prosecute the causes | 5. <u>Adv. Pro. No 18-00028 is properly treated by the Plan.</u><br><br>As mentioned above, the Plan provides for treatment of the Cooperativas' claims arising from Cooperativas Action.  Accordingly, such claims are not improperly released. |

| | |
|---|---|
| of action and remedies to which they may be entitled.  This unwarranted overreach of the discharge provisions, as this relates to the causes of action raised in Adversary Complaint docketed as case no. 18-00028 constitutes a violation of the confirmation provisions disposed in section 314(b) of PROMESA and 11 U.S.C. Section 1129(a)(3)."  Cooperativas Objection at 7. | |

## Exhibit B

**Certified Translation of the Regulations of the Puerto Rico House of Representatives**

**(TEXT FOR FINAL APPROVAL BY THE HOUSE
(JANUARY 9, 2017)**

**(AS AMENDED BY H.R  562
ON OCTOBER 17, 2017)**

**(AS AMENDED BY H.R. 412
ON MAY 16, 2017)**

**(AS AMENDED BY H.R. 226
ON MARCH 6, 2017)**

GOVERNMENT OF PUERTO RICO

18th. Legislative                                                    1st. Ordinary
Assembly                                                                Session

# HOUSE OF REPRESENTATIVES

# H.R. 1

JANUARY 2, 2017

Introduced by representatives *Méndez Núñez, Torres Zamora, Ramos Rivera, Rodríguez Aguiló, Hernández Alvarado, Alonso Vega, Aponte Hernández, Banchs Alemán, Bulerín Ramos, Charbonier Chinea, Charbonier Laureano, del Valle Colón, Franqui Atiles, Lassalle Toro, Lebrón Rodríguez, Mas Rodríguez, Meléndez Ortiz, Miranda Rivera, Morales Rodríguez, Navarro Suárez, Pagán Cuadrado, Parés Otero, Peña Ramírez, Pérez Cordero, Pérez Ortiz, Quiñones Irizarry, Rivera Ortega, Rodríguez Hernández, Rodríguez Ruiz, Santiago Guzmán, Soto Torres and Torres González*

Referred to the Internal Affairs Committee

**RESOLUTION**

To adopt the regulation that will govern the legislative proceedings and the internal government of the House of Representatives of Puerto Rico [] during the Eighteenth (18th) Legislative Assembly.

1     …

1          RULE 35.-DEBATES

2          SECTION 35.1.-Petition to make use of the word

3          When a Representative wishes to make use of the word to intervene in the

4     discussion of any matter, he/she will stand up and address the Speaker as "Mr. or

5     Mrs. Speaker."  The Speaker will respond "Mr. or Mrs. Representative," as the case may

6     be, followed by the last name of the Representative.  The Representative can then make

7     use of the word and address the House from his/her seat.

8          Section 35.2.-Assignment and order of turns

9          The Speaker will recognize the Representatives who will participate in a debate,

10    and will grant them a turn to make use of the word in the order they so sought.  When

11    two (2) or more Representatives seek to speak at the same time, the Speaker will decide

12    the turn order.

13         Section 35.3.-Right to open or close debate

14         The Chair of the Committee who informs a legislative measure or matter and the

15    Spokesman of the Majority will be entitled to open and close the debate thereon.  The

16    power to close the debate may be exercised by the informing Chair of Committee or the

17    Majority Spokesman, even if they had not opened it.   When more than one Committee

18    is informing, the same Chair of Committee who opened the debate will close it, and in

19    his/her absence, the Chair of the second informing Committee or the author of the

20    measure may close the debate. That turn will extend up to a maximum of ten (10)

21    minutes.

3

1      Also entitled is the author of a legislative measure or matter that was not

2    informed by a Committee or who has presented a debatable motion.

3      Approval of the previous question will not preclude the exercise of the right to

4    close the debate, as established in this Section.   In the event that such motion is

5    approved, the turn corresponding to the closing of the debate will be granted without

6    delay.   The matter immediately under discussion at the time of presentation and

7    approval of the previous question will then be submitted to voting.

8      …

9      Section 35.8.-Interruption of use of the word

10     No Representative making use of the word will be interrupted, except, in the

11    following instances:

12    a)    When a question of order or personal privilege or privilege of the Body is

13        raised that requires to be decided immediately; or

14    b)    When a question is addressed to the Representative, provided that the

15        Representative having the floor accepts it.   If such situation arose, the

16        Representative who wishes to ask a question will address the Speaker,

17        and will notify him/her of his/her intention.   The Speaker will ask the

18        Representative having the floor whether he/she wishes to hear the

19        question. The Representative may listen to the question, but is not obliged

20        to answer it.   If answered, the time consumed by the response will be

21        deducted from the time allowed to the Representative who asked the

22        question.

1    …

2                           RULE 41.-QUESTION OF ORDER

3          Section 41.1.-Definition

4          A question of order is that motion presented by a Representative whereby

5    he/she raises an aspect in relation with the application, compliance, or interpretation of

6    these Regulations.

7          Section 41.2.-Time to raise the question of order

8          Questions of order may be raised at any time during the Session of the day on

9    which a situation in relation with the application, compliance, or interpretation of these

10   Regulations emerges.

11         A question of order may not be presented while another previously presented is

12   pending, unless the Speaker had adopted the provisions of Section 41.3 of these

13   Regulations.

14         Section 41.3.-Decision on the question of order

15         The question of order will be submitted to the House Speaker, who should

16   immediately decide it.  However, if deemed necessary, the Speaker may reserve his/her

17   decision on such questions of order, but should issue it within the term of forty eight

18   (48) hours after it is submitted.  This term may be extended if so the Speaker requests.

19         Section 41.4.-Debate

20         When a question of order is presented, the Speaker will allow no debate in that

21   respect.  However, if deemed necessary for orientation and information purposes, the

22   Speaker may grant a turn to any Representative in order for the latter to state his/her

23   position for or against the merits of the question of order raised.

5

1        The turns stage will end at the discretion of the Speaker and every individual

2    term may not exceed five (5) minutes.

3        …

---

CERTIFICATION

I, Milagros Marcano Báez, do hereby certify that I meet the requirements of Rule 5g(2) of the Local Rules of the United States District Court for the District of Puerto Rico, as amended on April 12, 2018.  I further certify that I have translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

s/ Milagros Marcano Báez                                       January 9, 2019

---