# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING<br>CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## MEMORANDUM OF LAW IN SUPPORT OF PUERTO RICO SALES TAX FINANCING CORPORATION'S THIRD AMENDED TITLE III PLAN OF ADJUSTMENT

| | |
|---|---|
| **PROSKAUER ROSE LLP**<br>Eleven Times Square<br>New York, New York 10036<br>Telephone: (212) 969-3000<br>Facsimile: (212) 969-2900 | **O'NEILL & BORGES LLC**<br>250 Muñoz Rivera Ave., Suite 800<br>San Juan, PR 00918-1813<br>Telephone: (787) 764-8181<br>Facsimile: (787) 753-8944 |

*Attorneys for the Financial Oversight and Management Board
as Representative for COFINA in its Title III Case*

Dated: January 9, 2019

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................1

A.    BACKGROUND AND OVERVIEW OF THE PLAN.........................................2

    1.    Background of COFINA..............................................................2

    2.    Procedural Posture of COFINA's Title III Case and Events
Leading Up to the Plan ...............................................................3

    3.    The Title III Plan of Adjustment.................................................12

    4.    The Disclosure Statement Order.................................................13

    5.    The Solicitation and Tabulation of Votes in Favor of the Plan .................14

B.    THE PLAN MEETS EACH OF THE REQUIREMENTS UNDER TITLE
III OF PROMESA AND SHOULD BE CONFIRMED ......................................15

    1.    PROMESA § 314(b)(1):  The Plan Fully Complies with
the Provisions of the Bankruptcy Code Made Applicable by
PROMESA § 301 ......................................................................15

        a.    The Plan Satisfies the Classification
Requirements of Section 1122 of the Bankruptcy Code...............16

        b.    The Plan Satisfies Section 1123(a) of the Bankruptcy Code.........20

        c.    The Plan Complies with Section 1123(b) of the Bankruptcy
Code .................................................................................24

        d.    The Plan Complies with Section 1123(d) of the Bankruptcy
Code By Providing for the Cure of Defaults Under the Plan ........27

        e.    Section 1129(a)(2):  The Debtor Has Complied
with the Applicable Provisions of the Bankruptcy Code...............27

        f.    Section 1129(a)(3):  The Plan was Proposed
in Good Faith and Not by Any Means Forbidden by Law ............32

        g.    Section 1129(a)(6):  The Plan Does Not Contain Any Rate
Changes
Subject to the Jurisdiction of Any Governmental
Regulatory Commission................................................................33

        h.    Section 1129(a)(8):  The Plan Has Not Been Accepted
By Each Impaired Class Under the Plan, But Nonetheless
Can Be Confirmed By Satisfying 11 U.S.C. §§ 1129(a)(10)
and (b) ...............................................................................34

        i.    Section 1129(a)(10):  At Least One Impaired Class of
Claims
Voted in Favor of the Plan, Without Including Claims of
Insiders .............................................................................34

j.  Section 1129(b):  The Plan Satisfies the Cram-Down
Requirements with Respect to Class 10 ........................................35

2.  PROMESA § 314(b)(2):  The Plan Fully
Complies with the Provisions in Title III of PROMESA .........................37

3.  PROMESA § 314(b)(3):  The Debtor is Not Prohibited By
Law From Taking Any Action Necessary to Carry Out the Plan .............37

4.  PROMESA § 314(b)(4):  The Plan Provides for
Full Payment of All Allowed Priority Claims ...........................................40

5.  PROMESA § 314(b)(5):  The Plan Has
Obtained All Necessary Legislative, Regulatory, and Electoral
Approvals ....................................................................................................47

6.  PROMESA § 314(b)(6):
The Plan is in the Best Interest of Creditors and is Feasible ....................48

a.  The Plan is in the Best Interest of Creditors .................................48

b.  The Plan is Feasible. ......................................................................53

7.  PROMESA § 314(b)(7):  The Plan is
Consistent with the Fiscal Plan for COFINA. ...........................................56

8.  Bankruptcy Rule 3019:  The Plan Does Not Adversely Change the
Treatment of Claims of Creditors. .............................................................57

C.  THE INJUNCTION AND RELEASE PROVISIONS EMBODIED
IN THE PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED ............58

1.  The Debtor's Release of Claims Should Be Approved .............................59

2.  The Consensual Releases Should Be Approved ........................................64

3.  The Exculpation Sought In the Plan Is Appropriate .................................67

4.  The Injunction Sought is Necessary to Enforce
the Releases and Exculpations Contained in the Plan ..............................70

D.  CONCLUSION ....................................................................................................71

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<span style="font-variant:small-caps">ASES</span>

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody
Energy Corp.),*
   2017 U.S. Dist. LEXIS 47231 (E.D. Mo. March 30, 2017) ...................................................43

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Court (In re Chateaugay Corp.),*
   89 F.3d 942 (2d Cir. 1996)..............................................................................................17

*City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.),*
   656 F.3d 82 (1st Cir. 2011)............................................................................................59

*Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.),*
   709 F.2d 762 (1st Cir. 1983)..........................................................................................32

*Cosoff v. Rodman (In re W.T. Grant Co.),*
   699 F.2d 599 (2d Cir. 1983)..........................................................................................60

*Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network,
Inc.),*
   416 F.3d 136 (2d Cir. 2005)..........................................................................................64

*Faitoute Iron & Steel, Co. v. City of Asbury Park,*
   316 U.S. 502 (1942).......................................................................................................50

*Franklin High Yield Tax-Free Income Fund v. City of Stockton (In re City of Stockton),*
   542 B.R. 261 (B.A.P. 9th Cir. 2015)......................................................................32, 48, 51

*Granada Wines, Inc. v. New England Teamsters and Trucking Indus. Pension Fund,*
   748 F.2d 42 (1st Cir. 1984)......................................................................................16, 17

*Grogan v. Garner,*
   498 U.S. 279 (1991).......................................................................................................67

*Hicks, Muse & Co. v, Brandt (In re Healthco Int'l, Inc.),*
   136 F.3d 45 (1st Cir. 1998)............................................................................................60

*Hill v. Burdick (In re Moorhead Corp.),*
   208 B.R. 87 (B.A.P. 1st Cir. 1997).................................................................................60

*In re 203 N. LaSalle St. Ltd. P'ship,*
   190 B.R. 567 (Bankr. N.D. Ill. 1995), *aff'd,* 126 F.3d 955 (7th Cir. 1997), *rev'd on
other grounds,* 526 U.S. 434 (1999) .............................................................................36

*In re Armstrong World Indus., Inc.*,
   348 B.R. 111 (D. Del. 2006)..........................................................................35

*In re Armstrong World Indus., Inc.*,
   348 B.R. 136 (Bankr. D. Del. 2006) ............................................................16

*In re Barnwell Cty. Hosp.*,
   471 B.R. 849 (Bankr. D.S.C. 2012)...............................................................48

*In re BearingPoint, Inc.*,
   453 B.R. 486 (Bankr. S.D.N.Y. 2011)...........................................................66

*In re Buttonwood Partners Ltd.*,
   111 B.R. 57 (Bankr. S.D.N.Y 1990)..............................................................36

*In re C.P. del Caribe, Inc.*,
   140 B.R. 320 (Bankr. D.P.R. 1992) ...............................................................61

*In re Charles St. African Methodist Episcopal Church of Boston*,
   499 B.R. 66 (Bankr. D. Mass. 2013) ................................................15, 63, 64

*In re CHC Grp. Ltd.*,
   No. 16-31854 (BJH), 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar. 3, 2017) ...............42

*In re Chicago Invs., LLC*,
   470 B.R. 32 (Bankr. E.D. Mass 2012) ........................................................63, 64

*In re City of Detroit*,
   524 B.R. 147 (Bankr. E.D. Mich. 2014) .............................................. passim

*In re Colfer*,
   159 B.R. 602 (Bankr. D. Me. 1993)................................................................17

*In re Combustion Eng'g, Inc.*,
   391 F.3d 190 (3d Cir. 2004)...........................................................................16

*In re Connector 2000 Ass'n*,
   447 B.R. 752 (Bankr. D.S.C. 2011) ...........................................................47, 48

*In re Coram Healthcare Corp.*,
   315 B.R. 321 (Bankr. D. Del. 2004) ...............................................................17

*In re Corey*,
   892 F.2d 829 (9th Cir. 1989) ..........................................................................32

*In re Cuzco Dev. U.S.A., LLC*,
   2017 Bankr. LEXIS 531 (Bankr. D. Haw. Feb. 24, 2017) .............................19

*In re Dave's Detailing, Inc.*,
No. 13-08077 (RLM), 2015 WL 4601726 (Bankr. S.D. Ind. July 30, 2015) ........................20

*In re DBSD N. Am., Inc.*,
419 B.R. 179 (Bankr. S.D.N.Y. 2009) ...................................................................................64

*In re Drexel Burnham Lambert Grp., Inc.*,
960 F.2d 285 (2d Cir. 1992)...................................................................................................70

*In re Firstline Corp.*,
No. 06–70145–JDW, 2007 WL 269086 (Bankr. M.D. Ga. Jan. 27, 2007) .............................69

*In re Freymiller Trucking, Inc.*,
190 B.R. 913 (Bankr. W.D. Okla. 1996) ...............................................................................36

*In re G-I Holdings, Inc.*,
2009 U.S. Dist. LEXIS 108339 (D.N.J. Nov. 12, 2009).........................................................58

*In re Gato Realty Tr. Corp.*,
183 B.R. 15 (Bankr. D. Mass. 1995) .....................................................................................16

*In re Genesis Health Ventures, Inc.*,
266 B.R. 591 (Bankr. D. Del. 2001) ................................................................................35, 69

*In re Granite Broad. Corp.*,
369 B.R. 120 (Bankr. S.D.N.Y. 2007)...................................................................................67

*In re Heritage Org., L.L.C.*,
375 B.R. 230 (Bankr. N.D. Tex. 2007)..................................................................................17

*In re Heron, Burchette, Ruckert & Rothwell*,
148 B.R. 660 (Bankr. D.D.C. 1992) ......................................................................................45

*In re Indianapolis Downs, LLC*,
486 B.R. 286 (Bankr. D. Del. 2013) ................................................................................44, 45

*In re Jersey City Med. Ctr.*,
817 F.2d 1055 (3d Cir. 1987)................................................................................................17

*In re Johns-Manville Corp.*,
68 B.R. 618 (Bankr. S.D.N.Y 1986), *aff'd in part*, *rev'd in part on other grounds*, 78
B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d
636 (2d Cir. 1988)..........................................................................................................15, 27

*In re Kaiser Aluminum Corp.*,
No. 02–10429 (JKF), 2006 WL 616243 (Bankr. D. Del. Feb. 6, 2006)..................................17

*In re Kennedy*,
    158 B.R. 589 (Bankr. D.N.J. 1993) .......................................................................36

*In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*,
    No. 04-10585, 2009 Bankr. LEXIS 2846 (Bankr. P.R. Mar. 31, 2009) .................................61

*In re The Leslie Fay Cos.*,
    207 B.R. 764 (Bankr. S.D.N.Y. 1997).......................................................................35

*In re Master Mortgage Investment Fund, Inc.*,
    168 B.R. 930 (Bankr. W.D. Mo. 1994)............................................................62, 63, 64, 66

*In re Midway Gold US, Inc.*,
    575 B.R. 475 (Bankr. D. Colo. 2017) .......................................................................59

*In re Mount Carbon Metro. Dist.*,
    242 B.R. 18 (Bankr. D. Colo. 1999) ................................................................... passim

*In re Mt. Crane Serv.*, LLC
    2018 Bankr. LEXIS 3290 (Bankr. D. Utah Oct. 23, 2018) ....................................................19

*In re Oneida Ltd.*,
    351 B.R. 79 (Bankr. S.D.N.Y. 2006) .......................................................................67

*In re Puffer*,
    674 F.3d 78 (1st Cir. 2012).......................................................................33

*In re PWS Holding Corp.*,
    228 F.3d 224 (3d Cir. 2000)...............................................................27, 67, 68, 69

*In re Receivership Estate of Indian Motorcycle Mfg., Inc.*,
    299 B.R. 8 (D. Mass. 2003) .......................................................................60

*In re Reid Park Props. Ltd. Liab. Co.*,
    No. 4:11-BK-15267-EWH, 2012 WL 2934001 (Bankr. D. Ariz. July 18, 2012)....................20

*In re Resorts Int'l*,
    145 B.R. 412 (Bankr. D.N.J. 1990) .................................................................34, 36

*In re Rivera Echevarria*,
    129 B.R. 11 (Bankr. D.P.R. 1991) .......................................................................36

*In re Sanitary & Improvement Dist. No. 7*,
    98 B.R. 970 (Bankr. D. Neb. 1989) .................................................................38, 48

*In re Spansion*,
    426 B.R. 114 (Bankr. D. Del. 2010) .......................................................................59

*In re TCI 2 Holdings, LLC,*
  428 B.R. 117 (Bankr. D.N.J. 2010) ...................................................................43

*In re Toy & Sports Warehouse, Inc.,*
  37 B.R. 141 (Bankr. S.D.N.Y. 1984) ................................................................28

*In re Tribune Co.,*
  464 B.R. 126 (Bankr. D. Del. 2011) .................................................................63

*In re Waterford Hotel, Inc.,*
  497 B.R. 255 (Bankr. E.D. Mich. 2013) ...........................................................32

*In re Winn-Dixie Stores, Inc.,*
  356 B.R. 239 (Bankr. M.D. Fla. 2006) ..............................................................68

*In re Yellowstone Mountain Club, LLC,*
  No. 08–61570–11, 2009 WL 2163528 (Bankr. D. Mont. July 16, 2009) ...........67

*In re Zenith Elecs. Corp.,*
  241 B.R. 92 (Bankr. D. Del. 1999) ..............................................................35, 62

*Jeffrey v. Desmond,*
  70 F.3d 183 (1st Cir. 1995) ..........................................................................60, 61

*Jeremiah v. Richardson,*
  148 F.3d 17 (1st Cir. 1998) ...............................................................................60

*John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.,*
  987 F.2d 154 (3d Cir. 1993) .........................................................................17, 35

*Kelley v. Everglades Drainage District,*
  319 U.S. 415 (1943) ..........................................................................................54

*Lorillard v. Pons,*
  434 U.S. 575 (1978) ..........................................................................................37

*Marrama v. Citizens Bank of Mass.,*
  549 U.S. 365 (2007) ..........................................................................................67

*Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC),*
  478 B.R. 403 (D. Nev. 2012) ............................................................................69

*Murphy v. Weathers,*
  No. 7:07-CV-00027-HL, 2008 WL 4426080 (M.D. Ga. Sept. 25, 2008) .....67, 69

*Nat'l Heritage Found., Inc. v. Highbourne Found.,*
  760 F.3d 344 (4th Cir. 2014) ............................................................................69

*Resolution Trust Corp.* v. *Best Prods. Co. (In re Best Prods. Co.)*,
   177 B.R. 791 (S.D.N.Y. 1995), *aff'd*, 68 F.3d 26 (2d Cir. 1995) ...........................................59

*United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.)*,
   289 B.R. 269 (B.A.P. 1st Cir. 2003) ..........................................................................................60

*Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*,
   326 B.R. 497 (S.D.N.Y. 2005).........................................................................................68, 70

*W. Mining & Invs., LLC v. Bankers Trust Co.*,
   No. C.A. 02-1445, 2003 WL 503403 (D. Del. Feb. 19, 2003) ..............................................69

## STATUTES

11 U.S.C. § 105(a) ...................................................................................................................59

11 U.S.C. § 363(b) ...................................................................................................................46

11 U.S.C. § 365 ........................................................................................................................24

11 U.S.C. § 502 ........................................................................................................................30

11 U.S.C § 502(f) .....................................................................................................................40

11 U.S.C. § 503 ........................................................................................................................45

11 U.S.C. § 503(b) ..............................................................................................................44, 45

11 U.S.C. § 503(b)(1)(A).....................................................................................................42, 44

11 U.S.C. § 507(a) ....................................................................................................................40

11 U.S.C § 507(a)(2).............................................................................................................21, 40

11 U.S.C. § 524(e) ....................................................................................................................67

11 U.S.C. § 544(a)(1).................................................................................................................4

11 U.S.C. § 547(b) .....................................................................................................................4

11 U.S.C. § 548(a)(1)(B) ............................................................................................................5

11 U.S.C. § 549(a) .....................................................................................................................5

11 U.S.C. § 552(a) .....................................................................................................................5

11 U.S.C. § 901(a) ...............................................................................................................32, 46

11 U.S.C. § 943(b)(4) ...............................................................................................................38

11 U.S.C. § 943(b)(6) ............................................................................467, 48

11 U.S.C. § 943(b)(7) ................................................................................48,54

11 U.S.C. § 944 ...............................................................................................65

11 U.S.C. § 944(b)(1) ....................................................................................65

11 U.S.C. § 1122 ....................................................................................... passim

11 U.S.C. § 1122(a) .............................................................................16, 17, 18

11 U.S.C. § 1123 ...........................................................................................16

11 U.S.C. § 1123(a) .......................................................................................20

11 U.S.C. § 1123(a)(1) ..............................................................................20, 21

11 U.S.C § 1123(a)(1)–(5) ..........................................................................20

11 U.S.C. § 1123(a)(2) .................................................................................21

11 U.S.C. § 1123(a)(3) .................................................................................21

11 U.S.C. § 1123(a)(4)........................................................................... passim

11 U.S.C. § 1123(a)(5) .................................................................................22

11 U.S.C. § 1123(b) ...............................................................................24, 58

11 U.S.C. § 1123(b)(1) ...............................................................................24

11 U.S.C. § 1123(b)(2) ..........................................................................24, 25

11 U.S.C. § 1123(b)(3) ................................................................................26

11 U.S.C. § 1123(b)(3)(A) ....................................................................59, 61

11 U.S.C. § 1123(b)(3)(B) ............................................................................25

11 U.S.C. § 1123(b)(5) ................................................................................26

11 U.S.C. § 1123(b)(6) ..........................................................................26, 27

11 U.S.C. § 1123(d) .....................................................................................27

11 U.S.C. § 1125 ....................................................................................13, 27, 28

11 U.S.C. § 1125(e) ......................................................................................33

11 U.S.C. § 1126 .................................................................................................. passim

