# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[*] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>Related to Debtor COFINA Only |

---

[*]  The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**OMNIBUS REPLY OF THE COFINA SENIOR BONDHOLDERS'
COALITION TO OBJECTIONS TO CONFIRMATION OF THE
SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF
<u>PUERTO RICO SALES TAX FINANCING CORPORATION</u>**

# **TABLE OF CONTENTS**

**Page**

PRELIMINARY STATEMENT ........................................................................................2

ARGUMENT ................................................................................................................4

    A.    The Plan Is in the Best Interests of Creditors ..........................................4

    B.    The Plan Fairly Allocates Recoveries for Senior and Subordinate
           Bondholders ..............................................................................................9

    C.    The Plan's Classification and Treatment Are Appropriate...................14

    D.    Every Aspect of the Plan Has Been Conducted in Good Faith.............15

    A.    Insolvency Is Not A Prerequisite to Title III ........................................19

    E.    There Is No Discrimination in Favor of On-Island Bondholders .........20

    F.    The Agreement to Pay the Consummation Costs Was a Reasonable
           Exercise of Judgment by the Oversight Board ......................................22

    G.    There Is No Contracts Clause Violation ................................................28

    H.    There Is No Takings Clause Violation....................................................29

    I.    There Is No Due Process Violation ........................................................30

    J.    Objections Based on the Impact to the Market Are Irrelevant .............31

    K.    The Objections Misunderstand the Plan's Release Provisions .............31

    B.    The *Appointments Clause* Litigations Should Not Impact Confirmation.............32

    L.    The Cooperativas Adversary Proceeding Is Irrelevant ..........................33

    M.    Representative Natal Albelo's Superior Court Lawsuit Is Irrelevant to
           Confirmation ...........................................................................................33

CONCLUSION...........................................................................................................35

## <u>TABLE OF AUTHORITIES</u>

*In re Adelphia Communications Corp.*,
  368 B.R. 140 (Bankr. S.D.N.Y. 2007) ................................................................... 23

*In re Bank of New Eng. Corp.*,
  364 F.3d 355 (1st Cir. 2004) ................................................................................... 9

*BOKF, N.A. v. Momentive Performance Materials, Inc.*,
  138 S. Ct. 2653 (2018) ........................................................................................... 11

*In re CHC Group Ltd., et al.*,
  Case No. 16-BR-31854 (BJH) (Houser, J.) (Bankr. N.D. Tex. 2017) .............. 25, 26

*Chem. Bank New York Trust Co. v. Kheel*,
  369 F.2d 845 (2d Cir. 1966) ..................................................................................... 9

*In re City of Detroit, Mich.*,
  504 B.R. 97 (Bankr. E.D. Mich. 2013) ................................................................. 32

*In re City of Stockton, Cal.*,
  478 B.R. 8 (Bankr. E.D. Cal. 2012) ....................................................................... 26

*In re Connector 2000 Ass'n Inc.*,
  447 B.R. 752 (Bankr. D.S.C. 2011) ......................................................................... 8

*In re Energy Future Holdings Corp.*,
  842 F.3d 247 (3d. Cir. 2016) ................................................................................. 11

*Getz v. Edinburg Consolidated Independent School District*,
  101 F.2d 734 (5th Cir. 1939) ................................................................................... 8

*In re Heron, Burchette, Ruckert & Rothwell*,
  148 B.R. 660 (Bankr. D.D.C. 1992) ..................................................................... 25

*Horne v. Department of Agriculture*,
  135 S. Ct. 2419 (2015) ........................................................................................... 27

*In re Jefferson Cty., Ala.*,
  484 B.R. 427 (Bankr. N.D. Ala. 2012) ................................................................. 31

*Lebron v. Mechem Fin. Inc.*,
  27 F.3d 937 (3d Cir. 1994) ..................................................................................... 21

*In re Leslie Fay Cos. Inc.*,
  207 B.R. 764 (Bankr. S.D.N.Y. 1997) ................................................................. 25

*In re Mesa Air Group, Inc.*,
  2011 WL 320466 (Bankr. S.D.N.Y. Jan. 20, 2011)................................................................ 19

*Momentive Performance Materials Inc. v. BOKF NA (In re MPM Silicones, LLC)*,
  874 F.3d 806 (2d Cir. 2017) .......................................................................................... 11, 13

*In re Morad*,
  328 B.R. 264 (B.A.P. 1st Cir. 2005).................................................................................... 21

*In re Mount Carbon Metropolitan District*,
  242 B.R. 18 (D. Colo. 1999).................................................................................................. 8

*Noriega Rodriguez v. Jarabo*,
  136 D.P.R. 497 (P.R. 1994) .......................................................................................... 23, 25

*In re Peabody Energy Corp.*,
  582 B.R. 771 (E.D. Mo. 2017)..................................................................................... 23, 25

*In re Simplot*,
  No. 06-00002-TLM, 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) ................ 14

*In re Tribune Co.*,
  464 B.R. 126 (Bankr. D. Del. 2011), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del.
  2011) ............................................................................................................................. 16, 17

*In re Tribune Media Co.*,
  587 B.R. 606 (D. Del. 2018) ............................................................................................... 16

*United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Counties., Pa.*,
  441 U.S. 506 (1979)............................................................................................................ 27

*United States v. Commodities Trading Corp.*,
  339 U.S. 121 (1950)............................................................................................................ 29

*W. Coast Life Ins. Co. v. Merced Irrigation District*,
  114 F.2d 654 (9th Cir. 1940) ................................................................................................ 8

*In re W.R. Grace & Co.*,
  729 F.3d 311 (3d Cir. 2013) ............................................................................................... 24

*Wilmington Tr., N.A. v. Momentive Performance Materials, Inc.*,
  138 S. Ct. 2653 (2018)........................................................................................................ 11

## Statutes and Rules

11 U.S.C. § 109(c) ..................................................................................................................... 18

11 U.S.C. § 362(a)(3)................................................................................................................. 32

11 U.S.C. § 360(a) ...................................................................................................... 32

11 U.S.C. § 502 ................................................................................................... 10, 14

11 U.S.C. § 503 ...................................................................................................... 21

11 U.S.C. § 510(a) ...................................................................................................... 9

11 U.S.C. § 922(a) ............................................................................................... 32, 33

11 U.S.C. § 1103(3) ................................................................................................... 22

11 U.S.C. § 1123(a)(4) ............................................................................ 20, 23, 24, 25

11 U.S.C. § 1128 ................................................................................................... 7, 31

11 U.S.C. § 1129(a)(7) ................................................................................................. 8

11 U.S.C. § 1129(b)(1) ............................................................................................... 13

Puerto Rico Oversight, Management and Economic Stability Act, 48 U.S.C. §§ 2101-2241
("PROMESA") ........................................................................................... *passim*

Fed. R. Bankr. P. 2002 ............................................................................................... 28

Fed. R. Bankr. P. 9019 ............................................................................................. 6, 7

Fed. R. Civ. P. 56 ...................................................................................................... 10

## Treatises

6 COLLIER ON BANKRUPTCY, ¶ 943.03 (16th ed. 2013) ........................................... 6, 8

7 COLLIER ON BANKRUPTCY, ¶ 1123.01 (16th ed. 2013) .......................................... 23

## Constitutional Provisions

U.S. CONST. art. I, § 10, cl. 1 ..................................................................................... 26

U.S. CONST. art. IV .................................................................................................... 32

The COFINA Senior Bondholders' Coalition (the "Senior Coalition"), holders of more

than $5 billion in senior and subordinate COFINA bonds, through its undersigned counsel, files

this omnibus reply (the "Reply") to the eleven objections (collectively, the "Objections")[1] to

---

[1]   The Objections include:  (i) *Objections to the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation with Reservation of Rights* (the "Mangiaracina Objection") (Dkt. 4481); (ii) *Objection of Service Employees International Union and International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) to COFINA Plan of Adjustment* (the "SEIU-UAW Objection") (Dkt. 4556); (iii) *Amended Objection of the GMS Group, LLC to Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation and Request for Evidentiary Hearing* (the "GMS Objection") (Dkt. 4564); (iv) *Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* (the "Hein Objection") (Dkt. 4585); (v) *Objection of PROSOL-UTIER to Confirmation of the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation ("COFINA") [Case No. 17-3284, Docket Entry No. 380]* (the "PROSOL-UTIER Objection") (Dkt. 4592); (vi) *Supplement to Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* (the "Hein Supplement") (Dkt. 4595); (vii) *First Amended Objection of Mark Elliott, Individually and D/B/A Elliott Asset Management, to Entry of an Order Approving the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "Elliot Objection") (Dkt. 4598); (viii) *Joinder by and Supplement of the GMS Group, LLC to Supplemental Objection of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* (the "GMS Supplement") (Dkt. 4605); (ix) *Objection to Confirmation of the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation and Joinder of Objection by PROSOL-UTIER* (the "Natal Albelo Objection") (Dkt. 4607); (x) *Objection of Lawrence B. Dvores, Individual Investor and Owner of Uninsured Junior Lien COFINA Bonds to the Confirmation of the Proposed Plan of Adjustment for Puerto Rico Sales Tax Financing Corporation Bonds and in Support of and for Joinder with Objections Filed by the GMS Group and Peter C. Hein, Pro Se* (the "Dvores Objection") (Case No. 17-3284, Dkt. 420); and (xi) *Objection to the Confirmation of the Second Amended Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "Cooperativas Objection") (Case No. 17-3284, Dkt. 415).  Unless otherwise noted, all docket entries ("Dkt.") refer to the docket numbers in the lead case, *The Financial Oversight and Management Board, as Representative of the Commonwealth of Puerto Rico*, Bankruptcy Case No. 17-BK-3283-LTS, in these jointly administered Title III Cases. A number of Objections also try to "incorporate by reference" the letters emailed and mailed to the

confirmation of the Second Amended Title III Plan of Adjustment (as may be further amended, the "Plan") of Puerto Rico Sales Tax Financing Corporation ("COFINA"),[2] and states as follows:

## PRELIMINARY STATEMENT

1.      The Plan represents a monumental and critical achievement towards restoring Puerto Rico's financial health.  COFINA was the single largest issuer of municipal bonds for Puerto Rico and was the original rescue bond supported by both local political parties as a means to reduce Puerto Rico's borrowing costs with securitization techniques.  The Plan resolves massive and unprecedented litigation claims and restructures nearly $18 billion of outstanding indebtedness (approximately 25% of Puerto Rico's aggregate outstanding public indebtedness), thereby freeing up over $17.1 billion in sales tax revenues over the next 40 years for use by the Commonwealth.  If confirmed, the Plan will represent the first successful implementation of congressional intent in

---

Court.  As the Court has previously noted (Dkt. 4441), these letters—which lack any type of legal support or explanation—are procedurally improper and should not be considered formal "objections."  In any event, the issues referenced in the letters are also independently raised in the Objections, and thus addressed accordingly.

