## UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>    Debtors.* | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>    Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>Related to Debtor COFINA Only |

---

\* The Debtors in these Title III cases, along with each Debtor's respective bankruptcy case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (the "Commonwealth") (Bankruptcy Case No. 17-BK-3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566-LTS) (Last Four Digits of Federal Tax ID: 9686); (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-BK-4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**DECLARATION OF MATTHEW RODRIGUE IN SUPPORT OF OMNIBUS REPLY OF THE COFINA SENIOR BONDHOLDERS' COALITION TO OBJECTIONS TO CONFIRMATION OF THE SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA")**

I, MATTHEW RODRIGUE, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1. <u>Background.</u> I am a managing director at the firm Miller Buckfire & Co., where I have been employed since July 2008. I hold an M.B.A. from Harvard Business School, a B.S. in Computer Engineering from the University of Maine, and a B.S. in Electrical Engineering from the University of Maine. I serve as lead financial advisor to the COFINA Senior Bondholders' Coalition, and have been a senior member of the advisory team since the group's inception and throughout the above-captioned Title III Case. I submitted a declaration to the Court previously in an adversary proceeding in the above-captioned Title III Case. *Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation ("COFINA") et al.*, Adv. Proc. No. 17-00133-LTS (Dkt. 290-3) (July 21, 2017). I have testified as an expert in two other bankruptcy cases, *In re UniTek Global Services*, (Bankr. Del. 2014), and *In re Tidewater* (Bankr. Del. 2017). I have also published the following articles: *Bond Buyer*, "Turning point in Puerto Rico's debt crisis bears close watching for mainland America," April 19, 2017; *El Nuevo Dia*, "La deuda que sentara el future," April 21, 2017; *Forbes*, "Buying Muni Bonds? Caveat Emptor," June 27, 2017; *The Wall Street Journal*, "Securitized Muni Bonds Can Make Good Sense," December 3, 2017; and *The Hill*, "Puerto Rico debt process can impact your hometown," August 30, 2017.

2. <u>Scope.</u> I submit this declaration (the "<u>Declaration</u>") in support of the Omnibus Reply of the COFINA Senior Bondholders' Coalition to Objections to Confirmation of the Second Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation

("COFINA") (the "Omnibus Reply").[1] The scope of my testimony is limited to the specific matters set forth herein and I offer it solely to rebut certain assertions made in the Objections to the Plan.

3. <u>Hypothetical *Pari Passu* Distribution Calculation.</u> The Plan provides for the allowance of pre-petition bond claims of approximately $17,637,100,000, which corresponds to the amount of principal (including accretion on capital appreciation bonds) and accrued interest (on cash income bonds) on the Existing Securities as of May 4, 2017. Based on an assumed distributive value of approximately $13,516,300,000—which consists of approximately $12,021,300,000 face amount of new COFINA Bonds and approximately $1,495,000,000 in cash and synthetic accretion from August 1, 2018, the hypothetical recovery for all bondholder classes on a *pari passu* basis would be 76.64%.[2] The synthetic accretion to which I refer arises from the fact that the Plan—as negotiated by the PSA Creditors—provides accrued interest to holders of Existing Securities as if the Plan had become effective on August 1, 2018, and the new COFINA Bonds were issued and paying interest as of that date.

4. <u>Make-Whole Issue.</u> The Omnibus Reply refers to the potential allowance of a "make-whole" claim that may be considered in evaluating the reasonableness of the treatment to subordinate bondholders under the Plan. Under the Bond Resolution, including supplements to the Bond Resolution, certain series of senior bonds prohibit payment prior to maturity, except if accompanied by an applicable premium or "make-whole" payment, thereby guaranteeing a defined absolute level of returns to the investor. *See, e.g.*, First Supplemental Sales Tax Revenue Bond Resolution for the Series 2007A Senior Bonds § 2.4(c). As of December 31, 2018, the

---

[1] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Omnibus Reply.

[2] Assuming consummation of the Plan on February 1, 2019.

3

aggregate amount of such "make-whole" claims that could have been asserted for senior bonds is approximately $2.7 billion. If this amount were allowed, and the seniority of senior bonds were enforced, it would dramatically increase the amount of claims of senior bondholders and thereby diminish the value available for distribution to subordinate bondholders. Under the Plan, as negotiated by the PSA Creditors, no such "make-whole" claims will be allowed.

