Hearing Date: January 16, 2019 at 9:30 a.m. (Atlantic Standard Time)
Reply Deadline: January 12, 2019 at 3:00 p.m. (Atlantic Standard Time)

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>   Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>   as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>   Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>This filing relates to COFINA only |

**REPLY MEMORANDUM OF LAW OF THE BANK OF NEW YORK MELLON,
AS TRUSTEE, REGARDING COMPLIANCE WITH SECTION 19.5 OF THE PLAN**

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

## **TABLE OF CONTENTS**

                                                                                                                                                        **Page**

I.    WHITEBOX DELIBERATELY MISCHARACTERIZES SECTION 19.5 AND MISCONSTRUES THE RESOLUTION. ........................................................................ 1

II.   THE OPPOSITION PARTIES OFFER NO EVIDENCE TO COUNTER BNYM'S DEMONSTRATION OF REASONABLE LITIGATION EXPENSES. ........................... 6

# TABLE OF AUTHORITIES

Page(s)

**Cases**

Am Lung Ass'n v. Reilly,
 144 F.R.D. 622 (E.D.N.Y. 1992) ........................................................................................8

Beastie Boys v. Monster Energy Co.,
 112 F. Supp. 3d 31 (S.D.N.Y. 2015) ..................................................................................8

Becker v. Bank of New York Mellon, N.A.,
 172 F. Supp. 3d 777 (E.D. Pa. 2016) ..................................................................................2

Beech Cinema, Inc. v. Twentieth Century Fox Film Corp.,
 480 F. Supp. 1195 (S.D.N.Y. 1979) ...................................................................................8

Bluebird Partners, L.P. v. First Fid. Bank, N.A., N.J.,
 671 N.Y.S.2d 7 (N.Y. App. Div. 1st Dep't 1998) ..............................................................4

In re First Baldwin Bancshares, Inc.,
 No. 13-00027, 2013 WL 5429844 (Bankr. S.D. Ala. 2013) ..............................................5

Guiffre v. Maxwell,
 No. 15 Civ. 7433 (RWS), 2016 WL 254932 (S.D.N.Y. Jan. 20, 2016) ..............................9

In re Plymouth House Health Care Ctr.,
 No. 03-19135, 2005 WL 2589201 (Bankr. E.D. Pa. Mar. 15, 2005) ..................................5

In re Smith,
 77 B.R. 624 (Bankr. N.D. Ohio 1987) ...............................................................................5

Van Wagner Advert. Corp. v. S & M Enters.,
 67 N.Y.2d 186 (N.Y. 1986) ..............................................................................................10

**Statutes**

11 U.S.C. § 510(a) ........................................................................................................................5

**Regulations**

22 NYCRR § 202.70, N.Y. Commercial Division Rule 11(d) ......................................................9

**Other Authorities**

Restatement (Second) of Contracts § 202(2) (1981) (October 2018 Update) ...............................3

Robert M. Fishman, Gordon E. Gouveia, & Kimberly Bacher, *Revisiting the
Indubitable Equivalent Standard: Undoubtedly the Same or Close Enough?*
Norton J. Bankr. L. & Prac. 511, 517 (2011)..............................................................................9

Pursuant to the *Order Scheduling Replies to the January 9, 2019 Submissions Regarding the 19.5 Dispute* [Doc. No. 4672], The Bank of New York Mellon ("BNYM"), as trustee, hereby replies to Whitebox's response [Doc. No. 4653] ("WB Resp.") to BNYM's reservation of rights and Ambac's response [Doc. No. 4654] ("Ambac Resp.") to BNYM's declarations.[2]

I. **WHITEBOX DELIBERATELY MISCHARACTERIZES SECTION 19.5 AND MISCONSTRUES THE RESOLUTION.**

Whitebox failed to submit any papers, including opposing declarations, in response to BNYM's declarations regarding the amount to be withheld from distributions or posted by the Opposition Parties on January 9, 2019, in accordance with the applicable scheduling order.[3] Having waived its right to proffer arguments or declarations on this issue, Whitebox should not be heard regarding the amount of any reserve.

