# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors. [1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>        Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>**This Declaration Relates Only to COFINA and Shall be Filed in Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS** |

# DECLARATION OF NATALIE A. JARESKO IN SUPPORT
## OF CONFIRMATION OF THIRD AMENDED TITLE III PLAN
## OF ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

I, Natalie A. Jaresko, hereby declare and state as follows:

1.     I am the Executive Director of the Puerto Rico Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Electric Power Authority, the Puerto Rico Highways and Transportation Authority, and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA").

2.     I received my Master's Degree in Public Policy from the Harvard University Kennedy School of Government in 1989, and my Bachelor of Science Degree in Accounting from DePaul University in Chicago, Illinois in 1987.  From 1989 to 1992, I served in various economic positions at the U.S. State Department in Washington, D.C.  From 1992 to 1995, I served as the Chief of the Economic Section of the U.S. Embassy in Ukraine, where I was responsible for building a new economic relationship between the United States and newly-independent Ukraine. From 2014 to 2016, I served as Minister of Finance of Ukraine at one of the most critical times in Ukraine's history, rocked by a deep recession, foreign occupation, and war on part of its territory. During my tenure, I led the successful negotiation and implementation of one of the largest IMF programs in the institution's history, as well as a complex sovereign and sovereign-guaranteed debt restructuring.  As a result of the Ukrainian government's actions during my tenure, Ukraine is seeing its first signs of recovery, including stabilization of the domestic currency, growth in banking system deposits, sharply reduced inflation, and growth in industrial production.

3.     On June 30, 2016, President Obama signed into law PROMESA, establishing the Oversight Board pursuant to PROMESA section 101(b).  On August 31, 2016, President Obama

appointed the Oversight Board's seven voting members.  In March 2017, I was designated Executive Director of the Oversight Board.

4.      As Executive Director of the Oversight Board, I am responsible for, among other things, (i) managing and leading the affairs of the Oversight Board as its highest-level executive, under the guidance and supervision of the Oversight Board, (ii) organizing and participating in the Oversight Board's meetings and other meetings associated with the Oversight Board's business and operations, (iii) coordinating the discussion, negotiation and certification of COFINA's fiscal plan and fiscal plans of other covered territorial instrumentalities, as well as the analysis and certification process of annual budgets of COFINA and other covered territorial instrumentalities, (iv) assisting and participating, as required, in voluntary negotiations, creditor collective actions, and debt restructuring processes of COFINA and other covered territorial instrumentalities, and (v) promoting initiatives that create the necessary foundation for economic growth and restore opportunity to the people of Puerto Rico and access to the capital markets.

5.      In this role, I am in constant communication with the Oversight Board's counsel and financial advisors and consultants, the court-appointed mediation team led by Chief Bankruptcy Judge Barbara Houser,[2] and AAFAF and its counsel, financial advisors, and consultants.  In consultation with the members of the Oversight Board and its counsel and advisors, I review legal analyses and make recommendations to the Oversight Board on policy positions and strategies.

---

[2]    All references to Exhibits herein shall refer to the exhibits contained in the *Appendix of Consolidated Exhibits Referenced in the (I) Declaration of David M. Brownstein in Support of COFINA's Plan of Adjustment, (II) Declaration of Natalie A. Jaresko in Support of COFINA's Plan of Adjustment, and (III) Declaration of Natalie A. Jaresko in Support of Approval of the Commonwealth's 9019 Settlement Motion* filed concurrently with this declaration.  On June 23, 2017, the Court entered the *Order Appointing Mediation Team* [ECF No. 430], *see* Exhibit DX-A for a true and correct copy, appointing a mediation team currently comprised of:  (1) Chief Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); (4) Judge Victor Marrero (S.D.N.Y.); and (5) Judge Roberta Colton (Bankr. M.D. Fla.).

6.      I submit this declaration (the "Declaration") in support of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 436] (as may be modified further, the "Plan") and the *Memorandum of Law in Support of Confirmation of the Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* (the "Brief"), and the *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* [ECF No. 4663] (the "Reply"), and in response to the objections interposed to confirmation of the Plan by:  (a) Stephen Mangiaracina [ECF Nos. 4215 and 4481]; (b) Peter C. Hein [ECF Nos. 4585 and 4595];[3] (c) PROSOL-UTIER [ECF No. 4592]; (d) Mark Elliott [ECF No. 4598]; (e) the SEIU and UAW [ECF No. 4556]; (f) Manuel Natal-Albelo, et al [ECF No. 4607]; (g) GMS Group, LLC [ECF Nos. 4564 and 4605]; (h) Lawrence B. Dvores [ECF No. 4613]; and (i) certain Puerto Rico credit unions [Case No. 17-3284, ECF No. 415].

7.      Except as otherwise indicated, all facts set forth herein (or incorporated by reference herein) are based upon my personal knowledge or the personal knowledge of employees who report to me, my review of relevant documents, information provided to me by COFINA's advisors, or my opinion based upon my familiarity with COFINA.  If I were called upon to testify, I could and would testify competently as to the facts set forth herein.

8.      I am familiar with the Oversight Board's discussions, negotiations, and deliberations with respect to (a) the Commonwealth-COFINA Dispute,[4] (b) the Procedures Order,

---

[3]   Hein also filed, seven (7) days after the objection deadline, the *Second Supplement to Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan Scheduled for Hearing January 16, 2019, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [ECF No. 4673].

[4]   Capitalized terms used but not defined herein shall have the meanings given to them in the Plan, Brief, or *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 368] (the "Disclosure Statement"), as appropriate.

(c) the appointment of the Commonwealth Agent and the COFINA Agent, (d) the Agents'
announcement of the Agreement in Principle, (e) the Original Plan Support Agreement and the
A&R Plan Support Agreement, (f) the Settlement and entry into the Settlement Agreement, (g) the
Disclosure Statement, (h) the Plan and Plan Supplement, and (i) the Voting and Solicitation
Procedures.[5]

### Background on Negotiation of COFINA's Title III Plan of Adjustment

9.      Prior to the commencement of the Commonwealth's Title III Case, the Oversight
Board recognized that resolution of the Commonwealth-COFINA Dispute is a critical component
to the Commonwealth's restructuring.  Of the approximately $74 billion in aggregate Puerto Rico
debt, the GO Debt and COFINA's Existing Securities together account for approximately 55% of
the total funded indebtedness to be restructured.  The determination of which funds are available
to service COFINA's debt and the Commonwealth's debt is dependent upon which entity, the
Commonwealth or COFINA, owns the portion of the Commonwealth's general sales and use tax
(the "SUT") that was purportedly transferred to COFINA pursuant to Act of May 13, 2006, No.
91-2006, 2006 P.R. Laws 246 *et seq.* (codified as amended at P.R. Laws Ann. tit. 13, § 12) (as
amended, "Act 91").[6]  The Amended and Restated Sales Tax Revenue Bond Resolution, adopted
on July 13, 2007, as amended and restated on June 10, 2009 (as amended and supplemented, the
"Resolution"),[7] states that the SUT was pledged by COFINA to secure the repayment of the
COFINA bonds.  The amount at issue is significant—approximately $783 million in the current
fiscal year alone, which amount grows at four percent (4%) annually until it reaches $1.85 billion

---

[5]   *See* Exhibits DX-B, DX-C, DX-D, DX-E, DX-F, DX-G, DX-H, and DX-J for true and correct copies of the
Procedures Order, the Agreement in Principle, the A&R Plan Support Agreement, the Settlement Agreement, the
Disclosure Statement, the Plan, Plan Supplement, and the Disclosure Statement Order, respectively.

