**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

          Debtors.[1]

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION,

          Debtor.

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

PROMESA
Title III

No. 17 BK 3284-LTS

**This Declaration Relates Only to COFINA and Shall be Filed in Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS**

**DECLARATION OF DAVID M. BROWNSTEIN IN SUPPORT
OF CONFIRMATION OF THIRD AMENDED TITLE III PLAN OF
ADJUSTMENT OF PUERTO RICO SALES TAX FINANCING CORPORATION**

I, David M. Brownstein, hereby declare and state as follows:

1.      I am a Managing Director and Co-Head of the Municipal Finance Department in

Global Spread Products at Citigroup Global Markets Inc. ("Citi"). Citi has consistently been

---

[1]  The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

ranked as a top underwriter of municipal bonds and made commitments in excess of $20 billion to provide both bridge and long-term funding as well as credit and liquidity facilities to Citi's municipal clients.

2.      The Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the representative of the Commonwealth of Puerto Rico (the "Commonwealth"), the Puerto Rico Sales Tax Financing Corporation ("COFINA"), the Puerto Rico Highways and Transportation Authority, and the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, pursuant to Section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), retained Citi to serve as investment banker and financial advisor to the Oversight Board in connection with the Oversight Board's statutory duties under PROMESA and its task of working with the Commonwealth to create the necessary foundation for economic growth and to restore  opportunity to the  people of  the Commonwealth.  Citi is well situated to assist the Oversight Board in seeking to provide the Debtors with the necessary tools to restructure debt, access capital markets, and get back on the path to economic recovery because of, among other things, its expertise in municipal finance, capital markets, restructurings, and infrastructure and utility finance.

3.      I have been at Citi for 25 years and in the municipal market for a total of 35 years, serving as underwriter or advisor to over 200 municipal issuers on both revenue and general obligation bonds with a par amount in excess of $30 billion.  In addition to a bachelor's degree from Beloit College, I hold a number of professional licenses from the Financial Industry Regulatory Authority.  These include:

(a)  General Securities Principal, Series 24;
(b)  General Securities Representative, Series 7;
(c)  Municipal Securities Principal, Series 53; and
(d)  Municipal Securities Representative, Series 52.

4.      I also served as past Chairman of the Municipal Executive Committee of the Securities Industry and Financial Markets Association ("SIFMA").  During that time period, I assisted in obtaining federal guidance so that municipal governments could restructure outstanding auction-rate securities that failed as a result of liquidity challenges facing the municipal market. For my work in this role during the financial crisis commencing in 2008, I received the SIFMA 2012 Honor Roll Award.

5.      I have been directly involved in assisting distressed governments and have served as a banker to Jefferson County, Alabama on its 2013 sewer refinancing and Detroit, Michigan on its 2014 water and sewer debt restructuring, in getting both cases out of bankruptcy.  These two debt restructurings were each a significant component of the total debt restructured as part of the largest bankruptcies in the history of the municipal market at the time.

6.      With respect to COFINA, I have been in a lead role in all aspects of Citi's engagement, including (i) reviewing the COFINA Fiscal Plan[2] for accuracy and conformity to the Agreement in Principle,[3] (ii) in conjunction with Proskauer Rose LLP ("Proskauer Rose"), leading all negotiations with claimholders regarding the provisions of the COFINA plan of adjustment, (iii) attending virtually all of the mediation sessions regarding the COFINA plan of adjustment, (iv) speaking with market participants regarding the terms of the securities to be issued by Reorganized COFINA on the Effective Date pursuant to the plan of adjustment (the "COFINA

---

[2]   All references to Exhibits herein shall refer to the exhibits contained in the *Appendix of Consolidated Exhibits Referenced in the (I) Declaration of David M. Brownstein in Support of COFINA's Plan of Adjustment, (II) Declaration of Natalie A. Jaresko in Support of COFINA's Plan of Adjustment, and (III) Declaration of Natalie A. Jaresko in Support of Approval of the Commonwealth's 9019 Settlement Motion* filed concurrently with this declaration.  The "COFINA Fiscal Plan" means that certain Fiscal Plan of COFINA, dated October 18, 2018, and as certified by the Oversight Board on October 18, 2018, as such Fiscal Plan may be amended, restated, supplemented or modified from time to time in accordance with Section 201 of PROMESA. *See* Exhibit DX-SSS for a true and correct copy of the COFINA Fiscal Plan.

