IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| LEX CLAIMS, LLC, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ALEJANDRO GARCÍA PADILLA, et al., <br><br> Defendants. | Case No. 3:16-cv-02374 (FAB) |

**INTERVENOR-DEFENDANT AMBAC ASSURANCE CORPORATION'S MOTION TO
DISMISS PLAINTIFFS' PROMESA § 303(3) CLAIM, TO STRIKE CERTAIN
PORTIONS OF THE SAC'S PRAYER FOR RELIEF, OR, IN THE ALTERNATIVE, TO
CERTIFY THE COFINA QUESTION TO THE SUPREME COURT OF PUERTO RICO**

FERRAIUOLI LLC
   221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001

MILBANK, TWEED, HADLEY &
McCLOY LLP
   28 Liberty Street
New York, NY 10005
Telephone: (212) 530-5770
Facsimile:  (212) 822-5770

*Attorneys for Ambac Assurance Corporation*

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................. 1

FACTUAL BACKGROUND .................................................................................... 7

    A.    Key Provisions Of The Puerto Rico Constitution. .................................... 7

    B.    The Puerto Rico Legislative Assembly Establishes COFINA. .............. 8

    C.    The Puerto Rico Legislative Assembly Transfers A Portion Of IVU
        Revenues To COFINA. ............................................................................. 8

    D.    The Commonwealth Issues General Obligation Bonds To Be Paid Solely
        Out Of Monies In The Commonwealth Treasury. ................................... 9

    E.    The Governor Of Puerto Rico Issues An Executive Order Declaring A
        Moratorium On Payment Of General Obligation Debt. .......................... 11

    F.    The GO Plaintiffs Sue To Appropriate COFINA's Property. ................. 11

ARGUMENT ......................................................................................................... 12

I.      PLAINTIFFS' SECTION 303(3) CLAIM FAILS TO STATE A CLAIM
       BECAUSE THE EXECUTIVE ORDER IS NOT THE CAUSE OF THE
       TRANSFER OF IVU REVENUES. ................................................................. 12

II.     IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THOSE
       PORTIONS OF THE SAC'S PRAYER FOR RELIEF SEEKING AN
       INJUNCTION TRANSFERRING COFINA'S PROPERTY TO THE
       COMMONWEALTH. ....................................................................................... 15

    A.    The COFINA Remedial Provisions Seek Relief That Is Legally
        Unavailable. ............................................................................................. 17

    B.    The COFINA Remedial Provisions Are "Immaterial" Or "Impertinent"
        Under Rule 12(f) Because They Seek To Remedy Alleged Harms Not
        Caused By The Executive Order. ............................................................. 17

    C.    The COFINA Remedial Provisions Would Require The Court To
        Adjudicate Legal Issues Not Presented By The Section 303(3) Claim. .... 18

    D.    The COFINA Remedial Provisions Should Be Stricken To Avoid
        Eleventh Amendment Sovereign Immunity Questions. .......................... 19

III.    PLAINTIFFS' CONSTITUTIONAL CHALLENGE TO COFINA IS BARRED
       BY THE DOCTRINE OF LACHES. ............................................................. 20

IV.    SHOULD THE COURT DEEM THE MEANING OF "AVAILABLE
       RESOURCES" RELEVANT TO THE SECTION 303(3) CLAIM, THE
       QUESTION SHOULD BE CERTIFIED TO THE SUPREME COURT OF
       PUERTO RICO. ............................................................................................. 22

V.    SHOULD THE COURT DECLINE TO CERTIFY THE QUESTION, IT
      SHOULD DISMISS THE PREEMPTION CLAIM BECAUSE THE IVU
      REVENUES ARE NOT "AVAILABLE RESOURCES" WITHIN THE
      MEANING OF THE PUERTO RICO CONSTITUTION. ............................................... 26

      A.    The Constitutionality Of COFINA's Enabling Legislation Under Puerto
            Rico Law Is Subject To Highly Deferential "Rational Nexus" Review. .............. 27

      B.    The Legislative Assembly's Transfer Of IVU Revenues To COFINA Is
            Authorized By The Text And Structure Of The Puerto Rico Constitution .......... 28

            1.    The Puerto Rico Constitution's GO protections contemplate that
                  revenues raised by Commonwealth legislation may be transferred
                  outside the control of the Commonwealth. ................................................. 30

            2.    The COFINA structure is consistent with, and contemplated by,
                  the Puerto Rico constitutional scheme. ....................................................... 33

            3.    Plaintiffs' argument that permitting COFINA to stand would
                  undermine the constitutional GO protections is based on a
                  misreading of the Puerto Rico Constitution. .............................................. 35

      C.    The Opinions Of Three Puerto Rico Secretaries Of Justice And The Case
            Law Of Other Jurisdictions Support The Constitutionality Of The
            COFINA Structure. ............................................................................................ 37

            1.    The Secretary of Justice opinions finding the COFINA structure
                  constitutional are highly persuasive authority. ......................................... 38

            2.    The Case Law Of Other Jurisdictions Has Upheld The
                  Constitutionality Of Similar Securitization Structures. .......................... 38

                  a.    A promise of priority to appropriated funds does not
                        guarantee the availability, or restrict the transfer, of any
                        particular revenue stream. .............................................................. 38

                  b.    Constitutional requirements as to treatment of treasury
                        funds do not amount to a requirement that all legislatively
                        generated funds be covered into the treasury. ................................. 40

                  c.    Courts readily uphold legislation transferring revenue
                        streams to fund municipal corporations so long as the
                        legislation is appropriately cabined. .............................................. 41

      CONCLUSION ................................................................................................................. 45

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AES Puerto Rico, L.P. v. Trujillo-Panisse*,
  133 F. Supp. 3d 409 (D.P.R. 2015)................................................................7

*Anderson v. Regan*,
  425 N.E.2d 792 (N.Y. 1981).................................................40, 41, 43

*Assured Guar. Corp. v. García-Padilla*,
  Nos. 16-1037, 16-1095, 2016 WL 5794715 (D.P.R. Oct. 4, 2016).......................20

*Baro v. Murphy*,
  207 N.E.2d 593 (Ill. 1965)...........................................40, 41, 42, 43

*Barton v. Summers*,
  293 F.3d 944 (6th Cir. 2002)..................................................20

*Boivin v. Black*,
  225 F.3d 36 (1st Cir. 2000)..................................................29

*Brockett v. Spokane Arcades, Inc.*,
  472 U.S. 491 (1985))..................................................23

*Brushaber v. Union Pac. R. Co.*,
  240 U.S. 1 (1916)..................................................31

*Carrero-Ojeda v. Autoridad de Energia Electrica*,
  755 F.3d 711 (1st Cir. 2014)..................................................12

*Dallas Cnty. v. McCombs*,
  140 S.W.2d 1109 (Tex. 1940)..................................................44

*Defendini Collazo et al. v. E.L.A., Cotto*,
  Nos. RE-196, 199 90-371, 1993 WL 839857 (P.R. July 15, 1993).......................28

*DiLuglio v. New England Ins. Co.*,
  959 F.2d 355 (1st Cir. 1992)..................................................27

*Fantasy, Inc. v. Fogerty*,
  984 F.2d 1524 (9th Cir. 1993) ...............................16, 18, 19

*Fed. Deposit Ins. Corp. v. Mun. of Ponce*,
  904 F.2d 740 (1st Cir. 1990)..................................................38

*Flast v. Cohen*,
    392 U.S. 83 (1968)................................................................................................19

*Franklin Cal. Tax-Free Tr. v. Puerto Rico*,
    85 F. Supp. 3d 577, 614 (D.P.R. 2015)..............................................................17

*Friedman v. Am. Sur. Co. of N.Y.*,
    141 S.W.2d 570 (Tex. 1941)................................................................41, 42, 43

*Gibbons v. Ogden*,
    22 U.S. 1 (1824)..................................................................................................29

*Gipson v. Ingram*,
    223 S.W.2d 595 (Ark. 1949)........................................................................41, 43

*Graham v. Ill. State Toll Hwy. Auth.*,
    695 N.E.2d 630 (Ill. 1998)...........................................................................42, 43

*Greenless v. Almond*,
    277 F.3d 601 (1st Cir. 2002)........................................................................20, 21

*Hamilton v. Chendehen*,
    No. 1:15-cv-00661, 2016 WL 1402277 (E.D. Cal. Feb. 26, 2016) ....................15

*Hibbs v. Winn*,
    542 U.S. 88 (2004)..............................................................................................34

*Hickel v. Cowper*,
    874 P.2d 922 (Alaska 1994).........................................................................42, 43

*I.N.S. v. Chadha*,
    462 U.S. 919 (1983)............................................................................................35

*Interior Developers v. Mun. de San Juan*,
    177 D.P.R. 693 (2009) .......................................................................................28

*K-Mart Corp. v. Oriental Plaza, Inc.*,
    875 F.2d 907 (1st Cir. 1989)..............................................................................21

*Khan v. K2 Pure Solutions, L.P.*,
    No. 12-cv-05526, 2013 WL 6503345 (N.D. Cal. Dec. 4, 2013)..........................16

*King Cnty. v. Taxpayers of King Cnty.*,
    949 P.2d 1260 (Wash. 1997)........................................................................42, 43

*M.&B.S., Inc. v. Dept. de Agricultura*,
    118 D.P.R. 319 (P.R. 1987) ...............................................................................28

*Marks v. Cent. Intelligence Agency,*
    590 F.2d 997 (D.C. Cir. 1978) ........................................................................34

*Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan,*
    817 F. Supp. 2d 515 (E.D. Pa. 2011) ....................................................16, 17, 19

*Medina & Medina v. Country Pride Foods,*
    122 D.P.R. 172 (P.R. 1988) .......................................................................23, 24

*Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau,*
    979 F. Supp. 2d 104 (D.D.C. 2013) ................................................................20

*Municipality of Metro. Seattle v. O'Brien,*
    544 P.2d 729 (Wash. 1976) .......................................................................39, 41

*N.J. Sports & Exposition Auth. v. McCrane,*
    292 A.2d 545 (N.J. 1972) ..........................................................................42, 43

*Nieves ex rel. Nieves v. Univ. of P.R.,*
    7 F.3d 270 (1st Cir. 1993) ...............................................................................27

*OneWest Bank N.A. v. Lehman Bros. Holding Inc.,*
    No. 14-CV-8916, 2015 WL 1808947 (S.D.N.Y. Apr. 20, 2015) ..................15

*Opinion of the Justices to the House of Representatives,*
    471 N.E.2d 1266 (Mass. 1984) .............................................................41, 42, 43

*Pan Am. Computer Corp. v. Data Gen. Corp.,*
    112 D.P.R. 780 (P.R. May 14, 1982) ..............................................................25

*Penn Mut. Life Ins. Co. v. City of Austin,*
    168 U.S. 685 (1898) ........................................................................................22

*Providence Bank v. Billings,*
    29 U.S. 514 (1830) ..........................................................................................31

*Puerto Rico v. Franklin Cal. Tax-Free Tr.,*
    136 S. Ct. 1938 (2016) ....................................................................................29

*Questrom v. Federated Dept. Stores, Inc.,*
    41 F. Supp. 2d 294 (S.D.N.Y. 1999) .........................................................16, 19

*Quirk v. Municipal Assistance Corporation for the City of New York,*
    363 N.E.2d 549 (N.Y. 1977) .....................................................................38, 39

*Rodriguez–Suris v. Montesinos,*
    123 F.3d 10 (1st Cir. 1997) ..............................................................................27

*Roman-Samot v. Pontifical Catholic Univ. of P.R.*,
    No. 10-1879, 2011 WL 5025978 (D.P.R. Oct. 21, 2011) ......................................................16

*Romero v. Colegio de Abogados de Puerto Rico*,
    154 D.P.R. 370 (P.R. 2001) ........................................................................................23, 24

*Ruiz v. Bally Total Fitness Holding Corp.*,
    496 F.3d 1 (1st Cir. 2007) ......................................................................................................29

*Saratoga Harness Racing Ass'n v. Agriculture & N.Y. State Horse Breeding Dev.*
    *Fund*, 238 N.E.2d 730 (N.Y. 1968) ...........................................................35, 40, 41, 42

*Schulz v. State of N.Y.*,
    615 N.E.2d 953 (N.Y. 1993) ...........................................................................................21, 22

*SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*,
    831 N.E.2d 725 (Ind. 2005) ...................................................................................................22

*Solomon v. North Shore Sanitary District*,
    48 Ill. 2d 309 (Ill. 1971) .........................................................................................................22

*Sosa v. Alvarez-Machain*,
    542 U.S. 692 (2004) ...............................................................................................................34

*SRSNE Site Grp. v. Advance Coatings Co.*,
    No. 3:12-CV-443, 2014 WL 671317 (D. Conn. Feb. 21, 2014) ............................................15

*Tatum v. Wheeless*,
    178 So. 95 (Miss. 1938) ...................................................................................................41, 43

*Velez v. Srio. de Justicia*,
    115 D.P.R. 533 (P.R. 1984) ...................................................................................................28

*Wash. Legal Found. v. Mass. Bar Found.*,
    993 F.2d 962 (1st Cir. 1993) ..................................................................................................12

*Washington v. Crab Addison, Inc.*,
    No. C 08-5551, 2010 WL 2528963 (N.D. Cal. June 18, 2010) .......................................16, 18

*Watchtower Bible Tract Soc. of N.Y., Inc. v. Municipality of Santa Isabel*,
    Civ. No. 04-1452, 2013 WL 2554879 (D.P.R. June 11, 2013).........................................23, 24

**Rules**

Fed. R. Civ. P. 12(b)(6)................................................................................................. *passim*

Fed. R. Civ. P. 12(f) ..................................................................................................... *passim*

P.R. R. Civ. P. 52.2(d) ........................................................................................................25

Supreme Court of Puerto Rico Rule 25 ...............................................................................25

**Statutes**

13 L.P.R.A. § 11a(a) .......................................................................................................8

13 L.P.R.A. § 12 ................................................................................................. *passim*

13 L.P.R.A. § 13 .............................................................................................................44

13 L.P.R.A. § 13(d)................................................................................................8, 36, 44

13 L.P.R.A. § 41 ...............................................................................................10, 32, 35

23 L.P.R.A. § 104(c).......................................................................................................10

48 U.S.C. § 2121 ............................................................................................................25

48 U.S.C. § 2163(3) .................................................................................................2, 13

48 U.S.C. § 2165 ............................................................................................................20

Puerto Rico Oversight, Management, and Economic Stability Act Section 303(3).............. *passim*

**Constitutional Authorities**

United States Constitution .........................................................................................5, 20, 21

New York Constitution .................................................................................................40

Puerto Rico Constitution............................................................................................ *passim*

Washington Constitution .................................................................................................31

**Other Authorities**

5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* §
    1382 (3d ed. 1990) ..................................................................................................18

Merriam-Webster Online Dictionary, https://www.merriam-
    webster.com/dictionary/available ...........................................................................29

Intervenor-Defendant Ambac Assurance Corporation ("Ambac") respectfully submits this Motion to Dismiss Plaintiffs' PROMESA § 303(3) Claims, to Strike Certain Portions of the SAC's Prayer for Relief, or, in the Alternative, to Certify the COFINA Question to the Supreme Court of Puerto Rico (the "Motion"). By this Motion, Ambac moves (1) to dismiss the Second Cause of Action of the Second Amended Complaint ("SAC"), and the Twelfth Cause of Action to the extent it enforces the Second, for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure; (2) in the alternative, to strike, pursuant to Rule 12(f), those portions of the SAC's Prayer for Relief that seek an injunction prohibiting the transfer of any sales and use tax proceeds to the Puerto Rico Sales Tax Financing Corporation ("COFINA") and requiring that any such monies currently held by or on behalf of COFINA be diverted to the Treasury of the Commonwealth of Puerto Rico (the "Commonwealth"); (3) to bar the Second and Twelfth Causes of Action on equitable grounds under the doctrine of laches; and (4) to certify to the Supreme Court of Puerto Rico the question whether COFINA's property constitutes "available resources" of the Commonwealth for purposes of Article VI, Section 8 of the Puerto Rico Constitution.

## PRELIMINARY STATEMENT

This action purports to challenge an executive order (the "Executive Order") by which the Governor of Puerto Rico declared a moratorium on the payment of debt backed by the Commonwealth's full faith, credit, and taxing power (also known as general obligation or "GO" debt). Plaintiffs' real aim, however, is different: the wholesale appropriation of a revenue stream that was legally declared the property of COFINA by Puerto Rico statute a decade ago. Although Plaintiffs portray the COFINA structure as a "scheme" (or, in their more heated press releases, a "scam"), it was in fact established in plain view following debate and passage by both chambers of the Puerto Rico Legislative Assembly, analysis by the Puerto Rico Secretary of

Justice, and the supporting opinion of sophisticated bond counsel. Indeed, many Plaintiffs purchased their GO holdings with full awareness of the COFINA structure, as the applicable GO offering documents expressly disclosed that, under Puerto Rico law, the revenue stream at issue would not be available to repay GO debt.

COFINA has been essential to the Commonwealth's financing efforts, permitting it to access the capital markets on terms far preferable to what would otherwise be available. The Commonwealth has reaped significant benefit from this structure over the last decade. If it were allowed to be dismantled, not only would these structured finance opportunities disappear (imperiling the Commonwealth's recovery efforts), but COFINA's creditors—a large portion of whom are Puerto Rican individual retail investors—would suffer substantial losses, as COFINA would be deprived of the means to repay its debts. Meanwhile, the value of Plaintiffs' holdings—which likely were bought at distressed levels as a deliberate litigation play[1]—would skyrocket as GO bondholders coopt a revenue stream that was expressly excluded from GO bargained-for consideration.

The purported vehicle for Plaintiffs' frontal assault on COFINA is Section 303(3) of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which provides that "unlawful executive orders that alter, amend, or modify the rights of holders of any debt of the territory . . . shall be preempted." 48 U.S.C. § 2163(3). Plaintiffs' allegations do not stop with the theory that the Executive Order is unlawful because it suspends the payment of GO debt while applying resources available to the Commonwealth to other purposes. Such a theory, while certainly viable and indeed consistent with Ambac's position in other litigation, would not serve Plaintiffs' ultimate aim of dismantling COFINA and appropriating its property. Instead,

---

[1] Notably, the very name of the hedge fund plaintiff at the top of the caption—"Lex Claims LLC"— alludes to investments in legal claims.

Plaintiffs take their theory one step further and beyond the bounds of logic, alleging that the Executive Order is unlawful because it supposedly causes, or at least does not stop, the transfer of certain sales and use tax revenues to COFINA, which Plaintiffs contend constitute "available resources" that must be used to pay GO debt under the Puerto Rico Constitution.

Plaintiffs' theory that these sales and use taxes—known in Spanish as Impuesto sobre Ventas y Uso ("IVU")—are necessarily "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution is fundamentally flawed. First, by Plaintiffs' own allegations, the IVU revenues belong to COFINA and are not available to the Commonwealth: under COFINA's enabling legislation, they are the property of COFINA and are required to be deposited directly in a trust account for the benefit of COFINA, such that Puerto Rico's Secretary of the Treasury is unable to access them. Second, the fact that they are rendered unavailable by legislative design, far from rendering the transfer constitutionally problematic, is both permissible and in fact contemplated by the Puerto Rico Constitution, including the very provisions that provide protections for GO debt. Third, three Puerto Rico Secretaries of Justice, under different administrations, have endorsed COFINA's compliance with the Puerto Rico Constitution and the highest courts of states around the country have upheld similar financing structures against analogous lines of constitutional attack.

But this Court need not decide whether the IVU revenues belonging to COFINA are "available resources" within the meaning of the Puerto Rico Constitution, for four reasons:

1. The SAC's sole cause of action advancing that theory—a claim of preemption under Section 303(3) of PROMESA—fails to state a claim and accordingly must be dismissed.

2. Alternatively, even if the SAC stated a claim under Section 303(3), the Court should strike those portions of the SAC's Prayer for Relief that seek an injunction barring the statutorily

directed transfer of IVU revenues to COFINA and requiring that such funds instead be taken by the Commonwealth and applied to payment of GO debt.

3. Plaintiffs' challenge to the constitutionality of the COFINA structure is barred by the doctrine of laches.

4. Should the Court determine that the question whether the funds belonging to COFINA constitute "available resources" under the Puerto Rico Constitution is relevant to the disposition of Plaintiffs' Section 303(3) claim, and that that question is appropriately advanced at this late date, Ambac respectfully requests that the Court certify the question to the Supreme Court of Puerto Rico.

***Failure to state a preemption claim under Section 303(3).*** Plaintiffs allege that the Executive Order is unlawful and preempted because it supposedly diverts, or at least fails to halt the transfer of, IVU revenues to COFINA. This theory is belied by the Executive Order itself. The Executive Order does not cause the transfer of IVU revenues to COFINA, nor does it "permit" or "allow" such revenues to be transferred to COFINA. Indeed, had the Executive Order halted the transfer of IVU revenues to COFINA—as Plaintiffs suggest it should have in order to pass constitutional muster—such an order would have violated COFINA's enabling legislation, which renders the IVU revenues COFINA's property. Ultimately, the real target of Plaintiffs' challenge to COFINA is the enabling legislation itself, not the Executive Order. Such a challenge to a decade-old Puerto Rico statute, even if viable (it is not), simply does not fit within the contours of Section 303(3). Preempting the Executive Order will not result in an alternative flow of funds under the COFINA statute. *See infra* Point I.

***Motion to strike the prayer for injunctive relief invalidating the COFINA structure.*** In the alternative, the Court should strike those portions of the SAC's Prayer for Relief seeking an injunction that would dismantle the COFINA structure and appropriate COFINA's property (the

"COFINA Remedial Provisions"). First, the relief sought by the COFINA Remedial Provisions is not legally available to Plaintiffs. The remedy for a preemption claim is an injunction against enforcement of the preempted law, not an injunction against activity that is in no way caused by the preempted law. Second, the COFINA Remedial Provisions are "impertinent" and "immaterial" under Rule 12(f) because the issue advanced by the COFINA Remedial Provisions (whether the Commonwealth's statutory transfer of IVU revenues to COFINA is unlawful) has nothing to do with the underlying preemption question (whether the Executive Order is unlawful). Third, the COFINA Remedial Provisions ask the Court to address legal issues that are not necessary to resolution of the Section 303(3) claim, effectively pressing the Court to issue an impermissible advisory opinion. Finally, the COFINA Remedial Provisions—which seek relief that would not only halt an alleged violation of federal law, but would take the further step of telling the Commonwealth government how to allocate its own money—present potential sovereign immunity questions under the Eleventh Amendment that should be declined on constitutional avoidance grounds. *See infra* Point II.

*Laches doctrine.* Even if Plaintiffs had stated a claim or appropriately tethered their requests for relief to the underlying cause of action (they did neither), their challenge to the constitutionality of the COFINA structure—more than a decade after it was created—should be barred on equitable grounds by the doctrine of laches. Any party who felt aggrieved by the Legislative Assembly's grant of a property interest in IVU revenues to COFINA could have, and should have, challenged that grant many years ago. During a decade in which no such challenge was advanced, COFINA has issued approximately $16.3 billion in principal amount of bonds. Having sat idly by, Plaintiffs should not be permitted to hatch a lawsuit years later in a transparent attempt to extract negotiating leverage and increase the value of their bonds, all the while causing massive disruption to the Commonwealth's public finances. *See infra* Point III.

*Certification to the Supreme Court of Puerto Rico.* Should the Court determine that the question whether the IVU revenues qualify as "available resources" under the Puerto Rico Constitution is necessary for the disposition of the Section 303(3) claim, the Court should certify the question to the Supreme Court of Puerto Rico. The question presents a pure and undecided issue of Puerto Rico constitutional law, the resolution of which is certain to have broad, long-lasting consequences for the people and government of the Commonwealth. Thus, the standards governing certification under the Puerto Rico Rules of Civil Procedure would be easily satisfied, and the interests of comity would be served by deferring to the Supreme Court of Puerto Rico's unique authority in such matters. This is particularly so in light of the important role that COFINA has played in permitting access to the capital markets, and that similar securitization structures are likely to play in future access to the capital markets. *See infra* Point IV.

*The constitutional validity of the COFINA structure.* Should the Court determine to decide the issue despite the foregoing, the Court should affirm that the IVU revenues belonging to COFINA are not available resources of the Commonwealth that can be used to repay GO debt. First, under the plain meaning of the Puerto Rico Constitution, the IVU revenues are unavailable to the Commonwealth—they cannot be accessed or obtained by the Puerto Rico Treasury Secretary. Second, the text and structure of the Puerto Rico Constitution as a whole makes clear that not all revenues generated by Puerto Rico legislation will be deposited into the Commonwealth Treasury, and imposes no restriction on the Legislative Assembly's power to grant property interests in particular revenue streams (*i.e.*, to declare particular revenue streams *not* to be "available resources"). Third, the opinions of multiple Secretaries of Justice (to whom courts in the First Circuit give deference) and the overwhelming weight of judicial precedent support the constitutionality of the COFINA structure. Accordingly, even if the Section 303(3) claim somehow hinged on the constitutionality of COFINA (it does not), that claim should

nevertheless be dismissed because the IVU revenues are demonstrably not "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution.  *See infra* Point V.

## FACTUAL BACKGROUND[2]

### A.  Key Provisions Of The Puerto Rico Constitution.

Article VI, Section 2 of the Puerto Rico Constitution vests in the Legislative Assembly the exclusive power to impose and collect taxes, providing in broad language that that power "shall be exercised as determined by the Legislative Assembly."  P.R. Const. art. VI, § 2. Section 2 imposes no limitations on the exercise of that taxing power.  In particular, neither Section 2 nor any other provision of the Puerto Rico Constitution requires that funds raised by Commonwealth legislation be deposited in the Commonwealth Treasury.

Article VI does, however, circumscribe the Legislative Authority's broad taxing power with specific protections for GO debt.  First, Section 2 imposes a limit on the amount of debt that can be issued in a given fiscal year for which the Commonwealth pledges its "full faith, credit and taxing power."  *Id.*  The formula for measuring that GO debt limit is determined by reference to the amount of money "raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico" in the two preceding fiscal years.  *Id.*

Second, Article VI, Section 7 imposes a balanced budget requirement, providing that "the appropriations made for any fiscal year shall not exceed the total resources, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  *Id.* § 7.  With respect to GO debt (as well as other obligations of the Commonwealth), Section 7 effectively requires that the Commonwealth

---

[2] Unless otherwise specified, "¶ __" refers to paragraphs in the SAC.  "Ex. __" refers to exhibits to the Declaration of Roberto A. Cámara-Fuertes, dated March 20, 2017, submitted herewith.  This Court may properly consider these exhibits on the instant pleadings motion because they are either incorporated by reference in the SAC or are a matter of public record and are not offered for the truth of the contents thereof.  *See, e.g., AES Puerto Rico, L.P. v. Trujillo-Panisse*, 133 F. Supp. 3d 409, 415 (D.P.R. 2015) (Besosa, J.).

appropriate sufficient funds to meet those obligations, or raise taxes to supply the necessary funds if estimated revenues are insufficient to meet them.

      Third, Article VI, Section 8 guides the executive branch's disbursement of funds should "available resources" fall short of the estimated resources referenced in Section 7:

> In case the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

*Id.* § 8.  Section 2 creates a limited private right of action to enforce this provision, stating that "any holder of [GO] bonds or notes" may sue to compel the Secretary of the Treasury to apply "available resources" to the payment of GO debt "in any case provided for by Section 8 of this Article VI."  *Id.* § 2.

      **B.**      <u>The Puerto Rico Legislative Assembly Establishes COFINA.</u>

      COFINA is a public corporation and instrumentality of the Commonwealth, created by the Puerto Rico Legislative Assembly in 2006 in response to an urgent fiscal and economic crisis—at that time one of the worst in the Commonwealth's history.  (¶ 103; *see also* Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246, 247 (codified as amended at P.R. Laws Ann. tit. 13, § 12).)  COFINA is "a corporate and political entity independent and separate from the Commonwealth of Puerto Rico," 13 L.P.R.A. § 11a(a), designed "for the purpose of issuing bonds and utilizing other financing mechanisms," *id.* § 11a(b).

