**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------- x

AMBAC ASSURANCE CORPORATION

                         Plaintiff,             No. 1:17-cv-3804

       -against-

THE BANK OF NEW YORK MELLON,

                     Defendant.

-------------------------------------------------------------- x

## NOTICE OF REMOVAL

**PLEASE TAKE NOTICE** that The Bank of New York Mellon ("BNYM") files this

Notice of Removal pursuant to section 2166(d) of the Puerto Rico Oversight, Management, and

Economic Stability Act ("PROMESA"), 48 U.S.C. §§ 2101-2241, and removes to this Court the

above-entitled civil action from the Supreme Court of the State of New York, County of New

York (Index No. 652356/2017) (the "Civil Action"), and all claims and causes of action asserted

therein. This Court has original jurisdiction over the Civil Action and all claims and causes of

action therein pursuant to 48 U.S.C. § 2166(a)(2) and 28 U.S.C. § 1441(a). In support of this

Notice of Removal, BNYM states as follows:

        1.       The state court action was commenced on May 2, 2017, by the filing of a

Summons and Complaint (the "Complaint" or "Compl.") in the Supreme Court of the State of

New York, County of New York (the "State Court").

        2.       Plaintiff completed service of process by personal service on May 3, 2017.

DX-R

3.      Pursuant to 48 U.S.C. § 2166(d) and Federal Rule of Bankruptcy Procedure

9027(a)(1),[1] BNYM consents, upon removal of the Civil Action and the claims and causes of

action therein, to entry of final orders or judgment by the District Court.

4.      In accordance with 48 U.S.C. § 2166(d) and Federal Rule of Bankruptcy

Procedure 9027(a)(1), true and correct copies of all process, pleadings and orders filed in the

State Court to date are attached as **Exhibit A** to this Notice of Removal.

<u>Timeliness</u>

5.      BNYM has timely filed this notice of removal within the time permitted by 28

U.S.C. § 1446(b)(1).

6.      BNYM also has timely filed this notice of removal within the time permitted by

Federal Rule of Bankruptcy Procedure 9027(a)(2) for the removal of civil actions filed prior to

the commencement of a case under PROMESA.

<u>Procedural Background</u>

7.      On June 30, 2016, in response to the Commonwealth of Puerto Rico's (the

"<u>Commonwealth</u>") financial and economic difficulties, President Obama signed PROMESA into

law.

8.      PROMESA established a "Financial Oversight and Management Board" (the

"<u>Oversight Board</u>") to help the Commonwealth "achieve fiscal responsibility and access to the

capital markets." 48 U.S.C. §§ 2121 and (a)-(b)(1).

9.      PROMESA also provided for an out-of-court, voluntary restructuring process, *see*

*id.* §§ 2231-2232, and a court-supervised restructuring process akin to Chapter 9 of the

Bankruptcy Code ("<u>Title III</u>"), *see id.* §§ 2161 et seq.

---

[1]     Pursuant to PROMESA, the "Federal Rules of Bankruptcy Procedure shall apply to a case under this
subchapter and to all civil proceedings arising in or related to cases under this subchapter." 48 U.S.C.
§ 2170.

10.     Title III of PROMESA, entitled "Adjustments of Debts," enables the Oversight Board to file a petition to restructure its debts in a court-supervised process similar to Chapter 9 of the Bankruptcy Code.

11.     PROMESA imposed a stay on collection actions against the Commonwealth until May 1, 2017. 48 U.S.C. § 2194(d).

12.     On May 2, 2017—just one day after the expiration of the stay—Plaintiff Ambac Assurance Corporation ("Plaintiff") commenced the state court action against BNYM. Plaintiff alleges that BNYM failed to declare alleged "Events of Default" relating to bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA") and has caused and will continue to cause direct and foreseeable harm to Plaintiff, in breach of BNYM's alleged contractual, fiduciary, and other duties to Plaintiff and the bondholders that Plaintiff insures.

13.     Resolution of Plaintiff's allegations will affect which holders of the COFINA bonds will be entitled to receive payments on account of the COFINA bonds.

14.     On May 3, 2017, the Oversight Board filed a petition for the Commonwealth under Title III of PROMESA in the United States District Court for the District of Puerto Rico, styled *In re The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico*, Case No. 17-bk-3283-LTS.

15.     On May 5, 2017, the Oversight Board filed a petition for COFINA under Title III of PROMESA in the United States District Court for the District of Puerto Rico, styled *In re The Financial Oversight and Management Board for Puerto Rico as representative of Puerto Rico Sales Tax Financing Corporation (COFINA),* Case No. 17-bk-3284-LTS.

## **Grounds for Removal**[2]

16.     Removal is appropriate under 28 U.S.C. § 1441(a) and 48 U.S.C. § 2166(d)(1).

28 U.S.C. § 1441(a) permits removal to the district court of "any civil action brought in a State

court of which the district courts of the United States have original jurisdiction."  *Id.*  Section

2166(d)(1) of PROMESA similarly provides, in relevant part:  "A party may remove any claim

or cause of action in a civil action . . . to the district court for the district in which the civil action

is pending, if the district court has jurisdiction of the claim or cause of action under this section."

*See* 48 U.S.C. § 2166(d)(1).

17.     This Court has original jurisdiction of the Civil Action and the claims and causes

of action therein pursuant to 48 U.S.C. § 2166(a)(2), which provides that the federal district

courts shall have "original but not exclusive jurisdiction of all civil proceedings arising under

[PROMESA], or arising in or related to cases under [PROMESA]."  The Civil Action is related

to COFINA's case under PROMESA.

18.     Although there is no case law addressing when a civil proceeding is "related to" a

case under PROMESA, decisions in the bankruptcy context provide an appropriate analog.

19.     The test for determining whether a civil proceeding is "related to" a bankruptcy

case is "whether the outcome of that proceeding could conceivably have any effect on the estate

being administered in bankruptcy."  *In re G.S.F. Corp.*, 938 F.2d 1467, 1475 (1st Cir. 1991)

(internal quotations and citations omitted).  Thus, the proceeding need not be against the debtor

or against the debtor's property.  *See Pacor, Inc. v. Higgins*, 743 F.2d 984, 994 (3d Cir. 1984).

Rather, an action is "related to" bankruptcy if the outcome could "alter[] [the] debtor's rights,

liabilities, options, or freedom of action, or otherwise have an impact upon the handling and

---

[2]     Federal Rule of Bankruptcy Procedure 9027(a)(1) requires a notice of removal to "contain a short and
plain statement of the facts which entitle the party filing the notice to remove" a civil action.  *See*
Fed.R.Bankr.P. 9027(a)(1).

administration of the bankrupt estate." *G.S.F. Corp.*, 938 F.2d at 1475 (internal quotations and

citations omitted); *see also Kirschenbaum v. DOL (In re Robert Plan Corp.)*, 777 F.3d 594, 597

(2d Cir. 2015) ("The standard for 'related to' jurisdiction is 'whether the outcome of the

proceeding could conceivably have any effect upon the debtors' estate being administered.'")

(quoting *In re Turner*, 724 F.2d 338, 341 (2d Cir. 1983) (quotation marks omitted)), *cert denied*,

136 S.Ct. 317 (2015).

      20.     The Civil Action is "related to" COFINA's Title III Case under PROMESA.

Plaintiff directly challenges BNYM's actions as Trustee for COFINA-issued bonds, including

Senior and Subordinate Capital Appreciation Bonds and Senior and Subordinate Current Interest

Bonds.  Specifically, Plaintiff alleges that COFINA and the Commonwealth engaged in at least

seven material "Events of Default" under the Amended and Restated Sales Revenue Bond

Resolution (the "Resolution") pursuant to which BNYM acts as trustee, and that these "Events of

Default" threaten COFINA's solvency.  The occurrence or non-occurrence of those alleged

Events of Default determine the relative payment priority of holders of the COFINA bonds. *See*

*Delaware Trust Co. v. Wilmington Trust, N.A.*, 534 B.R. 500, 513 (S.D.N.Y. 2015) ("The

requirements for 'relating to' jurisdiction are clearly met in this case because resolution of the

allocation dispute certainly could have, at a minimum, a 'conceivable effect' on TCEH's

bankruptcy estate.").

      21.     Moreover, pursuant to section 804 of the Resolution, COFINA "agree[d] to

indemnify and save the Trustee harmless against any loss, liability or expenses . . . arising out of

or in connection with the acceptance or administration of the trust or trusts [thereunder],

including the costs and expenses of defending itself against any claim . . . asserted by . . . any

Bondowner or any other Person . . . or liability in connection with the exercise or performance of

any of its powers or duties [thereunder], . . . except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct." *See* Resolution § 804.[3]

22.     The Civil Action also is "related to" COFINA's Title III case because COFINA is contractually obligated to indemnify BNYM. *See Cambridge Place Inv. Mgmt. v. Morgan Stanley & Co.*, No. 10-11376-NMG, 2010 WL 6580503, at *5 (D. Mass. Dec. 28, 2010) ("Clearly, a finding of liability pursuant to an indemnification agreement on claims of the magnitude presented here would have such an impact."); *11 E. 36th LLC v. First Cent. Sav. Bank (In re 11 E. 36th LLC)*, No. 13-11506 (JLG), 2016 WL 152924, at *5 (Bankr. S.D.N.Y. Jan. 12, 2016) ("the claims asserted in the Third Party Complaint do implicate the Court's noncore jurisdiction as matters that are 'related to' the bankruptcy case based on the Debtors' contractual agreement to indemnify the DIP Lender against claims arising out of the Postpetition Financing"); *Pratt v. S. Cnty. Motor Sales, Inc.*, No. 4:12CV10492 ERW, 2012 WL 5906705, at *3 (E.D. Mo. Nov. 26, 2012) ("courts have consistently found that 'related to' jurisdiction exists when there is an underlying contractual right of indemnification").

23.     Therefore, the Civil Action implicates COFINA's liabilities and payments thereon. As a result, the outcome of this case "could conceivably" have an effect on the COFINA Title III case, including by altering COFINA's "rights, liabilities, options, or freedom of action."[4]

---

[3]     On May 4, 2017, BNYM demanded in writing that COFINA indemnify it against any losses incurred or suffered by BNYM in any way arising out of, related to, or in connection with Plaintiff's state court action.

[4]     It is "unnecessary to resolve" whether any of the claims and causes of action in the Civil Action "arises in" or "arises under" PROMESA for subject matter jurisdictional purposes because '[w]hether a particular proceeding ['arises in' or 'arises under'] represents a question wholly separate from that of subject-matter jurisdiction.'" *Geruschat v. Ernst Young LLP (In re Seven Fields Dev. Corp.)*, 505 F.3d 237, 257 (3d Cir. 2007) (quoting *In re Marcus Hook Dev. Park, Inc.*, 943 F.2d 261, 266 (3d Cir.

## Venue

24.     Pursuant to 48 U.S.C. § 2166(d)(1), venue in this action is proper in this Court as the District Court for the district in which the Civil Action is pending.

