# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>  as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>   Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br>   Plaintiff,<br>  v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>   Defendants. | Adversary No: _____<br><br><br>**ADVERSARY COMPLAINT FILED BY THE BANK OF NEW YORK MELLON, AS TRUSTEE, FOR INTERPLEADER AND DECLARATORY RELIEF** |

   The Bank of New York Mellon ("<u>BNYM</u>" or the "<u>Trustee</u>"), in its capacity as

trustee for sales tax revenue bonds issued by the Puerto Rico Sales Tax Financing Corporation

("<u>COFINA</u>"), through its undersigned counsel, Sepulvado & Maldonado, PSC and Reed Smith

LLP, for its Complaint against COFINA; Whitebox Multi-Strategy Partners, L.P., Whitebox

Asymmetric Partners, L.P., Whitebox Institutional Partners, L.P., and Pandora Select Partners,

L.P. (collectively, "Whitebox"); Ambac Assurance Corporation ("Ambac"); Franklin Advisers,

Inc. ("Franklin"); and Cede & Co. ("Cede"), as nominee for The Depository Trust Company

(collectively, the "Defendants"), alleges as follows:

## INTRODUCTION

1.     On June 1, 2017, BNYM is due to distribute $16.3 million to COFINA

bondholders, but various groups of COFINA bondholders dispute who is entitled to that money.

Multiple lawsuits already have been filed against BNYM over this distribution and the monthly

distributions that are to follow, exposing BNYM to inconsistent and competing claims.  BNYM

files this Adversary Complaint for interpleader and declaratory relief as a mere stakeholder, to

preserve these funds while the parties address and the Court resolves the constitutional, statutory,

and contractual issues underlying the competing and conflicting claims.

2.     BNYM is the trustee under the Amended and Restated Sales Tax Revenue

Bond Resolution (as amended and supplemented, the "Resolution"), adopted on July 13, 2007,

by COFINA.  COFINA is an independent governmental instrumentality of the Commonwealth

of Puerto Rico (the "Commonwealth").  Pursuant to the Resolution, COFINA issued several

series of bonds that are to be paid using dedicated portions of Puerto Rico sales tax revenues

(collectively, the "Bonds").[1]

3.     The Resolution contains a pledge by the Commonwealth that it will not

interfere with the transfer of those dedicated sales tax revenues to COFINA for distribution to

BNYM as trustee, and for further distribution to COFINA bondholders.  However, the

Commonwealth recently has taken certain actions that call into question the Commonwealth's

---

[1]     Capitalized terms used but not defined herein have the meanings given in the Resolution.  A copy of
the Resolution is attached as **Exhibit A**.

Case:17-03283-LTS Doc#:4759-18 Filed:05/30/17 Entered:09/30/17 17:45:34 Desc: Main
Document Page 3 of 383

commitment to honoring this pledge and that may impact COFINA's, BNYM's, and

bondholders' rights and interests in and to those sales tax revenues.

      4.      As a result of the Commonwealth's and COFINA's actions, BNYM has

been subjected to competing and conflicting demands and positions, including by various groups

of holders of beneficial interests in the Bonds ("the "Beneficial Holders"), insurers who insure

certain Bonds, and COFINA.  Those demands and positions include that:

- the Commonwealth's and COFINA's actions amount to an incurable covenant default, requiring BNYM to stop paying subordinate Beneficial Holders and only pay senior Beneficial Holders and, possibly, to accelerate all the Bonds;

- the Commonwealth's and COFINA's actions amount to a default, but one that may be cured after a 30-day notice period, requiring BNYM to continue paying subordinate Beneficial Holders until the 30-day notice period passes without a cure; and

- the Commonwealth's and COFINA's actions do not amount to a default or an Event of Default, so BNYM should continue paying subordinate Beneficial Holders unless and until there is a payment default or some other uncured default.

      5.      Further complicating these adverse and competing claims, the various

groups of Beneficial Holders have not (i) demonstrated to BNYM that they are Owners of the

Bonds; (ii) provided to BNYM certified evidence of their alleged beneficial interests in the

Bonds; or (iii) offered BNYM indemnification, as required under the Resolution.

      6.      A group of senior Beneficial Holders and an insurer of certain senior

Bonds have sued BNYM in two New York State court actions, seeking to compel BNYM to

declare Events of Default under the Resolution based upon the alleged incurable covenant

defaults, to cease making any payments to subordinate Beneficial Holders, and to accelerate the

principal and interest due on the senior Bonds.

Case:17-03283-LTS Doc#:4759-18 Filed:05/10/19 Entered:01/11/19 17:45:24 Desc: Main
Document Page 4 of 35

7.      By contrast, a group of subordinate Beneficial Holders have argued that there is no Event of Default, and they should continue to be paid unless and until the Commonwealth fails to cure any covenant default or until a payment default occurs.

8.      COFINA contends that its actions did not amount to a default, that any default may be cured within the applicable 30-day period, and any action taken based on any alleged default will violate the automatic stay.  Moreover, COFINA argues that the funds held by BNYM are COFINA's property and that the automatic stay precludes any act to exercise control over such property, including by the Beneficial Owners.

9.      Whether or not there has been a default, and whether or not any default has ripened into an Event of Default, are issues of great importance to all Beneficial Holders because those determinations affect the payment priority among various types and series of Bonds.  As an example, after an Event of Default, no payments may be made on subordinate Bonds until all of the senior Bonds are paid in full.  As another example, all amounts due and owing on the senior Bonds may be accelerated after an Event of Default, meaning that the principal and accreted interest on the senior "capital appreciation" Bonds, which have long-term maturities and do not receive current interest payments, will be accelerated and paid on a pro rata basis with the senior "current interest" Bonds, thereby having a dilutive impact on the latter.

10.      In addition to disputes among Beneficial Holders, certain holders of the Commonwealth's general obligation bonds filed a lawsuit in this court, *Lex Claims, LLC v. Padilla*, No. 16-cv-02374 (FAB) (D.P.R.), alleging that the entire COFINA structure (including the Resolution) violates the Puerto Rico constitution.  Therefore, the plaintiffs allege, all sales tax revenue should be diverted from COFINA, BNYM, and the Beneficial Holders and, instead, should be available for general use by the Commonwealth.

11.     To date, the principal and interest payable on the Bonds has been paid as and when due.  The next payment of $16,297,863.78 (the "June 1 Payment") is scheduled for June 1, 2017.  Payments are scheduled to be made monthly thereafter.  BNYM currently holds funds sufficient to make the June 1 Payment.

12.     In recognition of BNYM's limited duties as trustee and the competing demands upon funds held by BNYM in trust under the Resolution, BNYM files this interpleader and request for declaratory relief to obtain an adjudication of the respective rights and interests of the Defendants and any other party with an interest in the interpleaded funds.  To efficiently resolve these disputes in a manner that respects the rights of **all** Beneficial Holders and other parties in interest, BNYM seeks:

a.     to interplead the June 1 Payment and any future payments of principal and interest on a monthly basis until entry of a final order of this Court directing the timing and manner of the disbursement of such funds (collectively, net of BNYM's fees and expenses, the "Disputed Funds") so that the registered owner, the Beneficial Holders, and other parties in interest may assert any claims to such funds based upon the existence or non-existence of an Event of Default or any other alleged basis; and

b.     declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and relief under section 7701 of the N.Y. Civil Practice Law and Rules ("Article 77"): (i) to the extent not resolved by the interpleader, as to (a) BNYM's right under the Resolution not to comply with the Beneficial Holders' demands that may involve BNYM in expense or liability without direction from the Owner of the requisite percentage of the Bonds and satisfactory indemnification; (b) the non-existence of an Event of Default prior to, or as a result of, the commencement of COFINA's title III proceeding; and (c) the date that the cure period for nonmonetary covenant defaults under the Resolution expires; and (ii) regarding BNYM's right to appoint a separate trustee for the subordinate Bonds in light of the occurrence of a nonmonetary covenant default and the commencement of COFINA's title III proceeding.

## PARTIES

13.     Plaintiff BNYM is a bank organized under the laws of the State of New York having its principal place of business at 225 Liberty Street, New York, New York 10007.

14.     Defendant COFINA is an independent governmental instrumentality of the Commonwealth.

15.     Defendant Whitebox Multi-Strategy Partners, L.P. is a limited partnership organized in the British Virgin Islands having its principal place of business at 3033 Excelsior Blvd., Suite 300, Minneapolis, Minnesota 55416.

16.     Defendant Whitebox Asymmetric Partners, L.P. is a limited partnership organized in the Cayman Islands having its principal place of business at 3033 Excelsior Blvd., Suite 300, Minneapolis, Minnesota 55416.

17.     Defendant Whitebox Institutional Partners, L.P. is a limited partnership organized in Delaware having its principal place of business at 3033 Excelsior Blvd., Suite 300, Minneapolis, Minnesota 55416.

18.     Defendant Pandora Select Partners, L.P. is a limited partnership organized in the British Virgin Islands having its principal place of business at 3033 Excelsior Blvd., Suite 300, Minneapolis, Minnesota 55416.

19.     Defendant Ambac is a Wisconsin-domiciled stock insurance corporation having its principal place of business at One State Street Plaza, New York, New York 10004.

20.     Defendant Franklin is a California corporation having its principal place of business at One Franklin Parkway, San Mateo, California 94403.

21.     Defendant Cede is the registered owner of the Bonds as the nominee of The Depository Trust Company ("DTC"), a limited purpose trust company organized under New York banking law with its principal place of business in the City, County, and State of New York, which acts as the securities depository for the Bonds.  DTC is a domestic securities depository and clearing agency, registered with the U.S. Securities and Exchange Commission,

for the transmission of funds, data, and information between the financial institutions that

constitute its members and other institutions and issuers.

## JURISDICTION, VENUE, AND NATURE OF MATTER

22.     The Court has jurisdiction over this proceeding pursuant to 28 U.S.C.

§ 1335 because two or more of the Defendants to Count One (Statutory Interpleader) are adverse

claimants of diverse citizenship that are or may claim entitlement to the property that is subject

to the interpleader.

23.     The Court also has jurisdiction over all claims and causes of action in this

Complaint pursuant to 48 U.S.C. § 2166(a)(2) because they are at least "related to" the above-

captioned title III proceeding.

24.     This Court has personal jurisdiction over all of the Defendants pursuant to

48 U.S.C. § 2166(c).

25.     Venue in this district is proper pursuant to 48 U.S.C. § 2167 and 28 U.S.C.

§ 1391(b).

## FACTUAL BACKGROUND

**A.      The Puerto Rico Sales Tax Financing Corporation**

26.     In July 2006, the Legislative Assembly of the Commonwealth imposed a

tax (the "Commonwealth Sales Tax") at a rate of 5.5% on the sale or use of a broad range of

goods and the delivery of various services in the Commonwealth.  *See* Act of July 4, 2006, No.

117-2006, 2006 P.R. Laws 1231 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16),

§ 2401(b).

27.     In July 2007, the Legislative Assembly created COFINA as an

independent governmental instrumentality of the Commonwealth for the purpose of financing

the payment, retirement, or defeasance of certain Commonwealth debt obligations through the

issuance of new bonds secured by the assignment of a portion of the Commonwealth Sales Tax. *See* Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) ("Act No. 56").

28.     Act No. 56 requires the Commonwealth's Secretary of the Treasury to deposit the first receipts of the Commonwealth Sales Tax in each fiscal year in an amount specified by law (the "Pledged Sales Tax") in a special fund (the "Dedicated Sales Tax Fund") held and owned by COFINA separate and apart from the Commonwealth's general fund.  Act No. 56, § 2; P.R. Laws Ann. tit. 13, § 12.

29.     In consideration of COFINA's commitment to pay and retire certain of the Commonwealth's debt obligations, the Commonwealth transferred to COFINA the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax.  Act No. 56, § 3; P.R. Laws Ann. tit. 13, § 12.  ("[The Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the future funds that must be deposited in [the Dedicated Sales Tax Fund] pursuant to the provisions of [this Act] are hereby transferred to, and shall be the property of COFINA.").

30.     The Legislative Assembly directed that the Pledged Sales Tax belonged to COFINA and, as such, "shall not be deposited in the Treasury of Puerto Rico, nor shall [it] constitute resources available to the Commonwealth of Puerto Rico, nor shall [it] be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."  Act No. 56, § 3; P.R. Laws Ann. tit. 13, § 12.  COFINA is authorized to "pledge and otherwise encumber all or part of [the Pledged Sales Tax] solely for the payment of principal, interest and redemption premium of . . . bonds and other obligations of [COFINA] . . . to meet the purposes set forth in [Act No. 56]."  Act No. 56, § 4(c); P.R. Laws Ann. tit. 13, § 13(b).

**B.     The Resolution and the Bonds**

   **1.     Generally**

   31.     COFINA issued four types of Bonds under the Resolution:  (i) senior

"current interest" bonds (the "Senior CIBs"); (ii) senior "capital appreciation" bonds (the "Senior

CABs"); (iii) subordinate "current interest" bonds (the "Subordinate CIBs"); and (iv) subordinate

"capital appreciation" bonds (the "Subordinate CABs").  Interest on the Senior CIBs and the

Subordinate CIBs (together, the "CIBs") is payable on a current basis on established dates prior

to maturity.  Interest on the Senior CABs and the Subordinate CABs (together, the "CABs") is

"capitalized," or added to the principal balance, to be paid (generally) only at maturity or earlier

redemption or acceleration of maturity.  The CABs do not receive periodic interest payments and

have long-term maturity dates.  The Subordinate CIBs and the Subordinate CABs (together, the

"Subordinate Bonds") carry higher interest rates, but have a lien priority that is subordinate to all

of the Senior CIBs and the Senior CABs (together, the "Senior Bonds").  Upon an Event of

Default, the Subordinate Bonds also have a payment priority that is subordinate to the Senior

Bonds.  BNYM serves as trustee under the Resolution for all types and series of the Bonds.

   32.     The Bonds are special obligations of COFINA payable from the Pledged

Sales Tax without recourse against any other assets of COFINA.  Resolution § 201.  The Bonds

do not constitute a debt of the Commonwealth or a pledge of the good faith and credit of the

Commonwealth or the taxing power of the Commonwealth.  *Id.*

   33.     Pursuant to section 501 of the Resolution and related security agreements

between COFINA and BNYM, payment of the principal of, premium (if any), and interest on the

Bonds and other amounts due under the Resolution are secured by, among other things,

assignment of the Pledged Sales Tax and a security interest in all amounts on deposit with

Case:17-03283-LTS Doc#:4759 Filed:05/16/19 Entered:05/16/19 17:46 Desc: Main
Document Page 10 of 33

BNYM under the Resolution and all amounts required to be on deposit therein by the terms of

the Resolution.  *See* Resolution § 501.

### 2. Covenants of the Commonwealth and COFINA Under the Resolution

34.  The Resolution constitutes a contract among COFINA, BNYM, the

Bondowners, and other Beneficiaries.[2]  *See* Resolution §§ 103 ("the Resolution shall be deemed

to be and shall constitute a contract among [COFINA], the Owners from time to time of the

Bonds, and all other Beneficiaries"), 801 (BNYM appointed as trustee under Resolution).[3]

35.  COFINA agreed to several covenants under the Resolution.  Relevant to

this proceeding, COFINA agreed to "defend, preserve and protect the pledge of the Pledged

Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the

Resolution against all claims and demands of all persons whomsoever."  Resolution § 705.

36.  Additionally, the Commonwealth pledged that, until payment in full of the

Bonds and interest thereon, it would not "limit or restrict the rights or powers of the appropriate

officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts

constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the

provisions of the Act . . . ."  Resolution § 706.  The Commonwealth also pledged not to "limit or

restrict the rights" granted to COFINA under its enabling legislation or the rights of COFINA "to

meet its obligations to its Bondholders" until the Bonds and interest thereon are paid in full.  *Id.*

### 3. Events of Default and Exercise of Remedies Under the Resolution

37.  Pursuant to section 1101.1(i) of the Resolution, a default in the payment of

principal or interest due under any Bond shall constitute an Event of Default under the

---

[2]  "Bondowner" means "any person who shall be the **registered owner** of any Outstanding Bond or
Bonds."  Resolution § 101 (emphasis added).

[3]  The Resolution has the same functions as a trust indenture, as has been recognized by the parties in
*Lex Claims, LLC v. Padilla*, No. 16-cv-02374 (FAB) (D.P.R.).

Case:17-00133-LTS Doc#:11 Filed:05/16/17 Entered:05/16/17 21:46 Desc: Main
Document Page 11 of 383

Resolution. *Id.* § 1101.1(i). To date, COFINA has never defaulted on the payment of principal or interest under the Resolution.

38. Pursuant to section 1101.1(ii) of the Resolution, the "failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds" for a period of thirty (30) days "after written notice, specifying such failure and requesting that it be remedied, is given to [COFINA] by [BNYM] or any Beneficiary" shall constitute an Event of Default under the Resolution. *Id.* § 1101.1(ii).

39. Upon the occurrence and continuance of an Event of Default, BNYM "may," and upon the written request of Bondowners of not less than twenty-five percent (25%) in principal amount of the outstanding Bonds "shall," declare the principal of and accrued interest on the Bonds to be due and payable immediately. *Id.* § 1102.1. Upon acceleration, the principal and "accrued interest on the accelerated Bonds shall become due and payable immediately, and [BNYM] shall make demand for payment upon [COFINA] in an amount sufficient to pay principal . . . and interest accrued on the accelerated Bonds to the date established for payment thereof." *Id.*

**4.** **The Resolution's "Waterfall" After an Event of Default**

40. Section 1103.1 of the Resolution sets forth the priority of payments after an Event of Default. If the funds held by BNYM after payment of its reasonable fees and expenses are insufficient for the payment of principal and interest then due on the Bonds, such funds and any other moneys received or collected by BNYM after the occurrence of an Event of Default, must be applied pursuant to the following waterfall:

> FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph; . . . .

Resolution § 1103.1.[4] If the Bonds have been accelerated, the payments of principal and interest on the Bonds must be paid ratably, without preference or priority. *Id.*

41.  The Resolution provides that all Senior Bonds must be accorded senior status such that no Event of Default may be declared, and no remedy may be invoked, on account of the Subordinate Bonds, until the Senior Bonds are paid in full. Resolution § 1101.2.

---

[4]  Notwithstanding anything to the contrary set forth herein, BNYM hereby reserves its rights under sections 804 and 1103.1 of the Resolution to have its fees and expenses paid from any and all funds at any time held by or payable to BNYM under the Resolution prior to payment of the Bondowners.

Case 1:17-00283-LTS   Doc#4759-18   Filed 05/06/19   Entered 05/06/19 13:46   Desc: Main
Document   Page 13 of 393

**5.**      **BNYM's Limited Contractual Duties Under the Resolution.**

42.      The Resolution strictly limits BNYM's duties.[5]  BNYM "undertakes to perform . . . only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee."  Resolution § 802.  BNYM's permissive rights under the Resolution cannot be construed as duties.  *Id.*  BNYM has no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Resolution at the request or direction of Bondowners, unless the Bondowners offer BNYM "security or indemnity satisfactory to [BNYM] against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction."  *Id.*  The rights, duties, privileges, and immunities of BNYM under the Resolution are governed by New York law.  *Id.* § 1211.

**6.**      **Appointment of a Separate Trustee Under the Resolution**

43.      BNYM serves as the trustee under the Resolution for all of the Bonds and exercises its rights and performs its duties for the benefit of all Bondowners and BNYM.  *See* Resolution § 801.  However, pursuant to section 810 of the Resolution, BNYM is authorized to appoint a separate trustee "at any time for the purpose of meeting any legal requirement of any jurisdiction" and to vest such separate trustee with "such powers, duties, obligations, rights and

---

[5]      *E.g.*, Resolution §§ 306 (no duty to register the transfer of or exchange any Bonds called for redemption); 602.1 (no duty to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of COFINA as to specific investments); 510.4 (no duty to calculate amounts required to be deposited in the Rebate Account under federal tax law); 708.1 (no duty to inspect COFINA's books and records); 802 (no duty with respect to the authentication and delivery of the Bonds; no duty regarding application of the proceeds thereof; no duty regarding the application of any moneys paid to COFINA; no duty regarding the validity, perfection, priority, or enforceability of the pledge and security interest in the Pledged Property, whether or not impaired; no duty to exercise permissive rights; and no duty to exercise any right or power absent direction and satisfactory indemnification); 804 (no duty to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution); and 1105 (no duty to follow direction of Bondowners that, in BNYM's opinion, would unjustly prejudice other Bondowners or involve BNYM in personal liability).

trusts as [BNYM] may consider necessary or desirable . . . ."  Resolution § 810.  Once appointed

and "to the extent permitted by law," a separate trustee's rights, powers, duties, and obligations

must be:

> exercised or performed by the Trustee and such separate trustee or
> co-trustee jointly (it being understood that such separate trustee or
> co-trustee is not authorized to act separately without the Trustee
> joining in such act), except to the extent that under any law of any
> jurisdiction in which any particular act or acts are to be performed
> the Trustee shall be incompetent or unqualified to perform such act
> or acts, in which event such rights, powers, duties and obligations
> (including the holding of the Pledged Property or any portion
> thereof in any such jurisdiction) shall be exercised and performed
> singly by such separate trustee or co-trustee, but solely at the
> direction of the Trustee; . . . .

*Id.* § 810(b)(i).

## C.    PROMESA

44.    On June 30, 2016, in response to the Commonwealth's financial and

economic difficulties, President Obama signed into law The Puerto Rico Oversight,

Management, and Economic Stability Act, 48 U.S.C. § 2101 *et seq.* ("PROMESA").

45.    PROMESA established a "Financial Oversight and Management Board"

(the "Oversight Board") to help the Commonwealth and its governmental instrumentalities

"achieve fiscal responsibility and access to the capital markets."  48 U.S.C. §§ 2121 and (a)-

(b)(1).  PROMESA also provided for an out-of-court, voluntary restructuring process, *see id.* §§

2231-2232, and a court-supervised restructuring process, *see id.* §§ 2161 *et seq.*  The latter, title

III of PROMESA, enables the Oversight Board to file a petition to restructure the

Commonwealth's or any covered territorial instrumentality's debts in a court-supervised process

similar to chapter 9 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the

"Bankruptcy Code").

46.  PROMESA requires that the Commonwealth and covered instrumentalities submit a fiscal plan to the Oversight Board.  *See* 48 U.S.C. § 2141.  Among other requirements, PROMESA provides that any fiscal plan shall:

> (M)  ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under subchapter III, or a Qualifying Modification approved under subchapter VI; and

> (N)  **respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements** of a covered territory or covered territorial instrumentality in effect prior to June 30, 2016.

*Id.* § 2141(b)(1)(M), (N) (emphasis added).

47.  PROMESA imposed a stay on collection action against the Commonwealth until May 1, 2017.  *Id.* § 2194(d); *see Lex Claims LLC v. Ambac Assurance Corp.*, No. 17-1272 (1st Cir. April 4, 2017) (noting that PROMESA's stay was set to expire on May 1, 2017).

**D.  The Fiscal Plan**

48.  On March 13, 2017, Puerto Rico's Fiscal Agency and Financial Advisory Authority ("FAFAA") submitted a joint fiscal plan (as corrected, the "Fiscal Plan") to the Oversight Board.  On that date, the Oversight Board certified the Fiscal Plan.

49.  Under the heading of "Bondholder Negotiations and Consensus," the Fiscal Plan provides:

> The Government's Fiscal Plan consolidates available cash resources that can be made available for debt service payments. **The Fiscal Plan as proposed does not presume cash flow for debt service for any particular bondholder constituency**, including clawed back cash and special revenues, **nor does it take a position with respect to asserted constitutional or contractual**

- 15 -

**rights and remedies, validity of any bond structure, or the
dedication or application of tax streams / available resources**.

Fiscal Plan at 5 (emphasis added).  In addition, on page 6, entitled "What the Fiscal Plan does

not determine," under a subheading entitled "Legal & contractual issues not determined by the

Fiscal Plan," the Fiscal Plan provides that it does not attempt to resolve, among other items:

(i) "[t]he mechanisms by which projected cash flow available for debt service should be

allocated to different debt instruments;" and (ii) "[t]he value, validity and /or perfection of

pledges."  *See* Fiscal Plan at 6.

50.    Accordingly, the Fiscal Plan does not take any position regarding the

validity of COFINA's pledge of the Pledged Sales Tax to BNYM **or** the allocation of cash flow

among the Bonds and other Commonwealth debt instruments.

**E.    The Oversight Board Mediation**

51.    Commencing on April 13, 2017, the Oversight Board, the Commonwealth,

the Beneficial Holders, BNYM, and beneficial holders of general obligation bonds issued by the

Commonwealth, among others, participated in a mediation of disputes under the auspices of

former Bankruptcy Judge Allan Gropper.  *See* Statement of Oversight Board in Connection with

PROMESA Title III Petition [Doc. No. 1-2] ¶ 36.  Despite several mediation sessions and other

private negotiations, no agreements were reached before the expiration of the PROMESA stay on

May 1, 2017.  *Id.*

**F.    The Fiscal Plan Compliance Law**

52.    On Saturday, April 29, 2017, Commonwealth Governor Ricardo Rosselló

Nevares signed into law Act 26, titled the Fiscal Plan Compliance Law (the "Compliance Law").

The Compliance Law interferes with COFINA's rights and undermines the pledge of the Pledged

Sales Tax to BNYM.

Case:17-03283-LTS Doc#:1759-18 Filed:01/12/19 Entered:01/12/19 17:46 Desc: Main
Document Page 17 of 393

53.     Article 4.3 of the Compliance Law authorizes the Governor, under certain

conditions, to use the Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow

or to comply with the Commonwealth's Fiscal Plan.  *See* Compliance Law, Art. 4.3 ("the

Executive shall be authorized to use the Funds of COFINA" upon "presentation of a sworn

certification issued to the Legislative Assembly" establishing "the need, term and amount of the

funds to be used to cover an occasional and significant deficit in cash flow to comply with the

Fiscal Plan . . . .").

54.     Article 6.2 of the Compliance Law diverts the Pledged Sales Tax to the

Commonwealth's general fund under the custody of the Secretary of Treasury, who has authority

to determine the order of priority of the disbursements from the general fund, in direct violation

of COFINA's enabling legislation.  *See* Compliance Law, Art. 6.2.

55.     The enactment of the Compliance Law marked the first time that the

Commonwealth claimed a **right** to use the Pledged Sales Tax.

**G.      Notices of Default Relating to the Compliance Law**

56.     On May 1, 2017, BNYM demanded in separate letters to the

Commonwealth and COFINA that by May 3, 2017:  (i) the Commonwealth set forth any basis

for disagreement that the Compliance Law contravenes section 706 of the Resolution and, if

there is no disagreement, what actions the Commonwealth is taking to cure the default; and (ii)

COFINA explain in detail the actions that it is taking to defend, preserve, and protect the pledge

of the Pledged Sales Tax against the Commonwealth's claim to the Pledged Sales Tax under the

Compliance Law and any effort by the Governor to utilize the Pledged Sales Tax pursuant to the

Compliance Law.  *See* Letter from BNYM to COFINA, dated May 1, 2017, attached hereto as

**Exhibit B**; Letter from BNYM to FAFAA, dated May 1, 2017, attached hereto as **Exhibit C**.

57.     On May 1, 2017, Ambac sent COFINA notice of defaults under sections 705 and 706 of the Resolution and demanded that the defaults be remedied.[6]  Ambac described the enactment of the Compliance Law and approval of the Fiscal Plan as "incurable breaches" of the Resolution.  Ambac asserted "[a]lternatively," if the cure period of section 1101.1(ii) of the Resolution applies, the breaches must be cured before May 31, 2017.  *See* Letter from Ambac to COFINA, dated May 1, 2017, attached hereto as **Exhibit D**.

58.     On May 4, 2017, having received no responses to its May 1 letters to the Commonwealth and COFINA, BNYM sent COFINA notice of (i) the defaults under sections 705 and 706 of the Resolution as a result of the Commonwealth's enactment of the Compliance Law and COFINA's failure to take any action to defend, preserve, and protect its ownership and control of the Pledged Sales Tax and the pledge of the Pledged Sales Tax to BNYM against the Commonwealth's claim thereto in the Compliance Law and (ii) an additional default under section 704 of the Resolution as a result of COFINA's failure to respond to BNYM's demands for further assurances.  BNYM indicated that, pursuant to section 1101.1(ii) of the Resolution, the defaults under sections 705 and 706 of the Resolution will become Events of Default if they are not remedied within 30 days of the date of Ambac's May 1 default notice, and the default under section 704 of the Resolution will become an additional Event of Default if not remedied within 30 days of the date of BNYM's May 4 default notice.  *See* Letter from BNYM to COFINA, dated May 4, 2017, attached hereto as **Exhibit E**.

**H.      The Title III Proceedings of the Commonwealth and COFINA**

59.     On May 3, 2017, the Oversight Board filed a petition for relief on behalf of the Commonwealth under title III of PROMESA in the United States District Court for the

---

[6]      To BNYM's knowledge, this was the first time Ambac notified COFINA of any alleged default, thereby recognizing that any prior acts or omissions of which Whitebox complains, were not defaults.

District of Puerto Rico, currently styled *In re The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico*, Case No. 17-bk-3283-LTS.

60.     On May 5, 2017, the Oversight Board filed a petition for relief on behalf of COFINA under title III of PROMESA in the United States District Court for the District of Puerto Rico, currently styled *In re The Financial Oversight and Management Board for Puerto Rico as representative of Puerto Rico Sales Tax Financing Corporation (COFINA)*, Case No. 17-bk-3284-LTS.

I.      **The Conflicting Demands and Positions of the Beneficial Holders**

   1.      **The Inconsistent Demands of Beneficial Holders of the Senior CABs and Ambac and the Absence of Proof of Ownership or Offer of Indemnification**

61.     Certain Beneficial Holders of the Senior CABs and Ambac (which insures certain Senior CABs) assert that the submission of the Fiscal Plan and the enactment of the Compliance Law constituted immediate Events of Default under section 1101.1(ii) of the Resolution on the basis that they are incurable covenant defaults.  Those parties demanded that BNYM issue notices of Events of Default and accelerate and cease payments on the Bonds.  As detailed below, the Beneficial Holders' and Ambac's demands have been inconsistent and non-compliant with the Resolution.

62.     By letter dated January 31, 2017, Whitebox, an alleged Beneficial Holder of *less* than five percent (5%) of the Bonds, asserted that Events of Default had "plainly" occurred under the Resolution as a result of alleged failures by the Commonwealth and COFINA to defend, preserve, and protect the pledge of the Pledged Sales Tax.  Whitebox requested that BNYM refrain from making any payments on the Bonds.  If BNYM did not comply with Whitebox's request, Whitebox threatened to bring legal action to hold BNYM liable for not

Case:17-03283-LTS Doc#:4759-18 Filed:07/12/19 Entered:07/12/19 17:45:34 Desc: Main
Document Page 20 of 393

giving notice of Events of Default and ceasing payments on the Bonds. *See* Letter from
Whitebox's counsel to BNYM's counsel, dated January 31, 2017, attached hereto as **Exhibit F**.

63.     By letter dated February 6, 2017 (as well as at least one prior email),
BNYM advised Whitebox that BNYM did not believe there were any covenant defaults under
the Resolution and advised Whitebox that BNYM has no duty to perform any act that would
involve it in expense or liability, or take any action at the request of Bondowners, "without first
receiving direction from Bondowners holding the requisite majority in principal amount of the
outstanding Bonds and security and indemnity satisfactory to [BNYM]." *See* Letter from
BNYM's counsel to Whitebox's counsel, dated February 6, 2017, attached hereto as **Exhibit G**.

64.     By letter dated March 31, 2017, Whitebox asserted that the
Commonwealth breached section 706 of the Resolution by promulgating the Fiscal Plan, and
COFINA breached section 705 of the Resolution by not vigorously opposing the Fiscal Plan.
Whitebox demanded that BNYM issue a notice of default and cease making payments on the
Bonds. *See* Letter from Whitebox's counsel to BNYM's counsel, dated March 31, 2017,
attached hereto as **Exhibit H**.

65.     Whitebox offered no proof of ownership of the Bonds, let alone the 25%
required to direct BNYM, and offered no indemnification to protect BNYM from any liability to
COFINA, the holders of the Subordinate Bonds, or the holders of the Senior CIBs, all of which
would be prejudiced by an errant declaration of an immediate Event of Default and by a
cessation of payments on the Bonds.[7]

---

[7]     By an email dated January 20, 2017, counsel for Whitebox provided an uncertified aggregate list of
holdings of alleged beneficial interests in the Bonds. Although such information was sufficient for
purposes of understanding the parties attending the mediation, such uncertified information is
insufficient to direct BNYM in accordance with the Resolution. Further, Whitebox merely is the
holder of beneficial interests in the Bonds, not the registered Owner. As such, Whitebox has no
ability to direct BNYM under the Resolution.

66.     By letter dated April 30, 2017, Whitebox demanded that BNYM (i) declare the issuance and approval of the Fiscal Plan to be an "immediate, incurable default," (ii) cease all payments on the Bonds, (iii) notify COFINA that BNYM will accelerate the Bonds if the breaches are not cured within thirty (30) days, and (iv) require COFINA to cause the Commonwealth to revoke the troublesome provisions in the Compliance Law.  *See* Letter from Whitebox's counsel to BNYM's counsel, dated April 30, 2017, attached hereto as **Exhibit I**.

67.     Again, Whitebox offered no proof of ownership of the Bonds, let alone the 25% required to direct BNYM, and offered no indemnification to protect BNYM from any liability to COFINA, the holders of the Subordinate Bonds, or the holders of the Senior CIBs, all of which would be prejudiced by an errant declaration of an immediate Event of Default, by the premature acceleration of the Bonds, and by a cessation of payments on the Bonds.

68.     In further contravention of the Resolution, Whitebox did not provide the required prior written consent of Ambac or MBIA Insurance Corporation ("MBIA") with respect to acceleration of the Bonds that Ambac and MBIA insure.  *See* First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 (the "First Supplement"), attached hereto as **Exhibit J**, § 1.2 (defining "Ambac Insured Bonds" and "MBIA Insured Bonds") and Ex. B, subsection (j) under the heading "Ambac Insurance Policy" and subsection (vii) under the heading "MBIA Insurance Policy."

69.     By separate letter dated April 30, 2017, and received by BNYM on May 1, 2017, Ambac asserted the existence of immediate Events of Default under the Resolution as a result of alleged incurable breaches of sections 705 and 706 of the Resolution arising from the submission of the Fiscal Plan and the enactment of the Compliance Law.  Ambac demanded that BNYM immediately cease payments to the Subordinate Bonds, including the payment that was

due the next day on May 1, 2017.  *See* Letter from Ambac's counsel to BNYM's counsel, dated

April 30, 2017, attached hereto as **Exhibit K**.

70.     Ambac offered no indemnification to protect BNYM from any liability to

COFINA or the holders of the Subordinate Bonds, all of which would be prejudiced by an errant

declaration of an immediate Event of Default and by a cessation of payments on the Bonds.

71.     On May 2, 2017, BNYM reiterated in writing its request for direction and

indemnification from Whitebox, but Whitebox again did not respond.  *See* Letter from BNYM's

counsel to Whitebox's counsel, dated May 2, 2017, attached hereto as **Exhibit L**.

72.     Instead, by letter dated May 4, 2017, Whitebox (a) asserted that the

Commonwealth and COFINA had committed "incurable" Events of Default by approving the

Fiscal Plan and by enacting the Compliance Law and (b) demanded that BNYM immediately

accelerate all of the Bonds.  *See* Letter from Whitebox's counsel to BNYM's counsel, dated May

4, 2017, attached hereto as **Exhibit M**.[8]

73.     Yet again, Whitebox offered no proof of ownership of the Bonds, let alone

the 25% required to direct BNYM, and offered no indemnification to protect BNYM from any

liability to COFINA, the holders of the Subordinate Bonds, or the holders of the Senior CIBs, all

of which would be prejudiced by an errant declaration of an immediate Event of Default, by the

premature acceleration of the Bonds, and by a cessation of payments on the Bonds.

74.     By separate letter on May 4, 2017, Whitebox and other Beneficial Holders

that allegedly collectively hold beneficial interests in more than $2.285 billion (more than 25%)

---

[8]     On May 2, 2017, Whitebox and other Beneficial Holders commenced a lawsuit against COFINA,
FAFAA, and others seeking, among other things, a writ of mandamus compelling defendants to
amend the Fiscal Plan so that it complies with and respects the Beneficial Holders' constitutional,
statutory, and contractual rights. *See  Rodríguez Perelló v. Roselló Nevares*, No. 17-cv-1566
(D.P.R.), Complaint for Declaratory and Injunctive Relief [Doc. No. 1].  By seeking such relief,
Whitebox implicitly acknowledges that any covenant defaults relating to the Fiscal Plan are curable.

of the Senior Bonds (but less than 25% of the outstanding Bonds), asserted alleged Events of

Default and demanded that BNYM "declare the principal of and accrued interest on **all senior**

**COFINA Bonds** outstanding to be immediately due and payable [and] that . . . [BNYM] proceed

to protect its rights and the rights of the COFINA Senior Bondholders through the exercise of

any and all remedies set forth in subsections 1102(1)(i)-(iv) of the Resolution." *See* Letter from

COFINA Senior Bondholders to BNYM, dated May 4, 2017, attached hereto as **Exhibit N**. In

the same writing, Ambac consented to acceleration of the Senior CABs that it insures. *See id.*

75.     Like Whitebox's individual demands before it, the demands of this ad hoc

group of Beneficial Holders of Senior Bonds were deficient for a variety of reasons. First, none

of the Beneficial Holders provided proof of ownership or even a certification of the amount of

their alleged beneficial interests. Second, the Beneficial Holders offered no indemnification to

protect BNYM from any liability to COFINA, the holders of the Subordinate Bonds, or the

holders of the Senior CIBs, all of which would be prejudiced by an errant declaration of an

immediate Event of Default, by the premature acceleration of the Bonds, and by a cessation of

payments on the Bonds. Third, the Beneficial Holders failed to provide the required prior

written consent of MBIA. *See* First Supplement [Exhibit I] section (vii) of MBIA Insurance

Policy provisions.

76.     The Beneficial Holders' demand also was inconsistent with Whitebox's

demand sent earlier the same day. The Beneficial Holders demanded that BNYM accelerate

only the Senior Bonds, whereas Whitebox demanded that BNYM accelerate all of the Bonds.

77.     On May 5, 2017, BNYM reiterated its request for direction and

indemnification from Ambac pursuant to the Resolution. *See* Letter from BNYM's counsel to

Ambac's counsel, dated May 5, 2017, attached hereto as **Exhibit O**.

78. By letter dated May 12, 2017, an ad hoc group of Beneficial Holders of allegedly more than $2.3 billion of outstanding Senior Bonds (including CIBs and CABs) requested that BNYM acknowledge existing and continuing Events of Default under the Resolution, declare all Senior Bonds due and payable immediately, and make payment to Beneficial Holders of Senior Bonds (and not to Beneficial Holders of Subordinate Bonds). Alternatively, if BNYM reasonably determined that acceleration is not possible, the ad hoc group requested that BNYM make payments of principal and interest as and when due to Beneficial Holders of the Senior Bonds, again, to the exclusion of Beneficial Holders of the Subordinate Bonds. Under either alternative, the letter presumes the existence of an Event of Default on or prior to May 31, 2017. *See* Letter from counsel to ad hoc group of COFINA Senior Bondholders to BNYM and its counsel, dated May 12, 2017, attached hereto as **Exhibit P**.

79. The ad hoc group of Beneficial Holders of Senior Bonds offered no proof of ownership of the Bonds, let alone the 25% required to direct BNYM, and offered no indemnification to protect BNYM from any liability to COFINA, the holders of the Subordinate Bonds, or the holders of the non-directing Senior CIBs, all of which would be prejudiced by an errant declaration of an immediate Event of Default, by the premature acceleration of the Bonds, and by a cessation of payments on the Bonds.

80. At no time has Whitebox, the other demanding Beneficial Holders, or Ambac offered any indemnification to BNYM in accordance with the Resolution.

**2.      Position of Certain Beneficial Holders of the Subordinate Bonds Regarding a Curable Default and the Absence of an Event of Default**

81. By a letter dated May 5, 2017, alleged Beneficial Holders of nearly $3.6 billion of the Bonds, including $2.829 billion of the Subordinate CABs and $759 million of the Senior CABs, wrote to BNYM "agree[ing] with the Trustee that a default under the Resolution

Case:17-03283-LTS Doc#:4759-18 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: Main
Document Page 25 of 393

has now occurred as described in the Trustee's letter dated May 4, 2017," but disagreeing with

the assertion "that any other default or any Events of Default has occurred."  *See* Letter from Ad

Hoc Group of Subordinate Beneficial Interest Holders to BNYM, dated May 5, 2017, attached

hereto as **Exhibit Q**.  They also confirmed that BNYM's refusal to declare a default prior to May

1, 2017, was the "only plausible course of action for BNYM under the circumstances . . ." and

that "BNYM has complied with all of its obligations under the Resolution . . . ."  *Id.*

**J.     Position of Holders of the CIBs**

82.     Other than the May 12, 2017 letter from an ad hoc group of Beneficial

Holders of Senior Bonds (including certain Beneficial Holders of CIBs), BNYM has not received

any written demands from Beneficial Holders of the CIBs.  However, accelerating the CABs, for

which interest is capitalized and added to principal for many years, could reduce the share of

funds otherwise available to pay the CIBs.

**K.     Position of FAFAA**

83.     In a letter dated May 16, 2017, FAFAA took the position that there is no

default under the Resolution, that any default may be cured within the applicable 30-day period

as extended under section 108 of the Bankruptcy Code, and that any action taken based on any

alleged default will violate the automatic stay.  *See* Letter from FAFAA to BNYM, dated May

16, 2017, attached hereto as **Exhibit R**.  In a second letter dated May 16, 2017, FAFAA stated

that funds held by BNYM are property of COFINA and that the automatic stay precludes any act

to exercise control over such property that Beneficial Holders may seek to take based on an

assertion of ownership.  *See* Letter from FAFAA to BNYM's counsel, dated May 16, 2017,

attached hereto as **Exhibit S**.

Case:17-03283-LTS Doc#:4759 Filed:07/10/18 Entered:07/11/18 17:46 Desc: Main
Document Page 26 of 393

**L.    The New York State Court Litigation Against BNYM**

84.    Notwithstanding Whitebox's failure to provide direction and
indemnification to BNYM in accordance with the Resolution, on April 12, 2017, Whitebox
commenced a civil action against BNYM in the New York Supreme Court, County of New
York, styled *Whitebox Multi-Strategy Partners, L.P. et al., v. Bank of New York Mellon Corp.*,
651969/2017 (Sup. Ct. N.Y. County Apr. 12, 2017) (the "Whitebox Lawsuit").  A copy of the
complaint filed in the Whitebox Lawsuit is attached hereto as **Exhibit T**.

85.    Whitebox alleges in its complaint that BNYM breached putative duties to
Whitebox, as a Beneficial Holder of the Senior CABs, by failing to declare defaults and Events
of Default as a result of certain statements and decisions made by the Commonwealth and the
Oversight Board, starting in September 2015.  Whitebox Compl. ¶ 52.  Whitebox asserts six
causes of action for breach of trust, breach of fiduciary duty, waste, breach of contract, breach of
the implied covenant of good faith and fair dealing, and a declaratory judgment.  *See generally,*
*id.*  All of those claims are founded upon allegations that an Event of Default occurred under the
Resolution, a premise that impacts all Beneficial Holders of the Bonds.

86.    Notwithstanding Ambac's failure to provide direction and indemnification
to BNYM in accordance with the Resolution, on May 2, 2017, Ambac commenced a civil action
against BNYM in the New York Supreme Court, New York County, styled *Ambac Assurance*
*Corp. v. The Bank of New York Mellon*, 652356/2017 (Sup. Ct. N.Y. County May 2, 2017) (the
"Ambac Lawsuit" and together with the Whitebox Lawsuit, the "State Court Lawsuits").  A copy
of the complaint filed in the Ambac Lawsuit is attached hereto as **Exhibit U**.

87.    Ambac also alleges that BNYM breached its duties as a result of failing to
declare Events of Default in seven separate circumstances, starting in September 2015.  *See*
Ambac Compl. ¶ 6.  Ambac asserts five causes of action for breach of fiduciary duty, breach of

contract, breach of the implied covenant, gross negligence / breach of trust, and a declaratory

judgment.  *See generally, id.*  Among the relief Ambac seeks is "an injunction prohibiting

[BNYM] from making any additional interest payments to any Subordinate Bondholders" and an

affirmative "injunction directing [BNYM] to recognize an Event of Default and accelerate the

payments of the Bonds."  *See* Ambac Compl., Prayer for Relief.  All of those claims are founded

upon allegations that an Event of Default occurred under the Resolution, a premise that impacts

all Beneficial Holders of the Bonds.

88.     Moreover, under section 804 of the Resolution, COFINA "agree[d] to

indemnify and save the Trustee harmless against any loss, liability or expenses . . . arising out of

or in connection with the acceptance or administration of the trust or trusts [thereunder],

including the costs and expenses of defending itself against any claim . . . asserted by . . . any

Bondowner or any other Person . . . or liability in connection with the exercise or performance of

any of its powers or duties [thereunder] . . . ."  Resolution § 804.  Consequently, the cost of

defending the State Court Lawsuits, and any finding of liability against BNYM, will be borne by

COFINA, potentially diminishing the funds available to repay the Beneficial Holders.

### FIRST CAUSE OF ACTION
### (STATUTORY INTERPLEADER PURSUANT TO 28 U.S.C. § 1335(a))
### AGAINST ALL DEFENDANTS (OTHER THAN COFINA)

89.     The preceding paragraphs are incorporated by reference as if fully set

forth herein.

90.     The disputes between Whitebox, certain other alleged Beneficial Holders

of the Senior Bonds, and Ambac, on the one hand, and certain alleged Beneficial Holders of the

Subordinate Bonds, on the other hand, regarding whether an Event of Default has occurred and is

continuing and, to the extent there are curable, covenant defaults only, when the cure period

expires for those defaults, impact the rights of all Beneficial Holders to receive payment on account of the Bonds.  Any resolution of these disputes will affect the parties' interests in the Disputed Funds.

91.    Absent an Event of Default and acceleration of the Bonds, only Beneficial Holders of the CIBs receive periodic payments from COFINA.  Beneficial Holders of the CABs receive no payments until their distant maturity (as interest is capitalized during the terms of the CABs).  An Event of Default also may preclude Beneficial Holders of the Subordinate Bonds from receiving any payments until the Senior Bonds are fully retired or defeased.

92.    The Resolution does not address the treatment of the Disputed Funds in circumstances where there is a dispute regarding the existence of an Event of Default.

93.    There is no distribution of the Disputed Funds that would satisfy all of the competing demands of the various Beneficial Holders.  Under these circumstances, a distribution of the Disputed Funds to any particular series of the Bonds may subject BNYM to additional litigation (though meritless) by Beneficial Holders that do not receive a distribution.

94.    Accordingly, BNYM has a real and reasonable fear of vexatious and/or multiple or conflicting claims to the Disputed Funds by Beneficial Holders of various Bonds.

95.    Cede is named as a Defendant in this Count because it is the registered Owner of the Bonds.  In such capacity, Cede may notify all Beneficial Holders of this action.

96.    BNYM joins certain alleged Beneficial Holders as Defendants to provide the opportunity, if the Beneficial Holders have and demonstrate standing to do so, to state a claim to the Disputed Funds.

97.    The Disputed Funds exceed the statutory minimum.  *See* 28 U.S.C. § 1335(a).

98.     BNYM is unwilling to make any distributions of the Disputed Funds to any party without this Court's determination of the parties' respective interests, if any, in such Disputed Funds.

99.     BNYM is willing to deposit the June 1 Payment (and each successive monthly payment on the Bonds until the disputes are resolved) into the Court's Registry until the parties' respective rights to the Disputed Funds are determined.  Alternatively, BNYM is willing to hold the entirety of the Disputed Funds in the existing accounts into which they have been deposited, preserving the Disputed Funds and reserving all rights and claims thereto pending a determination by this Court of the parties' respective rights to such Disputed Funds.  BNYM further proposes that the Disputed Funds should continue to be invested, and the investment gains should continue to be applied, in accordance with the terms of the Resolution.

100.     BNYM has no interest in the Disputed Funds except to the extent of reasonable trustee's fees, attorneys' fees and costs, disbursements, and indemnifications payable under the Resolution, or with respect to this action, and the maintenance and distribution of the Disputed Funds as provided for in the Resolution and/or otherwise awarded by the Court.  *See*, *e.g.*, Resolution §§ 505(1), 804.

WHEREFORE, BNYM respectfully requests that the Court enter judgment:

a.     Directing BNYM to interplead the June 1 Payment and any future Disputed Funds on a monthly basis until entry of a final order of this Court directing the timing and manner of the disbursement of such Disputed Funds, as follows:  (i) BNYM shall hold the entirety of the Disputed Funds in the existing accounts into which they have been deposited and (ii) invest the Disputed Funds and apply the investment gains in accordance with the terms of the Resolution;

b.     Requiring all parties and all other individuals or entities claiming a right to any of the Disputed Funds to appear in this adversary proceeding and assert their respective rights in, or claims to, such Disputed Funds;

c.     Forever barring and precluding any party and all other individuals or entities with notice of this adversary proceeding and who fail to appear in this adversary

proceeding from asserting any claim against BNYM with respect to the Disputed Funds;

    d.    Restraining all parties and all other interested persons from instituting or continuing to pursue any and all claims and proceedings in any court or other tribunal against BNYM or any of its agents or affiliates relating to, or that may have any conceivable effect upon, any alleged interest (whether beneficial, legal, or otherwise) in, or the allocation or recovery of, any or all of the Disputed Funds, including, without limitation, the State Court Lawsuits;

    e.    Directing BNYM to distribute the Disputed Funds (net of BNYM's fees and expenses therefrom) as directed by the Court upon final judgment determining the respective interests of the Defendants and all other interested persons in the Disputed Funds;

    f.    Releasing and discharging BNYM from any and all claims and liability relating to the Disputed Funds or any right to, or interest in (beneficial, legal, or otherwise), the Disputed Funds, including, without limitation, claims of or liability to (i) the defendants in this adversary proceeding, (ii) any other person or entity claiming a right to or interest in the Disputed Funds, and (iii) all other persons or entities claiming by, through, or with any of the foregoing; and

    g.    Granting BNYM such further relief as is appropriate.

<p style="text-align:center"><strong>SECOND CAUSE OF ACTION<br>(RULE INTERPLEADER PURSUANT TO FEDERAL RULE OF<br>CIVIL PROCEDURE 22, AS MADE APPLICABLE BY<br>FEDERAL RULE OF BANKRUPTCY PROCEDURE 7022)<br>AGAINST ALL DEFENDANTS (OTHER THAN COFINA)</strong></p>

    101.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

    102.    The competing claims of Defendants (other than COFINA) expose BNYM to risk of potential double or multiple liabilities.

    103.    BNYM is unable to make any distributions of the Disputed Funds to any party, including the Defendants, without this Court's determination of the parties' respective interests in such Disputed Funds.

    104.    BNYM is willing to deposit the June 1 Payment (and each successive monthly payment on the Bonds until the disputes are resolved) into the Court's Registry until the

parties' respective rights to the Disputed Funds are determined.  Alternatively, BNYM is willing

to hold the entirety of the Disputed Funds in the existing accounts into which they have been

deposited, preserving the Disputed Funds and reserving all rights and claims thereto pending a

determination by this Court of the parties' respective rights to such Disputed Funds.  BNYM

further proposes that the Disputed Funds should continue to be invested, and the investment

gains should continue to be applied, in accordance with the terms of the Resolution.

105.    BNYM has no interest as a claimant in the Disputed Funds except to the

extent of reasonable trustee's fees, attorneys' fees and costs, disbursements, and indemnifications

payable under the Resolution, or with respect to this action, and the maintenance and distribution

of the Disputed Funds as provided for in the Resolution and/or otherwise awarded by the Court.

*See*, *e.g.*, Resolution §§ 505(1), 804.

WHEREFORE, BNYM respectfully requests that the Court enter judgment:

a.    Directing BNYM to interplead the June 1 Payment and any future Disputed
Funds on a monthly basis until entry of a final order of this Court directing the
timing and manner of the disbursement of such Disputed Funds, as follows:  (i)
BNYM shall hold the entirety of the Disputed Funds in the existing accounts into
which they have been deposited and (ii) invest the Disputed Funds and apply the
investment gains in accordance with the terms of the Resolution;

b.    Requiring all parties and all other individuals or entities claiming a right to any of
the Disputed Funds to appear in this adversary proceeding and assert their
respective rights in, or claims to, such Disputed Funds;

c.    Forever barring and precluding any party and all other individuals or entities with
notice of this adversary proceeding and who fail to appear in this adversary
proceeding from asserting any claim against BNYM with respect to the Disputed
Funds;

d.    Restraining all parties and all other interested persons from instituting or
continuing to pursue any and all claims and proceedings in any court or other
tribunal against BNYM or any of its agents or affiliates relating to, or that may
have any conceivable effect upon, any alleged interest (whether beneficial, legal,
or otherwise) in, or the allocation or recovery of, any or all of the Disputed Funds,
including, without limitation, the State Court Lawsuits;

    e.        Directing BNYM to distribute the Disputed Funds (net of BNYM's fees and expenses therefrom) as directed by the Court upon final judgment determining the respective interests of the Defendants and all other interested persons in the Disputed Funds;

    a.        Releasing and discharging BNYM from any and all claims and liability relating to the Disputed Funds or any right to, or interest in (beneficial, legal, or otherwise), the Disputed Funds, including, without limitation, claims of or liability to (i) the defendants in this adversary proceeding, (ii) any other person or entity claiming a right to or interest in the Disputed Funds, and (iii) all other persons or entities claiming by, through, or with any of the foregoing; and

    b.        Granting BNYM such further relief as is appropriate.

### THIRD CAUSE OF ACTION
### (DECLARATORY JUDGMENT PURSUANT TO 28 U.S.C. §§ 2201-2202) AGAINST ALL DEFENDANTS

106.    The preceding paragraphs are incorporated by reference as if fully set forth herein.

107.    As discussed in detail above, there are actual justiciable controversies between (a) BNYM, on the one hand, and Whitebox and certain other alleged Beneficial Holders, on the other hand, (b) BNYM and Ambac, (c) alleged Beneficial Holders of the CABs (and Ambac) and alleged Beneficial Holders of the CIBs, and (d) alleged Beneficial Holders of the Senior Bonds (and Ambac) and alleged Beneficial Holders of the Subordinate Bonds.

108.    To resolve the various disputes and disagreements by and among the parties, BNYM is entitled to declaratory relief as requested herein.

WHEREFORE, BNYM respectfully requests that the Court enter declaratory judgment as follows:

    a.        The only incurable default under section 1101.1(i) of the Resolution is the non-payment of principal, interest, or other amount due on the Bonds;

    b.        As of the date this Complaint was filed, there was no Event of Default under the Resolution;

Case:17-03283-LTS Doc#:4759-18 Filed:05/07/19 Entered:05/07/19 17:45:34 Desc: Main
Document Page 33 of 393

c.     Prior to April 29, 2017, when the Compliance Law was enacted, there was no default under the Resolution;

d.     The Commonwealth's enactment of the Compliance Law was a default, but not an immediate, incurable Event of Default;

e.     Section 108(b) of the Bankruptcy Code applies for purposes of calculating COFINA's "cure" period under section 1101.1(ii) of the Resolution;

f.     COFINA's cure period for a default under the Resolution expires on or about May 31, 2017, as may be extended by section 108(b) of the Bankruptcy Code;

g.     BNYM did not have a duty to act pursuant to the demands of Whitebox and the other alleged Beneficial Holders of the Senior Bonds because they are not Owners of any of the Bonds and BNYM received no direction from the Owner;

h.     BNYM did not have a duty to act pursuant to the demands of Whitebox, the other alleged Beneficial Holders of the Senior Bonds, and Ambac because they failed to offer any (let alone satisfactory) indemnification to BNYM;

i.     The automatic stay does not apply to the funds in BNYM's possession; and

j.     As a consequence of the Compliance Law and the commencement of this title III case, BNYM is authorized to (i) appoint a separate trustee for holders of the Subordinate Bonds under section 810 of the Resolution, which separate trustee shall not have to act on the direction of BNYM, and (ii) vest in such separate trustee such rights and powers as are approved by this Court.

## FOURTH CAUSE OF ACTION
### (RESOLUTION OF MATTERS CONCERNING A TRUST PURSUANT UNDER N.Y. C.P.L.R. §§ 7701 *ET SEQ.*) AGAINST ALL DEFENDANTS

109.   The preceding paragraphs are incorporated by reference as if fully set forth herein.

110.   Pursuant to section 7701 of N.Y. C.P.L.R., a "special proceeding may be brought to determine a matter relating to any express trust."  N.Y. C.P.L.R. § 7701.

111.   As indicated above, several disputes have arisen concerning, among other things, the existence or non-existence of an Event of Default, the ability of COFINA to cure a default under the Resolution, and the time period during which any default may be cured.

112.     Pursuant to Article 77 of the N.Y. C.P.L.R., BNYM seeks entry of
judgment resolving those matters.

WHEREFORE, BNYM respectfully requests that the Court enter judgment
providing as follows:

a.     The only incurable default under section 1101.1(i) of the Resolution is the non-payment of principal, interest, or other amount due on the Bonds;

b.     As of the date this Complaint was filed, there was no Event of Default under the Resolution;

c.     Prior to April 29, 2017, when the Compliance Law was enacted, there was no default under the Resolution;

d.     The Commonwealth's enactment of the Compliance Law was a default, but not an immediate, incurable Event of Default;

e.     Section 108(b) of the Bankruptcy Code applies for purposes of calculating COFINA's "cure" period under section 1101.1(ii) of the Resolution;

f.     COFINA's cure period for a default under the Resolution expires on or about May 31, 2017, as may be extended by section 108(b) of the Bankruptcy Code;

g.     BNYM did not have a duty to act pursuant to the demands of Whitebox and the other alleged Beneficial Holders of the Senior Bonds because they are not Owners of any of the Bonds and BNYM received no direction from the Owner;

h.     BNYM did not have a duty to act pursuant to the demands of Whitebox, the other alleged Beneficial Holders of the Senior Bonds, and Ambac because they failed to offer any (let alone satisfactory) indemnification to BNYM;

i.     The automatic stay does not apply to the funds in BNYM's possession; and

j.     As a consequence of the Compliance Law and the commencement of this title III case, BNYM is authorized to (i) appoint a separate trustee for holders of the Subordinate Bonds under section 810 of the Resolution, which separate trustee shall not have to act on the direction of BNYM, and (ii) vest in such separate trustee such rights and powers as are approved by this Court.

*[The remainder of this page was intentionally left blank.]*

- 34 -

Dated:  May 16, 2017
       San Juan, Puerto Rico

Respectfully submitted,

SEPULVADO & MALDONADO, PSC

By:    /s/ *Lee Sepulvado Ramos*
       Lee Sepulvado Ramos
       USDC-PR Bar No. 211912
       252 Ave. Ponce de León, Suite 1900
       Citibank Tower San Juan, PR 00918
       Telephone:  (787) 765-5656
       Facsimile:  (787) 294-0073
       Email:  lsepulvado@smlawpr.com

REED SMITH LLP
Eric A. Schaffer (*pro hac vice*)
Luke A. Sizemore (*pro hac vice*)
225 Fifth Avenue, Suite 1200
Pittsburgh, PA 15222
Telephone:  (412) 288-3131
Facsimile:  (412) 288-3063
Email:  eschaffer@reedsmith.com
Email:  lsizemore@reedsmith.com

REED SMITH LLP
Kurt F. Gwynne (*pro hac vice*)
1201 N. Market Street, Suite 1500
Wilmington, DE 19801
Telephone:  (302) 778-7550
Facsimile:  (302) 778-7575
Email: kgwynne@reedsmith.com

*Counsel for Plaintiff The Bank of New York Mellon, as trustee*

Case: 17-03283-LTS Doc#: 4759-18 Filed: 05/16/17 Entered: 05/16/17 21:17:46 Desc:
Exhibit Page 136 of 90

**Exhibit A**

Amended and Restated Sales Tax Revenue Bond Resolution

(Attached)

# PUERTO RICO SALES TAX FINANCING CORPORATION

## AMENDED AND RESTATED
## SALES TAX REVENUE BOND RESOLUTION

Adopted on July 13, 2007
As amended on June 10, 2009

511470.30 032563 RES

# TABLE OF CONTENTS

<div align="right">Page</div>

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

| | | |
|---|---|---|
| SECTION 101. | Definitions................................................................................ | 1 |
| SECTION 102. | Authority for this Resolution ................................................... | 21 |
| SECTION 103. | Resolution to Constitute Contract........................................... | 21 |
| SECTION 104. | Special Provisions Concerning Capital Appreciation Bonds...... | 21 |

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

| | | |
|---|---|---|
| SECTION 201. | Authorization of Bonds............................................................ | 23 |
| SECTION 202. | General Provisions for Issuance of Bonds. .............................. | 23 |
| SECTION 203. | Special Provisions for Refunding Bonds. ................................. | 27 |
| SECTION 204. | Delegation of Officers and Committees. .................................. | 28 |
| SECTION 205. | Credit and Liquidity Facilities; Rights of Credit Facility Providers. ........... | 28 |
| SECTION 206. | Qualified Hedges ...................................................................... | 29 |
| SECTION 207. | Parity Obligations and Subordinate Obligations..................... | 29 |

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

| | | |
|---|---|---|
| SECTION 301. | Medium of Payment; Form and Date; Letters and Numbers. ...... | 30 |
| SECTION 302. | Legends .................................................................................... | 30 |
| SECTION 303. | Execution and Authentication. ................................................ | 30 |
| SECTION 304. | Negotiability, Transfer and Registry....................................... | 31 |
| SECTION 305. | Registration of Transfer of Bonds........................................... | 31 |
| SECTION 306. | Regulations with Respect to Exchanges and Registration of Transfers ...................... | 31 |
| SECTION 307. | Bonds Mutilated, Destroyed, Stolen or Lost............................ | 32 |
| SECTION 308. | Preparation of Definitive Bonds; Temporary Bonds. ............... | 32 |
| SECTION 309. | Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount ....................... | 33 |
| SECTION 310. | Book-Entry-Only System........................................................... | 33 |

## ARTICLE IV

## REDEMPTION OF BONDS

| | | |
|---|---|---|
| SECTION 401. | Privilege of Redemption and Redemption Price........................ | 34 |

<div align="center">i</div>

# TABLE OF CONTENTS

Page

SECTION 402.   Redemption at the Election of the Corporation ..............................................34
SECTION 403.   Redemption out of Sinking Fund Installments. ................................................34
SECTION 404.   Selection of Bonds to be Redeemed in Partial Redemption. .........................35
SECTION 405.   Notice of Redemption ......................................................................................35
SECTION 406.   Payment of Redeemed Bonds ..........................................................................36
SECTION 407.   Cancellation and Disposition of Bonds ............................................................36

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.   The Pledge. ......................................................................................................38
SECTION 502.   Establishment of Fund and Accounts. ..............................................................38
SECTION 503.   Costs of Issuance Account and Capitalized Interest Account. .........................39
SECTION 504.   Bond Proceeds Account. ..................................................................................40
SECTION 505.   Revenue Account. .............................................................................................41
SECTION 506.   Debt Service Account. ......................................................................................43
SECTION 507.   Debt Service Reserve Account. ........................................................................45
SECTION 508.   Satisfaction of Sinking Fund Installments. ......................................................47
SECTION 509.   Redemption Account; Amounts to be Deposited Therein. ...............................48
SECTION 510.   Rebate Account. ................................................................................................49

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.   Security for Deposits .........................................................................................50
SECTION 602.   Investment of Funds, Accounts and Subaccounts Held by the
               Trustee .............................................................................................................50
SECTION 603.   Valuation and Sale of Investments. ..................................................................51

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

SECTION 701.   Payment of Obligations; Pledged Sales Tax Base Amount ...........................53
SECTION 702.   Extension of Payment of Bonds ........................................................................53
SECTION 703.   Offices for Servicing Bonds .............................................................................53
SECTION 704.   Further Assurance .............................................................................................53
SECTION 705.   Power to Issue Bonds and Pledge Funds and Accounts ..................................54
SECTION 706.   Agreement of the Commonwealth. ...................................................................54
SECTION 707.   Creation of Liens ..............................................................................................54
SECTION 708.   Accounts and Reports. ......................................................................................55

ii

# TABLE OF CONTENTS

Page

SECTION 709.  Tax Matters. ..................................................................................55
SECTION 710.  Issuance of Additional Bonds; Incurrence of Additional Parity
              Obligations and Subordinate Obligations; Payment of Obligations. ..........56
SECTION 711.  General. ..........................................................................................59

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.  Trustee Appointment and Acceptance of Duties ..........................60
SECTION 802.  Responsibilities of Trustee ..........................................................60
SECTION 803.  Evidence on Which Trustee May Act. .........................................61
SECTION 804.  Compensation and Indemnification ..............................................61
SECTION 805.  Certain Permitted Acts ...............................................................62
SECTION 806.  Resignation of Trustee ................................................................62
SECTION 807.  Removal of Trustee .....................................................................63
SECTION 808.  Appointment of Successor Trustee. .............................................63
SECTION 809.  Transfer of Rights and Property to Successor Trustee..................64
SECTION 810.  Appointment of Co-Trustee. ........................................................64
SECTION 811.  Merger or Consolidation .............................................................65
SECTION 812.  Adoption of Authentication .........................................................65
SECTION 813.  Accounting by Trustee; Nonpetition Covenant ...........................66

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.  Supplemental Resolutions Effective upon Filing with the Trustee .............67
SECTION 902.  Supplemental Resolutions Effective upon Consent of Trustee....................68
SECTION 903.  Supplemental Resolutions Effective with Consent of Bondowners .............68
SECTION 904.  General Provisions. ......................................................................68

## ARTICLE X

## AMENDMENTS

SECTION 1001.  Mailing and Publication. ............................................................70
SECTION 1002.  Powers of Amendment. ..............................................................70
SECTION 1003.  Consent of Bondowners .............................................................71
SECTION 1004.  Modifications by Unanimous Consent.........................................71
SECTION 1005.  Modification Before Bonds Outstanding .....................................71
SECTION 1006.  Exclusion of Bonds ....................................................................72
SECTION 1007.  Notation on Bonds ......................................................................72

iii

**TABLE OF CONTENTS**

## ARTICLE XI

## DEFAULTS AND REMEDIES

| | | |
|---|---|---|
| SECTION 1101. | Events of Default. | 73 |
| SECTION 1102. | Remedies. | 73 |
| SECTION 1103. | Priority of Payments After Event of Default. | 75 |
| SECTION 1104. | Termination of Proceedings | 76 |
| SECTION 1105. | Bondowners' Direction of Proceedings | 76 |
| SECTION 1106. | Limitation on Rights of Bondowners | 76 |
| SECTION 1107. | Possession of Bonds by Trustee Not Required | 77 |
| SECTION 1108. | Remedies Not Exclusive | 77 |
| SECTION 1109. | No Waiver of Default | 78 |
| SECTION 1110. | Notice of Event of Default | 78 |

## ARTICLE XII

## MISCELLANEOUS

| | | |
|---|---|---|
| SECTION 1201. | Defeasance. | 79 |
| SECTION 1202. | Evidence of Signatures of Bondowners and Owners of Bonds. | 81 |
| SECTION 1203. | Moneys Held for Particular Bonds | 82 |
| SECTION 1204. | Preservation and Inspection of Documents | 82 |
| SECTION 1205. | Parties Interested Herein | 82 |
| SECTION 1206. | No Personal Liability | 82 |
| SECTION 1207. | Successors and Assigns | 82 |
| SECTION 1208. | Severability of Invalid Provisions | 82 |
| SECTION 1209. | Headings | 82 |
| SECTION 1210. | Conflict | 83 |
| SECTION 1211. | Governing Law | 83 |
| SECTION 1212. | Effective Date | 83 |

iv

## SALES TAX REVENUE BOND RESOLUTION

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation, as follows:

### ARTICLE I

### DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101. Definitions. The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior

Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the

-2-

related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the

-3-

Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Proceeds Account** shall mean the Account by that name established by Section 502.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital

-4-

Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity, in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Commonwealth Sales Tax** shall mean the sales and use tax enacted by the Legislative Assembly of Puerto Rico by virtue of Act No. 117 of the Legislature of Puerto Rico, approved July 4, 2006, as amended.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at

which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act..

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to Section 502.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which

shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

    (i)    Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)    certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

-8-

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Holding Subaccount** means each Account by that name established in a Debt Service Account pursuant to Section 502.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)    Defeasance Obligations;

(ii)   Defeased Municipal Obligations;

(iii)  public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)  direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)   direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)  prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii) shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or

any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii) bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)   repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)   investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)   any other obligations conforming to any Corporation guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

-12-

(i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)     Bonds deemed to have been paid as provided in Section 1201;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in this Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

-13-

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.      All Revenues.

2.      All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3.      The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1201 and 1203.

4.      Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.      Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

-14-

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount**, means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 508) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be

-15-

based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by Section 502.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Series Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 203 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

511470.30 032563 RES

**Resolution** shall mean this Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of Section 710 or other purposes of the Resolution.

    3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

    4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution, subject to the provisions of Sections 1201 and 1203.

    5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee  in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee  under the terms of the Resolution, including any  available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Secretary** means, for purposes of the Resolution and so long as Bonds shall be Outstanding, the Secretary of the Board of Directors of Government Development Bank for Puerto Rico, who shall also act as Secretary of the Board of Directors of the Corporation and as Secretary under this Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee, in the form appended hereto as Appendix A.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amount, interest rate or other provisions.

511470.30 032563 RES

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with Article IX.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

511470.30 032563 RES

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

SECTION 102. Authority for this Resolution. This Resolution is adopted pursuant to the authority conferred on the Corporation by the Act.

SECTION 103. Resolution to Constitute Contract. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, the Resolution shall be deemed to be and shall constitute a contract among the Corporation, the Owners from time to time of the Bonds, and all other Beneficiaries; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and all other Beneficiaries, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and such Beneficiaries over any other thereof, except as expressly otherwise provided in or permitted by the Resolution.

SECTION 104. Special Provisions Concerning Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1. For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2. For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended redemption.

3. For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended exchange or substitution.

4. For purposes of Section 406, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount.

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended application of the subject assets.

6. For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the most recent Compounding Date.

7. For purposes of Section 1201, the principal amount of any Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

511470.30 032563 RES

# ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201. Authorization of Bonds. There is hereby created and established an issue of Bonds of the Corporation to be designated as "Sales Tax Revenue Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in the Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by the Resolution, in the manner and to the extent provided herein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property and other funds and assets of or available to the Corporation and pledged therefor, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202. General Provisions for Issuance of Bonds.

1. The Bonds may, if and when authorized by the Corporation pursuant to one or more Series Resolutions, be issued in one or more Series, as Senior Bonds or one or more Classes of Subordinate Bonds, and the designation thereof, in addition to the name "Sales Tax Revenue Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the Corporation may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, Taxable Bonds or Tax Exempt Bonds or any combination of the foregoing, which in each case may be Serial Bonds or Term Bonds, or any combination thereof. Any Bonds that are to be issued as Subordinate Bonds may be issued with priorities of payment hereunder among all such Subordinate Bonds, as set forth in the related Series Resolutions.

2. Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

        (i)     the authorized principal amount and designation of such Series of Bonds;

        (ii)    the purpose or purposes for which such Series of Bonds is being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of the Resolution: (a) to provide sufficient

-23-

511470.30 032563 RES

funds for the Project; (b) to refund or otherwise prepay any Bonds or other bonds, notes or other evidences of indebtedness issued by the Corporation for the Project; (c) to pay or provide for the payment of Financing Costs, including but not limited to Costs of Issuance; and/or (d) for such other purposes or projects as may be authorized by the Act, as the same may be amended and then in effect.

(iii)     the date or dates, maturity date or dates (which for all Bonds issued after the date of issuance of Bonds designated "Series 2008A", shall be on August 1 in the related year) and amounts of each maturity of the Bonds of such Series;

(iv)     the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, original issue discount and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which the rate at which Adjustable Rate Bonds of such Series bear interest shall be adjusted;

(v)     the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds (including Convertible Capital Appreciation Bonds), Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender bonds, Taxable Bonds or Tax Exempt Bonds;

(vi)     the designation of Bonds of such Series as Senior Bonds or as one or more Classes of Subordinate Bonds and the designation of Beneficiaries;

(vii)     the Record Date, if any, for such Bonds;

(viii)     the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)     if so determined by the Corporation, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)     the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)     the Redemption Price or Prices, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), provided that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this subsection shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

511470.30 032563 RES

(xii)　the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series (which date for all Bonds issued after the date of issuance of Bonds designated "Series 2008A" shall be on August 1 in the related year);

(xiii)　the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)　the amount, if any, or method of determining such amount, to be credited to the Costs of Issuance Account or otherwise to be paid for Costs of Issuance;

(xv)　if so determined by the Corporation, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)　if so determined by the Corporation, provisions for the sale of the Bonds of such Series;

(xvii)　provisions for the execution and authentication of the Bonds of such Series;

(xviii)　the forms of the Bonds of such Series and of the Trustee 's certificate of authentication;

(xix)　if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Contractual Maximum Interest Rate for such Bonds and the provisions, if any, as to the calculation or change of Adjustable Rates;

(xx)　if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof;

(xxi)　if so determined by the Corporation, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series reflecting the addition of resources to Revenues or Pledged Property;

(xxii)　if so determined with respect to the Bonds of such Series, that Section 709 shall not apply to such Bonds;

(xxiii)　deposits into Funds, Accounts and Subaccounts as may be required or permitted by the Resolution and not otherwise provided for above;

-25-

(xxiv) if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxv) if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined; and

(xxvi) any other provisions deemed advisable by the Corporation, not in conflict with the provisions of the Resolution or the Act as each is then in effect.

3.      Each Series of Bonds shall be executed by the Corporation for issuance under the Resolution and delivered to the Trustee and thereupon shall be authenticated by the Trustee and delivered to the Corporation or upon its order, but only upon satisfaction with the conditions to issuance of additional Bonds contained in Section 710 and only upon the receipt by the Trustee of:

(i)      a copy of the Resolution, certified by an Authorized Officer of the Corporation or the Secretary;

(ii)     an Opinion of Bond Counsel to the effect that (A) the Corporation has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the Corporation, is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid pledge for the benefit of the Owners of the Bonds which it purports to create of the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special obligations of the Corporation as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)    a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the Corporation;

-26-

(iv)    a copy of the Series Resolution authorizing such Series, certified by an Authorized Officer of the Corporation or the Secretary;

(v)    a certificate of an Authorized Officer of the Corporation as to deposits in Accounts and stating that the Corporation is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the Corporation;

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution or Supplemental Resolution adopted pursuant to Article IX.

4.    Each Series of Bonds shall be issued upon compliance with Section 710.

SECTION 203.  Special Provisions for Refunding Bonds.

1.    Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, including for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.    The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee only upon receipt by the Trustee (in addition to the requirements of Section 202) of:

(i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication, irrevocable instructions to the Trustee, to provide notice in the manner provided in Section 1201 with respect to the payment of such Bonds pursuant to such Section 1201;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of subsection 2 of Section 1201, which moneys and Defeasance Securities shall be held in trust and used only as provided in subsection 2 of Section 1201; and

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in

-27-

paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

3.      Refunding Bonds may be issued only upon compliance with Section 710.

SECTION 204.  Delegation of Officers and Committees.

A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer or committee of the Corporation, and any such committee may delegate to an Authorized Officer of the Corporation, the power to issue Bonds from time to time and to fix the details of any such Bonds by an appropriate certificate of such Authorized Officer.  Any such action by an Authorized Officer of the Corporation shall be in writing.  Each such action by an Authorized Officer or committee of the Corporation with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 205.  Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1.      In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2.      Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

511470.30 032563 RES

SECTION 206. <u>Qualified Hedges</u>. The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

SECTION 207. <u>Parity Obligations and Subordinate Obligations</u>. For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

## ARTICLE III

### GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.  Medium of Payment; Form and Date; Letters and Numbers.

1.    The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the applicable Series Resolution.

2.    The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.    Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.    Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.    If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of any Series authorized to be issued by such Supplemental Resolution may be evidenced in book entry form without definitive certificates delivered to each beneficial owner thereof.

SECTION 302.  Legends.  The Bonds of each Series in the form set forth in any Supplemental Resolution may also contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the Corporation prior to the authentication and delivery thereof.

SECTION 303.  Execution and Authentication.

1.    The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer of the Corporation and its corporate seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary.  In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Trustee, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.  Any Bond of a Series may be signed and sealed on behalf of the Corporation by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the Corporation, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

-30-

2.      The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Trustee.  Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee.  Such certificate of the Trustee  upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Resolution and that the Owner thereof is entitled to the benefits of the Resolution.

SECTION 304.  Negotiability, Transfer and Registry.  All Bonds issued under the Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in the Resolution and in the Bonds.  So long as any of the Bonds shall remain outstanding, the Corporation shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds;  and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or registration of transfer.  So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305.  Registration of Transfer of Bonds.

1.      The transfer of each Bond shall be registrable only upon the books of the Corporation, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney.  Upon the registration of transfer of any such Bond the Corporation shall issue in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2.      The Corporation and the Trustee  may deem and treat the person in whose name any Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary.  The Corporation agrees to indemnify and hold the Trustee harmless against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under the Resolution, in so treating such Owner.

SECTION 306.  Regulations with Respect to Exchanges and Registration of Transfers.  In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of the Resolution.  All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Trustee.  For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the Corporation

511470.30 032563 RES

or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in the Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the Corporation nor the Trustee shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307. Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, stolen or lost and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and Trustee may incur. All Bonds so surrendered to the Trustee shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the Corporation, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under the Resolution, in any moneys or securities held by the Corporation or the Trustee for the benefit of the Bondowners.

SECTION 308. Preparation of Definitive Bonds; Temporary Bonds.

1. Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 303, and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as an Authorized Officer of the Corporation may deem appropriate to temporary Bonds. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Resolution.

2.    All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

SECTION 309.  Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.  The Corporation shall file with the Trustee promptly at the end of each Bond Year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on Outstanding Bonds as of the end of such Bond Year, and (ii) such other specific information relating to such original issue discount as, in the judgment of the Trustee, may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

SECTION 310.  Book-Entry-Only System.  Notwithstanding any other provision of the Resolution, the Corporation may employ a book-entry-only system of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and/or the book-entry-only system depository.  Any provisions of the Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

## ARTICLE IV

### REDEMPTION OF BONDS

SECTION 401. <u>Privilege of Redemption and Redemption Price</u>. Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Resolution authorizing such Series.

SECTION 402. <u>Redemption at the Election of the Corporation</u>. In the case of any redemption of Bonds otherwise than as provided in Section 403, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

SECTION 403. <u>Redemption out of Sinking Fund Installments</u>.

1.     In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2.     In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 508) and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice

-34-

shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

3.    The Corporation shall, and hereby covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.  Selection of Bonds to be Redeemed in Partial Redemption.

1.    In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the Corporation shall designate the maturities of the Bonds to be redeemed.

2.    If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed.  For purposes of this Section 404, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.  Notice of Redemption.  When the Trustee shall receive notice from the Corporation of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Trustee shall give notice, in the name of the Corporation, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such notice is conditional and the conditions that must be satisfied.  Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond or portion thereof to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date, in the Currency in which the Bonds of such Series are payable, and that from and after such date interest thereon shall cease to accrue and be payable on the Bonds or portions thereof to be redeemed, unless, in the case of any conditional notice, such conditions are not satisfied.  The Trustee shall mail a copy of such notice, postage prepaid, no less than sixteen (16) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books.  Failure

-35-

so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Trustee of moneys sufficient to pay the Redemption Price of such Bonds, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such recission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

SECTION 406. Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not occur on account of a condition stated in the notice to the Trustee pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the Corporation shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds or portions thereof of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds or portions thereof of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407. Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Trustee, in accordance with the Trustee's standard procedures, and upon request from the Corporation the Trustee shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of,

511470.30 032563 RES

and one executed certificate shall be delivered to the Corporation and the other executed certificate shall be retained by the Trustee.

511470.30 032563 RES

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.  The Pledge.

1.     The Pledged Property, subject to Section 804, is hereby pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution, and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.  Nothing contained herein shall prevent (i) a Credit Facility, Liquidity Facility or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to this Article V with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

2.     To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.  Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

SECTION 502.  Establishment of Fund and Accounts.

1.     The "Project Fund" is hereby created and the following special Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall be held by the Trustee:

(1)     Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

(2)     Capitalized Interest Account,

(3)     Bond Proceeds Account,

(4)     Revenue Account,

-38-

(5)     Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

(6)     Debt Service Reserve Account, established for each Class of Bonds,

(7)     Redemption Account, and

(8)     Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

2.     The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.     Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

SECTION 503.  Costs of Issuance Account and Capitalized Interest Account.

1.     If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Persons as directed in writing to the Trustee by the Corporation.

2.     There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth in paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

3.     If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in

accordance with the requirements of the Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

4.    Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)    setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

5.    Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in subsection 6 of this Section.

6.    The Trustee shall deposit any funds described in subsection 5 of this Section in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

7.    In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 504.  Bond Proceeds Account.

1.    There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to this Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

-40-

2.     Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to provide for the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

3.     The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

4.     Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

SECTION 505.  Revenue Account.

1.     All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose.  All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts.  In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited.  Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America

-41-

Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto capitalized interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written

direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2. Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

3. Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

SECTION 506. Debt Service Account.

1. There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

2. There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account pursuant to Section 503 for the payment of interest on the Bonds of such Series.

(iii) Amounts transferred from the Debt Service Reserve Account pursuant to Section 507 for the payment of interest on the Bonds and the interest component of Parity Obligations.

3. There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

-43-

(i)     Amounts transferred from a Debt Service Reserve Account pursuant to Section 507 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account pursuant to Section 511 for the payment of Principal Installments of any Bonds.

4.      The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of subsection 2 of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.      The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee ; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of subsection 3 of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee, according to the amounts due on such date, without any discrimination or preference.

6.      In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

7.      There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to

-44-

be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

SECTION 507. Debt Service Reserve Account.

1.      At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

2.      Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

3.      Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

4.      Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.      If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized

-45-

Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

6. Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

7. Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this subsection. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to subsection 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section.

8.    Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

SECTION 508.  Satisfaction of Sinking Fund Installments.

1.    Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)    to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or

(ii)    to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2.    Upon the purchase or redemption of any Bond pursuant to subsection 1 of this Section, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited  against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. · Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee  a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.    In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee  in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall

511470.30 032563 RES

deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4.    In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5.    The Trustee shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in Section 403.

SECTION 509.  Redemption Account; Amounts to be Deposited Therein.

1.    The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)    amounts determined pursuant to subsection 6 of Section 503;

(ii)    amounts determined pursuant to subsection 4 of Section 504;

(iii)    amounts determined pursuant to subsection 2 of Section 505; and

(iv)    amounts transferred from the Debt Service Reserve Accounts pursuant to Section 507 for the payment of the Redemption Price of Bonds.

2.    Subject to the limitations contained in subsection 4 of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall

-48-

transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

3. To the extent not required to make up a deficiency as required in subsection 2 of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to subsection 1 of Section 505.

4. The transfers required by subsection 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 510. Rebate Account.

1. The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

2. The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

3. The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

4. The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

511470.30 032563 RES

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601. <u>Security for Deposits</u>. All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Trustee; provided, however, that it shall not be necessary, unless required by applicable law, for the Trustee to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Trustee to give security for any moneys which shall be represented by obligations purchased under the provisions of the Resolution as an investment of such moneys. The Trustee shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602. <u>Investment of Funds, Accounts and Subaccounts Held by the Trustee.</u>

1. Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2. Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

3. Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or

-50-

Subaccount but, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account, and if not required to be so deposited in the Rebate Account because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

4.     The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

5.     Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

6.     In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

SECTION 603. Valuation and Sale of Investments.

1.     In computing the amounts in the Revenue Account, Debt Service Accounts, Debt Service Reserve Accounts and Rebate Account obligations purchased as an investment of moneys therein shall be valued at Amortized Value. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

511470.30 032563 RES

2.     Neither the Trustee nor the Corporation shall be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article; provided, however, that nothing in this subsection shall affect the obligation of the Corporation under any of the Bonds.

511470.30 032563 RES

# ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

The Corporation covenants and agrees with the Trustee and the Bondowners as follows:

SECTION 701. <u>Payment of Obligations; Pledged Sales Tax Base Amount</u>. The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 5 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

SECTION 702. <u>Extension of Payment of Bonds</u>. The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the Corporation (i) to issue Option Bonds or Refunding Bonds as provided in herein and such issuance shall not be deemed to constitute an extension of maturity of Bonds or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703. <u>Offices for Servicing Bonds</u>. The Trustee shall at all times maintain one or more offices or agencies where Bonds may be presented for payment, registration of transfer or exchange, and where notices, demands and other documents may be served upon the Corporation in respect of the Bonds or of the Resolution. The Corporation hereby appoints the Trustee as its agent to maintain such offices or agencies.

SECTION 704. <u>Further Assurance</u>. At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other

-53-

moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705. Power to Issue Bonds and Pledge Funds and Accounts. The Corporation is duly authorized under all applicable laws to create and issue the Bonds and to adopt the Resolution and to pledge the Pledged Property purported to be pledged by the Resolution in the manner and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever.

SECTION 706. Agreement of the Commonwealth.

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2

-54-

and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

SECTION 707. Creation of Liens. Until the pledge created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1201, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under this Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under this Resolution.

SECTION 708. Accounts and Reports.

1.     The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee (it being understood that the Trustee shall have no duty so to inspect) and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing.

2.     The Corporation shall file with the Trustee  and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying such Event of Default or other event as described in this subsection, and specifying the nature and status of such Event of Default or other such event.

SECTION 709. Tax Matters.

1.     The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

2.     The Corporation will not make, or give its consent to the Trustee  or any other Person, to make, any use of the proceeds of the Bonds or of any moneys which may be

-55-

511470.30 032563 RES

deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

        3.      The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Tax Exempt Bonds shall be excluded from gross income for Federal income tax purposes.

        4.      Notwithstanding any other provision of this Resolution, including in particular Section 1201 hereof, the obligation to comply with the requirements of this Section 709 shall survive the defeasance or payment in full of the Bonds.

        SECTION 710.  Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations.

        1.      No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

        (1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and

511470.30 032563 RES

Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.    No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt

-57-

service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

> *Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

> *Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second

Subordinate Bonds and Second Subordinate Obligations and such additional Second Subordinate Bonds or Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2.     In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by Section 505.1 which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget.  Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act.  Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3.     The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

SECTION 711.  General.

1.     The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

2.     Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

# ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801. <u>Trustee Appointment and Acceptance of Duties</u>. The Bank of New York Mellon is hereby appointed as Trustee under the Resolution. The Trustee shall signify its acceptance of the duties and obligations imposed upon it by the Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Trustee shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in the Resolution.

SECTION 802. <u>Responsibilities of Trustee</u>. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by this Resolution, the feasibility of the Project, the compliance by the Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any

-60-

error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VIII.

SECTION 803. Evidence on Which Trustee May Act.

1. The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

2. Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3. Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

SECTION 804. Compensation and Indemnification. The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the

-61-

compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

SECTION 805. <u>Certain Permitted Acts</u>. The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806. <u>Resignation of Trustee</u>. The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in

Section 808, in which event such resignation shall take effect immediately on the appointment of such successor.

SECTION 807.  Removal of Trustee.  The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

SECTION 808.  Appointment of Successor Trustee.

1.      In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section.  The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books.  Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

2.      If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee  shall have given to the Corporation written notice as provided in Section 807 or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under Section 808, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee.  Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee  shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

-63-

SECTION 809.  Transfer of Rights and Property to Successor Trustee.

Any successor Trustee appointed under the Resolution shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee; but the Trustee  ceasing to act shall nevertheless, on the written request of the Corporation, or of the successor Trustee, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under the Resolution, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth but subject to Section 804.  Should any deed, conveyance or instrument in writing from the Corporation be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

SECTION 810.  Appointment of Co-Trustee.

(a)  Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable (including title to the Pledged Property or any part thereof).  Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Trustee shall, at the expense of the Corporation, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b)  Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)  all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such

-64-

rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

        (ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

        (iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

        (c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Resolution and the conditions of this Section 810. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

        (d)    Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without appointment of a new or successor trustee.

        SECTION 811.  <u>Merger or Consolidation</u>.  Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by the Resolution, shall be the successor to the Trustee without the execution or filing of any paper or the performance of any further act.

        SECTION 812.  <u>Adoption of Authentication</u>.  In case any of the Bonds contemplated to be issued under the Resolution shall have been authenticated but not delivered, any successor Trustee may adopt the certificate of authentication of any predecessor Trustee so authenticating such Bonds and deliver such Bonds so authenticated; and in case any of the said Bonds shall not have been authenticated, any successor Trustee may authenticate such Bonds in the name of the predecessor Trustee, or in the name of the successor Trustee, and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in the Resolution provided that the certificate of authentication of the Trustee shall have.

SECTION 813. <u>Accounting by Trustee; Nonpetition Covenant</u>. The Trustee shall, upon receipt of a written request therefor from the Corporation, provide to the Corporation an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under the Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Trustee shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the Corporation to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Corporation under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Corporation or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Corporation.

511470.30 032563 RES

## ARTICLE IX

### SUPPLEMENTAL RESOLUTIONS

SECTION 901. Supplemental Resolutions Effective upon Filing with the Trustee. For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

1. to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

2. to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

3. to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

4. to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

5. to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

6. to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

7. to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

8. to cure any ambiguity, defect or inconsistent provision in the Resolution;

9. to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

10. to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

11.     as permitted by Section 1005;

12.     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and not contrary to or inconsistent with the Resolution as theretofore in effect; or

13.     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902. Reserved.

SECTION 903. Supplemental Resolutions Effective with Consent of Bondowners. At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 904. General Provisions.

1.     The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

2.     Any Supplemental Resolution referred to and permitted or authorized by Sections 901 and 902 may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms. After any Supplemental Resolution becomes effective under this Article, the Corporation shall mail to the Owners a notice briefly describing such Supplemental Resolution; provided, however, the failure to give such notice , or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.     The Trustee is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901, 902 or 903

511470.30 032563 RES

and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

4.    No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

511470.30 032563 RES

# ARTICLE X

## AMENDMENTS

SECTION 1001. <u>Mailing and Publication</u>.

1.      Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2.      In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002. <u>Powers of Amendment</u>.  Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

511470.30 032563 RES

SECTION 1003. Consent of Bondowners. The Corporation may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 903, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Trustee ) together with a request to Bondowners for their consent thereto in form satisfactory to the Trustee, shall be mailed by the Corporation to Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Trustee (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002 and (b) an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the Corporation. Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee hereinafter in this Section provided for is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Trustee shall make and file with the Corporation a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the Corporation by mailing such notice to Bondowners. The Corporation shall file with the Trustee proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Trustee, shall be proof of the matters therein stated.

SECTION 1004. Modifications by Unanimous Consent. The terms and provisions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the Corporation with the Trustee of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005. Modification Before Bonds Outstanding. Prior to the issuance and delivery of the first Series of Bonds under the Resolution, the terms and conditions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

-71-

SECTION 1006. <u>Exclusion of Bonds</u>. Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

SECTION 1007. <u>Notation on Bonds</u>. Bonds authenticated and delivered after the effective date of any action taken as in Article IX or this Article provided may, and, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action. If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

511470.30 032563 RES

## ARTICLE XI

## DEFAULTS AND REMEDIES

SECTION 1101. Events of Default.

1.      Each of the following events shall constitute an Event of Default under the Resolution:

(i)      There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)      There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of this Resolution, and all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

2.      In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

SECTION 1102. Remedies.

1.      Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, declare

511470.30 032563 RES

the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i)     by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii)   by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.     In the enforcement of any remedy under the Resolution, but subject to Sections 201, 501 and 1206, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

511470.30 032563 RES

## SECTION 1103.  Priority of Payments After Event of Default.

1.   Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee  and its agents and attorneys necessary in the opinion of the Trustee  to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee  shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH of this subsection 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an

-75-

insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

2. The provisions of this Section are in all respects subject to the provisions of Section 702.

3. Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Compounded Amount, if any) to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

SECTION 1104. Termination of Proceedings. In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

SECTION 1105. Bondowners' Direction of Proceedings. Anything in this Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

SECTION 1106. Limitation on Rights of Bondowners.

1. No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the

-76-

right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or the Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2. Anything to the contrary contained in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. <u>Possession of Bonds by Trustee Not Required</u>. All rights of action under this Resolution or under any of the Bonds, enforceable by the Trustee, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. <u>Remedies Not Exclusive</u>. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

511470.30 032563 RES

SECTION 1109. <u>No Waiver of Default</u>. No delay or omission of the Trustee, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110. <u>Notice of Event of Default</u>. The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

# ARTICLE XII

# MISCELLANEOUS

SECTION 1201. Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section.  Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Series Resolution.  The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied.  In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.     Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in subsection 12of this Section.  Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in subsection 1 of this Section 1201 if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee  either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee  at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit

required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

4. Neither Defeasance Securities nor moneys deposited with the Trustee pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under this Section 1201.

5. For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of this Section, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of this Section, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

511470.30 032563 RES

6.     Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of this Section, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this subsection 4. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

7.     Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds.

1.     Any request, consent, revocation of consent or other instrument which the Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing.  The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such

-81-

a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2. The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3. Any request or consent by the Owner of any Bond shall bind all future Owners of such Bonds in respect of anything done or suffered to be done by the Corporation or the Trustee in accordance therewith.

SECTION 1203. Moneys Held for Particular Bonds. The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1204. Preservation and Inspection of Documents. All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1205. Parties Interested Herein. Nothing in the Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person or corporation, other than the Corporation, the Trustee, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of the Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in the Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Beneficiaries and the Owners of the Bonds.

SECTION 1206. No Personal Liability. Neither the members of the Corporation nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1207. Successors and Assigns. Whenever in the Resolution the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Resolution contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1208. Severability of Invalid Provisions. If any one or more of the covenants or agreements provided in the Resolution on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of the Resolution.

SECTION 1209. Headings. The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

511470.30 032563 RES

SECTION 1210. Conflict. All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1211. Governing Law. This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution and the provisions of Section 601 (and the "applicable law" referred to in such Section 601 shall not include the laws of the Commonwealth) shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1212. Notices. Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

To the Trustee:

The Bank of New York Mellon
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Phone: 212-815-6955
Fax: 212-815-5595/5596

To the Corporation:

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Phone: 787-722-2525
Fax: 787-728-0975

SECTION 1213. Effective Date. This Resolution shall take effect immediately upon its adoption.

511470.30 032563 RES

EXHIBIT A

## SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of July 31, 2007, is by and between the Puerto Rico Sales Tax Financing Corporation (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Sales Tax Revenue Bonds of the Debtor (the "Sales Tax Revenue Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on July 13, 2007, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as trustee under the Resolution (the "Secured Party").

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Sales Tax Revenue Bonds and payment to Beneficiaries in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the funds and accounts maintained by the Secretary of the Treasury, as paying agent, as the first repository for all Dedicated Sales Tax received from merchants and retailers and authorized collectors until deposited into the COFINA Project Fund (and all accounts therein) maintained under the Resolution, (ii) all amounts on deposit in the COFINA Project Fund (and all accounts therein) maintained under the Resolution, and all amounts required to be on deposit therein by the terms of the Resolution, and (iii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Sales Tax Revenue Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Sales Tax Revenue Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

PUERTO RICO SALES TAX FINANCING CORPORATION

By _____

    Name and Title:

THE BANK OF NEW YORK, as Trustee under the Resolution

By _____

    Name and Title:

511470.30 032563 RES

Case:17-00133-LTS Doc#:159-2 Filed:05/16/17 Entered:05/16/17 21:17:46 Desc:
Exhibit Page 1 of 9

**Exhibit B**

Letter from BNYM to COFINA, dated May 1, 2017

(Attached)



BNY MELLON

The Bank of New York Mellon

May 1, 2017

*By UPS Overnight Mail*

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sanchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director

Puerto Rico Sales Tax Financing Corporation
PO Box 42001
San Juan, PR 00940-2001
Attention: Executive Director

**Re:** **Amended and Restated Sales Tax Bond Resolution (as amended and supplemented from time to time, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA")**

Ladies and Gentlemen:

The Bank of New York Mellon (the "Trustee") is the trustee under the Resolution, pursuant to which COFINA issued certain senior and subordinate sales tax revenue bonds (the "Bonds"). Capitalized terms used but not defined in this notice have the meanings given in the Resolution.

On April 29, 2017, the Governor of the Commonwealth of Puerto Rico (the "Commonwealth") signed into law Act No. 24 (SB 432/HB 938) (the "Act"). The Act authorizes the Governor, among other things, to utilize the Pledged Property to cover deficiencies in the Commonwealth's cash flow or to comply with the Commonwealth's Fiscal Plan upon the submission of a sworn certification to the legislature establishing the need, the term, and the amount of funds to be utilized. In so doing, the Act undermines the pledge of the Pledged Property to the Trustee.

Pursuant to section 705 of the Resolution, COFINA agreed to defend, preserve, and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries, and the Bondowners under the Resolution against all claims and demands. Consistent with that agreement and the Trustee's right to further assurances under section 704 of the Resolution, the Trustee hereby demands that COFINA respond to this letter by May 3, 2017, setting forth in detail the actions that COFINA will take to defend, preserve, and protect the pledge of the Pledged Property against the Commonwealth's claim to the Pledged Property under the Act and any effort by the Governor to utilize the Pledged Property pursuant to the Act. Unless the Trustee receives a timely response, the Trustee will take such action as it deems appropriate.

COFINA's response also should address the issues raised in the Trustee's letter, dated April 21, 2017, demanding (i) indemnification in connection with the litigation captioned, *Whitebox Multi-Strategy Partners, L.P., et al. v. Bank of New York Mellon Corporation*, Index No. 651969/2017, pending in the Supreme Court of the State of New York, and (ii) further assurances that COFINA will comply with its obligations under section 705 of the Resolution.

The Trustee reserves all of its rights and remedies under the Resolution and related documents, all of which remain in full force and effect in accordance with their original terms. Nothing herein shall constitute a waiver, modification, or release of any breach, default, or Event of Default, whether existing or hereafter arising, or any of the Trustee's right and remedies relating thereto.

Questions concerning this notice may be directed to the Trustee by contacting Mr. Alex Chang at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286, by email at alex.chang@bnymellon.com, or by telephone at (212) 815-2816.

THE BANK OF NEW YORK MELLON,
as trustee

By: _____
Alex T. Chang
Vice President

cc: Eric A. Schaffer (by email only to eschaffer@reedsmith.com)
Lee Sepulvado (by email only to lsepulvado@smlawpr.com)
Robert N.H. Christmas (by email only to rchristmas@nixonpeabody.com)
Chris Mason (by email only to cmason@nixonpeabody.com)
Susheel Kirpalani (by email only to susheelkirpalani@quinnemanuel.com)
Daniel A. Fliman (by email only to dfliman@kasowitz.com)
Amy Caton (by email only to acaton@kramerlevin.com)
Thomas Moers Mayer (by email only to tmayer@kramerlevin.com)
William P. Smith (by email only to wsmith@mwe.com)
John K. Cunningham (by email only to jcunningham@whitecase.com)
Dennis F. Dunne (by email only to ddunne@milbank.com)
Marcia L. Goldstein (by email only to marcia.goldstein@weil.com)
Mark C. Ellenberg (by email only to mark.ellenberg@cwt.com)
Martin A. Sosland (by email only to martin.sosland@butlersnow.com)
Martin J. Bienenstock (by email only to mbienenstock@proskauer.com)

**Exhibit C**

Letter from BNYM to FAFAA, dated May 1, 2017

(Attached)



The Bank of New York Mellon

May 1, 2017

**By UPS Overnight Mail**

Puerto Rico Fiscal Agency and
Financial Advisory Authority
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention:  Executive Director

**Re:**   **Amended and Restated Sales Tax Bond Resolution (as amended and supplemented
from time to time, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico
Sales Tax Financing Corporation ("COFINA")**

Ladies and Gentlemen:

The Bank of New York Mellon (the "Trustee") is the trustee under the Resolution, pursuant to
which COFINA issued certain senior and subordinate sales tax revenue bonds (the "Bonds").
Capitalized terms used but not defined in this notice have the meanings given in the Resolution.

On April 29, 2017, the Governor of the Commonwealth of Puerto Rico (the "Commonwealth")
signed into law Act No. 24 (SB 432/HB 938) (the "Act").[1]  The Act authorizes the Governor,
among other things, to utilize the Pledged Property to cover deficiencies in the Commonwealth's
cash flow or to comply with the Commonwealth's Fiscal Plan upon the submission of a sworn
certification to the legislature establishing the need, the term, and the amount of funds to be
utilized.  In so doing, the Act undermines the pledge of the Pledged Property to the Trustee.

Pursuant to section 706 of the Resolution, the Commonwealth may not limit or restrict the rights
that are granted by COFINA's enabling legislation or COFINA's ability to meet its obligations to
Bondowners. As written, the Act appears to contravene this section.  The Trustee requests that
the Commonwealth respond to this letter by May 3, 2017, setting forth (a) if the Commonwealth
disagrees that the Act contravenes section 706, a complete explanation of the basis for any
disagreement, or (b) if the Commonwealth acknowledges the existence of a default, what
specific actions the Commonwealth is taking to cure the default.  Unless the Trustee receives a
timely response, the Trustee will take such action as it deems appropriate.

Separately, pursuant to section 705 of the Resolution, COFINA agreed to defend, preserve, and
protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries, and
the Bondowners under the Resolution against all claims and demands.  Does the Act implicate
COFINA's obligation to defend, preserve, and protect the pledge of the Pledged Property against

---

[1]  The Trustee requests a copy of the official English translation of the Act.

the Commonwealth's claim to the Pledged Property under the Act and any effort by the Governor to utilize the Pledged Property pursuant to the Act?

The Trustee reserves all of its rights and remedies under the Resolution and related documents, all of which remain in full force and effect in accordance with their original terms. Nothing herein shall constitute a waiver, modification, or release of any breach, default, or Event of Default, whether existing or hereafter arising, or any of the Trustee's rights and remedies relating thereto.

Questions concerning this notice may be directed to the Trustee by contacting Mr. Alex Chang at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286, by email at alex.chang@bnymellon.com, or by telephone at (212) 815-2816.

THE BANK OF NEW YORK MELLON, as trustee

By: _____
Alex T. Chang
Vice President

cc:     Eric A. Schaffer (by e-mail at eschaffer@reedsmith.com)
        Lee Sepulvado (by email only to lsepulvado@smlawpr.com)
        Claude D. Montgomery (by e-mail only to claude.montgomery@dentons.com)
        John J. Rapisardi (by e-mail only to jrapisardi@omm.com)
        Susheel Kirpalani (by email only to susheelkirpalani@quinnemanuel.com)
        Daniel A. Fliman (by email only to dfliman@kasowitz.com)
        Amy Caton (by email only to acaton@kramerlevin.com)
        Thomas Moers Mayer (by email only to tmayer@kramerlevin.com)
        William P. Smith (by email only to wsmith@mwe.com)
        John K. Cunningham (by email only to jcunningham@whitecase.com)
        Dennis F. Dunne (by email only to ddunne@milbank.com)
        Marcia L. Goldstein (by email only to marcia.goldstein@weil.com)
        Mark C. Ellenberg (by email only to mark.ellenberg@cwt.com)
        Martin A. Sosland (by email only to martin.sosland@butlersnow.com)
        Martin J. Bienenstock (by email only to mbienenstock@proskauer.com)

Case:17-00133-LTS Doc#:39-4 Filed:05/16/17 Entered:05/16/17 21:17:46 Desc:
Exhibit D Page 1 of 6

**Exhibit D**

Letter from Ambac to COFINA, dated May 1, 2017

(Attached)

**Ambac**

**Ambac Assurance Corp.**
One State Street Plaza
New York, NY 10004
212.658.7470

May 1, 2017

**VIA FACSIMILE AND HAND DELIVERY**

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sanchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Fax: 787-728-0975

Re:   **NOTICE OF FAILURES TO COMPLY WITH COVENANTS AND EVENTS OF
      DEFAULT**

To Whom It May Concern:

Ambac Assurance Corporation ("Ambac") insures more than $800 million in gross par
amount, and is a direct holder of bonds issued by the Puerto Rico Sales Tax Financing
Corporation ("COFINA"). As such, Ambac is a "Beneficiary" under the terms of the COFINA
Amended and Restated Sales Tax Revenue Bond Resolution, as amended on June 10, 2009,
("Resolution").

Pursuant to Section 1101.1(ii) of the Resolution, this letter shall serve as notice to
COFINA of its and the Commonwealth's failures to observe and/or refusals to comply with
covenants and agreements set forth in the Resolution. Certain actions or inaction by COFINA
and the Commonwealth, described herein, are direct violations of covenants and agreements
contained in Sections 705 and 706 of the Resolution and Section 14 of COFINA's enabling
statutes (collectively, the "Enabling Act"). Ambac hereby gives notice of said failures to comply
with the covenants and agreements set forth in the Resolution. The covenant breaches by the
Commonwealth and COFINA are incurable and therefore constitute an immediate Event of
Default. In the alternative that these actions or inaction did not constitute an immediate Event of
Default, they constitute a breach of the Resolution, and failure to remedy said breaches on or
before May 30, 2017, shall constitute an Event of Default under the Resolution. Ambac
demands that the failures be immediately remedied, including the repeal or amendment of the
Fiscal Plan Compliance Law (defined below) to exclude any and all COFINA revenues, and the
withdrawal of the so-called "Proposal" under Title VI of PROMESA publicly filed on April 28,
2017.

Over a decade ago, COFINA acquired a property interest in a portion of the
Commonwealth's sales and use tax, and such funds were pledged by COFINA as security for its
bonds. These funds were expressly removed from the Commonwealth's General Fund and out
of the reach of the Secretary of the Treasury. These funds were also publicly affirmed not to
constitute "available resources" of the Commonwealth. In reliance upon this structure, COFINA
has issued over $17 billion in debt; in connection with these issuances, Secretaries of Justice of

the Commonwealth have repeatedly opined that the structure is valid. Ambac issued its financial guaranty insurance policy in reliance on these legal features and representations.

On April 27, the Legislative Assembly passed House Bill 938 titled "Law on Compliance with the Fiscal Plan." This bill was signed into law by Governor Ricardo Rosselló on April 29, 2017 ("Fiscal Plan Compliance Law"). The Fiscal Plan Compliance Law directly interferes with the rights granted to COFINA pursuant to the Enabling Act and constitutes multiple breaches of the Commonwealth's covenant in Section 14(c) of the Enabling Act and Section 706 of the Resolution.

First, the Fiscal Plan Compliance Law diverts COFINA's revenues to the General Fund. Chapter 6 of the Fiscal Plan Compliance Law amends Sections 3, 7 and 8 of Act No. 230 of July 23, 1974, the "Accounting Law of the Government of Puerto Rico," to provide that upon effectiveness of the Plan Compliance Law, all special funds created by law for specific purposes will be credited to the General Fund and deposited in the current bank account of the Secretary so that he or she has full control of them. Those funds are to continue to be used for those purposes for which they were assigned by law or in the Fiscal Plan, in the order of priority apparently determined by the Secretary. Furthermore, the collections attributable to the additional 4.5% sales and use tax adopted in July of 2015 now flow directly into the General Fund beginning at the outset of the fiscal year, in contravention of the flow of funds established in the Enabling Act. These acts are direct limitations or restraints on the rights granted to COFINA under the Enabling Act. Specifically, the Enabling Act provides that the proceeds of the first revenues of the sales and use tax "shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." 13 L.P.R.A. § 12.

Second, Chapter 4 of the Fiscal Plan Compliance Law allows the Secretary of the Treasury of Puerto Rico, under certain conditions, to use COFINA's funds to cover a deficiency in the Commonwealth's cash flow to comply with the Fiscal Plan. Specifically, Chapter 4 of the Fiscal Plan Compliance Law purports to order all Puerto Rico public corporations and instrumentalities, without limitation or exception, to transfer to the Treasury Department any surpluses of generated revenues. Those funds are to be considered as "available resources" of the Commonwealth and deposited by the Treasury Department in the General Fund to comply with liquidity requirements contemplated in the Fiscal Plan. Article 4.03 expressly provides with respect to COFINA that the Secretary of the Treasury is authorized to use COFINA funds in an occasional manner, in compliance with certain conditions, to cover a significant deficiency in the cash flow or to comply with the Fiscal Plan. This is a blatant taking of COFINA property and violation of Section 13(a) of the Enabling Act, which provides that the Pledged Property "shall be deposited directly in the FIA and shall be used exclusively" for the purposes listed in the statute, which purposes do not include funding a Commonwealth cash flow deficiency. Section 12 of the Enabling Act further provides that the COFINA revenues shall not "be available for use by the Secretary of the Treasury."

The Fiscal Plan Compliance Law is a direct interference with and limitation and restriction on COFINA's rights and constitutes an unequivocal breach of the pledges of the Commonwealth contained in Section 14 of the Enabling Act and Section 706 of the Resolution. COFINA's silence in the face of this legislation, including its failure to lobby against the bill

- 2 -

during the legislative process to protect its control of the pledged revenues constitutes a breach of COFINA's duty, under Section 705 of the Resolution, to defend, preserve and protect the pledge of property and all of the rights of the Trustee, Beneficiaries, and Bondholders.

Commonwealth representatives openly admit that the Fiscal Plan Compliance Law is specifically designed to have the effect of taking these protected funds away from COFINA in order to provide the liquidity needed under the Fiscal Plan. In the April 25, 2017 edition of the on-island newspaper, El Nuevo Día, Elías Sánchez, the Governor's representative to the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), was quoted as saying "[t]he Fiscal Plan is conceptualized in the idea that all revenues of the government will now go to a single fund (contrary to what occurs now with COFINA)." Ricardo Cortés Chico, *'Finito' el Proximo Presupuesto*, EL NUEVO DÍA (Apr. 25, 2017). Furthermore, during the April 27, 2017 Puerto Rico Senate debate on the Fiscal Plan Compliance Law, Popular Democratic Party Senator Jose Nadal-Power remarked, "[h]ere the executive [branch] is being authorized to use the COFINA funds, the COFINA funds which are destined to pay bondholders, and now all of a sudden it is good to take the money that goes toward the payment of bondholders and use them towards the end determined by the executive [branch]?" There is no questioning that the Fiscal Plan Compliance Law is an open and direct attack on COFINA.

The publication of the so-called "Proposal" under Title VI of PROMESA, filed publicly by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") on the evening of April 28, 2017 constitutes a further repudiation of the COFINA structure, and overt breach of the covenants contained in the Enabling Act. AAFAF was created under chapter 6 of Act No. 21 of 2016 ("Act 21") to serve as "fiscal agent, financial advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing." Act No. 2016-21, section 602(a). In Act No. 2 of 2017, the Commonwealth expanded AAFAF's powers to include the authority "to manage issues such as, but not limited to, contracts, transactions and regulations of the agencies and public instrumentalities; to make the Authority the only entity authorized to renegotiate, restructure and or reach agreements with creditors related to all of part of the public debt or any other debt issued by any Governmental entity, including but not limited to agencies, boards, commissions, instrumentalities, public corporations or applicable political subdivision . . . ." Act No. 2017-2 at 1. In addition, AAFAF is the entity in charge of the collaboration, communication and cooperation efforts between the Government of Puerto Rico and the Oversight Board. AAFAF therefore acts as agent for and speaks for both the Commonwealth and COFINA in matters involving restructuring, including in making this Proposal.

Two core aspects of the Proposal violate the COFINA structure. First, the Proposal treats general obligation bonds as having priority over COFINA bonds, despite the fact that the revenues pledged to the COFINA bonds are explicitly made unavailable for the payment of general obligation bonds. The Proposal makes plain that the sales and use tax revenues pledged to COFINA will no longer be segregated and devoted solely to the payment of COFINA bonds, a structure the Commonwealth has covenanted to respect; instead, all sales and use tax revenues will be pooled into the general fund, in violation of legislative and contractual provisions. Second, the Proposal purports to treat senior COFINA bonds *pari passu* with junior COFINA

bonds in violation of express contractual subordination provisions. Utilizing a tool commonly referred to as a "death trap," the Proposal would distribute either (i) $6.9 billion in newly-issued Senior Bonds and $3.3 billion in Senior Cash Flow Bonds to all COFINA senior and subordinated bonds *pari passu* if the COFINA creditors consent to such treatment, or (ii) $450 million of newly-issued Short Term Notes only to COFINA senior bonds, reflecting a 2.5% recovery on the COFINA debt outstanding, if the COFINA creditors do not consent to the treatment in (i). Offering COFINA senior bondholders what amounts to a Hobson's choice is a direct repudiation by the Commonwealth of the contractual protections afforded to senior COFINA bonds under the Resolution and a flagrant dereliction of COFINA's duty to defend, preserve, and protect the pledge of revenues and all rights of the Trustee, Beneficiaries and Bondholders against all claims and demands..

The Commonwealth affirmatively covenanted, in section 706 of the Resolution, to not "limit or restrict the rights that are by [COFINA's Enabling] Act granted or the rights of [COFINA] to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired." The passage of the Fiscal Plan Compliance Law and issuance of the Commonwealth's Title VI Proposal constitute breaches of that covenant. This letter shall constitute notice under Section 1101.1(ii) of the Commonwealth's failures to observe or refusals to comply with this covenant.

In addition to the covenant by the Commonwealth, COFINA itself covenanted to "at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever." The failure by COFINA to protect itself from the Commonwealth's illegal and unqualified attack on its possession and control of the pledged revenues is a breach of COFINA's duty. The Title VI Proposal, which was submitted by AAFAF, acting as the exclusive agent for not only the Commonwealth but also for COFINA, is another breach by COFINA. Far from defending, preserving, or protecting the pledge of revenues to COFINA, the Title VI Proposal is a declaration of war on COFINA and its property. This letter constitutes notice under Section 1101.1(ii) of COFINA's failure to observe or refusal to comply with the covenant and agreements in the Resolution.

The Commonwealth's and COFINA's flagrant and incurable breaches of the Resolution, and clear intention to pillage COFINA to meet Commonwealth expenses, constitute Events of Default under Section 1101.1(ii). Alternatively, even if cure period referenced in Section 1101.1(ii) applied, failure to remedy the foregoing covenant breaches on or before May 30, 2017, shall constitute an Event of Default under the Resolution.

- 4 -

We reserve all rights and remedies with regard to the Commonwealth and/or COFINA.

Very truly yours,

David Barranco
Senior Managing Director,
Head of Risk Management
Ambac Assurance Corporation

cc:     Dennis F. Dunne, Esq.
        Chris M. Mason, Esq.
        Michael F. Williams, Esq.
        Sam J. Alberts, Esq.
        Martin J. Bienenstock, Esq.
        John J. Rapisardi, Esq.
        Eric A. Schaffer, Esq.

        COFINA Board of Directors
        COFINA Executive Director
        Hon. Ricardo Antonio Rosselló Nevares
        Mr. Gerardo José Portela Franco, Executive Director, AAFAF

**Exhibit E**

Letter from BNYM to COFINA, dated May 4, 2017

(Attached)



The Bank of New York Mellon

May 4, 2017

*By UPS Overnight Mail and Facsimile*

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sanchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Facsimile: (787) 728-0975

Puerto Rico Sales Tax Financing Corporation
PO Box 42001
San Juan, PR 00940-2001
Attention: Executive Director

Re:   **Notice of Default under Amended and Restated Sales Tax Bond Resolution (as
amended and supplemented from time to time, the "Resolution"), adopted on July
13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA")**

Ladies and Gentlemen:

The Bank of New York Mellon (the "Trustee") is the trustee under the Resolution, pursuant to
which COFINA issued certain senior and subordinate sales tax revenue bonds (the "Bonds").
Capitalized terms used but not defined in this notice have the meanings given in the Resolution.

On April 29, 2017, the Governor of the Commonwealth of Puerto Rico (the "Commonwealth")
signed into law Act No. 24 (SB 432/HB 938) (the "Fiscal Plan Compliance Law"). For the
reasons set forth herein, the Commonwealth's enactment of the Fiscal Plan Compliance Law and
COFINA's failure to take any action to defend, preserve, and protect its ownership and control of
the Pledged Property in connection with the enactment of the Fiscal Plan Compliance Law
constitute defaults under sections 705 and 706 of the Resolution.

Pursuant to section 706 of the Resolution, the Commonwealth may not limit or restrict the rights
that are granted by COFINA's enabling legislation or COFINA's ability to meet its obligations to
Bondowners. The Fiscal Plan Compliance Law interferes with COFINA's rights and
undermines the pledge of the Pledged Property to the Trustee. Chapter 6 of the Fiscal Plan
Compliance Law diverts the Pledged Property to the Commonwealth's general fund in direct
violation of COFINA's enabling legislation. Chapter 4 of the Fiscal Plan Compliance Law
authorizes the Governor, under certain conditions, to use the Pledged Property to cover
deficiencies in the Commonwealth's cash flow or to comply with the Commonwealth's Fiscal
Plan. As a result of these limitations and restrictions on COFINA's rights and ability to meet its

obligations to Bondowners, the Commonwealth's enactment of the Fiscal Plan Compliance Law constitutes a default under section 706 of the Resolution.[1]

Pursuant to section 705 of the Resolution, COFINA agreed to defend, preserve, and protect the pledge of the Pledged Property and all rights of the Trustee, the Beneficiaries, and the Bondowners under the Resolution against all claims and demands. COFINA's failure to take any action to defend, preserve, and protect its ownership and control of the Pledged Property and the pledge of the Pledged Property to the Trustee against the Commonwealth's claim upon the Pledged Property asserted in the Fiscal Plan Compliance Law constitutes a default under section 705 of the Resolution.

On May 1, 2016, Ambac Assurance Corporation ("Ambac") served notice ("Ambac's Default Notice") to COFINA of defaults under sections 705 and 706 of the Resolution and demanded that the defaults be remedied. Pursuant to section 1101.1(ii) of the Resolution, these defaults will become Events of Default if they are not remedied within 30 days of the date of Ambac's Default Notice.

Additionally, on May 1, 2016, the Trustee demanded that by May 3, 2017, COFINA explain in detail the actions that COFINA will take to defend, preserve, and protect the pledge of the Pledged Property against the Commonwealth's claim to the Pledged Property under the Fiscal Plan Compliance Law and any effort by the Governor to utilize the Pledged Property pursuant to the Fiscal Plan Compliance Law. The Trustee also demanded that COFINA respond to the Trustee's April 21, 2017, demand for (i) indemnification in connection with the litigation captioned, *Whitebox Multi-Strategy Partners, L.P., et al. v. Bank of New York Mellon Corporation*, Index No. 651969/2017, pending in the Supreme Court of the State of New York, and (ii) further assurances that COFINA will comply with its obligations under section 705 of the Resolution. COFINA has not responded to the Trustee's demands for further assurances. Such failures constitute additional defaults under section 704 of the Resolution, and the Trustee demands that they be remedied. Pursuant to section 1101.1(ii) of the Resolution, these defaults will become additional Events of Default if they are not remedied within 30 days of this notice.

The Trustee reserves all of its rights and remedies under the Resolution and related documents, all of which remain in full force and effect in accordance with their original terms. Nothing herein shall constitute a waiver, modification, or release of any breach, default, or Event of Default, whether existing or hereafter arising, or any of the Trustee's right and remedies relating thereto.

Questions concerning this notice may be directed to the Trustee by contacting Mr. Alex Chang at The Bank of New York Mellon, 101 Barclay Street, New York, NY 10286, by email at alex.chang@bnymellon.com, or by telephone at (212) 815-2816.

---

[1] For the avoidance of doubt, this notice does not assert any right or claim against the Commonwealth.

THE BANK OF NEW YORK MELLON,
as trustee

By: _____
Alex T. Chang
Vice President

cc:    Eric A. Schaffer (by email only to eschaffer@reedsmith.com)
       Lee Sepulvado (by email only to lsepulvado@smlawpr.com)
       Robert N.H. Christmas (by email only to rchristmas@nixonpeabody.com)
       Chris Mason (by email only to cmason@nixonpeabody.com)
       Susheel Kirpalani (by email only to susheelkirpalani@quinnemanuel.com)
       Daniel A. Fliman (by email only to dfliman@kasowitz.com)
       Amy Caton (by email only to acaton@kramerlevin.com)
       Thomas Moers Mayer (by email only to tmayer@kramerlevin.com)
       William P. Smith (by email only to wsmith@mwe.com)
       John K. Cunningham (by email only to jcunningham@whitecase.com)
       Dennis F. Dunne (by email only to ddunne@milbank.com)
       Marcia L. Goldstein (by email only to marcia.goldstein@weil.com)
       Mark C. Ellenberg (by email only to mark.ellenberg@cwt.com)
       Martin A. Sosland (by email only to martin.sosland@butlersnow.com)
       Martin J. Bienenstock (by email only to mbienenstock@proskauer.com)

Ambac Assurance Corporation            Financial Guaranty Insurance Company
One State Street Plaza                 125 Park Avenue
15th Floor                             New York, NY 10017
New York, NY 10004                     Attention: Risk Management
Attention: Surveillance Department

MBIA Insurance Corporation             Assured Guaranty Municipal Corp.
113 King Street                        31 West 52nd Street
Armonk, NY 10504                       New York, NY 10019,
Attention: Surveillance                Attention: Managing Director --
                                       Surveillance

- 3 -

**Exhibit F**

Letter from Whitebox's counsel to BNYM's counsel, dated January 31, 2017

(Attached)

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019-6799

212-506-1700

FACSIMILE: 212-506-1800

DANIEL A. FLIMAN
DIRECT DIAL: 212-506-1713
DFLIMAN@KASOWITZ.COM

ATLANTA
HOUSTON
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY

January 31, 2017

**VIA EMAIL**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

Re:     Amended and Restated Sales Tax Revenue Bond Resolution dated as of July 13, 2007, as amended on June 10, 2009, and as subsequently amended, restated, modified and/or supplemented (the "**Resolution**"), relating to certain notes (the "**COFINA Notes**") issued in several series and priorities by Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), for which The Bank of New York Mellon (the "**Trustee**") acts as trustee.[1]

Dear Eric:

As you know, we represent Whitebox Advisors LLC ("**Whitebox**"), in its capacity as holder of senior Capital Appreciation Bonds issued by COFINA (the "**Senior CAB Notes**") and subordinated Capital Appreciation Bonds issued by COFINA (the "**Subordinated CAB Notes**," and together with the Senior CAB Notes, the "**CAB Notes**").[2]

We understand that the Trustee presently holds certain sales and use tax revenues (the "**SUT Revenue**") received from COFINA pursuant to the Resolution (the "**Collected Funds**"), the amount of which exceeds $810 million. As stated during our January 24, 2017 call with the Trustee (the "**Jan. 24 Call**"), the Trustee should temporarily refrain from using the Collected Funds to make any payments on the COFINA Notes -- including, without limitation, by delaying any principal or interest payments that may allegedly be due on February 1, 2017 (the "**Feb. 1 Payments**") -- until the Commonwealth and COFINA commit to defend the COFINA structure against all challenges. As we have informed you, failure to retain the Collected Funds has the potential to harm ongoing restructuring efforts and will be a clear breach of the Trustee's duties to the COFINA Notes. This is especially so given the Trustee's failures over the last 17 months to take necessary steps to protect the COFINA Notes and to address the Trustee's crippling conflicts of interest.

---

[1]     Capitalized terms used but not defined herein are ascribed the definitions in the Resolution.

[2]     In response to the Trustee's request, on January 20, 2017, we provided the Trustee with holdings information concerning Whitebox's interests in the CAB Notes.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Eric A. Schaffer, Esq.
January 31, 2017
Page 2 of 3

Yesterday, you advised us that the Trustee has rejected our demand that it retain the Collected Funds temporarily and, to the contrary, intends to make the Feb. 1 Payments. You also stated the Trustee's position that no Events of Default have occurred under the Resolution. In light of these statements, we write to reiterate our position and to reserve all rights and remedies available to Whitebox should the Trustee in fact proceed with the Feb. 1. Payments despite our demand.

Contrary to the Trustee's position, Events of Default have plainly occurred and are continuing under the Resolution. Yet the Trustee has failed to act, despite a clear duty to do so. As documented, in part, in prior correspondence, numerous Events of Default have occurred under Section 705 and Section 706 of the Resolution.[3] Pursuant to the Resolution, upon an Event of Default, the Trustee may accelerate principal and accrued interest on the COFINA Notes. (Section 1102(1).) Upon acceleration, Compounded Amounts accruing on the CAB Notes become immediately due and owing, and the Cash Pay Notes and the CAB Notes are entitled to ratable payment. (Section 1103(1).)[4] That is a fundamental protection accorded to the CAB Notes in the Resolution because, otherwise, the CAB Notes would be functionally subordinated to the Cash Pay Notes -- which clearly was not provided for in the Resolution.

Moreover, as we stressed on the Jan. 24 Call, due to the CAB Notes' longer-term maturity, the CAB Notes, more than any other holders, rely on Sections 705 and 706 of the Resolution to protect the future sanctity of the COFINA structure, and by extension their future right to payment on their COFINA Notes. Over the last 17 months, the Commonwealth and COFINA have repeatedly failed to defend or to take necessary actions to preserve and to protect the COFINA Notes' contractual rights to the pledged SUT Revenue. Those failures have given rise to well-established defaults under Sections 705 and 706 of the Resolution. Yet, the Trustee, despite being on notice of such defaults, has consistently refused to call related Events of Default or to accelerate the COFINA Notes.

We note that the Trustee, as trustee for both the CAB Notes and the Cash Pay Notes, was conflicted when it previously refused to declare Events of Default and to accelerate the COFINA Notes. And, *today the Trustee remains conflicted*, with divided loyalties, as it maintains that no Events of Default have occurred and elects to make the Feb. 1 Payments. We believe that the Trustee's conflicts require it to retain the Collected Funds, which is the only way for the Trustee to avoid prejudicing one series of COFINA Notes for the benefit of another. After all, the Trustee

---

[3] Section 705 of the Resolution requires COFINA to "at all times defend, preserve, and protect the pledge of the Pledged Property . . . against all claims and demands of all persons whomsoever." Section 706 of the Resolution, among other things, provides that the Commonwealth will not "limit or restrict . . . the rights of [COFINA] to meet its obligations to its Bondholders . . . ." Failure to adhere to these terms -- upon written notice for over 30 days -- constitutes an Event of Default under the Resolution. (Section 1101(ii).)

[4] Whitebox takes no position herein regarding the relative rights of senior Notes and subordinated Notes under this provision of the Resolution and reserves all rights concerning same.

KASOWITZ, BENSON, TORRES & FRIEDMAN LLP

Eric A. Schaffer, Esq.
January 31, 2017
Page 3 of 3

cannot act in the best interest of *all* COFINA Notes, while at the same time picking and choosing who to pay and when.

\* \* \*

Over the past few weeks, we have stressed to the Trustee the foregoing points and provided you with notice of the issues at play and of the massive harm that threatens Whitebox if the Collected Funds are improperly distributed at this time. We had hoped that the Trustee would have taken this opportunity to try to remedy the past harms that its conflicted position and inaction have already inflicted upon the CAB Notes. The Trustee nonetheless seems intent on making the Feb. 1 Payments.

Accordingly, Whitebox intends to hold the Trustee fully accountable for any harm that arises from the Trustee's acts and omissions. As examples, but without limitation, Whitebox is prepared to bring legal action to hold the Trustee liable for its failures to assert viable Events of Default, for its failures to address conflicts of interest, and for any improper benefits that are conferred upon the Cash Pay Notes to the detriment of the CAB Notes. [5]

This letter does not waive any right, remedy, claim, or relief that Whitebox has now or in the future, each of which is reserved in full.

Sincerely,

Daniel A. Fliman

---

[5] We remind the Trustee that, as a non-governmental entity, actions against the Trustee are not precluded by the enactment of Section 405 of the Puerto Rico Oversight, Management, and Economic Stability Act.

**Exhibit G**

Letter from BNYM's counsel to Whitebox's counsel, dated February 6, 2017

(Attached)



Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

**Eric A. Schaffer**
Direct Phone: +1 412 288 4202
Email: eschaffer@reedsmith.com

February 6, 2017

**Via Email (dfliman@kasowitz.com) and U.S. Mail**

Daniel A. Fliman Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019

**Amended and Restated Sales Tax Revenue Bond Resolution (as further amended and supplemented, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), pursuant to which COFINA issued certain sales tax revenue bonds (the "Bonds").**

Dear Dan:

I am writing in response to your letter dated January 31, 2017. Preliminarily, my January 30, 2017 email responded to your initial request that the Trustee refrain from making the debt service payment due to holders of the COFINA bonds on February 1, 2017. In my email, I made the following points:

- There is no payment default under section 1101(i) of the Resolution.

- There is no covenant default under section 705 of the Resolution because, to the Trustee's knowledge, COFINA has not failed to defend the pledge of the Pledged Property against any legal claim or demand made against such Pledged Property. To the contrary, COFINA has engaged independent counsel and filed an answer and affirmative defenses in the only non-stayed action challenging the pledge of the Pledged Property.

- The Commonwealth has not interfered with the transfer of taxes to COFINA or otherwise limited or restricted COFINA's right or ability to meet its obligations.

- The Trustee has no duty to perform any act which would involve it in expense or liability, unless provided with security and indemnity satisfactory to it. Further, the Trustee has no duty to act at the request of Bondowners without first receiving direction from Bondowners holding the requisite majority in principal amount of the outstanding Bonds and security and indemnity satisfactory to the Trustee. The Trustee has not received direction and indemnification in connection with Whitebox's request.

ABU DHABI ♦ ATHENS ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MUNICH ♦ NEW YORK ♦ PARIS
PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

US_ACTIVE-130727843.5 02/06/2017 10:54 AM

Daniel A. Fliman Esq.
February 6, 2017
Page 2

# ReedSmith

I explained that in these circumstances the Trustee had no duty – indeed, no basis – to refrain from making the debt service payment due to Bondowners on February 1, 2017. In a second email on January 30, 2017, I noted that the Financial Emergency and Fiscal Responsibility Act (the "Act") as enacted removed the proposed provision in section 207(b) authorizing the Governor to re-designate special funds as part of the general fund – thereby eliminating the particular concern raised in your email referencing the Act.

Your January 31, 2017 letter does not address the points set forth above.

- You do not contend that there is a payment default.

- You do not set forth any basis for your conclusion that COFINA has failed to defend the pledge of the Pledged Property against any legal claim or demand made against such Pledged Property, nor do you respond to my statements that COFINA has engaged independent counsel and filed an answer and affirmative defenses in the only non-stayed action challenging the pledge of the Pledged Property.

- You do not set forth any basis for your conclusion that the Commonwealth has breached its pledge not to limit or restrict COFINA's right or ability to meet its obligations to Bondowners, nor do you respond to my statement that the Governor has not interfered with payments to COFINA.

- You do not deny that the Trustee has no obligation or duty to perform any act which would involve it in expense or liability – which would include expense or liability arising as a consequence of any delay in making payments on the Bonds – unless provided with security and indemnity satisfactory to it; that the Trustee has no duty to act at the request of Bondowners without first receiving direction from Bondowners holding the requisite majority in principal amount of the outstanding Bonds and security and indemnity satisfactory to the Trustee; and that the Trustee has not received either in connection with Whitebox's request.

Additionally, you state that the Trustee has breached its duties under the Resolution, but you do not identify any provision of the Resolution setting forth a duty that has been breached; you state that the Trustee has failed to take necessary steps to protect the Bonds, but you do not identify any specific steps that you believe were mandated under the terms of the Resolution; and you state that the Trustee may accelerate payment obligations upon an Event of Default while eliding the fact that this is a right, not an obligation, exercise of which is governed, *inter alia*, by Section 802 of the Resolution.

Daniel A. Fliman Esq.
February 6, 2017
Page 3

# ReedSmith

Your complaint that the Trustee has a conflict of interest because the interests of investors in the Capital Appreciation Bonds are antithetical to the interests of investors in Current Interest Bonds is inconsistent with the governing Resolution.[1]  Without presuming to opine upon any disputes between Whitebox and investors in Current Interest Bonds, the relationship between the Capital Appreciation Bonds and the Current Interest Bonds does not create a conflict for the Trustee.[2]  All parties' rights are governed by a single Resolution, the terms of which dictate what payments are made and when; the circumstances in which the Trustee exercises rights or remedies; and the role of the Trustee in the absence of direction and indemnification.  Performance in accordance with the terms of the Resolution is not a conflict, and investors are bound by the terms and limitations set forth in the Resolution.[3]

In this regard, you should be aware that the Trustee sent multiple notices to Bondowners.  Each notice stated that, pursuant to section 1105 of the Resolution, Bondowners holding a majority in principal amount of the outstanding Bonds may direct the method of conducting any remedial proceedings to be taken by the Trustee with respect to the Bonds, subject to certain rights of the Trustee.  Whitebox consistently has declined this invitation.  The Trustee continues to invite direction and indemnification in accordance with the Resolution.

Because the Resolution dictates the timing and recipients of any payments, and the Trustee has received no direction in accordance with the Resolution, your statement that the Trustee is "picking and choosing who to pay and when" is incorrect.  All Bondowners have received timely payment of amounts due on account of the Bonds.

With all this in mind, your concluding statement that Whitebox is prepared to bring legal action for an alleged failure to assert viable Events of Default, to address conflicts of interest, and for any improper benefits conferred upon the Current Interest Bonds to the detriment of the Capital Appreciation Bonds is

---

[1]  You note that Whitebox is not asserting a conflict as between the Senior Bonds and Subordinate Bonds, and there is no suggestion that the Trustee is self-interested.  While beyond the scope of this letter, please note that Whitebox has not provided all of the information requested by the Trustee with regard to Whitebox's beneficial interest.  The Trustee renews its request for such information.

[2]  While you state that Whitebox's interests are adverse to those of holders of the Current Interest Bonds, as well as COFINA and the Commonwealth, the Trustee has no knowledge of any communications between or among Whitebox and such other persons or entities.

[3]  Whitebox, as a highly sophisticated investor in securities, including distressed securities, is no less bound.

Daniel A. Fliman Esq.
February 6, 2017
Page 4

**ReedSmith**

contrary to the terms of the Resolution.  The Trustee reserves all rights, remedies, and defenses, and nothing in this letter limits, alters or impairs rights or remedies of any other parties having interests under or in connection with the Resolution.[4]

Very truly yours,

REED SMITH LLP

By:

Eric A. Schaffer

EAS:aei

---

[4]      A full analysis of section 405 of PROMESA, referenced on page 3 of your letter, is beyond the scope of your letter or this response, particularly as applicability of this section depends on the particular nature of any claims.  Suffice it to say that the Government of Puerto Rico, as defined in PROMESA, may disagree with your conclusion as to the scope of the stay.

**Exhibit I**

Letter from Whitebox's counsel to BNYM's counsel, dated April 30, 2017

(Attached)

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

DANIEL A. FLIMAN
DIRECT DIAL: (212) 506-1713
DIRECT FAX: (212) 835-5013
DFLIMAN@KASOWITZ.COM

April 30, 2017

**VIA EMAIL**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

      Re:    Puerto Rico Sales Tax Financing Corporation ("**COFINA**")[1]

Dear Eric:

As you know, we represent funds managed or advised by Whitebox Advisors LLC ("**Whitebox**"), as holders of senior COFINA Capital Appreciation Bonds (the "**Senior CAB Notes**").

We write to bring to your attention two recent events that constitute additional breaches of the covenants made by the Commonwealth and by COFINA in the Resolution, which breaches, left uncured, will trigger additional Events of Default.

*First*, the recent enactment by the Commonwealth's Legislature of Act 24 (SB 432/ HB 938), titled the Fiscal Plan Compliance law (the "**Compliance Law**") provides the Commonwealth with a roadmap to decimate the COFINA structure, a clear violation of its covenants under the Resolution.

---

[1]     Capitalized terms used but not defined herein are ascribed the definitions in the Amended and Restated Sales Tax Revenue Bond Resolution dated as of July 13, 2007, as amended on June 10, 2009, and as subsequently amended, restated, modified and/or supplemented (the "**Resolution**") relating to certain notes (the "**COFINA Notes**").

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Eric A. Schaffer, Esq.
April 30, 2017
Page 2 of 4

Chapter 4 of the Compliance Law provides the Commonwealth with powers to tap into any purported "surplus" funds of the Commonwealth's public corporations (which includes COFINA), to re-designate such funds as "available resources" and to transfer such funds to the Commonwealth's general fund, which is in direct contravention of the promise explicitly contained in the statutes that created the COFINA structure -- that the Commonwealth would not impair the collection of the sales and use tax or the rights of COFINA to the pledged sales and use tax revenues (the "**Pledged SUT Revenues**").  As to COFINA specifically, the Compliance Law further provides that the Commonwealth may designate Pledged SUT Revenues -- which are property of COFINA and pledged to the holders of COFINA Notes -- as "available resources" subject to certain procedures set forth in the legislation.

Enactment of the Compliance Law violates the Commonwealth's covenant not to "limit or restrict the rights … of [COFINA] to meet its obligations to its Bondholders."  (Resolution § 706.)  Moreover, COFINA's apparent failure to take any steps to oppose enactment of the Compliance Law is a clear breach of its covenant to "at all times defend, preserve, and protect the pledge of the Pledged Property … against all claims and demands of all persons whomsoever."  (Resolution § 705.)  The foregoing covenant breaches constitute "failure[s] to observe or refusal[s] to comply with the covenants and agreements set forth in the Resolution," which left uncured after notice, will give rise to Events of Default.  (Resolution § 1101(1)(ii).)

We note that this is not the first time the Commonwealth has attempted to enact legislation granting the ability to divert Pledged SUT Revenues.  On January 25, 2017, we brought to your attention a then-proposed provision in the Puerto Rico Financial Emergency and Fiscal Responsibility Act, in which Governor Rosselló, like here, proposed giving the Commonwealth the right to direct Pledged SUT Revenues to the general fund.  Luckily, that time, the disastrous provision was removed from the final version of the legislation, leading you to cover your inaction then by stating that "happily, [it] did not find its way into the Act."  (January 30, 2017 email from E. Schaffer to D. Fliman.)  Unfortunately, this time, the language remained, was approved by the Legislature and is now the law in the Commonwealth.

***Second***, on April 24, 2017 the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**") submitted its first proposal, ostensibly under Title VI of the Puerto Rico Oversight, Management, and Economic Stability Act (the "**April 24 Proposal**"), which constitutes yet another unequivocal default under the Resolution by both the Commonwealth -- for "restrict[ing] the rights … of [COFINA] to meet its obligations to its Bondholders" -- and COFINA for its continued failure to "at all times defend, preserve, and protect the pledge of the Pledged Property."

K A S O W I T Z   B E N S O N   T O R R E S   LLP

Eric A. Schaffer, Esq.
April 30, 2017
Page 3 of 4

In the April 24 Proposal, the Commonwealth purports to offer the holders of COFINA Notes a "choice" between an approximately 40% haircut on account of their COFINA Notes or their pro-rata share of short term notes equal to the amount in the "COFINA Pledged Account" -- an account already statutorily pledged to the holders of COFINA Notes.

Underpinning the April 24 Proposal is AAFAF's position that "The Cash Flow Available for Debt Service in the certified Fiscal Plan shall form the basis of a comprehensive settlement." (April 24 Proposal, at 1.)  However, as previously explained in our March 31, 2017 letter, the Commonwealth's March 13, 2017 Fiscal Plan for Puerto Rico (the "**Fiscal Plan**") commingles *all* funds (including Pledged SUT Revenues belonging to COFINA) to calculate the amount available for "Debt Service," which includes *all* debts of the Commonwealth and its instrumentalities.  And, even then, provides insufficient "Cash Flow" available to service such debt.  Thus, the April 24 Proposal is a confirmation of the fears we raised in our March 31, 2017 letter -- the Commonwealth intends to use Pledged SUT Revenues to service its non-COFINA debt.  COFINA, for its part, has taken no action whatsoever to counter the Commonwealth's intentions.

Even more egregious, in the April 24 Proposal, the Commonwealth purports to treat all COFINA Notes, senior and subordinate, ratably.  Such treatment makes no sense in light of the noteholders' relative rights under the Resolution and, we believe, was designed to elicit votes from holders with cross-holdings of general obligation and COFINA senior and subordinate debt.  The April 24 Proposal thus represents an additional example of why the senior and subordinate notes cannot be represented by a single trustee and further highlights the Trustee's extant and crippling conflicts of interest.

Based upon these developments, we renew our demand that the Trustee take all necessary steps to protect the COFINA Notes and, in particular, Whitebox's Senior CAB Notes.  To do so, the Trustee:  (a) should immediately declare a default, (b) demand that COFINA cause the Commonwealth to revoke the troublesome provisions in the Compliance Law and revise the April 24 Proposal to respect the COFINA structure, (c) notify COFINA that the Trustee will accelerate all COFINA Notes unless such breaches are cured within 30 days and (d) begin the process for appointing a separate trustee to represent the differing types of COFINA Notes.  Moreover, and in the interim, the Trustee *must* refrain from making any further payments on any COFINA Notes.

The Trustee's failure to act will give rise to liability of the Trustee under both the Resolution and independently on account of the ultra vires acts taken by the Trustee -- in addition to liability it has already incurred as set forth in Whitebox's legal action against the Trustee in New

# KASOWITZ BENSON TORRES LLP

Eric A. Schaffer, Esq.
April 30, 2017
Page 4 of 4

York State Court. Indeed, given the developments over the last seventy-two hours, continued inaction will evince a conscious disregard of the standard of care required for the Trustee and evidence the Trustee's gross negligence.

To help the Trustee understand the stakes here, we remind you that the harm threatening the COFINA Notes is *certain, severe and immediate*. The Compliance Law arms the Governor with the arsenal to carry out the attacks on the COFINA structure contemplated in the certified Fiscal Plan and set forth in the April 24 Proposal. Those attacks are *certain* because, as reflected in the certified Fiscal Plan and the April 24 Proposal, the Commonwealth clearly intends to utilize Pledged SUT Revenues to satisfy non-COFINA obligations. The harm is *severe* because, according to the certified Fiscal Plan, the Commonwealth cannot even service just COFINA debt, and diverting Pledged SUT Revenues to others, will massively increase that shortfall. The harm is *immediate* because starting on July 1, 2017, a mere 62 days from now, as now allowed by the Compliance Law, insufficient Pledged SUT Revenues will flow to COFINA and to the Trustee, thus triggering payment defaults -- to compound to the long list of existing Events of Default. If the Trustee fails to act, these consequences all rest on its shoulders.

We ask that you confirm by close of business Tuesday May 2, 2017, that the Trustee will comply with our demands above.

This letter does not waive any right, remedy, claim, or relief that Whitebox may have now or in the future, each of which is reserved in full.

Sincerely,

*/s/ Daniel A. Fliman*

Daniel A. Fliman

**Exhibit H**

Letter from Whitebox's counsel to BNYM's counsel, dated March 31, 2017 (without exhibits)

(Attached)

# KASOWITZ BENSON TORRES LLP

1633 BROADWAY

NEW YORK, NEW YORK 10019

(212) 506-1700

FAX: (212) 506-1800

DANIEL A. FLIMAN
DIRECT DIAL: (212) 506-1713
DIRECT FAX: (212) 835-5013
DFLIMAN@KASOWITZ.COM

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

March 31, 2017

**VIA EMAIL**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

> Re: Amended and Restated Sales Tax Revenue Bond Resolution dated as of July 13, 2007, as amended on June 10, 2009, and as subsequently amended, restated, modified and/or supplemented (the "**Resolution**"), relating to certain notes (the "**COFINA Notes**") issued in several series and priorities by Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), for which The Bank of New York Mellon (the "**Trustee**") acts as trustee[1]

Dear Eric:

As you know, we represent Whitebox Advisors LLC ("**Whitebox**"), in its capacity as holder COFINA Capital Appreciation Bonds (the "**CAB Notes**").

We write to update you on certain events that have occurred since our January 2017 conversation and subsequent correspondence affecting the rights of Whitebox and other CAB Notes holders under the Resolution. And, to reiterate our prior requests that the Trustee temporarily refrain from using funds the Trustee has received from COFINA to make any payments on the COFINA Notes.

As you are no doubt aware, the situation in the Commonwealth is deteriorating rapidly. In conjunction therewith, and since our last correspondence, the Commonwealth and COFINA have taken several recent actions and purposeful inactions -- in addition to the events described in prior

---

[1]    Capitalized terms used but not defined herein are ascribed the definitions in the Resolution and/or our February 1, 2017 letter.

KASOWITZ BENSON TORRES LLP

Eric A. Schaffer, Esq.
March 31, 2017
Page 2 of 4

correspondence -- which contravene their covenants under the Resolution and, left uncured, will trigger additional Events of Default.

On March 13, 2017, the Governor submitted to the PROMESA Oversight Board (the "**Oversight Board**") a final version of the Commonwealth's Fiscal Plan for Puerto Rico (the "**Fiscal Plan**") prepared by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"). The Oversight Board certified the Fiscal Plan, with certain modifications.[2] Under PROMESA, the Fiscal Plan, as certified, is a vital document that provides the framework for nearly all measures and initiatives enacted by the Commonwealth under the Oversight Board's supervision.

The Fiscal Plan and the Government's positions therein are problematic on numerous fronts. The Government's revenue forecasts combine sources of revenue, expressly including sales and use taxes that constitute Pledged Property, to calculate the Commonwealth's purported total "Revenues before Measures".[3] This tabulation clearly ignores the protections accorded to the Pledged Property in the Resolution, which require that such funds be regarded as segregated and available exclusively to satisfy the COFINA Notes. Even more troubling is the Government's "Debt sustainability" analysis in the Fiscal Plan.[4] That analysis takes "Revenues before Measures" subtracts "Non-interest expenses before measures" to calculate "Cash Flow Excl. Debt Service & Measures." The purported cash flows projected by the Commonwealth assume that *all* revenues, including the Pledged Property, are treated the same with no regard to the COFINA structure, and also assume that the Pledged Property is made available to pay General Fund Expenditures. The Commonwealth then projects how much debt it could service using *all* cash flows, meaning that the Commonwealth conveys it is prepared to use *any and all* revenues, *including the Pledged Property*, to pay General Fund Expenditures and to fund debt service payments going forward.

Through the Fiscal Plan, the Commonwealth clearly has, yet again, breached its covenant "that it will not limit or restrict . . . the rights of [COFINA] to meet its obligations to its Bondholders . . . " in breach of Section 706 of the Resolution. Notably, COFINA has failed to take any steps whatsoever to counter the Fiscal Plan and, to our knowledge, never opposed its certification by the Oversight Board. COFINA's failure to act is a blatant violation of its covenant to "defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries

---

[2]     Whitebox takes no position as to whether the Oversight Board's certification fully complied with the requirements of Section 201 of PROMESA, and reserves all rights regarding the same.

[3]     See Fiscal Plan, annexed at Appendix A, at 11.

[4]     Ibid. at 28.

K A S O W I T Z   B E N S O N   T O R R E S  LLP

Eric A. Schaffer, Esq.
March 31, 2017
Page 3 of 4

and the Bondowners under the Resolution against all claims and demands of all persons whatsoever" in breach of Section 705 of the Resolution.

We note that the Commonwealth's breach of its covenants is widely acknowledged by stakeholders for which the Trustee is retained to act. On March 27, 2017, a group that includes holders of approximately $2.8 billion in accreted COFINA Subordinated Notes and $748 million in COFINA Senior Notes, among others, sent a letter to the Oversight Board (the "**March 27 Letter**").[5] Those holders, in no uncertain terms, informed the Oversight Board that the Fiscal Plan "transfer[s] COFINA's property to the Commonwealth's General Fund and . . . fail[s] to respect the COFINA bondholders' lien on the assigned revenues granted to COFINA."[6] This is telling because even COFINA Subordinated Notes holders -- who *benefit by avoiding* an Event of Default and acceleration that cuts off their interest payments -- when faced with the Commonwealth's egregious positions in the Fiscal Plan, have raised the same concerns we raise above.

To add insult to injury, in the same week that the Oversight Board certified the Fiscal Plan, AAFAF and the Ad Hoc Group of General Obligation Bondholders -- who are actively challenging the constitutionality of the COFINA structure -- jointly announced that as a result of discussions amongst themselves "the Government of Puerto Rico will seek the prompt and expeditious resolution of the claims asserted by the GO Bondholders regarding the constitutionality of COFINA" (the **March 17 Release**").[7] The March 17 Release further confirms that the Commonwealth "is not taking a definitive position on the merits of the constitutional questions at this time."

AAFAF is the architect of the Fiscal Plan and its alignment with the GO Bondholders is alarming and deeply concerning for the future prospects of the COFINA structure. COFINA has taken no steps to oppose, much less to block, AAFAF's actions. Indeed, because COFINA has no independent executive director, it seems that AAFAF's staff is filling that role[8] and is taking affirmative steps to take over any efforts to negotiate the restructuring of COFINA's debts. COFINA was designed to be an independent autonomous entity, with unique rights and responsibilities, and its willingness to allow AAFAF, which has a stated agenda of violating the COFINA structure, to run roughshod over COFINA is a clear failure to "defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and

---

[5]     See March 27 Letter, annexed hereto at Appendix B.

[6]     Ibid. at 4.

[7]     See March 17 Release, annexed hereto at Appendix C.

[8]     Indeed, COFINA's investor relations site lists only an AAFAF representative as an available contact, *see http://www.gdb-pur.com/investors_resources/cofina.html.*

KASOWITZ BENSON TORRES LLP

Eric A. Schaffer, Esq.
March 31, 2017
Page 4 of 4

the Bondowners under the Resolution against all claims and demands of all persons whatsoever"
in breach of Section 705 of the Resolution.

Faced with these overwhelming facts, and with the resounding and widely-shared views
expressed by COFINA noteholders, we hope the Trustee will not continue to sit idly by and allow
the Commonwealth and COFINA to act in derogation of their obligations under the Resolution.
We demand that the Trustee immediately issue notices of default to COFINA for the violations of
Sections 705 and 706 of the Resolution. Moreover, given these breaches, and also for the reasons
set forth in prior correspondence, the Trustee must refrain from making payments on account of
the COFINA Notes. Please know that the Trustee's refusal to retain funds has already caused
Whitebox and other holders substantial damage.

We ask that you confirm by close of business **Tuesday, April 4, 2017** that the Trustee will
comply with our demands above.

This letter does not waive any right, remedy, claim, or relief that Whitebox may have now
or in the future, each of which is reserved in full.

Sincerely,

*/s/ Daniel A. Fliman*

Daniel A. Fliman

**Exhibit J**

First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007

(Attached)

# PUERTO RICO SALES TAX FINANCING CORPORATION

## FIRST SUPPLEMENTAL SALES TAX REVENUE BOND RESOLUTION

authorizing

## SALES TAX REVENUE BONDS SERIES 2007A

Adopted on July 13, 2007

**TABLE OF CONTENTS**

Page

ARTICLE I

DEFINITIONS AND STATUTORY AUTHORITY

SECTION 1.1.  Supplemental Resolution.................................................................. 1
SECTION 1.2.  Definitions .......................................................................................... 1
SECTION 1.3.  Interpretation...................................................................................... 5
SECTION 1.4.  Authority for this Series Resolution................................................... 5

ARTICLE II

AUTHORIZATION OF SERIES 2007A BONDS

SECTION 2.1.  Principal Amount, Designation and Series.......................................... 6
SECTION 2.2.  Purposes.............................................................................................. 6
SECTION 2.3.  Details of Series 2007A Bonds .......................................................... 6
SECTION 2.4.  Redemption.......................................................................................... 7
SECTION 2.5.  Book-Entry Provisions ....................................................................... 8
SECTION 2.6.  Form of Series 2007A Bonds ............................................................ 10
SECTION 2.7.  Insurance Provisions .......................................................................... 10
SECTION 2.8.  Interest Rate Exchange Agreements ................................................... 10

ARTICLE III

DISPOSITION OF PROCEEDS OF SERIES 2007A BONDS AND OTHER FUNDS

SECTION 3.1.  Deposits to Accounts........................................................................... 11

ARTICLE IV

MISCELLANEOUS

SECTION 4.1.  Headings.............................................................................................. 12
SECTION 4.2.  Governing Law.................................................................................... 12
SECTION 4.3.  Effective Date ..................................................................................... 12
SECTION 4.4.  No Representations of Trustee............................................................. 12
SECTION 4.5.  Invalid Provisions ............................................................................... 13

EXHIBIT A.  BOND FORMS ................................................................................... A-1
EXHIBIT B.  BOND INSURANCE POLICY PROVISIONS ....................

i

# FIRST SUPPLEMENTAL SALES TAX REVENUE BOND RESOLUTION

### authorizing

## SALES TAX REVENUE BONDS
## SERIES 2007A

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation (the "Corporation"), as follows:

## ARTICLE I

### DEFINITIONS AND STATUTORY AUTHORITY

SECTION 1.1. <u>Supplemental Resolution</u>. This Supplemental Sales Tax Revenue Bond Resolution (this **"Supplemental Resolution"**) is supplemental to, and is adopted in accordance with, Article II and Article IX of the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (the **"General Resolution"**). The General Resolution and this Supplemental Resolution are hereinafter collectively referred to as the **"Resolution"**.

SECTION 1.2. <u>Definitions</u>. (a) All terms which are defined in Section 101 of the General Resolution or Section 1.1 hereof, unless otherwise defined in subsection (b) of this Section, shall, for all purposes of this Supplemental Resolution, have the same meanings as such terms are given in Section 101 of the General Resolution or Section 1.1 hereof, respectively, unless the context shall clearly indicate some other meaning.

(b) The following terms shall, for all purposes of this Supplemental Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**"Ambac"** means Ambac Assurance Corporation, a Wisconsin-domiciled stock insurance company.

**"Ambac Insurance Policy"** means the financial guaranty insurance policy issued by Ambac insuring the payment when due of the principal of and interest on the Ambac Insured Bonds as provided therein.

**"Ambac Insured Bonds"** means the Series 2007A Bonds maturing on August 1 in the years 2047 and 2054.

**"Applicable Tax-Exempt Municipal Bond Rate"** means, for any Capital Appreciation Series 2007A Bond to be redeemed, the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data (internet address: www.tm3.com). If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be

508050.12 029578 RES

determined by the Corporation, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated by the Corporation from those yield curve rates on a straight-line basis. If Municipal Market Data no longer publishes the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year made available by Municipal Market Advisors (internet address: www.theconsensus.com). If Municipal Market Advisors no longer publishes the Consensus Scale yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will be determined by Goldman, Sachs & Co. as the quotation agent (the "Calculation Agent"), based upon the rate per annum equal to the yield to maturity (based upon semiannual compounding on each August 1 and February 1) of those tax-exempt general obligation bonds rated in the highest rating category by Moody's Investors Service with a maturity date closest to the remaining weighted maturity date of the Capital Appreciation Series 2007A Bonds having characteristics (other than the ratings) most comparable to those of the Capital Appreciation Series 2007A Bonds in the judgment of the Calculation Agent. The Calculation Agent's determination of the Applicable Tax-Exempt Municipal Bond Rate in such circumstances will be final and binding in the absence of manifest error. The Corporation's written notice of redemption provided to the Trustee pursuant to Section 405 of the General Resolution shall include the Applicable Tax-Exempt Municipal Bond Rate and the Trustee shall have no responsibility with respect to the accuracy of its calculation or its compliance with the terms of this definition.

"**Beneficial Owner**" means, whenever used with respect to a Series 2007A Bond, the Person in whose name such Series 2007A Bond is recorded as the beneficial owner of such Series 2007A Bond by a Participant on the records of such Participant or such Person's subrogee.

"**Bond Insurance Policies**" means the financial guaranty insurance policies issued by (i) Financial Guaranty Insurance Company with respect to the Series 2007A Bonds maturing August 1, 2040, August 1, 2041 and August 1, 2042 (the "FGIC Policy"), (ii) MBIA Insurance Corporation with respect to the Series 2007A Bonds maturing August 1, 2043 through August 1, 2046 (the "MBIA Policy"), and (iii) Ambac Assurance Corporation with respect to the Series 2007A Bonds maturing August 1, 2047 and August 1, 2054 (the "Ambac Policy").

"**Capital Appreciation Series 2007A Bonds**" means the Series 2007A Bonds maturing August 1, 2040 through August 1, 2056 as to which interest is not paid on a current basis but is accrued and compounded as Compounded Amount.

"**Cede & Co.**" means Cede & Co., the nominee of DTC, and any successor of DTC with respect to the Series 2007A Bonds.

"**Current Interest Adjustable Rate Series 2007A Bonds**" means the Series 2007A Bonds maturing August 1, 2057 bearing interest at the LIBOR-Based Interest Rate.

"**Current Interest Fixed Rate Series 2007A Bonds**" means the Series 2007A Bonds maturing August 1, 2057 bearing interest at the rate of 5.25% per annum.

"**Current Interest Series 2007 Bonds**" means the Current Interest Adjustable Rate Series 2007A Bonds and the Current Interest Fixed Rate Series 2007A Bonds.

508050.12 029578 RES

"**Debt Service Reserve Requirement**" for purposes of the Series 2007A Bonds means the amount of zero ($0).

"**FGIC**" means Financial Guaranty Insurance Company, a New York stock insurance company, or any successor thereto.

"**FGIC Insurance Policy**" means the municipal bond new issue insurance policy issued by FGIC that guarantees payment of principal of and interest on the FGIC Insured Bonds.

"**FGIC Insured Bonds**" means the Series 2007A Bonds maturing on August 1 in the years 2040 through 2042.

"**Interest Payment Date**" means, for Current Interest Fixed Rate Series 2007A Bonds, August 1 and February 1 in each year, commencing February 1, 2008, and for Current Interest Adjustable Rate Series 2007A Bonds, August 1, November 1, February 1 and May 1 in each year, commencing November 1, 2007; provided, that if any Interest Payment Date is a day ("Day X") that is not a Business Day, interest accrued to Day X shall be paid on the next succeeding Business Day.

"**Interest Rate Exchange Agreements**" means (i) the ISDA Master Agreement and Schedule thereto, as affected by Confirmations, between the Corporation and Goldman Sachs Capital Markets LP and (ii) the ISDA Master Agreement and Schedule thereto, as affected by Confirmations, between the Corporation and Lehman Brothers Special Financing Inc., each with respect to a notional amount equal to $218,000,000 aggregate principal amount of the Current Interest Adjustable Rate Series 2007A Bonds.

"**LIBOR Rate Determination Date**" means the day that is two (2) London Banking Days preceding each Interest Payment Date on the Current Interest Adjustable Rate Series 2007A Bonds.

"**LIBOR-Based Interest Accrual Period**" means the period beginning on an Interest Payment Date for the Current Interest Adjustable Rate Series 2007A Bonds (or the date of issuance thereof, for the period prior to the first Interest Payment Date) to but not including the following Interest Payment Date.

"**LIBOR-Based Interest Rate**" means a rate of interest equal to 67% of Three Month LIBOR plus 93 basis points (0.93%). All percentages resulting from any calculation of the interest rate on the Adjustable Rate Series 2007A Bonds shall be rounded to the nearest fifth decimal place (one-hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)). All dollar amounts used in or resulting from such calculation on the Adjustable Rate Series 2007A Bonds will be rounded to the nearest cent (with one-half cent being rounded upward).

"**London Banking Day**" means any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in the City of London, United Kingdom.

508050.12 029578 RES

**"Market Agent"** means initially, Goldman, Sachs & Co. or such other market agent as may be appointed by the Trustee, upon written direction from the Corporation, to identify Reference Banks and otherwise calculate Three-Month LIBOR, as set forth in the definition of "Three-Month LIBOR."

**"Master Escrow Agent"** means The Bank of New York, as master escrow agent under the Master Escrow Agreement.

**"Master Escrow Agreement"** means the 2007 Master Refunding and Payment Trust Agreement, dated as of July 31, 2007, between the Puerto Rico Public Finance Corporation and The Bank of New York, as Master Escrow Agent.

**"MBIA"** means MBIA Insurance Corporation, its successors and assigns.

**"MBIA Policy"** means the financial guaranty insurance policy issued by MBIA with respect to the MBIA Insured Bonds.

**"MBIA Insured Bonds"** means the Series 2007A Bonds maturing on August 1 in the years 2043 through 2046.

**"Parity Hedge Series 2007A Obligations"** means the net amount, if any, owed by the Corporation under each Interest Rate Exchange Agreement after the netting of the regular floating rate payments to be made by the Qualified Hedge Provider against the fixed rate payments to be made by the Corporation.

**"Participants"** means those broker-dealers, banks and other financial institutions for which DTC holds Series 2007A Bonds as securities depositary.

**"Record Date"** means, with respect to the payment of interest on Current Interest Series 2007A Bonds, the fifteenth calendar day (whether or not a Business Day) next preceding such Interest Payment Date.

**"Serial Bonds"** means (i) the Series 2007A Bonds maturing August 1, 2040 through August 1, 2047, (ii) the Current Interest Fixed Rate Series 2007A Bonds maturing August 1, 2057 and (iii) the Current Interest Adjustable Rate Series 2007A Bonds.

**"Series 2007A Bonds"** means the Corporation's Sales Tax Revenue Bonds, Series 2007A, authorized by Article II of this Supplemental Resolution.

**"Term Bonds"** for purposes of the Series 2007A Bonds means the Series 2007A Bonds maturing August 1, 2054 and August 1, 2056.

**"Three Month LIBOR"** means, with respect to the Current Interest Adjustable Rate Series 2007A Bonds, the rate for deposits in U.S. dollars with a three-month maturity that appears on Reuters Screen LIBOR 01 Page (or such other page as may replace that page on that service, or such other service as may be nominated by the British Bankers Association, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, on the LIBOR Rate Determination Date, except that, if such rate does not appear

-4-

on such page on the LIBOR Rate Determination Date, the Three-Month LIBOR Rate means a rate determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on the LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank market (herein referred to as the "Reference Banks") selected by the Market Agent. The Market Agent is to request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of the rates quoted by three (if three quotations are not provided, two or one, as applicable) major banks in New York City, selected by the Market Agent, at approximately 11:00 a.m., New York City time, on the LIBOR Rate Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity. If none of the banks in New York City selected by the Market Agent is then quoting rates for such loans, then the Three-Month LIBOR Rate for the ensuing interest period will mean the Three-Month LIBOR Rate then in effect in the immediately preceding LIBOR-Based Interest Accrual Period.

SECTION 1.3. Interpretation. Unless the context clearly otherwise requires, this Series Resolution shall be interpreted in accordance with applicable provisions of the General Resolution.

SECTION 1.4. Authority for this Series Resolution. This Series Resolution is adopted pursuant to the provisions of the Act and the General Resolution.

## ARTICLE II

### AUTHORIZATION OF SERIES 2007A BONDS

SECTION 2.1. <u>Principal Amount, Designation and Series</u>. Pursuant to the provisions of the General Resolution, a Series of Bonds to be designated as "Sales Tax Revenue Bonds" which shall be entitled to the benefit, protection and security of such provisions is hereby authorized, further designated "Series 2007A" in the aggregate principal amount at issuance of $2,667,603,572.60 . All of such Bonds shall constitute "Senior Bonds" under the Resolution.

SECTION 2.2. <u>Purposes</u>. The Series 2007A Bonds are being issued for the purpose of providing the Corporation with funds (i) to provide for the Repayment Project, and (ii) to pay Financing Costs, including but not limited to Costs of Issuance.

SECTION 2.3. <u>Details of Series 2007A Bonds</u>. (a) The Series 2007A Bonds shall be dated as of, and shall bear interest (or accreted Compounded Amount) initially from, the initial date of delivery thereof and payment therefor, and shall mature on August 1 in the years and in the principal amounts, and (except for Capital Appreciation Series 2007A Bonds) bear interest payable on each Interest Payment Date at the interest rates per annum, as set forth below:

| Maturity Date (August 1) | Principal Amount at Issuance | Rate | CAB Value at Maturity |
|---|---|---|---|
| 2040 | $ 15,445,848.60 | n/a | $ 77,805,000 |
| 2041 | 114,697,901.80 | n/a | 610,810,000 |
| 2042 | 113,630,448.00 | n/a | 637,800,000 |
| 2043 | 112,132,508.00 | n/a | 665,870,000 |
| 2044 | 110,597,947.20 | n/a | 695,060,000 |
| 2045 | 109,430,361.25 | n/a | 725,800,000 |
| 2046 | 108,235,860.00 | n/a | 757,000,000 |
| 2047 | 107,014,744.15 | n/a | 789,835,000 |
| 2054 | 701,475,105.60 | n/a | 7,619,760,000 |
| 2056 | 175,057,848.00 | n/a | 2,315,580,000 |
| 2057 | 563,885,000.00 | 5.25% | |
| 2057 | 436,000,000.00 | LIBOR-Based Interest Rate | |

(b) The Series 2007A Bonds maturing on August 1 in the years 2040, 2041, 2042, 2043, 2044, 2045, 2046 , 2047 and 2057 (both Current Interest Fixed Rate Series 2007A Bonds and Current Interest Adjustable Rate Series 2007A Bonds) shall constitute Serial Bonds. The Series 2007A Bonds maturing on August 1, 2054 and August 1, 2056 shall constitute Term

-6-

Bonds. The Series 2007A Bonds maturing on or before August 1, 2056 shall constitute Capital Appreciation Bonds.

(c)    The Current Interest Adjustable Rate Series 2007A Bonds shall bear a rate of interest during each LIBOR-Based Interest Accrual Period equal to the LIBOR-Based Interest Rate. The Market Agent will calculate the LIBOR-Based Interest Rate applicable to each LIBOR-Based Interest Rate Period and will notify the Trustee and the Corporation of the LIBOR-Based Interest Rate so calculated in writing, or by electronic communication promptly confirmed in writing, by no later than close of business on the second Business Day preceding the Interest Payment Date relating to such LIBOR-Based Interest Rate Period. All calculations of the LIBOR-Based Interest Rate by the Market Agent will be final and conclusive and binding on the Trustee, the Owners of the Adjustable Rate Series 2007A Bonds and the Corporation, absent manifest error. If the Market Agent fails to provide a notice of the LIBOR-Based Interest Rate as described in this paragraph, then the Trustee will calculate the LIBOR-Based Interest Rate for such LIBOR-Based Interest Rate Period and notify the Corporation of the LIBOR-Based Interest Rate so calculated as if it were the Market Agent by no later than close of business on the first Business Day preceding the Interest Payment Date relating to such LIBOR-Based Interest Rate Period.

(d)    Interest on the Current Interest Fixed Rate Series 2007A Bonds, and Compounded Amount on the Capital Appreciation Series 2007A Bonds shall be computed on the basis of a 360-day year of twelve 30-day months. Interest on the Current Interest Adjustable Rate Series 2007A Bonds shall be computed on the basis of actual days in a 365/366 day year.

(e)    All of the Series 2007A Bonds, excluding the Series 2007A Bonds maturing August 1, 2056 and August 1, 2057, shall be the subject of the Bond Insurance Policies as described in the definition of "Bond Insurance Policies."

(f)    The Series 2007A Bonds shall be issuable in denominations of $5,000 (for Capital Appreciation Series 2007A Bonds, of maturity amount) or integral multiples thereof. Each Series 2007A Bond shall be lettered "2007AR" and shall be numbered consecutively from (1) upwards in order of authentication by the Trustee or otherwise in such manner as the Trustee in its discretion shall determine.

(g)    *Except* as otherwise provided in Section 2.5, the principal of and premium, if any, and interest on the Series 2007A Bonds shall be payable at the Corporate Trust Office of the Trustee. *Except* as otherwise provided in Section 2.5, interest on the Series 2007A Bonds shall be paid by check or draft of the Trustee mailed to the Owners thereof as of the applicable Record Date at their respective addresses as shown on the registration books of the Corporation maintained by the Trustee, or, at the option of the Owner of $1,000,000 or more in principal amount at maturity of the Series 2007A Bonds by written notice to the Trustee from such Owner at least fifteen (15) calendar days prior to the related payment date, by wire transfer.

SECTION 2.4. Redemption. (a) The Series 2007A Bonds due on August 1 in the years 2054 and 2056 shall be redeemed in part through application of Sinking Fund Installments as provided in Sections 403 and 508 of the General Resolution, in each case at a Redemption Price equal to the Compounded Amount of the respective Series 2007A Bond or portion thereof

-7-

to be redeemed. Subject to the provisions of Section 508 of the General Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Series 2007A Bonds due on each of the dates specified above, there shall be due and the Corporation shall in any and all events be required to pay on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount is hereby established and shall constitute a Sinking Fund Installment for the retirement of the respective Series 2007A Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

| 2054 Maturity | | 2056 Maturity | |
|---|---|---|---|
| Sinking Fund Installment Date (August 1) | Amount | Sinking Fund Installment Date (August 1) | Amount |
| 2048 | $102,859,098.30 | 2055 | $88,021,458.00 |
| 2049 | 101,982,687.10 | 2056 | 87,036,390.00 |
| 2050 | 101,102,593.50 | | |
| 2051 | 100,217,436.60 | | |
| 2052 | 99,329,057.60 | | |
| 2053 | 98,438,837.40 | | |
| 2054 | 97,545,395.10 | | |

(b)     The Current Interest Fixed Rate Series 2007A Bonds and the Current Interest Adjustable Rate Series 2007A Bonds shall be subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the Corporation, in whole or in part in any order of maturity determined by the Corporation, at any time on and after August 1, 2017, at a Redemption Price equal to 100% of the principal amount thereof plus interest, if any, accrued to the redemption date.

(c)     The Capital Appreciation Series 2007A Bonds shall be subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the Corporation, in whole or in part in any order of maturity determined by the Corporation, at any time on or after August 1, 2012, at a Redemption Price equal to the greater of (i) 100% of the Compounded Amount thereof, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted, on a semi-annual basis (each August 1 and February 1), assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate (calculated on the fifth Business Day preceding the date fixed for redemption).

SECTION 2.5. Book-Entry Provisions. (a) *Except* as provided in subsection (d) of this Section, the Owner of all of the Series 2007A Bonds shall be Cede & Co., as nominee for DTC, and the Series 2007A Bonds shall be registered in the name of Cede & Co., as nominee for

-8-

DTC. Payment of interest on any Series 2007A Bond registered in the name of Cede & Co. shall be made by wire transfer of Federal or equivalent same day funds to the account of Cede & Co. on the Interest Payment Date for the Series 2007A Bonds at the address indicated for Cede & Co. in the registration books of the Corporation maintained by the Trustee.

(b)     The Series 2007A Bonds initially shall be issued in the form of separate single authenticated fully registered Bonds in the amount of each separate stated maturity and for each separate "CUSIP" number within a maturity of the Series 2007A Bonds. Upon initial issuance, the ownership of the Series 2007A Bonds shall be registered in the registration books of the Corporation maintained by the Trustee in the name of Cede & Co., as nominee of DTC. The Trustee and the Corporation may treat DTC (or its nominee) as the sole and exclusive Owner of the Series 2007A Bonds registered in its name for the purposes of payment of the principal or Redemption Price of or interest on the Series 2007A Bonds, selecting the Series 2007A Bonds or portions thereof to be redeemed, giving any notice permitted or required to be given to Owners of the Series 2007A Bonds under the General Resolution or this Supplemental Resolution, registering the transfer of the Series 2007A Bonds, obtaining any consent or other action to be taken by Owners of the Series 2007A Bonds and for all other purposes whatsoever, and neither the Trustee nor the Corporation shall be affected by any notice to the contrary. The Trustee and the Corporation shall not have any responsibility or obligation to any Participant, any Person claiming a beneficial ownership interest in the Series 2007A Bonds under or through DTC or any Participant, or any other Person which is not shown on the registration books as being an Owner of the Series 2007A Bonds, with respect to the accuracy of any records maintained by DTC or any Participant; the payment of DTC or any Participant of any amount in respect of the principal or Redemption Price of or interest on the Series 2007A Bonds; any notice which is permitted or required to be given to Owners of the Series 2007A Bonds under the General Resolution or this Supplemental Resolution; the selection by DTC or any Participant of any Person to receive payment in the event of a partial redemption of the Series 2007A Bonds; or any consent given or other action taken by DTC as Owner of the Series 2007A Bonds.

(c)     The Trustee shall pay all principal of, and premium, if any, and interest on the Series 2007A Bonds only to or "upon the order of" Cede & Co., as nominee for DTC (as that term is used in the Uniform Commercial Code as adopted in the Commonwealth), and all such payments shall be valid and effective to fully satisfy and discharge the Corporation's obligations with respect to the principal of, and premium, if any, and interest on the Series 2007A Bonds to the extent of the sum or sums so paid. No person other than DTC shall receive an authenticated Series 2007A Bond for each separate stated maturity or separate "CUSIP" number within a maturity evidencing the obligation of the Corporation to make payments of principal of and premium, if any, and interest on the Series 2007A Bonds pursuant to the General Resolution and this Supplemental Resolution. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions herein with respect to transfers, the word "Cede & Co." in this Supplemental Resolution shall refer to such new nominee of DTC.

(d)     In the event the Corporation determines that it is in the best interest of the Beneficial Owners that they be able to obtain Series 2007A Bond certificates, the Corporation may notify DTC and the Trustee, whereupon DTC will notify the Participants, of the availability through DTC of the Series 2007A Bond certificates, subject to DTC procedures. In such event,

-9-

the Corporation shall issue, and the Trustee shall transfer and exchange, Series 2007A Bond certificates as requested by DTC and any other Series 2007A Bond owners in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series 2007A Bonds at any time by giving notice to the Corporation and the Trustee and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depositary), the Corporation and the Trustee shall be obligated to deliver Series 2007A Bond certificates as described in the General Resolution. In the event Series 2007A Bond certificates are issued, the provisions of the General Resolution shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal and of and Redemption Price interest on such certificates. Whenever DTC requests the Corporation and the Trustee to do so, the Trustee and the Corporation will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the Series 2007A Bonds to any DTC Participant having Series 2007A Bonds credited to its DTC account or (ii) to arrange for another securities depositary to maintain custody of certificates evidencing the Series 2007A Bonds.

(e)     Notwithstanding any other provision of the General Resolution or this Supplemental Resolution to the contrary, so long as any Series 2007A Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to the principal of, and premium, if any, and interest on such Series 2007A Bond and all notices with respect to and surrender or delivery of such Series 2007A Bond shall be made and given, respectively, to or by DTC as provided by DTC's operating procedures. Bondholders shall have no lien or security interest in any rebate or refund paid by DTC to the Trustee which arises from the payment by the Trustee of principal of or interest on the Series 2007A Bonds in accordance with existing arrangements with DTC.

(f)     In connection with any notice or other communication to be provided to Owners of Series 2007A Bonds pursuant to the General Resolution or this Supplemental Resolution by the Corporation or the Trustee with respect to any consent or other action to be taken by Owners of Series 2007A Bonds, the Corporation or the Trustee, as the case may be, shall establish a record date for such consent or other action and give DTC notice of such record date not less than 15 calendar days in advance of such record date to the extent possible. Notice to DTC shall be given only when DTC under this subsection (f) is the sole Owner of the Series 2007A Bonds.

SECTION 2.6. <u>Form of Series 2007A Bonds</u>. Subject to the provisions of the General Resolution, the Series 2007A Bonds shall be in substantially the form of <u>Exhibit A</u>, with necessary and appropriate variations, omissions and insertions as permitted by the General Resolution and this Supplemental Resolution.

SECTION 2.7. <u>Insurance Provisions.</u>    Attached hereto as <u>Exhibit B</u> are special provisions relating to the Bond Insurance Policies.

SECTION 2.8. <u>Interest Rate Exchange Agreements.</u>    The Current Interest Adjustable Rate Series 2007A Bonds shall be the subject of the Interest Rate Exchange Agreements. "Parity Obligations" under the Resolution shall include the Parity Hedge Series 2007A Obligations.

508050.12 029578 RES

**ARTICLE III**

**DISPOSITION OF PROCEEDS OF SERIES 2007A BONDS AND OTHER FUNDS**

SECTION 3.1. Deposits to Accounts or Transfers. Upon receipt by the Corporation of the proceeds of sale of the Series 2007A Bonds, and receipt by the Corporation of the proceeds from liquidation of forward delivery agreements previously securing the Puerto Rico Public Finance Corporation's "QZAB" bonds issued under Trust Agreements dated December 12, 2001, May 18, 2004 and December 30, 2005 (in the amount of $4,400,000), there shall be deposited by the Corporation in or transferred by the Corporation to:

1.  Government Development Bank (account information: Citibank, N.A. ABA #021000089, for Government Development Bank (GDB) Account No. 36008661, for further credit to BGF-COFINA Acct. # 251-0034-3), the amount of $4,807,120.82 for Costs of Issuance; provided, that bond insurance premiums shall be wired directly from net proceeds of the Series 2007A Bonds to the applicable bond insurers ($9,284,905 with respect to the FGIC Policy, $21,325,000 with respect to the MBIA Policy and $39,719,277 with respect to the Ambac Policy) in payment of their fees in connection with the Bond Insurance Policies, and other amounts shall be wired to recipients thereof as directed to the Trustee in writing by Government Development Bank;

2.  by wire, directly, to the account of Government Development Bank (same account information), (i) in the amount of $202,994,351.42, for full repayment of the interim loan made by Government Development Bank to the Corporation for payment of FY 2008 debt service on bonds of the Public Finance Corporation pursuant to resolutions adopted by the Corporation on July 10, 2007, and (ii) in the amount of $1,721,252,641, for repayment of extraconstitutional debt, outstanding as of June 30, 2006, owed to Government Development Bank;

3.  the Capitalized Interest Account (Series 2007A Subaccount), the amount of $2,491,695.58; and

4.  the Trustee for credit to the Bond Proceeds Account, the balance of such proceeds, to be immediately transferred to the Master Escrow Agent to be applied in accordance with the terms of the Master Escrow Agreement.

508050.12 029578 RES

## ARTICLE IV

## MISCELLANEOUS

SECTION 4.1. <u>Headings</u>.   The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Supplemental Resolution.

SECTION 4.2. <u>Governing Law</u>.  This Supplemental Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that to the maximum extent permitted by applicable law, the rights, duties, privileges and duties of the Trustee, any Paying Agent and Bond Trustee, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 4.3. <u>Effective Date</u>.  This Supplemental Resolution shall take effect upon the filing with the Trustee of a copy hereof, certified by an Authorized Officer of the Corporation.

SECTION 4.4. <u>No Representations of Trustee</u>.  The recitals of fact herein and in the Series 2007ABonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same.   The Trustee makes no representations as to the validity or sufficiency of the General Resolution or this Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or this Supplemental Resolution, and the Trustee shall incur no liability in respect thereof.   The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Series 2007A Bonds.

SECTION 4.5. <u>Notices</u>.    Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

<u>To the Trustee:</u>

The Bank of New York
101 Barclay Street—7W
New York, New York 10286
Attention:  Northern Municipals
Phone:  212-815-6955
Fax:  212-815-5595/5596

<u>To the Corporation:</u>

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

-12-

Attention: Executive Director
Phone: 787-722-2525
Fax: 787-728-0975

SECTION 4.6. <u>Parties Interested Herein</u>. Nothing in this Resolution expressed or implied is intended or shall be construed to confer upon, or to give or grant to, any person or entity, other than the Corporation, the Trustee, the Bond Insurers, the Paying Agent, if any, and the registered owners of the Series 2007A Bonds, any right, remedy or claim under or by reason of this Resolution or any covenant, condition or stipulation hereof, and all covenants, stipulations, promises and agreements in this Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Bond Insurers, the Paying Agent, if any, and the registered owners of the Series 2007A Bonds.

SECTION 4.7. <u>Invalid Provisions.</u> In case any provision in this Supplemental Resolution or the Series 2007A Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

508050.12 029578 RES

EXHIBIT A

**FORM OF CURRENT INTEREST FIXED RATE/ADJUSTABLE RATE SERIES
2007A BONDS**

No. 2007AR-___ $_____

PUERTO RICO SALES TAX FINANCING CORPORATION
SALES TAX REVENUE BOND
SERIES 2007A

| DATED DATE | MATURITY DATE | [ADJUSTABLE] INTEREST RATE | CUSIP NO. |
|---|---|---|---|
| | | ____ % | ___ |

REGISTERED OWNER:     Cede & Co.

PRINCIPAL AMOUNT:

PUERTO RICO SALES TAX FINANCING CORPORATION (herein sometimes called the "Corporation"), an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns, upon presentation and surrender of this bond at the Corporate Trust Office (as defined in the General Resolution) of the Trustee hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT specified above, and to pay interest thereon from the most recent interest payment date to which interest has been paid, or, if no interest has been paid, from the DATED DATE specified above, until the earlier of the maturity or redemption of this bond, at the per annum INTEREST RATE specified above, payable on [August 1 and February 1 of each year, commencing February 1, 2008][August 1, November 1, February 1 and May 1 of each year, commencing November 1, 2007]. Both the principal of and the interest on this bond are payable in any coin or currency of the United States of America which, on the respective dates of payment thereof, shall be legal tender for the payment of public and private debts. Payment of the interest on this bond on any interest payment date will be made to the person appearing on the registration books of the Corporation maintained by the Trustee as the registered owner hereof as of the fifteenth calendar day (whether or not a business day) next preceding such interest payment date, such interest to be paid by check or draft mailed to the registered owner at such registered owner's address or, at the option of a registered owner of at least $1,000,000 in aggregate principal amount of the Series 2007A Bonds (hereinafter defined) who so requests the Trustee in writing at least 15 calendar days prior to such interest payment date, by wire transfer.

The Bonds are payable by the Corporation solely from the Pledged Property held under the Resolution. The Bonds do not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth of Puerto Rico or any of its municipalities or

political subdivisions or of instrumentalities (other than the Corporation), and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions or instrumentalities (other than the Corporation) shall be liable for the payment thereof.

The Series 2007A Bonds are subject to redemption prior to maturity as provided in the Resolution. Notice of redemption shall be given as provided in the Resolution.

This bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $2,667,603,572.60 designated "Sales Tax Revenue Bonds, Series 2007A" authorized to be issued pursuant to Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended, and under and pursuant to a Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (as amended, herein called the "General Resolution"), and a First Supplemental Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (such supplemental resolution and the General Resolution are herein called, collectively, the "Resolution"), for the purposes set forth in the Resolution.

The Series 2007A Bonds are part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Resolution for the purposes described in the Resolution. The Series 2007A Bonds and any such additional bonds are herein referred to collectively as the "Bonds".

The Bonds are special obligations of the Corporation. There is pledged to the payment of the principal or redemption price, if any, of and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the Corporation may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal thereof and the interest thereon on the terms and conditions set forth in the General Resolution.

Copies of the Resolution are on file at the office of the Corporation, and at the Corporate Trust Office of The Bank of New York, as trustee under the Resolution (including its successors, herein called the "Trustee"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the General Resolution, the provisions of the General Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This bond is transferable, as provided in the Resolution, only upon the books of the Corporation maintained for that purpose at the Corporate Trust Office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2007A Bond or Bonds in the same aggregate principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This bond shall not be valid or obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Trustee.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required by the Constitution and statutes of the Commonwealth of Puerto Rico and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Series 2007A Bonds, together with all other indebtedness of the Corporation, is within every debt and other limit prescribed by law.

IN WITNESS WHEREOF, the PUERTO RICO SALES TAX FINANCING CORPORATION has caused this bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

PUERTO RICO SALES TAX FINANCING
CORPORATION

By:_____
Executive Director

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

-3-

508050.12 029578 RES

CERTIFICATE OF AUTHENTICATION

This bond is one of the Series 2007A Bonds described in the within-mentioned Resolution.

THE BANK OF NEW YORK, as Trustee

By:_____
                Authorized Signatory

Date of Authentication:

-4-

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____          _____

_____          _____

By:

_____

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Trustee, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Trustee in addition to, or in
substitution for, STAMP, all in accordance
with the Securities Exchange Act of 1934, as
amended.

## FORM OF CAPITAL APPRECIATION SERIES 2007A BONDS

No. 2007AR-___                                                                      $_____

PUERTO RICO SALES TAX FINANCING CORPORATION
SALES TAX REVENUE BOND
SERIES 2007A

DATED DATE          MATURITY DATE                                    CUSIP NO.

                                                            ___                    ___

REGISTERED OWNER:          Cede & Co.

PRINCIPAL AMOUNT AT
ISSUANCE

PRINCIPAL AMOUNT AT
MATURITY

PUERTO RICO SALES TAX FINANCING CORPORATION (herein sometimes called the "Corporation"), an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns, upon presentation and surrender of this bond at the Corporate Trust Office (as defined in the General Resolution) of the Trustee hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT AT MATURITY specified above. The principal (consisting of Compounded Amount) of this bond is payable in any coin or currency of the United States of America which, on the date of payment thereof, shall be legal tender for the payment of public and private debts. Interest on this bond shall not be payable on a current basis but shall be compounded, and added to principal, on each August 1 and February 1 commencing August 1, 2007 such that the PRINCIPAL AMOUNT AT ISSUANCE specified above shall accrete to equal the PRINCIPAL AMOUNT AT MATURITY specified above on the MATURITY DATE specified above.

The Bonds are payable by the Corporation solely from the Pledged Property held under the Resolution. The Bonds do not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions or of instrumentalities (other than the Corporation), and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions nor instrumentalities (other than the Corporation) shall be liable for the payment thereof.

The Series 2007A Bonds are subject to redemption prior to maturity as provided in the Resolution. Notice of redemption shall be given as provided in the Resolution.

508050.12 029578 RES

This bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $2,667,603,572.60 designated "Sales Tax Revenue Bonds, Series 2007A" (herein called the "Series 2007A Bonds") authorized to be issued pursuant to Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended, and under and pursuant to a Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (as amended, herein called the "General Resolution"), and a First Supplemental Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (such supplemental resolution and the General Resolution are herein called, collectively, the "Resolution"), for the purposes set forth in the Resolution.

The Series 2007A Bonds are part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Resolution for the purposes described in the Resolution. The Series 2007A Bonds and any such additional bonds are herein referred to collectively as the "Bonds".

The Bonds are special obligations of the Corporation. There is pledged to the payment of the principal or redemption price, if any, of and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the Corporation may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal thereof and the interest thereon on the terms and conditions set forth in the General Resolution.

Copies of the Resolution are on file at the office of the Corporation, and at the Corporate Trust Office of The Bank of New York, as trustee under the Resolution (including its successors, herein called the "Trustee"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the General Resolution, the provisions of the General Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This bond is transferable, as provided in the Resolution, only upon the books of the Corporation maintained for that purpose at the Corporate Trust Office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2007A Bond or Bonds in the same aggregate principal amount, and of the same series,

-3-

maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This bond shall not be valid or obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Trustee.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required by the Constitution and statutes of the Commonwealth of Puerto Rico and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Series 2007A Bonds, together with all other indebtedness of the Corporation, is within every debt and other limit prescribed by law.

IN WITNESS WHEREOF, the PUERTO RICO SALES TAX FINANCING CORPORATION has caused this bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

<div style="margin-left:50%;">

PUERTO RICO SALES TAX FINANCING
CORPORATION

By:_____
          Executive Director

</div>

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

508050.12 029578 RES

## CERTIFICATE OF AUTHENTICATION

This bond is one of the Series 2007A Bonds described in the within-mentioned Resolution.

THE BANK OF NEW YORK, as Trustee

By:_____
    Authorized Signatory

Date of Authentication:

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____          _____

_____          _____

By:

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Trustee, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Trustee in addition to, or
in substitution for, STAMP, all in accordance
with the Securities Exchange Act of 1934, as
amended.

508050.12 029578 RES

**EXHIBIT B**

### SPECIAL PROVISIONS RELATING TO BOND INSURANCE POLICIES

#### MBIA INSURANCE POLICY

So long as the municipal bond insurance policy issued by MBIA shall be in full force and effect with respect to the MBIA Insured Bonds, the Corporation and the Trustee hereby agree to comply with the following provisions:

(i)     In the event that, on the second business day, and again on the business day, prior to any interest payment date on the MBIA Insured Bonds, there shall not be sufficient moneys to pay all principal of and interest on the MBIA Insured Bonds due on such interest payment date, the Trustee shall immediately notify MBIA or its designee on the same business day by telephone or telegraph, confirmed in writing by registered or certified mail, of the amount of the deficiency.

(ii)     If the deficiency is made up in whole or in part prior to or on such interest payment date, the Trustee shall so notify MBIA or its designee.

(iii)     In addition, if the Trustee has notice that any owner of an MBIA Insured Bond has been required to disgorge payments of principal of or interest on such Bond to a trustee in bankruptcy or creditors or others pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes a voidable preference to such owner within the meaning of any applicable bankruptcy laws, then the Trustee shall notify MBIA or its designee of such fact by telephone or telegraph, confirmed in writing by registered or certified mail.

(iv)     The Trustee is hereby irrevocably designated, appointed, directed and authorized to act as attorney-in-fact for owners of the MBIA Insured Bonds as follows:

(1)     If and to the extent there is a deficiency in amounts required to pay interest on the MBIA Insured Bonds, the Trustee shall (i) execute and deliver to State Street Bank and Trust Company, N.A., or its successors under the MBIA municipal bond insurance policy (the "MBIA Insurance Paying Agent"), in form satisfactory to the MBIA Insurance Paying Agent, an instrument appointing MBIA as agent for such owners in any legal proceeding related to the payment of such interest and an assignment to MBIA of the claims for interest to which such deficiency relates and which are paid by MBIA, (ii) receive as designee of the respective owners (and not as Trustee) in accordance with the tenor of the MBIA municipal bond insurance policy payment from the MBIA Insurance Paying Agent with respect to the claims for interest so assigned, and (iii) disburse the same to such respective owners; and

(2)     if and to the extent there is a deficiency in amounts required to pay principal of the MBIA Insured Bonds, the Trustee

Page 1

508050.12 029578 RES

shall (i) execute and deliver to the MBIA Insurance Paying Agent in form satisfactory to the MBIA Insurance Paying Agent an instrument appointing MBIA as agent for the owners thereof in any legal proceeding relating to the payment of such principal and an assignment to MBIA of any of the MBIA Insured Bonds surrendered to the MBIA Insurance Paying Agent or so much of the principal amount thereof as has not previously been paid or for which moneys are not held by the Trustee and available for such payment (but such assignment shall be delivered only if payment from the MBIA Insurance Paying Agent is received), (ii) receive as designee of the respective owners (and not as Trustee) in accordance with the tenor of the MBIA municipal bond insurance policy payment therefor from the MBIA Insurance Paying Agent, and (iii) disburse the same to such owners.

(v)     Payments with respect to claims for interest on and principal of the MBIA Insured Bonds disbursed by the Trustee from proceeds of the MBIA municipal bond insurance policy shall not be considered to discharge the obligation of the Corporation with respect to such Bonds, and MBIA shall become the owner of such unpaid MBIA Insured Bonds and claims for the interest in accordance with the tenor of the assignment made to it under the provisions of this paragraph or otherwise.

(vi)     With respect to the MBIA Insured Bonds, MBIA shall have all rights to institute any suit, action, or proceeding at law or in equity, and make direction to the Trustee, under the same terms as an Owner of the MBIA Insured Bonds under the Resolution.

(vii)     Other than the stated redemption provisions related to the MBIA Insured Bonds, acceleration of the principal of MBIA Insured Bonds upon an Event of Default under the Resolution must be subject to MBIA's prior written consent.

(viii)     Irrespective of whether any such assignment is executed and delivered, the Corporation and the Trustee hereby agree for the benefit of MBIA that:

(1)     they recognize that to the extent MBIA makes payments, directly or indirectly (as by paying through the Trustee), on account of principal of or interest on the MBIA Insured Bonds, MBIA will be subrogated to the rights of the owners of such Bonds to receive the amount of such principal and interest from the Corporation, and

(2)     the Corporation will accordingly pay to MBIA the amount of such principal and interest (including principal and interest recovered under subparagraph (ii) of the first paragraph of the MBIA municipal bond insurance policy, which principal and interest shall be deemed past due and not to have been paid), with interest thereon as provided herein and in the MBIA Insured Bonds, but only from the sources and in the manner provided herein for the payment of principal of and interest on the MBIA Insured Bonds to the owners thereof, and will otherwise treat MBIA as the owner of such rights to the amount of such principal and interest.

508050.12 029578 RES

(ix)     MBIA shall have the right to consent to all resolutions supplemental hereto to which owners of Bonds have the right to consent, and shall receive notice of any other supplemental resolutions. Copies of any resolutions supplemental hereto which have been consented to by MBIA shall be sent to Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc.

(x)     The Corporation shall furnish to MBIA notice of the resignation or removal of the Trustee and the appointment of a successor thereto.

(xi)     The Corporation shall furnish to MBIA copies of all notices required to be delivered to registered owners of the MBIA Insured Bonds and, on an annual basis, copies of the audited financial statements and annual budget of the Corporation. All notices required to be given to MBIA under this Resolution shall be in writing and shall be sent by registered or certified mail addressed to MBIA Insurance Corporation, 113 King Street, Armonk, New York 10504 Attention: Surveillance.

(xii)     To effect the defeasance of any outstanding MBIA Insured Bonds, the Corporation shall be permitted to deposit in trust for the owners of such Bonds cash and any obligations permitted by law; provided, however, that without the consent of MBIA, such obligations shall be limited to the following:

(1)     United States Treasury Certificates, Notes and Bonds (including State and Local Government Series - ("SLGS");

(2)     Direct obligations of the United States Treasury which have been stripped by the Treasury itself, CATS, TIGRS and similar securities;

(3)     The interest component of Resolution Funding Corp. strips which have been stripped by request to the Federal Reserve Bank of New York in book entry form;

(4)     Pre-refunded municipal bonds rated "Aaa" by Moody's Investors Service and "AAA" by Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc. If, however, the issue is only rated by Standard & Poor's (i.e., there is no Moody's rating), then the pre-refunded bonds must have been pre-refunded with cash, direct United States or United States guaranteed obligations, or "AAA" rated pre-refunded municipals to satisfy this condition; and

(5)     Obligations issued by the following, agencies which are backed by the full faith and credit of the United States:

a.     United States Export-Import Bank (Eximbank)

Direct obligations or fully guaranteed certificates of beneficial ownership

b.     Farmers Home Administration (FmHA)

Certificates of beneficial ownership

508050.12 029578 RES

c.   Federal Financing Bank

d.   General Services Administration

Participation Certificates

e.   United States Maritime Administration

Guaranteed Title XI financing

f.   United States Department of Housing and Urban Development

Project Notes

Local Authority Bonds

New Communities Debentures - United States government guaranteed debentures

United States Public Housing Notes and Bonds - United States government guaranteed public housing notes and bonds

Defeasance of the MBIA Insured Bonds must be preceded by at least 15 days prior notice to MBIA of the accompanying redemption of MBIA Insured Bonds and must be accompanied by (i) an opinion of counsel acceptable to MBIA that the escrow agreement establishing defeasance escrows for the MBIA Insured Bonds operates to legally defease the MBIA Insured Bonds within the meaning of the Resolution and (ii) an accountant's report with respect to the sufficiency of the escrows to defease the MBIA Insured Bonds.

(xiii) "Investment Obligations" under the Resolution means and includes any of the following securities:

(A) Direct obligations of the United States of America (including obligations issued or held in book-entry form on the books of the Department of the Treasury, and CATS and TIGRS) or obligations the principal of and interest on which are unconditionally guaranteed by the United States of America.

(B) Bonds, debentures, notes or other evidence of indebtedness issued or guaranteed by any of the following federal agencies and provided such obligations are backed by the full faith and credit of the United States of America (stripped securities are only permitted if they have been stripped by the agency itself):

Farmers Home Administration (FmHA)
Certificates of beneficial ownership

Federal Housing Administration Debentures (FHA)

General Services Administration
Participation certificates

Government National Mortgage Association (GNMA or "Ginnie Mae")
GNMA - guaranteed mortgage-backed bonds
GNMA - guaranteed pass-through obligations

U.S. Maritime Administration
Guaranteed Title XI financing

U.S. Department of Housing and Urban Development (HUD)
Project Notes
Local Authority Bonds
New Communities Debentures - U.S. government guaranteed debentures
US. Public Housing Notes and Bonds - U.S. government guaranteed public
housing notes and bonds

(C) Bonds, debentures, notes or other evidence of indebtedness issued or guaranteed by any of the following non-full faith and credit U.S. government agencies (stripped securities are only permitted if they have been stripped by the agency itself):

Federal Home Loan Bank System
Senior debt obligations

Federal Home Loan Mortgage Corporation (FHLMC or "Freddie Mac")
Participation Certificates
Senior debt obligations

Federal National Mortgage Association (FNMA or "Fannie Mae")
Mortgage-backed securities and senior debt obligations

Student Loan Marketing Association (SLMA or "Sallie Mae")
Senior debt obligations

Resolution Funding Corp. (REFCORP) obligations

Farm Credit System
Consolidated systemwide bonds and notes

(D) Money market funds registered under the Federal Investment Company Act of 1940, whose shares are registered under the Federal Securities Act of 1933, and having a rating by S&P of AAAm-G; AAA-m; or AA-m and if rated by Moody's rated Aaa, Aa1 or Aa2 (including funds for which the Trustee or an affiliate of the Trustee serves as investment manager, administrator, shareholder servicing agent, and/or custodian or subcustodian, notwithstanding that (i) the Trustee or an affiliate of the Trustee receives fees from such funds for services rendered, (ii) the Trustee charges and collects fees for services rendered pursuant to this Indenture, which fees are separate from and may be in addition to the fees received from such funds, and (iii) services performed for such funds and pursuant to this Indenture may at times duplicate those provided to such funds by the Trustee or its affiliates).

508050.12 029578 RES

(E) Certificates of deposit secured at all times by collateral described in (A) and/or (B) above. Such certificates must be issued by commercial banks, savings and loan associations or mutual savings banks rated "A" or higher by S&P. The collateral must be held by a third party and the bondholders must have a perfected first security interest in the collateral.

(F) Certificates of deposit, savings accounts, deposit accounts or money market deposits which are fully insured by FDIC, including BIF and SAIF.

(G) Investment Agreements, including GIC's, Forward Purchase Agreements and Reserve Fund Put Agreements acceptable to MBIA.

(H) Commercial paper rated, at the time of purchase, "Prime-1" by Moody's and "A-1" or better by S&P.

(I) Bonds or notes issued by any state or municipality which are rated by Moody's and S&P in one of the two highest rating categories assigned by such agencies.

(J) Federal funds or bankers acceptances with a maximum term of one year of any bank which has an unsecured, uninsured and unguaranteed obligation rating of "Prime-1" or "A3" or better by Moody's and "A-1" or "A" or better by S&P.

(K) Repurchase Agreements for 30 days or less must follow the following criteria. Repurchase Agreements which exceed 30 days must be acceptable to the Credit Provider. Repurchase agreements provide for the transfer of securities from a dealer bank or securities firm (seller/borrower) to a municipal entity (buyer/lender), and the transfer of cash from a municipal entity to the dealer bank or securities firm with an agreement that the dealer bank or securities firm will repay the cash plus a yield to the municipal entity in exchange for the securities at a specified date.

Repos must be between the municipal entity and a dealer bank or securities firm

    (a)    Primary dealers on the Federal Reserve reporting dealer list which are rated "A" or better by Standard & Poor's Corporation and Moody's Investor Services, or

    (b)    Banks rated "A" or above by Standard & Poor's Corporation and Moody's Investor Services.

The written repo contract must include the following:

    (a)    Securities which are acceptable for transfer are:

        (i)    Direct U.S. governments, or

        (ii)    Federal agencies backed by the full faith and credit of the U.S. government (and FNMA & FHLMC)

    (b)    The term of the repo may be up to 30 days

508050.12 029578 RES

(c)     The collateral must be delivered to the Trustee (if Trustee is not supplying the collateral) or third party acting as agent for the Trustee (if the Trustee is supplying the collateral) before/simultaneous with payment (perfection by possession of certificated securities).

(d)     <u>Valuation of Collateral</u>

<u>The securities must be valued weekly: marked-to-market</u> at current market price <u>plus</u> accrued interest

The value of collateral must be equal to 104% of the amount of cash transferred by the municipal entity to the dealer bank or security firm under the repo plus accrued interest. If the value of securities held as collateral slips below 104% of the value of the cash transferred by municipality, then additional cash and/or acceptable securities must be transferred. If, however, the securities used as collateral are FNMA or FHLMC, then the value of collateral must equal 105%.

(e)     Legal opinion which must be delivered to the Corporation and the Trustee.

Provided, however, that all Investment Securities must (A) have a predetermined fixed dollar amount of principal due at maturity that cannot vary or change, (B) if rated by S&P, not have an "r" highlighter affixed to their rating, (C) if such investments have a variable rate of interest, have an interest rate tied to a single interest rate index plus a fixed spread (if any) and must move proportionally with that index, and (D) not be subject to liquidation prior to their maturity.

(xiv)  The form of the MBIA Insured Bonds shall include the following statement of insurance:

## STATEMENT OF INSURANCE FOR MBIA INSURED BONDS

MBIA Insurance Corporation (the "Insurer") has issued a policy containing the following provisions, such policy being on file at The Bank of New York, New York, New York, as trustee and paying agent (the "Paying Agent").

The Insurer, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Corporation to the Paying Agent of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such

508050.12 029578 RES

principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "MBIA Insured Amounts". "Obligations" shall mean:

$440,396,676.45 (Original Principal Amount) and $2,843,355,000 (Maturity Value)
Puerto Rico Sales Tax Financing Corporation
Sales Tax Revenue Bonds, Series 2007A Maturing
August 1, 2043 through August 1, 2046

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the insurer from the Paying Agent or any owner of an Obligation the payment of an MBIA Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with State Street Bank and Trust Company, N.A., in New York, New York, or its successor, sufficient for the payment of any such MBIA Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the MBIA Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of MBIA Insured Amounts on the Obligations, such instruments being in a form satisfactory to State Street Bank and Trust Company, N.A., State Street Bank Trust Company, N.A. shall disburse to such owners or the Paying Agent payment of the MBIA Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such MBIA Insured Amounts and legally available therefor. This policy does not insure against loss of any redemption premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Corporation or any designee of the Corporation for such purpose. The term owner shall not include the Corporation or any party whose agreement with the Corporation constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancelable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

508050.12 029578 RES

MBIA Insurance Corporati

## AMBAC INSURANCE POLICY

So long as the Ambac Policy shall be in full force and effect with respect to the Ambac Insured Bonds, the Corporation (sometimes referred to as the "Corporation") and the Trustee shall comply with the following provisions (Ambac Assurance Corporation is referred to below as "Ambac" or "Ambac Assurance"):

(a)     Any provision of this Resolution expressly recognizing or granting rights in or to Ambac may not be amended in any manner which affects the rights of Ambac hereunder without the prior written consent of Ambac.  Ambac reserves the right to charge the Corporation a fee for any consent or amendment to the Resolution while the Ambac Policy is outstanding.

(b)     Unless otherwise provided in this Section, Ambac's consent shall be required in addition to bondholder consent, when required, for the following purposes: (i) adoption of any resolution supplemental to this Resolution; (ii) removal of the Trustee and selection and appointment of any successor Trustee; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires bondholder consent.

(c)     While the Ambac Policy is in effect, the Corporation  shall furnish to Ambac (to the attention of the Surveillance Department, unless otherwise indicated):

    (i)     as soon as practicable after the filing thereof, a copy of any financial statement of the Corporation and a copy of any audit and annual report of the Corporation at no cost to Ambac;

    (ii)     a copy of any notice to be given to the registered owners of the Ambac Insured Bonds, including, without limitation, notice of any redemption of or defeasance of Ambac Insured Bonds, and any certificate rendered pursuant to this Resolution relating to the security for the Ambac Insured Bonds at no cost to Ambac;

    (iii)     notifications required to be sent to Owners of Ambac Insured Bonds under the Master Continuing Disclosure Agreement; and

    (iv)     such additional information it may reasonably request.

(d)     The Trustee shall notify Ambac's General Counsel Office of any failure of the Corporation to provide notices, certificates or other communication to the Trustee. The Trustee agrees to this provision as a matter of courtesy and accommodation only and shall not be liable to any person for any failure to comply herewith.

(e)     The Corporation will permit Ambac to discuss the affairs, finances and accounts of the Corporation or any information Ambac may reasonably request regarding the security for the Ambac Insured Bonds with appropriate officers of the Corporation. The Corporation will permit Ambac to have access to and to make copies of all books and records relating to the Ambac Insured Bonds at any reasonable time.

508050.12 029578 RES

(f)    Ambac shall have the right to direct an accounting at the Corporation's expense, and the Corporation shall comply with such direction within thirty (30) days after receipt of written notice of the direction from Ambac; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and is diligently pursued, but only if such extension would not materially adversely affect the interests of any beneficial owner of the Ambac Insured Bonds.

(g)    Notwithstanding any other provision of this Resolution, the Trustee or the Corporation (as appropriate) shall immediately notify Ambac's General Counsel Office if at any time there are insufficient moneys to make any payments of principal of or interest on the Ambac Insured Bonds as required. The Trustee agrees to this provision as a matter of courtesy and accommodation only and shall not be liable to any person for any failure to comply herewith.

(h)    The Corporation shall provide Ambac with a copy of all reports and notices filed in accordance with this Resolution.

(i)    Notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the Ambac Insured Bonds shall be paid by Ambac pursuant to the Ambac Policy, such Bonds shall remain Outstanding for all purposes of this Resolution, not be defeased or otherwise satisfied and not be considered paid by the Corporation, and the pledge and all covenants, agreements and other obligations of the Corporation to the registered owners shall continue to exist and shall run to the benefit of Ambac, and Ambac shall be subrogated to the rights of such registered owners.

(j)    Upon the occurrence of an Event of Default under the Resolution, no Ambac Insured Bonds may have the principal thereof accelerated pursuant to the provisions of the Resolution without the prior written consent of Ambac, and Ambac shall have the right to consent to the annulment of any acceleration of the principal of the Ambac Insured Bonds/

(k)    As long as the Ambac Policy shall be in full force and effect, the Corporation and the Trustee agree to comply with the following provisions:

(i)    At least one (1) business day prior to each interest payment date, the Trustee will determine whether there will be sufficient funds to pay the principal of or interest on the Ambac Insured Bonds on such interest payment date. If the Trustee determines that there will be insufficient funds, it shall so notify Ambac. Such notice shall specify the amount of the anticipated deficiency, the Ambac Insured Bonds to which such deficiency is applicable and whether such Bonds will be deficient as to principal or interest, or both. If the Trustee has not so notified Ambac at least one (1) business day prior to an interest payment date, Ambac will make payments of principal or interest due on the Ambac Insured Bonds on or before the first (1st) day next following the date on which Ambac shall have received notice of such nonpayment from the Trustee.

(ii)    The Trustee shall, after giving notice to Ambac as provided in (i) above, make available to Ambac and, at Ambac's direction, to The Bank of New York, as insurance trustee for Ambac or any successor insurance trustee (the

Page 10

"Ambac Insurance Trustee"), the registration books of the Corporation maintained by the Trustee, and all records relating to the funds and accounts maintained under this Resolution.

(iii)    Upon request by Ambac the Trustee shall provide Ambac and the Ambac Insurance Trustee with a list of registered owners of Ambac Insured Bonds entitled to receive principal or interest payments from Ambac under the terms of the Ambac Policy, and shall make arrangements with the Ambac Insurance Trustee (I) to mail checks to the registered owners of Ambac Insured Bonds entitled to receive full or partial interest payments from Ambac and (II) to pay principal upon Ambac Insured Bonds surrendered to the Ambac Insurance Trustee by their registered owners entitled to receive full or partial principal payments from Ambac.

(iv)    The Trustee shall, at the time it provides notice to Ambac pursuant to (i) above, notify registered owners of Ambac Insured Bonds entitled to receive the payment of principal or interest thereon from Ambac (I) as to the fact of such entitlement, (II) that Ambac will remit to them all or a part of the interest payments next coming due upon proof of Bondholder entitlement to interest payments and delivery to the Ambac Insurance Trustee, of an appropriate assignment of the registered owner's right to payment, (III) that should they be entitled to receive full payment of principal from Ambac, they must surrender their Ambac Insured Bonds (along with an appropriate instrument of assignment to permit ownership of such Bonds to be registered in the name of Ambac) for payment to the Ambac Insurance Trustee, and not the Trustee, and (IV) that should they be entitled to receive partial payment of principal from Ambac, they must surrender their Ambac Insured Bonds for payment thereon first to the Trustee, who shall note on such Bonds the portion of the principal paid by the Trustee, and then, along with an appropriate instrument of assignment, to the Ambac Insurance Trustee, which will then pay the unpaid portion of principal.

(v)    In the event that the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment (as defined in the Ambac Policy) and which is made to a Bondholder by or on behalf of the Corporation has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time Ambac is notified pursuant to (i) above, notify all registered owners of Ambac Insured Bonds that in the event that any such registered owner's payment is so recovered, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available, and the Trustee shall furnish to Ambac its records evidencing the payments of principal of and interest on the Ambac Insured Bonds which have been made by the Trustee, and subsequently recovered from the registered owners thereof and the dates on which such payments were made.

(vi)    In addition to those rights granted Ambac under this Resolution, Ambac shall, to the extent it makes payment of principal of or interest on Ambac

508050.12 029578 RES

Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Ambac Policy, and to evidence such subrogation (I) in the case of subrogation as to claims for past due interest, the Trustee shall note Ambac's rights as subrogee on the registration books of the Corporation maintained by the Trustee upon receipt from Ambac of proof of the payment of interest thereon to the registered owners of the Ambac Insured Bonds, and (II) in the case of subrogation as to claims for past due principal, the Trustee shall note Ambac's rights as subrogee on the registration books of the Corporation maintained by the Trustee upon surrender of the Ambac Insured Bonds by the registered owners thereof together with proof of the payment of principal thereof.

(l)     To the extent that this Resolution confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this Resolution, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.

(m)     The Corporation hereby covenants and agrees that it shall reimburse Ambac Assurance for any amounts paid under the Ambac Policy and all costs of collection thereof and enforcement of this Resolution and any other documents executed in connection with this Resolution, together with interest thereon, from the date paid or incurred by Ambac Assurance until payment thereof in full by the Corporation, payable at the Insurer Payment Rate (as hereinafter defined), including without limitation (to the extent permitted by applicable law) interest on claims paid by Ambac Assurance in respect of interest on the Ambac Insured Bonds. Such payment obligation shall be payable on demand and on a parity with, and from the same sources and secured by the same security as, regularly scheduled principal and interest payments in respect of the Ambac Insured Bonds. For purposes of the foregoing, "Insurer Payment Rate" shall mean the lesser of (a) the maximum rate permissible under applicable usury or similar laws limiting interest rates and (b) the greater of (i) the then applicable highest rate of interest on the Ambac Insured Bonds  and (ii) the per annum rate of interest, publicly announced from time to time by JPMorgan Chase Bank, N.A. ("Chase") at its principal office in the City of New York, as its prime or base lending rate ("Prime Rate") (any change in such Prime Rate to be effective on the date such change is announced by Chase) plus 3 percent. The Insurer Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days. In the event that Chase ceases to announce its Prime Rate publicly, Prime Rate shall be the publicly announced prime or base lending rate of such national bank as Ambac Assurance shall specify.

(n)     *TRUSTEE-RELATED PROVISIONS*

1.  The Trustee (or Paying Agent) may be removed at any time, at the request of Ambac Assurance, for any breach of the Resolution set forth herein.

2.  Ambac Assurance shall receive prior written notice of any Trustee (or Paying Agent) resignation.

3.  Every successor Trustee appointed pursuant to the Resolution and the provisions hereof shall be a trust company or bank in good standing located in or incorporated under the laws of the United States of America, Commonwealth or a national banking association,

508050.12 029578 RES

duly authorized to exercise trust powers and subject to examination by federal or state authority, having a reported capital and surplus of not less than $50,000,000 and acceptable to Ambac Assurance. Any successor Paying Agent, if applicable, shall not be appointed unless Ambac approves such successor in writing.

4. Notwithstanding any other provision of this Resolution, in determining whether the rights of the Holders will be adversely affected by any action taken pursuant to the terms and provisions of this Resolution, the Trustee (or Paying Agent) shall consider the effect on the Holders as if there were no Financial Guaranty Insurance Policy.

5. Notwithstanding any other provision of this Resolution, no removal, resignation or termination of the Trustee (or Paying Agent) shall take effect until a successor, acceptable to Ambac, shall be appointed.

(o) ***Permitted Investment Guidelines:***
    ***Permitted Investments***

A.  Ambac Assurance will allow the following obligations to be used as Permitted Investments for all purposes, including defeasance investments in refunding escrow accounts.

    (Ambac Assurance does not give a premium credit for the investment of accrued and/or capitalized interest).

    (1) Cash (insured at all times by the Federal Deposit Insurance Corporation),

    (2) Obligations of, or obligations guaranteed as to principal and interest by, the U.S. or any agency or instrumentality thereof, when such obligations are backed by the full faith and credit of the U.S. including:

- U.S. treasury obligations
- All direct or fully guaranteed obligations
- Farmers Home Administration
- General Services Administration
- Guaranteed Title XI financing
- Government National Mortgage Association (GNMA)
- State and Local Government Series

    Any security used for defeasance must provide for the timely payment of principal and interest and cannot be callable or prepayable prior to maturity or earlier redemption of the rated debt (excluding securities that do not have a fixed par value and/or whose terms do not promise a fixed dollar amount at maturity or call date).

B.  Ambac will allow the following Obligations to be used as Permitted Investments for all purposes other than defeasance investments in refunding escrow accounts.

508050.12 029578 RES

(1)     Obligations of any of the following federal agencies which obligations represent the full faith and credit of the United States of America, including:

-Export-Import Bank
-Rural Economic Community Development Administration
-U.S. Maritime Administration
-Small Business Administration

-U.S. Department of Housing & Urban Development (PHAs)
-Federal Housing Administration
-Federal Financing Bank

(2)     Direct obligations of any of the following federal agencies which obligations are not fully    guaranteed by the full faith and credit of the United States of America:

-Senior debt obligations issued by the Federal National Mortgage Association (FNMA) or Federal Home Loan Mortgage Corporation (FHLMC).
-Obligations of the Resolution Funding Corporation (REFCORP)
-Senior debt obligations of the Federal Home Loan Bank System
-Senior debt obligations of other Government Sponsored Agencies approved by Ambac

(3)     U.S. dollar denominated deposit accounts, federal funds and bankers' acceptances with domestic commercial banks which have a rating on their short term certificates of deposit on the date of purchase of "P-1" by Moody's and "A-1" or "A-1+" by S&P and maturing not more than 360 calendar days after the date of purchase. (Ratings on holding companies are not considered as the rating of the bank);

(4)     Commercial paper which is rated at the time of purchase in the single highest classification, "P-1" by Moody's and "A-1+" by S&P and which matures not more than 270 calendar days after the date of purchase;

(5)     Investments in a money market fund rated "AAAm" or "AAAm-G" or better by S&P;

(6)     Pre-refunded Municipal Obligations defined as follows: any bonds or other obligations of any state of the United States of America or of any agency, instrumentality or local governmental unit of any such state which are not callable at the option of the Corporation prior to maturity or as to which irrevocable instructions have been given by the Corporation to call on the date specified in the notice; and

(A)  which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of Moody's or S&P or any successors thereto; or

Page 14

(B) (i) which are fully secured as to principal and interest and redemption premium, if any, by an escrow consisting only of cash or obligations described in paragraph A(2) above, which escrow may be applied only to the payment of such principal of and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (ii) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, to pay principal of and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate;

(7) Municipal Obligations rated "Aaa/AAA" or general obligations of states of the United States with a rating of "A2/A" or higher by both Moody's and S&P.

(8) Investment Agreements approved in writing by Ambac Assurance Corporation (supported by appropriate opinions of counsel); and

(9) other forms of investments (including repurchase agreements) approved in writing by Ambac.

C. The value of the above investments shall be determined as follows:
a) For the purpose of determining the amount in any fund, all Permitted Investments credited to such fund shall be valued at fair market value. The Corporation shall determine the fair market value based on accepted industry standards and from accepted industry providers. Accepted industry providers shall include but are not limited to pricing services provided by Financial Times Interactive Data Corporation, Merrill Lynch, Citigroup Global Markets Inc., Bear Stearns, or Lehman Brothers.
b) As to certificates of deposit and bankers' acceptances: the face amount thereof, plus accrued interest thereon; and
c) As to any investment not specified above: the value thereof established by prior agreement among the Corporation, the Trustee, and Ambac.

(p) *DEFEASANCE*

Notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the Ambac Insured Bonds shall be paid by Ambac Assurance pursuant to the Financial Guaranty Insurance Policy, the Ambac Insured Bonds shall remain "Outstanding" for all purposes, not be defeased or otherwise satisfied and not be considered paid by the Corporation, and the assignment and pledge of the Pledged Property and all covenants, agreements and other obligations of the Corporation to the registered owners shall continue to exist and shall run to the benefit of Ambac Assurance, and Ambac Assurance shall be subrogated to the rights of such registered owners.

(q) The form of the Ambac Insured Bonds shall include the following statement of insurance:

Page 15

508050.12 029578 RES

**[STATEMENT OF INSURANCE FOR AMBAC INSURED BONDS]**

Ambac Municipal Bond Insurance Policy No. 26827BE "Ambac Policy") with respect to payments due for principal of and interest on this bond has been issued by Ambac Assurance Corporation ("Ambac Assurance"). The Ambac Policy has been delivered to The Bank of New York, New York, as the Ambac Insurance Trustee under said Ambac Policy and will be held by such Ambac Insurance Trustee or any successor insurance trustee. The Ambac Policy is on file and available for inspection at the principal office of the Ambac Insurance Trustee and a copy thereof may be secured from Ambac Assurance or the Ambac Insurance Trustee. All payments required to be made under the Ambac Policy shall be made in accordance with the provisions thereof. The owner of this bond acknowledges and consents to the subrogation rights of Ambac Assurance as more fully set forth in the Ambac Policy.

## FGIC INSURANCE POLICY

So long as the municipal bond insurance policy issued by FGIC shall be in full force and effect with respect to the FGIC Insured Bonds, the Corporation and the Trustee hereby agree to comply with the following provisions:

(a)    If, on the third day preceding any interest payment date for the FGIC Insured Bonds there is not on deposit with the Trustee sufficient moneys available to pay all principal of and interest on the FGIC Insured Bonds due on such date, the Trustee shall immediately notify Financial Guaranty and U.S. Bank Trust National Association, New York, New York or its successor as its Fiscal Agent (the "Fiscal Agent") of the amount of such deficiency. If, by said interest payment date, the Corporation has not provided the amount of such deficiency, the Trustee shall simultaneously make available to Financial Guaranty and to the Fiscal Agent the registration books for the FGIC Insured Bonds maintained by the Trustee. In addition:

(i)    The Trustee shall provide Financial Guaranty with a list of the FGIC Insured Bondholders entitled to receive principal or interest payments from Financial Guaranty under the terms of the Bond Insurance Policy and shall make arrangements for Financial Guaranty and its Fiscal Agent (1) to mail checks or drafts to FGIC Insured Bondholders entitled to receive full or partial interest payments from Financial Guaranty and (2) to pay principal of the FGIC Insured Bonds surrendered to the Fiscal Agent by the FGIC Insured Bondholders entitled to receive full or partial principal payments from Financial Guaranty; and

(ii)    The Trustee shall, at the time it makes the registration books available to Financial Guaranty pursuant to (i) above, notify FGIC Insured Bondholders entitled to receive the payment of principal of or interest on the FGIC Insured Bonds from Financial Guaranty (1) as to the fact of such entitlement, (2) that Financial Guaranty will remit to them all or part of the interest payments coming due

Page 16

subject to the terms of the Bond Insurance Policy, (3) that, except as provided in paragraph (b) below, in the event that any FGIC Insured Bondholder is entitled to receive full payment of principal from Financial Guaranty, such FGIC Insured Bondholder must tender his FGIC Insured Bond with the instrument of transfer in the form provided on the FGIC Insured Bond executed in the name of Financial Guaranty, and (4) that, except as provided in paragraph (b) below, in the event that such FGIC Insured Bondholder is entitled to receive partial payment of principal from Financial Guaranty, such FGIC Insured Bondholder must tender his FGIC Insured Bond for payment first to the Trustee, which shall note on such FGIC Insured Bond the portion of principal paid by the Trustee, and then, with an acceptable form of assignment executed in the name of Financial Guaranty, to the Fiscal Agent, which will then pay the unpaid portion of principal to the FGIC Insured Bondholder subject to the terms of the Bond Insurance Policy.

(b) In the event that the Trustee has notice that any payment of principal of or interest on a FGIC Insured Bond has been recovered from a FGIC Insured Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time it provides notice to Financial Guaranty, notify all FGIC Insured Bondholders that in the event that any FGIC Insured Bondholder's payment is so recovered, such FGIC Insured Bondholder will be entitled to payment from Financial Guaranty to the extent of such recovery, and the Trustee shall furnish to Financial Guaranty its records evidencing the payments of principal of and interest on the FGIC Insured Bonds which have been made by the Trustee and subsequently recovered from FGIC Insured Bondholders, and the dates on which such payments were made.

(c) Financial Guaranty shall, to the extent it makes payment of principal of or interest on the FGIC Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Bond Insurance Policy and, to evidence such subrogation, (i) in the case of subrogation as to claims for past due interest, the Trustee shall note Financial Guaranty's rights as subrogee on the registration books maintained by the Trustee upon receipt from Financial Guaranty of proof of the payment of interest thereon to the FGIC Insured Bondholders of such FGIC Insured Bonds and (ii) in the case of subrogation as to claims for past due principal, the Trustee shall note Financial Guaranty's rights as subrogee on the registration books for the FGIC Insured Bonds maintained by the Trustee upon receipt of proof of the payment of principal thereof to the FGIC Insured Bondholders of such FGIC Insured Bonds. Notwithstanding anything in this authorizing document or the FGIC Insured Bonds to the contrary, the Trustee shall make payment of such past due interest and past due principal directly to Financial Guaranty to the extent that Financial Guaranty is a subrogee with respect thereto.

508050.12 029578 RES

(d)    *Defeasance Provisions*.  Only cash, direct non-callable obligations of the United States of America and securities fully and unconditionally guaranteed as to the timely payment of principal and interest by the United States of America, to which direct obligation or guarantee the full faith and credit of the United States of America has been pledged, Refcorp interest strips, CATS, TIGRS, STRPS, or defeased municipal bonds rated AAA by S&P or Aaa by Moody's (or any combination of the foregoing) shall be used to effect defeasance of the Bonds unless the Bond Insurer otherwise approves.  In the event of an advance refunding, the Corporation shall cause to be delivered a verification report of an independent nationally recognized certified public accountant.  If a forward supply contract is employed in connection with the refunding, (i) such verification report shall expressly state that the adequacy of the escrow to accomplish the refunding relies solely on the initial escrowed investments and the maturing principal thereof and interest income thereon and does not assume performance under or compliance with the forward supply contract, and (ii) the applicable escrow agreement shall provide that in the event of any discrepancy or difference between the terms of the forward supply contract and the escrow agreement (or the authorizing document, if no separate escrow agreement is utilized), the terms of the escrow agreement or authorizing document, if applicable, shall be controlling.

(e)    *Reporting Requirements*. The Corporation shall provide FGIC provided with the following:

(i)    Notice of the redemption, other than mandatory sinking fund redemption, of any of the Bonds, or of any advance refunding of the Bonds, including the principal amount, maturities and CUSIP numbers thereof;

(ii)    Notice of the downgrading by any rating agency of the Corporation's underlying public rating, or the underlying rating on the FGIC Insured Bonds or any parity obligations, to "non-investment grade";

(iii)    Notice of any material events pursuant to Rule 15c2-12 under the Securities Exchange Act of 1934, as amended; and

(iv)    Such additional information as FGIC may reasonably request from time to time.

(f)    **Permitted Investments**

Permitted Investments shall be valued by the Corporation as frequently as deemed necessary by FGIC, but not less often than annually, at the market value thereof, exclusive of accrued interest.  Deficiencies in the amount on deposit in any fund or account resulting from a decline in market value shall be restored no later than the succeeding valuation date.

The following investments shall be permitted under the Resolution:

Page 18

508050.12 029578 RES

1.  Direct obligations of the United States of America and securities fully and unconditionally guaranteed as to the timely payment of principal and interest by the United States of America ("U.S. Government Securities").

2.  Direct obligations* of the following federal agencies which are fully guaranteed by the full faith and credit of the United States of America:

    (a)  Export-Import Bank of the United States – Direct obligations and fully guaranteed certificates of beneficial interest
    (b)  Federal Housing Administration – debentures
    (c)  General Services Administration – participation certificates
    (d)  Government National Mortgage Association ("GNMAs") – guaranteed mortgage-backed securities and guaranteed participation certificates
    (e)  Small Business Administration – guaranteed participation certificates and guaranteed pool certificates
    (f)  U.S. Department of Housing & Urban Development – local authority bonds
    (g)  U.S. Maritime Administration – guaranteed Title XI financings
    (h)  Washington Metropolitan Area Transit Authority – guaranteed transit bonds

3.  Direct obligations* of the following federal agencies which are not fully guaranteed by the faith and credit of the United States of America:

    (a)  Federal National Mortgage Association ("FNMAs") – senior debt obligations rated Aaa by Moody's Investors Service ("Moody's") and AAA by Standard & Poor's Ratings Services ("S&P")
    (b)  Federal Home Loan Mortgage Corporation ("FHLMCs") – participation certificates and senior debt obligations rated Aaa by Moody's and AAA by S&P
    (c)  Federal Home Loan Banks – consolidated debt obligations
    (d)  Student Loan Marketing Association – debt obligations
    (e)  Resolution Funding Corporation – debt obligations

4.  Direct, general obligations of any state of the United States of America or any subdivision or agency thereof whose uninsured and unguaranteed general obligation debt is rated, at the time of purchase, A2 or better by Moody's and A or

---

\* The following are explicitly excluded from the securities enumerated in 2 and 3:

    (i)    All derivative obligations, including without limitation inverse floaters, residuals, interest-only, principal-only and range notes;
    (ii)   Obligations that have a possibility of returning a zero or negative yield if held to maturity;
    (iii)  Obligations that do not have a fixed par value or those whose terms do not promise a fixed dollar amount at maturity or call date; and
    (iv)  Collateralized Mortgage-Backed Obligations ("CMOs").

508050.12 029578 RES

better by S&P, or any obligation fully and unconditionally guaranteed by any state, subdivision or agency whose uninsured and unguaranteed general obligation debt is rated, at the time of purchase, A2 or better by Moody's and A or better by S&P.

5.   Commercial paper (having original maturities of not more than 270 days) rated, at the time of purchase, P-1 by Moody's and A-1 or better by S&P.

6.   Certificates of deposit, savings accounts, deposit accounts or money market deposits in amounts that are continuously and fully insured by the Federal Deposit Insurance Corporation ("FDIC"), including the Bank Insurance Fund and the Savings Association Insurance Fund.

7.   Certificates of deposit, deposit accounts, federal funds or bankers' acceptances (in each case having maturities of not more than 365 days following the date of purchase) of any domestic commercial bank or United States branch office of a foreign bank, provided that such bank's short-term certificates of deposit are rated P-1 by Moody's and A-1 or better by S&P (not considering holding company ratings).

8.   Investments in money-market funds rated AAAm or AAAm-G by S&P.

9.   State-sponsored investment pools rated AA- or better by S&P.

10.  Repurchase agreements that meet the following criteria:

(a)   A master repurchase agreement or specific written repurchase agreement, substantially similar in form and substance to the Public Securities Association or Bond Market Association master repurchase agreement, governs the transaction.

(b)   Acceptable providers shall consist of (i) registered broker/dealers subject to Securities Investors' Protection Corporation ("SIPC") jurisdiction or commercial banks insured by the FDIC, if such broker/dealer or bank has an uninsured, unsecured and unguaranteed rating of A3/P-1 or better by Moody's and A-/A-1 or better by S&P, or (ii) domestic structured investment companies approved by Financial Guaranty and rated Aaa by Moody's and AAA by S&P.

(c)   The repurchase agreement shall require termination thereof if the counterparty's ratings are suspended, withdrawn or fall below A3 or P-1 from Moody's, or A- or A-1 from S&P. Within ten (10) days, the counterparty shall repay the principal amount plus any accrued and unpaid interest on the investments.

(d)   The repurchase agreement shall limit acceptable securities to U.S. Government Securities and to the obligations of GNMA, FNMA or FHLMC described in 2(d), 3(a) and 3(b) above. The fair market value of the securities in relation to the amount of the repurchase obligation,

508050.12 029578 RES

including principal and accrued interest, is equal to a collateral level of at least 104% for U.S. Government Securities and 105% for GNMAs, FNMAs or FHLMCs. The repurchase agreement shall require (i) the Trustee or the Agent to value the collateral securities no less frequently than weekly, (ii) the delivery of additional securities if the fair market value of the securities is below the required level on any valuation date, and (iii) liquidation of the repurchase securities if any deficiency in the required percentage is not restored within two (2) business days of such valuation.

(e)    The repurchase securities shall be delivered free and clear of any lien to the bond trustee (herein, the "Trustee") or to an independent third party acting solely as agent ("Agent") for the Trustee, and such Agent is (i) a Federal Reserve Bank, or (ii) a bank which is a member of the FDIC and which has combined capital, surplus and undivided profits or, if appropriate, a net worth, of not less than $50 million, and the Trustee shall have received written confirmation from such third party that such third party holds such securities, free and clear of any lien, as agent for the Trustee.

(f)    A perfected first security interest in the repurchase securities shall be created for the benefit of the Trustee, and the corporation and the Trustee shall receive an opinion of counsel as to the perfection of the security interest in such repurchase securities and any proceeds thereof.

(g)    The repurchase agreement shall have a term of one year or less, or shall be due on demand.

(h)    The repurchase agreement shall establish the following as events of default, the occurrence of any of which shall require the immediate liquidation of the repurchase securities, unless Financial Guaranty directs otherwise:

(i)    insolvency of the broker/dealer or commercial bank serving as the counterparty under the repurchase agreement;

(ii)    failure by the counterparty to remedy any deficiency in the required collateral level or to satisfy the margin maintenance call under item 10(d) above; or

(iii)    failure by the counterparty to repurchase the repurchase securities on the specified date for repurchase.

11.    Investment agreements (also referred to as guaranteed investment contracts) that meet the following criteria:

(a)    A master agreement or specific written investment agreement governs the transaction.

(b)    Acceptable providers of uncollateralized investment agreements shall consist of (i) domestic FDIC-insured commercial banks, or U.S. branches

508050.12 029578 RES

of foreign banks, rated at least Aa2 by Moody's and AA by S&P; (ii) domestic insurance companies rated Aaa by Moody's and AAA by S&P; and (iii) domestic structured investment companies approved by Financial Guaranty and rated Aaa by Moody's and AAA by S&P.

(c) Acceptable providers of collateralized investment agreements shall consist of (i) registered broker/dealers subject to SIPC jurisdiction, if such broker/dealer has an uninsured, unsecured and unguaranteed rating of A1 or better by Moody's and A+ or better by S&P; (ii) domestic FDIC-insured commercial banks, or U.S. branches of foreign banks, rated at least A1 by Moody's and A+ by S&P; (iii) domestic insurance companies rated at least A1 by Moody's and A+ by S&P; and (iv) domestic structured investment companies approved by Financial Guaranty and rated Aaa by Moody's and AAA by S&P. Required collateral levels shall be as set forth in 11(f) below.

(d) The investment agreement shall provide that if the provider's ratings fall below Aa3 by Moody's or AA- by S&P, the provider shall within ten (10) days either (i) repay the principal amount plus any accrued and interest on the investment; or (ii) deliver Permitted Collateral as provided below.

(e) The investment agreement must provide for termination thereof if the provider's ratings are suspended, withdrawn or fall below A3 from Moody's or A- from S&P. Within ten (10) days, the provider shall repay the principal amount plus any accrued interest on the agreement, without penalty to the Corporation.

(f) The investment agreement shall provide for the delivery of collateral described in (i) or (ii) below ("Permitted Collateral") which shall be maintained at the following collateralization levels at each valuation date:

(i) U.S. Government Securities at 104% of principal plus accrued interest; or

(ii) Obligations of GNMA, FNMA or FHLMC (described in 2(d), 3(a) and 3(b) above) at 105% of principal and accrued interest.

(g) The investment agreement shall require the Trustee or Agent to determine the market value of the Permitted Collateral not less than weekly and notify the investment agreement provider on the valuation day of any deficiency. Permitted Collateral may be released by the Trustee to the provider only to the extent that there are excess amounts over the required levels. Market value, with respect to collateral, may be determined by any of the following methods:

(i) the last quoted "bid" price as shown in Bloomberg, Interactive Data Systems, Inc., The Wall Street Journal or Reuters;

508050.12 029578 RES

(ii)    valuation as performed by a nationally recognized pricing service, whereby the valuation method is based on a composite average of various bid prices; or

(iii)    the lower of two bid prices by nationally recognized dealers. Such dealers or their parent holding companies shall be rated investment grade and shall be market makers in the securities being valued.

(h)    Securities held as Permitted Collateral shall be free and clear of all liens and claims of third parties, held in a separate custodial account and registered in the name of the Trustee or the Agent.

(i)    The provider shall grant the Trustee or the Agent a perfected first security interest in any collateral delivered under an investment agreement. For investment agreements collateralized initially and in connection with the delivery of Permitted Collateral under 11(f) above, the Trustee and Financial Guaranty shall receive an opinion of counsel as to the perfection of the security interest in the collateral.

(j)    The investment agreement shall provide that moneys invested under the agreement must be payable and putable at par to the Trustee without condition, breakage fee or other penalty, upon not more than two (2) business days' notice, or immediately on demand for any reason for which the funds invested may be withdrawn from the applicable fund or account established under the authorizing document, as well as the following:

(i)    In the event of a deficiency in the debt service account;

(ii)    Upon acceleration after an event of default;

(iii)    Upon refunding of the bonds in whole or in part;

(iv)    Reduction of the debt service reserve requirement for the bonds; or

(v)    If a determination is later made by a nationally recognized bond counsel that investments must be yield-restricted.

Notwithstanding the foregoing, the agreement may provide for a breakage fee or other penalty that is payable in arrears and not as a condition of a draw by the Trustee if the corporation's obligation to pay such fee or penalty is subordinate to its obligation to pay debt service on the bonds and to make deposits to the debt service reserve fund.

(k)    The investment agreement shall establish the following as events of default, the occurrence of any of which shall require the immediate liquidation of the investment securities:

(i)    Failure of the provider or the guarantor (if any) to make a payment when due or to deliver Permitted Collateral of the character, at the times or in the amounts described above;

(ii)    Insolvency of the provider or the guarantor (if any) under the investment agreement;

508050.12 029578 RES

(iii)    Failure by the provider to remedy any deficiency with respect to required Permitted Collateral;

(iv)    Failure by the provider to make a payment or observe any covenant under the agreement;

(v)    The guaranty (if any) is terminated, repudiated or challenged; or

(vi)    Any representation of warranty furnished to the Trustee or the corporation in connection with the agreement is false or misleading.

(l)    The investment agreement must incorporate the following general criteria:

(i)    "Cure periods" for payment default shall not exceed two (2) business days;

(ii)    The agreement shall provide that the provider shall remain liable for any deficiency after application of the proceeds of the sale of any collateral, including costs and expenses incurred by the Trustee or Financial Guaranty;

(iii)    Neither the agreement or guaranty agreement, if applicable, may be assigned (except to a provider that would otherwise be acceptable under these guidelines) or amended without the prior consent of Financial Guaranty;

(iv)    If the investment agreement is for a debt service reserve fund, reinvestments of funds shall be required to bear interest at a rate at least equal to the original contract rate.

(v)    The provider shall be required to immediately notify Financial Guaranty and the Trustee of any event of default or any suspension, withdrawal or downgrade of the provider's ratings;

(vi)    The agreement shall be unconditional and shall expressly disclaim any right of set-off or counterclaim;

(vii)    The agreement shall require the provider to submit information reasonably requested by Financial Guaranty, including balance invested with the provider, type and market value of collateral and other pertinent information.

12.    Forward delivery agreements in which the securities delivered mature on or before each interest payment date (for debt service or debt service reserve funds) or draw down date (construction funds) that meet the following criteria:

(a)    A specific written investment agreement governs the transaction.

(b)    Acceptable providers shall be limited to (i) any registered broker/dealer subject to the Securities Investors' Protection Corporation jurisdiction, if such broker/dealer or bank has an uninsured, unsecured and unguaranteed obligation rated A3/P-1 or better by Moody's and A-/A-1 or better by S&P; (ii) any commercial bank insured by the FDIC, if such bank has an uninsured, unsecured and unguaranteed obligation rated A3/P-1 or better by Moody's and A-/A-1 or better by S&P; and (iii) domestic structured

508050.12 029578 RES

investment companies approved by Financial Guaranty and rated Aaa by Moody's and AAA by S&P.

(c)    The forward delivery agreement shall provide for termination or assignment (to a qualified provider hereunder) of the agreement if the provider's ratings are suspended, withdrawn or fall below A3 or P-1 from Moody's or A- or A-1 from S&P. Within ten (10) days, the provider shall fulfill any obligations it may have with respect to shortfalls in market value. There shall be no breakage fee payable to the provider in such event.

(d)    Permitted securities shall include the investments listed in 1, 2 and 3 above.

(e)    The forward delivery agreement shall include the following provisions:

    (i)    The permitted securities must mature at least one (1) business day before a debt service payment date or scheduled draw. The maturity amount of the permitted securities must equal or exceed the amount required to be in the applicable fund on the applicable valuation date.

    (ii)    The agreement shall include market standard termination provisions, including the right to terminate for the provider's failure to deliver qualifying securities or otherwise to perform under the agreement. There shall be no breakage fee or penalty payable to the provider in such event.

    (iii)    Any breakage fees shall be payable only on debt service payment dates and shall be subordinated to the payment of debt service and debt service reserve fund replenishments.

    (iv)    The provider must submit at closing a bankruptcy opinion to the effect that upon any bankruptcy, insolvency or receivership of the provider, the securities will not be considered to be a part of the provider's estate, and otherwise acceptable to Financial Guaranty.

    (v)    The agreement may not be assigned (except to a provider that would otherwise be acceptable under these guidelines) or amended without the prior written consent of Financial Guaranty.

13.    Forward delivery agreements in which the securities delivered mature after the funds may be required but provide for the right of the corporation or the Trustee to put the securities back to the provider under a put, guaranty or other hedging arrangement, only with the prior written consent of Financial Guaranty.

14.    Maturity of investments shall be governed by the following:

508050.12 029578 RES

(a)    Investments of monies (other than reserve funds) shall be in securities and obligations maturing not later than the dates on which such monies will be needed to make payments.

(b)    Investments shall be considered as maturing on the first date on which they are redeemable without penalty at the option of the holder or the date on which the Trustee may require their repurchase pursuant to repurchase agreements.

(c)    Investments of monies in reserve funds not payable upon demand shall be restricted to maturities of five years or less.

(f)    *Redemption Notices.*  Notice of any redemption of FGIC Insured Bonds shall either (i) explicitly state that the proposed redemption is conditioned on there being on deposit in the applicable fund or account on the redemption date sufficient money to pay the full redemption price of the FGIC Insured Bonds to be redeemed, or (ii) be sent only if sufficient money to pay the full redemption price of the FGIC Insured Bonds to be redeemed is on deposit in the applicable fund or account.

(a)    The applicable authorizing document provisions describing events of default shall specify that in determining whether a payment default has occurred or whether a payment on the FGIC Insured Bonds has been made under the authorizing document(s), no effect shall be given to payments made under the FGIC Policy.

(b)    Any acceleration of the FGIC Insured Bonds or any annulment thereof shall be subject to the prior written consent of FGIC (if it has not failed to comply with its payment obligations under the FGIC Policy).

(c)    FGIC shall receive immediate notice of any payment default and notice of any other default known to the Trustee or the Corporation within 30 days of the Trustee's knowledge thereof.

(d)    For all purposes of the authorizing document provisions governing events of default and remedies, except the giving of notice of default to FGIC Insured Bondholders, FGIC shall be deemed to be the sole holder of the FGIC Insured Bonds it has insured for so long as it has not failed to comply with its payment obligations under the FGIC Policy.

(e)    If the authorizing document permits the Trustee to waive any event of default, any such waiver shall be subject to the prior written consent of FGIC.

(f)    FGIC shall be included as a party in interest and as a party entitled to (i) notify the Corporation, the Trustee, if any, or any applicable receiver of the occurrence of an event of default and (ii) request the Trustee or receiver to intervene in judicial proceedings that affect the Bonds or the security therefor.  The Trustee or receiver shall be required to accept notice of default from FGIC.

508050.12 029578 RES

(g) *Amendments and Supplements.* Any amendment or supplement to the Resolution shall be subject to the prior written consent of FGIC. Any rating agency rating the FGIC Insured Bonds must receive notice of each amendment and a copy thereof at least 15 days in advance of its execution or adoption. FGIC shall be provided with a full transcript of all proceedings relating to the execution of any such amendment or supplement.

(h) *Successor Trustees, Etc.* No resignation or removal of the Trustee, Paying Agent or Bond Registrar shall become effective until a successor has been appointed and has accepted the duties of Trustee, Paying Agent or Bond Registrar, as applicable. FGIC shall be furnished with written notice of the resignation or removal of the Trustee, Paying Agent or Bond Registrar and the appointment of any successor thereto.

(i) *Reimbursement of Expenses.* The Corporation shall pay or reimburse FGIC for any and all charges, fees, costs, and expenses that FGIC may reasonably pay or incur in connection with the following: (i) the administration, enforcement, defense, or preservation of any rights or security hereunder or under any other transaction document; (ii) the pursuit of any remedies hereunder, under any other transaction document, or otherwise afforded by law or equity, (iii) any amendment, waiver, or other action with respect to or related to this agreement or any other transaction document whether or not executed or completed; (iv) the violation by the Corporation of any law, rule, or regulation or any judgment, order or decree applicable to it; (v) any advances or payments made by the Bond Insurer to cure defaults of the Corporation under the transaction documents; or (vi) any litigation or other dispute in connection with this agreement, any other transaction document, or the transactions contemplated hereby or thereby, other than amounts resulting from the failure of FGIC to honor its payment obligations under the FGIC Policy. FGIC reserves the right to charge a reasonable fee as a condition to executing any amendment, waiver, or consent proposed in respect of this agreement or any other transaction document. The obligations of the Corporation to FGIC shall survive discharge and termination of this agreement.

(j) *Notice Addresses.* The notice addresses for FGIC and the Fiscal Agent shall be as follows: Financial Guaranty Insurance Company, 125 Park Avenue, New York, New York 10017, Attention: Risk Management; and U.S. Bank Trust National Association, 100 Wall Street, 19th Floor, New York, New York 10005, Attention: Corporate Trust Department.

508050.12 029578 RES

Case:17-00188-LTS Doc#:7590 Filed:05/16/19 Entered:05/16/19 21:17:46 Desc:
Exhibit S Page 51 of 76

508050.12 029578 RES

Divider

**PUERTO RICO SALES TAX FINANCING CORPORATION**

---

**SECOND SUPPLEMENTAL SALES TAX REVENUE BOND
RESOLUTION**

**authorizing**

**SALES TAX REVENUE BONDS
SERIES 2007B**

---

Adopted on July 17, 2007

526812.6 029578 RES

**TABLE OF CONTENTS**

Page

ARTICLE I

DEFINITIONS AND STATUTORY AUTHORITY

SECTION 1.1.    Supplemental Resolution ........................................................................ 1
SECTION 1.2.    Definitions ............................................................................................. 1
SECTION 1.3.    Interpretation .......................................................................................... 2
SECTION 1.4.    Authority for this Series Resolution ........................................................ 2

ARTICLE II

AUTHORIZATION OF SERIES 2007B BONDS

SECTION 2.1.    Principal Amount, Designation and Series ................................................ 3
SECTION 2.2.    Purposes .................................................................................................. 3
SECTION 2.3.    Details of Series 2007B Bonds ................................................................ 3
SECTION 2.4.    Redemption .............................................................................................. 4
SECTION 2.5.    Book-Entry Provisions ............................................................................ 5
SECTION 2.6.    Form of Series 2007B Bonds ................................................................... 7

ARTICLE III

DISPOSITION OF PROCEEDS OF SERIES 2007B BONDS AND OTHER FUNDS

SECTION 3.1.    Deposits to Accounts or Transfers ........................................................... 8

ARTICLE IV

MISCELLANEOUS

SECTION 4.1.    Headings .................................................................................................. 9
SECTION 4.2.    Governing Law ........................................................................................ 9
SECTION 4.3.    Effective Date ......................................................................................... 9
SECTION 4.4.    No Representations of Trustee .................................................................. 9
SECTION 4.5.    Notices .................................................................................................... 9
SECTION 4.6.    Invalid Provisions ................................................................................. 10

EXHIBIT A.    BOND FORMS ..................................................................................... A-1

i

## SECOND SUPPLEMENTAL SALES TAX REVENUE BOND RESOLUTION

### authorizing

## SALES TAX REVENUE BONDS
## SERIES 2007B

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation (the "Corporation"), as follows:

### ARTICLE I

### DEFINITIONS AND STATUTORY AUTHORITY

SECTION 1.1. Supplemental Resolution. This Supplemental Sales Tax Revenue Bond Resolution (this **"Supplemental Resolution"**) is supplemental to, and is adopted in accordance with, Article II and Article IX of the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as amended, adopted by the Corporation on July 13, 2007 (the **"General Resolution"**). The General Resolution and this Supplemental Resolution are hereinafter collectively referred to as the **"Resolution"**.

SECTION 1.2. Definitions. (a) All terms which are defined in Section 101 of the General Resolution or Section 1.1 hereof, unless otherwise defined in subsection (b) of this Section, shall, for all purposes of this Supplemental Resolution, have the same meanings as such terms are given in Section 101 of the General Resolution or Section 1.1 hereof, respectively, unless the context shall clearly indicate some other meaning.

(b) The following terms shall, for all purposes of this Supplemental Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**"Beneficial Owner"** means, whenever used with respect to a Series 2007B Bond, the Person in whose name such Series 2007B Bond is recorded as the beneficial owner of such Series 2007B Bond by a Participant on the records of such Participant or such Person's subrogee.

**"Capital Appreciation Series 2007B Bonds"** means the Series 2007B Bonds maturing August 1, 2027 through August 1, 2032 as to which interest is not paid on a current basis but is accrued and compounded as Compounded Amount.

**"Cede & Co."** means Cede & Co., the nominee of DTC, and any successor of DTC with respect to the Series 2007B Bonds.

**"Current Interest Series 2007B Bonds"** for purposes of the Series 2007B Bonds, means the Series 2007B Bonds maturing August 1, 2036, August 1, 2037, August l, 2038, July 1, 2039, August 1, 2039, May 1, 2057, June 1, 2057, July 1, 2057 and August 1, 2057.

**"Debt Service Reserve Requirement"** for purposes of the Series 2007B Bonds means the amount of zero ($0).

**"Interest Payment Date"** means for Current Interest Series 2007B Bonds, the first day of each month, commencing September 1, 2007; provided, that if any Interest Payment Date is a day ("Day X") that is not a Business Day, interest accrued to Day X shall be paid on the next succeeding Business Day.

**"Master Escrow Agent"** means The Bank of New York, as master escrow agent under the Master Escrow Agreement.

**"Master Escrow Agreement"** means the 2007 Master Refunding and Payment Trust Agreement, dated as of July 31, 2007, between the Puerto Rico Public Finance Corporation and The Bank of New York, as Master Escrow Agent.

**"Participants"** means those broker-dealers, banks and other financial institutions for which DTC holds Series 2007B Bonds as securities depositary.

**"Record Date"** means, with respect to the payment of interest on Current Interest Series 2007B Bonds, the fifteenth calendar day (whether or not a Business Day) next preceding such Interest Payment Date.

**"Serial Bonds"** for purposes of the Series 2007B Bonds means the Series 2007B Bonds other than the Series 2007B Bonds maturing August 1, 2036.

**"Series 2007B Bonds"** means the Corporation's Sales Tax Revenue Bonds, Series 2007B, authorized by Article II of this Supplemental Resolution.

**"Term Bonds"** for purposes of the Series 2007B Bonds means the Series 2007B Bonds maturing August 1, 2036.

SECTION 1.3. Interpretation. Unless the context clearly otherwise requires, this Series Resolution shall be interpreted in accordance with applicable provisions of the General Resolution.

SECTION 1.4. Authority for this Series Resolution. This Series Resolution is adopted pursuant to the provisions of the Act and the General Resolution.

526812.6 029578 RES

## ARTICLE II

## AUTHORIZATION OF SERIES 2007B BONDS

SECTION 2.1. <u>Principal Amount, Designation and Series</u>. Pursuant to the provisions of the General Resolution, a Series of Bonds to be designated as "Sales Tax Revenue Bonds" which shall be entitled to the benefit, protection and security of such provisions is hereby authorized, further designated "Series 2007B" in the aggregate principal amount at issuance of $1,333,101,779.90. All of such Bonds shall constitute "Senior Bonds" under the Resolution.

SECTION 2.2. <u>Purposes</u>. The Series 2007B Bonds are being issued for the purpose of providing the Corporation with funds (i) to provide for the Repayment Project, (ii) to fund a deposit to the Debt Service Account, and (iii) to pay Financing Costs, including but not limited to Costs of Issuance.

SECTION 2.3. <u>Details of Series 2007B Bonds</u>. (a) The Series 2007B Bonds shall be dated as of, and shall bear interest (or accreted Compounded Amount) initially from, the initial date of delivery thereof and payment therefor, and shall mature in the years and in the principal amounts, and (except for Capital Appreciation Series 2007B Bonds) bear interest payable on each Interest Payment Date at the interest rates per annum, as set forth below:

| Maturity Date | Principal Amount at Issuance | Rate | CABs Value at Maturity |
|---|---|---|---|
| August 1, 2027 | $12,007,513.60 | n/a | $40,720,000.00 |
| August 1, 2028 | 30,000,504.45 | n/a | 108,145,000.00 |
| August 1, 2029 | 26,798,324.85 | n/a | 103,785,000.00 |
| August 1, 2030 | 29,298,676.00 | n/a | 120,670,000.00 |
| August 1, 2031 | 14,497,685.00 | n/a | 63,500,000.00 |
| August 1, 2032 | 34,499,076.00 | n/a | 160,700,000.00 |
| August 1, 2036 | 575,000,000.00 | 6.050% | n/a |
| August 1, 2037 | 167,780,000.00 | 6.050% | n/a |
| August 1, 2038 | 167,710,000.00 | 6.050% | n/a |
| July 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| August 1, 2039 | 37,755,000.00 | 6.050% | n/a |
| May 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| June 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| July 1, 2057 | 50,000,000.00 | 6.350% | n/a |
| August 1, 2057 | 50,000,000.00 | 6.350% | n/a |

(b) The Series 2007B Bonds other than the Series 2007B Bonds maturing August 1, 2036 shall constitute Serial Bonds. The Series 2007B Bonds maturing on August 1, 2036 shall constitute Term Bonds. The Series 2007B Bonds maturing from August 1, 2027 through August 1, 2032 shall constitute Capital Appreciation Bonds.

-3-

(c)    Interest on the Current Interest Series 2007B Bonds, and Compounded Amount on the Capital Appreciation Series 2007B Bonds, shall be computed on the basis of a 360-day year of twelve 30-day months.   Interest on the Current Interest Series 2007B Bonds shall be payable on the first day of each month, commencing September 1, 2007.  Compounded Amount on the Capital Appreciation Series 2007B Bonds shall be computed each August 1 and February 1 commencing February 1, 2008.

(d)    The Series 2007B Bonds shall be issuable in denominations of $5,000 (for Capital Appreciation Series 2007B Bonds, of maturity amount) or integral multiples thereof. Each Series 2007B Bond shall be lettered "2007BR" and shall be numbered consecutively from (1) upwards in order of authentication by the Trustee or otherwise in such manner as the Trustee in its discretion shall determine.

(e)    The provisions of Section 7.09 of the Bond Resolution shall not apply to the Series 2007B Bonds, which shall be issued with the intention that interest thereon is included in gross income for federal income tax purposes.

(f)    *Except* as otherwise provided in Section 2.5, the principal of and premium, if any, and interest on the Series 2007B Bonds shall be payable at the Corporate Trust Office of the Trustee.  *Except* as otherwise provided in Section 2.5, interest on the Series 2007B Bonds shall be paid by check or draft of the Trustee mailed to the Owners thereof as of the applicable Record Date at their respective addresses as shown on the registration books of the Corporation maintained by the Trustee, or, at the option of the Owner of $1,000,000 or more in principal amount at maturity of the Series 2007B Bonds, by written notice to the Trustee from such Owner at least fifteen (15) calendar days prior to the related payment date, by wire transfer.

SECTION 2.4.  Redemption.  (a) The Series 2007B Bonds due on August 1, 2036 shall be redeemed in part through application of Sinking Fund Installments as provided in Sections 403 and 508 of the General Resolution, in each case at a Redemption Price equal to the principal amount of the respective Series 2007B Bond or portion thereof to be redeemed together with interest accrued to the date fixed for redemption.  Subject to the provisions of Section 508 of the General Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Series 2007B Bonds due on each of the dates specified above, there shall be due and the Corporation shall in any and all events be required to pay on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount is hereby established and shall constitute a Sinking Fund Installment for the retirement of the respective Series 2007B Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

<div align="center">

2036 Maturity

Sinking Fund
Installment Date
(August 1)                      Amount

2033                          $105,430,000

</div>

-4-

526812.6 029578 RES

| 2034 | 129,270,000 |
| 2035 | 156,030,000 |
| 2036 | 184,270,000 |

(b)     The Current Interest Series 2007B Bonds shall be subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the Corporation, in whole or in part in any order of maturity determined by the Corporation, at any time on and after August 1, 2017, at a Redemption Price equal to 100% of the principal amount thereof plus interest, if any, accrued to the redemption date, and without premium.

(c)     The Capital Appreciation Series 2007B Bonds shall be subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding Bonds or other financing provided by the Corporation, in whole or in part in any order of maturity determined by the Corporation, at any time on and after August 1, 2017, at a Redemption Price equal to 100% of the Compounded Amount thereof, and without premium.

SECTION 2.5.  Book-Entry Provisions.  (a) *Except* as provided in subsection (d) of this Section, the Owner of all of the Series 2007B Bonds shall be Cede & Co., as nominee for DTC, and the Series 2007B Bonds shall be registered in the name of Cede & Co., as nominee for DTC.  Payment of interest on any Series 2007B Bond registered in the name of Cede & Co. shall be made by wire transfer of Federal or equivalent same day funds to the account of Cede & Co. on the Interest Payment Date for the Series 2007B Bonds at the address indicated for Cede & Co. in the registration books of the Corporation maintained by the Trustee.

(b)     The Series 2007B Bonds initially shall be issued in the form of separate single authenticated fully registered Bonds in the amount of each separate stated maturity and for each separate "CUSIP" number within a maturity of the Series 2007B Bonds.  Upon initial issuance, the ownership of the Series 2007B Bonds shall be registered in the registration books of the Corporation maintained by the Trustee in the name of Cede & Co., as nominee of DTC. The Trustee and the Corporation may treat DTC (or its nominee) as the sole and exclusive Owner of the Series 2007B Bonds registered in its name for the purposes of payment of the principal or Redemption Price of or interest on the Series 2007B Bonds, selecting the Series 2007B Bonds or portions thereof to be redeemed, giving any notice permitted or required to be given to Owners of the Series 2007B Bonds under the General Resolution or this Supplemental Resolution, registering the transfer of the Series 2007B Bonds, obtaining any consent or other action to be taken by Owners of the Series 2007B Bonds and for all other purposes whatsoever, and neither the Trustee nor the Corporation shall be affected by any notice to the contrary.  The Trustee and the Corporation shall not have any responsibility or obligation to any Participant, any Person claiming a beneficial ownership interest in the Series 2007B Bonds under or through DTC or any Participant, or any other Person which is not shown on the registration books as being an Owner of the Series 2007B Bonds, with respect to the accuracy of any records maintained by DTC or any Participant; the payment of DTC or any Participant of any amount in respect of the principal or Redemption Price of or interest on the Series 2007B Bonds; any notice which is permitted or required to be given to Owners of the Series 2007B Bonds under the General Resolution or this Supplemental Resolution; the selection by DTC or any Participant of

-5-

any Person to receive payment in the event of a partial redemption of the Series 2007B Bonds; or any consent given or other action taken by DTC as Owner of the Series 2007B Bonds.

(c)     The Trustee shall pay all principal of, and premium, if any, and interest on the Series 2007B Bonds only to or "upon the order of" Cede & Co., as nominee for DTC (as that term is used in the Uniform Commercial Code as adopted in the Commonwealth), and all such payments shall be valid and effective to fully satisfy and discharge the Corporation's obligations with respect to the principal of, and premium, if any, and interest on the Series 2007B Bonds to the extent of the sum or sums so paid. No person other than DTC shall receive an authenticated Series 2007B Bond for each separate stated maturity or separate "CUSIP" number within a maturity evidencing the obligation of the Corporation to make payments of principal of and premium, if any, and interest on the Series 2007B Bonds pursuant to the General Resolution and this Supplemental Resolution. Upon delivery by DTC to the Trustee of written notice to the effect that DTC has determined to substitute a new nominee in place of Cede & Co., and subject to the provisions herein with respect to transfers, the word "Cede & Co." in this Supplemental Resolution shall refer to such new nominee of DTC.

(d)     In the event the Corporation determines that it is in the best interest of the Beneficial Owners that they be able to obtain Series 2007B Bond certificates, the Corporation may notify DTC and the Trustee, whereupon DTC will notify the Participants, of the availability through DTC of the Series 2007B Bond certificates, subject to DTC procedures. In such event, the Corporation shall issue, and the Trustee shall transfer and exchange, Series 2007B Bond certificates as requested by DTC and any other Series 2007B Bond owners in appropriate amounts. DTC may determine to discontinue providing its services with respect to the Series 2007B Bonds at any time by giving notice to the Corporation and the Trustee and discharging its responsibilities with respect thereto under applicable law. Under such circumstances (if there is no successor securities depositary), the Corporation and the Trustee shall be obligated to deliver Series 2007B Bond certificates as described in the General Resolution. In the event Series 2007B Bond certificates are issued, the provisions of the General Resolution shall apply to, among other things, the transfer and exchange of such certificates and the method of payment of principal and of and Redemption Price interest on such certificates. Whenever DTC requests the Corporation and the Trustee to do so, the Trustee and the Corporation will cooperate with DTC in taking appropriate action after reasonable notice (i) to make available one or more separate certificates evidencing the Series 2007B Bonds to any DTC Participant having Series 2007B Bonds credited to its DTC account or (ii) to arrange for another securities depositary to maintain custody of certificates evidencing the Series 2007B Bonds.

(e)     Notwithstanding any other provision of the General Resolution or this Supplemental Resolution to the contrary, so long as any Series 2007B Bond is registered in the name of Cede & Co., as nominee of DTC, all payments with respect to the principal of, and premium, if any, and interest on such Series 2007B Bond and all notices with respect to and surrender or delivery of such Series 2007B Bond shall be made and given, respectively, to or by DTC as provided by DTC's operating procedures. Bondholders shall have no lien or security interest in any rebate or refund paid by DTC to the Trustee which arises from the payment by the Trustee of principal of or interest on the Series 2007B Bonds in accordance with existing arrangements with DTC.

526812.6 029578 RES

(f)     In connection with any notice or other communication to be provided to Owners of Series 2007B Bonds pursuant to the General Resolution or this Supplemental Resolution by the Corporation or the Trustee with respect to any consent or other action to be taken by Owners of Series 2007B Bonds, the Corporation or the Trustee, as the case may be, shall establish a record date for such consent or other action and give DTC notice of such record date not less than 15 calendar days in advance of such record date to the extent possible.  Notice to DTC shall be given only when DTC under this subsection (f) is the sole Owner of the Series 2007B Bonds.

SECTION 2.6.  Form of Series 2007B Bonds.  Subject to the provisions of the General Resolution, the Series 2007B Bonds shall be in substantially the form of Exhibit A, with necessary and appropriate variations, omissions and insertions as permitted by the General Resolution and this Supplemental Resolution.

-7-

# ARTICLE III

## DISPOSITION OF PROCEEDS OF SERIES 2007B BONDS AND OTHER FUNDS

SECTION 3.1. <u>Deposits to Accounts or Transfers</u>. Upon receipt by the Corporation of the proceeds of sale of the Series 2007B Bonds, and other amounts, including a drawing on the funds in the FIA Fund (as defined in the Act) in the amount of $9,793,824.85, which drawing is hereby authorized, there shall be deposited by the Corporation in or transferred by the Corporation to:

1. Government Development Bank (account information: Citibank, N.A. ABA #021000089, for Government Development Bank (GDB) Account No. 36008661, for further credit to BGF-COFINA Acct. # 251-0034-3), the amount of $2,528,807.30 for Costs of Issuance; provided, that amounts shall be wired to recipients thereof as directed to the Trustee in writing by Government Development Bank;

2. by wire, directly, to the account of Government Development Bank (same account information), (i) in the amount of $109,767,717.87, for full repayment of the interim loan made by Government Development Bank to the Corporation for payment of FY 2008 debt service on bonds of the Public Finance Corporation pursuant to resolutions adopted by the Corporation on July 10, 2007, and (ii) in the amount of $275,700,030, for payment of interest on extraconstitutional debt outstanding as of June 30, 2006 and owed to Government Development Bank;

3. the Debt Service Account (Senior Taxable) in the amount of $18,289,230.56, allocated entirely to the Interest Subaccount (Senior Taxable); and

4. the Trustee for credit to the Bond Proceeds Account, the balance of such proceeds, to be immediately transferred to the Master Escrow Agent to be applied in accordance with the terms of the Master Escrow Agreement.

## ARTICLE IV

## MISCELLANEOUS

SECTION 4.1. Headings.    The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Supplemental Resolution.

SECTION 4.2. Governing Law.  This Supplemental Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that to the maximum extent permitted by applicable law, the rights, duties, privileges and duties of the Trustee, any Paying Agent and Bond Trustee, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 4.3. Effective Date.  This Supplemental Resolution shall take effect upon the filing with the Trustee of a copy hereof, certified by an Authorized Officer of the Corporation.

SECTION 4.4. No Representations of Trustee.  The recitals of fact herein and in the Series 2007BBonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same.   The Trustee makes no representations as to the validity or sufficiency of the General Resolution or this Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or this Supplemental Resolution, and the Trustee shall incur no liability in respect thereof.  The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Series 2007B Bonds.

SECTION 4.5. Notices.    Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

To the Trustee:

The Bank of New York
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Phone: 212-815-6955
Fax: 212-815-5595/5596

To the Corporation:

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

-9-

Attention: Executive Director
Phone: 787-722-2525

        SECTION 4.6. <u>Invalid Provisions.</u> In case any provision in this Supplemental Resolution or the Series 2007B Bonds shall be invalid, illegal or unenforceable, the validity, legality and enforceability of the remaining provisions shall not in any way be affected or impaired thereby.

-10-

**EXHIBIT A**

### FORM OF CURRENT INTEREST SERIES 2007B BONDS

No. 2007BR-___                                                                     $_____

PUERTO RICO SALES TAX FINANCING CORPORATION
SALES TAX REVENUE BOND
SERIES 2007B

| DATED DATE | MATURITY DATE | INTEREST RATE | CUSIP NO. |
|---|---|---|---|
|  |  | ____% |  |

REGISTERED OWNER:        Cede & Co.

PRINCIPAL AMOUNT:

        PUERTO RICO SALES TAX FINANCING CORPORATION (herein sometimes called the "Corporation"), an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns, upon presentation and surrender of this bond at the Corporate Trust Office (as defined in the General Resolution) of the Trustee hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT specified above, and to pay interest thereon from the most recent interest payment date to which interest has been paid, or, if no interest has been paid, from the DATED DATE specified above, until the earlier of the maturity or redemption of this bond, at the per annum INTEREST RATE specified above, payable on the first day of each month commencing September 1, 2007. Both the principal of and the interest on this bond are payable in any coin or currency of the United States of America which, on the respective dates of payment thereof, shall be legal tender for the payment of public and private debts. Payment of the interest on this bond on any interest payment date will be made to the person appearing on the registration books of the Corporation maintained by the Trustee as the registered owner hereof as of the fifteenth calendar day (whether or not a business day) next preceding such interest payment date, such interest to be paid by check or draft mailed to the registered owner at such registered owner's address or, at the option of a registered owner of at least $1,000,000 in aggregate principal amount of the Series 2007B Bonds (hereinafter defined) who so requests the Trustee in writing at least 15 calendar days prior to such interest payment date, by wire transfer.

        The Bonds are payable by the Corporation solely from the Pledged Property held under the Resolution. The Bonds do not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions or of instrumentalities (other than the Corporation), and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions or instrumentalities (other than the Corporation) shall be liable for the payment thereof.

The Series 2007B Bonds are subject to redemption prior to maturity as provided in the Resolution. Notice of redemption shall be given as provided in the Resolution.

This bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $1,333,101,779.90 designated "Sales Tax Revenue Bonds, Series 2007B" authorized to be issued pursuant to Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended, and under and pursuant to a Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (as amended, herein called the "General Resolution"), and a Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Corporation on July 17, 2007 (such supplemental resolution and the General Resolution are herein called, collectively, the "Resolution"), for the purposes set forth in the Resolution.

The Series 2007B Bonds are part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Resolution for the purposes described in the Resolution. The Series 2007B Bonds, all previously issued bonds and any additional bonds issued under the Resolution are herein referred to collectively as the "Bonds".

The Bonds are special obligations of the Corporation. There is pledged to the payment of the principal or redemption price, if any, of and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the Corporation may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal thereof and the interest thereon on the terms and conditions set forth in the General Resolution.

Copies of the Resolution are on file at the office of the Corporation, and at the Corporate Trust Office of The Bank of New York, as trustee under the Resolution (including its successors, herein called the "Trustee"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the General Resolution, the provisions of the General Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This bond is transferable, as provided in the Resolution, only upon the books of the Corporation maintained for that purpose at the Corporate Trust Office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of

-2-

this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2007B Bond or Bonds in the same aggregate principal amount, and of the same series, maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This bond shall not be valid or obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Trustee.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required by the Constitution and statutes of the Commonwealth of Puerto Rico and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Series 2007B Bonds, together with all other indebtedness of the Corporation, is within every debt and other limit prescribed by law.

IN WITNESS WHEREOF, the PUERTO RICO SALES TAX FINANCING CORPORATION has caused this bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

<div style="text-align:right">

PUERTO RICO SALES TAX FINANCING CORPORATION

By:_____
       Executive Director

</div>

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

526812.6 029578 RES

## CERTIFICATE OF AUTHENTICATION

      This bond is one of the Series 2007B Bonds described in the within-mentioned Resolution.

                            THE BANK OF NEW YORK, as Trustee

                            By:_____
                                    Authorized Signatory

Date of Authentication:

-4-

ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____          _____

_____          _____

By:

_____

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Trustee, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Trustee in addition to, or in
substitution for, STAMP, all in accordance
with the Securities Exchange Act of 1934, as
amended.

**FORM OF CAPITAL APPRECIATION SERIES 2007B BONDS**

No. 2007BR-___                                                                            $ _____

PUERTO RICO SALES TAX FINANCING CORPORATION
SALES TAX REVENUE BOND
SERIES 2007B

<u>DATED DATE</u>          <u>MATURITY DATE</u>                                    <u>CUSIP NO.</u>

                                                                    ___                    ___

REGISTERED OWNER:          Cede & Co.

PRINCIPAL AMOUNT AT
ISSUANCE

PRINCIPAL AMOUNT AT
MATURITY

       PUERTO RICO SALES TAX FINANCING CORPORATION (herein sometimes called the "Corporation"), an instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), acknowledges itself indebted, and for value received, hereby promises to pay to the REGISTERED OWNER named above or registered assigns, upon presentation and surrender of this bond at the Corporate Trust Office (as defined in the General Resolution) of the Trustee hereinafter mentioned on the MATURITY DATE specified above (unless redeemed prior thereto as hereinafter provided), the PRINCIPAL AMOUNT AT MATURITY specified above. The principal (consisting of Compounded Amount) of this bond is payable in any coin or currency of the United States of America which, on the date of payment thereof, shall be legal tender for the payment of public and private debts. Interest on this bond shall not be payable on a current basis but shall be compounded, and added to principal, on each August 1 and February 1 commencing February 1, 2008 such that the PRINCIPAL AMOUNT AT ISSUANCE specified above shall accrete to equal the PRINCIPAL AMOUNT AT MATURITY specified above on the MATURITY DATE specified above.

       The Bonds are payable by the Corporation solely from the Pledged Property held under the Resolution. The Bonds do not constitute a debt, obligation or pledge of the full faith, credit and taxing power of the Commonwealth of Puerto Rico or any of its municipalities or political subdivisions or of instrumentalities (other than the Corporation), and neither the Commonwealth of Puerto Rico nor any of its municipalities or political subdivisions nor instrumentalities (other than the Corporation) shall be liable for the payment thereof.

       The Series 2007B Bonds are subject to redemption prior to maturity as provided in the Resolution. Notice of redemption shall be given as provided in the Resolution.

This bond is one of the bonds of a duly authorized series of bonds in the aggregate principal amount at issuance of $1,333,101,779.90 designated "Sales Tax Revenue Bonds, Series 2007B" (herein called the "Series 2007B Bonds") authorized to be issued pursuant to Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended, and under and pursuant to a Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution adopted by the Corporation on July 13, 2007 (as amended, herein called the "General Resolution"), and a Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Corporation on July 17, 2007 (such supplemental resolution and the General Resolution are herein called, collectively, the "Resolution"), for the purposes set forth in the Resolution.

The Series 2007B Bonds are part of a duly authorized issue of bonds issued and to be issued under the Act and under and pursuant to the Resolution for the purposes described in the Resolution. The Series 2007B Bonds, any previously issued bonds and any additional bonds issued under the Resolution are herein referred to collectively as the "Bonds".

The Bonds are special obligations of the Corporation. There is pledged to the payment of the principal or redemption price, if any, of and interest on the Bonds in accordance with the provisions of the Resolution, the Pledged Property as defined and provided in the Resolution, subject only to the provisions of the Resolution permitting the use and application thereof for the purposes and on the conditions set forth in the Resolution. Such pledge and other obligations of the Corporation may be discharged, wholly or in part, at or prior to the maturity of the Bonds upon the making of provision for the payment of the principal thereof and the interest thereon on the terms and conditions set forth in the General Resolution.

Copies of the Resolution are on file at the office of the Corporation, and at the Corporate Trust Office of The Bank of New York, as trustee under the Resolution (including its successors, herein called the "Trustee"), and reference to the Resolution and any and all supplements thereto and amendments thereof and to the Act is made for a description of the pledges and covenants securing the Bonds, the nature, extent and manner of enforcement of such pledges and covenants, the terms and conditions upon which Bonds have been issued and additional Bonds may be issued, the rights and remedies of the registered owners of the Bonds with respect thereto, and to other terms and provisions of the Bonds. To the extent and in the manner permitted by the terms of the General Resolution, the provisions of the General Resolution or any resolution amendatory thereof or supplemental thereto may be modified or amended.

The registered owner of this bond shall have no right to enforce the provisions of the Resolution, to institute action to enforce the provisions of the Resolution or to institute, appear in or defend any suit or other proceeding with respect thereto, *except* as provided in the Resolution.

This bond is transferable, as provided in the Resolution, only upon the books of the Corporation maintained for that purpose at the Corporate Trust Office of the Trustee by the registered owner hereof in person or by his attorney duly authorized in writing, upon surrender of this bond together with a written instrument of transfer duly executed by the registered owner or such registered owner's attorney duly authorized in writing, and thereupon a new fully registered Series 2007B Bond or Bonds in the same aggregate principal amount, and of the same series,

-3-

maturity and interest rate, shall be issued to the transferee in exchange therefor as provided in the General Resolution and upon the payment of the charges, if any, therein prescribed. The Corporation and the Trustee may treat and consider the person in whose name this bond is registered as the absolute owner hereof for the purpose of receiving payment of, or on account of, the principal or redemption price, if any, hereof and interest due hereon and for all other purposes whatsoever.

This bond shall not be valid or obligatory for any purpose or be entitled to any security or benefit under the Resolution until the Certificate of Authentication hereon shall have been signed by the Trustee.

IT IS HEREBY CERTIFIED, RECITED AND DECLARED that all acts, conditions and things required by the Constitution and statutes of the Commonwealth of Puerto Rico and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of this bond, exist, have happened and have been performed in due time, form and manner as required by law and that the issue of the Series 2007B Bonds, together with all other indebtedness of the Corporation, is within every debt and other limit prescribed by law.

IN WITNESS WHEREOF, the PUERTO RICO SALES TAX FINANCING CORPORATION has caused this bond to be executed in its name by the manual or facsimile signature of an authorized representative, as of the DATED DATE specified above.

PUERTO RICO SALES TAX FINANCING CORPORATION

By:_____
Executive Director

[SEAL]

Attest:

_____
Secretary or Assistant Secretary

-4-

CERTIFICATE OF AUTHENTICATION

This bond is one of the Series 2007B Bonds described in the within-mentioned Resolution.

THE BANK OF NEW YORK, as Trustee

By:_____
　　　　　　Authorized Signatory

Date of Authentication:

-5-

## ASSIGNMENT

FOR VALUE RECEIVED, the undersigned hereby sells, assigns, and transfers unto

_____

(please print or typewrite name and address of transferee)

_____

(please insert social security or other identifying number of assignee)
(For computer record only)

the within Bond and all rights thereunder, and hereby irrevocably constitutes and appoints
_____ Attorney to transfer the within
Bond on the books kept for registration thereof, with full power of substitution in the premises.

Dated: _____

Signature Guaranteed

_____          _____


_____          _____

By:

Signatures must be guaranteed by an "eligible
guarantor institution" meeting the
requirements of the Trustee, which
requirements include membership or
participation in the Security Transfer Agent
Medallion Program ("STAMP") or such other
"signature guarantee program" as may be
determined by the Trustee in addition to, or in
substitution for, STAMP, all in accordance
with the Securities Exchange Act of 1934, as
amended.

-6-

526812.6 029578 RES

**Exhibit K**

Letter from Ambac's counsel to BNYM's counsel, dated April 30, 2017

(Attached)



**Curtis, Mallet-Prevost, Colt & Mosle LLP**

| Almaty | Houston | | |
|---|---|---|---|
| Ashgabat | London | | **Telephone  +1 212 696 6000** |
| Astana | Mexico City | 101 Park Avenue | **Facsimile  +1 212 697 1559** |
| Beijing | Milan | New York, New York 10178-0061 | www.curtis.com |
| Buenos Aires | Muscat | | |
| Dubai | Paris | | **Theresa A. Foudy** |
| Frankfurt | Rome | | Tel: +1 212 696 8860 |
| Geneva | Washington, D.C. | | Fax: +1 917 368 8865 |
| | | | E-Mail: tfoudy@curtis.com |

April 30, 2017

**VIA EMAIL (eschaffer@reedsmith.com)**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

**VIA FACSIMILE**

The Bank of New York
101 Barclay Street-7W
New York, New York 10286
Attention: Northern Municipals
Phone:  212-815-6955
Fax:  212-815-5595/5596

> Re:  Events of Default in respect of the Amended and Restated Sales Tax Revenue Bond Resolution dated as of July 13, 2007, and amended on June 10, 2009, and as subsequently amended, restated, modified and/or supplemented (the "Resolution"), relating to certain bonds (the "COFINA Bonds") issued by the Puerto Rico Financing Corporation ("CONFINA")

Dear Mr. Schaffer:

We are co-counsel for Ambac Assurance Corporation ("Ambac"), in its capacity as an insurer of more than $800 million in gross par amount, and also as a direct holder, of COFINA Bonds, for which Bank of New York Mellon (the "Trustee") acts as trustee.  Ambac is a "Beneficiary" under the terms of the Resolution.

28541065v1

CURTIS

**Curtis, Mallet-Prevost, Colt & Mosle LLP**

Eric A. Schaffer, Esq.
April 30, 2017
Page 2

As you have been informed by certain holders of the COFINA Bond, multiple Events of Default[1] under the Resolution have already occurred, including the submission for approval to the PROMESA Oversight Board (the "Oversight Board") of a final version of the Commonwealth's Fiscal Plan for Puerto Rico prepared by the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") that is premised upon an unlawful taking of COFINA property by the Commonwealth. This weekend's developments, including the passage of House Bill 938 and the release of the Title VI restructuring proposal by AAFAF (the "Title VI Proposal"), the exclusive agent of both the Commonwealth and COFINA, leave no question that both the Commonwealth and COFINA have breached their obligations and undertakings under the Resolution. The numerous breaches of the covenants in the Resolution are incurable, and as a result, Events of Default have occurred and are continuing. Consistent with the Fiscal Plan prepared by the Commonwealth and certified by the Oversight Board, HB 938 and the Title VI Proposal both expressly purport to allow the unlawful taking of COFINA property to meet Commonwealth obligations.

In light of the existing Events of Default, no payments may or should be made to holders of the COFINA Subordinated Bonds until the Senior Bonds are paid in full. Accordingly, in accordance with the terms of the Resolution and the Eighteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011, the Trustee must immediately refrain from making any payments to holders of Subordinated Bonds.

We ask that you confirm immediately that the Trustee intends to comply with its obligations, and that it will not make any payment to the Subordinated Bonds tomorrow (May 1, 2017). Failure to comply with the terms of the COFINA debt documents will subject the Trustee to personal liability, and removal as Trustee at Ambac's direction in accordance with Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007. In particular, if the Trustee makes payments to the holders of Subordinated Bonds despite being prohibited from doing so as a result of the existing Events of Default, Ambac will hold the Trustee personally liable.

This letter does not waive, and indeed expressly preserves, all rights, remedies, claims, or other relief that Ambac may have now or in the future, including the right to proceed directly against the Trustee.

Very truly yours,

*Theresa A. Foudy*

Theresa A. Foudy

---

[1] Capitalized terms used by not defined herein have the meanings ascribed to them in the Resolution.

Case:17-00188-LTS Doc#:513-18 Filed:05/16/17 Entered:05/16/17 21:17:46 Desc:
Exhibit Page 141 of 9

# Exhibit M

Letter from Whitebox's counsel to BNYM's counsel, dated May 4, 2017

(Attached)

# KASOWITZ BENSON TORRES LLP

DANIEL A. FLIMAN
DIRECT DIAL: (212) 506-1713
DIRECT FAX: (212) 835-5013
DFliman@kasowitz.com

1633 BROADWAY
NEW YORK, NEW YORK 10019
(212) 506-1700
FAX: (212) 506-1800

ATLANTA
HOUSTON
LOS ANGELES
MIAMI
NEWARK
SAN FRANCISCO
SILICON VALLEY
WASHINGTON DC

May 4, 2017

**VIA EMAIL**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

      Re:    Puerto Rico Sales Tax Financing Corporation ("**COFINA**")[1]

Dear Eric:

      As you know, we represent funds managed or advised by Whitebox Advisors LLC ("**Whitebox**"), as holders of senior COFINA Capital Appreciation Bonds (the "**Senior CAB Notes**").

      We have reviewed the Trustee's notice of default issued to COFINA this morning. As I indicated in earlier communications, we believe the noticed defaults are non-curable and, as such, the events described in the Trustee's notice gave rise to Events of Default under the Resolution. We also note that the Trustee's notice today references Ambac's May 1, 2017 notice of default, which correctly states that the same breaches "constitute Events of Default under Section 1101.1(ii)" of the Resolution.

      Section 1102(1) of the Resolution provides, in pertinent part, that "[u]pon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to . . . declare the principal of and accrued interest on the Bonds to be immediately due and payable

---

[1]    Capitalized terms used but not defined herein are ascribed the definitions in the Amended and Restated Sales Tax Revenue Bond Resolution dated as of July 13, 2007, as amended on June 10, 2009, and as subsequently amended, restated, modified and/or supplemented (the "**Resolution**") relating to certain notes (the "**COFINA Notes**").

Case:17-00188-LTS Doc#:593-18 Filed:05/16/19 Entered:05/16/19 21:17:46 Desc:
Exhibit S Page 3 of 9

KASOWITZ BENSON TORRES LLP

Eric A. Schaffer, Esq.
May 4, 2017
Page 2 of 2

(Capital Appreciation Bonds at their Compounded Amount on the date of acceleration)."  Thus, the Trustee, even absent direction, has the ability to accelerate the COFINA Notes.  And it must do so immediately.  As you know, it was reported just hours ago that "Gov. Ricardo Rosselló said today that his administration is working on a Title III filing for COFINA bonds."  Upon a Title III filing, we expect the Trustee to be prevented, during imposing of the automatic stay, from accelerating the COFINA Notes pursuant to the Resolution.

Therefore, for the reasons we have stressed to you for months now, it is imperative in order to protect the COFINA Senior CAB Notes for which the Trustee serves as trustee, that the Trustee immediately accelerate all COFINA Notes.  The Trustee's failure to act accordingly will cause further harm to Whitebox and other stakeholders and, we believe, would be grossly negligent and yet another manifestation of the Trustee's conflicts of interest.

This letter does not waive any right, remedy, claim, or relief that Whitebox may have now or in the future, each of which is reserved in full.

Sincerely,

*/s/ Daniel A. Fliman*

Daniel A. Fliman

**Exhibit L**

Letter from BNYM's counsel to Whitebox's counsel, dated May 2, 2016

(Attached)



Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

**Eric A. Schaffer**
Direct Phone: +1 412 288 4202
Email: eschaffer@reedsmith.com

May 2, 2017

**Via Email (dfliman@kasowitz.com) and U.S. Mail**

Daniel A. Fliman, Esq.
Kasowitz, Benson, Torres & Friedman LLP
1633 Broadway
New York, New York 10019

Re: **Amended and Restated Sales Tax Bond Resolution (as amended and supplemented from time to time, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA")**

Dear Dan:

We shared your letter with The Bank of New York Mellon ("BNYM") upon receipt yesterday morning. Given the broad scope of your letter, we simply cannot give you a complete response by your deadline today. While we are studying your letter carefully, I want to get you this preliminary response.

We are aware of the enactment of Act 24 over the weekend. We have not seen an official English translation. If you think it would be useful to share your translation, please send it to me. We agree that Act 24 goes beyond any earlier legislation. You probably saw BNYM's Monday letters to COFINA and Commonwealth. As of this writing, we have had no responses.

We only received the April 24 Proposal yesterday. Based on our initial reading, it appears that proposal is inconsistent with provisions of the COFINA Resolution. Of course, unlike Act 24, this is only a proposal.

For purposes of considering your demands, we would appreciate responses to some of the points posed earlier.

- Your letter focuses on covenant issues. Are you aware of any payment default under the Resolution?

- As you know, BNYM has no duty to act without first receiving direction from bondholders holding the requisite majority in principal amount of the outstanding bonds and security and indemnity satisfactory to the Trustee. Are your clients offering direction and indemnification in accordance with the Resolution?

ABU DHABI ♦ ATHENS ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH
NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

Daniel A. Fliman, Esq.
May 2, 2017
Page 2

**ReedSmith**

- Similarly, the Trustee has no obligation or duty to perform any act which would involve it in expense or liability, unless provided with security and indemnity satisfactory to it. Again, are your clients offering indemnification?

- Have your clients given COFINA or AFAAF any notice of default under section 1101 of the Resolution or otherwise?

- What communications have your clients had with AFAAF, COFINA, or other parties in interest that might shed light on the matters addressed in your letter?

- Do your clients continue to participate in negotiations or discussions with other parties in interest as part of the larger group represented by Quinn Emanuel?

While we are studying your letter for purposes of providing an additional response, it would be useful to get your responses to the questions above.

Very truly yours,

REED SMITH LLP

By: *Eric Schaffer /EAS*

Eric A. Schaffer

EAS:aei

Case:17-00188-LTS Doc#:759-18 Filed:05/16/19 Entered:05/16/19 21:17:46 Desc:
Exhibit Page 1 of 23

**Exhibit N**

Letter from COFINA Senior Bondholders to BNYM, dated May 4, 2017 (without exhibits)

(Attached)

May 4, 2017

**VIA HAND DELIVERY & TELECOPY**

The Bank of New York Mellon
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Fax: 212-815-5595/5596

Re: Demand for Acceleration of COFINA Senior Bonds

To Whom It May Concern:

This letter shall serve as a demand, pursuant to Section 1102(1) of that certain Amended and Restated Sales Tax Revenue Bond Resolution, as amended on June 10, 2009 (the "Resolution"), that Bank of New York Mellon, as Trustee (the "Trustee") for the Bonds issued by the Puerto Rico Sales Tax Financing Corporation ("COFINA"), accelerate all senior Bonds issued by COFINA. All capitalized terms not otherwise defined herein are as defined in the Resolution.

The undersigned are holders of senior Bonds issued by COFINA (the "COFINA Senior Bondholders") and Ambac Assurance Corporation ("Ambac"), an insurer of certain Capital Appreciation Bonds issued by COFINA. The COFINA Senior Bondholders are Owners of, in aggregate, $2.285 billion in principal amount outstanding of Bonds issued by COFINA, representing more than twenty-five per centum (25%) in principal amount of Outstanding Bonds. Ambac insures COFINA senior Capital Appreciation Bonds with a current net accreted value of approximately $1.3 billion.

As explained in numerous letters to the Trustee, there have occurred and continue to occur multiple Events of Default under the Resolution.[1] Accordingly, pursuant to section 1102(1) of the Resolution, and to the extent the Trustee has not already done so, the COFINA Senior Bondholders hereby demand that the Trustee declare the principal of and accrued interest on all senior COFINA Bonds outstanding to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount as of the date of acceleration), and that the Trustee make demand for payment upon COFINA in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. The COFINA Senior Bondholders further demand that the Trustee proceed to protect its rights and the rights of the COFINA Senior

---

[1] Specifically, the following letters (attached hereto as Exhibit A) have provided the Trustee with notice of Events of Default under the Resolution: COFINA Senior Bondholders' letter to the Government Development Bank for Puerto Rico and COFINA, dated Sept. 24, 2015; Jose F. Rodriguez Perello's letter to COFINA, dated Feb. 8, 2016; COFINA bondholders' letter to COFINA and the Trustee, dated Apr. 6, 2016; COFINA Senior Bondholders' letter to the Trustee, dated June 23, 2016; Whitebox's letter to the Trustee, dated Jan. 31, 2017; Whitebox's letter to the Trustee, dated Feb. 9, 2017; Whitebox's letter to the Trustee, dated Mar. 31, 2017; Whitebox's letter to the Trustee, dated Apr. 30, 2017; Ambac's letter to COFINA and the Trustee, dated May 1, 2017.

Bondholders through the exercise of any and all remedies set forth in subsections 1102(1)(i)-(iv) of the Resolution.

    Pursuant to subsections (b) and (j) set forth under the heading "Ambac Insurance Policy" contained in Exhibit B of COFINA's First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 (the "First Supplemental"), Ambac hereby provides its prior written consent to the Trustee's acceleration of any and all Ambac Insured Bonds (as that term is defined in the First Supplemental), whether held by the COFINA Senior Bondholders or otherwise. Ambac reserves its right, pursuant to the terms of the Ambac Insurance Policy (as defined in the First Supplemental), to not make any payment thereunder, except at its sole option, following the acceleration of the Obligations (as defined in the Ambac Insurance Policy) until and to the extent such Obligations are Due for Payment but are unpaid by reason of Nonpayment (as defined in the Ambac Insurance Policy) by COFINA, all as subject to the terms and conditions of the Ambac Insurance Policy.

    This letter does not waive, and indeed expressly preserves, all rights, remedies, claims, or other relief that the COFINA Senior Bondholders and/or Ambac may have now or in the future, including the right to proceed directly against the Trustee.

cc: Eric A. Schaffer (via email)

Canary SC Master Fund, L.P.

By: _____

Name:   Thomas Stamatelos

Title:   Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:  Goldman Sachs & Co.

DTC Participant No.:  0005

Crescent 1, L.P.

By: _____
    Name:  Thomas Stamatelos
    Title:   Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:  Goldman Sachs & Co.

DTC Participant No.:  0005

CRS Master Fund, L.P.

By: _____
    Name:  Thomas Stamatelos
    Title:   Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:  Goldman Sachs & Co.

DTC Participant No.:  0005

**Cyrus Opportunities Master Fund II, Ltd.**

By:

Name: Thomas Stamatelos
Title: Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Goldman Sachs & Co.

DTC Participant No.: 0005

**Cyrus Select Opportunities Master Fund, Ltd.**

By:

Name: Thomas Stamatelos
Title: Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Goldman Sachs & Co.

DTC Participant No.: 0005

**Cyrus Special Strategies Master Fund, L.P.**

By:

Name: Thomas Stamatelos
Title: Authorized Signatory

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Goldman Sachs & Co.

DTC Participant No.: 0005

**Decagon Holdings 1, L.L.C.**

By: _Mark Gross_

Name: _____

Title: _Authorized Signatory_

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank & Trust Company_

DTC Participant No.: _0997_

**Decagon Holdings 2, L.L.C.**

By: _Mark Gross_

Name: _____

Title: _Authorized Signatory_

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank & Trust Company_

DTC Participant No.: _0997_

**Decagon Holdings 3, L.L.C**

By: _Mark Gross_

Name: _____

Title: _Authorized Signatory_

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank & Trust Co_

DTC Participant No.: _0997_

**Decagon Holdings 7, L.L.C.**

By: _____

Name:

Title: _____

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _____

DTC Participant No.: _____

**Decagon Holdings 8, L.L.C.**

By: _____

Name:

Title: _____

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _____

DTC Participant No.: _____

**Decagon Holdings 9, L.L.C.**

By: _____

Name:

Title: _____

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _____

DTC Participant No.: _____

**Decagon Holdings 4, L.L.C.**

By: _____
Name:
Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank + Trust Co._

DTC Participant No.: _0997_

**Decagon Holdings 5, L.L.C.**

By: _____
Name:
Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank + Trust Co._

DTC Participant No.: _0997_

**Decagon Holdings 6, L.L.C.**

By: _____
Name:
Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Street Bank + Trust Co._

DTC Participant No.: _0997_

**Decagon Holdings 10, L.L.C.**

By: _____

Name: _____

Title: _A Real Signity_

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _State Stree Bank & Trs Co_

DTC Participant No.: _0IA_

**GoldenTree Asset Management LP**, on behalf of
various funds and accounts for which it acts as
investment manager

By: _____

Name: Deeb Salen

Title: Partner

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Names and DTC Participant
Numbers will be provided upon request

**Merced Partners Limited Partnership**

By: _____

Name:　　Thomas G. Rock
Title:　　Authorized Representative

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:　Wells Fargo NA

DTC Participant No.:　2027


**Merced Partners IV, L.P.**

By: _____

Name:　　Thomas G. Rock
Title:　　Authorized Representative

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:　Wells Fargo NA

DTC Participant No.:　2027


**Merced Partners V, L.P.**

By: _____

Name:　　Thomas G. Rock
Title:　　Authorized Representative

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name:　Wells Fargo NA

DTC Participant No.:　2027

**Taconic Master Fund 1.5 L.P.**
**By: Taconic Capital Advisors L.P.**

By: _Elizabeth Keeley_

Name: Elizabeth Keeley

Title: General counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: BNY Mellon

DTC Participant No.: 901

**Taconic Opportunity Master Fund L.P.**
**By: Taconic Capital Advisors L.P.**

By: _Elizabeth Keeley_

Name: Elizabeth Keeley

Title: General Counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: BNY Mellon

DTC Participant No.: 901

**Tilden Park Investment Master Fund LP**

By: _____

Name: Jeremy Primer
Title: Managing Director

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Credit Suisse Securities (USA) LLC

DTC Participant No.: 355

DocuSign Envelope ID: DB6BCEBC-85DD-4A48-8212-1A1EADB56842

**Whitebox Asymmetric Partners, L.P.**

By: _____  5/4/2017 | 11:57 PDT
    EFEC9666E267489
    Name: Mark Strefling
    Title: Partner/General Counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Wells Fargo Bank, N.A.

DTC Participant No.: 00002027

**Whitebox Institutional Partners, L.P.**

By: _____  5/4/2017 | 11:57 PDT
    EFEC9666E267489
    Name: Mark Strefling
    Title: Partner/General Counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Wells Fargo Bank, N.A.

DTC Participant No.: 00002027

**Whitebox Multi-Strategy Partners, L.P.**

By: _____  5/4/2017 | 11:57 PDT
    EFEC9666E267489
    Name: Mark Strefling
    Title: Partner/General Counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Wells Fargo Bank, N.A.

DTC Participant No.: 00002027

**Whitebox Term Credit Fund I L.P.**

By: _____  5/4/2017 | 11:57 PDT

Name: Mark Strefling

Title: Partner/General Counsel

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Wells Fargo Bank, N.A.

DTC Participant No.: 00002027

**Pandora Select Partners, L.P.**

By: _____

Name: Mark Strefling    Title: Partner / General Counsel and Chi

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Wells Fargo Bank, N.A.

DTC Participant No.: 0002027

**Värde Credit Partners Master, L.P.**
By Värde Credit Partners G.P., LLC, Its General Partner
By Värde Partners, L.P., Its Managing Member
By Värde Partners, Inc., Its General Partner

By: _____
Name:
Title:
         **Jeremy D. Hedberg**
         **Principal**

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: <u>Goldman, Sachs & Co.</u>

DTC Participant No.: <u>0005</u>

**Värde Investment Partners, L.P.**
By Värde Investment Partners G.P., LLC, Its General
Partner
By Värde Partners, L.P., Its Managing Member
By Värde Partners, Inc., Its General Partner

By: _____
Name:
Title:
         **Jeremy D. Hedberg**
         **Principal**

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: <u>Goldman, Sachs & Co.</u>

DTC Participant No.: <u>0005</u>

**Värde Investment Partners (Offshore) Master, L.P.**
By Värde Investment Partners G.P., LLC, Its General Partner
By Värde Partners, L.P., Its Managing Member
By Värde Partners, Inc., Its General Partner

By: _____
Name:        Jeremy D. Hedberg
Title:          Principal

Senior Lien Bonds issued by the Puerto Rico Sales Tax Financing Authority known as "COFINA"

DTC Participant Name: _Goldman, Sachs & Co.___

DTC Participant No.: _0005_____


**The Värde Skyway Master Fund, L.P.**
By The Värde Skyway Fund G.P., LLC, Its General Partner
By Värde Partners, L.P., Its Managing Member
By Värde Partners, Inc., Its General Partner

By: _____
Name:        Jeremy D. Hedberg
Title:          Principal

Senior Lien Bonds issued by the Puerto Rico Sales Tax Financing Authority known as "COFINA"

DTC Participant Name: _Goldman, Sachs & Co.___

DTC Participant No.: _0005_____

SB Special Situation Master Fund SPC—
**Segregated Portfolio D**

By: _____

      Name:
      Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: Morgan Stanley / JPMCC

DTC Participant No.: #050 / 0352

**Scoggin International Fund Ltd.**

By: _____

      Name:
      Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: ___ — JPMCC

DTC Participant No.: 0352

**Scoggin Worldwide Fund Ltd.**

By: _____
Name:
Title:

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _____JPMCC_____

DTC Participant No.: _____0352_____

**Ambac Assurance Corporation**

By: _____

Name: DAVID P. BARRANCO

Title: SENIOR MANAGING DIRECTOR

Senior Lien Bonds issued by the Puerto Rico Sales
Tax Financing Authority known as "COFINA"

DTC Participant Name: _____

DTC Participant No.: _____

## CONSENT TO ACCELERATION

Ambac Assurance Corporation, as insurer pursuant to that certain First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, (the "First Supplemental"), for the Puerto Rico Sales Tax Financing Corporation, hereby provides its prior written consent to the Trustee's acceleration of any and all Ambac Insured Bonds (as that term is defined in the First Supplemental).

**Ambac Assurance Corporation**

By: _____

Name: _DAVID P. BARRANCO_

Title: _SENIOR MANAGING DIRECTOR_

Case:17-00188-LTS Doc#:7515 Filed:06/16/19 Entered:06/16/19 21:17:46 Desc:
Exhibit DX-S Page 17 of 9

**Exhibit O**

Letter from BNYM's counsel to Ambac's counsel, dated May 5, 2017

(Attached)



Eric A. Schaffer
Direct Phone: +1 412 288 4202
Email: eschaffer@reedsmith.com

Reed Smith LLP
Reed Smith Centre
225 Fifth Avenue
Pittsburgh, PA 15222-2716
Tel +1 412 288 3131
Fax +1 412 288 3063
reedsmith.com

May 5, 2017

**Via Email (tfoudy@curtis.com) and U.S. Mail**

Theresa A. Foudy, Esq.
Curtis, Mallet-Prevost, Colt & Mosle LLP
101 Park Avenue
New York, NY 10178-0061

Re:  **Amended and Restated Sales Tax Bond Resolution (as amended and supplemented from time to time, the "Resolution"), adopted on July 13, 2007, by the Puerto Rico Sales Tax Financing Corporation ("COFINA")**

Dear Theresa:

I am writing in response to your letter dated April 30, 2017. As you know, I received the letter only after our call late on the afternoon of Monday, May 1, 2017. While your filing of a complaint on Monday morning makes it unnecessary and indeed inappropriate for me to respond to each of the points in your letter, I want to avoid any miscommunication.

As we discussed on Monday afternoon, The Bank of New York Mellon ("BNYM") is aware of the enactment of Act 24. We still have not seen an official English translation. If you have one, please share it. I assume you are aware that BNYM responded on Monday by sending notices to COFINA and the Commonwealth and on Thursday with a notice of default to COFINA.

For purposes of considering issues raised in your letter, we would appreciate responses to some of questions posed earlier.

- Your letter focuses on covenant issues. Are you aware of any payment default under the Resolution?

- As you know, BNYM has no duty to act without first receiving direction from bondholders holding the requisite percentage in principal amount of the outstanding bonds and security and indemnity satisfactory to the Trustee. Are your clients offering direction and indemnification in accordance with the Resolution?

- Similarly, the Trustee has no obligation or duty to perform any act which would involve it in expense or liability, unless provided with security and indemnity satisfactory to it. Again, are your clients offering indemnification?

ABU DHABI ♦ ATHENS ♦ BEIJING ♦ CENTURY CITY ♦ CHICAGO ♦ DUBAI ♦ FRANKFURT ♦ HONG KONG ♦ HOUSTON ♦ KAZAKHSTAN ♦ LONDON ♦ LOS ANGELES ♦ MIAMI ♦ MUNICH
NEW YORK ♦ PARIS ♦ PHILADELPHIA ♦ PITTSBURGH ♦ PRINCETON ♦ RICHMOND ♦ SAN FRANCISCO ♦ SHANGHAI ♦ SILICON VALLEY ♦ SINGAPORE ♦ TYSONS ♦ WASHINGTON, D.C. ♦ WILMINGTON

US_ACTIVE-134257996.3 05/05/2017 1:11 PM

Theresa A. Foudy, Esq.
May 5, 2017
Page 2

**ReedSmith**

- What communications have your clients had with AAFAF, COFINA, or other parties in interest that might shed light on the matters addressed in your letter?

Please respond at your earliest convenience.

Very truly yours,

REED SMITH LLP

By:

Eric A. Schaffer

EAS:aei

# EXHIBIT P

Letter from counsel to ad hoc group of COFINA Senior Bondholders to BNYM and its counsel,
dated May 12, 2017

(Attached)

**quinn emanuel** trial lawyers | new york

51 Madison Avenue, 22nd Floor, New York, New York 10010-1601 | TEL (212) 849-7000 FAX (212) 849-7100

WRITER'S DIRECT DIAL NO.
**(212) 849-7200**

WRITER'S EMAIL ADDRESS
susheelkirpalani@quinnemanuel.com

May 12, 2017

**VIA EMAIL (eschaffer@reedsmith.com)**

Eric A. Schaffer, Esq.
Reed Smith LLP
225 Fifth Avenue
Pittsburgh, Pennsylvania 15222

**VIA FACSIMILE**

The Bank of New York
101 Barclay Street-7W
New York, New York 10286
Attention:  Northern Municipals
Phone:  212-815-6955
Fax:  212-815-5595/5596

> Re: **Effect of Notice of Event of Default; Puerto Rico Sales Tax Financing Corporation Amended and Restated Sales Tax Revenue Bond Resolution**

Dear Mr. Schaffer:

We write on behalf of holders of more than $2.3 billion of outstanding senior bonds (the "COFINA Senior Bondholder Coalition")[1] issued by the Puerto Rico Sales Tax Financing

---

[1]  This letter is sent on behalf of the following members of the COFINA Senior Bondholder Coalition: Aristeia Horizons, L.P.; Camino Cipres LLC; Camino Roble LLC; Canary SC Master Fund, L.P.; Canyon Balanced Master Fund, Ltd.; Canyon Value Realization Fund, L.P.; The Canyon Value Realization Master Fund, L.P.; Crescent 1, L.P.; CRS Master Fund, L.P.; Cyrus Opportunities Master Fund II, Ltd.; Cyrus Select Opportunities Master Fund, Ltd.; Cyrus Special Strategies Master Fund, L.P.; Decagon Holdings 1, L.L.C.; Decagon Holdings 2, L.L.C.; Decagon Holdings 3, L.L.C.; Decagon Holdings 4, L.L.C.; Decagon Holdings 5, L.L.C.; Decagon Holdings 6, L.L.C.; Decagon Holdings 7, L.L.C.; Decagon Holdings 8, L.L.C.; Decagon Holdings 9, L.L.C.; Decagon Holdings 10, L.L.C.; Merced Partners Limited Partnership; Merced Partners IV, L.P.; Merced Partners V, L.P.; Pandora Select Partners, L.P.; SB Special Situation Master Fund SPC, Segregated Portfolio D; Scoggin International Fund Ltd.; Scoggin Worldwide Fund Ltd.; Taconic Master Fund 1.5 L.P.; Taconic

---

**quinn emanuel urquhart & sullivan, llp**

LOS ANGELES | NEW YORK | SAN FRANCISCO | SILICON VALLEY | CHICAGO | WASHINGTON, DC | HOUSTON | SEATTLE
LONDON | TOKYO | MANNHEIM | MOSCOW | HAMBURG | PARIS | MUNICH | SYDNEY | HONG KONG | BRUSSELS | ZURICH

The Bank of New York
May 12, 2017
Page 2

Corporation ("COFINA" or the "Corporation"), for which Bank of New York Mellon (the "Trustee") serves as trustee under the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 and as amended on June 10, 2009 (the "Resolution").[2] The COFINA Senior Bondholder Coalition collectively hold approximately 30% of all outstanding COFINA Senior Bonds, and includes holders of significant amounts of both current interest bonds ("CIBs") and capital appreciation bonds ("CABs").

Reference is made to the Trustee's Notice to Holders of COFINA Sales Tax Revenue Bonds, Senior Series and Subordinate Series, dated as of May 9, 2017 ("Trustee's Notice"). In the Trustee's Notice, the Trustee informed holders of COFINA bonds of the existence of various covenant defaults by both COFINA and the Commonwealth of Puerto Rico (the "Commonwealth") under the Resolution. In addition, the Trustee's Notice informed holders of notices of default previously delivered to COFINA by each of Ambac Assurance Group ("Ambac"), as a bond insurer for COFINA Senior Bonds, and the Trustee on May 1, 2017 and May 4, 2017, respectively. The Trustee's Notice further informed holders that the defaults noticed under the Resolution will become Events of Default on May 31, 2017 if not remedied by such date in accordance with the terms of the Resolution. On May 5, 2017, counsel to certain funds managed by OppenheimerFunds, Inc., Franklin Advisers, Inc. and the First Puerto Rico Family of Funds (such funds, collectively, the "Mutual Fund Group"), which purport to own $3.6 billion of COFINA Bonds, wrote to the Trustee to inform the Trustee that the Mutual Fund Group agreed with the Trustee that a default under the Resolution has now occurred as described in the Trustee's notice of default letter dated May 4, 2017.[3] Thus, every known creditor group has acknowledged the Trustee's Notice and agreed with it. We write to formally request the Trustee comply with its contractual obligations to Senior Bondowners in light of the undisputed facts.

As you know, upon the public actions taken by representatives of the Commonwealth, members of the COFINA Senior Bondholder Coalition long ago noticed defaults against COFINA and the Commonwealth under the Resolution based upon, *inter alia,* the same failure "to defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever," Resolution § 705, that the Trustee and other COFINA Bondowners now acknowledge has occurred. On May 2, 2017, following the expiration of the stay imposed by PROMESA, certain members of COFINA Senior Bondholder Coalition filed a complaint in the District of Puerto Rico (the "Complaint"), describing in detail the numerous covenant defaults that

---

Opportunity Master Fund L.P.; Tilden Park Investment Master Fund LP; Värde Credit Partners Master, L.P.; Värde Investment Partners, L.P.; Värde Investment Partners (Offshore) Master, L.P.; The Värde Skyway Master Fund, L.P. This letter is not sent on behalf of Whitebox Advisors LLC or any of its managed funds.

[2] Capitalized terms not defined herein have the meanings ascribed to them in the Resolution.

[3] In its letter to the Trustee, counsel to the Mutual Fund Group informed the Trustee that it holds significantly more Subordinate Bonds ($2.829 billion) than Senior Bonds ($759 million).

The Bank of New York
May 12, 2017
Page 3

have occurred under sections 704, 705, and 706 of the Resolution. A copy of the Complaint is enclosed.[4]

Based on the existing and continuing Events of Default under section 1101(1)(ii) of the Resolution, the Trustee is prohibited from making any payments to holders of COFINA Subordinate Bonds until all COFINA Senior Bonds have been paid in full and defeased in accordance with the provisions of the Resolution. Specifically, the Trustee must make payments to holders of COFINA Senior Bonds in strict conformity with the requirements of section 1103 of the Resolution, which addresses the priority of payments after an Event of Default.

Moreover, in light of multiple breaches and uncurable defaults, that are Events of Default, under the Resolution, as described further in the Complaint, *see* Complaint at ¶¶ 88-92, 96-97, on May 4, 2017, Ambac and certain members of the COFINA Senior Bondholder Coalition, who collectively represent more than twenty-five per centum (25%) in principal amount of Outstanding Bonds, made a demand on the Trustee, pursuant to section 1102(1) of the Resolution, to declare the principal of and accrued interest on all COFINA Senior Bonds Outstanding to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount as of the date of acceleration) (the "Acceleration Demand"). The Acceleration Demand serves to protect all Senior Bondowners and, with respect to any property deposited with the Trustee, does not control any property of, and has no effect on COFINA. In addition, as you know, on the filing date of the COFINA title III case (May 5, 2017), all Senior Bonds are deemed due and payable immediately pursuant to section 502 of the Bankruptcy Code.

Thus, if the Trustee declares all Senior Bonds immediately due and payable, whether pursuant to the Acceleration Demand, applicable law, or in the Trustee's discretion under section 1102(1) of the Resolution, then the Trustee must make payments to the Owners of Senior Bonds in accordance with the operative provisions of section 1103(1), "ratably, without preference or priority of principal (Compounded Amount) over interest or interest over principal (Compounded Amount) …". *See* Resolution at § 1103(1). Even if the Trustee takes the position that an Event of Default will first mature on May 31, 2017, and only if there is not a cure of the defaults noticed by Ambac and the Trustee, then, for purposes of any payments to be made on June 1, 2017, the Trustee, either in the exercise of its own discretion or in accordance with the previously submitted Acceleration Demand, should declare all Senior Bonds due and owing and make payments to

---

[4] As described further in the Complaint, members of the COFINA Senior Bondholder Coalition and other COFINA Senior Bondowners wrote several letters to COFINA and the Government Development Bank of Puerto Rico ("GDB"), including one sent over 18 months ago, demanding that COFINA fulfill its obligations to provide further assurances to COFINA bondowners and to defend, preserve and protect COFINA's property—the Dedicated Sales Tax. Complaint at ¶¶ 94, 98. To date, COFINA has failed and refused to cure these breaches of the Resolution, and in fact has continued to acquiesce in challenges to COFINA and the COFINA structure, including litigation directly questioning COFINA's legality. *See generally id.* at ¶¶ 88-107.

The Bank of New York
May 12, 2017
Page 4

Owners of Senior Bonds in accordance the operative provisions of section 1103(1) as set forth in the prior sentence.

If, however, the Trustee, affirmatively chooses not to declare all Senior Bonds due and owing despite the Acceleration Demand and its independent right to do so, then the Trustee must then make payments to Senior Bonds as and when payment becomes due in accordance with the provisions of the first three decretal paragraphs of section 1103(1).

The Trustee has in its exclusive control more than $400 million and the seriousness of the Trustee's decisions cannot be overstated. The Trustee has two options: (1) It could honor the Acceleration Demand (or declare the Senior Bonds due and payable in its discretion) and thereby ensure equal treatment of all Senior Bonds; or (2) it could comply with section 1103(1)'s priority waterfall without declaring all Senior Bonds due and payable, thereby paying a sub-set of Senior Bonds on a current basis while other Senior Bonds continue to accrete interest for unpaid amounts. Given the cumulative effect of the Acceleration Demand and federal law, we believe the most prudent course of proceeding for the Trustee is to declare all Senior Bonds due and payable and distribute all cash on hand, net of reasonable reserves for the Trustee's expenses, to owners of Senior Bonds ratably.[5] If, however, the Trustee reasonably believes that acceleration is not possible at this time, we then request that the Trustee make payments of principal and interest to holders of Senior Bonds as and when payment becomes due in accordance with the provisions of 1103(1).[6] What is critical though is that, regardless of the option chosen, no payments can be made to Subordinate Bondowners.

Please advise us no later than May 22, 2017 that, in the event the events of default contained in the Trustee's Notice are not remedied by May 31, 2017, which option the Trustee has chosen to pursue with respect to payments to be made on June 1, 2017. We would be happy to discuss this matter further to achieve a mutually satisfactory arrangement that will avoid the need for litigation.

---

[5] To be clear, we are not, at this time, requesting the Trustee take any affirmative action against the COFINA or its property. Rather, we urge the Trustee to comply with the Acceleration Demand or otherwise declare all Senior Bonds due and payable in the Trustee's discretion, **at least with respect to any property that is or becomes deposited with the Trustee**.

[6] To the extent that the Trustee reasonably determines that acceleration is not possible at this time, this should not be construed to mean that COFINA Senior Bonds should not receive the same treatment under a plan of adjustment for COFINA, after accounting for any payments made during the Title III case.

The Bank of New York
May 12, 2017
Page 5

Nothing herein waives or releases any claims or rights against the Trustee, all of which are expressly preserved.

Sincerely,

Susheel Kirpalani

**Exhibit Q**

Letter from Ad Hoc Group of Subordinate Beneficial Interest Holders to BNYM,

dated May 5, 2017

(Attached)

KRAMER LEVIN NAFTALIS & FRANKEL LLP

AMY CATON
PARTNER
PHONE 212-715-7772
FAX 212-715-8000
ACATON@KRAMERLEVIN.COM

May 5, 2017

The Bank of New York Mellon, Trustee
101 Barclay Street
New York, New York 10286
Attn: Alex Chang

Re:   **Amended and Restated Sales Tax Bond Resolution (as amended and
supplemented from time to time, the "Resolution"), adopted on July 13, 2007, by
the Puerto Rico Sales Tax Financing Corporation ("COFINA")**

Dear Alex:

The undersigned is counsel to certain funds managed by OppenheimerFunds, Inc.,
Franklin Advisers, Inc. and the First Puerto Rico Family of Funds (such funds, collectively, the
"Mutual Fund Group"). The Mutual Fund Group beneficially owns nearly $3.6 billion of
COFINA Bonds.[1] Capitalized terms used but not defined herein have the meaning given in the
Resolution.

We agree with the Trustee that a default under the Resolution has now occurred as
described in the Trustee's letter dated May 4, 2017. However, we do not agree with the
assertions by Ambac Assurance Corporation ("Ambac"), an insurer of approximately $800
million in outstanding capital appreciation Bonds due in 2047 and 2054, that any other default or
any Events of Default has occurred.

To our knowledge, and on the facts and circumstances described in Ambac's recent
complaint,[2] Bank of New York Mellon ("BNYM") has not committed any breach of the
Resolution, and therefore cannot be removed by Ambac. It is our understanding that Ambac has
never requested that the Trustee declare a default or publicly expressed concern that there was a
default prior to April 29, 2017. As Ambac knows, Puerto Rico has consistently maintained that
no defaults under the Resolution had occurred prior to May 4, and Puerto Rico threatened legal
action and damages against the Trustee if the Trustee halted or adjusted payment on any of the
COFINA Bonds. *See* Letter from Richard J. Cooper, Cleary Gottlieb Steen & Hamilton LLP, to
Eric Schaffer, Reed Smith LLP (June 29, 2016); Letter from Richard J. Cooper, Cleary Gottlieb

---

[1] The Mutual Fund Group has provided the Trustee with CUSIP-level holdings data showing that the Mutual Fund
Group holds approximately $759 million Senior Bonds and $2,829 million Subordinate Bonds.
[2] Complaint, Ambac Assurance Corporation v. The Bank of New York Mellon, No. 652356 (N.Y. Sup. Ct. May 2,
2017).

1177 AVENUE OF THE AMERICAS   NEW YORK NY 10036-2714   PHONE 212.715.9100   FAX 212.715.8000

990 MARSH ROAD   MENLO PARK CA 94025-1949   PHONE 650.752.1700   FAX 650.752.1800

47 AVENUE HOCHE   75008 PARIS FRANCE   PHONE (33-1) 44 09 46 00   FAX (33-1) 44 09 46 01

WWW.KRAMERLEVIN.COM

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Page 2

Steen & Hamilton LLP, to Jose Rodriguez Perelló (Feb. 10, 2016). Even if Ambac had raised concerns with the Trustee, it is our understanding that at no time did Ambac or any Bondowner with the requisite authority to do so direct and indemnify the Trustee in accordance with the Resolution's requirements[3] to declare a default, accelerate the COFINA Bonds, or cease making payments to any COFINA Bondowners. If the Trustee had done so before the passage of PROMESA, the Trustee could have risked incurring substantial liability for having created an Event of Default and acceleration event. If BNYM had declared an Event of Default after the enactment of PROMESA, it would have violated PROMESA's stay provisions,[4] making any such declaration void and leaving BNYM at risk of liability for violating the stay. Therefore, the fact that BNYM did not act on any defaults alleged to have occurred prior to April 29, 2017 was not only completely reasonable, it was the only plausible course of action for BNYM under the circumstances.

In addition to the foregoing, while Ambac made a last-minute request to BNYM to declare an Event of Default and accelerate the Bonds one day before the May 1 payment, Ambac sent this notice when the PROMESA stay was still in effect, and in an untimely manner such that BNYM could not have realistically had time to react prior to the release of the May 1 payment. Moreover, BNYM made the payment to Bondowners while the PROMESA stay was in effect, pursuant to the Oversight Board's stated extension of the stay through May 1. It also appears that Ambac's direction was made without the required offer of indemnification for declaring a non-monetary default.

Based on our knowledge of the facts, BNYM has acted reasonably and has complied with its duties as indenture trustee. Upon enactment of the Compliance Act, BNYM prudently notified the Commonwealth and COFINA for the basis of a potential default and timely gave notice of a default. BNYM has therefore complied with its duties specifically set forth in the Resolution. *See* Resolution § 802. In advancing claims that BNYM has breached the Resolution, Ambac is merely seeking to create third party liability where none exists. The demands that Ambac has made of BNYM would create potential liability that no indenture trustee under any commercially reasonable indenture agreement – including the Resolution – would be required to bear.

With respect to Ambac's assertions that the Compliance Act itself created an incurable Event of Default, those assertions are incorrect as the threatened covenant breaches are capable of being cured by new legislation or actions by COFINA and Puerto Rico. Section 1101.1(ii) requires that COFINA and Puerto Rico be given 30 days to take actions to cure a breach before it can mature into an Event of Default. While it may be unlikely that COFINA and Puerto Rico will cure these violations during the cure period, these defaults nonetheless remain "curable." If the Trustee were to declare an Event of Default without having given Puerto Rico a cure period,

---

[3] Resolution §§ 802, 1106.
[4] PROMESA § 405.

KRAMER LEVIN NAFTALIS & FRANKEL LLP

Page 3

it could result in substantial potential liability for BNYM, liability for which Ambac has not offered to indemnify the Trustee in accordance with the Resolution.

    As stated above, BNYM has dutifully performed its obligations to all Bondowners. There is no merit to removing BNYM as Trustee because BNYM has complied with all of its obligations under the Resolution and, in our view, has tried to weigh the interest of the various Bondowners and act in accordance with those interests in protecting the trust estate.  BNYM should not accede to Ambac's demands to declare an Event of Default or resign.

    Please feel free to call me with any questions or concerns.  We look forward to continuing to work with you as indenture trustee for the COFINA Bonds.

Sincerely,

Amy Caton

cc:    Eric A. Schaffer
       Kurt F. Gwynne
       Luke A. Sizemore

**Exhibit R**

Letter from FAFAA to BNYM, dated May 16, 2017

(Attached)

May 16, 2017

BNY Mellon
c/o Alex Chang
101 Barclay Street
New York, NY 10286

Re:   Amended and Restated Sales Tax Revenue Bond Resolution, as amended on June
      10, 2009 (the "Resolution") and the Puerto Rico Sales Tax Financing Corporation
      ("COFINA")

Ladies and Gentlemen:

We are in receipt of your May 4, 2017 letter in which you assert an Event of Default has occurred or will occur under the bonds issued by COFINA because of the "Law on Compliance with the Fiscal Plan," Senate Bill 432, House Bill 938 (the "Fiscal Plan Compliance Law"), signed into law on April 27, 2017, conflict with sections 705 and 706 of the Resolution and permitted use of the pledged sales tax (the "Pledged Sales Tax"). An explanatory declaration of Governor Ricardo Rosselló Nevares appended to the Fiscal Plan Compliance Law confirms that Chapter IV of the statute does not apply to COFINA.

With respect to Chapter IV of the Fiscal Compliance Law, a committee (the "Committee") composed of Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Treasury Department, and the Executive Director of the Office of Management and Budget (OMB) is responsible for determining the amount of funds necessary for covering operational expenses and obligations as well as any remaining available surplus for public corporations, agencies, and instrumentalities of the Government of Puerto Rico. Such determination is to be made in accordance with the expenditure budget recommended by OMB for each fiscal year. As for COFINA, the Executive is authorized to use COFINA's funds as a last alternative pursuant to a sworn certification to the Puerto Rico Legislative Assembly. This certification must establish the need, terms and amount of funds to be used to "occasionally" cover a significant cash flow deficiency within the Government of Puerto Rico Fiscal Plan, as certified by the Financial Oversight and Management Board for Puerto Rico created under the Puerto Rico Oversight, Management and Economic Stability Act of 2016 (PROMESA).

To date the Committee has not exercised any such discretion and even if such discretion is ultimately exercised, there is no certainty that it would be inconsistent with the terms of the Resolution. As a result, there is no basis to assert that the Fiscal Compliance Law has triggered an Event of Default under the Resolution.

Additionally, sections 705 and 706 of the Resolution would not be violated even if the Fiscal Plan Compliance Law were applicable to COFINA at this time. Section 705 of the Resolution only requires COFINA to defend, preserve and protect the Pledged Property against *claims and*

*demands*. There have been no such claims or demands against the Pledged Property. As legislation, the Fiscal Plan Compliance Law is not a claim or demand. As noted above, Chapter IV of the Fiscal Plan Compliance Law merely authorizes the Committee to use the Pledged Sales Tax in certain limited circumstances. No such circumstances have arisen, and the Pledged Sales Tax have not been used. Moreover, no claims or demands against the Pledged Sales Tax have been made, and, therefore, COFINA's obligation under Section 705 to defend against claims or demands has not been triggered. If, under the new legislation, an action that constitutes a claim or demand against the Pledged Property were to be taken, COFINA would have thirty days from notice thereof to cure, which thirty-day cure period is extended under section 108 of Title 11 of the U.S. Code (the "Bankruptcy Code").[1]

Notably, Section 706 only prohibits the Commonwealth from (i) "limit[ing] or restrict[ing] the rights or power of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the Act" or (ii) "limit[ing] or restrict[ing] the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders". Such restrictions are not implicated here for the following reasons: (a) the Fiscal Plan Compliance Law does not limit or restrict any rights or powers of the Commonwealth to *impose, maintain, charge or collect* such taxes. Such taxes continue to be imposed, maintained, charged and collected; (b) no rights granted by the Act or rights of COFINA to meet its obligations to its Bondholders have in fact been limited or restricted; (c) there has been no actual impairment of the lien on the Pledged Property as the lien on Pledged Property remains in full force and effect; and (d) no revenues are currently required to be deposited or are available to be deposited, with the Trustee as the Trustee has already received the full Pledged Sales Tax Base Amount for Fiscal Year 2017. In accordance with the provisions of the Resolution and the Act no revenues are anticipated to be deposited with the Trustee until July 1, 2017.

Therefore, by virtue of the foregoing, the Fiscal Plan Compliance Law has had no impact on the Pledged Property. Furthermore, to reiterate, if actions are taken in the future under the authority granted under the Fiscal Plan Compliance Law that would limit or restrict the rights granted by the Act or the rights of COFINA to meet its obligations to the Bondholders, it would have thirty days after notice thereof to cure any default that might be triggered and such period would be subject to extension under section 108 of the Bankruptcy Code.

The above does not purport to be a complete or exhaustive list of reasons for which the assertions in your letter fail and we reserve the right to assert additional defenses to such assertions at any time. Nothing herein constitutes a waiver of any rights, remedies, or claims contained in the Resolution, the COFINA bonds or any other documents related thereto or any rights of COFINA

---

[1] Sections of the Bankruptcy Code referenced herein are incorporated to Title III by PROMESA section 301(a).

under Title III of PROMESA, including the extent to which any provision thereof affects the Pledged Property.

For the reasons set forth herein, COFINA hereby demands that you immediately retract and withdraw the assertions set forth in your May 4, 2017 letter and any declaration of the occurrence of a default or Event of Default under the Resolution and any remedies you may believe you are entitled to as a result thereof. Please be advised that any action you may seek to take based on any alleged default will violate the automatic stay under Bankruptcy Code section 362 and may cause substantial damage to COFINA. Accordingly, we reserve the right to hold you liable for any penalties, damages, including attorney's fees, with respect to such actions.

Sincerely,

John J. Rapisardi
O'Melveny & Myers
on behalf of the Puerto Rico Fiscal Agency and Financial
Advisory Authority (FAFAA)

cc:   Eric A. Schaffer (by email only to eschaffer@reedsmith.com)
      Lee Sepulvado (by email only to lsepulvado@smlawpr.com)
      Robert N.H. Christmas (by email only to rchristmas@nixonpeabody.com)
      Chris Mason (by email only to cmason@nixonpeabody.com)
      Susheel Kirpalani (by email only to susheelkirpalani@quinnemanuel.com)
      Daniel A. Fliman (by email only to dfliman@ksowitz.com)
      Amy Caton (by email only to acaton@kramerlevin.com)
      Thomas Moers Mayer (by email only to tmayer@kramerlevin.com)
      William P. Smith (by email only to wsmith@mwe.com)
      John K. Cunningham (by email only to jcunningham@whitecase.com)
      Dennis F. Dunne (by email only to ddunne@milbank.com)
      Marcia L. Goldstein (by email only to marcia.goldstein@weil.com)
      Mark C. Ellenberg (by email only to mark.ellenberg@cwt.com)
      Martin A. Sosland (by email only to martin sosland@butlersnow.com)
      Martin J. Bienenstock (by email only to mbienenstock@proskauer.com)
      Suzzanne Uhland (by email only to suhland@omm.com)
      Gerardo Portela (by email only to Gerardo.Portela@aafaf.pr.gov)
      José Santiago (by email only to Jose.Santiago@bgfpr.com)
      Belén Fornaris (by email only to Belen.Fornaris@bgfpr.com)

Ambac Assurance Corporation
One State Street Plaza
15th Floor
New York, NY 10004
Attention: Surveillance Department

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
Attention: Risk Management

MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
Attention: Surveillance

Assured Guaranty Municipal Corp.
31 West 52nd Street
New York, NY 10019
Attention: Managing Director -
Surveillance

**Exhibit S**

Letter from FAFAA to Counsel for BNYM, dated May 16, 2017

(Attached)

May 16, 2017

Eric A. Schaffer
ReedSmith
599 Lexington Avenue, 22nd Floor
New York, NY 10022

> Re: Amended and Restated Sales Tax Revenue Bond Resolution, as amended on June 10, 2009 (the "Resolution") and the Puerto Rico Sales Tax Financing Corporation ("COFINA")

Mr. Schaffer:

I am writing to set forth our position regarding ownership of the Accounts pledged as security for COFINA's obligations under the Bonds and held by the Trustee (the "Pledged Accounts").[1]

The Act provides that all Pledged Property deposited in the FIA "shall be the property of COFINA." The Resolution further provides that all Revenues shall be transferred from the FIA daily and deposited into certain Pledged Accounts held by the Trustee. Although the Pledged Accounts are held by the Trustee, they are not the property of the Bondholders.

Several provisions in the Resolution and the Official Statements published in connection with the bond issuance are inconsistent with any assertion of ownership by the Bondholders. The Official Statements describe the Pledged Accounts as held by the Trustee "subject to the lien and pledge created under the Resolution." The Bondholders hold a lien on the Pledged Accounts; they do not own the Pledged Accounts.

Section 505 of the Resolution provides that under certain circumstances COFINA can direct the Trustee to pay certain expenses and make transfers from certain Pledged Accounts, namely the Revenue Account. Under section 505, COFINA can order the Trustee, after certain obligations have been satisfied from the Revenue Account, to "release to the Corporation, free and clear of the lien of this Resolution, [the funds in the Revenue Account] to be applied for any lawful purpose of the Corporation." The authority granted to COFINA to direct use of the assets held in the Revenue Account for its general purposes, free of the Bondholders' lien, even under limited circumstances, is inconsistent with any assertion of ownership by the Bondholders.

Please be advised that any action the Bondholders may seek to take based on an assertion of ownership will be an act to exercise control over property of the estate in violation of the automatic stay under section 362(a) of the Bankruptcy Code (which is incorporated to Title III by section 301(a) of PROMESA) and may cause substantial harm to COFINA. Accordingly, we reserve the

---

[1] Capitalized terms not otherwise defined herein shall have the meaning set forth in the Resolution.

right to hold you liable for any damages, including attorney's fees, that may result from such actions.

Sincerely,

John J. Rapisardi
O'Melveny & Myers
on behalf of the Puerto Rico Fiscal Agency and Financial
Advisory Authority (FAFAA)

CC:   Martin J. Bienenstock
      Suzzanne Uhland

Case 17-03283-LTS   Doc#:7520-18   Filed:06/16/19   Entered:06/16/19 11:17:46   Desc:
Exhibit   Page 1 of 33

**Exhibit T**

Complaint against BNYM in the New York Supreme Court, County of New York, styled
Whitebox Multi-Strategy Partners, L.P. et al., v. Bank of New York Mellon Corp., 651969/2017
(Sup. Ct. N.Y. County Apr. 12, 2017)

(Attached)

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF NEW YORK**
------------------------------------------------------------------------ x

WHITEBOX MULTI-STRATEGY PARTNERS, L.P.,
WHITEBOX ASYMMETRIC PARTNERS, L.P.,
WHITEBOX INSTITUTIONAL PARTNERS, L.P., and
PANDORA SELECT PARTNERS, L.P.,

                         Plaintiffs,

                   -against-

BANK OF NEW YORK MELLON CORPORATION,

                       Defendant.

------------------------------------------------------------------------ x

Index No. _____

Date Issued: _____

**COMPLAINT**

Jury Trial Demanded

       Plaintiffs Whitebox Multi-Strategy Partners, L.P., Whitebox Asymmetric Partners, L.P.,

Whitebox Institutional Partners, L.P., and Pandora Select Partners, L.P. ( "Plaintiffs"), for their

complaint against defendant Bank of New York Mellon Corporation ("BONY" or "Defendant"),

allege as follows:

## NATURE OF THE ACTION[1]

      1.    This action arises from BONY's repeated failures over the last eighteen (18)

months to take appropriate measures to protect Plaintiffs and their COFINA Notes -- as BONY is

duty bound to do.[2]

      2.    From the moment of its appointment as Trustee, BONY had an obligation to act on

behalf of all COFINA Notes with undivided loyalties and to insulate itself from any and all

conflicts of interest.  BONY breached that obligation when, upon COFINA's subsequent issuance

---

[1]     Undefined capitalized terms used in this section of the Complaint are given the definitions set forth
elsewhere in the Complaint.
[2]     "COFINA" is an acronym for Corporación del Fondo de Interés Apremiante or, as otherwise known, the
Puerto Rico Sales Tax Financing Corporation.  COFINA, a public corporation established by the Commonwealth of
Puerto Rico, is the issuer of various types of tax revenue bonds (the "COFINA Notes").

Case 17-00158-LTS Doc#7520-8 Filed 05/16/19 Entered 05/16/19 17:45:34 Desc:
Exhibit DX-S Page 4 of 33

of different types of COFINA Notes, each of which carried drastically different payment, maturity and priority rights, BONY expanded its mandate to cover such new notes. Despite its many opportunities to cure those conflicts, such as by appointing co-trustees for different types of notes, and several requests to do so, BONY has refused, and all COFINA Notes have suffered as a consequence. Indeed, BONY has allowed this conflict of interest to put it into a state of paralysis and inaction that continues to harm Plaintiffs to this day.

3.    Specifically, since September 2015, BONY knew of, and failed to adequately respond to, no less than five (5) Events of Default occurring under the Resolution governing the COFINA Notes. Those Events of Default arise from public positions taken by the Commonwealth of Puerto Rico that pose an existential threat to COFINA and jeopardize all COFINA Notes; positions the Commonwealth made a covenant never to take. The Events of Default also arise from COFINA's failures to do anything at all to abide by its covenant to -- *at all times* -- defend COFINA's viability and its ability to repay the COFINA Notes. Despite the Commonwealth's and COFINA's covenant breaches, which long ago ripened into Events of Default, BONY has done little to protect Holders. While it continues to collect fees, BONY has sat idly by and has not enforced the rights or powers entrusted to it under the Resolution. As a result, COFINA's subordinate debts have been improperly preferred over its senior debts.

4.    Indeed, the particular type of senior COFINA Notes held by Plaintiffs -- referred to as Senior CAB Notes -- have suffered most acutely as a result. Because those notes carry the longest dated maturities with no current cash payments, the Senior CAB Notes are at severe risk if the COFINA structure is compromised. Acceleration of the COFINA Notes, a power granted to BONY upon an Event of Default, which makes all senior COFINA Notes due immediately and on a pro rata basis, is thus a critical protection to the Senior CAB Notes because they otherwise would

2

be forced to wait on the sidelines as COFINA is stripped of the resources specifically allocated to

it for the repayment of its notes (*i.e.*, sales and use tax revenues the Commonwealth has specifically

dedicated to COFINA) and as other senior COFINA Notes and subordinate COFINA Notes are

paid in full.

5.    BONY's duties to the Senior CAB Notes therefore required it to investigate and to

enforce the Events of Default, either by accelerating the COFINA Notes or refraining from making

any payments.  Yet, shackled by its own divided interests and personal financial incentives, BONY

failed to do so, with prejudice to Plaintiffs and others, and an improper benefit to subordinate

COFINA Notes.

6.    This action therefore seeks damages against BONY for its negligent conduct,

breaches of duties, contractual breaches and waste, as well as declaratory relief regarding BONY's

serious conflicts of interest and other failures as Trustee.

## PARTIES

7.    Plaintiff Whitebox Multi-Strategy Partners, L.P. is a limited partnership organized

in the British Virgin Islands, and brings this action in its own right and as holder of Senior CAB

Notes issued by COFINA.

8.    Plaintiff Whitebox Asymmetric Partners, L.P. is a limited partnership organized in

the Cayman Islands, and brings this action in its own right and as holder of Senior CAB Notes

issued by COFINA.

9.    Plaintiff Whitebox Institutional Partners, L.P. is a limited partnership organized in

Delaware, and brings this action in its own right and as holder of Senior CAB Notes issued by

COFINA.

10.     Plaintiff Pandora Select Partners, L.P. is a limited partnership organized in the British Virgin Islands, and brings this action in its own right and as holder of Senior CAB Notes issued by COFINA.

11.     Defendant BONY is a Delaware corporation with a principal place of business in New York, New York.  BONY serves as Trustee for all series of notes issued by COFINA pursuant to the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 10, 2009.

## JURISDICTION AND VENUE

12.     This Court has personal jurisdiction pursuant to CPLR §§ 301 and 302, because Defendant is a resident of the State of New York and the acts complained of occurred in the State of New York.

13.     Venue is proper in this Court pursuant to CPLR § 503 because Defendant resides in New York County.

## FACTUAL BACKGROUND

### I.     Facing Crisis, The Commonwealth Creates The COFINA Structure

14.     In 2006, Puerto Rico faced an unprecedented fiscal crisis that led to a full government shutdown and left 100,000 public employees without pay and 500,000 children without school.   In response, the Legislative Assembly imposed for the first time a sales and use tax (the "SUT") and, by statute, transferred ownership of a portion of the sales and use tax revenue ("Dedicated SUT Revenues") to what would ultimately become COFINA.  Shortly thereafter, in early 2007, the Legislative Assembly nearly unanimously passed Act 56, which officially created COFINA and authorized COFINA to issue bonds backed by Dedicated SUT Revenues.

15.     COFINA is an isolated entity and the Dedicated SUT Revenues are, by statute, "*owned* by COFINA."  Act 56 expressly separated COFINA's funds from the Commonwealth's

4

Case 17-00188-LTS Doc#7520-8 Filed 05/16/17 Entered 05/16/17 19:17:45:34 Desc:
Exhibit DX-S Page 7 of 33 393

general fund, ensuring that they would not be diverted to the Treasury of Puerto Rico and not used for other purposes.  Indeed, Act 56 specified that the Dedicated SUT Revenues "shall not constitute available resources of the Commonwealth of Puerto Rico *for any purpose*."

16.    In July 2007, COFINA adopted its "Sales Tax Revenue Bond Resolution," which was amended and restated on June 10, 2009, and as amended, modified, or supplemented thereafter (the "Resolution").

17.    Pursuant to the Resolution and statutory enactments, the statutory transfer of the Dedicated SUT Revenues to COFINA presently is accomplished through the following mechanism:  (1) the Commonwealth collects SUT at a rate of 11.5%, (2) out of the 11.5% collected, 6% constitutes Dedicated SUT Revenues that are owned by and flow to COFINA until it has received SUT up to a cap specified in the Resolution that is sufficient for COFINA's total debt service for the fiscal year, (3) out of the remaining 5.5%, 1% flows to municipalities and 4.5% flows to the general funds of the Commonwealth, and (4) Dedicated SUT Revenues in excess of the aforementioned cap flow to the general funds of the Commonwealth.

18.    This structure, which transfers ownership of the Dedicated SUT Revenues to COFINA, ensures that necessary debt service by COFINA is funded.  Given the importance of this structure, and the fact that the Dedicated SUT Revenues are the sole source of recovery for the COFINA Notes, the Resolution acknowledges that any interruption of revenues flowing to COFINA is an Event of Default.

19.    The isolation of COFINA from the credit risk of the Commonwealth's general fund, through COFINA's ownership of the Dedicated SUT Revenues and the statutory lien granted for the benefit of holders of COFINA notes (the "Holders"), enabled COFINA Notes to receive strong, investment-grade ratings, consistently higher than the ratings for the Commonwealth's general

5

obligations bonds (the "GO Bonds"). In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that **separates** the revenue stream supporting the bonds **from** the Commonwealth of Puerto Rico, along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal." It further stated that "[t]he legislative act creating COFINA ... **successfully separates** and **provides a priority interest** in the Commonwealth's sales and use taxes for the [COFINA] bondholders." Moody's echoed these assessments.

## II.   COFINA Issues $16 Billion Of Notes

20.     At the time of the Resolution's adoption in 2007, COFINA issued several types of COFINA Notes, comprised primarily of cash pay notes ("Senior Cash Pay Notes") and capital appreciation bonds ("Senior CAB Notes" and collectively with the Senior Cash Pay Notes, the "Senior Notes"). In total, during 2007 and 2008, COFINA issued approximately $5.2 billion in Senior Notes. The Senior Notes, because they were backed by the Dedicated SUT Revenues, afforded the Commonwealth with crucial, lower cost financing compared with the GO Bonds.

21.     By 2009, the Commonwealth was in need of additional resources. As such, through legislation, the Commonwealth increased the amount of Dedicated SUT Revenues owned by COFINA and caused COFINA to issue subordinate cash pay notes ("Subordinate Cash Pay Notes") and subordinate capital appreciation bonds ("Subordinate CAB Notes" and collectively with the Subordinate Cash Pay Notes, the "Subordinate Notes"). As used herein, "COFINA Notes" refers, collectively, to all Senior Notes and Subordinate Notes.

22.     The Subordinate Notes, which are structurally subordinate to all Senior Notes, carry higher interest rates than the Senior Notes and shorter maturities than most Senior Notes, including the Senior CAB Notes. Because of the inherently riskier nature of the Subordinate Notes, while they have a higher interest coupon, they have had a lower credit rating than the Senior Notes. In

Case 17-00188-LTS  Doc#7520-8 Filed 05/16/17 Entered 05/16/17 19:17:45:34 Desc:
Exhibit DX-S   Page 299 of 393
Exhibits   Page 8 of 33

essence, the issuance of the Subordinate Notes provides credit support to all Senior Notes by effectively protecting the Senior Notes from material declines in the Dedicated SUT Revenues owned by COFINA.  Nonetheless, when the Subordinate Notes were issued in 2009, the ratings agencies reaffirmed high ratings on the Senior Notes, in part, because of COFINA's strong legal structure.

23.     In total, investors on and off the island of Puerto Rico have purchased more than $16 billion of COFINA Notes.[3]   Of all bonds issued by the Commonwealth and its instrumentalities, COFINA is the most widely held by on-island investors; with a 7:1 ratio of on-island COFINA Notes holders versus on-island GO Bonds holders.

24.     As noted, the COFINA Notes consist of essentially these types of debt:

a.  **Senior Cash Pay Notes (approximately $4 billion principal amount outstanding)**, which are entitled to periodic interest payments in cash, and mature between 2020 and 2057.

b.  **Senior CAB Notes (approximately $3.7 billion accreted amount outstanding)**, which do not receive cash payments prior to stated maturity or acceleration.  Senior CAB Notes mature between 2022 and 2056, and thus are the lowest weighted average yielding bonds issued by COFINA or any other Commonwealth entity.   Initial principal amount is reinvested at a stated compounded rate and, upon stated maturity or acceleration, holders are entitled to receive the initial principal amount plus any then accrued appreciation at the compounded rate.   Senior CAB Notes -- because they receive no periodic

---

[3]      While the current amount of COFINA Notes is approximately $17.2 billion, due to capital appreciation as explained below, the original value of all notes at issuance was approximately $16.3 billion.

payments, have far off maturities, and are solely obligations of COFINA -- are critically dependent on the sanctity of the COFINA structure and the corresponding pledge of Dedicated SUT Revenues.

c.  **Subordinate Cash Pay Notes (approximately $8.2 billion principal amount outstanding)**, which, absent an Event of Default, receive periodic interest payments in cash, and mature between 2017 and 2044.

d.  **Subordinate CAB Notes (approximately $1.7 billion accreted amount outstanding)**, which do not receive cash payments prior to stated maturity or acceleration, and mature between 2023 and 2050.  Subordinate CAB Notes accrue principal in the same manner as Senior CAB Notes, as described above.

25.  Section 1101 of the Resolution provides that "that Owners of Subordinate Bonds . . . may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds . . . are not timely paid amounts due thereunder, until such time that Senior Bonds . . . are fully retired or are defeased in accordance with the provisions of this Resolution."  *As such, Subordinate Notes have no rights to enforce payments on their notes until all Senior Notes are repaid in full.*

26.  Despite the clearly conflicting and competing rights and interests of these different types of COFINA Notes, BONY has at all times since 2007 purported to act as the sole trustee for all COFINA Notes.

III.  **The Resolution Aims To Preserve and Protect The COFINA Structure**

27.  The Resolution sets forth (i) the terms governing all COFINA Notes and (ii) the rights of and protections for the holders of the COFINA Notes.

FILED: NEW YORK COUNTY CLERK 04/12/2017 01:17 PM          INDEX NO. 651969/2017

NYSCEF DOC. NO. 1 Case 17-00188-LTS Doc#?520-8 Filed:05/16/17 Entered:05/16/17 19:17:45:34 Desc:     RECEIVED NYSCEF: 04/12/2017
Exhibit S Page 30 of 33

28.     Section 1211 of the Resolution provides that "the rights, duties, privileges and immunities of the Trustee . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," which according to the Resolution is New York.[4]

29.     The Resolution creates a "continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued" pursuant thereto (the "Pledge").

30.     "Pledged Property" is defined under the Resolution to include, among other things, Dedicated SUT Revenues.  Section 501 of the Resolution provides that such funds are "pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds."  The Resolution further provides that Pledged Property shall "immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind."

31.     Given that COFINA Notes are only payable by COFINA and that, via the Pledge, the Dedicated SUT Revenues constitute the only source of funding for the repayment of the COFINA Notes, the Resolution necessarily contains critical assurances concerning the continuing flow of funds to COFINA.  Under normal circumstances, the treatment of revenues is governed by Section 505 of the Resolution, which provides that Dedicated SUT Revenues deposited into the COFINA "Revenue Account" may be withdrawn each month in accordance with the priority of the COFINA Notes.  Any interruption of revenues flowing to COFINA is an Event of Default.

32.     Moreover, the Resolution contains key provisions intended to reflect and reaffirm the statutorily assured viability of COFINA and the sanctity of the Pledge.  These assurances were

---

[4]     Ultra vires acts taken by BONY beyond its authority under the Resolution would cause BONY to incur liabilities outside its capacity as Trustee and beyond the provisions of the Resolution.

delivered through affirmative and negative covenants from COFINA and the Commonwealth included in the Resolution.

33. **First**, Section 705 of the Resolution requires COFINA to "***at all times*** defend, preserve, and protect the pledge of the Pledged Property … against all claims and demands of all persons whomsoever" (the "Covenant to Defend").

34. **Second**, Section 706 provides, among other things, that the Commonwealth shall not "limit or restrict the rights … of [COFINA] to meet its obligations to its Bondholders" (the "Covenant Not to Limit or Restrict").

35. These covenants go to the heart of the Resolution and its protections of the COFINA Notes' ability to be repaid. These protections are indeed so critical to the COFINA Notes that the failure of either COFINA or the Commonwealth to adhere to such covenants trigger an Event of Default under the Resolution.

36. Section 1101(1)(ii) provides, in pertinent part, that an Event of Default occurs upon a "failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, [if] such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any [Holder]."

37. As such, a breach by COFINA of its Covenant to Defend in Section 705 or by the Commonwealth of its Covenant Not to Limit or Restrict in Section 706, if left uncured for 30 days after notice, constitutes an Event of Default under the Resolution.

38. Section 1101(2) provides that following an Event of Default, payments are to be made in accordance with "Class Priority," which is defined under the Resolution to mean that "Senior Bonds" are to be paid "first until full funding or payment thereof," with payments then

FILED: NEW YORK COUNTY CLERK 04/12/2017 01:17 PM INDEX NO. 651969/2017

NYSCEF DOC. NO. 1    Case 17-00188-LTS Doc#7590-1 Filed 05/16/19 Entered 05/16/19 17:45:34 Desc:    RECEIVED NYSCEF: 04/12/2017

Exhibit DX-S Page 13 of 34

due and owing to Senior Notes entitled to *pari passu* treatment, and with payments flowing to the Subordinate Notes only after the Senior Notes are repaid in full.

39.     An Event of Default triggers both contractual obligations and heightened extra-contractual duties for BONY as Trustee, as well as authorizes the Trustee to accelerate all amounts outstanding under the Resolution.  Upon any such acceleration, the Resolution provides, the principal and "accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon [COFINA] in an amount sufficient to pay principal … and interest accrued on the accelerated Bonds to the date established for payment thereof."

40.     The remedy of acceleration thus affects each type of COFINA Notes differently. For example, if, upon acceleration, insufficient funds exist to repay all COFINA Notes in full, then principal and accrued interest are repaid ratably among the Senior Cash Pay Notes and Senior CAB Notes in the first instance.  In other words, and assuming COFINA's inability to pay all outstanding amounts, an acceleration entitles the Senior CAB Notes to *pari passu* treatment with the Senior Cash Pay Notes, but cuts off any right of the Subordinate Notes to payment.

41.     Any decision by BONY to accelerate is therefore subject to the competing and conflicting interests of the different types of COFINA Notes.  Perhaps in anticipation of that conflict, Section 810 of the Resolution empowers BONY to "appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable."

42.     To do so would, of course, affect BONY's go-forward remuneration.  Since its appointment as Trustee, BONY has received millions of dollars in compensation—earning, on average, more than $1.2 million per year.  And an election under Section 810 would, upon information and belief, reduce those fees materially.

43.     As alleged herein, BONY failed to make use of this remedial measure or to otherwise resolve its impairing conflicts of interest, and has continued to earn millions of dollars in fees for its purported role as Trustee for all COFINA Notes.  BONY's divided loyalties prevented it from prudently acting for Plaintiffs when the Commonwealth and COFINA breached their covenants in the Resolution, and its driving financial self-interest prevented it from relieving Plaintiffs of the burden and damage caused by BONY's own inaction.

IV.     **BONY's Failures To Protect Plaintiffs In Response to Numerous Events of Default**

44.     BONY is obligated to thoroughly investigate any possible breaches of the Resolution and, upon a determination that any such breach or default occurred, to exercise remedies necessary to protect Plaintiffs.

45.     As discussed below, BONY has consistently failed to protect Plaintiffs and to act in their best interests over the last several years.  As the financial crisis in the Commonwealth deepened and COFINA and the Pledge came under constant attacks, with increasing severity, *from the Commonwealth*, with *no defense by COFINA*, BONY sat idle.  BONY's failures to act have harmed and continue to severely harm Plaintiffs.

A.     **The September 9th Fiscal Plan**

46.     On September 9, 2015, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group") -- a group established and empowered by an executive order issued by former Governor Alejandro García Padilla -- published the Puerto Rico Fiscal Economic Growth Plan (the "September 9, 2015 Fiscal Plan").  That plan listed debts of the

Commonwealth and its instrumentalities in a manner that conflated COFINA's debt obligations with the general obligations of the Commonwealth. This constituted a drastic departure from past precedent, in which the Commonwealth, recognizing that it had transferred ownership of the Dedicated SUT Revenues to COFINA, and no longer had any interest in that property, kept the debt obligations of COFINA and the Commonwealth separate in audited financial statements, government budgets, plans and models.

47.     Moreover, and despite the clear pledge of the Dedicated SUT Revenues to the repayment of COFINA Notes, the September 9, 2015 Fiscal Plan referenced a possible "*clawback of revenues supporting certain Commonwealth tax supported debt*" for the benefit of *all noteholders*, including the GO Bonds. Meaning, the plan contemplated the potential for Dedicated SUT Revenues covered by the Pledge to be made available not just for COFINA Notes, but other debts as well.

48.     In these ways, the September 9, 2015 Fiscal Plan, prepared and published at the request of, and with the approval of, then Governor García Padilla, on behalf of the Commonwealth, breached the Commonwealth's Covenant Not to Limit or Restrict. Moreover, COFINA's failure to counter the September 9, 2015 Fiscal Plan, and its tacit approval of same as the then-Executive Director of COFINA was a member of the Working Group itself, was a breach of COFINA's Covenant to Defend.

49.     BONY was well aware of the September 9, 2015 Fiscal Plan and of the Commonwealth's and COFINA's covenant breaches related thereto.

50.     In a letter dated September 24, 2015, that was shared with BONY, counsel for certain Holders informed COFINA, that the September 9, 2015 Fiscal Plan "materially misrepresent[ed] the essential nature of COFINA's indebtedness to the investing public, and

materially harm[ed] COFINA and its bondholders." The letter declared further that these representations "mis[led] the public by lumping the Commonwealth's own debt together with COFINA's," improperly attempted to "consolidate assets and liabilities of COFINA with that of the Commonwealth," and accused the Commonwealth of intending for the same to "signal to the investing public at large that the Commonwealth's struggling fiscal health threatens the health of COFINA, ignoring the fact that insulation from the Commonwealth's other liabilities prompted the creation of COFINA in the first place."

51. These misstatements, the letter explained, were inconsistent with Section 501 and 201 of the Resolution, which together "make clear that the bonds issued by COFINA are *not* obligations of the Commonwealth." More significantly, COFINA's failure to correct these misstatements constituted a breach of COFINA's Covenant to Defend in Section 705. The letter therefore demanded that COFINA "promptly cure" these misstatements, "provide the necessary assurances of bondholders under the Resolution," and "untangle the COFINA debt and revenue from that of the Commonwealth."

52. Despite having knowledge of the September 9, 2015 Fiscal Plan, the September 24, 2015 letter, and the absence of any cure by the Commonwealth or COFINA, including after passage of 30 days following such letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiffs from such breaches. BONY also failed, as it is required to do under the Resolution, to give notice to all Holders of such Events of Default.

### B. The February 1, 2016 Restructuring Proposal

53. On February 1, 2016, the Working Group presented publicly its first restructuring proposal (the "February 1, 2016 Restructuring Proposal") which, again, listed debts of the

Commonwealth and its instrumentalities in a manner that conflated COFINA's debt obligations with the general obligations of the Commonwealth.

54.    The February 1, 2016 Restructuring Proposal, approved by then Governor García Padilla on behalf of the Commonwealth, was a clear breach of the Commonwealth's Covenant Not to Limit or Restrict, and COFINA's decision to allow this proposal to proceed unchallenged was a clear violation of its Covenant to Defend.

55.    In a letter dated February 8, 2016, certain Holders advised COFINA and BONY of the covenant breaches arising from the February 1, 2016 Restructuring Proposal. The letter characterized the February 1, 2016 Restructuring Proposal and the accompanying press release as the "antithesis of protecting and defending the Pledged Property for the benefit of Bondowners." Specifically, the letter took issue with, among other things, the fact that the press release (i) "includes COFINA debt service within the Commonwealth's own debt service-to-revenue and then calculates that ratio with reference to the Constitutional limits on general obligation bonds *of the Commonwealth*," and (ii) "concludes by stating the Working Group's agenda is to 'improve *the Commonwealth's* credit-worthiness.'"

56.    The letter "demand[ed] that [COFINA] immediately publish its own press release renouncing the Working Group's treatment of and misstatements about COFINA" and demanded further that COFINA "appoint independent legal and financial advisors to protect and defend COFINA's Bondowners 'against all claims and demands of all persons whomsoever,' including any actions and misstatements by COFINA's own agents who have participated in the Working Group in breach of the Resolution."

57.    Despite having knowledge of the February 1, 2016 Restructuring Proposal, the February 8, 2016 letter, and the absence of any cure by the Commonwealth or COFINA, including

after passage of 30 days following such letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiffs from such breaches. BONY also failed, as it is required to do under the Resolution, to give notice to all Holders of such Events of Default.

### C.    The 2016 Moratorium Act

58.    The Moratorium Act, enacted by the Commonwealth on April 6, 2016, empowered the Governor, by executive order, to declare "any government entity to be in a state of emergency" and, "if the executive order so provides, no payment on a covered obligation of such … government entity shall be made."

59.    Article 201(b)(ii) provided further that, "[d]uring the emergency period for any government entity," many rights and remedies would be restricted, including restrictions on the "exercise [of] any remedy, which remedy shall include any right of acceleration or termination … related to any covered obligation of such government entity, under any contract or applicable law as a result of … (A) non-payment of any obligation arising under or relating to any covered obligation of such government entity; [or] (B) breach of any condition or covenant under or related to any covered obligation of such government entity."

60.    Article 201(d) provided that "[i]f ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period … (ii) *any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof);* [and] *(iv) any statutory or other obligation to ensure payment of a covered obligation as if this Act were not enacted (or take any action in furtherance thereof).*"

61.    Article 601 stated that the Moratorium Act (and its provisions allowing the suspension of payments) would "take effect immediately upon enactment" and *included COFINA*

in its definition of "government entity," which meant that under the terms of the statute, the Governor could suspend COFINA's payments and make the Dedicated SUT Revenues available for the Commonwealth's obligations.

62.     The Moratorium Act, therefore, radically undercut COFINA's autonomy, and was a breach of the Commonwealth's Covenant Not to Limit or Restrict. [5]

63.     In a letter dated April 6, 2016 sent to COFINA, copying BONY, counsel for certain Holders notified COFINA that the "Moratorium Act constitute[d] an anticipatory breach of section 1101(1)(i) of the [COFINA] Resolution and Bonds because [it] permits the Governor to bar COFINA from making principal or interest payments" on any COFINA Notes.

64.     The letter also advised BONY that, in addition to the "improper restriction on COFINA paying its debts, the Moratorium Act further breaches sections 1101(1)(ii) of the Resolution" because it "restricts the rights of [bond owners] to exercise remedies if the Governor issues an executive order applicable to COFINA and [by] suspending or modifying any obligations of COFINA to cause the transfer of money to pay Bonds or to ensure payment of Bonds."

65.     In connection with that same notice, the Holders reminded COFINA (and BONY) of the continued Events of Default that had *already* occurred, namely COFINA's failure to cure the defaults noticed to it on September 24, 2015 and February 8, 2016, in connection with the September 9, 2015 Fiscal Plan and the February 1, 2016 Restructuring Proposal, respectively.

66.     Despite having knowledge of the Moratorium Act, the April 6, 2016 letter, and the absence of any cure by the Commonwealth or COFINA, including after passage of 30 days

---

[5]     On January 29, 2017, the Moratorium Act was replaced by the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Emergency Act"). The Emergency Act extended the operative provisions of the Moratorium Act, through and including May 1, 2017, which term may be extended by the Governor for three months. On information and belief, despite knowing of the severe threat the Emergency Act placed on the ability of COFINA to repay its notes, BONY did nothing to protect the Holders' interests in advance of the Emergency Act's enactment.

following such letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiffs from such breaches. BONY also failed, as it is required to do under the Resolution, to give notice to all Holders of such Events of Default.

D. **The *GO Bondholders'* Litigations**

67.     BONY's failures continued as, in the summer of 2016, attacks on COFINA's structure and go-forward viability escalated.

68.     On June 21, 2016, holders of certain GO Bonds ("GO Bondholders") commenced a litigation in the United States District Court for the Southern District of New York, No. 16 Civ. 4072, against the Commonwealth, then Governor García Padilla, the Treasury Secretary of the Commonwealth of Puerto Rico and the Director of the Office of Management and Budget of the Commonwealth of Puerto Rico (the "Jacana Lawsuit").

69.     In the action, the GO Bondholders alleged, *inter alia*, that the Dedicated SUT Revenues were "available resources" for the purposes of satisfying the GO Bonds. The complaint directly challenged the rights of COFINA and the Holders with respect to the Dedicated SUT Revenues and the Pledged Property, and alleged that the Moratorium Act was invalid because it violated the Contract Clause of the United States Constitution by purportedly failing to prioritize general obligations over, among others, obligations of COFINA. The GO Bondholders' complaint further alleged that funds transferred to COFINA, *i.e.*, the Dedicated SUT Revenues, are subject to clawback in favor of holders of GO Bonds.

70.     Remarkably, COFINA failed to take any steps to defend against such challenges, in clear violation of COFINA's Covenant to Defend. Rather, COFINA sat idly by in the wake of the GO Bondholders' allegations. Likewise, the Commonwealth's only action in the litigation, rather than advocating for the COFINA structure, was to file a meek "notice of stay" based on passage of the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"),

18

Pub. Law 114-187, which was enacted on June 30, 2016.[6]  (The PROMESA stay, which stays certain acts by parties until May 1, 2017, is inapplicable to this action.)[7]

71.    The Commonwealth took no substantive position in the litigation and COFINA never intervened or otherwise appeared.

72.    In a letter dated June 23, 2016, certain Holders reminded BONY that "COFINA has a clear contractual obligation to defend the Pledged Property and the Bondowners" in connection with the Jacana Litigation.  The letter, citing Sections 801 and 802 of the Resolution, also informed BONY that the "Trustee is likewise obligated to enforce the Resolution and the rights of Bondowners" and put "the Trustee on notice that there [was] a judicial challenge to COFINA's property and, pending resolution of that judicial challenge, the Trustee must demand that COFINA undertake all actions to preserve any and all property that is collateral of the [COFINA] Bondowners, including the retention of independent counsel to dispute the allegations in the Complaint."  The failure to do so, the letter added, "would result in a direct breach of the most fundamental promise in COFINA's Bond Resolution and would cause a shortfall of statutorily required amounts of pledged sales tax revenues."

---

[6]    The plaintiffs in the Jacana Litigation conceded that the lawsuit was stayed by PROMESA.  However, shortly thereafter, on July 20, 2016, certain other holders of GO Bonds commenced a similar lawsuit in the United States District Court for the District of Puerto Rico (the "Lex Claims Litigation").  Plaintiffs are part of a group of Holders that intervened as defendants in the Lex Claims Litigation, which action involves entirely different parties, facts and claims than those that are the subject of this lawsuit, and, indeed, the claims herein would not be germane to the Lex Claims Litigation.  The plaintiffs in the Lex Claims Litigation insisted that the PROMESA stay did not apply to certain claims in their second amended complaint in that lawsuit.  On February 17, 2017, the District Court ruled that the PROMESA stay did not apply to such claims, but the United States Circuit Court of Appeals for the First Circuit reversed that holding on April 4, 2017.  As such, the Lex Claims Litigation and the Jacana Litigation are presently both stayed pending expiration of the PROMESA stay on May 1, 2017.

[7]    Plaintiffs note that this action is brought solely against BONY, and not against the Commonwealth, its representatives or COFINA (as was the case in the Jacana Litigation and the Lex Claims Litigation).  Moreover, this action only seeks to redress breaches committed by BONY that have harmed Plaintiffs, for which BONY must pay damages.  Importantly, this action does not seek to collect on any obligations owed by the Commonwealth or COFINA nor to take control of or obtain any property from or of the Commonwealth or COFINA.

73.     Significantly, the letter cautioned that, "[g]iven COFINA's continuing refusal to hire independent advisors and its failure to acknowledge the existing Events of Default, the Trustee cannot sit idly by and close its eyes to the situation and how it could potentially impair more than $7 billion of Senior Bonds."

74.     Despite having knowledge of COFINA's failure to defend in the Jacana Litigation and in all other instances of attack on its structure, as alleged *supra*, and the absence of any cure by COFINA, including after passage of 30 days, BONY failed to take any actions to enforce the corresponding Event of Default or to otherwise protect Plaintiffs from such breaches. BONY also failed, as it is required to do under the Resolution, to give notice to all Holders of such Event of Default.

E.     **The February 1, 2017 Payments**

75.     Starting in early 2017, Plaintiffs commenced discussions with BONY concerning upcoming February 1, 2017 payments to certain Holders, for which BONY was holding funds already received from COFINA. Plaintiffs demanded that BONY refrain from making such payments based on the many existing Events of Default and the continuing attacks by the Commonwealth and others on COFINA and its viability.

76.     Plaintiffs also demanded that BONY seek confirmation from the Commonwealth that it intends to stand by the COFINA structure.

77.     In a letter dated January 31, 2017, Plaintiffs raised concerns with BONY's historic failures to act and to protect Plaintiffs and other Holders. As of the date of that letter, BONY was in possession of at least $810 million in Dedicated SUT Revenues, and Plaintiffs demanded that BONY "temporarily refrain from using [those funds] to make any payments on the COFINA Notes -- including, without limitation, by delaying any principal or interest payments that may allegedly be due on February 1, 2017 … -- until the Commonwealth and COFINA commit to defend the

FILED: NEW YORK COUNTY CLERK 04/12/2017 01:17 PM
NYSCEF DOC. NO. 1
INDEX NO. 651969/2017
RECEIVED NYSCEF: 04/12/2017
Case 17-00188-LTS Doc#7520-8 Filed 05/16/17 Entered 05/16/17 11:45:34 Desc:
Exhibit S Page 21 of 96393

COFINA structure against all challenges."   Failure to do so, Plaintiffs cautioned, would constitute a clear breach of BONY's duties to the COFINA Notes, particularly in light of its "failures over the last 17 months to take necessary steps to protect the COFINA Notes and to address the Trustee's crippling conflicts of interest."

78.     Plaintiffs reminded BONY that Events of Default "have plainly occurred and are continuing under the Resolution" and that they should have caused BONY to accelerate the COFINA Notes, entitling all Senior Notes to ratable payment.  "That is a fundamental protection accorded to the CAB Notes in the Resolution," Plaintiffs advised BONY, "because, otherwise, the CAB Notes would be functionally subordinated to the Cash Pay Notes – which clearly was not provided for in the Resolution."

79.     Plaintiffs also advised BONY of its inherently conflicted role.  Plaintiffs stated that BONY, as "Trustee for both the CAB Notes and the Cash Pay Notes, was conflicted when it previously refused to declare Events of Default and to accelerate the COFINA Notes.  And, *today the Trustee remains conflicted*, with divided loyalties, as it maintains that no Events of Default have occurred and elects not to make the Feb. 1 Payments."  Significantly, Plaintiffs urged BONY that "the Trustee's conflicts require it to retain the Collected Funds, which is the only way for the Trustee to avoid prejudicing one series of COFINA Notes for the benefit of another.  After all, the Trustee cannot act in the best interest of *all* COFINA Notes, while at the same time picking and choosing who to pay and when."

80.     BONY did just the opposite.  On February 1, 2017, BONY distributed a massive payment to Senior and Subordinate Cash Pay Notes holders notwithstanding its actual knowledge of existing Events of Default under the Resolution and of mounting attacks on the COFINA structure.  BONY made these payments intentionally, and, with knowledge of the public concerns

Case 17-00188-LTS  Doc#7-20  Filed 05/16/17  Entered 05/16/17 19:17:45  Desc:
Exhibit S  Page 314 of 393

regarding COFINA's on-going viability, was aware that the disbursement would risk a drastic impairment to the Senior CAB Notes.

81.     In a letter dated February 9, 2017, Plaintiffs reiterated their request that BONY "reach out to the new administration to obtain an affirmative commitment to protect and to defend the COFINA structure."  Plaintiffs cautioned that should BONY fail to seek such commitment Plaintiffs would "seek to hold it liable for any harm suffered by" Plaintiffs if BONY's "untested assumption" that the Commonwealth will protect the COFINA structure "proves to be wrong."

82.     Plaintiffs' demand was especially well-founded given that just the week before, Elias Sanchez, the Commonwealth's representative on the Oversight Board created by PROMESA, made a public statement that strongly indicated that the Commonwealth was not fully committed to the COFINA structure or to honoring the statutory transfer of ownership of the Dedicated SUT Revenues to COFINA.  In press accounts, on January 25, 2017, Mr. Sanchez was quoted as saying the Commonwealth "*currently*" had no plans to disrupt the flow of revenues to COFINA -- meaning that the Commonwealth's doing so was still a possibility.  Moreover, in other press accounts, on February 2, 2017, Mr. Portela, director of the Financial Advisory & Fiscal Agency Authority, the agency in charge of debt restructuring efforts on behalf of the Commonwealth, was quoted as saying "at this time, the Puerto Rico government has *no position* over which credit is more senior than the other," when asked about disputes between COFINA and the GO Bonds.

83.     Indeed, at the time, BONY was aware of another then-recent event that should have caused BONY to investigate and to demand assurances from the Commonwealth.  The Emergency Act, as first proposed, contained language that could have allowed the Governor to divert and to otherwise use Dedicated SUT Revenues.  While the Emergency Act was revised at the last minute

before passage to remove such language, the initial inclusion of language was so potentially damaging to COFINA and to the COFINA Notes that it should have prompted action by BONY (and, indeed, would have prompted action by any unconflicted trustee acting prudently).

84.     Upon information and belief, BONY failed to investigate further or to seek any commitments or assurances from the Commonwealth.

### F.     The Fiscal Plan

85.     On March 13, 2017, the Commonwealth prepared and submitted to the PROMESA Oversight Board its final Fiscal Plan for Puerto Rico (the "Fiscal Plan"), which was certified by the board.

86.     The Commonwealth's "Debt sustainability" analysis in the Fiscal Plan, which purportedly calculates the *total* amount available to service the Commonwealth's debt, assumes that *all* revenues, including the Dedicated SUT Revenues, are treated the same with no regard for the COFINA structure, and also assumes that the Dedicated SUT Revenues are made available to pay general Commonwealth expenditures.  The Commonwealth then projects how much debt it could service using *all* cash flows, meaning that the Commonwealth conveys it is prepared to use *any and all* revenues, including the Dedicated SUT Revenues, to pay general Commonwealth expenditures and to fund debt service payments going forward.

87.     Moreover, the Commonwealth's "Debt sustainability" analysis in the Fiscal Plan projects that the Commonwealth will have insufficient cash flows to cover even just the annual debt service payments to the COFINA Notes.  As such, the Fiscal Plan not only proposes to use Dedicated SUT Revenues to pay other debts of the Commonwealth and its instrumentalities, but also admits that in all circumstances there will occur a default on the payments due and owing on the COFINA Notes.

88.     The Fiscal Plan plainly constitutes a clear breach of the Commonwealth's Covenant Not to Limit or Restrict.  And, in as much as COFINA sits idly by and takes no steps to counter the Fiscal Plan and the harm it poses to COFINA and the Holders, COFINA is in breach of its Covenant to Defend.

89.     Making those breaches even more apparent, a press release issued shortly after the Fiscal Plan was certified announced that the Commonwealth was actively working with certain GO Bond holders to resolve the Lex Claims Litigation.  The complaint in that action directly attacked the rights of COFINA and its noteholders with respect to the Dedicated SUT Revenues and the Pledged Property, and alleged that those funds were subject to clawback in favor of holders of GO Bonds.  But rather than defend COFINA's statutory and constitutional separateness, the Commonwealth declined to take "a definitive position on the merits" of those crucial constitutional questions.

90.     The Commonwealth's mystifying alignment with the GO Bonds in connection with the Fiscal Plan and its vague statements concerning the Lex Claims Litigation -- combined with the long history of attacks by the Commonwealth on the COFINA structure -- provided additional bases for BONY to investigate and to demand assurances from the Commonwealth.  This development, among other things, gave a strong basis for BONY to explore the level of influence that the GO Bonds were having on the Commonwealth, and to seek to understand the reasons for and ramifications of this alignment.  Upon information and belief, BONY took no such steps to investigate or to seek necessary assurances.

91.     In a letter to BONY dated March 31, 2017, Plaintiffs informed BONY of these breaches and demanded that BONY take necessary steps to protect Plaintiffs, including by issuing notices of default and by refraining, in the interim, from making further payments on account of

the COFINA Notes. Plaintiffs demanded confirmation by April 4, 2017, that BONY will comply with such requests. No such confirmation was provided.

92.     BONY thus failed once more to take appropriate measures to protect Plaintiffs and others to which it owes duties. To date, and with regard to all Events of Default, BONY has failed to prudently investigate breaches of the Resolution (such as by seeking commitments or confirmations from the Commonwealth), failed to provide necessary notices of Events of Default to all Holders, and failed to either accelerate the COFINA Notes or to refrain from making payments to Holders until more certainty exists concerning COFINA's future. BONY's continued refusal to take any such action to protect Plaintiffs constitutes a grossly negligent abdication of its duties as Trustee (despite continuing to receive fees to perform such duties).

## V.     BONY Causes Plaintiffs To Suffer Millions of Dollars in Damages

93.     Numerous Events of Default exist under the Resolution and yet BONY has taken no actions to protect Plaintiffs from such defaults, including by accelerating the COFINA Notes or taking any other remedial measures. Meanwhile, BONY operates under severe conflicts of interest that allow it to receive higher fees as it represents all COFINA Notes, but prevent it from properly carrying out its duties and responsibilities to Plaintiffs.

94.     Since its appointment in 2007, BONY has received, on average, over $1.2 million in fees per year for its role as Trustee for all COFINA Notes under the Resolution. Should a separate or co-trustee be appointed, BONY's fees would, upon information and belief, drop precipitously. BONY's conflict therefore has, upon information and belief, persisted by reason of its own financial self-interest, and Plaintiffs have been harmed as a result.

95.     Plaintiffs' damages caused by BONY's conduct include, without limitation, amounts that Plaintiffs would have received on account of their Senior CAB Notes if, since the

Case 1:09-cv-00188-LTS Document 520-8 Filed 05/16/17 Entered 05/16/17 17:45:34 Desc: Exhibit DX-S Page 28 of 93393

earliest Event of Default alleged here, funds held by BONY would have been allocated to, and shared ratably by, all Senior Notes, to the exclusion of Subordinate Notes.

## FIRST CAUSE OF ACTION
### Negligence/Breach of Trust

96.      Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

97.      BONY owed Plaintiffs extra-contractual duties to perform its obligations with due care and avoid conflicts of interest.  BONY's acts and omissions breached those duties in negligent fashion by, among other things, (i) failing to prudently investigate potential Events of Default; (ii) becoming subject to conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith.

98.      BONY's grossly negligent breach of those duties has directly and proximately caused damage to Plaintiffs by impairing Plaintiffs' ability to fully collect the amounts owed under the Resolution, including, without limitation, by depriving them of accelerated disbursements and/or improperly releasing collected funds and thereby reducing the amount available to Plaintiffs upon a future monetary default and acceleration.

99.      Plaintiffs are entitled to an equitable order that BONY must appoint separate Trustees.

## SECOND CAUSE OF ACTION
### Breach of Fiduciary Duty

100.      Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

101.      Under New York law, after the occurrence of breaches that could ripen into Events of Default, BONY owed a fiduciary duty to Plaintiffs.  These fiduciary obligations included,

Case 17-00188-LTS Doc#750-8 Filed 05/16/17 Entered 05/16/17 17:45:34 Desc:
Exhibit Dx S Page 29 of 33

without limitation, duties to protect the interests of Plaintiffs, investigate both its own conflict of interests and potential Events of Default, and make prudent decisions concerning the exercise of appropriate remedies, whether contractual or extra-contractual, to address the same.

102.    BONY breached its fiduciary duties by, among other things, (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate potential Events of Default including, but not limited to, those alleged herein; (iii) failing to either accelerate the COFINA Notes or withhold payments to Senior Cash Pay Notes and Subordinate Cash Pay Notes pending an investigation into the ongoing Events of Default and/or receipt of adequate commitments from the Commonwealth and COFINA; and (iv) otherwise failing to act in the best interest of Plaintiffs or to protect their interests.

103.    BONY's material breaches of the Resolution have directly and proximately caused damage to Plaintiffs by impairing Plaintiffs' ability to fully collect the amounts owed under the Resolution, including, without limitation, by depriving them of accelerated disbursements and/or improperly releasing collected funds and thereby reducing the amount available to Plaintiffs upon a future monetary default and acceleration.

### THIRD CAUSE OF ACTION
### <u>Waste</u>

104.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

105.    BONY owed a duty to Plaintiffs to act in good faith, avoid conflicts of interest, and exercise all powers under the Resolution prudently to protect Plaintiffs.

106.    As alleged herein, Plaintiffs notified BONY that, because of the ongoing Events of Default, made worse by BONY's own conflicts of interest, it should refrain from disbursing payments to Cash Pay Notes pending BONY's investigation into the Events of Default or receipt

Case 17-00188-LTS Doc#7520-8 Filed 05/16/17 Entered 05/16/17 11:45:34 Desc:
Exhibit DX S Page 320 of 393

from either the Commonwealth or COFINA of adequate commitments.  Notwithstanding that notice, on February 1, 2017 and at all other points alleged herein, BONY intentionally distributed payments to Cash Pay Notes despite its knowledge that such disbursements would impair Senior CAB Notes.

107.    All such disbursements, and particularly the disbursement made on February 1, 2017, directly and materially impaired Plaintiffs' Senior CAB Notes.

108.    BONY's impairment of Plaintiffs' Senior CAB Notes directly and proximately caused damage to Plaintiffs by impairing Plaintiffs' ability to fully collect the amounts owed under the Resolution, including, without limitation, by knowingly and wrongfully releasing collected funds and thereby reducing the amount available to Plaintiffs upon a future monetary default and acceleration.

## FOURTH CAUSE OF ACTION
### Breach of Contract

109.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

110.    The Resolution is a valid contract between BONY, in its capacity as Trustee, and COFINA.

111.    As owner of COFINA Notes, Plaintiffs are beneficiaries of the Resolution and an intended third-party beneficiary of the same.  Plaintiffs performed their obligations under the Resolution and are entitled to enforce BONY's performance as Trustee.

112.    An Event of Default occurred as early September 9, 2015, and, as described above, numerous other related Events of Default occurred over the following eighteen (18) months. BONY and its responsible officers had and continue to have actual notice that Events of Default occurred.

113.    BONY breached the Resolution by, among other things, failing to provide Plaintiffs, with notice of such Events of Default, as it was required to do under Section 1110 of the Resolution.

114.    BONY's breaches constituted gross negligence and/or willful misconduct and directly and proximately caused Plaintiffs to suffer damages, including, at minimum, nominal damages.

### FIFTH CAUSE OF ACTION
### Breach of the Implied Covenant

115.    Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

116.    At all relevant times, including after the Events of Default discussed herein, BONY owed Plaintiffs, as express intended third-party beneficiaries under the Resolution, a duty of good faith and fair dealing that required BONY to ensure that it did not, by act or omission, injure Plaintiffs' rights to receive the benefits and protections provided for under the Resolution.

117.    BONY materially breached its duty of good faith and fair dealing under the Resolution and related implied covenants by, among other things, (i) failing in bad faith to prudently investigate potential Events of Default; (ii) failing to either accelerate the COFINA Notes or withhold payments to Cash Pay Notes pending an investigation into the ongoing Events of Default and/or receipt of adequate commitments from the Commonwealth and COFINA; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution.

118.    BONY's breaches of those implied covenants have directly and proximately caused damage to Plaintiffs by impairing Plaintiffs' ability to fully collect the amounts owed under the Resolution, including, without limitation, by depriving them of accelerated disbursements and/or

improperly releasing collected funds and thereby reducing the amount available to Plaintiffs upon a future monetary default and acceleration.

### SIXTH CAUSE OF ACTION
#### Declaratory Judgment

119.  Plaintiffs repeat and reallege each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

120.  As alleged herein, actual and justiciable controversies exist between the parties with respect to the rights, duties and obligations of the parties due and owing under New York law and the Resolution.

121.  In addition to, and in the alternative of, their other claims for damages asserted herein, Plaintiffs are entitled to a declaratory judgment declaring, *inter alia*, that:

a.  BONY breached its duties to Plaintiffs by (i) failing to prudently investigate potential Events of Default; (ii) becoming subject to conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith; and that

b.  BONY breached its fiduciary duties owed to Plaintiffs by (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate potential Events of Default; (iii) failing to either accelerate the COFINA Notes or withhold payments to Cash Pay Notes pending an investigation into the ongoing Events of Default and/or receipt of adequate commitments from the Commonwealth and COFINA; and (iv) otherwise failing to act in the best interest of Plaintiffs or to protect their interests; and that

Case 17-00188-LTS Doc#7590-8 Filed 05/16/19 Entered 05/16/19 17:45:34 Desc:
Exhibit DX S Page 323 of 393

c. BONY committed waste by intentionally distributing, on February 1, 2017 and at all other points alleged herein, payments to Cash Pay Notes despite its knowledge that such disbursements would impair Senior CAB Notes and materially impairing Plaintiffs' Senior CAB Notes as a result; and that

d. BONY breached the Resolution by failing to provide Plaintiffs with notice of Events of Default, as it was required to do under Section 1110 of the Resolution; and that

e. BONY breached its duty of good faith and fair dealing under the Resolution and related implied covenants by (i) failing in bad faith to prudently investigate potential Events of Default, (ii) failing to either accelerate the COFINA Notes or withhold payments to Cash Pay Notes pending an investigation into the ongoing Events of Default and/or receipt of adequate commitments from the Commonwealth and COFINA, and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs demand judgment against BONY as follows:

(a) Awarding compensatory and/or equitable relief in favor of Plaintiffs against BONY for breaches of its contractual and fiduciary duties, its gross negligence and ordinary negligence in an amount to be proven at trial; and

(b) Nominal damages for its breach of contract claim; and

(c) A declaration that BONY suffers from a conflict of interest under New York law and an order that BONY must appoint separate Trustees;

(d) A declaration by this Court that BONY, in the manner alleged herein, (i) breached its fiduciary duties to Plaintiffs; (ii) disbursed funds in a manner constituting waste; (iii) breached

the Resolution; and (iv) breached the covenant of good faith and fair dealing implied in the

Resolution; and

     (e)    Such other and further relief as the Court may deem just and proper.


Dated: New York, New York
      April 12, 2017

               KASOWITZ BENSON TORRES LLP

               By: _____
               Kenneth R. David (kdavid@kasowitz.com)
               Daniel A. Fliman (dfliman@kasowitz.com)
               Ryan P. Montefusco (rmontefusco@kasowitz.com)

               1633 Broadway
               New York, New York 10019
               (212) 506-1700

               *Attorneys for Plaintiffs*

32

Case:17-00133-LTS Doc#:752-18 Filed:05/16/19 Entered:05/16/19 21:17:46 Desc:
Exhibit S Page 1 of 41

**Exhibit U**

Complaint against BNYM in New York State Supreme Court, County of New York, styled
Ambac Assurance Corp. v. The Bank of New York Mellon, 652356/2017 (Sup. Ct. N.Y. County
May 2, 2017)

(Attached)

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK

-------------------------------------------------------------------- X

AMBAC ASSURANCE CORPORATION,

               Plaintiff,

      -against-

THE BANK OF NEW YORK MELLON,

            Defendant.

-------------------------------------------------------------------- X

Index No. _____

Date Issued: _____

~~COMPLAINT~~

Jury Trial Demanded

Plaintiff Ambac Assurance Corporation ("<u>Ambac</u>" or "<u>Plaintiff</u>"), for its complaint

against defendant The Bank of New York Mellon ("<u>BONY</u>" or "<u>Trustee</u>" or "<u>Defendant</u>"),

alleges as follows:

## NATURE OF THE ACTION[1]

1.     This action arises out of BONY's failure as a Trustee to protect the holders of

certain bonds (the "<u>Bondholders</u>") that Plaintiff Ambac insures. BONY's acting as a Trustee for

both senior and subordinated Bondholders at the same time presents an intractable conflict of

interest in the circumstances described herein, and has caused and will continue to cause direct

and foreseeable harm to Ambac, in breach of BONY's contractual, fiduciary, and other duties to

Ambac and the Bondholders Ambac insures.

2.     Rather than resign as trustee, or at least allow a co-trustee to serve with it, BONY

continues to act in its conflicted capacity. By so doing, BONY has inflicted—and, unless

---

[1] Capitalized terms used but not defined in this section of the Complaint are given the meanings ascribed to them
elsewhere in the Complaint.

impeded, will continue to inflict—enormous harm on the very persons it is duty-bound to protect: Ambac and its insureds.

3. In this action, Ambac seeks redress for harm already incurred, and seeks to stem further harm that will inevitably result unless BONY is either removed as trustee, or is compelled to take specific actions to prevent further harm: (i) accelerating payment of principal and interest on the bonds; and (ii) withholding further interest payments to subordinated Bondholders that have been unjustly receiving preferential treatment by BONY.

4. Ambac is a monoline insurer that provides financial guarantee insurance for more than $800 million in gross face amount of outstanding senior capital appreciation bonds (the "Senior CAB Bonds") issued by the Puerto Rico Sales Tax Financing Corporation, known in Spanish as Corporación del Fondo de Interés Apremiante ("COFINA"), pursuant to the terms of the Amended and Restated Sales Tax Revenue Bond Resolution dated as amended, restated, modified, and/or supplemented (the "Resolution"). Ambac is a named beneficiary under the Resolution. Ambac is also itself a holder of COFINA Bonds.

5. The Senior CAB Bonds do not provide for regular interest payments, but rather accrue interest until maturity many years in the future. However, COFINA has also issued Senior and Subordinate Cash Pay Bonds (collectively, the "Cash Pay Bonds"), whose holders are paid periodic cash interest payments on a current basis. Further, COFINA has issued Subordinated Capital Appreciation Bonds (the "Subordinate CAB Bonds"), which do not have regular interest payments.

6. COFINA's solvency and financial viability have been placed in jeopardy by the Commonwealth of Puerto Rico (the "Commonwealth") waging a direct attack on COFINA, putting the legal mechanisms in place to unlawfully and unconstitutionally take COFINA's

–2–

property, which would result in COFINA having insufficient assets to honor its obligations to the Bondholders. If the Commonwealth, with COFINA's acquiescence, was not seeking to seize property that belongs to COFINA, COFINA would remain solvent and viable. However, since September 2015, there have been at least seven material Events of Default by COFINA and the Commonwealth that threaten COFINA's solvency.

7.     These Events of Default provide BONY the power—and in fact impose on it the duty—to take remedial action to protect all of the Bondholders and Ambac as an insurer of certain Bonds. BONY's refusal to do so—despite repeated requests from Senior Bondholders— benefits the Subordinate Bondholders to the detriment of the Senior Bondholders in violation of BONY's obligation to act on behalf of all Bondholders with undivided loyalties and to avoid any conflicts of interest.

8.     The Subordinate Cash Pay Bondholders benefit most from BONY's failure to act, because they continue to be showered with cash payments drawn from COFINA's pool of assets that the Commonwealth is attempting to seize. Conversely, the holders of Senior CAB Bonds that are senior in priority to holders of Subordinate Cash Pay Bonds but that are not paid current interest, are harmed every day that BONY fails to recognize an Event of Default and continues to make the interest payments to the Subordinate Bondholders. Moreover, if the Commonwealth succeeds in its attempt to unconstitutionally take COFINA's property, and thus renders COFINA insolvent, BONY will have harmed all the Senior Bondholders, because every dollar BONY unnecessarily and inappropriately has paid and continues to pay to Subordinate Bondholders is a dollar that should have gone to the Senior Bondholders.

9.      If BONY were to fulfill its obligations by recognizing an Event of Default and accelerating the debt, the Subordinate Bondholders would receive nothing until the Senior Bondholders have been paid in full.

10.     By failing and refusing to recognize an Event of Default when required to do so, and by continuing to deplete COFINA's assets by paying periodic interest to the Subordinate Cash Pay Bondholders, BONY has breached its contractual, fiduciary, and other duties to Ambac and to the Senior Bondholders that Ambac insures.  BONY is required to act as a fiduciary and to perform its duties with due care and as a prudent person would in managing its own affairs. No prudent person would sit by as BONY has done while the government seeks to unlawfully and unconstitutionally seize assets it is duty-bound to protect.

11.     BONY must be held accountable for its deficient conduct to date, and must be prevented from causing even more harm.

## PARTIES

12.     Plaintiff Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York, 10004 and brings this action as an insurer of Senior CAB Bonds issued by COFINA and as a Bondholder itself. Ambac is a "Beneficiary" under the terms of the Resolution, as well as a specified third-party beneficiary of the Resolution.

13.     Defendant BONY is a New York state chartered bank with a principal place of business at 225 Liberty Street, New York, New York, 10007.  BONY serves as Trustee for a series of bonds issued by COFINA pursuant to the Resolution, as amended and supplemented.

– 4 –

## JURISDICTION AND VENUE

14.     This Court has personal jurisdiction pursuant to CPLR §§ 301 and 302, because Defendant is a resident of the State of New York and the acts complained of occurred in the State of New York.

15.     Venue is proper in this Court pursuant to CPLR § 503 because Defendant resides in New York County.

## FACTUAL BACKGROUND

### I.     The Commonwealth Creates COFINA After Facing Financial Crisis

16.     In 2006, Puerto Rico faced an exigent financial and economic crisis – at the time one of the worst in the Commonwealth's history.

17.     Among other measures designed to address the crisis, the Legislative Assembly enacted legislation to give the Commonwealth access to the capital markets at low and prudent cost through the creation of a securitization structure.  Through a series of statutes, the Legislative Assembly imposed for the first time a sales and use tax (the "SUT") and the entity that eventually became COFINA became the owner of a portion of the SUT revenue (the "Dedicated SUT Revenues").  Shortly thereafter, in early 2007, the Legislative Assembly passed Act 56, which officially created COFINA and authorized COFINA to issue bonds backed by the Dedicated SUT Revenues.

18.     The Dedicated SUT Revenues are, by statute, "*owned* by COFINA."  Act 56 expressly separated COFINA's funds from the Commonwealth's general funds (the "General Fund"), to prevent them from being diverted to the Treasury of Puerto Rico and used for other purposes.  Act 56 specified that the Dedicated SUT Revenues "shall not constitute available resources of the Commonwealth of Puerto Rico **for any purpose**." (emphasis added).

19.     In July 2007, COFINA adopted the Resolution.

20.    Pursuant to the Resolution and statutory enactments, the transfer of the Dedicated SUT Revenues to COFINA presently is accomplished through the following mechanism: (1) the Commonwealth collects SUT at a rate of 11.5%, (2) out of the 11.5% collected, 6% constitutes Dedicated SUT Revenues that are owned by and flow to COFINA until it has received SUT up to a cap specified in the Resolution that is sufficient for COFINA's total debt service for the fiscal year, (3) out of the remaining 5.5%, 1% flows to municipalities and 4.5% flows to the General Fund, and (4) Dedicated SUT Revenues in excess of the aforementioned cap flow to the General Fund.

21.    This structure ensures that necessary debt service by COFINA is funded. Given the importance of this structure, and the fact that the Dedicated SUT Revenues are the sole source of recovery for the COFINA Bonds, the Resolution mandates that any interruption of Dedicated SUT Revenues flowing to COFINA constitutes an Event of Default.

22.    The isolation of COFINA from the credit risk of the General Fund, through COFINA's ownership of the Dedicated SUT Revenues and the statutory lien granted for the benefit of Bondholders, enabled COFINA Bonds to receive strong, investment-grade ratings, consistently higher than the ratings for the Commonwealth's general obligations bonds (the "GO Bonds"). In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that *separates* the revenue stream supporting the bonds *from* the Commonwealth of Puerto Rico, along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal." It further stated that, "[t]he legislative act creating COFINA ... *successfully separates* and *provides a priority interest* in the Commonwealth's sales and use taxes for the [COFINA] bondholders." Moody's echoed these assessments.

## II.    The Commonwealth's Attempts To Attract Investors With Critical Rights And Protections

23.    In order to induce investors and insurers to lend their money to Puerto Rico through the COFINA structure and to obtain the insurance for the COFINA Bonds, both the Legislative Assembly and COFINA provided investors and insurers with critical rights and protections designed to assure them that COFINA's ownership of the property collateralizing their bonds was guaranteed.

24.    Chief among these protections are the statutory segregation of the Dedicated SUT Revenues from the General Fund, and COFINA's ownership of the Dedicated SUT Revenues, as discussed above. The Legislative Assembly explicitly promised that the Commonwealth would not impair the collection of the SUT and the rights of COFINA to the Dedicated SUT Revenues. This statutory covenant was made for the express purpose of encouraging Bondholder and insurer reliance and in order to avoid any concerns about future impairment given the Commonwealth's beleaguered financial condition. 13 L.R.P.A. § 14(c).

25.    The legal structure of COFINA—including the creation of a property right in and statutory lien on the Dedicated SUT Revenues that was insulated from the risks of the General Fund, and the Commonwealth's agreement not to impair that property interest—was critical to the investors and their insurers, such as Ambac, who relied on the promise that they would have the benefit of a separate legal structure and a dedicated stream of payments.

## III.    The Resolution Aims To Preserve And Protect The COFINA Structure

26.    Under the law and the Resolution, the Commonwealth and COFINA made contractual promises to prospective Bondholders and their insurers to assure them that even if the fiscal crisis continued, COFINA bonds would be safe and protected from the political and economic risks affecting the General Fund. Moreover, the Commonwealth promised that it

would not limit or restrict COFINA's rights to meet its obligations to its Bondholders before the Bonds and interest were fully paid and retired. These promises are found in the enabling legislation as well as the Resolution. The Resolution sets forth (i) the terms governing all COFINA Bonds; and (ii) the rights of and protections for the holders and insurers of the COFINA Bonds.

27. The Resolution creates a "continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued" pursuant thereto (the "Pledge").

28. "Pledged Property" is defined under the Resolution to include, among other things, Dedicated SUT Revenues. Section 501 of the Resolution provides that such funds are "pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds." The Resolution further provides that Pledged Property shall "immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind."

29. Because the COFINA Bonds are payable only by COFINA and, via the Pledge, the Dedicated SUT Revenues constitute the only source of funding for the repayment of the COFINA Bonds, the Resolution necessarily contains critical assurances concerning the continuing flow of funds to COFINA. Any interruption of revenues flowing to COFINA is an Event of Default. Investors and insurers, including Ambac, relied on these assurances when purchasing and insuring the COFINA Bonds. In fact, Ambac is a "Beneficiary" under the terms of the Resolution. Ambac is also a specified third-party beneficiary of the Supplemental Resolution.

30.     Moreover, the Resolution contains two key provisions intended to reflect and reaffirm the viability of COFINA and the sanctity of the Pledge.  These assurances were delivered through affirmative and negative covenants from COFINA and the Commonwealth included in the Resolution.

a)  **First**, Section 705 of the Resolution requires COFINA to "at all times defend, preserve, and protect the pledge of the Pledged Property . . . against all claims and demands of all persons whomsoever."

b)  **Second**, Section 706 provides, among other things, that the Commonwealth shall not "limit or restrict the rights . . . of [COFINA] to meet its obligations to its Bondholders."

31.     Because COFINA has no assets other than the Dedicated SUT Revenues and no other means of repaying Bondholders who lent billions of dollars to Puerto Rico, protection of the legal structure, and the enforcement of these promises and covenants, is essential to the integrity of the COFINA structure.  Recognizing the importance of these promises, the Resolution provides that "a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds" shall constitute an Event of Default, even when COFINA continues to make principal and interest payments to bondholders.  COFINA Resolution § 1101(ii).

### IV.     COFINA Issues $16 Billion Of Bonds

32.     At the time of the Resolution's adoption in 2007, COFINA issued several types of COFINA Bonds, comprised primarily of Senior Cash Pay Bonds and Senior CAB Bonds (collectively, the "Senior Bonds").[2]   In total, during 2007 and 2008, COFINA issued approximately $5.2 billion in Senior Bonds.  The Senior Bonds, because they were backed by the Dedicated SUT Revenues, afforded the Commonwealth with crucial, lower cost financing compared with the GO Bonds.

---

[2] As used herein, "COFINA Bonds" refers, collectively, to all Senior Bonds and Subordinate Bonds.

33.     Ambac agreed to insure Senior CAB Bonds in a face amount of $808.5 million at issuance.

34.     Ambac is a provider of financial guaranty insurance, by which an insurer guarantees scheduled payments of principal and interest as and when due on a bond or other obligation. Ambac insures scheduled principal and interest payments when due on municipal, public infrastructure, and structured financings both in the United States and around the world.

35.     Under the relevant provisions of the applicable bond documents, bond insurance policies, and applicable law, payment by Ambac neither satisfies nor discharges an issuer's obligation to pay and, to the extent Ambac makes such payments, it obtains assignments of rights from the Bondholders, becomes an owner of the Bonds, and/or becomes subrogated to the rights of Bondholders and effectively steps into the shoes of such Bondholders.

36.     One reason governments and municipalities, including COFINA, have historically taken advantage of financial guaranty insurance is that the insurance of their principal and interest payment obligations may have the effect of significantly enhancing their ability to raise funds. Such insurance is especially important for issuers such as the Commonwealth and COFINA who have—and will have—significant borrowing needs, notwithstanding their lower credit ratings.

37.     In exchange for its agreement to insure certain Senior CAB Bonds, Ambac negotiated and received special consent rights. Specifically, under the applicable bond insurance agreement, Ambac's consent is required *in addition to* Bondholder consent for any action requiring such consent. Such actions include any amendments or other modifications to the Resolution, which would require the consent of a majority in principal amount of the COFINA Bonds outstanding.

– 10 –

38.    In addition, Ambac is a "Beneficiary" of the Resolution, as defined there. *See* Resolution (Beneficiaries are "(i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding."). And Ambac is also a third-party beneficiary in accordance with the Resolution. *See* Resolution ("To the extent that this Resolution confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this Resolution, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.").

## V.    COFINA Issues Subordinate Bonds

39.    By 2009, in need of additional resources, the Commonwealth increased the amount of Dedicated SUT Revenues owned by COFINA and caused COFINA to issue Subordinate Cash Pay Bonds and Subordinate CAB Bonds (collectively with the Subordinate Cash Pay Bonds, the "Subordinate Bonds").

40.    The Subordinate Bonds, which are subordinate to all Senior Bonds, carry higher interest rates and shorter maturities than most Senior Bonds, including the Senior CAB Bonds. In essence, the issuance of the Subordinate Bonds provided credit support to all Senior Bonds by effectively protecting the Senior Bonds from material declines in the Dedicated SUT Revenues owned by COFINA.

41.    In total, investors have purchased more than $16 billion of COFINA Bonds, consisting of essentially the following four types of debt:

> a) **Senior Cash Pay Bonds (approximately $4 billion principal amount outstanding)**: entitled to periodic interest payments in cash, and mature between 2020 and 2057.

– 11 –

b) **Senior CAB Bonds (approximately $3.7 billion accreted amount outstanding)**: do not receive cash payments prior to stated maturity or acceleration. Senior CAB Bonds mature between 2022 and 2056, and thus are the lowest weighted average yielding bonds issued by COFINA or any other Commonwealth entity. Initial principal amount is reinvested at a stated compounded rate and, upon stated maturity or acceleration, holders are entitled to receive the initial principal amount plus any then accrued appreciation at the compounded rate. Because these Bonds do not receive periodic payments, have distant maturities, and are solely obligations of COFINA, they are critically dependent on the sanctity of the COFINA structure and the corresponding pledge of Dedicated SUT Revenues.

c) **Subordinate Cash Pay Bonds (approximately $8.2 billion principal amount outstanding)**: absent an Event of Default, receive periodic interest payments in cash, and mature between 2017 and 2044.

d) **Subordinate CAB Bonds (approximately $1.7 billion accreted amount outstanding)**: do not receive cash payments prior to stated maturity or acceleration.

## VI.    The Differing Classes Of Bonds Give Rise To Conflicts Of Interest For The Trustee

42.    Despite the conflicting and competing rights and interests of these different types of COFINA Bonds, BONY has at all times since 2007 acted as the sole trustee for all COFINA Bonds.[3]

43.    An Event of Default triggers both contractual obligations and heightened extra- contractual duties for BONY as Trustee, as well as empowers the Trustee to accelerate all amounts outstanding under the Resolution. Upon any such acceleration, the Resolution provides that the principal and "accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon [COFINA] in an amount sufficient to pay principal . . . and interest accrued on the accelerated Bonds to the date established for payment thereof."

---

[3] Section 1211 of the Resolution provides that "the rights, duties, privileges and immunities of the Trustee . . . shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located," which according to the Resolution is New York.

44.    Section 1101(2) of the Resolution provides that following an Event of Default, payments are to be made in accordance with "Class Priority," which is defined under the Resolution to mean that "Senior Bonds" are to be paid "first until full funding or payment thereof," with payments then due and owing to Senior Bonds entitled to *pari passu* treatment, and with payments flowing to the Subordinate Bonds only after the Senior Bonds are repaid in full.

45.    The remedy of acceleration thus affects each type of COFINA Bonds differently. For example, if, upon acceleration, insufficient funds exist to repay all COFINA Bonds in full, principal and accrued interest are repaid ratably among the Senior Cash Pay Bonds and Senior CAB Bonds in the first instance. In other words, and assuming COFINA's inability to pay all outstanding amounts, an acceleration entitles the Senior Bonds to *pari passu* treatment, and cuts off any right of the Subordinate Bonds to payment.

46.    Any decision by BONY to decline to accelerate upon an Event of Default is therefore subject to the competing and conflicting interests of the Senior Bonds as compared to the Subordinate Bonds. Thus, Section 810 of the Resolution empowers BONY to "appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the trustee may consider necessary or desirable." However, BONY has not chosen to make such an election under Section 810 to ameliorate the conflict of interest by the sole Trustee for both the Senior Bondholders and the Subordinate Bondholders at the same time.

– 13 –

## VII.    BONY Fails To Protect Plaintiff In Response To Numerous Events Of Default

47.    As set forth below, there have now been seven separate Events of Default. Under the Resolution, COFINA covenanted to "defend, preserve and protect" the COFINA structure and the rights of COFINA's creditors. However, it has failed to do so, standing idly by as the Legislative Assembly has dismantled the COFINA structure. Additionally, the Commonwealth covenanted, both in the Resolution and in COFINA's enabling legislation, not to take any action that would interfere with the rights of COFINA's creditors. The Events of Default below flagrantly violate that contractual and statutory covenant. Despite knowledge of these Events of Default, BONY has failed to take appropriate action, in that it has not accelerated payment on all Senior Bonds, and has instead continued making cash payments to the Subordinate Cash Pay Bonds to the detriment of Ambac and the Senior Bondholders it insures.

### A.    The First Event Of Default – The September 2015 Fiscal Plan

48.    Beginning in 2015, the Commonwealth began to abandon its commitment to honor its legal obligations to COFINA, its Bondholders, and Ambac. On June 28, 2015, then-Governor García Padilla admitted in an interview to the New York Times that "[t]he debt is not payable," and stated that creditors must "share the sacrifices."

49.    Subsequently, the Commonwealth suggested that it may no longer honor its legal obligation not to impair COFINA's rights to the Dedicated SUT Revenues. On September 9, 2015, the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "Working Group")—a group established and empowered by an executive order issued by the former governor—published the Puerto Rico Fiscal Economic Growth Plan (the "September 2015 Fiscal Plan"). This Plan ignored the essential promise that COFINA's assets and liabilities are to remain separate from the General Fund of the Commonwealth. Instead, the September 2015 Fiscal Plan combined all of COFINA's revenues and its debt service in with the

– 14 –

Commonwealth's assets and liabilities, which is inconsistent with COFINA's independent legal structure and disregards COFINA's property interest in the Dedicated SUT Revenues. The September 2015 Fiscal Plan publicly portrayed COFINA's debt obligations and assets as those of the Commonwealth, in direct contravention of the foundational premise of the COFINA structure. *See* September 2015 Fiscal Plan at 17, 61, and 62. This constituted a drastic departure from past precedent, in which the Commonwealth, consistent with the law, kept the debt obligations of COFINA and the Commonwealth separate in audited financial statements, government budgets, plans, and models.

50. Further, the September 2015 Fiscal Plan stated that, "the clawback of revenues supporting certain Commonwealth tax supported debt" may be available to "service all principal and interest on debt that has a constitutional priority."

51. In the wake of releasing the September 2015 Fiscal Plan, S&P immediately downgraded COFINA to a CC rating, just two notches above default, and stated that it believes "default or restructuring is highly likely and could take the form of either a missed debt service payment or a distressed exchange that we would characterize as a default," and that "all of Puerto Rico's tax-backed debt is highly vulnerable to nonpayment." *Street Insider, S&P Downgrades Puerto Rico's Tax-Backed Debt to 'CC', Outlook Negative*, Sep. 11, 2015.

52. Significantly, BONY was well-aware of the September 2015 Fiscal Plan and of the Commonwealth's and COFINA's breaches related thereto.

53. On information and belief, in a letter dated September 24, 2015, that was shared with BONY, counsel for certain Bondholders warned COFINA that the September 2015 Fiscal Plan "materially misrepresent[ed] the essential nature of COFINA's indebtedness to the investing public, and materially harm[ed] COFINA and its bondholders." The letter warned

further that these representations "mis[led] the public by lumping the Commonwealth's own debt together with COFINA's," improperly attempted to "consolidate assets and liabilities of COFINA with that of the Commonwealth," and accused the Commonwealth of intending to "signal to the investing public at large that the Commonwealth's struggling fiscal health threatens the health of COFINA, ignoring the fact that insulation from the Commonwealth's other liabilities prompted the creation of COFINA in the first place."

54.     These misstatements, the letter explained, were inconsistent with Sections 201 and 501 of the Resolution, which together "make clear that the bonds issued by COFINA are not obligations of the Commonwealth." The letter noted that COFINA's failure to correct these misstatements constituted a breach of COFINA's covenant in Section 705. The letter therefore demanded that COFINA "promptly cure" these misstatements, "provide the necessary assurances of bondholders under the Resolution," and "untangle the COFINA debt and revenue from that of the Commonwealth."

55.     Despite having knowledge of the September 2015 Fiscal Plan, the September 24, 2015 letter, and the absence of any cure by the Commonwealth or COFINA, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments on the Subordinate Bonds. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

**B.     The Second Event Of Default – The February 1, 2016 Restructuring Proposal**

56.     On February 1, 2016, the Working Group published a document—the "Puerto Rico Restructuring Proposal" (the "February 1, 2016 Restructuring Proposal"). The February 1, 2016 Restructuring Proposal unlawfully referred to COFINA debt as the debt of the Commonwealth, and even included COFINA debt service and revenue within the

– 16 –

Commonwealth's own debt and revenue calculations—a patent falsehood that is contrary to everything COFINA Bondholders and their insurers were told and promised when they purchased and insured COFINA Bonds.

57.     On information and belief, once again, this time in a letter dated February 8, 2016, certain Bondholders advised COFINA and BONY of the breaches arising from the February 1, 2016 Restructuring Proposal.  The letter correctly characterized the February 1, 2016 Restructuring Proposal and the accompanying press release as the "antithesis of protecting and defending the Pledged Property for the benefit of Bondowners."  Specifically, the letter took issue with, among other things, the fact that the press release (i) "includes COFINA debt service within the Commonwealth's own debt service-to-revenue and then calculates that ratio with reference to the Constitutional limits on general obligation bonds of the Commonwealth," and (ii) "concludes by stating the Working Group's agenda is to 'improve the Commonwealth's credit-worthiness.'"

58.     The letter "demand[ed] that [COFINA] immediately publish its own press release renouncing the Working Group's treatment of and misstatements about COFINA" and demanded further that COFINA "appoint independent legal and financial advisors to protect and defend COFINA's Bondowners 'against all claims and demands of all persons whomsoever,' including any actions and misstatements by COFINA's own agents who have participated in the Working Group in breach of the Resolution."

59.     Again, BONY did not fulfill its duties to defend all COFINA Bondholders and their insurers.  Despite having knowledge of the February 1, 2016 Restructuring Proposal and the February 8, 2016 letter, BONY failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Plaintiff by accelerating the bonds or ceasing to make payments

FILED: Case 17-03283-LTS Doc#: 4753-18 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc 56/2017
NYSCEF DOC. NO. 1          Exhibit S Page 19 of 41393          RECEIVED NYSCEF: 05/02/2017

to the Subordinate Cash Pay Bondholders. Instead, BONY ignored its irreparable conflict of interest. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

### C.    The Third Event Of Default – The 2016 Moratorium Act

60.    The Moratorium Act, enacted by the Commonwealth on April 6, 2016, empowered the Governor, by executive order, to declare "any government entity to be in a state of emergency" and, "if the executive order so provides, no payment on a covered obligation of such … government entity shall be made." Moratorium Act, Article 201(a).

61.    Article 201(b)(ii) provided further that, "[d]uring the emergency period for any government entity," many rights and remedies would be restricted, including restrictions on the "exercise [of] any remedy, which remedy shall include any right of acceleration or termination . . . related to any covered obligation of such government entity, under any contract or applicable law as a result of . . . (A) non-payment of any obligation arising under or relating to any covered obligation of such government entity; [or] (B) breach of any condition or covenant under or related to any covered obligation of such government entity."

62.    Article 201(d) provided that "[i]f ordered by the Governor during the emergency period created by this section, the following obligations may be suspended or modified, if applicable, until the end of the covered period … (ii) *any statutory or other obligation to transfer money (or its equivalent) to pay or secure any covered obligation (or take any action in furtherance thereof); [and] (iv) any statutory or other obligation to ensure payment of a covered obligation as if this Act were not enacted (or take any action in furtherance thereof)*." (emphasis added)

63.    Article 702 stated that the Moratorium Act (and its provisions allowing the suspension of payments) would "take effect immediately upon enactment" and *included*

– 18 –

*COFINA* in its definition of "government entity." Section 103(t)(i). This meant that under the terms of the statute, the Governor could suspend COFINA's payments and make the Dedicated SUT Revenues available for the Commonwealth's obligations.

64.    The Moratorium Act, therefore, radically undercut COFINA's autonomy, and was a breach of the Commonwealth's covenants.[4]

65.    On information and belief, in a letter dated April 6, 2016 sent to COFINA and BONY, counsel for certain Bondholders notified them that the "Moratorium Act constitute[d] an anticipatory breach of section 1101(1)(i) of the [COFINA] Resolution and Bonds because [it] permits the Governor to bar COFINA from making principal or interest payments" on any COFINA Bonds.

66.    The letter also advised COFINA and BONY that, in addition to the "improper restriction on COFINA paying its debts, the Moratorium Act further breaches sections 1101(1)(ii) of the Resolution," because it "restricts the rights of [Bondholders] to exercise remedies if the Governor issues an executive order applicable to COFINA and [by] suspending or modifying any obligations of COFINA to cause the transfer of money to pay Bonds or to ensure payment of Bonds."

67.    In connection with that same notice, the Bondholders reminded COFINA and BONY of the continued Events of Default that had already occurred, namely the Events of Default arising from the September 2015 Fiscal Plan and the February 1, 2016 Restructuring Proposal, respectively.

---

[4] On January 29, 2017, the Moratorium Act was replaced by the Puerto Rico Financial Emergency and Fiscal Responsibility Act (the "Emergency Act"). The Emergency Act extended the operative provisions of the Moratorium Act, through and including May 1, 2017, which term may be extended by the Governor for three months. On information and belief, despite knowing of the severe threat the Emergency Act placed on the ability of COFINA to repay its Bonds, BONY did nothing to protect the Bondholders' and their insurers' interests in advance of, or in light of, the Emergency Act's enactment.

68.    Despite having knowledge of the Moratorium Act and the April 6, 2016 letter, BONY again failed to take any actions to enforce these Events of Default or to otherwise protect Plaintiff by accelerating the bonds or ceasing to make payments to the Subordinate Cash Pay Bondholders.  BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Events of Default.

D.    The Fourth Event Of Default – The GO Bondholders' Litigations

69.    BONY's failures continued as, in the summer of 2016, attacks on COFINA's structure and viability escalated.

70.    On June 21, 2016, the GO Bondholders commenced a litigation in the United States District Court for the Southern District of New York, No. 16 Civ. 470, against the Commonwealth, then Governor García Padilla, the Treasury Secretary of the Commonwealth of Puerto Rico, and the Director of the Office of Management and Budget of the Commonwealth of Puerto Rico (the "Jacana Lawsuit").

71.    In the Jacana Lawsuit, the GO Bondholders alleged, *inter alia*, that the Dedicated SUT Revenues were "available resources" for the purposes of satisfying the GO Bonds.  The complaint directly challenged the rights of COFINA and the Bondholders with respect to the Dedicated SUT Revenues and the Pledged Property.  The GO Bondholders' complaint further alleged that funds transferred to COFINA, *i.e.*, the Dedicated SUT Revenues, are subject to clawback in favor of holders of GO Bonds.

72.    COFINA failed to take any steps to defend against such challenges.  Similarly, the Commonwealth took no substantive position in the Jacana Lawsuit.

73.    In a letter dated June 23, 2016, certain Bondholders reminded BONY that "COFINA has a clear contractual obligation to defend the Pledged Property and the Bondowners" in connection with the Jacana Lawsuit.  The letter, citing Sections 801 and 802 of

– 20 –

the Resolution, also informed BONY that the "Trustee is likewise obligated to enforce the Resolution and the rights of Bondowners" and put "the Trustee on notice that there [was] a judicial challenge to COFINA's property and, pending resolution of that judicial challenge, the Trustee must demand that COFINA undertake all actions to preserve any and all property that is collateral of the [COFINA] Bondowners, including the retention of independent counsel to dispute the allegations in the Complaint." The failure to do so, the letter added, "would result in a direct breach of the most fundamental promise in COFINA's Bond Resolution and would cause a shortfall of statutorily required amounts of pledged sales tax revenues."

74.    The letter cautioned that, "[g]iven COFINA's continuing refusal to hire independent advisors and its failure to acknowledge the existing Events of Default, the Trustee cannot sit idly by and close its eyes to the situation and how it could potentially impair more than $7 billion of Senior Bonds."

75.    On July 20, 2016, several GO Bondholders brought an action in the District Court for the District of Puerto Rico (the "Lex Claims Litigation"). Complaint, *Lex Claims, LLC v. Garcia-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. July 20, 2016) [Dkt. No. 1]. COFINA was added as a defendant on November 4, 2016. *See* Second Amended Complaint, *Lex Claims, LLC v. Garcia-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Nov. 4, 2016) [Dkt. No. 78]. The GO Bondholders claimed that the PROMESA[5] stay did not bar their pursuit of certain

---

[5] On June 30, 2016, President Obama signed into law PROMESA, which, among other things, provides a legal framework for adjustment of Puerto Rico debts and for the appointment of the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"). Pub. L. 114-187, codified at 48 U.S.C. § 2101 *et seq.*

PROMESA provided for a temporary stay of certain litigation, which expired on May 1, 2017. *See* PROMESA § 405(d)(1)(B); February 14, 2017 Letter from the Oversight Board. Congress stated that the purpose of the stay was to "allow the Government of Puerto Rico a limited period of time during which it can focus its resources on negotiating a voluntary resolution with creditors instead of defending numerous, costly creditor lawsuits . . . ." PROMESA § 405(n)(2).

claims challenging the COFINA structure, including the clawback of funds that had already been remitted to COFINA's accounts. On February 17, 2017, the District Court entered an order allowing the case to proceed in spite of the PROMESA stay. *See* Opinion and Order, *Lex Claims, LLC v. García-Padilla*, Case No. 3:16-cv-02374 (FAB) (D.P.R. Feb. 27, 2017) [Dkt. No. 184].

76.    Neither the Commonwealth nor COFINA—both defendants in the *Lex Claims* litigation—appealed this order. Instead, they acquiesced in the GO Bondholders' requests to pursue their challenge to the COFINA structure. Certain of the Bondholders, together with the Oversight Board and Plaintiff Ambac, sought to enforce the litigation stay that Congress deemed critical for the orderly and negotiated resolution of bond claims.

77.    These Bondholders, the Oversight Board, and Ambac prevailed in the First Circuit Court of Appeals, which eventually stayed the litigation in its entirety.

78.    However, on March 17, 2017, while the appeal was pending in the First Circuit, the Administration, through Autoridad de Asesoría y Agencia Fiscal de Puerto Rico ("AAFAF"), ignored its promise not to impair COFINA's right to the Dedicated SUT Revenues and issued a joint press release with the GO Bondholder plaintiffs in the Lex Claims Litigation, stating it "is not taking a definitive position on the merits of the constitutional questions [relating to COFINA's legal structure] at this time, [but] it will analyze the constitutional issues raised by the GO Bondholders. In addition, the Government will urge Judge Besosa to decide the issues raised by the GO Bondholders by April 30, 2017, and not support any efforts to defer or delay the resolution of the constitutional questions raised by the GO Bondholders until after the PROMESA litigation stay expires."

79.     COFINA provided no response to any of these statements and challenges to the COFINA structure and has thus failed to comply with the terms of the Resolution that require COFINA to give further assurances in support of the COFINA Bondholders' security interest in the Dedicated SUT Revenues, and to preserve, protect, and defend the COFINA structure and rights to the Dedicated SUT Revenues, including enforcement of the non-impairment covenant of the Commonwealth itself (Section 706).

80.     Despite having knowledge of COFINA's failure to defend in the Jacana Lawsuit and Lex Claims Litigation and all other instances of attack on its structure, as alleged *supra*, BONY failed to take any actions to enforce these Events of Default or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments to the Subordinate Cash Pay Bondholders. BONY also failed, as it is required to do under the Resolution, to give notice to all Bondholders of such Event of Default.

**E.     The Fifth Event Of Default – The March 13, 2017 Fiscal Plan**

81.     On March 13, 2017, AAFAF, on behalf of the Commonwealth and COFINA, submitted a joint fiscal plan (the "March 13 Fiscal Plan") to the Oversight Board. The Oversight Board certified the March 13 Fiscal Plan the same day. Once certified, the March 13 Fiscal Plan became binding on the Commonwealth and COFINA as a matter of federal law under PROMESA.

82.     The March 13 Fiscal Plan commingles COFINA's revenues, including the Dedicated SUT Revenues, and its debt service with the Commonwealth's assets and liabilities, ignoring COFINA's legal separateness from the General Fund. The March 13 Fiscal Plan effects a taking of Bondholders' property interest in the Dedicated SUT Revenues and solidifies the Commonwealth's breach of its non-impairment obligation under the COFINA Resolution. According to the March 13 Fiscal Plan, the total estimated cash flow available to pay debt

– 23 –

service over the next ten years will be less than the debt service owed by COFINA alone during such period. For example, COFINA's Dedicated SUT Revenues ranges from $724 million in 2018 to $1.031 billion in 2026, while the cash available for debt service under the March 13 Fiscal Plan ranges from $404 million in 2018 to $808 million in 2026. *See* March 13 Fiscal Plan at 10.

83.   Even if all of the cash flow purportedly available to pay debt service reflected in the March 13 Fiscal Plan were remitted to COFINA—and it is not clear that the March 13 Fiscal Plan contemplates that remittance—the amounts remitted to COFINA would fall short of the Dedicated SUT Revenues in seven of the next nine years, including immediately in fiscal year 2018, which begins on July 1, 2017. *See* March 13 Fiscal Plan at 27–28. Indeed, over the term of the March 13 Fiscal Plan, COFINA will suffer a shortfall of over $1.4 billion even if all cash flow available to pay debt is earmarked for COFINA. Consequently, in formulating the March 13 Fiscal Plan and submitting it for certification by the Oversight Board, the Commonwealth repudiated its obligations to COFINA, Ambac, and the Bonds Ambac insures, has taken the property owned by COFINA that secures the Bondholders' investments by statutory lien, and has created new law that impairs Bondholders' and insurers' contractual rights.

84.   The March 13 Fiscal Plan identified no legal authorization for its taking of COFINA property, its violation of the COFINA statute, or its impairment of the contractual rights of COFINA Bondholders and insurers. Nor did the March 13 Fiscal Plan explain or even assert that it was necessary and reasonable to violate the rights of COFINA Bondholders, as compared with other policy choices, in order to create a fiscal plan that complied with PROMESA.

85.    The March 13 Fiscal Plan constitutes a clear breach of the covenants of the Commonwealth. And, inasmuch as COFINA takes no steps to counter the March 13 Fiscal Plan and the harm it poses to COFINA, Ambac, the Bondholders, and other investors, COFINA is in breach of its covenants.

86.    On March 27, 2017, certain holders and an insurer of COFINA bonds wrote to the Oversight Board informing its members that the Fiscal Plan violates the law "by failing to respect the COFINA Bondholders' lien on the assigned revenues granted to COFINA."

87.    Additionally, in a letter to BONY dated March 31, 2017, certain Bondholders informed BONY of the breaches in question and demanded that BONY take necessary steps to protect Bondholders, including by issuing notices of default and by refraining, in the interim, from making further payments on account of the COFINA Bonds. The Bondholders demanded confirmation by April 4, 2017, that BONY will comply with such requests, but BONY failed to respond.

88.    BONY thus again failed to take appropriate measures to protect its investors and other insurers.

F.    **The Sixth Event Of Default – The Passage Of The Fiscal Compliance Law**

89.    Implementation of the March 13 Fiscal Plan began in April 2017. During an April 27, 2017 Puerto Rico Senate debate on the Fiscal Plan Compliance Law, Popular Democratic Party Senator José Nadal-Power remarked, "[h]ere the executive [branch] is being authorized to use the COFINA funds, the COFINA funds which are destined to pay [B]ondholders, and now all of a sudden it is good to take the money that goes toward the payment of [B]ondholders and use them towards the end determined by the executive [branch]?"

90.    On April 27, 2017, the Legislative Assembly passed House Bill 938 titled "Law on Compliance with the Fiscal Plan." This bill was signed into law by Governor Ricardo

Rosselló on April 29, 2017 (the "Fiscal Plan Compliance Law"). The Fiscal Plan Compliance Law directly interferes with the rights granted to COFINA and constitutes multiple uncurable breaches of the Commonwealth's covenants.

91.     First, the Fiscal Plan Compliance Law diverts COFINA's revenues to the General Fund. Chapter 6 of the Fiscal Plan Compliance Law amends Sections 3, 7, and 8 of Act No. 230 of July 23, 1974, the "Accounting Law of the Government of Puerto Rico," to provide that upon effectiveness of the Fiscal Plan Compliance Law, all special funds created by law for specific purposes will be credited to the General Fund and deposited in the current bank account of the Secretary so that he or she has full control of them. Furthermore, the collections attributable to the additional 4.5% sales and use tax adopted in July of 2015 now flow directly into the General Fund beginning at the outset of the fiscal year, in contravention of the flow of funds established by the Resolution. These acts are direct limitations or restraints on the rights granted to COFINA. Specifically, the proceeds of the first revenues of the sales and use tax "shall be directly deposited in the FIA at the time of receipt and shall not be deposited in the Treasury of Puerto Rico." 13 L.P.R.A. § 12.

92.     Second, Chapter 4 of the Fiscal Plan Compliance Law allows the Secretary of the Treasury of Puerto Rico, under certain conditions, to use COFINA's funds to cover a deficiency in the Commonwealth's cash flow to comply with the March 13 Fiscal Plan. Specifically, Chapter 4 of the Fiscal Plan Compliance Law purports to order all Puerto Rico public corporations and instrumentalities, without limitation or exception, to transfer to the Treasury Department any surpluses of generated revenues. Those funds are to be considered as "available resources" of the Commonwealth and deposited by the Treasury Department in the General Fund to comply with liquidity requirements contemplated in the Fiscal Plan. Article 4.03 expressly

– 26 –

provides with respect to COFINA that the Secretary of the Treasury is authorized to use COFINA funds in an occasional manner, in compliance with certain conditions, to cover a significant deficiency in the cash flow or to comply with the March 13 Fiscal Plan. This is a blatant taking of COFINA property and violation of the Resolution, which provides that the Pledged Property "shall be deposited directly in the FIA and shall be used exclusively" for the purposes listed in the statute, which purposes do not include funding a Commonwealth cash flow deficiency. The Resolution further provides that the COFINA revenues shall not "be available for use by the Secretary of the Treasury."

93. These events constitute multiple breaches of the Commonwealth's covenants and trigger an Event of Default. By failing to recognize the Event of Default, BONY once again failed to take appropriate measures to protect its investors and insurers.

F.    **The Seventh Event Of Default –**
      **The Issuance Of The Commonwealth's Title VI Proposal**

94. The publication of the so-called "Proposal" under Title VI of PROMESA, filed publicly by AAFAF on the evening of April 28, 2017, constitutes a further repudiation of the COFINA structure, and overt breach of the covenants contained in the Resolution. AAFAF was created under chapter 6 of Act No. 21 of 2016 to serve as fiscal agent, financial advisor, and reporting agent of the Commonwealth, its agencies, public corporations, instrumentalities, subdivisions, and/or municipalities, and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing. *See* Act No. 2016-21, Section 602(a). In Act No. 2 of 2017, the Commonwealth expanded AAFAF's powers to include, among other things, sole responsibility to renegotiate, to restructure, and/or to reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity. *See* Act No. 2017-2 at 1. In addition, AAFAF is the entity in charge of the

– 27 –

collaboration, communication, and cooperation efforts between the Government of Puerto Rico and the Oversight Board. AAFAF therefore acts as agent for and speaks for both the Commonwealth and COFINA in matters involving restructuring, including in making this Proposal.

95.    Two core aspects of the Proposal violate the COFINA structure. First, the Proposal treats GO Bonds as having priority over COFINA Bonds, despite the fact that the revenues pledged to the COFINA Bonds are explicitly made unavailable for the payment of GO Bonds. The Proposal makes plain that the SUT pledged to COFINA will no longer be segregated and devoted solely to the payment of COFINA Bonds, a structure the Commonwealth has covenanted to respect; instead, all SUT will be pooled into the General Fund, in violation of legislative and contractual provisions. Second, the Proposal purports to treat COFINA Senior Bondholders *pari passu* with COFINA Subordinate Bondholders in violation of express contractual subordination provisions. Utilizing a tool commonly referred to as a "death trap," the Proposal would distribute either (i) $6.9 billion in newly-issued Senior Bonds and $3.3 billion in Senior Cash Flow Bonds to all COFINA Senior and Subordinated Bonds *pari passu* if the COFINA creditors consent to such treatment; or (ii) $450 million of newly-issued Short Term Bonds only to COFINA Senior Bondholders, reflecting a 2.5% recovery on the COFINA debt outstanding, if the COFINA creditors do not consent to the treatment in (i). Offering COFINA Senior Bondholders what amounts to a Hobson's choice is a direct repudiation by the Commonwealth of the contractual and statutory protections afforded to COFINA Senior Bondholders under the Resolution and a flagrant dereliction of COFINA's duty to defend, preserve, and protect the pledge of revenues and all rights of the Trustee, Beneficiaries, and Bondholders against all claims and demands.

96.     The Commonwealth affirmatively covenanted, in section 706 of the Resolution, to not "limit or restrict the rights that are by [COFINA's Enabling] Act granted or the rights of [COFINA] to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired." The passage of the Fiscal Plan Compliance Law and issuance of the Commonwealth's Title VI Proposal constitute breaches of that covenant.

97.     In addition to the covenant by the Commonwealth, COFINA itself covenanted to "at all times, to the extent permitted by law, defend, preserve[,] and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries[,] and the Bondowners under the Resolution against all claims and demands of all persons whomsoever." Section 705. The failure by COFINA to protect itself from the Commonwealth's illegal and unqualified attack on its possession and control of the pledged revenues is a breach of COFINA's duty. The Title VI Proposal, which was submitted by AAFAF, acting as the exclusive agent for not only the Commonwealth but also for COFINA, is another breach by COFINA. Far from defending, preserving, or protecting the pledge of revenues to COFINA, the Title VI Proposal is a declaration of war on COFINA and its property.

98.     The Commonwealth's and COFINA's flagrant and incurable breaches of the Resolution, and clear intention to loot COFINA to meet Commonwealth expenses, constitute Events of Default under Section 1101.1(ii). And BONY, acting as Trustee for Bonds with conflicting interests, has failed to take any actions to enforce the corresponding Events of Default or to otherwise protect Senior Bondholders and Plaintiff by accelerating the Subordinate Bonds.

99.    To date, and with regard to all Events of Default, BONY has failed to prudently and reasonably investigate breaches of the Resolution (such as by seeking commitments or confirmations from the Commonwealth), has failed to provide necessary notices of Events of Default to all Bondholders, has failed to take any actions to enforce the Events of Default, or to otherwise protect Plaintiff by accelerating the Bonds or ceasing to make payments on the Bonds. BONY's refusal to take any such action to protect the Senior Bondholders and Plaintiff constitutes a negligent abdication of its duties as Trustee and a breach of its contractual and fiduciary obligations. No prudent person would fail to act in these circumstances where its property is under attack and may be hopelessly dissipated in the absence of action.

## VIII.   BONY's Failure To Withhold Payments

100.    On information and belief, starting in early 2017, certain Bondholders commenced discussions with BONY concerning upcoming February 1, 2017 payments to other Bondholders, for which BONY was holding funds already received from COFINA. Among other things, the Bondholders demanded that BONY refrain from making such payments based on the many existing Events of Default and the continuing attacks by the Commonwealth and others on COFINA and its viability. The Bondholders also advised BONY of its inherently conflicted role as Trustee for both Senior and Subordinate Bonds.

101.    Despite this, on February 1, 2017, BONY distributed a payment to Subordinate Bondholders notwithstanding its actual knowledge of existing Events of Default under the Resolution, of mounting attacks on the COFINA structure, and that the disbursement would risk a drastic impairment to the Senior CAB Bonds.

102.    At the time, BONY was aware of another then-recent event that should have caused BONY to investigate and to demand assurances from the Commonwealth. The Emergency Act, as first proposed, contained language that could have allowed the Governor to

– 30 –

divert and to otherwise use Dedicated SUT Revenues. While the Emergency Act was revised at the last minute before passage to remove such language, the initial inclusion of the language was so potentially damaging to COFINA and to the COFINA Bonds that it should have prompted action by BONY.

103.    On information and belief, BONY failed to investigate further or to seek any commitments or assurances from the Commonwealth.

104.    On April 30, 2017, counsel for Ambac wrote to BONY, notifying it again of the multiple, incurable breaches of COFINA and the Commonwealth's covenants and the corresponding Events of Default. Ambac instructed BONY that, in light of the existing Events of Default and in accordance with the Resolution and the subsequent supplements, BONY should cease making payments to the COFINA Subordinate Bondholders until the Senior Bonds are paid in full.

105.    Despite having knowledge of the Events of Default, on May 1, 2017, BONY, undeterred, went ahead and distributed cash interest payments to certain Subordinate Bondholders, causing harm to Ambac and the Senior CAB Bondholders Ambac insures.

## IX.    BONY's Action Will Cause Plaintiff To Suffer Millions Of Dollars In Damages

106.    Ambac is a "Beneficiary" under the terms of the Resolution, and a specified third-party beneficiary of the Supplemental Resolution. Also, in accordance with Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, Ambac may remove BONY as Trustee.

107.    Unlike Senior CAB Bonds, Subordinate Cash Pay Bonds are entitled to periodic interest payments in cash. As such, BONY, as Trustee, has been making cash payments to these Bondholders.

– 31 –

Exhibit 5 Page 33 of 41

108.    Because the Bonds insured by Ambac carry long-dated maturities with no current cash payments (unlike the Subordinate Cash Pay Bonds), they are at severe risk if the COFINA structure is compromised. Given the attack on COFINA's pool of assets, the interest that BONY is paying the Subordinate Bondholders is dissipating assets that should go to pay Senior Bondholders.

~~109.    In an Event of Default, BONY, as Trustee, has the authority, as well as the duty,~~ to accelerate the bonds where doing so is warranted for the protection of the Bondholders.[6]

110.    Upon acceleration, the Trustee applies any available funds according to a priority waterfall set forth in the Resolution. This waterfall structure has five basic categories: (1) fees on credit or liquidity facilities; (2) interest; (3) principal; (4) monoline claims for reimbursement or subrogation; and (5) miscellaneous payments. If, however, all Senior Bonds are accelerated, interest and principal are paid ratably without preference (rather than interest being paid before principal).

111.    At least seven Events of Default exist under the Resolution and yet BONY has taken no actions to protect Plaintiff from such defaults by accelerating the COFINA Bonds or taking any other remedial measures, such as ceasing payments. Meanwhile, BONY operates under egregious conflicts of interest that prevent it from properly carrying out its duties and responsibilities to Plaintiff.

112.    Ambac has notified BONY of these Events of Default and has further demanded that BONY accelerate all payments and cease all interest payments to the Subordinate Notes.

113.    Plaintiff has been directly and proximately harmed by BONY's actions, and as a result, has been damaged in an amount to be determined at trial.

---

[6] Under the Resolution, the Trustee may not accelerate the bonds insured by Ambac without Ambac's prior written consent.

– 32 –

## FIRST CAUSE OF ACTION
### Breach of Fiduciary Duty

114.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

115.    BONY owes a fiduciary duty to Plaintiff.    BONY's fiduciary obligations included, without limitation, duties to protect the interests of Plaintiff, to investigate both its own conflicts of interest and potential Events of Default, and to make prudent decisions concerning the exercise of appropriate remedies, whether contractual or extra-contractual, to address the same.

116.    BONY breached its fiduciary duties by, among other things, (i) failing to properly investigate and remedy its own conflicts of interest; (ii) failing to properly investigate potential Events of Default including, but not limited to, those alleged herein; (iii) failing to accelerate the COFINA Bonds and withhold payments to Subordinate Cash Pay Bondholders; and (iv) otherwise failing to act in the best interest of Plaintiff or to protect the Senior Bondholders' interests.

117.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds.  In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior Bondholders.  Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

118.    BONY's material breaches of its fiduciary duties directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

## SECOND CAUSE OF ACTION
### Breach of Contract

119.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

120.    The Resolution is a valid contract between COFINA and, *inter alia*, BONY, in its capacity as Trustee, and Plaintiff.

121.    Plaintiff is entitled to enforce BONY's performance as Trustee. Plaintiff is a Beneficiary of the Resolution, as that term is used therein. Furthermore, Plaintiff is "explicitly recognized as being a third-party beneficiary . . . and may enforce any such right, remedy[,] or claim conferred, given or granted" in either the Resolution or Supplemental Resolutions.

122.    Plaintiff performed its obligations under the Resolution.

123.    An Event of Default occurred as early as September 9, 2015, and, as described above, numerous other related Events of Default occurred over the following 19 months. BONY and its responsible officers had and continue to have actual notice that Events of Default occurred.

124.    BONY has breached and will continue to breach the Resolution by failing to provide Plaintiff with notice of Events of Default and by failing to recognize Events of Default and accelerate the Bonds. In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior Bondholders. Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

125.    BONY's breaches directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

### THIRD CAUSE OF ACTION
### Breach of the Implied Covenant

126.   Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

127.   At all relevant times, including after the Events of Default discussed herein, BONY owed Plaintiff, as a Beneficiary and express intended third-party beneficiary under the Resolution and Supplemental Resolutions, a duty of good faith and fair dealing that required BONY to ensure that it did not, by act or omission, injure Plaintiff's rights to receive the benefits and protections provided for under the Resolution.

128.   BONY materially breached its duty of good faith and fair dealing under the Resolution and related implied covenants by, among other things, (i) failing to reasonably investigate and recognize Events of Default; (ii) failing to accelerate the COFINA Bonds or to withhold payments to Subordinate Cash Pay Bondholders; and (iii) otherwise exercising its discretion arbitrarily and in bad faith under the Resolution, thereby depriving Ambac of the fruits of the contract.

129.   BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds.  In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe and irreparable detriment of the Senior CAB Bondholders.  Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

130.   BONY's breaches of those implied covenants directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

## FOURTH CAUSE OF ACTION
### Gross Negligence/Breach of Trust

131.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

132.    BONY owed Plaintiff extra-contractual duties to perform its obligations with due care and avoid any conflicts of interest.  BONY's acts and omissions breached those duties by, among other things, (i) failing to prudently investigate at least seven Events of Default; (ii) having conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith.

133.    BONY has acted contrary to the interests of Plaintiff by failing to recognize Events of Default and accelerate the Bonds.  In the interim, BONY continues to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly depleting a limited pool of assets to the severe detriment of the Senior CAB Bondholders.  Indeed, BONY is depriving COFINA of the only collateral available to repay its debts, thereby inevitably causing defaults on the Bonds Ambac insures.

134.    BONY's grossly negligent breach of those duties has directly and proximately caused and will continue to cause Plaintiff to suffer direct damages in an amount to be determined at trial.

135.    Plaintiff is also entitled to an equitable decree that BONY must resign as Trustee.

## FIFTH CAUSE OF ACTION
### Declaratory Judgment

136.    Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

– 36 –

137.    As alleged herein, actual and justiciable controversies exist between the parties
with respect to the rights, duties, and obligations of the parties due and owing under New York
law and the Resolution.

138.    In addition to, and in the alternative of, their other claims for damages asserted
herein, Plaintiff is entitled to a declaratory judgment declaring, *inter alia*, that:

a.  BONY breached its fiduciary duties owed to Plaintiff by (i) failing to properly
investigate and remedy its own conflicts of interest; (ii) failing to properly
investigate at least seven Events of Default; (iii) failing to accelerate the
COFINA Bonds and to withhold payments to Subordinate Cash Pay
Bondholders; and (iv) otherwise failing to act in the best interest of Plaintiff or
to protect their interests;

b.  BONY breached the Resolution by (i) failing to provide Plaintiff with notice
of the Events of Default; (ii) failing to recognize an Event of Default;
(iii) failing to accelerate the bonds; and (iv) failing to withhold payments, as it
is required to do;

c.  BONY breached its duty of good faith and fair dealing under the Resolution
and related implied covenants by (i) failing to reasonably investigate potential
Events of Default; (ii) failing to either accelerate the COFINA Bonds or
withhold payments to Subordinate Cash Pay Bondholders pending an
investigation into the ongoing Events of Default; and (iii) otherwise exercising
its discretion arbitrarily and in bad faith under the Resolution;

d.  BONY acted negligently and breached its duties to Plaintiff by (i) failing to
reasonably investigate potential Events of Default; (ii) becoming subject to

– 37 –

conflicts of interest in its role as Trustee and failing to eliminate those conflicts by, among other things, appointing separate or co-trustees under the Resolution; and (iii) otherwise exercising its discretion arbitrarily and in bad faith; and that

e.  Ambac has the authority to remove BONY as Trustee under Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007.

### SIXTH CAUSE OF ACTION
### Injunctive Relief

139.  Plaintiff repeats and realleges each and every allegation set forth in the preceding paragraphs above as if fully set forth herein.

140.  BONY has acted, and unless enjoined will continue to act, contrary to its fiduciary, contractual, and other obligations to Ambac by failing to recognize Events of Default and accelerate the Bonds. Unless enjoined, BONY will also continue to make interest payments to the Subordinate Cash Pay Bondholders, knowing full well that by so doing, it is improperly and irrevocably depleting a limited pool of assets to the irreparable injury of the Senior CAB Bondholders and Ambac. Unless enjoined, BONY will continue to deprive Senior Bondholders of the limited collateral available to pay them, and by doing so, will inevitably harm the Bonds Ambac insures.

141.  This Court should therefore enjoin BONY from making any further payments to any Subordinate Bondholders.

142.  This Court should also order BONY to recognize an Event of Default, and accelerate the payment of the Bonds.

143. Finally, this court should direct BONY to resign as Trustee, and appoint separate unconflicted Trustees.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against BONY as follows:

(a) Awarding direct damages in favor of Plaintiff against BONY in an amount to be proven at trial;

(b) A declaration that (i) BONY breached its fiduciary and other duties to Plaintiff; (ii) BONY breached the Resolution; and (iii) BONY breached the covenant of good faith and fair dealing implied in the Resolution;

(c) A declaration that Ambac may remove the Trustee pursuant to Section (n) of the Special Provisions Relating to Bond Insurance Policies contained in Exhibit B to the First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007;

(d) An injunction prohibiting BONY from making any additional interest payments to any Subordinate Bondholders;

(e) An injunction directing BONY to recognize an Event of Default, and accelerate the payment of the Bonds;

(f) A declaration that BONY suffers from a conflict of interest under New York law and a decree that BONY must resign as Trustee, as soon as separate unconflicted Trustees are appointed; and

(g) Such other and further relief as the Court may deem just and proper.

Case 1:17-03803-LTS Doc# 4758-18 Filed 01/12/19 Entered 01/12/19 17:45:34 Desc
Exhibit S Page 365 of 393

Dated: New York, New York
       May 2, 2017

CURTIS, MALLET-PREVOST,
   COLT & MOSLE LLP

By: _____ (NMM)

Steven J. Reisman (sreisman@curtis.com)
Theresa A. Foudy (tfoudy@curtis.com)
Jacques Semmelman (jsemmelman@curtis.com)
Michael J. Moscato (mmoscato@curtis.com)

101 Park Avenue
New York, New York 10178-0061
(212) 696-6000

*Attorneys for Plaintiff*

**B1040 (FORM 1040) (12/15)**

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS<br>The Bank of New York Mellon, as Trustee | DEFENDANTS<br>Puerto Rico Sales Tax Financing Corporation (COFINA), et al.<br>See Addendum for Additional<br>Defendants. |
|---|---|
| **ATTORNEYS** (Firm Name, Address, and Telephone No.)<br>Lee Sepulvado Ramos, Sepulvado & Maldonado, PSC<br>252 Ponce de León Avenue, Suite 1900, Citibank Tower<br>San Juan, PR 00918, (787)765-5656 | **ATTORNEYS** (If Known)<br>Hermann D. Bauer-Alvarez, O'Neill & Borges LLC<br>250 Munoz Rivera Ave., Suite 800, San Juan, PR 00918<br>(787)282-5723 |
| **PARTY** (Check One Box Only)<br>□ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    ☒ Other<br>□ Trustee | **PARTY** (Check One Box Only)<br>☒ Debtor    □ U.S. Trustee/Bankruptcy Admin<br>□ Creditor    □ Other<br>□ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Complaint for Interpleader and Declaratory Relief pursuant to, *e.g.*, 28 U.S.C. § 1335 (Statutory Interpleader), 28 U.S.C. § 2361, 28 U.S.C. §§ 2201-02 (Declaratory Judgment)

**NATURE OF SUIT**

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
- [ ] 11-Recovery of money/property - §542 turnover of property
- [ ] 12-Recovery of money/property - §547 preference
- [ ] 13-Recovery of money/property - §548 fraudulent transfer
- [ ] 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
- [ ] 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
- [ ] 31-Approval of sale of property of estate and of a co-owner - § 363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
- [ ] 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
- [ ] 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
- [ ] 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
- [ ] 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
- [ ] 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

**(continued next column)**

**FRBP 7001(6) – Dischargeability (continued)**
- [ ] 61-Dischargeability - §523(a)(5), domestic support
- [ ] 68-Dischargeability - §523(a)(6), willful and malicious injury
- [ ] 63-Dischargeability - §523(a)(8), student loan
- [ ] 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
- [ ] 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
- [ ] 71-Injunctive relief – imposition of stay
- [ ] 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
- [ ] 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
- [x] 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
- [ ] 01-Determination of removed claim or cause

**Other**
- [ ] SS-SIPA Case – 15 U.S.C. §§78aaa *et.seq.*
- [ ] 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| □ Check if this case involves a substantive issue of state law | □ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| □ Check if a jury trial is demanded in complaint | Demand $ |

Other Relief Sought

Interpleader and Declaratory Relief

**B1040 (FORM 1040) (12/15)**

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>Puerto Rico Sales Tax Financing Corporation | BANKRUPTCY CASE NO.<br>17 BK 3284 -LTS | |
| DISTRICT IN WHICH CASE IS PENDING<br>Puerto Rico | DIVISION OFFICE | NAME OF JUDGE<br>Laura Taylor Swain |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) | | |
| DATE<br>May 16, 2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Lee Sepulvado Ramos | |

### INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also must complete and file Form 1040, the Adversary Proceeding Cover Sheet, unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 1040 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party**. Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

**ADDENDUM TO CIVIL COVER SHEET**

| ADDITIONAL DEFENDANTS | ATTORNEYS |
|---|---|
| PUERTO RICO SALES TAX FINANCING CORPORATION (COFINA) | Robert N. H. Christmas<br>Chris Mason<br>NIXON PEABODY<br>437 Madison Avenue<br>New York, NY 10022-7039 |
| WHITEBOX MULTI-STRATEGY PARTNERS, L.P. | Kenneth R. David<br>Daniel A. Fliman<br>Ryan P. Montefusco<br>KASOWITZ BENSON TORRES LLP<br>1633 Broadway<br>New York, New York 10019 |
| WHITEBOX ASYMMETRIC PARTNERS, L.P. | Kenneth R. David<br>Daniel A. Fliman<br>Ryan P. Montefusco<br>KASOWITZ BENSON TORRES LLP<br>1633 Broadway<br>New York, New York 10019 |
| WHITEBOX INSTITUTIONAL PARTNERS, L.P. | Kenneth R. David<br>Daniel A. Fliman<br>Ryan P. Montefusco<br>KASOWITZ BENSON TORRES LLP<br>1633 Broadway<br>New York, New York 10019 |
| PANDORA SELECT PARTNERS, L.P. | Kenneth R. David<br>Daniel A. Fliman<br>Ryan P. Montefusco<br>KASOWITZ BENSON TORRES LLP<br>1633 Broadway<br>New York, New York 10019 |
| AMBAC ASSURANCE CORPORATION | Dennis F. Dunne<br>Atara Miller<br>MILBANK, TWEED, HADLEY & McCLOY LLP<br>28 Liberty Street<br>New York, New York 10005 |

| | Steven J. Reisman<br>Theresa A. Foudy<br>Jacques Semmelman<br>Michael J. Moscato<br>CURTIS, MALLET-PROVOST, COLT &<br>MOSLE<br>101 Park Avenue<br>New York, New York 10178-0061<br><br>Roberto A. Camara-Fuertes<br>FERRAIUOLI, LLC<br>PO Box 195168<br>San Juan, PR 00919-5168 |
| --- | --- |
| FRANKLIN ADVISERS, INC. | Amy Caton<br>Thomas Moers Mayer<br>KRAMER LEVIN NAFTALIS & FRANKEL<br>LLP<br>1177 Avenue of the Americas<br>New York, New York 10036-2714<br><br>Manuel Fernandez Bared<br>TORO, COLON, MULLET, RIVERA &<br>SIFRE, PSC<br>416 Ponce de Leon Avenue,<br>Union Plaza, Suite 311<br>San Juan, Puerto Rico 00918-3430 |
| CEDE & CO., as nominee for The Depository<br>Trust Company | Eric P. Heichel<br>EISEMAN LEVINE LEHRHAUPT &<br>KAKOYIANNIS, P.C.<br>805 Third Avenue<br>New York, NY 10022 |

LBF D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| | No. 17 BK 3284-LTS |
| as representative of | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), | |
| Debtor. | |
| THE BANK OF NEW YORK MELLON, as Trustee, | Adversary No: _____ |
| Plaintiff, | |
| v. | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company, | |
| Defendants. | |

## SUMMONS

To the above-named defendant: **PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA")**

YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance

of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  _Lee Sepulvado Ramos__, Esq., at the following address:_ 252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918__

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____          By:_____
                                         Deputy Clerk

# CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]      Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

       to:_____

[ ]      Personal Service: By leaving the process with the defendant or with an officer or agent

       of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____              Signature:_____

                                     Print Name:_____

                                     Address:_____

                                     _____

                                     _____

LBF D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>      as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>      Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br>      Plaintiff,<br>   v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>      Defendants. | Adversary No: _____ |

## SUMMONS

To the above-named defendant: **WHITEBOX MULTI-STRATEGY PARTNERS, L.P.**

      YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  Lee Sepulvado Ramos  , Esq., at the following address:  252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____          By:_____
                                           Deputy Clerk

Case 17-00133-LTS Doc#:1525-18 Filed:05/16/17 Entered:05/16/17 21:17:46 Desc:
Exhibit BX-S Page 375 of 393

## CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]    Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

to:_____

[ ]    Personal Service: By leaving the process with the defendant or with an officer or agent

of defendant at:_____



I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____            Signature:_____

                                 Print Name:_____

                                 Address:_____

                                 _____

                                 _____

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>     Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br><br>     Plaintiff,<br><br>  v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>     Defendants. | Adversary No: _____ |

<u>SUMMONS</u>

To the above-named defendant:  **WHITEBOX ASYMMETRIC PARTNERS, L.P.**

     YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney _Lee Sepulvado Ramos_, Esq., at the following address:_252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918_

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____      By:_____
                                        Deputy Clerk

# CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]     Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

        to:_____

[ ]     Personal Service: By leaving the process with the defendant or with an officer or agent

        of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____                    Signature:_____

                                    Print Name:_____

                                    Address:_____

                                    _____

                                    _____

Case:17-03283-LTS Doc#:4759-18 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00133-LTS Doc#:1-9 Filed:05/16/17 Entered:05/16/17 21:17:46 Desc:
Whitebox Institutional Summons Page 1 of 3
Exhibit DX Page 379 of 393

LBF D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>     as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>        Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br>             Plaintiff,<br>     v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>        Defendants. | Adversary No: _____ |

### SUMMONS

To the above-named defendant: **WHITEBOX INSTITUTIONAL PARTNERS, L.P.**

      YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  Lee Sepulvado Ramos __, Esq., at the following address:__ 252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918 __

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____          By:_____
                                          Deputy Clerk

# CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]     Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

        to:_____

[ ]     Personal Service: By leaving the process with the defendant or with an officer or agent

        of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____            Signature:_____

                                 Print Name:_____

                                 Address:_____

                                 _____

                                 _____

LBF D

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br><br>Plaintiff,<br><br>v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>Defendants. | Adversary No: _____ |

## SUMMONS

To the above-named defendant:  **PANDORA SELECT PARTNERS, L.P.**

YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  Lee Sepulvado Ramos  , Esq., at the following address:  252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____        By:_____
                                        Deputy Clerk

## CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]     Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

        to:_____

[ ]     Personal Service: By leaving the process with the defendant or with an officer or agent

        of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____                    Signature:_____

                                         Print Name:_____

                                         Address:_____

                                         _____

                                         _____

LBF D

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>       as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"),<br><br>       Debtor. | PROMESA<br>Title III<br><br><br>No. 17 BK 3284-LTS |
| THE BANK OF NEW YORK MELLON, as Trustee,<br>              Plaintiff,<br>    v.<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company,<br><br>            Defendants. | Adversary No: _____ |

## SUMMONS

To the above-named defendant:  **AMBAC ASSURANCE CORPORATION**

       YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  Lee Sepulvado Ramos  , Esq., at the following address:   252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____          By:_____
                                         Deputy Clerk

## CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]     Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

        to:_____

[ ]     Personal Service: By leaving the process with the defendant or with an officer or agent

        of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____          Signature:_____

                              Print Name:_____

                              Address:_____

                              _____

                              _____

Case 17-03283-LTS Doc#:4759-18 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: CEDE
Case:17-00133-LTS Doc#:3-15 Filed:05/16/17 Entered:05/16/17 12:19:46 Desc: CEDE
Exhibit DX S Summons Page 388 of 393

LBF D

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| IN RE: | PROMESA |
| | Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| | No. 17 BK 3284-LTS |
| as representative of | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), | |
| Debtor. | |
| THE BANK OF NEW YORK MELLON, as Trustee, | Adversary No: _____ |
| Plaintiff, | |
| v. | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company, | |
| Defendants. | |

<u>SUMMONS</u>

To the above-named defendant:  **CEDE & CO., as nominee for The Depository Trust
Company**

YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint
which is attached to this summons with the clerk of the court within 30 days after the date of issuance

of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  _Lee Sepulvado Ramos__, Esq., at the following address:__252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918__

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____          By:_____
                                         Deputy Clerk

# CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]     Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

        to:_____

[ ]     Personal Service: By leaving the process with the defendant or with an officer or agent

        of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____          Signature:_____

                               Print Name:_____

                               Address:_____

                               _____

                               _____

LBF D

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3284-LTS |
|     as representative of | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), | |
|       Debtor. | |

| | |
|---|---|
| THE BANK OF NEW YORK MELLON, as Trustee, | Adversary No: _____ |
|       Plaintiff, | |
|   v. | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company, | |
|       Defendants. | |

## SUMMONS

To the above-named defendant: **FRANKLIN ADVISERS, INC.**

      YOU ARE HEREBY SUMMONED and required to file a motion or answer to the complaint which is attached to this summons with the clerk of the court within 30 days after the date of issuance of this summons. If the defendant is the United State or its offices or agencies, then a motion or answer to the complaint shall be filed within 35 days.

At the same time your motion or answer is filed, you must serve a copy of it upon the plaintiff's attorney  Lee Sepulvado Ramos  , Esq., at the following address:  252 Ave. Ponce de Leon, Suite 1900, Citibank Tower San Juan, PR 00918

**IF YOU FAIL TO RESPOND TO THIS SUMMONS, YOUR FAILURE WILL BE DEEMED TO BE YOUR CONSENT TO ENTRY OF A JUDGMENT BY THE COURT AND JUDGMENT BY DEFAULT MAY BE TAKEN AGAINST YOU FOR THE RELIEF DEMANDED IN THE COMPLAINT.**

FRANCES RIOS DE MORAN, ESQ.
CLERK OF COURT

Date of Issuance:_____      By:_____
                                       Deputy Clerk

# CERTIFICATE OF SERVICE

I, _____(name), certify that service of this summons and a copy of

the complaint was made on _____ (date) by:

[ ]       Mail service: Regular, first class United States mail, postage fully pre-paid, addressed

          to:_____

[ ]       Personal Service: By leaving the process with the defendant or with an officer or agent

          of defendant at:_____


I further certify that I am, and at all times during the service of process was, not less than 18 years of

age and not a party to the matter concerning which service of process was made.

**I declare under penalty of perjury that the foregoing is true and correct.**


Date:_____                         Signature:_____

                                              Print Name:_____

                                              Address:_____

                                              _____

                                              _____