# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | No. 17 BK 3284-LTS |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"), | (This court filing relates only to No. 17 BK 3284-LTS.) |
| Debtor. | |
| THE BANK OF NEW YORK MELLON, as Trustee, | Adv. Proc. No. 17-133-LTS |
| Plaintiff, | |
| v. | |
| PUERTO RICO SALES TAX FINANCING CORPORATION ("COFINA"); WHITEBOX MULTI-STRATEGY PARTNERS, L.P.; WHITEBOX ASYMMETRIC PARTNERS, L.P.; WHITEBOX INSTITUTIONAL PARTNERS, L.P.; PANDORA SELECT PARTNERS, L.P.; AMBAC ASSURANCE CORPORATION; FRANKLIN ADVISERS, INC., and CEDE & CO., as nominee for The Depository Trust Company, | |
| Defendants. | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations.)

Case:17-00257-LTS Doc#:265 Filed:01/11/19 Entered:01/11/19 18:43:32 Desc:Main Exhibit DX-U Page 2 of 517

## STIPULATION AND [PROPOSED] ORDER

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"); the Commonwealth of Puerto Rico (the "Commonwealth"), and the Puerto Rico Sales Tax Financing Corporation ("COFINA") by and through the Financial Oversight and Management Board for Puerto Rico (the "FOMB") as representative of the Commonwealth and COFINA pursuant to section 315(b) of the Puerto Rico Oversight, Management, and Economic Stability Act; and the COFINA Senior Parties[2] (AAFAF, the Commonwealth, COFINA, and the COFINA Senior Parties are collectively the "Stipulating Parties"), through their respective undersigned counsel, stipulate and agree as follows:

### RECITALS

WHEREAS, on May 16, 2017, the Bank of New York Mellon filed the *Adversary Complaint Filed By The Bank of New York Mellon, as Trustee, for Interpleader and Declaratory Relief* (Dkt. No. 1);

WHEREAS, on June 6, 2017, the Court entered the Scheduling Order (Dkt. 154), which provided for, among other things, document and deposition discovery;

WHEREAS, on July 24, 2017, pursuant to the Scheduling Order, the COFINA Senior Parties served discovery requests and subpoenas and/or notices of deposition (the "Subpoenas") on the FOMB, the Commonwealth, AAFAF, the Government Development Bank for Puerto Rico, COFINA, and Rothschild & Co. Inc., and on individuals Ricardo Rossello Nevares, Gerardo Portela Franco, Christian Sobrino-Vega, Elías Sánchez Sifonte, Ramón Rosario, Todd Snyder, Pedro Soto, and Jesus Mattei (collectively, the "Subpoenaed Entities and Individuals");

---

[2] The COFINA Senior Parties are Ambac Assurance Corporation, the COFINA Senior Bondholders' Coalition, National Public Finance Guarantee Corporation, and Whitebox Asymmetric Partners, L.P. and certain affiliated entities.

WHEREAS, on August 7 and August 8, 2017, the Subpoenaed Entities and Individuals served their Responses and Objections to the Subpoenas;

WHEREAS, on August 11, 2017, the COFINA Senior Parties filed their *Urgent Motion Regarding Discovery Disputes and for a Pretrial Hearing Pursuant to Fed. R. Bankr. P. 7016* (the "Urgent Motion") (Dkt. No. 315), in which they sought, among other things, to "(i) compel the designation of an Oversight Board witness for depositions; (ii) compel the Government Parties to testify concerning the 'development of the Fiscal Plan and Revised Fiscal Plan with respect to the' DST; and (iii) compel the Commonwealth and/or its fact witnesses (including Mr. Rosario) to testify about [Act 26] and the explanatory statement";

WHEREAS, on August 22, 2017, the Court heard oral argument on the Urgent Motion;

WHEREAS, on August 23, 2017, the Court entered the Order on COFINA Senior Parties' Urgent Motion Regarding Discovery Disputes and for a Pretrial Hearing Pursuant to Fed. R. Bankr. P. 7016 (Dkt. No. 352), which stated, among other things, that "[t]he COFINA Senior Parties . . . and the Financial Oversight and Management Board . . . will attempt to reach a stipulation of facts in order to eliminate the need for the [COFINA] Senior Parties to take the deposition of the Oversight Board . . . [i]f no stipulation has been reached, the court will rule on the pending request that the Oversight Board designate a witness to be deposed . . ." and "[t]he [COFINA] Senior Parties may work with other parties to stipulate to facts which may eliminate the need for any depositions";

WHEREAS, AAFAF consulted with respect to facts with the individuals for whom depositions were scheduled;

WHEREAS, AAFAF, the Commonwealth, COFINA, and the COFINA Senior Parties have agreed to a stipulated statement of facts, attached hereto as Exhibit A (the "Statement of Facts") in order to eliminate the need for depositions;

WHEREAS, the COFINA Senior Parties have agreed to withdraw the Urgent Motion and the Subpoenas in exchange for the agreement of AAFAF, the Commonwealth and COFINA to be bound by the Statement of Facts;

WHEREAS, the Statement of Facts was provided to the Puerto Rico Funds, the Mutual Fund Group, Assured Guaranty Municipal Corporation, and the Bank of New York Mellon (the "Non-stipulating Parties") on September 26, 2017;

WHEREAS, the Non-stipulating Parties offered no comments regarding the Stipulation.

## AGREEMENT

WHEREFORE, IT IS HEREBY STIPULATED AND AGREED, subject to the Court's approval:

A.    The COFINA Senior Parties hereby withdraw the Urgent Motion and the Subpoenas.

B.    In exchange for the COFINA Senior Parties' withdrawal of the Urgent Motion and the Subpoenas, as set forth in the preceding paragraph A, AAFAF, the Commonwealth, and COFINA submit the Statement of Facts, which shall be binding on AAFAF, the Commonwealth and COFINA.

C.    The Stipulating Parties reserve all rights, except as any such rights are explicitly waived in the Statement of Facts.

IT IS FURTHER STIPULATED AND AGREED that this Stipulation may be signed in counterparts and that email or facsimile copies shall be deemed originals for all purposes.

Dated:

October 11, 2017

**AGREED TO**:

/s/ Andrés W. López
Andrés W. López
USDC No. 215311
**THE LAW OFFICES OF ANDRÉS W. LÓPEZ, P.S.C.**
902 Fernández Juncos Ave.
San Juan, PR 00907
Tel:  (787) 294-9508
Fax:  (787) 294-9519

*Co-Attorney for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

/s/ Peter Friedman
John J. Rapisardi
Suzzanne Uhland
Daniel L. Cantor
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

Peter Friedman
(Admitted *Pro Hac Vice*)
1625 Eye Street, NW
Washington, DC 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

**O'NEILL & BORGES** LLC
*/s/ Hermann D. Bauer*
Hermann D. Bauer (USDC No. 2125205)
*/s/ Daniel J. Pérez Refojos*
Daniel J. Pérez Refojos (USDC No. 303909)
250 Muñoz Rivera Avenue, Suite 800
San Juan, PR 00918-1813
T: 787.764.8181
F: 787.753.8944
hermann.bauer@oneillborges.com
daniel.perez@oneillborges.com

**PROSKAUER ROSE LLP**
Martin J. Bienenstock *(pro hac vice)*
Stephen L. Ratner *(pro hac vice)*
Chantel L. Febus *(pro hac vice)*
Eleven Times Square
New York, NY 10036-8299
T: 212.969.3000
F: 212.969.2900
mbienenstock@proskauer.com
sratner@proskauer.com
cfebus@proskauer.com

Ralph C. Ferrara *(pro hac vice)*
1001 Pennsylvania Ave. N.W.
Suite 600 South
Washington, D.C. 20004-2533
T: 212.416.6800
F: 212.416.6899
rferrara@proskauer.com

Timothy W. Mungovan *(pro hac vice)*
Michael R. Hackett *(pro hac vice)*
One International Place
Boston, MA 02110-2600
T: 617.526.9600
F: 617.526.9899
tmungovan@proskauer.com
mhackett@proskauer.com

*Attorneys for Defendant Financial Oversight and*
*Management Board for Puerto Rico*

REICHARD & ESCALERA

**By :** */s/ Rafael Escalera*
 **Rafael Escalera**
 USDC No. 122609
 escalera@reichardescalera.com

 */s/ Sylvia M. Arizmendi*
 **Sylvia M. Arizmendi**
 USDC-PR 210714
 arizmendis@reichardescalera.com

 */s/ Fernando Van Derdys*
 **Fernando Van Derdys**
 USDC-PR 201913
 fvander@reichardescalera.com

 */s/ Carlos R. Riviera-Ortiz*
 **Carlos R. Rivera-Ortiz**
 USDC-PR 303409
 riverac@reichardescalera.com

 */s/ Gustavo A. Pabón-Rico*
 **Gustavo A. Pabón-Rico**
 USDC-PR 231207
 pabong@reichardescalera.com

 255 Ponce de León Avenue
 MCS Plaza, 10th Floor
 San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

*/s/ Susheel Kirpalani*
**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Eric Winston** (*pro hac vice*)
ericwinston@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Kate Scherling** (*pro hac vice*)
katescherling@quinnemanuel.com

**Brant Duncan Kuehn** (*pro hac vice*)
brantkuehn@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

*Co-Counsel to the COFINA Senior Bondholders' Coalition*

FERRAIUOLI LLC

By:  /s/ Roberto Cámara-Fuertes
**Roberto Cámara-Fuertes** (USDC-PR No. 219002)
**Sonia Colón** (USDC-PR No. 213809)
221 Ponce de León Avenue, 5th Floor
San Juan, PR 00917
Telephone: (787) 766-7000
Facsimile:  (787) 766-7001
Email:  rcamara@ferraiuoli.com
        scolon@ferraiuoli.com

MILBANK, TWEED, HADLEY & M<sup>C</sup>CLOY LLP

By:  /s/ Grant R. Mainland
**Dennis F. Dunne**
**Andrew M. Leblanc**
**Atara Miller**
**Grant R. Mainland**
(admitted *pro hac vice*)
28 Liberty Street
New York, NY 10005
Telephone:  (212) 530-5000
Facsimile:  (212) 822-5770
Email: ddunne@milbank.com
        aleblanc@milbank.com
        amiller@milbank.com
        gmainland@milbank.com

CURTIS, MALLET-PREVOST, COLT & MOSLE LLP
By:  /s/ Theresa A. Foudy
**Steven J. Reisman**
**Theresa A. Foudy**
(admitted *pro hac vice*)
101 Park Avenue
New York, NY 10178
Telephone: (212) 696-6000
Facsimile:  (212) 697-1559
Email:  sreisman@curtis.com
        tfoudy@curtis.com

*Attorneys for Ambac Assurance Corporation*

*/s/ Eric Pérez-Ochoa*

Eric Pérez-Ochoa (USDC-PR No. 206314)
Alexandra Casellas-Cabrera (USDC-PR. No.
301010)
Lourdes Arroyo Portela (USDC-PR 226501)
**ADSUAR MUÑOZ GOYCO SEDA & PÉREZ-OCHOA, PSC, P.S.C.**
208 Ponce de León Avenue, Suite 1600
San Juan, Puerto Rico 00936
Telephone: (787) 756-9000
Facsimile: (787) 756-9010
Email: epo@amgprlaw.com
        acasellas@amgprlaw.com
        larroyo@amgprlaw.com

– and –

Marcia Goldstein
Jonathan Polkes
Salvatore A. Romanello
Gregory Silbert
Kelly DiBlasi
Jared R. Friedmann
Gabriel A. Morgan
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, New York 10153
Telephone: (212) 310-8000
Facsimile: (212) 310-8007
Email: marcia.goldstein@weil.com
        jonathan.polkes@weil.com
        salvatore.romanello@weil.com
        gregory.silbert@weil.com
        kelly.diblasi@weil.com
        jared.friedmann@weil.com
        gabriel.morgan@weil.com

*Attorneys for National Public Finance Guarantee Corporation*

**ARROYO & RIOS LAW OFFICES, P.S.C.**
PMB 688
1353 Ave. Luis Vigoreaux
Guaynabo, P.R. 00966
Tel.: 787-522-8080
Fax: 787-523-5696

_**s/ Moraima S. Ríos Robles**_
Moraima S. Ríos Robles
USDC-PR No. 224912
E-mail: mrios@arroyorioslaw.com
_**s/ Jessica A. Figueroa-Arce**_
Jessica A. Figueroa Arce
USDC-PR No. 225206
E-mail: jfigueroa@arroyorioslaw.com

_Attorneys for Whitebox Asymmetric Partners,
L.P., Whitebox Institutional Partners, L.P.,
Whitebox Multi-Strategy Partners, L.P.,
Pandora Select Partners, L.P., and Whitebox
Term Credit Fund I L.P._

**KASOWITZ BENSON TORRES LLP**
1633 Broadway
New York, NY 10019
Tel.: 212-506-1700
Fax: 212-506-1800

Kenneth R. David (_pro hac vice_)
E-mail: kdavid@kasowitz.com
Daniel A. Fliman (_pro hac vice_)
E-mail: dfliman@kasowitz.com
Ryan P. Montefusco (_pro hac forthcoming_)
E-mail: rmontefusco@kasowitz.com
Isaac S. Sasson (_pro hac vice_)
E-mail: isasson@kasowitz.com

_Attorneys for Whitebox Asymmetric Partners, L.P.,
Whitebox Institutional Partners, L.P., Whitebox
Multi-Strategy Partners, L.P., Pandora Select
Partners, L.P., and Whitebox Term Credit Fund I
L.P._

## ORDER

AND NOW, this _____ day of October, 2017, upon agreement of the parties it

is ORDERED that the foregoing is hereby approved.

_____
HON. JUDITH GAIL DEIN
United States Magistrate Judge

Case:17-00233-LTS Doc#:420 Filed:01/11/19 Entered:01/11/19 17:32:18 Desc: Main Document Page 11 of 51

## Exhibit A

**Statement of Facts of AAFAF, the Commonwealth of Puerto Rico, and COFINA**

<u>Statement of Facts – BNYM v. COFINA, Adv. Proc. 17-133-LTS</u>[1]

1.  Act 91-2006 was enacted into law on May 13, 2006 (as amended, the "COFINA Act")
    relating to the Puerto Rico Sales Tax Financing Corporation ("COFINA"[2]).  The
    COFINA Act provides that a portion of the total 11.5% sales and use tax (the "SUT") in
    the amount set forth in the COFINA Act, codified at 13 L.P.R.A. § 12(a), shall be
    deposited in the Dedicated Sales Tax Fund, maintained at Banco Popular (Account No.
    720118017), and established under the Sales Tax Revenue Bond Resolution, adopted by
    COFINA on July 13, 2007 (as amended and restated, and together with supplemental
    resolutions thereafter adopted, the "Resolution") that was entered into by COFINA, the
    owners from time to time of the bonds issued under the Resolution (the "COFINA
    Bonds"), and all other Beneficiaries (as defined in the Resolution).  The COFINA Act
    appears in P.R. Law Ann., tit. 13, §12.[3]

2.  COFINA is an "independent governmental instrumentality of the Commonwealth."
    COFINA Series 2007A Official Statement at 1.  The COFINA Act authorized COFINA
    to issue bonds.  P.R. Law Ann., tit. 13, § 11a(b).  Pursuant to the Resolution, COFINA
    issued series of COFINA Bonds.[4]

3.  On July 31, 2007, June 18, 2009, February 9, 2010, June 30, 2010, November 23, 2011,
    and December 13, 2011 the Secretary of Justice of the Commonwealth issued official
    opinions regarding the validity of the COFINA structure and the COFINA Bonds.
    Copies of the opinions are attached as Exhibits 1-6.

4.  The Resolution provides in Section 705 that "the Corporation is duly authorized under
    all applicable laws to create and issue the Bonds and to adopt the Resolution and to
    pledge the Pledged Property purported to be pledged by the Resolution in the manner

---

[1]  Inclusion of references to a portion of a document herein does not preclude any party from relying on any other
     portion of that document.  Further, nothing herein shall prejudice any party's rights with respect to any legal
     issue, including, but not limited to, whether or not a breach of the COFINA Resolution occurred.

[2]  In this Stipulation, "COFINA" shall mean the independent governmental instrumentality of the Commonwealth
     referenced in paragraph 2, the Board of Directors of COFINA, acting in its capacity as such, the officers of
     COFINA, acting in their capacity as such, and/or AAFAF to the extent that it is acting expressly on behalf of
     COFINA.

[3]  Nothing in this stipulation is intended or shall be construed as AAFAF's or the Commonwealth's taking a
     position on the validity of the COFINA structure in this or any other action.

[4]  COFINA issued the following series of COFINA Bonds: (i) Series 2007A in the amount of $2,667,603,572.60;
     (ii) Series 2007B in the amount of $1,333,101,779.90; (iii) Series 2007C in the amount of $499,996,627.90; (iv)
     Series 2008A in the amount of $737,046,992.35; (v) First Subordinate Series 2009A in the amount of
     $4,118,153,700; (vi) Senior Series 2009C in the amount of $237,875,000; (vii) First Subordinate Series 2009B
     in the amount of $1,217,915,799.20; (viii) First Subordinate Series 2010A in the amount of $1,823,757,271.30;
     (ix) First Subordinate Series 2010C in the amount of $1,619,404,596.60; (x) First Subordinate Series 2010D in
     the amount of $89,435,000; (xi) First Subordinate Series 2010E in the amount of $92,755,000; (xii) First
     Subordinate Series 2011A in the amount of $734,795,573.95; (xiii) First Subordinate Series 2011B in the
     amount of $45,620,000; (xiv) Senior Series 2011C in the amount of $1,006,474,702; and (xv) Senior Series
     2011D in the amount of $91,155,000.

and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever."

5. The Resolution provides in Section 706 that "Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation."

6. On January 18, 2017, AAFAF was designated by Act 2-2017 ("Act 2") to "renegotiate, restructure, and/or reach an agreement with creditors on all or part of the public debt or any other debt issued by any government entity[.]" Act 2-2017 (Jan. 18, 2017). AAFAF is a "public servant[] whose ultimate and most sacred duties are to the health, safety and welfare of the people of Puerto Rico, not to a single set of financial creditors." In the Title III cases, "[t]he Debtors (including COFINA) are governmental entities that are accountable to the citizens of Puerto Rico and bound by applicable law, not the interests of any one set of financially motivated constituents. And AAFAF does not have a profit motive or any basis to 'favor' one governmental entity over another." AAFAF's position in this regard has been set out in an informative motion filed by AAFAF in this adversary proceeding on June 2, 2017, a copy of which is attached hereto as Exhibit 7, and an informative motion filed in the Commonwealth's Title III case on June 24, 2017, a copy of which is attached hereto as Exhibit 8.

7. Act 2 designates AAFAF "as fiscal agent, financial advisor, and reporting agent of all entities of the Government of Puerto Rico," and as "the only entity of the Government of

Puerto Rico authorized to, on behalf of the Government of Puerto Rico or any component thereof, negotiate, restructure, and/or enter into Creditors' Agreements in connection with any debt of the Government, the public debt, debt instruments, any other present or future debt and/or agreement with the creditors of any of the components thereof[,]"including COFINA. AAFAF has conducted itself accordingly with respect to COFINA.

8. At no time did COFINA or AAFAF acting on behalf of COFINA make any statements or take any actions objecting to or opposing or seeking to prevent the passage of Act 2. Neither AAFAF nor COFINA admits that COFINA had an obligation to make statements or take action objecting to or opposing or seeking to prevent the passage of Act 2.

9. On or about March 10, 2017, AAFAF sent via email from Michael Williams of Kirkland & Ellis LLP to Andrew Rosenberg of Paul Weiss LLP, counsel to general obligation bondholders, a document entitled "Proposed Terms For Forbearance by Certain GO Bondholders." A true and correct copy of that document is attached hereto as Exhibit 9.

10. Pursuant to a letter dated January 18, 2017 (the "January 18 OB Letter"), a copy of which is attached hereto as Exhibit 10) from the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), the Government of Puerto Rico (the "Government") and AAFAF submitted a proposed fiscal plan to the Oversight Board on or about February 28, 2017, for approval and certification. The Oversight Board issued a further letter on March 9, 2017, regarding the proposed fiscal plan (a copy of which letter is attached hereto as Exhibit 11). The Government and AAFAF then submitted a revised proposed fiscal plan to the Oversight Board pursuant Act 2. The Oversight Board approved and certified that revised proposed plan, with certain "changes" (a word used solely for purposes of this Stipulation, as described in the footnote below), on March 13, 2017 (the "Fiscal Plan") (a copy of which is attached hereto as Exhibit 12). A corrected version of the Fiscal Plan (the "Corrected Fiscal Plan") was certified on April 18, 2017 (a copy of which is attached hereto as Exhibit 13).[5]

   a. At no time has COFINA, whether acting on its own or through AAFAF or any other agent, made any statements to AAFAF, the Commonwealth, or the Oversight Board (or any member thereof), or taken any action, objecting to or opposing the Fiscal Plan's treatment of the Pledged Sales Taxes or seeking to prevent the Oversight Board's certification of the Fiscal Plan.[6] Neither AAFAF nor COFINA admits that COFINA had an obligation or statutory authorization

---

[5] For purposes of this Stipulation, the terms "Fiscal Plan" and "Corrected Fiscal Plan" have the definitions provided in the text above, and the term "Revised Fiscal Plan" refers to the revisions certified by the Oversight Board on May 31, 2017 and attached to a June 2, 2017 letter from the Oversight Board to the Governor of Puerto Rico, the Speaker of the Senate of Puerto Rico, and the Speaker of the House of Representatives of Puerto Rico. This Stipulation does not reflect or address any changes in actual numbers, or in projections or forecasts, in any other documents or data compilations. Moreover, this Stipulation takes no position and makes no admissions in regard to whether the so-called "changes" in the Fiscal Plan, the Corrected Fiscal Plan, or the Revised Fiscal Plan regarding furloughs and pensions are amendments to and part of those plans or whether they were recommendations by the Oversight Board to the Governor. The stipulating parties reserve all rights with respect thereto.

[6] The term "Pledged Sales Taxes" is used herein as defined in the Resolution.

3

under applicable laws to make statements or take action objecting to or opposing the Fiscal Plan before it was submitted to the Oversight Board.[7]

b.  AAFAF did not present the Fiscal Plan to COFINA prior to certification by the Oversight Board on March 13, 2017.  Neither AAFAF nor COFINA admits that AAFAF had an obligation to do so under applicable laws.

c.  The Fiscal Plan "consolidates available cash resources that can be made available for debt service" under the Fiscal Plan, including the Dedicated Sales Taxes.

d.  In April 2017, Elias Sanchez, speaking in his capacity as the Governor's designee as ex officio member of the Oversight Board, stated that "[t]he Fiscal Plan is conceptualized in a way that all of the Government's revenues go into a single pool," as reported in *El Nuevo Día*, April 25, 2017 at p. 4 (a copy is attached hereto as Exhibit 14).  Under the Fiscal Plan, the Dedicated Sales Taxes are included in a "single pool" with the Government's other revenues covered by the Fiscal Plan.

e.  As set forth on page 6 of the Fiscal Plan, the Fiscal Plan does not include the revenues and expenses of the Puerto Rico Electric Power Authority, the Puerto Rico Aqueduct and Sewer Authority, the Children's Trust Fund, or the Puerto Rico Housing Finance Authority.

f.  In calculating "Cash flows post-Measures before Debt Service" of the Commonwealth and the entities covered by the Fiscal Plan, including COFINA, the Fiscal Plan includes the Dedicated Sales Taxes for the fiscal years covered by the Fiscal Plan.

g.  The Fiscal Plan does not provide any source of payment for debt service to public bonds other than "Cash flows post-Measures, before Debt Service."

h.  "Cash flows post-Measures, before Debt Service," provided in the Fiscal Plan is not sufficient to fully fund scheduled payments of principal and interest on COFINA's bonds for the fiscal years 2018, 2019, 2020, 2023, 2024, 2025, and 2026.

i.  Based on the projected level of revenue and expenses provided in the Fiscal Plan for fiscal years 2018, 2019, 2020, 2023, 2024, 2025, and 2026, some portion of the Pledged Sales Taxes is contemplated to pay the Fiscal Plan's projected expenses, and at least some portion of the Pledged Sales Taxes that would otherwise be used for COFINA debt service is contemplated to be used for purposes other than COFINA debt service.

j.  "Cash flows post-Measures, before Debt Service," provided in the Corrected Fiscal Plan is not sufficient to fully fund scheduled payments of principal and

---

[7]  See footnote 4 regarding the definition of "Fiscal Plan."

interest on COFINA's bonds for the fiscal years 2018, 2019, 2020, 2024, 2025, and 2026.

k.  Based on the projected level of revenue and expenses provided in the Corrected Fiscal Plan for fiscal years 2018, 2019, 2020, 2024, 2025, and 2026, some portion of the Pledged Sales Taxes is contemplated to pay the Corrected Fiscal Plan's projected expenses, and at least some portion of the Pledged Sales Taxes that would otherwise be used for COFINA debt service is contemplated to be used for purposes other than COFINA debt service

l.  The Fiscal Plan and the Corrected Fiscal Plan "as proposed do[] not presume cash flow for debt service for any particular bondholder constituency," including, but not limited to, any COFINA bondholders, and they do not determine "[t]he mechanisms by which projected cash flow available for debt service should be allocated to different debt instruments."

m.  The Pledged Sales Tax constitutes between 85.2% and 88.8% of the "Additional SUT" projections on page 11 of the Fiscal Plan for fiscal years 2017 through 2026.  The amounts and percentage in each year are shown in the table attached as Exhibit 15.

n.  The January 18 OB Letter provided the Government "with more detailed information on the specific goals and objectives that we believe ought to be incorporated into a viable fiscal plan that we may certify, as well as to provide the fiscal parameters for that plan."

o.  The January 18 OB Letter also communicated to the Government that the Oversight Board believed "the fiscal plan must target a structurally balanced budget by fiscal year 2019 and must articulate a clear path to achieving that goal, while simultaneously pursuing restoration of Puerto Rico's access to the capital markets."

p.  The January 18 OB Letter provided "Fiscal Plan Targets and Guidelines," including "1) revenue enhancements; 2) government right-sizing, efficiency and reduction; 3) reducing health care spending; 4) reducing higher education spending; and 5) pension reform[.]"

q.  The January 18 OB Letter summarized those "five principal areas" in a table that provided figures for "Total Baseline Revenues" and "Total Non-Debt Service Expenses," among other items.

r.  The January 18 OB Letter noted that "even with the immediate successful implementation of these measures the Implied Primary Surplus Available for Debt Service on fiscal year 2019—before taking into account any legacy deficits—is $0.8 billion, which represents only 21% of the contractual debt service of $3.9 billion for fiscal year 2019."

s.   AAFAF believes that it developed the proposed fiscal plans that it submitted to the Oversight Board in accordance with the "Total Baseline Revenues" as set forth in the January 18 OB Letter.

t.   Since January 18, 2017, every proposed fiscal plan that AAFAF submitted to the Oversight Board for certification by the Oversight Board included the Pledged Sales Taxes in the total Revenues before Measures.

u.   As of the date of this Stipulation, since January 18, 2017, AAFAF has not submitted to the Oversight Board for certification by the Oversight Board any fiscal plan that does not include the Pledged Sales Taxes in the total Revenues before Measures.

11. COFINA filed an Answer and Affirmative Defenses to Plaintiffs' Second Amended Complaint in the action captioned *Lex Claims LLC v. Garcia-Padilla,* No. 16-2374, on December 16, 2016 (a copy of COFINA's filing is attached hereto as Exhibit 16).  On the same date in the *Lex Claims* litigation, COFINA filed a Joinder in Notice and Motion to Stay Plaintiffs' Second Amended Complaint (a copy of COFINA's filing is attached hereto as Exhibit 17).

12. On or about March 17, 2017, AAFAF released a joint press release with the ad hoc group of general obligation bondholders (the "Joint Press Release") concerning the *Lex Claims* litigation (a copy of which is attached hereto as Exhibit 18).

a.   COFINA was made aware of the Joint Press Release before it was issued, no later than March 16, 2017.

b.   At no time did COFINA make any statements or take any action objecting to or opposing the Joint Press Release or seeking to prevent its issuance.  Neither AAFAF nor COFINA admits that COFINA had the obligation or statutory authorization to take make any such statement or take any such steps.

13. On or about April 28, 2017, AAFAF posted a settlement proposal on behalf of the Commonwealth for holders of COFINA Bonds and holders of general obligation bonds and bonds with a general obligation guarantee (the "April 28 Proposal") on Electronic Municipal Market Access ("EMMA").

a.   Prior to posting the April 28 Proposal on EMMA, the April 28 Proposal was shared with the ad hoc group of general obligation bondholders.  A substantively similar version of the April 28 Proposal was shared with counsel for the COFINA bondholders.

b.   The April 28 Proposal contemplated that Dedicated Sales Tax would be used to satisfy obligations of creditors other than COFINA Bondholders.

c.   COFINA was not aware of the April 28 Proposal before it was posted on EMMA. Neither AAFAF nor COFINA admits that AAFAF had an obligation under applicable law to inform COFINA of the April 28 Proposal.

d. At no time did COFINA make any statements to AAFAF, the Commonwealth, or the Oversight Board (or any member thereof), or take any action, objecting to or opposing the contents of the April 28 Proposal, or seeking to prevent its issuance. Neither AAFAF nor COFINA admits that COFINA had an obligation or statutory authorization under applicable law to make any such statements or take any such action.

e. On May 1, 2017, COFINA received a letter from Ambac Assurance Corporation, an insurer of bonds issued by COFINA (the "Ambac May 1 Letter"), stating that the April 28 Proposal constitutes an "overt breach of the covenants contained in the Enabling Act."

f. COFINA did not respond directly to the Ambac May 1 Letter except as set forth in paragraph 17 hereof.

14. Nixon Peabody LLP, on behalf of COFINA, attended the GO-COFINA mediation sessions on April 13, 17, 20, and 25, 2017.

15. On April 29, 2017, the Commonwealth of Puerto Rico enacted Act 26 of 2017 ("Act 26"). A certified English translation of Articles 4 and 6 of Act 26, produced by Juan E. Segarra, USCCI #06-067/translator, is attached as Exhibit 19.[8]

a. The Governor issued an explanatory statement (the "Explanatory Statement") accompanying Act 26. A copy of the Explanatory Statement is attached as Exhibit 20.

b. The first draft of the Explanatory Statement was prepared on April 28, 2017; the final draft was prepared on April 29, 2017.

c. The Explanatory Statement was signed by the Governor on April 29, 2017.

d. An English translation of the Explanatory Statement is attached as Exhibit 21.

e. The second paragraph of the Explanatory Statement addresses only Chapter VI of Act 26.

f. The third paragraph of the Explanatory Statement addresses only Chapter IV of Act 26.

g. At no time did COFINA make any statements to AAFAF, the Commonwealth, or the Oversight Board (or any member thereof), or take any action, objecting to or opposing Act 26's treatment of the Pledged Sales Tax, if any, or seeking to prevent the passage of Act 26. Neither AAFAF nor COFINA admits that

---

[8]  Parties may submit (or have already submitted) their own certified translation of Act 26 in this or other adversary proceedings or contested matters. Nothing herein shall bind any party to this certified translation of Act 26.

COFINA had an obligation or statutory authorization under applicable law to make any such statement or take any such action.

16. On May 1, 2017, The Bank of New York Mellon ("BNYM"), as Trustee for the COFINA bonds, sent a letter (the "BNYM May 1 Letter") to COFINA stating, among other things, that Act 26 "undermines the pledge of the Pledged Property to the Trustee." COFINA received the May 1 Letter. COFINA did not respond directly to the BNYM May 1 Letter except as set forth in paragraph 17 hereof.

17. On May 4, 2017, BNYM sent a notice of default (the "May 4 Default Notice") to COFINA concerning COFINA's compliance with section 705 of the Resolution and the Commonwealth's compliance with section 706 of the Resolution. COFINA received the May 4 Default Notice. On May 16, 2017, John Rapisardi of O'Melveny & Myers LLP, acting on behalf of AAFAF, sent a letter to BNYM responding to the May 4 Default Notice (the "May 16 Letter") (a copy of which is attached as Exhibit 22). Before the May 16 Letter, Suzzanne Uhland of O'Melveny & Myers LLP spoke by telephone to Eric Schaffer of Reed Smith LLP, counsel to BNYM, and conveyed substantially the same points made by Mr. Rapisardi in the May 16 Letter.

18. Prior to filing the COFINA Title III case, the Oversight Board issued a restructuring certification pursuant to PROMESA section 206(b) for COFINA. Prior to the issuance of that restructuring certification by the Oversight Board, the Governor of Puerto Rico, on behalf of COFINA and in coordination with AAFAF, advised the Oversight Board that "COFINA desire[d] to effect a plan to adjust its debts . . . to a sustainable level consistent with the Fiscal Plan." COFINA in fact desired to effect a plan to adjust its debts.

19. On May 5, 2017, a Title III petition was filed for COFINA.

   a. COFINA did not make any statements or take any action objecting to or opposing statements that "the Governor, in coordination with AAFAF, advise[d] the Oversight Board that COFINA desire[d] to effect a plan to adjust its debts and [thereby] request[ed] that the Oversight Board petition that COFINA enter into Title III of PROMESA for the purposes of adjusting COFINA's debts to a sustainable level consistent with the Fiscal Plan." Neither AAFAF nor COFINA admits that COFINA had the obligation or statutory authorization under applicable laws to make any such statements or take any such action.

   b. At no time did COFINA make any statements or take any action objecting to or opposing the Governor's request that the Oversight Board file a Title III petition on behalf of COFINA. Neither AAFAF nor COFINA admits that COFINA had an obligation or statutory authorization under applicable laws to make any such statements or take any such action.

   c. Prior to entry of the *Order Granting Interpleader, Staying Pending and Future Litigation Against the Bank of New York Mellon, as Trustee, Pursuant to 28 U.S.C. § 2361, and Granting Related Relief* (No. 17-133-LTS) [Dkt. No. 110] (the

"Interpleader Order"), COFINA was never unable to meet its debt obligations on a non-accelerated basis.

    d.    According to the projections underlying the Fiscal Plan, as reflected in the forecasts on the page labeled "Revenues Before Measures" of the Fiscal Plan, the Dedicated Sales Taxes projected for the years 2018 through 2026 will be sufficient to meet COFINA's debt obligations during those years.

20. No Board of Directors for any covered instrumentality that has filed a Title III petition has taken official action with respect to a request that the Oversight Board file the Title III petition for that instrumentality. Neither AAFAF nor COFINA admits that the Board of Directors of any such covered instrumentality, in its capacity as such, had the obligation or statutory authorization under applicable law to take action with regard to the Governor's request that the Oversight Board petition that such covered instrumentality enter into Title III of PROMESA.

21. Since May 30, 2017, the Trustee has held payments "in existing accounts on behalf of the party or parties ultimately determined by the Court to be entitled to the [funds]" pursuant to the Interpleader Order.

22. On July 31, 2017, AAFAF did not consent to the Trustee's making any future payments to COFINA bondholders while the interpleader is pending. *Joinder of the Puerto Rico Fiscal Agency and Financial Advisory Authority to the Response Of Financial Oversight and Management Board to COFINA Senior Bondholders' Coalition's Motion For Modification of Order Granting Interpleader and Reservation Of Rights* (No. 17-133-LTS) [Dkt. No. 299]

23. On June 10, 2017, the Oversight Board filed a Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute in the Commonwealth's Title III proceeding, which stated: "If there is no settlement or final adjudication as to the Commonwealth-COFINA Dispute by November 1, 2017, the Commonwealth will likely need to borrow funds from COFINA to fund the Commonwealth's operating budget." At the June 28, 2017 omnibus hearing in the Commonwealth's Title III proceeding, Judge Swain stated: "[I]n the event that [the Commonwealth] need[s] help or support from COFINA, the first step would be some, you know, borrowing from COFINA as opposed to an assertion of the right to permanently alienate from COFINA whatever the funds are that they feel are needed at that particular moment. And I see Mr. Bienenstock nodding, so I've got it mostly right, at least. So that, both the express message there and the urtext is that if this problem does need to be managed in context, it doesn't need a final decision overnight, because it would be set up as a loan." *See* ECF Nos. 303 (page 12, ¶ 31) in the Commonwealth's Title III proceeding, and the transcript of the June 28, 2017 omnibus hearing (page 53); *see also* ECF 450 (page 9, ¶ 15), and 718 (page 9, ¶ 34, revising the November 1, 2017 date to December 15, 2017) in the Commonwealth's Title III proceeding. True and correct copies of those documents are attached hereto as Exhibits 23-26, respectively.

24. The SUT collection rate for fiscal year 2016 was estimated at 67.9%.

25. Except to the extent otherwise stated in this Stipulation, COFINA did not oppose or take official action with respect to the following:

   a. the filing of the Title III petition on its behalf;

   b. the treatment of COFINA and/or the Dedicated Sales Taxes in the Fiscal Plan, the Corrected Fiscal Plan, the Revised Fiscal Plan, Act 26, or the April 28 Proposal; or

   c. the Oversight Board's certifications of the Fiscal Plan, the Corrected Fiscal Plan, or the Revised Fiscal Plan.

   Neither AAFAF nor COFINA admits that COFINA, as a covered instrumentality, in its capacity as such, had the obligation or statutory authorization under applicable law to make any such statements or take any such action with respect to the subject matter of this paragraph.

26. Except to the extent otherwise stated in this Stipulation, the Board of Directors of COFINA, in its capacity as such, did not formally meet regarding, or explicitly approve, or explicitly reject or challenge the Fiscal Plan, the Corrected Fiscal Plan, the Revised Fiscal Plan, the April 28, 2017 Proposal, Act 26, the Joint Press Release, or the filing of the COFINA Title III case on its behalf. Neither AAFAF nor COFINA admits that the COFINA Board of Directors, in its capacity as such, had the obligation or statutory authorization under applicable laws to formally meet regarding, or explicitly approve, or explicitly reject or challenge the Fiscal Plan, the Corrected Fiscal Plan, the Revised Fiscal Plan, the April 28, 2017 Proposal, Act 26, the Joint Press Release, or the filing of the COFINA Title III case on its behalf.

27. In the appendix to COFINA's Annual Financial Information and Operating Data Report, publicly filed on EMMA on May 1, 2017 (the "May 1 EMMA Filing"), COFINA stated that "[t]he Fiscal Plan, among other things, assumes that the Government will retain and use the revenues generated by the SUT, including the Pledged SUT, to cover its operating expenses rather than service the Corporation's issued and outstanding debt." In the same appendix, COFINA twice stated it "intends to continue to defend the lien established by the . . . Resolution as required thereby." A true and correct copy of the May 1 EMMA Filing is attached hereto as Exhibit 27.

28. Subject to the parties' reservation of rights in the first sentence of footnote 1 herein, the Commonwealth and AAFAF will not seek to introduce any evidence in Stage Two of the interpleader proceeding other than the facts set forth in this stipulation, including but not limited to facts or evidence related to alleged breaches of covenants in the Resolution, alleged cures of covenants in the Resolution, or Events of Default under the Resolution.

Case 17-00833-LTS Doc#:420-10 Filed:10/11/17 Entered:10/11/17 20:57:82 Desc:
Exhibit U Page 1 of 3

# EXHIBIT 1



COMMONWEALTH OF PUERTO RICO

*Departament of Justice*

ROBERTO J. SÁNCHEZ RAMOS
SECRETARY

July 31, 2007

Mr. Alfredo Salazar Conde
Chairman of the Board of Directors
Puerto Rico Sales Tax Financing Corporation
C/O Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Consulta Núm. 06-63-B

Dear Mr. Salazar Conde,

As per your request, and subject, of course, to what the Puerto Rico Supreme Court might eventually hold, I hereby issue my opinion that:

1.      The sales tax imposed by virtue of Act 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (as imposed from time to time by the Commonwealth of Puerto Rico (the "Commonwealth"), the "Commonwealth Sales Tax") has been validly imposed by law.

2.      Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act 291 of December 26, 2006 (collectively, "Act 91"), was validly enacted by the Commonwealth and, accordingly, the provisions regarding the deposit of present and future collections of the Dedicated Sales Tax in the Dedicated Sales Tax Fund, as provided for in Act 91, in consideration for the Puerto Rico Sales Tax Financing Corporation's (the "Corporation") commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation (the "Repayment Project"), are valid for the purposes stated in Act 91, insofar as they do not surrender the Commonwealth's taxation power.

P.O. Box 9020192, SAN JUAN, PR 00902-0192 Tel. (787) 721-2900 ext. 2100 Fax (787) 724-4770

CONFIDENTIAL

Consulta Núm. 06-63-B
Page 2

3. Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is transferred to the Corporation and said assets and funds of the Corporation shall not constitute available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

4. Subject to the power of the Legislative Assembly and the Executive Branch under the Constitution of the Commonwealth of Puerto Rico, and pursuant to Act 91, the Commonwealth has agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation: (i) to diligently enforce the Commonwealth Sales Tax to the extent of revenues described in Articles 2(a) and 4(e) of Act 91; (ii) to not limit or restrain the rights or powers validly conferred by Act 91 or the rights of the Corporation to comply with its obligations with its bondholders until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (iii) that no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

5. The Corporation is a valid independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Repayment Project, and to pledge the Dedicated Sales Tax to the repayment of such Bonds.

6. Act 91, as authority for the application of the Dedicated Sales Tax to the Repayment Project, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

Please do not hesitate to contact me if I can be of further assistance.

Cordially,

Roberto J. Sánchez Ramos

PR-INT-000010263

# EXHIBIT 2



COMMONWEALTH OF PUERTO RICO
## Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

Antonio M. Sagardía de Jesús
Secretary of Justice

Tel. (787) 723-4983
(787) 721-7771

June 18, 2009

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico  00940-2001

Attention:  Mr. Carlos M. García Rodríguez
            President and Chairman of the Board of Directors

Consulta Núm. 09-233-A

Dear Mr. García Rodríguez:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, First Subordinate Series 2009A and 2009B, and its Sales Tax Revenue Bonds, Senior Series 2009C, I hereby issue my opinion that:

    1.    Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

    2.    Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of

PR-INT-000011699

Consulta Núm. 09-233-A
Page 2

January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

3.     The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.     Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.     The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.     Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its

CONFIDENTIAL

Consulta Núm. 09-233-A
Page 3

power, through a change in law, to limit or restrict the character
or amount of such taxes and other receipts, or to substitute like
or comparable security in the form of taxes, fees, charges or
other receipts for deposit in the Dedicated Sales Tax Fund if,
for the ensuing fiscal years, the projected revenues certified by
the Secretary of the Treasury of such taxes, other receipts or
substituted collateral meet or exceed the debt service and other
charges and any coverage requirements set forth in the related
authorizing bond documents of the Corporation, (ii) the powers
conferred by Act 91, or (iii) the rights of the Corporation to
comply with its obligations with its bondholders, until such
time as such bonds, irrespective of their maturity, together with
the interest accrued, shall be completely paid and redeemed;
and (b) no amendment to Act 91 shall undermine any
obligation or commitment of the Corporation.

7.    The Corporation is a duly constituted and validly existing
      independent      governmental      instrumentality      of      the
      Commonwealth with the power to receive revenues produced
      by the Dedicated Sales Tax, to issue bonds for its corporate
      purposes, including the Permitted Uses, to adopt the Resolution
      under which its bonds are issued and to pledge the Dedicated
      Sales Tax to the repayment of such bonds.

8.    Act 91, as authority for the application of the Dedicated Sales
      Tax to the Permitted Uses, satisfies the requirements of
      Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the
Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Antonio M. Sagardía de Jesús

Case 17-00833-LTS Doc#:420-30 Filed:10/11/17 Entered:10/11/17 20:57:82 Desc:
Exhibit 3 Page 1 of 4

# EXHIBIT 3



COMMONWEALTH OF PUERTO RICO
**Departament of Justice**
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani                                     Tel. (787) 723-4983
Acting Secretary of Justice                                       (787) 721-7771

February 9, 2010

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention:   Mr. Carlos M. García Rodríguez
             President and Chairman of the Board of Directors

Consulta Núm. 10-175-A

Dear Mr. García Rodríguez:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax
Financing Corporation of $1,823,757,271.30 principal amount of its Sales Tax
Revenue Bonds, First Subordinate Series 2010A and $172,100,000.00 principal
amount of its Sales Tax Revenue Bonds, First Subordinate Series 2010B Bond
Anticipation Notes, I hereby issue my opinion that:

1.   Act No. 117 of the Legislative Assembly of Puerto Rico,
     approved July 4, 2006, was validly enacted by the
     Commonwealth of Puerto Rico (the "Commonwealth"), validly
     imposes the sales tax described therein (the "Sales Tax") and is
     in full force and effect.

2.   Act No. 91 of the Legislative Assembly of Puerto Rico,
     approved May 13, 2006, as amended by Act No. 291 of

CONFIDENTIAL                                                    PR-FOMB-000005935

Consulta Núm. 10-175-A
Page 2

    December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

3.  The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.  Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.  The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.  Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing

CONFIDENTIAL

PR-FOMB-000005936

Consulta Núm. 10-175-A
Page 3

shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

7.   The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

8.   Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

PR-FOMB-000005937

Case 17-00833-LTS Doc#:420-40 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit U Page 1 of 4

# EXHIBIT 4



COMMONWEALTH OF PUERTO RICO
## Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani                                    Tel. (787) 723-4983
Secretary of Justice                                                  (787) 721-7771

June 30, 2010

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention:    Mr. Carlos M. García Rodríguez
              President and Chairman of the Board of Directors

Consulta Núm. 10-336-A

Dear Mr. García Rodríguez:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax
Financing Corporation (the "Corporation") of $1,619,404,596.60 principal amount
of its Sales Tax Revenue Bonds, First Subordinate Series 2010C, $89,435,000
aggregate principal amount of its Sales Tax Revenue Bonds, First Subordinate
Series 2010D (Issuer Subsidy Build America Bonds) and $92,755,000 aggregate
principal amount of its Sales Tax Revenue Bonds, First Subordinate Series 2010E
(Issuer Subsidy Recovery Zone Economic Development Bonds), I hereby issue my
opinion that:

1.    Act No. 117 of the Legislative Assembly of Puerto Rico,
      approved July 4, 2006, as amended, was validly enacted by the
      Commonwealth of Puerto Rico (the "Commonwealth"), validly
      imposes the sales tax described therein (the "Sales Tax") and is
      in full force and effect.

CONFIDENTIAL                                        PR-FOMB-000008077

Consulta Núm. 10-336-A
Page 2

2.  Act No. 91 of the Legislative Assembly of Puerto Rico,
    approved May 13, 2006, as amended by Act No. 291 of
    December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of
    January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18
    of May 22, 2009 (collectively, "Act 91"), was validly enacted
    by the Commonwealth and is in full force and effect. Each of
    the statutes amending Act 91 was validly enacted by the
    Commonwealth and is in full force and effect.

3.  The provisions of Act 91 regarding the deposit of present and
    future collections of the portion of the Sales Tax described
    therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax
    Fund created under Act 91, in consideration for the
    commitment of the Corporation to make funds available to the
    Commonwealth to pay, or establish mechanisms to pay, all or
    part of the Commonwealth's debt and other obligations or
    expenses listed in Article 2(b) of Act 91 (the "Permitted
    Uses"), are valid.

4.  Pursuant to Act 91, the Dedicated Sales Tax Fund, including
    the right to receive collections of the Dedicated Sales Tax, is
    validly transferred to the Corporation.

5.  The Dedicated Sales Tax Fund, the funds on deposit therein and
    the Dedicated Sales Tax do not constitute available resources of
    the Commonwealth for purposes of Section 2 or Section 8 of
    Article VI of the Constitution of Puerto Rico, nor shall they be
    available for use by the Secretary of the Treasury of the
    Commonwealth.

6.  Pursuant to Act 91, the Commonwealth has validly agreed and
    promised to any person, firm or corporation or agency of the
    United States of America or of any state or of the
    Commonwealth of Puerto Rico that subscribes or acquires the
    bonds issued by the Corporation or that provides insurance or
    payment and liquidity sources that: (a) it will not limit or
    restrain (i) the rights or powers of the corresponding
    Commonwealth officials to impose, maintain and collect the
    taxes and other revenues to be deposited in the Dedicated Sales

CONFIDENTIAL

PR-FOMB-000008078

Consulta Núm. 10-336-A
Page 3

Tax Fund as provided in Act 91; provided that the foregoing
shall not preclude the Commonwealth from exercising its
power, through a change in law, to limit or restrict the character
or amount of such taxes and other receipts, or to substitute like
or comparable security in the form of taxes, fees, charges or
other receipts for deposit in the Dedicated Sales Tax Fund if,
for the ensuing fiscal years, the projected revenues certified by
the Secretary of the Treasury of such taxes, other receipts or
substituted collateral meet or exceed the debt service and other
charges and any coverage requirements set forth in the related
authorizing bond documents of the Corporation, (ii) the powers
conferred by Act 91, or (iii) the rights of the Corporation to
comply with its obligations with its bondholders, until such
time as such bonds, irrespective of their maturity, together with
the interest accrued, shall be completely paid and redeemed;
and (b) no amendment to Act 91 shall undermine any
obligation or commitment of the Corporation.

7. The Corporation is a duly constituted and validly existing
independent governmental instrumentality of the
Commonwealth with the power to receive revenues produced
by the Dedicated Sales Tax, to issue bonds for its corporate
purposes, including the Permitted Uses, to adopt the Resolution
under which its bonds are issued and to pledge the Dedicated
Sales Tax to the repayment of such bonds.

8. Act 91, as authority for the application of the Dedicated Sales
Tax to the Permitted Uses, satisfies the requirements of
Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the
Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

CONFIDENTIAL

PR-FOMB-000008079

Case 17-00833-LT5 Doc#450-20 Filed 04/12/19 Entered 04/12/19 20:57:82 Desc:
Exhibit 5 Page 37 of 507

# EXHIBIT 5



COMMONWEALTH OF PUERTO RICO
# Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

---

Guillermo A. Somoza Colombani
Secretary of Justice

Tel. (787) 723-4983
(787) 721-7771

November 23, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

      Attention:   Mr. Juan Carlos Batlle
                  President and Vice-Chairman of the Board

Inquiry No. 11-137-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, First Subordinate Series 2011A and Sales Tax Revenue Bonds, First Subordinate Series 2011B, I hereby issue my opinion that:

    1.    Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

    2.    Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

CONFIDENTIAL

3. The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4. Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5. The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6. Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

CONFIDENTIAL

Inquiry No. 11-137-B
Page 3

7.  The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

8.  Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

Case 17-00833-LTS Doc#:420-60 Filed:10/11/17 Entered:10/11/17 20:57:82 Desc:
Exhibit 6 Page 41 of 507

# EXHIBIT 6



COMMONWEALTH OF PUERTO RICO
## Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani
Secretary of Justice

Tel. (787) 723-4983
(787) 721-7771

December 13, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention: Mr. Juan Carlos Batlle
President and Vice-Chairman of the Board

Inquiry No. 11-145-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales Tax Revenue Bonds, Senior Series 2011D, I hereby issue my opinion that:

1. Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

2. Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

CONFIDENTIAL

3. The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4. Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5. The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6. Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

Inquiry No. 11-145-B
Page 3

7. The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

8. Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

PR-FOMB-000040148

# EXHIBIT 7

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3284 (LTS) |
| as representative of | |
| PUERTO RICO SALES TAX FINANCING<br>CORPORATION ("COFINA"), | |
| Debtor. | |
| THE BANK OF NEW YORK MELLON, as<br>Trustee, | Adversary No.: 17-133 (LTS) |
| Plaintiff, | |
| v. | |
| PUERTO RICO SALES TAX FINANCING<br>CORPORATION ("COFINA"); WHITEBOX<br>MULTI-STRATEGY PARTNERS, L.P.;<br>WHITEBOX ASYMMETRIC PARTNERS, L.P.;<br>WHITEBOX INSTITUTIONAL PARTNERS, L.P.;<br>PANDORA SELECT PARTNERS, L.P.; AMBAC<br>ASSURANCE CORPORATION; FRANKLIN<br>ADVISERS, INC.; and CEDE & CO., as nominee<br>for The Depository Trust Company, | |
| Defendants. | |

## RESPONSE OF THE PUERTO RICO FISCAL AGENCY AND FINANCIAL ADVISORY AUTHORITY TO INFORMATIVE CASE MANAGEMENT MOTIONS

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") files this *Response to Informative Case Management Motions* in response to informative motions filed in this matter. As noted by numerous parties, the critical issues here are legal and susceptible to

determination on dispositive motions without discovery. AAFAF agrees. Allegations about Puerto Rico's motivations in enacting statutes or promulgating the Fiscal Plan do not change the nature of the dispute here; the public acts, legislation and resolutions of Puerto Rico speak for themselves, and legal interpretations of the consequences of those materials are sufficient to determine whether defaults or Events of Default have occurred. For that reason, AAFAF respectfully requests that the Court enter the scheduling order attached as Exhibit A to the *Informative Motion of The Financial Oversight and Management Board Responding to Informative Motions Regarding Case Management* [D.I. 128].

To the extent that discovery is permitted after resolution of dispositive motions, it should be set on a schedule taking into account: (i) the nature of any remaining disputed material issues that need to be resolved; (ii) the nature of other then-ongoing litigation in the various Title III cases; (iii) the need for requested documents to be translated from Spanish to English so that counsel may review them prior to production for purposes of responsiveness and protection of privileges and other immunities from production; and (iv) the need for documents to be reviewed not only for attorney-client privileges but for governmental privileges that do not ordinarily apply in restructuring litigation but may exist in connection with this unique matter. With respect to depositions, the Court should ensure that any schedule permits sufficient time to make (a) appropriate accommodations for witnesses who wish to be deposed in Spanish; and (b) determinations as to whether requests to take the depositions of senior government officials have been submitted for purposes of harassment or other improper purposes.[1]

---

[1]    Although the issue need not be determined now, nothing in any party's submission justifies permitting the harassing tactics proposed by COFINA senior bondholders, who have leaked to the press that they intend to seek the expedited depositions of Puerto Rico's Governor and other senior public figures. *See Puerto Rico Sales Tax Creditors Want to Depose Officials Over 'Conflicts'*, Nick Brown, *Reuters*, June 1, 2017 (available at http://www.reuters.com/article/puertorico-debt-bankruptcy-idUSL1N1IY2JG).

*****

AAFAF is the governmental entity created by the Puerto Rico legislature to represent the Government of Puerto Rico in dealing with its creditors in all fiscal matters. On January 18, 2017, Governor Ricardo Rosselló signed into law Act 2-2017 (the "AAFAF Enabling Act"), which grants AAFAF authority to negotiate with creditors on behalf of the Government and its instrumentalities and ensure compliance with applicable fiscal plans and budgets under PROMESA.[2] The AAFAF Enabling Act grants AAFAF authority to act as "fiscal agent, financial advisor and reporting agent of all the entities of the Government of Puerto Rico [] to assist such entities in confronting the grave fiscal and economic emergency that Puerto Rico is currently experiencing." AAFAF Enabling Act § 5(a) (emphasis added). That act grants AAFAF the sole authority to "oversee all matters related to the restructuring, renegotiation or adjustment of any existing or future obligations, and the contingency plans for any existing or future obligations of the Government of Puerto Rico." *Id.* § 5(c). The AAFAF Enabling Act also provides that:

> AAFAF shall be the only entity of the Government of Puerto Rico authorized to renegotiate, restructure and/or enter into an Agreement with Creditors, on behalf of the Government of Puerto Rico or any of its components, relative to any Government debt, public debt, debt instruments, any other present or future debt and/or agreement with the creditors of any of its components.

*Id.* at § 8(q) (emphasis added). AAFAF's explicit power under Puerto Rico law to oversee and direct the course of any restructuring for any governmental entity is consistent with the Government of Puerto Rico's right to exercise its political and governmental powers. *See* PROMESA § 303.[3] In fact, further actions taken by Puerto Rico and AAFAF in accordance with

---

[2]  AAFAF is currently exercising its role on behalf of "Covered Territorial Entities" as designated by the Oversight Board under PROMESA. *See* PROMESA §§5(7), 101(d)(1).

[3]  AAFAF, of course, acknowledges the statutory role and powers of the Oversight Board as the Debtor's Representative in this Title III case and generally under PROMESA.

the certified Fiscal Plan are not only permitted but mandated to comply with PROMESA as well as the AAFAF Enabling Act.

Certain parties used their informative motions to raise insinuations about AAFAF's authority to represent COFINA in this proceeding. In doing so, they ignore fundamental provisions of both Puerto Rico law and PROMESA: put simply, AAFAF is the sole governmental entity under Puerto Rico law that has been charged to oversee all of Puerto Rico's entities in their respective restructurings and coordinate and cooperate on Puerto Rico's behalf on all matters with the Oversight Board. AAFAF Enabling Act at § 5(a). Only AAFAF has these powers under Puerto Rico law, and nothing under Puerto Rico law makes it a conflict for AAFAF to act on behalf of more than one territorial entity—or even permits any other entity to act on behalf of a territorial entity with respect to restructuring its debts. And, neither Puerto Rico law nor PROMESA gives any creditor the right to challenge AAFAF's capacity to act on behalf of COFINA or to assert an improper conflict of interest.

Both in the informative motions and in their comments before the Court, creditors appear to forget that all of these proceedings are title III cases, not corporate chapter 11 bankruptcies. The Debtors (including COFINA) are governmental entities that are accountable to the citizens of Puerto Rico and bound by applicable law, not the interests of any one set of financially motivated constituents. And AAFAF does not have a profit motive or any basis to "favor" one governmental entity over another.

AAFAF is made up of extraordinarily devoted public servants who are on the front line of addressing financial challenges unprecedented in American history. AAFAF's employees do not bill (or get paid) by the hour; they will not earn success fees or enhance their own bottom line— different from other parties here (but together with the Oversight Board's members), AAFAF

employees have no financial motives. Rather than face broadsides from parties seeking to advance their own parochial financial interests, AAFAF and its employees deserve respect and admiration for their unceasing efforts to fix Puerto Rico's problems and lead the Commonwealth and her people to a brighter future.

Dated: June 2, 2017
New York, New York

Respectfully submitted,

*/s/   John J. Rapisardi*

John J. Rapisardi
Suzzanne Uhland
Diana M. Perez
(*Pro Hac Vice Applications to be filed in Adversary Proceeding*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Tel: (212) 326-2000
Fax: (212) 326-2061

-and-

Peter Friedman
(*Pro Hac Vice Applications to be filed in Adversary proceeding*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Tel: (202) 383-5300
Fax: (202) 383-5414

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority on Behalf of COFINA*

*/s/ Andrés W. López*
Andrés W. López
USDC No. 215311

**THE LAW OFFICES OF ANDRÉS W. LÓPEZ, P.S.C.**
902 Fernández Juncos Ave.
San Juan, PR 00907

Tel: (787) 294-9508
Fax: (787) 294-9519

*Co-Attorney for the Puerto Rico Fiscal*
*Agency and Financial Advisory Authority on*
*Behalf of COFINA*

# EXHIBIT 8

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | PROMESA<br>Title III |
| THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO, | No. 17 BK 3283-LTS |
| as representative of | (Jointly Administered) |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | |
| Debtors.[1] | |

## AAFAF'S INFORMATIVE MOTION ON BEHALF OF THE DEBTOR ENTITIES REGARDING GOVERNANCE AND CONFLICT-OF-INTEREST ISSUES

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), as the entity authorized to act on behalf of the Debtor entities under the *Puerto Rico Fiscal Agency and Financial Advisory Authority Act*, Act 2-2017 (the "AAFAF Enabling Act"), respectfully submits this informative motion (the "Motion") to (i) apprise the Court of AAFAF's role and responsibilities in these proceedings and Puerto Rico's restructuring efforts generally, and (ii) correct certain misstatements by financial creditors' counsel at the May 17, 2017 hearing (the "May 17 Hearing") and in their objections to the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [D.I. 303] (the "Motion") concerning Puerto Rico public officials' fiduciary duties and AAFAF's ability to represent multiple Puerto Rico public corporations. Put simply, Puerto Rico's public officials and AAFAF are public

---

[1] The Debtors are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284) (Last Four Digits of Federal Tax ID: 8474).

servants whose ultimate and most sacred duties are to the health, safety and welfare of the people of Puerto Rico, not to a single set of financial creditors.

## Background on AAFAF

1.      AAFAF was created on April 6, 2016, pursuant to the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act 21-2016 (the "Moratorium Act") for the initial purpose of taking over the fiscal responsibilities of the Government Development Bank for Puerto Rico ("GDB").  At the time, GDB (which, unlike AAFAF, was a debt issuer) faced its own significant fiscal crisis and could not satisfy its debt service obligations.  *See* Moratorium Act, pt. II.A.  This fiscal crisis threatened GDB's ability to effectively carry out its duties as fiscal agent, financial advisor, and reporting agent of the Commonwealth and its agencies, instrumentalities, municipalities, and political subdivisions.  *See* 7 L.P.R.A. § 552(A).  To ensure that those essential government functions would be carried out unimpeded by the fiscal crisis, the Moratorium Act transferred GDB's duties as fiscal agent, financial advisor, and reporting agent to AAFAF.  *See* Moratorium Act § 602.  AAFAF was also granted the authority to "oversee all matters related to the restructuring or adjustment" of certain covered obligations, as designated by the Governor. *Id.* § 602(b).

2.      On June 30, 2016, Congress enacted the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA") to provide the Commonwealth with the tools necessary to address Puerto Rico's fiscal crisis and ensure future access to the capital markets. *See* PROMESA §§ 405(m)(6), 405(n).  Among other things, PROMESA provided the federal courts with authority to restructure the Commonwealth's debt obligations, and established an oversight mechanism to assist the Commonwealth in "reforming its fiscal governance and support the implementation of potential debt restructuring." *Id.* § 405(n).  Specifically, PROMESA section 101(b) established the Financial Oversight and Management Board for

2

Puerto Rico (the "Oversight Board"), which is tasked with certifying a fiscal plan, approving the Commonwealth's proposed budgets, filing Title III petitions on behalf of the Commonwealth and other covered entities, and acting as the debtor representative in the Title III proceeding. *See id.* §§ 201, 202, and 315.

3.　　On January 18, 2017, the Puerto Rico legislature enacted the AAFAF Enabling Act, which expanded AAFAF's authority and designated it as the **only** government entity authorized to renegotiate, restructure, and reach agreements with creditors in connection with public debt or any other debt issued by any government entity.　*See* AAFAF Enabling Act § 8(q). AAFAF was also granted authority to compel any governmental entity to take action to comply with the Fiscal Plan certified by the Oversight Board, and to take action on behalf of any government entity to ensure compliance.　*See id.* §§ 8(m) and (o).

4.　　Accordingly, AAFAF today acts on behalf of the Commonwealth and all of its related entities and instrumentalities in connection with devising and implementing (in conjunction with the Oversight Board) the strategies necessary to achieve PROMESA's dual goals of achieving fiscal responsibility and regaining access to the capital markets. *See* PROMESA § 101(a).　As a practical matter, this means that AAFAF has been authorized and empowered to negotiate with creditors and other parties-in-interest on behalf of the Commonwealth and public corporations such as COFINA to ensure that Puerto Rico's fiscal crisis is resolved in the public's best interest.

**Governance and Conflict Issues Related to the Debtors**

5.　　Certain creditor parties asserted at the May 17 Hearing and in their objections to the Motion that AAFAF is conflicted because it acts for both the Commonwealth and COFINA and has fiduciary duties to their creditors, who have diverging interests.　The creditor parties therefore contend that an independent fiduciary must be appointed to make fiscal, restructuring,

and settlement decisions on COFINA's behalf. As discussed below, however, that argument is premised on fiduciary principles applicable only to *private* corporations and ignores AAFAF's statutory mandate to engage with creditors in restructuring COFINA's debts.[2]

6. These Title III cases are not traditional corporate bankruptcies and neither AAFAF nor COFINA's directors have fiduciary duties to creditors. Their authority is derived from the people's sovereign power, and their duties are owed to the public, whose health, welfare, and safety must always be paramount, regardless of a public entity's solvency or insolvency. Creditors of public entities, by contrast, are merely contractual counterparties, whose rights are confined to the terms of the indentures and who are protected by the remedies provided under Puerto Rico or federal law. To the extent there is conflict between those contractual rights and the public good, public officials must make decisions based on sound public policy. Under no circumstances may private parties interfere with those decisions or take over the management of public entities, which must always be subject to oversight and accountability by the elected branches and the public. AAFAF therefore has no conflict of interest in these Title III cases because it must act at all times for the benefit of the public—not individual creditors—in accordance with its statutory and public policy mandate.

7. While this issue may be addressed in connection with specific requests for relief, the record must be clarified now given that certain parties have tried to create a cloud over AAFAF's ability to perform its statutory responsibilities. *See* AAFAF Enabling Act § 5(c). Indeed, AAFAF's ability to represent multiple public entities is critical to the success of these proceedings and to meeting PROMESA's goals.

---

[2]    Moreover, even if COFINA's directors have residual powers, they must be exercised on behalf of the public—not COFINA's creditors—because COFINA is a public entity engaged in the act of governing and disposing of public funds.

## I. Public Officials Owe Fiduciary Duties to the Public—Not Creditors.

8. Public officials generally have fiduciary duties to the public to serve with the highest fidelity and make decisions in the public's best interest.[3] Public officials do not, however, have fiduciary duties to government creditors (including bondholders), and may treat them as normal contractual counterparties[4]—including by breaching contractual obligations when the public interest requires. *See TM Park Ave. Assoc. v. Pataki*, 214 F.3d 344, 348-49 (2d Cir. 2000) ("The state, like any private party, must be able to breach contracts . . . .").[5]

9. There is no basis to depart from that rule here. There is no statute or regulation imposing on COFINA (or AAFAF acting on COFINA's behalf) fiduciary obligations to its creditors. And there is nothing in COFINA's enabling act (or AAFAF's) stating that it must prioritize creditor interests over the public interest when performing its statutory responsibilities. *See* 13 L.P.R.A. § 11a; *see also Fiscal Plan Compliance Act*, Law 26-2017 (enacted on April 29,

---

[3]  *See, e.g.*, *United States v. Nelson*, 712 F.3d 498, 509 (11th Cir. 2013) (holding that public official owed fiduciary duty to the public "to make governmental decisions in the public's best interest," even though the official was not paid for his work and worked only part time); *Gross v. Town of Cicero, Ill.*, 619 F.3d 697, 709 (7th Cir. 2010) (finding that "public officer occupies a fiduciary relationship to the political entity on whose behalf he serves"); *United States v. Kincaid-Chauncey*, 556 F.3d 923, 944 (9th Cir. 2009) ("A public official's duty to disclose material information need not be expressly imposed by statute or code because a public official inherently owes a fiduciary duty to the public to make governmental decisions in the public's best interest"); Kathleen Clark, *Do We Have Enough Ethics In Government Yet?: An Answer From Fiduciary Theory*, 1996 U. Ill. L. Rev. 57, *74 (1996) ("Numerous courts have recognized the fiduciary obligation of government employees, even in the absence of specific legislative or regulatory endorsements of such duties, and these courts have imposed fiduciary-like remedies in response to violations of the conflict and influence components of that obligation.").

[4]  *See Prime Healthcare Mgmt. v. Valley Health Sys. (In re Valley Health Sys.)*, 429 B.R. 692, 715 (Bankr. C.D. Cal. Apr. 8, 2010) (holding in Chapter 9 bankruptcy proceeding that directors of California health care district had no fiduciary duties to creditors because district was neither a chapter 11 debtor in possession nor an insolvent private corporation).

[5]  *See also Horwitz-Matthews, Inc. v. City of Chicago*, 78 F.3d 1248, 1250 (7th Cir. 1996) ("[W]hen a state repudiates a contract to which it is a party it is doing nothing different from what a private party does when the party repudiates a contract; it is committing a breach of contract."); *E & E Hauling, Inc. v. Forest Preserve Dist. of Du Page County, Ill.*, 613 F.2d 675, 679 (7th Cir. 1980) ("A state or its subdivision also may breach a contract and when it pays damages the obligation of the contract has also been dissolved.").

2017).[6] Nor have the other public corporations involved in Title III proceedings been assigned fiduciary duties to creditors. *See* 9 L.P.R.A. § 2002 (creating Puerto Rico Highways and Transportation Authority ("HTA") for purpose of "continuing the government's work to provide the people with the best roads and means of transportation"); 3 L.P.R.A. § 761 (establishing Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") and imposing on board of trustees fiduciary duties only to participating members and beneficiaries).

10.     COFINA and other public corporations therefore have the right and the obligation to negotiate with their creditors at arms' length and seek the best possible terms for the public, particularly given the scope of Puerto Rico's ongoing fiscal emergency.

11.     AAFAF, as the public corporations' authorized representative, has the same right and obligation, *see* AAFAF Enabling Act § 8(q), which it may exercise by renegotiating and restructuring the terms of their debt through these proceedings. When AAFAF acts on behalf of any public entity, it presents no conflict of interest because AAFAF owes a fiduciary duty only to the public, and it must act in the public's best interest at all times. In its fiduciary capacity, however, AAFAF need not take into account the best interest of creditors.

12.     The fact that Title III cases have been commenced does nothing to change that. PROMESA section 303 provides that (apart from certain provisions in Titles I and II that are inapplicable here) Title III does not "limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise

---

[6]     *See* 13 L.P.R.A. § 11a(b)(1) ("To pay or refinance, directly or indirectly, all or part of the extraconstitutional debt of the Commonwealth of Puerto Rico outstanding as of June 30, 2006, and the accrued interest thereon"); 11a(b)(7) ("to pay or finance operating expenses of the Government of the Commonwealth of Puerto Rico corresponding to fiscal years 2012-2013, 2013-2014, and 2014-2015").

6

of the political or governmental powers of the territory or territorial instrumentality."  As explained above, under applicable Puerto Rico law and as an exercise of political power, AAFAF has the sole ability to act on behalf of all Puerto Rico entities in connection with restructurings without any conflicts.  Title III does not limit or impair those powers in any way.

## II.    The Fiduciary Duties of Private Corporation Directors Are Irrelevant.

13.    Because there is no statutory basis in Puerto Rico for imposing on public officials a fiduciary duty to creditors, creditors seem to be relying on case law from other jurisdictions holding that directors of *private* corporations owe fiduciary duties to the corporation's creditors once the corporation is insolvent or in the "zone of insolvency."[7]  But the Puerto Rico courts have never recognized such a duty to creditors, let alone imposed it on directors of *public* corporations.  Nor would they for several reasons.

14.    First, the rationale in other jurisdictions for recognizing fiduciary duties to creditors of *private* corporations does not apply to *public* corporations.[8]  Directors of private corporations generally owe fiduciary duties only to the corporation and its stockholders—not creditors.[9]  Upon insolvency, however, some courts have held that the directors' fiduciary duties shift from shareholders to creditors because the creditors become the beneficiaries of any

---

[7]    *See, e.g.*, *Carrieri v. Jobs.com, Inc.*, 393 F.3d 508, 534 (5th Cir. 2004) ("Officers and directors that are aware that the corporation is insolvent, or within the 'zone of insolvency' as in this case, have expanded fiduciary duties to include the creditors of the corporation."); *In re Flutie N.Y. Corp.*, 310 B.R. 31, 57 (Bankr. S.D.N.Y. 2004) ("[A] director of a corporation that is in the zone or vicinity of insolvency, owes a fiduciary duty not only to [the corporation] and any shareholders, but also to its creditors."); *Technic Eng'g. Ltd. v. Basic Envirotech, Inc.*, 53 F. Supp. 2d 1007, 1011 (N.D. Ill. 1999) ("A corporate officer or director's duties change . . . if the corporation becomes insolvent" and they "occupy a fiduciary relation towards the creditors").

[8]    *See Katz v. Holzberg*, 2013 U.S. Dist. LEXIS 142989, at *13 (D.N.J. Oct. 2, 2013) (finding no legal basis to apply corporate law principles, such as veil piercing, to municipal entities).

[9]    *See, e.g., N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 99, 2007 Del. LEXIS 227, at *16-18 (Del. May 18, 2007) ("It is well established that the directors owe their fiduciary obligations to the corporation and its shareholders.").

residual value from the corporation's assets (as opposed to the shareholders when a corporation is solvent).[10] But unlike a private corporation, when a public corporation becomes insolvent there is no shift in beneficial ownership from shareholders to creditors that could justify an concomitant shift in fiduciary duties. The **public** remains the corporation's sole beneficiary at all times (regardless of its solvency), and its directors retain an unwavering duty to act in the public's best interest.

15.     Second, the most influential corporate-law jurisdictions no longer recognize a fiduciary duty to creditors even where a private corporation is insolvent. The Delaware Supreme Court's seminal decision in *Gheewalla*, 930 A.2d 92, is instructive. There, the court held that "[t]he creditors of a Delaware corporation that is either insolvent or in the zone of insolvency have no right, as a matter of law, to assert direct claims for breach of fiduciary duty against its directors." *Id.* at 103. The Court reasoned:

> Recognizing that directors of an insolvent corporation owe direct fiduciary duties to creditors, would create uncertainty for directors who have a fiduciary duty to exercise their business judgment in the best interest of the insolvent corporation. To recognize a new right for creditors to bring direct fiduciary claims against those directors would create a conflict between those directors' duty to maximize the value of the insolvent corporation for the benefit of all those having an interest in it, and the [hypothetical] newly recognized direct fiduciary duty to individual creditors. ***Directors of insolvent corporations must retain the freedom to engage in vigorous, good faith negotiations with individual creditors for the benefit of the corporation*.**"

*Id.* (emphasis added).

---

[10]     *See, e.g.*, *PCS Nitrogen, Inc. v. Ross Dev. Corp.*, 126 F. Supp. 3d 611, 622 (D.S.C. 2015) ("Several courts have summarized the economic reasoning behind the shift of fiduciary duty from shareholders to creditors upon corporate insolvency. When solvent, a corporation's creditors' rights are protected by the law of contract, whereas shareholders, as the residual owners of the corporation, bear the risk of officers' or directors' mismanagement and are thus owed a fiduciary duty. Upon insolvency, however, creditors displace shareholders as the residual owners of the corporation. Upon insolvency, then, creditors rather than shareholders bear the whole risk of mismanagement and are, therefore, owed the fiduciary duties formerly owed shareholders.") (collecting cases).

16. That logic applies with equal force to public corporations. Recognizing that directors of public corporations have fiduciary duties to creditors would create a conflict with their duty to act in the public's best interest. As with private corporations, directors of insolvent public corporations must retain the freedom to "engage in vigorous, good faith negotiations" with creditors if they are to strike the best possible deal *for the public*—as AAFAF intends to do here. Indeed, the public is depending on AAFAF to protect the public interest through the exercise of its statutory authority, whereas "creditors are afforded protection through contractual agreements, fraud and fraudulent conveyance law, implied covenants of good faith and fair dealing, bankruptcy law, general commercial law and other sources of creditor rights." *Id.* at 99.[11]

### **Oversight Board Responsibilities**

17. Certain parties asserted at the May 17 Hearing that the Oversight Board is a "trustee" of the Title III Cases, similar to a trustee under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").[12] This position is incorrect.

18. Although PROMESA section 301(c) (7) provides that the term "trustee"—when used in sections of the Bankruptcy Code made applicable to the Title III Cases under PROMESA—means the "Oversight Board," the concept of a chapter 11 trustee is not provided for in Title III of PROMESA. Under PROMESA section 315(b), the Oversight Board is the "representative of the debtor" in the Title III Cases, but its powers are limited to "action[s] necessary on behalf of the debtor to prosecute the case of the debtor," such as filing the petition,

---

[11]   Even if a corporate analogy were to apply here, all of the government debtors should be considered a single entity with a single set of residual beneficiaries (the public) and different creditor groups. While the creditors may have conflicting interests and agendas, the government entity would not.

[12]   For example, counsel to the COFINA Senior Bondholder Coalition stated that: "What PROMESA is essentially a Chapter 11 trustee case from the get go." May 17 Hr'g Tr. 65:13-14.

proposing a plan of adjustment, and otherwise submitting filings in the Title III Cases. PROMESA § 315(a).

19.     Unlike appointment of a chapter 11 Trustee, which divests a corporation's board of decision-making authority, the Oversight Board is ***expressly barred*** from taking control of the Debtors' governmental operations.  PROMESA section 303 provides that Title III "does not limit or impair the power of a covered territory to control, by legislation or otherwise, the territory or any territorial instrumentality thereof in the exercise of the political or governmental powers of the territory or territorial instrumentality, including expenditures for such exercise . . . ."  In addition, PROMESA section 301(a) does not incorporate Bankruptcy Code section 1108, which provides that a chapter 11 trustee "may operate the debtor's business."  As such, Title III of PROMESA expressly limits the Oversight Board's powers as compared with a chapter 11 trustee because the Oversight Board cannot interfere with the Debtors' governmental operations. Accordingly, the concept of a chapter 11 trustee is not provided for under Title III of PROMESA and the Oversight Board's role and responsibilities in these Title III Cases are distinctly different from those of a chapter 11 trustee under the Bankruptcy Code.

## Notice

20.     The Debtor entities have provided notice of this Motion to: (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims against each Debtor; (d) the Office of the United States Attorney for the District of Puerto Rico; (e) the Puerto Rico Department of Justice; (f) the Other Interested

Parties;[13] (g) counsel to the Oversight Board; and (h) all parties filing a notice of appearance in these Title III Cases. The Debtor entities submit that, in light of the nature of the relief requested, no other or further notice need be given.

### **Reservation of Rights**

21.     AAFAF, on behalf of the Debtor entities, files this Motion without prejudice to or waiver of its rights pursuant to PROMESA sections 303 and 305,[14] and does not by this Motion provide any consent otherwise required by PROMESA section 305.

WHEREFORE, AAFAF, on behalf of the Debtor entities, respectfully submits this Motion for informational purposes only and does not request the Court to enter related relief.

---

[13]   The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtors and (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors.

[14]   PROMESA section 305 provides:

LIMITATION ON JURISDICTION AND POWERS OF COURT.

Subject to the limitations set forth in titles I and II of this Act, notwithstanding any power of the court, unless the Oversight Board consents or the plan so provides, the court may not, by any stay, order, or decree, in the case or otherwise, interfere with—

(1) any of the political or governmental powers of the debtor;

(2) any of the property or revenues of the debtor; or

(3) the use or enjoyment by the debtor of any income producing property.

**RESPECTFULLY SUBMITTED.**

In San Juan Puerto Rico, this 24th day of June, 2017.

**I HEREBY CERTIFY**:  That on this same date, the foregoing has been electronically filed with the Clerk of the Court using the CM/ECF system, which will notify all counsel of record of such filing.

/s/ John J. Rapisardi

John J. Rapisardi
Suzzanne Uhland
Diana M. Perez
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
7 Times Square
New York, NY 10036
Tel:  (212) 326-2000
Fax:  (212) 326-2061

-and-

Peter Friedman
(Admitted *Pro Hac Vice*)
**O'MELVENY & MYERS LLP**
1625 Eye Street, NW
Washington, DC 20006
Tel:  (202) 383-5300
Fax:  (202) 383-5414

*Attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

/s/Andrés W. López

Andrés W. López
USDC No. 215311
**THE LAW OFFICES OF ANDRÉS W. LÓPEZ, P.S.C.**
902 Fernández Juncos Ave.
San Juan, PR 00907
Tel:  (787) 294-9508
Fax:  (787) 294-9519

*Co-Attorney for the Puerto Rico Fiscal Agency and Financial Advisory Authority*

# EXHIBIT 9

| From: | Portela Franco, Gerardo (AAFAF) |
| To: | Williams, Michael F.; 'Pedro Soto ⬛⬛⬛⬛⬛'; Fernandez Gonzalez, Blanca (AAFAF) |
| CC: | John Rapisardi; Montgomery, Claude D.; Alberts, Sam J.; Mondell, Dustin (dustin.mondell@rothschild.com); Snyder, Todd |
| Sent: | 3/10/2017 10:23:33 PM |
| Subject: | Re: PR - Rule 408 |
| Attachments: | 2017-03-10 PR-Lex Proposed GO Forbearance Terms.docx |

Thanks

Gerardo J. Portela Franco
Executive Director
Fiscal Agency & Financial Advisory Authority

On Fri, Mar 10, 2017 at 4:59 PM -0500, "Williams, Michael F." <mwilliams@kirkland.com> wrote:

Gerry -- For your reference, our email sending the proposal to the GO plaintiffs.  Thanks.

**MICHAEL F. WILLIAMS | KIRKLAND & ELLIS LLP**
655 15th Street, NW, Suite 1200 | Washington, DC 20005
1+202-879-5123 PH | http://www.kirkland.com/mwilliams

**From:** Williams, Michael F.
**Sent:** Friday, March 10, 2017 4:58 PM
**To:** '*arosenberg@paulweiss.com (arosenberg@paulweiss.com)'
**Cc:** Snyder, Todd; John Rapisardi; 'Montgomery, Claude D.'
**Subject:** PR - Rule 408

Andy -- Thanks for forwarding your indicative terms.  Please give us your thoughts on the attached.  Available to talk live if that is helpful.  Thanks.

**MICHAEL F. WILLIAMS | KIRKLAND & ELLIS LLP**
655 15th Street, NW, Suite 1200 | Washington, DC 20005
1+202-879-5123 PH | http://www.kirkland.com/mwilliams

The information contained in this communication is confidential, may be attorney-client privileged, may constitute inside information, and is intended only for the use of the addressee. It is the property of Kirkland & Ellis LLP or Kirkland & Ellis International LLP. Unauthorized use, disclosure or copying of this communication or any part thereof is strictly prohibited and may be unlawful. If you have received this communication in error, please notify us immediately by return email or by email to postmaster@kirkland.com, and destroy this communication and all copies thereof, including all attachments.

**Proposed Terms For Forbearance by Certain GO Bondholders**

I. Purpose of forbearance agreement

    A. The Government and certain GO bondholders have discussed a framework for achieving a stabilized negotiating environment for reaching a mutually satisfactory restructuring under Title VI of PROMESA of the total allowed outstanding principal amount of the GO bondholders and any additional monies that may be due and owing to the bondholders in connection with their constitutional and contractual rights and remedies. The Government's intent and desire is to achieve settlement with the GO bondholders within the context of Title VI of PROMESA, representing a conclusive and binding agreement on all participating parties.

II. Forbearance period and structure

    A. Forbearance of any litigation or other actions undertaken to enforce rights relating to principal or interest owed on GO Bonds.

    B. For a period of six months from the date of the execution of the forbearance agreement, which period may be further extended.

    C. The forbearance period would end early upon the occurrence of certain events TBD. For example, breaches of terms of the forbearance agreement, certain intervening events that would be prejudicial to GO Bondholders or Puerto Rico if the forbearance continues, etc.

III. Inducements to GO forbearing parties

    A. COFINA

        1. In the interest of consolidating all revenues to provide means of payment for debt service during the PROMESA Title VI process, and in accordance with the Law to Attend the Economic, Fiscal and Budget Crisis and Guarantee the Functioning of the Puerto Rico Government, submitted as House Bill 451 (as enacted on Jan. 23, 2017) (the "Fiscal Emergency Law"), the Government commits to active participation in support of a prompt and expeditious resolution of the constitutional issues that have been identified by the GOs.

        2. The Government commits to file a brief in the district court by March 20, 2017 requesting the prompt resolution of the constitutional issues in accordance with the Government priorities identified above, and the Government will not appeal the district court's decision that the PROMESA stay does not apply to the GO claims, though the Government

Error! Unknown document property name.

may, at the appropriate time, seek review or reconsideration of other statements presented by the district court in its ruling.

3.  The Government commits to review and advance the actions, whether executive, administrative, or legislative, necessary to achieve the consolidation of all revenues so as to make them available to all bondholders in accordance with their constitutional rights and contractual remedies during the Title VI negotiation process.

B.  Segregation and agreement concerning payment.

1.  The Government agrees to deposit into a segregated trust (the "Trust") an initial amount of approximately $146 million, representing the funds clawed back but not spent during 2016 pursuant to the Moratorium Law and which is currently on deposit with Banco Popular de Puerto Rico. The Trust funds will be held for subsequent distribution to GO bondholders in accordance with a subsequent agreement on the amount and treatment of such GO claims.

2.  The Government agrees to segregate and utilize a portion of future claw-back revenues as follows:

    (a)  The Government agrees to add $25 million of claw-back revenues to the Trust for segregation on behalf of the GO bondholders on the first day of each new quarter during Puerto Rico's fiscal year (the "Quarterly Transfer"). The first Quarterly Transfer will occur on April 1, 2017.

    (b)  The Government further agrees to increase the Quarterly Transfer to $50 million for each quarterly period after the date when the Government: (i) blocks SUT transfer from the joint GDB-COFINA Sales Tax Account at Banco Popular (the "Joint Account") to the Dedicated Sales Tax Fund at the Banco Popular trust department; and (ii) gains access to the funds held at the Joint Account.

IV.  Requirements for Implementation

A.  Approval of these terms represents sufficient agreement for the parties immediately to announce an agreement in principle concerning forbearance according to the period and structure stated in Section I above.

B.  The parties must reach approval of the terms in satisfaction of Section III:A by 6:00 p.m. AST on Sunday, March 12, 2017.

**Error! Unknown document property name.**

PR-INT-000019225

# EXHIBIT 10

**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
FOR PUERTO RICO**



*José B. Carrión III*
Chair

Members
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

**SENT VIA ELECTRONIC MAIL**

January 18, 2017

Honorable Ricardo A. Rosselló Nevares
Governor of Puerto Rico
La Fortaleza
PO Box 9020082
San Juan, PR 00902-0082

Dear Governor Rosselló Nevares:

Thank you for your letter of January 12, 2017 outlining the actions your Administration has taken in its first days in office and for Mr. Sánchez-Sifonte's January 4, 2017 letter in response to our letter of December 20, 2016. We appreciate the degree of alignment between your Administration's public policy platform and the policy guidelines outlined in our letter, as evidenced in your correspondence.

Thank you also for the opportunity to meet with you last Friday, January 13, in your office. As discussed at that meeting, the purpose of this letter is to provide you with more detailed information on the specific goals and objectives that we believe ought to be incorporated into a viable fiscal plan that we may certify, as well as to provide the fiscal parameters for that plan. We also would like to inform you of our preliminary determination regarding your request for an extension of both the time in which to submit the fiscal plan and the stay provided for under PROMESA.

As you are aware, and as we stated in our last letter, the Government of Puerto Rico faces a daunting fiscal challenge. The revised fiscal plan baseline released by the prior administration estimated that, unless significant fiscal and structural measures are implemented, the Government will have an **annual average fiscal gap of $7.0 billion** from fiscal year 2019 to fiscal year 2026.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 2

Verifying this number is a priority for us, and we understand it is an immediate priority for your Administration as well. In the coming days, we expect to complete the engagement of a forensic accounting firm to: (1) validate the bridge between the Commonwealth's last audited financial statements as of June 30, 2014 and the fiscal plan, and (2) provide an independent report on the total outstanding indebtedness for the Commonwealth by issuer, list of all debt issues by issuer, use of proceeds of each debt issuance, contractual debt service schedule and debt service currently in default.

Based on our review, however, we believe the $7.0 billion figure is a reasonable estimate for setting the fiscal plan's targets and guidelines and as a parameter to engage in Title VI negotiations with the Commonwealth's creditors.

## FISCAL PLAN TARGETS AND GUIDELINES

At the outset, we find it appropriate to remind you that at its November 18, 2016 public meeting here in Puerto Rico, the Oversight Board adopted and communicated publicly a set of five principles to evaluate the Government of Puerto Rico's proposed fiscal plan and to assess the degree to which the plan meets the 14 criteria established by PROMESA. This set of five principles adopted by the Oversight Board and the 14 criteria established by PROMESA regarding the elaboration of the fiscal plan are set forth in Schedule I to this letter.

We believe the fiscal plan must target a structurally **balanced budget by fiscal year 2019** and must articulate a clear path to achieving that goal, while simultaneously pursuing restoration of Puerto Rico's access to the capital markets. In accordance with PROMESA, the fiscal plan must ensure funding of essential government services, provide adequate funding for pension systems and provide capital expenditures and investments necessary to promote economic growth in Puerto Rico.

We expect that the fiscal plan will also contain aspirational goals for Puerto Rico and its people—such as returning the Island to a path of economic growth and bettering the lives of its people—as well as the reforms that you will be undertaking to achieve those goals.

With these guidelines in mind, and focusing on the objective of aligning recurring revenues and expenditures by fiscal year 2019, below we outline a path to achieve this goal with a mix of fiscal initiatives and structural reform proposals. Both components are equally important to foster growth: while fiscal initiatives optimize government revenue and expenditures to create a positive fiscal balance that attracts investment, structural reforms represent longer-term changes that ensure Puerto Rico will regain economic growth for decades to come.

That path requires action in at least five principal areas: 1) revenue enhancements; 2) government right-sizing, efficiency and reduction; 3) reducing health care spending; 4) reducing higher education spending; and 5) pension reform, as summarized in the following table.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 3

| $ in billions | FY 2019 Fiscal Gap | | |
|---|---|---|---|
| Total Baseline Revenues[1] | $15.4 | | |
| Total Non-Debt Service Expenses[2] | -19.1 | | |
| **Primary Balance before Debt Service and Measures** | **-3.7** | | |
| Contractual Debt Service | -3.9 | | |
| **Fiscal Gap** | **-7.6** | | |
| **Proposed Impact of Fiscal Measures** | | **Measures ($)** | **% change to Baseline[3]** |
| 1. Revenue Enhancements[4] | | +$1.5 | +15% |
| 2. Government Right-sizing, Efficiency and Reduction[5] | | +1.5 | -22% |
| 3. Reducing Health Care Spending[6] | | +1.0 | -28% |
| 4. Reducing Higher Education Spending | | +0.3 | -27% |
| 5. Pension Reform | | +0.2 | -10% |
| **Impact of Fiscal Measures[7]** | | **+$4.5** | |
| **Implied Primary Surplus after Measures Available for Debt Service[8]** | **$0.8** | | |

Notes:
1. Source is Government baseline released in December. Assumes GNP contraction of 16.2% in fiscal year 2018 and 1.2% in fiscal year 2019 in real terms. Includes $9.8 billion of non-federal revenue.
2. Includes $13.5 billion of non-federal expenditure.
3. % increase or decrease versus baseline forecasts for each area.
4. Includes Act 154 extension and review of tax regime for Act 154 companies, improve tax compliance and right-sizing of government fees and other sources of revenue.
5. Includes reducing non-essential government services through consolidation and headcount reduction, reducing total government compensation, right-sizing K-12 education expenditures to the current student population, eliminating subsidies to municipalities and private sector and introducing other efficiency measures. This target is net of impact from potential increased pension cost from government headcount reduction and social security expenditure for police and teachers not included in baseline projections.
6. Includes miSalud expenditures and other non-federal expenditures for healthcare related agencies.
7. Implies a 15% net revenue increase from baseline non-federal revenue of $9.8 billion and a 22% net expenditure reduction from baseline non-federal expenditure of $13.5 billion.
8. The implied primary surplus is based on aligning ongoing revenues and expenditures for fiscal year 2019. It does not reflect likely carry-in deficits and thus may overstate available resources in fiscal year 2019.

See Attachment A for more details.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 4

Please note that even with the immediate successful implementation of these measures the
**Implied Primary Surplus Available for Debt Service on fiscal year 2019—before taking
into account any legacy deficits**—is **$0.8 billion**, which represents only 21% of the contractual
debt service of $3.9 billion for fiscal year 2019.[1]

To be totally transparent and with the aim of certifying a fiscal plan as quickly as possible, we
lay out below in more detail the set of initiatives and accompanying revenue and savings targets
that we expect the Government's fiscal plan to incorporate in order **to achieve a structurally
balanced budget by fiscal year 2019,** which will accomplish PROMESA's objective of
balancing the Government's budget. The proposed initiatives also include, however, structural
reforms that will set up the Puerto Rican economy for long-term growth.

These recommendations are based on our collective experience with fiscal crises and analyses
conducted by our advisors. To be clear, presenting a plan that can achieve at least this level of
savings is a pre-requisite to certifying a fiscal plan. The Government may, however, determine to
employ other initiatives and make trade-offs that differ from those described below, but arrive at
a similar equilibrium.

## 1. Revenue Enhancements

To optimize revenue, the Government should make adjustments to the tax system, improve tax
administration and compliance, and right-size government fees, among other revenue
enhancement measures. The Government should design a tax regime that:

- Increases compliance through improved audit functions and systematically addresses
  leakage in the form of non-compliance and evasion.

- Widens the taxable base through a reduction in exemptions.

- Improves property tax collection through reappraisals and property registration efforts
  (and lowers municipal subsidies accordingly).

- Enhances tax administration through improved training and technology and reduced
  amnesties.

Together, we expect these initiatives to **increase government revenues by $1.5 billion
annually by fiscal year 2019**. This estimate incorporates your Administration's Act
154 extension and assumes a prospective review of the tax regime for Act 154
companies.

---

[1] In this letter, the Board takes no position on the outcome of the GO-COFINA dispute, and recognizes any
restructuring will have to reflect a consensual or judicial resolution of that dispute. Any certified fiscal plan will
contemplate fulfilling all of PROMESA's requirements, including those relating to essential services, pensions,
secured claims, and priorities. This letter is not intended to imply how funds will be allocated to satisfy those
requirements.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 5

## 2. Government Right-sizing, Efficiency and Reduction

Today, the Government directly provides and subsidizes many services, including security, transportation, and other activities that could be provided by the private sector. The Government has the opportunity to provide some services more efficiently and eliminate some services entirely, while maintaining an adequate level of essential services. Overall, we have estimated that government right-sizing, efficiency and reduction should generate approximately **$1.5 billion annually by fiscal year 2019**.

To realize these net savings, the Government should consider taking the following actions:

- Reducing non-personnel expenditure by at least 10% by re-negotiating large contracts, centralizing purchasing, and implementing other procurement best practices, such as clean sheeting and demand management, among others.
- Reducing payroll costs by approximately 30% by substantially eliminating positions and making other reductions to total public labor compensation, including consolidating and significantly reducing non-essential Government services.
- Eliminating municipal and private sector subsidies.
- Right-sizing K-12 education expenditures to the current student population.

From your executive orders declaring a fiscal emergency, imposing salary freezes, limiting the number of non-career personnel and other labor cost reductions and requiring agencies to build zero-based budgets, it appears that your administration shares this priority. Indeed, we would welcome further detail on the projected expenditure savings of your executive orders. Yet, we must be candid and stress that, to get closer to fiscal balance, a lot more will need to be done beyond the measures already adopted by your Administration.

## 3. Reducing Health Care Spending

MiSalud is a critical element of Puerto Rico's safety net and is fundamental to the stability of the health care delivery system. However, like other states and many businesses, the government of Puerto Rico has been challenged by rapidly rising health care costs that far outpace realistic revenue growth. The size of Puerto Rico's fiscal challenge, the loss of federal Medicaid funds and the fundamental imbalance between the growth in health spending and achievable revenue growth, makes significant reductions in health care spending necessary.

In fact, unless additional federal funding is provided after the expiration of funding under the Affordable Care Act, miSALUD will face a ballooning operating deficit expected to reach at least $1.0 billion in 2020. While the Oversight Board supports initiatives to seek additional federal healthcare funding, we do not believe that at this time it would be a prudent budgetary practice to include in the fiscal plan any such potential additional federal healthcare funding. Therefore, the Board believes the Government of Puerto Rico should include measures in the fiscal plan that would **generate annual savings in health care spending of $1.0 billion by fiscal year 2019**, such as implementing:

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 6

- A set of initiatives to increase efficiencies, which may include measures to reduce utilization / shift care to a lower cost setting, enhance fraud waste and abuse program, and optimize state-owned provider footprint.

- Additional significant cuts in coverage and benefits through miSALUD, and/or other health spending will be needed to yield additional savings.

## 4. Reducing Higher Education Spending

The University of Puerto Rico is one of the island's most important and revered assets, known for its high-quality programs and commitment to access for all students. However, there is an opportunity to increase tuition and reduce costs without compromising UPR's mission of providing equal access to all students or its quality of education.

The Government can **realize approximately $0.3 billion in annual savings** from reduced subsidies to UPR by:

- Moving to means-based tuition via higher per class credit prices, complemented by a more extensive use of federal government financial aid.

- Increasing the number of higher-paying international and mainland U.S. students, alumni gifts and federal grant funding.

- Right-sizing faculty and administrative staff, and reducing operating and maintenance costs.

## 5. Pension Reform

It is our goal that the Government pension plans become financially sustainable and that any pension reform protect the neediest and impose larger cuts on those with the largest benefits. Given the deep spending cuts and sacrifices required in all other areas of Government, we consider a reduction of approximately **10% in pension costs and related expenses may be necessary**, for savings of **$0.2 billion by fiscal year 2019**. The Oversight Board encourages a consensual approach to pension reforms which may involve new payment sources and mechanisms. We also propose the following actions:

- Enroll public safety and education employees in the Social Security system to provide them with diversified sources of retirement income.

- Segregate future contributions in accounts owned by employees to ensure employees' contributions will be available to pay their future retirement.

In addition to the five areas outlined above, it would be important for the fiscal plan to include measures to improve capital efficiency and other structural reforms, as described below.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 7

## Improving Capital Efficiency

There is a substantial opportunity to improve Puerto Rico's infrastructure. The World Economic Forum ranks the island's infrastructure quality below a 5.0, which puts it in the bottom third of jurisdictions reviewed, and below jurisdictions with a similar per capita income.

Additional investments to ensure that Puerto Rico's infrastructure catches up to the global median may be required and may be funded by one-time asset sales or similar means.

Specifically, we encourage the government to adopt the following measures:

- Increase focus on priority projects that directly support economic growth in Puerto Rico.

- Improve maintenance and delivery efficiency and optimize capital spending.

- Focus on using Public-Private Partnerships (P3s).

Two of your administration's new executive orders, establishing an infrastructure state of emergency to accelerate permitting and an interagency committee to coordinate the same, give us confidence you are prioritizing infrastructure development. Your letter announced you had introduced amendments to the P3 law to, among other things, allow private entities to propose P3 transactions and allow public employees' retirement systems to invest and participate in P3 agreements, which amendments were recently enacted. Clearly, we are aligned on placing a high priority on infrastructure. We look forward to working together to identify the best measures to achieve that shared goal.

## Structural Reforms

As mentioned earlier, a main objective of the fiscal plan is to create a pro-growth environment in Puerto Rico. In addition to the labor reform that your Administration has already proposed, we want to highlight two key structural reforms needed to accomplish this goal:

- Energy reform that catalyzes third party investment, accelerates the permitting process and right-sizes power supply to actual trends in power demand. [2]

- Improve ease of doing business in Puerto Rico by optimizing the permitting process and improving coordination with the federal government.

The measures listed above make up one ambitious but viable proposal. The Board welcomes the prospect of your Government's role in the development of a fiscal plan and remains prepared to certify a fiscal plan that it deems sustainable and workable according to PROMESA and the guidance described above. We also welcome the opportunity to work with your Administration

---

[2] The Board has reviewed, but has not taken a position on the PREPA restructuring support agreement (the "RSA"), in deference to your Administration's statement that it will promptly be providing its policy decisions concerning PREPA's business model, board of directors, and the RSA.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 8

to develop and implement the necessary reforms and the terms of the debt restructuring that will
allow Puerto Rico to achieve fiscal balance and regain access to credit markets at reasonable
interest rates. The Board is providing you with the fiscal framework, and within such framework
we expect that you and your Administration will make the public policy determinations
consistent with PROMESA.

## EXTENSION TO SUBMIT FISCAL PLAN

As described above, we welcome a collaborative approach with the Government in arriving at a
workable and sustainable fiscal plan the Board can certify. As per your request, the Board is
favorably inclined to extend the deadline for submitting your fiscal plan to the Board until
**February 28, 2017** such that the Board may certify the fiscal plan by no later than **March 15,
2017**. This extension will be formally considered at the Board's next public meeting later this
month and would be contingent upon the Government meeting and adhering to a set of
conditions and timelines, including:

- Your commitment to working towards a "once and done" approach that achieves
  structural balance, with no discussion or consideration of short-term liquidity loans or
  near-term financings that could restrict fiscal options.

- Development and implementation of a liquidity plan that addresses anticipated cash
  shortfalls at least through the duration of the stay in a manner that is acceptable to the
  Board by no later than January 30th including the Government's protocol for priority of
  payments and its public disclosure.

- Visibility on the cash position of the Government is critical, and to that end a 13-week
  rolling cash flow forecasting report for substantially all government budgets should be
  put in place and delivered to the Board within two weeks and weekly thereafter.

- To facilitate the forensic accounting review, the Government should deliver to the Board
  by January 25, 2017 a document detailing the bridge between the 2014 audited financial
  statements and the fiscal plan baseline scenario that includes details on all line items and
  assumptions.

- The Government will adhere to a schedule of important milestones (including the above)
  to be provided by the Board by January 23, 2017.

- The Government and the Board (and their advisors) will establish a clear joint working
  arrangement, information sharing protocol and work plan to be finalized by January 23,
  2017. (Our advisor McKinsey and AAFAF are already working on these.)

- Title VI negotiations conducted by your Administration will be in joint coordination with
  the Board and its advisors, including the participation of the Board and its advisors in all
  meeting with creditors. Likewise, the Board will invite your representatives and advisors
  to participate in any meetings with creditors the Board holds pursuant to its rights and
  duties under PROMESA.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 9

## EXTENSION OF THE STAY

Furthermore, as per your request, the Board is favorably inclined, in accordance with
PROMESA, to extend the PROMESA automatic stay until **May 1, 2017**. We understand that
extending the stay enables your Administration to develop a sustainable and workable fiscal plan
and engage in Title VI negotiations with creditors.[3] This extension will also be formally
considered at the Board's next public meeting later this month and would be contingent upon the
Government meeting and adhering to the set of conditions and timelines listed above.

## RESTRUCTURING PROCESS

Starting with meetings that occurred before you took office, we have advised all creditors
requesting meetings that the Board is in a "listen and learn" mode. Since you took office, we
have invited your representatives to every meeting. We have not made or responded to any
offers. To date, the meetings have been very constructive on that basis.

Now that you are in office, our intention is to support and collaborate with your Administration's
leadership in on-going restructuring conversations. Because PROMESA does not allow for any
restructurings not approved by the Board, we believe close coordination is the most efficient way
to conduct these conversations and to ensure negotiated agreements conform with the fiscal plan.
This means creditors will want to know the Board's position during negotiations so that any
agreement reached doesn't have to be later renegotiated.

Accordingly, the Board is willing to engage in these discussions alongside your representatives.
We believe we will deliver a better restructuring for Puerto Rico if we work together. To that
end, we would like to establish a clear timeline, and work plan for the Board, the Government
and their respective advisors by January 20th.

## PATH FORWARD

As implied above, we believe working together to develop a fiscal plan and a debt restructuring
process will provide us with the highest chances of successfully addressing Puerto Rico's fiscal
crisis. That said, nothing contained in this letter should be construed as waiving any right the
Oversight Board has, or limiting any action the Oversight Board might take, under PROMESA.

On the fiscal plan, we recommend that your Administration, as the duly-elected Government of
Puerto Rico, formulate the required policy decisions adhering to the guidance laid out above. To
facilitate the timely certification of the fiscal plan, we are providing you in Attachment B the
Board's guidelines as to the content and structure of the fiscal plan. The Board will use its own
financial model and assumptions (including macro-economic assumptions), and will work in
close coordination with your designated high-level taskforce. As per our December 20, 2016

---

[3] We are encouraged by your administration's swift efforts to renew negotiations with creditor constituencies which
began under the prior administration and did not result in a successful resolution of the differences among the
parties.

Governor Ricardo A. Rosselló Nevares
January 18, 2017
Page 10

letter, we await your formal designation of such high-level taskforce and your response to our recommendation that your Administration makes the fiscal plan and implementing the reforms and initiatives included in it a stated priority for all new appointees and Government employees.

We commend you on your sense of urgency, as we all agree that time is of the essence, and look forward to continuing our productive working relationship with you and your Administration.

José B. Carrión
Chair

Andrew G. Biggs
Carlos M. García
Arthur J. González
José R. González
Ana J. Matosantos
David A. Skeel, Jr.

C: Elías F. Sánchez-Sifonte

Attachments

SCHEDULE I



**FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO**

At its November 18, 2016 public meeting, the Financial Oversight and Management Board for Puerto Rico adopted the following principles to evaluate the Government of Puerto Rico's proposed fiscal plan and assess the degree to which the plan meets the 14 criteria established by PROMESA (see attachment). These five principles are:

Principle 1: The long-term fiscal plan must cover at least the next 10 fiscal years with meaningful progress in the next five and meet the standards set forth in the law (the 14 criteria). The fiscal plan should aim to meet the statutory criteria for the Board to be terminated within 10 years, which includes having adequate market access at reasonable rates and having at least four consecutive years of balanced budgets in accordance with modified accrual accounting standards.

Principle 2: The fiscal plan must work to stabilize the current economic situation, increase the economy's resilience, shore up public finances, support long-term, durable growth, meet basic needs of the citizenry, and restore opportunity for the people of Puerto Rico.

Principle 3: To properly establish an accurate assessment of the fiscal outlook, the base-case scenario within the fiscal plan must assume no additional federal support beyond that which is already established by law (e.g., no Affordable Care Act support extension) and no reliance on unsustainable Act 154 revenues in light of the expiration of said act. Initiatives included in the fiscal plan must be based on applicable laws or specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan.

Principle 4: The plan must include an appropriate mix of structural reform, fiscal adjustment, and debt restructuring. It must be informed by the relevant analytical tools (e.g., a debt sustainability analysis and a detailed economic projection) that assure the Board that the GPR is pursuing a comprehensive approach to address acute economic, budgetary, and demographic challenges.

Principle 5: The fiscal plan must be accompanied by relevant operational plans that show how the GPR will achieve the changes and reforms it proposes.

# PROMESA 14 CRITERIA FOR FISCAL PLANS

Section 201(b) of PROMESA identifies 14 specific components and objectives a fiscal plan
should address. In particular, PROMESA stipulates that the fiscal plan must provide a method to
achieve fiscal responsibility and access to the capital markets, in addition to the following:

1.  Provide for estimates of revenues and expenditures in conformance with agreed accounting
    standards and be based on (i) applicable laws; or (ii) specific bills that require enactment in
    order to reasonably achieve the projections of the fiscal plan;

2.  Ensure the funding of essential public services;

3.  Provide adequate funding for public pension systems;

4.  Provide for the elimination of structural deficits;

5.  For fiscal years in which a stay is not effective, provide for a debt burden that is sustainable;

6.  Improve fiscal governance, accountability, and internal controls;

7.  Enable the achievement of fiscal targets;

8.  Create independent forecasts of revenue for the period covered by the fiscal plan;

9.  Include a debt sustainability analysis;

10. Provide for capital expenditures and investments necessary to promote economic growth;

11. Adopt appropriate recommendations submitted by the Oversight Board;

12. Include such additional information as the Oversight Board deems necessary;

13. Ensure that assets, funds, or resources of a territorial instrumentality are not loaned to,
    transferred to, or otherwise used for the benefit of a covered territory or another covered
    territorial instrumentality of a covered territory, unless permitted; and

14. Respect the relative lawful priorities or lawful liens in the constitution, other laws, or
    agreements of a covered territory or covered territorial instrumentality in effect prior to the
    enactment of PROMESA.

## Attachment A

# Fiscal Initiatives Description and Sizing

■ Revenue area
■ Expenditure area

PRELIMINARY
NON-EXHAUSTIVE

| Initiative name | 2019 current baseline budget item (% of total) | Description | 2019 fiscal impact | % change to baseline |
|---|---|---|---|---|
| **Revenue Enhancements** | **$9.8B** (100%) | Bring taxes to appropriate levels and right price fees / special taxes:<br>• Act 154 extension and review of tax regime for Act 154 companies<br>• Improve tax compliance<br>• Right-size government fees and other sources of revenue (e.g. excise taxes and tolls) | ▪ $1.5B | ▪ 15% |

**Total non-federal revenue[1]**  $9.8B

| Right-size Gov't and Efficiency[3] | | | | | |
|---|---|---|---|---|---|
| | **Personnel** | ~$3.9B (29%) | • Reduce non-essential services through consolidation and headcount reduction<br>• Reduce total compensation | ▪ $0.9B[5] | ▪ ~(23%)[5] |
| | **Subsidies** | $0.4B (3%) | • Eliminate subsidies to municipalities upon revision of property tax regime and eliminate private subsidies to private sector | ▪ $0.4B | ▪ (100%) |
| | **Other operating expenditure** | ~$2.4B (18%) | • Centralize procurement to save at least 10% (average across categories) on goods and services | ▪ $0.2B | ▪ ~(10%) |

| **Reducing Health Care Spending** | **$3.6B[2]** (27%) | Address loss of federal ACA funding and reduce overall healthcare spend:<br>• Increase cost sharing, reduce utilization / shift care to lower cost setting, optimize procurement, address fraud, waste and abuse, and optimize state-owned provider footprint<br>• Additional cuts required in coverage and benefits through Mi Salud, and/or other health spend | ▪ $1.0B | ▪ (28%) |
|---|---|---|---|---|

| **Reducing Higher Education Spending** | **$1.0B** (7%) | Reduce government outlays to UPR by increasing revenue and reducing costs:<br>• Raise tuition and adopt means-based financial support<br>• Reduce operating costs by raising faculty- and admin-to-student ratios<br>• Implement additional initiatives, including increasing number of higher-paying international / mainland U.S. students, optimizing procurement, alumni gifts and federal grant funding | ▪ $0.3B | ▪ (27%) |
|---|---|---|---|---|

| **Pension Reform** | **$2.1B** (16%) | • Total pension costs to be reduced by 10% (can be done in a progressive way) | ▪ $0.2B | ▪ (10%) |
|---|---|---|---|---|

**Total non-federal expenditure[4]**  $13.5B

1 Excludes PREPA and PRASA and includes ($1.3B) assumed effect of economic contraction
2 Includes Mi Salud expenditure and other non-federal expenditures for healthcare-related agencies.
3 Baseline includes all other non-federal spend excluding PREPA, PRASA, healthcare and UPR spend categories (e.g., education, public safety).
4 Figure may be understated as it includes multiple public corporations and funds are shown 'net' (therefore may not reflect total revenue/expense baseline).
5 Net of impact from increased pension and social security expenditure due to personnel reductions not included in baseline projections

1

## Attachment B
# Fiscal Plan Table of Contents
(Subject to the appropriate allocation of responsibilities and resources between the Govt. of PR and the Oversight Board)

| | |
|---|---|
| **Overview** | ▪ Clarify objectives of the plan – to outline the guideposts for achieving fiscal health / return to capital markets and a detailed path to the aspiration for Puerto Rico |
| **Vision for PR** | ▪ Describe the aspirational vision for Puerto Rico in 5 and 10 years from now that provides a growing economic environment and improves the lives of people in Puerto Rico |
| **Outlook** | ▪ Present the baseline released in December 2016, as updated, including the bridge between 2014 audited financial statements and fiscal plan, and economic projections and assumptions |

| **Reform areas** | Overview | ▪ Outline fiscal balance targets and amount available for debt service |
|---|---|---|
| | Revenue enhancement | ▪ Adjustments to tax system, improve tax compliance and right-price fees |
| | Right-size gov't / efficiency | ▪ Reduce expenditures on public labor, procurement and subsidies |
| | Reducing healthcare spending | ▪ Reduce spend with efficiency initiatives and cuts in Mi Salud coverage benefits |
| | Reducing higher education spending | ▪ Increase tuition revenue, cut operating costs, and implement strategic initiatives |
| | Structural reforms | ▪ Introduce legislation to kick-start economic growth and improve quality of live |

| | |
|---|---|
| **Financial control reforms** | ▪ Define a timeline for providing audited statements<br>▪ Create visibility into Government's liquidity situation and take actions to ensure that funding remains available for critical services<br>▪ Create plans for improving financial oversight, controls, reporting, systems and processes |
| **Implementation** | ▪ Outline high-level plan for how Government will implement fiscal plan reforms<br>▪ Provide timelines for detailed implementation plans |
| **Long-term liabilities** | ▪ Describe proposed reforms for pensions, future obligations and expansion of social security<br>▪ Define principles for restructuring process and amount available for debt service, including debt sustainability analysis |
| **Appendices** | ▪ Assumption detail for:<br>  — Baseline projection (revenue, expenditure, debt obligations)<br>  — Fiscal plan (effect of measures on primary balance, economic growth, market access, interest rates, public debt) |

2

Case:17-00283-LTS Doc#:4720-10 Filed:10/14/17 Entered:10/14/17 20:54:32 Desc:
Exhibit 11 Page 1 of 6

# EXHIBIT 11



## FINANCIAL OVERSIGHT AND MANAGEMENT BOARD
## FOR PUERTO RICO

*Members*
*Andrew G. Biggs*
*Carlos M. García*
*Arthur J. González*
*José R. González*
*Ana J. Matosantos*
*David A. Skeel, Jr.*

*Ramón M. Ruiz-Comas*
Executive Director

*José B. Carrión III*
Chair

**SENT VIA ELECTRONIC MAIL**

March 9, 2017

Honorable Ricardo A. Rosselló Nevares
Governor of Puerto Rico
La Fortaleza
PO Box 9020082
San Juan, PR 00902-0082

Dear Governor Rosselló Nevares:

The Board has received the Government's proposed fiscal plan (the "Proposed Plan") and recognizes the many difficult decisions put forth to move Puerto Rico's financial condition in the right direction. Nonetheless, the Board has determined that the Proposed Plan does not comply with the requirements set forth in PROMESA.[1] Specifically, the Proposed Plan is based on unrealistic projections of economic growth, substantially underestimates spending, and reflects overly optimistic revenue projections. The Proposed Plan also fails to provide for the scale and timing of expenditure reduction required to achieve medium-term structural balance and near-term liquidity. As such, the Proposed Plan does not provide a path to restructuring debt and pension obligations to reach a sustainable level, and ensuring funding of essential services for the people of Puerto Rico. The Proposed Plan also does not provide the specificity of implementation detail required to fully evaluate the feasibility of most measures.

PROMESA provides the Government with a powerful tool to restore economic growth and opportunity to the people of Puerto Rico. Debt restructuring is necessary, but it alone is neither sufficient nor a sustainable solution. The scope of the Government's response to these fiscal challenges must be commensurate with the magnitude of the fiscal imbalance.

---

[1] For the reasons stated in this letter, the Board has determined the Proposed Plan does not provide a method to achieve fiscal responsibility and access to the capital markets because it does not satisfy adequately PROMESA § 201(b)(1)(B), (D), (E), (F), (G), and (I). Additionally, it does not provide sufficient data to determine whether it satisfies PROMESA § 201(b)(1)(M) and (N), although the Board understands compliance with those sections is dependent on future debt restructuring negotiations and other events. The Board's recommended revisions for the violations are also included in this letter.

Honorable Ricardo A. Rosselló Nevares
March 9, 2017
Page **2** of **5**

### *Baseline*

The Board has concluded that the revenue projections used by the Government to calculate structural deficits are overly optimistic in terms of: a) economic growth rates and the time to return to nominal economic growth; and, b) the failure to reflect near-certain declines in baseline revenues associated with corporate taxes and non-resident withholding taxes. In addition, based on the Ernst & Young analysis, the Board has concluded that the Government's FY17 expenditures could be understated by an amount ranging from $60 to $510 million, with a cumulative impact much greater over the next ten years. The Government's liquidity projection is further understated by $300 million in FY17.

The Board recommends that the FY17 General Fund Expenses ($8.3 billion per page 129 of the February 28th Proposed Plan) be increased by $585 million, based on recent historical expenditure trends. The impact of this adjustment over the next ten years is modeled in *Table 1* below.

*Table 1: Board guidance for adjustments to baseline expenditures on page 129 of the Proposed Plan*

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Expense reconciliation adjustment, $M** | (585) | (592) | (598) | (604) | (610) | (618) | (627) | (637) | (647) | (657) |

The Board recommends the following annual GNP and inflation rates included in *Table 2*:

*Table 2: Guidance on nominal annual GNP and inflation growth rates*

| | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| **PR Nominal GNP growth factor, %** | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% |
| **PR inflation rate factor, %** | (0.2%) | 1.2% | 1.0% | 1.0% | 1.1% | 1.3% | 1.5% | 1.5% | 1.6% | 1.6% |

### *Recommendations regarding revenues, subsidies and pensions*

The Board believes the Proposed Plan is headed in the right direction for the key reform areas of pensions, subsidy reductions (municipal, UPR, and private transfers), and improving tax compliance while committing to replacing and improving the corporate tax code. There are, however, a few areas where the Board requires corrections or supporting data, to reach certification:

- **Revenues:** The Board appreciates and supports efforts by the Government to continue to address tax non-compliance through improved audit and collections programs, particularly with regard to the sales and use tax and the income tax. The Board is concerned, however, that the aggressive pace of revenue enhancement included in the Proposed Plan is not supported by sufficient detail to justify these assumptions. The Board has concluded that a compliance uplift of around $150 million in FY18 and $300 million in FY19 is more achievable. The Board has also concluded that the rate of implementation for corporate tax reform as a replacement for Act 154 revenues is also too ambitious and that the revenues are overstated by at least $250 million in FY19. Moreover, as noted earlier, the Board believes the baseline growth assumptions in the

Honorable Ricardo A. Rosselló Nevares
March 9, 2017
Page **3** of **5**

Proposed Plan are too optimistic, which in turn results in unrealistic projections for the impact of these measures on future revenues. Puerto Rico has been in a steady state of economic decline for the past 10 years and there is insufficient economic evidence to suggest a turnaround in revenues at the level envisioned in the Proposed Plan.

- **Higher education.** The Board is supportive of the Governor's difficult decision to reduce subsidies to the University of Puerto Rico by $300 million in FY19. The magnitude of the Government's structural deficit, however, requires that this reduction in annual subsidy grow to a minimum of $450 million by FY21 as a result of: (1) application of measures to a growing expenditure baseline; and, (2) the phasing-in of additional measures related to tuition, other revenue enhancements, and operational improvements.

- **Pensions.** The Board agrees with the Government's proposal to shift active employees to a defined contribution system in which employee contributions would be segregated from funds used to pay benefits to current retirees, and employees would receive the full investment return on their accounts (versus currently receiving only 80 percent of investment returns in the ERS). The Board also supports the Government's proposal to reduce pension costs in a progressive way that protects the most vulnerable citizens. However these principles are inadequately implemented in the Proposed Plan. The Proposed Plan does not budget for the segregation of employee pension contributions. Unless contributions are immediately segregated, employees face the risk that their contributions will not be saved and invested to pay their future benefits. Additionally, the reductions in benefit costs proposed in the Proposed Plan are insufficient. Pension cost reductions substantially lower than the 10% benchmark set by the Board will shift an excessive amount of cost burdens to other stakeholders, including those who already are suffering from reductions in government outlays to health, education and other priorities. Benefit adjustments should be implemented in a manner that accounts for differences in Social Security coverage among different classes of Government employees. More detailed implementation plans for pension reforms are required, including provisions to ensure that the administrator chosen to manage employee accounts does so in a responsible way at the lowest possible cost to employees.

*Recommendations regarding healthcare and right-sizing*

There are two reform areas where the Proposed Plan needs significant improvement in terms of specificity, scale and timing, to achieve structural balance.

- **Healthcare reforms focused on "bending the cost curve".** While the Board supports efforts to curb fraud, waste and abuse in the Puerto Rican healthcare system, lasting and scaled reductions in healthcare expenditure on the Island require reforms focused on actually shifting care to lower cost sites, reducing unnecessary utilization of the health system and otherwise making the system more efficient. Further, in light of the fiscal cliff pending with the reduction in Affordable Care Act ("ACA") funding, the Government will need to implement further actions around cost-sharing and elimination of optional benefits. The Board suggests the Government include in its Proposed Plan interim

Honorable Ricardo A. Rosselló Nevares
March 9, 2017
Page **4** of 5

milestones to create targeted per member per month ("PMPM") ceilings to optimize government hospital traffic and a pathway to curb prescription drug costs. Further, while the Board would like to expand coverage on the Island, it does not believe the current fiscal situation allows for expansion of coverage during this period of fiscal crisis. Bottom line, the Government should achieve at least $100 million in annual expenditure reductions in healthcare in FY18; $300 million in FY19, and $750 million by FY21.

- **Government right-sizing that is sustainable in the short and long-term.** The Board agrees that employee benefits offered by public corporations should match those offered in other public agencies. However, the right-sizing measures are deficient in two dimensions: (1) there is a need for aggressive, emergency measures to reduce Government spending starting in FY18 (e.g., furloughs, greater reductions to Christmas bonuses, reduction of professional service fees and other contracts, and other measures outlined in the Board's March 8th letter); and (2) over the medium-term, the Proposed Plan lacks sufficient detail to demonstrate how consolidation and externalization measures will save sufficient funds in personnel and procurement expenses to close the structural deficit. Specifically, there need to be expenditure reductions in the legislative and executive branches of government, commensurate with those required of the executive branch, of at least 20%, as well as efforts to consolidate schools to align to the decline in student population. The Government will need to achieve personnel-related expenditure reductions of at least $550 million by FY18, $900 million by FY19, and $1.3 billion by FY21.

*Timing to reach fiscal balance*

Our review of the Proposed Plan leads us to the conclusion that the Government's structural reform measures will not achieve fiscal balance in two years. In order to achieve the right balance between mitigating the near-term economic crisis while also needing to rapidly address the near-term liquidity and debt sustainability needs of the Island, the Board has updated its guidance to recommend an additional year to achieve fiscal equilibrium. The Government needs to implement reforms to accomplish three objectives: (1) near-term liquidity; (2) medium-term structural balance; and (3) long-term economic recovery and growth.

*Structural Reforms*

The Board agrees with many of the structural reforms proposed by the Government to achieve long-term growth, particularly reforms to private labor and the Government permitting process. The levels of structural reforms laid out in the Proposed Plan are, however, insufficient to achieve the necessary rate of GNP growth. Specifically, the Government should strengthen its plans for lowering energy prices and improving labor force participation. Reforms should include, but not be limited to: reforming welfare and other public assistance programs to encourage work, removing anti-competitive regulations, reducing transaction costs associated with property registry, and creating a professional, technocratic government workforce. The Commonwealth must provide additional detail on the implementation and sequencing of each of its proposed measures.

Honorable Ricardo A. Rosselló Nevares
March 9, 2017
Page **5** of **5**

The Board appreciates the focus in the Proposed Plan on delivering the Government's capital projects more efficiently, including even greater utilization of public-private partnerships (P3s). When successfully executed, innovative procurement approaches can reduce costs, accelerate delivery and introduce new technologies. As the Government builds out a more specific project pipeline, it is critical that objective criteria be established that include projected return on investment or benefit/cost ratio as a foundational element for each investment. The Government should also continue to focus on building overall capital procurement and delivery capabilities (not just for P3 projects). In addition, while executive actions related to accelerated permitting are encouraging, the Government will need to build management systems (supported by adequate information technology) to drive faster decisions, focus on the way agencies coordinate with each other on the front lines, and develop project and program-level performance metrics related to approval speeds.

**Conclusion**

The Board recognizes the difficulties implicit in these policy decisions, as well as the long path to return Puerto Rico to fiscal stability. Reaching this goal will take time, enormous effort and the full commitment of Puerto Rico's political leadership, but done properly and in a sustained manner it will put Puerto Rico on the path to a better future. The Board specifies 9:00am AST on Saturday, March 11th as the deadline for submitting a revised, proposed fiscal plan.

Sincerely,

José B. Carrión
Chair

Andrew G. Biggs
Carlos M. García
Arthur J. González
José R. González
Ana J. Matosantos
David A. Skeel, Jr.

CC: Elías F. Sánchez-Sifontes

Case:17-00188-LTS Doc#:4/20-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX-12 Page 1 of 58

# EXHIBIT 12

Case: 17-00133-LTS Doc#: 4720-12 Filed: 10/14/17 Entered: 10/14/17 20:57:32 Desc:
Exhibit 12 Page 2 of 38



## GOVERNMENT OF PUERTO RICO

Puerto Rico Fiscal Agency and Financial
Advisory Authority

# FISCAL PLAN FOR PUERTO RICO

San Juan, Puerto Rico

March 13, 2017



# Disclaimer

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government instrumentalities the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties. The Government has had to rely upon preliminary information and unaudited financials for 2015 and 2016, in addition to the inherent complexities that are part of a government in transition, especially after a prolonged period of public finance obscurity. As such, AAFAF and the Government have made certain assumptions that may materially change once more clarity and transparency takes hold, especially after the Government issues the past due audited financials for 2015 and 2016 later this year.

The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.



## Table of Contents

I.     Introduction

II.    Financial Projections

III.   Fiscal Reform Measures

IV.    Structural Reforms

V.     Debt Sustainability Analysis

VI.    TSA Liquidity

VII.   Financial Control Reform

# I. INTRODUCTION



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00133-LTS Doc#:4720-12 Filed:01/11/19 Entered:01/11/19 20:57:32 Desc:
Exhibit DX-12 Page 95 of 507
Exhibit 12 Page 85 of 550

## What the Government's Proposed Fiscal Plan Seeks to Achieve

**Closing the Projected Baseline Fiscal Plan Deficit**

- At the direction of the Oversight Board, the Government's new administration has prepared this Fiscal Plan which supersedes the prior administration's December 2016 fiscal plan that was rejected by the Board. From the date the new administration took office, AAFAF and its advisors have earnestly worked in cooperation with the Board's input to put forth a credible and reliable Fiscal Plan that will guide Puerto Rico's fiscal and economic recovery
- **The Fiscal Plan commits to fiscal responsibility and implements specific revenue enhancements and targeted expenditure reductions to return Puerto Rico to fiscal stability and economic growth.** In particular, the Fiscal Plan averts the $67bn fiscal deficit from the prior administration's plan and achieves +$7.9bn in cumulative cash flow available for debt service through the 10 year period

**Further Improvement**

- The Government fully appreciates that despite fiscal and economic uncertainties, now is the time to set the benchmark for the needed fiscal and economic measures as outlined in the Fiscal Plan. The Government is demonstrating its commitment to correcting the mistakes of the past. The Government is also mindful that in stopping the cycle of deficit spending, it must do so without undermining economic recovery or endangering the health, welfare or safety of the 3.5 million US citizens living in Puerto Rico

**Bondholder Negotiations and Consensus**

- Per PROMESA Section 2.01(b)(1)(I), the fiscal plan must provide a debt sustainability analysis. The Government's Fiscal Plan consolidates available cash resources that can be made available for debt service payments. The Fiscal Plan as proposed does not presume cash flow for debt service for any particular bondholder constituency, including clawed back cash and special revenues, nor does it take a position with respect to asserted constitutional or contractual rights and remedies, validity of any bond structure, or the dedication or application of tax streams / available resources
- The Government believes that any fiscal plan should reflect commitment to develop and implement operational and structural improvements that demonstrate the Government's willingness to achieve maximum payment of its debt obligations as restructured. However, in achieving debt sustainability, Puerto Rico's bondholders will be called upon to share in the sacrifice needed for a feasible debt restructuring. **The Government believes communication, grounded in fiscal responsibility, can create the opportunity for maximum consensus among stakeholders and pave the way for Puerto Rico's long-term fiscal stability and economic growth**



Case:17-03283-LTS Doc#:4720-12 Filed:01/11/19 Entered:01/11/19 20:57:32 Desc:
Exhibit 12 Page 96 of 550

## What the Fiscal Plan does not determine

**Major Entities Impacted by the Fiscal Plan**

- The Fiscal Plan is for the Government as a covered entity under PROMESA. The Government's various taxes, fees and other revenues are used to fund, subsidize or guarantee payments of the debt of many covered entities by various means. Accordingly, this Fiscal Plan does provide for payment of expenses and capital investments in, among other covered entities: (1) Public Building Authority, (2) PR Sales Tax Financing Corporation ("COFINA"), (3) PR Highways and Transportation Authority ("HTA"), (4) PR Convention Center District Authority ("PRCCDA"), (5) PR Infrastructure Finance Authority ("PRIFA"), (6) Employees' Retirement System ("ERS"), (7) University of Puerto Rico ("UPR"), (8) Puerto Rico Industrial Development Company ("PRIDCO"), and (9) Government Development Bank ("GDB")

**Major Entities Not Covered by the Fiscal Plan**

- There are four entities whose revenues and expenses are not included in this Fiscal Plan: (1) Puerto Rico Electric Power Authority ("PREPA"), (2) Puerto Rico Aqueduct and Sewer Authority ("PRASA"), (3) The Children's Trust Fund and (4) Puerto Rico Housing Finance Authority ("PRHFA"). As a result, this Fiscal Plan does not take a position with respect to these entities' financial prospects or the debt sustainability of such entities

**Legal & contractual issues not determined by the Fiscal Plan**

The Fiscal Plan does not attempt to resolve, among others, the following issues:

- The mechanisms by which projected cash flow available for debt service should be allocated to different debt instruments

- What is an essential service for purposes of the exercise of the Government's police power

- The scope, timing or specific use of revenues to be frozen or redirected as 'claw back' revenue

- The value, validity and /or perfection of pledges

- Whether any particular bond or debt issuance may have been improvidently issued

- What the Government is permitted to accomplish through the increase or decrease of dedicated taxes, fees, tolls or other revenue sources



Case:17-00188-LTS Doc#:4720-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 12 Page 8 of 39

# II. FINANCIAL PROJECTIONS



# The Government will undertake fiscal measures that will reduce the fiscal gap by $39.6B, and create a 10 year cash flow surplus of $7.9B

- Based on the currently stated debt obligations, the 10-year budget gap is expected to reach $66.9B
    - ~$35.1B of expected principal and interest payments during the forecast period

- The Fiscal Plan estimates cash flows available for debt service. The chart below shows the key components of the forecast, including:
    - Base fiscal gap of $66.9B which includes full cost of debt service and does not include the impact of revenue and expense measures
    - Revenue and expense measures of $13.90B and $25.7B[1]
        - Revenue Measures: stabilizing corporate tax revenue through tax reform positively affects cash flows by $7.9B
        - Expense Measures: $19.2B of $25.1 (76%) due to Government right-sizing initiatives[2]



($MM)

Accumulated ACA funding loss of $16.1B

+39,580

7,873

35,158

-31,708

13,897

25,683

-66,865

| Base Financial Cash Flows | Debt Service | Cash Flow pre-Measures | Revenue Measures | Expense Measures | Cash Flows Post Measures Excluding Debt Service |



---

[1] See Section III, Fiscal Reform Measures for full detail
[2] See Section II (B)

8

## The current fiscal plan is a significant departure from the version presented in October, as it commits to higher revenue and expense measures of $4.4B and $16.4B, respectively

- The October proposed Fiscal Plan estimated negative cumulative cash flows pre-debt service over the projection period ('17-'26) of ($4.9B) vs. the Current Fiscal Plan projections estimating positive cumulative cash flows pre-debt service of $7.92B. The change is comprised primarily of:

  – Negative net impact on cash flows available for debt service, pre-Measures of -$8.0B

    • Decrease in total revenues of $1.7B

    • Decreased expenses of $6.3B

  – Enhanced revenue measures of $4.4B

  – Additional savings from Expense Measures of $16.4B



**($MM)**

| October Fiscal Plan cum. Cash Flows pre Debt Service | Changes to Revenue Baseline | Changes to Expenses Baseline | Revenue Measures | Expense Measures | Cash Flows Post Measures Excluding Debt Service |
|---|---|---|---|---|---|
| -4,947 | 1,658 | 6,301 | 4,352 | 16,427 | 7,873 |



## A summary of financials for the 10-year projection period shows positive cash flows post-measures, before debt service of $7.9B

### ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | *(2.2%)* | *(2.8%)* | *(2.4%)* | *(0.5%)* | *(0.4%)* | *0.3%* | *1.0%* | *1.6%* | *2.1%* | *2.6%* | |
| Revenues before Measures [1] | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Noninterest Exp. before Measures [1] | ($17,872) | ($18,981) | ($19,233) | ($19,512) | ($19,950) | ($20,477) | ($20,884) | ($21,310) | ($21,973) | ($22,316) | ($202,507) |
| **Cash flows pre-Measures** | **$1,080** | **($1,470)** | **($2,826)** | **($3,077)** | **($3,456)** | **($3,886)** | **($4,139)** | **($4,357)** | **($4,769)** | **($4,807)** | **($31,708)** |
| **Measures** | | | | | | | | | | | |
| Revenue measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| Expense measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683 |
| **Net impact of measures** | **--** | **1,875** | **3,393** | **3,799** | **4,515** | **4,789** | **4,995** | **5,108** | **5,491** | **5,615** | **39,580** |
| **Cash flows post-Measures, before Debt Service** | **$1,080** | **$404** | **$567** | **$722** | **$1,059** | **$903** | **$857** | **$751** | **$722** | **$808** | **$7,873** |

Cash flows post-measures, before debt service trends:

▪ FY 2017 estimate of $0.8B, declining to a low of $0.4B in FY 2018, driven by GNP contraction and ERS Paygo contributions of $1.0B in FY 2018

▪ Forecast peaks at $1.1B in FY 2021 before declining to $0.8B by FY 2026. Decline is primarily driven by Affordable Care Act ("ACA") funding expiration that increase steadily from ~$0.9B in FY 2018 to ~$2.4B in FY 2026

▪ Expense measures include $1.3B in supplier payment pay downs through the projection period



1 Full details in Appendix
2 This addback is illustrative, and is not reflected in the amounts available for debt service elsewhere in this Plan

# Revenues before measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% | |
| **Revenues** | | | | | | | | | | | |
| General Fund Revenues: | | | | | | | | | | | |
| Individual Income Taxes | $1,811.0 | $1,760 | $1,718 | $1,709 | $1,703 | $1,708 | $1,725 | $1,752 | $1,789 | $1,836 | $17,511 |
| Corporate Income Taxes | $1,515.0 | 1,473 | 1,437 | 1,430 | 1,424 | 1,429 | 1,443 | 1,466 | 1,497 | 1,536 | 14,649 |
| Non-Resident Withholdings | $685.0 | 666 | 650 | 647 | 644 | 646 | 652 | 663 | 677 | 694 | 6,624 |
| Alcoholic Beverages | $268.0 | 260 | 254 | 253 | 252 | 253 | 255 | 259 | 265 | 272 | 2,591 |
| Cigarettes | $112.0 | 109 | 106 | 106 | 105 | 106 | 107 | 108 | 111 | 114 | 1,083 |
| Motor Vehicles | $330.0 | 321 | 313 | 311 | 310 | 311 | 314 | 319 | 326 | 335 | 3,191 |
| Excises on Off-Shore Shipment Rum | $172.0 | 173 | 175 | 176 | 178 | 179 | 180 | 182 | 183 | 184 | 1,782 |
| Other General Fund Revenue | 506.0 | 386 | 377 | 375 | 373 | 374 | 378 | 384 | 392 | 402 | 3,948 |
| **Total** | **5,399** | **5,148** | **5,030** | **5,007** | **4,989** | **5,005** | **5,055** | **5,134** | **5,239** | **5,372** | **51,379** |
| General Fund Portion of SUT (10.5%) | 1,718 | 1,655 | 1,596 | 1,553 | 1,511 | 1,484 | 1,472 | 1,474 | 1,487 | 1,512 | 15,463 |
| Net Act 154 | 2,075 | 1,556 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 11,931 |
| **General Fund Revenue** | **$9,192** | **$8,360** | **$7,664** | **$7,598** | **$7,538** | **$7,527** | **$7,565** | **$7,646** | **$7,764** | **$7,921** | **$78,773** |
| Additional SUT (COFINA, FAM & Cine) | 850 | 877 | 906 | 936 | 968 | 1,003 | 1,039 | 1,078 | 1,118 | 1,161 | 9,936 |
| Other Tax Revenues | 1,337 | 1,396 | 1,401 | 1,411 | 1,423 | 1,429 | 1,436 | 1,445 | 1,455 | 1,466.6 | 14,199 |
| Other Non-Tax Revenues | 579 | 576 | 582 | 594 | 622 | 630 | 635 | 642 | 649 | 665.8 | 6,174 |
| **Adj. Revenue before Measures** | **$11,958** | **$11,208** | **$10,552** | **$10,539** | **$10,550** | **$10,588** | **$10,675** | **$10,810** | **$10,986** | **$11,215** | **$109,082** |
| Federal Transfers | 6,994 | 7,168 | 7,372 | 7,477 | 7,623 | 7,835 | 8,023 | 8,212 | 8,469 | 8,675 | 77,847 |
| Loss of Affordable Care Act ("ACA") Funding | -- | (865) | (1,516) | (1,582) | (1,680) | (1,833) | (1,953) | (2,069) | (2,251) | (2,382) | (16,130) |
| **Revenues before Measures** | **$18,952** | **$17,511** | **$16,407** | **$16,434** | **$16,494** | **$16,590** | **$16,746** | **$16,953** | **$17,204** | **$17,509** | **$170,799** |



# Non-interest expenses before measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses** | | | | | | | | | | | |
| General Fund Expenditures: | | | | | | | | | | | |
| Direct Payroll | ($3,271) | ($3,309) | ($3,342) | ($3,375) | ($3,413) | ($3,458) | ($3,509) | ($3,563) | ($3,619) | ($3,675) | ($34,532) |
| Direct Operational Expenses | (907) | (918) | (926) | (936) | (946) | (959) | (973) | (988) | (1,003) | (1,019) | (9,574) |
| Utilities | (260) | (332) | (352) | (360) | (373) | (372) | (369) | (374) | (387) | (395.5) | (3,575) |
| Special Appropriations | (3,890) | (4,037) | (4,068) | (4,068) | (4,209) | (4,140) | (4,143) | (4,136) | (4,250) | (4,147) | (41,087) |
| **General Fund Expenses** | **(8,329)** | **(8,596)** | **(8,688)** | **(8,738)** | **(8,941)** | **(8,929)** | **(8,993)** | **(9,060)** | **(9,259)** | **(9,236)** | **(88,768)** |
| Other: | | | | | | | | | | | |
| Paygo Contributions in Excess of Asset Balance | -- | (989) | (1,014) | (985) | (964) | (1,151) | (1,177) | (1,217) | (1,251) | (1,278) | (10,026) |
| Run-Rate Capital Expenditures | (283) | (400) | (407) | (415) | (422) | (429) | (437) | (445) | (453) | (462) | (4,154) |
| **Total other** | **(283)** | **(1,389)** | **(1,421)** | **(1,400)** | **(1,386)** | **(1,581)** | **(1,614)** | **(1,662)** | **(1,704)** | **(1,739)** | **(14,180)** |
| Component Units, Non-GF Funds and Ent. Funds: | | | | | | | | | | | |
| Net Deficit of Special Revenue Funds | (110) | (130) | (146) | (154) | (162) | (169) | (173) | (176) | (176) | (174) | (1,571) |
| Independently Forecasted Non-Enterprise CUs | (452) | (380) | (433) | (558) | (639) | (752) | (859) | (963) | (1,109) | (1,210) | (7,356) |
| HTA Operational Expenses | (246) | (234) | (236) | (238) | (239) | (243) | (246) | (250) | (254) | (258) | (2,444) |
| Other | (44) | (41) | (30) | (30) | (30) | (31) | (31) | (32) | (32) | (33) | (335) |
| **Total** | **(853)** | **(785)** | **(845)** | **(980)** | **(1,071)** | **(1,194)** | **(1,310)** | **(1,420)** | **(1,572)** | **(1,675)** | **(11,705)** |
| Disbur. of Tax Revenues to Entities Outside Plan | (335) | (302) | (304) | (307) | (313) | (314) | (316) | (319) | (322) | (334) | (3,168) |
| **Adj. Expenses before Measures** | **($9,800)** | **($11,071)** | **($11,259)** | **($11,425)** | **($11,712)** | **($12,018)** | **($12,234)** | **($12,461)** | **($12,857)** | **($12,984)** | **($117,822)** |
| Federal Programs | (6,994) | (7,168) | (7,372) | (7,477) | (7,623) | (7,835) | (8,023) | (8,212) | (8,469) | (8,675) | (77,847) |
| Reconciliation Adjustment | (585) | (592) | (598) | (604) | (610) | (618) | (627) | (637) | (647) | (657) | (6,175) |
| Other non-recurring | (493) | (150) | (5) | (5) | (5) | (5) | -- | -- | -- | -- | (663) |
| AP paydown | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- | -- |
| **Total** | **(8,072)** | **(7,910)** | **(7,975)** | **(8,086)** | **(8,238)** | **(8,458)** | **(8,650)** | **(8,849)** | **(9,116)** | **(9,332)** | **(84,685)** |
| **Noninterest Exp. before Measures** | **($17,872)** | **($18,981)** | **($19,233)** | **($19,512)** | **($19,950)** | **($20,477)** | **($20,884)** | **($21,310)** | **($21,973)** | **($22,316)** | **($202,507)** |



## Assumptions and Methodology: Expenses (1/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2016 Growth Methodology |
|----------|-------------|----------|----------|-------------------------------|
| **1** Direct Payroll | • Payroll and Operational Expenses<br>• Education Payroll<br>• Police Payroll | -3,271 | -3,675 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **2** Direct Operational Expenses | • Legislature<br>• Department of Education<br>• Other Agencies | -907 | -1,019 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **3** Utilities | • Power and Water<br>• PBA Operating Subsidy (Rent)<br>• Insurance Premiums | -260 | -396 | • PBA Operating Subsidy maintains<br>• Power and water have initial increase due to subsidy reduction with steady year-over-year growth until 2026 |
| **4** Special Appropriations | • UPR<br>• Judicial and Municipalities<br>• Retirement Systems<br>• Health Insurance | -3,890 | -4,147 | • UPR, Judicial and Municipalities increase in 2018, maintain steady-state following initial growth |
| **5** Paygo Contributions in Excess of Asset Balance | • Required Pay-go contribution: ERS, TRS and JRS | 0 | -1,278 | • Paygo program for ERS, TRS and JRS is initiated in 2018 with initial expenses of $989MM<br>• Steady growth in expenses starting in 2020 |
| **6** Run-Rate Capital Expenditures | • Non-Growth Capital Expenditures in the Base (Run-Rate)<br>• Growth Capex | 284 | -462 | • Initial increase in 2018 to $400MM and steady growth in following years based on previous year multiplied by PR Inflation following |

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: Exhibit DX 12 Page 104 of 507
Case:17-00133-LTS Doc#:4739-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc: Exhibit DX 12 Page 104 of 507

## Assumptions and Methodology: Expenses (2/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2026 Growth Methodology |
|---|---|---|---|---|
| **7** Reconciliation Adjustment | • Reconciliation Adjustment | -585 | -657 | • Initial increase in 2018 to $592MM with steady increase until 2026<br>• Reconciliation adjustment based on midrange estimate provided by E&Y analysis and audit |
| **8** Other Non-Recurring | • Payment of Past-Due Tax Refunds<br>• Transition and restructuring costs | -493 | 0 | • Initial decline in tax refunds in 2018 from $493MM to $150MM, decline in 2019 from $150MM to $5MM, and elimination of non-recurring expenses in 2023<br>• Costs to implement restructuring ($370MM over 10 years) |
| **9** Component Units | • Net Deficit of Special Revenue Funds<br>• Independently forecasted non-enterprise<br>• HTA Operational Expenses | -853 | -1,675 | • Net Deficit of Special Revenue Funds growth is based on previous year multiplied by PR Inflation<br>• Non-enterprise expenses include ASEM, ASES, ADEA, PRCCDA, PRIDCO, PRITA, Tourism, and UPR deficits<br>• PBA and the Port Authority run a surplus in 2017 that transitions towards deficit beginning in 2018<br>• Initial HTA decline in expenses due to a reduction in Past Due AP costs |



FINANCIAL PROJECTIONS

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 12 Page 105 of 507
Case:17-00133-LTS Doc#:4759-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX 12 Page 105 of 507

# Assumptions and Methodology: Macroeconomic factors



| Category | Description, % | 2017 – 2026 Growth Methodology |
|---|---|---|
| **1** PR Nominal GNP Growth Factor | -2.2, -2.8, -2.4, -0.5, -0.4, 0.3, 1.0, 1.6, 2.1, 2.6 | • Initial decrease to 97.2% in 2019<br>• Increase in 2020 to 99.5%<br>• Steady, minimal growth until 2026 |
| **2** PR Inflation | -0.2, 1.2, 1.0, 1.0, 1.1, 1.3, 1.5, 1.5, 1.6, 1.6 | • Initial negative inflation of -0.2% in 2017 increasing to 1.2% in 2018, 1.0% in 2019 with steady, minimal growth in Inflation until 2026 |
| **3** PR Population Growth Factor | -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2 | • Maintenance of 2017 PR Population Growth Factor of 99.8% |
| **4** US Population Growth | 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.7, 0.7, 0.7 | • Maintenance of 2017 US Population Growth of 100.8% until 2024, where it drops to 100.7% |



Case:17-00133-LTS Doc#:4730-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 12 Page 106 of 507

# III. FISCAL REFORM MEASURES



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: Exhibit DX-U Page 107 of 507
Case:17-03283-LTS Doc#:420-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc: Exhibit 12 Page 18 of 38

# Fiscal Reform measures reduce the 10-year financing gap by $39.6B

**Estimated Impact,** $MM

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-year Total |
|---|---|---|---|---|---|---|---|---|---|---|
| A Revenue Enhancement | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| B Government Right-sizing | 851 | 1,713 | 2,094 | 2,414 | 2,543 | 2,597 | 2,651 | 2,706 | 2,758 | 20,329 |
| C Reducing Healthcare Spending | 100 | 299 | 500 | 750 | 795 | 842 | 892 | 945 | 1,001 | 6,123 |
| D Pension Reform | 0 | 0 | 83 | 81 | 80 | 78 | 76 | 73 | 70 | 541 |
| TOTAL | 1,875 | 3,393 | 4,061 | 4,777 | 5,051 | 5,257 | 5,370 | 5,491 | 5,615 | 40,890 |

Excludes $1,310MM in supplier pay downs

Note: Values may not add up due to rounding; Excludes expenditures related to rehabilitation of trade terms with local suppliers





Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 12 Page 108 of 507
Case:17-00138-LTS Doc#:420-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX 12 Page 108 of 507

# Hacienda will embark in a multi-year transformation process to reduce leakage, improve revenue collections and adjust fees

**Revenue Enhancement Measures,** $MM



| | Adjust Taxes and Fees | Tax Compliance | Corporate Tax Reform |

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 |
| Adjust Taxes and Fees | 255 | 293 | 292 | 291 | 292 | 294 | 299 | 305 | 313 |
| Tax Compliance | 150 | 300 | 405 | 403 | 404 | 408 | 415 | 424 | 435 |
| Corporate Tax Reform | 519 | 788 | 688 | 838 | 938 | 1,038 | 1,038 | 1,038 | 1,038 |

| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Corporate Tax Reform** | ▪ The Government will use the breathing room provided by the extension of Act 154 to seek a more stable, consistent corporate tax policy that implements a broad-based regime with fewer exemptions by no later than January 2019 |  $519MM |
| **Tax Compliance** | ▪ Reduce leakage by increasing electronic SUT tax collections at the point of sale, including internet sales<br>▪ Improve revenue collections by using advanced analytics, expanding capacity and conducting targeted interventions |  $150MM |
| **Adjust Taxes and Fees** | ▪ Increase tobacco-related products excise tax and implement new property tax regime<br>▪ Revise fees including licenses, traffic fines, insurance fees and other charges for services to keep up with market trends |  $255MM |



Note: To meet fiscal plan objectives, the Government may consider additional measures.


Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 12 Page 109 of 507
Case:17-00133-LTS Doc#:4259-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 12 Page 109 of 507

# The Government must embark on a transformative journey in order to provide core services to citizens in an efficient and fiscally responsible manner

**Government Right-Sizing Measures[1]**, $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Personnel Related** | ▪ Freeze on payroll increases for fiscal years 2018 to 2020<br>▪ Improve employee mobilization across government, uniform fringe benefits and eliminate vacation and sick day liquidations to produce higher attrition rates or other payroll-related savings | $250MM |
| **Non-Personnel Related** | ▪ Freeze on operational cost increases for fiscal years 2018 to 2020<br>▪ Re-design the way the Government works by reducing non-core expenses, externalizing services to private entities, centralizing services to eliminate duplication, achieve procurement savings or other cost-cutting measures | $190MM |
| **Reduction of Subsidies** | ▪ Gradually reduce general fund subsidies to the University of Puerto Rico, municipalities and other direct subsidies to the private sector<br>▪ Proactively engage with the University of Puerto Rico, municipalities, as well as industry partners, to mitigate the economic development impact of subsidy removal | $411MM |



Note: To meet fiscal plan objectives, the Government may consider additional measures.
1) Post 2018, the relative distribution of savings between personnel and non-personnel related expenses will be decided as part of updates to the Fiscal Plan and the annual budget

19

# The Government will focus on improving efficiencies, adjusting benefits and developing a new healthcare model in order to achieve savings in healthcare spend



**Reducing Healthcare Spending Measures,** $MM

Legend:
- Modify Benefits Package
- Reduce Drug Cost
- Improve Payment Integrity
- Pay for Value
- New Healthcare Model

| Year | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 100 | 299 | 500 | 750 | 795 | 842 | 892 | 945 | 1,001 |

2019 breakdown: 45 / 60 / 84 / 110

| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Pay for Value** | ▪ Establish uniformed fee schedules and limit reimbursement rates for providers<br>▪ Replace current profit sharing arrangement with MCOs and replace with a Medical Loss Ratio | $38MM |
| **Improve Payment Integrity** | ▪ Establish partnerships to increase the scrutiny of premium payments for beneficiaries that have left the system or have another health insurance plan<br>▪ Establish Medicaid Fraud Control Unit and implement the Medicaid Management Information System to reduce waste, fraud and abuse | $25MM |
| **Reduce Drug Cost** | ▪ Reduce outpatient drug spending by increase pharmacy discounts on branded drugs, enforce mandatory dispensing of generic drugs, updating the preferred formulary and establishing shared-savings initiatives | $38MM |
| **Modify Benefits Package** | ▪ Evaluate services that could be capped and/or eliminated from the current benefit package without adversely affecting access for Mi Salud beneficiaries | $0 |
| **New Healthcare Model** | ▪ Develop a new healthcare model in which the Government pays for basic, less costly benefits and the patient pays for premium services selected resulting in cost reductions attributed to greater competition along with the capped PMPM amount | $0 |



Note: To meet fiscal plan objectives, the Government may consider additional measures.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX12 Page 111 of 507
Case:17-00188-LTS Doc#:4759-20 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX12 Page 111 of 507

# Segmentation of the defined contribution structure will protect the retirement savings of government employees

**Pension Reform Measures,** $MM



| | Changes to Special Laws |
| | Changes to Pension Benefits |

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 0 | 0 | 83 | 81 | 80 | 78 | 76 | 73 | 70 |
| Changes to Special Laws | | | 37 | 36 | 33 | 31 | 28 | 24 | 21 |
| Changes to Pension Benefits | | | 45 | 46 | 47 | 47 | 48 | 49 | 50 |

| **Reform Measures** | **Initiative** | **2018 Impact** |
|---|---|---|
| **Contribution Segregation and New Benefit Plans** | ▪ Switch to pay-as-you-go model, segregate prospective employee contributions, facilitate Social Security enrollment and improve investment alternatives |  $0 |
| **Adjust Retirement Benefits** | ▪ Protect benefits for lowest pension income earners. Progressive strategy to reduce retirement benefit costs including other post-employment benefits. |  $0 |



Note: To meet fiscal plan objectives, the Government may consider additional measures.

Case:17-00133-LTS Doc#:4730-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 12 Page 112 of 507

# IV. STRUCTURAL REFORMS



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 12 Page 113 of 507
Case:17-03283-LTS Doc#:4739-12 Filed:01/14/17 Entered:01/14/17 20:57:32 Desc:
Exhibit Exhibit 12 Page 113 of 39

## Implementing the package of structural reforms will provide a cumulative 2.0% increase in GNP growth

**1**    **Improve Ease of Business Activity**

**2**    **Improve Capital Efficiency**

**3**    **Energy Reform**

---

**1a**   **Increase Labor Participation**

- Institute public policy measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand
- Change welfare and labor incentives to encourage greater sector participation thus increasing labor supply

**1b**   **Permitting Process Reform**

- Centralize, streamline, and modernize and expedite permitting processes; increase business friendly environmental and economic growth

**1c**   **Tax Reform**

- Lower marginal tax rates and broaden the tax base; simplify and optimize the existing tax code to achieve gains in efficiency, ease of doing business and reducing tax evasion

**1d**   **Regulatory Reform**

- Reduce unnecessary regulatory burdens to reduce the drag of government on the private sector

**2a**   **Infrastructure Reform**

- Augmenting competitiveness by investing in critical infrastructure and quality of public services in roads, ports, telecommunications, water and waste, knowledge services, and other strategically important sectors

**2b**   **Public-Private Partnerships**

- Leverage key public assets through long term concessions to optimize quality of public infrastructure, services to public and sustainable operations and maintenance

**2c**   **Critical Projects**

- Implement management system to boost development of critical projects through expedited processes

**3a**   **Energy Reform**

- Leverage and facilitate expedited private sector investments in modern, cost-efficient, and environmentally compliant energy infrastructure; reform PREPA operations and services to clients; and allow for greater competition in energy generation

**4**    **Promoting Economic Development**

**4a**   **Enterprise Puerto Rico**

- Promote productivity growth, attract FDI & incentivize investments in technology through collaboration with the private sector

**4b**   **Destination Marketing Organization**

- Externalize the overseeing of marketing efforts & continuity under a single brand and as a unified front representing all of Puerto Rico's tourism components



INFRASTRUCTURE / P3 REFORM – P3 Program

# The initial stage of the P3 program includes launching of ~$5B of projects during the 2017-2019 calendar years that have been identified and are in project preparation

**P3 Project Identification**

- Identified initial list of priority projects with P3 potential
- Assessing project business cases and impact on the economy
- Split into 3 groups based on projected sequencing[1], **designed to launch in 2017, 2018 and 2019**

**Key Considerations in the Overall P3 Implementation**

- Project sequencing is designed to **effectively progress the advancement of projects and avoid major obstacles in the shortest timeline possible**. Thus, progression goes from easily executable/advanced permitting to more difficult/less advanced projects
- Need to **promote and improve funding models to use private funds**, where relevant, as leverage to maximize the unused federal funds current available
- Need to **further expand P3 pipeline** by requesting identification of new projects with P3 potential from government heads, monetizing non-essential services with market interest and precedent[2], additional infrastructure concessions[3], and pursuit of strategic P3 categories[4]

**P3 Key Target Areas %**



- Water: 8
- Other: 0
- Energy: 43
- Transport: 22
- Social infra: 7
- Waste mgmt: 20

→ **Capital Improvement Investment: ~$5B | Jobs Created: ~100,000**



| **10-Year Impact** | **2017** | | | | **2018** | | | | **2019** | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Q-17 | Q2-17 | Q3-17 | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 |
| **Group 1** Projects | • Launch Group 1 Projects • Estimated value ~$1B | | | | | | | | | | | |
| **Group 2** Projects | • Invest in preparing Group 2 • Data gathering, due diligence, etc. | | | | • Launch Group 2 Projects • Estimated value ~$2B | | | | | | | |
| **Group 3** Projects | | | • Invest heavily in preparing Group 3 • Data gathering, due diligence, etc. | | | | | | • Launch Group 3 Projects • Estimated value $2B | | | |

**(Project timeline includes P3 concessions included in Externalization measures)**

1 Based on existing level of detail, known roadblocks, project complexity 2 May include parking, National Parks, government-owned hotel properties, Puerto Rico lottery, state insurance fund, parking 3 May include regional airports, passenger ports 4 E.g. express lanes with dynamic tolling on existing congested roadways, broadband, infrastructure P3s including real estate funded infrastructure development



Case:17-00133-LTS Doc#:4720-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 12 Page 16 of 39

# V. DEBT SUSTAINABILITY ANALYSIS



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00188-LTS Doc#:4750-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX-12 Page 116 of 507

# Debt summary

- Below is a summary of the debt (excluding pension liabilities) considered in the fiscal plan
- Note: Amounts are estimated as of February 2017 and based upon preliminary unaudited numbers provided to AAFAF by issuer agencies and from publicly available information. On behalf of the Board, Ernst & Young is conducting an assessment of the debt outstanding to confirm these figures. Estimated amounts are subject to further review and may change

## Summary of debt outstanding as of February 2017 ($MM)

| Issuers included in Fiscal Plan | Bond principal | CAB | Unpaid P&I[1] | Private Loans | Total Bonds & Private loans | Loans from GDB/MFA Entities | Total Debt Service FY 17-19 | DSRF Balance |
|---|---|---|---|---|---|---|---|---|
| GO | $12,013 | $84 | $1,146 | $24 | $13,267 | $169 | $3,284 | -- |
| COFINA | 11,725 | 6,155 | -- | -- | 17,880 | -- | 2,138 | -- |
| HTA[2] | 4,106 | 135 | 6 | -- | 4,247 | 1,734 | 978 | 101 |
| PBA | 4,012 | -- | 117 | -- | 4,129 | 182 | 776 | 6 |
| GDB[3,4] | 3,182 | -- | 742 | 203 | 4,126 | -- | 1,887 | -- |
| ERS | 2,658 | 498 | -- | -- | 3,156 | -- | 500 | 44 |
| PRIFA[5] | 1,566 | 409 | 232 | -- | 2,207 | 127 | 465 | 2 |
| PFC | 1,025 | -- | 172 | -- | 1,197 | -- | 258 | -- |
| UPR[6] | 496 | -- | -- | 0 | 496 | 76 | 145 | 61 |
| PRCCDA | 386 | -- | -- | -- | 386 | 145 | 91 | 9 |
| PRIDCO | 145 | 11 | -- | -- | 156 | 78 | 54 | 19 |
| AMA | -- | -- | -- | 28 | 28 | -- | -- | -- |
| Other Central Gov't Entities | 197 | -- | 29 | 413 | 639 | 3,897 | -- | -- |
| **Total** | **$41,511** | **$7,293** | **$2,444** | **$668** | **$51,916** | **$6,409** | **$10,575** | **$242** |
| **Debt Issuers not incl. in Fiscal Plan** | | | | | | | | |
| PREPA | 8,259 | -- | -- | 697 | 8,956 | 36 | 2,775 | 6 |
| PRASA[7] | 3,943 | 28 | 13 | 584 | 4,568 | 229 | 995 | 93 |
| Children's Trust | 847 | 613 | -- | -- | 1,460 | -- | 140 | 85 |
| HFA | 542 | -- | -- | -- | 542 | 85 | 134 | 33 |
| PRIICO | -- | -- | -- | 98 | 98 | -- | -- | -- |
| Municipality Related Debt[8] | 556 | -- | -- | 1,140 | 1,696 | 2,036 | n.a. | 59 |
| **Total** | **$14,147** | **$641** | **$13** | **$2,520** | **$17,320** | **$2,386** | **$4,044** | **$276** |
| **Total** | **$55,658** | **$7,933** | **$2,457** | **$3,188** | **$69,236** | **$8,795** | **$14,619** | **$518** |
| *Less: GDB Bonds (excl. TDF)* | | | | | (3,766) | | | |
| *Plus: Loans from GDB/MFA Entities* | | | | | 8,795 | | | |
| **Public Sector Debt** | | | | | **$74,265** | | | |

**Notes:**
1) Unpaid principal and interest includes debt service that has been paid by insurers and is owed by the government
2) HTA includes Teodoro Moscoso bonds
3) GDB private loans includes Tourism Development Fund ("TDF") guarantees
4) Includes GDB Senior Guaranteed Notes Series 2013-B1 ("CFSE")
5) PRIFA includes PRIFA Rum bonds, PRIFA Petroleum Products Excise Tax BANs, PRIFA Port Authority bonds and $34.9m of PRIFA ASSMCA bonds
6) UPR includes $64.2m of AFICA Desarrollos Universitarios University Plaza Project bonds
7) PRASA bonds includes Revenue Bonds, Rural Development Bonds, Guaranteed 2008 Ref Bonds
8) Municipality Related Debt includes AFICA Guyanabo Municipal Government Center and Guaynabo Warehouse for Emergencies bonds



DEBT SUSTAINABILITY

## Debt service schedule

The table below summarizes the annual debt service through FY 2027 for all issuers included in the fiscal plan

### FY 2018 – FY 2027 debt service ($MM)

| Fiscal year ending June 30, | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 2027 |
|---|---|---|---|---|---|---|---|---|---|---|
| **Cash Interest** | | | | | | | | | | |
| GO | $714 | $699 | $680 | $658 | $641 | $621 | $597 | $571 | $545 | $518 |
| PBA | 183 | 179 | 175 | 171 | 165 | 158 | 153 | 147 | 140 | 135 |
| COFINA | 690 | 690 | 690 | 689 | 696 | 702 | 708 | 714 | 711 | 708 |
| HTA[1] | 207 | 201 | 197 | 191 | 182 | 174 | 170 | 166 | 160 | 151 |
| PRIFA[2] | 80 | 77 | 75 | 72 | 69 | 65 | 61 | 57 | 53 | 45 |
| PRCCDA | 18 | 17 | 17 | 16 | 15 | 15 | 14 | 13 | 12 | 11 |
| PFC | 56 | 54 | 53 | 52 | 50 | 48 | 47 | 44 | 42 | 40 |
| UPR[3] | 24 | 22 | 21 | 20 | 18 | 17 | 15 | 14 | 12 | 11 |
| ERS | 167 | 167 | 167 | 167 | 164 | 159 | 155 | 154 | 152 | 151 |
| GDB | 150 | 135 | 92 | 69 | 54 | 49 | 34 | 21 | 14 | 3 |
| PRIDCO | 8 | 7 | 7 | 6 | 5 | 5 | 4 | 3 | 2 | 2 |
| **Total** | **$2,296** | **$2,249** | **$2,172** | **$2,109** | **$2,059** | **$2,014** | **$1,957** | **$1,904** | **$1,844** | **$1,774** |
| **Principal** | | | | | | | | | | |
| GO | $351 | $392 | $439 | $334 | $358 | $378 | $402 | $428 | $454 | $481 |
| PBA | 66 | 70 | 74 | 101 | 109 | 100 | 101 | 107 | 96 | 106 |
| COFINA | 19 | 48 | 78 | 98 | 120 | 159 | 203 | 248 | 294 | 344 |
| HTA[1] | 148 | 90 | 120 | 170 | 158 | 101 | 85 | 114 | 187 | 149 |
| PRIFA[2] | 48 | 50 | 51 | 54 | 62 | 86 | 64 | 72 | 74 | 221 |
| PRCCDA | 12 | 13 | 14 | 14 | 15 | 16 | 17 | 17 | 18 | 19 |
| PFC | 30 | 32 | 33 | 34 | 36 | 37 | 39 | 41 | 43 | 46 |
| UPR[3] | 25 | 26 | 27 | 29 | 30 | 31 | 33 | 35 | 24 | 26 |
| ERS | (0) | -- | (0) | 50 | 70 | 80 | 19 | 22 | 29 | 36 |
| GDB | 277 | 848 | 432 | 434 | 143 | 47 | 541 | -- | 248 | 127 |
| PRIDCO | 10 | 11 | 11 | 11 | 13 | 13 | 14 | 15 | 16 | 17 |
| **Total** | **$987** | **$1,579** | **$1,280** | **$1,328** | **$1,112** | **$1,049** | **$1,518** | **$1,099** | **$1,484** | **$1,573** |
| **Total debt service** | | | | | | | | | | |
| GO | $1,066 | $1,090 | $1,118 | $991 | $999 | $999 | $999 | $999 | $999 | $999 |
| PBA | 249 | 249 | 249 | 272 | 273 | 258 | 254 | 253 | 236 | 241 |
| COFINA | 709 | 738 | 768 | 786 | 816 | 861 | 911 | 962 | 1,006 | 1,052 |
| HTA[1] | 355 | 291 | 317 | 362 | 340 | 275 | 254 | 280 | 347 | 300 |
| PRIFA[2] | 127 | 127 | 126 | 126 | 130 | 151 | 125 | 130 | 127 | 267 |
| PRCCDA | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| PFC | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 86 | 85 | 85 |
| UPR[3] | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 36 | 36 |
| ERS | 167 | 167 | 167 | 217 | 234 | 239 | 174 | 176 | 181 | 187 |
| GDB | 428 | 983 | 525 | 503 | 196 | 97 | 575 | 21 | 261 | 130 |
| PRIDCO | 18 | 18 | 18 | 16 | 18 | 18 | 18 | 18 | 18 | 18 |
| **Total** | **$3,283** | **$3,828** | **$3,453** | **$3,437** | **$3,171** | **$3,063** | **$3,475** | **$3,003** | **$3,329** | **$3,347** |

1   HTA includes Teodoro Moscoso Bridge
2   PRIFA includes PRIFA BANs
3   UPR includes AFICA UPP



# Debt sustainability

**The table below summarizes the annual cash flow available for debt service, and calculates implied debt capacity based on a range of interest rates and coverage ratios assuming an illustrative 35 year term**

- Cash flow available for debt service incorporates (i) the payment of essential services, (ii) benefit of clawback revenues and (iii) a prudent contingency reserve
- In the Fiscal Plan summarized below, the cash flow after Measures but before Debt Service averages $787m per year during the period 2017 - 2026

## Debt sustainability sensitivity analysis ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Baseline Projections** | | | | | | | | | | | |
| Revenues | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Expenses | (17,872) | (18,981) | (19,233) | (19,512) | (19,950) | (20,477) | (20,884) | (21,310) | (21,973) | (22,316) | (202,507) |
| **Cash Flow Excl. Debt Service & Measures** | 1,080 | (1,470) | (2,826) | (3,077) | (3,456) | (3,886) | (4,139) | (4,357) | (4,769) | (4,807) | (31,708) |
| **Impact of Measures** | | | | | | | | | | | |
| Revenue Measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| Expense Measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683 |
| **Total Measures** | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash Flow Available for Debt Service** | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

## Illustrative Sustainable Debt Capacity Sizing Analysis

| | | Sensitivity Analysis: Implied Debt Capacity at 10% Contingency | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | $700 | $750 | $800 | $850 | $900 | $950 | $1,000 | $1,050 | $1,100 |
| | *3.5%* | 12,600 | 13,500 | 14,400 | 15,301 | 16,201 | 17,101 | 18,001 | 18,901 | 19,801 |
| **Sensitivity Analysis: PV Rate %** | *4.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *4.5%* | 11,000 | 11,786 | 12,572 | 13,358 | 14,143 | 14,929 | 15,715 | 16,501 | 17,286 |

| | | Sensitivity Analysis: Implied Debt Capacity at 4% PV Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | $700 | $750 | $800 | $850 | $900 | $950 | $1,000 | $1,050 | $1,100 |
| | *5.0%* | 12,412 | 13,299 | 14,185 | 15,072 | 15,958 | 16,845 | 17,731 | 18,618 | 19,505 |
| **Sensitivity Analysis: % Contingency** | *10.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *15.0%* | 11,105 | 11,899 | 12,692 | 13,485 | 14,278 | 15,072 | 15,865 | 16,658 | 17,451 |



Case:17-00188-LTS Doc#:4720-12 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 12 Page 309 of 350

# VI. TSA LIQUIDITY



TSA Liquidity

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00133-LTS Doc#:4759-12 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX12 Page 120 of 507
Exhibit DX-12 Page 120 of 507

# Weekly cash flow forecast through 2017FY

| Cash Flows Before Cliffs, Measures and Debt | Fcst - 1 | Fcst - 2 | Fcst - 3 | Fcst - 4 | Fcst - 5 | Fcst - 6 | Fcst - 7 | Fcst - 8 | Fcst - 9 | Fcst - 10 | Fcst - 11 | Fcst - 12 | Fcst - 13 | Fcst - 14 | Fcst - 15 | Fcst - 16 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| *(figures in $mm)* | 3/17 | 3/24 | 3/31 | 4/7 | 4/14 | 4/21 | 4/28 | 5/5 | 5/12 | 5/19 | 5/26 | 6/2 | 6/9 | 6/16 | 6/23 | 6/30 |
| 1 General Collections | $349 | $254 | $58 | $71 | $66 | $760 | $186 | $63 | $66 | $334 | $60 | $44 | $59 | $134 | $520 | $57 |
| 2 Sales and Use Tax | 18 | 13 | 146 | 5 | 17 | 14 | 163 | 5 | 18 | 5 | 167 | 4 | 5 | 18 | 14 | 171 |
| 3 Excise Tax through Banco Popular | 64 | – | – | – | 77 | – | – | – | – | 68 | – | – | – | 57 | – | – |
| 4 Rum Tax | – | 10 | – | – | – | 11 | – | – | – | 18 | – | – | – | – | 22 | – |
| 5 Electronic Lottery | – | – | – | – | – | – | – | – | – | – | – | – | – | 14 | 37 | |
| 6 Subtotal | $432 | $277 | $204 | $76 | $161 | $784 | $349 | $68 | $84 | $424 | $227 | $48 | $64 | $210 | $570 | $265 |
| 7 Employee/Judiciary Retirement Admin. | – | – | – | – | 56 | – | – | – | 56 | – | – | – | – | 56 | – | – |
| 8 Teachers Retirement System | – | – | – | – | 70 | – | – | – | – | – | – | – | – | – | – | – |
| 9 Retirement System Transfers | – | – | – | – | $127 | – | – | – | $56 | – | – | – | – | $56 | – | – |
| 10 Federal Funds | 93 | 110 | 83 | 123 | 95 | 119 | 123 | 95 | 126 | 93 | 123 | 49 | 99 | 107 | 107 | 121 |
| 11 Other Inflows | 9 | – | 11 | – | – | 9 | 11 | – | – | – | – | 11 | – | – | – | 11 |
| 12 Tax Revenue Anticipation Notes | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 13 Total Inflows | $534 | $388 | $298 | $199 | $382 | $912 | $483 | $163 | $267 | $517 | $350 | $108 | $163 | $373 | $677 | $397 |
| 14 Payroll and Related Costs | (18) | (51) | (120) | (23) | (95) | (62) | (101) | (35) | (90) | (65) | (96) | (18) | (22) | (95) | (56) | (106) |
| 15 Pension Benefits | – | – | (87) | – | (82) | – | (87) | – | (82) | – | (87) | – | – | (82) | – | (87) |
| 16 Health Insurance Administration - ASES | (53) | (53) | (55) | (53) | (53) | (53) | (60) | (53) | (53) | (53) | (53) | (7) | (53) | (53) | (53) | (55) |
| 17 University of Puerto Rico - UPR | (18) | (18) | (24) | (18) | (18) | (18) | (24) | (18) | (18) | (18) | (18) | (6) | – | (36) | (18) | (24) |
| 18 Muni. Revenue Collection Center - CRIM | (21) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | – | (15) | (8) | (26) | |
| 19 Highway Transportation Authority - HTA | – | – | (16) | – | – | – | (16) | – | (19) | – | – | (19) | – | – | (19) | (19) |
| 20 Public Building Authority - PBA / AEP | (9) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | – | (4) | (4) | (4) | (4) | |
| 21 Other Governmental Entities | (20) | (9) | (54) | 25 | (20) | (9) | (54) | 25 | (20) | (9) | (12) | (18) | (3) | (20) | (9) | (63) |
| 22 Subtotal - Government Entity Transfers | ($120) | ($92) | ($160) | ($57) | ($103) | ($92) | ($165) | ($57) | ($122) | ($92) | ($90) | ($54) | ($59) | ($128) | ($111) | ($191) |
| 23 Supplier Payments | (57) | (57) | (58) | (86) | (86) | (86) | (87) | (68) | (68) | (68) | (68) | (53) | (65) | (65) | (65) | (66) |
| 24 Other Legislative Appropriations | (24) | (14) | (5) | (2) | – | (38) | (5) | (6) | (22) | (10) | (5) | (4) | – | (16) | (22) | (5) |
| 25 Tax Refunds | (12) | (13) | (4) | (1) | (6) | (39) | (4) | (7) | (4) | (4) | (31) | (3) | (1) | (4) | (6) | (41) |
| 26 Nutrition Assistance Program | (30) | (70) | (22) | (35) | (40) | (54) | (36) | (22) | (43) | (56) | (36) | (16) | (37) | (30) | (70) | (20) |
| 27 Other Disbursements | – | – | – | – | – | – | – | – | – | – | – | (4) | – | – | – | (4) |
| 28 Contingency | (16) | (16) | (16) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (23) | (23) | (23) | (23) | (23) |
| 29 Tax Revenue Anticipation Notes | – | – | – | – | – | – | (152) | – | – | – | (137) | – | – | – | (135) | |
| 30 Total Outflows | ($277) | ($313) | ($472) | ($233) | ($440) | ($399) | ($665) | ($223) | ($459) | ($324) | ($442) | ($312) | ($208) | ($443) | ($353) | ($676) |
| 31 Net Cash Flows Excluding Debt Service, Fiscal Cliffs and Measures | $257 | $75 | ($174) | ($34) | ($58) | $513 | ($182) | ($60) | ($193) | $194 | ($92) | ($204) | ($44) | ($70) | $324 | ($279) |
| 32 Bank Cash Position, Beginning (a) | $319 | $576 | $650 | $477 | $442 | $384 | $897 | $716 | $655 | $462 | $656 | $564 | $360 | $316 | $246 | $570 |
| 33 Bank Cash Position, Ending (a) | $576 | $650 | $477 | $442 | $384 | $897 | $716 | $655 | $462 | $656 | $564 | $360 | $316 | $246 | $570 | $291 |



*(a)  Excludes clawback account.*

30

## Liquidity Principles for FY 2018

- No external short-term financing

- Rollout of Disbursement Authorization Group in order to enforce priority of payments through defined critical services (see Section VII)

- Consolidate dispersed treasury functions and put in place oversight over accounts not centrally managed

- Refine and regularly update 13 week cash analysis with detailed forecasting of cash receipts and disbursements

- Provide detailed daily performance projections, results, and variances

1 Cash management authority is granted to AAFAF under Act 5-2017 and other relevant legislation

Case:17-00188-LTS   Doc#:4720-12   Filed:10/11/17   Entered:10/11/17 20:57:32   Desc:
Exhibit 12   Page 32 of 35

# VII. FINANCIAL CONTROL REFORM



## Current state of financial controls

- Cash is not centrally managed
  - No central office has visibility across all spending
  - Procurement agencies do not actively enforce terms and specifications
  - Limited coordinated effort to eliminate major cash outlays
  - Limited sweep of cash into general fund accounts
  - Cash disbursements is a manual and subjective process handled at Hacienda
  - No formal structure for reporting and release of audited financials

- Target is to improve level of detail on forecasting and specificity around assumptions
  - "Top-down" approach, based on prior year's Budget
  - Bank-to-book reconciliations are not often prepared in a timely manner
  - No tracking mechanisms exist to measure intra-year actual expenditures vs. budget on an accrual basis



FINANCIAL CONTROLS

## Budget certification per PROMESA § 202



**3/13:**
- Certification of Fiscal Plan

**6/30:**
- Last day for budget certification per PROMESA § 202(e)

**7/1:**
- Beginning of FY2018

March　　　　April　　　　May　　　　June　　　　July

**3/17:**
- Set timeline for budget certification per PROMESA § 202 (a)
- Work with Oversight Board in designing a reporting structure and reporting forms

**4/14:**
- Adopt procedures to deliver timely statements and to make public per PROMESA § 202(a)

**4/28:**
- Submit budget and implementation plan to Oversight Board

**5/22:**
- Submit revised budgets and supporting documents to Board, if necessary

**6/5:**
- Budget certification



FINANCIAL CONTROLS

## Quarterly budget compliance process per PROMESA § 203

| Quarterly Action | PROMESA section | Description | Proposed dates (mm/dd/yy) |
|---|---|---|---|
| **Reporting[1]** | § 203 (a) | Governor to submit a report describing: (1) the actual cash revenues, expenditures, and flows and (2) any other information requested by the Board | Q1: 10/15/17[1]<br>Q2: 1/16/18<br>Q3: 4/16/18<br>Q4: 7/16/18 |
| **External auditing** | § 203 (b) | Oversight Board to communicate the result of external auditing report to the government and identify any inconsistencies with the projected revenues, expenditures, or cash flows set forth in the certified Budget for such quarter | Q1: 11/10/17<br>Q2: 2/12/18<br>Q3: 5/10/18<br>Q4: 8/10/18 |
| **Correction of variance** | § 203 (b) | Government to provide additional information regarding any inconsistencies with the certified budget and implement remedial action to correct variances | Q1: 11/20/17<br>Q2: 2/20/18<br>Q3: 5/21/18<br>Q4: 8/20/18 |
| **Certification of variance / or Budget reductions by Board** | § 203 (c) and (d) | Board to certify that the government is at variance with the applicable certified Budget, and that the Government has initiated such measures as the Board considers sufficient to correct it<br>If the variances are not corrected, the Board shall make appropriate reductions in nondebt expenditures and may institute automatic hiring freezes in instrumentalities and prohibit them from entering in any contract in excess of $100,000 | Q1: 12/11/17<br>Q2: 3/12/18<br>Q3: 6/11/18<br>Q4: 9/10/18 |
| **Termination of budget reductions** | § 203 (e) | The Board should decide whether the government or instrumentality has made the appropriate measures to reduce expenditures or increase revenues and cancel the reductions | Ongoing |



1 Per PROMESA, these dates must be 15 days after end of each quarter

FINANCIAL CONTROLS

## Budget and Forecasting process

| | |
|---|---|
| **Define a timeline for each quarter's budget** | <ul><li>Certification process must adhere to PROMESA requirements</li><li>Should include, but not be limited to:<br>  — Certification process according to PROMESA requirements<br>  — Reporting, external auditing, and variance certifications</li></ul> |
| **Set guiding principles for budget and forecasting** | <ul><li>Budget should be prepared…<br>  — Within the **confines of the overall fiscal plan**<br>  — As a **positive cash balance** with sufficient safety margin, due to lack of access to capital markets</li></ul> |
| **Set, update, and track targets every quarter** | <ul><li>Use performance metrics, e.g.,:<br>  — Status? On track / Delayed / Completed<br>  — Reached target?<br>  — Above / below past instances?</li><li>Implement measures to correct variances from budget</li></ul> |



36

FINANCIAL CONTROLS

## Disbursement process

---

**Define disbursement process**

- Set guidelines and principles
- Work to match budget to disbursement authorizations
- Identify an effective, centralized, and time-sensitive disbursement process that involves the adequate authorities
    - Incorporate a mechanism that confirms alignment between revenues and expenses

---

**Implement a centralized disbursement digital database**

- Centralize into a single Treasury account with a corresponding database
- Update and review periodically
- Set a minimum available liquidity threshold and an alert-system

---

**Set, update, and track metrics every quarter**

- Establish preventive measures
- Implement detective procedures to correct problems before they arise
- Design a process to correct variances from budget mid-year



# EXHIBIT 13

Case:17-00133-LTS Doc#:4759-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 13 Page 2 of 35



## GOVERNMENT OF PUERTO RICO

**Puerto Rico Fiscal Agency and Financial Advisory Authority**

# FISCAL PLAN FOR PUERTO RICO

San Juan, Puerto Rico

March 13, 2017



# Disclaimer

The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF"), the Government of Puerto Rico (the "Government"), and each of their respective officers, directors, employees, agents, attorneys, advisors, members, partners or affiliates (collectively, with AAFAF and the Government instrumentalities the "Parties") make no representation or warranty, express or implied, to any third party with respect to the information contained herein and all Parties expressly disclaim any such representations or warranties. The Government has had to rely upon preliminary information and unaudited financials for 2015 and 2016, in addition to the inherent complexities that are part of a government in transition, especially after a prolonged period of public finance obscurity. As such, AAFAF and the Government have made certain assumptions that may materially change once more clarity and transparency takes hold, especially after the Government issues the past due audited financials for 2015 and 2016 later this year.

The Parties do not owe or accept any duty or responsibility to any reader or recipient of this presentation, whether in contract or tort, and shall not be liable for or in respect of any loss, damage (including without limitation consequential damages or lost profits) or expense of whatsoever nature of such third party that may be caused by, or alleged to be caused by, the use of this presentation or that is otherwise consequent upon the gaining of access to this document by such third party.

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Parties do not express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various financial, social, economic, environmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government and its agencies and instrumentalities, but also by entities such as the government of the United States. Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by AAFAF, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient shall be deemed to have acknowledged and agreed to the terms of these limitations.

This document may contain capitalized terms that are not defined herein, or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should consult with advisors of AAFAF should clarification be required.



## Table of Contents

I.      Introduction

II.     Financial Projections

III.    Fiscal Reform Measures

IV.     Structural Reforms

V.      Debt Sustainability Analysis

VI.     TSA Liquidity

VII.    Financial Control Reform

Case:17-00188-LTS Doc#:4759-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 13 Page 5 of 35

# I. INTRODUCTION



# What the Government's Proposed Fiscal Plan Seeks to Achieve

**Closing the Projected Baseline Fiscal Plan Deficit**

- At the direction of the Oversight Board, the Government's new administration has prepared this Fiscal Plan which supersedes the prior administration's December 2016 fiscal plan that was rejected by the Board. From the date the new administration took office, AAFAF and its advisors have earnestly worked in cooperation with the Board's input to put forth a credible and reliable Fiscal Plan that will guide Puerto Rico's fiscal and economic recovery

- **The Fiscal Plan commits to fiscal responsibility and implements specific revenue enhancements and targeted expenditure reductions to return Puerto Rico to fiscal stability and economic growth.** In particular, the Fiscal Plan averts the $67bn fiscal deficit from the prior administration's plan and achieves +$7.9bn in cumulative cash flow available for debt service through the 10 year period

**Further Improvement**

- The Government fully appreciates that despite fiscal and economic uncertainties, now is the time to set the benchmark for the needed fiscal and economic measures as outlined in the Fiscal Plan. The Government is demonstrating its commitment to correcting the mistakes of the past. The Government is also mindful that in stopping the cycle of deficit spending, it must do so without undermining economic recovery or endangering the health, welfare or safety of the 3.5 million US citizens living in Puerto Rico

**Bondholder Negotiations and Consensus**

- Per PROMESA Section 2.01(b)(1)(I), the fiscal plan must provide a debt sustainability analysis. The Government's Fiscal Plan consolidates available cash resources that can be made available for debt service payments. The Fiscal Plan as proposed does not presume cash flow for debt service for any particular bondholder constituency, including clawed back cash and special revenues, nor does it take a position with respect to asserted constitutional or contractual rights and remedies, validity of any bond structure, or the dedication or application of tax streams / available resources

- The Government believes that any fiscal plan should reflect commitment to develop and implement operational and structural improvements that demonstrate the Government's willingness to achieve maximum payment of its debt obligations as restructured. However, in achieving debt sustainability, Puerto Rico's bondholders will be called upon to share in the sacrifice needed for a feasible debt restructuring. **The Government believes communication, grounded in fiscal responsibility, can create the opportunity for maximum consensus among stakeholders and pave the way for Puerto Rico's long-term fiscal stability and economic growth**



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-13 Page 134 of 507
Case:17-90188-LTS Doc#:4720-13 Filed:01/12/19 Entered:01/12/19 20:57:32 Desc:
Exhibit 13 Page 134 of 507

# What the Fiscal Plan does not determine

**Major Entities Impacted by the Fiscal Plan**

- The Fiscal Plan is for the Government as a covered entity under PROMESA. The Government's various taxes, fees and other revenues are used to fund, subsidize or guarantee payments of the debt of many covered entities by various means. Accordingly, this Fiscal Plan does provide for payment of expenses and capital investments in, among other covered entities: (1) Public Building Authority, (2) PR Sales Tax Financing Corporation ("COFINA"), (3) PR Highways and Transportation Authority ("HTA"), (4) PR Convention Center District Authority ("PRCCDA"), (5) PR Infrastructure Finance Authority ("PRIFA"), (6) Employees' Retirement System ("ERS"), (7) University of Puerto Rico ("UPR"), (8) Puerto Rico Industrial Development Company ("PRIDCO"), and (9) Government Development Bank ("GDB")

**Major Entities Not Covered by the Fiscal Plan**

- There are four entities whose revenues and expenses are not included in this Fiscal Plan: (1) Puerto Rico Electric Power Authority ("PREPA"), (2) Puerto Rico Aqueduct and Sewer Authority ("PRASA"), (3) The Children's Trust Fund and (4) Puerto Rico Housing Finance Authority ("PRHFA"). As a result, this Fiscal Plan does not take a position with respect to these entities' financial prospects or the debt sustainability of such entities

**Legal & contractual issues not determined by the Fiscal Plan**

The Fiscal Plan does not attempt to resolve, among others, the following issues:

- The mechanisms by which projected cash flow available for debt service should be allocated to different debt instruments
- What is an essential service for purposes of the exercise of the Government's police power
- The scope, timing or specific use of revenues to be frozen or redirected as 'claw back' revenue
- The value, validity and /or perfection of pledges
- Whether any particular bond or debt issuance may have been improvidently issued
- What the Government is permitted to accomplish through the increase or decrease of dedicated taxes, fees, tolls or other revenue sources



Case:17-00138-LTS Doc#:4/20-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 13 Page 3 of 35

# II. FINANCIAL PROJECTIONS



## The Government will undertake fiscal measures that will reduce the fiscal gap by $39.6B, and create a 10 year cash flow surplus of $7.9B

- Based on the currently stated debt obligations, the 10-year budget gap is expected to reach $66.9B
  - ~$35.1B of expected principal and interest payments during the forecast period

- The Fiscal Plan estimates cash flows available for debt service. The chart below shows the key components of the forecast, including:
  - Base fiscal gap of $66.8B which includes full cost of debt service and does not include the impact of revenue and expense measures
  - Revenue and expense measures of $13.9B and $25.7B[1]
    - Revenue Measures: stabilizing corporate tax revenue through tax reform positively affects cash flows by $7.9B
    - Expense Measures: $19.2B of $25.7B (79%) due to Government right-sizing initiatives[2]



($MM)

Accumulated ACA funding loss of $16.1B

+39,580

| Base Financial Cash Flows | Debt Service[3] | Cash Flow pre-Measures | Revenue Measures | Expense Measures | Cash Flows Post Measures Excluding Debt Service |
|---|---|---|---|---|---|
| -66,836 | 35,129 | -31,708 | 13,897 | 25,683 | 7,873 |



[1] See Section IV, Fiscal Reform Measures for full detail     [3] Includes $1,415 of past due P&I (Aug 1, 2015 to July 1, 2016), and $277 in Other Adjustments.     8
[2] See government right-sizing section

FINANCIAL PROJECTIONS

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 137 of 507
Case:17-03283-LTS Doc#:4729-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 13 Page 137 of 55

## The current fiscal plan is a significant departure from the version presented in October, as it commits to higher revenue and expense measures of $4.4B and $16.4 B, respectively

- The October proposed Fiscal Plan estimated negative cumulative cash flows pre-debt service over the projection period ('17-'26) of ($4.9B) vs. the Current Fiscal Plan projections estimating positive cumulative cash flows pre-debt service of $7.92B. The change is comprised primarily of:
  - Negative net impact on cash flows available for debt service, pre-Measures of -$8.0B
    - Decrease in total revenues of $1.7B
    - Decreased expenses of $6.3B
  - Enhanced revenue measures of $4.4B
  - Additional savings from Expense Measures of $16.4B





Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX13 Page 138 of 507
Case:17-00188-LTS Doc#:426-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 13 Page 138 of 355

# A summary of financials for the 10-year projection period shows positive cash flows post-measures, before debt service of $7.9B

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | (2.2%) | (2.8%) | (2.4%) | (0.5%) | (0.4%) | 0.3% | 1.0% | 1.6% | 2.1% | 2.6% | |
| Revenues before Measures [1] | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Noninterest Exp. before Measures [1] | ($17,872) | ($18,981) | ($19,233) | ($19,512) | ($19,950) | ($20,477) | ($20,884) | ($21,310) | ($21,973) | ($22,316) | ($202,507) |
| **Cash flows pre-Measures** | **$1,080** | **($1,470)** | **($2,826)** | **($3,077)** | **($3,456)** | **($3,886)** | **($4,139)** | **($4,357)** | **($4,769)** | **($4,807)** | **($31,708)** |
| **Measures** | | | | | | | | | | | |
| Revenue measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897.1 |
| Expense measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683.3 |
| Net impact of measures | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash flows post-Measures, before Debt Service** | **$1,080** | **$404** | **$567** | **$722** | **$1,059** | **$903** | **$857** | **$751** | **$722** | **$808** | **$7,873** |

Cash flows post-measures, before debt service trends:

- FY 2017 estimate of $1.1B, declining to a low of $0.4B in FY 2018, driven by GNP contraction and ERS Paygo contributions of $1.0B in FY 2018

- Forecast peaks at $1.1B in FY 2021 before declining to $0.8B by FY 2026. Decline is primarily driven by Affordable Care Act ("ACA") funding expiration that increase steadily from ~$0.9B in FY 2018 to ~$2.4B in FY 2026

- Expense measures include $1.3B in supplier payment pay downs through the projection period



1  Full details in Appendix
2  This addback is illustrative, and is not reflected in the amounts available for debt service elsewhere in this Plan

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 139 of 507

# Revenues Before Measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| *PR Nominal GNP Growth* | *(2.2%)* | *(2.8%)* | *(2.4%)* | *(0.5%)* | *(0.4%)* | *0.3%* | *1.0%* | *1.6%* | *2.1%* | *2.6%* | |
| **Revenues** | | | | | | | | | | | |
| General Fund Revenues: | | | | | | | | | | | |
| Individual Income Taxes | $1,892 | $1,760 | $1,718 | $1,709 | $1,703 | $1,708 | $1,725 | $1,752 | $1,789 | $1,836 | $17,592 |
| Corporate Income Taxes | 1,515 | 1,473 | 1,437 | 1,430 | 1,424 | 1,429 | 1,443 | 1,466 | 1,497 | 1,536 | 14,649 |
| Non-Resident Withholdings | 685 | 666 | 650 | 647 | 644 | 646 | 652 | 663 | 677 | 694 | 6,624 |
| Alcoholic Beverages | 268 | 260 | 254 | 253 | 252 | 253 | 255 | 259 | 265 | 272 | 2,591 |
| Cigarettes | 112 | 109 | 106 | 106 | 105 | 106 | 107 | 108 | 111 | 114 | 1,083 |
| Motor Vehicles | 330 | 321 | 313 | 311 | 310 | 311 | 314 | 319 | 326 | 335 | 3,191 |
| Excises on Off-Shore Shipment Rum | 206 | 173 | 175 | 176 | 178 | 179 | 180 | 182 | 183 | 184 | 1,816 |
| Other General Fund Revenue | 391 | 386 | 377 | 375 | 373 | 374 | 378 | 384 | 392 | 402 | 3,833 |
| **Total** | **5,399** | **5,148** | **5,030** | **5,007** | **4,989** | **5,005** | **5,055** | **5,134** | **5,239** | **5,372** | **51,378** |
| General Fund Portion of SUT (10.5%) | 1,718 | 1,655 | 1,596 | 1,553 | 1,511 | 1,484 | 1,472 | 1,474 | 1,487 | 1,512 | 15,463 |
| Net Act 154 | 2,075 | 1,556 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 1,038 | 11,931 |
| **General Fund Revenue** | **$9,192** | **$8,360** | **$7,664** | **$7,598** | **$7,538** | **$7,527** | **$7,565** | **$7,646** | **$7,764** | **$7,921** | **$78,773** |
| Additional SUT (COFINA, FAM & Cine) | 850 | 877 | 906 | 936 | 968 | 1,003 | 1,039 | 1,078 | 1,118 | 1,161 | 9,936 |
| Other Tax Revenues | 1,337 | 1,396 | 1,401 | 1,411 | 1,423 | 1,429 | 1,436 | 1,445 | 1,455 | 1,467 | 14,199 |
| Other Non-Tax Revenues | 579 | 576 | 582 | 594 | 622 | 630 | 635 | 642 | 649 | 666 | 6,174 |
| **Adj. Revenue before Measures** | **$11,958** | **$11,208** | **$10,552** | **$10,539** | **$10,550** | **$10,588** | **$10,675** | **$10,810** | **$10,986** | **$11,215** | **$109,082** |
| Federal Transfers | 6,994 | 7,168 | 7,372 | 7,477 | 7,623 | 7,835 | 8,023 | 8,212 | 8,469 | 8,675 | 77,847 |
| Loss of Affordable Care Act ("ACA") Funding | -- | (865) | (1,516) | (1,582) | (1,680) | (1,833) | (1,953) | (2,069) | (2,251) | (2,382) | (16,130) |
| **Revenues before Measures** | **$18,952** | **$17,511** | **$16,407** | **$16,434** | **$16,494** | **$16,590** | **$16,746** | **$16,953** | **$17,204** | **$17,509** | **$170,799** |



FINANCIAL PROJECTIONS

# Non-Interest Expenses Before Measures

## ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Expenses** | | | | | | | | | | | |
| General Fund Expenditures: | | | | | | | | | | | |
| Direct Payroll | ($3,271) | ($3,309) | ($3,342) | ($3,375) | ($3,413) | ($3,458) | ($3,509) | ($3,563) | ($3,619) | ($3,675) | ($34,532) |
| Direct Operational Expenses | (907) | (918) | (926) | (936) | (946) | (959) | (973) | (988) | (1,003) | (1,019) | (9,574) |
| Utilities | (260) | (332) | (352) | (360) | (373) | (372) | (369) | (374) | (387) | (395) | (3,575) |
| Special Appropriations | (3,890) | (4,037) | (4,068) | (4,068) | (4,209) | (4,140) | (4,143) | (4,136) | (4,250) | (4,147) | (41,087) |
| **General Fund Expenses** | **(8,329)** | **(8,596)** | **(8,688)** | **(8,738)** | **(8,941)** | **(8,929)** | **(8,993)** | **(9,060)** | **(9,259)** | **(9,236)** | **(88,768)** |
| Other: | | | | | | | | | | | |
| Paygo Contributions in Excess of Asset Balance | -- | (989) | (1,014) | (985) | (964) | (1,151) | (1,177) | (1,217) | (1,251) | (1,278) | (10,026) |
| Run-Rate Capital Expenditures | (283) | (400) | (407) | (415) | (422) | (429) | (437) | (445) | (453) | (462) | (4,154) |
| **Total other** | **(283)** | **(1,389)** | **(1,421)** | **(1,400)** | **(1,386)** | **(1,581)** | **(1,614)** | **(1,662)** | **(1,704)** | **(1,739)** | **(14,180)** |
| Component Units, Non-GF Funds and Ent. Funds: | | | | | | | | | | | |
| Net Deficit of Special Revenue Funds | (110) | (130) | (146) | (154) | (162) | (169) | (173) | (176) | (176) | (174) | (1,571) |
| Independently Forecasted Non-Enterprise CUs | (452) | (380) | (433) | (558) | (639) | (752) | (859) | (963) | (1,109) | (1,210) | (7,356) |
| HTA Operational Expenses | (246) | (234) | (236) | (238) | (239) | (243) | (246) | (250) | (254) | (258) | (2,444) |
| Other | (44) | (41) | (30) | (30) | (30) | (31) | (31) | (32) | (32) | (33) | (335) |
| **Total** | **(853)** | **(785)** | **(845)** | **(980)** | **(1,071)** | **(1,194)** | **(1,310)** | **(1,420)** | **(1,572)** | **(1,675)** | **(11,705)** |
| Disbur. of Tax Revenues to Entities Outside Plan | (335) | (302) | (304) | (307) | (313) | (314) | (316) | (319) | (322) | (334) | (3,168) |
| **Adj. Expenses before Measures** | **($9,800)** | **($11,071)** | **($11,259)** | **($11,425)** | **($11,712)** | **($12,018)** | **($12,234)** | **($12,461)** | **($12,857)** | **($12,984)** | **($117,822)** |
| Federal Programs | (6,994) | (7,168) | (7,372) | (7,477) | (7,623) | (7,835) | (8,023) | (8,212) | (8,469) | (8,675) | (77,847) |
| Reconciliation Adjustment | (585) | (592) | (598) | (604) | (610) | (618) | (627) | (637) | (647) | (657) | (6,175) |
| Other non-recurring | (493) | (150) | (5) | (5) | (5) | (5) | -- | -- | -- | -- | (663) |
| **Total** | **(8,072)** | **(7,910)** | **(7,975)** | **(8,086)** | **(8,238)** | **(8,458)** | **(8,650)** | **(8,849)** | **(9,116)** | **(9,332)** | **(84,685)** |
| **Noninterest Exp. before Measures** | **($17,872)** | **($18,981)** | **($19,233)** | **($19,512)** | **($19,950)** | **($20,477)** | **($20,884)** | **($21,310)** | **($21,973)** | **($22,316)** | **($202,507)** |



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 141 of 507
Case:17-00138-LTS Doc#:429-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 13 Page 141 of 359

## Assumptions and Methodology: Revenue

| Category | Description | '17 Revenue $MM | '26 Revenue $MM | 2017 – 2026 Growth Methodology |
|---|---|---|---|---|
| **1 Taxes** | • Individual Income Taxes<br>• Corporate Income Taxes | 3,407 | 3,371 | • Grows with PR Nominal GNP Growth Factor<br>• Excludes corporate tax reform and compliance impact which is included within fiscal measure reform analyses |
| **2 Other General Fund Revenue** | • General Fund | 391 | 402 | • Grows with PR Nominal GNP Growth Factor |
| **3 Act 154** | • Act 154<br>• Act 154 / Foreign Company Tax Losses | 2,075 | 1,038 | • Act 154 revenue is sustained at 2017 levels until 2026<br>• Losses equal (519) in 2018, double in 2019, and sustained at 2019 levels |
| **4 SUT** | • General Fund Portion of SUT (10.5%)<br>• Additional SUT (COFINA, FAM, & Cine) | 2,568 | 2,673 | • Total SUT grown at PR Nominal GNP growth<br>• Allocation proportions grow at historical levels |
| **5 ACA Loss** | • Loss of Affordable Care Act ("ACA") Funding | 0 | -2,382 | • Initial decrease from (865) in 2018 to (1,516) in 2019<br>• Annual growth in loss of 6.7% from 2019 to 2026 |
| **6 Component Units** | • Other Tax Revenues<br>• Other Non-Tax Revenues | 1,916 | 2,132 | • Grows with PR Nominal GNP Growth Factor & Elasticity |

# Assumptions and Methodology: Expenses (1/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2016 Growth Methodology |
|---|---|---|---|---|
| **1** **Direct Payroll** | • Payroll and Operational Expenses<br>• Education Payroll<br>• Police Payroll | -3,271 | -3,675 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **2** **Direct Operational Expenses** | • Legislature<br>• Department of Education<br>• Other Agencies | -907 | -1,019 | • Growth based on previous year multiplied by PR Inflation and Inflation pass-through to payroll |
| **3** **Utilities** | • Power and Water<br>• PBA Operating Subsidy (Rent)<br>• Insurance Premiums | -260 | -396 | • PBA Operating Subsidy maintains<br>• Power and water have initial increase due to subsidy reduction with steady year-over-year growth until 2026 |
| **4** **Special Appropriations** | • UPR<br>• Judicial and Municipalities<br>• Retirement Systems<br>• Health Insurance | -3,890 | -4,147 | • UPR, Judicial and Municipalities increase in 2018, maintain steady-state following initial growth |
| **5** **Paygo Contributions in Excess of Asset Balance** | • Required Pay-go contribution: ERS, TRS and JRS | 0 | -1,278 | • Paygo program for ERS, TRS and JRS is initiated in 2018 with initial expenses of $989MM<br>• Steady growth in expenses starting in 2020 |
| **6** **Run-Rate Capital Expenditures** | • Non-Growth Capital Expenditures in the Base (Run-Rate)<br>• Growth Capex | -284 | -462 | • Initial increase in 2018 to $400MM and steady growth in following years based on previous year multiplied by PR Inflation following |

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 143 of 507
Case:17-00133-LTS Doc#:420-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 13 Page 163 of 355

## Assumptions and Methodology: Expenses (2/2)

| Category | Description | 2017 $MM | 2026 $MM | 2017 – 2026 Growth Methodology |
|---|---|---|---|---|
| **7 Reconciliation Adjustment** | • Reconciliation Adjustment | -585 | -657 | • Initial increase in 2018 to $592MM with steady increase until 2026<br>• Reconciliation adjustment based on midrange estimate provided by E&Y analysis and audit |
| **8 Other Non-Recurring** | • Payment of Past-Due Tax Refunds<br>• Transition and restructuring costs | -493 | 0 | • Initial decline in tax refunds in 2018 from $493MM to $150MM, decline in 2019 from $150MM to $5MM, and elimination of non-recurring expenses in 2023<br>• Costs to implement restructuring ($370MM over 10 years) |
| **9 Component Units** | • Net Deficit of Special Revenue Funds<br>• Independently forecasted non-enterprise<br>• HTA Operational Expenses | -853 | -1,675 | • Net Deficit of Special Revenue Funds growth is based on previous year multiplied by PR Inflation<br>• Non-enterprise expenses include ASEM, ASES, ADEA, PRCCDA, PRIDCO, PRITA, Tourism, and UPR deficits<br>• PBA and the Port Authority run a surplus in 2017 that transitions towards deficit beginning in 2018<br>• Initial HTA decline in expenses due to a reduction in Past Due AP costs |



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 144 of 507
Case:17-00133-LTS Doc#:4750-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 13 Page 144 of 507

# Assumptions and Methodology: Macroeconomic Factors



| Category | Description, % | 2017 – 2026 Growth Methodology |
|---|---|---|
| **1** **PR Nominal GNP Growth Factor** | -2.2, -2.8, -2.4, -0.5, -0.4, 0.3, 1.0, 1.6, 2.1, 2.6 | • Initial decrease to 97.2% in 2019<br>• Increase in 2020 to 99.5%<br>• Steady, minimal growth until 2026 |
| **2** **PR Inflation** | -0.2, 1.2, 1.0, 1.0, 1.1, 1.3, 1.5, 1.5, 1.6, 1.6 | • Initial negative inflation of -0.2% in 2017 increasing to 1.2% in 2018, 1.0% in 2019 with steady, minimal growth in Inflation until 2026 |
| **3** **PR Population Growth Factor** | -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2, -0.2 | • Maintenance of 2017 PR Population Growth Factor of 99.8% |
| **4** **US Population Growth** | 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.8, 0.7, 0.7, 0.7 | • Maintenance of 2017 US Population Growth of 100.8% until 2024, where it drops to 100.7% |

2017 2018 2019 2020 2021 2022 2023 2024 2025 2026



Case:17-00133-LTS   Doc#:4729-13   Filed:10/11/17   Entered:10/11/17 20:57:32   Desc:
Exhibit DX 13   Page 145 of 507

# III. FISCAL REFORM MEASURES



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00133-LTS Doc#:4750-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 13 Page 146 of 507

# Fiscal Reform measures reduce the 10-year financing gap by $39.6B



**Estimated Impact,** $MM

| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | 10-year Total |
|---|---|---|---|---|---|---|---|---|---|---|
| **A** Revenue Enhancement | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| **B** Government Right-sizing | 851 | 1,713 | 2,094 | 2,414 | 2,543 | 2,597 | 2,651 | 2,706 | 2,758 | 20,329 |
| **C** Reducing Healthcare Spending | 100 | 299 | 500 | 750 | 795 | 842 | 892 | 945 | 1,001 | 6,123 |
| **D** Pension Reform | 0 | 0 | 83 | 81 | 80 | 78 | 76 | 73 | 70 | 541 |
| **TOTAL** | 1,875 | 3,393 | 4,061 | 4,777 | 5,051 | 5,257 | 5,370 | 5,491 | 5,615 | 40,890 |

Excludes $1,310MM in supplier pay downs



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00138-LTS Doc#:4120-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX13 Page 147 of 507
Exhibit DX13 Page 147 of 507

# Hacienda will embark in a multi-year transformation process to reduce leakage, improve revenue collections and adjust fees

**Revenue Enhancement Measures,** $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Corporate Tax Reform** | ▪ The Government will use the breathing room provided by the extension of Act 154 to seek a more stable, consistent corporate tax policy that implements a broad-based regime with fewer exemptions by no later than January 2019 | $519MM |
| **Tax Compliance** | ▪ Reduce leakage by increasing electronic SUT tax collections at the point of sale, including internet sales<br>▪ Improve revenue collections by using advanced analytics, expanding capacity and conducting targeted interventions | $150MM |
| **Adjust Taxes and Fees** | ▪ Increase tobacco-related products excise tax and implement new property tax regime<br>▪ Revise fees including licenses, traffic fines, insurance fees and other charges for services to keep up with market trends | $255MM |



Note: To meet fiscal plan objectives, the Government may consider additional measures.

19

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 148 of 507
Case:17-00133-LTS Doc#:4/20-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 13 Page 248 of 359



# The Government must embark on a transformative journey in order to provide core services to citizens in an efficient and fiscally responsible manner

**Government Right-Sizing Measures[1],** $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Personnel Related** | ▪ Freeze on payroll increases for fiscal years 2018 to 2020<br>▪ Improve employee mobilization across government, uniform fringe benefits and eliminate vacation and sick day liquidations to produce higher attrition rates or other payroll-related savings |  $250MM |
| **Non-Personnel Related** | ▪ Freeze on operational cost increases for fiscal years 2018 to 2020<br>▪ Re-design the way the Government works by reducing non-core expenses, externalizing services to private entities, centralizing services to eliminate duplication, achieve procurement savings or other cost-cutting measures |  $190MM |
| **Reduction of Subsidies** | ▪ Gradually reduce general fund subsidies to the University of Puerto Rico, municipalities and other direct subsidies to the private sector<br>▪ Proactively engage with the University of Puerto Rico, municipalities, as well as industry partners, to mitigate the economic development impact of subsidy removal |  $411MM |



Note: To meet fiscal plan objectives, the Government may consider additional measures.
1) Post 2018, the relative distribution of savings between personnel and non-personnel related expenses will be decided as part of updates to the Fiscal Plan and the annual budget

# The Government will focus on improving efficiencies, adjusting benefits and developing a new healthcare model in order to achieve savings in healthcare spend

**Reducing Healthcare Spending Measures,** $MM



| Reform Measures | Description | 2018 Impact |
|---|---|---|
| **Pay for Value** | ▪ Establish uniformed fee schedules and limit reimbursement rates for providers<br>▪ Replace current profit sharing arrangement with MCOs and replace with a Medical Loss Ratio | **$38MM** |
| **Improve Payment Integrity** | ▪ Establish partnerships to increase the scrutiny of premium payments for beneficiaries that have left the system or have another health insurance plan<br>▪ Establish Medicaid Fraud Control Unit and implement the Medicaid Management Information System to reduce waste, fraud and abuse | **$25MM** |
| **Reduce Drug Cost** | ▪ Reduce outpatient drug spending by increase pharmacy discounts on branded drugs, enforce mandatory dispensing of generic drugs, updating the preferred formulary and establishing shared-savings initiatives | **$38MM** |
| **Modify Benefits Package** | ▪ Evaluate services that could be capped and/or eliminated from the current benefit package without adversely affecting access for Mi Salud beneficiaries | **$0** |
| **New Healthcare Model** | ▪ Develop a new healthcare model in which the Government pays for basic, less costly benefits and the patient pays for premium services selected resulting in cost reductions attributed to greater competition along with the capped PMPM amount | **$0** |



Note: To meet fiscal plan objectives, the Government may consider additional measures.

# Segmentation of the defined contribution structure will protect the retirement savings of government employees

**Pension Reform Measures,** $MM



| | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
|---|---|---|---|---|---|---|---|---|---|
| Total | 0 | 0 | 83 | 81 | 80 | 78 | 76 | 73 | 70 |
| Changes to Special Laws | | | 37 | 36 | 33 | 31 | 28 | 24 | 21 |
| Changes to Pension Benefits | | | 45 | 46 | 47 | 47 | 48 | 49 | 50 |

| Reform Measures | Initiative | 2018 Impact |
|---|---|---|
| **Contribution Segregation and New Benefit Plans** | ▪ Switch to pay-as-you-go model, segregate prospective employee contributions, facilitate Social Security enrollment and improve investment alternatives |  $0 |
| **Adjust Retirement Benefits** | ▪ Protect benefits for lowest pension income earners. Progressive strategy to reduce retirement benefit costs including other post-employment benefits. |  $0 |



Case:17-00188-LTS Doc#:4720-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 13 Page 151 of 507

# IV. STRUCTURAL REFORMS



## Implementing the package of structural reforms will provide a cumulative 2.0% increase in GNP growth

**1** Improve Ease of Business Activity

**2** Improve Capital Efficiency

**3** Energy Reform

**1a** Increase Labor Participation
- Institute public policy measures aimed to attract new businesses, create new employment opportunities, and foster private sector employment growth to increase labor demand
- Change welfare and labor incentives to encourage greater sector participation thus increasing labor supply

**1b** Permitting Process Reform
- Centralize, streamline, and modernize and expedite permitting processes; increase business friendly environmental and economic growth

**1c** Tax Reform
- Lower marginal tax rates and broaden the tax base; simplify and optimize the existing tax code to achieve gains in efficiency, ease of doing business and reducing tax evasion

**1d** Regulatory Reform
- Reduce unnecessary regulatory burdens to reduce the drag of government on the private sector

**2a** Infrastructure Reform
- Augmenting competitiveness by investing in critical infrastructure and quality of public services in roads, ports, telecommunications, water and waste, knowledge services, and other strategically important sectors

**2b** Public-Private Partnerships
- Leverage key public assets through long term concessions to optimize quality of public infrastructure, services to public and sustainable operations and maintenance

**2c** Critical Projects
- Implement management system to boost development of critical projects through expedited processes

**3a** Energy Reform
- Leverage and facilitate expedited private sector investments in modern, cost-efficient, and environmentally compliant energy infrastructure; reform PREPA operations and services to clients; and allow for greater competition in energy generation

**4** Promoting Economic Development

**4a** Enterprise Puerto Rico
- Promote productivity growth, attract FDI & incentivize investments in technology through collaboration with the private sector

**4b** Destination Marketing Organization
- Externalize the overseeing of marketing efforts & continuity under a single brand and as a unified front representing all of Puerto Rico's tourism components



Case:17-03283-LTS   Doc#:4759-20   Filed:01/12/19   Entered:01/12/19 17:45:34   Desc:
Exhibit DX 13   Page 153 of 507

# The initial stage of the P3 program includes launching of ~$5B of projects during the 2017-2019 calendar years that have been identified and are in project preparation

**P3 Project Identification**

- Identified initial list of priority projects with P3 potential
- Assessed project business cases and impacts on priority infrastructure needs, the economy, and efficient delivery of public services
- Split into 3 groups based on projected sequencing, **designed to launch in 2017, 2018 and 2019**

**Key Considerations in the Overall P3 Implementation**

- Project sequencing is designed to **effectively progress the advancement of projects and avoid major obstacles in the shortest timeline possible** (i.e., progression from easily executable/advanced permitting to more difficult/less advanced projects)
- Need to **promote and improve funding models to use private funds**, where relevant, as leverage to maximize the unused federal funds current available

**P3 Key Target Areas** %



Water  Other
8    0
Waste mgmt
20
Social infra
7
Transport
22
Energy
43



| 10-Year Impact | → Capital Improvement Investment: ~$5B \| Jobs Created: ~100,000 |

|  | 2017 | | | | 2018 | | | | 2019 | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
|  | Q-17 | Q2-17 | Q3-17 | Q4-17 | Q1-18 | Q2-18 | Q3-18 | Q4-18 | Q1-19 | Q2-19 | Q3-19 | Q4-19 |
| **Group 1** Projects | • Launch Group 1 Projects<br>• Estimated value ~$1B | | | | | | | | | | | |
| **Group 2** Projects | • Invest in preparing Group 2<br>• Data gathering, due diligence, etc. | | | | • Launch Group 2 Projects<br>• Estimated value ~$2B | | | | | | | |
| **Group 3** Projects | | • Invest heavily in preparing Group 3<br>• Data gathering, due diligence, etc. | | | | | | | • Launch Group 3 Projects<br>• Estimated value $2B | | | |

**(Project timeline includes P3 concessions included in Externalization measures)**



Case:17-00133-LTS Doc#:4720-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX 13 Page 154 of 507

# V. DEBT SUSTAINABILITY ANALYSIS



# Debt summary

- Below is a summary of the debt (excluding pension liabilities) considered in the fiscal plan
- Note: Amounts are estimated as of February 2017 and based upon preliminary unaudited numbers provided to AAFAF by issuer agencies and from publicly available information. On behalf of the Board, Ernst & Young is conducting an assessment of the debt outstanding to confirm these figures. Estimated amounts are subject to further review and may change

## Summary of debt outstanding as of February 2017 ($MM)

| Issuers included in Fiscal Plan | Bond principal | CAB | Unpaid P&I[1] | Private Loans | Total Bonds & Private loans | Loans from GDB/MFA Entities | Total Debt Service FY 17-19 | DSRF Balance |
|---|---|---|---|---|---|---|---|---|
| GO | $12,013 | $84 | $1,146 | $24 | $13,267 | $169 | $3,284 | -- |
| COFINA | 11,425 | 6,155 | -- | -- | 17,580 | -- | 2,121 | -- |
| HTA[2] | 3,983 | 135 | 6 | -- | 4,124 | 1,734 | 997 | 101 |
| PBA | 3,980 | -- | 117 | -- | 4,097 | 182 | 782 | 6 |
| GDB[3,4] | 3,182 | -- | 742 | 203 | 4,126 | -- | 1,863 | -- |
| ERS | 2,658 | 498 | -- | -- | 3,156 | -- | 500 | 44 |
| PRIFA[5] | 1,566 | 409 | 232 | -- | 2,207 | 49 | 464 | 2 |
| PFC | 1,025 | -- | 172 | -- | 1,197 | -- | 257 | -- |
| UPR[6] | 496 | -- | -- | 0 | 496 | 76 | 145 | 61 |
| PRCCDA | 386 | -- | -- | -- | 386 | 145 | 91 | 9 |
| PRIDCO | 145 | 11 | -- | -- | 156 | 78 | 54 | 19 |
| AMA | -- | -- | -- | 28 | 28 | -- | -- | -- |
| Other Central Gov't Entities | 197 | -- | 29 | 413 | 639 | 3,975 | -- | -- |
| **Total** | **$41,056** | **$7,293** | **$2,444** | **$668** | **$51,461** | **$6,409** | **$10,558** | **$242** |
| **Debt Issuers not incl. in Fiscal Plan** | | | | | | | | |
| PREPA | 8,259 | -- | -- | 697 | 8,956 | 36 | 2,775 | 6 |
| PRASA[7] | 3,943 | 28 | 13 | 584 | 4,568 | 229 | 995 | 93 |
| Children's Trust | 847 | 613 | -- | -- | 1,460 | -- | 140 | 85 |
| HFA | 542 | -- | -- | -- | 542 | 85 | 134 | 33 |
| PRIICO | -- | -- | -- | 98 | 98 | -- | -- | -- |
| Municipality Related Debt[8] | 556 | -- | -- | 1,140 | 1,696 | 2,036 | n.a. | 59 |
| **Total** | **$14,147** | **$641** | **$13** | **$2,520** | **$17,320** | **$2,386** | **$4,044** | **$276** |
| **Total** | **$55,203** | **$7,933** | **$2,457** | **$3,188** | **$68,781** | **$8,795** | **$14,602** | **$518** |
| *Less: GDB Bonds (excl. TDF)* | | | | | (3,766) | | | |
| *Plus: Loans from GDB/MFA Entities* | | | | | 8,795 | | | |
| **Public Sector Debt** | | | | | **$73,810** | | | |

Notes:
1) Unpaid principal and interest includes debt service that has been paid by insurers and is owed by the government
2) HTA includes Teodoro Moscoso bonds
3) GDB private loans includes Tourism Development Fund ("TDF") guarantees
4) Includes GDB Senior Guaranteed Notes Series 2013-B1 ("CFSE")
5) PRIFA includes PRIFA Rum bonds, PRIFA Petroleum Products Excise Tax BANs, PRIFA Port Authority bonds and $34.9m of PRIFA ASSMCA bonds
6) UPR includes $64.2m of AFICA Desarrollos Universitarios University Plaza Project bonds
7) PRASA bonds includes Revenue Bonds, Rural Development Bonds, Guaranteed 2008 Ref Bonds
8) Municipality Related Debt includes AFICA Guaynabo Municipal Government Center and Guaynabo Warehouse for Emergencies bonds



# Debt Service Schedule

**The table below summarizes the annual debt service through FY 2026 for all issuers included in the fiscal plan**

| FY 2017 – FY 2026 debt service ($MM) | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Fiscal year ending June 30, | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 |
| **Cash Interest** | | | | | | | | | | |
| GO | $733 | $714 | $699 | $680 | $658 | $641 | $621 | $597 | $571 | $545 |
| PBA | 186 | 186 | 183 | 179 | 175 | 169 | 163 | 157 | 151 | 145 |
| COFINA | 686 | 685 | 684 | 697 | 709 | 703 | 696 | 688 | 680 | 671 |
| HTA[1] | 206 | 201 | 194 | 188 | 182 | 175 | 167 | 160 | 153 | 145 |
| PRIFA[2] | 86 | 80 | 77 | 75 | 72 | 69 | 65 | 61 | 57 | 53 |
| PRCCDA | 19 | 18 | 17 | 17 | 16 | 15 | 15 | 14 | 13 | 12 |
| PFC | 56 | 55 | 54 | 53 | 51 | 50 | 48 | 47 | 44 | 42 |
| UPR[3] | 25 | 24 | 22 | 21 | 20 | 18 | 17 | 15 | 14 | 12 |
| ERS | 167 | 167 | 167 | 167 | 167 | 164 | 159 | 155 | 154 | 152 |
| GDB | 163 | 142 | 125 | 79 | 55 | 46 | 43 | 18 | 16 | 11 |
| PRIDCO | 8 | 8 | 7 | 7 | 6 | 5 | 5 | 4 | 3 | 2 |
| **Total** | **$2,333** | **$2,279** | **$2,229** | **$2,161** | **$2,109** | **$2,054** | **$1,999** | **$1,916** | **$1,857** | **$1,790** |
| **Principal** | | | | | | | | | | |
| GO | $395 | $351 | $392 | $439 | $334 | $358 | $378 | $402 | $428 | $454 |
| PBA | 91 | 66 | 70 | 74 | 100 | 102 | 96 | 103 | 107 | 100 |
| COFINA | 0 | 19 | 48 | 78 | 98 | 120 | 159 | 203 | 248 | 294 |
| HTA[1] | 131 | 140 | 126 | 136 | 142 | 150 | 146 | 155 | 164 | 169 |
| PRIFA[2] | 124 | 48 | 50 | 51 | 54 | 62 | 86 | 64 | 72 | 74 |
| PRCCDA | 12 | 12 | 13 | 14 | 14 | 15 | 16 | 17 | 17 | 18 |
| PFC | 29 | 30 | 32 | 33 | 34 | 36 | 37 | 39 | 41 | 43 |
| UPR[3] | 23 | 25 | 26 | 27 | 29 | 30 | 31 | 33 | 35 | 24 |
| ERS | (0) | 0 | -- | 0 | 50 | 70 | 80 | 19 | 22 | 29 |
| GDB | 309 | 277 | 848 | 432 | 434 | 143 | 47 | 541 | -- | 248 |
| PRIDCO | 10 | 10 | 11 | 11 | 11 | 13 | 13 | 14 | 15 | 16 |
| **Total** | **$1,124** | **$979** | **$1,614** | **$1,296** | **$1,299** | **$1,097** | **$1,091** | **$1,590** | **$1,149** | **$1,470** |
| **Total debt service** | | | | | | | | | | |
| GO | $1,128 | $1,066 | $1,090 | $1,118 | $991 | $999 | $999 | $999 | $999 | $999 |
| PBA | 277 | 253 | 252 | 253 | 274 | 270 | 259 | 260 | 258 | 245 |
| COFINA | 686 | 704 | 732 | 776 | 807 | 823 | 855 | 891 | 928 | 965 |
| HTA[1] | 337 | 340 | 320 | 324 | 324 | 325 | 314 | 315 | 317 | 314 |
| PRIFA[2] | 210 | 127 | 127 | 126 | 126 | 130 | 151 | 125 | 130 | 127 |
| PRCCDA | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 | 30 |
| PFC | 86 | 86 | 86 | 85 | 85 | 85 | 85 | 86 | 86 | 85 |
| UPR[3] | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 48 | 36 |
| ERS | 167 | 167 | 167 | 167 | 217 | 234 | 239 | 174 | 176 | 181 |
| GDB | 472 | 419 | 973 | 512 | 488 | 189 | 91 | 559 | 16 | 259 |
| PRIDCO | 18 | 18 | 18 | 18 | 16 | 18 | 18 | 18 | 18 | 18 |
| **Total** | **$3,457** | **$3,257** | **$3,843** | **$3,457** | **$3,408** | **$3,152** | **$3,090** | **$3,506** | **$3,006** | **$3,261** |

1  HTA includes Teodoro Moscoso Bridge
2  PRIFA includes PRIFA BANs
3  UPR includes AFICA UPP



28

# Debt sustainability

**The table below summarizes the annual cash flow available for debt service, and calculates implied debt capacity based on a range of interest rates and coverage ratios assuming an illustrative 35 year term**

- Cash flow available for debt service incorporates (i) the payment of essential services, (ii) benefit of clawback revenues and (iii) a prudent contingency reserve
- In the Fiscal Plan summarized below, the cash flow after Measures but before Debt Service averages $787m per year during the period 2017 - 2026

## Debt sustainability sensitivity analysis ($MM)

| Fiscal year ending June 30 ($ in millions) | 2017 | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 | 2026 | '17 - '26 total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Baseline Projections** | | | | | | | | | | | |
| Revenues | $18,952 | $17,511 | $16,407 | $16,434 | $16,494 | $16,590 | $16,746 | $16,953 | $17,204 | $17,509 | $170,799 |
| Expenses | (17,872) | (18,981) | (19,233) | (19,512) | (19,950) | (20,477) | (20,884) | (21,310) | (21,973) | (22,316) | (202,507) |
| **Cash Flow Excl. Debt Service & Measures** | 1,080 | (1,470) | (2,826) | (3,077) | (3,456) | (3,886) | (4,139) | (4,357) | (4,769) | (4,808) | (31,708) |
| **Impact of Measures** | | | | | | | | | | | |
| Revenue Measures | -- | 924 | 1,381 | 1,384 | 1,531 | 1,633 | 1,740 | 1,752 | 1,766 | 1,785 | 13,897 |
| Expense Measures | -- | 951 | 2,012 | 2,415 | 2,983 | 3,156 | 3,255 | 3,357 | 3,724 | 3,830 | 25,683 |
| **Total Measures** | -- | 1,875 | 3,393 | 3,799 | 4,515 | 4,789 | 4,995 | 5,108 | 5,491 | 5,615 | 39,580 |
| **Cash Flow Available for Debt Service** | $1,080 | $404 | $567 | $722 | $1,059 | $903 | $857 | $751 | $722 | $808 | $7,873 |

### Illustrative Sustainable Debt Capacity Sizing Analysis

| | | Sensitivity Analysis: Implied Debt Capacity at 10% Contingency | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | **$700** | **$750** | **$800** | **$850** | **$900** | **$950** | **$1,000** | **$1,050** | **$1,100** |
| | *3.5%* | 12,600 | 13,500 | 14,400 | 15,301 | 16,201 | 17,101 | 18,001 | 18,901 | 19,801 |
| **Sensitivity Analysis: PV Rate %** | *4.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *4.5%* | 11,000 | 11,786 | 12,572 | 13,358 | 14,143 | 14,929 | 15,715 | 16,501 | 17,286 |

| | | Sensitivity Analysis: Implied Debt Capacity at 4% PV Rate | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| **Illustrative Cash Flow Available** | | **$700** | **$750** | **$800** | **$850** | **$900** | **$950** | **$1,000** | **$1,050** | **$1,100** |
| | *5.0%* | 12,412 | 13,299 | 14,185 | 15,072 | 15,958 | 16,845 | 17,731 | 18,618 | 19,505 |
| **Sensitivity Analysis: % Contingency** | *10.0%* | 11,759 | 12,599 | 13,439 | 14,278 | 15,118 | 15,958 | 16,798 | 17,638 | 18,478 |
| | *15.0%* | 11,105 | 11,899 | 12,692 | 13,485 | 14,278 | 15,072 | 15,865 | 16,658 | 17,451 |



Case:17-00133-LTS Doc#:4/20-13 Filed:10/12/17 Entered:10/12/17 20:57:32 Desc:
Exhibit DX 13 Page 358 of 507

# VI. TSA LIQUIDITY



TSA LIQUIDITY

# Weekly cash flow forecast through 2017FY

| | Cash Flows Before Cliffs, Measures and Debt *(figures in $mm)* | Fcst - 1 3/17 | Fcst - 2 3/24 | Fcst - 3 3/31 | Fcst - 4 4/7 | Fcst - 5 4/14 | Fcst - 6 4/21 | Fcst - 7 4/28 | Fcst - 8 5/5 | Fcst - 9 5/12 | Fcst - 10 5/19 | Fcst - 11 5/26 | Fcst - 12 6/2 | Fcst - 13 6/9 | Fcst - 14 6/16 | Fcst - 15 6/23 | Fcst - 16 6/30 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | General Collections | $349 | $254 | $58 | $71 | $66 | $760 | $186 | $63 | $66 | $334 | $60 | $44 | $59 | $134 | $520 | $57 |
| 2 | Sales and Use Tax | 18 | 13 | 146 | 5 | 17 | 14 | 163 | 5 | 18 | 5 | 167 | 4 | 5 | 18 | 14 | 171 |
| 3 | Excise Tax through Banco Popular | 64 | – | – | – | 77 | – | – | – | 68 | – | – | – | 57 | – | – | – |
| 4 | Rum Tax | – | 10 | – | – | – | 11 | – | – | 18 | – | – | – | – | – | 22 | – |
| 5 | Electronic Lottery | – | – | – | – | – | – | – | – | – | – | – | – | – | – | 14 | 37 |
| 6 | Subtotal | $432 | $277 | $204 | $76 | $161 | $784 | $349 | $68 | $84 | $424 | $227 | $48 | $64 | $210 | $570 | $265 |
| 7 | Employee/Judiciary Retirement Admin. | – | – | – | – | 56 | – | – | – | 56 | – | – | – | – | 56 | – | – |
| 8 | Teachers Retirement System | – | – | – | – | 70 | – | – | – | – | – | – | – | – | – | – | – |
| 9 | Retirement System Transfers | – | – | – | – | 127 | – | – | – | 56 | – | – | – | – | 56 | – | – |
| 10 | Federal Funds | 93 | 110 | 83 | 123 | 95 | 119 | 123 | 95 | 126 | 93 | 123 | 49 | 99 | 107 | 107 | 121 |
| 11 | Other Inflows | 9 | – | 11 | – | – | 9 | 11 | – | – | – | – | 11 | – | – | – | 11 |
| 12 | Tax Revenue Anticipation Notes | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – | – |
| 13 | **Total Inflows** | **$534** | **$388** | **$298** | **$199** | **$382** | **$912** | **$483** | **$163** | **$267** | **$517** | **$350** | **$108** | **$163** | **$373** | **$677** | **$397** |
| 14 | Payroll and Related Costs | (18) | (51) | (120) | (23) | (95) | (62) | (101) | (35) | (90) | (65) | (96) | (18) | (22) | (95) | (56) | (106) |
| 15 | Pension Benefits | – | – | (87) | – | (82) | – | (87) | – | (82) | – | (87) | – | – | (82) | – | (87) |
| 16 | Health Insurance Administration - ASES | (53) | (53) | (55) | (53) | (53) | (53) | (60) | (53) | (53) | (53) | (53) | (7) | (53) | (53) | (53) | (55) |
| 17 | University of Puerto Rico - UPR | (18) | (18) | (24) | (18) | (18) | (18) | (24) | (18) | (18) | (18) | (18) | (6) | – | (36) | (18) | (24) |
| 18 | Muni. Revenue Collection Center - CRIM | (21) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | (8) | – | – | (15) | (8) | (26) |
| 19 | Highway Transportation Authority - HTA | – | – | (16) | – | – | – | (16) | – | (19) | – | – | (19) | – | – | (19) | (19) |
| 20 | Public Building Authority - PBA / AEP | (9) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | (4) | – | (4) | (4) | (4) | (4) | (4) |
| 21 | Other Governmental Entities | (20) | (9) | (54) | 25 | (20) | (9) | (54) | 25 | (20) | (9) | (12) | (18) | (3) | (20) | (9) | (63) |
| 22 | Subtotal - Government Entity Transfers | ($120) | ($92) | ($160) | ($57) | ($103) | ($92) | ($165) | ($57) | ($122) | ($92) | ($90) | ($54) | ($59) | ($128) | ($111) | ($191) |
| 23 | Supplier Payments | (57) | (57) | (58) | (86) | (86) | (86) | (87) | (68) | (68) | (68) | (68) | (53) | (65) | (65) | (65) | (66) |
| 24 | Other Legislative Appropriations | (24) | (14) | (5) | (2) | – | (38) | (5) | (6) | (22) | (10) | (5) | (4) | – | (16) | (22) | (5) |
| 25 | Tax Refunds | (12) | (13) | (4) | (1) | (6) | (39) | (4) | (7) | (4) | (4) | (31) | (3) | (1) | (4) | (6) | (41) |
| 26 | Nutrition Assistance Program | (30) | (70) | (22) | (35) | (40) | (54) | (36) | (22) | (43) | (56) | (36) | (16) | (37) | (30) | (70) | (20) |
| 27 | Other Disbursements | – | – | – | – | – | – | – | – | – | – | – | (4) | – | – | – | (4) |
| 28 | Contingency | (16) | (16) | (16) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (29) | (23) | (23) | (23) | (23) | (23) |
| 29 | Tax Revenue Anticipation Notes | – | – | – | – | – | – | (152) | – | – | – | – | (137) | – | – | – | (135) |
| 30 | **Total Outflows** | **($277)** | **($313)** | **($472)** | **($233)** | **($440)** | **($399)** | **($665)** | **($223)** | **($459)** | **($324)** | **($442)** | **($312)** | **($208)** | **($443)** | **($353)** | **($676)** |
| 31 | Net Cash Flows Excluding Debt Service, Fiscal Cliffs and Measures | $257 | $75 | ($174) | ($34) | ($58) | $513 | ($182) | ($60) | ($193) | $194 | ($92) | ($204) | ($44) | ($70) | $324 | ($279) |
| 32 | Bank Cash Position, Beginning (a) | $319 | $576 | $650 | $477 | $442 | $384 | $897 | $716 | $655 | $462 | $656 | $564 | $360 | $316 | $246 | $570 |
| 33 | **Bank Cash Position, Ending (a)** | **$576** | **$650** | **$477** | **$442** | **$384** | **$897** | **$716** | **$655** | **$462** | **$656** | **$564** | **$360** | **$316** | **$246** | **$570** | **$291** |



(a) Excludes clawback account.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Case:17-00133-LTS Doc#:4759-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 13 Page 360 of 507
Exhibit 13 Page 360 of 557

## Liquidity Principles for FY 2018

- No external short-term financing

- Rollout of Disbursement Authorization Group in order to enforce priority of payments through defined critical services (see Section VII)

- Consolidate dispersed treasury functions and put in place oversight over accounts not centrally managed

- Refine and regularly update 13 week cash analysis with detailed forecasting of cash receipts and disbursements

- Provide detailed daily performance projections, results, and variances



1 Cash management authority is granted to AAFAF under Act 5-2017 and other relevant legislation

Case:17-00133-LTS Doc#:4720-13 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX 13 Page 341 of 507

# VII. FINANCIAL CONTROL REFORM



## Current state of financial controls

- Cash is not centrally managed
  - No central office has visibility across all spending
  - Procurement agencies do not actively enforce terms and specifications
  - Limited coordinated effort to eliminate major cash outlays
  - Limited sweep of cash into general fund accounts
  - Cash disbursements is a manual and subjective process handled at Hacienda
  - No formal structure for reporting and release of audited financials

- Target is to improve level of detail on forecasting and specificity around assumptions
  - "Top-down" approach, based on prior year's Budget
  - Bank-to-book reconciliations are not often prepared in a timely manner
  - No tracking mechanisms exist to measure intra-year actual expenditures vs. budget on an accrual basis



## Budget certification per PROMESA § 202



**3/13:**
- Certification of Fiscal Plan

**6/30:**
- Last day for budget certification per PROMESA § 202(e)

**7/1:**
- Beginning of FY2018

March          April          May          June          July

**3/17:**
- Set timeline for budget certification per PROMESA § 202 (a)
- Work with Oversight Board in designing a reporting structure and reporting forms

**4/14:**
- Adopt procedures to deliver timely statements and to make public per PROMESA § 202(a)

**4/28:**
- Submit budget and implementation plan to Oversight Board

**5/22:**
- Submit revised budgets and supporting documents to Board, if necessary

**6/5:**
- Budget certification



## Quarterly budget compliance process per PROMESA § 203

| Quarterly Action | PROMESA section | Description | Proposed dates (mm/dd/yy) |
|---|---|---|---|
| **Reporting[1]** | § 203 (a) | ▪ Governor to submit a report describing: (1) the actual cash revenues, expenditures, and flows and (2) any other information requested by the Board | ▪ Q1: 10/15/17[1]<br>▪ Q2: 1/16/18<br>▪ Q3: 4/16/18<br>▪ Q4: 7/16/18 |
| **External auditing** | § 203 (b) | ▪ Oversight Board to communicate the result of external auditing report to the government and identify any inconsistencies with the projected revenues, expenditures, or cash flows set forth in the certified Budget for such quarter | ▪ Q1: 11/10/17<br>▪ Q2: 2/12/18<br>▪ Q3: 5/10/18<br>▪ Q4: 8/10/18 |
| **Correction of variance** | § 203 (b) | ▪ Government to provide additional information regarding any inconsistencies with the certified budget and implement remedial action to correct variances | ▪ Q1: 11/20/17<br>▪ Q2: 2/20/18<br>▪ Q3: 5/21/18<br>▪ Q4: 8/20/18 |
| **Certification of variance / or Budget reductions by Board** | § 203 (c) and (d) | ▪ Board to certify that the government is at variance with the applicable certified Budget, and that the Government has initiated such measures as the Board considers sufficient to correct it<br>▪ If the variances are not corrected, the Board shall make appropriate reductions in nondebt expenditures and may institute automatic hiring freezes in instrumentalities and prohibit them from entering in any contract in excess of $100,000 | ▪ Q1: 12/11/17<br>▪ Q2: 3/12/18<br>▪ Q3: 6/11/18<br>▪ Q4: 9/10/18 |
| **Termination of budget reductions** | § 203 (e) | ▪ The Board should decide whether the government or instrumentality has made the appropriate measures to reduce expenditures or increase revenues and cancel the reductions | ▪ Ongoing |



1 Per PROMESA, these dates must be 15 days after end of each quarter

## Budget and Forecasting process

**Define a timeline for each quarter's budget**

- Certification process must adhere to PROMESA requirements
- Should include, but not be limited to:
  - Certification process according to PROMESA requirements
  - Reporting, external auditing, and variance certifications

**Set guiding principles for budget and forecasting**

- Budget should be prepared…
  - Within the **confines of the overall fiscal plan**
  - As a **positive cash balance** with sufficient safety margin, due to lack of access to capital markets

**Set, update, and track targets every quarter**

- Use performance metrics, e.g.,:
  - Status? On track / Delayed / Completed
  - Reached target?
  - Above / below past instances?
- Implement measures to correct variances from budget



Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX 13 Page 166 of 507
Case:17-00133-LTS Doc#:4720-13 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX 13 Page 166 of 507

## Disbursement process

| | |
|---|---|
| **Define disbursement process** | ▪ Set guidelines and principles<br>▪ Work to match budget to disbursement authorizations<br>▪ Identify an effective, centralized, and time-sensitive disbursement process that involves the adequate authorities<br>   – Incorporate a mechanism that confirms alignment between revenues and expenses |
| **Implement a centralized disbursement digital database** | ▪ Centralize into a single Treasury account with a corresponding database<br>▪ Update and review periodically<br>▪ Set a minimum available liquidity threshold and an alert-system |
| **Set, update, and track metrics every quarter** | ▪ Establish preventive measures<br>▪ Implement detective procedures to correct problems before they arise<br>▪ Design a process to correct variances from budget mid-year |



Case:17-00133-LTS  Doc#:420-14  Filed:10/17/17  Entered:10/17/17 20:57:32  Desc:
Exhibit 14  Page 3 of 3

# EXHIBIT 14

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:45:34 Desc:
Exhibit DX-U1 Page 168 of 507



# PUERTO RICO HOY

**EL NUEVO DÍA**
Martes,
25 de abril de 2017

## $8,360
**MILLONES DE INGRESOS**
Estos son los fondos que, según las proyecciones, allegaría el gobierno en el año fiscal 2018
si no se toman medidas adicionales de recaudos.

# "FINITO" EL PRÓXIMO PRESUPUESTO

**Ricardo Cortés Chico**
rcortes@elnuevodia.com
Twitter: @rcorteschico

☑ Elías Sánchez advierte que todavía quedan por anunciarse drásticos cambios para las agencias
☑ Sostiene que las nuevas leyes permiten que haya una rápida y amplia intervención con los presupuestos de las dependencias gubernamentales

◻ El presupuesto que presentará el gobernador **Ricardo Rosselló Nevares** ante la Junta de Supervisión Fiscal (JSF) en o antes del próximo domingo incluirá la fusión de todas las agencias de servicios sociales, las de desarrollo económico, las cárceles del País e impulsará la clausura de una cantidad significativa de escuelas públicas.

Del mismo modo, se contempla incluir en el presupuesto mecanismos para aumentar la visibilidad y el alcance del Departamento de Hacienda sobre las finanzas de las agencias y los distintos potes de gobierno, incluyendo el de la Corporación del Fondo de Interés Apremiante (Cofina), ente cuyos acreedores no han sido afectados por los impagos del gobierno.

El representante del gobernador ante la JSF, **Elías Sánchez Sifonte**, explicó que el presupuesto, cuya porción para el Fondo General podría rondar los $9,284 millones, no tendrá mucho espacio para cambios o malabares porque se presume que el cuadre será "finito".

Advirtió, sin embargo, que varias leyes que firmó Rosselló Nevares allanan el camino para que Hacienda y la Autoridad de Asesoría Financiera y Agencia Fiscal (AAFAF) puedan intervenir y ajustar los presupuestos de las agencias y corporaciones públicas de ser necesario.

"No hay espacio para fallar en esto. Incluso, si ves el plan de liquidez, te das cuenta que para lograr las métricas todo está finito, y si no se logran los objetivos se pone en riesgo todo el balance. Si no se ejecuta bien, el efecto del Plan Fiscal en la economía podría ser peor que el que esperamos", dijo Sánchez en una entrevista con **El Nuevo Día**.

Con esto se refería a las proyecciones de una mayor contracción de la economía, que se anticipa que ocurra una vez comiencen a implementarse las medidas de austeridad que supervisa el organismo creado por el Congreso estadounidense.

El propio Plan Fiscal proyecta que el Producto Nacional Bruto (PNB) —uno de los principales indicadores económicos— caerá 2.8% entre el próximo 1 de julio hasta el 30 de junio de 2018. Esta valoración es a precios actuales. Si al cálculo se le quita la inflación, la caída real sería de 4%.

Algunos expertos, como el premio Nobel de Economía, **Joseph Stiglitz**, han advertido que este porcentaje subestima el efecto de la austeridad que se propone en el Plan Fiscal. En una reciente visita a Puerto Rico, el también ex vicepresidente del Banco Mundial, estimó que la caída del PNB real podría llegar hasta un 16%.

Sánchez Sifonte indicó que está al tanto de las críticas al Plan Fiscal de diversos economistas, muchos de ellos de calibre mundial. Indicó, no obstante, que tanto el gobierno como la JSF tienen sus propios peritos que han trabajado en colaboración y han llegado a los números esbozados en ese documento.

"De que pueda haber otras proyecciones, pues eso puede pasar, por tenemos nuestros peritos y estamos confiando que ese es el escenario (el del Plan Fiscal) más realista y con la esperanza que vamos a lograr un panorama mejor en el futuro", dijo Sánchez Sifonte, al admitir que, más allá


"La implementación (de los recortes) es una de las áreas que más difícil se le ha hecho al gobierno. Nadie cree que el gobierno va a tener la voluntad"


"La reducción de escuelas tiene mucha resistencia política, pero estamos en un escenario en que se reducen o se recorta la jornada, como dice la JSF"

"El Plan Fiscal está conceptualizado sobre la idea de que todos los ingresos del gobierno van a un solo pote (contrario a como pasa actualmente con Cofina)"

**ELÍAS SÁNCHEZ**
representante del gobernador en la JSF



**pressreader** Printed and distributed by PressReader
PressReader.com · +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc:
Exhibit DX-JJ Page 169 of 507

Case:17-00488-LTS Doc#:120-14 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit 14 Page 89 of 3



# 4%

**CAÍDA EN EL PNB REAL**

Los estimados del Plan Fiscal sugieren que la economía caerá este porcentaje en el año fiscal 2018, que inicia en julio.



# $924

**MILLONES**

Estos son los ingresos adicionales que buscará obtener el gobierno durante el próximo año fiscal como parte de la reestructuración fiscal.

**5**

de las presuntas fallas en el documento, hay otros asuntos que amenazan directamente la economía de Puerto Rico, como la reforma contributiva estadounidense y una posible alza de las tasas de interés por el Banco de la Reserva Federal.

Todo esto es particularmente importante en la creación del presupuesto, puesto que el gobierno está obligado a seguir los números que se establecen en el documento fiscal. Por ejemplo, si las proyecciones de recaudos que tiene el Plan no son certeras, el gobierno podría incurrir en un sobregasto, lo que podría desembocar en nuevas medidas de emergencia que afecten aún más el deterioro económico que se experimenta en Puerto Rico desde el 2006.

Y las dudas alrededor del Plan Fiscal incluyen aspectos importantes, como las proyecciones poblacionales, los multiplicadores económicos y los estimados de recaudos de los cambios esbozados para las rentas internas del gobierno, especialmente en el área de las contribuciones.

Por ejemplo, tan reciente como la semana pasada, el Departamento de Hacienda enmendó su estimado de recaudos para el aumento al arbitrio sobre los productos de tabaco. De unos $161 millones que se estimaban como nuevos ingresos inicialmente, se bajó a $52 millones. Esto responde a que se presume que el consumo de cigarrillos bajaría significativamente con el nuevo gravamen.

**HORA DE ENTREGA.** Actualmente, el gobierno trabaja revisando, partida a partida, las asignaciones específicas que tendrán las agencias y los entes que reciben algún tipo de transferencia estatal en el próximo presupuesto.

Este proceso, indicó Sánchez Sifonte, servirá para calibrar la zapata de los cambios que se establecerán como parte del Plan Fiscal certificado a mediados de marzo por la JSF.

Se supone que el gobierno entregue el presupuesto a la JSF, a más tardar, el 30 de abril. Si no cumple con esta disposición, la Junta podría activar los mecanismos de contingencia que en primera instancia implicarían eliminar el bono de Navidad de los empleados públicos y un recorte del 20%

de la jornada laboral en el gobierno.

La administración Rosselló debe entregar otros dos documentos a la JSF en esta fecha: la proyección de liquidez para el próximo año fiscal y los planes de implementación de los recortes en gastos y cambios estructurales del gobierno que contiene el Plan Fiscal.

Este último, según Sánchez Sifonte, representa el reto más grande para el gobierno por la actitud política que siempre permea cuando se intenta recortar los gastos del gobierno.

"Nadie cree que el gobierno va a tener la voluntad política para hacer estos cambios", dijo el representante del gobernador ante la JSF. Por ejemplo, indicó que, dentro de la mayoría legislativa, hay mucha resistencia con el cierre de escuelas públicas.

"Hay que entender que estamos en un escenario en eso se hace y se reduce la cantidad de escuelas o se hace lo que propuso la Junta de reducir la jornada de los maestros. Uno

puede pensar que hay otras alternativas, pero esas alternativas no producen los ahorros que se necesitan", aseguró.

Una situación similar describió cuando habló de la Universidad de Puerto Rico. Indicó que el sistema universitario público tiene que buscar una verdadera autonomía fiscal, procurando sus propios ingresos, como hace la mayoría de las universidades estadounidenses.

"La UPR tiene que independizarse realmente. Tienen que ser autosuficientes. Es un asunto de política pública, y creo que ellos tienen muchos recursos para generar ingresos", señaló.



## LAS CONDICIONES DEL PLAN FISCAL

La certificación del Plan Fiscal por la Junta, estuvo condicionada en varios aspectos:

● **Presentar el presupuesto** del año fiscal 2018 en o antes del 30 de abril de 2017.

● **Elaborar una propuesta** detallada sobre la puesta en marcha de las medidas de reducción del gasto gubernamental.

● **Crear una reserva** de $200 millones antes del inicio del próximo año fiscal.

Si no se cumplen estas metas fiscales, se podría poner en marcha un plan de contingencia que reduciría un 20% la jornada laboral de la gran mayoría de los empleados públicos y eliminaría el beneficio del bono de Navidad.

● **Proveer fondos** para los pagos de las pensiones bajo el sistema "pay as you go" usando los ingresos que recibe el gobierno en el Fondo General.

● **Segregar los fondos** de los distintos sistemas de pensiones.

Vea la traducción al inglés de esta nota en endi.com

FOTOS: DAVID.VILLAFANE@GFRMEDIA.COM

**press**reader
Printed and distributed by PressReader
PressReader.com • +1 604 278 4604
COPYRIGHT AND PROTECTED BY APPLICABLE LAW

# EXHIBIT 15




# PROJECT ESTADO

**SUT Summary - March 13th Fiscal Plan**

*($ in millions)*

|  | FY 2017 | FY 2018 | FY 2019 | FY 2020 | FY 2021 | FY 2022 | FY 2023 | FY 2024 | FY 2025 | FY 2026 |
|---|---|---|---|---|---|---|---|---|---|---|
| General Fund | $1,718 | $1,655 | $1,596 | $1,553 | $1,511 | $1,484 | $1,472 | $1,474 | $1,487 | $1,512 |
| Additional SUT (COFINA, FAM, Cine) | 850 | 877 | 906 | 936 | 968 | 1,003 | 1,039 | 1,078 | 1,118 | 1,161 |
| Total | 2,568 | 2,532 | 2,502 | 2,489 | 2,479 | 2,487 | 2,511 | 2,552 | 2,605 | 2,673 |
| *YoY Growth %* | | *(1.4%)* | *(1.2%)* | *(0.5%)* | *(0.4%)* | *0.3%* | *1.0%* | *1.6%* | *2.1%* | *2.6%* |
| | | | | | | | | | | |
| COFINA Pledge Amount | $724 | $753 | $783 | $815 | $847 | $881 | $916 | $953 | $991 | $1,031 |
| *YoY Growth %* | | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* | *4.0%* |
| | | | | | | | | | | |
| <u>Additional SUT</u> | | | | | | | | | | |
| COFINA - $ | $724 | $753 | $783 | $815 | $847 | $881 | $916 | $953 | $991 | $1,031 |
| Other - $ | $126 | $124 | $123 | $121 | $121 | $122 | $123 | $125 | $127 | $130 |
| | | | | | | | | | | |
| <u>Additional SUT</u> | | | | | | | | | | |
| COFINA - % | 85.2% | 85.9% | 86.4% | 87.0% | 87.5% | 87.8% | 88.2% | 88.4% | 88.6% | 88.8% |
| Other - % | 14.8% | 14.1% | 13.6% | 13.0% | 12.5% | 12.2% | 11.8% | 11.6% | 11.4% | 11.2% |

# EXHIBIT 16

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x
                                       :

LEX CLAIMS, LLC, *et al.*,            :

                Plaintiffs,   :

           - against -      :   Civil No. 3:16-cv-2374 (FAB)

ALEJANDRO GARCIA PADILLA, *et al.*,  :

              Defendants.  :

                                         :
-------------------------------------------------------------x

## COFINA DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFFS' SECOND AMENDED COMPLAINT

COME NOW Defendants Puerto Rico Sales Tax Financing Corporation ("COFINA") and the Honorable Juan Vaquer, as Executive Director of COFINA (collectively, the "COFINA Defendants"), specially appearing without submitting to the jurisdiction of this Court, and allege and state in answer to Plaintiffs' Second Amended Complaint that they:

1.     Admit that Plaintiffs purport to characterize their pleadings as alleged in the first sentence of paragraph 1 of the Second Amended Complaint, state that Plaintiffs' characterizations of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2101 *et seq*. ("PROMESA") in the second sentence of such paragraph are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

2.     Deny the allegations in paragraph 2 of the Second Amended Complaint.

3.     Deny the allegations in paragraph 3 of the Second Amended Complaint, except refer the Court to Section 204 of PROMESA for its provisions and effect.

4. Deny the allegations in paragraph 4 of the Second Amended Complaint, except refer the Court to Section 207 of PROMESA for its provisions and effect.

5. Lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 5 of the Second Amended Complaint, except refer the Court to the Puerto Rico Constitution, and its Article VI, for its provisions and effect.

6. State that the allegations in paragraph 6 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to the Puerto Rico Constitution and Exhibit A of the Second Amended Complaint for their provisions and effect.

7. Deny the allegations in paragraph 7 of the Second Amended Complaint, except refer the Court to Exhibits B and C of the Second Amended Complaint for their text.

8. State that the allegations in paragraph 8 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA and the Puerto Rico Constitution for their provisions and effect.

9. State that the allegations in paragraph 9 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except admit that Governor Garcia Padilla issued Executive Order 2016-30 (the "Executive Order"), and refer the Court to the Executive Order and PROMESA for their provisions and effect.

10. State that the allegations in paragraph 10 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except admit that the Commonwealth enacted a budget for Fiscal Year 2017, and

refer the Court to the text of such budget for its provisions and effect.

11.     Deny the allegations in paragraph 11 of the Second Amended Complaint,

except refer the Court to the alleged legislation enacted by the Commonwealth of Puerto Rico for

its provisions and effect.

12.     State that the allegations in paragraph 12 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA for its provisions and effect.

13.     Admit that Plaintiffs purport to characterize their pleadings as alleged in

paragraph 13 of the Second Amended Complaint, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA for its provisions and effect.

14.     Deny the allegations in paragraph 14 of the Second Amended Complaint,

except refer the Court to PROMESA for its provisions and effect.

15.     State that the allegations in paragraph 15 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

16.     State that the allegations in paragraph 16 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

17.     State that the allegations in paragraph 17 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except admit that Governor Garcia Padilla issued the Executive Order on the same

day PROMESA was signed into law, and refer the Court to the Executive Order for its
provisions and effect.

18.     Deny the allegations in paragraph 18 of the Second Amended Complaint.

19.     State that the allegations in paragraph 19 of the Second Amended
Complaint other than the first sentence are legal arguments requiring no response, and otherwise
deny the allegations in such paragraph, deny the allegations in the first sentence of such
paragraph, and refer the Court to Act No. 56-2007, Act No. 291-2006, and the Puerto Rico
Constitution for their provisions and effect.

20.     State that the allegations in paragraph 20 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny the allegations in such
paragraph, except refer the Court to PROMESA, the Puerto Rico Constitution, and the Executive
Order for their provisions and effect.

21.     State that the allegations in paragraph 21 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny the allegations in such
paragraph, except refer the Court to PROMESA for its provisions and effect.

22.     Deny the allegations in paragraph 22 of the Second Amended Complaint.

23.     Lack knowledge or information sufficient to form a belief as to the truth of
the allegations in paragraph 23 of the Second Amended Complaint, except admit that the parties
listed in such paragraph are Plaintiffs in this action.

24.     Admit the allegations in paragraph 24 of the Second Amended Complaint.

25.     Admit the allegations in paragraph 25 of the Second Amended Complaint,
except state that the allegations in footnote 1 of such paragraph are legal arguments requiring no
response, and otherwise deny the allegations in such footnote.

26.     Admit the allegations in paragraph 26 of the Second Amended Complaint.

27.     State that the allegations in paragraph 27 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except admit the allegations in the first sentence of such paragraph.

28.     Deny the allegations in paragraph 28 of the Second Amended Complaint, except admit that Puerto Rico law provides for the official duties of each of the individuals listed in paragraphs 25 through 27 of the Second Amended Complaint.

29.     Admit the allegations in paragraph 29 of the Second Amended Complaint.

30.     Admit the allegations in paragraph 30 of the Second Amended Complaint.

31.     Admit the allegations in paragraph 31 of the Second Amended Complaint.

32.     Deny the allegations in paragraph 32 of the Second Amended Complaint, except admit that the Defendants listed in paragraphs 29 through 31 of the Second Amended Complaint have the respective roles ascribed to them in those paragraphs.

33.     Admit that Plaintiffs purport to characterize their pleadings and this litigation as alleged in paragraph 33 of the Second Amended Complaint, and otherwise deny the allegations in such paragraph.

34.     State that the allegations in paragraph 34 of the Second Amended Complaint are legal argument requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

35.     Deny the allegations in paragraph 35 of the Second Amended Complaint, except admit that Governor Garcia Padilla delivered an address on June 29, 2015, and refer the Court to the transcript of that address for its text.

36.     Lack knowledge or information sufficient to form a belief as to the truth of
the allegations in paragraph 36 of the Second Amended Complaint concerning which legislative
options the Commonwealth of Puerto Rico considered in response to its unprecedented fiscal
crisis, and otherwise deny the allegations in such paragraph.

37.     Deny the allegations in paragraph 37 of the Second Amended Complaint,
except admit that the Commonwealth of Puerto Rico considered various legislative options in
response to its unprecedented fiscal crisis, and refer the Court to the actions of Congress for their
provisions and effect.

38.     State that the allegations in paragraph 38 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny the allegations in such
paragraph, except admit that Congress passed PROMESA, that the President signed it into law
on June 30, 2016, and refer the Court to PROMESA for its provisions and effect.

39.     State that the allegations in paragraph 39 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny the allegations in such
paragraph, except refer the Court to PROMESA for its provisions and effect.

40.     State that the allegations in paragraph 40 of the Second Amended
Complaint are legal arguments requiring no response, except admit the allegations in the first
three sentences of such paragraph, and refer the Court to PROMESA for its provisions and
effect.

41.     State that the allegations in paragraph 41 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny the allegations in such
paragraph, except refer the Court to PROMESA for its provisions and effect.

42.     Deny the allegations in paragraph 42 of the Second Amended Complaint, except refer the Court to Section 405(a)(1) of PROMESA for its provisions and effect.

43.     Deny the allegations in paragraph 43 of the Second Amended Complaint, except refer the Court to Section 405(a)(2) of PROMESA for its provisions and effect.

44.     State that the allegations in paragraph 44 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

45.     State that the allegations in the first sentence of paragraph 45 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such sentence, and deny the remaining allegations of such paragraph.

46.     State that the allegations in paragraph 46 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

47.     State that the allegations in the first sentence of paragraph 47 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such sentence, and deny the remaining allegations of such paragraph, except refer the Court to PROMESA for its provisions and effect.

48.     Deny the allegations in paragraph 48 of the Second Amended Complaint.

49.     State that the allegations in paragraph 49 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

50.     State that the allegations in paragraph 50 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA for its provisions and effect.

51.     State that the allegations in paragraph 51 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA for its provisions and effect.

52.     State that the allegations in paragraph 52 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA and Section 207 thereof for their provisions and

effect.

53.     State that the allegations in paragraph 53 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA and Section 303(3) thereof for their provisions

and effect.

54.     State that the allegations in paragraph 54 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA and Section 303(3) thereof for their provisions

and effect.

55.     State that the allegations in paragraph 55 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA for its provisions and effect.

56.     State that the allegations in paragraph 56 of the Second Amended

Complaint are legal arguments requiring no response, and otherwise deny the allegations in such

paragraph, except refer the Court to PROMESA and Section 303(1) thereof for their provisions and effect.

57. State that the allegations in paragraph 57 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

58. State that the allegations in paragraph 58 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to PROMESA for its provisions and effect.

59. State that the allegations in paragraph 59 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to the applicable law and contractual documents governing the referenced bonds for their provisions and effect.

60. Deny the allegations in paragraph 60 of the Second Amended Complaint, except admit that the Commonwealth of Puerto Rico has General Obligation Bond obligations outstanding, and refer the Court to the applicable law and contractual documents governing the referenced bonds for their provisions and effect.

61. State that the allegations in the last sentence of paragraph 61 of the Second Amended Complaint are legal arguments requiring no response, otherwise deny such allegations, and deny the remaining allegations in rest of such paragraph, except admit that the Commonwealth of Puerto Rico has General Obligation Guaranteed Bond obligations outstanding.

62. Deny the allegations in paragraph 62 of the Second Amended Complaint, except admit that the Commonwealth of Puerto Rico has bond obligations outstanding.

63. State that the allegations in paragraph 63 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny the allegations in such paragraph, except refer the Court to the Puerto Rico Constitution and the alleged 2014 Official Statement for their provisions and effect.

64. Deny the allegations in paragraph 64 of the Second Amended Complaint, except admit that Congress enacted Public Law No. 81-600 in 1950 and refer the Court to Public Law 600, H.R. Doc. No. 82-435, and the Joint Resolution of July 3, 1952 for their provisions and effect.

65. Deny the allegations in paragraph 65 of the Second Amended Complaint, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

66. Deny the allegations in paragraph 66 of the Second Amended Complaint, except refer the Court to P.R. Laws Ann. tit. 23 § 104(c) for its provisions and effect.

67. Deny the allegations in paragraph 67 of the Second Amended Complaint except refer the Court to the Puerto Rico Constitution and P.R. Laws. Ann. tit. 13 §§ 37 and 38 for their provisions and effect.

68. State that the allegations in the last sentence of paragraph 68 of the Second Amended Complaint are legal arguments requiring no response, otherwise deny such allegations, and deny the allegations in rest of such paragraph, except admit that the Governor of Puerto Rico made the statements alleged and refer the Court to such statements for their text.

69. State that the allegations in paragraph 69 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

70.     State that the allegations in paragraph 70 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

71.     State that the allegations in paragraph 71 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

72.     State that the allegations in paragraph 72 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

73.     State that the allegations in paragraph 73 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution and P.R. Laws. Ann. tit. 23, § 104(c) for their provisions and effect.

74.     Deny the allegations in paragraph 74 of the Second Amended Complaint.

75.     Deny the allegations in paragraph 75 of the Second Amended Complaint, except admit that Governor Garcia Padilla issued the Executive Order 2016-30 on June 30, 2016.

76.     State that the allegations in paragraph 76 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Moratorium Act and PROMESA for their provisions and effect.

77.     Deny the allegations in paragraph 77 of the Second Amended Complaint, except refer the Court to the GDB press release in Exhibit D for its text.

78.     Deny the allegations in paragraph 78 of the Second Amended Complaint, except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget, the

Commonwealth of Puerto Rico's financial disclosures alleged, the GDB press release in Exhibit

D, and the Executive Order in Exhibit F for their text, provisions and effect.

79.    State that the allegations in the last sentence of paragraph 79 of the Second

Amended Complaint are legal arguments requiring no response, and otherwise deny such

allegations, and deny the allegations in rest of such paragraph, except refer the Court to the

Commonwealth of Puerto Rico's Fiscal Year 2017 budget and the Commonwealth of Puerto

Rico's financial disclosures alleged for their provisions and effect.

80.    Deny the allegations in paragraph 80 of the Second Amended Complaint,

except refer the Court to P.R. Laws. Ann. tit 23, § 104(d)(1) for its provisions and effect.

81.    Deny the allegations in paragraph 81 of the Second Amended Complaint,

except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget for its

provisions and effect.

82.    Deny the allegations in paragraph 82 of the Second Amended Complaint,

except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget for its

provisions and effect.

83.    Deny the allegations in paragraph 83 of the Second Amended Complaint,

except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget for its

provisions and effect.

84.    Deny the allegations in paragraph 84 of the Second Amended Complaint,

except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget for its

provisions and effect.

85.    Deny the allegations in paragraph 85 of the Second Amended Complaint.

86.     Deny the allegations in paragraph 86 of the Second Amended Complaint, except refer the Court to the Commonwealth of Puerto Rico's Fiscal Year 2017 budget, PROMESA, and the Puerto Rico Constitution for their provisions and effect.

87.     Deny the allegations in paragraph 87 of the Second Amended Complaint, except admit that the Governor of Puerto Rico signed Act No. 74-2016 into law on July 20, 2016 and refer the Court to such Act, PROMESA, and the Puerto Rico Constitution for their provisions and effect.

88.     State that the allegations in paragraph 88 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to Act No 74-2016 for its provisions and effect.

89.     Deny the allegations in paragraph 89 of the Second Amended Complaint, except refer the Court to Act No. 74-2016 for its provisions and effect.

90.     State that the allegations in paragraph 90 of the Second Amended Complaint are legal arguments requiring no response, otherwise deny such allegations, except refer the Court to Act No. 74-2106, PROMESA, and the Puerto Rico Constitution for their provisions and effect.

91.     Deny the allegations in paragraph 91 of the Second Amended Complaint, except admit that Governor Garcia Padilla signed the Executive Order in Exhibit E and refer the Court to the Executive Order for its provisions and effect.

92.     Deny the allegations in paragraph 92 of the Second Amended Complaint, except refer the Court to the official statements made by Governor Garcia Padilla, GDB, and the Office of the Secretary of the Treasury for their text.

93.     Paragraph 93 purports to allege legal conclusions, and no response thereto
is required.  To the extent Paragraph 93 contains factual allegations, COFINA Defendants deny
such allegations.

94.     Deny the allegations in paragraph 94 of the Second Amended Complaint.

95.     State that the allegations in paragraph 95 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to Act No. 56-2007 for its provisions and effect.

96.     Deny the allegations in paragraph 96 of the Second Amended Complaint,
except admit that COFINA has issued bonds.

97.     Deny the allegations in paragraph 97 of the Second Amended Complaint,
except admit that the COFINA bond structure operates as set forth in the Official Statement for
Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds, First Subordinate
Series 2011A, and refers the Court to such Official Statement for its provisions and effect.

98.     State that the allegations in paragraph 98 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the Puerto Rico Constitution and Act No. 56-2007 for their provisions
and effect.

99.     Deny the allegations in paragraph 99 of the Second Amended Complaint.

100.     State that the allegations in paragraph 100 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations.

101.     State that the allegations in paragraph 101 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations.

102.    State that the allegations in paragraph 102 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to Act No. 117-2006 for its provisions and effect.

103.    State that the allegations in paragraph 103 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

104.    State that the allegations in paragraph 104 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

105.    State that the allegations in paragraph 105 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except admit that COFINA derives its revenues from SUT revenues.

106.    State that the allegations in paragraph 106 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to P.R. Laws Ann. tit. 13 §§ 11a(b) and 14a for their provisions and effect.

107.    State that the allegations in paragraph 107 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

108.    Deny the allegations in paragraph 108 of the Second Amended Complaint.

109.    Deny the allegations in paragraph 109 of the Second Amended Complaint.

110.    State that the allegations in paragraph 110 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

111.    State that the allegations in paragraph 111 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

112.    Deny the allegations in paragraph 112 of the Second Amended Complaint, except admit that the Commonwealth of Puerto Rico issued General Obligation Bonds of 2014 pursuant to the 2014 GO Bond Resolution, and refer the Court to such Resolution for its provisions and effect.

113.    State that the allegations in paragraph 113 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the 2014 GO Bond Resolution for its provisions and effect.

114.    State that the allegations in paragraph 114 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the 2014 GO Bond Resolution for its provisions and effect.

115.    State that the allegations in paragraph 115 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the 2014 GO Bond Resolution for its provisions and effect.

116.    State that the allegations in paragraph 116 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the 2014 GO Bond Resolution for its provisions and effect.

117.    State that the allegations in paragraph 117 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the various Puerto Rico General Obligation Bond resolutions alleged for their provisions and effect.

118.    State that the allegations in paragraph 118 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the 2012 GO Bond Resolution for its provisions and effect.

119.     State that the allegations in paragraph 119 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the 2012 GO Bond Resolution for its provisions and effect.

120.     State that the allegations in paragraph 120 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the 2006 Official Statement for PRIFA Special Tax Revenue Bonds
alleged for its provisions and effect.

121.     State that the allegations in paragraph 121 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations.

122.     State that the allegations in paragraph 122 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the Moratorium Act and Executive Order 2016-30 for their provisions
and effect.

123.     State that the allegations in paragraph 123 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the Moratorium Act and Executive Order 2016-30 for their provisions
and effect.

124.     State that the allegations in paragraph 124 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,
except refer the Court to the Moratorium Act and Executive Order 2016-30 for their provisions
and effect.

125.     State that the allegations in paragraph 125 of the Second Amended
Complaint are legal arguments requiring no response, and otherwise deny such allegations,

except refer the Court to the Moratorium Act and Executive Order 2016-30 for their provisions and effect.

### ANSWER TO FIRST CAUSE OF ACTION
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**PROMESA §§ 204(c)(3) (codified at 48 U.S.C. § 2144(c)(3)),**
**207 (codified at 48 U.S.C. § 2147); 28 U.S.C. § 2201(a)**

126.     Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 125 of the Second Amended Complaint as their answers and responses to paragraph 126 of the Second Amended Complaint.

127.     State that the allegations in the first sentence of paragraph 125 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Declaratory Judgment Act for its provisions and effect, and admit that Plaintiffs purport to characterize their pleadings as alleged in the second sentence of such paragraph.

128.     Deny the allegations in paragraph 128 of the Second Amended Complaint.

129.     Deny the allegations in paragraph 129 of the Second Amended Complaint.

130.     Deny the allegations in paragraph 130 of the Second Amended Complaint.

131.     Deny the allegations in paragraph 131 of the Second Amended Complaint.

132.     Deny the allegations in paragraph 132 of the Second Amended Complaint.

133.     Deny the allegations in paragraph 133 of the Second Amended Complaint, except admit that Plaintiffs purport to characterize their pleadings as alleged in such paragraph.

134.     Deny the allegations in paragraph 134 of the Second Amended Complaint.

## ANSWER TO SECOND CAUSE OF ACTION
### Declaratory and Injunctive Relief
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**PROMESA § 303(3) (codified at 48 U.S.C. § 2163(3)); 28 U.S.C. § 2201(a)**

135.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 134 of the Second Amended Complaint as their answers and responses to paragraph 135 of the Second Amended Complaint.

136.    Deny the allegations in paragraph 136 of the Second Amended Complaint, except admit that Plaintiffs purport to characterize their pleadings as alleged in such paragraph.

137.    Lack knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 137 of the Second Amended Complaint.

138.    Deny the allegations in paragraph 138 of the Second Amended Complaint.

139.    Deny the allegations in paragraph 139 of the Second Amended Complaint.

140.    Deny the allegations in paragraph 140 of the Second Amended Complaint.

141.    Deny the allegations in paragraph 141 of the Second Amended Complaint.

142.    Deny the allegations in paragraph 142 of the Second Amended Complaint.

143.    State that the allegations in paragraph 143 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to PROMESA for its provisions and effect.

144.    Deny the allegations in paragraph 144 of the Second Amended Complaint.

### ANSWER TO THIRD CAUSE OF ACTION
### Declaratory and Injunctive Relief
### (Against the Commonwealth Officer Defendants)
### PROMESA § 303(1) (codified at 48 U.S.C. § 2163(1)); 28 U.S.C. § 2201(a)

145.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 144 of the Second Amended Complaint as their answers and responses to paragraph 145 of the Second Amended Complaint.

146.    State that the allegations in the first and second sentences of paragraph 146 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Moratorium Act or 11 U.S.C. § 109(b)(2) for their provisions and effect, and lack knowledge or information sufficient to form a belief as to the truth of the allegations in the third sentence of such paragraph.

147.    State that the allegations in paragraph 147 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Moratorium Act and PROMESA for their provisions and effect.

148.    Deny the allegations in paragraph 148 of the Second Amended Complaint.

149.    Deny the allegations in paragraph 149 of the Second Amended Complaint.

150.    Deny the allegations in paragraph 150 of the Second Amended Complaint.

### ANSWER TO FOURTH CAUSE OF ACTION
### Declaratory and Injunctive Relief
### (Against the Commonwealth Officer Defendants and the COFINA Defendants)
### Article VI of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)

151.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 150 of the Second Amended Complaint as their answers and responses to paragraph 151 of the Second Amended Complaint.

152.     State that the allegations in paragraph 152 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

153.     State that the allegations in paragraph 153 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

154.     State that the allegations in paragraph 154 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Moratorium Act and the Executive Order for their provisions and effect.

155.     State that the allegations in paragraph 155 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

156.     Deny the allegations in paragraph 156 of the Second Amended Complaint.

157.     Deny the allegations in paragraph 157 of the Second Amended Complaint.

**ANSWER TO FIFTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**Article VI, Section 2 of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

158.     Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 157 of the Second Amended Complaint as their answers and responses to paragraph 158 of the Second Amended Complaint.

159.     State that the allegations in paragraph 159 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the text of the Puerto Rico Constitution for its provisions and effect.

160.     Deny the allegations in paragraph 160, except refer the Court to Act No. 56-2007 for its provisions and effect.

161.     State that the allegations in paragraph 161 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except admit that Banco Popular de Puerto Rico and First Data Corp. have a role in the process of collection of revenue by or on behalf of the Commonwealth that may be transferred through various accounts to a trust account established by or for Bank of New York Mellon as trustee for certain bonds issued by COFINA, and refer the Court to the Puerto Rico Constitution for its provisions and effect.

162.     State that the allegations in paragraph 162 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Puerto Rico Constitution for its provisions and effect.

### ANSWER TO SIXTH CAUSE OF ACTION
### Declaratory and Injunctive Relief
### (Against the Commonwealth Officer Defendants)
### Contract Clause of the United States Constitution; 28 U.S.C. § 2201(a)

163.     Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 162 of the Second Amended Complaint as their answers and responses to paragraph 163 of the Second Amended Complaint.

164.     State that the allegations in paragraph 164 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States Constitution, the Puerto Rico Constitution, the Moratorium Act, and the Executive Order for their provisions and effect.

165.     State that the allegations in the first three sentences of paragraph 165 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny

such allegations, except refer the Court to the Puerto Rico Constitution, the Moratorium Act, and the Executive Order for their provisions and effect, and deny the allegations in the fourth sentence of such paragraph.

166. Deny the allegations in paragraph 166 of the Second Amended Complaint.

167. Deny the allegations in paragraph 167 of the Second Amended Complaint, except admit that the Office of the Secretary of the Treasury issued a press release regarding the general fund on July 28, 2016, and refer the Court to the text of that document for its provisions and effect.

168. Deny the allegations in paragraph 168 of the Second Amended Complaint, except refer the Court to the text of the budgets and official government statements alleged for their provisions and effect.

169. Deny the allegations in paragraph 169 of the Second Amended Complaint, except admit that KPMG published a study regarding Puerto Rico tax policy on October 31, 2014, admit that a budget for Fiscal Year 2017 has been approved, and refer the Court to the text of those documents for their provisions and effect.

170. Deny the allegations in paragraph 170 of the Second Amended Complaint.

171. Deny the allegations in paragraph 171 of the Second Amended Complaint.

172. Deny the allegations in paragraph 172 of the Second Amended Complaint.

**ANSWER TO SEVENTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**Contract Clause of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)**

173. Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 172 of the Second Amended Complaint as their answers and responses to paragraph 173 of the Second Amended Complaint.

174.     State that the allegations in paragraph 174 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States and Puerto Rico Constitutions for their provisions and effect.

**ANSWER TO EIGHTH CAUSE OF ACTION**
**Monetary, Declaratory, and Injunctive Relief**
**(Against the Commonwealth and the Commonwealth Officer Defendants)**
**Takings and Due Process Clauses of the United States Constitution; 28 U.S.C. § 2201(a)**

175.     Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 174 of the Second Amended Complaint as their answers and responses to paragraph 175 of the Second Amended Complaint.

176.     State that the allegations in paragraph 176 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States Constitution for its provisions and effect.

177.     Deny the allegations in paragraph 177 of the Second Amended Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations concerning Plaintiffs' ownership of bonds and what Plaintiffs mean by "vested contractual and property rights."

178.     State that the allegations in paragraph 178 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

179.     State that the allegations in paragraph 179 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States Constitution, the Puerto Rico Constitution, the Moratorium Act, and the Executive Order for their provisions and effect.

180.     Deny the allegations in paragraph 180 of the Second Amended Complaint.

- 24 -

## ANSWER TO NINTH CAUSE OF ACTION
### Monetary, Declaratory, and Injunctive Relief
### (Against the Commonwealth and the Commonwealth Officer Defendants)
### Takings and Due Process Clauses of the Puerto Rico Constitution; 28 U.S.C. § 2201(a)

181.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 180 of the Second Amended Complaint as their answers and responses to paragraph 181 of the Second Amended Complaint.

182.    State that the allegations in paragraph 182 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States and Puerto Rico Constitutions for their provisions and effect.

## ANSWER TO TENTH CAUSE OF ACTION
### Declaratory and Injunctive Relief
### (Against the Commonwealth Officer Defendants)
### Unconstitutional Denial of Access to Courts; 28 U.S.C. § 2201(a)

183.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 182 of the Second Amended Complaint as their answers and responses to paragraph 183 of the Second Amended Complaint.

184.    State that the allegations in paragraph 184 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Executive Order and the Moratorium Act for their provisions and effect.

185.    State that the allegations in paragraph 185 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States Constitution, the Executive Order, and the Moratorium Act for their provisions and effect.

**ANSWER TO ELEVENTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants)**
**The Moratorium Act Is Invalid as Applied to the 2014 GO Bonds**
**Because the Puerto Rico Legislative Assembly Lacks Authority**
**to Modify the Terms of New York Law; 28 U.S.C. § 2201(a)**

186.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 185 of the Second Amended Complaint as their answers and responses to paragraph 186 of the Second Amended Complaint.

187.    Deny the allegations of paragraph 187 of the Second Amended Complaint, except refer the Court to the text of the 2014 GO Bond Resolution for its provisions and effect.

188.    State that the allegations in paragraph 188 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the United States Constitution for its provisions and effect.

189.    State that the allegations in paragraph 189 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Executive Order and the Moratorium Act for their provisions and effect.

190.    State that the allegations in paragraph 190 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except refer the Court to the Moratorium Act for its provisions and effect.

**ANSWER TO TWELFTH CAUSE OF ACTION**
**Declaratory and Injunctive Relief**
**(Against the Commonwealth Officer Defendants and the COFINA Defendants)**
**42 U.S.C. § 1983; 28 U.S.C. § 2201(a)**

191.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 190 of the Second Amended Complaint as their answers and responses to paragraph 191 of the Second Amended Complaint.

192.    Deny the allegations in paragraph 192 of the Second Amended Complaint except refer the Court to 42 U.S.C. § 1983 for its provisions and effect.

193.    Deny the allegations in paragraph 193 of the Second Amended Complaint.

**ANSWER TO THIRTEENTH CAUSE OF ACTION**
**Relief from Stay**
**(Against All Defendants)**
**PROMESA § 405(e) (codified at 48 U.S.C. § 2194(e))**

194.    Repeat and re-allege their answers and responses to the allegations in paragraphs 1 through 193 of the Second Amended Complaint as their answers and responses to paragraph 194 of the Second Amended Complaint.

195.    State that the allegations in paragraph 195 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations.

196.    Deny the allegations in paragraph 196 of the Second Amended Complaint, except refer the Court to Section 405(e)(1) of PROMESA for its provisions and effect.

197.    Deny the allegations in paragraph 197 of the Second Amended Complaint, except refer the Court to Section 405(e)(2) of PROMESA for its provisions and effect.

198.    Deny the allegations in paragraph 198 of the Second Amended Complaint, except lack knowledge or information sufficient to form a belief as to the truth of the allegations

concerning Plaintiffs' interest in this litigation, and refer the Court to PROMESA and its Section 405(e)(2) for their provisions and effect.

199.    State that the allegations in paragraph 199 of the Second Amended Complaint are legal arguments requiring no response, and otherwise deny such allegations, except admit that Plaintiffs purport to characterize their pleadings as alleged in such paragraph.

200.    To the extent statements in Plaintiffs' captions or headings are intended as allegations, they, and any other allegations not otherwise addressed above, are denied.

### Affirmative Defenses

### FIRST AFFIRMATIVE DEFENSE

201.    Plaintiffs' Second Amended Complaint is stayed in its entirety by Section 405(b)(1) of PROMESA.

### SECOND AFFIRMATIVE DEFENSE

202.    Plaintiffs' claims are barred in whole or in part by the doctrine of sovereign immunity.

### THIRD AFFIRMATIVE DEFENSE

203.    Plaintiffs' claims are barred in whole or in part by the doctrine of laches.

### FOURTH AFFIRMATIVE DEFENSE

204.    Plaintiffs' claims are barred in whole or in part by the doctrine of estoppel.

### FIFTH AFFIRMATIVE DEFENSE

205.    Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

### SIXTH AFFIRMATIVE DEFENSE

206.    Plaintiffs' claims are barred in whole or in part by the doctrine of unclean hands.

## SEVENTH AFFIRMATIVE DEFENSE

207.    Some or all of Plaintiffs lack standing to seek relief for their claims because they are not, pursuant to Section 18 of the GO Bond Resolution, or equivalent sections in other resolutions for the bonds they claim are entitled to the protections they seek to vindicate in this action, the registered owners of such bonds.

## EIGHTH AFFIRMATIVE DEFENSE

208.    Some or all of Plaintiffs' claims are barred by their failure to establish conditions precedent in Section 20(b) of the GO Bond Resolution, or equivalent sections in other resolutions for the bonds they claim are entitled to the protections they seek to vindicate in this action.

## NINTH AFFIRMATIVE DEFENSE

209.    Plaintiffs' claims are barred because, pursuant to Section 20(b) of the GO Bond Resolution, or equivalent sections in other resolutions for the bonds they claim are entitled to the protections they seek to vindicate in this action, the only party they can sue for relief with respect to payment from available Commonwealth resources or revenues on their bonds is the Treasurer of the Commonwealth of Puerto Rico, as further set forth in the last sentence of Article VI, Section 2 of the Puerto Rico Constitution, stating that:

> The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

## TENTH AFFIRMATIVE DEFENSE

210.    Plaintiffs' claims should be dismissed pursuant to Federal Rule of Civil Procedure 41(b) because the Second Amended Complaint fails to comply with Federal Rules of Civil Procedure 8(a) and (d).

WHEREFORE, the COFINA Defendants pray that this Court issue an order and direct that judgment be entered:

       A.      Dismissing all claims made against the COFINA Defendants, or either of them;

       B.      Awarding the COFINA Defendants their costs and expenses (including attorneys' fees); and

       C.      Granting the COFINA Defendants such other and further relief as may be just and proper.

Dated:  December 16, 2016

LAW OFFICES OF
GISELLE LÓPEZ SOLER


By: _/s/ Giselle López Soler_
    Giselle López Soler
    gls@lopezsolerlaw.com

    PMB 257
    Rd. 19 1353
    Guaynabo, PR 00966
    (787) 667-0941

    Attorneys for Defendants Puerto Rico Sales Tax
    Financing Corporation and the Honorable Juan
    Vaquer, as Executive Director of COFINA

Of Counsel:

Christopher M. Mason
cmason@nixonpeabody.com
Robert N. H. Christmas
rchristmas@nixonpeabody.com
Christopher J. Fong
cfong@nixonpeabody.com
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000

(*pro hac vice* admissions pending)

Case:17-00388-LTS Doc#:420-17 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 17 Page 2 of 5

# EXHIBIT 17

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x
                        :

LEX CLAIMS, LLC, *et al.*,        :

                       :

             Plaintiffs,   :

                       :

       - against -     :   Civil No. 3:16-cv-2374 (FAB)

                       :

ALEJANDRO GARCIA PADILLA, *et al.*,  :

                       :

            Defendants.  :

                       :
-------------------------------------------------------------x

**COFINA DEFENDANTS' JOINDER IN NOTICE AND MOTION
TO STAY PLAINTIFFS' SECOND AMENDED COMPLAINT**

TO THE HONORABLE COURT:

        Defendants Puerto Rico Sales Tax Financing Corporation ("COFINA") and the

Honorable Juan Vaquer, as Executive Director of COFINA (collectively, the "COFINA

Defendants"), specially appearing without submitting to the jurisdiction of this Court,

respectfully submit this joinder in the Notice of Automatic Stay [PACER Dkt. 84] (the "Stay

Notice"), filed on November 7, 2016 by the Honorable Alejandro García Padilla, the Honorable

Juan C. Zaragoza Gómez, and the Honorable Luis Cruz Batista (collectively, the "Puerto Rico

Officers") in this action.  The Puerto Rico Officers have taken the position that all claims in the

Second Amended Complaint [PACER Dkt. 78] filed by Plaintiffs in this action on November 4,

2016 are automatically stayed by Sections 405(b)(1) and (b)(3)-(6) of the Puerto Rico Oversight,

Management, and Economic Stability Act, 48 U.S.C. § 2101 *et seq*., ("PROMESA").

Alternatively, they have requested that this Court, in the exercise of its discretion and inherent

power to manage its docket, stay the piecemeal litigation and disposition of Counts 1 through 3

and 12 of the Second Amended Complaint.

By order dated November 16, 2016 [PACER Dkt. 103], the Court informed the parties that it will treat the Stay Notice as a motion to stay. The Plaintiffs have opposed the Stay Notice. [PACER Dkt. 127]. The Puerto Rico Officers have now briefed that issue. *See, e.g.,* Reply to Plaintiffs' Opposition to Notice of PROMESA Stay [PACER Dkt. 157]. For the following reasons, the COFINA Defendants respectfully join in the Stay Notice and that briefing.

1. COFINA is the issuer of certain sales tax revenue bonds (the "COFINA Bonds") pursuant to an Amended and Restated Sales Tax Revenue Bond Resolution (the "Resolution") adopted on July 13, 2007. *See* Plaintiffs' Opposition to COFINA Bondholders' Motion for Leave To Intervene ("Plaintiffs' Opp.") Ex. B. [PACER Dkt. 87].

2. Certain proceeds (the "Pledged Amounts") from sales taxes imposed by the Commonwealth of Puerto Rico (the "Commonwealth") are the only source for payment of the COFINA Bonds. Those Pledged Amounts are secured by a statutory lien. *See* Plaintiffs' Opp. Ex. B. at 44, 60-61.

3. As originally commenced on July 20, 2016 [PACER Dkt. 1], Plaintiffs had not sued the COFINA Defendants in this action.

4. On November 4, 2016, however, Plaintiffs filed a Second Amended Complaint [PACER Dkt. 78] in which they added the Commonwealth of Puerto Rico, the COFINA Defendants, and the Bank of New York Mellon, as Trustee for the COFINA Bonds, as additional Defendants. Plaintiffs also purported to add twelve new causes of action, including five (Counts 2, 4, 5, 12 and 13) specifically aimed at the COFINA Defendants.

5. In Counts 2, 4, 5, 12, and 13 Plaintiffs seek to deprive COFINA, and thus the bondholders to which it owes money, of the statutory lien and only source of repayment for the COFINA Bonds.

6.      The COFINA Defendants therefore have a strong interest in the stay asserted and requested originally by the Puerto Rico Officers.  Absent such a stay, the rights, security, and only source of payment by COFINA of its debts to its bondholders will be lessened or destroyed by litigation that otherwise should not currently be proceeding.

7.      The COFINA Defendants do not request additional briefing of the issues already briefed with respect to the stay.  They adopt and incorporate here by reference the applicable factual and legal arguments made by the Puerto Rico Officers, as further supported by several of the proposed intervenors in this case.  *See, e.g.,* Memorandum of Law In Support of COFINA Senior Bondholders' Motion for Leave To Intervene for the Limited Purpose of Seeking Enforcement of the PROMESA Stay [PACER Dkt. 50]; Ambac Assurance Corporation's Motion for Leave To Intervene and in Support of the PROMESA Stay [PACER Dkt. 55]; Financial Oversight and Management Board's Motion To Intervene [PACER Dkt. 62].

WHEREFORE, the COFINA Defendants respectfully request that:

A.      The Court accept their joinder as described above;

B.      The Court enter an order staying this action pursuant to Sections 405(b)(1) and (b)(3)-(6) of PROMESA; or

C.      In the alternative, and to the extent not already stayed, that the Court stay Counts 2, 4, 5, 12, and 13 of the Second Amended Complaint in the exercise of the Court's discretion and its inherent power to manage its docket, so as to prevent disruptive, piecemeal litigation; and

D.      Grant the COFINA Defendants such other and further relief as may be just and proper.

- 3 -

Dated:  December 16, 2016

LAW OFFICES OF
GISELLE LÓPEZ SOLER

By: _ /s/ Giselle López Soler_____
    Giselle López Soler
    gls@lopezsolerlaw.com

    PMB 257
    Rd. 19 1353
    Guaynabo, PR 00966
    (787) 667-0941

    Attorneys for Defendants Puerto Rico Sales Tax
    Financing Corporation and the Honorable Juan
    Vaquer, as Executive Director of COFINA

Of Counsel:

Christopher M. Mason
cmason@nixonpeabody.com
Robert N. H. Christmas
rchristmas@nixonpeabody.com
Christopher J. Fong
cfong@nixonpeabody.com
NIXON PEABODY LLP
437 Madison Avenue
New York, New York 10022
(212) 940-3000

(_pro hac vice_ admissions pending)

# EXHIBIT 18



## GOVERNMENT OF PUERTO RICO

Puerto Rico Rico Fiscal Agency and Financial
Advisory Authority

March 17, 2017

**SAN JUAN, P.R. —** The Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF", per its Spanish acronym) and the Ad Hoc Group of General Obligation Bondholders (the "GO Bondholders") announced a significant step forward today toward establishing a stabilized environment for commencing good-faith negotiations toward a consensual restructuring under Title VI of PROMESA. The discussions between AAFAF and the GO Bondholders are intended to provide the basis for reaching a broad resolution of the issues raised by the GO Bondholders in connection with their asserted constitutional and contractual rights and remedies. The parties are hopeful that these talks will lead to a resolution concerning the potential treatment of Constitutional Debt, and ultimately, comprehensive talks involving other creditors and stakeholders, with the objective of achieving a conclusive and binding agreement on all participating parties.

As a result of discussions between Gerardo Portela Franco, Executive Director of AAFAF, and representatives of GO Bondholders, the Government of Puerto Rico will seek the prompt and expeditious resolution of the claims asserted by the GO Bondholders regarding the constitutionality of COFINA in the litigation pending before Judge Francisco Besosa in the United States District Court for the District of Puerto Rico as *Lex Claims LLC, et al. v. Garcia-Padilla, et al.*, No. 16-2374. While the Government is not taking a definitive position on the merits of the constitutional questions at this time, it will analyze the constitutional issues raised by the GO Bondholders. In addition, the Government will urge Judge Besosa to decide the issues raised by the GO Bondholders by April 30, 2017, and not support any efforts to defer or delay the resolution of the constitutional questions raised by the GO Bondholders until after the PROMESA litigation stay expires. The Commonwealth acknowledges that prompt resolution of the *Lex Claims* litigation will foster negotiations among all creditors.

"We consider resolution of the constitutional questions to be essential for establishing ground rules for a negotiated resolution outside of Title III, said Andrew Rosenberg, a representative of the GO Bondholders. "It is commendable that the Governor is focusing significant attention and resources on trying to achieve a negotiated resolution."

Mr. Portela said, "The discussions we anticipate having with the GO Bondholders reaffirm the Government's commitment to pursuing an orderly resolution of the financial issues affecting Puerto Rico, and we emphasize that all creditors and stakeholders must be ready to move forward with good faith negotiations toward a consensual restructuring under Title VI of PROMESA."

# # #

Case:17-00133-LTS Doc#:420-19 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 19 Page 1 of 10

# EXHIBIT 19

**(Certified Translation of Chapters 4 and 6)**

CERTIFIED TRANSLATION

## CHAPTER 4. TRANSFER FROM PUBLIC CORPORATIONS, AGENCIES AND INSTRUMENTALITIES TO THE GENERAL FUND; CREATION OF THE CHARGES, FEES AND TARIFFS ADJUSTMENT COMMITTEE.

Article 4.01.- Transfer of Surplus

Public corporations, agencies and instrumentalities of the Government of Puerto Rico are hereby directed to transfer to the Department of the Treasury the surplus of the income produced. These funds will be considered as available resources of the State and deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico to meet the liquidity requirements set out in the Fiscal Plan adopted under the provisions of "Puerto Rico Oversight, Management and Economic Stability Act of 2016 " Public Law 114-187, also known as PROMESA.

Article 4.02.-Committee

The amount of funds that each of the corporations and instrumentalities will provide will be determined by a committee composed of the Executive Director of the Financial Advisory and Fiscal Agency Authority of Puerto Rico, the Secretary of the Treasury and the Executive Director of the Office of Management and Budget, who may establish the necessary tariffs to comply with the provisions of the Fiscal Plan approved for the Government of Pu erto Rico and the one which will rule its corporations. This committee will ensure that the transfer of funds as provided in Article 4.01 of this Act do not affect the services provided by public corporations and instrumentalities , and only consist of the available surplus after the operating expenses and obligations of



I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

these entities have been covered   in accordance with the   budgeted expenses approved

by the Office of Management and Budget for each fiscal year.

In addition, this committee is empowered to r     eview the sources of income of

public corporations , agencies  and instrumentalities and adjust  , increase or lower,   any

charge, tariff, rate,  fee, premium or  any revenue of  a similar nature, in order to comply

with the metrics provided in the     Fiscal  Plan  of  the  Government of Puerto Rico.     In

addition, the committee may impose an additional administrative charge to those taxes

that it deems necessary which may be from five percent (5%) up to ten percent (10%)   to

comply with the metrics of the Fiscal Plan approved by the Oversight Board.

This Act shall prevail over any other law which establishes       any charge,  tariff,

rate, fee, premium or  any revenue of  a similar nature  and the committee is authorized

to review , increase and lower the amount even though the same is established by law.

The committee shall have the authority to review, increase or lower these revenues

without regard to the provision of any Law, regulation or administrative order que

establishes and particular amount of these revenues.

Any provision of law, regulation, administrative order, corporate resolution, or

any other document of a similar nature , which restricts or decreases  the funds that can

be transferred by a public corporation , agency  or instrumentality of the Government of

Puerto Rico to the General Fund as provided in this Chapter is suspended.

The committee  is authorized  to promote any administrative order, circular letter

or regulation necessary for its operation and to comply with the provisions of this Act.

Article 4.03.- Exclusions

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

The University of Puerto Rico, created by virtue of Act No. 1 of January 20, 1966, as amended, known as the "University of Puerto Rico Act", and the Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico, created by virtue of Act No. 114-2001, as amended, known as the "Public Corporation for the Supervision and Insurance of Cooperatives of Puerto Rico Act", the Municipal Finance Corporation Act", better known as COFIM, Law No. 19 of January 24, 2014, as amended, the "Special Commission for Community Impact Legislative Funds Special Commission Act", Law 20-2015, and the Comptroller 's Special Reports Joint Commission Act", Law No. 83 of June 23, 1954, as amended. The funds that public corporations and entities created for community purposes receive fro m private entities are excluded from t he provisions of this Chapter.

With regards to the "Urgent Interest Fund Act", better known as COFINA, Act No. 9 of May 13, 2006, as amended, the Executive shall be authorized to use the Funds of COFINA, occasionally, and solely as a last resort and subject to the presentation of a sworn certification issued to the Legislative Assembly. The presentation of such certification shall not be construed that the Executive can use COFINA funds indefinitely. Said certification shall establish the need, term and amount of the funds t o be used to cover an occasional and significant deficit in cash flow to comply with the Fiscal Plan of the Government of Puerto Rico. The certification shall be signed and sworn by the Executive Director of the Financial Advice and Fiscal Agency Authority (AAFAF) and by the Director of the Office of Management and Budget. The signature and the oath of both officials shall not be delegated. The officials shall attest in the

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

certification that the information is  correct, exact, a nd  truthful  in  accordance  with  the fiscal reality of the Government of Puerto Rico.

Article 4.04.- Compliance Clause

All transfers made pursuant  to the provisions of this Chapter shall be subject to Section 201(b)(1) (M) of Public Act 114       -187 known as      *Puerto Rico Oversight, Management and Economic Stability Act or PROMESA.*

CHAPTER 6. ACCOUNTING LAW GOVERNMENT OF PUERTO RICO.

Article 6.01.- Section 3 of Act No. 230 of July 23, 1974, as amended  and known as "Government Accounting Act of Puerto Rico ", is amended  to add a new subsection (o) which reads as follows:

"Section 3. - Definitions.

When used in this Act, the following terms shall mean:

(a)       ...

...

(o)       Special Assignments      -   Assignments approved by       Joint Resolutions limiting the use of the assigned funds. ˝

Article  6.02.- subsection (b) is amended and a new subsection (e)       is  added  to Article 7 of Act       No. 230 of July 23, 1974, as amended       ,  known as  "Government Accounting Act of Puerto Rico", so that it reads as follows:

"Section 7. Revenue from public funds.

a.        ...

 I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

b.      All public funds of  dependencies  which do not have a specific destined

use  shall  be credited to the State Treasury General Fund and deposited

entirely in the current bank account of the Secretary or any other bank

account established as  he sees fit,  .   Furthermore, it is ordered that all of

the state special funds and other revenues of dependencies and public

corporations after July 1, 2017, shall be deposited in their       totality  in the

State Treasury under the custody of the Secretary of the Treasury or in the

banking institution that he deems adequate.  The Secretary of the Treasury

also in authorized to determine the order of priority of the disbursement

of payments payable from the s  pecial state funds and other revenues, in

accordance with the approved budget and the Fiscal Plan,  without it being

understood as a limitation upon the powers conferred on the Governor or

the Financial Advice and Fiscal Agency  Authority under the provisions of

Act No. 5  -2017.  This provision shall prevail over any other which is

contrary or inconsistent  which what is provided herein.    Any amount in

excess of the amount budgeted and            authorized   by the Office of

Management and Budget in each fiscal   year from special state funds   for

dependencies and public corporations  shall be deposited  in the Budgetary

Fund created under the   Act No.  147  of June 18, 980, as amended.    This

provision shall not apply to thoe funds assigned to municipalities under

the  Sales and Use Tax.        This provision shall not apply to private

donations that government entities receive for social purposes.

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate
translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

...

e)  After July 1st, 2017, all those special state funds created by law for specific purposes will be used for those purposes for which they were assigned by Law in accordance with the Budget recommended by the Office of Management and Budget and with the Fiscal Plan. Moreover, the Office of Management and Budget is authorized to create a fund under its custody. If there is any inconsistency between the law and the use of funds with the Fiscal Plan, the purpose provided in Fiscal Plan approved under the provisions of the Federal Law PROMESA shall prevail."

Article 6.03.- Subsections (h), (l) and (m) of Section 8 of Act No. 230 of July 23, 1974 as amended, known as "Government Accounting Act of Puerto Rico", are amended to read as follows:

"Article 8 - Allocations of public funds.

(a)  ...

...

(h)  Allocations and funds without a specific fiscal year, which have remained in the books without being disbursed on obligated for one (1) year, will be considered that they have fulfilled their purposes for purposes of this law and will be closed and enter immediately into the General Fund, except assignments and funds without a specific economic year allocated to carry out capital improvements that have been recorded and carried into the books. These will have a term of three (3) years from the date the

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

CERTIFIED TRANSLATION

allocation became legally effective to be disbursed and to comply with the purposes for which they were assigned. After the three (3) years, the obligated and non obligated balances of permanent improvement funds will be closed and deposited into Fund 301 . This provision shall apply only to assignments made before the 2017 -2018 fiscal year and will not be apply to those appropriations made by the Legislature through Legislative Donations or assignments under the Sales and Use Tax.

In those cases in which the agency or recipient of the capital improvements funds understand that the term of the assignment should extended to a term exceeding three (3) years, it may request it justifying the need to keep these resources the Of fice of Management and Budget at least three (3) months before said term expires. During this period, the Office of Management and Budget will analyze the request and determine the need to maintain current allocation, and the term and amount which will be extended. These resources shall be reallocated by the Legislature in projects.

(i) ....

...

(l)     Any assignment which remains one (1) year without being recorded into the books shall be considered, as a rule, automatically canceled and new legislative action will be required to use the money thus canceled. In exceptional cases *in* which it is demonstrated that valid reasons exist for not carrying into the books the allocation during the period of one (1)

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

year, such as the delay in resolving litigation in court and failure to carry out a public work because of      fiscal, technical or legal   difficulties, an allocation even after expiration of the aforementioned one (1) year  period can be subject to be accounted for.

The Secretary shall notify the Legislat      ive Assembly    of the action    s canceling assignments in the circumstances contemplated by t      his subsection, within thirty (30) days following the date the cancellation was ordered.

(m)    The Secretary shall    periodically  transfer  to  the surplus of the State Treasury General Fund, in accordance with the law, the balances of deposit accounts which  have remained unused or  without any movement in the accounting books  during one (1) year and, according to his opinion, that are not  necessary or do not fulfill the purposes for which they were created. Provided , that any claim   the Se cretary is obligated to pay with respect   to   such balances  ,  after being transferred from the manner provided above, shall be paid from any available funds not otherwise appropriated for other purposes."

I, Juan E. Segarra, USCCI #06-067/translator, certify that the foregoing is a true and accurate translation, to the best of my abilities, of the document in Spanish which I have seen.

# EXHIBIT 20

# GOBERNADOR DE PUERTO RICO
Ricardo Rosselló Nevares

## DECLARACION EXPLICATIVA DEL GOBERNADOR DE PUERTO RICO AL FIRMAR EL PROYECTO DE LA CAMARA 938

29 de abril de 2017

Hoy convertí en ley el Proyecto de la Cámara 938, mediante el cual se adopta la "Ley de Cumplimiento con el Plan Fiscal", a los fines de tomar las medidas necesarias para atemperar el marco legal y jurídico existente para dar el más fiel cumplimiento al Plan Fiscal aprobado por la Junta de Supervisión Fiscal creada al amparo de la Ley Federal PROMESA y para otros fines relacionados.

Esta Ley permitirá al Gobierno operar y brindar los servicios esenciales al Pueblo conforme al Plan Fiscal sin despedir empleados públicos. Por ello, esta legislación en su capítulo VI permite al Gobierno utilizar todos los fondos estatales especiales a partir del 1 de julio de 2017 para que se depositen en el Tesoro Estatal bajo la custodia del Secretario de Hacienda o de la entidad bancaria que éste determine. Ello, para poder aplicar a todos estos ingresos las normas de prioridad de pago con los ingresos de fondos estatales especiales no excluidos. Ese es el alcance del Capítulo VI de esta Ley.

Por su parte, el Capítulo IV de esta legislación se limita a sobrantes de algunas dependencias y corporaciones según determinado por el Plan Fiscal para allegar fondos adicionales al fondo general que provienen de los ajustes tarifarios a ciertos servicios según se establezcan en los planes fiscales certificados por la Junta de Supervisión Fiscal. Ello, no se refiere a otros ingresos de las corporaciones públicas salvo los determinados por ajustes tarifarios de corporaciones específicamente contenidas en los planes fiscales. Aunque se realiza en este capítulo una excepción para COFINA, la realidad es que esta corporación pública no genera sobrantes por lo que este capítulo no es de aplicabilidad para dicha entidad.

Cordialmente,

Ricardo Rosselló Nevares

PR-INT-000000506

# EXHIBIT 21



GOVERNOR OF PUERTO RICO
Ricardo Rosselló Nevares

EXPLANATORY DECLARATION OF THE GOVERNOR OF PUERTO RICO
UPON SIGNING HOUSE BILL 938

April 29, 2017

Today, I signed into law House Bill 938, upon which the "Fiscal Plan Compliance Act" is adopted in order to take the necessary measures to temper the existing legal and juridical framework to give full compliance to the Fiscal Plan approved by the Financial Oversight Board created pursuant to PROMESA and for other related purposes.

This Act will allow the Government to operate and provide essential services without terminating public employees. Therefore, this legislation in its Chapter VI allows the Government to use all special state funds from July 1, 2017 in order to deposit them in the State Treasury under the custody of the Secretary of the Treasury or the banking entity he determines. This, in order to be able to apply to all of these revenues the rules of payment priority with the revenues of non-excluded special state funds. This is the scope of Chapter VI of this Act.

In turn, Chapter IV of this legislation is limited to surpluses of some agencies and corporations as determined by the Fiscal Plan to collect additional funds to the general fund coming from the rate adjustments to certain services as set forth in the fiscal plan certified by the Financial Oversight Board. This does not refer to other revenue from public corporations except those determined by rate adjustments of corporations specifically contained in fiscal plans. Although a special exception is made in this chapter for COFINA, the reality is that this public corporation does not generate surplus; therefore, this chapter is not applicable to said entity.

Cordially,

[Signature]
Ricardo Rosselló Nevares

[illegible]

HB 938

## AN ACT

To create the "Fiscal Plan Compliance Act", for purposes of taking the measures necessary to temper the existing juridical and legal framework to give the most faithful to compliance to the Fiscal Plan approved by the Financial Oversight board created pursuant to PROMESA; to establish a uniform system of fringe benefits, including Christmas bonus and contribution to the medical plan, for all public employees and offices of public corporations, instrumentalities and agencies of the Government of Puerto Rico, except for the University of Puerto Rico; to amend Section 4.3 paragraph 2 (a) (e) (m) of Article 4, Section 5.2 of Article 5, Section 6.4 paragraph 1 (d) and 4 (1), 6.8 paragraph 2 (b) and 6.9 of Article 6, Section 7.2 paragraph 3 and 5 of Article 7, a new Article 2.11 (a) is added for purposes of amending Article 3 of Act 125 of June 10, 1967, as amended; to suspend the effectiveness of Article 9 and Section 10.2 of Act 8-2017, known as Human Resources Transformation and Administration in the Government of Puerto Rico Act"; to re-number current Articles 10 through 20 as Articles 9 through 19; to repeal Act 89-2016, known as "Temporary Public Service Employment Act"; to amend Articles 3, 6, and 7 of Act 253-1995, as amended, known as "Motor Vehicle Obligatory Liability Insurance Act"; in order to expand the coverage of Obligatory Liability Insurance Coverage from four thousand dollars ($4,000) to four thousand five hundred dollars ($4,500); to empower the review of premiums before June 30, 2017; to allow the declaration of an extraordinary dividend to members of the Joint Underwriting Association of the Obligatory Liability Insurance, as well as the application of an incentivized contribution to said dividend; to dispose of the distribution of the revenue obtained through the incentivized contribution and the adjustment of the premium in order to enter the General Fund; to authorize the Government to use surpluses of the public corporations as "available funds" to contribute to the General Fund; to authorize a Committee comprised by the directors of the Fiscal Agency and Financial Advisory Authority, the Budget and Management Office and the Department of the Treasury to modify the rates of the public corporations to comply with the metrics of the Fiscal Plan; to establish the rules and principles that must govern the process of sale of real estate properties of the Government of Puerto Rico; to create Real Estate Property Disposal and Evaluation Committee; to declare the public policy related to the sale of real estate property; to amend Articles 3, 7 and 8 of Act No. 230 of July 23 of 1974, as amended and known as the "Puerto Rico Government Accounting Act", in order to set forth that the allotment and funds without a determined economic year that have remained in the books without movement of disbursement or obligation for one (1) year shall be considered                  as                  having                  complied

66

CHAPTER 4.- TRANSFER OF PUBLIC CORPORATIONS, AGENCIES AND INSTRUMENTALITIES TO THE GENERAL FUND; CREATION OF THE COMMITTEE AND ADJUSTMENT OF CHARGES, RATES AND FEES.

ARTICLES ARTICLE 4.01 Transfer of Surpluses

The public corporations, agencies and instrumentalities of the Government of Puerto Rico are hereby ordered to transfer to the Department of the Treasury the surpluses of the revenues generated. Said funds shall be considered as resources available of the State and deposited by the Department of the Treasury in the General Fund of the Government of Puerto Rico to comply with the liquidity requirements contemplated in the Fiscal Plan adopted pursuant to the provisions of *Puerto Rico Oversight Management and Economic Stability Act of 2016*, Public Law 114-187, also known as PROMESA.

Article 4.02.-Committee

The amount of funds that each one of the corporations and instrumentalities will contribute shall be determined by a committee comprised by the Executive Director of the Fiscal Agency and Financial Advisory Authority of Puerto Rico, the Secretary of the Department of the Treasury and the Executive Director of the Budget and Management Office who may establish the rates necessary to comply with what is provided in the Fiscal Plan approved for the Government of Puerto Rico and which will govern its corporations. This committee will oversee that the transfer of the funds as provided in Article 4.01 of this Act do not affect the services offered by the public corporations and instrumentalities and that they be the surpluses available after having covered the operational expenses and obligations of said entities, in accordance with the budget of expenses recommended by the Budget and Management Office for each fiscal year.

Further, this Committee is empowered to review the sources of revenue of the public corporations, agencies and instrumentalities and to adjust, increase or decrease any charge, fee, tariff, rate, premium or any revenue of a similar nature, in order to comply with the metrics provided in the Puerto Rico Government Fiscal Plan. Further, the Committee may impose an additional administrative charge to such contributions that it deems necessary which may be from 5% to up to 10% to comply with the metrics of the Fiscal Plan certified by the Financial Oversight Board.

This Act shall have supremacy over any law establishing any charge, fee, tariff, rate, premium or any revenue of a similar nature and

67

the committee is hereby authorized to review, increase or decrease the amount even when it is provided by Law. This committee shall have the power to reviewing, increasing, or decreasing those revenues without being subject to the provisions of any law, regulation or administrative order establishing a particular amount for these revenues.

Any provision of law, regulation, administrative order, corporate resolution or any other document of a similar nature, restricting or reducing the funds that may be transferred by a public corporation, agency or instrumentality of the Government of Puerto Rico to the General Fund as provided in Chapter is hereby suspended.

The Committee is empowered to promote any administrative order, circular letter, or regulation necessary for its operation and for the compliance with the provisions of this act.

Article 4.03-Exclusions

Excluded from these provisions are the University of Puerto Rico, created by virtue of Act No. 1 of January 20, 1966, as amended, known as the "The University of Puerto Rico Act", and the Public Corporation for the Supervision and Insurance of Credit Unions of Puerto Rico, created by virtue of Act 114-2001, as amended, better known as the Puerto Rico Credit Union Insurance and Oversight Public Corporations act", "Municipal Financing Corporation Act", better known as COFIM, Act 19-2014, as amended, "Community Impact Legislative Funds Special Commission Committee Act" Act 20-2015 and "Controller Special Report Joint Commission Act", Act No. 83 of June 23, 1954, as amended. The funds of public corporations and entities with community purposes which funds are received from private entities are excluded from application of this Chapter.

As to the "Sales and Usage Tax Act", better known as COFINA, Act 9-2006, as amended, the Executive shall be empowered to use COFINA funds, occasionally, only as last alternative and subject to the presentation of a sworn certification submitted to the Legislative Assembly. From said certification, it shall not be deemed that the Executive will have an indefinite use of the COFINA funds. Said certification shall establish the need, term and amount of funds to be used, to cover a significant occasional deficiency in the cash flow to comply with the Fiscal Plan of the Government of Puerto Rico. Said Certificate shall be signed and sworn by the Executive Director of the Fiscal Agency and Financial Advisory Authority and by the Budget and Management Office Director. The signature and oath of these officers in the certification cannot be delegated. In said certification, the officers

68

shall accredit that the information is correct, true, and exact as to the fiscal reality of the Government of Puerto Rico.

Article 4.04.-Compliance Clause

All transfers made by virtue of the provisions of this chapter shall be subject to the requirements of Section 201 (b) (1) (M) of Public Law 114-187, known as *Puerto Rico Oversight Management and Economic Stability Act or PROMESA.*

CHAPTER 5.-DISPOSAL OF GOVERNMENT REAL ESTATE.

Article 5.01.-Public policy

It is hereby declared as public policy of the Government of Puerto Rico the best utilization of real estate property that are not being used by the state, for the purpose of delivering greater resources to the coffers. Further it promotes that such real state property that are currently in total disuse, may be dedicated to activities for common well-being, either for nonprofit uses, commercial or residential promoting the activation of the real estate market and the economy in general.

To comply with this public policy the design of an efficient sales procedure of real estate property, where the principles of competency, transparency, economic development, job creation, well-being and public interest permeate is hereby authorized.

Article 5.02.-Definitions

For purposes of this Chapter, the following words shall have the following meanings:

A.      Real Estate-Those that cannot be moved by themselves or be transferred from one place to another, such as land, buildings, etc., as well as those that are joined to a real estate property in a fixed manner, in order that it cannot be separated from it without breaking the matter or deterioration of the object and that belong to the agencies, dependencies, instrumentalities and public corporations of the Executive Branch of the Government of Puerto Rico.

B.      Committee-Refers to the Real Estate Evaluation and Disposal Committee.

72

e.     Perform any kind of study, inspection, analysis, or other endeavor on real estate property, including assuring that they are duly recorded in the Registry of the Property and that they have the title and any other requirement demanded by lay law as of the current year.

f.     Appraise real estate properties object of disposal. For that the necessary staff may be required and used, using the mechanism set forth in Act 8-2017.

Article 5.07.-Disposal of Real Estate Property.

The disposal of real estate of the Executive Branch of the Government of Puerto Rico shall be governed by a process that is fair and transparent where the same opportunities are provided to all participants, always safeguarding the public well-being and interest. In this tenor, every disposal shall be framed in the pursuit of the purposes set forth in this Act, maintaining a balance between the need of gathering more resources to the state and promoting economic development, procuring the well-being of society and/or creating jobs.

The Committee shall dispose of the real estate assets using as base the fair market value to be determined by the corresponding procedure of evaluation and appraisal or overseeing the utilization of the property for the benefit of the public interest.

The Executive Director of the Committee or his representative may act as authorized agent to carry out any transaction related to the title of the real estate property.

Article 5.08.-Conflict of Interest.

Any conflict of interest that may arise among the members of the Board during the performance of their functions pursuant to this Act, shall be addressed in accordance to what is provided by Act 1-2012, as amended, known as the Government Ethics Act of Puerto Rico of 2011".

Article 5.09.-Exception Clause.

No real estate property of the Executive Branch of the Government of Puerto Rico that is being used in housing classified by any person may be disposed of.

CHAPTER 6.-PUERTO RICO GOVERNMENT ACCOUNTING ACT

73

Article 6.01.-Article 3 of Act No. 230 of July 23, 1974, as amended and known as the Puerto Rico Government Accounting Act" is hereby amended in order to add a new paragraph (o) that reads as follows:

"Article 3.-Definitions.

When using this Act, the following terms shall mean:

(a)        ...

...

(o)        Special Allotments-Allotments approved by Joint Resolutions limiting the use of the assigned funds."

Article 6.02-Paragraph (b) is hereby amended and a new paragraph (e) is added to Article 7 of Act No. 230 of July 23, 1974, as amended, known as "Puerto Rico Government Accounting Act", in order to read as follows:

"Article 7.-Revenue from public funds.

a)        ...

All public funds of the dependencies that are not destined by law to a specific purpose shall be accredited to the General Fund of the State Treasury and shall be deposited in their entirety in the bank checking account of the Secretary or in any other bank account that he deems convenient to establish. Likewise, it is provided that from July 1, 2017, all special state funds and other revenue of public corporations and dependencies shall be deposited in their entirety in the State Treasury, under the custody of the Secretary of the Treasury or in the banking entity that he determines adequate. The Secretary of the Treasury shall also be empowered to determine the order of priority of the disbursements of payments charged to the special state funds and other revenues, according to the approved budget and the Fiscal Plan without this being deemed as a limitation to the powers conferred to the Governor and the Fiscal Agency and Financial Advisory Authority of Puerto Rico by virtue of the provisions of Act 5-2017. This provision shall have supremacy over any other that violates or is inconsistent with what is set forth herein. For each fiscal year, any amount in excess of what is budgeted and authorized by the Budget and Management Office to the public corporations and dependencies originating from special state funds shall enter the Budgetary Fund              created              by              virtue              of

74

Act No. 147 of June 18, 1980, as amended. This provision shall not be applicable to such funds that are assigned to municipalities by virtue of the Sales and Usage Tax. This provision shall not be applicable to the funds coming from private donations received by government entities with social purposes.

...

e)    Starting from July 1, 2017, all such special state funds created by Law for specific purposes shall continue to be used for those purposes for which they were assigned by Law, according to the Budget Recommended by the Budget and Management Office and with the Fiscal Plan. Likewise, the Budget and Management Office is empowered to create a reserve under its custody, as established by norm, which will allow the budgetary control of all expense item charged to the state special funds and other revenue. If any inconsistency exists between the law and the use of the funds with the Fiscal Plan, the purpose provided in the Fiscal Plan approved in accordance to the provisions of PROMESA and shall prevail.

Article 6.03.-Paragraphs (h), (l), and (m) of Article 8 of Act No. 230 of July 23, 1974, as amended, and known as "Puerto Rico Government Accounting Act", to read as follows:

"Article 8.-Allotments of public funds.

(a)    ...

...

(h)    The allotments and funds without determined economic year, that have remained in the books without movement of disbursement or obligation for one (1) year, shall be considered for purposes of this Act, as having met their purposes for which they will be immediately closed and entered into the General Fund, except allotments and funds without determined year assigned to carry out permanent improvements and that have been accounted for and taken to the books. These shall have a term of three (3) years from the legal effective date of the allotment to be disbursed and to comply with the purposes for which they were assigned. After the term of three (3) years has elapsed, the binding and nonbinding balances of the funds of permanent improvements shall be closed and entered to Fund 301. This provision shall only be applicable to allotments made prior to Fiscal Year 2017-2018 and shall not be applicable

to those allotments made by the Legislative Assembly by Legislative Donations or assignments by virtue of the Sales and Usage Tax.

       In such cases in which the agency or organism receiver of the funds of permanent improvements understands that the term of the allotment should be extended for a term greater than three (3) years, they may request it, justifying the need of maintaining these resources, to the Budget and Management Office at least three (3) months before the referred term expires. During this period, the Budget and Management Office shall analyze the petition and determine the need of maintaining the allotment current, the term for which it will be extended, and the amount. Said resources shall be re-scheduled by the Legislative Assembly.

(i)       ...

...

(l)       Any allotment that remains one (1) year without being taken to the books shall be considered, as a general rule, automatically canceled and new legislative action shall be required to use the monies so canceled. In such exceptional cases in which it is proven that there have been justified cause to not take to the books an assignment during a period of one (1) eat year stiffly, such as the delay in the resolution of litigations in courts, and the impossibility of carrying out a public work due to fiscal difficult fiscal, technical or legal difficulties, allotment may be accounted for even after the mentioned period of one (1) year has elapsed.

       The Secretary shall notify the Legislative Assembly of the action canceling allotments in the circumstances contemplated by this paragraph, during the thirty (30) days following the date in which said cancellation was provided.

(m)       Periodically, the Secretary shall transfer the surplus of the General Fund from the State Fund, according to law, the balances of deposit accounts that have remained without use or movement whatsoever in the accounting books for one (1 year and which, according to his opinion, are not necessary or do not meet the purposes for which they were created. Provided that any claim that comes to the Secretary obligated to pay with respect to said balances, after they have been transferred in the manner provided above, shall be paid from any available funds not destined to other attentions."

## No. 2017-131 TRANSLATOR'S CERTIFICATE OF ACCURACY

I, Mayra Cardona Durán, of legal age, single, resident of Guaynabo, Puerto Rico, Certified Interpreter of the United States Courts (Certification No. 98-020) and certified member of the National Association of Judiciary Interpreters (Member No. 10671) member in good standing of the American Translators Association (Member No. 230112), and admitted to the Puerto Rico Bar Association (Bar No. 12390) hereby CERTIFY: that according to the best of my knowledge and abilities, the foregoing is a true and rendition into English of the original Spanish text, which I have translated and it is stamped and sealed as described therein. This document is comprised of Eleven (11) Pages, including this certification page, and does not contain changes or erasures.

In Guaynabo, Puerto Rico today, Tuesday, June 13, 2017.

**Lcda. Mayra Cardona**
BA Lit/Fr, MA Trans, JD
**United States Courts Certified Interpreter**
**NAJIT Certified Interpreter and Translator**
3071 Alejandrino Ave. PMB 306 Guaynabo, Puerto Rico 00969-7035
Tel. (787) 530-1414 Fax (787) 789-7363
e-mail: mayra@cardona.com

Case:17-00188-LTS Doc#:420-22 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 22 Page 1 of 6

# EXHIBIT 22

**Exhibit R**

Letter from FAFAA to BNYM, dated May 16, 2017

(Attached)

May 16, 2017

BNY Mellon
c/o Alex Chang
101 Barclay Street
New York, NY 10286

       Re:    Amended and Restated Sales Tax Revenue Bond Resolution, as amended on June 10, 2009 (the "Resolution") and the Puerto Rico Sales Tax Financing Corporation ("COFINA")

Ladies and Gentlemen:

We are in receipt of your May 4, 2017 letter in which you assert an Event of Default has occurred or will occur under the bonds issued by COFINA because of the "Law on Compliance with the Fiscal Plan," Senate Bill 432, House Bill 938 (the "Fiscal Plan Compliance Law"), signed into law on April 27, 2017, conflict with sections 705 and 706 of the Resolution and permitted use of the pledged sales tax (the "Pledged Sales Tax"). An explanatory declaration of Governor Ricardo Rosselló Nevares appended to the Fiscal Plan Compliance Law confirms that Chapter IV of the statute does not apply to COFINA.

With respect to Chapter IV of the Fiscal Compliance Law, a committee (the "Committee") composed of Executive Director of the Puerto Rico Fiscal Agency and Financial Advisory Authority, the Secretary of the Treasury Department, and the Executive Director of the Office of Management and Budget (OMB) is responsible for determining the amount of funds necessary for covering operational expenses and obligations as well as any remaining available surplus for public corporations, agencies, and instrumentalities of the Government of Puerto Rico. Such determination is to be made in accordance with the expenditure budget recommended by OMB for each fiscal year. As for COFINA, the Executive is authorized to use COFINA's funds as a last alternative pursuant to a sworn certification to the Puerto Rico Legislative Assembly. This certification must establish the need, terms and amount of funds to be used to "occasionally" cover a significant cash flow deficiency within the Government of Puerto Rico Fiscal Plan, as certified by the Financial Oversight and Management Board for Puerto Rico created under the Puerto Rico Oversight, Management and Economic Stability Act of 2016 (PROMESA).

To date the Committee has not exercised any such discretion and even if such discretion is ultimately exercised, there is no certainty that it would be inconsistent with the terms of the Resolution. As a result, there is no basis to assert that the Fiscal Compliance Law has triggered an Event of Default under the Resolution.

Additionally, sections 705 and 706 of the Resolution would not be violated even if the Fiscal Plan Compliance Law were applicable to COFINA at this time. Section 705 of the Resolution only requires COFINA to defend, preserve and protect the Pledged Property against *claims and*

*demands*. There have been no such claims or demands against the Pledged Property. As legislation, the Fiscal Plan Compliance Law is not a claim or demand. As noted above, Chapter IV of the Fiscal Plan Compliance Law merely authorizes the Committee to use the Pledged Sales Tax in certain limited circumstances. No such circumstances have arisen, and the Pledged Sales Tax have not been used. Moreover, no claims or demands against the Pledged Sales Tax have been made, and, therefore, COFINA's obligation under Section 705 to defend against claims or demands has not been triggered. If, under the new legislation, an action that constitutes a claim or demand against the Pledged Property were to be taken, COFINA would have thirty days from notice thereof to cure, which thirty-day cure period is extended under section 108 of Title 11 of the U.S. Code (the "Bankruptcy Code").[1]

Notably, Section 706 only prohibits the Commonwealth from (i) "limit[ing] or restrict[ing] the rights or power of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the Act" or (ii) "limit[ing] or restrict[ing] the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders". Such restrictions are not implicated here for the following reasons: (a) the Fiscal Plan Compliance Law does not limit or restrict any rights or powers of the Commonwealth to *impose, maintain, charge or collect* such taxes. Such taxes continue to be imposed, maintained, charged and collected; (b) no rights granted by the Act or rights of COFINA to meet its obligations to its Bondholders have in fact been limited or restricted; (c) there has been no actual impairment of the lien on the Pledged Property as the lien on Pledged Property remains in full force and effect; and (d) no revenues are currently required to be deposited or are available to be deposited, with the Trustee as the Trustee has already received the full Pledged Sales Tax Base Amount for Fiscal Year 2017. In accordance with the provisions of the Resolution and the Act no revenues are anticipated to be deposited with the Trustee until July 1, 2017.

Therefore, by virtue of the foregoing, the Fiscal Plan Compliance Law has had no impact on the Pledged Property. Furthermore, to reiterate, if actions are taken in the future under the authority granted under the Fiscal Plan Compliance Law that would limit or restrict the rights granted by the Act or the rights of COFINA to meet its obligations to the Bondholders, it would have thirty days after notice thereof to cure any default that might be triggered and such period would be subject to extension under section 108 of the Bankruptcy Code.

The above does not purport to be a complete or exhaustive list of reasons for which the assertions in your letter fail and we reserve the right to assert additional defenses to such assertions at any time. Nothing herein constitutes a waiver of any rights, remedies, or claims contained in the Resolution, the COFINA bonds or any other documents related thereto or any rights of COFINA

---

[1] Sections of the Bankruptcy Code referenced herein are incorporated to Title III by PROMESA section 301(a).

under Title III of PROMESA, including the extent to which any provision thereof affects the Pledged Property.

For the reasons set forth herein, COFINA hereby demands that you immediately retract and withdraw the assertions set forth in your May 4, 2017 letter and any declaration of the occurrence of a default or Event of Default under the Resolution and any remedies you may believe you are entitled to as a result thereof. Please be advised that any action you may seek to take based on any alleged default will violate the automatic stay under Bankruptcy Code section 362 and may cause substantial damage to COFINA. Accordingly, we reserve the right to hold you liable for any penalties, damages, including attorney's fees, with respect to such actions.

Sincerely,

John J. Rapisardi
O'Melveny & Myers
on behalf of the Puerto Rico Fiscal Agency and Financial
Advisory Authority (FAFAA)

cc:     Eric A. Schaffer (by email only to eschaffer@reedsmith.com)
        Lee Sepulvado (by email only to lsepulvado@smlawpr.com)
        Robert N.H. Christmas (by email only to rchristmas@nixonpeabody.com)
        Chris Mason (by email only to cmason@nixonpeabody.com)
        Susheel Kirpalani (by email only to susheelkirpalani@quinnemanuel.com)
        Daniel A. Fliman (by email only to dfliman@ksowitz.com)
        Amy Caton (by email only to acaton@kramerlevin.com)
        Thomas Moers Mayer (by email only to tmayer@kramerlevin.com)
        William P. Smith (by email only to wsmith@mwe.com)
        John K. Cunningham (by email only to jcunningham@whitecase.com)
        Dennis F. Dunne (by email only to ddunne@milbank.com)
        Marcia L. Goldstein (by email only to marcia.goldstein@weil.com)
        Mark C. Ellenberg (by email only to mark.ellenberg@cwt.com)
        Martin A. Sosland (by email only to martin sosland@butlersnow.com)
        Martin J. Bienenstock (by email only to mbienenstock@proskauer.com)
        Suzzanne Uhland (by email only to suhland@omm.com)
        Gerardo Portela (by email only to Gerardo.Portela@aafaf.pr.gov)
        José Santiago (by email only to Jose.Santiago@bgfpr.com)
        Belén Fornaris (by email only to Belen.Fornaris@bgfpr.com)

Ambac Assurance Corporation
One State Street Plaza
15th Floor
New York, NY 10004
Attention: Surveillance Department

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
Attention: Risk Management

MBIA Insurance Corporation
113 King Street
Armonk, NY 10504
Attention: Surveillance

Assured Guaranty Municipal Corp.
31 West 52nd Street
New York, NY 10019
Attention: Managing Director -
Surveillance

# EXHIBIT 23

**Hearing Date**: June 28, 2017 at 9:30 a.m. (Prevailing Eastern Time)
**Objection Deadline**: June 16, 2017 at 4:00 p.m. (Prevailing Eastern Time)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

     Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

## MOTION OF DEBTORS FOR ORDER APPROVING
## PROCEDURE TO RESOLVE COMMONWEALTH-COFINA DISPUTE

To the Honorable United States District Court Judge Laura Taylor Swain:

    The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Sales

Tax Financing Corporation ("COFINA," and together with the Commonwealth, the "Debtors"),

by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight

Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight,

Management, and Economic Stability Act* ("PROMESA"),[2] respectfully submit this motion (the

"Motion"), pursuant to PROMESA sections 104(b), 315(a), and section 105(a) of title 11 of the

United States Code (the "Bankruptcy Code"), made applicable by PROMESA section 301(a), for

entry of an order, substantially in the form attached hereto as **Exhibit A** (the "Proposed Order"),

approving (a) appointment of an Oversight Board agent to serve as the Commonwealth

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number
listed as a bankruptcy case number due to software limitations and the last four (4) digits of
each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of
Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID:
3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case
No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

[2] PROMESA has been codified in 48 U.S.C. §§ 2101-2241.

Case:17-03283-LTS Doc#:3023 Filed:05/04/17 Entered:05/04/19 20:47:33 Desc: Main Document Page 2 of 307

representative in the "Commonwealth-COFINA Dispute" (defined below); (b) appointment of an Oversight Board agent to serve as the COFINA representative in the Commonwealth-COFINA Dispute; and (c) approving certain procedures related thereto.   In support of this Motion, the Debtors respectfully represent as follows:

2

## **Table of Contents**

Jurisdiction and Venue ............................................................................................................ 5

Background ............................................................................................................................... 5

    A.   The COFINA Bonds ..................................................................................................... 6

    B.   The Commonwealth-COFINA Dispute ....................................................................... 8

    C.   The Fiscal Plan ........................................................................................................... 10

Relief Requested .................................................................................................................... 11

Basis for Relief ...................................................................................................................... 11

Proposed Procedures ............................................................................................................. 14

Notice .................................................................................................................................... 16

No Prior Request .................................................................................................................... 17

## Table of Authorities

**Cases**

*In re Chinichian,* 784 F.2d 1440, 1443 (9th Cir. 1986) .................................................... 13

*Bird v. Crown Convenience (In re NWFX, Inc.),* 864 F.2d 588, 590 (8th Cir. 1988) .................. 13

*In re Cooper Properties Liquidating Trust, Inc.,* 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) .. 14

*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.,* 1991 Del. Ch. LEXIS
215 *108 n. 55 (Del Ch. 1991) .............................................................................. 14,15

*Protective Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson,* 390
U.S. 414, 424-425 (1968) ..................................................................................... 14, 15

**Statutes**

11 U.S.C. § 105(a) .................................................................................................. 5, 13

PROMESA § 104(b) ................................................................................................. 5,12

PROMESA § 301(a) .................................................................................................... 5

PROMESA § 305 ...................................................................................................... 15

PROMESA § 306(a) ..................................................................................................... 5

PROMESA § 307(a) ..................................................................................................... 5

PROMESA § 315(a) ................................................................................................. 5,13

PROMESA § 315(b) ................................................................................................... 15

P.R. Const. art. VI. § 8 .............................................................................................. 9

## Jurisdiction and Venue

1.      The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction over this matter pursuant to PROMESA section 306(a).

2.      Venue is proper pursuant to PROMESA section 307(a).

3.      The statutory bases for the relief requested herein are PROMESA sections 104(b), 315(a) and Bankruptcy Code section 105(a), made applicable in the Title III Cases by PROMESA section 301(a).

## Background

4.      On June 30, 2016, the Oversight Board was established under PROMESA section 101(b).  On August 31, 2016, President Obama appointed the Oversight Board's seven voting members.

5.      Pursuant to PROMESA section 315, "[t]he Oversight Board in a case under this title is the representative of the debtor[s]" and "may take any action necessary on behalf of the debtor[s] to prosecute the case[s] of the debtor[s], including filing a petition under section 304 of [PROMESA] . . . or otherwise generally submitting filings in relation to the case[s] with the court."

6.      On September 30, 2016, the Oversight Board designated the Debtors as covered entities under PROMESA section 101(d).

7.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under title III thereof (the "Commonwealth's Title III Case").

8.      On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA

pursuant to PROMESA section 304(a), commencing a case under title III thereof ("COFINA's Title III Case," and, together with the Commonwealth's Title III Case, the "Title III Cases").

9.     By operation of PROMESA and pursuant to section 315(b) the Oversight Board is the representative of the Commonwealth and COFINA in these Title III Cases.

10.     On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth's Title III Case and COFINA's Title III Case, for procedural purposes only [Docket No. 242].

11.     Background information regarding the Commonwealth and its instrumentalities, and the commencement of the instant Title III Cases, is contained in the *Notice of Statement of Oversight Board in Connection with PROMESA Title III Petition* [ECF No. 1], attached to the Commonwealth's title III petition.

**A.  The COFINA Bonds**

12.     COFINA is a statutory instrumentality of the Commonwealth.  It was created by Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16) (as amended, "Act 56") as a related entity for the Government Development Bank (the "GDB") for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006.

13.     COFINA issued bonds pursuant to the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 10, 2009 (the "2009 Resolution" or the "Resolution").  COFINA bonds that have been issued can be grouped into the following tranches: (i) Senior Current Interest Bonds; (ii) Senior Capital Appreciation Bonds; (iii) Subordinate Current Interest Bonds; and (iv) Subordinate Capital Appreciation Bonds (collectively, the "COFINA Bonds").

14.     The COFINA Bonds are non-recourse bonds and are payable solely from, and secured by, a security interest granted under the 2009 Resolution in the pledged property, consisting mainly of the pledged sales and use tax (the "Pledged Sales Tax").  As of July 1, 2015, the total sales and use tax in Puerto Rico (to be allocated among the Commonwealth, municipalities, and COFINA) was increased to 11.5%.[3]  COFINA's annual share of the sales and use tax is the greater of (i) a fixed amount (currently ~$725 million), which grows at 4% per year (the "Pledged Sales Tax Base Amount"), or (ii) a 3% sales and use tax.  *See* Act of May 13, 2006, No 91-2006, § 3(a).  Presently, the Pledged Sales Tax Base Amount is in excess of the 3% portion of the sales and use tax. [4]

15.     Act 56 requires the Commonwealth's Secretary of the Treasury to deposit the first receipts of the Commonwealth Sales Tax in each fiscal year in the amount specified by the Pledged Sales Tax in a special fund held separate and apart from the Commonwealth's general fund.  Act No. 56, § 2; P.R. Laws Ann. tit. 13, § 12.

16.     As of July 31, 2016, there is approximately $17.3 billion of COFINA Bonds outstanding ($7.6 billion of Senior Bonds and $9.7 billion of Subordinate Bonds).  Approximately $2.6 billion of COFINA bonds are insured.[5]  COFINA's debt service requirement

---

[3] *See* Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12.  The total sales and use tax ("SUT") is divided as follows: (I) a 4.5% SUT is paid to the Commonwealth pursuant to Act of July 1, 2015, No. 101-2015, sec. 6, § 4210.01(b); (II) a 6% SUT is divided between the Commonwealth, municipalities, and COFINA pursuant to Act of Jan. 24, 2014, No. 18-2014, art. 2–3, 2014 P.R. Laws 12; and (III) 1% SUT goes directly to Puerto Rico's municipalities pursuant to Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12.

[4] *See* Financial Information and Operating Data Report (Dec. 18, 2016), at 91.

[5] Approximately 15% of COFINA debt is insured, including 31% of Senior Bonds and 3% of Subordinated Bonds.  *See* Commonwealth of Puerto Rico Fiscal Plan Appendix, dated Oct. 14, 2016 (the "Fiscal Plan Appendix (Oct. 14, 2016)") at 11.

is approximately $725 million for the fiscal year ending June 30, 2017 and is projected to grow annually.

**B. The Commonwealth-COFINA Dispute**

17.     For purposes of the Title III Cases, the dominant issue is whether, after considering all procedural and substantive defenses, the Pledged Sales Taxes are either (a) property of the Commonwealth within the meaning of PROMESA section 301(c)(5), or (b) subject to an allowable claim of the Commonwealth having priority over all claims of COFINA (the "Commonwealth-COFINA Dispute").  If they are, then there may be no funds available to pay COFINA debt.  If they are not, then there will be $725 million less available per year to pay Commonwealth liabilities and expenses, which annual amount increases over time.

18.     On July 20, 2016, certain holders of the Commonwealth's general obligation debt filed a complaint against the Commonwealth's Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) a declaratory judgment that certain measures taken by the Commonwealth permitting transfers outside of the ordinary course or in violation of the Puerto Rico Constitution were prohibited under PROMESA, and (b) an injunction to prevent the same such transfers.  *See Lex Claims, et al. v. Garcia Padilla, et al.*, No. 16-02374-FAB (D.P.R. July 20, 2016) (hereinafter, "Lex Claims").

19.     By motion dated June 7, 2017 [Docket No. 270], the Puerto Rico Funds and Mutual Fund Group requested stay relief to continue the Lex Claims litigation including a certification to the Puerto Rico Supreme Court of the issues identified herein.  The Oversight Board will file a separate pleading explaining why that method of resolution would be improper and inconsistent with the reorganization in process.  Notably, that litigation centers on the question of whether the Pledged Sales Taxes are available resources of the Commonwealth

within the meaning of the Puerto Rico Constitution, whereas the Commonwealth-COFINA Dispute covers the broader question whether federal law impacts the answer to whether the Pledged Sales Taxes are property of the Commonwealth title III debtor or the COFINA title III debtor and what that impact is.

20.     The Commonwealth has issued approximately $17.8 billion in general obligation bond debt (the "GO Debt").  The GO Debt falls into two categories: (i) the Commonwealth's general obligation bonds ("GO Bonds"), which were issued by the Commonwealth, and are backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same pledge of the Commonwealth's good faith, credit, and taxing power ("GO-Guaranteed Bonds").

21.     Holders of the GO Debt argue, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. *Lex Claims* [Docket No. 78], at 4.  They point to Article VI, Section 8 of the Puerto Rico Constitution which provides that, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  In their view, the Pledged Sales Tax is an "available resource" and  COFINA was created and has issued bonds in an attempt to evade the GO Debtholders' claim on available resources and related constitutional limitations on the quantity of public debt the Commonwealth was permitted to issue.  *Lex Claims* [Docket No. 78], at 7.

22.     Holders and insurers of COFINA Bonds argue that the sales and use taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any

9

possibility the taxes may be property or available resources of the Commonwealth. *Lex Claims*
[Docket No. 232], at 30. They point to Act of May 13, 2006, No 91-2006, 2006 P.R. Laws 246
*et seq.* (codified as amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91") providing
the Pledged Sales Tax "shall [not] constitute available resources of the Commonwealth of Puerto
Rico nor be available for the use of the Secretary." Act 91, § 2. They further assert that COFINA
was essential in permitting the Commonwealth to access the capital markets on preferable terms.

### C. The Fiscal Plan

23.     On March 13, 2017, Puerto Rico's Fiscal Agency and Financial Advisory
Authority ("AAFAF") submitted a joint fiscal plan (as amended and corrected, the "Fiscal Plan")
to the Oversight Board. On that date, the Oversight Board certified the Fiscal Plan subject to
certain amendments.

24.     Whether the funds available for debt service under the Fiscal Plan should satisfy
COFINA debt, Commonwealth debt, or be divided between the two depends on which entity(s)
own the Pledged Sales Tax.

25.     Promptly after certification of the Fiscal Plan, the Oversight Board and the
Commonwealth undertook a joint effort to formulate restructuring proposals for all major
creditors based on the debt sustainability analysis in the Fiscal Plan. In March 2017, the
Oversight Board and the government requested holders of GO Debt and COFINA Bonds to
participate in mediation with the Oversight Board and government, in an attempt to, among other
things, resolve the Commonwealth-COFINA Dispute.

26.     The mediation commenced on April 13, 2017, under the auspices of former
Bankruptcy Judge Allan Gropper, who was nominated by a plurality of creditors. Despite
several mediation sessions and other private negotiations, no agreements were reached before the

expiration of the PROMESA stay on May 1, 2017.  After certain creditors commenced litigation against the Commonwealth and COFINA, the Oversight Board and the Commonwealth decided the best path forward was to file title III cases to protect Puerto Rico and its citizens.

27.     The Oversight Board has not taken sides in the Commonwealth-COFINA dispute.

## **Relief Requested**

28.     By this Motion, pursuant to PROMESA sections 104(b), 315(a), and Bankruptcy Code section 105(a), the Debtors seek entry of an order, substantially in the form of the Proposed Order, approving the appointment of independent Oversight Board agents to serve separately as the respective representatives of the Commonwealth and COFINA in the Commonwealth-COFINA Dispute (each, an "Agent"), and approving certain procedures related to such appointments and the parameters of each Agent's powers and authority.

## **Basis for Relief**

29.     The Oversight Board, as representative of the Commonwealth and COFINA, submits this Motion in the interest of creating a fair, transparent, and efficient structure for resolving the Commonwealth-COFINA Dispute.  At the outset of these Title III Cases, counsel for the Oversight Board brought to the Court's attention the importance of the Commonwealth-COFINA Dispute and the procedural efforts to resolve it.  The Court expressed at that time that "transparency is important in these proceedings. And so a method that, if these matters are controversial, will make the steps and the issues as transparent as possible is appropriate."  May 17, 20-17 Hr'g Tr. 63:5-9 [Docket No. 207].

30.     The numbers clearly illustrate the importance of resolving the Commonwealth-COFINA Dispute.   Of the approximately $74 billion in aggregate debt owed by the Commonwealth, the GO Debt and COFINA Bonds together account for approximately 55% of the total bond debt to be restructured.  The outcome of the Commonwealth-COFINA Dispute

will likely be dispositive as to the relative recoveries of the debt holders of COFINA and the Commonwealth. The debt service on the COFINA Bonds alone is estimated to be $725 million in fiscal year 2017, and is projected to grow each fiscal year. On the other hand, the Fiscal Plan contemplates an average of $787 million in available funds for debt service. Should the COFINA structure be determined to be valid, almost the entirety of the funds available for debt service may need to continue to flow to those creditors, leaving very little recovery to creditors of the Commonwealth.

31.     Time is of the essence to resolve the Commonwealth-COFINA Dispute because, if the Commonwealth is not entitled to any of the Pledged Sales Taxes,[6] it will, absent borrowing or further slashing expenses to a counterproductive extent, face acute cash management issues shortly after November 1, 2017. If there is no settlement or final adjudication as to the Commonwealth-COFINA Dispute by November 1, 2017, the Commonwealth will likely need to borrow funds from COFINA to fund the Commonwealth's operating budget.

32.     Further, until a resolution is reached on this gating issue, it is far less feasible for the Oversight Board to negotiate a consensual title III plan of adjustment for the Commonwealth and COFINA or any of their other Debtor-affiliates.

33.     PROMESA grants the Oversight Board the power to delegate its authority to agents. Specifically, section 104(b) provides that "[a]ny member or agent of the Oversight Board may, if authorized by the Oversight Board, take any action that the Oversight Board is authorized to take by this section." PROMESA § 104(b).

---

[6] The Pledged Sales Tax relates solely to COFINA's potential share of the 6% SUT allocated to the Commonwealth, municipalities, and COFINA by Act of Jan. 24, 2014. Even if the Pledged Sales Tax is found to be valid, the Commonwealth will receive any remaining revenues from the 6% SUT collections.

34.     PROMESA section 315(a) provides the Oversight Board with the power to take any action necessary to prosecute the Title III Cases.  *See* PROMESA § 315(a) ("For the purposes of this title, the Oversight Board may take any action necessary on behalf of the debtor to prosecute the case of the debtor . . .").  Given the importance of the Commonwealth-COFINA Dispute to Puerto Rico's overall restructuring, it is prudent to establish an independent debtor representative for the Commonwealth and COFINA to fully advocate, at arm's length, on behalf of each Debtor to reach a fair resolution.

35.     Congress mandated that the Oversight Board be the representative of every title III debtor, notwithstanding that it was self-evident that the title III debtors conduct thousands of transactions among themselves, creating significant claims among them.  Given the extraordinary magnitude of the Commonwealth-COFINA dispute, the proposed procedure submitted to the Court works within the framework that Congress contemplated: ensuring that each of the Debtors' (and their respective creditors') rights are protected and independently represented, while making sure that the Oversight Board remains in control of the overall restructuring of the Commonwealth and its instrumentalities.

36.     PROMESA section 301 makes applicable Bankruptcy Code section 105(a) to title III cases.  Section 105(a) provides, in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), the Court has expansive equitable powers to fashion any order or decree that carries out the statute.  *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that

13

equitable principles govern."); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a duty to protect whatever equities a debtor may have in property for the benefit of its creditors as long as that protection is implemented in a manner consistent with the bankruptcy laws.").

37.     After discussions with representatives of different types of COFINA creditors and Commonwealth creditors, it became evident the senior and subordinated COFINA creditors were concerned about which type of COFINA creditor the COFINA Agent (defined below) may try to serve.  To ameliorate that concern, we are proposing that each Agent be instructed to assess settlements from the viewpoint of maximizing the result for the Debtor the Agent represents, as opposed to maximizing it for a particular type of creditor of each Debtor.  While title III debtors are not corporate debtors, the same type of issue was hypothesized in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215 *108 n. 55 (Del Ch. 1991), where directors had to deal with a litigation whose settlement would impact creditors differently than shareholders.  Chancellor Allen explained how the directors should proceed, and his approach is quoted in **Exhibit D** hereto and adopted below for purposes of establishing the Agents' objectives and not to impose here duties unique to the corporate situation in *Credit Lyonnais*.  This is consistent with the settlement framework espoused by the United States Supreme Court in *Protective Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968).

### Proposed Procedures

38.     As representative of each Debtor, the Oversight Board proposes the following procedures (the "Proposed Procedures") to resolve the Commonwealth-COFINA Dispute:

    a.  The Oversight Board, as representative of title III debtor Commonwealth of Puerto Rico pursuant to PROMESA section 315(b), shall appoint an independent agent to serve as the Commonwealth representative to litigate and/or settle the

14

Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "<u>Commonwealth Agent</u>").

b.  The Oversight Board shall select the Commonwealth Agent from among the general statutory creditors' committee that may be appointed in the Commonwealth's title III case and at least two nominations made by the creditors of the Commonwealth listed on **<u>Exhibit B</u>**.

c.  The Oversight Board, as representative of title III debtor COFINA pursuant to PROMESA section 315(b), shall appoint an independent agent to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "<u>COFINA Agent</u>").

d.  The Oversight Board shall select the COFINA Agent from among the statutory creditors' committee that may be appointed in COFINA's title III case and at least two nominations made by the creditors and other interested stakeholders of COFINA listed on **<u>Exhibit C</u>**.

e.  If the creditors on **<u>Exhibit B</u>** and/or **<u>Exhibit C</u>** fail to agree on two nominations, Oversight Board members Arthur J. Gonzalez and David A. Skeel shall select the Agent(s) after consulting with creditors and considering potential persons that had and had not been nominated.

f.  Each Agent shall be entitled to retain legal and other professionals it reasonably deems appropriate.

    i.  Each Agent and each of its retained advisors shall be compensated by the Debtor on whose behalf they are acting, in conformity with PROMESA section 316 and any interim compensation procedures ordered by the Court.

g.  The Agents shall cooperate to commence the litigation to resolve the Commonwealth-COFINA Dispute by no later than ten (10) days after the Agents are appointed. In advance of the commencement of such litigation, the Agents, the Oversight Board, and AAFAF shall agree to a schedule constructed to enable the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute, on or before November 1, 2017, in the absence of a prior settlement. The order shall not impair or release any rights of the government or the Oversight Board under PROMESA or otherwise, including PROMESA section 305.

h.  Each Agent shall endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents based on the Agent's estimation of the probabilities of the potential outcomes, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents, consistent with the approach explained by Chancellor Allen of the Delaware Chancery Court in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215*108 n. 55 (Del. Ch. 1991),[7] and espoused in *Protective*

---

[7]  Chancellor Allen's approach is quoted on **<u>Exhibit D</u>** hereto.

15

*Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968).

i. To the extent it is necessary or desirable to link a settlement to the treatment of creditors' claims in a title III plan of adjustment, the Oversight Board may participate in the negotiations in an effort to reach such a settlement.

j. Any settlement negotiated by the Agents shall only be effective upon (i) consent of the Oversight Board, (ii) an order of the Court granting an Oversight Board motion requesting approval of such settlement, or (iii) confirmation of a title III plan of adjustment incorporating such settlement.

k. Notwithstanding the appointment of Agents, the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose a title III plan of adjustment for the Commonwealth and/or COFINA that incorporates a settlement of the Commonwealth-COFINA Dispute developed by the Agents, or developed by the Oversight Board, and the Oversight Board may negotiate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute.

39. Nothing herein shall deprive AAFAF and the government of any standing and other rights to appear that they have in any litigation relating to the Commonwealth-COFINA Dispute or any other litigations.

## Notice

40. The Debtors have provided notice of this Motion to the following parties (the "Notice Parties"): (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims against each Debtor; (d) the Office of the United States Attorney for the District of Puerto Rico; (e) counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority on behalf of the Governor of Puerto Rico; (f) the Puerto Rico Department of Justice; (g) the Other Interested Parties;[8] and (h) all parties filing a

---

[8] The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtors; and (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors.

16

notice of appearance in these Title III Cases. The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

**No Prior Request**

41. No prior request for the relief sought in this Motion has been made to this or any other court.

*[Remainder of Page Intentionally Left Blank]*

WHEREFORE the Debtors respectfully request the Court to enter an order, substantially in the form attached hereto as **Exhibit A**, (a) granting the Motion, (b) approving the appointment of the Commonwealth Agent, (c) approving the appointment of the COFINA Agent, (d) approving procedures related thereto as described herein, and (d) granting the Debtors such other relief as is just and proper.

Dated: June 9, 2017
     San Juan, Puerto Rico

Respectfully submitted,

*/s/* Martin J. Bienenstock

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial*
*Oversight and Management Board*
*as representative for the Debtors*

*/s/* Hermann D. Bauer

Hermann D. Bauer
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial*
*Oversight and Management Board*
*as Representative for the Debtors*

**Exhibit A**

**Proposed Order**

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

         Debtors.[1]

PROMESA
Title III


No. 17 BK 3283-LTS

(Jointly Administered)

-------------------------------------------------------------x

# ORDER APPROVING
# PROCEDURE TO RESOLVE COMMONWEALTH-COFINA DISPUTE

Upon the *Motion of Debtors for Order Approving Procedure to Resolve the Commonwealth-COFINA Dispute* (the "Motion");[2] and the Court having found it has subject matter jurisdiction over this matter pursuant to PROMESA section 306(a); and it appearing that venue is proper pursuant to PROMESA section 307(a); and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their creditors, and other parties in interest; and the Court having found that the Debtors provided adequate and appropriate notice of the Motion under the circumstances and that no other or further notice is required; and the Court having reviewed the Motion and having heard statements in support of the Motion at a hearing held before the Court (the "Hearing"); and the Court having determined that the legal and factual bases set forth in the Motion and at the Hearing establish just cause for the relief granted herein;

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

[2] Capitalized terms used but not otherwise defined herein have the meanings given to them in the Motion.

and any objections to the relief requested herein having been withdrawn or are overruled on the merits; and after due deliberation and sufficient cause appearing therefor, it is **HEREBY ORDERED THAT:**

1.    The Motion is granted as set forth herein.

2.    The Oversight Board may implement the following actions and procedures relating to the Commonwealth-COFINA Dispute:

    a.  The Oversight Board, as representative of title III debtor Commonwealth of Puerto Rico pursuant to PROMESA section 315(b), shall appoint an independent agent serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent").

    b.  The Oversight Board shall select the Commonwealth Agent from among the general statutory creditors' committee that may be appointed in the Commonwealth's title III case and at least two nominations made by the creditors of the Commonwealth listed on Exhibit B of the Motion.

    c.  The Oversight Board, as representative of title III debtor COFINA pursuant to PROMESA section 315(b), shall appoint an independent agent to serve as the COFINA representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent").

    d.  The Oversight Board shall select the COFINA Agent from among the statutory creditors' committee that may be appointed in COFINA's title III case and at least two nominations made by the creditors and other interested stakeholders of COFINA listed on Exhibit C of the Motion.

    e.  If the creditors on Exhibit B and/or Exhibit C of the Motion fail to agree on two nominations, Oversight Board members Arthur J. Gonzalez and David A. Skeel shall select the Agent(s) after consulting with creditors and considering potential persons that had and had not been nominated.

    f.  Each Agent shall be entitled to retain legal and other professionals it reasonably deems appropriate.

        i.  Each Agent and each of its retained advisors shall be compensated by the Debtor on whose behalf they are acting, in conformity with PROMESA section 316 and any interim compensation procedures ordered by the Court.

    g.  The Agents shall cooperate to commence the litigation to resolve the Commonwealth-COFINA Dispute by no later than ten (10) days after the Agents are appointed.  In advance of the commencement of such litigation, the Agents, the Oversight Board, and AAFAF shall agree to a schedule constructed to enable

the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute, on or before November 1, 2017, in the absence of a prior settlement.  This Order does not impair or release any rights of the government or the Oversight Board under PROMESA or otherwise, including PROMESA section 305.

h.  Each Agent shall endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents based on the Agent's estimation of the probabilities of the potential outcomes, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents, consistent with the approach explained by Chancellor Allen of the Delaware Chancery Court in *Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*, 1991 Del. Ch. LEXIS 215*108 n. 55 (Del. Ch. 1991), and espoused in *Protective Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-425 (1968).

i.  To the extent it is necessary or desirable to link a settlement to the treatment of creditors' claims in a title III plan of adjustment, the Oversight Board may participate in the negotiations in an effort to reach such a settlement.

j.  Any settlement negotiated by the Agents shall only be effective upon (i) consent of the Oversight Board, (ii) an order of the Court granting an Oversight Board motion requesting approval of such settlement, or (iii) confirmation of a title III plan of adjustment incorporating such settlement.

k.  Notwithstanding the appointment of Agents, the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose a title III plan of adjustment for the Commonwealth and/or COFINA that incorporates a settlement of the Commonwealth-COFINA Dispute, developed by the Agents, or developed by the Oversight Board, and the Oversight Board may negotiate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute.

3.  Nothing herein shall deprive AAFAF and the government of any standing and other rights to appear that they have in any litigation relating to the Commonwealth-COFINA Dispute or any other litigations.

4.  The Debtors and the Oversight Board, as the Debtors' representative, are authorized to take all actions, and to execute all documents, necessary or appropriate, to effectuate the relief granted in this order in accordance with the Motion.

5.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this order.

Dated: _____, 2017
   San Juan, Puerto Rico

           _____

           Honorable Laura Taylor Swain
           United States District Judge

Case 17-03283-LTS Doc#3920 Filed 05/11/18 Entered 05/11/18 22:45:31 Desc-Main Document 23 Page 254 of 520

# **Exhibit B**

List of Commonwealth Creditors and Stakeholders

1. Ad Hoc Group of GO Bondholders
2. Assured Guaranty
3. Financial Guaranty Insurance Co.
4. Syncora
5. UCC[1]

---

[1] To avoid overlap in nominations, only UCC members not otherwise accounted for on this list may provide a nomination on behalf of the UCC.

Case:17-03283-LTS Doc#:920 Filed:01/11/17 Entered:01/11/17 21:04:32 Desc Main Document Page 266 of 507

## **Exhibit C**

List of COFINA Creditors and Stakeholders

1. UBS Family of Funds/Puerto Rico Family of Funds
2. Mutual Fund Group
3. COFINA Senior Bondholders
4. Ambac Assurance Corp.
5. National Public Finance Guarantee Corp

**Exhibit D**

Excerpt from Chancellor Allen's Opinion in
*Credit Lyonnais Bank Nederland, N.V. v. Pathe Communications Corp.*,
1991 Del. Ch. LEXIS 215*108 n. 55 (Del. Ch. 1991).

Chancellor Allen opined as follows: "The possibility of insolvency can do curious things to incentives, exposing creditors to risks of opportunistic behavior and creating complexities for directors. Consider, for example, a solvent corporation having a single asset, a judgment for $ 51 million against a solvent debtor. The judgment is on appeal and thus subject to modification or reversal. Assume that the only liabilities of the company are to bondholders in the amount of $ 12 million. Assume that the array of probable outcomes of the appeal is as follows:

Expected Value

| | |
|---|---|
| 25% chance of affirmance ($ 51mm) | $ 12.75 |
| 70% chance of modification ($ 4mm) | $ 2.8 |
| 5% chance of reversal ($ 0) | $ 0 |
| Expected Value of Judgment on Appeal | $ 15.55 |

Thus, the best evaluation is that the current value of the equity is $ 3.55 million. ($ 15.55 million expected value of judgment on appeal $ 12 million liability to bondholders). Now assume an offer to settle at $ 12.5 million (also consider one at $ 17.5 million). By what standard do the directors of the company evaluate the fairness of these offers? The creditors of this solvent company would be in favor of accepting either a $ 12.5 million offer or a $ 17.5 million offer. In either event they will avoid the 75% risk of insolvency and default. The stockholders, however, will plainly be opposed to acceptance of a $ 12.5 million settlement (under which they get practically nothing). More importantly, they very well may be opposed to acceptance of the $ 17.5 million offer under which the residual value of the corporation would increase from $ 3.5 to $ 5.5 million. This is so because the litigation alternative, with its 25% probability of a $ 39 million outcome to them ($ 51 million -- $ 12 million $ 39 million) has an expected value to the residual risk bearer of $ 9.75 million ($ 39 million x 25% chance of affirmance), substantially greater than the $ 5.5 million available to them in the settlement. While in fact the stockholders' preference would reflect their appetite for risk, it is possible (and with diversified shareholders likely) that shareholders would prefer rejection of both settlement offers.

But if we consider the community of interests that the corporation represents it seems apparent that one should in this hypothetical accept the best settlement offer available providing it is greater than $ 15.55 million, and one below that amount should be rejected. But that result will not be reached by a director who thinks he owes duties directly to shareholders only. It will be reached by directors who are capable of conceiving of the corporation as a legal and economic entity. Such directors will recognize that in managing the business affairs of a solvent corporation in the vicinity of insolvency, circumstances may arise when the right (both the efficient and the fair) course to follow for the corporation may diverge from the choice that the stockholders (or the creditors, or the employees, or any single group interested in the corporation) would make if given the opportunity to act."

# EXHIBIT 24

```
 1                    UNITED STATES BANKRUPTCY COURT

 2                      DISTRICT OF PUERTO RICO

 3
      In Re:                      )        Docket No. 3:17-BK-3283(LTS)
 4                                )
                                  )        Title III
 5    The Financial Oversight and )
      Management Board for        )
 6    Puerto Rico,                )        (Jointly Administered)
                                  )
 7      as representative of      )
                                  )
 8    The Commonwealth of         )
      Puerto Rico, et al.,        )        June 28, 2017
 9                                )
                Debtors.          )
10
      _____
11
      In Re:                      )
12                                )
      The Financial Oversight and )        Docket No. 3:17-BK-3566(LTS)
13    Management Board for        )
      Puerto Rico,                )        (Joint Administration
14                                )         Requested)
        as representative of      )
15                                )
      Employees Retirement        )
16    System of the Government    )
      of the Commonwealth of      )
17    Puerto Rico,                )
                                  )
18              Debtor.           )
      _____
19
      In Re:                      )
20                                )
      The Financial Oversight and )        Docket No. 3:17-BK-3567(LTS)
21    Management Board for        )
      Puerto Rico,                )        (Joint Administration
22                                )         Requested)
        as representative of      )
23                                )
      Puerto Rico Highways and    )
24    Transportation Authority,   )
                                  )
25              Debtor.           )
      _____
```

1
—————————————————————————————————————————

2

3                              OMNIBUS HEARING

4        BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

5                   UNITED STATES DISTRICT COURT JUDGE.

6        —————————————————————————————————————————

7

8    PRESENT IN THE OMNIBUS HEARING:

9    The Honorable U.S. Chief Bankruptcy Judge Barbara Houser

10   The Honorable U.S. Magistrate Judge Judith Dein

11
     APPEARANCES:
12
     For the U.S. Trustee
13   Region 21:              Ms. Monsita Lecaroz Arribas,
                                  AUST
14
     For The Commonwealth
15   of Puerto Rico, et al.: Mr. Steven Weise, PHV
                             Mr. Martin Bienenstock, PHV
16                           Mr. Paul Possinger, PHV
                             Mr. Timothy Mungovan, PHV
17
     For AFSCME:             Ms. Sharon Levine, PHV
18
     For Peaje
19   Investment, LLC:        Mr. Allan S. Brilliant, PHV

20   For Stericycle of
     Puerto Rico:            Mr. Adrian Linares Palacios, Esq.
21
     For Ad Hoc Group of
22   General Obligation
     Bondholders:            Mr. Andrew N. Rosenberg, PHV
23                           Mr. Walter Reiman, PHV

24   For Glendon
     Opportunities, et al.,  Mr. Bruce Bennett, PHV
25

```
 1   APPEARANCES, Continued:

 2   For Ambac Assurance
     Corporation:            Mr. Dennis F. Dunne, PHV
 3
     For Assured Guaranty
 4   Corp.:                  Ms. Ellen M. Halstead, PHV

 5   For Puerto Rico AAA
     Portfolio Bond
 6   Fund II, Inc., et al.:  Mr. Jason N. Zakia, PHV

 7   For Puerto Rico Fiscal
     Agency and Financial
 8   Advisory Authority:     Mr. John Rapisardi, PHV
                             Ms. Suzzanne Uhland, PHV
 9                           Mr. Peter Friedman, PHV

10   For Official Committee
     of Unsecured Creditors: Mr. Luc Despins, PHV
11
     For Financial Guaranty
12   Insurance Company:      Mr. Martin Sosland, PHV

13   For Interamericas
     Turnkey Co., Inc.:      Mr. Maximiliano Trujillo, Esq.
14
     For United Auto Workers
15   International Union
     and Service Employees
16   International:          Mr. Peter DeChiara, Esq.

17   For Mutual Fund Group:  Mr. Philip Bentley, PHV
                             Mr. Thomas Moers Mayer, PHV
18
     For Ad Hoc Retiree
19   Committee:              Mr. Robert Gordon, PHV

20   For Canyon Balanced
     Master Fund Ltd.,
21   et al.:                 Mr. Susheel Kirpalani, PHV

22   For National Guaranty:  Mr. Jonathan Polkes, PHV

23


24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                          I N D E X

 2   WITNESSES:                                        PAGE

 3         None offered.

 4

 5   EXHIBITS:

 6         None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                                   San Juan, Puerto Rico

 2                                   June 28, 2017

 3                                   At or about 9:30 AM

 4                        *      *      *

 5        THE COURT:  Good morning to the parties at interest,

 6   attorneys, members of the public, and press gathered here in

 7   the court.

 8        Oh, I think we may have lost a phone line.  Can

 9   someone check?

10        COURTROOM DEPUTY:  17C just lost --

11        THE COURT:  Bear with me a moment so we can make sure

12   we are up.

13        Can you hear me in New York?

14        Again, everyone, I'm just grateful for your patience

15   for a few minutes while we work out the technical difficulty.

16   We'll just be a little while longer.

17        Thank you all for your patience.  We can continue

18   now.   There.  Now my microphone's working, too.

19        So once again, good morning to parties of interest,

20   attorneys, members of the public and press gathered here and

21   in New York, as well as those listening on the phone for this

22   second Omnibus hearing in these PROMESA Title III cases.

23        I thank the parties and their attorneys for their

24   candid and thoughtful submissions in advance of this hearing.

25        The litigation process and the progress in these
```

1    matters over the past few weeks has been rapid, and my staff

2    and I will continue to attend diligently to the issues that

3    are presented.

4          We have been joined by Magistrate Judge Judith Dein

5    of the District of Massachusetts who will be overseeing

6    aspects of these cases and related adversary proceedings

7    pursuant to referrals that I will enter from time to time.

8          The ability to partner with Judge Dein will help to

9    ensure prompt and appropriate attention to the many issues

10   that arise in the course of these proceedings.  And I will

11   introduce Judge Dein to you shortly.

12         I was gratified by the positive reception of my

13   appointment of the mediation team of distinguished judges.  I

14   am hopeful that their involvement will help to put

15   negotiations on a more productive track, and I am pleased that

16   I will be able to introduce chief bankruptcy Judge Barbara

17   Houser, the leader of the mediation team, to you in a few

18   minutes.

19         Before turning to these introductions, I will take a

20   moment to address a disclosure issue that has arisen as the

21   number of participants and lawyers involved in these

22   proceedings continues to grow.

23         I understand that Debevoise and Plimpton, LLP, which

24   I refer to as Debevoise, attorneys filed pro hoc vice

25   applications yesterday indicating that they represent Syncora

1    Guarantee, Inc. and Syncora Capital Assurance, Inc., which

2    I'll refer to collectively as Syncora, in connection with

3    these Title III cases.

4         One of my law clerks was formerly employed at

5    Debevoise.  His clerkship term ends in September, at which

6    time he may or may not return to Debevoise.  At this time he

7    does not have a formal offer from the firm, nor has he

8    formally committed to return to the firm.  In what may be an

9    abundance of caution, he will be screened from working on any

10   aspect of these Title III cases in which Debevoise's client,

11   Syncora, is directly involved.

12        By way of further disclosure, I, myself, was with

13   Debevoise until I left the firm to join the federal bench over

14   20 years ago.  I no longer have any financial ties to the

15   firm.

16        My other two law clerks working on these Title III

17   cases were also formerly with large law firms prior to

18   beginning their clerkships.  One was with Stroock, Stroock &

19   Lavan, LLP.  The other was with Otterbourg, PC.  That

20   individual who was with Otterbourg was employed at Proskauer

21   Rose, LLP five years ago.  At no time did any of my clerks

22   work on matters related to these Title III cases.

23        Notwithstanding the precautionary screening of my law

24   clerk from Debevoise, none of these former or possible future

25   relationships, in my view, impedes the ability of me or my law

1    clerks to be impartial or independent in any of our work on

2    any aspect of these cases.

3         If you disagree, any objections to the continuation

4    of the service of my law clerks and myself in these cases

5    should be made in writing and sent directly to the Clerk of

6    the Court for the District of Puerto Rico and not filed on the

7    docket. I will file a written notice to this effect,

8    including the deadline and the procedures on the docket soon.

9         Now we'll turn to the items on the status portion of

10   the agenda. I note in this connection that there are two

11   additions since the agenda was filed. I've granted the

12   request of the Office of the United States Trustee to be heard

13   regarding interim compensation and fee procedures.

14        We will also hear from the representative of the

15   recently constituted unsecured creditors committee. Both sets

16   of remarks I expect will be brief.

17        I now invite Chief Judge Barbara Houser of the United

18   States Bankruptcy Court for the Northern District of Texas to

19   the bench to say a few words for you. Judge Houser is a

20   distinguished jurist and leader in the insolvency field and

21   among her fellow federal judges.

22        Her impressive biography is attached to the Order

23   preliminarily appointing the mediation team which is filed on

24   the dockets of the Title III cases posted on the PROMESA area

25   of the Court's website. We are fortunate that she has agreed

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:34 Desc:
Exhibit X 24 Page 279 of 507

```
 1    to lend her considerable talents to the leadership of the

 2    extraordinary team of judges who have agreed to work with you

 3    and with each other to facilitate negotiated resolutions of

 4    the unprecedented issues facing Puerto Rico, her creditors and

 5    her people.

 6              Judge Houser.

 7              THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER:

 8              Thank you, Judge Swain, and good morning.  There is

 9    much I want to say today to the people of Puerto Rico and also

10    the parties of interest about the mediation process that we

11    are implementing here and why we are implementing it.  I will

12    start with two preliminary points and then answer three

13    specific questions.

14              First, for those of you who may not be familiar with

15    mediation, it has many advantages to litigation.  Mediations

16    are negotiated solutions to matters that are in dispute.  They

17    are less formal than court proceedings and they save time and

18    money.

19              While not all mediations result in a successful

20    resolution of all matters in dispute, when parties decide to

21    pursue mediation and participate in that mediation process in

22    good faith, common ground is often identified.

23              The mediation team's goal here is simple:  We will

24    assist the parties in finding solutions to the extraordinarily

25    complex issues Puerto Rico and they face.  Each member of the
```

1    mediation team is committed to this goal, and we are

2    optimistic that significant progress can be achieved if

3    everyone comes to the mediation process with a similar goal

4    and acts with us and each other in good faith.

5          Second, I think it is important that the people of

6    Puerto Rico, and all parties in interest in these cases know

7    that the federal judiciary is committed to the successful

8    resolution of these Title III cases as expeditiously as

9    possible, and to that end, has committed the talents and

10   expertise of five distinguished sitting federal judges from

11   across the United States to mediate disputes in these cases.

12         Members of the mediation team were designated to

13   serve in Puerto Rico through the intercircuit assignment

14   procedure of the judicial conference of the United States, the

15   national policy-making body for the federal court system.  And

16   each team member has specific and relevant experience that

17   makes him or her uniquely qualified to serve here.

18         Our tenure on the federal bench spans from 17 to 29

19   years.  We have mediated hundreds of cases; headed bankruptcy

20   and mediation practices at nationally known law firms; taught

21   alternative dispute resolution, litigation, bankruptcy, and

22   other courses at top law schools; and have been recognized by

23   various organizations and respected professional groups for an

24   assortment of achievements.  We are here to serve the people

25   of Puerto Rico and you as best we are able.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit X-U Page 281 of 507

```
 1              In speaking with you today, I will answer three
 2    specific questions:  First, why is a mediated resolution of
 3    these cases preferable; second, why were these particular five
 4    judges selected to be members of the mediation team; and
 5    third, how will the mediation process in these cases work.
 6              Returning to the first case, why is a mediated
 7    solution preferable?  A mediated resolution of the many
 8    complex novel issues presented in these Title III cases is
 9    ideal because a negotiated resolution can save the parties a
10    significant amount of time and money and eliminate much of the
11    uncertainty associated with litigating issues of first
12    impression under PROMESA.
13              These cases have already presented novel, complex
14    legal and factual issues to Judge Swain for resolution.  And,
15    of course, these cases are in their infancy, with many more
16    interesting, complex issues inevitable, and perhaps other
17    cases with equally challenging issues to be filed.
18              Many of these legal issues either are or will likely
19    be a first impression as PROMESA is a new statute enacted to
20    address the financial crisis Puerto Rico faces.  The novelty
21    of the issues and the fact that many of them have never before
22    been considered by a trial court, let alone an appellate
23    court, will add to the length of time that will be required to
24    litigate these issues to a final judgment Order.
25              Huge insolvency cases like these are always
```

```
1    expensive.  The administration of these Title III cases will

2    be no exception.  And the longer the case is pend -- no one's

3    ever had a problem hearing me before so --

4            THE COURT:  The other rooms are having a little

5    difficulty hearing us, so we've been asked to speak quite

6    directly into the microphone.

7            THE HONORABLE U.S. CHIEF BANKRUPTCY JUDGE HOUSER:

8    All right.  I'll do that.  Thank you, Judge Swain. Again, this

9    is a first, at least for me, about not being heard.

10           As I was saying, the longer these cases pend, the

11   more expensive they will be.  A consensual resolution or a

12   substantially consensual resolution of the complex, novel

13   issues presented here should shorten the time the debtors

14   spend in their respective Title III cases, which should, in

15   turn, reduce the expense attendant to the cases.  And, of

16   course, the lower the cost of administration of these cases,

17   the more value that will be available to distribute to

18   creditors and other parties entitled to distribution under a

19   plan or plans of arrangement.

20           Moreover, a negotiated resolution of the complex

21   issues that have arisen or will arise in these cases and

22   related proceedings will eliminate the uncertainty associated

23   with that litigation.  Judge Swain's decision on contested

24   matters and in adversary proceedings will be but the first

25   step in a time-consuming appellate process, first to the Court
```

```
 1   of Appeals for the First Circuit and then perhaps to the
 2   United States Supreme Court.
 3          The outcome of litigation and any attendant appeal is
 4   always uncertain and risky for the parties and, of course, a
 5   negotiated resolution will eliminate this uncertainty and
 6   risk.
 7          Given these obvious benefits of a consensual or a
 8   substantially consensual resolution of these cases to the
 9   people of Puerto Rico and all other parties of interest, it
10   makes perfect sense that a team of distinguished sitting
11   federal judges should be appointed to assist the parties in
12   their efforts to negotiate a consensual resolution here, if at
13   all possible, which brings me to why these five judges were
14   selected.
15          The short answer is that each is uniquely qualified
16   to serve as a member of the mediation team, as I will briefly
17   highlight.  Judge Tom Ambro is on the Third Circuit Court of
18   Appeals.  Judge Ambro was an insolvency lawyer before he took
19   the bench and is one of the most well-respected circuit judges
20   in the United States.  The opinions he has authored in the
21   insolvency area are always thoughtful and well reasoned.
22          Moreover, Judge Ambro is held in high regard by both
23   his peers and by the lawyers who argue cases on appeal to him.
24   In fact, just this past March, Judge Ambro received the
25   distinguished service award from the American College of
```

1  Bankruptcy Lawyers, which is the highest award that

2  organization bestows upon a person who has contributed

3  mightily to the betterment of the bankruptcy system.

4       Judge Nancy Atlas is a senior district judge from the

5  Southern District of Texas and just happens to be one of my

6  former law partners in our prior lives.  Before taking the

7  bench, Judge Atlas and I practiced law at a firm nationally

8  known for its insolvency expertise.

9       While at the firm, Judge Atlas was an accomplished

10  litigator and mediator.  She is now a highly-respected jurist

11  and has tried many cases involving complex financial

12  structures such as those presented here.  Given her extensive

13  mediation practice before taking the bench, she is the most

14  experienced mediator on my team.

15       Judge Victor Marrero is a senior district judge from

16  the Southern District of New York.  Judge Marrero is Puerto

17  Rican and brings a deep knowledge of Puerto Rico to our team.

18       Moreover, Judge Marrero brings significant knowledge

19  of the innerworkings of federal, state and city governmental

20  units from, among other things, his prejudgeship experiences

21  as assistant to the mayor of New York City, as the executive

22  director to the Department of City Planning of New York City,

23  as special counsel to the comptroller of New York City, as the

24  first assistant counsel to the governor of the State of New

25  York, and as undersecretary of the Department of Housing and

```
 1   Urban Development.

 2              These experiences give Judge Marrero unique insight

 3   into the challenges being faced by the various governmental

 4   entities of Puerto Rico.

 5              Judge Chris Klein is one of my bankruptcy judge

 6   colleagues from the Eastern District of California.  He's a

 7   very experienced bankruptcy judge, having been appointed to

 8   the bench in 1988.

 9              As relevant here, Judge Klein presided over the City

10   of Stockton bankruptcy case under Chapter Nine of the

11   Bankruptcy Code, which gives him a unique insight into many of

12   the issues that we will face in these Title III cases.

13              Finally, let me explain what our mediation process

14   will look like.  First, and perhaps most important, our

15   mediation process will be confidential on all sides.  This

16   will allow parties to have open and frank conversations with

17   the mediators and each other.

18              Parties must be free to speak to the mediators and

19   each other without fear that what is said will be reported in

20   the press, posted online, or used against them in a hearing

21   before Judge Swain.

22              Second, parties who wish to participate in our

23   mediation process must agree to participate in good faith.

24   This will help ensure that the mediators and other parties who

25   have also agreed to participate in the process in good faith
```

```
 1   are not wasting their time.

 2           Only through each party agreeing to participate in

 3   good faith can the mediators and all other parties be assured

 4   that the dialogue that will occur among the parties in

 5   mediation will be open, candid and hopefully productive.

 6           Third, our mediation process will require that

 7   throughout clients be present at each mediation session.

 8   Having clients present at all mediation sessions is

 9   extraordinarily important so that parties with a financial

10   stake in the outcome can be heard, and equally importantly,

11   can hear from other parties and the mediators regarding the

12   issues being addressed in mediation.

13           Finally, our mediation process will be voluntary so

14   that parties can choose to participate or not participate as

15   they determine to be in their respective best interest.  Our

16   core of voluntariness is that the mediators will not attempt

17   to force the parties to accept a resolution that they do not

18   find acceptable.

19           Parties with a financial stake in the outcome of the

20   issues being addressed in mediation are in the best position

21   to determine if a proposed resolution is in their respective

22   best interest.  If it is, presumably they will agree.  If it

23   isn't, they must be free to pursue another alternative,

24   including litigation, if they believe that alternative is

25   truly better for them.
```

Case:17-03283-LTS Doc#:4720-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit X 20 Page 18 of 163

```
 1            Just a few additional points about our mediation

 2   process before I conclude.  Our mediation process will be both

 3   facilitative and evaluative.  A facilitated mediation process

 4   is one in which the mediator facilitates the parties' ideas

 5   for how the issues being presented in mediation can be

 6   resolved.

 7            An evaluative mediation process is one in which the

 8   mediator evaluates the position being taken by the parties in

 9   hope of assisting them to understand both the strengths and

10   weaknesses of their respective positions.

11            By combining both processes here, I believe we

12   enhance the prospects for a consensual or substantially

13   consensual resolution of these cases.  Because our mediation

14   process will be both facilitative and evaluative, I believe

15   sitting federal judges are ideal mediators.

16            Having an experienced sitting federal judge serve as

17   a mediator can help the parties and their respective

18   professionals understand why a litigated solution may not be

19   in their respective interests.

20            In short, an experienced judge mediator can help a

21   party understand how that judge evaluates that party's legal

22   position.  Of course, no member of my mediation team can speak

23   for Judge Swain.  She will be the judge who will rule on

24   disputed issues if our mediation process is unsuccessful.

25            Moreover, no member of my mediation team will speak
```

1  to Judge Swain about any substantive issue that is being

2  addressed in mediation, nor will we have any insight into her

3  analysis of those issues.  But as experienced judges

4  ourselves, we are particularly well suited to provide the

5  parties with our insights into how we would rule on the issues

6  being mediated if we were the judge who could rule on those

7  issues.  Hopefully those insights will be useful to the

8  parties and may facilitate a consensual or substantially

9  consensual resolution of those issues.

10       Next, I want to give notice of the first formal

11  mediation meeting in these cases.  So lawyers, sharpen your

12  pencils.

13       Parties who have been actively participating in these

14  cases to date by filing motions or adversary proceedings, or

15  by opposing motions filed by other parties, must attend a

16  meeting with me and two other members of the mediation team on

17  July 12 in New York City.  This meeting will be held in the

18  ceremonial courtroom at the Federal District Courthouse

19  starting at 9:30 AM.

20       The office of the United States Trustee has appointed

21  two official committees in these cases, and committee counsel

22  must also attend this first meeting.  Other parties at

23  interest in the cases who wish to attend this meeting may

24  request the opportunity to do so by following the procedures

25  that will be explained further in a notice and Order entered

1  by me in these cases later this week.

2       I will review your request and attempt to accommodate

3  as many of them as possible.  To the extent you request the

4  opportunity to attend, but I cannot accommodate your request,

5  please be assured that other opportunities to meet with me or

6  other members of the mediation team will be provided to you,

7  as we truly want to understand the position of all parties in

8  interest in these cases.  For those of you required to attend,

9  please do mark your calendars with this date and time.

10       Finally, in closing, while much of the mediation

11  team's work in these cases must be done behind the scenes and

12  out of the public's eye, and thus will not be readily visible,

13  I ask all involved or affected by these cases to trust me when

14  I tell you that members of my mediation team and I will work

15  tirelessly to assist you in finding consensual solutions or

16  substantially consensual resolutions of the many complex

17  issues Puerto Rico and you face so that plans of adjustment

18  can be confirmed for the debtors.

19       This is a challenging task that will require the

20  cooperation, ingenuity and diligence of all involved.  I know

21  I speak for my entire mediation team in saying that serving as

22  judge mediators in these cases is an honor and responsibility

23  that we shoulder with great dedication and determination.  We

24  look forward to beginning our work in these cases.

25       Thank you, Judge Swain.

```
 1              THE COURT:  Thank you, Judge Houser.

 2              A number of requests were filed by attorneys wishing

 3     to speak regarding the mediation team, but since our agenda

 4     today is full and the mediation status item was included

 5     simply for the introduction of Judge Houser and her statements

 6     about the organizational plans of the team, I do not plan to

 7     call on individuals to make remarks at this time unless

 8     someone rises now and indicates that their issue is urgent.

 9              Is there anyone who wishes to make such an urgent

10     statement regarding the mediation process?

11              Sir, please come to the podium.

12              MR. DESPINS:  Good morning, Your Honor.  My name is

13     Luc Despins.  I'm sorry.  My local counsel should introduce

14     me.

15              THE COURT:  Good morning.

16              MR. O'NEILL:  Good morning, Your Honor, distinguished

17     colleagues, judges.  Patrick O'Neill as local counsel for the

18     Committee of Unsecured Creditors.

19              THE COURT:  Good morning.

20              MR. DESPINS:  So, Your Honor, we absolutely have no

21     concerns with respect to the mediation process except for one

22     issue, which is an issue that I wanted to address with respect

23     to other matters in the case as mentioned in the motion we

24     filed yesterday with the Court, and that is the issue of

25     timing.
```

Case: 17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:34 Desc:
Exhibit DX-U Page 292 of 507
Case: 17-00283-LTS Doc#:4720-20 Filed:01/11/19 Entered:01/11/19 20:54:32 Desc:
Exhibit 24 Page 291 of 165

21

 1          As you know, we were appointed -- we were just

 2   retained two days ago.  The parties in this case have been at

 3   this for, in some cases, years, and in other cases, months.

 4   And if the July 12 first meeting is intended to be substantive

 5   in terms of presenting position statements and all that, there

 6   is -- it would be very hard for the committee to participate

 7   in that short time frame.

 8          THE COURT:  I think I can speak for Judge Houser

 9   here, and she'll signal me if I've got this wrong, but the

10   July 12 meeting is an organizational meeting.  It is not

11   anticipated to be one that involves substantive discussions.

12   And indeed, the schedule for making mediation submissions will

13   be -- and the content of such submissions will be the

14   principal subject of that meeting.

15          MR. DESPINS:  Thank you.  So later on in the hearing

16   at a time that you'll determine, I'd like to be heard on

17   general relief from deadlines pending in the case, but that

18   deals with our issue in mediation, Your Honor.  Thank you.

19          THE COURT:  Thank you.

20          And now I invite Magistrate Judge Judith Dein to say

21   a few words and introduce herself to you.

22          Judge Dein is a very distinguished and well-respected

23   jurist who practiced commercial litigation before taking the

24   bench, and served on the prominent Federal Court in Boston for

25   many years, overseeing management of litigation and discovery

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:34 Desc:
Case:17-00283-LTS Doc#:420-20 Filed:01/12/19 Entered:01/12/19 20:57:32 Desc:
Exhibit DX-J Page 292 of 597
Exhibit 24 Page 23 of 163

22

1   disputes among a wide range of judicial duties.

2          It is fortunate that since PROMESA requires oversight

3   by a federal district judge, the federal statute that permits

4   district judges to partner with magistrate judges for

5   referring issues and areas of case management responsibility

6   to magistrate judges applies here, so that Judge Dein and I

7   will be able to work together as needed on pretrial matters

8   that arise in these cases and adversary proceedings.

9          Judge Dein's impressive biography is included in the

10  notice of appointment that is posted on the docket and in the

11  PROMESA section of the Court website.

12         Judge Dein.

13         THE HONORABLE UNITED STATES MAGISTRATE JUDGE DEIN:

14  No one has ever said they couldn't hear me either.

15         Thank you, Judge Swain.

16         Thank you everyone.  Those listening in as well.

17         I know for many of you this may be the first time

18  that you are working with a magistrate judge.  Just chalk that

19  up to one of the first times of a lot of things that are

20  happening in this litigation.

21         And my bio, as Judge Swain has said, is posted on the

22  website.  I hate being old enough to have a bio, but after 20

23  years in private practice, I was appointed to the bench in

24  2000.  Since then, I've been reappointed twice as a magistrate

25  judge.

1        I have extensive experience handling all types of

2   case management and pretrial matters, including complex

3   discovery matters.  My caseload includes referrals from both

4   the district judges as well as a docket of my own.

5        I am very much looking forward to assisting Judge

6   Swain, handling the matters referred to me, and helping move

7   these matters along as expeditiously and fairly as possible.

8        I gather we're supposed to introduce ourselves, so

9   I'd like to tell you a little bit about my personal style.

10  Well, very little.  Several years ago, Mass Lawyers Weekly

11  solicited input from the Bar who had tried cases in front of

12  various judges to give an evaluation.  I had just finished a

13  month long -- presiding over a month-long securities fraud

14  case and counsel felt the need to write in.  They did write

15  that it was a very positive experience, but they also wrote in

16  language which I have hanging on my wall.

17       Judge Dein, quote, has no particular quirks or

18  foibles that counsel appearing before her should consider.

19       I have no idea how to translate quirks or foibles

20  into Spanish, and I leave that to you.  And I'm curious as to

21  whether you will all agree when this matter is over.  My

22  family does not.  But I personally do not think of myself as

23  having quirks or foibles.  But anyway, what you see is what

24  you get.

25       You have my dedication, and you have my full-time

1    commitment.  And I am very much looking forward to working

2    with Judge Swain and all of you for an expeditious and fair

3    resolution of these historic matters.  Thank you.

4           THE COURT:  Thank you, Judge Dein.

5           I now invite counsel for the Oversight Board to come

6    to the podium to speak to the current status of the bank

7    authority motion which remains under advisement pending the

8    anticipated submission of the consent order.

9           MR. BIENENSTOCK:  Thank you, Your Honor.  Martin

10   Bienenstock with Proskauer Rose, LLP, for the Oversight

11   Board.

12          THE COURT:  Good morning, Mr. Bienenstock.

13          MR. BIENENSTOCK:  Good morning.  The bottom line is

14   that after the last hearing, we circulated a proposal that we

15   thought would garner the support of all the parties who spoke

16   up at the last hearing.  It had a lot of support, but not

17   unanimous support.

18          Since then, the passage of time has caused us to

19   believe that we can ask the Court to let us withdraw the

20   motion without prejudice.  If the need arises, we might come

21   back to Your Honor with a slightly different bank motion, but

22   for now, with the Court's permission, we'd like to withdraw it

23   without prejudice.

24          And we've consulted with the Commonwealth about this

25   obviously before making the suggestion.

```
 1              THE COURT:  And so will you file a motion to withdraw
 2     or do you want me to rule now on the record and enter an Order
 3     terminating that motion without prejudice?
 4              MR. BIENENSTOCK:  Preferably the latter, Your Honor.
 5     I don't think parties would object.  If they do, we can file a
 6     motion.
 7              THE COURT:  I see no hands indicating an objection to
 8     this oral motion, and so the motion to withdraw the bank
 9     authority motion without prejudice is granted and an Order
10     linking it with the appropriate docket numbers will be
11     entered.
12              MR. BIENENSTOCK:  Thank you, Your Honor.  And if I
13     might just insert one tidbit of positive news.  Two items on
14     the second agenda in the contested column have moved to the
15     uncontested column, those being the joint admin motion and the
16     stay motion.
17              THE COURT:  Thank you.  That is very good news
18     indeed.
19              MR. BIENENSTOCK:  Thank you, Your Honor.
20              THE COURT:  All right.  And so now I would invite the
21     representative of the United States Trustee to come to the
22     podium who requested to speak about interim compensation and
23     fee procedures.
24              Ms. Lecaroz.
25              U.S. TRUSTEE LECAROZ ARRIBAS:  Good morning, Your
```

 1   Honor, Judges.  May it please, the Court.

 2          Monsita Lecaroz Arribas, Assistant U.S. Trustee on

 3   behalf of Guy Gebhardt, Acting U.S. Trustee for Region 21.

 4   With me is Sean Cowley, an attorney with our Detroit office.

 5          Since the hearing on May 17, the United States

 6   Trustee has worked with counsel for the Oversight Board to

 7   develop an appropriate procedures order for these proceedings,

 8   including the appointment of an independent fee examiner.

 9          We have reached an agreement in principle on the

10   terms of such an order, and drafts have been exchanged for

11   comment.  We anticipate that a consensual fee procedures order

12   will be filed for consideration by the Court no later than the

13   next omnibus hearing date.

14          THE COURT:  I'm sorry, ma'am.  May I ask you to speak

15   a little bit slower so that we can be sure we get everything

16   down accurately?  Thank you.

17          U.S. TRUSTEE LECAROZ ARRIBAS:  I'm sorry, Your Honor.

18   Do you need me to repeat?

19          THE COURT:  No, just go forward a bit more slowly.

20          U.S. TRUSTEE LECAROZ ARRIBAS:  I'm done, Your Honor.

21   Thank you.

22          THE COURT:  All right.  Then thank you for the

23   submission.

24          And so now I recall the representative of the

25   Unsecured Creditors Committee.  Is this when you wanted to

Case:17-03283-LTS Doc#:4720-20 Filed:01/11/19 Entered:01/11/19 20:54:32 Desc:
Exhibit 24 Page 28 of 163

27

```
1    speak to your issue or do you want to wait?
2              MR. DESPINS:  If we could, Your Honor, we will do it
3    now.
4              THE COURT:  Very well.
5              MR. DESPINS:  Your Honor, again, for the record, Luc
6    Despins for Paul Hastings, counsel for the Unsecured Creditors
7    Committee.
8              THE COURT:  And you need to talk slower also.  Thank
9    you.
10             MR. DESPINS:  That is not the first time I've heard
11   that.
12             Your Honor, I think -- and the people who know me
13   know that generally I'm a man of few words.  And in this case,
14   I would ask the Court for your indulgence this morning.  I'll
15   try to be brief, but there are some key points that need to be
16   made.
17             First, we want to thank the Court for allowing us to
18   be here today and be heard on the various motions, despite the
19   fact the deadlines we have had passed on the responsive
20   pleadings.
21             In the motion we filed, however, we had said we
22   wanted prospective relief in the various deadlines that are
23   coming in the case, and we are in discussions with parties in
24   the case.  And we had left this part of the --
25             THE COURT:  May I interrupt you for a moment?
```

1    As you know, I crossed out that part of your Order.

2    I did that because it wasn't clear to me at that time what

3    deadlines you had in mind and what particular matters you

4    might want to try to become involved in.  So I thought it best

5    to take it up in context, which is apparently what you're

6    trying to do.

7         MR. DESPINS:  Correct.  And I'm glad you crossed it

8    out for that reason.

9         And Your Honor, basically, I want to address the

10   Court, before we get into the exact relief we're seeking, to

11   give you a bit of background on the committee.  The committee

12   is a very diverse committee with trade creditors, with an

13   entity that is owed millions of dollars for tax refunds that

14   were not paid, labor unions, et cetera, et cetera.  It's a

15   very broad group.

16        But more importantly, it is a committee that is a

17   fiduciary for all unsecured creditors, and that means the GO

18   bonds as well, Your Honor, and in particular the thousands of

19   creditors on the island that hold those bonds.  And that's a

20   very important part.  I mean by that the retail holders.  And

21   that's a very important point.

22        Even though they're not on our committee, we owe them

23   a fiduciary duty as we owe other creditors.  And the reason

24   I'm focusing on this unrepresented creditor group, Your Honor,

25   is because this case is like no other.  If we're dealing with

1     a private company, Chapter 11, generally it should have

2     complete discretion -- I shouldn't say complete discretion,

3     but it's their money.  We don't care.

4              In this case, however, the people who are actually

5     creditors also live on the island.  Everything has an impact

6     on them.  And that's why it's a critical point here.

7              The process, we all know, needs to be fair, but needs

8     to be perceived to be fair by those people.  And this is where

9     the committee comes in.  We need a meaningful apportionment to

10    be heard.  And that means, in some cases, more time.  And I

11    will get to exact relief in a second.

12             And I know Your Honor's reaction initially may be,

13    well, join the club.  I was just appointed to this case a

14    month and a half ago, and I'm in the same boat you are, except

15    you have hundreds of lawyers and I only have three clerks --

16    or two clerks.  And I would understand that, except that in

17    our case we have different roles.

18             And one of the roles that -- and I'm not saying that

19    our rules are more important.  Clearly the crucial role here

20    is that of the Court.  But the committee has a communication

21    role on the island that is critical here, and we cannot

22    accomplish that role unless we have some time to analyze the

23    issues and communicate with these creditors.  And that means

24    also our financial advisor, which was retained yesterday, Saul

25    Cooper.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit 24 Page 300 of 507

```
 1              And I know that in this case, you probably have the

 2     best firms in the world, but as I said initially, these firms

 3     have been in this some cases for a year, year and a half.

 4     Even the retiree committee counsel was involved from before

 5     the case.  So we are at a distinct disadvantage here and, you

 6     know, it's very important.

 7              And let me point out one issue in particular, which

 8     is the issue of the fiscal plan.  Your Honor has probably seen

 9     through the pleadings that this has become sort of a holy war

10     for some creditors describing the fiscal plan as an illegal

11     fiscal plan, et cetera, et cetera.

12              The committee's view on the fiscal plan is, I would

13     say, key.  And I'm not promising this, I don't want

14     Mr. Bienenstock to get too excited, but if the committee

15     concluded that the fiscal plan was appropriate, I think it

16     would be a very important data point.

17              We're not saying that's the case.  We're saying we

18     need to be given the time, the time, not only us, but our

19     financial advisors to do this analysis.  So that's one of the

20     elements.

21              The other element, Your Honor, it goes back to the

22     retail holders.  There's a section of PROMESA, 104,

23     subparagraph O, as in Oscar, that was put in there that says

24     that investigation with respect to the practices, with respect

25     to the sale of bonds, disclosure practices and sales practices
```

 1    with respect to the sale of bonds to retail holders should be

 2    or could be conducted.  To our knowledge, that has not

 3    occurred.

 4              You might say, okay, interesting, but so what.  How

 5    does that affect, for example, the motion you have to lift the

 6    stay in the ERS case this afternoon?  And probably in that

 7    case, it does not.  But in the context of global case issues,

 8    this is something that the committee needs to look at.  And

 9    that's a very important point.

10              So what I'm saying is the relief we're seeking may

11    not be one size fits all.  For certain matters, for example,

12    the ERS motion to lift the stay, I think we can probably deal

13    with going forward and going forward today.  But for other

14    matters, I mentioned mediation, that's a global case issue.

15    The committee needs some time to deal with that.

16              So what are we asking?  There are various deadlines

17    coming up, Your Honor.  For example, deadlines to intervene on

18    various proceedings and all that.

19              For the nonglobal matters, and by that I mean putting

20    aside the mediation for now, because I think we have some

21    comfort that the July meeting is organizational at this point.

22    We need a period of 20 days to -- relief of 20 days to file

23    whatever pleadings we decide to file, intervention, objection,

24    et cetera.

25              And I know that this may be disruptive to the

1    process, and we -- it may very well be that we will not file

2    responsive pleadings or intervention pleadings in a number of

3    these matters.  But initially, in order to be constructive and

4    to give, you know, to make sure that the creditors on the

5    island feel that the committee is playing a constructive role,

6    we need that short breathing spell, Your Honor, of 20 days.

7            For the mediation, I guess we'll deal with Judge

8    Houser on that, but it will be a longer period because the

9    issues there are monumental in terms of importance, but also

10   in terms of complexity.

11         THE COURT:  And so thank you for that very well

12   contextualized statement and request.  I am sure that the

13   mediation team, which literally wants and needs to meet

14   parties and groups where they are in order to engage

15   appropriately in mediation will take the issues that you've

16   raised into account in scheduling.

17           Perhaps because I don't have a perfect universal

18   memory, it's still -- of all of the deadlines that are in

19   place, it's still a bit unclear to me that there are deadlines

20   that have been set which directly implicate concerns that you

21   might want to engage with.

22           For instance, in the pending Bank of New York Mellon

23   COFINA interpleader, there was a deadline for complaints in --

24   for motions to intervene.  There is pending a motion to

25   intervene by the GO bondholders.  And there is a schedule for

```
 1   cueing up what is principally in focus intraCOFINA bondholder

 2   disputes.

 3             There I might suggest that you await my determination

 4   on the GO bondholders intervention motion, which is fully

 5   briefed, and if you feel the need to make a request, to

 6   make -- to intervene, to make an intervention application for

 7   the committee, it can be a more informed, targeted application

 8   rather than simply reopening that deadline.

 9             There is also a litigation schedule in place for a

10   preliminary injunction motion in the HTA case by Peaje, and

11   there are insurer adversaries in that case.  And then there is

12   a proceeding, a summary judgment proceeding cueing up toward a

13   September hearing date.

14             So all of this is to say that from my perspective, I

15   would rather that in the short term, you take the time over

16   the next few days or a couple of weeks to look at what's there

17   on the table in terms of deadlines, and I'm sure that

18   Oversight Committee counsel will help you with that.  And

19   everything, of course, is on the docket.

20             And then to the extent you feel a need to make a

21   targeted immediate request for some different deadline to make

22   some sort of submission or seek to intervene, I can respond to

23   that in a more informed way and we can do it in a way that's

24   more efficient.

25             MR. DESPINS:  So yes, if we do it on a case-by-case
```

```
 1    basis, I agree it will probably be more efficient.  And we're
 2    getting ahead of ourselves, but there's a motion, for example,
 3    to set up a procedure on the issue of GO bond -- or the
 4    Commonwealth versus COFINA.  And Your Honor --
 5            THE COURT:  We will be talking about that motion.
 6            MR. DESPINS:  Exactly.  So I think that that may --
 7    but I know, for example, that there's a deadline to file a
 8    motion to intervene in the Peaje investment case of June 29,
 9    which is tomorrow.
10            So that's the kind of deadline we're concerned of
11    getting defaulted.  But if we can come back to the Court on a
12    case-by-case basis and not be deemed to be time barred for
13    these things, then we're fine with that.
14            THE COURT:  That application is correct.
15            MR. DESPINS:  Okay.  Thank you.
16            THE COURT:  Thank you.
17            Yes, sir.
18            MR. ROSENBERG:  Good morning, Your Honor.  Andrew
19    Rosenberg, Paul, Weiss, Rifkind, Wharton & Garrison LLP for
20    the GO bondholder group.  I'll be very brief.
21            I, too, admit that I cannot possibly remember all of
22    the deadlines and all of the various pleadings to be filed in
23    the blizzard of papers that has been bestowed upon the Court.
24    I just have two quick remarks.  One was counsel for the
25    committee mentioned that we are looking out for the GO
```

       1    bondholders, retail GO bondholders.  Love the fact on the one

       2    hand that they are -- the unsecured committee is looking out

       3    for us or them.  On the other hand, I want to make sure the

       4    record is clear to make it known the GO bondholders know we

       5    have various liens.  I did want to mention that since that

       6    might be forgotten in the context of the unsecured committee

       7    looking out for us.

       8           And second, just in terms of the mediation, the one

       9    thing I would hope is that all other deadlines aside, that the

      10    mediation hopefully can proceed as quickly as possible.  I

      11    think one only need look around the courtroom here to see the

      12    number of parties and the number of issues and the incredible

      13    expense being incurred, that the sooner the mediation

      14    involving all of the relevant issues in this case can be

      15    commenced, I think that probably would be hopefully the best

      16    for everybody.  Thank you.

      17           THE COURT:  Thank you.

      18           MR. DUNNE:  Your Honor, may it please the Court.

      19    Dennis Dunne for Milbank Tweed on behalf of Ambac Assurance

      20    Corporation.  I'll be less than two minutes on this.

      21           I just wanted to pick up on one hypothetical that

      22    Your Honor raised, which was the interpleader action on

      23    COFINA.  I was a little unsure of what the last comment meant

      24    in terms of Mr. Despins may be able to come back at some point

      25    in time and ask to intervene in that.

1    I think we should see where we are at the end of the

2    day, as Your Honor was saying with respect to that, because

3    we're dealing with the creditors committee.  That's not a

4    creditors committee of COFINA.

5        They already have one representative from the

6    Commonwealth, the GOs, who are trying to come into that

7    litigation.  The creditor, the creditor arguments are all

8    going to be the same with respect to Mr. Despins as they are

9    with Mr. Rosenberg.  And Your Honor's going to decide that

10   intervention motion and presumably give us some guidance

11   today.

12       THE COURT:  I am not intending to make my ruling on

13   that orally today, but I do expect that it will be issued

14   soon.

15       MR. DUNNE:  And we believe that that issue, the

16   waterfall, the default acceleration rights within COFINA, the

17   credit issue is a paramount issue of importance here because

18   it guides settlement and informs a bunch of other pieces of

19   litigation.

20       That what we don't want to do is slow that down as a

21   result of 20 days from now finding we have to relitigate an

22   intervention motion that may be decided in the next couple of

23   days.

24       So all I'm saying today is I'd like to reserve my

25   right to have that discussion, if they aren't announced, on

1    that issue, because depending on which way you come out, it

2    could be more or less relevant for me on that issue -- we may

3    need to know sooner than 20 days if litigation issues comes

4    up.

5             THE COURT:  Thank you.  It's basically the structure

6    that I had in mind.  I will be making my ruling on the motion

7    that is fully briefed.  And I expect that Mr. Despins'

8    decision on whether he wants to seek to intervene would be

9    informed by and responsive in a way to whatever ruling I make.

10   And it would be -- I am giving him permission to re-raise in

11   that context his application for an extended period to seek to

12   intervene.

13            So there are a couple of steps there, and there are

14   discussions and determinations that can and should be had in

15   that context.

16            MR. DUNNE:  Thank you, Your Honor.

17            One last point, just a factual one.  And

18   Mr. Rosenberg touched on this.  Mr. Despins said that the

19   creditors committee for the Commonwealth is a fiduciary for

20   all the unsecureds, including the GOs.  On a factual note, I

21   know that a number of Mr. Rosenberg's clients sought to serve

22   on that committee, as well as a number of insurers who insure

23   general obligation bonds.  They were not appointed to that

24   creditors committee.

25            So the notion that they were not appointed to the

 1    committee to potentially provide some representation or voice

 2    for the GOs -- we get the committee is fully charged with that

 3    representation.  I think the conclusion is the opposite.  I

 4    think it's more likely the U.S. Trustee decided for the reason

 5    that Mr. Rosenberg said, that because of their constitutional

 6    priority above the unsecured creditor class, that they were

 7    not appropriate appointees to, or members of, the creditors

 8    committee for purposes of discharging a duty to the general

 9    unsecured class at the Commonwealth.

10              THE COURT:  Clearly that is an issue.

11              MR. DUNNE:  Yes.  Thank you, Your Honor.

12              THE COURT:  Thank you.

13              All right then.  I think at this point we get to turn

14    to the uncontested matters part of the agenda, which are

15    action items.  As we move into these items, we have some new

16    technology here.  I'll be using the light system on the podium

17    to help us all stay within the time allocations that were

18    proposed on the agenda.

19              I'm hopeful that we can stay well under those time

20    allocations, and I still retain some hope that we'll be able

21    to address everything on the agenda today without having to

22    reconvene tomorrow.

23              So we will set the timer for the time allotment on

24    the agenda.  The yellow light will go on when half of that

25    time has elapsed, and the red light will go on when the time

```
 1   has run out.  And there is a lighted display on the podium for
 2   which the person at the podium can see how much time is left.
 3          So please be brief and nonduplicative in remarks
 4   concerning any contested matters.  And try to focus on truly
 5   contested material issues, as the agenda is long.  And bear in
 6   mind that I have reviewed your submissions.
 7          So Mr. Bienenstock.
 8          MR. BIENENSTOCK:  Your Honor, if it's okay, my
 9   partner, Paul Possinger, will present the uncontested
10   motions.
11          THE COURT:  Very well.  Thank you, Mr. Possinger.
12          MR. POSSINGER:  Thank you, Your Honor.  Paul
13   Possinger, Proskauer Rose, on behalf of the Oversight Board.
14          Your Honor, I will be addressing the Epiq employment
15   application, the joint administration motion, and the motion
16   to apply to confirm application of the stay in these cases.
17   As Mr. Bienenstock indicated, the latter two are now
18   uncontested.  We filed updated Orders yesterday on the joint
19   administration and stay motions.
20          So I think because all three of those motions are now
21   uncontested, it may be most efficient to simply ask if Your
22   Honor has any questions or concerns regarding the motions or
23   any proposed Orders on those three matters.
24          THE COURT:  I do not believe I do, but let me just
25   check my notes.  So we have the Epiq motion, the joint
```

 1  administration, and the stay confirmation motion.

 2          So on the Epiq motion, that is granted, and I will

 3  enter an Order in the form of docket entry number 299-3, which

 4  was filed in the 17-3283 master docket.

 5          MR. POSSINGER:  Thank you, Your Honor.

 6          THE COURT:  The joint administration motion -- so

 7  just to confirm, the Peaje and ERS secured creditors

 8  objections are withdrawn.

 9          MR. POSSINGER:  I believe that is the case, Your

10  Honor.  Peaje's counsel is present.

11          MR. BRILLIANT:  Yes, Your Honor.  Pursuant to the

12  agreement we had with the modified Order, we withdraw our

13  position.

14          THE COURT:  Thank you, Mr. Brilliant.

15          MR. BRILLIANT:  Yes, Your Honor.  I'm sorry.  Allen

16  Brilliant on behalf of Peaje.

17          THE COURT:  Thank you.

18          And the ERS secured creditors.

19          MR. BENNETT:  Bruce Bennett on behalf of the ERS

20  secured creditors.  Yes, we have reached an agreement on the

21  form of the creditors.

22          THE COURT:  Thank you, Mr. Bennett.  Therefore, the

23  joint administration -- I'm sorry.

24          MR. DECHIARA:  Your Honor, I'm here to speak on the

25  stay application.

```
 1              THE COURT:  All right.  So there's someone who wants

 2    to speak on the stay application, and we'll get to that in a

 3    moment.

 4              So the joint administration motion is granted.  And

 5    the Court will enter the proposed Order that was filed as to

 6    docket entry number 513 in 17-3283.  Let me just make sure I

 7    don't have -- 513-1 in 17-3283.  That was filed on the 27th of

 8    June at 6:30 in the afternoon.

 9              So is that the one I should be talking about?

10              MR. POSSINGER:  That's correct, Your Honor.

11              I'm also looking at docket number 150 in case number

12    17-3566.  That is the ERS case.  They are identical.

13              THE COURT:  So as long as I file an identical Order

14    in each of the cases, it doesn't matter which filing I take

15    up; is that correct?

16              MR. POSSINGER:  That's correct.

17              THE COURT:  Thank you very much.

18              So now with respect to the extension of the automatic

19    stay, you indicated it's your understanding that it's

20    uncontested, but there are two people standing in the aisle,

21    which suggests to me that they may have some differences.  But

22    first, will you explain why you state it's uncontested?

23              MR. POSSINGER:  Yes, Your Honor.  There were eight

24    objections filed to this motion.  We then engaged with each of

25    the objecting parties and made significant revisions to the
```

Case:17-00288-LTS Doc#:420-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit 24 Page 43 of 163

```
 1    Order, really just to make it clear that the Order is

 2    confirming the application of the stays as they exist on 362

 3    and 922 of the Bankruptcy Code; that they don't apply to

 4    adversary proceedings; that the stays don't apply to adversary

 5    proceedings in this case.  They don't apply to discovery in

 6    those adversary proceedings in these cases.

 7            And so we made extensive provisions.  Late yesterday

 8    we made the final round of provisions based on comments that

 9    we received from Peaje to resolve the eighth objection.

10            At the time we filed on Saturday, we had resolved

11    seven of the eight.  So it's my understanding that the updated

12    Order that we filed last night at docket number 516-1 resolves

13    all of the objections to this motion.

14            THE COURT:  All right.  And so I ask you to step

15    aside so that the gentleman who's standing there can introduce

16    himself and speak.

17            MR. DECHIARA:  Good morning, Your Honor.  Peter

18    DeChiara from the law firm of Cohen, Weiss and Simon, LLP.  We

19    are counsel for the Service Employees International Union and

20    the United Auto Workers Union.  I will be brief, Your Honor.

21            These two unions together represent about 23,000

22    employees of the Commonwealth of Puerto Rico.  They include

23    school cafeteria workers, janitors, people who get up and go

24    to work each morning and allow the offices, and schools,

25    hospitals and government offices of this island to function.
```

1   They are modestly paid, some barely above the poverty level.

2         It's through these unions that they seek to have

3   their voices heard in these proceedings.  These two unions,

4   the UAW and SEIU, we don't object to the stay motion, and we

5   don't have any issues with the revised proposed Order.  But we

6   do rise to raise an issue that is a critical one for our

7   members, and we wanted to alert the Court to the issue.

8         At the core of every collective bargaining

9   relationship is a grievance arbitration machinery that allows

10  disputes to be resolved expeditiously and out of court.  The

11  Supreme Court has ruled again and again that a smoothly

12  functioning grievance procedure is critical to maintaining

13  labor peace and productive labor relations, and the courts of

14  the Commonwealth have recognized that same principle.

15        The Commonwealth's unionized workforce, like any

16  large unionized workforce, generates as a matter of course a

17  substantial number of disputes, grievances over matters such

18  as employee discharge, employee discipline, alleged violations

19  by management.  At any given time, there are dozens, if not

20  hundreds, of grievances pending.

21        Some concededly involve relatively minor matters, but

22  some, like unjust discharge of an employee, are grave matters

23  to the employee involved and his or her family.

24        THE COURT:  I understand.  So are you asking me to do

25  something in particular at this time, or are you asking that

1  the Oversight Board hear that you are going to come to them

2  with some sort of a streamlining proposal for applications to

3  lift stay on grievance matters?  I'd ask you to cut to the

4  chase.

5        MR. DECHIARA:  Let me get right to the chase, Your

6  Honor.  Thank you.

7        We have a legal disagreement, let me put it that way,

8  with the Oversight Board.  We believe that under PROMESA, the

9  automatic stay does not bar the processing of the grievances

10  and arbitrations.

11       I understand the Oversight Board disagrees with our

12  position.  I am not here today to argue that position.  The

13  debtors have indicated a willingness to meet with us to

14  discuss a process for allowing -- to talk about the

15  possibility of allowing grievances and arbitrations to go

16  forward, and we appreciate that from the debtors and we intend

17  to work with them in good faith to get that done.

18       So to conclude, I hope, Your Honor, never have to

19  appear before this Court to argue the issue, but we thought it

20  was important, because it's just a critical issue, to alert

21  the Court that there is a potential dispute which we hope we

22  can resolve and you'll never have to rule on it.  Thank you.

23       THE COURT:  Thank you.

24       MS. LEVINE:  Good morning, Your Honor.  Very briefly,

25  Sharon Levine on behalf of the American Federation of State

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit 24 Page 46 of 163

```
 1    and Municipal Employees.  We joined in response and dialogue

 2    with counsel for the Oversight Board and appreciate that

 3    conversation.

 4         We met with members yesterday, some last night, and

 5    obviously this is just a very stressful situation, so just the

 6    idea that there is a dialogue has been helpful.  Thank you.

 7         THE COURT:  Thank you.  And I am glad to hear it.

 8         MR. POSSINGER:  Paul Possinger again for the

 9    Oversight Board.  Yes, we had those discussions.  As Your

10    Honor may have seen, there are many lift stay motions already

11    coming in on sort of an ordinary course on operational matters

12    such as automobile repossession, things like that.

13         THE COURT:  Yes.

14         MR. POSSINGER:  Including these employment matters.

15    And rather than having to address these as they arise

16    piecemeal, because there could be hundreds of them --

17         THE COURT:  The Court would appreciate that.

18         MR. POSSINGER:  Understood.

19         THE COURT:  So as they come in and until I am given

20    notice of some agreed global protocol, as you've seen when a

21    lift stay motion comes in, I enter an Order setting a

22    timetable that's within the Section 362 timetable, provided

23    it's on submission, unless someone asks for a hearing, and

24    then in the very ordinary course, things that have happened so

25    far, it's turned out to be unopposed.  And then I go ahead and
```

1    I file my Order.

2          So it would be nice if I didn't have to do that

3    motion by motion, but until I find out that I don't, I'll do

4    it motion by motion.

5          MR. POSSINGER:  And we appreciate that it would be

6    nice if the employees don't have to do it motion by motion.

7          THE COURT:  Yes.

8          MR. POSSINGER:  And I think Your Honor has already

9    seen, we've done this on an automobile case that didn't

10   require a motion.  So we'll work with them.

11         THE COURT:  Yes.  Thank you.

12         And so the extension of automatic stay 105 motion is

13   granted to the extent embodied in the proposed revised Order,

14   which was filed as 516-2 in case 17-3283, which grants a

15   narrower and more focused scope of relief than the original

16   motion had sought.

17         MR. POSSINGER:  That's correct, Your Honor.

18         THE COURT:  And I thank you all for working to

19   resolve all of the objections.

20         MR. POSSINGER:  Thank you, Your Honor.

21         THE COURT:  Thank you.

22         MR. POSSINGER:  I believe the utilities motion is

23   next, and that's a motion of AAFAF.

24         THE COURT:  Thank you.

25         MS. UHLAND:  Good morning, Your Honor, Suzanne

 1   Uhland of O'Melveny & Myers on behalf of AAFAF, representing

 2   the debtor entities.

 3        THE COURT:  Good morning, Ms. Uhland.

 4        MS. UHLAND:  Good morning.  I believe we have a

 5   consensual arrangement.  We had one objector, Stericycle, that

 6   did not confirm its agreement to our revised form of Order,

 7   although we do believe that our revised form of Order did

 8   address all of their objections.

 9        THE COURT:  Is there anyone here who wishes to speak

10   for Stericycle?  A gentleman has just risen.

11        MR. LINARES:  Good morning, Your Honor.

12        THE COURT:  Good morning.

13        MR. LINARES:  Adrian Linares on behalf of

14   Stericycle.

15        THE COURT:  May I just ask you to say your name once

16   more slowly?

17        MR. LINARES:  Yes, ma'am.

18        THE COURT:  And spell it.

19        MR. LINARES:  Adrian, A-d-r-i-a-n.  My last is

20   Linares, L-i-n-a-r-e-s.

21        THE COURT:  Thank you, Mr. Linares.  Please

22   proceed.

23        MR. LINARES:  Thank you, Your Honor.  We don't have

24   an answer in a definite way, because our clients have been

25   traveling and we haven't discussed the final proposal of the

1   motion.  But as of today, it appears to me that it's quite

2   fine, so I believe in the next five days we will have a formal

3   response to that.

4           THE COURT:  Well, let me ask you this:  If I were to

5   grant the motion today, given the deadlines that had been set,

6   this Order sets up a procedure for identifying a particular

7   issue with respect to a particular service provider.  And so

8   your client would be able to invoke that procedure, I suppose,

9   you know, if there is currently an issue.

10          MR. LINARES:  Yes.

11          THE COURT:  And so is there any real impediment that

12  you can identify for me today to signing the Order as --

13  entering the Order as proposed?

14          MR. LINARES:  Honestly, no.

15          The COURT:  Thank you for your candor.

16          MR. LINARES:  Okay.

17          MS. UHLAND:  Thank you, Your Honor.  The proposed

18  Order does have one date to be filled in.

19          THE COURT:  So I have document 442 filed in 3283.

20          MS. UHLAND:  Yes.

21          THE COURT:  So would you point me to --

22          MS. UHLAND:  Paragraph seven.

23          THE COURT:  Yes.  And what is your suggestion as to

24  the request deadline, assuming that I don't actually enter

25  this Order until tomorrow or thereabouts?

```
 1                MS. UHLAND:  I would like to give people a sufficient

 2   -- I guess working backwards from the next Omnibus hearing, if

 3   we had two weeks prior to that hearing to address anything

 4   requested, I think that would be fine.

 5                THE COURT:  Would it make sense to express this in

 6   terms of a formula that sort of renews and applies itself with

 7   respect to each Omni going forward rather than a particular

 8   date that would then require me to enter a superseding Order

 9   in the event that issues come up --

10                MS. UHLAND:  Yes.

11                THE COURT:  -- before the next Omni?

12                MS. UHLAND:  Yes.  So maybe we could rewrite it so

13   it's noticed in accordance with the motion, timing for a

14   regular matter.

15                THE COURT:  I think that makes sense.  And so I will

16   look to you to file a notice of presentment on -- we'll call

17   it five days notice, I think that's what we looked at last

18   time, for a revised Order that incorporates a formula here

19   rather than a specific date.

20                MS. UHLAND:  Okay.  We will do so.

21                THE COURT:  With that caveat, the motion is granted,

22   and I will look forward to the revised proposed Order.

23                MS. UHLAND:  All right.  Thank you, Your Honor.

24                THE COURT:  Thank you.

25                And so I believe that the next agenda item is the
```

```
 1   Mutual Fund Group's Lift Stay motion.

 2              MR. BENTLEY:  Good morning, Your Honor.

 3              THE COURT:  Good morning.

 4              MR. BENTLEY:  Philip Bentley of Kramer, Levin,

 5   Naftalis and Frankel for the Mutual Funds Group.

 6              We've agreed with our co-defendants in the Puerto

 7   Rico Funds that I'll be taking the lead on this morning's

 8   argument.  My co-counsel, Jason Zakia, from the Puerto Rico

 9   Funds will be adding a few brief comments after I'm done.

10              THE COURT:  Just to reiterate how we're doing the

11   lights, we've just set the light for 30 minutes, and it will

12   go yellow at 15 minutes.  And I will expect within that half

13   hour, everyone who wants and needs to be heard on this will

14   have an opportunity to speak.

15              MR. BENTLEY:  And I have a proposal on how to deal

16   with that.

17              I would ask if the Court sees fit, that the two of us

18   be given a total of 15 minutes, including brief rebuttal, and

19   that the objectors themselves divide up the remaining 15

20   minutes.

21              THE COURT:  Can the objectors live with that?  I hear

22   yes.

23              So how much time do you want to reserve for rebuttal?

24              MR. BENTLEY:  If Your Honor wouldn't mind, I would

25   like to leave the balance of my time, but if you want me to
```

1    carve it up in advance, I would say three minutes.

2              THE COURT:  If you mean the balance and --

3              MR. BENTLEY:  The balance that remains after

4    Mr. Zakia and I are done.

5              THE COURT:  Right.  So I'm going to -- we're going to

6    look at 12 minutes as you go along now, and we'll warn you at

7    12 minutes, or you look at 12 minutes and we'll stop you there

8    if you want to have three left at least.

9              MR. BENTLEY:  That's great, Your Honor.  I appreciate

10   it.

11             THE COURT:  All right.  Please proceed.

12             MR. BENTLEY:  The motion we've filed presents Your

13   Honor with a fundamental choice, which court should decide the

14   issue of whether the Puerto Rico Statutes that created the

15   COFINA structure are valid or not under the Puerto Rico

16   Constitution.

17             Should it be a federal court, meaning this court,

18   subject to, in all likelihood, an appeal by whichever party

19   loses, or a court up in Boston, or should it be a Commonwealth

20   court, and specifically the Puerto Rico Supreme Court to whom

21   the Court can certify its issues directly.

22             I'm going to present three points in support of our

23   motion this morning.  The first one which I'll spend most of

24   my time on is we believe the arguments for certifying this

25   matter to the Puerto Rico Supreme Court are overwhelmingly

1    strong.  I'll return to that in a moment.

2            My second point is time, we think, is of the essence.

3    Your Honor has heard from the Oversight Board, from AAFAF that

4    by November 1, they believe they may run out of cash.  The

5    Commonwealth may run out of cash and may need access to

6    COFINA's funds in order to continue their operations.

7            We don't believe that November 1 is a real deadline.

8    I won't go into the details of that, but one -- just one

9    detail is there's recently been mention of 800 million dollars

10   being available that hadn't previously been identified.

11   That's a large sum that could effect the timing quite a bit.

12           But the point that's relevant for this motion is at

13   some point, and we don't know when, at some point, suddenly

14   and perhaps unexpectedly, Your Honor will find herself within

15   another urgent motion in front of you, perhaps by the

16   Oversight Board, perhaps by AAFAF, saying Your Honor, we now

17   need COFINA's money and we need a ruling within X days.  And X

18   is probably not going to be a lot longer than maybe 30 days.

19           If and when that happens, it will be too late for

20   Your Honor, if you were inclined at that time, to send the

21   matter to the Puerto Rico Supreme Court.  Your Honor would

22   probably be put in a position where you would be forced to

23   rule, perhaps on a preliminary basis, perhaps on a final

24   basis, as to this fundamental issue of Puerto Rico

25   constitutional law.  Because that will be at the heart of the

```
 1    issue that you may be asked to decide on an expedited basis,

 2    can COFINA's cash be taken?

 3            And so we believe that Your Honor really needs to

 4    decide today, do you want to send that issue to the Puerto

 5    Rico Supreme Court.

 6            THE COURT:  Now, I believe in the papers filed by the

 7    Oversight Board and AAFAF, one response to your urgency, and

 8    let's avoid a midnight call argument, is that in the event

 9    that they need help or support from COFINA, the first step

10    would be some, you know, borrowing from COFINA as opposed to

11    an assertion of the right to permanently alienate from COFINA

12    whatever the funds are that they feel are needed at that

13    particular moment.

14            And I see Mr. Bienenstock nodding, so I've got it

15    mostly right, at least.

16            So that, both the express message there and the

17    urtext is that if this problem does need to be managed in

18    context, it doesn't need a final decision overnight, because

19    it would be set up as a loan.

20            So do you have a response to that?

21            MR. BENTLEY:  I do, Your Honor.  I understand that

22    that's what they've said.  We have concerns about whether a

23    loan could adequately secure COFINA's entitlement to the

24    funds, given the Commonwealth in this scenario would say we

25    think we're going to be running out of cash.
```

Case:17-00228-LTS  Doc#:420-20  Filed:01/11/19  Entered:01/11/19 20:57:32  Desc:
Exhibit 24  Page 324 of 507

```
 1            We think in that circumstance, there would be a risk

 2    of COFINA getting not the cash we think it's entitled to, but

 3    rather a loan that doesn't provide it with adequate security

 4    for those funds.

 5            THE COURT:  Thank you.  You can continue.

 6            MR. BENTLEY:  The third of my three big picture

 7    points is we heard Judge Houser's introduction to the

 8    mediation team, the mediation process.  Everybody in this

 9    courtroom, I think, hopes that the mediation will be

10    successful.  That will be the best for everybody and for the

11    island.

12            A mediator needs tools.  A mediator needs the parties

13    to be incentivized to settle.  And Your Honor is very familiar

14    with the technique of setting a trial date to force the

15    parties to settle, to force them to make the difficult

16    decisions that they won't make until they really have a gun to

17    their head.

18            In this case, we think what's most akin to a gun to

19    the head or a trial date is an upcoming ruling, an expected

20    ruling by the Puerto Rico Supreme Court.  That's the ruling,

21    that's the one ruling that cannot be appealed except by the

22    longshot mechanism of seeking cert from the U.S. Supreme

23    Court, which might be difficult given that the key issues

24    there are issues of Puerto Rico law.

25            Whereas if Your Honor -- if the gun to the parties'
```

1   head were an expected ruling by Your Honor on this issue of

2   Puerto Rico law, it might have less -- might be less

3   threatening to the parties because it would be expected that

4   the losing party would appeal.  And so the ultimate

5   decision -- and then the First Circuit might itself send the

6   case back to the Puerto Rico Supreme Court, as circuit courts

7   often do.

8           So that would be not an imminent gun to the head.  It

9   would be perhaps a gun with soft bullets.  So that's our

10  second pitch, Your Honor.  We think setting this process in

11  motion of getting the issue to the Supreme Court now will give

12  the mediators the strongest tools to work with to fully get

13  the parties' attention.

14          THE COURT:  Now, I noted reading your papers that you

15  were not arguing lack of adequate protection.  You are arguing

16  cause in the form of these various efficiency dispute

17  resolution promotion considerations; is that correct?

18          MR. BENTLEY:  As to the lift stay matter, that is

19  correct.  With respect to the protocol motion and some of the

20  procedures that are proposed here, we're very certainly

21  arguing adequate protection, but that's a separate matter.

22          THE COURT:  Thank you.

23          And do you have any further response to the

24  objections that the Supreme Court of Puerto Rico at the end of

25  the day isn't likely to accept the certified questions because

1    they arise in the context of PROMESA and therefore, at least

2    possibly involve mixed questions of federal and state law?

3           You've cited the 2003 Judiciary Act in your papers,

4    but as we read them, the Puerto Rico Supreme Court Rule 25(B)

5    still says that the Court would not except certification of a

6    mixed question of federal and local law.

7           So do you have any further -- anything further for me

8    than what's in your papers about why you feel so sure that if

9    we allow Judge Besosa to decide whether he wants to certify

10   and then certifies, they'd be likely to take it?

11          MR. BENTLEY:  Yes.  As we say in our papers, the

12   rules have been relaxed a lot since the cases decided by the

13   other side were handed down.  And yes, the Puerto Rico Supreme

14   Court has a lot of discretion.  And yes, it will come down to

15   their discretion here.

16          And for the reasons I'm going to get to in a moment,

17   we think that they will agree that the reasons for having them

18   decide this issue are overwhelmingly strong.  And that would

19   overcome, we believe, any concern they may have about mixed

20   questions of law.

21          The one other thing I would say, Your Honor, is we

22   think the notion that there are federal laws here is just not

23   founded.  And very briefly on that, first, as we say in our

24   papers, for the past 40 years it's been clear First Circuit

25   Supreme Court authority that a debtor's interest in property

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit X24 Page 58 of 163

1   is determined by state law, here Commonwealth law, not by

2   federal law.

3        The only case cited by the Oversight Board contrary

4   to that is 42 years old.  It's superseded by those more recent

5   cases.

6        As for PROMESA 305 and 306, we think they clearly

7   don't apply.  I won't repeat the arguments in our papers

8   unless Your Honor has questions.

9        But I'd just add one brief point, and that is even if

10  Your Honor thought there was some ambiguity in 305 and 6 such

11  that they might apply, we think the clincher would be the

12  Fifth Amendment.  The Fifth Amendment says once property

13  rights have been created, a later statute can't later be

14  enacted that takes away those property rights.

15       Here if we're right that these property rights were

16  created and were valid ten years ago when COFINA was set up,

17  PROMESA can't take away those property rights because it was

18  clear back then and up until the time -- until PROMESA was

19  enacted, Puerto Rico hadn't been subject to the bankruptcy

20  law.  Puerto Rico had been treated like a state.

21       That's why Puerto Rico felt the need to enact its

22  bankruptcy reform.  It's the DERA Act, Debt Enforcement and

23  Recovery Act, which the Surpreme threw out.  It's because

24  Congress had never allowed Puerto Rico to use the bankruptcy

25  laws.  So PROMESA fundamentally changes that.  And if PROMESA

```
 1   were read to take away our property rights, that would be a

 2   take.

 3         THE COURT:  Thank you.

 4         MR. BENTLEY:  I'll turn that, if I may, to the main

 5   point, and I'll try to cover that briefly.  And that is if

 6   there ever were a case that warrants a certification to a

 7   state Supreme Court here at the Commonwealth Supreme Court, we

 8   think this is it for a number of reasons.  First --

 9         THE COURT:  I think you're running on one minute to

10   your 12.  Is that -- okay.

11         MR. BENTLEY:  Okay.  I may cut a little bit into my

12   rebuttal time, but let me try to be brief.

13         First, it's not only an unsettled issue of Puerto

14   Rico law.  There's not a single Puerto Rico precedent, so the

15   Court would be starting from scratch.

16         Second, we're not talking about Puerto Rico common

17   law or statute, we're talking about the Commonwealth's

18   foundational document, the Constitution.

19         And third, this is a matter of just overwhelming and

20   practical importance to the island for several reasons.  It's

21   the cornerstone for any restructuring.  I think most parties

22   in this courtroom agree, it's the issue that needs to be

23   resolved first.

24         And second, if the Court, whether it's Your Honor or

25   the First Circuit or the Puerto Rico Supreme Court were to
```

1    strike down COFINA and say no, under Puerto Rico's

2    institution, you can't securitize tax revenues, that could

3    have a devastating impact going forward on the ability of the

4    Commonwealth to issue new bonds that were -- that gave us a

5    security interest in tax revenues.

6         A Federal Court, Your Honor, the First Circuit,

7    shouldn't be put in a position of making a decision of that

8    monumental of an impact on Puerto Rico.

9         Thank you, Your Honor.

10        THE COURT:  Thank you.

11        MR. ZAKIA:  Mr. Bentley made the point, and I won't

12   repeat them, but just one thing I'd like to emphasize on a

13   question Your Honor asked.  No one is proposing certifying the

14   Puerto Rico Supreme Court and -- issues of Puerto Rico law.

15   The issue that is proposed to be certified is whether COFINA,

16   the structure is valid under the Commonwealth law.  The issue

17   raised, which they believe and we disagree, that under the

18   Commonwealth institution, these statutes which provide for the

19   title of these funds to go to COFINA are intact.  That is

20   purely a question of Commonwealth law.

21        As Mr. Bentley explained, it is a critically

22   important question.  So the one, I guess, point I would add to

23   that is a matter of comity, in addition to efficiency, and

24   he's actually right.

25        One thing Judge Houser said is when Your Honor makes

1    decisions, that's one step in the process to resolution, but

2    there are additional steps.  In this particular instance,

3    going directly to the Supreme Court of Puerto Rico let's us do

4    that one step.

5         So if there are going to be courthouse steps in which

6    to settle this case, that's the proper courthouse we would

7    submit.  But there is no proposal to certify, and I think that

8    needs to be clear.

9         THE COURT:  Thank you.

10        So I will -- there's one minute and five seconds left

11   in the movant's time, so will the first opponent please come

12   to the podium as quickly as possible.

13        Mr. Bienenstock, please.

14        MR. BIENENSTOCK:  Thank you, Your Honor.  And I will

15   be as -- Martin Bienenstock with Proskauer Rose for the

16   Oversight Board.  I'll be as quick as possible.

17        Following points.  First, the issue that is to be

18   determined in this case is whether under PROMESA Section

19   306(b), the sales and use taxes at issue are property of the

20   debtor.  That is a federal question arising under federal

21   statute.  It may or may not be informed, under territory law,

22   that the taxes are subject to being available resources of the

23   Commonwealth.

24        Two, they don't like Colonial Realty.  We made our

25   argument.  I won't pursue that.  We think we're right, but I

```
 1    don't want to use the time on that.  Let me take a much more
 2    classic, federal bankruptcy question issue that this involves,
 3    finality.
 4            If a debtor files a Chapter 7 liquidation case, an
 5    individual, and says that there's a million dollars in trust
 6    for the debtor's daughter that's not property of the estate
 7    because debtor put it in trust a long time before bankruptcy,
 8    no issues for transfer, the debtor would be right unless the
 9    debtor reserved the power to revoke the trust.
10            If it has the power to revoke the trust, then what's
11    in the trust is part of the bankruptcy estate.  Here, the
12    Puerto Rico legislature passed a law saying the sales and use
13    taxes are not available resources of the Commonwealth.  Puerto
14    Rico legislature can pass another statute saying they are,
15    with that terminus.
16            Does that make this property of the debtor for
17    purposes of 306(b) of PROMESA?  That's the issue.  There are
18    arguments on both sides.  But it is a federal question, and
19    that's the question that needs to be certified.
20            Second, the Commonwealth and COFINA own that question
21    and that cause of action, not creditors who are litigating
22    before these cases started based on their interest as secured
23    creditors of COFINA.  They're only secured by what COFINA has.
24    The question is, what does COFINA have.  Is it property of
25    COFINA or is it property of the Commonwealth?
```

```
 1              Your Honor, those are really the basic questions.  I
 2    could tell from Your Honor's comments that Your Honor fully
 3    absorbed our pleadings, so I'll defer to the next person.
 4              THE COURT:  Thank you.
 5              Mr. Kirpalani.
 6              MR. KIRPALANI:  Good morning, Your Honor.  For the
 7    record, Susheel Kirpalani of Quinn Emanuel on behalf of the
 8    COFINA Senior Bondholders Coalition.
 9              I'll also be very careful with the time, because we
10    want to get through this, and there's other people who deserve
11    the time to speak.
12              This is a very limited motion and a limited question.
13    I feel a little bit like the mutual funds have tried to hijack
14    the process and the important question that the Court, this
15    Court will have to determine at some point, and that is do you
16    need, does Your Honor need advice or instruction or guidance
17    from the Puerto Rico Supreme Court.
18              This motion does not need to reach that issue.  This
19    motion is a motion to lift the stay, frankly, in a case where
20    the plaintiffs themselves have opposed the motion where the
21    plaintiff's themselves lack standing because of the
22    intervention of the Title III cases.
23              It's a point that I made to the First Circuit that
24    once we get to a Title III case, only the Trustee in
25    bankruptcy will have standing on behalf of the Commonwealth to
```

1    bring the potential challenge to COFINA.  And it was us that

2    filed the certification motion to the Supreme Court, not the

3    mutual funds.

4          So when they asked us if we would join in this, our

5    reaction was this was entirely premature and Lex Claims is

6    simply the wrong vehicle.  Mr. Bienenstock and the Oversight

7    Board filed a motion for a protocol, which we'll address when

8    that issue is up before Your Honor later today.

9          But there will be come a time Your Honor may notice

10   that in the proposed order that we submitted in connection

11   with the protocol, we struck the word "this Court" would

12   determine the issues, and instead we said the "appropriate

13   court."

14         Because Your Honor, even if it's filed before you,

15   may decide, I want to certify certain questions to the Puerto

16   Rico Supreme Court.  That doesn't need to be decided in the

17   context of this motion to lift the stay.

18         This motion to lift the stay is defective because the

19   plaintiffs themselves lack standing and, therefore, the action

20   lacks Article III case or controversy.

21         With respect to the issue that Mr. Bienenstock just

22   raised, federal question issues relating to the property of

23   the estate, as we point out, there is no estate under Section

24   541 in PROMESA's property of the debtor.

25         And I don't agree that it will be a mixed question of

1  federal and state law and territory law.  I do believe the

2  issues will ultimately be those of Puerto Rico law, unless we

3  can settle them.

4          And with respect to the right or reversionary

5  interest to revoke, we filed a lawsuit in Federal Court citing

6  the U.S. and Puerto Rico Constitutions contracts clause

7  because what Mr. Bienenstock did not remind the Court is that

8  along with that right to revert, revoke or change the laws,

9  there was also a nonimpairment covenant that was given by the

10 Commonwealth that they will never do exactly that.  And so

11 there is a hierarchy and analysis under Constitutional

12 jurisprudence of what that means.

13         We filed a lawsuit to explain what that means on May

14 2nd.  It has been stayed.  All of these issues will get

15 resolved at some point, but this particular motion is

16 defective on the procedural basis that the Lex Claims lawsuit

17 is just the improper vehicle to resolve it.

18         And the Court does not need to reach the issue in

19 connection with denying this motion to lift the stay, rather

20 Your Honor may one day or the First Circuit may one day ask

21 the Puerto Rico Supreme Court for legal advice.

22         Thank you, Your Honor.

23         THE COURT:  Thank you.

24         MR. DUNNE:  Dennis Dunne from Milbank Tweed on behalf

25 of Ambac.  I'm not going to repeat what you heard already from

1   the objectors.  I'll just make a couple points.

2           THE COURT:  But you do have to talk a little slower.

3           MR. DUNNE:  Yes.  But the green light hasn't turned

4   yellow yet, so I guess I have no excuse for the speed.

5           I want to get to two points, really.  One is I think

6   it's odd and kind of telling at the same time that the movants

7   here are seeking to direct the prosecution of a claim that

8   they were not the plaintiffs for pre-petition and that we

9   believe is now not capable of being prosecuted by that

10  plaintiff group because it's an asset of the Commonwealth.

11          So why are they doing it?  They're doing it because I

12  think they really dislike what's on the next docket item,

13  which is the protocol motion with respect to the Oversight

14  Board.

15          And they hope if you granted this, that would

16  completely obviate the need for any litigation on the issue

17  here.  But that's not a reason to do this, Your Honor.  We

18  think that as we put in our paper here, it's the

19  constitutional -- principle of avoidance.  There are a number

20  of threshold issues there that could resolve that litigation,

21  failure to state claim, some other preliminary issues.  And I

22  think the case was pretty clear that it's only when a

23  constitutional issue remains left standing that you should

24  deal with it.

25          And maybe as Mr. Kirpalani said, at that point in

1  time you might decide to certify it.  And I do want to be

2  clear on that, Ambac, we're not saying it's never ripe for

3  certification.  It might be, but we have to go through the

4  procedures and requirements.  And when we get to the place

5  where the circumstance is warranted, we should.

6       Last point.  I disagree with the notion that

7  certification would somehow catalyze settlement.  And this

8  could be a theme you hear from me, and I suspect others, on a

9  number of points.  Settlement is unlikely to occur here in

10 this litigation, in other litigations, without development of

11 the fiscal plan.

12      As Judge Houser and her mediation team is going to

13 hear, I suspect from a number of parties on July 12, we need

14 transparency, accountability and more importantly, an open

15 attitude of engagement with respect to the fiscal plan.

16 Before we have the cornerstone of the size of the pie that

17 usually precedes dividing up the pie.

18      Right now we want to jump to divvying up the pie when

19 we don't know what the pie is.  We'll hear more about that

20 later, but there's a little bit of a sequencing issue here.

21 The issue has come to the forefront because of the nature of

22 what happens once we have Title III cases, and we're losing

23 sight of kind of the underlying financial predicates that we

24 need to develop more.

25      Thank you, Your Honor.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:31 Desc:
Case:17-00283-LTS Doc#:4720-20 Filed:01/11/19 Entered:01/11/19 20:57:32 Desc:
Exhibit DX-U Page 337 of 597
Exhibit 24 Page 68 of 163

67

```
1            THE COURT:  Thank you.

2            The gentleman in the front row who was standing up

3    before, and the gentleman coming up now will come up after.

4    I'm sorry.  I'll let the gentleman with the blue tie speak

5    first and then the gentleman with the purple tie speak after

6    that.

7            MR. RIEMAN:  Thank you, Your Honor.  Walter Rieman,

8    Paul Weiss, Rifkind, Wharton & Garrison for the Ad Hoc Group

9    of General Obligation Bondholders in opposition to the motion.

10           As has been noted, my clients are the plaintiffs in

11   the Lex Claims litigation.  And while we do not agree that we

12   lack standing to raise the underlying disputed issue as a

13   result of the Title III filing, as has been said, we do agree

14   that the Lex Claims litigation is not an appropriate vehicle

15   for certification of this issue.

16           Lifting the stay as the movants request would

17   inappropriately remove from this Court's control the question

18   of whether and how to certify issues to the Supreme Court of

19   Puerto Rico, and again would remove from this Court the

20   ability to define those issues.

21           The motion is a motion to lift the stay.  It's not a

22   motion for certification.  So the consequence of granting a

23   motion would be that Judge Besosa who's presiding over the Lex

24   Claims litigation prior to its being stayed would be asked to

25   decide whether certification should occur.
```

1          Presumably, he wouldn't be told that certification

2     would be useful to resolve any issue pending before him.  No

3     one contends that the stay should be lifted in Lex Claims with

4     respect to any other issue.  And indeed, the claims as framed

5     in the Lex Claims amended complaint have been entirely

6     overtaken by events.

7          So instead, Judge Besosa would confront the

8     completely puzzling question of whether to certify an issue to

9     the Supreme Court of Puerto Rico, not because it would be

10    useful to resolve Lex Claims, but instead because it would be

11    useful to resolve issues pending before Your Honor in these

12    Title III proceedings.

13         With respect, that's just crazy.  And then if

14    certification were to occur, which we think it would not, the

15    Supreme Court of Puerto Rico would then be required to apply

16    its jurisprudence considering whether to accept certification

17    to a request emanating from Judge Besosa, but implicating

18    issues pending the Title III proceedings before Your Honor.

19         That seems to us as similarly crazy and similarly

20    likely to result in the objection of a request for

21    certification at that level.  Your Honor's about to hear the

22    COFINA procedures motion.

23         There will be opportunities for parties to request

24    certification of issues to the Supreme Court of Puerto Rico in

25    an orderly way, pursuant to whatever procedures Your Honor

1    decides to put in place for resolution of the issues

2    implicated by the COFINA procedures motion.

3         Opportunities may arise in the context of the

4    interpleader proceeding involving the Bank of New York, or

5    from adversary proceedings that have yet to be filed.  But it

6    is Your Honor that should remain in control of these issues.

7    Your Honor may want to consider if a request for certification

8    is made from this Court, the effect certification would have

9    on the pace of and scheduling of the action before this Court,

10   and on the prospects for settlement.  We do not agree that

11   granting this motion would advance the settlement process and

12   we think that it will throw resolution of this issue into

13   procedural chaos.

14        Thank you, Your Honor.

15        THE COURT:  Thank you.

16        And the gentleman in the purple tie.

17        MR. GORDON:  Thank you and good morning, Your Honor.

18   For the record, my name is Robert Gordon of Jenner & Block on

19   behalf of the Official Committee of the Retired Employees of

20   Puerto Rico.

21        THE COURT:  There's a total of just under two minutes

22   left in this segment, so --

23        MR. GORDON:  Which feeds right into what I was going

24   to say, which is in the interest of efficiency, we choose to

25   just rely upon the pleading we filed.  I realize we did file

1  something with respect to this matter, but I think all the

2  other counsel have articulated the issues very well in

3  opposition of the motion and maintaining the matters before

4  this Court.

5          Thank you, Your Honor.

6          THE COURT:  Thank you, Mr. Gordon.

7          MR. SOSLAND:  Thank you, Your Honor.  Martin Sosland

8  of Butler Snow on behalf of Financial Guarantee Assurance

9  Corporation.

10          THE COURT:  Good morning.

11          MR. SOSLAND:  Although Mr. Dunne and I may be on

12  opposite sides of the underlying substantive dispute, but we

13  oppose this motion for exactly the same reasons that Mr. Dunne

14  articulated, so I won't repeat them, only to say that we are

15  against the motion.

16          THE COURT:  Thank you.

17          MR. TRUJILLLO:  Good morning, Your Honor.

18  Maximiliano Trujillo.  I represent a very small creditor.

19  It's an eminent domain creditor.  But my motion to appear here

20  today is for just one point, that any motion to lift the stay,

21  unless the Honorable Court changes these rulings, is subject

22  to local rule 4001-B supporting that.

23          Who is the owner?  What is the agreement?  Was the

24  lien effectively perfected?  And we don't have those documents

25  in this and other matters of stay of proceedings.  So this is

 1    a threshold issue that the Honorable Court should decide in

 2    this and the other areas.

 3          Now, there has been questions of Constitutionality

 4    and the Fifth Amendment, and we -- possibly the retroactive

 5    effect of Puerto Rican law.  But there is a -- there are

 6    Puerto Rican laws that predate all contracts here that would

 7    be able to be used by this Honorable Court if that happens to

 8    PROMESA or whatever.  And that's the civil code of Puerto Rico

 9    and the law of judicial procedures, because the civil code is

10    from 1890, and the laws of judicial procedures pertaining to

11    the composition of debts is of 1885.

12          THE COURT:  Thank you, Mr. Trujillo.

13          MR. DESPINS:  Ten seconds, Your Honor.  Just the

14    committee supports the denial of the motion on the basis that

15    it's premature at this time.

16          THE COURT:  Thank you.

17          MR. BENTLEY:  Three quick questions, Your Honor.

18    Mr. Bienenstock cited PROMESA 306(b).  That's a provision that

19    says this Court, the Title III Court has exclusive

20    jurisdiction.  As we point out in our reply at pages five and

21    six, the Bankruptcy Code has an identical exclusive

22    jurisdiction provision.  The First Circuit nevertheless has

23    felt free to certify issues of state law to state courts.

24    This Court can do the same.

25          Secondly, the gentleman with the blue tie, Mr. Rieman

1    for the GOs said it would be crazy to ask Judge Besosa to make

2    a certification decision that really hinges heavily on issues

3    of the cases before Your Honor.

4              Your Honor, we believe there is a lot to be said for

5    you to make that decision and not Judge Besosa for that

6    reason.  So we would not object if Your Honor is inclined to

7    transfer the Lex Claims case to this Court, pursuant to

8    Section 306(d)(3) of PROMESA.  We would have no objection to

9    that.

10             Finally, we have heard no reason, we have heard no

11   rebuttal, no answer to why it's not urge -- no one's explained

12   why it's not urgent to get a ruling on this pivotal issue

13   soon.  Why it's not urgent to the effective management of

14   these cases, to avoiding a Federal Court having to rule on

15   this issue or the effectiveness of the mediation.

16             We've heard technical issues raised by parties who

17   appear to be afraid of how the Puerto Rico Supreme Court may

18   rule.  We've heard nothing Your Honor cannot take care of and

19   resolve if Your Honor agrees that that's the best path

20   forward.

21             THE COURT:  Thank you.

22             MR. BENTLEY:  Was I under a minute?  Almost.

23             THE COURT:  Yes.  You got there.  All right.  Thank

24   you.

25             I have considered carefully the submissions that were

1  made before today and listened carefully to the argument made

2  here today.

3       For the following reasons, the motion for partial

4  lift of the stay of the Lex Claims litigation is denied.

5  Title 11, Section 362(d) of the United States Code made

6  applicable in these proceedings by PROMESA, Section 301 as

7  codified at Title 48, Section 2161 of the United States Code

8  permits this Court to lift the automatic stay imposed by the

9  filing of these Title III cases in a separate -- in a separate

10 action for cause.  Citing In Re:  Sonnax Industries, Inc., 907

11 F.2d 1280 at 1286, a Second Circuit decision from 1990, the

12 movants rely on four factors to show that there is cause to

13 lift the stay.

14      First, whether relief would result in a partial or

15 complete resolution of the issues.

16      Second, the interests of judicial economy and the

17 expeditious and economical resolution of litigation.

18      Three, whether the parties are ready for trial in the

19 other proceedings.

20      And four, the impact of the stay on the parties and

21 the balance of harms.  Similar factors are used to evaluate

22 lift stay motions in the First Circuit, see Unanue,

23 U-n-a-n-u-e, hyphen, Casal, C-a-s-a-l, 159 B.R. 90, District

24 of Puerto Rico, 1993, affirmed 23 F3d 395, First Circuit,

25 1994.

```
 1            Having carefully considered all of the submissions
 2   and arguments, the Court concludes that cause to lift the stay
 3   has not been shown in this case.
 4            The premise of the Mutual Fund Group's motion is that
 5   there is a need for speedy determination of whether COFINA's
 6   SUT revenues are available resources of the Commonwealth under
 7   the Constitution of Puerto Rico.  That this determination
 8   should be made by the Supreme Court of Puerto Rico in the
 9   first instance, and that the stay of the Lex Claims
10   litigations should be lifted solely as to that aspect of the
11   pending motion, which requests certification of a question to
12   the Supreme Court of Puerto Rico to allow that to occur.
13            This premise suffers from inherent problems that make
14   it speculative at best, that the relief sought would result in
15   a partial or complete resolution of the issues raised in these
16   Title III proceedings.
17            The result that the Mutual Fund Group seeks to
18   achieve a ruling by the Supreme Court of Puerto Rico on the
19   status of COFINA's revenues is not a certain outcome of the
20   lifting of the stay.
21            Judge Besosa would first have to grant the pending
22   certification motion, which would require that he address
23   first the question of whether the Lex Claims plaintiffs still
24   have standing sufficient to support subject matter
25   jurisdiction in the litigation following the commencement of
```

```
 1    these Title III proceedings.

 2           The objectors here argue that there will be a

 3    significant and colorable challenge to the Lex Claims

 4    plaintiffs' standings to proceed with their suit, in light of

 5    the fact that the Oversight Board is now the sole

 6    representative of the Commonwealth and any property of the

 7    Commonwealth, including its legal claims.

 8           This argument is not a frivolous one, and the federal

 9    court is always obligated to determine whether it has subject

10    matter jurisdiction.  Even were Judge Besosa to conclude that

11    the Court still has subject matter jurisdiction over the Lex

12    Claims litigation, the question of -- the issue of whether the

13    question presented by the certification motion is a pure

14    question of Puerto Rico law is a complicated one that's

15    highlighted by several objectors.

16           Following the filing of the Title III cases, PROMESA

17    governs the property of the debtors, including both the

18    Commonwealth and COFINA.  It is not at all clear that the

19    question that the Mutual Fund Group seeks to have asked and

20    answered is one that would be susceptible to a determination,

21    as a pure matter of Puerto Rico constitutional law.

22           But rather is one that certainly arguably, and

23    possibly likely, involves the interplay of federal law, namely

24    PROMESA, and provisions of the Puerto Rico Constitution.

25           The mixed nature of the question at issue highlights
```

1  a further potential road block, whether the Supreme Court of

2  Puerto Rico would accept the certified question.  Rule 25(b)

3  of the Supreme Court of Puerto Rico makes clear that the Court

4  is unlikely to accept a mixed question on certification.

5       Thus, if the Supreme Court of Puerto Rico were to

6  view the certified question as one that could not be answered

7  solely by looking to Puerto Rico law for any reason, it would

8  decline to accept the question.

9       That rule, 25(b), states plainly that the Court would

10 not accept a mixed question that involves aspects of federal

11 law and aspects of Puerto Rico's local law.  The objectors

12 made clear that the Supreme Court of Puerto Rico would, at the

13 very least, be confronted with arguments that the certified

14 question is exactly such a mixed question.

15      Accordingly, the Court concludes that the movants

16 have not shown that the relief requested would likely result

17 in a partial or complete resolution of the issues, nor do the

18 remaining factors movants identify counsel in favor of lifting

19 the stay.

20      The interests of judicial economy do not favor

21 piecemeal litigation of issues that are central to these Title

22 III proceedings in a variety of courts.

23      This Court has pending numerous adversary proceedings

24 and motion practice that seek, in various ways, to address the

25 very issue raised in the certification question, and this

1  Court is fully capable of engaging the issue in an appropriate

2  manner at an appropriate time.

3        Furthermore, the Lex Claims parties have not fully

4  briefed the certification motion and are not better positioned

5  to litigate that issue than the parties to the Title III

6  proceedings, and so the speedy resolution argument for cause

7  is one that is not terribly persuasive.

8        Finally, the balance of harms does not tilt in favor

9  of the movants.  The movants have not demonstrated a

10  particular harm that they are likely to suffer in the absence

11  of their requested relief and acknowledgement that they are

12  not contending that adequate protection is an issue in their

13  argument for relief from the stay.

14        Accordingly, the Court concludes that there is no

15  cause to lift the stay on that aspect of -- on any aspect of

16  the Lex Claims litigation and the motion is denied.

17        Now, in passing, the movants raised in their papers

18  and did just now a request to transfer the Lex Claims

19  litigation into the Title III proceedings as an adversary

20  proceeding.

21        That request is denied at this time without prejudice

22  to motion practice on regular notice or a stipulation seeking

23  such relief.  In this connection, the parties are directed to

24  consider the issue of subject matter jurisdiction and whether

25  and to what extent the motion practice pending in Lex Claims,

```
 1   if it were to become an adversary proceeding, would need to be
 2   modified or withdrawn in light of the changed circumstances.
 3   So once again, that motion is denied.  Thank you.
 4            And so now let us move to the Commonwealth COFINA
 5   procedures.
 6            I'm sorry.  Hold on just one second.
 7            So we will do the timer here in 15 minute segments
 8   with the yellow light at seven and a half minutes, rather than
 9   30 minute segments.
10            Do I gather that we're going to start with opposition
11   to the motion?
12            MR. MOERS MAYER:  Yes, Your Honor.  Tom Mayer on for
13   Kramer Levin.  After discussing with Mr. Bienenstock I believe
14   just about every other party that has to be heard on this
15   matter, the thought was the objectors would go first.  Since
16   the Mutual Fund Group's objections was the most vehement of
17   the objections, I would start, and then the objectors would
18   follow.  And then Mr. Bienenstock and other supporters of the
19   motion would go last.
20            THE COURT:  Very well.  Go ahead, sir.
21            MR. ROSENBERG:  Andrew Rosenberg from Paul, Weiss,
22   Rifkind, Wharton & Garrison.  In terms of the 15 minutes, I
23   think we can certainly try, and everyone will be brief, but I
24   think there's eight oppositions to this.  And we have come up
25   with an order.
```

1    We're toward the end.  My remarks are probably only

2    three minutes or so, but we do want to make sure that

3    everybody is given an opportunity to be heard, which may be

4    difficult in 15 minutes with eight parties.

5        THE COURT:  I will bear that in mind.  I'm going to

6    keep the clock set for 15 minutes.  And, you know, that is an

7    incentive to be nonduplicative and considerate of each other,

8    and I will also be considerate of the overall circumstances

9    when the light reaches red.

10       MR. ROSENBERG:  Brevity is our forte.

11       THE COURT:  Thank you.  Mr. Mayer.

12       MR. MOERS MAYER:  Thank you, Your Honor.  The Mutual

13   Fund Group objects to the Oversight Board's own procedural

14   motion, to cut straight to the chase, because it is designed

15   to give away dedicated sales tax that would otherwise pay us

16   in full, and I will show why that is.

17       First, let's deal with the Oversight Board's retained

18   control.  Assume that the COFINA agent does a great job.  It

19   goes out, whoever he or she is, and it litigates and

20   negotiates and brings back a settlement of 90 percent goes to

21   COFINA.

22       Does that settlement become effective?  No, it does

23   not, because the Oversight Board can veto it.  And that

24   settlement does not fund the Oversight Board's fiscal plan, so

25   of course the Oversight Board will veto it.  So this, quote,

```
1    settlement procedure is a one-way ratchet.

2          If the settlement that is reached works, the

3    settlement will get approved by the Oversight Board, and if it

4    doesn't, it won't.  And then the Order originally submitted --

5    Oversight Board approval is game over.  There wasn't even a

6    way to get to this Court for somebody to object if the

7    settlement was good, bad or indifferent.

8          Second, let's look at what the COFINA agent does.

9    And our papers talk about the limits on the COFINA agent's

10   situation.  What incentive does the COFINA agent have to do a

11   good job?  It doesn't get paid more or less.

12         What compulsion does the COFINA agent have to do a

13   good job?  Well, the Court orders the COFINA agent to do a

14   good job.  That's basically what the proposed Order does.  It

15   says -- the Court signs where it says, each agent shall

16   endeavor, to the best of the agent's ability, to litigate and

17   negotiate.

18         And that is the spark, if you will, of -- well, Your

19   Honor, that's a receiver.  A receiver is an officer of the

20   Court that does what the Court tells the receiver to do.  It's

21   not responsible to anybody else.

22         And that's what the Oversight Board is asking this

23   Court to appoint in its Order appointing this agent, and

24   that's something that this Court cannot do under Section

25   105(b), which is incorporated in connection with PROMESA.
```

```
 1            The only response the Oversight Board has to that is,
 2   well, no, it's not a receiver because a receiver receives
 3   revenues.  Well, that's not true.
 4            Your Honor's been on the bench 20 plus years, I
 5   think, and I suspect you've seen more than one receiver
 6   receiving property and responsible for property that receives
 7   revenue.  This is a receiver, and the Court retains no
 8   authority for this Court to appoint it.
 9            Now, finally, I want to talk about denial of adequate
10   protection.  This is the counter example.  Let's assume that
11   the COFINA agent determines that it has only a 25 percent
12   chance of winning.
13            Now, we think that's crazy.  We do think we're going
14   to win.  We don't think there's a federal issue.  We just
15   argued that.  We obviously hope that the Puerto Rico issues
16   would be determined our way, otherwise we wouldn't be here to
17   get to the Puerto Rican support.
18            But let's assume the COFINA agent says that in its
19   judgment, it's a 25 percent chance of winning.  So COFINA
20   starts out with a five percent interest in the sales tax.
21   That's all it's got.  So the COFINA agent gives away its five
22   percent, then it gives away all of the sales tax and it gives
23   away a big chunk of sales tax that goes to pay the seniors.
24   And under the settlement procedures, this is all sanctified in
25   advance because the Order commands, directs, approves the use
```

1   of the Credit Lyonnais standard for determining when to settle

2   and when not.

3       And again, of course if its 25 percent goes to COFINA

4   and 75 goes to Commonwealth, the Oversight Board will love

5   that. That's probably good enough -- I don't know, I haven't

6   done the numbers -- to make their fiscal plan work. That's

7   the agenda of the settlement procedure.

8       It's to settle the litigation mostly, if not

9   entirely, with sales tax that would otherwise pay junior

10   bondholders in full. And Credit Lyonnais did not deal with

11   this situation at all. Credit Lyonnais ruled on the fiduciary

12   duties of the Board of a for-profit corporation with respect

13   to a lawsuit that hadn't been pledged to anybody.

14       It didn't deal with a lawsuit that had been pledged

15   or where the pledger's interest was minimal and any settlement

16   will be zero. And it doesn't provide any support or guidance

17   as to how an agent for a municipal pass-through entity with no

18   duties to anyone should behave.

19       Because that is all COFINA is, a pass-through entity,

20   it is set up to secure the COFINA seniors and COFINA juniors.

21   So this agenda of creating a settlement procedure to fund the

22   Commonwealth's budget with COFINA's tax revenues under a

23   procedure, which makes it difficult to impossible to challenge

24   the parties with real money at stake, that denies us adequate

25   protection. We can't accept that an agent would give away our

1  credit collateral on a Credit Lyonnais standard.

2         And it's also the agenda of the seniors.  The seniors

3  have objected to the settlement procedures, but they're okay

4  so long as they control who does the settlement, whether it is

5  their agent who does it.  And I expect that you're going to

6  hear that they're senior, we're junior, we lose.  That's the

7  way the world works.

8         Well, that's not true.  As we stand here today, we

9  believe we have a lien that will pay us in full, that will be

10 validated, and we are entitled to adequate protection of that

11 lien.

12        And as -- Your Honor, a long time ago ran into a very

13 odd case involving similar questions in West Point Stevens.

14 As the 2nd Circuit said in West Point Stevens, adequate

15 protection is a statutory right that is taken very seriously,

16 and a secured creditor will not be found to have waived its

17 right to adequate protection unless there is more than an

18 ambiguous waiver of that right.

19        Well, Your Honor, in the trust agreement, there is no

20 way to rule that adequate protection is not even mentioned.

21 With respect to our lien, Article 10 of the trust agreement,

22 which is not subject to the seniors, says the lien can be

23 waived on the grounds of consent.

24        So it isn't constitutional, and we don't think it's

25 fair to empower an agent under a Credit Lyonnais standard to

```
 1    give away collateral and leave COFINA juniors with nothing in
 2    order to fund the Commonwealth's budget.
 3          So we urge the Court for those reasons and others set
 4    forth in our papers, including the case in controversy
 5    requirement, which the Oversight Board does not believe even
 6    applies, to deny approval of those procedures, which in our
 7    view sets up a fake litigation with fake fiduciaries as a
 8    pretext for taking collateral, which would otherwise pay us in
 9    full.
10          Thank you.
11          THE COURT:  Before you sit down, I have one question
12    to you.  It seems to me that one possible reading of the
13    construct proffered by the Oversight Board insofar as it
14    purports to focus on the agent maximizing the amount of money
15    that comes to COFINA, as opposed to serving the interests of
16    particular interest holders in COFINA bonds, is that the issue
17    of how whatever money is collected for COFINA would be
18    determined -- the issue of how it would be divided among the
19    COFINA bondholders would be determined either by settlement or
20    by resolution of the legal issues.
21          It's just a pot that might be smaller or bigger.  And
22    so I think I hear you saying that unless the pot is the
23    maximum pot, that would certainly leave money under the
24    ordinary application of the waterfall for your clients.  Your
25    clients are necessarily out of the money under this proposal.
```

```
 1          So long-winded question, not as clear as I'd like it

 2   to have been, but am I -- do you think that I'm reading it

 3   inappropriately where I read it to say if there's a pot of X,

 4   then there's a separate exercise in settlement or litigation

 5   as among the COFINA bondholders to determine whether the

 6   junior COFINA bondholders get their --

 7          MR. MOERS MAYER:  I think you're reading their

 8   position correctly, Your Honor, but I think it's quite

 9   disingenuous.  If, in fact, as we fully expect will play out,

10   should the Settlement Procedures Order be granted and should

11   matters evolve as they clearly are engineered to evolve --

12   let's keep it simple.  Let's assume it's half juniors and half

13   seniors, and the COFINA agent says, I'm going to settle for 50

14   percent.  The result of that settlement is going to be a de

15   minimis recovery for the juniors.  But it may fund the

16   Commonwealth's budget, so that works for the Commonwealth,

17   works for the Oversight Board, works for everybody except the

18   people who have a lien on that last 50 percent.

19          And the way the determination is made, does it make

20   sense to give it up or not, it has nothing to do with

21   protecting our 50 percent.  It has to do with a corporate

22   fiduciary standard that has nothing to do with protecting our

23   collateral.

24          And I submit, there's a difference between telling a

25   board how to exercise its fiduciary duties to an entity and
```

1   protecting someone's collateral, especially when the entity

2   itself has no economic interest in what is being settled.

3            THE COURT:  Thank you.

4            Again, let's aim for nonduplicative.  You see there's

5   four minutes on the clock.  We'll manage the clock, but let's

6   try to be as efficient as possible.

7            MR. POLKES:  I appreciate it, Your Honor.  We have a

8   very different position.  This is Jonathan Polkes from Weil,

9   Gotshal for National Guarantee.  And I can tell Your Honor on

10  behalf of us, and I speak for the other senior holders, we

11  actually did view the suggestion as one of the agents as a

12  positive development overall in connection with this.  Our

13  issue concerns the independence of that agent for COFINA in

14  particular.

15           You can't be -- this is the camel's nose in the tent.

16  The fact of the matter is, is that whatever the Oversight

17  Board says in terms of they're not a not-for-profit

18  institution and have everybody's best interest at heart, there

19  is a very fundamental conflict here.

20           The fiscal plan is the conflict.  The fiscal plan

21  that was submitted by the Oversight Board on behalf of both in

22  this Title III, the Commonwealth in its Title III presupposes

23  raiding COFINA funds.  And the Oversight Board simply can't be

24  in a position to control what happens with regard to both of

25  those things if it is going to satisfy its duties with each

Case:17-00283-LTS Doc#:4750-20 Filed:01/12/19 Entered:01/12/19 20:54:32 Desc:
Exhibit 24 Page 357 of 163

1    separate debt.  And we take it they're acknowledging that

2    effect is good for them.

3         The same needs to be with an appointment of an agent,

4    but the agent, it has to zealously protect COFINA's interest

5    and has to zealously protect COFINA's interest and maximize

6    the return for that particular debtor.  And the Oversight

7    Board can't do that and at the same time work to get the best

8    for the Commonwealth.

9         The specific issue that we have in mind really, the

10   most important one is the retained veto right of settlement.

11   That was raised already.  There are really very specific

12   issues in disagreement here.  They can't have that.  They

13   can't say, we're going to give -- appoint an agent who can

14   zealously protect the interest of COFINA, but at the same time

15   we get to torpedo the agent.  That makes the agent really just

16   cosmetic.  And it's not okay.  They have to be really

17   independent.

18        For the same reason, they shouldn't have any right to

19   appoint or nominate or name in any other way appoint an agent.

20   It's inappropriate atmospherically.  It's inappropriate in

21   terms of appropriate process, inappropriate as a practical

22   matter.  This agent has to -- we need, the creditors need a

23   debtor representative whose sole independent position is to

24   zealously try to maximize recovery for that estate.

25        And I must say that even after the fact that's been

Case:17-00283-LTS Doc#:4720-20 Filed:01/11/19 Entered:01/11/19 20:57:32 Desc:
Exhibit 24 Page 359 of 507

 1    agreed to by the Oversight Board, they've agreed that the duty

 2    of this agent will be to maximize the recovery on behalf of

 3    the debtor.  But the only way that can happen is if the agent

 4    is not beholding in any way to the Oversight Board with this

 5    agreement.

 6           And I just want to emphasize one thing and I'll

 7    finish with this actually.  This conflict is very real.  The

 8    fiscal plan presupposes raiding COFINA's funds, otherwise, it

 9    doesn't work.  It doesn't make sense.  I must say there's a

10    crisis of confidence on our side of the table.  We don't

11    believe that.  We don't believe that.  I don't think anyone up

12    here does.  And that's going to become an issue in the

13    mediation.

14           Judge Houser, I think that's something you will hear

15    very often.  And we have filed an interpleader action,

16    discovery request, plan of work, fiscal plan, and have been

17    completely rebuffed.  The objections are based on executive

18    privilege, understanding that the Oversight Board submits a

19    fiscal plan stating we need emergency relief, but we're not

20    going to let you look into any of the assumptions of the

21    fiscal plan.

22           So this conflict couldn't be more real.  The only way

23    this agent process works is if people have faith in the

24    integrity of the agent.  And in that regard, the Oversight

25    Board should have no say in who is selected and should not

```
 1    retain any settlement veto rights at all.

 2              Thank you.

 3              THE COURT:  But how do you get past case or

 4    controversy if the Oversight Board, wearing its COFINA hat,

 5    doesn't have to own at least the litigation position?  I can

 6    see there are lots of issues with this proposal.  One of them

 7    that I see is that maybe litigation with the specific brief is

 8    one thing that binds COFINA and the other binds the

 9    Commonwealth, the opposite position.  It might be something

10    that needed to be handled differently from the pool of

11    participants in a settlement negotiation and from authority to

12    approve or disapprove a settlement.

13              Is there any -- do you see any daylight there, and

14    how would you -- how do I have a case or controversy if I'm

15    appointing litigants and telling them what to argue?

16              MR. POLKES:  Fair enough.  First of all, I think that

17    question, it's pointed to -- into the Oversight Board, a

18    question for them as much as us.

19              THE COURT:  Yes.

20              MR. POLKES:  Second, PROMESA -- in the statute, we

21    will have to try and figure it out as we go forward.  I think

22    third of all, the authority of PROMESA does help.  I mean,

23    this is for -- I understand this has been foreseen.  I can't

24    imagine why else there's the ability or -- having foreseen,

25    you could appoint an agent and give them whatever authority
```

1    the Oversight Board itself has.

2              And the fourth thing is perhaps the Oversight Board

3    could continue to have a voice.  In other words, it's not like

4    they have to be fully recused from these proceedings as we go

5    forward.  They can file briefs, can have a seat at the table.

6              To us, the important thing is that the debt, the

7    COFINA debtor itself have a truly dedicated representative

8    whose sole concern is preserving the assets of the COFINA

9    estate.

10             THE COURT:  Thank you.

11             MR. POLKES:  Thank you, Your Honor.

12             THE COURT:  Okay.  We're sort of at 17 minutes.

13   We're going to reset the clock at ten minutes and ask that

14   everyone who remains, try to stay in those ten minutes.

15             MR. KIRPALANI:  Thank you, Your Honor.  Susheel

16   Kirpalani from Quinn Emanuel on behalf of the COFINA Seniors

17   Bondholder Coalition.

18             As Mr. Polkes mentioned on behalf of National, we

19   worked very hard in the face of this motion to try to organize

20   ourselves, at least among the COFINA senior representatives.

21   And the Coalition, along with National, along with Ambac, did

22   provide independent objections, but that -- all proposed the

23   exact same proposed order that we believe would resolve our

24   objections.

25             Yesterday, after everything else had been filed, I

1     took some time to go through it.  I'm sure what your team and

2     staff has done.  If you read everything that was filed, and

3     there is a way to synthesize, so I'm going to do my best to

4     try to do that, the Oversight Board says November 1st is a

5     real issue for the Commonwealth and COFINA.  There are a lot

6     of creditors in this courtroom who dispute that.  We frankly

7     don't have any idea, which is why we took a slightly different

8     approach in terms of what our concerns are with respect to the

9     fiscal plan.

10          Mr. Despins stood up earlier and said the official

11     unsecured creditors committee is just getting involved and he

12     just got hired two days ago.  He needs time to weigh in on

13     that.  So what we put in our proposed Order list that November

14     1st is the date.  That was the date that was requested by the

15     Oversight Board.

16          Your Honor will have the opportunity to control its

17     own Order and revisit them based on subsequent events if

18     someone brings to the Court's attention evidence that, in

19     fact, that allegation of November 1st need was not

20     well-founded or if circumstances have changed.  So we don't

21     think that's really a gating issue with our proposed Order.

22          The mutual funds and UBS said forcing litigation to

23     be commenced within ten days in this court is a bit of a

24     manufactured process, and that raised Article III concerns.

25     Your Honor may notice that again, we've changed where the

```
 1    court is.  It says the appropriate court.

 2            And we also would eliminate the ten-day period that

 3    also addresses the unsecured creditors committee's concern

 4    that this is moving too fast and they can't catch up to the

 5    train.

 6            I think for purposes of the protocol, what the

 7    Oversight Board did was take what Congress gave them and said,

 8    you have legal authority over two distinct entities, and you

 9    have legal authority under federal law to appoint agents.  But

10    after that, the agents should decide when they will be ready

11    to bring the litigation.

12            They have the November 1 date as a ticking clock,

13    unless they determine that that's not a real date.  And they

14    can't do that.  You don't need to prewire, if you will, every

15    single issue of when litigation has to be commenced and what

16    court will ultimately decide that.  And we think that all of

17    those issues can be addressed with our proposed Order.

18            We do believe the COFINA senior representatives

19    should have a say as to who the agent for COFINA is.  With all

20    due respect to Mr. Mayer, they are the subordinated

21    bondholders.  Their documents are clear, that following the

22    amendment, the senior bondholders control all remedies, and

23    this would fall within that context, Your Honor.

24            And with that, I would pass the podium to others for

25    more time to speak.
```

```
 1              THE COURT:  Thank you.

 2              MR. DUNNE:  May it please the Court.  Dennis Dunne on

 3     behalf of Ambac.  I'm not going to repeat anything that was

 4     said.  I just want to be clear that Ambac filed an objection,

 5     because we do believe that the proposed procedures are legally

 6     infirm.

 7              The Oversight Board seems to ignore an asymmetry of

 8     rights between the Commonwealth and COFINA.  On the

 9     Commonwealth side, you clearly have a contingent litigation

10     claim that is an asset of the Commonwealth.  It's kind of

11     valueless until proven up.

12              On the other side, in the COFINA box, you have

13     legislation that granted property rights in the SUT, granted

14     liens to creditors who are all up here.  There's actually

15     legislation that says the SUT shall not constitute available

16     resources.

17              So on the COFINA side, people are happy with the

18     legal landscape that exists today, and those secure creditors

19     are capable of defending themselves from any attack by the

20     Commonwealth.

21              But not withstanding the fact we believe the proposed

22     procedures are legally infirm, we support the proposals that

23     are set out in the proposed Order we attached, which are the

24     same ones that Mr. Kirpalani referenced and counsel for

25     National referenced as well.
```

1         But that's primarily the one which we would be in

2 support, as we believe otherwise, as the proposed procedures

3 were originally reflected in the motion, they're legally

4 infirm and should not be approved.

5         Thank you, Your Honor.

6         THE COURT:  Thank you.

7         MS. HALSTEAD:  Good morning, Your Honor.  Ellen

8 Halstead for Cadwalader, Wickersham & Taft on behalf of the

9 Assured Guaranty Corporation, Assured Municipal Corporation.

10         We made two limited objections to this motion.  The

11 first, I believe that I've resolved with Mr. Bienenstock, was

12 asking for notice and approval by the Court of any settlement.

13 And I believe that Mr. Bienenstock has agreed to include what

14 we suggested in our proposed order in paragraph J.

15         THE COURT:  Yes.  That does seem to be reflected in

16 the Reply.

17         MS. HALSTEAD:  Thank you, Your Honor.

18         Our second objection is that the Commonwealth and

19 COFINA dispute does not need to be resolved by November 1st.

20 And all that we would suggest in order to resolve that

21 objection would just be to strike that from paragraph 2-G.

22         That's an artificial deadline for resolution of the

23 dispute.  And as set forth in our papers, there are much more

24 dominant and larger issues in these cases that need to be

25 resolved before a plan of adjustment can be confirmed.

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:34 Desc:
Exhibit X-U Page 365 of 507

1    And I think other people have mentioned the

2    Commonwealth's recent liquidity projections by the

3    Commonwealth show they have 850 million dollars of surplus,

4    and that just highlights there that there's no need for this

5    November 1st deadline.

6    And I just want to address one other point that the

7    debtors raised in their reply.  Mr. Polkes and Mr. Dunne have

8    already addressed points regarding the fiscal plan.  In their

9    reply, the debtor said, in relying on Section 106(e), and they

10   argue that the fiscal plan cannot be challenged by any

11   creditor or reviewed by the Court.

12   And this position by the debtors is a complete

13   obstacle to any consensual resolution of these various

14   litigations that we have and could result in years of

15   litigation.  And the essence of this position is no matter how

16   blatantly the debtors ignore PROMESA requirements, no court

17   can ever review what they did in the fiscal plan.

18   THE COURT:  I understand that there's a fight about

19   the significance and impact of that provision.  I really do

20   want to focus right now, and there are many people lined up

21   behind you, on the specific objections to the proposals.  And

22   I think you've spoken to the principal ones that you've

23   raised.

24   And so unless there's something else that is

25   essential to this issue, I ask that you cede the podium.

1          MS. HALSTEAD:  Thank you, Your Honor.  I was just

2     replying to what they put in their Reply.  Thank you.

3          THE COURT:  Thank you.

4          MR. ROSENBERG:  Andrew Rosenberg, Paul, Weiss,

5     Rifkind, Wharton & Garrison, Your Honor.  I will try to be

6     brief.  I will point out that we're the first pure GO holder,

7     and there's at least a couple of points that I do want to

8     make.

9          One is just to conclude possibly the discussion of

10    the artificial November 1 deadline.  All that I think that

11    you've seen so far, Your Honor, is that there has been,

12    through the Center of Investigative Journalism, found certain

13    papers in litigation that revealed there was an additional 850

14    million dollars, and that certainly suggests that November 1

15    is an artificial deadline.

16         The only response that we have from the Oversight

17    Board before the Court I think is a footnote that the

18    Commonwealth told us they need that money, they're going to

19    spend it for something else.  I don't think that's evidence in

20    any way, shape or form justifying the date.

21         Second, and I think more directly to the point about

22    the process here, however this is resolved, whether it's

23    through litigation or whether it's resolved from settlement,

24    there's ultimately going to be an inquiry in terms of the

25    settlement as to the fairness and litigation as to the ability

Case:17-03283-LTS Doc#:4759-20 Filed:01/12/19 Entered:01/12/19 20:54:34 Desc:
Exhibit 24 Page 96 of 163

 1    to bind everyone.

 2            And this is ultimately going to look at adequacy of

 3    representation.  It's going to look at due process issues.

 4    And what you've seen from the combined pleadings, and I looked

 5    at them both together at the Oversight Board and AAFAF, and I

 6    think they do need to be considered somewhat together because

 7    one is the representative of the Commonwealth and one is the

 8    Commonwealth.

 9            They say three things:  First, we have no fiduciary

10    duty to creditors whatsoever.  Our only duty is to the people

11    of Puerto Rico.  Whether that's true or not, that's their

12    position.

13            Two, they say they're free to violate contracts,

14    they're free to violate the Constitution.  That's their

15    position, whether right or wrong.

16            Finally, their position, which you have certainly

17    heard enough of today, is that the debt service number in the

18    fiscal plan is unreviewable.  It is what it is.

19            So the question is how does that square with adequacy

20    of representation and due process in this context?  And I

21    think essentially what you find is that it fails the test.

22    You have a conflicted entity, and it says it's conflicted, the

23    Oversight Board, but it also appears to have no stake in the

24    outcome of how the creditors do, because it says it has no

25    duties to them.

1          And it says that they're going to divide up the debt

2     service number, whatever it is.  Yet, that entity that has no

3     interest as to which creditor gets what, nevertheless is

4     picking their representative.  It can veto any settlement that

5     they arrive at because the settlement can only come through

6     this Court with their motion, the way I read the pleadings.

7          And they get to determine the litigation schedule or

8     whatever works, I guess is best for the Commonwealth, for the

9     Board, but having nothing to do with the proper solution for

10    the creditors as to this money.

11         By now, in similar circumstances in bankruptcy, when

12    the Court approves a litigant for so-called estate causes of

13    action, it's not the conflicted debtor that, for obvious

14    reasons, that gets to pick the litigant, set the schedule, et

15    cetera.  It's usually somebody else.  And the Court ultimately

16    determines whether that's the right person and whether it

17    should go ahead, et cetera, not the conflicted debtor entity.

18         Here we have the control board picking the party that

19    litigates and reserving the right to essentially do the

20    settlement themselves or over their objection.  The result of

21    this has to be whether there's a litigated outcome or a

22    settlement outcome, that there's going to be a cloud of

23    uncertainty.

24         The exact thing that they want to achieve, some type

25    of finality in all of this process in an artificially short

1    time will have the opposite effect, because there will be a

2    cloud, a due process cloud, an adequate state of

3    representation cloud over any result that arrives as a result

4    of this protocol.

5           We believe a lot of the sins, not all, but a lot of

6    the sins can be done by -- resolved certainly by greater Court

7    involvement and having the Court ultimately approve who the

8    representative is.

9           In our case, just to quickly mention, we believe it

10   has to be the GO Group.  It's not, Your Honor, that we're

11   looking for more work.  We have plenty to do already here.

12   But we are the only truly unconflicted party.  This is no

13   disrespect to any of the insureds, but they wrap -- some of

14   them are more GO than others, but they all wrap other things.

15          And as to the official creditors committee, it is

16   largely composed of suppliers.  Someone who has been mentioned

17   has a large tax refund.  The Commonwealth has said over and

18   over again in public, and we intend to pay the suppliers in

19   full.  We intend to pay the tax refunds in full.

20          The laboring units have a continuing relationship

21   with the Commonwealth.  They depend on them for their

22   livelihood and jobs.

23          The one person they haven't said is -- they certainly

24   have not said they don't have intention to pay the GOs.  We

25   are the ones who are not being paid.  We have the greatest

1    interest in having this resolved properly.

2           Finally, and I'll conclude with this, Your Honor,

3    we've been studying this issue, I hate to say it, for two

4    years now.  I think this is doubly important, given the

5    newness of other parties to this, that if you're going to have

6    any type of schedule suggested by the Oversight Board or the

7    Commonwealth to resolve this, quote, quickly, it certainly

8    makes sense to have the input of the parties that have been

9    looking at this for years as opposed to someone who's looking

10   at it for days, weeks, or not at all.

11          Thank you, Your Honor.

12          THE COURT:  Thank you.

13          MR. ZAKIA:  Your Honor, Jason Zakia, White & Case on

14   behalf of the Puerto Rico Funds this morning.

15          Two points in less than one minute.  First, the legal

16   authorities cited by the Board for the appointment of this

17   agent is the agency delegation of PROMESA.

18          The Board has admitted, I think forthrightly, the

19   conflict of interest that they have standing on both sides.

20   And we do submit that it is impossible to cure that conflict

21   of interest by delegating to one of their agents as proposed

22   here.

23          Mr. Mayer used the term "fake fiduciary" -- I don't

24   think he used it lightly -- to set up a so-called fiduciary

25   and then tell them what to do, give them the time frame in

```
 1   which to do it, and then say come back to me and we will
 2   either bless or not what you do.  It is no fiduciary at all.
 3   So we would agree with Mr. Mayer and Mr. Dunne and others that
 4   that is legally improper.
 5           Also agreeing with Mr. Mayer and Mr. Dunne, it is not
 6   necessary.  The secured creditors on the COFINA side are able
 7   and willing to protect their own interest.  There is no need
 8   for an artificial construct of a fake fiduciary to act
 9   accordingly on our behalf.
10           But if Your Honor disagrees and decides -- this is
11   the second point I'd like to make.  If Your Honor disagrees
12   and decides there is to be an agent, we would respectfully
13   disagree with the suggestion of several of the other COFINA
14   holders that you can somehow artificially exclude parties,
15   including my clients, from having a say on anything including
16   the appointment of that.
17           We set out in our argument and in our papers, and I
18   won't repeat it, but the bases put forth for excluding us from
19   the nomination process are spurious allegations made against
20   an affiliate of the manager of the funds that we represent,
21   which have been debunked and certainly do not provide any
22   legal basis for excluding us from this process, should Your
23   Honor decide to.
24           Thank you.
25           THE COURT:  Thank you.
```

1           MR. GORDON:  Thank you.  Again, for the record,

2    Robert Gordon on behalf of Jenner & Block on behalf of the

3    Official Committee of Retired Employees of Puerto Rico.  I

4    will be very brief, Your Honor.

5           The committee is a representative of the interests of

6    approximately 160,000 retirees in Puerto Rico.  And according

7    to papers filed by the Commonwealth commencing these cases, it

8    indicates that the underfunding liability owed to public

9    pension holders is approximately 49 billion dollars, and that

10   does not include claims related to other post employment

11   benefits.  As a result, the retiree committee is arguably the

12   largest single creditor constituency in this entire case.

13          With that background, Your Honor, we do not rise to

14   object, especially to a procedural motion or to the inclusion

15   of various parties in the process of selecting an agent or

16   engaging in litigation in a similar process.  We only object

17   to the inexplicable omission of the retiree committee from

18   that process.  The resolution of the Commonwealth COFINA

19   dispute could have a significant impact on the Commonwealth's

20   overall restructuring.  As a representative of the single

21   largest creditor constituency in the Commonwealth's

22   restructuring, we submit it's simply inappropriate to exclude

23   the retiree committee from the process engaged and the other

24   processes proposing the motion.

25          The retiree committee on behalf of the retirees

1   absolutely should not be included in this process.  This is so

2   not only because of the size of the claims, but also because

3   most of the 160,000 retirees are also residents of the island.

4           If the ultimate goal of this process is a legal

5   rehabilitation of a community known as Puerto Rico, it is

6   again, we submit, improper to exclude such a significant

7   constituency of that community in this process.

8           The proposed motion contemplates the inclusion of the

9   unsecured creditors committee and the selection of the agent

10  in the other processes.  We do not object to their inclusion,

11  but again, we question the contrasting, the exclusion of the

12  retiree committee from this process.

13          THE COURT:  Yes.

14          MR. GORDON:  Considering also the fact the claims of

15  the retirees in the aggregate are significantly larger than

16  those comprised by the unsecured creditors committee, and the

17  interest of the retirees are certainly very compelling.

18  Therefore, Your Honor, our request is simple and straight

19  forward.  If the Court grants the motion or is inclined to

20  grant the motion, we simply ask that the retirees committee be

21  included in the process of the Commonwealth agent, involved in

22  litigation and settlement processes as proposed in the motion.

23          THE COURT:  Thank you.

24          There is one other person who wants to speak.

25          MR. DESPINS:  Yes, Your Honor.

1          THE COURT:  Each of you, one and a half minutes

2     because --

3          MR. DESPINS:  Okay.  Thank you, Your Honor.

4          THE COURT:  Thank you.

5          MR. DESPINS:  Luc Despins for the creditors

6     committee.  I will address the key issue here, which is the

7     committee supports the procedures subject to the date of issue

8     that has been discussed, but on the basis that the committee

9     would be the Commonwealth representative.

10          There's been a suggestion by the Paul Weiss group

11     that somehow they should be the agent for the Commonwealth.

12     And, Your Honor, it is -- I'm saying this as politely as I

13     can, it's heresy to suggest that private parties should be

14     given essentially derivative standing to bring a claim on

15     behalf of the estate.  That's never done, as you know.  You

16     need fiduciaries.

17          And the fact that there are no GO bondholders on the

18     committee as of the moment, we owe a duty to all of them, and

19     therefore there is only one fiduciary which has the broadest

20     mandate, which is the creditors committee.  And that's why we

21     should be the agent.

22          Thank you.

23          THE COURT:  Thank you.

24          MR. SOSLAND:  Your Honor, Martin Sosland with Butler

25     Snow on behalf of FGAC.  FGAC's objection is slightly

         1    different than what's been articulated by the other objecting

         2    parties.  We accept that.  We believe that the real problem

         3    with the procedure is it misdefines the issue.  It misdefines

         4    the problem.

         5         The GO COFINA dispute is not, as Mr. Bienenstock

         6    would suggest, a dispute between which one of these debtor's

         7    property lies.  This is a dispute about the rights of

         8    bondholders that are derived both from underlying documents

         9    and statutes, and under PROMESA itself, which provides in

        10    201(b)(1)(n) what the fiscal climate is with respect to

        11    relevant lawful priorities or lawful liens to the parties.

        12         Now, whether you're a COFINA holder or GO holder, you

        13    don't think the fiscal plan does that, which is why everyone

        14    is objecting.  The rights for the GO holders, which is where

        15    FGAC is, as with Mr. Rosenberg's clients, our rights derive

        16    not only from that statute, but in the COFINA Statute 16(b),

        17    which we cited in our papers, which says that COFINA shall not

        18    underline the rights of the holders in the GO debt.  Not the

        19    Commonwealth, the holders of the debt.  Section 11 of RNB

        20    adopted by PROMESA from Title 11 gives any party in interest a

        21    right to be heard.  We should be heard.

        22         In this context, there are a lot of people involved.

        23    The parties with the economic interest will not slow down the

        24    resolution, but will actually speed up the resolution.  And

        25    we're all going to have to vote on the plans for adjustments.

1          Thank you.

2          THE COURT:  Mr. Bienenstock, I will set the clock

3     initially for 20 minutes, but I want to make some remarks

4     before I start this clock that may or may not help to bring

5     this part of the discussion to a close earlier.

6          I believe that many of the points that have been made

7     are salient ones.  I'm not convinced that they can't be

8     overcome, but I am and was, based on the submissions, fairly

9     well persuaded before coming in here today that the current

10    proposal has some fundamental problems.

11         And those include this question of what the real

12    relationship is between the debtors and the person of the

13    Oversight Board and these agents, the degree to which the

14    Oversight Board can instruct or preempt particularly on the

15    settlement side.

16         On the litigation side, and this goes to the case in

17    controversy issue, what the litigation brief of the agent is,

18    and whether the agent having been given a core principle to

19    pursue and defend to the death binds the debtor for all

20    purposes and all of the implications of those positions.

21         And going back to just the basic proposition that an

22    agent is authorized by PROMESA, I have a concern about the

23    language of 104(b).

24         Your proposal, and many of the variations on that,

25    that accept the notion that an agent is an appropriate

1  vehicle, seems to read 104(b) to say that it authorizes any

2  agent to take any action that the Oversight Board is

3  authorized to take by PROMESA.

4       But that provision of the statute says to take any

5  action the Oversight Board is authorized to take by this

6  section, which if it refers to 104 itself, doesn't intuitively

7  or clearly pick up all of the authority of the Oversight Board

8  under Title III.

9       There are other provisions in 104.  There's one about

10  making contracts for people to do what the Oversight Board can

11  do.  There's provisions about filing actions.  But I would

12  invite some rethinking and perhaps -- well, anyway, some more

13  information about that.

14       And so to truly cut to the chase, as I've urged other

15  people to do, my intention today is to deny without prejudice

16  this particular application to urge the parties to work

17  together to come up with a different sort of proposal or

18  structure that deals with -- more clearly with the relational

19  issues, that deals with whether the same person or combination

20  of people should be at the settlement table as at the

21  litigation table, that deals with the statutory authority

22  point.

23       And I'm happy to be able to offer into this that the

24  mediation team is willing and available to facilitate those

25  efforts and discussions among the parties.  So I figured it

```
 1    was only fair to give you a preview, given the time and what's
 2    been said.
 3              MR. BIENENSTOCK:  Thank you, Your Honor.
 4              THE COURT:  With gifts like this, you don't need
 5    enemies, right?
 6              MR. BIENENSTOCK:  Martin Bienenstock of Proskauer
 7    Rose for the Oversight Board.
 8              In view of Your Honor's comments, which I do
 9    appreciate, I'm trying to very quickly figure out what I can
10    say that would move things forward as opposed to simply find
11    out when Judge Houser is first available.
12              THE COURT:  That's an important ingredient.
13              MR. BIENENSTOCK:  But I think it's important to
14    respond to some of the issues, and also especially the issues
15    Your Honor raised so that there's an understanding on
16    everyone's behalf of the issues we have to solve.
17              First, in terms of choosing the agent, talking about
18    it in theory has been done today, and in the pleadings, is
19    much more difficult than talking about actual facts.  And the
20    actual facts, as far as the Commonwealth's side, are that as
21    much as the statutory creditors committee for the unsecured
22    claim holders needs more time on a bunch of things, they real
23    fast determine that they should be the agent.  And this was
24    Mr. Despins lucky day, because the Oversight Board agrees.
25              It's a natural -- it's certainly a natural happening
```

1    of events in bankruptcy to turn over something like this to a

2    statutory committee chosen by the U.S. Trustee, obviously with

3    excellent counsel and other professionals.

4            So that leaves who should be the agent on the COFINA

5    side, which doesn't have a statutory committee for good

6    reasons.  They're all saying they're secured, et cetera.

7            Now, there, Mr. Kirpalani has suggested to me four

8    choices, any one of which are people of spectacular

9    reputation, both for integrity and legal ability with their

10   law firms.  I think maybe 11 didn't make suggestions to me,

11   because they were pursuing their stay motion.

12           But it really shouldn't be too hard to choose -- for

13   them to all come up with a bunch of potential agents and to

14   choose one.  I mean, Mr. Kirpalani's list is a great start.

15           Now, we've agreed, as Your Honor saw in our reply,

16   we've agreed that any settlement would be subject to Court

17   approval.  And that was our intention from the start, although

18   we understand how the parties read the proposed Order to see

19   that as a possibility and not a requirement, but we have

20   confirmed it's a requirement.

21           THE COURT:  But is it true, though, that whether a

22   settlement proposal advances to the request for Court approval

23   is entirely in the control of the Oversight Board?

24           MR. BIENENSTOCK:  Okay.  That's exactly what I was

25   going to address, yes.

```
 1              If the settlement is a pure, simple settlement, let's
 2    say 50, 50, COFINA, Commonwealth, they split up the sales and
 3    use taxes, we weren't worried about that type of settlement.
 4    That would not be something that we would oppose or veto.  We
 5    just deal with it.
 6              What the contemplation was --
 7              THE COURT:  Mr. Mayer says you deal with it because
 8    it works for you.  It works for the fiscal plan.
 9              MR. BIENENSTOCK:  It could be 90/10 in his favor, but
10    I'm saying we're not going to a pure settlement.  How much for
11    one side, how much for the other is not what we were thinking
12    we needed a veto right for.
13              What we were thinking was there's going to be very
14    creative people on both sides and on the mediation side, and
15    it may not be a pure settlement in a couple of ways.
16              First, it's hard to settle simply how much money will
17    go into the estate and get creditor support, if you want
18    creditor support along with it, which would be nice, unless
19    the creditors know how that -- the money in the estate is
20    going to be distributed to them.
21              That's particularly on the COFINA side, the documents
22    may make that pretty clear.  On the Commonwealth side, it also
23    may be clear, but still everyone would want to know what type
24    of plan of adjustment would go along with a particular
25    settlement.
```

```
 1              That's number one, why our motion said that the

 2    Oversight Board would participate in the mediation, because we

 3    might be able to facilitate settlements that otherwise

 4    couldn't be done.  People just don't want to say 50/50 or some

 5    other ratio.

 6              Second, even if they're not asking for the Oversight

 7    Board to add in terms of a plan of adjustment to a settlement

 8    as to who owns the sales and use taxes, they might come up

 9    with a -- with some other scheme of settlement that might or

10    might not be compatible with the fiscal plan and the

11    satisfaction of the Oversight Board's statutory missions.

12              And if that's the case, we would want to be able to

13    tell them, if we do this settlement, we can't succeed in our

14    mission, so please change it one way or the other.

15              Not to make it better or worse for one side or the

16    other, but simply to let the settlement be compatible with the

17    overall goals we're supposed to achieve.  That is the only

18    reason why we put it there.

19              And frankly, you know, that could be resolvable, you

20    know.  Perhaps members of the mediation team could be the

21    monitors as to whether we're appropriately exercising some

22    influence on the settlement for that reason.

23              We just need a settlement.  We can't afford to have a

24    settlement that makes it impossible to succeed in the overall

25    mission of PROMESA.  That was the only reason we did.
```

1          As far as the concern that was voiced that we would

2     nix something simply if it were very much in favor of COFINA,

3     absolutely not.

4          The Oversight Board acts as representative of COFINA

5     in the COFINA case, and its duties would preclude it from

6     doing that.  And it knows that.  And similarly on the

7     Commonwealth side.

8          And as far as the comment that was made that the

9     fiscal plans raids COFINA, that's just not true.  The fiscal

10    plan shows the expenses that need to be paid for the overall

11    Commonwealth and the amount available for debt service.  And

12    it's only going to be done under a plan of adjustment legally.

13    No one's going to take money in violation of PROMESA from one

14    entity and put it in another in some kind of raid.

15         That was never our intent.  We never said that.  I

16    understand that advocates are trying to attack us by saying

17    that's how they read it, but it doesn't say that, and that

18    is -- there's no way the Oversight Board would ever do that.

19         As far as the issue of adequate protection that's

20    been raised, Your Honor, this is not an issue of adequate

21    protection.  This is an issue of determining what's to be --

22    what is the collateral in the first place, not adequately

23    protecting the collateral.

24         The secured creditors at COFINA are just that,

25    they're secured by whatever COFINA has.  This dispute is what

 1  does COFINA have, not how it's going to be protected.

 2         The reason why the Oversight Board was going to

 3  select the agents was it's the Oversight Board's agents.  We

 4  are not in PROMESA anywhere expressly.  It says you can give

 5  away your duties in prosecuting these cases and coming up with

 6  plan adjustment to other people.

 7         They're our agents.  And we were trying to protect

 8  against the notion that we would abuse that by choosing agents

 9  beyond reproach.  I think a statutory committee is one way and

10  selections from creditors is another way.  How could -- how

11  could we be abusing that if we're taking selections from the

12  creditors?  It's impossible.

13         And, you know, we know that if people are concerned

14  about how the settlement finally gets done that is presented

15  to the Court, there's a concept of heightened scrutiny that if

16  the Oversight Board has told the sides, you know, your

17  settlement doesn't work, but you have to change it for the

18  following reasons, the Court can impose heightened scrutiny on

19  whether it wants to approve that settlement.

20         We're only going to do something to enable the

21  mission of PROMESA to be carried out, and we need to be able

22  to do that.  But there are those protections because of the

23  Court process that will make sure that's the only objective

24  that the Oversight Board was trying to carry out.

25         As far as the November 1 deadline, we explained that

```
1    there are two reasons for that deadline.  The first is as is
2    crystal clear, and I think to everyone in the courtroom, this
3    is a gating issue.
4         It is impossible to do a plan of adjustment for
5    COFINA or for the Commonwealth without knowing what assets are
6    available to be distributed.  And this is 55 percent of the
7    bond debt.
8         November 1 is a reasonable date to try to accomplish
9    that goal, regardless of cash flow problems.  When we filed
10   the motion, the cash projections we had from the Commonwealth
11   were that they would have negative cash by the end of
12   November.  A small positive balance at the beginning, negative
13   by the end.  That's why we said November 1.
14        As we explained in our reply, this 853 million
15   dollars Your Honor has heard about is not all good news.  Some
16   of it is just not paying payables, accelerated collections,
17   others things.  On balance, they're probably better off.  And
18   maybe the date for a squeeze on cash is later, and we're happy
19   when there's solid data to keep the Court advised.  But even
20   if the date is later, we still think everyone should try to
21   get this done by November 1.
22        Your Honor, at the first hearing we had, made a big
23   point about the fact that this should be done as expeditiously
24   as possible for the people of Puerto Rico and for all kinds of
25   other reasons.  And we think that is actually reason enough to
```

1  pick a date.

2          If November 1 bothers the Court or other parties,

3  then let's say let's pick something as quick and as practical.

4  And as Your Honor noted before, if there's a cash need, we

5  will try to resolve that need by borrowing.

6          We have not admitted that by seeking to have agents,

7  the Oversight Board is conflicted.  The Oversight Board is

8  given a statutory role.  It's not a lot different from the

9  holding company of a large Chapter 11 corporation with a lot

10  of subsidiaries and affiliates.  The same management

11  represents all of them as Chapter 11 debtors.

12          Here, we are less conflicted than the Chapter 11

13  situation, if conflicted at all, which we don't think we are,

14  because we're not for profit.  We're not trying to get

15  something for the Board as a whole, as an entity.  It's just a

16  judicial, Congressional negotiation.

17          It's not for profit.  It's just trying to do the

18  right thing.  And it knows how to carry out its duties as

19  representative of different entities.

20          The reason that we opted for the general creditors

21  committee as opposed to the retirees committee is that the

22  fiscal plan says that on average, we think that the retirees

23  need to be paid 90 percent of their pensions.  That was for

24  lots of reasons.

25          A lot of them are not eligible for Social Security.

```
 1    A lot of them will barely be at the poverty level with that
 2    payout.  They are on the island and they spend money on the
 3    island.  There are all kinds of reasons for that.  But given
 4    that the goal is 90 percent on average, we didn't think people
 5    who were starting out with 90 cents in their pocket would be
 6    looked at as being as aggressive as a committee that is
 7    representing creditors who are faced with potentially far less
 8    than that.
 9            We have the greatest respect, sympathy and admiration
10    for the retirees and their committee and their professionals.
11    Just for those reasons, we thought choosing between the two
12    committees, the more general committee was the appropriate,
13    with the more appropriate agent.
14            I guess it's obvious that we disagree with FGAC that
15    the issue is not property ownership.  It is property
16    ownership.
17            I hope I've answered Your Honor's questions about the
18    relationship between the agent and the Oversight Board in
19    explaining the only situations we would really want to impose
20    ourselves on settlement.  And we could perhaps, as I
21    mentioned, use the mediation judges or one of them or whatever
22    to help in that degree.
23            THE COURT:  And are you bound by the litigation
24    positions that are -- is it the intention to give the COFINA
25    agent a core brief that says, you know, you must litigate to
```

1    the death the question of COFINA ownership of the SUT revenues

2    and to frame a particular question?

3          Right now the proposal that you gave me says, you

4    know, there are these issues and there'll be one champion,

5    there'll be another champion.  And it's very vague.  And it's

6    not clear to me that the -- at least the debtors, at the end

7    of the day, need to own certain legal positions.

8          The ultimate plan of adjustment may propose to

9    compromise those legal positions for other reasons, but I need

10   to see the debtor's position that's going to be litigated

11   before me.

12         MR. BIENENSTOCK:  Okay.  The issue that we intended

13   to put in each agent's hand and which we think our citations

14   to Credit Lyonnais were designed to support really what Your

15   Honor said.  The COFINA agent is supposed to maximize sales

16   and use taxes, being the property of COFINA.  The Commonwealth

17   agent is supposed to maximize sales and use taxes being

18   property of the Commonwealth, and they're supposed to litigate

19   that issue simultaneously with efforts to settle as part of

20   the -- and they should use the mediation team to try to

21   settle.  But they should be doing both simultaneously.

22         THE COURT:  Given the time, I don't want to belabor

23   this, but I can perceive, and I perceive in the fiscal plan

24   the potential for a determination that on the settlement side,

25   maximizing the ultimate benefit of, you know, COFINA

1  bondholders, for instance, might be tied up in the notion that

2  Puerto Rico needs to be healthy in the out years and not

3  solely a question of the ability to grab everything that's on

4  the table now under a lien.  And so those could be different

5  positions depending on the context.

6         So, yeah, I am going to give it all back to you to

7  reformulate, but that's the best I can do to articulate that

8  concern.

9         MR. BIENENSTOCK:  That's a very interesting concern,

10  if I understood correctly.  Your Honor was suggesting that if

11  COFINA could have it all, is that really in its interest if it

12  would so impair the Commonwealth that there wouldn't be as

13  much sales and use tax in the future because the economy would

14  be so injured.  We would totally leave that up to the agent.

15  As far as we're concerned --

16         THE COURT:  But would you permit the agent's decline

17  to litigate vigorously the proposition that COFINA is entitled

18  to everything, or do you want this agent to litigate

19  vigorously that proposition so that it's from a point of

20  knowledge, leverage, power, or lack thereof that COFINA then

21  makes its decision as to what the plan of adjustment should

22  look like?  That's the distinction I'm trying to make.

23         MR. BIENENSTOCK:  I think we would want the COFINA

24  agent to litigate to the death what they believe is in the

25  best interest of COFINA.  That may take into account what I

 1  think Your Honor just articulated, and I think I just did, but

 2  we wouldn't tell it what's in the best interest.  We leave

 3  that completely up to them.

 4          Really, as I explained at the outset, our only desire

 5  to have influence on the settlement is if someone comes up

 6  with something that just doesn't work.  And work -- when I say

 7  work, I mean from the viewpoint of we wouldn't be able to have

 8  plans of adjustment that would enable the mission of PROMESA

 9  to get fiscal responsibility and access to capital markets if

10  that settlement were -- that was the only motivation for that.

11          And finally, we explained partly so, I wouldn't do it

12  here in any length, in our status report, what we called the

13  recurring issue on the fiscal plan.  We totally get all the

14  creditors would like us to say there's more available to go to

15  them.  We wish there were.

16          We're working every day.  The Board tries to come up

17  with things to improve the prospects of the Commonwealth.  But

18  Congress put some pretty extraordinary things into PROMESA.

19  So unlike in Chapter 11, where if it doesn't work, you go to

20  Chapter 22 or 33, and it's not the end of the world

21  necessarily, but Congress clearly said here it wants it done

22  once right, and it doesn't want the Oversight Board subject

23  being jawboned and saying look, you'll have other revenues and

24  make everyone happy.  That's a very, very serious issue.  I'm

25  sure, you know, the mediation team and Your Honor -- it will

 1   speed up the litigation already.  Your Honor is going to hear

 2   it, and the mediation team is going to hear it, but I can't

 3   emphasize enough what a critical, important issue that is.

 4   And that's just so we can carry out the mission we're supposed

 5   to carry out.

 6            So Your Honor, I will reach out, the Oversight Board

 7   will reach out to the mediation team.  But I'd like to know,

 8   can we -- it's hard to get anonymity in this crowd.

 9            Based on if we get something that we think is as good

10   as we can do, but it's not unanimous, I'd like to know that

11   the Oversight Board, on a prompt timetable, can bring it back

12   to the Court, because this really has to get done for the

13   reasons I mentioned.

14            THE COURT:  Yes.  The motion practice can be renewed.

15   I am asking you to try to make it unanimous and certainly make

16   it responsive to my concerns and the sorts of concerns that

17   have been raised here.

18            But if it's not unanimous, then cue up a motion with

19   a suggested timetable that doesn't necessarily coincide with

20   an Omni.  And there'll be an opportunity to file opposition

21   papers, and we'll go from there.

22            MR. BIENENSTOCK:  All right.  Thank you.

23            MR. RAPISARDI:  Your Honor, may I be heard?

24            THE COURT:  Mr. Rapisardi, yes.

25            MR. RAPISARDI:  John Rapisardi on behalf of AAFAF.

```
 1              Your Honor, we filed papers in support of the

 2   Oversight Board's motion.  And in just listening to the

 3   dialogue, what convinced the government to go along with the

 4   Oversight Board's motion was not that it was premised upon the

 5   concept of conflicts, but they were endeavoring to create not

 6   only a transparency to allow the parties access to a

 7   litigation strategy pursued by the COFINA side and both the

 8   Commonwealth side, the government was, at the outset,

 9   concerned about yet another line of -- lawyers being lined up,

10   one representing the agent for COFINA, one representing the

11   agent for the Commonwealth, and a potential for the litigation

12   spinning out of control.

13              What gave us comfort was the Board retaining control

14   over the process in terms of if the litigation reaches

15   impasse.  And I think that's why I think the mediation will be

16   very helpful, that the Board could still intervene, and

17   consistent with your observations, Your Honor, with respect to

18   Section 104, it does -- the Board may designate its agent

19   within the section.  And under those provisions under 104,

20   they are more mechanical in nature.

21              I don't believe the Board can just carte blanche

22   delegate power that goes to the heart of PROMESA, for example,

23   proposing a plan or proposing a settlement -- I'm sorry,

24   ceding to the agents or otherwise and propose a settlement

25   that's inconsistent with the fiscal plan that is certified.
```

1    So the government does have concerns that if the

2    Board somehow grants these agents power or authority to

3    litigate endlessly without any road to breaking the impasse --

4    and it was Your Honor who threw out there the idea that there

5    should be a parallel plan process where working through a

6    mediation process, that there's a straw-man plan on the table

7    that advises the parties of their down side risk.

8    We heard now for over a month each of the

9    constituencies talking about that they're statutory

10   lienholders and they're special revenue bondholders.  Well,

11   there's a countervailing view that they are not statutory

12   lienholders.  They are not special revenue bondholders.  They

13   are just ordinary creditors whose rights in Section 552 with

14   respect to future sales and use taxes are cut off.

15   I'm not arguing that point, but that is a real

16   possibility that could be presented under a plan of

17   adjustment, given the COFINAs, or on the other side, the GOs,

18   who assert they have a statutory lien to available resources.

19   Well, there are some really good case laws, including

20   an article written by a member on the Oversight Board which

21   suggests that they may not have a lien, and so they're an

22   ordinary general unsecured creditor.

23   Everyone in this room is an experienced lawyer, and

24   they know what the power of cramdown has and what it can do.

25   And what I would suggest is that during the mediation process,

```
 1   that we have a plan in process so the parties are negotiating

 2   PROMESA, because up until now, we saw the Lex Claims

 3   litigation go forward, that didn't bring parties to

 4   settlement.

 5         The rationale, even for this motion, was, you know,

 6   I'd asked originally what would drive the parties to settle,

 7   and the answer is, well, fear of losing.

 8         Your Honor, the parties in this entire matter, each

 9   of the constituencies have had a winner-take-all mentality.

10   And I think that's going to be very important in terms of

11   breaking through that.  In the original mediation that we had

12   in March, that's a problem we confronted.

13         The GOs are very -- you know, represented by very

14   capable counsel.  COFINA's represented by very capable

15   counsel.  And they believe very strongly in their positions.

16   And that's going to be a challenge for the mediation, Your

17   Honor.

18         And I believe there has to be some thread of

19   influence that brings parties together that strikes real fear

20   into them that if they don't at some point come to a consensus

21   and they continue to litigate the impasse, that the Board will

22   move forward with its own plan.

23         The Board has an exclusive right and discretion to

24   file a plan of adjustment, and its hands should not be tied by

25   any settlement or agreement where agents are running off
```

```
 1   pursuing a course of action that's contrary to what's
 2   contained in PROMESA.
 3           Thank you, Your Honor.
 4           THE COURT:  Thank you.  We will now break for 45
 5   minutes.  I hope that at least some of you can find some lunch
 6   here.  We will resume at 1:30.  And on the ERS lift of stay
 7   motion, I'll hear opponents first.
 8           Thank you.  We are adjourned.
 9           All rise.
10           (At 12:41 PM, recess taken.)
11           (At 1:34 PM, proceedings reconvened.)
12           THE COURT:  So just for clarity, the ruling on the
13   final motion of the morning, which was the GO COFINA
14   procedures motion, is that the motion is denied without
15   prejudice to renewal with a reformulated proposal addressing
16   the issues that were raised, and I expect that there will be
17   work with the mediators in aid of the reformulation of the
18   proposal.
19           And one logistical issue, it appears that people in
20   the remote rooms are having some difficulty hearing the people
21   who speak from the podium.  And so Counsel, as you come to the
22   podium, please make sure that the microphone is pointing
23   toward your mouth and project as if you were at the opera, and
24   then the people in the remote locations and on the telephone
25   should be able to hear more clearly.  And I thank you for that
```

1    on my behalf and theirs.

2              (Proceedings concluded.)

3                                  *        *        *

```
 1  U.S. DISTRICT COURT     )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 126 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain on June 28,

 8  2017.

 9

10

11

12

13  S/ Amy Walker

14  Amy Walker, CSR 3799

15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25
```

< Dates >
July 12 18:17,
   21:10, 66:13
July 12 first 21:4
June 28, 2017 1:16,
   5:2, 126:7
June 29 34:8
May 17 26:5
May 2nd 64:13
may one 64:20
November 1 52:4,
   52:7, 92:12,
   96:10, 96:14,
   113:25, 114:8,
   114:13, 114:21,
   115:2
November 1st 91:4,
   91:13, 91:19,
   94:19, 95:5


< 1 >
10 83:21
104 30:22, 107:6,
   121:19, 121:20
104(b 106:23, 107:1
104. 107:9
105 46:12
105(b 80:25
106(e 95:9
11 29:1, 73:5,
   105:19, 105:20,
   109:10, 115:9,
   115:11, 115:12,
   119:20
12 51:6, 51:7
12. 58:10
126 126:4
1280 73:11
1286 73:11
12:41 124:11
15 50:12, 50:18,
   50:19, 78:7,
   78:22, 79:4, 79:6
150 41:11
159 73:23
16(b 105:16
160,000 102:6, 103:3
17 10:18, 90:12
17-3283 40:4, 46:14

17-3283. 41:6, 41:7
17-3566. 41:12
17-BK-3283(LTS 1:6
17-BK-3566(LTS 1:24
17-BK-3567(LTS 1:40
17C 5:10
1885. 71:11
1890 71:10
1988. 15:8
1990 73:11
1993 73:24
1994. 73:25
1:30. 124:7
1:34 124:12


< 2 >
2-G 94:21
20 7:14, 22:22,
   31:22, 32:6,
   36:21, 37:3, 81:4,
   106:3
2000. 22:24
2003 56:3
201(b)(1)(n 105:10
21. 26:3
2161 73:7
21: 2:16
22 119:21
23 73:24
23,000 42:21
25 81:11, 81:19,
   82:3
25(b 56:4, 76:2,
   76:9
27th 41:7
29 10:18
299-3 40:3
2nd 83:14


< 3 >
30 50:11, 52:18,
   78:9
301 73:6
305 57:6, 57:10
306 57:6
306(b 60:19, 61:17,
   71:18
306(d)(3 72:8

3283 48:19
33 119:21
362 42:2, 45:22
362(d 73:5
3799 126:14
395 73:24
3: 1:6, 1:24, 1:40


< 4 >
40 56:24
4001-B 70:22
42 57:4
442 48:19
45 124:5
48 73:7
49 102:9


< 5 >
50 85:13, 85:18,
   85:21, 110:2
50/50 111:4
513 41:6
513-1 41:7
516-1 42:12
516-2 46:14
541 63:24
55 114:6
552 122:14


< 6 >
6 57:10
6:30 41:8


< 7 >
7 61:4
75 82:4


< 8 >
800 52:9
850 95:3, 96:13
853 114:14


< 9 >
90 73:23, 79:20,

115:23, 116:4,
116:5
90/10 110:9
907 73:10
922 42:3
9:30 5:3, 18:19

< A >
A-d-r-i-a-n 47:19
AAA 3:9
AAFAF 46:23, 47:1,
52:3, 52:16, 53:7,
97:5, 121:1
ability 6:8, 7:25,
59:3, 67:20,
80:16, 89:24,
96:25, 109:9,
118:3, 126:5
able 6:16, 10:25,
22:7, 35:24,
38:20, 48:8, 71:7,
101:6, 107:23,
111:3, 111:12,
113:21, 119:7,
125:1
above 38:6, 43:1
absence 77:10
absolutely 20:20,
103:1, 112:3
absorbed 62:3
abundance 7:9
abuse 113:8
abusing 113:11
accelerated 114:16
acceleration 36:16
accept 16:17, 55:25,
68:16, 76:2, 76:4,
76:8, 76:10,
82:25, 105:2,
106:25
acceptable 16:18
access 52:5, 119:9,
121:7
accommodate 19:2,
19:4
accomplish 29:22,
114:8
accomplished 14:9
accordance 49:13

according 102:6
Accordingly 76:15,
77:14, 101:9
account 32:16,
118:25
accountability 66:14
accurate 126:5
accurately 26:16
achieve 74:18,
98:24, 111:17
achieved 10:2
achievements 10:24
acknowledgement
77:11
acknowledging 87:1
across 10:11
Act 56:3, 57:22,
57:23, 101:8
Acting 26:3
action 35:22, 38:15,
61:21, 63:19,
69:9, 73:10,
88:15, 98:13,
107:2, 107:5,
124:2
actions 107:11
actively 18:13
acts 10:4, 112:4
actual 108:19,
108:20
actually 29:4,
48:24, 59:24,
86:11, 88:7,
93:14, 105:24,
114:25
Ad 2:33, 3:36, 67:8
add 11:23, 57:9,
59:22, 111:7
adding 50:9
addition 59:23
additional 17:1,
60:2, 96:13
additions 8:11
address 6:20, 11:20,
20:22, 28:9,
38:21, 45:15,
47:8, 49:3, 63:7,
74:22, 76:24,
95:6, 104:6,
109:25

addressed 16:12,
16:20, 18:2,
92:17, 95:8
addresses 92:3
addressing 39:14,
124:16
adequacy 97:2, 97:19
adequate 54:3,
55:15, 55:21,
77:12, 81:9,
82:24, 83:10,
83:14, 83:17,
83:20, 99:2,
112:19, 112:20
adequately 53:23,
112:22
adjourned 124:9
adjustment 19:17,
94:25, 110:24,
111:7, 112:12,
113:6, 114:4,
117:8, 118:21,
119:8, 122:18,
123:25
adjustments 105:25
admin 25:15
Administered 1:11
Administration 1:26,
1:42, 12:1, 12:16,
39:15, 39:19,
40:1, 40:6, 40:23,
41:4
admiration 116:9
admit 34:21
admitted 100:18,
115:6
adopted 105:20
Adrian 2:31, 47:13,
47:19
advance 5:24, 51:1,
69:11, 81:25
advances 109:22
advantages 9:15
adversaries 33:11
adversary 6:6,
12:24, 18:14,
22:8, 42:4, 42:6,
69:5, 76:23,
77:19, 78:1
advice 62:16, 64:21

advised 114:19
advisement 24:7
advises 122:8
advisor 29:24
advisors 30:19
Advisory 3:15
advocates 112:16
affect 31:5
affected 19:13
affiliate 101:20
affiliates 115:10
affirmed 73:24
afford 111:23
afraid 72:17
AFSCME 2:25
afternoon 31:6, 41:8
Agency 3:14, 100:17
agenda 8:10, 8:11,
  20:3, 25:14,
  38:14, 38:18,
  38:21, 38:24,
  39:5, 49:25, 82:7,
  82:21, 83:2
agents 86:11, 92:9,
  92:10, 100:21,
  106:13, 109:13,
  113:3, 113:7,
  113:8, 115:6,
  121:25, 122:3,
  124:1
aggregate 103:15
aggressive 116:6
ago 7:14, 7:21,
  21:2, 23:10,
  29:14, 57:16,
  83:12, 91:12
agree 15:23, 16:22,
  23:21, 34:1,
  56:17, 58:22,
  63:25, 67:11,
  67:13, 69:10,
  101:3
agreed 8:25, 9:2,
  15:25, 45:20,
  50:6, 88:1, 94:13,
  109:15, 109:16
agreeing 16:2, 101:5
agreement 26:9,
  40:12, 40:20,
  47:6, 70:23,

83:19, 83:21,
  88:5, 124:1
agrees 72:19, 108:24
ahead 34:2, 45:25,
  78:20, 98:17
aid 124:18
aim 86:4
aisle 41:20
akin 54:18
al 1:16, 2:20, 2:39,
  3:11, 3:41
alert 43:7, 44:20
alienate 53:11
Allan 2:28
allegation 91:19
allegations 101:19
alleged 43:18
Allen 40:15
allocations 38:17,
  38:20
allotment 38:23
allow 15:16, 42:24,
  56:9, 74:12, 121:7
allowed 57:24
allowing 27:17,
  44:14, 44:15
allows 43:9
Almost 72:22
alone 11:22
already 11:13, 36:5,
  45:10, 46:8,
  64:25, 87:11,
  95:8, 99:11, 120:2
alternative 10:21,
  16:23, 16:24
Although 47:7,
  70:11, 109:17
Ambac 3:3, 35:19,
  64:25, 66:2,
  90:21, 93:3, 93:4
ambiguity 57:10
ambiguous 83:18
Ambro 13:17, 13:18,
  13:22, 13:24
amended 68:5
Amendment 57:12,
  71:4, 92:22
American 13:25,
  44:25
among 8:21, 14:20,

16:4, 22:1, 84:18,
  85:5, 90:20,
  107:25
amount 11:10, 84:14,
  112:11
Amy 126:13, 126:14
analysis 18:3,
  30:19, 64:11
analyze 29:22
Andrew 2:35, 34:18,
  78:21, 96:4
announced 36:25
anonymity 120:9
answer 9:12, 11:1,
  13:15, 47:24,
  72:11, 123:8
answered 75:20,
  76:6, 116:17
anticipate 26:11
anticipated 21:11,
  24:8
anybody 80:21, 82:13
anyway 23:23, 107:12
apparently 28:5
appeal 13:3, 13:23,
  51:18, 55:4
appealed 54:21
Appeals 13:1, 13:18
appear 44:19, 70:19,
  72:17
APPEARANCES 2:13,
  3:1
appearing 23:18
appears 48:1, 97:23,
  124:20
appellate 11:22,
  12:25
applicable 73:6
application 33:6,
  33:7, 34:14,
  37:11, 39:15,
  39:16, 40:25,
  41:2, 42:2, 84:24,
  107:16
applications 6:25,
  44:2
applies 22:6, 49:6,
  84:6
apply 39:16, 42:3,
  42:4, 42:5, 57:7,

57:11, 68:15
appoint 80:23, 81:8,
  87:13, 87:19,
  89:25, 92:9
appointed 13:11,
  15:7, 18:20, 21:1,
  22:23, 29:13,
  37:23, 37:25
appointees 38:7
appointing 8:23,
  80:23, 89:15
appointment 6:13,
  22:10, 26:8, 87:3,
  100:16, 101:16
apportionment 29:9
appreciate 44:16,
  45:2, 45:17, 46:5,
  51:9, 86:7, 108:9
approach 91:8
appropriate 6:9,
  25:10, 26:7,
  30:15, 38:7,
  63:12, 67:14,
  77:1, 77:2, 87:21,
  92:1, 106:25,
  116:12, 116:13
appropriately 32:15,
  111:21
approval 80:5, 84:6,
  94:12, 109:17,
  109:22
approve 89:12, 99:7,
  113:19
approved 80:3, 94:4
approves 81:25,
  98:12
approximately 102:6,
  102:9
arbitration 43:9
arbitrations 44:10,
  44:15
area 8:24, 13:21
areas 22:5, 71:2
arguably 75:22,
  102:11
argue 13:23, 44:12,
  44:19, 75:2,
  89:15, 95:10
argued 81:15
arguing 55:15,

55:21, 122:16
argument 50:8, 53:8,
  60:24, 60:25,
  73:1, 75:8, 77:6,
  77:13, 101:17
arguments 36:7,
  51:24, 57:7,
  61:18, 74:2, 76:13
arise 6:10, 12:21,
  22:8, 45:15, 56:1,
  69:3
arisen 6:20, 12:21
arises 24:20
arising 60:20
around 35:11
arrangement 12:19,
  47:5
ARRIBAS 2:16, 25:25,
  26:2, 26:17, 26:20
arrive 98:5
arrives 99:3
Article 63:20,
  83:21, 91:24,
  122:21
articulate 118:7
articulated 70:2,
  70:14, 105:1,
  119:1
artificial 94:22,
  96:10, 96:15,
  101:8
artificially 98:25,
  101:14
aside 31:20, 35:9,
  42:15
asks 45:23
aspect 7:10, 8:2,
  74:10, 77:15
aspects 6:6, 76:10,
  76:11
assert 122:19
assertion 53:11
asset 65:10, 93:10
assets 90:8, 114:5
assignment 10:13
assist 9:24, 13:11,
  19:15
Assistant 14:21,
  14:24, 26:2
assisting 17:9, 23:5

associated 11:11,
  12:22
assortment 10:24
Assume 79:18, 81:10,
  81:18, 85:12
assuming 48:24
assumptions 88:20
Assurance 3:3, 7:1,
  35:19, 70:8
Assured 3:6, 16:3,
  19:5, 94:9
asymmetry 93:7
Atlas 14:4, 14:7,
  14:9
atmospherically
  87:20
attached 8:22, 93:23
attack 93:19, 112:16
attempt 16:16, 19:2
attend 6:2, 18:15,
  18:22, 18:23,
  19:4, 19:8
attendant 12:15,
  13:3
attention 6:9,
  55:13, 91:18
attitude 66:15
attorney 26:4
attorneys 5:6, 5:20,
  5:23, 6:24, 20:2
AUST 2:17
authored 13:20
authorities 100:16
Authority 1:47,
  3:15, 24:7, 25:9,
  56:25, 81:8,
  89:11, 89:22,
  89:25, 92:8, 92:9,
  107:7, 107:21,
  122:3
authorized 106:22,
  107:3, 107:5
authorizes 107:1
Auto 3:28, 42:20
automatic 41:18,
  44:9, 46:12, 73:8
automobile 45:12,
  46:9
available 12:17,
  52:10, 60:22,

61:13, 74:6,
93:15, 107:24,
108:11, 112:11,
114:6, 119:15,
122:19
average 115:22,
116:4
avoid 53:8
avoidance 65:19
avoiding 72:14
await 33:3
award 13:25, 14:1
away 57:14, 57:17,
58:1, 79:15,
81:21, 81:22,
81:23, 82:25,
84:1, 113:5

< B >
back 24:21, 30:21,
34:11, 35:24,
55:6, 57:18,
79:20, 101:1,
106:21, 118:6,
120:12
background 28:11,
102:13
backwards 49:2
bad 80:7
balance 50:25, 51:2,
51:3, 73:21, 77:8,
114:12, 114:17
Balanced 3:39
Bank 24:6, 24:21,
25:8, 32:22, 69:4
Bankruptcy 1:1,
2:10, 6:16, 8:18,
9:7, 10:19, 10:21,
12:7, 14:1, 14:3,
15:5, 15:7, 15:10,
15:11, 42:3,
57:19, 57:22,
57:24, 61:2, 61:7,
61:11, 62:25,
71:21, 98:11,
109:1
Bar 23:11, 44:9
Barbara 2:10, 6:16,
8:17

barely 43:1, 116:1
bargaining 43:8
barred 34:12
Based 42:8, 61:22,
88:17, 91:17,
106:8, 120:10
bases 101:18
basic 62:1, 106:21
basically 28:9,
37:5, 80:14
basis 34:1, 34:12,
52:23, 52:24,
53:1, 64:16,
71:14, 101:22,
104:8
Bear 5:11, 39:5,
79:5
become 28:4, 30:9,
78:1, 79:22, 88:12
beginning 7:18,
19:24, 114:12
behalf 26:3, 35:19,
39:13, 40:16,
40:19, 44:25,
47:1, 47:13, 62:7,
62:25, 64:24,
69:19, 70:8,
86:10, 86:21,
88:2, 90:16,
90:18, 93:3, 94:8,
100:14, 101:9,
102:2, 102:25,
104:15, 104:25,
108:16, 121:1,
125:2
behave 82:18
behind 19:11, 95:21
beholding 88:4
belabor 117:22
bench 7:13, 8:19,
10:18, 13:19,
14:7, 14:13, 15:8,
21:24, 22:23, 81:4
benefit 117:25
benefits 13:7,
102:11
Bennett 2:39, 40:19,
40:22
BENTLEY 3:33, 50:2,
50:4, 50:15,

50:24, 51:3, 51:9,
51:12, 53:21,
54:6, 55:18,
56:11, 58:4,
58:11, 59:11,
59:21, 71:17,
72:22
Besosa 56:9, 67:23,
68:7, 68:17, 72:1,
72:5, 74:21, 75:10
best 10:25, 16:15,
16:20, 16:22,
28:4, 30:2, 35:15,
54:10, 72:19,
74:14, 80:16,
86:18, 87:7, 91:3,
98:8, 118:7,
118:25, 119:2,
126:5
bestowed 34:23
bestows 14:2
better 16:25, 77:4,
111:15, 114:17
betterment 14:3
beyond 113:9
big 54:6, 81:23,
114:22
bigger 84:21
billion 102:9
bind 97:1
binds 89:8, 106:19
bio 22:21, 22:22
biography 8:22, 22:9
bit 23:9, 26:15,
26:19, 28:11,
32:19, 52:11,
58:11, 62:13,
66:20, 91:23
blanche 121:22
blatantly 95:16
bless 101:2
blizzard 34:23
Block 69:18, 76:1,
102:2
blue 67:4, 71:25
boat 29:14
body 10:15
Bond 3:10, 34:3,
114:7
Bondholder 33:1,

34:20, 90:17
Bondholders 2:35,
  32:25, 33:4, 35:1,
  35:4, 62:8, 67:9,
  82:10, 84:19,
  85:5, 85:6, 92:21,
  92:22, 104:17,
  105:8, 118:1,
  122:11, 122:13
bonds 28:18, 28:19,
  30:25, 31:1,
  37:23, 59:4, 84:16
borrowing 53:10,
  115:5
Boston 21:24, 51:19
bothers 115:2
bottom 24:13
bound 116:23
box 93:12
break 124:5
breaking 122:4,
  123:12
breathing 32:6
Brevity 79:10
brief 8:16, 27:15,
  34:20, 39:3,
  42:20, 50:9,
  50:18, 57:9,
  58:12, 78:23,
  89:7, 96:6, 102:4,
  106:17, 116:25
briefed 33:5, 37:7,
  77:4
briefly 13:16,
  44:24, 56:23, 58:5
briefs 90:5
Brilliant 2:28,
  40:11, 40:14,
  40:15, 40:16
bring 63:1, 92:11,
  104:14, 106:4,
  120:12, 123:4
brings 13:13, 14:17,
  14:18, 79:20,
  91:18, 123:20
broad 28:15
broadest 104:19
Bruce 2:39, 40:19
budget 82:22, 84:2,
  85:16

bullets 55:9
bunch 36:18, 108:22,
  109:13
Butler 70:8, 104:24


< C >
C-a-s-a-l 73:23
Cadwalader 94:8
cafeteria 42:23
calendars 19:9
California 15:6
call 20:7, 49:16,
  53:8
called 119:13
camel 86:15
candid 5:24, 16:5
candor 48:15
Canyon 3:39
capable 65:9, 77:1,
  93:19, 123:15
Capital 7:1, 119:9
care 29:3, 72:18
careful 62:9
carefully 72:25,
  73:1, 74:1
carried 113:21
carry 113:24,
  115:18, 120:5,
  120:6
carte 121:22
carve 51:1
Casal 73:23
case-by-case 33:25,
  34:12
caseload 23:3
cash 52:4, 52:5,
  53:2, 53:25, 54:2,
  114:9, 114:10,
  114:11, 114:18,
  115:4
CAT 3:48
catalyze 66:7
catch 92:4
cause 55:16, 61:21,
  73:10, 73:12,
  74:2, 77:6, 77:15
caused 24:18
causes 98:12
caution 7:9

caveat 49:21
cede 95:25
ceding 121:25
Center 96:12
central 76:21
cents 116:5
ceremonial 18:18
cert 54:22
certain 31:11,
  63:15, 74:19,
  96:12, 117:7
certainly 55:20,
  75:22, 78:23,
  84:23, 96:14,
  97:16, 99:6,
  99:23, 100:7,
  101:21, 103:17,
  108:25, 120:16
certification 56:5,
  58:6, 63:2, 66:3,
  66:7, 67:15,
  67:22, 67:25,
  68:1, 68:14,
  68:16, 68:21,
  68:24, 69:7, 69:8,
  72:2, 74:11,
  74:22, 75:13,
  76:4, 76:25, 77:4
certified 55:25,
  59:15, 61:19,
  76:2, 76:6, 76:13,
  122:1
certifies 56:10
certify 51:21, 56:9,
  60:7, 63:15, 66:1,
  67:18, 68:8,
  71:23, 126:4
certifying 51:24,
  59:13
cetera 28:14, 30:11,
  31:24, 98:15,
  98:17, 109:6
chalk 22:18
challenge 63:1,
  75:3, 82:23,
  123:17
challenged 95:10
challenges 15:3
challenging 11:17,
  19:19

champion 117:4, 117:5
chance 81:12, 81:19
change 64:8, 111:14, 113:17
changed 78:2, 91:20, 91:25
changes 57:25, 70:21
chaos 69:13
Chapter 15:10, 29:1, 61:4, 115:9, 115:11, 115:12, 119:20, 119:21
charged 38:2
chase 44:4, 44:5, 79:14, 107:14
check 5:9, 39:25
CHIEF 2:10, 6:16, 8:17, 9:7, 12:7
choice 51:13
choices 109:8
choose 16:14, 69:24, 109:12, 109:14
choosing 108:17, 113:8, 116:11
chosen 109:2
Chris 15:5
chunk 81:23
Circuit 13:1, 13:17, 13:19, 55:5, 55:6, 56:24, 58:25, 59:6, 62:23, 64:20, 71:22, 73:11, 73:22, 73:24, 83:14
circulated 24:14
circumstance 54:1, 66:5
circumstances 78:2, 79:8, 91:20, 98:11
citations 117:13
cited 56:3, 57:3, 71:18, 100:16, 105:17
Citing 64:5, 73:10
City 14:19, 14:21, 14:22, 14:23, 15:9, 18:17
civil 71:8, 71:9
claim 65:7, 65:21,

93:10, 104:14, 108:22
Claims 63:5, 64:16, 67:11, 67:14, 67:24, 68:3, 68:4, 68:5, 68:10, 72:7, 73:4, 74:9, 74:23, 75:3, 75:7, 75:12, 77:3, 77:16, 77:18, 77:25, 102:10, 103:2, 103:14, 123:3
clarity 124:13
class 38:6, 38:9
classic 61:2
clause 64:6
clear 28:2, 35:4, 42:1, 56:24, 57:18, 60:8, 65:22, 66:2, 75:18, 76:3, 76:12, 85:1, 92:21, 93:4, 110:22, 110:23, 114:2, 117:6
Clearly 29:19, 38:10, 57:6, 85:11, 93:9, 107:7, 107:18, 119:22, 125:1
Clerk 7:24, 8:5
clerks 7:4, 7:16, 7:21, 8:1, 8:4, 29:15, 29:16
clerkship 7:5
clerkships 7:18
client 7:10, 48:8
clients 16:7, 16:8, 37:21, 47:24, 67:10, 84:24, 84:25, 101:15, 105:15
climate 105:10
clincher 57:11
clock 79:6, 86:5, 90:13, 92:12, 106:2, 106:4
close 106:5
closing 19:10
cloud 98:22, 99:2,

99:3
club 29:13
co-counsel 50:8
co-defendants 50:6
Co. 3:26
Coalition 62:8, 90:17, 90:21
Code 15:11, 42:3, 71:8, 71:9, 71:21, 73:5, 73:7
codified 73:7
Cofinas 122:18
Cohen 42:18
coincide 120:20
collateral 83:1, 84:1, 84:8, 85:23, 86:1, 112:22, 112:23
colleagues 15:6, 20:17
collected 84:17
collections 114:16
collective 43:8
collectively 7:2
College 13:25
colorable 75:3
column 25:14, 25:15
combination 107:19
combined 97:4
combining 17:11
comes 10:3, 29:9, 37:3, 45:21, 84:15, 119:5
comfort 31:21, 121:14
coming 27:23, 31:17, 45:11, 67:3, 106:9, 113:5
comity 59:23
commands 81:25
commenced 35:15, 91:23, 92:15
commencement 74:25
commencing 102:7
comment 26:11, 35:23, 112:8
comments 42:8, 50:9, 62:2, 108:8
commercial 21:23
commitment 24:1

committed 7:8, 10:1,
  10:7, 10:9
committees 18:21,
  116:12
common 9:22, 58:16
communicate 29:23
communication 29:20
community 103:5,
  103:7
Company 3:23, 29:1,
  115:9
compatible 111:10,
  111:16
compelling 103:17
compensation 8:13,
  25:22
complaint 68:5
complaints 32:23
complete 29:2,
  73:15, 74:15,
  76:17, 95:12
completely 65:16,
  68:8, 88:17, 119:3
complex 9:25, 11:8,
  11:13, 11:16,
  12:12, 12:20,
  14:11, 19:16, 23:2
complexity 32:10
complicated 75:14
composed 99:16
composition 71:11
comprised 103:16
compromise 117:9
comptroller 14:23
compulsion 80:12
concededly 43:21
concept 113:15,
  121:6
concern 56:19, 90:8,
  92:3, 106:22,
  112:1, 118:8,
  118:9
concerned 34:10,
  113:13, 118:15,
  121:10
concerning 39:4
concerns 20:21,
  32:20, 39:22,
  53:22, 86:13,
  91:8, 91:24,

120:17, 122:2
conclude 17:2,
  44:18, 75:10,
  96:9, 100:2
concluded 30:15
concluded. 125:3
concludes 74:2,
  76:15, 77:14
conclusion 38:3
conducted 31:2
conference 10:14
confidence 88:10
confidential 15:15
confirm 39:16, 40:7,
  47:6
confirmation 40:1
confirmed 19:18,
  94:25, 109:20
confirming 42:2
conflict 86:19,
  86:20, 88:7,
  88:22, 100:19,
  100:20
conflicted 97:22,
  98:13, 98:17,
  115:7, 115:12,
  115:13
conflicts 121:6
confront 68:7
confronted 76:13,
  123:13
Congress 57:24,
  92:7, 119:19,
  119:22
Congressional 115:16
connection 7:2,
  8:10, 63:10,
  64:19, 77:23,
  80:25, 86:12
consensual 12:11,
  12:12, 13:7, 13:8,
  13:12, 17:12,
  17:13, 18:8, 18:9,
  19:15, 19:16,
  26:11, 47:5, 95:13
consensus 123:21
consent 24:8, 83:23
consequence 67:22
consider 23:18,
  69:7, 77:24

considerable 9:1
considerate 79:7,
  79:8
consideration 26:12
considerations 55:17
considered 11:22,
  72:25, 74:1, 97:6
Considering 68:16,
  103:14
consistent 121:18
consisting 126:4
constituencies
  122:10, 123:10
constituency 102:12,
  102:21, 103:7
constitute 93:15
constituted 8:15
Constitution 51:16,
  58:18, 74:7,
  75:24, 97:14
Constitutional 38:5,
  52:25, 64:11,
  65:19, 65:23,
  75:21, 83:24
Constitutionality
  71:3
Constitutions 64:6
construct 84:13,
  101:8
constructive 32:3,
  32:5
consulted 24:24
contained 124:3
contemplates 103:8
contemplation 110:6
contending 77:12
contends 68:3
content 21:13
contested 12:23,
  25:14, 39:4, 39:5
context 28:5, 31:7,
  35:6, 37:11,
  37:15, 53:18,
  56:1, 63:17, 69:3,
  92:23, 97:20,
  105:22, 118:5
contextualized 32:12
contingent 93:9
continuation 8:3
continue 5:17, 6:2,

52:6, 54:5, 90:3,
123:22
Continued 3:1
continues 6:22
continuing 99:20
contracts 64:6,
71:6, 97:13,
107:10
contrary 57:3, 124:2
contrasting 103:11
contributed 14:2
control 67:17, 69:6,
79:18, 83:4,
86:24, 91:16,
92:22, 98:18,
109:23, 121:13,
121:14
controversy 63:20,
84:4, 89:4, 89:14,
106:17
conversation 45:3
conversations 15:16
convinced 106:7,
121:4
Cooper 29:25
cooperation 19:20
core 16:16, 43:8,
106:18, 116:25
cornerstone 58:21,
66:16
Corp. 3:7
corporate 85:21
Corporation 3:4,
35:20, 70:9,
82:12, 94:9, 115:9
Correct 28:7, 34:14,
41:10, 41:15,
41:16, 46:17,
55:17, 55:19
correctly 85:8,
118:10
cosmetic 87:16
cost 12:16
Counsel 14:23,
14:24, 18:21,
20:13, 20:17,
23:14, 23:18,
24:5, 26:6, 27:6,
30:4, 33:18,
34:24, 40:10,

42:19, 45:2, 70:2,
76:18, 93:24,
109:3, 123:15,
123:16, 124:22
counter 81:10
countervailing
122:12
couple 33:16, 36:22,
37:13, 65:1, 96:7,
110:15
course 6:10, 11:15,
12:16, 13:4,
17:22, 33:19,
43:16, 45:11,
45:24, 79:25,
82:3, 124:2
courses 10:22
court. 63:13
Courthouse 18:18,
60:5, 60:6
COURTROOM 5:10,
18:18, 35:11,
54:9, 58:22, 91:6,
114:2
courts 43:13, 55:6,
71:23, 76:22
covenant 64:9
cover 58:5
Cowley 26:4
cramdown 122:25
crazy 68:13, 68:19,
72:1, 81:13
create 121:6
created 51:14,
57:13, 57:16
creating 82:21
creative 110:14
Credit 36:17, 82:1,
82:10, 82:11,
83:1, 83:25,
117:14
creditor 28:24,
36:7, 38:6, 70:18,
70:19, 83:16,
95:11, 98:3,
102:12, 102:21,
110:17, 110:18,
122:23
crisis 11:20, 88:10
critical 29:6,

29:21, 43:6,
43:12, 44:20,
120:4
critically 59:21
crossed 28:1, 28:7
crowd 120:9
crucial 29:19
crystal 114:2
CSR 126:14
cue 120:19
cueing 33:1, 33:12
cure 100:20
curious 23:20
current 24:6, 106:9
currently 48:9
cut 44:3, 58:11,
79:14, 107:14,
122:15


< D >

data 30:16, 114:19
date 18:14, 19:9,
26:13, 33:13,
48:18, 49:8,
49:19, 54:14,
54:19, 91:14,
92:12, 92:13,
96:20, 104:7,
114:8, 114:18,
114:20, 115:1
daughter 61:6
day 36:2, 55:25,
64:20, 108:24,
117:7, 119:17
daylight 89:13
days 21:2, 31:22,
32:6, 33:16,
36:21, 36:23,
37:3, 48:2, 49:17,
52:17, 52:18,
91:12, 91:23,
100:10
de 85:14
deadline 8:8, 32:23,
33:8, 33:21, 34:7,
34:10, 48:24,
52:7, 94:22, 95:5,
96:10, 96:15,
113:25, 114:1

deadlines 21:17,
  27:19, 27:22,
  28:3, 31:16,
  31:17, 32:18,
  32:19, 33:17,
  34:22, 35:9, 48:5
deal 31:12, 31:15,
  32:7, 50:15,
  65:24, 79:17,
  82:10, 82:14,
  110:5, 110:7
dealing 28:25, 36:3
deals 21:18, 107:18,
  107:19, 107:21
death 106:19, 117:1,
  118:24
Debevoise 6:23,
  6:24, 7:5, 7:6,
  7:10, 7:13, 7:24
Debt 57:22, 87:1,
  90:6, 97:17, 98:1,
  105:18, 105:19,
  112:11, 114:7
Debtor 1:35, 1:49,
  47:2, 56:25,
  60:20, 61:4, 61:6,
  61:7, 61:8, 61:9,
  61:16, 63:24,
  87:6, 87:23, 88:3,
  90:7, 95:9, 98:13,
  98:17, 105:6,
  106:19, 117:10
Debtors 1:18, 12:13,
  19:18, 44:13,
  44:16, 75:17,
  95:7, 95:12,
  95:16, 106:12,
  115:11, 117:6
debts 71:11
debunked 101:21
DECHIARA 3:31,
  40:24, 42:17,
  42:18, 44:5
decide 9:20, 31:23,
  36:9, 51:13, 53:1,
  53:4, 56:9, 56:18,
  63:15, 66:1,
  67:25, 71:1,
  92:10, 92:16,
  101:23

decided 36:22, 38:4,
  56:12, 63:16
decides 69:1,
  101:10, 101:12
decision 12:23,
  37:8, 53:18, 55:5,
  59:7, 72:2, 72:5,
  73:11, 118:21
decisions 54:16,
  60:1
decline 76:8, 118:16
dedicated 79:15,
  90:7
dedication 19:23,
  23:25
deemed 34:12
deep 14:17
default 36:16
defaulted 34:11
defective 63:18,
  64:16
defend 106:19
defending 93:19
defer 62:3
define 67:20
definite 47:24
degree 106:13,
  116:22
Dein 2:11, 6:4, 6:8,
  6:11, 21:20,
  21:22, 22:6, 22:9,
  22:12, 22:13,
  23:17, 24:4
delegate 121:23
delegating 100:21
delegation 100:17
demonstrated 77:9
denial 71:14, 81:9
denied 73:4, 77:16,
  77:21, 78:3,
  124:15
denies 82:24
Dennis 3:4, 35:19,
  64:24, 93:2
deny 84:6, 107:15
denying 64:19
Department 14:22,
  14:25
depend 99:21
depending 37:1,

118:5
DEPUTY 5:10
DERA 57:22
derivative 104:14
derive 105:15
derived 105:8
describing 30:10
deserve 62:10
designate 121:19
designated 10:12
designed 79:14,
  117:14
desire 119:4
Despins 3:20, 20:12,
  20:13, 20:20,
  21:15, 27:2, 27:5,
  27:6, 27:10, 28:7,
  33:25, 34:6,
  34:15, 35:24,
  36:8, 37:7, 37:18,
  71:13, 91:10,
  103:25, 104:3,
  104:5, 108:24
despite 27:18
detail 52:9
details 52:8
determination 19:23,
  33:3, 74:5, 74:7,
  75:20, 85:19,
  117:24
determinations 37:14
determine 16:15,
  16:21, 21:16,
  62:15, 63:12,
  75:9, 85:5, 92:13,
  98:7, 108:23
determined 57:1,
  60:18, 81:16,
  84:18, 84:19
determines 81:11,
  98:16
determining 82:1,
  112:21
Detroit 26:4
devastating 59:3
develop 26:7, 66:24
Development 15:1,
  66:10, 86:12
dialogue 16:4, 45:1,
  45:6, 121:4

difference 85:24
differences 41:21
different 24:21,
  29:17, 33:21,
  86:8, 91:7, 105:1,
  107:17, 115:8,
  115:19, 118:4
differently 89:10
difficult 54:15,
  54:23, 79:4,
  82:23, 108:19
difficulty 5:15,
  12:5, 124:21
diligence 19:20
diligently 6:2
direct 65:7
directed 77:23
directly 7:11, 8:5,
  12:6, 32:20,
  51:21, 60:3, 96:21
director 14:22
directs 81:25
disadvantage 30:5
disagree 8:3, 59:17,
  66:6, 101:13,
  116:14
disagreement 44:7,
  87:12
disagrees 44:11,
  101:10, 101:11
disapprove 89:12
discharge 43:18,
  43:22
discharging 38:8
discipline 43:18
disclosure 6:20,
  7:12, 30:25
discovery 21:25,
  23:3, 42:5, 88:16
discretion 29:2,
  56:14, 56:15,
  123:24
discuss 44:14
discussed 47:25,
  104:8
discussing 78:13
discussion 36:25,
  96:9, 106:5
discussions 21:11,
  27:23, 37:14,

45:9, 107:25
disingenuous 85:9
dislike 65:12
display 39:1
dispute 9:16, 9:20,
  10:21, 44:21,
  55:16, 70:12,
  91:6, 94:19,
  94:23, 102:19,
  105:5, 105:6,
  105:7, 112:25
disputed 17:24,
  67:12
disputes 10:11,
  22:1, 33:2, 43:10,
  43:17
disrespect 99:13
disruptive 31:25
distinct 30:5, 92:8
distinction 118:22
distinguished 6:13,
  8:20, 10:10,
  13:10, 13:25,
  20:16, 21:22
distribute 12:17
distributed 110:20,
  114:6
distribution 12:18
District 1:3, 2:5,
  2:6, 6:5, 8:6,
  8:18, 14:4, 14:5,
  14:15, 14:16,
  15:6, 18:18, 22:3,
  22:4, 23:4, 73:23,
  126:1, 126:2,
  126:7
diverse 28:12
divide 50:19, 98:1
divided 84:18
dividing 66:17
divvying 66:18
Docket 1:6, 1:24,
  1:40, 8:7, 8:8,
  22:10, 23:4,
  25:10, 33:19,
  40:3, 40:4, 41:6,
  41:11, 42:12,
  65:12
dockets 8:24
document 48:19,

58:18
documents 70:24,
  92:21, 105:8,
  110:21
doing 50:10, 65:11,
  112:6, 117:21
dollars 28:13, 52:9,
  61:5, 95:3, 96:14,
  102:9, 114:15
domain 70:19
dominant 94:24
done 19:11, 26:20,
  44:17, 46:9, 50:9,
  51:4, 82:6, 91:2,
  99:6, 104:15,
  108:18, 111:4,
  112:12, 113:14,
  114:21, 114:23,
  119:22, 120:13
doubly 100:4
down 26:16, 36:20,
  56:13, 56:14,
  59:1, 84:11,
  105:23, 122:8
dozens 43:19
drafts 26:10
drive 123:7
due 92:20, 97:3,
  97:20, 99:2
Dunne 3:4, 35:18,
  35:19, 36:15,
  37:16, 38:11,
  64:24, 65:3,
  70:11, 70:13,
  93:2, 95:7, 101:3,
  101:5
during 123:1
duties 22:1, 82:12,
  82:18, 85:25,
  86:25, 97:25,
  112:5, 113:5,
  115:18
duty 28:23, 38:8,
  88:1, 97:10,
  104:18


< E >
earlier 91:10, 106:5
Eastern 15:6

economic 86:2,
105:23
economical 73:17
economy 73:16,
76:20, 118:13
effect 8:7, 52:11,
69:8, 71:5, 87:2,
99:1
effective 72:13,
79:22
effectively 70:24
effectiveness 72:15
efficiency 55:16,
59:23, 69:24
efficient 33:24,
34:1, 39:21, 86:6
efforts 13:12,
107:25, 117:19
eight 41:23, 78:24,
79:4
eight. 42:11
eighth 42:9
either 11:18, 22:14,
84:19, 101:2
elapsed 38:25
element 30:21
elements 30:20
eligible 115:25
eliminate 11:10,
12:22, 13:5, 92:2
Ellen 3:7, 94:7
emanating 68:17
Emanuel 62:7, 90:16
embodied 46:13
emergency 88:19
eminent 70:19
emphasize 59:12,
88:6, 120:4
employed 7:4, 7:20
employee 43:18,
43:22, 43:23
Employees 1:30,
3:30, 42:19,
42:22, 45:1, 46:6,
69:19, 102:3
employment 39:14,
45:14, 102:10
empower 83:25
enable 113:20, 119:8
enact 57:21

enacted 11:19,
57:14, 57:19
end 10:9, 36:1,
55:24, 79:1,
114:11, 114:13,
117:6, 119:21
endeavor 80:16
endeavoring 121:6
endlessly 122:4
ends 7:5
enemies 108:5
Enforcement 57:22
engage 32:14, 32:21
engaged 41:24,
102:23
engagement 66:15
engaging 77:1,
102:16
engineered 85:11
enhance 17:12
enough 22:22, 82:5,
89:16, 97:17,
114:25, 120:4
ensure 6:9, 15:24
enter 6:7, 25:2,
40:3, 41:5, 45:21,
48:24, 49:8
entered 18:25, 25:11
entering 48:13
entire 19:21,
102:12, 123:9
entirely 63:5, 68:5,
82:9, 109:23
entities 15:4, 47:2,
92:8, 115:19
entitled 12:18,
54:2, 83:10,
118:17
entitlement 53:23
entity 28:13, 82:17,
82:19, 85:25,
86:1, 97:22, 98:2,
98:17, 112:14,
115:15
entry 40:3, 41:6
Epiq 39:14, 39:25,
40:2
equally 11:17, 16:10
ERS 31:6, 31:12,
40:7, 40:18,

40:19, 41:12,
124:7
especially 86:1,
102:14, 108:14
Esq 2:31, 3:26, 3:31
essence 52:2, 95:15
essential 95:25
essentially 97:21,
98:19, 104:14
estate 61:6, 61:11,
63:23, 87:24,
90:9, 98:12,
104:15, 110:17,
110:19
et 1:16, 2:20, 2:39,
3:11, 3:41, 28:14,
30:11, 31:24,
98:14, 98:17,
109:6
evaluate 73:21
evaluates 17:8,
17:21
evaluation 23:12
evaluative 17:3,
17:7, 17:14
event 49:9, 53:8
events 68:6, 91:17,
109:1
Everybody 35:16,
54:8, 54:10, 79:3,
85:17, 86:18
Everyone 5:14, 10:3,
22:16, 50:13,
78:23, 90:14,
97:1, 105:13,
108:16, 110:23,
114:2, 114:20,
119:25, 122:24
Everything 26:15,
29:5, 33:19,
38:21, 90:25,
91:2, 118:3,
118:18
evidence 91:18,
96:19
evolve 85:11
exact 28:10, 29:11,
90:23, 98:24
Exactly 34:6, 64:10,
70:13, 76:14,

109:24
examiner 26:8
example 31:5, 31:11,
  31:17, 34:2, 34:7,
  81:10, 121:23
excellent 109:3
except 20:21, 29:14,
  29:16, 54:21,
  56:5, 85:17
exception 12:2
exchanged 26:10
excited 30:14
exclude 101:14,
  102:22, 103:6
excluding 101:18,
  101:22
exclusion 103:11
exclusive 71:19,
  71:21, 123:24
excuse 65:4
executive 14:21,
  88:17
exercise 85:4, 85:25
exercising 111:21
EXHIBITS 4:9
exist 42:2
exists 93:18
expect 8:16, 36:13,
  37:7, 50:12, 83:5,
  85:9, 124:17
expected 54:19,
  55:1, 55:3
expedited 53:1
expeditious 24:2,
  73:17
expeditiously 10:8,
  23:7, 43:10,
  114:23
expense 12:15, 35:13
expenses 112:10
expensive 12:1,
  12:11
experience 10:16,
  23:1, 23:15
experienced 14:14,
  15:7, 17:16,
  17:20, 18:3,
  122:24
experiences 14:20,
  15:2

expertise 10:10,
  14:8
explain 15:13,
  41:22, 64:13
explained 18:25,
  59:21, 72:11,
  113:25, 114:14,
  119:4, 119:12
explaining 116:19
express 49:5, 53:16
expressly 113:4
extended 37:11
extension 41:18,
  46:12
extensive 14:12,
  23:1, 42:7
extent 19:3, 33:20,
  46:13, 77:25
extraordinarily
  9:24, 16:9
extraordinary 9:2,
  119:19
eye 19:12


< F >
F. 3:4
F.2d 73:11
F3d 73:24
face 9:25, 15:12,
  19:17, 90:19
faced 15:3, 116:7
faces 11:20
facilitate 9:3,
  18:8, 107:24,
  111:3
facilitated 17:3
facilitates 17:4
facilitative 17:3,
  17:14
facing 9:4
fact 11:21, 13:24,
  27:19, 35:1, 75:5,
  85:9, 86:16,
  87:25, 91:19,
  93:21, 103:14,
  104:17, 114:23
factors 73:12,
  73:21, 76:18
facts 108:19, 108:20

factual 11:14,
  37:17, 37:20
fails 97:21
failure 65:21
Fair 24:2, 29:7,
  29:8, 83:25,
  89:16, 108:1
fairly 23:7, 106:8
fairness 96:25
faith 9:22, 10:4,
  15:23, 15:25,
  16:3, 44:17, 88:23
fake 84:7, 100:23,
  101:8
fall 92:23
familiar 9:14, 54:13
family 23:22, 43:23
far 45:25, 96:11,
  108:20, 112:1,
  112:8, 112:19,
  113:25, 116:7,
  118:15
fast 92:4, 108:23
favor 76:18, 76:20,
  77:8, 110:9, 112:2
fear 15:19, 123:8,
  123:20
Federation 44:25
fee 8:13, 25:23,
  26:8, 26:11
feeds 69:23
feel 32:5, 33:5,
  33:20, 53:12,
  56:8, 62:13
fellow 8:21
felt 23:14, 57:21,
  71:23
few 5:15, 6:1, 6:17,
  8:19, 17:1, 21:21,
  27:13, 33:16, 50:9
FGAC 104:25, 105:15,
  116:14
fiduciaries 84:7,
  104:16
fiduciary 28:17,
  28:23, 37:19,
  82:11, 85:22,
  85:25, 97:9,
  100:23, 100:24,
  101:2, 101:8,

104:19
field 8:20
Fifth 57:12, 71:4
fight 95:18
figure 89:21, 108:9
figured 107:25
file 8:7, 25:1,
  25:5, 31:22,
  31:23, 32:1, 34:7,
  41:13, 46:1,
  49:16, 69:25,
  90:5, 120:21,
  123:25
files 61:4
filing 18:14, 41:14,
  67:13, 73:9,
  75:16, 107:11
filled 48:18
final 11:24, 42:8,
  47:25, 52:23,
  53:18, 124:14
finality 61:3, 98:25
Finally 15:13,
  16:13, 19:10,
  72:10, 77:8, 81:9,
  97:16, 100:2,
  113:14, 119:12
Financial 1:9, 1:24,
  1:40, 3:14, 3:22,
  7:14, 11:20,
  14:11, 16:9,
  16:19, 29:24,
  30:19, 66:23, 70:8
find 16:18, 46:3,
  52:14, 97:21,
  108:10, 124:6
finding 9:24, 19:15,
  36:21
fine 34:13, 48:2,
  49:4
finish 88:7
finished 23:12
firm 7:7, 7:8, 7:13,
  7:15, 14:7, 14:9,
  42:18
firms 7:17, 10:20,
  30:2, 109:10
Fiscal 3:13, 30:8,
  30:10, 30:11,
  30:12, 30:15,

66:11, 66:15,
  79:24, 82:6,
  86:20, 88:8,
  88:16, 88:19,
  88:21, 91:9, 95:8,
  95:10, 95:17,
  97:18, 105:10,
  105:13, 110:8,
  111:10, 112:9,
  115:22, 117:23,
  119:9, 119:14,
  122:1
fit 50:17
fits 31:11
five 7:21, 10:10,
  11:3, 13:13, 48:2,
  49:17, 60:10,
  71:20, 81:20,
  81:21
flow 114:9
focus 33:1, 39:4,
  84:14, 95:20
focused 46:15
focusing 28:24
foibles 23:18,
  23:19, 23:23
follow 78:18
Following 18:24,
  60:17, 73:3,
  74:25, 75:16,
  92:21, 113:18
footnote 96:17
for-profit 82:12
force 16:17, 54:14,
  54:15
forced 52:22
forcing 91:22
forefront 66:21
foreseen 89:23,
  89:24
forgotten 35:6
form 40:3, 40:21,
  47:6, 47:7, 55:16,
  96:20
formal 7:7, 9:17,
  18:10, 48:2
formally 7:8
former 7:24, 14:6
formerly 7:4, 7:17
formula 49:6, 49:18

forte 79:10
forth 84:4, 94:23,
  101:18
forthrightly 100:18
fortunate 8:25, 22:2
forward 19:24, 23:5,
  24:1, 26:19,
  31:13, 44:16,
  49:7, 49:22, 59:3,
  72:20, 89:21,
  90:5, 103:19,
  108:10, 123:4,
  123:23
found 83:16, 96:12
foundational 58:18
founded 56:23
four 73:12, 73:20,
  86:5, 109:7
fourth 90:2
frame 21:7, 100:25,
  117:2
framed 68:4
frank 15:16
Frankel 50:5
frankly 62:19, 91:6,
  111:19
fraud 23:13
free 15:18, 16:23,
  71:23, 97:13,
  97:14
Friedman 3:17
frivolous 75:8
front 23:11, 52:15,
  67:2
full 20:4, 79:16,
  82:10, 83:9, 84:9,
  99:19
full-time 23:25
fully 33:4, 37:7,
  38:2, 55:12, 62:2,
  77:1, 77:3, 85:9,
  90:4
function 42:25
functioning 43:12
Fund 3:11, 3:33,
  3:40, 50:1, 74:4,
  74:17, 75:19,
  78:16, 79:13,
  79:24, 82:21,
  84:2, 85:15

fundamental 51:13,
   52:24, 86:19,
   106:10
fundamentally 57:25
Funds 50:5, 50:7,
   50:9, 52:6, 53:12,
   53:24, 54:4,
   59:19, 62:13,
   63:3, 86:23, 88:8,
   91:22, 100:14,
   101:20
future 7:24, 118:13,
   122:15


< G >
game 80:5
garner 24:15
Garrison 34:19,
   67:8, 78:22, 96:5
gather 23:8, 78:10
gathered 5:6, 5:20
gating 91:21, 114:3
gave 59:4, 92:7,
   117:3, 121:14
Gebhardt 26:3
General 2:34, 21:17,
   37:23, 38:8, 67:9,
   115:20, 116:12,
   122:23
generally 27:13,
   29:1
generates 43:16
gentleman 42:15,
   47:10, 67:2, 67:3,
   67:4, 67:5, 69:16,
   71:25
gets 98:3, 98:14,
   113:14
getting 34:2, 34:11,
   54:2, 55:11, 91:11
gifts 108:4
give 15:2, 18:10,
   23:12, 28:11,
   32:4, 36:10, 49:1,
   55:11, 79:15,
   82:25, 84:1,
   85:20, 87:13,
   89:25, 100:25,
   108:1, 113:4,

116:24, 118:6
Given 13:7, 14:12,
   30:18, 43:19,
   45:19, 48:5,
   50:18, 53:24,
   54:23, 64:9, 79:3,
   100:4, 104:14,
   106:18, 108:1,
   115:8, 116:3,
   117:22, 122:18
gives 15:11, 81:21,
   81:22, 105:20
giving 37:10
glad 28:7, 45:7
Glendon 2:38
global 31:7, 31:14,
   45:20
goal 9:23, 10:1,
   10:3, 103:4,
   114:9, 116:4
goals 111:17
GORDON 3:37, 69:17,
   69:18, 69:23,
   70:6, 102:1,
   102:2, 103:14
Gos 36:6, 37:20,
   38:2, 72:1, 99:24,
   122:18, 123:14
Gotshal 86:9
Government 1:31,
   42:25, 121:4,
   121:9, 122:2
governmental 14:19,
   15:3
governor 14:24
governs 75:17
grab 118:3
grant 48:5, 74:21,
   103:20
granted 8:11, 25:9,
   40:2, 41:4, 46:13,
   49:21, 65:15,
   85:10, 93:13
granting 67:22,
   69:11
grants 46:14,
   103:19, 122:3
grateful 5:14
gratified 6:12
grave 43:22

great 19:23, 51:9,
   79:18, 109:14
greater 99:6
greatest 99:25,
   116:9
green 65:3
grievance 43:9,
   43:12, 44:3
grievances 43:17,
   43:20, 44:9, 44:15
ground 9:22
grounds 83:23
Group 2:33, 3:33,
   28:15, 28:24,
   34:20, 50:1, 50:5,
   65:10, 67:8, 74:4,
   74:17, 75:19,
   78:16, 79:13,
   99:10, 104:10
groups 10:23, 32:14
grow 6:22
Guarantee 7:1, 70:8,
   86:9
Guaranty 3:6, 3:22,
   3:43, 94:9
guess 32:7, 49:2,
   59:22, 65:4, 98:8,
   116:14
guidance 36:10,
   62:16, 82:16
guides 36:18
gun 54:16, 54:18,
   54:25, 55:8, 55:9
Guy 26:3


< H >
half 29:14, 30:3,
   38:24, 50:12,
   78:8, 85:12, 104:1
HALSTEAD 3:7, 94:7,
   94:8, 94:17, 96:1
hand 35:2, 35:3,
   117:13
handed 56:13
handled 89:10
handling 23:1, 23:6
hands 25:7, 123:25
hanging 23:16
happen 88:3

happened 45:24
happening 22:20,
  108:25
happens 14:5, 52:19,
  66:22, 71:7, 86:24
happy 93:17, 107:23,
  114:18, 119:25
hard 21:6, 90:19,
  109:12, 110:16,
  120:9
harm 77:10
harms 73:21, 77:8
Hastings 27:6
hat 89:4
hate 22:22, 100:3
head 54:17, 54:19,
  55:1, 55:8
headed 10:19
healthy 118:2
hear 5:13, 8:14,
  16:11, 22:14,
  44:1, 45:7, 50:21,
  66:8, 66:13,
  66:19, 68:21,
  83:6, 84:22,
  88:14, 120:2,
  120:3, 124:8,
  125:1
heard 8:12, 12:9,
  16:10, 21:16,
  27:10, 27:18,
  29:10, 43:3,
  50:13, 52:3, 54:7,
  64:25, 72:10,
  72:16, 72:18,
  78:14, 79:3,
  97:17, 105:21,
  114:15, 120:24,
  122:9
HEARING 2:4, 2:9,
  5:22, 5:24, 12:3,
  12:5, 15:20,
  21:15, 24:14,
  24:16, 26:5,
  26:13, 33:13,
  45:23, 49:2, 49:3,
  114:22, 124:21
heart 52:25, 86:18,
  121:23
heavily 72:2

heightened 113:15,
  113:18
held 13:22, 18:17
help 6:8, 6:14,
  15:24, 17:17,
  17:20, 33:18,
  38:17, 53:9,
  89:22, 106:4,
  116:22
helpful 45:6, 121:17
helping 23:6
heresy 104:13
herself 21:21, 52:14
hierarchy 64:11
high 13:22
highest 14:1
highlight 13:17
highlighted 75:15
highlights 75:25,
  95:4
highly-respected
  14:10
Highways 1:46
hijack 62:13
hinges 72:2
hired 91:12
historic 24:3
Hoc 2:33, 3:36,
  6:24, 67:8
Hold 28:19, 78:6
holder 96:6, 105:12
holders 28:20,
  30:22, 31:1,
  84:16, 86:10,
  101:14, 102:9,
  105:14, 105:18,
  105:19, 108:22
holding 115:9
holy 30:9
Honestly 48:14
Honorable 2:5, 2:10,
  2:11, 9:7, 12:7,
  22:13, 70:21,
  71:1, 71:7, 126:6
hope 17:9, 35:9,
  38:20, 44:18,
  44:21, 65:15,
  81:15, 116:17,
  124:6
hopeful 6:14, 38:19

Hopefully 16:5,
  18:7, 35:10, 35:15
hopes 54:9
hospitals 42:25
hour 50:13
Houser 2:10, 6:17,
  8:17, 8:19, 9:6,
  9:7, 12:7, 20:1,
  20:5, 21:8, 32:8,
  54:7, 59:25,
  66:12, 88:14,
  108:11
Housing 14:25
HTA 33:10
Huge 11:25
hundreds 10:19,
  29:15, 43:20,
  45:16
hyphen 73:23
hypothetical 35:21


< I >
idea 23:19, 45:6,
  91:7, 122:5
ideal 11:9, 17:15
ideas 17:4
identical 41:12,
  41:13, 71:21
identified 9:22,
  52:10
identify 48:12,
  76:18
identifying 48:6
ignore 93:7, 95:16
II 3:11
III 1:8, 5:22, 7:3,
  7:10, 7:16, 7:22,
  8:24, 10:8, 11:8,
  12:1, 12:14,
  15:12, 62:22,
  62:24, 63:20,
  66:22, 67:13,
  68:12, 68:18,
  71:19, 73:9,
  74:16, 75:1,
  75:16, 76:22,
  77:5, 77:19,
  86:22, 91:24,
  107:8

illegal 30:10
imagine 89:24
immediate 33:21
imminent 55:8
impact 29:5, 59:3,
  59:8, 73:20,
  95:19, 102:19
impair 118:12
impartial 8:1
impasse 121:16,
  122:4, 123:22
impedes 7:25
impediment 48:11
implementing 9:11
implicate 32:20
implicated 69:2
implicating 68:17
implications 106:20
importance 32:9,
  36:17, 58:20
important 10:5,
  15:14, 16:9,
  28:20, 28:21,
  29:19, 30:6,
  30:16, 31:9,
  44:20, 59:22,
  62:14, 87:10,
  90:6, 100:4,
  108:12, 108:13,
  120:4, 123:11
importantly 16:10,
  28:16, 66:14
impose 113:18,
  116:19
imposed 73:8
impossible 82:23,
  100:20, 111:24,
  113:12, 114:4
impression 11:12,
  11:19
impressive 8:22,
  22:9
improper 64:17,
  101:4, 103:6
improve 119:18
in. 23:14, 28:4,
  29:9, 48:18
inappropriate 87:20,
  87:21, 102:22
inappropriately

67:17, 85:3
Inc. 3:11, 3:26,
  7:1, 73:10
incentive 79:7,
  80:10
incentivized 54:13
inclined 52:20,
  72:6, 103:19
include 42:22,
  94:13, 102:10,
  106:11
included 20:4, 22:9,
  103:1, 103:21
includes 23:3
Including 8:8,
  16:24, 23:2, 26:8,
  37:20, 45:14,
  50:18, 75:7,
  75:17, 84:4,
  101:15, 122:20
inclusion 102:14,
  103:8, 103:10
inconsistent 122:1
incorporated 80:25
incorporates 49:18
incredible 35:12
incurred 35:13
independence 86:13
independent 8:1,
  26:8, 87:17,
  87:23, 90:22
indicated 39:17,
  41:19, 44:13
indicates 20:8,
  102:8
indicating 6:25,
  25:7
indifferent 80:7
individual 7:20,
  61:5
individuals 20:7
indulgence 27:14
Industries 73:10
inevitable 11:16
inexplicable 102:17
infancy 11:15
infirm 93:6, 93:22,
  94:4
influence 111:22,
  119:5, 123:20

information 107:13
informed 33:7,
  33:23, 37:9, 60:21
informs 36:18
ingenuity 19:20
ingredient 108:12
inherent 74:13
initially 29:12,
  30:2, 32:3, 106:3
injunction 33:10
injured 118:14
innerworkings 14:19
input 23:11, 100:8
inquiry 96:24
insert 25:13
insight 15:2, 15:11,
  18:2
insights 18:5, 18:7
insofar 84:13
insolvency 8:20,
  11:25, 13:18,
  13:21, 14:8
instance 32:22,
  60:2, 74:9, 118:1
instead 63:12, 68:7,
  68:10
institution 59:2,
  59:18, 86:18
instruct 106:14
instruction 62:16
Insurance 3:23
insure 37:22
insureds 99:13
insurer 33:11
insurers 37:22
intact 59:19
integrity 88:24,
  109:9
intend 44:16, 99:18,
  99:19
intended 21:4,
  117:12
intending 36:12
intent 112:15
intention 99:24,
  107:15, 109:17,
  116:24
Interamericas 3:25
intercircuit 10:13
interesting 11:16,

31:4, 118:9
interests 17:19,
    73:16, 76:20,
    84:15, 102:5
interim 8:13, 25:22
International 3:29,
    3:31, 42:19
interplay 75:23
interpleader 32:23,
    35:22, 69:4, 88:15
interrupt 27:25
intervene 31:17,
    32:24, 32:25,
    33:6, 33:22, 34:8,
    35:25, 37:8,
    37:12, 121:17
intervention 31:23,
    32:2, 33:4, 33:6,
    36:10, 36:22,
    62:22
intracofina 33:1
introduce 6:11,
    6:16, 20:13,
    21:21, 23:8, 42:15
introduction 20:5,
    54:7
introductions 6:19
intuitively 107:6
investigation 30:24
Investigative 96:12
Investment 2:28,
    34:8
invite 8:17, 21:20,
    24:5, 25:20,
    107:12
invoke 48:8
involve 43:21, 56:2
involved 6:21, 7:11,
    19:13, 19:20,
    28:4, 30:4, 43:23,
    91:11, 103:21,
    105:22
involvement 6:14,
    99:7
involves 21:11,
    61:2, 75:23, 76:10
involving 14:11,
    35:14, 69:4, 83:13
island 28:19, 29:5,
    29:21, 32:5,

42:25, 54:11,
    58:20, 103:3,
    116:2, 116:3
issued 36:13
item 20:4, 49:25,
    65:12
items 8:9, 25:13,
    38:15
itself 49:6, 55:5,
    86:2, 90:1, 90:7,
    105:9, 107:6


< J >
janitors 42:23
Jason 3:11, 50:8,
    100:13
jawboned 119:24
Jenner 69:18, 102:2
job 79:18, 80:11,
    80:13, 80:14
jobs 99:22
John 3:15, 121:1
join 7:13, 29:13,
    63:4
joined 6:4, 45:1
Joint 1:26, 1:42,
    25:15, 39:15,
    39:18, 39:25,
    40:6, 40:23, 41:4
Jointly 1:11
Jonathan 3:43, 86:8
Journalism 96:12
Juan 5:1
Judges 6:13, 8:21,
    9:2, 10:10, 11:4,
    13:11, 13:13,
    13:19, 17:15,
    18:3, 20:17, 22:4,
    22:6, 23:4, 23:12,
    26:1, 116:21
judgment 11:24,
    33:12, 81:19
judicial 10:14,
    22:1, 71:9, 71:10,
    73:16, 76:20,
    115:16
Judiciary 10:7, 56:3
Judith 2:11, 6:4,
    21:20

July 31:21
jump 66:18
June 41:8
junior 82:9, 83:6,
    85:6
juniors 82:20, 84:1,
    85:12, 85:15
jurisdiction 71:20,
    71:22, 74:25,
    75:10, 75:11,
    77:24
jurisprudence 64:12,
    68:16
jurist 8:20, 14:10,
    21:23
justifying 96:20


< K >
keep 79:6, 85:12,
    114:19
key 27:15, 30:13,
    54:23, 104:6
kind 34:10, 65:6,
    66:23, 93:10,
    112:14
kinds 114:24, 116:3
Kirpalani 3:41,
    62:5, 62:6, 62:7,
    65:25, 90:15,
    90:16, 93:24,
    109:7, 109:14
Klein 15:5, 15:9
knowing 114:5
knowledge 14:17,
    14:18, 31:2,
    118:20
known 10:20, 14:8,
    35:4, 103:5
knows 112:6, 115:18
Kramer 50:4, 78:13


< L >
L-i-n-a-r-e-s 47:20
labor 28:14, 43:13
laboring 99:20
lack 55:15, 62:21,
    63:19, 67:12,
    118:20

lacks 63:20
landscape 93:18
language 23:16,
  106:23
large 7:17, 43:16,
  52:11, 99:17,
  115:9
largely 99:16
larger 94:24, 103:15
largest 102:12,
  102:21
Last 24:14, 24:16,
  35:23, 37:17,
  42:12, 45:4,
  47:19, 49:17,
  66:6, 78:19, 85:18
Late 42:7, 52:19
later 19:1, 21:15,
  26:12, 57:13,
  63:8, 66:20,
  114:18, 114:20
latter 25:4, 39:17
Laura 2:5, 126:7
Lavan 7:19
lawful 105:11
laws 56:22, 57:25,
  64:8, 71:6, 71:10,
  122:20
lawsuit 64:5, 64:13,
  64:16, 82:13,
  82:14
lawyer 13:18, 122:24
Lawyers 6:21, 13:23,
  14:1, 18:11,
  23:10, 29:15,
  121:10
lead 50:7
leader 6:17, 8:20
leadership 9:1
least 12:9, 51:8,
  53:15, 56:1,
  76:13, 89:5,
  90:20, 96:7,
  117:6, 124:6
leave 23:20, 50:25,
  84:1, 84:23,
  118:14, 119:2
leaves 109:4
LECAROZ 2:16, 25:24,
  25:25, 26:2,

26:17, 26:20
left 7:13, 27:24,
  39:2, 51:8, 60:10,
  65:23, 69:22
legal 11:14, 11:18,
  17:21, 44:7,
  64:21, 75:7,
  84:20, 92:8, 92:9,
  93:18, 100:15,
  101:22, 103:4,
  109:9, 117:7,
  117:9
legally 93:5, 93:22,
  94:3, 101:4,
  112:12
legislation 93:13,
  93:15
legislature 61:12,
  61:14
lend 9:1
length 11:23, 119:13
less 9:17, 35:20,
  37:2, 55:2, 80:11,
  100:15, 115:12,
  116:7
level 43:1, 68:21,
  116:1
leverage 118:20
Levin 50:4, 78:13
Levine 2:25, 44:24,
  44:25
Lex 63:5, 64:16,
  67:11, 67:14,
  67:23, 68:3, 68:5,
  68:10, 72:7, 73:4,
  74:9, 74:23, 75:3,
  75:11, 77:3,
  77:16, 77:18,
  77:25, 123:3
liability 102:8
lien 70:24, 83:9,
  83:11, 83:21,
  83:22, 85:18,
  118:4, 122:19,
  122:22
lienholders 122:11,
  122:13
liens 35:5, 93:14,
  105:11
lies 105:7

Lift 31:5, 31:12,
  44:3, 45:10,
  45:21, 50:1,
  55:18, 62:19,
  63:17, 63:18,
  64:19, 67:21,
  70:20, 73:4, 73:8,
  73:13, 73:22,
  74:2, 77:15, 124:7
lifted 68:3, 74:10
Lifting 67:16,
  74:20, 76:18
light 38:16, 38:24,
  38:25, 50:11,
  65:3, 75:4, 78:2,
  78:8, 79:9
lighted 39:1
lightly 100:24
lights 50:11
likelihood 51:18
likely 11:18, 38:4,
  55:25, 56:10,
  68:20, 75:23,
  76:16, 77:10
limited 62:12, 94:10
limits 80:9
LINARES 2:31, 47:11,
  47:13, 47:17,
  47:19, 47:20,
  47:21, 47:23,
  48:10, 48:14,
  48:16
line 5:8, 24:13,
  121:10
lined 95:20, 121:10
linking 25:10
liquidation 61:4
liquidity 95:2
list 91:13, 109:14
listened 73:1
listening 5:21,
  22:16, 121:3
literally 32:13
litigant 98:12,
  98:14
litigants 89:15
litigate 11:24,
  77:5, 80:16,
  116:25, 117:18,
  118:17, 118:18,

118:24, 122:4,
123:22
litigated 17:18,
98:21, 117:10
litigates 79:19,
98:19
litigating 11:11,
61:21
litigations 66:10,
74:10, 95:14
litigator 14:10
little 5:16, 12:4,
23:9, 23:10,
26:15, 35:23,
58:11, 62:13,
65:2, 66:20
live 29:5, 50:21
livelihood 99:22
lives 14:6
LLC 2:28
LLP 6:23, 7:19,
7:21, 24:10,
34:19, 42:18
loan 53:19, 53:23,
54:3
local 20:13, 20:17,
56:6, 70:22, 76:11
locations 124:25
logistical 124:20
long 23:13, 39:5,
41:13, 61:7, 83:4,
83:12
long-winded 85:1
longer 5:16, 7:14,
12:2, 12:10, 32:8,
52:18
longshot 54:22
look 15:14, 19:24,
31:8, 33:16,
35:11, 49:16,
49:22, 51:6, 51:7,
80:8, 88:20, 97:2,
97:3, 118:22,
119:24
looked 49:17, 97:4,
116:6
looking 23:5, 24:1,
34:25, 35:2, 35:7,
41:11, 76:7,
99:11, 100:9

lose 83:6
loses 51:19
losing 55:4, 66:22,
123:8
lost 5:8, 5:10
lot 22:19, 24:16,
52:18, 56:12,
56:14, 72:4, 91:5,
99:5, 105:22,
115:8, 115:9,
115:25, 116:1
lots 89:6, 115:24
Love 35:1, 82:4
lower 12:16
Ltd 3:40
Luc 3:20, 20:13,
27:5, 104:5
lucky 108:24
lunch 124:6
Lyonnais 82:1,
82:10, 82:11,
83:1, 83:25,
117:14


< M >
M. 3:7
ma'am 26:14, 47:17
machinery 43:9
MAGISTRATE 2:11,
6:4, 21:20, 22:4,
22:6, 22:13,
22:18, 22:24
main 58:4
maintaining 43:12,
70:3
man 27:13
manage 86:5
managed 53:17
Management 1:10,
1:25, 1:41, 21:25,
22:5, 23:2, 43:19,
72:13, 115:10
manager 101:20
mandate 104:20
manner 77:2
manufactured 91:24
March 13:24, 123:13
mark 19:9
markets 119:9

Marrero 14:15,
14:16, 14:18, 15:2
Martin 2:21, 3:23,
24:9, 60:15, 70:7,
104:24, 108:6
Mass 23:10
Massachusetts 6:5
Master 3:40, 40:4
material 39:5
matter 23:21, 41:14,
43:16, 49:14,
51:25, 52:21,
55:18, 55:21,
58:19, 59:23,
70:1, 74:24,
75:10, 75:11,
75:21, 77:24,
78:15, 86:16,
87:22, 95:15,
123:9
matters 6:1, 7:22,
9:16, 9:20, 12:24,
20:23, 22:7, 23:2,
23:3, 23:6, 23:7,
24:3, 28:3, 31:11,
31:14, 31:19,
32:3, 38:14, 39:4,
39:23, 43:17,
43:21, 43:22,
44:3, 45:11,
45:14, 70:3,
70:25, 85:11
Maximiliano 3:26,
70:18
maximize 87:5,
87:24, 88:2,
117:15, 117:17
maximizing 84:14,
117:25
maximum 84:23
Mayer 3:34, 78:12,
79:11, 79:12,
85:7, 92:20,
100:23, 101:3,
101:5, 110:7
mayor 14:21
mean 28:20, 31:19,
51:2, 89:22,
109:14, 119:7
meaning 51:17

meaningful 29:9
means 28:17, 29:10,
  29:23, 64:12,
  64:13
meant 35:23
mechanical 121:21
mechanism 54:22
mediate 10:11
mediated 10:19,
  11:2, 11:6, 11:7,
  18:6
Mediations 9:15,
  9:19
mediator 14:10,
  14:14, 17:4, 17:8,
  17:17, 17:20,
  54:12
mediators 15:17,
  15:18, 15:24,
  16:3, 16:11,
  16:16, 17:15,
  19:22, 55:12,
  124:18
meet 19:5, 32:13,
  44:13
meeting 18:11,
  18:16, 18:17,
  18:22, 18:23,
  21:4, 21:10,
  21:14, 31:21
Mellon 32:22
member 9:25, 10:16,
  13:16, 17:22,
  17:25, 122:21
Members 5:6, 5:20,
  10:12, 11:4,
  18:16, 19:6,
  19:14, 38:7, 43:7,
  45:4, 111:20
memory 32:18
mentality 123:10
mention 35:5, 52:9,
  99:9
mentioned 20:23,
  31:14, 34:25,
  83:20, 90:18,
  95:1, 99:16,
  116:21, 120:14
message 53:16
met 45:4

microphone 5:18,
  12:6, 124:23
midnight 53:8
mightily 14:3
Milbank 35:19, 64:24
million 52:9, 61:5,
  95:3, 96:14,
  114:14
millions 28:13
mind 28:3, 37:6,
  39:6, 50:24, 79:5,
  87:9
minimal 82:15
minimis 85:15
minor 43:21
minute 58:9, 60:10,
  72:22, 78:7, 78:9,
  100:15
minutes 5:15, 6:18,
  35:20, 50:11,
  50:12, 50:18,
  50:20, 51:1, 51:6,
  51:7, 69:21, 78:8,
  78:22, 79:2, 79:4,
  79:6, 86:5, 90:12,
  90:13, 90:14,
  104:1, 106:3,
  124:6
misdefines 105:3
mission 111:14,
  111:25, 113:21,
  119:8, 120:5
missions 111:11
mixed 56:2, 56:6,
  56:19, 63:25,
  75:25, 76:4,
  76:10, 76:14
modestly 43:1
modified 40:12, 78:2
MOERS 3:34, 78:12,
  79:12, 85:7
moment 5:11, 6:20,
  27:25, 41:3, 52:1,
  53:13, 56:16,
  104:18
money 9:18, 11:10,
  29:3, 52:17,
  82:24, 84:14,
  84:17, 84:23,
  84:25, 96:18,

98:10, 110:16,
  110:19, 112:13,
  116:2
monitors 111:21
Monsita 2:16, 26:2
month 23:13, 29:14,
  122:9
month-long 23:13
months 21:3
monumental 32:9,
  59:8
mostly 53:15, 82:8
motions 18:14,
  18:15, 27:18,
  32:24, 39:10,
  39:19, 39:20,
  39:22, 45:10,
  73:22
motivation 119:10
mouth 124:24
movant 60:11
movants 65:6, 67:16,
  73:12, 76:15,
  76:18, 77:9, 77:17
move 23:6, 38:15,
  78:4, 108:10,
  123:23
moved 25:14
moving 92:4
MS 2:16, 2:25, 3:7,
  3:16, 25:24,
  44:24, 46:25,
  47:3, 47:4, 48:17,
  48:20, 48:22,
  49:1, 49:10,
  49:12, 49:20,
  49:23, 94:7,
  94:17, 96:1
Mungovan 2:23
Municipal 45:1,
  82:17, 94:9
Mutual 3:33, 50:1,
  50:5, 62:13, 63:3,
  74:4, 74:17,
  75:19, 78:16,
  79:12, 91:22
Myers 47:1
myself 7:12, 8:4,
  23:22

< N >
N. 2:35, 3:11
Naftalis 50:5
name 20:12, 47:15,
  69:18, 87:19
namely 75:23
Nancy 14:4
narrower 46:15
National 3:43,
  10:15, 86:9,
  90:18, 90:21,
  93:25
nationally 10:20,
  14:7
natural 108:25
nature 66:21, 75:25,
  121:21
necessarily 84:25,
  119:22, 120:20
necessary 101:6
needed 22:7, 53:12,
  89:10, 110:12
needs 29:7, 31:8,
  31:15, 32:13,
  50:13, 53:3,
  54:12, 58:22,
  60:8, 61:19, 87:3,
  91:12, 108:22,
  118:2
negative 114:11,
  114:12
negotiate 13:12,
  80:17
negotiated 9:3,
  9:16, 11:9, 12:20,
  13:5
negotiates 79:20
negotiating 123:2
negotiation 89:11,
  115:16
negotiations 6:15
nevertheless 71:22,
  98:3
New 5:13, 5:21,
  11:19, 14:16,
  14:21, 14:22,
  14:23, 14:24,
  18:17, 32:22,
  38:15, 59:4, 69:4

newness 100:5
news 25:13, 25:17,
  114:15
Next 18:10, 26:13,
  33:16, 36:22,
  46:23, 48:2, 49:2,
  49:11, 49:25,
  62:3, 65:12
nice 46:2, 46:6,
  110:18
night 42:12, 45:4
Nine 15:10
nix 112:2
No. 1:6, 1:24, 1:40,
  48:14
nodding 53:14
nominate 87:19
nomination 101:19
nonduplicative 39:3,
  79:7, 86:4
None 4:5, 4:11, 7:24
nonglobal 31:19
nonimpairment 64:9
nor 7:7, 18:2, 76:17
Northern 8:18
nose 86:15
not-for-profit 86:17
note 8:10, 37:20
noted 55:14, 67:10,
  115:4
notes 39:25
nothing 72:18, 84:1,
  85:20, 85:22, 98:9
notice 8:7, 18:10,
  18:25, 22:10,
  45:20, 49:16,
  49:17, 63:9,
  77:22, 91:25,
  94:12
noticed 49:13
notion 37:25, 56:22,
  66:6, 106:25,
  113:8, 118:1
Notwithstanding 7:23
novel 11:8, 11:13,
  12:12
novelty 11:20
November 114:12
number 6:21, 20:2,
  32:2, 35:12,

37:21, 37:22,
  40:3, 41:6, 41:11,
  42:12, 43:17,
  58:8, 65:19, 66:9,
  66:13, 97:17,
  98:2, 111:1
numbers 25:10, 82:6
numerous 76:23
ny 87:18


< O >
O'melveny 47:1
O'neill 20:16, 20:17
object 25:5, 43:4,
  72:6, 80:6,
  102:14, 102:16,
  103:10
objected 83:3
objecting 41:25,
  105:1, 105:14
objection 25:7,
  31:23, 42:9,
  68:20, 72:8, 93:4,
  94:18, 94:21,
  98:20, 104:25
objections 8:3,
  40:8, 41:24,
  42:13, 46:19,
  47:8, 55:24,
  78:16, 78:17,
  88:17, 90:22,
  90:24, 94:10,
  95:21
objective 113:23
objector 47:5
objectors 50:19,
  50:21, 65:1, 75:2,
  75:15, 76:11,
  78:15, 78:17
objects 79:13
obligated 75:9
Obligation 2:34,
  37:23, 67:9
observations 121:18
obstacle 95:13
obviate 65:16
obvious 13:7, 98:13,
  116:14
obviously 24:25,

45:5, 81:15, 109:2
occur 16:4, 66:9,
    67:25, 68:14,
    74:12
occurred 31:3
odd 65:6, 83:13
offer 7:7, 107:23
offered 4:5, 4:11
Office 8:12, 18:20,
    26:4
officer 80:19
offices 42:24, 42:25
Official 3:19,
    18:21, 69:19,
    91:10, 99:15,
    102:3, 126:15
often 9:22, 55:7,
    88:15
Okay 31:4, 34:15,
    39:8, 48:16,
    49:20, 58:10,
    58:11, 83:3,
    87:16, 90:12,
    104:3, 109:24,
    117:12
old 22:22, 57:4
omission 102:17
Omni 49:7, 49:11,
    120:21
Omnibus 2:4, 2:9,
    5:22, 26:13, 49:2
once 5:19, 47:15,
    57:12, 62:24,
    66:22, 78:3,
    119:23
one-way 80:1
one. 37:17, 109:14
ones 93:24, 95:22,
    99:25, 106:7
online 15:20
open 15:16, 16:5,
    66:14
opera 124:24
operational 45:11
operations 52:6
opinions 13:20
opponent 60:11
opponents 124:8
Opportunities 2:39,
    19:5, 68:23, 69:3

opportunity 18:24,
    19:4, 50:14, 79:3,
    91:16, 120:21
oppose 70:13, 110:4
opposed 53:10,
    62:20, 84:15,
    100:9, 108:10,
    115:21
opposing 18:15
opposite 38:3,
    70:12, 89:9, 99:1
opposition 67:9,
    70:3, 78:10,
    120:21
oppositions 78:24
opted 115:20
optimistic 10:2
oral 25:8
orally 36:13
orderly 68:25
Orders 39:18, 39:23,
    80:13
ordinary 45:11,
    45:24, 84:24,
    122:14, 122:23
organization 14:2
organizational 20:6,
    21:10, 31:21
organizations 10:23
organize 90:19
original 46:15,
    123:12
originally 80:4,
    94:3, 123:7
Oscar 30:23
others 66:8, 84:3,
    92:24, 99:14,
    101:3, 114:17
otherwise 79:15,
    81:16, 82:9, 84:8,
    88:8, 94:2, 111:3,
    121:25
Otterbourg 7:19,
    7:20
ourselves 18:4,
    23:8, 34:2, 90:20,
    116:20
outcome 13:3, 16:10,
    16:19, 74:19,
    97:24, 98:21,

98:22
outset 119:4, 121:9
overall 79:8, 86:12,
    102:20, 111:17,
    111:24, 112:10
overcome 56:19,
    106:8
overnight 53:18
overseeing 6:5,
    21:25
overtaken 68:6
overwhelming 58:19
overwhelmingly
    51:25, 56:18
owe 28:22, 28:23,
    104:18
owed 28:13, 102:8
own 23:4, 61:20,
    79:13, 89:5,
    91:17, 101:7,
    117:7, 123:23
owner 70:23
ownership 116:15,
    116:16, 117:1
owns 111:8


< P >
pace 69:9
PAGE 4:3
pages 71:20, 126:4
paid 28:14, 43:1,
    80:11, 99:25,
    112:10, 115:23
Palacios 2:31
paper 65:18
papers 34:23, 53:6,
    55:14, 56:3, 56:8,
    56:11, 56:24,
    57:7, 77:17, 80:9,
    84:4, 94:23,
    96:13, 101:17,
    102:7, 105:17,
    120:22, 121:2
Paragraph 48:22,
    94:14, 94:21
parallel 122:6
paramount 36:17
part 27:24, 28:1,
    28:20, 38:14,

61:11, 106:5,
117:19
partial 73:3, 73:14,
    74:15, 76:17
participants 6:21,
    89:11
participate 9:21,
    15:22, 15:23,
    15:25, 16:2,
    16:14, 21:6, 111:2
participating 18:13
particular 11:3,
    23:17, 28:3,
    28:18, 30:7,
    43:25, 48:6, 48:7,
    49:7, 53:13, 60:2,
    64:15, 77:10,
    84:16, 86:14,
    87:6, 107:16,
    110:24, 117:2
particularly 18:4,
    106:14, 110:21
partly 119:12
partner 6:8, 22:4,
    39:9
partners 14:6
party 16:2, 17:21,
    51:18, 55:4,
    78:14, 98:18,
    99:12, 105:20
pass 61:14, 92:24
pass-through 82:17,
    82:19
passage 24:18
passed 27:19, 61:12
passing 77:17
past 6:1, 13:24,
    56:24, 89:3
path 72:19
patience 5:14, 5:17
Patrick 20:17
Paul 2:22, 27:6,
    34:19, 39:9,
    39:12, 45:8, 67:8,
    78:21, 96:4,
    104:10
pay 79:15, 81:23,
    82:9, 83:9, 84:8,
    99:18, 99:19,
    99:24

payables 114:16
paying 114:16
payout 116:2
PC 7:19
peace 43:13
Peaje 2:27, 33:10,
    34:8, 40:7, 40:10,
    40:16, 42:9
peers 13:23
pencils 18:12
pend 12:2, 12:10
pending 21:17, 24:7,
    32:22, 32:24,
    43:20, 68:2,
    68:11, 68:18,
    74:11, 74:21,
    76:23, 77:25
pension 102:9
pensions 115:23
perceive 117:23
perceived 29:8
percent 79:20,
    81:11, 81:19,
    81:20, 81:22,
    82:3, 85:14,
    85:18, 85:21,
    114:6, 115:23,
    116:4
perfect 13:10, 32:17
perfected 70:24
Perhaps 11:16, 13:1,
    15:14, 32:17,
    52:14, 52:15,
    52:16, 52:23,
    55:9, 90:2,
    107:12, 111:20,
    116:20
period 31:22, 32:8,
    37:11, 92:2
permanently 53:11
permission 24:22,
    37:10
permit 118:16
permits 22:3, 73:8
person 14:2, 39:2,
    62:3, 98:16,
    99:23, 103:24,
    106:12, 107:19
personal 23:9
personally 23:22

perspective 33:14
persuaded 106:9
persuasive 77:7
pertaining 71:10
Peter 3:17, 3:31,
    42:17
Philip 3:33, 50:4
phone 5:8, 5:21
PHV 2:20, 2:21,
    2:22, 2:23, 2:25,
    2:28, 2:35, 2:36,
    2:39, 3:4, 3:7,
    3:11, 3:15, 3:16,
    3:17, 3:20, 3:23,
    3:33, 3:34, 3:37,
    3:41, 3:43
pick 35:21, 98:14,
    107:7, 115:1,
    115:3
picking 98:4, 98:18
picture 54:6
pie 66:16, 66:17,
    66:18, 66:19
piecemeal 45:16,
    76:21
pieces 36:18
pitch 55:10
pivotal 72:12
place 32:19, 33:9,
    66:4, 69:1, 112:22
plainly 76:9
plaintiff 62:21,
    65:10
plaintiffs 62:20,
    63:19, 65:8,
    67:10, 74:23, 75:4
Planning 14:22
plans 12:19, 19:17,
    20:6, 105:25,
    112:9, 119:8
play 85:9
playing 32:5
pleading 69:25
pleadings 27:20,
    30:9, 31:23, 32:2,
    34:22, 62:3, 97:4,
    98:6, 108:18
Please 19:5, 19:9,
    20:11, 26:1,
    35:18, 39:3,

47:21, 51:11,
60:11, 60:13,
93:2, 111:14,
124:23
pleased 6:15
pledged 82:13, 82:14
pledger 82:15
plenty 99:11
Plimpton 6:23
plus 81:4
PM 124:11, 124:12
pocket 116:5
podium 20:11, 24:6,
25:22, 38:16,
39:1, 39:2, 60:12,
92:24, 95:25,
124:22, 124:23
Point 29:6, 30:7,
35:24, 37:17,
38:13, 48:21,
52:2, 52:12,
52:13, 57:9, 58:5,
59:11, 59:22,
62:15, 62:23,
63:23, 64:15,
65:25, 70:20,
71:20, 83:13,
83:14, 95:6, 96:6,
96:21, 101:11,
114:23, 118:19,
122:16, 123:21
point. 28:21, 30:16,
31:9, 31:21, 66:6,
107:22
pointed 89:17
pointing 124:23
points 9:12, 17:1,
27:15, 51:22,
54:7, 60:17, 65:1,
65:5, 66:9, 95:8,
96:7, 100:15,
106:6
policy-making 10:15
politely 104:12
Polkes 3:43, 86:7,
86:8, 89:16,
89:20, 90:11,
90:18, 95:7
pool 89:10
Portfolio 3:10

portion 8:9
position 16:20,
17:8, 17:22, 19:7,
21:5, 40:13,
44:12, 52:22,
59:7, 85:8, 86:8,
86:24, 87:23,
89:5, 89:9, 95:12,
95:15, 97:12,
97:15, 97:16,
117:10
positioned 77:4
positions 17:10,
106:20, 116:24,
117:7, 117:9,
118:5, 123:16
positive 6:12,
23:15, 25:13,
86:12, 114:12
possibility 44:15,
109:19, 122:17
possible 7:24, 10:9,
13:13, 19:3, 23:7,
35:10, 60:12,
60:16, 84:12,
86:6, 114:24
possibly 34:21,
56:2, 71:4, 75:23,
96:9
POSSINGER 2:22,
39:9, 39:11,
39:12, 39:13,
40:5, 40:9, 41:10,
41:16, 41:23,
45:8, 45:14,
45:18, 46:5, 46:8,
46:17, 46:20,
46:22
post 102:10
posted 8:24, 15:20,
22:10, 22:21
pot 84:21, 84:22,
84:23, 85:3
potential 44:21,
63:1, 76:1,
109:13, 117:24,
121:12
potentially 38:1,
116:7
poverty 43:1, 116:1

power 61:9, 61:10,
118:20, 121:23,
122:3, 122:25
practical 58:20,
87:21, 115:3
practice 14:13,
22:23, 76:24,
77:22, 77:25,
120:15
practiced 14:7,
21:23
practices 10:20,
30:24, 30:25
pre-petition 65:8
precautionary 7:23
precedent 58:14
precedes 66:17
preclude 112:5
predate 71:6
predicates 66:23
preempt 106:14
preferable 11:3,
11:7
Preferably 25:4
prejudgeship 14:20
prejudice 24:20,
24:23, 25:3, 25:9,
77:21, 107:15,
124:16
preliminarily 8:23
preliminary 9:12,
33:10, 52:23,
65:21
premature 63:5,
71:15
premise 74:4, 74:13
premised 121:5
PRESENT 2:9, 16:7,
16:8, 39:9, 40:10,
51:22
presented 6:3, 11:8,
11:13, 12:13,
14:12, 17:5,
75:13, 113:14,
122:17
presenting 21:5
presentment 49:16
presents 51:12
preserving 90:8
presided 15:9

presiding 23:13,
  67:23
press 5:6, 5:20,
  15:20
Presumably 16:22,
  36:10, 68:1
presupposes 86:22,
  88:8
pretext 84:8
pretrial 22:7, 23:2
pretty 65:22,
  110:22, 119:19
preview 108:1
previously 52:10
prewire 92:14
primarily 94:1
principal 21:14,
  95:22
principally 33:1
principle 26:9,
  43:14, 65:19,
  106:18
prior 7:17, 14:6,
  49:3, 67:24
priorities 105:11
priority 38:6
private 22:23, 29:1,
  104:13
privilege 88:18
pro 6:24
probably 30:1, 30:8,
  31:6, 31:12, 34:1,
  35:15, 52:18,
  52:22, 79:1, 82:5,
  114:17
problem 12:3, 53:17,
  105:2, 105:4,
  123:13
problems 74:13,
  106:10, 114:9
procedural 64:16,
  69:13, 79:13,
  102:14
procedure 10:14,
  34:3, 43:12, 48:6,
  48:8, 80:1, 82:7,
  82:21, 82:23,
  105:3
Procedures 8:8,
  8:13, 18:24,

25:23, 26:7,
  26:11, 55:20,
  66:4, 68:22,
  68:25, 69:2, 71:9,
  71:10, 78:5,
  81:24, 83:3, 84:6,
  85:10, 93:5,
  93:22, 94:2,
  104:7, 124:15
proceed 35:10,
  47:22, 51:11, 75:4
proceeding 33:12,
  69:4, 77:20, 78:1
processes 17:11,
  102:24, 103:10,
  103:22
processing 44:9
produced 3:47
productive 6:15,
  16:5, 43:13
professional 10:23
professionals 17:18,
  109:3, 116:10
proffered 84:13
profit 115:14,
  115:17
progress 5:25, 10:2
project 124:24
projections 95:2,
  114:10
prominent 21:24
promising 30:13
promotion 55:17
prompt 6:9, 120:12
proper 60:6, 98:9
properly 100:1
property 56:25,
  57:12, 57:14,
  57:15, 57:17,
  58:1, 60:19, 61:6,
  61:16, 61:24,
  61:25, 63:22,
  63:24, 75:6,
  75:17, 81:6,
  93:13, 105:7,
  116:15, 117:16,
  117:18
proposal 24:14,
  44:2, 47:25,
  50:15, 60:7,

84:25, 89:6,
  106:10, 106:24,
  107:17, 109:22,
  117:3, 124:16,
  124:19
proposals 93:22,
  95:21
propose 117:8,
  121:25
proposed 16:21,
  38:18, 39:23,
  41:5, 43:5, 46:13,
  48:13, 48:17,
  49:22, 55:20,
  59:15, 63:10,
  80:14, 90:22,
  90:23, 91:13,
  91:21, 92:17,
  93:5, 93:21,
  93:23, 94:2,
  94:14, 100:21,
  103:8, 103:22,
  109:18
proposing 59:13,
  102:24, 121:24
proposition 106:21,
  118:17, 118:19
prosecuted 65:9
prosecuting 113:5
prosecution 65:7
Proskauer 7:20,
  24:10, 39:13,
  60:15, 108:6
prospective 27:22
prospects 17:12,
  69:10, 119:18
protect 87:4, 87:5,
  87:14, 101:7,
  113:7
protected 113:1
protecting 85:21,
  85:22, 86:1,
  112:23
protection 55:15,
  55:21, 77:12,
  81:10, 82:25,
  83:10, 83:15,
  83:17, 83:20,
  112:19, 112:21
protections 113:22

protocol 45:20,
  55:19, 63:7,
  63:11, 65:13,
  92:6, 99:4
proven 93:11
provide 18:4, 38:1,
  54:3, 59:18,
  82:16, 90:22,
  101:21
provided 19:6, 45:22
provider 48:7
provides 105:9
provision 71:18,
  71:22, 95:19,
  107:4
provisions 42:7,
  42:8, 75:24,
  107:9, 107:11,
  121:20
public 5:6, 5:20,
  19:12, 99:18,
  102:8
pure 75:13, 75:21,
  96:6, 110:1,
  110:10, 110:15
purely 59:20
purple 67:5, 69:16
purports 84:14
purposes 38:8,
  61:17, 92:6,
  106:20
Pursuant 6:7, 40:11,
  68:25, 72:7
pursue 9:21, 16:23,
  60:25, 106:19
pursued 121:8
pursuing 109:11,
  124:2
put 6:14, 30:23,
  44:7, 52:22, 59:7,
  61:7, 65:18, 69:1,
  91:13, 96:2,
  101:18, 111:18,
  112:14, 117:13,
  119:19
putting 31:19
puzzling 68:8


< Q >

qualified 10:17,
  13:15
questions 9:13,
  11:2, 39:22,
  55:25, 56:2,
  56:20, 57:8, 62:1,
  63:15, 71:3,
  71:17, 83:13,
  116:17
quick 34:24, 60:16,
  71:17, 115:3
quickly 35:10,
  60:12, 99:9,
  100:7, 108:9
Quinn 62:7, 90:16
quirks 23:17, 23:19,
  23:23
quite 12:5, 48:1,
  52:11, 85:8
quote 23:17, 79:25,
  100:7


< R >

raid 112:14
raiding 86:23, 88:8
raids 112:9
raise 43:6, 67:12
raised 32:16, 35:22,
  59:17, 63:22,
  72:16, 74:15,
  76:25, 77:17,
  87:11, 91:24,
  95:7, 95:23,
  108:15, 112:20,
  120:18, 124:17
ran 83:12
range 22:1
rapid 6:1
Rapisardi 3:15,
  120:24, 120:25,
  121:1
ratchet 80:1
rather 33:8, 33:15,
  45:15, 49:7,
  49:19, 54:3,
  64:19, 75:22, 78:8
ratio 111:5
rationale 123:6
Re 1:6, 1:22, 1:38,

73:10
re-raise 37:10
reach 62:18, 64:18,
  120:7, 120:8
reached 26:9, 40:20,
  80:2
reaches 79:9, 121:15
reaction 29:12, 63:5
read 56:4, 58:1,
  85:3, 91:2, 98:6,
  107:1, 109:18,
  112:17
readily 19:12
reading 55:14,
  84:12, 85:2, 85:7
ready 73:18, 92:10
real 48:11, 52:7,
  82:24, 88:7,
  88:22, 91:5,
  92:13, 105:2,
  106:11, 108:22,
  122:16, 123:20
realize 69:25
Really 42:1, 53:3,
  54:16, 62:1, 65:5,
  65:12, 72:2, 87:9,
  87:11, 87:15,
  87:16, 91:21,
  95:19, 109:12,
  116:19, 117:14,
  118:11, 119:4,
  120:13, 122:20
reappointed 22:24
reason 28:8, 28:23,
  38:4, 65:17, 72:6,
  72:10, 76:7,
  87:18, 111:18,
  111:22, 111:25,
  113:2, 114:25,
  115:20
reasonable 114:8
reasoned 13:21
reasons 56:16,
  56:17, 58:8,
  58:20, 70:13,
  73:3, 84:3, 98:14,
  109:6, 113:18,
  114:1, 115:24,
  115:24, 116:3,
  116:11, 117:9,

120:14
rebuffed 88:17
rebuttal 50:18,
  50:23, 58:12,
  72:11
recall 26:24
received 13:24, 42:9
receiver 80:19,
  80:20, 81:2, 81:5,
  81:7
receives 81:2, 81:6
receiving 81:6
recent 57:4, 95:2
recently 8:15, 52:9
reception 6:12
recess 124:11
recognized 10:22,
  43:14
reconvene 38:22
reconvened. 124:12
record 25:2, 27:5,
  35:4, 62:7, 69:18,
  102:1
recorded 3:47
Recovery 57:23,
  85:15, 87:24, 88:2
recurring 119:14
recused 90:4
red 38:25, 79:9
reduce 12:15
refer 6:24, 7:2
referenced 93:24,
  93:25
referrals 6:7, 23:3
referred 23:6
referring 22:5
refers 107:6
reflected 94:3,
  94:15
reform 57:22
reformulate 118:7
reformulated 124:16
reformulation 124:18
refund 99:17
refunds 28:13, 99:19
regard 13:22, 86:24,
  88:24
regarding 8:13,
  16:11, 20:3,
  20:10, 39:22, 95:8

regardless 114:9
Region 2:16, 26:3
regular 49:14, 77:22
rehabilitation 103:5
Reiman 2:36
reiterate 50:10
related 6:6, 7:22,
  12:22, 102:10
relating 63:22
relational 107:18
relations 43:13
relationship 43:9,
  99:20, 106:12,
  116:18
relationships 7:25
relatively 43:21
relaxed 56:12
relevant 10:16,
  15:9, 35:14, 37:2,
  52:12, 105:11
relief 21:17, 27:22,
  28:10, 29:11,
  31:10, 31:22,
  46:15, 73:14,
  74:14, 76:16,
  77:11, 77:13,
  77:23, 88:19
relitigate 36:21
rely 69:25, 73:12
relying 95:9
remain 69:6
remaining 50:19,
  76:18
remains 24:7, 51:3,
  65:23, 90:14
remarks 8:16, 20:7,
  34:24, 39:3, 79:1,
  106:3
remedies 92:22
remember 34:21
remind 64:7
remote 124:21,
  124:25
remove 67:17, 67:19
renewal 124:16
renewed 120:15
renews 49:6
reopening 33:8
repeat 26:18, 57:7,
  59:12, 64:25,

70:14, 93:3,
  101:18
Reply 71:20, 94:16,
  95:7, 95:9, 96:2,
  109:15, 114:14
replying 96:2
report 119:13
reported 15:19
Reporter 126:15
repossession 45:12
represent 6:25,
  42:21, 70:18,
  101:20
representation 38:1,
  38:3, 97:3, 97:20,
  99:3
representative 1:13,
  1:28, 1:44, 8:14,
  25:21, 26:24,
  36:5, 75:6, 87:23,
  90:7, 97:7, 98:4,
  99:8, 102:5,
  102:20, 104:9,
  112:4, 115:19
representatives
  90:20, 92:18
represented 123:14,
  123:15
representing 47:1,
  116:7, 121:11
represents 115:11
reproach 113:9
reputation 109:9
request 8:12, 18:24,
  19:2, 19:3, 19:4,
  32:12, 33:5,
  33:21, 48:24,
  67:16, 68:17,
  68:20, 68:23,
  69:7, 77:18,
  77:21, 88:16,
  103:18, 109:22
Requested 1:27,
  1:43, 25:22, 49:4,
  76:16, 77:11,
  91:14
requests 20:2, 74:11
require 16:6, 19:19,
  46:10, 49:8, 74:22
required 11:23,

19:8, 68:15
requirement 84:5,
  109:19, 109:20
requirements 66:4,
  95:16
requires 22:2
reserve 36:24, 50:23
reserved 61:9
reserving 98:19
reset 90:13
residents 103:3
resolutions 9:3,
  19:16
resolvable 111:19
resolve 42:9, 44:22,
  46:19, 64:17,
  65:20, 68:2,
  68:10, 68:11,
  72:19, 90:23,
  94:20, 100:7,
  115:5
resolved 17:6,
  42:10, 43:10,
  58:23, 64:15,
  94:11, 94:19,
  94:25, 96:22,
  96:23, 99:6, 100:1
resolves 42:12
resources 60:22,
  61:13, 74:6,
  93:16, 122:19
respect 20:21,
  20:22, 30:24,
  31:1, 36:2, 36:8,
  41:18, 48:7, 49:7,
  55:19, 63:21,
  64:4, 65:13,
  66:15, 68:4,
  68:13, 70:1,
  82:12, 83:21,
  91:8, 92:20,
  105:10, 116:9,
  121:18, 122:15
respected 10:23
respectfully 101:12
respective 12:14,
  16:15, 16:21,
  17:10, 17:17,
  17:19
respond 33:22,

108:14
response 45:1, 48:3,
  53:7, 53:20,
  55:23, 81:1, 96:16
responsibility
  19:22, 22:5, 119:9
responsible 80:21,
  81:6
responsive 27:19,
  32:2, 37:9, 120:17
restructuring 58:21,
  102:20, 102:22
result 9:19, 36:21,
  67:13, 68:20,
  73:14, 74:14,
  74:17, 76:16,
  85:14, 95:14,
  98:20, 99:3,
  102:11
resume 124:7
retail 28:20, 30:22,
  31:1, 35:1
retain 38:20, 89:1
retained 21:2,
  29:24, 79:17,
  87:10
retaining 121:14
retains 81:7
rethinking 107:12
Retired 69:19, 102:3
Retiree 3:36, 30:4,
  102:11, 102:17,
  102:23, 102:25,
  103:12
retirees 102:6,
  102:25, 103:3,
  103:15, 103:17,
  103:20, 115:21,
  115:22, 116:10
Retirement 1:30
retroactive 71:4
return 7:6, 7:8,
  52:1, 87:6
Returning 11:6
revealed 96:13
revenue 81:7,
  122:11, 122:13
revenues 59:2, 59:5,
  74:6, 74:19, 81:3,
  82:22, 117:1,

119:24
reversionary 64:4
revert 64:8
review 19:2, 95:17
reviewed 39:6, 95:11
revised 43:5, 46:13,
  47:6, 47:7, 49:18,
  49:22
revisions 41:25
revisit 91:17
revoke 61:9, 61:10,
  64:5, 64:8
rewrite 49:12
Rican 14:17, 71:5,
  71:6, 81:17
Rieman 67:7, 71:25
Rifkind 34:19, 67:8,
  78:22, 96:5
rights 36:16, 57:13,
  57:14, 57:15,
  57:17, 58:1, 89:1,
  93:8, 93:13,
  105:7, 105:14,
  105:15, 105:18,
  122:14
ripe 66:2
rise 43:6, 102:13,
  124:10
risen 47:10
rises 20:8
risk 13:6, 54:1,
  122:8
risky 13:4
RNB 105:19
road 76:1, 122:4
Robert 3:37, 69:18,
  102:2
role 29:19, 29:21,
  29:22, 32:5, 115:8
roles 29:17, 29:18
room 122:24
rooms 12:4, 124:21
Rose 7:21, 24:10,
  39:1, 60:15,
  108:7
Rosenberg 2:35,
  34:18, 34:19,
  36:9, 37:18,
  37:21, 38:5,
  78:21, 79:10,

96:4, 105:15
round 42:8
row 67:2
Rule 17:23, 18:5,
  18:6, 25:2, 44:22,
  52:23, 56:4,
  70:22, 72:14,
  72:18, 76:2, 76:9,
  83:20
ruled 43:11, 82:11
rules 29:19, 56:12
ruling 36:12, 37:6,
  37:9, 52:17,
  54:19, 54:20,
  54:21, 55:1,
  72:12, 74:18,
  124:13
rulings 70:21
run 39:1, 52:4, 52:5
running 53:25, 58:9,
  124:1

< S >
S. 2:28
S/ 126:13
sale 30:25, 31:1
sales 30:25, 60:19,
  61:12, 79:15,
  81:20, 81:22,
  81:23, 82:9,
  110:2, 111:8,
  117:15, 117:17,
  118:13, 122:15
salient 106:7
San 5:1
sanctified 81:24
satisfaction 111:11
satisfy 86:25
Saturday 42:10
Saul 29:24
save 9:17, 11:9
saw 109:15, 123:3
saying 12:10, 19:21,
  29:18, 30:17,
  31:10, 36:2,
  36:24, 52:16,
  61:12, 61:14,
  66:2, 84:22,
  104:12, 109:6,

110:10, 112:16,
  119:24
says 30:23, 56:5,
  57:12, 61:5,
  71:19, 80:15,
  81:18, 83:22,
  85:13, 86:17,
  91:4, 92:1, 93:15,
  97:22, 97:24,
  98:1, 105:17,
  107:4, 110:7,
  113:4, 115:22,
  116:25, 117:3
scenario 53:24
scenes 19:11
schedule 21:12,
  32:25, 33:9, 98:7,
  98:14, 100:6
scheduling 32:16,
  69:9
scheme 111:9
school 42:23
schools 10:22, 42:24
scope 46:15
scratch 58:15
screened 7:9
screening 7:23
scrutiny 113:15,
  113:18
Sean 26:4
seat 90:5
Second 5:22, 10:5,
  11:3, 15:22,
  25:14, 29:11,
  35:8, 52:2, 55:10,
  58:16, 58:24,
  61:20, 73:11,
  73:16, 78:6, 80:8,
  89:20, 94:18,
  96:21, 101:11,
  111:6
Secondly 71:25
seconds 60:10, 71:13
Section 22:11,
  30:22, 45:22,
  60:18, 63:23,
  72:8, 73:5, 73:6,
  73:7, 80:24, 95:9,
  105:19, 107:6,
  121:19, 121:20,

122:14
secure 53:23, 82:20,
  93:18
secured 40:7, 40:18,
  40:20, 61:22,
  61:23, 83:16,
  101:6, 109:6,
  112:24, 112:25
securities 23:13
securitize 59:2
Security 54:3, 59:5,
  115:25
seek 33:22, 37:8,
  37:11, 43:2, 76:24
seeking 28:10,
  31:10, 54:22,
  65:7, 77:22, 115:6
seeks 74:17, 75:19
seem 94:15
seems 68:19, 84:12,
  93:7, 107:1
seen 30:8, 45:10,
  45:20, 46:9, 81:5,
  96:11, 97:4
sees 50:17
segment 69:22
segments 78:7, 78:9
SEIU 43:4
select 113:3
selected 11:4,
  13:14, 88:25
selecting 102:15
selection 103:9
selections 113:10,
  113:11
send 52:20, 53:4,
  55:5
Senior 14:4, 14:15,
  62:8, 83:6, 86:10,
  90:20, 92:18,
  92:22
Seniors 81:23,
  82:20, 83:2,
  83:22, 85:13,
  90:16
sense 13:10, 49:5,
  49:15, 85:20,
  88:9, 100:8
sent 8:5
separate 55:21,

73:9, 85:4, 87:1
September 7:5, 33:13
sequencing 66:20
serious 119:25
seriously 83:15
serve 10:13, 10:17,
  10:24, 13:16,
  17:16, 37:21
served 21:24
Service 3:30, 8:4,
  13:25, 42:19,
  48:7, 97:17, 98:2,
  112:11
serving 19:21, 84:15
session 16:7
sessions 16:8
set 32:20, 34:3,
  38:23, 48:5,
  50:11, 53:19,
  57:16, 79:6,
  82:20, 84:3,
  93:23, 94:23,
  98:14, 100:24,
  101:17, 106:2
sets 8:15, 48:6,
  84:7
setting 45:21,
  54:14, 55:10
settle 54:13, 54:15,
  60:6, 64:3, 82:1,
  82:8, 85:13,
  110:16, 117:19,
  117:21, 123:7
settled 86:2
settlements 111:3
seven 42:11, 78:8
seven. 48:22
Several 23:10,
  58:20, 75:15,
  101:13
shall 80:15, 93:15,
  105:17
shape 96:20
Sharon 2:25, 44:25
sharpen 18:11
she'll 21:9
short 13:15, 17:20,
  21:7, 32:6, 33:15,
  98:25
shorten 12:13

shortly 6:11
shoulder 19:23
shouldn't 29:2,
  59:7, 87:18,
  109:12
show 73:12, 79:16,
  95:3
shown 74:3, 76:16
shows 112:10
side 56:13, 88:10,
  93:9, 93:12,
  93:17, 101:6,
  106:15, 106:16,
  108:20, 109:5,
  110:11, 110:14,
  110:21, 110:22,
  111:15, 112:7,
  117:24, 121:8,
  121:9, 122:8,
  122:18
sides 15:15, 61:18,
  70:12, 100:19,
  110:14, 113:16
sight 66:23
signal 21:9
significance 95:19
significant 10:2,
  11:10, 14:18,
  41:25, 75:3,
  102:19, 103:6
significantly 103:15
signing 48:12
signs 80:15
Similar 10:3, 73:21,
  83:13, 98:11,
  102:16
similarly 68:19,
  112:6
Simon 42:18
simple 9:23, 85:12,
  103:18, 110:1
simply 20:5, 33:8,
  39:21, 63:6,
  86:23, 102:22,
  103:20, 108:10,
  110:16, 111:16,
  112:2
simultaneously
  117:19, 117:21
single 58:14, 92:15,

102:12, 102:20
sins 99:5, 99:6
Sir 20:11, 34:17,
  78:20
sit 84:11
sitting 10:10,
  13:10, 17:15,
  17:16
situation 45:5,
  80:10, 82:11,
  115:13
situations 116:19
six 71:21
size 31:11, 66:16,
  103:2
slightly 24:21,
  91:7, 104:25
slow 36:20, 105:23
slower 26:15, 27:8,
  65:2
slowly 26:19, 47:16
small 70:18, 114:12
smaller 84:21
smoothly 43:11
Snow 70:8, 104:25
so-called 98:12,
  100:24
Social 115:25
soft 55:9
sole 75:5, 87:23,
  90:8
solely 74:10, 76:7,
  118:3
solicited 23:11
solid 114:19
solution 11:7,
  17:18, 98:9
solutions 9:16,
  9:24, 19:15
solve 108:16
somebody 80:6, 98:15
somehow 66:7,
  101:14, 104:11,
  122:3
Someone 5:9, 20:8,
  41:1, 45:23, 86:1,
  91:18, 99:16,
  100:9, 119:5
somewhat 97:6
Sonnax 73:10

soon 8:8, 36:14, 72:13
sooner 35:13, 37:3
sorry 20:13, 26:14, 26:17, 40:15, 40:23, 67:4, 78:6, 121:24
sort 30:9, 33:22, 44:2, 45:11, 49:6, 90:12, 107:17
sorts 120:17
Sosland 3:23, 70:7, 70:11, 104:24
sought 37:21, 46:16, 74:14
Southern 14:5, 14:16
Spanish 23:20
spans 10:18
spark 80:18
speaking 11:1
special 14:23, 122:11, 122:13
specific 9:13, 10:16, 11:2, 49:19, 87:9, 87:11, 89:7, 95:21
specifically 51:20
spectacular 109:8
speculative 74:14
speed 65:4, 105:24, 120:2
speedy 74:5, 77:6
spell 32:6, 47:18
spend 12:14, 51:23, 96:19, 116:2
spinning 121:13
split 110:2
spoke 24:15
spoken 95:22
spurious 101:19
square 97:19
squeeze 114:18
staff 6:1, 91:2
stake 16:10, 16:19, 82:24, 97:23
stand 83:8
standard 82:1, 83:1, 83:25, 85:22
standing 41:20, 42:15, 62:21,

62:25, 63:19, 65:23, 67:2, 67:12, 74:24, 100:19, 104:14
standings 75:4
start 9:12, 78:10, 78:17, 106:4, 109:14, 109:17
started 61:22
starting 18:19, 58:15, 116:5
starts 81:20
State 14:19, 14:24, 41:22, 44:25, 56:2, 57:1, 57:20, 58:7, 64:1, 65:21, 71:23, 99:2
statement 20:10, 32:12
statements 20:5, 21:5
States 1:1, 2:6, 8:12, 8:18, 10:11, 10:14, 13:2, 13:20, 18:20, 22:13, 25:21, 26:5, 73:5, 73:7, 76:9, 126:7
stating 88:19
status 8:9, 20:4, 24:6, 74:19, 119:13
Statute 11:19, 22:3, 57:13, 58:17, 60:21, 61:14, 89:20, 105:16, 107:4
Statutes 51:14, 59:18, 105:9
statutory 83:15, 107:21, 108:21, 109:2, 109:5, 111:11, 113:9, 115:8, 122:10, 122:12, 122:19
stayed 64:14, 67:24
stays 42:2, 42:4
stenography 3:47
step 12:25, 42:14, 53:9, 60:1, 60:4

steps 37:13, 60:2, 60:5
Stericycle 2:30, 47:5, 47:10, 47:14
Steven 2:20
Stevens 83:13, 83:14
stipulation 77:22
Stockton 15:10
stood 91:10
stop 51:7
straight 79:14, 103:18
strategy 121:8
straw-man 122:7
streamlining 44:2
strengths 17:9
stressful 45:5
strike 59:1, 94:21
strikes 123:20
strong 52:1, 56:18
strongest 55:12
strongly 123:16
Stroock 7:18
struck 63:11
structure 37:5, 51:15, 59:16, 107:18
structures 14:12
studying 100:3
style 23:9
subject 21:14, 51:18, 57:19, 60:22, 70:21, 74:24, 75:9, 75:11, 77:24, 83:22, 104:7, 109:16, 119:23
submission 24:8, 26:23, 33:22, 45:23
submissions 5:24, 21:12, 21:13, 39:6, 72:25, 74:1, 106:8
submit 60:7, 85:24, 100:20, 102:22, 103:6
submits 88:18
submitted 63:10, 80:4, 86:21

subordinated 92:20
subparagraph 30:23
subsequent 91:17
subsidiaries 115:10
substantial 43:17
substantially 12:12,
   13:8, 17:12, 18:8,
   19:16
substantive 18:1,
   21:4, 21:11, 70:12
succeed 111:13,
   111:24
successful 9:19,
   10:7, 54:10
suddenly 52:13
suffer 77:10
suffers 74:13
sufficient 49:1,
   74:24
suggest 33:3, 94:20,
   104:13, 105:6,
   123:1
suggested 94:14,
   100:6, 109:7,
   120:20
suggesting 118:10
suggestion 24:25,
   48:23, 86:11,
   101:13, 104:10
suggestions 109:10
suggests 41:21,
   96:14, 122:22
suit 75:4
suited 18:4
sum 52:11
summary 33:12
superseded 57:4
superseding 49:8
suppliers 99:16,
   99:18
support 24:15,
   24:16, 24:17,
   51:22, 53:9,
   74:24, 81:17,
   82:16, 93:22,
   94:2, 110:17,
   110:18, 117:14,
   121:2
supporters 78:18
supporting 70:22

supports 71:14,
   104:7
suppose 48:8
supposed 23:8,
   111:17, 117:15,
   117:17, 117:18,
   120:5
surplus 95:3
Surpreme 57:23
susceptible 75:20
Susheel 3:41, 62:7,
   90:15
suspect 66:8, 66:13,
   81:5
SUT 60:24, 74:6,
   93:13, 93:15,
   117:1
Suzzanne 3:16, 46:25
Swain 2:5, 9:8,
   11:14, 12:8,
   12:23, 15:21,
   17:23, 18:1,
   19:25, 22:15,
   22:21, 23:6, 24:2,
   126:7
sympathy 116:9
Syncora 6:25, 7:1,
   7:2, 7:11
synthesize 91:3
System 1:31, 10:15,
   14:3, 38:16


< T >
table 33:17, 88:10,
   90:5, 107:20,
   107:21, 118:4,
   122:8
Taft 94:8
taken. 124:11
talents 9:1, 10:9
targeted 33:7, 33:21
task 19:19
taught 10:20
tax 28:13, 59:2,
   59:5, 79:15,
   81:20, 81:22,
   81:23, 82:9,
   82:22, 99:17,
   99:19, 118:13

taxes 60:19, 60:22,
   61:13, 110:3,
   111:8, 117:16,
   117:17, 122:15
Taylor 2:5, 126:7
technical 5:15,
   72:16
technique 54:14
technology 38:16
telephone 124:25
tells 80:20
Ten 57:16, 71:13,
   90:13, 90:14,
   91:23
ten-day 92:2
tent 86:15
tenure 10:18
term 7:5, 33:15,
   100:23
terminating 25:3
terminus 61:15
terms 21:5, 26:10,
   32:9, 32:10,
   33:17, 35:8,
   35:24, 49:6,
   78:22, 86:17,
   87:21, 91:8,
   96:24, 108:17,
   111:7, 121:15,
   123:11
terribly 77:7
territory 60:21,
   64:1
test 97:21
Texas 8:18, 14:5
theirs 125:2
theme 66:8
themselves 50:19,
   62:20, 62:21,
   63:19, 93:19,
   98:20
theory 108:18
there'll 117:4,
   117:5, 120:21
thereabouts 48:25
thereof 118:20
they've 53:22, 88:1
thinking 110:11,
   110:13
Third 11:5, 13:17,

16:6, 54:6, 58:19,
89:22
Thomas 3:34
though 28:22, 109:21
thoughtful 5:24,
13:21
thousands 28:18
thread 123:19
threatening 55:3
Three 9:12, 11:1,
29:15, 39:20,
39:23, 51:1, 51:8,
51:22, 54:6,
71:17, 73:18,
79:2, 97:9
threshold 65:20,
71:1
threw 57:23, 122:5
throughout 16:7
throw 69:12
ticking 92:12
tidbit 25:13
tie 67:4, 67:5,
69:16, 71:25
tied 118:1, 123:25
ties 7:14
tilt 77:8
time-consuming 12:25
timer 38:23, 78:7
timetable 45:22,
120:12, 120:20
timing 20:25, 49:13,
52:11
Timothy 2:23
tirelessly 19:15
today 9:9, 11:1,
20:4, 27:18,
31:13, 36:11,
36:13, 36:24,
38:21, 44:12,
48:1, 48:5, 48:12,
53:4, 63:8, 70:20,
73:1, 73:2, 83:8,
93:18, 97:17,
106:9, 107:15,
108:18
together 22:7,
42:21, 97:5, 97:6,
107:17, 123:20
Tom 13:17, 78:12

tomorrow 34:9,
38:22, 48:25
took 13:18, 91:1,
91:7
tools 54:12, 55:12
top 10:22
torpedo 87:15
total 50:18, 69:21
totally 118:14,
119:14
touched 37:18
toward 33:12, 79:1,
124:24
track 6:15
trade 28:12
train 92:5
Transcript 3:47,
126:4
transcription 126:5
transfer 61:8, 72:7,
77:18
translate 23:19
transparency 66:14,
121:7
Transportation 1:47
traveling 47:25
treated 57:20
trial 11:22, 54:14,
54:19, 73:18
tried 14:11, 23:11,
62:13
tries 119:17
true 81:3, 83:8,
97:11, 109:21,
112:9, 126:5
TRUJILLLO 70:17
Trujillo 3:26,
70:18, 71:12
truly 16:25, 19:7,
39:4, 90:7, 99:12,
107:14
trust 19:13, 61:5,
61:7, 61:9, 61:10,
61:11, 83:19,
83:21
Trustee 2:15, 8:12,
18:20, 25:21,
25:25, 26:2, 26:3,
26:6, 26:17,
26:20, 38:4,

62:24, 109:2
try 27:15, 28:4,
39:4, 58:5, 58:12,
78:23, 86:6,
87:24, 89:21,
90:14, 90:19,
91:4, 96:5, 114:8,
114:20, 115:5,
117:20, 120:16
trying 28:6, 36:6,
108:9, 112:16,
113:7, 113:24,
115:14, 115:17,
118:22
turn 8:9, 12:15,
38:13, 58:4, 109:1
turned 45:25, 65:3
turning 6:19
Turnkey 3:26
Tweed 35:19, 64:24
twice 22:24
Two 7:16, 8:10,
9:12, 18:16,
18:21, 21:2,
25:13, 29:16,
34:24, 35:20,
39:17, 41:20,
42:21, 43:3, 49:3,
50:17, 60:24,
65:5, 69:21,
91:12, 92:8,
94:10, 97:13,
100:3, 100:15,
114:1, 116:11
type 98:24, 100:6,
110:3, 110:23
types 23:1


< U >
U-n-a-n-u-e 73:23
UAW 43:4
UBS 91:22
UHLAND 3:16, 46:25,
47:1, 47:3, 47:4,
48:17, 48:20,
48:22, 49:1,
49:10, 49:12,
49:20, 49:23
ultimate 55:4,

103:4, 117:8,
117:25
ultimately 64:2,
    92:16, 96:24,
    97:2, 98:15, 99:7
unanimous 24:17,
    120:11, 120:16,
    120:19
Unanue 73:22
uncertain 13:4
uncertainty 11:11,
    12:22, 13:5, 98:23
unclear 32:19
unconflicted 99:12
uncontested 25:15,
    38:14, 39:9,
    39:18, 39:21,
    41:20, 41:22
underfunding 102:8
underline 105:18
underlying 66:23,
    67:12, 70:12,
    105:8
undersecretary 14:25
understand 6:23,
    17:9, 17:18,
    17:21, 19:7,
    29:16, 43:24,
    44:11, 53:21,
    89:23, 95:18,
    109:18, 112:16
understanding 41:19,
    42:11, 88:18,
    108:15
Understood 45:18,
    118:10
unexpectedly 52:14
Union 3:29, 42:19,
    42:20
unionized 43:15,
    43:16
unions 28:14, 42:21,
    43:2, 43:3
unique 15:2, 15:11
uniquely 10:17,
    13:15
United 1:1, 2:6,
    3:28, 8:12, 8:17,
    10:11, 10:14,
    13:2, 13:20,

18:20, 22:13,
    25:21, 26:5,
    42:20, 73:5, 73:7,
    126:6
units 14:20, 99:20
universal 32:17
unjust 43:22
unless 20:7, 29:22,
    45:23, 57:8, 61:8,
    64:2, 70:21,
    83:17, 84:22,
    92:13, 95:24,
    110:18
unlike 119:20
unlikely 66:9, 76:4
unopposed 45:25
unprecedented 9:4
unrepresented 28:24
unreviewable 97:18
Unsecured 3:20,
    8:15, 20:18,
    26:25, 27:6,
    28:17, 35:2, 35:6,
    38:6, 38:9, 91:11,
    92:3, 103:9,
    103:16, 108:21,
    122:23
unsecureds 37:20
unsettled 58:13
unsuccessful 17:24
unsure 35:23
until 7:13, 45:19,
    46:3, 48:25,
    54:16, 57:18,
    93:11, 123:3
upcoming 54:19
updated 39:18, 42:11
Urban 15:1
urge 72:11, 84:3,
    107:16
urged 107:14
urgency 53:7
urgent 20:8, 20:9,
    52:15, 72:12,
    72:13
urtext 53:17
useful 18:7, 68:2,
    68:10, 68:11
using 38:16
utilities 46:22

< V >
vague 117:5
valid 51:15, 57:16,
    59:16
validated 83:10
value 12:17
valueless 93:11
variations 106:24
variety 76:22
various 10:23, 15:3,
    23:12, 27:18,
    27:22, 31:16,
    31:18, 34:22,
    35:5, 55:16,
    76:24, 95:13,
    102:15
vehement 78:16
vehicle 63:6, 64:17,
    67:14, 107:1
versus 34:4
veto 79:23, 79:25,
    87:10, 89:1, 98:4,
    110:4, 110:12
vice 6:24
Victor 14:15
view 7:25, 30:12,
    76:6, 84:7, 86:11,
    108:8, 122:12
viewpoint 119:7
vigorously 118:17,
    118:19
violate 97:13, 97:14
violation 112:13
violations 43:18
visible 19:12
voice 38:1, 90:3
voiced 112:1
voices 43:3
voluntariness 16:16
voluntary 16:13
vote 105:25


< W >
wait 27:1
waived 83:16, 83:23
waiver 83:18
Walker 126:13,

126:14
wall 23:16
Walter 2:36, 67:7
wanted 20:22, 26:25,
  27:22, 35:21, 43:7
wants 32:13, 37:8,
  41:1, 50:13, 56:9,
  103:24, 113:19,
  119:22
war 30:9
warn 51:6
warranted 66:5
warrants 58:6
wasting 16:1
waterfall 36:16,
  84:24
ways 76:24, 110:15
weaknesses 17:10
wearing 89:4
website 8:25, 22:11,
  22:22
week 19:1
Weekly 23:10
weeks 6:1, 33:16,
  49:3, 100:10
weigh 91:12
Weil 86:8
Weise 2:20
Weiss 34:19, 42:18,
  67:8, 78:21, 96:4,
  104:10
well-founded 91:20
well-respected
  13:19, 21:22
West 83:13, 83:14
Wharton 34:19, 67:8,
  78:22, 96:5
whatever 31:23,
  37:9, 53:12,
  68:25, 71:8,
  84:17, 86:16,
  89:25, 98:2, 98:8,
  112:25, 116:21
whatsoever 97:10
Whereas 54:25
whichever 51:18
White 100:13
whoever 79:19
whole 115:15
whom 51:20

Wickersham 94:8
wide 22:1
willing 101:7,
  107:24
willingness 44:13
win 81:14
winner-take-all
  123:10
winning 81:12, 81:19
wish 15:22, 18:23,
  119:16
wishes 20:9, 47:9
wishing 20:2
withdraw 24:19,
  24:22, 25:1, 25:8,
  40:12
withdrawn 40:8, 78:2
within 36:16, 38:17,
  45:22, 50:12,
  52:14, 52:17,
  91:23, 92:23,
  121:20
without 15:19,
  24:20, 24:23,
  25:3, 25:9, 38:21,
  66:10, 77:21,
  107:15, 114:5,
  122:4, 124:15
withstanding 93:21
WITNESSES 4:3
word 63:11
words 8:19, 21:21,
  27:13, 90:3
work 5:15, 7:22,
  8:1, 9:2, 11:5,
  19:11, 19:14,
  19:24, 22:7,
  42:24, 44:17,
  46:10, 55:12,
  82:6, 87:7, 88:9,
  88:16, 99:11,
  107:16, 113:17,
  119:6, 119:7,
  119:20, 124:18
worked 26:6, 90:19
Workers 3:28, 42:20,
  42:23
workforce 43:15,
  43:16
working 5:18, 7:9,

7:16, 22:18, 24:1,
  46:18, 49:2,
  119:17, 122:6
works 80:2, 83:7,
  85:16, 85:17,
  88:23, 98:8, 110:8
world 30:2, 83:7,
  119:21
worried 110:3
worse 111:15
wrap 99:13, 99:14
write 23:14
writing 8:5
written 8:7, 122:21
wrote 23:15


< Y >
year 30:3
years 7:14, 7:21,
  10:19, 21:3,
  21:25, 22:23,
  23:10, 56:24,
  57:4, 57:16, 81:4,
  95:14, 100:4,
  100:9, 118:2
yellow 38:24, 50:12,
  65:4, 78:8
Yesterday 6:25,
  20:24, 29:24,
  39:18, 42:7, 45:4,
  90:25
York 5:13, 5:21,
  14:16, 14:21,
  14:22, 14:23,
  14:25, 18:17,
  32:22, 69:4


< Z >
Zakia 3:11, 50:8,
  51:4, 59:11,
  100:13
zealously 87:4,
  87:5, 87:14, 87:24
zero. 82:16

Case:17-00188-LTS Doc#:420-25 Filed:10/14/17 Entered:10/14/17 20:57:32 Desc:
Exhibit DX-25 Page 433 of 507

# EXHIBIT 25

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

      Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

*[Caption continued on next page]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); and (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474).

```
------------------------------------------------------------x
```

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO
    as representative of
THE COMMONWEALTH OF PUERTO RICO, *et al.*
       Movants,[2]

v.

International Union, United Automobile, Aerospace
and Agricultural Implement Workers of America
(UAW), *et al.*
       Respondents.[3]

PROMESA
Title III

This Document Relates to:[4]
17 BK 3283; 17 BK 3284

```
------------------------------------------------------------x
```

---

[2] The Movants to the Motion include in the Commonwealth of Puerto Rico and the Puerto Rico Sales Tax Financing Corporation ("COFINA").

[3] The Respondents to the Motion (the "Respondents") include: The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW) ("UAW"), Service Employees International Union ("SEIU"), American Federation of State, County & Municipal Employees ("AFSCME"), Goldman Sachs Asset Management, L.P. ("GSAM"), Financial Guaranty Insurance Company ("FGIC"), the Mutual Fund Group (which consists of mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds), the Puerto Rico Funds (which are the following Puerto Rico-based funds: Puerto Rico AAA Portfolio Bond Fund II, Inc.; Puerto Rico AAA Portfolio Bond Fund, Inc.; Puerto Rico AAA Portfolio Target Maturity Fund, Inc.; Puerto Rico Fixed Income Fund, Inc.; Puerto Rico Fixed Income Fund II, Inc.; Puerto Rico Fixed Income Fund III, Inc.; Puerto Rico Fixed Income Fund IV, Inc.; Puerto Rico Fixed Income Fund V, Inc.; Puerto Rico Fixed Income Fund VI, Inc.; Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.; Puerto Rico Investors Bond Fund I; Puerto Rico Investors Tax-Free Fund, Inc.; Puerto Rico Investors Tax-Free Fund, Inc. II; Puerto Rico Investors Tax-Free Fund III, Inc.; Puerto Rico Investors Tax-Free Fund IV, Inc.; Puerto Rico Investors Tax-Free Fund V, Inc.; Puerto Rico Investors Tax-Free Fund VI, Inc.; Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.; Tax-Free Puerto Rico Fund, Inc.; Tax-Free Puerto Rico Fund II, Inc.; Tax-Free Puerto Rico Target Maturity Fund, Inc.; and UBS IRA Select Growth & Income Puerto Rico Fund), National Public Finance Guarantee Corporation ("National"), the COFINA Senior Bondholders' Coalition (which includes José F. Rodríguez Perelló and the following institutional holders of the COFINA senior bonds: Aristeia Horizons, L.P.; Camino Cipres LLC; Camino Roble LLC; Canary SC Master Fund, L.P.; Canyon Capital Advisors LLC (on behalf of its participating clients); River Canyon Fund Management LLC (on behalf of its participating clients); Crescent 1, L.P.; CRS Master Fund, L.P.; Cyrus Opportunities Master Fund II, Ltd.; Cyrus Select Opportunities Master Fund, Ltd.; Cyrus Special Strategies Master Fund, L.P.; Decagon Holdings 1, L.L.C.; Decagon Holdings 2, L.L.C.; Decagon Holdings 3, L.L.C.; Decagon Holdings 4, L.L.C.; Decagon Holdings 5, L.L.C.; Decagon Holdings 6, L.L.C.; Decagon Holdings 7, L.L.C.; Decagon Holdings 8, L.L.C.; Decagon Holdings 9, L.L.C.; Decagon Holdings 10, L.L.C.; Merced Partners Limited Partnership; Merced Partners IV, L.P.; Merced Partners V, L.P.; Pandora Select Partners, L.P.; SB Special Situation Master Fund SPC, Segregated Portfolio D; Scoggin International Fund Ltd.; Scoggin Worldwide Fund Ltd.; Taconic Master Fund 1.5 L.P.; Taconic Opportunity Master Fund L.P.; Tilden Park Investment Master Fund LP; Värde Credit Partners Master, L.P.; Värde Investment Partners, L.P.; Värde Investment Partners (Offshore) Master, L.P.; The Värde Skyway Master Fund, L.P; Whitebox Asymmetric Partners, L.P.; Whitebox Institutional Partners, L.P.; Whitebox Multi-Strategy Partners, L.P.; and Whitebox Term Credit Fund I L.P.), Ambac Assurance Corporation ("AMBAC"), Ad Hoc Group of General Obligation Bondholders ("GO Group"), and Assured Guaranty Corp. and Assured Guaranty Municipal Corp. (f/k/a Financial Security Assurance Inc.) (together, "Assured").

[4] Pursuant to Paragraph 5 of the Joint Administration Order entered in lead Case No. 17 BK 3283-LTS [ECF No. 242], this pleading will be filed in both the lead Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS.

# TABLE OF CONTENTS

**Page**

The Debtors and Respondents Agree on Several Aspects of the Procedures ............................. 3

Respondents Inappropriately Attack the Certified Fiscal Plan ................................... 8

There is No Article III Standing Issue ................................................. 9

The Procedures Comply with PROMESA ............................................ 10

Respondents Seek to Usurp PROMESA's Grant of Exclusivity to the Debtors ..................... 14

There are No Issues of Due Process ............................................... 15

Notice .................................................................... 18

i

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Charleston Sav. Bank v. Martin* (*In re Colonial Realty Inv. Co.*),
   516 F.2d 154 (1st Cir. 1975) ........................................................................8

*Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics
   Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003) ........................................................................14

*United States v. Johnson*,
   319 U.S. 302 (1943) ........................................................................17

*Wellness Int'l Network, Ltd. v. Sharif*,
   135 S. Ct. 1932 (2015) (Roberts, C.J., dissenting) ........................................10

STATUTES

11 U.S.C. § 1109 ........................................................................4

Act No. 91-2006, § 2 ........................................................................8

PROMESA § 101(a) ........................................................................2

PROMESA § 101(g) ........................................................................2

PROMESA § 104(b) ........................................................................2

PROMESA § 106(e) ........................................................................9

PROMESA §§ 201, 202 ........................................................................2

PROMESA § 306(b) ........................................................................8, 15

PROMESA § 312(a) ........................................................................2

PROMESA § 315(a) ........................................................................10

PROMESA § 315(b) ........................................................................1, 2, 10, 12

OTHER AUTHORITIES

162 CONG. REC. H3600-01 (daily ed. June 9, 2016) (statement of Rep. Velazquez) ................11

Case 17-03283-LTS   Doc#4759-30   Filed 01/12/19   Entered 01/12/19 17:45:31   Desc
Exhibit DX-JJ   Page 438 of 507
Case 17-03283-LTS   Doc#4759-30   Filed 01/12/19   Entered 01/12/19 17:45:31   Desc
Exhibit DX-JJ   Page 438 of 507

*Financial and Economic Challenges in Puerto Rico*, U.S. Senate Comm. on
    Finance, at 23 (Sept. 29, 2015) (statement of Ms. Acosta) ....................................................11

Claire Hill and Brett McDonnell, *Sanitizing Interested Transactions*, 36 DEL. J.
    CORP. L. 903 (2011), at http://scholarship.law.umn.edu/faculty_articles/81...........................12

FED. R. CIV. P. 19.............................................................................................................................3

U.S. CONST. art. IV § 3, cl. 2 ......................................................................................................10

# OMNIBUS REPLY OF DEBTORS TO RESPONSES
## TO MOTION OF DEBTORS FOR ORDER APPROVING
### PROCEDURE TO RESOLVE THE COMMONWEALTH-COFINA DISPUTE

To the Honorable United States District Court Judge Laura Taylor Swain:

The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Sales Tax Financing Corporation ("COFINA," and together with the Commonwealth, the "Debtors"), by and through the Financial Oversight and Management Board for Puerto Rico the ("Oversight Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"),[5] respectfully submit this omnibus reply (the "Omnibus Reply") to the responses (the "Responses")[6] filed to the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [ECF No. 303] (the "Motion"), and respectfully represent as follows:

---

[5] PROMESA has been codified in 48 U.S.C. §§ 2101–2241.

[6] *See* (i) *Response and Reservation of Rights of International Union, United Automobile, Aerospace and Agricultural Implement Workers of America (UAW), Service Employees International Union, and American Federation of State, County & Municipal Employees to Debtors' Motion for an Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Unions Response") [ECF No. 357]; (ii) *Opposition of Goldman Sachs Asset Management, L.P. to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "GSAM Response") [ECF No. 360]; (iii) *Response in Opposition of Financial Guaranty Insurance Company to Puerto Rico Funds and Mutual Fund Group's Motion for Relief from the Automatic Stay and Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "FGIC Response") [ECF No. 369]; (iv) *Objection of Mutual Fund Group and the Puerto Rico Funds to Debtors' Motion for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Mutual Fund Group Response") [ECF No. 372]; (v) *National Public Finance Guarantee Corporation's Objection to the Financial Oversight and Management Board for Puerto Rico's Motion for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "National Response") [ECF No. 373]; (vi) *Objection of COFINA Senior Bondholders' Coalition to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "COFINA Senior Bondholders Response") [ECF No. 374]; (vii) *AMBAC Assurance Corporation's Objection to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "AMBAC Response") [ECF No. 375]; (viii) *Objection of the Ad Hoc Group of General Obligation Bondholders to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "GO Group Response") [ECF No. 408]; and (ix) *Limited Objection of Assured Guaranty Corp. and Assured Guaranty Municipal Corp. to Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Assured Response") [ECF No. 411].

## Omnibus Reply

1.      Responses to the Motion overlook two undisputed critical facts.  First, the Oversight Board is not a for-profit holding company or group of controlling shareholders looking to profit.  Indeed, its members are completely uncompensated.[7]  The Oversight Board has no reason to favor creditors of the Commonwealth over creditors of COFINA or the reverse.  Its statutory and only mission is to provide a method to achieve fiscal responsibility and access to capital markets.[8]  Accordingly, its selection of agents to act for the Commonwealth and COFINA in litigation and negotiations is not tainted by any bias or motive prejudicial to the Commonwealth or COFINA or their respective creditors.  Second, all relief the Oversight Board requests is authorized by PROMESA.  PROMESA (a) renders the Oversight Board the title III representative of both the Commonwealth and COFINA,[9] (b) authorizes the Oversight Board to act through agents,[10] (c) grants the Oversight Board the exclusive right to file a plan of adjustment for each of the Commonwealth and COFINA,[11] and (d) grants the Oversight Board the exclusive power to control the fiscal plan and budget of the Commonwealth and COFINA, among the other sixty-one covered entities.[12]

2.      It is inconceivable that when Congress put the Oversight Board in charge of every Title III debtor, it did not know there were all kinds of relationships and claims between and among the Commonwealth and its instrumentalities.  Moreover, one can only imagine the chaos

---

[7] PROMESA § 101(g).

[8] PROMESA § 101(a).

[9] PROMESA § 315(b).

[10] PROMESA § 104(b).

[11] PROMESA § 312(a).

[12] PROMESA §§ 201, 202.

Congress would have created if it had created multiple, independent chiefs to control the different entities.  Accordingly, Respondents' allegations of conflict have no substance, and are objections to PROMESA as opposed to the Oversight Board's statutory entitlement to the relief the Motion requests.  Indeed, some Responses go so far as to ask the Court to override PROMESA by endowing certain entities with powers Congress granted solely to the Oversight Board.

3.      Although Congress designated the Oversight Board as representative of title III debtors with full awareness that claims may exist among them, the Oversight Board has proposed additional procedures, in compliance with PROMESA, to resolve the Commonwealth-COFINA Dispute[13] fairly, efficiently, and transparently (the "Procedures").  While most Respondents embrace some aspects of the Procedures, many denigrate the Oversight Board's efforts to appoint two independent agents of the Oversight Board to represent each of the Commonwealth and COFINA.  As demonstrated below, the Procedures are plainly authorized by and consistent with PROMESA and are thoughtfully formulated to provide the fairest possible method to procure a resolution of this gating issue.

***The Debtors and Respondents Agree on Several Aspects of the Procedures***

4.      Among the Responses received, common ground emerges.

5.      Intervention.  Respondents, such as the UAW and AFSCME, do not object to the Procedures but only reserve their rights to intervene and participate in any litigation commenced by the Agents.[14]  Other Respondents voiced concerns regarding their right to intervene.[15]  The Procedures encroach neither on Federal Rules of Civil Procedure Rule 19, nor Bankruptcy Code

---

[13] Capitalized terms used but not otherwise defined shall have the same meaning given to them in the Motion.

[14] Unions Response at 2.

[15] *See, e.g.*, Mutual Funds Group Response at 11; COFINA Senior Bondholders Response at 7.

section 1109, nor any right of intervention. The Court can rule on intervention motions and rights to appear under Bankruptcy Code section 1109, as they arise and once litigation commences. The only difference between the Oversight Board and Respondents in regard to intervention is that many Respondents demand they be granted intervention now, while the Oversight Board believes intervention motions should be determined after the litigation exists and the Court has the benefit of the facts and circumstances. The same issue arose in connection with the joint administration motion, and on May 17, 2017, the Court agreed intervention should not be considered before it is ripe.

6. <u>Mediation</u>. Various Respondents note the mediation process that began prior to the commencement of these Title III Cases and highlight the Court's appointment of an esteemed panel of jurists to mediate significant issues.[16] They request that such mediation promptly resume using a mediator selected from the Court-appointed mediation team. The Motion expressly requires that the Agents attempt to negotiate a resolution. That negotiation can certainly take place in mediation. Additionally, because the Agents will only be litigating whether the Commonwealth or COFINA own the Pledged Sales Tax, the Oversight Board is willing to participate in the mediation with the Agents and creditors so creditors' treatment under the plans of adjustment can be negotiated. It is frequently easier to settle when a party knows what it will get, as opposed to knowing only what assets will be property of the debtor.

7. <u>Court Approval of Settlement</u>. Other Respondents raise concerns regarding court approval of any settlement that emerges as a result of the Procedures.[17] To the extent the Motion and its Proposed Order did not make clear that any settlement will be subject to court approval,

---

[16] *See, e.g.*, FGIC Response at 3; National Response at 3; *see also Order Appointing Mediation Team* [ECF No. 430].

[17] *E.g.* COFINA Senior Bondholders Response at 6; Assured Response at 7.

4

the Debtors agree it should be and will be.  Any proposed settlement may be submitted for court approval as a standalone settlement or as part of the confirmation hearing if the settlement is proposed in a plan of adjustment.  Interested parties will have the opportunity to object to any settlement.

8.      Fiduciary Duties.  As explained above, many Respondents contend the Agents should be deemed to have fiduciary duties to COFINA and the Commonwealth, respectively. The Debtors contend that Agents' duties should not be shoehorned into a fiduciary duty.  Rather, each Agent has all the duties imposed by PROMESA on the Oversight Board as representative of COFINA or the Commonwealth, as the case may be.  We submit the Court should not change the duties imposed by PROMESA by limitation or extension.

9.      November 1 Deadline.  Some Respondents take issue with the November 1, 2017 deadline to resolve the Commonwealth-COFINA Dispute, and yet suggest that very deadline in their proposed order.[18]  Notably, while many Respondents question whether projected cash flow issues support the November 1, 2017 deadline, no Respondents challenge the fact that the Commonwealth-COFINA Dispute is a gating issue in these Title III cases.[19]  Negotiations of plans of adjustment for both the Commonwealth and COFINA cannot be meaningful without knowing which entity owns the Pledged Sales Tax.  That reason alone substantiates the November 1, 2017 deadline.

10.     The November 1 deadline also remains an important constraint for financial reasons.  Contrary to many Respondents' assertions that the Oversight Board had no evidence of

---

[18] See, e.g., National Response at 10 & Exh. A at 3; AMBAC Response at 12 & Exh. 2 at 3.

[19] With the exception of Assured and AMBAC, who, notwithstanding this Court's previous exhortations to avoid "issue creep," took an opportunity to criticize the Certified Fiscal Plan in its response.  Assured Response at 1; AMBAC Response at 3.  AMBAC also argued that the real gating issue is the intra-COFINA dispute.  AMBAC Response at 9.  But resolution of that dispute is irrelevant here, as the COFINA Agent will maximize return to the COFINA estate no matter which bondholders prevail in the intra-COFINA dispute.

the need for a November 1 deadline, the Commonwealth had furnished the Oversight Board with data that demonstrated, at the time, that the Commonwealth would have a negative cash balance before the end of November 2017.[20]

11.  Some Respondents assert that actual cash collections have surpassed projections by $850 million.  The Oversight Board has learned from the Commonwealth that what appears to be an improved liquidity position is largely the result of certain measures,[21] including deferred expenses, which will lead to higher expenses going forward.  Significantly, however, the cash projections have assumed, among other things, that (a) all savings contemplated in the Certified Fiscal Plan will be realized on schedule, and (b) none of the creditors attempting to procure revenues (*i.e.*, the HTA and ERS litigations, among others) will succeed.  Moreover, the cash projections need to be reduced by approximately $400 million representing the cash allocated for debt service in the new fiscal year.  It is possible that the cash situation on November 1, 2017 will be better or worse than currently projected, and the Oversight Board will certainly undertake to keep the Court and creditors apprised of all material changes in projections as it obtains

---

[20] As explained in the paragraph below, we understand the liquidity forecast has since been adjusted to reflect certain recent events and more current data.  However, the Oversight Board is still informed, for reasons explained below, that the overall conclusion that the November 1, 2017 deadline is important to the Commonwealth's cash situation remains unchanged.

[21] The measures include: (i) the non-payment of principal and interest payable to the State Insurance Fund Corporation, the Automobile Accident Compensation Administration, and the Temporary Non-Occupational Disability Insurance otherwise due in June 2017 and deferred until May 2018, which increased liquidity by $423 million; and (ii) the adjustment of payments to suppliers the Fiscal Plan, which resulted in a liquidity increase of $150 million.

In addition to the deferred expenses, there was some liquidity improvement due to increased revenues.  These include: (i) $46 million of revenues primarily related to claw back retained from the Highway and Transportation Administration; (ii) General Fund collections improved by $74 million; (iii) collections of $90 million, including $20 million of *Crudita* revenue subject to claw back and other revenue not projected, that was received by various agencies, including the Office of Insurance Commissioner, the Department of Labor, and the Administration for Child Support; (iv) allocations from federal funds programs surpassed the amount forecasted by $33 million; and (v) there was positive variance in other miscellaneous net inflows of $43 million.  Certain of these payments were projected to occur in later periods, and others were extraordinary revenues not expected to recur.  *See* Press Release, AAFAF, The PR Government Effectively Faced the Expiration of Medicaid Funds (June 14, 2017).

information from the Commonwealth.  Currently, however, November 1 remains the date that cash issues may negatively impact the Commonwealth.

12.     For these reasons, an expedited litigation schedule is both necessary and reasonable. As a preliminary matter, the fact that an expedited schedule has been requested inures to the benefit of such Respondents as it will give them clarity as to their rights while reducing the expense and time involved in a hotly contested litigation.  The Commonwealth and COFINA implicate the monies available to pay approximately 55% of all the bond debt in all the actual and potential Title III Cases.  Based on this alone, it must be resolved expeditiously for progress to be made.  Ten (10) days is not too short a timeline for the Agents to commence litigation.[22]  The entities vying for the privilege of representing the Commonwealth or COFINA are likely already preparing, and once appointed, the Agents can retain anyone appropriate to get up-to-speed as quickly as possible.

13.     <u>No Certification to Supreme Court of Puerto Rico</u>.  Finally, the Oversight Board refers the Court to the Debtors' separate objection[23] and to the objection of FGIC to the *Puerto Rico Funds and Mutual Fund Group's Motion for Relief from the Automatic Stay* [ECF No. 270], in which creditors seek to pursue at least partial resolution of the Commonwealth-COFINA Dispute in the Puerto Rico Supreme Court.  The Debtors explain in their own objection that certification should not be granted because, among other things, (a) the ultimate question is whether the Pledged Sales Tax is property of the debtor under PROMESA, as opposed to being exclusively a question of Commonwealth law, (b) the Puerto Rico Supreme Court does not

---

[22]  National asks that a request to expedite the litigation come from the Commonwealth's Agent themselves. National Response at 10.  But the Agent's role is pursuing the claims subject to the Procedures, not representing the Commonwealth in its Title III case.  Surely, National cannot intend the agent make every decision the Commonwealth makes moving forward.

[23] *See Opposition of the Financial Oversight and Management Board for Puerto Rico to the Motion for Relief From the Automatic Stay Filed by the Puerto Rico Funds and Mutual Fund Group* [ECF No. 407].

accept for certification issues turning on both Commonwealth and federal law, and (c) the question to be certified is a cause of action belonging to the Commonwealth and COFINA, and not to the creditors.  The Procedures, in contrast, provide for this federal title III court to decide a federal question, namely whether the Pledged Sales Taxes are property of COFINA or the Commonwealth within the meaning of PROMESA section 306(b).  That question may be informed by whether the SUT are "available resources" of the Commonwealth under the Puerto Rico Constitution, but that is not dispositive of the issue, as demonstrated by *Charleston Sav. Bank v. Martin* (*In re Colonial Realty Inv. Co.*), 516 F.2d 154, 158 (1st Cir. 1975) (internal citations omitted).[24]  Moreover, the Procedures, which provide for resolution of the central issue in these title III cases by Agents of the Debtors in this title III court, are far preferable to litigation of this dispute by creditors in other courts, because the likelihood of settlement is materially greater if the dispute is under the control of two designated Agents, each representing the best interests of their respective Debtor, rather than multitudes of diversely situated, and diversely motivated, creditors.

### *Respondents Inappropriately Attack the Certified Fiscal Plan*

14.     AMBAC, National, and Assured raise their recurring issue of whether the Certified Fiscal Plan is subject to litigation or negotiation.  They have each commenced separate litigation attempting to litigate the Certified Fiscal Plan.[25]  The Certified Fiscal Plan, however, is

---

[24] In *Colonial Realty*, local Massachusetts law provided a mortgagee, not the debtor, owns the mortgaged property because it holds the deed. *Id.* at 158.  Here, the Commonwealth's statute provides the sales and use taxes are not "available resources" of the Commonwealth.  Act No. 91-2006, § 2.  *Colonial Realty*, however, ruled the debtor owned the mortgaged property for purposes of bankruptcy law, notwithstanding the idiosyncratic Massachusetts law providing the mortgagee owned the property.  *In re Colonial Realty Inv. Co.*, 516 F.2d at 158.  The question here is whether the Commonwealth law providing taxes are not its available resources are nevertheless its property for purposes of PROMESA section 306(b) because it enacted the taxes, the taxes arise from Commonwealth transactions, the Commonwealth retains the power to alter or repeal them, and the Commonwealth collects them.

[25] *Ambac Assurance Corp. v. Commonwealth of P. R.*, No. 3:17-ap-159-LTS; *Assured Guar. Corp. v. Commonwealth of P. R.*, No. 3:17-ap-125-LTS (listing both Assured and National as plaintiffs).

subject to neither for reasons provided in the *Debtors' Status Report Regarding (a) Financial Disclosures to Creditors and (b) Status of Settlement Discussions* [ECF No. 350]. In short, PROMESA section 106(e) provides that no district court has subject matter jurisdiction over a challenge to the certification of the fiscal plan.[26] Section 106(e) carries out the policy of insulating the FOMB from pressure and temptation to increase the amounts it believes are realistic to pay creditors and to provide vital services to the people of Puerto Rico.

15. National gratuitously charges that the Oversight Board did not mediate in good faith and did not negotiate. National neglects to disclose that National is breaching the confidentiality provisions of the mediation agreement by making such charges. The Debtors invite National to negotiate how the available moneys are allocated among creditors and how any net revenues in excess of the Oversight Board's projections can be transferred to creditors.[27] The Certified Fiscal Plan merely shows how much money is available for debt service. Nothing prevents that money from being allocated to COFINA creditors to the extent COFINA owns the Pledged Sales Tax. Thus, nothing in the Certified Fiscal Plan is harmful to COFINA. It is neutral. If the Commonwealth needs money before or after litigation is resolved, it would borrow from COFINA.

***There is No Article III Standing Issue***

16. A dispute between COFINA and the Commonwealth over which entity owns the Pledged Sales Tax is an actual case and controversy. That the proposed representative of COFINA would be an agent of the Oversight Board in its capacity as representative of COFINA,

---

[26] PROMESA section 106(e) provides "There shall be no jurisdiction, in any United States district court to review challenges to the Oversight Board's certification determinations under this Act."

[27] National's remark that the Oversight Board has "repeatedly ignored… requests for information" likewise has no basis in fact. National Response at 3. The Oversight Board sent responses to creditors' letters of June 2, 2017, and June 5, 2017, detailed the voluminous financial disclosures the Oversight Board has already made available and is further forthcoming.

and the proposed representative of the Commonwealth would be an agent of the Oversight Board in its capacity as representative of the Commonwealth, does nothing to eliminate the actual case and controversy.

17.     Moreover, the "case or controversy" requirement only applies to the exercise of Article III power.  But no such requirement exists under Article I, which provides Congress with the authority to establish bankruptcy laws, nor does it exist under the Territory Clause.  Indeed, identifying "property of the estate" has long been a central feature of bankruptcy adjudication resolved by Article I bankruptcy judges, which is "inescapably central to the restructuring of the debtor-creditor relationship."[28]  Therefore, even though an Article III judge is presiding over the COFINA Title III case, the determination of whether COFINA or the Commonwealth owns the Pledged Sales Tax does not require the exercise of Article III judicial power.  Rather, Article I bankruptcy judges make those determinations routinely.  Even if the dispute over which debtor owns the Pledged Sales Tax required Article III judicial power, the Procedures proposed in the Motion enable the dispute to be litigated at arm's length.

***The Procedures Comply with PROMESA***

18.     Congress is entitled to control its territories as it desires pursuant to the Territory Clause in the United States Constitution.  U.S. CONST. art. IV § 3, cl. 2.  In crafting PROMESA, Congress was careful to ensure that the Oversight Board controls the reorganization efforts of the Commonwealth and its instrumentalities.  PROMESA section 315(b) specifically designates the Oversight Board, and no other party, as the representative of Commonwealth and COFINA for purposes of these Title III Cases.  As such, the Oversight Board "may take any action necessary on behalf of the debtor to prosecute the case of the debtor…."  PROMESA § 315(a).  Congress

---

[28] *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1952 (2015) (ROBERTS, C.J., dissenting).

established this procedure with full awareness of the complex web of claims and other relationships between and among the Commonwealth and its instrumentalities.[29]  Indeed, Congress was specifically aware of the Commonwealth-COFINA Dispute when it enacted PROMESA.[30]  Congress nevertheless proceeded to name the Oversight Board as representative of all title III debtors.

19.  Among the numerous powers bestowed on the Oversight Board by Congress is the power to appoint its own agents to undertake actions on its behalf.  PROMESA section 104(b) enables the Oversight Board to authorize an agent to take any action the Oversight Board is authorized to take—which includes litigating and negotiating the Commonwealth-COFINA Dispute.

20.  The Mutual Fund Group attacks the appointment of the Agents as inconsistent with PROMESA because the Agent would represent COFINA *independent* of the Oversight Board.[31]  However, no inconsistency exists.  An agent is defined as "someone who is authorized to act for or in place of another; a representative."[32]  As the Oversight Board is entitled to represent COFINA, it can appoint an Agent as representative to do the same.  PROMESA expressly confirms this authority.

21.  Utilizing its power to appoint agents and its authority to "take any action necessary on behalf of the debtor to prosecute the case of the debtor," the Oversight Board has

---

[29] "The island has issued 18 different classes of debt—from general obligation to COFINA, to GDB [Government Development Bank], to utility bonds.  Various local and State laws are involved, and the result is a web of confusion."  162 CONG. REC. H3600-01, at H3632 (daily ed. June 9, 2016) (statement of Rep. Velazquez).

[30] "We need to have a solution soon, because we are running out of money.  As the Governor mentioned, we are starting this process, and the idea is to respect the differences between the General Obligation bonds and COFINA."  *Financial and Economic Challenges in Puerto Rico*, U.S. Senate Comm. on Finance, at 23 (Sept. 29, 2015) (statement of Ms. Acosta).

[31] Mutual Fund Group Response at 8 (emphasis in original).

[32] *Agent*, Black's Law Dictionary (10th ed. 2014).

11

taken meticulous care to ensure a fair and orderly process to resolve the Commonwealth-COFINA Dispute and to give the creditors a voice in this process. The Procedures provide the respective creditors of the Commonwealth and COFINA the opportunity to nominate independent Agents to represent their respective Debtors in pursuing a settlement or final adjudication of the Commonwealth-COFINA Dispute. The Oversight Board, in turn, must select from among the creditors' nominees and the statutory creditors' committee to serve as the Oversight Board's *independent* agent. Moreover, to provide a swift resolution to this gating issue, the Agents must commence litigation to resolve the Commonwealth-COFINA Dispute by no later than ten (10) days after their appointment and must further construct litigation schedule that enables the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute on or before November 1, 2017. This structure parallels similar structures undertaken by corporations whereby corporations establish special committees comprised of independent directors to assess the fairness of or negotiate transactions. Such structures have been repeatedly utilized by corporations and blessed by courts for their ability to create arm's length bargains.[33]

22.     In spite of the clarity of the Oversight Board's authority to appoint agents to carry out any of its powers under PROMESA, National claims the Oversight Board, by filing the Motion, concedes that it and its counsel have an irreconcilable conflict and therefore cannot represent COFINA.[34] National's claim, and AMBAC's similar claim, is wrong. They each ignore that Congress requires in PROMESA section 315(b) that the Oversight Board serve as COFINA's representative and the Commonwealth's representative. National advances this argument while it insures $690 million of GO Bonds and $1.1 billion of COFINA Senior

---

[33] *See generally* Claire Hill and Brett McDonnell, *Sanitizing Interested Transactions*, 36 DEL. J. CORP. L. 903 (2011), at http://scholarship.law.umn.edu/faculty_articles/81.

[34] National Response at 1.

Bonds.[35]  By its reasoning, National should have nothing to say in this matter, just as it alleges the Oversight Board should not.  Yet National requests that it be given veto power over the selection of the COFINA Agent by advocating the Agent must be unanimously selected by COFINA senior bondholders, including itself.  National asserts the Oversight Board should have no role (including the roles assigned by Congress in PROMESA), while it reserves rights for itself.[36]

23.      Despite Respondents' contentions to the contrary, it is clear from the Procedures that the Agents wield no more power than what the Oversight Board may grant them through PROMESA section 104(b).  Similarly, the Agents should have the same obligations to the Debtors as their principal—*i.e.*, the Oversight Board.  The creditors' request to amend the Proposed Order to impose fiduciary duties on the COFINA Agent,[37] is unnecessary and changes PROMESA.  All duties that PROMESA imposes on the Oversight Board in serving as COFINA's representative in litigation and negotiation are automatically duties of the Agent. There is no valid basis to shoehorn the Agent's actual duties into a fiduciary duty sound bite.

24.      Some objectors strained to characterize the Motion as something it is not, to create straw-man objections.  For instance, the contention that the Oversight Board is requesting a receiver is simply inaccurate.[38]  The Agent's duty is not to receive revenues.  Its duty is to litigate and negotiate.  Likewise, the claim the Agent is akin to a "non-statutory fiduciary" acting

---

[35] The Mutual Fund Group has a similar conflict, holding over $1.8 billion in GO Bonds, and $3.5 billion of COFINA bonds.  *See Mutual Fund Group's Response to the Bank of New York Mellon's Urgent Motion for An Order to Show Cause and Incorporated Memorandum of Law*, No. 3:17-ap-133-LTS [ECF. No. 20] at 4 n.3.

[36] National Response at 8.

[37] COFINA Senior Bondholders Response at 3.

[38] Mutual Fund Group Response at 6–7.

like a trustee is sheer fiction.[39]  The Motion is clear that the Agent is being appointed pursuant to PROMESA section 104(b) to exercise the same powers as the Oversight Board has.  Upon resolution of the Commonwealth-COFINA Dispute, as contemplated by the Procedures, the Commonwealth or COFINA will receive all the SUT it is entitled to receive.  There will be no receiver and no trustee.

**_Respondents Seek to Usurp PROMESA's Grant of Exclusivity to the Debtors_**

25.     At their core, certain of the Responses propose an inappropriate usurpation of the Oversight Board's role as representative of title III debtors and its exclusive and unlimited right to propose a plan of adjustment for each title III debtor.  _See_ PROMESA § 312(a).  Indeed, in the case of the Ad Hoc Group of General Obligation Bondholders (the "GO Group"), no effort is made to hide this intention, as the GO Group claims it is "the only adequate Commonwealth Agent."[40]  Creditors' rights, such as the GO Group's rights, however, are dependent on the Debtors' property rights—a fact that has been known to all creditors from the outset.[41]  Despite arguments labelled as "due process," creditors cannot step into the shoes of the Debtors or the Oversight Board to pursue claims that belong solely to the Debtors—even if such Debtors' claims impact creditor recoveries—where the Debtors have shown every intention of fully pursuing such claims.[42]  The Court should not allow creditors to modify or go around the Procedures to commandeer the litigation of the Commonwealth-COFINA Dispute.

---

[39] _Id._ at 7.

[40] GO Group Response at 14.

[41] The GO Group concedes this fact, noting that the "analogous situation" is where a trustee consents to a creditors' committee pursuing claims derivatively on behalf of the debtor.  GO Group Response at 16.

[42] _See Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery_, 330 F.3d 548, 553 (3d Cir. 2003) (finding creditor's committees can pursue derivate actions if a debtor-in-possession unreasonably refuses to pursue such action and is neglecting its fiduciary duty).  _Cybergenics_ is the opposite of the facts here, where, regardless of the colorability of the claims of the Debtors as to the rights to the Pledged Sales Tax, the Debtors have clearly not refused to bring such claims.

26. The Commonwealth-COFINA Dispute is limited to the question of whether, after considering all procedural and substantive defenses, the Pledged Sales Tax is either (a) property of the Commonwealth within the meaning of PROMESA section 306(b), or (b) subject to an allowable claim of the Commonwealth having priority over all claims of COFINA. The fact that resolution of this issue has an impact on creditors is simply the nature of creditors' dependent rights and does not change the reality that the causes of action belong to the Commonwealth and COFINA, and creditors have no standing to pursue them. To determine otherwise would mean that a creditor of a corporation would have standing in any litigation involving that corporation that may affect the value of that creditor's claim.[43]

27. Not only should the Commonwealth and COFINA (through the appointed Agents) be drivers of the process to resolve the Commonwealth-COFINA Dispute, the Oversight Board (as representative of these Debtors for purposes of title III) must be involved. PROMESA section 312(a) provides that "[o]nly the Oversight Board, after the issuance of a certificate pursuant to section 104(j) of this Act, may file a plan of adjustment of the debts of the debtor." Accordingly, any settlement that arises can only be incorporated into a title III plan of adjustment through affirmative consent and cooperation of the Oversight Board. Although creditors may want to take control of these claims and rights of the Debtors, they cannot change or ignore the statutory framework Congress enacted.

***There are No Issues of Due Process***

28. The GO Group's arguments relating to due process are an attempt to supplant the Oversight Board as representative of COFINA. Their argument is based on the false premise

---

[43] For the same reasons, there is no issue of adequate protection. The COFINA bondholders' collateral is entirely dependent on whether COFINA owns the Pledged Sales Tax. If COFINA does not own it, then they have no collateral. This is not a matter of taking bondholder collateral, it is a matter of finding out if they have any collateral. At the resolution of the Commonwealth-COFINA Dispute, the funds subject to dispute will be available to the party rightfully entitled to them.

that the Procedures seek appointment of an Agent to pursue *creditors'* claims and not the *Debtors'* claims.[44]   Building on this premise, the GO Group attempts to flip this script: even though they are seeking to step into the shoes of the Commonwealth and litigate on its behalf, they make it appear as if the Commonwealth is looking to litigate as the creditors' representative. They then argue that such a representative must adequately represent creditors' interests.   This argument is incorrect.   Because creditors' rights are dependent on the Debtors' rights, and because the Commonwealth-COFINA Dispute seeks resolution of claims held by the Debtors alone, creditors lack standing to pursue these causes of action and GO Group's due process arguments fail.   As aforesaid, to whatever extent creditors have intervention rights, nothing in the Procedures deprives them of such rights.

29.   Resolution of the Commonwealth-COFINA Dispute may impact creditor recoveries, but it does not *bind* creditors' rights as it pertains to their claims at the respective Debtor.[45]   While the value of a creditor's claim may be affected, the creditors' legal rights of recovery are unaltered.   Accordingly, due process does not require that the Agent represent creditors' rights because it is the Debtors' rights that each Agent represents.   Indeed, the Agents to be nominated by creditors to represent the Commonwealth or COFINA, respectively, are not agents of the creditors, but agents of the Oversight Board as representative of the respective Debtors.   The GO Group's proposed analysis that "a class representative must have an interest in vigorously pursuing the claims of the class, and must have no interest antagonistic to the interests of other class members"[46] is simply inapplicable here because the Agent does not purport to be

---

[44] This misconception is shared by a number of creditors who contend the claims to be resolved by the Procedures are *creditors'* claims.  *See, e.g.,* AMBAC Response at 8; FGIC Response at 3.

[45] *See* GO Group Response at 11.

[46] GO Group Response at 12.

(and, in compliance with PROMESA, could not purport to be) representative of the creditors. In any event, if the GO Group is truly concerned about having its "day in court,"[47] it may seek to appear and intervene in any litigation the Agents commence.

30.     Any concern that the Agents would not vigorously pursue their respective Debtors' claims is misplaced. The Procedures are not collusive for this very reason.[48] While the alleged due process requirement that the agent "adequately represent" creditors' interests is inapplicable here, there is no valid concern that either Agent would not vigorously advocate on behalf of its Debtor, as the interests and incentives of the Debtors are very much aligned with those of their respective creditors. The Procedures provide that the Oversight Board must select the Agent for the Commonwealth from the general statutory creditors' committee and at least two nominations made by creditors. It is only if the creditors fail to agree on at least two nominations that Oversight Board members shall select the Agents *after* consulting with creditors and considering potential persons that had not been nominated. As long as creditors nominate two representatives, the Oversight Board can only select from the statutory creditors' committee and Agents that have been deemed acceptable to such creditors.

31.     Finally, the GO Group asks that, due to alleged "due process defects," the Court, not the Oversight Board, should appoint the Commonwealth Agent. The GO Group makes this request only after submitting its own audition for the position of Agent by stating it is the "only adequate Commonwealth Agent" and that "it alone has mastered the issues well enough to

---

[47] GO Group Response at 10.

[48] The Mutual Fund Group's citation to *United States v. Johnson*, 319 U.S. 302 (1943), is therefore wholly inapposite. Mutual Fund Group Response at 9. In *Johnson*, a "friendly suit" was instituted at appellee's request, and the plaintiff never even met the attorney who appeared on his behalf. *Id.* at 303–04. The Supreme Court found that there was no case or controversy and dismissed the suit. *See id.* at 305. Here, there is nothing "friendly" about a lawsuit whose determination could affect property of the Debtor's estates to the tune of hundreds of millions if not billions of dollars.

litigate within ten days of being selected."[49]  Such a request, if granted, would go directly against Congress's intent in crafting PROMESA.  PROMESA provides for the Oversight Board to appoint its own agents.  While the Oversight Board is willing to limit its selection to the statutory creditors' committee and nominations provided by groups of creditors, the Oversight Board should not be ordered to abdicate its role as representative of the Debtor or give up its ability to select its own agents.  That any settlement or plan of adjustment must be approved by the Court before becoming effective already provides the judicial check that the GO Group purportedly seeks.

### Notice

32.    The Debtors have provided notice of this Omnibus Reply to the following parties: (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims against each Debtor; (d) the Office of the United States Attorney for the District of Puerto Rico; (e) counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority on behalf of the Governor of Puerto Rico; (f) the Puerto Rico Department of Justice; (g) the Other Interested Parties;[50] and (h) all parties filing a notice of appearance in these Title III Cases.

*[Remainder of Page Intentionally Left Blank]*

---

[49] GO Group Response at 14.

[50] The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtors; (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors; and (iii) counsel to the Respondents.

Dated: June 24, 2017
      San Juan, Puerto Rico

Respectfully submitted,

/s/  Martin J. Bienenstock

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel:  (212) 969-3000
Fax:  (212) 969-2900

*Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

/s/  Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel:  (787) 764-8181
Fax:  (787) 753-8944

*Co-Attorneys for the Financial Oversight and
Management Board as representative for the
Debtors*

Case:17-00188-LTS Doc#:420-26 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit DX-P Page 1 of 41

# EXHIBIT 26

**Hearing Date**: August 9, 2017 at 9:30 a.m. (Prevailing Eastern Time)
**Objection Deadline**: July 28, 2017 at 4:00 p.m. (Prevailing Eastern Time)
(or as otherwise specified by the Court)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

      Debtors.[1]

-------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

*[Caption continued on next page]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

```
--------------------------------------------------------x
```

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

THE COMMONWEALTH OF PUERTO RICO

           Debtor.

```
--------------------------------------------------------x
```

PROMESA
Title III

No. 17 BK 3283-LTS

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION,

           Debtor.

```
--------------------------------------------------------x
```

PROMESA
Title III

No. 17 BK 3284-LTS

This Document Relates to:[2]
17 BK 3283; 17 BK 3284

## REVISED MOTION OF DEBTORS FOR ORDER APPROVING STIPULATION PROVIDING PROCEDURE TO RESOLVE COMMONWEALTH-COFINA DISPUTE

To the Honorable United States District Court Judge Laura Taylor Swain:

      The Commonwealth of Puerto Rico (the "Commonwealth") and the Puerto Rico Sales

Tax Financing Corporation ("COFINA," and together with the Commonwealth, the "Debtors"),

by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight

Board"), as the Debtors' representative pursuant to section 315(b) of the *Puerto Rico Oversight,*

*Management, and Economic Stability Act* ("PROMESA"),[3] respectfully submit this revised

motion (the "Revised Motion"), pursuant to PROMESA sections 104(b), 315(a), and

---

[2] Pursuant to Paragraph 5 of the Joint Administration Order entered in lead Case No. 17 BK 3283-LTS [ECF No. 242], this pleading will be filed in both the lead Case No. 17 BK 3283-LTS and in Case No. 17 BK 3284-LTS.

[3] PROMESA has been codified in 48 U.S.C. §§ 2101-2241.

ii

sections 105(a), 503(b)(3)(B), 1103(c), and 1109(b) of title 11 of the United States Code (the "Bankruptcy Code"), made applicable by PROMESA section 301(a), for entry of an order approving a stipulation in the form attached hereto as **Exhibit A** (the "Agreed Order"), approving (a) appointment of the statutory committee of unsecured claimholders appointed by the United States Trustee on June 15, 2017 (the "Creditors' Committee") to serve as the Commonwealth agent in the "Commonwealth-COFINA Dispute" (defined below); (b) appointment of [_____] to serve as the COFINA agent in the Commonwealth-COFINA Dispute; and (c) approving certain procedures related thereto, to be binding on all parties in interest in the Debtors' cases. In support of this Revised Motion, the Debtors respectfully represent as follows:

## <u>Table of Contents</u>

Jurisdiction and Venue ................................................................................................... 1

Background ..................................................................................................................... 1

    A.   The COFINA Bonds ............................................................................ 2

    B.   The Commonwealth-COFINA Dispute ................................................ 4

    C.   The Fiscal Plan ..................................................................................... 6

    D.   The Commonwealth-COFINA Procedures Motion .............................. 7

Relief Requested ............................................................................................................ 8

Basis for Relief .............................................................................................................. 8

Proposed Procedures ................................................................................................... 12

Notice .......................................................................................................................... 18

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Bird v. Crown Convenience (In re NWFX, Inc.)*,
   864 F.2d 588 (8th Cir. 1988) .................................................................................... 10

*Commodore International, Ltd. v. Gould (In re Commodore International, Ltd.)*,
   262 F.3d 96 (2d Cir. 2001) ......................................................................... 11, 21, 22

*In re Chinichian*,
   784 F.2d 1440 (9th Cir. 1986) .................................................................................. 10

*In re Cooper Properties Liquidating Trust, Inc.*,
   61 B.R. 531 (Bankr. W.D. Tenn. 1986) .................................................................... 10

*In re Sunset Hollow Properties, LLC*,
   359 B.R. 366 (Bankr. D. Mass. 2007) ................................................................ 11, 22

*Lex Claims, et al. v. Garcia Padilla, et al.*,
   No. 16-02374-FAB (D.P.R. July 20, 2016) ............................................................... 5

*Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*,
   330 F.3d 548 (3d Cir. 2003) ............................................................................... 11, 21

*Protective Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v.
   Anderson*,
   390 U.S. 414 (1968) ........................................................................................... 11, 24

*Puerto Rico Fiscal Agency and Financial Advisory
   Authority*, Act 2-2017 (Jan. 18, 2017) ............................................................... 15, 27

STATUTES

11 U.S.C. §§ 105(a), 503(b)(3)(B), 1103(c), and 1109(b) ............................................. 7, 11, 21

PROMESA § 101(b) ........................................................................................................ 1

PROMESA § 101(d) ....................................................................................................... 1

PROMESA § 104(b) ................................................................................................. 1, 1, 7

PROMESA § 104(j) ........................................................................................................ 1

PROMESA § 104(j) ........................................................................................................ 1

PROMESA § 105(a) .................................................................................................. 1, 10

PROMESA § 1103(c) ..................................................................................................... 1

PROMESA § 206 ........................................................................................................... 1

PROMESA § 301 ........................................................................................................... 10

PROMESA § 301(a) ................................................................................................... 1, 1

PROMESA § 303 ............................................................................................. 13, 25, 29

PROMESA § 304 ........................................................................................................... 1

PROMESA § 304(a) ................................................................................................... 1, 2

PROMESA § 305 ............................................................................................. 13, 25, 29

PROMESA § 306(a) ................................................................................................. 1, 21

PROMESA § 307(a) ................................................................................................. 1, 21

PROMESA §  314(b) .............................................................................................. 14, 26

PROMESA § 315 ........................................................................................................... 1

PROMESA § 315(a) ....................................................................................................... 1

PROMESA § 315(b) ....................................................................................... 1, 2, 12, 15

PROMESA § 315(b) ................................................................................................ 23, 27

PROMESA § 316 ......................................................................................................... 24

PROMESA § 503(b)(3)(B) ............................................................................................. 1

## Jurisdiction and Venue

1.      The United States District Court for the District of Puerto Rico (the "Court") has subject matter jurisdiction over this matter pursuant to PROMESA section 306(a).

2.      Venue is proper pursuant to PROMESA section 307(a).

3.      The statutory bases for the relief requested herein are PROMESA sections 104(b), 315(a) and Bankruptcy Code section 105(a), made applicable in the Title III Cases by PROMESA section 301(a).

## Background

4.      On June 30, 2016, the Oversight Board was established under PROMESA section 101(b).  On August 31, 2016, President Obama appointed the Oversight Board's seven voting members.

5.      Pursuant to PROMESA section 315, "[t]he Oversight Board in a case under this title is the representative of the debtor[s]" and "may take any action necessary on behalf of the debtor[s] to prosecute the case[s] of the debtor[s], including filing a petition under section 304 of [PROMESA] . . . or otherwise generally submitting filings in relation to the case[s] with the court."

6.      On September 30, 2016, the Oversight Board designated the Debtors as covered entities under PROMESA section 101(d).

7.      On May 3, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to section 304(a) of PROMESA, commencing a case under title III thereof (the "Commonwealth's Title III Case").

8.      On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA

1

pursuant to PROMESA section 304(a), commencing a case under title III thereof ("COFINA's Title III Case," and, together with the Commonwealth's Title III Case, the "Title III Cases").

9.　　By operation of PROMESA and pursuant to section 315(b) the Oversight Board is the representative of the Commonwealth and COFINA in these Title III Cases.

10.　　On June 1, 2017, the Court entered an order granting the joint administration of the Commonwealth's Title III Case and COFINA's Title III Case, for procedural purposes only [Docket No. 242].

11.　　Background information regarding the Commonwealth and its instrumentalities, and the commencement of the instant Title III Cases, is contained in the *Notice of Statement of Oversight Board in Connection with PROMESA Title III Petition* [Docket No. 1], attached to the Commonwealth's title III petition.

**A. The COFINA Bonds**

12.　　COFINA is a statutory instrumentality of the Commonwealth.  It was created by Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a–16) (as amended, "Act 56") as a related entity for the Government Development Bank (the "GDB") for the purpose of financing the payment, retirement, or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006.

13.　　COFINA issued bonds pursuant to the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 10, 2009 (the "2009 Resolution" or the "Resolution").  COFINA bonds that have been issued can be grouped into the following tranches: (i) Senior Current Interest Bonds; (ii) Senior Capital Appreciation Bonds; (iii) Subordinate Current Interest Bonds; and (iv) Subordinate Capital Appreciation Bonds (collectively, the "COFINA Bonds").

2

14.     The COFINA Bonds are non-recourse bonds and are payable solely from, and secured by, a security interest granted under the 2009 Resolution in the pledged property, consisting mainly of the pledged sales and use tax (the "Pledged Sales Tax").  As of July 1, 2015, the total sales and use tax in Puerto Rico (to be allocated among the Commonwealth, municipalities, and COFINA) was increased to 11.5%.[1]  COFINA's annual share of the sales and use tax is the greater of (i) a fixed amount (currently ~$750 million), which grows at 4% per year (the "Pledged Sales Tax Base Amount"), or (ii) 2.75% of the sales and use tax collected that is shared between the Commonwealth and COFINA.  *See* Act of May 13, 2006, No 91-2006, § 3(a).  Presently, the Pledged Sales Tax Base Amount is in excess of the 2.75% portion of the sales and use tax.[2]

15.     Act 56 requires the Commonwealth's Secretary of the Treasury to deposit the first receipts of the Commonwealth Sales Tax in each fiscal year in the amount specified by the Pledged Sales Tax in a special fund held separate and apart from the Commonwealth's general fund.  Act No. 56, § 2; P.R. Laws Ann. tit. 13, § 12.

16.     As of July 31, 2016, there is approximately $17.3 billion of COFINA Bonds outstanding ($7.6 billion of Senior Bonds and $9.7 billion of Subordinate Bonds).

---

[1] *See* Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12.  The total sales and use tax ("SUT") is divided as follows: (I) a 4.5% SUT is paid to the Commonwealth pursuant to Act of July 1, 2015, No. 101-2015, sec. 6, § 4210.01(b); (II) a 6% SUT is divided between the Commonwealth, municipalities, and COFINA pursuant to Act of Jan. 24, 2014, No. 18-2014, art. 2–3, 2014 P.R. Laws 12; and (III) 1% SUT goes directly to Puerto Rico's municipalities pursuant to Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12.

[2] *See* Financial Information and Operating Data Report (Dec. 18, 2016), at 91.

3

Approximately $2.6 billion of COFINA bonds are insured.[3]  COFINA's debt service requirement is approximately $750 million for the fiscal year ending June 30, 2018 and is projected to grow annually.

**B. The Commonwealth-COFINA Dispute**

17.  For purposes of the Title III Cases, a dominant issue is whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law (the "Commonwealth-COFINA Dispute").  If they are property of the Commonwealth, then there may be no funds available to pay COFINA debt.[4]  If they are property of COFINA, then there will be approximately $750 million less available per year to pay Commonwealth liabilities and expenses, which annual amount increases over time.

18.  The Commonwealth has issued or guaranteed approximately $17.8 billion in general obligation bond debt (the "GO Debt").  The GO Debt falls into two categories: (i) the Commonwealth's general obligation bonds ("GO Bonds"), which were issued by the Commonwealth, and are backed by a pledge of the Commonwealth's good faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same pledge of the Commonwealth's good faith, credit, and taxing power ("GO-Guaranteed Bonds").

---

[3] Approximately 15% of COFINA debt is insured, including 31% of Senior Bonds and 3% of Subordinated Bonds.  *See* Commonwealth of Puerto Rico Fiscal Plan Appendix, dated Oct. 14, 2016 (the "Fiscal Plan Appendix (Oct. 14, 2016)") at 11.

[4] Some COFINA creditors assert that if they do not have a lien against the sales and use taxes, they would have claims against the Commonwealth.

4

19.     On July 20, 2016, certain holders of the Commonwealth's general obligation debt filed a complaint against the Commonwealth's Governor, Secretary of Treasury, and Office of Management and Budget Director seeking (a) a declaratory judgment that certain measures taken by the Commonwealth permitting transfers outside of the ordinary course or in violation of the Puerto Rico Constitution were prohibited under PROMESA, and (b) an injunction to prevent such transfers. *See Lex Claims, et al. v. Garcia Padilla*, *et al*., No. 16-02374-FAB (D.P.R. July 20, 2016) (hereinafter, "Lex Claims").

20.     Holders of the GO Debt argue, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. *Lex Claims* [Docket No. 78], at 4.  They point to Article VI, Section 8 of the Puerto Rico Constitution which provides that, if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.  In their view, the Pledged Sales Tax is an "available resource" and COFINA was created and has issued bonds in an attempt to evade the GO Debtholders' claim on available resources and related constitutional limitations on the quantity of public debt the Commonwealth was permitted to issue.  *Lex Claims* [Docket No. 78], at 7.

21.     Holders and insurers of COFINA Bonds argue that the sales and use taxes were legislatively rendered property of COFINA from their inception, thereby eliminating any possibility the taxes may be property or available resources of the Commonwealth.  *Lex Claims* [Docket No. 232], at 30.  They point to Act of May 13, 2006, No 91-2006, 2006 P.R. Laws 246 *et seq*. (codified as amended at P.R. Laws Ann. tit. 13, § 12) (as amended, "Act 91") providing

the Pledged Sales Tax "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." Act 91, § 2. They further assert that COFINA was essential in permitting the Commonwealth to access the capital markets on preferable terms.

## C. The Fiscal Plan

22. On March 13, 2017, Puerto Rico's Fiscal Agency and Financial Advisory Authority ("AAFAF") submitted a joint fiscal plan (as amended and corrected, the "Fiscal Plan") to the Oversight Board. On that date, the Oversight Board certified the Fiscal Plan subject to certain amendments.

23. Whether the funds available for debt service under the Fiscal Plan should satisfy COFINA debt, Commonwealth debt, or be divided between the two depends on which entity(s) own the Pledged Sales Tax.

24. Promptly after certification of the Fiscal Plan, the Oversight Board and the Commonwealth undertook a joint effort to formulate restructuring proposals for all major creditors based on the debt sustainability analysis in the Fiscal Plan. In March 2017, the Oversight Board and the government requested holders of GO Debt and COFINA Bonds to participate in mediation with the Oversight Board and government, in an attempt to, among other things, resolve the Commonwealth-COFINA Dispute.

25. The mediation commenced on April 13, 2017, under the auspices of former Bankruptcy Judge Allan Gropper, who was nominated by a plurality of creditors. Despite several mediation sessions and other private negotiations, no agreements were reached before the expiration of the PROMESA stay on May 1, 2017. After certain creditors commenced litigation against the Commonwealth and COFINA, the Oversight Board and the Commonwealth decided

the best path forward was to file title III cases for the Commonwealth and COFINA to protect Puerto Rico and its citizens.

26.     The Oversight Board has not taken sides in the Commonwealth-COFINA dispute.

**D.  The Commonwealth-COFINA Procedures Motion**

27.     On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Motion") [Dkt. No. 303] to authorize a procedure to resolve the Commonwealth-COFINA Dispute in furtherance of fulfilling its responsibilities under PROMESA.

28.     At the omnibus hearing held in San Juan, Puerto Rico on June 28, 2017 (the "Hearing"), the Court denied the Motion without prejudice.  At the Hearing, the Court directed the Oversight Board to seek the agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Houser of the Northern District of Texas (the "Mediation"), and authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties.

29.     Since the Hearing, Chief Bankruptcy Judge Barbara Houser has worked tirelessly with the Oversight Board and creditors to formulate procedures agreeable to many of the interested parties.  The revised proposed procedures at issue here incorporate many of the comments and changes proposed by the interested parties.

30.     At many creditors' request, the revised proposed procedures are embodied in the attached stipulation (the "Stipulation"), rather than a standard motion.  Accordingly, this Revised Motion requests that the Stipulation be approved by its being SO ORDERED.  Because the Stipulation was being negotiated right up to the last hours to file this Revised Motion, it was not possible to collect signatures before filing it.  Nevertheless, the Stipulation has always provided

Case:17-03283-LTS Doc#:4380-8 Filed:01/14/19 Entered:01/14/19 22:00:37 Desc: Debtors's Page 454 of 440

and contemplated that if SO ORDERED, it would be binding on all signatories (the "Signatories") and other parties in interest.

## Relief Requested

31.     By this Revised Motion, pursuant to PROMESA sections 104(b), 315(a), and Bankruptcy Code sections 105(a), 503(b)(3)(B), 1103(c), and 1109(b), the Debtors request that the Stipulation be SO ORDERED.    As explained below, the Stipulation appoints a Commonwealth Agent and COFINA Agent to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and provides a procedure and timeline for the Agents to consult with creditors of their respective debtors.

## Basis for Relief

32.     The Oversight Board, as representative of the Commonwealth and COFINA, submits this Revised Motion in the interest of creating a fair, transparent, and efficient structure for resolving the Commonwealth-COFINA Dispute.    At the outset of these Title III Cases, counsel for the Oversight Board brought to the Court's attention the importance of the Commonwealth-COFINA Dispute and the procedural efforts to resolve it.  The Court expressed at that time that "transparency is important in these proceedings. And so a method that, if these matters are controversial, will make the steps and the issues as transparent as possible is appropriate."  May 17, 20-17 Hr'g Tr. 63:5-9 [Docket No. 207].

33.     The numbers clearly illustrate the importance of resolving the Commonwealth-COFINA Dispute.    Of the approximately $74 billion in aggregate debt owed by the Commonwealth, the GO Debt and COFINA Bonds together account for approximately 55% of the total bond debt to be restructured.  The outcome of the Commonwealth-COFINA Dispute will weigh heavily on the relative recoveries of the debt holders of COFINA and the Commonwealth.  The debt service on the COFINA Bonds alone is estimated to be approximately

$750 million in fiscal year 2017, and is projected to grow each fiscal year. On the other hand, the Fiscal Plan contemplates an average of $787 million in available funds for debt service. Should the Pledged Sales Taxes be determined to be property of COFINA, very little or no funds will be projected to be available for debt service at the Commonwealth, and vice versa. The Oversight Board is endeavoring to spearhead initiatives to grow investments in the Commonwealth to expand the pie for everyone, but new initiatives take time to generate results.

34. Time is of the essence to resolve the Commonwealth-COFINA Dispute because, if the Commonwealth is not entitled to any of the Pledged Sales Taxes,[5] it may, absent borrowing or further slashing expenses to a counterproductive extent, face acute cash management issues beginning December 15, 2017. If there is no settlement or final adjudication as to the Commonwealth-COFINA Dispute by December 15, 2017, the Commonwealth may need to borrow funds from COFINA to fund the Commonwealth's operating budget.

35. Further, until a resolution is reached on this gating issue, it is far less feasible for the Oversight Board to negotiate a consensual title III plan of adjustment for the Commonwealth and COFINA or any of their other Debtor-affiliates.

36. PROMESA grants the Oversight Board the power to delegate its authority to agents. Specifically, section 104(b) provides that "[a]ny member or agent of the Oversight Board may, if authorized by the Oversight Board, take any action that the Oversight Board is authorized to take by this section." PROMESA § 104(b).

37. PROMESA section 315(a) provides the Oversight Board with the power to take any action necessary to prosecute the Title III Cases. *See* PROMESA § 315(a) ("For the

---

[5] The Pledged Sales Tax relates solely to COFINA's potential share of the 6% SUT allocated to the Commonwealth, municipalities, and COFINA by Act of Jan. 24, 2014. Even if the Pledged Sales Tax is found to be valid, the Commonwealth will receive any remaining revenues from the 6% SUT collections.

9

purposes of this title, the Oversight Board may take any action necessary on behalf of the debtor to prosecute the case of the debtor . . .").  Given the importance of the Commonwealth-COFINA Dispute to Puerto Rico's overall restructuring, it is prudent to establish an independent debtor representative for each of the Commonwealth and COFINA to fully advocate, at arm's length, on behalf of each Debtor to reach a fair resolution.

38.  Congress mandated that the Oversight Board be the representative of every title III debtor, notwithstanding that it was self-evident that the title III debtors conduct thousands of transactions among themselves, creating significant claims among them.  Given the extraordinary magnitude of the Commonwealth-COFINA dispute, the proposed procedure submitted to the Court works within the framework that Congress contemplated: ensuring that each of the Debtors' (and their respective creditors') rights are protected and independently represented, while making sure that the Oversight Board remains in control of the overall restructuring of the Commonwealth and its instrumentalities.

39.  PROMESA section 301 makes applicable Bankruptcy Code section 105(a) to title III cases.  Section 105(a) provides, in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."  11 U.S.C. § 105(a).  Under section 105(a), the Court has expansive equitable powers to fashion any order or decree that carries out the statute.  *See, e.g., In re Chinichian*, 784 F.2d 1440, 1443 (9th Cir. 1986) ("Section 105 sets out the power of the bankruptcy court to fashion orders as necessary pursuant to the purposes of the Bankruptcy Code."); *Bird v. Crown Convenience (In re NWFX, Inc.)*, 864 F.2d 588, 590 (8th Cir. 1988) ("The overriding consideration in bankruptcy . . . is that equitable principles govern."); *In re Cooper Properties Liquidating Trust, Inc.*, 61 B.R. 531, 537 (Bankr. W.D. Tenn. 1986) ("[T]he Bankruptcy Court is one of equity and as such it has a

duty to protect whatever equities a debtor may have in property for the benefit of its creditors as

long as that protection is implemented in a manner consistent with the bankruptcy laws.").

40.     With respect to the appointment of the Commonwealth Agent (as defined below),

Bankruptcy Code sections 105(a), 503(b)(3)(B), 1103(c), and 1109(b) permit the Oversight

Board to consensually grant standing to the Creditors' Committee, when necessary and

beneficial to do so. *See Commodore International, Ltd. v. Gould (In re Commodore*

*International, Ltd.)*, 262 F.3d 96 (2d Cir. 2001) (setting forth test for consensual grant of

derivative standing); *see generally Official Committee of Unsecured Creditors of Cybergenics*

*Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (court may authorize creditors' committee to

recover property for the benefit of the debtor's estate); *accord In re Sunset Hollow Properties,*

*LLC*, 359 B.R. 366, 383 (Bankr. D. Mass. 2007) (approving of "standing derived from the []

debtor passed on to its Creditors' Committee" and citing with approval *Commodore Int'l Ltd. v.*

*Gould et al, (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 98 (2d Cir. 2001) ("a debtor in

possession may stipulate to representation by an unsecured creditors' committee 'so long as the

bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed

necessary and beneficial.'")).

41.     After discussions with representatives of different types of COFINA creditors and

Commonwealth creditors, it became evident the senior and subordinated COFINA creditors were

concerned about which type of COFINA creditor the COFINA Agent (defined below) may try to

serve.  To ameliorate that concern, the Oversight Board proposes that each Agent be instructed to

assess settlements from the viewpoint of maximizing the result for the Debtor the Agent

represents, as opposed to maximizing it for a particular type of creditor of each Debtor.  This is

consistent with the settlement framework espoused by the United States Supreme Court in

11

*Protective Committee for Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390

U.S. 414, 424-425 (1968).

<u>**Proposed Procedures**</u>

42.    The Stipulation provides the following procedures (the "<u>Proposed Procedures</u>") to

resolve the Commonwealth-COFINA Dispute:

    a.  The Oversight Board, as representative of title III debtor Commonwealth of
Puerto Rico pursuant to PROMESA section 315(b), authorizes the Creditors'
Committee to serve as the Commonwealth representative to litigate and/or settle
the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the
"<u>Commonwealth Agent</u>").

    b.  The Oversight Board, as representative of title III debtor COFINA pursuant to
PROMESA section 315(b), authorizes [_____] to serve as the
COFINA representative to litigate and/or settle the Commonwealth-COFINA
Dispute on behalf of COFINA (the "<u>COFINA Agent</u>").

    c.  Solely in respect of settlement discussions, the Commonwealth shall have two
creditor representatives (the "<u>Commonwealth Creditor Representatives</u>")
appointed as follows—

        i.  One Commonwealth Creditor Representative shall be selected by the Ad
Hoc Group of GO Bondholders and Assured Guaranty Corp. (together,
"<u>AGO</u>"); [6] and

       ii.  One Commonwealth Creditor Representative shall be the Official
Committee of Retirees;

    d.  Each of the Commonwealth Agent and the COFINA Agent (each, an "<u>Agent</u>")
shall be entitled to retain legal and other professionals it reasonably deems
appropriate.  The Commonwealth Agent shall retain the law firm [_____],
with the matter led by [_____], to serve as its counsel.  The
Creditors' Committee's retained advisors, the COFINA Agent and its retained
advisors, and the Commonwealth Creditor Representatives shall be compensated
by the Debtor on whose behalf they are acting, in conformity with PROMESA

---

[6] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the following shall be added
to paragraph 4.c.(i) of the Stipulation:

        For the avoidance of doubt, the Commonwealth Creditor Representatives
that are not statutory committees shall not, by virtue of their selection for
such position or their participation in settlement discussions, take on any
duty to refrain from trading any securities (or derivatives of securities),
provided, however, that nothing herein exempts any person or entity from
compliance with all applicable securities laws.

section 316 and any interim compensation procedures ordered by the Court; and in the case of counsel for the Creditors' Committee and counsel for the Official Committee of Retirees, the order of this Court authorizing the retention of such counsel.  For the avoidance of doubt, the Commonwealth Creditor Representative selected by the Ad Hoc Group of GO Bondholders and AGO shall be an individual.[7]  Such individual shall not be authorized to retain legal or other professionals at the expense of the Commonwealth to assist him/her in carrying out his/her functions in the Agreed Order, but the individual shall be compensated for his/her time and reasonable expenses.  The Official Committee of Retirees shall be entitled to compensation of its advisors, but not to compensation for its members' time.

e.  By no later than ten (10) days after the Agreed Order is so ordered, the Agents shall meet and confer regarding the time and form of commencement of litigation to resolve the Commonwealth-COFINA Dispute.  In advance of the commencement of such litigation, the Agents, the Oversight Board, AAFAF, and the Permitted Intervenors (as defined below) shall agree to a schedule constructed to enable the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute, on or before December 15, 2017, unless extended by the Court, for cause, *sua sponte,* or upon application of any of the Signatories, in the absence of a prior settlement (the "Resolution Date"); provided, that, if the parties do not agree on a schedule within 15 days after entry of the Agreed Order, the Agents may together or separately seek approval from the Court by motion upon shortened notice of a proposed schedule.

f.  Each Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents.  In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents.  If the Agents negotiate a settlement, they should be guided by *Protective Committee of Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968).  Neither the Agent nor its professionals (in their capacities as professionals to the Agent) shall litigate, nor attempt to negotiate, or participate in the mediation of, any of the rights of any bondholder versus another bondholder under the COFINA Bond Resolution, or any bondholder versus an insurer of such bonds.  Each Agent shall have the rights of its respective debtor solely in respect of the conduct of the litigation and settlement of the Commonwealth-COFINA Dispute.  In connection with fulfilling its duties hereunder, the Agent shall consult with the major creditor constituencies of the Debtor it represents and any Permitted Intervenors that intervene on that Agent's side of the Commonwealth-

---

[7] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the Commonwealth Creditor Representative selected by the Ad Hoc Group of GO Bondholders and Assured Guaranty Corp. may be an individual, group, or committee.  If it is a group or committee, its compensation shall not exceed compensation for the time of one individual.

13

COFINA Dispute.[8]  In agreeing to the Stipulation, no Signatory waives any right to object to a settlement negotiated by the Agent on any ground, including that such settlement is a denial of adequate protection or other right that may be asserted by such objector.  Each Agent shall have access to any information of the Debtor it represents reasonably necessary to the Agent performing its duties in resolving the Commonwealth-COFINA Dispute; provided that any objections of the Debtors may be resolved by the mediators.  For the avoidance of doubt, this does not include access to information of the Oversight Board.  To the extent a Debtor provides privileged information or work product, the Agent is not authorized to waive the privilege or to share the information with any third parties for any purpose, unless authorized to do so in writing by its Debtor. Notwithstanding the foregoing, in the mediation process, (i) the Agent(s) reserve the right to seek access to relevant Commonwealth and/or Oversight Board information that is neither privileged nor work product that will allow them to understand the financial need that the Commonwealth anticipates satisfying from the Pledged Sales Taxes, and (ii) the Commonwealth and the Oversight Board reserve the right to oppose such access on any ground including that the certified fiscal plans show all financial needs to be satisfied.  The Assigned Mediator(s) (as defined in the Mediation Agreement) will work with all parties to attempt to resolve any dispute over access to this information (including disputes with respect to privilege and work product).  Nothing herein shall (a) preclude the Signatories from sharing with the Agents information obtained in the Mediation necessary to understand the financial need that the Commonwealth anticipates satisfying from the Pledged Sales Taxes, or from sharing privileged information with the Agents and Agents' counsel in furtherance of any common interest, and (b) entitle any Signatory to any privileged information or work product.

g.  In addition, each Agent may consider what result, through litigation, negotiation and mediation, will render its Debtor best able to achieve fiscal responsibility and access to the capital markets, in the judgment of each Agent.  Nothing herein waives any rights of the Commonwealth and AAFAF under PROMESA sections 303 and 305, except as provided by the Puerto Rico Constitution, the U.S. Constitution, and PROMESA.

h.  To the extent it is necessary or desirable to link a settlement to the treatment of creditors' claims in a title III plan of adjustment, the Oversight Board and AAFAF may participate in the negotiations and Mediation in an effort to reach such a settlement.

---

[8] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the following shall be added to paragraph 4.f. of the Stipulation:

To the extent not already required herein, the Commonwealth Agent shall consult with the Commonwealth Creditor Representatives, the Ad Hoc Group of GO Bondholders, and AGO (to the extent that the Ad Hoc Group of GO Bondholders and AGO have not been selected as a Commonwealth Creditor Representative) regarding the status of negotiations with respect to settlement of the Commonwealth-COFINA dispute.

i.  Any settlement negotiated pursuant to the protocol approved herein shall be filed with the Court by the Agents upon reaching agreement but shall only be effective upon (i) with respect to the Commonwealth, (a) approval of the Commonwealth Agent and at least one of the Commonwealth Creditor Representatives, provided, however, the Commonwealth Creditor Representatives are not authorized to negotiate any proposed settlement, but only to consent thereto, and (b)(1) this Court's approval of such settlement pursuant to a final order as to which (A) the deadline to file a notice of appeal or petition for certiorari has lapsed (including any extension provided by Bankruptcy Rule 8002(b)(1)) and no appeal or petition is pending or, (B) if the subject of a timely appeal or petition, no stay, suspension, or injunction precluding effectiveness has been granted and is continuing (a "Final Order"), or (2) confirmation of a title III plan of adjustment in the Commonwealth title III case incorporating such settlement pursuant to a Final Order, and which plan has become effective; and (ii) with respect to COFINA, confirmation of a title III plan of adjustment in the COFINA title III case incorporating such settlement pursuant to a Final Order, and which plan has become effective; *provided, however*, that, other than with respect to ensuring that such settlement is properly embodied within the title III plan of adjustment, the COFINA Agent shall not participate in the negotiations of a title III plan of adjustment in the COFINA title III case.  Any settlement negotiated pursuant to the protocol approved herein shall be presented simultaneously for approval to both Commonwealth Creditor Representatives

j.  If the Oversight Board determines it is impracticable to schedule a timely confirmation hearing on a Commonwealth plan of adjustment embodying the proposed settlement negotiated by the Agents, then any proposed settlement negotiated by the Agents that can be implemented by the Commonwealth independently of a plan of adjustment (*e.g.*, a settlement that allocates the Pledged Sales Taxes between COFINA and the Commonwealth, but does not provide for how the Commonwealth will distribute such assets to creditors), may be submitted for this Court's approval with respect to the Commonwealth only by the Commonwealth Agent or the Oversight Board.  Absent agreement of all Signatories, any proposed settlement outside a plan of adjustment for the Commonwealth shall be submitted for approval on not less than 45 days' notice, and shall be heard and if approved, approved contemporaneously with confirmation of a title III plan of adjustment in the COFINA title III case incorporating such settlement.

k.  All parties in interest, including the Oversight Board and AAFAF, may appear and be heard with respect to any proposed settlement; *provided, however*, that neither the Oversight Board nor AAFAF shall have any right to contest any judgment made by the Agents pursuant to subparagraph f.

l.  In the event that the Commonwealth-COFINA Dispute is resolved by a settlement developed under this protocol, the Oversight Board shall file a title III plan of adjustment for COFINA incorporating such settlement, with an accompanying disclosure statement, and the Oversight Board shall propose how COFINA's property will be distributed to COFINA creditors (consistent with the plan

15

distributions, if any, agreed to by all parties in the Mediation), no later than 45 days after such settlement is presented by the Agents to the Oversight Board; provided that, no hearing to consider approval of any settlement of the Commonwealth-COFINA Dispute with respect to COFINA shall occur, and objections to such settlement by COFINA's creditors and other parties in interest shall not be due, until a reasonable time after the Oversight Board files a title III plan of adjustment for COFINA, and such hearing date and objection deadline may be concurrent with the hearing date and objection deadline for the COFINA plan of adjustment. If any court of competent jurisdiction denies confirmation of the plan incorporating the settlement developed under this protocol, the Oversight Board shall use good faith efforts to file one or more amended plans, each of which incorporates such settlement, in order to comply with the confirmation requirements of section 314(b) of PROMESA; *provided*, *however*, that if the Court determines no confirmable plan for COFINA can be proposed consistent with the settlement, then the settlement shall be deemed null and void.

m. For the avoidance of doubt, the litigation or negotiation by the Agents shall not include issues other than the Commonwealth-COFINA Dispute; *provided, however,* that any resolution of the Commonwealth-COFINA Dispute implemented under a title III plan of adjustment shall be a final resolution of all issues affecting entitlements of each allowed claim against COFINA to its distributions under the plan, including with respect to the nature, validity, extent and priority of the liens pledged to secure the COFINA bonds, and may resolve all potential claims by holders of COFINA bonds against the Commonwealth, provided further that any such treatment of COFINA bondholders' claims, if any, against the Commonwealth as part of the settlement shall be on terms acceptable to the Commonwealth Agent and the Oversight Board.

n. Notwithstanding anything in the Agreed Order, the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute, developed by the Agents, or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute; provided, however, that if the Agents reach a proposed settlement of the Commonwealth-COFINA Dispute before the Court fixes a date for a hearing on the disclosure statement of the Oversight Board's proposed plan of adjustment for COFINA, the Oversight Board shall amend its proposed disclosure statement so at the confirmation hearing on the proposed plan of adjustment for COFINA, the Agents' proposed settlement shall first be considered by the Court together with the proposed plan distributions, if any, agreed to by all parties in the Mediation, or otherwise, together with plan distributions proposed by the Oversight Board.

43. Each of the creditor parties, statutory committees, and Creditor Representatives that are Signatories (the "Permitted Intervenors"), shall be authorized to intervene, in its individual capacity or as part of a group, and be heard in any litigation between the Agents to resolve the Commonwealth-COFINA Dispute without further order of the Court; *provided, however*, that the Court may impose reasonable limitations on participation by the Permitted Intervenors to avoid duplication and undue burdens on the Court. AAFAF, as the government's agent in accordance with the *Puerto Rico Fiscal Agency and Financial Advisory Authority*, Act 2-2017 (Jan. 18, 2017) (the "AAFAF Enabling Act"), may also intervene as of right to exercise its rights to be heard under applicable law. AAFAF shall not contravene the FOMB's statutory status as the Commonwealth's representative pursuant to PROMESA § 315(b). Nothing herein waives the rights of any party in interest from asserting any intervenor is conflicted. Nothing herein shall deprive AAFAF and the government of any other intervention rights they have and shall not deprive any other party in interest of any standing, intervention rights, and other rights to appear that they have in any litigation relating to the Commonwealth-COFINA Dispute or any other litigation. For the avoidance of doubt, the grant of intervention to any party, including the Permitted Intervenors, shall neither affect nor impair the ability of the Agents to settle the Commonwealth-COFINA Dispute in accordance with the Proposed Procedures above nor modify the standards for approval by the Court of any settlement reached by the Agents.

44. Nothing contained in the Proposed Procedures or Agreed Order shall be deemed, asserted, or construed as an admission by any Signatory nor shall it substantively impact any party's rights, claims, defenses, or counterclaims in connection with the Commonwealth-COFINA Dispute or under the COFINA Bond Resolution.

45.     There shall be common interest and joint defense privileges for all communications (including work product shared) between or among an Agent and the Creditor Representatives or creditors of the Debtor such Agent represents.  All such communications shall be confidential and shall not be subject to discovery or other disclosure.

## Notice

46.     The Debtors have provided notice of this Revised Motion to the following parties (the "Notice Parties"): (a) the Office of the United States Trustee for the District of Puerto Rico; (b) the indenture trustees and/or agents, as applicable, for the Debtors' bonds; (c) the entities on the list of creditors holding the 20 largest unsecured claims against each Debtor; (d) the Office of the United States Attorney for the District of Puerto Rico; (e) counsel to the Puerto Rico Fiscal Agency and Financial Advisory Authority on behalf of the Governor of Puerto Rico; (f) the Puerto Rico Department of Justice; (g) the Other Interested Parties;[9] and (h) all parties filing a notice of appearance in these Title III Cases.  The Debtors submit that, in light of the nature of the relief requested, no other or further notice need be given.

*[Remainder of Page Intentionally Left Blank]*

---

[9]  The "Other Interested Parties" include the following: (i) counsel to certain of the insurers and trustees of the bonds issued or guaranteed by the Debtors; and (ii) counsel to certain ad hoc groups of holders of bonds issued or guaranteed by the Debtors.

WHEREFORE the Debtors respectfully request the Court SO ORDER the Stipulation and grant the Debtors such other and further relief as is just.

Dated: July 21, 2017
     San Juan, Puerto Rico

Respectfully submitted,

/s/ Martin J. Bienenstock

Martin J. Bienenstock
Paul V. Possinger
Ehud Barak
Maja Zerjal
(Admitted *Pro Hac Vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial
Oversight and Management Board
as representative for the Debtors*

/s/ Hermann D. Bauer

Hermann D. Bauer
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial
Oversight and Management Board
as Representative for the Debtors*

## Exhibit A

**Stipulation and Agreed Order**

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*

      Debtors.[1]

------------------------------------------------------------x

PROMESA
Title III

No. 17 BK 3283-LTS

(Jointly Administered)

*[Caption continued on next page]*

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); and (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

```
-------------------------------------------------------------x
```

In re:

PROMESA
Title III

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

     as representative of

No. 17 BK 3283-LTS

THE COMMONWEALTH OF PUERTO RICO

     Debtor.

```
-------------------------------------------------------------x
```

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

PROMESA
Title III

     as representative of

PUERTO RICO SALES TAX FINANCING
CORPORATION,

No. 17 BK 3284-LTS

     Debtor.

```
-------------------------------------------------------------x
```

## STIPULATION AND AGREED ORDER APPROVING
## PROCEDURE TO RESOLVE COMMONWEALTH-COFINA DISPUTE

     This stipulation and agreed order ("Stipulation") is entered into by the undersigned parties (the "Signatories") to resolve the issues raised by the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Motion") and this Stipulation shall be noticed generally prior to consideration by the Court so the Court's ruling shall be binding on all parties in interest.[2]

---

[2] Capitalized terms used but not otherwise defined herein shall have the meanings given to them in the Motion.

Case:17-03283-LTS Doc#:4780 Filed:01/14/19 Entered:01/14/19 22:07:32 Desc:Main
Document Page 487 of 507

## RECITALS

**WHEREAS,** the Oversight Board filed the Motion in order to authorize a procedure to resolve the Commonwealth-COFINA Dispute in furtherance of fulfilling its responsibilities under PROMESA;

**WHEREAS**, the Court denied the Motion without prejudice at the omnibus hearing held in San Juan, Puerto Rico, on June 28, 2017 (the "Hearing");

**WHEREAS**, at the Hearing, the Court directed the Oversight Board to seek the agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation with Chief Bankruptcy Judge Houser of the Northern District of Texas (the "Mediation"), and authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties;

**WHEREAS**, in an effort to advance the Title III Cases and facilitate the litigation or settlement of the Commonwealth-COFINA Dispute, the Signatories have agreed upon a revised procedure as set forth below and respectfully request the Court to enter this Stipulation as an agreed Order, binding on all parties in interest in the Debtors' cases.

**NOW, THEREFORE**, the Signatories agree and, upon the Court's approval, it shall be ordered and binding on all parties in interest as follows:

1.     Notice; Jurisdiction; Venue.  The Debtors provided adequate and appropriate notice of the Motion and of this Stipulation under the circumstances and no other and further notice is required.  The Court has subject matter jurisdiction over this matter pursuant to section 306(a) of PROMESA.  Venue is proper pursuant to section 307(a) of PROMESA.

2.     Appointment Of Agents.  With respect to the appointment of the Commonwealth Agent (as defined below), Bankruptcy Code sections 105(a), 503(b)(3)(B), 1103(c), and 1109(b)

3

permit the Oversight Board to consensually grant standing to the Creditors' Committee (as defined below), when necessary and beneficial to do so (*see Commodore International, Ltd. v. Gould (In re Commodore International, Ltd.)*, 262 F.3d 96 (2d Cir. 2001) (setting forth test for consensual grant of derivative standing); *see generally Official Committee of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548 (3d Cir. 2003) (court may authorize creditors' committee to recover property for the benefit of the debtor's estate); *accord In re Sunset Hollow Properties, LLC*, 359 B.R. 366, 383 (Bankr. D. Mass. 2007) (approving of "standing derived from the [] debtor passed on to its Creditors' Committee" and citing with approval *Commodore Int'l Ltd. v. Gould et al, (In re Commodore Int'l Ltd.)*, 262 F.3d 96, 98 (2d Cir. 2001) ("a debtor in possession may stipulate to representation by an unsecured creditors' committee 'so long as the bankruptcy court exercises its judicial oversight and verifies that the litigation is indeed necessary and beneficial.'")).  Further, with respect to the appointment of the Commonwealth Agent and the COFINA Agent (as defined below and, together with the Commonwealth Agent, the "Agents"), section 104(g) of PROMESA authorizes the Executive Director to enter into any contracts that are appropriate to carry out the Oversight Board's responsibilities under PROMESA and section 104(b) permits the appointment of an agent by the Oversight Board to take any action that the Oversight Board is authorized to take by section 104 of PROMESA.  The Signatories agree and, upon entry of the Stipulation by the Court, the Court finds, that approval of the procedures is necessary and appropriate to carry out the provisions of Title III of the Debtors' cases, the conferral of agent status on the Commonwealth Agent and COFINA Agent is (i) in the best interests of the Debtors and their respective property and (ii) necessary and beneficial to the efficient resolution of these cases, and this Stipulation constitutes a permitted contract pursuant to sections 104(b) and (g) of PROMESA.  This finding with

respect to section 104 of PROMESA is limited to the facts and circumstances presented by this Stipulation, and shall have no binding effect outside of these facts and circumstances. Solely to the extent, if any, that section 305 of PROMESA serves as a limitation on judicial power over the authority delegated to the Agents, the Oversight Board hereby consents.

3. <u>Objections Withdrawn or Overruled</u>. All objections to the procedures approved herein by any Signatory have been withdrawn by such Signatory, subject to the explicit reservation of rights herein, or are overruled on the merits upon entry of this Stipulation by the Court; *provided, however* that nothing herein shall be deemed, asserted, or construed as an admission by any Signatory and nothing herein shall substantively impact any party's rights, claims, defenses, or counterclaims in connection with the Commonwealth-COFINA Dispute or under the COFINA Bond Resolution.

4. <u>Procedures</u>. Upon entry by the Court of this Stipulation, and subject to paragraph 11 herein, the Oversight Board shall implement the following actions and procedures relating to this issue: Whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt (the "<u>Pledged Sales Taxes</u>") are property of the Commonwealth or COFINA under applicable law (the "<u>Commonwealth-COFINA Dispute</u>").[3]

    a. The Oversight Board, as representative of title III debtor Commonwealth of Puerto Rico pursuant to PROMESA section 315(b), authorizes the statutory committee of unsecured claimholders appointed by the United States Trustee on June 15, 2017 (the "Creditors' Committee") to serve as the Commonwealth representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "<u>Commonwealth Agent</u>").

    b. The Oversight Board, as representative of title III debtor COFINA pursuant to PROMESA section 315(b), authorizes _____to serve as the COFINA

---

[3] If any creditors contend the determination of the foregoing issue requires determination of claims or defenses personal to such creditors and not owned by the Commonwealth or COFINA, the Court shall separately determine how such claims and defenses shall be adjudicated.

5

representative to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent").

c. Solely in respect of settlement discussions, the Commonwealth shall have two creditor representatives (the "Commonwealth Creditor Representatives") appointed as follows—

    i. One Commonwealth Creditor Representative shall be selected by the Ad Hoc Group of GO Bondholders and Assured Guaranty Corp. ("AGO"); [4] and

    ii. One Commonwealth Creditor Representative shall be the Official Committee of Retirees;

d. Each of the Commonwealth Agent and the COFINA Agent shall be entitled to retain legal and other professionals it reasonably deems appropriate. The COFINA Agent shall retain the law firm _____, with the matter led by _____, to serve as its counsel. The Creditors' Committee's retained advisors, the COFINA Agent and its retained advisors, and the Commonwealth Creditor Representatives shall be compensated by the Debtor on whose behalf they are acting, in conformity with PROMESA section 316 and any interim compensation procedures ordered by the Court; and in the case of counsel for the Creditors' Committee and counsel for the Official Committee of Retirees, the order of this Court authorizing the retention of such counsel. For the avoidance of doubt, the Commonwealth Creditor Representative selected by the Ad Hoc Group of GO Bondholders and AGO shall be an individual.[5] Such individual shall not be authorized to retain legal or other professionals at the expense of the Commonwealth to assist him/her in carrying out his/her functions in this Stipulation, but the individual shall be compensated for his/her time and reasonable expenses. The Official Committee of Retirees shall be entitled to compensation of its advisors, but not to compensation for its members' time.

e. By no later than ten (10) days after this Stipulation is so ordered, the Agents shall meet and confer regarding the time and form of commencement of litigation to resolve the Commonwealth-COFINA Dispute. In advance of the commencement

---

[4] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the following shall be added to paragraph 4.c.(i):

    For the avoidance of doubt, the Commonwealth Creditor Representatives that are not statutory committees shall not, by virtue of their selection for such position or their participation in settlement discussions, take on any duty to refrain from trading any securities (or derivatives of securities), provided, however, that nothing herein exempts any person or entity from compliance with all applicable securities laws.

[5] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the Commonwealth Creditor Representative selected by the Ad Hoc Group of GO Bondholders and Assured Guaranty Corp. may be an individual, group, or committee. If it is a group or committee, its compensation shall not exceed compensation for the time of one individual.

of such litigation, the Agents, the Oversight Board, AAFAF, and the Permitted Intervenors (as defined below) shall agree to a schedule constructed to enable the Court to rule, on a final basis, on the Commonwealth-COFINA Dispute, on or before December 15, 2017, unless extended by the Court, for cause, *sua sponte* or upon application of any of the Signatories, in the absence of a prior settlement (the "Resolution Date"); provided, that, if the parties do not agree on a schedule within 15 days after entry of this Stipulation, the Agents may together or separately seek approval from the Court by motion upon shortened notice of a proposed schedule.

f.   Each Agent shall have a duty of good faith, care, and loyalty to the Debtor the Agent represents. In furtherance of such duties, each Agent shall, with the advice and assistance of counsel, endeavor to the best of the Agent's ability under the circumstances to litigate and negotiate from the perspective of what result is best for the Debtor the Agent represents, as opposed to what result is best for any particular type of creditor of the Debtor the Agent represents. If the Agents negotiate a settlement, they should be guided by *Protective Committee of Independent Shareholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414 (1968). Neither the Agent nor its professionals (in their capacities as professionals to the Agent) shall litigate, nor attempt to negotiate, or participate in the mediation of, any of the rights of any bondholder versus another bondholder under the COFINA Bond Resolution, or any bondholder versus an insurer of such bonds. Each Agent shall have the rights of its respective debtor solely in respect of the conduct of the litigation and settlement of the Commonwealth-COFINA Dispute. In connection with fulfilling its duties hereunder, the Agent shall consult with the major creditor constituencies of the Debtor it represents and any Permitted Intervenors that intervene on that Agent's side of the Commonwealth-COFINA Dispute.[6] In agreeing to this Stipulation, no Signatory waives any right to object to a settlement negotiated by the Agent on any ground, including that such settlement is a denial of adequate protection or other right that may be asserted by such objector. Each Agent shall have access to any information of the Debtor it represents reasonably necessary to the Agent performing its duties in resolving the Commonwealth-COFINA Dispute; provided that any objections of the Debtors may be resolved by the mediators. For the avoidance of doubt, this does not include access to information of the Oversight Board. To the extent a Debtor provides privileged information or work product, the Agent is not authorized to waive the privilege or to share the information with any third parties

---

[6] If the Ad Hoc GO Group of GO bondholders becomes a Signatory, the following shall be added to paragraph 4.f.:

To the extent not already required herein, the Commonwealth Agent shall consult with the Commonwealth Creditor Representatives, the Ad Hoc Group of GO Bondholders, and AGO (to the extent that the Ad Hoc Group of GO Bondholders and AGO have not been selected as a Commonwealth Creditor Representative) regarding the status of negotiations with respect to settlement of the Commonwealth-COFINA dispute.

7

for any purpose, unless authorized to do so in writing by its Debtor. Notwithstanding the foregoing, in the mediation process, (i) the Agent(s) reserve the right to seek access to relevant Commonwealth and/or Oversight Board information that is neither privileged nor work product that will allow them to understand the financial need that the Commonwealth anticipates satisfying from the Pledged Sales Taxes, and (ii) the Commonwealth and the Oversight Board reserve the right to oppose such access on any ground including that the certified fiscal plans show all financial needs to be satisfied. The Assigned Mediator(s) (as defined in the Mediation Agreement) will work with all parties to attempt to resolve any dispute over access to this information (including disputes with respect to privilege and work product). Nothing herein shall (a) preclude the Signatories from sharing with the Agents information obtained in the Mediation necessary to understand the financial need that the Commonwealth anticipates satisfying from the Pledged Sales Taxes, or from sharing privileged information with the Agents and Agents' counsel in furtherance of any common interest, and (b) entitle any Signatory to any privileged information or work product.

g.   In addition, each Agent may consider what result, through litigation, negotiation and mediation, will render its Debtor best able to achieve fiscal responsibility and access to the capital markets, in the judgment of each Agent. Nothing herein waives any rights of the Commonwealth and AAFAF under PROMESA sections 303 and 305 subject to any limitations thereon imposed by the Puerto Rico Constitution, the U.S. Constitution, or PROMESA.

h.   To the extent it is necessary or desirable to link a settlement to the treatment of creditors' claims in a title III plan of adjustment, the Oversight Board and AAFAF may participate in the negotiations and Mediation in an effort to reach such a settlement.

i.   Any settlement negotiated pursuant to the protocol approved herein shall be filed with the Court by the Agents upon reaching agreement but shall only be effective upon (i) with respect to the Commonwealth, (a) approval of the Commonwealth Agent and at least one of the Commonwealth Creditor Representatives, provided, however, the Commonwealth Creditor Representatives are not authorized to negotiate any proposed settlement, but only to consent thereto, and (b)(1) this Court's approval of such settlement pursuant to a final order as to which (A) the deadline to file a notice of appeal or petition for certiorari has lapsed (including any extension provided by Bankruptcy Rule 8002(b)(1)) and no appeal or petition is pending or, (B) if the subject of a timely appeal or petition, no stay, suspension, or injunction precluding effectiveness has been granted and is continuing (a "Final Order"), or (2) confirmation of a title III plan of adjustment in the Commonwealth title III case incorporating such settlement pursuant to a Final Order, and which plan has become effective; and (ii) with respect to COFINA, confirmation of a title III plan of adjustment in the COFINA title III case incorporating such settlement pursuant to a Final Order, and which plan has become effective; provided, however, that, other than with respect to ensuring that such settlement is properly embodied within the title III plan of adjustment, the COFINA Agent shall not participate in the negotiations of a title III plan of

adjustment in the COFINA title III case. Any settlement negotiated pursuant to the protocol approved herein shall be presented simultaneously for approval to both Commonwealth Creditor Representatives.

j.   If the Oversight Board determines it is impracticable to schedule a timely confirmation hearing on a Commonwealth plan of adjustment embodying the proposed settlement negotiated by the Agents, then any proposed settlement negotiated by the Agents that can be implemented by the Commonwealth independently of a plan of adjustment (*e.g.*, a settlement that allocates the Pledged Sales Taxes between COFINA and the Commonwealth, but does not provide for how the Commonwealth will distribute such assets to creditors), may be submitted for this Court's approval with respect to the Commonwealth only by the Commonwealth Agent or the Oversight Board. Absent agreement of all Signatories, any proposed settlement outside a plan of adjustment for the Commonwealth shall be submitted for approval on not less than 45 days' notice, and shall be heard and if approved, approved contemporaneously with confirmation of a title III plan of adjustment in the COFINA title III case incorporating such settlement.

k.   All parties in interest, including the Oversight Board and AAFAF, may appear and be heard with respect to any proposed settlement; *provided, however*, that neither the Oversight Board nor AAFAF shall have any right to contest any judgment made by the Agents pursuant to subparagraph f.

l.   In the event that the Commonwealth-COFINA Dispute is resolved by a settlement developed under this protocol, the Oversight Board shall file a title III plan of adjustment for COFINA incorporating such settlement, with an accompanying disclosure statement, and the Oversight Board shall propose how COFINA's property will be distributed to COFINA creditors (consistent with the plan distributions, if any, agreed to by all parties in the Mediation), no later than 45 days after such settlement is presented by the Agents to the Oversight Board; provided that, no hearing to consider approval of any settlement of the Commonwealth-COFINA Dispute with respect to COFINA shall occur, and objections to such settlement by COFINA's creditors and other parties in interest shall not be due, until a reasonable time after the Oversight Board files a title III plan of adjustment for COFINA, and such hearing date and objection deadline may be concurrent with the hearing date and objection deadline for the COFINA plan of adjustment. If any court of competent jurisdiction denies confirmation of the plan incorporating the settlement developed under this protocol, the Oversight Board shall use good faith efforts to file one or more amended plans, each of which incorporates such settlement, in order to comply with the confirmation requirements of section 314(b) of PROMESA; *provided, however*, that if the Court determines no confirmable plan for COFINA can be proposed consistent with the settlement, then the settlement shall be deemed null and void.

m.   For the avoidance of doubt, the litigation or negotiation by the Agents shall not include issues other than the Commonwealth-COFINA Dispute; *provided, however,* that any resolution of the Commonwealth-COFINA Dispute implemented under a title III plan of adjustment shall be a final resolution of all

issues affecting entitlements of each allowed claim against COFINA to its distributions under the plan, including with respect to the nature, validity, extent and priority of the liens pledged to secure the COFINA bonds, and may resolve all potential claims by holders of COFINA bonds against the Commonwealth, provided further that any such treatment of COFINA bondholders' claims, if any, against the Commonwealth as part of the settlement shall be on terms acceptable to the Commonwealth Agent and the Oversight Board.

n. Notwithstanding anything in this Stipulation, the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute, developed by the Agents, or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute; provided, however, that if the Agents reach a proposed settlement of the Commonwealth-COFINA Dispute before the Court fixes a date for a hearing on the disclosure statement of the Oversight Board's proposed plan of adjustment for COFINA, the Oversight Board shall amend its proposed disclosure statement so at the confirmation hearing on the proposed plan of adjustment for COFINA, the Agents' proposed settlement shall first be considered by the Court together with the proposed plan distributions, if any, agreed to by all parties in the Mediation, or otherwise, together with plan distributions proposed by the Oversight Board.

5. <u>Intervention; Rights To Participate</u>. Each of the creditor parties, statutory committees, and Creditor Representatives, that are Signatories (the "<u>Permitted Intervenors</u>"), shall be authorized to intervene, in its individual capacity or as part of a group, and be heard in any litigation between the Agents to resolve the Commonwealth-COFINA Dispute without further order of the Court; *provided, however*, that the Court may impose reasonable limitations on participation by the Permitted Intervenors to avoid duplication and undue burdens on the Court. AAFAF, as the government's agent in accordance with the *Puerto Rico Fiscal Agency and Financial Advisory Authority*, Act 2-2017 (Jan. 18, 2017) (the "<u>AAFAF Enabling Act</u>"), may also intervene as of right to exercise its rights to be heard under applicable law. AAFAF shall not contravene the FOMB's statutory status as the Commonwealth's representative pursuant to PROMESA § 315(b). Nothing herein waives the rights of any party in interest from

asserting any intervenor is conflicted. Nothing herein shall deprive AAFAF and the government of any other intervention rights they have and shall not deprive any other party in interest of any standing, intervention rights, and other rights to appear that they have in any litigation relating to the Commonwealth-COFINA Dispute or any other litigation. For the avoidance of doubt, the grant of intervention to any party, including the Permitted Intervenors, shall neither affect nor impair the ability of the Agents to settle the Commonwealth-COFINA Dispute in accordance with paragraph 4 above nor modify the standards for approval by the Court of any settlement reached by the Agents.

6.    <u>Effectiveness</u>.  Immediately upon entry by the Court of this Stipulation and Order, (a) the Debtors and the Oversight Board, as the Debtors' representative, are authorized to take all actions, and to execute all documents, necessary or appropriate, to effectuate the relief granted herein, and (b) this Stipulation and Order shall be binding on all entities having received prior notice of the hearing on this Stipulation and Order

7.    <u>Jointly Drafted</u>.  The preparation of this Stipulation has been a joint effort of the Signatories and the resulting document shall not, solely as a matter of judicial construction, be construed more severely against one of the Signatories than the other.

8.    <u>Retention Of Jurisdiction</u>.  This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Stipulation and Order.

9.    <u>Whole Agreement</u>.  This is the whole agreement among the Signatories in respect of its subject matter, and all prior statements and actions are merged herein.

10.    <u>Amendment</u>.  This Stipulation may not be amended except in a writing signed by the Signatories and approved by the Court.

11

11.     <u>Rights Preserved</u>.  Except as expressly provided herein, no Signatory waives or releases any rights, including, without limitation, (i) the right to seek dismissal of the Commonwealth and/or COFINA Title III petitions, (ii) any rights under the COFINA Bond Resolution and any applicable bond resolutions, statutes, and constitutional provisions, (iii) the right, if any, to challenge any fiscal plan, (iv) the right to seek Court approval of certification to the Supreme Court of Puerto Rico of the Commonwealth law issues in the Commonwealth-COFINA Dispute, subject to all other parties' rights to oppose such relief on any ground including without limitation that similar relief was previously requested and denied, and (v) the right to seek a stay of other litigation in the Title III cases that may involve the Commonwealth-COFINA Dispute or property subject to it.  Except as provided in paragraph 2, the Oversight Board does not consent or otherwise release any rights of the Oversight Board under PROMESA or otherwise, including section 305 of PROMESA.  The rights and powers of the government of Puerto Rico under the Puerto Rico Constitution and PROMESA, including without limitation under sections 303 and 305 of PROMESA, are expressly reserved, subject to any limitations thereon imposed by the Puerto Rico Constitution, the U.S. Constitution, or PROMESA.

12.     <u>Confidentiality</u>.  There shall be common interest and joint defense privileges for all communications (including work product shared) between or among an Agent and the Creditor Representatives or creditors of the Debtor such Agent represents.   All such communications shall be confidential and shall not be subject to discovery or other disclosure.

13.     <u>Further Assurances</u>.  Each Signatory shall take such actions and sign such documents as necessary or desirable to carry out this Stipulation.

14. <u>Counterpart Originals</u>.  This Stipulation may be signed in counterpart originals as if signed in one original document.  Emailed scans of this Stipulation signed by a Signatory shall be deemed an original for all purposes.

15. <u>No Conflict</u>.  The representation by counsel to the Creditors' Committee of the Creditors' Committee as Commonwealth Agent with respect to the Commonwealth-COFINA Dispute shall not create an attorney-client relationship between such Creditors' Committee counsel and the Commonwealth, AAFAF, or the Oversight Board and therefore counsel for the Creditors' Committee shall be free to advocate positions adverse to such parties in the Title III cases.

Accepted and Agreed:

<u>The Parties to the Stipulation</u>:

AD HOC GROUP OF GO BONDHOLDERS

_____
Name:
Title:

UBS FAMILY OF FUNDS/PUERTO RICO FAMILY OF FUNDS

_____
Name:
Title:

MUTUAL FUND GROUP

_____
Name:
Title:

13

COFINA SENIOR BONDHOLDERS

_____
Name:
Title:

AMBAC ASSURANCE CORP.

_____
Name:
Title:

NATIONAL PUBLIC FINANCE
GUARANTEE CORP.

_____
Name:
Title:

OFFICIAL COMMITTEE OF UNSECURED
CREDITORS

_____
Name:
Title:

Dated: _____, 2017                SO ORDERED:
        San Juan, Puerto Rico

                                          _____
                                          Honorable Laura Taylor Swain
                                          United States District Judge

14

Case:17-00188-LTS Doc#:420-27 Filed:10/11/17 Entered:10/11/17 20:57:32 Desc:
Exhibit 27 Page 1 of 9

# EXHIBIT 27



# GOVERNMENT OF PUERTO RICO

## Puerto Rico Fiscal Agency and Financial Advisory Authority

## Municipal Secondary Market Disclosure Information Cover Sheet
## Municipal Securities Rulemaking Board (MSRB)
## Electronic Municipal Market Access System (EMMA)

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Name of bond issue exactly as it appears on the cover of the Official Statement:

_____

_____

_____

Nine-digit CUSIP* numbers if available, to which the information relates:

_____

_____

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:   __**Puerto Rico Sales Tax Financing Corporation (COFINA)**_____

Other Obligated Person's Name (if any): _____

Six-digit CUSIP* number(s):   __**74529J**_____

**TYPE OF INFORMATION PROVIDED:**

A.   ☒ **Annual Financial Information and Operating Data pursuant to Rule 15c2-12**

   **Fiscal Period Covered:** __2015-16_____

B.   ☐ **Audited Financial Statements or CAFR pursuant to Rule 15c2-12**

   **Fiscal Period Covered:** _____

C.   ☐ **Notice of Failure to Provide Annual Financial Information as Required**

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


_/s/ Sebastián M. Torres Rodríguez_____
Sebastián M. Torres Rodríguez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
   as Fiscal Agent for the Commonwealth

Dated: May 1, 2017



PO Box 42001 • San Juan, PR 00940-2001 • Telephone (787) 722-2525

PUERTO RICO SALES TAX FINANCING CORPORATION

ANNUAL FINANCIAL INFORMATION
Fiscal Year 2016

Introduction

In connection with the issuances by the Puerto Rico Sales Tax Financing Corporation (the "Corporation or COFINA") of its Sales Tax Revenue Bonds, and in compliance with Rule 15c2-12, as amended, of the Securities and Exchange Commission (SEC), the Corporation has covenanted to file within 305 days after the end of each fiscal year, with the Municipal Securities Rulemaking Board (MSRB) through the Electronic Municipal Market Access System (EMMA), a report setting forth with respect to such fiscal year the following information:

- The Corporation's annual audited financial statements, prepared on the basis of generally accepted accounting principles.

- The information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent.

- Such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

Appendix I

Included as Appendix I is the Corporation's Annual Financial Information and Operating Data Report for the fiscal year ended June 30, 2016, consisting of the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, as prepared by the Corporation.

Note

The Corporation's Audited Financial Statements for the fiscal year ended June 30, 2016 will be submitted as soon as available.

APPENDIX I


PUERTO RICO SALES TAX FINANCING CORPORATION


ANNUAL FINANCIAL INFORMATION AND OPERATING DATA REPORT

PUERTO RICO SALES TAX FINANCING CORPORATION

ANNUAL FINANCIAL INFORMATION AND OPERATING DATA REPORT

Dedicated Sales Tax Fund

Act No. 91-2006, as amended ("Act 91"), established the Dedicated Sales Tax Fund, a special fund held and owned by the Puerto Rico Sales Tax Financing Corporation (the "Corporation") separate and apart from the General Fund of the Government of Puerto Rico (the "Government"). Act 91 requires that the following amounts of the Commonwealth Sales and Use Tax ("SUT") be deposited in the Dedicated Sales Tax Fund, whichever is greater: (i) a minimum fixed amount, referred to as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the SUT collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is five point five percent (5.5%) (the greater of (i) and (ii) being referred to as the "Pledged SUT").

Act No. 18-2014 ("Act 18") modified the distribution of SUT collections transferred to the Corporation and subsequently received by the Government by (i) increasing the Government's portion of the SUT from 5.5% to 6.0% effective February 1, 2014 and (ii) creating the Municipal Administration Fund ("MAF"). Act No. 84-2016, however, amended Act 18 and Act 91 to separate the SUT collections transferred to the Corporation from those transferred to MAF. As a result, (a) the Corporation continues to have the right to receive an amount equal to the greater of (i) the Pledged Sales Tax Base Amount and (ii) the Pledged SUT; and (b) the MAF will receive 0.5% of the Commonwealth's portion of the SUT. Deposits to the MAF will be made concurrently with deposits of the Pledged SUT and before making any deposits to the Government's General Fund. The Government will receive the amounts remaining after the Pledged SUT has been transferred to the Corporation, but not more than 2.75% of the  5.5% allocation of the SUT.

In each Fiscal Year, the first collections of the 5.5% allocation of the SUT are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged SUT. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2016 is $724,109,885. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. The moneys on deposit in the Dedicated Sales Tax Fund are used for the payment of the Corporation's bonds or to satisfy the purposes set forth in Act 91.

In anticipation of a bond issuance by the Corporation in the second half of fiscal year 2014, legislation was approved in October 2013 to increase the portion of the allocation of the SUT transferred to the Corporation from 2.75% to 3.50%. Since the Corporation bond issue was postponed, Act 72-2014, enacted in June 2014, suspended the transfer of these additional funds to the Corporation until the fiscal year following the year in which the Corporation bond issue is completed. As of the date of this report, the Corporation has not completed such bond issue.

Act No. 72-2015, as amended, provided for the replacement of the SUT with a value added tax, among other things. The imposition of the value added tax was scheduled to commence on June 1, 2016. Act No. 101-2015 amended Act 91 to, among other things, include specific references to those sections of the Puerto Rico Internal Revenue Code that impose the SUT at a rate of 6.0% and provide that, once the value added tax replaces the SUT, the Corporation will receive an amount equal to 6.0% of such value added tax. Act No. 54-2016, however, repealed

the provisions of the Puerto Rico Internal Revenue Code providing for the replacement of the SUT with a value added tax. As a result, those provisions referencing the value added tax are no longer applicable.

On April 6, 2016, the Government approved Act No. 21-2016 authorizing the Governor to, among other things, declare a moratorium with respect to certain Government instrumentalities, including the Corporation. A moratorium, however, has not been declared with respect to the Corporation.

On April 28, 2017, the Puerto Rico Fiscal Agency and Financial Advisory Authority released a proposed restructuring plan for the Corporation's debt. A copy of the proposed restructuring plan is available on the Electronic Municipal Market Access System (EMMA).

On April 29, 2017, the Governor of Puerto Rico signed into law House Bill 938, which, among other things, requires public corporations to transfer to the Government any excess revenues generated by such public corporation. Such excess revenues shall be deemed available resources of the Government and be deposited to the credit of the General Fund in order to satisfy the liquidity requirements of the Fiscal Plan approved in accordance with PROMESA. The amount of funds to be transferred to the General Fund shall be determined by a committee comprised of the Executive Director of the Puerto Rico Financial Advisory and Fiscal Agency Authority, the Secretary of the Treasury and the Director of the Office of Management and Budget. The committee is required to ensure that the amount of funds so transferred to the General Fund does not affect the services offered by the particular public corporation and that such amounts are determined after such public corporation's operational expenses and obligations have been covered. House Bill 938 also authorizes the Executive Branch to use the Pledged SUT solely as a last resort and subject to providing the Legislative Assembly with a sworn statement establishing the need for such use, the term of such use and the amount of funds to be used, to cover an occasional significant cash flow deficiency to comply with the Government's Fiscal Plan. The statement is required to be signed and sworn by the Executive Director of the Puerto Rico Financial Advisory and Fiscal Agency Authority and the Director of the Office of Management and Budget. The signature and swearing of the statement shall be non-delegable. Those government officers shall also certify that the information is correct, exact and true consistent with the Government's fiscal reality. No such statement has been proposed or provided to the Legislative Assembly at this point.

It is not yet clear how this law would affect the current legal regime for the Corporation. The Corporation intends to continue to defend the lien established by the Corporation Resolution as required thereby.

The Corporation has received a letter from a bond insurer that claims that as a result of the passage of House Bill 938 an event of default has occurred under to the Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 and amended June 10, 2009 (the "Corporation Resolution") or may be declared if not cured within thirty (30) days.

Pledged SUT Received by the Corporation

The Pledged Sales Tax Base Amount for the Fiscal Year ended June 30, 2016 was $696,259,504.

For Fiscal Year 2016, The Bank of New York Mellon, as Trustee for the Corporation, received $696,259,504 of Pledged SUT.

Recent Developments

*Lex Claims, LLC.* et al. *v. Alejandro García Padilla,* et al., No. 3:16-cv-2374 (FAB) (D. P.R. 2016).

On July 20, 2016, certain beneficial owners of general obligation bonds issued by the Government filed a complaint against the Governor, Secretary of the Treasury, and Director of the Office of Management and Budget of Puerto Rico seeking declaratory and injunctive relief under the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"), to invalidate an executive order imposing an alleged moratorium on payment of debt owed to them, to invalidate a budget that they claim purported not to pay debt owed to them (and that instead made improper transfers to the Government Development Bank and others), and to reverse certain allegedly improper transfers that would supposedly dissipate assets needed for payment of their debt.  It also sought, as a second cause of action, relief from the otherwise automatic stay on litigation imposed by PROMESA.

An amended complaint was filed on August 15, 2016, followed by a notice or motion of stay filed by Defendants on August 22, 2016, which the Court denied on September 2, 2016. Defendants filed a motion to dismiss that same day, and a motion to reconsider the denial of stay on September 7, 2016.

On October 7, 2016, the Plaintiffs proposed to amend their Complaint to include a number of other Defendants, among them the Corporation and Mr. Juan Vaquer, as Executive Director of the Corporation (collectively, the "Corporation Defendants"), as well as the corporate Trustee (The Bank of New York Mellon) for the debt issued by the Corporation.   Plaintiffs also moved to lift an automatic stay against litigation imposed by PROMESA with respect to the new Defendants.

On October 24, 2016, the first of a number of motions to intervene was filed by other holders or owners of debt (in this initial instance, beneficial owners of senior debt issued by the Corporation.  Eventually beneficial owners of both senior and subordinate Corporation debt; various bond insurers insuring certain Corporation debt, certain general obligation debt, or both; and the Financial Management and Oversight Board for Puerto Rico (the "Oversight Board"), would seek to intervene (and would eventually succeed).

On November 4, 2016, the Court denied the motions to reconsider staying the case made by the initial Defendants (and thus held that the PROMESA stay was not, in fact, automatic as to certain claims).  That same day, a Second Amended Complaint was filed pursuant to permission

granted by the Court. In this pleading, Plaintiffs for the first time challenged the Corporation's legality and the legality of the senior and subordinate debt it had issued.

Five Counts of the Second Amended Complaint—numbers 2, 4, 5, 12, and 13—name the Corporation Defendants. Of these five counts, two of them, numbers 2 and 12, were not (according to the Court's prior orders) subject to the automatic stay pursuant to Section 405(b) of PROMESA.

On December 5, 2016, the initial Defendants answered and raised affirmative defenses to the Second Amended Complaint. On December 16, 2016, the Corporation Defendants similarly filed an answer and affirmative defenses on the grounds that the claims against them lack a proper legal basis and are subject to various legal and equitable affirmative defenses. The Trustee filed a motion to dismiss that same day, which was eventually fully briefed (but has not been decided).

As the Corporation Defendants pointed out in their answer, the Corporation had first issued sales tax revenue bonds pursuant to the Corporation Resolution. The proceeds of the Pledged SUT from sales taxes validly imposed by the Government are the only source for payment of those bonds and the balance of the of the Corporation's indebtedness. The Corporation Defendants alleged that all of these facts (and others establishing or asserting the constitutionality of the Corporation and its debts and the existence of the lien on the Pledged SUT) have been known to Plaintiffs or their predecessors for approximately a decade, during which time no one ever challenged the legality of the Corporation or the Corporation debts.

The motion of the Oversight Board to intervene was denied by the Court on February 17, 2017. On March 3, 2017, the Oversight Board appealed to the United States Court of Appeals for the First Circuit. While this was pending, various intervenors which had answered the Second Amended Complaint moved (beginning on March 18, 2017) for judgment on the pleadings, in effect seeking to dismiss the Plaintiffs' case, and to certify certain questions (including effectively issues of the validity of the Corporation debt) to the Puerto Rico Supreme Court. Those motions were eventually briefed, but not decided.

On March 20, 2017, efforts began by some parties to pursue mediation, either by order of the Court or voluntarily. That same day, before the deadline by which the Corporation Defendants needed to join in certain motions, the United States Court of Appeals reversed the denial of the Oversight Board's motion to intervene and held that the PROMESA stay applied to the litigation as a whole.

In response to various orders of the Court concerning its ability to impose court-ordered mediation during a stay, the parties eventually began a voluntary mediation process. That process is currently continuing. The automatic stay under PROMESA will expire on May 1, 2017.

**Designation of the Corporation as a Covered Territorial Instrumentality and Approval of the Government's Fiscal Plan**

One of the roles of the Oversight Board is to provide fiscal oversight through the development and approval of fiscal plans and budgets for the Government and any instrumentalities that become "covered territorial instrumentalities" (as such term is defined in Section 5 of PROMESA) by virtue of designation by the Oversight Board pursuant to Section 101 of PROMESA.

On September 30, 2016, the Oversight Board resolved to designate certain entities of the Government and all public corporations of Puerto Rico, as well as the affiliates and subsidiaries thereof, as covered territorial instrumentalities subject to the oversight framework provided by PROMESA. Such designations include, among others, the Corporation.

On February 28, 2017, the Government filed a proposed fiscal plan with the Oversight Board (the "Proposed Fiscal Plan"). The Oversight Board rejected the Proposed Fiscal Plan. The Government then submitted an Amended Fiscal Plan (the "Fiscal Plan"), which was certified by the Oversight Board on March 13, 2017 as satisfying the requirements set forth in PROMESA. The Fiscal Plan, among other things, assumes that the Government will retain and use the revenues generated by the SUT, including the Pledged SUT, to cover its operating expenses rather than service the Corporation's issued and outstanding debt. The Corporation intends to continue to defend the lien established by the Corporation Resolution as required thereby.

For further information regarding the Fiscal Plan, please refer the copy of the Fiscal Plan filed by the Government with the Municipal Securities Rulemaking Board through its Electronic Municipal Market Access system ("EMMA"). For further information regarding these designations, please refer to PROMESA and the Oversight Board's website (www.oversightboard.pr.gov). For more information regarding the Commonwealth, the Corporation and PROMESA, please refer to the "Commonwealth Financial Information and Operating Data Report – December 18, 2016" filed by the Government with EMMA.