# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------ x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA<br>: Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, et al., | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

------------------------------------------------------------------------ x

------------------------------------------------------------------------ x

|  |  |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | : Adv. Proc. No. _____ |
|  | : |
|  | : |
| as agent of | : |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, | : **COMPLAINT** |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| BETTINA WHYTE, | : |
|  | : |
| as agent of | : |
|  | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|  | : |
| Defendant. | : |

------------------------------------------------------------------------ x

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), and (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474).

Pursuant to Federal Rules of Bankruptcy Procedure 7001(2) and (9), made applicable to these title III cases by section 310 of PROMESA (48 U.S.C. § 2170), the Official Committee of Unsecured Creditors of all title III Debtors (except COFINA) (the "Committee"), as the "Commonwealth Agent" with respect to the "Commonwealth-COFINA Dispute," as defined in the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Docket No. 996] (the "Commonwealth-COFINA Dispute Stipulation"), by and through its undersigned counsel, alleges as follows:

## NATURE OF PROCEEDING

1.  This adversary proceeding is being commenced to resolve the Commonwealth-COFINA Dispute.  As defined in the Commonwealth-COFINA Dispute Stipulation, the issue in dispute is "[w]hether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes [the "SUT"] purportedly pledged by COFINA to secure debt . . . are property of the Commonwealth or COFINA under applicable law."[1]  As set forth below, the SUT revenues, wherever located and whenever arising, are the exclusive property of the Commonwealth.

2.  The COFINA enabling legislation did not transfer to COFINA present ownership of future SUT revenues.  Nor did it assign to COFINA the Commonwealth's "right to receive" such revenues.  At most, the purported transfer to COFINA of future SUT revenues amounted to an unsecured promise that yet-to-exist revenues would be transferred to COFINA in the future. If it was of any legal effect beyond an unsecured promise, the purported transfer of future SUT revenues to COFINA can only be viewed as a grant of a security interest in after-acquired

---

[1]    Commonwealth-COFINA Dispute Stipulation ¶4.  Whether any of the SUT revenues can be used by the Commonwealth in the exercise of its police power even if the Court were to determine that such SUT revenues are the property of COFINA is beyond the scope of this proceeding.  Similarly, the issue of the allowance of any claim of COFINA as a creditor in the Commonwealth's title III case is beyond this proceeding's scope.

Case:17-00257-LTS Doc#:1 Filed:09/08/17 Entered:09/08/17 23:05:34 Desc: Main Document Page 3 of 60

property that was and is governed by Article 9 of the Uniform Commercial Code as adopted by Puerto Rico. Any security interest of COFINA in future SUT revenues never became enforceable against the Commonwealth, and, even if it did, it was not perfected and is thus avoidable (and is otherwise subordinate to the rights of the Oversight Board as trustee). Moreover, any such security interest was cut off by the commencement of the Commonwealth's title III case. And even if the transfer to COFINA was more than an unsecured promise and was not a secured transaction, it is still avoidable under applicable provisions of the Bankruptcy Code.

3.      In any event, the COFINA structure is unconstitutional because the substantial result of the COFINA enabling legislation was to evade or violate various provisions of the Puerto Rico constitution, including constitutional debt limits, the constitutional priority of payment (outside of title III) granted to Puerto Rico's public debtholders, and the constitution's balanced budget clause. As a result, all of the tax revenues at issue are exclusively Commonwealth property, including all revenues on deposit at The Bank of New York Mellon ("<u>BONY</u>") when the Commonwealth's title III case was commenced and all revenues deposited at BONY since that time.

<b><u>PARTIES</u></b>

4.      Plaintiff the Commonwealth of Puerto Rico is a territory of the United States and a Debtor in these Title III cases. The Commonwealth's title III case was commenced by the filing of a petition on May 3, 2017 (the "<u>Commonwealth Petition Date</u>").

5.      Defendant COFINA is a purported public corporation and instrumentality of the Commonwealth and a Debtor in these title III cases. COFINA's title III case was commenced by the filing of a petition on May 5, 2017.

3

6.      The Commonwealth and its public corporations and instrumentalities are represented in these title III cases by the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board").

7.      Pursuant to the Commonwealth-COFINA Dispute Stipulation, the Oversight Board has appointed the Committee as the Commonwealth Agent and Bettina Whyte as the "COFINA Agent" for purposes of litigating the Commonwealth-COFINA Dispute in all of its facets.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to section 306(a) of PROMESA (48 U.S.C. § 2166(a)).

9.      Venue is proper in this district pursuant to section 307(a) of PROMESA (48 U.S.C. § 2167(a)).

10.     The Commonwealth-COFINA Dispute is an actual and justiciable controversy within the meaning of 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading, may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought."

## BACKGROUND

### I.      Overview of COFINA structure

11.     In essence, the COFINA structure is an attempted "off balance sheet" financing transaction collateralized by a portion of the Commonwealth's SUT revenues.

12.     The COFINA entity was created as a purported "public corporation and instrumentality of the Commonwealth" that is purportedly "independent and separate from the Commonwealth" but "attached" to the Government Development Bank for Puerto Rico (the

"GDB") (now the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF")), which is the financial advisory authority of the Commonwealth.[2] The directors of COFINA are all directors of the GDB (now AAFAF).[3]

13.    COFINA's only authorized purpose is to issue bonds backed by a dedicated portion of the Commonwealth's SUT revenues.  The only authorized use of the bond proceeds (other than to pay COFINA's administrative expenses) is to pay debts and expenses of the Commonwealth.[4]

14.    COFINA has no assets or source of income other than the dedicated SUT revenues, which are deposited into a specified fund (the "Dedicated Sales Tax Fund").[5]  By design, the dedicated SUT revenues are never deposited into the Commonwealth treasury, although they are collected by the Commonwealth (or an agent acting on its behalf).[6]  COFINA has no right or authority to collect or enforce the SUT, and taxpayers owe no duty or obligation to COFINA.[7]

15.    Attached as Exhibit A is a chart depicting the basic COFINA structure.

## II.    Sales and Use Tax

16.    The SUT is a general sales and use tax applicable to a wide range of goods and services.  Pursuant to Act No. 117 of July 4, 2006, the Commonwealth imposed the SUT for the first time, effective November 1, 2006, at a rate of 5.5% (the "Commonwealth SUT").  The Act also authorized the municipalities in the Commonwealth to levy separate sales and use taxes at an additional rate of 1.5% (the "Municipal SUT").

---

[2]    P.R. Laws Ann. tit. 13, §§ 11a(a) and 11a(e).
[3]    P.R. Laws Ann. tit. 13, § 11a(e).
[4]    P.R. Laws Ann. tit. 13, § 11a(b).
[5]    P.R. Laws Ann. tit. 13, § 12.
[6]    P.R. Laws Ann. tit. 13, § 12; P.R. Laws Ann. tit. 13 §§ 32021-32031.
[7]    See P.R. Laws Ann. tit. 13 § 11a(b) (limiting the powers of COFINA); P.R. Laws Ann. tit. 13 §§ 32021-32031 (providing for the collection of the SUT).

17.     Simultaneously with the imposition of the SUT, and also pursuant to Act No. 117, the Commonwealth repealed a 5% (net effective 6%) general excise tax imposed on imported goods and a 3.6% general excise tax imposed on goods manufactured in Puerto Rico.  Act No. 117 was an amendment to the Puerto Rico Internal Revenue Code of 1994 (as previously amended), which provides in Section 2405 that "**[t]he [sales and use] taxes fixed in this Subtitle shall be funds of the Commonwealth at the time they are collected**."[8]

18.     Act No. 1 of January 31, 2011 repealed the Puerto Rico Internal Revenue Code of 1994 (as amended) and replaced it with the Puerto Rico Internal Revenue Code of 2011, which maintained the Commonwealth SUT and the Municipal SUT, as well as the related statutory framework.

19.     Act No. 18 of January 24, 2014 increased the Commonwealth SUT from 5.5% to 6% and reduced the Municipal SUT from 1.5% to 1.0%, effective February 1, 2014.

20.     Act No. 72 of May 29, 2014 provided for the replacement of the SUT with a more onerous value added tax.  As a "transition" to the value added tax, the Act also increased the Commonwealth SUT by 4.5% (from 6.0% to 10.5%), effective July 1, 2015.

21.     Act No. 54 of May 26, 2016 repealed the provisions of Act No. 72 relating to the value added tax.  Act No. 54 also repealed the 4.5% increase in the Commonwealth SUT and replaced it with a 4.5% sales and use tax surcharge dedicated exclusively to the Commonwealth's General Fund.  As a result, the effective allocation of the SUT is currently 6% for the Commonwealth SUT, 4.5% for the Commonwealth's General Fund, and 1.0% for the municipalities.

22.     Act No. 84 of July 22, 2016 amended section 3 of Act 91 to maintain the portion of the Commonwealth SUT previously dedicated to COFINA.  Specifically, the Act provided for

---

[8]     2006 P.R. Laws 117, § 2405(c).

the calculation of the dedicated portion of the Commonwealth SUT based on a specified

percentage equal to 2.75% divided by 5.5% rather than 2.75% divided by the 6%

Commonwealth SUT rate, which, but for the Act, would have been the denominator in the

calculation of the specified percentage of Commonwealth SUT revenues dedicated to COFINA

and would have decreased that specified percentage.

23.     The entire Commonwealth SUT is applied in accordance with the "flow of funds"

described below.

## III.     COFINA Enabling Legislation (Act 91 and its Amendments)

24.     Act No. 91 of the Puerto Rico Legislative Assembly, approved on May 13, 2006

(as amended, "Act 91"), provided a method and source of payment for debt of the

Commonwealth for which there was no effective payment source (so-called "extraconstitutional

debt," as distinct from "full faith and credit" obligations, which are sometimes referred to as

"constitutional debt").

25.     Act 91 provided for the creation of a special fund called the "Urgent Interest

Fund" and the deposit into the Urgent Interest Fund of 1% of the Commonwealth SUT revenues

collected during each fiscal year.  The Act further provided for the use of the collections in the

Urgent Interest Fund to pay the Commonwealth's extraconstitutional debt in existence as of

June 30, 2006.

26.     Through a series of amendments, Act 91 became the enabling act for COFINA

and the foundation of a financing mechanism to pay the Commonwealth's extraconstitutional

debt and general Commonwealth operating expenses.

