# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

-------------------------------------------------------------------- X

*In re*

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

-------------------------------------------------------------------- X

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO,

      as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

      as representative of

THE COMMONWEALTH OF PUERTO RICO,

             Plaintiff-Counterclaim-
             Defendant,

      v.

BETTINA WHYTE,

      as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

      as representative of

PROMESA Title III
Case No. 17-BK-3283 (LTS)

(Jointly Administered)

Adv. Proc. No. 17-00257-LTS

**ANSWER IN INTERVENTION
AND COUNTER- AND
CROSSCLAIMS OF THE
COFINA SENIOR
BONDHOLDERS' COALITION**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

THE PUERTO RICO SALES TAX FINANCING          :
CORPORATION ("COFINA"),

                                Defendant-Counterclaim-
                                Plaintiff,

      and

THE COFINA SENIOR BONDHOLDERS'
COALITION,

                                Intervenor-Defendants-
                                Counter and Crossclaim-
                                Plaintiffs.

                v.

PERMITTED INTERVENORS,

                                Crossclaim Defendants
-------------------------------------------------------------------- X

Intervenor Defendants/Counter- and Crossclaim Plaintiffs, the COFINA Senior Bondholders' Coalition (as its members are identified below), by and through its undersigned counsel, (i) responds to the Amended Complaint filed by the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico (the "<u>Commonwealth Agent</u>"), as agent for the representative of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), and (ii) asserts counter- and crossclaims.

## **PRELIMINARY STATEMENT**[2]

<u>What's at Stake in This Dispute</u>

This adversary proceeding arises out of the Commonwealth's attempt to take property that COFINA owns pursuant to duly-enacted and constitutional legislation.  COFINA is an independent public corporation created by the Commonwealth government more than a decade ago in order to issue bonds to refinance debt during the Commonwealth's last financial crisis.

---

[2]  Capitalized terms not otherwise defined herein shall have the meanings given to them in the *Answer, Defenses, and Counterclaims of the Appointed Agent of the Puerto Rico Sales Tax Financing Corporation (COFINA)* (Docket No. 27).

To provide COFINA with specific property to repay the new bonds—and thereby substantially reduce the cost of borrowing—the Commonwealth by statute imposed a new sales and use tax (the "SUT") and provided that the first proceeds from that tax must be deposited in a special account—the Dedicated Sales Tax Fund. The statute unequivocally provided that current and future funds generated by a specific portion of the SUT would be "the property of COFINA" from the instant they arose, and that the funds would neither be the Commonwealth's property nor available to pay any of the Commonwealth's obligations. In reliance on the statute, billions of dollars of bonds were purchased by investors on and off the island, the proceeds of which went directly to the Commonwealth and its creditors.

The constitutionality of the legislative actions that created COFINA and its property interests had never been questioned, until several holders of the Commonwealth's most recently issued high-yield unsecured bonds (the "GO Bondholders") did so in 2016. Indeed, for nearly a decade, Puerto Rico officials and their counsel repeatedly assured bondholders as to the legality and security of the COFINA structure, and used those assurances to issue more COFINA bonds at interest rates substantially lower than would otherwise have been available. COFINA's property interests were also disclosed in the offering documents for all GO Bond issuances after COFINA was created. The GO Bondholders raised no objection to COFINA during this time, expressly recognizing COFINA's ownership of the dedicated SUT funds and that COFINA's prior issuance of bonds was backed by a first priority lien on COFINA's ownership of that property. The GO Bondholders in 2014 in fact **ratified and contractually agreed to the COFINA structure** in connection with the issuance of $3.5 billion in GO Bonds.

After the Commonwealth extracted billions of dollars from COFINA and its bondholders, the GO Bondholders abruptly changed their tune in 2016, contending for the first time not only

that all SUT revenues owned by COFINA were available to repay the GO Bonds, but that the GO Bondholders had first right to those revenues, including ahead of the COFINA bondholders who were secured by a fully perfected, first priority pledge of those funds. No court had considered the merits of the GO Bondholders' attempt to invert Puerto Rico's first and largest securitization and raid the Dedicated Sales Tax Fund prior to the time the Commonwealth and COFINA filed for bankruptcy.

Having lost the ability to assert these claims by virtue of the bankruptcies, the strike suit previously employed by a faction of Commonwealth bondholders has now largely been recast by the representative of the Commonwealth's unsecured creditors. Despite the change of players, the lawsuit in effect still presents a dispute among different groups of bondholders of different legal entities, seeking to allocate the funds that are categorized in the fiscal plan as "funds available for [bondholder] debt service." Because the money is already designated for creditors (and it should go to COFINA's), a ruling respecting COFINA's rights in the litigation will not impair the government's ability to provide essential services to the citizens of Puerto Rico. In fact, such a ruling would benefit the Commonwealth as it would enable the Commonwealth to continue to utilize securitizations like COFINA to access the capital markets going forward. Preserving this ability is especially crucial now since general obligation debt already exceeds the constitutional debt limit and consequently cannot be used further to generate funding for the Commonwealth. Moreover, the Commonwealth's access to the capital markets is not a theoretical concern: both COFINA and the Commonwealth Agents' legal mandates include regaining and preserving this access. *See* Commonwealth-COFINA Dispute Stipulation ¶ 4(g). It is also one of PROMESA's primary objectives. *See* PROMESA §§ 101(a), 201(b)(1).

The primary issue in this lawsuit therefore is which group of municipal creditors should be paid from the current and future funds in the Dedicated Sales Tax Fund: COFINA bondholders, who loaned $16 billion for the Commonwealth's benefit based on a pledge of that specific revenue stream without recourse to "full faith, credit and taxing powers," and who seek a ruling respecting COFINA's rights that would aid the Commonwealth to access the capital markets going forward, *or* Commonwealth bondholders, who knowingly and voluntarily made the opposite investment decision, taking on General Fund credit risk (and its associated higher rate of return)?

### COFINA Owns the Dedicated Sales Tax, and Always Will; the Commonwealth Doesn't Own the Dedicated Sales Tax, and Never Will

Faced with a statute that plainly declares the funds in question belong to COFINA for the benefit of its bondholders, the Commonwealth Agent borrows square peg theories from commercial lending transactions to say that COFINA does not actually own sales tax revenues as they are collected. In doing so, the Commonwealth Agent ignores the plain language of the statute, seeking instead to rewrite it, asserting the Commonwealth is somehow the owner of future SUT revenues, and that COFINA should be re-characterized as an unsecured creditor of the Commonwealth. The Commonwealth Agent makes these assertions even though the Commonwealth itself has repeatedly reaffirmed COFINA's property rights through subsequent legislation, legal opinions, official statements, and press releases. This opportunistic reversal of position profoundly undermines the integrity of the Commonwealth's entire system of laws, including the delegation of powers and responsibilities set forth in the Puerto Rico Constitution. Indeed, the lawless position urged by the Commonwealth Agent is not only short-sighted, it has no home in a place that upholds property rights guaranteed to COFINA and its creditors under the U.S. Constitution.

4

Fundamentally, most of the Commonwealth Agent's claims are based on the fallacy that COFINA never could have owned future SUT revenues because it was "impossible" for the Legislative Assembly to create an ownership interest in funds that would be generated in the future. This contention that there can "never" be a transfer of a "present ownership of future revenues" has no basis in law, logic, or practice. Indeed, "[t]here are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor." *Speelman v. Pascal*, 178 N.E.2d 723, 725 (N.Y. 1961); *see also DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (holding that a contract reading "agrees and does hereby grant and assign" all rights in future inventions "was not merely an agreement to assign, but an express assignment of rights in future inventions").[3]

Moreover, the Commonwealth's lead argument ignores the bedrock principle in bankruptcy that "[p]roperty interests are created and defined by state law." *Butner v. U.S.*, 440 U.S. 48, 55 (1979). That is precisely what occurred here, and the Legislative Assembly could not have been more clear when establishing COFINA that "all future funds that must be deposited in the [Dedicated Sales Tax Fund] … are *hereby transferred to, and shall be the property of COFINA*." Act 56 of 2007, § 3; P.R. Laws Ann. tit. 13, § 12 (emphasis added). There is no dispute on what the text of the statute actually says, and the Commonwealth Agent's strain to find it ambiguous is dependent on accepting its fallacious premise of impossibility. The Commonwealth Agent's request to divine legislative intent by citing metaphysics and Latin proverbs should be denied.

---

[3]    Even if the Commonwealth Agent were correct that COFINA does not presently own future SUT revenues (it is not), the Commonwealth Agent cannot seriously contend that COFINA does not own all revenues that have been collected to date, including those currently held in the dedicated reserve account for COFINA and its creditors. There is nothing "future" about money in a bank account, which money belongs to COFINA and is subject to the COFINA bondholders' liens.

Puerto Rico has since 1952 operated under a system of government authorized by a constitution. The Puerto Rico Constitution entrusts the legislative branch of the government with the power to impose taxes and determine how the proceeds will be used. In the same vein, the Federal Relations Act has long charged the legislative branch of the territories to take such steps as are necessary to protect the public credit, which is exactly what occurred here. Furthermore, under the Puerto Rico Civil Code, the plain language of the statute is to be interpreted as written. In other words, acting pursuant to its unquestionable scope of power, and for a legitimate public purpose, the Legislative Assembly determined that the Pledged Sales Tax and the Dedicated Sales Tax Fund "shall be the property of COFINA" and "shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose." Act 56 of 2007, Stmt. of Motives; P.R. Laws Ann. tit. 13, § 12.

The Commonwealth Agent's argument that transfers of future funds are purportedly "impossible" is also refuted by the fact that COFINA is hardly unique. Indeed, tax-backed securitization is a common form of municipal financing in the United States, with many other local governments issuing bonds backed by future sales or other tax revenues. Unlike unsecured general obligation borrowing, tax-backed securitizations are backed by dedicated revenue streams that are insulated from the municipality's underlying credit risk, thus allowing the municipality to borrow at a reduced cost. Examples include a 2000 issuance by the Nassau County Interim Finance Authority backed by a sales and use tax; a 2009 issuance by Washington, D.C. backed by personal income and business franchise taxes; a 2014 issuance by the Michigan Finance Authority backed by a personal income tax; a 2015 issuance by the Massachusetts School Building Authority backed by a sales tax; and many more. More recently on October 11, 2017, the City Council of Chicago approved an ordinance to create a securitization structure

6

backed by sales tax for the City of Chicago, which has received investment-grade credit ratings of 'AAA' from Fitch (nine notches higher than the City's rating of BBB-) and 'AA' from S&P (five notches higher than the City's rating of BBB+) and is expected to reduce debt service costs for taxpayers. The Commonwealth Agent's arguments, if credited, would upend all these offerings and render municipal securitizations forever impossible throughout the United States.

Moreover, if the Court were to accept that attributing ownership of future property to COFINA is impossible under Puerto Rico law, then, at the very least, the Commonwealth equitably assigned the Pledged Sales Tax to COFINA. There is no dispute that the Commonwealth unequivocally intended by statute to transfer ownership of the Pledged Sales Tax to COFINA and did so "in consideration of" COFINA's having paid billions of dollars to the Commonwealth. If this transfer was impossible to accomplish under the law, then it was certainly accomplished as a matter of equity, either as an equitable assignment or because all SUT revenues that were intended or misrepresented to be transferred have been and will continue to be held in a resulting or constructive trust for COFINA until COFINA's bondholders are repaid from those revenues.

Finally, even if the Commonwealth Agent were correct that COFINA does not have a present ownership interest in the dedicated SUT funds that will be collected in the future, it does not follow that the Commonwealth owns those funds, or indeed will ever own them. Yet, many of the Commonwealth Agent's theories in its Amended Complaint rest upon the erroneous assumption that the Commonwealth will own the SUT funds when they are collected, and that the Commonwealth merely has an obligation to turn those funds over to COFINA at that time. The Commonwealth Agent's assumption is wrong, because Puerto Rico law makes clear that, from the outset, only COFINA owns the dedicated SUT funds, and that COFINA will continue

to own the SUT funds throughout the collection process. Thus, even if the Commonwealth Agent were correct that COFINA does not currently own the future sales tax, the Commonwealth does not own them either, and will never own them, not even for a nanosecond. COFINA is the only entity that does, or ever will, own the dedicated SUT funds.

Puerto Rico law provides that the SUT "shall become funds of the Government at the time they are collected" by the merchant. P.R. Laws Ann. tit. 13, § 32025(c). It is at that moment that money becomes the property of the Government, rather than that of the merchant or its customer. The "Government," however, isn't just the Commonwealth; it includes "public corporations, public instrumentalities, and municipalities of the Government of Puerto Rico," including COFINA. P.R. Laws Ann. tit. 13, §§ 11a, 32001. And as noted, Puerto Rico law makes absolutely clear that the "Government" that owns the SUT dedicated to COFINA is, in fact, COFINA, not the Commonwealth. The funds "shall be the property of COFINA" and "shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose." Act 56 of 2007, Stmt. of Motives; P.R. Laws Ann. tit. 13, § 12. Nor shall the dedicated SUT funds "be deposited in the Treasury of Puerto Rico." P.R. Laws Ann. tit. 13, § 12. Thus, from the very second that money becomes "funds" under Puerto Rico law, that money is COFINA's, not the Commonwealth's. There will never be a moment in time when the Commonwealth will own the dedicated SUT, and every theory the Commonwealth Agent rests on that premise fails.

<u>COFINA as Transferee of an Unavoidable Security Interest</u>

Even assuming arguendo a transfer of outright ownership of future SUT revenues did not occur, the transfer was at least a transfer of a security interest in the property. But try as it may, the Commonwealth Agent cannot articulate a viable theory to avoid that interest. The special statute that created COFINA granted COFINA a transfer of not just an interest in, but outright

8

ownership of, future SUT revenues, and further granted COFINA's creditors statutory liens on the same funds. The Commonwealth Agent's contention that the legislation creating COFINA is invalid because it was not prepared in the form of a signed "security agreement" is absurd, as even the Commonwealth Agent must acknowledge that the Uniform Commercial Code does not apply to the extent that another statute governs the creation of a security interest. The UCC is further irrelevant because that same law expressly transferred the SUT to COFINA and made clear to the world that only COFINA and its creditors—and not the Commonwealth and its creditors—would have rights to those funds. Indeed, the Commonwealth expressly and publicly disclaimed any ownership interest in those funds. The validity of COFINA's interest in those funds turns on the validity of that legislation, and not on general rules that apply to commercial transactions. In addition, even if the UCC applied to security interests created by statute, the SUT transferred to COFINA would be a payment intangible for which a filing was not required.

Moreover, even if both (i) the Commonwealth somehow owned the SUT and (ii) COFINA's security interest were somehow governed by the UCC and unperfected, the Commonwealth Agent still would be powerless to avoid COFINA's interest under Bankruptcy Code sections 547 or 544. Pursuant to Bankruptcy Code section 926 (made applicable by section 301(a) of PROMESA), a transfer of property for the benefit of bondholders, as here, cannot be avoided under section 547. And section 544, for its part, permits a trustee to avoid a transfer of property only if there could be a hypothetical judicial lien or execution creditor with respect to that property. No such creditor could exist, because no creditor under Puerto Rico law can ever have a judicial lien or execution on government taxes, such as the dedicated stream that the Commonwealth transferred to COFINA.

Nor is there any transfer of "property of the debtor" to avoid. Per the COFINA statute's plain terms, any future SUT funds do not vest in the Commonwealth, but rather vest directly in COFINA as soon as they arise. In other words, even if the Commonwealth Agent is correct that the SUT funds will not become property capable of being owned until sometime in the future, such property will **never** be owned by the Commonwealth, and there was not and never will be any Commonwealth "property of the debtor" to transfer.

The remainder of the Commonwealth Agent's kitchen-sink bankruptcy claims are similarly unavailing.[4]

### "Available Resources," "Deficit Financing," and The Puerto Rico Constitution

This finally leaves the Commonwealth Agent with the "Hail Mary" constitutional arguments previously raised by the GO Bondholders. These arguments fare no better. The Legislative Assembly exercised its broad power to impose taxes and issue debt when it imposed the SUT, created COFINA, and transferred ownership of the Dedicated Sales Tax Fund and Pledged Sales Tax to COFINA. The Commonwealth Agent provides no reason why the Legislative Assembly's exercise of its taxing power should be second guessed. So long as the Legislative Assembly's acts are directed to a "public purpose," the Puerto Rico Constitution grants it wide latitude in carrying out that authority. Here, it is undisputed that the Legislative Assembly created COFINA to alleviate Puerto Rico's economic crisis and repay pre-existing debt rather than allow the public credit to go into default. Because these goals are quintessentially public in nature, the Legislative Assembly was well within its authority in passing the COFINA enabling legislation. Moreover, issuance of the COFINA Bonds did not

---

[4] Nothing herein concedes that Title III and the Bankruptcy Code sections it incorporates could be applied retroactively to take valid property interests that existed as of the date of the passage of PROMESA.

violate the Puerto Rico Constitution's balanced budget requirement. The Puerto Rico Constitution, Puerto Rico's organic acts, and the Federal Relations Act all authorize the Legislative Assembly to issue debt to protect the public credit and to advance tax revenues to finance budget deficits. And since COFINA Bonds are not backed by the full faith and credit of the Commonwealth, the constitutional debt service and maturity limits, and constitutional priority for public debtholders, are wholly irrelevant.

While meritless, the Commonwealth Agent's constitutional arguments do not even challenge all of the COFINA bond issuances. Building upon the false premise that COFINA Bonds are backed by the full faith and credit debt of the Commonwealth (and thus subject to the limits on such debt), the Commonwealth Agent contends that certain issuances of COFINA Bonds exceeded either the constitutional debt service limit or debt maturity limit under Article VI, Section 2 of the Puerto Rico Constitution. But even the Commonwealth Agent acknowledges that billions of dollars of COFINA Bonds come within the constitutional limits. For example, COFINA Bonds issued in 2007 and 2008 would not have breached the debt service limit, and a significant amount of 2007 and 2008 COFINA Bonds also had maturities of less than 30 years. Similarly, the Commonwealth Agent argues that COFINA violated the Puerto Rico Constitution's balanced budget requirements. Even if correct, this argument would not apply to the senior COFINA Bonds issued in 2007 and 2008 because the balanced budget requirements relate to "deficit financing" whereas the COFINA bonds were issued to refinance pre-existing debt. Thus, accepting the Commonwealth Agent's strained theories does not equate to COFINA as a whole being unconstitutional.

### If The Commonwealth Agent Is Right, COFINA Is The Commonwealth's Biggest Creditor, and The GO Bondholders Are Subordinated to COFINA

Furthermore, even if all of the Commonwealth Agent's ownership, lien avoidance, and constitutional arguments were correct, the result would be a massive unsecured claim by COFINA against the Commonwealth. COFINA has transferred to the Commonwealth billions of dollars in bond proceeds, which has funded the Commonwealth's provision of government services and payment of the Commonwealth's own creditors. COFINA is entitled to be repaid that amount **at least** on par with the Commonwealth's other creditors, and indeed senior to the GO Bonds.

The Commonwealth, through the Oversight Board, has made clear that any purported "priority" the GO Bonds may have been entitled to under the Puerto Rico Constitution does not apply to the allowance and priority of claims in the Commonwealth's Title III case, because federal law (PROMESA) preempts the Puerto Rico Constitution. Therefore, at the very least, COFINA's claim against the Commonwealth would be *pari passu* with the Commonwealth's other debts. Moreover, claims in respect of GO Bonds issued after COFINA's creation, which charged higher interest to the Commonwealth on the basis of not having recourse to COFINA's dedicated share of SUT, should be subordinated to COFINA's resulting unsecured claim, either under Bankruptcy Code section 510(a) on account of the express ratification of COFINA's seniority by holders of such GO Bonds or under section 510(c) and other principles of equity.

