Case:17-00257-LTS Doc#:975-27 Filed:01/12/19 Entered:01/12/19 17:45:34 Desc: Main Document Page 1 of 305

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| *In re* | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, et al. | (Jointly Administered) |
| Debtors.[1] | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | PROMESA Title III |
| as agent of | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | No. 17-00257 (LTS) |
| as representative of | |
| THE COMMONWEALTH OF PUERTO RICO, | |
| Plaintiff, | |
| v. | |
| BETTINA WHYTE, | |
| as agent of | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | |
| Defendant. | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

DX-CC

**INTERVENOR-DEFENDANT AND COUNTERCLAIMANT AMBAC
ASSURANCE CORPORATION'S ANSWER AND AFFIRMATIVE DEFENSES
TO THE UNSECURED CREDITOR COMMITTEE'S AMENDED COMPLAINT
<u>AND COUNTERCLAIMS AGAINST THE COMMONWEALTH</u>**

Intervenor-Defendant and Counterclaimant Ambac Assurance Corporation ("<u>Ambac</u>"), by

and through its attorneys, Ferraiuoli LLC and Milbank, Tweed, Hadley & McCloy LLP, hereby

answers and responds to the Amended Complaint ("<u>Complaint</u>") filed by the Official Committee

of Unsecured Creditors of the Commonwealth of Puerto Rico (the "<u>Commonwealth Agent</u>") as

agent of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), and asserts counterclaims

against the Commonwealth.[2]  Ambac is entitled to intervene as of right in this proceeding pursuant

to the Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute

(Case 17-0328; Dkt. No. 996) (the "<u>Stipulation</u>").

<u>**COUNTERCLAIMS AGAINST THE COMMONWEALTH**</u>

<u>**PRELIMINARY STATEMENT**</u>

1.      In 2006, the Commonwealth was embroiled in a fiscal crisis that was, at the time,

the worst in its history.  As part of a broad-based budget restructuring program designed to address

these fiscal problems, the Commonwealth decided to create a new stream of sales-and-use tax

revenues.  The Commonwealth declared these revenues the property of, and transferred ownership

thereof to, a newly established independent financing entity, which it authorized to issue bonds

secured by these revenues.  The purpose of this financing entity, the Puerto Rico Sales Tax

Financing Corporation ("<u>COFINA</u>"), was twofold: to issue bonds secured by this stream of

dedicated sales-and-use tax ("<u>DST</u>") revenues, and to use the bonds' sale proceeds to, for example,

---

[2]      Heeding the Court's desire "to avoid duplication and undue burdens on the Court" (Stipulation ¶ 5), Ambac
is not currently asserting counterclaims duplicative of those alleged in the Amended Answer, Defenses, And
Counterclaims of the Appointed Agent of the Puerto Rico Sales Tax Financing Corporation (COFINA) (Case 17-
00257; Dkt. No. 75), filed on October 30, 2017 (the "<u>COFINA Agent Counterclaims</u>").  However, if the COFINA
Agent is later found to lack the power to assert any of the COFINA Agent Counterclaims, Ambac reserves the right
to amend its pleadings to include some or all of the COFINA Agent Counterclaims.

pay down Commonwealth debts and expenses, stimulate the Puerto Rico economy, and fund emergency disaster relief accounts.

2. The Commonwealth shielded COFINA with an impregnable series of protections that guaranteed COFINA would receive an uninterrupted stream of DST revenues from which to repay its bonds. The Commonwealth broadcast these protections into the bond markets to help market and sell the COFINA bonds, and potential investors relied on these protections when deciding whether to purchase COFINA bonds.

3. The Commonwealth also ensured the DST revenues would be the exclusive property of COFINA by imposing the DST for the sole benefit of COFINA, immediately transferring full and complete ownership of the DST revenue stream to COFINA, and authorizing COFINA to issue bonds backed by the DST revenue stream. The Commonwealth made clear that such COFINA bonds were not debts of the Commonwealth and were not backed by a pledge of the Commonwealth's full faith and credit.

4. To insulate COFINA from the financial position of the Commonwealth, and protect COFINA's property from the risk of future appropriation by the government, the Commonwealth wove numerous protections into the statutes creating COFINA. For example, DST revenues are deposited into an account owned by COFINA and not into the Commonwealth's General Fund, making the revenue stream inaccessible to the Secretary of the Treasury. The statutes also provide that the DST revenues are the property of COFINA and are not "available resources" under Article VI, Section 8 of the Puerto Rico Constitution.

5. Article VI, Section 8 of the Puerto Rico Constitution guides the executive branch's disbursement of funds should the Commonwealth's "available resources" for a fiscal year be insufficient to meet the legislative appropriations for that fiscal year. P.R. Const. art. VI, § 8. In

3

such an event, the Commonwealth's "available resources" must first be applied to all remaining public debt payments for that fiscal year, and all other disbursements must thereafter be made in accordance with an order of priorities established by law.  *Id.* § 8.  "[A]vailable resources" are those funds that have been "covered into the Treasury of Puerto Rico."  *Id.* § 2.

6.     In short, by making the DST revenue stream unavailable to the government, the Commonwealth codified that, in times of financial distress, COFINA bondholders would continue to be repaid from their DST revenues, and general obligation ("GO") bondholders would continue to be repaid from any available resources in the General Fund.  The Commonwealth repeatedly proclaimed the independence and legality of the COFINA structure to the public, including to all purchasers of GO debt issued after COFINA's creation—explicitly informing each GO bondholder that COFINA's DST revenue stream could never be used to repay their bonds under any circumstance.

7.     Further demonstrating its commitment to guaranteeing the free flow of DST revenues to COFINA and its bondholders, the Commonwealth took the additional step of including three overlapping statutory covenants[3] that prohibit the Commonwealth from negatively impacting COFINA's ability to repay its bondholders (or any other obligation), or impairing any of the rights granted to COFINA by the Commonwealth.

8.     Ambac directly and reasonably relied on these statutory covenants in deciding to insure COFINA bonds with a face amount of $808.5 million at issuance and a net accreted value of approximately $1.35 billion today.

_____

[3]     The Commonwealth covenanted to "not limit nor restrain" (1) "the rights or powers hereby conferred by this Act" or (2) "the rights of COFINA to meet its agreements with bondholders until such time as such bonds, regardless of their date, together with the interest accrued, shall be completely paid and redeemed."  The Commonwealth further covenanted that (3) "[n]o amendment to Act No. 91 . . . shall undermine any obligation or commitment of COFINA." Act 56 of July 5, 2007.

4

9. The Commonwealth then caused these statutory covenants to be reiterated in the resolutions governing the COFINA bonds. These resolutions constituted new and independent contracts that directly benefitted Ambac. Ambac also relied on this independent source of contractual covenants and protections when it decided to insure COFINA bonds.

10. Ambac further relied on two additional Commonwealth assurances issued by the Secretary of Justice of the Commonwealth: (1) an opinion letter, which stated that every aspect of COFINA's structure, and each of the Commonwealth's statutory protections and covenants, were valid, constitutional, and fully effective and enforceable against the Commonwealth; and (2) a certification, which affirmed that all information contained in the official statements governing the COFINA bonds—which reaffirmed the Commonwealth's statutory protections and covenants— was accurate, truthful, and contained no misstatements or omissions of material facts. The value and marketability of the COFINA bonds, as well as the favorable rate of interest the Commonwealth was obliged to pay, were undeniably based on the Commonwealth's statutory protections, covenants, and assurances.

11. Since COFINA's creation, recognizing the benefits of the structure to the Commonwealth, the Commonwealth has repeatedly increased the size of the DST revenue stream owned by COFINA and authorized COFINA to issue approximately $17 billion worth of bonds (net accreted value). Over that same period, the Commonwealth strengthened its protection of COFINA's DST revenue stream—adding additional statutory covenants to prohibit, for example, the Commonwealth from removing its officials' power to transfer the DST revenues to COFINA; expanding the direct beneficiaries of those covenants; and providing new assurances as to the constitutionality and legality of COFINA's structure. Each of these expanded safeguards was also reiterated in COFINA's bond resolutions.

5

12.     Upon issuing its bonds, COFINA honored its commitments to the Commonwealth by allocating the COFINA bond proceeds in accordance with its statutory mandate.

13.     For a decade, the Commonwealth also honored its commitments to COFINA.  But in 2016, GO bondholders—as a direct result of GO bond defaults caused by the Commonwealth violating its constitutional duty to prioritize payment of GO debt from available resources in the General Fund—launched an attack on COFINA's constitutionality, suing Commonwealth officers in an attempt to divert COFINA's stream of DST revenues and apply them to the GO bond payments the Commonwealth refused to make.  Rather than honor its constitutional commitments, however, the Commonwealth chose to abdicate its responsibilities, and refused to even affirm that it believed COFINA was constitutional.

14.     The Commonwealth's purported neutrality on COFINA, however, was short-lived. The Commonwealth soon began to devise a fiscal plan predicated on appropriating COFINA's DST revenues.  Once the fiscal plan was certified, the Commonwealth then passed new legislation to implement that fiscal plan and effectuate the misappropriation of COFINA's property.

15.     Now, through a Complaint filed on its behalf by the Commonwealth Agent, the Commonwealth is affirmatively seeking to tear down the COFINA structure and strip COFINA of its exclusive ownership of the DST revenue stream pledged to its bonds.  To accomplish this, the Commonwealth brazenly impugns its own motives for creating COFINA—alleging that COFINA was always unconstitutional because the Commonwealth created COFINA for the purpose of issuing illegal and unconstitutional debt.  In so doing, the Commonwealth has violated each of its covenants.

16.     If the Commonwealth Agent were to establish the allegations underlying its claims challenging the constitutionality of COFINA (*i.e.*, the Twelfth and Thirteenth Causes of Action),

then COFINA was merely an elaborate scam to circumvent the Puerto Rico Constitution and issue unlawful and unconstitutional public debt. In other words, a victory for the Commonwealth on these Causes of Action would mean that the Commonwealth perpetrated a $17 billion fraud on its investors and insurers by wrapping those allegedly illegal bonds in a mantle of unwarranted legitimacy and safety to help con investors and insurers.

*       *       *

17.     In view of the foregoing, and set forth more fully below, Ambac hereby alleges both direct and contingent counterclaims.

18.     <u>Direct counterclaims</u>. The Commonwealth has breached its contracts with Ambac by affirmatively advocating to deprive Commonwealth officials of their power to transfer DST revenues to COFINA, to divest COFINA of the power to fulfill its statutory mandates, to declare COFINA's structure unconstitutional and invalid, and to strip COFINA of all present and future funds from which it could pay its current and future obligations. These breaches could be neither bolder nor clearer.

19.     In the alternative, the Commonwealth has failed to satisfy its implied contractual duties in good faith. The Commonwealth must indemnify Ambac for all losses that flow from these express or implied breaches.

20.     <u>Contingent counterclaims</u>. If the Commonwealth Agent succeeds in establishing the allegations supporting its Twelfth and Thirteenth Causes of Action, then the Commonwealth induced Ambac—through fraudulent misrepresentations, omissions, and deceit (*dolo*)—into insuring billions of dollars of COFINA bonds.

21.     Additionally, any delay in transferring—or loss in value of—the DST revenues flowing to COFINA will constitute a substantial impairment of COFINA's (and Ambac's) contract

7

rights (which impairment is neither reasonable nor necessary to an important public purpose), and an unconstitutional taking of property without just compensation or due process of law—all in violation of the Contracts, Takings, and Due Process Clauses of the U.S. Constitution.

22.     Finally, if the Commonwealth Agent establishes that COFINA's structure violates Article VI, Section 8 of the Puerto Rico Constitution by rendering the DST revenues unavailable to the Commonwealth, then COFINA is entitled to a declaration that the proper (and complete) remedy for that alleged violation is to make COFINA's DST revenue stream subject to "clawback." Once transformed into revenue bonds subject to clawback, the Puerto Rico Constitution and statutory payment priority require COFINA bonds to be paid immediately after GO debt (and before any other Commonwealth debts or expenses).

## **THE PARTIES**

23.     Ambac is a Wisconsin-domiciled stock insurance corporation with its principal place of business at One State Street Plaza, New York, New York 10004.

24.     Ambac is a monoline financial guaranty insurer that provides financial guarantees to the United States and global public finance, infrastructure, and structured finance markets. It insures approximately $1.35 billion (net accreted value) in Series 2007A COFINA bonds and directly holds approximately $534 million (net accreted value) in COFINA bonds.

25.     Ambac brings this action to protect and enforce its rights under the U.S. Constitution, duly enacted federal law, and Commonwealth law, as described below.

26.     Counterclaim Defendant the Commonwealth is a territory of the United States.

27.     Counterclaim Defendant the Commonwealth Agent (the Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico) serves as the agent of Commonwealth in this dispute pursuant to the Stipulation.

## JURISDICTION AND VENUE

28.     This Court has jurisdiction over the subject matter of this adversary proceeding pursuant to section 306(a) of PROMESA (48 U.S.C. § 2166(a)).  The parties also agreed to the jurisdiction of this Court pursuant to the Stipulation.

29.     Venue is proper in this district pursuant to section 307(a) of PROMESA (48 U.S.C. § 2167(a)) and 28 U.S.C. § 1391(b).  The parties also agreed to venue in this district pursuant to the Stipulation.

30.     The Commonwealth is not protected by sovereign immunity because, among other things, the Commonwealth waived its sovereign immunity with respect to any claims related to the facts and claims in its Complaint, including these counterclaims, due to its initiation of the Complaint, and its continued participation in these Title III cases.

31.     These counterclaims present an actual controversy that is ripe for adjudication.  As described below, the Commonwealth has breached its contractual obligations to Ambac and, contingent upon certain findings or declarations made by this Court, has engaged in fraudulent conduct and/or violated the Contracts, Takings, and Due Process Clauses of the U.S. Constitution. In the event COFINA defaults on its payments to holders of the Series 2007A Bonds as a result, Ambac may be required to pay claims under its financial guaranty insurance policy insuring such Bonds (the "Policy"; attached hereto as Ex. A).

## FACTUAL ALLEGATIONS

I.     **The Commonwealth Creates COFINA, Transfers Property to It, And Imbues It With Ironclad Statutory and Contractual Protections.**

32.     In 2006, Puerto Rico faced an exigent financial and economic crisis—at the time one of the worst in the Commonwealth's history.  *See* Act of May 13, 2006, No. 91-2006, 2006 P.R. Laws 246, 247 (codified as amended at P.R. Laws Ann. tit. 13, § 12).  As a result, the

Commonwealth had an urgent need for financing in difficult market conditions. To meet this need, the Puerto Rico Legislative Assembly established COFINA, "a corporate and political entity independent and separate from the Commonwealth of Puerto Rico" created "for the purpose of issuing bonds and utilizing other financing mechanisms." 13 L.P.R.A. §§ 11a(a)-(b).

33.    To enable COFINA to fulfill its statutory purpose, the Commonwealth followed the blueprints of other constitutionally upheld structures used to securitize state and municipal revenue streams: it transferred property to COFINA (ownership of a dedicated revenue stream and the bank account that the stream flows into), shielded that property from any future impairment or diminution (*e.g.*, at most, the property can be replaced only with equally protected property sufficient to make all future debt service payments), authorized COFINA to pledge that property as collateral for future bond issuances, and provided that such collateral would be subject to a statutory lien in favor of COFINA's bondholders. *See* 13 L.P.R.A. §§ 12-14.

34.    The statute establishing COFINA's structure, Act 91, creates a revenue stream through which the DST revenues flow and routes that revenue stream directly into a special account owned by COFINA—the *Fondo de Interes Apremiante* or "FIA." 13 L.P.R.A. § 12 ("The FIA and all the funds deposited therein on the effective date of this act and all the future funds that must be deposited in the FIA pursuant to the provisions of §§ 11a-16 of this title are hereby transferred to, and shall be the property of COFINA."). The FIA acts as a collection point for the funds that flow through the revenue stream.

35.    Pursuant to the Resolution governing the relevant COFINA Bonds (the "COFINA Resolution," attached hereto as Ex. B[4]), COFINA pledged its property interest in the DST to The

---

[4]     Exhibit B is comprised of the original 2007 Resolution and the 2009 Amended and Restated Resolution.

Bank of New York Mellon ("BNYM"), COFINA's Trustee, for the payment of, and as security

for, any bonds issued by COFINA.

36.     The DST revenue stream is comprised of the "first revenues" of the Commonwealth

sales-and-use tax ("SUT") up to a certain minimum annual amount and then a percentage of any

SUT generated above that minimum amount.  *Id.*

37.     The Commonwealth protects the DST revenue stream from impairment or

diminution by, among other things, having the revenue stream routed directly into the FIA without

flowing through the General Fund.  13 L.P.R.A. § 12 (the DST must be "directly deposited in FIA

at the time of receipt and shall not be deposited in the Treasury of Puerto Rico").  COFINA owns

the FIA, which is an account "administered by GDB."  *Id.*  The DST revenues are subsequently

transferred from the FIA to a trust account maintained at BNYM.

38.     Full ownership of the stream of DST revenues—and all attendant property rights

and interests—were transferred from the Commonwealth to COFINA at the time Act 91 was

enacted, making the stream of DST revenues COFINA's exclusive property.[5]  *Id.*

39.     Act 91 further shelters the stream of DST revenues by expressly providing that the

DST shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall the[y]

be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."  13

L.P.R.A. § 12.  This safeguards the stream of DST revenues from impairment even in the event of

a fiscal year shortfall, which was reiterated by the Commonwealth in Official Statements for GO

bonds issued after COFINA began issuing bonds.  *See, e.g.*, Ex. C at 29 (expressly disclosing to

potential GO bond purchasers that the DST revenues belonging to COFINA "do not constitute

---

[5]     Act 91 makes certain DST revenues "the property of the FIA" (13 L.P.R.A. § 14(b)); however, because the
FIA is itself "property of COFINA" (13 L.P.R.A. § 12), all DST revenues are COFINA's property.

'available resources' of the Commonwealth" and that such funds are therefore "not available for the payment of principal of and interest on the [GO] Bonds").

40.     Act 91 also makes clear that bonds issued by COFINA do "not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities" and are not backed by a pledge of the Commonwealth's full faith, credit, and taxing power.  13 L.P.R.A. § 13(d).  COFINA's bonds are payable solely from the stream of DST revenues, although a comparable revenue stream (or other security) may be substituted if it satisfies an exhaustive list of stringent preconditions verifying that security to be, among other things, subject to the same protections as the stream of DST revenues, and sufficient to satisfy all future bond service payments.  *See* 13 L.P.R.A. § 14(c); COFINA Resolution § 706.

41.     The Commonwealth also made express statutory covenants with COFINA's bondholders that, while any COFINA bonds are still outstanding, it would not limit or restrain (i) any powers conferred under Act 91, or (ii) COFINA's ability to repay its bondholders; nor would it (iii) amend Act 91 in a way that undermines COFINA's ability to meet its obligations or commitments (the "Original Non-Impairment Covenants").  *See* Act 56 of July 5, 2007; 13 L.P.R.A. § 14(c).

42.     The Commonwealth further reaffirmed that every aspect of COFINA's structure, and each of the Commonwealth's statutory protections and covenants, were valid, constitutional, and fully effective and enforceable against the Commonwealth, in an opinion letter issued by the Commonwealth Secretary of Justice.  *See* Opinion of the Secretary of Justice of the Commonwealth dated July 31, 2007 (attached hereto as Ex. D).

43.     The Original Non-Impairment Covenants were later amended to make their benefit to COFINA bond insurers even more explicit, and to add a new statutory covenant which

prohibited the Commonwealth from limiting or restraining the rights or powers of Commonwealth officials to acquire COFINA's DST revenues and transfer them to COFINA (the "Expanded Non-Impairment Covenants"; and, together with the Original Non-Impairment Covenants, the "Non-Impairment Covenants").  *See* Act 1 of January 14, 2009; 13 L.P.R.A. § 14(c).

      44.    Act 91 states in relevant part:

> The Commonwealth of Puerto Rico hereby agrees and promises any person, firm or corporation . . . who [] acquires bonds issued by COFINA, or who provides insurance . . . for such bonds, that . . . the Commonwealth shall not limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the FIA pursuant to the provisions of this Act . . . nor shall the Commonwealth limit or hinder the powers hereby conferred by this Act or the rights of COFINA to meet its agreements with bondholders, until such time as such bonds, regardless of their date, together with the interest accrued, shall be completely paid and redeemed.  No amendment to Act [91] shall undermine any obligation or commitment of COFINA.

13 L.P.R.A. § 14(c).

      45.    The Non-Impairment Covenants, as statutory covenants, bind all future legislatures to their terms and prevent the Commonwealth from breaching or retroactively repealing them.

      46.    Section 706 of the COFINA Resolution, titled "Agreement of the Commonwealth," reiterated each of the statutory Non-Impairment Covenants as they were made, and expressly incorporated each of them as part of the contractual agreement with COFINA's bond insurers and bondholders.  Section 706 states in relevant part:

> Pursuant to [Act 91], [COFINA] hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of [Act 91] . . . and (ii) limit or restrict the rights that are by [Act 91] granted or the rights of the [COFINA] to meet its obligations to its

Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. [Act 91] further provides that no amendment to [Act 91] shall impair any obligation or commitment of [COFINA].

COFINA Resolution § 706.

47.    Ambac is a Beneficiary under the COFINA Resolution, and thus the Non-Impairment Covenants contained in Section 706 were expressly designed to protect Ambac (and parties like it).  *Id.*; *id.* § 101.

48.    COFINA's ownership of the DST revenues was reiterated in the Series 2007A Bond offering materials Ambac received, which stated *inter alia* that "[u]nder the provisions of Act 91, the [DST revenues] and all present and future collections of the [DST revenues] are . . . the property of" COFINA.  Sales Tax Revenue Bonds Series 2007A, Official Statement (July 13, 2007) ("2007A Official Statement") at 17 (attached hereto as Ex. E).  The Original Non-Impairment Covenants were also reaffirmed in the 2007A Official Statement, which stated that the "Commonwealth agrees and commits . . . that it will not limit or restrain the rights and powers conferred by [Act 91] or the rights of [COFINA] to comply with its agreements with [COFINA bondholders] until said bonds, together with the interest thereon, are completely retired and that no amendment to [Act 91] shall impair any obligation or commitment of [COFINA]."  *Id.* at 22. The Commonwealth then certified that all information in the 2007A Official Statement "is accurate and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made therein, in light of the circumstances under which they were made, not misleading."  Commonwealth of Puerto Rico, Certificate of the Secretary of the Treasury (July 31, 2007) (attached hereto as Ex. F).

49.    All the Non-Impairment Covenants were further reiterated and repeated in COFINA's later Official Statements, *see, e.g.*, Commonwealth of Puerto Rico, Supplement to

14

Certain Official Statements of Puerto Rico Sales Tax Financing Corporation (December 11, 2011) at 22-23, and two additional Opinions of Commonwealth Secretaries of Justice (from two different administrations and both major parties), which also reaffirmed that COFINA's structure was completely legal and constitutional. *See, e.g.*, Opinion of the Secretary of Justice of the Commonwealth dated December 13, 2011 (attached hereto as Ex. G).

## II. Ambac Insures Certain COFINA Bonds In Reliance Upon The Commonwealth's Ironclad Statutory and Contractual Protections.

50.     COFINA issued its first series of bonds in 2007—approximately $2.7 billion in face amount of Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"). The Series 2007A Bonds fell into two types: current interest bonds ("CIBs") and capital appreciation bonds ("CABs"). According to the terms of the issuance, the CIBs receive semi-annual interest payments until maturity, whereas the principal amount of the CABs compounds without payment of interest until a series of maturity dates ranging from August 1, 2040 to August 1, 2056.

51.     In connection with the Series 2007A Bond issuance, Ambac agreed to insure certain CABs in that issuance having a face amount of $808.5 million (the "Ambac-Insured Bonds"). The Ambac-Insured Bonds have maturity dates ranging from August 1, 2047 to August 1, 2054. Today, the net accreted value of the Ambac-Insured Bonds is approximately $1.35 billion.

52.     Ambac's financial guaranty insurance policy related to the Ambac-Insured Bonds (the "Policy") guarantees scheduled payments of principal and interest on the Ambac-Insured Bonds as and when they come due. If COFINA fails to make a timely payment, Ambac may be required to make that payment in lieu of COFINA. Ambac's payment, however, neither satisfies nor discharges COFINA's obligation to pay the debt, nor discharges any claims against any parties connected to COFINA's failure to pay the debt.

53.     To the extent Ambac makes any payments on the Series 2007A Bonds, Ambac obtains an assignment of all rights from the bondholders, becomes an owner of the bonds, and/or becomes subrogated to the rights of bondholders and effectively steps into the shoes of such bondholders.

54.     The Commonwealth benefitted from Ambac's Policy because Ambac's guarantee that holders of the Ambac-Insured Bonds would receive their principal and interest payments significantly enhanced COFINA's ability to market and sell the bonds at favorable interest rates—thus ensuring that sufficient funds could be raised such that Commonwealth debts and expenses could be paid using the proceeds from the sale of the Ambac-Insured Bonds.

55.     Ambac issued the Policy in direct and justifiable reliance on the Commonwealth's statutory protections, which were codified in Act 91 and repeated in the various documents used to issue, market, and sell the Series 2007A Bonds.  These documents, including the COFINA Resolution, were material to Ambac's decision to issue the Policy, as evidenced by the fact that Ambac negotiated and received special rights and protections for itself under the Resolution as bond insurer.  These protections were, in turn, expressly disclosed in the Official Statement for the Series 2007A Bonds.  (Ex. E at 8.)

## FIRST COUNTERCLAIM FOR RELIEF
### (For Breach of Contract Against The Commonwealth)

56.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 55 hereof, as if fully set forth herein.

57.     Under Act 91, the Commonwealth statutorily covenanted to COFINA bond insurers and bondholders that the Commonwealth would not limit or restrain, while any COFINA bonds were still outstanding, (i) the rights or powers of Commonwealth officials to acquire the funds that must be transferred to COFINA, (ii) any powers conferred under Act 91, or (iii) COFINA's ability

to repay its bondholders; nor would it (iv) amend Act 91 in a way that undermines COFINA's ability to meet its obligations or commitments (the Non-Impairment Covenants). 13 L.P.R.A. § 14(c).

58.     These statutory Non-Impairment Covenants were reiterated in the COFINA Resolution for the express benefit of Beneficiaries under the COFINA Resolution. COFINA Resolution § 706. Ambac is a Beneficiary under the COFINA Resolution. *Id.*; *id.* § 101. Ambac is also an express third-party beneficiary under the COFINA Resolution. *See* First Supplemental Sales Tax Revenue Bond Resolution (July 13, 2007), Ambac Insurance Policy § (*l*) (attached hereto as Ex. H).

59.     The Non-Impairment Covenants operate to guarantee the uninterrupted flow of DST revenues to COFINA for the full and timely payment of its bonds. *See id.*; 13 L.P.R.A. § 14(c). For example, the Non-Impairment Covenants prohibit the Commonwealth from breaching other statutory protections that independently ensure the Commonwealth transfers the DST revenues to COFINA. These independent statutory protections declare, *inter alia*, that:

a.     The DST revenues are "the property of COFINA" (13 L.P.R.A. § 12);

b.     DST revenues are statutorily prohibited from being applied ***by any party*** to any purpose other than paying COFINA obligations (*id.* § 13(a));

c.     COFINA (via its FIA) must be funded with certain minimum amounts of DST revenues each fiscal year from first-available revenues (*id.* §§ 12, 14);

d.     The DST revenues must be "directly deposited in the FIA at the time of receipt" (*id.* §§ 12, 13, 14(a));

e.     The DST revenues "shall not be deposited in the Treasury of Puerto Rico" (*id.* § 12; *see also id.* § 14(e));

17

f.    The DST revenues cannot "constitute resources available to the Commonwealth" and are not "available for use by the Secretary of the Treasury" (*id.* § 12);

g.    No party except COFINA's bondholders can have a superior claim to any DST revenues pledged to the COFINA bonds (*id.* § 13(b)); and

h.    COFINA's bonds could ***never*** violate the provisions of the Puerto Rico Constitution regulating public debt issuances because those bonds "shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor of its other instrumentalities" and are not backed by a pledge of the Commonwealth's full faith, credit, and taxing power (*id.* § 13(d); *see* P.R. Const. art. II, § 2).

60.    Ambac provided consideration for the Non-Impairment Covenants contained in both Act 91 and the COFINA Resolution by, among other things, insuring COFINA bonds.

61.    The Non-Impairment Covenants contained in Act 91 are binding statutory contracts that are enforceable by Ambac against the Commonwealth. *See, e.g.*, 13 L.P.R.A. § 14(c); 31 L.P.R.A. § 3391 (elements of contract).

62.    The Non-Impairment Covenants contained in the COFINA Resolution are binding contracts that are enforceable by Ambac against the Commonwealth. *See, e.g.*, COFINA Resolution § 706; 31 L.P.R.A. § 3391 (elements of contract).

63.    The decision to include the Non-Impairment Covenants in *both* Act 91 and the COFINA Resolution clearly reflected the Commonwealth's intent to prevent future legislatures from being able to evade the Non-Impairment Covenants, since the Non-Impairment Covenants

would be effective through the COFINA Resolution even if the Commonwealth attempted to unlawfully revoke the Non-Impairment Covenants through legislation.

      64.    The Commonwealth breached the Non-Impairment Covenants when it:

        a.    Enacted Act 26-2017 (the "<u>Fiscal Plan Compliance Law</u>"), which purports to operationalize the Commonwealth's certified fiscal plan, which is itself predicated on unlawfully diverting DST revenues from COFINA to the Commonwealth in violation of the Non-Impairment Covenants; and

        b.    Filed the Complaint, in which each of the thirteen Causes of Action breach Non-Impairment Covenants by attempting to:

          i.    Destroy or subordinate COFINA's property interests in the DST revenues (Causes of Action 1-10, 12-13);

          ii.    Prohibit the Commonwealth from transferring DST revenues to COFINA and/or strip COFINA of DST revenues it has already received (Causes of Action 1-13); and

          iii.    Void and invalidate the COFINA structure, including the Non-Impairment Covenants themselves (Causes of Action 12-13).

      65.    To the extent COFINA is unable to fulfill its obligation to holders of Ambac-Insured Bonds due to these breaches, and Ambac must pay claims under the Policy as a result, the Commonwealth must indemnify Ambac for all such losses. *E.g.*, 31 L.P.R.A. §§ 3023, 3052, 5141.

      66.    In the alternative, to the extent there can be no breach of the Non-Impairment Covenants until the Commonwealth has been granted relief upon one of the Causes of Action in its Complaint, Ambac hereby realleges and asserts the above counterclaims (¶¶ 56-65), contingent upon the Commonwealth being awarded relief upon one of the Causes of Action in its Complaint.

## SECOND COUNTERCLAIM FOR RELIEF
### (Alternative, For Breach of Good Faith Performance Against The Commonwealth)

67. Ambac repeats and realleges the allegations contained in paragraphs 1 through 66 hereof, as if fully set forth herein.

68. The Non-Impairment Covenants, as contained in both Act 91 and the COFINA Resolution, created binding contractual commitments on the Commonwealth.

69. Puerto Rico law automatically imposes a duty of good faith performance on contracting parties. Good faith performance emphasizes faithfulness to a common purpose and consistency with the justified expectations of the other party.

70. This duty of good faith extends not only to what was expressly stipulated in the contract, but also the implied consequences of those express stipulations. *See, e.g.*, 31 L.P.R.A. § 3375.

71. As Act 91 and the COFINA Resolution make clear, transferring absolute ownership over the DST revenue stream to COFINA for the full and timely payment of its bonds (in order to induce bond insurers to insure, and purchasers to purchase, COFINA bonds) was a common purpose of Act 91, the Non-Impairment Covenants, and the COFINA Resolution.

72. The justified expectation of Ambac (and COFINA) was that the Commonwealth not only would strictly comply with the express terms of the Non-Impairment Covenants, but also act in good faith to fulfill the overall intent and purpose behind the Non-Impairment Covenants— namely, that the Commonwealth would never: (i) attempt to breach the Non-Impairment Covenants; nor (ii) take any affirmative action that could lead to a breach of the Non-Impairment Covenants.

73. The intent of Act 91, the Non-Impairment Covenants, and the COFINA Resolution is clear: to create an independent financing entity, transfer to it ownership of a portion of the SUT

revenue stream, pledge this property as collateral for bonds (which bonds would then be publicly issued to raise capital needed for various Commonwealth purposes), have all bond debt service payments be paid from this property, and induce bondholders to buy—and insurers to insure—said bonds based upon this structure.

74.     The duty of good faith therefore required the Commonwealth to, among other things:

> a.    Refrain from taking any action that could divert the DST revenues away from COFINA, including, but not limited to, by creating or effectuating a fiscal plan that could accomplish such a diversion (*id.*); and
>
> b.    Refrain from filing the Complaint, or allowing any similar attack on COFINA's structure or flow of funds to be made on its behalf.  (*Id.*)

75.     Thus, to the extent there has not been a breach of an express provision of the Non-Impairment Covenants, the Commonwealth, by taking the actions set forth above in Paragraph 74, has breached its implied duty of good faith in fulfilling its obligations under the Non-Impairment Covenants.

76.     If COFINA is unable to fulfill its obligation to holders of Ambac-Insured Bonds due to these breaches of good faith performance, and Ambac must pay claims under the Policy as a result, the Commonwealth must indemnify Ambac for all such losses.  *E.g.*, 31 L.P.R.A. §§ 3023, 3052, 5141.

77.     In the alternative, to the extent there can be no breach of good faith performance until the Commonwealth has been granted relief upon one of the Causes of Action in its Complaint, Ambac hereby realleges and asserts the above counterclaims (¶¶ 67-76), contingent upon the Commonwealth being awarded relief upon one of the Causes of Action in its Complaint.

## THIRD COUNTERCLAIM FOR RELIEF
### (Contingent, For Fraud Against The Commonwealth)

78. Ambac repeats and realleges the allegations contained in paragraphs 1 through 77 hereof, as if fully set forth herein.

79. The Complaint's Twelfth and Thirteenth Causes of Action seek to declare Act 91 unconstitutional because the Commonwealth's purported purpose in creating COFINA was to unlawfully evade certain provisions of the Puerto Rico Constitution. (*See* Compl. ¶¶ 138-174.) Moreover, the allegations supporting these Causes of Action clearly allege that the Commonwealth knowingly created COFINA with the specific intent to fulfill that unconstitutional purpose, and that the substantial effect of creating COFINA was the successful evasion of those constitutional restrictions. (*See id.*)

80. If allegations supporting the Complaint's Twelfth and Thirteenth Causes of Action are found to be true, and Act 91 is declared unconstitutional as a result, then the Commonwealth created COFINA with the fraudulent intent to evade the Puerto Rico Constitution.

81. Additionally, if allegations supporting the Complaint's Twelfth and Thirteenth Causes of Action are found to be true, and Act 91 is declared unconstitutional as a result, then it is also true that:

    a. Ambac issued its Policy without knowledge of this fraudulent intent, or the true risk that Act 91 would be declared unconstitutional, because the Commonwealth withheld this information from Ambac. Ambac reasonably relied on the non-existence of this fraudulent intent when it issued the Policy.

    b. Ambac also issued the Policy in reasonable reliance on various other Commonwealth misrepresentations, including:

22

- that all parts of Act 91 were validly enacted by the Commonwealth and are fully enforceable and effective (*see, e.g.*, Exs. D-F);

- that the COFINA structure is constitutional (Exs. D-F);

- that the Commonwealth actually and lawfully transferred the FIA to COFINA (13 L.P.R.A. § 12; Exs. D-F);

- that the Commonwealth actually, immediately, and lawfully transferred to COFINA full ownership of the DST revenue stream, including the right to receive all future DST revenues (13 L.P.R.A. § 12; Exs. D-F);

- that such DST revenues are actually and lawfully COFINA's property (13 L.P.R.A. § 12; Exs. D-F);

- that the Commonwealth must "diligently enforce the [collection of] the [DST]" (Ex. D);

- that such DST revenues are not "available resources" under the Puerto Rico Constitution, and are not available to the Secretary of Treasury in any circumstance (13 L.P.R.A. § 12; Exs. D-F);

- that COFINA bonds are not public debt, and are not subject to any of the public debt limitations in the Puerto Rico Constitution (13 L.P.R.A. § 12; Exs. D-F); and

- the Original Non-Impairment Covenants (13 L.P.R.A. § 12; Exs. D-F).

c. The Commonwealth perpetrated these misrepresentations and omissions in order to induce Ambac to issue the Policy because Ambac's Policy would facilitate the issuance and sale of COFINA bonds, the proceeds of which were used to pay, among other things, certain debts and expenses of the Commonwealth.

d. These misrepresentations and omissions were further incorporated into the various documents that Ambac relied upon to make its decision to issue the

23

Policy, including the opinion letter written by the Commonwealth Secretary of Justice (Ex. D), for the purpose of effectuating the fraud.

     e.     Ambac reasonably relied on the Commonwealth's misrepresentations and omissions to issue its Policy. Ambac would not have issued the Policy without such misrepresentations and omissions.

     f.     Ambac's reliance on the above misrepresentations and omissions was both reasonable and foreseeable. There was no way Ambac could have known—or even suspected—that the Commonwealth intended to consummate the creation of an unconstitutional financing entity (COFINA) through fraud, nor that the Commonwealth would affirmatively attempt to dismantle COFINA when it became more financially expedient for the Commonwealth to do so.