11 U.S.C § 1126(c) .............................................................................................30, 31, 34

11 U.S.C § 1126(f) ....................................................................................................31

11 U.S.C § 1126(g) ...................................................................................................34

11 U.S.C § 1127(a) ...................................................................................................58

11 U.S.C § 1129 .......................................................................................................14

11 U.S.C § 1129(a) ...................................................................................................27

11 U.S.C § 1129(a)(1) ......................................................................................15, 27, 37

11 U.S.C § 1129(a)(2) ...............................................................................................27

11 U.S.C § 1129(a)(3) ...........................................................................................32, 33

11 U.S.C. § 1129(a)(4) ..............................................................................................46

11 U.S.C § 1129(a)(6) ...............................................................................................33

11 U.S.C § 1129(a)(8) ...........................................................................................34, 35

11 U.S.C § 1129(a)(9) ...............................................................................................40

11 U.S.C § 1129(a)(9)(A) ..........................................................................................40

11 U.S.C § 1129(a)(10) .........................................................................................34, 35

11 U.S.C § 1129(b) ...............................................................................................34, 35

11 U.S.C § 1129(b)(1) ...........................................................................................35, 36

11 U.S.C. § 1129(b)(2) ..............................................................................................36

11 U.S.C § 1129(b)(2)(B) ......................................................................................36, 37

11 U.S.C § 1145 .......................................................................................................26

48 U.S.C. §§ 2101–2241 ..............................................................................................1

PROMESA § 104(j) .................................................................................................3, 56

PROMESA § 201(b)(1) ...............................................................................................55

PROMESA §§ 201(b)(1)(A), (D)–(I) .............................................................................55

PROMESA §§ 201(b)(1)(B)–(C) ................................................................................ 55, 56

PROMESA § 206 ............................................................................................................... 3

PROMESA § 207 ............................................................................................................. 48

PROMESA § 301 ........................................................................................... 15, 16, 20, 65

PROMESA § 301(a) ................................................................................................ 2, 32, 46

PROMESA § 304(a) ......................................................................................................... 3

PROMESA § 306 ............................................................................................................. 59

PROMESA § 310 ............................................................................................................. 57

PROMESA § 313 ........................................................................................................ 57, 58

PROMESA § 314(b) ........................................................................................................ 37

PROMESA § 314(b)(1) .............................................................................................. 15, 37

PROMESA §§ 314(b)(1)–(7) ........................................................................................... 37

PROMESA § 314(b)(2) .............................................................................................. 15, 37

PROMESA § 314(b)(3) ........................................................................................... 37, 38, 39

PROMESA § 314(b)(4) .............................................................................................. 40, 47

PROMESA § 314(b)(5) .............................................................................................. 47, 48

PROMESA § 314(b)(6) .......................................................................................... 48, 48, 56

PROMESA § 314(b)(7) .............................................................................................. 56, 57

PROMESA § 315(b) ........................................................................................................... 1

## OTHER AUTHORITIES

121 Cong. Rec. H39413 (daily ed. Dec. 9, 1975) ......................................................... 54

4 COLLIER ON BANKRUPTCY, ¶ 943.03[7] ....................................................................... 49

Fed. R. Bankr. P. 3019 .................................................................................................... 57

Fed. R. Bankr. P. 3019(a) ............................................................................................... 57

Fed. R. Bankr. P. 9019 .................................................................................................... 61

H.R. REP. 94-686, 32-33 (1976) .................................................................................................53

H.R. REP. NO. 95-595 (1977)...........................................................................................15, 27

S. REP. NO. 95-989 (1978)........................................................................................................27

The Puerto Rico Sales Tax Financing Corporation ("COFINA"), as Title III debtor in the above-captioned Title III case (the "Debtor") under the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtor's representative pursuant to section 315(b) of PROMESA,[1] respectfully submits this memorandum of law in support of confirmation (the "Memorandum" or the "Brief") of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 436] (as may be modified further, the "Plan").[2]

## PRELIMINARY STATEMENT[3]

The Plan is the culmination of years of hard work and diligent negotiation to resolve the Commonwealth-COFINA Dispute,[4] beginning prior to the commencement of this Title III Case, and up to and through the announcements of the Agreement in Principle and Plan. Resolution of this dispute was a gating issue to resolving COFINA's Title III Case, and approval of the Settlement and confirmation of the Plan ends such uncertainty, determines what downward adjustments will be made to COFINA's $18 billion of funded indebtedness (and what funds will be available to the Commonwealth), and brightens the path of Puerto Rico's economic future. Conversely, without a consensual resolution, a litigated outcome could present holders of GO

---

[1]   PROMESA is codified 48 U.S.C. §§ 2101–2241.

[2]   In further support of confirmation of the Plan, the Debtor will also be submitting (a) the declarations of Natalie Jaresko, Executive Director of the Oversight Board (the "Jaresko Declaration"), and David Brownstein, Managing Director at Citibank, N.A. (the "Brownstein Declaration"), on January 14, 2019, and (b) the declaration of Christina Pullo, Vice President of Solicitation & Public Securities of Prime Clerk LLC ("Prime Clerk"), the Debtor's notice and balloting agent (the "Voting Declaration"), on January 15, 2019.

[3]   While the parties to the A&R Plan Support Agreement support confirmation of the Plan, positions taken with respect to specific legal issues in this Brief should not be attributed to parties to the A&R Plan Support Agreement other than the Oversight Board.

[4]   Capitalized terms used but not otherwise defined herein shall have those meanings ascribed to them below, in the Plan, or in the *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 368] (the "Disclosure Statement"), as applicable.

Bonds and Existing Securities with an all-or-nothing result.  COFINA creditors could face the possibility of potentially zero recovery, while the Commonwealth might be without funds to address essential services or permit recoveries to its creditors.  In each instance, regardless of the winner or loser in such litigation, the byproduct would be significant delay, cost, and more uncertainty for all of Puerto Rico's stakeholders.

The Plan incorporates the hard-fought resolution of the Commonwealth-COFINA Dispute by the Oversight Board's independent agents and the largest creditors of both debtors under the auspices of this Court's appointed mediation team, and establishes a final major milestone for the Title III Case to move towards its conclusion.  The Plan represents a fair resolution of the Commonwealth-COFINA dispute, as well as disputes among various groups of COFINA claimholders.  These resolutions were the result of arm's length negotiations where all interested parties were ably represented.  The Plan has the overwhelming support of the COFINA creditor constituencies and is a major step forward in Puerto Rico's recovery from its fiscal crisis, and should be approved by this Court.

As set forth below, the Plan satisfies the confirmation requirements of title III of PROMESA, including the sections of the Bankruptcy Code which were incorporated therein by PROMESA section 301(a).[5]  The Debtor requests that the Court overrule all the objections and confirm the Plan as proposed.

**A.  <u>BACKGROUND AND OVERVIEW OF THE PLAN</u>**

**1.  Background of COFINA**

As described in more detail in the Disclosure Statement, COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth.  COFINA receives revenues from a

---

[5]   The Debtor further provides support for the releases, injunction, and exculpations in the Plan.

sales or use tax on a broad range of goods and services in the Commonwealth, which are transferred each Fiscal Year to COFINA (the "SUT Revenues").

COFINA was authorized to use the SUT Revenues to pay or finance, in whole or in part, or fund, among other things: (i) certain appropriation backed debt outstanding as of June 30, 2006 payable to the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Public Finance Corporation ("PFC"); and (ii) certain Commonwealth expenses.

### 2. Procedural Posture of COFINA's Title III Case and Events Leading Up to the Plan

On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and, at the request of the Governor of Puerto Rico, filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under title III thereof (the "Commonwealth's Title III Case").[6]  Thereafter, on May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and, at the request of the Governor of Puerto Rico, filed a voluntary petition for relief for COFINA pursuant to PROMESA section 304(a), commencing a case under title III thereof ("COFINA's Title III Case").   On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth's Title III Case and COFINA's Title III Case, for procedural purposes only [ECF No. 242].[7]

On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "Procedures

---

[6]   Unless indicated otherwise, ECF number references shall be to pleadings filed in the Commonwealth's Title III Case, No. 17 BK 3283.

[7]   On June 15, 2017, the United States Trustee for Region 21 (the "U.S. Trustee") appointed the statutory creditors' committee in the Commonwealth's Title III Case (the "Committee" or "UCC") [ECF No. 338].  That same day, on June 15, 2017, the U.S. Trustee filed a *Notice of No Appointment of Official Committee of Unsecured Creditors for Puerto Rico Sales Tax Financing Corporation (COFINA)* [ECF No. 339], indicating there is no creditors' committee in COFINA's Title III Case.

Order"), which, among other things, provided that:  (a) the Oversight Board authorized the Committee to serve as the agent for the Oversight Board, as representative of the Commonwealth in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board authorized Bettina M. Whyte to serve as the agent for the Oversight Board, as representative of COFINA in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").  The Procedures Order defined the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law . . . ."  Procedures Order ¶ 4.

On September 9, 2017, the Committee, as Commonwealth Agent, commenced an adversary proceeding to prosecute the Commonwealth-COFINA Dispute styled *The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico v. Bettina Whyte* [Adv. Proc. No. 17-257-LTS] (the "Adversary Proceeding"), and, in its complaint (the "Complaint"), sought declaratory judgments that, among other things, (a) Act 91 did not transfer present ownership of future SUT Revenues to COFINA; (b) Act 91 did not assign to COFINA any "right to receive" future SUT revenues; (c) the transfer language in Act 91 was, at most, an unsecured promise of a future transfer that can be breached or otherwise rejected in Title III; (d) COFINA has no enforceable security interest in future SUT Revenues; (e) any unperfected security interest in SUT Revenues is avoidable under sections 544(a)(1) and 547(b) of the Bankruptcy Code; (f) in the event that any security interest is not avoidable under section 544(a)(1) or section 547(b) any transfer made within two years of the petition date is still

avoidable as a fraudulent transfer pursuant to section 548(a)(1)(B); (g) any post-petition transfer

is avoidable under section 549(a); (h) any security interest held by COFINA is subordinate to

rights of the Oversight Board acting as trustee/lien creditor; (i) any security interest was "cut off"

by the commencement of the Title III case pursuant to section 552(a); (j) any post-petition

transfers are not governed by the Uniform Commercial Code and avoidable because they were

incomplete at the time the Title III petition was filed; (k) any post-petition transfer of SUT

revenues to non-Commonwealth entities violates the automatic stay; (l) Act 91 is

unconstitutional because it evades the debt provisions of the Commonwealth Constitution; and

(m) the COFINA structure is unconstitutional because the result of the enabling legislation was

to violate the debt limit, priority of payment to public debtholders, and balanced budget

provisions of the Commonwealth Constitution. Adversary Proceeding, ECF No. 1.

   On September 15, 2017, the COFINA Agent filed her answer to the Complaint (as

amended on October 30, 2017, the "Answer and Counterclaims"), vigorously disputing the

Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory

judgments that, among other things: (a) the COFINA enabling legislation is constitutional and

thereby made the Pledged Sales Taxes transferred to COFINA and the fund into which it was

deposited property of COFINA and not "available resources" of the Commonwealth, or in the

alternative, COFINA has a perfected unavoidable lien in the Pledged Sales Taxes; (b) the

Commonwealth's misappropriation of the Pledged Sales Taxes and COFINA's account violates

the United States and Commonwealth Constitutions; (c) the Fiscal Plan Act violates PROMESA;

(d) Act No. 84-2016, which purportedly amended the COFINA enabling legislation to decrease

the amount of first revenues of the SUT that COFINA receives from 6% to 5.5%, violates

PROMESA, and COFINA is entitled to the first revenues of the 6% SUT until the Pledged Sales

Tax Base Amount is reached each year; (e) the Resolution constitutes a contract among COFINA, BNYM and the COFINA creditors, and the Commonwealth committed tortious interference with respect to such contract; (f) to the extent the Commonwealth prevails on its theories that the COFINA structure violates the Commonwealth's Constitution, the Commonwealth fraudulently induced COFINA creditors to invest in COFINA bonds; and (g) any non-COFINA debt, including GO Bonds, issued in violation of the debt limit provisions in the Commonwealth Constitution are not entitled to priority under the Commonwealth Constitution's debt priority provisions. Adversary Proceeding, ECF No. 27.

The COFINA Agent's Answer and Counterclaims also sought injunctive relief, including that: (y) the Court impose a constructive trust in COFINA's favor over the Pledged Sales Taxes in order to prevent the Commonwealth's alleged tortious interference and fraud with respect to such revenues; and (z) the Court enter an order permanently enjoining the Commonwealth from, among other things, diverting or transferring the Pledged Sales Taxes away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues. *Id.*

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO Debt bondholders, as well as other parties that had been permitted to intervene in the Adversary Proceeding, filed counterclaims and cross-claims regarding ownership of the Pledged Sales Taxes. Adversary Proceeding, ECF Nos. 88, 90, 94.

On December 21, 2017, the Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims and counterclaims as outside the scope of the Commonwealth-COFINA Dispute, as well as several claims asserted by

the intervening parties (the "Dismissed Claims").   Adversary Proceeding, ECF No. 167 (the

"Scope Order").   The Court found that the scope of the dispute, as defined in the Procedures

Order, is confined to whether the Commonwealth or COFINA owns the Pledged Sales Taxes.

The Dismissed Claims, the Court found, were outside the scope of the Commonwealth-COFINA

Dispute because they presumed either the Commonwealth or COFINA's ownership of the

Pledged Sales Taxes or addressed other issues that were not antecedent to the ownership

question.   The Court later clarified, upon the joint request of the Oversight Board, the

Commonwealth Agent, and the COFINA Agent, that in the event of a global settlement (not

litigation), the Agents had the power to settle any and all of the Dismissed Claims together with

the in-scope claims.   Adversary Proceeding, ECF No. 284.

Following entry of the Scope Order and subsequent order permitting the

Commonwealth to amend its Complaint, the remaining claims asserted by the Commonwealth

Agent are that (a) Act 91 did not transfer present ownership of future SUT Revenues to

COFINA, (b) Act 91 did not assign to COFINA any right to receive future SUT Revenues, and

(c) the COFINA enabling act was designed to, and did, violate the debt and balanced budget

provisions of the Commonwealth Constitution.   The remaining claims asserted by the COFINA

Agent are that the COFINA enabling legislation is constitutional and the Pledged Sales Taxes

and Dedicated Sales Tax Fund are COFINA's property.

On February 21, 2018, the Agents and several of the intervening parties filed

cross-motions for summary judgment.   The Commonwealth Agent asserted that (a) Act 91 did

not transfer to COFINA a present property interest in potential future tax revenues because no

such property exists to be transferred; (b) there was no "true sale" of future tax revenues to

COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate

those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT Revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Commonwealth Constitution. Adversary Proceeding, ECF Nos. 321, 322, 323, 324. The intervening parties which filed cross-motions in favor of the Commonwealth asserted, among other things, that (a) the scope of the Adversary Proceeding is limited to ownership of post-petition and future SUT Revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT Revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT Revenues is not an asset that can be transferred; (d) the Pledged Sales Taxes remain property of the Commonwealth because they are "available resources" under the Commonwealth Constitution, and (e) Act 56 did not transfer ownership of the Pledged Sales Taxes to COFINA. Adversary Proceeding, ECF Nos. 300, 314.

Conversely, in her motion for summary judgment, the COFINA Agent asserted, among other things, that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Taxes to COFINA through Act 91 and that the tax revenue stream and the account into which it is deposited are not "available resources" of the Commonwealth. Adversary Proceeding, ECF Nos. 312, 316, 317. The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged

8

Sales Taxes to COFINA was valid under the Commonwealth Constitution, (b) the Pledged Sales Taxes are not "available resources" under the Commonwealth Constitution, (c) it is not "legally impossible" to transfer future SUT Revenues, and (d) the plain terms of COFINA's enabling legislation clearly transferred ownership of the Pledged Sales Taxes to COFINA. Adversary Proceeding, ECF Nos. 307, 318, 320, 325.  The Court heard argument on the cross-motions for summary judgment on April 10, 2018, and thereafter took the case under advisement.

Throughout the litigation process, the Agents availed themselves of the Court-appointed mediation team in the hopes of reaching a consensual resolution.  With the specter of a summary-judgment determination looming, the Agents recommenced mediation in the hope of resolving the Commonwealth-COFINA Dispute.  Through the auspices of the mediation team, on June 5, 2018, the Commonwealth Agent and the COFINA Agent reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the "Agreement in Principle"). Adversary Proceeding, ECF No. 486.  A few days later, on June 7, 2018, the Commonwealth Agent and the COFINA Agent publicly announced such agreement, filed the Agreement in Principle for all creditors to review.  *Id.*

On June 14, 2018, pursuant to the Agreement in Principle, the Commonwealth Agent filed the *Commonwealth Agent's Urgent Motion, Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019, for Order Establishing Procedures Governing 5.5% SUT Revenues Collected on or After July 1, 2018*, Adversary Proceeding, ECF No. 495 (the "Disputed Funds Motion"), seeking an order establishing procedures governing the 5.5% portion of the SUT collected on or after July 1, 2018, pending implementation of the settlement of the Commonwealth-COFINA Dispute.