In addition to the Objections, Whitebox Multi-Partners, L.P. ("Whitebox") filed a *Memorandum of Law Pursuant to Section 19.5 of COFINA's Amended Title III Plan of Adjustment* (the "Whitebox MOL") (Dkt. 4602) in connection with its dispute with Bank of New York Mellon ("BNYM").  Although not styled as a Plan objection, the Senior Coalition (excluding Whitebox) notes here its disagreement with the Whitebox MOL regarding the meaning and operation of section 19.5 of the Plan to the extent that Whitebox asserts that COFINA itself (and therefore its bondholders) should be liable for the fees and expenses BNYM incurred in defending against claims brought by Whitebox and Ambac.  The import of section 19.5 of the Plan is that any holdback of distributions by BNYM on account of the claims asserted in the Ambac and Whitebox Actions, as will be determined by the Court at the Confirmation Hearing, will solely come from Ambac and Whitebox distributions and not from COFINA or its other bondholders.  In the event the Court requires a reserve from all bondholders, the members of the Senior Coalition reserve all rights to file any and all actions they believe appropriate to protect their interests.

[2]  Capitalized terms not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

passing bankruptcy legislation to assist Puerto Rico in reversing a persistent cycle of financial distress, hampering growth to the detriment of its residents—who are U.S. citizens.

2.      For more than a decade, Puerto Rico has been challenged by high unemployment, excessive debt, a shrinking economy, and residents leaving the Island for better opportunities and better healthcare on the mainland.  In recognition of the magnitude of the financial crisis then extant in Puerto Rico, in 2016, Congress and President Obama, in a rare bipartisan act, passed and signed into law, respectively, the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA").  Among other things, PROMESA provided for the establishment of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") and provided the Oversight Board with the tools and authority to seek to restructure the debts of the Commonwealth and its governmental instrumentalities and public corporations, such as COFINA.

3.      Section 101(a) of PROMESA states, in simple terms, Congress's goals when it passed PROMESA:  "The purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets."  While simply stated, Congress understood that the Oversight Board would need to be vested with overarching authority to resolve complicated fiscal and financial issues that prior administrations had been unable or unwilling to address.  Towards that end, the Oversight Board was granted the exclusive authority to represent both the Commonwealth and its governmental instrumentalities in their respective Title III cases and to commence Title III cases for such entities even in the absence of insolvency. As an apolitical, impartial governmental body, the Oversight Board was empowered to craft flexible solutions to steer Puerto Rico out of acrimonious "all or nothing" litigation, the prime example of which was the bespoke protocol it developed to resolve the Commonwealth-COFINA

3

Dispute, which granted authority to two court-appointed fiduciaries to litigate or settle the issues as between the two competing debtors.

4.       The Plan is a critical step towards Puerto Rico achieving fiscal responsibility and regaining access to capital markets, at which point the Oversight Board will no longer be needed. The Plan has obtained overwhelming creditor support from a diverse body of creditors, including institutional investors, monoline insurers, and individual retail bondholders.  The best proof of support for the Plan is the limited number of objections actually filed by COFINA creditors.  Of the thousands of creditors holding nearly $18 billion in COFINA bonds, only nine (9) entities, including individuals, filed objections against the Plan, and three (3) of those nine do not even hold claims against COFINA.  The balance of the objectors represent a relatively small amount of the outstanding COFINA bonds.  Put simply (and as will be demonstrated at the hearing to consider confirmation of the Plan), the Plan meets the standards for confirmation under section 314 of PROMESA, including that the Plan is feasible, is consistent with the COFINA Fiscal Plan, and is in the best interests of COFINA's creditors.  Accordingly, the Senior Coalition respectfully requests that the Court confirm the Plan.

## **ARGUMENT**

### A.       **The Plan Is in the Best Interests of Creditors**

5.       A common theme running throughout many of the Objections is that the Plan is not in the best interests of creditors.  Specifically, the Objections argue that because COFINA legally and constitutionally owns its portion of the SUT (the "PSTBA"), any Plan that does not result in a 100% recovery should be rejected.[3]  This argument—while rhetorically satisfying—assumes a COFINA litigation victory on every issue that was compromised by the fiduciaries most

---

[3]   *See, e.g.*, Hein Obj. at 17-21, 27-35; Elliot Obj. at 5, 8-9, 12-13.

knowledgeable about the risks and benefits of litigation (the "Commonwealth Agent" and "COFINA Agent," respectively).  In other words, although disguised as a "best interests" argument, these Objections are nothing more than a disagreement with the wisdom of settling.  Moreover, as discussed below, it ignores the legal meaning of the "best interests" test under PROMESA.

6.      In the Commonwealth-COFINA Dispute, the Commonwealth Agent asserted 13 different claims against COFINA, and success on many of them could have resulted in COFINA having *no* interest in the PSTBA, and thus no money to satisfy its obligations to creditors.  While the Senior Coalition steadfastly believes in the strength of its arguments that the COFINA structure is consistent with both the Puerto Rico Constitution and federal bankruptcy law, the risk of losing cannot cavalierly be cast aside as just noise.  The issues are unprecedented and enormously complex.  Moreover, a litigated outcome would have resulted in a binary outcome:  COFINA either owned all of the PSTBA, or it owned nothing more than an unsecured claim against the Commonwealth.[4]  Rather than assume that risk—and delay any resolution for years as the dispute was litigated and appealed throughout the federal court system, and perhaps the Supreme Court of Puerto Rico—the Plan enhances COFINA's status as ironclad, federally validated, and the indisputable owner of its revenues, albeit in a reduced amount.  Most importantly, especially for investors who depend on interest income, the Plan provides for the prompt resumption of interest payments for *all* COFINA bondholders.

7.      Like the parties that filed Objections, the Senior Coalition (which also holds a substantial amount of subordinate bonds) would of course have preferred that COFINA receive a greater share of the PSTBA in the Commonwealth-COFINA Dispute settlement (the "Settlement").  But that does not mean that the percentage COFINA did receive as part of the Settlement, as

---

[4]      The Commonwealth Agent questioned whether COFINA would even have such a claim.

incorporated into the Plan to support the new COFINA bonds, is unfair, unreasonable, or somehow not in the best interests of COFINA's creditors. As the Oversight Board explained in its motion in the Commonwealth Title III case to approve the Settlement and in its omnibus reply in support of the Settlement,[5] all that is required for a settlement to be approved is that it "falls above the lowest point in the range of reasonableness." 9019 Reply at 8-9 (citing cases). Given the numerous and various attacks on COFINA's legality and the incentives for COFINA to resolve the dispute without years of litigation so that interest payments can resume, the 53.65%/46.35% first-dollar split in favor of COFINA is entirely reasonable.[6] What's more, the Plan provides additional protections for COFINA and its creditors, such as a federal court order "quieting title" to COFINA's ownership of a majority of the PSTBA—and on a first-dollars basis—against all possible future challenges and a strengthened non-impairment and substitution covenant, forever removing the cloud over title to COFINA's property interest that has existed since COFINA's creation in 2007.[7] If the Plan were to be rejected, and the Commonwealth-COFINA Dispute were

---

[5]   The *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Dkt. 4067) (the "9019 Motion") and the *Commonwealth of Puerto Rico's Omnibus Reply to Objections to Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* (Dkt. 4434) ("9019 Reply"), respectively. Rather than repeat all of the points raised in the 9019 Motion and 9019 Reply, which apply equally to the Objections raised here, the Senior Coalition hereby incorporates these pleadings by reference.

[6]   Indeed, the fact that numerous Commonwealth creditors and parties-in-interest objected to the Settlement on the grounds that it was too favorable towards COFINA and its creditors is further proof of its overall reasonableness.

[7]   The Elliot Objection argues that the Plan must be rejected because the dispute over whether or not the PSTBA is an "available resource" is left open. Elliot Obj. at 3-4. This is not true and misses the critical benefit of the entire Settlement. The Plan and Confirmation Order ensure that COFINA's portion of the PSTBA is not and will never be an available resource of the Commonwealth. *See* Plan §§ 16.7 & 25.1(c)(v); *see also* PROMESA § 4 (providing for supremacy

litigated to conclusion, even if COFINA were successful, it would not have these ironclad protections. Nor would successful litigation on COFINA's ownership rights have prevented the Commonwealth from attempting to "turn off the tap," from enacting other measures that could have reduced the sales tax transferred to COFINA, or even from outright repealing the sales tax, spurring infinite rounds of further litigation as to the appropriate remedies, if any.