5. <u>Plan Reflects Compromise on Seniority Being Enforced.</u> I have performed hypothetical recovery calculations based on the assumption that the payment priority in the Bond Resolution would be enforced, and junior bondholders would not be entitled to any distribution until senior bonds are paid in full, including post-petition interest. The Plan does not, however, enforce such strict priority because the PSA Parties wished to achieve a consensual plan without the need to invoke the cram-down provisions of the Bankruptcy Code. The calculations therefore are used to illustrate the compromise set forth in the Plan. Attached to this Declaration as Exhibit 1 is a sensitivity analysis showing the hypothetical recoveries for senior and subordinate classes under different scenarios with respect to enforcement of the payment priority waterfall under the Bond Resolution. The scenarios are based on (i) the senior bondholders' pre-petition accrued claim of approximately $7,760,871,000 and the subordinate bondholders' pre-petition accrued claim of approximately $9,876,236,000, as of May 4, 2017; (ii) the senior bondholders' post-petition accrued claim of approximately $8,291,000,000 and the subordinate bondholders' post-petition accrued claim of approximately $10,597,000,000, as of August 1, 2018, the approximate date the PSA was agreed upon; and (iii) illustrative senior bondholder recoveries, ranging from 99.0% of pre-petition claim to 91.0% of pre-petition claim. For each level of senior bondholders' recovery, there is a corresponding recovery to subordinate bondholders. At each level, there is also an implied probability of whether the strict priority of

senior bonds over subordinate bonds, *i.e.*, that all senior bonds are repaid in full (including post-petition interest) before subordinate bonds receive any payment, would be enforced under the Bond Resolution. As set forth in Exhibit 1, the recoveries for senior and subordinate bondholders under the Plan correspond to an approximate 60% probability that strict priority in favor of senior bondholders would prevail. In the event that the "make-whole" claims on account of senior bonds described in Paragraph 4 was allowed, the recoveries of subordinate holders would be further decreased.

6. Attached to this Declaration as Exhibit 2 is a historical pricing chart for COFINA Existing Securities since January 1, 2013. Exhibit 2 demonstrates that, following announcements that ultimately led to a default, the market value of the Existing Securities reflects the greater risks of owning subordinate bonds.

7. Attached to this Declaration as Exhibit 3 in an implied yield to worst sensitivity analysis for the new COFINA Bonds. An implied duration-weighted average price and yield on the ratable strip of new COFINA Bonds can be derived by observing the current price on COFINA's Existing Securities. As illustrated on Exhibit 3, notwithstanding the imminence of confirmation of the Plan, current trading prices on the Existing Securities suggest that senior bondholders are not receiving the market value of 93%, let alone 100% (before even considering post-petition interest). Accordingly, senior bondholders in effect likely accepted recoveries that reflect greater discounts to their entitlements under a strict priority regime than is readily apparent from their 93% headline recovery value.

8. <u>Impact on Liquidity from Lock-Up Agreements.</u> Lastly, I have significant experience negotiating restructuring support agreements and similar "lock-ups," such as the one contained in the COFINA PSA. When investors sign on to such agreements, they become

obligated to support a deal, often subject to certain conditions, including the transferability of their claims. This obligation limits the optionality with respect to the investors' bond holdings. The bonds also become less marketable to certain buyers, particularly retail holders and certain mutual funds. The market value of such restricted bonds relative to unrestricted bonds usually reflects this loss of optionality and reduced marketability. *See, e.g.*, Aswath Damodaran, DAMODARAN ON VALUATION Ch. 14 (2006) ("The notion that investors will pay less for illiquid assets than for otherwise similar liquid assets is neither new nor revolutionary. . . . Both the theory and the empirical evidence suggest that illiquidity matters and that investors attach a lower price to assets that are more illiquid than to otherwise similar assets that are liquid."); Rawley Thomas and Benton E. Gup, THE VALUATION HANDBOOK: VALUATION TECHNIQUES FROM TODAY'S TOP PRACTITIONERS Ch. 18 (2009) ("If the price of the asset goes down during the period of illiquidity and the realized price is lower than the price at which the asset was purchased, there is a realized loss."). Although impossible to quantify in advance with exact certainty, in my experience this value reduction ranges from 50 basis points on the low end to 200 basis points or more on the high end.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my knowledge and belief.

Dated: New York, New York
January 9, 2019

By: _____
Matthew Rodrigue

6

# COFINA Confirmation Demonstratives

January 9, 2019

# IMPORTANT INFORMATION

*These materials were prepared by Miller Buckfire & Co., LLC ("Miller Buckfire") on January 9, 2019 for confidential use only and may not be used or relied upon or further distributed for any purpose except as agreed in writing by Miller Buckfire. These materials are based on publically available information. Miller Buckfire assumes no responsibility to investigate or verify such information and has relied on the completeness and accuracy of such information. To the extent such information includes estimates and forecasts of future financial performance or other future developments, Miller Buckfire has assumed that such estimates and forecasts are reasonable. No representation or warranty, express or implied, is made as to the accuracy or completeness of such information and nothing contained herein is, or shall be relied upon as, a representation, whether as to the past, the present or the future. These materials are necessarily based upon information available to Miller Buckfire, including financial, bond market, legal, economic, policy and other conditions and circumstances existing and disclosed to Miller Buckfire as of the date hereof, all of which are subject to change. These materials speak as of the date of their preparation, except as otherwise noted. Miller Buckfire does not have any obligation to update, bring-down, review or reaffirm these materials. Under no circumstances should the delivery of these materials imply that any information or analyses included would be the same if made as of any other date. Any valuation, projection or other estimate contained herein is only an approximation, subject to uncertainties and contingencies, all of which are difficult to predict and beyond the control of Miller Buckfire, and thus nothing herein is intended to be, and should not be construed in any respect as, a statement or guaranty of value. These materials must be considered in their totality. Miller Buckfire is not acting in any capacity as a fiduciary of any party. These materials are not intended to provide a basis for evaluating, and should not be considered a recommendation with respect to, any transaction or other matter. These materials are not an offer or solicitation to trade any securities and are not a commitment by anybody to provide or arrange any financing or trade in any related security. These materials may not reflect information known to other professionals of Miller Buckfire and its affiliates. Miller Buckfire and its affiliates provide no legal, accounting or tax advice. Accordingly, any statements contained herein as to tax matters were neither written nor intended by Miller Buckfire or its affiliates to be used and cannot be used by any taxpayer for the purpose of avoiding tax penalties that may be imposed on such taxpayer. All persons should seek legal, accounting and tax advice based on their particular circumstances from independent advisors regarding the effect on them of anything described herein. Miller Buckfire or its personnel may make statements or provide advice that is contrary to the information contained in these materials.*