Instead of complying with the Scheduling Order, Whitebox responded to BNYM's reservation of rights regarding the Plan. In so doing, Whitebox continued to mischaracterize the purpose and plain meaning of section 19.5 and to misconstrue applicable provisions of the Resolution. Whitebox (unlike Ambac) contends that it did not assume COFINA's obligations to BNYM under the Resolution. WB Resp. ¶¶ 9-22. That argument is a red-herring. Preliminarily, no one argues that the Resolution obligates Whitebox to indemnify BNYM, meaning that Whitebox's cases construing indemnification contracts between party litigants are irrelevant. More to the point, Whitebox's argument conveniently ignores that the Title III Court's determination under section 19.5 must "satisfy in full" BNYM's secured claim against COFINA under section 804 and BNYM's priority under the waterfall of section 1103.1.

---

[2] Capitalized terms used but not defined in this reply have the meanings given in the *Memorandum of Law of The Bank of New York Mellon, as Trustee, Regarding Compliance with Section 19.5 of the Plan* [Doc. No. 4657] ("BNYM Memo.").

[3] *Order Granting Urgent Consensual Motion for Entry of Order Establishing Procedures Regarding Section 19.5 of the COFINA Plan of Adjustment* [Doc. No. 4518] (the "Scheduling Order").

- 1 -

Because the Title III Court is not being asked to decide whether Whitebox agreed to indemnify BNYM, Whitebox's citation to Becker v. Bank of New York Mellon, N.A., 172 F. Supp. 3d 777 (E.D. Pa. 2016), where there was no equivalent to section 19.5, is wholly inapposite. The question here is what reserve is required by sections 1129(b)(2) and 510(a) of the Bankruptcy Code to provide BNYM the "indubitable equivalent" of its secured claim against COFINA and to honor its payment priority ahead of Cede & Co. ("Cede"), as nominee for The Depository Trust Company and sole Bondowner, and the Beneficiaries. That a reserve from funds otherwise payable to *Cede* ultimately impacts only the Opposition Parties (as Beneficial Holders) by virtue of the Plan is fair and appropriate because their desire to litigate is the only reason a reserve is necessary. Because the Plan contemplates creating a reserve from trust funds *before* distributions to Cede (and to Beneficial Holders), the Title III Court need not find that Whitebox assumed COFINA's obligations. Indeed, as investors, the Opposition Parties are subject to BNYM's lien and payment priorities. Whitebox may object to application of section 19.5, but that issue is between Whitebox and COFINA and other parties in interest.

Whitebox admits that section 804 of the Resolution grants BNYM a Charging Lien for expenses "associated with" BNYM's powers and duties, but wrongly contends that the Potential Litigation Expenses are not included. WB Resp. ¶ 25. The plain language of section 804, which Whitebox glosses over, confirms that the Charging Lien secures payment from COFINA of "all reasonable expenses, charges, ***counsel fees*** and other disbursements . . . incurred ***in and about the performance of their powers and duties*** under the Resolution . . . ." Resolution § 804 (emphasis added). Outside of an issuer default, these protections are implicated primarily when the trustee is sued over its performance, which is at the heart of the Lawsuits. The Potential Litigation Expenses are "in and about" or "associated with" BNYM's proper and timely

- 2 -

performance of its duty to make distributions on account of the Existing Securities and its power to declare defaults absent direction and satisfactory indemnity from a Bondowner.[4] BNYM also has the "power" or legal right to defend itself in its capacity as trustee. Accordingly, BNYM has a Charging Lien "therefor" on "any and all funds" in its possession.

Whitebox does not contest that BNYM has an indemnification claim against COFINA under section 804. See WB Resp. ¶ 3. It wrongly contends, however, that the obligation is unsecured. Id. ¶ 24. By arguing that the COFINA Pledged Taxes secure payment of the Existing Securities only, Whitebox ignores that such lien is expressly "subject to Section 804 . . . *and* subject to the provisions of the Resolution permitting the application of the [COFINA Pledged Taxes] for the purposes and on the terms and conditions set forth in the Resolution." Resolution § 501.1 (emphasis added). Each clause must be given meaning.[5] The COFINA Pledged Property is subject in all respects to (i) BNYM's rights to payment and indemnification under section 804 and (ii) its priority of payment under section 1103.1, which "permit[s] application of the [COFINA Pledged Taxes]" to pay BNYM's fees and expenses on a first priority basis. Accordingly, BNYM has a first lien priority (section 804) *and* a first payment priority (section 1103.1), *and* the lien granted in section 501.1 expressly is made subject to BNYM's senior lien