[6]   *See* Exhibit DX-TTT for a true and correct copy of Act 91.

[7]   *See* Exhibit DX-K for a true and correct copy of the Resolution.

in fiscal year 2041 and remains fixed at that amount until COFINA's bonds are repaid in accordance with their terms (the "Pledged Sales Tax Base Amount"). Under the COFINA Fiscal Plan,[8] this would result in billions of dollars over the next forty (40) years. Therefore, if the Pledged Sales Taxes were property of COFINA, the Commonwealth would have $783 million less in fiscal year 2019 (which annual amount would increase over time) to pay its liabilities and expenses, including addressing the essential services of the Commonwealth and the needs of its citizens. Conversely, if the Pledged Sales Taxes were property of the Commonwealth, the Oversight Board believes there would not be any funds available to address and satisfy COFINA's outstanding indebtedness. Until a resolution was reached on the Commonwealth-COFINA Dispute, the Oversight Board would not be able to begin to formulate a Title III plan of adjustment for the Commonwealth, COFINA, or any of their other debtor-affiliates.

10. _Existing Litigation of Commonwealth-COFINA Dispute_. On July 20, 2016, certain holders of GO Bonds filed a complaint in the U.S. District Court for the District of Puerto Rico against the Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) declaratory relief that the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service payments and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on the Commonwealth's general obligations bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the government permitting transfers outside of the ordinary course. _Lex Claims, LLC v. Garcia-Padilla_; District Court, District of Puerto Rico, July 20, 2016,

---

[8]   _See_ Exhibit DX-SSS for a true and correct copy of the COFINA Fiscal Plan, as certified by the Financial Oversight and Management Board for Puerto Rico, October 18, 2018 (the "COFINA Fiscal Plan").

Case No. 16-2374-FAB (the "Lex Claims Litigation").[9]  On November 4, 2016, the plaintiffs filed

a second amended complaint, as further described below, adding new causes of action, including

three causes of action relating to COFINA, and adding COFINA and other parties as defendants.[10]

On December 16, 2016, COFINA filed an answer to the second amended complaint generally

denying the allegations and asserting various affirmative defenses.[11]   Certain COFINA

bondholders who intervened in the Lex Claims Litigation also filed answers generally denying the

allegations and asserting various defenses and counter- and cross-claims.

11.     Plaintiffs in the Lex Claims Litigation, in their second amended complaint, argue,

among other things, that the Commonwealth Constitution[12] requires the Commonwealth to pay the

GO Debt ahead of any other expenditure.  They claim that, pursuant to Article VI, Section 8 of the

Commonwealth Constitution, if Puerto Rico's "available resources" are insufficient to meet all its

appropriations, "interest on the public debt and amortization thereof shall first be paid, and other

disbursements shall thereafter be made in accordance with the order of priorities established by

law."  They further allege the Pledged Sales Taxes are an "available resource" and COFINA was

created and has issued bonds in an attempt to evade the claim of holders of GO Debt on "available

resources" and related constitutional limitations on the quantity of public debt the Commonwealth

was permitted to issue.  Plaintiffs requested two declaratory judgments that challenge the legal

validity of COFINA: (1) a declaration that the Pledged Sales Taxes constitute "available resources"

and that such funds cannot be deposited with COFINA or its bondholders; and (2) a declaration

---

[9]   *See* Exhibit DX-M for a true and correct copy of the Lex Claims Litigation complaint.

[10]   *See* Exhibit DX-N for a true and correct copy of the Lex Claims Litigation second amended complaint.

[11]   *See* Exhibit DX-O for a true and correct copy of COFINA's answer to the second amended complaint in the Lex
Claims Litigation.

[12]   *See* Exhibit UUU for a true and correct copy of the Commonwealth Constitution.

that the Commonwealth is obligated to afford the GO Debt absolute priority, including priority over required deposits with COFINA and its bondholders.

12.     Holders and insurers of Existing Securities, permitted to intervene in the Lex Claims Litigation, asserted that the Pledged Sales Taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or "available resources" of the Commonwealth.[13]   Such holders and insurers rely upon Act 91 providing the Pledged Sales Taxes "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary."  Act 91 § 2.  They further asserted that the question whether COFINA's property constitutes "available resources" should be certified to the Supreme Court of Puerto Rico because, in their view, its resolution would involve a pure and undecided issue of Puerto Rico Constitutional law that would have long-lasting consequences for the Commonwealth.   They asserted that COFINA is essential in permitting Puerto Rico to access the capital markets on favorable terms and that the plaintiffs in the Lex Claims Litigation were able to extract higher interest payments precisely because COFINA's property was not available to repay them.

13.     In response to uncertainty surrounding the transfer of the SUT, and contending that an event of default had already occurred under the Existing Bond Resolution, Ambac and Whitebox commenced separate litigations against BNYM, the trustee under the Existing Bond Resolution, alleging various causes of action, each premised upon allegations that an event of default had occurred prior to April 29, 2017, and that BNYM had breached its alleged duties by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate"

---

[13]   *See* <u>Exhibit DX-P</u> for a true and correct copy of the *Intervenor-Defendant Ambac Assurance Corporation's Motion to Dismiss Plaintiff's PROMESA § 303(3) Claim, to Strike Certain Portions of the SAC's Prayer for Relief, or, in the Alternative, to Certify the COFINA Question to the Supreme Court of Puerto Rico*.  Lex Claims Litigation, ECF No. 232, at 30.

Existing Securities.[14]   If such creditors were correct, then, in their view, the subordination

provisions attendant to the Existing Securities would apply, and no payments to holders of "First

Subordinate" Existing Securities would have been permissible.

14.      BNYM responded that the Ambac Action and Whitebox Actions, including any

claims and causes of action for gross negligence, willful misconduct, or intentional fraud, lacked

merit and should be dismissed with prejudice.   BNYM claimed, and Whitebox and Ambac

disagreed, that such actions should fail for a variety of reasons, including, without limitation: (i)

there were no defaults or events of default under the Existing Bond Resolution prior to April 29,

2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability,

or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request

or direction of bond owners, unless the bond owners offered BNYM security or indemnity

satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred; and (iii) a

failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond

Resolution.

15.      _Prepetition Attempts to Resolve Creditor Disputes_.  Promptly after certification of

the Commonwealth's fiscal plan on March 13, 2017, the Oversight Board and the Commonwealth

undertook a joint effort to formulate restructuring proposals for all major creditors based on the

debt sustainability analysis in such fiscal plan.  The Oversight Board and AAFAF requested that

holders of GO Debt and COFINA's Existing Securities participate in mediation with the Oversight

Board and AAFAF.   The mediation began on April 13, 2017, under the auspices of former

Bankruptcy Judge Allan Gropper.    Despite several mediation sessions and other private

---

[14]   _See_ Exhibits DX-Q and DX-R for true and correct copies of the Whitebox complaint and Ambac complaint.

negotiations, no agreement was reached before the pre-Title III stay provided in PROMESA section 405 expired on May 1, 2017.