[3]   *See* Exhibit DX-C for a true and correct copy of Agreement in Principle.

Bonds"), including the marketability of such bonds, and (v) providing assistance to Proskauer Rose in drafting financial aspects of the *Third Amended Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 436] (as amended, modified, or supplemented, the "Plan")[4] and the *Disclosure Statement for the Second Amended Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17 BK 3284, ECF No. 368] (the "Disclosure Statement").

7.        I submit this declaration (the "Declaration") in support of confirmation of the Plan, the *Memorandum of Law in Support of Confirmation of the Title III Plan of Adjustment of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3282, ECF No. 4664] (the "Brief"), and the *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* [Case No. 17-3283, ECF No. 4663] (the "Reply"), and in response to the objections interposed to confirmation of the Plan by:  (a) Stephen Mangiaracina [Case No. 17-3283, ECF Nos. 4215 and 4481]; (b) Peter C. Hein [Case No. 17-3283, ECF Nos. 4585 and 4595][5]; (c) PROSOL-UTIER [Case No. 17-3283, ECF No. 4592]; (d) Mark Elliott [Case No. 17-3283, ECF No. 4598]; (e) the SEIU and UAW [Case No. 17-3284, ECF No. 4556]; (f) Manuel Natal-Albelo, *et al.* [Case No. 17-3283, ECF No. 4607]; (g) GMS Group, LLC [Case No. 17-3283, ECF Nos. 4564 and 4605]; (h) Lawrence B. Dvores [Case No. 17-3283, ECF No. 4613]; and (i) certain Puerto Rico credit unions [Case No. 17-3284, ECF No. 415].

8.        I am authorized to submit this Declaration on behalf of COFINA.  Except as otherwise indicated, and except to the extent I recite statutory background information, all facts

---

[4]    Capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

[5]    Hein also filed, seven (7) days after the objection deadline, the *Second Supplement to Objection, of Individual COFINA Subordinate Bondholder Residing in the 50 States Who Purchased at the Original Offering Prices, to Confirmation of Puerto Rico Sales Tax Financing Corporation ("COFINA") Plan Scheduled for Hearing January 16, 2019, and Response and Opposition to COFINA's Thirteenth Omnibus Objection to Individual Claim No. 10701* [ECF No. 4673].

set forth herein (or incorporated by reference herein) are based upon my personal knowledge or

the personal knowledge of employees who report to me, my review of relevant documents,

information provided to me by COFINA's advisors, my understanding based upon my familiarity

with COFINA and its financial condition, and my experience in the industry.  If I were called upon

to testify, I could and would testify competently as to the facts set forth herein.

### Background on Negotiation of COFINA's Title III Plan of Adjustment

9.      I am aware that, pursuant to Act 117-2006, approved July 4, 2006, the

Commonwealth imposed for the first time a general tax on the sales and use of a broad range of

goods and services in Puerto Rico at a rate of 5.5% and authorized its municipalities to impose an

additional separate rate of 1.5% (the sales and use tax revenues at the 5.5% rate, the "Dedicated

Sales Taxes," and the portion of the Dedicated Sales Taxes transferred to COFINA, the "Pledged

Sales Taxes").  On July 1, 2015, the Commonwealth further imposed a 4.5% sales and use tax

surcharge.  Based upon the foregoing increases, I am aware that the total SUT in Puerto Rico

(allocated among the Commonwealth, municipalities, and COFINA) has been increased to, and

remains at, 11.5%.[6]  The validity of the COFINA structure and the purported transfer of the

Pledged Sales Taxes lies at the heart of the Commonwealth-COFINA Dispute.

10.      I am aware that on May 3 and 5, 2017, the Oversight Board issued restructuring

certifications pursuant to PROMESA sections 104(j) and 206 and filed voluntary petitions for

relief for the Commonwealth and COFINA, respectively, pursuant to PROMESA section 304(a),

commencing cases under Title III thereof.