      **C.**      <u>The Puerto Rico Legislative Assembly Transfers A Portion Of IVU Revenues To COFINA.</u>

      Bonds issued by COFINA do "not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities," *id.* § 13(d), and are not backed by a pledge of the Commonwealth's full faith, credit, and taxing power.  (¶ 15 ("[B]onds issued by COFINA

are *not* covered by any pledge of the Commonwealth's good faith, credit, or taxing power and
are *not* public debt for purposes of the Puerto Rico Constitution") (emphasis in original).)
Rather, COFINA's bonds are payable solely from a revenue stream belonging to COFINA under
its enabling legislation.

Specifically, COFINA's enabling legislation created a special fund known as the *Fondo
de Interes Apremiante*, or "FIA." (¶ 103; 13 L.P.R.A. § 12.) The statute provided that all funds
deposited in the FIA and all future funds required to be deposited therein "are hereby transferred
to, and shall be the property of COFINA." 13 L.P.R.A. § 12. The funds to be deposited in the
FIA are the "first revenues" of the IVU up to a certain minimum amount, with COFINA then
receiving a percentage of IVU revenues generated above the minimum amount. *Id.* The funds
belonging to COFINA are to be "directly deposited in FIA at the time of receipt and shall not be
deposited in the Treasury of Puerto Rico." *Id.* The funds are first deposited in an account held
by COFINA at Banco Popular de Puerto Rico, and are subsequently transferred to a trust account
maintained at Bank of New York Mellon, the COFINA Trustee. (¶ 97.) Under the governing
bond resolution, COFINA pledged its property interest in the IVU revenues to the COFINA
Trustee for the payment of, and as security for, any bonds issued by COFINA. (Ex. A § 501.)

According to the SAC, more than $17.2 billion in bonds issued by COFINA is currently
outstanding. (¶ 96.) In 2007, Ambac agreed to insure certain senior capital appreciation bonds
totaling approximately $808.5 million in gross par amount at issuance, with maturities beginning
in 2047 and continuing through 2054. (Ex. B at 1.)

D. **The Commonwealth Issues General Obligation Bonds To Be
Paid Solely Out Of Monies In The Commonwealth Treasury.**

Plaintiffs are holders of the Commonwealth's general obligation debt—*i.e.*, bonds issued
directly by the Commonwealth and backed by a pledge of the Commonwealth's full faith, credit,

and taxing power, or bonds guaranteed by the Commonwealth.  (¶ 5.)  As noted, the Puerto Rico Constitution provides that, in the event the resources available to the Commonwealth in a given fiscal year are insufficient to meet appropriations, those resources must be applied first to payment of GO debt.  P.R. Const. art. VI, § 8.  The remaining funds are then allocated according to a priority scheme set by statute.  *See* 23 L.P.R.A. § 104(c).

The statutes governing the issuance and repayment of GO debt provide that, if the originally contemplated source of funds is insufficient to cover debt service, the only additional source of funds for repayment are "available funds in the Commonwealth Treasury."  13 L.P.R.A. § 41; *see also id.* § 62 (Commonwealth guaranty obligations payable only from "unencumbered funds in the Treasury of Puerto Rico"); *id.* § 35 (redemption or purchase of GO bonds payable "from any available funds in the insular treasury"); *id.* § 38 (GO Tax Revenue Anticipation Notes "shall be paid . . . from any available funds in the Commonwealth Treasury").  The GO bond documents cited in the SAC (¶¶ 112-119) affirm this structure, stating that the GO bonds are to be paid by the Secretary of the Treasury "from any funds in the Treasury of the Commonwealth available for such purpose in the fiscal year for which said payment is required."  (Ex. C § 19.)

As noted, COFINA's enabling legislation provides that COFINA's IVU revenues "shall not be deposited in the Treasury of Puerto Rico."  13 L.P.R.A. § 12.  The statute further provides that the IVU revenues shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."  *Id.*  The Official Statements for GO bonds expressly disclose to potential purchasers that, under Puerto Rico law, the IVU revenues belonging to COFINA "do not constitute 'available resources' of the Commonwealth" and that such funds are therefore "not available for the payment of principal of and interest on the [GO] Bonds."  (Ex. D at 29.)

E.      **The Governor Of Puerto Rico Issues An Executive Order Declaring A Moratorium On Payment Of General Obligation Debt.**

On June 30, 2016, the Governor of Puerto Rico issued the Executive Order. Among other things, the Executive Order purported to suspend the Commonwealth's obligation to make payments on GO debt, with the exception of certain payments owed to the Government Development Bank for Puerto Rico. (¶ 91.) The Executive Order purported to extend similar payment moratoria that had already been declared with respect to other municipal corporations— issuers whose pledged revenues were, unlike COFINA's, available to the Commonwealth and thus expressly subject to "clawback" to make payments on GO debt in the event of a fiscal year shortfall.[3] The Executive Order did not mention, and took no action regarding, COFINA or the IVU revenues. (SAC Ex. E.)

F.      **The GO Plaintiffs Sue To Appropriate COFINA's Property.**

Plaintiffs assert a grab bag of claims sounding in United States and Puerto Rico constitutional law, as well as claims alleging violations of PROMESA. (¶¶ 126-199.) Plaintiffs concede that most of these claims are stayed by PROMESA; per this Court's Opinion and Order dated February 17, 2017, however, the PROMESA-based claims are permitted to proceed. (Dkt. No. 184 at 27.) Because Ambac has intervened in this action solely to defend its interest in COFINA, this Motion challenges only the Second Cause of Action—the sole substantive cause of action attacking COFINA that is not stayed by PROMESA[4]—and related requests for relief. This Motion likewise seeks dismissal of the Twelfth Cause of Action under 42 U.S.C.§ 1983, but only to the extent it is asserted to enforce the Second Cause of Action.

---

[3]     The other municipal corporations included the Puerto Rico Highways and Transportation Authority (HTA), Puerto Rico Infrastructure Financing Authority (PRIFA), Metropolitan Bus Authority (AMA), Puerto Rico Public Finance Corporation (PFC), and the Public Buildings Authority (PBA).

[4] Of course, Ambac reserves the right to defend against other claims attacking COFINA that are currently subject to the PROMESA stay at the appropriate time should the stay expire or be lifted.

The Second Cause of Action alleges that the Executive Order is unlawful and therefore preempted by Section 303(3) of PROMESA. (¶¶ 140-141.) Although the SAC suggests that the Executive Order is unlawful because the Commonwealth is in default on GO debt while applying available resources to other uses, in alleged violation of the Puerto Rico Constitution (¶¶ 77-79), the SAC's principal theory is that the Executive Order is unlawful because it does not prohibit the statutorily required transfer of IVU revenues to COFINA. (*Id.* ¶¶ 20, 92, 109.) As a remedy for their preemption claim, Plaintiffs request not only that the Court invalidate and bar enforcement of the Executive Order, but also that it prohibit the legally mandated transfer of IVU revenues to COFINA and direct any IVU revenues currently or in the future held by or on behalf of COFINA to be diverted to the Commonwealth Treasury. (*Id.* at 67-68.)

## **ARGUMENT**

**I.** **PLAINTIFFS' SECTION 303(3) CLAIM FAILS TO STATE A CLAIM BECAUSE THE EXECUTIVE ORDER IS NOT THE CAUSE OF THE TRANSFER OF IVU REVENUES.**

In evaluating a motion to dismiss, the Court's "sole inquiry . . . is whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiff[], the complaint states a claim for which relief can be granted. In other words, we ask whether the complaint contain[s] sufficient factual matter to state a claim to relief that is plausible on its face." *Carrero-Ojeda v. Autoridad de Energia Electrica*, 755 F.3d 711, 717 (1st Cir. 2014) (internal citations and quotation marks omitted). Although a court in ruling on a pleadings motion must accept all well-pleaded factual allegations as true, it need not defer to a plaintiff's characterization of the law. *See Wash. Legal Found. v. Mass. Bar Found.*, 993 F.2d 962, 971 (1st Cir. 1993) ("Because only well-pleaded facts are taken as true, we will not accept a complainant's unsupported conclusions or interpretations of law.").

To state a claim of preemption under Section 303(3) of PROMESA, a plaintiff must plead facts showing that an executive order has been issued which, as relevant here, unlawfully alters, amends, or modifies the debt of the territory. 48 U.S.C. § 2163(3). The SAC's Second Cause of Action alleges that the Executive Order is unlawful and therefore preempted by Section 303(3) of PROMESA not because it declares a moratorium on payment of GO debt, but because it purportedly "diverts" IVU revenues or "permits" or "allows" them to be transferred to COFINA. On the face of the SAC and the material incorporated by reference therein, Plaintiffs' Section 303(3) claim is premised on a gross mischaracterization of the Executive Order, which is in no way the cause of any transfer of money to COFINA. Accordingly, the Second and Twelfth Causes of Action should be dismissed pursuant to Rule 12(b)(6) for failure to state a claim.

Plaintiffs' description of the Executive Order bears little resemblance to the actual text of the Executive Order itself. For instance, Plaintiffs allege that "[t]he Commonwealth, ***acting pursuant to the Executive Order***, has . . . unlawfully diverted . . . 'available resources' to COFINA." (¶ 92 (emphasis added).) This is false: the Executive Order nowhere mentions COFINA, and as it relates to GO debt merely declares "a moratorium on the Commonwealth's obligation to make payments on any bonds or notes issued or guaranteed by the Commonwealth" (excepting obligations to GDB). (SAC Ex. E at 2 ¶ 1.) Elsewhere, Plaintiffs allege that "[t]he Executive Order . . . ***prevents*** the Commonwealth from using 'available resources' held by COFINA to repay holders of Constitutional Debt." (¶ 109 (emphasis added).) Also false: the Executive Order says nothing one way or the other regarding the availability to the Commonwealth of IVU revenues. It is not the Executive Order that ***prevents*** the Commonwealth from accessing those revenues; it is COFINA's enabling legislation that takes them out of the Commonwealth's reach. *See* 13 L.P.R.A. § 12 (IVU revenues "are hereby transferred to, and shall be the property of COFINA" and "shall not be deposited in the Treasury of Puerto Rico").

Nor is Plaintiffs' Section 303(3) claim salvaged by the SAC's repeated allegations that the Executive Order somehow "permits" or "allows" the IVU revenues to be transferred to COFINA. (*See, e.g.*, SAC ¶ 20 ("By allowing SUT revenues to flow to COFINA and consequently allowing COFINA to continue paying its bondholders, the Executive Order permits the application of 'available revenues' to bonds issued by COFINA instead of the Commonwealth's Constitutional Debt."); *see also id.* ¶¶ 92, 109.) In substance, Plaintiffs' theory is that anything not affirmatively prohibited by the Executive Order is caused by the Executive Order—*i.e.*, that its failure to halt the transfer of IVU revenues to COFINA means that the Executive Order is the source of that transfer. Of course, if that were true, one would expect that invalidation of the Executive Order would remedy the alleged harm. But as Plaintiffs recognize, striking down the Executive Order would have ***no effect*** on the transfer of IVU revenues to COFINA.

Indeed, Plaintiffs' theory that the Executive Order violates the law by failing to halt the transfer of IVU revenues to COFINA is untenable because such an order would itself violate Puerto Rico law. Plaintiffs cannot disregard the fact that COFINA's enabling legislation is a valid and enforceable law unless and until a court of competent jurisdiction declares otherwise. And the statute expressly requires, with no exceptions, that the IVU revenues "shall be directly deposited in the [*Fondo de Interes Apremiante*] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." 13 L.P.R.A. § 12. The Governor is not free to issue an executive order that overrides that statutory command. Indeed, such an order would itself violate Puerto Rico law and be preempted under Section 303(3).

Put simply, if Plaintiffs believe that the transfer of IVU revenues to COFINA is illegal, the target of their claim must be the cause of that transfer—*i.e.*, COFINA's enabling legislation, ***not*** the Executive Order. And although the SAC suggests in passing that that legislation is

Case 3:16-cv-02374-FAB Document 132 Filed 03/20/17 Page 23 of 34

unconstitutional (¶ 153), no cause of action—and certainly not the Section 303(3) claim—seeks declaratory or injunctive relief to that effect. Instead, Plaintiffs seek to bootstrap their implicit attack on a decade-old Puerto Rico statute into Section 303(3) because that is the only mechanism available to them for pleading around the PROMESA stay. While this Court has permitted Plaintiffs' PROMESA-based claims to proceed, it should not permit Plaintiffs to use Section 303(3) to challenge a decade-old statute that has nothing to do with—and is certainly not caused by—the purportedly preempted Executive Order.

The Executive Order does not divert any funds to COFINA or otherwise modify the assignment of revenues to COFINA, and the SAC's Second and Twelfth Causes of Action should therefore be dismissed under Rule 12(b)(6) for failure to state a claim.[5]

## II. IN THE ALTERNATIVE, THE COURT SHOULD STRIKE THOSE PORTIONS OF THE SAC'S PRAYER FOR RELIEF SEEKING AN INJUNCTION TRANSFERRING COFINA'S PROPERTY TO THE COMMONWEALTH.

In the alternative,[6] even if the SAC stated a claim under Section 303(3), the relief sought by Plaintiffs in connection with that claim is improper and should be stricken under Rule 12(f).

---

[5] To the extent the Section 303(3) claim is premised on the more modest theory that the Executive Order is unlawful because it declares a moratorium on GO debt while the Commonwealth continues to apply indisputably "available resources" (*i.e.*, revenues deposited in the Commonwealth Treasury) to other, subordinate expenditures, Ambac does not disagree. In Ambac's lawsuit challenging the Puerto Rico Governor's "clawback" orders, Ambac acknowledged that, if available resources are insufficient to meet appropriations in a given fiscal year, GO debt must be paid first out of such available resources. *See Assured Guar. Corp.. v. García-Padilla*, No. 16-cv-1037 (D.P.R. Jan 7, 2016) (Complaint ¶ 52, Dkt. No. 1). And it may be the case that such a claim could be validly pled; Ambac takes no position on whether Plaintiffs should be granted leave to replead on that basis. But that is not Plaintiffs' gambit here—their goal in the SAC is to have the Executive Order declared unlawful on the theory that it "permits" (and therefore causes) the transfer of IVU revenues to COFINA—an interpretation that is facially at odds with the terms of the Executive Order itself.

[6] The case law is mixed on whether a challenge to the legal sufficiency of a prayer for relief should be advanced as a motion to dismiss under Rule 12(b)(6) or a motion to strike under Rule 12(f). *Compare SRSNE Site Grp. v. Advance Coatings Co.*, No. 3:12-CV-443, 2014 WL 671317, at *1 (D. Conn. Feb. 21, 2014) (noting that the defendant "'move[d] to dismiss' one of the forms of relief requested by [the] [p]laintiffs," but that "[s]uch a motion is not properly a motion to dismiss and is more properly styled as a motion to strike"), *with Hamilton v. Chendehen*, No. 1:15-cv-00661, 2016 WL 1402277, at *3 (E.D. Cal. Feb. 26, 2016) ("The Court finds that the proper mechanism for dismissing Plaintiff's prayer for relief is by way of Rule 12(b)(6), not 12(f)."). At least one court has recognized that little turns on the distinction. *See OneWest Bank N.A. v. Lehman Bros. Holding Inc.*, No. 14-CV-8916, 2015 WL 1808947, at *2 n.1 (S.D.N.Y. Apr. 20, 2015) (declining to decide whether challenge on the pleadings to prayer for relief should be brought as motion to dismiss or motion to strike "because [the Court's] conclusion would be the

Rule 12(f) provides that a district court may, in the exercise of its discretion,[7] "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Federal courts have construed Rule 12(f) to extend to a complaint's "prayer for relief" enumerating the nature of the relief sought. *See, e.g.*, *Questrom v. Federated Dept. Stores, Inc.*, 41 F. Supp. 2d 294, 307 (S.D.N.Y. 1999), *aff'd*, 2 F. App'x 81 (2d Cir. 2001); *Washington v. Crab Addison, Inc.*, No. C 08-5551, 2010 WL 2528963, at *4 (N.D. Cal. June 18, 2010). Specifically, courts will strike portions of a prayer for relief seeking a remedy that (1) is not legally available, *see Medevac MidAtlantic, LLC v. Keystone Mercy Health Plan*, 817 F. Supp. 2d 515, 520 (E.D. Pa. 2011); (2) is "immaterial" or "impertinent" in the sense that it does not logically flow from the underlying claim, *see Khan v. K2 Pure Solutions, L.P.*, No. 12-cv-05526, 2013 WL 6503345, at *10 (N.D. Cal. Dec. 4, 2013); or (3) would require the court to decide spurious or irrelevant issues, *see Fogerty*, 984 F.2d at 1527. Each rationale is applicable to those portions of the SAC's Prayer for Relief that go far beyond invalidation of the Executive Order, but rather seek to enjoin the transfer of any IVU revenues (or substitute revenues) to COFINA (the "<u>COFINA Remedial Provisions</u>").[8]

---

same either way"). Nonetheless, so as to avoid any procedural question, Ambac has presented its motion as one to dismiss or to strike in the alternative.

[7] *See, e.g.*, *Roman-Samot v. Pontifical Catholic Univ. of P.R.*, No. 10-1879, 2011 WL 5025978, at *8 (D.P.R. Oct. 21, 2011) ("[T]he granting of the motion to strike is within the discretion of the court." (internal citation and quotation marks omitted)); *Fantasy, Inc. v. Fogerty*, 984 F.2d 1524, 1527 (9th Cir. 1993) ("We review a district court's decision to strike matter pursuant to Fed. R. Civ. P. 12(f) for an abuse of discretion."), *rev'd on other grounds*, 510 U.S. 517 (1994).

[8] The provisions of the Prayer for Relief that should be stricken are paragraphs I.D, I.E, I.F.1, I.F.2, and I.F.3. In substance, those provisions request a declaration that the IVU revenues are not "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution and cannot be transferred to COFINA; that no payments may be made on COFINA bonds while any default on GO bonds is ongoing; that COFINA must transfer any IVU revenues currently held or received in the future to the Commonwealth Treasury; and that the Commonwealth must segregate and preserve any such funds received from COFINA. (SAC at 67-68.)

A.    **The COFINA Remedial Provisions Seek Relief That Is Legally Unavailable.**

First, the COFINA Remedial Provisions should be stricken because they seek relief that is not legally available.  *See, e.g.*, *Medevac MidAtlantic*, 817 F. Supp. 2d at 520 (striking remedial provisions of a pleading "is appropriate when the type or amount of relief sought is unavailable under law").  Plaintiffs' Section 303(3) claim alleges that the Executive Order is preempted.  If that claim is successful on the merits, the appropriate remedy will be no more than—and no less than—an order declaring the Executive Order void and enjoining against its enforcement.  *See, e.g.*, *Franklin Cal. Tax-Free Tr. v. Puerto Rico*, 85 F. Supp. 3d 577, 614 (D.P.R.) (Besosa, J.) ("The Recovery Act is preempted by the federal Bankruptcy Code and is therefore void pursuant to the Supremacy Clause of the United States Constitution. The Commonwealth defendants, and their successors in office, are permanently enjoined from enforcing the Recovery Act."), *aff'd*, 805 F.3d 322 (1st Cir. 2015), 136 S. Ct. 1938 (2016).  The COFINA Remedial Provisions, however, ask for much more.  In addition to an injunction against the enforcement of the Executive Order, Plaintiffs seek an order abrogating a statutory transfer of property to COFINA—a transfer that is neither caused nor affected by the Executive Order.  As a matter of law, even if Plaintiffs were to prevail on their preemption claim, they are not entitled to such relief.  The COFINA Remedial Provisions should accordingly be stricken.  *See, e.g.*, *Washington*, 2010 WL 2528963, at *4 (striking prayer for injunctive relief as legally unavailable).

B.    **The COFINA Remedial Provisions Are "Immaterial" Or "Impertinent" Under Rule 12(f) Because They Seek To Remedy Alleged Harms Not Caused By The Executive Order.**

Second, the COFINA Remedial Provisions should be stricken because they are "immaterial" or "impertinent" under Rule 12(f).  "'Impertinent matter consists of statements that do not pertain, and are not necessary, to the issues in question.'"  *Fogerty*, 984 F.2d at 1527

-17-

(quoting 5C Charles Alan Wright & Arthur R. Miller, *Federal Practice & Procedure* § 1382, at 706-07 (3d ed. 1990)). Likewise, "'[i]mmaterial' matter is that which has no essential or important relationship to the claim for relief . . . ." 5C Wright & Miller, § 1382. "[T]here is considerable overlap between the concepts of 'impertinent' and 'immaterial' matter." *Id.*

The issue advanced by the COFINA Remedial Provisions (whether the Commonwealth's statutory transfer of IVU revenues to COFINA is unlawful) has nothing to do with the underlying preemption question (whether the Executive Order is unlawful). The preemption claim asks whether the Commonwealth was within its rights to cease paying GO debt. The "available resources" question asks whether, assuming the GO moratorium was ***not*** permissible, which resources must be at the Commonwealth's disposal in paying GO debt. The first asks: must it pay? The second: with what money? Not only are these questions entirely distinct; the question regarding availability of resources has no bearing on the fundamental question whether the default was permissible. This is especially so where, as here, the SAC in numerous instances challenges the Commonwealth's failure to apply monies that indisputably qualify as "available resources" to payment of GO debt. (*See* ¶ 77 (failure to use $200 million available in Commonwealth operating account to pay GO debt); ¶ 78 (failure to use "clawback" funds that were "indisputably available" to pay GO debt); ¶ 79 (payment of bonds issued by Puerto Rico instrumentalities)). The COFINA Remedial Provisions should be stricken for this additional reason. *See Questrom*, 41 F. Supp. 2d at 307 (striking as immaterial portions of a prayer for relief seeking a judicial determination to which the plaintiff was not entitled).

C. **The COFINA Remedial Provisions Would Require The Court To Adjudicate Legal Issues Not Presented By The Section 303(3) Claim.**

Third, and relatedly, the COFINA Remedial Provisions should be stricken because they would require the Court to adjudicate legal issues that are not presented by the preemption

question. *See Fogerty*, 984 F.2d at 1527 ("[T]he function of a 12(f) motion to strike is to avoid the expenditure of time and money that must arise from litigating spurious issues by dispensing with those issues prior to trial."); *Medevac MidAtlantic*, 817 F. Supp. 2d at 520 ("The purpose of [Rule 12(f)] is to clean-up the pleadings, streamline the litigation and avoid inquiry into irrelevant matters.").

The only issue before this Court on the Section 303(3) claim is whether the Executive Order's declaration of a moratorium on payment of GO debt is unlawful and therefore preempted. Although the "available resources" question may be of interest to certain creditors—most notably GO bondholders such as Plaintiffs who seek to bolster their leverage in restructuring negotiations—it is simply irrelevant to the preemption question and unnecessary to remedy any harm caused by the Executive Order if it is ultimately held to be unlawful and preempted. In the context of the Section 303(3) claim, for the Court to opine on the issue whether the IVU revenues constitute "available resources" within the meaning of the Puerto Rico Constitution would be a quintessential advisory opinion. *See Flast v. Cohen*, 392 U.S. 83, 96 (1968) ("[T]he oldest and most consistent thread in the federal law of justiciability is that the federal courts will not give advisory opinions.") (internal quotation marks omitted). The Court should decline to provide one. *See Greenless v. Almond*, 277 F.3d 601, 607 (1st Cir. 2002) ("It is not . . . the role of the federal courts to answer legal questions unless specific cases need answers.").

### D. The COFINA Remedial Provisions Should Be Stricken To Avoid Eleventh Amendment Sovereign Immunity Questions.

Finally, the COFINA Remedial Provisions should be stricken on constitutional avoidance grounds. *See Morgan Drexen, Inc. v. Consumer Fin. Prot. Bureau*, 979 F. Supp. 2d 104, 115 (D.D.C. 2013) (finding that "principles of constitutional avoidance . . . *undermined* the argument

for injunctive relief"), *aff'd*, 785 F.3d 684 (D.C. Cir. 2015).  It is questionable whether the relief requested by the COFINA Remedial Provisions would be permitted by sovereign immunity principles under the Eleventh Amendment.  It is questionable whether the relief requested by the COFINA Remedial Provisions would be permitted by sovereign immunity principles under the Eleventh Amendment.  While a Court may issue an injunction prospectively requiring the Commonwealth to halt an ongoing violation of federal law,[9] it may not affirmatively direct the Commonwealth on how to spend its money.[10]  That is precisely the order Plaintiffs seek in the COFINA Remedial Provisions—an order requiring both that the GO debt be paid, and that the IVU revenues be used to pay it.  *Cf. Barton v. Summers*, 293 F.3d 944, 951 (6th Cir. 2002) ("[A]n attempt to force the allocation of state funds implicates core sovereign interests."). Striking the COFINA Remedial Provisions would avoid the constitutional question under the Eleventh Amendment.  *Cf. Greenless*, 277 F.3d at 603 (affirming dismissal while avoiding "the difficult question whether a claim of the sort [the plaintiff] asserts . . . would be barred by the Eleventh Amendment").

## III.  PLAINTIFFS' CONSTITUTIONAL CHALLENGE TO COFINA IS BARRED BY THE DOCTRINE OF LACHES.

Even if Plaintiffs had stated a claim or appropriately tethered its requests for relief to the underlying cause of action (they did neither), their challenge to the constitutionality of the COFINA structure—more than a decade after it was created—should be barred by laches. Laches is an equitable doctrine that bars the assertion of claims due to an unreasonable delay in

---

[9] Such an injunction would clearly be consistent with the Eleventh Amendment if it were determined that the Executive Order violates federal law.  *See Assured Guar. Corp. v. García-Padilla*, No. 16-1037, 16-1095, 2016 WL 5794715, at *5 (D.P.R. Oct. 4, 2016) (Besosa, J.) (holding that federal constitutional claims challenging "clawback" orders issued by the Governor of Puerto Rico did not run afoul of sovereign immunity because the claims sought declaratory and injunctive relief barring enforcement of those orders on a prospective basis).

[10] Indeed, at least in a Title III context, such an order would violate Section 305 of PROMESA.  48 U.S.C. § 2165 (prohibiting federal courts from interfering with "any of the political or governmental powers of the debtor" or "any of the property or revenues of the debtor").

bringing suit that resulted in prejudice to the opposing party.  *See, e.g.*, *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 911 (1st Cir. 1989).  Here, Plaintiffs delay is both unreasonable and prejudicial.

Plaintiffs admit that a challenge to COFINA's constitutionality could have been brought at any time since the passage of COFINA's enabling legislation a decade ago.  (See Dkt. No. 39 at 3.)  Instead of timely bringing such a challenge, Plaintiffs loaded up on billions of dollars in GO bonds, including substantial amounts in the face of disclosure documents expressly emphasizing that, under Puerto Rico law, the IVU revenues belonging to COFINA "do not constitute 'available resources' of the Commonwealth" and that such funds are therefore "not available for the payment of principal of and interest on the [GO] Bonds."  (Ex. D at 29.)  There was nothing preventing Plaintiffs or any other GO bondholders from mounting a challenge during this time period; to the extent they believe that their rights are impaired by the COFINA structure, they certainly did not need to wait until the Executive Order caused a default on their bonds.  *See Schulz v. State of N.Y.*, 615 N.E.2d 953, 957 (N.Y. 1993) (dismissing state constitutional challenge to financing on laches grounds after 11-month delay).[11]

To permit such a challenge at this belated date would cause enormous prejudice to COFINA's creditors.  During a decade in which no such challenge was advanced, COFINA has issued approximately $16.3 billion in principal amount of bonds.  *See SMDfund*, 831 N.E.2d at 729-30 (barring on laches grounds constitutional claims challenging state financing where plaintiffs delayed for 17 years and $44 million in bonds were issued in the meantime); *Solomon*, 48 Ill. 2d at 322 (two-year delay "coupled with the issuance and sale of $8 million in bonds and

---

[11] *See also SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*, 831 N.E.2d 725, 729-30 (Ind. 2005); *Solomon v. North Shore Sanitary District*, 48 Ill. 2d 309, 322 (Ill. 1971); *Penn Mut. Life Ins. Co. v. City of Austin*, 168 U.S. 685, 699-701 (1898).

the expenditure of a part of these funds" warranted application of laches). Courts routinely reject the type of gamesmanship present here, where Plaintiffs held off on mounting a constitutional challenge to COFINA so as to exploit maximum leverage in a restructuring scenario. This is especially true where, as here, Plaintiffs' claims would cause "traumatic disturbance" to matters of public finances. *See Schulz*, 615 N.E.2d at 957 ("Realistically, constitutional challenges to public financing of such massive and profound dimension, possibly causing traumatic disturbance to settled matters of public finances and governance, should be undertaken reasonably promptly.").