## Transfer of Removed Civil Action

25.     PROMESA provides that "[a] district court *shall* transfer any civil proceeding arising under this subchapter, or arising in or related to a case under this subchapter, to the district court in which the case under this subchapter is pending." 48 U.S.C. § 2166(d)(3) (emphasis added).

## Filing and Service of Removal Papers

26.     Pursuant to 28 U.S.C. § 1446(d) and Federal Rule of Bankruptcy Procedure 9027(b) and (c), BNYM will file a copy of this Notice of Removal with the Clerk of Court for the Supreme Court of the State of New York, County of New York. BNYM also will promptly serve a copy of this Notice on counsel for Plaintiff.

WHEREFORE, BNYM hereby removes the Civil Action, and all claims and causes of action therein, from the Supreme Court of the State of New York, County of New York, to the United States District Court for the Southern District of New York.

*[The remainder of this page was intentionally left blank.]*

---

1991)). Therefore, this Court has jurisdiction of the claims and causes of action in the Civil Action so long as they are at least "related to" COFINA's Title III case. BNYM reserves all of its rights regarding the nature of such claims and causes of action.

Dated: May 19, 2017
      New York, New York

                                  Respectfully submitted,

                                      /s/ C. Neil Gray
                                Eric A. Schaffer
                                David M. Schlecker
                                C. Neil Gray
REEDS SMITH LLP
599 Lexington Avenue
New York, New York 10022
(212) 521-5450
Email:  eschaffer@reedsmith.com
Email:  dschlecker@reedsmith.com
Email:  cgray@reedsmith.com

*Attorneys for Defendant,*
*The Bank of New York Mellon*

## CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of

Court using the CM/ECF system, which will send automatic notification of such filing to all

CM/ECF participants.

I also mailed a copy of the foregoing, first class postage prepaid, addressed as follows:

Steven J. Reisman
Theresa A. Foudy
Jacques Semmelman
Michael J. Moscato
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061

Dated: May 19, 2017

_____
/s/ C. Neil Gray
C. Neil Gray

**Exhibit A**

Copies of all process, pleadings, and orders filed in the State Court

(Attached)

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 11 of 57

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

--------------------------------------------------------------------- X
                    :

AMBAC ASSURANCE CORPORATION,       :     Index No. _____

                   :

         Plaintiff,       :     **SUMMONS**

                   :

       -against-       :     Plaintiff designates New York

                   :     County as the place of trial.

THE BANK OF NEW YORK MELLON,      :

                   :     Venue is proper pursuant to

        Defendant.     :     CPLR § 503.

                   :

--------------------------------------------------------------------- X

TO THE ABOVE-NAMED DEFENDANT:

      YOU ARE HEREBY SUMMONED to answer the Complaint in this action and to serve a

copy of your answer on Plaintiff's attorneys within twenty (20) days after the service of this

summons, exclusive of the day of service, or within thirty (30) days after the service is complete

if this summons is not personally delivered to you within the State of New York.  In case of your

failure to appear or answer, judgment will be taken against you by default for the relief

demanded in the Complaint.

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R2   Page 12 of 57

Dated: New York, New York
      May 2, 2017

                                    CURTIS, MALLET-PREVOST,
                                    COLT & MOSLE LLP

                       By: _Theresa Foudy_ (NMM)
                             Steven J. Reisman (sreisman@curtis.com)
                             Theresa A. Foudy (tfoudy@curtis.com)
                             Jacques Semmelman (jsemmelman@curtis.com)
                             Michael J. Moscato (mmoscato@curtis.com)
                     101 Park Avenue
                     New York, New York 10178-0061
                     (212) 696-6000

                     *Attorneys for Plaintiff*

TO:
THE BANK OF NEW YORK MELLON
Attn.:  General Counsel
225 Liberty Street
New York, New York 10007

Case 17-03283-LTS Doc#4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc:
Exhibit DX-R2 Page 13 of 57

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

------------------------------------------------------------------------ X
                                               :

AMBAC ASSURANCE CORPORATION,       :

                                  :      Index No. _____

                 Plaintiff,           :

                                  :      Date Issued: _____

                 -against-            :

                                  :      **COMPLAINT**

THE BANK OF NEW YORK MELLON,         :

                                  :      Jury Trial Demanded

                 Defendant.           :

------------------------------------------------------------------------ X

Plaintiff Ambac Assurance Corporation ("Ambac" or "Plaintiff"), for its complaint against defendant The Bank of New York Mellon ("BONY" or "Trustee" or "Defendant"), alleges as follows:

## NATURE OF THE ACTION[1]

1.       This action arises out of BONY's failure as a Trustee to protect the holders of certain bonds (the "Bondholders") that Plaintiff Ambac insures. BONY's acting as a Trustee for both senior and subordinated Bondholders at the same time presents an intractable conflict of interest in the circumstances described herein, and has caused and will continue to cause direct and foreseeable harm to Ambac, in breach of BONY's contractual, fiduciary, and other duties to Ambac and the Bondholders Ambac insures.

2.       Rather than resign as trustee, or at least allow a co-trustee to serve with it, BONY continues to act in its conflicted capacity. By so doing, BONY has inflicted—and, unless

---

[1] Capitalized terms used but not defined in this section of the Complaint are given the meanings ascribed to them elsewhere in the Complaint.

Case 17-03283-LTS Doc#4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc: Exhibit DX-R Page 14 of 57

impeded, will continue to inflict—enormous harm on the very persons it is duty-bound to protect: Ambac and its insureds.

3.  In this action, Ambac seeks redress for harm already incurred, and seeks to stem further harm that will inevitably result unless BONY is either removed as trustee, or is compelled to take specific actions to prevent further harm: (i) accelerating payment of principal and interest on the bonds; and (ii) withholding further interest payments to subordinated Bondholders that have been unjustly receiving preferential treatment by BONY.

4.  Ambac is a monoline insurer that provides financial guarantee insurance for more than $800 million in gross face amount of outstanding senior capital appreciation bonds (the "Senior CAB Bonds") issued by the Puerto Rico Sales Tax Financing Corporation, known in Spanish as Corporación del Fondo de Interés Apremiante ("COFINA"), pursuant to the terms of the Amended and Restated Sales Tax Revenue Bond Resolution dated as amended, restated, modified, and/or supplemented (the "Resolution"). Ambac is a named beneficiary under the Resolution. Ambac is also itself a holder of COFINA Bonds.

5.  The Senior CAB Bonds do not provide for regular interest payments, but rather accrue interest until maturity many years in the future. However, COFINA has also issued Senior and Subordinate Cash Pay Bonds (collectively, the "Cash Pay Bonds"), whose holders are paid periodic cash interest payments on a current basis. Further, COFINA has issued Subordinated Capital Appreciation Bonds (the "Subordinate CAB Bonds"), which do not have regular interest payments.

6.  COFINA's solvency and financial viability have been placed in jeopardy by the Commonwealth of Puerto Rico (the "Commonwealth") waging a direct attack on COFINA, putting the legal mechanisms in place to unlawfully and unconstitutionally take COFINA's

–2–

Case 17-03283-LTS Doc#4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc:
Exhibit DX-R 2 Page 15 of 57

property, which would result in COFINA having insufficient assets to honor its obligations to the Bondholders. If the Commonwealth, with COFINA's acquiescence, was not seeking to seize property that belongs to COFINA, COFINA would remain solvent and viable. However, since September 2015, there have been at least seven material Events of Default by COFINA and the Commonwealth that threaten COFINA's solvency.

7.      These Events of Default provide BONY the power—and in fact impose on it the duty—to take remedial action to protect all of the Bondholders and Ambac as an insurer of certain Bonds. BONY's refusal to do so—despite repeated requests from Senior Bondholders—benefits the Subordinate Bondholders to the detriment of the Senior Bondholders in violation of BONY's obligation to act on behalf of all Bondholders with undivided loyalties and to avoid any conflicts of interest.

8.      The Subordinate Cash Pay Bondholders benefit most from BONY's failure to act, because they continue to be showered with cash payments drawn from COFINA's pool of assets that the Commonwealth is attempting to seize. Conversely, the holders of Senior CAB Bonds that are senior in priority to holders of Subordinate Cash Pay Bonds but that are not paid current interest, are harmed every day that BONY fails to recognize an Event of Default and continues to make the interest payments to the Subordinate Bondholders. Moreover, if the Commonwealth succeeds in its attempt to unconstitutionally take COFINA's property, and thus renders COFINA insolvent, BONY will have harmed all the Senior Bondholders, because every dollar BONY unnecessarily and inappropriately has paid and continues to pay to Subordinate Bondholders is a dollar that should have gone to the Senior Bondholders.

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R2   Page 16 of 57

9.       If BONY were to fulfill its obligations by recognizing an Event of Default and accelerating the debt, the Subordinate Bondholders would receive nothing until the Senior Bondholders have been paid in full.

10.      By failing and refusing to recognize an Event of Default when required to do so, and by continuing to deplete COFINA's assets by paying periodic interest to the Subordinate Cash Pay Bondholders, BONY has breached its contractual, fiduciary, and other duties to Ambac and to the Senior Bondholders that Ambac insures. BONY is required to act as a fiduciary and to perform its duties with due care and as a prudent person would in managing its own affairs. No prudent person would sit by as BONY has done while the government seeks to unlawfully and unconstitutionally seize assets it is duty-bound to protect.

11.      BONY must be held accountable for its deficient conduct to date, and must be prevented from causing even more harm.

## PARTIES

12.      Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004 and brings this action as an insurer of Senior CAB Bonds issued by COFINA and as a Bondholder itself. Ambac is a "Beneficiary" under the terms of the Resolution, as well as a specified third-party beneficiary of the Resolution.

13.      Defendant BONY is a New York state chartered bank with a principal place of business at 225 Liberty Street, New York, New York, 10007. BONY serves as Trustee for a series of bonds issued by COFINA pursuant to the Resolution, as amended and supplemented.

Case 17-03283-LTS Doc#4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc:
Exhibit DX-RR Page 93 of 37

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction pursuant to CPLR §§ 301 and 302, because Defendant is a resident of the State of New York and the acts complained of occurred in the State of New York.

15.     Venue is proper in this Court pursuant to CPLR § 503 because Defendant resides in New York County.

## FACTUAL BACKGROUND

### I.      The Commonwealth Creates COFINA After Facing Financial Crisis

16.     In 2006, Puerto Rico faced an exigent financial and economic crisis – at the time one of the worst in the Commonwealth's history.

17.     Among other measures designed to address the crisis, the Legislative Assembly enacted legislation to give the Commonwealth access to the capital markets at low and prudent cost through the creation of a securitization structure.   Through a series of statutes, the Legislative Assembly imposed for the first time a sales and use tax (the "SUT") and the entity that eventually became COFINA became the owner of a portion of the SUT revenue (the "Dedicated SUT Revenues").   Shortly thereafter, in early 2007, the Legislative Assembly passed Act 56, which officially created COFINA and authorized COFINA to issue bonds backed by the Dedicated SUT Revenues.