27.     The amendments to Act 91 accomplished the following (among other things):

(i)      Changed the name of the Urgent Interest Fund to the "Dedicated Sales Tax Fund."[9]

(ii)      Created COFINA as a purportedly independent public corporation "attached" to the GDB (in lieu of a previously authorized subsidiary of the GDB called the "Urgent Interest Fund Corporation").[10]

(iii)      Authorized COFINA to (a) issue bonds payable solely from, and secured solely by, the Commonwealth SUT revenues deposited into the Dedicated Sales Tax Fund and (b) use the proceeds of those bonds solely to pay the Commonwealth's extraconstitutional debt in existence as of June 30, 2006.[11]

(iv)      Later expanded the authorized uses of COFINA bond proceeds to include (a) the payment of additional extraconstitutional debt of the Commonwealth, (b) the repayment of funds borrowed by the Commonwealth from the GDB to finance budget deficits, and (c) the direct payment of general Commonwealth operating expenses.[12]

28.      The amendments to Act 91 also provided for a series of increases in the portion of Commonwealth SUT revenues required to be transferred to the Dedicated Sales Tax Fund in each fiscal year (the "Transfer Amount").

29.      The Transfer Amount for each fiscal year is the greater of (a) a specified percentage of all collections of the Commonwealth SUT during that fiscal year (the "Specified Percentage") and (b) a base amount that increases by 4% from fiscal year to fiscal year (the "Base Amount"). The amendments to Act 91 increased both the Specified Percentage and the

---

[9]    2007 P.R. Laws 56.
[10]   2007 P.R. Laws 56; 2006 P.R. Laws 291.
[11]   2007 P.R. Laws 56.
[12]   2009 P.R. Laws 1.

Base Amount.[13] After giving effect to the Act 91 amendments, the Specified Percentage is 50% and the Base Amount (which is more than $753 million for fiscal year 2018) increases by 4% from fiscal year to fiscal year until it reaches $1.85 billion.

30. Transfers to the Dedicated Sales Tax Fund are required to be made from the first Commonwealth SUT collections in each fiscal year (*i.e.*, starting each July 1).

31. Act 91 states that the Commonwealth SUT collections that are transferred to the Dedicated Sales Tax Fund are not intended to be "available resources" of the Commonwealth and, therefore, may not be used by the Commonwealth for any purpose.[14]

32. If, in any fiscal year, the Commonwealth SUT collections transferred to the Dedicated Sales Tax Fund are insufficient to pay the debt service on the COFINA bonds, additional Commonwealth SUT collections in the next fiscal year must be transferred to the Dedicated Sales Tax Fund to make up for the insufficiency.[15]

33. If, in any fiscal year, the Commonwealth SUT collections are less than the Base Amount, the Secretary of the Treasury of the Commonwealth is authorized to cover that shortfall from any available funds, and the Director of the Office of Management and Budget of the Commonwealth is required to include the appropriations necessary to cover that shortfall in the budget for the current fiscal year or the next fiscal year.[16]

34. If, in any fiscal year, the Specified Percentage of the Commonwealth SUT collections exceeds the Base Amount for that fiscal year, the Commonwealth is required to deposit the excess collections in the Dedicated Sales Tax Fund.[17]

---

[13] 2006 P.R. Laws 291; 2007 P.R. Laws 56; 2009 P.R. Laws 1; 2009 P.R. Laws 7.
[14] 2006 P.R. Laws 91, § 3, as amended P.R. Law Ann. tit. 13 § 12.
[15] P.R. Laws Ann. tit. 13 § 14(d)
[16] P.R. Laws Ann. tit. 13 § 14(a)
[17] P.R. Laws Ann. tit. 13 § 14(b)

## IV.  Overview of COFINA Bond Offerings

35.     COFINA has issued fifteen series of bonds:  three in 2007; one in 2008; three in 2009; four in 2010; and four in 2011.[18]

36.     A significant percentage of the COFINA bonds were issued as capital appreciation bonds.  Interest on such bonds is not payable on a current basis but rather compounds semi-annually and is payable at maturity.[19]

37.     The COFINA bonds matured or mature in fiscal years 2016 through 2058.[20]

38.     All of the COFINA bonds are non-recourse obligations of COFINA payable solely from the Commonwealth SUT revenues deposited into the Dedicated Sales Tax Fund (and, in turn, transferred to BONY as trustee for the COFINA bondholders).

39.     As of February 2017, there were $17.58 billion of COFINA bonds outstanding (including $6.16 billion in present value of capital appreciation bonds).[21]

## V.  The SUT "Flow of Funds"

40.     All SUT revenues are collected, transferred, and deposited as follows:

(i)     Merchants and retailers remit SUT collections and submit tax returns to Banco Popular de Puerto Rico ("Banco Popular") or to a tax collector that, in turn, transfers the remittances and returns to Banco Popular, which is responsible for receiving and verifying the SUT collections and returns.

(ii)    On a daily basis, Banco Popular transfers the SUT collections to a joint account of the GDB (acting on behalf of the Commonwealth) and COFINA at Banco Popular (the "Sales Tax Account").

---

[18]   GOVERNMENT DEVELOPMENT BANK, Puerto Rico Sales Tax Financing Corporation (COFINA), http://www.gdb-pur.com/investors_resources/cofina.html.
[19]   Commonwealth of P.R. Fin. Info. & Operating Data Report, dated Dec. 18, 2016, at 182.
[20]   Commonwealth of P.R. Fiscal Plan App., dated Oct. 14, 2016, at 8.
[21]   Commonwealth of P.R. Fin. Info. & Operating Data Report, dated Dec. 18, 2016, at 182.

(iii)    Based on information in the tax returns submitted by the merchants and retailers, Banco Popular segregates the collections attributable to the Commonwealth SUT from the collections attributable to the Municipal SUT.

(iv)    On a daily basis with a two-day delay, Banco Popular transfers from the Sales Tax Account to the Dedicated Sales Tax Fund (which is a COFINA account at Banco Popular) the collections attributable to the Commonwealth SUT.

(v)    On a daily basis, Banco Popular transfers the SUT collections in the Dedicated Sales Tax Fund as follows: *first*, to BONY as trustee for the COFINA bondholders up to the Base Amount for the then-current fiscal year; *second,* to the Commonwealth up to the Base Amount for that fiscal year; and, *third,* 50% to BONY as trustee for the COFINA bondholders and 50% to the Commonwealth for the remainder of that fiscal year.[22]

### **FIRST CAUSE OF ACTION**

**28 U.S.C § 2201(a)**
**(Declaration that Act 91 Did Not Transfer Present**
**Ownership of Future SUT Revenues to COFINA)**

41.    Paragraphs 1-40 are incorporated by reference as if fully set forth herein.

42.    In 2007, Act 91 was amended to provide that "[t]he [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the **future funds** that must be deposited in the [Dedicated Sales Tax Fund] . . . are hereby transferred to, and shall be the property of COFINA."[23] (emphasis added).

43.    With respect to "future funds," the statute is ambiguous as to whether the transfer purportedly occurred on the effective date of the Act or occurs as and when future SUT revenues

---

22    P.R. Laws Ann. tit. 13, §§ 32101 and 32104.
23    2006 P.R. Laws 91, § 3, as amended, P.R. Law Ann. tit. 13 § 12.

11

are deposited into the Dedicated Sales Tax Fund.  **The ambiguity arises because the statute speaks in terms of a present transfer ("are hereby transferred") of funds to be deposited in the future ("future funds that must be deposited")**.

44.     If the language is read as purporting to transfer **present ownership** of future revenues on the effective date of the Act, no such transfer occurred because no such transfer is possible.  The law has no comprehension of a **present** transfer of **future** property (as distinct from a present **promise** that yet-to-exist property will be transferred in the future).

45.     It is a basic legal maxim (and a dictate of logic and common sense) that "one cannot give what one does not have" (in Latin, "*nemo dat qui non habet*").  Thus, "[i]t is impossible on the face to have a vested property right in after-acquired property . . . because, by definition, after-acquired property is a mere contingency."  *First Nat'l Bank of Colorado Springs v. Hamilton* (*In re Hamilton*), 18 B.R. 868, 870 (Bankr. D. Colo. 1982).  It is simply incoherent to say that COFINA has owned since 2007 tax revenues generated by the sale of a television that has not yet occurred and that might never occur.

46.     The notion of a present transfer of future funds is also directly at odds with the Commonwealth's inalienable power to repeal or reduce the SUT and with other provisions of Act 91 itself.

47.     The Official Statement for each series of COFINA bonds included the following risk disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  In accordance with these provisions, **the Legislative Assembly may amend,**

> **modify or repeal Act 117 [now a provision of the tax code], which imposes the [SUT].**[24]

(emphasis added).

48.    Thus, the COFINA bondholders were all on notice that the future SUT revenues securing their bonds were not COFINA's vested property and could disappear at any time.

49.    Indeed, COFINA's bond counsel noted in its 2011 opinion letter that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . [and] [t]hus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely."  The opinion letter also noted that this fact had been "clearly disclosed" to bondholders.[25]

50.    The prospect of a reduction or elimination of the SUT remained a serious concern among market participants, as evidenced by a highly unusual public conference call arranged by the GDB in October 2013 so that investors could directly question COFINA's bond counsel about their prior opinions.[26]  During that call, one investor asked:  "[A]re we correct to assume that risk of materially negatively altering the COFINA structure via legislative action is very low?"  The answer started with a "yes" but was quickly qualified with the frank acknowledgment that "[f]uture legislatures could take action if deemed appropriate."

51.    Furthermore, Act 91 provides that it "does not limit the power of the Commonwealth of Puerto Rico, by means of a law or amendment, to **limit or restrain the nature or the amount of such [SUT] or other revenues or to substitute similar or**

---

[24]    GOVERNMENT DEVELOPMENT BANK, Puerto Rico Sales Tax Financing Corporation (COFINA), http://www.gdb-pur.com/investors_resources/cofina.html.
[25]    Opinion of Nixon Peabody LLP dated Dec. 13, 2011, at 10.
[26]    GOVERNMENT DEVELOPMENT BANK, Conference Call About COFINA Legal Opinions (available at http://www.gdb-pur.com/investors_resources/documents/10-31-13TranscriptionGDBPR-Final.pdf).

comparable collateral [in the form of] other taxes, fees, charges or other income to be
deposited into the [Dedicated Sales Tax Fund] if, for the following fiscal years, the revenues
projected by the Secretary of the Treasury from such substitutive tax, income or collateral is
equal to or greater than the service of the debt and other charges and any coverage requirement
included in the COFINA bond authorizing documents."[27] (emphasis added).  It is noteworthy
that Act 91 itself refers to the dedicated SUT revenues as "collateral."