### At Stake Is Puerto Rico's Access to The Capital Markets

If the Commonwealth Agent's repudiation of COFINA's ownership rights is permitted, Puerto Rico's restructuring efforts would be hampered, if not derailed. Among other things, it would signal to investors worldwide that Puerto Rico will not respect the laws passed to protect them and effectively preclude the Commonwealth from implementing securitizations similar to

COFINA, structures that are required to re-access the capital markets and eliminate the need for federal fiscal oversight and supervision. Indeed, municipal investors would rightly be wary that the Commonwealth would take another "that was then, this is now" stance and dedicate a revenue stream to bondholders only to try to strip them of their property rights later. The Commonwealth's resulting inability to access securitizations like COFINA would be devastating to its future prospects, since additional full-faith and credit debt is no longer available to it. This is so because that debt already exceeds the constitutional debt limit and will continue to do so, as certain issuers that have debt guaranteed by the Commonwealth have been unable to meet their debt service payments. This foreclosure of securitized fund raising would be utterly inconsistent with the Commonwealth Agent's mandate to "achieve fiscal responsibility and access to the capital markets." Commonwealth-COFINA Dispute Stipulation ¶ 4(g). Accordingly, the Commonwealth Agent's claims should be rejected.

## NATURE OF THE PROCEEDING

1. Denies the allegations of paragraph 1; except admits that this adversary proceeding is pursuant to the Commonwealth-COFINA Dispute Stipulation; and further admits that, as set forth in the Commonwealth-COFINA Dispute Stipulation, the issue in this adversary proceeding is "whether, considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes [the "SUT"] purportedly pledged by COFINA to secure debt … are property of the Commonwealth or COFINA under applicable law."

2. States that paragraph 2 asserts legal conclusions to which no specific response is required. To the extent a response is required, denies the allegations of paragraph 2.

13

3.        States that paragraph 3 asserts legal conclusions to which no specific response is required.  To the extent a response is required, denies the allegations of paragraph 3.

## PARTIES

4.        Denies the allegations of paragraph 4.

5.        Refers to the Commonwealth-COFINA Dispute Stipulation for a fair, accurate, and complete statement of its contents; admits that the Commonwealth is a territory of the United States and a Debtor in these Title III cases and that the Title III case was commenced by the filing of a petition on May 3, 2017; and otherwise denies the allegations of paragraph 5.

6.        Refers to the Commonwealth-COFINA Dispute Stipulation for a fair, accurate, and complete statement of its contents; admits that COFINA is a Debtor in these Title III cases and that COFINA's Title III case was commenced by the filing of a petition on May 5, 2017; and otherwise denies the allegations of paragraph 6.

7.        Refers to the Commonwealth-COFINA Dispute Stipulation for a fair, accurate, and complete statement of its contents; and otherwise denies the allegations of paragraph 7.

## JURISDICTION AND VENUE

8.        Admits.

9.        Admits.

10.        Admits that the Commonwealth Agent purports to seek relief under 28 U.S.C. § 2201(a); denies that the Commonwealth Agent is entitled to any of the relief sought in the Amended Complaint; and otherwise denies the allegations of paragraph 10.

## BACKGROUND

I.      **Overview of COFINA Structure**

11.        Denies the allegations of paragraph 11.

12.     Admits that COFINA is a public corporation that is independent from the
Commonwealth; further admits that the directors of COFINA are all directors of the GDB; and
otherwise denies the allegations of paragraph 12.

13.     Denies the allegations of paragraph 13.

14.     Admits that the dedicated SUT revenues deposited in the Dedicated Sales Tax
Fund are never deposited into the Commonwealth treasury; and otherwise denies the allegations
of paragraph 14.

15.     Denies the allegations of paragraph 15.

## II.     Sales and Use Tax

16.     Denies that the SUT dedicated to COFINA may be characterized as
"Commonwealth SUT," and that the SUT dedicated to COFINA is a "general sales and use tax,"
but otherwise admits the allegations of paragraph 16; the COFINA Senior Bondholders'
Coalition objects generally to the Commonwealth Agent's use of the defined term
"Commonwealth SUT" as used throughout the Amended Complaint, because all SUT dedicated
to COFINA is COFINA's SUT, and not that of the Commonwealth.

17.     Denies the allegations of paragraph 17.

18.     Admits that Act No. 1 of January 31, 2011 repealed the Puerto Rico Internal
Revenue Code of 1994 (as amended) and replaced it with the Puerto Rico Internal Revenue Code
of 2011; and otherwise denies the allegations of paragraph 18.

19.     Refers to Act No. 18 for a fair, accurate, and complete statement of its contents;
and otherwise denies the allegations of paragraph 19.

20.     Refers to Act No. 72 for a fair, accurate, and complete statement of its contents;
and otherwise denies the allegations of paragraph 20.

21.     Refers to Act No. 54 for a fair, accurate, and complete statement of its contents; and otherwise denies the allegations of paragraph 21.

22.     Refers to Act No. 84 for a fair, accurate, and complete statement of its contents; and otherwise denies the allegations of paragraph 22.

23.     Refers to the various legislative acts described below for a fair, accurate, and complete statement of their contents; and otherwise denies the allegations of paragraph 23.

## III.     COFINA Enabling Legislation (Act 91 and its Amendments)

24.     States that paragraph 24 asserts legal conclusions to which no specific response is required. To the extent a response is required, admits that Act No. 91 was approved by the Puerto Rico Legislative Assembly May 13, 2006, but otherwise denies the allegations of paragraph 24. The Senior COFINA Bondholders' Coalition objects to the purported definition of "extraconstitutional debt" as used throughout the Amended Complaint.

25.     States that paragraph 25 asserts legal conclusions to which no specific response is required. To the extent a response is required, admits that Act 91 provided for the creation of a special fund called the "Urgent Interest Fund" and the deposit into the Urgent Interest Fund of 1% of the Commonwealth SUT revenues collected during each fiscal year, and that the Act further provided for the use of the collections in the Urgent Interest Fund to pay certain of the Commonwealth's debt in existence as of June 30, 2006, but otherwise denies the allegations of paragraph 25.

26.     Denies the allegations of paragraph 26.

27.     Admits the allegations contained in subsection (i) of paragraph 27; and otherwise denies the allegations of paragraph 27.

28.     Admits that the amendments to Act 91 also provided for a series of increases in the portion of SUT revenues that was transferred to the Dedicated Sales Tax Fund, but otherwise

16

denies the allegations of paragraph 28. The Senior COFINA Bondholders' Coalition objects to
the Commonwealth Agent's use of the defined term "Transfer Amount" as used throughout the
Amended Complaint, to the extent is suggests that SUT has not already been transferred to
COFINA.

29.    Admits the allegations of paragraph 29.

30.    Admits that the first SUT funds were transferred to COFINA, but otherwise
denies the allegations of paragraph 30.

31.    Admits the allegations of paragraph 31.

32.    Admits that if SUT collections received by the Dedicated Sales Tax Fund are
insufficient to pay the debt service on the COFINA bonds, additional SUT collections in the next
fiscal year must be deposited into the Dedicated Sales Tax Fund to make up for the insufficiency,
but otherwise denies the allegations of paragraph 32.

33.    Admits that if, in any fiscal year, the SUT collections are less than the Base
Amount, the Secretary of the Treasury of the Commonwealth is authorized to cover that shortfall
from any available funds, and the Director of the Office of Management and Budget of the
Commonwealth is required to include the appropriations necessary to cover that shortfall in the
budget for the current fiscal year or the next fiscal year, but otherwise denies the allegations of
paragraph 33.

34.    Denies the allegations of paragraph 34.

**IV.   Overview of COFINA Bond Offerings**

35.    Admits the allegations of paragraph 35.

36.    Denies the allegations of paragraph 36.

37.    Admits that the COFINA bonds have scheduled maturities from 2016 through
2058, but otherwise denies the allegations of paragraph 37.

38.     Denies the allegations of paragraph 38.

39.     Refers to the cited report for a fair, accurate, and complete statement of its contents; and otherwise denies the allegations of paragraph 39.

**V.      The SUT "Flow of Funds"**

40.     Admits the allegations contained in subsection (i); and otherwise denies the allegations of paragraph 40.

<u>**FIRST CAUSE OF ACTION**</u>

**28 U.S.C. § 2201(a)**
**(Declaration that Act 91 Did Not Transfer Present**
**Ownership of Future SUT Revenues to COFINA)**

41.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

42.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 42.

43.     Denies the allegations of paragraph 43.

44.     Denies the allegations of paragraph 44.

45.     Denies the allegations of paragraph 45.

46.     Denies the allegations of paragraph 46.

47.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 47.

48.     Denies the allegations of paragraph 48.

49.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 49.

50.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 50.

51.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 51.

52.     Denies the allegations of paragraph 52.

53.     Denies the allegations of paragraph 53.

54.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 54.

55.     Denies the allegations of paragraph 55.

56.     Denies the allegations of paragraph 56.

57.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 57.

58.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 58.

59.     Denies the allegations of paragraph 59.

60.     The allegations of paragraph 60 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 60.

## SECOND CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that Act 91 Did Not Assign to COFINA Any
### "Right to Receive" Future SUT Revenues)

61.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

62.     Refers to the referenced documents for the complete contents thereof; and otherwise denies the allegations of paragraph 62.

63.     Refers to the referenced documents for the complete contents thereof; and otherwise denies the allegations of paragraph 63.

64.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 64.

65.     Denies the allegations of paragraph 65.

66.     Denies the allegations of paragraph 66.

67.     Denies the allegations of paragraph 67.

68.     Denies the allegations of paragraph 68.

69.     Denies the allegations of paragraph 69.

70.     The allegations of paragraph 70 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 70.

## THIRD CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that Purported Transfer of "Future Funds" to COFINA Was, at Most, Unsecured Promise that SUT Revenues Would be Transferred to COFINA in the Future)

71.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

72.     Denies the allegations of paragraph 72.

73.     Denies the allegations of paragraph 73.

74.     The allegations of paragraph 74 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 75.

75.     The allegations of paragraph 75 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 75.

## FOURTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that COFINA Has No Enforceable
### Security Interest in Future SUT Revenues)

76.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

77.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 77.

78.     Denies the allegations of paragraph 78.

79.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 79.

80.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 80.

81.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 81.

82.     Denies the allegations of paragraph 82.

83.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 83.

84.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 84.

85.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 85.

86.     Denies the allegations of paragraph 86.

87.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 87.

88.     The allegations of paragraph 88 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 88.

### FIFTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**Bankruptcy Code Sections 544(a)(1) and 547(b)**
**(Declaration that Any Unperfected Security Interest of COFINA in SUT Revenues is**
**Avoidable; Avoidance of Any Such Interest)**

89.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

90.     Denies the allegations of paragraph 90.

91.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 91.

92.     Denies the allegations of paragraph 92.

93.     Denies the allegations of paragraph 93.

94.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 94.

95.     Admits the term "trustee," when used in a section of title 11, United States Code, made applicable in a case under Title III of PROMESA by subsection 301(a) thereof, means the Oversight Board, except as provided in section 926 of title 11, United States Code, and otherwise denies the allegations of paragraph 95.

96.     The allegations of paragraph 96 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 96.

97.     Refer to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 97.

98.     Denies the allegations of paragraph 98.

99.     Denies the allegations of paragraph 99.

100.    Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 100.

101.    Denies the allegations of paragraph 101.

102.    The allegations of paragraph 102 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 102.

## SIXTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 548(a)(1)(B)
### (Declaration that Any Interest of COFINA in SUT Revenues is Avoidable as Fraudulent Transfer; Avoidance of Any Such Interest)

103.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

104.    The allegations of paragraph 104 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 104.

## SEVENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 549
### (Declaration that Any Post-Petition Transfer to COFINA of SUT Revenues is Avoidable Post-Petition Transaction; Avoidance of Such Transactions)

105.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

106.    Denies the allegations of paragraph 106.

107.    The allegations of paragraph 107 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 107.

## EIGHTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**UCC Section 9-317(a)(2)**
**(Declaration that Any Security Interest of COFINA in SUT Revenues is Subordinate to Rights of Oversight Board as Trustee)**

108.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

109.     Refers to the referenced document for the complete contents thereof.

110.     Admits the term "trustee", when used in a section of title 11, United States Code, made applicable in a case under Title III of PROMESA by subsection 301(a) thereof, means the Oversight Board, except as provided in section 926 of title 11, United States Code, and otherwise denies the allegations of paragraph 110.

111.     The allegations of paragraph 111 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 111.

112.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 112.

113.     The allegations of paragraph 113 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 113.

## NINTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**Bankruptcy Code Section 552(a)**
**(Declaration that Any Security Interest Was Cut Off by Commencement of Commonwealth's Title III Case)**

114.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

115.     Refers to the referenced document for the complete contents thereof.

116.     Denies the allegations of paragraph 116.

117.     Denies the allegations of paragraph 117.

118.     The allegations of paragraph 118 state a legal conclusion to which no answer is
required.  To the extent that an answer is required, denies the allegations of paragraph 118.

## TENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Sections 544(a)(1) and 547(b)
### (Declaration that Any Non-UCC Transfer of Post-Petition
### SUT Revenues is Avoidance; Avoidance of Any Such Transfer)

119.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing
answers as though they were fully set forth in this paragraph.

120.     Refers to the referenced document for the complete contents thereof; and
otherwise denies the allegations of paragraph 120.

121.     Refers to the referenced document for the complete contents thereof; and
otherwise denies the allegations of paragraph 121.

122.     Denies the allegations of paragraph 122.

123.     Refers to the referenced document for the complete contents thereof; and
otherwise denies the allegations of paragraph 123.

124.     Admits the term "trustee", when used in a section of title 11, United States Code,
made applicable in a case under Title III of PROMESA by subsection 301(a) thereof, means the
Oversight Board, except as provided in section 926 of title 11, United States Code, and otherwise
denies the allegations of paragraph 124.

125.     The allegations of paragraph 125 state a legal conclusion to which no answer is
required.  To the extent that an answer is required, denies the allegations of paragraph 125.

126.     Denies the allegations of paragraph 126.

127.   The allegations of paragraph 127 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 127.

128.   Denies the allegations of paragraph 128.

129.   Denies the allegations of paragraph 129.

130.   The allegations of paragraph 130 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 130.

## ELEVENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 362(a)
### (Declaration that Post-Petition Transfer of SUT Revenues
### to Non-Commonwealth Entities Violates Automatic Stay)

131.   The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

132.   Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 132.

133.   Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 133.

134.   Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 134.

135.   Denies the allegations of paragraph 135.

136.   Denies the allegations of paragraph 136.

137.   The allegations of paragraph 137 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 137.

## **TWELFTH CAUSE OF ACTION**

### **28 U.S.C. § 2201(a)**
### **(Declaration that Act 91 is Unconstitutional Because**
### **Substantial Result of COFINA Structure was Evasion of**
### **Constitutional Debt Limits and Constitutional Debt Priority)**

138.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

139.     Denies the allegations of paragraph 139.

140.     Denies the allegations of paragraph 140.

**Evasion of Constitutional Debt Limits**

141.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 141.

142.     Denies the allegations of paragraph 142.

143.     Denies the allegations of paragraph 143.

144.     The allegations of paragraph 144 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 144.

145.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 145.

**Evasion of Constitutional Debt Priority**

146.     Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 146.

147.     Denies the allegations of paragraph 147.

148.     Denies the allegations of paragraph 148.

**Unconstitutionality of COFINA Structure**

149. The allegations of paragraph 149 state a legal conclusion to which no answer is required. To the extent that an answer is required, denies the allegations of paragraph 149.

150. Refers to the referenced document for the complete contents thereof.

151. Refers to the referenced document for the complete contents thereof.

152. Refers to the referenced document for the complete contents thereof.

153. Refers to the referenced document for the complete contents thereof.

154. Refers to the referenced document for the complete contents thereof.

155. Refers to the referenced document for the complete contents thereof.

156. Denies the allegations of paragraph 156.

157. The allegations of paragraph 157 state a legal conclusion to which no answer is required. To the extent that an answer is required, denies the allegations of paragraph 157.

## THIRTEENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
**(Declaration that COFINA Structure is Unconstitutional Because Act 91 was
Enacted and/or Amended in Violation of Constitutional Balanced Budget Clause)**

158. The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing answers as though they were fully set forth in this paragraph.

159. Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 159.

160. Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 160.

161. Denies the allegations of paragraph 161.

162. Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 162.

163.    Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 163.

164.    Lack sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in paragraph 164 and on that basis denies the allegations contained therein.

165.    Lack sufficient knowledge or information upon which to form a belief as to the truth of the allegations contained in paragraph 165 and on that basis denies the allegations contained therein.

166.    Denies the allegations of paragraph 166.

167.    Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 167.

168.    Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 168.

169.    The allegations of paragraph 169 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 169.

170.    Denies the allegations of paragraph 170.

171.    Denies the allegations of paragraph 171.

172.    Refers to the referenced documents for the complete contents thereof; and otherwise denies the allegations of paragraph 172.

173.    Refers to the referenced document for the complete contents thereof; and otherwise denies the allegations of paragraph 173.

174.    The allegations of paragraph 174 state a legal conclusion to which no answer is required.  To the extent that an answer is required, denies the allegations of paragraph 174.

## PRAYER FOR RELIEF

The allegations in Plaintiff's "Prayer for Relief" contain legal conclusions to which no answer is required. To the extent that a response is required, the COFINA Senior Bondholders' Coalition denies all allegations contained in paragraphs A through O of Plaintiff's "Prayer for Relief."

## GENERAL DENIAL

To the extent that the COFINA Senior Bondholders' Coalition may have failed to respond to any of the allegations in the Amended Complaint, it denies them.

## DEFENSES

The COFINA Senior Bondholders' Coalition asserts the following defenses to the Amended Complaint, reserving the right to timely raise such additional defenses as may be appropriate in light of the developments in this action. Any defense asserted vis-à-vis the Commonwealth is also asserted vis-à-vis any party purporting to act on behalf of the Commonwealth or its creditors, including the Commonwealth Agent.

## FIRST DEFENSE

### (Estoppel)

The doctrine of estoppel bars claims by the Commonwealth to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund or otherwise interfere with COFINA's rights and the rights of its creditors with respect to the Pledged Sales Tax and the Dedicated Sales Tax Fund. The Commonwealth, through its duly-enacted laws, legal opinions, official statements, and press releases, has represented to COFINA, its creditors, and to others on numerous occasions that the Pledged Sales Tax and the Dedicated Sales Tax Fund were transferred to COFINA, are the exclusive property of COFINA, and are not subject to use by the Commonwealth. COFINA's creditors reasonably relied on the Commonwealth's representations

in purchasing the COFINA Bonds, and the Commonwealth had reason to believe that COFINA's creditors would rely on its representations. The Commonwealth is estopped from now taking a contrary position.

## SECOND DEFENSE

### (Laches)

The doctrine of laches bars claims by the Commonwealth to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund or otherwise interfere with COFINA's rights and the rights of its creditors with respect to the Pledged Sales Tax and the Dedicated Sales Tax Fund. The Commonwealth unreasonably delayed in claiming rights to the Pledged Sales Tax and the Dedicated Sales Tax Fund, making such claims for the first time a decade after transferring the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA. Allowing the Commonwealth to appropriate the funds would prejudice COFINA and its bondholders, both of whom issued and purchased, respectively, COFINA Bonds based on the Commonwealth's representations.