82.     If Act 91 is declared unconstitutional, Ambac will be damaged because COFINA will be unable to satisfy its obligations to its bondholders, and Ambac may be forced to pay claims under its Policy as a result.

83.     Therefore, if a Court grants relief on the Commonwealth Agent's Twelfth and Thirteenth Causes of Action, the Commonwealth must indemnify Ambac against any losses Ambac suffers as a result of issuing the Policy.

## FOURTH COUNTERCLAIM FOR RELIEF
### (Contingent, For *Dolo* Against The Commonwealth)

84.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 83 hereof, as if fully set forth herein.

85.     Under Puerto Rico contract law, when a party uses "deceit" (known as "*dolo*" in Spanish) to induce another party to enter into a contract, the inducing party must indemnify the

induced party for all damages flowing from the existence of the contract. *E.g.*, 31 L.P.R.A. §§ 3408, 3421, 3023.

86. *Dolo* claims can be brought against third parties and/or non-parties to a contract that engage in deceit.

87. As set forth above, (¶¶ 78-83), if allegations supporting the Complaint's Twelfth and Thirteenth Causes of Action are found to be true, and Act 91 is declared unconstitutional as a result, then the Commonwealth used deceit to fraudulently induce Ambac to issue its Policy.

88. Therefore, if a Court grants relief on the Commonwealth Agent's Twelfth and Thirteenth Causes of Action, the Commonwealth must indemnify Ambac for any claims paid on the Policy. *E.g.*, 31 L.P.R.A. §§ 3023, 3052, 5141.

## FIFTH COUNTERCLAIM FOR RELIEF
### (Contingent, For Violation Of The Contracts Clause Of The U.S. Constitution Against The Commonwealth)

89. Ambac repeats and realleges the allegations contained in paragraphs 1 through 88 hereof, as if fully set forth herein.

90. The Contracts Clause provides, in pertinent part, that "[n]o State shall . . . pass any . . . Law impairing the Obligation of Contracts . . . ." U.S. Const., art. I, § 10, cl. 1. The primary purpose behind the enactment of the Contracts Clause was to prevent States from adopting laws that would permit borrowers (including the States themselves) to abrogate their debts at the expense of creditors.

91. Puerto Rico's version of Article 9 of the Uniform Commercial Code (the "Old Puerto Rico UCC"), a state law, was adopted pursuant to the Puerto Rico Commercial Transactions Act of 1996 (Act 208-1996), as amended. It was effective when the Ambac-Insured Bonds were insured and sold in 2007.

92.     A revised version of the Puerto Rico UCC (the "New Puerto Rico UCC") became effective on January 17, 2013, pursuant to Act 21-2012.

93.     When the Ambac-Insured Bonds were insured and sold in 2007, the transfers of DST revenues from the Commonwealth to COFINA were made pursuant to Act 91, and were not subject to or controlled by the Old Puerto Rico UCC.  (Old Puerto Rico UCC § 9-104.)  The adoption of the New Puerto Rico UCC did not change the fact that the transfers of DST revenues from the Commonwealth to COFINA are governed exclusively by Act 91.

94.     The New Puerto Rico UCC does not apply to the transfers of DST revenues from the Commonwealth to COFINA because, *inter alia*, (i) such transfers are exempted from the New Puerto Rico UCC because they were exempted from the Old Puerto Rico UCC (New Puerto Rico UCC § 9-702(b)); and (ii) Act 91 is a specific and special statute that cannot be displaced by a general statute such as the New Puerto Rico UCC.

95.     To the extent this Court finds that the transfer of DST revenues from the Commonwealth to COFINA was not subject to or controlled by the Old Puerto Rico UCC, but is subject to or controlled by the New Puerto Rico UCC, and awards the Commonwealth relief that limits or restrains the transfer of the DST revenues as a result, such relief will constitute a substantial impairment of Ambac's contract rights under the Non-Impairment Covenants.

96.     Such impairments would be neither a necessary nor reasonable means of serving the important public purposes behind adopting the New Puerto Rico UCC, which could have been served without affecting the transfer of DST revenues from the Commonwealth to COFINA.

97.     Thus, if this Court were to find that the transfers of DST revenues from the Commonwealth to COFINA were not subject to or controlled by the Old Puerto Rico UCC, but are subject to or controlled by the New Puerto Rico UCC, then any application of the New Puerto

Rico UCC that limits or restrains the transfers of DST revenues from the Commonwealth to COFINA will constitute a violation of the Contracts Clause.

## SIXTH COUNTERCLAIM FOR RELIEF
### (Contingent, For Violation Of The Takings And Due Process Clauses Of The U.S. Constitution Against The Commonwealth)

98.     Ambac repeats and realleges the allegations contained in paragraphs 1 through 97 hereof, as if fully set forth herein.

99.     The Takings Clause provides that "private property [shall not] be taken for public use, without just compensation." U.S. Const. amend. V. The Takings Clause applies to the States, and the Commonwealth, by virtue of Section 1 of the Fourteenth Amendment to the U.S. Constitution. U.S. Const. amend. XIV, § 1.

100.    Furthermore, the Due Process Clauses forbid the Commonwealth from depriving "any person . . . of life, liberty, or property, without due process of law." U.S. Const. amends. V, XIV, § 1.

101.    Ambac and holders of Ambac-Insured Bonds have property rights and interests in the uninterrupted flow of DST revenues from the Commonwealth to COFINA. *See, e.g.*, ¶¶ 33-35, 38, 48, 59, 73, 81.

102.    If the transfer of DST revenues from the Commonwealth to COFINA is limited or restrained in any way, and just compensation is not provided therefor, then such limits or restraints constitute an unconstitutional taking and a violation of Ambac's due process rights.

## SEVENTH COUNTERCLAIM FOR RELIEF
### (Contingent, For Declaratory Relief Pursuant to 18 U.S.C. 2201 Against The Commonwealth)

103.    Ambac repeats and realleges the allegations contained in paragraphs 1 through 102 hereof, as if fully set forth herein.

104. The Complaint seeks declarations that Act 91 violates the public debt priority provisions of the Puerto Rico Constitution because Act 91 dedicates the DST revenues to COFINA and exempts them from being "available resources" subject to clawback pursuant to Article VI, Section 8 of the Puerto Rico Constitution. (Compl. ¶¶ 146-48.)

105. However, even if Act 91 violates the public debt priority provisions (it does not), the proper remedy for that relief is not the wholesale invalidation of Act 91, but the targeted severance of the offending clause, while leaving the remainder of the statute fully intact. Act 91 contains an express severability clause. *E.g.*, Act 291-2006 § 8 ("If any provision of this Act or the application thereof should be found to be invalid, such a ruling shall not affect the remaining provisions nor the application of this Act which may stand in effect without the provisions thus found to be invalid, and for this purpose, the provisions of this Act are severable.").

106. Moreover, even if the entirety of Act 91 were found unconstitutional—and assuming COFINA's bonds were not deemed void *ab initio* as a result—COFINA's bonds would remain issued and outstanding, regardless of whether the flow of funds between the Commonwealth and COFINA is interrupted or subject to clawback.

107. In such circumstances, to avoid a violation of the Contracts Clause of the U.S. Constitution, if this Court finds that the DST revenues are "available resources" of the Commonwealth, the complete remedy is excising from Act 91 the provision that exempts the DST revenues from being "available resources."

108. The effect of declaring the DST revenues to be available resources, however, is that the COFINA bonds—because they remain revenue bonds—will be second in payment priority to any validly-issued public debt.[6] Pursuant to the Article VI, Section 8 of the Puerto Rico

---

[6] Ambac notes that the COFINA Agent's Eighth Cause of Action challenges the legal validity of certain issuances of public debt. (Dkt. No. 75 at ¶¶ 122-128.)

Constitution, once all public debt obligations have been paid from available revenues, all "other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8.

109.    This order of priorities is codified in 23 L.P.RA. § 104(c) (the "<u>OMB Act</u>"), which places repayment of revenue bonds second only to the payment of public debt. OMB Act § 4(c) (requiring the payment of "binding obligations to safeguard the credit, reputation and good name of the Government of the Commonwealth of Puerto Rico" immediately after securing repayment of the public debt).

110.    While the Commonwealth purports to have superseded the OMB Act with later legislation, such *post hoc* reprioritizations violate the Contracts Clause of the U.S. Constitution.

111.    Thus, in accordance with Act 91, and in order to prevent a violation of the Contracts Clause of the U.S. Constitution, Ambac is entitled to a declaration stating that the effect of any invalidation of Act 91—in whole or in part—is to cause the COFINA bonds to become revenue bonds subject to clawback, and which must be repaid second only to the public debt.

## <u>RELIEF DEMANDED</u>

WHEREFORE, Ambac respectfully requests that the Court enter judgment against the Counterclaim Defendants as follows:

(a)  Declaring that the Commonwealth breached contractual obligations flowing to Ambac by: (i) enacting and/or enforcing the Fiscal Plan Compliance Law; and/or (ii) filing and pursuing relief via the Complaint through the Commonwealth Agent;

(b)  Declaring that the Commonwealth failed to perform in good faith its contractual obligations by: (i) creating, and/or failing to oppose the certification of, fiscal plans predicated on diverting DST revenues away from COFINA; (ii) enacting and/or enforcing the Fiscal Plan

Compliance Law; and/or (iii) filing, and pursuing relief via, the Complaint through the Commonwealth Agent;

(c) Enjoining the Counterclaim Defendants from committing any further breaches of the Commonwealth's express and/or implied contractual obligations;

(d) Requiring the Commonwealth to indemnify Ambac for any losses suffered by Ambac under the Policy as a result of the conduct complained of herein; and

(e) Granting such further relief as the Court deems just and proper.

**CONTINGENT RELIEF DEMANDED**

WHEREFORE, only to the extent any of Ambac's contingent claims become non-contingent, Ambac respectfully requests that the Court enter judgment against the Counterclaim Defendants as follows:

(a) Declaring that the Commonwealth fraudulently induced Ambac to insure COFINA bonds;

(b) Declaring that the Commonwealth induced Ambac to insure COFINA bonds using deceit (*dolo*);

(c) Declaring that any application of the New Puerto Rico UCC that limits or restrains the transfers of DST revenues from the Commonwealth to COFINA constitutes a violation of the Contracts Clause of the U.S. Constitution;

(d) Declaring that any limitation or restraint on the transfer of DST revenues from the Commonwealth to COFINA (i) constitutes a violation of the Takings Clause of the U.S. Constitution to the extent just compensation is not provided therefor, and (ii) constitutes a violation of the Due Process Clause of the U.S. Constitution;

(e)  Enjoining the Commonwealth from taking any further action in violation of the

Contracts, Takings, and/or Due Process Clauses of the U.S. Constitution;

(f)  Requiring the Commonwealth to indemnify Ambac for any losses suffered by Ambac

under the Policy as a result of the conduct complained of herein;

(g)  Declaring that, to the extent any portion of Act 91 is deemed invalid, the maximum

relief available to the Commonwealth is that the COFINA bonds will become revenue bonds

subject to clawback, and which must be repaid second only to the public debt; and

(h)  Granting such further relief as the Court deems just and proper.

## ANSWER TO THE AMENDED COMPLAINT

### NATURE OF PROCEEDING

1.    This   adversary   proceeding   is   being   commenced   to   resolve   the
Commonwealth-COFINA Dispute.   As defined in the Commonwealth-COFINA Dispute
Stipulation, the issue in dispute is "[w]hether, after considering all procedural and substantive
defenses and counterclaims, including constitutional issues, the sales and use taxes [the "<u>SUT</u>"]
purportedly pledged by COFINA to secure debt . . . are property of the Commonwealth or COFINA
under applicable law."[2]  As set forth below, the SUT revenues, wherever located and whenever
arising, are the exclusive property of the Commonwealth.

> FN2: Commonwealth-COFINA Dispute Stipulation ¶4.  Whether any of the SUT
> revenues can be used by the Commonwealth in the exercise of its police
> power even if the Court were to determine that such SUT revenues are the
> property of COFINA is beyond the scope of this proceeding.  Similarly, the
> issue of the allowance of any claim of COFINA as a creditor in the
> Commonwealth's title III case is beyond this proceeding's scope.

<u>ANSWER NO. 1</u>: Ambac states that the first two sentences of Paragraph 1, including

footnote 2, constitute a characterization of the action, to which no response is required.  To the

extent a response is required, Ambac respectfully refers the Court to the Commonwealth-COFINA

Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.  The third sentence of Paragraph 1 sets forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac denies

the allegations in the third sentence of Paragraph 1.

2.      The COFINA enabling legislation did not transfer to COFINA present ownership
of future SUT revenues.  Nor did it assign to COFINA the Commonwealth's "right to receive"
such revenues.  At most, the purported transfer to COFINA of future SUT revenues amounted to
an unsecured promise that yet-to-exist revenues would be transferred to COFINA in the future.  If
it was of any legal effect beyond an unsecured promise, the purported transfer of future SUT
revenues to COFINA can only be viewed as a grant of a security interest in after-acquired property
that was and is governed by Article 9 of the Uniform Commercial Code as adopted by Puerto Rico.
Any security interest of COFINA in future SUT revenues never became enforceable against the
Commonwealth, and, even if it did, it was not perfected and is thus avoidable (and is otherwise
subordinate to the rights of the Oversight Board as trustee).  Moreover, any such security interest
was cut off by the commencement of the Commonwealth's title III case.  And even if the transfer
to COFINA was more than an unsecured promise and was not a secured transaction, it is still
avoidable under applicable provisions of the Bankruptcy Code.

ANSWER NO. 2: Ambac states that Paragraph 2 sets forth legal conclusions, to which no

response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 2, and respectfully refers the Court to the COFINA enabling legislation, Article 9 of the

Puerto Rico UCC, PROMESA, and the Bankruptcy Code, which speak for themselves, regarding

their complete and accurate contents.

3.      In any event, the COFINA structure is unconstitutional because the substantial
result of the COFINA enabling legislation was to evade or violate various provisions of the Puerto
Rico constitution, including constitutional debt limits, the constitutional priority of payment
(outside of title III) granted to Puerto Rico's public debtholders, and the constitution's balanced
budget clause.  As a result, all of the tax revenues at issue are exclusively Commonwealth property,
including all revenues on deposit at The Bank of New York Mellon ("BONY") when the
Commonwealth's title III case was commenced and all revenues deposited at BONY since that
time.

ANSWER NO. 3: Ambac states that Paragraph 3 sets forth legal conclusions, to which no

response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 3, and respectfully refers the Court to COFINA's enabling legislation and the Puerto

Rico Constitution, which speak for themselves, regarding their complete and accurate contents.

<u>**PARTIES**</u>

4. The Commonwealth and its public corporations and instrumentalities are represented in these title III cases by the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>").

<u>ANSWER NO. 4</u>: Ambac admits the allegations of Paragraph 4 to the extent the allegations refer to debtors under Title III of PROMESA, and otherwise denies the allegations of Paragraph 4.

5. Plaintiff the Committee was appointed by the Oversight Board as the Commonwealth Agent pursuant to the Commonwealth-COFINA Dispute Stipulation. The Commonwealth of Puerto Rico is a territory of the United States and a Debtor in these Title III cases. The Commonwealth's title III case was commenced by the filing of a petition on May 3, 2017 (the "<u>Commonwealth Petition Date</u>").

<u>ANSWER NO. 5</u>: With respect to the first sentence of Paragraph 5, Ambac respectfully refers the Court to the Commonwealth-COFINA Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith. Ambac admits the remaining allegations of Paragraph 5.

6. Defendant Bettina Whyte was appointed by the Oversight Board as the "<u>COFINA Agent</u>" pursuant to the Commonwealth-COFINA Dispute Stipulation. COFINA is a purported public corporation and instrumentality of the Commonwealth and a Debtor in these title III cases. COFINA's title III case was commenced by the filing of a petition on May 5, 2017.

<u>ANSWER NO. 6</u>: With respect to the first sentence of Paragraph 6, Ambac respectfully refers the Court to the Commonwealth-COFINA Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith. Ambac admits the remaining allegations of Paragraph 6, except denies the allegations in the second sentence of Paragraph 6 to the extent that sentence alleges that COFINA is not in fact a public corporation and instrumentality of the Commonwealth.

7. Pursuant to the Commonwealth-COFINA Dispute Stipulation, the Oversight Board has appointed the Committee as the Commonwealth Agent and Bettina Whyte as the COFINA Agent for purposes of litigating the Commonwealth-COFINA Dispute in all of its facets.

ANSWER NO. 7: Ambac respectfully refers the Court to the Commonwealth-COFINA

Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

## JURISDICTION AND VENUE

8.      This Court has jurisdiction over the subject matter of this adversary proceeding
pursuant to section 306(a) of PROMESA (48 U.S.C. § 2166(a)).

ANSWER NO. 8: Ambac states that Paragraph 8 sets forth legal conclusions, to which no

response is required.

9.      Venue is proper in this district pursuant to section 307(a) of PROMESA (48 U.S.C.
§ 2167(a)).

ANSWER NO. 9: Ambac states that Paragraph 9 sets forth legal conclusions, to which no

response is required.

10.     The Commonwealth-COFINA Dispute is an actual and justiciable controversy
within the meaning of 28 U.S.C. § 2201(a), which provides that "[i]n a case of actual controversy
within its jurisdiction . . . any court of the United States, upon the filing of an appropriate pleading,
may declare the rights and other legal relations of any interested party seeking such declaration,
whether or not further relief is or could be sought."

ANSWER NO. 10: Ambac states that Paragraph 10 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to 28 U.S.C. § 2201(a), which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

## BACKGROUND

**I.      Overview of COFINA Structure**

11.     In essence, the COFINA structure is an attempted "off balance sheet" financing
transaction collateralized by a portion of the Commonwealth's SUT revenues.

ANSWER NO. 11: Ambac denies the allegations of Paragraph 11.

12.     The COFINA entity was created as a purported "public corporation and
instrumentality of the Commonwealth" that is purportedly "independent and separate from the

Commonwealth" but "attached" to the Government Development Bank for Puerto Rico (the "GDB").  Prior to the creation of the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") in 2015, the GDB served as the financial advisory authority of the Puerto Rico government.[3]  The directors of COFINA are, and have always been, the directors of the GDB.[4] The Executive Director of AAFAF is a director of both the GDB and COFINA.[7]

> FN 3: P.R. Laws Ann. tit. 13, §§ 11a(a) and 11a(e).

> FN 4: P.R. Laws Ann. tit. 13, § 11a(e).

> FN 5: 2017 P.R. Laws 2, § 6(a).

ANSWER NO. 12: Ambac states that Paragraph 12 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to the referenced statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

13.    COFINA's only authorized purpose is to issue bonds backed by a dedicated portion of the Commonwealth's SUT revenues (and to utilize swaps and other financing mechanisms related to the bonds).  The only authorized use of the bond proceeds (other than to pay COFINA's administrative expenses) is to pay debts and expenses of the Commonwealth and to "nourish" certain economic development and other funds created by the Commonwealth for Commonwealth purposes.[8]

> FN 6: P.R. Laws Ann. tit. 13, § 11a(b).

ANSWER NO. 13: Ambac states that Paragraph 13 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 13.

14.    COFINA has no assets or source of income other than the dedicated SUT revenues, which are deposited into a specified fund (the "Dedicated Sales Tax Fund").[7]  By design, the dedicated SUT revenues are never deposited into the Commonwealth treasury, although they are collected by the Commonwealth (or an agent acting on its behalf).[8]  COFINA has no right or authority to collect or enforce the SUT, and taxpayers owe no duty or obligation to COFINA.[9]

> FN 7: P.R. Laws Ann. tit. 13, § 12.
> FN 8: P.R. Laws Ann. tit. 13, § 12; P.R. Laws Ann. tit. 13 §§ 32021-32031.

> FN 9: See P.R. Laws Ann. tit. 13 § 11a(b) (limiting the powers of COFINA); P.R.
> Laws Ann. tit. 13 §§ 32021-32031 (providing for the collection of the SUT).

ANSWER NO. 14: Ambac states that Paragraph 14 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced statutes, which speak for themselves, regarding their complete and accurate

contents, and denies any allegations inconsistent therewith.

15.     Attached as Exhibit A is a chart depicting the basic COFINA structure.

ANSWER NO. 15: Ambac states that Paragraph 15 and Exhibit A together set forth legal

conclusions, to which no response is required. To the extent a response is required, Ambac denies

that Exhibit A accurately depicts the COFINA structure.

## II.     Sales and Use Tax

16.     The SUT is a general sales and use tax applicable to a wide range of goods and
services. Pursuant to Act No. 117 of July 4, 2006, the Commonwealth imposed the SUT for the
first time, effective November 1, 2006, at a rate of 5.5% (the "Commonwealth SUT"). The Act
also authorized the municipalities in the Commonwealth to levy separate sales and use taxes at an
additional rate of 1.5% (the "Municipal SUT").

ANSWER NO. 16: With respect to the first sentence of Paragraph 16, Ambac admits that

the SUT is a sales and use tax applicable to a wide range of goods and services, and otherwise

denies the allegations in the first sentence of Paragraph 16. With respect to the second and third

sentences of Paragraph 16, Ambac states that they set forth legal conclusions, to which no response

is required. To the extent a response is required, Ambac respectfully refers the Court to Act 117-

2006, which speaks for itself, regarding its complete and accurate contents, and denies any

allegations inconsistent therewith.

17.     Simultaneously with the imposition of the SUT, and also pursuant to Act No. 117,
the Commonwealth repealed a 5% (net effective 6%) general excise tax imposed on imported
goods and a 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Act No. 117
was an amendment to the Puerto Rico Internal Revenue Code of 1994 (as previously amended),

which provides in Section 2405 that "**[t]he [sales and use] taxes fixed in this Subtitle shall be funds of the Commonwealth at the time they are collected**."[10]

FN 10: 2006 P.R. Laws 117, § 2405(c).

ANSWER NO. 17: Ambac states that Paragraph 17 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the referenced statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

18. Act No. 1 of January 31, 2011 repealed the Puerto Rico Internal Revenue Code of 1994 (as amended) and replaced it with the Puerto Rico Internal Revenue Code of 2011, which maintained the Commonwealth SUT and the Municipal SUT, as well as the related statutory framework.

ANSWER NO. 18: Ambac states that Paragraph 18 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the referenced statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

19. Act No. 18 of January 24, 2014 increased the Commonwealth SUT from 5.5% to 6% and reduced the Municipal SUT from 1.5% to 1.0%, effective February 1, 2014.

ANSWER NO. 19: Ambac states that Paragraph 19 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 18-2014, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

20. Act No. 72 of May 29, 2015 provided for the replacement of the SUT with a higher value added tax, which was to become effective on April 1, 2016 or up to 60 days later at the discretion of the Secretary of the Treasury. As a "transition" to the value added tax, the Act also increased the Commonwealth SUT by 4.5% (from 6.0% to 10.5%), effective July 1, 2015.

ANSWER NO. 20: Ambac states that Paragraph 20 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court

to Act 72-2014, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

21.    Act No. 54 of May 26, 2016 repealed the provisions of Act No. 72 relating to the value added tax. and repealed the 4.5% increase in the Commonwealth SUT In addition, the Act imposed a 4.5% sales and use tax surcharge dedicated exclusively to the Commonwealth's General Fund (the "SUT Surcharge"). As a result, the effective distribution of the SUT is currently 6.0% Commonwealth SUT, 4.5% SUT Surcharge, and 1.0% Municipal SUT.

ANSWER NO. 21: Ambac states that Paragraph 21 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 54-2016 and the statutes referenced in Paragraphs 16 through 20, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

22.    Act No. 84 of July 22, 2016 amended section 3 of Act 91 to maintain the portion of the Commonwealth SUT previously dedicated to COFINA. Specifically, the Act provided for the calculation of the dedicated portion of the Commonwealth SUT based on a specified percentage equal to 2.75% divided by 5.5% rather than 2.75% divided by the 6% Commonwealth SUT rate, which, but for the Act, would have been the denominator in the calculation of the specified percentage of Commonwealth SUT revenues dedicated to COFINA and would have decreased that specified percentage.

ANSWER NO. 22: Ambac states that Paragraph 22 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 84-2016 and the statutes referenced in Paragraphs 16 through 21, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

23.    The Commonwealth SUT dedicated to COFINA is applied in accordance with the "flow of funds" described below.

ANSWER NO. 23: Ambac states that Paragraph 23 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 23.

## III.    COFINA Enabling Legislation (Act 91 and its Amendments)

24.    Act No. 91 of the Puerto Rico Legislative Assembly, approved on May 13, 2006 (as amended, "Act 91"), provided a method and source of payment for debt of the Commonwealth for which there was no effective payment source (so-called "extraconstitutional debt," as distinct from "full faith and credit" obligations, which are sometimes referred to as "constitutional debt").

ANSWER NO. 24: Ambac states that Paragraph 24 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

25.    Act 91 provided for the creation of a special fund called the "Urgent Interest Fund" and the deposit into the Urgent Interest Fund of 1% of the Commonwealth SUT revenues collected during each fiscal year.  The Act further provided for the use of the collections in the Urgent Interest Fund to pay the Commonwealth's extraconstitutional debt in existence as of June 30, 2006.

ANSWER NO. 25: Ambac states that Paragraph 25 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

26.    Through a series of amendments, Act 91 became the enabling act for COFINA and the foundation of a financing mechanism to pay the Commonwealth's extraconstitutional debt and general Commonwealth operating expenses.

ANSWER NO. 26: Ambac states that Paragraph 26 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

27.    The amendments to Act 91 accomplished the following (among other things):

(i)    Established the English name of the Fondo de Ineterés Apremiante (Urgent Interest Fund) as the "Dedicated Sales Tax Fund."[11]

(ii)    Created COFINA as a purportedly independent public corporation "attached" to the GDB (in lieu of a previously authorized subsidiary of the GDB called the "Urgent Interest Fund Corporation").[12]

  (iii) Authorized COFINA to (a) issue bonds payable solely from, and secured solely by, the Commonwealth SUT revenues deposited into the Dedicated Sales Tax Fund and (b) use the proceeds of those bonds solely to pay the Commonwealth's extraconstitutional debt in existence as of June 30, 2006.[13]

  (iv) Later expanded the authorized sources of payment for the COFINA Bonds to include federal subsidies for interest on any bonds issued pursuant to the "Build America Bonds" program.[14]

  (v) Later expanded the authorized uses of COFINA bond proceeds to include (a) the payment of additional extraconstitutional debt of the Commonwealth, (b) the repayment of funds borrowed by the Commonwealth from the GDB to finance budget deficits, and (c) the direct payment of general Commonwealth operating expenses.[15]

FN 11: 2007 P.R. Laws 56.

FN 12: 2007 P.R. Laws 56; 2006 P.R. Laws 291.

FN 13: 2007 P.R. Laws 56.

FN 14: 2009 P.R. Laws 18. Of the approximately $17 billion in bonds issued by COFINA, only $182,190,000 (around 1%) were issued as "Build America Bonds." Federal subsidies received by COFINA with respect to its "Build America Bonds" are used solely to pay interest on those bonds. COFINA is obligated to pay interest on its "Build America Bonds" whether or not it receives the federal subsidies (and, in the event that COFINA does not receive the federal subsidies, such interest is paid from the Commonwealth SUT revenues deposited in the Dedicated Sales Tax Fund). *See* Official Statement, dated June 24 2010, for COFINA's First Subordinate Series 2010D Bonds and First Subordinate Series 2010E Bonds, pp. 19-20.

FN 15: 2009 P.R. Laws 1.

  ANSWER NO. 27: Ambac states that Paragraph 27 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

  28. The amendments to Act 91 also provided for a series of increases in the portion of Commonwealth SUT revenues required to be transferred to the Dedicated Sales Tax Fund in each fiscal year (the "Transfer Amount").

  ANSWER NO. 28: Ambac states that Paragraph 28 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court

to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and

accurate contents, and denies any allegations inconsistent therewith.

29.     The Transfer Amount for each fiscal year is the greater of (a) a specified percentage
of all collections of the Commonwealth SUT during that fiscal year (the "Specified Percentage")
and (b) a base amount that increases by 4% from fiscal year to fiscal year (the "Base Amount").
The amendments to Act 91 increased both the Specified Percentage and the Base Amount.[16] After
giving effect to Act 91 amendments, the Specified Percentage is 50% and the Base Amount (which
is more than $753 million for fiscal year 2018) increases by 4% from fiscal year to fiscal year until
it reaches $1.85 billion.

> FN 16: 2006 P.R. Laws 291; 2007 P.R. Laws 56; 2009 P.R. Laws 1; 2009 P.R.
> Laws 7.

ANSWER NO. 29: Ambac states that Paragraph 29 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and

accurate contents, and denies any allegations inconsistent therewith.

30.     Transfers to the Dedicated Sales Tax Fund are required to be made from the first
Commonwealth SUT collections in each fiscal year (i.e., starting each July 1).

ANSWER NO. 30: Ambac states that Paragraph 30 sets forth a legal conclusion, to which

no response is required.

31.     Act 91 states that the Commonwealth SUT collections that are transferred to the
Dedicated Sales Tax Fund are not intended to be "available resources" of the Commonwealth and,
therefore, may not be used by the Commonwealth for any purpose.[17]

> FN 17: 2006 P.R. Laws 91, § 3, as amended P.R. Law Ann. tit. 13 § 12.

ANSWER NO. 31: Ambac respectfully refers the Court to Act 91 and its relevant

amendments, which speak for themselves, regarding their complete and accurate contents, and

denies any allegations inconsistent therewith.

32.     If, in any fiscal year, the Commonwealth SUT collections transferred to the
Dedicated Sales Tax Fund are insufficient to pay the debt service on the COFINA bonds, additional

Commonwealth SUT collections in the next fiscal year must be transferred to the Dedicated Sales Tax Fund to make up for the insufficiency.[18]

FN 18: P.R. Laws Ann. tit. 13 § 14(d).

ANSWER NO. 32: Ambac states that Paragraph 32 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

33.     If, in any fiscal year, the Commonwealth SUT collections are less than the Base Amount, the Secretary of the Treasury of the Commonwealth is authorized to cover that shortfall from any available funds, and the Director of the Office of Management and Budget of the Commonwealth is required to include the appropriations necessary to cover that shortfall in the budget for the current fiscal year or the next fiscal year.[19]

FN 19: P.R. Laws Ann. tit. 13 § 14(a).

ANSWER NO. 33: Ambac states that Paragraph 33 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

34.     If, in any fiscal year, the Specified Percentage of the Commonwealth SUT collections exceeds the Base Amount for that fiscal year, the Commonwealth is required to deposit the excess collections in the Dedicated Sales Tax Fund.[20]

FN 20: P.R. Laws Ann. tit. 13 § 14(b).

ANSWER NO. 34: Ambac states that Paragraph 34 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

## IV.    Overview of COFINA Bond Offerings

35.     COFINA has issued fifteen series of bonds:  three in 2007; one in 2008; three in 2009; four in 2010; and four in 2011.[21]

> FN 21: GOVERNMENT DEVELOPMENT BANK, Puerto Rico Sales Tax Financing Corporation (COFINA), http://www.gdb-pur.com/investors_resources/cofina.html.

ANSWER NO. 35: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 35, except to the extent they set forth legal conclusions, to which no response is required. Ambac respectfully refers the Court to the referenced website, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith. Ambac admits that COFINA issued certain Series 2007A Bonds.

36.    A significant percentage of the COFINA bonds were issued as capital appreciation bonds. Interest on such bonds is not payable on a current basis but rather compounds semi-annually and is payable at maturity.[22]

> FN 22: Commonwealth of P.R. Fin. Info. & Operating Data Report, dated Dec. 18, 2016, at 182.

ANSWER NO. 36: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 36, except to the extent they set forth legal conclusions, to which no response is required. Ambac respectfully refers the Court to the referenced document, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith. Ambac admits that COFINA issued certain Series 2007A Bonds and that certain of these bonds were capital appreciation bonds.

37.    The COFINA bonds matured or mature in fiscal years 2016 through 2058.[23]

> FN 23: Commonwealth of P.R. Fiscal Plan App., dated Oct. 14, 2016, at 8.

ANSWER NO. 37: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 37, except to the extent they set forth legal conclusions, to which no response is required. Ambac respectfully refers the Court to the referenced document, which speaks for itself, regarding its complete and accurate contents, and denies any allegations

inconsistent therewith. Ambac admits that COFINA issued certain Series 2007A Bonds and that

certain of these bonds were capital appreciation bonds that mature in 2047 through 2054.

38.     All of the COFINA bonds are non-recourse obligations of COFINA payable solely
from the Commonwealth SUT revenues deposited into the Dedicated Sales Tax Fund (and, in turn,
transferred to BONY as trustee for the COFINA bondholders).

ANSWER NO. 38: Ambac states that Paragraph 38 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Act 91, which speaks for itself, regarding its complete and accurate contents, and denies any

allegations inconsistent therewith.

39.     As of February 2017, there were $17.58 billion of COFINA bonds outstanding
(including $6.16 billion in present value of capital appreciation bonds).[24]

FN 24: Commonwealth of P.R. Fin. Info. & Operating Data Report, dated Dec. 18,
2016, at 182.

ANSWER NO. 39: Ambac lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 39.  Ambac respectfully refers the Court to the

referenced document, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

## V.     The SUT "Flow of Funds"

40.     All SUT revenues are collected, transferred, and deposited as follows:

(i)     Merchants and retailers remit SUT collections and submit tax returns to
Banco Popular de Puerto Rico ("Banco Popular") or to a tax collector that,
in turn, transfers the remittances and returns to Banco Popular, which is
responsible for receiving and verifying the SUT collections and returns.

(ii)    On a daily basis, Banco Popular transfers the SUT collections to a joint
account of the GDB (acting on behalf of the Commonwealth) and COFINA
at Banco Popular (the "Sales Tax Account").

(iii)   Based on information in the tax returns submitted by the merchants and
retailers, Banco Popular segregates the collections attributable to the
Commonwealth SUT from the collections attributable to the Municipal
SUT.

(iv)    On a daily basis with a two-day delay, Banco Popular transfers from the
Sales Tax Account to the Dedicated Sales Tax Fund (which is a COFINA

account at Banco Popular) the Commonwealth SUT collections that are dedicated to COFINA.

(v) On a daily basis, Banco Popular transfers the SUT collections in the Dedicated Sales Tax Fund as follows: *first*, to BONY as trustee for the COFINA bondholders up to the Base Amount for the then-current fiscal year; *second*, to the Commonwealth up to the Base Amount for that fiscal year; and, *third*, 50% to BONY as trustee for the COFINA bondholders and 50% to the Commonwealth for the remainder of that fiscal year.[25]

FN 25: P.R. Laws Ann. tit. 13, §§ 32101 and 32104.

ANSWER NO. 40: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 40, including all of its subparts, except to the extent Paragraph 40 sets forth legal conclusions, to which no response is required. Ambac respectfully refers the Court to the referenced statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

## FIRST CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that Act 91 Did Not Transfer Present
### Ownership of Future SUT Revenues to COFINA)

41. Paragraphs 1-40 are incorporated by reference as if fully set forth herein.

ANSWER NO. 41: Ambac repeats its responses and answers to Paragraphs 1-40 above.

42. In 2007, Act 91 was amended to provide that "[t]he [Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the **future funds** that must be deposited in the [Dedicated Sales Tax Fund] . . . are hereby transferred to, and shall be the property of COFINA."[26] (emphasis added).

FN 26: 2006 P.R. Laws 91, § 3, as amended, P.R. Law Ann. tit. 13 § 12.