On June 29, 2018, the Court entered an order, Adversary Proceeding, ECF No. 525, (the "Disputed Funds Order") establishing procedures governing revenues received from the Pledged Sales Taxes on deposit and to be deposited with BNYM, as trustee for the Existing Securities.  The Disputed Funds Order provides, among other things, that BNYM will separately account for (i) Pledged Sales Tax revenues currently in BNYM accounts or received on or before June 30, 2018, (ii) Pledged Sales Tax revenues received by BNYM on or after July 1, 2018, and prior to the earlier of the end of the Abeyance Period plus thirty (30) calendar days or the date of a ruling by the Court on the pending motions for summary judgment in the Adversary Proceeding, and (iii) Pledged Sales Tax revenues received by BNYM following the end of the Abeyance Period.  Following entry of the Disputed Funds Order, the Commonwealth Agent and BNYM reached an agreement resolving BNYM's concern regarding sufficient notice to beneficial holders of Existing Securities with respect to the order.  Subsequently, the Court entered an order modifying and replacing the Disputed Funds Order incorporating the agreement between the Commonwealth and BNYM.  Adversary Proceeding, ECF No. 534.

Accepting the inter-debtor resolution set forth in the Agreement in Principle, and as a result of over two weeks of mediation among the interested parties, led by Judges Houser, Ambro, and Atlas, the Oversight Board announced on August 8, 2018 that it had reached an agreement with certain holders and insurers of Existing Securities on the economic treatment of Existing Securities and the terms of new securities for a proposed COFINA plan of adjustment consistent with the Oversight Board's authority pursuant to the Procedures Order.

Subsequently, and again with the involvement and benefit of the mediation team, the Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del Patio, Inc.

(collectively, the "Settlement Parties") entered into that certain Plan Support Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that contemplates, among other things, (a) terms of the compromise and settlement of the Commonwealth-COFINA Dispute set forth in the Agreement in Principle, which, among other things, allocates an amount up to fifty-three and sixty five one-hundredths percent (53.65%) of the annual Pledged Sales Tax Base Amount to COFINA, and confirms that COFINA is the sole owner of the amounts held at BNYM as of June 30, 2018; (b) approval by the Court of the terms of the compromise and settlement of the Commonwealth-COFINA Dispute concurrently through a plan of adjustment in COFINA's Title III Case and the Settlement Motion in the Commonwealth's Title III Case; and (c) the agreement of the Settlement Parties to support the confirmation of a COFINA plan of adjustment consistent with the term sheet attached to the Original Plan Support Agreement.

        After further mediation, on September 20, 2018, the Settlement Parties amended and restated the Original Plan Support Agreement (the "A&R Plan Support Agreement") to include additional holders of Existing Securities, who also hold significant amounts of GO Bonds and were among the plaintiffs in the *Lex Claims Litigation* that initially ignited the Commonwealth-COFINA Dispute.  Pursuant thereto, Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable affiliates, who are significant holders of Existing Securities, will request dismissal, with prejudice, of their claims and causes of action in the *Lex Claims Litigation* premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the SUT Revenues purportedly transferred by the Commonwealth to COFINA, and any other claims and causes of action which may challenge the transactions contemplated in the A&R Plan Support Agreement, COFINA's plan of adjustment, or the Settlement Motion,

effective upon the entry of an order approving the Settlement and confirmation of COFINA's plan of adjustment incorporating the Settlement.  A&R Plan Support Agreement § 4.13.

On October 19, 2018, the Commonwealth filed the *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [ECF No. 4067], seeking approval of the terms of the global compromise and settlement (the "Settlement") between the Commonwealth and the COFINA resolving the Commonwealth-COFINA Dispute. The material terms of the Settlement are the foundational building blocks of the Plan and its approval is a prerequisite to the confirmation and effectiveness of the Plan.

### 3.  The Title III Plan of Adjustment

On October 19, 2018, the Debtor filed the Plan, Disclosure Statement, and *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17 BK 3284, ECF No. 307] (the "Approval Motion").

Pursuant to the Plan, starting in Fiscal Year 2019, the Commonwealth and COFINA will split the Pledged Sales Tax Base Amount, on a 46.35% and 53.65% basis, respectively.  There will also be a distribution of Plan consideration consisting of new COFINA Bonds and cash, providing a recovery for holders of "Senior" Existing Securities and "First Subordinate" Existing Securities on their allowed claims in the aggregate amount equal to approximately 93% (plus accrued interest at the weighted average rate on the new bonds commencing as of August 2018) and 56% (plus accrued interest at the weighted average rate on

12

the new bonds commencing as of August 2018), respectively.  The Plan, if confirmed by the Court, will also resolve all COFINA-related litigation, including the Interpleader Action (except for litigation between BNYM, Ambac, and Whitebox), and validate the COFINA structure for all future purposes.

### 4.  The Disclosure Statement Order

The Disclosure Statement was approved by this Court on November 29, 2018 [Case No. 17 BK 3284, ECF No. 375] (the "Disclosure Statement Order").  Pursuant to the Disclosure Statement Order, the Court granted the Approval Motion and approved the Disclosure Statement as "contain[ing] adequate information within the meaning of section 1125 of the Bankruptcy Code . . . for purposes of soliciting acceptances and rejections of the Plan . . . ." Disclosure Statement Order at 3.  The Court also (i) established January 2, 2019, at 5:00 p.m., (Atlantic Standard Time) as the Confirmation Objection Deadline, *id.* at 10, (ii) established January 8, 2019 at 6:00 p.m. (Atlantic Standard Time) as the voting deadline by which (a) ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting Deadline"), and (b) the election deadline by which ballots to elect the form of distribution were required to be received by Prime Clerk, (the "Election Deadline"),[8] *id.* at 13, and (iii) scheduled a hearing on January 16, 2019 at 9:30 a.m. (Atlantic Standard Time) to consider confirmation of the Plan (the "Confirmation Hearing") [Case No. 17 BK 3284, ECF No. 302].  Numerous parties interposed objections to the Plan.  A response to such objections is set forth below and in the contemporaneously filed omnibus reply (the "Reply") to objections to the Plan.

---

[8]   The Court later extended the Election Deadline to January 11, 2019 at 6:00 p.m. (Atlantic Standard Time) [ECF No. 400].

5. **The Solicitation and Tabulation of Votes in Favor of the Plan**

Consistent with the Disclosure Statement Order, Prime Clerk served solicitation packages to be distributed to all claim holders entitled to vote. The solicitation packages contained, among other things: (i) the notice setting forth the time, date, and place of the Confirmation Hearing (the "Confirmation Hearing Notice"); (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating to distributions under the Plan; and (v) in the case of creditors in Class 6, the Class 6 Notice. Prime Clerk also served election notices to holders of Claims in Classes 1 and 5, to elect into Classes 4 and 7, respectively, or if in Class 2 or 3, to elect to receive the applicable trust certificates.

As of today, the Debtor has received sufficient votes in favor of the Plan to satisfy section 1129 of the Bankruptcy Code and support its request for an order confirming the Plan. On January 15, 2019, the Debtor will be filing the Voting Declaration, providing the details and audited results of the vote by each Class, and will advise the Court about the status of the elections.

As the Voting Declaration will show, all of the Classes entitled to vote on the Plan have voted to accept the Plan. Class 10 (the "Non-Voting Class") is impaired, will not receive or retain any property under the Plan, and is deemed to have rejected the Plan.

**B.   THE PLAN MEETS EACH OF THE REQUIREMENTS UNDER TITLE III OF PROMESA AND SHOULD BE CONFIRMED**

To confirm the Plan, the Debtor must demonstrate that the Plan satisfies the applicable provisions of title 11 of the Bankruptcy Code, made applicable to COFINA's Title III Case by PROMESA section 301. *See* PROMESA § 314(b)(1).[9]  Additionally, the Debtor must also demonstrate the Plan complies with the provisions of title III of PROMESA. *Id.* § 314(b)(2).   Through the collective filings with the Court, including the Plan, the Disclosure Statement, the Plan Supplement, this Memorandum, the Reply, the Voting Declaration, the Brownstein Declaration, the Jaresko Declaration, and any additional evidence adduced at the Confirmation Hearing, the Debtor will demonstrate that the Plan satisfies all applicable subsections of title 11 of the Bankruptcy Code and title III of PROMESA.

**1.   PROMESA § 314(b)(1):  The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301**

The language in PROMESA section 314(b)(1) mirrors that of section 1129(a)(1) of the Bankruptcy Code, which provides that a plan must "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(1).   This provision ensures the requirements of sections 1122 and 1123 of the Bankruptcy Code, which govern classification of claims and contents of a plan, respectively, have been satisfied.   H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978); *see also In re Charles St. African Methodist Episcopal Church of Boston*, 499 B.R. 66, 95 (Bankr. D. Mass. 2013); *In re Johns-Manville Corp.*, 68 B.R. 618, 629 (Bankr. S.D.N.Y 1986), *aff'd in part*, *rev'd in part on other grounds*, 78 B.R. 407 (S.D.N.Y. 1987), *aff'd sub nom. Kane v. Johns-Manville Corp.*, 843 F.2d 636 (2d Cir.

---

[9]   As relevant to this Memorandum, such sections are as follows:  1122, 1123(a)(1), 1123(a)(2), 1123(a)(3), 1123(a)(4),  1123(a)(5),  1123(b),  1123(d),  1125,  1126(a),  1126(b),  1126(c),  1126(e),  1126(f),  1126(g), 1129(a)(2), 1129(a)(3), 1129(a)(6), 1129(a)(8), 1129(a)(10), 1129(b)(1), 1129(b)(2)(A), and 1129(b)(2)(B).

1988).  The Plan complies fully with the requirements of sections 1122 and 1123 applied by

PROMESA section 301, as well as other applicable provisions of the Bankruptcy Code.

      **a.**    **The Plan Satisfies the Classification**
                     **Requirements of Section 1122 of the Bankruptcy Code**

Section 1122 of the Bankruptcy Code sets forth the requirements for the

classification of claims and interests in a plan.  Section 1122(a) provides:

> (a)    Except as provided in subsection (b) of this section, a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.

11 U.S.C. § 1122(a).

Thus, a plan may provide for multiple classes of claims or interests as long as

each claim or interest *within a class* is substantially similar to the other claims or interests in that

class.  *See In re Combustion Eng'g, Inc.*, 391 F.3d 190, 239 (3d Cir. 2004) (substantially similar

claims should be classified together); *In re Armstrong World Indus., Inc.*, 348 B.R. 136, 159

(Bankr. D. Del. 2006) ("A classification structure satisfies section 1122 of the Bankruptcy Code

when a reasonable basis exists for the structure, and the claims or interests within each particular

class are substantially similar."); *see also In re Gato Realty Tr. Corp.*, 183 B.R. 15, 21 (Bankr.

D. Mass. 1995) (*citing Granada Wines, Inc. v. New England Teamsters and Trucking Indus.

Pension Fund*, 748 F.2d 42 (1st Cir. 1984)) (similar claims may be classified separately based on

such claims' rank, character, and status).  The Bankruptcy Code does not require that all similar

claims be placed in one class:

> The express language of this statute explicitly forbids a plan from placing dissimilar claims in the same class; it does not, though, address the presence of similar claims in different classes.  Although the legislative history behind § 1122 is inconclusive regarding the significance (if any) of this omission, it remains clear that Congress intended to afford bankruptcy judges broad discretion to decide the propriety of plans in light of the facts of each case.

16

*Aetna Cas. & Sur. Co. v. Clerk, United States Bankr. Court (In re Chateaugay Corp.)*, 89 F.3d 942, 949 (2d Cir. 1996) ("[C]lassification is constrained by two straight-forward rules: [d]issimilar claims may not be classified together; similar claims may be classified separately only for a legitimate reason."); *In re Jersey City Med. Ctr.*, 817 F.2d 1055, 1060-61 (3d Cir. 1987) ("[W]e agree with the general view which permits the grouping of similar claims in different Classes."); *John Hancock Mut. Life Ins. Co. v. Route 37 Bus. Park Assocs.*, 987 F.2d 154, 158 (3d Cir. 1993) ("[T]he classification of the claims or interests must be reasonable.") (citation omitted).

Courts have identified several grounds justifying separate classification, including where members of a class possess different legal rights. *See In re Heritage Org., L.L.C.*, 375 B.R. 230, 298 n.86 (Bankr. N.D. Tex. 2007) (finding that if creditors had different legal rights under equitable subordination, then separate classification would be appropriate); *In re Kaiser Aluminum Corp.,* No. 02–10429 (JKF), 2006 WL 616243, at *4–6 (Bankr. D. Del. Feb. 6, 2006) (permitting classification scheme after consideration of the diverse characteristics of each class of creditors' legal rights).

Importantly, a plan proponent is afforded significant flexibility in classifying claims under section 1122(a) so long as there is a reasonable basis for the classification structure. *See  Jersey City Med. Ctr.*, 817 F.2d at 1060–61; *cf. In re Colfer*, 159 B.R. 602, 606 (Bankr. D. Me. 1993) (quoting *Granada Wines*, 748 F.2d at 46 (separate classifications for unsecured creditors justified "where the legal character of their claims is such as to accord them a status different from the other unsecured creditors")).

However, separate classification will not be allowed when it is done to control the voting outcome.  *See, e.g.*, *In re Coram Healthcare Corp.*, 315 B.R. 321, 350 (Bankr. D. Del.

2004) ("classification of claims should not be permitted solely on the basis of how the plan proponent thinks the creditor will vote. That is gerrymandering."). Here, the Plan's classification structure is proper and in accordance with section 1122(a) of the Bankruptcy Code. The Plan's classification scheme is as follows:[10]

| Class | Class Description | Estimated Percentage (%) Recovery |
|---|---|---|
| Class 1 | Senior COFINA Bond Claims | If the Claimholder chooses Taxable Election, they will be placed in Class 4<br><br>If the Claimholder chooses No Taxable Election: 93.015% |
| Class 2 | Senior COFINA Bond Claims (Ambac) | 100% |
| Class 3 | Senior COFINA Bond Claims (National) | 100% |
| Class 4 | Senior COFINA Bond Claims (Taxable Election) | 95.015% |
| Class 5 | Junior COFINA Bond Claims | If the Claimholder chooses Taxable Election, they will be placed in Class 7<br><br>If the Claimholder chooses No Taxable Election: 56.414% |
| Class 6 | Junior COFINA Bond Claims (Assured) | 100% |
| Class 7 | Junior COFINA Bond Claims (Taxable Election) | 58.414% |
| Class 8 | GS Derivative Claim | The Class will receive up to 93.015%, depending on the Title III Court's determination, |
| Class 9 | General Unsecured Claims | If Class 9 votes to accept the Plan: 0.252%.<br><br>If Class 9 votes to reject the Plan: 0%. |
| Class | Section 510(b) Subordinated Claims | 0% |

---

[10] Further information regarding the distributions made to the various classes can be found in the Plan and Disclosure Statement.

| Class | Class Description | Estimated Percentage (%) Recovery |
|---|---|---|
| 10 | | |

The Plan's classification of Claims satisfies the requirements of section 1122 of the Bankruptcy Code because the Claims in each Class are substantially similar to the other Claims in such Class, and all Claims in each Class differ from the Claims in each other Class because they have different legal rights or based on other relevant criteria. *See* Plan § 4.1. For example, all holders of Claims in Classes 1–3 hold the same underlying security, "Senior Existing Securities and receive materially the same distributions under the Plan, but are classified separately based on whether they are insured by Ambac (Class 2), or National (Class 3), or uninsured (Class 1), as such insurance agreements provide bondholders different rights thereunder. Similarly, holders of Claims in Classes 5 and 6 hold the same underlying security, "First Subordinate" Existing Securities, and receive materially the same distributions under the Plan, but are classified separately based on whether they are uninsured (Class 5) or insured by Assured (Class 6). Likewise, similar to many chapter 11 plans where creditors may choose a different recovery, such as opting to be included in a convenience class where the amount of the claim exceeds the threshold established for such treatment in the plan, and, thereby, be removed from a general unsecured class,[11] the holders within Classes 1 and 5 have the option to elect to receive cash and all taxable bonds, moving into Classes 4 and 7, respectively, so that more tax-exempt bonds are available to holders of claims in Classes 1 and 5.

---

[11] *See, e.g.*, *In re Mt. Crane Serv.*, LLC., 2018 Bankr. LEXIS 3290, *20 (Bankr. D. Utah Oct. 23, 2018) (confirming a plan allowing holders of class 2 claims to make a "Convenience Class Election" to convert their claim to Class 34, where the allowed amount thereof (up to $1,000) is paid in full); *In re Cuzco Dev. U.S.A., LLC*, 2017 Bankr. LEXIS 531, *70 (Bankr. D. Haw. Feb. 24, 2017) ("If a holder of a Class 5 Claim elects for its claim to be classified as a Convenience Class Claim under Class 4 above, then such claim shall be excluded from Class 5.").

In addition, the Senior COFINA Bond Claims and Junior COFINA Bond Claims are in different classes and receive different recoveries because they have different underlying rights.  Specifically, in an event of default, payment of the Junior COFINA Bond Claims, such as those bonds issued under the Seventh Supplemental Sales Tax Revenue Bond Resolution, is subordinate to payment of the Senior Bonds issued under the Amended and Restated Sales Tax Revenue Bond Resolution.  *See* <u>Adversary Proceeding</u>, [ECF No. 547], Exhibit A (Amended and Restated Sales Tax Revenue Bond Resolution) at Section 101 (defining "Subordinate Bonds" as having a priority of payment *subordinate* to payment of the Senior Bonds) (emphasis added); Seventh Supplemental Sales Tax Revenue Bond Resolution at Section 2.1 (explaining the Series 2011A Bonds shall constitute "Subordinate Bonds" under the Resolution); *see also In re Reid Park Props. Ltd. Liab. Co.*, No. 4:11-BK-15267-EWH, 2012 WL 2934001, at *2 (Bankr. D. Ariz. July 18, 2012) (requiring separate classification of two promissory notes secured by real property, where an inter-creditor agreement made one note subordinate to the other); *In re Dave's Detailing, Inc.*, No. 13-08077 (RLM), 2015 WL 4601726, at *6 (Bankr. S.D. Ind. July 30, 2015) (separately classifying subordinated and unsubordinated unsecured claims).