8.     The Plan, and the Confirmation Order, if entered, will ensure COFINA's revitalization and will prevent any future challenges to COFINA's ownership of, and any attempts by the Commonwealth to divert, COFINA's portion of the PSTBA. This outcome is unquestionably in the best interests of COFINA's creditors as that term is used in the everyday sense.[8]

9.     More importantly, confirmation of the Plan is in the best interests of creditors, as measured under PROMESA, which requires "the court to consider whether available remedies

---

of PROMESA over all state or territorial law); 6 COLLIER ON BANKRUPTCY ¶ 944.03[1][b] (16th ed. rev. 2013) ("The requirement of a court determination of validity is extra assurance for those who might be skittish about the nature of the bonds being issued . . . . It has the added feature of removing any doubt concerning the matter, because the determination of the court on that issue should be binding in the future.").

[8]   The SEIU-UAW and PROSOL-UTIER Objections argue that the Plan is inconsistent with the Commonwealth Fiscal Plan, is detrimental to the Commonwealth, and fails to define essential services. SEIU-UAW Obj. at 2; PROSOL-UTIER Obj. at 17-31. All of these arguments lack merit and are irrelevant to confirmation of the Plan. As an initial matter, neither SEIU-UAW nor PROSOL-UTIER have alleged that they own COFINA bonds or are otherwise parties in interest in the COFINA Title III Case. 11 U.S.C. § 1128. As for the merits, many of these arguments are copied and pasted from the objections these parties filed to the 9019 Motion. As such, the Senior Coalition refers the Court to the 9019 Reply, which responds to them. The Senior Coalition does note, however, that the allegation that the Plan must fail because it does not define and account for essential services is misplaced. COFINA is a public corporation, not a governing territory. As such, it does not provide essential services, and thus there is no need for the Plan to "define" or "account" for them. That may be an issue for the Commonwealth Fiscal Plan and any Commonwealth Plan of Adjustment that may be proposed in the future.

under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by such plan."  PROMESA § 314(b)(6).  Unlike the best interests test under chapter 11, which requires that an individual creditor recover no less under the proposed plan than the creditor would receive in a hypothetical liquidation under chapter 7 of the Bankruptcy Code, 11 U.S.C. § 1129(a)(7), PROMESA requires that the court consider the interests of all creditors, collectively, when determining whether the plan provides a greater recovery than would be available to creditors outside of the Title III case.[9]

10.     As specifically applied to COFINA's Title III Case, for the reasons stated above, the "best interests" analysis therefore depends on the outcome of the "all or nothing" litigation that threatened COFINA's entire structure.  If the settlement of those issues is reasonable, then the best interests of creditors necessarily follow since virtually all of COFINA's property is being distributed to its creditors under the Plan.  It bears emphasizing that the great majority of COFINA's creditors support the Plan, and the Objections asserting "best interests" are really just saying more money would be better.  While this is undoubtedly true, it has no legal significance in this context.  "The purpose of the Bankruptcy Act as expressed in chapter 10 [now chapter 9 of the Bankruptcy Code] is to permit the scaling down of municipal securities, on the theory that half a loaf is better than no bread.  Some of the bondholders may be dissatisfied with the bargain but under the provisions of the law they are bound by the action of the majority."  *Getz v. Edinburg Consol. Indep. Sch. Dist.*, 101 F.2d 734, 736 (5th Cir. 1939).

---

[9]   *See, e.g.*, 6 COLLIER ON BANKRUPTCY ¶ 943.03[7][a] (16th ed. 2013); *see also In re Mount Carbon Metro. Dist.*, 242 B.R. 18, 33-34 (D. Colo. 1999).  *Accord W. Coast Life Ins. Co. v. Merced Irr. Dist*., 114 F.2d 654, 679 (9th Cir. 1940) (affirming confirmation of plan under municipal debtor provisions of Bankruptcy Act of 1898 when the plan payments were "all that could reasonably be expected in all the existing circumstances"); *In re Connector 2000 Ass'n Inc.*, 447 B.R. 752, 765-66 (Bankr. D.S.C. 2011).

B.      **The Plan Fairly Allocates Recoveries for Senior and Subordinate Bondholders**

11.      The argument lodged by a handful of holders of COFINA's subordinate bonds is that the senior recoveries are too high and the subordinate recoveries are too low.  Specifically, the Objections argue (i) that senior and subordinate bondholders should receive the same recovery because any impairment of COFINA's ownership of the PSTBA should affect the parties equally[10] and (ii) that the cash being held by BNYM, as trustee, for COFINA bondholders should be distributed ratably to the senior and subordinate parties.[11]  These arguments gloss over the risk-reward proposition when purchasing subordinate bonds and the importance of enforcing subordination agreements in bankruptcy.  *See* 11 U.S.C. § 510(a), incorporated by PROMESA § 301(a); *see also In re Bank of New Eng. Corp.*, 364 F.3d 355, 362 (1st Cir. 2004) (noting that enforcement of subordination agreements in bankruptcy prevents subordinate creditors from receiving windfalls after they specifically bargained for less lucrative payment arrangement, and concluding that equity demands enforcement because "[e]quality among creditors who have lawfully bargained for different treatment is not equity but its opposite") (quoting *Chem. Bank New York Trust Co. v. Kheel*, 369 F.2d 845, 848 (2d Cir. 1966) (Friendly, J. concurring)).

---

[10]  *See, e.g.*, Hein Obj. at 16-17; Elliot Obj. at 8-9; Dvores Obj. at 3-4.  It bears noting that while he is objecting *pro se*, Mr. Dvores is actually a sophisticated investor in areas of finance and must be presumed to understand the meaning of subordinated bonds given his extensive employment experience with GMS (another objector) and FINRA.  *See* Lawrence Baruch Dvores Broker Registration, https://brokercheck.finra.org/individual/summary/1047267#disclosuresSection (last visited January 9, 2018).

[11]  Hein Obj. at 11-12.  Mr. Peter C. Hein, also appearing *pro se*, is an experienced attorney at Wachtell, Lipton, Rosen & Katz, one of the preeminent and most sophisticated law firms in the world.  His areas of expertise include securities, corporate, ERISA, real estate, insurance and other complex commercial litigation.  *See* Wachtell, Lipton, Rosen & Katz, *Peter C. Hein*, http://www.wlrk.com/PCHein/.

12.     As the Court is aware, the relationship and payment waterfall between senior and subordinate COFINA bondholders was heavily contested by sophisticated investors during COFINA's Title III Case.  *See generally Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation ("COFINA") et al.*, Adv. Proc. No. 17-00133-LTS (the "Interpleader").  The Objections argue that senior and subordinate bondholders are equal and should receive payments under the Plan on a *pari passu* basis.  This position is so contrary to terms of the Bond Resolution that it was never even argued by the well-heeled and well-advised Mutual Fund Group, The Puerto Rico Funds, and Assured Guaranty in the Interpleader.  *See, e.g.*, *Motion for Summary Judgment by the Mutual Fund Group and Puerto Rico Funds*, Adv. Proc. No. 17-133 (LTS) (Dkt. 433), at 27-32; *Motion for Summary Judgment of Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*, Adv. Proc. No. 17-133 (LTS) (Dkt. 439), at 9-12, 31-35.  The position taken by the advocates for subordinate bondholders during the early days of the Title III Case, and prior to giving effect to the Settlement of the Commonwealth-COFINA Dispute, was that subordination kicks in only if there were a shortfall of funds (and not just upon a default).  In any event, the existence of a shortfall today is the inescapable result of the Settlement (which makes COFINA incapable of paying all its bonds) and the deemed acceleration of all bonds by virtue of section 502 of the Bankruptcy Code.

13.     The Senior Coalition, and other senior parties, by contrast, have contended that the Bond Resolution created an unequivocal senior-subordinate structure in which senior bondholders are entitled to payment in full following a default before subordinate bondholders receive *any* funds from the issuer.  *See, e.g.*, *Joint Motion for Summary Judgment and Incorporated Memorandum of Law of the COFINA Senior Bondholders' Coalition and Whitebox*, Adv. Proc. No. 17-00133-LTS (Dkt. 431), at 29-31; *COFINA Senior Parties' Joint Memorandum of Law in*

*Partial Opposition to (1) Mutual Fund Group's and Puerto Rico Funds' Motion for Summary Judgment; (2) Motion for Summary Judgment of Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*; and (3) *Motion of the Bank of New York Mellon, as Trustee, for Partial Summary Judgment Pursuant to Fed. R. Civ. P. 56*, Adv. Proc. No. 17-00133-LTS (Dkt. 472), at 22-31.[12]

14.     Putting aside the legal merits, if the objecting subordinate bondholders' position were correct, and both senior and subordinate bonds were treated equally, the recoveries for both groups of bondholders, on a pre-petition claim basis, would have been approximately 76.64% notional recovery.[13] By contrast, if the strict priority of the senior bondholders were upheld, senior bondholders would have been entitled to a par recovery *plus* post-petition interest and, potentially, a very significant "make-whole" payment owing under the terms of the Bond Resolution before subordinate bondholders received *any* recovery on account of their claims.[14] Undoubtedly, the present value of the subordinate bondholders' recovery would plummet well below the current

---

[12]     *See* Declaration of Matthew Rodrigue ("Rodrigue Decl."), filed concurrently herewith, at ¶ 6, Ex. 2. (Demonstrative) (showing historical pricing chart for COFINA senior and subordinate bonds, demonstrating that, following announcements that ultimately led to a default, the market value of the Existing Securities reflects the greater risks of owning subordinate bonds).