# PROBABILITY-WEIGHTED RECOVERY SENSITIVITY



|  |  | Probability of Strict Priority[1] | | | | | | | | |  |
|---|---|---|---|---|---|---|---|---|---|---|---|
|  |  | Senior and Subordinate Prepetition Recoveries | | | | | | | | |  |
|  |  |  |  |  |  |  |  | Proposed POA |  |  |  |
| Annual Coupon | Distributable Value[2] | 99.0% 51.3% | 98.0% 52.1% | 97.0% 52.9% | 96.0% 53.7% | 95.0% 54.5% | 94.0% 55.3% | 93.0% 56.1% | 92.0% 56.8% | 91.0% 57.6% | <---Prepetition Senior Recovery (%)[3] <---Prepetition Sub Recovery (%)[3] |
| 5.00% | $12,755 | 77% | 74% | 72% | 69% | 66% | 63% | 60% | 57% | 54% |  |

Approximates Proposed Plan of Adjustment[4]

___

Note: Distributable value and recovery figures shown as of August 1, 2018.
(1) Probability of strict priority assumes Senior post-petition claim of $8,291 million and Subordinate post-petition claim of $10,597 million as of August 1, 2018.
(2) Distributable value shown excludes cash amounts of (i) $333 million for the RSA fee, (ii) $60 million for on-island taxable election-flex funds, and (iii) $38 million in set-aside funds.
(3) Per Senior pre-petition accrued claim of $7,761 million and Subordinate pre-petition accrued claim of $9,876 million as of May 4, 2017.
(4) Recoveries do not include interest accrued at the plan duration-weighted average rate of 5.022% from August 1, 2018 to emergence date.

# COFINA HISTORICAL PRICING



# IMPLIED YTW SENSITIVITY ANALYSIS

**The price of COFINA's existing bonds can be used to derive an implied duration-weighted average price and yield on the strip of new COFINA bonds**

### Implied Price & YTW of New Tax-Exempt COFINA Bonds

**Assuming 100% of new COFINA bonds are tax-exempt**

| | Current Senior Debt Price | | | | | | |
|---|---|---|---|---|---|---|---|
| | **70%** | **72%** | **74%** | **76%** | **78%** | **80%** | **82%** |
| Implied Price | 73% | 75% | 77% | 80% | 82% | 84% | 87% |
| Implied YTW | 7.35% | 7.11% | 6.89% | 6.68% | 6.47% | 6.27% | 6.08% |

| | Current Subordinate Debt Price | | | | | | |
|---|---|---|---|---|---|---|---|
| | **42%** | **43%** | **44%** | **45%** | **46%** | **47%** | **48%** |
| Implied Price | 74% | 75% | 77% | 79% | 81% | 82% | 84% |
| Implied YTW | 7.26% | 7.09% | 6.91% | 6.78% | 6.59% | 6.43% | 6.28% |

**Assuming 25% of new COFINA bonds are taxable[1]**

| | Current Senior Debt Price | | | | | | |
|---|---|---|---|---|---|---|---|
| | **70%** | **72%** | **74%** | **76%** | **78%** | **80%** | **82%** |
| Implied Price | 75% | 78% | 80% | 83% | 85% | 88% | 90% |
| Implied YTW | 7.04% | 6.83% | 6.62% | 6.43% | 6.23% | 6.05% | 5.88% |

| | Current Subordinate Debt Price | | | | | | |
|---|---|---|---|---|---|---|---|
| | **42%** | **43%** | **44%** | **45%** | **46%** | **47%** | **48%** |
| Implied Price | 76% | 78% | 80% | 81% | 84% | 86% | 87% |
| Implied YTW | 6.96% | 6.80% | 6.64% | 6.52% | 6.35% | 6.21% | 6.07% |

Note: Figures shown as of January 1, 2019. Senior bondholders' cash recovery of $655MM and Subordinate bondholders' cash recovery of $114MM.
(1) Assumes taxable yield premium of 100 basis points and 100% of the current interest bonds maturing in 2040 are taxable.