---

4 See WB Resp. ¶ 25 (admitting that "in and about" is synonymous with "associated with").
5 The Resolution makes the lien of section 501.1 and the waterfall priority of section 1103.1 "subject to Section 804." Whitebox continues to misconstrue this language as a limitation on BNYM's rights, rather than a limitation on the lien of section 501.1 and the Bondowners' rights to payment under section 1103.1. Whitebox would have the Title III Court change "subject to Section 804" to read "subject to *the first sentence of* Section 804" or "subject to *the lien prior to Bondowners* in Section 804." What the Resolution states, however, is that sections 501.1 and 1103.1 are "subject to Section 804" in its entirety, including BNYM's right to payment, the Charging Lien, *and* indemnification. And all such rights come within the scope of sections 501.1 and 1103.1. This reading is consistent with section 802 of the Resolution, which unambiguously states: "every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to [BNYM] shall be subject to the provisions of this Article VIII." Resolution § 802; see also id. § 1108 (BNYM's remedies are cumulative); Restatement (Second) of Contracts § 202(2) (1981) (October 2018 Update) ("A writing is interpreted as a whole").

(section 804) *and* all rights to payment (sections 804 and 1103.1).  See Bluebird Partners, L.P. v. First Fid. Bank, N.A., N.J., 671 N.Y.S.2d 7, 12 (N.Y. App. Div. 1st Dep't 1998) (interpreting indenture holistically and recognizing that the indenture "trustees' entitlement to compensation for 'all proper charges, expenses or advances' takes priority over payments of principal or interest due on any of the certificates—in other words, a first priority lien.").

Whitebox admits that BNYM has first priority in the waterfall of section 1103.1 for certain charges and expenses, see WB Resp. ¶ 27, but wrongly contends that the Potential Litigation Expenses are not included.  Payment of the Potential Litigation Expenses has priority ahead of Bondowner distributions for four independent reasons.  *First*, as Whitebox acknowledges, section 1103.1 is expressly "[s]ubject to section 804," id., which, as established above, unambiguously requires COFINA to pay BNYM's counsel fees in connection with the Lawsuits.  *Second*, that section 1103.1 is subject to section 804 also establishes BNYM's first priority payment rights for "any . . . expenses . . . arising out of or in connection with the . . . administration of the trust or trusts [under the Resolution] . . . except to the extent that such . . . expense is due to its own gross negligence or willful misconduct."  Resolution § 804.  *Third*, Whitebox acknowledges BNYM's priority for expenses that, in BNYM's opinion, are "necessary" to "protect the interests" of Bondowners.  WB Resp. ¶ 27.  Defending the Lawsuits serves to protect Bondowners because the allegations implicate the integrity of the Resolution, the existence of an event of default, and the rights and relationship between Bondowners.  Further, BNYM may seek damages in the Lawsuits for the benefit of Bondowners as a result of the Opposition Parties' pursuit of a preferential recovery in contravention of section 103 of the Resolution.  *Fourth*, Whitebox acknowledges BNYM's priority for expenses and liabilities incurred and advances made in the performance of BNYM's duties under the Resolution.  Id.

The Lawsuits and the Potential Litigation Expenses relate directly to the performance of BNYM's duty of making distributions on subordinate Existing Securities.

Sections 804 and 1103.1 provide BNYM with non-duplicative, layered protections. Section 804 governs BNYM's rights to payment and indemnification from COFINA and provides the Charging Lien for certain compensation and expenses. Section 1103.1 governs priority of payment among creditors, but only after an event of default. As a result, while BNYM has rights to payment and indemnification and a Charging Lien as against COFINA pre-default, it gains priority of payment vis-à-vis Bondowners for these and other claims after an event of default. This makes sense given that COFINA is less likely to be capable of meeting its obligations to BNYM under section 804 after an event of default. In any event, Whitebox's notion that the Resolution parties intended for the trustee—in exchange for a mere $2,000 in annual compensation per series of Existing Securities—to self-fund unknown litigation defense costs for unknown years until someday proven to have acted without gross negligence is absurd and inconsistent with bond industry history and practice. See BNYM Memo. § II.