16.     After competing bondholder groups commenced litigation against the Commonwealth and COFINA, it became clear to the Oversight Board, in consultation with the Government and at the request of the Government, and after consideration of creditor support for a Title III filing, that the best path forward for the Commonwealth and COFINA to resolve the Commonwealth-COFINA Dispute was to file the Title III Cases to afford the Commonwealth and COFINA additional time and breathing room to seek to resolve the impasse.

17.     On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing a case under Title III thereof. On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA pursuant to PROMESA section 304(a), commencing a case under Title III thereof.

18.     *BNYM Initiates the Interpleader Action*.  Following the filing of COFINA's Title III petition, BNYM, as trustee for the Existing Securities, was in possession of hundreds of millions of dollars for the benefit of holders of both junior and senior Existing Securities, but without clarity about how the money should be distributed.  On May 16, 2017, BNYM filed the Interpleader Action,[15] seeking a determination of competing claims to the Disputed Funds by certain holders of beneficial interests in the Existing Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA.  On May 30, 2017, the Title III Court

---

[15]  *See* Exhibit DX-S for a true and correct copy of the Interpleader Action complaint.

granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions be made until the Title III Court issues a final ruling in the Interpleader Action.[16]

19.    From June to September 2017, several parties, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, officials and advisors, including COFINA, the Government Development Bank for Puerto Rico, Rothschild, the Commonwealth, AAFAF, and the Oversight Board.  The subpoenaed entities and individuals produced documents, depositions were taken of Banco Popular, and AAFAF, COFINA, the Commonwealth, and the Oversight Board each stipulated to binding statements of facts in lieu of depositions.[17]   Interpleader Action, ECF Nos. 415, 420.

20.    The implications of the Interpleader Action cannot be overlooked in the context of the Plan.  As mentioned above, if an event of default under the Existing Bond Resolution had occurred, the senior bondholders might have had repayment of their bonds accelerated, all to the detriment of the junior bondholders.  Specifically, independent of the validity of the transfer of the SUT to COFINA, such acceleration might require the senior bondholders to be paid in full before junior bondholders could declare an event of default, accelerate junior bonds, and exercise remedies.  In short, the Interpleader Action is primarily a dispute between junior and senior COFINA creditors about their payment rights and priorities vis-à-vis each other, which is being settled pursuant to the Plan.

21.    _The Oversight Board's Steps to Resolve the Commonwealth-COFINA Dispute_. Pursuant to PROMESA section 315(b), the Oversight Board is representative of the Commonwealth and COFINA in their respective Title III cases.  Given the importance of the issues

---

[16]   _See_ Exhibit DX-T for a true and correct copy of the _Order Granting Interpleader, Staying Pending and Future Litigation Against the Bank of New York Mellon, as Trustee, Pursuant to 28 U.S.C. § 2361, and Granting Related Relief_ [Adv. Proc. No. 17-00133, ECF No. 110].

[17]   _See_ Exhibits DX-ZZZ and DX-U for true and correct copies of ECF Nos. 415 and 420 in the Interpleader Action.

involved in the Commonwealth-COFINA Dispute, the Oversight Board analyzed various options for resolving the dispute and determined that the best path forward was to have arm's length negotiations between the Commonwealth and COFINA to resolve the dispute.  Shortly following the commencement of the Commonwealth's Title III Case, the Oversight Board sought to institute procedures for an orderly process to resolve the Commonwealth-COFINA Dispute, which process involved the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute.  On June 10, 2017, the Oversight Board filed *the Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-3284, ECF No. 303] (the "Commonwealth-COFINA Dispute Procedures Motion").[18]  On June 28, 2017, the Court denied the Commonwealth-COFINA Dispute Procedures Motion, without prejudice, but (a) requested that the Oversight Board seek agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.[19]

22.     Consistent with the Court's request, the Oversight Board worked with Chief Bankruptcy Judge Houser and any creditor party who sought to participate to formulate procedures agreeable to the interested parties.  On July 21, 2017, the Oversight Board filed the Revised Motion of Debtors for Order Approving Stipulation Providing Procedure to Resolve Commonwealth-COFINA Dispute [ECF No. 718][20] seeking approval of a stipulation establishing a protocol to

---

[18]   *See* Exhibit DX-V for a true and correct copy of the Commonwealth-COFINA Dispute Procedures Motion.

[19]   *See* Exhibit DX-W for a true and correct copy of the *Order Denying, Without Prejudice, Commonwealth-COFINA Dispute Procedures Motion* [Case No. 17-3283, ECF No. 544].

[20]   *See* Exhibit DX-X for a true and correct copy of the *Revised Motion of Debtors for Order Approving Stipulation Providing Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-3283, ECF No. 718].

address the Commonwealth-COFINA Dispute, including the appointment of respective agents for the Oversight Board as debtor representatives for the Commonwealth and COFINA to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the Agents to consult with creditors and their respective debtors.

23.     On August 10, 2017, the Court entered the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 996] (the "Procedures Order"), which provides, among other things, that (a) the Oversight Board, as representative of the Commonwealth in its Title III case, authorized the Committee to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth; and (b) the Oversight Board, as representative of COFINA in its Title III case, authorized Bettina Whyte to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA.

24.     *The Adversary Proceeding, the Agreement in Principle, and Entry into the Settlement Agreement and A&R Plan Support Agreement*.     On September 8, 2017, the Commonwealth Agent commenced an adversary proceeding seeking a resolution of the Commonwealth-COFINA Dispute (the "Adversary Proceeding").  Concurrently with the litigation of the Adversary Proceeding, the Agents and various parties to the Commonwealth-COFINA Dispute engaged in mediation led by mediation team leader Hon. Barbara J. Houser to resolve the dispute.  At the time, such efforts were unsuccessful.

25.     Following oral argument regarding the respective motions for summary judgment filed in the Adversary Proceeding, the Mediation Team and the Agents rekindled such discussions. The Oversight Board was not a party to such mediation efforts, other than to be informed of their existence.  Likewise, the Oversight Board was unaware of all of the parties that may have

13

participated in such mediation. On June 7, 2018, the Agents announced an Agreement in Principle to resolve the Commonwealth-COFINA Dispute. While the Oversight Board asserted that, among other things, the Agreement in Principle exceeded the scope of the Adversary Proceeding and the Procedures Order by attempting to, among other things, dictate the terms of plans of adjustment in the Title III Cases and limit the availability and use of funds, the Oversight Board determined, after reviewing the extensive litigation history and issues raised in the Adversary Proceeding and assessing the likelihood of success for the Commonwealth in the litigation, that the central component of the Agreement in Principle—the 53.65% / 46.35% allocation of the disputed sales and use tax revenue between COFINA and the Commonwealth, respectively—was a fair and reasonable settlement and compromise of the Commonwealth-COFINA Dispute given the substantial risks of litigation, and determined to build upon the central component of the Agreement in Principle to garner support for a confirmable COFINA plan of adjustment.

26.     Beginning in July, and building upon the Agreement in Principle, the Oversight Board and its advisors engaged in over two weeks of court-sanctioned mediation among interested parties convened by the mediation team on a COFINA plan of adjustment and the attendant issues that needed to be resolved for a viable plan to be proposed, including the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action. On August 8, 2018, the Oversight Board announced that it had reached an agreement with certain holders and insurers of COFINA's Existing Securities and AAFAF on the economic treatment of COFINA's Existing Securities and the terms of new securities to be issued pursuant to a proposed COFINA plan of adjustment, of which the Agreement in Principle was the foundation.[21]

---

[21]   *See* <u>Exhibit DX-UU</u> for a true and correct copy of the August 8, 2018 press release.