11.      I am aware that on September 8, 2017, the Commonwealth Agent commenced an

adversary proceeding seeking a resolution of the Commonwealth-COFINA Dispute (the

---

[6]    On December 10, 2018, Puerto Rico enacted Act 257-2018, which reduced the sales and use tax rate applicable
solely with respect to prepared foods sold by restaurants from 11.5% to 7%, effective October 1, 2019.

"Adversary Proceeding").[7]  On June 7, 2018, following mediation efforts to which the Oversight

Board was not a party, the Agents announced an Agreement in Principle to resolve the

Commonwealth-COFINA Dispute.  The principal term of the Agreement in Principle was the

53.65% / 46.35% allocation of the PSTBA[8] between COFINA and the Commonwealth,

respectively, and the comprehensive legal settlement of all challenges to the COFINA structure

that could be brought by the Commonwealth and its creditors.

12.      Building upon the Agreement in Principle, I am aware that on August 8, 2018,

following over two weeks of court-sanctioned mediation among interested parties (including Citi

on behalf of the Oversight Board) convened by the mediation team, the Oversight Board

announced that it had reached an agreement with certain holders and insurers of COFINA's

Existing Securities and AAFAF.  The agreement addressed the economic treatment of COFINA's

Existing Securities and the terms of new securities to be issued pursuant to a COFINA plan of

adjustment (the "Securities Terms"),[9] which Securities Terms were developed by Citi at the

request of the Oversight Board and ultimately embodied in the Original Plan Support Agreement.[10]

### The Securities Terms

13.      Citi participated actively in the development of the Securities Terms to address the

concerns of both COFINA and its bondholders.  Specifically, the Securities Terms were designed

with two focal points in mind: (i) to ensure COFINA could effectively return to the capital markets

on a go-forward basis; and (ii) to provide the existing COFINA creditors with optimal potential

---

[7]    *See* Exhibit DX-Y for a true and correct copy of the Adversary Proceeding Complaint.

[8]    The "PSTBA" means the Pledged Sales Tax Base Amount (*i.e.*, the annual dollar amount determined for each
fiscal year of the Commonwealth in accordance with Section 3 of Act 91-2006 of the Commonwealth, as amended.

[9]    *See* Exhibit  DX-YY for a true and correct copy of the presentation that details the Securities Terms.

[10]   The Original Plan Support Agreement was executed by the Oversight Board, COFINA, AAFAF, certain holders
of "Senior" Existing Securities, Ambac, National, certain holders of "First Subordinate" Existing Securities,
Assured, and Bonistas.

recovery under the circumstances.  In the context of performing this work, I was aware that creditor representatives advised Citi that they were particularly concerned about a possible double "haircut" (*i.e.*, first, a reduction to the amount of their original claims through the Plan, and second, a subsequent reduction through less-valuable replacement bonds they receive in exchange for their original bonds).

14.     The Securities Terms also provided that the COFINA Bonds to be issued pursuant to the Plan will bear fixed interest rates, including Current Interest Bonds, ("CIBs"), which pay cash interest, and Capital Appreciation Bonds ("CABs"), which accrete non-cash interest until maturity.  All COFINA Bonds are deemed to accrue interest beginning as of August 1, 2018.  The CIBs have a staggered maturity schedule and have a par value in the aggregate of approximately $9 billion.  The CABs also have a staggered maturity schedule and have an initial value of approximately $3 billion.

15.     To provide protection to holders of the COFINA Bonds, no parity debt may be issued other than refinancing bonds that produce debt savings in each year for COFINA and no maturity extensions (the "Additional Bonds Test").  After fiscal year 2028, a final maturity extension is permissible for future subordinated lien bonds, but only if the bonds are issued in compliance with the Additional Bonds Test.  Further, the Securities Terms provide that subordinated lien bonds for the benefit of the Commonwealth are payable only from the 5.50% pledged SUT if both (a) the preceding year's pledged 5.5% SUT is greater than one-and-a-half times (1.50x) the COFINA Bonds' annual debt service in any succeeding year, and (b) the preceding year's collections from the 5.5% SUT is equal to or greater than a one-and-one-tenth times (1.10x) coverage ratio to maximum annual debt service.