IV.   **SHOULD THE COURT DEEM THE MEANING OF "AVAILABLE RESOURCES" RELEVANT TO THE SECTION 303(3) CLAIM, THE QUESTION SHOULD BE CERTIFIED TO THE SUPREME COURT OF PUERTO RICO.**

As set forth in detail above, it is not necessary to resolve the question whether COFINA's property constitutes available resources under the Puerto Rico Constitution to dispose of Plaintiffs' Section 303(3) claim. Should the Court disagree, however, the question should be certified to the Supreme Court of Puerto Rico, as it presents a pure and undecided issue of Puerto Rico constitutional law, the resolution of which will surely have broad, long-lasting consequences for the people and government of the Commonwealth, including significant impact on its ability to restructure its debt, regain access to the capital markets, and emerge from its current fiscal crisis. Specifically, should it prove necessary, Ambac would respectfully request that this Court certify the following questions to the Supreme Court of Puerto Rico:

> Does COFINA's enabling legislation legally render IVU revenues COFINA property, making them unavailable to the Secretary of the Treasury such that they are not "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution?[12]

---

[12] The SAC assumes that if the IVU revenues are deemed "available resources" within the meaning of the Puerto Rico Constitution, they necessarily must be applied to GO debt. This assumption is baseless: by its terms, Article VI, Section 8 is triggered only "[i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year." Because the question whether Section 8 has been triggered is a

This question presents a novel issue of Puerto Rico law involving previously unaddressed provisions of the Puerto Rico Constitution. In such circumstances, it is particularly appropriate for federal courts to defer to a state or commonwealth's highest court. "Speculation by a federal court about the meaning of a state statute in the absence of prior state court adjudication is particularly gratuitous when . . . the state courts stand willing to address questions of state law on certification from a federal court." *Brockett v. Spokane Arcades, Inc.*, 472 U.S. 491, 510 (1985) (O'Connor, J., concurring). The Supreme Court of Puerto Rico has "repeatedly welcomed the federal court's willingness to resort to [it] by way of the certification mechanism when addressing unresolved questions of Puerto Rican law." *Romero v. Colegio de Abogados de Puerto Rico*, 154 D.P.R. 370, 374 (P.R. 2001); *see also Medina & Medina v. Country Pride Foods*, 122 D.P.R. 172, 181-82 (P.R. 1988) ("The certification process is a valuable tool used by the federal forum . . . when we have no clear-cut precedents to settle the controversy pending in that jurisdiction."). And, as courts in this District have recognized, certification serves an important function in fostering comity between and respect for federal and Commonwealth courts. *Watchtower Bible Tract Soc. of N.Y., Inc. v. Municipality of Santa Isabel*, Civ. No. 04-1452, 2013 WL 2554879, at *5 (D.P.R. June 11, 2013) ("Rather than boldly asserting itself as the ultimate authority of local law, a federal court should afford the local judiciary the opportunity to be the first to rule on the legality or constitutionality of local law."); *see also Medina & Medina*, 122 D.P.R. at 182 (Certification is a "mechanism for easing and smoothing any differences that may arise between federal and Puerto Rican courts.").

Moreover, certification improves outcomes and preserves judicial resources by ensuring that federal courts adopt the proper construction of state statutes: "[t]he certification mechanism

---

mixed question of law and fact, Ambac does not seek certification of this question. Nonetheless, should it prove necessary, Ambac reserves the right at the appropriate time to challenge this aspect of the preemption claim.

is widely applauded as increasing the likelihood of a federal court answering the substantive question correctly and demonstrating a federal court's respect for the state court." *Watchtower*, 2013 WL 2554879, at *5 (citing Rebecca Hollander-Blumoff, *The Psychology of Procedural Justice in the Federal Courts*, 63 HASTINGS L.J. 127, 169 (2011); Jonathan Remy Nash, *Examining the Power of Federal Courts to Certify Questions of State Law*, 88 CORNELL L. REV.1672, 1697 (2003)).

The question whether pledged IVU revenues constitute "available resources" within the meaning of Article VI, Section 8 of the Puerto Rico Constitution is particularly well-suited for adjudication by the Supreme Court of Puerto Rico. "[I]t is the Supreme Court of Puerto Rico which has the authority to construe the laws and the Constitution of the Commonwealth of Puerto Rico." *Romero*, 154 D.P.R. at 374. Here, the question of Puerto Rico constitutional law is of enormous import to the people of Puerto Rico and should be decided by the court uniquely empowered to answer them. Plaintiffs seek an order declaring, among other things, that "the revenues diverted to COFINA . . . are 'available resources' within the meaning of Article VI, Section 8 of the Puerto Rico Constitution and that such funds cannot be transferred to COFINA or COFINA bondholders." (SAC Prayer for Relief I.D.) At bottom, this request is an attempt to dismantle a financing structure that, in the virtually unanimous judgment of the Commonwealth's elected representatives, was necessary to address a severe fiscal and economic crisis. If Plaintiffs are successful, the very securitization structure that provided the Commonwealth with access to the capital markets during its last financial crisis would crumble, seriously jeopardizing the potential for the Commonwealth to regain access to the capital markets. *See* 48 U.S.C. § 2121 (noting that the purpose of the Oversight Board is to allow Puerto Rico "to achieve fiscal responsibility and access to the capital markets"). The impact on the

retail investors in Puerto Rico who hold billions of dollars of COFINA bonds would be devastating.

Under the Puerto Rico Rules of Civil Procedure, a petition for certification may be executed when a federal district court "has a case for its consideration in which there are local issues of law that are decisive in the cause of action . . . for which there are no clear precedents in the decisions of the Supreme Court of the Commonwealth of Puerto Rico." P.R. R. Civ. P. 52.2(d). Certification requires the district court to file a petition with the Supreme Court of Puerto Rico under Rule 25 of the Rules of the Supreme Court. The petition must meet four requirements: "(1) questions of Puerto Rican law [are] involved; (2) said questions may determine or are determinant to the outcome of the case; (3) there are no clear precedents in the case law of the Supreme Court of Puerto Rico; (4) an account of all the facts relevant to said questions [is] included, clearly showing the nature of the controversy in which the questions arise." *Pan Am. Computer Corp. v. Data Gen. Corp.*, 112 D.P.R. 780, 788 (P.R. 1982).

These standards would be easily satisfied here. First, these questions involve pure issues of Puerto Rico constitutional law. In answering the questions, the Supreme Court of Puerto Rico would need to consider only the Puerto Rico Constitution and Puerto Rico statutes, not federal law or the United States Constitution. Second, the question of COFINA's constitutionality is potentially determinative of the central dispute in this case: should the Supreme Court of Puerto Rico determine that the IVU revenues do not constitute "available resources," there would be no need for this Court to consider the extraordinary step of diverting COFINA's property to the Commonwealth Treasury. Third, no Puerto Rico court has interpreted the Constitution's use of "available resources" or passed on the constitutionality of the COFINA structure. Fourth, the questions here are almost purely legal; the minimal factual background necessary to answer the questions would be straightforward and easily presented to the Supreme Court of Puerto Rico.

For the foregoing reasons, should the Court determine that the question of COFINA's validity under the Puerto Rico Constitution is necessary to the disposition of the Section 303(3) claim, Ambac respectfully requests that the Court certify the question set forth above to the Supreme Court of Puerto Rico.  In the alternative, Ambac requests that this Court invite the parties to submit briefing (including proposed certification petitions) as to whether the questions should be certified.

## V.     SHOULD THE COURT DECLINE TO CERTIFY THE QUESTION, IT SHOULD DISMISS THE PREEMPTION CLAIM BECAUSE THE IVU REVENUES ARE NOT "AVAILABLE RESOURCES" WITHIN THE MEANING OF THE PUERTO RICO CONSTITUTION.

If the Court concludes that, to dispose of the Section 303(3) claim, it is necessary to determine whether the IVU revenues belonging to COFINA by statute are nonetheless "available resources" of the Commonwealth, and decides to rule on the issue itself, the Court should dismiss the Section 303(3) claim under Rule 12(b)(6).  First, the validity of COFINA's enabling legislation under the Puerto Rico Constitution is subject to highly deferential "rational nexus" review in which the Court asks only whether there is a rational relationship between the legislation and a legitimate government interest; that standard is clearly met here where, according to the SAC itself, the COFINA structure was created to address an urgent fiscal crisis. Second, under both the text and structure of the Puerto Rico Constitution, the Legislative Assembly acted well within its constitutional authority in rendering the IVU revenues unavailable to the Commonwealth.  Third, three Puerto Rico Secretaries of Justice have endorsed the constitutionality of the COFINA structure—opinions which are deemed highly persuasive in the First Circuit—and courts in other jurisdictions have routinely upheld similar structures against analogous lines of constitutional attack.

A.   **The Constitutionality Of COFINA's Enabling Legislation Under Puerto Rico Law Is Subject To Highly Deferential "Rational Nexus" Review.**

In passing on the validity of a Puerto Rico statute under the Puerto Rico Constitution, the Court's analysis is limited to "mak[ing] an independent determination as to the rule of law the state's highest court is likely to adopt." *DiLuglio v. New England Ins. Co.*, 959 F.2d 355, 359 (1st Cir. 1992). If the Court finds that "the course [the Supreme Court of Puerto Rico] would take is reasonably clear," it should follow that course. *Nieves ex rel. Nieves v. Univ. of P.R.*, 7 F.3d 270, 275 (1st Cir. 1993) (quoting *Porter v. Nutter*, 913 F.2d 37, 41 n. 4 (1st Cir. 1990)); *Rodriguez–Suris v. Montesinos*, 123 F.3d 10, 13 (1st Cir. 1997). Where the "jurisdiction's highest court has not spoken on a precise issue of law," the federal court must "look to 'analogous state court decisions, persuasive adjudications by courts of sister states, learned treatises, and public policy considerations identified in state decisional law' in order to make an 'informed prophecy' of how the state court would rule on the precise issue." *Rodriguez-Suris*, 123 F.3d at 13 (quoting *Blinzler v. Marriott Int'l, Inc.*, 81 F.3d 1148, 1151 (1st Cir. 1996)).

The Supreme Court of Puerto Rico's analysis here would be subject to a highly deferential standard of review applied to constitutional challenges to legislation concerning economic matters. The Supreme Court of Puerto Rico uses two standards of review—"strict scrutiny" and "rational nexus"—and economic legislation is evaluated using the rational nexus test.[13] *Defendini Collazo et al. v. E.L.A., Cotto*, Nos. RE-196, 199 90-371, 1993 WL 839857 (P.R. July 15, 1993) (statute capping damages awards in tort suits involving Commonwealth employees had rational nexus to a legitimate government interest in reducing Commonwealth expenditures). Under this test, an economic statute will not be struck down "unless it is clearly

---

[13] The Legislative Assembly's exercise of its taxing power, in particular, is subject to a similarly deferential standard of review, requiring only that the legislation have a "public purpose." *See Interior Developers v. Mun. de San Juan*, 177 D.P.R. 693, 703 (2009).

arbitrary and no rational nexus is found between the same and a legitimate State interest."
*M.&B.S., Inc. v. Dept. de Agricultura*, 118 D.P.R. 319, 333 (P.R. 1987). Additionally, "the
burden of proof [is] on whoever alleges the unconstitutionality of the legislation in controversy."
*Velez v. Srio. de Justicia*, 115 D.P.R. 533, 538 (P.R. 1984).

COFINA's enabling legislation easily satisfies this deferential standard. According to the
SAC, COFINA's enabling legislation was passed "[i]n response to a fiscal crisis." (¶ 103.) In
fact, as the statute itself says, the fiscal crisis was, at the time, the worst in Puerto Rico's history.
*See* Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246, 247 (codified as amended at P.R.
Laws Ann. tit. 13, § 12). Moreover, a stated cause of the crisis was the issuance of appropriation
debt, which COFINA was specifically enacted to retire. *Id.*; (¶ 93). Thus, there is plainly a
rational nexus between the creation of COFINA and the Commonwealth's legitimate interest in
ameliorating a cause of the Commonwealth's fiscal difficulties. *Cf. M.&B.S.*, 118 D.P.R. at 334
(statute regulating milk sales had rational nexus to a legitimate government interest in protecting
public health and welfare).

**B.  The Legislative Assembly's Transfer Of IVU Revenues To COFINA Is Authorized By The Text And Structure Of The Puerto Rico Constitution.**

As an initial matter, the IVU revenues are not resources that are available to the
Commonwealth. It is axiomatic that, absent any ambiguity, words in constitutional and statutory
provisions are to be interpreted according to their plain meaning. *See*, *e.g.*, *Gibbons v. Ogden*,
22 U.S. 1, 188 (1824) (framers of the Constitution "must be understood to have employed words
in their natural sense, and to have intended what they have said."); *Boivin v. Black*, 225 F.3d 36,
40 (1st Cir. 2000) (words chosen by legislators, "if not specifically defined, carry their ordinary
meaning"). Here, there is no ambiguity in the use of the word "available" in the Puerto Rico
Constitution or in COFINA's enabling legislation. The dictionary defines "available" as

"present or ready for immediate use"; and "accessible, obtainable." <u>Merriam-Webster Online</u> <u>Dictionary</u>, https://www.merriam-webster.com/dictionary/available. On the face of the SAC, the IVU revenues do not meet this definition because they are not deposited in the Commonwealth Treasury, but rather are deposited directly in an account at Banco Popular and subsequently BNY outside of the control of the Commonwealth. (¶¶ 97-98, 100, 160-161.) Indeed, the fact of this lawsuit and the relief sought by Plaintiffs prove the point—the only way for the Commonwealth to receive the IVU revenues statutorily belonging to COFINA is by way of an injunction requiring the flow of funds to COFINA to cease and be diverted instead to the Commonwealth Treasury. The analysis should end there. *See*, *e.g.*, *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1946 (2016) (when a statute's text is plain, analysis into meaning begins and ends with the text); *Ruiz v. Bally Total Fitness Holding Corp.*, 496 F.3d 1, 8 (1st Cir. 2007) (judicial interpretation of the meaning of a text begins with the language used and, where "that language is clear and unambiguous, the inquiry is at an end").

Plaintiffs nonetheless allege that, although the IVU revenues were declared by statute to be COFINA's property and are unavailable to the Secretary of the Treasury, it was constitutionally impermissible for the Legislative Assembly to render them so. According to Plaintiffs' theory, the IVU revenues are by their very essence "available"—a quality that purportedly cannot be altered by what the SAC characterizes as "arbitrary legislative distinctions." (¶ 99; *see also* ¶ 19 ("Sales and use taxes imposed by the Commonwealth, however, are a quintessential example of 'available resources' for purposes of the Constitutional Debt Priority Guarantee.").) In fact, even if (counterfactually) the IVU revenues were deposited directly in the Commonwealth Treasury, it was well within the Legislative Assembly's constitutional power to declare them not to be "available resources" within the meaning of the Puerto Rico Constitution. Far from prohibiting the transfer of or grant of a property interest in

any particular revenue stream, the text and structure of the Puerto Rico Constitution afford the Legislative Assembly broad authority to impose and collect taxes, and indeed to **_transfer_** the proceeds of such taxes, as it sees fit. Article VI, Section 8—which governs how the **_executive branch_** must apply those revenues made available to it by the **_legislative branch_**—says nothing about the legislature's broad and inherent authority in the management and allocation of the Commonwealth's resources.

      1.      <u>The Puerto Rico Constitution's GO protections contemplate that revenues raised by Commonwealth legislation may be transferred outside the control of the Commonwealth.</u>

Plaintiffs claim that Article VI, Section 8 of the Puerto Rico Constitution provides an all-encompassing protection for GO bonds—designated unsubtly by the SAC as the "Constitutional Debt Priority Guarantee." (*E.g.*, ¶ 8.) It is true that the Puerto Rico Constitution provides substantial protections for GO debt. Those protections, however, arise more broadly from numerous provisions of Article VI—critical context which the SAC deliberately downplays. When viewed in that broader context, it becomes clear that the COFINA structure, and in particular the Legislative Assembly's transfer of IVU revenues to COFINA, is entirely consistent with—and indeed contemplated by—the Puerto Rico Constitution, including its GO protections.

*Article VI, Section 2: Broad Taxing Power Vested in the Legislative Assembly.* As an initial matter, Article VI, Section 2 vests in the Legislative Assembly the power to impose and collect taxes. The scope of that authority is broad and exclusive—it is to be "exercised as determined by the Legislative Assembly." P.R. Const. art. VI, § 2. The United States Supreme Court has long recognized that the taxing power gives the legislature broad discretion over its exercise. *See Providence Bank v. Billings*, 29 U.S. 514, 563-64 (1830) (Marshall, J.) (the taxing power is "an incident of sovereignty" that is "co-extensive with that [sovereignty]," and is to be exercised "[as] determined by the legislature" absent a constitutional limitation); *see also*

*Brushaber v. Union Pac. R. Co.*, 240 U.S. 1, 12 (1916) (the taxing power "[unquestionably] embraces every conceivable power of taxation"). Thus, without an explicit constitutional limit on the Legislative Assembly's taxing power, it retains not only the power to tax and spend, but to control every aspect of such power, including the ability to allocate and assign custody to all tax revenues, set limits on how the revenues will be spent, and determine when and whether state entities or accounts will receive such revenues. *See id.* Notably, Article VI, Section 2 imposes no limitation on the Legislative Assembly's taxing power other than the balanced budget requirement discussed below (at 29-30). In particular, and in contrast to certain state constitutions, [14] it imposes no requirement that funds raised by Puerto Rico legislation be deposited in the Commonwealth Treasury.

*Article VI, Section 2: GO Debt Ceiling.* Article VI, Section 2 imposes a limit on the amount of debt that can be issued in a given year for which the Commonwealth pledges its "full faith, credit and taxing power." Importantly, the GO debt ceiling is measured by reference to the amount of money "raised under the provisions of Commonwealth legislation *and covered into the Treasury of Puerto Rico*" in the two preceding fiscal years. P.R. Const. art. VI, § 2 (emphasis added). Thus, Section 2 clearly contemplates that revenues (such as IVU revenues) might be raised by Commonwealth legislation and *not* covered into the Commonwealth Treasury—*i.e.*, might not be made "available" to the Commonwealth. Section 2 also makes clear that the GO debt ceiling is measured by the Commonwealth's ability to pay, and that that ability

---

[14] Specifically, the Constitutions of Arizona, Connecticut, Georgia, Idaho, Louisiana, North Dakota, South Dakota, Virginia, and Washington each require that funds raised by state legislation must be deposited in the state treasury. *See, e.g.*, Wash. Const. art. VII, § 6 ("All taxes levied and collected for state purposes shall be paid in money only into the state treasury.").

is a function of the funds that are available to the Commonwealth—*i.e.*, the money "covered into" the Commonwealth Treasury.[15]

*Article VI, Section 7: The Balanced Budget Provision.* Article VI, Section 7 provides that appropriations for a given fiscal year may not exceed "total resources" estimated for that fiscal year unless taxes have been imposed to cover the shortfall. In policy parlance, this is a "balanced budget" provision. That provision serves as a critical protection for GO bondholders insofar as it requires that money be appropriated to pay upcoming GO debt payment obligations, and if estimated resources are insufficient, then taxes must be raised. Indeed, this is the only affirmative prescription for the Legislative Assembly's exercise of its taxing power to be found in the Puerto Rico Constitution. Importantly, the balancing of the budget is achieved by reference to "total resources," showing that the reference to "available resources" in Article VI, Section 8 necessarily refers to something less than all resources generated by Puerto Rico legislation—a distinction that is also reflected in Article VI, Section 2. *See* P.R. Const. art. VI, § 2 (referring to "the total amount of the annual revenues raised under the provisions of Commonwealth legislation *and covered into the Treasury of Puerto Rico*" (emphasis added)).

*Article VI, Section 8: The GO Priority Over "Available Resources."* Immediately following the balanced budget provision is the GO priority in Article VI, Section 8. The balanced budget provision in Section 7 creates a dilemma that Section 8 is designed to solve:

---

[15] That the Puerto Rico Constitution assumes that GO debt would be paid only out of money that is actually covered into the Commonwealth Treasury is further supported by the unique history of Puerto Rico and its Constitution. The Commonwealth's GO bond enabling statutes were enacted prior to the ratification of the Puerto Rico Constitution and the transformation of Puerto Rico into a commonwealth. These statutes expressly provide that GO bonds will be repaid though "funds in the Commonwealth treasury." *See, e.g.*, 13 L.P.R.A. § 41; (¶ 67; noting GO bond enabling statutes were enacted in 1942, ten years before the ratification of the Puerto Rico Constitution in 1952). Instead of altering or limiting the power of the Legislative Assembly by requiring, as some other state constitutions do, that all funds raised by legislation be deposited in the general treasury, the framers of the Puerto Rico Constitution accepted the terms of the GO bonds. *See* P.R. Const. art. IX, § 4 ("The Commonwealth . . . shall be the successor of The People of Puerto Rico for all purposes, including without limitation the . . . payments of debts and liabilities in accordance with their terms.").

because the budget is balanced solely by reference to *estimated* revenues, the question arises what to do when and if those revenues come in short of estimates? Section 8 provides the answer: if resources prove insufficient to pay what was appropriated in the budgeting process because of a shortfall in revenue, all resources *available* for GO debt service must be applied first to those obligations. This protection ties directly to Section 2, which ensures that any GO debt is commensurate to the funds available to pay it—*i.e.*, the funds actually "covered into" the Commonwealth Treasury.[16]

### 2. The COFINA structure is consistent with, and contemplated by, the Puerto Rico constitutional scheme.

The COFINA structure is entirely consistent with, and indeed contemplated by, the foregoing constitutional scheme.

*First*, the Puerto Rico Constitution grants the Legislative Assembly broad authority over the imposition and collection of taxes, providing that the taxing power "shall be exercised as determined by the Legislative Assembly." P.R. Const. art. VI, § 2. It certainly does not empower the Governor to issue an executive order that would upend a legislative determination in that sphere—including the Legislative Assembly's determination that the IVU revenues should be deposited directly in a trust account for the benefit of COFINA and removed from the reach of the Commonwealth—as Plaintiffs contend the Executive Order should have done here. (*See* ¶ 20; *see also Marks v. Cent. Intelligence Agency*, 590 F.2d 997, 1003 (D.C. Cir. 1978) ("[A]n executive order cannot supersede a statute.").

---

[16] Article VI, Section 2 also creates a limited private right of action by which "any holder of [GO] bonds or notes" may sue to compel the Secretary of the Treasury to apply any "available resources" in accordance with Article VI, Section 8. Importantly, this provision was not made a part of Article VI, Section 8. Instead, it was placed in the same section as the GO debt ceiling provision—reinforcing the connection between "available resources" and funds "covered into the Treasury of Puerto Rico."

*Second*, the very provision designed to ensure that GO debt is maintained at a level that can sustainably be serviced takes as its measuring stick the money that is "covered into" the Commonwealth Treasury—*i.e.*, all money available to the Commonwealth—*not* all money generated by Commonwealth legislation. Indeed, Section 2 ***necessarily*** views money generated by Commonwealth legislation as more broad than money covered into the Commonwealth Treasury, making clear that it is entirely appropriate—and indeed constitutionally expected—that certain monies generated by Commonwealth legislation would *not* be deposited in the Commonwealth Treasury and that GO bondholders would have *no* claim on those monies.[17] The same is true of the contrast between Section 7 (which balances the budget by reference to "total resources") and Section 8 (which instructs the Secretary of the Treasury how to apply "available resources" in the event of a fiscal year shortfall)—by definition "available" means something less than "total." *See, e.g.*, *Sosa v. Alvarez-Machain*, 542 U.S. 692, 711 n.9 (2004) (discussing "general rule that when the legislature uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended") (internal quotation marks and citations omitted); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (a law "should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

*Third*, and relatedly, there is no provision requiring that all money generated by Commonwealth legislation be covered into the Commonwealth Treasury, or otherwise prohibiting the transfer or alienation of funds. The absence of such a provision is in stark

---

[17] That the GO debt ceiling in Article VI, Section 2 of the Puerto Rico Constitution is calculated with reference only to monies "covered into" the Commonwealth Treasury further reinforces that not all revenues are intended to be used for the repayment of GO debt. The constitutional debt limit is intended to ensure that debt is not incurred in amounts greater than the government's ability to pay. If total revenues were intended to be applied to the service of GO debt, it would be illogical to constrain the incurrence of GO debt relative only to the smaller pool of available revenues.

contrast to those state constitutions that do contain such a provision (*see supra* at 31 n.13), and even then, courts have generally found such provisions to be subject to exceptions. *See Saratoga Harness Racing Ass'n v. Agriculture & N.Y. State Horse Breeding Dev. Fund*, 238 N.E.2d 730, 733 (N.Y. 1968) ("[N]ot every fund made up of public moneys raised through taxation or otherwise comes within the purview of [the constitutional appropriation provision]."). (*See generally infra* Point V.C. 2.)

*Fourth*, the GO priority in Article VI, Section 8 itself imposes no restrictions on the Legislative Assembly and thus has no bearing on the propriety of the Legislative Assembly's transfer of IVU revenues to COFINA. Rather, Section 8—which immediately follows and logically flows from Section 7—merely instructs the **executive branch** on how to apply those resources that have been made available to the Commonwealth should actual revenues fall short of budgeted estimates.[18] *Cf. I.N.S. v. Chadha*, 462 U.S. 919, 945, 951 (1983) (by virtue of the Constitution's structure, powers and limits of one branch are not applicable to another).

### 3. Plaintiffs' argument that permitting COFINA to stand would undermine the constitutional GO protections is based on a misreading of the Puerto Rico Constitution.

Having assiduously avoided the broader constitutional framework governing both GO debt and the Legislative Assembly's exercise of its taxing power, the SAC mounts a straw man: that if COFINA is deemed constitutionally permissible, then the Legislative Assembly would be able to "assign an unlimited amount of resources to support new borrowing." (¶ 95.) As an initial matter, had the framers of the Puerto Rico Constitution wished to place limits on the

---

[18] Further, Plaintiffs' theory that the Legislative Assembly cannot limit the source of funds used to repay GO bonds would invalidate the GO bonds' own enabling statutes. These statutes explicitly limit repayment of the GO bonds to funds "in the Commonwealth treasury." *See* 13 L.P.R.A. § 41; *see also id.* § 35 (redemption or purchase of GO bonds payable "from any available funds in the insular treasury"); *id.* § 38 (GO Tax Revenue Anticipation Notes "shall be paid . . . from any available funds in the Commonwealth Treasury"); (*accord* ¶¶ 113, 119; GO bonds payable from "funds in the Treasury of the Commonwealth").

amount of borrowing by Commonwealth instrumentalities—as opposed to the Commonwealth itself—they could have done so. But as Plaintiffs recognize, the debt ceiling in Article VI, Section 2 applies only to **GO debt** secured by a pledge of the full faith, credit, and taxing power of the Commonwealth, and the COFINA bonds are neither issued by the Commonwealth nor backed by such a pledge. (¶ 15 ("[B]onds issued by COFINA are *not* covered by any pledge of the Commonwealth's good faith, credit, or taxing power and are *not* public debt for purposes of the Puerto Rico Constitution." (emphasis in original).).) Indeed, COFINA's enabling legislation expressly confirms that fact. *See* 13 L.P.R.A. § 13(d) (bonds issued by COFINA are not obligations of the Commonwealth and the "full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged" for the payment of COFINA bonds).