18.     The Dedicated SUT Revenues are, by statute, "*owned* by COFINA." Act 56 expressly separated COFINA's funds from the Commonwealth's general funds (the "General Fund"), to prevent them from being diverted to the Treasury of Puerto Rico and used for other purposes.   Act 56 specified that the Dedicated SUT Revenues "shall not constitute available resources of the Commonwealth of Puerto Rico **for any purpose.**" (emphasis added).

19.     In July 2007, COFINA adopted the Resolution.

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R2   Page 18 of 57

20.     Pursuant to the Resolution and statutory enactments, the transfer of the Dedicated SUT Revenues to COFINA presently is accomplished through the following mechanism: (1) the Commonwealth collects SUT at a rate of 11.5%, (2) out of the 11.5% collected, 6% constitutes Dedicated SUT Revenues that are owned by and flow to COFINA until it has received SUT up to a cap specified in the Resolution that is sufficient for COFINA's total debt service for the fiscal year, (3) out of the remaining 5.5%, 1% flows to municipalities and 4.5% flows to the General Fund, and (4) Dedicated SUT Revenues in excess of the aforementioned cap flow to the General Fund.

21.     This structure ensures that necessary debt service by COFINA is funded. Given the importance of this structure, and the fact that the Dedicated SUT Revenues are the sole source of recovery for the COFINA Bonds, the Resolution mandates that any interruption of Dedicated SUT Revenues flowing to COFINA constitutes an Event of Default.

22.     The isolation of COFINA from the credit risk of the General Fund, through COFINA's ownership of the Dedicated SUT Revenues and the statutory lien granted for the benefit of Bondholders, enabled COFINA Bonds to receive strong, investment-grade ratings, consistently higher than the ratings for the Commonwealth's general obligations bonds (the "GO Bonds"). In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that *separates* the revenue stream supporting the bonds *from* the Commonwealth of Puerto Rico, along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal." It further stated that, "[t]he legislative act creating COFINA ... *successfully separates* and *provides a priority interest* in the Commonwealth's sales and use taxes for the [COFINA] bondholders." Moody's echoed these assessments.

Case 17-03283-LTS Doc#4759-17 Filed 01/13/19 Entered 01/13/19 17:45:34 Desc:
Exhibit DX-R2 Page 19 of 57

## II. The Commonwealth's Attempts To Attract Investors With Critical Rights And Protections

23.      In order to induce investors and insurers to lend their money to Puerto Rico through the COFINA structure and to obtain the insurance for the COFINA Bonds, both the Legislative Assembly and COFINA provided investors and insurers with critical rights and protections designed to assure them that COFINA's ownership of the property collateralizing their bonds was guaranteed.

24.      Chief among these protections are the statutory segregation of the Dedicated SUT Revenues from the General Fund, and COFINA's ownership of the Dedicated SUT Revenues, as discussed above.  The Legislative Assembly explicitly promised that the Commonwealth would not impair the collection of the SUT and the rights of COFINA to the Dedicated SUT Revenues. This statutory covenant was made for the express purpose of encouraging Bondholder and insurer reliance and in order to avoid any concerns about future impairment given the Commonwealth's beleaguered financial condition.  13 L.R.P.A. § 14(c).

25.      The legal structure of COFINA—including the creation of a property right in and statutory lien on the Dedicated SUT Revenues that was insulated from the risks of the General Fund, and the Commonwealth's agreement not to impair that property interest—was critical to the investors and their insurers, such as Ambac, who relied on the promise that they would have the benefit of a separate legal structure and a dedicated stream of payments.

## III. The Resolution Aims To Preserve And Protect The COFINA Structure

26.      Under the law and the Resolution, the Commonwealth and COFINA made contractual promises to prospective Bondholders and their insurers to assure them that even if the fiscal crisis continued, COFINA bonds would be safe and protected from the political and economic risks affecting the General Fund.  Moreover, the Commonwealth promised that it

– 7 –

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-R2 Page 20 of 57

would not limit or restrict COFINA's rights to meet its obligations to its Bondholders before the Bonds and interest were fully paid and retired. These promises are found in the enabling legislation as well as the Resolution. The Resolution sets forth (i) the terms governing all COFINA Bonds; and (ii) the rights of and protections for the holders and insurers of the COFINA Bonds.

27. The Resolution creates a "continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued" pursuant thereto (the "Pledge").

28. "Pledged Property" is defined under the Resolution to include, among other things, Dedicated SUT Revenues. Section 501 of the Resolution provides that such funds are "pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds." The Resolution further provides that Pledged Property shall "immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind."

29. Because the COFINA Bonds are payable only by COFINA and, via the Pledge, the Dedicated SUT Revenues constitute the only source of funding for the repayment of the COFINA Bonds, the Resolution necessarily contains critical assurances concerning the continuing flow of funds to COFINA. Any interruption of revenues flowing to COFINA is an Event of Default. Investors and insurers, including Ambac, relied on these assurances when purchasing and insuring the COFINA Bonds. In fact, Ambac is a "Beneficiary" under the terms of the Resolution. Ambac is also a specified third-party beneficiary of the Supplemental Resolution.

Case:17-03283-LTS Doc#:4759-17 Filed:01/13/19 Entered:01/13/19 17:45:34 Desc:
Exhibit/DX-R2 Page 21 of 57

30.    Moreover, the Resolution contains two key provisions intended to reflect and reaffirm the viability of COFINA and the sanctity of the Pledge.  These assurances were delivered through affirmative and negative covenants from COFINA and the Commonwealth included in the Resolution.

    a)  **First**, Section 705 of the Resolution requires COFINA to "at all times defend, preserve, and protect the pledge of the Pledged Property . . . against all claims and demands of all persons whomsoever."

    b)  **Second**, Section 706 provides, among other things, that the Commonwealth shall not "limit or restrict the rights . . . of [COFINA] to meet its obligations to its Bondholders."

31.    Because COFINA has no assets other than the Dedicated SUT Revenues and no other means of repaying Bondholders who lent billions of dollars to Puerto Rico, protection of the legal structure, and the enforcement of these promises and covenants, is essential to the integrity of the COFINA structure.  Recognizing the importance of these promises, the Resolution provides that "a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds" shall constitute an Event of Default, even when COFINA continues to make principal and interest payments to bondholders.  COFINA Resolution § 1101(ii).

## IV.    COFINA Issues $16 Billion Of Bonds

32.    At the time of the Resolution's adoption in 2007, COFINA issued several types of COFINA Bonds, comprised primarily of Senior Cash Pay Bonds and Senior CAB Bonds (collectively, the "Senior Bonds").[2]  In total, during 2007 and 2008, COFINA issued approximately $5.2 billion in Senior Bonds.  The Senior Bonds, because they were backed by the Dedicated SUT Revenues, afforded the Commonwealth with crucial, lower cost financing compared with the GO Bonds.

---

[2] As used herein, "COFINA Bonds" refers, collectively, to all Senior Bonds and Subordinate Bonds.

Case 17-03283-LTS Doc 4759-17 Filed 01/13/19 Entered 01/13/19 17:45:34 Desc:
Exhibit/DX-R Page 22 of 57

33.     Ambac agreed to insure Senior CAB Bonds in a face amount of $808.5 million at issuance.

34.     Ambac is a provider of financial guaranty insurance, by which an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation. Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.

35.     Under the relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay and, to the extent Ambac makes such payments, it obtains assignments of rights from the Bondholders, becomes an owner of the Bonds, and/or becomes subrogated to the rights of Bondholders and effectively steps into the shoes of such Bondholders.

36.     One reason governments and municipalities, including COFINA, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds. Such insurance is especially important for issuers such as the Commonwealth and COFINA who have—and will have—significant borrowing needs, notwithstanding their lower credit ratings.

37.     In exchange for its agreement to insure certain Senior CAB Bonds, Ambac negotiated and received special consent rights. Specifically, under the applicable bond insurance agreement, Ambac's consent is required *in addition to* Bondholder consent for any action requiring such consent. Such actions include any amendments or other modifications to the Resolution, which would require the consent of a majority in principal amount of the COFINA Bonds outstanding.

Case 17-03283-LTS  Doc#4759-17  Filed 01/13/19  Entered 01/13/19 17:45:34  Desc:
Exhibit DX-P  Page 23 of 57

38.      In addition, Ambac is a "Beneficiary" of the Resolution, as defined there. *See* Resolution (Beneficiaries are "(i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding."). And Ambac is also a third-party beneficiary in accordance with the Resolution. *See* Resolution ("To the extent that this Resolution confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this Resolution, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.").

## V.    COFINA Issues Subordinate Bonds

39.      By 2009, in need of additional resources, the Commonwealth increased the amount of Dedicated SUT Revenues owned by COFINA and caused COFINA to issue Subordinate Cash Pay Bonds and Subordinate CAB Bonds (collectively with the Subordinate Cash Pay Bonds, the "Subordinate Bonds").

40.      The Subordinate Bonds, which are subordinate to all Senior Bonds, carry higher interest rates and shorter maturities than most Senior Bonds, including the Senior CAB Bonds. In essence, the issuance of the Subordinate Bonds provided credit support to all Senior Bonds by effectively protecting the Senior Bonds from material declines in the Dedicated SUT Revenues owned by COFINA.

41.      In total, investors have purchased more than $16 billion of COFINA Bonds, consisting of essentially the following four types of debt:

   a) **Senior Cash Pay Bonds (approximately $4 billion principal amount outstanding):** entitled to periodic interest payments in cash, and mature between 2020 and 2057.

– 11 –

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: Exhibit DX-R2 Page 24 of 57

b) **Senior CAB Bonds (approximately $3.7 billion accreted amount outstanding):** do not receive cash payments prior to stated maturity or acceleration. Senior CAB Bonds mature between 2022 and 2056, and thus are the lowest weighted average yielding bonds issued by COFINA or any other Commonwealth entity. Initial principal amount is reinvested at a stated compounded rate and, upon stated maturity or acceleration, holders are entitled to receive the initial principal amount plus any then accrued appreciation at the compounded rate. Because these Bonds do not receive periodic payments, have distant maturities, and are solely obligations of COFINA, they are critically dependent on the sanctity of the COFINA structure and the corresponding pledge of Dedicated SUT Revenues.

c) **Subordinate Cash Pay Bonds (approximately $8.2 billion principal amount outstanding):** absent an Event of Default, receive periodic interest payments in cash, and mature between 2017 and 2044.

d) **Subordinate CAB Bonds (approximately $1.7 billion accreted amount outstanding):** do not receive cash payments prior to stated maturity or acceleration.

## VI.   The Differing Classes Of Bonds Give Rise To Conflicts Of Interest For The Trustee

42.    Despite the conflicting and competing rights and interests of these different types of COFINA Bonds, BONY has at all times since 2007 acted as the sole trustee for all COFINA Bonds.[3]

43.    An Event of Default triggers both contractual obligations and heightened extra- contractual duties for BONY as Trustee, as well as empowers the Trustee to accelerate all amounts outstanding under the Resolution. Upon any such acceleration, the Resolution provides that the principal and "accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon [COFINA] in an amount sufficient to pay principal . . . and interest accrued on the accelerated Bonds to the date established for payment thereof."