52.     The "equal or greater" substitution condition applies only to the substitution of
other collateral for the SUT revenues dedicated to COFINA under Act 91; not to any reduction
or repeal of the SUT, which could be accomplished without any substitution of other revenues.

53.     To state the obvious, if the SUT can be repealed or reduced at any time, and if
future SUT revenues can be substituted with "similar or comparable collateral" (*i.e.*, revenues
from an entirely different source), such yet-to-exist SUT revenues cannot already be COFINA's
property.

54.     Moreover, Act 91 provides for the return of any SUT revenues remaining in the
Dedicated Sales Tax Fund when all COFINA bonds have been repaid.  Although the return is
"authorized" rather than expressly mandatory, COFINA cannot use SUT revenues for any
purpose other than to pay its administrative expenses and its bondholders, and, as a practical
matter, the Commonwealth has control over the disposition of any remaining funds because
COFINA is "attached" to the GDB and governed exclusively by GDB directors.

55.     The practical inevitability of any excess SUT revenues being returned to the
Commonwealth is fundamentally inconsistent with the idea that such yet-to-exist revenues
became the property of COFINA in 2007.

---

[27]     2006 P.R. Laws 91, §5(c), as amended, P.R. Law Ann. tit. 13 §14(c).

56.     Perhaps the most powerful demonstration that COFINA does not own future SUT revenues is that the Commonwealth has unilaterally reallocated such revenues to its General Fund.

57.     In October 2013, the Puerto Rico Legislature amended Act 91 to increase the portion of future Commonwealth SUT revenues transferred to COFINA so as to allow for the issuance of additional COFINA bonds.[28] In July 2014, the Puerto Rico Legislature amended the 2013 amendment to suspend the increase in future SUT revenues "transferred" to COFINA nine months earlier.[29]

58.     The "Statement of Motives" for the 2014 amendment offered the following rationale for the Legislature's action:

> As the GDB has publicly stated, neither [the Commonwealth] nor its instrumentalities, including COFINA, intend to tap into the stock market through a bond issue during this fiscal year. In light of this situation, the Legislative Assembly deems it prudent that the General Fund receives the Sales and Use Tax revenues **transferred to COFINA** under [the 2013 amendment], until such revenues are needed to repay any bond or note issued by COFINA in the future. When that time comes, the transfer to COFINA of the Sales and Use Tax revenues and the use therefor contemplated under [the 2013 amendment] shall be effective.[30]

(emphasis added).

59.     The additional future revenues "transferred to COFINA" could not have become COFINA's property in 2013 if, in 2014, the Commonwealth could unilaterally reallocate those revenues to its General Fund.

60.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 did not transfer present ownership of future SUT revenues to COFINA.

---

[28]   2013 P.R. Laws 116.
[29]   2014 P.R.. Laws 72.
[30]   2014 P.R. Laws 72.

## SECOND CAUSE OF ACTION

### 28 U.S.C § 2201(a)
### (Declaration that Act 91 Did Not Assign to COFINA
### Any "Right to Receive" Future SUT Revenues)

61.     Paragraphs 1-60 are incorporated by reference as if fully set forth herein.

62.     Tellingly, the legal opinions rendered in connection with the issuance of COFINA

bonds do not speak in terms of a present transfer of future property, and they contain no analysis

of how such a transfer would be possible.

63.     Rather, they all refer to a transfer of the Commonwealth's "right to receive"

future dedicated tax revenues, opining without analysis that this purported transfer was valid.

*See* Opinion of the P.R. Dep't of Justice dated Dec. 13, 2011, at 2 ("Pursuant to Act 91, the

Dedicated Sales Tax Fund, including the **right to receive** collections of the Dedicated Sales Tax,

is validly transferred to [COFINA]."); Opinion of Nixon Peabody LLP dated Dec. 13, 2011,

at 11 ("Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's **right to**

**receive** the Pledged Sales Tax, to [COFINA]."); Opinion of Pietrantoni Mendez & Alvarez LLC

dated Dec. 13, 2011, at 8 ("Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged

Sales Tax, including the Commonwealth's **right to receive** the Pledged Sales Tax, to

[COFINA].") (emphasis added).

64.     Act 91, however, says nothing about a transfer of the Commonwealth's "right to

receive" future SUT revenues.

65.     In any event, such a transfer would, on its face, not have vested COFINA with

ownership of dedicated SUT revenues **prior to their receipt**.

66.     Nor would a transfer of the Commonwealth's "right to receive" have constituted

an assignment of any such right.  COFINA has no right or authority to collect or enforce the

SUT, which is owed by taxpayers exclusively to the Commonwealth.[31]  Indeed, the

Commonwealth was at pains to disclaim any transfer of its taxing power with respect to the

SUT.[32]

     67.    As set forth above, revenues from the SUT are collected on behalf of the

Commonwealth and deposited into a joint account of the GDB (an instrumentality of the

Commonwealth) and COFINA.  Only then are revenues allocable to the Commonwealth SUT (as

opposed to those allocable to the municipalities) transferred to the Dedicated Sales Tax Fund.[33]

     68.    Thus, any purported transfer of the "right to receive" (**which, again, Act 91 says**

**nothing about**) would have amounted to nothing more than a promise to pay SUT revenues over

to COFINA as and when collected by the Commonwealth, as distinct from an assignment of a

direct right to collect and enforce the SUT, which would have entailed an unconstitutional

transfer of the Commonwealth's taxing power.  *See* Puerto Rico Constitution, Article VI, Section

2 (prohibiting any surrender or suspension of the Commonwealth's taxing power);

RESTATEMENT (SECOND) OF CONTRACTS § 330 (AM. LAW INST. 1981) ("A contract . . . to

transfer proceeds to be received in the future by the promisor, is not an assignment."); *id* at cmt.

B ("[A] promise by an obligee that he will collect money due him and pay over all or part of it to

the promisee is not an assignment."); *IBEC v. Banco Comercial*, 117 D.P.R. 371, 376 [17 P.R.

Offic. TRANS. 446, 453] (1986) (in an assignment of rights, "[t]he assignee holds the same

position and binding relationship with regard to the debtor from the moment the credit is

transferred.").

---

[31]   *See* P.R. Law Ann. tit. 13 § 11a(b) (limiting the powers of COFINA); P.R. Law Ann. tit. 13 §§ 32021-32031
     (providing for the collection of the SUT).
[32]   2006 P.R. Laws 91, § 8, as amended, P.R. Law Ann. tit. 13 § 8(a), P.R. Law Ann. tit. 13 § 16(a).
[33]   Official Statement for COFINA Senior Series 2011C Bonds, at 15 & 16.

Case:17-03283-LTS Doc#:4759-24 Filed:01/12/19 Entered:01/13/19 03:45:34 Desc: Main
Document Page 18 of 60

69.     Put the other way around, without an assignment to COFINA of the right to collect and enforce the dedicated portion of the SUT, any transfer of the "right to receive" would have amounted to nothing more than an "unsecured" promise by the Commonwealth to pay over to COFINA the dedicated portion of the SUT as and when collected.

70.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 did not assign to COFINA the Commonwealth's "right to receive" the dedicated portion of future SUT revenues.

### THIRD CAUSE OF ACTION

#### 28 U.S.C § 2201(a)
**(Declaration that Purported Transfer of "Future Funds" to COFINA Was, at Most, Unsecured Promise that SUT Revenues Would Be Transferred to COFINA in the Future)**

71.     Paragraphs 1-70 are incorporated by reference as if fully set forth herein.

72.     Given the foregoing, the purported transfer to COFINA of "future funds" is most sensibly read as a promise that future SUT revenues would be transferred to COFINA as and when deposited into the Dedicated Sales Tax Fund.

73.     Like any other pre-petition promise of a debtor, that promise can be breached, revoked, and/or rejected after the filing of a title III petition, giving COFINA, at most, an unsecured claim in the Commonwealth's title III case.[34]

74.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that, with respect to "future funds," the statutory transfer language was, at most, an unsecured promise that SUT revenues would be transferred to COFINA in the future, which promise can be breached, revoked, or, pursuant to section 365 of the Bankruptcy Code, rejected

---

[34]     Such unsecured claim would be subject to any defenses the Commonwealth may have, which is an issue beyond the scope of this proceeding.

to the extent of any executory contract between the Commonwealth and COFINA with respect to future SUT revenues.

75.     To the extent necessary to satisfy its mandate under the Commonwealth-COFINA Dispute Stipulation, the Commonwealth Agent hereby indicates its intent to breach, revoke, and/or reject that unsecured promise.

### FOURTH CAUSE OF ACTION

### 28 U.S.C § 2201(a)
### (Declaration that COFINA Has No Enforceable
### Security Interest in Future SUT Revenues)

76.     Paragraphs 1-75 are incorporated by reference as if fully set forth herein.

77.     If the purported transfer to COFINA of "future funds" (or of any "right to receive" such funds) was of any legal effect beyond an unsecured promise that funds would be transferred in the future, it could only be viewed as a grant by the Commonwealth to COFINA of a security interest in after-acquired property, *i.e.*, future SUT revenues.  Indeed, viewing the transfer as a secured transaction is consistent with the Commonwealth's ability under Act 91 to replace future SUT revenues with other "**collateral**."

78.     If viewed as a grant of a security interest, the transfer of "future funds" was and is governed by Article 9 of the Uniform Commercial Code, as adopted by Puerto Rico (the "UCC").  More specifically, any such purported transfer would most properly be characterized as a grant of a security interest in "accounts" or "payment intangibles" (as defined in the UCC) to secure the Commonwealth's obligation (which arises by operation of law) to reimburse COFINA for the use of COFINA bond proceeds to pay debts and expenses of the Commonwealth and/or as a non-recourse third-party pledge by the Commonwealth of collateral to secure COFINA's obligation to pay its bondholders.