## THIRD DEFENSE

### (*Actos Propios*)

The doctrine of *actos propios* bars claims by the Commonwealth to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund or otherwise interfere with COFINA's rights and the rights of COFINA's creditors with respect to the Pledged Sales Tax and the Dedicated Sales Tax Fund. The Commonwealth, through its duly-enacted laws, legal opinions, official statements, and press releases, has represented to COFINA, its creditors, and to others on numerous occasions that the Pledged Sales Tax and the Dedicated Sales Tax Fund were transferred to COFINA, the exclusive property of COFINA, and not subject to use by the

Commonwealth. COFINA's creditors purchased COFINA Bonds in reliance on the Commonwealth's representations, which the Commonwealth now contends were false. COFINA creditors' reliance on the statements by the Commonwealth was in good faith and they would be prejudiced if the Commonwealth is permitted to confiscate or otherwise interfere with COFINA's rights and the rights of its creditors in the Pledged Sales Tax and the Dedicated Sales Tax Fund.

## **FOURTH DEFENSE**

### **(Abstention)**

The Court should not declare a Puerto Rico law to be unconstitutional absent a determination by the Justices of the Supreme Court of Puerto Rico. To the extent that the Commonwealth Agent seeks a declaration that the laws governing COFINA violate the Constitution of Puerto Rico, the Commonwealth Agent could have first sought a consensual resolution with the COFINA Bondholders and then asserted such a claim in a Commonwealth of Puerto Rico court if necessary. The Commonwealth Agent's claims concerning the constitutionality of the laws governing COFINA should be dismissed. The COFINA Senior Bondholders' Coalition hereby reserves its right to move for certification to the Supreme Court of Puerto Rico with regard to questions of Puerto Rico law including, among other things, the constitutionality of COFINA.

## **FIFTH DEFENSE**

### **(Failure to State a Claim)**

The Commonwealth Agent fails to state a claim upon which relief can be granted.

## SIXTH DEFENSE

### (Ratification)

COFINA and others have represented to COFINA's creditors and to others consistently that the Pledged Sales Tax and the Dedicated Sales Tax Fund were transferred to and are the exclusive property of COFINA, and validly pledged to COFINA's creditors, and could not be used by the Commonwealth. COFINA's creditors purchased the COFINA Bonds in reliance on those and other representations. The Commonwealth, through its legal opinions, official statements, and press releases, has ratified COFINA's and others' statements and actions for a decade, never challenging COFINA's rights or the rights of its creditors in the Pledged Sales Tax and the Dedicated Sales Tax Fund.

## SEVENTH DEFENSE

### (Contrary to Public Policy)

The Commonwealth seeks to confiscate the Pledged Sales Tax and the funds in the Dedicated Sales Tax Fund from COFINA and its creditors for its own use. This relief would be contrary to public policy, because it would undermine investor confidence, call into question the integrity of the tax-backed securitization model upon which many states and municipalities rely, and seriously jeopardize the ability of the Commonwealth, states, and municipalities to raise capital quickly and inexpensively (if at all) through a tax-backed securitization plan.

## EIGHTH DEFENSE

### (Unjust Enrichment)

The Commonwealth created COFINA and transferred the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA in exchange for, and in order to induce: (i) COFINA's issuance of COFINA Bonds and use of the proceeds from the bonds to pay the Commonwealth's

33

extraconstitutional debt and for other specified uses, and (ii) the COFINA creditors' purchases of COFINA Bonds. Having reaped billions of dollars from COFINA Bonds, the Commonwealth would be unjustly enriched if it were permitted to confiscate the Pledged Sales Tax and the Dedicated Sales Tax Fund.

### NINTH DEFENSE

### (Unclean Hands)

The Commonwealth is not entitled to the relief it seeks because it has acted in bad faith and has unclean hands.

### TENTH DEFENSE

### (In Pari Delicto)

The doctrine of *in pari delicto* bars claims by the Commonwealth to access the Pledged Sales Tax and the Dedicated Sales Tax Fund or otherwise interfere with COFINA's rights or the rights of its creditors with respect to the Pledged Sales Tax and the Dedicated Sales Tax Fund.

### ELEVENTH DEFENSE

### (Statutory Defenses to Avoidance)

The Commonwealth Agent is not entitled to the relief it seeks because the transfer to COFINA may not be avoided pursuant to 11 U.S.C. §§ 544, 546(e), 547-550, or any other law that might be applicable.

### TWELFTH DEFENSE

### (Statutory Exception to Preference Liability)

The Commonwealth Agent is not entitled to the relief it seeks because the transfer to COFINA is exempt from preference liability pursuant to 11 U.S.C. § 547(c), 11 U.S.C. § 926(b)

and any applicable safe harbors provided for by PROMESA or applicable bankruptcy law
incorporated therein, including, without limitation, 11 U.S.C. § 546(e).

## THIRTEENTH DEFENSE

### (Limitation on Avoidance Recovery)

The Commonwealth Agent is not entitled to avoid and recover any transfer to the extent
such avoidance and/or recovery would benefit of any its creditors who ratified the COFINA
transactions, or whose claims are subject to disallowance in the Commonwealth's Title III case.

## FOURTEENTH DEFENSE

### (Sovereign Immunity)

Claims brought by the Commonwealth Agent under 11 U.S.C. §§ 544, 547-550, or any
other law that might be applicable are barred because COFINA is an independent instrumentality
of the Commonwealth of Puerto Rico immune from liability, and it has not waived that
immunity.

## FIFTEENTH DEFENSE

### (Federal Preemption)

The Commonwealth is preempted by federal law, including PROMESA, the Bankruptcy
Code, and the United States Constitution, from taking any action to appropriate, or otherwise
interfere with COFINA's rights or the rights of its creditors in, the Pledged Sales Tax and the
Dedicated Sales Tax Fund.

## SIXTEENTH DEFENSE

### (Preemption by PROMESA)

Sections 4 and 303(3) of PROMESA preempts the Commonwealth from taking any
action that would interfere with COFINA's rights or the rights of its creditors in the Pledged

Sales Tax and the Dedicated Sales Tax Fund. Additionally, section 305 of PROMESA bars a court from taking any action that would interfere with COFINA's rights or the rights of its creditors in the Pledged Sales Tax and the Dedicated Sales Tax Fund or COFINA's or its creditors' use or enjoyment of the Pledged Sales Tax and the Dedicated Sales Tax Fund.

## **SEVENTEENTH DEFENSE**

### **(Preemption Pursuant to 28 U.S.C. § 959)**

The Commonwealth Agent alleges that it "stands in the shoes of the Oversight Board as 'trustee' with respect to the Commonwealth-COFINA Dispute," and, therefore, the Commonwealth Agent is bound by 28 U.S.C. § 959, which provides that "a trustee, receiver or manager appointed in any cause pending in any court of the United States … shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated …." Accordingly, the Commonwealth Agent is bound by the laws of Puerto Rico, including the laws governing COFINA and the legislative mandate transferring the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA, and it may not take any action that is contrary to those laws.

## **EIGHTEENTH DEFENSE**

### **(Taking)**

The Commonwealth transferred the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA, and COFINA pledged those assets to the COFINA bondholders to secure repayment of the COFINA Bonds, before PROMESA was enacted. Any retroactive application of PROMESA to take this property, without just compensation, would constitute a taking in violation of the Constitutions of the United States and Puerto Rico.

### NINETEENTH DEFENSE

### (Unconstitutional Retroactive Application of the Bankruptcy Code)

The Commonwealth transferred the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA, and COFINA pledged those assets to the COFINA bondholders to secure the repayment of the COFINA Bonds, before PROMESA was enacted, which for the first time established a law for the Commonwealth and its instrumentalities to adjust their debts. Any retroactive application of provisions of the Bankruptcy Code, made applicable to Title III proceedings under PROMESA, to deprive COFINA and its bondholders of their property rights, without just compensation, would constitute a taking in violation of the United States Constitution.

### TWENTIETH DEFENSE

### (Statute of Limitations)

The Commonwealth Agent's claims are barred, in whole or in part, by the applicable statute of limitations.

### TWENTY-FIRST DEFENSE

### (Authority Pursuant to Commonwealth-COFINA Dispute Stipulation)

To the extent that the Commonwealth Agent's claims exceed its authority pursuant to the Commonwealth-COFINA Dispute Stipulation, such claims are void as *ultra vires*.

### TWENTY-SECOND DEFENSE

### (COFINA's Interests Are Not Subject To Bankruptcy Code Section 552)

COFINA holds a statutory lien to the Pledged Sales Tax and the Dedicated Sales Tax Fund, and future tax revenues are proceeds of COFINA's existing collateral; as a result, the Commonwealth Agent's reference to Bankruptcy Code section 552 is inapplicable.

## TWENTY-THIRD DEFENSE

### (Bankruptcy Code Section 902, 922, and 928)

The Pledged Sales Tax and the Dedicated Sales Tax Fund reflect special revenues; as a result, the Commonwealth Agent's references to Bankruptcy Code sections 552 and 362 are inapplicable.

## TWENTY-FOURTH DEFENSE

### (Constitution of Puerto Rico)

Even if certain issuances of COFINA Bonds exceeded either the constitutional debt service limit or debt maturity limit under Article VI, Section 2 of the Puerto Rico Constitution or violated the Constitution's balanced budget requirements, as the Commonwealth Agent incorrectly contends, these purported constitutional infirmities would not apply to most, if any, of the COFINA Bonds issued in 2007 and 2008 because these bonds would not have breached the debt service or maturity limits and were not issued as deficit financing. The Commonwealth Agent's constitutional claims thus also do not apply to the property interests underlying these 2007 and 2008 COFINA Bonds.

## PRAYER FOR RELIEF ON PLAINTIFF'S AMENDED COMPLAINT

WHEREFORE, the COFINA Senior Bondholders' Coalition respectfully requests judgment as follows:

a. dismissing the Amended Complaint with prejudice;

b. awarding the COFINA Senior Bondholders' Coalition their costs, disbursements, and any allowable attorney's fees incurred in this adversary proceeding; and

c. awarding such other relief as the Court deems just and proper.

## THE COFINA SENIOR BONDHOLDERS' COALITION
## COUNTER AND CROSS-CLAIMS

1.　　In 2006, the Commonwealth faced a severe financial crisis that led to a complete

shutdown of its government.　In response to the crisis, the Commonwealth implemented a tax-

backed securitization plan similar to those used by states and municipalities around the country.

This plan involved creating an independent entity (here, COFINA) to issue bonds that would be

repaid through a continuous stream of special tax revenue dedicated to that entity.　Because the

bonds are supported by segregated tax revenue, they are insulated from the underlying credit risk

of the Commonwealth and carried an interest rate that is significantly lower than the

Commonwealth's unsecured debt.　This is a common and attractive structure because it is a less

expensive mechanism for raising capital than issuing general obligation debt.　For example, the

Commonwealth's 2014 general obligation bonds carried an effective interest rate of

approximately 9.1%, whereas COFINA-issued debt has a weighted average cost of 5.7%.

2.　　To implement this plan, the Commonwealth created COFINA in 2007 and

authorized it to issue bonds to investors in order to raise capital. The Commonwealth also

imposed the SUT for the express and special purpose of COFINA, and by statute transferred the

Pledged Sales Tax[5] to the Dedicated Sales Tax Fund.　Pursuant to legislation passed by the vote

of nearly every representative of both major political parties, the Commonwealth "transferred to"

COFINA the Dedicated Sales Tax Fund.　It also "transferred to" COFINA "all the funds

deposited [in the Dedicated Sales Tax Fund] on the effective date of this Act and all the future

funds that must be deposited in … [that Fund] pursuant to the provisions of" the statute, meaning

the Pledged Sales Tax, including all Pledged Sales Tax revenues collected in the future.　For the

---

[5]　The definition of "Pledged Sales Tax" shall include any and all rights that COFINA has with
respect to the SUT.

avoidance of doubt, the statute also provided that the Pledged Sales Tax and Dedicated Sales Tax Fund "shall be the property of COFINA" and "shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose." Act of July 5, 2007, No. 56-2007 (codified as amended at P.R. Laws Ann. tit. 13, §§ 11a-16) (emphasis added).

3.      Since then, the Commonwealth consistently and repeatedly affirmed that COFINA was valid under Puerto Rico law, and that the Dedicated Sales Tax Fund and the Pledged Sales Tax **belonged to COFINA**. The Commonwealth's clear position appeared in legislation passed by the Legislative Assembly, press releases and bond offering documents, and opinions by Secretaries of Justice of Puerto Rico spanning three different administrations. COFINA also obtained legal opinions from law firms in both Puerto Rico and the mainland United States that unanimously supported the validity of COFINA under the Constitution of Puerto Rico and other governing local and federal law. COFINA thus enabled the Commonwealth to raise over $16 billion of sorely-needed capital and reduce its overall cost of borrowing at a time when the market doubted the Commonwealth's unsecured credit. And until Puerto Rico's current financial crisis—almost ten years after the fact—no one disagreed.

4.      Based on the sanctity of the Commonwealth's laws and the complete absence of any opposition from anyone, COFINA issued the COFINA Bonds to investors, and ratings agencies issued high, investment-grade ratings to the bonds. In the last decade, COFINA's creditors have purchased over $16 billion of COFINA Bonds, with Puerto Rico residents owning approximately $2.8 billion worth of these bonds. COFINA Bonds were particularly attractive to retirees in Puerto Rico, who accepted the relatively low interest rate on the bonds because of the plain language of the enabling statutes, and the consensus of everyone involved, that COFINA investments were safe and secure on account of COFINA's ownership of the Pledged Sales Tax

40

and Dedicated Sales Tax Fund. And again, COFINA Bonds have been the most cost-effective source of financing for the Commonwealth since the 2006 financial crisis, providing estimated savings of between $66 million and $132 million for every $1 billion of COFINA Bonds issued. Press Release, Puerto Rico Department of the Treasury, GDB (Sept. 25, 2013).

5.     Despite all this, the Commonwealth, through the Commonwealth Agent, attempts to reverse course. In the face of clear legislative action and a decade's worth of Commonwealth practice, the Commonwealth Agent seeks to take COFINA's ownership of the Pledged Sales Tax from COFINA and its creditors, and give it to the Commonwealth and its creditors, including holders of the Commonwealth's unsecured GO Bonds. In attempting to do so, the Commonwealth Agent mischaracterizes COFINA's legislative enactments, which transferred ownership (including by definition the right to receive proceeds) of the Pledged Sales Tax to COFINA, as rank and file commercial transactions subject to Article 9 of the Uniform Commercial Code. But these are not commercial contracts creating a mere security interest in "future funds" that are governed by Article 9 and that can be avoided in bankruptcy; this was an outright transfer of ownership of the future tax funds to COFINA, as clearly expressed by the Commonwealth in its legislation, and as reaffirmed by the Commonwealth in its official statements and representations for a decade. Article 9 has no place in this litigation because the COFINA Enabling Act, as further defined below, is a specific Puerto Rico law, implemented by the Legislative Assembly, that transferred "all the future funds that must be deposited" in the Dedicated Sales Tax Fund to COFINA and made those future funds "the property of COFINA." The Commonwealth Agent's action is thus nothing more than attempt to rewrite history, usurp the role of the Legislative Assembly, and change the law to prefer its own creditor constituency to COFINA's. This attempt should be rejected.

41

6.     The Commonwealth Agent further claims it is legally impossible to transfer—as the Commonwealth did to COFINA—a stream of future revenues.  Yet, these transfers are commonplace in municipal finance and the private debt markets, and have been endorsed by courts across the country.  They also are the backbone of a $4 trillion market for securitized transactions, covering everything from royalties to mortgage payments.  If the Commonwealth Agent were correct that it is legally "impossible" for a legislature to transfer the proceeds of taxes collected in the future, the integrity of the entire tax-backed securitization model on which states and municipalities around the country have relied to raise low-cost capital would be destabilized.

7.     The Commonwealth's new position, if credited, also would imperil its current recovery efforts, and indeed harm the Commonwealth and its citizens for years to come.  The Commonwealth is in the midst of an unprecedented financial crisis.  In response, Congress passed a bespoke statute—PROMESA—to provide a framework for the Commonwealth to raise capital to promote growth and restructure its debts.  The use of COFINA (or a similar securitization structure) will be critical to achieving these goals, as investors are unlikely to invest in new Puerto Rican debt on terms the Commonwealth can afford unless the debt is secured by property beyond the reach of General Fund creditors.  Investors are also unlikely to invest in new Puerto Rican debt if they believe, as the Commonwealth Agent purports to, that the Commonwealth can price debt on the basis that it is backed by dedicated property, then in breach of its covenants do an about-face and claim a decade later that the debt is in fact unsecured.  By attempting to invade the COFINA structure, the Commonwealth Agent's action only serves to undermine investor confidence and jeopardize the Commonwealth's chance of successfully raising capital in the future.

42

8.     To protect COFINA's and its creditors' right to the Pledged Sales Tax and the Dedicated Sales Tax Fund, and to ensure that investors can put faith in any future tax-backed securitization plan implemented by the Commonwealth or its instrumentalities, the COFINA Senior Bondholders' Coalition asserts the counterclaims set forth below against the Commonwealth.  The COFINA Senior Bondholders' Coalition also brings cross-claims against the "Permitted Intervenors" holding interests in Puerto Rico's general obligation bonds.  Many of these bondholders have also taken positions in these and other proceedings that are aimed at taking the stream of Pledged Sales Tax that the Commonwealth validly transferred to COFINA over a decade ago for the benefit of COFINA Bondholders and have it applied instead to the payment of the their own unsecured bonds.

## PARTIES

9.     The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico is the appointed representative of the Commonwealth of Puerto Rico, a territory of the United States.

10.     The members of the COFINA Senior Bondholders' Coalition are Fideicomiso Plaza, and the following entities, either as beneficial holders or on behalf of managed funds and accounts: Aristeia Horizons, L.P.; Canary SC Master Fund, L.P.; Cyrus Capital Partners, L.P.; Decagon Holdings 1, L.L.C.; Decagon Holdings 2, L.L.C.; Decagon Holdings 3, L.L.C.; Decagon Holdings 4, L.L.C.; Decagon Holdings 5, L.L.C.; Decagon Holdings 6, L.L.C.; Decagon Holdings 7, L.L.C.; Decagon Holdings 8, L.L.C.; Decagon Holdings 9, L.L.C.; Decagon Holdings 10, L.L.C.; GoldenTree Asset Management LP; Old Bellows Partners LP; Scoggin Management LP; Taconic Master Fund 1.5 L.P.; Taconic Opportunity Master Fund L.P.; Tilden Park Capital Management LP; and Whitebox Advisors LLC.

11.     The Permitted Intervenors are the signatories Commonwealth-COFINA Dispute

Stipulation, other than the COFINA Senior Bondholders' Coalition.

## BACKGROUND

### A.     COFINA Is Created and Received Ownership of the Pledged Sales Tax

12.     In 2006, Puerto Rico faced an unprecedented financial crisis that led to a full shut-

down of its government.  In response, the Legislative Assembly enacted Act 91 of 2006 ("Act

91"), which created the "Puerto Rico Urgent Interest Fund Corporation" ("UIFC") as a

subsidiary of the Development Bank of Puerto Rico (the "GDB") to help alleviate Puerto Rico's

economic crisis.  The Legislative Assembly also imposed for the first time a sales and use tax

("SUT") and, by statute, transferred ownership of a portion of the SUT (the "Pledged Sales Tax")

to the UIFC.  *See* Act 291 of 2006.