ANSWER NO. 42: Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

43. With respect to "future funds," the statute is ambiguous as to whether the transfer purportedly occurred on the effective date of the Act or occurs as and when future SUT revenues are deposited into the Dedicated Sales Tax Fund. **The ambiguity arises because the statute**

speaks in terms of a present transfer ("are hereby transferred") of funds to be deposited in the future ("future funds that must be deposited").

ANSWER NO. 43: Ambac states that Paragraph 43 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 43.

44.     If the language is read as purporting to transfer **present ownership** of future revenues on the effective date of the Act, no such transfer occurred because no such transfer is possible. The law has no comprehension of a **present** transfer of **future** property (as distinct from a present **promise** that yet-to-exist property will be transferred in the future).

ANSWER NO. 44: Ambac states that Paragraph 44 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 44.

45.     It is a basic legal maxim (and a dictate of logic and common sense) that "one cannot give what one does not have" (in Latin, "*nemo dat qui non habet*"). Thus, "[i]t is impossible on the face to have a vested property right in after-acquired property . . . because, by definition, after-acquired property is a mere contingency." *First Nat'l Bank of Colorado Springs v. Hamilton* (*In re Hamilton*), 18 B.R. 868, 870 (Bankr. D. Colo. 1982). It is simply incoherent to say that COFINA has owned since 2007 tax revenues generated by the sale of a television that has not yet occurred and that might never occur.

ANSWER NO. 45: Ambac states that Paragraph 45 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 45.

46.     The notion of a present transfer of future funds is also directly at odds with the Commonwealth's inalienable power to repeal or reduce the SUT and with other provisions of Act 91 itself.

ANSWER NO. 46: Ambac states that Paragraph 46 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 46, and respectfully refers the Court to Act 91 and its relevant amendments, which speak

for themselves, regarding their complete and accurate contents.

47.     The Official Statement for each series of COFINA bonds included the following risk disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  In accordance with these provisions, **the Legislative Assembly may amend, modify or repeal Act 117 [now a provision of the tax code], which imposes the [SUT]**.[27]

(emphasis added).

> FN 27: GOVERNMENT DEVELOPMENT BANK, Puerto Rico Sales Tax Financing Corporation (COFINA), http://www.gdb-pur.com/investors_resources/cofina.html.

ANSWER NO. 47: Ambac respectfully refers the Court to the Official Statement for each series of COFINA bonds, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

48.     Thus, the COFINA bondholders were all on notice that the future SUT revenues securing their bonds were not COFINA's vested property and could disappear at any time.

ANSWER NO. 48: Ambac denies the allegations of Paragraph 48.

49.     Indeed, COFINA's bond counsel noted in its 2011 opinion letter that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . [and] [t]hus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely."  The opinion letter also noted that this fact had been "clearly disclosed" to bondholders.[28]

> FN 28: Opinion of Nixon Peabody LLP dated Dec. 13, 2011, at 10.

ANSWER NO. 49: Ambac respectfully refers the Court to the referenced opinion letter, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

50.     The prospect of a reduction or elimination of the SUT remained a serious concern among market participants, as evidenced by a highly unusual public conference call arranged by the GDB in October 2013 so that investors could directly question COFINA's bond counsel about their prior opinions.[29]  During that call, one investor asked: "[A]re we correct to assume that risk of materially negatively altering the COFINA structure via legislative action is very low?"  The

answer started with a "yes" but was quickly qualified with the frank acknowledgment that "[f]uture legislatures could take action if deemed appropriate."

> FN 29: GOVERNMENT DEVELOPMENT BANK, Conference Call About COFINA Legal Opinions (available at http://www.gdb-pur.com/investors_resources/documents/10-31-13TranscriptionGDBPR-Final.pdf).

ANSWER NO. 50: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the first sentence of Paragraph 50, except to the extent they set forth legal conclusions, to which no response is required. With respect to the second and third sentences of Paragraph 50, Ambac respectfully refers the Court to the referenced transcript, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

51. Furthermore, Act 91 provides that it "does not limit the power of the Commonwealth of Puerto Rico, by means of a law or amendment, to **limit or restrain the nature or the amount of such [SUT] or other revenues or to substitute similar or comparable collateral [in the form of] other taxes, fees, charges or other income to be deposited into the [Dedicated Sales Tax Fund]** if, for the following fiscal years, the revenues projected by the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or greater than the service of the debt and other charges and any coverage requirement included in the COFINA bond authorizing documents."[30] (emphasis added). It is noteworthy that Act 91 itself refers to the dedicated SUT revenues as "collateral."

FN 30: 2006 P.R. Laws 91, §5(c), as amended, P.R. Law Ann. tit. 13 §14(c).

ANSWER NO. 51: With respect to the allegations in the first sentence of Paragraph 51, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith. Ambac denies the allegations in the second sentence of Paragraph 51.

52. The "equal or greater" substitution condition applies only to the substitution of other collateral for the SUT revenues dedicated to COFINA under Act 91; not to any reduction or repeal of the SUT, which could be accomplished without any substitution of other revenues.

ANSWER NO. 52: Ambac states that Paragraph 52 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 52, and respectfully refers the Court to Act 91 and its relevant amendments, which speak

for themselves, regarding their complete and accurate contents.

53.     To state the obvious, if the SUT can be repealed or reduced at any time, and if future
SUT revenues can be substituted with "similar or comparable collateral" (*i.e.*, revenues from an
entirely different source), such yet-to-exist SUT revenues cannot already be COFINA's property.

ANSWER NO. 53: Ambac states that Paragraph 53 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 53.

54.     Moreover, Act 91 provides for the return of any SUT revenues remaining in the
Dedicated Sales Tax Fund when all COFINA bonds have been repaid.  Although the return is
"authorized" rather than expressly mandatory, COFINA cannot use SUT revenues for any purpose
other than to pay its administrative expenses and its bondholders, and, as a practical matter, the
Commonwealth has control over the disposition of any remaining funds because COFINA is
"attached" to the GDB and governed exclusively by GDB directors.

ANSWER NO. 54: With respect to the allegations in the first sentence of Paragraph 54,

Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for

themselves, regarding their complete and accurate contents, and denies any allegations inconsistent

therewith.  Ambac states that the allegations in the second sentence of Paragraph 54 set forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac denies

the allegations in the second sentence of Paragraph 54.

55.     The practical inevitability of any excess SUT revenues being returned to the
Commonwealth is fundamentally inconsistent with the idea that such yet-to-exist revenues became
the property of COFINA in 2007.

ANSWER NO. 55: Ambac denies the allegations of Paragraph 55.

56.     Perhaps the most powerful demonstration that COFINA does not own future SUT
revenues is that the Commonwealth has unilaterally reallocated such revenues to its General Fund.

ANSWER NO. 56: Ambac states that Paragraph 56 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 56.

57.     In October 2013, the Puerto Rico Legislature amended Act 91 to increase the portion of future Commonwealth SUT revenues transferred to COFINA so as to allow for the issuance of additional COFINA bonds.[31]   In July 2014, the Puerto Rico Legislature amended the 2013 amendment to suspend the increase in future SUT revenues "transferred" to COFINA nine months earlier.[32]

> FN 31: 2013 P.R. Laws 116.
> FN 32: 2014 P.R.. Laws 72.

ANSWER NO. 57: Ambac states that Paragraph 57 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and

accurate contents, and denies any allegations inconsistent therewith.

58.     The "Statement of Motives" for the 2014 amendment offered the following rationale for the Legislature's action:

> As the GDB has publicly stated, neither [the Commonwealth] nor its instrumentalities, including COFINA, intend to tap into the stock market through a bond issue during this fiscal year.  In light of this situation, the Legislative Assembly deems it prudent that the General Fund receives the Sales and Use Tax revenues **transferred to COFINA** under [the 2013 amendment], until such revenues are needed to repay any bond or note issued by COFINA in the future. When that time comes, the transfer to COFINA of the Sales and Use Tax revenues and the use therefor contemplated under [the 2013 amendment] shall be effective.[33]

(emphasis added).

> FN 33: 2014 P.R. Laws 72.

ANSWER NO. 58: Ambac respectfully refers the Court to Act 72-2014 for its complete

and accurate contents, and denies any allegations inconsistent therewith.

59.     The additional future revenues "transferred to COFINA" could not have become COFINA's property in 2013 if, in 2014, the Commonwealth could unilaterally reallocate those revenues to its General Fund.

ANSWER NO. 59: Ambac states that Paragraph 59 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 59.

60. Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 did not transfer present ownership of future SUT revenues to COFINA.

ANSWER NO. 60: Ambac states that Paragraph 60 sets forth legal conclusions to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 60.

## SECOND CAUSE OF ACTION

### 28 U.S.C § 2201(a)
### (Declaration that Act 91 Did Not Assign to COFINA
### Any "Right to Receive" Future SUT Revenues)

61. Paragraphs 1-60 are incorporated by reference as if fully set forth herein.

ANSWER NO. 61: Ambac repeats its responses and answers to Paragraphs 1-60 above.

62. Tellingly, the legal opinions rendered in connection with the issuance of COFINA bonds do not speak in terms of a present transfer of future property, and they contain no analysis of how such a transfer would be possible.

ANSWER NO. 62: Ambac states that Paragraph 62 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced legal opinions, which speak for themselves, regarding their complete and accurate

contents, and denies any allegations inconsistent therewith.

63. Rather, they all refer to a transfer of the Commonwealth's "right to receive" future dedicated tax revenues, opining without analysis that this purported transfer was valid. *See* Opinion of the P.R. Dep't of Justice dated Dec. 13, 2011, at 2 ("Pursuant to Act 91, the Dedicated Sales Tax Fund, including the **right to receive** collections of the Dedicated Sales Tax, is validly transferred to [COFINA]."); Opinion of Nixon Peabody LLP dated Dec. 13, 2011, at 11 ("Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's **right to receive** the Pledged Sales Tax, to [COFINA]."); Opinion of Pietrantoni Mendez & Alvarez LLC dated Dec. 13, 2011, at 8 ("Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's **right to receive** the Pledged Sales Tax, to [COFINA].") (emphasis added).

ANSWER NO. 63: Ambac states that Paragraph 63 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced legal opinions, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

64.     Act 91, however, says nothing about a transfer of the Commonwealth's "right to receive" future SUT revenues.

ANSWER NO. 64: Ambac states that Paragraph 64 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

65.     In any event, such a transfer would, on its face, not have vested COFINA with ownership of dedicated SUT revenues **prior to their receipt**.

ANSWER NO. 65: Ambac states that Paragraph 65 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 65.

66.     Nor would a transfer of the Commonwealth's "right to receive" have constituted an assignment of any such right. COFINA has no right or authority to collect or enforce the SUT, which is owed by taxpayers exclusively to the Commonwealth.[34] Indeed, the Commonwealth was at pains to disclaim any transfer of its taxing power with respect to the SUT.[35]

> FN 34: See P.R. Law Ann. tit. 13 § 11a(b) (limiting the powers of COFINA); P.R. Law Ann. tit. 13 §§ 32021-32031 (providing for the collection of the SUT).
> FN 35: 2006 P.R. Laws 91, § 8, as amended, P.R. Law Ann. tit. 13 § 8(a), P.R. Law Ann. tit. 13 § 16(a).

ANSWER NO. 66: Ambac states that Paragraph 66 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations in the first and second sentences of Paragraph 66. With respect to the third sentence of Paragraph 66, Ambac respectfully refers the Court to the referenced statutes for their complete and accurate contents, and denies any allegations inconsistent therewith.

67.     As set forth above, revenues from the SUT are collected on behalf of the Commonwealth and deposited into a joint account of the GDB (an instrumentality of the

Commonwealth) and COFINA. Only then are revenues allocable to the Commonwealth SUT (as opposed to those allocable to the municipalities) transferred to the Dedicated Sales Tax Fund.[36]

FN 36: Official Statement for COFINA Senior Series 2011C Bonds, at 15 & 16.

ANSWER NO. 67: Ambac states that Paragraph 67 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 67.

68.     Thus, any purported transfer of the "right to receive" (**which, again, Act 91 says nothing about**) would have amounted to nothing more than a promise to pay SUT revenues over to COFINA as and when collected by the Commonwealth, as distinct from an assignment of a direct right to collect and enforce the SUT, which would have entailed an unconstitutional transfer of the Commonwealth's taxing power. *See* Puerto Rico Constitution, Article VI, Section 2 (prohibiting any surrender or suspension of the Commonwealth's taxing power); RESTATEMENT (SECOND) OF CONTRACTS § 330 (AM. LAW INST. 1981) ("A contract . . . to transfer proceeds to be received in the future by the promisor, is not an assignment."); *id* at cmt. B ("[A] promise by an obligee that he will collect money due him and pay over all or part of it to the promisee is not an assignment."); *IBEC v. Banco Comercial*, 117 D.P.R. 371, 376 [17 P.R. Offic. TRANS. 446, 453] (1986) (in an assignment of rights, "[t]he assignee holds the same position and binding relationship with regard to the debtor from the moment the credit is transferred.").

ANSWER NO. 68: Ambac states that Paragraph 68 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 68.

69.     Put the other way around, without an assignment to COFINA of the right to collect and enforce the dedicated portion of the SUT, any transfer of the "right to receive" would have amounted to nothing more than an "unsecured" promise by the Commonwealth to pay over to COFINA the dedicated portion of the SUT as and when collected.

ANSWER NO. 69: Ambac states that Paragraph 69 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 69.

70.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 did not assign to COFINA the Commonwealth's "right to receive" the dedicated portion of future SUT revenues.

ANSWER NO. 70: Ambac states that Paragraph 70 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 70.

## THIRD CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
**(Declaration that Purported Transfer of "Future Funds" to COFINA Was, at Most, Unsecured Promise that SUT Revenues Would Be Transferred to COFINA in the Future)**

71.     Paragraphs 1-70 are incorporated by reference as if fully set forth herein.

ANSWER NO. 71: Ambac repeats its responses and answers to Paragraphs 1-70 above.

72.     Given the foregoing, the purported transfer to COFINA of "future funds" is most sensibly read as a promise that future SUT revenues would be transferred to COFINA as and when deposited into the Dedicated Sales Tax Fund.

ANSWER NO. 72: Ambac states that Paragraph 72 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 72.

73.     Like any other pre-petition promise of a debtor, that promise can be breached, revoked, and/or rejected after the filing of a title III petition, giving COFINA, at most, an unsecured claim in the Commonwealth's title III case.[37]

> FN 37: Such unsecured claim would be subject to any defenses the Commonwealth may have, which is an issue beyond the scope of this proceeding.

ANSWER NO. 73: Ambac states that Paragraph 73, including footnote 37, sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 73.

74.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that, with respect to "future funds," the statutory transfer language was, at most, an unsecured promise that SUT revenues would be transferred to COFINA in the future, which promise can be breached, revoked, or, pursuant to section 365 of the Bankruptcy Code, rejected to the extent of any executory contract between the Commonwealth and COFINA with respect to future SUT revenues.

ANSWER NO. 74: Ambac states that Paragraph 74 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 74.

75.     To the extent necessary to satisfy its mandate under the Commonwealth-COFINA
Dispute Stipulation, the Commonwealth Agent hereby indicates its intent to breach, revoke, and/or
reject that unsecured promise.

ANSWER NO. 75: Ambac lacks knowledge or information sufficient to form a belief as

to the truth of the allegations of Paragraph 75, except to the extent Paragraph 75 contains a

characterization of Plaintiff's purported legal rights, to which no response is required.  Ambac

further avers that the allegations of Paragraph 75 are beyond the scope of the Commonwealth

Agent's powers and authority.

## FOURTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that COFINA Has No Enforceable
### Security Interest in Future SUT Revenues)

76.     Paragraphs 1-75 are incorporated by reference as if fully set forth herein.

ANSWER NO. 76: Ambac repeats its responses and answers to Paragraphs 1-75 above.

77.     If the purported transfer to COFINA of "future funds" (or of any "right to receive"
such funds) was of any legal effect beyond an unsecured promise that funds would be transferred
in the future, it could only be viewed as a grant by the Commonwealth to COFINA of a security
interest in after-acquired property, *i.e.*, future SUT revenues.  Indeed, viewing the transfer as a
secured transaction is consistent with the Commonwealth's ability under Act 91 to replace future
SUT revenues with other "**collateral**."

ANSWER NO. 77: Ambac states that Paragraph 77 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 77.

78.     If viewed as a grant of a security interest, the transfer of "future funds" was and is
governed by Article 9 of the Uniform Commercial Code, as adopted by Puerto Rico (the "UCC").
More specifically, any such purported transfer would most properly be characterized as a grant of
a security interest in "accounts" or "payment intangibles" (as defined in the UCC) to secure the

Commonwealth's obligation (which arises by operation of law) to reimburse COFINA for the use
of COFINA bond proceeds to pay debts and expenses of the Commonwealth and/or as a non-
recourse third-party pledge by the Commonwealth of collateral to secure COFINA's obligation to
pay its bondholders.

ANSWER NO. 78: Ambac states that Paragraph 78 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 78.

79.     In this regard, the subjective intent of the parties to create a security interest is not
– and never has been – needed to create such an interest.  As the drafters of the UCC made clear
in their 2010 revisions:  "When a security interest is created, [Article 9] applies regardless of the
form of the transaction or the name that parties have given to it.  Likewise, the subjective intention
of the parties with respect to the legal characterization of their transaction is irrelevant to whether
this Article applies, as it was to the application of former Article 9."[38]

FN 38: UCC § 9-102 cmt. 2.

ANSWER NO. 79: Ambac states that Paragraph 79 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to the Puerto Rico UCC and its official comments, which speak for themselves, regarding their

complete and accurate contents, and denies any allegations inconsistent therewith.

80.     The "old" version of UCC Article 9 ("Old Article 9"), which was in effect when
the "future funds" transfer language was added to Act 91, excluded from its scope any "transfer
by a government, political subdivision or governmental instrumentality or agency **to the extent
such transfer is governed by special statute**."[39] (emphasis added).

FN 39: Old UCC § 9-104(e).

ANSWER NO. 80: Ambac states that Paragraph 80 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Old Article 9, which speaks for itself, regarding its complete and accurate contents, and denies

any allegations inconsistent therewith.

81.     Act 91 was not a "special statute" with respect to the Commonwealth-COFINA
transfer because it did not "govern" the transfer with respect to matters that would otherwise be
governed by Article 9 (*e.g.*, attachment and perfection).  *See* Old UCC § 9-104, cmt. 5 ("Since
these assignments [of collateral in connection with governmental borrowings] are usually

governed by special provisions of law, these governmental transfers are excluded from this Article.") (emphasis added).

ANSWER NO. 81: Ambac states that Paragraph 81 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 81, and respectfully refers the Court to Article 9 of the Puerto Rico UCC and its official comments, which speak for themselves, regarding their complete and accurate contents.

82. Even if Act 91 were a "special statute" and Old Article 9 did not apply to the purported transfer of future SUT revenues to COFINA, Article 9 became applicable to the purported transfer of "future funds" with Puerto Rico's adoption of "Revised Article 9" in 2013.[40]

> FN 40: Section 9-702(a) of Revised Article 9 provides that, "[e]xcept as otherwise provided in this part, this Act applies to a transaction or lien within its scope, even if the transaction or lien was entered into or created before this Act takes effect." (emphasis added).

ANSWER NO. 82: Ambac states that Paragraph 82 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 82, and respectfully refers the Court to Part 7 of Article 9 of the Puerto Rico UCC for its complete and accurate contents.

83. The "scope" section of Revised Article 9 provides that it applies generally to security interests in accounts and payment intangibles but "does not apply to the extent that . . . another statute of this Commonwealth expressly governs the creation, perfection, priority, or enforcement of a security interest created by this Commonwealth or a governmental unit of this Commonwealth"[41] (emphasis added)). If anything, this exclusion is narrower than the exclusion in Old Article 9.

FN 41: Revised UCC § 9-109(c).

ANSWER NO. 83: Ambac states that Paragraph 83 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 83, and respectfully refers the Court to Article 9 of the Puerto Rico UCC for its complete and accurate contents.

84. Act 91 contains no provisions governing the attachment, priority, perfection, or enforcement of any security interest granted **by the Commonwealth to COFINA**, and no other statute governs these matters.

ANSWER NO. 84: Ambac states that Paragraph 84 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91, which speaks for itself, regarding its complete and accurate contents; denies any allegations inconsistent therewith; and otherwise denies the allegations of Paragraph 84.

85. By contrast, Act 91 contains detailed provisions governing the attachment, perfection, and priority of the security interest granted **by COFINA to its bondholders** (and, even though the statute provides that no further steps are required for perfection, BONY, as trustee for the bondholders, filed a UCC financing statement against COFINA).

ANSWER NO. 85: Ambac states that Paragraph 85 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith. Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 85 concerning BONY's UCC filings.

86. Thus, the purported transfer of future SUT revenues to COFINA either was never excluded from Article 9 or ceased to be excluded when Revised Article 9 became effective in 2013.

ANSWER NO. 86: Ambac states that Paragraph 86 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 86.

87. Section 9-203 of the UCC (Old and Revised) provides, in relevant part, that a security interest becomes enforceable against the debtor only if the debtor has authenticated (*i.e.*, signed) a security agreement. Here, no security agreement was ever signed or otherwise authenticated by the Commonwealth.

ANSWER NO. 87: Ambac states that the first sentence of Paragraph 87 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac

respectfully refers the Court to the referenced statute for its complete and accurate contents, and

denies any allegations inconsistent therewith.  With respect to the second sentence of Paragraph

87, Ambac denies the allegations contained therein.

88.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28
U.S.C § 2201(a) that no security interest of COFINA ever became enforceable against the
Commonwealth.

ANSWER NO. 88: Ambac states that Paragraph 88 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 88.

### FIFTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**Bankruptcy Code Sections 544(a)(1) and 547(b)**
**(Declaration that Any Unperfected Security Interest of COFINA**
**in SUT Revenues is Avoidable; Avoidance of Any Such Interest)**

89.     Paragraphs 1-88 are incorporated by reference as if fully set forth herein.

ANSWER NO. 89: Ambac repeats its responses and answers to Paragraphs 1-88 above.

90.     Even if a security interest became enforceable against the Commonwealth, the
security interest was not and is not perfected.

ANSWER NO. 90: Ambac states that Paragraph 90 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 90.

91.     Under the transition rules for Revised Article 9, secured parties had one year from
the effective date (January 17, 2013) to perfect any security interest within its scope that was not
covered by Old Article 9.[42]

FN 42: Revised UCC § 9-703(b).

ANSWER NO. 91: Ambac states that Paragraph 91 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Part 7 of Article 9 of the Puerto Rico UCC, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

92.     To perfect a security interest in accounts or general intangibles under Old Article 9, a secured party (here, COFINA) needed to file a UCC financing statement, which COFINA did not do.  The requirement is the same for the perfection of a security interest in "payment intangibles," which is the applicable term under Revised Article 9.

ANSWER NO. 92: With respect to the first sentence of Paragraph 92, Ambac lacks knowledge or information sufficient to form a belief as to the truth of whether COFINA filed a financing statement.  Ambac states that the remainder of Paragraph 92 sets forth legal conclusions to which no response is required.  To the extent a response is required, Ambac denies the remaining allegations of Paragraph 92.

93.     Any unperfected security interest of COFINA in accounts or payment intangibles is avoidable pursuant to section 544(a)(1) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)).

ANSWER NO. 93: Ambac states that Paragraph 93 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 93.

94.     Section 544(a)(1) of the Bankruptcy Code provides that "(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by— (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists."[43]

FN 43: 11 U.S.C. § 544(a)(1).

ANSWER NO. 94: With respect to the allegations of Paragraph 94, Ambac respectfully refers the Court to Section 544(a) of the Bankruptcy Code for its complete and accurate contents, and denies any allegations inconsistent therewith.

95.     In these title III cases, the term "trustee" means the Oversight Board.[44]

        FN 44: PROMESA § 301(c)(7).

ANSWER NO. 95: Ambac states that Paragraph 95 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 95.

96.     The Commonwealth Agent stands in the shoes of the Oversight Board as "trustee"
with respect to the Commonwealth-COFINA Dispute.

ANSWER NO. 96: Ambac states that Paragraph 96 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to the Commonwealth-COFINA Dispute Stipulation, which speaks for itself, regarding its

complete and accurate contents, and denies any allegations inconsistent therewith.

97.     Pursuant to section 9-317(a)(2) of Revised Article 9, an unperfected security
interest is subordinate to the rights of a person who becomes a lien creditor before the security
interest is perfected.

ANSWER NO. 97: Ambac states that Paragraph 97 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Section 9-317 of the Puerto Rico UCC for its complete and accurate contents, and denies any

allegations inconsistent therewith.

98.     The Oversight Board, and therefore the Commonwealth Agent, has the status of a
lien creditor by virtue of section 544(a)(1) of the Bankruptcy Code.

ANSWER NO. 98: Ambac states that Paragraph 98 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 98.

99.     In addition, under specified circumstances that are present here, section 547(b) of
the Bankruptcy Code empowers the trustee to avoid transfers of an interest of the debtor in property
made prior to the petition date.

ANSWER NO. 99: Ambac states that Paragraph 99 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 99.

100.    Pursuant to section 547(e)(2)(C) of the Bankruptcy Code, a transfer is deemed
made immediately before the petition date if such transfer is not perfected at the later of the
commencement of the case or 30 days after the transfer takes effect.

ANSWER NO. 100: Ambac states that Paragraph 100 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac respectfully refers the Court

to Section 547 of the Bankruptcy Code, which speaks for itself, regarding its complete and accurate

contents, and denies any allegations inconsistent therewith.

101.    Because any security interest of COFINA was not perfected as of the
Commonwealth Petition Date, any transfer of an interest in SUT revenues is deemed to have
occurred immediately before the Commonwealth Petition Date and thus during the applicable
avoidance period under section 547(b)(4).

ANSWER NO. 101: Ambac states that Paragraph 101 sets forth legal conclusions, to which

no response is required.  To the extent a response is required, Ambac denies the allegations of

Paragraph 101.

102.    Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28
U.S.C § 2201(a) that any unperfected security interest of COFINA in SUT revenues is avoidable.
The Commonwealth Agent also seeks to avoid any such interest under section 547(b).

ANSWER NO. 102: Ambac states that the first sentence of Paragraph 102 sets forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac denies

the allegations in the first sentence of Paragraph 102.  Ambac lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 102,

except to the extent that sentence contains a characterization of Plaintiff's purported legal rights,

to which no response is required.  Ambac further avers that the allegations in the second sentence

of Paragraph 102 are beyond the scope of the Commonwealth Agent's powers and authority.

## SIXTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 548(a)(1)(B)
### (Declaration that Any Interest of COFINA in SUT Revenues Is
### Avoidable as Fraudulent Transfer; Avoidance of Any Such Interest)

103.    Paragraphs 1-102 are incorporated by reference as if fully set forth herein.

ANSWER NO. 103: Ambac repeats its responses and answers to Paragraphs 1-102 above.

104.    To the extent the Court determines that any interest of COFINA in SUT revenues is not a security interest or that any pre-petition transfer to COFINA of an interest in SUT revenues is not avoidable pursuant to section 544(a)(1) or 547(b) of the Bankruptcy Code, the Commonwealth Agent is entitled to a declaration, pursuant to 28 U.S.C § 2201(a), that any such transfer made within two years before the Commonwealth Petition Date is avoidable as a fraudulent transfer pursuant to section 548(a)(1)(B) of the Bankruptcy Code insofar as the Commonwealth received less than reasonably equivalent value for any such transfer and the conditions in section 548(a)(1)(B)(i) or 548(a)(1)(B)(ii) were met.  The Commonwealth Agent also seeks to avoid any such transfer under section 548(a)(1)(B).

ANSWER NO. 104: Ambac states that the first sentence of Paragraph 104 sets forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac denies

the allegations in the first sentence of Paragraph 104.  Ambac lacks knowledge or information

sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 104,

except to the extent that sentence contains a characterization of Plaintiff's purported legal rights,

to which no response is required.  Ambac further avers that the allegations in the second sentence

of Paragraph 104 are beyond the scope of the Commonwealth Agent's powers and authority.

## SEVENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 549
### (Declaration that Any Post-Petition Transfer to COFINA of SUT Revenues
### Is Avoidable Post-Petition Transaction; Avoidance of Such Transactions)

105.     Paragraphs 1-104 are incorporated by reference as if fully set forth herein.

ANSWER NO. 105: Ambac repeats its responses and answers to Paragraphs 1-104 above.

106.     Subject to certain inapplicable exceptions, section 549(a) of the Bankruptcy Code empowers the trustee to avoid any unauthorized transfer of property of the Commonwealth's estate (such as transfers of SUT revenues) that occurs after the commencement of the case.

ANSWER NO. 106: Ambac states that Paragraph 106 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to Section 549 of the Bankruptcy Code, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

107.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that any post-petition transfer to COFINA of SUT revenues is avoidable.  The Commonwealth Agent also seeks to avoid such transfers under section 549.

ANSWER NO. 107: Ambac states that the first sentence of Paragraph 107 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations in the first sentence of Paragraph 107.  Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 107, except to the extent that sentence contains a characterization of Plaintiff's purported legal rights, to which no response is required.  Ambac further avers that the allegations in the second sentence of Paragraph 107 are beyond the scope of the Commonwealth Agent's powers and authority.

### EIGHTH CAUSE OF ACTION

**28 U.S.C. § 2201(a)**
**UCC Section 9-317(a)(2)**
**(Declaration that Any Security Interest of COFINA in SUT**
**Revenues Is Subordinate to Rights of Oversight Board as Trustee)**

108.     Paragraphs 1-107 are incorporated by reference as if fully set forth herein.

ANSWER NO. 108: Ambac repeats its responses and answers to Paragraphs 1-107 above.

109.    Section 9-102(a)(52)(C) of the UCC defines a "lien creditor" to include "a trustee in bankruptcy from the date of the filing of the petition."[45]

FN 45: PROMESA § 301(c)(7).

ANSWER NO. 109: Ambac respectfully refers the Court to the referenced statutes for their complete and accurate contents, and denies any allegations inconsistent therewith.

110.    In these title III cases, the term "trustee" means the Oversight Board.[46]

FN 46: PROMESA § 301(c)(7).

ANSWER NO. 110: Ambac states that Paragraph 110 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 110.

111.    The Commonwealth Agent stands in the shoes of the Oversight Board as "trustee" with respect to the Commonwealth-COFINA Dispute.

ANSWER NO. 111: Ambac states that Paragraph 111 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the Commonwealth-COFINA Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

112.    Pursuant to section 9-317(a)(2) of Revised Article 9, an unperfected security interest is subordinate to the rights of a person who becomes a lien creditor before the security interest is perfected.

ANSWER NO. 112: Ambac states that Paragraph 112 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Section 9-317 of the Puerto Rico UCC, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

113.    Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that any security interest of COFINA is subordinate to the rights of the Oversight Board as trustee.

ANSWER NO. 113: Ambac states that Paragraph 113 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 113.

## NINTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 552(a)
### (Declaration that Any Security Interest Was Cut Off
### By Commencement of Commonwealth's Title III Case)

114.    Paragraphs 1-113 are incorporated by reference as if fully set forth herein.

ANSWER NO. 114: Ambac repeats its responses and answers to Paragraphs 1-113 above.

115.    Section 552(a) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), provides that, subject to certain inapplicable exceptions, "property acquired . . . by the debtor after the commencement of the case is not subject to any lien resulting from any security agreement entered into by the debtor before the commencement of the case."[47]

FN 47: 11 U.S.C. § 552(a).

ANSWER NO. 115: Ambac states that Paragraph 115 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac respectfully refers the Court to the referenced statutes for their complete and accurate contents, and denies any allegations inconsistent therewith.

116.    Even if COFINA has a security interest in SUT revenues (whether perfected or not), it could only have resulted from a pre-petition security agreement.

ANSWER NO. 116: Ambac states that Paragraph 116 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 116.

117.    Any post-petition SUT revenues are after-acquired property of the Commonwealth.

ANSWER NO. 117: Ambac states that Paragraph 117 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 117.

118.    Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that any security interest of COFINA as to SUT revenues acquired post-petition was cut off by the commencement of the Commonwealth's title III case.

ANSWER NO. 118: Ambac states that Paragraph 118 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 118.

## TENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Sections 544(a)(1) and 547(b)
### (Declaration that Any Non-UCC Transfer of Post-Petition
### SUT Revenues Is Avoidable; Avoidance of Any Such Transfers)

119.    Paragraphs 1-118 are incorporated by reference as if fully set forth herein.

ANSWER NO. 119: Ambac repeats its responses and answers to Paragraphs 1-118 above.

120.    Even the senior COFINA bondholders could not bring themselves to claim that Act 91 transferred to COFINA present ownership of future SUT revenues. In their motion for judgment on the pleadings in the *Lex Claims* case, they took the position that "from the moment they are **generated**, the Transferred Tax Revenues are the property of COFINA."[48] (emphasis added).

> FN 48: Major COFINA Bondholders' Mot. for J. on the Pleadings to Dismiss the Second & Twelfth Causes of Action in Pls' Second Amended Complaint, at 13, Lex Claims, LLC v. Padilla, No. 16-02374 (FAB) (D.P.R. Mar. 19, 2017) [Docket No. 225].

ANSWER NO. 120: Ambac denies the allegations in the first sentence of Paragraph 120. Ambac respectfully refers the Court to the referenced court filing for its complete and accurate contents, and denies any allegations inconsistent therewith, including the allegation that the Major COFINA Bondholders can be accurately equated with "the senior COFINA bondholders."

121.    However, the transfer language in Act 91 says nothing about the point at which SUT revenues are "generated." Rather, it speaks only in terms of future SUT revenues that must be "deposited" into the Dedicated Sales Tax Fund.

ANSWER NO. 121: Ambac states that Paragraph 121 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Act 91 and its relevant amendments, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

122.    In any event, whether the transfer occurs when the future SUT revenues are generated or when they are deposited into the Dedicated Sales Tax Fund, and even if the transfer was of some legal effect beyond an unsecured promise and was not and is not governed by UCC Article 9, any interest of COFINA in post-petition SUT revenues is avoidable pursuant to section 544(a)(1) of the Bankruptcy Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. § 2161(a)), because the transfer of such future revenues was, at best, incomplete as of the filing of the Commonwealth's title III petition.

ANSWER NO. 122: Ambac states that Paragraph 122 sets forth legal conclusions to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 122.

123.    Section 544(a)(1) provides that "(a) The trustee shall have, as of the commencement of the case, and without regard to any knowledge of the trustee or of any creditor, the rights and powers of, or may avoid any transfer of property of the debtor or any obligation incurred by the debtor that is voidable by— (1) a creditor that extends credit to the debtor at the time of the commencement of the case, and that obtains, at such time and with respect to such credit, a judicial lien on all property on which a creditor on a simple contract could have obtained such a judicial lien, whether or not such a creditor exists."[49]

FN 49: 11 U.S.C. § 544(a)(1).

ANSWER NO. 123: Ambac respectfully refers the Court to Section 544 of the Bankruptcy Code for its complete and accurate contents, and denies any allegations inconsistent therewith.

124.    In these title III cases, the term "trustee" as used in applicable provisions of the Bankruptcy Code means the Oversight Board.[50]

FN 47: PROMESA § 301(c)(7).

ANSWER NO. 124: Ambac states that Paragraph 124 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to Section 301 of PROMESA for its complete and accurate contents, and denies any allegations inconsistent therewith.

125.     The Commonwealth Agent stands in the shoes of the Oversight Board as "trustee" with respect to the Commonwealth-COFINA Dispute.

ANSWER NO. 125: Ambac states that Paragraph 125 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the Commonwealth-COFINA Dispute Stipulation, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

126.     Any transfer of property of the debtor that is incomplete as of the petition date is voidable by a judicial lien creditor that obtained the lien at the time of the commencement of the case.

ANSWER NO. 126: Ambac states that Paragraph 126 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 126.

127.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that any non-UCC interest of COFINA in post-petition SUT revenues is avoidable. The Commonwealth Agent, also seeks to avoid any such interests under section 544(a)(1).

ANSWER NO. 127: Ambac states that the first sentence of Paragraph 127 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations in the first sentence of Paragraph 127. Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 127, except to the extent that sentence contains a characterization of Plaintiff's purported legal rights, to which no response is required. Ambac further avers that the allegations in the second sentence of Paragraph 127 are beyond the scope of the Commonwealth Agent's powers and authority.

128.     In addition, under specified circumstances that are present here, section 547(b) of the Bankruptcy Code empowers the trustee to avoid transfers of an interest of the debtor in property made prior to the petition date.