### b.       The Plan Satisfies Section 1123(a) of the Bankruptcy Code

Section 1123(a) of the Bankruptcy Code contains seven requirements that a chapter 11 plan must satisfy, *see* 11 U.S.C. § 1123(a).  However, PROMESA incorporates only the first five of those requirements, sections 1123(a)(1)–(5).   PROMESA § 301.   As demonstrated below, the Plan complies with each of these requirements.

### (i)       The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(1) By Designating Classes of Claims

Section 1123(a)(1) of the Bankruptcy Code provides that a plan may designate, subject to section 1122, classes of claims and interests other than claims of a kind specified in

sections 507(a)(2) (administrative expense claims), 507(a)(3) (claims arising during the "gap"

period in an involuntary case), and 507(a)(8) of the Bankruptcy Code (unsecured priority tax

claims).  *See* 11 U.S.C. § 1123(a)(1).  As discussed above, Article IV of the Plan designates ten

separate Classes of Claims for the Debtor.  *See* Plan, Art. IV.  Thus, the Plan complies with the

requirements of section 1123(a)(1) of the Bankruptcy Code.

> **(ii)** **The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(2) By Specifying Unimpaired Classes**

Section 1123(a)(2) of the Bankruptcy Code requires that the Plan "specify any

class of claims or interests that is not impaired under the plan."  11 U.S.C. § 1123(a)(2).  The

Plan meets this requirement by identifying each unimpaired Class of Claims under the Plan.

Specifically, Article XXII of the Plan specifies that Claims in Classes 1 through 10 are all

impaired; accordingly there are no unimpaired Classes under the Plan.  *See* Plan, Art. XXII.

Thus, the Plan complies with the requirements of section 1123(a)(2) of the Bankruptcy Code.[12]

> **(iii)** **The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(3) By Specifying the Treatment of Impaired Classes**

Section 1123(a)(3) of the Bankruptcy Code requires that the Plan "specify the

treatment of any class of claims or interests that is impaired under the plan."  11 U.S.C.

§ 1123(a)(3).  The Plan meets this requirement by setting forth the treatment of impaired Classes.

*See* Plan, Art. V–XIV; *see also* Art. XXII.  Articles V–XIV of the Plan identify all impaired

Classes and describes the treatment of the Claims in each of the Classes.  *See id.*  Thus, the Plan

satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

---

[12]  It should be noted that the existing holders of Allowed Junior COFINA Bond Claims (Assured) will receive (through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus, be rendered unimpaired.  However, Assured will be subrogated to the rights of such holders and will received distributions pursuant to the Plan, thereby rendering Assured's claims impaired.

   (iv) **The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(4) By Providing Equal Treatment within Each Class of Claims**

   Section 1123(a)(4) of the Bankruptcy Code requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4). Pursuant to sections 1122 and 1123(a)(4) of the Bankruptcy Code, each holder of an Allowed Claim within a particular Class will receive the same treatment as other Allowed Claims in such Class, except to the extent that holders have agreed to less favorable treatment. *See* Plan, Art. V–XIV. For example, holders of claims in Class 1 (Senior COFINA Bond Claims) and Class 5 (Junior COFINA Bonds Claims) each receive the same treatment, 93.015% and 56.414%, respectively. However, an option is given to certain holders in each of Class 1 and Class 5 to elect out of such Class if such holder wants to receive taxable bonds under the Plan. If a holder of a Claim in Class 1 or 5 elects, they are no longer in that Class, and are instead treated as holders of Claims in Class 4 or 7, respectively. Accordingly, all holders of Claims in each of Class in 1, 4, 5, and 7 receive the same treatment under the Plan. *See also supra* note 11 (indicating that courts have approved plans where claimholders elect to be treated as members of a convenience class). Thus, the Plan complies with the requirements of section 1123(a)(4) of the Bankruptcy Code.

   (v) **The Plan Complies with the Requirements of 11 U.S.C. § 1123(a)(5) By Providing Adequate Means for Its Implementation**

   Section 1123(a)(5) of the Bankruptcy Code requires that, [n]otwithstanding any otherwise applicable nonbankruptcy law, a Plan provide "adequate means" for its implementation. *See* 11 U.S.C. § 1123(a)(5). Article XXVIII of the Plan and various other provisions provide for the means by which the Plan will be implemented:

- Section 16.1 provides for the issuance of COFINA Bonds on the Effective Date;

- Section 19.1 provides for distributions to be made to holders of Allowed Claims under the Plan;

- Section 26.1 provides that, except as set forth in the Plan, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA;

- Section 28.1 provides that, on the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, without further action by any Person or Entity under any other applicable law, regulation, order, or rule;

- Section 28.3 provides for the appointment of the board of directors of Reorganized COFINA, consisting of three (3) persons appointed by the Governor of the Commonwealth all of whom shall meet the independence and qualification standards set forth in the Definitive Documents;

- Section 28.5 provides that the COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan and as reflected in the Term Sheet; and

- Section 30.1 provides for the re-vesting of assets.  Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan.

*See* Plan, Arts. XVI, XIX, XXVI, XXVIII, & XXX.

c.      **The Plan Complies with Section 1123(b) of the Bankruptcy Code**

In addition to the requirements of section 1123(a) of the Bankruptcy Code, section 1123(b) contains discretionary provisions that may be (but are not required to be) incorporated into a chapter 11 plan. *See* 11 U.S.C. § 1123(b). The Plan contains several discretionary provisions permitted by section 1123(b) of the Bankruptcy Code, as described below.

(i)     **The Plan Permissibly Provides for the Impairment/Unimpairment of Certain Claims**

Section 1123(b)(1) provides that a plan may "impair or leave unimpaired any class of claims, secured or unsecured, or of interests." 11 U.S.C. § 1123(b)(1). All Classes of Claims are impaired by the Plan. *See* Plan, Article XXII. Accordingly, the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

(ii)    **The Plan Permissibly Provides for the Assumption and Rejection of Executory Contracts**

Section 1123(b)(2) allows a plan, subject to section 365 of the Bankruptcy Code, to provide for the assumption, assignment, or rejection of executory contracts and unexpired leases of the debtor not previously rejected. *See* 11 U.S.C. § 1123(b)(2). Article XVIII of the Plan provides that, as of the Effective Date, all Executory Contracts to which COFINA is a party to are rejected, except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and

24

Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date.  *See* Plan § 18.1.

Of the Debtor's Executory Contracts, the Lehman Debt Service Deposit Agreement has already been rejected by order of the Title III Court.  *See* [Case No. 17 BK 3284, ECF No. 392].   The Plan Supplement, filed with the Court on December 31, 2018, will be amended to designate one contract as being assumed pursuant to the Plan:  the Banking Services Contract dated as of May 15, 2007, by and among Banco Popular de Puerto Rico, the Government Development Bank of Puerto Rico, and the Puerto Rico Department of Treasury, as amended by that certain Amendment to Banking Services Contract executed on October 5, 2007, that certain Second Amendment to Banking Services Contract executed on December 28, 2007, that certain Third Amendment to Banking Services Contract executed on June 18, 2009 (pursuant to which, among other things, COFINA was added as a party), and that certain letter agreement dated October 5, 2015 (and as such agreement may further be amended, restated, supplemented, or otherwise modified from time to time, the "Banking Services Contract").  All other Executory Contracts, including the GS Swap Agreement, will be deemed rejected as of the Effective Date.  Accordingly, the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### (iii)    The Plan Permissibly Provides for the Retention and Enforcement of Claims

Section 1123(b)(3)(B) of the Bankruptcy Code provides that a plan may "provide for the retention and enforcement by the debtor" of certain claims or interests.  11 U.S.C. § 1123(b)(3)(B).  Section 26.1 of the Plan provides that, "[e]xcept as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and

25

power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court." *See* Plan § 26.1.   Accordingly, the Plan is consistent with section 1123(b)(3) of the Bankruptcy Code.

### (iv)   The Plan Permissibly Provides for Modification of Claimholders' Rights

Section 1123(b)(5) of the Bankruptcy Code provides for the modification of rights of secured or unsecured claimholders under the Plan.  For example, the Plan modifies the rights of the Senior COFINA Bond Claims in Class 1, which Senior COFINA Bonds Claims are receiving their "Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary." Plan § 5.1.  In total, the Plan modifies the rights of holders of Claims in all Classes 1–10.  Accordingly, the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### (v)   The Plan Permissibly Includes Other Appropriate Provisions

Section 1123(b)(6) of the Bankruptcy Code is a catch-all provision that permits inclusion of any appropriate provision as long as it is consistent with applicable provisions of the Bankruptcy Code.  In accordance with the Bankruptcy Code and as further detailed herein, the Plan provides for, among other things:  (a) certain releases, injunctions, and exculpations; (b) assumption of certain director and officer indemnification and reimbursement obligations; and (c) an exemption from registration pursuant to section 1145 of the Bankruptcy Code for the issuance and distribution of COFINA Bonds, Ambac Certificates, Assured Certificates, and

National Certificates.  Accordingly, the Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

> **d.**    **The Plan Complies with Section 1123(d) of the Bankruptcy Code By Providing for the Cure of Defaults Under the Plan**

Section 1123(d) of the Bankruptcy Code provides that, if a plan proposes to cure a default, the amount necessary to cure the default shall be determined "in accordance with the underlying agreement and applicable nonbankruptcy law." 11 U.S.C. § 1123(d).  Section 18.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed or assumed and assigned under the Plan.  *See* Plan § 18.4. All cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan.  As only the Banking Services Contract is being assumed and its assumption is in compliance with the Bankruptcy Code, the Debtor is not aware of any monetary defaults it must cure.  Accordingly, the Plan complies with the requirements of section 1123(d) of the Bankruptcy Code.  Based upon the foregoing, the Plan satisfies the requirements of section 1129(a)(1) of the Bankruptcy Code.

> **e.**    **Section 1129(a)(2):  The Debtor Has Complied with the Applicable Provisions of the Bankruptcy Code**

Section 1129(a)(2) of the Bankruptcy Code requires that the plan proponent "compl[y] with the applicable provisions of [the Bankruptcy Code]."  11 U.S.C. § 1129(a)(2); *see also In re PWS Holding Corp.*, 228 F.3d 224, 248 (3d Cir. 2000).  The legislative history to section 1129(a)(2) explains that this provision is intended to incorporate the disclosure and solicitation requirements set forth in sections 1125 and 1126 of the Bankruptcy Code.  *See* H.R. REP. NO. 95-595, at 412 (1977); S. REP. NO. 95-989, at 126 (1978) ("Paragraph (2) [of § 1129(a)] requires that the proponent of the plan comply with the applicable provisions of chapter 11, such as section 1125 regarding disclosure."); *see also  Johns-Manville Corp.*, 68 B.R. at 630 ; *In re*

*Toy & Sports Warehouse, Inc.*, 37 B.R. 141, 149 (Bankr. S.D.N.Y. 1984). The Debtor has complied with the applicable provisions of the Bankruptcy Code, including the provisions of sections 1125 and 1126, regarding disclosure and solicitation of the Plan.

### (i)   The Debtor Has Complied with Section 1125 of the Bankruptcy Code

Section 1125 of the Bankruptcy Code provides, in pertinent part, that:

(b)   An acceptance or rejection of a plan may not be solicited after the commencement of the case under [the Bankruptcy Code] from a holder of a claim or interest with respect to such claim or interest, unless, at the time of or before such solicitation, there is transmitted to such holder the plan or a summary or the plan, and a written disclosure statement approved, after notice and a hearing, by the court as containing adequate information . . . .

(c)   The same disclosure statement shall be transmitted to each holder of a claim or interest of a particular class, but there may be transmitted different disclosure statements, differing in amount, detail, or kind of information, as between classes.

11 U.S.C. § 1125.

On October 19, 2018, the Debtor filed the Disclosure Statement and the Approval Motion. After notice and a hearing held on November 20, 2018, the Court entered the Disclosure Statement Order and approved the Disclosure Statement pursuant to section 1125 of the Bankruptcy Code as containing "adequate information" of a kind and in sufficient detail to enable hypothetical, reasonable investors typical of the Debtor's claimholders to make an informed judgment whether to accept or reject the Plan. Pursuant to the Disclosure Statement Order, the Court also approved, among other things:  (i) all materials to be included in the Solicitation Packages; (ii) the forms of Ballots; (iii) the procedures for voting and for tabulation of votes to accept or reject the Plan; and (iv) the manner of service of the Solicitation Packages.

Thereafter, in accordance with the Disclosure Statement Order, the Debtor, by and through Prime Clerk, the Debtor's balloting agent, distributed Solicitation Packages to all holders

of Claims entitled to vote under the Plan, which contained: (i) the Confirmation Hearing Notice; (ii) a flash drive (or hard copy, in the Debtor's discretion) containing the Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) the appropriate Elections Notice, if any; and (v) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax related information relating to distributions under the Plan; with each of the foregoing accompanied by its Spanish-language translation. *See Certificate of Service of Solicitation Materials*, dated December 12, 2018 [Case No. 17 BK 3284, ECF No. 387], at 1–3. The Debtor did not solicit acceptances or rejections of the Plan from any holder of Claims prior to the transmission of the Solicitation Packages. As will be established at the Confirmation Hearing, Prime Clerk solicited and tabulated votes in accordance with the Disclosure Statement Order. Furthermore, the Court entered orders establishing the (i) Confirmation Objection Deadline, (ii) Voting Deadline, (iii) Election Deadline, and (iv) Confirmation Hearing Date, putting creditors and other parties in interest on notice of the pertinent deadlines for the process of confirming the Plan.

Additionally, as required by the Disclosure Statement Order, the Debtor (i) published the Confirmation Hearing Notice once in each of (a) *El Nuevo Dia* in Spanish (primary circulation is in Puerto Rico), (b) *Caribbean Business* in English (primary circulation is in Puerto Rico), (c) *El Diario* in Spanish (primary circulation is in New York), (d) *El Nuevo Herald* in Spanish (primary circulation is Miami), and (e) *The Bond Buyer*, on a date not less than twenty-five (25) nor more than thirty-two (32) calendar days prior to the date of the Confirmation Hearing, *see* Publication Affidavit, filed January 3, 2019 [ECF No. 4615], and (ii) caused no less

29

than ten (10) radio advertisements, to be aired during the period from December 7, 2018 up to and including December 21, 2018, on (a) WMEG FM (contemporary hit radio) in Spanish and (b) WKAQ AM (Spanish language talk radio) in Spanish, informing listeners of (a) the approval of the Disclosure Statement and the scheduling of the Confirmation Hearing, (b) the date by which Confirmation Objections must be filed and served, (c) the Voting Deadline and the Election Deadline and (d) an information hotline to receive certain additional information. *See* Publication Affidavit, filed January 8, 2019 [ECF No. 4645].

The Debtor will establish at the Confirmation Hearing the methodology for the tabulation of Ballots and results of voting with respect to the Plan.

### (ii)   The Debtors Have Obtained Acceptances of the Plan Consistent with Section 1126 of the Bankruptcy Code

Section 1126 of the Bankruptcy Code sets forth the requirements for acceptance of a plan of reorganization. *See* 11 U.S.C. § 1126. Under section 1126, only holders of allowed claims and allowed equity interests in impaired classes that will receive or retain property under a plan on account of such claims or equity interests may vote to accept or reject a plan. *See id*. The statute provides, in pertinent part, that:

(a)   The holder of a claim or interest allowed under section 502 of [the Bankruptcy Code] may accept or reject a plan . . .

(f)   Notwithstanding any other provision of this section, a class that is not impaired under a plan, and each holder of a claim or interest of such class, are conclusively presumed to have accepted the plan, and solicitation of acceptances with respect to such class from the holders of claims or interests of such class is not required.

*Id*.

As to impaired classes entitled to vote to accept or reject a plan, section 1126(c) of the Bankruptcy Code specifies the requirements for acceptance of a plan by classes of claims:

> (c)     A class of claims has accepted a plan if such plan has been accepted by creditors, other than any entity designated under subsection (e) of this section, that hold at least two-thirds in amount and more-than one-half in number of the allowed claims of such class held by creditors, other than any entity designated under subsection (e) of this section, that have accepted or rejected the plan.

11 U.S.C. § 1126(c).

As set forth in the Disclosure Statement, the Voting Declaration, and this Memorandum, and in accordance with section 1126 of the Bankruptcy Code, the Debtor solicited votes from the holders of all Claims allowed for voting purposes in each Class of impaired Claims entitled to vote on the Plan. Specifically, votes were solicited from the holders of Claims in Classes 1–3, 5–6, and 8–9. Creditors who elect to be treated within Classes 4 and 7, rather than within Classes 1 and 5, respectively, are deemed to have accepted the Plan.

The voting and solicitation procedures were proper. Pursuant to the Disclosure Statement Order, the insurers, Ambac, Assured, and National, voted the Claims of the underlying bondholders, who receive an estimated 100% recovery as a result of the insurers' payments, and are accordingly not prejudiced or impaired by the insurers voting such Claims.