[13]     *See* Rodrigue Decl. at ¶ 3.

[14]     Certain series of senior bonds prohibited payment prior to maturity, except if accompanied by a "make-whole" payment, thereby guaranteeing a defined level of returns to the investor. *See, e.g.*, First Supplemental Sales Tax Revenue Bond Resolution for the Series 2007A Senior Bonds § 2.4(c). These claims, if allowed, could exceed $2.7 billion, severely impacting recoveries to subordinate bondholders. Rodrigue Decl. at ¶ 4. While the allowance of "make-wholes" has not yet been adjudicated by the First Circuit, the Senior Coalition notes that the Second and Third Circuits have come out differently, with the Third Circuit allowing the claim to the extent required by the bond documents. *Compare MPM Silicones, L.L.C. v. BOKF, N.A.*, 874 F.3d 787, 802 (2d Cir. 2017), *cert. denied sub nom. BOKF, N.A. v. Momentive Performance Materials, Inc.*, 138 S. Ct. 2653 (2018), and *cert. denied sub nom. Wilmington Tr., N.A. v. Momentive Performance Materials, Inc.*, 138 S. Ct. 2653 (2018), *with*, *In re Energy Future Holdings Corp.*, 842 F.3d 247, 257-58 (3d. Cir. 2016) (Ambro, J.).

56.41% notional recovery under the Plan if subordinate bondholders were not paid until senior bondholders were paid all of their entitlements in full. Recognizing the risk of an adverse decision for both sides, the senior/subordinate split reflected in the Plan represents a fair compromise of this inter-creditor dispute.[15] As ultimately agreed by all parties at the negotiating table—including holders of billions of dollars of subordinate bonds—the current senior/subordinate split reflects an approximate 60% chance that the senior bondholder position of strict priority would prevail (assuming that the new COFINA bonds trade at par), even conservatively excluding any make-whole amounts. Rodrigue Decl. at ¶ 5, Ex. 1 (Demonstrative).

15.  As for the claim that it is unfair that the cash that has accumulated at BNYM is going to senior rather than subordinate bondholders, the Objections fail to explain why it is unfair in light of the Bond Resolution's payment priority waterfall or why it should be analyzed separately from the overall allocation of value provided to creditors under the Plan. As an initial matter, the Plan provides that any bondholder, senior or subordinate, entitled to pre-petition accrued cash interest in respect of its bonds will receive a payment of cash on account of such interest. *See* Plan at § 1.161 (defining Section 103 Cash), §§ 5.1, 9.1 (providing for distribution of Section 103 Cash to holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims, respectively). Since the Plan does not provide for the payment of post-petition interest, the remaining cash is allocated to senior bondholders as part of the 93% notional recovery on their bankruptcy claim (with the balance coming in the form of the identical bonds given to the

---

[15]   In light of the unquestionable payment priority of senior bonds following an event of default under the Bond Resolution, subordinate bondholders bore a much greater risk of loss in the Commonwealth-COFINA Dispute, and thus were much more likely to swing for the fences in the litigation instead of seeking a reasonable compromise of the dispute. *See Ion Media Networks, Inc.*, 419 B.R. 585, 595 (Bankr. S.D.N.Y. 2009) (holding that "plainly worded contracts establishing priorities and limiting obstructionist, destabilizing and wasteful behavior should be enforced and creditor expectations should be appropriately fulfilled").

subordinate bondholders).   Ultimately, the agreement to distribute the BNYM cash to senior bondholders (and to subordinate Puerto Rico investors who accepted taxable bonds) was part of the inextricably intertwined series of concessions that led to the senior bondholders' agreement to accept a less-than-par recovery so that subordinate bondholder recoveries could increase, even though certain senior bondholders felt strongly that they were entitled to strict priority.

16.   What also may not be readily apparent from merely reading the Plan is that the negotiated weighted average interest rate on the new COFINA bonds (5.0%) is lower than the weighted average of the original senior bonds.   The agreement by the Senior Coalition to accept lower interest rates than their original investment created flexibility for the Oversight Board to issue more bonds backed by the same 53.65% of the PSTBA owned by COFINA (*i.e.*, at no additional cost to the Commonwealth), thereby creating more currency to distribute to subordinate bondholders.   In a cramdown (or "cram-up") scenario where seniority were upheld and senior bondholders were paid an interest rate set by the court as the "indubitable equivalent" of their interest in COFINA's property, a higher interest rate would have lowered the amount of bonds that could be issued, which would have reduced the recovery on subordinate bonds even further.   *See, e.g.*, *MPM Silicones, L.L.C.*, 874 F.3d at 806 (reversing district court and bankruptcy court and mandating trial on whether there is an efficient market for the bonds and, if so, setting a market rate of interest).   The complexity of such proceedings cannot be overstated, particularly in a case of this magnitude where there is undoubtedly an efficient market for municipal bonds, but very little comparable restructured Puerto Rico bonds per se.   The point, simply, is that the nominal

recovery values set forth in the Plan do not provide the complete picture and must be understood with reference to the alternatives in a non-consensual scenario.[16]

17.     Accordingly, the allocation of recoveries between senior and subordinate bondholders is fair and reasonable, and thus the Objections on those grounds should be overruled.[17]

### C.     The Plan's Classification and Treatment Are Appropriate

18.     Two Objections claim that the Plan's stated recoveries of 93.01% for senior bonds and 56.41% for subordinate bonds are inaccurate because they do not account for the pre-petition bonds' varying maturities and coupon rates.[18]   These Objections also allege that the failure to account for these different maturities and coupon rates in allocating new bonds results in unfair discrimination.[19]   These Objections are based on a misunderstanding of how claims are classified and how recoveries are calculated in bankruptcy proceedings.

---

[16]     *See* Rodrigue Decl. at ¶ 7, Ex. 3 (Demonstrative) (illustrating that, notwithstanding the imminence of confirmation of the Plan, current trading prices on COFINA's Existing Securities demonstrate that the market believes a higher interest rate than that set forth in the Plan would be required in order for the new COFINA Bonds to trade at par).

[17]     The GMS Objection contends that the Plan is unfair and inequitable and thus fails to comply with section 1129(b)(1) of the Bankruptcy Code.  GMS Obj. at 20-21.  All impaired bondholder classes have accepted the Plan.  Accordingly, the section 1129(b) "fair and equitable" and "unfair discrimination" tests are inapplicable to the Court's consideration of confirmation of the Plan.  *See* 11 U.S.C. § 1129(b)(1) (applying fair and equitable standard only "if all of the applicable requirements of subsection (a) of this section *other than paragraph (8)* are met with respect to a plan, the court, on request of the proponent of the plan, shall confirm the plan notwithstanding the requirements of such paragraph if the plan does not discriminate unfairly, and is fair and equitable, with respect to *each class of claims or interests that is impaired under, and has not accepted, the plan*") (emphasis added); *see also In re Simplot*, 2007 WL 2479664, at *14 (Bankr. D. Idaho Aug. 28, 2007) (concluding "§ 1129(a)(8) is satisfied, and [thus] § 1129(b) is not at issue").

[18]     GMS Supplement at 3-5; Dvores Obj. at 3-4.

[19]     GMS Supplement at 6.

14

19.     Under section 502 the Bankruptcy Code, which is incorporated into PROMESA via section 301(a), the value of a claim is determined "as of the date of the filing of the petition."  Thus, when COFINA filed a petition to enter Title III on May 5, 2017, the COFINA Bonds became "due" and were given a fixed value at that time.  This means that any unpaid interest that would have accrued post-petition, the differences in maturity dates, and the varying coupon rates are all irrelevant for calculating the amount of a claim and recoveries on such claims.[20]  *See* 11 U.S.C. § 502(b)(2) (disallowing claims for unmatured interest).  With this principle in mind, the Plan accurately allows all COFINA bond claims in amounts fixed as of the petition date, and the 93.01% recovery for senior bonds and 56.41% recovery for subordinate bonds is accurate.

### D.     Every Aspect of the Plan Has Been Conducted in Good Faith

20.     The Objections try to cast doubt over the entire COFINA bankruptcy:  the filing of the Title III Case; the propriety of the resolution of the Commonwealth-COFINA Dispute; the judicially-supervised mediation process; and the arm's-length formulation of the Plan by alleging, among other things, that the parties were conflicted, that subordinate and individual bondholder interests were never considered or represented, and that the mediation parties inappropriately profited from their participation in the mediation.[21]  In other words, that the parties have acted in bad faith.  These aspersions lack merit and any scintilla of evidence, and thus should be summarily rejected.

21.     As an initial matter, the Commonwealth-COFINA Dispute was led by two court-appointed independent fiduciaries who were explicitly tasked with achieving the best result for

---

[20] To be clear, if strict priority was enforced, the senior bonds may have been eligible to receive post-petition interest, which would make *senior* pre-petition coupons relevant.  Senior bondholders waived this opportunity, however, to help achieve an acceptable Plan compromise.