Even were BNYM's indemnification claims unsecured as Whitebox suggests, BNYM's intercreditor first priority payment right remains enforceable. The Court in In re First Baldwin Bancshares, Inc., No. 13-00027, 2013 WL 5429844 (Bankr. S.D. Ala. 2013), held that an intercreditor agreement like 1103.1 will subordinate payment rights of secured creditors, like the Bondowners, to claims of unsecured creditors (according to Whitebox, like BNYM). Id. at *8, aff'd sub. nom. Pilot v. Alesco, No. 13-0638, 2014 WL 1900668 (S.D. Ala. 2014); see also In re Smith, 77 B.R. 624, 627 (Bankr. N.D. Ohio 1987); In re Plymouth House Health Care Ctr., No. 03-19135, 2005 WL 2589201, at *6 (Bankr. E.D. Pa. Mar. 15, 2005). The parties' intercreditor subordination agreement is enforceable. See 11 U.S.C. § 510(a); BNYM Memo. § IV.C.

**II. THE OPPOSITION PARTIES OFFER NO EVIDENCE TO COUNTER BNYM'S DEMONSTRATION OF REASONABLE LITIGATION EXPENSES.**

The Plan provides that the Title III Court "shall determine" the "amount" of any reserve. Plan § 19.5. On this issue, BNYM submitted the declarations of two expert witnesses: Daniel Goldberg, who provided a detailed line item analysis of each task in his $25-40 million budget; and Robert Fishman, an experienced practitioner and fee examiner, including in the Detroit bankruptcy proceeding, who reviewed Goldberg's budget from the perspective of a fee examiner. Fishman's opinion accounts for the protections available to the Opposition Parties should the reserve ultimately be overfunded, namely: (i) BNYM's undertaking to return any unused funds; (ii) BNYM's agreement that the Opposition Parties may challenge the reasonableness of BNYM's fees and expenses, subject to appropriate procedures; and (iii) the Opposition Parties' ability, if they win on the merits, to argue that BNYM's conduct was such that BNYM is not entitled to retain its fees and expenses. Fishman ¶¶ 38-41. In contrast, neither Opposition Party submitted any evidence concerning the amount of a reserve.

Ambac does not proffer any cognizable evidentiary opposition, see Ambac Resp. ¶ 4 n.4, offering instead its *ipse dixit* that "$25-$40 million" is "an amount far in excess of a reasonable amount under the circumstances." Ambac Resp. ¶ 2. Ambac faults BNYM for the "speculative," id. ¶ 8, and "purely hypothetical nature of" its analysis, id. ¶ 4 n.4, but budgeting for future litigation is inherently speculative. Recognizing this reality, section 19.5 of the Plan contemplates a reserve for fees and expenses that "***may*** be incurred by BNYM." Plan § 19.5 (emphasis added).[6] Because the Plan and the Procedures Order invite parties to submit evidence

---

[6] In view of this, Ambac's demand for evidence of Reed Smith's actual fee arrangement for the Lawsuits is misplaced. BNYM is not bound to use Reed Smith as its counsel in connection with the Lawsuits. As a result, the hourly rates assumed by Goldberg merely are indicative of the fees and expenses that "may" be incurred by BNYM. In any event, Goldberg used hourly rates without discounts because that is Reed Smith's current arrangement for the Lawsuits.

of fees and expenses that "may" be incurred, BNYM retained experts to create and vet a litigation budget for the Lawsuits that is indicative of the fees and expenses that BNYM may incur. Indeed, as a result of the Opposition Parties' election not to participate in this exercise, BNYM's expert declarations are the *only* evidence before the Title III Court.

The Opposition Parties should not be heard to complain about the speculative nature of budgeting because they have done nothing to narrow the budget assumptions. Understanding that the Lawsuits must be amended, BNYM has no insight into the scope of the Opposition Parties' amended allegations, claims, or alleged damages. Indeed, BNYM asked the Opposition Parties repeatedly to disclose the damages sought in the Lawsuits to no avail.[7] Although BNYM does not have details regarding the Opposition Parties' amended claims and alleged damages, the Opposition Parties' litigious track record in this Title III Case and the aggression with which they are pursuing BNYM is noteworthy for purposes of budgeting.[8]

Contrary to Ambac's charge, Ambac Resp. ¶¶ 11, 14-20, Goldberg accounted for the work completed by BNYM during the Interpleader Action. Goldberg ¶¶ 44-45, 47, 102. More fundamentally, Ambac's argument is missing any statement from the Opposition Parties regarding the relevance of the Interpleader Action to the Lawsuits. They do not assert that a decision in favor of BNYM on its partial summary judgment motion would be dispositive of the Lawsuits, nor do they agree to the reinstatement of BNYM's summary judgment motion. Ambac Resp. ¶¶ 11, 18. Ambac does not contest that the Lawsuits may raise additional issues not addressed in stage two of the Interpleader Action, including standard of care, standing, damages, and causation. Indeed, Goldberg discusses nine categories of issues that could be the subject of