27.    The Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA
Bonds, Ambac, National, certain holders of Junior COFINA Bonds, Assured, and Bonistas del
Patio, Inc. (collectively, the "Settlement Parties") entered into that certain Plan Support
Agreement, dated as of August 29, 2018 (the "Original Plan Support Agreement"), that
contemplates, among other things, (a) terms to the compromise and settlement of the
Commonwealth-COFINA Dispute developed by the Oversight Board and consistent with the
terms of the Agreement in Principle, which, among other things, allocates an amount up to fifty-
three and sixty five one-hundredths percent (53.65%) of the annual Pledged Sales Tax Base
Amount to COFINA, and confirms that COFINA is the sole owner of the amounts held at BNYM
as of June 30, 2018, and (b) terms of the treatment between junior and senior Existing Securities
to resolve the dispute between holders of junior and senior Existing Securities regarding whether
or not a default had been triggered under the Resolution.

28.    After further mediation, on September 20, 2018, the Settlement Parties amended
and restated the Original Plan Support Agreement (the "A&R Plan Support Agreement") to include
additional holders of Existing Securities, who also hold significant amounts of GO Bonds and were
among the plaintiffs in the Lex Claims Litigation.  Among other things, the A&R Plan Support
Agreement provides that Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each
of their applicable affiliates, who are significant holders of Existing Securities, will request
dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation
premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the
SUT revenues purportedly transferred by the Commonwealth to COFINA, and any other claims
and causes of action that may challenge the transactions contemplated in the A&R Plan Support
Agreement, COFINA's plan of adjustment, or this Motion, effective upon the entry of an order

15

approving the Settlement and confirmation of COFINA's plan of adjustment incorporating the Settlement.  A&R Plan Support Agreement § 4.13.

29.     After the August 8, 2018 announcement, the Oversight Board, as representative of the Commonwealth, negotiated the terms of the Settlement Agreement with the COFINA Agent, consistent with the economic terms of the Agreement in Principle.  On August 13, 2018, the Commonwealth Agent filed an informative motion stating that it was not prepared to enter into a definitive agreement for the Agreement in Principle, because the Oversight Board's then most-recent certified fiscal plan for the Commonwealth allegedly was materially different from the one in effect when the Agreement in Principle had been announced.[22]  On October 19, 2018, after extensive discussion and deliberations, the Oversight Board, as representative of the Commonwealth, approved entry into the Settlement Agreement with the COFINA Agent.

30.     *The Title III Plan of Adjustment*.  On October 19, 2018, the Debtor filed the Plan, Disclosure Statement, and *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I) Approving Disclosure Statement, (II) Fixing Voting Record Date, (III) Approving Confirmation Hearing Notice, (IV) Approving Solicitation Packages and Distribution Procedures, (V) Approving Forms of Ballots and Election Notices, and Voting and Election Procedures, (VI) Approving Notice of Non-Voting Status, (VII) Fixing Voting and Election Deadlines, and (VIII) Approving Vote Tabulation Procedures* [Case No. 17 BK 3284, ECF No. 307] (the "Approval Motion").

31.     The Plan provides that, pursuant to the compromise and settlement of the Commonwealth-COFINA Dispute, the Pledged Sales Tax Base Amount will be allocated 46.35%

---

[22]  *See* Exhibit DX-VV for a true and correct copy of the *Commonwealth Agent's Informative Motion With Respect to Oversight Board's Announcement, Dated August 8, 2018, Regarding Certain Terms for COFINA Plan of Adjustment* [Case No. 17-00257, ECF No. 540].

/ 53.65%, between the Commonwealth and COFINA, respectively.  The Plan also provides for the distribution of consideration consisting of new COFINA Bonds and cash, providing a recovery for holders of "Senior" Existing Securities and "First Subordinate" Existing Securities on their allowed claims.  The Plan, if confirmed by the Court, will also resolve all COFINA-related litigation, including the Interpleader Action (except for litigation between BNYM, Ambac, and Whitebox), and validate the COFINA structure for all future purposes.

32.     The Disclosure Statement Order.  On November 29, 2018, the Court entered an order [Case No. 17 BK 3284, ECF No. 375] (the "Disclosure Statement Order")[23] approving the Disclosure Statement as "contain[ing] adequate information within the meaning of section 1125 of the Bankruptcy Code . . . for purposes of soliciting acceptances and rejections of the Plan . . . ." Disclosure Statement Order at 3.  The Court also (i) established January 2, 2019, at 5:00 p.m., (Atlantic Standard Time) as the Confirmation Objection Deadline, *id.* at 10, (ii) established January 8, 2019 at 6:00 p.m. (Atlantic Standard Time) as the deadline by which (a) ballots to accept or reject the Plan were required to be received by Prime Clerk (the "Voting Deadline"), and (b) elections regarding the form of distribution (including a determination regarding commutation with respect to certain insured claims) were required to be received by Prime Clerk (the "Election Deadline"),  *id.* at 13, and (iii) scheduled a hearing on January 16, 2019 at 9:30 a.m. (Atlantic Standard Time) to consider confirmation of the Plan [Case No. 17-3284, ECF No. 302].  By subsequent order of the Court [Case No. 17-3284, ECF No. 400], the Election Deadline was extended to January 11, 2019, at 6:00 p.m. (Atlantic Standard Time)[24]

---

[23]   *See* Exhibit DX-WW for a true and correct copy of the Disclosure Statement Order.

[24]   *See* Exhibit DX-RRR for a true and correct copy of the *Order Granting Urgent Motion for Entry of Order Extending Election of Distribution Deadline in Connection with the COFINA Plan Of Adjustment* [Case No. 17-3284, ECF No. 400].

33.     <u>The Solicitation and Tabulation of Votes in Favor of the Plan</u>.  Consistent with the Disclosure Statement Order, the Debtor caused Prime Clerk to distribute solicitation packages to all claim holders entitled to vote.  The solicitation packages contained, among other things:  (i) the notice setting forth the time, date, and place of the Confirmation Hearing (the "<u>Confirmation Hearing Notice</u>"); (ii) a flash drive (or hard copy, in the Debtor's discretion) containing this Disclosure Statement Order (without the exhibits thereto) and Disclosure Statement (together with all exhibits thereto, including the Plan); (iii) the appropriate form of Ballot, if any, with instructions for completing the Ballot, and a pre-addressed, pre-paid return envelope; (iv) solely with respect to holders of Claims in Classes 8 and 9, a W-9 form or W-8 BEN form, as appropriate, for purposes of collecting certain tax-related information relating to distributions under the Plan; and (v) in the case of creditors in Class 6, the Class 6 Notice.  Prime Clerk also served election notices to holders of Claims in Classes 1 and 5, to permit the election into Classes 4 and 7, respectively, or if in Class 2 or 3, to elect to receive the applicable trust certificates rather than the commutation alternative being offered by the respective monoline insurers.

**<u>Compliance with PROMESA Section 314(b)</u>**[25]

34.     I believe that the Plan complies with the provisions of PROMESA Section 314(b) discussed herein, as such provisions have been explained to me by the Oversight Board's legal advisors, based on (a) my understanding of the Plan, (b) the events that occurred throughout COFINA's Title III Case, and (c) various orders entered by the Court during COFINA's Title III Case and the requirements of PROMESA Title III.