16.     To support the credit rating of the COFINA Bonds, the Securities Terms also provide for (a) a non-impairment covenant, which provides that (i) the pledged SUT percentage may be reduced to a rate less than 5.50% only if two rating agencies confirm at least an A2/A category rating or higher subsequent to such reduction and (ii) the pledged SUT percentage is not reduced below 3.00%, and (b) retention of Title III Court jurisdiction to ensure the protection and enforcement of the legal framework and security pledges pursuant to which the COFINA Bonds are being issued.  Further, repayment of the COFINA Bonds is to be secured by a statutory first lien on COFINA's interest in the 5.50% pledged SUT.  No parity debt may be issued other than refinancing bonds that produce debt savings in each year for COFINA and no maturity extensions.

17.     On October 19, 2018, COFINA entered into the Settlement Agreement[11] with the COFINA Agent and filed the Plan and the Disclosure Statement.  The Plan provides that, pursuant to the compromise and settlement of the Commonwealth-COFINA Dispute, the PSTBA will be allocated 46.35% / 53.65% between the Commonwealth and COFINA, respectively.  The Plan also provides for the distribution of consideration consisting of COFINA Bonds and cash, providing a recovery for holders of "Senior" Existing Securities and "First Subordinate" Existing Securities on their allowed claims.

### All Major Classes of Claims Were Represented in Plan Negotiations

18.     Building upon the Agreement in Principle, the Oversight Board (with Citi's assistance and my active participation) engaged in over two weeks of mediation among interested parties to resolve, among other things, issues regarding the relative rights of holders of "Senior" Existing Securities and "First Subordinate" Existing Securities that led to the commencement of

---

[11]  *See* Exhibit DX-E for a true and correct copy of the Settlement Agreement, dated as of October 19, 2018, between the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico, and Bettina M. Whyte, in her capacity as the court-appointed agent of the Oversight Board, as representative of the Puerto Rico Sales Tax Financing Corporation ("Settlement Agreement").

the Interpleader Action.  This mediation, again, was led by the court-appointed mediation team and involved various COFINA creditor constituencies, including those representing significant interests of "First Subordinate" Existing Securities.

19.     I understand that Assured, an insurer of approximately $274 million in "First Subordinate" Existing Securities, is aligned with the economic interest of the holders of "First Subordinate" Existing Securities and has no exposure, either through insurance coverage or beneficial ownership, to "Senior" Existing Securities.  I am aware that Assured participated fully in litigation from the perspective of "First Subordinate" Existing Securities.  Assured participated in Plan mediation and was a party to the A&R Plan Support Agreement.[12]  Additionally, retail COFINA bondholders were represented throughout the process by retail or mutual funds, representing the interests of mainland and "on-island" bondholders, and Bonistas, advocating for the interests of Puerto Rico resident bondholders, all signatories to the A&R Plan Support Agreement that included terms for the treatment of the holders of "Senior" and "First Subordinate" Existing Securities to settle the issues of the relative rights between such holders.  This settlement was also subsequently incorporated into the Plan.

20.     The Plan represents the culmination of months of intensive negotiations and discussions among all parties in interest in an independently driven process by the court-appointed mediation team.  I believe all constituencies were represented in the negotiation of the Plan. Perhaps the best indicator of the widespread creditor participation in the Plan negotiations is the multitude of creditors that executed the A&R Plan Support Agreement.  Cumulatively, such parties hold, own, beneficially own, or insure approximately an aggregate $5.6 billion in "Senior" Existing

---

[12]  *See* Exhibit DX-D for a true and correct copy of the A&R Plan Support Agreement.

Securities, and $3.7 billion in "First Subordinate" Existing Securities.[13]   I believe the process

utilized by the mediation team reached a fair resolution of Commonwealth-COFINA Dispute and

related disputes.