In any event, Plaintiffs' suggestion that upholding the COFINA structure would enable the Legislative Assembly to starve the Commonwealth of the resources to support the servicing of its GO debt is incorrect. As explained above, the Puerto Rico Constitution requires that sufficient resources be appropriated to service GO debt in two provisions that the SAC glosses over. First, Section 2 ties the limit on the amount of GO debt that can be issued to money "covered into" the Commonwealth Treasury (*i.e.*, available resources) in the preceding two years. P.R. Const. art. VI, § 2. Second, Section 7 requires that money be appropriated for upcoming payments on GO debt, or that taxes be raised if estimated revenues are insufficient. *Id.* § 7. Indeed, Section 8—which Plaintiffs suggest is the entirety of the GO protection—is largely secondary to these more fundamental protections, providing a backstop if the primary safeguards in Sections 2 and 7 fail. Thus, Plaintiffs' hypothetical scenario in which the Legislative Assembly siphons off limitless sums outside of the Commonwealth's control, thereby starving the Commonwealth of the ability to service its GO debt, would be prevented by the

Puerto Rico Constitution itself.  It is wholly unrelated, however, to the fact that the transfer of IVU revenues to COFINA *is* constitutionally permissible.

    **C.**    **<u>The Opinions Of Three Puerto Rico Secretaries Of Justice And The Case Law Of Other Jurisdictions Support The Constitutionality Of The COFINA Structure.</u>**

Finally, consistent with the plain meaning of the term "available" and the overall text and structure of the Puerto Rico Constitution, judicial precedent supports the validity of the Legislative Assembly's transfer of IVU revenues to COFINA.  The three Puerto Rico Secretaries of Justice who have considered the issue have each opined that the COFINA structure comports with the Puerto Rico Constitution.  Such opinions are deemed "highly persuasive" in the First Circuit.  Moreover, the highest courts of numerous states have addressed analogous challenges to legislation transferring dedicated revenue streams to public corporations in the face of allegedly inconsistent constitutional language.  The case law establishes three critical points.  First, constitutional protections affording bondholders a first claim to appropriated funds do not obligate the legislature to include any particular revenue stream as a source of such funds.  Second, constitutional restrictions on the use of available funds likewise do not mean that all funds generated by legislative assessment must be covered into the general treasury.  Third, where legislatures carve out particular revenue streams to fund municipal corporations, courts readily uphold such structures provided certain factors are present—the existence of a trust with designated beneficiaries, limitations on the amount and uses of the transferred revenues, an urgent need motivating the creation of the structure, and so on.  Each of these jurisprudential strands supports the COFINA structure.

1. **The Secretary of Justice opinions finding the COFINA structure constitutional are highly persuasive authority.**

Three Secretaries of Justice of Puerto Rico from both major political parties have specifically opined that the COFINA structure is constitutional, and that COFINA's IVU revenues are not available resources of the Commonwealth. (Ex. E; Ex. F at 35.) Plaintiffs have suggested elsewhere that this authority is somehow unworthy of the Court's consideration. (Dkt. No. 93 at 13 n.10.) This is wrong. "Although opinions of the Attorney General or the Puerto Rican equivalent, the Secretary of Justice, are not binding on the courts, the Supreme Court of the United States has recognized that they are 'entitled to careful consideration by the courts, and quite generally regarded as highly persuasive.'" *Fed. Deposit Ins. Corp. v. Mun. of Ponce*, 904 F.2d 740, 746 (1st Cir. 1990) (quoting *Harris Cnty. Comm'rs Court v. Moore*, 420 U.S. 77, 87 n.10 (1974)). This is "particularly so" where, as here, "the Secretary's opinions are consistent with the judicial precedent." *Id.* Thus, while it is clear that the Court is not ***bound*** by these opinions, they are entitled to substantial deference.

2. **The Case Law Of Other Jurisdictions Has Upheld The Constitutionality Of Similar Securitization Structures.**

    a. **A promise of priority to appropriated funds does not guarantee the availability, or restrict the transfer, of any particular revenue stream.**

In *Quirk v. Municipal Assistance Corporation for the City of New York*, 363 N.E.2d 549 (N.Y. 1977), holders of general obligation bonds issued by New York City sued to enjoin the alleged "diversion" of sales tax revenues to an entity created by the State of New York called the Municipal Assistance Corporation ("MAC"). The legislation at issue, which was passed in response to New York City's 1970s fiscal crisis, suspended a New York City sales tax and replaced it with an identical tax imposed by the state, with the proceeds flowing directly to MAC. *Id.* at 550. The plaintiffs alleged that "the diversion of tax revenues from the city to

MAC impair[ed] the position of city bondholders, since fewer tax revenues w[ould] be available for repayment of principal and interest on city bonds," and that the legislation thus violated the Contracts Clause of the U.S. Constitution. *Id.* The New York Court of Appeals rejected the argument. The Court acknowledged that the city bondholders had a "'first lien' on the city's revenues" because the State Constitution "obligate[d] the city to appropriate moneys for the repayment of city bonds" and "assure[d] that out of the revenues which are collected, money must be provided to satisfy obligations to the bondholders." *Id.*. The Court held, however, that such a constitutional "first lien" did not impose an obligation to maintain the city sales tax or any other particular revenue stream for the benefit of its bondholders. *Id.* at 550-51.

*Quirk* is directly on point. Just as there was no obligation for New York City to make any particular revenue source available for repayment of its bonds, neither Article VI, Section 8 nor any other provision of the Puerto Rico Constitution requires the Commonwealth to ensure that any particular revenue stream (whether IVU revenues or otherwise) will be made available to secure repayment of GO debt. Nor does the Puerto Rico Constitution impose any restriction on the Legislative Assembly's ability to transfer property to municipal corporations. Rather, the Puerto Rico Constitution merely provides (1) that the GO debt ceiling should be calculated by reference to funds covered into the Commonwealth Treasury, P.R. Const. art. VI, § 2; (2) that the Commonwealth must maintain a balanced budget (*i.e.*, one in which appropriations do not exceed revenues), *id.* § 7; and (3) that if available resources prove insufficient to meet appropriations, those available resources should be applied to GO debt first, *id.* § 8. These requirements have no bearing on whether there is an obligation to ensure that every last dollar raised through Commonwealth legislation be committed or "covered into" the Commonwealth Treasury. *See Quirk*, 363 N.E.2d at 550 ("[T]his 'first lien' on the city's revenues does not give bondholders the right to insist that any particular existing taxes be maintained or new ones

imposed to produce those revenues."). On the face of the Puerto Rico Constitution, and in contrast to other state constitutions,[19] there is no such obligation.

>       **b.      Constitutional requirements as to treatment of treasury funds do not amount to a requirement that all legislatively generated funds be covered into the treasury.**

In *Saratoga Harness Racing Association v. Agriculture and New York State Horse Breeding Development Fund*, 238 N.E.2d 730 (N.Y. 1968), the plaintiffs challenged the constitutionality of legislation which created a public corporation to be funded by a tax on private horse racing associations. The revenues generated by the tax flowed directly to the public corporation, rather than into New York's general treasury. *Id.* at 732. The plaintiffs alleged that the legislation violated the "appropriation" provision of the New York Constitution, which provided (in relevant part) that "[n]o money shall ever be paid out of the state treasury or any of its funds, or any of the funds under its management, except in pursuance of an appropriation by law . . . ." *Id.* The plaintiffs alleged that, in light of this appropriation requirement, it was constitutionally impermissible for the revenues generated by the tax to flow directly to the public corporation; rather, they maintained, it must flow to the state and be disbursed pursuant to appropriation. *Id.* at 733.

Noting that "not every fund made up of public moneys raised through taxation or otherwise comes within the purview of [the appropriation provision]," the New York Court of Appeals held that the legislative structure was constitutional because the legislature effectively maintained control over the spending such that "all that [was] left to the 'Fund' [was] the

---

[19] *See Municipality of Metro. Seattle v. O'Brien*, 544 P.2d 729, 733 (Wash. 1976) ("***Except in cases where the constitution requires that moneys be paid into the state treasury***, . . . the legislature has authority to determine the nature, the place and character of custody, and the requisites for the expenditure of a fund created by it." (emphasis added)); *Baro v. Murphy*, 207 N.E.2d 593, 598 (Ill. 1965) (upholding power of legislature to transfer revenues other than taxes to a special use "and to eliminate them from the State Treasury"; taxes excluded from that power due to express provision of Illinois Constitution requiring that all taxes be covered into state treasury).

administration of the expenditures in accordance with the legislative mandate." *Id.*  In a subsequent decision, *Anderson v. Regan*, 425 N.E.2d 792 (N.Y. 1981), the New York Court of Appeals explained that "[o]ur holding in *Saratoga* . . . was clearly predicated upon the fact that *the money in issue there, although raised through legislative assessment, never became the property of the State and was never placed within the State treasury*, but rather was immediately deposited in a separate fund administered by a legislatively created public benefit corporation." *Id.* at 793 (emphasis added).

*Saratoga* and *Anderson* together support the proposition that even where a constitutional provision requires that funds deposited in the state treasury be treated in a certain manner, such a provision does not bar legislation that prevents such funds from ever reaching the state treasury.  That rule is directly applicable here:  although the Puerto Rico Constitution provides guidelines as to how the Secretary of the Treasury must apply available funds in the event revenues fall short in a given fiscal year, P.R. Const. art. VI, § 8, that provision imposes no restrictions on funds that never reach the Commonwealth Treasury.  The fact that the IVU revenues are "raised through legislative assessment," as was the case in *Anderson*, 425 N.E.2d at 793, does not compel a contrary result.

> c.  **Courts readily uphold legislation transferring revenue streams to fund municipal corporations so long as the legislation is appropriately cabined.**

This is not to say that legislatures are entirely unrestricted in their ability to transfer dedicated revenue streams to municipal corporations.  Rather, in evaluating the particular legislative structure at issue, courts consider a number of factors, such as (1) whether it was passed in response to exigent circumstances;[20] (2) whether the transferred revenues are placed in

---

[20] *See, e.g.*, *Municipality of Metro. Seattle v. O'Brien*, 544 P.2d 729 (Wash. 1976); *Opinion of the Justices to the House of Representatives*, 471 N.E.2d 1266 (Mass. 1984); *Baro v. Murphy*, 207 N.E.2d 593 (Ill. 1965).

trust for particular beneficiaries;[21] (3) whether the revenues are deposited in a special fund to be used for specific purposes;[22] (4) whether the revenues are received on account of the state or the public corporation created by the legislation;[23] (5) whether the transferred revenues are subject to a monetary cap;[24] and (6) whether the bonds secured by the transferred revenues are obligations of the state or solely of the public corporation.[25]  Where many of these factors are present, courts have consistently rejected constitutional challenges to such legislative structures.  The Court should do the same here.

The opinion of the Supreme Judicial Court of Massachusetts in *Opinion of the Justices to the House of Representatives*, 471 N.E.2d 1266 (Mass. 1984), is instructive.  There, the legislature established a public corporation called the Massachusetts Development Bank ("Mass/Bank") to provide financing for various infrastructure projects, including through the issuance of bonds.  Mass/Bank was funded through a tax imposed on all business corporations subject to taxation in the state.  The revenues were deposited directly into a "special fund" designated solely for Mass/Bank's use, including as a source of repayment for any debt securities issued by Mass/Bank.  The question before the Court was whether this structure violated a constitutional provision requiring that "[a]ll money received on account of the commonwealth

[21] *See, e.g.*, *Tatum v. Wheeless*, 178 So. 95 (Miss. 1938); *Gipson v. Ingram*, 223 S.W.2d 595 (Ark. 1949); *Friedman v. Am. Sur. Co. of N.Y.*, 141 S.W.2d 570 (Tex. 1941); *Saratoga Harness Racing Ass'n v. Agriculture & N.Y. State Horse Breeding Dev. Fund*, 238 N.E.2d 730 (N.Y. 1968); *Opinion of Justices*, 471 N.E.2d at 1269; *Baro*, 207 N.E.2d at 593.

[22] *See, e.g.*, *King Cnty. v. Taxpayers of King Cnty.*, 949 P.2d 1260 (Wash. 1997); *Saratoga Harness Racing*, 238 N.E.2d at 730; *Friedman*, 141 S.W.2d at 570; *Opinion of Justices*, 471 N.E.2d at 1269; *Baro*, 207 N.E.2d at 593; *Graham v. Ill. State Toll Hwy. Auth.*, 695 N.E.2d 630 (Ill. 1998); *N.J. Sports & Exposition Auth. v. McCrane*, 292 A.2d 545 (N.J. 1972); *Hickel v. Cowper*, 874 P.2d 922 (Alaska 1994).

[23] *See, e.g.*, *King Cnty.*, 949 P.2d at 1260; *Saratoga Harness Racing*, 238 N.E.2d at 730; *Opinion of the Justices*, 471 N.E.2d at 1269; *Friedman*, 141 S.W.2d at 570.

[24] *See, e.g.*, *Graham,* 695 N.E.2d at 360; *Saratoga Harness Racing*, 238 N.E.2d at 730; *Opinion of the Justices*, 471 N.E.2d at 1269.

[25] *See, e.g.*, *Baro*, 207 N.E.2d at 593; *Graham*, 695 N.E.2d at 360; *N.J. Sports*, 292 A.2d at 545.

[of Massachusetts] from any source whatsoever shall be paid into the treasury thereof." *Id*. at 1274.

The Court ruled that it need not decide the question whether the tax revenues received by Mass/Bank constituted "money received on account of the commonwealth"—a terminological issue similar to Puerto Rico's "available resources" question—because the revenues were "received in trust and disbursed according to conditions prescribed in the bill," subject to a monetary cap on the revenues generated and limits on their use. *Id.* at 1276. Observing that the trust structure would "increase the marketability of debt obligations to be issued by Mass/Bank," the Court held that the use of the tax revenues to secure bonds was appropriately specific, with the bondholders as the beneficiaries of the structure. *Id.* Numerous cases are in accord.[26]

The decisions in which legislation alienating government revenues was invalidated are likewise instructive, albeit by contrast. For instance, in *Opinion of Justices*, 484 N.E.2d 95 (Mass. 1985), the Supreme Judicial Court of Massachusetts invalidated a proposed bill which would dedicate a portion of certain local taxes to the Massachusetts Convention Center Authority. The court found the single limitation on spending—that the funds would not be used to construct sports arenas—"hardly consequential to the broad range of authorized expenditures," and noted that convention centers are not the "traditional, central, and basic government activities" that were the basis for similar legislation the court had previously declared valid. *Id*. at 100. Similarly, in *Anderson*, the New York Court of Appeals found that by placing federal funds in the state treasury for "administrative convenience" before disbursing them to state agencies with "little or no legislative participation," the state executive branch violated New

---

[26] *See Friedman*, 151 S.W.2d 570 (Tex. 1941); *Baro*, 207 N.E.2d 593 (Ill. 1965); *Graham*, 695 N.E.2d 360 (Ill. 1998); *Tatum*, 178 So. 95 (Miss. 1938); *Gipson*, 223 S.W.2d 595 (Ark. 1949); *N.J. Sports & Exposition Auth.*, 292 A.2d 545 (N.J. 1972); *Hickel*, 874 P.2d 922 (Alaska 1994); *King Cnty.*, 949 P.2d 1260 (Wash. 1997).

York's constitutional appropriation provision governing the expenditure of state funds. 425 N.E.2d at 793.[27]

The factors warranting invalidation of the legislation in the foregoing cases are entirely absent here; rather, the COFINA structure reflects all of the features that have led courts to uphold similar structures against constitutional attack. First, as Plaintiffs acknowledge, the Legislative Assembly created COFINA in response to an urgent fiscal crisis—then the most severe in the Commonwealth's history. (¶ 103.) Second, much like the tax revenues at issue in *Mass/Bank*, the IVU revenues are held in trust for the benefit of COFINA's bondholders. (¶¶ 97, 161.) Third, the IVU revenues are deposited directly in a special fund—the *Fondo de Interes Apremiante*, or "FIA" (¶ 103)—and are to be used for specific, statutorily enumerated purposes. 13 L.P.R.A. § 13. Fourth, the IVU revenues are not received on account of the Commonwealth, as the COFINA enabling statute expressly provides that the IVU revenues shall not constitute resources available to the Commonwealth. 13 L.P.R.A. § 12. Fifth, the IVU revenues belonging to COFINA are subject to a monetary cap. (¶ 100.) Finally, as Plaintiffs allege (¶ 15) and the COFINA statute expressly confirms, the bonds issued by COFINA are not obligations of the Commonwealth and the "full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged" for the payment of COFINA bonds. 13 L.P.R.A. § 13(d).

<p style="text-align:center">*     *     *</p>

In sum, on the face of the pleadings, the IVU revenues are statutorily the property of COFINA and are literally unavailable to the Commonwealth, and thus do not constitute "available resources" under the plain meaning of Article VI, Section 8. The only question is

---

[27] Other equally distinguishable examples include: *Opinion of Justices*, 134 N.E.2d 892 (Mass. 1956) (proposed statute did not create a trust for hunting and fishing license and permit fees, nor provide any limits on the funds or the purposes for which they may be used); *Dallas Cnty. v. McCombs*, 140 S.W.2d 1109, 1111 (Tex. 1940) (blanket statement that certain cities had "from time to time [] been visited with public calamities of one kind or another" insufficient to justify diversion of general ad valorem taxes originally collected as state revenues).

whether the fact that the IVU revenues have been rendered unavailable by legislative design renders COFINA's enabling legislation constitutionally suspect. That is plainly not so, as COFINA's enabling legislation clearly has a "rational nexus" to the Commonwealth's legitimate government interest in addressing a fiscal crisis; the text and structure of the Puerto Rico Constitution fully authorize the COFINA structure; three Puerto Rico Secretaries of Justice have affirmed the constitutionality of the structure; and the overwhelming weight of judicial precedent has upheld similar structures against analogous constitutional attack. Accordingly, even if this Court were to conclude that the "available resources" question is relevant the Section 303(3) claim (it is not), and decline to certify the question to the Supreme Court of Puerto Rico, it should dismiss the Second Cause of Action and that portion of the Twelfth Cause of Action that relates to COFINA pursuant to Rule 12(b)(6) because the Supreme Court of Puerto Rico would rule that the Legislative Assembly's transfer of the IVU revenues to COFINA was valid under the Puerto Rico Constitution.

## <u>CONCLUSION</u>

For the foregoing reasons, Ambac respectfully requests that this Court enter an order dismissing the SAC's Second Cause of Action and Twelfth Cause of Action, to the extent it is asserted to enforce the Second Cause of Action, under Rule 12(b)(6) for failure to state a claim upon which relief can be granted, or, in the alternative, striking the COFINA Remedial Provisions under Rule 12(f). Ambac also requests dismissal of the Second and Twelfth Causes of Action on equitable grounds under the doctrine of laches. Further in the alternative, Ambac requests that the Court certify the question whether the IVU revenues are "available resources" under the Puerto Rico Constitution to the Supreme Court of Puerto Rico.

Dated: San Juan, Puerto Rico
       March 20, 2017

                          FERRAIUOLI LLC

By:    */s/ Roberto A. Cámara-Fuertes*
          Roberto A. Cámara-Fuertes
          USDC P.R. No. 219002
          221 Ponce de León Avenue 5th Floor
          San Juan, PR 00917
          Telephone: (787) 766-7000
          Facsimile: (787) 766-7001
          Email: rcamara@ferraiuoli.com

                          MILBANK, TWEED, HADLEY & MCCLOY LLP

By:    */s/ Andrew M. Leblanc*
          Dennis Dunne (*admitted pro hac vice*)
          Andrew M. Leblanc (*admitted pro hac vice*)
          Atara Miller (*admitted pro hac vice*)
          Grant R. Mainland (*admitted pro hac vice*)
          28 Liberty Street
          New York, NY 10281
          Telephone: (212) 530-5770
          Facsimile: (212) 530-5770
          Email: ddunne@milbank.com
                   aleblanc@milbank.com
                   amiller@milbank.com
                   gmainland@milbank.com

          *Attorneys for Ambac Assurance Corporation*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

LEX CLAIMS, LLC, et al.,

                   Plaintiffs,

        v.

ALEJANDRO GARCÍA PADILLA, et al.,

                   Defendants.

Case No. 3:16-cv-02374 (FAB)

**DECLARATION OF ROBERTO A. CÁMARA-FUERTES IN SUPPORT OF
INTERVENOR-DEFENDANT AMBAC ASSURANCE CORPORATION'S MOTION TO
DISMISS, TO STRIKE, OR, IN THE ALTERNATIVE, TO CERTIFY THE COFINA
QUESTION TO THE SUPREME COURT OF PUERTO RICO**

        Roberto A. Cámara-Fuertes, pursuant to 28 U.S.C. § 1746, hereby declares as follows:

        1.      I am an attorney associated with the law firm of Ferraiuoli LLC, counsel to Intervenor Ambac Assurance Corporation ("Ambac") in the above-captioned action. I am a member in good standing of the bar of this Court. I submit this declaration in support of Intervenor-Defendant Ambac Assurance Corporation's Motion to Dismiss Plaintiffs' PROMESA § 303 Claim, to Strike Certain Portions of the SAC's Prayer for Relief, or, in the Alternative, to Certify the COFINA Question to the Supreme Court of Puerto Rico, filed on March 20, 2017.

        2.      Attached as **Exhibit A** is a true and correct copy of the Amended and Restated Sales Tax Revenue Bond Resolution adopted by the Puerto Rico Sales Tax Financing Corporation on July 13, 2007, as amended on June 10, 2009.

        3.      Attached as **Exhibit B** is a true and correct copy of the Financial Guaranty Insurance Policy, Number 26827BE, issued by Ambac, dated July 31, 2007.

4.      Attached as **Exhibit C** is a true and correct copy of the Bond Resolution Authorizing and Securing $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A.

5.      Attached as **Exhibit D** is a true and correct copy of an excerpt from the Official Statement dated March 11, 2014, issued in connection with the $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A.

6.      Attached as **Exhibit E** is a true and correct copy of a letter dated December 13, 2011, from Secretary of Justice Guillermo A. Somoza Colombani to the Government Development Bank for Puerto Rico and the Puerto Rico Sales Tax Financing Corporation.

7.      Attached as **Exhibit F** is a true and correct copy of an excerpt from the Official Statement dated November 16, 2011, issued in connection with the $734,795,573.95 Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, First Subordinate Series 2011A.

I declare under penalty of perjury that the foregoing is true and correct.

Dated: March 20, 2017
       San Juan, Puerto Rico

Roberto A. Cámara-Fuertes
USDC P.R. No. 219002
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile: (787) 766-7001
Email: rcamara@ferraiuoli.com

- 2 -

# PUERTO RICO SALES TAX FINANCING CORPORATION

---

## AMENDED AND RESTATED
## SALES TAX REVENUE BOND RESOLUTION

---

Adopted on July 13, 2007
As amended on June 10, 2009

511470.30 032563 RES

# TABLE OF CONTENTS

Page

## ARTICLE I

### DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101.   Definitions...................................................................................1
SECTION 102.   Authority for this Resolution ........................................................21
SECTION 103.   Resolution to Constitute Contract.................................................21
SECTION 104.   Special Provisions Concerning Capital Appreciation Bonds.........................21

## ARTICLE II

### AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201.   Authorization of Bonds..................................................................23
SECTION 202.   General Provisions for Issuance of Bonds. .....................................23
SECTION 203.   Special Provisions for Refunding Bonds. ........................................27
SECTION 204.   Delegation of Officers and Committees. ..........................................28
SECTION 205.   Credit and Liquidity Facilities; Rights of Credit Facility Providers.............28
SECTION 206.   Qualified Hedges ...........................................................................29
SECTION 207.   Parity Obligations and Subordinate Obligations.............................29

## ARTICLE III

### GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.   Medium of Payment; Form and Date; Letters and Numbers........................30
SECTION 302.   Legends...........................................................................................30
SECTION 303.   Execution and Authentication..........................................................30
SECTION 304.   Negotiability, Transfer and Registry..................................................31
SECTION 305.   Registration of Transfer of Bonds......................................................31
SECTION 306.   Regulations with Respect to Exchanges and Registration of
               Transfers ........................................................................................31
SECTION 307.   Bonds Mutilated, Destroyed, Stolen or Lost......................................32
SECTION 308.   Preparation of Definitive Bonds; Temporary Bonds. .........................32
SECTION 309.   Tender of Option Bonds or Fixed Tender Bonds; Original Issue
               Discount..........................................................................................33
SECTION 310.   Book-Entry-Only System...................................................................33

## ARTICLE IV

### REDEMPTION OF BONDS

SECTION 401.   Privilege of Redemption and Redemption Price...............................34

i

**TABLE OF CONTENTS**

Page

SECTION 402.    Redemption at the Election of the Corporation ..............................................34
SECTION 403.    Redemption out of Sinking Fund Installments. .............................................34
SECTION 404.    Selection of Bonds to be Redeemed in Partial Redemption. ........................35
SECTION 405.    Notice of Redemption ....................................................................................35
SECTION 406.    Payment of Redeemed Bonds ........................................................................36
SECTION 407.    Cancellation and Disposition of Bonds..........................................................36

ARTICLE V

PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND
APPLICATION THEREOF

SECTION 501.    The Pledge. ....................................................................................................38
SECTION 502.    Establishment of Fund and Accounts. ............................................................38
SECTION 503.    Costs of Issuance Account and Capitalized Interest Account. .......................39
SECTION 504.    Bond Proceeds Account...................................................................................40
SECTION 505.    Revenue Account.............................................................................................41
SECTION 506.    Debt Service Account......................................................................................43
SECTION 507.    Debt Service Reserve Account. .......................................................................45
SECTION 508.    Satisfaction of Sinking Fund Installments. .....................................................47
SECTION 509.    Redemption Account; Amounts to be Deposited Therein. ............................48
SECTION 510.    Rebate Account. ..............................................................................................49

ARTICLE VI

SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.    Security for Deposits.......................................................................................50
SECTION 602.    Investment of Funds, Accounts and Subaccounts Held by the
                Trustee.............................................................................................................50
SECTION 603.    Valuation and Sale of Investments. ................................................................51

ARTICLE VII

PARTICULAR COVENANTS OF THE CORPORATION

SECTION 701.    Payment of Obligations; Pledged Sales Tax Base Amount...........................53
SECTION 702.    Extension of Payment of Bonds.......................................................................53
SECTION 703.    Offices for Servicing Bonds............................................................................53
SECTION 704.    Further Assurance ...........................................................................................53
SECTION 705.    Power to Issue Bonds and Pledge Funds and Accounts ...............................54
SECTION 706.    Agreement of the Commonwealth. ..................................................................54
SECTION 707.    Creation of Liens.............................................................................................54
SECTION 708.    Accounts and Reports. ....................................................................................55

511470.30 032563 RES

## TABLE OF CONTENTS

<div align="right">Page</div>

SECTION 709.     Tax Matters. ....................................................................................................55
SECTION 710.     Issuance of Additional Bonds; Incurrence of Additional Parity
                 Obligations and Subordinate Obligations; Payment of  Obligations. ...........56
SECTION 711.     General. ...........................................................................................................59

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.     Trustee Appointment and Acceptance of Duties ..........................................60
SECTION 802.     Responsibilities of Trustee ..........................................................................60
SECTION 803.     Evidence on Which Trustee May Act ..........................................................61
SECTION 804.     Compensation and Indemnification ..............................................................61
SECTION 805.     Certain Permitted Acts ................................................................................62
SECTION 806.     Resignation of Trustee .................................................................................62
SECTION 807.     Removal of Trustee ......................................................................................63
SECTION 808.     Appointment of Successor Trustee. .............................................................63
SECTION 809.     Transfer of Rights and Property to Successor Trustee ................................64
SECTION 810.     Appointment of Co-Trustee. ........................................................................64
SECTION 811.     Merger or Consolidation ..............................................................................65
SECTION 812.     Adoption of Authentication .........................................................................65
SECTION 813.     Accounting by Trustee; Nonpetition Covenant ...........................................66

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.     Supplemental Resolutions Effective upon Filing with the Trustee ...............67
SECTION 902.     Supplemental Resolutions Effective upon Consent of Trustee ....................68
SECTION 903.     Supplemental Resolutions Effective with Consent of Bondowners .............68
SECTION 904.     General Provisions. ......................................................................................68

## ARTICLE X

## AMENDMENTS

SECTION 1001.     Mailing and Publication. .............................................................................70
SECTION 1002.     Powers of Amendment ................................................................................70
SECTION 1003.     Consent of Bondowners ..............................................................................71
SECTION 1004.     Modifications by Unanimous Consent ........................................................71
SECTION 1005.     Modification Before Bonds Outstanding ....................................................71
SECTION 1006.     Exclusion of Bonds .....................................................................................72
SECTION 1007.     Notation on Bonds ......................................................................................72

<div align="center">iii</div>

# TABLE OF CONTENTS

Page

## ARTICLE XI

## DEFAULTS AND REMEDIES

SECTION 1101.  Events of Default. ..................................................................73
SECTION 1102.  Remedies.............................................................................73
SECTION 1103.  Priority of Payments After Event of Default. ..............................75
SECTION 1104.  Termination of Proceedings ....................................................76
SECTION 1105.  Bondowners' Direction of Proceedings......................................76
SECTION 1106.  Limitation on Rights of Bondowners.........................................76
SECTION 1107.  Possession of Bonds by Trustee Not Required ...........................77
SECTION 1108.  Remedies Not Exclusive ........................................................77
SECTION 1109.  No Waiver of Default..............................................................78
SECTION 1110.  Notice of Event of Default.......................................................78

## ARTICLE XII

## MISCELLANEOUS

SECTION 1201.  Defeasance. .........................................................................79
SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds. ...............81
SECTION 1203.  Moneys Held for Particular Bonds ............................................82
SECTION 1204.  Preservation and Inspection of Documents.................................82
SECTION 1205.  Parties Interested Herein ........................................................82
SECTION 1206.  No Personal Liability .............................................................82
SECTION 1207.  Successors and Assigns..........................................................82
SECTION 1208.  Severability of Invalid Provisions ............................................82
SECTION 1209.  Headings .............................................................................82
SECTION 1210.  Conflict ...............................................................................83
SECTION 1211.  Governing Law .....................................................................83
SECTION 1212.  Effective Date ......................................................................83

511470.30 032563 RES

## SALES TAX REVENUE BOND RESOLUTION

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation, as follows:

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101. Definitions. The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior

Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the

-2-

related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the

Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Proceeds Account** shall mean the Account by that name established by Section 502.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital

-4-

Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity, in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Commonwealth Sales Tax** shall mean the sales and use tax enacted by the Legislative Assembly of Puerto Rico by virtue of Act No. 117 of the Legislature of Puerto Rico, approved July 4, 2006, as amended.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at

-5-

which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act..