---

[3] Section 1211 of the Resolution provides that "the rights, duties, privileges and immunities of the Trustee . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," which according to the Resolution is New York.

Case:17-03283-LTS  Doc#:4759-17  Filed:01/12/19  Entered:01/12/19 17:45:34  Desc:
Exhibit DX-R  Page 25 of 57

44.     Section 1101(2) of the Resolution provides that following an Event of Default, payments are to be made in accordance with "Class Priority," which is defined under the Resolution to mean that "Senior Bonds" are to be paid "first until full funding or payment thereof," with payments then due and owing to Senior Bonds entitled to *pari passu* treatment, and with payments flowing to the Subordinate Bonds only after the Senior Bonds are repaid in full.

45.     The remedy of acceleration thus affects each type of COFINA Bonds differently. For example, if, upon acceleration, insufficient funds exist to repay all COFINA Bonds in full, principal and accrued interest are repaid ratably among the Senior Cash Pay Bonds and Senior CAB Bonds in the first instance.  In other words, and assuming COFINA's inability to pay all outstanding amounts, an acceleration entitles the Senior Bonds to *pari passu* treatment, and cuts off any right of the Subordinate Bonds to payment.

46.     Any decision by BONY to decline to accelerate upon an Event of Default is therefore subject to the competing and conflicting interests of the Senior Bonds as compared to the Subordinate Bonds.  Thus, Section 810 of the Resolution empowers BONY to "appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the trustee may consider necessary or desirable."  However, BONY has not chosen to make such an election under Section 810 to ameliorate the conflict of interest by the sole Trustee for both the Senior Bondholders and the Subordinate Bondholders at the same time.

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit 17 Part 2   Page 16 of 57

## VII.   BONY Fails To Protect Plaintiff In Response To Numerous Events Of Default

47.     As set forth below, there have now been seven separate Events of Default. Under the Resolution, COFINA covenanted to "defend, preserve and protect" the COFINA structure and the rights of COFINA's creditors. However, it has failed to do so, standing idly by as the Legislative Assembly has dismantled the COFINA structure. Additionally, the Commonwealth covenanted, both in the Resolution and in COFINA's enabling legislation, not to take any action that would interfere with the rights of COFINA's creditors. The Events of Default below flagrantly violate that contractual and statutory covenant. Despite knowledge of these Events of Default, BONY has failed to take appropriate action, in that it has not accelerated payment on all Senior Bonds, and has instead continued making cash payments to the Subordinate Cash Pay Bonds to the detriment of Ambac and the Senior Bondholders it insures.

### A.   The First Event Of Default – The September 2015 Fiscal Plan

48.     Beginning in 2015, the Commonwealth began to abandon its commitment to honor its legal obligations to COFINA, its Bondholders, and Ambac. On June 28, 2015, then-Governor García Padilla admitted in an interview to the New York Times that "[t]he debt is not payable," and stated that creditors must "share the sacrifices."

49.     Subsequently, the Commonwealth suggested that it may no longer honor its legal obligation not to impair COFINA's rights to the Dedicated SUT Revenues. On September 9, 2015, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group")—a group established and empowered by an executive order issued by the former governor—published the Puerto Rico Fiscal Economic Growth Plan (the "September 2015 Fiscal Plan"). This Plan ignored the essential promise that COFINA's assets and liabilities are to remain separate from the General Fund of the Commonwealth. Instead, the September 2015 Fiscal Plan combined all of COFINA's revenues and its debt service in with the

– 14 –

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-R Page 27 of 57

Commonwealth's assets and liabilities, which is inconsistent with COFINA's independent legal structure and disregards COFINA's property interest in the Dedicated SUT Revenues. The September 2015 Fiscal Plan publicly portrayed COFINA's debt obligations and assets as those of the Commonwealth, in direct contravention of the foundational premise of the COFINA structure. *See* September 2015 Fiscal Plan at 17, 61, and 62. This constituted a drastic departure from past precedent, in which the Commonwealth, consistent with the law, kept the debt obligations of COFINA and the Commonwealth separate in audited financial statements, government budgets, plans, and models.

50.     Further, the September 2015 Fiscal Plan stated that, "the clawback of revenues supporting certain Commonwealth tax supported debt" may be available to "service all principal and interest on debt that has a constitutional priority."

51.     In the wake of releasing the September 2015 Fiscal Plan, S&P immediately downgraded COFINA to a CC rating, just two notches above default, and stated that it believes "default or restructuring is highly likely and could take the form of either a missed debt service payment or a distressed exchange that we would characterize as a default," and that "all of Puerto Rico's tax-backed debt is highly vulnerable to nonpayment." *Street Insider, S&P Downgrades Puerto Rico's Tax-Backed Debt to 'CC', Outlook Negative*, Sep. 11, 2015.

52.     Significantly, BONY was well-aware of the September 2015 Fiscal Plan and of the Commonwealth's and COFINA's breaches related thereto.

53.     On information and belief, in a letter dated September 24, 2015, that was shared with BONY, counsel for certain Bondholders warned COFINA that the September 2015 Fiscal Plan "materially misrepresent[ed] the essential nature of COFINA's indebtedness to the investing public, and materially harm[ed] COFINA and its bondholders." The letter warned

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit/DX-P2 Page 28 of 57 INDEX NO. 652356/2017

further that these representations "mis[led] the public by lumping the Commonwealth's own debt together with COFINA's," improperly attempted to "consolidate assets and liabilities of COFINA with that of the Commonwealth," and accused the Commonwealth of intending to "signal to the investing public at large that the Commonwealth's struggling fiscal health threatens the health of COFINA, ignoring the fact that insulation from the Commonwealth's other liabilities prompted the creation of COFINA in the first place."

54.     These misstatements, the letter explained, were inconsistent with Sections 201 and 501 of the Resolution, which together "make clear that the bonds issued by COFINA are not obligations of the Commonwealth." The letter noted that COFINA's failure to correct these misstatements constituted a breach of COFINA's covenant in Section 705. The letter therefore demanded that COFINA "promptly cure" these misstatements, "provide the necessary assurances of bondholders under the Resolution," and "untangle the COFINA debt and revenue from that of the Commonwealth."

55.     Despite having knowledge of the September 2015 Fiscal Plan, the September 24, 2015 letter, and the absence of any cure by the Commonwealth or COFINA, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments on the Subordinate Bonds. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

**B.     The Second Event Of Default – The February 1, 2016 Restructuring Proposal**

56.     On February 1, 2016, the Working Group published a document—the "Puerto Rico Restructuring Proposal" (the "February 1, 2016 Restructuring Proposal"). The February 1, 2016 Restructuring Proposal unlawfully referred to COFINA debt as the debt of the Commonwealth, and even included COFINA debt service and revenue within the

– 16 –

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-R Page 29 of 57

Commonwealth's own debt and revenue calculations—a patent falsehood that is contrary to everything COFINA Bondholders and their insurers were told and promised when they purchased and insured COFINA Bonds.

57. On information and belief, once again, this time in a letter dated February 8, 2016, certain Bondholders advised COFINA and BONY of the breaches arising from the February 1, 2016 Restructuring Proposal. The letter correctly characterized the February 1, 2016 Restructuring Proposal and the accompanying press release as the "antithesis of protecting and defending the Pledged Property for the benefit of Bondowners." Specifically, the letter took issue with, among other things, the fact that the press release (i) "includes COFINA debt service within the Commonwealth's own debt service-to-revenue and then calculates that ratio with reference to the Constitutional limits on general obligation bonds of the Commonwealth," and (ii) "concludes by stating the Working Group's agenda is to 'improve the Commonwealth's credit-worthiness.'"

58. The letter "demand[ed] that [COFINA] immediately publish its own press release renouncing the Working Group's treatment of and misstatements about COFINA" and demanded further that COFINA "appoint independent legal and financial advisors to protect and defend COFINA's Bondowners 'against all claims and demands of all persons whomsoever,' including any actions and misstatements by COFINA's own agents who have participated in the Working Group in breach of the Resolution."

59. Again, BONY did not fulfill its duties to defend all COFINA Bondholders and their insurers. Despite having knowledge of the February 1, 2016 Restructuring Proposal and the February 8, 2016 letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the bonds or ceasing to make payments

Case:17-03283-LTS Doc#:4759-17 Filed:01/13/19 Entered:01/13/19 17:45:34 Desc:
Exhibit DX R 2 Page 30 of 57

to the Subordinate Cash Pay Bondholders. Instead, BONY ignored its irreparable conflict of interest. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

### C.    The Third Event Of Default – The 2016 Moratorium Act

60.    The Moratorium Act, enacted by the Commonwealth on April 6, 2016, empowered the Governor, by executive order, to declare "any government entity to be in a state of emergency" and, "if the executive order so provides, no payment on a covered obligation of such … government entity shall be made." Moratorium Act, Article 201(a).

61.    Article 201(b)(ii) provided further that, "[d]uring the emergency period for any government entity," many rights and remedies would be restricted, including restrictions on the "exercise [of] any remedy, which remedy shall include any right of acceleration or termination . . . related to any covered obligation of such government entity, under any contract or applicable law as a result of . . . (A) non-payment of any obligation arising under or relating to any covered obligation of such government entity; [or] (B) breach of any condition or covenant under or related to any covered obligation of such government entity."

62.    Article 201(d) provided that "[i]f ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period … (ii) *any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof); [and] (iv) any statutory or other obligation to ensure payment of a covered obligation as if this Act were not enacted (or take any action in furtherance thereof).*" (emphasis added)

63.    Article 702 stated that the Moratorium Act (and its provisions allowing the suspension of payments) would "take effect immediately upon enactment" and *included*

– 18 –

Case:17-03283-LTS Doc#:4759-17 Filed:01/13/19 Entered:01/13/19 17:45:34 Desc:
Exhibit DX-R2 Page 31 of 57

*COFINA* in its definition of "government entity." Section 103(t)(i). This meant that under the terms of the statute, the Governor could suspend COFINA's payments and make the Dedicated SUT Revenues available for the Commonwealth's obligations.

64.    The Moratorium Act, therefore, radically undercut COFINA's autonomy, and was a breach of the Commonwealth's covenants.[4]

65.    On information and belief, in a letter dated April 6, 2016 sent to COFINA and BONY, counsel for certain Bondholders notified them that the "Moratorium Act constitute[d] an anticipatory breach of section 1101(1)(i) of the [COFINA] Resolution and Bonds because [it] permits the Governor to bar COFINA from making principal or interest payments" on any COFINA Bonds.

66.    The letter also advised COFINA and BONY that, in addition to the "improper restriction on COFINA paying its debts, the Moratorium Act further breaches sections 1101(1)(ii) of the Resolution," because it "restricts the rights of [Bondholders] to exercise remedies if the Governor issues an executive order applicable to COFINA and [by] suspending or modifying any obligations of COFINA to cause the transfer of money to pay Bonds or to ensure payment of Bonds."

67.    In connection with that same notice, the Bondholders reminded COFINA and BONY of the continued Events of Default that had already occurred, namely the Events of Default arising from the September 2015 Fiscal Plan and the February 1, 2016 Restructuring Proposal, respectively.