79.     In this regard, the subjective intent of the parties to create a security interest is not – and never has been – needed to create such an interest.  As the drafters of the UCC made clear in their 2010 revisions:  "When a security interest is created, [Article 9] applies regardless of the form of the transaction or the name that parties have given to it.  Likewise, the subjective intention of the parties with respect to the legal characterization of their transaction is irrelevant to whether this Article applies, as it was to the application of former Article 9."[35]

80.     The "old" version of UCC Article 9 ("Old Article 9"), which was in effect when the "future funds" transfer language was added to Act 91, excluded from its scope any "transfer by a government, political subdivision or governmental instrumentality or agency **to the extent such transfer is governed by special statute**."[36] (emphasis added).

81.     Act 91 was not a "special statute" with respect to the Commonwealth-COFINA transfer because it did not "govern" the transfer with respect to matters that would otherwise be governed by Article 9 (*e.g.*, attachment and perfection).  *See* Old UCC § 9-104, cmt. 5 ("Since these assignments [of collateral in connection with governmental borrowings] are usually **governed by special provisions of law**, these governmental transfers are excluded from this Article.") (emphasis added).

82.     Even if Act 91 were a "special statute" and Old Article 9 did not apply to the purported transfer of future SUT revenues to COFINA, Article 9 became applicable to the purported transfer of "future funds" with Puerto Rico's adoption of Revised Article 9 in 2013.[37]

83.     The "scope" section of Revised Article 9 provides that it applies generally to security interests in accounts and payment intangibles but "does not apply **to the extent** that . . .

---

[35]   UCC § 9-102 cmt. 2.
[36]   Old UCC § 9-104(e).
[37]   Section 9-702(a) of Revised Article 9 provides that, "[e]xcept as otherwise provided in this part, this Act applies to a transaction or lien within its scope, even if the **transaction** or lien was entered into or created before this Act takes effect." (emphasis added).

Case:17-03283-LTS Doc#:4759-24 Filed:09/09/17 Entered:09/09/17 13:22:05 Desc: Main
Document Page 21 of 60

another statute of this Commonwealth **expressly governs** the **creation**, **perfection**, priority, or enforcement of a security interest created by this Commonwealth or a governmental unit of this Commonwealth"[38] (emphasis added)).  If anything, this exclusion is narrower than the exclusion in Old Article 9.

84.     Act 91 contains no provisions governing the attachment, priority, perfection, or enforcement of any security interest granted **by the Commonwealth to COFINA**, and no other statute governs these matters.

85.     By contrast, Act 91 contains detailed provisions governing the attachment, perfection, and priority of the security interest granted **by COFINA to its bondholders** (and, even though the statute provides that no further steps are required for perfection, BONY, as trustee for the bondholders, filed a UCC financing statement against COFINA).

86.     Thus, the purported transfer of future SUT revenues to COFINA either was never excluded from Article 9 or ceased to be excluded when Revised Article 9 became effective in 2013.

87.     Section 9-203 of the UCC (Old and Revised) provides, in relevant part, that a security interest becomes enforceable against the debtor only if the debtor has authenticated (*i.e.*, signed) a security agreement.  Here, no security agreement was ever signed or otherwise authenticated by the Commonwealth.

88.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that no security interest of COFINA ever became enforceable against the Commonwealth.

---

[38]     Revised UCC § 9-109(c).

Case:17-03283-LTS Doc#:4759-24 Filed:09/09/19 Entered:09/09/19 07:45:34 Desc: Main Document Page 22 of 60

## FIFTH CAUSE OF ACTION

### 28 U.S.C § 2201(a)
### Bankruptcy Code Sections 544(a)(1) and 547(b)
### (Declaration that Any Unperfected Security Interest of COFINA
### in SUT Revenues is Avoidable; Avoidance of Any Such Interest)

89.     Paragraphs 1-88 are incorporated by reference as if fully set forth herein.

90.     Even if a security interest became enforceable against the Commonwealth, the security interest was not and is not perfected.

91.     Under the transition rules for Revised Article 9, secured parties had one year from the effective date (January 17, 2013) to perfect any security interest within its scope that was not covered by Old Article 9.[39]

92.     To perfect a security interest in accounts or general intangibles under Old Article 9, a secured party (here, COFINA) needed to file a UCC financing statement, which COFINA did not do.  The requirement is the same for the perfection of a security interest in "payment intangibles," which is the applicable term under Revised Article 9.

93.     Any unperfected security interest of COFINA in accounts or payment intangibles is avoidable pursuant to section 544(a)(1) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)).

94.     Section 544(a)(1) of the Bankruptcy Code provides that "(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by— (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with

---

[39]     Revised UCC § 9-703(b).

respect to such credit, a judicial lien on all property on which a creditor on a simple contract

could have obtained such a judicial lien, whether or not such a creditor exists."[40]

95.    In these title III cases, the term "trustee" means the Oversight Board.[41]

96.    As the Commonwealth Agent, the Committee stands in the shoes of the Oversight

Board as "trustee" with respect to the Commonwealth-COFINA Dispute.

97.    Pursuant to section 9-317(a)(2) of Revised Article 9, an unperfected security

interest is subordinate to the rights of a person who becomes a lien creditor before the security

interest is perfected.

98.    The Oversight Board, and therefore the Committee as the Commonwealth Agent,

has the status of a lien creditor by virtue of section 544(a)(1) of the Bankruptcy Code.

99.    In addition, under specified circumstances that are present here, section 547(b) of

the Bankruptcy Code empowers the trustee to avoid transfers of an interest of the debtor in

property made prior to the petition date.

100.    Pursuant to section 547(e)(2)(C) of the Bankruptcy Code, a transfer is deemed

made immediately before the petition date if such transfer is not perfected at the later of the

commencement of the case or 30 days after the transfer takes effect.

101.    Because any security interest of COFINA was not perfected as of the

Commonwealth Petition Date, any transfer of an interest in SUT revenues is deemed to have

occurred immediately before the Commonwealth Petition Date and thus during the applicable

avoidance period under section 547(b)(4).

102.    Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C

§ 2201(a) that any unperfected security interest of COFINA in SUT revenues is avoidable.  The

---

[40]    11 U.S.C. § 544(a)(1).
[41]    PROMESA § 301(c)(7).

Committee, as the Commonwealth Agent, also seeks to avoid any such interest under section
547(b).

**SIXTH CAUSE OF ACTION**

**28 U.S.C § 2201(a)**
**Bankruptcy Code Section 548(a)(1)(B)**
**(Declaration that Any Interest of COFINA in SUT Revenues Is**
**Avoidable as Fraudulent Transfer; Avoidance of Any Such Interest)**

103.     Paragraphs 1-102 are incorporated by reference as if fully set forth herein.

104.     To the extent the Court determines that any interest of COFINA in SUT revenues
is not a security interest or that any pre-petition transfer to COFINA of an interest in SUT
revenues is not avoidable pursuant to section 544(a)(1) or 547(b) of the Bankruptcy Code, the
Commonwealth is entitled to a declaration, pursuant to 28 U.S.C § 2201(a), that any such
transfer made within two years before the Commonwealth Petition Date is avoidable as a
fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code insofar as the
Commonwealth received less than reasonably equivalent value for any such transfer and the
conditions in section 548(a)(1)(B)(i) or 548(a)(1)(B)(ii) were met.  The Committee, as the
Commonwealth Agent, also seeks to avoid any such transfer under section 548(a)(1)(B).

**SEVENTH CAUSE OF ACTION**

**28 U.S.C. § 2201(a)**
**Bankruptcy Code Section 549**
**(Declaration that Any Post-Petition Transfer to COFINA of SUT Revenues**
**Is Avoidable Post-Petition Transaction; Avoidance of Such Transactions)**

105.     Paragraphs 1-104 are incorporated by reference as if fully set forth herein.

106.     Subject to certain inapplicable exceptions, section 549(a) of the Bankruptcy Code
empowers the trustee to avoid any unauthorized transfer of property of the Commonwealth's
estate (such as transfers of SUT revenues) that occurs after the commencement of the case.

107.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that any post-petition transfer to COFINA of SUT revenues is avoidable. The Committee, as the Commonwealth Agent, also seeks to avoid such transfers under section 549.

### EIGHTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### UCC Section 9-317(a)(2)
### (Declaration that Any Security Interest of COFINA in SUT
### Revenues Is Subordinate to Rights of Oversight Board as Trustee)

108.     Paragraphs 1-107 are incorporated by reference as if fully set forth herein.

109.     Section 9-102(a)(52)(C) of the UCC defines a "lien creditor" to include "a trustee in bankruptcy from the date of the filing of the petition."[42]

110.     In these title III cases, the term "trustee" means the Oversight Board.[43]

111.     As the Commonwealth Agent, the Committee stands in the shoes of the Oversight Board as "trustee" with respect to the Commonwealth-COFINA Dispute.

112.     Pursuant to section 9-317(a)(2) of Revised Article 9, an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected.

113.     Accordingly, the Committee as the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that any security interest of COFINA is subordinate to the rights of the Oversight Board as trustee.

---

[42]     UCC §9-102(a)(52)(c).
[43]     PROMESA § 301(c)(7).

## NINTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**Bankruptcy Code Section 552(a)**
**(Declaration that Any Security Interest Was Cut Off**
**By Commencement of Commonwealth's Title III Case)**

114.    Paragraphs 1-113 are incorporated by reference as if fully set forth herein.

115.    Section 552(a) of the Bankruptcy Code, as made applicable to these title III cases

by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), provides that, subject to certain

inapplicable exceptions, "property acquired . . . by the debtor after the commencement of the

case is not subject to any lien resulting from any security agreement entered into by the debtor

before the commencement of the case."[44]

116.    Even if COFINA has a security interest in SUT revenues (whether perfected or

not), it could only have resulted from a pre-petition security agreement.

117.    Any post-petition SUT revenues are after-acquired property of the

Commonwealth.

118.    Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C

§ 2201(a) that any security interest of COFINA as to SUT revenues acquired post-petition was

cut off by the commencement of the Commonwealth's title III case.