13.     In July 2007, the Legislative Assembly passed Act 56 of 2007 ("Act 56"), which

officially created COFINA as a replacement for the UIFC, and amended the law so that COFINA

was not a subsidiary of the GDB, but rather "a corporate and political entity independent and

separate from the Commonwealth."  Act 56 transferred ownership of the Pledged Sales Tax to

COFINA, and granted statutory authority for COFINA to issue bonds secured by the Pledged

Sales Tax.  *See* Act 56 (and with Act 91 and Act 291 of 2006, and Act 18 of 2009, the "COFINA

Enabling Act,").  These legislative acts were passed by the vote of nearly every representative of

both major parties in a rare show of bipartisan support.

14.     Importantly, the COFINA Enabling Act expressly transferred ownership of the

Dedicated Sales Tax Fund and the Pledged Sales Tax, including future Pledged Sales Tax, to

COFINA.  Act 56 provides in particular:

> The [Dedicated Sales Tax Fund] and all the funds deposited therein on the
> effective date of this act and ***all the future funds that must be deposited in the***

> *[Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA.*

P.R. Laws Ann. tit. 13, § 12 (emphasis added). Accordingly, upon the enactment of Act 56 in 2007, COFINA owned the entire stream of Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future. COFINA's funds were also separated from the Commonwealth's general fund such that they "shall not be covered into the Treasury of Puerto Rico and shall neither constitute available resources of the Commonwealth of Puerto Rico nor be available for the use of the Secretary." *Id.*

15. Act 56, for example, requires the Pledged Sales Tax to be deposited in the Dedicated Sales Tax Fund and prohibited it from being deposited in the Treasury of Puerto Rico or available to the Commonwealth:

> The [Dedicated Sales Tax Fund] shall be funded each fiscal year from the [designated] sources, the proceeds of which shall be directly deposited in the [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, ***nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico.***

P.R. Laws Ann. tit. 13, § 12 (emphasis added). The Statement of Motives to Act 56 further stated that the Legislative Assembly's intention was to:

> increase the amount of funds that are deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Act 91 so that they be used to pay the extraconstitutional debt, that they be ***owned by COFINA*** … and that ***such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose*** ….

Act 56 Statement of Motives (emphasis added). This demonstrates that the Legislative Assembly intended for the funds in the Dedicated Sales Tax Fund, and all funds required to be deposited in the Dedicated Sales Tax Fund by law, to be the property of COFINA.

16.     The COFINA Enabling Act also authorized COFINA to pledge the Pledged Sales

Tax as security for its payment on the bonds issued by COFINA.  *See* P.R. Laws Ann. tit. 13,

§ 13.  Specifically, the COFINA Enabling Act provided, in relevant part, that:

> COFINA is hereby authorized to pledge and otherwise encumber all or part of
> such revenues [of the Dedicated Sales Tax Fund] solely for the payment of
> principal, interest and redemption premium of such bonds and other obligations of
> [COFINA] that were incurred with respect to such bonds to meet the purposes set
> forth in [this Act] and the payment of obligations incurred under any type of
> financing or surety agreement or interest rate swap agreement executed with
> respect to such bonds.  Said pledge shall be valid and binding as of the time it is
> made without the need for a public or notarized document. The income or
> revenues thus encumbered, including those subsequently received by COFINA,
> shall be subject to said lien immediately, without the need of physically delivering
> the same or any other act, and said lien shall be valid and binding and shall
> prevail against any third party that has a claim of any kind for damages, breach of
> contract or any other grounds against COFINA, regardless of the fact that said
> third party has not been so notified.

*Id*.

17.     The Legislative Assembly plainly recognized that the transfer of the Pledged

Sales Tax and the Dedicated Sales Tax Fund to COFINA, the segregation of those funds from

the Treasury, and the pledge of the Pledged Sales Tax as security for COFINA's payments on its

bonds, were integral to raising capital cost-effectively.   Indeed, because the Commonwealth

created COFINA to rescue the Commonwealth from an ongoing fiscal crisis that foreseeably

could persist and worsen, the Legislative Assembly went further and explicitly covenanted that

the Commonwealth would not impair the collection of the SUT and the rights of COFINA to the

Pledged Sales Tax (the "Non-Impairment Covenant").  *See* P.R. Laws Ann. tit. 13, § 14(c)

("[T]he Commonwealth shall not: (i) limit nor restrain the rights or powers of the corresponding

officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and

other income to constitute the amounts to be deposited into the [Dedicated Sales Tax Fund]

pursuant to the provisions of §§ 11a-16 of this title . . . or (ii) limit or restrain the powers hereby

46

conferred by §§ 11a-16 of this title or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be entirely paid for and withdrawn.  No amendment to §§ 11a-16 of this title, shall undermine any obligation or commitment of COFINA.").

18.      By insulating the COFINA Bonds from the Commonwealth's known credit risk, the COFINA Bonds could carry a lower interest rate than general obligation debt.  In fact, the House of Representatives' Treasury and Financial Affairs Commission stated that COFINA would have "the power to issue debt which will be able to procure a higher credit classification than the debt of the Government of Puerto Rico, and therefore have access to the capital markets at more reasonable interest rates."  Positive Report on H.B. 3163, Remarks of the House of Representatives' Treasury and Financial Affairs Commission.  The separation of COFINA and the segregation of the Dedicated Sales Tax Fund and Pledged Sales Tax were essential to COFINA bondholders because, while they would not be supported by the Commonwealth's full faith and credit (like general obligations), they would have the benefit of a dedicated stream of payments.

**B.      COFINA Raises Over $16 Billion on the Basis that It Owned the Pledged Sales Tax and the Dedicated Sales Tax Fund**

19.      Exercising its statutory authority to issue bonds, COFINA adopted the Amended and Restated Sales Tax Revenue Bond Resolution (as amended and supplemented, the "Resolution") on July 13, 2007.  The Resolution is a contract among COFINA, Bank of New York Mellon ("BNYM") (the trustee for all COFINA Bonds), the COFINA bondholders, and certain other beneficiaries.  Resolution § 103.

20.      Pursuant to the Resolution, COFINA issued several series of COFINA Senior Bonds in 2007 and 2008.  Bondholders purchased approximately $4.5 billion and $740 million of

Senior Bonds in 2007 and 2008, respectively. The proceeds were transferred by COFINA to the Commonwealth for the purpose of paying certain outstanding obligations of the Commonwealth.

21. The COFINA Bonds are obligations of COFINA payable from the Pledged Sales Tax without recourse to any assets of the Commonwealth. Resolution § 201. The COFINA Bonds do not constitute a debt of the Commonwealth and, unlike general obligation bonds, are not backed by a pledge of the full faith credit of the Commonwealth. *Id*.[6] Nonetheless, the Resolution reflects that the Commonwealth itself made a number of express commitments to COFINA bondholders, including that the Commonwealth would not interfere with the bondholders' rights to payment, on account of which COFINA and its bondholders have legally enforceable rights. *See, e.g.*, Resolution § 706; 13 L.P.R.A. § 14(c). The Resolution reiterated the Commonwealth's commitment in the COFINA Enabling Act to respect COFINA's rights to the Pledged Sales Tax and the Dedicated Sales Tax Fund, and not interfere with COFINA's obligations to pay the COFINA bondholders using those funds. The Commonwealth agreed that it would not "limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund" until payment in full of the COFINA Bonds. Resolution § 706. The Commonwealth also agreed not to "limit or restrict the rights" granted to COFINA under its enabling legislation or the rights of COFINA to "meet its obligations" to its bondholders until the COFINA Bonds and interest thereon are paid in full. *Id.*

22. The COFINA Enabling Act was amended in early 2009 to expand the COFINA structure and transfer additional SUT to the Dedicated Sales Tax Fund. *See* Act 1 of 2009; Act 7

---

[6]   Notably, at the time of the issuance of these Senior Bonds, the Commonwealth had the capacity to issue additional general obligation bonds ("GO Bonds"), but because of significantly lower costs and higher ratings associated with tax-backed securitization, the Commonwealth created COFINA for the purpose of lowering its borrowing costs.

of 2009. These amendments also significantly expanded the purpose of COFINA to include, among other things, the payment, servicing and/or refinancing of various existing Commonwealth debt. Therefore, the Resolution was amended in 2009 to provide for the issuance of subordinate bonds (the "Subordinate Bonds"). Between 2009 and 2011, COFINA sold additional bonds—both Senior and Subordinate Bonds—to investors on and off the Island.

23. By transferring the Pledged Sales Tax to COFINA, the Commonwealth has raised more than $16 billion by monetizing future tax revenues. According to the GDB, COFINA saved the Commonwealth between $1.1 and $2.2 billion in borrowing costs. *See Treasury Secretary and Interim GDB President Announce Amendments to COFINA Act that Will Facilitate More Cost-effective Financing for the Commonwealth*, PRNewswire, Sept. 25, 2013.

24. For nearly a decade, the COFINA structure functioned as intended, providing the Commonwealth with the low-cost financing it desperately needed throughout an ongoing financial crisis. During that time, it was always understood that COFINA owned the Pledged Sales Tax and that the Pledged Sales Tax was not available to the Commonwealth's general fund or to service the Commonwealth's general obligations. The Commonwealth, for example, has acknowledged that COFINA's success was due to these ownership rights. With the first offering, the GDB stated that COFINA had placed more than $2.6 billion in bonds in the U.S. tax-exempt market, and that the placement was possible because "the protection that the Dedicated Sales Tax Fund provides these bonds allowed 'investors to react with great enthusiasm to the bond issue, which translated into a two-fold oversubscription.'" Press Release, GDB, *Historic Puerto Rico $2.6 Billion Bond Issue Placed Successfully by COFINA* (July 11, 2007); *see also* Act No. 116, Statement of Motives ("Bonds issued by [COFINA] have been the most cost-effective source of financing for the Commonwealth of Puerto, since the creation of [COFINA]. Given that such

49

bonds are backed by the revenues of the sales and use tax, which is an ongoing and reliable source of income tied to ordinary economic activity of Puerto Rico's citizens, their credit rating is higher than that of general obligation bonds of the Commonwealth of Puerto Rico.").

25.    With each issuance of COFINA Bonds, COFINA obtained legal opinions from reputable counsel in both Puerto Rico and mainland United States that confirmed the validity of the COFINA structure.  For example:

- "[A] court … would find that *Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to* **[COFINA]**, that said asset and right of [COFINA] shall not constitute 'available resources including surplus' of the Commonwealth … and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth."  Opinion Letter of Hawkins Delafield & Wood LLP at 5 (June 18, 2009) (emphasis added).

- "*Act 91 … validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to* **[COFINA]**" and "the Pledged Sales Tax does not constitute 'available resources' … of the Commonwealth."  Opinion Letter of Pietrantoni Mendez & Alvarez LLC at 8 (June 18, 2009) (emphasis added).

- "When Act 91 is reviewed in light of the relevant precedent, we find that the *Act is structured to include virtually all of the elements that courts have relied on in upholding legislation against a claim that the legislature acted unconstitutionally* …."  Opinion Letter of Nixon Peabody at 9 (February 9, 2010) (emphasis added).

- "[W]e are of the opinion that a court … would find that (1) *Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to* **[COFINA]**, (2) said asset and right of [COFINA] shall not constitute 'available resources including surplus' of the Commonwealth … *and therefore are not subject to a first claim by the owners of public debt of the Commonwealth* … and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth."  Opinion Letter of Nixon Peabody at 11 (December 13, 2011) (emphasis added).

- "[*H*]ad *the framers of the Puerto Rico Constitution desired to limit the ability of the Legislature to assign future tax revenues they could have done so by including in the Puerto Rico Constitution an explicit anti-dedication clause* … It is our opinion, based on our examination of the law and other matters … we consider pertinent … a court would hold that **[***Act 91***]** *validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to* **[COFINA]** …."  Opinion Letter of Pietrantoni, Mendez & Alvarez LLC at 6-8 (December 13, 2011) (emphasis added).

26.    In light of COFINA's ownership of the Pledged Sales Tax and the statutory lien granted to bondholders, COFINA Bonds received strong, investment-grade ratings even in the face of a waning General Fund.  In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that separates the revenue stream supporting the bonds from the Commonwealth of Puerto Rico along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal."  Standard & Poor's, Puerto Rico Sales Tax Fin. Corp., Jun. 28, 2007 at 2.  It further stated that "[t]he legislative act creating COFINA . . . *successfully separates* and *provides a priority interest* in the Commonwealth's sales and use taxes for [COFINA] bondholders."  *Id.* (emphasis added).  Standard & Poor's issued a rating letter in connection with each offering of COFINA Bonds, with each letter emphasizing the importance of the separateness of COFINA and the Dedicated Sales Tax Fund from the Commonwealth.  *See* Standard & Poor's, *Ratings Direct: Puerto Rico Sales Tax Bonds Rating Raised to 'AA-'* at 1-2 (May 18, 2009); Standard & Poor's, *Ratings Direct: Puerto Rico Sales Tax Financing Corporation; Sales Tax* at 2-3 (Jan. 14, 2010); Standard & Poor's, *Ratings Direct: Puerto Rico Sales Tax Financing Corp.; Sales Tax* at 1-2 (Nov. 15, 2011).

27.    The views of Moody's were the same, noting that COFINA's high-quality rating reflected "[a] strong legal structure, including a pledge of the larger of 1% of the Commonwealth's 5.5% sales tax revenues or a base amount, that does not flow through the General Fund and may only be used for repayment of the appropriation-supported debt. … The Commonwealth has also covenanted not to impair bondholder's [*sic*] rights."  Moody's Investor Service, *New Issue: Moody's Assigns A1 Rating And Stable Outlook To Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bonds* (June 27, 2007), at 2 (emphasis added).  The

ratings also reflected the use of a common municipal financing structure—a tax-backed securitization. Subsequent ratings letters by Moody's reiterate that the agency relied on COFINA's sole ownership (and "first right") over the Pledged Sales Tax and the Dedicated Sales Tax Fund to assign high ratings to COFINA Bonds. Moody's Investor Service, *New Issue: Moody's Assigns Aa2 Rating on $1.1 Billion Puerto Rico Sales Tax Revenue Bonds, Senior Series 2011C and 2011D* at 3-4 (Nov. 23, 2011); *see also* Moody's Investor Service, *New Issue: Moody's Assigns A1 to $500M Puerto Rico Sales Tax Revenue Bonds, Series 2007C* at 2 (Dec. 18, 2007); Moody's Investors Service, *New Issue: Moody's Assigns A1 Rating on $1.8 Billion Puerto Rico Sales Tax Revenue Bonds, First Subordinate Series 2010C-E* at 3 (June 16, 2010).

28. This investor and rating agency confidence in the COFINA structure was supported by COFINA's bond offering documents. They stated, for example, that the COFINA Bonds "will be payable from and secured by a security interest [in the Pledged Sales Tax] … imposed by a newly-enacted statute of the Commonwealth that grants to [COFINA] ***ownership*** of the Pledged Sales Tax …." Commonwealth of Puerto Rico, Sales Tax Revenue Bonds Series 2007A, Official Statement (July 13, 2007) (emphasis added). Investors were also told that "[u]nder the provisions of Act 91, the [Dedicated Sales Tax Fund] and all present ***and future collections*** of the Pledged Sales Tax are transferred to, and made the property of, [COFINA]," and that the "Commonwealth agrees and commits … that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of [COFINA] to comply with its agreements with [COFINA bondholders] until said bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of [COFINA]." *Id*. at 17, 22 (emphasis added).

29.     Monoline insurance companies insured COFINA Bonds in reliance on the Commonwealth's representations, with Ambac Assurance Corporation, National Public Finance Guaranty Corporation, and Assured Guaranty, for example, having insured billions of dollars of COFINA Bonds.

30.     For nearly ten years, no party had ever challenged the COFINA structure or COFINA's ownership of the Pledged Sales Tax.  This was so despite the fact that the Legislative Assembly specifically created a mechanism to allow any person who wished to challenge the legislative transfer of the Pledged Sales Tax, or the statutory liens thereby created.  When COFINA was expanded in 2009, the Legislative Assembly conferred jurisdiction on the Supreme Court of Puerto Rico to "resolve any matter … when the issue is the validity or constitutionality" of the COFINA-enabling laws.  Act 7 of 2009 § 69.  Despite this jurisdictional grant, there had been no challenge to COFINA's ownership of the Pledged Sales Tax until a group of opportunistic GO Bondholders filed a lawsuit in July 2016 challenging the transfer of the Pledged Sales Tax to COFINA.[7]

## C.     The Commonwealth Repeatedly Reaffirms COFINA's Property Rights

31.     At no point before these proceedings has the Commonwealth disclaimed COFINA's ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund.  To the contrary, the Commonwealth has continuously confirmed COFINA's property rights.

32.     It has done so, for example, through subsequent amendments to the laws governing COFINA.  In January 2009, the Legislative Assembly passed legislation ("Act 1") increasing the percentage of the Pledged Sales Tax deposited in the Dedicated Sales Tax Fund.

---

[7]   The constitutionality of other aspects of the 2009 legislation was challenged on a timely basis. *See Dominguez Castro v. ELA,* 178 DPR 1 (2010) (upholding the constitutionality of Act 7 of 2009 from various challenges under both the U.S. and Puerto Rico Constitutions brought by public employees who were laid off from their employment pursuant to a fiscal stabilization plan that the Commonwealth implemented pursuant to Act 7).

*See* Act No. 1; P.R. Laws Ann. tit. 13, §§ 11a-16.  Act 1 reiterated that COFINA is "a corporate and political entity independent and separate from the Commonwealth," and that the Pledged Sales Tax "shall be directly deposited in the Dedicated Sales Tax Fund at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth …, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth …."  *Id.* § 3.  Moreover, only two years ago, the Legislative Assembly enacted a law providing that "the funds covered in the [Dedicated Sales Tax Fund] shall neither be deposited in the Treasury of Puerto Rico, constitute resources available to the Commonwealth, nor be available for use by the Secretary of the Treasury."  Act of July 1, 2015, No. 101-2015 (codified as amended at P.R. Laws Ann. tit. 13, § 11a-1) ("Act 101").

33.     The Commonwealth also confirmed COFINA's ownership rights in its financial statements for every year since COFINA's creation.  The 2008 financial report states that:

> the portion of the sales and use tax allocated to COFINA is not included as internal revenue in consistency with the legislation creating COFINA, **which legislation transfers ownership of such portion of the sales and use tax to COFINA** and provides that such portion is not "available resources" under the constitutional provisions relating to the payment of debt service.

Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Year Ended June 30, 2008 at 102 (emphasis added); *see, e.g.*, Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Year Ended June 30, 2009 at 33 (same); Commonwealth of Puerto Rico Comprehensive Annual Financial Report, Year Ended June 30, 2012 at 32 (same); Commonwealth of Puerto Rico Basic Financial Statements and Required Supplementary Information, Year Ended June 30, 2014 at 25 (similar).