<u>ANSWER NO. 128</u>: Ambac states that Paragraph 128 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 128.

129.     Pursuant to section 547(e)(3) of the Bankruptcy Code, for purposes of section 547, a transfer is not made at least until the debtor has acquired rights in the property transferred.  The Commonwealth does not acquire rights in SUT revenues until taxable goods or services are purchased, thereby giving the Commonwealth the right to collect the tax from the purchaser or merchant.

<u>ANSWER NO. 129</u>: Ambac states that Paragraph 129 sets forth legal conclusions, to which no response is required.  To the extent a response to the first sentence of Paragraph 129 is required, Ambac respectfully refers the Court to Section 547 of the Bankruptcy Code for its complete and accurate contents, and denies any allegations inconsistent therewith.  To the extent a response to the second sentence of Paragraph 129 is required, Ambac denies the allegations.

130.     Accordingly, the Commonwealth Agent is entitled to a declaration that any non-UCC interest of COFINA in post-petition SUT revenues and SUT revenues within the applicable avoidance period are avoidable.  The Commonwealth Agent also seeks to avoid any such interests under section 547(b).

<u>ANSWER NO. 130</u>: Ambac states that the first sentence of Paragraph 130 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations in the first sentence of Paragraph 130.  Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of Paragraph 130, except to the extent that sentence contains a characterization of Plaintiff's purported legal rights, to which no response is required.  Ambac further avers that the allegations in the second sentence of Paragraph 130 are beyond the scope of the Commonwealth Agent's powers and authority.

## ELEVENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### Bankruptcy Code Section 362(a)
### (Declaration that Post-Petition Transfer of SUT Revenues
### to Non-Commonwealth Entities Violates Automatic Stay)

131.    Paragraphs 1-130 are incorporated by reference as if fully set forth herein.

ANSWER NO. 131: Ambac repeats its responses and answers to Paragraphs 1-130 above.

132.    Subject to certain inapplicable exceptions, section 362(a)(3) of the Bankruptcy
Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. §
2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . .
any act to obtain possession of property of the estate or of property from the estate or to exercise
control over property of the estate."[51]

FN 51: 11 U.S.C. §362(a)(3).

ANSWER NO. 132: Ambac states that Paragraph 132 sets forth legal conclusions, to which

no response is required.  To the extent a response to Paragraph 132 is required, Ambac respectfully

refers the Court to the referenced statutes for their complete and accurate contents, and denies any

allegations inconsistent therewith.

133.    Subject to certain inapplicable exceptions, section 362(a)(5) of the Bankruptcy
Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. §
2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . .
any act to create, perfect, or enforce against property of the debtor any lien to the extent that such
lien secures a claim that arose before the commencement of the case."[52]

FN 52: 11 U.S.C. §362(a)(5).

ANSWER NO. 133: Ambac states that Paragraph 133 sets forth legal conclusions, to which

no response is required.  To the extent a response to Paragraph 133 is required, Ambac respectfully

refers the Court to the referenced statutes for their complete and accurate contents, and denies any

allegations inconsistent therewith.

134.    Subject to certain inapplicable exceptions, section 362(a)(6) of the Bankruptcy
Code, as made applicable to these title III cases by section 301(a) of PROMESA (48 U.S.C. §
2161(a)), provides that the filing of a petition "operates as a stay, applicable to all entities, of . . .

any act to collect, assess, or recover a claim against the debtor that arose before the commencement of the case."[53]

FN 53: 11 U.S.C. §362(a)(6).

ANSWER NO. 134: Ambac states that Paragraph 134 sets forth legal conclusions, to which no response is required.  To the extent a response to Paragraph 134 is required, Ambac respectfully refers the Court to the referenced statutes for their complete and accurate contents, and denies any allegations inconsistent therewith.

135.     The ongoing depositing of SUT revenues to the Sales Tax Account removes those revenues from the sole control of the Commonwealth and constitutes an act to collect, assess, or recover a claim against the Commonwealth that arose before the Commonwealth Petition Date and are therefore in violation of sections 362(a)(3) and 362(a)(6) of the Bankruptcy Code.

ANSWER NO. 135: Ambac states that Paragraph 135 sets forth legal conclusions, to which no response is required.  To the extent a response is required, Ambac denies the allegations of Paragraph 135.

136.     Further, even if the transfer to COFINA of "future funds" (or of any "right to receive" such funds) created a security interest of COFINA in future SUT revenues, any act to perfect any such security interest as and when dedicated SUT revenues come into existence, including by transferring such revenues to COFINA such that they are in COFINA's possession, is prohibited by section 362(a)(5) of the Bankruptcy Code.

ANSWER NO. 136: Ambac states that Paragraph 136 sets forth legal conclusions, to which no response is required.  To the extent a response to Paragraph 136 is required, Ambac denies the allegations of Paragraph 136.

137.     Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that the ongoing post-petition depositing of SUT revenues into the Sales Tax Account, the Dedicated Sales Tax Fund, and BONY account is in violation of section 362(a) of the Bankruptcy Code.

ANSWER NO. 137: Ambac states that Paragraph 137 sets forth legal conclusions, to which no response is required.  To the extent a response to Paragraph 137 is required, Ambac denies the allegations.

## TWELFTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that Act 91 Is Unconstitutional Because
### Substantial Result of COFINA Structure Was Evasion of
### Constitutional Debt Limits and Constitutional Debt Priority)

138.    Paragraphs 1-137 are incorporated by reference as if fully set forth herein.

ANSWER NO. 138: Ambac repeats its responses and answers to Paragraphs 1-137 above.

139.    As the story is told by the senior COFINA bondholders, the creation of the COFINA structure was an almost heroic feat of financial engineering that "rescued" the Commonwealth from imminent financial peril. *See, e.g., COFINA Senior Bondholders' Motion and Incorporated Memorandum of Law for Judgment on the Pleadings Pursuant to Federal Rule of Civil Procedure 12(c)*, at 42 (referring to COFINA bonds as Puerto Rico's "first rescue bond"), *Lex Claims, LLC v. Padilla*, No. 16-02374 (FAB) (D.P.R. Mar. 18, 2017). To be sure, the COFINA structure was a feat of financial and legal engineering, but this only serves to highlight that the structure was an evasion of Puerto Rico's constitutional limitations on the issuance of Commonwealth debt and the constitutional priority granted to the Commonwealth's public debtholders. Ultimately, the issuance of COFINA bonds did no more than stave off the day of reckoning while adding billions of dollars to Puerto Rico's already unsustainable debt burden.

ANSWER NO. 139: Ambac respectfully refers the Court to the referenced court filing for

its complete and accurate contents, and denies any allegations inconsistent therewith. Ambac

states that the second sentence of Paragraph 139 set forth legal conclusions, to which no response

is required. To the extent a response to the second sentence of Paragraph 137 is required, Ambac

denies the allegations. Ambac denies the allegations in the third sentence of Paragraph 139.

140.    Looking through the form to the **economic substance** of the COFINA structure, it is nothing but a conduit for borrowing by the Commonwealth. **The only purpose of the COFINA entity is to pay the Commonwealth's debts and expenses with the proceeds of bonds for which the only source of payment is general Commonwealth tax revenues.** Unlike the typical issuer of a government "revenue bond," COFINA does not operate any project or system from which the revenues backing its bonds are derived.

ANSWER NO. 140: Ambac denies the allegations of Paragraph 140.

### Evasion of Constitutional Debt Limits

141.    Puerto Rico's constitution places limits on the issuance and guarantee of debt by the Commonwealth. Article VI, Section 2 of the constitution provides that:

**no direct obligations of the Commonwealth** for money borrowed directly by the Commonwealth evidenced by bonds or notes **for the payment of which the full faith credit and taxing power of the Commonwealth shall be pledged shall be issued** by the Commonwealth **if** the total of (i) the amount of principal of and interest on such bonds and notes, together with the amount of principal of and interest on all such bonds and notes theretofore issued by the Commonwealth and then outstanding, payable in any fiscal year and (ii) any amounts paid by the Commonwealth in the fiscal year next preceding the then current fiscal year for principal or interest on account of any outstanding obligations evidenced by bonds or notes guaranteed by the Commonwealth, **shall exceed 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year** (the "Debt Service Limit").

P.R. Laws Ann. Const. art VI, §2 (emphasis added).  The same section further provides that "no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date" (the "Debt Maturity Limit," and, together with the "Debt Service Limit," the "Constitutional Debt Limits").  *Id.*

ANSWER NO. 141: Ambac respectfully refers the Court to the Puerto Rico Constitution

for its complete and accurate contents, and denies any allegations inconsistent therewith.

142.    As shown in the chart attached as Exhibit B, had the COFINA bonds been issued as direct, "full faith and credit" Commonwealth debt, the Debt Service Limit would have been exceeded in 2009 at the latest.  By 2012, the Debt Service Limit would have been exceeded by a huge margin.

ANSWER NO. 142: Ambac states that Paragraph 142 and Exhibit B set forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph

142.

143.    In addition, all but three of COFINA's fourteen bond offerings would have involved violations of the Debt Maturity Limit.  As shown in the chart attached as Exhibit C, some COFINA bonds were issued with maturities of **48 and 50 years**.

ANSWER NO. 143: Ambac states that Paragraph 143 and Exhibit C set forth legal

conclusions, to which no response is required.  To the extent a response is required, Ambac lacks

knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph

143.

144.    It cannot be the case that, to evade the Constitutional Debt Limits or to borrow more money when the market will not support the issuance of additional GO debt, the Commonwealth can simply go "off balance sheet" by diverting general tax revenues to a special purpose entity created for the sole purpose of issuing bonds to pay the Commonwealth's own debts and expenses. *See Crick v. Rash*, 229 S.W. 63, 70 (Ky. 1921) (holding that allowing a state to "validate" a debt through mere specification of a separate fund would allow debts to "be contracted in unlimited amounts and payable in the far distant future, and still be immune from attack as violating constitutional provisions limiting indebtedness"); *State ex rel. Wash. State Fin. Comm. v. Martin*, 384 P.2d 833, 842 (Wash. 1963) ("[I]f the state undertakes or agrees to provide any part of the fund from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund are likewise issued upon the credit of the state and are in truth debts of the state."); *Morris v. Board of Regents*, 625 P.2d 562, 564 (Nev. 1981) (finding that the "constitutional debt limitation would be largely nullified" if bonds were not considered debts of the state simply because they were backed by "specific tax revenues").

ANSWER NO. 144: Ambac states that Paragraph 144 sets forth legal conclusions, to which

no response is required.  To the extent a response to Paragraph 144 is required, Ambac denies the

allegations.

145.    Indeed, the Debt Service Limit was drafted to apply only to direct, "full and faith and credit" debt of the Commonwealth because it was understood that any bonds issued by public corporations (such as COFINA) would be "revenue bonds" paid **solely from revenues derived from the issuing corporation's activities** (not from general Commonwealth tax revenues).  As reported to the Puerto Rico Senate in connection with the amendment of the Puerto Rico constitution in 1961 to add the Constitutional Debt Limits:

> When discussing revenue bonds, it should be clarified that the bonds issued and to be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when calculating the State's borrowing margin [*i.e.*, the Debt Service Limit], since for the payment of the same the good faith of the People of Puerto Rico is not committed and they will continue to be paid **only from the income derived by said corporations**.  Only in the event that the State guarantees any of these bonds, which it has not done so far, and that it has to pay in a given year a deficiency of the debt requirements thereof, with which the amount thus paid will be counted against the borrowing margin of the Commonwealth.[54]

(emphasis added).

FN 54: Certified translation of the Daily Sessions Record, Senate of Puerto Rico, Tuesday, September 5, 1961.

<u>ANSWER NO. 145</u>: Ambac denies the allegations in the first sentence of Paragraph 145. With respect to the second sentence of Paragraph 145, Ambac respectfully refers the Court to the referenced translation for its complete and accurate contents, and denies any allegations inconsistent therewith.

**<u>Evasion of Constitutional Debt Priority</u>**

146.    Puerto Rico's constitution also prioritizes the payment of the Commonwealth's public debt over all other debts and expenses in the event of a revenue shortfall (the "Constitutional Debt Priority").  Article VI, Section 8 of the constitution provides that:

> [i]n case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

In addition, Article VI, Section 2 of the constitution provides that:

> [t]he Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof.

<u>ANSWER NO. 146</u>: Ambac states that the first sentence of Paragraph 146 sets forth legal conclusions, to which no response is required.  To the extent a response is required to the first sentence of Paragraph 146, and with respect to the second and third sentences of Paragraph 146, Ambac respectfully refers the Court to Article VI of the Puerto Rico Constitution, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

147.    There can be no dispute that, prior to the Commonwealth Petition Date, the SUT revenues dedicated to COFINA would, but for their dedication to COFINA, be "available revenues" of the Commonwealth (which would first be paid to the holders of lawfully issued Commonwealth public debt).[55]  Accordingly, the dedication of SUT revenues to COFINA reduced the revenues that would otherwise be available to the Commonwealth to pay its creditors.

> FN 55: The Committee, solely in its capacity as the Commonwealth Agent, takes no position on whether the same priority would obtain after the Commonwealth Petition Date.

76

ANSWER NO. 147: Ambac states that Paragraph 147 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations. With

respect to footnote 55, Ambac lacks knowledge or information sufficient to form a belief as to the

truth of the allegations.

148.     Stated bluntly, if the Commonwealth can render general tax revenues "unavailable"
simply by dedicating them to a special purpose entity that does nothing but issue bonds to pay the
Commonwealth's own debts and expenses, **there is no principled limit on the Commonwealth's
ability to undermine the Constitutional Debt Priority**. *See State ex rel. Shkurti v. Withrow*, 513
N.E.2d 1332, 1336-1337 (Ohio 1987) (holding that, if "surcharges" on employer contributions to
state unemployment compensation program could qualify as a "special fund," then "the legislature,
or the debt-contracting authority, could divide the public revenue into numerous subdivisions,
calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the
'public health fund,' and others almost without limit"); *State ex rel. Lesmeister v. Olson*, 354
N.W.2d 690, 698 (N.D. 1984) ("Were we to accept the proposition that a pledge of any specific
tax revenues would be sufficient to invoke the 'special fund' doctrine, the constitutional debt
limitation would be largely nullified, since the legislature could exempt almost any obligation from
its strictures merely by identifying a specific tax from which the obligation could be paid."); *Long
v. Napolitano*, 53 P.3d 172, 189 (Ariz. Ct. App. 2002) (rejecting the argument that any designated
tax revenues could be used to pay revenue bondholders, as "the legislature could effectively nullify
the constitutional debt restrictions simply by segregating general revenues in special funds").

ANSWER NO. 148: Ambac states that Paragraph 148 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations.

## Unconstitutionality of COFINA Structure

149.     When a financing transaction is structured so as to avoid a constitutional provision,
it is unconstitutional and void.

ANSWER NO. 149: Ambac states that Paragraph 149 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations.

150.     For example, in *Ayer v. Comm'r of Administration*., 165 N.E.2d 885 (Mass. 1960),
the Commonwealth of Massachusetts legislature created a structure designed to evade a
constitutional requirement that certain actions not be taken without a vote of two-thirds of each
house then present. At issue was an emergency act (passed without such a two-thirds vote) that
created a non-profit corporation "for the purpose of constructing a State office building to house
various departments, commissions and agencies of the Commonwealth." *Id*. at 886.

ANSWER NO. 150: Ambac states that Paragraph 150 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the referenced case, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

151.    After the act was signed into law, the Commonwealth of Massachusetts and the corporation entered into a "contract of lease" under which the Commonwealth was "about to expend money raised, or to be raised, by the general taxation of the inhabitants of the Commonwealth and to incur obligations purporting to bind the Commonwealth." *Id.* at 886-87. The corporation, in turn, was about to borrow money under a trust agreement and "issue and sell bonds whose repayment is secured by a pledge of rentals" to be paid by the Commonwealth under the contract of lease. *Id.*at 887. The proceeds of the bonds and other borrowings were to be used to construct office space for use by the Commonwealth as part of a "government center" development project. *Id.* Upon the payment of all debt obligations of the corporation, the office building was to become the Commonwealth's property. *Id.*

ANSWER NO. 151: Ambac states that Paragraph 151 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the referenced case, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

152.    Taxpayers attacked the structure on the primary grounds that it was unconstitutional in that "the statutory scheme [was] **in substance a borrowing of money by the Commonwealth** without a vote, taken by the yeas and nays, of two thirds of each house of the General Court present and voting." *Id.* at 888 (emphasis added). The Supreme Judicial Court of Massachusetts agreed.

ANSWER NO. 152: Ambac states that Paragraph 152 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac respectfully refers the Court to the referenced case, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

153.    The court began by noting that, "[i]f the Commonwealth itself were to borrow on bonds issued by it for the purpose of erecting an office building, this could be done only by a [two-thirds] vote," and thus "[t]he question [was] whether this is substantially the situation presented by the corporation created by [the statute at issue] and the contract of lease." *Id.*at 889 (internal quotations marks omitted). Stated another way, the question was whether "this somewhat elaborate statute created an entity sufficiently apart from the Commonwealth itself to avoid being

classified as 'colorable' or as a 'subterfuge to evade the [Commonwealth constitution]' when the scheme embodied in it is viewed as a whole?" *Id*.

ANSWER NO. 153: Ambac states that Paragraph 153 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced case, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

154. The court concluded that, while the corporation was a separate legal entity that could issue bonds and sue and be sued, "these attributes [were] not enough to meet the [taxpayers'] constitutional challenge." *Id*. at 889. This was because, "viewing the project as a whole, the [corporation was] **nothing more than a mere intermediary to carry out only one purpose**." *Id*. (emphasis added). In this regard, the court observed that the corporation was not like other municipal entities, which "exist for more than a single, temporary purpose" and "perform services for others than the sovereign itself," acquiring "income from those for whom their services are performed." *Id*. at 890. The court further observed that "[t]he statute and the 'contract of lease' which it permits, when scrutinized together, have all the earmarks of a State operation," including that "[t]he members of the [corporation] appear to be public officers." *Id*. at 892.

ANSWER NO. 154: Ambac states that Paragraph 154 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced case, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

155. For these reasons, the court went on to hold that the statute at issue was unconstitutional and "void upon its face" because "**to hold otherwise would be to exalt artifice above reality**." *Id*. (internal quotations marks omitted) (emphasis added). Indeed, "[t]he creation of the [corporation] to execute the 'contract of lease' [was] merely one phase of an integrated plan **of which the substantial result is constitutional evasion**." *Id*. (emphasis added).

ANSWER NO. 155: Ambac states that Paragraph 155 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to the referenced case, which speaks for itself, regarding its complete and accurate contents, and

denies any allegations inconsistent therewith.

156. The creation of the COFINA structure was no less an evasion of Puerto Rico's Constitutional Debt Limits and Constitutional Debt Priority. Just as with the corporation in *Ayer*, COFINA has no purpose other than to accomplish indirectly what could not have been

accomplished directly. COFINA, which is controlled exclusively by directors of the GDB, borrowed money from bondholders to pay the Commonwealth's debts and expenses, and it pays the bondholders with Commonwealth tax revenues diverted from the Commonwealth treasury. Bondholders have no recourse to assets other than SUT revenues. COFINA is a "mere intermediary," pure and simple. Any other conclusion would, in the words of the *Ayer* court, "exalt artifice above reality."

ANSWER NO. 156: Ambac states that Paragraph 156 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations.

157. Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that Act 91 is unconstitutional because the substantial result of the COFINA structure was evasion of the Constitutional Debt Limits and the Constitutional Debt Priority, with the result that all dedicated SUT revenues, including the revenues currently on deposit at BONY, are the exclusive property of the Commonwealth.

ANSWER NO. 157: Ambac states that Paragraph 157 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations.

## THIRTEENTH CAUSE OF ACTION

### 28 U.S.C. § 2201(a)
### (Declaration that COFINA Structure Is Unconstitutional Because Act 91 Was Enacted and/or Amended In Violation of Constitutional Balanced Budget Clause)

158. Paragraphs 1-157 are incorporated by reference as if fully set forth herein.

ANSWER NO. 158: Ambac repeats its responses and answers to Paragraphs 1-157 above.

159. In February 1974, the GDB ran an advertisement in *Barron's* magazine (attached as Exhibit D) touting the balanced budget clause in Puerto Rico's constitution (the "Constitutional Balanced Budget Clause") as a reason investors should feel comfortable buying Puerto Rico bonds.

ANSWER NO. 159: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 159. Ambac respectfully refers the Court to Exhibit D, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

160. In a stunning gem of historical irony, the ad proclaimed that "their soundness as investments is underscored by a forthright and fundamental fact: that **deficit financing is specifically prohibited in the Constitution of the Commonwealth**." Ex. D (emphasis added).

ANSWER NO. 160: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 160. Ambac respectfully refers the Court to Exhibit D, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

161.    This should have been a good selling point, but what seemed a "forthright and fundamental fact" to the GDB in 1974 was expediently forgotten or ignored.

ANSWER NO. 161: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations of Paragraph 161.

162.    In the English version of the Puerto Rico constitution approved by the U.S. Congress, Section 7 of Article VI provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, estimated for said fiscal Year unless the imposition of taxes sufficient to cover said appropriations is provided by law." (emphasis added).

ANSWER NO. 162: Ambac respectfully refers the Court to the English version of Article VI, Section 7 of the Puerto Rico Constitution, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

163.    The Spanish version of the constitution adopted by the Puerto Rico legislature uses the term "recursos totales," which in English means "total **resources**," not "total **revenues**" (which would be rendered "rentas totales" in Spanish).

ANSWER NO. 163: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 163, including the translations contained therein. Ambac respectfully refers the Court to the Spanish version of the Puerto Rico Constitution, which speaks for itself, regarding its complete and accurate contents, and denies any allegations inconsistent therewith.

164.    During Puerto Rico's constitutional convention, a delegate inquired (in Spanish) as to the meaning of the term "recursos totales." The question was taken up by the president of the drafting committee, who explained (in Spanish) that "recursos totales" was meant to be broader than "total revenues," which was the term used in the balanced budget clause of the Jones Act, which governed Puerto Rico until the adoption of the Puerto Rico constitution.[56]  He further

explained that "recursos totals" was meant to include, among other things beyond tax revenues, the "issuance of bonds" (translated from Spanish).

> FN 56: The Jones Act provided that "[n]o appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the Government of Porto Rico during any fiscal year shall exceed the total revenue then provided for by law and applicable for such appropriation or expenditure, including any available surplus in the treasury, unless the legislature making such appropriation shall provide for levying a sufficient tax to pay such appropriation or expenditure within such fiscal year." Section 34 of Jones Act, ch. 145, 39 Stat. 951, 963 (1917) (emphasis added).

ANSWER NO. 164: Ambac lacks knowledge or information sufficient to form a belief as to the truth of the allegations in Paragraph 164, including the translations contained therein. Ambac respectfully refers the Court to the referenced documents and statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

165. Thus, while the Spanish version of the constitution uses a term that is broader than "total revenues" and was meant to include some form of bond proceeds, the English version uses "total revenues" just like the Jones Act.

ANSWER NO. 165: Ambac respectfully refers the Court to the referenced documents and statutes, which speak for themselves, regarding their complete and accurate contents, and denies any allegations inconsistent therewith.

166. Since "revenues" does not include borrowings (which are a form of expense when repaid), the constitutionality of deficit financing depends, as an initial matter, on which version of the constitution controls.

ANSWER NO. 166: Ambac states that Paragraph 166 sets forth legal conclusions, to which no response is required. To the extent a response is required, Ambac denies the allegations of Paragraph 166.

167. The answer to that question is found in Public Law 600 of June 4, 1951, which is the law by which the U.S. Congress "provide[d] for the organization of a constitutional government by the people of Puerto Rico," and Public Law 447 of July 3, 1952, which is the law

by which the U.S. Congress approved the Puerto Rico constitution conditional upon certain amendments not relevant here.

ANSWER NO. 167: Ambac states that Paragraph 167 sets forth legal conclusions, to which

no response is required. Ambac respectfully refers the Court to the referenced statutes, which

speak for themselves, regarding their complete and accurate contents, and denies any allegations

inconsistent therewith.

168. Public Law 600 provided that "[u]pon **approval by the Congress** the constitution shall **become effective in accordance with its terms**."[57] (emphasis added). Public Law 447 provided that "the constitution of the Commonwealth of Puerto Rico **hereby approved** [*i.e.*, the English version] shall **become effective** when the Constitutional Convention of Puerto Rico shall have declared in a formal resolution its acceptance in the name of the people of Puerto Rico of the conditions of approval herein contained, and when the Governor of Puerto Rico, being duly notified by the proposed officials of Constitutional Convention of Puerto Rico that such resolution of acceptance has been formally adopted, shall issue a proclamation to that effect."[58] (emphasis added).

> FN 57: Public Law 600, 64 Stat. 319, 48 U.S.C.A. §§ 731b-731e (1951).
> FN 58: Public Law 447, 66 Stat. 327-328; 48 U.S.C.A. § 731d (1952).

ANSWER NO. 168: Ambac respectfully refers the Court to the referenced statutes, which

speak for themselves, regarding their complete and accurate contents, and denies any allegations

inconsistent therewith.

169. Accordingly, the "terms" in accordance with which the constitution became effective were the terms of the **English version** approved by the U.S. Congress; not the Spanish version debated at the constitutional convention.

ANSWER NO. 169: Ambac states that Paragraph 169 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac respectfully refers the Court

to Public Law 447 and Public Law 600, which speak for themselves, regarding their complete and

accurate contents, and denies any allegations inconsistent therewith.

170. Even if the constitution had become effective in accordance with the terms of the Spanish version, there would be no reason to interpret "recursos totales" to include long-term financing of massive structural deficits through the issuance of bonds by "off balance sheet" entities. If limited to GO bonds of the Commonwealth, any deficit financing would at least be

constrained by the otherwise applicable Constitutional Debt Limits. If deficit financing through COFINA-like structures is allowed, the Balanced Budget Clause truly has no meaning to speak of.

ANSWER NO. 170: Ambac states that Paragraph 170 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 170.

171. In deciding to include the Balanced Budget Clause in Puerto Rico's constitution, the delegates to the constitutional convention could not have intended to leave the door open for unconstrained deficit financing that would eviscerate the purpose of having such a clause in the first place.

ANSWER NO. 171: Ambac states that Paragraph 171 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 171.

172. The COFINA structure was initially created to finance the payment of the Commonwealth's "extraconstitutional" debt.[59] As used in the Commonwealth, the term "extraconstitutional debt" refers to debt for which there is no dedicated source of payment and includes debt for which payment is subject to annual appropriation by the legislature (but for which the legislature has made no such appropriation). By retiring its extraconstitutional debt with the proceeds of COFINA bonds, the Commonwealth freed itself from having to appropriate funds for their payment, thereby financing deficit spending by reducing the "appropriations" side of the budget equation.

> FN 59: Act No. 56 of the Puerto Rico Legislative Assembly, approved July 5, 2007 (amending Act 91 and in which the "Statement of Motives" states that "Act No. 91 was recently amended by Act No. 291 of December 26, 2006, for the purpose of establishing the financial structure necessary to pay or refinance the extraconstitutional debt.").

ANSWER NO. 172: With respect to the allegations in the first sentence of Paragraph 172,

including footnote 59, Ambac respectfully refers the Court to Act 56-2007 and Act 91, which

speak for themselves, regarding their complete and accurate contents, and denies any allegations

inconsistent therewith. Ambac denies the allegations in the second and third sentences of

Paragraph 172.

173. In 2009, Act 91 was amended to expand the permitted uses of COFINA bond proceeds to include the direct payment of general Commonwealth operating expenses that could

not be funded from recurring revenues. As former Puerto Rico Governor Acevedo Vila remarked:
"What [former GDB President] Alfredo [Salazar] and I designed to pay old debt, became an
instrument to finance annual operating deficits."[60]

> FN 60: Luis Ortiz, Cofina and GO Creditors Wage War, CARIBBEAN BUS. (Feb.
> 2, 2017), http://caribbeanbusiness.com/ cofina-and-go-creditors-wage-
> war/.

ANSWER NO. 173: Ambac respectfully refers the Court to Act 91 and the referenced

article, which speak for themselves, regarding their complete and accurate contents, and denies

any allegations inconsistent therewith.

174.    Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28
U.S.C § 2201(a) that the COFINA structure is unconstitutional because Act 91 was enacted and/or
amended in violation of the Constitutional Balanced Budget Clause, with the result that all
dedicated SUT revenues, including revenues currently on deposit at BONY, are the exclusive
property of the Commonwealth.

ANSWER NO. 174: Ambac states that Paragraph 174 sets forth legal conclusions, to which

no response is required. To the extent a response is required, Ambac denies the allegations of

Paragraph 174.

## PRAYER FOR RELIEF

Ambac states that Plaintiff's Prayer for Relief sets forth legal conclusions, to which no

response is required. To the extent a response is required, Ambac denies the allegations.

## AFFIRMATIVE DEFENSES TO THE COMPLAINT

Ambac asserts the following affirmative defenses and reserves the right to assert others

when and if they become appropriate, known, or available in this action. The statement of any

affirmative defense below does not assume the burden of proof as to which applicable law places

the burden on Plaintiff.

### First Affirmative Defense

Plaintiff fails to state a claim upon which relief can be granted.

### Second Affirmative Defense

Plaintiff lacks standing to pursue the relief it seeks.

### Third Affirmative Defense

Plaintiff's claims are barred to the extent they exceed the scope of the Commonwealth Agent's authority under the Commonwealth-COFINA Dispute Stipulation, including, but not limited to, those claims purportedly seeking the invalidation of Act 91 on constitutional grounds or the rejection or avoidance of promises or liens.

### Fourth Affirmative Defense

Plaintiff's claims are time-barred by statutes of limitation and/or the doctrine of laches.

### Fifth Affirmative Defense

Plaintiff's claims are barred by the doctrine of estoppel.

### Sixth Affirmative Defense

Plaintiff's claims are barred by the doctrines of waiver, release, acquiescence, or ratification.

### Seventh Affirmative Defense

Plaintiff's claims are barred by the doctrine of unclean hands.

### Eighth Affirmative Defense

Plaintiff's claims are barred because they would unjustly enrich the Commonwealth.

### Ninth Affirmative Defense

Plaintiff's claims are barred by the doctrine of marshaling.

### Tenth Affirmative Defense

Plaintiff is not entitled to equitable relief because it has an adequate remedy at law.

### Eleventh Affirmative Defense

Plaintiff's claims are barred because they failed to mitigate their harm.

### Twelfth Affirmative Defense

Plaintiff's claims are barred due to the doctrine of *in pari delicto*.

### Thirteenth Affirmative Defense

Plaintiff's claims are barred by the doctrine of assumption of risk.

### Fourteenth Affirmative Defense

Plaintiff's claims are preempted by supreme federal law.

### Fifteenth Affirmative Defense

Plaintiff's claims are barred due to the doctrine of unconscionability.

### Sixteenth Affirmative Defense

Plaintiff's claims are barred due to a lack of causation because Plaintiff caused its own injury.

### Seventeenth Affirmative Defense

Plaintiff's claims are barred because they are contrary to public policy.

### Eighteenth Affirmative Defense

Any taking of property rights or interests belonging to Ambac, COFNA, or the COFINA bondholders, including contract-based property rights or interests, without just compensation, violates the U.S. and Puerto Rico Constitutions. This includes any application of the Uniform Commercial Code to the Commonwealth-COFINA Dispute, because the Uniform Commercial Code did not (and does not) apply to the transfer of the DST revenues from the Commonwealth to COFINA.

### Nineteenth Affirmative Defense

To the extent Plaintiff "stands in the shoes of the Oversight Board as 'trustee' with respect to the Commonwealth-COFINA Dispute," it is bound to the laws governing trustees; including 28 U.S.C. § 959, which provides that "a trustee, receiver or manager appointed in any case pending in any court of the United States . . . shall manage and operate the property in his possession as such trustee, receiver or manager according to the requirements of the valid laws of the State in which such property is situated. . . ." Thus, Plaintiff is prohibited from taking any actions that would violate Puerto Rico law.

### Twentieth Affirmative Defense

Because COFINA is a Title III debtor under PROMESA, the Commonwealth is prohibited from taking any action that would interfere with COFINA's DST revenues or other COFINA property. Section 305 of PROMESA further preempts any court from taking such action, as do other supreme federal laws and the U.S. Constitution.

### Twenty-First Affirmative Defense

Plaintiff, to the extent it has the power and authority to seek such relief, cannot avoid transfer of the DST revenues to COFINA pursuant to 11 U.S.C. §§ 544, 547-550.

### Twenty-Second Affirmative Defense

Plaintiff's Fifth, Sixth, Seventh, and Tenth Causes of Action are barred by sections 11 U.S.C. § 546(e), 11 U.S.C. § 547(c), and 11 U.S.C. § 926(b), each as incorporated by section 301 of PROMESA.

### Twenty-Third Affirmative Defense

Plaintiff cannot establish that post-petition transfers of the DST revenues to COFINA violate the automatic stay because Plaintiff has consented to such transfers.

### Twenty-Fourth Affirmative Defense

Under abstention principles, this Court should dismiss the Complaint and either (i) certify all novel questions of Puerto Rico constitutional law, or (ii) require Plaintiff to bring such claims in local Puerto Rico courts. To the extent the above options are discretionary, this Court should exercise its discretion to dismiss the Complaint and require adherence to one of the above options. Ambac reserves its right to move for certification to the Supreme Court of Puerto Rico or pursue other abstention-related relief.

### Twenty-Fifth Affirmative Defense

Plaintiffs' claims are barred by the doctrine of *actos propios*.

### Twenty-Sixth Affirmative Defense

To the extent any portion(s) of Act 91 are deemed unconstitutional or otherwise void, Act 91's severability clauses—as well as general severability and/or separability principles generally—prevent the whole of Act 91 from being deemed unconstitutional or otherwise void.

Dated: November 6, 2017
      San Juan, Puerto Rico

**FERRAIUOLI LLC**

By: <u>/s/ *Roberto Cámara-Fuertes*</u>
    Roberto Cámara-Fuertes (USDC-PR No. 219002)
    Sonia Colón (USDC-PR No. 213809)
    221 Ponce de León Avenue, 5th Floor
    San Juan, PR 00917
    Telephone: (787) 766-7000
    Facsimile: (787) 766-7001
    Email: rcamara@ferraiuoli.com
        scolon@ferraiuoli.com


**MILBANK, TWEED, HADLEY & McCLOY LLP**

By: <u>/s/ *Andrew M. Leblanc*</u>
    Dennis F. Dunne
    Andrew M. Leblanc
    Atara Miller
    Grant R. Mainland
    (admitted *pro hac vice*)
    28 Liberty Street
    New York, NY 10005
    Telephone: (212) 530-5770
    Facsimile: (212) 822-5770
    Email: ddunne@milbank.com
        aleblanc@milbank.com
        amiller@milbank.com
        gmainland@milbank.com

*Attorneys for Ambac Assurance Corporation*

# Exhibit A

# Ambac

## Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor: **PUERTO RICO SALES TAX FINANCING CORPORATION**

Policy Number: **26827BE**

Obligations: $808,489,849.75 of $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A, dated their date of delivery and consisting of: $107,014,744.15 of Capital Appreciation Bonds maturing on August 1, 2047; and $701,475,105.60 of Capital Appreciation Bonds maturing on August 1, 2054. The Trustee is The Bank of New York, New York, New York.