Pursuant to section 1126(f) of the Bankruptcy Code, holders of Claims in unimpaired Classes are conclusively presumed to have accepted the Plan and were not entitled to vote on the Plan. As discussed above, however, except with respect to holders of Allowed Junior COFINA Bond Claims receiving payments from Assured, there are no unimpaired Classes. *See* Plan, Art. XXII. Further, in accordance with the Disclosure Statement Order, the Debtor distributed a notice of the Confirmation Hearing and non-voting status to each holder of Claims in the Non-Voting Class.

      **f.**       **Section 1129(a)(3):  The Plan was Proposed
in Good Faith and Not by Any Means Forbidden by Law**

Section 1129(a)(3) of the Bankruptcy Code requires that a plan be "proposed in good faith and not by any means forbidden by law."  11 U.S.C. § 1129(a)(3).  The Bankruptcy Code does not define "good faith," but rather, courts generally interpret it to mean that "there exists a reasonable likelihood that the plan will achieve a result consistent with the objectives and purposes of the Bankruptcy Code."  *In re City of Detroit*, 524 B.R. 147, 247–48 (Bankr. E.D. Mich. 2014) (quoting *In re Waterford Hotel, Inc.*, 497 B.R. 255, 266 (Bankr. E.D. Mich. 2013)); *Connell v. Coastal Cable T.V., Inc. (In re Coastal Cable T.V., Inc.)*, 709 F.2d 762, 765 (1st Cir. 1983); *In re Corey*, 892 F.2d 829, 835 (9th Cir. 1989).

Title III of PROMESA is analogous to Chapter 9 of the Bankruptcy Code, as it adopts many of the same provisions of the Bankruptcy Code that Chapter 9 adopts.  *Compare* PROMESA § 301(a) *with* 11 U.S.C. § 901(a).  The principal purpose of Chapter 9 "is to allow an insolvent municipality to restructure its debts in order to continue to provide public services."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 41 (Bankr. D. Colo. 1999); *Detroit*, 524 B.R. at 248.  "The primary purpose of debt restructure for a municipality is not future profit, but rather continued provision of public services."  *Mount Carbon*, 242 B.R. at 34; *Detroit*, 524 B.R. at 248.  Furthermore, the purposes of title III also include to "provide a method for a covered territory to achieve fiscal responsibility and access to capital markets."  These purposes of Title III are most relevant here, as COFINA does not provide services to citizens, and is only a special securitization vehicle for the limited purposes set forth in Act 91.

In determining whether the plan achieves a result consistent with the objectives and purposes of Chapter 9 (and, by analogy, PROMESA title III), courts look at the totality of the circumstances in a particular case.  *See Franklin High Yield Tax-Free Income Fund v. City of*

*Stockton (In re City of Stockton)*, 542 B.R. 261, 279 (B.A.P. 9th Cir. 2015); *Mount Carbon*, 242 B.R. at 39; *Detroit*, 524 B.R. at 248; *In re Puffer*, 674 F.3d 78, 81 (1st Cir. 2012).

The Oversight Board proposed the Plan in good faith and not by any means forbidden by law.  The Oversight Board's appointment of the Commonwealth Agent and COFINA Agent is but one indicator of the Plan's good faith.  The Agents vigorously represented their constituencies, and worked hard to obtain the best conceivable recovery.  The foundation of the Plan was the Agreement in Principle, which divided the SUT Revenues, and resolved the Adversary Proceeding.  Thereafter, with all creditors represented at an arm's-length negotiation, and with the assistance of the mediation team, the Plan was proposed.  Holders of Claims acted in good faith in negotiating the respective recoveries for holders of "Senior" Existing Securities and "First Subordinate" Existing Securities.  Even so, the Oversight Board is, and they are not, the proponent of the Plan.  The overwhelming support for the Plan received from all Classes entitled to vote provides independent evidence of the Oversight Board's good faith.  The Oversight Board, and its directors, officers, employees, agents, affiliates, and professionals have acted in "good faith" within the meaning of section 1125(e) of the Bankruptcy Code, thereby satisfying the "good faith" requirement of section 1129(a)(3) of the Bankruptcy Code.

In light of the foregoing, it is clear the Plan was proposed in good faith and promotes the rehabilitative objectives and purposes of PROMESA and the Bankruptcy Code, and therefore satisfies the requirements of section 1129(a)(3) of the Bankruptcy Code.

g. **Section 1129(a)(6):  The Plan Does Not Contain Any Rate Changes Subject to the Jurisdiction of Any Governmental Regulatory Commission**

Section 1129(a)(6) of the Bankruptcy Code requires that any regulatory commission having jurisdiction over the rates charged by a reorganized debtor in the operation of its businesses approve any rate change provided for in the Plan.  *See* 11 U.S.C. § 1129(a)(6).

Because the Debtor's business is not governed by regulated rates, this provision is not applicable for purposes of confirming the Plan.

**h.      Section 1129(a)(8):  The Plan Has Not Been Accepted By Each Impaired Class Under the Plan, But Nonetheless Can Be Confirmed By Satisfying 11 U.S.C. §§ 1129(a)(10) and (b)**

Section 1129(a)(8) of the Bankruptcy Code requires that each class of impaired claims or interests either accept the Plan or not be impaired under the plan, subject to the exceptions identified in section 1129(b).  *See* 11 U.S.C. §§ 1129(a)(8), 1129(b).  Section 1126 provides that a plan is accepted by an impaired class of claims if the accepting class members hold at least two-thirds in amount and more than one-half in number of the claims held by the class members that voted on the plan.  *See* 11 U.S.C. § 1126.  Under section 1126(g) of the Bankruptcy Code, however, impaired classes that neither receive nor retain property under the plan are deemed to reject the plan.

The evidence presented at the Confirmation Hearing will show that each of the impaired Classes, other than the deemed rejecting Class, voted to accept the Plan with the requisite numerosity and dollar amounts required by section 1126(c) of the Bankruptcy Code. Confirmation is nevertheless achievable, as explained in more detail below, because the Plan satisfies the requirements of sections 1129(a)(10) and 1129(b) of the Bankruptcy Code. Accordingly, the Debtor's Plan overcomes the requirement of section 1129(a)(8) by satisfying sections 1129(a)(10) and 1129(b).

**i.      Section 1129(a)(10):  At Least One Impaired Class of Claims Voted in Favor of the Plan, Without Including Claims of Insiders**

Section 1129(a)(10) requires the affirmative acceptance of a plan by at least one class of impaired claims, "determined without including any acceptance of the plan by any insider." *Id*; *see also In re Resorts Int'l*, 145 B.R. 412, 479 (Bankr. D.N.J. 1990) (where four

classes of impaired creditors accepted the plan, exclusive of insiders, requirements of section 1129(a)(10) were satisfied).

As the Voting Declaration will show, at least one impaired Class—*e.g.*, Class 1, has accepted the Plan.  No insider Claims are included in the tabulation of votes for Class 1. Accordingly, the requirement of section 1129(a)(10) of the Bankruptcy Code has been met.

**j.       Section 1129(b):  The Plan Satisfies the Cram-Down Requirements with Respect to Class 10**

Section 1129(b)(1) of the Bankruptcy Code provides that, if certain requirements are met, a plan shall be confirmed notwithstanding that section 1129(a)(8) is not satisfied with respect to one or more classes.  *See* 11 U.S.C. § 1129(b)(1).  In particular, section 1129(b)(1) requires that, to confirm a plan that has not been accepted by all impaired Classes, the plan proponent must show that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the non-accepting impaired Classes.  *See In re Zenith Elecs. Corp.,* 241 B.R. 92, 105 (Bankr. D. Del. 1999); *see also John Hancock* 987 F.2d at 157 n.5.  The plan proponent bears the burden of proof by a preponderance of the evidence.  *See In re Armstrong World Indus., Inc.*, 348 B.R. 111, 120 (D. Del. 2006); *In re Genesis Health Ventures, Inc.*, 266 B.R. 591, 616 n.23 (Bankr. D. Del. 2001).   As discussed above, Class 10 rejected the Plan. Accordingly, the Debtor must satisfy section 1129(b) of the Bankruptcy Code with respect to this Class to be able to confirm the Plan.

**(i)      The Plan Does Not Unfairly Discriminate Against Class 10 and Complies with the Requirements of 11 U.S.C. § 1129(b)(1)**

The section 1129(b)(1) "unfair discrimination" standard does not prohibit all types of discrimination among holders of impaired, dissenting classes; instead, it only prohibits <u>unfair</u> discrimination.  *In re The Leslie Fay Cos.*, 207 B.R. 764, 791 n.37 (Bankr. S.D.N.Y.

1997); *In re Buttonwood Partners Ltd.,* 111 B.R. 57, 62 (Bankr. S.D.N.Y 1990).   The

Bankruptcy Code does not provide a standard for when "unfair discrimination" exists.  *See In re*

*203 N. LaSalle St. Ltd. P'ship*, 190 B.R. 567, 585 (Bankr. N.D. Ill. 1995), *aff'd,* 126 F.3d 955

(7th Cir. 1997), *rev'd on other grounds*, 526 U.S. 434 (1999).  Instead, courts typically examine

the facts and circumstances of the case and determine whether unfair discrimination has occurred

in each particular case.  *See, e.g.*, *In re Rivera Echevarria*, 129 B.R. 11, 13 (Bankr. D.P.R. 1991);

*In re Freymiller Trucking, Inc.*, 190 B.R. 913, 916 (Bankr. W.D. Okla. 1996) (holding that a

determination of unfair discrimination requires a court to "consider all aspects of the case and the

totality of all the circumstances").   A plan unfairly discriminates in violation of section

1129(b)(1) of the Bankruptcy Code only if classes comprising similarly situated claims or

interests receive treatment under the plan that is not equivalent, and there is no reasonable basis

for the disparate treatment, *i.e.*, the unfair discrimination test is a horizontal test; it measures

different plan treatment across the line of classes of claims of similar priority.  *See, e.g.*, *203 N.*

*LaSalle St. Ltd. P'ship*, 190 B.R. at 585–86 ("[A]ny discrimination must be supported by a

legally acceptable rationale."); *In re Kennedy*, 158 B.R. 589, 599 (Bankr. D.N.J. 1993);  *Resorts*

*Int'l*, 145 B.R. at 481.

As to the rejecting Class, Class 10, the Plan does not discriminate, as all holders

of subordinated claims in that class will not be receiving distributions pursuant to the Plan.

Thus, the Plan does not unfairly discriminate against holders of Claims in the dissenting Classes.

### (ii)     The Plan Is Fair and Equitable with Respect to Class 10 and Complies with the Requirements of 11 U.S.C. § 1129(b)(2)

Section 1129(b)(2)(B) of the Bankruptcy Code—the codification of the absolute

priority rule—provides that, for a plan to be fair and equitable with respect to unsecured

creditors, such creditors may receive less than the value of their claims as of the effective date of

a plan only if no class of junior claims or interests receives any distribution on account of the claims therein.  11 U.S.C. § 1129(b)(2)(B).

Class 10 Claims are subordinated, so they are not entitled to receive any distributions in any circumstances.  There is no class junior to Class 10; therefore, there is no such junior class is receiving any distribution.  Accordingly, the Plan is fair and equitable with respect to Class 10 Claims.

### 2.  PROMESA § 314(b)(2):  The Plan Fully Complies with the Provisions in Title III of PROMESA

There is little to no legislative history on section 314(b)(2) of PROMESA.  As its language mirrors that of section 314(b)(1) of PROMESA, which in turn is modeled off of section 1129(a)(1) of the Bankruptcy Code, the Oversight Board submits it should be applied similarly. *See, e.g.*, *Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (where "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the interpretation given to the incorporated law, at least insofar as it affects the new statute.").

As set forth above, the Plan complies fully with the requirements of sections 314(b)(1)–(7) of PROMESA, as well as other applicable provisions of the Bankruptcy Code. Accordingly, the Plan complies with PROMESA section 314(b)(2).

### 3.  PROMESA § 314(b)(3):  The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan

PROMESA § 314(b) provides, in relevant part, that a court "shall" confirm a plan if "the debtor is not prohibited by law from taking any action necessary to carry out the plan." *Id.* § 314(b)(3).

The legislative history of PROMESA does not provide any guidance on PROMESA § 314(b)(3).  Chapter 9 of the Bankruptcy Code contains an identical provision to

37

PROMESA § 314(b)(3)—Bankruptcy Code § 943(b)(4).  *See* 11 U.S.C. § 943(b)(4) ("The court

shall confirm a plan if . . . the debtor is not prohibited by law from taking any action necessary to

carry out the plan.").   There are very few opinions that analyze the parameters of Bankruptcy

Code § 943(b)(4).  In *In re Sanitary & Improvement Dist. No. 7*, 98 B.R. 970 (Bankr. D. Neb.

1989), the debtor proposed a plan of adjustment that issued new notes to the debtor's bondholder

at a discounted rate.  *Id*. at 972.  There, certain bondholders objected to confirmation, arguing

Bankruptcy Code § 943(b)(4) was not satisfied because state law required bonds to be paid in

full and the new notes did not pay them in full on their prepetition claims.  *Id*. at 973.  The court

held the debtor could impair the bond claims and alter the principal amount, interest rate, and

term of the bonds notwithstanding the existence of state law requiring payment in full.  *Id*. at

974–75.  As the court explained:

> If a municipality were required to pay prepetition bondholders the full
> amount of their claim with interest as contained on the face of the bonds
> and the [municipality] had no ability to impair the bondholder claims over
> objection, the whole purpose and structure of chapter 9 would be of little
> value .… To create a federal statute [chapter 9 of the Bankruptcy Code]
> based upon the theory that federal intervention was necessary to permit
> adjustment of a municipality's debts and then to prohibit the municipality
> from adjusting such debts is not, in the point of view of this Court, a
> logical or necessary result.

*Id*. at 974.  However, the new bonds had a call provision that permitted payment at less than the

par amount of the new notes.  *Id*.  The court found this call provision was "prohibited by state

law and . . . prohibited by Section 943(b)(4) of the Bankruptcy Code."  *Id*. at 975.  The court

reasoned the new bonds "must be issued in conformance with state law and the terms of their

redemption and payment must be in conformance with state law."  *Id*. at 974.  The court

determined the ability to redeem the notes below par violated the state law requirement that

bondholders' must be paid in full.  Thus, although a debtor can impair a prepetition claim

notwithstanding state law to the contrary, *see also Detroit*, 524 B.R. at 212, a debtor may not take a post-effective date action that would otherwise violate state law.

Here, the Plan contains no provisions which would require it to violate Commonwealth law.  Like in *Sanitary & Improvement Dist. No.* 7 and *Detroit*, here, the Plan impairs *prepetition* Claims.  But, consistent with *Sanitary & Improvement Dist. No.* 7 and *Detroit*, the Debtor is not seeking to implement post-Effective Date actions which would, at that point in time, require the violation of Commonwealth law.  Specifically, to implement the Settlement and the Plan, the Commonwealth passed the New Bond Legislation, which established the legal framework for the restructuring of COFINA's issued and outstanding bonds.  The New Bond Legislation authorizes the transactions contemplated by the Plan, providing for the collateralization of the COFINA Pledged Taxes and the granting of the New Collateral and incorporating such other terms as set forth in section 25.1(b)(viii) of the Plan.  To this end, the New Bond Legislation provides for (i) the modification of COFINA's corporate governance structure, (ii) the authorization for COFINA, from and after the Effective Date ("Reorganized COFINA"), to issue COFINA Bonds and COFINA Parity Bonds and provide for the terms of such bonds, (iii) confirmation of Reorganized COFINA's ownership of the COFINA Revenues, (iv) the creation of a statutory lien to secure the COFINA Bonds and COFINA Parity Bonds, and (v) covenants to secure further the repayment of the COFINA Bonds and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements.  *See* Disclosure Statement at 2–3.  Accordingly, the Plan satisfies PROMESA section 314(b)(3).

### 4. PROMESA § 314(b)(4):  The Plan Provides for
### Full Payment of All Allowed Priority Claims

Section 1129(a)(9) of the Bankruptcy Code requires that persons holding claims

entitled to priority treatment under section 507(a) of the Bankruptcy Code receive specified cash

payments under a plan.  *See* 11 U.S.C. § 1129(a)(9).  While PROMESA does not incorporate

Section 1129(a)(9), it does include an essentially identical requirement in PROMESA section

314(b)(4), which provides that:

> The court shall confirm the plan if—except to the extent that the holder of a
> particular claim has agreed to a different treatment of such claim, the plan
> provides that on the effective date of the plan each holder of a claim of a kind
> specified in 507(a)(2) of title 11, United States Code, will receive on account of
> such claim cash equal to the allowed amount of such claim[.]

*Id.* § 314(b)(4).  The primary difference between the PROMESA and Bankruptcy Code sections

is PROMESA's exclusion of Bankruptcy Code requirements to pay types of claims which do not

exist in a title III case under PROMESA.  For example, Bankruptcy Code section 1129(a)(9)(A)

provides that unsecured claims allowed under section 502(f) of the Bankruptcy Code are

required to be paid in full.  *See* 11 U.S.C. § 1129(a)(9)(A).  As Bankruptcy Code section 502(f)

contemplates claims arising in an involuntary case, which cannot occur under PROMESA, the

payment of the amount of such allowed claims in cash could not have been incorporated into

PROMESA.

In accordance with PROMESA section 314(b)(4), Section 3.1 of the Plan

provides that on the later to occur of (i) the Effective Date and (ii) the date on which an

Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a)

pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of

such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative

Expense Clam in accordance with such other terms no more favorable to the claimant than as

may be agreed upon by and between the holder thereof and Reorganized COFINA; provided,
however, that Allowed Administrative Expense Claims representing indebtedness incurred in the
ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in
accordance with the terms and subject to the conditions of any agreement governing, investment
evidencing, or other document relating to such transactions; and, provided, further, that, if any
such ordinary course expense is not billed, or a written request for payment is not made, within
ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the
holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan.