[21]  *E.g.*, GMS Obj. at 10-11, 51-52; Dvores Obj. at 5-7.

their respective debtor, without considering the interests of any particular creditor. *See Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Protocol") (Dkt. 996) at ¶ 4(f) ("Each Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents. In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents."). Any implication that they did otherwise is simply baseless. And, in any event, the time to complain about their appointment or the process itself is long past. The Protocol outlining the procedures for resolving the Commonwealth-COFINA Dispute and appointing the Agents was submitted to the Court in August 2017. *See id.* Anyone objecting to the Protocol, including the Agents' appointments, had ample opportunity to voice their concerns at any time prior to their announcement of the Agreement in Principle; no one did.

22. Similarly baseless is the claim that the mediation process was somehow tainted or unfair to subordinate and individual bondholders. The mediation process was overseen by three federal judges appointed by the Court, including judges with particular expertise in bankruptcy law. Without delving into the details—which the mediation parties are forbidden from disclosing publicly—the Senior Coalition will simply say that the subordinate bondholder representatives were sophisticated, well-heeled, and ably advised by legal and financial advisors. All views and interests were fully represented and thoroughly debated by investors with billions of dollars (and, potentially, their jobs) on the line. Indeed, the Mutual Fund Group, the Puerto Rico Funds Group, and Assured Guaranty have consistently advanced the subordinate bondholders' position

16

throughout these proceedings.[22]  *See, e.g.*, *Motion for Summary Judgment by the Mutual Fund Group and Puerto Rico Funds*, Adv. Proc. No. 17-133 (LTS) (Dkt. 433); *Mutual Fund Group's and Puerto Rico Funds' Motion for Summary Judgment*, Adv. Proc. No. 17-257 (LTS) (Dkt. 318); *Motion for Summary Judgment of Assured Guaranty Corp. and Assured Guaranty Municipal Corp.*, Adv. Proc. No. 17-133 (LTS) (Dkt. 439).  The Bonistas del Patio, meanwhile, have consistently represented the position of individual, Puerto Rico-based bondholders, many of whom hold subordinate bonds.

23.      Implicit in this "unfairness" argument is the suggestion that subordinate bondholders were excluded from the process.  But there is no evidence (either submitted to the Court or available to the Senior Coalition) to suggest that any objecting party sought to participate in the litigation or mediation process and was turned away.  To the contrary, as the GMS Group, one of the objecting parties asserting the unfairness of the treatment of subordinate bonds under the Plan, noted in an article on their public webpage that Oppenheimer, Goldman Sachs, and

---

[22]  The Dvores Objection argues that these groups do not count as subordinate bondholder representatives because they also hold senior bonds.  This argument is overly simplistic—a review of every pleading filed by these parties indicates that the positions taken always advanced their subordinate bondholder interest, even at the expense of the senior bondholder position.  *See In re Tribune Co.*, 464 B.R. 126, 157 (Bankr. D. Del. 2011), *on reconsideration in part*, 464 B.R. 208 (Bankr. D. Del. 2011), *aff'd sub nom. In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018), *and aff'd in part sub nom.*, *In re Tribune Media Co.*, 587 B.R. 606 (D. Del. 2018) ("It is unsurprising that many of the players in this drama had business relationships based upon prior, and potentially future, deals.  Indeed, based upon my experience, I would be surprised if, in a large, complex business reorganization there were no connections among various constituents.  The Court's focus, however, is not on the existence of connections, but on whether such connections rise to potential or actual conflicts.  Without any tangible evidence of actual wrongdoing or harm to the Debtors, suspicion of a potential conflict is not sufficient to demonstrate bad faith.").  In addition to being over-simplified, the Objection is also factually wrong.  Assured Guaranty Corporation only insured subordinate COFINA bonds and does not hold or insure senior COFINA bonds.

Santander Bank are all "major subordinate bondholders,"[23] who actively participate in the various litigations and ultimately became parties to the Plan Support Agreement.  Moreover, there were numerous instances where notice was given and opportunities existed for any party to be heard.  For example:

- There were *two* omnibus hearings  (June 28, 2017 & August 9, 2017) discussing the process to resolve the Commonwealth-COFINA Dispute.

  - In fact, the initial process was rejected because the Court wanted to ensure greater independence of the Agents from the Oversight Board in part to ensure the Agents were arm's-length adversaries—anticipating the very issue raised by the Dvores Objection.

  - The ultimate process, which made clear the independence and separate fiduciary duties owed by each Agent, was approved through the Protocol signed by numerous creditors on either side of the "v", and specifically references court-ordered mediation and a party's right to intervene.

- Any party could have sought to intervene and file a pleading in the Commonwealth-COFINA Dispute.  Indeed, there were six separate motions for summary judgment ultimately filed.

- The Court allowed briefing on the Agents' motion to hold any summary judgment decision in abeyance while the various parties sought to negotiate a resolution the Commonwealth-COFINA Dispute.  Adv. Proc. No. 17-257 (LTS), Dkt. 485.

- No party objected to the process at any of these stages, and no party sought to participate and was shut out.

24.     It is inappropriate and unfair to the numerous creditors that did participate in good faith for others to complain about the fairness of the process when they never sought to participate.  *See Tribune*, 464 B.R. at 157 (overruling objection of senior noteholders who did not participate in early mediation process because the order appointing the mediator clearly gave the party the opportunity to participate).

---

[23]     *See Puerto Rico COFINA Sales Tax Bonds Continue to Rally on Tentative Settlement Agreement…*, The GMS Group (Jun. 11, 2018), https://www.gmsgroup.com/Puerto-Rico-COFIN-Sales-Tax-Bonds-Continue-to-Rally.

25.     Finally, the allegation—again without any support—that there was some sort of advantage taken by mediation parties is patently false.  Members of the Senior Coalition were regularly restricted from trading for long periods of time throughout the Title III Case due to their participation in the mediation.  Any material nonpublic information learned in mediation was routinely disclosed by the Oversight Board and/or AAFAF (or both), and when such negotiations did not involve the Government Parties, then by the Senior Coalition itself, to ensure that no one possessed information that was not public.  While it is true, as disclosed on a regular basis pursuant to Rule 2019 of the Bankruptcy Rules, that members of the Senior Coalition bought or sold COFINA bonds at various points, such trading only occurred before the mediation "blackout" period began or after it ended and the relevant details of the mediation had been made public.[24]  To carelessly allege otherwise, without any evidentiary support, is slanderous.

26.     Every aspect of the Title III Case has been conducted in good faith and for the benefit of COFINA as a whole.  Any Objection claiming the contrary should be overruled.

**E.  <u>Insolvency Is Not a Prerequisite to Title III</u>**

27.     A number of Objections raise the issue of COFINA's solvency.  Specifically, they contend that because SUT collections (prior to the Settlement) were greater than the total debt service of outstanding COFINA bonds, COFINA should never have been placed in Title III in the first place.[25]  In other words, COFINA was not equitably insolvent, and thus the whole Title III

---

[24]   The Dvores Objection, for example, references the increase in COFINA subordinate bond holdings disclosed in the First and Seventh Verified Statements of Tilden Park Capital Management LP ("<u>Tilden Park</u>").  *See* Dvores Obj. at 6.  These Verified Statements, however, were filed approximately sixteen months apart, and the Dvores Objection ignores all of the Verified Statements filed in between and the large periods of time during which Tilden Park did not purchase or sell *any* COFINA subordinate bonds.

[25]   Mangiaracina Obj. at 3-5; Hein Obj. at 28-29.

Case is a "fraud." But Congress specifically chose not to make insolvency a prerequisite for Title III. While chapter 9 requires a debtor to be a "municipality" and "insolvent," *see* 11 U.S.C. § 109(c), PROMESA has no similar requirement.[26] Instead, all that is required is that a covered entity (which COFINA is) "desires to effect a plan to adjust its debts," PROMESA § 302(3), and that the Oversight Board achieve a super-majority vote (five out of seven members) to issue a restructuring certification, PROMESA §§ 206(b), 302(2). These so-called "gateway" requirements for Title III were the way Congress balanced the desire to provide Puerto Rico with bankruptcy tools while at the same time avoiding thorny litigation over what it means for a sovereign state to be insolvent. Given that insolvency is not a prerequisite to Title III, these Objections must be overruled.

### F.   There Is No Discrimination in Favor of On-Island Bondholders

28.   Numerous Objections have alleged unfair discrimination between bondholders living in Puerto Rico and bondholders living outside of Puerto Rico.[27] They base this allegation on sections 5.2 and 9.2 of the Plan, which allow certain Puerto Rico Investors and Institutions—but not mainland investors—to elect to receive taxable bonds and a cash payment equal to 2% of the bonds. However, the Objections misunderstand the purpose of this election which is to attempt to *equalize* payments between Puerto Rico investors and non-Puerto Rico investors.

29.   Because mainland investors are subject to federal taxation, while Puerto Rico residents are generally not, the Plan aims to place as many taxable bonds as possible—to the extent that all bonds cannot be issued as tax exempt—with Puerto Rico residents in an attempt to equalize

---

[26]   Indeed, § 109(c) is *not* incorporated into PROMESA.