---

[7] Notably, counsel for the Opposition Parties have never responded to BNYM's November 29, 2018, written request for specifics regarding, *inter alia*, the amount of damages claimed.
[8] Whitebox, for example, appears to object to application of section 19.5 of the Plan, even at the risk of forfeiting its payments under the Plan Support Agreement.

discovery, of which the 2017 defaults are a subset of only one. Goldberg ¶ 106. The Opposition Parties do not assert that they will limit or forgo discovery. Ambac Resp. ¶¶ 15-17.[9] The Opposition Parties do not assert that New York law applies to every issue that may be raised in the Lawsuits. Id. ¶¶ 19-20. In short, BNYM does not know the Opposition Parties' positions on these issues, and Ambac provides no evidence that the Lawsuits will be the non-event it portrays. Given BNYM's lack of insight into the scope of amended claims, Goldberg correctly assumed that additional issues may be raised, additional legal work may be required, and BNYM's pending partial summary judgment motion may not be dispositive.

Additional arguments regarding the reasonableness of Goldberg's budget are unavailing:

- Ambac's complaint that Goldberg assumed a "top-heavy ratio of senior lawyers to junior lawyers," Ambac Resp. ¶ 10 n.6, fails to account for his use of a weighted blended rate based on the assumption that junior lawyers will work more hours than senior lawyers. Goldberg ¶ 52. Further, Ambac's cases are inapposite. See, e.g., Beastie Boys v. Monster Energy Co., 112 F. Supp. 3d 31, 51 (S.D.N.Y. 2015) ("firm billed nearly 2.5 times as many partner hours as associate hours"); Beech Cinema, Inc. v. Twentieth Century Fox Film Corp., 480 F. Supp. 1195, 1196 (S.D.N.Y. 1979) (1053 partner hours vs. 33 associate hours), aff'd, 622 F.2d 1106 (2d Cir. 1980).

- Goldberg did not estimate that more than $2 million would be spent on case assessment, development, and administration "before the case even requires an Answer." Ambac Resp. ¶ 10. His estimate spans "the life of the Anticipated Litigation." Goldberg ¶ 63.

- Ambac faults Goldberg and Fishman for ignoring Reed Smith's actual budgets for the Lawsuits, Ambac Resp. ¶ 13, but the only budget prepared for defense of the Lawsuits was in the context of the confidential mediation and was inappropriate to share with these witnesses.[10]

- Ambac's argument that BNYM's budget cannot consider counterclaims, Ambac Resp. ¶ 22, ignores the fact that analysis and pursuit of counterclaims

---

[9] In Am Lung Ass'n v. Reilly, 144 F.R.D. 622, 628 (E.D.N.Y. 1992) (Ambac Resp. ¶ 16), the Court denied recovery for discovery responded to after the service of a summary judgment motion that ended the case; here, there is a "partial" summary judgment motion pending that may or may not end the case.

[10] BNYM is prepared to proffer that budget should the Title III Court wish to examine it.

- 8 -

are part of any comprehensive defense strategy and, consequently, related fees and expenses would be incurred "in connection with" defense of the Lawsuits.

Ambac's proposal of a "staged bond" as an alternative form of security to cash collateral is unworkable. See Ambac Resp. ¶¶ 3, 8. The concept is undefined. Ambac has not proffered a sample bond or identified its issuer or material terms. Ambac also fails to describe the staging with sufficient specificity. Will the Lawsuits halt while parties retain experts and litigate the reasonableness of fees for the next stage? Will there be shadow motion practice over whether the bond for the "motion to dismiss" stage also includes discovery and, if so, should it cover all discovery or only document discovery?[11] Will the bond be joint and several and, if not, what happens if one party's suit is dismissed but the other continues? Will BNYM have to disclose privileged strategy to support its bond requests? Ambac cites no support for its unseemly proposal that a plaintiff can decide how much, when, and under what conditions its adversary can incur and pay legal fees and expenses. Ambac's opaque, but exceptionally intrusive, "bond" is unworkable and costs of compliance would only increase any bonded amount.