---

[25]   The below list is not exhaustive of the requirements in PROMESA section 314(b)(1)–(7) to confirm a Title III plan of adjustment.  Those sections not discussed here will be discussed in the Brownstein Declaration or the Pullo Declaration.

**A. PROMESA § 314(b)(1)**: *The Plan Fully Complies with the Provisions of the Bankruptcy Code Made Applicable by PROMESA § 301.*

**i. Bankruptcy Code Section 1122(a)**

35.     Article IV of the Plan designates the classification of Claims.  I believe such classification complies with section 1122(a) of the Bankruptcy Code because each Class contains only claims that are substantially similar to each other.  The Plan designates the following ten (10) Classes of Claims:

> Class 1 (Senior COFINA Bond Claims)
>
> Class 2 (Senior COFINA Bond Claims (Ambac))
>
> Class 3 (Senior COFINA Bond Claims (National))
>
> Class 4 (Senior COFINA Bond Claims (Taxable Election))
>
> Class 5 (Junior COFINA Bond Claims)
>
> Class 6 (Junior COFINA Bond Claims (Assured))
>
> Class 7 (Junior COFINA Bond Claims (Taxable Election))
>
> Class 8 (GS Derivative Claim)
>
> Class 9 (General Unsecured Claims)
>
> Class 10 (Section 510(b) Subordinated Claims)

36.     It is my understanding that the classification of Claims set forth in the Plan is reasonable and was not done to control the outcome of voting to accept or reject the Plan, as the classification is based upon differences in the legal nature and/or priority of such Claims in accordance with applicable law.  Specifically, all holders of Claims in Classes 1, 2, and 3 hold the same underlying security, "Senior" Existing Securities, but are classified separately based on whether they are uninsured (Class 1) or insured by Ambac (Class 2) or National (Class 3), as such insurance agreements provide bondholders different rights thereunder.  Similarly, holders of Claims in Classes 5 and 6 hold the same underlying security, "First Subordinate" Existing

Securities, but are classified separately based on whether they are uninsured (Class 5) or insured by Assured (Class 6).

37.     In addition, Senior COFINA Bond Claims and Junior COFINA Bond Claims are in different Classes because they have different underlying rights.  Specifically, in the event of default, payment to the Junior COFINA Bond Claims, such as those bonds issued under the Seventh Supplemental Sales Tax Revenue Bond Resolution,[26] is subordinate to payment of the Senior COFINA Bond Claims.

38.     Likewise, based upon the elections offered pursuant to the Plan, holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims that are either Puerto Rico Institutions or Puerto Rico Individuals, to the extent elections were made, were shifted to other Classes (Class 4 and Class 7, respectively) to denote the election made and the alternative form of distribution elected.

### ii.   Bankruptcy Code Section 1123(a)(1)

39.     Section 4.1 of the Plan designates ten (10) separate Classes of Claims for the Debtor, other than Claims of the type described in section 507(a)(2) of the Bankruptcy Code.  Accordingly, I believe the Plan satisfies the requirements of section 1123(a)(1) of the Bankruptcy Code.

### iii.   Bankruptcy Code Section 1123(a)(2)

40.     Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are all impaired.  Existing holders of Allowed Junior COFINA Bond Claims (Assured) will receive (through payment by Assured), on the Effective Date, the Acceleration Price for their Assured Insured Bonds, and thus be effectively rendered unimpaired.  However, Assured will be subrogated

---

[26] *See* Exhibit DX-XX for a true and correct copy of the Seventh Supplemental Sales Tax Revenue Bond, adopted on June 10, 2009.

to the rights of such holders and will received distributions pursuant to the Plan, thereby rendering Assured's claims impaired.  Accordingly, I do not believe there are any unimpaired Classes under the Plan, and I believe the Plan satisfies the requirements of section 1123(a)(2) of the Bankruptcy Code.

### iv.    Bankruptcy Code Section 1123(a)(3)

41.    Articles V through XIV of the Plan identify the treatment of all Classes of Claims that are impaired under the Plan.  Accordingly, I believe the Plan satisfies the requirements of section 1123(a)(3) of the Bankruptcy Code.

### v.    Bankruptcy Code Section 1123(a)(4)

42.    Articles V through XIV of the Plan provide that the treatment of each Claim in each particular Class is the same as the treatment of each other Claim in such Class, except to the extent that a holder of an Allowed Claim has agreed to less favorable treatment of its Claim.  If a holder of a Claim in Class 1 or 5 elects out of such Class so as to receive all taxable bonds, rather than a mix of taxable and tax-exempt bonds, pursuant to the Plan, such holder is no longer in such Class, and, instead, is treated as a holder of a Claim in Class 4 or 7, respectively.  Accordingly, I believe all holders of Claims in each of Classes 1, 4, 5, and 7 receive the same treatment as holders of other Claims in the same Class pursuant to the Plan.

43.    The Consummation Costs are not being paid to the Consummation Cost Parties on account of their Claims against COFINA.  During the lengthy and complex court-appointed mediation led by Chief Bankruptcy Judge Houser, the Consummation Cost Parties agreed to various conditions and covenants set forth in the A&R Plan Support Agreement, including, among other things, a pledge to support the Plan, the imposition of restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means through

substantial contribution claims.  As consideration for their efforts in assisting in the formulation

of the Plan (which has garnered significant creditor support), continuing to assist in the finalization

of definitive agreements and ancillary documents, and the costs incurred in those and other efforts

(including the expenses of defending COFINA's property interests for which the PSA Creditors

asserted a right to seek substantial contribution claims), the Oversight Board determined that it

was fair and reasonable for the Consummation Cost Parties to be paid the Consummation Costs.

Based upon representations of counsel and, in some instances, pleadings filed with the Title III

Court, the Oversight Board estimates the aggregate postpetition fees and expenses of the

Consummation Cost Parties to be at least $135 million.

44.     In considering the "net" cost of paying the Consummation Costs to the

Consummation Cost Parties, it must be noted that the Consummation Cost Parties hold nearly $10

billion of the outstanding $17.6 billion in outstanding Bond Claims.  Thus, approximately $190

million ($10 billion / $17.6 billion * $332 million) of the Consummation Costs (2% of their

collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the

absence of the Consummation Costs provision.  Accordingly, the Consummation Cost provision

provides for a "net" incremental payment for the Consummation Cost Parties of approximately

$140 million.  This amount equates to approximately 1.3% of the total Allowed Bond Claims of

the Consummation Cost Parties.  The Oversight Board estimates the aggregate postpetition fees

and expenses of the Consummation Cost Parties to exceed the "net" cost of the Consummation

Costs of approximately $140 million.

45.     The payment of the Consummation Costs was a critical component of the

interlocking agreements set forth in the A&R Plan Support Agreement.  The absence of the A&R

Plan Support Agreement could have resulted in a costly, contentious, and lengthy confirmation

process for COFINA.  Under such a scenario, there would be no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than eighteen (18) months.  In consideration of the benefits obtained for COFINA in entering into the A&R Plan Support Agreement, the benefits to COFINA creditors from the mediation and the costs to and burdens of intense mediation with the Consummation Cost Parties, the Oversight Board determined that it was an appropriate use of COFINA's property to pay the Consummation Costs and provide an opportunity for COFINA to emerge from Title III as expeditiously as possible.