**The Treatment of Holders of "Senior" and
"First Subordinate" Existing Securities Is Predicated on Their Underlying Rights**

21.    *COFINA's Existing Securities and Existing Bond Resolution*.    Each series of

Existing Securities was issued pursuant to a supplemental resolution providing for its issuance and

the terms of such series, in each case adopted by the Board of Directors of COFINA.   The

Resolution,[14] together with the supplemental resolutions issued pursuant thereto, is referred to as

the "Existing Bond Resolution."   The various supplemental resolutions authorized the issuance of

both "Subordinate Bonds" and "Senior Bonds" as defined in the Resolution.[15]   As of the Petition

Date, COFINA had outstanding $17.64 billion aggregate principal and unpaid interest amount of

bonds issued under the Existing Bond Resolution, including approximately $7.76 billion of claims

arising from "Senior" Existing Securities[16] and approximately $9.88 billion of claims arising from

"First Subordinate" Existing Securities.[17]

22.    The Existing Bond Resolution in respect of "Senior" Existing Securities provides

for the issuance of additional bonds that are "subordinate to payment of the Senior Bonds and

which are further subject to the terms of priority of payment among the several Classes, if any, of

---

[13]   *See* true and correct copies of Exhibits A and B of the A&R Plan Support Agreement, a true and correct copy of
which can be found at Exhibit DX-D.

[14]   *See* Exhibit DX-K for a true and correct copy of Resolution.

[15]   A representative supplemental resolution is the Seventh Supplemental Sales Tax Revenue Bond Resolution (the
"Seventh Supplemental Resolution").  *See* Exhibit DX-XX for a true and correct copy of the Seventh Supplemental
Resolution.

[16]   Approximately $1.33 billion of the "Senior" Existing Securities are insured by Ambac, and $1.10 billion are
insured by National.

[17]   Approximately $0.25 billion of the "First Subordinate" Existing Securities are insured by Assured.

Subordinate Bonds."[18]  Many supplemental resolutions issued subsequent to the Resolution state that Bonds issued thereunder are "First Subordinate" Existing Securities.  For example, the Seventh Resolution provides that "[a]ll of the Series 2009A Bonds shall constitute "Subordinate Bonds" under the Resolution."[19]

23.    *The Subordination of the "First Subordinate" Existing Securities to the "Senior" Existing Securities*.  The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.[20]  If an event of default under the Existing Bond Resolution had occurred, the holders of "Senior" Existing Securities would have had repayment of their bonds accelerated, all to the detriment of the holders of "First Subordinate" Existing Securities.  Furthermore, holders of "Senior" Existing Securities could have established an entitlement to the face value of their bond and a "make-whole" provision before the holders of "First Subordinate" Existing Securities received any distributions. Independent of the validity of the transfer of certain sales and use taxes to COFINA, such acceleration would have required the holders of "Senior" Existing Securities to be paid in full before holders of "First Subordinate" Existing Securities could declare an event of default, accelerate "First Subordinate" Existing Securities, and exercise other remedies.  Indeed, I am aware that certain holders of "Senior" Existing Securities asserted that they had the right to be paid in full, including interest and any applicable premiums, in reliance on the aforementioned provisions.

---

[18]   Section 101 of the Resolution, a true and correct copy of which can be found at <u>Exhibit DX-K</u>.

[19]   Section 2.1 of the Seventh Supplemental Resolution, a true and correct copy of which can be found at <u>Exhibit DX-XX</u>.

[20]   *See* Exhibit A to the Plan, a true and correct copy of which can be found at <u>Exhibit DX-G</u>.