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to Section 502.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which

-6-

shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

-7-

(ii)     Defeased Municipal Obligations;

(iii)     certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

511470.30 032563 RES

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

-9-

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Holding Subaccount** means each Account by that name established in a Debt Service Account pursuant to Section 502.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)    Defeasance Obligations;

(ii)   Defeased Municipal Obligations;

(iii)  public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)  shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or

-10-

any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii) bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix) repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x) investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi) any other obligations conforming to any Corporation guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

-11-

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

-12-

511470.30 032563 RES

       (i)      any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

       (ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

       (iii)   Bonds deemed to have been paid as provided in Section 1201;

       (iv)    Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

       (v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

       (vi)    as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

       In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in this Resolution.

       With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

-13-

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.  All Revenues.

2.  All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3.  The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1201 and 1203.

4.  Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.  Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

-14-

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 508) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be

-15-

based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

-16-

Rebate Account shall mean the Account by that name established by Section 502.

Rebate Amount shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

Record Date shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Series Resolution authorizing such Bond.

Redemption Account shall mean the Account by that name established by Section 502.

Redemption Price shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

Refunding Bonds shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 203 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Series Resolution.

Related August 2 Computation Period shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

Reserve Account Cash Equivalent shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

-17-

**Resolution** shall mean this Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

  1. All Pledged Sales Tax received by the Corporation or the Trustee.

  2. With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of Section 710 or other purposes of the Resolution.

  3. Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

  4. Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution, subject to the provisions of Sections 1201 and 1203.

  5. Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

511470.30 032563 RES

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Secretary** means, for purposes of the Resolution and so long as Bonds shall be Outstanding, the Secretary of the Board of Directors of Government Development Bank for Puerto Rico, who shall also act as Secretary of the Board of Directors of the Corporation and as Secretary under this Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee, in the form appended hereto as Appendix A.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with Article IX.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

-20-

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

SECTION 102. Authority for this Resolution. This Resolution is adopted pursuant to the authority conferred on the Corporation by the Act.

SECTION 103. Resolution to Constitute Contract. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, the Resolution shall be deemed to be and shall constitute a contract among the Corporation, the Owners from time to time of the Bonds, and all other Beneficiaries; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and all other Beneficiaries, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and such Beneficiaries over any other thereof, except as expressly otherwise provided in or permitted by the Resolution.

SECTION 104. Special Provisions Concerning Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1. For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2. For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended redemption.

3. For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended exchange or substitution.

-21-

4. For purposes of Section 406, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount.

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended application of the subject assets.

6. For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the most recent Compounding Date.

7. For purposes of Section 1201, the principal amount of any Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

-22-

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201. <u>Authorization of Bonds</u>. There is hereby created and established an issue of Bonds of the Corporation to be designated as "Sales Tax Revenue Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in the Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by the Resolution, in the manner and to the extent provided herein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property and other funds and assets of or available to the Corporation and pledged therefor, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202. <u>General Provisions for Issuance of Bonds</u>.

1.      The Bonds may, if and when authorized by the Corporation pursuant to one or more Series Resolutions, be issued in one or more Series, as Senior Bonds or one or more Classes of Subordinate Bonds, and the designation thereof, in addition to the name "Sales Tax Revenue Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the Corporation may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, Taxable Bonds or Tax Exempt Bonds or any combination of the foregoing, which in each case may be Serial Bonds or Term Bonds, or any combination thereof. Any Bonds that are to be issued as Subordinate Bonds may be issued with priorities of payment hereunder among all such Subordinate Bonds, as set forth in the related Series Resolutions.

2.      Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)      the authorized principal amount and designation of such Series of Bonds;

(ii)      the purpose or purposes for which such Series of Bonds is being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of the Resolution:  (a) to provide sufficient

-23-

funds for the Project; (b) to refund or otherwise prepay any Bonds or other bonds, notes or other evidences of indebtedness issued by the Corporation for the Project; (c) to pay or provide for the payment of Financing Costs, including but not limited to Costs of Issuance; and/or (d) for such other purposes or projects as may be authorized by the Act, as the same may be amended and then in effect.

(iii)     the date or dates, maturity date or dates (which for all Bonds issued after the date of issuance of Bonds designated "Series 2008A", shall be on August 1 in the related year) and amounts of each maturity of the Bonds of such Series;

(iv)     the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, original issue discount and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which the rate at which Adjustable Rate Bonds of such Series bear interest shall be adjusted;

(v)     the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds (including Convertible Capital Appreciation Bonds), Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender bonds, Taxable Bonds or Tax Exempt Bonds;

(vi)     the designation of Bonds of such Series as Senior Bonds or as one or more Classes of Subordinate Bonds and the designation of Beneficiaries;

(vii)     the Record Date, if any, for such Bonds;

(viii)     the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)     if so determined by the Corporation, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)     the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)     the Redemption Price or Prices, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), provided that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this subsection shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

-24-

(xii)   the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series (which date for all Bonds issued after the date of issuance of Bonds designated "Series 2008A" shall be on August 1 in the related year);

(xiii)   the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)   the amount, if any, or method of determining such amount, to be credited to the Costs of Issuance Account or otherwise to be paid for Costs of Issuance;

(xv)   if so determined by the Corporation, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)   if so determined by the Corporation, provisions for the sale of the Bonds of such Series;

(xvii)   provisions for the execution and authentication of the Bonds of such Series;

(xviii) the forms of the Bonds of such Series and of the Trustee 's certificate of authentication;

(xix)   if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Contractual Maximum Interest Rate for such Bonds and the provisions, if any, as to the calculation or change of Adjustable Rates;

(xx)   if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof;

(xxi)   if so determined by the Corporation, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series reflecting the addition of resources to Revenues or Pledged Property;

(xxii)  if so determined with respect to the Bonds of such Series, that Section 709 shall not apply to such Bonds;

(xxiii) deposits into Funds, Accounts and Subaccounts as may be required or permitted by the Resolution and not otherwise provided for above;

511470.30 032563 RES

(xxiv)  if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxv)  if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined; and

(xxvi)  any other provisions deemed advisable by the Corporation, not in conflict with the provisions of the Resolution or the Act as each is then in effect.

3.  Each Series of Bonds shall be executed by the Corporation for issuance under the Resolution and delivered to the Trustee and thereupon shall be authenticated by the Trustee and delivered to the Corporation or upon its order, but only upon satisfaction with the conditions to issuance of additional Bonds contained in Section 710 and only upon the receipt by the Trustee of:

(i)  a copy of the Resolution, certified by an Authorized Officer of the Corporation or the Secretary;

(ii)  an Opinion of Bond Counsel to the effect that (A) the Corporation has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the Corporation, is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid pledge for the benefit of the Owners of the Bonds which it purports to create of the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special obligations of the Corporation as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)  a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the Corporation;

-26-

(iv)    a copy of the Series Resolution authorizing such Series, certified by an Authorized Officer of the Corporation or the Secretary;

(v)    a certificate of an Authorized Officer of the Corporation as to deposits in Accounts and stating that the Corporation is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the Corporation;

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution or Supplemental Resolution adopted pursuant to Article IX.

4.    Each Series of Bonds shall be issued upon compliance with Section 710.

SECTION 203.  Special Provisions for Refunding Bonds.

1.    Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, including for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.    The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee only upon receipt by the Trustee (in addition to the requirements of Section 202) of:

(i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication, irrevocable instructions to the Trustee, to provide notice in the manner provided in Section 1201 with respect to the payment of such Bonds pursuant to such Section 1201;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of subsection 2 of Section 1201, which moneys and Defeasance Securities shall be held in trust and used only as provided in subsection 2 of Section 1201; and

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in

-27-

paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

3.      Refunding Bonds may be issued only upon compliance with Section 710.

SECTION 204.  Delegation of Officers and Committees.

A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer or committee of the Corporation, and any such committee may delegate to an Authorized Officer of the Corporation, the power to issue Bonds from time to time and to fix the details of any such Bonds by an appropriate certificate of such Authorized Officer.  Any such action by an Authorized Officer of the Corporation shall be in writing.  Each such action by an Authorized Officer or committee of the Corporation with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 205.  Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1.      In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2.      Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

-28-

SECTION 206.  <u>Qualified Hedges</u>.  The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

SECTION 207.  <u>Parity Obligations and Subordinate Obligations</u>.  For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

511470.30 032563 RES

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.  Medium of Payment; Form and Date; Letters and Numbers.

1.  The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the applicable Series Resolution.

2.  The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.  Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.  Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.  If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of any Series authorized to be issued by such Supplemental Resolution may be evidenced in book entry form without definitive certificates delivered to each beneficial owner thereof.

SECTION 302.  Legends.  The Bonds of each Series in the form set forth in any Supplemental Resolution may also contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the Corporation prior to the authentication and delivery thereof.

SECTION 303.  Execution and Authentication.

1.  The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer of the Corporation and its corporate seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary.  In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Trustee, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.  Any Bond of a Series may be signed and sealed on behalf of the Corporation by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the Corporation, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

-30-

2.     The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Resolution and that the Owner thereof is entitled to the benefits of the Resolution.

SECTION 304. Negotiability, Transfer and Registry. All Bonds issued under the Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in the Resolution and in the Bonds. So long as any of the Bonds shall remain outstanding, the Corporation shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or registration of transfer. So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305. Registration of Transfer of Bonds.

1.     The transfer of each Bond shall be registrable only upon the books of the Corporation, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond the Corporation shall issue in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2.     The Corporation and the Trustee may deem and treat the person in whose name any Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary. The Corporation agrees to indemnify and hold the Trustee harmless against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under the Resolution, in so treating such Owner.

SECTION 306. Regulations with Respect to Exchanges and Registration of Transfers. In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of the Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Trustee. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the Corporation

-31-

or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in the Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the Corporation nor the Trustee shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307. Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, stolen or lost and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and Trustee may incur. All Bonds so surrendered to the Trustee shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the Corporation, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under the Resolution, in any moneys or securities held by the Corporation or the Trustee for the benefit of the Bondowners.

SECTION 308. Preparation of Definitive Bonds; Temporary Bonds.

1.      Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 303, and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as an Authorized Officer of the Corporation may deem appropriate to temporary Bonds. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Resolution.

-32-

2.     All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

SECTION 309.  <u>Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount</u>.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.  The Corporation shall file with the Trustee promptly at the end of each Bond Year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on Outstanding Bonds as of the end of such Bond Year, and (ii) such other specific information relating to such original issue discount as, in the judgment of the Trustee, may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

SECTION 310.  <u>Book-Entry-Only System</u>.  Notwithstanding any other provision of the Resolution, the Corporation may employ a book-entry-only system of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and/or the book-entry-only system depository.  Any provisions of the Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

-33-

# ARTICLE IV

## REDEMPTION OF BONDS

SECTION 401. <u>Privilege of Redemption and Redemption Price</u>. Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Resolution authorizing such Series.

SECTION 402. <u>Redemption at the Election of the Corporation</u>. In the case of any redemption of Bonds otherwise than as provided in Section 403, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

SECTION 403. <u>Redemption out of Sinking Fund Installments</u>.

1. In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2. In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 508) and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice

-34-

shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

3. The Corporation shall, and hereby covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404. <u>Selection of Bonds to be Redeemed in Partial Redemption</u>.

1. In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the Corporation shall designate the maturities of the Bonds to be redeemed.

2. If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section 404, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405. <u>Notice of Redemption</u>. When the Trustee shall receive notice from the Corporation of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Trustee shall give notice, in the name of the Corporation, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such notice is conditional and the conditions that must be satisfied. Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond or portion thereof to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date, in the Currency in which the Bonds of such Series are payable, and that from and after such date interest thereon shall cease to accrue and be payable on the Bonds or portions thereof to be redeemed, unless, in the case of any conditional notice, such conditions are not satisfied. The Trustee shall mail a copy of such notice, postage prepaid, no less than sixteen (16) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books. Failure

-35-

so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Trustee of moneys sufficient to pay the Redemption Price of such Bonds, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such recission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

SECTION 406. Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not occur on account of a condition stated in the notice to the Trustee pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the Corporation shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds or portions thereof of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds or portions thereof of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407. Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Trustee, in accordance with the Trustee's standard procedures, and upon request from the Corporation the Trustee shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of,

511470.30 032563 RES

and one executed certificate shall be delivered to the Corporation and the other executed certificate shall be retained by the Trustee.

511470.30 032563 RES

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.  The Pledge.

1.     The Pledged Property, subject to Section 804, is hereby pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution, and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.  Nothing contained herein shall prevent (i) a Credit Facility, Liquidity Facility or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to this Article V with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

2.     To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.  Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

SECTION 502.  Establishment of Fund and Accounts.

1.     The "Project Fund" is hereby created and the following special Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall be held by the Trustee:

(1)     Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

(2)     Capitalized Interest Account,

(3)     Bond Proceeds Account,

(4)     Revenue Account,

-38-

(5)     Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

(6)     Debt Service Reserve Account, established for each Class of Bonds,

(7)     Redemption Account, and

(8)     Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

2.     The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.     Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

SECTION 503.  Costs of Issuance Account and Capitalized Interest Account.

1.     If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Persons as directed in writing to the Trustee by the Corporation.

2.     There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth in paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

3.     If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in

accordance with the requirements of the Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

4.      Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)      stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

5.      Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in subsection 6 of this Section.

6.      The Trustee  shall deposit any funds described in subsection 5 of this Section in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

7.      In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 504.  Bond Proceeds Account.

1.      There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to this Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time.  Such amounts may include, but not be limited to, proceeds of Bonds and Build America Tax Credit Receipts.  Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Case 3:16-cv-02374-FAB Document 282-2 Filed 03/20/17 Page 46 of 89

2. Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to provide for the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

3. The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

4. Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

SECTION 505. Revenue Account.

1. All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America

Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto capitalized interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written

-42-

direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2.   Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

3.   Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds.  Such purchases shall be made at such price or prices as determined by such written instructions.  If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

SECTION 506.  Debt Service Account.

1.   There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

2.   There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)   Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)   Amounts transferred from the Capitalized Interest Account pursuant to Section 503 for the payment of interest on the Bonds of such Series.

(iii)   Amounts transferred from the Debt Service Reserve Account pursuant to Section 507 for the payment of interest on the Bonds and the interest component of Parity Obligations.

3.   There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

-43-

(i)      Amounts transferred from a Debt Service Reserve Account pursuant to Section 507 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)      Amounts transferred from the Redemption Account pursuant to Section 511 for the payment of Principal Installments of any Bonds.

4.      The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of subsection 2 of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.      The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee ; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of subsection 3 of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee, according to the amounts due on such date, without any discrimination or preference.

6.      In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

7.      There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to

511470.30 032563 RES

be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

SECTION 507. Debt Service Reserve Account.

1.      At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

2.      Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

3.      Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

4.      Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.      If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized

-45-

Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

6.    Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

7.    Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this subsection. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to subsection 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section.

511470.30 032563 RES

8.     Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

SECTION 508.   Satisfaction of Sinking Fund Installments.

1.     Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)     to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or

(ii)    to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2.     Upon the purchase or redemption of any Bond pursuant to subsection 1 of this Section, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited  against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption.  Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee  a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.     In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment.  All Bonds so delivered to the Trustee  in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds.  Concurrently with such delivery of such Bonds the Corporation shall

-47-

deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4. In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5. The Trustee shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in Section 403.

SECTION 509. <u>Redemption Account; Amounts to be Deposited Therein.</u>

1. The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i) amounts determined pursuant to subsection 6 of Section 503;

(ii) amounts determined pursuant to subsection 4 of Section 504;

(iii) amounts determined pursuant to subsection 2 of Section 505; and

(iv) amounts transferred from the Debt Service Reserve Accounts pursuant to Section 507 for the payment of the Redemption Price of Bonds.

2. Subject to the limitations contained in subsection 4 of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall

-48-

transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

3.      To the extent not required to make up a deficiency as required in subsection 2 of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to subsection 1 of Section 505.

4.      The transfers required by subsection 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 510.  Rebate Account.

1.      The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

2.      The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

3.      The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

4.      The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

511470.30 032563 RES

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601. <u>Security for Deposits</u>. All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Trustee; provided, however, that it shall not be necessary, unless required by applicable law, for the Trustee to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Trustee to give security for any moneys which shall be represented by obligations purchased under the provisions of the Resolution as an investment of such moneys. The Trustee shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602. <u>Investment of Funds, Accounts and Subaccounts Held by the Trustee.</u>

1.      Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.      Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

3.      Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or

-50-

Subaccount but, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account, and if not required to be so deposited in the Rebate Account because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

4. The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

5. Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

6. In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

SECTION 603. Valuation and Sale of Investments.

1. In computing the amounts in the Revenue Account, Debt Service Accounts, Debt Service Reserve Accounts and Rebate Account obligations purchased as an investment of moneys therein shall be valued at Amortized Value. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

-51-

2.    Neither the Trustee nor the Corporation shall be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article; provided, however, that nothing in this subsection shall affect the obligation of the Corporation under any of the Bonds.

511470.30 032563 RES

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

The Corporation covenants and agrees with the Trustee and the Bondowners as follows:

SECTION 701. Payment of Obligations; Pledged Sales Tax Base Amount. The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 5 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

SECTION 702. Extension of Payment of Bonds. The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the Corporation (i) to issue Option Bonds or Refunding Bonds as provided in herein and such issuance shall not be deemed to constitute an extension of maturity of Bonds or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703. Offices for Servicing Bonds. The Trustee shall at all times maintain one or more offices or agencies where Bonds may be presented for payment, registration of transfer or exchange, and where notices, demands and other documents may be served upon the Corporation in respect of the Bonds or of the Resolution. The Corporation hereby appoints the Trustee as its agent to maintain such offices or agencies.

SECTION 704. Further Assurance. At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other

-53-

moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705.  Power to Issue Bonds and Pledge Funds and Accounts.  The Corporation is duly authorized under all applicable laws to create and issue the Bonds and to adopt the Resolution and to pledge the Pledged Property purported to be pledged by the Resolution in the manner and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever.

SECTION 706.  Agreement of the Commonwealth.

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2

-54-

and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

SECTION 707. Creation of Liens. Until the pledge created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1201, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under this Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under this Resolution.

SECTION 708. Accounts and Reports.

1. The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee (it being understood that the Trustee shall have no duty so to inspect) and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing.

2. The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying such Event of Default or other event as described in this subsection, and specifying the nature and status of such Event of Default or other such event.

SECTION 709. Tax Matters.

1. The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

2. The Corporation will not make, or give its consent to the Trustee or any other Person, to make, any use of the proceeds of the Bonds or of any moneys which may be

-55-

511470.30 032563 RES

deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

      3.    The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Tax Exempt Bonds shall be excluded from gross income for Federal income tax purposes.

      4.    Notwithstanding any other provision of this Resolution, including in particular Section 1201 hereof, the obligation to comply with the requirements of this Section 709 shall survive the defeasance or payment in full of the Bonds.

      SECTION 710. <u>Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations</u>.

      1.    No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

      (1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and

-56-

Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.      (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.      No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt

-57-

service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second

-58-

Subordinate Bonds and Second Subordinate Obligations and such additional Second Subordinate Bonds or Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2.    In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by Section 505.1 which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3.    The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

SECTION 711. General.

1.    The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

2.    Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

511470.30 032563 RES

## ARTICLE VIII

### CONCERNING THE TRUSTEE

SECTION 801. <u>Trustee Appointment and Acceptance of Duties</u>. The Bank of New York Mellon is hereby appointed as Trustee under the Resolution. The Trustee shall signify its acceptance of the duties and obligations imposed upon it by the Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Trustee shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in the Resolution.

SECTION 802. <u>Responsibilities of Trustee</u>. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by this Resolution, the feasibility of the Project, the compliance by the Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any

-60-

error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VIII.

SECTION 803. Evidence on Which Trustee May Act.

1. The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

2. Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3. Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

SECTION 804. Compensation and Indemnification. The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the

compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

SECTION 805. Certain Permitted Acts. The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806. Resignation of Trustee. The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in

Section 808, in which event such resignation shall take effect immediately on the appointment of such successor.

SECTION 807. <u>Removal of Trustee</u>. The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

SECTION 808. <u>Appointment of Successor Trustee</u>.

1.      In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

2.      If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in Section 807 or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under Section 808, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

-63-

SECTION 809.  Transfer of Rights and Property to Successor Trustee.

Any successor Trustee appointed under the Resolution shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee; but the Trustee ceasing to act shall nevertheless, on the written request of the Corporation, or of the successor Trustee, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under the Resolution, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth but subject to Section 804.  Should any deed, conveyance or instrument in writing from the Corporation be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

SECTION 810.  Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable (including title to the Pledged Property or any part thereof).  Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Trustee shall, at the expense of the Corporation, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such

-64-

rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)     the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Resolution and the conditions of this Section 810. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without appointment of a new or successor trustee.

SECTION 811. Merger or Consolidation. Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by the Resolution, shall be the successor to the Trustee  without the execution or filing of any paper or the performance of any further act.

SECTION 812. Adoption of Authentication.   In case any of the Bonds contemplated to be issued under the Resolution shall have been authenticated but not delivered, any successor Trustee may adopt the certificate of authentication of any predecessor Trustee so authenticating such Bonds and deliver such Bonds so authenticated; and in case any of the said Bonds shall not have been authenticated, any successor Trustee may authenticate such Bonds in the name of the predecessor Trustee, or in the name of the successor Trustee, and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in the Resolution provided that the certificate of authentication of the Trustee  shall have.

511470.30 032563 RES

SECTION 813.  <u>Accounting by Trustee; Nonpetition Covenant</u>.   The Trustee shall, upon receipt of a written request therefor from the Corporation, provide to the Corporation an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under the Resolution as of the date of such accounting.  Notwithstanding any prior termination of this Resolution, the Trustee  shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the Corporation to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Corporation under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Corporation or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Corporation.

511470.30 032563 RES

# ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901. <u>Supplemental Resolutions Effective upon Filing with the Trustee.</u> For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

1.     to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

2.     to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

3.     to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

4.     to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

5.     to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

6.     to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

7.     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

8.     to cure any ambiguity, defect or inconsistent provision in the Resolution;

9.     to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

10.     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

-67-

511470.30 032563 RES

11.     as permitted by Section 1005;

12.     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

13.     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.  Reserved.

SECTION 903.  Supplemental Resolutions Effective with Consent of Bondowners.  At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 904.  General Provisions.

1.     The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

2.     Any Supplemental Resolution referred to and permitted or authorized by Sections 901 and 902 may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively.  The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.  After any Supplemental Resolution becomes effective under this Article, the Corporation shall mail to the Owners a notice briefly describing such Supplemental Resolution; provided, however, the failure to give such notice , or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.     The Trustee is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901, 902 or 903

-68-

Case 3:16-cv-02374-FAB Document 232-2 Filed 03/20/17 Page 74 of 89

and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

4. No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

# ARTICLE X

## AMENDMENTS

### SECTION 1001. Mailing and Publication.

1.      Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2.      In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002. Powers of Amendment. Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.   No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

511470.30 032563 RES

SECTION 1003.  Consent of Bondowners.  The Corporation may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 903, to take effect when and as provided in this Section.  A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Trustee ) together with a request to Bondowners for their consent thereto in form satisfactory to the Trustee, shall be mailed by the Corporation to Bondowners.  Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Trustee  (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002 and (b) an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided.  Ownership of Bonds shall be conclusively presumed by the registration books of the Corporation.  Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee  hereinafter in this Section provided for is filed.  At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Trustee shall make and file with the Corporation  a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents.  Such written statement shall be conclusive that such consents have been so filed.  At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the Corporation by mailing such notice to Bondowners.  The Corporation shall file with the Trustee proof of the mailing of such notice.  A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Trustee, shall be proof of the matters therein stated.

SECTION 1004.  Modifications by Unanimous Consent.  The terms and provisions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the Corporation with the Trustee of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005.  Modification Before Bonds Outstanding.  Prior to the issuance and delivery of the first Series of Bonds under the Resolution, the terms and conditions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

-71-

    SECTION 1006. <u>Exclusion of Bonds</u>. Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

    SECTION 1007. <u>Notation on Bonds</u>. Bonds authenticated and delivered after the effective date of any action taken as in Article IX or this Article provided may, and, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action. If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

511470.30 032563 RES

## ARTICLE XI

### DEFAULTS AND REMEDIES

SECTION 1101. <u>Events of Default</u>.

1.      Each of the following events shall constitute an Event of Default under the Resolution:

(i)      There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)      There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

provided, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of this Resolution, and all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

2.      In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

SECTION 1102. <u>Remedies</u>.

1.      Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, declare

-73-

511470.30 032563 RES

the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)  by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)  by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)  by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)  by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.  In the enforcement of any remedy under the Resolution, but subject to Sections 201, 501 and 1206, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

511470.30 032563 RES

## SECTION 1103.  Priority of Payments After Event of Default.

1.     Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee  and its agents and attorneys necessary in the opinion of the Trustee  to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee  shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH of this subsection 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an

511470.30 032563 RES

insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

2.      The provisions of this Section are in all respects subject to the provisions of Section 702.

3.      Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct.  Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Compounded Amount, if any) to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate for the fixing of any such date.  The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

SECTION 1104.  Termination of Proceedings.  In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

SECTION 1105.  Bondowners' Direction of Proceedings.    Anything in this Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee  hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, including Section 804 hereof, and that the Trustee  shall have the right to decline to follow any such direction which in the opinion of the Trustee  would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

SECTION 1106.  Limitation on Rights of Bondowners.

1.      No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Trustee  written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee  after the

-76-

right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or the Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2.     Anything to the contrary contained in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. <u>Possession of Bonds by Trustee Not Required</u>. All rights of action under this Resolution or under any of the Bonds, enforceable by the Trustee, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. <u>Remedies Not Exclusive</u>. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

-77-

SECTION 1109.  No Waiver of Default.  No delay or omission of the Trustee, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110.  Notice of Event of Default.  The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries.  Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof:  (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

511470.30 032563 RES

## ARTICLE XII

## MISCELLANEOUS

SECTION 1201. Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section.   Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied.  In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.     Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in subsection 12of this Section.  Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in subsection 1 of this Section 1201 if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee  either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee  at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit

-79-

required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

4.     Neither Defeasance Securities nor moneys deposited with the Trustee pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under this Section 1201.