---

[4] On January 29, 2017, the Moratorium Act was replaced by the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Emergency Act"). The Emergency Act extended the operative provisions of the Moratorium Act, through and including May 1, 2017, which term may be extended by the Governor for three months. On information and belief, despite knowing of the severe threat the Emergency Act placed on the ability of COFINA to repay its Bonds, BONY did nothing to protect the Bondholders' and their insurers' interests in advance of, or in light of, the Emergency Act's enactment.

Case 17-03283-LTS Doc 4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc:
Exhibit DX-R Page 32 of 57

68.     Despite having knowledge of the Moratorium Act and the April 6, 2016 letter,
BONY again failed to take any actions to enforce these Events of Default or to otherwise protect
Plaintiff by accelerating the bonds or ceasing to make payments to the Subordinate Cash Pay
Bondholders.  BONY also failed, as it is required to do under the Resolution, to give notice to all
Bondholders of such Events of Default.

**D.      The Fourth Event Of Default – The GO Bondholders' Litigations**

69.     BONY's failures continued as, in the summer of 2016, attacks on COFINA's
structure and viability escalated.

70.     On June 21, 2016, the GO Bondholders commenced a litigation in the United
States District Court for the Southern District of New York, No. 16 Civ. 470, against the
Commonwealth, then Governor García Padilla, the Treasury Secretary of the Commonwealth of
Puerto Rico, and the Director of the Office of Management and Budget of the Commonwealth of
Puerto Rico (the "Jacana Lawsuit").

71.     In the Jacana Lawsuit, the GO Bondholders alleged, *inter alia*, that the Dedicated
SUT Revenues were "available resources" for the purposes of satisfying the GO Bonds.  The
complaint directly challenged the rights of COFINA and the Bondholders with respect to the
Dedicated SUT Revenues and the Pledged Property.  The GO Bondholders' complaint further
alleged that funds transferred to COFINA, *i.e.*, the Dedicated SUT Revenues, are subject to
clawback in favor of holders of GO Bonds.

72.     COFINA failed to take any steps to defend against such challenges.  Similarly, the
Commonwealth took no substantive position in the Jacana Lawsuit.

73.     In a letter dated June 23, 2016, certain Bondholders reminded BONY that
"COFINA has a clear contractual obligation to defend the Pledged Property and the
Bondowners" in connection with the Jacana Lawsuit.  The letter, citing Sections 801 and 802 of

Case 17-03283-LTS Doc#4759-17 Filed 01/13/19 Entered 01/13/19 17:45:34 Desc:
Exhibit DX-R Page 33 of 57

the Resolution, also informed BONY that the "Trustee is likewise obligated to enforce the Resolution and the rights of Bondowners" and put "the Trustee on notice that there [was] a judicial challenge to COFINA's property and, pending resolution of that judicial challenge, the Trustee must demand that COFINA undertake all actions to preserve any and all property that is collateral of the [COFINA] Bondowners, including the retention of independent counsel to dispute the allegations in the Complaint." The failure to do so, the letter added, "would result in a direct breach of the most fundamental promise in COFINA's Bond Resolution and would cause a shortfall of statutorily required amounts of pledged sales tax revenues."

74.     The letter cautioned that, "[g]iven COFINA's continuing refusal to hire independent advisors and its failure to acknowledge the existing Events of Default, the Trustee cannot sit idly by and close its eyes to the situation and how it could potentially impair more than $7 billion of Senior Bonds."

75.     On July 20, 2016, several GO Bondholders brought an action in the District Court for the District of Puerto Rico (the "Lex Claims Litigation"). Complaint, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. July 20, 2016) [Dkt. No. 1]. COFINA was added as a defendant on November 4, 2016. *See* Second Amended Complaint, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Nov. 4, 2016) [Dkt. No. 78]. The GO Bondholders claimed that the PROMESA[5] stay did not bar their pursuit of certain

---

[5] On June 30, 2016, President Obama signed into law PROMESA, which, among other things, provides a legal framework for adjustment of Puerto Rico debts and for the appointment of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"). Pub. L. 114-187, codified at 48 U.S.C. § 2101 *et seq.*

PROMESA provided for a temporary stay of certain litigation, which expired on May 1, 2017. *See* PROMESA § 405(d)(1)(B); February 14, 2017 Letter from the Oversight Board. Congress stated that the purpose of the stay was to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with creditors instead of defending numerous, costly creditor lawsuits . . . ." PROMESA § 405(n)(2).

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-II Page 94 of 57

claims challenging the COFINA structure, including the clawback of funds that had already been remitted to COFINA's accounts. On February 17, 2017, the District Court entered an order allowing the case to proceed in spite of the PROMESA stay. *See* Opinion and Order, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Feb. 27, 2017) [Dkt. No. 184].

76.     Neither the Commonwealth nor COFINA—both defendants in the *Lex Claims* litigation—appealed this order. Instead, they acquiesced in the GO Bondholders' requests to pursue their challenge to the COFINA structure. Certain of the Bondholders, together with the Oversight Board and Plaintiff Ambac, sought to enforce the litigation stay that Congress deemed critical for the orderly and negotiated resolution of bond claims.

77.     These Bondholders, the Oversight Board, and Ambac prevailed in the First Circuit Court of Appeals, which eventually stayed the litigation in its entirety.

78.     However, on March 17, 2017, while the appeal was pending in the First Circuit, the Administration, through Autoridad de Asesoría y Agencia Fiscal de Puerto Rico ("AAFAF"), ignored its promise not to impair COFINA's right to the Dedicated SUT Revenues and issued a joint press release with the GO Bondholder plaintiffs in the Lex Claims Litigation, stating it "is not taking a definitive position on the merits of the constitutional questions [relating to COFINA's legal structure] at this time, [but] it will analyze the constitutional issues raised by the GO Bondholders. In addition, the Government will urge Judge Besosa to decide the issues raised by the GO Bondholders by April 30, 2017, and not support any efforts to defer or delay the resolution of the constitutional questions raised by the GO Bondholders until after the PROMESA litigation stay expires."

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 35 of 57

79.    COFINA provided no response to any of these statements and challenges to the COFINA structure and has thus failed to comply with the terms of the Resolution that require COFINA to give further assurances in support of the COFINA Bondholders' security interest in the Dedicated SUT Revenues, and to preserve, protect, and defend the COFINA structure and rights to the Dedicated SUT Revenues, including enforcement of the non-impairment covenant of the Commonwealth itself (Section 706).

80.    Despite having knowledge of COFINA's failure to defend in the Jacana Lawsuit and Lex Claims Litigation and all other instances of attack on its structure, as alleged *supra*, BONY failed to take any actions to enforce these Events of Default or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments to the Subordinate Cash Pay Bondholders.  BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Event of Default.

**E.    The Fifth Event Of Default – The March 13, 2017 Fiscal Plan**

81.    On March 13, 2017, AAFAF, on behalf of the Commonwealth and COFINA, submitted a joint fiscal plan (the "March 13 Fiscal Plan") to the Oversight Board.  The Oversight Board certified the March 13 Fiscal Plan the same day.  Once certified, the March 13 Fiscal Plan became binding on the Commonwealth and COFINA as a matter of federal law under PROMESA.

82.    The March 13 Fiscal Plan commingles COFINA's revenues, including the Dedicated SUT Revenues, and its debt service with the Commonwealth's assets and liabilities, ignoring COFINA's legal separateness from the General Fund.  The March 13 Fiscal Plan effects a taking of Bondholders' property interest in the Dedicated SUT Revenues and solidifies the Commonwealth's breach of its non-impairment obligation under the COFINA Resolution. According to the March 13 Fiscal Plan, the total estimated cash flow available to pay debt

Case:17-03283-LTS  Doc#:4759-17  Filed:01/12/19  Entered:01/12/19 17:45:34  Desc:
Exhibit DX-R Page 36 of 57

service over the next ten years will be less than the debt service owed by COFINA alone during such period. For example, COFINA's Dedicated SUT Revenues ranges from $724 million in 2018 to $1.031 billion in 2026, while the cash available for debt service under the March 13 Fiscal Plan ranges from $404 million in 2018 to $808 million in 2026. *See* March 13 Fiscal Plan at 10.

83.      Even if all of the cash flow purportedly available to pay debt service reflected in the March 13 Fiscal Plan were remitted to COFINA—and it is not clear that the March 13 Fiscal Plan contemplates that remittance—the amounts remitted to COFINA would fall short of the Dedicated SUT Revenues in seven of the next nine years, including immediately in fiscal year 2018, which begins on July 1, 2017. *See* March 13 Fiscal Plan at 27–28. Indeed, over the term of the March 13 Fiscal Plan, COFINA will suffer a shortfall of over $1.4 billion even if all cash flow available to pay debt is earmarked for COFINA. Consequently, in formulating the March 13 Fiscal Plan and submitting it for certification by the Oversight Board, the Commonwealth repudiated its obligations to COFINA, Ambac, and the Bonds Ambac insures, has taken the property owned by COFINA that secures the Bondholders' investments by statutory lien, and has created new law that impairs Bondholders' and insurers' contractual rights.

84.      The March 13 Fiscal Plan identified no legal authorization for its taking of COFINA property, its violation of the COFINA statute, or its impairment of the contractual rights of COFINA Bondholders and insurers. Nor did the March 13 Fiscal Plan explain or even assert that it was necessary and reasonable to violate the rights of COFINA Bondholders, as compared with other policy choices, in order to create a fiscal plan that complied with PROMESA.

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 37 of 57

85.     The March 13 Fiscal Plan constitutes a clear breach of the covenants of the Commonwealth.  And, inasmuch as COFINA takes no steps to counter the March 13 Fiscal Plan and the harm it poses to COFINA, Ambac, the Bondholders, and other investors, COFINA is in breach of its covenants.

86.     On March 27, 2017, certain holders and an insurer of COFINA bonds wrote to the Oversight Board informing its members that the Fiscal Plan violates the law "by failing to respect the COFINA Bondholders' lien on the assigned revenues granted to COFINA."

87.     Additionally, in a letter to BONY dated March 31, 2017, certain Bondholders informed BONY of the breaches in question and demanded that BONY take necessary steps to protect Bondholders, including by issuing notices of default and by refraining, in the interim, from making further payments on account of the COFINA Bonds.  The Bondholders demanded confirmation by April 4, 2017, that BONY will comply with such requests, but BONY failed to respond.

88.     BONY thus again failed to take appropriate measures to protect its investors and other insurers.

**F.      The Sixth Event Of Default – The Passage Of The Fiscal Compliance Law**

89.     Implementation of the March 13 Fiscal Plan began in April 2017.  During an April 27, 2017 Puerto Rico Senate debate on the Fiscal Plan Compliance Law, Popular Democratic Party Senator José Nadal-Power remarked, "[h]ere the executive [branch] is being authorized to use the COFINA funds, the COFINA funds which are destined to pay [B]ondholders, and now all of a sudden it is good to take the money that goes toward the payment of [B]ondholders and use them towards the end determined by the executive [branch]?"