## TENTH CAUSE OF ACTION

**28 U.S.C § 2201(a)**
**Bankruptcy Code Sections 544(a)(1) and 547(b)**
**(Declaration that Any Non-UCC Transfer of Post-Petition**
**SUT Revenues Is Avoidable; Avoidance of Any Such Transfers)**

119.    Paragraphs 1-118 are incorporated by reference as if fully set forth herein.

120.    Even the senior COFINA bondholders could not bring themselves to claim that

Act 91 transferred to COFINA present ownership of future SUT revenues.  In their motion for

---

[44]    11 U.S.C. § 552(a)

judgment on the pleadings in the *Lex Claims* case, they took the position that "from the moment they are **generated**, the Transferred Tax Revenues are the property of COFINA."[45] (emphasis added).

121.     However, the transfer language in Act 91 says nothing about the point at which SUT revenues are "generated."  Rather, it speaks only in terms of future SUT revenues that must be "deposited" into the Dedicated Sales Tax Fund.

122.     In any event, whether the transfer occurs when the future SUT revenues are generated or when they are deposited into the Dedicated Sales Tax Fund, and even if the transfer was of some legal effect beyond an unsecured promise and was not and is not governed by UCC Article 9, any interest of COFINA in post-petition SUT revenues is avoidable pursuant to section 544(a)(1) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), because the transfer of such future revenues was, at best, incomplete as of the filing of the Commonwealth's title III petition.

123.     Section 544(a)(1) provides that "(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by—  (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists."[46]

---

[45]     Major COFINA Bondholders' Mot. for J. on the Pleadings to Dismiss the Second & Twelfth Causes of Action in Pls' Second Amended Complaint, at 13, *Lex Claims, LLC v. Padilla*, No. 16-02374 (FAB) (D.P.R. Mar. 19, 2017) [Docket No. 225].
[46]     11 U.S.C. § 544(a)(1).

Case:17-03283-LTS Doc#:4759-24 Filed:09/01/17 Entered:09/08/17 03:45:34 Desc: Main
Document Page 28 of 44

124.     In these title III cases, the term "trustee" as used in applicable provisions of the Bankruptcy Code means the Oversight Board.[47]

125.     As the Commonwealth Agent, the Committee stands in the shoes of the Oversight Board as "trustee" with respect to the Commonwealth-COFINA Dispute.

126.     Any transfer of property of the debtor that is incomplete as of the petition date is voidable by a judicial lien creditor that obtained the lien at the time of the commencement of the case.

127.     Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that any non-UCC interest of COFINA in post-petition SUT revenues is avoidable. The Committee, as the Commonwealth Agent, also seeks to avoid any such interests under section 544(a)(1).

128.     In addition, under specified circumstances that are present here, section 547(b) of the Bankruptcy Code empowers the trustee to avoid transfers of an interest of the debtor in property made prior to the petition date.

129.     Pursuant to section 547(e)(3) of the Bankruptcy Code, for purposes of section 547, a transfer is not made at least until the debtor has acquired rights in the property transferred. The Commonwealth does not acquire rights in SUT revenues until taxable goods or services are purchased, thereby giving the Commonwealth the right to collect the tax from the purchaser or merchant.

130.     Accordingly, the Commonwealth is entitled to a declaration that any non-UCC interest of COFINA in post-petition SUT revenues and SUT revenues within the applicable avoidance period are avoidable.  The Committee, as the Commonwealth Agent, also seeks to avoid any such interests under section 547(b).

---

[47]     PROMESA § 301(c)(7).

## ELEVENTH CAUSE OF ACTION

### 28 U.S.C § 2201(a)
### Bankruptcy Code Section 362(a)
### (Declaration that Post-Petition Transfer of SUT Revenues
### to Non-Commonwealth Entities Violates Automatic Stay)

131.    Paragraphs 1-130 are incorporated by reference as if fully set forth herein.

132.    Subject to certain inapplicable exceptions, section 362(a)(3) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . . any act to obtain possession of property of the estate or of property from the estate or to exercise control over property of the estate."[48]

133.    Subject to certain inapplicable exceptions, section 362(a)(5) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . . any act to create, perfect, or enforce against property of the debtor any lien to the extent that such lien secures a claim that arose before the commencement of the case."[49]

134.    Subject to certain inapplicable exceptions, section 362(a)(6) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . . any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."[50]

135.    The ongoing depositing of SUT revenues to the Sales Tax Account removes those revenues from the sole control of the Commonwealth and constitutes an act to collect, assess, or

---

[48]    11 U.S.C. §362(a)(3).
[49]    11 U.S.C. §362(a)(5).
[50]    11 U.S.C. §362(a)(6).

recover a claim against the Commonwealth that arose before the Commonwealth Petition Date

and are therefore in violation of sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

136.    Further, even if the transfer to COFINA of "future funds" (or of any "right to

receive" such funds) created a security interest of COFINA in future SUT revenues, any act to

perfect any such security interest as and when dedicated SUT revenues come into existence,

including by transferring such revenues to COFINA such that they are in COFINA's possession,

is prohibited by section 362(a)(5) of the Bankruptcy Code.

137.    Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28

U.S.C. § 2201(a) that the ongoing post-petition depositing of SUT revenues into the Sales Tax

Account, the Dedicated Sales Tax Fund, and BONY account is in violation of section 362(a) of

the Bankruptcy Code.

### TWELFTH CAUSE OF ACTION

**28 U.S.C § 2201(a)**
**(Declaration that Act 91 Is Unconstitutional Because**
**Substantial Result of COFINA Structure Was Evasion of**
**Constitutional Debt Limits and Constitutional Debt Priority)**

138.    Paragraphs 1-137 are incorporated by reference as if fully set forth herein.

139.    As the story is told by the senior COFINA bondholders, the creation of the

COFINA structure was an almost heroic feat of financial engineering that "rescued" the

Commonwealth from imminent financial peril.  *See, e.g.*, *COFINA Senior Bondholders' Motion*

*and Incorporated Memorandum of Law for Judgment on the Pleadings Pursuant to Federal Rule*

*of Civil Procedure 12(c)*, at 42 (referring to COFINA bonds as Puerto Rico's "first rescue

bond"), *Lex Claims, LLC v. Padilla*, No. 16-02374 (FAB) (D.P.R. Mar. 18, 2017).  To be sure,

the COFINA structure was a feat of financial and legal engineering, but this only serves to

highlight that the structure was an evasion of Puerto Rico's constitutional limitations on the

issuance of Commonwealth debt and the constitutional priority granted to the Commonwealth's

public debtholders.  Ultimately, the issuance of COFINA bonds did no more than stave off the

day of reckoning while adding billions of dollars to Puerto Rico's already unsustainable debt

burden.

140.    Looking through the form to the **economic substance** of the COFINA structure, it

is nothing but a conduit for borrowing by the Commonwealth.  **The only purpose of the**

**COFINA entity is to pay the Commonwealth's debts and expenses with the proceeds of**

**bonds for which the only source of payment is general Commonwealth tax revenues**.

Unlike the typical issuer of a government "revenue bond," COFINA does not operate any project

or system from which the revenues backing its bonds are derived.

### Evasion of Constitutional Debt Limits

141.    Puerto Rico's constitution places limits on the issuance and guarantee of debt by

the Commonwealth.  Article VI, Section 2 of the constitution provides that:

> **no direct obligations of the Commonwealth** for money borrowed directly by the
> Commonwealth evidenced by bonds or notes **for the payment of which the full**
> **faith credit and taxing power of the Commonwealth shall be pledged shall be**
> **issued** by the Commonwealth **if** the total of (i) the amount of principal of and
> interest on such bonds and notes, together with the amount of principal of and
> interest on all such bonds and notes theretofore issued by the Commonwealth and
> then outstanding, payable in any fiscal year and (ii) any amounts paid by the
> Commonwealth in the fiscal year next preceding the then current fiscal year for
> principal or interest on account of any outstanding obligations evidenced by
> bonds or notes guaranteed by the Commonwealth, **shall exceed 15% of the**
> **average of the total amount of the annual revenues raised under the**
> **provisions of Commonwealth legislation and covered into the Treasury of**
> **Puerto Rico in the two fiscal years next preceding the then current fiscal year**
> (the "Debt Service Limit").

P.R. Laws Ann. Const. art VI, §2 (emphasis added).  The same section further provides that "no

such bonds or notes issued by the Commonwealth for any purpose other than housing facilities

shall mature later than 30 years from their date" (the "Debt Maturity Limit," and, together with

the "Debt Service Limit," the "Constitutional Debt Limits"). *Id.*

142.    As shown in the chart attached as Exhibit B, had the COFINA bonds been issued

as direct, "full faith and credit" Commonwealth debt, the Debt Service Limit would have been

exceeded in 2009 at the latest. By 2012, the Debt Service Limit would have been exceeded by a

huge margin.

143.    In addition, all but three of COFINA's fourteen bond offerings would have

involved violations of the Debt Maturity Limit. As shown in the chart attached as Exhibit C,

some COFINA bonds were issued with maturities of **48 and 50 years**.

144.    It cannot be the case that, to evade the Constitutional Debt Limits or to borrow

more money when the market will not support the issuance of additional general obligation debt,

the Commonwealth can simply go "off balance sheet" by diverting general tax revenues to a

special purpose entity created for the sole purpose of issuing bonds to pay the Commonwealth's

own debts and expenses. *See Crick v. Rash*, 229 S.W. 63, 70 (Ky. 1921) (holding that allowing a

state to "validate" a debt through mere specification of a separate fund would allow debts to "be

contracted in unlimited amounts and payable in the far distant future, and still be immune from

attack as violating constitutional provisions limiting indebtedness"); *State ex rel. Wash. State

Fin. Comm. v. Martin*, 384 P.2d 833, 842 (Wash. 1963) ("[I]f the state undertakes or agrees to

provide any part of the fund from any general tax, be it excise or ad valorem, then securities

issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth

debts of the state."); *Morris v. Board of Regents*, 625 P.2d 562, 564 (Nev. 1981) (finding that the

"constitutional debt limitation would be largely nullified" if bonds were not considered debts of

the state simply because they were backed by "specific tax revenues").