34.     Secretaries of Justice serving three different administrations of alternating political parties have issued six opinions confirming that the transfer of the Pledged Sales Tax to COFINA was valid, and that the Pledged Sales Tax does not constitute available resources of the

Commonwealth. In 2007, for example, Secretary of Justice Roberto J. Sanchez Ramos concluded that "Act No. 91 ... was validly enacted by the Commonwealth" and that "the Dedicated Sales Tax Fund, including the ***right to receive collections of the [Pledged Sales Tax], is transferred to [COFINA]*** and said assets and funds of [COFINA] shall not constitute available resources of the Commonwealth ...." Letter of Roberto J. Sanchez Ramos, Consulta Num. 06-63-B, ¶¶ 2-3 (July 13, 2007) (emphasis added). In June 2009, Secretary of Justice Antonio M. Sagardia de Jesus similarly concluded that Act 91 is valid, that the "Dedicated Sales Tax Fund, including the ***right to receive collections of the [Pledged Sales Tax], is validly transferred to [COFINA]***," and that the "Dedicated Sales Tax Fund, the funds on deposit therein and the [Pledged Sales Tax] do not constitute available resources of the Commonwealth ... " Letter of Antonio M. Sagardia, Consulta Num. 09-233-A, ¶¶ 2-3 (June 18, 2009) (emphasis added).

35. Since 2010, Secretary of Justice Guillermo A. Somoza Colombani has reached the same conclusion—four times. *See* Letter of Secretary of Justice Guillermo A. Somoza Colombani, Consulta Num. 10-175-A, ¶¶ 2, 5 (Feb. 9, 2010) ("Act No. 91 ... and each of the statutes amending Act 91 were validly enacted" and the "Dedicated Sales Tax Fund, the funds on deposit therein and the [Pledged Sales Tax] do not constitute available resources of the Commonwealth for Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth."); Letter of Secretary of Justice Guillermo A. Somoza Colombani, Consulta Num. 10-336-A, ¶¶ 2, 5 (June 30, 2010) (same); Letter of Secretary of Justice Guillermo A. Somoza Colombani, Inquiry No. 11-137-B, ¶¶ 2, 5 (Nov. 23, 2011) (same); Letter of Secretary of Justice Guillermo A. Somoza Colombani, Inquiry No. 11-145-B, ¶¶ 2, 5 (Dec. 13, 2011) (same).

55

36.     The GDB touted these opinions in reassuring investors.  During an investor call on October 31, 2013, the Interim President of the GDB stated that "[i]mportantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in Puerto Rico: four Secretaries of Justice, serving three different administrations (of alternating political parties), have issued opinions that **the SUT allocated to COFINA is not subject to 'claw back.'**"  Remarks of Jose Pagan of the Government Development Bank, Conference Call about COFINA Legal Opinions at 2 (Oct. 31, 2013) (emphasis added).  He also stated that, because "COFINA's credit is bolstered by strong legal protections for bondholders," "COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth."  *Id*. (emphasis added).

37.     After the call, the GDB issued a press release reiterating COFINA's ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund:

- "Law 91-2006, which created COFINA, transferred ownership of a portion of the [SUT] to COFINA and provided that any transferred portion are not 'available resources' under the Constitutional provisions relating to full faith and credit [GO Bonds]."

- "The law provides that the Commonwealth agrees not to limit or restrict the rights granted by the COFINA Act or the rights of COFINA to meet its obligations to its bondholders."

- "COFINA's bond documents require written confirmation of all outstanding ratings and opinions confirming that new revenue would not constitute 'available resources' in the event the SUT were to be replaced with another source of revenues."

- "The Puerto Rico Secretary of Justice has provided, for each COFINA transaction (13 in total), a legal opinion that the SUT allocated to COFINA is not subject to 'claw-back' by GO bondholders under the PR Constitution.  US-based Bond Counsel and PR-based Underwriters' Counsel have delivered legal opinions reaching the same conclusion."

Press Release, Puerto Rico Dept. of the Treasury, GDB (Oct. 31, 2013).

38.     The Commonwealth's claims in this case that COFINA does not own anything or is otherwise invalid are impossible to square with these earlier representations.

**D.     The Commonwealth Issues General Obligation Bonds, Which Are Unsecured and Thus Receive Higher Yields**

39.     After the creation of COFINA, the Commonwealth continued to raise funds through the issuance of GO Bonds.  Unlike COFINA Bonds, GO Bonds are supported by an unsecured pledge of the Commonwealth's good faith, credit or taxing power and are considered public debt for purposes of the Puerto Rico Constitution.[8]  As such, GO Bondholders do not have an interest in any property of the Commonwealth nor of any of its instrumentalities, such as COFINA.  *See, e.g.*, Official Stmt. For General Obligation Bonds of 2014, Series A, at 16 ("Holders of … general obligation debt may not attach the Commonwealth's property.").

40.     Rather, they possess a different source of repayment, namely a promise to "any funds" in the Commonwealth's Treasury.  *See, e.g.*, Bond Resolution adopted March 11, 2014, § 19.  This never included the Pledged Sales Tax, which, pursuant to the COFINA Enabling Act, is not paid into the Treasury.  Though they do not have rights to the Pledged Sales Tax, GO Bondholders have a purported first (albeit unsecured) claim on the Commonwealth's "available resources."  Under the Puerto Rico Constitution, if "available resources" are insufficient to fund all of the desired spending, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const. art. VI, § 8.

41.     Because the GO Bondholders cannot turn to any specific property of the Commonwealth or its instrumentalities for repayment on their bonds, GO Bonds have

---

[8]     Given their unsecured status, the GO Bondholders have sought to participate on the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico.

consistently had lower credit ratings than the COFINA bonds.  While COFINA Bonds were given strong investment-grade ratings for their greater perceived safety, the GO Bonds issued in 2014, for example, received a rating from Moody's of only Ba2, meaning that they were "judged to be speculative and are subject to substantial credit risk."[9]  Indeed, as recently as 2013, the Legislative Assembly acknowledged that GO Bonds were rated lower than COFINA Bonds because the latter were "backed by the revenues of the sales and use tax" while the GO Bonds were supported by a promise to pay when funds were available.  Stmt. of Motives, Act of Oct. 10, 2013, No. 116-2013.

42.     To compensate investors for the risk of lending on an unsecured basis against the financial health of the Commonwealth's general fund, GO Bonds consistently garnered a higher interest rate than COFINA bonds.  That rate peaked with the 2014 issuance of GO Bonds, which charged 8%.  This significant rate for municipal debt was on top of an "Original Issue Discount" ("OID") of 7% of the face amount that the purchasers of 2014 GO Bonds (the "2014 GO Bondholders") negotiated to enrich their deal.  This meant that the Commonwealth issued and promised to repay $3.5 billion of debt but in exchange received only $3.255 billion from the bondholders.  Moreover, $422.7 million of proceeds from the bonds were earmarked for the payment of interest on the bonds, meaning this money was unavailable to the Commonwealth.  Adjusting for the effect of this amount and the OID, the interest rate on the 2014 GO Bonds was in economic substance 9.1% (which, for comparison, exceeds the limit under Puerto Rico usury law).  *See* P.R. Laws Ann. tit. 10 § 998.  Thus, whereas the weighted average cost of COFINA bonds has been about 5.7%, for the GO Bonds (accounting for these incentives) the weighted average for GO Bonds has been about 6.37%.

---

[9]     *See* Moody's Investors Services, "Rating Symbols and Definitions," available at https://www.moodys.com/researchdocumentcontentpage.aspx?docid=PBC_79004.

43.     The GO Bondholders understood that, in exchange for this higher interest rate, they had absolutely no claim to COFINA's revenues.  Since the creation of COFINA, there have been 18 issuances or remarketings of GO Bonds.  Each one was made pursuant to a bond resolution by the Commonwealth and is accompanied by one or more preliminary and final "Official Statements."  In every one of these issuances, the Official Statements expressly state that the Pledged Sales Tax has been committed to COFINA and thus is not available to repay the GO Bonds.

44.     For instance, the 2014 Preliminary Official Statement and the 2014 Official Statement together affirm no less than *eight times* that the Pledged Sales Tax is not available to the 2014 GO Bonds.  The documents state that the Pledged Sales Tax does "not constitute 'available resources' … and [is] not available for use by the Secretary of the Treasury."  2014 Official Stmt. at 29.  In another section: "the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds." *Id.*  The reason for this was that the "legislation creating COFINA … *transfers ownership* of [the Dedicated Sales Tax] to COFINA."  *Id.* at 31 (emphasis added).  These acknowledgements were then repeated multiple times. *See id.* at 31, Appx. II-58 & II-59.  Identical disclosures were made in the Preliminary Official Statement as well.  *See* 2014 Preliminary Official Stmt., 27-28, 30, Appx. II-58 & II-59.  The same is true for the rest of the GO Bond issuances.[10]

---

[10]  *See* March 7, 2012 Official Statement (Series 2012 A) at 13, 14, I-54; March 7, 2012 Official Statement (Series 2012 B) at 12, 13, I-54; July 11, 2011 Supplement to Official Statement (Series 2011, 2011 D, 2011 E) at 20, 21, I-48; June 16, 2011 Remarketing Statement (Sub-Series 2003 C-5-2) at 32, 34; March 10, 2011 Official Statement (Series 2011 C) at 18-19, 20, I-48; February 10, 2011 Official Statement (Series 2011 A) at 18, 19, I-48; December 3, 2009 Official Statement (Series 2009 C) at 13, 14; November 4, 2009 Official Statement (Series 2009 B) at 14, 15, I-37; September 11, 2009 Official Statement (Series 2009 A) at 10-11, 12, I-37; September 11, 2009 Remarketing Statement (Series 2007 A-4) at 10, 11, I-37; September 5, 2008 Official Statement (Series A) at 12, I-30, I-41, I-65; May 7, 2008 Supplement to Official Statement (Series 2008 C) at 5, 16, I-31, I-42; May 7, 2008 Supplement to Official Statement (Series 2008 A, 2008 B) at 5-6, 29, I-31, I-42; May 7, 2008 Supplement to Remarketing

45. Moreover, in the case of the 2014 GO Bondholders, their own 2014 GO Resolution expressly incorporated these disclosures regarding the transfer of the SUT to COFINA and the unavailability of the same to the Commonwealth and its creditors. The 2014 Preliminary Official Statement and the 2014 Official Statement—which made clear that the Dedicated Sales Tax is not available to pay the 2014 GO Bonds—were stapled to the 2014 Resolution, which by its terms *ratified, confirmed and approved* them. *See* 2014 Resolution §§ 31 & 32.

46. For more than ten years after COFINA's enabling legislation was passed, no GO Bondholder had ever questioned COFINA's exclusive right to the Pledged Sales Tax. This was so even though the most recent GO Bond offering was used to refinance (and repay) more than $330 million of lower cost COFINA obligations. 2014 Official Stmt. at 33 (showing amount of COFINA bonds "as adjusted" following 2014 GO Bond issuance).[11] Rather than challenge COFINA's payment structure, the GO Bondholders benefited from it. Every year, they collected higher interest rates because their bonds were unsecured and riskier. They also benefitted from the lower-cost financing and additional capital that COFINA bonds provided to the Commonwealth.

## E. The Commonwealth Unlawfully Modifies COFINA's Rights to SUT Proceeds

47. On June 30, 2016, PROMESA was signed into law. It provides for the establishment of a Financial Oversight and Management Board (the "Oversight Board") with broad responsibilities and powers. Among other things, the Oversight Board may petition under

---

Statement (Series 2007 A-6, A-7, A-8, A-9) at 7, 30, I-31, I-42; October 16, 2007 Supplement to Official Statement (Series 2007 A) at 40, I-27; September 13, 2007 Preliminary Official Statement (Series 2007 A) at 12, I-27; September 13, 2007 Preliminary Official Statement (Series 2007 B) at 11, I-27.

[11] The COFINA bond anticipation notes that were refinanced by the 2014 GO Bonds had an interest rate of 1.95%.

Title III of PROMESA for the commencement of a court-supervised restructuring process to allow the Commonwealth to restructure in a proceeding similar to that of a filing under chapter 9 or 11 of title 11 of the United States Bankruptcy Code. PROMESA § 304 (codified at 48 U.S.C. § 2164).

48.    PROMESA requires that the Commonwealth and its instrumentalities develop and maintain a fiscal plan under the supervision of the Oversight Board which provides "a method to achieve fiscal responsibility and access to capital markets …." PROMESA § 201(b)(1) (codified at 48 U.S.C. § 2141(b)(1)). A fiscal plan promulgated pursuant to PROMESA must "respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory …." PROMESA § 201(b)(1)(N) (codified at 48 U.S.C. § 2141(b)(1)(N)).

49.    In violation of PROMESA, the Commonwealth has sought to change the priority or the rate at which COFINA received SUT proceeds. As background, although Act 56 provides a formula for determining the amount of SUT proceeds that COFINA receives in a given year (the "Pledged Base Amount"), the rate at which COFINA receives those proceeds until the Pledged Base Amount is satisfied can fluctuate.

50.    On January 24, 2014, the Legislative Assembly passed Act No. 18-2014 ("Act 18"), which increased the amount of SUT proceeds collected by the Commonwealth that COFINA receives from 5.5% to 6%. Act 18 also provided for a corresponding decrease in the amount of SUT proceeds that Commonwealth municipalities receive from 1.5% to 1%. This means that Act 18 did not change the Pledged Base Amount, rather it increased the amount of collateral backing the Pledged Base Amount and thus increased the likelihood that bondholders

would be paid. This change was made to "strengthen the financial capacity of [COFINA]." *See* Act 18.

51.     Act 18 also established a special fund known as the Municipal Administration Fund ("MAF"). *See id.* at art. 1, § 2(a). MAF is funded by 0.5% of the SUT but this interest in the SUT proceeds is subordinate to COFINA's right to the Pledged Base Amount.[12] Thus, MAF received 0.5% of SUT proceeds only after COFINA received the total Pledged Base Amount in a given year.

52.     On July 22, 2016, less than month after PROMESA was enacted, the Legislative Assembly amended Act 18 so that "[d]eposits to [MAF] shall be made on a monthly basis" without any condition that those payments are subordinate to COFINA's rights to SUT proceeds. Act 84 of 2016, at § 2(a). As a result of this unlawful change, COFINA became entitled to receive only 5.5% of SUT proceeds, rather than 6%, reducing both the rate at which the Pledged Base Amount would be satisfied and the value of the Pledged Base Amount collateral backing COFINA Bonds. Commonwealth municipalities, on the other hand, receive monthly proceeds regardless of whether COFINA has received the Pledged Base Amount.

---

[12]   Except for the transitory period between February 1, 2014, and June 30, 2014, the revenues of the [SUT] received every fiscal year by the Commonwealth . . . shall be deposited into said special fund, ***once the Fixed Income is deposited in the Dedicated Sales Tax Fund, as required under Act No. 91*** …

…

***Deposits to this special fund shall be made: (i) after an amount which bears the same ratio to the Required Annual Deposit accumulated once the Fixed Income has been deposited in the Dedicated Sales Tax Fund, as required under Act No. 91 … is deposited from the first revenues of the [SUT]***; and (ii) after such amount is deposited, periodically every month, by the financial institution acting as custodian of the revenues of the State IVU imposed by the Commonwealth.

*Id.* (emphasis added).

53. By passing Act 84, the Commonwealth has adversely altered COFINA's right to receive 6% of SUT proceeds in violation of PROMESA.

**F.    The Commonwealth Impermissibly Seeks to Take COFINA's Property**

54. On March 13, 2017, the Commonwealth's Fiscal Agency and Financial Advisory Authority submitted a joint fiscal plan (the "Fiscal Plan") to the Oversight Board, which was approved by the Oversight Board that same day. The Fiscal Plan purports to resolve the Commonwealth's deficit with a projected $7.9 billion in cumulative debt service over the next 10 years. Fiscal Plan at 5-6. However, in so doing, the Fiscal Plan is silent on whether COFINA is the sole owner of the Dedicated Sales Tax Fund and the Pledged Sales Tax, including all Pledged Sales Tax collected in the future, or whether the Commonwealth may access those funds to satisfy its own debts. As such, the Fiscal Plan completely disregards PROMESA's requirement that it "ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory."

55. Then, breaching a decade's worth of representations and agreements that COFINA owned the Pledged Sales Tax and that the Commonwealth could not and would not use the Pledged Sales Tax, on April 29, 2017, the Commonwealth reversed course and enacted the Fiscal Plan Compliance Law (the "Compliance Law"), which purports to authorize the Governor of Puerto Rico to use the Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow or to comply with the Fiscal Plan. The Compliance Law calls for the Pledged Sales Tax to be transferred from the Dedicated Sales Tax Fund to the Commonwealth's general fund under the custody of the Secretary of Treasury. The Secretary of Treasury is granted the authority to determine how the disburse the money in the Commonwealth's general fund, which now may include the Pledged Sales Tax, even though the COFINA Enabling Act prohibits the Secretary of Treasury from using those funds for any reason.

56. The Commonwealth's actions ignore COFINA's governing laws and are utterly inconsistent with its long-held position that COFINA is a separate entity with exclusive ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund. These actions also create a significant obstacle to the Commonwealth's emergence from its current financial situation. In the midst of a financial crisis, Puerto Rico will need to raise capital to promote growth and restructure its debts. The Commonwealth's attempt to seize COFINA's funds impairs its ability to use affordable securitization structures like COFINA in the future because investors can never be sure that the Commonwealth will not attempt to do to them what it is trying to do here, namely taking property that it has acknowledged for years it does not own to repay its own creditors. In the end, the Commonwealth's claims in this case are not only incorrect legally, they are dangerously short-sighted.

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### COFINA Validly Owns the Pledged Sales Tax and the Dedicated Sales Tax Fund

57. The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

58. This dispute is immediate and real because the Commonwealth enacted the Compliance Law and the Commonwealth Agent has asserted claims against COFINA in order to misappropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund.

59. There is an actual controversy between COFINA and the Commonwealth in that this matter is before the Court for the purpose of determining "[w]hether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales

and use taxes purportedly pledged by COFINA to secure debt (the 'Pledged Sales Taxes') are property of the Commonwealth or COFINA under applicable law." Commonwealth-COFINA Dispute Stipulation at ¶ 4.

60.    The Commonwealth enacted Act 91, which mandated that a portion of a new sales and use tax—the Pledged Sales Tax—be deposited in the Dedicated Sales Tax Fund.

61.    The Commonwealth also enacted Act 56, which amended Act 91, providing that the "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of this law are hereby transferred to, and shall be the property of COFINA." Act 56, § 3; P.R. Laws Ann. tit. 13, § 12.

62.    Act 56 further provides that the funds deposited in the Dedicated Sales Tax Fund "shall not be deposited in the Treasury of Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico." *Id*.

63.    In addition, the Commonwealth enacted Act 1, which reiterated that COFINA was "a corporate and political entity independent and separate from the Commonwealth," and that the Pledged Sales Tax "shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of Puerto Rico, nor shall it constitute resources available to the Commonwealth …, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth …." Act 1; P.R. Laws Ann. tit. 13, § 11a-16.

64.    The Commonwealth further enacted Act 101, reaffirming that "the funds covered into [the Dedicated Sales Tax Fund] shall neither be deposited in the Treasury of Puerto Rico,

constitute resources available to [the Commonwealth], nor be available for use by the Secretary of the Treasury." Act 101; P.R. Laws Ann. tit. 13, § 11a-1.

65.    The Legislative Assembly duly enacted Acts 91, 56, 1, and 101 in accordance with the constitutional authority provided to it under the Constitution of Puerto Rico.  Contrary to the Commonwealth's assertions, those statutes do not violate Sections 2 or 7 of Article VI or any other provision of the Puerto Rico Constitution.  Nor do the Pledged Sales Tax or Dedicated Sales Tax Fund constitute available resources for purposes of Article VI, Section 8 of the Puerto Rico Constitution.