Premium: **$39,719,277.00**

**Ambac Assurance Corporation (Ambac),** a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

Secretary

Authorized Representative

Effective Date: July 31, 2007

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

A- 11765

# Exhibit B

# PUERTO RICO SALES TAX FINANCING CORPORATION

## SALES TAX REVENUE BOND RESOLUTION

Adopted on July 13, 2007

511470.19 029578 RES

**TABLE OF CONTENTS**

Page

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

| | | |
|---|---|---|
| SECTION 101. | Definitions | 1 |
| SECTION 102. | Authority for this Resolution | 18 |
| SECTION 103. | Resolution to Constitute Contract | 18 |
| SECTION 104. | Special Provisions Concerning Capital Appreciation Bonds. | 18 |

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

| | | |
|---|---|---|
| SECTION 201. | Authorization of Bonds | 20 |
| SECTION 202. | General Provisions for Issuance of Bonds | 20 |
| SECTION 203. | Special Provisions for Refunding Bonds | 24 |
| SECTION 204. | Delegation of Officers and Committees. | 25 |
| SECTION 205. | Credit and Liquidity Facilities; Rights of Credit Facility Providers. | 25 |
| SECTION 206. | Qualified Hedges | 25 |
| SECTION 207. | Parity Obligations and Subordinate Obligations | 26 |

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

| | | |
|---|---|---|
| SECTION 301. | Medium of Payment; Form and Date; Letters and Numbers. | 27 |
| SECTION 302. | Legends | 27 |
| SECTION 303. | Execution and Authentication | 27 |
| SECTION 304. | Negotiability, Transfer and Registry | 28 |
| SECTION 305. | Registration of Transfer of Bonds | 28 |
| SECTION 306. | Regulations with Respect to Exchanges and Registration of Transfers | 28 |
| SECTION 307. | Bonds Mutilated, Destroyed, Stolen or Lost | 29 |
| SECTION 308. | Preparation of Definitive Bonds; Temporary Bonds. | 29 |
| SECTION 309. | Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount | 30 |
| SECTION 310. | Book-Entry-Only System | 30 |

## ARTICLE IV

## REDEMPTION OF BONDS

| | | |
|---|---|---|
| SECTION 401. | Privilege of Redemption and Redemption Price | 31 |

i

**TABLE OF CONTENTS**

Page

SECTION 402.    Redemption at the Election of the Corporation ...........................................31
SECTION 403.    Redemption out of Sinking Fund Installments. ...........................................31
SECTION 404.    Selection of Bonds to be Redeemed in Partial Redemption. ........................32
SECTION 405.    Notice of Redemption .................................................................................32
SECTION 406.    Payment of Redeemed Bonds......................................................................33
SECTION 407.    Cancellation and Disposition of Bonds.......................................................33

ARTICLE V

PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND
APPLICATION THEREOF

SECTION 501.    The Pledge. .................................................................................................35
SECTION 502.    Establishment of Fund and Accounts...........................................................35
SECTION 503.    Costs of Issuance Account and Capitalized Interest Account. ......................36
SECTION 504.    Bond Proceeds Account. ..............................................................................37
SECTION 505.    Revenue Account...........................................................................................38
SECTION 506.    Debt Service Account....................................................................................40
SECTION 507.    Debt Service Reserve Account. .....................................................................41
SECTION 508.    Satisfaction of Sinking Fund Installments....................................................43
SECTION 509.    Redemption Account; Amounts to be Deposited Therein...............................44
SECTION 510.    Rebate Account..............................................................................................45

ARTICLE VI

SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.    Security for Deposits.....................................................................................46
SECTION 602.    Investment of Funds, Accounts and Subaccounts Held by the
                Trustee..........................................................................................................46
SECTION 603.    Valuation and Sale of Investments................................................................47

ARTICLE VII

PARTICULAR COVENANTS OF THE CORPORATION

SECTION 701.    Payment of Obligations; Pledged Sales Tax Base Amount ..........................49
SECTION 702.    Extension of Payment of Bonds....................................................................49
SECTION 703.    Offices for Servicing Bonds .........................................................................49
SECTION 704.    Further Assurance ........................................................................................49
SECTION 705.    Power to Issue Bonds and Pledge Funds and Accounts...............................50
SECTION 706.    Agreement of the Commonwealth. ................................................................50
SECTION 707.    Creation of Liens..........................................................................................50
SECTION 708.    Accounts and Reports...................................................................................51

ii

**TABLE OF CONTENTS**

Page

SECTION 709.   Tax Matters.................................................................................. 51
SECTION 710.   Issuance of Additional Bonds; Incurrence of Additional Parity
                Obligations and Subordinate Obligations; Payment of Obligations. ......... 51
SECTION 711.   General. .................................................................................... 53

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.   Trustee Appointment and Acceptance of Duties ........................................ 54
SECTION 802.   Responsibilities of Trustee ......................................................... 54
SECTION 803.   Evidence on Which Trustee May Act. ................................................. 55
SECTION 804.   Compensation and Indemnification ................................................... 55
SECTION 805.   Certain Permitted Acts .............................................................. 56
SECTION 806.   Resignation of Trustee ............................................................. 56
SECTION 807.   Removal of Trustee ................................................................. 57
SECTION 808.   Appointment of Successor Trustee. .................................................. 57
SECTION 809.   Transfer of Rights and Property to Successor Trustee.............................. 58
SECTION 810.   Appointment of Co-Trustee.......................................................... 58
SECTION 811.   Merger or Consolidation ............................................................ 59
SECTION 812.   Adoption of Authentication ......................................................... 59
SECTION 813.   Accounting by Trustee; Nonpetition Covenant ....................................... 60

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.   Supplemental Resolutions Effective upon Filing with the Trustee ............. 61
SECTION 902.   Supplemental Resolutions Effective upon Consent of Trustee ................. 62
SECTION 903.   Supplemental Resolutions Effective with Consent of Bondowners ............ 62
SECTION 904.   General Provisions. ................................................................ 62

## ARTICLE X

## AMENDMENTS

SECTION 1001.   Mailing and Publication. ......................................................... 64
SECTION 1002.   Powers of Amendment .............................................................. 64
SECTION 1003.   Consent of Bondowners ............................................................ 65
SECTION 1004.   Modifications by Unanimous Consent ............................................... 65
SECTION 1005.   Modification Before Bonds Outstanding ............................................ 65
SECTION 1006.   Exclusion of Bonds ............................................................... 66
SECTION 1007.   Notation on Bonds ................................................................ 66

iii

**TABLE OF CONTENTS**

Page

ARTICLE XI

DEFAULTS AND REMEDIES

SECTION 1101.   Events of Default. ................................................................. 67
SECTION 1102.   Remedies. ........................................................................... 68
SECTION 1103.   Priority of Payments After Event of Default. ........................... 69
SECTION 1104.   Termination of Proceedings..................................................... 70
SECTION 1105.   Bondowners' Direction of Proceedings ..................................... 70
SECTION 1106.   Limitation on Rights of Bondowners. ....................................... 70
SECTION 1107.   Possession of Bonds by Trustee Not Required ........................... 71
SECTION 1108.   Remedies Not Exclusive .......................................................... 71
SECTION 1109.   No Waiver of Default .............................................................. 72
SECTION 1110.   Notice of Event of Default ....................................................... 72

ARTICLE XII

MISCELLANEOUS

SECTION 1201.   Defeasance. .......................................................................... 73
SECTION 1202.   Evidence of Signatures of Bondowners and Owners of Bonds. ...... 75
SECTION 1203.   Moneys Held for Particular Bonds ........................................... 76
SECTION 1204.   Preservation and Inspection of Documents ................................ 76
SECTION 1205.   Parties Interested Herein ......................................................... 76
SECTION 1206.   No Personal Liability ............................................................... 76
SECTION 1207.   Successors and Assigns............................................................. 76
SECTION 1208.   Severability of Invalid Provisions............................................. 76
SECTION 1209.   Headings .............................................................................. 76
SECTION 1210.   Conflict................................................................................. 77
SECTION 1211.   Governing Law ...................................................................... 77
SECTION 1212.   Effective Date ....................................................................... 77

iv

511470.19 029578 RES

# SALES TAX REVENUE BOND RESOLUTION

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation, as follows:

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101. Definitions. The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related

Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

-2-

511470.19 029578 RES

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the eleventh sentence of Section 802 of this Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Proceeds Account** shall mean the Account by that name established by Section 502.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital

-3-

511470.19 029578 RES

Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity, in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Commonwealth Sales Tax** shall mean the sales and use tax enacted by the Legislative Assembly of Puerto Rico by virtue of Act No. 117 of the Legislature of Puerto Rico, approved July 4, 2006, as amended.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

-4-

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to Section 502.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

-5-

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i)     Government Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or

-6-

trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

-7-

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

. **Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

    (i)    Defeasance Obligations;

    (ii)    Defeased Municipal Obligations;

    (iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

    (iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

    (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

-8-

(vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)   shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)   bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)   repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)   investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)   any other obligations conforming to any Corporation guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the

-9-

Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

-10-

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

(i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)     Bonds deemed to have been paid as provided in Section 1201;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital

-11-

Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in this Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.  All Revenues.

2.  All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

3.  The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1201 and 1203.

4.  Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.  Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through

-12-

(4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 508) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long

-13-

511470.19 029578 RES

term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by Section 502.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Series Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

-14-

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 203 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or retirement or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Dedicated Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean this Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

1.    All Pledged Sales Tax received by the Corporation or the Trustee.

2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of Section 710 or other purposes of the Resolution.

3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

-15-

511470.19 029578 RES

4.      Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution, subject to the provisions of Sections 1201 and 1203.

5.      Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203.

**Secretary** means, for purposes of the Resolution and so long as Bonds shall be Outstanding, the Secretary of the Board of Directors of Government Development Bank for Puerto Rico, who shall also act as Secretary of the Board of Directors of the Corporation and as Secretary under this Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee, in the form appended hereto as Appendix A.

**Senior Bonds** means the Series 2007 Bonds of the series designated "Series 2007A" and "Series 2007B" and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of the Series 2007 Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under this Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2).

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to

-16-

maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with Article IX.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to Section 801 to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

-17-

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

SECTION 102. <u>Authority for this Resolution</u>. This Resolution is adopted pursuant to the authority conferred on the Corporation by the Act.

SECTION 103. <u>Resolution to Constitute Contract</u>. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, the Resolution shall be deemed to be and shall constitute a contract among the Corporation, the Owners from time to time of the Bonds, and all other Beneficiaries; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and all other Beneficiaries, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and such Beneficiaries over any other thereof, except as expressly otherwise provided in or permitted by the Resolution.

SECTION 104. <u>Special Provisions Concerning Capital Appreciation Bonds</u>.

Except as otherwise may be provided in a Supplemental Resolution:

1. For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2. For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended redemption.

3. For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended exchange or substitution.

4. For purposes of Section 406, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount.

5. For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended application of the subject assets.

-18-

6.     For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the most recent Compounding Date.

7.     For purposes of Section 1201, the principal amount of any Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

511470.19 029578 RES

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201. <u>Authorization of Bonds</u>. There is hereby created and established an issue of Bonds of the Corporation to be designated as "Sales Tax Revenue Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in the Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by the Resolution, in the manner and to the extent provided herein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property and other funds and assets of or available to the Corporation and pledged therefor, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202. <u>General Provisions for Issuance of Bonds</u>.

1. The Bonds may, if and when authorized by the Corporation pursuant to one or more Series Resolutions, be issued in one or more Series, as Senior Bonds or one or more Classes of Subordinate Bonds, and the designation thereof, in addition to the name "Sales Tax Revenue Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the Corporation may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, Taxable Bonds or Tax Exempt Bonds or any combination of the foregoing, which in each case may be Serial Bonds or Term Bonds, or any combination thereof. Any Bonds that are to be issued as Subordinate Bonds may be issued with priorities of payment hereunder among all such Subordinate Bonds, as set forth in the related Series Resolutions.

2. Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)     the authorized principal amount and designation of such Series of Bonds;

(ii)    the purpose or purposes for which such Series of Bonds is being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of the Resolution: (a) to provide sufficient

-20-

funds for the Repayment Project; (b) to refund or otherwise prepay any Bonds or other bonds, notes or other evidences of indebtedness issued by the Corporation for the Repayment Project; (c) to pay or provide for the payment of Financing Costs, including but not limited to Costs of Issuance; and/or (d) for such other purposes or projects as may be authorized by the Act, as the same may be amended and then in effect.

(iii)     the date or dates, maturity date or dates and amounts of each maturity of the Bonds of such Series;

(iv)     the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, original issue discount and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which the rate at which Adjustable Rate Bonds of such Series bear interest shall be adjusted;

(v)     the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds (including Convertible Capital Appreciation Bonds), Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender bonds, Taxable Bonds or Tax Exempt Bonds;

(vi)     the designation of Bonds of such Series as Senior Bonds or as one or more Classes of Subordinate Bonds and the designation of Beneficiaries;

(vii)     the Record Date, if any, for such Bonds;

(viii)     the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)     if so determined by the Corporation, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)     the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)     the Redemption Price or Prices, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), provided that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this subsection shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

-21-

(xii)   the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series;

(xiii)   the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)   the amount, if any, or method of determining such amount, to be credited to the Costs of Issuance Account or otherwise to be paid for Costs of Issuance;

(xv)   if so determined by the Corporation, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)   if so determined by the Corporation, provisions for the sale of the Bonds of such Series;

(xvii)   provisions for the execution and authentication of the Bonds of such Series;

(xviii)   the forms of the Bonds of such Series and of the Trustee 's certificate of authentication;

(xix)   if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Contractual Maximum Interest Rate for such Bonds and the provisions, if any, as to the calculation or change of Adjustable Rates;

(xx)   if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof;

(xxi)   if so determined by the Corporation, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series reflecting the addition of resources to Revenues or Pledged Property;

(xxii)   if so determined with respect to the Bonds of such Series, that Section 709 shall not apply to such Bonds;

(xxiii)   deposits into Funds, Accounts and Subaccounts as may be required or permitted by the Resolution and not otherwise provided for above;

(xxiv)   if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be

-22-

511470.19 029578 RES

denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxv)  if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined; and

(xxvi)  any other provisions deemed advisable by the Corporation, not in conflict with the provisions of the Resolution or the Act as each is then in effect.

3.  Each Series of Bonds shall be executed by the Corporation for issuance under the Resolution and delivered to the Trustee and thereupon shall be authenticated by the Trustee and delivered to the Corporation or upon its order, but only upon satisfaction with the conditions to issuance of additional Bonds contained in Section 710 and only upon the receipt by the Trustee of:

(i)  a copy of the Resolution, certified by an Authorized Officer of the Corporation or the Secretary;

(ii)  an Opinion of Bond Counsel to the effect that (A) the Corporation has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the Corporation, is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid pledge for the benefit of the Owners of the Bonds which it purports to create of the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special obligations of the Corporation as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)  a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the Corporation;

(iv)  a copy of the Series Resolution authorizing such Series, certified by an Authorized Officer of the Corporation or the Secretary;

-23-

511470.19 029578 RES

(v)     a certificate of an Authorized Officer of the Corporation as to deposits in Accounts and stating that the Corporation is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the Corporation;

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution or Supplemental Resolution adopted pursuant to Article IX.

4.    Each Series of Bonds shall be issued upon compliance with Section 710.

SECTION 203.  Special Provisions for Refunding Bonds.

1.    Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, including for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.    The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee only upon receipt by the Trustee (in addition to the requirements of Section 202) of:

(i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication, irrevocable instructions to the Trustee, to provide notice in the manner provided in Section 1201 with respect to the payment of such Bonds pursuant to such Section 1201;

(iii)   either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of subsection 2 of Section 1201, which moneys and Defeasance Securities shall be held in trust and used only as provided in subsection 2 of Section 1201; and

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

-24-

3.    Refunding Bonds may be issued upon compliance with Section 710 in lieu of compliance with subsection 2 of this Section.

SECTION 204.  Delegation of Officers and Committees.

A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer or committee of the Corporation, and any such committee may delegate to an Authorized Officer of the Corporation, the power to issue Bonds from time to time and to fix the details of any such Bonds by an appropriate certificate of such Authorized Officer.  Any such action by an Authorized Officer of the Corporation shall be in writing.  Each such action by an Authorized Officer or committee of the Corporation with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

SECTION 205.  Credit and Liquidity Facilities; Rights of Credit Facility Providers.

1.    In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

2.    Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

SECTION 206.  Qualified Hedges.  The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the

-25-

Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

SECTION 207.  <u>Parity Obligations and Subordinate Obligations</u>.  For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

511470.19 029578 RES

## ARTICLE III

### GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301. <u>Medium of Payment; Form and Date; Letters and Numbers</u>.

1.     The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the applicable Series Resolution.

2.     The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.     Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.     Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.     If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of any Series authorized to be issued by such Supplemental Resolution may be evidenced in book entry form without definitive certificates delivered to each beneficial owner thereof.

SECTION 302. <u>Legends</u>.  The Bonds of each Series in the form set forth in any Supplemental Resolution may also contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the Corporation prior to the authentication and delivery thereof.

SECTION 303. <u>Execution and Authentication</u>.

1.     The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer of the Corporation and its corporate seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary.  In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Trustee, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.  Any Bond of a Series may be signed and sealed on behalf of the Corporation by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the Corporation, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

-27-

2. The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Resolution and that the Owner thereof is entitled to the benefits of the Resolution.

SECTION 304. <u>Negotiability, Transfer and Registry</u>. All Bonds issued under the Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in the Resolution and in the Bonds. So long as any of the Bonds shall remain outstanding, the Corporation shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or registration of transfer. So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305. <u>Registration of Transfer of Bonds</u>.

1. The transfer of each Bond shall be registrable only upon the books of the Corporation, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond the Corporation shall issue in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2. The Corporation and the Trustee may deem and treat the person in whose name any Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary. The Corporation agrees to indemnify and hold the Trustee harmless against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under the Resolution, in so treating such Owner.

SECTION 306. <u>Regulations with Respect to Exchanges and Registration of Transfers</u>. In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of the Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Trustee. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the Corporation

-28-

or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in the Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the Corporation nor the Trustee shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307. Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, stolen or lost and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and Trustee may incur. All Bonds so surrendered to the Trustee shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the Corporation, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under the Resolution, in any moneys or securities held by the Corporation or the Trustee for the benefit of the Bondowners.

SECTION 308. Preparation of Definitive Bonds; Temporary Bonds.

1. Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 303, and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as an Authorized Officer of the Corporation may deem appropriate to temporary Bonds. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Resolution.

-29-

2.      All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

SECTION 309.  Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.  The Corporation shall file with the Trustee promptly at the end of each Bond Year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on Outstanding Bonds as of the end of such Bond Year, and (ii) such other specific information relating to such original issue discount as, in the judgment of the Trustee, may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

SECTION 310.  Book-Entry-Only System.  Notwithstanding any other provision of the Resolution, the Corporation may employ a book-entry-only system of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and/or the book-entry-only system depository.  Any provisions of the Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

511470.19 029578 RES

# ARTICLE IV

# REDEMPTION OF BONDS

SECTION 401. <u>Privilege of Redemption and Redemption Price</u>. Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Resolution authorizing such Series.

SECTION 402. <u>Redemption at the Election of the Corporation</u>. In the case of any redemption of Bonds otherwise than as provided in Section 403, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

SECTION 403. <u>Redemption out of Sinking Fund Installments</u>.

1. In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2. In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 508) and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice

-31-

shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

3.    The Corporation shall, and hereby covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404.  Selection of Bonds to be Redeemed in Partial Redemption.

1.    In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the Corporation shall designate the maturities of the Bonds to be redeemed.

2.    If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed.  For purposes of this Section 404, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405.  Notice of Redemption.  When the Trustee shall receive notice from the Corporation of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Trustee shall give notice, in the name of the Corporation, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such notice is conditional and the conditions that must be satisfied.  Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond or portion thereof to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date, in the Currency in which the Bonds of such Series are payable, and that from and after such date interest thereon shall cease to accrue and be payable on the Bonds or portions thereof to be redeemed, unless, in the case of any conditional notice, such conditions are not satisfied.  The Trustee shall mail a copy of such notice, postage prepaid, no less than sixteen (16) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books.  Failure

-32-

so to mail any such notice to any particular Owner shall not affect the validity of the proceedings
for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such
notice shall not affect the validity of the proposed redemption of Bonds.

Any notice of optional redemption of Bonds given pursuant to this Section may
be made conditional upon receipt by the Trustee of moneys sufficient to pay the Redemption
Price of such Bonds, in the Currency in which the Bonds of such Series are payable, or upon the
satisfaction of any other condition or the occurrence of any other event, which notice shall
specify any such conditions or events. Any conditional notice so given may be rescinded at any
time before payment of such Redemption Price if any such condition so specified is not satisfied
or if any such other event shall not occur. Notice of such rescission shall be given by the
Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of
redemption, and the Trustee shall give notice of such recission to affected Owners of Bonds at
least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the
conditional notice of redemption was given.

SECTION 406. Payment of Redeemed Bonds. Notice having been given in the
manner provided in Section 405, the Bonds or portions thereof so called for redemption shall
become due and payable on the redemption date so designated at the Redemption Price, plus
interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such
Series are payable, and upon presentation and surrender thereof at the office specified in such
notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest
accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series
are payable, except to the extent the same shall not occur on account of a condition stated in the
notice to the Trustee pursuant to Section 402 and in the notice of redemption pursuant to
Section 405. If there shall be called for redemption less than all of a Bond, the Corporation shall
execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without
charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so
surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the
redemption date, moneys for the redemption of all the Bonds or portions thereof of any like
Series and maturity and interest rate to be redeemed, together with interest to the redemption
date, shall be held by the Trustee so as to be available therefor on said date and if notice of
redemption shall have been provided as aforesaid, and, with respect to any conditional notice of
redemption, the conditions stated in the notice of redemption shall have been met and satisfied,
then, from and after the redemption date, interest on the Bonds or portions thereof of such Series
and maturity and interest rate so called for redemption shall cease to accrue and become payable.
If said moneys shall not be so available on the redemption date, such Bonds or portions thereof
shall continue to bear interest until paid at the same rate as they would have borne had they not
been called for redemption.

SECTION 407. Cancellation and Disposition of Bonds. All Bonds paid or
redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or
redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled
shall be disposed of by the Trustee, in accordance with the Trustee's standard procedures, and
upon request from the Corporation the Trustee shall execute a certificate of disposition in
duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of,

-33-

and one executed certificate shall be delivered to the Corporation and the other executed certificate shall be retained by the Trustee.

511470.19 029578 RES

**ARTICLE V**

**PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND
ACCOUNTS AND APPLICATION THEREOF**

SECTION 501.  The Pledge.

1.      The Pledged Property, subject to Section 804, is hereby pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution, and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.  Nothing contained herein shall prevent (i) a Credit Facility, Liquidity Facility or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to this Article V with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

2.      To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.  Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

SECTION 502.  Establishment of Fund and Accounts.

1.      The "Repayment Project Fund" is hereby created and the following special Accounts and Subaccounts are hereby created and established within the Repayment Project Fund, each of which shall be held by the Trustee:

(1)      Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

(2)      Capitalized Interest Account,

(3)      Bond Proceeds Account,

(4)      Revenue Account,

-35-

(5)     Debt Service Account, each of which shall contain therein a Principal Subaccount and an Interest Subaccount, established for each Class of Bonds, and separately established for Series of Tax Exempt Bonds in such Class and Taxable Bonds in such Class,

(6)     Debt Service Reserve Account, established for each Class of Bonds,

(7)     Redemption Account, and

(8)     Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

2.     The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

3.     Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

SECTION 503.  Costs of Issuance Account and Capitalized Interest Account.

1.     If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Persons as directed in writing to the Trustee by the Corporation.

2.     There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth in paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

3.     If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in

-36-

accordance with the requirements of the Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

4.      Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)      stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

5.      Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in subsection 6 of this Section.

6.      The Trustee  shall deposit any funds described in subsection 5 of this Section in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

7.      In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 504. Bond Proceeds Account.

1.      There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to this Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time.  Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

2.      Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds

-37-

shall be applied (a) to provide for the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

        3.      The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

        (i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

        (ii)      stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

        4.      Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

SECTION 505. Revenue Account.

        1.      All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

-38-

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in paragraph 2 below of this Section 505, and then (z) for release to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

2.  Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

3.  Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

-39-

511470.19 029578 RES

SECTION 506. <u>Debt Service Account</u>.

1.     There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH of Section 505.1.

2.     There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)    Amounts transferred from the Capitalized Interest Account pursuant to Section 503 for the payment of interest on the Bonds of such Series.

(iii)   Amounts transferred from the Debt Service Reserve Account pursuant to Section 507 for the payment of interest on the Bonds and the interest component of Parity Obligations.

3.     There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)     Amounts transferred from a Debt Service Reserve Account pursuant to Section 507 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)    Amounts transferred from the Redemption Account pursuant to Section 511 for the payment of Principal Installments of any Bonds.

4.     The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of subsection 2 of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.     The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee ; provided, however, that amounts deposited to the Principal

-40-

Account pursuant to clause (ii) of subsection 3 of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee, according to the amounts due on such date, without any discrimination or preference.

6. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 507. Debt Service Reserve Account.

1. At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

2. Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

3. Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

4. Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such

-41-

amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5.     If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

6.     Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

7.     Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this subsection. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to subsection 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or

-42-

a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section.

        8.     Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

SECTION 508. Satisfaction of Sinking Fund Installments.

        1.     Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

        (i)     to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or

        (ii)     to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

        2.     Upon the purchase or redemption of any Bond pursuant to subsection 1 of this Section, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or

-43-

Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.      In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4.      In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5.      The Trustee shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in Section 403.

SECTION 509.  Redemption Account; Amounts to be Deposited Therein.

1.      The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)      amounts determined pursuant to subsection 6 of Section 503;

(ii)     amounts determined pursuant to subsection 4 of Section 504;

(iii)    amounts determined pursuant to subsection 2 of Section 505; and

-44-

(iv)    amounts transferred from the Debt Service Reserve Accounts pursuant to Section 507 for the payment of the Redemption Price of Bonds.

2.    Subject to the limitations contained in subsection 4 of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation,  shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

3.    To the extent not required to make up a deficiency as required in subsection 2 of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds.  Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to subsection 1 of Section 505.

4.    The transfers required by subsection 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 510.  Rebate Account.

1.    The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

2.    The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

3.    The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

4.    The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

-45-

**ARTICLE VI**

**SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS**

SECTION 601. Security for Deposits. All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Trustee; provided, however, that it shall not be necessary, unless required by applicable law, for the Trustee to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Trustee to give security for any moneys which shall be represented by obligations purchased under the provisions of the Resolution as an investment of such moneys. The Trustee shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602. Investment of Funds, Accounts and Subaccounts Held by the Trustee.

1. Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2. Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

3. Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or

-46-

Subaccount but, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account, and if not required to be so deposited in the Rebate Account because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

4.    The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

5.    Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

6.    In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

SECTION 603. Valuation and Sale of Investments.

1.    In computing the amounts in the Revenue Account, Debt Service Accounts, Debt Service Reserve Accounts and Rebate Account obligations purchased as an investment of moneys therein shall be valued at Amortized Value. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

2.      Neither the Trustee nor the Corporation shall be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article; provided, however, that nothing in this subsection shall affect the obligation of the Corporation under any of the Bonds.

511470.19 029578 RES

**ARTICLE VII**

**PARTICULAR COVENANTS OF THE CORPORATION**

The Corporation covenants and agrees with the Trustee and the Bondowners as follows:

SECTION 701. <u>Payment of Obligations; Pledged Sales Tax Base Amount</u>. The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 5 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

SECTION 702. <u>Extension of Payment of Bonds</u>. The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the Corporation (i) to issue Option Bonds or Refunding Bonds as provided in herein and such issuance shall not be deemed to constitute an extension of maturity of Bonds or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703. <u>Offices for Servicing Bonds</u>. The Trustee shall at all times maintain one or more offices or agencies where Bonds may be presented for payment, registration of transfer or exchange, and where notices, demands and other documents may be served upon the Corporation in respect of the Bonds or of the Resolution. The Corporation hereby appoints the Trustee as its agent to maintain such offices or agencies.

SECTION 704. <u>Further Assurance</u>. At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other

-49-

moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705. <u>Power to Issue Bonds and Pledge Funds and Accounts</u>. The Corporation is duly authorized under all applicable laws to create and issue the Bonds and to adopt the Resolution and to pledge the Pledged Property purported to be pledged by the Resolution in the manner and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever.

SECTION 706. <u>Agreement of the Commonwealth</u>.

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

SECTION 707. <u>Creation of Liens</u>. Until the pledge created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1201, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under this Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under this Resolution.

SECTION 708. <u>Accounts and Reports</u>.

1.      The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee (it being understood that the Trustee shall have no duty so to inspect) and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing.

2.      The Corporation shall file with the Trustee  and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying such Event of Default or other event as described in this subsection, and specifying the nature and status of such Event of Default or other such event.

SECTION 709. <u>Tax Matters</u>.

1.      The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

2.      The Corporation will not make, or give its consent to the Trustee  or any other Person, to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

3.      The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Tax Exempt Bonds shall be excluded from gross income for Federal income tax purposes.

4.      Notwithstanding any other provision of this Resolution, including in particular Section 1201 hereof, the obligation to comply with the requirements of this Section 709 shall survive the defeasance or payment in full of the Bonds.

SECTION 710. <u>Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations</u>.

1.      No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on

-51-

the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

        A.      (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

        B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

        2.      In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by Section 505.1 which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

        3.      The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsections 1(A) or (B) of this Section 710.

SECTION 711.  General.

1.      The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

2.      Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

511470.19 029578 RES

# ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801. <u>Trustee Appointment and Acceptance of Duties</u>. The Bank of New York is hereby appointed as Trustee under the Resolution. The Trustee shall signify its acceptance of the duties and obligations imposed upon it by the Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Trustee shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in the Resolution.

SECTION 802. <u>Responsibilities of Trustee</u>. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by this Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an

-54-

Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VIII.

SECTION 803. <u>Evidence on Which Trustee May Act</u>.

1. The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

2. Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3. Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

SECTION 804. <u>Compensation and Indemnification</u>. The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel

-55-

fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

SECTION 805. <u>Certain Permitted Acts</u>. The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806. <u>Resignation of Trustee</u>. The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in

-56-

Section 808, in which event such resignation shall take effect immediately on the appointment of such successor.

SECTION 807. Removal of Trustee. The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

SECTION 808. Appointment of Successor Trustee.

1. In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

2. If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in Section 807 or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under Section 808, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

-57-

SECTION 809. Transfer of Rights and Property to Successor Trustee.

Any successor Trustee appointed under the Resolution shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee; but the Trustee ceasing to act shall nevertheless, on the written request of the Corporation, or of the successor Trustee, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under the Resolution, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth but subject to Section 804. Should any deed, conveyance or instrument in writing from the Corporation be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

SECTION 810. Appointment of Co-Trustee.

(a)    Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable (including title to the Pledged Property or any part thereof). Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Trustee shall, at the expense of the Corporation, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b)    Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i)    all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such

-58-

rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

(ii)     no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

(iii)     the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

(c)     Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Resolution and the conditions of this Section 810. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

(d)     Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without appointment of a new or successor trustee.

SECTION 811. Merger or Consolidation. Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by the Resolution, shall be the successor to the Trustee without the execution or filing of any paper or the performance of any further act.

SECTION 812. Adoption of Authentication.     In case any of the Bonds contemplated to be issued under the Resolution shall have been authenticated but not delivered, any successor Trustee may adopt the certificate of authentication of any predecessor Trustee so authenticating such Bonds and deliver such Bonds so authenticated; and in case any of the said Bonds shall not have been authenticated, any successor Trustee may authenticate such Bonds in the name of the predecessor Trustee, or in the name of the successor Trustee, and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in the Resolution provided that the certificate of authentication of the Trustee shall have.

-59-

SECTION 813. <u>Accounting by Trustee; Nonpetition Covenant</u>. The Trustee shall, upon receipt of a written request therefor from the Corporation, provide to the Corporation an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under the Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Trustee shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the Corporation to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Corporation under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Corporation or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Corporation.

-60-

**ARTICLE IX**

**SUPPLEMENTAL RESOLUTIONS**

SECTION 901. <u>Supplemental Resolutions Effective upon Filing with the Trustee.</u> For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

1.    to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

2.    to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

3.    to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

4.    to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

5.    to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

6.    to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

7.    to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

8.    to cure any ambiguity, defect or inconsistent provision in the Resolution;

9.    to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

10.    to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

-61-

511470.19 029578 RES

11.    as permitted by Section 1005;

12.    to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

13.    to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.  Reserved.

SECTION 903.  Supplemental    Resolutions    Effective    with    Consent    of Bondowners.  At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 904.  General Provisions.

1.    The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

2.    Any Supplemental Resolution referred to and permitted or authorized by Sections 901 and 902 may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively.  The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.  After any Supplemental Resolution becomes effective under this Article, the Corporation shall mail to the Owners a notice briefly describing such Supplemental Resolution; provided, however, the failure to give such notice , or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.    The Trustee is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901, 902 or 903

-62-

and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

4.     No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

511470.19 029578 RES

# ARTICLE X

# AMENDMENTS

SECTION 1001. Mailing and Publication.

1.     Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2.     In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002. Powers of Amendment.  Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee  without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

-64-

SECTION 1003. <u>Consent of Bondowners</u>. The Corporation may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 903, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Trustee ) together with a request to Bondowners for their consent thereto in form satisfactory to the Trustee, shall be mailed by the Corporation to Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Trustee (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002 and (b) an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the Corporation. Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee hereinafter in this Section provided for is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Trustee shall make and file with the Corporation a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the Corporation by mailing such notice to Bondowners. The Corporation shall file with the Trustee proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Trustee, shall be proof of the matters therein stated.

SECTION 1004. <u>Modifications by Unanimous Consent</u>. The terms and provisions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the Corporation with the Trustee of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005. <u>Modification Before Bonds Outstanding</u>. Prior to the issuance and delivery of the first Series of Bonds under the Resolution, the terms and conditions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

511470.19 029578 RES

SECTION 1006. Exclusion of Bonds. Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article. At the time of any consent or other action taken under this Article, the Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

SECTION 1007. Notation on Bonds. Bonds authenticated and delivered after the effective date of any action taken as in Article IX or this Article provided may, and, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action. If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

-66-

## ARTICLE XI

### DEFAULTS AND REMEDIES

SECTION 1101. Events of Default.

1.      Each of the following events shall constitute an Event of Default under the Resolution:

(i)      There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)      There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of this Resolution, and all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

2.      The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax shall not constitute a default or Event of Default under the Resolution.

3.      In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

-67-

SECTION 1102. Remedies.

1.    Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

    (i)    by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

    (ii)    by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

    (iii)    by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

    (iv)    by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2.    In the enforcement of any remedy under the Resolution, but subject to Sections 201, 501 and 1206, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such

511470.19 029578 RES

amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

SECTION 1103. Priority of Payments After Event of Default.

1. Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH of this subsection 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded

-69-

Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

2.      The provisions of this Section are in all respects subject to the provisions of Section 702.

3.      Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct.  Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Compounded Amount, if any) to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate for the fixing of any such date.  The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

SECTION 1104.  Termination of Proceedings.  In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

SECTION 1105.  Bondowners' Direction of Proceedings.  Anything in this Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee  hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, including Section 804 hereof, and that the Trustee  shall have the right to decline to follow any such direction which in the opinion of the Trustee  would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

SECTION 1106.  Limitation on Rights of Bondowners.

1.      No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Trustee  written notice of the Event of Default or breach of duty on account of which such suit,

-70-

---

action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or the Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2.    Anything to the contrary contained in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. <u>Possession of Bonds by Trustee Not Required</u>. All rights of action under this Resolution or under any of the Bonds, enforceable by the Trustee, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. <u>Remedies Not Exclusive</u>. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

-71-

SECTION 1109. <u>No Waiver of Default</u>. No delay or omission of the Trustee, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110. <u>Notice of Event of Default</u>. The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

511470.19 029578 RES

## ARTICLE XII

## MISCELLANEOUS

SECTION 1201. Defeasance.

1.     Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.     If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.     Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in subsection 12of this Section. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in subsection 1 of this Section 1201 if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit

-73-

required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

4.     Neither Defeasance Securities nor moneys deposited with the Trustee pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under this Section 1201.

5.     For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of this Section, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of this Section, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

6.     Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of this Section, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this subsection 4. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

7.     Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds.

1.     Any request, consent, revocation of consent or other instrument which the Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing.  The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer.  Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such

-75-

511470.19 029578 RES

a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2.    The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3.    Any request or consent by the Owner of any Bond shall bind all future Owners of such Bonds in respect of anything done or suffered to be done by the Corporation or the Trustee in accordance therewith.

SECTION 1203. <u>Moneys Held for Particular Bonds</u>. The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1204. <u>Preservation and Inspection of Documents</u>. All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1205. <u>Parties Interested Herein</u>. Nothing in the Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person or corporation, other than the Corporation, the Trustee, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of the Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in the Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Beneficiaries and the Owners of the Bonds.

SECTION 1206. <u>No Personal Liability</u>. Neither the members of the Corporation nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1207. <u>Successors and Assigns</u>. Whenever in the Resolution the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Resolution contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1208. <u>Severability of Invalid Provisions</u>. If any one or more of the covenants or agreements provided in the Resolution on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of the Resolution.