       Furthermore, the Consummation Costs should be approved as administrative
expenses.  Here, the Consummation Costs are classified as Administrative Expense Claims in the
Plan, which means they are not payments on account of prepetition claims held by the parties to
receive such costs (each, a "Consummation Cost Party").  See Plan § 3.3.  Indeed, the Plan does
not list the Consummation Costs under the treatment sections for the relevant claims, nor does
the Disclosure Statement include the Consummation Costs in the projected recoveries for the
various classes.  Instead, the costs are being paid separately as independent reimbursement of
expenses incurred by the Consummation Cost Parties.  This is further evidenced by the fact that
the A&R Plan Support Agreement itself provided for the payment of the Consummation Costs,
indicating that the costs arose postpetition and would only be paid on the Effective Date and in
consideration of execution of the A&R Plan Support Agreement and compliance with the
numerous covenants set forth therein.

       In considering the "net" cost of paying the Consummation Costs to the
Consummation Cost Parties, it must be noted that the Consummation Cost Parties hold nearly
$10 billion of the outstanding $17.6 billion in outstanding Bond Claims.  Thus, approximately

$190 million ($10 billion / $17.6 billion * $332 million) of the Consummation Costs (2% of their collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the absence of the Consummation Costs provision.  Accordingly, the Consummation Cost provision provides for a "net" incremental payment for the Consummation Cost Parties of approximately $140 million.  This amount equates to approximately 1.3% of the total Allowed Bond Claims of the Consummation Cost Parties.  Critically, the Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to exceed the "net" cost of the Consummation Costs of approximately $140 million.

As described in the Plan and previously in the Disclosure Statement, the payment of the Consummation Costs is being made "to compensate the Consummation Cost Parties for the cost of the negotiation, confirmation and consummation of the Term Sheet and the Plan of Adjustment, and in consideration of (a) the negotiation, execution and delivery of the A&R PSA by each Consummation Cost Party and (b) the obligations and covenants contained in the Amended PSA."  Plan § 3.3.  Thus, the Consummation Costs are being paid on account of the actual and necessary expenses in negotiating the A&R Plan Support Agreement, which settles extremely complex issues and allows COFINA to emerge from bankruptcy in an expedited fashion without squandering value in continued vicious litigation to the detriment of the Puerto Rico people and all claimholders as a whole.  As a result, the Consummation Costs are properly considered administrative expenses under section 503(b)(1)(A), which authorizes the payment of the "actual, necessary costs and expenses of preserving the estate[.]"  11 U.S.C. § 503(b)(1)(A).

Case law supports the payment of the Consummation Costs.  In *In re CHC Grp. Ltd.*, No. 16-31854 (BJH), 2017 Bankr. LEXIS 1016 (Bankr. N.D. Tex. Mar. 3, 2017) [ECF No. 1794], Chief Judge Houser approved a plan that provided some members of class 5 with a Put

42

Option Premium, to compensate them for agreeing to backstop a rights offering under the plan.

Judge Houser held, in relevant part:

> The Put Option Premium payable to the Plan Sponsors is not a distribution on their Class 5 Claims, but is consideration for the Plan Sponsors' commitment to backstop the Rights Offering . . . [and] the Debtors' agreement to pay the Put Option Premium was necessary to obtain the Plan Sponsors' commitment to backstop the Rights Offering.  The Debtors wanted the assurance up front that the substantial funds they needed to demonstrate feasibility of the Plan were committed – irrespective of what might happen to the Debtors' business and operations between the filing of the Plan and its confirmation and consummation.  The Debtors received this assurance in the form of the Backstop Agreement, and the cost of that assurance was the Put Option Premium.  Accordingly, the Court concludes that *the payment of the Put Option Premium to the Plan Sponsors does not constitute impermissible disparate treatment in violation of section 1123(a)(4) of the Bankruptcy Code, but is instead consideration paid in return for the Plan Sponsors' agreement to backstop the Rights Offering.*

*Id.* at *52–54 (emphasis added); *see also In re TCI 2 Holdings, LLC*, 428 B.R. 117, 133 (Bankr. D.N.J. 2010) (no violation of § 1123(a)(4) when only certain second lien noteholders were permitted to participate in a backstop of a rights offering, and the court ruled that "[h]ere, all holders of allowed Second Lien Note claims are classified together, and receive the same treatment on account of their claims.  The Backstop Fee proposed to be paid to the Backstop Parties is not a distribution to the Second Lien Noteholders on account of their Second Lien Note claims.  Rather, the Backstop Fee is offered as consideration for the $225 million commitment made by the Backstop Parties, which will be paid only if the $225 million is funded.  There is no violation of the classification mandate of § 1123(a)(4)."); *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 2017 U.S. Dist. LEXIS 47231 (E.D. Mo. March 30, 2017) ("The Ad Hoc Committee has not presented any authority for the proposition that providing preferential opportunities to participate in equity investments (with related backstop commitments) violates § 1123(a)(4).  The few cases addressing this issue suggest that it does not . . . .  At this stage, the Court is not sufficiently persuaded that the PPA

and related agreements constituted treatment on account of class members' claims or interests, rather than treatment on account [of] the class members' other rights or contributions, including their commitments (and ability) to provide financing.").

Other cases provide additional support for allowing payment of the Consummation Costs.  In *In re Indianapolis Downs, LLC*, 486 B.R. 286 (Bankr. D. Del. 2013), following months of negotiation, various holders of second and third lien debt (the "Restructuring Support Parties") entered into a restructuring support agreement.  In it, the Restructuring Support Parties pledged to support a plan that contemplated the debtors selling substantially all of their assets, so long as the debtors could obtain a sufficiently high price.  The debtors filed a plan based on the restructuring support agreement, which, among other things, sought to pay the "legal and professional fees of the Restructuring Support Parties."  *Id.* at 300.  Other parties objected to this as a violation of section 1123(a)(4), as it gave certain members of the classes of second and third lien debt "extra" compensation.

The Bankruptcy Court for the District of Delaware held the payments were permissible, holding that the payments were permitted under section 503(b)(1)(A) as an actual, necessary cost of the reorganization.  For various reasons, including that the Restructuring Support Parties had also supported the debtors' DIP financing requests and the fees were also approved under the DIP order entered in the case, the court agreed with the debtors that in helping draw up the restructuring support agreement, the Restructuring Support Parties "performed a central role in the formulation of the confirmable Plan and to otherwise keep these proceedings moving forward."  *Id.* at 301.  As such, the court held that:

> Allowance of the fees and expenses under § 503(b) is supported by the record in these proceedings and by the Court's own observations that, in the absence of the laboriously negotiated resolution built into the RSA and the Plan, these cases would either have either dragged on (expensively) for many more months or

> devolved (much more expensively) into ferocious litigation between and among
> the Debtors and their stakeholders.  Accordingly, the Court finds that the Debtors
> have carried their burden to demonstrate that payment of the professional fees and
> expenses of the Restructuring Support Parties is permissible pursuant to
> Bankruptcy Code § 503(b).

*Id.*  As a result, the court held that the plan did not violate section 1123(a)(4).  This was because

the Restructuring Support Parties were getting the same treatment under the plan as all other

members of the same class.  While recognizing the professional fee payments were a "substantial

sum," the court held that the payments did not represent an "enhanced distribution," but rather,

separate payments justified by section 503 (and by the previously entered DIP order).

The parallels between *In re Indianapolis Downs* and the facts here are substantial.

As such, the Consummation Costs should be properly seen as a permissible payment under

section 503 that is *not* on account of the creditors' prepetition claims, and therefore permissible

under section 1123(a)(4).

Other cases also support the legitimacy of the Consummation Costs.  For

example, in *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C.

1992), the plan classified a variety of partners of a law firm together and gave them all the same

distribution.  The plan also provided that certain partners who agreed to contribute funds to the

plan to release certain other parties would receive the benefit of a permanent injunction of claims

against them.  This was challenged as a violation of section 1123(a)(4), on the grounds some

partners would end up benefitting from the permanent injunction, while others in the same class

would not.

The court held that this was not a violation of section 1123(a)(4) because "[t]he

plan's provisions dealing with partner contributions, releases, and the permanent injunction have

no connection to a partner's status as a claim or interest holder within a particular class.  These

45

provisions constitute a separate feature of the plan, designed to allow adequate funding of the plan." *Id.* "This policy is applied to every partner without regard to his status as a claim or interest holder. As such, it does not constitute treatment of a claim of a particular class for purposes of § 1123(a)(4)." *Id.*

Similarly, here, the Consummation Costs do not constitute treatment on account of the Consummation Cost Parties' prepetition claims and, therefore, their payment does not violate Bankruptcy Code section 1123(a)(4).

In the alternative, COFINA has the authority to use its property as it sees fit, including to pay the Consummation Costs to parties who significantly contributed to the Plan. In general, under chapter 11 of the Bankruptcy Code, both sections 1129(a)(4) and 363(b) prohibit the payment of expenses such as the Consummation Costs without prior court approval. *See* 11 U.S.C. § 1129(a)(4) ("The court shall confirm a plan only if all of the following requirements are met . . . [a]ny payment made or to be made by the proponent, by the debtor, or by a person issuing securities or acquiring property under the plan, for services or for costs and expenses in or in connection with the case, or in connection with the plan and incident to the case, *has been approved by, or is subject to the approval of, the court as reasonable*."); 11 U.S.C. § 363(b) (The trustee, *after notice and a hearing*, may use, sell, or lease, other than in the ordinary course of business, property of the estate . . .") (emphases added).

However, similar to chapter 9 of the Bankruptcy Code, PROMESA does not incorporate either of these provisions into Title III. *See* PROMESA § 301(a); 11 U.S.C. § 901(a). Accordingly, COFINA can make these payments without seeking prior court approval. Even though the Consummation Costs could be paid by COFINA at any time, COFINA has

structured the payment to coincide with the Effective Date of the Plan in order to guarantee that such payments are only made if and when the Plan has been consummated.

Thus, the requirements of PROMESA section 314(b)(4) are satisfied.

### 5. PROMESA § 314(b)(5): The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals

Section 314(b)(5) of PROMESA requires that any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval, for the Plan to be confirmed. *See* PROMESA § 314(b)(5). This provision is similar, but not identical to, 11 U.S.C. § 943(b)(6) (not incorporated into PROMESA), which provides a plan shall be confirmed if "any regulatory or electoral approval necessary under applicable nonbankruptcy law in order to carry out any provision of the plan has been obtained, or such provision is expressly conditioned on such approval." 11 U.S.C. § 943(b)(6). The difference between the two provisions is PROMESA section 314(b)(5) includes "legislative" consent. The legislative history of PROMESA does not provide any guidance on the scope or intent of this provision, or on the inclusion of legislative approvals. The likely reason for the addition is the Commonwealth, unlike many chapter 9 debtors (for example, a sanitation district), has a governing legislative body. Bankruptcy Code "[s]ection 943(b)(6) requires regulatory or electoral approval for any action to be taken under the plan that would require such approval in the absence of the chapter 9 case." *In re Connector 2000 Ass'n*, 447 B.R. 752, 765 (Bankr. D.S.C. 2011).

In *Connector 2000 Ass'n*, the debtor provided authorization to the Department of Transportation to take the actions necessary to implement the terms embodied in the chapter 9 plan, so the court determined that Bankruptcy Code section 943(b)(6) was satisfied. Similar to

*Connector 2000 Ass'n*, most cases summarily find the debtor has complied with section 943(b)(6). *See, e.g.*, *In re Barnwell Cty. Hosp.*, 471 B.R. 849 (Bankr. D.S.C. 2012) (section 943(b)(6) satisfied where the county assuming the debtor's pension debt under the chapter 9 plan passed the requisite ordinance authorizing such assumption); *Stockton*, 542 B.R. 261 (section 943(b)(6) satisfied where residents of city voted in favor of sale tax increase necessary to fund chapter 9 plan, as required by state law).

Here, there are no approvals to obtain and, as discussed above, the Commonwealth has enacted the New Bond Legislation.  Further, by approving the COFINA Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA section 207.[13]   Accordingly, the Plan satisfies PROMESA section 314(b)(5).

### 6.   PROMESA § 314(b)(6):
   The Plan is in the Best Interest of Creditors and is Feasible

#### a.   The Plan is in the Best Interest of Creditors

Section 943(b)(7) of the Bankruptcy Code requires that a plan must be in the "best interests" of claimholders and interest holders.  11 U.S.C. § 943(b)(7).  The best interests of creditors test in chapter 9 under the Bankruptcy Code "simply requires the Court to make a determination of whether or not the plan as proposed is better than the alternatives." *Sanitary & Improvement Dist.*, No. 7, 98 B.R. at 974.  If it is not at least as good, a plan under chapter 9 is not confirmable.  In Title III, PROMESA section 314(b)(6) only requires the Court to consider

---

[13]   PROMESA section 207 provides in full:

   For so long as the Oversight Board remains in operation, no territorial government may, without the prior approval of the Oversight Board, issue debt or guarantee, exchange, modify, repurchase, redeem, or enter into similar transactions with respect to its debt.

   *Id.* § 207.

whether creditors may recover more under non-bankruptcy laws.  Section 314(b)(6) does not

impose a litmus test as to whether a Title III plan of adjustment can be confirmed.

> Section 314(b)(6) provides:

> The court shall confirm the plan if—the plan is feasible and in the best interests of
> creditors, which shall require the court to consider whether available remedies
> under the non-bankruptcy laws and constitution of the territory would result in a
> greater recovery for the creditors than is provided by such plan.

PROMESA § 314(b)(6) (the "PROMESA Test").

> Section 314(b)(6) and its legislative history provide no indication, however, that

the method of determining what creditors may recover under non-bankruptcy law differs

between chapter 9 and Title III.

> *Collier* suggests that the "best interest" test acts as a floor requiring a reasonable

effort at payment of creditors by the municipal debtor, and that the "feasibility" requirement sets

a corresponding ceiling which prevents the chapter 9 debtor from promising more than it can

deliver.  4 COLLIER ON BANKRUPTCY, ¶ 943.03[7]; *Mount Carbon Metro. Dist.*, 242 B.R. 18, 34

(Bankr. D. Colo. 1999).

> In *Detroit*, the court performed the best interests test by first analyzing what state

law remedies would provide creditors if the case were dismissed.  Looking to state law, the court

concluded the only remedy this provided creditors was "the right to take the judgment to the

"supervisor" or "assessing officer" of the municipality, who then "shall proceed to assess the

amount [of the judgment] ... upon the taxable property" of the municipality, "upon the then next

tax roll.""  524 B.R. at 213–14.  The court noted:

> The principal asset of a municipality is its taxing power and that, unlike an asset
> of a private corporation, can not be available for distribution.  An unsecured
> municipal security is therefore merely a draft on the good faith of a municipality
> in exercising its taxing power. . . .  In effect, therefore, the practical value of an
> unsecured claim against the city is inseparable from reliance upon the

effectiveness of the city's taxing power.  The only remedy for the enforcement of such a claim is a mandamus to compel the levying of authorized taxes.

*Id.* at 214 (citing *Faitoute Iron & Steel, Co. v. City of Asbury Park,* 316 U.S. 502 (1942)).

Second, the court analyzed what creditors would actually recover in the event of a dismissal.  The court reviewed the testimony of the city's experts, who testified that raising taxes would not raise any revenue.  *Id.* at 215.  The court agreed.  Accordingly:

> If the case were dismissed, therefore, unsecured creditors, including retiree creditors, would be limited to any additional property tax revenues that the City could levy in addition to the City's existing property tax collections for its general fund.

*Id.* at 214.  Accordingly, the right would be an "empty right to litigate" to require Detroit to raise taxes to pay the unsecured claimholders, which it wouldn't do, both because it would be unlikely to raise much (if any) additional revenue, and because they were not legally allowed to raise tax rates.

The court additionally noted that "[t]here is no more money available for creditors in the City's already tight budget projections.  Every dollar is accounted for in providing necessary services, in implementing the necessary RRIs ("Reinvestment and Restructuring Initiatives"), and in meeting plan obligations."  *Id.* at 219.  However, the court did not indicate this finding was essential to its determination the plan was in the best interests of the creditors.

In computing creditors' recovery, the court examined the creditors' loss of other plan benefits in the event the case was dismissed.  *Id.* at 217.  If the plan were not confirmed, in addition to losing the benefits of the plan settlements, the city would lose, among other things, the state contributions, contributions from the Detroit Institute of Art and charitable foundations (the "Grand Bargain").  It would also have to finance the balance of its obligations under its swap settlement, lose funds it was going to use to refinance its post-petition loan, lose any

50

potential enhancement to its credit rating, and, most importantly, lose the benefits of the RRIs.
*Id.*

Additionally, the court made clear that the creditors could access no other assets in the bankruptcy case. City assets were off-limits. The only remedy under state law was "a court-ordered property tax assessment process under Michigan's Revised Judicature Act." *Id.* at 218. Accordingly, the value of the city's assets were irrelevant to the best interests test (similar reasoning would apply to the city's determinations about what spending was necessary, although the court in *Detroit* did not opine on this issue in either direction). *Id.*[14]

Here, COFINA has no power to raise taxes. The alternative to the Plan is protracted litigation in the Adversary Proceeding which could lead to an all-or-nothing recovery for either holders of Commonwealth claims or COFINA's Existing Securities. For any individual class of creditors to do better than the Plan, they would have to prevail in the Adversary Proceeding, which is far from a guarantee (as evinced by the equitable split of SUT Revenues contemplated in the Plan). Even if one side does prevail, litigation costs will skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT Revenues.