[27]   *See, e.g.*, Hein Obj. at 8-12; GMS Supplement at 5-6; Dvores Obj. at 4.

the tax burden of all investors.[28] However, because of the imbedded costs of taxable bonds in relation to tax-exempt bonds, they are valued at a discount for the purposes of any future sale in the secondary market. Accordingly, recoveries in the form of taxable bonds to Puerto Rico Investors making the taxable election under the Plan would be less than similarly situated mainland investors who only receive tax-exempt bonds. The 2% cash payment is meant to induce the Puerto Rico Investors to elect to receive the otherwise less valuable taxable bonds from a market value perspective to monetize the federal tax exemption generally available to Puerto Rico residents, thereby increasing the amount of tax-exempt bonds available to other investors. This approach is far from novel. Indeed, bankruptcy courts have previously confirmed plans that account for how new securities will trade on the secondary markets. *See In re Mesa Air Group, Inc.*, 2011 WL 320466, at *8 (Bankr. S.D.N.Y. Jan. 20, 2011) (noting that 10% premium provided to non-U.S. citizens in comparison to U.S. citizens was necessary to equate the value between the new stock and new warrants distributed under the plan based on how the two securities would trade on the open market, and further noting that the uncontroverted testimony shows that the premium is necessary to ensure equal treatment under section 1123(a)(4)).

30. Accordingly, there is no unfair discrimination and disparate treatment between Puerto Rico and mainland investors, and the Objections should be overruled.

---

[28] The percentage of bonds that will ultimately be taxable versus tax-exempt remains unknown. The option for Puerto Rico investors to elect to receive taxable bonds, and thus receive the 2% fee for those bonds, is limited to the final percentage of taxable bonds. Only if a Puerto Rico investor opts for and actually receives taxable bonds will the investor be given the fee.

### G.     The Agreement to Pay the Consummation Costs Was a Reasonable Exercise of Judgment by the Oversight Board

31.     The Mangiaracina Objection complains about the Consummation Costs paid to the PSA Creditors.[29]  Any concerns regarding these payments, however, are unfounded.  As explained by the Senior Coalition in its *Response to the Objection of Bank of New York Mellon to the Proposed Disclosure Statement for the COFINA Plan* (Dkt. 4289),[30] the inclusion of the Consummation Costs paid to the PSA Creditors is a reasonable exercise of judgment by the Oversight Board in its discretion of how best to use COFINA's property.  This is especially true given the time, effort, and money expended by the PSA Creditors for the benefit of COFINA and as consideration for the conditions, obligations, and covenants agreed to in the Plan Support Agreement.

32.     As an initial matter, the fees and expenses incurred by the PSA Creditors in connection with the development of the Plan and with their other efforts to defend COFINA in the Title III Case exceed $100 million.[31]  At the very least, these fees, costs, and expenses have allowed the PSA Creditors to provide the following benefits for COFINA and *all* of COFINA's creditors:

- They have defended the COFINA structure and COFINA's property rights in *Lex Claims, LLC et al. v. The Commonwealth of Puerto Rico*, Case No. 16-cv-02374-

---

[29]   Mangiaracina Obj. at 3.

[30]   The Senior Coalition only provides a brief summary of that explanation here, and respectfully refers the Court to Dkt. 4289, which the Senior Coalition incorporates by reference, for a more thorough discussion.

[31]   The Senior Coalition has provided copies of its invoices since May 2017 (without individual time entries) to counsel to the Oversight Board.

FAB; *Rodríguez Perelló et al. v. Rossello-Nevarez et al.*, Case No. 17-cv-01566-FAB; and the Commonwealth-COFINA Dispute[32];

- They have coordinated with the Oversight Board to craft the Protocol governing and ultimately resolving the Commonwealth-COFINA Dispute;

- They have participated in mediation resulting in the Agreement in Principal, Plan Support Agreement, and ultimate Settlement of the Commonwealth-COFINA Dispute;

- They have assisted the Commonwealth and the Oversight Board in creating a confirmable Plan, and assisted in the preparation of the necessary documents to effectuate the Plan; and

- They have assisted the Commonwealth in ensuring that the new COFINA legislation is consistent with the Plan.

33.     In addition, the PSA Creditors have given up a number of additional rights in consideration for the payment of Consummation Costs, which include the limitation on their ability

---

[32]  Even the Interpleader—which was not only an intra-COFINA creditor dispute but also a dispute with COFINA itself—fought to preserve the relevance of key protections for COFINA and its creditors that were imbedded in the legislation creating COFINA and the Bond Resolution.

to sell the bonds,[33] a waiver of the right to substantial contribution,[34] and the inability to object to the Plan even if macro-economic conditions greatly improved or interest rates rose, or both.[35]

34.     It bears emphasizing that COFINA does not have a statutory creditors' committee representing the interests of COFINA creditors.  Under section 1103(c)(3) of the Bankruptcy Code, made applicable to COFINA's Title III Case under section 301 of PROMESA, formulation of a plan is the function of a statutory committee, the expenses of which are entirely borne by the debtor. Here, the PSA Creditors served as the counterparty to the Oversight Board and AAFAF in negotiating the Plan and in ensuring the Oversight Board that it had significant creditor support for the Plan.[36]

---

[33]  Under the Plan Support Agreement, the PSA Creditors agreed to "lock up" their bonds until as long as June 1, 2019—almost ten months after signing the Plan Support Agreement—and thus gave up their rights to dispose of their bonds freely as and how they choose.

[34]  Given that the Plan—and substantial recovery for COFINA's creditors—likely would not exist without the work of the PSA Creditors, the PSA Creditors believe they would be entitled to substantial contribution and reimbursement of expenses under section 503 of the Bankruptcy Code, incorporated into these Title III proceedings through section 301(a) of PROMESA.  The Senior Coalition submits that the Consummation Costs should also be approved because they would satisfy the substantial contribution test since the PSA Creditors have provided "actual and demonstrable benefit" to COFINA and its creditors.  *See, e.g.*, *Lebron v. Mechem Fin. Inc.*, 27 F.3d 937, 944 (3d Cir. 1994) ("In determining whether there has been a 'substantial contribution' pursuant to section 503(b)(3)(D), the applicable test is whether the efforts of the applicant resulted in an actual and demonstrable benefit to the debtor's estate and the creditors." (internal quotation marks omitted)); *see also In re Morad*, 328 B.R. 264, 273 (B.A.P. 1st Cir. 2005) (citing *Lebron*).

[35]  Another way to consider why the Oversight Board may have believed it valuable to "lock in" a Plan Support Agreement with nearly $10 billion in claims is that the Oversight Board effectively acquired an option to hold creditors of COFINA to a certain recovery for a period of up to ten months no matter what occurred that may change the calculus from the perspective of creditors.

[36]  Under the Protocol, the Court appointed the COFINA Agent to represent the interests of the debtor COFINA.  However, the COFINA Agent's scope was limited to the Commonwealth-COFINA Dispute only.  The COFINA Agent was expressly prohibited from any involvement in the negotiation or formulation of a plan of adjustment for COFINA.  Furthermore, the COFINA Agent was not allowed to retain her own financial advisor and thus was required to rely upon

35.     Taking all of this into account, Consummation Costs of approximately $140 million[37] are fair and reasonable.  Put simply, the payment of the Consummation Costs was a critical component of the interlocking agreements set forth in the Plan Support Agreement.  The absence of the Plan Support Agreement could have resulted in a costly, contentious, and lengthy confirmation process for COFINA, with no certainty that a confirmable plan could have been presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than 18 months.  In consideration of these factors, the Oversight Board determined that it was an appropriate use of COFINA's property to secure the "lock-ups," pay the Consummation Costs, and provide an opportunity for COFINA to exit Title III as expeditiously as possible.

36.     Finally, the payment of Consummation Costs to the PSA Creditors does not violate section 1123(a)(4) of the Bankruptcy Code, which mandates that "a plan shall . . . provide the same treatment for each claim or interest of a particular class . . . ."  11 U.S.C. § 1123(a)(4).[38]  While it is true that all *claims* must be treated equally, the same is not true for all *claimants*.  *See* 7 COLLIER ON BANKRUPTCY ¶ 1123.01 (16th ed. 2013) ("The equality addressed by section 1123(a)(4) extends only to the treatment of members of the same class of claims and interests, and not to the

---

[37]   advisors to the PSA Creditors even in negotiating the settlement of the Commonwealth-COFINA Dispute.

[37]   Though the Objections understandably refer to $332 million in Consummation Costs, using that number fails to account for the fact that the PSA Creditors hold the majority of COFINA's bonds, so redistributing $332 million *pro rata* would result in approximately $192 million of that amount being "round-tripped" to the PSA Creditors.  The "net" Consummation Costs, therefore, are actually $140 million—the difference between what the PSA Creditors receive with the Consummation Costs payment ($332 million) and what they would receive without it ($192 million).

[38]   Section 1123(a)(4) of the Bankruptcy Code is incorporated into Title III proceedings through section 301(a) of PROMESA.

plan's overall treatment of the creditors holding such claims or interest . . . .  Creditors should not confuse equal treatment of claims with equal treatment of claimants."); *see also In re Peabody Energy Corp.*, 582 B.R. 771, 781 (E.D. Mo. 2017) (same); *In re Adelphia Commc'ns Corp.*, 368 B.R. 140, 249-50 (Bankr. S.D.N.Y. 2007) ("[C]ourts have held that the statute does not require identical treatment for all class members in all respects under a plan, and that the requirements of section 1123(a)(4) apply only to a plan's treatment *on account of particular claims* or interests in a specific class—not the treatment that members of the class may separately receive under a plan on account of the class members' other rights or contributions.") (emphasis in original).

37.    Here, the *claims* held by the PSA Creditors are treated the same as every other bondholder under the Plan:  holders of senior COFINA bonds will receive a 93.01% recovery on their bonds while holders of COFINA subordinate bonds will receive a 56.41% recovery.[39]  *See* Plan at §§ 1.114, 1.168.  This is true regardless of whether the holder is a retail investor, an institutional investor, or a PSA Creditor.  As discussed above, the payment of the Consummation Costs is intended to compensate the claimants for:  (i) the significant costs and expenses expended by the PSA Creditors in order to achieve a confirmable plan in lieu of seeking substantial contribution; (ii) agreeing to "lock up" their bonds until potentially June 1, 2019, and thus accepting the attendant risk of unfavorable market conditions;[40] and (iii) agreeing to support the Plan—another restriction not applicable to non-PSA Creditors.[41]

---

[39]   As explained above, there is a slight difference in treatment between Puerto Rico and mainland investors.