A "staged bond" also fails to provide what is required under the law. BNYM is entitled to the indubitable equivalent of its secured claim against COFINA. See generally BNYM Memo. § III. "Value and risk are the key concepts in the indubitable equivalent analysis. Value and risk are fact-intensive issues that generally require expert analysis and testimony." Robert M. Fishman, Gordon E. Gouveia, & Kimberly Bacher, *Revisiting the Indubitable Equivalent Standard: Undoubtedly the Same or Close Enough?*, 20 Norton J. Bankr. L. & Prac. 511, 517 (2011). The Opposition Parties bear the burden of demonstrating indubitable equivalence, see

---

[11] See, e.g., Guiffre v. Maxwell, No. 15 Civ. 7433 (RWS), 2016 WL 254932, at *1 (S.D.N.Y. Jan. 20, 2016) ("'[D]iscovery should not be routinely stayed simply on the basis that a motion to dismiss has been filed'"); 22 NYCRR § 202.70, N.Y. Commercial Division Rule 11(d) (court determines "whether discovery will be stayed").

BNYM Memo. at 22, but have not even tried to satisfy it. As between cash reserves and a promise of "staged bonds" posted years into the future by a company that only recently emerged from rehabilitation, there is no equivalence, let alone indubitable equivalence.

BNYM also is entitled to enforce its intercreditor lien and payment priorities. See generally BNYM Memo. § IV. These priorities mandate payment of the Potential Litigation Expenses on a current basis from funds in BNYM's possession. Substitution of a staged bond would deprive BNYM of its bargained-for rights against non-debtors. Ambac (and Whitebox) cannot limit or avoid BNYM's intercreditor rights, enforceable in this Title III Case, by insisting on conditions not in the Resolution and forcing BNYM to take a staged bond.

Ambac's plea for equity, see Ambac Resp. ¶¶ 3, 5-6, is misplaced because the parties' rights are governed by the Plan and the Resolution (including an intercreditor agreement). Even then, Ambac has submitted no evidence at all that the holdback will "disproportionate[ly]" harm it. See Van Wagner Advert. Corp. v. S & M Enters., 67 N.Y.2d 186, 195 (N.Y. 1986) (affirming finding of disproportionate harm that "has support in the proof"). Ambac does not explain how the possibility of lost interest is "disproportionate" to the risk that BNYM may be left without any recourse whatsoever if Ambac is unable to post a bond in future stages. This entire argument is suspect because Ambac fails to acknowledge any of the protections available to it in the event of overfunding.

For the reasons set forth herein and BNYM's prior submissions, the Title III Court should permit BNYM to reserve $35 million from distributions to the Opposition Parties for the Potential Litigation Expenses.

| | |
|---|---|
| Dated: January 12, 2019<br>San Juan, Puerto Rico | Respectfully submitted, |
| SEPULVADO, MALDONADO & COURET | REED SMITH LLP |
| */s/ Albéniz Couret-Fuentes*<br>Elaine Maldonado-Matías<br>USDC-PR Bar No. 217309<br>Albéniz Couret-Fuentes<br>USDC-PR Bar No. 222207<br>José Javier Santos Mimoso<br>USDC-PR Bar No. 208207<br>304 Ponce de León Ave. – Suite 990<br>San Juan, PR 00918<br>Telephone: (787) 765-5656<br>Facsimile: (787) 294-0073<br>Email: emaldonado@smclawpr.com<br>Email: acouret@smclawpr.com<br>Email: jsantos@smclawpr.com | */s/ Eric A. Schaffer*<br>Eric A. Schaffer<br>Luke A. Sizemore<br>225 Fifth Avenue, Suite 1200<br>Pittsburgh, PA 15222<br>Telephone: (412) 288-3131<br>Facsimile : (412) 288-3063<br>Email : eschaffer@reedsmith.com<br>Email : lsizemore@reedsmith.com<br><br>Louis M. Solomon<br>C. Neil Gray<br>599 Lexington Avenue<br>New York, NY 10022<br>Telephone: (212) 521-5400<br>Facsimile: (212) 521-5450<br>Email: lsolomon@reedsmith.com<br>Email: cgray@reedsmith.com<br><br>Kurt F. Gwynne<br>1201 N. Market Street, Suite 1500<br>Wilmington, DE 19801<br>Telephone: (302) 778-7550<br>Facsimile: (302) 778-7575<br>Email: kgwynne@reedsmith.com |

*Counsel to The Bank of New York Mellon,
as indenture trustee*

- 11 -