### vi.   Bankruptcy Code Section 1123(a)(5)

46.    Various provisions of the Plan provide adequate and proper means for its implementation:

- Section 16.1 provides for the issuance of COFINA Bonds on the Effective Date;

- Section 19.1 provides for distributions to be made to holders of Allowed Claims under the Plan;

- Section 26.1 provides that, "[e]xcept as set forth in the Plan, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA;"

- Section 28.1 provides that, on the Effective Date, all matters provided for under the Plan that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan, as applicable, shall be authorized and approved in all respects in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, without further action by any Person or Entity under any other applicable law, regulation, order, or rule;

- Section 28.3 provides for the appointment of the board of directors of Reorganized COFINA, consisting of three (3) persons appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in the Definitive Documents;

- Section 28.5 provides that "[t]he COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan and as reflected in the Term Sheet;" and

- Section 30.1 provides for the re-vesting of assets: "Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan."

47.    Additionally, the Plan Supplement contains, among other things, substantially final forms of the (i) New Bond Indenture, (ii) the COFINA Bonds, (iii) the Reorganized COFINA By-Laws, and (iv) the new Banking Services Contract.  Accordingly, I believe that the Plan, together with the documents and arrangements set forth in the Plan Supplement, provides adequate means for its implementation.  Accordingly, I believe the Plan satisfies the requirements of section 1123(a)(5) of the Bankruptcy Code.

### vii.    Bankruptcy Code Section 1123(b)(1)

48.    Section 23.1 of the Plan specifies that Claims in Classes 1 through 10 are all impaired.  Accordingly, I believe the Plan is consistent with section 1123(b)(1) of the Bankruptcy Code.

### viii.    Bankruptcy Code Section 1123(b)(2)

49.    Article XVIII of the Plan provides that, as of the Effective Date, all Executory Contracts and Unexpired Leases to which COFINA is a party are rejected, "except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically

24

designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement; provided, however, that COFINA reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date."    Plan § 18.1; Plan Supplement at Exhibit I [ECF No. 4588] (as may be amended).  Accordingly, I believe the Plan is consistent with section 1123(b)(2) of the Bankruptcy Code.

### ix.   Bankruptcy Code Section 1123(b)(3)(A)

50.    The Plan incorporates the settlement and compromise of (a) the Commonwealth-COFINA Dispute Settlement in Article II of the Plan and (b) issues regarding the relative rights between senior and junior COFINA bondholders that remain the subject of the Interpleader Action. I believe such settlements and compromises are in the best interests of COFINA and its creditors, and well above the lowest range of reasonableness.  Accordingly, I believe the Plan is consistent with section 1123(b)(3)(A) of the Bankruptcy Code.

### x.   Bankruptcy Code Section 1123(b)(3)(B)

51.    Section 26.1 of the Plan provides that, "[e]xcept as settled and released herein, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, and any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the

25

Title III Court." Accordingly, I believe the Plan is consistent with section 1123(b)(3)(B) of the Bankruptcy Code.

### xi.   Bankruptcy Code Section 1123(b)(5)

52.     Articles V through XIV of the Plan modify the rights of holders of Claims in all Classes. There are no Classes whose holders' rights have been left unaffected pursuant to the Plan. Accordingly, I believe the Plan is consistent with section 1123(b)(5) of the Bankruptcy Code.

### xii.   Bankruptcy Code Section 1123(b)(6)

53.     The Plan provides for, among other things: (a) certain releases, injunctions, and exculpations; (b) assumption of certain director and officer indemnification and reimbursement obligations; and (c) an exemption from registration pursuant to Bankruptcy Code section 1145 for the issuance and distribution of COFINA Bonds, Ambac Certificates, Assured Certificates, and National Certificates. Accordingly, I believe the Plan is consistent with section 1123(b)(6) of the Bankruptcy Code.

### xiii.   Bankruptcy Code Section 1123(d)

54.     Section 18.4 of the Plan provides for the payment of cure amounts required to be paid to the counterparties of Executory Contracts that are assumed, or assumed and assigned under the Plan. All cure amounts will be determined in accordance with the underlying agreements and applicable nonbankruptcy law, and pursuant to the procedures established by the Plan. As only the Banking Services Contract is being assumed and its assumption is in compliance with the Bankruptcy Code, the Debtor is not aware of any monetary defaults it must cure. Accordingly, the Plan is consistent with section 1123(d) of the Bankruptcy Code.

### xiv. Bankruptcy Code Section 1129(a)(2)

55.     To the best of my knowledge and belief, based on my experience and involvement in the process culminating in the Plan, as well as discussions with the Oversight Board's legal counsel, COFINA (i) has complied with applicable provisions of the Bankruptcy Code, except as otherwise provided or permitted by orders of this Court, and (ii) has complied with the applicable provisions of the Bankruptcy Code, the Bankruptcy Rules, the Local Rules, and the Disclosure Statement Order in transmitting the Disclosure Statement, the Plan, the Ballots, the Election Notices, and related documents, and in soliciting and tabulating votes on the Plan. The Oversight Board, with the assistance of its professionals, and in coordination with AAFAF, expended significant time and effort preparing the Disclosure Statement and sought and received input and comment thereon from all the parties to the A&R Plan Support Agreement, and all other parties in interest. This Court approved the Disclosure Statement as containing adequate information and meeting the requirements of section 1125 and 1126 of the Bankruptcy Code. It is my further understanding that the Debtor has properly solicited and tabulated votes with respect to the Plan. Accordingly, I believe the Debtor has complied with section 1129(a)(2).

### xv. Bankruptcy Code § 1129(a)(3).

56.     The Plan was proposed in good faith with the legitimate and honest purpose of providing a method for a covered territory to achieve fiscal responsibility and access to capital markets, consistent with the purposes of PROMESA. As set forth in detail above in Paragraphs 15–29 above, the Plan (including the settlements and compromises contained therein) is the result of extensive arm's-length negotiations among the Settlement Parties through mediation led by Chief Bankruptcy Judge Houser. The Agreement in Principle was the product of an independent

process overseen by the court-appointed mediation team in which the Oversight Board did not

participate or have any control over the parties who could participate.

57.    Following the Agents' announcement of the Agreement in Principle to resolve the

Commonwealth-COFINA Dispute, the Oversight Board built upon the Agreement in Principle and

engaged in over two weeks of mediation among interested parties on a COFINA plan of adjustment

and the attendant issues that needed to be resolved for a viable plan to be proposed, including the

relative rights between senior and junior COFINA bondholders that remain the subject of the

Interpleader Action.  The Plan is designed to implement the settlement and compromise of, among

other things, the Commonwealth-COFINA Dispute and the Interpleader Action, and maximize

value for COFINA's creditors, while avoiding protracted litigation that could delay distributions

to creditors, or worse, result in no recoveries for any COFINA creditors.

58.    The Plan and the Disclosure Statement reflect the culmination of those efforts and

the substantial input of each representative group.

### xvi.    Bankruptcy Code Section 1129(a)(6)

59.    The Plan does not provide for any rate changes by COFINA, and I therefore do not

believe this section of the Bankruptcy Code applies.