24.     I am aware of litigation regarding competing claims to funds held by The Bank of New York Mellon.  This litigation, namely the Interpleader Action and any related litigation, revolved around a dispute between holders of "First Subordinate" and "Senior" Existing Securities about their payment rights and priorities vis-à-vis each other.  The contractual subordination of the holders of "First Subordinate" Existing Securities to the "Senior" Existing Securities includes the risk that the amount of SUT available to bondholders is compromised.  The original bargained-for agreement between holders of "First Subordinate" and "Senior" Existing Securities includes the possibility that, if monies available to COFINA bondholders are reduced, holders of "Senior" Existing Securities shall be satisfied first.  This contractual subordination is not just related to the risk the SUT revenues are less than projected, but also covers all possible reasons for a reduction in revenues.  One risk was that an event of default had already occurred as asserted in the Interpleader Action and related litigation, and the acceleration provision in the Existing Bond Resolution was triggered, such that only holders of "Senior" Existing Securities were entitled to receive cash flows thereunder.  The senior-subordinate relationship and payment waterfall entitle holders of "Senior" Existing Securities to payment in full before holders of "First Subordinate" Existing Securities receive any recovery.  Enforcement of strict priority following an event of default could result in holders of "Senior" Existing Securities receiving a par recovery plus post-petition interest and other payments under the Existing Bond Resolution.  In such a situation, subordinate bondholders would not receive any recovery for many years, and the present value of any such recovery would be substantially less than the recovery subordinate bondholders would receive under the Plan.

25.     A settlement regarding the validity of the COFINA structure and the ability of the SUT to flow into COFINA was also a potential risk to COFINA bondholders, even when the

12

bondholders first purchased COFINA bonds.   The Settlement relieves holders of "First Subordinate" Existing Securities of these risks.   Additionally, the holders of "Senior" Existing Securities are receiving less than par on their bonds (approximately 93% recovery is projected for Class 1), while the holders of "First Subordinate" Existing Securities are receiving a significant recovery.  Had an event of default occurred, or the SUT revenues been insufficient to satisfy all bondholders outside of this settlement, holders of "First Subordinate" Existing Securities would have borne the risk of not receiving any monies until holders of "Senior" Existing Securities were paid in full.

26.     Further, the Settlement and securities issued pursuant to the Plan appropriately do not reflect the varying interest rates and maturities on the Existing Securities.  For the purposes of distribution pursuant to the Plan, claims arising from the Existing Securities are valued, based solely on the outstanding principal amount and accrued interest and/or accreted capital appreciation, as of the day before the commencement of COFINA's Title III Case.

**The Taxable Distribution Election Benefits All Claimholders in Classes 1 and 5**

27.     It is uncertain whether all of the COFINA Bonds issued to holders of Existing Securities under the Plan will be tax-exempt.  This would cause concern for many mainland investors that their recovery would be artificially depressed if they received taxable bonds on account of their Existing Securities.  Accordingly, the Plan contains provisions that all Puerto Rico Investors and Puerto Rico Institutions can elect to receive taxable bonds as well as a supplemental 2% cash recovery.  Recoveries for mainland investors are enhanced by this election by maximizing the amount of tax-exempt securities available for such investors.

28.     Accordingly, recoveries for all bondholders are enhanced if on-island bondholders, who generally are not subject to U.S. federal income taxation, elect to be treated in Classes 4 or 7

13

and, as a result, receive taxable bonds. When on-island bondholders elect taxable treatment, the ability of mainland bondholders to receive a higher proportion, and potentially even all, of their distribution in tax-exempt COFINA bonds is enhanced, thereby enhancing recoveries for mainland bondholders.  Providing the taxable election only to on-island bondholders ensures that both local and mainland investors receive reasonably equivalent treatment in respect of their claims.

**Reorganized COFINA's Revenues Are Sufficient to Service COFINA's Debt Obligations**

29.     One of the Oversight Board's main goals throughout the restructuring process has been to ensure that the debt service obligations on the COFINA Bonds can be serviced by Reorganized COFINA's revenues.  Critically, as a special securitization vehicle, COFINA does not provide any services to Commonwealth residents, and debt service thus is COFINA's sole purpose.

30.     Citi reviewed the COFINA Fiscal Plan for accuracy and conformity to the Agreement in Principle.  The COFINA Fiscal Plan contemplates that debt service on the COFINA Bonds equals 53.65% of the PSTBA.[21]  I, along with my colleagues at Citi, helped negotiate the terms of the Plan so that the debt service on the COFINA Bonds will be slightly below 53.65% of the PSTBA,[22] virtually identical to the amount contemplated by the COFINA Fiscal Plan. Accordingly, the debt service on the COFINA Bonds is consistent with the debt sustainability analysis contained in the COFINA Fiscal Plan.[23]

31.     Citi's analysis of the COFINA Fiscal Plan showed that reasonable assumptions— that stimulus from disaster funds, structural and fiscal reforms to the Puerto Rico economy and

---

[21]   *See* Exhibit 13 of the COFINA Fiscal Plan, a true and correct copy of which can be found at <u>Exhibit DX-SSS</u>.