5.     For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of this Section, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of this Section, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

511470.30 032563 RES

6.    Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of this Section, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this subsection 4. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

7.    Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds.

1.    Any request, consent, revocation of consent or other instrument which the Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing.  The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such

-81-

a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2.      The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3.      Any request or consent by the Owner of any Bond shall bind all future Owners of such Bonds in respect of anything done or suffered to be done by the Corporation or the Trustee in accordance therewith.

SECTION 1203.  Moneys Held for Particular Bonds.  The amounts held by the Trustee  for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1204.  Preservation and Inspection of Documents.   All documents received by the Trustee  under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1205.  Parties Interested Herein.  Nothing in the Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person or corporation, other than the Corporation, the Trustee, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of the Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in the Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Beneficiaries and the Owners of the Bonds.

SECTION 1206.  No Personal Liability.  Neither the members of the Corporation nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1207.  Successors and Assigns.   Whenever in the Resolution the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Resolution contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1208.  Severability of Invalid Provisions.  If any one or more of the covenants or agreements provided in the Resolution on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of the Resolution.

SECTION 1209.  Headings.   The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

-82-

SECTION 1210. <u>Conflict</u>. All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1211. <u>Governing Law</u>. This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution and the provisions of Section 601 (and the "applicable law" referred to in such Section 601 shall not include the laws of the Commonwealth) shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1212. <u>Notices</u>. Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

<u>To the Trustee:</u>

The Bank of New York Mellon
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Phone: 212-815-6955
Fax: 212-815-5595/5596

<u>To the Corporation:</u>

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Phone: 787-722-2525
Fax: 787-728-0975

SECTION 1213. <u>Effective Date</u>. This Resolution shall take effect immediately upon its adoption.

-83-

511470.30 032563 RES

**EXHIBIT A**

SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of July 31, 2007, is by and between the Puerto Rico Sales Tax Financing Corporation (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Sales Tax Revenue Bonds of the Debtor (the "Sales Tax Revenue Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on July 13, 2007, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as trustee under the Resolution (the "Secured Party").

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Sales Tax Revenue Bonds and payment to Beneficiaries in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the funds and accounts maintained by the Secretary of the Treasury, as paying agent, as the first repository for all Dedicated Sales Tax received from merchants and retailers and authorized collectors until deposited into the COFINA Project Fund (and all accounts therein) maintained under the Resolution, (ii) all amounts on deposit in the COFINA Project Fund (and all accounts therein) maintained under the Resolution, and all amounts required to be on deposit therein by the terms of the Resolution, and (iii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Sales Tax Revenue Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Sales Tax Revenue Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

PUERTO RICO SALES TAX FINANCING CORPORATION

By _____

      Name and Title:

THE BANK OF NEW YORK, as Trustee under the Resolution

By _____

      Name and Title:

# Ambac

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

## Financial Guaranty Insurance Policy

Obligor: PUERTO RICO SALES TAX FINANCING CORPORATION     Policy Number: 26827BE

Obligations: $808,489,849.75 of $2,667,603,572.60 Sales Tax Revenue Bonds,    Premium:   $39,719,277.00
Series 2007A, dated their date of delivery and consisting of:
$107,014,744.15 of Capital Appreciation Bonds maturing on August 1, 2047;
and $701,475,105.60 of Capital Appreciation Bonds maturing on August 1,
2054. The Trustee is The Bank of New York, New York, New York.

**Ambac Assurance Corporation (Ambac)**, a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

SEAL

Secretary

Authorized Representative

Effective Date:   July 31, 2007

THE BANK OF NEW YORK acknowledges that it has agreed
to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

A- 11765



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| | | | |
|---|---|---|---|
| **Issuer:** | Puerto Rico Sales Tax Financing Corporation | **Policy Number:** | 07010326 |
| | | **Control Number:** | 0010001 |
| **Bonds:** | $243,774,198.40 in original principal amount of Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds Series 2007A consisting of $15,445,848.60 Capital Appreciation Bonds due August 1, 2040; $114,697,901.80 Capital Appreciation Bonds due August 1, 2041; and $113,630,448.00 Capital Appreciation Bonds due August 1, 2042 | **Premium:** | $9,284,905.00 |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment"

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Municipal Bond
## New Issue Insurance Policy

means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date: July 31, 2007**

**Authorized Representative**

U.S. Bank Trust National Association acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

COUNTERSIGNATURE:

EASTERN AMERICAN INSURANCE AGENCY, INC.

Licensed Resident Agent

**Authorized Officer**



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| | |
|---|---|
| Policy Number: 07010326 | Control Number: 0010001 |

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:  July 31, 2007**

**Authorized Representative**

Acknowledged as of the Effective Date written above:

COUNTERSIGNATURE:

EASTERN AMERICA INSURANCE AGENCY, INC.

Licensed Resident Agent

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement
## To Financial Guaranty Insurance Company
## Insurance Policy

| Policy Number: 07010326 | Control Number: 0010001 |
|---|---|

It is further understood that with respect to the Bonds maturing August 1 in the years 2040, 2041 and 2042, the amount insured under this Policy is that portion of the accreted value (as set forth in the bond documents under which the Bonds are issued) of said Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:** July 31, 2007

**Authorized Representative**

**Acknowledged as of the Effective Date written above:**

COUNTERSIGNATURE:
EASTERN AMERICA INSURANCE AGENCY, INC.

Licensed Resident Agent

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

# FINANCIAL GUARANTY INSURANCE POLICY
## MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. 499240

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to   The Bank of New York, New York, New York

or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

$440,396,676.45 (Original Principal Value) $2,843,355,000 (Maturity Value)
Puerto Rico Sales Tax Financing Corporation
Sales Tax Revenue Bonds, Series 2007A
(Insured Maturities due August 1, 2043 through August 1, 2046)

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this 31st day of July, 2007.

COUNTERSIGNED:
AMERICAN FOREIGN UNDERWRITERS CORP.

Resident Licensed Agent
F. Phillip Rodriguez

San Juan, P. R.
City, State
STD-RCS-7
01/05

MBIA Insurance Corporation

President

Attest:

Assistant Secretary



July 31, 2007

The Bank of New York
New York, New York

$440,396,676.45 (Original Principal Value) $2,843,355,000 (Maturity Value)
Puerto Rico Sales Tax Financing Corporation
Sales Tax Revenue Bonds, Series 2007A
(Insured Maturities due August 1, 2043 through August 1, 2046)

Ladies and Gentlemen:

In connection with the above-described obligations (the "Obligations") of which you are acting as paying agent (the "Paying Agent"), please be advised that the payment to you of principal of and interest on the Obligations has been guaranteed by a policy of financial guaranty insurance (the "Policy") issued by the MBIA Insurance Corporation (the "Insurer"). U.S. Bank Trust National Association, New York, New York, (the "Fiscal Agent") is acting as the fiscal agent for the Insurer.

The Policy unconditionally and irrevocably guarantees to any owner or holder of the Obligations or, if applicable, of the coupons appertaining thereto (the "Owner"), the full and complete payment required to be made by or on behalf of the issuer of the Obligations (the "Issuer") to the Paying Agent or its successor of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any Owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference (a "Preference") to the Owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence are referred to collectively in this letter as the "Insured Amounts."

The Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligations. The Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of Obligations upon tender by an Owner thereof; or (iv) any Preference relating to (i) through (iii) above.

**MBIA Insurance Corporation** • 113 King Street • Armonk, NY 10504 • +1 914 273 4545 • *www.mbia.com*



**mbia**

WISDOM IN ACTION℠

-2-

In the event that the Issuer does not make full and complete payment when due of the principal of and interest on the Obligations, please immediately notify, by telephone or telegraph, the Insurer, 113 King Street, Armonk, New York, 10504, (914) 273-4545. On the due date or within one business day after receipt of such notice, whichever is later, the Insurer will deposit funds with the Fiscal Agent sufficient to pay the Obligations (or, if applicable, coupons appertaining thereto) then due. Upon presentment and surrender of such Obligations (or, if applicable, coupons) or presentment of such other proof of ownership of Obligations together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for the Owners in any legal proceeding related to payment of Insured Amounts on the Obligations (or, if applicable, coupons), such instruments being in a form satisfactory to the Fiscal Agent, the Fiscal Agent shall disburse to you payment of the Insured Amounts due on such Obligations (and, if applicable, coupons), less any amount held by you for the payment of such Insured Amounts and legally available therefor.

Forms of such instruments of assignment and instruments to effect the appointment of the Insurer as such agent for the Owners (collectively, the "Claim Documents"), which are currently acceptable to the Fiscal Agent and the Insurer, are on file with the Fiscal Agent. The Insurer may, from time to time, file revised forms of Claim Documents with the Fiscal Agent in substitution for the forms previously filed with the Fiscal Agent, and upon such filing, the revised forms shall supersede all forms of Claim Documents previously filed with the Fiscal Agent, except as otherwise directed by the Insurer in writing.

In the event that you shall have prior knowledge of an impending failure by the Issuer to make payment on the Obligations (or, if applicable, coupons) when due, please immediately notify the Insurer so that it will be possible to have funds available for you on the due date to make payments against surrendered Obligations (and, if applicable, coupons).

Your cooperation in this matter will be most appreciated and will make it possible for the Owners of Obligations guaranteed by the Insurer to be assured of all payments when due.

Very truly yours,

Gary C. Dunton
President

**EXECUTION VERSION**

**COMMONWEALTH OF PUERTO RICO**

_____

**BOND RESOLUTION**

Adopted March 11, 2014

_____

Authorizing and Securing

$3,500,000,000
COMMONWEALTH OF PUERTO RICO
GENERAL OBLIGATION BONDS OF 2014, SERIES A

# TABLE OF CONTENTS

**Page**

| | | |
|---|---|---|
| Section 1: | Definitions. | 3 |
| Section 2: | Interpretation | 4 |
| Section 3: | Authorization, Designation and Details of Bonds | 4 |
| Section 4: | Redemption of Bonds | 6 |
| Section 5: | Notice of Redemption | 6 |
| Section 6: | Partial Redemption | 7 |
| Section 7: | Effect of Calling for Redemption | 8 |
| Section 8: | Payment of Bonds | 8 |
| Section 9: | Execution, Issuance, Form and Delivery of Bonds | 8 |
| Section 10: | Concerning the Registrar; Acceptance of Duties | 9 |
| Section 11: | Registrar Entitled to Indemnity | 9 |
| Section 12: | Registrar Not Liable for Failure of the Commonwealth to Act | 9 |
| Section 13: | Compensation and Indemnification of Registrar | 10 |
| Section 14: | Registrar May Be Bondholder | 10 |
| Section 15: | Registrar Not Responsible for Recitals | 10 |
| Section 16: | Certain Rights of Registrar | 11 |
| Section 17: | Exchange and Registration of Transfer of Bonds | 11 |
| Section 18: | Ownership of Bonds | 12 |
| Section 19: | Pledge of Good Faith and Credit | 12 |
| Section 20: | Action by Bondholders | 12 |
| Section 21: | Appointment of Escrow Agent | 13 |
| Section 22: | Deposit and Application of Moneys in Escrow Fund | 13 |
| Section 23: | Approval of Escrow Deposit Agreement | 13 |
| Section 24: | Approval of Purchase Contract | 13 |
| Section 25: | Award and Delivery of Bonds | 13 |
| Section 26: | Deposit and Application of Moneys | 13 |
| Section 27: | Application of Remainder of Bond Proceeds | 14 |
| Section 28: | Notification of Refunded Bondholders | 14 |
| Section 29: | Authorization to Act | 14 |
| Section 30: | Legal Opinion | 14 |
| Section 31: | Preliminary Official Statement | 14 |
| Section 32: | Official Statement | 15 |
| Section 33: | Continuing Disclosure | 15 |
| Section 34: | Amendments | 17 |
| Section 35: | Parties Interested Herein | 18 |
| Section 36: | Tax Covenant | 18 |
| Section 37: | Governing Law; Jurisdiction and Venue | 19 |
| Section 38: | Waiver of Immunity | 20 |
| Section 39: | Payments Due on Non-Business Day | 20 |
| Section 40: | Severability of Invalid Provisions | 20 |
| Section 41: | Effectiveness. | 2 |

(i)

Exhibit A – The Refunded Bonds
Exhibit B – Form of Bonds
Exhibit C – Purchase Contract
Exhibit D – Preliminary Official Statement
Exhibit E – Official Statement

**A RESOLUTION PROVIDING FOR THE ISSUANCE OF UP TO $3,500,000,000 COMMONWEALTH OF PUERTO RICO GENERAL OBLIGATION BONDS OF 2014, SERIES A; APPROVING A PURCHASE CONTRACT WITH THE UNDERWRITERS OF SAID BONDS; AWARDING SAID BONDS TO THE UNDERWRITERS THEREOF; APPOINTING AN ESCROW AGENT AND APPROVING AN ESCROW DEPOSIT AGREEMENT; AND DETERMINING AND PROVIDING FOR CERTAIN OTHER MATTERS IN CONNECTION THEREWITH.**

**WHEREAS**, by virtue of Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended ("Act No. 33"), Act No. 242-2011 of the Legislative Assembly of Puerto Rico, approved December 13, 2011 ("Act No. 242"), Act No. 45-2013 of the Legislative Assembly of Puerto Rico, approved June 30, 2013 ("Act No. 45"), and Act No. 34-2014 of the Legislative Assembly of Puerto Rico, approved March 4, 2014 ("Act No. 34" and together with Act No. 33, Act No. 242, and Act No. 45, the "Acts"), the Secretary of the Treasury (the "Secretary") of the Commonwealth of Puerto Rico (the "Commonwealth") is authorized to sell and issue at any one time or from time to time, upon resolution for that purpose and with the approval of the Governor of the Commonwealth (the "Governor"), bonds and bond anticipation notes of the Commonwealth in an aggregate amount not to exceed Three Billion Five Hundred Millions Dollars ($3,500,000,000), in order to (i) refinance principal and interest on any indebtedness or other obligations of the Commonwealth, including but not limited to any debt or obligation payable to Government Development Bank for Puerto Rico ("Development Bank") from budgetary appropriations approved by the Legislative Assembly, (ii) refinance principal and interest on any indebtedness incurred by any public corporation for the purpose of financing working capital of the Commonwealth, (iii) finance or refinance any obligations of the Commonwealth due under any interest rate swap agreements, basis swap agreements, interest rate capitation agreements, or debt service deposit agreements, including but not limited to any termination payments pursuant to such agreements, (iv) finance or refinance indebtedness or other obligations of the Puerto Rico Public Buildings Authority ("PBA"), (v) finance or refinance certain necessary public improvements identified in Act No. 242, (vi) finance or refinance working capital of the Commonwealth for Fiscal Year 2014 pursuant to Act No. 45, and (vii) refinance any bond issues or indebtedness of the Commonwealth pursuant to which its good faith, credit and taxing power are pledged pursuant to Act No. 33; and

**WHEREAS**, pursuant to Act No. 242, the Secretary, with the approval of the Governor, previously issued bond anticipation notes to Development Bank, currently outstanding in the aggregate principal amount of $221,850,921 (the "GDB BANs"), the proceeds of which have been used to finance and/or refinance on an interim basis a portion of the costs of certain necessary public improvements, until such time as bonds could be issued pursuant to Act No. 242; and

**WHEREAS**, pursuant to Act No. 45, the Secretary, with the approval of the Governor, previously issued notes to Development Bank, currently outstanding in the aggregate principal amount of $92,500,000 (the "GDB Notes"), the proceeds of which were applied in accordance with the provisions of Act No. 45; and

WHEREAS, pursuant to Act No. 33, the Secretary, with the approval of the Governor, previously issued public improvement refinancing notes to Development Bank, (i) currently outstanding in the aggregate principal amount of $215,936,841 ("Notes I"), the proceeds of which were used to finance monthly interest deposits to the Redemption Fund (as hereinafter defined) required during Fiscal Year 2013 with respect to outstanding public improvement bonds and public improvement refunding bonds of the Commonwealth (the "Outstanding GO Bonds"), (ii) currently outstanding in the aggregate principal amount of $516,090,251 ("Notes II"), the proceeds of which were used to finance monthly principal deposits required during Fiscal Year 2013 and certain monthly principal deposits required during Fiscal Year 2014, and certain monthly interest deposits required during Fiscal Year 2014 to the Redemption Fund with respect to the Outstanding GO Bonds, (iii) currently outstanding in the aggregate principal amount of $313,959,628 ("Notes III"), the proceeds of which were used to finance certain monthly interest deposits required to the Redemption Fund during Fiscal Year 2014 with respect to the Outstanding GO Bonds, and (iv) currently outstanding in the aggregate principal amount of $77,637,839 ("Notes IV," and together with Notes I, Notes II and Notes III, the "Refunded Notes"), the proceeds of which were used to finance certain monthly principal deposits to the Redemption Fund required during Fiscal Year 2014 with respect to the Outstanding GO Bonds, in each case, until such time as bonds could be issued pursuant to Act No. 33; and

WHEREAS, the Commonwealth has issued to Development Bank from time to time notes as evidence of borrowings used to fund the working capital needs of the Commonwealth, which notes are outstanding under various lines of credit from and loan agreements with Development Bank in the aggregate principal amount of $234,274,074 (the "Working Capital Notes"); and

WHEREAS, pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended, the Puerto Rico Sales Tax Financing Corporation ("COFINA") previously issued its bond anticipation notes (the "COFINA BANs"), currently outstanding in the aggregate principal amount of $330,300,000, the proceeds of which have been used to finance operational expenses of the Commonwealth for Fiscal Year 2013; and

WHEREAS, the Commonwealth has heretofore issued the public improvement refunding bonds set forth on **Exhibit A** hereto (collectively, the "Refunded Bonds"); and

WHEREAS, the Commonwealth has executed certain interest rate exchange agreements and confirmations thereunder relating to certain of the Refunded Bonds with Morgan Stanley Capital Services LLC, FMS Wertmanagement AöR, The Bank of New York Mellon, and Merrill Lynch Capital Services, Inc. (collectively, the "interest rate hedges"), in order, in part, to manage the Commonwealth's risk of interest rate changes with respect to the Refunded Bonds and other indebtedness of the Commonwealth; and

WHEREAS, PBA previously issued notes to Development Bank, (i) currently outstanding in the aggregate principal amount of $103,652,602 ("PBA Note I"), the proceeds of which were used to finance and/or refinance certain monthly interest deposits required during Fiscal Year 2013 with respect to certain outstanding obligations of PBA, and (ii) currently outstanding in the aggregate principal amount of $71,110,000 ("PBA Note II," and together with PBA Note I, the "PBA Notes"), the proceeds of which were used to finance and/or refinance

2

certain monthly principal deposits required during Fiscal Year 2013 with respect to certain outstanding obligations of PBA; and

**WHEREAS**, the Board of Directors of Development Bank has provided a report and recommendation to the Secretary and the Governor regarding the issuance and sale of bonds pursuant to the Act No. 34, including with respect to the proposed use of proceeds of such bonds and the terms and conditions of the sale of such bonds, as set forth in the Purchase Contract (as hereinafter defined); and

**WHEREAS,** the Secretary has determined, based in part on the recommendation of the Board of Directors of Development Bank, that it is desirable at this time to provide for the issuance of up to Three Billion Five Hundred Million Dollars ($3,500,000,000) total principal amount of general obligation bonds of the Commonwealth (the "Bonds") pursuant to the Acts, to (i) repay to Development Bank the GDB BANs, the GDB Notes, a portion of the Refunded Notes, a portion of the Working Capital Notes, and a portion of the PBA Notes, (ii) repay the COFINA BANs, (iii) refund the Refunded Bonds, (iv) pay certain fees in connection with the termination of the interest rate hedges, (v) fund interest on a portion of the Bonds through July 1, 2016, and (vi) pay expenses related to the issuance and sale of the Bonds; and

**WHEREAS,** the underwriters named in the Purchase Contract (hereinafter defined) have agreed to purchase the Bonds in an aggregate principal amount of $3,500,000,000, on the terms and conditions contained in the Purchase Contract relating to the Bonds, dated March 11, 2014 (the "Purchase Contract"), by and among the Commonwealth and the respective underwriters named therein;

**NOW THEREFORE, I, MELBA ACOSTA-FEBO**, Secretary of the Treasury of the Commonwealth of Puerto Rico, DO HEREBY RESOLVE AND DETERMINE as follows:

Section 1: <u>Definitions.</u> Capitalized words and terms defined in this Section, unless a different meaning clearly appears from the context, for all purposes of this Resolution and any resolution supplemental hereto, shall have the respective meanings specified in this Section. Words defined in the preamble of this Resolution and not otherwise defined in this Section shall have the respective meanings given to such words in said preamble. Capitalized words and terms which are not defined in this Section or in said preamble shall have the respective meanings specified in the Purchase Contract, unless a different meaning clearly appears from the context.

"Amortization Requirement" as applied to any term bonds for any fiscal year, means the principal amount fixed or computed for such fiscal year as set forth in this Resolution for the retirement of such term bonds by purchase or redemption.

"Bondholder," "Holder," "Holder of Bonds" or "Owner" or any similar term, when used with reference to a Bond, means any person who shall be the registered owner thereof.

"Business Day" means a day when the banks located in The City of New York or the Municipality of San Juan, Puerto Rico are not required or authorized to remain closed and when the New York Stock Exchange is not closed.

3

"DTC" means The Depository Trust Company, New York, New York, a limited purpose trust company organized under the laws of the State of New York, in its capacity as securities depository for the Bonds, or any successor depository for any Bonds.

"Electronic Means" means telecopy, facsimile transmission, email transmission or other similar electronic means of communication providing evidence of transmission, including a telephone communication confirmed by any other method set forth in this definition.

"Person" shall mean any individual, partnership, association, corporation, joint venture, joint-stock company, unincorporated organization or government or any agency or political subdivision thereof.

"Puerto Rican Federal Relations Act" means the Act of the Congress of the United States entitled: "An Act to provide a civil government for Puerto Rico, and for other purposes," approved March 2, 1917, as amended, as continued in effect by Public Law 600, approved July 3, 1950.

"Registrar" means Banco Popular de Puerto Rico, in the Municipality of San Juan, Puerto Rico.

"Resolution" means this resolution as the same may be supplemented from time to time as herein permitted.

Section 2:     Interpretation.  Words of the masculine gender are deemed and construed to include correlative words of the feminine and neuter genders.  Words importing the singular number include the plural and vice versa.

(a)     The terms "herein", "hereunder", "hereby", "hereto", "hereof" and any similar terms refer to this Resolution; and the term "heretofore" means before, and the term "hereafter" means after the effective date of this Resolution.

(b)     Sections and subsections mentioned by number and letter only are the respective Sections and subsections of this Resolution so numbered or lettered.

(c)     Whenever any time of day or particular hour is specified herein, such time or hour shall be determined on the basis of Eastern Standard Time or Eastern Daylight Savings Time, whichever is then in effect in New York, New York.

Section 3:     Authorization, Designation and Details of Bonds.

(a)     For the purpose of providing funds to (i) repay to Development Bank the GDB BANs, the GDB Notes, a portion of the the Refunded Notes and the Working Capital Notes, and a portion of the PBA Notes, (ii) repay the COFINA BANs, (iii) refund the Refunded Bonds, (iv) pay certain termination payments due under the interest rate hedges, either through reimbursement to the Commonwealth or repayment of lines of credit used to finance such termination payments, (v) fund interest on a portion of the Bonds through July 1, 2016, and (vi) pay expenses related to the issuance and sale of the Bonds, there shall be issued at this time under the authority of the Puerto Rican Federal Relations Act and the Constitution and laws of

4

the Commonwealth, including the Acts, the Bonds in the aggregate principal amount of Three Billion Five Hundred Million Dollars ($3,500,000,000). The Bonds shall be designated "Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A," shall be dated their date of delivery, shall be number from R-1 upwards, and shall be issuable as registered bonds without coupons in the minimum denomination of $100,000, with integral multiples of $5,000 in excess thereof; provided, however, that upon receipt by the Registrar from the Secretary of written evidence from any of Fitch Ratings, Moody's Investors Service, or Standard & Poor's Rating Services that the Bonds have been rated "BBB-," "Baa3," or "BBB-," or higher, respectively, then the minimum authorized denomination of the Bonds shall be reduced to $5,000.

The Bonds shall mature on July 1, 2035, and shall bear interest at the rate of 8% per annum.

The Amortization Requirements for the Bonds are as set forth below.

| Year (July 1) | Amortization Requirement | Year (July 1) | Amortization Requirement |
|---|---|---|---|
| 2021 | $ 15,900,000 | 2029 | $245,900,000 |
| 2022 | 74,000,000 | 2030 | 263,700,000 |
| 2023 | 158,200,000 | 2031 | 299,200,000 |
| 2024 | 176,200,000 | 2032 | 427,400,000 |
| 2025 | 137,900,000 | 2033 | 360,000,000 |
| 2026 | 88,900,000 | 2034 | 458,700,000 |
| 2027 | 177,200,000 | 2035[*] | 428,700,000 |
| 2028 | 188,100,000 | | |

_____
[*] Maturity

(b) Interest on the Bonds shall be payable on January 1 and July 1 in each year, commencing on July 1, 2014. Each Bond shall bear interest from the interest payment date next preceding the date on which it is authenticated, unless authenticated on an interest payment date, in which case it shall bear interest from such interest payment date, or, unless authenticated prior to the first interest payment date, in which case it shall bear interest from its date; provided, however, that if at the time of authentication of any such Bond interest is in default, such Bond shall bear interest from the date to which interest shall have been paid or duly provided for. Interest on the Bonds shall be computed on the basis of a 360-day year of twelve 30-day months.

(c) Book-Entry Only Bonds. The Bonds shall be initially issued through the book-entry system maintained by DTC, which will act as Securities Depository for the Bonds, and the Bonds will be initially registered in the name of DTC or its nominee. Notwithstanding any other provisions of this Resolution to the contrary, so long as the Bonds are held in DTC's book-entry system and registered in the name of DTC or its nominee, all payments with respect to principal of and interest on the Bonds and all notices with respect to the Bonds shall be made and given, respectively, to DTC as provided in the Blanket Issuer Letter of Representations, dated May 4, 1995 (the "DTC Agreement"), by and between the Commonwealth and DTC. If DTC

discontinues providing its services as Securities Depository with respect to the Bonds, and the Commonwealth decides no longer to use the services of a Securities Depository, definitive Bonds will be executed, authenticated and delivered to the beneficial owners thereof. If the Commonwealth determines not to continue use of the system of book-entry transfers through DTC (or a successor Securities Depository) with respect to the Bonds, definitive Bonds will be executed, authenticated and delivered to the beneficial owners thereof.

Section 4:     Redemption of Bonds.   The Bonds are subject to redemption prior to maturity as follows:

(a)     Optional Redemption.   The Bonds shall be subject to redemption prior to maturity, at the option of the Secretary, from any moneys that may be available for that purpose, at any time on or after July 1, 2020, either in whole or in part (and if in part, in such order of annual Amortization Requirements as directed by the Secretary), on any Business Day, at a redemption price equal to the principal amount of the Bonds to be redeemed, without premium, together with accrued interest to the date fixed for redemption.

(b)     Mandatory Redemption.  The Secretary shall, on or before July 1, 2021, and on or before each July 1 thereafter in respect of each fiscal year for which there is an Amortization Requirement for the Bonds as set forth above, apply to the retirement, by purchase or redemption, of such Bonds an amount at least equal to the Amortization Requirement for such Bonds for the immediately preceding fiscal year. If the Secretary elects to purchase the Bonds, the Secretary shall endeavor to purchase such Bonds or portions thereof secured hereby and then outstanding, whether or not such Bonds or portions thereof shall then be subject to redemption, at the most advantageous price obtainable with reasonable diligence, such price not to exceed the principal of such Bonds.

The Secretary shall call for redemption on each July 1 on which Bonds are subject to redemption in accordance with this paragraph (b), a principal amount of Bonds equal to the aggregate principal amount of the Bonds to be redeemed pursuant to the Amortization Requirements therefor, less the aggregate principal amount of the Bonds, if any, purchased by the Secretary in accordance with this paragraph (b) since the preceding July 1.