90.     On April 27, 2017, the Legislative Assembly passed House Bill 938 titled "Law on Compliance with the Fiscal Plan."  This bill was signed into law by Governor Ricardo

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit Dx-22 Page 38 of 57

Rosselló on April 29, 2017 (the "Fiscal Plan Compliance Law"). The Fiscal Plan Compliance Law directly interferes with the rights granted to COFINA and constitutes multiple uncurable breaches of the Commonwealth's covenants.

91.     First, the Fiscal Plan Compliance Law diverts COFINA's revenues to the General Fund. Chapter 6 of the Fiscal Plan Compliance Law amends Sections 3, 7, and 8 of Act No. 230 of July 23, 1974, the "Accounting Law of the Government of Puerto Rico," to provide that upon effectiveness of the Fiscal Plan Compliance Law, all special funds created by law for specific purposes will be credited to the General Fund and deposited in the current bank account of the Secretary so that he or she has full control of them. Furthermore, the collections attributable to the additional 4.5% sales and use tax adopted in July of 2015 now flow directly into the General Fund beginning at the outset of the fiscal year, in contravention of the flow of funds established by the Resolution. These acts are direct limitations or restraints on the rights granted to COFINA. Specifically, the proceeds of the first revenues of the sales and use tax "shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." 13 L.P.R.A. § 12.

92.     Second, Chapter 4 of the Fiscal Plan Compliance Law allows the Secretary of the Treasury of Puerto Rico, under certain conditions, to use COFINA's funds to cover a deficiency in the Commonwealth's cash flow to comply with the March 13 Fiscal Plan. Specifically, Chapter 4 of the Fiscal Plan Compliance Law purports to order all Puerto Rico public corporations and instrumentalities, without limitation or exception, to transfer to the Treasury Department any surpluses of generated revenues. Those funds are to be considered as "available resources" of the Commonwealth and deposited by the Treasury Department in the General Fund to comply with liquidity requirements contemplated in the Fiscal Plan. Article 4.03 expressly

Case:17-03283-LTS  Doc#:4759-17  Filed:01/12/19  Entered:01/12/19 17:45:34  Desc:
Exhibit DX-R  Page 39 of 57

provides with respect to COFINA that the Secretary of the Treasury is authorized to use COFINA funds in an occasional manner, in compliance with certain conditions, to cover a significant deficiency in the cash flow or to comply with the March 13 Fiscal Plan. This is a blatant taking of COFINA property and violation of the Resolution, which provides that the Pledged Property "shall be deposited directly in the FIA and shall be used exclusively" for the purposes listed in the statute, which purposes do not include funding a Commonwealth cash flow deficiency. The Resolution further provides that the COFINA revenues shall not "be available for use by the Secretary of the Treasury."

93.     These events constitute multiple breaches of the Commonwealth's covenants and trigger an Event of Default. By failing to recognize the Event of Default, BONY once again failed to take appropriate measures to protect its investors and insurers.

### F.     The Seventh Event Of Default –
### The Issuance Of The Commonwealth's Title VI Proposal

94.     The publication of the so-called "Proposal" under Title VI of PROMESA, filed publicly by AAFAF on the evening of April 28, 2017, constitutes a further repudiation of the COFINA structure, and overt breach of the covenants contained in the Resolution. AAFAF was created under chapter 6 of Act No. 21 of 2016 to serve as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, public corporations, instrumentalities, subdivisions, and/or municipalities, and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing. *See* Act No. 2016-21, Section 602(a). In Act No. 2 of 2017, the Commonwealth expanded AAFAF's powers to include, among other things, sole responsibility to renegotiate, to restructure, and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity. *See* Act No. 2017-2 at 1. In addition, AAFAF is the entity in charge of the

Case 17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit 17   Page 40 of 57

collaboration, communication, and cooperation efforts between the Government of Puerto Rico and the Oversight Board. AAFAF therefore acts as agent for and speaks for both the Commonwealth and COFINA in matters involving restructuring, including in making this Proposal.

95.    Two core aspects of the Proposal violate the COFINA structure. First, the Proposal treats GO Bonds as having priority over COFINA Bonds, despite the fact that the revenues pledged to the COFINA Bonds are explicitly made unavailable for the payment of GO Bonds. The Proposal makes plain that the SUT pledged to COFINA will no longer be segregated and devoted solely to the payment of COFINA Bonds, a structure the Commonwealth has covenanted to respect; instead, all SUT will be pooled into the General Fund, in violation of legislative and contractual provisions. Second, the Proposal purports to treat COFINA Senior Bondholders *pari passu* with COFINA Subordinate Bondholders in violation of express contractual subordination provisions. Utilizing a tool commonly referred to as a "death trap," the Proposal would distribute either (i) $6.9 billion in newly-issued Senior Bonds and $3.3 billion in Senior Cash Flow Bonds to all COFINA Senior and Subordinated Bonds *pari passu* if the COFINA creditors consent to such treatment; or (ii) $450 million of newly-issued Short Term Bonds only to COFINA Senior Bondholders, reflecting a 2.5% recovery on the COFINA debt outstanding, if the COFINA creditors do not consent to the treatment in (i). Offering COFINA Senior Bondholders what amounts to a Hobson's choice is a direct repudiation by the Commonwealth of the contractual and statutory protections afforded to COFINA Senior Bondholders under the Resolution and a flagrant dereliction of COFINA's duty to defend, preserve, and protect the pledge of revenues and all rights of the Trustee, Beneficiaries, and Bondholders against all claims and demands.

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:15:34 Desc:
Exhibit/DX-R 2 Page 41 of 57

96.     The Commonwealth affirmatively covenanted, in section 706 of the Resolution, to not "limit or restrict the rights that are by [COFINA's Enabling] Act granted or the rights of [COFINA] to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired." The passage of the Fiscal Plan Compliance Law and issuance of the Commonwealth's Title VI Proposal constitute breaches of that covenant.

97.     In addition to the covenant by the Commonwealth, COFINA itself covenanted to "at all times, to the extent permitted by law, defend, preserve[,] and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries[,] and the Bondowners under the Resolution against all claims and demands of all persons whomsoever." Section 705. The failure by COFINA to protect itself from the Commonwealth's illegal and unqualified attack on its possession and control of the pledged revenues is a breach of COFINA's duty. The Title VI Proposal, which was submitted by AAFAF, acting as the exclusive agent for not only the Commonwealth but also for COFINA, is another breach by COFINA. Far from defending, preserving, or protecting the pledge of revenues to COFINA, the Title VI Proposal is a declaration of war on COFINA and its property.

98.     The Commonwealth's and COFINA's flagrant and incurable breaches of the Resolution, and clear intention to loot COFINA to meet Commonwealth expenses, constitute Events of Default under Section 1101.1(ii). And BONY, acting as Trustee for Bonds with conflicting interests, has failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Senior Bondholders and Plaintiff by accelerating the Subordinate Bonds.

Case 17-03283-LTS Doc 4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc:
Exhibit DX-R2 Page 43 of 57

99.     To date, and with regard to all Events of Default, BONY has failed to prudently and reasonably investigate breaches of the Resolution (such as by seeking commitments or confirmations from the Commonwealth), has failed to provide necessary notices of Events of Default to all Bondholders, has failed to take any actions to enforce the Events of Default, or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments on the Bonds. BONY's refusal to take any such action to protect the Senior Bondholders and Plaintiff constitutes a negligent abdication of its duties as Trustee and a breach of its contractual and fiduciary obligations.  No prudent person would fail to act in these circumstances where its property is under attack and may be hopelessly dissipated in the absence of action.

## VIII.   BONY's Failure To Withhold Payments

100.     On information and belief, starting in early 2017, certain Bondholders commenced discussions with BONY concerning upcoming February 1, 2017 payments to other Bondholders, for which BONY was holding funds already received from COFINA.  Among other things, the Bondholders demanded that BONY refrain from making such payments based on the many existing Events of Default and the continuing attacks by the Commonwealth and others on COFINA and its viability.  The Bondholders also advised BONY of its inherently conflicted role as Trustee for both Senior and Subordinate Bonds.

101.     Despite this, on February 1, 2017, BONY distributed a payment to Subordinate Bondholders notwithstanding its actual knowledge of existing Events of Default under the Resolution, of mounting attacks on the COFINA structure, and that the disbursement would risk a drastic impairment to the Senior CAB Bonds.

102.     At the time, BONY was aware of another then-recent event that should have caused BONY to investigate and to demand assurances from the Commonwealth. The Emergency Act, as first proposed, contained language that could have allowed the Governor to

FILED: NEW YORK COUNTY CLERK 05/02/2017 03:37 AM
NYSCEF DOC. NO. 1
INDEX NO. 652356/2017
RECEIVED NYSCEF: 05/02/2017

divert and to otherwise use Dedicated SUT Revenues. While the Emergency Act was revised at the last minute before passage to remove such language, the initial inclusion of the language was so potentially damaging to COFINA and to the COFINA Bonds that it should have prompted action by BONY.

103.   On information and belief, BONY failed to investigate further or to seek any commitments or assurances from the Commonwealth.

104.   On April 30, 2017, counsel for Ambac wrote to BONY, notifying it again of the multiple, incurable breaches of COFINA and the Commonwealth's covenants and the corresponding Events of Default. Ambac instructed BONY that, in light of the existing Events of Default and in accordance with the Resolution and the subsequent supplements, BONY should cease making payments to the COFINA Subordinate Bondholders until the Senior Bonds are paid in full.

105.   Despite having knowledge of the Events of Default, on May 1, 2017, BONY, undeterred, went ahead and distributed cash interest payments to certain Subordinate Bondholders, causing harm to Ambac and the Senior CAB Bondholders Ambac insures.

IX.   **BONY's Action Will Cause Plaintiff To Suffer Millions Of Dollars In Damages**

106.   Ambac is a "Beneficiary" under the terms of the Resolution, and a specified third-party beneficiary of the Supplemental Resolution. Also, in accordance with Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, Ambac may remove BONY as Trustee.

107.   Unlike Senior CAB Bonds, Subordinate Cash Pay Bonds are entitled to periodic interest payments in cash. As such, BONY, as Trustee, has been making cash payments to these Bondholders.

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-RZ   Page 44 of 57

108.   Because the Bonds insured by Ambac carry long-dated maturities with no current cash payments (unlike the Subordinate Cash Pay Bonds), they are at severe risk if the COFINA structure is compromised.  Given the attack on COFINA's pool of assets, the interest that BONY is paying the Subordinate Bondholders is dissipating assets that should go to pay Senior Bondholders.

109.   In an Event of Default, BONY, as Trustee, has the authority, as well as the duty, to accelerate the bonds where doing so is warranted for the protection of the Bondholders.[6]

110.   Upon acceleration, the Trustee applies any available funds according to a priority waterfall set forth in the Resolution.  This waterfall structure has five basic categories:  (1) fees on credit or liquidity facilities; (2) interest; (3) principal; (4) monoline claims for reimbursement or subrogation; and (5) miscellaneous payments.  If, however, all Senior Bonds are accelerated, interest and principal are paid ratably without preference (rather than interest being paid before principal).