145.    Indeed, the Debt Service Limit was drafted to apply only to direct, "full and faith and credit" debt of the Commonwealth because it was understood that any bonds issued by public corporations (such as COFINA) would be "revenue bonds" paid **solely from revenues derived from the issuing corporation's activities** (not from general Commonwealth tax revenues).  As reported to the Puerto Rico Senate in connection with the amendment of the Puerto Rico constitution in 1961 to add the Constitutional Debt Limits:

> When discussing revenue bonds, it should be clarified that the bonds issued and to be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when calculating the State's borrowing margin [*i.e.*, the Debt Service Limit], since for the payment of the same the good faith of the People of Puerto Rico is not committed and they will continue to be paid **only from the income derived by said corporations**.  Only in the event that the State guarantees any of these bonds, which it has not done so far, and that it has to pay in a given year a deficiency of the debt requirements thereof, with which the amount thus paid will be counted against the borrowing margin of the Commonwealth.[51]

(emphasis added).

**<u>Evasion of Constitutional Debt Priority</u>**

146.    Puerto Rico's constitution also prioritizes the payment of the Commonwealth's public debt over all other debts and expenses in the event of a revenue shortfall (the "Constitutional Debt Priority").  Article VI, Section 8 of the constitution provides that:

> [i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

In addition, Article VI, Section 2 of the constitution provides that:

> [t]he Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

---

[51]    Certified translation of the Daily Sessions Record, Senate of Puerto Rico, Tuesday, September 5, 1961.

33

147.    There can be no dispute that, prior to the Commonwealth Petition Date, the SUT revenues dedicated to COFINA would, but for their dedication to COFINA, be "available revenues" of the Commonwealth (which would first be paid to the holders of lawfully issued Commonwealth public debt).[52]  Accordingly, the dedication of SUT revenues to COFINA reduced the revenues that would otherwise be available to the Commonwealth to pay its creditors.

148.    Stated bluntly, if the Commonwealth can render general tax revenues "unavailable" simply by dedicating them to a special purpose entity that does nothing but issue bonds to pay the Commonwealth's own debts and expenses, **there is no principled limit on the Commonwealth's ability to undermine the Constitutional Debt Priority**.  *See State ex rel. Shkurti v. Withrow*, 513 N.E.2d 1332, 1336-1337 (Ohio 1987) (holding that, if "surcharges" on employer contributions to state unemployment compensation program could qualify as a "special fund," then "the legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit"); *State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 698 (N.D. 1984) ("Were we to accept the proposition that a pledge of any specific tax revenues would be sufficient to invoke the 'special fund' doctrine, the constitutional debt limitation would be largely nullified, since the legislature could exempt almost any obligation from its strictures merely by identifying a specific tax from which the obligation could be paid."); *Long v. Napolitano*, 53 P.3d 172, 189 (Ariz. Ct. App. 2002) (rejecting the argument that any designated tax revenues could be used to pay revenue

---

[52]    The Committee, solely in its capacity as the Commonwealth Agent, takes no position on whether the same priority would obtain after the Commonwealth Petition Date.

bondholders, as "the legislature could effectively nullify the constitutional debt restrictions

simply by segregating general revenues in special funds.").

**Unconstitutionality of COFINA Structure**

149.     When a financing transaction is structured so as to avoid a constitutional

provision, it is unconstitutional and void.

150.     For example, in *Ayer v. Comm'r of Administration.*, 165 N.E.2d 885 (Mass.

1960), the Commonwealth of Massachusetts legislature created a structure designed to evade a

constitutional requirement that certain actions not be taken without a vote of two-thirds of each

house then present.  At issue was an emergency act (passed without such a two-thirds vote) that

created a non-profit corporation "for the purpose of constructing a State office building to house

various departments, commissions and agencies of the Commonwealth."  *Id.* at 886.

151.     After the act was signed into law, the Commonwealth of Massachusetts and the

corporation entered into a "contract of lease" under which the Commonwealth was "about to

expend money raised, or to be raised, by the general taxation of the inhabitants of the

Commonwealth and to incur obligations purporting to bind the Commonwealth." *Id.* at 886-87.

The corporation, in turn, was about to borrow money under a trust agreement and "issue and sell

bonds whose repayment is secured by a pledge of rentals" to be paid by the Commonwealth

under the contract of lease.  *Id.* at 887.  The proceeds of the bonds and other borrowings were to

be used to construct office space for use by the Commonwealth as part of a "government center"

development project.  *Id.*  Upon the payment of all debt obligations of the corporation, the office

building was to become the Commonwealth's property.  *Id.*

152.     Taxpayers attacked the structure on the primary grounds that it was

unconstitutional in that "the statutory scheme [was] **in substance a borrowing of money by the**

**Commonwealth** without a vote, taken by the yeas and nays, of two thirds of each house of the

General Court present and voting." *Id.* at 888 (emphasis added). The Supreme Judicial Court of

Massachusetts agreed.

153. The court began by noting that, "[i]f the Commonwealth itself were to borrow on

bonds issued by it for the purpose of erecting an office building, this could be done only by a

[two-thirds] vote," and thus "[t]he question [was] whether this is substantially the situation

presented by the corporation created by [the statute at issue] and the contract of lease." *Id.* at 889

(internal quotations marks omitted). Stated another way, the question was whether "this

somewhat elaborate statute created an entity sufficiently apart from the Commonwealth itself to

avoid being classified as 'colorable' or as a 'subterfuge to evade the [Commonwealth

constitution] when the scheme embodied in it is viewed as a whole?" *Id*.

154. The court concluded that, while the corporation was a separate legal entity that

could issue bonds and sue and be sued, "these attributes [were] not enough to meet the

[taxpayers'] constitutional challenge." *Id.* at 889. This was because, "viewing the project as a

whole, the [corporation was] **nothing more than a mere intermediary to carry out only one**

**purpose**." *Id.* (emphasis added). In this regard, the court observed that the corporation was not

like other municipal entities, which "exist for more than a single, temporary purpose" and

"perform services for others than the sovereign itself," acquiring "income from those for whom

their services are performed." *Id*. at 890. The court further observed that "[t]he statute and the

'contract of lease' which it permits, when scrutinized together, have all the earmarks of a State

operation," including that "[t]he members of the [corporation] appear to be public officers." *Id*.

at 892.

155. For these reasons, the court went on to hold that the statute at issue was

unconstitutional and "void upon its face" because "**to hold otherwise would be to exalt artifice**

above reality." *Id*. (internal quotations marks omitted) (emphasis added). Indeed, "[t]he creation of the [corporation] to execute the 'contract of lease' [was] merely one phase of an integrated plan **of which the substantial result is constitutional evasion**." *Id*. (emphasis added).

156. The creation of the COFINA structure was no less an evasion of Puerto Rico's Constitutional Debt Limits and Constitutional Debt Priority. Just as with the corporation in *Ayer*, COFINA has no purpose other than to accomplish indirectly what could not have been accomplished directly. COFINA, which is controlled exclusively by directors of the GDB, borrowed money from bondholders to pay the Commonwealth's debts and expenses, and it pays the bondholders with Commonwealth tax revenues diverted from the Commonwealth treasury. Bondholders have no recourse to assets other than SUT revenues. COFINA is a "mere intermediary," pure and simple. Any other conclusion would, in the words of the *Ayer* court, "exalt artifice above reality."

157. Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 is unconstitutional because the substantial result of the COFINA structure was evasion of the Constitutional Debt Limits and the Constitutional Debt Priority, with the result that all dedicated SUT revenues, including the revenues currently on deposit at BONY, are the exclusive property of the Commonwealth.

### THIRTEENTH CAUSE OF ACTION

#### 28 U.S.C § 2201(a)
#### (Declaration that COFINA Structure Is Unconstitutional Because Act 91 Was Enacted and/or Amended In Violation of Constitutional Balanced Budget Clause)

158. Paragraphs 1-157 are incorporated by reference as if fully set forth herein.

159. In February 1974, the GDB ran an advertisement in *Barron's* magazine (attached as Exhibit D) touting the balanced budget clause in Puerto Rico's constitution (the

"Constitutional Balanced Budget Clause") as a reason investors should feel comfortable buying Puerto Rico bonds.

160.    In a stunning gem of historical irony, the ad proclaimed that "their soundness as investments is underscored by a forthright and fundamental fact:  that **deficit financing is specifically prohibited in the Constitution of the Commonwealth**." Ex. D (emphasis added).

161.    This should have been a good selling point, but what seemed a "forthright and fundamental fact" to the GDB in 1974 was expediently forgotten or ignored.

162.    In the English version of the Puerto Rico constitution approved by the U.S. Congress, Section 7 of Article VI provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." (emphasis added).

163.    The Spanish version of the constitution adopted by the Puerto Rico legislature uses the term "recursos totales," which in English means "total **resources**," not "total **revenues**" (which would be rendered "rentas totales" in Spanish).

164.    During Puerto Rico's constitutional convention, a delegate inquired (in Spanish) as to the meaning of the term "recursos totales."  The question was taken up by the president of the drafting committee, who explained (in Spanish) that "recursos totales" was meant to be broader than "total revenues," which was the term used in the balanced budget clause of the Jones Act, which governed Puerto Rico until the adoption of the Puerto Rico constitution.[53]  He

---

[53] The Jones Act provided that "[n]o appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the Government of Porto Rico during any fiscal year shall exceed the *total revenue* then provided for by law and applicable for such appropriation or expenditure, including any available surplus in the treasury, unless the legislature making such appropriation shall provide for levying a sufficient tax to pay such appropriation or expenditure within such fiscal year."  Section 34 of Jones Act, ch. 145, 39 Stat. 951, 963 (1917) (emphasis added).

further explained that "recursos totals" was meant to include, among other things beyond tax revenues, the "issuance of bonds" (translated from Spanish).

165.    Thus, while the Spanish version of the constitution uses a term that is broader than "total revenues" and was meant to include some form of bond proceeds, the English version uses "total revenues" just like the Jones Act.

166.    Since "revenues" does not include borrowings (which are a form of expense when repaid), the constitutionality of deficit financing depends, as an initial matter, on which version of the constitution controls.

167.    The answer to that question is found in Public Law 600 of June 4, 1951, which is the law by which the U.S. Congress "provide[d] for the organization of a constitutional government by the people of Puerto Rico," and Public Law 447 of July 3, 1952, which is the law by which the U.S. Congress approved the Puerto Rico constitution conditional upon certain amendments not relevant here.