66.    Pursuant to these duly-enacted statutes, under Puerto Rico law, the Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund, were transferred to COFINA and are the property of COFINA.  At a minimum, and in the alternative: (i) COFINA has a perfected and unavoidable lien in the stream of Pledged Sales Tax pursuant to applicable bankruptcy and non-bankruptcy law; or (ii) there is an enforceable subordination agreement whereby the Commonwealth has agreed to subordinate any interest or claim it may have in or to the stream of Pledged Sales Tax to the interest of COFINA and its creditors.

67.    Accordingly, the COFINA Senior Bondholders' Coalitions seeks a declaration that: (i) the statutes creating COFINA and directing transfer of the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA are constitutional under the Constitution of Puerto Rico; (ii) the Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund are the property of COFINA; and (iii) the Pledged Sales Tax and the Dedicated Sales Tax Fund are not "available resources" under the Constitution of Puerto Rico.

68. In the alternative, if the Court finds that the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, the COFINA Senior Bondholders' Coalition seek a declaration that: (i) COFINA has a perfected and unavoidable lien in the stream of Pledged Sales Tax pursuant to applicable bankruptcy and non-bankruptcy law; or (ii) there is an enforceable subordination agreement whereby the Commonwealth agreed to subordinate any interest it may have in the stream of Pledged Sales Tax to COFINA's interest and those of its creditors in the stream of Pledged Sales Tax.

## SECOND CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

**Commonwealth Misappropriation of the Pledged Sales Tax and Dedicated Sales Tax Fund Would Violate the Takings Clauses of the Constitutions of the United States and Puerto Rico and the Due Process Clause of the United States Constitution**

69. The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

70. The Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund are the property of COFINA under applicable Puerto Rico law.

71. The COFINA bondholders have a valid, enforceable, and fully perfected security interest in the Pledged Sales Tax, which is a property interest. *See* P.R. Laws Ann. tit. 13 § 13 ("COFINA is hereby authorized to pledge and otherwise encumber all or part of such revenues [of the Dedicated Sales Tax Fund] solely for the payment of principal, interest and redemption premium of such bonds and other obligations of [COFINA] that were incurred with respect to such bonds to meet the purposes set forth in [this Act] …"); Resolution §§ 501(1), (2).

72. This dispute is immediate and real because the Commonwealth enacted the Compliance Law and the Commonwealth Agent has asserted claims against COFINA in order to misappropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund belonging to COFINA, which would result in stripping the COFINA bondholders of their lien on the Pledged Sales Tax.

73. There is an actual controversy between COFINA and the COFINA bondholders on the one hand and the Commonwealth on the other regarding whether misappropriation of the Pledged Sales Tax and/or the Dedicated Sales Tax Fund would violate the U.S. Constitution.

74. The Takings Clause of the Fifth Amendment to the United States Constitution (the "U.S. Takings Clause") provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The U.S. Takings Clause is applicable to the States and the Commonwealth by virtue of section 1 of the Fourteenth Amendment to the U.S. Constitution (the "Due Process Clause"). *Id*. at amend. XIV.

75. The Constitution of the Commonwealth of Puerto Rico similarly provides, in Article II, section 9, that "[p]rivate property shall not be taken or damaged for public use except upon payment of just compensation and in the manner provided by law" (the "Puerto Rico Takings Clause"). P.R. Const. art. II, § 9.

76. COFINA's property right and the COFINA bondholders' security interest in the Pledged Sales Tax and the Dedicated Sales Tax Fund are property rights protected by the U.S. Takings Clause, the Due Process Clause, and the Puerto Rico Takings Clause. The Commonwealth, through the Compliance Law and this litigation, seeks to take those property rights away from COFINA and the COFINA Bondholders and to leave the COFINA bondholders without any compensation.

77.     In addition, the Compliance Law was not enacted for a "public purpose" within the meaning of the U.S. and Puerto Rico Takings Clauses.  Rather, it was enacted in order to divert assets to the General Fund so that the Commonwealth could make debt service payments to other creditors contemplated in its fiscal plan.

78.     Under the U.S. and Puerto Rico Takings Clauses, defendants may not take property from private parties unless the taking is for a "public use."  Taking property from secured creditors of COFINA in order to give it to unsecured creditors of the Commonwealth would be a purely private taking and therefore is not a "public use" within the meaning of the U.S. and Puerto Rico Takings Clauses.

79.     Accordingly, the Commonwealth's taking of this property is not for a public use and is therefore unconstitutional.  Even if the Commonwealth's taking of COFINA and the COFINA bondholders' property *were* for a public use, under the U.S. and Puerto Rico Takings Clauses, the Commonwealth would be required to provide COFINA and the COFINA bondholders' with "just compensation."  COFINA and the COFINA bondholders are therefore entitled to all appropriate remedies for that violation, including, without limitation, declaratory relief along with damages.

### THIRD CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### Declaration that Any Award of Just Compensation or Damages for Violation of the Takings Clauses Cannot Be Impaired by a PROMESA Plan or an Order Confirming a PROMESA Plan

80.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

81.     The Compliance Law violates the U.S. and Puerto Rico Takings Clauses by taking COFINA's and COFINA bondholders' property without providing just compensation.

82.     If the Compliance Law is implemented, COFINA and the COFINA bondholders will be entitled to an award of damages and/or just compensation for these constitutional violations.

83.     Because COFINA Senior Bondholders were adequately secured at all times relevant to this action, the amount of just compensation required for the taking of COFINA Senior Bondholders' collateral pursuant to the Compliance Law is no less than the principal amount of the COFINA Senior Bonds and any and all interest and other amounts accruing thereon until the date compensation is paid.

84.     Impairing COFINA Senior Bondholders' constitutional claims in a Title III plan would violate the Fifth and Fourteenth Amendments to the United States Constitution and Article II of the Puerto Rico Constitution.

85.     The COFINA Senior Bondholders are therefore entitled to a declaration that any award of just compensation or damages for violation of the U.S. and Puerto Rico Takings Clauses cannot be impaired by a PROMESA plan of adjustment or an order confirming a PROMESA plan of adjustment.

### FOURTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### Commonwealth Impairment of COFINA'S and COFINA Bondholders' Contractual Rights to the Pledged Sales Tax and Dedicated Sales Tax Fund Would Violate the Contracts Clauses of the Constitutions of the United States and Puerto Rico

86.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

87.     Article I, section 10, clause 1 of the United States Constitution (the "<u>Contracts Clause</u>") prohibits any State from "pass[ing] any . . . law impairing the obligation of contracts." The Contracts Clause applies to the Commonwealth of Puerto Rico.

88.     Article II, section 7 of the Constitution of the Commonwealth of Puerto Rico also provides that "[n]o laws impairing the obligation of contracts shall be enacted" (the "<u>Puerto Rico Contracts Clause</u>").  P.R. Const. art. II, § 7.

89.     Under the Non-Impairment Covenant of the COFINA Enabling Act, the Commonwealth covenanted that it "shall not: (i) limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the [Dedicated Sales Tax Fund] pursuant to the provisions of §§ 11a-16 of this title . . . or (ii) limit or restrain the powers hereby conferred by §§ 11a-16 of this title or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be entirely paid for and withdrawn.  No amendment to §§ 11a-16 of this title, shall undermine any obligation or commitment of COFINA."  P.R. Laws Ann. tit. 13, § 14(c).

90.     The Resolution reiterated the Commonwealth's commitment to COFINA bondholders that it would not impair COFINA's rights to the Dedicated Sales Tax Fund and Pledged Sales Tax.  Consistent with the COFINA Enabling Act, the Resolution makes clear that the Commonwealth would not "limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund" until payment in full of the COFINA Bonds.  Resolution § 706.  The Commonwealth also would not "limit or restrict the

rights" granted to COFINA under its enabling legislation or the rights of COFINA to "meet its obligations" to its bondholders until the COFINA Bonds and interest thereon are paid in full. *Id.*

91.     The Compliance Law and the Commonwealth Agent's allegations in this lawsuit seek to impair the contract between COFINA and the COFINA bondholders by interfering with COFINA's ability to make contractually-required payments to COFINA bondholders from the Pledged Sales Tax and the funds in the Dedicated Sales Tax Fund.  They also seek to impair the Commonwealth's own obligations to the COFINA bondholders as set forth in the COFINA Enabling Act and reaffirmed in the Resolution and in multiple official statements by the Commonwealth.

92.     This substantial impairment of COFINA's and the COFINA bondholders' contractual rights is unnecessary in light of the availability of more moderate courses of action and unreasonable in light of the surrounding circumstances.  The Commonwealth could negotiate with the COFINA Senior Bondholders' Coalition and other senior creditors to consensually restructure COFINA's rights and obligations rather than unreasonably attempt to violate them. To date, every single restructuring proposal made by the COFINA Senior Bondholders' Coalition to voluntarily deliver a portion of the Pledged Sales Tax to stimulate the Commonwealth's economy has gone unanswered.

93.     Given all of these circumstances, the Compliance Law and the Commonwealth's actions in authorizing this lawsuit substantially, unreasonably, and unnecessarily impair the obligation of contracts, and accordingly violate the Contracts Clause and the Puerto Rico Contracts Clause.

94.     Neither PROMESA nor any other federal law authorizes or allows the
Commonwealth or the Court to impair contracts in the manner implemented by the Compliance
Law or this litigation.

95.     Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that
the Commonwealth's misappropriation of the Pledged Sales Tax and/or the Dedicated Sales Tax
Fund would constitute violations of the Contracts Clauses of the Constitutions of the United
States and the Commonwealth of Puerto Rico.

**FIFTH CAUSE OF ACTION**

**Declaratory Judgment, 28 U.S.C. § 2201(a)**

**Against the Commonwealth and the Permitted Intervenors**

**The Compliance Law Violates PROMESA**

96.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing
allegations as though they were fully set forth in this paragraph.

97.     The Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the
future, and the Dedicated Sales Tax Fund are the property of COFINA under applicable law.

98.     This dispute is immediate and real because the Commonwealth enacted the
Compliance Law in order to misappropriate the Pledged Sales Tax and the Dedicated Sales Tax
Fund belonging to COFINA.

99.     PROMESA provides that a method of composition of indebtedness may not bind
any creditor that does not consent to the composition.  PROMESA § 303(1) (codified at 48
U.S.C. § 2163(1)).

100.    PROMESA also provides that if any property of an instrumentality of the
Commonwealth is transferred in violation of applicable law, the Commonwealth shall be liable
for the value of such property.  PROMESA § 407(a) (codified at 48 U.S.C. § 2195(a)).

73

101.     As described above, the Commonwealth has passed the Compliance Law, which authorizes the Governor of Puerto Rico to, under certain circumstances, use the Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow or to comply with the Fiscal Plan. The Compliance Law calls for the Pledged Sales Tax to be transferred from the Dedicated Sales Tax Fund to the Commonwealth's general fund under the custody of the Secretary of Treasury.

102.     The Compliance Law constitutes a method of composition in violation of PROMESA § 303(1) in that it seeks to consolidate the Pledged Sales Tax and the Dedicated Sales Tax Fund belonging to COFINA with the Commonwealth's general fund, without the consent of COFINA.

103.     The Compliance Law also violates PROMESA § 407(a) because it seeks to transfer the Pledged Sales Tax and the Dedicated Sales Tax Fund belonging to COFINA to the Commonwealth, without providing COFINA value for its property.

104.     Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that the Commonwealth's misappropriation of the Pledged Sales Tax and/or the Dedicated Sales Tax Fund through the Compliance Law violates sections 303(1) and 407(a) of PROMESA.

## SIXTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth

### Secured Status in the Commonwealth Title III Case Pursuant to 11 U.S.C. § 506(a)

105.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

106.     Section 506(a)(1) of the Bankruptcy Code, 11 U.S.C. § 506(a), made applicable by section 301 of PROMESA provides that "[a]n allowed claim of a creditor secured by a lien on

property in which the [debtor] has an interest … is a secured claim to the extent of the value of such creditor's interest in the estate's interest in such property.

107.    Pursuant to the COFINA Enabling Act, the COFINA bondholders have valid, perfected liens on the pledged property.

108.    The COFINA bondholders' liens extend to the "proceeds" of pledged property, including the proceeds of Pledged Sales Tax previously received by COFINA as well as the proceeds of COFINA's right to receive future Pledged Sales Tax.

109.    The Puerto Rico Uniform Commercial Code (both in 2007 and today) provides that "[a] security interest or agricultural lien continues in collateral notwithstanding sale, lease, license, exchange, or other disposition thereof unless the secured party authorized the disposition free of the security interest or agricultural lien," and also that "a security interest attaches to any identifiable proceeds of collateral."  19 L.P.R.A. § 2265(a); *see also* 19 L.P.R.A. § 2106(2) (2008) ("[A] security interest continues in collateral notwithstanding sale, exchange or other disposition thereof unless the disposition was authorized by the secured party in the security agreement or otherwise, and also continues in any identifiable proceeds including collections received by the debtor.").  Nothing contained in PROMESA alters, amends, or preempts these laws.

110.    The Compliance Law authorizes the Governor of Puerto Rico to, under certain circumstances, use the Pledged Sales Tax to cover deficiencies in the Commonwealth's cash flow or to comply with the Fiscal Plan, including by transferring the Pledged Sales Tax from the Dedicated Sales Tax Fund to the Commonwealth's general fund under the custody of the Secretary of Treasury.  The Secretary of Treasury is granted the authority to determine how to disburse the money in the Commonwealth's general fund, which now may include the Pledged

Sales Tax, even though the COFINA Enabling Act prohibits the Secretary of Treasury from using the Pledged Sales Tax for any reason. Any disbursement of COFINA's funds, not in accordance with the Resolution, is a "disposition" of COFINA bondholders' collateral.

111. In addition, the Compliance Law effectively transfers COFINA's "right to receive" Pledged Sales Tax from COFINA to the Commonwealth. This transfer of COFINA's "right to receive" Pledge Sales Tax thus amounts to a "disposition" of COFINA bondholders' collateral.

112. The COFINA bondholders have not consented to these or any other dispositions of their collateral.

113. The Commonwealth failed to act in good faith in potentially causing COFINA to dispose of the COFINA bondholders' collateral to the Commonwealth for no consideration.

114. Therefore, pursuant to 19 L.P.R.A. § 2106(2) (2008) and 19 L.P.R.A. § 2265(a) (2017), if the Compliance Law is valid, all assets or cash proceeds of COFINA transferred to the Commonwealth and any Pledged Sales Tax made to the Commonwealth's general fund remain subject to COFINA bondholders' liens.

115. To the extent the Commonwealth acquires property subject to the COFINA bondholders' liens, such acquisition gives rise to a secured claim in favor of the COFINA bondholders against the Commonwealth in its Title III case.

116. The value of the property subject to COFINA Senior Bondholders' valid, perfected liens is greater than the value of COFINA Senior Bondholders' claims against the Commonwealth.

117. Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that they are secured creditors to the full extent of their claims against the Commonwealth.

## SEVENTH CAUSE OF ACTION

## Declaratory Judgment, 28 U.S.C. § 2201(a)

## Against the Commonwealth and the Permitted Intervenors

## Act 84 Violates PROMESA

118.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

119.    When PROMESA was enacted, pursuant to Act 18, COFINA was entitled to receive 6% of SUT proceeds until it received the full Pledged Base Amount in a given year, and its right to receive SUT proceeds was senior to MAF's right to receive SUT proceeds.  Under PROMESA, the Commonwealth is prohibited from altering COFINA's right to receive 6% of SUT proceeds or the priority between COFINA and MAF.

120.    This dispute is immediate and real because, after the enactment of PROMESA, the Commonwealth has taken steps, including through its enactment of Act 84, to reduce the amount of SUT proceeds COFINA receives from 6% to 5.5% and to eliminate the priority of COFINA over MAF.

121.    There is an actual controversy between COFINA and the Commonwealth, because the Commonwealth has averred that, pursuant to Act 84, COFINA is only entitled to receive 5.5% of SUT proceeds until it receives the Pledged Base Amount, and COFINA's right to receive SUT proceeds is no longer senior to MAF's right to receive SUT proceeds.

122.    Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that: (i) the reduction of the amount of SUT proceeds COFINA receives from 6% to 5.5%, implemented by Act 84, is void and invalid because it violates PROMESA; and (ii) COFINA is entitled to 6% of the SUT proceeds collected by the Commonwealth until the Pledged Base Amount is reached in a given year.

## EIGHTH CAUSE OF ACTION

### Tortious Interference With Contract

### Against the Commonwealth

123.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

124.    The Resolution constitutes a contract among COFINA, BNYM, the COFINA bondholders, and certain other beneficiaries.

125.    The Commonwealth knew about the existence of the Resolution because, *inter alia*, (i) the Legislative Assembly passed the enabling legislation pursuant to which the Resolution was adopted; (ii) three Secretaries of Justice issued a total of six legal opinions in connection with the issuances of COFINA Bonds, which were all made pursuant to the Resolution; and (iii) the Commonwealth represented that it would not: (a) "limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund," or (b) "limit or restrict the rights" granted to COFINA under its enabling legislation or the rights of COFINA to "meet its obligations" to its bondholders until the COFINA Bonds and interest thereon are paid in full.

126.    The Resolution authorized COFINA to issue bonds secured by the Pledged Sales Tax and the Dedicated Sales Tax Fund.

127.    The Commonwealth intentionally interfered with the Resolution, as well as the rights and obligations of COFINA under the Resolution, with fault by, among other things, enacting the Compliance Law and seeking to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund, including in this action.

78

128. As a result of the Commonwealth's tortious acts, the COFINA Senior Bondholders have suffered, and will continue to suffer, damages in the form of the misappropriated Pledged Sales Tax and Dedicated Sales Tax Fund, delay, attorneys' fees and expenses, and other damages to be proven at trial.

129. Accordingly, the COFINA Senior Bondholders' Coalition seek the recognition of, or imposition of, a constructive trust in their or COFINA's favor over the Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund.

## NINTH CAUSE OF ACTION

### Fraud

### Against the Commonwealth

130. The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

131. The COFINA Senior Bondholders purchased COFINA Bonds in reliance on numerous Commonwealth representations, including those referenced above, that the Commonwealth had previously transferred the right to receive the Pledged Sales Tax and the Dedicated Sales Tax Fund to COFINA, the Commonwealth would not interfere with COFINA's right to meet its obligations to the COFINA bondholders, and the Pledged Sales Tax and the Dedicated Sales Tax Fund would belong solely to COFINA, not constitute "available resources" under the Constitution of the Commonwealth of Puerto Rico, and not be used by the Commonwealth.

132. To the extent the Commonwealth intentionally structured COFINA and the transfer of the Pledged Sales Tax to COFINA in order to avoid the debt limits in the Constitution of Puerto Rico, as the Commonwealth alleges through the Commonwealth Agent in this

litigation (Compl. ¶¶ 140-57), then the Commonwealth's representations to COFINA (as well as to investors and monoline insurers) were knowingly false and were made with the intent to deceive COFINA and the purchasers of COFINA Bonds.

133.    The Commonwealth intended to defraud the COFINA Senior Bondholders, in that it intended to induce, and did induce, them to purchase COFINA Bonds and commit to pay the extraconstitutional debt of the Commonwealth based on the foregoing representations.