SECTION 1209. <u>Headings</u>. The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

-76-

SECTION 1210. <u>Conflict</u>.  All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1211. <u>Governing Law</u>.  This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution and the provisions of Section 601 (and the "applicable law" referred to in such Section 601 shall not include the laws of the Commonwealth) shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1212. <u>Notices</u>.  Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

<u>To the Trustee:</u>

The Bank of New York
101 Barclay Street—7W
New York, New York 10286
Attention: Northern Municipals
Phone: 212-815-6955
Fax: 212-815-5595/5596

<u>To the Corporation:</u>

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention: Executive Director
Phone: 787-722-2525
Fax: 787-728-0975

SECTION 1213. <u>Effective Date</u>.  This Resolution shall take effect immediately upon its adoption.

-77-

511470.19 029578 RES

EXHIBIT A

SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of July 31, 2007, is by and between the Puerto Rico Sales Tax Financing Corporation (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Sales Tax Revenue Bonds of the Debtor (the "Sales Tax Revenue Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on July 13, 2007, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as trustee under the Resolution (the "Secured Party").

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Sales Tax Revenue Bonds and payment to Beneficiaries in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the funds and accounts maintained by the Secretary of the Treasury, as paying agent, as the first repository for all Dedicated Sales Tax received from merchants and retailers and authorized collectors until deposited into the COFINA Repayment Project Fund (and all accounts therein) maintained under the Resolution, (ii) all amounts on deposit in the COFINA Repayment Project Fund (and all accounts therein) maintained under the Resolution, and all amounts required to be on deposit therein by the terms of the Resolution, and (iii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Sales Tax Revenue Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Sales Tax Revenue Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

PUERTO RICO SALES TAX FINANCING CORPORATION

By _____

    Name and Title:

THE BANK OF NEW YORK, as Trustee under the Resolution

By _____

    Name and Title:

511470.19 029578 RES

Case:17-00257-LTS Doc#:94-2 Filed:11/06/17 Entered:11/06/17 21:49:52 Desc:
Exhibit C Page 85 of 173

# PUERTO RICO SALES TAX FINANCING CORPORATION

---

## AMENDED AND RESTATED
## SALES TAX REVENUE BOND RESOLUTION

---

Adopted on July 13, 2007
As amended on June 10, 2009

511470.30 032563 RES

# TABLE OF CONTENTS

Page

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

| | | |
|---|---|---|
| SECTION 101. | Definitions | 1 |
| SECTION 102. | Authority for this Resolution | 21 |
| SECTION 103. | Resolution to Constitute Contract | 21 |
| SECTION 104. | Special Provisions Concerning Capital Appreciation Bonds | 21 |

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

| | | |
|---|---|---|
| SECTION 201. | Authorization of Bonds | 23 |
| SECTION 202. | General Provisions for Issuance of Bonds. | 23 |
| SECTION 203. | Special Provisions for Refunding Bonds. | 27 |
| SECTION 204. | Delegation of Officers and Committees. | 28 |
| SECTION 205. | Credit and Liquidity Facilities; Rights of Credit Facility Providers. | 28 |
| SECTION 206. | Qualified Hedges | 29 |
| SECTION 207. | Parity Obligations and Subordinate Obligations | 29 |

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

| | | |
|---|---|---|
| SECTION 301. | Medium of Payment; Form and Date; Letters and Numbers. | 30 |
| SECTION 302. | Legends | 30 |
| SECTION 303. | Execution and Authentication. | 30 |
| SECTION 304. | Negotiability, Transfer and Registry. | 31 |
| SECTION 305. | Registration of Transfer of Bonds. | 31 |
| SECTION 306. | Regulations with Respect to Exchanges and Registration of Transfers | 31 |
| SECTION 307. | Bonds Mutilated, Destroyed, Stolen or Lost. | 32 |
| SECTION 308. | Preparation of Definitive Bonds; Temporary Bonds. | 32 |
| SECTION 309. | Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount | 33 |
| SECTION 310. | Book-Entry-Only System. | 33 |

## ARTICLE IV

## REDEMPTION OF BONDS

| | | |
|---|---|---|
| SECTION 401. | Privilege of Redemption and Redemption Price | 34 |

i

**TABLE OF CONTENTS**

Page

SECTION 402.   Redemption at the Election of the Corporation ...........................................34
SECTION 403.   Redemption out of Sinking Fund Installments. .........................................34
SECTION 404.   Selection of Bonds to be Redeemed in Partial Redemption. .......................35
SECTION 405.   Notice of Redemption ...............................................................................35
SECTION 406.   Payment of Redeemed Bonds ....................................................................36
SECTION 407.   Cancellation and Disposition of Bonds.......................................................36

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501.   The Pledge. ..............................................................................................38
SECTION 502.   Establishment of Fund and Accounts. ........................................................38
SECTION 503.   Costs of Issuance Account and Capitalized Interest Account. .....................39
SECTION 504.   Bond Proceeds Account..............................................................................40
SECTION 505.   Revenue Account........................................................................................41
SECTION 506.   Debt Service Account. ................................................................................43
SECTION 507.   Debt Service Reserve Account. ...................................................................45
SECTION 508.   Satisfaction of Sinking Fund Installments. ................................................47
SECTION 509.   Redemption Account; Amounts to be Deposited Therein. ...........................48
SECTION 510.   Rebate Account...........................................................................................49

## ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601.   Security for Deposits...................................................................................50
SECTION 602.   Investment of Funds, Accounts and Subaccounts Held by the
               Trustee...................................................................................................50
SECTION 603.   Valuation and Sale of Investments. .............................................................51

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

SECTION 701.   Payment of Obligations; Pledged Sales Tax Base Amount..........................53
SECTION 702.   Extension of Payment of Bonds...................................................................53
SECTION 703.   Offices for Servicing Bonds........................................................................53
SECTION 704.   Further Assurance.......................................................................................53
SECTION 705.   Power to Issue Bonds and Pledge Funds and Accounts ...............................54
SECTION 706.   Agreement of the Commonwealth. ..............................................................54
SECTION 707.   Creation of Liens.........................................................................................54
SECTION 708.   Accounts and Reports. ................................................................................55

ii

**TABLE OF CONTENTS**

Page

SECTION 709.   Tax Matters. ...................................................................................55
SECTION 710.   Issuance of Additional Bonds; Incurrence of Additional Parity
               Obligations and Subordinate Obligations; Payment of Obligations. ...........56
SECTION 711.   General. ............................................................................................59

## ARTICLE VIII

## CONCERNING THE TRUSTEE

SECTION 801.   Trustee Appointment and Acceptance of Duties ...........................................60
SECTION 802.   Responsibilities of Trustee ...................................................................60
SECTION 803.   Evidence on Which Trustee May Act ..........................................................61
SECTION 804.   Compensation and Indemnification ...........................................................61
SECTION 805.   Certain Permitted Acts .......................................................................62
SECTION 806.   Resignation of Trustee .......................................................................62
SECTION 807.   Removal of Trustee ...........................................................................63
SECTION 808.   Appointment of Successor Trustee. ...........................................................63
SECTION 809.   Transfer of Rights and Property to Successor Trustee .......................................64
SECTION 810.   Appointment of Co-Trustee. ...................................................................64
SECTION 811.   Merger or Consolidation ......................................................................65
SECTION 812.   Adoption of Authentication ...................................................................65
SECTION 813.   Accounting by Trustee; Nonpetition Covenant .................................................66

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901.   Supplemental Resolutions Effective upon Filing with the Trustee ..............67
SECTION 902.   Supplemental Resolutions Effective upon Consent of Trustee ....................68
SECTION 903.   Supplemental Resolutions Effective with Consent of Bondowners .............68
SECTION 904.   General Provisions. ...........................................................................68

## ARTICLE X

## AMENDMENTS

SECTION 1001.   Mailing and Publication. ....................................................................70
SECTION 1002.   Powers of Amendment ..........................................................................70
SECTION 1003.   Consent of Bondowners ........................................................................71
SECTION 1004.   Modifications by Unanimous Consent ...........................................................71
SECTION 1005.   Modification Before Bonds Outstanding ........................................................71
SECTION 1006.   Exclusion of Bonds ...........................................................................72
SECTION 1007.   Notation on Bonds ............................................................................72

iii

# TABLE OF CONTENTS

Page

## ARTICLE XI

## DEFAULTS AND REMEDIES

SECTION 1101.  Events of Default. .................................................................................73
SECTION 1102.  Remedies. ..............................................................................................73
SECTION 1103.  Priority of Payments After Event of Default. ........................................75
SECTION 1104.  Termination of Proceedings ...................................................................76
SECTION 1105.  Bondowners' Direction of Proceedings ..................................................76
SECTION 1106.  Limitation on Rights of Bondowners .....................................................76
SECTION 1107.  Possession of Bonds by Trustee Not Required ......................................77
SECTION 1108.  Remedies Not Exclusive ........................................................................77
SECTION 1109.  No Waiver of Default ..............................................................................78
SECTION 1110.  Notice of Event of Default ......................................................................78

## ARTICLE XII

## MISCELLANEOUS

SECTION 1201.  Defeasance. .............................................................................................79
SECTION 1202.  Evidence of Signatures of Bondowners and Owners of Bonds. .................81
SECTION 1203.  Moneys Held for Particular Bonds .........................................................82
SECTION 1204.  Preservation and Inspection of Documents .............................................82
SECTION 1205.  Parties Interested Herein .........................................................................82
SECTION 1206.  No Personal Liability ...............................................................................82
SECTION 1207.  Successors and Assigns ...........................................................................82
SECTION 1208.  Severability of Invalid Provisions ..........................................................82
SECTION 1209.  Headings ..................................................................................................82
SECTION 1210.  Conflict ....................................................................................................83
SECTION 1211.  Governing Law ........................................................................................83
SECTION 1212.  Effective Date .........................................................................................83

iv

# SALES TAX REVENUE BOND RESOLUTION

BE IT RESOLVED by the Puerto Rico Sales Tax Financing Corporation, as follows:

## ARTICLE I

## DEFINITIONS AND STATUTORY AUTHORITY

SECTION 101. <u>Definitions</u>. The following terms shall, for all purposes of this Resolution, have the following meanings, unless the context shall clearly indicate some other meaning:

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior

Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the

-2-

related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to this Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the

Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of this Resolution, and for the purposes of the thirteenth sentence of Section 802 of this Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Proceeds Account** shall mean the Account by that name established by Section 502.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, or (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital

-4-

Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity, in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to Section 502.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Commonwealth Sales Tax** shall mean the sales and use tax enacted by the Legislative Assembly of Puerto Rico by virtue of Act No. 117 of the Legislature of Puerto Rico, approved July 4, 2006, as amended.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at

-5-

which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of this Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act..

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to Section 502.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which

511470.30 032563 RES

shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Account** shall mean the Account by that name established by Section 502.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

(i) Government Obligations;

-7-

511470.30 032563 RES

(ii)     Defeased Municipal Obligations;

(iii)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) or (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

511470.30 032563 RES

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

511470.30 032563 RES

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Holding Subaccount** means each Account by that name established in a Debt Service Account pursuant to Section 502.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by Section 502.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

(i)     Defeasance Obligations;

(ii)    Defeased Municipal Obligations;

(iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)     direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)   shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or

-10-

any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)   bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)   repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)   investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)   any other obligations conforming to any Corporation guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

-11-

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding,** when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

511470.30 032563 RES

(i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

(ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)     Bonds deemed to have been paid as provided in Section 1201;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in this Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

-13-

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

      1.     All Revenues.

      2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

      3.     The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Sections 1201 and 1203.

      4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

      5.     Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

511470.30 032563 RES

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in Section 508) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by Section 502.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be

-15-

based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

-16-

**Rebate Account** shall mean the Account by that name established by Section 502.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Series Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by Section 502.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to this Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to Section 203 or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to this Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

511470.30 032563 RES

**Resolution** shall mean this Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by Section 502.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of Section 710 or other purposes of the Resolution.

    3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

    4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution, subject to the provisions of Sections 1201 and 1203.

    5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

511470.30 032563 RES

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Secretary** means, for purposes of the Resolution and so long as Bonds shall be Outstanding, the Secretary of the Board of Directors of Government Development Bank for Puerto Rico, who shall also act as Secretary of the Board of Directors of the Corporation and as Secretary under this Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee, in the form appended hereto as Appendix A.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to Article III or Section 1007, regardless of variations in maturities, principal amount, interest rate or other provisions.

-19-

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to Section 1201.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of this Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with Article IX.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

Term Bonds shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

Trustee shall mean the bank, trust company or national banking association appointed pursuant to Section 801 to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

Words of the masculine gender shall be deemed and construed to include correlative words of the feminine and neuter genders. Unless the context shall otherwise indicate, words importing the singular number shall include the plural number and vice versa.

The terms "hereby," "hereof," "hereto," "herein," "hereunder," and any similar terms as used in this Resolution, refer to this Resolution. All references to Articles and Sections in this Resolution refer to the Articles and Sections hereof unless otherwise expressly stated.

SECTION 102. Authority for this Resolution. This Resolution is adopted pursuant to the authority conferred on the Corporation by the Act.

SECTION 103. Resolution to Constitute Contract. In consideration of the purchase and acceptance of any and all of the Bonds authorized to be issued hereunder by those Persons who shall hold the same from time to time, the Resolution shall be deemed to be and shall constitute a contract among the Corporation, the Owners from time to time of the Bonds, and all other Beneficiaries; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and all other Beneficiaries, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and such Beneficiaries over any other thereof, except as expressly otherwise provided in or permitted by the Resolution.

SECTION 104. Special Provisions Concerning Capital Appreciation Bonds.

Except as otherwise may be provided in a Supplemental Resolution:

1. For purposes of clause (ii) within the definition of "Outstanding" in this Resolution, the principal amount of any Capital Appreciation Bond, in reference to the payment thereof at maturity, shall be deemed to equal its Maturity Amount.

2. For purposes of the definition of "Redemption Price" in this Resolution, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended redemption.

3. For purposes of Sections 305, 307 and 308, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended exchange or substitution.

4.    For purposes of Section 406, the principal amount of any Capital Appreciation Bond shall be deemed to equal its Compounded Amount.

5.    For purposes of Sections 501, 502, and 1103, and of all other provisions of this Resolution relating to security for the Bonds or application of assets which secure the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the date of the intended application of the subject assets.

6.    For purposes of Sections 1002, 1003, 1101, 1102, 1105 and 1106 and of all other provisions of this Resolution relating to consents or directions given by, or requests of, Owners of the Bonds, the principal amount of each Capital Appreciation Bond shall be deemed to equal its Compounded Amount as of the most recent Compounding Date.

7.    For purposes of Section 1201, the principal amount of any Capital Appreciation Bond payable upon the maturity thereof shall be deemed to equal its Maturity Amount.

511470.30 032563 RES

## ARTICLE II

## AUTHORIZATION AND ISSUANCE OF BONDS

SECTION 201. Authorization of Bonds. There is hereby created and established an issue of Bonds of the Corporation to be designated as "Sales Tax Revenue Bonds," which Bonds may be issued as hereinafter provided without limitation as to amount except as is or may hereafter be provided in the Resolution or in a Supplemental Resolution or as may be limited by law. There is hereby further created by the Resolution, in the manner and to the extent provided herein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to this Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds or any Ancillary Bond Facility. Neither any Bond nor any Ancillary Bond Facility shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the good faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond or any Ancillary Bond Facility be payable out of any funds or assets other than the Pledged Property and other funds and assets of or available to the Corporation and pledged therefor, and the Bonds and each Ancillary Bond Facility shall contain a statement to the foregoing effect.

SECTION 202. General Provisions for Issuance of Bonds.

1.    The Bonds may, if and when authorized by the Corporation pursuant to one or more Series Resolutions, be issued in one or more Series, as Senior Bonds or one or more Classes of Subordinate Bonds, and the designation thereof, in addition to the name "Sales Tax Revenue Bonds," shall include such further appropriate particular designations added to or incorporated in such title for the Bonds of any particular Series as the Corporation may determine, including designations of Classes. Each Bond shall bear upon its face the designation so determined for the Series to which it belongs. Except as may be limited by applicable law, Bonds of a Series may be issued in the form of Capital Appreciation Bonds, Convertible Capital Appreciation Bonds, Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender Bonds, Taxable Bonds or Tax Exempt Bonds or any combination of the foregoing, which in each case may be Serial Bonds or Term Bonds, or any combination thereof. Any Bonds that are to be issued as Subordinate Bonds may be issued with priorities of payment hereunder among all such Subordinate Bonds, as set forth in the related Series Resolutions.

2.    Each Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds shall also specify, except as may be limited by applicable law:

(i)    the authorized principal amount and designation of such Series of Bonds;

(ii)    the purpose or purposes for which such Series of Bonds is being issued, which shall be one or more of the following, to the extent then permitted by applicable law and the provisions of the Resolution:  (a) to provide sufficient

-23-

funds for the Project; (b) to refund or otherwise prepay any Bonds or other bonds, notes or other evidences of indebtedness issued by the Corporation for the Project; (c) to pay or provide for the payment of Financing Costs, including but not limited to Costs of Issuance; and/or (d) for such other purposes or projects as may be authorized by the Act, as the same may be amended and then in effect.

(iii)   the date or dates, maturity date or dates (which for all Bonds issued after the date of issuance of Bonds designated "Series 2008A", shall be on August 1 in the related year) and amounts of each maturity of the Bonds of such Series;

(iv)   the interest rate or rates of the Bonds of such Series (which may include variable, convertible or other rates, original issue discount and zero interest rate bonds), or the manner of determining such interest rate or rates, and the interest payment dates of the Bonds of such Series, and the date or dates on which the rate at which Adjustable Rate Bonds of such Series bear interest shall be adjusted;

(v)   the type of Bonds to be issued, including, but not limited to, Capital Appreciation Bonds (including Convertible Capital Appreciation Bonds), Current Interest Bonds, Adjustable Rate Bonds, Option Bonds, Fixed Tender bonds, Taxable Bonds or Tax Exempt Bonds;

(vi)   the designation of Bonds of such Series as Senior Bonds or as one or more Classes of Subordinate Bonds and the designation of Beneficiaries;

(vii)   the Record Date, if any, for such Bonds;

(viii)   the denomination or denominations of, and the manner of dating, numbering and lettering, the Bonds of such Series;

(ix)   if so determined by the Corporation, any Debt Service Reserve Requirement for the Bonds of such Series, and the method of calculating the same and funding thereof (which may be from Bond proceeds);

(x)   the place or places of payment of the principal of and premium, if any, and interest on the Bonds of such Series, or the method of determining the same;

(xi)   the Redemption Price or Prices, if any, and, subject to the provisions of Article IV, the redemption terms, if any, for the Bonds of such Series (including but not limited to any notice of redemption period other than as provided in Section 406), provided that Bonds of any maturity for which Sinking Fund Installments shall be established pursuant to paragraph (xii) of this subsection shall in any event be redeemable, or payable at maturity, by application of the Sinking Fund Installments for such Bonds on the due dates of such Sinking Fund Installments;

-24-

(xii)    the amount of each Sinking Fund Installment, or the method for determining such amount, and due date of each Sinking Fund Installment, if any, for Bonds of like maturity of such Series (which date for all Bonds issued after the date of issuance of Bonds designated "Series 2008A" shall be on August 1 in the related year);

(xiii)   the amount, if any, or the method for determining such amount, to be credited to the Capitalized Interest Account, for capitalized interest with respect to such Series of Bonds and provisions for the application thereof to the payment of all or a portion of the interest on such Series of Bonds or any other Series of Bonds;

(xiv)    the amount, if any, or method of determining such amount, to be credited to the Costs of Issuance Account or otherwise to be paid for Costs of Issuance;

(xv)     if so determined by the Corporation, provisions for the application of any moneys available therefor to the purchase or redemption of Bonds of such Series and for the order of purchase or redemption of such Bonds;

(xvi)    if so determined by the Corporation, provisions for the sale of the Bonds of such Series;

(xvii)   provisions for the execution and authentication of the Bonds of such Series;

(xviii)  the forms of the Bonds of such Series and of the Trustee 's certificate of authentication;

(xix)    if Bonds of such Series are Adjustable Rate Bonds that are not the subject of a Qualified Hedge, the Contractual Maximum Interest Rate for such Bonds and the provisions, if any, as to the calculation or change of Adjustable Rates;

(xx)     if Bonds of such Series are Option Bonds or Fixed Tender Bonds, provisions regarding tender for purchase or redemption thereof and payment of the purchase or Redemption Price thereof;

(xxi)    if so determined by the Corporation, modifications to the definition of Revenues or Pledged Property applicable to the Bonds of such Series reflecting the addition of resources to Revenues or Pledged Property;

(xxii)   if so determined with respect to the Bonds of such Series, that Section 709 shall not apply to such Bonds;

(xxiii)  deposits into Funds, Accounts and Subaccounts as may be required or permitted by the Resolution and not otherwise provided for above;

511470.30 032563 RES

(xxiv) if such Bonds are not payable in Dollars, the Foreign Currency or Currencies or Currency Unit in which the Bonds of such Series shall be denominated or in which payment of the principal of (and/or premium, if any) and/or interest on the Bonds of such Series may be made;

(xxv) if the amount of principal of (and premium, if any) or interest on the Bonds of such Series may be determined with reference to an index, including, but not limited to, an index based on a Currency or Currencies other than that in which the Bonds of such Series are denominated or payable, or any other type of index, the manner in which such amounts shall be determined; and

(xxvi) any other provisions deemed advisable by the Corporation, not in conflict with the provisions of the Resolution or the Act as each is then in effect.

3.     Each Series of Bonds shall be executed by the Corporation for issuance under the Resolution and delivered to the Trustee and thereupon shall be authenticated by the Trustee and delivered to the Corporation or upon its order, but only upon satisfaction with the conditions to issuance of additional Bonds contained in Section 710 and only upon the receipt by the Trustee of:

(i)     a copy of the Resolution, certified by an Authorized Officer of the Corporation or the Secretary;

(ii)     an Opinion of Bond Counsel to the effect that (A) the Corporation has the right and power under the Act, as amended to the date of such opinion, to adopt the Resolution and the Resolution has been duly and lawfully adopted by the Corporation, is in full force and effect and is valid and binding upon the Corporation and enforceable in accordance with its terms, and no other authorization for the Resolution is required; (B) the Resolution creates the valid pledge for the benefit of the Owners of the Bonds which it purports to create of the Pledged Property, subject only to the provisions of the Resolution permitting the application thereof to the purposes and on the terms and conditions set forth in the Resolution; and (C) the Bonds of such Series are valid and binding special obligations of the Corporation as provided in the Resolution, enforceable in accordance with their terms and the terms of the Resolution (except insofar as the enforceability thereof may be limited by bankruptcy, moratorium, insolvency or other laws affecting creditors' rights or remedies theretofore or thereafter enacted and may be subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law), or other customary exception), and entitled to the benefit of the Resolution and of the Act, as amended to the date of such opinion, and such Bonds have been duly and validly authorized, executed and issued in accordance with law, including the Act, as amended to the date of such opinion, and in accordance with the Resolution;

(iii)     a written order as to the authentication and delivery of the Bonds of such Series, signed by an Authorized Officer of the Corporation;

-26-

511470.30 032563 RES

(iv)    a copy of the Series Resolution authorizing such Series, certified by an Authorized Officer of the Corporation or the Secretary;

(v)    a certificate of an Authorized Officer of the Corporation as to deposits in Accounts and stating that the Corporation is not in default in any material respect in the performance of any of the terms, provisions or covenants of this Resolution or any Supplemental Resolution to be complied with or performed by the Corporation;

(vi)    such further documents as are required by the provisions of this Section or Article IX or any Supplemental Resolution or Supplemental Resolution adopted pursuant to Article IX.

4.    Each Series of Bonds shall be issued upon compliance with Section 710.

SECTION 203.    Special Provisions for Refunding Bonds.

1.    Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of Section 202 and this Section, as Refunding Bonds, including for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation.  Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

2.    The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee only upon receipt by the Trustee (in addition to the requirements of Section 202) of:

(i)    irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

(ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication, irrevocable instructions to the Trustee, to provide notice in the manner provided in Section 1201 with respect to the payment of such Bonds pursuant to such Section 1201;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of subsection 2 of Section 1201, which moneys and Defeasance Securities shall be held in trust and used only as provided in subsection 2 of Section 1201; and

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in

-27-

paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

    3.      Refunding Bonds may be issued only upon compliance with Section 710.

SECTION 204.  <u>Delegation of Officers and Committees</u>.

    A Supplemental Resolution authorizing Bonds may delegate to any Authorized Officer or committee of the Corporation, and any such committee may delegate to an Authorized Officer of the Corporation, the power to issue Bonds from time to time and to fix the details of any such Bonds by an appropriate certificate of such Authorized Officer. Any such action by an Authorized Officer of the Corporation shall be in writing. Each such action by an Authorized Officer or committee of the Corporation with respect to any Bonds shall be deemed to be part of the Supplemental Resolution providing for such Bonds.

    SECTION 205.  <u>Credit and Liquidity Facilities; Rights of Credit Facility Providers</u>.

    1.      In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

    2.      Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

511470.30 032563 RES

SECTION 206.  Qualified Hedges.  The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

SECTION 207.  Parity Obligations and Subordinate Obligations.  For purposes of Articles V and XI, all Parity Obligations and Subordinate Obligations shall specify, to the extent applicable, the interest and principal components of such Parity Obligations and Subordinate Obligations; provided, however, that in the case of Qualified Hedges, scheduled payments thereunder shall constitute the interest components thereof and there shall be no principal components.

511470.30 032563 RES

## ARTICLE III

## GENERAL TERMS AND PROVISIONS OF BONDS

SECTION 301.  <u>Medium of Payment; Form and Date; Letters and Numbers.</u>

1.     The Bonds shall be payable, with respect to interest, principal and premium, if any, in Dollars or any Currency which at the time of payment is legal tender for the payment of public and private debts, as provided in the applicable Series Resolution.

2.     The Bonds of each Series shall be issued only in the form of fully registered Bonds without coupons unless otherwise authorized by the Supplemental Resolution authorizing the issuance thereof.

3.     Each Bond shall be lettered and numbered as provided in the Supplemental Resolution authorizing the issuance thereof and so as to be distinguished from every other Bond.

4.     Bonds of each Series shall be dated as provided in the Supplemental Resolution authorizing the issuance thereof.

5.     If so provided by the Supplemental Resolution authorizing the issuance thereof, the Bonds of any Series authorized to be issued by such Supplemental Resolution may be evidenced in book entry form without definitive certificates delivered to each beneficial owner thereof.

SECTION 302.  <u>Legends.</u>  The Bonds of each Series in the form set forth in any Supplemental Resolution may also contain or have endorsed thereon such provisions, specifications and descriptive words not inconsistent with the provisions of the Resolution as may be necessary or desirable to comply with custom or otherwise, as may be determined by the Corporation prior to the authentication and delivery thereof.

SECTION 303.  <u>Execution and Authentication.</u>

1.     The Bonds shall be executed in the name of the Corporation by the manual or facsimile signature of an Authorized Officer of the Corporation and its corporate seal (or a facsimile thereof) shall be thereunto affixed, imprinted, engraved or otherwise reproduced, and attested by the manual or facsimile signature of its Secretary.  In case any one or more of the officers who shall have signed or sealed any of the Bonds shall cease to be such officer before the Bonds so signed and sealed shall have been authenticated and delivered by the Trustee, such Bonds may, nevertheless, be authenticated and delivered as herein provided, and may be issued as if the persons who signed or sealed such Bonds had not ceased to hold such offices.  Any Bond of a Series may be signed and sealed on behalf of the Corporation by such persons as at the time of the execution of such Bond shall be duly authorized or hold the proper office in the Corporation, although at the date borne by the Bonds of such Series such persons may not have been so authorized or have held such office.

-30-

2. The Bonds of each Series shall bear thereon a certificate of authentication, in the form set forth in the Supplemental Resolution authorizing such Bonds, executed manually by the Trustee. Only such Bonds as shall bear thereon such certificate of authentication shall be entitled to any right or benefit under the Resolution and no Bond shall be valid or obligatory for any purpose until such certificate of authentication shall have been duly executed by the Trustee. Such certificate of the Trustee upon any Bond executed on behalf of the Corporation shall be conclusive evidence that the Bond so authenticated has been duly authenticated and delivered under the Resolution and that the Owner thereof is entitled to the benefits of the Resolution.

SECTION 304. Negotiability, Transfer and Registry. All Bonds issued under the Resolution shall be negotiable, subject to the provisions for registration and registration of transfer contained in the Resolution and in the Bonds. So long as any of the Bonds shall remain outstanding, the Corporation shall maintain and keep, at the Corporate Trust Office, books for the registration and registration of transfer of Bonds; and, upon presentation thereof for such purpose at said office, the Corporation shall register or cause to be registered therein, under such reasonable regulations as it or the Trustee may prescribe, any Bond entitled to registration or registration of transfer. So long as any of the Bonds remain Outstanding, the Corporation shall make all necessary provision to permit the exchange of Bonds at the Corporate Trust Office.

SECTION 305. Registration of Transfer of Bonds.

1. The transfer of each Bond shall be registrable only upon the books of the Corporation, which shall be kept for that purpose at the Corporate Trust Office, by the Owner thereof in person or by his attorney duly authorized in writing, upon surrender thereof together with a written instrument of transfer duly executed by the Owner or his duly authorized attorney. Upon the registration of transfer of any such Bond the Corporation shall issue in the name of the transferee a new Bond or Bonds of the same aggregate principal amount, Series, maturity, and interest rate, as the surrendered Bond.

2. The Corporation and the Trustee may deem and treat the person in whose name any Bond shall be registered upon the books of the Corporation as the absolute owner of such Bond whether such Bond shall be overdue or not, for the purpose of receiving payment of, or on account of, the principal or Redemption Price, if any, of and interest on such Bond and for all other purposes, and all such payments so made to any such Owner or upon his duly authorized written order shall be valid and effectual to satisfy and discharge the liability upon such Bond to the extent of the sum or sums so paid, and neither the Corporation nor the Trustee shall be affected by any notice to the contrary. The Corporation agrees to indemnify and hold the Trustee harmless against any and all loss, cost, charge, expense, judgment or liability incurred by it, acting in good faith and without gross negligence under the Resolution, in so treating such Owner.

SECTION 306. Regulations with Respect to Exchanges and Registration of Transfers. In all cases in which the privilege of exchanging Bonds or registering transfers of Bonds is exercised, the Corporation shall execute and the Trustee shall authenticate and deliver Bonds in accordance with the provisions of the Resolution. All Bonds surrendered in any such exchanges or registration of transfers shall forthwith be canceled by the Trustee. For every such exchange or registration of transfer of Bonds, whether temporary or definitive, the Corporation

-31-

or the Trustee may make a charge sufficient to reimburse it for any tax, fee or other governmental charge required to be paid with respect to such exchange or registration of transfer, and, except (i) with respect to the delivery of definitive Bonds in exchange for temporary Bonds, (ii) in the case of a Bond issued upon the first exchange or registration of transfer of a Bond or Bonds surrendered for such purpose within 60 days after the first authentication and delivery of any of the Bonds of the same Series, or (iii) as otherwise provided in the Resolution, may charge a sum sufficient to pay the cost of preparing each new Bond issued upon such exchange or registration of transfer, which sum or sums shall be paid by the person requesting such exchange or registration of transfer as a condition precedent to the exercise of the privilege of making such exchange or registration of transfer. Neither the Corporation nor the Trustee shall be required to register the transfer of or exchange any Bonds called for redemption.

SECTION 307. Bonds Mutilated, Destroyed, Stolen or Lost. In case any Bond shall become mutilated or be destroyed, stolen or lost, the Corporation shall execute, and thereupon the Trustee shall authenticate and deliver, a new Bond of like Series, maturity, and principal amount as the Bond so mutilated, destroyed, stolen or lost, in exchange and substitution for such mutilated Bond, upon surrender and cancellation of such mutilated Bond or in lieu of and substitution for the Bond destroyed, stolen or lost, upon filing with the Trustee evidence satisfactory to the Corporation and the Trustee that such Bond has been destroyed, stolen or lost and upon furnishing the Corporation and the Trustee with indemnity satisfactory to them and complying with such other reasonable regulations as the Corporation and the Trustee may prescribe and paying such expenses as the Corporation and Trustee may incur. All Bonds so surrendered to the Trustee shall be canceled by it. Any such new Bonds issued pursuant to this Section in substitution for Bonds alleged to be destroyed, stolen or lost shall constitute original additional contractual obligations on the part of the Corporation, whether or not the Bonds so alleged to be destroyed, stolen or lost be at any time enforceable by anyone, and shall be equally secured by and entitled to equal and proportionate benefits with all other Bonds issued under the Resolution, in any moneys or securities held by the Corporation or the Trustee for the benefit of the Bondowners.

SECTION 308. Preparation of Definitive Bonds; Temporary Bonds.

1. Until the definitive Bonds of any Series are prepared, the Corporation may execute, in the same manner as is provided in Section 303, and, upon the request of the Corporation, the Trustee shall authenticate and deliver, in lieu of definitive Bonds, one or more temporary Bonds substantially of the tenor of the definitive Bonds in lieu of which such temporary Bond or Bonds are issued, in denominations or any multiples thereof authorized by the Corporation, and with such omissions, insertions and variations as an Authorized Officer of the Corporation may deem appropriate to temporary Bonds. The Corporation at its own expense shall prepare and execute and, upon the surrender of such temporary Bonds for exchange and the cancellation of such surrendered temporary Bonds, the Trustee shall authenticate and, without charge to the Owner thereof, deliver in exchange therefor definitive Bonds, of the same aggregate principal amount, Series and maturity if any, as the temporary Bonds surrendered. Until so exchanged, the temporary Bonds shall in all respects be entitled to the same benefits and security as definitive Bonds authenticated and issued pursuant to the Resolution.

2.    All temporary Bonds surrendered in exchange either for another temporary Bond or Bonds or for a definitive Bond or Bonds shall be forthwith canceled by the Trustee.

SECTION 309.  <u>Tender of Option Bonds or Fixed Tender Bonds; Original Issue Discount</u>.  Option Bonds or Fixed Tender Bonds which are required to be delivered for redemption or purchase pursuant to the provisions hereof or of the Supplemental Resolution authorizing such Bonds shall be deemed surrendered for transfer even though such Bonds have not been actually delivered by the Owners thereof.  The Corporation shall file with the Trustee promptly at the end of each Bond Year (i) a written notice specifying the amount of original issue discount (including daily rates and accrual periods) accrued on Outstanding Bonds as of the end of such Bond Year, and (ii) such other specific information relating to such original issue discount as, in the judgment of the Trustee, may then be relevant under the Internal Revenue Code of 1986, as amended from time to time.

SECTION 310.  <u>Book-Entry-Only System</u>.  Notwithstanding any other provision of the Resolution, the Corporation may employ a book-entry-only system of registration with respect to any Bonds, and the procedures regarding such registration shall be set forth in a Supplemental Resolution and/or the book-entry-only system depository.  Any provisions of the Resolution inconsistent with book-entry-only Bonds, including but not limited to the manner in which Bonds may be paid, shall not be applicable to such book-entry-only Bonds.

511470.30 032563 RES

## ARTICLE IV

## REDEMPTION OF BONDS

SECTION 401. <u>Privilege of Redemption and Redemption Price</u>. Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in this Article IV, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in this Article IV as may be specified in the Supplemental Resolution authorizing such Series.

SECTION 402. <u>Redemption at the Election of the Corporation</u>. In the case of any redemption of Bonds otherwise than as provided in Section 403, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in Section 406, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

SECTION 403. <u>Redemption out of Sinking Fund Installments</u>.

1. In addition to the redemption of Bonds pursuant to Sections 401 and 402 above, Term Bonds issued pursuant to this Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

2. In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in Section 508) and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice

shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

3.      The Corporation shall, and hereby covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

SECTION 404. Selection of Bonds to be Redeemed in Partial Redemption.

1.      In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to Section 401 or 402 hereof, the Corporation shall designate the maturities of the Bonds to be redeemed.