---

[14] Although not necessarily required to be decided for purposes of this Title III Case, the Debtor reserves the right to argue that, in the alternative, the best interests test is applied to creditors collectively, not individually. *Detroit* held that "[c]onfirmation may not be denied simply because some creditors may do better upon dismissal . . . The Court finds that the plan is in the best interests of the creditors as a whole." *Id.* at 217; *see also Stockton*, 542 B.R. at 283 (By its terms, the "best interests" test in chapter 9 is collective rather than individualized). *Detroit* further held:

> Whether in bankruptcy or outside of bankruptcy, no provision of law allows the creditors to access City assets, most importantly including the DIA art, to satisfy their claims. The market value of the City's assets, including its art is, therefore, irrelevant in this case. As observed above, a judgment creditor's sole remedy is a court-ordered property tax assessment process under Michigan's Revised Judicature Act. Michigan law prohibits execution on municipal property.

*Detroit*, 524 B.R. at 218; *see also Stockton*, 542 B.R. at 286 ("We conclude that the "best interests" test in chapter 9 considers the collective interests of all concerned creditors in a municipal plan of adjustment rather than focusing on the claims of individual creditors."). This interpretation (that the test applies to creditors as a whole) is further corroborated by the plain language of title III, which uses the plural "creditors" when discussing the best interests test.

In addition, independent of the validity of the transfer of the SUT to COFINA, the holders of "First Subordinate" Existing Securities face the risk that an event of default will accelerate the bonds such that they are not paid until holders of "Senior" Existing Securities are paid in full. The Existing Bond Resolution provides that upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the "Senior" Existing Securities to be immediately due and payable. Upon such declaration, the principal of and accrued interest on the "Senior" Existing Securities become immediately due and payable. In addition, upon a declaration of an event of default, holders of "First Subordinate" Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder until such time that the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution. Upon an event of default, the Existing Bond Resolution provides for the priority of payments in favor of the "Senior Existing Securities" if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due.

If the Plan is not confirmed, the parties will likely lose the benefit of the agreement resolving the Commonwealth-COFINA Dispute. Litigation thereto will continue in an all-or-nothing fashion, leaving some creditors much worse off and some creditors much better off. The Plan's provision for a distribution of approximately 93% to holders of "Senior" Existing Securities and approximately 56% to "First Subordinate" Existing Securities, in light of the risks attendant to the Commonwealth-COFINA Dispute and the Interpleader Action, among others, could be far superior to what both groups of bondholders would receive outside of the Plan. The overwhelming acceptance of the Plan by the various classes indicates such creditors

believe this Plan to be in their best interests.  The Plan avoids all of the pitfalls of delay, litigation costs, and uncertainty by codifying the consensual agreement reached by the major stakeholders in COFINA's Title III Case.

###     b.     The Plan is Feasible.

Both PROMESA and chapter 9 contain the same language requiring the plan to be feasible.  Therefore, the PROMESA feasibility inquiry should be the same as in chapter 9, *i.e.*, whether the plan offers a reasonable prospect of success and is workable.

The legislative history of the chapter 9 feasibility test is sparse.  The feasibility test, legislative history explains, requires the debtor to have a "reasonable prospect" that its financial projections will perform under the plan as anticipated.

> The feasibility requirement means that there is a reasonable prospect that the petitioner will be able to perform under the plan.  That is, it must appear to the court, based on the petitioner's past and projected future tax revenues and expenses that it will have enough to make the payments required by the plan. . . . (W)here future tax revenues are the only source to which creditors can look for payment of their claims, considered estimates of those revenues constitute the only available basis for appraising the respective interests of different classes of creditors.  In order that a court may determine the fairness of the total amount of cash or securities offered to creditors by the plan, the court must have before it data which will permit a reasonable, and hence an informed, estimate of the probable future revenues available for the satisfaction of creditors. . . . Appropriate facts which might have been considered . . . are the revenues which have in the past been received from each source of taxation, the present assessed value of property subject to each tax, the tax rates currently prescribed, the probate effect on future revenues of a revision in the tax structure adopted in 1941, the extent of past tax delinquencies, and any general economic conditions of the District which may reasonably be expected to affect the percentage of future delinquencies . . . .

H.R. Rep. 94-686, 32-33, 1976 U.S.C.C.A.N. 539, 570–71.

Further, a feasible plan need not be in balance on the confirmation date of the plan, but instead, "within a reasonable period of time after confirmation of the plan."  *In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 34 n.46 (Bankr. D. Colo. 1999).  A colloquy on the

floor of the House of Representatives referred favorably to *Kelley v. Everglades Drainage District*, 319 U.S. 415 (1943), and stated the feasibility requirement as found in *Kelley* as a "require[ment] that a reasoned estimate be made of current and projected future revenues and expenses in order that the court be able to evaluate the likelihood of performance and the availability of funds to meet the petitioner's obligations under the plan." 121 Cong. Rec. H39413 (daily ed. Dec. 9, 1975) (remarks of Reps. Kindness and Edwards), reprinted in Norton Bankruptcy Law and Practice 2d at 915 (1998–99).

"[A] plan of adjustment is feasible under section 943(b)(7) if it offers "a reasonable prospect of success and is workable." *In re Mount Carbon Metro. Dist.*, Feb. 23, 2010 Hearing Tr. at 3:19–21 (Bankr. D. Colo. 1999). A bankruptcy court must, in the course of determining feasibility of a chapter 9 plan, evaluate whether it is probable that debtor can both pay prepetition debt and provide future public services at the level necessary to its viability as a municipality. *Id.*

The court has an independent duty to determine if the plan is feasible. *See In re Mount Carbon*, 242 B.R. at 36 ("Not only is feasibility an express requirement set out in § 943(b)(7), but the long history of Chapter 9 requires an objective evaluation of the [chapter 9 debtor's] proposed reorganization.") (citing *Kelly*, 319 U.S. at 418–19). *Detroit*, 524 B.R. at 219. A plan is feasible if the following question can be answered in the affirmative:

> Is it likely that the [Debtor], after the confirmation of the Plan of Adjustment, will be able to sustainably provide basic municipal services to the citizens of [the Debtor] and to meet the obligations contemplated in the Plan without the significant probability of a default?

*Id.* at 222; *see also Carbon*, 242 B.R. at 35. In *Detroit*, the court hired its own financial advisor to examine the feasibility of the chapter 9 plan. *See id.* at 219–45 (discussing the feasibility of

the plan). This was necessary because creditors are unlikely to argue a plan is not feasible, as that would indicate they think the city needs *more* resources to operate moving forward.

Here, the COFINA Fiscal Plan, certified on October 18, 2018, demonstrates that the Plan is feasible because it provides for the issuance of the COFINA Bonds contemplated by the Plan, and that such obligations can be satisfied. PROMESA section 201(b)(1), which sets forth the requirements for a fiscal plan, requires, among other things, that the fiscal plan:

> (A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards . . . ;
>
> (D) provide for the elimination of structural deficits;
>
> (E) for fiscal years covered by a Fiscal Plan in which a stay under subchapters III or IV is not effective, provide for a debt burden that is sustainable;
>
> (F) improve fiscal governance, accountability, and internal controls;
>
> (G) enable the achievement of fiscal targets;
>
> (H) create independent forecasts of revenue for the period covered by the Fiscal Plan; and
>
> (I) include a debt sustainability analysis.

PROMESA §§ 201(b)(1)(A), (D)–(I). When the Oversight Board certified the COFINA fiscal plan, it certified the above requirements were satisfied, including that the fiscal plan "provide[s] for a debt burden that is sustainable." *Id.* § 201(b)(1)(E). Moreover, whereas in Detroit and other chapter 9 cases the debtor needed to demonstrate it could "sustainably provide basic municipal services to the citizens of [the Debtor,]" *Detroit*, 524 B.R. at 222, here, COFINA does not provide services to citizens, and is only a special securitization vehicle for the limited purposes set forth in Act 91. Accordingly, the feasibility analysis need only focus on whether Reorganized COFINA will have sufficient funds to pay the debts as promised by the Plan. *Cf.*

PROMESA §§ 201(b)(1)(B)–(C) ("A Fiscal Plan . . . shall . . . ensure the funding of essential

public services [and] provide adequate funding for public pension systems . . .").

Further, as will be demonstrated at the Confirmation Hearing, the assumptions

underlying the Fiscal Plan are realistic such that the Fiscal Plan itself is feasible. In FY 2019, the

5.5% SUT, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, is

projected to be $1.4 billion and COFINA only has debt service in FY 2019 of $420 million. As a

result, COFINA has a very healthy debt service coverage ratio of 3.33x in FY 2019. While the

debt service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the

40-year average coverage ratio is still a robust 2.46x. *See* COFINA Fiscal Plan, at 27 (Exhibit

18). Further, the PSTBA reaches a plateau in FY 2041 and never increases after that point, so

any subsequent increase in the 5.5% SUT after FY 2041 will necessarily improve the debt

service coverage ratio. In short, assuming there is no catastrophic decline in Commonwealth

sales and use tax collections that fails to normalize, the feasibility of the COFINA Plan is plainly

established.

Based upon the foregoing, the Plan satisfies the best interests test and feasibility

test, and the requirements of section 314(b)(6) of PROMESA.

### 7. PROMESA § 314(b)(7): The Plan is Consistent with the Fiscal Plan for COFINA.

PROMESA section 314(b)(7) requires that the Plan be consistent with the Fiscal

Plan certified by the Oversight Board. The Debtor believes that the Plan is consistent with the

Fiscal Plan, and the Oversight Board has certified that the Plan is indeed consistent with the

Fiscal Plan pursuant to PROMESA section 104(j). The projections in the Plan are consistent

with the debt sustainability analysis set forth in the Fiscal Plan; the Plan is not projecting greater

expenditures than the debt sustainability allows.   Accordingly, the requirement of section 314(b)(7) of PROMESA is satisfied.

### 8. Bankruptcy Rule 3019:  The Plan Does Not Adversely Change the Treatment of Claims of Creditors.

Pursuant to PROMESA section 313, the Oversight Board "may modify the plan at any time before confirmation, but may not modify the plan so that the plan as modified fails to meet the requirements of this subchapter.  After the Oversight Board files a modification, the plan as modified becomes the plan."   PROMESA § 313.   In addition, with respect to modifications made after acceptance but prior to confirmation, Bankruptcy Rule 3019, made applicable to COFINA's Title III Case by PROMESA section 310, provides, in pertinent part:

> [A]fter a plan has been accepted and before its confirmation, the proponent may file a modification of the plan.  If the court finds after hearing on notice to the trustee, any committee appointed under the Code, and any other entity designated by the court that *the proposed modification does not adversely change the treatment of the claim of any creditor* or the interest of any equity security holder who has not accepted in writing the modification, it shall be deemed accepted by all creditors and equity security holders who have previously accepted the plan.

Fed. R. Bankr. P. 3019(a) (emphasis added).

As noted above, filed herewith, the Oversight Board filed a "Third Amended Plan," containing minor revisions to address certain concerns, together with a redlined version reflecting such changes.  None of the modifications adversely change the treatment of the claim of any creditor.  First, in Article X, and based upon understandings between Assured, COFINA, and the Oversight Board, the Plan was amended to provide that COFINA will enter a remarketing agreement with Assured with respect to the COFINA Bonds allocable to the holders of Allowed Junior COFINA Bond Claims (Assured), and as to which will be received by Assured as subrogee of such holder.   Assured was always responsible for the 100% cash payment, so the holders of Claims in Class 6 are not impacted in any way by this change.

Second, the Plan was updated to ensure the releases provided thereunder are consistent with the agreement reached in the A&R Plan Support Agreement, *see* Plan § 30.2, as well as other technical changes to ensure that neither the Ambac Action nor Whitebox Actions interfere with distributions to bondholders.  Specifically, the Plan has been modified to ensure that BNYM, Whitebox, and Ambac can continue their litigation among themselves, *see* Plan § 2.1, but also to ensure that COFINA or Reorganized COFINA is not responsible for any of BNYM's fees or expenses in connection with that litigation after the Effective Date.  *See* Plan § 19.13.

Accordingly, the Plan can be confirmed without the filing of a new disclosure statement and balloting of the newly-filed Plan.  *Cf. In re G-I Holdings, Inc.*, 2009 U.S. Dis. LEXIS 108339, at *98 (D.N.J. Nov. 12, 2009) (requiring a new disclosure statement and balloting of the amended plan pursuant to Bankruptcy Code section 1127(a)[15] if such amendments are material and adversely affect the way creditors are treated).

### C.  THE INJUNCTION AND RELEASE PROVISIONS EMBODIED IN THE PLAN ARE PERMISSIBLE AND SHOULD BE APPROVED

The Plan includes release, exculpation, and injunction provisions.  These discretionary provisions are proper because, among other things, they are the product of arm's-length negotiations, are integral to the Plan, and are critical to obtaining the support of the Debtor's key creditors for the Plan.  Such release, exculpation, and injunction provisions are fair and equitable, are given for valuable consideration, and are in the best interests of the Debtor and its creditors.  The release, exculpation, and injunction provisions are consistent with the Bankruptcy Code and, thus, the requirements of section 1123(b) of the Bankruptcy Code are satisfied.

---

[15] While Bankruptcy Code section 1127(a) is not directly incorporated into PROMESA, an analogous provision is included as PROMESA section 313.

The Court has jurisdiction under PROMESA section 306 of the United States Code to approve the injunction, exculpation, and releases set forth in Article XXX of the Plan. In addition, section 105(a) of the Bankruptcy Code permits issuance of the injunction and approval of the releases and exculpation set forth in Article XXX of the Plan.

### 1. The Debtor's Release of Claims Should Be Approved

Under Section 30.5 of the Plan, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons proposed to release the Released Parties[16] from Claims or Causes of Action they may have against such Released Parties. A plan that proposes to release a claim or a cause of action belonging to a debtor is considered a "settlement" for purposes of satisfying section 1123(b)(3)(A) of the Bankruptcy Code. *See, e.g.*, *In re Midway Gold US, Inc.*, 575 B.R. 475, 509 (Bankr. D. Colo. 2017) (citing *In re Spansion*, 426 B.R. 114, 142–43 n.48 (Bankr. D. Del. 2010)). Section 1123(b)(3)(A) specifically provides that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate." 11 U.S.C. § 1123(b)(3)(A). *See, e.g.*, *Resolution Trust Corp.* v. *Best Prods. Co. (In re Best Prods. Co.)*, 177 B.R. 791, 794 n.4 (S.D.N.Y. 1995) ("Irrespective of whether a claim is settled as part of a plan pursuant to section 1123(b)(3)(A) of the Bankruptcy Code or pursuant to a separate motion under Bankruptcy Rule 9019, the standards applied by the Bankruptcy Court for approval are the same."), *aff'd*, 68 F.3d 26 (2d Cir. 1995). The First Circuit has emphasized that "[s]tipulations of settlement are favored by the courts, and they will rarely be set aside absent fraud, collusion,

---

[16] The Released Parties are defined as:

Collectively, solely to the extent provided in the Plan, (a) the Government Parties, (b) the Commonwealth, (c) the COFINA Agent, (d) the PSA Creditors, (e) BNYM, (f) upon satisfaction of the conditions set forth in decretal paragraph 3 of the Abeyance Stipulation, the Creditors' Committee, its members, and the Commonwealth Agent, and (g) with respect to the foregoing clauses (a) through (f), each of their respective Related Persons.

Plan at § 1.152.

mistake or other such factors." *United States v. Sterling Consulting Corp. (In re Indian Motorcycle Co.)*, 289 B.R. 269, 282 (B.A.P. 1st Cir. 2003); *see also Hicks, Muse & Co. v, Brandt (In re Healthco Int'l, Inc.)*, 136 F.3d 45, 50 n.5 (1st Cir. 1998).

       The approval of settlements is within the court's "wide discretion." *See Jeremiah v. Richardson*, 148 F.3d 17, 22 (1st Cir. 1998). However, while a court should apply its own independent judgment to determine whether to approve a settlement, it should also afford deference to the judgment of the trustee or debtor in possession; *see City Sanitation, LLC v. Allied Waste Servs. of Mass., LLC (In re Am. Cartage, Inc.)*, 656 F.3d 82, 92 (1st Cir. 2011); *In re Receivership Estate of Indian Motorcycle Mfg., Inc.*, 299 B.R. 8, 21 (D. Mass. 2003) (the court should give "substantial deference to the business judgment of a bankruptcy trustee when deciding whether to approve a settlement"); *Hill v. Burdick (In re Moorhead Corp.)*, 208 B.R. 87, 89 (B.A.P. 1st Cir. 1997) ("The [bankruptcy] judge . . . is not to substitute her judgment for that of the trustee, and the trustee's judgment is to be accorded some deference." (citation omitted)); *In re Healthco* 136 F.3d at 50 n.5; and consider the paramount interests of creditors; *see Jeffrey v. Desmond*, 70 F.3d 183, 185 (1st Cir. 1995) (noting that court should give proper deference to the reasonable views of creditors). Accordingly, a settlement should generally be approved unless it "falls below the lowest point in the range of reasonableness." *In re Am. Cartage*, 656 F.3d at 91 (citing *Cosoff v. Rodman (In re W.T. Grant Co.)*, 699 F.2d 599, 608 (2d Cir. 1983)).

       In determining the reasonableness of a settlement, courts in the First Circuit consider the following four factors: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of the litigation involved, and the expense, inconvenience and delay attending it; and,

(iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise. *Jeffrey*, 70 F.3d at 185; *see also In re Indian Motorcycle Co.*, 289 B.R. at 283; *In re Laser Realty, Inc. v. Fernandez (In re Fernandez)*, No. 04-10585, 2009 Bankr. LEXIS 2846, at *9 (Bankr. P.R. Mar. 31, 2009); *In re C.P. del Caribe, Inc.*, 140 B.R. 320, 325 (Bankr. D.P.R. 1992).