[40]   *See* Rodrigue Decl. ¶ 8 (describing impact of liquidity restrictions on bond trading prices).

[41]   As set forth above, no creditor had been denied the opportunity to participate in COFINA's Title III Case, the mediation, or the formulation of the Plan.  All creditors were given notice of the Commonwealth-COFINA Dispute, the motions to approve and/or object to the Protocol, to

26

38.      It was the efforts (that are still ongoing) and covenants made by the PSA Creditors, as reflected in that Plan Support Agreement, that provided the consideration for the payment of Consummation Costs.  Indeed, unlike recoveries on the bond claims, the Consummation Costs go to the PSA Creditors, regardless of whether the PSA Creditor ultimately sells the bonds with the Plan Support Agreement restrictions attached or keeps the bonds.  In other words, the payment is tied to the *claimant*, for the services rendered by the claimant, and does not travel with the underlying bonds.  Courts have consistently held that fees and payments paid to *claimants* for actions unrelated to the underlying bond claim do not run afoul of section 1123(a)(4).  *See, e.g.*, *In re Peabody*, 582 B.R. at 782 (finding no section 1123(a)(4) violation where certain parties within the class entered into a backstop commitment with the debtor because the agreement was both a benefit to the creditors and "an obligation and a commitment to refrain from trading"); *In re CHC Group Ltd.*, *et al.*, Case No. 16-BR-31854 (BJH) (Houser, J.) (Bankr. N.D. Tex. 2017), Dkt. 1794, at 10-11, 21 (finding that the plan of adjustment did not violate section 1123(a)(4) where "Plan Sponsors," which included "the beneficial holders, or investment advisors or managers for the account of such beneficial holders, of Senior Secured Notes . . . that have executed the Plan Support Agreement" received "payment of the Put Option Premium . . . in the form of additional New Convertible Second Lien Notes"); *In re Leslie Fay Cos. Inc.*, 207 B.R. 764, 791-92 (Bankr. S.D.N.Y. 1997) (agreeing that section 1123(a)(4) is not violated where certain

---

intervene in the Commonwealth-COFINA Dispute, and to file substantive and dispositive motions in the Commonwealth-COFINA Dispute.  *See, e.g.*, Dkts. 303, 544, 718, 719, 857, 868, 996; *see generally* Adv. Proc. No. 17-ap-00257-LTS.  That a creditor chose to forego the opportunity to participate in the process that led to the Plan, and now cannot receive a share of the Consummation Costs, does not violate section 1123(a)(4).  *See In re W.R. Grace & Co.*, 729 F.3d 311, 327 (3d Cir. 2013) ("[C]ourts have interpreted the 'same treatment' requirement to mean that all claimants in a class must have 'the same opportunity' for recovery . . . .  What matters, then, is not that claimants recover the same amount but that they have equal opportunity to recover on their claims.") (citation omitted).

equity holders received stock options because the stock options were given to management as a result of "arms-length bargained for consideration to ensure their needed cooperation in the reorganization effort" and not "'on account' of their prepetition equity interests"); *In re Heron, Burchette, Ruckert & Rothwell*, 148 B.R. 660, 672 (Bankr. D.D.C. 1992) (overruling objections based on section 1123(a)(4) because the "objectors fail to distinguish between a partner's treatment under the plan on account of a claim or interest and treatment for other reasons" and the "plan's provisions dealing with partner contributions, releases, and the permanent injunction have no connection to a partner's status as a claim or interest holder within a particular class"). Furthermore, the "lock-up" requirements apply not only to the bonds held when the Plan Support Agreement was executed (which was the basis for allocating the Consummation Costs) but to all bonds subsequently acquired (even though Consummation Costs are not paid on account of subsequently acquired bonds). Today, the members of the Senior Coalition own more than $5 billion in senior and subordinate bonds (as opposed to approximately $4.4 billion in bonds when the Plan Support Agreement was signed), and pursuant to the Plan Support Agreement all such bonds became automatically restricted and "locked in" to the Plan until potentially June 1, 2019.

39. Accordingly, the Court should overrule any Objections related to the Consummation Costs.

**H.** **There Is No Contracts Clause Violation**

40. The Hein Objection alleges that the Plan constitutes a violation of the U.S. Constitution's Contracts Clause.[42] However, the Contracts Clause only prohibits *states* from impairing contracts and does not apply to the federal government and federal law. *See* U.S. CONST. art. I, § 10, cl. 1 ("No State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . .");

---

[42] Hein Obj. at 18-20.

*In re City of Stockton, Cal.*, 478 B.R. 8, 16 (Bankr. E.D. Cal. 2012) ("[W]hile a state cannot make a law impairing the obligation of contract, Congress can do so.").  Indeed, the whole purpose of Title III of PROMESA—just like the Bankruptcy Code—is to adjust the debtor-creditor relationship.  As the *Stockton* court recognized, "Every discharge impairs contracts.  While bankruptcy law endeavors to provide a system of orderly, predictable rules for treatment of parties whose contracts are impaired, that does not change the starring role of contract impairment in bankruptcy.  It follows, then, that contracts may be impaired . . . without offending the Constitution." *Id.*  So, too, here under Title III of PROMESA.

## I.     There Is No Takings Clause Violation

41.     A number of Objections argue that the Plan violates the U.S. Constitution's Takings Clause because the objectors' property interest—their lien over the SUT revenues owned by COFINA—has been reduced to a smaller percentage of the PSTBA (which is itself a subset of the SUT) and they have not been fully compensated for it.[43]  This argument misunderstands the relationship between the Settlement, the Plan, and the Takings Clause.  While the objectors are correct that COFINA granted bondholders a lien on the SUT revenues, the validity, value, and nature of this lien were all challenged.  Indeed, the Commonwealth Agent argued in the Commonwealth-COFINA Dispute that COFINA neither owned any portion of the SUT revenues nor had a perfected lien on them.  If the Commonwealth Agent had prevailed, and the Court found that COFINA did not own or have any interest in the PSTBA, the value of the lien COFINA granted to its bondholders would have been zero.  The Settlement resolved this dispute by valuing COFINA's ownership interest (and thus the lien granted to its bondholders) at 53.65% of the PSTBA.  COFINA's bondholders are being compensated under the Plan in accordance with

---

[43]  Hein Obj. at 20-21; Hein Supplement at 3-4; Elliot Obj. at 6-8; Mangiaracina Obj. at 5.

COFINA's settled interest of 53.65% of the PSTBA.  Because the bondholders are receiving equivalent value pursuant to the Settlement, there is no violation of the Takings Clause.  *Horne v. Dep't of Agric.*, 135 S. Ct. 2419, 2432 (2015) ("The Court has repeatedly held that just compensation normally is to be measured by 'the market value of the property at the time of the taking."); *United States v. 564.54 Acres of Land, More or Less, Situated in Monroe & Pike Ctys., Pa.*, 441 U.S. 506, 517 (1979) ("Allowing respondent the fair market value of its property is thus consistent with the basic equitable principles of fairness . . . underlying the Just Compensation Clause"); *United States v. Commodities Trading Corp.*, 339 U.S. 121, 126 (1950) ("[T]he normal measure of just compensation has been current market value.").

### J.   There Is No Due Process Violation

42.   The Hein Objection alleges that the Due Process rights of subordinate bondholders were violated because they did not have enough time to adequately digest and understand the Disclosure Statement before they were required to vote on the Plan.[44]  This objection is meritless. The Court approved the Disclosure Statement and procedures for voting, objecting, and making elections on November 29, 2018.  *See* Dkt. 4382.  Consistent with this order, creditors were given until January 2, 2019 to object to the Plan (35 days), January 8, 2019 to vote on the Plan (41 days), and January 11 to make elections under the Plan (44 days).[45]  *Id.*  This is longer than the 28 days required under Rule 2002 of the Federal Rules of Bankruptcy Procedure, incorporated into this Title III Case via section 310 of PROMESA.[46]

---

[44]   Hein Obj. at 23-25.

[45]   This deadline was initially January 8 but was extended three days, to January 11.  *See* Dkt. 4583.

[46]   Similarly meritless is the Due Process claim based on the submission of the Plan Supplement and Plan Related Documents filed on December 31, 2018.  Plan Documents and Supplements are

### K.   **Objections Based on the Impact to the Market Are Irrelevant**

43.    Two Objections allege that confirming the Plan will have negative impacts on secured bonds generally and set a bad precedent for the municipal bond market specifically.[47] However, these claims are purely speculative.  The Objections have provided no support for this allegation, and the Plan cannot be rejected because of the possibility that confirmation *may* negatively impact *other* bonds in the market.  Moreover, if anything, confirmation of the Plan will only strengthen the market for COFINA bonds (and indirectly other secured municipal bonds).  By confirming the Plan, COFINA will have a Court-approved settlement indisputably proclaiming that COFINA is the owner of, and has a property interest in, its portion of the PSTBA and will have stronger covenants explicitly designed to protect bondholders.  The Plan also provides for the Court to retain jurisdiction to enforce this right.  This will only help COFINA and Puerto Rico regain access to the capital markets—one of the predominant purposes of PROMESA (*see* § 101(a))—and thus the Court should overrule these speculative (and likely incorrect) Objections.