### xvii.    Bankruptcy Code Section 1129(b)(1)

60.    At this time, the Debtor is unaware of any Section 510(b) Subordinated Claims

other than thinly-documented assertions set forth in in several proofs of claim.  However, due to

uncertainty regarding such assertions and out of an abundance of caution, the Debtor included such

classification within the Plan.  The Plan's treatment of Claims in Class 10 is proper, because all

similarly-situated holders of Claims will receive similar treatment.  All holders of subordinated

claims in Class 10 will not be receiving distributions pursuant to the Plan, and are deemed to reject

the Plan.  Accordingly, I believe the Plan does not unfairly discriminate against holders of Claims in Class 10 (Section 510(b) Subordinated Claims).

**xviii.  Bankruptcy Code Section 1129(b)(2)**

61.  The Plan's treatment of Claims in Class 10 is proper, because no class of junior claims will receive distributions under the Plan.  There is no Class that is junior to Class 10, and, thus, no holder of claims or interests junior to Claims in Class 10 will receive or retain any property under the Plan on account of any such claim or interest.

**B.  PROMESA § 314(b)(2)**:  *The Plan Fully Complies with the Provisions in Title III of PROMESA.*

62.  To the best of my knowledge and belief, based on my experience as well as my participation in the process culminating with the Plan and discussions with the Debtor's legal counsel, the Debtor has complied with applicable provisions of PROMESA, including section 314(b)(1)-(7).

**C.  PROMESA § 314(b)(3)**:  *The Debtor is Not Prohibited By Law From Taking Any Action Necessary to Carry Out the Plan.*

63.  To the best of my knowledge, the Plan contains no provisions that would require it to violate Commonwealth law.  Specifically, the Commonwealth passed the New Bond Legislation,[27] which established the legal framework for the restructuring of COFINA's issued and outstanding bonds.  The New Bond Legislation authorizes the transactions contemplated by the Plan, including, without limitation, providing for the collateralization of the COFINA Pledged Taxes and the granting of the New Collateral and incorporating such other terms as set forth in the Plan.  To this end, the New Bond Legislation provides for (i) the modification of COFINA's corporate governance structure, (ii) the authorization for Reorganized COFINA to issue COFINA

---

[27] *See* <u>Exhibit DX-QQQ</u> for a true and correct copy of the New Bond Legislation.

Bonds and COFINA Parity Bonds and provide for the terms of such bonds, (iii) confirmation of Reorganized COFINA's ownership of the COFINA Revenues, (iv) the creation of a statutory lien to secure the COFINA Bonds and COFINA Parity Bonds, and (v) covenants to secure further the repayment of the COFINA Bonds and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements.

**D. PROMESA Section 314(b)(4)**:  *The Plan Provides Each Holder of an Administrative Claim Cash, Equal to the Allowed Amount of Such Claim, on the Effective Date*

64.    Section 3.1 of the Plan provides that, "[o]n the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized COFINA; provided, however, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, provided, further, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan."

65.    As provided for by the Plan, the Consummation Costs are being paid in Cash on the Effective Date of the Plan.  All other Allowed Administrative Expense Claims, if any, will

likewise be paid pursuant to the terms of Section 3.1 of the Plan. Accordingly, I believe the Plan complies with PROMESA section 314(b)(4).

**E. PROMESA § 314(b)(5)**: *The Plan Has Obtained All Necessary Legislative, Regulatory, and Electoral Approvals*

66.      As discussed above, the Commonwealth has passed the New Bond Legislation, and there are no approvals left to obtain to effectuate the Plan. Further, by approving the COFINA Fiscal Plan, the Oversight Board provided approval for the issuance of securities contemplated by the Plan as required by PROMESA section 207. Accordingly, I believe the Plan satisfies PROMESA section 314(b)(5).

**F. PROMESA § 314(b)(6)**: *The Plan Is in the Best Interests of Creditors*

67.      COFINA has no power to raise taxes. The alternative to the Plan is protracted litigation in the Adversary Proceeding, which could lead to an all-or-nothing recovery for holders of either Commonwealth claims or COFINA's Existing Securities. For any individual class of creditors to do better than the Plan, they would have to prevail in the Adversary Proceeding, which is far from a guarantee (as evinced by the equitable split of SUT Revenues contemplated in the Plan). Even if one side to the litigation were to prevail, litigation costs would skyrocket, and it could be months, if not years, before a court issues a final, unappealable order resolving who is entitled to the SUT Revenues.

68.      In addition, independent of the validity of the transfer of the SUT to COFINA, the holders of "First Subordinate" Existing Securities face the risk that an event of default will accelerate the bonds such that "First Subordinate" Existing Securities will not be paid until holders of "Senior" Existing Securities are paid in full. The Existing Bond Resolution provides that, upon an event of default, the Trustee may, or upon the written request of owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and accrued interest on the

"Senior" Existing Securities to be immediately due and payable.  Upon such declaration, the principal of, and accrued interest on, the "Senior" Existing Securities becomes immediately due and payable.  In addition, upon a declaration of an event of default, holders of "First Subordinate" Existing Securities may not declare a default, or cause the Trustee to take any remedial action thereunder, until such time as the "Senior" Existing Securities are fully retired or are defeased in accordance with the provision of the Existing Bond Resolution.  Upon an event of default, the Existing Bond Resolution provides for the priority of payments in favor of the "Senior Existing Securities" if the funds held by the Trustee are insufficient for the payment of interest and principal or Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due.

69.     If the Plan is not confirmed, the parties may lose the benefit of the agreement resolving the Commonwealth-COFINA Dispute.  Litigation could continue in an all-or-nothing fashion, leaving some creditors much worse off and some creditors much better off.  The Plan's provision for a distribution of approximately 93% to holders of "Senior" Existing Securities and approximately 56% to "First Subordinate" Existing Securities, in light of the risks attendant to the Commonwealth-COFINA Dispute and the Interpleader Action, among others, could be far superior to what both groups of bondholders might receive outside of the Plan.  The overwhelming acceptance of the Plan by the various classes indicates such creditors believe this Plan to be in their best interests.  The Plan avoids the pitfalls of delay, litigation costs, and uncertainty by codifying the consensual agreement reached by the major stakeholders in COFINA's Title III Case.

**G. Bankruptcy Rule 3019**: *The Plan Does Not Adversely Change the Treatment of Claims of Creditors.*

70.     After the Voting Deadline passed, the Oversight Board filed a "Third Amended Plan," containing minor revisions to address certain concerns raised by certain parties.  None of the modifications adversely change the treatment of the Claim of any creditor.  First, in Article X, and based upon understandings between Assured, COFINA, and the Oversight Board, the Plan was amended to provide that COFINA will enter a remarketing agreement with Assured with respect to the COFINA Bonds allocable to the holders of Allowed Junior COFINA Bond Claims (Assured), and as to such COFINA Bonds which will be received by Assured as subrogee of such holder.  Assured was always responsible for the 100% cash payment of the Acceleration Price on the Effective Date, so the holders of Claims in Class 6 are not impacted in any way by this change.

71.     Second, the Plan was updated to ensure the releases provided thereunder are consistent with the agreement reached in the A&R Plan Support Agreement, *see* Plan § 30.2, as well as other technical changes to ensure that neither the Ambac Action nor the Whitebox Actions interfere with distributions to bondholders.  Specifically, the Plan has been modified to ensure that BNYM, Whitebox, and Ambac can continue their litigation among themselves, *see* Plan § 2.1, but also to ensure that COFINA or Reorganized COFINA, as the case may be, is not responsible for any of BNYM's fees or expenses in connection with that litigation after the Effective Date.  *See* Plan § 19.13.