[22]   *See* Exhibit A to the Plan, Footnote * ("[D]ebt service on [COFINA] Bonds will be slightly below the 53.65% PSTBA."), a true a correct copy of which can be found at <u>Exhibit DX-G</u>.

[23]   *See* Chapter 7 of the COFINA Fiscal Plan, a true and correct copy of which can be found at <u>Exhibit DX-SSS</u>.

improvements in tax collection methods will maintain a robust amount of personal consumption in the Commonwealth—justify the COFINA Fiscal Plan's SUT projections.

32.     The COFINA Fiscal Plan provides that, because the SUT is a tax of general application covering a broad range of goods and services with few exceptions, more spending and buying in the Commonwealth will generate greater SUT revenues.  Government and private disaster funding will stimulate spending and buying and, in turn, bolster SUT revenues.  Altogether, over $82 billion in disaster relief funding is projected from 2018 to 2033.[24]  Among other things, this funding will be distributed directly to individuals and families affected by Hurricane Maria and will support reconstruction on the island.[25]  Such funds are projected to stimulate spending in the Commonwealth and maintain robust SUT revenue projections.[26]  Government reforms including labor, energy and corporate reforms are projected to increase Puerto Rico's economic output by 0.95% by FY 2023.[27]  In helping to develop the COFINA Plan, my Citi colleagues and I came to believe that the COFINA Fiscal Plan is based on the reasonable assumption that this economic growth will translate to growth in SUT revenues.  Additionally, the COFINA Fiscal Plan provides that better tax collection methods and increased compliance efforts will yield a 5% increase in total SUT collected by 2021.[28]

33.     _The SUT Projections Are Amply Sufficient to Service the Debt Obligations on the COFINA Bonds_.  In FY 2019, the 5.5% SUT, from which COFINA collects "first dollars" pursuant to Section 16.3 of the Plan, is projected to be approximately $1.4 billion.[29]  My colleagues and I

---

[24]  _See id._, Section 5.1.

[25]  _See id._

[26]  _See id._

[27]  _See id._, Section 5.2.

[28]  _See id._, Section 6.2.

[29]  _See id._, at 26 (Exhibit 16).

15

therefore concluded that the SUT taxable base from which Reorganized COFINA collects its revenue in "first dollars" should more than amply cover the debt service on COFINA Bonds in FY 2019 of $420 million.[30]  As a result, I believe COFINA has a very healthy debt service coverage ratio of 3.33x (*i.e.*, $1.4 billion / $420 million) in FY 2019.  While the debt service coverage ratio is projected to decrease as the PSTBA increases by 4% each year, the 40-year average coverage ratio is still a robust 2.46x.[31]  Further, the PSTBA reaches a plateau in FY 2041 and never increases after that point, so any subsequent increase in the 5.5% SUT after FY 2041 will necessarily improve the debt service coverage ratio.  Indeed, the 5.5% SUT could remain exactly the same until FY 2058, and Reorganized COFINA would still have no issue servicing the debt obligations on the COFINA Bonds—and after FY 2058, no further payments are required on the COFINA Bonds.[32]

34.     Accordingly, in helping to develop the Plan, I came to believe that it is feasible and consistent with the COFINA Fiscal Plan.


Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct to the best of my knowledge, information, and belief.


Dated: January 12, 2019                                   /s/ David M. Brownstein
        Paris, France                                     David M. Brownstein
                                                          Managing Director
                                                          Citigroup Global Markets Inc.

---

[30]  *See id.*, at 9 (Exhibit 3).
[31]  *See id.*, at 27 (Exhibit 18).
[32]  *See id.*, at 28 (Exhibit 19).