If the principal amount of Bonds so retired on or before July 1 of any year exceeds the Amortization Requirement for the Bonds for such date, the Amortization Requirements for the Bonds for any succeeding date or dates may, at the option of the Secretary, be decreased by the amount of such excess.

No such purchase shall be made by the Secretary within the period of 35 days immediately preceding any July 1 on which the Bonds are subject to call for redemption under the provisions of this paragraph (b), except from moneys other than the moneys set aside or deposited for the redemption of the Bonds.

Section 5:     Notice of Redemption.   At least 20 days prior to the date upon which any such redemption is to be made, a notice of such redemption, signed by the Registrar, designating the redemption date and the principal amount and accrued interest on the Bonds to be paid and, if less than all of the Bonds then outstanding shall be called for redemption, the particular Bonds or

portions thereof to be redeemed, shall be given by registered or certified mail, postage prepaid, return receipt requested to the Owners of the Bonds or portions thereof to be redeemed, at their addresses as they appear on the Bond Register (hereinafter provided for).  Any defect in or the failure to mail such notice to the Owner of any Bond designated for redemption shall not affect the validity of the proceedings for the redemption of any other Bonds.  In case any Bond is to be redeemed in part only, the notice of redemption which relates to such Bond shall state also that on or after the redemption date, upon presentation and surrender of such Bond at the corporate trust office of the Registrar in the Municipality of San Juan, Puerto Rico, a new Bond or Bonds in authorized denominations and in an aggregate principal amount equal to the unredeemed portion of such Bond will be issued.  All Bonds so presented and surrendered shall be cancelled by the Registrar.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are.  If at the time of giving a notice of redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it subject to the deposit of the redemption moneys with the Registrar not later that the opening of business on the redemption date, and such notice and the corresponding optional redemption shall be of no effect unless such moneys are so deposited.  Any conditional notice of optional redemption may be rescinded by notice given to the Registrar by the Secretary by Electronic Means no later than two Business Days prior to the date specified for redemption.   The Registrar shall give notice of such rescission as soon thereafter as practicable in the same manner, and to the same persons, as notice of such redemption was given pursuant to this Resolution.

Section 6:     Partial Redemption.  If less than all of the Bonds are to be redeemed or paid prior to maturity, the specific Amortization Requirements to be redeemed shall be selected by the Commonwealth, and within such Amortization Requirement, (a) if DTC is acting as securities depository for the Bonds at the time of such redemption, any partial redemption of the Bonds shall be effected by DTC on a pro rata basis in accordance with DTC's rules and procedures and neither the Commonwealth nor the Registrar shall have any responsibility to ensure that DTC properly selects such Bonds for redemption, and (b) if DTC is not acting as securities depository for the Bonds at the time of such redemption, any redemption of less than all of the Bonds shall be effected by the Registrar among the registered owners of the Bonds on a pro-rata basis, provided that that in no event shall any partial redemption reduce the remaining outstanding principal amount of any Bond to below $100,000 (or $5,000, if the conditions set forth in Section 3(a) have been met for the reduction in the minimum authorizied denomination of the Bonds).

In case part but not all of an outstanding Bond shall be selected for redemption, the Owner thereof or such Owner's attorney or legal representative shall present and surrender such Bond for payment of the principal amount thereof so called for redemption at the corporate trust office of the Registrar in the Municipality of San Juan, Puerto Rico.   Thereupon, the Commonwealth shall execute in the manner provided in Section 9 of this Resolution and the Registrar shall authenticate and deliver to or upon the order of such Owner or such Owner's legal representative, without charge therefor, for the unredeemed portion of the Bond so surrendered, a Bond or Bonds, at the option of such Owner or such Owner's attorney or legal representative, of

7

the same maturity, bearing interest at the same rate, of authorized denominations and in principal amount equal to the unredeemed portion of such Bond so surrendered.

Section 7: <u>Effect of Calling for Redemption</u>. Notice having been given in the manner and under the conditions hereinabove provided, the Bonds or portions thereof so called for redemption shall, on the redemption date designated in such notice, become and be due and payable at the principal amount, redemption premium, if any, and accrued interest provided for redemption of such Bonds on such date. On the date so designated for redemption, notice having been given and moneys for payment of the principal of and accrued interest on the Bonds so called for redemption being held by the Registrar, interest on the Bonds or portions thereof so called for redemption shall cease to accrue. Bonds or portions thereof which have been duly called for redemption under the provisions of this Resolution, or with respect to which irrevocable instructions to call for redemption or to pay at or prior to maturity have been given to the Registrar in form satisfactory to it, and for the payment of the principal of and the accrued interest on which, sufficient available moneys, or investments permitted by law which investments shall not contain provisions permitting redemption thereof at the option of the issuer, the principal of and interest on which when due, and without any reinvestment thereof, will provide sufficient moneys, shall be held in trust for the Owners of the Bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under this Resolution, and the Owners thereof shall have no rights in respect thereof except to receive payment of the principal of and the accrued interest on such Bonds or portions thereof and in the case of a Bond to be redeemed in part only, to receive a Bond for any unredeemed portion thereof as herein provided.

Section 8: <u>Payment of Bonds</u>. Principal of the Bonds is payable only to the Owner or its registered assigns at the corporate trust office of the Registrar in the Municipality of San Juan, Puerto Rico, upon the presentation and surrender of such Bond, in any coin or currency of the United States of America which, at the date of payment thereof, is legal tender for the payment of public and private debts. Payment of the interest on any Bond shall be made to the person appearing on the registration books of the Commonwealth hereinafter mentioned as the Owner thereof (or the previous Bond or Bonds evidencing the same debt as that evidenced by such Bond) at the close of business on the record rate for such interest, which shall be the June 15 or December 15 (whether or not a Business Day) next preceding the applicable interest payment date in respect of the Bonds, such interest to be paid in like coin or currency by check mailed to such person at his address as it appears on such registration books, all as provided in this Resolution.

Section 9: <u>Execution, Issuance, Form and Delivery of Bonds</u>. The Bonds authorized by this Resolution shall bear the manual or facsimile signatures of the Governor and the Secretary, and the official seal of the Commonwealth, or a facsimile thereof, shall be imprinted upon each of the Bonds and attested to by the manual or facsimile signature of the Secretary of State of Puerto Rico.

In case any officer of the Commonwealth whose signature or whose facsimile signature shall appear on any Bonds shall cease to be such officer before the delivery of such Bonds, such signature or such facsimile signature shall nevertheless be valid and sufficient for all purposes the same as if he had remained in office until such delivery, and also any Bond may be executed

by such persons as at the actual time of the execution of such Bond shall be the proper officers to sign such Bond although at the date of such Bond such persons may not have been such officers.

The Bonds shall be executed substantially in the form and manner set forth in **Exhibit B** hereto and delivered to the Registrar for authentication.

When the Bonds shall have been executed and authenticated as required by this Resolution, the Registrar shall deliver the Bonds as directed by the Secretary but only upon receipt of written notice from the Secretary of receipt of the purchase price of the Bonds. The Registrar shall be entitled to rely conclusively upon such notice as to the amount of such purchase price.

The Secretary shall apply the proceeds received from the sale of the Bonds in accordance with the provisions of Sections 26 and 27 hereof.

No Bond shall be entitled to any benefit under this Resolution or be valid or become obligatory for any purpose, unless there appears on such Bond a certificate of authentication substantially in the form provided in **Exhibit B** hereto, executed by the Registrar, and such executed certificate upon any Bond shall be conclusive evidence that such Bond has been duly authenticated and delivered hereunder. The Registrar's certificate of authentication on any Bond shall be deemed to have been duly executed if signed by an authorized officer of the Registrar, but it shall not be necessary that the same officer sign the certificate of authentication on all of the Bonds that may be issued hereunder at any one time.

Section 10:    Concerning the Registrar; Acceptance of Duties. Banco Popular de Puerto Rico, in the Municipality of San Juan, Puerto Rico is hereby appointed as Registrar under this Resolution. Prior to the issuance of the Bonds under the provisions of this Resolution, the Secretary shall obtain from a duly authorized officer of said bank a written acceptance of the duties, obligations and trusts imposed upon said bank by this Resolution.

The Registrar undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Registrar.

Section 11:    Registrar Entitled to Indemnity. The Registrar shall be under no obligation to do anything in its judgment proper to be done by it as such Registrar without indemnity, and in such case the Commonwealth shall reimburse the Registrar for all reasonable costs and expenses, outlays and counsel fees and other reasonable disbursements properly incurred in connection therewith.

Section 12:    Registrar Not Liable for Failure of the Commonwealth to Act. The Registrar shall not be liable or responsible because of the failure of the Commonwealth or of any of its employees or agents to make any collections or deposits or to perform any act herein required of the Commonwealth or because of the loss of any moneys arising through the insolvency or the act or default or omission of any other depositary in which such moneys shall have been deposited under the provisions of this Resolution. The Registrar shall not be responsible for the application of any moneys deposited with it and paid out, withdrawn or transferred hereunder if such application, payment, withdrawal or transfer shall be made in

accordance with the provisions of this Resolution. The immunities and exemptions from liability of the Registrar hereunder shall extend to its directors, officers, employees and agents.

None of the provisions of this Resolution shall be construed to relieve the Registrar from liability for its own negligent action, its own negligent failure to act, or its own willful misconduct, except that:

(a)     the Registrar shall not be liable for any error of judgment made in good faith by any one of its officers, unless it shall be established that the Registrar was negligent in ascertaining the pertinent facts;

(b)     no provision of this Resolution shall require the Registrar to expend or risk its own funds or otherwise incur any financial liability in the performance of any of its duties hereunder, or in the exercise of any of its rights or powers, if it shall have reasonable grounds for believing that repayment of such funds or adequate indemnity against such risk or liability is not reasonably assured to it; and

(c)     this paragraph shall not be construed to limit the effect of Sections 11 and 13 hereof.

Section 13:     <u>Compensation and Indemnification of Registrar</u>. The Commonwealth shall pay to the Registrar compensation as agreed upon between the Registrar and the Commonwealth for all services performed by it hereunder (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust) and also all its reasonable expenses, disbursements and advances and those of its attorneys, agents and employees incurred in and about the administration and execution of the trusts hereby created and the performance of its powers and duties hereunder, and, subject to the provisions of Section 12 hereof, the Commonwealth shall indemnify and save the Registrar harmless against any loss, liability or expenses which it may incur without negligence or bad faith on its part, arising out of or in connection with the acceptance or administration of the trusts hereunder, including the costs and expenses of defending itself against any claim or liability in connection with the exercise and performance of its powers and duties hereunder.

Section 14:     <u>Registrar May Be Bondholder</u>. The Registrar, and its directors, officers, employees or agents, may buy, sell, own, hold and deal in any of the Bonds, may engage, as principal or agent, or be interested, in any financial or other transaction with the Commonwealth, may maintain any and all other general banking and business relations with the Commonwealth with like effect and in the same manner as if the Registrar were not Registrar under this Resolution, and may act as depositary, trustee or agent for any committee or body of holders of the Bonds issued under and secured by this Resolution or other obligations of the Commonwealth with like effect and in the same manner as if the Registrar were not Registrar under this Resolution; and no implied covenant shall be read into this Resolution against the Registrar in respect of such matters.

Section 15:     <u>Registrar Not Responsible for Recitals</u>. The recitals contained herein and in the Bonds, except the certificate of authentication endorsed thereon, shall be taken as the statements of the Commonwealth, and the Registrar assumes no responsibility for their

correctness.  The Registrar makes no representations as to the validity or sufficiency of this Resolution or of the Bonds.

Section 16:   Certain Rights of Registrar.  The Registrar may rely and shall be protected in acting or refraining from acting upon any resolution, order, notice, request, direction, consent, waiver, certificate, statement, instrument, requisition, bond or other paper or document believed by it to be genuine and to have been adopted or signed by the proper board or person or to have been prepared and furnished pursuant to any of the provisions of this Resolution, or upon the written advice of any attorney, accountant or other expert believed by the Registrar to be qualified in relation to the subject matter, and the Registrar shall be under no duty to make any investigation or inquiry as to any statements contained or matters referred to in any such document.  Except as expressly provided herein, the Registrar shall not be under any obligation to see to the recording or filing of this Resolution or any other document or otherwise to the giving to any person of notice of the provisions hereof or thereof.

The Registrar may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys, and the Registrar shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder.

Section 17:   Exchange and Registration of Transfer of Bonds.  The Commonwealth shall cause books (collectively, the "Bond Register") for the exchange and for the registration of transfers of Bonds as provided in this Resolution to be kept at the corporate trust office of the Registrar in the Municipality of San Juan, Puerto Rico.

Bonds, upon surrender thereof to the Registrar, together with an assignment duly executed by the Owner or such Owner's attorney or legal representative in such form as shall be satisfactory to the Registrar, may, at the option of the Owner thereof, be exchanged for an equal aggregate principal amount of Bonds of the same maturity, of any denomination or denominations authorized by this Resolution, and bearing interest at the same rate.

The transfer of any Bond may be registered upon the Bond Register only upon surrender thereof to the Registrar together with an assignment duly executed by the Owner or such Owner's attorney or legal representative in such form as shall be satisfactory to the Registrar.  Upon any such registration of transfer the Commonwealth shall execute in the manner provided by Section 9 of this Resolution and the Registrar shall authenticate and deliver in exchange for such Bond a new Bond or Bonds registered in the name of the transferee or transferees, of any denomination or denominations authorized by this Resolution, in an aggregate principal amount equal to the outstanding principal amount of such Bond.

In all cases in which Bonds shall be exchanged or the transfer of Bonds shall be registered hereunder, the Commonwealth shall execute in the manner provided by Section 9 of this Resolution and the Registrar shall authenticate and deliver at the earliest practicable time Bonds in accordance with the provisions of this Resolution.  All Bonds surrendered in any such exchange or registration of transfer shall forthwith be cancelled by the Registrar.  The Registrar may make a charge for every such exchange or registration of transfer of Bonds sufficient to reimburse it for any tax or other governmental charge required to be paid with respect to such

exchange or registration of transfer, but no other charge shall be made to any Bondholder for the privilege of exchanging or registering the transfer of Bonds under the provisions of this Resolution. The Registrar shall not be required to make any such exchange or registration of transfer of Bonds during the 15 days immediately preceding the date of mailing of notice of redemption, or after such Bond or any portion thereof has been selected for redemption.

Section 18: <u>Ownership of Bonds</u>. As to any Bond, the person in whose name the same shall be registered shall be deemed and regarded as the absolute owner thereof for all purposes and payment of or on account of the principal of or interest on any such Bond shall be made only to or upon the order of the Owner thereof or such Owner's registered assigns or legal representative, and neither the Commonwealth nor the Registrar shall be affected by any notice to the contrary.

Section 19: <u>Pledge of Good Faith and Credit; Bonds Constitute Public Debt</u>. The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and the interest on the Bonds authorized by this Resolution. The Bonds constitute public debt, as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth of Puerto Rico (the "<u>Constitution</u>"). The Secretary is authorized and directed to pay the principal of and the interest on the Bonds as the same shall fall due from any funds in the Treasury of the Commonwealth available for such purpose in the fiscal year for which said payment is required. Such funds in the Treasury of the Commonwealth available for such purpose shall be deposited by the Secretary in trust with the Registrar in the amounts required for payment of the interest on any Bonds by the Registrar on any interest payment date and the principal of any Bonds by the Registrar on any principal payment (including any redemption) date.

Section 20: <u>Action by Bondholders.</u> In the event that the Commonwealth does not make any payment of principal of or interest on the Bonds when due in accordance with the provisions of this Resolution, a Bondholder may:

(a) bring an action against the Secretary, in accordance with the provisions of Section 2 of Article VI of the Constitution, to compel the Secretary of the Treasury to apply available Commonwealth resources to the payment of the Bonds, as constituting public debt of the Commonwealth, in accordance with the provisions of Section 8 of Article VI of the Constitution; and

(b) seek any other remedies that are available under applicable law or in equity to any other holder of a Commonwealth bond to which its good faith, credit and taxing power are pledged.

The remedies set forth in this Section 20 are the only remedies available to a Bondholder in the event that the Commonwealth does not make any payment of principal of or interest on the Bonds when due in accordance with the provisions of this Resolution. The principal of the Bonds is not subject to acceleration in the event of any such non-payment.

Section 21:   <u>Appointment of Escrow Agent</u>.  Banco Popular de Puerto Rico, San Juan, Puerto Rico is appointed as Escrow Agent under the terms of the Escrow Deposit Agreement, hereinafter mentioned.

Section 22:   <u>Deposit and Application of Moneys in Escrow Fund</u>.  The proceeds of the sale of the Bonds in the amounts set forth in the Escrow Deposit Agreement shall be transferred to the Escrow Agent on the date of delivery of the Bonds for deposit to the credit of the Escrow Fund (as defined in the Escrow Deposit Agreement), in accordance with the provisions of the Escrow Deposit Agreement.  Such proceeds shall be held and applied as provided in the Escrow Deposit Agreement.

Section 23:   <u>Approval of Escrow Deposit Agreement</u>.  The execution and delivery by me or the President or any Executive Vice President of Development Bank, as agent of the Commonwealth, of an escrow deposit agreement by and between the Commonwealth and the Escrow Agent with respect to those Refunded Bonds that will not be redeemed on the date of issuance of the Bonds are hereby authorized, and said escrow deposit agreement (the "<u>Escrow Deposit Agreement</u>") shall be in form and substance acceptable to the person executing the same, his or her execution of the Escrow Deposit Agreement to be conclusive evidence of any such approval.

Section 24:   <u>Approval of Purchase Contract</u>. The form of the Purchase Contract presented to me this day and attached hereto as **Exhibit C** is hereby approved.  The Purchase Contract shall be executed and delivered by me substantially in the form of **Exhibit C**, with such changes as I determine to be necessary or appropriate and in the best interest of the Commonwealth, such execution and delivery to be conclusive evidence of my approval of such changes.

Section 25:   <u>Award and Delivery of Bonds</u>.  The offer submitted by Barclays Capital, as the representative of the underwriters named in the Purchase Contract (the "<u>Underwriters</u>"), presented to me on the date hereof offering to purchase the Bonds at an aggregate purchase price equal to $3,226,869,539.33 (representing the par amount of such Bonds ($3,500,000,000), less original issue discount of $245,000,000, less underwriters' discount of $28,130,460.67) without accrued interest, is hereby accepted, and such Bonds are hereby awarded to the Underwriters (which underwriters have been recommended by management and approved by the Board of Directors of Development Bank), subject to the terms and conditions of the Purchase Contract.

Section 26:   <u>Deposit and Application of Moneys</u>.  The proceeds of the sale of the Bonds shall be applied as follows: a portion of the proceeds of the Bonds shall be deposited as set forth in Section 22 and the Escrow Deposit Agreement and used to refund the Refunded Bonds identified therein, a portion of such proceeds shall be deposited to the Commonwealth Debt Redemption Fund (formerly, the Special Fund for the Amortization and Redemption of General Obligations Evidenced by Bonds and Promissory Notes) (the "<u>Redemption Fund</u>") and used to pay a portion of the interest due during Fiscal Years 2014, 2015 and 2016 on the Bonds, a portion of the proceeds of the Bonds shall be applied to refund certain of the Refunded Bonds on the date of issuance of the Bonds, a portion of the proceeds of the Bonds shall be applied to repay to Development Bank the GDB BANs, the GDB Notes, a portion of the Refunded Notes and the Working Capital Notes, and a portion of the PBA Notes, and a portion of the proceeds of

13

the Bonds shall be applied to pay certain fees in connection with the termination of the interest rate hedges, in each case, as set forth in one or more certificates of the Secretary filed on or before the date of delivery of the Bonds with the Registrar.

Section 27: <u>Application of Remainder of Bond Proceeds</u>. The remainder of the proceeds from the sale of the Bonds not applied as specified in Section 26 above shall be applied to the payment of the expenses related to the issuance and sale of the Bonds as may be set forth in one or more certificates signed by the Secretary and filed with the Registrar and Development Bank upon or after the issuance of the Bonds.

Section 28: <u>Notification of Refunded Bondholders</u>. The Secretary shall notify or cause to be notified, as applicable, the Owners of the Refunded Bonds and the COFINA BANs to be repaid or redeemed and to take all other steps necessary for said repayment or redemption, as provided in and in accordance with the applicable provisions of the resolutions authorizing the the Refunded Bonds and the COFINA BANs, and in accordance with the provisions of the Escrow Deposit Agreement with respect to the Refunded Bonds identified therein.

Section 29: <u>Authorization to Act</u>. The Secretary, the Registrar, and the officers and agents of the Commonwealth, the Registrar, and Development Bank, in its capacity as Fiscal Agent for the Commonwealth, are hereby authorized and directed to do all acts and things required of or deemed advisable by them, including, without limitation, the execution and delivery of any other agreements, instruments and certificates, required or deemed advisable for the full, punctual and complete performance of all the terms, covenants, provisions and agreements contained in the Bonds, this Resolution, the resolutions authorizing the issuance of the Refunded Bonds, the GDB BANs, the GDB Notes, the Refunded Notes, the Working Capital Notes, the PBA Notes, the COFINA BANs, the Escrow Deposit Agreement, and any other documents executed and delivered in connection with any of the foregoing.

Section 30: <u>Legal Opinion</u>. In the event any Bonds are no longer registered in the name of a Securities Depository or its nominee, there shall be printed on the reverse of each such Bond the legal opinion of Greenberg Traurig, LLP, Bond Counsel to the Commonwealth, with respect to the validity of such Bonds, and immediately following such legal opinion a certificate signed with the facsimile signature of the Secretary of State of Puerto Rico substantially as follows:

"I HEREBY CERTIFY that the foregoing is a true and correct copy of the legal opinion upon the bonds therein described which was manually signed by Greenberg Traurig, LLP, Boston, Massachusetts, and was dated the date of delivery of and payment for said bonds.

[Facsimile signature]

Secretary of State of Puerto Rico"

Section 31: <u>Preliminary Official Statement</u>. The Preliminary Official Statement of the Commonwealth, dated March 6, 2014, as supplemented by the Supplement to Preliminary Offical Statement, dated March 10, 2014 (together, the "<u>Preliminary Official Statement</u>"), relating to the Bonds in the form presented to me this day and attached hereto as **Exhibit D**, is

14

hereby approved and the distribution and use of said Preliminary Official Statement by the Underwriters in connection with the offering of said Bonds is hereby in all respects ratified, confirmed and approved.

Section 32:   Official Statement.  The Official Statement, dated March 11, 2014, of the Commonwealth relating to the issuance and sale of the Bonds, in the form presented to me, or to the President or any Executive Vice President of Development Bank acting as my agent on the date of the adoption of this Resolution, and attached hereto as **Exhibit E**, is hereby approved with such appropriate changes, insertions and omissions as may be approved by me as evidenced by my signing said Official Statement, and the Underwriters are hereby authorized to distribute said Official Statement in connection with the offering and sale of said Bonds.

Section 33:   Continuing Disclosure.

(a)      In accordance with the requirements of Rule 15c2-12, as amended (the "Rule"), promulgated by the Securities and Exchange Commission (the "Commission"), the Commonwealth hereby covenants for the benefit of the persons who from time to time are the owners of the Bonds for federal income tax purposes (collectively, the "beneficial owners"):

(i)      to file, within 305 days after the end of each fiscal year, commencing with the fiscal year ended June 30, 2013, with the Municipal Securities Rulemaking Board (the "MSRB") through its Electronic Municipal Market Access system ("EMMA"), core financial information and operating data for the prior fiscal year, including (i) the Commonwealth's audited financial statements, prepared in accordance with generally accepted accounting principles in effect from time to time, and (ii) material historical quantitative data (including financial information and operating data) on the Commonwealth and revenues, expenditures, financial operations and indebtedness generally found in the Official Statement; and

(ii)      to file, in a timely manner, not in excess of 10 business days after the occurrence of the event, with the MSRB through EMMA, notice of the occurrence of any of the following events with respect to the Bonds:

(A)      principal and interest payment delinquencies;

(B)      non-payment related defaults, if material;

(C)      unscheduled draws on debt service reserves reflecting financial difficulties;

(D)      unscheduled draws on credit enhancements reflecting financial difficulties;

(E)      substitution of credit or liquidity providers, or their failure to perform;

(F)      adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or

15

other material notices or determinations with respect to the tax status of the Bonds, or other material events affecting the tax status of the Bonds;

      (G)    modifications to rights of the holders (including beneficial owners) of the Bonds, if material;

      (H)    Bond calls, if material;

      (I)    defeasances;

      (J)    release, substitution, or sale of property securing repayment of the Bonds, if material;

      (K)    rating changes;

      (L)    tender offers;

      (M)    bankruptcy, insolvency, receivership, or similar proceeding of the Commonwealth;

      (N)    the consummation of a merger, consolidation or acquisition involving the Commonwealth or the sale of substantially all of the assets of the Commonwealth, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

      (O)    the appointment of a successor or additional trustee, or the change of name of a trustee, if material.

Unless otherwise required by law, all notices, documents and information provided to the MSRB shall be provided in electronic format as prescribed by the MSRB and shall be accompanied by identifying information as prescribed by the MSRB.

The Commonwealth will also covenant to file in a timely manner with the MSRB through EMMA, notice of a failure to provide the required annual financial information on or before the specified period.

The Commonwealth does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Bonds, unless the Commonwealth applies for or participates in obtaining the enhancement.

The Commonwealth does not undertake to provide the above-described event notice of a mandatory scheduled redemption, not otherwise contingent upon the occurrence of an event, if the terms, dates and amounts of redemption are set forth in detail in the Official Statement, the only open issue is which Bonds will be redeemed in the case of a redemption of less than all of the Bonds of a maturity, and notice of redemption is given in accordance with the terms of this Resolution and the applicable Bonds being redeemed.

The Commonwealth may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Commonwealth, such other events are material with respect to the Bonds, but the Commonwealth does not undertake to provide any such notice of the occurrence of any event except those events listed above.

The Commonwealth acknowledges that its undertaking pursuant to the Rule is intended to be for the benefit of the beneficial owners of the Bonds, and shall be enforceable by any such beneficial owners, provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific performance of the Commonwealth's obligations hereunder.

(b)    No beneficial owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenant (the "Covenant") or for any remedy for breach thereof, unless such beneficial owner shall have filed with the Commonwealth written notice of any request to cure such breach, and the Commonwealth shall have refused to comply within a reasonable time.  Notwithstanding the provisions of Section 37(b) hereof, all Proceedings shall be instituted only in a Commonwealth court located in the Municipality of San Juan for the equal benefit of all beneficial owners of the outstanding Bonds benefited by the Covenant, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

(c)    Notwithstanding the provisions of Section 34 hereof, the Covenant may only be amended if:

(i)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Commonwealth, or type of business conducted; the Covenant, as amended, would have complied with the requirements of the Rule at the time of award of the Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interest of beneficial owners, as determined by parties unaffiliated with the Commonwealth; or

(ii)    all or any part of the Rule, as interpreted by the staff of the Commission at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Commonwealth elects that the Covenant shall be deemed amended accordingly.

The Commonwealth further agrees in conjunction with any such amendment that the annual financial information containing the amended operating data or financial information will explain, in narrative form, the reasons for the amendment and the impact of the change in the type of operating data or financial information being provided.

(d)    Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

Section 34:    Amendments. Subject to the limitations contained in Section 33 hereof, without the consent of any Bondholders, the Secretary, with the approval of the Governor, may, from time to time and at any time, adopt such resolutions supplemental hereto as shall not be

inconsistent with the terms and provisions hereof (which supplemental resolutions shall thereafter form a part hereof):

(a)     to cure any ambiguity or formal defect or omission to correct or supplement any provision herein which may be inconsistent with any other provision herein or to make any other provisions with respect to matters or questions arising under this Resolution which may not be inconsistent with the provisions of this Resolution, provided such action shall not adversely affect the interests of the Holders of the Bonds, or to correct any inconsistent provisions or errors in this Resolution; or

(b)     to modify, amend or supplement this Resolution or any supplement or amendment hereto in such manner as to permit the Bonds to be rated by any nationally recognized securities rating service.