111.   At least seven Events of Default exist under the Resolution and yet BONY has taken no actions to protect Plaintiff from such defaults by accelerating the COFINA Bonds or taking any other remedial measures, such as ceasing payments.  Meanwhile, BONY operates under egregious conflicts of interest that prevent it from properly carrying out its duties and responsibilities to Plaintiff.

112.   Ambac has notified BONY of these Events of Default and has further demanded that BONY accelerate all payments and cease all interest payments to the Subordinate Notes.

113.   Plaintiff has been directly and proximately harmed by BONY's actions, and as a result, has been damaged in an amount to be determined at trial.

_____

[6] Under the Resolution, the Trustee may not accelerate the bonds insured by Ambac without Ambac's prior written consent.

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 45 of 57

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty

114.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

115.    BONY owes a fiduciary duty to Plaintiff.    BONY's fiduciary obligations included, without limitation, duties to protect the interests of Plaintiff, to investigate both its own conflicts of interest and potential Events of Default, and to make prudent decisions concerning the exercise of appropriate remedies, whether contractual or extra-contractual, to address the same.

116.    BONY breached its fiduciary duties by, among other things, (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate potential Events of Default including, but not limited to, those alleged herein; (iii) failing to accelerate the COFINA Bonds and withhold payments to Subordinate Cash Pay Bondholders; and (iv) otherwise failing to act in the best interest of Plaintiff or to protect the Senior Bondholders' interests.

117.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds.    In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior Bondholders.    Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

118.    BONY's material breaches of its fiduciary duties directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

Case 1:17-cv-02283-kTG   Doc #: 4759-17   Filed: 01/13/19   Entered: 01/13/19 17:45:34   Desc:
Exhibit DX-R   Page 46 of 57

## SECOND CAUSE OF ACTION
## Breach of Contract

119.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

120.   The Resolution is a valid contract between COFINA and, *inter alia*, BONY, in its capacity as Trustee, and Plaintiff.

121.   Plaintiff is entitled to enforce BONY's performance as Trustee.  Plaintiff is a Beneficiary of the Resolution, as that term is used therein.  Furthermore, Plaintiff is "explicitly recognized as being a third-party beneficiary . . . and may enforce any such right, remedy[,] or claim conferred, given or granted" in either the Resolution or Supplemental Resolutions.

122.   Plaintiff performed its obligations under the Resolution.

123.   An Event of Default occurred as early as September 9, 2015, and, as described above, numerous other related Events of Default occurred over the following 19 months.  BONY and its responsible officers had and continue to have actual notice that Events of Default occurred.

124.   BONY has breached and will continue to breach the Resolution by failing to provide Plaintiff with notice of Events of Default and by failing to recognize Events of Default and accelerate the Bonds.  In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior Bondholders.  Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

125.   BONY's breaches directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-R Page 47 of 57

### THIRD CAUSE OF ACTION
### Breach of the Implied Covenant

126.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

127.    At all relevant times, including after the Events of Default discussed herein, BONY owed Plaintiff, as a Beneficiary and express intended third-party beneficiary under the Resolution and Supplemental Resolutions, a duty of good faith and fair dealing that required BONY to ensure that it did not, by act or omission, injure Plaintiff's rights to receive the benefits and protections provided for under the Resolution.

128.    BONY materially breached its duty of good faith and fair dealing under the Resolution and related implied covenants by, among other things, (i) failing to reasonably investigate and recognize Events of Default; (ii) failing to accelerate the COFINA Bonds or to withhold payments to Subordinate Cash Pay Bondholders; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution, thereby depriving Ambac of the fruits of the contract.

129.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds. In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior CAB Bondholders. Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

130.    BONY's breaches of those implied covenants directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

Case:17-03283-LTS Doc#:4759-17 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-R Page 48 of 57

## FOURTH CAUSE OF ACTION
### Gross Negligence/Breach of Trust

131.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

132.    BONY owed Plaintiff extra-contractual duties to perform its obligations with due care and avoid any conflicts of interest.  BONY's acts and omissions breached those duties by, among other things, (i) failing to prudently investigate at least seven Events of Default; (ii) having conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith.

133.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds.  In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe detriment of the Senior CAB Bondholders.  Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

134.    BONY's grossly negligent breach of those duties has directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

135.    Plaintiff is also entitled to an equitable decree that BONY must resign as Trustee.

## FIFTH CAUSE OF ACTION
### Declaratory Judgment

136.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

– 36 –

Case 17-03283-LTS Doc 6759-17 Filed 01/13/19 Entered 01/13/19 17:45:34 Desc
Exhibit DX-R Page 49 of 57

137. As alleged herein, actual and justiciable controversies exist between the parties with respect to the rights, duties, and obligations of the parties due and owing under New York law and the Resolution.

138. In addition to, and in the alternative of, their other claims for damages asserted herein, Plaintiff is entitled to a declaratory judgment declaring, *inter alia*, that:

a. BONY breached its fiduciary duties owed to Plaintiff by (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate at least seven Events of Default; (iii) failing to accelerate the COFINA Bonds and to withhold payments to Subordinate Cash Pay Bondholders; and (iv) otherwise failing to act in the best interest of Plaintiff or to protect their interests;

b. BONY breached the Resolution by (i) failing to provide Plaintiff with notice of the Events of Default; (ii) failing to recognize an Event of Default; (iii) failing to accelerate the bonds; and (iv) failing to withhold payments, as it is required to do;

c. BONY breached its duty of good faith and fair dealing under the Resolution and related implied covenants by (i) failing to reasonably investigate potential Events of Default; (ii) failing to either accelerate the COFINA Bonds or withhold payments to Subordinate Cash Pay Bondholders pending an investigation into the ongoing Events of Default; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution;

d. BONY acted negligently and breached its duties to Plaintiff by (i) failing to reasonably investigate potential Events of Default; (ii) becoming subject to

– 37 –

Case: 17-03283-LTS Doc#: 4759-17 Filed: 01/12/19 Entered: 01/12/19 17:45:34 Desc:
Exhibit DX-R Page 50 of 57

conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith; and that

e. Ambac has the authority to remove BONY as Trustee under Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007.

## SIXTH CAUSE OF ACTION
### Injunctive Relief

139.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

140.    BONY has acted, and unless enjoined will continue to act, contrary to its fiduciary, contractual, and other obligations to Ambac by failing to recognize Events of Default and accelerate the Bonds.  Unless enjoined, BONY will also continue to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly and irrevocably depleting a limited pool of assets to the irreparable injury of the Senior CAB Bondholders and Ambac.  Unless enjoined, BONY will continue to deprive Senior Bondholders of the limited collateral available to pay them, and by doing so, will inevitably harm the Bonds Ambac insures.

141.    This Court should therefore enjoin BONY from making any further payments to any Subordinate Bondholders.

142.    This Court should also order BONY to recognize an Event of Default, and accelerate the payment of the Bonds.

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 51 of 57

143.    Finally, this court should direct BONY to resign as Trustee, and appoint separate

unconflicted Trustees.

PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against BONY as follows:

(a)    Awarding direct damages in favor of Plaintiff against BONY in an amount to be

proven at trial;

(b)    A declaration that (i) BONY breached its fiduciary and other duties to Plaintiff;

(ii) BONY breached the Resolution; and (iii) BONY breached the covenant of good faith and fair

dealing implied in the Resolution;

(c)    A declaration that Ambac may remove the Trustee pursuant to Section (n) of the

Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First

Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007;

(d)    An injunction prohibiting BONY from making any additional interest payments to

any Subordinate Bondholders;

(e)    An injunction directing BONY to recognize an Event of Default, and accelerate

the payment of the Bonds;

(f)    A declaration that BONY suffers from a conflict of interest under New York law

and a decree that BONY must resign as Trustee, as soon as separate unconflicted Trustees are

appointed; and

(g)    Such other and further relief as the Court may deem just and proper.

Case 17-03283-LTS   Doc 4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit DX-R   Page 52 of 57

Dated: New York, New York
     May 2, 2017

                     CURTIS, MALLET-PREVOST,
                       COLT & MOSLE LLP

                 By: _Theresa Foudy_ (NMM)
                     Steven J. Reisman (sreisman@curtis.com)
                     Theresa A. Foudy (tfoudy@curtis.com)
                     Jacques Semmelman (jsemmelman@curtis.com)
                     Michael J. Moscato (mmoscato@curtis.com)
              101 Park Avenue
              New York, New York 10178-0061
              (212) 696-6000

              *Attorneys for Plaintiff*

FILED: NEW YORK COUNTY CLERK 05/02/2017 03:01 AM INDEX NO. 652356/2017
NYSCEF DOC. NO. 2                                              RECEIVED NYSCEF: 05/02/2017

# REQUEST FOR JUDICIAL INTERVENTION

UCS-840 (7/2012)

| For Court Clerk Use Only: |
|---|
| IAS Entry Date |
| |
| Judge Assigned |
| |
| RJI Date |

**Supreme** _____ **COURT, COUNTY OF** _____ **New York** _____

Index No: _____ Date Index Issued: _____

**CAPTION:** Enter the complete case caption. Do not use et al or et ano. If more space is required, attach a caption rider sheet.

AMBAC ASSURANCE CORPORATION

**Plaintiff(s)/Petitioner(s)**

-against-

THE BANK OF NEW YORK MELLON

**Defendant(s)/Respondent(s)**

## NATURE OF ACTION OR PROCEEDING: Check ONE box only and specify where indicated.

**MATRIMONIAL**
- ○ Contested

  **NOTE:** For all Matrimonial actions where the parties have children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum**. For Uncontested Matrimonial actions, use RJI form UD-13.

**TORTS**
- ○ Asbestos
- ○ Breast Implant
- ○ Environmental: _____
  (specify)
- ○ Medical, Dental, or Podiatric Malpractice
- ○ Motor Vehicle
- ○ Products Liability: _____
  (specify)
- ○ Other Negligence: _____
  (specify)
- ○ Other Professional Malpractice: _____
  (specify)
- ○ Other Tort: _____
  (specify)

**OTHER MATTERS**
- ○ Certificate of Incorporation/Dissolution   [see **NOTE** under Commercial]
- ○ Emergency Medical Treatment
- ○ Habeas Corpus
- ○ Local Court Appeal
- ○ Mechanic's Lien
- ○ Name Change
- ○ Pistol Permit Revocation Hearing
- ○ Sale or Finance of Religious/Not-for-Profit Property
- ○ Other: _____
  (specify)

**COMMERCIAL**
- ○ Business Entity (including corporations, partnerships, LLCs, etc.)
- ◉ Contract
- ○ Insurance (where insurer is a party, except arbitration)
- ○ UCC (including sales, negotiable instruments)
- ○ Other Commercial: _____
  (specify)

  **NOTE:** For Commercial Division assignment requests [22 NYCRR § 202.70(d)], complete and attach the **COMMERCIAL DIV RJI Addendum**.