168.    Public Law 600 provided that "[u]pon **approval by the Congress** the constitution shall **become effective in accordance with its terms**."[54] (emphasis added).  Public Law 447 provided that "the constitution of the Commonwealth of Puerto Rico **hereby approved** [*i.e.*, the English version] shall **become effective** when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proposed officials of Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect."[55] (emphasis added).

---

[54]    Public Law 600, 64 Stat. 319, 48 U.S.C.A. §§ 731b-731e (1951).
[55]    Public Law 447, 66 Stat. 327-328; 48 U.S.C.A. § 731d (1952).

169.     Accordingly, the "terms" in accordance with which the constitution became
effective were the terms of the **English version** approved by the U.S. Congress; not the Spanish
version debated at the constitutional convention.

170.     Even if the constitution had become effective in accordance with the terms of the
Spanish version, there would be no reason to interpret "recursos totales" to include long-term
financing of massive structural deficits through the issuance of bonds by "off balance sheet"
entities.  If limited to general obligation bonds of the Commonwealth, any deficit financing
would at least be constrained by the otherwise applicable Constitutional Debt Limits.  If deficit
financing through COFINA-like structures is allowed, the Balanced Budget Clause truly has no
meaning to speak of.

171.     In deciding to include the Balanced Budget Clause in Puerto Rico's constitution,
the delegates to the constitutional convention could not have intended to leave the door open for
unconstrained deficit financing that would eviscerate the purpose of having such a clause in the
first place.

172.     The COFINA structure was initially created to finance the payment of the
Commonwealth's "extraconstitutional" debt.[56]  As used in the Commonwealth, the term
"extraconstitutional debt" refers to debt for which there is no dedicated source of payment and
includes debt for which payment is subject to annual appropriation by the legislature (but for
which the legislature has made no such appropriation).  By retiring its extraconstitutional debt
with the proceeds of COFINA bonds, the Commonwealth freed itself from having to appropriate

---

[56]   Act No. 56 of the Puerto Rico Legislative Assembly, approved July 5, 2007 (amending Act 91 and in which the
"Statement of Motives" states that "Act No. 91 was recently amended by Act No. 291 of December 26, 2006,
for the purpose of establishing the financial structure necessary to pay or refinance the extraconstitutional
debt.").

Case:17-03283-LTS   Doc#:4759-24   Filed:09/07/17   Entered:09/07/17 23:05:34   Desc: Main
Document   Page 41 of 60

funds for their payment, thereby financing deficit spending by reducing the "appropriations" side of the budget equation.

173.    In 2009, Act 91 was amended to expand the permitted uses of COFINA bond proceeds to include the direct payment of general Commonwealth operating expenses that could not be funded from recurring revenues.  As former Puerto Rico Governor Acevedo Vilá remarked:  "What [former GDB President] Alfredo [Salazar] and I designed to pay old debt, became an instrument to finance annual operating deficits."[57]

174.    Accordingly, the Commonwealth is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that the COFINA structure is unconstitutional because Act 91 was enacted and/or amended in violation of the Constitutional Balanced Budget Clause, with the result that all dedicated SUT revenues, including revenues currently on deposit at BONY, are the exclusive property of the Commonwealth.

## PRAYER FOR RELIEF

WHEREFORE, the Commonwealth respectfully requests judgment as follows:

A.    On the First Cause of Action, declaring that Act 91 did not transfer present ownership of future SUT revenues to COFINA;

B.    On the Second Cause of Action, declaring that Act 91 did not assign to COFINA the Commonwealth's "right to receive" future SUT revenues;

C.    On the Third Cause of Action, declaring that, with respect to "future funds," the transfer language in Act 91 was, at most, an unsecured promise that SUT revenues would be transferred to COFINA in the future, which promise can be breached, revoked, and/or rejected by the Commonwealth in the context of this title III case;

---

[57]    Luis Ortiz, *Cofina and GO Creditors Wage War*, CARIBBEAN BUS. (Feb. 2, 2017),
       http://caribbeanbusiness.com/ cofina-and-go-creditors-wage-war/.

D.      On the Fourth Cause of Action, declaring that COFINA has no enforceable security interest in SUT revenues;

E.      On the Fifth Cause of Action, declaring that any unperfected security interest of COFINA with respect to post-petition SUT revenues and any pre-petition SUT revenues deposited at BONY within the applicable avoidance period are avoidable;

F.      On the Sixth Cause of Action, to the extent the Court determines that any interest of COFINA in SUT revenues is not a security interest or that any pre-petition transfer to COFINA of an interest in SUT revenues is not otherwise avoidable, declaring that any such transfer made within two years before the Commonwealth Petition Date is avoidable as a fraudulent transfer;

G.      On the Seventh Cause of Action, declaring that any post-petition transfer of SUT revenues to COFINA is avoidable;

H.      On the Eighth Cause of Action, declaring that any security interest of COFINA in SUT revenues is subordinate to the rights of the Oversight Board as trustee;

I.      On the Ninth Cause of Action, declaring that any security interest of COFINA (whether perfected or not) was cut off by the commencement of the Commonwealth's title III case;

J.      On the Tenth Cause of Action, declaring that any non-UCC transfer to COFINA is, at best, avoidable as incomplete with respect to post-petition SUT revenues and as a preferential transfer with respect to any transfer within the applicable avoidance period;

K.      On the Fifth, Sixth, Seventh, and Tenth Causes of Action, avoiding any interests or transfers described therein;

L.     On the Eleventh Cause of Action, declaring that the ongoing post-petition depositing of SUT revenues into the Sales Tax Account, the Dedicated Sales Tax Fund, and the BONY account is in violation of section 362(a) of the Bankruptcy Code;

M.     On the Twelfth Cause of Action, declaring that Act 91 is unconstitutional because the substantial result of the COFINA structure was evasion of Puerto Rico's Constitutional Debt Limits and Constitutional Debt Priority, with the result that all dedicated SUT revenues, including the revenues currently on deposit at BONY, are the exclusive property of the Commonwealth;

N.     On the Thirteenth Cause of Action, declaring that the COFINA structure is unconstitutional because Act 91 was enacted and/or amended in violation of Puerto Rico's Constitutional Balanced Budget Clause, with the result that all dedicated SUT revenues, including revenues currently on deposit at BONY, are the exclusive property of the Commonwealth; and

O.     Granting such other and further relief as the Court deems just and proper.


[SIGNATURES ON FOLLOWING PAGE]

Dated:     September 8, 2017          /s/ Luc A. Despins
           San Juan, Puerto Rico
                                      PAUL HASTINGS LLP
                                      Luc. A. Despins, Esq. *(Pro Hac Vice)*
                                      James R. Bliss, Esq. *(Pro Hac Vice)*
                                      James B. Worthington, Esq. *(Pro Hac Vice)*
                                      G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
                                      200 Park Avenue
                                      New York, New York 10166
                                      Telephone:  (212) 318-6000
                                      lucdespins@paulhastings.com
                                      jamesbliss@paulhastings.com
                                      jamesworthington@paulhastings.com
                                      alexbongartz@paulhastings.com

                                      *Counsel to the Official Committee of Unsecured
                                      Creditors for all Title III Debtors (except COFINA), as
                                      agent for the Commonwealth in the Commonwealth-
                                      COFINA Dispute*

                                      - and -

                                      /s/ Juan J. Casillas Ayala

                                      CASILLAS, SANTIAGO & TORRES LLC
                                      Juan J. Casillas Ayala, Esq., USDC - PR 218312
                                      El Caribe Office Building
                                      53 Palmeras Street, Ste. 1601
                                      San Juan, Puerto Rico 00901-2419
                                      Telephone: (787) 523-3434
                                      jcasillas@cstlawpr.com

                                      *Proposed Replacement Local Counsel to the Official
                                      Committee of Unsecured Creditors for all Title III
                                      Debtors (except COFINA), as agent for the
                                      Commonwealth in the Commonwealth-COFINA Dispute*

# EXHIBIT A

Case:17-00257-LTS Doc#:131-2 Filed:09/08/17 Entered:09/08/17 23:22:05 Desc:
Exhibit X Page 2 of 2

## Basic COFINA Structure



Case 17-00257-JTS Doc#:35-2 Filed:09/08/17 Entered:09/08/17 23:22:05 Desc: Exhibit B Page 1 of 2

**EXHIBIT B**

Case:17-00257-LTS Doc#:39-24 Filed:09/08/17 Entered:09/08/17 23:22:05 Desc:
Exhibit B Page 2 of 2

# Debt Service Limit



Case: 17-00257-LTS Doc#: 13-24 Filed: 09/09/17 Entered: 09/09/17 23:22:05 Desc:
Exhibit C Page 1 of 2

# **EXHIBIT C**

# COFINA Bond Maturities [1]



Notes:
1. Analysis prepared as of August 3, 2017
2. Capital Appreciation Bonds ("CAB")
3. Current Interest Bonds ("CIB")
4. Convertible Capital Appreciation Bonds ("CCAB")

Case:17-00257-LTS Doc#:1-4 Filed:09/06/17 Entered:09/06/17 23:22:05 Desc:
Exhibit D Page 3 of 2

**EXHIBIT D**

GDB Advertisement in *Barron's* Magazine



DPR MODIFIED PROMESA B1040 (FORM 1040) (05/17)

| PROMESA COVER SHEET (Instructions on Reverse) | CASE NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS (DEBTOR, if Title III Petition; ISSUER, if Title VI Application) Official Committee of Unsecured Creditors of the Commonwealth, as agent of, the Commonwealth of Puerto Rico | DEFENDANTS Bettina Whyte, as agent of, the Puerto Rico Sales Tax Financing Corporation |
|---|---|
| ATTORNEYS (Firm Name, Address, and Telephone No.) See attached Addendum. | ATTORNEYS (If Known) See attached Addendum. |
| PARTY (Check One Box Only) ☑ Debtor ☐ Creditor ☐ Trustee ☐ U.S. Trustee/Bankruptcy Admin ☐ Other | PARTY (Check One Box Only) ☑ Debtor ☐ Creditor ☐ Trustee ☐ U.S. Trustee/Bankruptcy Admin ☐ Other |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

See attached Addendum.