134.    The COFINA Senior Bondholders' reliance on the Commonwealth's fraudulent misrepresentations was reasonable and foreseeable. There was no reason for them to suspect that the Commonwealth would not seek to uphold its own legislation and subsequent statements affirming the validity of that legislation, or that the Commonwealth intentionally structured COFINA and the enabling legislation to avoid the Commonwealth's constitutional debt limits.

135.    As a result of the Commonwealth's fraud, the COFINA Senior Bondholders have suffered, and will continue to suffer, damages in the form of the misappropriated Pledged Sales Tax and Dedicated Sales Tax Fund, delay, attorney's fees and expenses, and other damages to be proven at trial.

136.    Accordingly, the COFINA Senior Bondholders' Coalition seeks the recognition of, or imposition of, a constructive trust in their or COFINA's favor over the Pledged Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund.

**TENTH CAUSE OF ACTION**

**Permanent Injunction**

**Against the Commonwealth**

137.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

138.     As shown above, the Commonwealth's confiscation of the Pledged Sales Tax and the funds in the Dedicated Sales Tax Fund would violate the United States Constitution.

139.     The COFINA Senior Bondholders' Coalition seeks an order permanently enjoining the Commonwealth from: (i) diverting or transferring the Pledged Sales Tax proceeds, including all Pledged Sales Tax proceeds collected in the future, or the funds in the Dedicated Sales Tax Fund away from COFINA and COFINA's creditors; (ii) designating the Pledged Sales Tax, including all Pledged Sales Tax proceeds collected in the future, or the funds in the Dedicated Sales Tax Fund as "available resources" under the Constitution of Puerto Rico; (iii) taking any action to "breach, revoke, and/or reject" the transfer of the Pledged Sales Tax, including all Pledged Sales Tax collected in the future, or the Dedicated Sales Tax Fund to COFINA and for the benefit of COFINA's creditors; (iv) taking any action to interfere with or attempt to interfere with COFINA's rights or the rights of its creditors to the Pledged Sales Tax, including all Pledged Sales Tax collected in the future, or the funds in the Dedicated Sales Tax Fund; and (v) taking any action to interfere with or attempt to interfere with COFINA's or the COFINA bondholders' rights and obligations under the Resolution.

140.     If the Commonwealth succeeds in its effort to confiscate the Pledged Sales Tax and the funds in the Dedicated Sales Tax Fund to pay its creditors, the COFINA Senior Bondholders' Coalition will lack an adequate remedy at law because their obligations are secured by this property and the Commonwealth is insolvent.

141.     The injunctive relief requested is therefore necessary and appropriate.

## ELEVENTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### If the Commonwealth Did Not Transfer Ownership, Then It Equitably Assigned the Pledged Sales Tax to COFINA or Its Creditors

142. The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

143. If the Commonwealth did not effectuate a legally valid transfer of ownership of the future Pledged Sales Tax to COFINA, then it should be deemed to have equitably assigned the property to COFINA or its creditors.

144. The COFINA Enabling Act, in addition to the related Statements of Motives, numerous press releases, bond offering documents, and official statements and opinions, shows the Commonwealth's intent to transfer ownership to COFINA of the Dedicated Sales Tax Fund, and all funds deposited therein, including "all the future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions of [the COFINA Enabling Act]." P.R. Laws Ann. tit. 13 § 12. The statute expressly states that those funds and the Dedicated Sales Tax Fund "are hereby transferred to, and shall be the property of COFINA." *Id.* According to the COFINA Enabling Act, "[t]his transfer [was] made in exchange for, *and in consideration of* COFINA's commitment to pay, or establish mechanisms to pay, all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the accrued interest thereon …." *Id.* (emphasis added).

145. The COFINA Enabling Act also states that the Pledged Sales Tax (i) "shall be directly deposited in the [Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited into the Treasury of Puerto Rico," (ii) "nor shall [it] constitute resources available to

82

the Commonwealth of Puerto Rico," (iii) "nor shall [it] be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico." *Id.*

146.    COFINA's initial bond issuances, in 2007 and 2008, raised approximately $4.5 billion and $740 million, respectively, which funds were in fact transferred by COFINA to the Commonwealth for the purpose of paying the Commonwealth's extraconstitutional debt, as specified in P.R. Laws Ann. tit. 13 § 11a(b)(1).  The COFINA Enabling Act was amended in 2009 to significantly expand the purpose of COFINA to include, among other things, the payment, servicing and/or refinancing of various existing Commonwealth debt. *See id.* § 11a(b). In total, COFINA has issued over $16 billion in bonds, the proceeds of which were used for the Commonwealth's benefit.

147.    The Commonwealth's attempt now to take back ownership of the Pledged Sales Tax would result in its unjust enrichment, at COFINA and its creditors' detriment and great expense.  This dispute is immediate and real because the Commonwealth enacted the Compliance Law and has asserted claims against COFINA in order to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund.

148.    Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that, if the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA (i) the Commonwealth equitably assigned the Pledged Sales Tax, including all future Pledged Sales Tax, to COFINA or its creditors, as provided in the COFINA Enabling Act, and (ii) the equitable assignment gives rise to a property interest of COFINA or its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA.

## TWELFTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### If the Commonwealth Did Not Transfer Ownership, Then the Pledged Sales Tax Is Held In A Resulting Trust for the Benefit of COFINA

149.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

150.    If the Commonwealth did not effectuate a legally valid transfer of ownership of the future Pledged Sales Tax to COFINA, then the Pledged Sales Tax is held in a resulting trust for COFINA's and its creditors' benefit.

151.    The Commonwealth's intent to transfer ownership of the Dedicated Sales Tax Fund and the Pledged Sales Tax, including future Pledged Sales Tax, to COFINA is shown by the express provisions of the COFINA Enabling Act as well as the related Statements of Motives, and numerous Commonwealth press releases, bond offering documents, and official statements and opinions.

152.    The Commonwealth Agent alleges that "the revenues from the SUT are collected on behalf of the Commonwealth and deposited into a joint account of the GDB and COFINA." Compl ¶ 67.  To the extent any entity other than COFINA holds the Pledged Sales Tax, that entity (including the Commonwealth) was not intended by the Commonwealth to have a beneficial interest in that property.

153.    This dispute is immediate and real because the Commonwealth enacted the Compliance Law and has asserted claims against COFINA in order to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund.

154.     Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that, if the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA (i) the Pledged Sales Tax, including all future Pledged Sales Tax, is held in a resulting trust for the benefit of COFINA and its creditors, and (ii) the resulting trust gives rise to a property interest of COFINA and its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA.

## THIRTEENTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Commonwealth and the Permitted Intervenors

### If the Commonwealth Did Not Transfer Ownership, Then the Pledged Sales Tax Is Held In A Constructive Trust for the Benefit of COFINA

155.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

156.     If the Commonwealth did not effectuate a legally valid transfer of ownership of the future Pledged Sales Tax to COFINA and the Commonwealth in fact did not intend to transfer ownership of the future Pledged Sales Tax to COFINA, the Pledged Sales Tax must be held in constructive trust for COFINA.

157.     The Commonwealth's transfer of ownership of the Dedicated Sales Tax Fund and the Pledged Sales Tax, including future Pledged Sales Tax, to COFINA was effectuated through the COFINA Enabling Act.

158.     The Pledged Sales Tax is segregated in accounts at Banco Popular and BNYM. Per the COFINA Enabling Act, the Pledged Sales Tax is never deposited in the "Treasury of Puerto Rico." P.R. Laws Ann. tit. 13 § 12. And while the Pledged Sales Tax is not "available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico," *id.*, the

Commonwealth now seeks to take the Pledged Sales Tax for itself, in violation of its own law and as part of its fraud on COFINA and the COFINA Bondholders.

159.     The Commonwealth's misrepresentations, through the COFINA Enabling Act and its subsequent statements and actions, induced COFINA to issue over $16 billion of debt and commit to pay the extraconstitutional debt and other expenses of the Commonwealth. The Commonwealth's attempt now to take back ownership of the Pledged Sales Tax would result in its unjust enrichment, at COFINA and its creditors' detriment and great expense. This dispute is immediate and real because the Commonwealth enacted the Compliance Law and has asserted claims against COFINA in order to appropriate the Pledged Sales Tax and the Dedicated Sales Tax Fund.

160.     Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that, if the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA  (i)  the Pledged Sales Tax, including all future Pledged Sales Tax, is held in a constructive trust for the benefit of COFINA and its creditors, and has been since the creation of COFINA, and (ii) the constructive trust gives rise to a property interest of COFINA and its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA.

**FOURTEENTH CAUSE OF ACTION**

**Declaratory Judgment, 28 U.S.C. § 2201(a)**

**Against the Commonwealth and the Permitted Intervenors**

**If the Commonwealth Did Not Transfer Ownership, and COFINA
Does Not Have a Security Interest, the Bankruptcy Code and PROMESA
Preempt Any Priority of Payment in the Puerto Rico Constitution**

161.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

162.    If the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, and COFINA does not have an enforceable security interest in the same, then COFINA would still have an unsecured claim against the Commonwealth, and this claim would be at least *pari passu* with the unsecured claims of the Commonwealth's other creditors, including holders of the Commonwealth's GO Bonds, regardless of any priority afforded to the GO Bonds by the Puerto Rico Constitution.

163.    Holders of public debt, including GO Bondholders (collectively, the purported "Constitutional Debtholders"), cite to Article VI, Section 8 of the Puerto Rico Constitution in asserting that they have an "absolute first claim and lien on available resources of the Commonwealth."[13]  That section provides that when "the available resources including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursement shall thereafter be made in accordance with the order of priorities established by law."  P.R. Const., art. VI, § 8 (the "Commonwealth Priority Provision").

164.    This provision, however, does not apply in these proceedings.  Federal law preempts conflicting state or territory law under the Supremacy Clause of the U.S. Constitution. *See* U.S. Const. art. VI, cl. 2.  Federal law preempts even state or territorial constitutions. Consistent with this U.S. constitutional principle, Section 4 of PROMESA, entitled "Supremacy," states that "[t]he provisions of this Act shall prevail over any general or specific provisions of territory law, State law, or regulation that is inconsistent with this Act."  48 U.S.C. § 2103.  Likewise, the Bankruptcy Code, much of which is incorporated into Title III of PROMESA, has been held to preempt conflicting state and territorial laws.  PROMESA in turn

---

[13]  *See ACP Master, Ltd. v. Commonwealth of Puerto Rico*, Adv. Pro. No. 17-189-LTS [Docket No. 1] ¶ 28.

87

was enacted pursuant to Congress's powers under the Territory Clause of the U.S. Constitution, which are broad, plenary, and "practically unlimited." *Cincinnati Soap Co. v. U.S.*, 301 U.S. 308, 317 (1937).

165. Thus, to the extent the Puerto Rico Constitution or other laws of Puerto Rico—including the Commonwealth Priority Provision—require priorities that differ from those set forth in PROMESA and section 507(a) of the Bankruptcy Code, those laws are preempted in these cases. Indeed, the Oversight Board, as representative of the Commonwealth in its Title III case, has made this exact argument.[14] The representations of the Oversight Board are binding on the Commonwealth Agent. The Commonwealth Agent is therefore estopped from taking a contrary position in this litigation.

166. Accordingly, in the event the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, and COFINA does not have an enforceable security interest in the same, the COFINA Senior Bondholders' Coalition seeks a declaration that (i) any priority given to the purported Constitutional Debtholders under the Puerto Rico Constitution, including the Commonwealth Priority Provision, or under any other Puerto Rico law, is preempted by federal law, and (ii) the purported Constitutional Debtholders are entitled only to be repaid no more than *pari passu* with the Commonwealth's other unsecured creditors pursuant to section 507(a) of the Bankruptcy Code, made applicable to the Commonwealth's Title III case by section 301(a) of PROMESA.

---

[14] *See ACP Master, Ltd. v. Commonwealth of Puerto Rico*, Adv. Pro. No. 17-189-LTS [Docket No. 35] at 46-47.

**FIFTEENTH CAUSE OF ACTION**

**Declaratory Judgment, 28 U.S.C. § 2201(a)**

**Against the Commonwealth and the Permitted Intervenors**

**GO Bonds, "PBA" Bonds, and Other Debt Issued in Violation of
the Puerto Rico Constitution's Debt Limit Are Not Entitled to Priority**

167.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing

allegations as though they were fully set forth in this paragraph.

168.    GO Bonds issued after 2011 are not entitled to any priority of repayment over

COFINA Bonds because they were issued when the Commonwealth's general obligations

exceeded the constitutional debt service limit and thus are not entitled to the Commonwealth's

full faith and credit.

169.    Under the Puerto Rico Constitution, only bonds that are issued within the debt

limit are supported by the Commonwealth's full faith and credit.  As set forth in Article VI,

Section 2, the Commonwealth may not issue bonds backed by its "full faith credit and taxing

power" if:

> the total of (i) the amount of principal of and interest on such bonds and notes,
> together with the amount of principal of and interest on all such bonds and notes
> theretofore issued by the Commonwealth and then outstanding, payable in any
> fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next
> preceding the then current fiscal year for principal or interest on account of any
> outstanding obligations evidenced by bonds or notes guaranteed by the
> Commonwealth, shall exceed 15% of the average of the total amount of the
> annual revenues raised under the provisions of Commonwealth legislation and
> covered into the Treasury of Puerto Rico in the two fiscal years next preceding the
> then current fiscal year ….

*See* P.R. Const., art. VI, § 2.  This means that the Commonwealth is prohibited from issuing full

faith and credit public-debt bonds if (i) the amounts due on them "payable in any fiscal year"

plus (ii) the amounts paid for principal or interest "on account of" any bonds guaranteed in the

last fiscal year exceeds 15% of the average revenues deposited into the Treasury over the two

previous years. Moreover, the Commonwealth "shall not guarantee any obligations" if the 15%
debt service limit is exceeded. *Id.*

170.    That limit was breached in 2011. By March of that year, the average revenues for
the prior two fiscal years was approximately $7.3 billion. June 30, 2012 Year End Fin. Report at
292 (showing "Internal revenue average for two years"). At the same time, it was calculated that,
over the life of the bonds, the highest amount "payable" on GO Bonds "in any fiscal year"
(which the Official Statements refer to as the "future maximum annual debt service" amount),
was approximately $957.9 million. Mar. 2011 Series C Official Stmt. at 21 (showing debt
service requirements on GO Bonds). Adding the amount that the Commonwealth had paid the
prior year on bonds it guaranteed raises this number to approximately $968.4 million, which was
approximately 13.23% of average revenues (968.4 million divided by 7.3 billion). *See id.* at 22
(showing that the Commonwealth paid approximately $10.5 million on bonds it guaranteed).

171.    Other full faith and credit obligations also need to be added to complete the
calculation consistent with both the text of the Puerto Rico Constitution and its obvious purpose.
Between June 1995 and June 2012, the Commonwealth pledged its full faith, credit, and taxing
power to support more than $6.7 billion of bonds to fund its office buildings and other facilities.
June 8, 2012 PBA Official Stmt., Preamble ("The Bonds are … secured by the guaranty of the
Commonwealth … to draw from any funds available in the Department of Treasury"). These
bonds were issued through the Puerto Rico Public Buildings Authority ("PBA") and were
supported by rental payments on facilities that the PBA leased to the Commonwealth. The
Commonwealth's good faith and credit were also "pledged for the payment of rentals" on all of
its lease agreements with the PBA. *Id.* at 14.

172.    The economic substance and effect of these transactions is that the Commonwealth borrowed money from investors from the issuance of "PBA Bonds," and agreed to pledge its full faith and credit *twice* to repay the bonds through "rental payments" to the PBA and then a guarantee (with the same full faith and credit) of any shortfalls between the "rent" and the principal and interest payments due on the bonds.  Although the PBA has many bondholders, the Commonwealth is the PBA's only lessee.  *See id.* at 19 ("the [PBA] enters into lease agreements … with various departments [etc.] of the Commonwealth").  Moreover, the timing and amount of the Commonwealth's payments to the PBA is tied to the principal and interest requirements on the bonds.  *See id.* (showing that rentals owed by the Commonwealth "are calculated taking into account … Principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings").  When "rent" is due, the Treasury sends funds to the GDB under an Inter-Agency Agreement designed to speed up payment; funds from this "rent" are then used to service the PBA bonds.  *See id.* at 16.  Indeed, one time, there was an impromptu reduction in PBA's debt service requirements, and a corresponding reduction in the "rent" the Commonwealth had to pay for that period.  *See id.* at 17.  Given the nature of the PBA bonds' recourse, and its "double full faith protection," the "rental obligations and payments" by the Commonwealth were in fact "for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth."

173.    The only reason the PBA Bonds have yet to be included in the debt limit calculation, despite being supported by the full faith and credit of the Commonwealth (in two ways), is that the PBA acts as a conduit thereby creating the illusion that the Commonwealth does not have a direct obligation to PBA Bond investors.  Yet, the reality is to the contrary.  When the PBA Bonds are correctly accounted for, the Commonwealth's full faith and credit

obligations were approximately 15.1% of average revenues by March 2011—an amount that exceeded the constitutional debt limit. At that time, the Commonwealth issued $442 million of 2011 Series C GO Bonds. With this issuance, the Commonwealth's maximum debt service amount (considering both GO and PBA bonds) was approximately $1.1 billion (compared to average revenues at that time of approximately $7.3 billion).[15] By August 2011, the Commonwealth's obligations were approximately 15.3% of average revenues. And by the time the 2014 GO Bonds were issued in March 2014 (and including that issuance), the Commonwealth well exceeded the limit, with obligations of approximately 17.5% of average revenues.



174. As a result, no GO Bonds (or PBA Bonds) issued after 2011 can claim an entitlement to the Commonwealth's guarantee of full faith, credit and taxing power. *See* P.R. Const., art. VI, § 2 ("the Commonwealth shall not guarantee any obligations" if the debt limit is

---

[15] In other words, as of the March 2011 issuance, the maximum debt service the Commonwealth had to pay on both GO Bonds and PBA bonds in one year was approximately $1.1 billion in 2012.

exceeded). Without this, holders of these bonds also cannot claim any entitlement to the Commonwealth's "available resources" or the Commonwealth Priority Provision.

175.     Accordingly, in the event that COFINA only has an unsecured claim against the Commonwealth, the COFINA Senior Bondholders' Coalition seeks a declaration that holders of GO Bonds and PBA Bonds and any other debt issued after February 2011 in excess of the debt limit are entitled only to be repaid, at the most, *pari passu* with the Commonwealth's other unsecured creditors pursuant to section 507(a) of the Bankruptcy Code, made applicable to the Commonwealth's Title III case by section 301(a) of PROMESA.

## SIXTEENTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against the Permitted Intervenors

### Claims Seeking To Challenge the Validity of COFINA Are Barred by Laches, Estoppel, and *Actos Propios*

176.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

177.     Any claim for equitable relief sought by Permitted Intervenors challenging the validity of COFINA are barred by the doctrines of laches and estoppel.  GO Bondholders in particular have challenged COFINA's ownership of the Pledged Sales Tax[16] but that challenge was inexcusably late, coming only last year after tens of billions of dollars in general obligations and COFINA Bonds had been issued and serviced on the basis of COFINA's property rights being segregated from the General Fund and unavailable to the Commonwealth.

178.     Most of these GO Bondholders acquired their bonds after COFINA was created, and thus knew from the outset that payment on their bonds could not be made from the Pledged

---

[16]     *See Lex Claims, LLC v. Alejandro García Padilla*, No. 16-civ.-2374 (FAB) (D. P.R.).