2.      If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed.  For purposes of this Section 404, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

SECTION 405. Notice of Redemption.  When the Trustee shall receive notice from the Corporation of its election to redeem Bonds pursuant to Section 402, or when Bonds are to be redeemed pursuant to Section 403, the Trustee shall give notice, in the name of the Corporation, of the redemption of such Bonds, which notice shall specify the Series and maturities and interest rate of the Bonds to be redeemed, the redemption date and the place or places where amounts due upon such redemption will be payable and, if less than all of the Bonds of any like Series and maturity and interest rate are to be redeemed, the letters and numbers or other distinguishing marks of such Bonds so to be redeemed, and, in the case of Bonds to be redeemed in part only such notice shall also specify the respective portions of the principal amount thereof to be redeemed, and, if applicable, that such notice is conditional and the conditions that must be satisfied.  Such notice of redemption shall further state that on such redemption date there shall become due and payable upon each Bond or portion thereof to be redeemed the Redemption Price thereof, together with interest accrued to the redemption date, in the Currency in which the Bonds of such Series are payable, and that from and after such date interest thereon shall cease to accrue and be payable on the Bonds or portions thereof to be redeemed, unless, in the case of any conditional notice, such conditions are not satisfied.  The Trustee shall mail a copy of such notice, postage prepaid, no less than sixteen (16) days before the redemption date, or such other period for any particular Bonds as may be provided by the Supplemental Resolution authorizing such Bonds, to the Owners of Bonds or portions of Bonds which are to be redeemed, at their last address, if any, appearing upon the registry books.  Failure

-35-

511470.30 032563 RES

so to mail any such notice to any particular Owner shall not affect the validity of the proceedings for the redemption of Bonds not owned by such Owner and failure of any Owner to receive such notice shall not affect the validity of the proposed redemption of Bonds.

Any notice of optional redemption of Bonds given pursuant to this Section may be made conditional upon receipt by the Trustee of moneys sufficient to pay the Redemption Price of such Bonds, in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event, which notice shall specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of such Redemption Price if any such condition so specified is not satisfied or if any such other event shall not occur. Notice of such rescission shall be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee shall give notice of such recission to affected Owners of Bonds at least one (1) Business Day prior to such scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

SECTION 406. Payment of Redeemed Bonds. Notice having been given in the manner provided in Section 405, the Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, and upon presentation and surrender thereof at the office specified in such notice, such Bonds, or portions thereof, shall be paid at the Redemption Price plus interest accrued and unpaid to the redemption date, in the Currency in which the Bonds of such Series are payable, except to the extent the same shall not occur on account of a condition stated in the notice to the Trustee pursuant to Section 402 and in the notice of redemption pursuant to Section 405. If there shall be called for redemption less than all of a Bond, the Corporation shall execute and the Trustee shall authenticate and deliver, upon the surrender of such Bond, without charge to the Owner thereof, for the unredeemed balance of the principal amount of the Bond so surrendered, Bonds of like Series and maturity in any authorized denomination. If, on the redemption date, moneys for the redemption of all the Bonds or portions thereof of any like Series and maturity and interest rate to be redeemed, together with interest to the redemption date, shall be held by the Trustee so as to be available therefor on said date and if notice of redemption shall have been provided as aforesaid, and, with respect to any conditional notice of redemption, the conditions stated in the notice of redemption shall have been met and satisfied, then, from and after the redemption date, interest on the Bonds or portions thereof of such Series and maturity and interest rate so called for redemption shall cease to accrue and become payable. If said moneys shall not be so available on the redemption date, such Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

SECTION 407. Cancellation and Disposition of Bonds. All Bonds paid or redeemed, either at or before maturity, shall be delivered to the Trustee when such payment or redemption is made, and such Bonds shall thereupon be promptly canceled. Bonds so canceled shall be disposed of by the Trustee, in accordance with the Trustee's standard procedures, and upon request from the Corporation the Trustee shall execute a certificate of disposition in duplicate by the signature of one of its Authorized Officers describing the Bonds so disposed of,

511470.30 032563 RES

and one executed certificate shall be delivered to the Corporation and the other executed certificate shall be retained by the Trustee.

511470.30 032563 RES

## ARTICLE V

## PLEDGE; ESTABLISHMENT AND MAINTENANCE OF FUNDS AND ACCOUNTS AND APPLICATION THEREOF

SECTION 501. <u>The Pledge</u>.

1.    The Pledged Property, subject to Section 804, is hereby pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution, and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds.   Nothing contained herein shall prevent (i) a Credit Facility, Liquidity Facility or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to this Article V with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

2.    To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof.   Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

SECTION 502. <u>Establishment of Fund and Accounts</u>.

1.    The "Project Fund" is hereby created and the following special Accounts and Subaccounts are hereby created and established within the Project Fund, each of which shall be held by the Trustee:

(1)    Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

(2)    Capitalized Interest Account,

(3)    Bond Proceeds Account,

(4)    Revenue Account,

-38-

        (5)    Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

        (6)    Debt Service Reserve Account, established for each Class of Bonds,

        (7)    Redemption Account, and

        (8)    Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

        2.    The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

        3.    Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

SECTION 503.  Costs of Issuance Account and Capitalized Interest Account.

        1.    If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Persons as directed in writing to the Trustee by the Corporation.

        2.    There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth in paragraph (xiii) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds.

        3.    If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in

511470.30 032563 RES

accordance with the requirements of the Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

4. Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

5. Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in subsection 6 of this Section.

6. The Trustee shall deposit any funds described in subsection 5 of this Section in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

7. In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

SECTION 504. Bond Proceeds Account.

1. There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to this Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

511470.30 032563 RES

2. Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to provide for the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

3. The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

4. Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

SECTION 505. Revenue Account.

1. All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America

-41-

Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of capitalized interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto capitalized interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written

-42-

direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

2. Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

3. Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

SECTION 506. Debt Service Account.

1. There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

2. There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i) Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii) Amounts transferred from the Capitalized Interest Account pursuant to Section 503 for the payment of interest on the Bonds of such Series.

(iii) Amounts transferred from the Debt Service Reserve Account pursuant to Section 507 for the payment of interest on the Bonds and the interest component of Parity Obligations.

3. There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

-43-

(i)     Amounts transferred from a Debt Service Reserve Account pursuant to Section 507 for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)     Amounts transferred from the Redemption Account pursuant to Section 511 for the payment of Principal Installments of any Bonds.

4.     The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of subsection 2 of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, according to the amounts due on such date, without any discrimination or preference.

5.     The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee ; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of subsection 3 of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee, according to the amounts due on such date, without any discrimination or preference.

6.     In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201.

7.     There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding Amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to

be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

SECTION 507. Debt Service Reserve Account.

1. At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

2. Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to this Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

3. Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

4. Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to Section 1201, and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

5. If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized

-45-

Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

6.      Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

7.      Reserve Account Cash Equivalents may be deposited in a Debt Service Reserve Account as provided in this subsection. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to subsection 3 of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by subsection 5 of this Section.

511470.30 032563 RES

8.      Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

SECTION 508.    <u>Satisfaction of Sinking Fund Installments.</u>

1.      Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows:

(i)      to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or

(ii)      to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

2.      Upon the purchase or redemption of any Bond pursuant to subsection 1 of this Section, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited  against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption.  Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee  a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

3.      In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment.  All Bonds so delivered to the Trustee  in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds.  Concurrently with such delivery of such Bonds the Corporation shall

-47-

deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

4.    In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

5.    The Trustee shall, upon receipt of the notice specified by Section 403 and in the manner provided in Article IV, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in Section 403.

SECTION 509.  Redemption Account; Amounts to be Deposited Therein.

1.    The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)    amounts determined pursuant to subsection 6 of Section 503;

(ii)    amounts determined pursuant to subsection 4 of Section 504;

(iii)    amounts determined pursuant to subsection 2 of Section 505; and

(iv)    amounts transferred from the Debt Service Reserve Accounts pursuant to Section 507 for the payment of the Redemption Price of Bonds.

2.    Subject to the limitations contained in subsection 4 of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall

-48-

transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

3.  To the extent not required to make up a deficiency as required in subsection 2 of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to subsection 1 of Section 505.

4.  The transfers required by subsection 2 of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to Section 405, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

SECTION 510.  Rebate Account.

1.  The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

2.  The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

3.  The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

4.  The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

511470.30 032563 RES

# ARTICLE VI

## SECURITY FOR DEPOSITS AND INVESTMENT OF FUNDS

SECTION 601. Security for Deposits. All moneys held hereunder by the Trustee shall be continuously and fully secured, for the benefit of the Corporation and the Owners of the Bonds and Parity Obligations in such manner as may then be required by applicable federal or state laws and regulations regarding security, by Investment Obligations of a market value at least equal at all times to the amount of the deposit so held by the Trustee; provided, however, that it shall not be necessary, unless required by applicable law, for the Trustee to give security for the deposit of any moneys with them held in trust and set aside for the payment of the principal or Redemption Price of, or interest on, any Bonds, or for the Trustee to give security for any moneys which shall be represented by obligations purchased under the provisions of the Resolution as an investment of such moneys. The Trustee shall have no obligation for the payment of interest on moneys properly held by it uninvested hereunder.

SECTION 602. Investment of Funds, Accounts and Subaccounts Held by the Trustee.

1.      Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated hereby except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of this Resolution as of the end of the preceding month.

2.      Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

3.      Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or

-50-

Subaccount but, unless otherwise expressly provided in this Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account, and if not required to be so deposited in the Rebate Account because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

4. The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to this Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

5. Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

6. In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

SECTION 603. Valuation and Sale of Investments.

1. In computing the amounts in the Revenue Account, Debt Service Accounts, Debt Service Reserve Accounts and Rebate Account obligations purchased as an investment of moneys therein shall be valued at Amortized Value. Accrued interest received upon the sale of any Investment Obligation shall be treated as income from such Investment Obligation for purposes of this Section, except to the extent that such accrued interest represents the repayment of accrued interest paid upon purchase of such Investment Obligations.

511470.30 032563 RES

2.     Neither the Trustee nor the Corporation shall be liable or responsible for the making of any investment authorized by the provisions of this Article, in the manner provided in this Article, or for any loss resulting from any such investment so made or disposed of in the manner provided in this Article; provided, however, that nothing in this subsection shall affect the obligation of the Corporation under any of the Bonds.

511470.30 032563 RES

## ARTICLE VII

## PARTICULAR COVENANTS OF THE CORPORATION

The Corporation covenants and agrees with the Trustee and the Bondowners as follows:

SECTION 701. <u>Payment of Obligations; Pledged Sales Tax Base Amount</u>. The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in this Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 5 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

SECTION 702. <u>Extension of Payment of Bonds</u>. The Corporation shall not directly or indirectly extend or assent to the extension of the maturity of any of the Bonds or claims for interest by the purchase or funding of such Bonds or by any other arrangement. Nothing herein shall be deemed to limit the right of the Corporation (i) to issue Option Bonds or Refunding Bonds as provided in herein and such issuance shall not be deemed to constitute an extension of maturity of Bonds or (ii) to apply any amount in the Debt Service Account or the Redemption Account to the purchase or redemption of Bonds as provided in this Resolution.

SECTION 703. <u>Offices for Servicing Bonds</u>. The Trustee shall at all times maintain one or more offices or agencies where Bonds may be presented for payment, registration of transfer or exchange, and where notices, demands and other documents may be served upon the Corporation in respect of the Bonds or of the Resolution. The Corporation hereby appoints the Trustee as its agent to maintain such offices or agencies.

SECTION 704. <u>Further Assurance</u>. At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other

-53-

511470.30 032563 RES

moneys, securities and funds hereby pledged or assigned, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

SECTION 705. <u>Power to Issue Bonds and Pledge Funds and Accounts</u>. The Corporation is duly authorized under all applicable laws to create and issue the Bonds and to adopt the Resolution and to pledge the Pledged Property purported to be pledged by the Resolution in the manner and to the extent provided in the Resolution. The Pledged Property is and will be free and clear of any pledge, lien, charge or encumbrance thereon or with respect thereto except as permitted by the Resolution, and all corporate action on the part of the Corporation to that end has been and will be duly and validly taken. The Bonds are and will be the valid and legally binding special obligations of the Corporation enforceable in accordance with their terms and the terms of the Resolution. The Corporation shall at all times, to the extent permitted by law, defend, preserve and protect the pledge of the Pledged Property and all the rights of the Trustee, the Beneficiaries and the Bondowners under the Resolution against all claims and demands of all persons whomsoever.

SECTION 706. <u>Agreement of the Commonwealth</u>.

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available resources" of the Commonwealth for purposes of Section 2

-54-

and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

SECTION 707. Creation of Liens. Until the pledge created in Section 501 of this Resolution shall be discharged and satisfied as provided in Section 1201, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under this Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under this Resolution.

SECTION 708. Accounts and Reports.

1. The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee (it being understood that the Trustee shall have no duty so to inspect) and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing.

2. The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying such Event of Default or other event as described in this subsection, and specifying the nature and status of such Event of Default or other such event.

SECTION 709. Tax Matters.

1. The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

2. The Corporation will not make, or give its consent to the Trustee or any other Person, to make, any use of the proceeds of the Bonds or of any moneys which may be

511470.30 032563 RES

deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

       3.     The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Tax Exempt Bonds shall be excluded from gross income for Federal income tax purposes.

       4.     Notwithstanding any other provision of this Resolution, including in particular Section 1201 hereof, the obligation to comply with the requirements of this Section 709 shall survive the defeasance or payment in full of the Bonds.

       SECTION 710.  Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations.

       1.     No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

       (1)  (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and

Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.     (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.     (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C. No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt

-57-

service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second

-58-

Subordinate Bonds and Second Subordinate Obligations and such additional Second Subordinate Bonds or Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2.      In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by Section 505.1 which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3.      The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

SECTION 711. General.

1.      The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

2.      Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

511470.30 032563 RES

## ARTICLE VIII

### CONCERNING THE TRUSTEE

SECTION 801. <u>Trustee Appointment and Acceptance of Duties</u>. The Bank of New York Mellon is hereby appointed as Trustee under the Resolution. The Trustee shall signify its acceptance of the duties and obligations imposed upon it by the Resolution by executing the certificate of authentication endorsed upon the Bonds, and by executing such certificate upon any Bond the Trustee shall be deemed to have accepted such duties and obligations not only with respect to the Bond so authenticated, but with respect to all Bonds thereafter to be issued, but only, however, upon the terms and conditions set forth in the Resolution.

SECTION 802. <u>Responsibilities of Trustee</u>. The Trustee undertakes to perform such duties and only such duties as are specifically set forth in this Resolution, and no implied covenants or obligations shall be read into this Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of this Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by this Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by this Resolution, the feasibility of the Project, the compliance by the Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by this Resolution, whether or not impaired by operation of law. No provision of this Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by this Resolution at the request or direction of any of the Owners pursuant to this Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any

-60-

error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under this Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by this Resolution. Anything in this Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of this Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of this Article VIII.

SECTION 803. Evidence on Which Trustee May Act.

1.    The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

2.    Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon. The Trustee shall not be bound to make any investigation into the facts or matters stated in any resolution, certificate, statement, instrument, opinion, report, notice, request, direction, consent, order, bond, debenture, note, other evidence of indebtedness or other paper or document.

3.    Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee  shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

SECTION 804. Compensation and Indemnification. The Corporation shall pay to the Trustee  from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the

-61-

compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section 804, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under this Resolution, when the Trustee incurs expenses or renders services in connection with a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of this Section 804 shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under this Section 804 shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

SECTION 805. Certain Permitted Acts. The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding. The Trustee may execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents or attorneys and the Trustee shall not be responsible for any misconduct or negligence on the part of any agent or attorney appointed with due care by it hereunder. The rights, privileges, protections, immunities and benefits given to the Trustee, including, without limitation, its right to be indemnified, are extended to, and shall be enforceable by, the Trustee in each of its capacities hereunder, and each agent, custodian and other Person employed to act hereunder.

SECTION 806. Resignation of Trustee. The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in

Section 808, in which event such resignation shall take effect immediately on the appointment of such successor.

SECTION 807. <u>Removal of Trustee</u>. The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

SECTION 808. <u>Appointment of Successor Trustee</u>.

1.    In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

2.    If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in Section 807 or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under Section 808, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

511470.30 032563 RES

SECTION 809. <u>Transfer of Rights and Property to Successor Trustee.</u>

Any successor Trustee appointed under the Resolution shall execute, acknowledge and deliver to its predecessor Trustee, and also to the Corporation, an instrument accepting such appointment, and thereupon such successor Trustee, without any further act, deed or conveyance, shall become fully vested with all moneys, estates, properties, rights, powers, duties and obligations of such predecessor Trustee, with like effect as if originally named as Trustee; but the Trustee ceasing to act shall nevertheless, on the written request of the Corporation, or of the successor Trustee, upon payment of its charges and all other amounts payable to it hereunder, execute, acknowledge and deliver such instruments of conveyance and further assurance and do such other things as may reasonably be required for more fully and certainly vesting and confirming in such successor Trustee all the right, title and interest of the predecessor Trustee in and to any property held by it under the Resolution, and shall pay over, assign and deliver to the successor Trustee any money or other property subject to the trusts and conditions herein set forth but subject to Section 804. Should any deed, conveyance or instrument in writing from the Corporation be required by such successor Trustee for more fully and certainly vesting in and confirming to such successor Trustee any such estates, rights, powers and duties, any and all such deeds, conveyances and instruments in writing shall, on request, and so far as may be authorized by law, be executed, acknowledged and delivered by the Corporation.

SECTION 810. <u>Appointment of Co-Trustee.</u>

(a) Notwithstanding any other provisions of this Resolution, at any time for the purpose of meeting any legal requirement of any jurisdiction (including any jurisdiction in which any part of the Pledged Property may at the time be located), the Trustee shall have the power and may execute and deliver all instruments necessary to appoint one or more Persons to act as a co-trustee or co-trustees, or separate trustee or separate trustees (including with respect to all or any part of the Pledged Property), and to vest in such Person or Persons, in such capacity and for the benefit of the Bondowners, subject to the other provisions of this Section, such powers, duties, obligations, rights and trusts as the Trustee may consider necessary or desirable (including title to the Pledged Property or any part thereof). Each co-trustee or separate trustee hereunder shall be required to have a combined capital and surplus (computed in accordance with Section 310(a)(2) of the Trust Resolution Act of 1939, as amended) of at least $50,000,000 and the Trustee shall, at the expense of the Corporation, provide prompt notice to holders of the appointment of any co-trustee or separate trustee.

(b) Every separate trustee and co-trustee shall, to the extent permitted by law, be appointed and act subject to the following provisions and conditions:

(i) all rights, powers, duties and obligations conferred or imposed upon the Trustee shall be conferred or imposed upon and exercised or performed by the Trustee and such separate trustee or co-trustee jointly (it being understood that such separate trustee or co-trustee is not authorized to act separately without the Trustee joining in such act), except to the extent that under any law of any jurisdiction in which any particular act or acts are to be performed the Trustee shall be incompetent or unqualified to perform such act or acts, in which event such

-64-

rights, powers, duties and obligations (including the holding of the Pledged Property or any portion thereof in any such jurisdiction ) shall be exercised and performed singly by such separate trustee or co-trustee, but solely at the direction of the Trustee;

      (ii)    no trustee hereunder shall be personally liable by reason of any act or omission of any other trustee hereunder; and

      (iii)    the Trustee may at any time accept the resignation of or remove any separate trustee or co-trustee.

      (c)    Any notice, request or other writing given to the Trustee shall be deemed to have been given to each of the then separate trustees and co-trustees, as effectively as if given to each of them. Every instrument appointing any separate trustee or co-trustee shall refer to this Resolution and the conditions of this Section 810. Each separate trustee and co-trustee, upon its acceptance of the trusts conferred, shall be vested with the estates or property specified in its instrument of appointment, either jointly with the Trustee or separately, as may be provided therein, subject to all the provisions of this Resolution, specifically including every provision of this Resolution relating to the conduct of, affecting the liability of, or affording protection or rights (including the right to compensation, reimbursement and indemnification hereunder) to, the Trustee. Every such instrument shall be filed with the Trustee.

      (d)    Any separate trustee or co-trustee may at any time constitute the Trustee its agent or attorney-in-fact with full power and authority, to the extent not prohibited by law, to do any lawful act under or in respect of this Resolution on its behalf and in its name. If any separate properties, rights, remedies and trusts shall vest in and be exercised by the Trustee, to the extent permitted by law, without appointment of a new or successor trustee.

      SECTION 811. <u>Merger or Consolidation</u>. Any company into which the Trustee may be merged or converted or with which it may be consolidated or any company resulting from any merger, conversion or consolidation to which it shall be a party or any company to which the Trustee may sell or transfer all or substantially all of its corporate trust business, provided such company shall be a bank or trust company organized under the laws of any state of the United States or the Commonwealth or a national banking association, and shall be authorized by law to perform all the duties imposed upon it by the Resolution, shall be the successor to the Trustee without the execution or filing of any paper or the performance of any further act.

      SECTION 812. <u>Adoption of Authentication</u>. In case any of the Bonds contemplated to be issued under the Resolution shall have been authenticated but not delivered, any successor Trustee may adopt the certificate of authentication of any predecessor Trustee so authenticating such Bonds and deliver such Bonds so authenticated; and in case any of the said Bonds shall not have been authenticated, any successor Trustee may authenticate such Bonds in the name of the predecessor Trustee, or in the name of the successor Trustee, and in all such cases such certificate shall have the full force which it is anywhere in said Bonds or in the Resolution provided that the certificate of authentication of the Trustee shall have.

511470.30 032563 RES

SECTION 813. <u>Accounting by Trustee; Nonpetition Covenant.</u> The Trustee shall, upon receipt of a written request therefor from the Corporation, provide to the Corporation an accounting of the amounts on deposit in all Funds, Accounts and Subaccounts maintained under the Resolution as of the date of such accounting. Notwithstanding any prior termination of this Resolution, the Trustee shall not, prior to the date which is one year and one day after the termination of this Resolution, acquiesce, petition or otherwise invoke or cause the Corporation to invoke the process of any court or government authority for the purpose of commencing or sustaining a case against the Corporation under any Federal or state bankruptcy, insolvency or similar law or appointing a receiver, liquidator, assignee, trustee, custodian, sequestrator or other similar official of the Corporation or any substantial part of its property, or ordering the winding up or liquidation of the affairs of the Corporation.

-66-

## ARTICLE IX

## SUPPLEMENTAL RESOLUTIONS

SECTION 901. <u>Supplemental Resolutions Effective upon Filing with the Trustee.</u> For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

1.  to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

2.  to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

3.  to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

4.  to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

5.  to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in Section 202, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

6.  to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

7.  to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to Section 301(5);

8.  to cure any ambiguity, defect or inconsistent provision in the Resolution;

9.  to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under this Resolution of any Bonds then Outstanding;

10. to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by Section 501(1).

511470.30 032563 RES

11.     as permitted by Section 1005;

12.     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

13.     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

SECTION 902.  Reserved.

SECTION 903.  Supplemental Resolutions Effective with Consent of Bondowners.  At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Article X, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of Article X, shall become fully effective in accordance with its terms as provided in Article X.

SECTION 904.  General Provisions.

1.     The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of this Article IX and Article X. Nothing contained in this Article IX or Article X shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of Section 704 or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

2.     Any Supplemental Resolution referred to and permitted or authorized by Sections 901 and 902 may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively.  The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.  After any Supplemental Resolution becomes effective under this Article, the Corporation shall mail to the Owners a notice briefly describing such Supplemental Resolution; provided, however, the failure to give such notice , or any defect therein, shall not impair or affect the validity of such Supplemental Resolution under this Article.

3.     The Trustee is hereby authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by Sections 901, 902 or 903

-68-

511470.30 032563 RES

and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

4.     No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

511470.30 032563 RES

# ARTICLE X

# AMENDMENTS

SECTION 1001.  Mailing and Publication.

1.     Any provision in this Article for the mailing of a notice or other paper to Bondowners shall be fully complied with if it is mailed postage prepaid only (i) to each Owner of Bonds then Outstanding at his address, if any, appearing upon the registry books of the Corporation, and (ii) to the Trustee.

2.     In case by reason of the suspension of regular mail service or by reason of any other cause it shall be impracticable to give such notice by mail as required by the Resolution, then such notification as shall be made with the approval of the Trustee shall constitute a sufficient notification for every purpose hereunder.

SECTION 1002.  Powers of Amendment.  Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in Section 1003, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee  without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons, or amount and timing of payments due, without the prior written consent of such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

511470.30 032563 RES

SECTION 1003. <u>Consent of Bondowners</u>. The Corporation may at any time adopt a Supplemental Resolution making a modification or amendment permitted by the provisions of Section 903, to take effect when and as provided in this Section. A copy of such Supplemental Resolution (or brief summary thereof or reference thereto in form approved by the Trustee ) together with a request to Bondowners for their consent thereto in form satisfactory to the Trustee, shall be mailed by the Corporation to Bondowners. Such Supplemental Resolution shall not be effective unless and until (i) there shall have been delivered to the Trustee (a) the written consents of Owners of the percentage of the aggregate principal amount of Outstanding Bonds specified in Section 1002 and (b) an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted and filed by the Corporation in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms, and (ii) notice shall have been given as hereinafter in this Section provided. Ownership of Bonds shall be conclusively presumed by the registration books of the Corporation. Any such consent shall be binding upon the Owner of the Bonds giving such consent and, anything in Section 1102 to the contrary notwithstanding, upon any subsequent Owner of such Bonds and of any Bonds issued upon registration of transfer thereof or in exchange therefor (whether or not such subsequent Owner thereof has notice thereof), unless such consent is revoked in writing by the Owner of such Bonds giving such consent or a subsequent Owner thereof by filing with the Trustee, prior to the time when the written statement of the Trustee hereinafter in this Section provided for is filed. At any time after the Owners of the required percentages of Bonds shall have filed their consents to the Supplemental Resolution, the Trustee shall make and file with the Corporation a written statement that the Owners of such required percentage of the aggregate principal amount of Bonds have filed such consents. Such written statement shall be conclusive that such consents have been so filed. At any time thereafter, notice, stating in substance that the Supplemental Resolution (which may be referred to as a Supplemental Resolution adopted by the Corporation on a stated date, a copy of which is on file with the Trustee) has been consented to by the Owners of the required percentage of the aggregate principal amount of Bonds and will be effective as provided in this Section, shall be given Bondowners by the Corporation by mailing such notice to Bondowners. The Corporation shall file with the Trustee proof of the mailing of such notice. A record, consisting of the papers required or permitted by this Section 1003 to be delivered to the Trustee, shall be proof of the matters therein stated.

SECTION 1004. <u>Modifications by Unanimous Consent</u>. The terms and provisions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect upon the adoption and filing by the Corporation with the Trustee of a Supplemental Resolution and the consent of the Owners of all of the Bonds then Outstanding, such consent to be given as provided in Section 1003 except that no notice to Bondowners shall be required.

SECTION 1005. <u>Modification Before Bonds Outstanding</u>. Prior to the issuance and delivery of the first Series of Bonds under the Resolution, the terms and conditions of the Resolution and the rights and obligations of the Corporation and of the Owners of the Bonds may be modified or amended in any respect without the consent of any person, upon the adoption of a Supplemental Resolution and the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation.

511470.30 032563 RES

SECTION 1006.  Exclusion of Bonds.  Bonds owned or held by or for the account of the Corporation shall not be deemed Outstanding for the purpose of consent or other action or any calculation of Outstanding Bonds provided for in this Article, and the Corporation shall not be entitled with respect to such bonds to give any consent or take any other action provided for in this Article.  At the time of any consent or other action taken under this Article, the Corporation shall furnish the Trustee a certificate of an Authorized Officer, upon which the Trustee may rely, describing all Bonds so to be excluded.

SECTION 1007.  Notation on Bonds.  Bonds authenticated and delivered after the effective date of any action taken as in Article IX or this Article provided may, and, if the Trustee so determines, shall, bear a notation by endorsement or otherwise in form approved by the Corporation and the Trustee as to such action, and in that case upon demand of the Owner of any Bond Outstanding at such effective date and presentation of his Bond for the purpose at the Corporate Trust Office of the Trustee, suitable notation shall be made on such Bond by the Trustee as to any such action.  If the Corporation or the Trustee shall so determine, new Bonds so modified as in the opinion of the Trustee and the Corporation to conform to such action shall be prepared, authenticated and delivered, and, upon demand of the Owner of any Bond then Outstanding, shall be exchanged, without cost to such Bondowners for Bonds of the same Series and maturity and then Outstanding, upon surrender of such Bonds.

511470.30 032563 RES

# ARTICLE XI

## DEFAULTS AND REMEDIES

SECTION 1101. <u>Events of Default</u>.

1.      Each of the following events shall constitute an Event of Default under the Resolution:

(i)      There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)      There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

provided, that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of this Resolution, and all references in this Article XI to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

2.      In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

SECTION 1102. <u>Remedies</u>.

1.      Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, declare

-73-

the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

2. In the enforcement of any remedy under the Resolution, but subject to Sections 201, 501 and 1206, the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

511470.30 032563 RES

SECTION 1103. Priority of Payments After Event of Default.

1.      Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee  and its agents and attorneys necessary in the opinion of the Trustee  to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee  shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH of this subsection 1, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST or FOURTH of this paragraph;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an

-75-

insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

2. The provisions of this Section are in all respects subject to the provisions of Section 702.

3. Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal (or Compounded Amount, if any) to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

SECTION 1104. Termination of Proceedings. In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights hereunder, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

SECTION 1105. Bondowners' Direction of Proceedings. Anything in this Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of this Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

SECTION 1106. Limitation on Rights of Bondowners.

1. No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law hereunder, or for the protection or enforcement of any right under this Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the

-76-

right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers herein granted or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are hereby declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under this Resolution or for any other remedy provided hereunder or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary hereby secured shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of this Resolution, or to enforce any right hereunder or under law with respect to the Bonds, or the Resolution, except in the manner herein provided, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner herein provided and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in this Article shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued hereunder to the Owner thereof at the time and place in said Bond expressed.

2. Anything to the contrary contained in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

SECTION 1107. Possession of Bonds by Trustee Not Required. All rights of action under this Resolution or under any of the Bonds, enforceable by the Trustee, may be enforced by it without the possession of any of the Bonds or the production thereof on the trial or other proceeding relative thereto, and any such suit, action or proceeding instituted by the Trustee shall be brought in its name for the benefit of all the Owners of such Bonds, subject to the provisions of this Resolution.

SECTION 1108. Remedies Not Exclusive. No remedy herein conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given hereunder or now or hereafter existing at law or in equity or by statute.

511470.30 032563 RES

SECTION 1109. <u>No Waiver of Default</u>. No delay or omission of the Trustee, the Beneficiaries or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by this Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

SECTION 1110. <u>Notice of Event of Default</u>. The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

511470.30 032563 RES

# ARTICLE XII

## MISCELLANEOUS

SECTION 1201. <u>Defeasance.</u>

1.      Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of this Section. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions of this Section, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant to this Article or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

2.      If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

3.      Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in subsection 12of this Section. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in subsection 1 of this Section 1201 if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any, deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit

-79-

required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance with this Section and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

4.      Neither Defeasance Securities nor moneys deposited with the Trustee pursuant to this Section, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under this Section 1201.

5.      For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of this Section, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of this Section, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

511470.30 032563 RES

6. Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of this Section only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of this Section, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes of this subsection 4. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

7. Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

SECTION 1202. Evidence of Signatures of Bondowners and Owners of Bonds.

1. Any request, consent, revocation of consent or other instrument which the Resolution may require or permit to be signed and executed by the Bondowners may be in one or more instruments of similar tenor, and shall be signed or executed by such Bondowners in person or by their attorneys appointed in writing. The fact and date of the execution by any Bondowner or his attorney duly authorized in writing of such instruments may be proved by a guarantee of the signature thereon by a bank or trust company or by the certificate of any notary public or other officer authorized to take acknowledgments of deeds, that the person signing such request or other instrument acknowledged to him the execution thereof, or by an affidavit of a witness of such execution, duly sworn to before such notary public or other officer. Where such execution is by an officer of a corporation or association or a member of a partnership, or on behalf of such

-81-

511470.30 032563 RES

a corporation, association or partnership, such signature guarantee, certificate or affidavit shall constitute proof of his authority.

2.    The ownership of Bonds and the amount, numbers and other identification, and date of holding the same shall be proved by the registry books.

3.    Any request or consent by the Owner of any Bond shall bind all future Owners of such Bonds in respect of anything done or suffered to be done by the Corporation or the Trustee in accordance therewith.

SECTION 1203.  Moneys Held for Particular Bonds.  The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

SECTION 1204.  Preservation and Inspection of Documents.  All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

SECTION 1205.  Parties Interested Herein.  Nothing in the Resolution expressed or implied is intended or shall be construed to confer upon, or to give to, any person or corporation, other than the Corporation, the Trustee, the Beneficiaries, and the Owners of the Bonds, any right, remedy or claim under or by reason of the Resolution or any covenant, condition or stipulation thereof; and all the covenants, stipulations, promises and agreements in the Resolution contained by and on behalf of the Corporation shall be for the sole and exclusive benefit of the Corporation, the Trustee, the Beneficiaries and the Owners of the Bonds.

SECTION 1206.  No Personal Liability.  Neither the members of the Corporation nor any other Person executing the Bonds or an Ancillary Bond Facility shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

SECTION 1207.  Successors and Assigns.  Whenever in the Resolution the Corporation is named or referred to, it shall be deemed to include its successors and assigns and all the covenants and agreements in the Resolution contained by or on behalf of the Corporation shall bind and inure to the benefit of its successors and assigns whether so expressed or not.

SECTION 1208.  Severability of Invalid Provisions.  If any one or more of the covenants or agreements provided in the Resolution on the part of the Corporation or the Trustee to be performed should be contrary to law, then such covenant or covenants, agreement or agreements, shall be deemed severable from the remaining covenants and agreements, and shall in no way affect the validity of the other provisions of the Resolution.

SECTION 1209.  Headings.  The section headings contained herein are for reference purposes only and will not affect in any way the meaning or interpretation of this Resolution.

511470.30 032563 RES

SECTION 1210.  Conflict.   All resolutions or parts of resolutions or other proceedings of the Corporation in conflict herewith be and the same are repealed insofar as such conflict exists.

SECTION 1211.  Governing Law.   This Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contained in this Resolution and the provisions of Section 601 (and the "applicable law" referred to in such Section 601 shall not include the laws of the Commonwealth) shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

SECTION 1212.  Notices.   Except as otherwise provided herein, all notices, certificates or other communications hereunder shall be in writing and shall be deemed given upon receipt, by hand delivery, mail, overnight delivery, or telecopy, except in the case of notices or communications given to the Trustee, which shall be effective only upon actual receipt, addressed as follows:

To the Trustee:

The Bank of New York Mellon
101 Barclay Street—7W
New York, New York 10286
Attention:  Northern Municipals
Phone:  212-815-6955
Fax:  212-815-5595/5596

To the Corporation:

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
Roberto Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940
Attention:  Executive Director
Phone:  787-722-2525
Fax:  787-728-0975

SECTION 1213.  Effective Date.   This Resolution shall take effect immediately upon its adoption.

-83-

511470.30 032563 RES

**EXHIBIT A**

SECURITY AGREEMENT

This SECURITY AGREEMENT, dated as of July 31, 2007, is by and between the Puerto Rico Sales Tax Financing Corporation (the "Debtor") and Owners (this and other capitalized terms used herein and not otherwise defined herein shall have the meanings given to them in the Resolution referenced below) from time to time of the Sales Tax Revenue Bonds of the Debtor (the "Sales Tax Revenue Bonds") issued from time to time pursuant to the provisions of the Debtor's Resolution No. __, adopted on July 13, 2007, as amended and supplemented from time to time (the "Resolution"), and other Beneficiaries, which Owners and Beneficiaries are represented for purposes of this Security Agreement by The Bank of New York, as trustee under the Resolution (the "Secured Party").

In order to provide security for the Debtor's payment of principal of, premium (if any) and interest on its Sales Tax Revenue Bonds and payment to Beneficiaries in accordance with their respective terms and the terms of the Resolution, Debtor hereby grants to the Secured Party a security interest in (i) the funds and accounts maintained by the Secretary of the Treasury, as paying agent, as the first repository for all Dedicated Sales Tax received from merchants and retailers and authorized collectors until deposited into the COFINA Project Fund (and all accounts therein) maintained under the Resolution, (ii) all amounts on deposit in the COFINA Project Fund (and all accounts therein) maintained under the Resolution, and all amounts required to be on deposit therein by the terms of the Resolution, and (iii) all proceeds thereof and all after-acquired property, subject to application as permitted by the Resolution. Remedies for failure of the Debtor to make timely payment of principal of, premium (if any) and interest on the Sales Tax Revenue Bonds or failure of the Debtor to fulfill its other covenants contained in the Resolution for the benefit of the Owners of the Sales Tax Revenue Bonds are as set forth in the Resolution.

The Debtor shall cause UCC financing statements and continuation statements to be filed, as appropriate, and the Secured Party shall not be responsible for any UCC filings.