Section 30.5 of the Plan represents a valid settlement pursuant to section 1123(b)(3)(A) and Bankruptcy Rule 9019 of any Claims each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons may have against the Released Parties in exchange for, the treatment set forth in the Plan with respect to such Released Parties' Claims against them. Here, the Debtor's releases are in the best interests of the Debtor and represent a sound exercise of the Debtor's business judgment. As an initial matter, with the exclusion of the Commonwealth-COFINA Dispute, which is being compromised pursuant to the Settlement and incorporated into the Plan, and acts relating to the Ambac Action and Whitebox Actions, which are being preserved pursuant to the Plan, *see* Section 30.2(c), the Debtor is not aware of any claims that could be asserted against the Released Parties and no creditor has informed the Debtor that it believes such an action should be brought which the Debtor believes would be meritorious. Further, without the assurance of protection from liability, the Released Parties involved in the Plan process may not have participated in the negotiations that led to the development of the Settlement and Plan.

The settlement embodied in the Releases complies with the standard set forth by the First Circuit in *Jeffrey*. The Releases are an integral component of the Plan and were given as part of the consideration exchanged in Plan negotiations. Further, the Released Parties were integral to the development of the Plan, were parties to negotiations over the terms of the Plan,

and expected a release in exchange for their contributions to the Debtor's Plan. The Debtor also considered, among other factors, (a) the lack of any allegation of potential claims against the Released Parties, (b) the costs and benefits associated with pursuing any claims, (c) the likely risks and rewards associated with pursuing any claims, and (d) the value provided by the Released Parties to the Plan and the Debtor's restructuring process. After weighing these factors, the Debtor determined, in its business judgment, that the benefits provided by the Released Parties to the Debtor far outweighed any potential value associated with the claims being released.

Moreover, although the Oversight Board submits that the releases are governed by case law applicable to settlements as explained above, the provision for releases also satisfies the test applied to third-party releases in a plan as outlined in *In re Master Mortgage Investment Fund, Inc.*, 168 B.R. 930, 934 (Bankr. W.D. Mo. 1994), and applied in *In re Zenith Electronics Corp.*, 241 B.R. 92, 100 (Bankr. D. Del. 1999) (considering similar factors to determine if a debtor release of a third party should be allowed as part of a plan). The *Master Mortgage/Zenith* factors include whether: (i) there is an identity of interest between the debtor and the third party such that the suit against the non-debtor is, in essence, a suit against the debtor or will deplete the assets of the estate; (ii) the non-debtor has contributed substantial assets to the reorganization; (iii) the injunction is essential to the reorganization (without it, there is little likelihood of success); (iv) a substantial majority of the creditors have agreed to support the injunction, and, specifically, the impacted class(es) "overwhelmingly" votes to accept the proposed plan treatment; and (v) the plan provides a mechanism for the payment of all, or substantially all, of the claims of the class(es) affected by the injunction. *Master Mortgage*, 168 B.R. at 935. The *Master Mortgage/Zenith* factors are not a rigid test; rather, the court should "engage[] in a fact

specific review, weighing the equities of [the individual] case." *See id.* at 935.  The factors are not "an exclusive list of considerations, nor are they a list of conjunctive requirements." *See id*; s*ee also Charles St.*, 499 B.R. at 100 ("These factors are neither exclusive nor conjunctive requirements."); *In re Chicago Invs., LLC*, 470 B.R. at 32, 95 (Bankr. E.D. Mass 2012) (same).

The releases meet most, if not all, of the *Master Mortgage/Zenith* factors:

- Some of the Released Parties, such as the Creditors' Committee, share an identity of interest with the Debtor because (i) any costs incurred defending the Creditors' Committee from any lawsuit will come from the Debtor and deplete assets of the which could be used to pay the Creditors' Committee's constituents, and (ii) the Debtor and the Released Parties "share the common goal of confirming the . . . Plan," *see In re Tribune Co.*, 464 B.R. 126, 153 (Bankr. D. Del. 2011);

- The Released Parties have participated in the Plan process and provided significant value to the Debtor's Plan and contributions to the Plan;

- The releases are an integral part of the Plan, *see* Section 30.4, and the failure to effect the release provisions set forth in the Plan would seriously impair the Debtor's ability to confirm the Plan, which would reduce the value available for distribution;

- The overwhelming majority of the voting Creditors voted in Plan, as the Voting Declaration will show; and

- The Plan provides for payment of Classes affected by the injunction, including Classes 1–4, 6, and 8, which holders thereof can expect a recovery up to at least 93.015%, and Classes 5 and 7, which holders thereof can expect a recovery up to 58.414%.

As part of the Settlement, the Released Parties have each made material contributions to the Plan, which contributions have flowed directly to the recovery afforded the claimholders and thus are indispensable to the Plan.  Accordingly, as set forth above, the Debtor's release of the Released Parties represents a valid exercise of their authority, is necessary for the consummation of the Plan, and should be approved.

## 2. The Consensual Releases Should Be Approved

The Plan also provides for discharge of COFINA and Reorganized COFINA and the Release of Claims and Causes of Action (the "Consensual Releases"). *See* Plan, § 30.2.

Courts within the First Circuit have found that third party releases may be approved under appropriate circumstances. *See, e.g.*, *Charles St.*, 499 B.R. at 100 ("a chapter 11 plan may, in appropriate circumstances, include a third-party release."); *see also Findings of Fact, Conclusions of Law and Order Confirming the Third Amended Joint Chapter 11 Plan of New England Compounding Pharmacy, Inc.*, *In re New England Compounding Pharmacy, Inc.*, Case No. 12-19882-HJB (Bankr. D. Mass., May 25, 2015) (confirming chapter 11 plan containing non-consensual third party releases). Generally, in determining whether a non-debtor release is appropriate, bankruptcy courts in the First Circuit have adopted and considered the five-factor test set forth in *Master Mortgage*, discussed above. *See Chicago Invs.*, 470 B.R. at 95–96 (adopting *Master Mortgage* test when determining whether third party injunctions will be allowed); *see also Charles St.*, 499 B.R. at 100 (same). Notwithstanding the line of cases following the *Master Mortgage* test, courts have also widely acknowledged that it is also perfectly appropriate for a chapter 11 plan to contain consensual third party releases.[17] Here, with two exceptions mentioned below, the releases in Section 30.2 of the Plan are consensual releases.

The Debtor submits that, under the circumstances of COFINA's Title III Case, the Consensual Releases are appropriate and should be approved in their entirety. The Consensual Releases seek only to release parties that made a significant contribution to the Plan, including:

---

[17] *See, e.g.*, *Deutsche Bank AG v. Metromedia Fiber Network, Inc. (In re Metromedia Fiber Network, Inc.)*, 416 F.3d 136, 142 (2d Cir. 2005) ("Nondebtor releases may also be tolerated if the affected creditors consent"); *In re DBSD N. Am., Inc.*, 419 B.R. 179, 218 (Bankr. S.D.N.Y. 2009) (third party releases "may . . . be used if the affected creditors consent").

(i) COFINA and Reorganized COFINA, from all Claims or Causes of Action, and from all Entities, *see* Plan § 30.2(a)–(b);[18]

(ii) the Government Releasees,[19] from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the PSA Creditors and their respective Related Persons, *see* Plan, § 30.2(c);

(iii) BNYM and (a) each of its Related Persons, from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution by each of the PSA Creditors, *see* Plan § 30.2(c), excluding any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively, and (b) each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions, *see* Plan § 30.2(d);

(iv) the Commonwealth Agent Releasees,[20] from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order, *see* Plan § 30.2(e); and

(v) the Commonwealth, from all Claims and Causes of Action held by any Creditor, solely in such capacity.  *See* Plan § 30.2(f).

The Consensual Releases are necessary and essential to the Plan.  As mentioned above, the releases have been negotiated with the COFINA's key creditor constituencies as part

---

[18] The release of COFINA and Reorganized COFINA can also be justified as a discharge pursuant to section 944 of the Bankruptcy Code, made applicable to COFINA's Title III case by PROMESA section 301, which discharges the Debtor "from all debts as of the time when the plan is confirmed[.]"  11 U.S.C. § 944(b)(1).

[19] The Government Releasees are defined as:

Collectively**,** the [Oversight Board, COFINA, and AAFAF] and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

Plan §§ 1.105, 1.103.

[20] The Commonwealth Agent Releasees are defined as:

the Commonwealth Agent and the Creditors' Committee, its members and each of their respective current and former officers, directors, agents, attorneys, employees, affiliates, advisors, and consultants, solely in such capacities

Plan § 30.2(e).

of the formulation of the Plan.  Thus, it is clear that a substantial number of creditors have expressly consented to the releases.  Notably, the court in *Master Mortgage* viewed this factor as "the single most important factor."  *Id*. at 938.  The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM[21]—can likewise be approved under the appropriate standard.   The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the Settlement.  *Id.* at 938.  Without the release, the Commonwealth would not have agreed to the Settlement, which laid the groundwork for the formulation of this Plan.

Further, it is imperative to the Plan that BNYM be released.  Without a release, BNYM would withhold distributions to bondholders necessary to effectuate the Plan.  Additionally, the release is narrowly tailored so that it exempts acts of gross negligence, intentional fraud, or willful misconduct, as well as the ongoing Ambac Action and Whitebox Actions.

In the absence of contention and identifiable claims to be released, the Consensual Releases serve two simple but valuable functions:   (i) incentivizing the applicable released parties to support, and undertake actions that support, confirmation of the Plan without the fear of future baseless lawsuits, and (ii) facilitating Reorganized COFINA's fresh start post emergence from COFINA's Title III Case.  *See, e.g.*, *In re BearingPoint, Inc.*, 453 B.R. 486, 494 (Bankr. S.D.N.Y. 2011) ("[S]takeholders in chapter 11 cases, unhappy with their recoveries, have more than occasionally brought frivolous litigation against estate fiduciaries."); *Marrama v.*

---

[21]  BNYM is the beneficiary of both a mutual release from the PSA Creditors, *see* Plan § 30.2(c), and a third-party release from "liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest."  *See* Plan § 30.2(d).

*Citizens Bank of Mass.*, 549 U.S. 365, 367 (2007) ("The principal purpose of the Bankruptcy Code is to grant a 'fresh start' to the 'honest but unfortunate debtor.'" (quoting *Grogan v. Garner*, 498 U.S. 279 (1991)).   The Oversight Board submits that such objectives are well-warranted and support approval of the Consensual Releases.   The releases are fair and necessary for the reorganization and do not work to the detriment of any claimholder.   Accordingly, the Consensual Releases should be approved.

### 3.   The Exculpation Sought In the Plan Is Appropriate

Courts have held that exculpation provisions like the one in Section 30.7 of the Plan (the "Exculpation Provision") are appropriate when the parties are released or exculpated for acts or omissions in connection with or related to the "the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan, except for willful misconduct or gross negligence . . . ."   *See PWS Holding Corp.*, 228 F.3d at 245–47 (holding that release of, among others, debtors and creditor committees, including such parties' officers, directors, employees, professionals and advisors, was appropriate where it was given for activity related to the pursuit of the chapter 11 plan and excluded willful misconduct and gross negligence); *In re Yellowstone Mountain Club, LLC*, No. 08–61570–11, 2009 WL 2163528, at *5 (Bankr. D. Mont. July 16, 2009) (exculpation provision which does not release willful misconduct or gross negligence is "perfectly proper"); *Murphy v. Weathers*, No. 7:07-CV-00027-HL, 2008 WL 4426080, at *6 (M.D. Ga. Sept. 25, 2008) (exculpation which includes professionals other than just the creditors committee and its members does not run afoul of section 524(e) of the Bankruptcy Code if it does not extend to acts of gross negligence, willful misconduct, or breach of fiduciary duties); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation clause that excludes gross negligence and intentional misconduct); *In re Oneida Ltd.*, 351 B.R. 79, 94 n.22 (Bankr.

S.D.N.Y. 2006); *see also Upstream Energy Servs. v. Enron Corp. (In re Enron Corp.)*, 326 B.R. 497, 504 (S.D.N.Y. 2005) (upholding exculpation provisions of plan that were "reasonable and customary and in the best interests of the estates"); *In re Winn-Dixie Stores, Inc.*, 356 B.R. 239, 261 (Bankr. M.D. Fla. 2006) (exculpation appropriate where beneficiaries of exculpation had expectation of its approval, it was a result of negotiation, and the plan was overwhelmingly accepted).

The Exculpated Parties include: (a) COFINA; (b) AAFAF, (c) the Oversight Board and each of its members; (d) each of the PSA Creditors and Bonistas, solely in its capacity as a party to the Plan Support Agreement and a Creditor and not as a creditor of any other Entity, including, without limitation, the Commonwealth; and (e) with respect to each of the foregoing clauses (a) through (d), such Entity's current and former Affiliates, and such Entity's and its current and former Affiliates' current and former Related Persons solely in the capacities referred to above. *See* Plan § 1.93.  In general, the Exculpated Parties "shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case", among other things.  *See* Plan § 30.7.  Such Exculpated Parties have participated in good faith in formulating and negotiating the Plan and should be entitled to protection for the activities engaged in during COFINA's Title III Case.  In *PWS Holding Corp.*, the Third Circuit approved a plan provision exculpating, among others, the debtors, the reorganized debtors, a certain "Creditor Representative,"[22] the committee or any of their respective members, employees, and professionals from claims of creditors for "any act or omission in connection with, related to, or arising out of, the Chapter 11 Cases, the pursuit of confirmation of the Plan, the consummation of the Plan or the Administration of the Plan or the property to be distributed under the Plan,

---

[22]  In *Genesis*, 266 B.R. at 606 n.14, the bankruptcy court noted the "creditor representative" probably served a similar function to an administrative agent.

68

except for willful misconduct or gross negligence." 228 F.3d at 246. The *PWS* decision, and subsequent decisions in the Third and other Circuits, have granted exculpations to entities serving functions that are similar in nature to the Exculpated Parties. *See, e.g.*, *W. Mining & Invs., LLC v. Bankers Trust Co.*, No. C.A.02-1445, 2003 WL 503403, at *4 (D. Del. Feb. 19, 2003) (there is nothing inherently suspect about a plan provision releasing, among others, the DIP lenders, bank lenders, and the committee, from any liability for past, present, and future acts or omissions in connection with the sale and liquidation of the debtor's assets, other than those arising out of gross negligence or willful misconduct); *Genesis*, 266 B.R. at 605 (approving exculpation clause for administrative agents and lenders under various credit agreements, as well as their respective members, officers, directors, employees, agents, or professionals, and noting, "to the extent that [release provisions] set forth the applicable standards of liability for persons associated with and providing services toward the reorganization of the debtors, the provisions may be approved."); *Nat'l Heritage Found., Inc. v. Highbourne Found.*, 760 F.3d 344, 346 n.2 (4th Cir. 2014) (approving "exculpation provision [ ] limited to acts or omissions taken in connection [with] the bankruptcy case itself"); *Meritage Homes of Nev., Inc. v. JPMorgan Chase Bank, N.A. (In re S. Edge LLC)*, 478 B.R. 403, 403 (D. Nev. 2012) (approving exculpation provision relating generally to the Chapter 11 case, the disclosure statement, the confirmed plan or any document entered into during the Chapter 11 case).

Exculpation provisions like the one in Section 30.7 of the Plan provide appropriate protection for key parties involved in negotiating the Plan and preserving assets for the estate, employees, officers and directors of the debtors, and professionals from frivolous litigation. *See, e.g.*, *Murphy*, 2008 WL 4426080, at *6 (exculpation is appropriate, particularly where litigation has been threatened); *In re Firstline Corp.*, No. 06–70145–JDW, 2007 WL

269086, at *3 (Bankr. M.D. Ga. Jan. 27, 2007) (exculpation clauses are "necessary to discourage any frivolous litigation.").  Management and advisors to debtors and the key constituents in the negotiation of a plan alike rely on the availability of such provisions, where a limited number of parties in interest are likely to be unhappy with the results of the extensive negotiation and the bankruptcy process.

All the Exculpated Parties played a key role in the development of the Plan and the negotiations which paved the way for a successful reorganization, and would expect to receive a customary exculpation for their efforts during these cases.  Exculpation for parties participating in the plan process is appropriate where plan negotiations could not have occurred without protection from liability.  *See In re Drexel Burnham Lambert Grp., Inc.*, 960 F.2d 285, 293 (2d Cir. 1992); *Enron Corp.*, 326 B.R. at 503 (excising similar exculpation provisions would "tend to unravel the entire fabric of the Plan, and would be inequitable to all those who participated in good faith to bring it into fruition").  Accordingly, the Exculpation Provision should be approved.

### 4.  The Injunction Sought is Necessary to Enforce the Releases and Exculpations Contained in the Plan

Sections 30.3, 30.6, and 30.11 of the Plan provides for an injunction (the "Injunction") against all Entities from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, both prior to and after the Effective Date.  The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose.  Accordingly, the Injunction should be approved.

70

## D.  <u>CONCLUSION</u>

Thus, given the impressive restructuring initiatives accomplished by the Debtor in this case, and the clear satisfaction of the statutory confirmation requirements, the Debtor respectfully requests that this Court confirm the Plan.

Dated: January 9, 2019
      San Juan, Puerto Rico

Respectfully submitted,

<u>/s/  Martin J. Bienenstock</u>

Martin J. Bienenstock
Brian. S. Rosen
(Admission *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and Management Board as representative for the Debtors*

<u>/s/  Hermann D. Bauer</u>

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and Management Board as representative for the Debtors*