### L.   **The Objections Misunderstand the Plan's Release Provisions**

44.    Various parties object to the release provisions in sections 30.2, 30.3, 30.5, 30.6, and 30.7 of the Plan as overbroad.[48]  But contrary to this assertion, the release provisions are actually quite narrowly tailored.  For example, the release only relates to claims based on a claimant's status as a COFINA creditor.  This type of release is standard procedure in bankruptcy;

---

routinely filed in the days leading up to confirmation.  *See, e.g.*, *In re Pacific Drilling S.A.*, Case No. 17-13193 (Bankr. S.D.N.Y).  Moreover, these documents only serve to implement and effectuate the Plan, and the effect of these documents has already been disclosed in the Disclosure Statement, which was approved on November 29, 2018.  *See* Dkt. 4382.

[47]   Elliot Obj. at 13-15; Mangiaracina Obj. at 7.

[48]   Hein Obj. at 25; Cooperativas Obj. at 5-8; GMS Obj. at 17-20.

indeed, if a debtor were not released from claims prior to confirmation, the whole purpose of

bankruptcy (and PROMESA) of giving the debtor a fresh start would be thwarted. *See* PROMESA

§ 101(a) ("The purpose of the Oversight Board is to provide a method for a covered territory to

achieve fiscal responsibility and access to the capital markets."). A broader release provision,

which could have included third party releases, was intentionally *not* included in the Plan.

Accordingly, these Objections should be overruled.[49]

M.      **The Appointments Clause Litigations Should Not Impact Confirmation**

45.      The Hein Objection argues that the Plan cannot be confirmed because the various

challenges to the Oversight Board's appointment under the U.S. Constitution's Appointments

Clause are currently pending before the First Circuit.[50]   But as the Hein Objection correctly notes,

this Court has already ruled that there was no Appointments Clause violation. *See Opinion and

Order Denying the Aurelius Motions to Dismiss the Title III Petition and for Relief from the

Automatic Stay* (Dkt. 3503). Moreover, it is unclear what would happen even if the First Circuit

reversed this Court and found the Oversight Board's appointments to be invalid. This issue was

raised before this Court (*see* Jan. 10, 2018 Hr'g Tr. at 66:20-68:18) and again before the First

Circuit. It would be inappropriate to reject the Plan based on speculation as to what a higher court

*may* ultimately hold and as to what the impact of an adverse decision *may* be upon prior Oversight

Board actions, such as the Plan. The Objection should therefore be overruled.

---

[49]   Putting aside the Objections' substantive inadequacies, they should also be overruled because
they fail to follow the Court's requirement that any objection "include, where appropriate,
proposed language to be inserted in the Plan to resolve any such objection." *See* Dkt. 4382 at 10,
¶ 16. If the Objections believed the release provisions were too broad, they should have proposed
more narrowly tailored language to fix the alleged problem.

[50]   Hein Obj. at 25.

### N.   The Cooperativas Adversary Proceeding Is Irrelevant

46.   The Cooperativas Objection argues that the Plan cannot be confirmed because it makes no mention of an adversary proceeding brought by the Cooperativas, *Cooperativa de Ahorro y Credito Abraham Rosa et al. v. Commonwealth of Puerto Rico et al.*, Adv. Proc. No. 18-00028 (the "Adversary Proceeding"), and thus the Plan's discharge provision—section 30.2—may be read to require dismissal of the Adversary Proceeding.  The Plan makes no mention of the Adversary Proceeding because it has nothing to do with COFINA.  The Adversary Proceeding includes COFINA merely as a nominal defendant, and nothing in the Adversary Proceeding either directly implicates COFINA or touches on the issues being resolved in the Plan.  Confirmation of the Plan, therefore, will not require dismissal of the Adversary Proceeding as it relates to the actual defendants (the Commonwealth, AAFAF, GDB, and GDB officers), and the Objection should be overruled.[51]

### O.   Representative Natal Albelo's Superior Court Lawsuit Is Irrelevant to Confirmation

47.   The Natal Albelo Objection argues that the Plan cannot be confirmed because Representative Natal Albelo's lawsuit in the Puerto Rico Superior Court, Case SJ2018CV10569, challenges COFINA and the newly-enacted Act 241, which incorporates the Settlement into law, subject only to confirmation of the Plan.  This Objection should be overruled.  As an initial matter, neither Representative Natal Albelo nor the various labor unions who joined the Natel Albelo Objection allege that they hold COFINA bonds or are otherwise parties-in-interest in COFINA's Title III Case.  11 U.S.C. § 1128.

---

[51]   The Cooperativas Objection should also be overruled because it failed to follow the Court's requirement that any objection "include, where appropriate, proposed language to be inserted in the Plan to resolve any such objection."  *See* Dkt. 4382 at 10, ¶ 16.  Given that the Cooperativas Objection is based entirely on the omission of the Adversary Proceeding, this is precisely the type of objection where proposed language is appropriate.

48.      In any event, the Natal Albelo Objection lacks merit.  While the Plan does reference "New Bond Legislation," which has become Act 241, the Plan is not dependent on this legislation. Rather, the legislation is intended as complementary to the Plan by providing additional, "double-barrel" protections for COFINA and its bondholders.

49.      Perhaps most importantly, though, Representative Natal Albelo's lawsuit is frivolous.  *First*, it is filed in violation of the automatic stay, and thus cannot proceed and is void as a matter of law.  *In re Jefferson Cty., Ala.*, 484 B.R. 427, 446-47 (Bankr. N.D. Ala. 2012) (staying state action under § 922(a)(1) because "it is uncontestable that the proposed suit is against three of Jefferson County's commissioners who are officers within the meaning of 11 U.S.C. § 922(a)(1)."); *see also In re City of Detroit, Mich.*, 504 B.R. 97, 166-67 (Bankr. E.D. Mich. 2013): ("11 U.S.C. § 362(a)(3) provides that a petition filed under section 301 . . . operates as a stay, applicable to all entities, of . . . any act . . . to exercise control over property of the estate[.]' . . . '[A]n action taken against a nondebtor which would inevitably have an adverse impact upon the property of the estate must be barred by the [section 362(a)(3) ] automatic stay provision.'").[52]

50.      *Second*, any claims alleged in the lawsuit regarding COFINA's constitutionality have already been litigated *and settled* by the parties to the Settlement.  Claims attacking COFINA on any grounds (including constitutionality) will be discharged by the Court under the Plan pursuant to federal bankruptcy law, which is the supreme law of the land.  *See* U.S. Const. art. IV ("This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United States, shall be the supreme law of the land"); PROMESA § 4 ("The provisions of this Act shall prevail over any

---

[52]   Sections 362(a) and 922(a) of the Bankruptcy Code are incorporated into PROMESA via section 301(a).

general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act.").

51.     *Third*, though the remaining allegations raised by Representative Natal Albelo in his lawsuit are couched as free speech violations, the underlying facts reveal that the controversy at issue arose from an internal procedural dispute amongst legislators regarding interpretation of their debate procedures.  This is the type of dispute from which the courts refrain intervention, in deference to the Legislative Branch. *Noriega Rodriguez v. Jarabo*, 136 D.P.R. 497, 534 (P.R. 1994) (explaining that the Courts "cannot transfer to the judicial forum the internal controversies of the legislative branches, which are the product of the discrepancies between the legislators, arising through the normal and usual process of the legislative debate") (unofficial translation). [53] Furthermore, it is not even clear that Act 241 would be void even if Representative Natal Albelo were successful in his lawsuit.  And even if it were, the Legislative Assembly could simply repass the legislation after permitting Representative Natal Albelo to speak.

52.     In other words, this lawsuit is simply a distraction which will have no real impact on COFINA, and thus should not hold up confirmation.  The Natal Albelo Objection should be overruled.

## **CONCLUSION**

For the foregoing reasons, the Court should overrule the Objections and confirm the Plan.

**[Signature Page Follows]**

---

[53] This opinion has only been published in Spanish.  The Senior Coalition respectfully requests leave to file the Spanish version as Exhibit 1 to the Declaration of Susheel Kirpalani, filed concurrently herewith, while a certified translation is prepared.  The Senior Coalition is also concurrently filing a motion requesting a one-week extension to file the certified translation.

DATED: January 9, 2019

Respectfully submitted,

REICHARD & ESCALERA

By : _/s/ Rafael Escalera_
     **Rafael Escalera**
     USDC No. 122609
     escalera@reichardescalera.com

     **Sylvia M. Arizmendi**
     USDC-PR 210714
     arizmendis@reichardescalera.com

     **Fernando Van Derdys**
     USDC-PR 201913
     fvander@reichardescalera.com

     **Carlos R. Rivera-Ortiz**
     USDC-PR 303409
     riverac@reichardescalera.com

     **Gustavo A. Pabón-Rico**
     USDC-PR 231207
     pabong@reichardescalera.com

     255 Ponce de León Avenue
     MCS Plaza, 10th Floor
     San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART & SULLIVAN, LLP

**Susheel Kirpalani** (_pro hac vice_)
susheelkirpalani@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (_pro hac vice_)
erickay@quinnemanuel.com

**Kate Scherling** (_pro hac vice_)
katescherling@quinnemanuel.com

**Darren M. Goldman** (_pro hac vice_)
darrengoldman@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel for the COFINA Senior Bondholders' Coalition*

36

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel for the parties of record.

/s/Carlos R. Rivera-Ortiz
USDC-PR 303409