72.     Accordingly, it is my understanding that the Plan can be confirmed without the filing of a new disclosure statement and balloting of the newly-filed Plan.

### The Releases, Exculpation, and Injunctions Pursuant to the Settlement

73.     The Commonwealth-COFINA Dispute presented the potential for extended, complex, expensive, and value-destructive litigation among competing interests and entities.  A

fundamental objective of the Debtor and the Oversight Board throughout COFINA's Title III Case has been to structure a transaction to fairly divide the SUT while avoiding the winner-take-all nature of litigation related to the validity of the COFINA structure and related claims. The prompt, efficient conclusion of COFINA's Title III Case is premised on the proposed comprehensive resolution and settlement this dispute

74.    None of these issues has been fully litigated in these cases. However, cross-motions for summary judgment had been filed on the underlying constitutional questions, and significant resources were expended on these initial phases. In an effort to avoid disputes that could jeopardize a consensual resolution creating the highest value for all stakeholders, the Agents and then the PSA Creditors engaged in good-faith negotiations over a period of many months, as discussed above. The robust, arm's-length negotiations were successful and yielded substantial consensus and support for a consensual plan, as evidenced by the Agreement in Principle, culminating in the Settlement Agreement and the Plan.

75.    In order to incentivize the PSA Creditors to grant the concessions outlined above, and in consideration of the substantial benefits provided by the Released Parties, the Debtor agreed to prosecute and pursue the releases, exculpation, and injunction provisions set forth in the Plan. Each aspect of the Settlement is interdependent and relied upon by the Agents and, especially, the PSA Creditors, who made material concessions as to their respective positions to enable the expeditious confirmation of the Plan. Such settlements take into account the legal and factual risks to the allowance of the claims. Modifications to any aspect of the Settlement or the failure to approve the Settlement undoubtedly may result in events of termination under the A&R Plan Support Agreement, jeopardize settlement of the Commonwealth-COFINA Dispute, and set back the administration of COFINA's Title III Case for an extended period as holders of GO Debt and

COFINA's Existing Securities get bogged down in the maze of uncontrolled litigation for prosecution of their claims.

### A. Debtor Releases

76.     Pursuant to Section 30.5 of the Plan, each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons proposed to release the Released Parties from Claims or Causes of Action they may have against such Released Parties.  The Debtor's Release constitutes a sound exercise of the Debtor's judgment and meets the applicable legal standard:  the Debtor's Release is fair, reasonable, and in the best interests of the Debtor.  During the course of negotiations regarding the Plan and predecessor agreements, it was clear that the Debtor's Release would be a necessary condition to consummation of the Settlement embodied in the Plan.  In exchange for such releases, the Debtors secured the substantial concessions provided by the Settlement and the Plan.  Similarly, the Released Parties provided integral support throughout COFINA's Title III Case and incurred significant costs in doing so.

77.     Furthermore, with the exclusion of the Commonwealth-COFINA Dispute, which is being compromised pursuant to the Settlement and incorporated into the Plan, and acts relating to the Ambac Action and Whitebox Actions, which are being preserved pursuant to the Plan, *see* Section 30.2(c), the Debtor is not aware of any claims that could be asserted against the Released Parties and no creditor has informed the Debtor that it believes any such action should be brought that the Debtor believes would be meritorious.  In addition, without the assurance of protection from liability, the Released Parties involved in the Plan process may not have participated in the negotiations that led to the development of the Settlement and Plan.  Had the Debtor's Release not been provided, the Debtor's chances of resolving the Commonwealth-COFINA Dispute, and

proposing the Plan that was ultimately accepted by every voting Class, would have been diminished.

### B. Consensual Releases

78.     Section 30.2 of the Plan provides for the Consensual Releases of the Released Parties by the holders of Claims.  The consensual releases seek only to release parties that made a significant contribution to the Plan:

     i.    COFINA and Reorganized COFINA, from all Claims or Causes of Action, and from all Entities, *see* Plan § 30.2(a)–(b);

    ii.    the Government Releasees, from all Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, who are being released by each of the PSA Creditors and their respective Related Persons, *see* Plan, § 30.2(c);

   iii.    BNYM and (a) each of its Related Persons, from any and all Claims and causes of action arising from or related to the Existing Securities, the Bond Claims and the Bond Resolution by each of the PSA Creditors, *see* Plan § 30.2(c), excluding any and all Claims and Causes of Action for gross negligence, willful misconduct and intentional fraud asserted or which can be asserted by Ambac or Whitebox in the Ambac Action and Whitebox Actions, respectively, and (b) each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns, from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest, excluding acts of gross negligence, intentional fraud, or willful misconduct, of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions, *see* Plan § 30.2(d);

   iv.    the Commonwealth Agent Releasees, from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order, *see* Plan § 30.2(e); and

    v.    the Commonwealth, from all Claims and Causes of Action held by any Creditor, solely in such capacity.  *See* Plan § 30.2(f).

79.     The consensual releases are necessary and essential to the Plan.  As mentioned above, the releases have been negotiated with COFINA's key creditor constituencies as part of the

formulation of the Plan.  Thus, it is clear that a substantial number of creditors have expressly consented to the releases.  The two third-party releases included in the Plan—in favor of the Commonwealth and BNYM—can likewise be approved under the appropriate standard.  The Commonwealth has committed substantial assets to the reorganization, by funding the expenses of the Commonwealth Agent (and AAFAF) in negotiating the Plan, and in agreeing to the Settlement.  *Id.* at 938.  Without the release, the Commonwealth would not have agreed to the Settlement, which laid the groundwork for the formulation of this Plan.

80.     Further, it is imperative to the Plan that BNYM be released.  Without a release, BNYM would withhold distributions to bondholders necessary to effectuate the Plan. Additionally, the release is narrowly tailored so that it exempts acts of gross negligence, intentional fraud, or willful misconduct, solely in the context of the Ambac Action and the Whitebox Actions.

### C. Exculpation

81.     Section 30.7 of the Plan contains a release and exculpation for certain parties for claims arising out or relating to, among other things, any act taken or omitted to be taken consistent with the Plan in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation, or approval of the Plan (the "Exculpation Provision").

82.     Such parties greatly contributed to the Debtor's reorganization efforts and enabled the successful prosecution of the Plan in exchange, in part, for the Exculpation Provision.  Failing to approve this provision would expose the parties to litigation after months of  good faith negotiations.  Therefore, I believe the Court should approve  the Exculpation Provision as an integral and important part of the Debtor's Plan.

37

**D. Injunction**

83.     The injunction set forth in Sections 30.3, 30.6, and 30.11 of the Plan provides for an injunction (the "Injunction") against all Entities from commencing or continuing in any manner any suit, action, or other proceeding on account of or respecting any Claim, demand, liability, obligation, debt, right, Cause of Action, interest or remedy released or to be released pursuant to the Plan or the Confirmation Order, both prior to and after the Effective Date.  The Injunction is necessary to preserve and enforce the releases and exculpations, and is narrowly tailored to achieve that purpose.  Accordingly, I believe the Injunction should be approved.

84.     Based upon the facts set forth above and in the Brownstein Declaration and the Pullo Declaration, the Plan should be confirmed in accordance with PROMESA section 314(b).

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: January 12, 2019                                  /s/ Natalie A. Jaresko
      San Juan, Puerto Rico                         Natalie A. Jaresko
                                               Oversight Board, Executive Director