Section 35:     <u>Parties Interested Herein</u>.  Except as otherwise expressly provided in this Resolution, nothing in this Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person, other than the Commonwealth, the owners of the Bonds, and the Underwriters any right, remedy or claim under or by reason of this Resolution or any covenant, stipulation, obligation, agreement or condition herein.  Except as otherwise expressly provided in this Resolution, all the covenants, stipulations, obligations, promises and agreements in this Resolution by and on behalf of the Commonwealth shall be for the sole and exclusive benefit of the Commonwealth, the Owners of the Bonds, and the Underwriters.

Section 36:     <u>Tax Covenant</u>.  The Commonwealth shall comply with the requirements of the Internal Revenue Code of 1986, as amended, and the regulations promulgated thereunder, to the extent permitted by the Constitution and laws of the Commonwealth, so that interest on the Bonds shall remain excludable from gross income for federal income tax purposes of the recipients thereof to the same extent that such interest was excludable on the date of initial delivery of the Bonds.

(a)     <u>General</u>.  The Commonwealth hereby covenants with the holders of the Bonds that, notwithstanding any other provisions of this Resolution, it shall not take any action, or fail to take any action, if any such action or failure would adversely affect the exclusion from gross income of interest on the Bonds under Section 103 of the Internal Revenue Code of 1986, and the regulations issued thereunder, as the same may be amended from time to time, and any successor provisions of law (the "<u>Code</u>").  The Commonwealth shall not, directly or indirectly, use or permit the use of proceeds of the Bonds or any of the property financed or refinanced with proceeds of the Bonds, or any portion thereof, by any person other than a governmental unit (as such term is used in Section 141 of the Code) in such manner or to such extent as would result in the loss of exclusion from gross income for federal income tax purposes of interest on the Bonds.

(b)     <u>Use of Proceeds</u>.  The Commonwealth shall not take any action, or fail to take any action, if any such action or failure would cause the Bonds to be "private activity bonds" within the meaning of Section 141 of the Code, and in furtherance thereof, shall not make any use of the proceeds of the Bonds or any of the property financed or refinanced with proceeds of the Bonds, or any portion thereof, or any other funds of the Commonwealth, that would cause the Bonds to be "private activity bonds" within the meaning of Section 141 of the Code.  So long as any

18

Bonds are outstanding, the Commonwealth, with respect to such proceeds and property and such other funds, will comply with applicable requirements of the Code and all regulations of the United States Department of the Treasury issued thereunder.  The Commonwealth shall establish reasonable procedures necessary to ensure continued compliance with the Code and the continued qualification of the Bonds as "governmental bonds."

(c)       Arbitrage.  The Commonwealth shall not, directly or indirectly, use or permit the use of any proceeds of the Bonds, or of any property financed or refinanced thereby, or other funds of the Commonwealth, or take or omit to take any action, that would cause the Bonds to be "arbitrage bonds" within the meaning of Section 148 of the Code.  The Commonwealth shall comply with all requirements of Section 148 of the Code and all regulations of the United States Department of the Treasury issued thereunder to the extent such requirements are, at the time, in effect and applicable to the Bonds.

(d)       Federal Guarantee.  The Commonwealth shall not make any use of the proceeds of the Bonds or any other funds of the Commonwealth, or take or omit to take any other action, that would cause the Bonds to be "federally guaranteed" within the meaning of Section 149(b) of the Code.

(e)       Compliance with Tax Certificate.  The Commonwealth covenants that it will comply with the provisions of the Tax Certificate of the Commonwealth executed in connection with the issuance of the Bonds, which is incorporated herein by reference as if fully set forth herein.  These covenants shall survive payment in full or defeasance of the Bonds.

Section 37:       Governing Law; Jurisdiction and Venue.

(a)       This Resolution shall be governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the Bonds or this Resolution, except with respect to the adoption and execution hereof by the Commonwealth, which shall be governed by the laws of the Commonwealth.

(b)       The Commonwealth hereby irrevocably submits to the exclusive jurisdiction of any New York state or U.S. federal court sitting in the Borough of Manhattan, The City of New York, New York, and any Commonwealth court or U.S. federal Court sitting in San Juan, Puerto Rico, and any appellate court from any thereof (each an "applicable court"), in any action or proceeding arising out of or relating to the Bonds or this Resolution, and the Commonwealth hereby irrevocably agrees that all claims in respect of such action or proceeding (other than a Proceeding instituted in accordance with Section 33(b) hereof, which shall only be instituted in accordance with the provisions of such Section) may be heard and determined in any such applicable court.  The Commonwealth hereby irrevocably waives, to the fullest extent permitted by applicable law, the defense of an inconvenient forum to the maintenance of such action or proceeding and any right of jurisdiction in such action or proceeding brought in any applicable court on account of the place of domicile of the Commonwealth.  The Commonwealth hereby initially appoints Corporation Service Company as its agent (the "Process Agent") to receive on behalf of itself and its property service of copies of the summons and complaint and any other process that may be served in any such action or proceeding.  The Secretary may replace the

19

Process Agent with a substitute agent, and if so will provide notice of such replacement as an "event" in accordance with Section 33, if the Secretary determines that the Process Agent can no longer adequately provide the services required hereunder.

Section 38:   Waiver of Immunity.

In accordance with the provisions of Act No. 34, the Commonwealth waives immunity from the jurisdiction of any of the applicable courts only in a suit brought to compel the Secretary to comply with the provisions of Sections 2 and 8 of Article VI of the Constitution with respect to its obligations on the Bonds, or to enforce other remedies with respect to the Bonds provided in Section 20 of this Resolution; provided, however, that this waiver constitutes a limited and specific waiver by the Commonwealth solely for the purposes of the Bonds, and under no circumstances shall it be construed as a general waiver by the Commonwealth or a waiver with respect to proceedings unrelated to the exercise of remedies available under this Resolution.

Section 39:   Payments Due on Non-Business Day. In any case where the date of payment of interest or principal of any of the Bonds shall not be a Business Day, then payment of interest or principal need not be made on such date but may be made on the next succeeding Business Day with the same force and effect as if made on such date, and no interest on such payment shall accrue for the period after such date.  The Commonwealth shall not be required to take any action on any day which is a public holiday in the Commonwealth but may take such action on the next day which is not a public holiday.

Section 40:   Severability of Invalid Provisions.  If any one or more of the provisions, covenants or agreements in this Resolution on the part of the Commonwealth to be performed should be contrary to law, then such provision or provisions, covenant or covenants, agreement or agreements, shall be deemed separable from the remaining provisions, covenants and agreements, and shall in no way affect the validity of the other provisions of this Resolution or of the Bonds.

*[Signature page follows.]*

Section 41:   <u>Effectiveness.</u>  This Resolution shall take effect upon its approval by the Governor of Puerto Rico.

Adopted on March 11, 2014

_____
Secretary of the Treasury of Puerto Rico

The foregoing Resolution and the issuance of the Bonds authorized thereby as therein set forth are hereby approved this 11th day of March, 2014.

_____
Governor of Puerto Rico

(Seal)

Attest:

_____
Secretary of State of Puerto Rico

CONSENTED TO AS TO SECTIONS 37 AND 38 HEREOF:

_____
Secretary of Justice of Puerto Rico

[Signature Page to Bond Resolution]

# EXHIBIT A

## REFUNDED BONDS

| Series of Bond | Maturity (July 1) | Principal Amount Outstanding | Redemption Price | Redemption Date |
|---|---|---|---|---|
| Public Improvement Refunding Bonds, Series 2003 C-5-1 | 2021 | $ 44,905,000 | 100% | March 17, 2014 |
| Public Improvement Refunding Bonds, Series 2003 C-5-2 | 2020 | 188,710,000 | 100 | April 10, 2014 |
| Public Improvement Refunding Bond, Series 2003 C-6-1 | 2024 | 98,695,000 | 100 | March 17, 2014 |
| Public Improvement Refunding Bond, Series 2003 C-6-2 | 2024 | 98,690,000 | 100 | March 17, 2014 |
| Public Improvement Refunding Bonds, Series 2007A-2 | 2029 | 14,915,000 | 100 | April 10, 2014 |
| Public Improvement Refunding Bonds, Series 2007A-3 | 2029 | 14,925,000 | 100 | March 17, 2014 |

**EXHIBIT B**

**[FORM OF BONDS]**

**UNLESS THIS BOND IS PRESENTED BY AN AUTHORIZED REPRESENTATIVE OF THE DEPOSITORY TRUST COMPANY, A NEW YORK LIMITED PURPOSE TRUST COMPANY ("DTC"), TO THE ISSUER OR ITS AGENT FOR REGISTRATION OF TRANSFER, EXCHANGE, OR PAYMENT, AND ANY BOND ISSUED IS REGISTERED IN THE NAME OF CEDE & CO. OR IN SUCH OTHER NAME AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC (AND ANY PAYMENT IS MADE TO CEDE & CO. OR TO SUCH OTHER ENTITY AS IS REQUESTED BY AN AUTHORIZED REPRESENTATIVE OF DTC), ANY TRANSFER, PLEDGE, OR OTHER USE OF THIS BOND FOR VALUE OR OTHERWISE BY OR TO ANY PERSON IS WRONGFUL INASMUCH AS THE REGISTERED OWNER HEREOF, CEDE & CO., HAS AN INTEREST HEREIN.**

No. R-___                                                                                      $_____

United States of America

COMMONWEALTH OF PUERTO RICO

GENERAL OBLIGATION BONDS OF 2014, SERIES A

| Interest Rate | Maturity Date | CUSIP No. |
|---|---|---|
| 8% | July 1, 2035 | 74514LE86 |

Registered Owner:   Cede & Co.

Principal Amount:   Dollars

     The Commonwealth of Puerto Rico (the "Commonwealth") is justly indebted and for value received hereby promises to pay to the Registered Owner named above or registered assigns or legal representatives, on the Maturity Date specified above (or earlier as hereinafter referred to), upon the presentation and surrender hereof, the Principal Amount specified above and to pay interest thereon from the date hereof or from the January 1 or July 1 next preceding the date of authentication to which interest shall have been paid, unless such date of authentication is a January 1 or July 1, in which case from such date, at the Interest Rate per annum specified above, until payment of such Principal Amount, such interest to the payment hereof being payable semi-annually on the first (1st) day of each January and July, commencing on July 1, 2014.  The Principal Amount of this bond is payable upon presentation and surrender hereof at the corporate trust office of Banco Popular de Puerto Rico, Registrar, in the Municipality of San Juan, Puerto Rico.  Payment of the interest on this bond shall be paid by check mailed to the person appearing on the registration books of the Commonwealth (kept at the above office of the Registrar) as the registered owner hereof (or of the previous bond or bonds evidencing the same debt as that evidenced by this bond) at the close of business on the

record date for such interest, which shall be the June 15 or December 15 (whether or not a business day) next preceding such interest payment date.  Both the principal of and interest on this bond are payable in such coin or currency of the United States of America which, at the respective dates of payment thereof, is legal tender for the payment of public and private debts.  The good faith, credit and taxing power of the Commonwealth of Puerto Rico are irrevocably pledged for the prompt payment of the principal of and the interest on this bond.

This bond is one of a duly authorized issue of bonds of the Commonwealth issued in the aggregate principal amount of $3,500,000,000, known as "Commonwealth of Puerto Rico General Obligation Bonds of 2014, Series A", issued under the authority of and in full compliance with an Act of the Senate and House of Representatives of the United States in Congress assembled entitled, "An Act to provide a civil government for Puerto Rico, and for other purposes," approved March 2, 1917, as amended, as continued in effect by Public Law 600, approved July 3, 1950, as amended, and now known as the "Puerto Rican Federal Relations Act," and the Constitution and laws of the Commonwealth, including Act No. 33 of the Legislative Assembly of Puerto Rico, approved December 7, 1942, as amended ("Act No. 33"), Act No. 242-2011 of the Legislative Assembly of Puerto Rico, approved December 13, 2011 ("Act No. 242"), Act No. 45-2013 of the Legislative Assembly of Puerto Rico, approved June 30, 2013 ("Act No. 45"), and Act No. 34-2014 of the Legislative Assembly of Puerto Rico, March 4, 2014 ("Act No. 34" and together with Act No. 33, Act No. 242, and Act No. 45, the "Acts"), and pursuant to a resolution of determination to issue said bonds (the "Resolution") duly adopted by the Secretary of the Treasury of Puerto Rico (the "Secretary of the Treasury"), approved by the Governor of Puerto Rico, and consented to by the Secretary of Justice of Puerto Rico with respect to certain matters only, as set forth therein, for the purpose of funding certain necessary public improvements, refunding the principal component of and interest on certain outstanding bonds and notes of the Commonwealth and certain of its public corporations, refunding certain outstanding bonds and notes of the Commonwealth, funding interest on a portion of such bonds, paying fees in connection with the termination of certain interest rate exchange agreements, and paying certain expenses related to the issuance and sale of the bonds and, by the acceptance of this bond, the owner hereof assents to all the provisions of the Resolution. The bonds constitute public debt as described in and for the purposes of Section 2 and Section 8 of Article VI of the Constitution of the Commonwealth.  Reference is made to the Resolution for a description of the rights, limitations of rights, duties, obligations and immunities of the Commonwealth and the bondholders, as applicable. The Resolution may be amended to the extent and in the manner provided therein.

The bonds are issuable as registered bonds without coupons in a minimum denomination of $100,000, and any multiple of $5,000 in excess thereof; provided, however, that the minimum denomination of the bonds may be reduced to $5,000, if the conditions set forth in the Resolution are met with respect to such reduction.  At the corporate trust office of the Registrar, in the Municipality of San Juan, Puerto Rico, in the manner and subject to the limitations and conditions provided in the Resolution and without cost except for any tax or other governmental charge, bonds may be exchanged for an equal aggregate principal amount of bonds of authorized denominations.

The bonds are subject to redemption prior to maturity, at the option of the Secretary, from any moneys that may be available for that purpose, at any time on or after July 1, 2020, either in

whole or in part (and if in part, in such order of annual Amortization Requirements as directed by the Secretary) on any Business Day, at a redemption price equal to the principal amount of the bonds to be redeemed, without premium, together with accrued interest to the date fixed for redemption.

In addition, the bonds of this issue shall be redeemed, to the extent provided in the Resolution, commencing on July 1, 2021 and on July 1 in each year thereafter in principal amounts equal to the Amortization Requirements for such bonds, as defined in the Resolution, plus accrued interest, without premium.

Any such optional redemption, either in whole or in part, may be made upon at least 20 days' prior notice by registered or certified mail to all registered owners and otherwise as provided in the Resolution, and shall be made in the manner and under the terms and conditions provided in the Resolution. Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are, as set forth in the Resolution. If at the time of giving a notice of redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later that the opening of business on the redemption date, and such notice and the corresponding optional redemption shall be of no effect unless such moneys are so deposited. Any conditional notice of optional redemption may be rescinded by notice given to the Registrar by the Secretary of the Treasury by Electronic Means no later than two Business Days prior to the date specified for redemption. The Registrar shall give notice of such rescission as soon thereafter as practicable in the same manner, and to the same persons, as notice of such redemption was given pursuant to the Resolution.

On the date designated for redemption, notice having been given as provided in the Resolution and available moneys for payment of the principal of and accrued interest on the bonds so called for redemption being held by the Registrar, interest on the bonds so called for redemption shall cease to accrue. Bonds and portions of bonds which have been duly called for redemption under the provisions of the Resolution, or with respect to which irrevocable instructions to call for redemption or to pay at or prior to maturity have been given to the Registrar in form satisfactory to it, and for the payment of the principal of and the accrued interest on which sufficient available moneys or investments permitted by law (determined in accordance with the Resolution) shall be held in trust for the owners of the bonds or portions thereof to be paid or redeemed, shall not be deemed to be outstanding under the Resolution, and the registered owners thereof shall have no rights in respect thereof except to receive payment of the principal of and the accrued interest thereon. If a portion of this bond shall be called for redemption, a new bond or bonds in an aggregate principal amount equal to the unredeemed portion hereof will be issued to the registered owner upon the surrender hereof in accordance with the provisions of the Resolution.

If less than all of the bonds shall be called for redemption, the portions thereof to be redeemed shall be selected in such manner as provided in the Resolution.

The transfer of this bond is registrable by the registered owner hereof in person or by such owner's attorney or legal representative at the corporate trust office of the Registrar in the

Municipality of San Juan, Puerto Rico, but only in the manner and subject to the limitations and conditions provided in the Resolution and upon surrender and cancellation of this bond. Upon any such registration of transfer the Commonwealth shall execute and the Registrar shall authenticate and deliver in exchange for this bond a new bond or bonds registered in the name of the transferee or transferees, of the same maturity, bearing interest at the same rate, in any authorized denominations and in principal amount equal to the principal amount of this bond.

This bond shall be governed and construed in accordance with the laws of the State of New York, and the laws of the State of New York shall apply to any action or proceeding arising out of the bonds and the Resolution, other than as to authorization and execution, which shall be governed by the laws of the Commonwealth.

This bond shall not be valid or become obligatory for any purpose or be entitled to any benefit under the Resolution until this bond shall have been authenticated by the execution by the Registrar of the certificate of authentication endorsed hereon.

It is hereby certified and recited that all acts, conditions and things required to happen, exist and be performed precedent to and in the issuance of this bond have happened, exist and have been performed in due time, form and manner as required by the Constitution and laws of the Commonwealth of Puerto Rico, and the total indebtedness of the Commonwealth, including this bond, does not exceed any debt or other limitation prescribed by law.

*[Remainder of this page intentionally left blank.]*

B-4

      IN WITNESS WHEREOF, the Commonwealth of Puerto Rico has caused this bond to be executed with the facsimile signatures of the Governor of Puerto Rico and the Secretary of the Treasury of Puerto Rico and a facsimile of the official seal of the Commonwealth of Puerto Rico to be imprinted hereon and attested by the facsimile signature of the Secretary of State of Puerto Rico, all as of the ___ day of _____, 20_____.


[Facsimile signature]_____
Governor of Puerto Rico


[Facsimile signature]_____
Secretary of the Treasury of Puerto Rico

(SEAL)


Attest:

[Facsimile signature]_____
Secretary of State of Puerto Rico

B-5

CERTIFICATE OF AUTHENTICATION

This is one of the bonds issued under the provisions of the Resolution mentioned herein.

BANCO POPULAR DE PUERTO RICO,
as Registrar

By:_____
    Authorized Officer

Date of authentication: _____

FORM OF ASSIGNMENT

FOR VALUE RECEIVED the undersigned hereby sells, assigns and transfers unto

_____

[please print or type name and address of Transferee]

the within bond and all rights thereunder, and hereby irrevocably constitutes and appoints _____ attorney to register the transfer of the within bond on the books kept for registration thereof, with full power of substitution in the premises.

Signature: _____

Dated: _____     Guaranteed by: _____

NOTICE:  The signature to this assignment must correspond with the name as it appears upon the face of the within bond in every particular, without alteration or enlargement or any change whatever and must be guaranteed by an "eligible guarantor institution" meeting the requirements of the Registrar which requirements will include membership or participation in the Securities Transfer Agents Medallion Program or such other "signature guarantee program" as may be determined by the Registrar in addition to, or in substitution for the Securities Transfer Agents Medallion Program, all in accordance with the Securities Exchange Act of 1934, as amended.

B-7

**EXHIBIT C**

**PURCHASE CONTRACT**

Included in this transcript as Item 15

_____

**EXHIBIT D**

**PRELIMINARY OFFICIAL STATEMENT**

See copy of the Preliminary Official Statement, dated March 6, 2014, as supplemented by a Supplement to Preliminary Official Statement, dated March 10, 2014, relating to the $3,000,000,000 (preliminary) Commonwealth of Puerto Rico General Obligation Bonds of 2014, included in this transcript as Item 19

_____

**EXHIBIT E**

**OFFICIAL STATEMENT**

See copy of the Official Statement, dated March 11, 2014, relating to the $3,500,000,000 Commonwealth of Puerto Rico General Obligation Bonds of 2014, included in this transcript as Item 20

_____

*BOS 47359304v10*

**NEW ISSUE - BOOK-ENTRY ONLY**

<div align="right">

**RATINGS:** Moody's: **Ba2**
**See RATINGS** S&P: **BB+**
Fitch: **BB**

</div>

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

<div align="center">

**$3,500,000,000**
# COMMONWEALTH OF PUERTO RICO
### General Obligation Bonds of 2014, Series A

</div>

**Dated: Date of Delivery** <div align="right">**Due: July 1, 2035**</div>

The General Obligation Bonds of 2014, Series A (the "Bonds") are issuable as registered bonds without coupons in denominations of $100,000 and any multiple of $5,000 in excess thereof. See "General" under THE BONDS herein for a description of certain events affecting the denominations of the Bonds. The Bonds will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book-Entry Only System" under THE BONDS herein and in Appendix IV. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2014. The Bonds are subject to redemption prior to maturity as set forth herein.

**A purchase of the Bonds involves significant risks. Prospective purchasers should read this Official Statement in its entirety and consider the information set forth in RISK FACTORS, beginning on page 5, prior to purchasing any of the Bonds. A purchase of the Bonds is suitable only for purchasers that can bear the risks of price declines, limited liquidity and the possible failure to pay debt service described in this Official Statement.**

A portion of the proceeds of the Bonds will be used to repay bonds or notes purchased, or related liquidity facilities provided, by certain of the underwriters. See USE OF PROCEEDS herein.

**The Bonds are general obligations of the Commonwealth of Puerto Rico (the "Commonwealth"). The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources. The Constitution of Puerto Rico empowers a holder of bonds and notes evidencing public debt, including the Bonds, to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of, and interest on, public debt when due.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain matters will be passed upon for the Commonwealth by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as Disclosure Counsel, and for the Underwriters by their counsel Sidley Austin LLP, New York, New York, and O'Neill & Borges LLC, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 17, 2014.

<div align="center">

**BARCLAYS**   **MORGAN STANLEY**   **RBC CAPITAL MARKETS**

**BofA Merrill Lynch**   **Goldman, Sachs & Co.**   **J.P. Morgan**   **Ramirez & Co., Inc.**

**FirstBank PR Securities**   **Jefferies**   **Mesirow Financial, Inc.**   **Oriental Financial Services**
**Popular Securities**   **Santander Securities**   **UBS FS Puerto Rico**

</div>

March 11, 2014

includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its instrumentalities.

The Bond Resolution provides that if the Commonwealth does not pay any installment of principal of or interest on the Bonds when due, a bondholder may bring suit against the Secretary of the Treasury to require application of available Commonwealth resources, including surplus, to the payment of such installment of principal or interest, as applicable, in accordance with the provisions of Section 2 of Article VI of the Constitution. The Bond Resolution provides that this right to bring an action against the Secretary and any other remedies that may be available to holders of the Commonwealth's general obligation bonds are the only remedies available to the holders of the Bonds in the event that the Commonwealth fails to make a payment on the Bonds when due. The Bonds are not subject to acceleration in the event of such nonpayment. See "Risks Related to the Bonds" under RISK FACTORS for a discussion of certain factors that may affect the availability of this remedy to the bondholders.

Commonwealth statutory law establishes certain "priority norms" relating to the disbursement of public funds, which law recognizes the Constitutional first priority of debt service on the public debt, including the Bonds. The law establishes the order of priorities as follows: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations, including the Bonds, and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

Pursuant to certain Commonwealth statutes, certain taxes and fees imposed by Commonwealth law are not considered "available resources" of the Commonwealth for purposes of the Constitutional provisions relating to the payment of public debt, or are available to pay public debt only if all other available Commonwealth resources are insufficient to pay such public debt.

The most significant of these is Act 91-2006, as amended ("Act 91"), which allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA. Act 91 provides that the Dedicated Sales Tax Fund created by such law, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA, do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Commonwealth Constitution and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. The validity of this legislative allocation, however, has not been challenged in or ruled upon by any court.

The Commonwealth has also assigned certain revenues to the Highways Authority, PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to the Highways Authority; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation provides that the assigned taxes and fees are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt, their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose. Since the Commonwealth has never defaulted on its public debt and has never had to apply amounts allocated to the Highways Authority, PRIFA or PRCCDA to the payment of its public debt, it is not clear how a bondholder would be able to establish that all other



COMMONWEALTH OF PUERTO RICO
**Departament of Justice**
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani
Secretary of Justice

Tel. (787) 723-4983
(787) 721-7771

December 13, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention:   Mr. Juan Carlos Batlle
President and Vice-Chairman of the Board

Inquiry No. 11-145-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales Tax Revenue Bonds, Senior Series 2011D, I hereby issue my opinion that:

1.   Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

2.   Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

3.  The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.  Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.  The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.  Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

Inquiry No. 11-145-B
Page 3

      7.      The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

      8.      Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

**NEW ISSUE – BOOK-ENTRY ONLY**

**RATINGS (see RATINGS herein):**

**S&P: A+**
**Moody's: A1**
**Fitch: A+**

$734,795,573.95
# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, First Subordinate Series 2011A

Consisting of

$397,758,386.20 Series 2011A-1         $337,037,187.75 Series 2011A-2

**Dated:** Date of Delivery                                   **Due:** August 1, as shown on the inside cover pages

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds"), to refund certain outstanding bonds of the Corporation and provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to cover operating expenses of the Commonwealth, as described herein. Concurrently with the issuance of the Series 2011A Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds" and, together with the Series 2011A Bonds, the "First Subordinate Series 2011 Bonds"). The Series 2011B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2011A Bonds is not contingent upon the issuance of the Series 2011B Bonds. The Corporation also proposes to issue in the near future additional Sales Tax Revenue Bonds, Senior Series in the United States taxable and tax-exempt markets and in Puerto Rico pursuant to separate official statements. See PLAN OF FINANCING. The issuance of the First Subordinate Series 2011 Bonds is not contingent upon the issuance of such additional bonds. The Series 2011A-2 Bond are not being offered to the public.

**The First Subordinate Series 2011 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales and use tax imposed by the Commonwealth. The First Subordinate Series 2011 Bonds are subordinate in payment priority to the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein) and additional senior bonds that may be issued by the Corporation, as described herein. The First Subordinate Series 2011 Bonds are on a parity in payment priority with the outstanding First Subordinate Bonds (as defined herein), and additional first subordinate bonds that may be issued or first subordinate obligations that may be incurred by the Corporation, as described herein. The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.***

The Series 2011A Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2011A Bonds on the records of The Depository Trust Company and its participants. The Series 2011A Bonds are being issued as Current Interest Bonds and Capital Appreciation Bonds. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest payment dates, interest rates, prices and approximate yields of the Series 2011A Bonds. Prospective investors should consider the information set forth in RISK FACTORS before investing.

**This cover page contains information for quick reference only. It is *not* a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision.**

*In the opinion of Bond Counsel, under existing law and assuming compliance with the tax covenants described herein, and the accuracy of certain representations and certifications made by the Corporation and the Commonwealth, interest on the Series 2011A-1 Bonds is excluded from gross income for Federal income tax purposes under Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"). Bond Counsel is of the opinion that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the Code with respect to individuals and corporations. Bond Counsel is further of the opinion that interest on the Series 2011A-1 Bonds is exempt from state, Commonwealth and local income taxation. See TAX MATTERS herein.*

**The Series 2011A Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2011A Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2011A Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, withdrawal or modification of the offer without notice, and the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon for the Underwriters by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as Underwriters' Counsel. It is expected that the Series 2011A Bonds will be delivered through The Depository Trust Company on or about November 23, 2011*

## Citigroup

| Barclays Capital | Goldman, Sachs & Co. | Wells Fargo Securities |
|---|---|---|
| BMO Capital Markets | BofA Merrill Lynch | Jefferies & Company |
| J.P. Morgan | Morgan Stanley | Ramirez & Co. Inc. |
| Raymond James | RBC Capital Markets | UBS FS Puerto Rico |
| BBVAPR MSD | FirstBank PR Securities | Oriental Financial Services |
| Popular Securities | Santander Securities        Scotia MSD | VAB FINANCIAL |

November 16, 2011

obligation or commitment of the Corporation. See *Commonwealth Non-Impairment Covenant*" under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

### Certain Constitutional Considerations Relating to Act 91

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the First Subordinate Series 2011 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2011 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. In connection with the issuance of each series of Outstanding Senior Bonds and First Subordinate Bonds, the then Secretary of Justice issued an opinion reaching the same conclusion (the "Secretary of Justice Opinions").