**REAL PROPERTY:** How many properties does the application include? _____
- ○ Condemnation
- ○ Mortgage Foreclosure (specify)   ○ Residential   ◉ Commercial
  Property Address: _____
  _____
  Street Address        City        State        Zip

  **NOTE:** For Mortgage Foreclosure actions involving a one- to four-family, owner-occupied, residential property, or an owner-occupied condominium, complete and attach the **FORECLOSURE RJI Addendum**.
- ○ Tax Certiorari - Section: _____ Block: _____ Lot: _____
- ○ Tax Foreclosure
- ○ Other Real Property: _____
  (specify)

**SPECIAL PROCEEDINGS**
- ○ CPLR Article 75 (Arbitration)   [see **NOTE** under Commercial]
- ○ CPLR Article 78 (Body or Officer)
- ○ Election Law
- ○ MHL Article 9.60 (Kendra's Law)
- ○ MHL Article 10 (Sex Offender Confinement-Initial)
- ○ MHL Article 10 (Sex Offender Confinement-Review)
- ○ MHL Article 81 (Guardianship)
- ○ Other Mental Hygiene: _____
  (specify)
- ○ Other Special Proceeding: _____
  (specify)

## STATUS OF ACTION OR PROCEEDING: Answer YES or NO for EVERY question AND enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons w/notice been filed? | ◉ | ○ | If yes, date filed: 05/02/2017 |
| Has a summons and complaint or summons w/notice been served? | ○ | ◉ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ○ | ◉ | If yes, judgment date: _____ |

1 of 2

Case 1:17-03283-bTG Doc# 4759-17 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc Exhibit DX-R2 Page 54 of 57

**NATURE OF JUDICIAL INTERVENTION:** Check ONE box only AND enter additional information where indicated.

- ○ Infant's Compromise
- ○ Note of Issue and/or Certificate of Readiness
- ○ Notice of Medical, Dental, or Podiatric Malpractice    Date Issue Joined: _____
- ○ Notice of Motion                Relief Sought: _____    Return Date: _____
- ○ Notice of Petition              Relief Sought: _____    Return Date: _____
- ○ Order to Show Cause             Relief Sought: _____    Return Date: _____
- ○ Other Ex Parte Application      Relief Sought: _____
- ○ Poor Person Application
- ○ Request for Preliminary Conference
- ○ Residential Mortgage Foreclosure Settlement Conference
- ○ Writ of Habeas Corpus
- ● Other (specify): Assignment to the Commercial Division

**RELATED CASES:** List any related actions. For Matrimonial actions, include any related criminal and/or Family Court cases. If additional space is required, complete and attach the RJI Addendum. If none, leave blank.

| Case Title | Index/Case No. | Court | Judge (if assigned) | Relationship to Instant Case |
|---|---|---|---|---|
| Whitebox Multi-Strategy v. The Bank of New York Mellon | 651969/2017 | Supreme Court, County of New York | Hon. Jeffrey K. Oing | Same defendant; arising from substantially the same facts |
| | | | | |
| | | | | |

**PARTIES:** For parties without an attorney, check "Un-Rep" box AND enter party address, phone number and e-mail address in space provided. If additional space is required, complete and attach the RJI Addendum.

| Un-Rep | Parties: List parties in caption order and indicate party role(s) (e.g. defendant; 3rd-party plaintiff). | Attorneys and/or Unrepresented Litigants: Provide attorney name, firm name, business address, phone number and e-mail address of all attorneys that have appeared in the case. For unrepresented litigants, provide address, phone number and e-mail address. | Issue Joined (Y/N) | Insurance Carrier(s): |
|---|---|---|---|---|
| ☐ | AMBAC ASSURANCE CORPORATION — Last Name; First Name / Primary Role: Plaintiff; Secondary Role (if any): | Foudy — Last Name; Theresa — First Name; Curtis, Mallet-Prevost, Colt & Mosle LLP — Firm Name; 101 Park Avenue — Street Address; New York — City; New York — State; 10078 — Zip; +1 (212) 696-8860 — Phone; +1 (212) 697-1559 — Fax; tfoudy@curtis.com — e-mail | ○ YES  ● NO | |
| ☐ | The Bank of New York Mellon — Last Name; First Name / Primary Role: Defendant; Secondary Role (if any): | Last Name; First Name; Firm Name; Street Address; City; State; Zip; Phone; Fax; e-mail | ○ YES  ● NO | |
| ☐ | Last Name; First Name / Primary Role; Secondary Role (if any): | Last Name; First Name; Firm Name; Street Address; City; State; Zip; Phone; Fax; e-mail | ○ YES  ○ NO | |
| ☐ | Last Name; First Name / Primary Role; Secondary Role (if any): | Last Name; First Name; Firm Name; Street Address; City; State; Zip; Phone; Fax; e-mail | ○ YES  ○ NO | |

I AFFIRM UNDER THE PENALTY OF PERJURY THAT, TO MY KNOWLEDGE, OTHER THAN AS NOTED ABOVE, THERE ARE AND HAVE BEEN NO RELATED ACTIONS OR PROCEEDINGS, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION PREVIOUSLY BEEN FILED IN THIS ACTION OR PROCEEDING.

Dated: 05/02/2017

_____
2614204
**ATTORNEY REGISTRATION NUMBER**

_____
**SIGNATURE**
Theresa Foudy
**PRINT OR TYPE NAME**

[ Print Form ]

**NYSCEF DOC. NO. 2**

Case 17-03283-LTS Doc 4759-17 Filed 01/13/19 Entered 01/13/19 17:45:34 Desc: Exhibit DX-P Page 55 of 57

SUPREME COURT OF THE STATE OF NEW YORK

COUNTY OF New York

                                                              x

AMBAC ASSURANCE CORPORATION

                                    Plaintiff(s)/Petitioner(s)
-against-

THE BANK OF NEW YORK MELLON

                                    Defendant(s)/Respondent(s)
                                                              x

UCS-840C
3/2011

Index No. _____

RJI No. (if any) _____

**COMMERCIAL DIVISION**
**Request for Judicial Intervention Addendum**

**COMPLETE WHERE APPLICABLE** [add additional pages if needed]:

**Plaintiff/Petitioner's cause(s) of action** [check all that apply]:

- [X] Breach of contract or fiduciary duty, fraud, misrepresentation, business tort (e.g. unfair competition), or statutory and/or common law violation where the breach or violation is alleged to arise out of business dealings (e.g. sales of assets or securities; corporate restructuring; partnership, shareholder, joint venture, and other business agreements; trade secrets; restrictive covenants; and employment agreements not including claims that principally involve alleged discriminatory practices)
- [ ] Transactions governed by the Uniform Commercial Code (exclusive of those concerning individual cooperative or condominium units)
- [ ] Transactions involving commercial real property, including Yellowstone injunctions and excluding actions for the payment of rent only
- [ ] Shareholder derivative actions — without consideration of the monetary threshold
- [ ] Commercial class actions — without consideration of the monetary threshold
- [X] Business transactions involving or arising out of dealings with commercial banks and other financial institutions
- [ ] Internal affairs of business organizations
- [ ] Malpractice by accountants or actuaries, and legal malpractice arising out of representation in commercial matters
- [ ] Environmental insurance coverage
- [ ] Commercial insurance coverage (e.g. directors and officers, errors and omissions, and business interruption coverage)
- [ ] Dissolution of corporations, partnerships, limited liability companies, limited liability partnerships and joint ventures — without consideration of the monetary threshold
- [ ] Applications to stay or compel arbitration and affirm or disaffirm arbitration awards and related injunctive relief pursuant to CPLR Article 75 involving any of the foregoing enumerated commercial issues — without consideration of the monetary threshold

**Plaintiff/Petitioner's claim for compensatory damages** [exclusive of punitive damages, interest, costs and counsel fees claimed]:

$ $1.3 bilibin

**Plaintiff/Petitioner's claim for equitable or declaratory relief** [brief description]:

As specified in the Complaint, Plaintiff seeks a damages award and declaratory relief that Defendant breached duties owed to Plaintiff pursuant to contract and New York law. Plaintiff also seeks, as specified in the Complaint, injunctive relief prohibiting Defendant from continuing breach of such duties.

**Defendant/Respondent's counterclaim(s)** [brief description, including claim for monetary relief]:

**I REQUEST THAT THIS CASE BE ASSIGNED TO THE COMMERCIAL DIVISION. I CERTIFY THAT THE CASE MEETS THE JURISDICTIONAL REQUIREMENTS OF THE COMMERCIAL DIVISION SET FORTH IN 22 NYCRR § 202.70(a), (b) AND (c).**

Dated: 05/02/2017

_Theresa Foudy (ams)_
SIGNATURE

Theresa Foudy
PRINT OR TYPE NAME

Case 1:17-03283-LTS   Doc#4759-17   Filed 01/12/19   Entered 01/12/19 17:45:34   Desc:
Exhibit BX-R   Page 56 of 57

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

AMBAC ASSURANCE CORPORATION,

INDEX NUMBER: 652356/2017

vs                                    *Plaintiff*

THE BANK OF NEW YORK MELLON,

                                      *Defendant*

## AFFIDAVIT OF SERVICE

State of New York }
County of New York } ss.:

The undersigned, being duly sworn, deposes and says;

Deponent is not a party herein, is over 18 years of age and resides in Sunnyside, New York

That on **5/3/2017** at **3:10 PM** at **225 Liberty Street, 21st Floor, New York, NY 10007**

deponent served a(n) **Notice of Commencement of Action Subject to Mandatory Electronic Filing, Summons and Complaint, Request for Judicial Intervention, Request for Judicial Intervention Addendum**

on **The Bank of New York Mellon**, a domestic corporation,

by delivering thereat a true copy of each to **Stephen K. Marino** personally,

deponent knew said corporation so served to be the corporation described in said documents as said defendant and knew said individual to be **Authorized Agent** thereof.

<u>Description of Person Served:</u>
Gender : Male
Skin : White
Hair : Lt. Brown/Balding
Age : 51 - 65 Yrs.
Height : 5' 9" - 6' 0"
Weight :161-200 Lbs.
Other :

BNY | MELLON

Stephen K. Marino
ant Treasurer

Legal
Enforcement & Investigation
225 Liberty Street, 21 t Floor
New York, NY 10286
T 212 635 1694 F 212 635 7270
stephen.marino@bnymellon.com

Di Cong Jiang
License No.1220800

Sworn to before me this
3rd day of May, 2017

NOTARY PUBLIC
JOHN DICANIO
NOTARY PUBLIC STATE OF NEW YORK
WESTCHESTER COUNTY
LIC. # 01DI4977768
COMM EXP. 2/11/2019

Serving By Irving, Inc. | 233 Broadway, Suite 2201 | New York, NY 10279
New York City Dept. of Consumer Affairs License No. 0761160

1 of 1

### CERTIFICATE OF SERVICE

I hereby certify that on this date, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send automatic notification of such filing to all CM/ECF participants.

I also mailed a copy of the foregoing, first class postage prepaid, addressed as follows:

Steven J. Reisman
Theresa A. Foudy
Jacques Semmelman
Michael J. Moscato
CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
101 Park Avenue
New York, New York 10178-0061

Dated: May 19, 2017

_____/s/ C. Neil Gray_____
C. Neil Gray