## NATURE OF SUIT

☐ PROMESA Title III Petition ☐ PROMESA Title VI Application for Approval of Modifications
☐ Other Federal Question ☑ Adversary Proceeding ☐ Demand $ _____

*If Adversary Proceeding is checked, number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc., below:*

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☐ 14-Recovery of money/property – other

**FRBP 7001(2) - Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief - imposition of stay
☐ 72-Injunctive relief - other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☑ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

## TITLE III CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES

| NAME OF DEBTOR The Commonwealth of Puerto Rico | CASE NO. 17-BK-3283 (LTS) | |
|---|---|---|
| DISTRICT IN WHICH CASE IS PENDING District of Puerto Rico | DIVISION OFFICE | NAME OF JUDGE Laura Taylor Swain |

DPR MODIFIED PROMESA B1040 (FORM 1040) (05/17)

| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
|---|---|---|
| PLAINTIFF | DEFENDANT | ADVERSARY PROCEEDING NO. |
| DISTRICT IN WHICH CASE IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF) /s/ Luc. A. Despins (Admitted Pro Hac Vice) | | |
| DATE<br>9/8/2017 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br>Luc. A. Despins | |

THIS FORM IS TO BE USED EXCLUSIVELY FOR FILINGS RELATING TO THE PUERTO RICO OVERSIGHT MANAGEMENT AND ECONOMIC STABILITY ACT (PROMESA). FOR ADMINISTRATION PURPOSES **ONLY**, THE PUBLIC DOCKETS FOR PROMESA PROCEEDINGS UNDER TITLE III AND ADVERSARY PROCEEDINGS WILL BE MAINTAINED ON THE CASE MANAGEMENT/ELECTRONIC CASE FILING (CM/ECF) SYSTEM OF THE UNITED STATES BANKRUPTCY COURT FOR THE DISTRICT OF PUERTO RICO. THESE CASES ARE UNDER THE JURISDICTION OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO.

Case:17-00257-LTS Doc#:1-3 Filed:09/08/17 Entered:09/08/17 23:17:45 Desc:
Exhibit D-2 Page 3 of 5

**ADDENDUM TO COVER SHEET**

**CAUSE OF ACTION:**

This adversary proceeding is being commenced by the Official Committee of Unsecured Creditors of all title III Debtors (except COFINA) (the "Committee"), as the "Commonwealth Agent" with respect to the "Commonwealth-COFINA Dispute," as defined in the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Docket No. 996] (the "Commonwealth-COFINA Dispute Stipulation"),  to resolve the Commonwealth-COFINA Dispute.  As defined in the Commonwealth-COFINA Dispute Stipulation, the issue in dispute is "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt . . . are property of the Commonwealth or COFINA under applicable law."  The Committee makes the allegations stated in its complaint pursuant to Federal Rules of Bankruptcy Procedure 7001(2) and (9), made applicable to these title III cases by section 310 of PROMESA (48 U.S.C. § 2170).

The causes of action involve the following federal statutes: 28 U.S.C § 2201(a); 11 U.S.C. § 544(a)(1); 11 U.S.C. § 552(a); Section 544(a)(1) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)); Section 552(a) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)); Section 362(a)(3) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), Section 362(a)(5) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)); Section 362(a)(6) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)); Section 547(b) of the Bankruptcy Code; Section 547(e) of the Bankruptcy Code; Section 548(a)(1)(B) of the Bankruptcy Code; Section 549(a) of the Bankruptcy Code; Section 365 of the Bankruptcy Code; Public Law 600, 64 Stat. 319, 48 U.S.C.A. §§ 731b-731e (1951); Public Law 447, 66 Stat. 327-328; 48 U.S.C.A. § 731d (1952).

| Plaintiff | Counsel to Plaintiff |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, <br><br> as agent of <br><br> THE COMMONWEALTH OF PUERTO RICO | **PAUL HASTINGS LLP** <br> Luc. A. Despins, Esq. *(Pro Hac Vice)* <br> James R. Bliss, Esq. *(Pro Hac Vice)* <br> James B. Worthington, Esq. *(Pro Hac Vice)* <br> G. Alexander Bongartz, Esq. *(Pro Hac Vice)* <br> 200 Park Avenue <br> New York, New York 10166 <br> Telephone: (212) 318-6000 <br> lucdespins@paulhastings.com <br> jamesbliss@paulhastings.com <br> jamesworthington@paulhastings.com <br> alexbongartz@paulhastings.com <br><br> **CASILLAS, SANTIAGO & TORRES LLC** <br> Juan J. Casillas Ayala, Esq., USDC - PR 218312 <br> Diana M. Batlle-Barasorda, Esq., USDC - PR 213103 <br> Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710 <br> Ericka C. Montull-Novoa, Esq., USDC - PR 230601 <br> El Caribe Office Building <br> 53 Palmeras Street, Ste. 1601 <br> San Juan, Puerto Rico 00901-2419 <br> Telephone: (787) 523-3434 <br> jcasillas@cstlawpr.com <br> dbatlle@cstlawpr.com <br> aaneses@cstlawpr.com <br> emontull@cstlawpr.com |

Case:17-30257-LTS Doc#:23-24 Filed:09/08/17 Entered:09/08/17 23:22:05 Desc:
Exhibit DX-V Page 5 of 5

| Defendant | Counsel to Defendant |
|---|---|
| BETTINA WHYTE,<br><br>as agent of<br><br>THE PUERTO RICO SALES TAX FINANCING CORPORATION, | **NAVARRO-CABRER LAW OFFICES**<br>Nilda M. Navarro-Cabrer, Esq.<br>USDC - PR 20212<br>El Centro I, Suite 206<br>500 Muñoz Rivera Avenue<br>San Juan, Puerto Rico 00918<br>Telephone: (787) 764-9595<br>Facsimile: (787) 765-7575<br>navarro@navarrolawpr.com<br><br>**WILLKIE FARR & GALLAGHER LLP**<br>Matthew A. Feldman, Esq. (*pro hac vice*) Joseph G. Minias, Esq. (*pro hac vice*)<br>Martin L. Seidel, Esq. (*pro hac vice*)<br>James C. Dugan, Esq. (*pro hac vice*)<br>Jeffrey B. Korn, Esq. (*pro hac vice*)<br>787 Seventh Avenue<br>New York, NY 10019<br>Tel: (212) 728-8000<br>Fax: (212) 728-8111<br>mfeldman@willkie.com<br>jminias@willkie.com<br>mseidel@willkie.com<br>jdugan@willkie.com<br>jkorn@willkie.com<br>Counsel to the COFINA Agent |

# UNITED STATES DISTRICT COURT

## DISTRICT OF PUERTO RICO

### CATEGORY SHEET

**You must accompany your complaint with this Category Sheet, and the Civil Cover Sheet (JS-44).**

| | |
|---|---|
| Attorney Name (Last, First, MI): | Casillas Ayas, Juan, J. |
| USDC-PR Bar Number: | 218312 |
| Email Address: | jcasillas@cstlawpr.com |

1. Title (caption) of the Case (provide only the names of the <u>first</u> party on <u>each</u> side):

   Plaintiff: The Commonwealth of Puerto Rico

   Defendant: Puerto Rico Sales Tax Financing Corporation

2. Indicate the category to which this case belongs:

   ☒ Ordinary Civil Case
   ☐ Social Security
   ☐ Banking
   ☐ Injunction

3. Indicate the title and number of related cases (if any).



4. Has a prior action between the same parties and based on the same claim ever been filed before this Court?

   ☐ Yes
   ☒ No

5. Is this case required to be heard and determined by a district court of three judges pursuant to 28 U.S.C. § 2284?

   ☐ Yes
   ☒ No

6. Does this case question the constitutionality of a state statute? (See, Fed.R.Civ. P. 24)

   ☒ Yes
   ☐ No

Date Submitted: 9/8/2017

rev. Dec. 2009

[ Print Form ] [ Reset Form ]

Case:17-03025-LTS Doc#:119-24 Filed:09/08/17 Entered:09/08/17 13:17:45 Desc:
Summons Page 59 of 60

DPR MODIFIED AO 440 (Rev. 06/12)  Summons in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### District of Puerto Rico

|  |  |  |
|---|---|---|
| Official Committee of Unsecured Creditors of the Commonwealth, as agent of, the Commonwealth of Puerto Rico | ) ) ) ) ) | |
| *Plaintiff(s)* | ) | Civil Action No. |
| v. | ) ) ) | |
| Bettina Whyte, as agent of, the Puerto Rico Sales Tax Financing Corporation | ) ) ) | |
| *Defendant(s)* | ) | |

## SUMMONS IN A CIVIL ACTION

To: *(Defendant's name and address)*

Counsel for Bettina Whyte, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York,NY 10019

Navarro-Cabrer Law Offices, 500 Muñoz Rivera Avenue,San Juan, Puerto Rico 00918

A lawsuit has been filed against you.

Within 21 days after service of this summons on you (not counting the day you received it) — or 60 days if you are the United States or a United States agency, or an officer or employee of the United States described in Fed. R. Civ. P. 12 (a)(2) or (3) — or 90 days in a Social Security Action — you must serve on the plaintiff an answer to the attached complaint or a motion under Rule 12 of the Federal Rules of Civil Procedure.  The answer or motion must be served on the plaintiff or plaintiff's attorney, whose name and address are:

Paul Hastings LLP, 200 Park Avenue  New York, New York 10166

Casillas, Santiago & Torres, 53 Palmeras Street, Ste. 1601 San Juan, Puerto Rico 00901-2419

If you fail to respond, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

*FRANCES RIOS DE MORAN, ESQ.*
*CLERK OF COURT*

Date: 9/8/2017

_____
*Signature of Clerk or Deputy Clerk*

DPR MODIFIED AO 440 (Rev. 06/12)  Summons in a Civil Action (Page 2)

Civil Action No.

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 4 (l))*

This summons for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I personally served the summons on the individual at *(place)* _____

_____ on *(date)* _____ ; or

☐ I left the summons at the individual's residence or usual place of abode with *(name)* _____

_____ , a person of suitable age and discretion who resides there,

on *(date)* _____ , and mailed a copy to the individual's last known address; or

☐ I served the summons on *(name of individual)* _____ , who is

designated by law to accept service of process on behalf of *(name of organization)* _____

_____ on *(date)* _____ ; or

☐ I returned the summons unexecuted because _____ ; or

☐ Other *(specify):* _____

_____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $ _____ .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

_____