Sales Tax because COFINA owned it.  That point was made abundantly clear in the documents pursuant to which the GO Bonds were issued.  The 2014 documents, for example, affirm no less than **eight times** that the Pledged Sales Tax is not available to pay the 2014 GO Bonds.  They stated that the Pledged Sales Tax does "not constitute 'available resources' … and [is] not available for use by the Secretary of the Treasury."  2014 Official Stmt. at 29.  They also made clear that the reason for this was that the "legislation creating COFINA … **transfers ownership** of [the Dedicated Sales Tax] to COFINA."  *Id.* at 31 (emphasis added).  Similar statements appeared in the offering documents for the bond issuances before 2014.  Pre-COFINA bondholders likewise do not have any excuse for their delay because they could have challenged COFINA's enabling legislation or any of its amendments in the last 10 years.

179.    In addition to opportunity and notice, the bondholders also had the means to challenge the validity of the Pledged Sales Tax.  In 2009, legislation was enacted which expanded COFINA and transferred additional funds to it.  That legislation conferred jurisdiction to the Supreme Court of Puerto Rico to "resolve any matter … when the issue is the validity or constitutionality" of the COFINA-enabling laws.  Act 7-2009 § 69.  Despite this jurisdictional grant, no one ever challenged COFINA's ownership to the Pledged Sales Tax and the Dedicated Sales Tax Fund.

180.    The GO Bondholders also improperly benefitted from their silence until now.  To compensate for the unsecured nature of their investment, the GO Bondholders received higher effective interest rates than those paid on COFINA Bonds.  The purchasers of 2014 GO Bonds, in particular, bargained for an effective interest rate (accounting for the OID and funds earmarked for interest payments back to them) of approximately 9.1%—a rate higher than that which would be considered usurious under Puerto Rico law.  *See* P.R. Laws Ann. tit. 10 § 998

94

(limiting the rate on loans greater than $3,000 to 8%). And they collected this benefit—
amassing over $500 million in profit.

181.    Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that
Permitted Intervenors challenging the validity of COFINA are barred by the doctrines of laches,
estoppel, and *actos propios* from seeking any independent equitable relief in these cases.

## SEVENTEENTH CAUSE OF ACTION

### Declaratory Judgment, 28 U.S.C. § 2201(a)

### Against 2014 GO Bondholders

### 2014 GO Bondholders Contractually Disclaimed Any Entitlement to the Pledged Sales Tax

182.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing
allegations as though they were fully set forth in this paragraph.

183.    The 2014 GO Bondholders are among those who have challenged COFINA's
ownership of the Pledged Sales Tax and Dedicated Sales Tax Fund. But they are independently
prohibited from asserting this challenge because they contractually disclaimed any entitlement to
that property.

184.    These bondholders negotiated for New York law to apply to their contract—the
2014 Resolution. Under the 2014 Resolution, the 2014 GO Bondholders consented to the
complete exclusion of the Pledged Sales Tax from their funding sources. Under the contract's
repayment provisions, the 2014 GO Bondholders are entitled to payment only from "any funds in
the Treasury of the Commonwealth." 2014 Resolution, § 19. If the Commonwealth did not pay
principal or interest on the bonds from the "funds in the Treasury," the 2014 GO Bondholders
agreed that their remedy would be to "compel the Secretary of the Treasury to apply available
Commonwealth resources to the payment of the Bonds ...." *Id.* at § 20(a) (emphasis added).
The agreement is unambiguous as to what was *not* included in these amounts, stating that

COFINA's revenues "do not constitute 'available resources' of the Commonwealth." 2014
Official Stmt. at 29. And these were not "available resources" precisely because the "legislation
creating COFINA … *transfers ownership* of [the Dedicated Sales Tax] to COFINA." *Id.* at 31
(emphasis added).

185.    As a result, regardless of whether the COFINA structure is valid and COFINA
owns the Pledged Sales Tax and Dedicated Sales Tax Fund, the 2014 GO Bondholders
contractually agreed that they could not receive repayment from these sources.

186.    Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that
the 2014 GO Bondholders are contractually barred from receiving any funds from the Pledged
Sales Tax and Dedicated Sales Tax Fund, whether directly or through the Commonwealth.

### EIGHTEENTH CAUSE OF ACTION

### Unjust Enrichment

### Against the Commonwealth and the GO Bondholders

187.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing
allegations as though they were fully set forth in this paragraph.

188.    If the COFINA Senior Bondholders' interests are unsecured, then the
Commonwealth and the GO Bondholders have been unjustly enriched at the expense of the
COFINA Senior Bondholders.

189.    Based on the representation and assurances that COFINA owned a dedicated
revenue stream in the form of the Pledged Sales Tax and the Dedicated Sales Tax Fund,
COFINA Bonds earned much less than the Commonwealth's unsecured debt. Indeed, COFINA
Bonds have been the most cost-effective source of financing for the Commonwealth since the
2006 financial crisis, providing estimated savings of between $66 million and $132 million for

every $1 billion of COFINA Bonds issued. Overall, according to the GDB, COFINA saved the Commonwealth between $1.1 and $2.2 billion in borrowing costs.

190. By contrast, GO Bonds consistently garnered a higher interest rate than COFINA Bonds because of the risk of lending on an unsecured basis against the financial health of the Commonwealth's general fund. That rate peaked with the 2014 issuance of GO Bonds, which charged 8%. This significant rate for municipal debt was on top of an OID of 7% of the face amount that the 2014 GO Bondholders negotiated to enrich their deal. This meant that the Commonwealth issued and promised to repay $3.5 billion but in exchange received only $3.255 billion from the bondholders. Moreover, $422.7 million of proceeds from the bonds were earmarked for the payment of interest on the bonds, meaning this money was unavailable to the Commonwealth. Adjusting for the effect of this amount and the OID, the interest rate on the 2014 GO Bonds was in economic substance 9.1%. Thus, whereas the weighted average cost of COFINA Bonds has been about 5.75%, for the GO Bonds (accounting for these incentives) it has been about 6.37%. The GO Bondholders understood that, in exchange for this higher interest rate, they had absolutely no claim to COFINA's revenues.

191. If the Commonwealth and the GO Bondholders are correct that COFINA Bonds are unsecured *and* of lower priority than the GO Bonds, then the Commonwealth and the GO Bondholders will have unjustly profited from COFINA and its creditors because the Pledged Sales Tax was created for COFINA and its creditors but will be used to repay GO Bonds. The Commonwealth will have paid billions of its outstanding extraconstitutional debt using COFINA borrowings that should have been far more expensive than they were. This inequity is compounded by the Commonwealth's and the GO Bondholders' complete about-face. Had they challenged COFINA at its inception rather than remain silent or tout the contrary position (that

COFINA owned the Pledged Sales Tax), then the COFINA Bonds would have been priced commensurate with unsecured, subordinated debt, as the Commonwealth now claims the COFINA Bonds are, and investors would not have purchased the bonds for far more than they were worth.

192.   The Commonwealth's and the GO Bondholders' wrongful actions renders their acceptance and retention of the benefits of the Pledged Sales Tax and the costs savings associated with the COFINA Bonds highly unjust and inequitable.

193.   Equity and good conscience therefore require the Commonwealth and the GO Bondholders to disgorge these ill-gotten gains.

### NINETEENTH CAUSE OF ACTION

### Contractual Subordination, 11 U.S.C. § 510(a), PROMESA § 301(a)

### Against the Permitted Intervenors

### If the Commonwealth Did Not Transfer Ownership, and COFINA Does Not Have a Security Interest, Claims By GO Bondholders Are Subordinated By Agreement

194.   The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

195.   If the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, and COFINA does not have an enforceable security interest in the same, then COFINA would still have an unsecured claim against the Commonwealth.  The COFINA Senior Bondholders would also have a claim against the Commonwealth for, among other things, violations of the COFINA Enabling Act, violations of the affirmation of the Commonwealth's commitments in the Resolution, and violations of the COFINA Senior Bondholders' statutory and constitutional rights.  As creditors of the Commonwealth, COFINA and the COFINA Senior Bondholders would have standing to object to the claims of the Commonwealth's other creditors.

196.     A subordination agreement is enforceable in bankruptcy to the same extent such agreement is enforceable under applicable non-bankruptcy law.

197.     All claims of GO Bondholders who ratified, confirmed, and/or approved as part of their investment that the Pledged Sales Tax was unavailable to them agreed their rights were subordinate to COFINA's with respect to such funds.

198.     Subordination of the claims of such GO Bondholders to those of COFINA and its creditors is consistent with section 510(a) of the Bankruptcy Code.

### TWENTIETH CAUSE OF ACTION

### Equitable Subordination, 11 U.S.C. § 510(c), PROMESA § 301(a)

### Against the Permitted Intervenors

### If the Commonwealth Did Not Transfer Ownership, and COFINA Does Not Have a Security Interest, Claims By GO Bondholders Should Be Equitably Subordinated

199.     The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing allegations as though they were fully set forth in this paragraph.

200.     If the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, and COFINA does not have an enforceable security interest in the same, then COFINA would still have an unsecured claim against the Commonwealth.  The COFINA Senior Bondholders would also have a claim against the Commonwealth for, among other things, violations of the COFINA Enabling Act, violations of the affirmation of the Commonwealth's commitments in the Resolution, and violations of the COFINA Senior Bondholders' statutory and constitutional rights.  As creditors of the Commonwealth, COFINA and the COFINA Senior Bondholders would have standing to object to the claims of the Commonwealth's other creditors.

201.     The Court should exercise the full extent of its equitable powers to ensure that the unsecured claims of the GO Bondholders, and only to the extent such claims are allowed, are

subordinated to any claim that COFINA and the COFINA Senior Bondholders have against the
Commonwealth pursuant to section 510(c) of the Bankruptcy Code.

202.    Equitable subordination would be consistent with the provisions and purposes of
the Bankruptcy Code.

## TWENTY-FIRST CAUSE OF ACTION

## Declaratory Judgment, 28 U.S.C. § 2201

## Against the Commonwealth

### Post-Petition Transfer of the Pledged Sales Tax to Entities
### Other Than COFINA Violates the Automatic Stay

203.    The COFINA Senior Bondholders' Coalition repeats and realleges the foregoing
allegations as though they were fully set forth in this paragraph.

204.    Subject to certain inapplicable exceptions, section 362(a)(3) of the Bankruptcy
Code, as made applicable to these Title III cases by section 301(a) of PROMESA (48 U.S.C.
§ 2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities,
of … any act to obtain possession of property of the estate or of property from the estate or to
exercise control over property of the estate."

205.    Subject to certain inapplicable exceptions, section 362(a)(6) of the Bankruptcy
Code, as made applicable to these Title III cases by section 301(a) of PROMESA (48 U.S.C.
§ 2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities,
of … any act to collect, assess, or recover a claim against the debtor that arose before the
commencement of the case."

206.    The Oversight Board commenced COFINA's Title III case by filing a petition on
May 5, 2017.  Accordingly, any attempt by the Commonwealth to invade the Pledged Sales Tax
or the Dedicated Sales Tax Fund constitutes an act to obtain possession of COFINA's property,

to exercise control over COFINA's property, and to collect, assess, or recover a claim against
COFINA that arose before COFINA's petition date and is therefore in violation of sections
362(a)(3) and 362(a)(6) of the Bankruptcy Code.

207.     Accordingly, the COFINA Senior Bondholders' Coalition seeks a declaration that
the Commonwealth's attempts to interfere with COFINA's property rights to the Pledged Sales
Tax or the Dedicated Sales Tax Fund are in violation of section 362(a) of the Bankruptcy Code.

## PRAYER FOR RELIEF

WHEREFORE, the COFINA Senior Bondholders' Coalition respectfully requests
judgment as follows:

   a. (First Cause of Action) declaring that: (i) the statutes creating COFINA and
      transferring ownership of the Pledged Sales Tax and the Dedicated Sales Tax Fund to
      COFINA are constitutional under the Constitution of Puerto Rico; (ii) the Pledged
      Sales Tax, including all Pledged Sales Tax revenue collected in the future, and the
      Dedicated Sales Tax Fund are the property of COFINA; and (iii) the Pledged Sales
      Tax and the Dedicated Sales Tax Fund are not "available resources" under the
      Constitution of Puerto Rico;

   b. (Second and Fourth Causes of Action) declaring that the Commonwealth's
      misappropriation of the Pledged Sales Tax and/or the Dedicated Sales Tax Fund
      would constitute violations of the Takings Clauses and the Contract Clauses of the
      Constitutions of the United States and the Commonwealth of Puerto Rico and the Due
      Process Clause of the Constitution of the United States;

   c. (Third Cause of Action) declaring that any award of just compensation or damages
      for violation of the U.S. and Puerto Rico Takings Clauses cannot be impaired by a
      PROMESA plan of adjustment or an order confirming a PROMESA plan of
      adjustment;

   d. (Fifth Cause of Action) declaring that the Commonwealth's misappropriation of the
      Pledged Sales Tax and/or the Dedicated Sales Tax Fund through the Compliance Law
      violates sections 303(1) and 407(a) of PROMESA;

   e. (Sixth Cause of Action) if the Commonwealth acquires property subject to the
      COFINA bondholders' liens, declaring that the COFINA Senior Bondholders
      are secured creditors to the full extent of their claims against the Commonwealth;

   f. (Seventh Cause of Action) declaring that: (i) the reduction of the amount of SUT
      proceeds COFINA receives from 6% to 5.5%, implemented by Act 84, is void and

invalid because it violates PROMESA; and (ii) COFINA is entitled to 6% of the SUT proceeds collected by the Commonwealth until the Pledged Base Amount is reached in a given year;

g.  (Tenth Cause of Action) permanently enjoining the Commonwealth from:

    1.  diverting or transferring the Pledged Sales Tax proceeds, including all Pledged Sales Tax revenue collected in the future, or the funds in the Dedicated Sales Tax Fund away from COFINA and COFINA's creditors;

    2.  designating the Pledged Sales Tax proceeds, including all Pledged Sales Tax proceeds collected in the future, or the funds in the Dedicated Sales Tax Fund as "available resources" under the Constitution of Puerto Rico;

    3.  taking any action to "breach, revoke, and/or reject" the transfer of the Pledged Sales Tax, including all Pledged Sales Tax collected in the future, or the Dedicated Sales Tax Fund to COFINA and for the benefit of COFINA's creditors;

    4.  taking any action to interfere with or attempt to interfere with COFINA's rights or the rights of its creditors to the Pledged Sales Tax, including all Pledged Sales Tax collected in the future, or the Dedicated Sales Tax Fund; and

    5.  taking any action to interfere with or attempt to interfere with COFINA's rights and obligations under the Resolution;

h.  if the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA:

    1.  (First Cause of Action) declaring that (i) COFINA has a perfected and unavoidable lien in the stream of Pledged Sales Tax pursuant to applicable bankruptcy and non-bankruptcy law; or (ii) there is an enforceable subordination agreement whereby the Commonwealth agreed to subordinate any interest it may have in the stream of Pledged Sales Tax to COFINA's and its creditors' interest in the stream of Pledged Sales Tax;

    2.  (Eleventh Cause of Action) alternatively, declaring that: (i) the Commonwealth equitably assigned the Pledged Sales Tax, including all future Pledged Sales Tax, to COFINA or its creditors, as provided in the COFINA Enabling Act; and (ii) the equitable assignment gives rise to a property interest of COFINA or its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA;

    3.  (Twelfth Cause of Action) alternatively, declaring that: (i) the Pledged Sales Tax, including all future Pledged Sales Tax, is held in a resulting trust for the benefit of COFINA and its creditors; and (ii) the resulting trust gives rise to a property interest of COFINA and its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA;

i.   (Eighth, Ninth, and Thirteenth Causes of Action) recognizing or imposing a constructive trust in COFINA's or the COFINA Senior Bondholder's favor over the Pledged Sales Tax, including all Pledged Sales Tax revenue collected to date and to be collected in the future, and the Dedicated Sales Tax Fund; and ruling that such property has been so held since the creation of COFINA and that the constructive trust gives rise to a property interest of COFINA and its creditors in the Pledged Sales Tax, including all future Pledged Sales Tax, that is not a claim subject to discharge under the Bankruptcy Code or PROMESA;

j.   if the Commonwealth did not transfer ownership of the Pledged Sales Tax to COFINA, and COFINA does not have an enforceable security interest in the same:

   1.   (Fourteenth Cause of Action) declaring that (i) any priority given to the purported Constitutional Debtholders under the Puerto Rico Constitution, including the Commonwealth Priority Provision, or under any other Puerto Rico law, is preempted by federal law, and (ii) the purported Constitutional Debtholders are entitled only to be repaid no more than *pari passu* with the Commonwealth's other unsecured creditors pursuant to section 507(a) of the Bankruptcy Code;

   2.   (Nineteenth and Twentieth Causes of Action) under sections 510(a) and 510(c) of the Bankruptcy Code, subordinating the claims of GO Bondholders for purposes of distribution, such that no claim of these creditors is paid ahead of any claim by the COFINA Senior Bondholders;

k.   (Fifteenth Cause of Action) if COFINA only has an unsecured claim against the Commonwealth, declaring that holders of GO Bonds and PBA Bonds and any other debt issued after February 2011 in excess of the debt limit are entitled only to be repaid no more than *pari passu* with the Commonwealth's other unsecured creditors pursuant to section 507(a) of the Bankruptcy Code, made applicable to the Commonwealth's Title III case by section 301(a) of PROMESA;

l.   (Sixteenth Cause of Action) declaring that Permitted Intervenors challenging the validity of COFINA are barred by the doctrines of laches, estoppel, and *actos propios* from seeking any independent equitable relief in these cases;

m.   (Seventeenth Cause of Action) declaring that the 2014 GO Bondholders are contractually barred from receiving any funds from the Pledged Sales Tax and Dedicated Sales Tax Fund;

n.   (Eighteenth Cause of Action) if the COFINA Senior Bondholders' interests are unsecured, disgorging the Commonwealth's and the GO Bondholders' unjust benefits and awarding compensatory damages in an amount to be determined at trial together with prejudgment interest at the maximum rate allowable by law;

o.   (Twenty-First Cause of Action) declaring that the Commonwealth's attempts to interfere with COFINA's property rights to the Pledged Sales Tax or the Dedicated Sales Tax Fund are in violation of section 362(a) of the Bankruptcy Code; and

p.  awarding such other relief, in law and equity, as the Court deems just and proper.

DATED:  November 6, 2017

Respectfully submitted,

REICHARD & ESCALERA

By :  */s/ Rafael Escalera*
      **Rafael Escalera**
      USDC No. 122609
      escalera@reichardescalera.com

      */s/ Sylvia M. Arizmendi*
      **Sylvia M. Arizmendi**
      USDC-PR 210714
      arizmendis@reichardescalera.com

      */s/ Carlos R. Rivera-Ortiz*
      **Carlos R. Rivera-Ortiz**
      USDC-PR 303409
      riverac@reichardescalera.com

      */s/ Gustavo A. Pabón-Rico*
      **Gustavo A. Pabón-Rico**
      USDC-PR 231207
      pabong@reichardescalera.com

      */s/ Zarel J. Soto-Acabá*
      **Zarel J. Soto-Acabá**
      USDC-PR 231913
      zsoto@reichardescalera.com

255 Ponce de León Avenue
MCS Plaza, 10th Floor
San Juan, Puerto Rico 00917-1913
      Co-Counsel for the COFINA Senior Bondholders' Coalition

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Eric Winston** (*pro hac vice*)
ericwinston@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Brant Duncan Kuehn** (*pro hac vice*)
brantkuehn@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603