PUERTO RICO SALES TAX FINANCING CORPORATION

By _____

      Name and Title:

THE BANK OF NEW YORK, as Trustee under the Resolution

By _____

      Name and Title:

511470.30 032563 RES

# Exhibit C

**NEW ISSUE - BOOK-ENTRY ONLY**

| | RATINGS: | |
|---|---|---|
| | Moody's: | **Ba2** |
| See RATINGS | S&P: | **BB+** |
| | Fitch: | **BB** |

*In the opinion of Bond Counsel, subject to compliance with certain tax covenants, interest on the Bonds is not includable in gross income for federal income tax purposes under existing statutes, regulations, rulings and court decisions. Interest on the Bonds will not be an item of tax preference for purposes of the federal alternative minimum tax imposed on individuals and corporations; however, interest on the Bonds will be taken into account in determining adjusted current earnings for purposes of computing the alternative minimum tax imposed on corporations. See TAX MATTERS for a description of certain other federal tax consequences of ownership of the Bonds. Bond Counsel is further of the opinion that the Bonds and the interest thereon are exempt from state, Commonwealth of Puerto Rico and local income taxation.*

# $3,500,000,000
# COMMONWEALTH OF PUERTO RICO
## General Obligation Bonds of 2014, Series A

**Dated: Date of Delivery**                                                                                      **Due: July 1, 2035**

The General Obligation Bonds of 2014, Series A (the "Bonds") are issuable as registered bonds without coupons in denominations of $100,000 and any multiple of $5,000 in excess thereof. See "General" under THE BONDS herein for a description of certain events affecting the denominations of the Bonds. The Bonds will be initially registered only in the name of Cede & Co., as nominee of The Depository Trust Company, New York, New York ("DTC"), which will act as securities depository for the Bonds. See "Book-Entry Only System" under THE BONDS herein and in Appendix IV. Interest on the Bonds will accrue from their date of issuance and will be payable semi-annually on each January 1 and July 1, commencing on July 1, 2014. The Bonds are subject to redemption prior to maturity as set forth herein.

**A purchase of the Bonds involves significant risks. Prospective purchasers should read this Official Statement in its entirety and consider the information set forth in RISK FACTORS, beginning on page 5, prior to purchasing any of the Bonds. A purchase of the Bonds is suitable only for purchasers that can bear the risks of price declines, limited liquidity and the possible failure to pay debt service described in this Official Statement.**

A portion of the proceeds of the Bonds will be used to repay bonds or notes purchased, or related liquidity facilities provided, by certain of the underwriters. See USE OF PROCEEDS herein.

**The Bonds are general obligations of the Commonwealth of Puerto Rico (the "Commonwealth"). The good faith, credit and taxing power of the Commonwealth are irrevocably pledged for the prompt payment of the principal of and interest on the Bonds. The Constitution of Puerto Rico provides that public debt of the Commonwealth, which includes the Bonds, constitutes a first claim on available Commonwealth resources. The Constitution of Puerto Rico empowers a holder of bonds and notes evidencing public debt, including the Bonds, to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of, and interest on, public debt when due.**

The Bonds are offered for delivery when, as and if issued and accepted by the Underwriters, subject to the approval of legality of Greenberg Traurig, LLP, Boston, Massachusetts, Bond Counsel, and certain other conditions. Certain matters will be passed upon for the Commonwealth by Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, as Disclosure Counsel, and for the Underwriters by their counsel Sidley Austin LLP, New York, New York, and O'Neill & Borges LLC, San Juan, Puerto Rico. It is expected that the Bonds will be available for delivery through the facilities of DTC on or about March 17, 2014.

| | | |
|---|---|---|
| **BARCLAYS** | **MORGAN STANLEY** | **RBC CAPITAL MARKETS** |
| **BofA Merrill Lynch** | **Goldman, Sachs & Co.** | **J.P. Morgan** | **Ramirez & Co., Inc.** |
| **FirstBank PR Securities** | **Jefferies** | **Mesirow Financial, Inc.** | **Oriental Financial Services** |
| **Popular Securities** | **Santander Securities** | | **UBS FS Puerto Rico** |

March 11, 2014

**Pages Intentionally Omitted**

mail any such notice to DTC in respect of, or the registered owner of, any Bond will not affect the validity of the proceedings for the redemption of any other Bond.

Any notice of optional redemption may state that the redemption is conditional and, if so, the notice shall state what the conditions are. If at the time of mailing a notice of optional redemption there shall not have been deposited with the Registrar moneys sufficient to redeem the Bonds called for redemption, such notice shall state that it is subject to the deposit of the redemption moneys with the Registrar not later than the opening of business on the redemption date, and such notice and the corresponding redemption shall be of no effect unless such moneys are so deposited. A conditional notice of optional redemption may be rescinded by the Commonwealth upon not less than two Business Days' notice prior to the proposed redemption date. In addition, the Registrar shall give notice as soon as practicable after the proposed redemption date in the same manner as notices of redemption are given of the failure of the Commonwealth to make the required deposit.

If less than all the Bonds are to be redeemed or paid prior to maturity, the specific amortization requirements of the Bonds to be redeemed shall be selected by the Commonwealth, and then within an amortization requirement, (a) if DTC is acting as securities depository for the Bonds at the time of such redemption, any redemption of less than all the Bonds shall be effected by DTC on a pro rata pass through distribution of principal basis in accordance with DTC's rules and procedures, and if the DTC operational arrangements do not allow for redemption on a pro rata pass-through distribution of principal basis, the Bonds will be selected for redemption in accordance with DTC procedures, by lot, and neither the Commonwealth nor the Registrar shall have any responsibility to ensure that DTC or its Participants properly select such Bonds for redemption, and (b) if DTC is not acting as securities depository for the Bonds at the time of such redemption, any redemption of less than all the Bonds shall be effected by the Registrar among the registered owners of the Bonds on a pro-rata basis, subject to minimum Authorized Denominations.

It is the Commonwealth's intent that redemption allocations made by DTC be made on a pro rata pass-through distribution of principal basis as described above. However, neither the Commonwealth nor the underwriters can provide any assurance that DTC, DTC's direct and indirect participants or any other intermediary will allocate the redemption of Bonds on such basis or whether in the case of an individual beneficial owner, the principal amount of such owner's Bonds is reduced by a percentage much greater or lesser than the overall percentage of Bonds redeemed in part. In addition, if the DTC operational arrangements do not allow for the redemption of the Bonds on a pro rata pass-through distribution of principal basis as discussed above, then the Bonds will be selected for redemption, in accordance with DTC procedures, by lot.

**Certain Provisions of the Bonds and the Bond Resolution related to the Commonwealth's Pledge of its Good Faith, Credit and Taxing Power and the Priority Norms**

In accordance with the Act, the Bonds and the Bond Resolution provide that the Commonwealth has pledged the good faith, credit and taxing power of the Commonwealth for the prompt payment of the principal of and interest on the Bonds. Pursuant to the Act, the Bonds constitute general obligations of the Commonwealth, payable from any funds available to the Commonwealth, which funds are appropriated as a continuous appropriation, without the need for the Legislative Assembly to make specific appropriations for such purposes.

The Bonds and the Bond Resolution provide that the Bonds constitute public debt, as described in Section 8 of Article VI of the Constitution ("Section 8"). Section 8 provides that public debt of the Commonwealth constitutes a first claim on "available resources" of the Commonwealth. Public debt

28

includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its instrumentalities.

The Bond Resolution provides that if the Commonwealth does not pay any installment of principal of or interest on the Bonds when due, a bondholder may bring suit against the Secretary of the Treasury to require application of available Commonwealth resources, including surplus, to the payment of such installment of principal or interest, as applicable, in accordance with the provisions of Section 2 of Article VI of the Constitution. The Bond Resolution provides that this right to bring an action against the Secretary and any other remedies that may be available to holders of the Commonwealth's general obligation bonds are the only remedies available to the holders of the Bonds in the event that the Commonwealth fails to make a payment on the Bonds when due. The Bonds are not subject to acceleration in the event of such nonpayment. See "Risks Related to the Bonds" under RISK FACTORS for a discussion of certain factors that may affect the availability of this remedy to the bondholders.

Commonwealth statutory law establishes certain "priority norms" relating to the disbursement of public funds, which law recognizes the Constitutional first priority of debt service on the public debt, including the Bonds. The law establishes the order of priorities as follows: first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations, including the Bonds, and guaranteed debt for which the Commonwealth's guarantee has been exercised; second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes.

Pursuant to certain Commonwealth statutes, certain taxes and fees imposed by Commonwealth law are not considered "available resources" of the Commonwealth for purposes of the Constitutional provisions relating to the payment of public debt, or are available to pay public debt only if all other available Commonwealth resources are insufficient to pay such public debt.

The most significant of these is Act 91-2006, as amended ("Act 91"), which allocates a portion of the Commonwealth sales and use tax to pay debt service on the bonds issued by COFINA. Act 91 provides that the Dedicated Sales Tax Fund created by such law, the funds on deposit therein and the Commonwealth sales and use tax pledged to COFINA, do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Commonwealth Constitution and are not available for use by the Secretary of the Treasury. As a result, the portion of the Commonwealth sales and use tax allocated to COFINA is not available for the payment of principal of and interest on the Bonds. The validity of this legislative allocation, however, has not been challenged in or ruled upon by any court.

The Commonwealth has also assigned certain revenues to the Highways Authority, PRIFA, and PRCCDA. These consist of (i) motor vehicle fuel taxes, crude oil and derivative products excise taxes, cigarette excise taxes and license fees allocated to the Highways Authority; (ii) federal excise taxes imposed on alcoholic beverages and tobacco products produced in Puerto Rico and sold in the United States, which taxes are returned by the federal government to the Commonwealth and allocated to PRIFA; and (iii) hotel occupancy taxes imposed by hotels on paying guests, which are allocated to PRCCDA. Although the legislation provides that the assigned taxes and fees are subject to first being applied to the payment of the principal of and interest on the Commonwealth public debt, their application to the payment of public debt is effective only if and to the extent that all other available Commonwealth resources are insufficient for that purpose. Since the Commonwealth has never defaulted on its public debt and has never had to apply amounts allocated to the Highways Authority, PRIFA or PRCCDA to the payment of its public debt, it is not clear how a bondholder would be able to establish that all other

29

available Commonwealth resources would be insufficient for such purpose, and therefore require the application of such revenues to the payment of public debt. Nothing in the Constitution or in applicable law expressly requires the Highways Authority, PRIFA or PRCCDA to return to the Commonwealth funds already transferred to it, even if other available resources of the Commonwealth are insufficient for the payment of public debt.

**Governing Law, Jurisdiction and Venue**

The Bonds and the Bond Resolution are governed by and are to be construed in accordance with the laws of the State of New York, except with respect to authorization (or in the case of the Bond Resolution, adoption) and execution of the same by the Commonwealth, which shall be governed by the laws of the Commonwealth.

Pursuant to the Bond Resolution, a bondholder may bring an action to enforce the provisions of the Bonds and the Bond Resolution only in New York courts or U.S. federal courts sitting, in either case, in the Borough of Manhattan, The City of New York, New York, or Commonwealth courts or U.S. federal courts sitting in either case in San Juan, Puerto Rico, and any appellate court from any thereof (the "applicable courts").

Pursuant to the Bond Resolution, the Commonwealth has waived immunity from the jurisdiction of the applicable courts only in a suit brought to compel the Secretary of the Treasury to comply with the provisions of Sections 2 and 8 of Article VI of the Constitution of Puerto Rico with respect to its obligations on the Bonds, or to enforce other remedies with respect to the Bonds available to the holders thereof under the Bond Resolution, as described above under the caption "Certain Provisions of the Bonds and the Bond Resolution related to the Commonwealth's Pledge of its Good Faith, Credit and Taxing Power and the Priority Norms." The Bond Resolution provides that such waiver constitutes a limited and specific waiver by the Commonwealth solely for the purposes of the Bonds, and under no circumstance shall it be construed as a general waiver by the Commonwealth or a waiver with respect to proceedings unrelated to the exercise of remedies pursuant to the Bond Resolution.

**Special Fund for the Bonds (General Obligation) Debt Service**

Act No. 83-1991, as amended, provides for the levy of an annual special tax of 1.03% of the assessed value of all real and personal property not exempt from taxation. The proceeds of said tax are credited to the Redemption Fund for application to the payment of general obligation bonds and notes of the Commonwealth.

Act No. 39-1976, as amended ("Act 39"), requires the Secretary of the Treasury to transfer each month from available funds of the Commonwealth to the Redemption Fund such amounts which, together with certain other funds deposited therein in such month, will be equal to the sum of one-sixth of the interest to be paid in the next six months and one-twelfth of the principal to be paid or required to be amortized within the next twelve months on all bonds and notes of the Commonwealth for which its good faith and credit are pledged as the same become due and all bonds and notes of the Commonwealth for which the guaranty of the Commonwealth has been exercised. Moneys in the Redemption Fund are held in trust by GDB. Act 39 provides that the obligation of the Secretary of the Treasury to make the above transfers is cumulative, and the amount of any deficiency in any month shall be added to the amount of transfers required in future months until such deficiency has been fully paid. On March 6, 2014, the Redemption Fund was fully funded.

In the past, GDB has invested a portion of the funds on deposit in the Redemption Fund in GDB time deposits as authorized by Act 39. Upon the issuance of the Bonds, GDB, as trustee, intends to invest

# Pages Intentionally Omitted

# Exhibit D



COMMONWEALTH OF PUERTO RICO

## *Departament of Justice*

ROBERTO J. SÁNCHEZ RAMOS
SECRETARY

July 31, 2007

Mr. Alfredo Salazar Conde
Chairman of the Board of Directors
Puerto Rico Sales Tax Financing Corporation
C/O Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Consulta Núm. 06-63-B

Dear Mr. Salazar Conde,

As per your request, and subject, of course, to what the Puerto Rico Supreme Court
might eventually hold, I hereby issue my opinion that:

1.     The sales tax imposed by virtue of Act 117 of the Legislative
Assembly of Puerto Rico, approved July 4, 2006 (as imposed from time to time by
the Commonwealth of Puerto Rico (the "Commonwealth"), the "Commonwealth
Sales Tax") has been validly imposed by law.

2.     Act No. 91 of the Legislative Assembly of Puerto Rico, approved
May 13, 2006, as amended by Act 291 of December 26, 2006 (collectively, "Act
91"), was validly enacted by the Commonwealth and, accordingly, the provisions
regarding the deposit of present and future collections of the Dedicated Sales Tax
in the Dedicated Sales Tax Fund, as provided for in Act 91, in consideration for the
Puerto Rico Sales Tax Financing Corporation's (the "Corporation") commitment to
pay, or establish mechanisms to pay, all or part of the extraconstitutional debt
outstanding as of June 30, 2006, with the net proceeds of the bonds issued by the
Corporation and with other funds and resources available to the Corporation (the
"Repayment Project"), are valid for the purposes stated in Act 91, insofar as they
do not surrender the Commonwealth's taxation power.

Consulta Núm. 06-63-B
Page 2

3.      Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right
to receive collections of the Dedicated Sales Tax, is transferred to the Corporation
and said assets and funds of the Corporation shall not constitute available resources
of the Commonwealth for purposes of Section 8 of Article VI of the Constitution
of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury
of the Commonwealth.

4.      Subject to the power of the Legislative Assembly and the Executive
Branch under the Constitution of the Commonwealth of Puerto Rico, and pursuant
to Act 91, the Commonwealth has agreed and promised to any person, firm or
corporation or agency of the United States of America or of any state or the
Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the
Corporation: (i) to diligently enforce the Commonwealth Sales Tax to the extent of
revenues described in Articles 2(a) and 4(e) of Act 91; (ii) to not limit or restrain
the rights or powers validly conferred by Act 91 or the rights of the Corporation to
comply with its obligations with its bondholders until such time as such bonds,
irrespective of their maturity, together with the interest accrued, shall be
completely paid and redeemed; and (iii) that no amendment to Act 91 shall
undermine any obligation or commitment of the Corporation.

5.      The Corporation is a valid independent governmental instrumentality
of the Commonwealth with the power to receive revenues produced by the
Dedicated Sales Tax, to issue bonds for its corporate purposes, including the
Repayment Project, and to pledge the Dedicated Sales Tax to the repayment of
such Bonds.

6.      Act 91, as authority for the application of the Dedicated Sales Tax to
the Repayment Project, satisfies the requirements of Section 9 of Article VI of the
Constitution of Puerto Rico.

Please do not hesitate to contact me if I can be of further assistance.

Cordially,

Roberto J. Sánchez Ramos

# Exhibit E

NEW ISSUE – BOOK-ENTRY ONLY
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) assuming continuing compliance with certain tax covenants as described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. See "Tax Matters" herein.*

## PUERTO RICO SALES TAX FINANCING CORPORATION
### $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

**Dated:** Date of Delivery                                                            **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2007A Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds, the Series 2007B Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new statute (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as fixed rate bonds (the "Fixed Rate Bonds") in the form of current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), and as LIBOR-based adjustable rate bonds (the "LIBOR Bonds") as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on August 1, 2007, and will be payable at maturity or redemption. Interest on the LIBOR Bonds will be payable quarterly, commencing on November 1, 2007. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

The scheduled payment of principal and interest on certain of the Bonds will be guaranteed under bond insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, and Ambac Assurance Corporation, as indicated in the inside cover page of this Official Statement.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman, Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | | **Lehman Brothers** |
| **AG Edwards** | **Banc of America Securities LLC** | **BBVAPR MSD** |
| **Bear, Stearns & Co., Inc.** | **Citi** | **First Albany** |
| **JPMorgan** | **Loop Capital** | **Merrill Lynch & Co.** |
| **Morgan Stanley** | **Oriental Financial Services** | **Popular Securities** |
| **RBC Capital Markets** | **Samuel A. Ramírez & Co.** | **Santander Securities** |
| **UBS Investment Bank** | **Wachovia Bank, National Association** | |

July 13, 2007

Case:17-00257-LTS Doc#:945-5 Filed:11/06/17 Entered:11/06/17 21:49:02 Desc:
Exhibit E Page 3 of 15

# Pages Intentionally Omitted

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006, and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA Inc.'s web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA at its principal executive offices.

**Ambac Assurance Corporation**

The following information has been furnished by Ambac for the use in this Official Statement. Reference is made to *Appendix H* for a specimen of the Ambac Insurance Policy. Concurrently with the issuance of the Bonds, Ambac will issue the Ambac Insurance Policy for the Ambac Insured Bonds. The Ambac Insurance Policy guarantees the scheduled payment of principal of and interest on the Ambac Insured Bonds when due, as set forth in the form of the Ambac Insurance Policy included as *Appendix H* to this Official Statement.

*Payment Pursuant to Financial Guaranty Insurance Policy.* Ambac has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds, effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee"), that portion of the principal of and interest on the Ambac Insured Bonds that shall become due for payment but shall be unpaid by reason of nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy). Ambac will make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes due for payment or within one business day following the date on which Ambac shall have received notice of nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond that has become due for payment and that is made to a owner by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, non-appealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does **not** insure any risk other than nonpayment (as set forth in the Ambac Insurance Policy). Specifically, the Ambac Insurance Policy does **not** cover:

1.      payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

8

        2.      payment of any redemption, prepayment or acceleration premium; and

        3.      nonpayment of principal or interest caused by the insolvency or negligence of the Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy. Payment of interest pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the owner's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, or right to payment of the principal of or interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering owner's rights to payment.

*General.* Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $10,194,000,000 (unaudited) and statutory capital of approximately $6,557,000,000 (unaudited) as of March 31, 2007. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. S&P, Moody's and Fitch have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc., is subject to the informational requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including Ambac Financial Group, Inc. These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac. The address of Ambac's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004, and its telephone number is (212) 668-0340.

*Incorporation of Certain Documents by Reference.* The following documents filed by Ambac Financial Group, Inc. with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

Ambac Financial Group, Inc.'s Annual Report on <u>Form 10-K</u> for the fiscal year ended December 31, 2006 and filed on March 1, 2007;

Ambac Financial Group, Inc.'s Current Report on <u>Form 8-K</u> dated and filed on April 25, 2007; and

Ambac Financial Group, Inc.'s Quarterly Report on <u>Form 10-Q</u> for the fiscal quarterly period ended March 31, 2007 and filed on May 10, 2007.

**Pages Intentionally Omitted**

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds, or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix D-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---:|
| Principal Amount of the Bonds | $2,667,603,572.60 |
| Additional Sources of Funds | 4,400,000.00 |
| Original Issue Premium | 15,456,087.85 |
| **Total Sources** | $2,687,459,660.45 |

**Uses**

| | |
|---|---:|
| Payment of Extraconstitutional Debt | $2,594,848,882.83 |
| Underwriters' Discount and Other Costs of Issuance[1] | 92,610,777.62 |
| **Total Uses** | $2,687,459,660.45 |

[1] Includes insurance premiums aggregating $70,329,182, legal, printing, and other financing expenses.

## PLEDGED SALES TAX

**Commonwealth Sales Tax**

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax: (i) taxable

items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

**Sales Tax Revenue Projections and Actual Collections**

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information.* The CTM is an

16

input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

**Pledged Sales Tax and FIA Fund**

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires

17

that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

**Property Pledged for the Payment of the Bonds**

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority: (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the

Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Additional Bonds, Refunding Bonds and Other Obligations**

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be

20

increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

## Commonwealth's Authority to Cover Deficiencies

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## Special Investment Considerations

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative

21

Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

## TAX MATTERS

**United States Tax Considerations**

*Opinion of Bond Counsel to the Corporation*

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, assuming continuing compliance with certain tax covenants described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel to the Corporation has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Corporation, the Commonwealth, the Government Development Bank, and others, in connection with the Bonds, and Bond Counsel to the Corporation has assumed compliance by the Corporation, the Commonwealth,

Case:17-00257-LTS Doc#:94-5 Filed:11/06/17 Entered:11/06/17 21:49:02 Desc:
Exhibit E Page 15 of 15

# Pages Intentionally Omitted

# Exhibit F

11

## CERTIFICATE OF THE SECRETARY OF THE TREASURY

I, JUAN CARLOS MENDEZ, Secretary of the Treasury of the Commonwealth of Puerto Rico, DO HEREBY CERTIFY AND ACKNOWLEDGE with respect to the transactions accompanying the issuance by the Puerto Rico Sales Tax Financing Corporation (the "Corporation") on the date hereof of $2,667,603,572.60 aggregate principal amount at issuance of its Sales Tax Revenue Bonds, Series 2007A and $1,333,101,779.90 aggregate principal amount at issuance of its Sales Tax Revenue Bonds, Series 2007B (together, the "Bonds") pursuant to the terms of the Bond Resolution and First Supplemental Bond Resolution adopted by the Corporation on July 13, 2007 and Second Supplemental Bond Resolution adopted by the Corporation on July 17, 2007 (collectively, the "Resolution") pursuant to which The Bank of New York is acting as trustee (the "Trustee"), as follows:

1. The Bonds are being issued pursuant to the authority of Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented ("Act 91"), in order to provide funds for the payment or retirement, directly or indirectly, of certain "extraconstitutional" obligations of the Commonwealth outstanding as of June 30, 2006 (the "Obligations") owed to Government Development Bank for Puerto Rico ("Government Development Bank") and to the Puerto Rico Public Finance Corporation ("PFC").

2. Certain of the net proceeds of the Bonds, and other available funds, are to be applied on the date hereof (i) to immediately discharge and retire Obligations owed to Government Development Bank through a direct payment of funds by the Trustee to Government Development Bank in the amount of $1,996,952,671 (representing the principal amount of such Obligations of $1,731,252,641 plus accrued interest on all Obligations incurred in FY 2003 through 2006 equal to $265,700,030), (ii) to cause the defeasance of Obligations represented by certain PFC bonds, and provision for the payment of interest on certain PFC bonds, through a direct payment of funds equal to $1,597,501.105.83 by the Trustee to The Bank of New York, as master escrow agent (the "Master Escrow Agent") under the terms of the 2007 Master Refunding and Payment Trust Agreement (the "Master Escrow Agreement"), dated as of July 30, 2007, between PFC and the Master Escrow Agent, such funds to be held and administered pursuant to the terms of the Master Escrow Agreement, and (iii) to cause $312,762,069.29 to be applied to the indirect payment of Obligations related to certain current debt service liabilities in Fiscal Year 2008 on PFC bonds which were provided for pursuant to a bridge loan extended by Government Development Bank to the Corporation, as authorized by the Corporation on July 10, 2007, through the repayment of such bridge loan in full to Government Development Bank. All such transactions are for the benefit of the Commonwealth Treasury and have been agreed to in consultation with the undersigned.

3. The undersigned has reviewed the information contained in the Official Statement with respect to the Series 2007A Bonds, dated July 13, 2007, and the Official Statement with respect to the Series 2007 B Bonds, dated July 17, 2007, and appearing under the caption "PLEDGED SALES TAX." Such information is accurate and does not contain any untrue statement of a material fact or omit to state any material fact necessary in order to make

the statements made therein, in light of the circumstances under which they were made, not misleading.

IN WITNESS WHEREOF, I have hereunto set my hand this 31st day of July, 2007.

Juan Carlos Mendez, Secretary of the Treasury of the Commonwealth of Puerto Rico

# Exhibit H

# PUERTO RICO SALES TAX FINANCING CORPORATION

## FIRST SUPPLEMENTAL SALES TAX REVENUE BOND RESOLUTION

authorizing

## SALES TAX REVENUE BONDS
## SERIES 2007A

Adopted on July 13, 2007

# Pages Intentionally Omitted

## AMBAC INSURANCE POLICY

So long as the Ambac Policy shall be in full force and effect with respect to the Ambac Insured Bonds, the Corporation (sometimes referred to as the "Corporation") and the Trustee shall comply with the following provisions (Ambac Assurance Corporation is referred to below as "Ambac" or "Ambac Assurance"):

(a)     Any provision of this Resolution expressly recognizing or granting rights in or to Ambac may not be amended in any manner which affects the rights of Ambac hereunder without the prior written consent of Ambac.  Ambac reserves the right to charge the Corporation a fee for any consent or amendment to the Resolution while the Ambac Policy is outstanding.

(b)     Unless otherwise provided in this Section, Ambac's consent shall be required in addition to bondholder consent, when required, for the following purposes: (i) adoption of any resolution supplemental to this Resolution; (ii) removal of the Trustee and selection and appointment of any successor Trustee; and (iii) initiation or approval of any action not described in (i) or (ii) above which requires bondholder consent.

(c)     While the Ambac Policy is in effect, the Corporation  shall furnish to Ambac (to the attention of the Surveillance Department, unless otherwise indicated):

(i)     as soon as practicable after the filing thereof, a copy of any financial statement of the Corporation and a copy of any audit and annual report of the Corporation at no cost to Ambac;

(ii)    a copy of any notice to be given to the registered owners of the Ambac Insured Bonds, including, without limitation, notice of any redemption of or defeasance of Ambac Insured Bonds, and any certificate rendered pursuant to this Resolution relating to the security for the Ambac Insured Bonds at no cost to Ambac;

(iii)   notifications required to be sent to Owners of Ambac Insured Bonds under the Master Continuing Disclosure Agreement; and

(iv)    such additional information it may reasonably request.

(d)     The Trustee shall notify Ambac's General Counsel Office of any failure of the Corporation to provide notices, certificates or other communication to the Trustee. The Trustee agrees to this provision as a matter of courtesy and accommodation only and shall not be liable to any person for any failure to comply herewith.

(e)     The Corporation will permit Ambac to discuss the affairs, finances and accounts of the Corporation or any information Ambac may reasonably request regarding the security for the Ambac Insured Bonds with appropriate officers of the Corporation. The Corporation will permit Ambac to have access to and to make copies of all books and records relating to the Ambac Insured Bonds at any reasonable time.

508050.12 029578 RES

(f)  Ambac shall have the right to direct an accounting at the Corporation's expense, and the Corporation shall comply with such direction within thirty (30) days after receipt of written notice of the direction from Ambac; provided, however, that if compliance cannot occur within such period, then such period will be extended so long as compliance is begun within such period and is diligently pursued, but only if such extension would not materially adversely affect the interests of any beneficial owner of the Ambac Insured Bonds.

(g)  Notwithstanding any other provision of this Resolution, the Trustee or the Corporation (as appropriate) shall immediately notify Ambac's General Counsel Office if at any time there are insufficient moneys to make any payments of principal of or interest on the Ambac Insured Bonds as required. The Trustee agrees to this provision as a matter of courtesy and accommodation only and shall not be liable to any person for any failure to comply herewith.

(h)  The Corporation shall provide Ambac with a copy of all reports and notices filed in accordance with this Resolution.

(i)  Notwithstanding anything herein to the contrary, in the event that the principal and/or interest due on the Ambac Insured Bonds shall be paid by Ambac pursuant to the Ambac Policy, such Bonds shall remain Outstanding for all purposes of this Resolution, not be defeased or otherwise satisfied and not be considered paid by the Corporation, and the pledge and all covenants, agreements and other obligations of the Corporation to the registered owners shall continue to exist and shall run to the benefit of Ambac, and Ambac shall be subrogated to the rights of such registered owners.

(j)  Upon the occurrence of an Event of Default under the Resolution, no Ambac Insured Bonds may have the principal thereof accelerated pursuant to the provisions of the Resolution without the prior written consent of Ambac, and Ambac shall have the right to consent to the annulment of any acceleration of the principal of the Ambac Insured Bonds/

(k)  As long as the Ambac Policy shall be in full force and effect, the Corporation and the Trustee agree to comply with the following provisions:

(i)  At least one (1) business day prior to each interest payment date, the Trustee will determine whether there will be sufficient funds to pay the principal of or interest on the Ambac Insured Bonds on such interest payment date. If the Trustee determines that there will be insufficient funds, it shall so notify Ambac. Such notice shall specify the amount of the anticipated deficiency, the Ambac Insured Bonds to which such deficiency is applicable and whether such Bonds will be deficient as to principal or interest, or both. If the Trustee has not so notified Ambac at least one (1) business day prior to an interest payment date, Ambac will make payments of principal or interest due on the Ambac Insured Bonds on or before the first (1st) day next following the date on which Ambac shall have received notice of such nonpayment from the Trustee.

(ii)  The Trustee shall, after giving notice to Ambac as provided in (i) above, make available to Ambac and, at Ambac's direction, to The Bank of New York, as insurance trustee for Ambac or any successor insurance trustee (the

Page 10

508050.12 029578 RES

"Ambac Insurance Trustee"), the registration books of the Corporation maintained by the Trustee, and all records relating to the funds and accounts maintained under this Resolution.

(iii)    Upon request by Ambac the Trustee shall provide Ambac and the Ambac Insurance Trustee with a list of registered owners of Ambac Insured Bonds entitled to receive principal or interest payments from Ambac under the terms of the Ambac Policy, and shall make arrangements with the Ambac Insurance Trustee (I) to mail checks to the registered owners of Ambac Insured Bonds entitled to receive full or partial interest payments from Ambac and (II) to pay principal upon Ambac Insured Bonds surrendered to the Ambac Insurance Trustee by their registered owners entitled to receive full or partial principal payments from Ambac.

(iv)    The Trustee shall, at the time it provides notice to Ambac pursuant to (i) above, notify registered owners of Ambac Insured Bonds entitled to receive the payment of principal or interest thereon from Ambac (I) as to the fact of such entitlement, (II) that Ambac will remit to them all or a part of the interest payments next coming due upon proof of Bondholder entitlement to interest payments and delivery to the Ambac Insurance Trustee, of an appropriate assignment of the registered owner's right to payment, (III) that should they be entitled to receive full payment of principal from Ambac, they must surrender their Ambac Insured Bonds (along with an appropriate instrument of assignment to permit ownership of such Bonds to be registered in the name of Ambac) for payment to the Ambac Insurance Trustee, and not the Trustee, and (IV) that should they be entitled to receive partial payment of principal from Ambac, they must surrender their Ambac Insured Bonds for payment thereon first to the Trustee, who shall note on such Bonds the portion of the principal paid by the Trustee, and then, along with an appropriate instrument of assignment, to the Ambac Insurance Trustee, which will then pay the unpaid portion of principal.

(v)    In the event that the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond which has become Due for Payment (as defined in the Ambac Policy) and which is made to a Bondholder by or on behalf of the Corporation has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with the final, nonappealable order of a court having competent jurisdiction, the Trustee shall, at the time Ambac is notified pursuant to (i) above, notify all registered owners of Ambac Insured Bonds that in the event that any such registered owner's payment is so recovered, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available, and the Trustee shall furnish to Ambac its records evidencing the payments of principal of and interest on the Ambac Insured Bonds which have been made by the Trustee, and subsequently recovered from the registered owners thereof and the dates on which such payments were made.

(vi)    In addition to those rights granted Ambac under this Resolution, Ambac shall, to the extent it makes payment of principal of or interest on Ambac

508050.12 029578 RES

Insured Bonds, become subrogated to the rights of the recipients of such payments in accordance with the terms of the Ambac Policy, and to evidence such subrogation (I) in the case of subrogation as to claims for past due interest, the Trustee shall note Ambac's rights as subrogee on the registration books of the Corporation maintained by the Trustee upon receipt from Ambac of proof of the payment of interest thereon to the registered owners of the Ambac Insured Bonds, and (II) in the case of subrogation as to claims for past due principal, the Trustee shall note Ambac's rights as subrogee on the registration books of the Corporation maintained by the Trustee upon surrender of the Ambac Insured Bonds by the registered owners thereof together with proof of the payment of principal thereof.

(l)       To the extent that this Resolution confers upon or gives or grants to Ambac any right, remedy or claim under or by reason of this Resolution, Ambac is hereby explicitly recognized as being a third-party beneficiary hereunder and may enforce any such right, remedy or claim conferred, given or granted hereunder.

(m)       The Corporation hereby covenants and agrees that it shall reimburse Ambac Assurance for any amounts paid under the Ambac Policy and all costs of collection thereof and enforcement of this Resolution and any other documents executed in connection with this Resolution, together with interest thereon, from the date paid or incurred by Ambac Assurance until payment thereof in full by the Corporation, payable at the Insurer Payment Rate (as hereinafter defined), including without limitation (to the extent permitted by applicable law) interest on claims paid by Ambac Assurance in respect of interest on the Ambac Insured Bonds. Such payment obligation shall be payable on demand and on a parity with, and from the same sources and secured by the same security as, regularly scheduled principal and interest payments in respect of the Ambac Insured Bonds. For purposes of the foregoing, "Insurer Payment Rate" shall mean the lesser of (a) the maximum rate permissible under applicable usury or similar laws limiting interest rates and (b) the greater of (i) the then applicable highest rate of interest on the Ambac Insured Bonds and (ii) the per annum rate of interest, publicly announced from time to time by JPMorgan Chase Bank, N.A. ("Chase") at its principal office in the City of New York, as its prime or base lending rate ("Prime Rate") (any change in such Prime Rate to be effective on the date such change is announced by Chase) plus 3 percent. The Insurer Payment Rate shall be computed on the basis of the actual number of days elapsed over a year of 360 days. In the event that Chase ceases to announce its Prime Rate publicly, Prime Rate shall be the publicly announced prime or base lending rate of such national bank as Ambac Assurance shall specify.

(n)       *TRUSTEE-RELATED PROVISIONS*

1.   The Trustee (or Paying Agent) may be removed at any time, at the request of Ambac Assurance, for any breach of the Resolution set forth herein.

2.   Ambac Assurance shall receive prior written notice of any Trustee (or Paying Agent) resignation.

3.   Every successor Trustee appointed pursuant to the Resolution and the provisions hereof shall be a trust company or bank in good standing located in or incorporated under the laws of the United States of America, Commonwealth or a national banking association,

508050.12 029578 RES

Case:17-00257-LTS Doc#:928-8 Filed:11/06/17 Entered:11/06/17 21:49:02 Desc:
Exhibit H Page 8 of 9

# Pages Intentionally Omitted

# Exhibit G



COMMONWEALTH OF PUERTO RICO
**Departament of Justice**
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani                                     Tel. (787) 723-4983
Secretary of Justice                                                           (787) 721-7771

December 13, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention:    Mr. Juan Carlos Batlle
              President and Vice-Chairman of the Board

Inquiry No. 11-145-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax
Financing Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales
Tax Revenue Bonds, Senior Series 2011D, I hereby issue my opinion that:

1.    Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4,
      2006, was validly enacted by the Commonwealth of Puerto Rico (the
      "Commonwealth"), validly imposes the sales tax described therein (the
      "Sales Tax") and is in full force and effect.

2.    Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13,
      2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of
      July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009,
      and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the
      statutes amending Act 91 were validly enacted by the Commonwealth and
      are in full force and effect.

Inquiry No. 11-145-B
Page 2

3.      The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.      Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.      The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.      Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

7. The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

8. Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani