# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors. | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION,<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS |

## DISCLOSURE STATEMENT FOR THE
## SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE
## <u>DEBTS OF PUERTO RICO SALES TAX FINANCING CORPORATION</u>

**PROSKAUER ROSE LLP**
Eleven Times Square
New York, New York 10036
Telephone: (212) 969-3000
Facsimile: (212) 969-2900

**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Telephone: (787) 764-8181
Facsimile: (787) 753-8944

*Attorneys for the Financial Oversight and Management Board*
*as Representative for the Puerto Rico Sales Tax Financing Corporation in its Title III Case*

Dated: November 26, 2018

DX-QQQ

THIS IS NOT A SOLICITATION OF VOTES ON, OR ELECTIONS OF DISTRIBUTIONS PURSUANT TO, THE *SECOND AMENDED TITLE III PLAN OF ADJUSTMENT OF THE DEBTS OF PUERTO RICO SALES TAX FINANCING CORPORATION*, DATED NOVEMBER 16, 2018 [CASE NO. 17-3284, ECF NO. ____] (THE "PLAN OF ADJUSTMENT"). VOTES MAY NOT BE SOLICITED UNTIL THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF PUERTO RICO (THE "TITLE III COURT") HAS APPROVED A DISCLOSURE STATEMENT. THIS DISCLOSURE STATEMENT (THE "DISCLOSURE STATEMENT") IS BEING SUBMITTED FOR APPROVAL, BUT HAS NOT YET BEEN APPROVED BY THE TITLE III COURT. THE INFORMATION IN THIS DISCLOSURE STATEMENT IS SUBJECT TO CHANGE. THIS DISCLOSURE STATEMENT IS NOT AN OFFER TO SELL ANY SECURITIES AND IS NOT SOLICITING AN OFFER TO BUY ANY SECURITIES.

## IMPORTANT INFORMATION

THE PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT ("PROMESA") PROVIDES THAT THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO (THE "OVERSIGHT BOARD") MAY TAKE ANY ACTION NECESSARY TO PROSECUTE THE CASE UNDER TITLE III OF PROMESA (THE "TITLE III CASE") OF THE DEBTOR,[1] INCLUDING FILING A TITLE III PETITION, SUBMITTING A PLAN OF ADJUSTMENT FOR THE DEBTOR, AND OTHERWISE GENERALLY SUBMITTING FILINGS IN RELATION TO THE TITLE III CASE. PROMESA ALSO PROVIDES THAT ONLY THE OVERSIGHT BOARD MAY FILE A PLAN OF ADJUSTMENT OF THE DEBTS OF COFINA. PROMESA REQUIRES THAT THE PLAN OF ADJUSTMENT FOR A TITLE III DEBTOR BE FILED IN ITS TITLE III CASE TOGETHER WITH A DOCUMENT CALLED A DISCLOSURE STATEMENT. THIS DOCUMENT IS THE DISCLOSURE STATEMENT FOR THE PLAN OF ADJUSTMENT DESCRIBED HEREIN. THIS PROPOSED DISCLOSURE STATEMENT INCLUDES CERTAIN EXHIBITS, EACH OF WHICH ARE INCORPORATED INTO THIS DISCLOSURE STATEMENT AS IF SET FORTH IN FULL HEREIN. THIS DISCLOSURE STATEMENT HAS BEEN PREPARED AND FILED BY THE OVERSIGHT BOARD ON BEHALF OF COFINA. ALL PROVISIONS OF TITLE 11 OF THE UNITED STATES CODE (THE "BANKRUPTCY CODE") REFERENCED HEREIN ARE MADE APPLICABLE TO THIS TITLE III CASE BY PROMESA SECTION 301(a).

THE TITLE III COURT HAS REVIEWED THIS DISCLOSURE STATEMENT, AND HAS DETERMINED THAT IT CONTAINS ADEQUATE INFORMATION PURSUANT TO BANKRUPTCY CODE SECTION 1125(b) AND MAY BE SENT TO

---

[1] The Oversight Board submits this Disclosure Statement in Case No. 17-BK-3284-LTS, as the Title III debtor representative of the Puerto Rico Sales Tax Financing Corporation ("COFINA") in its Title III Case, in accordance with PROMESA section 315(b) (the Oversight Board, in its capacity as representative of COFINA, is referred to as the "Debtor").

YOU TO SOLICIT YOUR VOTE ON AND ELECTION OF THE FORM OF
DISTRIBUTION TO BE RECEIVED UNDER THE PLAN OF ADJUSTMENT.

ALL HOLDERS OF CLAIMS ENTITLED TO VOTE ON THE PLAN OF
ADJUSTMENT OR MAKE AN ELECTION THEREUNDER ARE ENCOURAGED TO
READ AND CAREFULLY CONSIDER THIS ENTIRE DISCLOSURE STATEMENT,
INCLUDING THE RISK FACTORS CITED HEREIN AND THE PLAN OF
ADJUSTMENT ATTACHED HERETO, BEFORE VOTING TO ACCEPT OR REJECT
THE PLAN OF ADJUSTMENT OR MAKING AN ELECTION THEREUNDER. SEE
SECTION XIV OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK
FACTORS TO BE CONSIDERED."

THIS DISCLOSURE STATEMENT CONTAINS STATEMENTS THAT ARE
"FORWARD-LOOKING STATEMENTS" WITHIN THE MEANING OF CERTAIN
FEDERAL SECURITIES LAWS. ALL STATEMENTS CONTAINED HEREIN THAT
ARE NOT CLEARLY HISTORICAL IN NATURE ARE FORWARD-LOOKING AND
THE WORDS "ANTICIPATE," "BELIEVE," "COULD," "SHOULD," "EXPECT,"
"ESTIMATE," "FORECAST," "INTEND," "POTENTIAL," "PROJECT," "TARGET,"
AND SIMILAR EXPRESSIONS ARE GENERALLY INTENDED TO IDENTIFY
FORWARD-LOOKING STATEMENTS. ALL STATEMENTS CONTAINED IN THIS
DISCLOSURE STATEMENT, OTHER THAN STATEMENTS OF HISTORICAL FACT,
INCLUDING STATEMENTS ABOUT THE PLAN OF ADJUSTMENT, STRATEGIES,
PROSPECTS, AND EXPECTATIONS REGARDING FUTURE EVENTS AND
COFINA'S FINANCIAL PERFORMANCE, ARE FORWARD-LOOKING
STATEMENTS THAT INVOLVE CERTAIN RISKS AND UNCERTAINTIES. WHILE
THESE STATEMENTS REPRESENT THE DEBTOR'S CURRENT JUDGMENT ON
WHAT THE FUTURE MAY HOLD, AND THE DEBTOR BELIEVES THESE
JUDGMENTS ARE BASED UPON REASONABLE ASSUMPTIONS UNDER THE
CIRCUMSTANCES, THESE STATEMENTS ARE NOT GUARANTEES OF ANY
EVENTS OR FINANCIAL RESULTS, AND COFINA'S ACTUAL RESULTS MAY
DIFFER MATERIALLY. THE INFORMATION INCLUDED IN THIS DISCLOSURE
STATEMENT, INCLUDING THE FORWARD-LOOKING STATEMENTS AND
PROJECTIONS OF CERTAIN FINANCIAL DATA FOLLOWING CONSUMMATION
OF THE PLAN OF ADJUSTMENT, ARE MADE ONLY AS OF THE DATE OF THIS
DISCLOSURE STATEMENT, UNLESS OTHERWISE SPECIFIED. THE DEBTOR
UNDERTAKES NO OBLIGATION TO UPDATE PUBLICLY THE INFORMATION
CONTAINED IN THIS DISCLOSURE STATEMENT, INCLUDING ANY FORWARD-
LOOKING STATEMENTS, TO REFLECT NEW INFORMATION, FUTURE EVENTS
OR OTHERWISE, EXCEPT AS REQUIRED BY LAW. ALL FORWARD-LOOKING
STATEMENTS INVOLVE RISKS AND UNCERTAINTIES, MANY OF WHICH ARE
BEYOND COFINA'S CONTROL, WHICH MAY CAUSE ACTUAL RESULTS,
PERFORMANCE, OR ACHIEVEMENTS TO DIFFER MATERIALLY FROM
ANTICIPATED RESULTS, PERFORMANCE, OR ACHIEVEMENTS. THE DEBTOR
CANNOT GUARANTEE THAT PROJECTED RESULTS OR EVENTS WILL BE
ACHIEVED. FACTORS THAT COULD CAUSE COFINA'S ACTUAL RESULTS TO
BE MATERIALLY DIFFERENT FROM THE DEBTOR'S EXPECTATIONS INCLUDE
THOSE FACTORS DESCRIBED HEREIN UNDER SECTION XIV, ENTITLED

"CERTAIN RISK FACTORS TO BE CONSIDERED." THE DEBTOR URGES HOLDERS OF CLAIMS TO CONSIDER THESE FACTORS CAREFULLY IN EVALUATING THE FORWARD-LOOKING STATEMENTS AND NOT TO PLACE UNDUE RELIANCE ON THESE FORWARD-LOOKING STATEMENTS.

THE STATEMENTS AND OTHER INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT WERE MADE AS OF THE DATE SET FORTH ON THE COVER PAGE, UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER THAT THE FACTS SET FORTH HEREIN ARE UNCHANGED SINCE THE DATE SET FORTH ON THE COVER PAGE HEREOF. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON, OR MAKE AN ELECTION WITH RESPECT TO, THE PLAN OF ADJUSTMENT MUST RELY ON ITS OWN EVALUATION OF COFINA AND ITS OWN ANALYSIS OF THE TERMS OF THE PLAN OF ADJUSTMENT IN DECIDING WHETHER TO ACCEPT OR REJECT, OR ELECT THE FORM OF DISTRIBUTION PURSUANT TO, THE PLAN OF ADJUSTMENT.

A PLAN SUPPLEMENT CONTAINING DRAFT OR FINAL VERSIONS OF PRIMARY DOCUMENTS REQUIRED TO CONSUMMATE THE TRANSACTIONS CONTEMPLATED BY THE PLAN OF ADJUSTMENT WILL BE FILED WITH THE CLERK OF THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN FIFTEEN (15) DAYS) PRIOR TO THE VOTING DEADLINE,[2] OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES. THE PLAN SUPPLEMENT SHALL BE DEEMED INCORPORATED INTO AND PART OF THE PLAN OF ADJUSTMENT AS IF SET FORTH THEREIN IN FULL.

THE DEBTOR IS PROVIDING THE INFORMATION IN THIS DISCLOSURE STATEMENT SOLELY FOR PURPOSES OF SOLICITING HOLDERS OF CLAIMS ENTITLED TO VOTE TO ACCEPT OR REJECT, OR ELECT THE FORM OF DISTRIBUTION PURSUANT TO, THE PLAN OF ADJUSTMENT. NOTHING IN THIS DISCLOSURE STATEMENT MAY BE USED BY ANY PERSON FOR ANY OTHER PURPOSE. THE CONTENTS OF THIS DISCLOSURE STATEMENT SHALL NOT BE DEEMED AS PROVIDING ANY LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE. THE DEBTOR URGES EACH HOLDER OF A CLAIM TO CONSULT WITH ITS OWN ADVISORS WITH RESPECT TO ANY SUCH LEGAL, FINANCIAL, SECURITIES, TAX, BUSINESS, OR OTHER ADVICE IN REVIEWING THIS DISCLOSURE STATEMENT AND THE PLAN OF ADJUSTMENT.

THE OVERSIGHT BOARD, AS COFINA'S TITLE III DEBTOR REPRESENTATIVE IN THIS TITLE III CASE PURSUANT TO PROMESA SECTION 315(b), HAS NOT AUTHORIZED ANY PARTY TO GIVE ANY INFORMATION CONCERNING THE PLAN OF ADJUSTMENT, COFINA, OR THE VALUE OF COFINA'S PROPERTY, OTHER THAN AS SET FORTH IN THIS DISCLOSURE

---

[2] The "Voting Deadline" is defined as 5:00 p.m. (Atlantic Standard Time) on January 8, 2019, unless such time is extended.

STATEMENT OR THE DISCLOSURE STATEMENT ORDER.[3]  HOLDERS OF CLAIMS SHOULD NOT RELY UPON ANY OTHER INFORMATION, REPRESENTATIONS, WARRANTIES, OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OR REJECTION OF, OR OBTAIN AN ELECTION OF DISTRIBUTION PURSUANT TO, THE PLAN OF ADJUSTMENT.

THIS DISCLOSURE STATEMENT AND THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DO NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER.  FURTHER, THE TITLE III COURT'S APPROVAL OF THE ADEQUACY OF THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE THE TITLE III COURT'S CONFIRMATION OF THE PLAN OF ADJUSTMENT.  THE TITLE III COURT HAS SCHEDULED A HEARING ON JANUARY 16, 2019 TO CONSIDER CONFIRMATION OF THE PLAN OF ADJUSTMENT UNDER THOSE SPECIFIC BANKRUPTCY CODE PROVISIONS MADE APPLICABLE TO THE TITLE III CASE PURSUANT TO PROMESA SECTIONS 301 AND 314.

NEITHER THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION NOR ANY FOREIGN OR STATE SECURITIES COMMISSION HAS APPROVED OR DISAPPROVED OF THE SECURITIES DESCRIBED HEREIN OR THIS DISCLOSURE STATEMENT OR OPINED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED HEREIN.  ANY REPRESENTATION TO THE CONTRARY MAY BE A CRIMINAL OFFENSE.

NONE OF THE SECURITIES TO BE ISSUED TO HOLDERS OF ALLOWED CLAIMS PURSUANT TO THE PLAN OF ADJUSTMENT WILL HAVE BEEN REGISTERED WITH THE SECURITIES & EXCHANGE COMMISSION (THE "SEC") UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR UNDER ANY STATE "BLUE SKY" LAWS, AND SUCH SECURITIES WILL BE ISSUED IN RELIANCE UPON EXEMPTIONS FROM THE REGISTRATION REQUIREMENTS OF THE SECURITIES ACT AND EQUIVALENT STATE LAWS.

THE DEBTOR RECOMMENDS POTENTIAL RECIPIENTS OF COFINA BONDS (AS DEFINED HEREIN), AMBAC CERTIFICATES (AS DEFINED IN THE PLAN OF ADJUSTMENT), OR NATIONAL CERTIFICATES (AS DEFINED IN THE PLAN OF ADJUSTMENT), AS APPLICABLE, TO BE ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT CONSULT THEIR OWN ADVISORS CONCERNING ANY RESTRICTIONS ON HOLDING OR THE TRANSFERABILITY OF SUCH SECURITIES, OR ANY OTHER POTENTIAL CONSEQUENCE OF HOLDING SUCH SECURITIES.

THE TAX CONSEQUENCES OF THE PLAN OF ADJUSTMENT TO HOLDERS OF CLAIMS ARE COMPLEX, AND DEPEND IN PART ON BOTH THE TYPE OF CLAIM HELD AND THE INDIVIDUAL CIRCUMSTANCES OF EACH HOLDER OF A

---

[3]  Capitalized terms used but not defined in this Disclosure Statement have the respective meanings given to them in the Plan of Adjustment.

CLAIM. THE DEBTOR RECOMMENDS THAT ALL HOLDERS OF CLAIMS CONSULT THEIR OWN RESPECTIVE TAX ADVISORS CONCERNING THE U.S. FEDERAL, STATE, TERRITORIAL (INCLUDING PUERTO RICO), LOCAL AND NON-U.S. TAX CONSEQUENCES OF THE PLAN OF ADJUSTMENT IN THEIR RESPECTIVE INDIVIDUAL CIRCUMSTANCES.

THIS DISCLOSURE STATEMENT SUMMARIZES CERTAIN PROVISIONS OF THE PLAN OF ADJUSTMENT, CERTAIN OTHER DOCUMENTS, AND CERTAIN FINANCIAL INFORMATION RELATING TO COFINA. THE DEBTOR BELIEVES THESE SUMMARIES ARE FAIR AND ACCURATE. NO OTHER PARTY, INCLUDING OTHER PARTIES TO THE AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, DATED SEPTEMBER 20, 2018 (THE "AMENDED PSA"), MAKES ANY REPRESENTATION AS TO THE FAIRNESS OR ACCURACY OF THESE SUMMARIES OR THE DESCRIPTIONS OF PARTIES' LEGAL RIGHTS AND REMEDIES CONTAINED HEREIN. IF THERE IS ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION CONTAINED IN THIS DISCLOSURE STATEMENT AND THE TERMS AND PROVISIONS OF THE PLAN OF ADJUSTMENT OR ANY OF THE OTHER DOCUMENTS OR FINANCIAL INFORMATION REFERENCED HEREIN, THE TERMS AND PROVISIONS OF THE PLAN OF ADJUSTMENT, OR SUCH OTHER DOCUMENT OR FINANCIAL INFORMATION, AS APPLICABLE, SHALL GOVERN FOR ALL PURPOSES.

THE DEBTOR RESERVES THE RIGHT TO AMEND, MODIFY, OR WITHDRAW THE PLAN OF ADJUSTMENT AT ANY TIME, IN ACCORDANCE WITH THE TERMS OF THE AMENDED PSA, THE PLAN OF ADJUSTMENT AND PROMESA TITLE III.

---

**QUESTIONS AND ANSWERS**

**RELATING TO**

**TITLE III PLAN OF ADJUSTMENT OF THE DEBTS OF**

**PUERTO RICO SALES TAX FINANCING CORPORATION**

---

i

## I. GENERAL

**1.   What did I receive in this package?**

You should have received the following items in this package:

**A.   This Disclosure Statement;**

**B.   The Plan of Adjustment;**

**C.   The Notice of (I) Approval of Disclosure Statement, (II) Establishment of Record Dates, (III) Hearing on Confirmation of the Plan of Adjustment and Procedures for Objection to Confirmation of the Plan of Adjustment, (IV) Procedures and Deadline for Voting on the Plan of Adjustment and Making Certain Elections Thereunder (the "<u>Confirmation Hearing Notice</u>");**

**D.   If you are entitled to vote on the Plan of Adjustment, a Ballot (as defined below), dated [____], 2018;**

**E.   If you are entitled to make an election of the form of distribution under the Plan of Adjustment, an Election Notice (as defined below), dated [____], 2018;**

**F.   If you are a holder of Claims in Classes 8 or 9, a W-9 form or W-8 BEN form; and**

**G.   If you are a holder of Claims in Class 6, the Class 6 Notice (as defined in the Disclosure Statement Order).**

The items listed above are collectively referred to herein as the "<u>Plan Materials</u>." The Plan Materials and such other information with respect to the Plan of Adjustment are also available on the Debtor's website, https://cases.primeclerk.com/puertorico/.

**2.   <u>Why am I receiving this package?</u>**

You are receiving the Plan Materials because you are listed as a holder of a Claim against COFINA. Your Claim will be treated pursuant to the Plan of Adjustment. As a holder of a Claim, you may be entitled to vote to accept or reject the Plan of Adjustment. You may also be entitled to make an election regarding the form of distribution you will receive pursuant to the Plan of Adjustment on account of your Claim. The Disclosure Statement, including these Questions and Answers, and the other Plan Materials describe the terms pursuant to which a holder of a Claim is entitled to vote to accept or reject the Plan or Adjustment and/or make an election of the form of distribution.

**You are encouraged to read and carefully consider the entire Plan of Adjustment and Disclosure Statement, including the Risk Factors cited therein, before voting to accept or reject the Plan of Adjustment and/or making an election of the form of distribution with respect to your Claim.**

101361236v29

**3.    What is the Plan of Adjustment?**

On October 19, 2018, the Oversight Board, as COFINA's Title III debtor representative pursuant to PROMESA section 315(b), filed the Plan of Adjustment with the Title III Court. The Plan of Adjustment is the product of substantial negotiations reflecting various settlements and compromises, and provides for the adjustment of COFINA's debts. The Plan of Adjustment sets forth the manner in which Claims against COFINA will be treated if the Title III Court confirms the Plan of Adjustment and the Effective Date occurs.

The Debtor submits that the Plan of Adjustment maximizes the value of COFINA's assets for the benefit of its creditors, and that any alternative to confirmation of the Plan of Adjustment would result in significant delays, litigation, lost value, and additional costs.

**4.    What is the Disclosure Statement?**

Your decision to vote to approve or reject the Plan of Adjustment and/or to make an election of the form of distribution to be received under the Plan of Adjustment may be based on a variety of factors. Certain information regarding COFINA, the Existing Securities, and the Plan of Adjustment is set forth in the Disclosure Statement. To make an informed decision, you are encouraged to read the entire Disclosure Statement, including the risk factors cited therein, and Plan of Adjustment, in addition to the Ballot and/or Election Notice, instructions related thereto and the other Plan Materials, before voting to accept or reject the Plan of Adjustment or making an election of the form of distribution to be received under the Plan of Adjustment with respect to your Claims.

5.     **What is required for the Plan of Adjustment to be confirmed?**

At the Confirmation Hearing, the Title III Court will determine whether the Plan of Adjustment satisfies the requirements for confirmation.  The Plan of Adjustment must comply with the provisions of PROMESA section 314(b), including any applicable provisions of Bankruptcy Code section 1129.  Among the requirements for confirmation are that the Plan of Adjustment (1) is accepted by the requisite holders of all impaired Classes of Claims or, if not so accepted, is accepted by at least one impaired Class of Claims, (2) is in the "best interests" of creditors, which requires the Title III Court to consider whether available remedies under non-bankruptcy law, including the Puerto Rico Constitution, would result in a greater recovery for the creditors than is provided by the Plan of Adjustment, (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

A plan is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan of adjustment.  Only those holders of claims who actually vote to accept or reject the plan count in the tabulation.

For more detailed information on the requirements to confirm the Plan of Adjustment, please refer to Section VII.C of the Disclosure Statement.

## II.  VOTING AND ELECTION QUESTIONS

6.     **What are the Ballot and Election Notice?**

A Ballot is enclosed with the Plan Materials distributed to holders of Claims entitled to vote to accept or reject the Plan of Adjustment.  The Ballot is to be used by holders of Claims entitled to vote on the Plan of Adjustment to cast a vote to accept or reject the Plan of Adjustment, and includes information regarding the voting deadlines and detailed instructions for casting a vote.

An Election Notice is enclosed with the Plan Materials distributed to holders of Claims entitled to make an election of the form of distribution such holder will receive pursuant to the Plan of Adjustment.  The Election Notice includes information regarding the election deadline and detailed instructions for making an election of the form of distribution to be received pursuant to the Plan of Adjustment.

7.     **Am I entitled to vote? Should I have received a Ballot?**

The Plan Materials you received will only include a Ballot if you are entitled to vote to accept or reject the Plan of Adjustment.  Only the following holders of Claims are entitled to vote:

- Holders of Senior COFINA Bond Claims (Class 1)[4]

---

[4]     A "Senior COFINA Bond Claim" is a Bond Claim, other than a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National) or a Senior COFINA Bond Claim (Taxable Election), on account of a "Senior Existing Security."

- Holders of Junior COFINA Bond Claims (Class 5)[5]

- Holders of the GS Derivative Claim (Class 8)[6]

- Holders of General Unsecured Claims (Class 9)[7]

Holders of Senior COFINA Bond Claims (Ambac)[8] (Class 2), Senior COFINA Bond Claims (National)[9] (Class 3), and Junior COFINA Bond Claims (Assured)[10] (Class 6) are not entitled to vote on the Plan of Adjustment. Pursuant to the Plan of Adjustment and the Disclosure Statement Order, only the applicable bond insurer (Ambac, National, or Assured) with respect to these Claims is entitled to vote to accept or reject the Plan of Adjustment. Holders of Claims in Classes 2 and 3, however, are entitled to make an election of the form of distribution they wish to receive pursuant to the Plan of Adjustment.

## 8. Am I entitled to make an election?  Should I have received an Election Notice?

The Plan Materials you received will only include an Election Notice if you are a holder of Claims in any of the following Classes:

- Holders of Senior COFINA Bond Claims (Class 1)

- Holders of Senior COFINA Bond Claims (Ambac) (Class 2)

- Holders of Senior COFINA Bond Claims (National) (Class 3)

- Holders of Junior COFINA Bond Claims (Class 5)

---

[5] A "Junior COFINA Bond Claim" is a Bond Claim, other than a Junior COFINA Bond Claim (Assured) or a Junior COFINA Bond Claim (Taxable Election), on account of a "First Subordinate" Existing Security.

[6] A "GS Derivative Claim" is the Claim arising from or relating to that certain ISDA Master Agreement, dated as of July 31, 2007, between Goldman Sachs Bank USA (as successor to Goldman Sachs Capital Markets, L.P.) and COFINA, as amended by that certain Amendment, dated September 24, 2014.

[7] A "General Unsecured Claim" is any Claim other than an Administrative Expense Claim, a Senior COFINA Bond Claim, a Senior COFINA Bond Claim (Ambac), a Senior COFINA Bond Claim (National), a Senior COFINA Bond Claim (Taxable Election), a Junior COFINA Bond Claim, a Junior COFINA Bond Claim (Assured), a Junior COFINA Bond Claim (Taxable Election), or a GS Derivative Claim.

[8] A "Senior COFINA Bond Claim (Ambac)" is a Bond Claim on account of a "Senior" Existing Security, the repayment of which has been insured by Ambac.

[9] A "Senior COFINA Bond Claim (National)" is a Bond Claim on account of a "Senior" Existing Security, the repayment of which has been insured by National.

[10] A "Junior COFINA Bond Claim (Assured)" is a Bond Claim on account of a "First Subordinate" Existing Security, the scheduled repayment of which has been insured by Assured in accordance with the terms of the Assured Insurance Policies, including pursuant to a secondary market insurance policies.

With respect to holders of Senior COFINA Bond Claims (Class 1) and Junior COFINA Bond Claims (Class 5), only certain holders are entitled to make a taxable election if they meet certain requirements. Please see Section III below in this Questions and Answers.

**9. I received a Ballot and/or an Election Notice. What are my options?**

*Class 1 – Senior COFINA Bond Claims*:

If you received a Ballot indicating that you are a holder of a Senior COFINA Bond Claim in Class 1, you may cast a vote to accept or reject the Plan of Adjustment. Please refer to the Ballot for detailed instructions on how to cast your vote. For information on the treatment of your Claim, please refer to the Disclosure Statement and Plan of Adjustment.

If you received an Election Notice indicating that you are a holder of a Senior COFINA Bond Claim in Class 1, you may be eligible to elect to receive your distribution pursuant to the Plan of Adjustment in the form of the Senior Taxable Bond Distribution and be treated under Class 4 (Senior COFINA Bond Claim (Taxable Election)). Please see Section III below in this Questions and Answers. For a summary of the eligibility requirements to make such election, please see Question 19 below, and for more information on such requirements, refer to the Disclosure Statement and Plan of Adjustment. Please refer to the Election Notice for detailed instructions on how to make your election. For more information on the treatment of your Claim pursuant to such election, please refer to the Disclosure Statement and Plan of Adjustment.

*Class 2 - Senior COFINA Bond Claims (Ambac)*:

If you received an Election Notice indicating that you are a holder of Senior COFINA Bond Claims (Ambac) in Class 2, you are not entitled to vote to accept or reject the Plan of Adjustment and will not receive a separate Ballot for such purpose. However, you are entitled to make an election of the form of distribution pursuant to the Plan of Adjustment. You may elect to receive on the Effective Date, in full satisfaction, release, and exchange of your Senior COFINA Bond Claim (Ambac), a pro rata share of:

(1) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of section 6.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall be deemed to have agreed to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates); or

(2) the Ambac Certificates described in Sections 6.3 and 17.1 of the Plan of Adjustment.

If you (i) fail to timely elect to receive the Ambac Certificates or (ii) submit an election for less than all of your Class 2 Claims (in which case, such election shall be void and of no force or effect), then you will be deemed to have elected to commute the Ambac Insurance

Policy, to release and discharge Ambac's obligations pursuant to the Ambac Insurance Policy and to receive distributions in accordance with clause (1) above.

Please refer to the Election Notice for detailed instructions on how to make your election. For more information on the treatment of your Claim pursuant to such election, please refer to the Disclosure Statement and Plan of Adjustment.

### *Class 3 - Senior COFINA Bond Claims (National)*:

If you received an Election Notice indicating that you are a holder of Senior COFINA Bond Claims (National) in Class 3, you are not entitled to vote to accept or reject the Plan of Adjustment and will not receive a separate Ballot for such purpose. However, you are entitled to make an election of the form of distribution pursuant to the Plan of Adjustment. You may elect to receive on the Effective Date, in full satisfaction, release, and exchange of your Senior COFINA Bond Claim (National), a pro rata share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) Cash, distributable by or at the direction of National, in accordance with the provisions of section 7.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall be deemed to have agreed to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust, or the National Certificates); or

(2) the National Certificates described in Sections 7.3 and 17.2 of the Plan.

If you (i) fail to timely elect to receive the National Certificates or (ii) submit an election for less than all of your Class 2 Claims (in which case, such election shall be void and of no force or effect), then you will be deemed to have elected to commute the National Insurance Policies, to release and discharge National's obligations under the National Policies, and to receive distributions in accordance with clause (1) above.

Please refer to the Election Notice for detailed instructions on how to make your election. For more information on the treatment of your Claim pursuant to such election, please refer to the Disclosure Statement and Plan of Adjustment.

### *Class 5 – Junior COFINA Bond Claims*:

If you received a Ballot indicating that you are a holder of a Junior COFINA Bond Claim in Class 5, you may cast a vote to accept or reject the Plan of Adjustment. Please refer to the Ballot for detailed instructions on how to cast your vote. For information on the treatment of your Claim, please refer to the Disclosure Statement and Plan of Adjustment.

If you received an Election Notice indicating that you are a holder of a Junior COFINA Bond Claim in Class 5, you may be eligible to elect to receive your distribution pursuant to the

Plan of Adjustment in the form of the Junior Taxable Bond Distribution and be treated under Class 7 (Junior COFINA Bond Claim (Taxable Election)). Please see Section III below in this Questions and Answers. For a summary of the eligibility requirements to make such election, please see Question 19 below, and for more information on such requirements, refer to the Disclosure Statement and Plan of Adjustment. Please refer to the Election Notice for detailed instructions on how to make your election. For more information on the treatment of your Claim pursuant to such election, please refer to the Disclosure Statement and Plan of Adjustment.

### *Class 6 – Junior COFINA Bond Claims (Assured)*:

If you received the Class 6 Notice indicating that you are a beneficial holder of securities giving rise to Claims under Class 6 (Senior COFINA Bond Claims (Assured)), you are not entitled to vote to accept or reject the Plan of Adjustment and will not receive a separate Ballot for such purpose. You are also not entitled to make an election of the form of distribution pursuant to the Plan of Adjustment and will not receive a separate Election Notice.

### *Class 8 – GS Derivative Claim*:

If you received a Ballot indicating that you are a holder of the GS Derivative Claim in Class 8, you may cast a vote to accept or reject the Plan of Adjustment. Please refer to the Ballot for detailed instructions on how to cast your vote. For information on the treatment of your Claim, please refer to the Disclosure Statement and Plan of Adjustment.

### *Class 9 – General Unsecured Claims*:

If you received a Ballot indicating that you are a holder of a General Unsecured Claim in Class 9, you may cast a vote to accept or reject the Plan of Adjustment. Please refer to the Ballot for detailed instructions on how to cast your vote. For information on the treatment of your Claim, please refer to the Disclosure Statement and Plan of Adjustment.

**10.** **How do I submit a Ballot?**

If you received a Ballot indicating that you are a holder of a Claim in Classes 1 or 5:

> To submit a Ballot and have your vote counted, you must complete, sign, and return your Ballot in the included envelope so that it is received by your broker, bank, commercial bank, trust company, dealer, or other agent or nominee (the "Nominee") (or otherwise follow the instructions of your Nominee) to permit your Nominee to complete and return a master ballot (a "Master Ballot") to the Balloting Agent so the Master Ballot is actually received by the Balloting Agent no later than the Voting Deadline (5:00 p.m. (Atlantic Standard Time) on January 8, 2019).

Do not mail or return Ballots directly to the Oversight Board, COFINA, AAFAF, the Title III Court, or the Balloting Agent.  Please contact your Nominee with any questions regarding the date the Nominee needs to receive your Ballot in order to timely submit the Master Ballot to the Balloting Agent.

If you received a Ballot indicating that you are a holder of a Claim in Classes 8 or 9:

To submit a Ballot and have your vote counted, you must complete, sign, and return your Ballot so that it is received by the Balloting Agent at the address listed on the Ballot no later than the Voting Deadline (5:00 p.m. (Atlantic Standard Time) on January 8, 2019).  Ballots must be delivered to the Balloting Agent (i) at the address listed on the Ballot (or in the enclosed envelope, which may have a different zip code) or (ii) via Prime Clerk's E-Ballot platform by visiting https://cases.primeclerk.com/puertorico, clicking on the "Submit E-Ballot" link and following the instructions set forth on the website.  Holders are encouraged to submit their Ballots via the E-Ballot platform.  If you choose to submit your Ballot via the E-Ballot platform, you should NOT submit your paper copy Ballot as well.  Please choose only one form of return of your Ballot.

## 11. How do I make an election of the form of distribution to be received pursuant to the Plan of Adjustment?

To make an election of the form of distribution to be received pursuant to the Plan of Adjustment, you must instruct your broker or nominee to electronically deliver your Existing Securities via the Automatic Tender Offer Program ("ATOP") at The Depositary Trust Company ("DTC").  If you are a holder of Claims in Class 1 or 5, you must also certify via DTC's ATOP system that you are either a Puerto Rico Investor or Puerto Rico Institution.  No paperwork is required to be delivered to Prime Clerk LLC to effectuate the election.

Please refer to your Election Notice for more detailed information on how to make your election.

## 12. Can I split my vote on the Plan of Adjustment?

No, you may not split your vote on the Plan of Adjustment with respect to the Claims you hold in a Class. You must vote all the Claims you hold in a Class to accept or reject the Plan of Adjustment. If you also hold Claims in other Classes, you may receive more than one Ballot, labeled for a different Class of Claims.  Your vote will be counted in determining acceptance or rejection of the Plan of Adjustment by a particular Class of Claims only if you complete, sign, and return the Ballot labeled for that Class of Claims in accordance with the instructions on the Ballot.  Holders of Claims in Classes 1 or 5 who validly elect to receive the Taxable Bond Distribution are deemed to vote to accept the Plan of Adjustment.

## 13. Can I split my election?

No, you may not split your election of the form of distribution to be received pursuant to the Plan of Adjustment with respect to the Claims you hold in a Class.  If you make an election,

you must make such election with respect to all the Claims you hold in a Class. If you also hold Claims in other Classes and are entitled to make an election with respect to such Claims, you may receive more than one Election Notice, labeled for a different Class of Claims. Your election will be registered only if you make such election in accordance with the instructions on the Election Notice.

**14.    What is the Voting Deadline?**

*For holders of Claims in Classes 1 and 5*:  If you are returning your Ballot to the Nominee, please allow sufficient time to permit your Nominee to complete and return a Master Ballot to Prime Clerk LLC so that the Master Ballot is received by Prime Clerk LLC no later than 5:00 p.m. (Atlantic Standard Time) on January 8, 2019 (the "Voting Deadline"). Please follow the instructions of the Nominee to permit the Nominee to complete and return a Master Ballot on or before the Voting Deadline.

*For holders of Claims in Classes 8 and 9*:  If you are returning your Ballot to the Balloting Agent, the Ballot must be received by the Balloting Agent no later than 5:00 p.m. (Atlantic Standard Time) on January 8, 2019.

**15.    What is the Election Deadline?**

An election of the form of distribution pursuant to the Plan of Adjustment must be made in accordance with the instructions on the Election Notice by no later than 5:00 p.m. (Atlantic Standard Time) on January 8, 2019 (the "Election Deadline"). Elections made after the Election Deadline will not be considered.

**16.**     <u>Can I change my mind after I submit my Ballot?</u>

Yes, if you submit more than one Ballot voting the same Claim(s) before the Voting Deadline, the last properly completed Ballot received by the Balloting Agent before the Voting Deadline will be deemed to reflect your vote, and will supersede any prior Ballots submitted. Once the Voting Deadline has passed, you may no longer change your vote.

**17.**     <u>Can I change my mind after I make an election?</u>

Yes, you may revoke an election and withdraw your Existing Securities tendered through DTC's ATOP at any time before the Election Deadline. If you revoke your election at any time before the Election Deadline, you may once again make an election of the form of distribution pursuant to the Plan of Adjustment at any time before the Election Deadline. Please refer to the instructions on the Election Notice to revoke or make an election.

### III. QUESTIONS ABOUT THE TAXABLE ELECTION

The following are certain questions and answers relating to certain aspects of the election a Puerto Rico domiciled bondholder may make in order to participate in Class 4 or 7 and receive the Taxable Bond Distribution. The questions and answers should be read as a supplement to the full Plan of Adjustment and you should seek professional advice to determine the most appropriate course of action to best meet your goals and objectives.

**18.**     <u>What is the taxable election?</u>

If you make the taxable election, you will receive COFINA Bonds that are federally taxable and receive a fee of 2% (net of any administrative costs of the election process—expected to be $1/10^{th}$ of 1%) of your Claim in cash. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section XV of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. The amount of available cash set aside is $60 million and will satisfy up to $3 billion of bondholders making the taxable election. Classes 4 and 7 are guaranteed an allocation of a minimum of $1 billion of COFINA Bonds. To the extent subscriptions exceed $1 billion, you may only receive a pro rata portion of your subscription amount. If subscriptions exceed available COFINA Bonds, Puerto Rico Investor subscriptions will be filled first.

The federally taxable COFINA Bonds will be current interest securities that will have semi-annual cash flows consisting of interest and principal until maturity. For applicable bondholders not making the taxable election, bondholders will receive a pro rata share of the COFINA Bonds. It is expected that this portion will be primarily U.S. tax-exempt securities and may also include some federally taxable bonds. In either case, all of such bonds will be exempt from current Puerto Rico income taxes. Additionally, the pro rata portion of the COFINA Bonds will be a mixture of both Current Interest Bonds (semi-annual interest until maturity) and Capital Appreciation Bonds (no cash flow until principal amortization dates). Tables 1 and 2 below are amortizations of cash flows expected to be received by bondholders under the options available for holders of Claims in Classes 1 and 5. Schedule 1 relates to Existing Securities giving rise to

Claims under Class 1, and Schedule 2 relates to Existing Securities giving rise to Claims under Class 5.

If you elect to receive federally taxable COFINA Bonds, your COFINA Bonds will have an expected average life of 19.8 years and an average interest rate of 4.55%.

If you elect to receive federally tax-exempt COFINA Bonds, your COFINA Bonds will have an expected average life of 28.2 years and an average interest rate of approximately 4.85%.

Please review the cash flows for the two alternatives below carefully. The federally taxable COFINA Bonds, which are exempt from current Puerto Rico income taxes, are shorter in duration, and for that reason, have a higher total cash flow in years outstanding. The federally tax-exempt COFINA Bonds have a significantly longer duration and provide cash flow to the bondholder over that longer time period. For that reason, the tax-exempt COFINA Bonds have a smaller cash flow receipt to the bondholder.

If you intend to sell your bonds immediately or at some point in the future, please consult your financial advisor to discuss your options in more detail. The value of Taxable COFINA Bonds may or may not be less than the value of the tax-exempt COFINA Bonds in a secondary market resale as a result of factors that may include the size of your COFINA Bond holdings, demand in the secondary market, the value of federal and local tax exemptions, and interest rates, among other factors.

Holders of Claims in Classes 1 or 5 who validly elect to receive the Taxable Bond Distribution are deemed to vote to accept the Plan of Adjustment.

*[Remainder of page intentionally left blank]*

### Table 1A – Illustrative Example of $50,000 holdings of "Senior" Existing Securities If You ELECT to Receive Taxable COFINA Bonds.

| Determination of Recovery | Claim $ | Base Recovery % | Base Recovery $ | 2% Cash Fee | Total Recovery $ |
|---|---|---|---|---|---|
| COFINA Senior | $50,000.00 | 93.01% | $46,505.00 | $1,000.00 | $47,505.00 |
| COFINA Subordinate | | 56.41% | | | |
| Total | $50,000.00 | 93.01% | $46,505.00 | $1,000.00 | $47,505.00 |

| Recovery in Bonds and Cash | |
|---|---|
| Total Par | $46,000.00 |
| Rounding Cash | 505.00 |
| Total Par & Rounding Cash | $46,505.00 |
| 2% Cash Fee | 1,000.00 |
| Total Par, Rounding Cash & 2% Cash Fee | $47,505.00 |

Summary of New Bond Terms

| Current Interest Bond Terms | | | Capital Appreciation Bond Terms | | | | |
|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Par | Final Maturity | Yield | Initial Principal $ | Accreted Interest $ | Total Cash Flow $ |
| Total | | $46,000.00 | Total | | - | - | - |
| 2034 | 4.500% | - | 2024 | 4.250% | | | |
| 2040 | 4.550% | 46,000.00 | 2027 | 4.375% | | | |
| 2053 | 4.750% | - | 2029 | 4.375% | | | |
| 2058 | 5.000% | - | 2031 | 4.500% | | | |
| | | | 2033 | 4.500% | | | |
| | | | 2046 | 5.375% | | | |
| | | | 2051 | 5.625% | | | |

| (7/1) Year | Yr# | Current Interest Bonds | | Capital Appreciation Bonds | | All Bonds | Rounding Cash | 2% Cash Fee | Total Cash Flow | Cumulative Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Initial Principal | Accreted Interest | Principal & Interest | | | | |
| Total | | $46,000.00 | $41,321.58 | $- | $- | $87,321.58 | $505.00 | $1,000.00 | $88,826.58 | |
| 2019 | 1 | - | 1,918.58 | - | - | 1,918.58 | 505.00 | 1,000.00 | 3,423.58 | 3,423.58 |
| 2020 | 2 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 5,516.58 |
| 2021 | 3 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 7,609.58 |
| 2022 | 4 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 9,702.58 |
| 2023 | 5 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 11,795.58 |
| 2024 | 6 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 13,888.58 |
| 2025 | 7 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 15,981.58 |
| 2026 | 8 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 18,074.58 |
| 2027 | 9 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 20,167.58 |
| 2028 | 10 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 22,260.58 |
| 2029 | 11 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 24,353.58 |
| 2030 | 12 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 26,446.58 |
| 2031 | 13 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 28,539.58 |
| 2032 | 14 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 30,632.58 |
| 2033 | 15 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 32,725.58 |
| 2034 | 16 | - | 2,093.00 | - | - | 2,093.00 | - | - | 2,093.00 | 34,818.58 |
| 2035 | 17 | 6,000.00 | 2,093.00 | - | - | 8,093.00 | - | - | 8,093.00 | 42,911.58 |
| 2036 | 18 | 6,000.00 | 1,820.00 | - | - | 7,820.00 | - | - | 7,820.00 | 50,731.58 |
| 2037 | 19 | 7,000.00 | 1,547.00 | - | - | 8,547.00 | - | - | 8,547.00 | 59,278.58 |
| 2038 | 20 | 8,000.00 | 1,228.50 | - | - | 9,228.50 | - | - | 9,228.50 | 68,507.08 |
| 2039 | 21 | 9,000.00 | 864.50 | - | - | 9,864.50 | - | - | 9,864.50 | 78,371.58 |
| 2040 | 22 | 10,000.00 | 455.00 | - | - | 10,455.00 | - | - | 10,455.00 | 88,826.58 |
| 2041 | 23 | - | - | - | - | - | | | - | |
| 2042 | 24 | - | - | - | - | - | | | - | |
| 2043 | 25 | - | - | - | - | - | | | - | |
| 2044 | 26 | - | - | - | - | - | - | - | - | - |
| 2045 | 27 | - | - | - | - | - | - | - | - | - |
| 2046 | 28 | - | - | - | - | - | - | - | - | - |
| 2047 | 29 | - | - | - | - | - | - | - | - | - |
| 2048 | 30 | - | - | - | - | - | - | - | - | - |
| 2049 | 31 | - | - | - | - | - | - | - | - | - |
| 2050 | 32 | - | - | - | - | - | - | - | - | - |
| 2051 | 33 | - | - | - | - | - | - | - | - | - |
| 2052 | 34 | - | - | - | - | - | - | - | - | - |
| 2053 | 35 | - | - | - | - | - | - | - | - | - |
| 2054 | 36 | - | - | - | - | - | - | - | - | - |
| 2055 | 37 | - | - | - | - | - | - | - | - | - |
| 2056 | 38 | - | - | - | - | - | - | - | - | - |
| 2057 | 39 | - | - | - | - | - | - | - | - | - |
| 2058 | 40 | - | - | - | - | - | - | - | - | - |

*Analysis is Illustrative and does not factor in Section 103 Cash. All of the bonds will be Taxable.
Actual Allocation of New COFINA Bonds will vary and Actual Sinking Fund Redemptions will vary.

xiii

### Table 1B – Illustrative Example of $50,000 holdings of "Senior" Existing Securities If You __DO NOT__ Elect to Receive Taxable COFINA Bonds.

| Determination of Recovery | Claim $ | Base Recovery % | Net Cash Recovery $ | Cash Available for Distribution | Total Recovery $ |
|---|---|---|---|---|---|
| COFINA Senior | $50,000.00 | 93.01% | $42,513.61 | $3,991.39 | $46,505.00 |
| COFINA Subordinate | | 56.41% | | | |
| Total | $50,000.00 | 93.01% | $42,513.61 | $3,991.39 | $46,505.00 |

| Recovery in Bonds and Cash | |
|---|---|
| Total Par | $42,346.83 |
| Rounding Cash | 166.78 |
| Total Par & Rounding Cash | $42,513.61 |
| Cash Available for Distribution | 3,991.39 |
| Total Par, Rounding Cash & 2% Cash Fee | $46,505.00 |

**Summary of New Bond Terms**

| Current Interest Bond Terms | | | Capital Appreciation Bond Terms | | | | |
|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Par | Final Maturity | Yield | Initial Principal | Accreted Interest | Total Cash Flow |
| Total | | $32,000.00 | Total | | $10,346.83 | $25,905.12 | $36,251.95 |
| 2034 | 4.500% | 1,000.00 | 2024 | 4.250% | 779.71 | 220.29 | 1,000.00 |
| 2040 | 4.550% | 10,000.00 | 2027 | 4.375% | 679.83 | 320.17 | 1,000.00 |
| 2053 | 4.750% | 6,000.00 | 2029 | 4.375% | 623.46 | 376.54 | 1,000.00 |
| 2058 | 5.000% | 15,000.00 | 2031 | 4.500% | 562.81 | 437.19 | 1,000.00 |
| | | | 2033 | 4.500% | 1,029.76 | 926.71 | 1,956.47 |
| | | | 2046 | 5.375% | 4,094.46 | 11,734.92 | 15,829.38 |
| | | | 2051 | 5.625% | 2,576.80 | 11,889.30 | 14,466.10 |

| (7/1) Year | Yr# | Current Interest Bonds Principal | Current Interest Bonds Interest | Capital Appreciation Bonds Initial Principal | Capital Appreciation Bonds Accreted Interest | All Bonds Principal & Interest | Rounding Cash | Cash Available for Distribution | Total Cash Flow | Cumulative Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| Total | | $32,000.00 | $47,979.08 | $10,346.83 | $25,905.12 | $116,231.03 | $166.78 | $3,991.39 | $120,389.20 | |
| 2019 | 1 | - | 1,407.08 | - | - | 1,407.08 | 166.78 | 3,991.39 | 5,565.25 | 5,565.25 |
| 2020 | 2 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 7,100.25 |
| 2021 | 3 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 8,635.25 |
| 2022 | 4 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 10,170.25 |
| 2023 | 5 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 11,705.25 |
| 2024 | 6 | - | 1,535.00 | 779.71 | 220.29 | 2,535.00 | - | - | 2,535.00 | 14,240.25 |
| 2025 | 7 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 15,775.25 |
| 2026 | 8 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 17,310.25 |
| 2027 | 9 | - | 1,535.00 | 679.83 | 320.17 | 2,535.00 | - | - | 2,535.00 | 19,845.25 |
| 2028 | 10 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 21,380.25 |
| 2029 | 11 | - | 1,535.00 | 623.46 | 376.54 | 2,535.00 | - | - | 2,535.00 | 23,915.25 |
| 2030 | 12 | - | 1,535.00 | - | - | 1,535.00 | - | - | 1,535.00 | 25,450.25 |
| 2031 | 13 | - | 1,535.00 | 562.81 | 437.19 | 2,535.00 | - | - | 2,535.00 | 27,985.25 |
| 2032 | 14 | - | 1,535.00 | 514.88 | 441.59 | 2,491.47 | - | - | 2,491.47 | 30,476.72 |
| 2033 | 15 | - | 1,535.00 | 514.88 | 485.12 | 2,535.00 | - | - | 2,535.00 | 33,011.72 |
| 2034 | 16 | 1,000.00 | 1,535.00 | - | - | 2,535.00 | - | - | 2,535.00 | 35,546.72 |
| 2035 | 17 | 1,000.00 | 1,490.00 | - | - | 2,490.00 | - | - | 2,490.00 | 38,036.72 |
| 2036 | 18 | 1,000.00 | 1,444.50 | - | - | 2,444.50 | - | - | 2,444.50 | 40,481.22 |
| 2037 | 19 | 2,000.00 | 1,399.00 | - | - | 3,399.00 | - | - | 3,399.00 | 43,880.22 |
| 2038 | 20 | 2,000.00 | 1,308.00 | - | - | 3,308.00 | - | - | 3,308.00 | 47,188.22 |
| 2039 | 21 | 2,000.00 | 1,217.00 | - | - | 3,217.00 | - | - | 3,217.00 | 50,405.22 |
| 2040 | 22 | 2,000.00 | 1,126.00 | - | - | 3,126.00 | - | - | 3,126.00 | 53,531.22 |
| 2041 | 23 | - | 1,035.00 | 682.41 | 1,618.74 | 3,336.15 | - | - | 3,336.15 | 56,867.37 |
| 2042 | 24 | - | 1,035.00 | 682.41 | 1,744.08 | 3,461.49 | - | - | 3,461.49 | 60,328.86 |
| 2043 | 25 | - | 1,035.00 | 682.41 | 1,876.26 | 3,593.67 | - | - | 3,593.67 | 63,922.53 |
| 2044 | 26 | - | 1,035.00 | 682.41 | 2,015.64 | 3,733.05 | - | - | 3,733.05 | 67,655.58 |
| 2045 | 27 | - | 1,035.00 | 682.41 | 2,162.61 | 3,880.02 | - | - | 3,880.02 | 71,535.60 |
| 2046 | 28 | - | 1,035.00 | 682.41 | 2,317.59 | 4,035.00 | - | - | 4,035.00 | 75,570.60 |
| 2047 | 29 | - | 1,035.00 | 483.15 | 1,919.85 | 3,438.00 | - | - | 3,438.00 | 79,008.60 |
| 2048 | 30 | - | 1,035.00 | 483.15 | 2,056.92 | 3,575.07 | - | - | 3,575.07 | 82,583.67 |
| 2049 | 31 | - | 1,035.00 | 483.15 | 2,201.79 | 3,719.94 | - | - | 3,719.94 | 86,303.61 |
| 2050 | 32 | - | 1,035.00 | 483.15 | 2,354.94 | 3,873.09 | - | - | 3,873.09 | 90,176.70 |
| 2051 | 33 | - | 1,035.00 | 644.20 | 3,355.80 | 5,035.00 | - | - | 5,035.00 | 95,211.70 |
| 2052 | 34 | 3,000.00 | 1,035.00 | - | - | 4,035.00 | - | - | 4,035.00 | 99,246.70 |
| 2053 | 35 | 3,000.00 | 892.50 | - | - | 3,892.50 | - | - | 3,892.50 | 103,139.20 |
| 2054 | 36 | 3,000.00 | 750.00 | - | - | 3,750.00 | - | - | 3,750.00 | 106,889.20 |
| 2055 | 37 | 3,000.00 | 600.00 | - | - | 3,600.00 | - | - | 3,600.00 | 110,489.20 |
| 2056 | 38 | 3,000.00 | 450.00 | - | - | 3,450.00 | - | - | 3,450.00 | 113,939.20 |
| 2057 | 39 | 3,000.00 | 300.00 | - | - | 3,300.00 | - | - | 3,300.00 | 117,239.20 |
| 2058 | 40 | 3,000.00 | 150.00 | - | - | 3,150.00 | - | - | 3,150.00 | 120,389.20 |

*Analysis is Illustrative and does not factor in Section 103 Cash. Cash Available for Distribution is estimated. A portion of the bonds may be Taxable.
Actual Allocation of New COFINA Bonds will vary and Actual Sinking Fund Redemptions will vary.

101361236v29

**Table 2A –** **Illustrative Example of $50,000 holdings of "First Subordinate" Existing Securities If You <u>ELECT</u> to Receive Taxable COFINA Bonds.**

| Determination of Recovery | Claim $ | Base Recovery % | Base Recovery $ | 2% Cash Fee | Total Recovery $ |
|---|---|---|---|---|---|
| COFINA Senior | - | 93.01% | - | - | - |
| COFINA Subordinate | $50,000.00 | 56.41% | $28,205.00 | $1,000.00 | $29,205.00 |
| Total | $50,000.00 | 56.41% | $28,205.00 | $1,000.00 | $29,205.00 |

| Recovery in Bonds and Cash | |
|---|---|
| Total Par | $28,000.00 |
| Rounding Cash | 205.00 |
| Total Par & Rounding Cash | $28,205.00 |
| 2% Cash Fee | 1,000.00 |
| Total Par, Rounding Cash & 2% Cash Fee | $29,205.00 |

**Summary of New Bond Terms**

| Current Interest Bond Terms | | | Capital Appreciation Bond Terms | | | | |
|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Par | Final Maturity | Yield | Initial Principal | Accreted Interest | Total Cash Flow |
| Total | | $28,000.00 | Total | | $- | $- | $- |
| 2034 | 4.500% | - | 2024 | 4.250% | - | - | - |
| 2040 | 4.550% | 28,000.00 | 2027 | 4.375% | - | - | - |
| 2053 | 4.750% | - | 2029 | 4.375% | - | - | - |
| 2058 | 5.000% | - | 2031 | 4.500% | - | - | - |
| | | | 2033 | 4.500% | - | - | - |
| | | | 2046 | 5.375% | - | - | - |
| | | | 2051 | 5.625% | - | - | - |

| (7/1) | | Current Interest Bonds | | Capital Appreciation Bonds | | All Bonds | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Year | Yr# | Principal | Interest | Initial Principal | Accreted Interest | Principal & Interest | Rounding Cash | 2% Cash Fee | Total Cash Flow | Cumulative Cash Flow |
| Total | | $28,000.00 | $25,055.33 | $- | $- | $53,055.33 | $205.00 | $1,000.00 | $54,260.33 | |
| 2019 | 1 | - | 1,167.83 | - | - | 1,167.83 | 205.00 | 1,000.00 | 2,372.83 | 2,372.83 |
| 2020 | 2 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 3,646.83 |
| 2021 | 3 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 4,920.83 |
| 2022 | 4 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 6,194.83 |
| 2023 | 5 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 7,468.83 |
| 2024 | 6 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 8,742.83 |
| 2025 | 7 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 10,016.83 |
| 2026 | 8 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 11,290.83 |
| 2027 | 9 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 12,564.83 |
| 2028 | 10 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 13,838.83 |
| 2029 | 11 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 15,112.83 |
| 2030 | 12 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 16,386.83 |
| 2031 | 13 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 17,660.83 |
| 2032 | 14 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 18,934.83 |
| 2033 | 15 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 20,208.83 |
| 2034 | 16 | - | 1,274.00 | - | - | 1,274.00 | - | - | 1,274.00 | 21,482.83 |
| 2035 | 17 | 4,000.00 | 1,274.00 | - | - | 5,274.00 | - | - | 5,274.00 | 26,756.83 |
| 2036 | 18 | 4,000.00 | 1,092.00 | - | - | 5,092.00 | - | - | 5,092.00 | 31,848.83 |
| 2037 | 19 | 4,000.00 | 910.00 | - | - | 4,910.00 | - | - | 4,910.00 | 36,758.83 |
| 2038 | 20 | 5,000.00 | 728.00 | - | - | 5,728.00 | - | - | 5,728.00 | 42,486.83 |
| 2039 | 21 | 5,000.00 | 500.50 | - | - | 5,500.50 | - | - | 5,500.50 | 47,987.33 |
| 2040 | 22 | 6,000.00 | 273.00 | - | - | 6,273.00 | - | - | 6,273.00 | 54,260.33 |
| 2041 | 23 | - | - | - | - | - | - | - | - | - |
| 2042 | 24 | - | - | - | - | - | - | - | - | - |
| 2043 | 25 | - | - | - | - | - | - | - | - | - |
| 2044 | 26 | - | - | - | - | - | - | - | - | - |
| 2045 | 27 | - | - | - | - | - | - | - | - | - |
| 2046 | 28 | - | - | - | - | - | - | - | - | - |
| 2047 | 29 | - | - | - | - | - | - | - | - | - |
| 2048 | 30 | - | - | - | - | - | - | - | - | - |
| 2049 | 31 | - | - | - | - | - | - | - | - | - |
| 2050 | 32 | - | - | - | - | - | - | - | - | - |
| 2051 | 33 | - | - | - | - | - | - | - | - | - |
| 2052 | 34 | - | - | - | - | - | - | - | - | - |
| 2053 | 35 | - | - | - | - | - | - | - | - | - |
| 2054 | 36 | - | - | - | - | - | - | - | - | - |
| 2055 | 37 | - | - | - | - | - | - | - | - | - |
| 2056 | 38 | - | - | - | - | - | - | - | - | - |
| 2057 | 39 | - | - | - | - | - | - | - | - | - |
| 2058 | 40 | - | - | - | - | - | - | - | - | - |

*Analysis is Illustrative and does not factor in Section 103 Cash. All of the bonds will be Taxable.

Actual Allocation of New COFINA Bonds will vary and Actual Sinking Fund Redemptions will vary.

**Table 2B –** **Illustrative Example of $50,000 holdings of "First Subordinate" Existing Securities If You <u>DO NOT</u> Elect to Receive Taxable COFINA Bonds.**

| Determination of Recovery | Claim $ | Base Recovery % | Net Cash Recovery $ | Cash Available for Distribution | Total Recovery $ |
|---|---|---|---|---|---|
| COFINA Senior | - | 93.01% | - | - | - |
| COFINA Subordinate | $50,000.00 | 56.41% | $28,205.00 | $- | $28,205.00 |
| Total | $50,000.00 | 56.41% | $28,205.00 | $- | $28,205.00 |

| Recovery in Bonds and Cash | |
|---|---|
| Total Par | $28,112.31 |
| Rounding Cash | 92.69 |
| Total Par & Rounding Cash | $28,205.00 |
| Cash Available for Distribution | - |
| Total Par, Rounding Cash & 2% Cash Fee | $28,205.00 |

Summary of New Bond Terms

| Current Interest Bond Terms | | | Capital Appreciation Bond Terms | | | | |
|---|---|---|---|---|---|---|---|
| Final Maturity | Rate | Par | Final Maturity | Yield | Initial Principal | Accreted Interest | Total Cash Flow |
| Total | | $21,000.00 | Total | | $7,112.31 | $15,849.96 | $22,962.27 |
| 2034 | 4.500% | 1,000.00 | 2024 | 4.250% | 779.71 | 220.29 | 1,000.00 |
| 2040 | 4.550% | 7,000.00 | 2027 | 4.375% | 679.83 | 320.17 | 1,000.00 |
| 2053 | 4.750% | 3,000.00 | 2029 | 4.375% | 623.46 | 376.54 | 1,000.00 |
| 2058 | 5.000% | 10,000.00 | 2031 | 4.500% | 562.81 | 437.19 | 1,000.00 |
| | | | 2033 | 4.500% | 514.88 | 485.12 | 1,000.00 |
| | | | 2046 | 5.375% | 2,502.17 | 7,283.70 | 9,785.87 |
| | | | 2051 | 5.625% | 1,449.45 | 6,726.95 | 8,176.40 |

| (7/1) Year | Yr# | Current Interest Bonds | | Capital Appreciation Bonds | | All Bonds | Rounding Cash | Cash Available for Distribution | Total Cash Flow | Cumulative Cash Flow |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Principal | Interest | Initial Principal | Accreted Interest | Principal & Interest | | | | |
| Total | | $21,000.00 | $30,900.67 | $7,112.31 | $15,849.96 | $74,862.94 | $92.69 | $- | $74,955.63 | |
| 2019 | 1 | - | 922.17 | - | - | 922.17 | 92.69 | - | 1,014.86 | 1,014.86 |
| 2020 | 2 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 2,020.86 |
| 2021 | 3 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 3,026.86 |
| 2022 | 4 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 4,032.86 |
| 2023 | 5 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 5,038.86 |
| 2024 | 6 | - | 1,006.00 | 779.71 | 220.29 | 2,006.00 | - | - | 2,006.00 | 7,044.86 |
| 2025 | 7 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 8,050.86 |
| 2026 | 8 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 9,056.86 |
| 2027 | 9 | - | 1,006.00 | 679.83 | 320.17 | 2,006.00 | - | - | 2,006.00 | 11,062.86 |
| 2028 | 10 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 12,068.86 |
| 2029 | 11 | - | 1,006.00 | 623.46 | 376.54 | 2,006.00 | - | - | 2,006.00 | 14,074.86 |
| 2030 | 12 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 15,080.86 |
| 2031 | 13 | - | 1,006.00 | 562.81 | 437.19 | 2,006.00 | - | - | 2,006.00 | 17,086.86 |
| 2032 | 14 | - | 1,006.00 | - | - | 1,006.00 | - | - | 1,006.00 | 18,092.86 |
| 2033 | 15 | - | 1,006.00 | 514.88 | 485.12 | 2,006.00 | - | - | 2,006.00 | 20,098.86 |
| 2034 | 16 | 1,000.00 | 1,006.00 | - | - | 2,006.00 | - | - | 2,006.00 | 22,104.86 |
| 2035 | 17 | 1,000.00 | 961.00 | - | - | 1,961.00 | - | - | 1,961.00 | 24,065.86 |
| 2036 | 18 | 1,000.00 | 915.50 | - | - | 1,915.50 | - | - | 1,915.50 | 25,981.36 |
| 2037 | 19 | 1,000.00 | 870.00 | - | - | 1,870.00 | - | - | 1,870.00 | 27,851.36 |
| 2038 | 20 | 1,000.00 | 824.50 | - | - | 1,824.50 | - | - | 1,824.50 | 29,675.86 |
| 2039 | 21 | 1,000.00 | 779.00 | - | - | 1,779.00 | - | - | 1,779.00 | 31,454.86 |
| 2040 | 22 | 2,000.00 | 733.50 | - | - | 2,733.50 | - | - | 2,733.50 | 34,188.36 |
| 2041 | 23 | - | 642.50 | 227.47 | 539.58 | 1,409.55 | - | - | 1,409.55 | 35,597.91 |
| 2042 | 24 | - | 642.50 | 454.94 | 1,162.72 | 2,260.16 | - | - | 2,260.16 | 37,858.07 |
| 2043 | 25 | - | 642.50 | 454.94 | 1,250.84 | 2,348.28 | - | - | 2,348.28 | 40,206.35 |
| 2044 | 26 | - | 642.50 | 454.94 | 1,343.76 | 2,441.20 | - | - | 2,441.20 | 42,647.55 |
| 2045 | 27 | - | 642.50 | 454.94 | 1,441.74 | 2,539.18 | - | - | 2,539.18 | 45,186.73 |
| 2046 | 28 | - | 642.50 | 454.94 | 1,545.06 | 2,642.50 | - | - | 2,642.50 | 47,829.23 |
| 2047 | 29 | - | 642.50 | 161.05 | 639.95 | 1,443.50 | - | - | 1,443.50 | 49,272.73 |
| 2048 | 30 | - | 642.50 | 322.10 | 1,371.28 | 2,335.88 | - | - | 2,335.88 | 51,608.61 |
| 2049 | 31 | - | 642.50 | 322.10 | 1,467.86 | 2,432.46 | - | - | 2,432.46 | 54,041.07 |
| 2050 | 32 | - | 642.50 | 322.10 | 1,569.96 | 2,534.56 | - | - | 2,534.56 | 56,575.63 |
| 2051 | 33 | - | 642.50 | 322.10 | 1,677.90 | 2,642.50 | - | - | 2,642.50 | 59,218.13 |
| 2052 | 34 | 1,000.00 | 642.50 | - | - | 1,642.50 | - | - | 1,642.50 | 60,860.63 |
| 2053 | 35 | 2,000.00 | 595.00 | - | - | 2,595.00 | - | - | 2,595.00 | 63,455.63 |
| 2054 | 36 | 2,000.00 | 500.00 | - | - | 2,500.00 | - | - | 2,500.00 | 65,955.63 |
| 2055 | 37 | 2,000.00 | 400.00 | - | - | 2,400.00 | - | - | 2,400.00 | 68,355.63 |
| 2056 | 38 | 2,000.00 | 300.00 | - | - | 2,300.00 | - | - | 2,300.00 | 70,655.63 |
| 2057 | 39 | 2,000.00 | 200.00 | - | - | 2,200.00 | - | - | 2,200.00 | 72,855.63 |
| 2058 | 40 | 2,000.00 | 100.00 | - | - | 2,100.00 | - | - | 2,100.00 | 74,955.63 |

*Analysis is Illustrative and does not factor in Section 103 Cash. Cash Available for Distribution is estimated. A portion of the bonds may be Taxable.
Actual Allocation of New COFINA Bonds will vary and Actual Sinking Fund Redemptions will vary.

101361236v29

19. **Am I eligible to make a taxable election?**

Only holders of Claims in Class 1 or Class 5 who are (i) a Puerto Rico Investor, or (ii) a Puerto Rico Institution may make a taxable election.

A holder of a Claim in Class 1 or Class 5 qualifies as:

- a **Puerto Rico Investor** if such holder is either,

    o A natural person that is a resident of the Commonwealth of Puerto Rico (for Puerto Rico personal income tax purposes), or

    o An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth of Puerto Rico (for Puerto Rico personal income tax purposes).

- a **Puerto Rico Institution** if such holder is not a Puerto Rico Investor and is an entity that is domiciled in Puerto Rico.

20. **Should I elect to receive taxable or tax-exempt COFINA Bonds?**

None of COFINA, the Oversight Board, the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF") and the Commonwealth of Puerto Rico make any recommendation as to whether you should elect to receive taxable or tax-exempt bonds. You should consult with your financial, tax, legal and other advisors in making your decision. Holders should consider their respective investment objectives and consult with their financial, tax, legal and other advisors for additional information, which may include evaluating the market value of each portfolio option prior to determining whether to elect to receive taxable or tax-exempt bonds.

101361236v29

## IV. QUESTIONS ABOUT THE EXISTING SECURITIES

**21.** **If my Existing Securities were entitled to interest in advance of COFINA's filing of its Title III case, will I receive that interest?**

Yes, interest due on the Existing Securities prior to the filing of COFINA's Title III case will be paid in cash to holders of Existing Securities as of the time distributions are made pursuant to the Plan of Adjustment.

**22.** **In addition to the COFINA Bonds, will I be receiving accrued but unpaid interest?**

The price you are receiving for your Existing Securities on exchange takes into account accrued but unpaid interest up to, but not including, the date of the filing of COFINA's Title III case on May 5, 2017. In addition to the price and interest on May 4, 2017, you will also be accruing interest on the COFINA Bonds, commencing August 1, 2018.

The Existing Securities composed of Current Interest Bonds will receive cash for interest accrued from each bond's last interest payment date through May 4, 2017, one day prior to the filing of COFINA's Title III case.

Interest Accruing from August 1, 2018 (based upon the par and coupon on the COFINA Bonds) to the Effective Date will be paid in cash from the COFINA Bonds portion of the Pledged Sales Tax Base Amount for Fiscal Year 2019.

## V. QUESTIONS ABOUT THE COFINA BONDS

**23.** **What are the COFINA Bonds being issued?**

On the Effective Date, Reorganized COFINA will issue the COFINA Bonds as (a) four series of Current Interest Bonds ("CIBs"), and (b) seven series of Capital Appreciation Bonds ("CABs"). The COFINA Bonds will be dated as of August 1, 2018 and will accrue or accrete interest, as applicable, from such date.

*CIBs.* The CIBs will mature on July 1 of the years, in the principal amounts, and bear interest at the rates set forth below:

| Maturity | Principal Amount | Interest Rate |
|---|---|---|
| 2034 | $ 375,090,000 | 4.500% |
| 2040 | 2,996,115,000 | 4.550 |
| 2053 | 1,451,135,000 | 4.750 |
| 2058 | 4,297,080,000 | 5.000 |

Interest on the CIBs that has accrued will be paid on the Effective Date and on each July 1 and January 1 thereafter (each such date an "Interest Payment Date"). Interest on the CIBs will be computed on the basis of a 360-day year consisting of twelve 30-day months. The CIBs will be issued as fully registered bonds in denominations of $1,000 or any integral multiples thereof.

*CABs.* The CABs will mature on July 1 of the years, in the principal amounts, and accrete at the rates, set forth below:

| Maturity | Initial Issuance Amount | Accretion Rate |
|---|---|---|
| 2024 | $  166,818,954.50 | 4.250% |
| 2027 | 246,346,597.95 | 4.375 |
| 2029 | 220,190,485.50 | 4.375 |
| 2031 | 256,162,971.50 | 4.500 |
| 2033 | 263,752,428.80 | 4.500 |
| 2046 | 1,108,991,315.10 | 5.375 |
| 2051 | 639,639,064.00 | 5.625 |

Interest on the CABs will be computed on the basis of a 360-day year consisting of twelve 30-day months.  The CABs will be issued as fully registered bonds in denominations of $1,000 or any integral multiples thereof.

If any such Interest Payment Date or maturity date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

See Article VIII of the Disclosure Statement for additional information regarding the COFINA Bonds to be issued.

## 24.    Are the COFINA Bonds secured?

The New Bond Legislation provides that the COFINA Bonds will be secured by a statutory first lien on all of COFINA's right, title and interest in and to the COFINA Pledged Taxes.  The statutory first lien shall automatically attach from the time such obligations are issued without further action or authorization by COFINA or any other entity, person, governmental authority or officer.  The statutory lien shall be valid and binding from the time such obligations are executed and delivered and the statutory lien shall automatically be effective, binding and enforceable against all Persons having claims of any kind in tort, contract or otherwise against COFINA or its assets irrespective of whether such Persons have notice of such lien.

25. **What will be the tax consequences for me pursuant to the Plan of Adjustment if it is confirmed?**

Your tax consequences pursuant to the Plan of Adjustment will depend on your elections and your specific circumstances. Generally, the Debtor expects that the exchange of the Existing Securities for the COFINA Bonds and cash will be a taxable transaction for U.S. federal income tax purposes. Please consult your own tax advisor regarding the federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan of Adjustment in light of your specific circumstances.

Article XV of the Disclosure Statement provides a summary of a general description of certain material U.S. federal income tax consequences of the Plan of Adjustment. Furthermore, Article XVI of the Disclosure Statement provides a summary of a general description of certain material Puerto Rico income tax consequences of the Plan of Adjustment. However, these discussions are not a substitute for careful tax planning and professional tax advice based upon your individual circumstances. You should seek advice based on your particular circumstances from your own tax advisor.

## VI.  ADDITIONAL INFORMATION

26. **Whom may I contact if I have questions or would like additional copies of this document?**

If you have any questions, or if you did not receive a copy of any Plan Materials or would like additional copies of this Questions and Answers or any Plan Materials, please contact Prime Clerk LLC by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), or by email at puertoricoballots@primeclerk.com.  Please do not direct any inquiries to COFINA, the Oversight Board, or the Title III Court.

### PLEASE NOTE

ALL THE TERMS AND CONDITIONS OF THE PLAN OF ADJUSTMENT ARE SET FORTH OR DESCRIBED IN THE PLAN MATERIALS, INCLUDING THE DISCLOSURE STATEMENT. YOU SHOULD READ EACH SUCH DOCUMENT THOROUGHLY IN ORDER TO MAKE AN INFORMED DECISION REGARDING THE PLAN OF ADJUSTMENT.  **BY SUBMITTING YOUR BALLOT AND/OR MAKING AN ELECTION IN CONNECTION WITH THE PLAN OF ADJUSTMENT, YOU SHALL BE DEEMED TO HAVE ACKNOWLEDGED AND REPRESENTED TO COFINA THAT YOU HAVE RECEIVED, AND HAVE HAD THE OPPORTUNITY TO REVIEW, THE PLAN OF ADJUSTMENT, THE QUESTIONS AND ANSWERS, THE DISCLOSURE STATEMENT AND THE OTHER PLAN MATERIALS PRIOR TO MAKING THE DECISION AS TO WHETHER OR NOT YOU SHOULD VOTE TO ACCEPT OR REJECT THE PLAN OF ADJUSTMENT OR MAKE AN ELECTION WITH RESPECT TO YOUR CLAIMS. THE SOLICITATION OF VOTES IS SUBJECT TO ALL TERMS AND CONDITIONS SET FORTH IN THE DISCLOSURE STATEMENT AND THE ORDER OF THE TITLE III COURT APPROVING THE DISCLOSURE STATEMENT**

**AND THE PROCEDURES FOR THE SOLICITATION OF VOTES TO ACCEPT OR REJECT THE PLAN OF ADJUSTMENT CONTAINED THEREIN.**

NO PERSON HAS BEEN AUTHORIZED TO GIVE ANY INFORMATION OR MAKE ANY REPRESENTATION REGARDING THE PLAN OF ADJUSTMENT ON BEHALF OF COFINA THAT IS NOT CONTAINED IN THESE QUESTIONS AND ANSWERS AND THE OTHER PLAN MATERIALS. IF GIVEN OR MADE, SUCH INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS IT HAS NOT BEEN AUTHORIZED.

**Table of Contents**

|  |  |  | Page |
|---|---|---|---|
| I. | Introduction | | 1 |
|  | A. | PROMESA Title III: An Overview | 5 |
|  | B. | Summary of Key Components of COFINA's Plan of Adjustment | 5 |
|  | C. | Holders of Claims Entitled to Vote on the Plan of Adjustment | 21 |
|  | D. | Solicitation and Voting Procedures | 23 |
|  | E. | Confirmation Hearing and Deadline for Objections to Confirmation | 24 |
| II. | Overview of COFINA | | 24 |
|  | A. | Historical Information About COFINA | 24 |
|  | B. | Summary of COFINA's Revenues, Assets, and Liabilities | 38 |
| III. | Significant Events Leading to Commencement of COFINA's Title III Case | | 40 |
|  | A. | The Commonwealth's Steady Operational and Financial Decline | 40 |
|  | B. | Creation of AAFAF | 43 |
|  | C. | Summary of PROMESA | 44 |
|  | D. | Adoption of Commonwealth Fiscal Plan and COFINA Fiscal Plan | 50 |
|  | E. | Summary of Certain Pre-Title III Litigation Relevant to COFINA | 53 |
|  | F. | Commencement of the Commonwealth Title III Case | 57 |
| IV. | Overview of COFINA's Title III Case | | 57 |
|  | A. | Commencement of COFINA's Title III Case | 57 |
|  | B. | Lex Claims Motion for Relief from the Automatic Stay | 57 |
|  | C. | Other Related Litigation | 58 |
|  | D. | Claims Process and Bar Date | 63 |
|  | E. | The Commonwealth-COFINA Dispute | 64 |
| V. | Compromises and Settlements | | 71 |
| VI. | The Title III Plan of Adjustment | | 77 |
|  | A. | Overview of the Plan of Adjustment | 77 |
|  | B. | Compromise and Settlement of Disputes | 78 |
|  | C. | Provisions for Payment of Administrative Expense Claims | 78 |
|  | D. | Classification and Treatment of Claims | 81 |
|  | E. | Provisions Regarding Allocation of Unsubscribed Taxable Election Cash | 92 |
|  | F. | Treatment of Executory Contracts and Unexpired Leases | 93 |
|  | G. | Provisions Governing Distributions | 95 |
|  | H. | Rights and Powers of Disbursing Agent | 100 |
|  | I. | Procedures for Treatment of Disputed Claims | 100 |
|  | J. | Acceptance or Rejection of the Plan of Adjustment, Effect of Rejection by One or More Classes of Claims | 103 |
|  | K. | Identification of Claims Impaired by the Plan and Not Impaired by the |  |

i

|  |  | Plan | 104 |
| L. | | Conditions Precedent to Confirmation of the Plan | 104 |
| M. | | Conditions Precedent to the Effective Date | 106 |
| N. | | Prosecution and Extinguishment of Claims Held by COFINA | 110 |
| O. | | Modification, Revocation, or Withdrawal of the Plan of Adjustment | 110 |
| P. | | Retention of Jurisdiction | 112 |
| Q. | | Miscellaneous Provisions | 114 |
| VII. | Confirmation of the Plan of Adjustment | | 127 |
| A. | | Confirmation Hearing | 127 |
| B. | | Deadlines to Object to Confirmation | 127 |
| C. | | Requirements for Confirmation of the Plan of Adjustment | 129 |
| VIII. | Provisions Regarding COFINA Bonds | | 134 |
| A. | | General | 135 |
| B. | | Redemption | 136 |
| C. | | Collateral for Repayment of COFINA Bonds | 141 |
| D. | | Statutory Lien | 142 |
| E. | | Application of COFINA Revenues | 143 |
| F. | | Refunding Bonds | 143 |
| G. | | Certain Covenants of Reorganized COFINA | 145 |
| H. | | Bond Indenture | 147 |
| I. | | Defeasance | 153 |
| J. | | Certain Provisions Relating to Capital Appreciation Bonds | 154 |
| K. | | Notices | 155 |
| L. | | Governing Law | 155 |
| M. | | Venue | 155 |
| N. | | Book-Entry Only | 155 |
| O. | | Continuing Disclosure | 156 |
| IX. | Trusts | | 159 |
| A. | | Terms of Ambac Trust | 159 |
| B. | | Terms of National Trust | 161 |
| X. | New Bond Legislation | | 163 |
| A. | | Purpose and Separate Legal Existence of Reorganized COFINA | 163 |
| B. | | Ownership of the COFINA Revenues | 163 |
| C. | | Permitted and Prohibited Activities | 164 |
| D. | | Corporate Governance | 165 |
| E. | | The Plan of Adjustment | 165 |
| F. | | Covenants of the Commonwealth | 167 |
| XI. | Corporate Governance and Management of Reorganized COFINA | | 168 |
| A. | | Corporate Action | 168 |

101361236v29

| | B. | Amendment of By-Laws | 169 |
| | C. | Directors of the Reorganized COFINA | 169 |
| | D. | Officers of Reorganized COFINA | 169 |
| | E. | Structure for Collection and Application of COFINA Pledged Taxes | 169 |
| XII. | Sales and Use Taxes | | 170 |
| | A. | General | 170 |
| | B. | Collections by Source | 172 |
| | C. | COFINA Pledged Taxes | 173 |
| XIII. | Commonwealth Economic Indicators | | 175 |
| | A. | General | 175 |
| | B. | Historical Population Trends | 175 |
| | C. | Historical Personal Income Trends | 176 |
| | D. | Historical Personal Consumption Trends | 177 |
| | E. | Historical GNP Trends | 178 |
| XIV. | Certain Risk Factors to Be Considered | | 179 |
| | A. | Risks Related to the Title III Case | 180 |
| | B. | Risks Related to COFINA | 182 |
| | C. | Risks Related to the COFINA Bonds | 183 |
| | D. | Risks Related to the Collection of the Pledged Sales Tax | 190 |
| | E. | Risk Factors Related to Future Judicial Actions | 194 |
| | F. | Risks Related to Future Legislative Actions | 196 |
| | G. | Risks Related to Tax Treatment of the COFINA Bonds | 197 |
| XV. | Material United States Federal Income Tax Considerations | | 199 |
| | A. | General | 199 |
| | B. | U.S. Holders | 200 |
| | C. | Puerto Rico Individuals and Puerto Rico Corporations | 215 |
| | D. | Non-U.S. Holders | 217 |
| | E. | FATCA | 218 |
| XVI. | Certain Material Puerto Rico Income Tax Considerations | | 219 |
| | A. | P.R. Holders | 220 |
| | B. | Consequences to P.R. Holders | 220 |
| | C. | Non-P.R. Holders | 225 |
| XVII. | Applicability of Certain Federal and State Securities Laws | | 226 |
| | A. | General | 226 |
| XVIII. | Financial Information and Projections | | 228 |
| | A. | Financial Statements | 228 |
| | B. | COFINA Fiscal Plan and Projections | 228 |

XIX.  Additional Information ................................................................................................ 229

XX.   Conclusion ............................................................................................................... 229

**<u>Table of Exhibits</u>**

**<u>Exhibit A</u>** – The Plan of Adjustment

**<u>Exhibit B</u>** – The Amended PSA

**<u>Exhibit C</u>** – The Scheduled Amortization and Certain Other Terms of COFINA Bonds

**<u>Exhibit D</u>** – The Certified COFINA Fiscal Plan

**<u>Exhibit E</u>** – Audited Financial Statements for COFINA for the Year Ended June 30, 2015

**<u>Exhibit F</u>** – The English Version of the New Bond Legislation

**<u>Exhibit G</u>** – A Schedule of Existing Securities Listed by CUSIP and Class, as Determined Prior to Elections made Pursuant to the Plan of Adjustment

101361236v29

# I. **Introduction**

THE FOLLOWING STATEMENTS IN THIS SECTION I ARE QUALIFIED IN THEIR ENTIRETY BY THE MORE DETAILED INFORMATION CONTAINED ELSEWHERE IN THIS DISCLOSURE STATEMENT AND IN THE PLAN OF ADJUSTMENT AND THE EXHIBITS TO EACH.

Pursuant to Bankruptcy Code section 1125, made applicable to Title III of PROMESA pursuant to PROMESA section 301(a), the Oversight Board submits this Disclosure Statement to all holders of Claims against COFINA in connection with (i) the solicitation of acceptances or rejections of, and elections of distributions pursuant to, the proposed Plan of Adjustment and (ii) the hearing on confirmation of the Plan of Adjustment (the "<u>Confirmation Hearing</u>") scheduled for January 16, 2019 at 9:30 a.m. (Atlantic Standard Time).

To the extent any inconsistencies exist between this Disclosure Statement, the Amended PSA, the Term Sheet, and the Plan of Adjustment, the terms and provisions of the Plan of Adjustment will govern.

This Disclosure Statement includes the following exhibits and supplements:

- The Plan of Adjustment, together with its exhibits (Exhibit A);

- The Amended PSA (Exhibit B);

- The Scheduled Amortization and Certain Other Terms of COFINA Bonds (Exhibit C);

- The Fiscal Plan of COFINA, dated October 18, 2018, and as certified by the Oversight Board on October 18, 2018 (as such Fiscal Plan may be amended, restated, supplemented or modified from time to time in accordance with PROMESA section 201, the "<u>COFINA Fiscal Plan</u>") (Exhibit D);

- Audited Financial Statements for COFINA for the Year Ended June 30, 2015 (Exhibit E);

- The English version of Puerto Rico House Bill No. 1837 (the "<u>New Bond Legislation</u>") (Exhibit F); and

- A schedule of Existing Securities listed by CUSIP and class, as determined prior to elections made pursuant to the Plan of Adjustment (Exhibit G).

On June 30, 2016, the Oversight Board was established under PROMESA section 101(b). On August 31, 2016, President Barack Obama appointed the seven (7) members of the Oversight Board pursuant to PROMESA section 101(e). Prior to the Title III Case being commenced, the Oversight Board, at the request of the Governor, filed a voluntary petition for relief for the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>") in the Title III Court (the "<u>Commonwealth Title III Case</u>"). On May 5, 2017, the Oversight Board issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and, at the request of the Governor,

filed a voluntary petition for relief for COFINA pursuant to PROMESA section 304(a) in the Title III Court, commencing the Title III Case. While the Title III Case is distinct from the Commonwealth Title III Case, both cases are related and raise certain similar issues. Most notably, there has been a dispute between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA pursuant to Act 91-2006 to secure payment of certain indebtedness of COFINA (the "Commonwealth-COFINA Dispute").

On October 19, 2018, the Debtor filed (a) the *Puerto Rico Sales Tax Financing Corporation's Motion for Order (I) Approving Notice of Disclosure Statement Hearing; (II) Approving Disclosure Statement; (III) Fixing Voting Record Date; (IV) Scheduling Plan Confirmation Hearing and Approving Form and Manner of Related Notice and Objection Procedures; (V) Approving Solicitation Packages and Procedures for the Distribution Thereof; (VI) Approving Forms of Ballots and Voting Procedures; (VII) Fixing Voting Deadline; and (VIII) Approving Vote Tabulation Procedures* with the Title III Court [Case No. 17-3284, ECF No. 307] (the "Disclosure Statement Approval Motion"); (b) the *Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 309] (the "Original Plan of Adjustment"); and (c) the *Disclosure Statement for the Title III Plan of Adjustment of the Debts of Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3284, ECF No. 310] (the "Original Disclosure Statement"). Also on October 19, 2018, the Oversight Board, in its capacity as the representative of the Commonwealth, filed in the Commonwealth Title III Case the *Commonwealth of Puerto Rico's Motion Pursuant to Bankruptcy Rule 9019 for Order Approving Settlement Between Commonwealth of Puerto Rico and Puerto Rico Sales Tax Financing Corporation* [Case No. 17-3283, ECF No. 4067] (the "Settlement Motion"), seeking an order of the Title III Court approving the compromise and settlement of the Commonwealth-COFINA Dispute, described further in Section III.E.1 of this Disclosure Statement, entitled "The Commonwealth-COFINA Dispute and the Lex Claims Litigation."

On November 7 and 8, 2018, respectively, the New Bond Legislation was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, Governor Rosselló Nevares signed into law the New Bond Legislation, which amends and restates Act No. 91-2006, as amended, to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds. The New Bond Legislation authorizes the transactions contemplated by the Plan of Adjustment, providing for the collateralization of the COFINA Pledged Taxes and the granting of the New Collateral[11] and incorporating such other terms as set forth in section 25.1(b)(viii) of the Plan of Adjustment. To this end, the New Bond Legislation provides for (i) the modification of COFINA's corporate governance structure, (ii) the authorization for COFINA, from and after the Effective Date ("Reorganized COFINA"), to issue COFINA Bonds (as defined herein) and COFINA Parity Bonds (as defined herein) and provide for the terms of such bonds, (iii) confirmation of Reorganized COFINA's ownership of the COFINA Revenues,[12] (iv) the creation of a statutory lien to secure the COFINA Bonds and

---

[11] The "New Collateral" is defined as the collateral which, pursuant to enacted legislation, may be substituted by the Commonwealth to replace the COFINA Pledged Taxes, or already substituted collateral, as security for the repayment of the COFINA Bonds, subject to satisfaction of the requirements set forth in Section 16.7 of the Plan of Adjustment.

[12] "COFINA Revenues" shall mean the COFINA Pledged Taxes (as defined below) and all rights thereto including the right to receive the COFINA Pledged Taxes (as defined below) pursuant to the First Dollars Funding (as

2

COFINA Parity Bonds, and (v) covenants to secure further the repayment of the COFINA Bonds and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax (as defined below) upon satisfaction of certain requirements.

On November [ ], 2018, the Title III Court entered the Disclosure Statement Order approving the Disclosure Statement. **APPROVAL OF THIS DISCLOSURE STATEMENT DOES NOT, HOWEVER, CONSTITUTE A DETERMINATION BY THE TITLE III COURT AS TO THE FAIRNESS OR MERITS OF THE PLAN OF ADJUSTMENT. THE TITLE III COURT WILL CONSIDER CONFIRMATION OF THE PLAN OF ADJUSTMENT AT THE CONFIRMATION HEARING SCHEDULED FOR JANUARY 16, 2019 AT 9:30 A.M. (ATLANTIC STANDARD TIME).**

The Confirmation Hearing may be adjourned or continued from time to time. Therefore, parties in interest should check the online docket at https://cases.primeclerk.com/puertorico to confirm the latest scheduled date and time of the Confirmation Hearing.

The Debtor is furnishing this Disclosure Statement as the proponent of the Plan of Adjustment pursuant to Bankruptcy Code section 1125 and in connection with the solicitation of votes to accept or reject, and elections of distributions pursuant to, the Plan of Adjustment, as it may be amended or supplemented from time to time in accordance with Title III and the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), as made applicable to Title III pursuant to PROMESA section 310.

This Disclosure Statement provides the information required by Bankruptcy Code section 1125 and summarizes the Plan of Adjustment, COFINA's operations, and its financial condition (including the COFINA Fiscal Plan and its financial projections), as well as other related matters, including the treatment of holders of Claims against COFINA. This Disclosure Statement also describes certain potential federal and Puerto Rico income tax consequences to holders of Claims, voting and distribution election procedures, and the confirmation process.

A ballot for the acceptance or rejection of the Plan of Adjustment (a "Ballot") and/or a notice of election of distributions under the Plan of Adjustment (an "Election Notice") is enclosed with the copy of this Disclosure Statement distributed to the holders of Claims in the Classes that are entitled to vote to accept or reject the Plan of Adjustment and/or elect the form of distribution they will receive under the Plan of Adjustment. The Ballot includes information regarding the voting deadlines and detailed instructions for voting to accept or reject the Plan of Adjustment. The Election Notice includes information regarding the election deadline and detailed instructions for making an election of the form of distribution to be received under the Plan of Adjustment. Before voting and/or making the applicable election, each holder of a Claim entitled to vote and/or make an election should read this Disclosure Statement (including the exhibits and documents incorporated by reference herein) and the instructions accompanying the Ballot and Election Notice. These documents contain, among other things, important information concerning the classification of Claims for voting and tabulation of votes. No

defined below) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the Pledged Sales Tax Base Amount (as defined below) in any given Fiscal Year until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

3

solicitation of votes on the Plan of Adjustment may be made except pursuant to this Disclosure Statement, as it may be amended, the Disclosure Statement Order, and Bankruptcy Code section 1125. In voting on the Plan of Adjustment or making an election, the holder of a Claim should rely solely on the information relating to COFINA contained or incorporated by reference in this Disclosure Statement and the Plan of Adjustment, including the exhibits attached to these documents.

> **THE PLAN OF ADJUSTMENT IS THE PRODUCT OF SUBSTANTIAL NEGOTIATIONS AND REFLECTS VARIOUS SETTLEMENTS AND COMPROMISES AMONG THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, AMBAC ASSURANCE CORPORATION ("AMBAC"), NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION ("NATIONAL"), ASSURED GUARANTY MUNICIPAL CORP. ("ASSURED"), CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS DEL PATIO, INC. (AN ORGANIZATION ADVOCATING FOR THE INTERESTS OF LOCAL BONDHOLDERS AND REFERRED TO HEREIN AS "BONISTAS"). THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, AMBAC, NATIONAL, ASSURED, CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS BELIEVE THE PLAN OF ADJUSTMENT REPRESENTS A FAIR AND REASONABLE OUTCOME FOR ALL CREDITORS OF COFINA AND, THEREFORE, CONFIRMATION OF THE PLAN OF ADJUSTMENT IS IN THE BEST INTERESTS OF COFINA AND ITS CREDITORS. THE DEBTOR, AAFAF, CERTAIN SIGNIFICANT HOLDERS OF SENIOR COFINA BOND CLAIMS, AMBAC, NATIONAL, ASSURED, CERTAIN SIGNIFICANT HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BONISTAS RECOMMEND THAT YOU VOTE TO ACCEPT THE PLAN OF ADJUSTMENT.**
>
> **FOR THE AVOIDANCE OF DOUBT, THIS DISCLOSURE STATEMENT IS DISTRIBUTED SOLELY ON BEHALF OF THE DEBTOR, AND SOME OF THE STATEMENTS HEREIN MAY BE DISPUTED BY CERTAIN CREDITORS OR THE DEBTOR, INCLUDING, WITHOUT LIMITATION, STATEMENTS REGARDING THE INTERPRETATION OF PROMESA AND RIGHTS AND REMEDIES OF COFINA, HOLDERS OF SENIOR COFINA BOND CLAIMS, HOLDERS OF JUNIOR COFINA BOND CLAIMS, AND BOND INSURERS (AMBAC, NATIONAL, AND ASSURED). EXCEPT AS OTHERWISE EXPRESSLY PROVIDED HEREIN, THE VIEWS EXPRESSED IN THIS DISCLOSURE STATEMENT ARE THE VIEWS OF THE DEBTOR ONLY AND MAY NOT BE ATTRIBUTED TO ANY OF THE SETTLEMENT PARTIES (AS DEFINED BELOW) OR ANY OTHER PARTY.[13]**

---

[13] While the Settlement Parties (as defined below) support the Plan of Adjustment and the Settlement, except as otherwise expressly provided herein, including with respect to the information provided by applicable bond insurers (Ambac, National, and Assured) in Article IX of this Disclosure Statement, the views expressed in this Disclosure Statement are not the views of the Settlement Parties, including AAFAF.

## A.  PROMESA Title III: An Overview

Confirmation of a Title III plan of adjustment by the Title III Court binds the debtor, any issuer of securities under the plan of adjustment, any person acquiring property under the plan of adjustment, and any creditor of the debtor.  Subject to certain limited exceptions, the order confirming a plan of adjustment discharges a debtor from any debt that arose prior to the date of confirmation of the plan and substitutes therefor the applicable obligations specified under the confirmed plan of adjustment.

The Title III Court will confirm a plan of adjustment if it satisfies both PROMESA section 314(b) and the incorporated subsections of Bankruptcy Code section 1129, which are further discussed in Section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."  Among other things, PROMESA section 314(b) requires that (i) the plan of adjustment comply with the provisions of PROMESA and the applicable provisions of the Bankruptcy Code, (ii) all the required legislative, regulatory, or electoral approvals necessary to carry out any provision of the plan of adjustment shall have been obtained, or such provision is conditioned upon such approval, (iii) the plan of adjustment is feasible and in the best interests of creditors, and (iv) the plan of adjustment is consistent with the applicable fiscal plan certified by the Oversight Board under PROMESA Title II.  On October 18, 2018, pursuant to PROMESA section 104(j), the Oversight Board certified the submission of the Original Plan of Adjustment.  On November 16, 2018, pursuant to PROMESA section 104(j), the Oversight Board certified the submission of the Plan of Adjustment. PROMESA section 314(b) requires that the Title III Court make an independent determination of whether the Plan of Adjustment is consistent with the applicable fiscal plan.

While the Debtor believes all classes of Claims should vote to accept the Plan of Adjustment, the Plan of Adjustment may be "crammed down" on non-accepting creditors. Bankruptcy Code section 1129(b)(1) provides that, if all of the applicable requirements of section 1129(a) (including the requirement that at least one impaired class accepts the plan of adjustment) other than class acceptance (as provided in section 1129(a)(8)) are met with respect to a plan of adjustment, the Title III Court, on request of the proponent, shall confirm the plan of adjustment if it does not discriminate unfairly and is fair and equitable with respect to each class of claims or interests that is impaired under and has not accepted the plan of adjustment.

## B.  Summary of Key Components of COFINA's Plan of Adjustment

The Debtor submits that the Plan of Adjustment maximizes the value of COFINA's assets for the benefit of its creditors, and that any alternative to confirmation of the Plan of Adjustment would result in significant delays, litigation, lost value, and additional costs.

The Debtor also believes the Plan of Adjustment's contemplated restructuring is feasible and in the best interests of COFINA's creditors.  If confirmation of the Plan of Adjustment were to be denied, COFINA's options would be either for the Debtor to propose an alternate Title III plan of adjustment or for the Title III Case to be dismissed, in which event multi-party, multifaceted litigation would likely ensue (including litigation with the statutory committee of unsecured creditors of the Commonwealth (the "UCC" or "Committee") as the agent for the

101361236v29

Oversight Board, as representative of the Commonwealth pursuant to the *Stipulation and Order Approving Procedure to Resolve Commonwealth Dispute* [Case No. 17-3283, ECF No. 996] (the "Procedures Order")), as holders of claims compete for the limited resources available to pay those claims.

The following overview summarizes certain key components of the Plan of Adjustment. The overview is qualified in its entirety by the full text of the Plan of Adjustment.

### 1. Implementation of Settlement Agreement

On June 5, 2018, the Commonwealth Agent (as defined below) and the COFINA Agent (as defined below) announced that they had reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the "Agreement in Principle"). Following such announcement, the Oversight Board, COFINA, AAFAF, certain holders of Senior COFINA Bond Claims, Ambac, National, certain holders of Junior COFINA Bond Claims, Assured, and Bonistas (collectively, the "Settlement Parties") engaged in extensive communications regarding the Plan of Adjustment process, and participated in an extensive Title III Court-authorized mediation process in a concerted effort to further develop the Agreement in Principle and the securities to be issued as a result, and to resolve any existing and potential disputes, including the Commonwealth-COFINA Dispute. These efforts culminated in the entry into a Plan Support Agreement and Term Sheet, dated August 29, 2018 (the "Original PSA"), among the Settlement Parties, predicated upon the Agreement in Principle.

The Amended PSA includes additional holders of Existing Securities, who also held significant amounts of certain GO Bonds (as defined below), and provides for the dismissal of certain of the claims and causes of action asserted by Aurelius Capital Master, Ltd. and Six PRC Investments LLC in the litigation styled *Lex Claims, LLC v. The Commonwealth of Puerto Rico*, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at the First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on, among other things, challenges to COFINA's constitutionality and COFINA's entitlement to proceeds of the sales and use taxes. The compromises and settlements under the Amended PSA are set forth in the Plan of Adjustment pursuant to which distributions to creditors will be made in accordance with its terms and the Settlement Agreement attached to the Settlement Motion.

Key provisions of the Amended PSA incorporated into the Plan of Adjustment include:

- Settlement of the Commonwealth-COFINA Dispute by allocating an amount up to fifty-three and sixty-five one-hundredths percent (53.65%) of the Pledged Sales Tax Base Amount (as defined below) in any given fiscal year to COFINA (with the balance of the annual Pledged Sales Tax Base Amount distributed to the Commonwealth). If the Plan of Adjustment is approved, all pending claims and causes of action related to the Commonwealth-COFINA Dispute will be dismissed with prejudice;

- Issuance of new bonds by Reorganized COFINA to holders of Existing Securities, which will be governed by the New Bond Indenture containing certain covenants agreed to by the Settlement Parties. As discussed in detail in the following section, "Puerto Rico

Investors" and "Puerto Rico Institutions" that hold uninsured Existing Securities will be eligible to receive additional consideration if they elect to receive new taxable bonds under the Plan of Adjustment. Additionally, certain holders of insured Existing Securities have the option of receiving interests in a trust or escrow account established by their applicable bond insurer in lieu of the distribution they would otherwise receive on account of their Existing Securities; and

- Allocation of certain existing cash deposits between the Commonwealth and COFINA, as described in Section V.3(a) of this Disclosure Statement (amounts allocated to COFINA will be used, in part, to fund distributions to holders of Existing Securities).

Except if Class 9 – General Unsecured Claims votes to reject the Plan of Adjustment, the Plan of Adjustment provides a recovery to all classes of Claims not subject to subordination.

### 2. Holders of Allowed Claims Permitted to Vote or Make Elections

Pursuant to the Disclosure Statement Order and the Plan of Adjustment, certain holders of Claims are entitled to make an election regarding the form of distribution they will receive under the Plan of Adjustment. Some holders of Claims may not be entitled to vote to accept or reject the Plan of Adjustment as the insurers of their bonds were granted voting rights, but such holders are entitled to make the foregoing elections. Below is a chart summarizing who will receive a Ballot and/or Election Notice as well as an overview of the distribution elections and limitations on voting applicable to certain holders of Claims.

| | Ballot | Election Notice | Non-Voting Notice |
|---|:---:|:---:|:---:|
| Holders of Claims in Class 1 – Senior COFINA Bond Claims | X | X | |
| Beneficial holders of Claims in Class 2 – Senior COFINA Bond Claims (Ambac) | | X | |
| Ambac with respect to Claims in Class 2 – Senior COFINA Bond Claims (Ambac) | X | | |
| Beneficial holders of Claims in Class 3 – Senior COFINA Bond Claims (National) | | X | |
| National with respect to Claims in Class 3 – Senior COFINA Bond Claims (National) | X | | |
| Holders of Claims in Class 4 – Senior COFINA Bond Claims (Taxable Election)[14] | | | |

---

[14] All holders of Claims in respect of "Senior" Existing Securities that are not Ambac Insured Bonds or National Insured Bonds will receive a Class 1 Ballot. Puerto Rico Investors and Puerto Rico Institutions holding such

|  | Ballot | Election Notice | Non-Voting Notice |
|---|---|---|---|
| Holders of Claims in Class 5 – Junior COFINA Bond Claims | X | X | |
| Beneficial holders of Claims in Class 6 – Junior COFINA Bond Claims (Assured) | | | X |
| Assured with respect to Claims in Class 6 – Junior COFINA Bond Claims (Assured) | X | | |
| Holders of Claims in Class 7 – Junior COFINA Bond Claims (Taxable Election)[15] | | | |
| Holder of Claims in Class 8 – GS Derivative Claim | X | | |
| Holders of Claims in Class 9 – General Unsecured Claims | X | | |
| Holders of Claims in Class 10 – Section 510(b) Subordinated Claims | | | X[16] |

*Senior Taxable Bond Distribution Election.* If you hold "Senior" Existing Securities that are not Ambac Insured Bonds or National Insured Bonds, you may opt out of treatment under Class 1 and elect to have your Claim treated as a Senior COFINA Bond Claim (Taxable Election) under Class 4 in order to receive your distribution under the Plan of Adjustment in the form of the Senior Taxable Bond Distribution if you certify that you are a Puerto Rico Investor or a Puerto Rico Institution. A holder of uninsured Existing Securities qualifies as:

- a **Puerto Rico Investor** if such holder is either,

---

Claims may opt out of Class 1 and elect to be treated under Class 4 to receive a Taxable Bond Distribution. Holders treated under Class 4 will be deemed to accept the Plan of Adjustment and will not receive a Class 4-specific Ballot, but electing holders may cast a provisional vote to accept or reject the Plan of Adjustment on the Class 1 Ballot, which will be counted if it is later determined that they are not eligible for Class 4 or if Class 4 is oversubscribed, in which case their Claims will be treated wholly or partially under Class 1 and their votes will be counted with Class 1.

[15] Each holder of a Claim in respect of "First Subordinate" Existing Securities that are not Assured Insured Bonds will receive a Class 5 Ballot. Puerto Rico Investors and Puerto Rico Institutions holding such Claims may opt out of Class 5 and elect to be treated under Class 7 to receive a Taxable Bond Distribution. Holders treated under Class 7 will be deemed to accept the Plan of Adjustment and will not receive a Class 7-specific Ballot, but electing holders may cast a provisional vote to accept or reject the Plan of Adjustment on the Class 5 Ballot, which will be counted if it is later determined that they are not eligible for Class 7 or if Class 7 is oversubscribed, in which case their claims will be treated wholly or partially under Class 5 and their votes will be counted with Class 5.

[16] Holders of Claims in Class 10 will receive a special notice indicating they are deemed to reject the Plan of Adjustment and not entitled to vote.

- o A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

- o An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

- a **Puerto Rico Institution** if such holder is not a Puerto Rico Investor and is an entity that is domiciled in Puerto Rico.

If you make the above-described election and your Claim is treated as a Senior COFINA Bond Claim (Taxable Election) under Class 4, you will be deemed to accept the Plan of Adjustment, but will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined you are ineligible to have your Claim treated under Class 4 or if Class 4 is oversubscribed relative to the maximum size of the class. If you do not elect to receive your distribution under Class 4 or if you are determined to be ineligible for treatment under Class 4, your Claim will be treated under Class 1 and your vote will be counted with Class 1.

**IF YOU ELECT TO RECEIVE THE SENIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 93.015% OF YOUR "SENIOR" EXISTING SECURITIES AND CASH IN AN AMOUNT APPROXIMATELY EQUAL TO 2% OF YOUR "SENIOR" EXISTING SECURITIES. IF YOU DO NOT ELECT TO RECEIVE THE SENIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 93.015% OF YOUR "SENIOR" EXISTING SECURITIES AND NO CASH.**

COFINA Bonds distributed to holders electing treatment under Class 4 will have certain repayment terms that differ from those distributed to holders receiving treatment under Class 1. You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in Section XV., entitled "Material United States Federal Income Tax Considerations" and Section XVI., entitled "Certain Material Puerto Rico Income Tax Considerations" of this Disclosure Statement, before making an election to receive your distribution under the Plan of Adjustment in the form of the Senior Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section XV of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule. Even if you qualify as a Puerto Rico Investor or Puerto Rico Institution, you may not be exempt from paying U.S. federal income tax on the Taxable COFINA Bonds. The tax consequences described in this Disclosure Statement are not a substitute for careful tax planning and professional tax advice relating to your individual circumstances and you should seek advice from your own tax advisor.

***Junior Taxable Bond Distribution Election.*** If you hold "First Subordinate" Existing Securities that are not Assured Insured Bonds, you may opt out of treatment under Class 5 and

elect to have your Claim treated as a Junior COFINA Bond Claim (Taxable Election) under Class 7 in order to receive your distribution under the Plan of Adjustment in the form of the Junior Taxable Bond Distribution if you certify that you are a Puerto Rico Investor or a Puerto Rico Institution.  A holder of uninsured "First Subordinate" Existing Securities qualifies as:

- a **Puerto Rico Investor** if such holder is either,

  - A natural person that is a resident of the Commonwealth (for Puerto Rico personal income tax purposes), or

  - An entity that is wholly owned by or entirely beneficially owned by one or more natural persons that are residents of the Commonwealth (for Puerto Rico personal income tax purposes).

- a **Puerto Rico Institution** if such holder is not a Puerto Rico Investor and is an entity that is domiciled in Puerto Rico.

If you make the above-described election and your Claim is treated as a Junior COFINA Bond Claim (Taxable Election) under Class 7, you will be deemed to accept the Plan of Adjustment, but will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined you are ineligible to have your Claim treated under Class 7 or if Class 7 is oversubscribed relative to the maximum size of the class.  If you do not elect to receive your distribution under Class 7 or if you are determined to be ineligible for treatment under Class 7, your Claim will be treated under Class 5 and your vote will be counted with Class 5.

**IF YOU ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES AND CASH IN AN AMOUNT APPROXIMATELY EQUAL TO 2% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES.  IF YOU DO NOT ELECT TO RECEIVE THE JUNIOR TAXABLE BOND DISTRIBUTION, YOU WILL RECEIVE A DISTRIBUTION CONSISTING PRIMARILY OF COFINA BONDS APPROXIMATELY EQUAL TO 56.414% OF YOUR "FIRST SUBORDINATE" EXISTING SECURITIES AND NO CASH.**

COFINA Bonds distributed to holders electing treatment under Class 7 will have certain repayment terms that differ from those distributed to holders receiving treatment under Class 5. You are encouraged to review the entire Disclosure Statement, including the tax consequences of making an election discussed in Section XV., entitled "Material United States Federal Income Tax Considerations" and Section XVI., entitled "Certain Material Puerto Rico Income Tax Considerations" of this Disclosure Statement, before making an election to receive your distribution under the Plan of Adjustment in the form of the Junior Taxable Bond Distribution. As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section XV of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.  Even if you qualify

as a Puerto Rico Investor or Puerto Rico Institution, you may not be exempt from paying U.S. federal income tax on the Taxable COFINA Bonds. The tax consequences described in this Disclosure Statement are not a substitute for careful tax planning and professional tax advice relating to your individual circumstances and you should seek advice from your own tax advisor.

       ***Senior COFINA Bond Claims (Ambac) – Distribution Election and Voting.*** If you are a beneficial holder of securities giving rise to impaired Claims in Class 2 (Senior COFINA Bond Claims (Ambac)), you may elect on your Election Notice(s) to receive either your Pro Rata Share of (1) the Senior COFINA Bond Distribution, or (2) the Ambac Certificates; however, you will not be able to vote to accept or reject the Plan of Adjustment. However, Ambac will have the right to vote to accept or reject the Plan of Adjustment on behalf of beneficial holders of securities giving rise to impaired Claims in Class 2, as contemplated by the Amended PSA.

       ***Senior COFINA Bond Claims (National) – Distribution Election and Voting.*** If you are a beneficial holder of securities giving rise to impaired Claims in Class 3 (Senior COFINA Bond Claims (National)), you may elect on your Election Notice(s) to receive either your Pro Rata Share of (1) the Senior COFINA Bond Distribution, or (2) the National Certificates; however, you will not be able to vote to accept or reject the Plan of Adjustment. However, National will have the right to vote to accept or reject the Plan of Adjustment on behalf of beneficial holders of securities giving rise to impaired Claims in Class 3, as contemplated by the Amended PSA.

       AFTER THE ELECTION DEADLINE, ALL SECURITIES THAT HAVE BEEN TENDERED WITH RESPECT TO AN ELECTION WILL BE RESTRICTED FROM FURTHER TRADING OR TRANSFER UNTIL THE EFFECTIVE DATE OF THE PLAN OF ADJUSTMENT. THIS IS NECESSITATED BY THE DEPOSITORY TRUST COMPANY PROCEDURES TO ASSOCIATE AN ELECTION WITH THE UNDERLYING SECURITY, WHICH CAN ONLY BE ACCOMPLISHED BY TENDERING THE UNDERLYING SECURITY.

       **3.    Treatment of Allowed Claims**

       Except for Administrative Claims and Professional Claims, which are not required to be classified, all Claims that existed on the Petition Date are divided into classes under the Plan of Adjustment. The following summarizes the treatment of the classified Claims under the Plan of Adjustment on the Effective Date. The amount that a creditor may actually recover could vary from the estimates below.

***Class 1 – Senior COFINA Bond Claims***: On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim against COFINA shall receive its Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds, and (d) Rounding Amount Cash, if necessary.

Any holder of an Allowed Senior COFINA Bond Claim who is (i) a Puerto Rico Investor or (ii) a Puerto Rico Institution may elect to be treated under Class 4 – Senior COFINA Bond Claims (Taxable Election). As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes. Residents of Puerto Rico should read Section XV of the Disclosure Statement,

entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

Estimated Percentage Recovery – Taxable Election: 95.015%

Estimated Percentage Recovery – No Taxable Election: 93.015%

***Class 2 – Senior COFINA Bond Claims (Ambac)***:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Ambac) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of section 6.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall be deemed to have agreed to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates); or

(2) the Ambac Certificates representing an interest in the Ambac Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released Ambac from its obligations and liabilities under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, (ii) such holder shall not be entitled to the benefit of the Ambac Insurance Policy and shall have no right to make a claim under, or receive payment from, the Ambac Insurance Policy, (iii) Ambac shall be released from its obligations under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, and (iv) the Ambac Insurance Policy shall be terminated and commuted in full with respect to such holder's Ambac Insured Bonds, no provision of the Ambac Insurance Policy with respect to such Ambac Insured Bonds shall survive termination, and such Ambac Insured Bonds shall no longer have the benefit of the Ambac Insurance Policy.

***Ambac Insurance Contribution:*** In consideration for the releases to be given to Ambac, and in accordance with section 6.1(a) of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall receive, in addition to the Senior COFINA Bond Distribution, consideration from Ambac in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date (the "<u>Ambac Commutation Payment</u>"), and the beneficial holder thereof shall have no other or further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates.  A holder of an

12

Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall be deemed to have had, on or after the Effective Date, the Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) cancelled.

**Non-Commutation/Ambac Trust:** In the event that a holder of a Senior COFINA Bond Claim (Ambac) timely elects to receive the distributions set forth in section 6.1(b) of the Plan of Adjustment, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution and the Ambac Insured Bonds allocable to such electing holder into the Ambac Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of Ambac Certificates in consideration therefor.

**Terms of Ambac Trust (Section 17.1 of the Plan of Adjustment):** Subject to the provisions of section 17.1 of the Plan of Adjustment, on the Effective Date, each beneficial holder of Allowed Senior COFINA Bond Claims (Ambac) that validly elects to receive the Ambac Certificates shall be deemed to have exchanged and deposited such holder's Ambac Insured Bonds into the Ambac Trust that is formed for the benefit of beneficial holders of such Ambac Insured Bonds in exchange for one or more Ambac Certificates issued by the Ambac Trust and evidencing a pro rata beneficial ownership interest in the Ambac Trust Assets. On the Effective Date, COFINA shall concurrently with the exchange described in the immediately preceding sentence, deposit the Ambac Trust Assets into the Ambac Trust. The Ambac Trust Assets shall not be property of COFINA, but shall be held by the trustee of the Ambac Trust solely for the benefit of the holders of Ambac Certificates and Ambac (to the extent that it is subrogated to or assigned the rights of the holders of the Ambac Certificates) in accordance with the terms of the Ambac Trust agreement. In the opinion of counsel to Ambac, the holders of Ambac Certificates shall be the "tax owners" of the Ambac Trust Assets for U.S. Federal income tax purposes.

**Deemed Acceleration:** The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Ambac Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided*, *however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

**Commutation Disclosure:** Ambac notes that a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to have elected) to commute its Ambac Insurance Policy is estimated to receive aggregate consideration under the Plan of Adjustment (assuming the COFINA Bonds trade at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, comprised of (i) COFINA Bonds, (ii) interest accrual or accretion on COFINA Bonds, commencing as of August 1, 2018, (iii) Cash, and (iv) the Ambac Commutation

13

Payment. Ambac makes no representation regarding this Disclosure Statement, including, without limitation, whether the COFINA Bonds will trade at par.

Estimated Percentage Recovery: 100%

***Class 3 - Senior COFINA Bond Claims (National)***:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (National) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) Cash, distributable by or at the direction of National, in accordance with the provisions of section 7.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall be deemed to have agreed to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust, or the National Certificates); or

(2) the National Certificates representing an interest in the National Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released National from its obligations and liabilities under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, (ii) such holder shall not be entitled to the benefit of the National Insurance Policies and shall have no right to make a claim under, or receive payment from, the National Insurance Policies, (iii) National shall be released from its obligations under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, and (iv) the National Insurance Policies shall be terminated and commuted in full with respect to such holder's National Insured Bonds, no provision of the National Insurance Policies with respect to such National Insured Bonds shall survive termination, and such National Insured Bonds shall no longer have the benefit of the National Insurance Policies.

***National Insurance Contribution:*** In consideration for the releases to be given to National, and in accordance with the provisions of section 7.1 of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall receive, in addition to its Pro Rata Share of the Senior COFINA Bond Distribution, Cash distributable by or at the direction of National, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date (the "<u>National Commutation Payment</u>"), and the beneficial holder thereof shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust, or the National Certificates.  The provisions set forth in section 7.2 of the Plan of Adjustment apply only to Senior

14

COFINA Bond Claims (National) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof is or its predecessor in interest otherwise purchased or acquired insurance on the secondary market. A holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) cancelled.

***Non-Commutation/National Trust:*** In the event that a holder of a Senior COFINA Bond Claim (National) timely elects to receive the distributions set forth in section 7.1(b) of the Plan of Adjustment (in accordance with the instructions set forth in the Election Notice), on the Effective Date COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the National Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of National Certificates in consideration therefor.

***Commutation Disclosure:*** National notes that a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to have elected) to commute its National Insurance Policy is estimated to receive aggregate consideration under the Plan of Adjustment (assuming the COFINA Bonds trade at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, comprised of (i) COFINA Bonds, (ii) interest accrual or accretion on COFINA Bonds, commencing as of August 1, 2018, (iii) Cash, and (iv) the National Commutation Payment. National makes no representation regarding this Disclosure Statement, including, without limitation, whether the COFINA Bonds will trade at par.

***National Election:*** At any time prior to the commencement of the Disclosure Statement Hearing, National may elect, in a written notice provided to the Oversight Board, an alternative treatment option for Senior COFINA Bond Claims (National), pursuant to which, in the sole and absolute discretion of National, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the Effective Date, the National Insured Bonds shall be paid off, in full, at an acceleration price equal to one hundred percent (100%) of the Compounded Amount (as defined in the Existing Bond Resolution) of the National Insured Bonds, as of the Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National), shall be used to pay, in Cash, one hundred percent (100%) of the Compounded Amount of the National Insured Bonds, as of the Effective Date, with any deficiency in such amounts being paid by National in full, in Cash, on the Effective Date.

Estimated Percentage Recovery: 100%

101361236v29

***Class 4 – Senior COFINA Bond Claims (Taxable Election)***:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

> (1) the Senior COFINA Bond Distribution, consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds, and (ii) Rounding Amount Cash, if necessary; and

> (2) the Taxable Election Cash.

> If Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Class 4 Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Class 1 Senior COFINA Bond Claim.

> If Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Class 4 Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Class 1 Senior COFINA Bond Claim.

> Estimated Percentage Recovery:  95.01%

***Class 5 – Junior COFINA Bond Claims***:  On the Effective Date and subject to the right of election set forth in section 9.2 of the Plan of Adjustment, each holder of an Allowed Junior COFINA Bond Claim against COFINA shall be entitled to receive its Pro Rata Share of the Junior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds, and (c) Rounding Amount Cash, if necessary.

Any holder of an Allowed Junior COFINA Bond Claim who is (i) a Puerto Rico Investor or (ii) a Puerto Rico Institution may elect to be treated under Class 7 – Junior COFINA Bond Claims (Taxable Election).  As a general matter, residents of Puerto Rico are not subject to U.S. federal income taxes.  Residents of Puerto Rico should read Section XV of the Disclosure Statement, entitled "Material United States Federal Income Tax Considerations—Puerto Rico Individuals and Puerto Rico Corporations" for a discussion of important limitations to this general rule.

> Estimated Percentage Recovery – Taxable Election:  58.414%

> Estimated Percentage Recovery – No Taxable Election:  56.414%

***Class 6 – Junior COFINA Bond Claims (Assured)***:  The Assured Insured Bonds giving rise to Junior COFINA Bond Claims(Assured) shall be paid, in full, the applicable Acceleration Price as of the Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and (2) otherwise as follows:  the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured)

16

shall be (i) guaranteed in accordance with a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the Effective Date, the applicable Acceleration Price, with any deficiency in such amounts being paid by Assured in accordance with the Assured Insurance Policies guaranteeing the Assured Insured Bonds underlying the Junior COFINA Bond Claims (Assured). The principal amount, maturities and interest rates of the Assured New Bonds will be determined by Assured in consultation with the underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds without insurance (although the Assured New Bonds may mature later than the other COFINA Bonds, but in no event later than FY2058). The costs associated with the issuance of the Assured New Bonds will be payable by COFINA or Reorganized COFINA, as applicable. All other terms regarding the underwriting of the Assured New Bonds will be subject to the approval of Assured. In the event, on or prior to the Effective Date, Assured New Bonds cannot be sold or issued into the market on terms acceptable to Assured, then, on the Effective Date, Assured shall pay the applicable Acceleration Price to the holders of the Assured Insured Bonds, and Assured shall receive the Pro Rata Share of the Junior COFINA Bond Distribution allocable to the holders of the Assured Insured Bonds. Payment of the applicable Acceleration Price with respect to any Assured Insured Bond shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

> ***Deemed Acceleration:*** The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Assured Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided*, *however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

Estimated Percentage Recovery: 100%

***Class 7 – Junior COFINA Bond Claims (Taxable Election)***: On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Junior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

(a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary; and

(b) the Taxable Election Cash.

If Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Class 7 Junior COFINA Bond Claim (Taxable Election) up to such Bond

Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Class 5 Junior COFINA Bond Claim.

If Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Class 7 Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Class 5 Junior COFINA Bond Claim.

Estimated Percentage Recovery: 58.414%

**Class 8 – GS Derivative Claim**: On the Effective Date, the holder of the Allowed GS Derivative Claim against COFINA shall, to the extent that the termination value of the GS Derivative Claim is

(1) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and, with respect to the balance of the GS Derivative Claim, (a) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a Parity Obligation, as defined in the Existing Bond Resolution, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (b) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a not a Parity Obligation, such holder shall not receive a distribution pursuant to the Plan of Adjustment, or

(2) less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to Reorganized COFINA.

Estimated Percentage Recovery: Depending on the Title III Court's determination, up to 93.015%.

**Class 9 – General Unsecured Claims**: On the Effective Date, if Class 9 votes to accept the Plan of Adjustment, each holder of an Allowed General Unsecured Claim against COFINA shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00); *provided*, *however*, that if Class 9 votes to reject the Plan of Adjustment, holders of Allowed General Unsecured Claims against COFINA shall not receive a distribution pursuant to the Plan of Adjustment.

Estimated Percentage Recovery: If Class 9 votes to accept the Plan of Adjustment, 0.252%. If Class 9 votes to reject the Plan of Adjustment, 0%.

**Class 10 – Section 510(b) Subordinated Claims**: Allowed Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan of Adjustment, and each holder of an Allowed Section 510(b) Subordinated Claim shall be deemed to have rejected the Plan of Adjustment.

4. **Overview of COFINA Bonds to be issued on the Effective Date**

On the Effective Date, Reorganized COFINA will issue: (i) four (4) series of Current Interest Bonds ("CIBs"), and (ii) seven (7) series of Capital Appreciation Bonds ("CABs") (collectively, and together with any other bonds issued by COFINA or Reorganized COFINA pursuant to the Plan of Adjustment, the "COFINA Bonds"). Subject to certain adjustments permitted under the Plan of Adjustment, including with respect to the Assured New Bonds, the CIBs will have an aggregate original principal amount of $9,119,420,000, interest rates between 4.5% and 5.0%, and stated maturity dates between July 1, 2034 and July 1, 2058. Subject to certain adjustments permitted under the Plan of Adjustment, including with respect to the Assured New Bonds, CABs will have an aggregate original principal amount of $2,901,901,817, interest rates between 4.025% and 5.625%, and stated maturity dates between July 1,2024 and July 1, 2051. The COFINA Bonds will be issued pursuant to the New Bond Indenture. The COFINA Bonds will be distributed as set forth in the Plan of Adjustment. Notwithstanding the timing of the Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the "dated" date of the COFINA Bonds.

Neither the CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.; *provided that*, no COFINA Bonds may exceed a yield of 12% under Puerto Rico law.

Pursuant to the Plan of Adjustment, and subject to certain qualifications provided in the Plan of Adjustment, Reorganized COFINA may also issue securities after the Effective Date, on a *pari passu* basis with the COFINA Bonds issued on the Effective Date, for the purpose of refinancing, in whole or in part, COFINA Bonds or securities previously issued to refinance COFINA Bonds (the "COFINA Parity Bonds"). Except with respect to the issuance of COFINA Parity Bonds, Reorganized COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the Effective Date.

5. **Overview of Ambac Certificates and National Certificates**

*Ambac Certificates*. On or prior to the Effective Date, the Ambac Trust will be established for the benefit of beneficial holders of Senior COFINA Bond Claims (Ambac) that validly elect to receive the Ambac Certificates in accordance with the approved solicitation procedures. On the Effective Date, the following shall be deposited (or deemed deposited) into the Ambac Trust: (1) the Ambac Insured Bonds allocable to the electing holders of the Senior COFINA Bond Claims (Ambac), (2) the Senior COFINA Bond Distribution (consisting of Section 103 Cash, if applicable, COFINA Cash Available for distribution, COFINA Bonds, and Rounding Amount Cash, if necessary) allocable to the electing holders of the Senior COFINA Bond Claims (Ambac) and (3) the benefits of the Ambac Insurance Policy (collectively (1)-(3), the "Ambac Trust Assets"). Notwithstanding the deposit therein, the Ambac Insured Bonds allocable to the electing holders of Senior COFINA Bond Claims (Ambac) shall not be cancelled and all rights and remedies (other than with respect to the payment obligations of COFINA) under and in accordance with such Ambac Insured Bonds, the Existing Bond Resolution, and the Ambac Insurance Policy shall be preserved and remain in full force and effect.

Upon deposit of the Ambac Trust Assets, the trustee shall issue on a pro rata basis two series of Ambac Certificates, (i) a series with a mandatory redemption date of August 1, 2047, and (ii) a series with a mandatory redemption date of August 1, 2054 ("Series 2054"), to the beneficial holders of the Ambac Insured Bonds that validly elected to receive the Ambac Certificates.   The Ambac Certificates will provide for payments in accordance with the scheduled sinking fund payments with respect to the Series 2054 and the maturity date of such holder's Ambac Insured Bonds.   The scheduled sinking fund payment dates for the Series 2054 are August 1, 2048, August 1, 2049, August 1, 2050, August 1, 2051, August 1, 2052, and August 1, 2053.   Each holder of the Ambac Certificates is expected to receive a mixture of taxable and tax-exempt income from the Ambac Trust.

Each class of Ambac Certificates will have its own class accretion schedule that sets forth the accreted payment amounts as of any date.   Each distribution on the Ambac Certificates (whether or not taxable to a holder or reduced by withholding or tax payments made by the Ambac Trust) shall reduce the related obligation of Ambac under the Ambac Insurance Policy, shall be deemed to reduce the amount outstanding on the Ambac Insured Bonds, and shall result in the recalibration of the related class accretion schedules.   Upon repayment or redemption of all Ambac Certificates, Ambac will be entitled to receive all remaining assets in the Ambac Trust. In the opinion of counsel to Ambac, the holders of Ambac Certificates shall be the "tax owners" of the Ambac Trust Assets for U.S. Federal income tax purposes.

Although the trustee of the Ambac Trust will hold the Ambac Trust Assets for the benefit of the holders of the Ambac Certificates, the trustee will not actively manage the Ambac Trust. The trust agreement will provide that Ambac will have the right to direct the trustee to dispose of COFINA Bonds or take certain other actions in respect of the Ambac Trust Assets, including any actions permitted of a holder of the COFINA Bonds.   Distributions to holders of Ambac Certificates from payments received on the Taxable COFINA Bonds will not be distributed to holders of the Ambac Certificates if Ambac directs the Trustee to reinvest such distributions. Accordingly, there can be no guarantee as to when holders of Ambac Certificates will receive distributions on the Taxable COFINA Bonds.

The Ambac Certificates are not expected to be liquid.   There will be no market for any class of Ambac Certificates prior to the issuance of the Ambac Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of such Ambac Certificates.

Additional terms and conditions of the Ambac Trust are described in Section IX.A of this Disclosure Statement.

Beneficial Holders of Senior COFINA Bond Claims (Ambac) are encouraged to review the entire Disclosure Statement, including the risk factors of electing to receive Ambac Certificates discussed in Section XIV.C of this Disclosure Statement, before making an election to receive a distribution under the Plan of Adjustment in the form of the Ambac Certificates.

***National Certificates.***   On or prior to the Effective Date, the National Trust shall be formed on behalf of, and for the sole benefit of the holders of Senior COFINA Bond Claims (National) that validly elect to receive the National Certificates in accordance with the approved

solicitation procedures and so long as any such holder has not otherwise agreed to commute the National Insurance Policies on or prior to the Effective Date pursuant to the Plan of Adjustment or otherwise. On or before the Effective Date, the following shall be deposited (or deemed deposited) into the National Trust: (i) the National insured Existing Securities that have not been commuted; (ii) the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) that elect to receive National Certificates; (iii) the National Insurance Policies; and (iv) National's entitlement to the Consummation Costs, as defined in the Amended PSA (collectively, (i) through (iv), the "National Trust Assets"). The National Insured Bonds allocable to the electing holders of the Senior COFINA Bond Claims (National) shall not be cancelled and all rights and remedies (other than with respect to payment obligations of COFINA) under and in accordance with such National Insured Bonds, the Existing Bond Resolution, and the National Insurance Policies shall be preserved and remain in full force and effect.

Upon deposit of the National Trust Assets into the National Trust, the trustee shall issue on a pro rata basis one or more series of National Certificates to the beneficial holders of Senior COFINA Bond Claims (National) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Trust. The National Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Trust. Any such distribution shall (i) in all cases, occur promptly upon receipt thereof by the National Trust and (ii) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders by the amount of such distribution. Each series of National Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.

Beneficial holders of Senior COFINA Bond Claims (National) are encouraged to review the entire Disclosure Statement, including the risk factors of electing to receive National Certificates discussed in Section XIV.C of this Disclosure Statement, before making an election to receive a distribution under the Plan of Adjustment in the form of the National Certificates.

## C.      Holders of Claims Entitled to Vote on the Plan of Adjustment

Pursuant to PROMESA Title III and the Bankruptcy Code, only holders of Allowed Claims in classes of claims or equity interests that are impaired and are not deemed to have accepted or rejected a proposed Title III plan of adjustment are entitled to vote to accept or reject a proposed plan of adjustment. Classes of claims in which the holders of claims are unimpaired under the plan of adjustment are deemed to have accepted the plan and are not entitled to vote to accept or reject the plan of adjustment. Classes of claims in which the holders of claims will receive no recovery under the plan of adjustment are deemed to have rejected the plan of adjustment and are also not entitled to vote to accept or reject the plan of adjustment.

Holders of Allowed Claims in the following Classes are entitled to vote to accept or reject the Plan of Adjustment:

Class 1 – Senior COFINA Bond Claims;

21

Class 5 – Junior COFINA Bond Claims;

Class 8 – GS Derivative Claims; and

Class 9 – General Unsecured Claims.

Any Puerto Rico Investor or Puerto Rico Institution holding an Allowed Claim eligible for treatment under Class 1 may opt out of Class 1 and elect to be treated under Class 4 and in such event, shall be deemed to accept the Plan of Adjustment.  Any Puerto Rico Investor or Puerto Rico Institution holding an Allowed Claim eligible for treatment under Class 5 may opt out of Class 5 and elect to be treated under Class 7 and, in such event, shall be deemed to accept the Plan of Adjustment.  For more information regarding eligibility to make such elections, please refer to Section VI.D.2 of this Disclosure Statement.  Eligible holders who elect to be treated under Classes 4 and 7, respectively, will be entitled to cast a provisional vote to accept or reject the Plan of Adjustment, which will be counted if it is later determined such holders are ineligible to be treated under Class 4 or 7, or if Classes 4 and 7 are oversubscribed relative to the maximum allowed size of such classes, in which case, such holders' Claims will be treated wholly or partially under Class 1 or 5, as applicable.

Beneficial holders of Existing Securities or Allowed Claims (or their nominees) in the following Classes are not entitled to vote to accept or reject the Plan of Adjustment:

Class 2 – Senior COFINA Bond Claims (Ambac);

Class 3 – Senior COFINA Bond Claims (National); and

Class 6 – Junior COFINA Bond Claims (Assured).

Under the Plan of Adjustment, only the applicable bond insurer (Ambac, National, or Assured) with respect to Claims in these Classes is entitled to vote to accept or reject the Plan of Adjustment, pursuant to the terms of the applicable bond insurance policy.  Beneficial holders of Claims in Classes 2 and 3 are entitled to make an election of the form of distribution they wish to receive under the Plan of Adjustment.  For more information regarding the voting procedures for Classes 2 and 3, please refer to Section VI.D.2 of this Disclosure Statement.

Holders of Allowed Claims in Class 10 – Section 510(b) Subordinated Claims will not receive a distribution pursuant to the Plan of Adjustment and shall be deemed to have rejected the Plan of Adjustment and are not entitled to vote.

Bankruptcy Code section 1126 defines "acceptance" of a plan of adjustment by a class of claims as acceptance by creditors in that class holding at least two-thirds in dollar amount and more than one-half in number of the allowed claims of such class held by creditors that voted for acceptance or rejection of the plan of adjustment.  Thus, acceptance of the Plan of Adjustment by Claims in each Class entitled to vote on the Plan of Adjustment will occur only if at least two-thirds in dollar amount and a majority in number of the holders of Allowed Claims in such Class that have actually voted their Ballots have voted in favor of the Plan of Adjustment.  A vote may be disregarded if the Title III Court determines, after notice and a hearing, that the acceptance or

rejection was not solicited or procured in good faith or in accordance with the applicable provisions of PROMESA or the Bankruptcy Code.

It is important that holders of Claims in Classes 1, 5, 8, and 9, as well as the applicable bond insurer (Ambac, National, or Assured) with respect to Claims in Classes 2, 3, and 6, that are eligible to vote exercise their right to vote to accept or reject the Plan of Adjustment. **EVEN IF YOU DO NOT VOTE OR DO NOT HAVE THE RIGHT TO VOTE TO ACCEPT THE PLAN OF ADJUSTMENT, YOU MAY BE BOUND BY THE PLAN OF ADJUSTMENT IF IT IS CONFIRMED BY THE TITLE III COURT.** The amount and number of votes required for acceptance or rejection of the Plan of Adjustment by a Class are computed on the basis of Claims actually voting to accept or reject the Plan of Adjustment. There are no quorum requirements with respect to the number of Claims in a Class that actually vote.

If at least one impaired class of claims accepts a Title III plan of adjustment (without counting the votes of insiders), Bankruptcy Code section 1129(b), made applicable to Title III of PROMESA pursuant to PROMESA section 301(a), permits the confirmation of the plan of adjustment under certain conditions, notwithstanding the rejection of the plan of adjustment by one or more other impaired classes of claims. Under that section, a plan of adjustment may be confirmed by a court if the plan of adjustment does not "discriminate unfairly" and is "fair and equitable" with respect to each rejecting class. Refer to Section VII.C.1(e) of this Disclosure Statement for more information.

The Debtor's determination as to whether to request confirmation of the Plan of Adjustment pursuant to Bankruptcy Code section 1129(b) will be announced prior to or at the Confirmation Hearing.

### D.    Solicitation and Voting Procedures

On October 19, 2018, the Debtor filed the Disclosure Statement Approval Motion, seeking an order from the Title III Court (i) approving the proposed Disclosure Statement, (ii) fixing a Voting Record Date (as defined therein) for voting on the Plan of Adjustment, (iii) approving the Confirmation Hearing Notice (as defined therein), (iv) approving the proposed contents of the Solicitation Package (as defined therein) and procedures for distribution thereof, (v) approving the forms of Ballots and Election Notices, and establishing solicitation, voting, distribution election, and balloting procedures, (vi) approving the form and manner of Notice of Non-Voting Status – Class 10 (as defined therein), (vii) fixing the Voting Deadline (as defined therein) and Election Deadline (as defined therein), and (viii) approving procedures for tabulating creditor votes. On November 16, 2018, the Debtor filed its omnibus reply to various objections that were filed to the Disclosure Statement Approval Motion. Attached to the Debtor's omnibus reply was a revised Disclosure Statement Order, which the Title III Court entered on November [ ], 2018.

For more information regarding the solicitation and voting procedures surrounding the Plan of Adjustment, see the Disclosure Statement Order.

### E. Confirmation Hearing and Deadline for Objections to Confirmation

Pursuant to Bankruptcy Code section 1128, the Title III Court has scheduled the Confirmation Hearing on whether the Debtor has fulfilled the confirmation requirements of PROMESA section 314 on January 16, 2019 at 9:30 a.m. (Atlantic Standard Time) before the Honorable Laura Taylor Swain, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined. The Confirmation Hearing may be adjourned from time to time without notice except as given at the Confirmation Hearing or at any subsequent adjourned Confirmation Hearing.

The Title III Court has ordered that objections, if any, to confirmation of the Plan of Adjustment be filed and served on or before January 2, 2019 at 5:00 p.m. (Atlantic Standard Time).

## II. Overview of COFINA

### A. Historical Information About COFINA

### 1. COFINA Enabling Act

COFINA is a public corporation and instrumentality of the Commonwealth constituting a corporate and political entity independent and separate from the Commonwealth, created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006 (as amended by Act No. 291, approved December 26, 2006; Act No. 56, approved July 5, 2007; Act No. 1, approved January 14, 2009; Act No. 7, approved March 9, 2009, as amended; Act No. 18, approved May 22, 2009; Act 133, approved July 12, 2012; Act 116, approved October 10, 201; Act 101, approved July 1, 2015; and Act 84, approved July 22, 2016) (collectively, "Act 91").

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006, the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% and authorized its municipalities to impose a municipal sales and use tax at a rate of 1.5% (the sales and use tax revenues at the 5.5% rate, the "SUT Revenues").[17]

Act 91 currently requires that the following amounts of the SUT Revenues be transferred in each Fiscal Year to COFINA, whichever is greater: (i) a minimum fixed amount (the "Pledged

---

[17] In 2014, the Commonwealth lowered the municipal sales and use tax by 0.5% and increased the Commonwealth sales and use tax by the same amount (with the revenues from the 0.5% remaining for the benefit of the Municipal Administration Fund). The Commonwealth then increased the aggregate rate of the Commonwealth sales and use tax from 6% to 10.5% by imposing a sales and use tax surcharge of 4.5%. The revenues attributable to such increase are the property of the Commonwealth and are not available to COFINA. More recently, the Commonwealth reset the portion of the Commonwealth sales and use tax from which COFINA moneys are derived to the original 5.5%.

Sales Tax Base Amount" or "PSTBA");[18] and (ii) the product of the amount of the SUT Revenues collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5% (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). The Pledged Sales Tax is the only source of funds available to pay debt service on "Senior" Existing Securities and "First Subordinate" Existing Securities.[19]

As originally established in 2006, COFINA was authorized to use such portion of the SUT Revenues to pay or finance, in whole or in part, or fund: (i) certain appropriation backed debt outstanding as of June 30, 2006 payable to the Government Development Bank for Puerto Rico ("GDB") and the Puerto Rico Public Finance Corporation ("PFC"); and (ii) certain Commonwealth expenses.

During 2009, the Legislative Assembly expanded the purposes of COFINA to authorize COFINA to pay or finance, in whole or in part, or fund: (i) the debt of the Secretary of the Treasury of the Commonwealth (the "Secretary of the Treasury") with GDB in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by GDB payable from future Commonwealth GO Bonds (as defined below), and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012, to the extent included in the annual budget of the Commonwealth, (vi) that certain Puerto Rico Economic Stimulus Fund, (vii) that certain Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) that certain Economic Cooperation and Public Employees Alternatives Fund.

## 2.    Existing COFINA Bond Resolution and Existing Securities

The Existing Securities, as defined below, were issued pursuant to a Sales Tax Revenue Bond Resolution adopted on July 13, 2007 (as amended and restated on June 10, 2009, the "STRB Resolution").  Each series of Existing Securities was issued pursuant to a supplemental resolution providing for its issuance and the terms of such series, in each case adopted by the Board of Directors of COFINA. The STRB Resolution together with the supplemental resolutions issued pursuant thereto is referred to as the "Existing Bond Resolution."  Under the Existing Bond Resolution, the Bank of New York Mellon acts as trustee (the "Trustee") for the Existing Securities.

As of the Petition Date, COFINA had outstanding $17.64 billion aggregate principal and unpaid interest amount of its sales tax revenue bonds issued under the Existing Bond Resolution, including $11.55 billion of current interest bonds, plus $6.10 billion accreted on existing capital

---

[18]    Specifically, the Pledged Sales Tax Base Amount" or "PSTBA" shall mean the annual dollar amounts determined for each Fiscal Year of the Commonwealth in accordance with Section 3 of Act No. 91-2006 of the Commonwealth, as amended.

[19]    It has been asserted that, under section 5(d) of Act 91, if the amounts transferred to COFINA are insufficient to cover its obligations, including the Existing Securities, Act 91 provides for the transfer of future SUT Revenues to cover such deficiency

appreciation bonds and convertible capital appreciation bonds (collectively, the "<u>Existing
Securities</u>"). The Existing Securities consist of $7.76 billion senior and $9.88 billion first
subordinate bonds (respectively, the ""<u>Senior</u>" Existing Securities" and ""<u>First Subordinate</u>"
Existing Securities"), as described below.

### *"Senior" Existing Securities*

The "Senior" Existing Securities[20] were issued between 2007 and 2011, bearing interest
rates between 3.80% and 6.35% and maturing between August 1, 2020 and August 1, 2057. The
"Senior" Existing Securities are subject to voluntary redemption at the option of COFINA
commencing between August 1, 2017 and August 1, 2021. Certain of the "Senior" Existing
Securities are capital appreciation bonds and certain are current interest bonds. Capital
appreciation bonds or "CABs" do not pay interest on a current basis, but rather accrete interest
until maturity, when the entire compounded amount is due. As of the Petition Date, there was
$7.74 billion aggregate principal amount of "Senior" Existing Securities outstanding, consisting
of $4.02 billion aggregate principal amount of current interest bonds and $2.25 billion aggregate
principal amount of CABs plus $1.46 billion accreted.  Approximately $1.33 billion of the
"Senior" Existing Securities are insured by Ambac and $1.10 billion are insured by National.

The "Senior" Existing Securities are payable solely from and secured equally and ratably
by a security interest granted under the Existing Bond Resolution in the Pledged Property, as
defined in the Existing Bond Resolution.  It should be noted that there is an existing dispute as to
whether the Existing Bond Resolution in fact grants COFINA a valid security interest in the
Pledged Property.  This dispute, referred to as the Commonwealth-COFINA Dispute, is
described further in Section IV.E of this Disclosure Statement.  The Pledged Property also
includes the following, collectively:  (1) all COFINA Revenues, as defined in the Existing Bond
Resolution; (2) all right, title and interest of COFINA in and to COFINA Revenues, and all rights
to receive the same; and (3) funds, deposits, accounts, and subaccounts held by the Trustee.

The "Senior" Existing Securities are senior in payment priority to the "First Subordinate"
Existing Securities. Upon an event of default, the Trustee may, or upon the written request of
owners of 25% of all outstanding "Senior" Existing Securities, shall, declare the principal of and
accrued interest on the "Senior" Existing Securities to be immediately due and payable.  Upon
such declaration, the principal of and accrued interest on the "Senior" Existing Securities become
immediately due and payable.  In addition, upon a declaration of an event of default, holders of
"First Subordinate" Existing Securities may not declare a default, or cause the Trustee to take
any remedial action thereunder in the event that "First Subordinate" Existing Securities are not
timely paid amounts due thereunder until such time that the "Senior" Existing Securities are fully
retired or are defeased in accordance with the provision of the Existing Bond Resolution. Upon
an event of default, the Existing Bond Resolution provides for the priority of payments if the
funds held by the Trustee are insufficient for the payment of interest and principal or

---

[20] COFINA's "Senior" Existing Securities consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the
"<u>Series 2007A Bonds</u>"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "<u>Series 2007B Bonds</u>"), (iii) Sales Tax
Revenue Bonds, Series 2007C (the "<u>Series 2007C Bonds</u>"), (iv) Sales Tax Revenue Bonds, Series 2008A (the
"<u>Series 2008A Bonds</u>"), (v) Sales Tax Revenue Bonds, Series 2009C (the "<u>Series 2009C Bonds</u>"), (vi) Sales Tax
Revenue Bonds, Series 2011C (the "<u>Series 2011C Bonds</u>"), and (vii) Sales Tax Revenue Bonds, Series 2011D
(the "<u>Series 2011D Bonds</u>").

26

Compounded Amount (as defined in the Existing Bond Resolution) or redemption price then due on the "Senior" Existing Securities.

A schedule of the "Senior" Existing Securities is included in Exhibit A to the Plan of Adjustment.

### *"First Subordinate" Existing Securities*

The "First Subordinate" Existing Securities [21] were issued between 2009 and 2011, bearing interest rates between 3.63% and 7.48% and maturing between August 1, 2017 and August 1, 2050. The "First Subordinate" Existing Securities are subject to voluntary redemption at the option of COFINA commencing between August 1, 2014 and August 1, 2029. Certain of the "First Subordinate" Existing Securities are CABs and certain are current interest bonds. As of the Petition Date, there was $9.81 billion aggregate principal amount of "First Subordinate" Existing Securities outstanding, consisting of $7.39 billion aggregate principal amount of current interest bonds and $1.50 billion aggregate principal amount of CABs plus $0.87 billion accreted. Approximately $0.25 billion of the "First Subordinate" Existing Securities are insured by Assured.

The "First Subordinate" Existing Securities are payable solely from and secured equally and ratably by a security interest granted under the Existing Bond Resolution in the Pledged Property, as defined in the Existing Bond Resolution. The "First Subordinate" Existing Securities cannot declare an event of default or control remedies until the "Senior" Existing Securities are satisfied in full.

The relative rights and remedies of the "Senior" Existing Securities and "First Subordinate" Existing Securities, including the nature and scope of any subordination, is a matter of dispute among various parties in interest, and certain parties in interest may dispute the description of such matters (or of other matters) contained in this Disclosure Statement.

A schedule of the "First Subordinate" Existing Securities is included in Exhibit A to the Plan of Adjustment.

### 3. Insurance of Existing Securities

### (a) *National Public Finance Guarantee Corporation*

The following information has been furnished by National for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or

---

[21] The "First Subordinate" Existing Securities consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), (v) Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds"), (vi) Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds"), (vii) Sales Tax Revenue Bonds, First Subordinate Series 2011A (the "Series 2011A Bonds"), and (vii) Sales Tax Revenue Bonds, First Subordinate Series 2011B (the "Series 2011B Bonds").

completeness of information, including documents incorporated herein by reference. With respect to certain "Senior" Existing Securities, National issued financial guaranty insurance policies (whether initially issued by (i) Financial Guaranty Insurance Corporation and subsequently novated to National, or (ii) MBIA Insurance Corporation and subsequently reinsured by National, together with all agreements and other documents related thereto, the "National Insurance Policies"), pursuant to which National guaranteed the scheduled payment of principal of and interest on such Senior COFINA Bond Claims (National) when due, as set forth in the National Insurance Policies.

The National Insurance Policies unconditionally and irrevocably guarantee the full and complete payment required to be made by or on behalf of COFINA to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Senior COFINA Bond Claims (National) as such payment shall become due but shall not be so paid (except that if there is any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the National Insurance Policies shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, subject to any of National's right to elect in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment that is subsequently recovered from any owner of the Senior COFINA Bond Claims (National) pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law.

The National Insurance Policies do not insure against loss of any prepayment premium that may at any time be payable with respect to any Senior COFINA Bond Claim (National). The National Insurance Policies do not, under any circumstance, insure against loss relating to, among other things: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; or (iii) payments of the purchase price of the Senior COFINA Bond Claims (National) upon tender by an owner thereof. The National Insurance Policies also do not insure against nonpayment or any other act or omission of the Bond Trustee or any other paying agent, if any, for the Senior COFINA Bond Claims (National).

*General*. National is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against National. National is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the U.S. Virgin Islands and the Territory of Guam.

The principal executive offices of National are located at 1 Manhattanville Road, Suite 301, Purchase, New York 10577 and the main telephone number at that address is (917) 765-3333.

*Regulation*. As a financial guaranty insurance company licensed to do business in the State of New York, National is subject to the New York Insurance Law which, among other

28

things, prescribes minimum capital requirements and contingency reserves against liabilities for National, limits the classes and concentrations of investments that are made by National and required the approval of policy rates and forms that are employed by National. State law also regulates the amount of both the aggregate and individual risks that may be insured by National, the payment of dividends by National, changes in control with respect to National, and transactions among National and its affiliates.

The National Insurance Policies are not covered by the Property/Casualty Insurance Security Funds specified in Article 76 of the New York Insurance Law.

### *Financial Strength Ratings of National*.

On December 1, 2017, at the request of National, S&P Global Ratings withdrew its "A" financial strength rating on National. On January 17, 2018, Moody's downgraded the financial strength rating of National to Baa2 from A3 with a stable outlook. Moody's Investors Services, at its discretion and in the absence of a contract with National, continues to maintain ratings on National. On December 5, 2017, at the request of National, Kroll Bond Rating Agency withdrew its rating. Any further explanation as to the significance of the ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates. National does not guaranty the market price of the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates nor does it guaranty that the ratings on the Existing Securities, COFINA Bonds, Senior COFINA Bond Claims (National) and/or National Certificates will not be revised or withdrawn.

### *National Financial Information.* Based upon statutory financials, as of September 30, 2018, National had total net admitted assets of $3.5 billion (unaudited), total liabilities of $1.4 billion (unaudited), and total surplus of $2.1 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning National, see the financial statements of MBIA Inc. and its subsidiaries as of December 31, 2017, prepared in accordance with generally accepted accounting principles, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 2017.

### *Incorporation of Certain Documents by Reference.* The following documents filed by MBIA Inc. with the SEC are incorporated by reference into this Disclosure Statement:

(1)      MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017;

(2)     MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended September 30, 2018.

Any documents, including any financial statement of National and its subsidiaries that are included therein or attached as exhibits thereto, filed by MBIA Inc. pursuant to section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") after the date of MBIA Inc.'s most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the Voting Deadline established by the Disclosure Statement Order shall be deemed to be incorporated by reference in this Disclosure Statement and to be a part hereof from the respective dates of filing such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Disclosure Statement, shall be deemed to be modified or superseded for purposes of this Disclosure Statement to the extent that a statement contained herein or in any other subsequently filed documents that also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2017 and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended June 30, 2018) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA, Inc.'s web site at http://www.nationalpfg.com; and (iv) at no cost, upon request to MBIA, Inc. at its principal executive offices.

National makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by National and presented under the heading "COFINA Bond Insurance – (a) National Public Finance Guarantee Corporation."

**(b)     *Ambac Assurance Corporation***

The following information has been furnished by Ambac for the use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated herein by reference. Ambac issued a financial guaranty insurance policy (the "Ambac Insurance Policy") for some of the "Senior" Existing Securities (the "Ambac Insured Bonds"), pursuant to which Ambac guaranteed the scheduled payment of principal of and interest on such Ambac Insured Bonds when due, as set forth in the Ambac Insurance Policy.  As described in section 17.1 of the Plan of Adjustment, holders of Senior COFINA Bond Claims (Ambac) who elect to receive the Ambac Certificates will deposit their Ambac Insured Bonds in the Ambac Trust, which will be considered the holder of such Ambac Insured Bonds, in exchange for the Ambac Certificates.   The following information is provided as a summary and shall not be deemed to modify the terms of the Ambac Insurance Policy (which terms govern to the extent of any inconsistency with the summary below).

30

*Payment Pursuant to Ambac Insurance Policy*. Under the terms of the Ambac Insurance Policy, Ambac is obligated to pay to The Bank of New York Mellon, in New York, New York, or any successor thereto (the "Insurance Trustee"), or, at Ambac's discretion, to the registered holders of the Ambac Insured Bonds, that portion of the principal of and interest on the Ambac Insured Bonds that shall become Due for Payment but shall be unpaid by reason of Nonpayment (as each of such terms is defined in the Ambac Insurance Policy) by COFINA. Under the terms of the Ambac Insurance Policy, Ambac is obligated to make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes Due for Payment or within one business day following the date on which Ambac shall have received notice of Nonpayment from the Bond Trustee.

The Ambac Insurance Policy insures payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. Under the Ambac Insurance Policy, if the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on the outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. Under the Ambac Insurance Policy, if there is any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by COFINA). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

The Ambac Insurance Policy does **not** insure any risk other than Nonpayment (as set forth in the Ambac Insurance Policy). Specifically, the Ambac Insurance Policy does **not** cover, among other things:

(1)     payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

(2)     payment of any redemption, prepayment or acceleration premium, which at any time may become due in respect of any obligations, other than at the sole option of Ambac; and

(3)     nonpayment of principal or interest caused by the insolvency or negligence of the Bond Trustee, paying agent or bond registrar, if any.

Under the Ambac Insurance Policy and the bond documents for the Ambac Insured Bonds, if it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy. Payment of interest

31

pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the holder's right to payment to Ambac.

Under the Ambac Insurance Policy and the bond documents for the Ambac Insured Bonds, upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, and the right to payment of the principal of and interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering holder's rights to such payment, in each case to the extent of such payment.

*General.* Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states (except Tennessee), the District of Columbia, the Commonwealth and the U.S. Virgin Islands (although certain licenses have been suspended or restricted), with admitted assets of approximately $3,159,221,803 (unaudited) and statutory capital of approximately $1,120,927,510 (unaudited) as of September 30, 2018. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve.

Ambac makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by Ambac and presented under the heading "COFINA Bond Insurance – (b) Ambac Assurance Corporation."

*Available Information.* The parent company of Ambac, Ambac Financial Group, Inc. ("AFG"), is subject to the informational and periodic reporting requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549. Please call the SEC at 1-800-SEC-0330 for further information on the public reference room. The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding issuers that file electronically with the SEC, including AFG. These reports, proxy statements and other information can also be read at AFG's internet website at www.ambac.com.   AFG's common stock and warrants are listed on NASDAQ and trade under the symbols "AMBC" and "AMBCW," respectively.

Copies of Ambac's financial statements prepared on the basis of accounting practices prescribed or permitted by the State of Wisconsin's Office of the Commissioner of Insurance are available from Ambac and can also be read at AFG's internet website at www.ambac.com. The address of Ambac's administrative offices is One State Street Plaza, 16th Floor, New York, New York 10004, and its telephone number is (212) 658-7470.

*Incorporation of Certain Documents by Reference.* The following documents filed by AFG with the SEC (File No. 1-10777) are incorporated by reference in this Disclosure Statement:

(1)     The Company's Current Reports on Form 8-K filed on February 15, 2018;

(2)     The Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 and filed on February 28, 2018;

(3)     The Company's Quarterly Report on Form 10-Q for the quarter ended March 31, 2018 filed on May 9, 2018;

(4)     The Company's Current Reports on Form 8-K filed on May 18, 2018;

(5)     The Company's Current Reports on Form 8-K filed on June 25, 2018;

(6)     The Company's Current Reports on Form 8-K filed on July 16, 2018;

(7)     The Company's Current Reports on Form 8-K filed on July 26, 2018;

(8)     The Company's Quarterly Report on Form 10-Q for the quarter ended June 30, 2018 filed on August 8, 2018; and

(9)     The Company's Quarterly Report on Form 10-Q for the quarter ended September 30, 2018 filed on November 7, 2018.

Ambac's consolidated financial statements and all other information relating to Ambac and subsidiaries included in AFG's periodic reports filed with the SEC subsequent to the date of this Disclosure Statement and prior to the Effective Date shall, to the extent filed (rather than furnished pursuant to Item 9 of Form 8-K), be deemed to be incorporated by reference into this Disclosure Statement and to be a part hereof from the respective dates of filing of such reports.

Any information contained in a document furnished by AFG incorporated in this Disclosure Statement by reference shall be modified or superseded for the purposes of this Disclosure Statement to the extent that any information contained in a subsequently filed document incorporated by reference herein modifies or supersedes such information.  Any information so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Disclosure Statement.

Copies of all information regarding Ambac that is incorporated by reference in this Disclosure Statement are available for inspection in the same manner as described above in "*Available Information*."

All documents subsequently filed by AFG pursuant to the requirements of the Exchange Act after the date of this Disclosure Statement will be available for inspection in the same manner as described above in "*Available Information*."

**(c)     *Assured Guaranty Municipal Corp.***

The following information has been furnished by Assured for use in this Disclosure Statement, and the Debtor makes no representation as to its fair presentation, accuracy, or completeness of information, including documents incorporated herein by reference. With respect to certain "First Subordinate" Existing Securities (the "Assured Insured Bonds"), Assured issued municipal insurance policies (including policies issued in the secondary market,

and together with all agreements and other documents related thereto, the "Assured Insurance Policies"), pursuant to which Assured guaranteed the scheduled payment of principal of and interest on such Assured Insured Bonds when due, as set forth in the Assured Insurance Policies.

**Payment Pursuant to Assured Insurance Policy.** Under the terms of the Assured Insurance Policies, Assured agreed to pay to the trustee (the "Assured Insured Bonds Trustee") or paying agent (the "Assured Insured Bonds Paying Agent") for the Assured Insured Bonds, for the benefit of the Owners of the applicable Assured Insured Bonds or, at the election of Assured, directly to each Owner of an applicable Assured Insured Bond, and subject to the terms of the applicable Assured Insurance Policy, that portion of the principal of and interest on the applicable Assured Insured Bonds that shall become Due for Payment (as defined below) but shall be unpaid by reason of Nonpayment (as defined below) by COFINA.

On the later of the day on which such principal and interest becomes Due for Payment or the Business Day next following the Business Day on which Assured shall have received Notice of Nonpayment, Assured will disburse to or for the benefit of each Owner of an applicable Assured Insured Bond the face amount of principal of and interest on the Assured Insured Bond that is then Due for Payment but is then unpaid by reason of Nonpayment by COFINA, but only upon receipt, by Assured, in a form reasonably satisfactory to it, of (a) evidence of the Owner's right to receive payment of the principal or interest then Due for Payment and (b) evidence, including any appropriate instruments of assignment, that all of the Owner's rights with respect to payment of such principal or interest that is Due for Payment shall thereupon vest in Assured. Upon disbursement in respect of an Assured Insured Bond, Assured shall become the owner of the Assured Insured Bond, any appurtenant coupon to the Assured Insured Bond or right to receipt of payment of principal of or interest on the Assured Insured Bond and shall be fully subrogated to the rights of the Owner, including the Owner's right to receive payments under the Assured Insured Bond, to the extent of any payment by Assured under the applicable Assured Insurance Policy. Payment by Assured to the Assured Insured Bonds Trustee or Assured Insured Bonds Paying Agent for the benefit of the Owners shall, to the extent of such payment, discharge the obligation of Assured under the applicable Assured Insurance Policy.

For the purposes of this section of the Disclosure Statement, solely as it pertains to information furnished by Assured for use in this Disclosure Statement, the following terms shall have the following meanings:

"Business Day" means any day other than (a) a Saturday or Sunday or (b) a day on which banking institutions in the State of New York or Assured's fiscal agent are authorized or required by law or executive order to remain closed.

"Due for Payment" means (a) when referring to the principal of an Assured Insured Bond, payable on the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity unless Assured shall elect, in its sole discretion, to pay such principal due upon such acceleration together with any accrued interest to the date of acceleration and (b) when referring to interest on an Assured Insured Bond, payable on the stated date for payment of interest.

34

"Nonpayment" means, in respect of an Assured Insured Bond, the failure of COFINA to have provided sufficient funds to the Assured Insured Bonds Trustee or Assured Insured Bonds Paying Agent for payment in full of all principal and interest that is Due for Payment on such Assured Insured Bond.

"Notice" means telephonic or telecopied notice, subsequently confirmed in a signed writing, or written notice by registered or certified mail, from an Owner, the Assured Insured Bonds Trustee or the Assured Insured Bonds Paying Agent to Assured which notice shall specify (a) the person or entity making the claim, (b) the Policy Number, (c) the claimed amount and (d) the date such claimed amount became Due for Payment.

"Owner" means, in respect of an Assured Insured Bond, the person or entity who, at the time of Nonpayment, is entitled under the terms of such Assured Insured Bond to payment thereof, except that "Owner" shall not include COFINA or any person or entity whose direct or indirect obligation constitutes the underlying security for the Assured Insured Bonds.

***General.*** Assured is a New York domiciled financial guaranty insurance company and an indirect subsidiary of Assured Guaranty Ltd. ("AGL"), a Bermuda-based holding company whose shares are publicly traded and are listed on the New York Stock Exchange under the symbol "AGO". AGL, through its operating subsidiaries, provides credit enhancement products to the U.S. and global public finance, infrastructure, and structured finance markets. Neither AGL nor any of its shareholders or affiliates, other than Assured, is obligated to pay any debts of Assured or any claims under any insurance policy issued by Assured.

Assured's financial strength is rated "AA" (stable outlook) by S&P Global Ratings, a business unit of Standard & Poor's Financial Services LLC ("S&P"), "AA+" (stable outlook) by Kroll Bond Rating Agency, Inc. ("KBRA") and "A2" (stable outlook) by Moody's Investors Service, Inc. ("Moody's"). Each rating of Assured should be evaluated independently. An explanation of the significance of the above ratings may be obtained from the applicable rating agency. The above ratings are not recommendations to buy, sell or hold any security, and such ratings are subject to revision or withdrawal at any time by the rating agencies, including withdrawal initiated at the request of Assured in its sole discretion. In addition, the rating agencies may at any time change Assured's long-term rating outlooks or place such ratings on a watch list for possible downgrade in the near term. Any downward revision or withdrawal of any of the above ratings, the assignment of a negative outlook to such ratings or the placement of such ratings on a negative watch list may have an adverse effect on the market price of any security guaranteed by Assured. Assured only guarantees scheduled principal and scheduled interest payments payable by the issuer of bonds insured by Assured on the date(s) when such amounts were initially scheduled to become due and payable (subject to and in accordance with the terms of the relevant insurance policy), and does not guarantee the market price or liquidity of the securities it insures, nor does it guarantee that the ratings on such securities will not be revised or withdrawn.

***Current Financial Strength Ratings***. On June 26, 2018, S&P announced it had affirmed Assured's financial strength rating of "AA" (stable outlook). Assured can give no assurance as to any further ratings action that S&P may take.

On May 7, 2018, Moody's announced it had affirmed Assured's insurance financial strength rating of "A2" (stable outlook). Assured can give no assurance as to any further ratings action that Moody's may take.

On January 23, 2018, KBRA announced it had affirmed Assured's insurance financial strength rating of "AA+" (stable outlook). Assured can give no assurance as to any further ratings action that KBRA may take.

For more information regarding Assured's financial strength ratings and the risks related thereto, see AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2017.

*Capitalization of Assured.* At June 30, 2018:

- The policyholders' surplus of Assured was approximately $2,221 million.

- The contingency reserves of Assured and its indirect subsidiary Municipal Assurance Corp. ("MAC") (as described below) were approximately $1,166 million. Such amount includes 100% of Assured's contingency reserve and 60.7% of MAC's contingency reserve.

- The net unearned premium reserves and net deferred ceding commission income of Assured and its subsidiaries (as described below) were approximately $1,898 million. Such amount includes (i) 100% of the net unearned premium reserve and deferred ceding commission income of Assured, (ii) the consolidated net unearned premium reserves and net deferred ceding commissions of Assured's wholly owned subsidiary Assured Guaranty (Europe) plc ("AGE"), and (iii) 60.7% of the net unearned premium reserve of MAC.

The policyholders' surplus of Assured and the contingency reserves, net unearned premium reserves and deferred ceding commission income of Assured and MAC were determined in accordance with statutory accounting principles. The net unearned premium reserves and net deferred ceding commissions of AGE were determined in accordance with accounting principles generally accepted in the United States of America.

*Incorporation of Certain Documents by Reference.* Portions of the following documents filed by AGL with the SEC (File No. 001-32141) that relate to Assured are incorporated by reference in this Disclosure Statement and shall be deemed to be a part hereof:

(1) AGL's Annual Report on Form 10-K for the fiscal year ended December 31, 2017 (filed by AGL with the SEC on February 23, 2018);

(2) AGL's Quarterly Report on Form 10-Q for the quarterly period ended March 31, 2018 (filed by AGL with the SEC on May 4, 2018); and

(3) AGL's Quarterly Report on Form 10-Q for the quarterly period ended June 30, 2018 (filed by AGL with the SEC on August 2, 2018).

All consolidated financial statements of Assured and all other information relating to Assured included in, or as exhibits to, documents filed by AGL with the SEC pursuant to Section 13(a) or 15(d) of the Securities Exchange Act of 1934, as amended, excluding Current Reports or portions thereof "furnished" under Item 2.02 or Item 7.01 of Form 8-K, after the filing of the last document referred to above and before the termination of the solicitation shall be deemed incorporated by reference into this Disclosure Statement and to be a part hereof from the respective dates of filing such documents. Copies of materials incorporated by reference are available over the internet at the SEC's website at http://www.sec.gov, at AGL's website at http://www.assuredguaranty.com, or will be provided upon request at Assured Guaranty Municipal Corp.: 1633 Broadway, New York, New York 10019, Attention: Communications Department (telephone (212) 974-0100). Except for the information referred to above, no information available on or through AGL's website shall be deemed to be part of or incorporated in this Disclosure Statement.

Any information regarding Assured included herein under the caption "Assured Guaranty Municipal Corp." or included in a document incorporated by reference herein (collectively, the "Assured Information") shall be modified or superseded to the extent that any subsequently included Assured Information (either directly or through incorporation by reference) modifies or supersedes such previously included Assured Information. Any Assured Information so modified or superseded shall not constitute a part of this Disclosure Statement, except as so modified or superseded.

Assured makes no representation regarding this Disclosure Statement, including but not limited to the fair presentation, accuracy or completeness of information contained in this Disclosure Statement, nor has it participated in the preparation of this Disclosure Statement, other than in connection with the information supplied by Assured and presented under the heading "COFINA Bond Insurance – (c) Assured Guaranty Municipal Corporation."

*Miscellaneous Matters.* Assured has not independently verified, makes no representation regarding, and does not accept any responsibility for the accuracy or completeness of this Disclosure Statement or any information or disclosure contained herein, or omitted herefrom, other than with respect to the accuracy of the information supplied by Assured regarding Assured and the Assured Insurance Policies.

### 4. Miscellaneous Contractual Obligations Related to the Existing Securities

*Debt Service Deposit Agreement.* COFINA, the Trustee, and Lehman Brothers Holdings, Inc., as Plan Administrator for Lehman Brothers Special Financing, Inc. ("Lehman"), entered into that certain Debt Service Deposit Agreement, dated as of July 1, 2008 (the "DSDA"). Pursuant to prior agreements, Lehman made upfront payments to the Puerto Rico Public Finance Corporation, and Lehman was owed money in connection with the reductions of cash flows under such prior agreements. In lieu of paying Lehman, the Trustee, COFINA, and Lehman executed the DSDA, whereby Lehman may cause certain "Qualified Securities" to be delivered to the Trustee on certain specified dates. If Lehman delivers such securities, the Trustee must purchase them at par out of funds available in the applicable debt service account. If COFINA redeems, defeases, repurchases, or refunds any of the "Senior" Existing Securities covered under the DSDA, COFINA must pay Lehman the "Termination Amount," which is

designed to preserve the economic equivalent of Lehman's rights under the DSDA. As of the date hereof, the DSDA provides no value to COFINA.

At this time, the Debtor intends to reject the DSDA. To the extent that the DSDA remains executory in nature, the DSDA will be deemed rejected pursuant to Plan § 18.1 as of the Effective Date unless otherwise rejected by COFINA in the interim. Consistent with the proof of claim filed by Lehman (Claim No. 42158), to the extent that Lehman has a Claim against COFINA arising under the DSDA (or the rejection thereof), such Claim has been classified in Class 9 as a general unsecured claim pursuant to the Plan of Adjustment.

**_Goldman Sachs Swap Agreement._** On July 12, 2007, COFINA and Goldman Sachs Bank USA (f/k/a Goldman Sachs Capital Markets, L.P.) ("GS Bank") entered into a swap agreement, governed by (i) the terms of a confirmation, dated July 12, 2007, and (ii) an International Swap Dealers Association, Inc. Master Agreement, dated as of July 31, 2007, as amended by (1) the Credit Support Annex to the Schedule to the ISDA Master Agreement, dated as of September 24, 2014, and (2) the Amendment to the ISDA Master Agreement, dated as of September 24, 2014 (collectively, the "GS Swap Agreement"). The GS Swap Agreement provides for a variety of payments under a fixed schedule and requires COFINA to post collateral over time.

## B.  Summary of COFINA's Revenues, Assets, and Liabilities

### 1.  Flow of COFINA Pledged Taxes

Pursuant to Act 117-2006, as amended ("Act 117"), the Commonwealth imposed for the first time a tax on the sale or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% and authorized its municipalities to impose a municipal sales and use tax of up to 1.5%. In May 2015, the Commonwealth also imposed a 4.5% sales and use tax surcharge, which is the property of the Commonwealth and not available to COFINA.

Each month, on or prior to the 10th day, merchants and retailers are required to file the returns and pay all sales and use tax revenues collected during the prior month (including the SUT Revenues) to Banco Popular de Puerto Rico ("Banco Popular") or any other agent designated by the Secretary of the Treasury of Puerto Rico. Banco Popular is required to transfer all sales and use tax revenues (including the SUT Revenues) to a joint collection account (the "Sales Tax Account"). Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers all SUT Revenues on a daily basis (with a 2 day delay) to a dedicated sales tax fund (the "DSTF"), an account established pursuant to Act 91 and held at Banco Popular's Trust Department in the name of COFINA. Act 91 provides that all funds deposited in the DSTF and all future funds that must be deposited into the DSTF pursuant to the provisions of Act 91 are "the property of COFINA."

Commencing at the beginning of each fiscal year of the Commonwealth, which begins on July 1 (the "Fiscal Year"), Banco Popular transfers on a daily basis all moneys on deposit in the DSTF to an account (the "Revenue Account") that also is owned by COFINA and held at Bank of New York Mellon ("BNYM") until the Pledged Sales Tax Base Amount established for each Fiscal Year has been deposited therein. Under the Existing Bond Resolution, after an amount

38

equal to the Pledged Sales Tax Base Amount has been deposited in the Revenue Account, all SUT Revenues are distributed to the Puerto Rico Treasury Department for general use by the Commonwealth until the Commonwealth also has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, the Existing Bond Resolution provides that half of all SUT Revenue collected is transferred to the Revenue Account to serve as collateral for the Existing Securities and the other half is transferred to the Treasury Department for use by the Commonwealth.

On the last business day of each calendar month, amounts deposited in the Revenue Account are transferred to certain debt service accounts and debt service reserve accounts established for the Existing Securities according to the priorities set forth in section 505 of the Existing Bond Resolution until each debt service account holds sufficient funds to make principal and interest payments for the next 12-month period (or 15-month period for bonds that pay debt service quarterly or monthly) and each debt service reserve account holds an amount calculated under the applicable supplemental resolution adopted by COFINA with respect to each series of Existing Securities issued. The funds transferred to the debt service accounts are then allocated to a principal subaccount, an interest subaccount, and a holding subaccount (collectively, with the Revenue Account, the debt service accounts, and the debt service reserve accounts, the "Project Accounts"). Payments on the Existing Securities are made from the principal and interest subaccounts. The Project Accounts are accounts of COFINA that are maintained by BNYM and are subject to the lien of the holders of COFINA Bonds.

### 2.    Security for Existing Securities

Pursuant to the Existing Bond Resolution, the Existing Securities are limited obligations of COFINA payable solely from, and secured by a grant of a security interest in, the Pledged Property.  It should be noted that there is an existing dispute as to whether the Existing Bond Resolution in fact grants COFINA a valid security interest in the Pledged Property.  This dispute, referred to as the Commonwealth-COFINA Dispute, is described further in Section IV.E of this Disclosure Statement.  In general, the Existing Bond Resolution defines "Pledged Property" to consist of (i) all "Revenues" (as discussed below), and all right, title and interest of COFINA in and to the Revenues and all rights to receive the same, (ii) the funds, accounts and subaccounts held by the Trustee (subject in each case to certain limited exceptions), and certain other moneys, securities and cash equivalents from time to time held by the Trustee under the terms of the Existing Bond Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by COFINA to the Trustee under the Existing Bond Resolution as and for additional security for the Existing Securities, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property described in clauses (i) through (iii) above, including those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Existing Bond Resolution defines the term "Revenues" to consist of all Pledged Sales Tax collections received by COFINA or the Trustee and other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of COFINA or by the Trustee, lawfully available for the purposes of the Existing Bond Resolution and deposited by or on behalf of COFINA or by the Trustee in any fund, account or subaccount held by the Trustee (subject in each case to certain limited exceptions).  It should be noted that it is disputed whether the security interest in the Pledged Property received by COFINA continues after commencement of the Title III Case.

39

### III.   Significant Events Leading to Commencement of COFINA's Title III Case

**A.    The Commonwealth's Steady Operational and Financial Decline**

**1.    The Commonwealth**

*General.* The Commonwealth is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated by the United States Census Bureau of approximately 3.34 million as of July 1, 2017.

The Commonwealth came under United States sovereignty pursuant to the Treaty of Paris of 1898. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized the Commonwealth to draft and approve its own Constitution, which was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of the Commonwealth, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952. The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative and judicial branches of government. The current Governor, Ricardo Rosselló Nevares, was sworn into office for a four-year term on January 2, 2017. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms.

Residents of the Commonwealth do not vote in Presidential elections and are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied on Puerto Rico source income earned by Puerto Rico residents.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth exercises virtually the same control over its internal affairs as do each of the 50 states. Recently, as a result of the current fiscal crisis that affects the Commonwealth, the United States Congress enacted PROMESA, which established the Oversight Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs while the Oversight Board remains in existence under PROMESA.  Congress created the Oversight Board for the purpose of providing a method for the Commonwealth and its instrumentalities to achieve fiscal responsibility and access to capital markets.

*Description of the Commonwealth's Public Corporations and Instrumentalities.* In the Commonwealth, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the Commonwealth. Public corporations may obtain revenues from rates charged for services or products, but, as described further below, many receive sizable subsidies from the Commonwealth. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the Commonwealth.

Public corporations, such as COFINA and the PFC, have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (in the case of COFINA) or appropriations (in the case of PFC) as their sole source of repayment.

### 2. Description of the Commonwealth's Economy and Fiscal Challenges

*General.* The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis. Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues. During the past 12 years, the Commonwealth's balance sheet has significantly deteriorated due to years of economic contraction, recurring budget deficits, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions.

The Commonwealth's balance sheet deterioration, combined with continued structural imbalances between revenues and expenditures and the Commonwealth's inability to access the capital markets, resulted in the Commonwealth and certain of its instrumentalities becoming unable to make scheduled debt payments while continuing to provide government services and ultimately being placed into debt restructuring proceedings under Title III of PROMESA.

*The Commonwealth's Economy.* The Commonwealth's economy entered a recession in the fourth quarter of fiscal year 2006, and the Commonwealth's gross national product ("GNP") has contracted (in real terms) every fiscal year between 2007 and 2017, with the exception of fiscal year 2012. The slight GNP growth in fiscal year 2012 was due mainly to the large number of stimuli and deficit spending injected into the Commonwealth's economy during the period and not as a result of economic recovery.

The Puerto Rico Planning Board (the "Planning Board") has the legal responsibility of creating an annual Economic Report to the Governor and the Legislative Assembly, presenting the Commonwealth's economic outlook and an analysis of its economic behavior. According to the Planning Board's report released in January 2018, the Commonwealth's real GNP for fiscal years 2016 and 2017 decreased by 1.3% and 2.4%, respectively. The Planning Board's GNP forecast for fiscal year 2018, which was released in April 2017 and has not been revised, projects a contraction of 1.5%. These numbers do not account for the impact of Hurricanes Irma or María.

In Fiscal Year 2017, preliminary aggregate personal income in the Commonwealth was $64.5 billion and personal income per capita was $19,140.

The economy of the Commonwealth is closely linked to the United States economy, as most of the external factors that affect the Commonwealth's economy are determined by the policies and performance of the United States economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation and tourist expenditures. During Fiscal Year 2017, approximately 78% of the Commonwealth's exports went to the United States mainland, while the United States mainland was the source of approximately 53% of the Commonwealth's imports.

41

*Recurrent Deficits.* One of the principal causes of the Commonwealth's current fiscal crisis has been its inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the costs of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities (such as employee retirement benefits), the ballooning cost of healthcare and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to generally accepted accounting principles in the United States.

*Employment.* Total average annual employment, as measured by the Commonwealth's Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey," has decreased in recent years. The reduction in total employment began in the fourth quarter of Fiscal Year 2007, when total employment was 1,244,425, and continued to decline consistently until the first half of fiscal year 2015, after which time employment levels largely stabilized. According to the Household Survey, during fiscal year 2017, total employment remained relatively unchanged from the prior Fiscal Year, with a 0.4% decrease compared to the same period for the prior Fiscal Year, while the unemployment rate averaged 11.5%, compared to 11.7% for the prior Fiscal Year.

According to the Department of Labor and Human Resources' Current Employment Statistics Survey (Establishment Survey – NAICS Codes), total payroll for non-farm employment decreased by 1% during Fiscal Year 2017 as compared to Fiscal Year 2016. Total private employment also fell during Fiscal Year 2017 by 0.6%, which translates to a reduction of almost 4,000 employees, as compared to the same period for the prior Fiscal Year.

*Aggregate Debt Burden of the Commonwealth and Its Instrumentalities.* As of March 31, 2017, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $72.1 billion (including accreted interest on capital appreciation bonds). For Fiscal Year 2019, the aggregate scheduled annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities is approximately $4.6 billion. The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Connecticut, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. state median. The Commonwealth's tax-supported debt per capita, as a share of GDP and as a share of personal income, is also disproportionally high when compared to mainland jurisdictions.

*Pension Liabilities.* In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of the most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Prior to fiscal year 2018, Commonwealth employees, together with employees of certain public corporations (excluding PREPA and UPR, which have separate retirement plans) and municipalities, participated in the following three principal retirement systems: ERS, the Puerto Rico System of Annuities and Pensions for Teachers ("TRS") and the Retirement System for the Judiciary of the Commonwealth of Puerto Rico ("JRS" and, together with ERS and TRS, the "Retirement

Systems"). ERS is the largest of the three Retirement Systems.  The combined Retirement Systems' net pension liability was approximately $49 billion as of June 30, 2015.

*Hurricanes Irma and Maria*.  In September 2017, Hurricanes Irma and Maria struck Puerto Rico causing widespread damage throughout the island and exacerbating the economic challenges described above. Hurricane Maria made landfall in Puerto Rico on September 20, 2017, bringing sustained winds of 155 miles per hour and significant rainfall over a 30-hour period of time.  Hurricane Maria crossed Puerto Rico diagonally, entering through the southeast and exiting through the northwest region of the island.  The hurricane caused catastrophic destruction in Puerto Rico, leaving the island completely without power and flooding many streets and roads.  Only two weeks prior to Hurricane Maria, Hurricane Irma—one of the strongest hurricanes ever recorded in the Atlantic—passed by Puerto Rico's northern coast.  As a result of the massive impact of the hurricanes, the government of Puerto Rico undertook a series of actions to address the crisis.  As it relates to COFINA, on November 8, 2017, the Governor issued executive order OE-2017-068, which established a 10% reimbursement for certain small and mid-sized business on their SUT filings from August 2017 through November 2017. Further, due to the extended power outages in the wake of Hurricane Maria that left many people without access to refrigeration or ovens, the Governor temporarily waived SUT collections on prepared foods through December 2017 to enable relief organizations and families to maximize their resources.

## B.    Creation of AAFAF

On April 6, 2016, the Government enacted the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act (the "Moratorium Act"), which granted the governor of the Commonwealth (the "Governor") the authority to, among other things, (i) implement a moratorium on debt service payments, (ii) redirect certain revenues assigned to public entities for the payment of their obligations to the payment of essential services, and (iii) temporarily stay related creditor remedies. In connection with the Moratorium Act, the former Governor, Alejandro García Padilla, issued a number of executive orders, including orders to declare a moratorium on the payment of debt service by various government entities, including the Commonwealth.

Also on April 6, 2016, AAFAF was created under the Moratorium Act for the purpose of assuming GDB's role as fiscal agent, financial advisor and reporting agent to the Commonwealth and its instrumentalities and municipalities. In January 2017, AAFAF's role was expanded to include additional responsibilities related to the restructuring of the indebtedness of the Commonwealth and its instrumentalities and to oversee compliance with the fiscal plans and budgets of said entities approved by the Oversight Board pursuant to PROMESA.

## C. Summary of PROMESA[22]

### 1. Enactment of PROMESA

On June 30, 2016, Congress enacted PROMESA, which provides a framework for the Commonwealth and its covered instrumentalities to restructure their indebtedness by establishing, among other things:

- the Oversight Board, which provides oversight of the Commonwealth's and COFINA's restructuring efforts by, among other things, (i) reviewing and approving fiscal plans and budgets for the Commonwealth and its covered instrumentalities, and (ii) representing the Commonwealth and its covered instrumentalities in any cases commenced under Title III of PROMESA;

- a court-supervised, quasi-bankruptcy process under Title III similar to chapter 9 of the Bankruptcy Code to allow the Commonwealth and its covered instrumentalities to restructure their indebtedness pursuant to a plan of adjustment;

- a Congressional Task Force on Economic Growth in Puerto Rico that reports to Congress on the conditions leading to the Commonwealth's fiscal crisis and the status of the Commonwealth's public debt; and

- a framework for the designation, oversight and implementation of critical infrastructure projects aimed at growing the Commonwealth's economy.

### 2. Creation of the Oversight Board

Pursuant to PROMESA section 101(a), the Oversight Board was established upon the enactment of PROMESA for the purpose of providing "a method for a covered territory to achieve fiscal responsibility and access to the capital markets." The Oversight Board currently consists of seven voting members appointed by the President of the United States from a bipartisan list of nominees and a non-voting *ex officio* member appointed by the Governor. On August 31, 2016, President Obama appointed the Oversight Board's seven voting members, who are (1) José B. Carrión III, (2) Carlos M. García, (3) David A. Skeel, Jr., (4) Andrew G. Biggs, (5) Arthur J. González, (6) José R. González, and (7) Ana J. Matosantos. Christian Sobrino Vega currently serves as the Commonwealth's non-voting *ex officio* member of the Oversight Board.

Each member of the Oversight Board serves a three-year term without any compensation and may be appointed to an unlimited number of consecutive terms, but the President of the United States may remove any member for cause.

In addition to its seven voting members and non-voting *ex officio* member, the Oversight Board also has an executive team, which includes (i) Natalie A. Jaresko, as Executive Director,

---

[22] This section summarizes certain provisions of PROMESA. Although the Debtor believes that this description covers the materially relevant provisions of PROMESA, this summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, PROMESA.

(ii) Jaime El Koury, as General Counsel, (iii) Kyle A. Rifkind, as Deputy General Counsel, and (iv) Noel Zamot, as Revitalization Coordinator. Pursuant to the Oversight Board's bylaws, the Executive Director acts as the chief executive officer of the Oversight Board with general supervision and direction of its business affairs (including the power to enter into contracts on behalf of the Oversight Board), subject to the supervision and control of the Oversight Board. The General Counsel acts as the chief legal officer of the Oversight Board. The Revitalization Coordinator is responsible for executing the duties prescribed under PROMESA section 503 relating to the identification, prioritization and implementation of critical infrastructure projects for the Commonwealth.

In accordance with PROMESA section 108(a), the Oversight Board acts as an autonomous entity, such that neither the Governor nor the Legislative Assembly may exercise any control over the Oversight Board and its activities and cannot take any actions that would impair or defeat the purposes of PROMESA. Although created by federal statute, the Oversight Board is not a "department, agency, establishment, or instrumentality of the Federal Government." Instead, as set forth in PROMESA section 101(c)(1), the Oversight Board is deemed "an entity within the territorial government" of the Commonwealth. The Oversight Board operates from offices located in San Juan, Puerto Rico and New York, New York.

In accordance with PROMESA section 209, the Oversight Board will continue in existence until the Oversight Board certifies that: (i) the Commonwealth has adequate access to short-term and long-term capital markets at reasonable interest rates to meet its borrowing needs; and (ii) for at least four consecutive Fiscal Years (a) the Commonwealth has developed its budgets in accordance with modified accrual accounting standards, and (b) the expenditures made by the Commonwealth during each such Fiscal Year did not exceed its revenues during that year, as determined in accordance with modified accrual accounting standards.

### 3. Oversight Board Powers and Responsibilities

*Certification of Fiscal Plans and Budgets*

One of the cornerstones of PROMESA is the development, approval and enforcement of fiscal plans and budgets for the Commonwealth and its covered instrumentalities. Such fiscal plans and budgets provide a framework for achieving fiscal responsibility and access to the capital markets. Fiscal plans are long-term planning tools, covering a period of at least five Fiscal Years, while budgets cover at least one Fiscal Year. Budgets must be consistent with the fiscal plan then in effect.

PROMESA contemplates that the Oversight Board and the elected government of the Commonwealth will work together to adopt a fiscal plan. The process begins with the Oversight Board providing the Governor with a schedule for the development, submission, and approval of fiscal plans for the Commonwealth and any covered instrumentality. The Governor is required to submit the proposed fiscal plan in accordance with such schedule. Following submission, the Oversight Board may certify the proposed fiscal plan if it determines that such fiscal plan meets 14 statutory requirements set forth in PROMESA, which are designed to "provide a method to achieve fiscal responsibility and access to the capital markets." The fiscal plan must:

- provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws, or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- ensure the funding of essential public services;

- provide adequate funding for public pension systems;

- provide for the elimination of structural deficits;

- for Fiscal Years covered by a fiscal plan in which a stay under Title III or Title IV of PROMESA is not effective, provide for a debt burden that is sustainable;

- improve fiscal governance, accountability and internal controls;

- enable the achievement of fiscal targets;

- create independent forecasts of revenue for the period covered by the fiscal plan;

- include a debt sustainability analysis;

- provide for capital expenditures and investments necessary to promote economic growth;

- adopt appropriate recommendations submitted by the Oversight Board;

- include such additional information as the Oversight Board deems necessary;

- ensure that assets, funds or resources of a territorial instrumentality are not loaned to, transferred to or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III or a Qualifying Modification approved under Title VI of PROMESA; and

- respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

The Oversight Board reviews the proposed fiscal plan and determines whether it satisfies these 14 requirements. If the Oversight Board determines that the fiscal plan satisfies these requirements, it will approve and certify the fiscal plan. If the Oversight Board determines that the fiscal plan does not satisfy these requirements, it will issue a notice of violation to the Governor that includes recommendations for revisions to the fiscal plan and an opportunity to correct the violations. The exchange of proposed fiscal plans and Oversight Board recommendations can continue, as long as there is time, until the Oversight Board is satisfied with the fiscal plan submitted by the Governor. However, if the Governor fails to submit a fiscal plan or a revised fiscal plan that, in the Oversight Board's sole discretion, satisfies the

46

requirements set forth above within the time frame set by the Oversight Board, the Oversight Board is required to develop and certify a fiscal plan that satisfies such requirements. Alternatively, at the Oversight Board's option, instead of exchanging proposed fiscal plans and recommendations, the Governor and the Oversight Board may jointly develop and certify a fiscal plan that reflects a consensus between them.

After certification of the fiscal plan, the Oversight Board will provide to the Governor and the Legislative Assembly a schedule for the development, approval and certification of budgets for the Commonwealth and its covered instrumentalities. The Oversight Board also must provide to the Governor and the Legislative Assembly a revenue forecast for use in developing the budget. If the Oversight Board determines that the proposed Commonwealth budget submitted by the Governor is compliant with the certified fiscal plan, the Oversight Board will approve it and submit it to the Legislative Assembly. If the Oversight Board determines in its sole discretion that the proposed budget is not compliant with the fiscal plan, it will provide a notice of violation to the Governor that includes a description of the necessary corrective action and an opportunity to correct such violation by submitting a revised budget that complies with the fiscal plan. The Governor may submit as many revised budgets as the schedule established by the Oversight Board permits. However, if the Governor fails to submit a Commonwealth budget that complies with the fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit to the Governor and the Legislative Assembly a budget that complies with the certified fiscal plan. The Legislative Assembly will then submit to the Oversight Board the budget it adopts in order that the Oversight Board can determine whether such budget complies with the certified fiscal plan. If the Oversight Board determines that the budget adopted by the Legislative Assembly complies with the certified fiscal plan, the Oversight Board will issue a compliance certification for such budget. If the Oversight Board determines that the budget adopted by the Legislative Assembly does not comply with the certified fiscal plan, the Oversight Board will provide to the Legislative Assembly a notice of violation that includes a description of the necessary corrective action and an opportunity to correct such violation. The Legislative Assembly may submit as many revised budgets as the schedule established by the Oversight Board permits. If the Governor and the Legislative Assembly fail to develop and approve a budget that complies with the fiscal plan within the time frame set by the Oversight Board, the Oversight Board must develop and submit a budget that complies with the certified fiscal plan before the first day of the Fiscal Year for which the Commonwealth budget is being developed. Such budget shall be deemed approved by the Governor and Legislative Assembly, the subject of a compliance certification issued by the Oversight Board, and in full force and effect beginning on the first day of the applicable Fiscal Year. Budgets of instrumentalities are developed by the Governor and follow a similar process between the Governor and the Oversight Board, whereby the Governor develops an instrumentality budget and the Oversight Board reviews it to determine whether it complies with the instrumentality's certified fiscal plan. If the Governor fails to develop an instrumentality budget that complies with the certified fiscal plan for that instrumentality before the first day of the Fiscal Year, the Oversight shall submit to the Governor a revised budget which shall be deemed approved by the Governor, the subject of a compliance certificate issued by the Oversight Board and in full force and effect for the applicable Fiscal Year.

Not later than 15 days after the last day of each quarter of a Fiscal Year, the Governor must submit to the Oversight Board a financial report for the Commonwealth and each covered

47

instrumentality describing actual revenues, expenditures and cash flows for such quarter. If the Oversight Board determines that actual revenues, expenditures and cash flows are not consistent with the projected revenues, expenditures or cash flows set forth in the certified budget for such quarter, the Oversight Board will establish a deadline by which the Commonwealth must provide an explanation for the inconsistency that the Oversight Board finds reasonable or the Commonwealth must implement corrective actions to address such inconsistency. If the Commonwealth fails to provide a reasonable explanation or to correct the inconsistency, the Oversight Board must certify to the President, the United States Congress, the Governor, and the Legislative Assembly that the Commonwealth is inconsistent with the certified budget and describe the amount of the inconsistency. After providing such certification and determining that the Commonwealth has failed to correct the inconsistency, the Oversight Board must make appropriate reductions in non-debt expenditures to ensure that revenues and expenses are in compliance with the Commonwealth's certified budget. In the case of an instrumentality, the Oversight Board can also institute automatic hiring freezes and prohibit such instrumentality from entering into any contract.

Since the enactment of PROMESA on June 30, 2016, the Oversight Board has certified budgets for the Commonwealth for fiscal years 2018 and 2019. The Commonwealth's general fund budget for Fiscal Year 2019 as certified by the Oversight Board authorizes approximately $8.8 billion in expenditures. The three largest categories of general fund expenditures in Fiscal Year 2019 are: (1) K-12 and higher education (25%); (2) pension paygo obligations (22%); and (3) public safety (10%). Healthcare expenditures funded by the general fund are substantially lower than in prior years due to a temporary increase in Medicaid funds, which covers the majority of total local healthcare costs through September 2019. Relative to Fiscal Year 2018, the Commonwealth's general fund budget also included material reductions in payroll expenditures ($271 million) and subsidies to the University of Puerto Rico ($71 million) and municipalities ($44 million), and the elimination of the Christmas bonus ($67 million). The current budget also included new expenditures such as police salary increases ($19 million) and overtime back pay ($122 million) and salary increases for teachers ($24 million). The budget also included strict controls on spending and reapportionment authority to enforce fiscal discipline. In addition, for Fiscal Year 2019, the Oversight Board certified separate budgets for each instrumentality in order to provide greater transparency and improve budget monitoring.

In furtherance of the foregoing duties, the Oversight Board has the authority to enforce the fiscal plans and budgets by reviewing certain activities of the government of the Commonwealth and its instrumentalities. Accordingly, the Commonwealth's proposed legislative acts must be submitted to the Oversight Board and must be accompanied by an estimate of the new law's impact on expenditures and revenues. The Oversight Board also has the authority to review any of the contracts, rules, regulations and orders of the Commonwealth and its covered instrumentalities for their economic impact on the fiscal plans and budgets. If the Oversight Board determines that any of the foregoing activities are inconsistent with a fiscal plan or budget, the Oversight Board may (subject to certain limitations set forth in PROMESA) take any actions necessary to ensure that the enactment of a new law or execution of a new contract will not adversely affect compliance with the fiscal plan or budget. In addition, the Oversight Board at any time may submit to the Governor or the Legislative Assembly recommendations for actions that would ensure compliance with the fiscal plans or otherwise promote financial stability and management responsibility in the Commonwealth's public corporations. The

48

Commonwealth may adopt or reject such recommendations, subject to providing a report to the President of the United States and Congress on its justifications for rejecting any recommendations.

The Commonwealth and its covered instrumentalities may not issue any debt without the approval of the Oversight Board pursuant to PROMESA section 207.

### Title III of PROMESA

PROMESA provides the Commonwealth and its instrumentalities with two alternative methods to adjust unsustainable debt: (i) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modification to financial debt can be accepted by a supermajority of creditors; and (ii) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of the Bankruptcy Code.

PROMESA Title III establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under chapter 9 of the Bankruptcy Code. Under PROMESA section 302, in order to be a debtor under Title III, the territory and/or its instrumentalities must (i) have an Oversight Board established for it or be designated a "covered entity"; (ii) have the Oversight Board issue a restructuring certification under PROMESA section 206(b); and (iii) "desire to effect a plan [of adjustment] to adjust its debt." The Oversight Board has sole authority to file a voluntary petition seeking protection under PROMESA Title III.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. Immediately upon filing the Title III petition, Bankruptcy Code sections 362 and 922 (which are incorporated into Title III cases under PROMESA) apply to automatically stay litigation against the debtor (the "Title III Stay"). After the Title III case is commenced, the Chief Justice of the United States Supreme Court must designate a district court judge to sit by designation and preside over the Title III case. PROMESA section 303 also provides that the commencement of a Title III case "does not limit or impair the powers of a covered territory to control by legislation or otherwise the exercise of the political or governmental powers of the territory or territorial instrumentality," subject, however, to the limitations contained in PROMESA Titles II and III.

The core component of the Title III case is the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file a plan of adjustment and to modify a plan of adjustment prior to confirmation. In order to be confirmed, a proposed plan of adjustment must meet the requirements set forth under PROMESA section 314.

### Other Powers and Responsibilities

Pursuant to PROMESA section 208, within 30 days after the end of each Commonwealth Fiscal Year, the Oversight Board is required to submit an annual report to the President of the United States, Congress, the Governor and the Legislative Assembly. The annual report must describe the Commonwealth's progress in achieving PROMESA's objectives and how the Oversight Board has assisted such progress. In addition, the Oversight Board must describe the

49

precise manner in which it used its allocated funds during the Fiscal Year. The annual report may also include the Oversight Board's recommendations for further federal action, including amending PROMESA or enacting other legislation, to support compliance with certified fiscal plans.

In addition to the foregoing core responsibilities, the Oversight Board has also been granted other significant powers to assist in achieving its objectives. These additional powers include, among other things:

1. holding hearings and sessions;

2. obtaining official data from the Commonwealth, the federal government and creditor information;

3. accepting, using and disposing of gifts;

4. issuing subpoenas;

5. entering into contracts;

6. enforcing the laws of the Commonwealth prohibiting public sector employees from participating in a strike or lockout;

7. certifying voluntary restructuring agreements and protecting pre-existing restructuring agreements between the Commonwealth and its creditors;

8. certifying debt modifications under Title VI of PROMESA;

9. initiating civil actions to enforce its authority under PROMESA;

10. imposing appropriate penalties against officers or employees of the Commonwealth for violations of valid orders of the Oversight Board;

11. investigating the Commonwealth's disclosure and selling practices related to its bonds;

12. ensuring the prompt payment and administration of Commonwealth taxes;

13. analyzing any materially underfunded pensions in the Commonwealth's pension system; and

14. intervening in any litigation filed against the Commonwealth or its covered instrumentalities.

## D.    Adoption of Commonwealth Fiscal Plan and COFINA Fiscal Plan

To fulfill its mission of achieving for the Commonwealth fiscal responsibility and market access, the Oversight Board evaluates the macroeconomic framework underlying the fiscal plans (including for COFINA) proposed by the Governor.  Thus, starting as early as September 2016,

50

the Oversight Board, alongside its economists, municipal consultants, and financial advisors, spent hundreds of hours in research and working sessions in order to understand the dire situation in Puerto Rico.  The Oversight Board also held numerous internal meetings and external meetings with government officials and the various creditor groups.  The Oversight Board got up to speed on the many fiscal challenges that Puerto Rico faces and within only a few months was in a position to formulate its own fiscal plan or evaluate the Government's proposed fiscal plan.

The Oversight Board was also tasked with providing recommendations to ensure that the proposed plans comport with the requirements and goals of PROMESA.   Among these requirements is that the fiscal plan provide Puerto Rico with a method to achieve fiscal responsibility and access to the capital markets.  In addition, Congress in PROMESA expressed the view that any durable solution for Puerto Rico's fiscal crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.[23]

On March 11, 2017, Governor Rosselló Nevares submitted a joint fiscal plan of the Commonwealth, which included COFINA, to the Oversight Board, and the advisors of the Governor and of the Oversight Board engaged in extensive discussions on March 11 and 12, 2017.  After the Governor submitted a final revised version of the fiscal plan on March 13, 2017, the Oversight Board voted unanimously to certify the joint fiscal plan, as amended, on March 13, 2017.  The joint fiscal plan has evolved over the past nineteen (19) months based upon a multitude of factors, including the devastation caused by Hurricanes Irma and Maria that hit Puerto Rico approximately six months after the March 2017 certification of the fiscal plan, and the resulting effect upon Puerto Rico and its inhabitants.

Following the devastation caused by Hurricanes Irma and María, the Oversight Board certified a revised fiscal plan for the Commonwealth on April 19, 2018 after extensive discussions between the Oversight Board and the Government of Puerto Rico to address issues regarding labor reform in the fiscal plan.  The Oversight Board and Governor Rosselló continued to engage in good-faith negotiations over labor reform in the Commonwealth fiscal plan, and on May 30, 2018, the Oversight Board certified a revised Commonwealth fiscal plan that incorporated the Oversight Board and Governor's compromise regarding labor reform, including the repeal of certain legislation.  The Legislative Assembly, however, ultimately failed to pass any repeal of such legislation, and on June 29, 2018, the Oversight Board re-certified its revised version of the Commonwealth fiscal plan that reverted back to the April 19, 2018 fiscal plan requirements.

A revised Commonwealth fiscal plan that certified on June 29, 2018 was subject to an adversary complaint filed on July 5, 2018 by Governor Rosselló and AAFAF in *Rosselló Nevares v. The Financial Oversight and Management Board for Puerto Rico*, Adv. Proc. No. 18-00080.  In their adversary complaint, Governor Rosselló and AAFAF sought declaratory and injunctive relief against (a) the Oversight Board, (b) each of its members, and (c) its Executive

---

[23] PROMESA section 701 ("It is the sense of the Congress that any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States.").

Director, solely in their official capacities, seeking (i) a declaration that the Oversight Board lacks the authority to impose policy initiatives on the Government through a fiscal plan and/or budget, including the fiscal plan and budget, as certified by the Oversight Board; (ii) a declaration that the substantive policy mandates contained in the certified fiscal plan and rejected by the Governor pursuant to PROMESA section 205 are null and void; (iii) a declaration that the substantive policy mandates contained in the certified budget exceeds the Board's powers and are null and void; and (iv) an injunction against the defendants that would prohibit them from implementing and enforcing the Oversight Board's rejected policy recommendations contained in the certified fiscal plan and budget.

After a hearing on July 25, 2018, the Title III Court issued a ruling partially dismissing certain claims of the complaint. On September 10, 2018, the Governor and AAFAF moved the Title III Court to certify its decision for immediate interlocutory appeal to the U.S. Court of Appeals for the First Circuit. On September 21, 2018, the Oversight Board filed its opposition to the motion, arguing that the Governor and AAFAF have failed to show any of the statutory predicates for certification of an interlocutory appeal. On September 27, 2018, the Governor and AAFAF filed a reply in support of their motion, arguing that all three grounds set out in the legal standard for certification have been met, although only one is needed to be sufficient.    On October 9, 2018, the Title III court denied plaintiffs' certification motion, but, on its own motion, certified for immediate interlocutory appeal certain aspects of its order dismissing certain claims of the complaint.  Specifically, the aspects of the dismissal order which address claims concerning the following two issues are certified for appeal: (i) whether plaintiffs were entitled to declarations concerning the ability of the Oversight Board to treat as mandatory fiscal plan and budgetary provisions that the Governor had specifically rejected; and (ii) the issue of whether the certification of a budget under PROMESA precludes reprogramming of previously-authorized expenditures from prior years.  The Title III Court noted that for both issues there is no controlling Supreme Court or First Circuit authority, and that a definitive appellate resolution of these issues can clarify the legal context for the resolution of certain policy-based conflicts between the Government and the Oversight Board, mapping important contours of the "awkward power-sharing arrangement" between the Oversight Board and the Government that has been created by PROMESA.

On August 21, 2018, the Commonwealth submitted a revised fiscal plan to the Oversight Board, which incorporated substantial updates to the Commonwealth fiscal plan certified on June 29, 2018.  On August 30, 2018, the Oversight Board delivered to the Commonwealth a notice of violation pursuant to PROMESA section 201(c)(3)(B) requiring certain revisions before the Oversight Board could certify the fiscal plan as compliant with the requirements of PROMESA.  On September 7, 2018, the Commonwealth submitted a revised fiscal plan to the Oversight Board.  On October 23, 2018, the Oversight Board voted to certify the Commonwealth fiscal plan, as amended.

In connection with negotiations surrounding the Original PSA (as further described below in Section IV.E.4 of this Disclosure Statement, entitled "Entry into the Amended PSA") and in anticipation of the transactions contemplated by the Original PSA, on August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for Fiscal Years 2019 to 2023.  On August 27, 2018, COFINA submitted its fiscal plan to the Oversight Board.  On August 30, 2018, the Oversight Board delivered to COFINA a notice of violation pursuant to

52

section PROMESA 201(c)(3)(B) requiring certain changes and/or explanations in a revised COFINA fiscal plan. On September 7, 2018, COFINA submitted a revised fiscal plan to the Oversight Board. On October 18, 2018, the Oversight Board voted to certify the COFINA fiscal plan, as amended.

### E.   Summary of Certain Pre-Title III Litigation Relevant to COFINA

#### 1.   The Commonwealth-COFINA Dispute and the Lex Claims Litigation

The Commonwealth has issued or guaranteed approximately $17.8 billion in general obligation bond debt (the "GO Debt"). The GO Debt falls into two categories: (i) the general obligation bonds issued by the Commonwealth (the "GO Bonds") that are backed by a pledge of the Commonwealth's full faith, credit, and taxing power; and (ii) bonds issued by certain of the Commonwealth's public corporations, which are guaranteed by the same pledge of the Commonwealth's full faith, credit, and taxing power.

On July 20, 2016, certain holders of the GO Bonds commenced an action in the U.S. District Court for the District of Puerto Rico against the Commonwealth and several of its officials, including the Governor, seeking (a) declaratory relief that the *Puerto Rico Emergency Moratorium and Financial Rehabilitation Act*, Act 21-2016 ("Act 21"), which authorized the Governor to, among other things, declare a temporary moratorium on debt service and stay creditor remedies, and an executive order issued pursuant to Act 21 announcing a moratorium on payment of the Commonwealth's GO Bonds, are preempted by PROMESA section 204(c)(3), and (b) an injunction to prevent certain measures taken by the Commonwealth permitting transfers outside of the ordinary course. *Lex Claims, LLC v. García-Padilla*; District Court, District of Puerto Rico, July 20, 2016, Case No. 16-2374-FAB (the "Lex Claims Litigation"). On November 6, 2016, the plaintiffs filed a second amended complaint adding new causes of action, including three causes of action relating to COFINA, and adding COFINA and other parties as defendants. On December 16, 2016, COFINA filed an answer to the second amended complaint generally denying the allegations and asserting various affirmative defenses.

Plaintiffs in the Lex Claims Litigation argued, among other things, that the Puerto Rico Constitution requires the Commonwealth to pay the GO Debt ahead of any other expenditure. They point to article VI, section 8 of the Puerto Rico Constitution, which provides that if Puerto Rico's "available resources" are insufficient to meet all its appropriations, "interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, section 8. In their view, the Pledged Sales Tax is an "available resource" and COFINA was created and has issued bonds in an attempt to evade the claim of holders of GO Debt on available resources and related constitutional limitation on the quantity of public debt the Commonwealth was permitted to issue.

Holders and insurers of the Existing Securities, permitted to intervene in the Lex Claims Litigation, argue that the Pledged Sales Tax was legislatively rendered property of COFINA from its inception, thereby eliminating any possibility that such tax may be property or "available resources" of the Commonwealth. They point to Act 91 providing the Pledged Sales Tax "shall [not] constitute available resources of the Commonwealth of Puerto Rico nor be

available for the use of the Secretary." Act 91, section 2. They further assert that COFINA was essential in permitting the Commonwealth to access the capital markets on favorable terms.

Following the commencement of the Title III Case, the Title III Court entered an order on May 17, 2017 staying the Lex Claims Litigation. There has been no further activity in this action since the commencement of the Title III Case. In accordance with the terms of the Amended PSA, on the Effective Date, certain claims in the Lex Claims Litigation shall be dismissed with prejudice.

2. ***Whitebox Multi-Strategy Partners, L.P., et al. v Bank of New York Mellon Corp.*, 651969/2017 (Sup. Ct. N.Y. County April 12, 2017) (the "<u>Whitebox Lawsuit</u>")**

On April 12, 2017, plaintiffs Whitebox Multi-Strategy Partners, L.P. and certain of its affiliates (collectively, "<u>Whitebox</u>") commenced a civil action against BNYM, as the trustee for sales tax revenue bonds issued by COFINA, in the New York Supreme Court, County of New York. Whitebox asserted causes of action against BNYM for breach of trust, breach of fiduciary duty, waste, breach of contract, breach of the implied covenant of good faith and fair dealing, and a declaratory judgment. Each cause of action is premised upon allegations that an event of default occurred under the Existing Bond Resolution prior to April 29, 2017, and that BNYM breached alleged duties to Whitebox by failing to declare such defaults and resign as trustee of the "Senior" or the "First Subordinate" Existing Securities. The Whitebox Lawsuit was removed to the United States District Court for the Southern District of New York [Case No. 17-CV-3750-LTS], and venue was transferred to the Title III Court [Adv. Proc. No. 17-AP-143-LTS]. Pursuant to an order entered by the Title III Court in the Interpleader Action (as defined below), the Whitebox Lawsuit is stayed pending further order of the Title III Court.

3. ***Ambac Assurance Corp. V. The Bank of New York Mellon*, 652356/2017 (Sup. Ct. N.Y. May 2, 2017) (the "<u>Ambac Lawsuit</u>" and, together with the Whitebox Lawsuit, the "<u>Lawsuits</u>")**

On May 2, 2017, Ambac commenced a civil action against BNYM, as the trustee for sales tax revenue bonds issued by COFINA, in the New York Supreme Court, County of New York. Ambac asserted causes of action against BNYM for breach of fiduciary duty, breach of contract, breach of the implied covenant of good faith and fair dealing, gross negligence / breach of trust, and a declaratory judgment. Ambac alleges in each cause of action that an event of default occurred under the Existing Bond Resolution prior to April 29, 2017, and that BNYM breached alleged duties to Ambac by failing to declare such defaults and resign as trustee of the "Senior" and the "First Subordinate" Existing Securities. The Ambac Lawsuit was removed to the United States District Court for the Southern District of New York, and BNYM has requested that venue be transferred to the Title III Court. Pursuant to an order entered by the Title III Court in the Interpleader Action (as defined below), the Ambac Lawsuit is stayed pending further order of the Title III Court.

BNYM believes that the Lawsuits, including any claims and causes of action for gross negligence, willful misconduct, or intentional fraud, which are not dismissed pursuant to the Plan of Adjustment, lack merit and should be dismissed with prejudice. BNYM claims, and

54

Whitebox and Ambac disagree, that the Lawsuits should fail for a variety of reasons, including, without limitation: (i) there were no defaults or events of default under the Existing Bond Resolution prior to April 29, 2017; (ii) BNYM had no obligation to perform any act that would involve it in expense or liability, or to exercise any of the rights or powers vested in it by the Existing Bond Resolution at the request or direction of bondowners, unless the bondowners offered BNYM security or indemnity satisfactory to BNYM against the costs, expenses, and liabilities that might be incurred by it in compliance with the request or direction, and neither Whitebox nor Ambac provided such indemnity; and (iii) a failure to comply with the no-action clause contained in Section 1106.1 of the Existing Bond Resolution.

Whitebox and Ambac disagree. First, they contend that prior to April 29, 2017, BNYM was consistently warned (by Whitebox, Ambac, and other holders of "Senior" Existing Securities) that multiple events of default had occurred, and that by letters dated May 1 and May 4, 2017, BNYM itself notified COFINA that an event of default had occurred. Second, Whitebox and Ambac contend that, under New York law, following an event of default an indenture trustee assumes a special duty to secure the assets of the trust and act with undivided loyalty to trust beneficiaries, which BNYM failed to do. Third, Whitebox and Ambac contend that no limitations or exculpatory provisions contained in the indenture will shield a trustee's actions that are inconsistent with its duty of undivided loyalty to trust beneficiaries.

BNYM further asserts that it may have claims or causes of action against other parties, including holders of beneficial interests in the "First Subordinate" Existing Securities, as well as additional claims and causes of action against Whitebox and Ambac. Specifically, BNYM asserts that, in the Lawsuits, Whitebox and Ambac allege that BNYM improperly made payments of principal and interest to owners of "First Subordinate" Existing Securities after the occurrence of one or more alleged events of default, when such payments allegedly should have been made to, or held for the benefit of, owners of "Senior" Existing Securities. As a result, BNYM claims, and Whitebox and Ambac disagree, that **if the Title III Court or another court determines that such payments were improper, BNYM could seek the return of those funds from prior, current, or future beneficial holders of "First Subordinate" Existing Securities or their transferees, successors, or assigns.**

Whitebox and Ambac disagree that BNYM could, as a matter of law, assert a non-frivolous, non-sanctionable claim against holders of "First Subordinate" Existing Securities (or their transferees, successors, or assigns). Whitebox and Ambac contend that BNYM has failed to articulate a viable basis for such claims. Whitebox and Ambac likewise contend that BNYM has not articulated a viable basis for any claims or causes of action against them.

The Plan of Adjustment provides for a determination by the Title III Court as to an appropriate amount of funds, if any, to be reserved or posted by Whitebox and Ambac for the benefit of BNYM's fees and expenses which may be incurred in defense of the Lawsuits. BNYM has expressed concern that, notwithstanding such judicial determination, it may face the risk of satisfaction of such fees and expenses and more protection should be afforded. Specifically, BNYM asserts that, pursuant to Section 804 of the Existing Bond Resolution, COFINA is obligated to pay to BNYM from time to time reasonable compensation for all services rendered under the Existing Bond Resolution and to indemnify and make BNYM harmless against any loss, liability, or expenses arising out of or in connection with the

55

acceptance or administration of the trusts or trusts under the Existing Bond Resolution, including the costs and expenses of defending itself against any claim or liability in connection with the exercise or performance of any of its powers or duties under the Existing Bond Resolution, except to the extent that such loss, damage, claim, liability, or expense is due to its own gross negligence, willful misconduct or intentional fraud. BNYM further claims, and COFINA disagrees, that the obligations of COFINA under Section 804 of the Existing Bond Resolution survive the satisfaction and discharge of the Existing Securities and the termination for any reason of the Existing Bond Resolution.

BNYM has informally asserted that the Plan of Adjustment impairs its secured claim and other legal, equitable, and contractual rights under Sections 804 and 1103.1 of the Existing Bond Resolution without classifying BNYM's secured claim and providing it an opportunity to vote to accept or reject the Plan of Adjustment. In that regard, and despite the clear language of the Plan of Adjustment, BNYM alleges that the Plan of Adjustment does not provide for the satisfaction of all of BNYM's reasonable fees and expenses incurred under the Existing Bond Resolution following the Effective Date, the Plan of Adjustment deprives BNYM of its lien on all funds held by BNYM under the Existing Bond Resolution by compelling the distribution of those funds prior to the satisfaction in full of BNYM's secured claim against COFINA, and the Plan of Adjustment deprives BNYM of its contractual priority of payment vis-à-vis all bondowners and beneficiaries other than with respect to those Existing Securities insured or beneficially owned by Ambac and Whitebox. COFINA believes that the provisions of the Plan of Adjustment providing for the payment of any and all fees, to the extent deemed appropriate by the Title III Court, are more than adequate to protect BNYM and, at the same time, provide recoveries for all parties not involved in the Lawsuits.

### 4. *Rodriguez-Perello, et al. v. Rosselló-Nevares, et al.*, Case No. 17-cv-1566-FAB

On May 2, 2017, certain COFINA bondholders commenced an action for declaratory and injunctive relief against COFINA, AAFAF, GDB, Governor Rosselló and certain other governmental officials. Plaintiffs asserted that their interest in the Existing Securities provided them with contract and property rights protected by the Constitutions of the United States and the Commonwealth, as well as federal and Puerto Rico statutes. Plaintiffs further asserted that the defendants had unlawfully and unconstitutionally impaired these contractual rights and taken plaintiffs' property. In the action, plaintiffs sought protection and vindication of their rights through a declaratory judgment that defendants had breached plaintiffs' constitutional, statutory, and contractual obligations to COFINA bondholders, and injunctive relief against defendants' continuation of those breaches.

Following the commencement of the Title III Case, the Title III Court entered an order on May 17, 2017 staying the litigation. There has been no further activity in this action since the commencement of the Title III Case.

### 5. Other Creditor Litigation

Pursuant to PROMESA section 405, the establishment of the Oversight Board operated as a temporary stay of all actions, claims, and proceedings in any court or tribunal with respect to any Liability, as defined in PROMESA section 405(a), of the Commonwealth and its territorial

instrumentalities. As soon as the PROMESA section 405 stay expired, dozens of creditors threatened to file or pursue lawsuits against the Commonwealth and its territorial instrumentalities. In response, the Oversight Board had little choice but to file petitions under Title III of PROMESA for the Commonwealth and certain of its instrumentalities, which gave rise to a further stay and continue to protect the Commonwealth and its territorial instrumentalities.

## F. Commencement of the Commonwealth Title III Case

After negotiations with its creditor constituencies, the Commonwealth was unable to negotiate—and saw no prospect of negotiating—an out-of-court resolution that would address its financial situation and lay a foundation for economic recovery and prosperity going forward without a renegotiation of outstanding debts. Accordingly, on May 3, 2017, the Oversight Board, at the request of the Governor, issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for the Commonwealth pursuant to PROMESA section 304(a), commencing the Commonwealth Title III Case.

On June 23, 2017, the Title III Court entered the *Order Appointing Mediation Team* [Case No. 17-3283, ECF No. 430] "to further the goal of the successful, consensual resolution of the issues raised in these debt adjustment proceedings." The members of the mediation team currently include: (1) Judge Barbara Houser (Bankr. N.D. Tex.); (2) Judge Thomas Ambro (3d. Cir.); (3) Judge Nancy Atlas (S.D. Tex.); (4) Judge Victor Marrero (S.D.N.Y.); and (5) Judge Roberta Colton (Bankr. M.D. Fla.).

## IV. Overview of COFINA's Title III Case

## A. Commencement of COFINA's Title III Case

On May 5, 2017, the Oversight Board, at the request of the Governor, issued a restructuring certification pursuant to PROMESA sections 104(j) and 206 and filed a voluntary petition for relief for COFINA, pursuant to PROMESA section 304(a), commencing the Title III Case (the Title III Case, together with the Commonwealth Title III Case, the "Title III Cases").

On June 1, 2017, the Title III Court entered an order granting the joint administration of the Commonwealth Title III Case and the Title III Case, for procedural purposes only [Case No. 17-3283, ECF No. 242].

Since the Petition Date, the Title III Stay has provided COFINA with an important "breathing spell" to address its financial circumstances and craft a plan of adjustment without interference from adverse creditor actions.

## B. Lex Claims Motion for Relief from the Automatic Stay

On June 7, 2017, the UBS Family of Funds and the Puerto Rico Family of Funds (together, the "Puerto Rico Funds"), and mutual funds managed by Oppenheimer Funds, Inc., Franklin Advisers, Inc., and the First Puerto Rico Family of Funds (collectively, the "Movants") filed the *Puerto Rico Funds and Mutual Funds Group's Motion for Relief from the Automatic Stay* [Case No. 17-3283, ECF No. 270] (the "Lex Claims Motion") seeking an order lifting that

automatic stay to allow the Lex Claims Litigation, before the U.S. District Court for the District of Puerto Rico, to proceed in order for the District Court to decide the Puerto Rico Funds' motion to certify the question of the constitutionality of COFINA to the Puerto Rico Supreme Court (the "Certification Motion"), and if the Certification Motion is granted, to allow the Puerto Rico Supreme Court to consider and decide the certified questions. In the alternative, Movants requested that the Lex Claims Litigation be transferred pursuant to PROMESA section 306(d)(3) to the Title III Cases as an adversary proceeding.

The Title III Court denied the Lex Claims Motion without prejudice, holding that (1) the Movants did not show that lifting the stay would result in a partial or complete resolution of the issues where it was uncertain that the District Court would grant the certification if the stay was lifted or, if the Certification Motion was granted, that the Puerto Rico Supreme Court would accept certification; (2) judicial economy would not be achieved by lifting the automatic stay because the Title III Court had before it various adversary proceedings pending to address the very issues raised in the certified questions; (3) the certification had not been fully briefed in the Lex Claims Litigation, and the parties in the Lex Claims Litigation were not better positioned to litigate the issues in the certified questions than the parties to the Title III proceedings; and (4) the Movants have not demonstrated a particular harm that they are likely to suffer in the absence of relief from the automatic stay.

## C.    Other Related Litigation

### 1.    *Bank of New York Mellon v. COFINA, et al.*, Adv. Proc. No. 17-00133

On May 16, 2017, shortly after the commencement of the COFINA Title III Case, BNYM, as the trustee for the Existing Securities, filed an interpleader action in the Title III Court (the "Interpleader Action") seeking a court order determining competing claims to the funds generated from the Pledged Sales Taxes held in BNYM's possession (the "Disputed Funds")[24] by certain holders of beneficial interests in the Existing Securities (including Whitebox), insurers of the Existing Securities (including Ambac), and COFINA. As a neutral stakeholder, BNYM filed the Interpleader Action to preserve the Disputed Funds while the Title III Court resolved the parties' disputes. In the first stage of the Interpleader Action, the Title III Court recognized the parties' competing claims, granted BNYM's request to interplead the Disputed Funds, and ordered BNYM to hold the Disputed Funds (net of BNYM's fees and expenses) on behalf of the party or parties ultimately determined by the Title III Court to be entitled to them. In the second stage of the Interpleader Action, cross-motions for summary judgment were fully briefed and argued relating to a determination of the defendants' respective interests in the Disputed Funds and whether a default or event of default occurred under the Existing Bond Resolution and, if so, when such default or event of default occurred. The Title III Court's scheduling order provided that BNYM's requests for declaratory relief and any counterclaims of Whitebox and Ambac against BNYM would be determined in the third stage of the Interpleader Action. Among other affirmative claims, BNYM sought a declaratory judgment against all defendants, including Whitebox and Ambac, that there were no defaults or events of

---

[24] The Disputed Funds include the funds on deposit prior to July 1, 2018 in the debt service reserve and such other accounts and including earnings thereon held by BNYM, as the COFINA bond trustee, for the benefit of the bondholders. As summarized below, the Commonwealth-COFINA Settlement provides for the distribution of the Disputed Funds.

default under the Existing Bond Resolution prior to April 29, 2017. BNYM believes that a determination in its favor on that issue alone would be fatal to the Lawsuits.

On May 30, 2017, the Title III Court granted the interpleader request and ordered the Disputed Funds remain in trust and no distributions made until the Title III Court issues a final ruling in the Interpleader Action. From June to September 2017, several parties and parties in interest, including BNYM and certain creditors, served document requests and deposition subpoenas on various Puerto Rico Government entities, affiliates, and officials, including COFINA, the Government Development Bank for Puerto Rico, the Commonwealth, AAFAF, and the Oversight Board. The subpoenaed entities and individuals produced documents, but AAFAF and the Oversight Board each submitted binding statements of facts in lieu of depositions. On November 6, 2017, several parties in interest, including BNYM and certain creditors, filed motions for summary judgment. Briefing on the summary judgment motions was completed on January 5, 2018, and summary judgment is pending. On September 27, 2018, in light of the agreements and compromises under the Commonwealth-COFINA Settlement and the Plan of Adjustment, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 1, 2018. [Adv. Proc. No. 17-00133, ECF. No. 518].

### 2. *UTIER v. Puerto Rico Elec. Power Auth., et. al.*, Adv. Proc. No. 17-00228

Plaintiff challenges the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the Senate. Plaintiff seeks declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid. Plaintiff also seeks to enjoin the Oversight Board from exercising any authority granted to it by PROMESA.

Defendants moved to dismiss the amended complaint on November 3, 2017, arguing (i) Plaintiff lacks standing, and the Title III Court therefore lacks subject-matter jurisdiction, because it has not alleged harm from the Oversight Board's appointment and acts; and (ii) Plaintiff failed to state a claim under the Appointments Clause because (a) the Oversight Board does not implicate the Appointments Clause since it is part of the territorial, rather than federal, government, and (b) the Appointments Clause does not apply to Puerto Rico. Defendants further argued that UTIER seeks relief far broader than required by the claims it asserts. A hearing on the motion to dismiss was held on January 10, 2018.

On August 15, 2018, the Title III Court entered an opinion and order granting Defendants' motion to dismiss the amended complaint. The Title III Court held that Plaintiff had standing, but that, as it determined in another Appointments Clause challenge, *In re Fin. Oversight and Mgmt. Bd. for P.R.*, ___ F. Supp. 3d ___, 2018 WL 3425294, at *6 (D.P.R. July 13, 2018), there is no constitutional defect in the method of appointment. The Title III Court reasoned that the Oversight Board is an instrumentality of the Commonwealth established pursuant to Congress's plenary powers under the Territories Clause, and its members are not officers of the United States. On August 16, 2018, Plaintiffs filed a notice of appeal to the First Circuit, and on August 27, filed a motion to expedite the appeal. On September 7, 2018, the

First Circuit granted Plaintiffs' motion to expedite and also consolidated Plaintiffs' appeals (First Circuit Case No. 18-1787, Doc No. 00117336253) with two related Appointments Clause challenges brought by Aurelius Investment, LLC et al. (First Circuit Case No. 18-1671) and Assured Guaranty Corp. et al. (First Circuit Case No. 18-1746). Briefing in the consolidated appeals is ongoing, and oral argument before the First Circuit is scheduled for December 3, 2018.

### 3. *Cooperativa de Ahorro y Credito Abraham Rosa, et. al. v. Commonwealth of Puerto Rico, et. al.*, Adv. Proc. No. 18-00028

Plaintiffs—credit unions holding debt issued by the Commonwealth—brought an action against, among others, the Oversight Board, the Commonwealth, and its instrumentalities seeking (i) a declaratory judgment that their claims are nondischargeable, as defendants incurred debts through false pretenses/fraud; (ii) the designation of their claims as a separate class in any eventual plan of adjustment of the Commonwealth or any covered entity under PROMESA, and a declaratory judgment that their claims are nondischargeable under PROMESA; (iii) damages for breach of contract; (iv) remedies available under Commonwealth and federal securities laws and Commonwealth negligence, fiduciary duty, and fraud laws; and (v) unspecified damages under common law.

On August 6 and October 1, 2018, Defendants filed motions to dismiss the complaint. Plaintiffs' oppositions to the motions to dismiss are due December 6, 2018, and Defendants' replies are due January 9, 2019.

### 4. *Pinto-Lugo, et. al. v. United States of America, et. al.*, Adv. Proc. No. 18-00041

Plaintiffs allege that PROMESA is unconstitutional because it violates the First, Fifth, and Fourteenth Amendments to the United States Constitution, international treaties, and the Declaration of Independence. Plaintiffs primarily base their arguments on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs request (i) a declaration that PROMESA violates the aforementioned constitutional provisions, the Declaration of Independence, the United Nations Charter, the United Nations Declaration of Human Rights, and the International Covenant of Civil and Political Rights; (ii) the removal of two Oversight Board members; (iii) a stay of the Title III proceedings and the adoption of fiscal plans until an audit of the Commonwealth's debt can occur and any persons engaging in illegal conduct surrounding the sale of bonds is held liable; (iv) the United States assume the Commonwealth's public debt; and (v) an order prohibiting any sale of PREPA.

The United States, the Oversight Board, and Governor Rosselló all moved to dismiss the case, alleging that (i) Plaintiffs lacked standing, (ii) certain claims are barred by PROMESA sections 4, 105, and 210(a), (iii) the treaties do not create binding domestic legal obligation, (iv) the Declaration of Independence is not a legally operative document, (v) Congress is not constrained by separation-of-powers principles when it legislates pursuant to the Territories Clause, (vi) the court does not have the authority to remove Oversight Board members, and (vii) the Oversight Board is not obligated to conduct an audit.

The action is currently pending.

5. **_Unión de Empleados de la Corporación del Fondo del Seguro del Estado v. Government of the United States of America, et. al._**, **Adv. Proc. No. 18-00066**

Plaintiffs—three Commonwealth unions and four individual union members—allege that PROMESA violates the Thirteenth and Fifteenth Amendments to the United States Constitution and various international treaties and charters. Plaintiffs' claims are based primarily on their views on the *Insular Cases* and the United States' alleged treatment of Puerto Rico as a colony. Plaintiffs seek declaratory judgments that (i) PROMESA violates the Thirteenth and Fifteenth Amendments; (ii) the Oversight Board's acts to date are unconstitutional and null; and (iii) PROMESA violates various international treaties and charters. Plaintiffs further request that the court (i) overturn the *Insular Cases*; (ii) enjoin Defendants from acting pursuant to the authority granted by PROMESA; and (iii) direct Congress to decolonize Puerto Rico.

Plaintiffs' second amended complaint was filed on October 5, 2018. Defendants have twenty-eight (28) days to file an answer or otherwise respond to the second amended complaint.

6. **_In re The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico_**, **No. 18-1108**

Plaintiffs—beneficial owners of general obligation bonds issued by the Commonwealth and of bonds issued by certain Commonwealth instrumentalities—filed an adversary complaint on June 29, 2017. *ACP Master, Ltd., et al. v. The Commonwealth of Puerto Rico, et al.*, Adv. Proc. No. 17-ap-189. Plaintiffs asserted that their bonds are secured by an absolute and enforceable first claim and lien on all of the Commonwealth's available resources and that their debt is senior to all other debt issued by the Commonwealth. Plaintiffs also claim their bonds are "Constitutional Debt" entitled to unique protections under the Puerto Rico Constitution because they are backed by a pledge of the Commonwealth's good faith, credit, and taxing power. Plaintiffs further allege that the Constitutional Debt is entitled to full and timely payment. Plaintiffs seek declarations that (i) certain property tax and claw back revenues (collectively, the "Revenues") can only be applied to pay Constitutional Debt; (ii) the Commonwealth lacks an equitable or beneficial property interest in the Revenues and that Plaintiffs have statutory liens on the Revenues; (iii) Plaintiffs' liens on the claw back revenues are liens on special revenues; (iv) the Commonwealth's diversion of the Revenues is an unconstitutional taking; and (v) the Revenues must be segregated and cannot be used for any purpose other than paying Constitutional Debt. Plaintiffs also seek an injunction requiring Defendants to segregate and preserve the Revenues.

Defendants filed a motion to dismiss on August 21, 2017, principally arguing that the claims are precluded by PROMESA section 305 or seek advisory opinions. Defendants also argue that certain claims are precluded by PROMESA sections 4 and 106(e) and that Plaintiffs have no property interests in or liens on the Revenues. Defendants further argue that the Puerto Rico Constitution does not create a property right recoverable under its debt-repayment priority scheme and that certain counts fail because there is an adequate remedy at law (money damages).

The Title III Court granted the motion to dismiss in part for failure to state a claim and in part for lack of subject-matter jurisdiction. The Title III Court held that certain claims sought (1)

impermissible advisory opinions because they were vague or would not resolve any current concrete dispute or (2) were barred by PROMESA section 305 because they would interfere with the Commonwealth's use of its property or revenues or its governmental powers without the consent of the Oversight Board.

Plaintiffs appealed the decision to the First Circuit Court of Appeals.  The appeal has been fully briefed by the parties, and Altair Global Credit Opportunities Fund (A), LLC, *et al.* submitted an amicus brief.  Plaintiffs also filed a letter of supplemental authority regarding the First Circuit's decision in *In re Puerto Rico Electric Power Authority* (PREPA), No. 17-2079, and Defendants filed a letter in response.  Oral argument is currently scheduled for November 5, 2018.

### 7. *In re The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico*, No. 18-1746

On July 23, 2018, Assured filed an adversary complaint challenging the constitutionality of PROMESA on the grounds that the appointment of the members of the Oversight Board violated the Appointments Clause and separation-of-powers doctrine, inasmuch as the members were not appointed by the President with the advice and consent of the Senate.  *Assured Guaranty Corp., et al. v. The Financial Oversight and Management Board for Puerto Rico, et al.*, Adv. Proc. No. 18-ap-087.

On August 3, 2018, the Title III Court entered a stipulated judgment dismissing the case. Assured filed a notice of appeal to the First Circuit on the same day.  This appeal has been consolidated with related Appointments Clause challenges brought by Aurelius Investment, LLC, *et al.* (No. 18-1671) and UTIER (No. 18-1787).  The parties in the consolidated appeal have filed their initial briefs.  Appellants' reply briefs are due on October 24, 2018, and oral argument is scheduled for December 3, 2018.

### 8. *Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico*, Adv. Pro. No. 18-090-LTS

On July 25, 2018, Plaintiffs—members of the Popular Democratic Party—filed an adversary complaint seeking an order declaring that the Oversight Board's members were appointed in violation of the Appointments Clause; or, in the alternative, an order declaring that Congress's delegation of executive and legislative authority to the Oversight Board violates the separation-of-powers doctrine; or, in the alternative, an order declaring that the Oversight Board's exercise of authority over budgeting impermissibly interferes with the common-law right of legislative autonomy.  If Plaintiffs prevail on their constitutional claims, they request that the Title III Court enjoin the Oversight Board from exercising authority under PROMESA, and if Plaintiffs prevail on their common-law claim, they request that the Title III Court permanently enjoin the Oversight Board from engaging in such interference.  On July 30, 2018, the Title III Court certified the constitutional challenge to the Attorney General.

On August 24, 2018, the parties filed a joint status report in which Plaintiffs agreed to stay their claim that the Oversight Board's members were appointed in violation of the Appointments Clause pending a decision in Aurelius' appeal of the denial of its motion to

dismiss the Commonwealth Title III petition (the "*Aurelius* appeal") (Case Nos. 18-1671, 18-1746, 18-1787). Plaintiffs also agreed to dismiss their common-law claim. The parties disagreed as to whether Plaintiffs' remaining claim regarding the separation-of-powers doctrine should be stayed pending the resolution of the *Aurelius* appeal. On September 6, 2018, the Title III Court dismissed the common-law claim. On October 4, 2018, the Oversight Board filed a motion to stay litigation related to Plaintiffs' adversary complaint. Five days later, Plaintiffs filed an opposition to the Oversight Board's motion. The Oversight Board's reply brief is due on October 25, 2018.

## D. Claims Process and Bar Date

### 1. Section 924/925 Lists

Bankruptcy Code section 924 requires debtors to file a list of creditors. Bankruptcy Code section 925 provides that "[a] proof of claim is deemed filed" for claims set forth on the list of creditors required by Bankruptcy Code section 924 except as to claims that are "listed as disputed, contingent, or unliquidated." 11 U.S.C. § 925.

### 2. Bar Date Orders

Pursuant to the *Order (A) Establishing Deadlines and Procedures for Filing Proofs of Claims and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-3283, ECF No. 2521] (the "Initial Bar Date Order") and *Order (A) Extending Deadlines for Filing Proofs of Claim and (B) Approving Form and Manner of Notice Thereof* [Case No. 17-3283, ECF No. 3160] (together with the Initial Bar Date Order, the "Bar Date Orders"), the Title III Court established the following bar dates for filing proofs of claim in the Title III Cases:

- June 29, 2018 at 4:00 p.m., Atlantic Standard Time, as the general bar date for the filing of all proofs of claim (the "General Bar Date"), except as noted below;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is the first business day that is 35 days after the date of entry of the applicable order rejecting an executory contract or unexpired lease as the bar date for any Claims arising from the rejection of such executory contract or unexpired lease;

- the later of (a) the General Bar Date or (b) 4:00 p.m., Atlantic Standard Time, on the date that is 35 days after the date that a notice of an amendment to the List of Creditors is served on a claimant as the bar date for any Claims relating to such amendment to the List of Creditors.

The Bar Date Orders authorized the following parties to file master proofs of claim on behalf of the constituencies described below:

- The indenture trustees, fiscal agents, or any similar agent or nominee (each a "Bond Representative") for each respective series of bonds issued by a debtor or non-debtor (to the extent such Bond Representative exists) may file a master proof of claim against the applicable debtor on behalf of themselves and all holders of bond claims

for the respective series of bonds for obligations arising under the respective trust agreements, resolutions, or similar bond document (the "Bond Documents"); and

- Each agent under any credit agreement may file a separate master proof of claim against the applicable debtor on behalf of itself and all lenders under such credit agreement.

Approximately 3,472 proofs of claim have been filed in the Title III Case asserting Claims against COFINA and/or its property. BNYM, as trustee for Existing Securities, has filed various claims against COFINA on behalf of COFINA bondholders. In addition, many holders of COFINA Bonds also filed proofs of claim against COFINA. The Debtor believes that many of the proofs of claim filed by COFINA bondholders are duplicative of the claims filed by BNYM or otherwise resolved under the Plan of Adjustment.

## E.    The Commonwealth-COFINA Dispute

### 1.    General Background

The dominant issue in the COFINA Title III Case is the Commonwealth-COFINA Dispute (*i.e.*, the dispute regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA to secure repayment of certain indebtedness of COFINA). If such revenues are property of the Commonwealth, it is the Commonwealth's position that there may be no funds available to pay COFINA's debts. If such revenues are property of COFINA, then there will be approximately $750 million less available per year (which annual amount will increase over time) to pay the Commonwealth's liabilities and expenses.

### 2.    Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute

On June 10, 2017, the Oversight Board filed the *Motion of Debtors for Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* (the "Commonwealth-COFINA Dispute Procedures Motion") [Case No. 17-3283, ECF No. 303] to authorize a procedure to resolve the Commonwealth-COFINA Dispute in furtherance of fulfilling its responsibilities under PROMESA.

At the omnibus hearing held in San Juan, Puerto Rico on June 28, 2017, the Title III Court denied the Commonwealth-COFINA Dispute Procedures Motion without prejudice. The Title III Court (a) directed the Oversight Board to seek the agreement of all interested parties to a procedure for resolving the Commonwealth-COFINA Dispute through confidential mediation under the supervision of Chief Bankruptcy Judge Barbara Houser of the Northern District of Texas, and (b) authorized the Oversight Board to file a revised motion with or without unanimous support of interested parties. Following the hearing, the Oversight Board worked with Chief Bankruptcy Judge Houser and various creditors to formulate procedures agreeable to the interested parties.

On July 21, 2017, the Oversight Board filed the *Revised Motion of Debtors for Order Approving Stipulation Providing Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-3283, ECF No. 718] seeking approval of a stipulation establishing a protocol to address

the Commonwealth-COFINA Dispute, including appointing a Commonwealth agent and COFINA agent to litigate, mediate, and/or settle the Commonwealth-COFINA Dispute, and providing a procedure and timeline for the agents to consult with creditors and their respective debtors.

On August 10, 2017, the Title III Court entered the Procedures Order, which, among other things, provided that (a) the Oversight Board authorized the Creditors' Committee to serve as the agent for the Oversight Board, as representative of the Commonwealth in the Commonwealth Title III Case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of the Commonwealth (the "Commonwealth Agent"); and (b) the Oversight Board authorized Bettina Whyte to serve as the agent for the Oversight Board, as representative of COFINA in its Title III case, to litigate and/or settle the Commonwealth-COFINA Dispute on behalf of COFINA (the "COFINA Agent" and together with the Commonwealth Agent, the "Agents").[25] The Procedures Order defines the Commonwealth-COFINA Dispute as "whether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt are property of the Commonwealth or COFINA under applicable law . . . ." Procedures Order ¶ 4.

The Procedures Order also expressly acknowledges that the Oversight Board retains its authority to separately develop a settlement to the Commonwealth-COFINA Dispute and propose plans of adjustment for the Commonwealth and COFINA. Specifically, the Procedures Order provides that "the Oversight Board shall remain the only party authorized by PROMESA to propose a title III plan of adjustment, and to carry out that power and duty, the Oversight Board may, at any time, propose title III plans of adjustment for the Commonwealth and COFINA that incorporate a settlement of the Commonwealth-COFINA Dispute developed by the Agents or developed by the Oversight Board, and the Oversight Board may negotiate and mediate with creditors to achieve such settlement of the Commonwealth-COFINA Dispute . . . ." Procedures Order ¶ 4(n).

On August 21, 2017, the COFINA Agent filed a motion seeking an order: (i) confirming the applicability of 48 U.S.C. § 2125 to the COFINA Agent and her employees with respect to her work resolving the Commonwealth-COFINA Dispute, (ii) confirming that the COFINA Agent's local Puerto Rico counsel may be employed by the COFINA Agent without further application or order of the Title III Court, and (iii) clarifying that the COFINA Agent and her professionals retained pursuant to the Procedures Order will have their allowed fees and expenses paid pursuant to the Title III Court's order on interim compensation for professionals in the Title III Case [Case No. 17-3283, ECF No. 1121] (the "Clarification Motion").

On November 3, 2017, the Title III Court entered an order granting the Clarification Motion, but preserving the Oversight Board's and any other party in interest's arguments as to the scope of authority delegated by the Oversight Board to the Agents or otherwise set forth in the Procedures Order.

---

[25] Following the entry of the Procedures Order, the Agents, along with certain creditor parties, engaged in confidential mediation with Chief Bankruptcy Judge Barbara Houser.

101361236v29

On September 11, 2017, the COFINA Agent filed an *Application of COFINA Agent for Entry of Order Authorizing Retention of Centerview Partners LLC as Financial Advisor and Expert* [Case No. 17-3283, ECF No. 1273] (the "Centerview Application"), seeking authorization for the COFINA Agent to retain Centerview Partners LLC ("Centerview") to provide financial advisory and expert services that include familiarizing itself with the fiscal condition of the Commonwealth and COFINA, reviewing and evaluating COFINA's capital structure and advising on possible restructuring strategies, providing expert testimony at any hearings in connection with the Commonwealth-COFINA Dispute, and assisting and advising with negotiation and mediation strategy. On September 19, 2017, the Oversight Board, as representative of COFINA, filed its objection to the Centerview Application [Case No. 17-3283, ECF Nos. 1347, 1352]. On October 18, 2017, the Title III Court entered an order denying the Centerview Application, holding that (1) the proper scope and terms of Centerview's retention cannot be decided without first clarifying the scope of the COFINA Agent's authority and duties under the Procedures Order, including whether formulation of hypothetical restructuring scenarios is an appropriate exercise of the COFINA Agent's negotiation responsibilities under the Procedures Order, given PROMESA reserves to the Oversight Board the exclusive power to propose any plan of adjustment for confirmation, and (2) the Centerview Application was insufficiently fleshed out as to the reasons for certain of the proposed services, and did not provide the Title III Court with sufficient bases for approving Centerview's flat fee compensation terms.

### 3. *Official Committee of Unsecured Creditors v. Whyte*, Adv. Proc. No. 17-00257

On September 8, 2017, the Creditors' Committee,[26] as Commonwealth Agent, commenced an adversary proceeding to prosecute the Commonwealth-COFINA Dispute, Adv. Proc. No. 17-00257, (the "Adversary Proceeding"). The Commonwealth Agent's adversary proceeding complaint, Adversary Proceeding, ECF No. 1 (the "Complaint"), sought declaratory judgments that, among other things, (a) Act 91 did not transfer present ownership of future SUT revenues to COFINA; (b) Act 91 did not assign to COFINA any "right to receive" future SUT revenues; (c) the transfer language in Act 91 was, at most, an unsecured promise of a future transfer that can be breached or otherwise rejected in Title III; (d) COFINA has no enforceable security interest in future SUT revenues; (e) any unperfected security interest in SUT revenues is avoidable under Bankruptcy Code sections 544(a)(1) and 547(b); (f) in the event that any security interest is not avoidable under section 544(a)(1) or section 547(b) any transfer made within two years of the petition date is still avoidable as a fraudulent transfer pursuant to section 548(a)(1)(B); (g) any post-petition transfer is avoidable under section 549(a); (h) any security interest held by COFINA is subordinate to rights of the Oversight Board acting as trustee/lien creditor; (i) any security interest was "cut off" by the commencement of the Commonwealth Title III case pursuant to section 552(a), as post-petition SUT revenues are after-acquired property; (j) any non-UCC post-petition transfers are avoidable because they were incomplete at the time the Commonwealth Title III petition was filed; (k) any post-petition transfer of SUT revenues to non-Commonwealth entities violates the automatic stay; (l) Act 91 is unconstitutional because it evades the debt provisions of Puerto Rico's Constitution; and (m) the

---

[26] The "Creditors' Committee" is the statutory committee of unsecured creditors appointed in, among other cases, the Commonwealth Title III Case, but not the Title III Case.

101361236v29

COFINA structure is unconstitutional because Act 91 was enacted and/or amended in violation of the balanced budget clause of the Puerto Rico Constitution.

The Commonwealth Agent asserted in its Complaint that the Pledged Sales Tax is property of the Commonwealth because (a) the COFINA enabling legislation (including Act 91, as amended) did not grant COFINA a right to future revenues, merely an unsecured promise that such revenues would be transferred to COFINA in the future and, even if there were a security interest, it is unperfected and therefore avoidable under Title III and the Bankruptcy Code, and (b) the COFINA structure is unconstitutional because the result of the enabling legislation was to violate the debt limit, priority of payment to public debtholders, and balanced budget provisions of the Commonwealth Constitution.

On September 15, 2017, the COFINA Agent filed her answer to the Complaint, Adversary Proceeding, ECF No. 27 (the "Answer and Counterclaims"), vigorously disputing the Commonwealth Agent's claims, asserting various counterclaims, and seeking declaratory judgments that: (a) the COFINA enabling legislation is constitutional and thereby made the Pledged Sales Tax transferred to COFINA property of COFINA and not an "available resource" of the Commonwealth; (b) COFINA has a perfected and unavoidable lien in the Pledged Sales Tax, and/or there is an enforceable subordination agreement whereby the Commonwealth has agreed to subordinate any interest it may have in the Pledged Sales Tax to the interest of COFINA, and/or the Pledged Sales Tax is held in constructive trust for the benefit of COFINA; (c) the Commonwealth's misappropriation of the Pledged Sales Tax violates the United States and Puerto Rico Constitutions; (d) the fiscal plan compliance law violates PROMESA; (e) Act No. 84-2016, which amended the COFINA enabling legislation to decrease the amount of SUT proceeds COFINA receives from 6% to 5.5%, violates PROMESA, and COFINA is entitled to 6% of the SUT proceeds until the Pledged Sales Tax Base Amount is reached each year; and (f) any non-COFINA debt, including GO Bonds issued in violation of the debt limit provisions in the Puerto Rico Constitution, are not entitled to priority under the Puerto Rico Constitution's debt priority provisions. The COFINA Agent's Answer and Counterclaims also sought injunctive relief, including that: (y) the Court impose a constructive trust in COFINA's favor over the Pledged Sales Tax in order to prevent the Commonwealth's alleged tortious interference and fraud with respect such revenues; and (z) the Court enter an order permanently enjoining the Commonwealth from diverting or transferring the Pledged Sales Tax proceeds away from COFINA, designating such revenues as "available resources," and taking any action to breach, revoke or reject the transfer of such revenues to COFINA or to otherwise interfere with COFINA's rights to such revenues.

In addition to the claims asserted by the Commonwealth Agent and the COFINA Agent, multiple groups of COFINA and GO Debt bondholders, as well as other parties that had been permitted to intervene in the Adversary Proceeding, filed counterclaims and cross-claims regarding ownership of the applicable portion of the SUT.

On December 21, 2017, the Title III Court entered an order dismissing, without prejudice, several of the Commonwealth Agent's and the COFINA Agent's claims as outside the scope of the Commonwealth-COFINA Dispute, as well as several claims asserted by the intervening parties (the "Dismissed Claims"). The Title III Court found that the scope of the Dispute, as defined in the Procedures Order, is confined to whether the Commonwealth or

COFINA owns the Pledged Sales Tax. The Dismissed Claims, the Title III Court found, were outside the scope of the Commonwealth-COFINA Dispute because they presumed either the Commonwealth's or COFINA's ownership of the Pledged Sales Tax or addressed other issues that were not related to the ownership question. Following the Title III Court's order and subsequent order permitting the Commonwealth Agent to amend its complaint, which it did on January 16, 2018, the Commonwealth Agent's only remaining claims asserted that (a) Act 91 did not transfer present ownership of future SUT Revenues to COFINA; (b) Act 91 did not assign to COFINA any "right to receive" future SUT Revenues; and (c) Act 91 was designed to, and did, violate the debt and balanced budget provisions of the Puerto Rico Constitution. The COFINA Agent's only remaining claims asserted that Act 91 is constitutional and the Pledged Sales Tax and DSTF are COFINA's property.

On February 1, 2018, the Oversight Board and the Agents filed a joint motion seeking to expand the authority, and the coverage of orders relating to immunity protection and compensation, of the Agents and their professionals, in connection with the mediation of the Dismissed Claims, which the Court granted pursuant to an order entered on February 10, 2018.

On February 21, 2018, the Commonwealth Agent, the COFINA Agent, and several of the intervening parties, filed cross-motions for summary judgment. In its motion, the Commonwealth Agent asserted that (a) Act 91 did not transfer to COFINA a present property interest in potential future tax revenues because no such property exists to be transferred; (b) there was no "true sale" of future tax revenues to COFINA because the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues, and the Commonwealth and COFINA both accounted for the transaction in question as a "collateralized borrowing" by the Commonwealth rather than a "sale" of revenues to COFINA; (c) Act 91 did not transfer to COFINA the Commonwealth's "right to receive" future tax revenues because the Act says nothing to that effect, and the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs; and (d) Act 91 and the purported SUT revenue transfer are unconstitutional because the Legislative Assembly cannot create financing structures that operate as an evasion of the debt and balanced budget provisions of the Puerto Rico Constitution. Adversary Proceeding, ECF Nos. 321, 322, 323, 324. The intervening parties who filed cross-motions in favor of the Commonwealth asserted, among other things, that (a) the scope of the Adversary Proceeding is limited to ownership of post-petition and future SUT revenues which cannot have been transferred to COFINA due to the automatic stay; (b) under the Puerto Rico Civil Code, the Commonwealth did not transfer ownership of future SUT revenues to COFINA; (c) under the Bankruptcy Code, a "right to receive" future SUT revenues is not an asset that can be transferred; (d) the Pledged Sales Tax remains property of the Commonwealth because it is an "available resource" under the Puerto Rico Constitution; and (e) Act 56 did not transfer ownership of the Pledged Sales Tax to COFINA. Adversary Proceeding, ECF Nos. 300, 314. Conversely, the COFINA Agent asserted that the Legislative Assembly has the power to, and did, transfer the Pledged Sales Tax to COFINA through Act 91. Adversary Proceeding, ECF Nos. 312, 316, 317. The intervening parties who filed cross-motions in favor of COFINA asserted, among other things, that (a) the Commonwealth's transfer of the Pledged Sales Tax to COFINA was valid under the Puerto Rico Constitution; (b) the Pledged Sales Tax is not an "available resource" under the Puerto Rico Constitution; (c) it is not "legally impossible" to transfer future SUT revenues; and (d) the plain terms of COFINA's enabling legislation clearly

transferred ownership of the Pledged Sales Tax to COFINA. Adversary Proceeding, ECF No. 307. A hearing on the cross-motions was held on April 10, 2018.

Concurrently with the litigation in the Adversary Proceeding, the Agents participated in court-sanctioned mediation to settle the Commonwealth-COFINA Dispute. Through the auspices of the mediation team, the Agents reached an understanding set forth in that certain Agreement in Principle on a settlement of the Commonwealth-COFINA Dispute. On June 5, 2018, the Agents jointly moved to hold the Title III Court's decision on the pending motions for summary judgment in abeyance for sixty (60) days due to their Agreement in Principle to settle the Commonwealth-COFINA Dispute. Adversary Proceeding, ECF No. 484 (the "Abeyance Motion"). On June 7, 2018, the Agents announced the terms of their Agreement in Principle, which contemplates, among other things, that, starting in Fiscal Year 2019, the Commonwealth and COFINA will share the Pledged Sales Tax Base Amount, on a 46.35% and 53.65% basis, respectively. Adversary Proceeding, ECF No. 486.

The Title III Court entered an order granting the Abeyance Motion on June 11, 2018, agreeing to hold the summary judgment motions in abeyance until August 4, 2018. On August 3, 2018, upon a joint motion of the Agents, the Title III Court extended its order holding its decision on the motions for summary judgment in abeyance until September 13, 2018. On September 12, 2018, upon another joint motion of the Agents, the Title III Court further extended this date to October 3, 2018. On September 27, 2018, in light of the agreements and compromises set forth in the Settlement Agreement and the Plan of Adjustment, the Title III Court, *sua sponte*, entered an order terminating the pending summary judgment motions without prejudice to restoration of the motions on or after October 3, 2018. Adversary Proceeding, ECF No. 544.

On June 14, 2018, consistent with the Agreement in Principle, the Commonwealth Agent filed the *Commonwealth Agent's Urgent Motion, Pursuant to Bankruptcy Code Section 105(a) and Bankruptcy Rule 9019, for Order Establishing Procedures Governing 5.5% SUT Revenues Collected on or After July 1, 2018*, Adversary Proceeding, ECF No. 495 (the "Disputed Funds Motion"), seeking an order establishing procedures governing the 5.5% portion of the SUT collected by Banco Popular or other authorized collector of the SUT on or after July 1, 2018, pending implementation of the settlement of the Commonwealth-COFINA Dispute. Following discussions with a number of parties, the Commonwealth Agent resolved virtually all issues raised with respect to the Disputed Funds Motion and filed a revised proposed order.

On June 29, 2018, the Court entered an order, Adversary Proceeding, ECF No. 525 (the "Disputed Funds Order") establishing procedures governing revenues received from the Pledged Sales Tax on deposit and to be deposited with BNYM, as trustee for the Existing Securities. The Disputed Funds Order provides, among other things, that BNYM will separately account for (i) Pledged Sales Tax revenues currently in BNYM accounts or received on or before June 30, 2018, (ii) Pledged Sales Tax revenues received by BNYM on or after July 1, 2018 and prior to the earlier of the end of the Abeyance Period plus 30 calendar days or the date of a ruling by the Court on the pending motions for summary judgment in the Adversary Proceeding, and (iii) Pledged Sales Tax revenues received by BNYM following the end of the Abeyance Period.

Following entry of the Disputed Funds Order, the Commonwealth Agent and BNYM reached an agreement resolving BNYM's concern with respect to the Disputed Funds Motion regarding sufficient notice to beneficial holders of Existing Securities, and the Court entered an order modifying and replacing the Disputed Funds Order incorporating the agreement between the Commonwealth and BNYM.

### 4. Entry into the Amended PSA

The Settlement Parties engaged in extensive discussions regarding the Plan of Adjustment process to resolve, among other things, the Commonwealth-COFINA Dispute and the intra-COFINA creditor disputes, with the invaluable participation of the mediation team. On August 29, 2018, the Settlement Parties entered into the Original PSA that contemplated, among other things, the following: (i) the compromise and settlement of the Commonwealth-COFINA Dispute that provides COFINA ownership of an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the Pledged Sales Tax Base Amount; (ii) approval by the Title III Court of the terms of the compromise and settlement of the Commonwealth-COFINA Dispute concurrently through the Plan of Adjustment in the Title III Case and the Settlement Motion in the Commonwealth Title III Case; (iii) acknowledgement by the parties thereto that, so long as the agreement is in effect, each Insurer (as defined in the Original PSA) shall have the exclusive right to vote to accept or reject the Plan of Adjustment on account of any Existing Securities it insures; and (iv) filing of the Disclosure Statement and Plan of Adjustment with the Title III Court for COFINA in the COFINA Title III Cases on or before October 15, 2018, concurrently with a Settlement Motion to be filed in the Commonwealth Title III Case, seeking the approval of the compromise and settlement of the Commonwealth-COFINA Dispute. The Settlement Parties also agreed to support the filing of, and vote to accept, a plan of adjustment consistent with the Term Sheet attached to the Original PSA. The Plan of Adjustment attached as Exhibit A hereto is consistent with the Term Sheet and supported by the Settlement Parties.

On September 20, 2018, the Original PSA was amended and restated to include certain additional holders of Existing Securities, who also held significant amount of certain GO Bonds and were among the plaintiffs in the Lex Claims Action. Among other things, the Amended PSA provides that (i) Aurelius Capital Master, Ltd. and Six PRC Investments LLC, and each of their applicable entities, will request dismissal, with prejudice, of their claims and causes of action in the Lex Claims Litigation, effective upon the entry of an order approving the Settlement Motion and confirmation of the Plan of Adjustment, and (ii) parties to the Amended PSA generally will not oppose approval of the Settlement Motion in the Commonwealth Title III Case.

In order to compensate the parties for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan of Adjustment, and in consideration of (a) the execution and delivery of the Amended PSA by certain of the parties thereto and (b) the obligations and covenants contained in the Amended PSA provides that each Consummation Cost Party (as defined in the Plan of Adjustment) is entitled to receive, in accordance with the terms set forth in the Term Sheet and the Plan of Adjustment, based upon such entity's respective positions (insured or otherwise) as of 5:00 p.m. (EDT) on August 7, 2018, a pro rata a share of cash in an amount equal to two percent, truncated to two decimal points, of (i) the aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond

70

Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00).

Any of the PSA Creditor Parties (as defined in the Amended PSA) may terminate the Amended PSA, solely as to itself, upon written notice to the parties thereto if, among other things, the Settlement Motion, the Plan of Adjustment, the Disclosure Statement, and the motion seeking entry of the Disclosure Statement Order are not filed on or prior to October 15, 2018. Any party to the Amended PSA may terminate the Amended PSA, solely as to itself, upon written notice to the parties thereto if, among other things, another party materially breaches any of the covenants thereunder or if the Confirmation Order is not entered by the Title III Court and the Effective Date does not occur on or prior to March 1, 2019; provided, however, that such date may be extended up to and including June 1, 2019 upon joint instruction and notice provided by the Government Parties (as defined in the Amended PSA).

## V.  Compromises and Settlements

The Settlement Agreement is incorporated into the Plan of Adjustment and shall be considered contemporaneously with the Plan of Adjustment pursuant to Bankruptcy Code sections 105(a), 1123(a)(5) and 1123(b)(3) and Bankruptcy Rule 9019. The Settlement represents a compromise and settlement between the Oversight Board, on behalf of the Commonwealth, and the COFINA Agent, on behalf of COFINA, as set forth in the Settlement Agreement.  The Settlement Agreement represents a full, final, and complete compromise, settlement, and release of, among other matters, the claims and issues arising from and relating to the Commonwealth-COFINA Dispute, including without limitation, the claims asserted in the Adversary Proceeding.

On October 19, 2018, the Commonwealth filed the Settlement Motion in the Commonwealth Title III Case.  The Settlement Agreement will be contemporaneously considered for approval by the Title III Court: (i) in the Commonwealth Title III Case through submission of the Settlement Motion and Settlement Order pursuant to Bankruptcy Rule 9019 and (ii) in the COFINA Title III Case through submission of the Plan of Adjustment, which fully incorporates the Settlement Agreement.

In the Settlement Motion, the Commonwealth seeks an order of the Title III Court approving, pursuant to Bankruptcy Rule 9019, the terms of the compromise and settlement between the Commonwealth and COFINA resolving the Commonwealth-COFINA Dispute as reflected in the Settlement Agreement.  For the Settlement Motion to be approved, the Title III Court must find that the Settlement Agreement satisfies the requirements of Bankruptcy Rule 9019, meaning that the Settlement terms are found to not fall below the lowest point in the range of reasonableness in view of, among other things, the legal issues being resolved by the settlement.

In determining the reasonableness of the Settlement, the Title III Court will consider: (i) the probability of success in the litigation being compromised; (ii) the difficulties, if any, to be encountered in the matter of collection; (iii) the complexity of litigation involved, and the

101361236v29

expense, inconvenience and delay attending it; and (iv) the paramount interest of the creditors and a proper deference to their reasonable views in the premise.

The terms of the compromise and settlement in the Settlement Agreement are reasonable and meet the requirements for approval under Bankruptcy Rule 9019 because, among other things, (i) the issues resolved pursuant to the Settlement Agreement are complex, many of which present questions of first impression, (ii) regardless of the Title III Court's ruling in the Adversary Proceeding to determine the Commonwealth-COFINA Dispute, it is likely that multiple appeals would follow, (iii) protracted litigation would come at a substantial cost to the Commonwealth and COFINA, and (iv) if the Commonwealth were determined to be the owner of the Pledged Sales Taxes, including future SUT Revenues, none of the $750 million Pledged Sales Tax Base Amount (which increases annually) would be available for COFINA's use towards distribution to its creditors.

In the absence of approval of the Settlement Agreement, COFINA and its stakeholders would be faced with a return to the complex, protracted and novel litigation of the Commonwealth-COFINA Dispute, which threatened the very foundation of COFINA. In addition, the Holders face substantial risks in event the Commonwealth-COFINA Dispute is decided in favor of the Commonwealth.  If the Commonwealth were to prevail, the Holders recoveries could be materially adversely affected.  On the other hand, if COFINA were determined to be the owner, none of the Pledged Sales Tax Base Amount would be available to the Commonwealth for payment of essential services or distribution to its creditors.

If there is any inconsistency between the Settlement Order, the Plan of Adjustment and the Confirmation Order, the documents shall control in the following order of priority: (i) the Settlement Order, (ii) the Confirmation Order, and (iii) the Plan of Adjustment.

Pursuant to the Settlement Motion and section 2.1 of the Plan of Adjustment, the Commonwealth-COFINA Dispute shall be compromised and settled as follows:

1.      **COFINA Interests**

COFINA will be granted an ownership interest in the COFINA Pledged Taxes and all rights thereto, including the right to receive the COFINA Pledged Taxes pursuant to the First Dollars Funding[27] in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given fiscal year until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms (the "COFINA Portion").

2.      **Commonwealth Interests**

The Commonwealth will be granted an ownership interest that is second in priority of payment, funding and collections, in the COFINA Pledged Taxes and all rights thereto subject to the First Dollars Funding described in Section V.4 of this Disclosure Statement.  This ownership

---

[27] The "First Dollars Funding" is defined as the allocation of "first dollars" collected from COFINA Pledged Taxes, including, without limitation, the criteria set forth in Section 16.5 of the Plan of Adjustment required to be satisfied in order to permit, among other things, quarterly deposits of "first dollars" collected from COFINA Pledged Taxes.

interest includes the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year of the Commonwealth, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms. The Commonwealth shall have no ownership interest in the COFINA Portion, and the Commonwealth Portion[28] shall exclude the COFINA Portion.

**3.  Distribution of Amounts Held in BNYM Debt Service, Reserve, and Other Accounts**

**(a)  Pre-FY2019 BNYM Deposits**

One hundred percent (100%) of the Pre-FY2019 BNYM Deposits held by BNYM in accordance with the Adversary Proceeding (as defined below) and such other orders entered in connection therewith shall be distributed as COFINA Cash Available for Distribution under the Plan of Adjustment; provided, however, Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by BNYM, as the Existing COFINA Bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the Adversary Proceeding shall be distributed as follows (the "Initial Distributions"):

(i)  Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) will be distributed to the Commonwealth,

(ii)  Five Million Dollars ($5,000,000.00) will be allocated to fund an operating expense fund for COFINA, and

(iii)  Forty Million Dollars ($40,000,000.00) will be allocated to the Taxable Election Cash distributable under the Plan of Adjustment. If the Taxable Election

---

[28] The "Commonwealth Portion" is defined as collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given fiscal year, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion; and, provided, further, that (y) subject to the provisions regarding the Additional Bonds Test and the First Dollars Funding set forth in Sections 16.3 and 16.5 hereof, respectively, the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year unless and until COFINA has received the COFINA Portion and (z) the Commonwealth shall have no right to receive Debt Service Savings in any fiscal year unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such fiscal year, including any overdue debt service payments from all prior fiscal years, are made as required, in accordance with the provisions regarding the Additional Bonds Test set forth in Section 16.3 hereof; and, provided, further, that the COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and, in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, the COFINA Portion shall not be subject to the automatic stay in any such Commonwealth proceeding.

Cash distributable under the Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash.

After the Initial Distributions, one hundred percent (100%) of the Pre-FY2019 BNYM Deposits will be distributed (a) first, to further fund the account to be established on or prior to the Effective Date in accordance with the New Bond Indenture[29] and maintained for the purpose of satisfying the operating expenses of Reorganized COFINA in the ordinary course of business (the "COFINA Operating Expense Account") up to an additional Ten Million Dollars ($10,000,000.00), and (b) second, to the extent of any further remainder, to be distributed evenly to (x) COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and (y) the Commonwealth, on the other hand.

### (b)    FY2019 BNYM Deposits

On the Effective Date, COFINA will receive, for purposes of distribution in accordance with the Plan of Adjustment, one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (collectively, the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding.

### (c)    Residual FY2019 BNYM Deposits

Any remaining FY2019 BNYM Deposits after distribution of the COFINA FY2019 BNYM Deposits will be distributed to the Commonwealth.

### 4.    First Dollars Funding

The COFINA Portion will be funded annually from "first dollars" collected from the COFINA Pledged Taxes until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

Beginning in fiscal year 2024 of the Commonwealth, if (i) for any date of determination at which time the Oversight Board or any successor is in existence, (1) the prior and then-current fiscal year budgets are balanced, as determined by the Oversight Board (or its successor in interest), and (2) the Commonwealth is current on its continuing disclosure requirements relating to its audited financial statements; (ii) quarterly bucketing of twenty-five percent (25%) of the COFINA Portion associated with the then-current fiscal year of the Commonwealth is shown to be necessary to avoid intra-FY tax revenue anticipation notes borrowing, and (iii) collection of prior fiscal year COFINA Pledged Taxes provided a two times (2x) coverage of the COFINA

---

[29] The "New Bond Indenture" is defined as the trust indenture to be executed as of the Effective Date pursuant to which Reorganized COFINA shall issue the COFINA Bonds, as it may be amended, supplemented or modified from time to time, which such agreement may be contained within the New Bond Indenture or may be in a separate agreement by and between Reorganized COFINA and the trustee for the COFINA Bonds.

Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms:

(a) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the COFINA Portion associated with the then-current fiscal year of the Commonwealth will be deposited into the Debt Service Fund[30] (the "Post-FY2024 Deposits"); and

(b) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be deposited in accordance with the "Flow of Funds" established in the New Bond Indenture.

However, in any quarter in which there is a shortfall in the amounts required to be deposited under the Post-FY2024 Deposits, then such shortfall will be added to the amount required to be paid in accordance with the Post-FY2024 Deposits in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "Debt Service Fund" held by the trustee for the benefit of, and payment of debt service with respect to, the COFINA Bonds and the COFINA Parity Bonds.

Furthermore, in any quarter in which there is a shortfall in the amount required to be deposited under the Remaining Post-FY2024 Deposits, then such shortfall will be added to the amount required to be paid under the Remaining Post-FY2024 Deposits in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

## 5. Additional Terms of Compromise and Settlement

The Commonwealth will have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a fiscal year of the Commonwealth unless and until COFINA has received the COFINA Portion. The Commonwealth will have no right to receive Debt Service Savings[31] in any fiscal year of the Commonwealth unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such fiscal year of the Commonwealth, including any overdue debt service payments from all prior fiscal years of the Commonwealth, are made as required. The COFINA Portion will not be property of the Commonwealth, and if there is any subsequent Title III case or similar or other proceeding of the Commonwealth, in any forum, it shall not be subject to the automatic stay.

## 6. Compromise Date

---

[30] The "Debt Service Fund" is defined as the account to be established pursuant to the New Bond Indenture in the name of the trustee for the COFINA Bonds, which account shall be for the purpose of receiving, holding and distributing funds for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds.

[31] "Debt Service Savings" are defined as, for each fiscal year, the difference between (a) principal and interest due on COFINA Bonds and COFINA Parity Bonds, then outstanding, prior to the issuance of COFINA Parity Bonds and/or Reorganized COFINA's purchase of COFINA Bonds and COFINA Parity Bonds in the open market and (b) principal and interest due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or Reorganized COFINA's purchase of such COFINA Bonds and COFINA Parity Bonds.

Unless (i) approval of the Settlement Motion is denied by the Title III Court, or (ii) the Effective Date does not occur, the effective date of the compromise and settlement shall be retroactive to July 1, 2018 and, in addition to receipt of the net Pre-FY2019 BNYM Deposits and the COFINA FY2019 BNYM Deposits on the Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019.

### 7. Litigation Dismissal

On the Effective Date, pursuant to the Settlement Order and the Confirmation Order, (1) BNYM shall make distributions as set forth in the Plan of Adjustment, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Oversight Board, the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have no further obligations in connection with the Adversary Proceeding and the COFINA Agent and, upon satisfaction of the conditions set forth in decretal paragraph 3 of the Abeyance Stipulation, the Commonwealth Agent, the Creditors' Committee and its members, together with their respective professionals, shall be deemed to have been released from any and all liabilities associated therewith or that otherwise arise from or relate to the Title III Case, the Actions, the Adversary Proceeding, the Interpleader Action, the Plan of Adjustment, the Plan Support Agreement and the compromises set forth in the Commonwealth-COFINA Dispute Settlement, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations or property, (3) the Interpleader Action shall be dismissed, with prejudice, and all other Claims and Causes of Action asserted, or that could have been asserted, therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of the Plan of Adjustment, and (4) except with respect to Claims and Causes of Action asserted, or that could have been asserted, by Ambac or Whitebox, whether sounding in contract or tort, against BNYM in the Ambac Action or the Whitebox Actions, respectively, for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and Claims and Causes of Action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

Litigation identified in "Other Related Litigation" under OVERVIEW OF COFINA's TITLE III CASE, and not subject to dismissal pursuant to the Plan of Adjustment, may be permitted to proceed. There can be no assurance that litigation that is permitted to proceed will not have a material adverse effect on Reorganized COFINA after its emergence from Title III or the effectiveness of the Plan of Adjustment or the Confirmation Order. For additional information regarding significant risks associated with the Plan of Adjustment, *see* "CERTAIN RISK FACTORS TO BE CONSIDERED."

### 8. Allowance of Bond Claims

Solely for purposes of confirmation and consummation of the Plan of Adjustment, on the Effective Date, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National) shall be deemed allowed in the aggregate amount of $7,760,871,398.36, (ii) the Junior COFINA

Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34; *provided*, *however*, that, in accordance with the solicitation procedures attendant to the Plan of Adjustment, the foregoing amounts shall be deemed allowed for voting purposes, and (iii) the holders of Existing Securities shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Article II of the Plan of Adjustment, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

9. **Releases, Injunctions, and Exculpation**

The releases, injunctions, and exculpation provided in Article XXX of the Plan of Adjustment (and, with respect to the COFINA Agent, Article II of the Plan of Adjustment) are integral to obtaining the value provided under the Commonwealth-COFINA Dispute Settlement and the releases, injunctions, and exculpation under the Plan of Adjustment and Plan Support Agreement constitute an essential component of the compromises reached and are not severable from the other provisions of the Plan of Adjustment.

## VI. The Title III Plan of Adjustment

### A. Overview of the Plan of Adjustment

THE FOLLOWING SUMMARY HIGHLIGHTS CERTAIN OF THE SUBSTANTIVE PROVISIONS OF THE PLAN OF ADJUSTMENT, AND IS NOT, NOR IS IT INTENDED TO BE, A COMPLETE DESCRIPTION OR A SUBSTITUTE FOR A FULL AND COMPLETE REVIEW OF THE PLAN OF ADJUSTMENT. THE DEBTOR URGES ALL HOLDERS OF CLAIMS TO CAREFULLY READ AND STUDY THE PLAN OF ADJUSTMENT, A COPY OF WHICH IS ATTACHED HERETO AS EXHIBIT A.

Bankruptcy Code section 1123, made applicable to the Title III Case by PROMESA, provides that except for administrative claims, a plan of adjustment must categorize claims against a debtor into individual classes. Although PROMESA and the Bankruptcy Code give COFINA significant flexibility in classifying claims, Bankruptcy Code section 1122 dictates that a plan of adjustment may only place a claim into a class containing claims that are substantially similar.

The Plan of Adjustment identifies ten (10) Classes of Claims (certain of which encompass numerous individual series of the relevant debt, as set forth on the Exhibits to the Plan of Adjustment). These Classes take into account the differing nature and priority of Claims against COFINA. Administrative Claims are not classified for purposes of voting or receiving distributions under the Plan of Adjustment (as is required by Bankruptcy Code section 1123(a)(1)) but are treated separately as unclassified Claims.

The Plan of Adjustment provides specific treatment for each Class of Claims. Only certain holders of Claims that are impaired under the Plan of Adjustment are entitled to vote and receive Distributions under the Plan of Adjustment.

Unless otherwise provided in the Plan of Adjustment or the Confirmation Order, the treatment of any Claim under the Plan of Adjustment will be in full satisfaction, settlement,

release and discharge of, and in exchange for, such Claim. Upon Confirmation, the Plan of Adjustment will be binding on all holders of a Claim regardless of whether such holders voted on the Plan of Adjustment or voted to accept the Plan of Adjustment.

The following discussion sets forth the classification and treatment of all Claims against COFINA. It is qualified in its entirety by the terms of the Plan of Adjustment, which is attached hereto as Exhibit A, and which should be read carefully by you in considering whether to vote to accept or reject the Plan of Adjustment.

**B.     Compromise and Settlement of Disputes**

**1.     Commonwealth-COFINA Dispute**

The Settlement Agreement is incorporated into the Plan of Adjustment. The Settlement Agreement shall be approved as part of the Plan of Adjustment pursuant to Bankruptcy Code sections 105(a), 1123(a)(5) and 1123(b)(3) and Bankruptcy Rule 9019. If there is any inconsistency between the Settlement Order, the Plan of Adjustment and the Confirmation Order, the documents shall control in the following order of priority: (i) the Settlement Order, (ii) the Confirmation Order, and (iii) the Plan of Adjustment; *provided*, *however*, that under no circumstances shall the Confirmation Order modify the economic terms of the Plan of Adjustment. For additional information, see Section V of this Disclosure Statement above, entitled "Compromises and Settlements."

**C.     Provisions for Payment of Administrative Expense Claims**

In accordance with section 1123(a)(1) of the Bankruptcy Code, made applicable to the Title III Case pursuant to section 301(a) of PROMESA, Administrative Expense Claims and Professional Claims have not been classified and thus are excluded from the Classes of Claims set forth in Article IV of the Plan of Adjustment.

**1.     Administrative Expense Claims**

An Administrative Claim is a claim against COFINA arising on or after the Petition Date and prior to the Effective Date for a cost or expense of administration related to COFINA's Title III Case that is entitled to priority or superpriority under sections 364(c)(1), 503(b), or 507(a)(2) of the Bankruptcy Code, as made applicable by section 301 of PROMESA.

On the later to occur of (i) the Effective Date and (ii) the date on which an Administrative Expense Claim shall become an Allowed Claim, Reorganized COFINA shall (a) pay to each holder of an Allowed Administrative Expense Claim, in Cash, the full amount of such Administrative Expense Claim or (b) satisfy and discharge such Allowed Administrative Expense Claim in accordance with such other terms no more favorable to the claimant than as may be agreed upon by and between the holder thereof and Reorganized COFINA; *provided*, *however*, that Allowed Administrative Expense Claims representing indebtedness incurred in the ordinary course by COFINA shall be paid in full and performed by Reorganized COFINA in accordance with the terms and subject to the conditions of any agreement governing, investment evidencing, or other document relating to such transactions; and, *provided*, *further*, that, if any such ordinary course expense is not billed, or a written request for payment is not made, within

ninety (90) days after the Effective Date, such ordinary course expense shall be barred and the holder thereof shall not be entitled to, or receive, a distribution pursuant to the Plan of Adjustment.

## 2. Professional Compensation and Reimbursement Claims

All Entities awarded compensation or reimbursement of expenses by the Title III Court shall be paid in full, in Cash, in the amounts allowed by the Title III Court (a) as soon as reasonably practicable following the later to occur of (i) the Effective Date and (ii) the date upon which the Title III Court order allowing such Claims is deemed to be a Final Order or (b) upon such other terms no more favorable to the claimant than as may be mutually agreed upon between such claimant and the Government Parties; *provided*, *however*, that, except as provided in the Plan of Adjustment, each Professional must file its application for final allowance of compensation for professional services rendered and reimbursement of expenses on or prior to the Administrative Claim Bar Date. Reorganized COFINA is authorized to pay compensation for professional services extended and reimbursement of expenses incurred after the Effective Date in the ordinary course and without the need for Title III Court approval.

## 3. Consummation Costs

In order to compensate Consummation Cost Parties for the cost of negotiation, confirmation and consummation of the Term Sheet and the Plan of Adjustment, and in consideration of (a) the negotiation, execution and delivery of the Amended PSA by each Consummation Cost Party and (b) the obligations and covenants contained in the Amended PSA, each Consummation Cost Party, on the Effective Date, shall receive, based upon such Entity's respective positions (insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, its pro rata share of Cash in an amount equal to two percent (2.0%), truncated to two decimal points, of (i) the aggregate face amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (ii) One Billion Dollars ($1,000,000,000.00) that will be allocated to on-island investors who choose to accept taxable bonds under the Plan of Adjustment, subject to the exceptions provided in section 3.3 of the Plan of Adjustment. The Consummation Costs equate to approximately $332 million.

Pursuant to PROMESA section 305, the Court may not interfere with COFINA's property unless the Oversight Board consents or the Plan of Adjustment so provides. Here, the Oversight Board is seeking Court approval of the payment of the Consummation Costs in connection with confirmation of the Plan of Adjustment. The Debtor has determined, in the exercise of its business judgment, that payment of the Consummation Costs to the Consummation Cost Parties is a reasonable and necessary use of COFINA's property for the reasons described below.

During lengthy and complex negotiations among the Government Parties, the PSA Creditors and Bonistas, supervised by three federal judges acting as Court-appointed mediators, the Consummation Cost Parties agreed to various conditions and covenants set forth in the Amended PSA, including a pledge to support the Plan of Adjustment, the imposition of

restrictions on the transfer of their bonds, and a waiver of their right to seek reimbursement of expenses through other means through substantial contribution claims. As consideration for their efforts in assisting in the formulation of the Plan of Adjustment that has garnered significant creditor support, continuing to assist in the finalization of definitive agreements and ancillary documents, and the costs incurred in those and other efforts (including the expenses of defending COFINA's property interests for which the PSA Creditors asserted a right to seek substantial contribution claims), the Oversight Board determined that the Consummation Cost Parties should be paid the Consummation Costs. Based upon representations of counsel and, in some instances, pleadings filed with the Title III Court, the Oversight Board estimates the aggregate postpetition fees and expenses of the Consummation Cost Parties to be at least $135 million. *See Response of the COFINA Senior Bondholders' Coalition to the Objection of Bank of New York Mellon to the Proposed Disclosure Statement for the COFINA Plan of Adjustment* [Case No. 17-3284, ECF No. 351] ¶ 12 ("It is estimated that the aggregate fees and expenses incurred by the COFINA PSA Parties . . . beginning on the COFINA Title III filing date (May 5, 2017) through present . . . are in excess of $100 million.").

The Consummation Cost Parties consist of holders and insurers of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), Junior COFINA Bond Claims, and Junior COFINA Bond Claims (Assured). Collectively, the Consummation Cost Parties hold or insure approximately $10 billion of Allowed Bond Claims, and the aggregate amount of the Consummation Costs equals approximately $332 million. In considering the "net" cost of paying the Consummation Costs to the Consummation Cost Parties, however, it must be noted that the Consummation Cost Parties hold approximately $10 billion of the outstanding $17.6 billion in outstanding Bond Claims. Thus, approximately $200 million of the Consummation Costs (2% of their collective $10 billion claim) would have been distributed to the Consummation Cost Parties in the absence of the Consummation Costs provision. Accordingly, the Consummation Cost provision provides for a "net" incremental payment for the Consummation Cost Parties of approximately $132 million. This amount equates to approximately 1.3% of the total Allowed Bond Claims of the Consummation Cost Parties. Critically, the "net" cost of the Consummation Costs of approximately $132 million is less than the aggregate postpetition fees and expenses of the Consummation Cost Parties (estimated by the Oversight Board to exceed $135 million). In the event that the Consummation Costs exceed the aggregate postpetition fees and expenses of the Consummation Cost Parties, however, any such differential is intended to be (i) compensation for the various conditions and covenants set forth in the Amended PSA to which the Consummation Cost Parties agreed (including a pledge to support the Plan of Adjustment, the imposition of transfer restrictions, and a waiver of substantial contribution claims described above) and (ii) consideration for the Consummation Cost Parties' efforts in assisting in the formulation of the Plan of Adjustment that has garnered significant creditor support.

Additionally, it is not clear that the Consummation Costs are being paid from funds that constitute the bondholders' shared collateral. For instance, the funds used to pay the Consummation Costs could be the Commonwealth's property (there is extensive litigation surrounding this very issue) or the funds could be unencumbered property of COFINA in the event the bondholders' purported security interest in such funds is determined to be unperfected and/or avoidable. Accordingly, there is no guarantee that the funds being used to pay the

Consummation Costs would have been distributed to bondholders collectively in the absence of the Consummation Cost provision.

The payment of the Consummation Costs was a critical component of the interlocking agreements set forth in the Amended PSA. The absence of the Amended PSA could have resulted in a costly, contentious and lengthy confirmation process for COFINA. Under such a scenario, there would be no certainty that a confirmable plan could be presented to creditors and the Court for approval, further delaying recoveries to creditors who have not received any payments on their bonds for more than 18 months. In consideration of the benefits obtained for COFINA in entering into the Amended PSA and the costs and burdens associated on the Consummation Cost Parties, the Oversight Board determined that it was an appropriate use of COFINA's property to pay the Consummation Costs and provide an opportunity for COFINA to emerge from Title III as expeditiously as possible.

**D.     Classification and Treatment of Claims**

If the Plan of Adjustment is confirmed by the Title III Court, each Allowed Claim in a particular Class will receive the same treatment as the other Allowed Claims in such Class, whether or not the holder of such Claim voted to accept the Plan of Adjustment.

**1.     General Notes on Classification and Treatment of Classified Claims**

Pursuant to Bankruptcy Code sections 1122 and 1123, Claims (other than Claims arising under Bankruptcy Code section 507(a)(2), which Claims do not require classification pursuant to Bankruptcy Code section 1123(a)) are classified for all purposes, including voting, confirmation, and distribution pursuant to the Plan of Adjustment, as set forth in the Plan of Adjustment. A Claim shall be deemed classified in a particular Class only to the extent that the Claim qualifies within the description of that Class. A Claim is Allowed in that Class if it has not been paid or otherwise settled prior to the Effective Date, and satisfies the definition of a Claim that is Allowed or is otherwise Allowed pursuant to the terms of the Plan of Adjustment.

**2.     Treatment of Classified Claims**

**THE PROJECTED RECOVERIES SET FORTH BELOW ARE ESTIMATES ONLY AND THEREFORE ARE SUBJECT TO CHANGE. FOR A COMPLETE DESCRIPTION OF THE DEBTOR'S CLASSIFICATION AND TREATMENT OF CLAIMS, REFERENCE SHOULD BE MADE TO THE ENTIRE PLAN OF ADJUSTMENT.[32]**

Class 1 – Senior COFINA Bond Claims

    **(a)**    Classification: Class 1 consists of all Bond Claims, other than Senior COFINA Bond Claims (Ambac), Senior COFINA Bond Claims (National), or Senior

---

[32] Where applicable, the projected recoveries below are based upon the face amount of the applicable security distributed under the Plan of Adjustment, and does not include interest on such security or payment of the Consummation Costs.

COFINA Bond Claims (Taxable Election), on account of a "Senior" Existing Security.

**(b)**     Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim against COFINA shall receive its Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds, and (d) Rounding Amount Cash, if necessary.

**(c)**     Voting:  Class 1 is Impaired by the Plan of Adjustment.  Class 1 and each holder of an Allowed Senior COFINA Bond Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

**(d)**     Taxable Election:  Any Puerto Rico Investor or Puerto Rico Institution holding a Bond Claim that is eligible to receive treatment under Class 1 may opt out of Class 1 and elect to be treated under Class 4 – Senior COFINA Bond Claims (Taxable Election).

**(e)**     Allowed Amount of Claims:  $5,326,205,475.16

**(f)**     Projected Recovery under the Plan of Adjustment – Taxable Election:  95.015%

**(g)**     Projected Recovery under the Plan of Adjustment – No Taxable Election: 93.015%

Class 2 – Senior COFINA Bond Claims (Ambac)

**(a)**     Classification:  Class 2 consists of all Bond Claims on account of a "Senior" Existing Security, the repayment of which has been insured by Ambac.

**(b)**     Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Ambac) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of section 6.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of Ambac with respect to the Ambac Insurance Policy (and, by making such election, the holder shall be deemed to have agreed to commute the Ambac Insurance Policy relating to such holder's Allowed Senior COFINA Bond Claim (Ambac) and such holder shall have no other or further rights with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates); or

(2) the Ambac Certificates representing an interest in the Ambac Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released Ambac from its obligations and liabilities under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, (ii) such holder shall not be entitled to the benefit of the Ambac Insurance Policy and shall have no right to make a claim under, or receive payment from, the Ambac Insurance Policy, (iii) Ambac shall be released from its obligations under or related to the Ambac Insurance Policy in respect of such holder's Ambac Insured Bonds, and (iv) the Ambac Insurance Policy shall be terminated and commuted in full with respect to such holder's Ambac Insured Bonds, no provision of the Ambac Insurance Policy with respect to such Ambac Insured Bonds shall survive termination, and such Ambac Insured Bonds shall no longer have the benefit of the Ambac Insurance Policy.

***Ambac Insurance Contribution:*** In consideration for the releases to be given to Ambac, and in accordance with Section 6.1(a) of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall receive, in addition to the Senior COFINA Bond Distribution, consideration from Ambac in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the Ambac Insurance Policy, the Ambac Trust, or the Ambac Certificates. A holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates shall be deemed to have had, on or after the Effective Date, the Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) cancelled.

***Non-Commutation/Ambac Trust:*** In the event that a holder of a Senior COFINA Bond Claim (Ambac) timely elects to receive the distributions set forth in section 6.1(b) of the Plan of Adjustment, on the Effective Date, COFINA shall deposit or be deemed to have deposited, among other things, such holder's Pro Rata Share of the Senior COFINA Bond Distribution into the Ambac Trust and such holder shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond Distribution and shall receive its pro rata share of Ambac Certificates in consideration therefor.

***Commutation Disclosure:*** Ambac notes that a beneficial holder of an Allowed Senior COFINA Bond Claim (Ambac) that elects (or is deemed to have elected) to commute its Ambac Insurance Policy is estimated to receive aggregate consideration under the Plan of Adjustment (assuming the COFINA Bonds trade at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond Claim (Ambac) as of the Petition Date, comprised of (i) COFINA Bonds, (ii) interest accrual or accretion on COFINA Bonds, commencing as of August 1, 2018, (iii) Cash, and (iv) the Ambac Commutation Payment. Ambac makes no

83

representation regarding this Disclosure Statement, including, without limitation, whether the COFINA Bonds will trade at par.

***Deemed Acceleration:*** The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Ambac Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided*, *however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

***Alternative Treatment:*** The Oversight Board and Ambac reserve the right to formulate an alternative election or implementation option with respect to the Senior COFINA Bond Claims (Ambac), including, without limitation, with respect to the deemed acceleration of the Ambac Insured Bonds on the Effective Date; *provided*, *however*, that any such alternative implementation option must be proposed, in writing, prior to the commencement of the Disclosure Statement Hearing; *and*, *provided*, *further*, that any such alternative election or implementation option shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise affect in any way, any commutation agreements or arrangements agreed to or entered into prior to, on or after the effective date of any agreement between Ambac, on the one hand, and any holder of any Senior COFINA Bond Claims (Ambac), on the other hand, in connection with the Ambac Insurance Policy.

**(c)** Voting: Class 2 is Impaired by the Plan of Adjustment. Beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) are not entitled to vote to accept or reject the Plan of Adjustment, but are entitled to make an election of distributions to be received pursuant to the Plan of Adjustment. Ambac, as contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan of Adjustment.

**(d)** Allowed Amount of Claims: $1,325,310,140.00

**(e)** Projected Recovery under the Plan of Adjustment: 100%

Class 3 – Senior COFINA Bond Claims (National)

**(a)** Classification: Class 3 consists of all Bond Claims on account of a "Senior" Existing Security, the repayment of which has been insured by National.

**(b)** Treatment: On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (National) against COFINA shall have the option to elect to receive its Pro Rata Share of:

(1) (a) the Senior COFINA Bond Distribution consisting of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds, and (iv) Rounding Amount Cash, if necessary, plus (b) Cash, distributable by or at

84

the direction of National, in accordance with the provisions of section 7.2 of the Plan of Adjustment, in full and complete satisfaction, release, and discharge of any further obligation of National with respect to the applicable National Insurance Policies (and, by making such election, the holder shall be deemed to have agreed to commute the National Insurance Policies relating to such holder's Allowed Senior COFINA Bond Claim (National) and such holder shall have no other or further rights with respect to the National Insurance Policies, the National Trust, or the National Certificates); or

(2) the National Certificates representing an interest in the National Trust Assets.

For the avoidance of doubt, with respect to any holder of an Allowed Senior COFINA Bond Claim (National) that elects (or is deemed to elect) to receive distributions in accordance with the provisions of subsection (1) above, (i) such holder shall be deemed to have released National from its obligations and liabilities under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, (ii) such holder shall not be entitled to the benefit of the National Insurance Policies and shall have no right to make a claim under, or receive payment from, the National Insurance Policies, (iii) National shall be released from its obligations under or related to the National Insurance Policies in respect of such holder's National Insured Bonds, and (iv) the National Insurance Policies shall be terminated and commuted in full with respect to such holder's National Insured Bonds, no provision of the National Insurance Policies with respect to such National Insured Bonds shall survive termination, and such National Insured Bonds shall no longer have the benefit of the National Insurance Policies.

***National Insurance Contribution:*** In consideration for the releases to be given to National, and in accordance with the provisions of section 7.1 of the Plan of Adjustment, on the Effective Date, a beneficial holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall receive, in addition to its Pro Rata Share of the Senior COFINA Bond Distribution, Cash distributable by or at the direction of National, in an amount equal to five and one quarter percent (5.25%) times the amount of such holder's Allowed Senior COFINA Bond Claim (National) as of the Petition Date, and the beneficial holder thereof shall have no other or further rights under or with respect to the National Insurance Policies, the National Trust, or the National Certificates.  The provisions set forth in section 7.2 of the Plan of Adjustment apply only to Senior COFINA Bond Claims (National) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof is or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of an Allowed Senior COFINA Bond Claim (National) that fails to validly elect to receive National Certificates shall be deemed to have had, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) cancelled.

*Non-Commutation/National Trust:* In the event that a holder of a Senior
COFINA Bond Claim (National) timely elects to receive the distributions set forth
in section 7.1(b) of the Plan of Adjustment (in accordance with the instructions set
forth in the Election Notice), on the Effective Date, COFINA shall deposit or be
deemed to have deposited, among other things, such holder's Pro Rata Share of the
Senior COFINA Bond Distribution into the National Trust and such holder
shall be deemed to have received its Pro Rata Share of the Senior COFINA Bond
Distribution and shall receive its pro rata share of National Certificates in
consideration therefor.

*Commutation Disclosure:* National notes that a beneficial holder of an Allowed
Senior COFINA Bond Claim (National) that elects (or is deemed to have elected)
to commute its National Insurance Policy is estimated to receive aggregate
consideration under the Plan of Adjustment (assuming the COFINA Bonds trade
at par) totaling at least 100% of such holder's Allowed Senior COFINA Bond
Claim (National) as of the Petition Date, comprised of (i) COFINA Bonds, (ii)
interest accrual or accretion on COFINA Bonds, commencing as of August 1,
2018, (iii) Cash, and (iv) the National Commutation Payment. National makes no
representation regarding this Disclosure Statement, including, without limitation,
whether the COFINA Bonds will trade at par.

*National Election:* At any time prior to the commencement of the Disclosure
Statement Hearing, National may elect, in a written notice provided to the
Oversight Board, an alternative treatment option for Senior COFINA Bond
Claims (National), pursuant to which, in the sole and absolute discretion of
National, and subject to the consent of the Oversight Board, which consent shall
not be unreasonably withheld, on the Effective Date, the National Insured Bonds
shall be paid off, in full, at an acceleration price equal to one hundred percent
(100%) of the Compounded Amount (as defined in the New Bond Indenture) of
the National Insured Bonds, as of the Effective Date, as follows: the COFINA
Bonds to be issued to holders of Senior COFINA Bond Claims (National) shall be
underwritten and sold into the market, the proceeds of which, together with any
cash portion of the Senior COFINA Bond Distribution that would otherwise be
allocated for payment of Senior COFINA Bond Claims (National), shall be used
to pay, in Cash, one hundred percent (100%) of the Compounded Amount of the
National Insured Bonds, as of the Effective Date, with any deficiency in such
amounts being paid by National in full, in Cash, on the Effective Date.

(c)     Voting:  Class 3 is Impaired by the Plan of Adjustment.  Beneficial holders of
Allowed Senior COFINA Bond Claims (National) are not entitled to vote to
accept or reject the Plan of Adjustment, but are entitled to make an election of
distributions to be received pursuant to the Plan of Adjustment.  National, as
contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan
of Adjustment.

(d)     Allowed Amount of Claims:  $1,109,355,783.20

(e) Projected Recovery under the Plan of Adjustment: 100%

Class 4 – Senior COFINA Bond Claims (Taxable Election)

    (a) Classification:  Class 4 consists of all Bond Claims, other than Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National), on account of a "Senior" Existing Security, the holder of which (a) has affirmatively elected to receive a Senior Taxable Bond Distribution and (b) is (i) a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

    (b) Treatment:  On the Effective Date, each holder of an Allowed Senior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Senior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

    (1) the Senior COFINA Bond Distribution, consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds have been distributed, tax-exempt COFINA Bonds, and (ii) Rounding Amount Cash, if necessary; and

    (2) the Taxable Election Cash.

    (c) Voting:  Class 4 is Impaired by the Plan of Adjustment; however, holders of Claims in Class 4 elected to be treated in such Class and, therefore, are deemed to accept the Plan of Adjustment.

    (d) Allowed Amount of Claims:  The number of Claims in Class 4 entitled to a distribution depends upon how many holders of Senior COFINA Bond Claims in Class 1 elect to be treated under Class 4 – Senior COFINA Bond Claims (Taxable Election).

    (e) Projected Recovery under the Plan of Adjustment:  95.01%

Class 5 – Junior COFINA Bond Claims

(a) Classification:  Class 5 consists of all Bond Claims, other than Junior COFINA Bond Claims (Assured) and Junior COFINA Bond Claims (Taxable Election), on account of a "First Subordinate" Existing Security.

(b) Treatment:  On the Effective Date and subject to the right of election set forth in section 9.2 of the Plan of Adjustment, each holder of an Allowed Junior COFINA Bond Claim against COFINA shall be entitled to receive its Pro Rata Share of the Junior COFINA Bond Distribution, consisting of (a) Section 103 Cash, if applicable, (b) COFINA Bonds, and (c) Rounding Amount Cash, if necessary.

(c) Voting:  Class 5 is Impaired by the Plan of Adjustment.  Class 5 and each holder of an Allowed Junior COFINA Bond Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

(d) Taxable Election:  Any Puerto Rico Investor or Puerto Rico Institution eligible to receive treatment under Class 5 may opt out of Class 5 and elect to be treated under Class 7 – Junior COFINA Bond Claims (Taxable Election).

(e) Allowed Amount of Claims:  $9,622,958,392.18

(f) Projected Recovery under the Plan of Adjustment – Taxable Election:  58.414%

(g) Projected Recovery under the Plan of Adjustment – No Taxable Election: 56.414%

## Class 6 – Junior COFINA Bond Claims (Assured)

(a) Classification:   Class 6 consists of all Bond Claims on account of a "First Subordinate" Existing Security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured, including pursuant to a secondary market insurance policy.

(b) Treatment:  On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Assured) shall be entitled to receive, in full satisfaction, release and exchange of such holder's Allowed Junior COFINA Bond Claim (Assured) and the Assured Insured Bonds giving rise to Junior COFINA Bond Claims (Assured), and shall be paid, in full, the applicable Acceleration Price as of the Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which, in each case, is allocable to Junior COFINA Bond Claims (Assured), and (2) otherwise as follows:  the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured) shall be (i) guaranteed in accordance with a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the Effective Date, the applicable Acceleration Price, with any deficiency in such amounts being paid by Assured in accordance with the Assured Insurance Policies guaranteeing the Assured Insured Bonds underlying the Junior COFINA Bond Claims (Assured). The principal amount, maturities and interest rates of the Assured New Bonds will be determined by Assured in consultation with the underwriter for the Assured

New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds without insurance (although the Assured New Bonds may mature later than the other COFINA Bonds, but in no event later than FY2058). The costs associated with the issuance of the Assured New Bonds will be payable by COFINA or Reorganized COFINA, as applicable. All other terms regarding the underwriting of the Assured New Bonds shall be subject to the approval of Assured. In the event that, on or prior to the Effective Date, Assured New Bonds cannot be sold or issued into the market, then, on the Effective Date, Assured shall pay the applicable Acceleration Price to the holders of the Assured Insured Bonds, and Assured shall receive the Pro Rata Share of the Junior COFINA Bond Distribution allocable to the holders of the Assured Insured Bonds. Payment of the applicable Acceleration Price with respect to any Assured Insured Bond in accordance with Section 10.1 of the Plan of Adjustment shall satisfy and discharge all of Assured's obligations under the Assured Insurance Policies with respect to such Assured Insured Bond.

**Deemed Acceleration:** The principal amount (or Compounded Amount in the case of capital appreciation bonds) of the Assured Insured Bonds will be deemed accelerated and immediately due and payable, including for purposes of section 1102 of the Bond Resolution, as of the Effective Date; *provided*, *however*, that such deemed acceleration shall not affect, nor will it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

**Alternative Treatment:** The Oversight Board and Assured reserve the right to formulate an alternative election or implementation option with respect to the Junior COFINA Bond Claims (Assured); *provided*, *however*, that any such alternative implementation option must be proposed, in writing prior to the commencement of the Disclosure Statement Hearing.

(c)    Voting: Class 6 is Impaired by the Plan of Adjustment. Beneficial holders of Allowed Junior COFINA Bond Claims (Assured) are not entitled to vote to accept or reject the Plan of Adjustment, and are not entitled to make an election of distributions to be received pursuant to the Plan of Adjustment. Assured, as contemplated by the Amended PSA, is entitled to vote to accept or reject the Plan of Adjustment.

(d)    Allowed Amount of Claims: $274,558,467.08

(e)    Projected Recovery under the Plan of Adjustment: 100%

Class 7 – Junior COFINA Bond Claims (Taxable Election)

(a)    Classification: Class 7 consists of all Bond Claims, other than Junior COFINA Bond Claims (Assured), on account of a "First Subordinate" Existing Security, the holder of which (a) has affirmatively elected to receive a Junior Taxable Bond

Distribution and (b) is (i) either (i) a Puerto Rico Investor; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Investors in respect of Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution; provided, however, that, if Taxable Bond Distributions are elected by Puerto Rico Institutions in respect of Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

**(b)**     Treatment:  On the Effective Date, each holder of an Allowed Junior COFINA Bond Claim (Taxable Election) against COFINA shall be entitled to receive, in full satisfaction, release, and exchange of such holder's Allowed Junior COFINA Bond Claim (Taxable Election), its Pro Rata Share of:

(a) the Junior COFINA Bond Distribution consisting of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary; and

(b) the Taxable Election Cash.

**(c)**     Voting:  Class 7 is Impaired by the Plan of Adjustment; however, holders of Claims in Class 7 elected to be treated in such Class and, therefore, are deemed to accept the Plan of Adjustment.

**(d)**     Allowed Amount of Claims:  The number of Claims in Class 7 entitled to a distribution depends upon how many holders of Junior COFINA Bond Claims in Class 5 elect to be treated under Class 7 – Junior COFINA Bond Claims (Taxable Election).

**(e)**     Projected Recovery under the Plan of Adjustment:  58.414%

### Class 8 – GS Derivative Claim

**(a)**     Classification: Class 8 consists of the GS Derivative Claim against COFINA.

**(b)**     Treatment:  On the Effective Date, the holder of the Allowed GS Derivative Claim against COFINA shall, to the extent that the termination value of the GS Derivative Claim is

(1) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and, with respect to the balance of the GS Derivative Claim, (a) to the extent that rejection damages, if any, associated with

90

such GS Derivative Claim is a Parity Obligation, as defined in the New Bond Indenture, such holder's Pro Rata Share of the Senior COFINA Bond Distribution, consisting of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (b) to the extent that rejection damages, if any, associated with such GS Derivative Claim is a not a Parity Obligation, such holder shall not receive a distribution pursuant to the Plan of Adjustment, or

(2) less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to Reorganized COFINA.

**(c)**   Voting:  Class 8 is Impaired by the Plan of Adjustment.  Class 8 and the holder of an Allowed GS Derivative Claim against COFINA is entitled to vote to accept or reject the Plan of Adjustment.

**(d)**   Estimated Allowed Amount of Claims:  Depending on the date of termination, $54 million - $62 million

**(e)**   Projected Recovery under the Plan of Adjustment:  Depending on the Title III Court's determination, up to 93.015%

Class 9 – General Unsecured Claims

**(a)**   Classification:   Class 9 consists of all General Unsecured Claims against COFINA.

**(b)**   Treatment:  On the Effective Date, if Class 9 votes to accept the Plan of Adjustment, each holder of an Allowed General Unsecured Claim against COFINA shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00); provided, however, that if Class 9 votes to reject the Plan of Adjustment, holders of Allowed General Unsecured Claims against COFINA shall not receive a distribution pursuant to the Plan of Adjustment.

**(c)**   Voting:  Class 9 is Impaired by the Plan of Adjustment.  Class 9 and each holder of an Allowed General Unsecured Claim against COFINA are entitled to vote to accept or reject the Plan of Adjustment.

**(d)**   Estimated Allowed Amount of Claims: $39,724,128.65

**(e)**   Projected Recovery under the Plan of Adjustment: If Class 9 votes to accept the Plan of Adjustment, 0.252%.  If Class 9 votes to reject the Plan of Adjustment, 0%.

Class 10 – Section 510(b) Subordinated Claims

91

(a) Classification: Class 10 consists of all Section 510(b) Subordinated Claims against COFINA.

(b) Treatment: Allowed Section 510(b) Subordinated Claims shall not receive a distribution pursuant to the Plan of Adjustment.

(c) Voting: Class 10 is Impaired by the Plan of Adjustment. Class 10 and each holder of a Section 510(b) Subordinated Claim are deemed to have rejected the Plan of Adjustment.

(d) Estimated Allowed Amount of Claims: $0

(e) Projected Recovery under the Plan of Adjustment: 0%

## E. Provisions Regarding Allocation of Unsubscribed Taxable Election Cash

### 1. Unsubscribed Taxable Election Cash Amount

On the Effective Date, the amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders of Allowed Senior COFINA Bond Claims (Taxable Election) and Allowed Junior COFINA Bond Claims (Taxable Election) in Classes 4 and 7, respectively, but not distributed based upon elections made or not made, as the case may be, then the Taxable Election Remainder Amount shall be reallocated and distributed as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) first, if the aggregate amount of Taxable Election Cash distributable under the Plan of Adjustment is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as Taxable Election Cash in accordance with the Plan of Adjustment, (ii) second, to the extent of any remainder, to further fund the COFINA Operating Expense Account up to an additional Ten Million Dollars ($10,000,000.00), and (iii) third, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution, and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be added to the COFINA Cash Available for Distribution and allocated to holders of Allowed Bond Claims in accordance with the terms and provisions of the Plan of Adjustment.

### 2. Commonwealth/COFINA Expenses

Notwithstanding anything contained in the Plan of Adjustment to the contrary, all expenses, including Allowed Administrative Expense Claims and Allowed Professional Claims, incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of sections 2.1 and 15.1 of the Plan of Adjustment and otherwise by the Commonwealth.

F. **Treatment of Executory Contracts and Unexpired Leases**

1. **Rejection or Assumption of Remaining Executory Contracts and Unexpired Leases**

Pursuant to section 365(b)(2) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and subject to the provisions of sections 18.5 and 18.7 of the Plan of Adjustment, all Executory Contracts and Unexpired Leases that exist between COFINA and any Entity, and which have not expired by their own terms on or prior to the Confirmation Date, shall be deemed rejected by COFINA as of the Effective Date, except for any Executory Contract and Unexpired Lease that (a) has been assumed and assigned or rejected pursuant to an order of the Title III Court entered prior to the Effective Date or (b) is specifically designated as a contract or lease to be assumed or assumed and assigned on the schedules to the Plan Supplement; *provided*, *however*, that the Debtor reserves the right, on or prior to the Confirmation Date, to amend such schedules to delete any Executory Contract and Unexpired Lease therefrom or add any Executory Contract and Unexpired Lease thereto, in which event such Executory Contract(s) and Unexpired Lease(s) shall be deemed to be, as the case may be, either rejected, assumed, or assumed and assigned as of the Effective Date. The Debtor shall serve (y) notice of any Executory Contract and Unexpired Lease to be assumed or assumed and assigned through the operation of section 18.1 of the Plan of Adjustment, by including a schedule of such contracts and leases in the Plan Supplement and (z) notice of any Executory Contract and Unexpired Lease to be rejected through the operation of the section 18.1 of the Plan of Adjustment, by serving a separate notice to the relevant counterparties to such agreements. To the extent there are any amendments to such schedules, the Debtor shall provide notice of any such amendments to the parties to the Executory Contract and Unexpired Lease affected thereby. The listing of a document on the schedules to the Plan Supplement or in any separate notice shall not constitute an admission by the Debtor that such document is an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder.

2. **Approval of Rejection or Assumption of Executory Contracts and Unexpired Leases**

Entry of the Confirmation Order by the Title III Court shall constitute approval, pursuant to sections 365(a) and 1123(b)(2) of the Bankruptcy Code, of the rejection, assumption, or assumption and assignment, as the case may be, of an Executory Contract and an Unexpired Lease pursuant to section 18.1 of the Plan of Adjustment.

3. **Inclusiveness**

Unless otherwise specified on the schedules to the Plan Supplement, each Executory Contract and Unexpired Lease listed or to be listed therein shall include any and all modifications, amendments, supplements, restatements, or other agreements made directly or indirectly by any agreement, instrument, or other document that in any manner affects such Executory Contract and Unexpired Lease, without regard to whether such agreement, instrument, or other document is listed on such schedule.

### 4. Cure of Defaults

Except to the extent that different treatment has been agreed to by the non-debtor party or parties to any Executory Contract and Unexpired Lease to be assumed or assumed and assigned pursuant to section 18.1 of the Plan of Adjustment, the Debtor shall, pursuant to the provisions of section 1123(a)(5)(G) and 1123(b)(2) of the Bankruptcy Code and consistent with the requirements of section 365 of the Bankruptcy Code, within at least twenty (20) days prior to the Confirmation Hearing, file with the Title III Court and serve by first class mail on each non-COFINA party to such Executory Contracts and Unexpired Leases to be assumed pursuant to section 18.1 of the Plan of Adjustment, a notice, which shall list the cure amount as to each executory contract or unexpired lease to be assumed or assumed and assigned. The parties to such Executory Contracts and Unexpired Leases will have twenty (20) days from the date of service of such notice to file and serve any objection to the cure amounts listed by the Debtor. If there are any objections filed, the Title III Court shall hold a hearing on a date to be set by the Title III Court. Notwithstanding section 18.1 of the Plan of Adjustment, the Debtor shall retain its rights to reject any of its Executory Contracts and Unexpired Leases that are subject to a dispute concerning amounts necessary to cure any defaults through the Effective Date.

### 5. Insurance Policies

Subject to the terms and provisions of section 18.7 of the Plan of Adjustment, each of COFINA's Insurance Policies and any agreements, documents, or instruments relating thereto, are treated as Executory Contracts under the Plan of Adjustment. Unless otherwise provided in the Plan of Adjustment and to the extent executory in nature, on the Effective Date, COFINA shall, first, deposit all Insurance Policies and any agreements, documents and instruments relating to coverage of all insured Bond Claims into the applicable Trusts and, second, be deemed to have rejected all such Insurance Policies and any agreements, documents, and instruments relating to coverage of all insured Claims; *provided*, *however*, that, such rejection shall not, and shall not be construed to, discharge or relieve any of Ambac, Assured or National with respect to their respective obligations to holders of Allowed Senior COFINA Bond Claims (Ambac), Allowed Junior COFINA Bond Claims (Assured) and Allowed Senior COFINA Bond Claims (National), respectively, that have elected to receive the relevant trust certificates hereunder pursuant to the applicable Insurance Policy. For the avoidance of doubt, nothing contained in the Plan of Adjustment shall prejudice any subrogation, reimbursement, or similar rights of an insured against the applicable Trust or the assets thereof.

### 6. Rejection Damage Claims

If the rejection of an Executory Contract and Unexpired Lease by the Debtor hereunder results in damages to the other party or parties to such contract or lease, any claim for such damages, if not heretofore evidenced by a filed proof of Claim, shall be forever barred and shall not be enforceable against COFINA, or its properties or agents, successors, or assigns, including, without limitation, Reorganized COFINA, unless a proof of Claim is filed with the Title III Court and served upon attorneys for the Oversight Board and Reorganized COFINA, as the case may be, on or before thirty (30) days after the late to occur of (i) the Confirmation Date, and (ii) the date of entry of an order by the Title III Court authorizing rejection of a particular Executory Contract and Unexpired Lease.

7. **Indemnification and Reimbursement Obligations**

For purposes of the Plan of Adjustment, (i) to the extent executory in nature, the obligations of COFINA, including, without limitation, directors and officers insurance policies, to indemnify and reimburse its directors or officers that were directors or officers, respectively, on or prior to the Petition Date shall be deemed assumed as of the Effective Date and (ii) indemnification obligations of COFINA arising from conduct of officers and directors during the period from and after the Petition Date shall be Administrative Expense Claims.

8. **Nonoccurrence of Effective Date**

If the Effective Date does not occur, the Title III Court shall retain jurisdiction with respect to any request to extend the deadline for assuming or rejecting Executory Contracts and Unexpired Leases pursuant to section 365(d)(4) of the Bankruptcy Code, unless such deadline(s) have expired.

9. **Reservation of Rights**

Nothing contained in the Plan of Adjustment or the Plan Supplement shall constitute an admission by the Debtor, Reorganized COFINA, or any other party that any such contract or lease is in fact an Executory Contract and Unexpired Lease or that COFINA has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption, the Debtor or Reorganized COFINA shall have forty-five (45) days following entry of a Final Order resolving such dispute to alter the treatment of such contract or lease.

G. **Provisions Governing Distributions**

1. **Time and Manner of Distribution**

Except as otherwise provided in the Plan of Adjustment, including, without limitation, in Articles X and XVIII thereof, distributions under the Plan of Adjustment shall be made to each holder of an Allowed Claim as follows:

(a) ***Distributions to Holders of Bond Claims***

Except as otherwise provided in the Plan of Adjustment, within ten (10) Business Days following the Effective Date, and subject to the terms and provisions of section 19.5 of the Plan of Adjustment regarding distributions to Ambac and Whitebox on account of the pendency of the Ambac Action and the Whitebox Actions, respectively, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Senior COFINA Bond Claim, an Allowed Senior COFINA Bond Claim (Ambac), an Allowed Senior COFINA Bond Claim (National), an Allowed Senior COFINA Bond Claim (Taxable Election), an Allowed Junior COFINA Bond Claim, an Allowed Junior COFINA Bond Claim (Assured) and an Allowed Junior COFINA Bond Claim (Taxable Election), in each case consistent with the terms of the Plan of Adjustment, such Creditor's Pro Rata Share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash, Taxable Election Cash, Consummation Costs, if applicable, and COFINA Bonds, together with, where applicable, the consideration described in

95

sections 6.1 and 7.1 of the Plan of Adjustment, or, in lieu of all of the foregoing, certificates in the applicable Trust.

### (b) *Distributions with Respect to GS Derivative Claim*

Within ten (10) Business Days following the Effective Date, and solely to the extent that the holder of the Allowed GS Derivative Claim is entitled to a distribution in excess of the value of the collateral retained by such holder, the Disbursing Agent shall distribute, or cause to be distributed, to the holder of the Allowed GS Derivative Claim, such Creditor's share, if any, of Section 103 Cash, COFINA Cash Available for Distribution, Rounding Amount Cash and COFINA Bonds.

### (c) *Distributions with Respect to General Unsecured Claims*

Within ten (10) Business Days following the Effective Date, and solely to the extent that Class 9 votes to accept the Plan of Adjustment, the Disbursing Agent shall distribute or cause to be distributed to each holder of an Allowed General Unsecured Claim such Creditor's Pro Rata Share, if any, of One Hundred Thousand Dollars ($100,000.00).

### (d) *Distribution of Cash to Holders of Certain Other Claims*

Except as otherwise provided in the Plan of Adjustment, on or as soon as practicable after the later of (i) the Effective Date and (ii) the date on which such Claim becomes an Allowed Claim, the Disbursing Agent shall distribute, or cause to be distributed, to each holder of an Allowed Administrative Expense Claim, Cash in the amount of such Allowed Claim.

### 2. Timeliness of Payments

Any payment or distribution to be made pursuant to the Plan of Adjustment shall be deemed to be timely made if made within ten (10) days after the date specified in the Plan of Adjustment. Whenever any distribution to be made under the Plan of Adjustment shall be due on a day other than a Business Day, such distribution shall instead be made, without interest, on the immediately succeeding Business Day, but shall be deemed to have been made on the date due, including, without limitation, deeming distributions made pursuant to section 19.1(a) of the Plan of Adjustment to have been made on the Effective Date.

### 3. Distributions by the Disbursing Agent

Except as otherwise provided in the Plan of Adjustment, all distributions under the Plan of Adjustment shall be made by the Disbursing Agent. The Disbursing Agent shall be deemed to hold all property to be distributed hereunder in trust for the Entities entitled to receive the same. The Disbursing Agent shall not hold an economic or beneficial interest in such property.

### 4. Manner of Payment under the Plan of Adjustment

Unless the Entity receiving a payment agrees otherwise, any payment in Cash to be made by the Disbursing Agent shall be made, at the election of the payor, by check drawn on a domestic bank or by wire transfer from a domestic bank; *provided*, *however*, that no Cash

payment shall be made to a holder of an Allowed Claim until such time, if ever, as the amount payable thereto is equal to or greater than Ten Dollars ($10.00).

### 5.    Delivery of Distributions

Subject to the provisions of Rule 9010 of the Bankruptcy Rules, and except as provided in the Plan of Adjustment, distributions and deliveries to holders of Allowed Claims shall be made at the address of each such holder as set forth on the Schedules filed with the Title III Court, unless superseded by the address set forth on proofs of Claim filed by such holders, or at the last known address of such holder if no proof of Claim is filed or if COFINA has been notified in writing of a change of address, subject to the qualifications provided in section 19.5 of the Plan of Adjustment.

### 6.    Cancellation of Notes, Instruments, Certificates, and Other Documents

Except (a) as provided in any contract, instrument or other agreement or document entered into or delivered in connection with the Plan of Adjustment, (b) for purposes of evidencing a right to distribution under the Plan of Adjustment, or (c) as specifically provided otherwise in the Plan of Adjustment (including any rejection of Executory Contracts or Unexpired Leases pursuant to section 18.1 thereof), on the Effective Date, the "Senior" and "First Subordinate" Existing Securities and all instruments and documents related thereto will be deemed automatically cancelled, terminated and of no further force or effect against COFINA without any further act or action under any applicable agreement, law, regulation, order or rule, with COFINA and BNYM having no continuing obligations or duties and responsibilities thereunder and the obligations of the parties to COFINA, as applicable, under the Existing Securities and all instruments and documents related thereto shall be discharged, subject to the qualifications provided in section 19.6 of the Plan of Adjustment.

### 7.    Undeliverable/Reserved Distributions

#### (a)    *Holding of Undeliverable Distributions by the Disbursing Agent*

If any distribution to any holder is returned to the Disbursing Agent as undeliverable, no further distribution shall be made to such holder unless and until the Disbursing Agent is notified, in writing, of such holder's then-current address.  Subject to the terms and provisions of section 19.7(b) of the Plan of Adjustment, undeliverable distributions shall remain in the possession of the Disbursing Agent until such time as a distribution becomes deliverable.  All Entities ultimately receiving previously undeliverable Cash shall not be entitled to any interest or other accruals of any kind.  Nothing contained in the Plan of Adjustment shall require the Disbursing Agent to attempt to locate any holder of an Allowed Claim.

#### (b)    *Failure to Claim Undeliverable Distributions*

If (i) a check is sent, by the Disbursing Agent to a holder in respect of distributions and such check is not negotiated within one hundred twenty (120) days following the date on which such check was issued, or (ii) any other form of distribution to a holder is otherwise undeliverable, the Disbursing Agent (or its duly authorized agent) shall, on or prior to the date that is one hundred eighty (180) days from (i) the Effective Date, with respect to all Allowed

97

Claims as of the Effective Date, and (ii) the date that a distribution is made with respect to any Disputed Claim that becomes an Allowed Claim subsequent to the Effective Date, file a list with the Title III Court setting forth the names of those Entities for which distributions have been made hereunder that have not been negotiated or have been returned as undeliverable as of the date thereof. Any holder of an Allowed Claim on such list that does not identify itself and assert its rights pursuant to the Plan of Adjustment to receive a distribution within six (6) months from the date so listed shall have its entitlement to such undeliverable distribution discharged and shall be forever barred from asserting any entitlement pursuant to the Plan of Adjustment, against Reorganized COFINA, the trustees, or their respective professionals, agents, or property, and any (1) Cash in the possession of the Disbursing Agent or the trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for use to discharge operating expenses of Reorganized COFINA and (2) COFINA Bonds in the possession of the Disbursing Agent or trustee with respect to Existing Securities, as the case may be, shall be released to Reorganized COFINA for cancellation or deposit into the treasury of Reorganized COFINA, as determined by Reorganized COFINA in its sole and absolute discretion.

## 8. Withholding and Reporting Requirements

Any party issuing any instrument or making any distribution under the Plan of Adjustment shall comply with all applicable withholding and reporting requirements imposed by any United States federal, state or local tax law or Tax Authority, and all distributions under the Plan of Adjustment shall be subject to any such withholding or reporting requirements. Notwithstanding the above, each holder of an Allowed Claim that is to receive a distribution under the Plan of Adjustment shall have the sole and exclusive responsibility for the satisfaction and payment of any Taxes imposed on such holder by any governmental unit, including income, withholding and other tax obligations, on account of such distribution. Any party issuing any instrument or making any distribution under the Plan of Adjustment has the right, but not the obligation, to not make a distribution until such holder has made arrangements satisfactory to such issuing or disbursing party for payment of any such withholding tax obligations and, if any party issuing any instrument or making any distribution under the Plan of Adjustment fails to withhold with respect to any such holder's distribution, and is later held liable for the amount of such withholding, the holder shall reimburse such party. The Disbursing Agent may require, as a condition to the receipt of a distribution, that the holder complete the appropriate Form W-8 or Form W-9, as applicable to each holder. If the holder fails to comply with such a request within one year, such distribution shall be deemed an Unclaimed Distribution.

## 9. Time Bar to Cash Payments

Checks issued by the Disbursing Agent on account of Allowed Claims shall be null and void if not negotiated within one hundred twenty (120) days from and after the date of issuance thereof. Requests for reissuance of any check shall be made directly to the Disbursing Agent by the holder of the Allowed Claim with respect to which such check originally was issued. Any claim in respect of such a voided check shall be made on or before the later of (i) the first (1st) anniversary of the Effective Date or (ii) ninety (90) days after the date of issuance of such check, if such check represents a final distribution hereunder on account of such Claim. After such date, all Claims in respect of voided checks shall be discharged and forever barred and the

Disbursing Agent shall retain all monies related thereto for the sole purpose of redistribution to holders of Allowed Claims in accordance with the terms and provisions hereof.

### 10. Distributions After Effective Date

Distributions made after the Effective Date to holders of Claims that are not Allowed Claims as of the Effective Date, but which later become Allowed Claims, shall be deemed to have been made in accordance with the terms and provisions of Article XIX of the Plan of Adjustment.

### 11. Setoffs

Except as otherwise provided in the Plan of Adjustment or in the Confirmation Order, the Disbursing Agent may, pursuant to applicable bankruptcy or non-bankruptcy law, set off against any Allowed Claim and the distributions to be made pursuant to the Plan of Adjustment on account thereof (before any distribution is made on account of such Claim by the Disbursing Agent), the claims, rights, and causes of action of any nature that COFINA or Reorganized COFINA may hold against the holder of such Allowed Claim; *provided*, *however*, that neither the failure to effect such a setoff nor the allowance of any Claim hereunder shall constitute a waiver or release by COFINA or Reorganized COFINA of any such claims, rights, and causes of action that COFINA or the Reorganized COFINA may possess against such holder; and, *provided*, *further*, that nothing contained in the Plan of Adjustment is intended to limit the ability of any Creditor to effectuate rights of setoff or recoupment preserved or permitted by the provisions of sections 553, 555, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment; *and*, *provided*, *further*, that nothing in section 19.11 of the Plan of Adjustment shall affect the releases and injunctions provided in Article XXX of the Plan of Adjustment.

### 12. Allocation of Plan Distributions Between Principal and Interest

To the extent that any Allowed Claim entitled to a distribution under the Plan of Adjustment consists of indebtedness and other amounts (such as accrued but unpaid interest thereon), such distribution shall be allocated first to the principal amount of the Claim (as determined for U.S. federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claim, to such other amounts; *provided*, *however*, that COFINA or Reorganized COFINA's treatment of any distributions for its tax purposes will not be binding on any Creditor as to the treatment of such distributions for any regulatory, tax or other purposes.

### 13. Payment of Trustee Fees and Expenses

Upon the entry of an order of the Title III Court authorizing payment thereof, upon notice and a hearing, the Disbursing Agent, unless otherwise stayed, shall pay the Trustee Claims; *provided*, *however*, that, with respect to the allowance of Trustee Claims for which an order of the Title III Court had been entered prior to the Effective Date, the Disbursing Agent shall pay such Trustee Claims as soon as practicable after the Effective Date. To the extent that the Disbursing Agent fails to pay any Trustee Claim approved by the Title III Court, such trustee shall have the right to assert its Lien and priority rights pursuant to the applicable indenture or

governing documents for payment of any payment or other distribution to be made in accordance with the provisions contained in the Plan of Adjustment. Notwithstanding the foregoing, the Disbursing Agent shall be responsible and, upon presentation of supporting documentation in form and substance satisfactory to the Disbursing Agent, shall satisfy the trustee distribution expenses; *provided*, *however*, that, under no circumstance shall the Disbursing Agent be responsible for any indemnification obligation, cost, or expense of any of the trustees associated with the gross negligence, intentional fraud or willful misconduct of a trustee in making any such distribution.

## H. Rights and Powers of Disbursing Agent

### 1. Exculpation

From and after the Effective Date, the Disbursing Agent shall be exculpated by all Entities, including, without limitation, holders of Claims and other parties in interest, from any and all claims, causes of action, and other assertions of liability arising out of the discharge of the powers and duties conferred upon such Disbursing Agent by the Plan of Adjustment or any order of the Title III Court entered pursuant to or in furtherance of the Plan of Adjustment, or applicable law, except for actions or omissions to act arising out of the gross negligence or willful misconduct of such Disbursing Agent. No holder of a Claim or other party in interest shall have or pursue any claim or cause of action against the Disbursing Agent for making payments in accordance with the Plan of Adjustment or for implementing the provisions of the Plan of Adjustment.

### 2. Powers of the Disbursing Agent

Except as may be provided otherwise hereunder, the Disbursing Agent shall be empowered to (a) take all steps and execute all instruments and documents necessary to effectuate the Plan of Adjustment, (b) make distributions contemplated by the Plan of Adjustment, (c) comply with the Plan of Adjustment and the obligations thereunder, and (d) exercise such other powers as may be vested in the Disbursing Agent pursuant to order of the Title III Court, pursuant to the Plan of Adjustment, or as deemed by the Disbursing Agent to be necessary and proper to implement the provisions of the Plan of Adjustment.

### 3. Fees and Expenses Incurred From and After the Effective Date

Except as otherwise ordered by the Title III Court, the amount of any reasonable fees and expenses incurred by the Disbursing Agent from and after the Effective Date and any reasonable compensation and expense reimbursement claims, including, without limitation, reasonable fees and expenses of counsel, incurred by the Disbursing Agent, shall be paid in Cash without further order of the Title III Court.

## I. Procedures for Treatment of Disputed Claims

### 1. Objections to Claims; Prosecution of Disputed Claims

Except with respect to Allowed Claims, Reorganized COFINA shall object to, and shall assume any pending objection filed by the Debtor to, the allowance of Claims filed with the Title

III Court with respect to which it disputes liability, priority or amount, including, without limitation, objections to Claims that have been assigned and the assertion of the doctrine of equitable subordination with respect thereto. All objections, affirmative defenses and counterclaims shall be litigated to Final Order; *provided*, *however*, that Reorganized COFINA shall have the authority to file, settle, compromise or withdraw any objections to Claims, without approval of the Title III Court. Unless otherwise ordered by the Title III Court, to the extent not already objected to by the Debtor, Reorganized COFINA shall file and serve all objections to Claims as soon as practicable, but, in each instance, not later than one hundred twenty (120) days following the Effective Date or such later date as may be approved by the Title III Court. Notwithstanding anything contained in the Plan of Adjustment to the contrary, on the Effective Date, any Bond Claim filed by any Entity, other than the Bond Claims filed by BNYM, as trustee with respect to the Existing Securities, for amounts due under Existing Securities, shall be deemed disallowed and expunged and the Oversight Board shall instruct Prime Clerk LLC, its court-appointed representative, to remove such Bond Claims from the claims registry maintained for the benefit of the Title III Court.

2.      **Estimation of Claims**

Except with respect to Allowed Claims, on and after the Effective Date, and unless otherwise limited by an order of the Title III Court, Reorganized COFINA may at any time request the Title III Court to estimate for final distribution purposes any contingent, unliquidated or Disputed Claim pursuant to section 502(c) of the Bankruptcy Code regardless of whether the Debtor previously objected to or sought to estimate such Claim, and the Title III Court will retain jurisdiction to consider any request to estimate any Claim at any time during litigation concerning any objection to any Claim, including, without limitation, during the pendency of any appeal relating to any such objection. Unless otherwise provided in an order of the Title III Court, if the Title III Court estimates any contingent, unliquidated or Disputed Claim, the estimated amount shall constitute either the allowed amount of such Claim or a maximum limitation on such Claim, as determined by the Title III Court; *provided*, *however*, that, if the estimate constitutes the maximum limitation on such Claim, Reorganized COFINA may elect to pursue supplemental proceedings to object to any ultimate allowance of such Claim; and, *provided*, *further*, that the foregoing is not intended to limit the rights granted by section 502(j) of the Bankruptcy Code. All of the aforementioned Claims objection, estimation and resolution procedures are cumulative and not necessarily exclusive of one another.

3.      **Payments and Distributions on Disputed Claims**

(a)      *Disputed Claims Holdback*

From and after the Effective Date, and until such time as each Disputed Claim has been compromised and settled, estimated by the Title III Court in an amount constituting the allowed amount, or allowed or disallowed by Final Order of the Title III Court, Reorganized COFINA shall retain, for the benefit of each holder of a Disputed Claim, COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds, and, to the extent elected by such holder, Trust Certificates, and any dividends, gains or income attributable in respect of any of the foregoing, in an amount equal to the Pro Rata Share of distributions that would have been made to the holder of such Disputed Claim if it were an Allowed Claim in an

101361236v29

amount equal to the lesser of (i) the liquidated amount set forth in the filed proof of Claim relating to such Disputed Claim, (ii) the amount in which the Disputed Claims shall be estimated by the Title III Court pursuant to section 502 of the Bankruptcy Code constitutes and represents the maximum amount in which such Claim may ultimately become an Allowed Claim, and (iii) such other amount as may be agreed upon by the holder of such Disputed Claim and Reorganized COFINA; _provided_, _however_, that the recovery by any holder of a Disputed Claim shall not exceed the lesser of (i), (ii) and (iii) above. Any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds retained and held for the benefit of a holder of a Disputed Claim shall be treated as payment and reduction on account of such Disputed Claim for purposes of computing any additional amounts to be paid in Cash distributed in COFINA Bonds if the Disputed Claim ultimately becomes an Allowed Claim. Such Cash and any dividends, gains or income paid on account of the COFINA Bonds (if any) retained for the benefit of holders of Disputed Claims shall be retained by Reorganized COFINA for the benefit of such holders pending determination of their entitlement thereto under the terms of the Plan of Adjustment. To the extent that Reorganized COFINA retains COFINA Bonds on behalf of Disputed Claims holders, until such time as such COFINA Bonds are distributed, Reorganized COFINA shall exercise voting or consent rights with respect to such bonds.

(b)     _**Allowance of Disputed Claims**_

At such time as a Disputed Claim becomes, in whole or in part, an Allowed Claim, Reorganized COFINA shall distribute to the holder thereof the distributions, if any, to which such holder is then entitled under the Plan of Adjustment, together with any earnings that have accrued on the amount of COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds so retained (net of any expenses, including any taxes, relating thereto), but only to the extent that such earnings are attributable to the amount of the Allowed Claim. Such distribution, if any, shall be made as soon as practicable after the date that the order or judgement of the Title III Court allowing such Disputed Claim becomes a Final Order, but in no event more than ninety (90) days thereafter. The balance of any COFINA Cash Available for Distribution, Section 103 Cash, Rounding Amount Cash and COFINA Bonds previously retained but not distributed to a Disputed Claim holder shall be included in future distributions with respect to COFINA Bonds.

4.     **Authority to Amend List of Creditors**

Except with respect to Bond Claims, the Debtor shall have the authority to amend the List of Creditors with respect to any Claim and to make distributions based on such amended List of Creditors without approval of the Title III Court. If any such amendment to the List of Creditors reduces the amount of a Claim or changes the nature or priority of a Claim, the Debtor will provide the holder of such Claim with notice of such amendment and such holder will have twenty (20) days to file an objection to such amendment with the Title III Court. If no such objection is filed, the Disbursing Agent may proceed with distributions based on such amended List of Creditors without approval of the Title III Court.

5.      **Non-Accrual of Interest**

Unless otherwise specifically provided for in the Plan of Adjustment or by order of the Title III Court, post-petition interest shall not accrue or be paid on Claims, Allowed or otherwise, and no holder of a Claim, Allowed or otherwise, shall be entitled to interest accruing on or after the Petition Date on any Claim or right.  Additionally, and without limiting the foregoing, interest shall not accrue or be paid on any Disputed Claim with respect to the period from the Effective Date to the date a final distribution is made on account of such Disputed Claim, if and when such Disputed Claim becomes an Allowed Claim.

6.      **Disallowance of Claims**

All Claims of any Entity from which property is sought by the Debtor under sections 550, or 553 of the Bankruptcy Code or that the Debtor alleges is a transferee of a transfer that is avoidable under sections 544, 545, 547, 548, or 549 of the Bankruptcy Code shall be disallowed if:  (a) the Entity, on the one hand, and the Debtor, on the other hand, agree or the Title III Court has determined by Final Order that such Entity or transferee is liable to turn over any property or monies under any of the aforementioned sections of the Bankruptcy Code; and (b) such Entity or transferee has failed to turn over such property by the date set forth in such agreement or Final Order.

**J.      Acceptance or Rejection of the Plan of Adjustment, Effect of Rejection by One or More Classes of Claims**

1.      **Impaired Classes to Vote**

Except as otherwise provided pursuant to the Disclosure Statement Order, each holder, as of the voting record date established in the Disclosure Statement Order, of a Claim in an impaired Class not otherwise deemed to have rejected or accepted the Plan of Adjustment shall be entitled to vote separately to accept or reject the Plan of Adjustment.

2.      **Acceptance by Class of Creditors**

An impaired Class of holders of Claims shall have accepted the Plan of Adjustment if the Plan of Adjustment is accepted by at least two-thirds (2/3) in dollar amount and more than one-half (1/2) in number of the Allowed Claims of such Class that have affirmatively voted to accept or reject the Plan of Adjustment.

3.      **Cramdown**

If any impaired Class of Claims shall fail to accept, or be deemed to reject, the Plan of Adjustment in accordance with section 1129(a) of the Bankruptcy Code, the Debtor reserves the right to request that the Title III Court confirm the Plan of Adjustment in accordance with section 1129(b) of the Bankruptcy Code.

101361236v29

**K. Identification of Claims Impaired by the Plan and Not Impaired by the Plan**

**1. Impaired Classes**

Claims in Classes 1 through 10 are impaired under the Plan of Adjustment.

**2. Impaired Classes to Vote**

The Claims in Classes 1 through 9 are impaired and receiving distributions pursuant to the Plan of Adjustment, and are therefore entitled to vote to accept or reject the Plan of Adjustment; *provided*, *however*, that, based upon the elections made on the Election Notice, Classes 4 and 7 are deemed to have accepted the Plan of Adjustment. The Claims in Class 10 are impaired and not receiving a distribution pursuant to the Plan of Adjustment and, therefore, Class 10 is deemed to have rejected the Plan of Adjustment.

**L. Conditions Precedent to Confirmation of the Plan**

Confirmation of the Plan of Adjustment is subject to satisfaction of the following conditions precedent:

**1. Conditions Precedent to Confirmation of the Plan**

**(a) *Fiscal Plan Certification***

The Oversight Board shall have determined that the Plan of Adjustment is consistent with the COFINA Fiscal Plan and shall have certified the submission of the Plan of Adjustment, and any modifications to the Plan of Adjustment through the Confirmation Date, in accordance with sections 104(j) and 313 of PROMESA.[33]

**(b) *Required Orders***

The Clerk of the Title III Court shall have entered an order or orders (including, without limitation, the Disclosure Statement Order, the Confirmation Order, and the Settlement Order) providing for the following:

(i) Approving the Disclosure Statement as containing "adequate information" pursuant to section 1125 of the Bankruptcy Code;

(ii) Authorizing the solicitation of votes and elections with respect to the Plan of Adjustment;

(iii) Determining that all votes and elections or deemed elections are binding and have been properly tabulated;

---

[33] Pursuant to the unanimous written consent, dated October 18, 2018, the Oversight Board certified the COFINA Fiscal Plan. By resolution dated October 19, 2018, the Oversight Board certified submission of the original plan of adjustment pursuant to PROMESA section 104(j). Pursuant to unanimous written consent, dated November 16, 2018, the Oversight Board certified submission of the Plan of Adjustment.

(iv)  Confirming and giving effect to the terms and provision of the Plan of Adjustment, including the releases set forth in Article XXX of the Plan of Adjustment;

(v)  Approving the Settlement Agreement in accordance with its terms, including, but not limited to, the releases of the Agents and their respective representatives, professionals and advisors;

(vi)  Determining that all applicable tests, standards and burdens in connection with the Plan of Adjustment have been duly satisfied and met by the Oversight Board, COFINA and the Plan of Adjustment;

(vii)  Approving the documents in the Plan Supplement, other than the New Bond Legislation (to the extent included in the Plan Supplement) and the Reorganized COFINA By-Laws;

(viii)  Authorizing Reorganized COFINA to execute, enter into, and deliver the documents in the Plan Supplement, and to execute, implement and take all actions otherwise necessary or appropriate to give effect to the transactions contemplated by the Plan of Adjustment, the documents in the Plan Supplement, and the Settlement Agreement;

(ix)  Determining that the compromises and settlements set forth in the Settlement Agreement and the Plan of Adjustment are appropriate, reasonable and approved; and

(x)  The deemed acceleration of the Existing Securities on the Effective Date (i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if requested by Ambac and/or National prior to the commencement of the Disclosure Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; *provided*, *however*, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date.

(c)  ___Form of Orders___

The Confirmation Order, the Settlement Order and the Plan of Adjustment are each in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas.

(d)  ___Confirmation Order___

The Confirmation Order includes (i) determinations that all of the settlements and compromises contained in the Plan of Adjustment and the Settlement Agreement satisfy applicable standards under sections 365, 1123(b)(3) and 1129 of the Bankruptcy Code and Bankruptcy Rule 9019, to the extent applicable, (ii) the releases, exculpations, and injunctions set forth in Article XXX of the Plan of Adjustment, and (iii) the provisions set forth in section 25.1(c) of the Plan of Adjustment.

105

2.      **Waiver of Conditions Precedent to Confirmation**

To the extent practicable and legally permissible, each of the conditions precedent in section 24.1 of the Plan of Adjustment may be waived, in whole or in part, by the Oversight Board, subject to the prior written consent of AAFAF, COFINA, the PSA Creditors and Bonistas, which consent shall not be unreasonably withheld. Any such waiver of a condition precedent may be effected at any time by filing a notice thereof with the Title III Court executed by the Oversight Board.

**M.     Conditions Precedent to the Effective Date**

1.      **Conditions Precedent to the Effective Date**

The occurrence of the Effective Date and the substantial consummation of the Plan of Adjustment are subject to satisfaction of the following conditions precedent:

(a)      *Satisfaction of Certain Settlement Agreement Conditions*

The satisfaction of the "Conditions to Effective Date" set forth in Section 4 of the Settlement Agreement.

(b)      *Fiscal Plan Certification*

The Oversight Board shall have determined that the Plan of Adjustment is consistent with COFINA Fiscal Plan and shall have certified the submission of the Plan of Adjustment, and any modifications to the Plan of Adjustment through the Confirmation Date, in accordance with sections 104(j) and 313 of PROMESA.[34]

(c)      *Entry of the Confirmation Order*

The Clerk of the Title III Court shall have entered the Confirmation Order in accordance with section 314 of PROMESA and section 1129 of the Bankruptcy Code, made applicable to the Title III Case pursuant to section 301 of PROMESA, which shall be in form and substance reasonably acceptable to the Oversight Board, AAFAF, COFINA, the PSA Creditors and Bonistas, and the Confirmation Order shall provide for the following:

(i)      Authorize COFINA and Reorganized COFINA, as the case may be, to take all actions necessary to enter into, implement, and consummate the contracts, instruments, releases, leases, indentures, and other agreements or documents created in connection with the Plan;

(ii)      Decree that the provisions of the Confirmation Order and the Plan of Adjustment are non-severable and mutually dependent;

---

[34] Pursuant to the unanimous written consent, dated October 18, 2018, the Oversight Board certified the COFINA Fiscal Plan. By resolution dated October 19, 2018, the Oversight Board certified submission of the original plan of adjustment pursuant to PROMESA section 104(j). Pursuant to unanimous written consent, dated November 16, 2018, the Oversight Board certified submission of the Plan of Adjustment.

(iii)   Authorize COFINA and Reorganized COFINA, as the case may be, to (1) make all distributions and issuances as required under the Plan of Adjustment and (2) enter into any agreements and transactions, as set forth in the Plan Supplement;

(iv)   Authorize the implementation of the Plan of Adjustment in accordance with its terms.

(v)   The COFINA Bonds and the covenants by COFINA, Reorganized COFINA, and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the Sales Tax, non-impairment, substitution of collateral and tax-exemption covenants set forth in Article XVI of the Plan of Adjustment), as provided in the New Bond Legislation and the New Bond Indenture, constitute valid, binding, legal and enforceable obligations of COFINA, Reorganized COFINA, and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) is the property of Reorganized COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, Reorganized COFINA, the Commonwealth, or any instrumentality of the Commonwealth, other than liens and claims afforded to holders of COFINA Bonds under the Plan of Adjustment and the Confirmation Order, and shall not be "available resources" or "available revenues" of the Government of Puerto Rico, as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or English version of the Puerto Rico Constitution);

(vi)   Pursuant to the New Bond Legislation, the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien as described in section 16.2 of the Plan of Adjustment, which Lien shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;[35]

(vii)   The statutory lien on, and pledges of, COFINA Pledged Taxes as provided in the New Bond Legislation and the New Bond Indenture, as applicable, and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and enforceable; including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution of New Collateral as adequate protection for the property rights conferred under the Plan of Adjustment and the Confirmation Order;

(viii)   New Bond Legislation has been enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in section 28.3 of the Plan of Adjustment, (ii) permit the Sales Tax, tax exemption, substitution of New Collateral and non-impairment provisions referred to therein and (iii) grant such other authorizations, if any, which may

---

[35] On November 7 and 8, 2018, respectively, the New Bond Legislation was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, Governor Rosselló Nevares signed into law the New Bond Legislation.

107

be required to implement the transactions contemplated therein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory Lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the Additional Bonds Test, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission of any disputes under the New Bond Indenture to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Creditor Parties.  To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the New Bond Indenture;

(ix)   The transfer of the COFINA Portion (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) pursuant to the Plan of Adjustment is appropriate and binding and specifically enforceable against Reorganized COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the Plan of Adjustment, including, without limitation, because the transfer of the COFINA Portion created in Reorganized COFINA an ownership interest in such property (and any substitution of New Collateral on the terms and conditions provided for in the Plan of Adjustment) and is a valid provision made to pay or secure payment of the COFINA Bonds;

(x)   The deemed acceleration of the Existing Securities on the Effective Date (i) in connection with  the treatment of Junior COFINA Bond Claims (Assured) and (ii) if requested by Ambac and/or National prior to the commencement of the Disclosure Statement Hearing, in connection with the Senior COFINA Bond Claims (Ambac) and the National Election, respectively; *provided*, *however*, that, such deemed acceleration shall not affect, nor shall it be construed to affect, any issues regarding the existence of a "default" or an "event of default" with respect to the Existing Securities which were pending prior to the Effective Date;

(xi)   The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (1) COFINA, (2) Reorganized COFINA, (3) the Commonwealth, (4) each Person or Entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including each holder of a Bond Claim and each holder of a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the Plan of Adjustment and, if impaired, whether or not such person or entity accepted the Plan of Adjustment, (5) any other Person or Entity, and (6) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians; and

(xii)    The Plan of Adjustment is consistent with the COFINA Fiscal Plan and satisfied section 314(b)(7) of PROMESA.

    **(d)**    <u>*No Injunction*</u>

The Confirmation Order shall be effective and not be stayed in any respect.

    **(e)**    <u>*Authorizations*</u>

All (1) authorizations, consents, regulatory approvals, rulings, or documents, if any, that are necessary to implement and effectuate the Plan of Adjustment, including, without limitation, the New Bond Legislation,[36] have been obtained or enacted and not revoked, and (2) except to the extent expressly provided in the Plan of Adjustment and not inconsistent with any other provision of the Plan of Adjustment, unless otherwise permitted or required by PROMESA or similar authority, completion of any other required legislative or other governmental action required to consummate the Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a New Bond Indenture, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder.

    **(f)**    <u>*Execution of Documents; Other Actions*</u>

All actions and all contracts, instruments, settlements, releases and other agreements or documents, including Definitive Documents,[37] necessary to implement the terms and provisions of the Plan of Adjustment, including the Definitive Documents, are effected or executed and delivered, as applicable, in form and substance reasonably satisfactory to the Government Parties, the PSA Creditors and Bonistas, and are in full force and effect.

    **(g)**    <u>*Opinions*</u>

Usual and customary legal opinions for issuances of the type similar to the COFINA Bonds by outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Creditors, have

---

[36] On November 7 and 8, 2018, respectively, the New Bond Legislation was passed in the Puerto Rico House of Representatives and the Puerto Rico Senate. On November 15, 2018, Governor Rosselló Nevares signed into law the New Bond Legislation.

[37] The "<u>Definitive Documents</u>" are defined as, collectively, the definitive documents and agreements to which COFINA will be a party as contemplated by the Plan, including (a) the Plan and any documentation or agreements related thereto, (b) the Confirmation Order and pleadings in support of entry thereof, (c) the New Bond Indenture and documents or agreements related thereto, (d) the form of bonds for the COFINA Bonds, (e) the New Banking Services Agreement and (f) each other document that will comprise the Plan Supplement. The form and substance of each document comprising the "Definitive Documents" shall be reasonably acceptable to the Government Parties and to the PSA Creditors and Bonistas.

been delivered to the applicable trustee or other parties regarding the Definitive Documents and the Plan of Adjustment.

## 2. Waiver of Conditions Precedent

Subject to the provisions of the Plan of Adjustment, the Debtor may waive any of the conditions to the Effective Date set forth in section 25.1 of the Plan of Adjustment at any time without any notice to any other parties in interest, other than the PSA Creditors and Bonistas, and without any further notice to or action, order, or approval of the Title III Court, and without any formal action other than proceeding to confirm and consummate the Plan of Adjustment.

## 3. Effect of Non-Occurrence of Conditions to Effective Date

If prior to the Effective Date, the Confirmation Order is vacated pursuant to a Final Order, then, except as provided in any order of the Title III Court vacating the Confirmation Order, the Plan of Adjustment will be null and void in all respects, and nothing contained in the Plan of Adjustment or Disclosure Statement shall: (a) constitute a waiver or release of any Claims, or Causes of Action; (b) prejudice in any manner the rights of COFINA, the Oversight Board, or any other Entity; or (c) constitute an admission, acknowledgment, offer, or undertaking of any sort by COFINA, the Oversight Board, or any other Entity.

## N. Prosecution and Extinguishment of Claims Held by COFINA

### 1. Prosecution of Claims

Except as settled and released in the Plan of Adjustment, from and after the Effective Date, Reorganized COFINA shall have the exclusive right and power to litigate any Claim or Cause of Action that constituted an Asset of COFINA, including, without limitation, any Avoidance Action, any other Cause of Action, right to payment, or Claim that may be pending on the Effective Date or instituted by COFINA or Reorganized COFINA thereafter, to a Final Order, and may compromise and settle such claims, without approval of the Title III Court.

## O. Modification, Revocation, or Withdrawal of the Plan of Adjustment

### 1. Modification of Plan of Adjustment

Subject to (a) sections 104(j) and 313 of PROMESA and sections 942 and 1127(d) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and (b) the terms and provisions of the Plan Support Agreement, the Debtor may alter, amend or modify the Plan of Adjustment or the Exhibits at any time prior to or after the Confirmation Date but prior to the Effective Date. A holder of a Claim that has accepted the Plan of Adjustment shall be deemed to have accepted the Plan of Adjustment as altered, amended or modified so long as the proposed alteration, amendment or modification does not materially and adversely change the treatment of the Claim of such holder.

2.      **Revocation or Withdrawal**

(a)      Subject to the terms and provisions of the Plan Support Agreement, the Plan of Adjustment may be revoked or withdrawn prior to the Confirmation Date by the Debtor.

(b)      If the Plan of Adjustment is revoked or withdrawn prior to the Confirmation Date, or if the Plan of Adjustment does not become effective for any reason whatsoever, then the Plan of Adjustment shall be deemed null and void. In such event, nothing contained in the Plan of Adjustment shall be deemed to constitute a waiver or release of any claim by COFINA or any other Entity, or to prejudice in any manner the rights of COFINA or any other Entity in any further proceeding involving COFINA.

3.      **Amendment of Plan of Adjustment Documents**

From and after the Effective Date, the authority to amend, modify, or supplement the Plan Supplement, the Exhibits to the Plan Supplement and the Exhibits to the Plan of Adjustment, and any document attached to any of the foregoing, shall be as provided in such Plan Supplement, Exhibit to the Plan Supplement, or Exhibit to the Plan of the Adjustment and their respective attachments, as the case may be.

4.      **No Admission of Liability**

(a)      The submission of the Plan of Adjustment is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Entity with respect to any of the matters addressed in the Plan of Adjustment.

(b)      None of the Plan of Adjustment (including, without limitation, the Exhibits hereto), or any settlement entered, act performed or document executed in connection with the Plan of Adjustment: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in any of the Related Actions or of any wrongdoing or liability of any Entity; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Entity in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA, COFINA, or any other Person or Entity with respect to the validity of any Claim.  None of the Plan of Adjustment or any settlement entered, act performed or document executed in connection with the Plan of Adjustment shall be admissible in any proceeding for any purposes, except to carry out the terms of the Plan of Adjustment, and except that, once confirmed, any Entity may file the Plan of Adjustment in any action for any purpose, including, but not limited to, in order to support a defense or counterclaim based on the principles of res judicata, collateral estoppel, release, good faith settlement, judgment bar or reduction or any other theory of claim preclusion or issue preclusion or similar defense of counterclaim.

P.      **Retention of Jurisdiction**

1.      **Retention of Jurisdiction**

The Title III Court shall retain and have exclusive jurisdiction over any matter arising under PROMESA, arising in or related to, the Title III Case and the Plan of Adjustment, or that relates to the following:

(a)      to allow, disallow, determine, liquidate, classify, estimate, or establish the priority, secured or unsecured status, or amount of any Claim, including, without the limitation, the resolution of any request for payment of any Claim and the resolution of any and all objections to the secured or unsecured status, priority, amount, or allowance of Claims;

(b)      to resolve any matters related to Executory Contracts or Unexpired Leases, including, without limitation, (a) the assumption or assumption and assignment of any Executory Contract or Unexpired Lease to which COFINA is party or with respect to which COFINA may be liable and to hear, determine, and, if necessary, liquidate, any Claims arising therefrom, including pursuant to section 365 of the Bankruptcy Code; (b) any potential contractual obligation under any Executory Contract or Unexpired Lease that is assumed or assumed and assigned; and (c) any dispute regarding whether a contract or lease is or was executory or expired;

(c)      to ensure that distributions to holders of Allowed Claims are accomplished pursuant to the provisions of the Plan of Adjustment and adjudicate any and all disputes arising from or relating to distributions under the Plan of Adjustment;

(d)      to adjudicate, decide, or resolve any motions, adversary proceedings, contested or litigated matters, and any other matters, and grant or deny any applications involving COFINA or Reorganized COFINA that may be pending on the Effective Date or brought thereafter;

(e)      to decide and resolve all matters related to the granting and denying, in whole or in part, any applications for allowance of compensation or reimbursement of expenses to Professionals authorized pursuant to PROMESA, the Plan of Adjustment or orders entered by the Title III Court;

(f)      to enter and implement such orders as may be necessary or appropriate to execute, implement, or consummate the provisions of (a) contracts, instruments, releases, indentures, and other agreements or documents approved by Final Order in the Title III Case and (b) the Plan of Adjustment, the Confirmation Order, and contracts, instruments, releases, indentures, and other agreements or documents created in connection with the Plan of Adjustment, including, without limitation, orders pertaining to the substitution of New Collateral for COFINA Pledged Taxes to secure repayment of the COFINA Bonds and COFINA Parity Bonds;

(g)      to resolve any cases, controversies, suits, disputes or other challenges of any kind that may arise in connection with the consummation, interpretation or enforcement of the Plan of Adjustment, the Confirmation Order, or any contract, instrument, release or other

agreement or document that is entered into or delivered pursuant to the Plan of Adjustment or any Entity's rights arising from or obligations incurred in connection with the Plan of Adjustment or such documents;

       **(h)**    to approve any modification of the Plan of Adjustment or approve any modification of the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan of Adjustment or the Confirmation Order, or remedy any defect or omission or reconcile any inconsistency in any order, the Plan of Adjustment, the Confirmation Order or any contract, instrument, release or other agreement or document created in connection with the Plan of Adjustment or the Confirmation Order, or enter any order in aid of confirmation pursuant to sections 945 and 1142(b) of the Bankruptcy Code, in such manner as may be necessary or appropriate to consummate the Plan of Adjustment;

       **(i)**    to adjudicate, decide or resolve any matters relating to COFINA's compliance with the Plan of Adjustment and the Confirmation Order consistent with section 945 of the Bankruptcy Code;

       **(j)**    to determine any other matters that may arise in connection with or relate to the Plan of Adjustment, the Disclosure Statement, the Confirmation Order or any contract, instrument, release or other agreement or document entered into or delivered in connection with the Plan of Adjustment, the Disclosure Statement or the Confirmation Order, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

       **(k)**    to enter and implement other orders, or take such other actions as may be necessary or appropriate to restrain interference by any Entity with consummation or enforcement of the Plan of Adjustment or the Confirmation Order;

       **(l)**    to adjudicate any and all controversies, suits or issues that may arise regarding the validity of any actions taken by any Entity pursuant to or in furtherance of the Plan of Adjustment or Confirmation Order, including, without limitation, issuance of the COFINA Bonds or COFINA Parity Bonds, and enter any necessary or appropriate orders or relief in connection with such adjudication; to determine any other matters that may arise in connection with or relate to the Plan of Adjustment, the Disclosure Statement, the Confirmation Order, the Settlement Agreement, or any contract, instrument, release, or other agreement or document created in connection with the Plan of Adjustment, in each case, solely to the extent that any such document does not provide for another court or courts to have exclusive jurisdiction;

       **(m)**    to enter and implement such orders as are necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated;

       **(n)**    to enter an order or final decree concluding or closing the Title III Case pursuant to section 945(b) of the Bankruptcy Code;

       **(o)**    to enforce and clarify any orders previously entered by the Title III Court in the Title III Case; and

**(p)** to hear any other matter over which the Title III Court has jurisdiction under sections 305 and 306 of PROMESA.

## Q. Miscellaneous Provisions

### 1. Title to Assets

Except as provided in the Confirmation Order, on the Effective Date, title to all Assets and properties of COFINA encompassed by the Plan of Adjustment shall vest in Reorganized COFINA, free and clear of all Liens (except the Liens securing repayment of the COFINA Bonds and the COFINA Parity Bonds), and the Confirmation Order shall be a judicial determination of discharge of the liabilities of COFINA except as provided in the Plan of Adjustment.

### 2. Discharge and Release of Claims and Causes of Action

**(a)** Except as expressly provided in the Plan of Adjustment or the Confirmation Order, all distributions and rights afforded under the Plan of Adjustment shall be, and shall be deemed to be, in exchange for, and in complete satisfaction, settlement, discharge and release of, all Claims or Causes of Action against COFINA that arose, in whole or in part, prior to the Effective Date, relating to COFINA or Reorganized COFINA or any of its Assets, property, or interests of any nature whatsoever, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan of Adjustment on account of such Claims or Causes of Action. Upon the Effective Date, COFINA and Reorganized COFINA shall be deemed discharged and released from any and all Claims, Causes of Action, and any other debts that arose, in whole or in part, prior to the Effective Date (including prior to the Petition Date), and all debts of the kind specified in sections 502(g), 502(h) or 502(i) of the Bankruptcy Code, whether or not (a) a proof of claim based upon such debt is filed or deemed filed under section 501 of the Bankruptcy Code, (b) a Claim based upon such debt is allowed under section 502 of the Bankruptcy Code (or is otherwise resolved), or (c) the holder of a Claim based upon such debt voted to accept the Plan of Adjustment.

**(b)** Except as provided in section 30.11 of the Plan of Adjustment or the Confirmation Order, all Entities shall be precluded from asserting any and all Claims against COFINA and Reorganized COFINA, and each of their respective Assets, property and rights, remedies, Claims or Causes of Action or liabilities of any nature whatsoever, relating to COFINA or Reorganized COFINA or any of their respective assets and property, including any interest accrued on such Claims from and after the Petition Date, and regardless of whether any property will have been distributed or retained pursuant to the Plan of Adjustment on account of such Claims or other obligations, suits, judgments, damages, debts, rights, remedies, causes of action or liabilities. In accordance with the foregoing, except as expressly provided in the Plan of Adjustment or the Confirmation Order, the Confirmation Order shall constitute a judicial determination, as of the Effective Date, of the discharge and release of all such Claims, Causes of Action, or debt of or against COFINA pursuant to sections 524 and 944 of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and such discharge shall void and extinguish any judgment obtained against COFINA or Reorganized COFINA and

their respective Assets and property at any time, to the extent such judgment is related to a discharged Claim, debt or liability. As of the Effective Date, and in consideration for the value provided under the Plan of Adjustment and the Settlement Agreement, each holder of a Claim in any Class under the Plan of Adjustment shall be and hereby is deemed to release and forever waive and discharge as against COFINA and Reorganized COFINA, and their respective Assets and property, all such Claims.

(c)     Notwithstanding the provisions of section 30.2 of the Plan of Adjustment, in accordance with the provisions of the Plan Support Agreement, each of the PSA Creditors and their respective Related Persons, solely in their capacity as Creditors of COFINA, shall (i) be deemed to have released and covenanted not to sue or otherwise pursue or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims[38] or any of the claims or causes of action asserted or which could have been asserted in the Actions, and (ii) not directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by section 30.2(c) of the Plan of Adjustment.

(d)     On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the compromise and settlement of Bond Claims pursuant to the terms and provisions of the Plan of Adjustment (including, without limitation, the distributions to be made on account of "Senior" and "First Subordinate" Existing Securities), the resolution of the Interpleader Action and the terms and provisions of section 19.5 of the Plan of Adjustment regarding the Ambac Action and the Whitebox Actions, to the fullest extent permissible under applicable law, BNYM and each holder and beneficial holder of Existing Securities and their transferrees, successors or assigns shall be released from liability for all Claims and Causes of Action arising from or related to the payment by BNYM to beneficial holders of Existing Securities of regularly scheduled payments of principal and interest; *provided*, *however*, that the foregoing release of BNYM shall not extend, nor shall it be construed to extend, to acts of gross negligence, intentional fraud, or willful misconduct of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted in the Ambac Action and the Whitebox Actions.

(e)     On the Effective Date, (i) the COFINA Agent and its agents, attorneys, affiliates, advisors, consultants and attorneys, solely in such capacities, and (ii) in the event that the Commonwealth Agent and the Creditors' Committee and the Commonwealth Agent (1) do not object to approval of the Settlement Motion, approval of the Disclosure Statement and

---

[38] The "Government Released Claims" are collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; *provided, however*, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to COFINA's obligations pursuant to the Plan of Adjustment or the securities to be issued pursuant to the Plan of Adjustment or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

confirmation of the Plan of Adjustment and do not file the Motion to Enforce or (2) subject to the provisions of decretal paragraph 4 of the Abeyance Stipulation, file the Motion to Enforce or an objection to approval of the merits of the Settlement Motion, approval of this Disclosure Statement and confirmation of the Plan of Adjustment by the Title III Court, and unless the Title III Court determines that any such objection and the Motion to Enforce was filed in bad faith, the Commonwealth Agent and the Creditors' Committee, its members and each of their respective current and former officers, directors, agents, attorneys, employees, affiliates, advisors, and consultants, solely in such capacities (collectively, the "Commonwealth Agent Releasees"), shall be released from liability for all Claims and Causes of Action (as if such Causes of Action were against the Commonwealth Agent Releasees) with respect to the Adversary Proceeding, the Agreement in Principle, the Settlement Agreement, the Settlement Motion and the Settlement Order.

**(f)** On the Effective Date, and in consideration of the Commonwealth-COFINA Dispute Settlement and the resolution of the Interpleader Action, to the fullest extent permissible under applicable law, the Commonwealth shall be released from all liability from all Claims and Causes of Action held by any Creditor, solely in such capacity, arising from or relating to the relationship of the Commonwealth and COFINA, including, without limitation, any Claim or Cause of Action arising from or relating to the commencement of the Adversary Proceeding and pendency and the compromise and settlement of the Interpleader Action and the allocation of funds in accordance with Section 2.1 of the Plan of Adjustment.

### 3. Injunction on Claims

Except as otherwise expressly provided in section 30.11 of the Plan of Adjustment, the Confirmation Order or such other Final Order of the Title III Court that may be applicable, all Entities who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to section 30.2 of the Plan of Adjustment or who have held, hold or may hold Claims or any other debt or liability that is discharged or released pursuant to section 30.2 of the Plan of Adjustment are permanently enjoined, from and after the Effective Date, from (a) commencing or continuing, directly or indirectly, in any manner, any action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) of any kind on any such Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment against any of the Released Parties[39] or any of their respective assets or property, (b) the enforcement, attachment, collection or recovery by any manner or means of any judgment, award, decree or order against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment, (c) creating, perfecting, or enforcing any encumbrance of any kind against any of the Released Parties or any of their respective assets or property on account of any Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment, and (d) except to the extent provided, permitted or preserved by sections 553, 555, 556, 559, or 560 of the Bankruptcy Code or pursuant to the common law right of recoupment, asserting any right of setoff,

---

[39] The "Released Parties" are defined as, collectively, solely to the extent provided in the Plan of Adjustment, (a) the Government Parties, (b) the Commonwealth, (c) the COFINA Agent, (d) the PSA Creditors and (e) upon satisfaction of the conditions set forth in decretal paragraph 3 of the Abeyance Stipulation, the Creditors' Committee, its members, and the Commonwealth Agent, together with each of their respective Related Persons.

subrogation or recoupment of any kind against any obligation due from any of the Released Parties or any of their respective assets or property, with respect to any such Claim or other debt or liability that is discharged pursuant to the Plan of Adjustment. Such injunction shall extend to all successors and assigns of the Released Parties and their respective assets and property.

### 4. Integral to Plan of Adjustment

Each of the discharge, injunction, exculpation and release provisions provided in Article XXX of the Plan of Adjustment is an integral part of the Plan of Adjustment and is essential to its implementation. Each of the Released Parties shall have the right to independently seek the enforcement of the discharge, injunction and release provisions set forth in Article XXX of the Plan of Adjustment.

### 5. Releases by COFINA and Reorganized COFINA

Except as otherwise expressly provided in the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement, on the Effective Date, and for good and valuable consideration each of COFINA and Reorganized COFINA, the Disbursing Agent and each of COFINA's and Reorganized COFINA's Related Persons shall be deemed to have and hereby does irrevocably and unconditionally, fully, finally and forever waive, release, acquit, and discharge the Released Parties from any and all Claims or Causes of Action that COFINA, Reorganized COFINA, and the Disbursing Agent, or any of them, or anyone claiming through them, on their behalf or for their benefit, have or may have or claim to have, now or in the future, against any Released Party that are Released Claims[40] or otherwise are based upon, relate to, or arise out of or in connection with, in whole or in part, any act, omission, transaction, event or other circumstance relating to COFINA taking place or existing on or prior to the Effective Date,

---

[40] The "Released Claims" are defined as, collectively, (a) with respect to those Entities party to the Amended PSA, Claims and Causes of Action released under the Plan of Adjustment and in accordance with the Amended PSA, (b) Claims and Causes of Action that arise in, are related to or have been or could have been asserted against COFINA or its Assets in the Title III Case, (c) Claims and Causes of Action that have been or could have been asserted by COFINA (with respect to releases given by COFINA) and by Creditors or the Government Parties relating to Claims they have against the Released Parties (with respect to releases given by Releasing Parties (as defined below)), and (d) Claims that otherwise arise from or relate to the Title III Case, the Actions, the Adversary Proceeding, the Interpleader Action, the Plan of Adjustment, the Amended PSA and the compromises set forth in the Commonwealth-COFINA Dispute Settlement, including, without limitation, in connection with or related to any of the Government Parties, and their respective subsidiaries, assets, liabilities, operations, or property; provided, however, that, "Released Claims" is not intended to include, nor shall it have the effect of including, Claims or Causes of Action unrelated to COFINA or Claims or Causes of Action for gross negligence, willful misconduct or intentional fraud asserted by, or that could have been asserted, whether sounding in contract or tort, against BNYM by Ambac or Whitebox in the Ambac Lawsuit and the Whitebox Lawsuit, respectively; and provided, further, that "Released Claims" is not intended to release, nor shall it have the effect of releasing, any party from the performance of its obligations in accordance with the Confirmation Order or the Plan of Adjustment, including, without limitation, performance of obligations arising from or related to the COFINA Bonds and the COFINA Parity Bonds.

The "Releasing Parties" are defined as, collectively, solely to the extent provided in the Plan of Adjustment, (a) all holders of Claims against COFINA or its Assets; (b) such holders' current and former Affiliates and (c) with respect to the foregoing clauses (a) and (b), each such Entity's current and former Related Persons; provided, however, that each Entity described in the foregoing clauses (a) through (c) is providing releases pursuant to the Plan of Adjustment solely in such Entity's capacity as a Creditor and not as a creditor of the Commonwealth or any Entity or Affiliate of the Commonwealth.

and/or any Claim, act, fact, transaction, occurrence, statement, or omission in connection with or alleged or that could have been alleged in the Actions, the Related Actions, including, without limitation, any such Claim, demand, right, liability, or cause of action for indemnification, contribution, or any other basis in law or equity for damages, costs or fees; *provided*, *however*, that the foregoing release shall not extend, nor shall it be construed to extend, to acts of gross negligence, intentional fraud, or willful misconduct of BNYM, including, without limitation, any acts which have been asserted, or which could have been asserted, in the Ambac Action and the Whitebox Action.

6.      **Injunction Related to Releases**

As of the Effective Date, all Entities that hold, have held, or may hold a Released Claim that is released pursuant to section 30.5 of the Plan of Adjustment, are, and shall be, permanently, forever and completely stayed, restrained, prohibited, barred and enjoined from taking any of the following actions, whether directly or indirectly, derivatively or otherwise, on account of or based on the subject matter of such discharged Released Claims: (i) commencing, conducing or continuing in any manner, directly or indirectly, any suit, action or other proceeding (including, without limitation, any judicial, arbitral, administrative or other proceeding) in any forum; (ii) enforcing, attaching (including, without limitation any prejudgment attachment), collecting, or in any way seeking to recover any judgment, award, decree, or other order; (iii) creating, perfecting or in any way enforcing in any matter, directly or indirectly, any Lien; (iv) setting off, seeking reimbursement or contributions from, or subrogation against, or otherwise recouping in any manner, directly or indirectly, any amount against any liability or obligation owed to any Entity released under sections 30.5 of the Plan of Adjustment; and (v) commencing or continuing in any manner, in any place of any judicial, arbitration or administrative proceeding in any forum, that does not comply with or its inconsistent with the provisions of the Plan of Adjustment or the Confirmation Order.

7.      **Exculpation**

(a)      ***Government Parties***

The Oversight Board, the Commonwealth, AAFAF, COFINA, and each of their respective Related Persons, solely acting in its capacity as such at any time up to and including the Effective Date, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formulation, preparation, dissemination, implementation, confirmation or approval of the Plan of Adjustment or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transactions set forth in the Plan of Adjustment and the Settlement Agreement; *provided*, *however*, that the foregoing provisions of section 30.7 of the Plan of Adjustment shall not affect the liability of any Entity that otherwise would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct. Nothing in provisions of section 30.7(a) of the Plan of Adjustment shall prejudice the right of any of the Government Parties, and the Government Parties' officers and directors serving at any time up to and including the Effective Date, and each of their respective professionals to assert reliance upon

118

advice of counsel as a defense with respect to their duties and responsibilities under the Plan of Adjustment.

    **(b)**     <u>*Monoline Insurers*</u>

    Each of Ambac, Assured and National, and their respective Related Persons, shall not have or incur any liability to any Entity for any act taken or omitted to be taken consistent with the Plan of Adjustment in connection with the formulation, preparation, dissemination, implementation, acceptance, confirmation or approval of the Plan of Adjustment, including, without limitation, in connection with the structure of the Trusts, commutation, the treatment of Senior COFINA Bond Claims (Ambac), the treatment of Junior COFINA Bond Claims (Assured), the National Election, the voting procedures, the election procedures, and any release of obligations under the applicable Insurance Policies; *provided*, *however*, that, notwithstanding anything contained in the Plan of Adjustment to the contrary, the terms and provisions of the Plan of Adjustment shall not, and shall not be construed to, release or exculpate: (1) with respect to any beneficial holder of the Ambac Insured Bonds that receives Ambac Certificates in accordance with the Plan of Adjustment, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy (which claim shall only be asserted by the trustee of the Ambac Trust), as adjusted to account for any distributions from the Ambac Trust (and any claims or defences that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of National Insured Bonds that received National Certificates in accordance with the Plan of Adjustment, any claim against National with respect to National's obligations under the National Insurance Policies (which claim shall be asserted in accordance with the terms of the National Insurance Policies), as adjusted to account for any distributions from the National Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations to such beneficial holder under the National Insurance Policies); or (3) with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the applicable Acceleration Price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies).

    **(c)**     <u>*PSA Creditors and Bonistas*</u>

    Each of the PSA Creditors and Bonistas solely in its capacity as a party to the Plan Support Agreement and a Creditor, as applicable, from the Petition Date up to and including the Effective Date and each of their respective Related Persons shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the formation, preparation, dissemination, implementation, confirmation or approval of the Plan of Adjustment or any compromises or settlements contained therein, the Disclosure Statement, the Settlement Agreement, or any contract, instrument, release or other agreement or document provided for or contemplated in connection with the consummation of the transaction set forth in the Plan of Adjustment and the Settlement Agreement; *provided*, *however*, that the provisions of section 30.7(c) of the Plan of Adjustment shall not affect the liability of any Entity that otherwise

119

would result from any such act or omission to the extent that such act or omission is determined in a Final Order to have constituted intentional fraud or willful misconduct.

**(d)** *Agents*

Each of (i) the COFINA Agent and (ii) in the event that the Creditors' Committee and the Commonwealth Agent (1) do not object to approval of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan and do not file the Motion to Enforce or (2) subject to the provisions of decretal paragraph 4 of the Abeyance Stipulation, file the Motion to Enforce or an objection to approval of the merits of the Settlement Motion, approval of the Disclosure Statement and confirmation of the Plan by the Title III Court, and unless the Title III Court determines that any such objection and the Motion to Enforce was filed in bad faith, the Commonwealth Agent, solely in its capacity as agent of the Oversight Board with respect to the Commonwealth, to litigate and/or settle the Commonwealth-COFINA Dispute, respectively, shall not have or incur any liability to any Entity for any act taken or omitted to be taken in connection with the Title III Case, the Commonwealth-COFINA Dispute, including, without limitation, the Commonwealth-COFINA Dispute Order, the Adversary Proceeding, the Commonwealth-COFINA Dispute Settlement, the Settlement Agreement, the Settlement Motion and the Settlement Order.

**8.     Appointments Related Litigation**

Notwithstanding anything contained in the Plan of Adjustment to the contrary, in the event that a Final Order is entered in connection with the Appointments Related Litigation subsequent to entry of the Settlement Order and the Confirmation Order, in consideration of the distributions made, to be made, or deemed to be made in accordance with the terms and provisions of the Plan of Adjustment and documents and instruments related hereto, all Creditors or such other Entities receiving, or deemed to have received, distributions pursuant to or as a result of the Plan of Adjustment, consent and agree that such Final Order shall not in any way or manner reverse, affect or otherwise modify the transactions contemplated in the Plan of Adjustment, the Settlement Agreement, the Confirmation Order and the Settlement Order, including, without limitation, the compromise and settlement of the Commonwealth-COFINA Dispute and the releases, exculpations and injunctions provided pursuant to Article XXX of the Plan of Adjustment.

**9.     Bar Order**

To the limited extent provided in the Plan of Adjustment, each and every Entity is permanently enjoined, barred and restrained from instituting, prosecuting, pursuing or litigating in any manner any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, direct or derivative, whether asserted or unasserted, against any of the Released Parties, based upon, related to, or arising out of or in connection with any of the Released Claims, confirmation and consummation of the Plan of Adjustment, the negotiation and consummation of the Settlement Agreement, or any claim, act, fact, transaction, occurrence, statement or omission in connection with or alleged or that could have been alleged in the Related Actions, including, without limitation, any such claim, demand, right, liability or cause of action for indemnification,

contribution, or any other basis in law or equity for damages, costs or fees incurred arising directly or indirectly from or otherwise relating to the Related Actions, either directly or indirectly by any Person for the direct or indirect benefit of any Released Party arising from or related to the claims, acts, facts, transactions, occurrences, statements or omissions that are, could have been or may be alleged in the related Actions or any other action brought or that might be brought by, through, on behalf of, or for the benefit of any of the Released Parties (whether arising under federal, state or foreign law, and regardless of where asserted).

**10.  No Waiver**

Notwithstanding anything to the contrary contained in sections 30.5 and 30.6 of the Plan of Adjustment, the releases and injunctions set forth in such sections shall not, and shall not be deemed to, limit, abridge or otherwise affect the rights of the Oversight Board, AAFAF, Reorganized COFINA, or the PSA Creditors to enforce, sue on, settle or compromise the rights, claims and other matters expressly retained by any of them.

**11.  Supplemental Injunction**

Notwithstanding anything contained in the Plan of Adjustment to the contrary, except to the limited extent provided in the Plan of Adjustment, all Entities, including Entities acting on their behalf, who currently hold or assert, have held or asserted, or may hold or assert, any Released Claims against any of the Released Parties based upon, attributable to, arising out of or relating to any Claim against COFINA, whenever and wherever arising or asserted, whether in the U.S. or anywhere else in the world, whether sounding in tort, contract, warranty, statute, or any other theory of law, equity or otherwise, shall be, and shall be deemed to be, permanently stayed, restrained and enjoined from taking any action against any of the Released Parties for the purpose of directly or indirectly collecting, recovering or receiving any payment or recovery with respect to any Released Claims arising prior to the Effective Date (including prior to the Petition Date), including, but not limited to:

(a)  Commencing or continuing in any manner any action or other proceeding of any kind with respect to any such Released Claim against any of the Released Parties or the assets or property of any Released Party;

(b)  Enforcing, attaching, collecting or recovering, by any manner or means, any judgment, award, decree or order against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(c)  Creating, perfecting or enforcing any Lien of any kind against any of the Released Parties or the assets or property of any Released Party with respect to any such Released Claim;

(d)  Except as otherwise expressly provided in the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement, asserting, implementing or effectuating any setoff, right of subrogation, indemnity, contribution or recoupment of any kind against any obligation due to any of the Released Parties or against the property of any Released Party with respect to any such Released Claim; and

**(e)** Taking any act, in any manner, in any place whatsoever, that does not conform to, or comply with, the provisions of the Plan of Adjustment, the Confirmation Order, or the Settlement Agreement relating to such Released Claim; provided, however, that COFINA's compliance with the formal requirements of Bankruptcy Rule 3016 shall not constitute an admission that the Plan of Adjustment provides for any injunction against conduct not otherwise enjoined under the Bankruptcy Code.

## 12. Post-Effective Date Fees and Expenses

From and after the Effective Date, Reorganized COFINA shall, in the ordinary course of business and without the necessity for any approval by the Title III Court, retain professionals and pay the reasonable professional fees and expenses incurred by Reorganized COFINA related to implementation and consummation of the Plan of Adjustment without further approval from Title III Court.

## 13. Securities Act Exemption

Pursuant to section 1145 of the Bankruptcy Code (other than an underwriter as defined in section 1145(b) of the Bankruptcy Code) and/or Section 3(a)(2) of the Securities Act, the offering, issuance, and distribution of the COFINA Bonds, Ambac Certificates and National Certificates pursuant to the terms hereof shall be exempt from registration under the Securities Act and any state or local law requiring registration for the offer, issuance or distribution of securities, including, but not limited to, the registration requirements of Section 5 of the Securities Act and any other applicable state or federal law requiring registration and/or prospectus delivery or qualification prior to the offering, issuance, distribution, or sale of securities.

## 14. Severability

Subject to the terms and provisions of the Plan Support Agreement, if, prior to the Confirmation Date, any term or provision of the Plan of Adjustment shall be held by the Title III Court to be invalid, void or unenforceable, the Title III Court shall, with the consent of the Government Parties, have the power to alter and interpret such term or provision to make it valid or enforceable to the maximum extent practicable, consistent with the original purpose of the term or provision held to be invalid, void or unenforceable, and such term or provision shall then be applicable as altered or interpreted. Notwithstanding any such holding, alteration or effect and shall in no way be affected, impaired or invalidated by such holding, alteration or interpretation.

## 15. Governing Law

Except to the extent that other federal law is applicable, or to the extent that an exhibit hereto or any document to be entered into in connection with the Plan of Adjustment provides otherwise, the rights, duties, and obligations arising under the Plan of Adjustment shall be governed by, and construed and enforced in accordance with, PROMESA (including the provisions of the Bankruptcy Code made applicable under section 301 of PROMESA) and, to the extent not inconsistent therewith, the laws of the Commonwealth of Puerto Rico giving effect to principles of conflicts of laws.

16. **Closing Case**

The Debtor shall, promptly upon the full administration of the Title III Case, file with the Title III Court all documents required by Bankruptcy Rule 3022 and any applicable order of the Title III Court. Notwithstanding the closing of the Title III Case, the Title III Court shall retain jurisdiction of all of the matters set forth in Article XXIX of the Plan of Adjustment.

17. **Section Headings**

The section headings contained in the Plan of Adjustment are for reference purposes only and shall not affect in any way the meaning or interpretation of the Plan of Adjustment.

18. **Inconsistencies**

To the extent of any inconsistency between (a) the information contained in the Disclosure Statement and the terms and provisions of the Plan of Adjustment, the terms and provisions contained in the Plan of Adjustment shall govern and (b) the terms and provisions of the Plan of Adjustment and the terms and provisions of the Confirmation Order, the terms and provisions of the Confirmation Order shall govern and be deemed a modification of the Plan of Adjustment; *provided*, *however*, that under no circumstances shall the Confirmation Order modify the economic terms set forth in the Plan of Adjustment.

19. **Document Retention**

From and after the Effective Date, COFINA may maintain documents in accordance with their standard document retention policy, as may be altered, amended, modified, or supplemented by COFINA.

20. **Immediate Binding Effect**

Pursuant to section 944(a) of the Bankruptcy Code, applicable to the Title III Case pursuant to section 301 of PROMESA, and notwithstanding Bankruptcy Rules 3020(e), 6004(h), or 7062 or otherwise, upon the occurrence of the Effective Date, the terms of the Plan of Adjustment and the Plan Supplement shall be immediately effective and enforceable and deemed binding on any and all holders of Claims and their respective successors and assigns, whether or not the Claim of any such holder is impaired under the Plan of Adjustment and whether or not such holder has accepted the Plan of Adjustment. The releases, exculpations, and settlements effected under the Plan of Adjustment will be operative, and subject to enforcement by the Title III Court, from and after the Effective Date, including pursuant to the injunctive provisions of the Plan of Adjustment. Once approved, the compromises and settlements embodied in the Plan of Adjustment, along with the treatment of any associated Allowed Claims, shall not be subject to collateral attack or other challenge by any Entity in any court or other forum. As such, any Entity that opposes the terms of any compromise and settlement set forth in the Plan of Adjustment must (a) challenge such compromise and settlement prior to confirmation of the Plan of Adjustment and (b) demonstrate appropriate standing to object and that the subject compromise and settlement does not meet the standards governing settlements under Bankruptcy Rule 9019 and other applicable law.

123

### 21. Additional Documents

On or before the Effective Date, the Debtor may file with Clerk of the Title III Court such agreements and other documents as may be necessary or appropriate to effectuate and further evidence the terms and conditions of the Plan of Adjustment. COFINA and all holders of Claims receiving distributions pursuant to the Plan of Adjustment and all other parties in interest, from time to time, may prepare, execute, and deliver any agreements or documents and take any other actions as may be necessary or advisable to effectuate the provisions and intent of the Plan of Adjustment.

### 22. Reservation of Rights

Except as expressly set forth in the Plan of Adjustment, the Plan of Adjustment shall have no force or effect unless the Title III Court shall enter the Confirmation Order. None of the filing of the Plan of Adjustment, any statement or provision contained in the Plan of Adjustment, or the taking of any action by COFINA with respect to the Plan of Adjustment, the Disclosure Statement, or the Plan Supplement shall be or shall be deemed to be an admission or waiver of any rights of COFINA with respect to the holders of Claims or with respect to the Commonwealth prior to the Effective Date. Except as expressly set forth in the Plan of Adjustment, the rights and powers of the government of Puerto Rico under the Puerto Rico Constitution and PROMESA, including, without limitation, under sections 303 and 305 of PROMESA, are expressly reserved (subject to any limitation thereon imposed by the Puerto Rico Constitution, the U.S. Constitution or PROMESA), and nothing in the Plan of Adjustment shall be deemed a waiver of any such rights and powers.

### 23. Termination of the Oversight Board

Upon the termination or dissolution of the Oversight Board pursuant to section 209 of PROMESA or otherwise, all rights, powers and authorities of the Oversight Board to implement and perform under the Plan of Adjustment shall vest in COFINA or Reorganized COFINA, as applicable, without the need for any notice to, or action by, the Title III Court, the Oversight Board, COFINA, Reorganized COFINA or any other Entity. Neither COFINA nor Reorganized COFINA shall be, or be deemed to be, a successor to the Oversight Board by reason of any theory of law or equity, and neither COFINA nor Reorganized COFINA shall assume or be responsible for any liability or obligation of the Oversight Board of any kind or nature whatsoever.

### 24. Successors and Assigns

Except as expressly provided otherwise in the Plan of Adjustment, the rights, benefits, and obligations of any Entity named or referred to in the Plan of Adjustment or the Confirmation Order shall be binding on, and shall inure to the benefit of any heir, executor, administrator, successor or assign, Affiliate, officer, director, agent, representative, attorney, beneficiaries, or guardian, if any, of each Entity.

## 25.    Notices

All notices, requests to, demands or other document(s) required by the Plan of Adjustment or the Confirmation Order to be served on or delivered to the Oversight Board, COFINA or AAFAF: to be effective shall be in writing including by facsimile transmission and unless otherwise expressly provided in the Plan of Adjustment, shall be deemed to have been duly given or made when actually delivered or, in the case of notice by facsimile transmission, when received and telephonically confirmed, addressed as follows:

| | |
|---|---|
| If to the Oversight Board, to: | Financial Oversight and Management Board for Puerto Rico<br>250 Muñoz Rivera Ave, Suite 800<br>San Juan, PR 00918-1813<br>Attn:   Natalie A. Jaresko, Executive Director |
| | – with a copy to – |
| | PROSKAUER ROSE LLP<br>Eleven Times Square<br>New York, NY 10036<br>Attn:   Martin J. Bienenstock, Esq.<br>          Brian S. Rosen, Esq.<br>Tel:    (212) 969-3000<br>Fax:    (212) 969-2900 |
| If to COFINA, to: | Puerto Rico Sales Tax Financing Corporation<br>c/o Fiscal Agency and Financial Advisory Authority<br>Roberto Sánchez Vilella (Minillas) Government Center<br>De Diego Ave. Stop 22<br>San Juan, Puerto Rico 00907<br>Attn:    Christian Sobrino Vega, Executive Director |
| | – with a copy to – |
| | O'MELVENY & MYERS LLP<br>Seven Times Square<br>New York, NY 10036<br>Attn:    John Rapisardi, Esq.<br>           Suzzanne Uhland, Esq.<br>Tel:    (212) 326-2000<br>Fax:    (212) 326-2061 |
| If to AAFAF, to: | Fiscal Agency and Financial Advisory Authority<br>Roberto Sánchez Vilella (Minillas) Government Center<br>De Diego Ave. Stop 22<br>San Juan, Puerto Rico 00907 |

125

Attn:    Christian Sobrino Vega, Executive Director

– with a copy to –

O'MELVENY & MYERS LLP
Seven Times Square
New York, NY 10036
Attn:    John Rapisardi, Esq.
             Suzzanne Uhland, Esq.
Tel:     (212) 326-2000
Fax:     (212) 326-2061

## 26.    Term of Injunctions or Stays

Unless otherwise provided in the Plan of Adjustment or in the Confirmation Order, all injunctions or stays in effect in the Title III Case (pursuant to sections 105, 362, or 922 of the Bankruptcy Code or any order of the Title III Court) and existing on the Confirmation Date (excluding any injunctions or stays contained in the Plan of Adjustment or the Confirmation Order) shall remain in full force and effect until the Effective Date.  All injunctions or stays contained in the Plan of Adjustment or the Confirmation Order shall remain in full force and effect in accordance with their terms.

## 27.    Entire Agreement

Except as otherwise indicated, the Plan of Adjustment supersedes all previous and contemporaneous negotiations, promises, covenants, agreements, understandings, and representations on such subjects, all of which have become merged and integrated into the Plan of Adjustment.

## 28.    Plan Supplement

All documents included in the Plan Supplement are incorporated into and are a part of the Plan of Adjustment as if set forth in full in the Plan of Adjustment.  Upon the filing of the Plan Supplement with the Clerk of the Title III Court, copies of the documents contained therein shall be made available upon written request to the Oversight Board's counsel at the address above or by downloading such documents from https://cases.primeclerk.com/puertorico/ or the Title III Court's website, available via PACER.  Unless otherwise ordered by the Title III Court, to the extent any document in the Plan Supplement is inconsistent with the terms of any part of the Plan of Adjustment that does not constitute the Plan Supplement, such part of the Plan of Adjustment that does not constitute the Plan Supplement shall control; *provided*, *however*, that, with respect to matters governed by the New Bond Indenture, to the extent that any provisions of the Plan of Adjustment are inconsistent with the New Bond Indenture, the New Bond Indenture shall control.

101361236v29

# VII. Confirmation of the Plan of Adjustment

## A. Confirmation Hearing

PROMESA and the Bankruptcy Code require the Title III Court, after notice, to conduct a Confirmation Hearing at which it will hear arguments in support of the Plan of Adjustment, any objections to the Plan of Adjustment, and consider evidence with respect to whether the Plan of Adjustment should be confirmed. At the Confirmation Hearing, the Title III Court will confirm the Plan of Adjustment only if all of the requirements of PROMESA section 314 described below are met.

On October 9, 2018, the Title III Court entered the *Order Granting Urgent Motion for Entry of Order Establishing Hearing Dates to (I) Determine the Adequacy of Information in the COFINA Disclosure Statement, (II) Approve the Rule 9019 Settlement of the Commonwealth-COFINA Dispute in the Commonwealth Title III Case and (III) Confirm the COFINA Plan of Adjustment* [Case No. 17-3284, ECF No. 302] (the "Scheduling Order"). Among other things, the Scheduling Order provides that the Confirmation Hearing will begin on January 16, 2019, at 9:30 a.m. (Atlantic Standard Time) before the Honorable Laura Taylor Swain, United States District Judge, at the Title III Court, Clemente Ruiz Nazario United States Courthouse, 150 Carlos Chardón Avenue, San Juan, P.R. 00918 at a courtroom to be later determined. The Confirmation Hearing may be adjourned from time to time by the Title III Court or the Debtor without further notice, except for an announcement of the adjourned date made at the Confirmation Hearing.

## B. Deadlines to Object to Confirmation

The Disclosure Statement Order establishes the objection deadline to confirmation of the Plan of Adjustment as January 2, 2019 at 5:00 p.m. (Atlantic Standard Time). Objections to confirmation of the Plan of Adjustment must: (1) be in writing; (2) state the name and address of the objecting party and the nature of the Claim of such party; (3) state with particularity the basis and nature of any objection; and (4) be filed with the Title III Court, and served on the following parties so that they are received no later than the applicable deadline set forth above:

(a) the Office of the United States Trustee for the District of Puerto Rico, Edificio Ochoa, 500 Tanca Street, Suite 301, San Juan, PR 00901 (re: In re: Commonwealth of Puerto Rico);

(b) attorneys for the Oversight Board as representative of COFINA, Proskauer Rose LLP, 11 Times Square, New York, New York 10036, Attn: Martin J. Bienenstock, Esq., and Brian Rosen, Esq.;

(c) co-attorneys for the Oversight Board as representative of COFINA, O'Neill & Borges LLC, 250 Muñoz Rivera Ave., Suite 800, San Juan, PR 00918- 1813, Attn: Hermann D. Bauer, Esq.;

(d) the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, O'Melveny & Myers LLP, Times Square Tower, 7 Times Square, New York, NY 10036, Attn: John J. Rapisardi, Esq., Suzzanne Uhland, Esq., and Diana M. Perez, Esq.;

(e) the attorneys for the Puerto Rico Fiscal Agency and Financial Advisory Authority, Marini Pietrantoni Muniz, LLC, Luis C. Marini-Biaggi, Esq., MCS Plaza, Suite 500, 255 Ponce de León Ave., San Juan P.R. 00917;

(f) the attorneys for the Official Committee of Unsecured Creditors, Paul Hastings LLP, 200 Park Ave., New York, NY 10166, Attn: Luc A. Despins, Esq., Andrew V. Tenzer, Esq., Michael E. Comerford, Esq., and G. Alexander Bongartz, Esq.;

(g) those creditors holding the 20 largest unsecured claims against COFINA (on a consolidated basis);

(h) the attorneys for the Official Committee of Unsecured Creditors, Casillas, Santiago & Torres LLC, El Caribe Office Building, 53 Palmeras Street, Ste. 1601, San Juan, PR 00901, Attn: Juan J. Casillas Ayala, Esq. and Alberto J.E. Añeses Negrón, Esq.;

(i) the attorneys for the Official Committee of Retired Employees, Jenner & Block LLP, 919 Third Ave., New York, NY 10022, Attn: Robert Gordon, Esq. and Richard Levin, Esq., and Jenner & Block LLP, 353 N. Clark Street, Chicago, IL 60654, Attn: Catherine Steege, Esq. and Melissa Root, Esq.;

(j) the attorneys for the Official Committee of Retired Employees, Bennazar, García & Milián, C.S.P., Edificio Union Plaza, PH-A, 416 Ave. Ponce de León, Hato Rey, PR 00918, Attn: A.J. Bennazar- Zequeira, Esq.;

(k) all parties that have requested notice pursuant to Rule 2002 of the Federal Rules of Bankruptcy Procedure;

(l) the attorneys for Ambac, Milbank, Tweed, Hadley & McCloy LLP, 28 Liberty Street, New York, NY 10005, Attn: Dennis Dunne, Esq. and Atara Miller, Esq.;

(m) the attorneys for Assured, Cadwalader, Wickersham & Taft, 200 Liberty Street, New York, NY 10281, Attn: Mark Ellenberg, Esq., Lary Stromfeld, Esq., Ivan Loncar, Esq., and Casey Servais, Esq.;

(n) the attorneys for National, Weil, Gotshal & Manges LLP, 767 Fifth Avenue, New York, NY 10153, Attn: Marcia L. Goldstein, Esq. and Gabriel Morgan, Esq.;

(o) the attorneys for the COFINA Senior Bondholders' Coalition, Quinn Emanuel Urquhart & Sullivan, LLP, 51 Madison Avenue, New York, NY 10010, Attn: Susheel Kirpalani, Esq. and Eric Kay, Esq.;

(p) the attorneys for Oppenheimer and the First Puerto Rico Family of Funds, Kramer Levin Naftalis & Frankel LLP, 1177 Avenue of the Americas, New York, NY 10036, Attn: Thomas Moers Mayer, Esq., Amy Caton, Esq., and Douglas Buckley, Esq.;

(q) the attorneys for GSAM, McDermott, Will & Emery LLP, 444 West Lake Street, Chicago, IL 60606, Attn: William P. Smith, Esq., David L. Taub, Esq., and Alexandra C. Scheibe, Esq.;

(r) the attorneys for the Puerto Rico Funds, White & Case LLP, 200 South Biscayne Boulevard, Miami, FL 33131, Attn: John K. Cunningham, Esq. and Fernando de la Hoz, Esq.;

(s) the attorneys for Bonistas del Patio, Inc., Davis, Polk & Wardwell LLP, 450 Lexington Avenue, New York, NY 10017, Attn: Donald Bernstein, Esq. and Brian Resnick, Esq.;

(t) the attorneys to certain of the Insured Senior Holders, Norton Rose Fulbright US LLP, 1301 Avenue of the Americas, New York, NY 10019, Attn: Lawrence A. Larose, Esq. and Eric Daucher, Esq.;

(u) the attorneys to GoldenTree Asset Management LP, Akin Gump Strauss Hauer & Feld LLP, One Bryant Park, New York, NY 10036, Attn: Ira S. Dizengoff, Esq. and Philip C. Dublin, Esq.;

(v) the attorneys to Tilden Park Capital Management LP, Simpson Thacher & Bartlett LLP, 425 Lexington Avenue, New York, NY 10017, Attn: Sandy Qusba, Esq. and Nicholas Baker, Esq.;

(w) the attorneys to Whitebox Advisors LLC, Stroock & Stroock & Lavan LLP, 180 Maiden Lane, New York, NY 10038, Attn: Daniel A. Fliman, Esq.; and

(x) the attorneys for Aurelius and Six PRC, Paul, Weiss, Rifkind, Wharton & Garrison LLP, 1285 Avenue of the Americas, New York, NY 10019, Attn: Andrew N. Rosenberg, Esq.

For purposes of filing objections in these cases, the address of the Title III Court is: United States District Court for the Southern District of New York, Daniel Patrick Moynihan United States Courthouse, 500 Pearl St., Suite No. 3212, New York, New York 10007-1312

## C. Requirements for Confirmation of the Plan of Adjustment

Pursuant to PROMESA section 312(a), only the Oversight Board may file a plan of adjustment on behalf of the debtor upon the issuance of a certificate under PROMESA section 104(j).[41] The Plan of Adjustment must comply with other provisions of PROMESA section 314(b), including the applicable provisions of Bankruptcy Code section 1129(b), as follows:

- The Plan of Adjustment must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301 (PROMESA section 314(b)(1));

- The Plan of Adjustment must comply with the provisions of PROMESA Title III (PROMESA section 314(b)(2));

- COFINA must not be prohibited by law from taking any action necessary to carry out the Plan of Adjustment (PROMESA section 314(b)(3));

---

[41] PROMESA section 104(j) provides that before filing a plan of adjustment on behalf of the debtor, the Oversight Board must certify the plan of adjustment. To certify the plan of adjustment, the Oversight Board must determine, in its sole discretion, that the plan of adjustment is consistent with the applicable certified fiscal plan.

- Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan of Adjustment must provide that on the Effective Date each holder of a claim of a kind specified in Bankruptcy Code section 507(a)(2) will receive on account of such claim cash equal to the allowed amount of such claim (PROMESA section 314(b)(4));

- Any legislative, regulatory, or electoral approval necessary under applicable law in order to carry out any provision of the Plan of Adjustment must be obtained, or such provision must be expressly conditioned on such approval (PROMESA section 314(b)(5));

- The Plan of Adjustment must be consistent with the fiscal plan certified by the Oversight Board for COFINA under title II (PROMESA section 314(b)(7));

- COFINA, as the proponent of the Plan of Adjustment by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (Bankruptcy Code section 1129(a)(2)); PROMESA section 301(a); and

- The Plan of Adjustment must have been proposed in good faith and not by any means forbidden by law (Bankruptcy Code section 1129(a)(3); PROMESA section 301(a)).

Moreover, with respect to classification of claims, PROMESA section 301(e) provides that in determining whether claims are substantially similar for the purpose of Bankruptcy Code section 1122, the Oversight Board shall consider whether such claims are secured and whether such claims have priority over other claims.

At the Confirmation Hearing, the Title III Court will determine whether the Plan of Adjustment satisfies the requirements of Title III of PROMESA. The Debtor believes that the Plan of Adjustment will satisfy all of the applicable statutory requirements of PROMESA and the Bankruptcy Code. Among the requirements for confirmation are that the Plan of Adjustment (1) is accepted by the requisite holders of all impaired Classes of Claims or, if not so accepted, is accepted by at least one impaired Class of Claims, is "fair and equitable," and does not discriminate unfairly as to the non-accepting class, (2) is in the "best interests" of creditors, which requires the Title III Court to consider whether available remedies under the non-bankruptcy laws and Puerto Rico Constitution would result in a greater recovery for the creditors than is provided by the Plan of Adjustment (3) is feasible, and (4) complies with the applicable provisions of PROMESA and the Bankruptcy Code.

1.     **General Requirements for Confirmation**

A plan of adjustment is accepted by an impaired class of claims if holders of two-thirds in dollar amount and a majority in number of allowed claims of that class vote to accept the plan of adjustment. Only those holders of claims who actually vote to accept or reject the plan count in the tabulation. All impaired classes must accept the plan in order for the plan to be confirmed without application of the "cramdown" test contained in Bankruptcy Code sections 1129(b)(1), (b)(2)(A) and (b)(2)(B). For additional information on "cramdown," see "Cramdown" below.

130

(a)     **_The Plan of Adjustment Complies with Applicable Provisions of the Bankruptcy Code_**

The Plan of Adjustment must comply with the provisions of the Bankruptcy Code made applicable by PROMESA section 301.  These requirements include:

- COFINA, as the proponent of the Plan of Adjustment by and through the Oversight Board, must have complied with all provisions of the Bankruptcy Code (Bankruptcy Code section 1129(a)(2)); PROMESA section 301(a); and

- The Plan of Adjustment must have been proposed in good faith and not by any means forbidden by law (Bankruptcy Code section 1129(a)(3); PROMESA section 301(a)).

The Debtor believes that the Plan of Adjustment satisfies these requirements.

(b)     **_The Plan of Adjustment is Consistent with the Fiscal Plan_**

PROMESA section 314(b)(7) requires that the Plan of Adjustment be consistent with the Fiscal Plan certified by the Oversight Board.  The Debtor believes that the Plan of Adjustment is consistent with the Fiscal Plan, and the Oversight Board has certified that the Plan of Adjustment is indeed consistent with the Fiscal Plan pursuant to PROMESA section 104(j).

(c)     **_The "Best Interests of Creditors" Test_**

Notwithstanding acceptance of the Plan of Adjustment by each impaired Class of Claims, the Title III Court also must determine that the Plan of Adjustment is in the best interests of creditors pursuant to PROMESA section 314(b)(6). To satisfy this "best interests of creditors" test under PROMESA, a debtor must establish that confirmation of its proposed plan of adjustment, more likely than not, would leave the debtor's creditors as a whole in a better position than would dismissal of the debtor's title III case. Because the failure of plan confirmation and dismissal of a debtor's Title III case, in most instances, would result in a race to the courthouse that could leave many creditors with no recovery at all, the best interests of creditors test is a flexible standard that is less stringent than a test requiring that a plan of adjustment be "fair and equitable."

The Debtor believes that the Plan of Adjustment satisfies the best interest of creditors test set forth in PROMESA section 314(b)(6).  Confirmation of the Plan of Adjustment relieves COFINA of a substantial portion of its debt burden (in excess of $5 billion in face amount of debt and more than $32 billion in nominal debt service over the next 40 years) and resolves the risk of non-payment to holders of Existing Securities posed by the Commonwealth-COFINA Dispute.  It also ensures that COFINA will be able to service the COFINA Bonds through its ownership of the COFINA Portion, an ownership that will be authorized under the Settlement Agreement, the Confirmation Order, and the New Legislation. In the absence of confirmation of the Plan of Adjustment, and the various interrelated settlements and compromises reflected in the Plan of Adjustment, COFINA and its stakeholders would be faced with a return to the complex, protracted, and novel litigation of the Commonwealth-COFINA Dispute, which threatened the very foundation of COFINA to service its Existing Securities.

The foregoing demonstrates the simple proposition that prompted COFINA's Title III filing in the first instance: *there is no non-restructuring solution to the problems facing COFINA and its stakeholders*. The Plan of Adjustment embodies COFINA's attempt to provide claimants with the highest possible recovery (consistent with their relative rights against COFINA) while resolving the litigation that threatens COFINA's ability to pay its debts. Accordingly, the Debtor believes that the Plan of Adjustment provides a better outcome than creditors could have achieved, as a whole, outside of the Title III Case and, thus, satisfies the "best interest of creditors" test set forth at PROMESA section 314(b)(6).

(d)     *Feasibility*

Section 314(b)(6) also requires that a plan of adjustment be feasible. While the best interests of creditors test establishes a "floor" with respect to how much a debtor can be expected to pay creditors under a plan of adjustment, the feasibility standard of PROMESA section 314(b)(6) imposes a "ceiling" on creditor recoveries under such a plan of adjustment. To satisfy the feasibility requirement, a municipal debtor must generally demonstrate, by a preponderance of the evidence, that it has the ability to make the payments set forth in the proposed plan of adjustment while also maintaining sufficient assets to (i) provide adequate levels of governmental services, (ii) fund normal operations, and (iii) remain financially viable after the conclusion of the Title III case and during the contemplated payment period.

To determine whether a proposed plan of adjustment satisfies the feasibility standard of PROMESA section 314(b)(6), a court must analyze the debtor's income and expense projections. A plan of adjustment is feasible if the debtor's income and expense projections (i) are realistic, reliable and not unreasonably optimistic and (ii) the plan is workable and appears to have a reasonable prospect of success; *i.e.*, it appears reasonably probable that the debtor will be able to make the payments to creditors contemplated in the plan of adjustment while maintaining adequate levels of services. Because COFINA is a securitization vehicle that never provided services to Commonwealth residents beyond its financing function, the Title III Court need only (i) determine whether COFINA's projected revenues and expenses are reasonable, and (ii) if so, decide whether COFINA will be able to make the contemplated payments under the Plan of Adjustment while avoiding a recurrence of the type of financial distress that caused it to commence its Title III case.

For purposes of determining whether the Plan of Adjustment meets this requirement, COFINA has prepared financial projections (as set forth in greater detail in Section XVIII of this Disclosure Statement, entitled "Financial Information and Projections" and <u>Exhibit E</u>) that demonstrate, as a result of COFINA's ownership of the COFINA Portion, COFINA's ability to fulfill its obligations under the Plan of Adjustment during that period. The Debtor believes that its financial projections (and its underlying assumptions) are reasonable and demonstrate a probability that COFINA will be able to satisfy its obligations under the Plan of Adjustment. Accordingly, the Debtor believes that the Plan of Adjustment meets the feasibility requirement of PROMESA section 314(b)(6).

(e)     *Cramdown*

PROMESA and the Bankruptcy Code provide that the Title III Court may confirm a plan of adjustment that is not accepted by all impaired classes if at least one impaired class of claims accepts the plan and the so-called "cramdown" provisions set forth in Bankruptcy Code sections 1129(b)(l), (b)(2)(A) and (b)(2)(B) are satisfied. The plan of adjustment may be confirmed under the cramdown provisions if, in addition to satisfying the other requirements of PROMESA section 314(b), it (i) is "fair and equitable" and (ii) does not discriminate unfairly with respect to each class of claims that is impaired under and has not accepted the plan of adjustment. To the extent that any impaired Classes of Claims do not accept the Plan of Adjustment under Bankruptcy Code section 1126(c), the Debtor believes that the Plan of Adjustment and the treatment of all Classes of Claims under the Plan of Adjustment satisfy the following requirements for nonconsensual confirmation of the Plan of Adjustment.

i.       "Fair and Equitable"

Uncertainty exists as to the contours of the "fair and equitable" requirement in Title III. Outside of the context of Title III, the "fair and equitable" requirement generally requires, among other things, that, unless a dissenting unsecured class of claims receives payment in full for its allowed claims, no holder of allowed claims in any class junior to that class may receive or retain any property on account of such claims. This is known as the "absolute priority rule." Few published opinions have addressed the meaning of the "fair and equitable" requirement in chapter 9 cases. Courts have held that the "fair and equitable" requirement in chapter 9 cases is understood as requiring that, where a debtor seeks nonconsensual confirmation of a plan of adjustment, the impaired creditors of such debtor, under the proposed plan of adjustment, will receive all that they can reasonably expect under the circumstances.

With respect to holders of secured claims, the "fair and equitable" requirement generally requires that secured claimholders (1)(a) retain the liens securing their claims to the extent of the allowed amount of such claim and (b) receive deferred cash payments totaling at least the allowed amount of their claims, of a value, as of the effective date of the plan of adjustment, of at least the value of such creditors' interest in the debtor's interest in the collateral securing the creditors' claim, or (ii) for the realization by such holders of the indubitable equivalent of such creditors' claims. Under the Plan of Adjustment and the Confirmation Order, COFINA will be the owner of the COFINA Portion and holders of COFINA Bonds will receive a statutory lien against the COFINA Portion and deferred cash payments on account of the COFINA Bonds of substantially all the value of the COFINA Assets.

Accordingly, the Debtor believes that the Plan is "fair and equitable" with respect to holders of Claims against COFINA as it provides such holders of Claims with all they reasonably can expect under the circumstances of the Title III Case. In the absence of confirmation, COFINA and its stakeholders would be faced with a return to litigation of the Commonwealth-COFINA Dispute. Under the circumstances, the Debtor does not believe that it could provide holders of Claims with greater recoveries while also settling the Commonwealth-COFINA Dispute and addressing the risk that litigation posed to COFINA and its stakeholders.

ii.       Unfair Discrimination

A plan of adjustment does not "discriminate unfairly" if a dissenting class is treated substantially equally with respect to other classes similarly situated, and no class receives more than it is legally entitled to receive for its claims. The Debtor believes that the Plan of Adjustment does not unfairly discriminate against any impaired Class of Claims.

**IN THE EVENT OF REJECTION OF THE PLAN OF ADJUSTMENT BY ONE OR MORE IMPAIRED CLASSES, THE DEBTOR RESERVES THE RIGHT TO REQUEST THE TITLE III COURT TO CONFIRM THE PLAN OF ADJUSTMENT IN ACCORDANCE WITH PROMESA AND BANKRUPTCY CODE SECTION 1129(b)(1), (b)(2)(A) AND (b)(2)(B). THE DEBTOR, SUBJECT TO THE PRIOR WRITTEN CONSENT OF THE PSA CREDITORS, HAS RESERVED THE RIGHT TO MODIFY THE PLAN OF ADJUSTMENT TO THE EXTENT, IF ANY, THAT CONFIRMATION OF THE PLAN OF ADJUSTMENT UNDER PROMESA SECTION 314 AND BANKRUPTCY CODE SECTION 1129(b) REQUIRES MODIFICATION.**

### 2. Alternatives to Confirmation and Consummation of the Plan

The Debtor has evaluated numerous alternatives to the Plan of Adjustment, which is premised and conditioned upon approval and effectiveness of the Settlement Agreement, including alternative structures and terms of the Plan of Adjustment and delaying the adoption thereof. While the Debtor has concluded that the Plan of Adjustment is the best alternative and will maximize recoveries by holders of Allowed Claims against COFINA, if the Plan of Adjustment is not confirmed, the Debtor could attempt to formulate and propose a different plan of adjustment. The Plan of Adjustment was formulated after months of difficult negotiations among numerous creditor constituencies, including in connection with numerous mediation sessions ordered by the Title III Court (see Section IV.E of this Disclosure Statement). Under the circumstances, the Debtor believes that the Plan of Adjustment provides the greatest and earliest possible recoveries to Creditors and that acceptance and confirmation of the Plan of Adjustment and approval of the Settlement Agreement are in the best interests of the Debtor and all Creditors. The Debtor further believes that any alternative to the Plan of Adjustment would result in unnecessary delay, uncertainty, litigation, and expense, the net effect of which would result in recoveries to Creditors less than the distributions to be made to Creditors under the Plan of Adjustment. The Debtor, therefore, believes that confirmation and consummation of the Plan of Adjustment is preferable to potential alternatives.

### VIII. Provisions Regarding COFINA Bonds

**THE COFINA BONDS WILL BE ISSUED PURSUANT TO THE TERMS AND PROVISIONS OF THE NEW BOND INDENTURE. THE NEW BOND INDENTURE CONSTITUTES PART OF THE PLAN SUPPLEMENT AND WILL BE FILED SEPARATELY WITH THE TITLE III COURT AS SOON AS PRACTICABLE (BUT IN NO EVENT LATER THAN FIFTEEN (15) DAYS) PRIOR TO THE VOTING DEADLINE, OR ON SUCH OTHER DATE AS THE TITLE III COURT ESTABLISHES, IN ACCORDANCE WITH THE DISCLOSURE STATEMENT ORDER. PURSUANT TO THE PLAN SUPPORT AGREEMENT, THE NEW BOND INDENTURE WILL BE CONSISTENT WITH THE PLAN SUPPORT AGREEMENT IN ALL RESPECTS AND OTHERWISE BE IN FORM AND SUBSTANCE REASONABLY SATISFACTORY TO**

**EACH PARTY TO THE PLAN SUPPORT AGREEMENT. THE DESCRIPTION OF
THE TERMS AND PROVISIONS OF THE COFINA BONDS AND NEW BOND
INDENTURE IN THIS PART VIII OF THE DISCLOSURE STATEMENT
REPRESENTS THE DEBTOR'S BEST AVAILABLE DESCRIPTION AS OF THE
DATE HEREOF, AND THE ACTUAL TERMS AND PROVISIONS OF THE COFINA
BONDS AND NEW BOND INDENTURE ARE SUBJECT TO MATERIAL CHANGE
WITHOUT FURTHER NOTICE BY THE DEBTOR EXCEPT AS PROVIDED IN THE
PLAN SUPPLEMENT. TO THE EXTENT THERE IS ANY CONFLICT BETWEEN
THE DESCRIPTION IN THIS PART VIII OF THE DISCLOSURE STATEMENT AND
THE NEW BOND INDENTURE, THE NEW BOND INDENTURE GOVERNS IN ALL
RESPECTS.**

### A.     General

The COFINA Bonds and the COFINA Parity Bonds will be issued pursuant to the terms and provisions of the New Bond Indenture and will be distributed as set forth in the Plan of Adjustment. As described below under the caption "COFINA Parity Bonds", Reorganized COFINA may issue additional bonds for refunding or refinancing purposes only to the extent permitted by the New Bond Indenture, secured and payable on a *pari passu* basis with the COFINA Bonds (the "COFINA Parity Bonds"). The definitive documentation governing the COFINA Bonds and the COFINA Parity Bonds shall generally provide for the terms set forth in this summary, subject to the results of any election permitted by the Plan of Adjustment, such as the Junior COFINA Bond Claim (Taxable Election) and the Senior COFINA Bond Claim (Taxable Election) and other adjustments permitted or required by the Plan of Adjustment. This summary does not purport to be complete and is subject to, and is qualified in its entirety by reference to, all the provisions of the COFINA Bonds, the New Bond Indenture and the Plan of Adjustment.

On the Effective Date, Reorganized COFINA shall issue the COFINA Bonds as a single Series with (i) four (4) maturities of current interest bonds (the "CIBs") and (ii) seven (7) maturities of capital appreciation bonds (the "CABs"). The COFINA Bonds will be dated as of August 1, 2018 and will accrue or accrete interest, as applicable, from such date.

*CIBs.* The CIBs will mature on July 1 of the years, in the principal amounts and bear interest at the rates set forth below:

| Year | Principal Amount | Interest Rate |
|------|------------------|---------------|
| 2034 | $   375,090,000 | 4.50% |
| 2040 | 2,996,115,000 | 4.55 |
| 2053 | 1,451,135,000 | 4.75 |
| 2058 | 4,297,080,000 | 5.00 |

Interest on the CIBs will be paid on the Effective Date and semi-annually on each July 1 and January 1 thereafter (each such date an "Interest Payment Date"). Interest on the CIBs will be computed on the basis of a 360-day year consisting of twelve 30-day months. The CIBs will

135

be issued as fully registered bonds in denominations of $1,000 or any integral multiples thereof. If any such Interest Payment Date or maturity date is not a Business Day, any action to be taken on such date need not be taken on such date but may be taken on the next succeeding Business Day with the same force and effect as if taken on such date, with no additional interest accruing in respect of the delay.

*CABs*. The CABs will mature on July 1 of the years, in the principal amounts and accrete at the rates set forth below:

| Maturity | Initial Issuance Amount | Maturity Amount | Accretion Rate |
|---|---|---|---|
| 2024 | $ 166,818,954.50 | $ 201,537,898.10 | 4.250% |
| 2027 | 246,346,597.95 | 348,676,228.60 | 4.375 |
| 2029 | 220,190,485.50 | 346,050,471.60 | 4.375 |
| 2031 | 256,162,971.50 | 445,599,082.70 | 4.500 |
| 2033 | 263,752,428.80 | 500,306,662.00 | 4.500 |
| 2046 | 1,108,991,315.10 | 4,252,407,026.55 | 5.375 |
| 2051 | 639,639,064.00 | 3,543,673,606.80 | 5.625 |

Interest on the CABs will not be payable on a current basis but will accrete semi-annually from August 1, 2018 on each July 1 and January 1 (each a "Valuation Date"), and will be treated as if accruing interest in equal daily amounts between Valuation Dates, until payable at maturity (or upon earlier redemption).

## B. Redemption

### (a) *Optional Redemption*

The COFINA Bonds maturing on July 1, 2024 and July 1, 2027 are not subject to redemption prior to maturity.

The COFINA Bonds, other than the COFINA Bonds maturing on July 1, 2024 and July 1, 2027, are subject to redemption prior to maturity, at the election or direction of Reorganized COFINA, in whole or in part (and, if in part, in an Authorized Denomination) on any Business Day, during the periods and at the redemption prices set forth below:

| Maturity | Redemption Period | Redemption Price |
|---|---|---|
| 2029 | July 1, 2028 through June 30, 2029 | 103% of Accreted Value |
| 2031 | July 1, 2028 through June 30, 2029 | 105% of Accreted Value |
|  | July 1, 2029 through June 30, 2031 | 103% of Accreted Value |
| 2033 | July 1, 2028 through June 30, 2031 | 107.5% of Accreted Value |
|  | July 1, 2031 through June 30, 2032 | 105% of Accreted Value |
|  | July 1, 2032 through June 30, 2033 | 103% of Accreted Value |

| 2034 | On or after July 1, 2025 | 100% |
| 2040, 2053 and 2058 | On or after July 1, 2028 | 100% |
| 2046 and 2051 | July 1, 2028 through June 30, 2033 | 107.5% of Accreted Value |
| | July 1, 2033 through June 30, 2038 | 105% of Accreted Value |
| | July 1, 2038 through June 30, 2043 | 103% of Accreted Value |
| | On or after July 1, 2043 | 100% of Accreted Value |

**(b)** ***Mandatory Sinking Fund Redemption***

The COFINA Bonds are subject to mandatory redemption, in part, through application of Sinking Fund Installments, at a redemption price of 100% of the principal amount thereof, plus accrued or accreted interest:

$201,537,898.10
COFINA Bonds
maturing July 1, 2024

| Year | Accreted Value |
| --- | --- |
| 2019 | $ 19,606,660.20 |
| 2021 | 17,479,550.10 |
| 2022 | 35,660,810.70 |
| 2023 | 54,565,877.10 |
| 2024[†] | 74,225,000.00 |

[†] Final maturity.

$348,676,228.60
COFINA Bonds
maturing July 1, 2027

| Year | Accreted Value |
| --- | --- |
| 2025 | $94,674,753.80 |
| 2026 | 115,941,474.80 |
| 2027[†] | 138,060,000.00 |

[†] Final maturity.

$346,050,471.60
COFINA Bonds
maturing July 1, 2029

| Year | Accreted Value |
| --- | --- |
| 2028 | $161,065,471.60 |

137

2029[†]          184,985,000.00

[†] Final maturity.

$445,599,082.70
COFINA Bonds
maturing July 1, 2031

| Year | Accreted Value |
|------|----------------|
| 2030 | $ 209,859,082.70 |
| 2031[†] | 235,740,000.00 |

[†] Final maturity.

$500,306,662.00
COFINA Bonds
maturing July 1, 2033

| Year | Accreted Value |
|------|----------------|
| 2032 | $262,646,662.00 |
| 2033[†] | 237,660,000.00 |

[†] Final maturity.

$375,090,000
COFINA Bonds
maturing July 1, 2034

| Year | Amount |
|------|--------|
| 2033 | $ 52,970,000.00 |
| 2034[†] | 322,120,000.00 |

[†] Final maturity.

$2,996,115,000
COFINA Bonds
maturing July 1, 2040

| Year | Amount |
|------|--------|
| 2035 | $366,885,000.00 |
| 2036 | 415,060,000.00 |
| 2037 | 466,685,000.00 |
| 2038 | 521,965,000.00 |
| 2039 | 581,125,000.00 |
| 2040[†] | 644,395,000.00 |

[†] Final maturity.

$4,252,407,026.55
COFINA Bonds
maturing July 1, 2046

| Year | Accreted Value |
|------|----------------|
| 2041 | $708,735,023.75 |
| 2042 | 708,737,287.50 |
| 2043 | 708,734,532.20 |
| 2044 | 708,732,767.50 |
| 2045 | 708,732,415.60 |
| 2046[†] | 708,735,000.00 |

[†] Final maturity.

$3,543,673,606.80
COFINA Bonds
maturing July 1, 2051

| Year | Accreted Value |
|------|----------------|
| 2047 | $708,736,815.00 |
| 2048 | 708,734,564.85 |
| 2049 | 708,734,662.00 |
| 2050 | 708,732,564.95 |
| 2051[†] | 708,735,000.00 |

[†] Final maturity.

$1,451,135,000
COFINA Bonds
maturing July 1, 2053

| Year | Amount |
|------|--------|
| 2052 | $708,735,000.00 |
| 2053[†] | 742,400,000.00 |

[†] Final maturity.

$4,297,080,000
COFINA Bonds
maturing July 1, 2058

| Year | Amount |
|------|--------|
| 2054 | $777,665,000.00 |
| 2055 | 816,545,000.00 |
| 2056 | 857,375,000.00 |
| 2057 | 900,240,000.00 |
| 2058[†] | 945,255,000.00 |

[†] Final maturity.

(c)  *Selection of COFINA Bonds to be Redeemed from Sinking Fund Installments*

If less than all of the COFINA Bonds of a Series are to be redeemed, the Depository Trust Company, on behalf of the Trustee, shall select the COFINA Bonds within the same maturity of such Series to be redeemed by means of a random lottery.

139

**(d)** *Purchase of COFINA Bonds*

Reorganized COFINA may, at any time subsequent to the first day of any Fiscal Year but in no event less than thirty-five (35) days prior to the succeeding date on which a Sinking Fund Installment is scheduled to be due, direct the Trustee to purchase, with money on deposit in the Debt Service Fund, at a price not in excess of par plus interest accrued and unpaid to the date of such purchase, COFINA Bonds to be redeemed from such Sinking Fund Installment. Any COFINA Bonds so purchased or otherwise purchased and delivered to the Trustee shall be canceled upon receipt thereof by the Trustee and evidence of such cancellation shall be given to the Reorganized COFINA. The principal amount of each COFINA Bond so canceled shall be credited against the Sinking Fund Installment due on such date.

**(e)** *Notice of Redemption*

Whenever COFINA Bonds are to be redeemed, the Trustee shall give notice of the redemption of the COFINA Bonds in the name of COFINA which notice will specify (a) the COFINA Bonds to be redeemed, (b) the maturity dates and interest rates or accretion rates of the COFINA Bonds to be redeemed and the date such COFINA Bonds were issued; (c) the numbers and other distinguishing marks of the COFINA Bonds to be redeemed, including CUSIP numbers; (d) the redemption date; (e) the Redemption Price, if then known; and (f) the principal amount of each COFINA Bond to be redeemed. If Reorganized COFINA's obligation to redeem the COFINA Bonds is subject to conditions, the notice will include a statement to that effect and of the conditions to such redemption. Such notice shall further state that, if on such date all conditions to redemption have been satisfied, there shall become due and payable on such date upon each COFINA Bond to be redeemed the Redemption Price thereof, together with interest accrued and unpaid thereon to the redemption date, and that, from and after such date, payment having been made or provided for, interest thereon shall cease to accrue.

The Trustee will give notice by mailing a copy of such notice not less than thirty (30) days nor more than sixty (60) days prior to the redemption date, to the registered owners of the COFINA Bonds which are to be redeemed, at their last known addresses appearing on the registration books not more than ten (10) Business Days prior to the date such notice is given. The failure of any Holder of a COFINA Bond to be redeemed to receive such notice shall not affect the validity of the proceedings for the redemption of the COFINA Bonds.

**(f)** *Payment of Redeemed Bonds*

Notice having been given by mail in the manner described above, the COFINA Bonds or portions thereof so called for redemption shall become due and payable on the redemption date so designated at the Redemption Price, plus interest accrued and unpaid to the redemption date, and, upon presentation and surrender of such COFINA Bonds, at the office or offices specified in such notice, such COFINA Bonds, or portions thereof, shall be paid at the Redemption Price, plus interest accrued and unpaid to the redemption date. If there is called for redemption less than all of the principal amount of a COFINA Bond, Reorganized COFINA will execute and the Trustee will authenticate and deliver, upon the surrender of such COFINA Bond, without charge to the owner thereof, for the unredeemed balance of the principal amount of the registered COFINA Bond so surrendered, COFINA Bonds of like maturity in any of the authorized

140

denominations. If, on the redemption date, money for the redemption of all COFINA Bonds or portions thereof of any like maturity to be redeemed, together with interest accrued and unpaid thereon to the redemption date, shall be held by the Trustee and Paying Agents so as to be available therefor on such date and if notice of redemption shall have been mailed as described above, then, from and after the redemption date, interest on the COFINA Bonds or portions thereof so called for redemption shall cease to accrue and such COFINA Bonds shall no longer be considered to be Outstanding under the New Bond Indenture. If such money is not available on the redemption date, such COFINA Bonds or portions thereof shall continue to bear interest until paid at the same rate as they would have borne had they not been called for redemption.

## C.  Collateral for Repayment of COFINA Bonds

Repayment of the COFINA Bonds and COFINA Parity Bonds from the COFINA Receipts, as defined below, shall be secured by a statutory first lien on the Pledged Sales Taxes, as defined below, in an amount not to exceed the COFINA Revenues, as defined below, subject to the "*Substitution of Collateral*" provisions described below. Such lien shall (a) remain in effect and (b) be closed until, in each case, the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

"Pledged Sales Taxes" shall mean (a) the present and future revenues and collections generated by the portion of the Sales and Use Tax that corresponds to a tax rate of five and one-half percent (5.5%) and (b) the Substituted Collateral, if any.

"COFINA Revenues" means the Pledged Sales Taxes payable to Reorganized COFINA in accordance with Article 4.1 of the Act (*First Dollars Funding of COFINA Revenues*), in each Fiscal Year in the following amounts (which amounts are equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for each Fiscal Year):

| Fiscal Year | COFINA Revenues | Fiscal Year | COFINA Revenues |
|---|---|---|---|
| 2019 | $420,185,325 | 2039 | $920,677,791 |
| 2020 | 436,992,738 | 2040 | 957,504,902 |
| 2021 | 454,472,448 | 2041 | 992,525,000 |
| 2022 | 472,651,346 | 2042 | 992,525,000 |
| 2023 | 491,557,399 | 2043 | 992,525,000 |
| 2024 | 511,219,696 | 2044 | 992,525,000 |
| 2025 | 531,668,483 | 2045 | 992,525,000 |
| 2026 | 552,935,223 | 2046 | 992,525,000 |
| 2027 | 575,052,631 | 2047 | 992,525,000 |
| 2028 | 598,054,737 | 2048 | 992,525,000 |
| 2029 | 621,976,926 | 2049 | 992,525,000 |
| 2030 | 646,856,003 | 2050 | 992,525,000 |
| 2031 | 672,730,244 | 2051 | 992,525,000 |
| 2032 | 699,639,453 | 2052 | 992,525,000 |
| 2033 | 727,625,032 | 2053 | 992,525,000 |
| 2034 | 756,730,033 | 2054 | 992,525,000 |

| 2035 | 786,999,234 | 2055 | 992,525,000 |
| 2036 | 818,479,203 | 2056 | 992,525,000 |
| 2037 | 851,218,371 | 2057 | 992,525,000 |
| 2038 | 885,267,106 | 2058 | 992,525,000 |

For each Fiscal Year following 2058 and until all Principal and interest on the COFINA Bonds and COFINA Parity Bonds has been paid in full or defeased in accordance with Section 12.01 of the New Bond Indenture, "COFINA Revenues" shall include an amount equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for such Fiscal Year.

"COFINA Revenue Fund" means the fund so designated, created and established pursuant to Section 5.02 of the New Bond Indenture.

"COFINA Receipts" means the proceeds of the COFINA Revenues received by Reorganized COFINA pursuant to the Act and the Banking Services Agreement.

"Fixed Income" means, for Fiscal Year 2018 and 2019, seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251) and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four percent (4%) of such Fixed Income, up to the Maximum Amount. The Fixed Income for each Fiscal Year shall be funded from the first revenues collected of the COFINA Pledged Sales Taxes.

"Maximum Amount" means One Billion Eight Hundred and Fifty Million dollars ($1,850,000,000.00).

Until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, the COFINA Revenues shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes, subject to the qualifications provided in Section 16.5 of the Plan of Adjustment.

For more information, please refer to Section [IV.F.4] of this Disclosure Statement.

**D. Statutory Lien**

The New Bond Legislation provides that the COFINA Bonds and COFINA Parity Bonds shall be secured by a statutory first lien on the Trust Estate described in the New Bond Indenture, including all of Reorganized COFINA's right, title and interest in and to the COFINA Pledged Taxes. The statutory first lien shall automatically attach from the time COFINA Bonds and COFINA Parity Bonds are issued without further action or authorization by Reorganized COFINA or any other entity, person, governmental authority or officer. The statutory lien shall be valid and binding from the time such COFINA Bonds and COFINA Parity Bonds are executed and delivered and the statutory lien shall automatically be effective, binding and enforceable against all Persons having claims of any kind in tort, contract or otherwise against Reorganized COFINA or its assets irrespective of whether such Persons have notice of such lien.

## E. Application of COFINA Revenues

Promptly (and in no event later than two Business Days) following the deposit of the COFINA Receipts into the COFINA Revenue Fund, the Trustee shall withdraw from the COFINA Revenue Fund and transfer and apply such amounts as follows and in the following order of priority:

*First*:  To the following accounts on a *pro rata* basis:

(i)  the Interest Account of the Debt Service Fund, in each Fiscal Year, an amount equal to the Interest Funding Requirement for such Fiscal Year; and

(ii)  the Principal Account of the Debt Service Fund, in each Fiscal Year, an amount equal to the Principal Funding Requirement for such Fiscal Year;

*Second*:  Upon the direction of an Authorized Officer of the Corporation, to the Arbitrage Rebate Fund the amount set forth in such direction;

*Third*:  To the Operating Reserve Fund, in each Fiscal Year, the amount certified by an Authorized Officer of the Corporation as being necessary to deposit to the Operating Reserve Fund such that the total amount on deposit in the Operating Reserve Fund in such Fiscal Year equals the Operating Reserve Fund Cap;

*Fourth*:  Upon the direction of an Authorized Officer of the Corporation and with the consent of the Secretary of Treasury, to the Debt Retirement Fund, the amount set forth in such direction; and

*Fifth*: To the Remainder Fund, any remaining balance.

"Interest Funding Requirement" means, for each Fiscal Year, an amount equal to 100% of the interest due and payable on all outstanding COFINA Bonds and COFINA Parity Bonds in such Fiscal Year and on the next succeeding July 1, excluding interest actually paid on the first day such Fiscal Year and including any interest unpaid in prior Fiscal Years (and, for the avoidance of doubt, interest on such overdue interest) calculated based on a 360-day year consisting of twelve (12) 30-day month minus.

"Principal Funding Requirement" means for each Fiscal Year, an amount equal to the sum of the Principal due on all outstanding COFINA Bonds and COFINA Parity Bonds in such Fiscal Year and on the next succeeding Principal Payment Date, excluding Principal actually paid on the first day such Fiscal Year and including any Principal unpaid in prior Fiscal Years.

## F. Refunding Bonds

### (a)  *COFINA Parity Bonds*

Reorganized COFINA shall, at the written direction of the Secretary of the Treasury, issue COFINA Parity Bonds to refund or refinance the COFINA Bonds or other COFINA Parity Bonds provided, that (a) notwithstanding the terms of such COFINA Parity Bonds, Reorganized

143

COFINA shall not be entitled to an increase of the COFINA Revenues; (b) the principal and interest payment dates on the COFINA Parity Bonds shall be the same principal and interest payments dates on the COFINA Bonds; (c) the final maturity date of the COFINA Parity Bonds shall not be later than July 1, 2058; and (d) upon the issuance of any COFINA Parity Bonds:

      (a)     annual debt service due on all COFINA Bonds and outstanding COFINA Parity Bonds in the then-current and each future Fiscal Year immediately after the issuance of the COFINA Parity Bonds shall be equal to or less than annual debt service due on all outstanding COFINA Bonds and COFINA Parity Bonds in the then-current and each future Fiscal Year immediately prior to such issuance; and

      (b)     as set forth in the New Bond Indenture, Debt Service Savings shall only be realized in the same Fiscal Years in which principal of on the COFINA Bonds and COFINA Parity Bonds and the interest thereon were refunded and/or purchased.

      **(b)**     ***Additional Indebtedness***

Following the issuance of the Initial Bonds, Reorganized COFINA may not incur any additional indebtedness except that the Reorganized COFINA may issue or incur:

      (a)     COFINA Parity Bonds under and in compliance with the provisions of the New Bond Indenture summarized above; and

      (b)     obligations under and in accordance with the provisions of Section 16.3 of the Plan of Adjustment ("Subordinated Lien Bonds"), as described in the next following paragraph (the "Additional Bonds Test").

Reorganized COFINA may issue Subordinated Lien Bonds for the benefit of, and with the consent of, the Government and for any lawful purpose of the Government, provided that (x) repayment of such Subordinated Lien Bonds shall be secured by a second lien that is subordinated in all respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the Pledged Sales Taxes; **provided, however,** that repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Receipts and (y) prior to the issuance thereof, the Secretary of Treasury and an Authorized Officer of the Corporation shall deliver a jointly executed certificate to the Trustee certifying that the following conditions are each satisfied:  (i) (1) the projected Pledged Sales Taxes ((A) which, in the event that Subordinated Lien Bonds are being issued prior to Fiscal Year 2024, are calculated assuming the preceding Fiscal Year's collection of the Pledged Sales Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Government's certified fiscal plan, dated April 18, 2018, or (B) in the event that Subordinated Lien Bonds are being issued during Fiscal Year 2024 or thereafter, are calculated assuming that preceding Fiscal Year's collection of the Pledged Sales Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) Fiscal Years) equals or exceeds (2) one and one-half times (1.5x), in any succeeding Fiscal Year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien

Bonds (including the Subordinated Lien Bonds to be issued); (ii) the preceding Fiscal Year's collections from the Pledged Sales Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding Fiscal Year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (iii) the Subordinated Lien Bonds have a maturity not later than Fiscal Year 2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing Additional Bonds Test, final maturity beyond Fiscal Year 2058 shall be permissible for future Subordinated Lien Bonds.

Any Subordinated Lien Bonds permitted to be issued by Reorganized COFINA under the New Bond Indenture and under the Act shall be issued pursuant to a separate bond resolution or bond indenture provided that the issuance thereof is authorized by the Additional Bonds Test set forth above and by the Commonwealth Legislature, which legislation shall establish the terms of such Subordinate Lien Bonds and the purposes for which the proceeds of such Subordinate Lien Bonds will be used. Any such Subordinated Lien Bonds issued by the Reorganized COFINA shall not be secured by nor shall such Subordinated Lien Bonds be payable from the Trust Estate.

## G. Certain Covenants of Reorganized COFINA

The New Bond Indenture will provide that Reorganized COFINA will, among other things:

(a)     pay principal and interest on the COFINA Bonds and COFINA Parity Bonds in accordance with the terms thereof;

(b)     except for the Statutory Lien granted under the New Bond Indenture, maintain the trust estate free and clear of any pledge, lien, charge or other encumbrance, prior to, or of equal rank with, or junior to, the Statutory Lien;

(c)     as far as authorized by law, pass, make, do, execute, acknowledge and deliver all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all of the rights and pledges made under the New Bond Indenture;

(d)     keep proper books and records (separate from all other records and accounts of the Government and other Government Entities) and cause such books and accounts to be audited annually after the end of each Fiscal Year by a nationally recognized independent certified public accounting firm selected by Reorganized COFINA;

(e)     maintain in the Borough of Manhattan, in the City of New York, an office or agency where COFINA Bonds or the COFINA Parity Bonds may be presented or surrendered for payment, where COFINA Bonds or COFINA Parity Bonds may surrendered for registration of transfer or exchange and where notices and demands to or upon COFINA in respect of the COFINA Bonds, COFINA Parity Bonds and the New Bond Indenture may be serves and give prompt written notice to the Trustee of the

145

location and of any change in the location of such office or agency;

(f)     prior to the start of each Fiscal Year, prepare a budget of operating expenses for Reorganized COFINA for such Fiscal Year;

(g)     pay all taxes and assessments or other municipal or governmental charges, if any, lawfully levied or assessed upon the trust estate; and

(h)     to use its reasonable best efforts and to work in good faith to obtain the best ratings on the then outstanding COFINA Bonds and COFINA Parity Bonds from Ratings Services that issue ratings on such COFINA Bonds and COFINA Parity Bonds at the request of the Reorganized COFINA in the event that Reorganized COFINA is required by the COFINA Act and the New Bond Indenture to provide Substituted Collateral; and

(i)     do and perform or cause to be done and performed all things required to be done and performed by or on behalf of Reorganized COFINA under the provisions of the New Bond Indenture.

Unless expressly permitted by the New Bond Indenture, Reorganized COFINA will not, among other things:

(a)     directly or indirectly extend or assent to the extension of the maturity of any of the COFINA Bonds and the COFINA Parity Bonds or claims for interest by the purchase or funding of such COFINA Bonds and the COFINA Parity Bonds or claims for interest or by any other arrangement and, in case the maturity of any of such COFINA Bonds and the COFINA Parity Bonds or the time for payment of any such claims for interest shall be extended with the written consent of the Holders of such COFINA Bonds and the COFINA Parity Bonds;

(b)     create or cause to be created any lien or charge prior to that of the COFINA Bonds and the COFINA Parity Bonds on the trust estate. Except as permitted in the New Bond Indenture, create or cause to be created any lien or charge that equal or subordinated to that of the COFINA Bonds and the COFINA Parity Bonds on the trust estate; ***provided, however,*** that nothing contained in the New Bond Indenture will prevent Reorganized COFINA from issuing Subordinated Lien Bonds in accordance with the Additional Bonds Test;

(c)     until all COFINA Bonds and the COFINA Parity Bonds, together with the interest thereon, and all amounts and obligations under the New Bond Indenture and under the Ancillary Agreements, have been completely paid in cash in full or defeased in accordance with the New Bond Indenture, make any payments or distributions of the COFINA Revenues or moneys in the funds and accounts established under the New Bond Indenture except in accordance with the provisions of the New Bond Indenture; or

(d)     take any action or fail to take any action that would cause interest on tax-exempt COFINA Bonds or COFINA Parity Bonds to be includable in gross income for federal income tax purposes and will do and perform all acts and things permitted by law

146

and reasonably necessary or desirable to assure that interest paid to the Holders of any tax exempt COFINA Bonds and COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

## H.  Bond Indenture

### (a)  *Modification and Amendment of the New Bond Indenture*

The New Bond Indenture shall not be modified or amended in any respect except in accordance with and subject to the provisions of the New Bond Indenture described below. Subject to the limitations set forth in the New Bond Indenture and consistent with the Plan of Adjustment, Reorganized COFINA may execute and deliver at any time or from time to time Supplemental Indentures for any one or more of the following purposes, and any such Supplemental Indentures shall become effective in accordance with its terms:

(a)  To provide for the issuance of a Series of COFINA Parity Bonds under and in accordance with the provisions of the New Bond Indenture and to prescribe the terms and conditions pursuant to which such COFINA Parity Bonds may be issued, paid or redeemed;

(b)  To add additional covenants and agreements of Reorganized COFINA for the purpose of further securing the payment of the COFINA Bonds and COFINA Parity Bonds, provided such additional covenants and agreements are not contrary to or inconsistent with the covenants and agreements of Reorganized COFINA contained in the New Bond Indenture and in the Ancillary Agreements; provided that such additional covenants and agreements shall be for the equal benefit and security of all COFINA Bonds and COFINA Parity Bonds, without discrimination or preference;

(c)  To prescribe further limitations and restrictions upon the issuance of COFINA Parity Bonds and Subordinate Lien Bonds by Reorganized COFINA which are not contrary to or inconsistent with the limitations and restrictions thereon theretofore in effect, including the limitations and restrictions set forth in the Act, the Plan of Adjustment and the legislation enacted relating to the issuance of Subordinate Lien Bonds;

(d)  To surrender any right, power or privilege reserved to or conferred upon Reorganized COFINA by the terms of the New Bond Indenture, provided that the surrender of such right, power or privilege is not contrary to or inconsistent with the covenants and agreements of Reorganized COFINA contained therein, in the Ancillary Agreements or in the Act;

(e)  To confirm, as further assurance, any pledge under the New Bond Indenture, and the subjection to any lien, claim or pledge created or to be created by the provisions thereof, of the COFINA Pledged Sales Taxes, or any pledge of any other money, investments thereof or funds provided that such further assurance shall be for the equal benefit and security of all COFINA Bonds and COFINA Parity Bonds, without discrimination or preference;

147

(f)    To modify any of the provisions of the New Bond Indenture or of any previously adopted Supplemental Indenture in any other respects, provided that such modifications shall not be effective until after all outstanding COFINA Bonds and COFINA Parity Bonds as of the effective date of such Supplemental Indenture shall cease to be outstanding, and all COFINA Bonds and the COFINA Parity Bonds issued under such Supplemental Indentures shall contain a specific reference to the modifications contained in such subsequent Supplemental Indenture; or

(g)    With the consent of the Trustee, to cure any ambiguity or defect or inconsistent provision in the New Bond Indenture or to insert such provisions clarifying matters or questions arising thereunder as are necessary or desirable, provided that any such modifications are not contrary to or inconsistent therewith as theretofore in effect, or to modify any of the provisions thereof or of any previous Supplemental Indenture in any other respect, provided that such modification shall not adversely affect the interests of the Bondholders in any respect.

(h)    Notwithstanding the above, no Supplemental Indenture authorized by this section shall be effective unless and until Reorganized COFINA has delivered an opinion of Transaction Counsel to the Trustee to the effect that the execution of the Supplemental Indenture will not adversely affect the excludability of interest on the COFINA Bonds and the COFINA Parity Bonds from gross income of the Holders for federal income tax purposes.

Except as described in clauses (a) through (h) above, any modification or amendment of the New Bond Indenture and of the rights and obligations of Reorganized COFINA and of the Holders of the COFINA Bonds and the COFINA Parity Bonds thereunder, in any particular, may be made by a Supplemental Indenture, with the written consent (i) of the Holders of at least a Majority in Interest (as such term is defined below) of the COFINA Bonds and the COFINA Parity Bonds outstanding at the time such consent is given, or (ii) in case less than all of the several Series of COFINA Bonds and the COFINA Parity Bonds then outstanding are affected by the modification or amendment, of the Holders of at least a Majority in Interest of the COFINA Bonds and the COFINA Parity Bonds of each Series so affected and outstanding at the time such consent is given; *provided, however,* that any such amendment or modification is consistent with the provisions of the Plan of Adjustment; *provided, further,* if such modification or amendment will, by its terms, not take effect so long as any COFINA Bonds and the COFINA Parity Bonds of any specified like Series, maturity remain outstanding, the consent of the Holders of such COFINA Bonds and the COFINA Parity Bonds shall not be required and such COFINA Bonds shall not be deemed to be outstanding for the purpose of any calculation of outstanding COFINA Bonds and the COFINA Parity Bonds under this paragraph.  No such modification or amendment shall, without the prior written consent of the Holder of such COFINA Bond or COFINA Parity Bond, permit a change in the provisions related to the timing or amount of any payment on the COFINA Bonds and the COFINA Parity Bonds, including, without limitation, any change in the amount or date of any Sinking Fund Installment, payment of Principal or any other payment, the terms of redemption or maturity of the principal of any outstanding COFINA Bond or COFINA Parity Bond or of any installment of interest thereon or a reduction in the principal amount or the Redemption Price thereof or in the rate of interest thereon.  Further, no such modification or amendment shall, without the prior written consent of

148

the Holder of such COFINA Bond or COFINA Parity Bond, reduce the percentages or otherwise affect the classes of Bonds the consent of the Holders of which is required to effect any such modification or amendment. For the purposes of this paragraph, a Series shall be deemed to be affected by a modification or amendment hereof if the same adversely affects or diminishes the rights of the Holders of COFINA Bonds and the COFINA Parity Bonds of such Series in any respect. The Trustee may in its discretion determine whether or not, in accordance with the foregoing provisions, the COFINA Bonds and the COFINA Parity Bonds of any particular Series or maturity would be affected by any modification or amendment of the new Bond Indenture and any such determination shall be binding and conclusive on Reorganized COFINA and all Holders of COFINA Bonds and the COFINA Parity Bonds. The Trustee may receive an opinion of Transaction Counsel as conclusive evidence as to whether the COFINA Bonds and the COFINA Parity Bonds of any particular Series or maturity would be so affected by any such modification or amendment hereof.

"Majority in Interest" means as of any particular date of calculation, the Holders of a majority of the outstanding COFINA Bonds and COFINA Parity Bonds eligible to act on a matter, measured by (i) with respect to COFINA Bonds and COFINA Parity Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (ii) with respect to Capital Appreciation Bonds, the Accreted Value of such COFINA Bonds or COFINA Parity Bonds as of such date.

"Quarter in Interest" means as of any particular date of calculation, the Holders of twenty-five percent (25%) of the outstanding COFINA Bonds and COFINA Parity Bonds eligible to act on a matter, measured by (a) with respect to COFINA Bonds and COFINA Parity Bonds other than Capital Appreciation Bonds, the Principal amount thereof and (b) with respect to Capital Appreciation Bonds, the Accreted Value of such COFINA Bonds and COFINA Parity Bonds as of such date.

### (b) *Events of Default*

An "Event of Default" under the New Bond Indenture means any one of the following events:

(a) payment of the principal or Redemption Price of any COFINA Bond or COFINA Parity Bond is not made by Reorganized COFINA when due and payable, either at maturity or by proceedings for redemption or otherwise;

(b) payment of an installment of interest on any COFINA Bond or COFINA Parity Bond is not made by Reorganized COFINA when due and payable;

(c) Reorganized COFINA defaults in the due and punctual performance of any other of the covenants, conditions, agreements and provisions contained in the New Bond Indenture or in the COFINA Bonds or COFINA Parity Bond or in any Supplemental Indenture on the part of Reorganized COFINA to be performed and such default shall continue for sixty (60) after written notice specifying such default and requiring same to be remedied shall have been given to Reorganized COFINA by the

Trustee, which may give such notice in its discretion and shall give such notice at the written request of the Holders of not less than a Quarter in Interest of the outstanding COFINA Bonds, and COFINA Parity Bonds unless, if such default is capable of being cured but is not capable of being cured within sixty (60) days, Reorganized COFINA has commenced to cure such default within sixty (60) days and does cure such default within ninety (90) days of the date the default initially occurred;

(d)     Reorganized COFINA, pursuant to or within the meaning of any U.S. federal or Commonwealth insolvency, bankruptcy, reorganization, restructuring receivership or any other form of debtor relief law, including without limitation, PROMESA (collectively, "Bankruptcy Laws"):

(i)     commences proceedings to be adjudicated bankrupt or insolvent;

(ii)     consents to the institution of bankruptcy or insolvency proceedings against it;

(iii)     files, or consents to the filing of, a petition or answer or consent seeking an arrangement of debt, reorganization, dissolution, winding up or relief under applicable Bankruptcy Law;

(iv)     consents to the appointment of a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of it or for all or any substantial part of its property;

(v)     makes a general assignment for the benefit of its creditors;

(vi)     takes any corporate or similar action in furtherance of any of the foregoing; or

(e)     a court of competent jurisdiction enters an order or decree under any Bankruptcy Law that:

(i)     is for relief against Reorganized COFINA in a proceeding in which Reorganized COFINA is to be adjudicated bankrupt or insolvent;

(ii)     approves as properly filed a petition seeking reorganization, arrangement, adjustment or composition of or in respect of Reorganized COFINA under any Bankruptcy Law;

(iii)     appoints a receiver, interim receiver, receiver and manager, liquidator, assignee, trustee, sequestrator or other similar official of Reorganized COFINA for all or any substantial part of the property of Reorganized COFINA; or

(iv)     orders the liquidation, dissolution or winding up of Reorganized COFINA and the order or decree remains unstayed and in effect for 60 consecutive days;

(f)     the Commonwealth defaults in the due and punctual performance of any of the covenants of the Commonwealth contained in the COFINA Act or the New Bond Indenture; and

(g)     Reorganized COFINA permits the validity or effectiveness of the New Bond Indenture, the COFINA Bonds or the COFINA Parity Bonds to be impaired, and such impairment affects the enforceability of or payments on the COFINA Bonds or COFINA Parity Bonds, or any person to be released from any covenants or obligations with respect to the COFINA Bonds or COFINA Parity Bonds.

(c)     _**Remedies**_

(a)     If an Event of Default occurs and is continuing, the Trustee shall continue to make payments in accordance with the priority of payments described below.

(b)     If an Event of Default occurs and is continuing, the Trustee (i) upon the written request of Holders of not less than a Quarter in Interest of the outstanding COFINA Bonds and COFINA Parity Bonds, shall proceed to protect and enforce its rights and the rights of the Holders by such of the following remedies as the Trustee shall deem most effective to protect and enforce such rights or such of the following remedies as Holders of not less than a Quarter in Interest of the outstanding COFINA Bonds and COFINA Parity Bonds shall instruct; and (ii) may exercise rights and remedies if (y) Holders holding not less than a Majority in Interest of the outstanding COFINA Bonds and COFINA Parity Bonds consent thereto or (z) the proceeds of such exercise would be sufficient to pay in full the principal of and the accrued but unpaid interest and any other amounts owed under the COFINA Bonds and COFINA Parity Bonds as of the date of such exercise (collectively, the "Remedy Limitations"):

(i)     initiation of Proceedings (as defined below) to (A) collect all amounts due in respect of the COFINA Bonds and COFINA Parity Bonds limited, upon recovery thereunder, to the trust estate; (B) enforce any and all rights of the Holders under the New Bond Indenture, under the Act or other applicable law; (C) enforce any covenant or agreement in this New Bond Indenture or in aid of the exercise of any power granted in the New Bond Indenture; or (D) enforce any other proper remedy or legal or equitable right vested in the Trustee or Holders by this New Bond Indenture, the Act or other applicable law; or

(ii)     enforcement of the statutory lien created by the COFINA Act by exercising such other rights or remedies in respect of the trust estate to the same extent as the Corporation;

(c)     In any Proceedings brought by the Trustee (and also any Proceedings involving the interpretation of any provision of the New Bond Indenture to which the Trustee shall be a party), the Trustee shall be held to represent all the Holders, and it shall not be necessary to make any Holder a party to any such Proceedings.

(d)     Subject to the provisions of the New Bond Indenture, if an Event of

151

Default occurs and is continuing, the Trustee shall be under no obligation to exercise any of the rights or powers under the New Bond Indenture at the request or direction of any of the Holders if the Trustee reasonably believes it will not be adequately indemnified against the costs, expenses and liabilities which might be incurred by it in complying with such request.

Upon the happening and continuance of any Event of Default specified in the New Bond Indenture, then and in every such case, the Trustee shall, upon the written request of the Holders of not less than a Quarter in Interest of the outstanding COFINA Bonds and COFINA Parity Bonds proceed to protect and enforce its rights and the rights of the Bondholders under the New Bond Indenture or under any Supplemental Indenture or under applicable laws by such suits, actions or special proceedings in equity or at law or under any Supplemental Indenture or in aid or execution of any power granted in the New Bond Indenture, or for an accounting against the Reorganized COFINA as if the Reorganized COFINA were the trustee of an express trust, or for the enforcement of any proper legal or equitable remedy as the Trustee shall deem most effectual to protect and enforce such rights, including the enforcement of its rights and remedies, as assignee, under any agreement assigned to it hereunder, including but not limited to its rights and obligations under the Act.

In the enforcement of any remedy under the New Bond Indenture and under each Supplemental Indenture the Trustee shall be entitled to sue for, enforce payment of, and receive any and all amounts then, or during any default becoming, and at any time remaining, due from the Reorganized COFINA for principal or interest or otherwise under any of the provisions of the Indenture or of any Supplemental Indenture or of the COFINA Bonds and COFINA Parity Bonds, with interest on overdue payments of the principal of or interest on the COFINA Bonds and COFINA Parity Bonds at the rate or rates of interest specified in such COFINA Bonds and COFINA Parity Bonds, together with any and all costs and expenses of collection and of all proceedings hereunder and under any Supplemental Indenture and under such COFINA Bonds and COFINA Parity Bonds, without prejudice to any other right or remedy of the Trustee or of the Holders of such Bonds, and to recover and enforce judgment or decree against the Reorganized COFINA but solely as provided in the New Bond Indenture and under any Supplemental Indenture and in such COFINA Bonds and COFINA Parity Bonds, for any portion of such amounts remaining unpaid, with interest, costs and expenses, and to collect in any manner provided by law, the money adjudged or decreed to be payable.

"Proceeding" means any suit in equity, action at law or other judicial or administrative proceeding.

(d) **_Priority of Payments after Default_**

If (i) an Event of Default shall occur or be continuing or (ii) at any time the money held by the Trustee under the New Bond Indenture and under each Supplemental Indenture is not sufficient to pay the Principal of and interest on the COFINA Bonds and COFINA Parity Bonds as they become due and payable, the money held by the Trustee under the New Bond Indenture and under each Supplemental Indenture together with any money then available or thereafter becoming available to pay the Principal of and interest on the COFINA Bonds and COFINA Parity Bonds, whether through exercise of the remedies provided for in the New Bond Indenture or otherwise, shall be applied (after payment of all amounts owing to the Trustee under the New Bond Indenture) as follows:

First:  *Pro rata*:

(A) To the payment to the persons entitled thereto of all installments of interest then due in the order of the maturity of the installments of such interest, and, if the amount available shall not be sufficient to pay in full any installment, then to the payment thereof ratably, according to the amounts due on such installment, to the persons entitled thereto, without any discrimination or preference; and

(B) To the payment to the persons entitled thereto of the unpaid principal or Redemption Price of any COFINA Bonds and COFINA Parity Bonds which shall have become due whether at maturity or by call for redemption in the order of their due dates and, if the amount available shall not be sufficient to pay in full all such amounts due on any date, then to the payment thereof ratably, according to the amount of principal or Redemption Price due on such date, to the persons entitled thereto, without any discrimination or preference.

Second: To be applied by the Trustee to fund the deposits in the priority set forth above (*Application of COFINA Receipts*).

## I.    Defeasance

If Reorganized COFINA shall pay or cause to be paid to the Holder of a COFINA Bond or COFINA Parity Bond of a Series the principal or Redemption Price of and interest thereon, at the times and in the manner stipulated therein, in the New Bond Indenture, and in the applicable Supplemental Indenture, then the pledge of the trust estate and all other rights granted by the New Bond Indenture to such COFINA Bonds and COFINA Parity Bonds shall be discharged and satisfied.

COFINA Bonds or COFINA Parity Bonds for the payment or redemption of which money shall have been set aside and shall be held in trust by the Trustee (through deposit of money for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed in the preceding paragraph.  All outstanding COFINA Bonds or COFINA Parity Bonds of any Series or any maturity within a Series or a portion of a maturity within a Series shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed in the previous paragraph if (i) in case any of said COFINA Bonds or COFINA Parity Bonds are to be redeemed on any date prior to their maturity, Reorganized COFINA shall have given to the Trustee, in form satisfactory to it, irrevocable instructions to give as provided in the

101361236v29

New Bond Indenture notice of redemption on said date of such COFINA Bonds and COFINA Parity Bonds; and (ii) there shall have been deposited with the Trustee either money in an amount which shall be sufficient, or defeasance securities the principal of and interest on which when due will provide money which, together with the money, if any, deposited with the Trustee at the same time, shall be sufficient in the judgment of a nationally recognized verification agent to pay when due the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, and interest due and to become due on said COFINA Bonds or COFINA Parity Bonds on and prior to the redemption date or maturity date thereof, as the case may be; and (iii) in the event said COFINA Bonds and COFINA Parity Bonds are not by their terms subject to redemption within the next succeeding sixty (60) days, Reorganized COFINA shall have given the Trustee, in form satisfactory to it, irrevocable instructions to give, as soon as practicable, by first class mail, postage prepaid, to the Holders of said COFINA Bonds and COFINA Parity Bonds at their last known addresses appearing on the registration books, a notice to the Holders of such COFINA Bonds and COFINA Parity Bonds that the deposit required by (ii) above has been made with the Trustee and that said COFINA Bonds and COFINA Parity Bonds are deemed to have been paid in accordance with the New Bond Indenture and stating such maturity or redemption date upon which money is to be available for the payment of the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, of and interest on said COFINA Bonds or COFINA Parity Bonds; and (iv) in the event of a defeasance of a tax-exempt COFINA Bond or COFINA Parity Bond, Reorganized COFINA shall have delivered to the Trustee an opinion of Transaction Counsel to the effect that said COFINA Bond or COFINA Parity Bonds having been deemed to have been paid as provided in the Indenture would not (A) cause said COFINA Bond or COFINA Parity Bonds to be considered to have been "reissued" for purposes of Section 1001 of the Code and (B) adversely affect the exclusion of interest on such tax-exempt bond from gross income for purposes of federal income taxation.

Any income or interest certified by the Trustee to be in excess of the amounts required to pay the principal, Sinking Fund Installments, if any, or Redemption Price, if applicable, of and interest on such COFINA Bonds and COFINA Parity Bonds, as realized, shall be applied by the Trustee as follows: first, to the Arbitrage Rebate Fund, the amount required to be deposited therein in accordance with the direction of an Authorized Officer of Reorganized COFINA; and, then, the balance thereof to the Remainder Fund. The money so paid by the Trustee shall be released of any trust, pledge, lien, encumbrance or security interest created by the New Bond Indenture.

## J.    Certain Provisions Relating to Capital Appreciation Bonds

For the purposes of receiving payment of the Redemption Price of a Capital Appreciation Bond is redeemed prior to maturity, the then current Accreted Value of such COFINA Bond shall be deemed to be its principal amount. In computing the principal amount of COFINA Bonds held by the registered owner of a Capital Appreciation Bond in giving to the Reorganized COFINA or the Trustee any notice, consent, request, or demand pursuant hereto for any purpose whatsoever, the Accreted Value of such Capital Appreciation Bond as at the immediately preceding Valuation Date shall be deemed to be its principal amount. Notwithstanding any other provision of the New Bond Indenture, the amount payable at any time with respect to the principal and Sinking Fund Installments, if any, of and interest on any Capital Appreciation Bond shall not exceed the Accreted Value thereof at such time. For purposes of receiving

payment of the Redemption Price or principal or Sinking Fund Installments, if any, of a Capital Appreciation Bond called for redemption prior to maturity, the difference between the Accreted Value of such Capital Appreciation Bond when the Redemption Price or principal thereof is due upon such redemption or declaration and the principal of such Capital Appreciation Bond on the date the bonds of the Series of which it is a part were first issued shall be deemed not to be accrued and unpaid interest thereon.

### K.    Notices

The Trustee shall give notice of each Event of Default under the New Bond Indenture known to it to Reorganized COFINA within 10 days after knowledge of the occurrence thereof and to the Holders of COFINA Bonds and COFINA Parity Bonds within thirty (30) days after knowledge of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  While COFINA Bonds and COFINA Parity Bonds are held in book-entry form, notices will be delivered by the Trustee to DTC.  If the COFINA Bonds and COFINA Parity Bonds are issued in definitive form, these notices will be mailed to the addresses provided to the Indenture Trustee by the Holders of record as of the relevant record date.  Such notices will be deemed to have been given as of the date of delivery to DTC or mailing.

### L.    Governing Law

The New Bond Indenture, the COFINA Bonds and COFINA Parity Bonds are governed by and will be construed in accordance with the laws of the State of New York applicable to agreements made in and to be performed wholly within such jurisdiction.

### M.    Venue

The Title III Court shall retain jurisdiction from and after the Effective Date of all matters arising from or related to the Plan of Adjustment including, without limitation with respect to the payment, enforcement and remedies of the COFINA Bonds and COFINA Parity Bonds to the extent permitted by law.  Any legal action, suit, or proceeding arising from or related to the COFINA Bonds and COFINA Parity Bonds (a) shall be brought by any party or its successors or assigns in any wealth and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

### N.    Book-Entry Only

The COFINA Bonds will initially be registered through a book-entry only system operated by The Depository Trust Company, New York, New York ("DTC").  Beneficial interests in the COFINA Bonds may be held through DTC, directly as a participant or indirectly through organizations that are participants in DTC.  Beneficial ownership interest in the COFINA Bonds will be available in the book-entry form only, in authorized denominations and any whole multiple thereof.  Purchasers of beneficial ownership interest in the COFINA Bonds (the "Beneficial Owners") will not receive certificates representing their interest in the COFINA Bonds received in the exchange.  While held in book-entry only form, all payments of principal

155

of and interest on the COFINA Bonds will be made by wire transfer to DTC or its nominee as the sole registered owner of the COFINA Bonds. Payments to Beneficial Owners are the sole responsibility of DTC and its participants.

## O.  Continuing Disclosure

The delivery of the COFINA Bonds pursuant to the Plan of Adjustment is not covered by SEC Rule 15c2-12 because the COFINA Bonds are proposed to be issued in exchange for the Existing COFINA Bonds without involvement of an underwriter, as defined in such Rule 15c2-12 (the "Rule"). However, Reorganized COFINA intends to voluntarily execute and deliver, for the benefit of the holders of the COFINA Bonds, a new continuing disclosure undertaking (the "CDA") containing certain disclosure obligations. The CDA will be delivered on the Effective Date. Pursuant to the CDA, Reorganized COFINA will provide the following information:

(a)      Within 305 days after the end of each Fiscal Year, beginning 305 days after the Fiscal Year ending June 30, 2019, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"):

> (1)      Reorganized COFINA's audited financial statements; provided, however, if the audited financial statements of Reorganized COFINA are not available on the date required above, Reorganized COFINA shall post on EMMA, or shall cause to be posted on EMMA, unaudited financial statements and the audited financial statements shall be filed promptly upon becoming available to Reorganized COFINA;

> (2)      the Operating Reserve Fund balance, the Interest Funding Requirement and the Principal Funding Requirement for the current and succeeding Fiscal Year;

> (3)      information of the type included in this Disclosure Statement under the articles entitled "COFINA Pledged Taxes" and "Commonwealth Economic Indicators";

> (4)      the balance of on deposit in the Operating Reserve Fund as of the last Business Day of such Fiscal Year; and

> (5)      such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

(b)      In a timely manner, not in excess of 10 business days after the occurrence of the event, to the MSRB through EMMA, notice of any of the following events with respect to the COFINA Bonds:

> (1)      principal and interest payment delinquencies;

> (2)      non-payment related defaults, if material;

(3)    unscheduled draws on debt service reserves reflecting financial difficulties;

(4)    unscheduled draws on credit enhancements reflecting financial difficulties;

(5)    substitution of credit or liquidity providers, or their failure to perform;

(6)    adverse tax opinions, the issuance by the Internal Revenue Service of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices of determinations with respect to the tax status of the COFINA Bonds, or other material events affecting the tax status of the COFINA Bonds;

(7)    modifications to rights of COFINA Bondholders, if material;

(8)    COFINA Bond calls, if material, and tender offers;

(9)    defeasances;

(10)    release, substitution, or sale of property securing repayment of COFINA Bonds, if material;

(11)    rating changes;

(12)    bankruptcy, insolvency, receivership or similar proceedings of Reorganized COFINA;

(13)    the consummation of a merger, consolidation, or acquisition involving Reorganized COFINA or the sale of all or substantially all of the assets of Reorganized COFINA, other than in the ordinary course of business, the entry into a definitive agreement to undertake such an action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; and

(14)    the appointment of a successor or additional trustee or the change of name of a trustee, if material.

With respect to the following events:

Event (3).  Event (3) is included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers dated September 19, 1995. However, Event (3) may not be applicable since no "debt service reserves" will be established for the COFINA Bonds.

Events (4) and (5).  Reorganized COFINA does not undertake to provide any notice with respect to credit enhancement (including credit facilities and liquidity facilities) added after the delivery of the COFINA Bonds, unless Reorganized COFINA applies for or participates in obtaining the enhancement.

157

Event (6). Event (6) is relevant only to the extent interest on the COFINA Bonds is tax-exempt.

Events (8). Reorganized COFINA does not undertake to provide notice of a mandatory scheduled redemption through Sinking Fund Installments not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in connection with the delivery of such COFINA Bonds subject to Sinking Fund Installments, (ii) the only open issue is which COFINA Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the owners of the COFINA Bonds as required under the terms of the COFINA Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or COFINA Bond purchases.

Event (13). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

Reorganized COFINA may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of Reorganized COFINA, such other event is material with respect to the COFINA Bonds, but Reorganized COFINA does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

(c)     In a timely manner, to the MSRB, notice of any failure by Reorganized COFINA to comply with paragraph (a) above.

No Bondholder may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Bondholder shall have filed with Reorganized COFINA evidence of ownership and a written notice of and request to cure such breach, Reorganized COFINA shall have refused to comply within a reasonable time and such Bondholder stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all Bondholders of the outstanding COFINA Bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

During the past five years, COFINA has failed to file or not filed on a timely basis certain of its audited financial statements and annual financial information due to the unavailability of this information by the required posting date, although notices of the failure to file were posted in a timely manner. Additionally, notices of changes in insured ratings were not made in a timely manner. COFINA has committed to providing its audited financial statements for the fiscal years ended June 30, 2016 and 2017 and the annual financial information for fiscal year ended June 30, 2017 as soon as they are available.

## IX. Trusts

### A. Terms of Ambac Trust

#### (a) *General Terms*

On or prior to the Effective Date, COFINA shall establish the Ambac Trust, solely on behalf of, and for the benefit of beneficial holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elect to receive the Ambac Certificates in accordance with the approved solicitation procedures pursuant to the Disclosure Statement Order and set forth on the Ballot/Election Notice. On the Effective Date, the following Ambac Trust Assets shall be deposited (or deemed deposited) into the Ambac Trust: (1) the Ambac Insured Bonds allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac), (2) the Senior COFINA Bond Distribution (consisting of Section 103 Cash, if applicable, COFINA Cash Available for Distribution, COFINA Bonds and Rounding Amount Cash, if necessary) allocable to such electing holders of Allowed Senior COFINA Bond Claims (Ambac) and (3) the benefit of the Ambac Insurance Policy. The COFINA Bonds shall consist of Taxable COFINA Bonds and Tax-Exempt COFINA Bonds. Notwithstanding the deposit of such holders' Ambac Insured Bonds in the Ambac Trust, such Ambac Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with such Ambac Insured Bonds, the Bond Resolution (other than with respect to the payment and other obligations of COFINA and the Commonwealth thereunder) and the Ambac Insurance Policy shall be preserved and remain in full force and effect. The Ambac Trust shall be the owner of any Ambac Insured Bonds deposited therein, provided that all rights with respect to such Ambac Insured Bonds shall be subject to the terms of the trust agreement.

Upon deposit of the Ambac Trust Assets, the trustee shall issue two series of Ambac Certificates, (i) a series with a mandatory redemption date of August 1, 2047, and (ii) a series with a mandatory redemption date of August 1, 2054, to the holders of Allowed Senior COFINA Bond Claims (Ambac) that validly elected to receive the Ambac Certificates. The Ambac Certificates will provide for payments in accordance with the scheduled sinking fund payments with respect to the Series 2054 and the maturity date of such holder's Ambac Insured Bonds. The scheduled sinking fund payments dates for the Series 2054 are each of August 1, 2048, August 1, 2049, August 1, 2050, August 1, 2051, August 1, 2052, and August 1, 2053. Subject to the terms of the trust agreement, each series of Ambac Certificates shall bear unique CUSIPs and be freely tradeable and transferrable through The Depository Trust Company, subject to the terms of the trust agreement. Each class of Ambac Certificates will have its own class accretion schedule that sets forth the accreted payment amounts as of any date. Ambac shall not insure any payments on the Ambac Certificates, shall not be required to pay any default or other interest

amounts with respect to the Ambac Insured Bonds, and is only required to pay its obligations under the Ambac Insurance Policy as provided therein and in the trust agreement. In addition, Ambac shall have the right, but not any obligation, to make payments in whole or in part under the Ambac Insurance Policy prior to the applicable mandatory redemption date for a class of Ambac Certificates. To the extent Ambac determines, in its sole discretion, to make any earlier payment under the Ambac Insurance Policy, upon such payment, the remaining obligations of Ambac with respect to such Ambac Insurance Policy shall result in the recalibration of the related class accretion schedules. Upon repayment or redemption of all Ambac Certificates, Ambac shall be entitled to receive all remaining assets in the Ambac Trust.

Other than with respect to their differing mandatory redemption dates and accretion schedules, each class of the Ambac Certificates shall have substantially the same terms and entitle the holder thereof to its pro rata share of distributions made by the Ambac Trust. Each distribution on the Ambac Certificates (whether or not taxable to a holder or reduced by withholding or tax payments made by the Ambac Trust) shall reduce the related obligation of Ambac under the Ambac Insurance Policy, shall be deemed to reduce the amount outstanding on the Ambac Insured Bonds, and shall result in the recalibration of the related class accretion schedules. The Ambac Trust will distribute all payments received on the Tax-Exempt COFINA Bonds to holders of the Ambac Certificates promptly following receipt thereof in accordance with the trust agreement. Ambac may elect, in its sole discretion, to distribute from time to time payments received on account of the Taxable COFINA Bonds to holders of the Ambac Certificates or to reinvest such payments in investments permitted by the terms of the trust agreement; provided, however, that the Ambac Trust shall have no obligation to distribute such payments prior to the applicable mandatory redemption date for a series. In addition, Ambac may, in its sole and absolute discretion, direct the Ambac Trust to sell all or any portion of the COFINA Bonds held by the Ambac Trust in accordance with the terms of the trust agreement and thereafter, if such COFINA Bonds are Tax-Exempt COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of the Ambac Certificates and, if such COFINA Bonds are Taxable COFINA Bonds, direct the Ambac Trust to distribute the proceeds of such sale to the holders of Ambac Certificates or retain the proceeds of such sale in the Ambac Trust. Moreover, Ambac may, in its sole and absolute discretion, distribute Ambac Trust Assets held by the Ambac Trust to the holders of Ambac Certificates, at a market value calculated in accordance with the terms of the trust agreement, whereupon the applicable portion of each holder's Ambac Certificates shall be cancelled. Ambac shall be deemed the sole holder of the COFINA Bonds in the Ambac Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings. Taxes on any investment earnings, shall be paid out of the Ambac Trust Assets.

The Ambac Trust agreement will provide that (a) all rights of a holder of COFINA Bonds held by the Ambac Trust (whether as to amendments and consents, direction of remedies or otherwise) shall be exercisable solely by Ambac and no holder of the Ambac Certificates shall be entitled to any right with respect to the COFINA Bonds and (b) Ambac may, at its option, elect to direct a distribution of a proportional percentage of the underlying COFINA Bonds to individual holders of Ambac Certificates upon the release of such holder's claims on the related Ambac Insurance Policy and against the Ambac Trust. Such distribution and release shall not

160

give rise to any other holder of Ambac Certificates asserting a right to receive the same treatment.

On the Effective Date, unless otherwise agreed to by Ambac, the position at the Depository Trust Company with respect to each Ambac Insured Bond deposited, or deemed deposited, into the Ambac Trust pursuant to the terms and provisions of the Plan shall become zero and the Ambac Trust shall be deemed the sole holder of such Ambac Insured Bonds.

### (b) *Costs and Expenses*

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to Section 17.1 of the Plan of Adjustment, including, without limitation, fees and expenses associated with the formation and maintenance of the Ambac Trust and the fees and expenses incurred by the trustee of the Ambac Trust, shall be the sole obligation and responsibility of the Ambac (solely with respect to the formation of the Ambac Trust) and the Ambac Trust, and not COFINA or Reorganized COFINA, as the case may be, and the failure of Ambac (solely with respect to the formation of the Ambac Trust) and the Ambac Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the Ambac Trust.

## B. Terms of National Trust

In the event that National declines to exercise the National Election, on or prior to the Effective Date, the National Trust shall be formed on behalf of, and for the sole benefit of beneficial holders of, National Insured Bonds that (a) elect to receive National Certificates on the Ballot/Election Notice distributed in connection with the solicitation of acceptances and rejections of the Plan of Adjustment and (b) have not otherwise agreed to commute the National Insurance Policies on or prior to the Effective Date. The trustee of the National Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market. On the Effective Date, the National Trust Assets, consisting of (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) in accordance with the terms of section 7.1(b) of the Plan of Adjustment, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with section 3.3 of the Plan of Adjustment, shall be deposited into the National Trust. The costs, including fees and expenses and any obligation arising under the Term Sheet or the Plan of Adjustment, associated with the formation and operation of the National Trust shall be paid out of the National Trust Assets. Notwithstanding the deposit of such holders' National Insured Bonds in the trust, such National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with such National Insured Bonds, the Bond Resolution (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trust shall issue one or more series of National Certificates to the beneficial holders of Senior COFINA Bond Claims (National) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Trust.

101361236v29

The National Certificates shall entitle a National Certificate Holder to its pro rata share of value in and any distribution of Cash from the respective National Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders in the amount of such distribution. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Trust actually makes payment to the National Certificate Holders. Each series of National Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through the Depository Trust Company.

### (a) *Sale of COFINA Bonds*

So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Trust, deliver or direct the trustee to deliver a Sale Notice to all National Certificate Holders, through Depository Trust Company or any similar means, setting forth its intention to sell, for Cash, all or a portion of the COFINA Bonds held in the National Trust. The Sale Proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; *provided*, *however*, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the Plan Support Agreement, and (iii) be included in a Plan Supplement.

To the extent that a holder of a Senior COFINA Bond Claim (National) agrees to commute the National Insurance Policies on or prior to the Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Trust or the National Certificates.

### (b) *Costs and Expenses*

All fees, costs and expenses incurred in connection with transactions contemplated pursuant to section 17.2 of the Plan of Adjustment, including, without limitation, fees and expenses associated with the formation and maintenance of the National Trust and the fees and

162

expenses incurred by the trustee of the National Trust, shall be the sole obligation and responsibility of the National Trust, and not COFINA or Reorganized COFINA, as the case may be, and failure of the National Trust to satisfy any such obligations shall release and discharge COFINA and Reorganized COFINA, as the case may be, from fulfilling any further obligations in connection with the National Trust.

## X. New Bond Legislation

New Bond Legislation was enacted authorizing the transactions contemplated by the Plan of Adjustment, providing for the collateralization of the COFINA Pledged Taxes and the granting of the New Collateral and incorporating such other terms as set forth in section 25.1(b)(viii) of the Plan of Adjustment.

Specifically, on November 15, 2018, Governor Rosselló Nevares signed into law the New Bond Legislation, which amends and restates Act No. 91-2006, as amended, to establish the legal framework for the restructuring of COFINA's issued and outstanding bonds. To this end, the New Bond Legislation provides for (i) the modification of COFINA's corporate governance structure, (ii) the authorization for Reorganized COFINA to issue COFINA Bonds and COFINA Parity Bonds and provide for the terms of such bonds, (iii) confirmation of Reorganized COFINA's ownership of the COFINA Revenues, (iv) the creation of the statutory lien to secure the COFINA Bonds and COFINA Parity Bonds, and (v) covenants to secure further the repayment of the COFINA Bonds and COFINA Parity Bonds, such as the COFINA Revenues being funded from first funds, a non-impairment covenant and covenants that allow the Commonwealth to modify the Pledged Sales Tax upon satisfaction of certain requirements.

Below is a summary description of certain provisions of the New Bond Legislation, which does not purport to be complete and is qualified in its entirety by reference to the full text of the New Bond Legislation. Capitalized terms not otherwise defined in this Section X of the Disclosure Statement shall have the meanings given to them in the New Bond Legislation or the Plan of Adjustment, as applicable.

### A. Purpose and Separate Legal Existence of Reorganized COFINA

The New Bond Legislation provides that Reorganized COFINA's purpose is to (i) issue the COFINA Bonds, (ii) own and administer the COFINA Revenues, and (iii) issue any other bonds, notes or evidence of indebtedness of Reorganized COFINA as may be permitted by the Plan of Adjustment and the Ancillary Agreements and which will be payable from such sources as may be provided for by the Legislative Assembly.

The New Bond Legislation also provides that Reorganized COFINA is and shall be recognized for all purposes as an independent and separate legal entity from the Government of Puerto Rico. It shall be operated independently, and its business and affairs shall be governed by or under the direction of its Board of Directors.

### B. Ownership of the COFINA Revenues

The New Bond Legislation provides that any and all ownership interests and rights to the COFINA Revenues were, have been or are thereby transferred to Reorganized COFINA and that

such transfer is an absolute transfer of all legal and equitable right, title and interest, and not a pledge or other financing. It also provides that (i) Reorganized COFINA is and will be the sole and exclusive owner of the COFINA Revenues until such time as the COFINA Bonds and COFINA Parity Bonds, if applicable, together with any interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms and (ii) the COFINA Revenues do not constitute "available resources" or "available revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution.

The COFINA Revenues are defined as Reorganized COFINA's right to receive the first funds comprising the portion of the sales and use tax imposed by the Commonwealth that corresponds to a tax rate of five and one-half percent (5.5%) in any Fiscal Year (July 1 to June 30) up to an amount equal to fifty-three and sixty-five one hundredths percent (53.65%) of the Fixed Income for each such Fiscal Year. For Fiscal Year 2018-2019, the Fixed Income is seven hundred eighty-three million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251) and, for each subsequent fiscal year, the Fixed Income for the prior Fiscal Year plus four percent (4%) of such Fixed Income, up to one billion eight hundred fifty million dollars ($1,850,000,000).

## C.    Permitted and Prohibited Activities

The New Bond Legislation provides that Reorganized COFINA will not engage in any activity other than: (i) receiving and owning the COFINA Revenues and such other revenues or property as may be provided or transferred to Reorganized COFINA; (ii) adopting the Restructuring Resolution; (iii) issuing, from time to time, COFINA Bonds, COFINA Parity Bonds, and any bonds, notes or evidences of indebtedness the issuance of which is authorized by section 203 of the New Bond Resolution; (iv) entering into and performing the Ancillary Agreements, including payment of its portion of the Financing Costs; (v) to pay any bonds, notes or evidences of indebtedness the issuance of which is authorized by section 203 of the New Bond Legislation by pledging, on a basis subordinate in all respects to the lien established in section 302 of the New Bond Legislation, (a) any amounts remaining of the COFINA Revenues after the payment of principal and interest on the COFINA Bonds and COFINA Parity Bonds or (b) any other funds or property that may be allocated to Reorganized COFINA after the Effective Date; and (vi) taking any and all other actions as may be necessary or appropriate to effectuate the transactions contemplated by the Plan of Adjustment. Additionally, the New Bond Legislation grants Reorganized COFINA certain ancillary powers described in Article 205 of the New Bond Legislation, in order to carry out its authorized activities.

Pursuant to Article 206 of the New Bond Legislation, Reorganized COFINA will be prohibited from taking any of the following actions: (i) merging or consolidating, directly or indirectly, with any person, (ii) incurring, guaranteeing or otherwise becoming obligated to pay any debt or other obligations other than the COFINA Bonds, COFINA Parity Bonds, or bonds or other evidences of indebtedness authorized pursuant to section 203 of the New Bond Legislation and certain other costs, (iii) pledging, creating or recording liens on any of its properties (including the COFINA Revenues), other than (a) the pledge to secure the payment of COFINA Bonds and COFINA Parity Bonds created pursuant to section 302 of this Act or (b) any pledge

or lien to secure any bond, note or evidence of indebtedness permitted under section 203 of the New Bond Legislation but only to the extent such pledge or lien is subordinate in all respects to the lien established in section 302 of this Act, (iv) engaging in any business activities other than as expressly authorized by the New Bond Legislation, (v) dissolving, liquidating, selling, or, except as permitted by section 204(e), otherwise transferring any or all of the COFINA Revenues, and (vi) voting to authorize Reorganized COFINA to commence a proceeding under Title III of PROMESA or similar judicial restructuring proceedings under applicable laws subject to the provisions of such laws, and (vii) taking any other action that is inconsistent with Reorganized COFINA's purpose as set forth in the New Bond Legislation or ancillary thereto. In addition, the New Bond Legislation prohibits the Board of Directors from voting to authorize Reorganized COFINA to commence a case under Title III of PROMESA or other similar judicial restructuring process under applicable law.

**D.      Corporate Governance**

The powers of Reorganized COFINA shall be exercised by the Board of Directors, which shall be composed of three (3) members appointed by Governor Rosselló Nevares; provided, that, pursuant to the provisions of the Ancillary Agreements, certain holders of COFINA Bonds may submit up to three (3) recommendations for the Governor's consideration of the initial appointment of Reorganized COFINA's directors but the Governor shall be under no obligation to appoint any such recommended persons. Each member of the Board of Directors must satisfy the independence and qualification standards (including that no member of the Board of Directors may be an officer, employee or director of any entity of the Government of Puerto Rico other than Reorganized COFINA) set forth in the Ancillary Agreements.

Each member of the Board of Directors shall (a) be entitled to one (1) vote and (b) be appointed for a term of three (3) years and may serve consecutive terms as an appointed member; provided, that the Governor may remove any member prior to the expiration of their term if such member fails to uphold the responsibilities set forth in this Act or for gross negligence, willful misconduct or fraud. All decisions and actions of the Board of Directors shall require the affirmative vote of the majority of the members of the Board of Directors at the time serving; provided, that, Reorganized COFINA's bylaws may require a higher approval threshold for particular matters described therein.

**E.      The Plan of Adjustment**

***Authorization of the COFINA Bonds and COFINA Parity Bonds.*** In order to authorize the issuance of the COFINA Bonds and COFINA Parity Bonds, Reorganized COFINA must adopt one or more resolutions providing for the (i) issuance of the COFINA Bonds and COFINA Parity Bonds and the terms thereof, and (ii) payment of certain costs and expenses, each in accordance with the terms of the Plan of Adjustment.

***Source of Repayment of the COFINA Bonds and COFINA Parity Bonds.*** The COFINA Bonds and COFINA Parity Bonds will be payable solely from the COFINA Revenues, in accordance with the terms of the Plan of Adjustment and the Ancillary Agreements. Moreover, the COFINA Bonds and COFINA Parity Bonds will not constitute a debt of the Commonwealth

or of any public corporation or instrumentality of the Commonwealth other than as a special limited obligation of Reorganized COFINA as described herein.

*Creation of Statutory Lien on the COFINA Revenues.* Upon the issuance of the COFINA Bonds and the COFINA Parity Bonds, they will be automatically secured by a statutory first lien on the all of Reorganized COFINA's right, title and interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of the holders of COFINA Bonds and COFINA Parity Bonds.  Such statutory first lien is created automatically and shall automatically attach and be perfected, valid and binding from and after the Effective Date, without any further act or agreement by any Person. No instrument needs to be executed or delivered or recorded in any official record or in any government registry or office in order to perfect or continue such statutory first lien or to establish or maintain the priority thereof. No commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other government entity or any other Person shall limit, defeat, impair or interfere with such statutory lien. Such lien is valid, binding, perfected and enforceable against all Persons having claims of any kind in tort, contract or otherwise against Reorganized COFINA or its assets irrespective of whether such Persons have notice of such lien.

*First Funds Funding of the COFINA Revenues.*  Each fiscal year, the first funds comprising the Pledged Taxes shall be transferred to, and deposited with, Reorganized COFINA, or any account or fund designated by Reorganized COFINA, until such time as Reorganized COFINA has received an amount equal to the COFINA Revenues for such fiscal year.  The requirement that the first funds comprising the Pledged Taxes up to the COFINA Revenues be deposited with Reorganized COFINA or in any account or fund designated by Reorganized COFINA may not be modified; provided, that the Bond Indenture may contain provisions allowing for the quarterly distribution of the Pledged Taxes between Reorganized COFINA and the Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture and consistent with the  Plan of Adjustment.  Reorganized COFINA shall have these rights until such time as the COFINA Bonds and COFINA Parity Bonds, together with any interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in cash in full or have otherwise been discharged in accordance with their terms.

During each fiscal year, the Indenture Trustee or such other Person as may be designated in the Bond Indenture shall determine, on a monthly basis, if Reorganized COFINA has received the COFINA Revenues.  Once the Indenture Trustee or such other Person determines that the COFINA Revenues have been deposited with the Indenture Trustee (or that portion of the COFINA Revenues as Reorganized COFINA may be entitled to the extent the quarterly distribution referenced above is in effect), all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico.

*Excess Funding of Reorganized COFINA.*  Once the Indenture Trustee determines that the COFINA Revenues have been deposited with the Indenture Trustee (or that portion of the COFINA Revenues as Reorganized COFINA may be entitled to the extent the quarterly distribution referenced above is in effect), all revenues of the Pledged Taxes received after such determination shall be transferred to the Government of Puerto Rico.  Also, the amounts deposited with Reorganized COFINA each fiscal year in excess of the amounts required to pay

166

principal and interest on the COFINA Bonds and COFINA Parity Bonds then due and payable (including the principal and interest due and payable on any past due COFINA Bonds and COFINA Parity Bonds), satisfy obligations assumed pursuant to the Ancillary Agreements then due and payable, pay its transaction costs or operating expenses as provided in the Ancillary Agreements, or make any other payment related to other obligations incurred by Reorganized COFINA, will be transferred to Reorganized COFINA, free and clear of the statutory lien established by the New Bond Legislation and any other lien established by the Ancillary Agreements.

## F.    Covenants of the Commonwealth

The Government of Puerto Rico, with the intent of being contractually bound, agrees and covenants with Reorganized COFINA and each Person that holds COFINA Bonds or COFINA Parity Bonds, and authorizes Reorganized COFINA to include such covenant in the Bond Indenture for the benefit of the holders of COFINA Bonds and COFINA Parity Bonds, that it will not, and no Government Entity shall be authorized to, until the COFINA Bonds and COFINA Parity Bonds, together with the interest thereon, and all amounts and obligations under all Ancillary Agreements, have been completely paid in cash in full or otherwise discharged in accordance with their terms:

(a)    take any action that would (A) impair Reorganized COFINA's right to receive the COFINA Revenues, (B) limit or alter the rights vested in COFINA or Reorganized COFINA in accordance with the Plan of Adjustment to fulfill the terms of any agreements with the holders of COFINA Bonds and COFINA Parity Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any Fiscal Year, or (D) impair the rights and remedies of the holders of the COFINA Bonds and COFINA Parity Bonds or the collateral security established under section 302 of this Act;

(b)    reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless, in connection with such reduction, the credit rating and other requirements set forth in the Ancillary Agreements are satisfied; *provided*, *however*, that, notwithstanding the foregoing, until all obligations with respect to the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of the Pledged Taxes is reduced below three percent (3%), then, in connection with such reduction, the Government of Puerto Rico must comply with the Substitution Requirements;

(c)    impair, limit, restrict, rescind, delay or modify the rights or powers of Reorganized COFINA, the Indenture Trustee or the holders of COFINA Bonds and COFINA Parity Bonds under this Act or relating to the COFINA Revenues, or Reorganized COFINA's ability to meet its obligations to its bondholders;

(d)    amend the New Bond Legislation to impair, limit, restrict, rescind, delay or modify any obligation or commitment of Reorganized COFINA to the holders of COFINA Bonds and COFINA Parity Bonds; and

(e)      limit or restrict the rights or powers of the appropriate officers of the Government of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing shall not preclude the Government of Puerto Rico from exercising its power, through a change in law, replace the portion of the Sales Tax that corresponds to a tax rate of five and one half percent (5.5%) with Substituted Collateral in accordance with the Substitution Requirements.

For purposes of (e) above, the term (i) "Substituted Collateral" means all or a portion of a tax of general applicability throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and (ii) "Substitution Requirements" means (1) the enactment of legislation providing for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal to the COFINA Revenues has been irrevocably transferred to and is owned solely and exclusively by Reorganized COFINA to the full extent provided under section 202 of the New Bond Legislation, (B) that, following such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not, and shall not constitute, "available resources" or "available revenues" of the Government of Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as otherwise used in the Puerto Rico Constitution, (C) for a lien on such Substituted Collateral in favor of the Indenture Trustee for the benefit of the holders of COFINA Bonds and COFINA Parity Bonds to the full extent provided for under section 302 of the New Bond Legislation, and (D) that the Government of Puerto Rico and the government entities shall continue to provide the covenants set forth in section 303 of the New Bond Legislation with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect to the Substituted Collateral.

## XI.    Corporate Governance and Management of Reorganized COFINA

### A.    Corporate Action

On the Effective Date, all matters provided for under the Plan of Adjustment that would otherwise require approval of the directors of COFINA or Reorganized COFINA, including, without limitation, the authorization to issue or cause to be issued the COFINA Bonds, the authorization to enter into the Definitive Documents, the adoption of Reorganized COFINA By-Laws, and the election or appointment, as the case may be, of directors and officers of Reorganized COFINA pursuant to the Plan of Adjustment, as applicable, shall be authorized and approved in all respects, in each case, in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without further action by any Person or Entity under any other applicable law, regulation, order, or rule. Other matters provided under the Plan of Adjustment involving the corporate structure of the Reorganized COFINA or corporate action by Reorganized COFINA, as applicable, shall be deemed to have occurred, be authorized, and shall be in effect in accordance with the New Bond Legislation and the new corporate governance documents, as applicable, and without requiring further action by any Person or Entity under any other applicable law, regulation, order, or rule. Without limiting the foregoing, from and after the Confirmation Date, COFINA and Reorganized COFINA shall take any and all actions deemed appropriate in order to consummate the transactions contemplated

168

herein in accordance with the New Bond Legislation and the new corporate governance documents, as applicable.

**B.    Amendment of By-Laws**

As of the Effective Date, Reorganized COFINA shall adopt new by-laws consistent with the New Bond Legislation and the Plan of Adjustment.

**C.    Directors of the Reorganized COFINA**

On the Effective Date, and pursuant to the terms and provisions of section 25.1(c) of the Plan of Adjustment, the Reorganized COFINA By-Laws shall provide that the board of directors of Reorganized COFINA shall consist of three (3) persons appointed by the Governor of the Commonwealth all of whom shall meet the independence and qualification standards set forth in the Definitive Documents, including, without limitation, that the independent director may not be an officer, employee, or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors. The initial directors shall be disclosed prior to the Confirmation Hearing. If, during the period from the Confirmation Hearing up to and including the Effective Date, circumstances require the substitution of one (1) or more persons selected to serve on the boards of directors of Reorganized COFINA, the Governor of the Commonwealth shall choose a substitute and COFINA shall file a notice thereof with the Title III Court and, for purposes of Bankruptcy Code section 1129, any such replacement person, designated in accordance with the requirements of the immediately preceding sentence, shall be deemed to have been selected and disclosed prior to the Confirmation Hearing. Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of Junior COFINA Bond Claims and Assured) may collectively submit up to the three (3) recommendations for the Governor's consideration regarding the initial appointment of independent directors; *provided, however*, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing.

**D.    Officers of Reorganized COFINA**

To the extent applicable, the board of directors of Reorganized COFINA shall elect officers of Reorganized COFINA as of or after the Effective Date.

**E.    Structure for Collection and Application of COFINA Pledged Taxes**

The COFINA Bonds shall be issued by Reorganized COFINA pursuant to the New Bond Legislation and the New Bond Indenture, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the Plan of Adjustment and as reflected in the Term Sheet. Reorganized COFINA shall be authorized, but not required, to enter into one or more agreements, including, without limitation, the New Banking Services Agreement, providing for the collection and deposit of the COFINA Pledged Taxes, which agreement or agreements may provide, among other things, that the COFINA Portion shall be (a)

169

promptly after collection, kept in segregated bank accounts maintained in one or more mainland U.S. banks and in the name of the trustee appointed under the New Bond Indenture and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

## XII.  Sales and Use Taxes

### A.  General

Pursuant to the provisions of Act No. 1-2011, as amended, also known as the Internal Revenue Code for a New Puerto Rico (the "PR Code"), the Government of Puerto Rico imposes a sales and use tax at a rate of 6.0% (the "Government SUT") and a sales and use tax surcharge at a rate of 4.5% (the "SUT Surcharge"). The PR Code also provides for the imposition of a sales and use tax by the municipalities at a rate of 1.0% (the "Municipal SUT"). The Government SUT, SUT Surcharge, and Municipal SUT are sometimes referred to collectively as the "SUT."

The PR Code provides that every merchant engaged in a business that sells taxable items must collect the SUT as a withholding agent, unless such merchant is otherwise exempted. The term "taxable items" includes: (i) tangible personal property, (ii) taxable services, and (iii) admission rights. The PR Code defines "tangible personal property" as including items or personal property that may be seen, weighed, measured, or touched, or that is in any manner perceptible to the senses, or that is susceptible to appropriation, including computer software and prepaid phone cards, among others. The term tangible personal property, however, excludes: (i) money or the equivalent of money, stock, bonds, notes, promissory notes, mortgages, insurance, securities, or other obligations, (ii) automobiles, propellants, all-terrain vehicles (ATVs), motorcycles, ships, heavy equipment, buses, and trucks, as said terms are defined in the PR Code, (iii) intangibles, (iv) gasoline, airplane fuel, gas oil or diesel oil, crude oil, partially manufactured and finished products derived from petroleum, and any other hydrocarbon mixture, except for propane gas and its byproducts and other gases of similar nature, (v) electric power generated by the Electric Power Authority or any other entity which generates electric power, and (vi) the water supplied by the Aqueducts and Sewers Authority.

The PR Code contains various exemptions on the imposition of the SUT. The following transactions are some of those that are exempt from the imposition of the SUT: (i) services or tangible personal property acquired by the Government, (ii) services provided by small merchants (persons with annual volume of business not exceeding $50,000), and (iii) advertising services and legal services, which are excluded from the definition of taxable services.

The PR Code also provides for reduced rates based on the type of transaction or the merchant processing the transaction. For example, merchants rendering services directly to another business are generally subject to a SUT at a reduced rate of 4.0% and are exempt from the Municipal SUT (the "B2B SUT"). The B2B SUT also applies to services rendered by a foreign person (which includes entities organized outside of Puerto Rico and/or entities that are not Puerto Rico residents, not doing business in Puerto Rico) to an entity doing business in Puerto Rico. Although the B2B SUT applies to a broad scope of services, the following services are not treated as transactions subject to the B2B SUT and, hence, are currently subject to the

170

SUT: (i) banking charges and fees imposed by financial institutions to their business clients for the management of their deposit accounts, (ii) collection services, (iii) security services, including armored services and private investigation services, (iv) cleaning services, (v) laundry services, (vi) repair and maintenance services of tangible personal property, (vii) telecommunication services, (viii) waste disposal services, and (ix) daily rental of motor vehicles.

The SUT has various components that are distributed based on the source of the particular revenues. The Government SUT is comprised of revenues collected as a result of the imposition of the sales and use tax at a rate of (i) 5.5% (the Pledged Sales Tax) and (ii) 0.5% (the "FAM SUT").

Exhibit 1 below shows the SUT collections since 2006. Exhibit 2 below shows the historical allocation of the SUT between FAM, COFINA and the Government.

EXHIBIT 1: SALES AND USE TAX HISTORICAL COLLECTIONS[1] (10.5%)



[1] SUT historical collections source: http://www.hacienda.gobierno.pr/inversionistas/estadisticas-y-recaudos-statistics-andrevenues/ingresos-del-impuesto-sobre-ventas-y-uso-ivu-sales-and-use-tax-sut-revenues. Increased SUT collections beginning in fiscal year 2016 are due primarily to the imposition of the SUT Surcharge, which is not part of the COFINA Pledged Taxes.

*[Remainder of page intentionally left blank]*

171

EXHIBIT 2: ALLOCATION OF SALES AND USE TAX



**Allocation of Sales and Use Tax[1]**

1 $3.2 million of SUT revenues flow to CINE every year.
2 Up to annual cap of $420 million in 2019, which grows by 4.0% each year to a maximum of $993 million.

## B.    Collections by Source

The chart below illustrates the composition of the Sales Tax collections attributable to sales made during fiscal year 2018 based on actual receipts by the Treasury Department from July 1, 2017 to June 30, 2018.  Of the fiscal year 2018 collections, approximately 39.8% were from retail trade activity (including 30.1% from General Merchandise, 14.5% from Homegoods Retailers, 15.9% from Landscaping and Construction Materials, 14.2% from Clothing and Accessories and 10.6% were from Auto Parts).



**Commonwealth Sales Tax Collections by Source for Fiscal Year 2017-2018**

## C.     COFINA Pledged Taxes

The COFINA Pledged Taxes are the present and future revenues and collections generated by the portion of the Government SUT that corresponds to a tax rate of five and one-half percent (5.5%).  The COFINA Portion consists of the COFINA Pledged Taxes and all rights thereto, including, without limitation, the right to receive the "first dollars" collected by the portion of the Government SUT at a tax rate of five and one half percent (5.5%) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the Pledged Sales Tax Base Amount in any given fiscal year until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

**HISTORICAL AND ESTIMATED SUT COLLECTIONS**
*(in millions of dollars)*

173

| Year Ended June 30, | Total SUT[1] | B2B | 4.5% Unpledged SUT | Adjusted SUT[2] | FAM[3] | 5.5% Pledged SUT |
|---|---|---|---|---|---|---|
| 2008 | $ 1,144 | $ | $ - | $ 1,144 | $ - | $ 1,144 |
| 2009 | $ 993 | $ | $ - | $ 993 | $ - | $ 993 |
| 2010 | $ 1,094 | $ | $ - | $ 1,094 | $ - | $ 1,094 |
| 2011 | $ 1,107 | $ | $ - | $ 1,107 | $ - | $ 1,107 |
| 2012 | $ 1,138 | $ | $ - | $ 1,138 | $ - | $ 1,138 |
| 2013 | $ 1,162 | $ | $ - | $ 1,162 | $ - | $ 1,162 |
| 2014 | $ 1,242 | $ | $ - | $ 1,242 | $ - | $ 1,242 |
| 2015 | $ 1,417 | $ | $ - | $ 1,417 | $ 118 | $ 1,299 |
| 2016 | $ 2,377 | $ 92 | $ 979 | $ 1,306 | $ 109 | $ 1,197 |
| 2017 | $ 2,548 | $ 166 | $ 1,021 | $ 1,361 | $ 113 | $ 1,248 |
| 2018 | $ 2,522 | $ 183 | $ 1,003 | $ 1,337 | $ 111 | $ 1,225 |
| | $ 16,744 | $ 441 | $ 3,003 | $ 13,301 | $ 452 | $ 12,849 |

[1] Total SUT is sourced from Hacienda.

[2] Adjusted SUT is shown to illustrate the removal of B2B as it is not pledged to collateral, as such, FY16 through FY18 will not tie to Hacienda's reported SUT due to the removal of B2B.

[3] FAM is the spanish acronym for the Municipal Administration Fund, a fund created to provide a financial mechanism to finance the debt of municipalities

*[Remainder of page intentionally left blank]*

## HISTORICAL AND ESTIMATED COFINA PLEDGED TAX COLLECTIONS
*(in thousands of dollars)*

| | FISCAL YEAR 2016 | FISCAL YEAR 2017 | FISCAL YEAR 2018 |
|---|---|---|---|
| July | $ 80,843 | $103,203 | $105,427 |
| August | 99,928 | 105,229 | 118,234 |
| September | 93,151 | 99,186 | 82,768 |
| October | 94,771 | 97,688 | 53,921 |
| November | 96,593 | 103,480 | 77,844 |
| December | 107,876 | 108,796 | 111,202 |
| January | 122,651 | 126,596 | 110,824 |
| February | 96,523 | 99,405 | 103,119 |
| March | 98,186 | 96,863 | 105,603 |

| | | | |
|---|---|---|---|
| April | 101,939 | 102,427 | 114,599 |
| May | 99,045 | 97,455 | 118,935 |
| June | 105,402 | 107,565 | 122,803 |

## XIII.  **Commonwealth Economic Indicators**

### A.  **General**

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of SUT revenues. This summary does not purport to discuss all of the variables that may impact the level of SUT revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the future level of SUT revenues.

### B.  **Historical Population Trends**

According to the United States Census Bureau, the population of Puerto Rico was 3,337,177 in 2017, compared to 3,406,520 in 2016. The population of San Juan, the island's capital and largest city, was 346,534 in 2016 compared to 337,288 in 2017.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2015 and 2016, the real gross national product contracted by 0.8% and 1.3%, respectively. For fiscal year 2017, preliminary reports indicate that the real gross national product contracted by 2.4%. The Oversight Board projects a decrease in real gross national product of 8.0% for fiscal year 2018 and an increase of 7.8% for fiscal year 2019.

The economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth are GNP and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Government to make projections of SUT revenues.

175

## C.    Historical Personal Income Trends

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2017. In fiscal year 2017, aggregate personal income was $64.5 billion ($46.8 billion at 2005 prices) and personal income per capita was $19,140 ($13,873 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $18.5 billion in fiscal year 2017 ($17.1 billion in fiscal year 2016). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $15.2 billion, or 82.1% of the transfer payments to individuals in fiscal year 2017 ($13.7 billion, or 79.9%, in fiscal year 2016). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2017.

*[Remainder of page intentionally left blank]*

**Commonwealth of Puerto Rico**
**Personal Income**
*(in millions of dollars)*

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2013** | **2014** | **2015** | **2016** | **2017**[1] |
| Employees' compensation | | | | | |
|   Business, household and nonprofit institutions | 20,401.7 | 20,378.1 | 20,410.0 | 20,158.3 | 20,258.8 |
|   Government | 8,237.5 | 7,825.1 | 7,264.0 | 7,263.0 | 7,127.9 |

176

| | | | | | |
|---|---|---|---|---|---|
| Other | 1,201.9 | 1,146.0 | 1,199.9 | 1,221.1 | 1,279.8 |
| Total Employees' compensation | $29,841.1 | $29,349.3 | $28,873.9 | $28,615.4 | $28,666.4 |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,150.9 | 2,236.8 | $2,172.4 | 2,159.5 | $2,176.2 |
| Employers | 3,136.0 | 3,134.4 | $3,076.1 | 3,194.7 | $3,372.5 |
| Total Contributions for social insurance | $5,286.9 | $5,371.2 | $5,248.5 | $5,354.2 | $5,548.7 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,805.5 | 2,912.2 | 3,120.5 | 3,428.5 | 3,396.6 |
| Dividends of domestic corporations | 239.3 | 224.9 | 223.5 | 232.0 | 241.1 |
| Miscellaneous income and dividends received from abroad | 5.7 | 7.0 | 6.9 | 7.4 | 7.9 |
| Rental income of persons | 9,668.3 | 9,490.3 | 9,346.8 | 9,116.3 | 8,964.4 |
| Personal interest income | 2,699.9 | 2,424.0 | 3,189.5 | 3,179.3 | 3,181.1 |
| Total Proprietors' income | $15,418.7 | $15,058.5 | $15,887.2 | $15,963.6 | $15,791.1 |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 5,468.2 | 5,741.5 | 5,798.0 | 5,905.1 | 5,943.0 |
| Federal government | 16,299.7 | 16,324.1 | 16,399.0 | 16,464.2 | 17,776.4 |
| U.S. state governments | 29.9 | 30.3 | 33.5 | 33.9 | 30.4 |
| Business | 1,971.1 | 1,556.7 | 1,570.0 | 1,498.0 | 1,406.7 |
| Other nonresidents | 417.9 | 426.5 | 443.3 | 461.1 | 475.4 |
| Total transfer payments | $24,186.8 | $24,079.1 | $24,243.7 | $24,362.4 | $25,631.9 |
| Total Personal Income | $64,159.7 | $63,115.7 | $63,756.3 | $63,587.2 | $64,540.7 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board

## D.    Historical Personal Consumption Trends

During Fiscal Year 2017, at current prices, personal consumption amounted to $61.6 billion, representing an increase of $0.07 billion or 0.1%, from Fiscal Year 2016. This increase was based on a 1.2% increase in services (52.4% of personal consumption); however, durable goods decreased 0.8% (9.0% of personal consumption), and nondurable goods decreased 1.1% (38.5% of personal consumption). At constant 2005 prices, personal consumption decreased 2.0%. Real consumption expenditures in durable goods decreased by 0.5%, nondurable goods decreased by 4.6% and services decreased by 1.1% from Fiscal Year 2016. The decline in expenditures of durable goods is characteristic of economies in recession.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2017.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
*(in millions of dollars)*

| | | Fiscal Years Ended June 30 | | | |
|---|---|---|---|---|---|
| | 2013 | 2014 | 2015 | 2016 | 2017[1] |

| | | | | | |
|---|---|---|---|---|---|
| Food | 9,534.9 | 9,209.0 | 9,401.0 | 8,887.3 | 8,820.6 |
| Alcoholic beverages and tobacco products | 1,899.9 | 1,923.5 | 1,877.0 | 1,727.6 | 1,748.4 |
| Clothing and accessories | 3,203.7 | 2,827.5 | 2,578.8 | 2,391.3 | 2,067.2 |
| Personal care | 1,332.6 | 1,309.2 | 1,483.1 | 1,374.5 | 1,263.6 |
| Housing | 12,987.8 | 12,882.5 | 13,470.0 | 14,049.3 | 14,926.0 |
| Household operations | 2,360.9 | 2,519.0 | 2,569.0 | 2,532.2 | 2,165.6 |
| Medical care and funeral expenses | 11,608.7 | 11,673.2 | 12,482.1 | 13,060.0 | 13,432.6 |
| Business services | 2,733.7 | 2,770.8 | 2,556.2 | 2,445.0 | 2,462.7 |
| Transportation | 1,408.0 | 1,436.1 | 1,232.8 | 1,279.0 | 1,269.9 |
| Recreation | 3,662.0 | 3,907.6 | 4,233.5 | 4,643.4 | 4,443.1 |
| Gasoline and Oil | 3,191.9 | 3,241.0 | 2,553.3 | 2,077.1 | 2,105.4 |
| Education | 2,078.7 | 2,065.1 | 1,996.5 | 1,871.0 | 1,836.8 |
| Automobiles | 2,829.4 | 2,635.2 | 2,241.0 | 2,230.0 | 2,309.6 |
| Miscellaneous purchases | 3,645.3 | 3,499.6 | 2,966.1 | 2,928.9 | 2,711.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $65,788.2 | $65,388.0 | $65,465.5 | $65,481.4 | $65,652.8 |
| Less: Expenditures in Puerto Rico by nonresidents | (3,310.6) | (3,438.6) | (3,825.0) | (3,984.8) | (4,090.1) |
| Total Personal Consumption Expenditures | $62,477.6 | $61,899.4 | $61,640.5 | $61,496.6 | $61,562.7 |

(1) Preliminary figures.
Source: Puerto Rico Planning Board.

## E.    Historical GNP Trends

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to GNP and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2017.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30, 2013, Through June 30, 2017**

| 2013 | 2014 | 2015 | 2016 | 2017[1] |
|---|---|---|---|---|

101361236v29

| Gross national product — $ millions [2] | $68,944.9 | $68,797.5 | $69,602.0 | $70,221.8 | $70,565.4 |
| Real gross national product — $ millions ([2005] prices) | $48,433.5 | $47,580.8 | $47,193.0 | $46,569.7 | $45,477.7 |
| Annual percentage increase (decrease) in real gross national product [(2005] | (0.1) % | (1.8) % | (0.8) % | (1.3) % | (2.4) % |
| U.S. annual percentage increase in real gross national product [(2005) prices) [3] | 1.8 % | 2.5 % | 2.9 % | 1.6 % | 2.2 % |

[1]   Preliminary.
[2]   In current dollars.
*Sources:* Puerto Rico Planning Board
[3]   IMF World Economic Outlook Database, October 2018.

## XIV.   Certain Risk Factors to Be Considered

AS WITH ANY INVESTMENT, RECOVERIES ON THE COFINA BONDS INVOLVE RISKS. YOU SHOULD CAREFULLY CONSIDER THE RISK FACTORS SET FORTH BELOW REGARDING THE PLAN OF ADJUSTMENT AND COFINA BONDS, AS WELL AS ALL OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT. THE FOLLOWING RISK FACTORS ARE NOT THE ONLY RISKS COFINA FACES, ARE NOT MEANT TO BE A COMPLETE LIST OF RISKS ASSOCIATED WITH THE PLAN OF ADJUSTMENT OR THE COFINA BONDS AND DO NOT NECESSARILY REFLECT THE RELATIVE IMPORTANCE OF VARIOUS RISKS. ADDITIONAL RISKS AND UNCERTAINTIES NOT CURRENTLY KNOWN TO THE DEBTOR OR THAT THE DEBTOR DOES NOT CURRENTLY CONSIDER TO BE MATERIAL, OR THAT ARE GENERALLY APPLICABLE TO ALL GOVERNMENTAL INSTRUMENTALITIES, ALSO MAY MATERIALLY AND ADVERSELY AFFECT COFINA AND COFINA'S ABILITY TO CONSUMMATE THE PLAN OF ADJUSTMENT AND MAKE PAYMENTS ON THE COFINA BONDS. YOU ARE ADVISED TO CONSIDER THE FOLLOWING RISK FACTORS, AMONG OTHERS, AND TO REVIEW THE OTHER INFORMATION CONTAINED OR INCORPORATED BY REFERENCE INTO THIS DISCLOSURE STATEMENT BEFORE MAKING ANY DECISIONS WITH RESPECT TO THE PLAN OF ADJUSTMENT OR COFINA BONDS. ANY ONE OR MORE OF THE FACTORS DISCUSSED HEREIN, AND OTHER FACTORS NOT DESCRIBED HEREIN, COULD AFFECT RECOVERIES UNDER THE PLAN OF ADJUSTMENT OR LEAD TO A DECREASE IN THE MARKET VALUE AND THE LIQUIDITY OF THE COFINA BONDS. THERE CAN BE NO ASSURANCE THAT OTHER RISK FACTORS NOT DISCUSSED BELOW WILL NOT BECOME MATERIAL IN THE FUTURE.

NEITHER THE DEBTOR NOR ANY FEDERAL, STATE, OR COMMONWEALTH SECURITIES COMMISSION OR REGULATORY AUTHORITY HAS APPROVED OR DISAPPROVED THE COFINA BONDS AND OTHER SECURITIES TO BE ISSUED PURSUANT TO THE PLAN OF ADJUSTMENT OR PASSED ON THE ADEQUACY OR ACCURACY OF THIS DISCLOSURE STATEMENT.

179

A.      **Risks Related to the Title III Case**

*The Title III Court may not confirm the Plan of Adjustment.*

PROMESA section 314(b) and Bankruptcy Code section 1129 (in its incorporated parts) set forth the requirements for confirmation of a Title III plan of adjustment, and require the Title III Court to make a series of specified, independent findings.  There can be no assurance that the Title III Court will find that the Plan of Adjustment meets all of these requirements and confirm the Plan of Adjustment.  If the Plan of Adjustment is not confirmed, it is uncertain what recoveries, if any, holders would receive with respect to their Claims under an alternative plan of adjustment or under other applicable law if the Title III Court dismissed the Title III Case.  For additional information, see Section VII.C of this Disclosure Statement, entitled "Requirements for Confirmation of the Plan of Adjustment."

*The Title III Court has not approved or disapproved the Fiscal Plan.*

Under PROMESA section 314(b)(7), the Plan of Adjustment must be consistent with the COFINA Fiscal Plan certified by the Oversight Board.  Although the Oversight Board has certified under PROMESA section 104(j)(3) that the Plan of Adjustment is consistent with the COFINA Fiscal Plan, PROMESA section 314(b) requires that the Title III Court make an independent determination as to whether the Plan of Adjustment is consistent with the COFINA Fiscal Plan. Therefore, there can be no assurance that the Title III Court will find that the Plan of Adjustment is consistent with the COFINA Fiscal Plan.

*The Title III Court may not approve the settlements and compromises in the Plan of Adjustment or the Settlement Motion contemporaneously filed in the Commonwealth Title III Case.*

The Plan of Adjustment is contingent on the approval of the Settlement Motion in the Commonwealth Title III Case.  Concurrently with the Debtor's filing of the Plan of Adjustment in the Title III Case, the Oversight Board, in its capacity as representative of the Commonwealth in the Commonwealth Title III Case pursuant to PROMESA section 315(b), filed the Settlement Motion in the Commonwealth Title III Case, which Settlement Motion seeks, among other things, court approval of the compromise and settlement of the Commonwealth-COFINA Dispute in accordance with the terms and provisions of the Settlement Agreement.  For the Settlement Motion to be approved, the Title III Court must find that the Commonwealth-COFINA Dispute settlement satisfies the requirements of Bankruptcy Rule 9019, meaning that the settlement would have to be found to not fall below the lowest point in the range of reasonableness in view of, among other things, the legal issues being resolved by the settlement.

The Debtor believes that the significant compromises and settlements reflected in the Plan of Adjustment and Settlement Agreement are fair, equitable, and reasonable.  Such compromises and settlements are an integral part of the Plan of Adjustment, and they provide value and certainty for COFINA and all Creditors by eliminating significant litigation risk and expenses, and providing a framework for COFINA to emerge from Title III expeditiously.

While parties to the Plan Support Agreement include holders of billions of dollars in Claims against the Commonwealth, other parties in interest in the Commonwealth Title III Case

may object to the Settlement Motion.  For example, the Creditors' Committee has threatened to object to the Settlement Motion.  There can be no assurance that the Settlement Motion will be approved.  If the Settlement Motion is not approved in the Commonwealth Title III Case, the Debtor may not be able to confirm the Plan of Adjustment.

The Plan of Adjustment may also be contingent on the approval of other settlements and compromises resolved under the Plan of Adjustment.  If the settlements and compromises contained in the Plan of Adjustment require approval, but are not approved, the Debtor may not be able to confirm the Plan of Adjustment.

***The Effective Date may not occur.***

Article XXV of the Plan of Adjustment provides for certain conditions that must be satisfied (or waived) prior to the occurrence of the Effective Date.  Many of the conditions are outside of the control of COFINA.  As of the date of this Disclosure Statement, there can be no assurance that any or all of the conditions to effectiveness of the Plan of Adjustment will be satisfied (or waived).  Accordingly, even if the Plan of Adjustment is confirmed by the Title III Court, there can be no assurance that the Plan of Adjustment will be consummated and the adjustment of COFINA's debts completed. See Section VI.M of this Disclosure Statement, entitled "Conditions Precedent to the Effective Date" (description of the conditions to the effectiveness of the Plan of Adjustment).  In addition, certain agreements contemplated in the Plan of Adjustment impose conditions that must be satisfied as of the Effective Date.  There can be no assurance that such conditions will be timely satisfied or waived.

***If the Amended PSA is terminated, the ability of the Debtor to consummate the Plan of Adjustment may be materially and adversely affected.***

The Amended PSA contains a number of termination events, upon the occurrence of which certain parties to the Amended PSA may terminate or withdraw from such agreement. For example, if certain milestones are not met (including with respect to consummation of the Plan of Adjustment), certain parties may have the right to terminate or withdraw from the Amended PSA.  If the Amended PSA is terminated, each of the parties thereto will be released from their obligations in accordance with the terms of the Amended PSA. In addition, upon the occurrence of certain events, individual parties to the Amended PSA may withdraw from such agreement and be released from their obligations under such agreement. For instance, each creditor party to the Amended PSA may terminate the Amended PSA, solely as to itself, if the Debtor withdraws the Settlement Motion, the Plan of Adjustment, the Disclosure Statement, or the motion seeking entry of an order approving the Disclosure Statement, or files any motion or pleading with the Title III Court, in each case, that is inconsistent with the Amended PSA in any material respect and such motion or pleading has not been withdrawn within a specified period of time. The withdrawal of support by creditors from, or the termination of, the Amended PSA may have a material adverse effect on the Debtor's ability to consummate the Plan of Adjustment.

*The amount of Cash allocated to Rounding Amount Cash may be insufficient to ensure that certain holders of Allowed Claims receive their Pro Rata Share of CIBs in the minimum par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond.*

Holders of Allowed Claims classified in Classes 1 through 8, if necessary, may receive a distribution of Rounding Amount Cash, depending on the elections of such holders, as appropriate, and, with respect to the holder of the GS Derivative Claim (to the extent it is an Allowed Claim), the priority nature of the GS Derivative Claim. The Plan defines Rounding Amount Cash to mean the amount of Cash necessary, up to a maximum aggregate amount of Twenty-Five Million Dollars ($25,000,000.00), for distribution to such holders in the form of rounding amounts to ensure that such holders receive their Pro Rata Share of CIBs, in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond. The aggregate amount of Cash necessary to ensure that such holders receive their Pro Rata Share of CIBs in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond, however, may exceed Twenty-Five Million Dollars ($25,000,000.00). If the aggregate amount of Cash necessary to ensure that such holders receive their Pro Rata Share of CIBs in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond exceeds Twenty-Five Million Dollars ($25,000,000.00), such holders' Pro Rata Share of CIBs may be truncated and Rounding Amount Cash limited to their share of the available Twenty-Five Million Dollars ($25,000,000.00).

*Distributions on account of the GS Derivative Claim may dilute distributions on account of Bond Claims*

Pursuant to Section 12.1 of the Plan of Adjustment, the holder of the GS Derivative Claim may receive a Pro Rata Share of the Senior COFINA Bond Distribution, consisting of COFINA Cash Available for Distribution, COFINA Bonds and, if necessary, Rounding Amount Cash, if (i) all or any portion of the GS Derivative Claim becomes an Allowed Claim, (ii) the amount of such Allowed Claim exceeds the value of collateral in the holder's possession, and (iii) to the extent of the excess, such Allowed Claim is a "Parity Obligation" under the bond Resolution. Distributions of COFINA Cash Available for Distribution, COFINA Bonds, and Rounding Amount Cash to holders of Bond Claims are subject to dilution under these circumstances.

**B.     Risks Related to COFINA**

*The financial information contained herein is based upon COFINA's books and records and publicly available information as of the date hereof or the date to which such information relates, as applicable; no audit or independent examination of such information was performed.*

The financial information contained herein has not been, and will not be, audited or reviewed by any independent accounting firm or third party and is limited in scope. Although the Debtor believes that it has used its reasonable efforts to assure the accuracy of the financial information provided herein, there can be no assurance that the financial information contained herein is without material inaccuracies or inconsistencies. In addition, the historical data provided in this Disclosure Statement relating to SUT Revenue may differ substantially from

future SUT Revenue. The Debtor has not independently verified the financial information contained herein, including any information contained herein regarding the projected future SUT Revenue. Furthermore, certain events that are not within the control of COFINA may materially impact future SUT Revenue. As a result, you are cautioned not to place undue reliance on any of the financial information contained herein.

***The Debtor has no duty to update the statements contained in this Disclosure Statement.***

The statements contained in this Disclosure Statement are made by the Debtor as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has been no change in the information set forth herein since that date. The Debtor has no duty to update this Disclosure Statement unless otherwise ordered to do so by the Title III Court or as required under the Bankruptcy Code or Bankruptcy Rules.

***No representations outside this Disclosure Statement are authorized.***

No representations concerning or related to COFINA, the Title III Case, or the Plan of Adjustment are authorized by the Title III Court, PROMESA, or the Bankruptcy Code, other than as set forth in this Disclosure Statement and any other Solicitation Materials that accompany this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan of Adjustment that are other than as contained in, or included with, this Disclosure Statement should be relied upon by you at your own risk in arriving at your decision.

***Financial reporting going forward may not be completed on a timely basis.***

COFINA's most recent audited financial statements was released as of and for the year ended June 30, 2015. No guaranty can be made as to the availability of current audited financial statements or COFINA's ability to provide financial reporting on a timely basis.

## C.    Risks Related to the COFINA Bonds

***The COFINA Bonds are special limited obligations of COFINA payable solely from, secured solely by, and having recourse solely to, the COFINA Pledged Taxes. The COFINA Bonds are not indebtedness or liabilities of the Commonwealth or any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Bonds are not backed by the good faith, credit and taxing power of the Commonwealth, nor are they payable or secured by any of the Commonwealth's public instrumentalities or political subdivisions, other than COFINA. The COFINA Bonds represent indebtedness solely of COFINA and will not be insured or guaranteed by the Commonwealth, the Trustee or any of their respective affiliates, or any other Commonwealth government entity.***

As a result of concerns with the Commonwealth's current financial circumstances, holders of the COFINA Bonds may encounter limited market acceptance upon any attempt to sell COFINA Bonds, making sales at or near par potentially difficult. Holders of COFINA Bonds after the Effective Date may not be able to sell such bonds for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of such bonds before a potential purchaser would be willing to purchase COFINA Bonds. There can be no assurance that a secondary market will exist for any COFINA Bonds. The absence of a

secondary market for the COFINA Bonds or a lack of liquidity in the secondary markets could limit bondholders' ability to resell any COFINA Bonds or adversely affect the market value of the COFINA Bonds.

The COFINA Bonds and transactions described herein will be made on the basis of exemptions from registration provided in the Securities Act of 1933, as amended. The COFINA Bonds have not been approved or disapproved by the United States Securities and Exchange Commission, any state or Commonwealth securities commission or any other regulatory authority, nor have any of the forgoing passed upon the accuracy or adequacy of this Disclosure Statement. Any representation to the contrary is a criminal offense. Therefore, the secondary market for the COFINA Bonds may be limited, and bondholders may not be able to sell the COFINA Bonds when they want to do so or obtain the price that they wish to receive for the COFINA Bonds, and, as a result, could suffer significant losses.

Given the unique nature of the Plan of Adjustment, certain closing conditions and closing deliverables, including legal opinions, with respect to the Plan of Adjustment will differ in type and scope from those typically required in municipal debt offering transactions that occur outside of a court-supervised restructuring process. In making their investment decision, investors should consider that certain actions, procedures or requirements of legal advisors and other third parties in connection with the Plan of Adjustment will differ materially from and be more limited than those typical requirements.

Major disruptions in the global financial markets in recent years have caused a significant reduction in liquidity in the secondary market for securities. While conditions in the financial markets and the secondary markets have improved, periods of illiquidity could occur again and affect the secondary market, thereby materially adversely affecting the value of the COFINA Bonds and limiting bondholders' ability to sell the COFINA Bonds. Concerns with the Commonwealth's fiscal crisis may also adversely affect the market value and liquidity of the COFINA Bonds.

### Limited Nature of Remedies

Upon any declaration of default under the New Bond Indenture, Reorganized COFINA's payment of the COFINA Bonds cannot be accelerated.

### Limited Nature of Ratings; Reductions, Suspension, or Withdrawal of a Rating

While COFINA has agreed to use commercially reasonable best efforts to obtain ratings on the COFINA Bonds as soon as reasonably practicable as determined solely by COFINA, the New Bond Indenture will not include a covenant by COFINA to maintain a specific rating with respect to outstanding COFINA Bonds.

Any future rating assigned to the COFINA Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the COFINA Bonds on their respective maturity or mandatory redemption dates. Any rating of the COFINA Bonds is not a recommendation to purchase, hold or sell such COFINA Bonds and such rating will not address the marketability of such COFINA Bonds, their market price, or suitability for a particular investor. There is no assurance that any rating will remain for any

given period of time or that any rating will not be lowered, suspended, or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for Reorganized COFINA or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the COFINA Bonds.

**An adverse rating of the COFINA Bonds could adversely affect the market price of the COFINA Bonds and/or the Trust Certificates.**

Notwithstanding that COFINA will not initially solicit a rating, a rating agency may issue an unsolicited rating on the COFINA Bonds, employing quantitative and qualitative factors, including Reorganized COFINA's actual or perceived financial strength, the prospects for payment of principal and interest on the COFINA Bonds, the impact of the Commonwealth's fiscal crisis, and other macroeconomic conditions in the Commonwealth related to the collection of sales tax revenues or otherwise. Ratings also reflect various methodologies and assumptions used by the rating agencies, which are subject to change without notice. Actions taken by the rating agencies can include initiating, maintaining, upgrading, downgrading or withdrawing a current rating of Reorganized COFINA's indebtedness or placing Reorganized COFINA on negative outlook for possible future downgrading. Such action may be taken at any time and is beyond COFINA's control. The downgrade or withdrawal of any credit rating of Reorganized COFINA's indebtedness, including the COFINA Bonds, or placing Reorganized COFINA on negative outlook for possible future downgrading may have a negative effect on the value of the COFINA Bonds.

**The investment of holders electing to receive either an Ambac Certificate or a National Certificate will be dependent on the business and financial prospects of Ambac and National, respectively.**

If you are eligible and properly elect to receive either an Ambac Certificate or a National Certificate, then your investment will also be dependent on the business and financial prospects of Ambac or National, respectively. Holders that elect to receive trust certificates should, in addition to evaluating the ability of Reorganized COFINA to fulfill its obligations under the COFINA Bonds, also evaluate the ability of the applicable insurer to make payments on the applicable insurance policies deposited as trust assets for the benefit of the trusts. In recent years, many bond insurers have become significantly weaker from a financial perspective. If an insurer experiences financial difficulties of its own in the future, it may not be able to make payments on the applicable insurance policies deposited as trust assets for the benefit of the bondholders.

**Risks Relating to Making or Declining to Make the Commutation Election - Senior COFINA Bond Claims (Ambac) and Senior COFINA Bond Claims (National)**

The Plan of Adjustment provides holders of Class 2 Senior COFINA Bond Claims (Ambac) and Class 3 Senior COFINA Bond Claims (National) with an option to choose whether to commute their insurance policies or to receive a distribution of Ambac Certificates or National Certificates, as applicable. A holder of an Allowed Senior COFINA Bond Claim (Ambac) that does not validly elect to receive Ambac Certificates will have, on or after the Effective Date, the

Ambac Insured Bonds, including the obligations of Ambac under the related Ambac Insurance Policy, underlying such holder's Allowed Senior COFINA Bond Claim (Ambac) canceled and such holder shall receive distributions in accordance with section 6.1(a) of the Plan of Adjustment. Similarly, a holder of an Allowed Senior COFINA Bond Claim (National) that does not validly elect to receive National Certificates will have, on or after the Effective Date, the National Insured Bonds, including the obligations of National under the related National Insurance Policies, underlying such holder's Allowed Senior COFINA Bond Claim (National) canceled and such holder shall receive distributions in accordance with section 7.1(a) of the Plan of Adjustment.

The ability of a non-commuting holder of Class 2 or Class 3 Claims to recover on account of its Allowed Claims is subject to the collection risk associated with the applicable insurer (*i.e.*, Ambac or National). The holders of Class 2 and Class 3 Claims should investigate the financial condition of Ambac and National, as applicable, prior to determining whether to make the commutation election under the Plan of Adjustment.

Future events could occur that could give rise to payment or other counterparty risks with respect to each of Ambac and National. Such risks could attach to the Ambac Certificates and National Certificates, as applicable, and the Debtor can make no guarantee that any holder would be able to realize any particular level of recovery from its insurer.

### Risks Relating to the Ambac Certificates

Holders that elect to receive Ambac Certificates will be subject to additional risks including, but not limited to, the following:

- The Ambac Certificates are not expected to be liquid. There will be no market for the Ambac Certificates before the issuance of the Ambac Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the Ambac Certificates;

- Distributions to holders of Ambac Certificates from payments received on the Taxable COFINA Bonds will not be distributed to holders of the Ambac Certificates if Ambac directs the Trustee to reinvest such distributions. Accordingly, there can be no guarantee as to when holders of Ambac Certificates will receive distributions on the Taxable COFINA Bonds;

- Holders of Ambac Certificates will likely receive both taxable and tax-exempt income on account of their Ambac Certificates. It is anticipated that distributions on the tax-exempt COFINA Bonds will be passed-through to holders of Ambac Certificates as tax-exempt distributions, but none of COFINA, the Ambac Trust, or Ambac makes any assurance that such distributions will be tax exempt. Certain distributions on the Ambac Certificates are expected not to be tax exempt and holders of Senior COFINA Bond Claims (Ambac) that intend to elect to receive the Ambac Certificates should consider the impact of this characterization on their individual tax position. Holders of Ambac Certificates

186

may also be deemed to receive taxable income in excess of distributions made to them ("phantom income"), which could result in the holders having obligations to pay taxes in amounts that exceed distributions from the Ambac Trust.  To the extent that distributions on the Ambac Certificates represent proceeds of sales or other dispositions of the COFINA Bonds, any gains on such sales will be treated as taxable to the holders of Ambac Certificates unless offset by losses.  See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds."  Holders are urged to discuss the potential acquisition of the Ambac Certificates with their tax and accounting advisors before making any election relating thereto;

- The potential mix of tax-exempt and taxable income on the Ambac Certificates, as well as the absence of assurances by COFINA, the Ambac Trust or Ambac that distributions by the Ambac Trust of tax-exempt income received by the Ambac Trust on tax-exempt COFINA Bonds will be tax-exempt, may adversely affect the ability to resell Ambac Certificates and/or the price at which Ambac Certificates may be resold;

- Each distribution on the Ambac Certificates will reduce the related obligation of Ambac under the Ambac Insurance Policy.  Notwithstanding any tax that is payable by a holder of Ambac Certificates on account of distributions from the Ambac Trust, the gross amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder) will reduce Ambac's obligations under the Ambac Insurance Policy;

- Early payments may leave a holder of Ambac Certificates unable to reinvest in comparable investments;

- The Ambac Trust is expected to be treated as a partnership for U.S. federal income tax purposes and, accordingly, holders of Ambac Certificates will receive partnership reporting statements for tax purposes.  It will be the obligation of holders of the Ambac Certificates to provide the Ambac Trust with sufficient information for the Ambac Trust to prepare such reporting.  See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds."  Holders are urged to discuss the potential acquisition of the Ambac Certificates with their tax and accounting advisors before making any election relating thereto;

- No holder of Ambac Certificates will have the right to direct the trustee to take any action with respect to the Ambac Trust Assets.  The applicable Trust Agreement will provide that Ambac will have the right to direct the trustee to dispose of COFINA Bonds or take certain other actions in respect of the Ambac Trust Assets, including any actions permitted of a holder of the COFINA Bonds.  Accordingly, the Ambac Trust may not take actions with respect to the COFINA Bonds (such as selling the COFINA Bonds or enforcing remedies under the COFINA Bonds) that an investor would take if it held the COFINA Bonds directly;

187

- Except as provided under the Ambac Insurance Policy, holders of the Ambac Certificates will have no recourse to the trustee of the Ambac Certificates, Ambac, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the Ambac Certificates, except as set forth in the Ambac Insurance Policy and the trust agreement. Additionally, only the Ambac Trust itself (and not the holders of Ambac Certificates) will have recourse to the Ambac Insurance Policy insuring the bonds underlying the Senior COFINA Bond Claims (Ambac). The Ambac Certificates will be obligations of the Ambac Trust and distributions thereon will only be made out of the Ambac Trust Assets;

- There will be no obligation to obtain ratings on the Ambac Certificates. However, a rating agency may issue an unsolicited rating on the Ambac Certificates. Such action may be taken at any time and is beyond the control of COFINA, Ambac, and the holders of Ambac Certificates. Such rating may have a negative effect on the value of the Ambac Certificates; and

- The value of the Ambac Certificates will be dependent in part on the business and financial prospects of Ambac. Holders of Ambac Certificates should, in addition to evaluating the ability of COFINA to fulfill its obligations under the COFINA Bonds, also evaluate the ability of Ambac to fulfill its obligations under the Ambac Insurance Policy. If Ambac experiences financial difficulties of its own in the future, it may not be able to make payments on the Ambac Insurance Policy deposited as trust assets for the benefit of the trusts.

### Risks Relating to the National Certificates

Holders that elect to receive National Certificates will be subject to additional risks including, but not limited to, the following:

- The National Certificates may not be liquid. There will be no market for the National Certificates before the issuance of the National Certificates and there can be no assurance that a secondary market will develop or, if it does develop, that it will provide liquidity of investment or that it will continue for the life of the National Certificates;

- Holders of National Certificates will likely receive both taxable and tax-exempt income on account of their National Certificates. It is anticipated that distributions on the tax-exempt COFINA Bonds will be passed-through to holders of National Certificates as tax-exempt distributions, but neither COFINA, the National Trust, nor National makes any assurance that such distributions will be tax exempt. Certain distributions on the National Certificates may not be tax exempt and holders of Senior COFINA Bond Claims (National) that intend to elect to receive the National Certificates should consider the impact of this characterization on their individual tax position. Holders of National Certificates may also be deemed to receive taxable income in excess of distributions made to them ("phantom income"), which could result in the holders having obligations to

188

pay taxes in amounts that exceed distributions from the National Trust. To the extent that distributions on the National Certificates represent proceeds of sales or other dispositions of the COFINA Bonds, any gains on such sales will be treated as taxable to the holders of National Certificates unless offset by losses. See "Material United States Federal Income Tax Considerations – Taxation on Sale or Other Disposition of Tax-Exempt COFINA Bonds." Holders are urged to discuss the potential acquisition of the National Certificates with their tax and accounting advisors before making any election relating thereto;

- The potential mix of tax-exempt and taxable income on the National Certificates, as well as the absence of assurances by COFINA, the National Trust or National that distributions by the National Trust of tax-exempt income received by the National Trust on tax-exempt COFINA Bonds will be tax-exempt, may adversely affect the ability to resell National Certificates and/or the price at which National Certificates may be resold;

- Pursuant to the terms of the trust agreement, each holder of National Certificates shall be entitled to its pro rata share of value in and any distribution of cash from the National Trust. In addition, National may, at any time prior to the dissolution of the National Trust, subject to the terms of the trust agreement, deliver or direct the trustee to deliver a general notice to all holders of National Certificates of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Trust. Each distribution on the National Certificates, including sale proceeds, will automatically reduce the related obligation of National under the National Insurance Policies as of the date of such distribution. Notwithstanding any tax that is payable by or on behalf of a holder of National Certificates on account of distributions from the National Trust, or payable by the National Trust itself, the gross amount of the distribution allocable to such holder (without any reduction for taxes payable by such holder or the National Trust) will reduce National's obligations under the National Insurance Policies;

- Early payments may leave a holder of National Certificates unable to reinvest in comparable investments;

- Subject to the terms of the trust agreement, National (1) will have the right to direct the trustee to sell COFINA Bonds from the National Trust and (2) so long as National is not in default under the National Insurance Policies and has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar proceedings), will be deemed the sole holder of COFINA Bonds in the National Trust with respect to voting, amendment, acceleration, events of default, and election and direction of rights and remedies. Accordingly, the National Trust may not take actions with respect to the COFINA Bonds (such as selling the COFINA Bonds or enforcing remedies under the COFINA Bonds) that an investor would take if it held the COFINA Bonds directly;

- Except as provided under the National Insurance Policies, holders of the National Certificates will have no recourse to the trustee of the National Certificates,

National, or any their Related Persons. Moreover, holders will have no recourse against such persons or their assets for payments on the National Certificates, except as set forth in the National Insurance Policies and the trust agreement. The National Certificates will be obligations of the National Trust and distributions thereon will only be made out of the National Trust Assets;

- There will be no obligation to obtain ratings on the National Certificates. However, a rating agency may issue an unsolicited rating on the National Certificates. Such action may be taken at any time and is beyond the control of COFINA, National, and the holders of National Certificates. Such rating may have a negative effect on the value of the National Certificates; and

- The value of the National Certificates will be dependent in part on the business and financial prospects of National. Holders of National Certificates should, in addition to evaluating the ability of COFINA to fulfill its obligations under the COFINA Bonds, also evaluate the ability of National to fulfill its obligations under the National Insurance Policies. If National experiences financial difficulties of its own in the future, it may not be able to make payments on the National Insurance Policies deposited as trust assets for the benefit of the trusts.

## D.    Risks Related to the Collection of the Pledged Sales Tax

***The Commonwealth's ongoing fiscal and economic crisis and global economic developments could adversely affect the collections of the Pledged Sales Tax, Reorganized COFINA's ability to make timely payment on the COFINA Bonds, and the market value of the COFINA Bonds.***

Under the Plan of Adjustment, COFINA will be the sole owner of the COFINA Portion. The COFINA Portion consists of the COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollar Funding in Section 16.5 of the Plan of Adjustment) in an amount up to fifty-three and sixty-five one-hundredths percent (53.65%) of the Pledged Sales Tax Base Amount in any given fiscal year until the COFINA Bonds have been paid or satisfied in full in accordance with their terms. Accordingly, COFINA's ability to pay debt service on the COFINA Bonds is dependent upon the Commonwealth generating an amount of sales and use tax on an annual basis of at least the amount of the COFINA Portion.

The Commonwealth is in the midst of a profound fiscal and economic crisis, which has affected many of the Commonwealth's public instrumentalities and municipalities. The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2017 (inclusive). According to the Puerto Rico Planning Board's latest economic forecast (published in April 2017), gross national product is also projected to further contract by 1.5% during fiscal year 2018. In addition, these forecasts were compiled prior to the devastation caused by Hurricanes Irma and María (as described below), which are expected to further negatively affect economic growth. The Revised Commonwealth Fiscal Plan, which accounts for the impact of Hurricanes Irma and María, estimates a 13.3% contraction in real gross national product in fiscal year 2018. Indeed, the Commonwealth Fiscal Plan, as certified by the Oversight Board on October 23, 2018, projects deficits for the

Commonwealth from FY2034 onward.

Factors that may continue to adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal policy, the cost of repairs and rebuilding from severe weather events, United States and global economic and trade conditions, population decline, epidemics or pandemics of communicable diseases, the Commonwealth's high level of debt and the ongoing debt restructuring proceedings. Thus far, efforts by the Commonwealth to alleviate the recession have been unsuccessful, and it is not expected that the recession will end in the near to medium term.

Population decline has had, and may continue to have, an adverse impact on the Commonwealth's economic growth. According to the United States Census Bureau, the population of the Commonwealth decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate, and migration to the United States mainland. The U.S. Census Bureau estimates suggest that the Commonwealth continued to lose population during fiscal year 2017 as well. Although it is too soon to accurately forecast the full effect and impact of the recent disruption caused by Hurricanes Irma and María, it is anticipated that population decline will accelerate. Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short or medium term. In addition, the average age of the population of the Commonwealth is increasing, due mainly to a reduction in the birth rate and the migration of younger people to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers. Moreover, this trend increases the demand for health and other services provided by the Commonwealth and its municipalities, and the relative cost to the Commonwealth and its municipalities of providing such services. There can be no assurance that historical trends related to economic conditions in the Commonwealth are predictive of future trends.

Events in the global financial markets, including downgrades of sovereign debt, devaluation of currencies by foreign governments and slowing economic growth, have caused or may cause a significant reduction in liquidity in the secondary market for asset-backed securities, which could adversely affect the market value of the COFINA Bonds and limit the ability of an investor to sell its COFINA Bonds. On June 23, 2016, the United Kingdom voted in a referendum to discontinue its membership in the European Union. On March 29, 2017, the United Kingdom provided formal notice to the European Council stating its intention to leave the European Union. The exit of the United Kingdom or any other country out of the European Union or the abandonment by any country of the euro may have a destabilizing effect on all Eurozone countries and their economies and a negative effect on the global economy as a whole. No prediction or assurance can be made as to the effect that these developments may have on the Commonwealth's economy or the market value of the COFINA Bonds.

If the recession in the Commonwealth continues or is exacerbated by other regional or global economic downturns, as the case may be, the collection of SUT may be impaired, which will directly affect COFINA's ability to make timely payments on the COFINA Bonds.

191

***The full effect of the damage caused by Hurricanes Irma and María, which struck the
Commonwealth in September 2017, is currently unknown, but was significant and may have a
material adverse effect on the Commonwealth and its economy, the collections of SUT and
Reorganized COFINA's ability to make payments on the COFINA Bonds.***

In September 2017, Hurricanes Irma and María struck the Commonwealth. The physical
damage from such storms was significant and widespread and there was substantial damage to
the Commonwealth's power grid, infrastructure, buildings, residences and other structures. The
U.S. federal government has approved a major disaster declaration for the Commonwealth, and
the Federal Emergency Management Agency has made federal disaster assistance available to
the Commonwealth. Recovery efforts continue throughout the Commonwealth.

It is not possible at present to quantify with any certainty the medium-term or long-term
impacts of Hurricanes Irma and María on the Commonwealth and its economy, collections of
SUT or COFINA's ability to make payments on the COFINA Bonds, any offsetting economic
benefit that may result from recovery and rebuilding activities or the amount of additional
resources from federal, Commonwealth and other local sources that will be required. No
assurances can be given as to the impact of Hurricanes Irma and María or other future severe
weather events on the Commonwealth and its economy, the collections of taxes and COFINA's
ability to make payments on the COFINA Bonds.

***The Commonwealth's macroeconomic data may not accurately reflect the performance of its
economy and that of its municipalities.***

The Puerto Rico Planning Board has acknowledged the existence of certain significant
deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the
deflators of the components of trade-related services and, in some cases, monetary accounts of
certain components of gross national product. As a result, the historical rate of change in gross
national product at constant prices (real gross national product change) and at current prices
(nominal gross national product change) could have been either overstated or understated for
several years. It is still too early to determine how these deficiencies have affected, or will affect,
the Commonwealth's macroeconomic data. Until such time as these revisions are finalized and
fully applied to the Commonwealth's macroeconomic data, there is no assurance that previously
reported macroeconomic data accurately reflects the performance of the economy of the
Commonwealth.

***Factors Affecting SUT Revenues: Competition***

Increases in SUT rates in the Commonwealth may create incentives for certain purchases
to be made in jurisdictions with lower overall sales tax rates. As a result, increasing SUT rates
may not result in a corresponding percentage increase in revenues, and may prompt certain
commercial and industrial activities to relocate to jurisdictions with lower sales tax rates.

***Factors Affecting SUT Revenues: Internet Sales***

In future years, it is expected that increasing numbers of sales transactions will take place
over the Internet. If these Internet sales are not treated, for SUT purposes, comparably to, or if
they displace, the types of transactions where the SUT currently is collected, tax collections may

be adversely affected.

### *Legislative Assembly Authority over the Commonwealth Sales Tax*

Section 2 of Article VI of the Puerto Rico Constitution states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See Section XII of this Disclosure Statement, entitled "COFINA Pledged Taxes."

Under the New Bond Legislation and New Bond Indenture, the Commonwealth will covenant for the benefit of all initial and subsequent holders of COFINA Bonds and COFINA Parity Bonds, that, until all obligations *with* respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair Reorganized COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the Plan and the Confirmation Order to fulfill the terms of any agreements with the holders of COFINA Bonds and COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any Fiscal Year, or (4) impair the rights and remedies of the holders of the COFINA Bonds or COFINA Parity Bonds or the collateral security thereof. The New Bond Legislation will also contain a covenant that if the Commonwealth seeks to enact legislation that would permit a Commonwealth revenue stream to replace the COFINA Pledged Taxes as security for the repayment of the COFINA Bonds, it can do so only upon, and on each such occasion, the Commonwealth having to satisfy certain specified conditions, including (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by Reorganized COFINA in the same manner and to the same extent as the COFINA Portion.

### *Certain Constitutional Considerations Related to Act 91*

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary

of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

It is a condition to effectiveness of the Plan of Adjustment that the Confirmation Order provides that the COFINA Bonds and the covenants by Reorganized COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants set forth in Article XVI of the Plan of Adjustment) constitute valid, binding, legal and enforceable obligations of Reorganized COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for in the Plan of Adjustment) is the property of Reorganized COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of Reorganized COFINA, the Commonwealth, or any instrumentality of the Commonwealth (other than liens and claims afforded to holders of COFINA Bonds under the Plan of Adjustment) and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution. The Confirmation Order will also provide for the Title III Court to retain jurisdiction over any disputes that may arise in respect of the COFINA Bonds. While the settlement of the Commonwealth-COFINA Dispute on the terms set forth in the Plan of Adjustment and Settlement Agreement significantly mitigates the risk of potential challenges to the COFINA Bonds in relation to COFINA's Existing Securities, there can be no assurance the Confirmation Order will be binding on persons who are not existing creditors of COFINA or the Commonwealth in any future litigation challenging (i) the New Bond Legislation, (ii) that the COFINA Portion does not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) that the COFINA Portion is not available for use by the Secretary of the Treasury.

## E.    Risk Factors Related to Future Judicial Actions

***The COFINA Bonds are being issued in connection with a plan of adjustment subject to confirmation pursuant to PROMESA Title III, which is newly enacted legislation that has not been previously used for financial restructuring, and substantial uncertainties related to its construction exists, including uncertainties due to the lack of judicial decisions interpreting PROMESA Title III.***

The Plan of Adjustment is effected pursuant to PROMESA Title III. PROMESA is a new federal statute signed into law in 2016, and a plan of adjustment pursuant to Title III thereof has not yet been confirmed by any court or consummated by any party. As a result, there are uncertainties relating to the successful confirmation and consummation of a plan of adjustment pursuant to PROMESA Title III. For example, it is uncertain to what extent an order of the Title III Court confirming the Plan of Adjustment can be appealed or its effectiveness delayed. While courts likely will borrow from existing precedents from chapters 9 and 11 of the Bankruptcy Code, there can be no assurances that courts would do so or consider other factors when interpreting the provisions of PROMESA. Such uncertainties may affect, among other things, market perception and, therefore, the trading value of the COFINA Bonds.

In addition, there is uncertainty associated with the consummation of a plan of adjustment pursuant to PROMESA Title III because there is no judicial experience interpreting the provisions of a plan of adjustment confirmed pursuant to PROMESA Title III. Judicial interpretations of a plan of adjustment confirmed pursuant to PROMESA Title III, including those related to the successful consummation of a plan of adjustment, could affect the value of the COFINA Bonds.

***PROMESA is subject to challenges regarding its constitutionality.***

For example, certain parties have challenged the constitutionality of PROMESA on the grounds that appointment of the members of the Oversight Board violates the Appointments Clause and the separation-of-powers principles of the United States Constitution because the members were not appointed by the President with the advice and consent of the Senate. These parties seek to dismiss the Commonwealth Title III Case and seek declaratory judgments that PROMESA violates the Appointments Clause and that all of the Oversight Board's acts to date are invalid. These parties also seek to enjoin the Oversight Board from exercising any authority granted to it by PROMESA. The Title III Court entered an opinion and order holding that there is no constitutional defect in the method of appointment. The parties challenging PROMESA's constitutionality have filed a notice of appeal to the First Circuit. There can be no assurance as to the outcome of the constitutional challenge to PROMESA. For additional information, see Section IV.C of this Disclosure Statement, entitled "Other Related Litigation."

***COFINA may be subject to future claims and legal actions.***

Reorganized COFINA may be subject to various claims and legal actions arising in the ordinary course of its activities that arise after the Effective Date. The Debtor is not able to predict the nature and extent of any such claims and actions and cannot guarantee that the ultimate resolution of such claims and actions will not have a material adverse effect on Reorganized COFINA after its emergence from Title III.

***COFINA Bonds may not trade at par.***

Holders of the COFINA Bonds may encounter limited market acceptance of Reorganized COFINA's credit upon any attempt to sell Reorganized COFINA debt obligations, making sales at or near par potentially difficult. Holders of Reorganized COFINA debt after the Effective Date may not be able to sell such debt for any price for some time. Alternatively, potential purchasers may demand discounts to the par amount of obligations before a potential purchaser would be willing to purchase Reorganized COFINA debt of any kind. There can be no assurance that a secondary market will exist for any Reorganized COFINA debt.

***The enforcement of rights under the COFINA Bonds, New Bond Indenture, and New Bond Legislation may be unavailable to the extent Reorganized COFINA is subject to a subsequent case under Title III of PROMESA.***

The holders of COFINA Bonds may be unable to enforce rights under the COFINA Bonds, New Bond Indenture, and New Bond Legislation to the extent Reorganized COFINA is subject to a subsequent case under Title III of PROMESA as a result of the application of the automatic stay on enforcement of remedies that would become effective upon the filing of the

Title III petition.

Pursuant to the New Bond Legislation, Reorganized COFINA will be a "bankruptcy remote," single purpose public corporation to the fullest extent permitted under applicable law. As a bankruptcy remote entity, Reorganized COFINA should not be permitted to restructure its debts pursuant to any federal or local insolvency or bankruptcy regime, whether in existence now or enacted in the future. Furthermore, the Confirmation Order shall provide that in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that the COFINA Portion owned by Reorganized COFINA shall not be subject to the automatic stay. Nonetheless, there can be no assurance that a court would not allow Reorganized COFINA to be the subject of an insolvency or bankruptcy proceeding, or that a court would not determine the COFINA Portion to be subject to the automatic stay in the event of a future insolvency or bankruptcy proceeding by the Commonwealth.

***Certain closing conditions and closing deliverables with respect to the Plan of Adjustment may differ in type and scope from those described herein.***

Certain closing conditions and closing deliverables with respect to the Plan of Adjustment may differ in type and scope from those described herein if the Title III Court enters a Confirmation Order that is different than expected.

## F. Risks Related to Future Legislative Actions

***Notwithstanding the New Bond Legislation's non-impairment provisions, future legislative action could negatively impact collections on the Pledged Sales Tax and reduce the value of the COFINA Bonds.***

Notwithstanding the New Bond Legislation's non-impairment provisions, future action by the Legislative Assembly could change the New Bond Legislation in ways that affect the security and sources of payment on the COFINA Bonds. Any such action would be subject to the Commonwealth's statutory covenant to the bondholders that it will not impair, limit, restrict, rescind, delay or modify the rights and powers of Reorganized COFINA, the Trustee or the Holders under the New Bond Legislation, or Reorganized COFINA's ability to meet its obligations to bondholders, until the COFINA Bonds have been paid in full or are otherwise discharged. While the covenant is designed to act as adequate protection of Reorganized COFINA and its bondholders' interest in property, any such action, as well as the litigation that likely would ensue, might adversely affect the value of the COFINA Bonds and the recoveries on the COFINA Bonds. Furthermore, the enforcement of any rights against the Commonwealth under the Commonwealth's statutory non-impairment covenant may be subject to the exercise of judicial discretion and limitations on legal remedies against the Commonwealth or the enforcement of the non-impairment covenant. See Section X.F of this Disclosure Statement, entitled "Covenants of the Commonwealth."

In addition, other future actions by the Legislative Assembly that do not violate the Commonwealth's statutory non-impairment covenant could also materially adversely affect the value of the COFINA Bonds and the recoveries on the COFINA Bonds.

### G. Risks Related to Tax Treatment of the COFINA Bonds

*The treatment of the exchange of the Existing Securities for COFINA Bonds is uncertain.*

The Debtor expects that the exchange of Existing Securities for COFINA Bonds will constitute a taxable exchange for U.S. federal income tax purposes. A U.S. Holder (as defined in "Material United States Federal Income Tax Considerations") will recognize gain or loss equal to the difference between the amount realized on the exchange (except to the extent attributable to accrued and unpaid interest) and the U.S. Holder's adjusted tax basis in the Existing Securities on the date of the exchange. If, contrary to the Debtor's expectation, the IRS were to determine that the exchange of the Existing Securities for the COFINA Bonds is treated as a recapitalization, gain or loss generally would not be recognized for U.S. federal income tax purposes in connection with the exchange of the Existing Securities for COFINA Bonds, and other tax consequences described below under "Material United States Federal Income Tax Considerations" may differ materially. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims*"—*Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange.*"

*The proportion of COFINA Bonds that will be issued as tax-exempt debt is uncertain.*

The COFINA Bonds will be issued either as Tax-Exempt COFINA Bonds (as defined in "Material United States Federal Income Tax Considerations") or Taxable COFINA Bonds (as defined in "Material United States Federal Income Tax Considerations"). While the Commonwealth expects that, under existing law as of the date of this Disclosure Statement, at least a portion of the COFINA Bonds will be Tax-Exempt COFINA Bonds, the proportion of COFINA Bonds that will be Tax-Exempt COFINA Bonds is uncertain and cannot be determined as of the date of this Disclosure Statement. The Commonwealth expects to cause an opinion of nationally recognized bond counsel addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds on the Effective Date. Recipients of the COFINA Bonds should refer to such opinion for more information on the tax status of the COFINA Bonds. However, such opinion is not binding on the IRS or the courts, and it is possible that the IRS or the courts may disagree with any conclusions contained therein. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims*"—*Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds—Interest Including OID.*"

*The manner in which interest accruals should be calculated with respect to the COFINA Bonds for U.S. tax purposes is uncertain.*

The Commonwealth does not intend to treat the COFINA Bonds as "contingent payment debt instruments" under the applicable Treasury Regulations (as defined in "Material United States Federal Income Tax Considerations"), and U.S. Holders will be bound by this

197

determination in the absence of contrary determination by the IRS or the courts. However, if the IRS or a court determines that the COFINA Bonds are deemed to be contingent payment debt instruments, interest accruals on the COFINA Bonds will be determined under original issue discount principles, and each U.S. Holder, regardless of its method of accounting for U.S. federal income tax purposes, will be required to accrue income on the New Bonds on a constant yield basis at a comparable yield to the return on a fixed rate instrument with similar terms, subject to adjustments to reflect the occurrence or non-occurrence of the underlying contingency. Portions of the accrued income, or the adjustments to reflect the occurrence or non-occurrence of underlying contingencies, could be taxable to U.S. Holders even with respect to Tax-Exempt COFINA Bonds. In addition, any gain recognized by a U.S. Holder on the sale or other disposition of a COFINA Bond would be treated as ordinary interest income, and any loss would be an ordinary loss to the extent of the interest previously included in gross income and, thereafter, capital loss. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims"—Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds—Interest Including OID.*"

**The treatment of the National and Ambac Trusts is uncertain.**

To the extent the National Trust will be treated as a grantor trust for U.S. federal income tax purposes, each National Certificate Holder (as defined in "Material United States Federal Income Tax Considerations") will be treated as receiving its respective National Certificate(s) in exchange for its Allowed Claims, and as owning its pro rata undivided interest in the assets held in such trust, each to the extent of its pro rata interest in the certificates of such trust. Furthermore, to the extent the Ambac Trust is treated as a partnership for U.S. federal income tax purposes, it should not be subject to any entity level U.S. federal income tax. Each holder of an Ambac Certificate will be treated as receiving its respective certificate in exchange of its Allowed Class 2 Claims, and as owning an interest in the Ambac Trust. However, contrary to the Commonwealth's expectation, the IRS may determine that the National and Ambac Trusts are properly characterized in a manner other than as provided herein. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims— Holders of Senior Bond COFINA Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), and Senior Bond COFINA Claims (National) that elect to receive the National Certificates (Class 3) —Tax Characterization of the Trusts.*"

**U.S. Holders may be required to report income in certain years in excess of the amount of cash received by such holders in those years, resulting in "phantom income" for U.S. federal income tax purposes.**

If, for U.S. federal income tax purposes, the Taxable COFINA Bonds (as defined in "Material United States Federal Income Tax Considerations") are issued with more than a de minimis amount of original issue discount, generally, 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity, then a holder of Taxable COFINA Bonds subject to U.S. federal income tax must include original issue discount in income as it accrues (regardless of the holder's regular method of tax accounting) using a

198

constant yield method under the accrual rules for original issue discount. If interest accruals exceed the cash payments on the Taxable COFINA Bonds in any year, a U.S. Holder will have "phantom income" in that year, which may be substantial.

In the event of a sale or other taxable disposition of a COFINA Bond with accrued market discount, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued in the event of a sale or other taxable disposition of a COFINA Bond. Recent legislation and IRS guidance may affect the timing of interest inclusion and market discount inclusions for accrual basis taxpayers that maintain financial statements in accordance with GAAP or any other financial reporting standard. See "*Material United States Federal Income Tax Considerations—U.S. Holders—Tax Treatment of Allowed Claims—Holders of Senior Bond COFINA Claims (Class 1), Senior Bond COFINA Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior Bond COFINA Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bond.*"

ALL HOLDERS SHOULD READ THE DISCUSSION OF THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PURCHASE, OWNERSHIP, AND DISPOSITION OF THE NEW BONDS THAT IS CONTAINED IN THIS DISCLOSURE STATEMENT UNDER THE HEADING "MATERIAL UNITED STATES FEDERAL INCOME TAX CONSIDERATIONS."

## XV. Material United States Federal Income Tax Considerations

### A.     General

A general description of certain material U.S. federal income tax consequences of the Plan of Adjustment to Holders of certain Claims is provided below. This description is based on the U.S. Internal Revenue Code of 1986, as amended (the "IRC"), regulations promulgated under the IRC (the "Treasury Regulations"), judicial decisions and administrative determinations, all as in effect on the date of this Disclosure Statement and all of which are subject to change, possibly with retroactive effect. Changes in any of these authorities or in their interpretation could cause some or all of the U.S. federal income tax consequences of the Plan of Adjustment to differ materially from the consequences described below.

The U.S. federal income tax consequences of the Plan of Adjustment are complex. As of the date of this Disclosure Statement, a private letter ruling has not been submitted to the Internal Revenue Service (the "IRS") and no written or other formal determination has been issued by the IRS; no opinion has been requested from the Debtor's counsel concerning any tax consequence of the Plan of Adjustment except as specifically set forth therein; and no tax opinion is given by this Disclosure Statement.

The description that follows does not cover all aspects of U.S. federal income taxation that may be relevant to Holders of Claims. For example, the description does not address issues of special concern to certain types of taxpayers (*e.g.*, regulated investment companies, real estate investment trusts, banks and certain other financial institutions, insurance companies, tax-exempt

organizations, retirement plans, individual retirement and other tax-deferred accounts, Holders that are, or hold their Claims through, S corporations, partnerships or other pass-through entities for U.S. federal income tax purposes, persons whose functional currency for tax purposes is not the U.S. dollar, dealers in securities or foreign currency, traders that mark-to-market their securities, persons subject to the alternative minimum tax, individuals receiving Social Security or Railroad Retirement benefits, and persons whose claims are part of a straddle, hedging, constructive sale, or conversion transaction). In addition, the description does not address U.S. federal taxes other than income taxes, nor does it apply to any person that acquires COFINA Bonds in the secondary market. Furthermore, the description does not discuss state, territorial (including Puerto Rico), local or non-U.S. income or other tax consequences (including estate or gift tax consequences).

For these reasons, the description that follows is not a substitute for careful tax planning and professional tax advice based upon the individual circumstances of each Holder of a Claim. Holders of Claims are urged to consult with their own tax advisors regarding the federal, state, territorial (including Puerto Rico), local and non-U.S. tax consequences of the Plan of Adjustment.

**The Puerto Rico tax consequences of the Plan of Adjustment to Holders that are bona fide residents of the Commonwealth, and others who may be subject to tax on a gross or net basis by the Commonwealth are not discussed in this section. Such Holders should review the section "Certain Material Puerto Rico Income Tax Considerations" below.**

**B. U.S. Holders**

**1. Definition of U.S. Holder**

Unless otherwise noted, the discussion below applies only to U.S. Holders. As used herein, the term "U.S. Holder" means a beneficial owner of Existing Securities on the Effective Date of the Plan of Adjustment that is, for U.S. federal income tax purposes:

- an individual who is a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation for U.S. federal income tax purposes, created or organized in or under the laws of the United States, any state thereof or the District of Columbia;

- an estate the income of which is subject to U.S. federal income taxation regardless of its source; or

- a trust, if a court within the United States is able to exercise primary jurisdiction over its administration and one or more U.S. persons have authority to control all of its substantial decisions, or if the trust has a valid election in effect under applicable U.S. Treasury regulations to be treated as a U.S. person.

If a partnership or other entity or arrangement taxable as a partnership for U.S. federal income tax purposes holds Existing Securities, the U.S. federal income tax treatment of a partner

200

in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership holding Existing Securities are urged to consult their tax advisors.

The term "U.S. Holder" does not include a Puerto Rico Individual or a Puerto Rico Corporation, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should review the discussion below as to U.S. federal income tax consequences of the Plan of Adjustment under "—Puerto Rico Individuals and Puerto Rico Corporations."

A U.S. Holder who holds Allowed Claims on more than one Class may have different U.S. federal income tax consequences for each Class of Allowed Claims. Holders should carefully review the sections of this discussion applicable to each Class of Allowed Claims such U.S. Holder holds, and U.S. Holders of more than one Class of Allowed Claims should consult their own tax advisors as to the potential interaction of the U.S. federal income tax consequences of each Class of Allowed Claims such U.S. Holder holds.

Certain U.S. Holders that use the accrual method of accounting for U.S. federal income tax purposes generally will be required to include certain amounts in income with respect to the Allowed Claims no later than the time that such amounts are reflected on certain financial statements of such U.S. Holders. Such U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax consequences of the Plan of Adjustment in their individual circumstances.

2.     **Tax Treatment of Allowed Claims**

    (a)    ***Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)***

The Debtor expects that pursuant to the Plan of Adjustment, each U.S. Holder of any of the following: (i) Senior COFINA Bond Claims; (ii) Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates; (iii) Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates; and (iv) Junior COFINA Bond Claims will be treated as exchanging a portion of such U.S. Holder's Existing Securities that are classified in these Classes of Claims for COFINA Bonds and exchanging the remaining portion of such U.S. Holder's Existing Securities that are classified in these Classes of Claims for cash, in separate transactions for U.S. federal income tax purposes. The remainder of this discussion assumes this will be the case.

This discussion does not apply to U.S. Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates or to U.S. Holders of Senior COFINA Bond Claims (National) that elect to receive the National Certificates. See below under "—Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates, and Senior COFINA Bond Claims (National) that elect to receive the National Certificates" regarding the

U.S. federal income tax consequences of the Plan of Adjustment for such U.S. Holders.

i.    **Tax Treatment of Exchange**

The tender of the allocable portion of the Existing Securities in exchange for the COFINA Bonds will be treated as an exchange of such allocable portion of the Existing Securities for the COFINA Bonds for U.S. federal income tax purposes.

Whether or not such exchange will be taxable for a U.S. Holder will depend in part on whether or not the exchange of a portion of the Existing Securities for the COFINA Bonds qualifies as a recapitalization for U.S. federal income tax purposes. The exchange of such portion of the Existing Securities for COFINA Bonds will constitute a recapitalization for U.S. federal income tax purposes only if (i) COFINA is classified as a corporation for U.S. federal income tax purposes and (ii) both the Existing Securities and the COFINA Bonds are treated as "securities" for purposes of the applicable IRC provisions. It is not clear whether COFINA would be classified as a corporation for U.S. federal income tax purposes. The Debtor believes that the Existing Securities and the COFINA Bonds are securities for U.S. federal income tax purposes. While the matter is not free from doubt, the Debtor intends to take the position that the exchange does not qualify as a recapitalization because neither COFINA nor Reorganized COFINA should be classified as a corporation for U.S. federal income tax purposes. However, no direct authority exists on this issue, and U.S. Holders should consult their own tax advisors regarding whether the exchange qualifies as a recapitalization for U.S. federal income tax purposes.

a.    **Tax Treatment if the Exchange is not Treated as a Recapitalization**

If, consistent with the Debtor's expectation, the exchange of a portion of the Existing Securities for the COFINA Bonds pursuant to the Plan of Adjustment does not qualify as a recapitalization, then the exchange will be considered a taxable exchange under Section 1001 of the IRC. In this case, a U.S. Holder will recognize gain or loss in an amount equal to (i) the "issue price" of the COFINA Bonds for U.S. federal income tax purposes (determined in the manner described below under "—Issue Price"), (ii) less the allocable portion of the U.S. Holder's adjusted tax basis in the Existing Securities that were tendered therefor (such adjusted tax basis calculated as described below). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the allocable portion of the Existing Securities for the COFINA Bonds pursuant to the exchange will generally be capital gain or loss and, if the U.S. Holder's holding period of the Existing Securities surrendered is more than one year, long-term capital gain or loss.

If the exchange of the allocable portion of Existing Securities for COFINA Bonds is a taxable exchange, the holding period for the COFINA Bonds will begin the day after the exchange. A U.S. Holder's tax basis in the COFINA Bonds received in the exchange will generally be equal to the "issue price" of the COFINA Bonds (determined in the manner described below under "—Issue Price").

b.    **Tax Treatment if the Exchange is Treated as a Recapitalization**

If contrary to the Debtor's expectation, the IRS determines that the exchange of the allocable portion of the Existing Securities for the COFINA Bonds is treated as a recapitalization, then gain or loss generally would not be recognized for U.S. federal income tax purposes in connection with the U.S. Holder's receipt of the COFINA Bonds.

A U.S. Holder will generally have an adjusted tax basis in an Existing Security (equal to the amount it paid for such Existing Security), plus any original issue discount ("OID," described below) and market discount previously included in income in respect of such Existing Security and minus any payments on the Existing Securities other than a payment of qualified stated interest and any previously amortized bond premium on such Existing Security.

Further, if the exchange is treated as a recapitalization, a U.S. Holder's aggregate tax basis in the COFINA Bonds received in the exchange will be equal to the allocable portion of such U.S. Holder's tax basis in the Existing Securities exchanged therefor, plus the amount of any gain recognized by such U.S. Holder on the exchange, minus cash (other than cash received attributable to accrued but unpaid interest) and fair market value of other property received for the Existing Securities. The U.S. Holder's holding period in the COFINA Bonds will include the holding period for the Existing Securities exchanged therefor.

### c. Tax Treatment of Receipt of Cash

#### (1) Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash

Each of Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash is expected to be treated as a payment on the Existing Securities, other than cash received attributable to accrued but unpaid interest. The Plan of Adjustment provides that, to the extent applicable, all distributions to a holder of a Claim will apply first to the principal amount of such Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Claim to the extent that interest is payable under the Plan of Adjustment. Legislative history of the Bankruptcy Tax Act of 1980 indicates that an allocation of consideration as between principal and interest provided in certain reorganizations under the United States Bankruptcy Code is binding for U.S. federal income tax purposes. The Treasury Regulations generally treat payments on indebtedness as allocated first to accrued but unpaid interest. However, the IRS has provided that in the case of an insolvent issuer, payments in liquidation of the debt (including tax-exempt bonds) are allocated first, to principal and then to accrued but unpaid interest. While the Debtor intends to report distributions to a U.S. Holder in accordance with the Plan of Adjustment, there can be no assurance that the IRS will respect those allocations with respect to Existing Securities. U.S. Holders should consult their tax advisors to determine the appropriate characterization of payments received.

A U.S. Holder will recognize gain or loss in an amount equal to (i) the cash received (other than cash received attributable to accrued but unpaid interest), (ii) less the allocable portion of the U.S. Holder's adjusted tax basis in the Existing Securities that were tendered therefor (such adjusted tax basis calculated as described above). Subject to the discussion under "—Market Discount," any gain or loss that a U.S. Holder recognizes upon the exchange of the allocable portion of Existing Securities for cash will generally be capital gain or loss and, if the

U.S. Holder's holding period of the Existing Securities surrendered is more than one year, long-term capital gain or loss. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations.

Subject to the discussion in the first paragraph of this Section, if any of the cash received is attributable to accrued but unpaid interest on the Existing Securities, the treatment of such cash paid to a U.S. Holder will depend on whether the accrued but unpaid interest on such U.S. Holder's Claim is, or is not, tax-exempt for U.S. federal income tax purposes. In general, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be required to include such amount of cash received as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. A U.S. Holder that was previously required to include in taxable income any accrued but unpaid interest on a Claim that is not tax-exempt may be entitled to recognize a deductible loss to the extent that such interest is not satisfied under the Plan of Adjustment. However, a U.S. Holder that receives a distribution of accrued but unpaid interest on a Claim that is tax-exempt will not be required to include such amount as interest income for U.S. federal income tax purposes upon receipt of a distribution with respect to such interest. Although U.S. Holders generally will not be required to include the foregoing amounts in computing U.S. taxable income, U.S. Holders will likely have to report such amounts to the IRS.

For tax-exempt Existing Securities that are capital appreciation bonds, the accrual of the original issue discount is treated as tax exempt interest and, as such original issue discount accrued, the amount thereof would have increased the tax basis of a bondholder, thereby increasing a bondholder's investment in the capital appreciation bond. Such increase in tax basis is generally considered an increase in the principal amount of the capital appreciation bond such that the principal amount is equal to the accreted value thereof from time to time. While there is no direct authority that concludes such accruals are treated as principal for purposes of applying the allocation rules between principal and interest described above for insolvent issuers, the treatment of such accruals as principal for general U.S. federal income tax purposes should also apply in this case.

U.S. Holders of Claims on which interest has accrued are urged to consult their own tax advisors regarding the tax treatment of distributions under the Plan of Adjustment and the deductibility of any accrued but unpaid interest for U.S. federal income tax purposes.

### (2) Consummation Costs

The U.S. federal income tax treatment of the Consummation Costs is unclear. The Debtor intends to treat the receipt of the Consummation Costs in the same manner as the Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash as discussed above under "—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash". It is possible, however, that the Consummation Costs could instead be treated as a separate fee that would be reported as ordinary income, rather than an amount paid under the Existing Securities. U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the Consummation Costs.

### (3) National Payment and Ambac Payment

The holders of Senior COFINA Bond Claims (National) and Senior COFINA Bond Claims (Ambac) that do not validly elect to receive the National Certificates or Ambac Certificates, respectively, will each receive their pro rata portion of Senior COFINA Bond Distribution plus consideration from National or Ambac, as applicable. Generally, for U.S. federal income tax purposes, the IRS treats a bond insurance policy as both incidental and not a separate debt instrument or similar investment if, at the time it is purchased: (i) the amount paid to obtain it is reasonable; (ii) the purchase is customary; and (iii) it is consistent with the expectation that the issuer of the bonds, rather than the insurer, will pay debt service on the bonds. Additionally, the result is the same regardless of whether the holder acquired the bonds at original issuance or on the secondary market. Although the matter is not free from doubt, the Debtor believes that the Senior COFINA Bond Distribution received by U.S. Holders of Senior COFINA Bond Claims (National) and U.S. Holders of Senior COFINA Bond Claims (Ambac) pursuant to the Plan of Adjustment will be treated in the same manner as described above under "—Tax Treatment of Exchange; —Tax Treatment of Receipt of Cash—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and—Consummation Costs."

The consideration from National and Ambac may be treated as an additional payment of principal or interest, as applicable, under the Existing Securities. Furthermore, to the extent that the payments relate to a tax-exempt bond, any amounts received that relate to accrued but unpaid interest may not be subject to tax. The IRS has ruled in situations where the debtor is not in bankruptcy proceedings that interest paid by an insurance company on behalf of an issuer of tax-exempt obligations is excludable from gross income of the holders of such obligations. The Debtor intends to report the consideration from National and Ambac in a manner consistent with such rulings.

U.S. Holders of Senior COFINA Bond Claims (National) and U.S. Holders of Senior COFINA Bond Claims (Ambac) should consult their own tax advisors regarding the tax treatment of payments received under the Plan of Adjustment.

### d. Market Discount

If a U.S. Holder acquired the Existing Securities for less than the "adjusted issue price" of the Existing Securities and the difference between the U.S. Holder's cost and the "adjusted issue price" exceeded a *de minimis* threshold (equal to 0.25 percent of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining complete years to maturity), such difference will generally be treated as "market discount."

If the exchange of the Existing Securities for the COFINA Bonds does not qualify as a recapitalization, any gain recognized on the exchange should be treated as ordinary income to the extent of any accrued market discount not previously included in ordinary income with respect to the Existing Securities.

If the exchange of the Existing Securities for the COFINA Bonds qualifies as a recapitalization, any accrued market discount not previously included in ordinary income with respect to the Existing Securities should generally carry over to the COFINA Bonds and not be

205

recognized on the exchange.

However, to the extent gain is recognized pursuant to the exchange of Existing Securities for COFINA Bonds, including in the case of a recapitalization (as a result of the receipt of cash), a U.S. Holder must include as ordinary income any gain that would have otherwise been treated as capital gain to the extent of the accrued market discount on the Existing Securities, unless the U.S. Holder previously elected to include the market discount in income as it accrued. See below "—Taxation of COFINA Bonds—Sale, Retirement or Other Disposition of COFINA Bonds" for a further discussion regarding the election to include market discount in income as it accrues.

Holders should consult their own tax advisors regarding the tax treatment of market discount pursuant to the exchange including the interaction of the market discount, OID and acquisition premium rules.

ii.      **Taxation of COFINA Bonds**

The COFINA Bonds will be issued as either bonds the interest on which is excluded from gross income for U.S. federal income tax purposes (the "Tax-Exempt COFINA Bonds") or bonds the interest on which is not excluded from gross income for U.S. federal income tax purposes (the "Taxable COFINA Bonds"). While the Commonwealth expects that, under existing law as of the date of this Disclosure Statement, interest on at least a portion of the COFINA Bonds will be excluded from gross income for U.S. federal income tax purposes, the tax status of the COFINA Bonds cannot be determined as of the date of this Disclosure Statement. The Commonwealth expects to cause an opinion of nationally recognized bond counsel ("Bond Counsel") addressing the tax status of the COFINA Bonds to be delivered with the COFINA Bonds on the Effective Date. Recipients of the COFINA Bonds should refer to such opinion for more information on the tax status of the COFINA Bonds.

a.      **Issue Price**

The Debtor expects that the issue price of the COFINA Bonds should equal the fair market value of the COFINA Bonds on the date of the exchange. This determination is based on the Debtor's conclusion that both the Existing Securities and the COFINA Bonds should be treated as "publicly traded" within the meaning of the applicable Treasury Regulations. The fair market value of the COFINA Bonds will be determined by the "trading price" on the date of the exchange. There is no specific guidance on how to determine the trading price as of a specific time; however, related regulations suggest that a taxpayer may use any consistently applied, reasonable method to determine fair market value when there is more than one sales price or quoted price. The Debtor's determination that the Existing Securities and the COFINA Bonds are "publicly traded" will be binding on all Holders, unless a Holder discloses its contrary position in the manner required by applicable Treasury Regulations. The rules regarding the determination of "issue price" are complex and highly detailed, and U.S. Holders should consult their own tax advisors regarding the determination of the "issue price" of the COFINA Bonds for U.S. federal income tax purposes.

b.      **Interest Including OID**

The U.S. federal income tax rules used to determine what amounts are treated as interest

206

are complex. U.S. Holders are urged to consult their own tax advisors regarding what amounts will be treated as interest for U.S. federal income tax purposes in their individual circumstances.

### (1) Tax-Exempt COFINA Bonds

The IRC imposes certain requirements that must be met subsequent to the issuance and delivery of the Tax-Exempt COFINA Bonds for interest thereon to be and remain excluded from gross income for U.S. federal income tax purposes pursuant to Section 103 of the IRC. Noncompliance with such requirements could cause the interest on the Tax-Exempt COFINA Bonds to be included in gross income for U.S. federal income tax purposes retroactive to the date of issue of the Tax-Exempt COFINA Bonds. When the Tax-Exempt COFINA Bonds are issued on the Effective Date, the Commonwealth and COFINA will covenant to comply with the applicable requirements of the Code in order to maintain the exclusion of the interest on the Tax-Exempt COFINA Bonds from gross income for U.S. federal income tax purposes pursuant to Section 103 of the Code. In addition, the Commonwealth and COFINA will have made certain representations and certifications relating to the Tax-Exempt COFINA Bonds. Bond Counsel will not independently verify the accuracy of those representations and certifications.

On the Effective Date, Bond Counsel is expected to deliver an opinion that, under then-existing law and assuming compliance with the aforementioned covenants, and the accuracy of the representations and certifications made by the Commonwealth, COFINA, and Reorganized COFINA, amounts treated as interest for U.S. federal income tax purposes on the Tax-Exempt COFINA Bonds will be excluded from gross income for U.S. federal income tax purposes under Section 103 of the Code. Bond Counsel is also expected to opine that such interest is not treated as a preference item in calculating the alternative minimum tax imposed under the IRC. Amounts allocable to pre-issuance accrued interest on the Tax-Exempt COFINA Bonds will not be treated as tax-exempt interest.

### (2) Taxable COFINA Bonds

If interest on the COFINA Bonds (or a portion of them) is not treated as exempt from gross income for U.S. federal income tax purposes, then payments or accruals of "qualified stated interest" (as defined below) on the COFINA Bonds (or the relevant portion of them) will be taxable to such U.S. Holder as ordinary interest income at the time received or accrued, in accordance with such U.S. Holder's regular method of accounting for U.S. federal income tax purposes. The term "qualified stated interest" generally means stated interest that is unconditionally payable in cash or property (other than debt instruments of the issuer) at least annually during the entire term of the debt instrument at a single fixed rate of interest, or, subject to certain conditions, based on one or more interest indices. Stated interest payments on the COFINA Bonds is expected to be qualified stated interest.

### (3) OID

The amount of OID on the COFINA Bonds, if any, will be equal to the excess of the sum of all principal and stated interest payments (other than qualified stated interest) provided by the COFINA Bonds (initially taking into account the payment schedule as described below) over the "issue price" (determined in the manner described above under "—Issue Price") of the COFINA

207

Bonds. Furthermore, the taxable COFINA Bonds would bear OID only if the issue price of a COFINA Bond is less than its principal amount by more than a de minimis amount. OID will be considered de minimis if it is less than 0.25% of the stated redemption price at maturity multiplied by the number of remaining complete years to maturity of the COFINA Bonds. U.S. Holders, whether on the cash or accrual method of accounting for U.S. federal income tax purposes, must include the OID in gross income (as ordinary income) as it accrues (on a constant yield to maturity basis), regardless of whether cash attributable to such OID is received at such time. However, the COFINA Bonds may be subject to the acquisition premium rules (described below under "—Acquisition Premium"), which could reduce the amount of OID includible in gross income.

For taxable COFINA Bonds, the amount of OID includible in gross income by a U.S. Holder in any taxable year generally is the sum of the "daily portions" of OID with respect to a COFINA Bond for each day during such taxable year or portion of such taxable year on which the U.S. Holder holds the COFINA Bond. The daily portion is determined by allocating to each day in any "accrual period" a pro rata portion of the OID allocable to that accrual period. The "accrual period" for a COFINA Bond may be of any length and may vary in length over the term of the COFINA Bond, provided that each accrual period is no longer than one year and each scheduled payment of principal or interest occurs on the first day or the final day of an accrual period. The amount of OID allocable to any accrual period, subject to the possible adjustments described below, will be an amount equal to the product of the COFINA Bond's "adjusted issue price" at the beginning of the accrual period and its yield to maturity (less payments of qualified stated interest allocable to that period). The "yield to maturity" of the COFINA Bonds is the discount rate that, when used in computing the present value (as of the issue date) of all principal and interest payments to be made on the COFINA Bonds, produces an amount equal to the "issue price" of the COFINA Bonds. The amount of OID allocable to the final accrual period is the difference between the amount payable at maturity (other than a payment of qualified stated interest) and the "adjusted issue price" at the beginning of the final accrual period. The "adjusted issue price" of a COFINA Bond at the beginning of any accrual period is equal to its "issue price," increased by the accrued OID for each prior accrual period and reduced by any payments made on the COFINA Bond during the prior accrual periods (other than payments of qualified stated interest).

For Tax-Exempt COFINA Bonds, the amount of OID is excluded from gross income for U.S. federal income tax purposes to the same extent as interest on the Tax-Exempt COFINA Bonds. The OID accruals are computed in the same manner as described above for Taxable COFINA Bonds, but such accruals will be added to the Holder's tax basis for the Tax-Exempt COFINA Bonds. The accrual of OID may be taken into account as an increase in the amount of tax-exempt income for purposes of determining various other tax consequences of owning the Tax-Exempt COFINA Bonds, even though there will not be a corresponding cash payment. Owners of the Tax-Exempt COFINA Bonds with OID are advised that they should consult with their own advisors with respect to the tax consequences of owning such Tax-Exempt COFINA Bonds.

This disclosure assumes that the COFINA Bonds will not be considered contingent payment debt instruments.

The rules regarding OID are complex and the rules described above may not apply in all cases. If other rules apply instead, U.S. Holders receiving the COFINA Bonds could be treated differently than described above. U.S. Holders receiving the COFINA Bonds should consult their own tax advisors regarding the potential application of the OID and related U.S. federal income tax rules to the COFINA Bonds.

### c.      Acquisition Premium

A COFINA Bond would be treated as acquired at an acquisition premium if the U.S. Holder's initial basis in a COFINA Bond is (a) less than or equal to the sum of all amounts payable on the COFINA Bond (other than payments of qualified stated interest) and (b) greater than the COFINA Bond's "adjusted issue price."

If a taxable COFINA Bond was acquired with acquisition premium, generally a U.S. Holder would reduce the amount of OID that otherwise would be included in income for each accrual period by an amount equal to (i) the amount of OID otherwise includible in income multiplied by (ii) a fraction, the numerator of which is the excess of the adjusted tax basis of the COFINA Bond immediately after its acquisition by the U.S. Holder over the "adjusted issue price" of the COFINA Bond and the denominator of which is the excess of the sum of all amounts payable on the COFINA Bond after the purchase date, other than payments of qualified stated interest, over the COFINA Bond's "adjusted issue price." If a Tax-Exempt Bond were acquired with acquisition premium, a U.S. Holder will reduce the COFINA Bond's tax basis during each accrual period using the same method described above for a taxable COFINA Bond.

As an alternative to reducing the amount of OID that otherwise would be included in income during an accrual period or reducing the tax basis of the COFINA Bond in the case of a Tax-Exempt Bond, the U.S. Holder may elect to compute OID accruals by applying the constant yield method described above. U.S. Holders who acquire COFINA Bonds with acquisition premium should consult their own tax advisors as to the consequences of such an election in their individual circumstances.

### d.      Sale, Retirement or Other Disposition of COFINA Bonds

A U.S. Holder will generally recognize taxable gain or loss on the sale, exchange, retirement (including redemption) or other taxable disposition of a COFINA Bond equal to the difference, if any, between (i) the amount realized upon such disposition (other than cash received attributable to accrued but unpaid interest) and (ii) the adjusted tax basis of the COFINA Bond. A U.S. Holder's adjusted tax basis in a COFINA Bond will generally equal such U.S. Holder's tax basis on such COFINA Bond on the date the U.S. Holder acquired such COFINA Bond, increased by any OID previously accrued by the U.S. Holder, and decreased by the amount of any cash payments (other than payments of qualified stated interest) previously received on the COFINA Bond by the U.S. Holder. U.S. Holders should consult with their own tax advisors as to the tax basis of their COFINA Bonds on the date of acquisition.

Subject to the discussion of market discount below, any gain or loss that a U.S. Holder recognizes upon the sale or other taxable disposition of a COFINA Bond should generally

constitute capital gain or loss and will be long-term capital gain or loss if such Holder's holding period in the COFINA Bond is greater than one year. A U.S. Holder's holding period in COFINA Bonds received pursuant to the exchange will begin the day after the exchange, if the exchange is not treated as a recapitalization. If the exchange is treated a recapitalization, a U.S. Holder's holding period in COFINA Bonds received pursuant to the exchange will include the holding period of the Existing Securities exchanged therefor. Long-term capital gain is generally taxable at preferential rates to non-corporate U.S. Holders. The deductibility of capital losses is subject to limitations. U.S. Holders should consult their own tax advisors as to the possibility of market discount carrying over to the COFINA Bonds in case, contrary to the Debtor's expectation, the IRS rules that the exchange of the Existing Securities for the COFINA Bonds is a recapitalization. Upon a taxable disposition of the COFINA Bonds, a U.S. Holder must recognize ordinary income (in lieu of capital gain) to the extent of accrued market discount, unless the U.S. Holder previously elected to include the market discount in income as it accrued. A U.S. Holder can elect to include market discount in income as it accrues, in which case such income would be treated as ordinary interest income at the time it is recognized and the U.S. Holder would increase its basis in the COFINA Bond by the amount of the market discount recognized. Such election is made by including market discount in income on a timely filed U.S. federal income tax return and attaching a statement to the return providing that such election has been made.

If such election is made, the election applies to all market discount bonds acquired by the U.S. Holder during the year for which the election is made and all subsequent years.

**(b)**    ***Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), and Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3)***

This section only addresses U.S. Holders that elect to receive the Ambac Certificates or the National Certificates, as applicable. See below under "—Tax Treatment of Exchange if National Exercises the National Election" for the U.S. federal income tax consequences to U.S. Holders if National exercises the National Election.

i.     **National Trust**

a.     **Tax Characterization of the Trust**

The National Trust is expected to be treated as a grantor trust for U.S. federal income tax purposes. To the extent the National Trust is treated as a grantor trust, each National Certificate Holder will be treated as receiving their respective certificate in exchange of their Allowed Claims, and as owning its pro rata undivided interest in the National Trust Assets, each to the extent of its pro rata interest in the National Certificates.  U.S. Holders should consult their own tax advisors regarding the U.S. federal income tax treatment of the National Trust.

To the extent National Certificate Holders are treated as owning their pro rata share of the National Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan of Adjustment directly and as owners of their pro-rated portion of the COFINA Bonds.  Interest on a portion of such COFINA Bonds is expected to be excluded

from gross income for U.S. federal income tax purposes (such interest, the "National Trust Tax-Exempt Interest"). Orrick Herrington & Sutcliffe, LLP expects to deliver an opinion, on the Effective Date that, under then current law, the National Trust Tax-Exempt Interest received by the National Trust, and passed through and paid to the National Certificate Holders will be excluded from gross income for federal incomes tax purposes to the same extent as if the COFINA Bonds were directly held by the National Certificate Holders. Such opinion is subject to the final documentation governing the National Trust. The opinion of Orrick Herrington & Sutcliffe, LLP is not binding on the IRS or the courts. No opinion is expected to be delivered by Orrick Herrington & Sutcliffe, LLP or any other counsel on payments made to the National Trust, and passed through to the National Certificate Holders, that do not derive from the COFINA Bonds.

It is possible that the IRS may assert that the National Trust is properly characterized in a manner other than as a grantor trust for U.S. federal income tax purposes. Such alternative characterization could result in different (and possibly adverse) tax consequences to the National Trust and the National Certificate Holders. All National Certificate Holders are urged to consult their own tax advisors regarding the tax consequences in case the National Trust is not classified as a grantor trust for U.S. federal income tax purposes.

### b. Taxation of Ownership and Sale or Disposition of the National Certificates

To the extent that each National Certificate Holder is treated as owning its pro rata share of the applicable outstanding National Insured Bonds and related insurance policy, it will be entitled to payments from the underlying insurance policy. The U.S. federal income tax treatment of payments from the underlying insurance policy after the Effective Date is uncertain and National Certificate Holders are urged to consult their own tax advisors regarding the U.S. federal income tax treatment of such insurance payments. To the extent that each National Certificate Holder is treated as owning its pro rata share of the COFINA Bonds, see "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Taxation of COFINA Bonds" above for a discussion of the U.S. federal income tax consequences of owning the COFINA Bonds.

To the extent that each National Certificate Holder is treated as receiving its pro rata share of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National) including the Consummation Cost, see above "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange" for the U.S. federal income tax consequences of receiving such distribution.

Certain aspects of the U.S. federal income tax treatment of owning and disposing of a National Certificate are uncertain. U.S. Holders should consult their tax advisors regarding the ownership, sale and disposition of the National Certificates in their individual circumstances.

c.     **Tax Treatment of Exchange if National Exercises the National Election**

If National exercises the National Election, U.S. Holders of Senior COFINA Bond Claims (National) will receive cash consideration in an amount equal to one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolution) of the National Insured Bonds. As discussed above in "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange—Tax Treatment of Receipt of Cash," generally, a U.S. Holder that was not previously required to include in taxable income any accrued but unpaid interest on a Bond Claim that is not tax-exempt may be required to include such amount as interest income for U.S. federal income tax purposes. Otherwise, the remainder portion of such cash consideration is expected to be treated as a payment under the Existing Securities. A U.S. Holder would recognize gain or loss in an amount equal to the difference between (i) the cash received, and (ii) the U.S. Holder's adjusted tax basis in the Senior COFINA Bond Claims (National).

ii.     **Ambac Trust**

a.     **Tax Characterization of the Trust**

Although it is not free from doubt, the Ambac Trust is expected by Ambac to be treated as a partnership for U.S. federal income tax purposes. To the extent the Ambac Trust is treated as a partnership, it should not be subject to any entity level U.S. federal income tax. Each holder of an Ambac Certificate will be treated as receiving their respective certificate in exchange of their Allowed Claims, and as owning an interest in the Ambac Trust. Certain restrictions and limitations may be placed on the ownership or transferability of the Ambac Certificates if a determination is made that such provisions are necessary or desirable to prevent the Ambac Trust from being treated as a publicly traded partnership taxable as a corporation.

U.S. Holders should consult with their own tax advisors regarding the U.S. federal income tax treatment of the Ambac Trust.

b.     **Taxation of Sale or Other Disposition of Tax-Exempt COFINA Bonds**

To the extent that Tax-Exempt COFINA Bonds are sold at a gain, such gain shall be distributed to each Ambac Certificate Holder but will be subject to U.S. federal income taxation to the extent not offset by any consequent losses.

(c)     _**Junior COFINA Bond Claims (Assured) (Class 6)**_

U.S. Holders of Junior COFINA Bond Claims (Assured) will receive one hundred percent (100%) of the Junior COFINA Bond Claims (Assured) at an acceleration price of par plus accrued interest or Compounded Amount.   Generally, the U.S. federal income tax

consequences to the U.S. Holders of Junior COFINA Bond Claims (Assured) would be as described above under "—Tax Treatment of Exchange if National Exercises the National Election." U.S. Holders of Junior COFINA Bond Claims (Assured) should consult their tax advisors regarding the tax consequences of the Plan of Adjustment in their individual circumstances.

**(d)**      *Holders of Senior COFINA Bond Claims (Taxable Election) (Class 4) and Junior COFINA Bond Claims (Taxable Election) (Class 7)*

The exchange of the Existing Securities for the COFINA Bonds and the distribution of Rounding Amount Cash by U.S. Holders of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) generally will be treated as described above under "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Exchange; —Tax Treatment of Receipt of Cash—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and—Consummation Costs." Although, not free from doubt, the Debtor expects that the Taxable Bond Election Amount generally shall be treated similarly to the description above of Consummation Costs under "—Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3) and Junior COFINA Bond Claims (Class 5)—Tax Treatment of Receipt of Cash—Section 103 Cash, COFINA Cash Available for Distribution and Rounding Amount Cash and—Consummation Costs."

U.S. Holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims that are eligible to make the election described above should consult their own tax advisors regarding the U.S. federal income tax consequences of making such election. As described above, the term "U.S. Holders" as defined herein does not include Puerto Rico Individuals and Puerto Rico Corporations, each as defined below under "—Puerto Rico Individuals and Puerto Rico Corporations." Puerto Rico Individuals and Puerto Rico Corporations should see the discussion below under "—Puerto Rico Individuals and Puerto Rico Corporations.

**(e)**      *Holders of GS Derivative Claims (Class 8)*

The tax treatment of derivatives is complex. U.S. Holders of GS Derivative Claims should refer to the underlying offering document and agreement and consult their tax advisors regarding the tax treatment of their derivatives including the consequences of the termination of their contracts.

**(f)**      *Holders of General Unsecured Claims (Class 9)*

In the event that a U.S. Holder of General Unsecured Claims votes to accept the Plan of Adjustment and receives its pro rata share of One Hundred Thousand Dollars ($100,000.00), it would recognize gain or loss in an amount equal to the difference between (a) the amount of such cash, and (b) the U.S. Holder's adjusted tax basis in such General Unsecured Claims.

213

### 3. Bad Debt and/or Worthless Securities Deduction

A U.S. Holder who, under the Plan of Adjustment, receives in respect of an Allowed Claim an amount less than the U.S. Holder's tax basis in the Allowed Claim may be entitled in the year of receipt (or in an earlier or later year) to a bad debt deduction or a worthless securities deduction. The rules governing the character, timing and amount of bad debt or worthless securities deductions place considerable emphasis on the facts and circumstances of the U.S. Holder, the obligor and the instrument with respect to which a deduction is claimed. U.S. Holders of Allowed Claims should consult their tax advisors with respect to their ability to take such a deduction.

### 4. Medicare Surtax

A U.S. Holder of Taxable COFINA Bonds that is an individual, estate or trust that does not fall into a special class of trusts that is exempt from such tax, is subject to a 3.8% Medicare surtax on the lesser of (1) the U.S. Holder's "net investment income" (or "undistributed net investment income" in the case of an estate or trust) for the relevant taxable year, which includes, among other items, interest (including original issue discount) on debt, and capital gains from the sale or other taxable disposition of debt, and (2) the excess of the U.S. Holder's modified adjusted gross income (or adjusted gross income in the case of an estate or trust) for the taxable year over a certain threshold (which in the case of individuals is between $125,000 and $250,000, depending on the individual's circumstances). A U.S. Holder that is an individual, estate or trust should consult its own tax advisors regarding the applicability of the Medicare surtax to its income and gains in respect of its exchanges and their ownership of the COFINA Bonds.

### 5. Information Reporting and Backup Withholding

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the COFINA Bonds, and (iii) payments of proceeds of the sale or other disposition of the COFINA Bonds.

Additionally, backup withholding may apply to any payments if such U.S. Holder (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding. The application for exemption is available by providing a properly completed IRS Form W-9 (or suitable substitute).

Backup withholding is not an additional tax. A U.S. Holder generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain U.S. Holders are not subject to information reporting and backup withholding, in some cases provided they properly identify themselves as exempt. U.S. Holders should consult their own tax advisors regarding their qualification for an exemption from backup withholding

214

and the procedures for obtaining such an exemption.

## C.  Puerto Rico Individuals and Puerto Rico Corporations

### 1.  Definition of Puerto Rico Individuals and Puerto Rico Corporations

As used herein, the term "Puerto Rico Individual" means a beneficial owner of a Bond Claim or COFINA Bond that is an individual and a bona fide resident of the Commonwealth within the meaning of Section 937 of the IRC and the Treasury Regulations for the entire taxable year that includes the Effective Date. As used herein, the term "Puerto Rico Corporation" means a beneficial owner of a Bond Claim or COFINA Bond that is a corporation organized under the laws of the Commonwealth.

The following discussion includes only certain U.S. federal income tax consequences of the Plan of Adjustment to Puerto Rico Individuals and Puerto Rico Corporations. The discussion does not include any non-U.S. (including Puerto Rico) tax considerations. A Puerto Rico Individual or a Puerto Rico Corporation should review the section "Certain Material Puerto Rico Income Tax Considerations" below for the Puerto Rico tax consequences of the Plan of Adjustment.

The rules governing the U.S. federal income tax consequences to Puerto Rico Individuals and Puerto Rico Corporations are complex. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding the U.S. federal, state and local and the foreign tax consequences of the consummation of the Plan of Adjustment in their own circumstances.

### 2.  Tax Treatment of Exchange

A Puerto Rico Individual generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan of Adjustment. A Puerto Rico Corporation generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan of Adjustment, unless such gain is effectively connected with such Puerto Rico Corporation's conduct of a trade or business in the United States, in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—Sale, Retirement or Other Disposition of COFINA Bonds."

### 3.  Taxation of COFINA Bonds

#### (a)  *Treatment of Interest*

Payments of interest on a COFINA Bond (including OID) to a Puerto Rico Individual or a Puerto Rico Corporation, generally, would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United

States and interest (including OID) on the Taxable Bonds is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

(b) <b><i><u>Sale, Retirement or Other Disposition of COFINA Bonds</u></i></b>

Gain realized upon a sale, retirement or other disposition of a COFINA Bond by a Puerto Rico Individual or a Puerto Rico Corporation generally would not be subject to U.S. federal income tax unless, in the case of a Puerto Rico Corporation, the Puerto Rico Corporation is deemed to be engaged in a trade or business in the United States and such income is effectively connected with the conduct of a trade or business within the United States.

If a Puerto Rico Corporation is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a COFINA Bond by the Puerto Rico Corporation is "effectively connected" with the conduct of that trade or business, then the Puerto Rico Corporation would be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder. In addition, a Puerto Rico Corporation may be subject to a branch profits tax with respect to such effectively connected income.

The tax consequences of the Plan of Adjustment to Puerto Rico Individuals and Puerto Rico Corporations are uncertain. Puerto Rico Individuals and Puerto Rico Corporations should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan of Adjustment.

**4. Information Reporting and Backup Withholding**

Information reporting will generally apply to (i) payments in respect of the exchange, (ii) payments of principal and interest and OID, if any, on the COFINA Bonds, and (iii) payments of proceeds of the sale or other disposition of the COFINA Bonds.

In general, a Puerto Rico Individual will not be subject to backup withholding with respect to any payments on the COFINA Bonds if it provides a validly completed IRS Form W-9 (or suitable substitute) unless such Puerto Rico Individual (a) fails to provide an accurate taxpayer identification number, (b) furnishes an incorrect taxpayer identification number, (c) is notified by the IRS that it has failed to report all interest and dividends required to be shown on its U.S. federal income tax returns, or (d) fails to certify under penalties of perjury that the U.S. Holder has furnished a correct taxpayer identification number and that the IRS has not notified the U.S. Holder that the U.S. Holder is subject to backup withholding.

A Puerto Rico Corporation, generally, will not be subject to backup withholding with respect to payments in respect of the exchange or payments of principal and interest and OID, if any, on the COFINA Bonds, provided that the Puerto Rico Corporation has provided a validly completed IRS Form W-8BEN-E (or other applicable form) establishing that it is not a U.S. person as defined in the IRC (or it satisfies certain documentary evidence requirements for establishing that it is not a U.S. person). Information reporting and, depending on the

216

circumstances, backup withholding will apply to payments of proceeds of the sale or other disposition of the COFINA Bonds made within the United States or conducted through certain United States-related financial intermediaries, unless the Puerto Rico Corporation certifies to the payor under penalties of perjury that it is not a U.S. person (and the payor does not have actual knowledge or reason to know that such Puerto Rico Corporation is a U.S. person), or otherwise establishes an exemption.

Backup withholding is not an additional tax. A Puerto Rico Individual or Puerto Rico Corporation, as applicable, generally may obtain a refund of any amounts withheld under the backup withholding rules that exceed its U.S. federal income tax liability by timely filing a refund claim with the IRS.

Certain Puerto Rico Individuals and Puerto Rico Corporations are not subject to information reporting and backup withholding in some cases provided they properly identify themselves as exempt. Puerto Rico Individuals and Puerto Rico Corporations should consult their own tax advisors regarding their qualification for an exemption from backup withholding and the procedures for obtaining such an exemption.

**D.      Non-U.S. Holders**

**1.      Definition of Non-U.S. Holders**

Unless otherwise noted, the discussion below applies only to Non-U.S. Holders. As used herein, the term "Non-U.S. Holder" means a beneficial owner of Existing Securities that is not (i) a U.S. Holder, (ii) a partnership or other entity treated as a partnership or other pass-through entity for U.S. federal income tax purposes or (iii) an individual that is a bona fide resident of Puerto Rico for all or part of the taxable year that includes the Effective Date.

The following discussion includes only certain U.S. federal income tax consequences of the Plan of Adjustment to Non-U.S. Holders. The discussion does not include any non-U.S. tax considerations. The rules governing the U.S. federal income tax consequences to Non-U.S. Holders are complex. Non-U.S. Holders should consult their own tax advisors regarding the U.S. federal, state and local and the foreign tax consequences of the consummation of the Plan of Adjustment in their individual circumstances.

**2.      Tax Treatment of Exchange**

A Non-U.S. Holder generally would not be subject to U.S. federal income tax with respect to any gain realized on the exchange of an Allowed Claim pursuant to the Plan of Adjustment, unless (i) such gain is effectively connected with such Non-U.S. Holder's conduct of a trade or business in the United States (and, if an income tax treaty applies, such gain is attributable to a permanent establishment or fixed base maintained by such Non-U.S. Holder in the United States), in which case the gain will be subject to tax in the same manner as effectively connected income as described below under "—Sale, Retirement or Other Disposition of COFINA Bonds;" or (ii) such Non-U.S. Holder is a nonresident alien individual who holds the COFINA Bonds as a capital asset and is present in the United States for 183 days or more in the taxable year of the exchange and such gain is derived from sources within the United States.

217

3.      **Taxation of COFINA Bonds**

(a)      <u>*Treatment of Interest*</u>

Payments of interest on a COFINA Bond (including OID) to a Non-U.S. Holder, which will be foreign source income for U.S. federal income tax purposes, generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such income is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and interest (including OID) on the Taxable COFINA Bonds is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that interest (including OID) on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

(b)      <u>*Sale, Retirement or Other Disposition of COFINA Bonds*</u>

Gain realized upon a sale, retirement or other disposition of a COFINA Bond by a Non-U.S. Holder generally would not be subject to U.S. federal income tax so long as the Non-U.S. Holder is not deemed to be engaged in a trade or business in the United States and such gain is not effectively connected with the conduct of a trade or business within the United States.

If a Non-U.S. Holder is treated as engaged in a trade or business in the United States and gain realized upon a sale, retirement or other disposition of a COFINA Bond by the Non-U.S. Holder is "effectively connected" with the conduct of that trade or business, then the Non-U.S. Holder will be subject to U.S. federal income tax on that gain on a net income basis generally in the same manner as if it were a U.S. Holder unless an applicable income tax treaty provides otherwise. In addition, if the Non-U.S. Holder is a corporation, it may be subject to a branch profits tax with respect to such effectively connected income unless an applicable income tax treaty applies to reduce such rate.

The tax consequences of the Plan of Adjustment to the Non-U.S. Holders are uncertain. Non-U.S. Holders should consult their tax advisors regarding the particular tax consequences to them of the transactions contemplated by the Plan of Adjustment.

E.      **FATCA**

Pursuant to FATCA, foreign financial institutions (which term includes most foreign hedge funds, private equity funds, mutual funds, securitization vehicles and other investment vehicles) and certain other foreign entities generally must comply with certain new information reporting rules with respect to their U.S. account holders and investors or confront a new withholding tax on U.S.-source payments made to them (whether received as a beneficial owner or as an intermediary for another party). A foreign financial institution or such other foreign entity that does not comply with the FATCA reporting requirements generally would be subject

to withholding tax with respect to any "withholdable payments." For this purpose, "withholdable payments" are any U.S.-source payments of fixed or determinable, annual or periodic income and, beginning January 1, 2019, also include the entire gross proceeds from the sale or other disposition of any property of a type which can produce U.S.-source interest or dividends even if the payment would otherwise not be subject to U.S. nonresident withholding tax. For taxable years beginning no earlier than January 1, 2019, withholding under FATCA generally may apply to certain "foreign passthru payments." Withholding under FATCA generally should not apply to payments of interest (including OID) under a COFINA Bond because such payment generally should be foreign source income. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules. Holders should consult with their tax advisors as to the application of FATCA in their individual circumstances.

## XVI.  Certain Material Puerto Rico Income Tax Considerations

A general description of certain material Puerto Rico income tax consequences of the Plan of Adjustment to Holders of Allowed Claims is provided below. This summary is based on current provisions of Act No. 91 of May 13, 2016, as amended, known as the Urgent Interest Fund Act, the Puerto Rico Internal Revenue Code of 2011, as amended (the "P.R. Code") and the regulations promulgated or applicable thereunder issued by the Department of Treasury of Puerto Rico (the "P.R. Treasury"), the Puerto Rico Municipal Property Tax Act of 1991, as amended, and the regulations promulgated thereunder, the Municipal License Tax Act, as amended, and the regulations promulgated thereunder, and administrative pronouncements and judicial decisions in connection with the foregoing laws and regulations (collectively, "Applicable P.R. Tax Law"). Changes in or new interpretations of Applicable P.R. Tax Law may have retroactive effect and could significantly affect the Puerto Rico tax consequences described below.

The Puerto Rico tax consequences of the Plan of Adjustment are complex. As of the date of this Disclosure Statement, no ruling has been requested from the P.R. Treasury with respect to the tax consequences discussed herein, and the discussion below is not binding upon P.R. Treasury or the courts. No tax opinion is given by this Disclosure Statement and no assurance can be given that P.R. Treasury would not assert, or that a court would not sustain, a different position than any position discussed herein.

Except as specifically noted otherwise, this summary does not address U.S. federal, state, local or foreign tax consequences of the exchange, nor does it purport to address all aspects of Puerto Rico taxation that may be relevant to a holder in light of its individual circumstances or to a holder that may be subject to special tax rules (such as registered investment companies, broker-dealers, banks, insurance companies, financial institutions, tax-exempt organizations, corporations of individuals, partnership or other pass-through entities, beneficial owners of pass-through entities, Holders who hold Claims or who will hold the COFINA Bonds as part of a straddle, hedge, conversion transaction, or other integrated investment, or subsequent purchasers of COFINA Bonds).

Furthermore, this summary assumes that a Holder holds Existing Securities and COFINA Bonds only as a "capital asset" (within the meaning of section 1034.01(a)(1) of the P.R. Code) and that the COFINA Bonds qualify as debt under the P.R. Code.

219

**THIS SUMMARY IS FOR GENERAL INFORMATION PURPOSES ONLY, AND
IS NOT INTENDED TO BE, AND SHOULD NOT BE CONSTRUED TO BE, LEGAL OR
TAX ADVICE TO ANY PARTICULAR HOLDER. YOU ARE URGED TO CONSULT
YOUR OWN TAX ADVISOR WITH REGARD TO THE APPLICATION OF THE
APPLICABLE P.R. TAX LAWS , AS WELL AS THE APPLICATION OF NON-
INCOME TAX LAWS AND THE LAWS OF NON-PUERTO RICO TAXING
JURISDICTIONS, TO YOUR PARTICULAR SITUATION.**

A.    **P.R. Holders**

1.    **Definition of P.R. Holder**

Unless otherwise noted, the discussion below applies only to P.R. Holders. As used
herein, the term "P.R. Holder" means a beneficial owner of Existing Securities or COFINA
Bonds, that is:

- An individual who for the entire taxable year is a bona fide resident of Puerto Rico for
  purposes of section 933 of the IRC (as determined under section 937(a) of such code) and
  resident of Puerto Rico for purposes of the P.R. Code;

- a corporation or other entity organized under the laws of Puerto Rico that is treated as a
  corporation for Puerto Rico income tax purposes, excluding a corporation or any other
  type of entity subject to pass through tax treatment or any other special tax regime under
  the P.R. Code;

- an estate, the income of which is subject to Puerto Rico income taxation regardless of its
  source; or

- a trust (other than a business trust), all of the beneficiaries of which are individual
  residents of Puerto Rico, as described above.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico
income tax purposes holds Existing Securities or COFINA Bonds, the Puerto Rico income tax
treatment of a partner in such partnership generally will depend upon the status of the partner and
the activities of the partnership. Partners in such a partnership are urged to consult their tax
advisors.

B.    **Consequences to P.R. Holders**

1.    **Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond
      Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2);
      Senior COFINA Bond Claims (National) that do not elect to receive the
      National Certificates (Class 3); and Junior COFINA Bond Claims (Class 5)
      (These Holders are collectively referred to in this discussion as the "SENIOR
      AND JUNIOR HOLDERS")**

(a)    *Tax Treatment of Exchange*

The exchange of Existing Securities for COFINA Bonds will constitute a taxable exchange of the Existing Securities, unless such exchange qualifies as a recapitalization under the P.R. Code. An exchange of Existing Securities for COFINA Bonds will constitute a tax-free recapitalization, in part, for Puerto Rico income tax purposes if (i) COFINA is classified as a corporation under the P.R. Code and (ii) both the Existing Securities and the COFINA Bonds are treated as "securities" for purposes of the applicable P.R. Code provisions. It is not clear whether COFINA would be classified as a corporation under the P.R. Code. While the matter is not free from doubt, the Debtor intends to take the position that the exchange does not qualify as a recapitalization under the P.R. Code since COFINA does not seem to be the type of entity classified as a corporation. However, no direct Puerto Rico authority exists on this issue, and P.R. Holders should consult their own tax advisors regarding whether the exchange qualifies as a recapitalization for Puerto Rico income tax purposes and the Puerto Rico income tax consequences in that event. The discussion below assumes that the exchange of Existing Securities for the COFINA Bonds does not qualify as a recapitalization.

### (b)     *Exchange of Existing Securities for COFINA Bonds*

If, consistent with the Debtor's position, the exchange of the Existing Securities for the COFINA Bonds pursuant to the Plan of Adjustment does not qualify as a recapitalization, the exchange of Existing Securities for the COFINA Bonds will constitute a taxable exchange for Puerto Rico income tax purposes. Therefore, a P.R. Holder will recognize gain or loss equal to the difference between the amount realized on the exchange and the P.R. Holder's adjusted tax basis in the Existing Securities on the date of the exchange. The amount realized on the exchange of Existing Securities will equal the fair market value of each COFINA Bond plus any cash received (except for any portion attributable to accrued and unpaid interest). Please refer to the discussion below related to cash payments for consummation costs and insurance payments.

Gain or loss on the exchange of Existing Securities for COFINA Bonds will be a capital gain or loss and may be a long-term capital gain or loss if the P.R. Holder's holding period for the COFINA Bonds is longer than one year. Long-term capital gains recognized by P.R. Holders that are individuals, estate and trusts may be subject to a maximum Puerto Rico income tax rate of 15% (or a maximum of 24% if the alternate basic tax is applicable). The long-term capital gains of P.R. Holders that are taxable as corporations may be subject to a maximum Puerto Rico income tax rate of 20%.

P.R. Holders may deduct capital losses realized in the exchange of the Existing Securities for COFINA Bonds against capital gains realized during the taxable year, and non-corporate P.R. Holders may deduct any excess net capital losses of up to $1,000 against ordinary income. Excess net capital losses may be carried forward as short-term losses for seven taxable years and may be used to offset up to 80% of the capital gains realized during any such taxable years.

*Accrued Interest.* To the extent that any consideration (*i.e.*, COFINA Bonds or portion thereof, plus any cash payment) received by a P.R. Holder in exchange for Existing Securities is attributable to accrued and unpaid interest on the Existing Securities, that amount of consideration will be considered exempt interest income for Puerto Rico income tax purposes. In that event, the portion allocated to accrued and unpaid interest will reduce the amount realized by the P.R. Holder to compute gain or loss on the exchange.

221

The Plan of Adjustment provides that, to the extent applicable, all distributions to a P.R. Holder of an Allowed Claim will be applied first to the principal amount of such Allowed Claim until such principal amount is paid in full and then to any applicable accrued interest included in such Allowed Claim to the extent that interest is payable under the Plan of Adjustment. There is no specific Applicable P.R. Tax Law that considers how payments must be applied in this situation. Therefore, for Puerto Rico income tax purposes, the Debtor intends to treat the distributions to a P.R. Holder in accordance with the Plan of Adjustment. In that event, any distributions received under the Plan of Adjustment would be applied first to reduce your adjusted basis in the Existing Securities (and if it is not sufficient to cover the adjusted basis in the Existing Securities, any amount not covered will be used to compute your loss), next to reduce your accrued and unpaid interest and lastly to determine your gain.

**Cash payments of Consummation Costs and Insurance Payments.** The Puerto Rico income tax treatment of cash payments of consummation costs and the insurance payments is not specifically addressed by Applicable P.R. Tax Law and there is no clear guidance on the matter. However, the Debtor intends to treat the National and Ambac payments similar to the treatment adopted for U.S. federal income tax purposes, thus, they will be part of your amount realized on the exchange of Existing Securities for COFINA Bonds and subject to Puerto Rico income taxes as described above. Please refer to the U.S. federal income tax discussion of "Holders of Senior COFINA Bond Claims (Class 1), Senior COFINA Bond Claims (Ambac) that do not elect to receive the Ambac Certificates (Class 2); Senior COFINA Bond Claims (National) that do not elect to receive the National Certificates (Class 3); and Junior COFINA Bond Claims (Class 5) — Tax Treatment of Receipt of Cash". However, P.R. Treasury may not agree and consider such payments (or some of them) as amounts not paid under the Existing Securities and tax them separately as ordinary income.

P.R. Holders should consult their own tax advisors regarding the tax treatment of distributions received under the Plan of Adjustment.

(c)    **_Ownership of COFINA Bonds_**

*Interest*. Interest paid or accrued to P.R. Holders on the COFINA Bonds will not be subject to Puerto Rico income tax (including the alternate basic tax and the alternative minimum tax), and the municipal license tax.

The excess of the principal amount of the COFINA Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax (including the alternate basic tax and the alternative income tax), and municipal license tax.

Ownership of the COFINA Bonds may result in a portion of the interest paid or accrued by a P.R. Holder and other expenses incurred by the P.R. Holder attributable to interest on the COFINA Bonds being disallowed as deductions for Puerto Rico income tax purposes.

**Sale, Exchange or Retirement of the COFINA Bonds.** As a result of the New Bond Legislation, the transfer of the COFINA Bonds will be totally exempt from Puerto Rico income taxes.

101361236v29

P.R. Holders are urged to consult their tax advisors regarding any limitations in the use of capital losses that may result in connection with the sale, exchange or retirement of the COFINA Bonds.

*Property Taxes.* The COFINA Bonds will be exempt from Puerto Rico property taxes.

*Estate and Gift Taxes.* The transfer of the COFINA Bonds by gift or upon the death of a P.R. Holder that is an individual will not be subject to Puerto Rico estate or gift taxes.

**2.      Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2) and Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3)**

For purposes of the following discussion, each of the Ambac Trust and the National Trust will be referred to as a "Trust," as applicable, and the assets that shall be deposited into each such Trust as "Trust Assets," as applicable. Each of the Ambac Certificates and the National Certificates will be referred to as a "Trust Certificate," and each P.R. Holder who holds such Trust Certificates will be referred to as a "Certificate Holder."

### (a)      *Tax Characterization of the Trusts*

Under the P.R. Code, the Trusts will be classified as grantor trusts if classified as such for U.S. federal income tax purposes. Therefore, please refer to the U.S. federal income tax discussion under "Holders of Senior COFINA Bond Claims (Ambac) that elect to receive the Ambac Certificates (Class 2), Senior COFINA Bond Claims (National) that elect to receive the National Certificates (Class 3) — National Trust — Tax Characterization of the Trust — Ambac Trust — Tax Characterization of the Trust".

The rest of this discussion assumes that the Trusts will be classified as grantor trusts for U.S. federal and Puerto Rico income tax purposes. However, if the Trusts are not classified as grantor trusts for U.S. federal income tax purposes, P.R. Treasury may assert that the Trusts are properly characterized in a manner other than as grantor trusts for Puerto Rico income tax purposes. Such alternative characterization could result in different (and possibly adverse) tax consequences to the Trusts and the Certificate Holders than the ones discussed below. Each Certificate Holder is urged to consult its own tax advisor regarding the tax consequences in case the Trusts are not classified as grantor trusts.

### (b)      *Taxation of Ownership and Sale or Disposition of the Trust Certificates*

If a Trust is treated as a grantor trust, each Certificate Holder will be treated as receiving applicable Trust Certificates in exchange of its Allowed Claims and as owning its pro rata undivided interest in the applicable Trust Assets, each to the extent of its pro rata interest in the applicable Trust.

To the extent Certificate Holders are treated as owning their pro rata share of the applicable Trust Assets under a grantor trust, they will be treated as if they had received distributions under the Plan of Adjustment directly and as owners of their prorate portion of the COFINA Bonds.  Therefore, they will be subject to Puerto Rico income taxes similar to the

manner discussed in this discussion for "SENIOR and JUNIOR Holders — Tax Treatment of Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds."

P.R. Holders are urged to consult their tax advisors regarding the ownership, sale and disposition of the Trust Certificates under their individual circumstances.

(c)    ***Tax Treatment if National Exercises the National Election***

If National exercises the National Election, P.R. Holders of Senior COFINA Bond Claims (National) will receive cash consideration in an amount equal to one hundred percent (100%) of the Compounded Amount (as defined in the Existing Bond Resolution) of the National Insured Bonds. The Debtor intends to treat such cash consideration as payments under the Existing Securities. Therefore, a P.R. Holder would recognize gain or loss in an amount equal to the difference between the cash received and the P.R. Holder's adjusted tax basis in the Senior COFINA Bond Claims (National), except for any amount allocated to accrued and unpaid interest. Please refer to the discussions for "SENIOR and JUNIOR Holders — Tax Treatment of the Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds" for more detail.  In particular, please refer to "SENIOR and JUNIOR Holders — Cash payments of Consummation Costs and Insurance Payments" for discussion of payments made by National.

3.    **Tax Treatment of Junior COFINA Bond Claims (Assured) (Class 6)**

P.R. Holders of Junior COFINA Bond Claims (Assured) will receive one hundred percent (100%) of the Junior COFINA Bond Claims (Assured) at an acceleration price of par plus accrued interest or compounded amount.  Generally, the Puerto Rico income tax consequences to the P.R. Holders of Junior COFINA Bond Claims (Assured) would be as described above under "Treatment of Exchange if National Exercises the National Election."

4.    **Holders of Senior COFINA Bond Claims (Taxable Election) (Class 4) and Junior COFINA Bond Claims (Taxable Election) (Class 7)**

The exchange of the Existing Securities for the COFINA Bonds and cash by P.R. Holders of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) will be treated as described above under "SENIOR and JUNIOR Holders — Tax Treatment of Exchange — Exchange of Existing Securities for COFINA Bonds — Ownership of COFINA Bonds".  Although Applicable P.R. Tax Law does not specifically address treatment of Taxable Election Cash, the Debtor expects that the Taxable Election Cash will be treated similarly to the Debtor's description above for cash payments of Consummation Costs and Insurance Payments under "SENIOR and JUNIOR Holders — Exchange of Existing Securities for COFINA Bonds."

P.R. Holders of Senior COFINA Bond Claims and Junior COFINA Bond Claims that are eligible to make the election described above should consult their own tax advisors regarding the Puerto Rico income tax consequences of making such election.

101361236v29

### 5. Holders of GS Derivative Claims (Class 8)

The tax treatment of derivatives is complex and there is limited guidance under the Applicable P.R. Law. P.R. Holders of GS Derivative Claims should refer to the underlying offering document and agreement and consult their tax advisors regarding the tax treatment of their derivatives including the consequences of the termination of their contracts.

### 6. Holders of General Unsecured Claims (Class 9)

In the event that a P.R. Holder of General Unsecured Claims votes to accept the Plan of Adjustment and receives its pro rata share of One Hundred Thousand Dollars ($100,000.00), it would recognize gain or loss in an amount equal to the difference between the amount of such cash, and the P.R. Holder's adjusted tax basis in such General Unsecured Claims.

## C. Non-P.R. Holders

### 1. Definition of Non-P.R. Holders

Unless otherwise noted, the discussion below applies only to Non-P.R Holders. As used herein, the term "Non-P.R. Holder" means a beneficial owner of Existing Securities or COFINA Bonds that is not (i) a P.R. Holder or (ii) a partnership or other entity treated as a partnership or other pass-through entity for Puerto Rico income tax purposes.

If a partnership or other entity or arrangement taxable as a partnership for Puerto Rico income tax purposes holds Existing Securities or COFINA Bonds, the Puerto Rico income tax treatment of a partner in such partnership generally will depend upon the status of the partner and the activities of the partnership. Partners in such a partnership are urged to consult their tax advisors.

The following discussion includes only certain Puerto Rico income tax consequences of the Plan of Adjustment to Non-P.R. Holders. The discussion does not include any non-Puerto Rico tax considerations. Non-P.R. Holders should consult their own tax advisors regarding the Puerto Rico and foreign tax consequences of the consummation of the Plan of Adjustment under their individual circumstances.

### 2. Tax Treatment of Exchange

As a result of the New Bond Legislation, the transfer of the COFINA Bonds by a Non-P.R. Holder will be totally exempt from Puerto Rico income taxes.

Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes are urged to consult their tax advisors regarding any limitations in the use of capital losses that may result in connection with the sale, exchange or retirement of the COFINA Bonds.

3.      **Taxation of COFINA Bonds**

*Payments of Interest*. Interest paid or accrued on the COFINA Bonds to a Non-P.R. Holder will not be subject to Puerto Rico income tax (including the alternate basic tax and alternative minimum tax), and municipal license tax.

The excess of the principal amount of the COFINA Bond due at maturity over its initial issue price, if any, will not be subject to Puerto Rico income tax (including the alternate basic tax and alternative minimum tax), and municipal license tax.

The deductions for Puerto Rico income tax purposes of a Non-P.R. Holder engaged in a trade or business in Puerto Rico that are related to interest paid or accrued and other expenses incurred that are attributable to interest on the COFINA Bonds may be disallowed.

*Sale, Exchange or Retirement of COFINA Bonds*. Gain recognized on the sale or exchange of the COFINA Bonds by a Non-P.R. Holder that is not engaged in a trade or business in Puerto Rico will not be subject to Puerto Rico income tax, by way of withholding or otherwise, or municipal license tax. On the other hand, Non-P.R. Holders that are corporations (or treated as corporations under the P.R. Code) and nonresident aliens that are engaged in trade or business in Puerto Rico for Puerto Rico income tax purposes will be subject to Puerto Rico income tax on any such gain if it is effectively connected with their Puerto Rico trade or business

*Property Taxes*. The COFINA Bonds will be exempt from Puerto Rico property taxes.

*Estate and Gift Taxes.* The transfer of the COFINA Bonds by gift or upon the death of a Non-P.R. Holder will not be subject to Puerto Rico gift or estate taxes, as the case may be.

## XVII. <u>Applicability of Certain Federal and State Securities Laws</u>

A.      **General**

1.      **Registration of Securities**

In general, securities issued by Reorganized COFINA such as the COFINA Bonds are exempt from the registration requirements of the Securities Act under section 3(a)(2) of the Securities Act.

In addition to exemptions provided to government agencies and instrumentalities such as Reorganized COFINA under the Securities Act, Bankruptcy Code section 1145(a)(1), made applicable to the Title III Case pursuant to PROMESA section 301, provides an exemption from the registration requirements of the Securities Act and from any requirements arising under state securities laws for the offer or sale under a plan of adjustment of securities of the debtor, an affiliate of the debtor participating in a joint plan of adjustment with the debtor, or a successor of the debtor.  The Bankruptcy Code provides that certain creditors, which are deemed "underwriters" within the meaning of the Bankruptcy Code, may not resell such securities without registration under the Securities Act or pursuant to an exemption therefrom. Since obligations of COFINA are exempt from registration under generally applicable securities law, this exception is not relevant to securities of Reorganized COFINA, although the provisions of

226

Bankruptcy Code section 1145 which suspend the operation of securities laws may not be available to "underwriters" within the meaning of the Bankruptcy Code. Creditors of COFINA who believe they meet the definition of "underwriter" within the meaning of the Bankruptcy Code should consult qualified counsel with respect to their obligations under relevant federal and state securities laws.

Like the exemption from registration provided to COFINA under section 3(a)(2) of the Securities Act, generally applicable securities laws provide an exemption from qualification for certain trust indentures entered into by governmental entities. Therefore, each trust indenture, ordinance and resolution relating to the COFINA Bonds will be exempt from qualification under section 304(a)(4) of the Trust Indenture Act.

To the extent the Ambac Certificates or the National Certificates are deemed to be "securities," the issuance of the Ambac Securities and the National Certificates under the Plan of Adjustment is expected to be exempt from registration under the Securities Act of 1933, as amended, and any other applicable federal, state and local laws requiring registration of securities. The Ambac Trust and the National Trust are also expected to be exempt from registration under the Investment Company Act of 1940, as amended.

## 2. Market Disclosure

### (a) *Initial Offer and Sale*

Although exempt from registration, securities issued by Reorganized COFINA are subject to the anti-fraud provisions of federal securities laws. Section 10(b) of the Securities Act and Rule 10b-5 promulgated by the SEC under the Securities Act generally prohibit fraud in the purchase and sale of securities. Therefore, each publicly offered sale of Reorganized COFINA obligations typically is accompanied by an offering document that is referred to as an "Official Statement" and contains disclosure of material information regarding the issuer and the securities being sold so that investors may make an informed investment decision as to whether to purchase the securities being offered. Bankruptcy Code section 1125(d), which has been adopted by PROMESA, provides that the adequacy of any disclosure to creditors and hypothetical investors typical of holders of Claims in this case is not subject to principals of any otherwise applicable non-bankruptcy law, rule or regulation, which includes federal securities laws. Instead, Bankruptcy Code section 1125(b), which has been adopted by PROMESA, provides disclosure regulation by requiring that adequate information be provided to the various classes of creditors of COFINA and to hypothetical investors in obligations of COFINA through a disclosure statement such as this Disclosure Statement.

### (b) *Continuing Disclosure*

Publicly offered securities of Reorganized COFINA generally are subject to the requirements of the Rule (that is, Rule 15c2-12 under the Exchange Act (as defined above)), promulgated by the SEC under the Securities Act, unless such securities meet certain exemptions provided for in the Rule. Among other requirements, the Rule requires underwriters participating in an offering to obtain an agreement imposing ongoing market disclosure requirements upon an issue of municipal securities, such as Reorganized COFINA.

The delivery of the COFINA Bonds pursuant to the Plan is not covered by the Rule because the COFINA Bonds are proposed to be issued in exchange for a claimholder's Claim without the involvement of an underwriter as defined in the Rule. However, Reorganized COFINA intends to voluntarily execute and deliver, for the benefit of the holders of the COFINA Bonds, a new CDU containing certain disclosure obligations. The CDU will be delivered on the Effective Date.

State securities laws generally provide registration exemptions for subsequent transfers by a bona fide owner for the owner's own account and subsequent transfers to institutional or accredited investors. Such exemptions generally are expected to be available for subsequent transfers of the COFINA Bonds.

## XVIII. Financial Information and Projections

### A.    Financial Statements

A copy of COFINA's audited financial statements for the year ended June 30, 2015 is attached to this Disclosure Statement as Exhibit E.

### B.    COFINA Fiscal Plan and Projections

Attached to this Disclosure Statement as Exhibit D is a copy of the COFINA Fiscal Plan, certified by the Oversight Board on October 18, 2018, which provides details regarding COFINA's projected operations under the Plan of Adjustment, subject to the assumptions and qualifications set forth in the certified COFINA Fiscal Plan.

It is important to note the projections described in the COFINA Fiscal Plan may differ from actual performance and are highly dependent on significant assumptions concerning the future economic and financial condition of the Commonwealth and its instrumentalities, which are affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the government of Puerto Rico, the Oversight Board, and other third-party entities such as the government of the United States.

The financial projections included in the COFINA Fiscal Plan assume the successful implementation of the Plan of Adjustment. The financial projections included in the COFINA Fiscal Plan should be reviewed in conjunction with the assumptions, notes, and qualifications included in the COFINA Fiscal Plan, and the assumptions, qualifications, and explanations set forth in this Disclosure Statement, including in the Sections titled "Overview of COFINA," "The Title III Plan of Adjustment," "Certain Risk Factors to Be Considered," "Federal Income Tax Consequence of Consummation of the Plan of Adjustment," and "Applicability of Certain Federal and State Securities Laws."

The COFINA Fiscal Plan does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express

an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the government of Puerto Rico or COFINA and the information contained herein.

In deciding whether to vote to accept or reject the Plan of Adjustment, holders of Claims must make their own determinations as to the reasonableness of the assumptions and the reliability of the financial projections and should consult with their own advisors.

## XIX.  **Additional Information**

Any statements in this Disclosure Statement concerning the provisions of any document are not necessarily complete, and in each instance reference is made to such document for the full text thereof. Certain documents described or referred to in this Disclosure Statement have not been attached as Exhibits because of the impracticability of furnishing copies of these documents to all recipients of this Disclosure Statement. All Exhibits to the Plan of Adjustment will be filed with the Title III Court and available for review, free of charge, on the Document Website at https://cases.primeclerk.com/puertorico prior to the Voting Deadline. Copies of all Exhibits to the Plan of Adjustment also may be obtained, free of charge, by contacting the Solicitation Agent, Prime Clerk LLC, by telephone at (844) 822-9231 (toll free for U.S. and Puerto Rico) or (646) 486-7944 (for international callers), available 10:00 a.m. to 7:00 p.m. (Atlantic Standard Time) (Spanish available), or by email at puertoricoballots@primeclerk.com and reference "COFINA Plan of Adjustment Exhibits" in the subject line.  Please note that Prime Clerk LLC is not authorized to provide, and will not provide, legal advice.

## XX.  **Conclusion**

The Debtor believes the Plan of Adjustment is in the best interests of all creditors and urges the holders of impaired Claims entitled to vote on the Plan of Adjustment to vote to accept the Plan of Adjustment and to evidence the acceptance by timely returning their Ballots marked to accept the Plan of Adjustment by the Voting Deadline.


Dated: San Juan, Puerto Rico
     November 26, 2018

PUERTO RICO SALES TAX FINANCING CORPORATION, by and through the Financial Oversight and Management Board for Puerto Rico as its representative

By:    */s/ Natalie A. Jaresko*
Name:  Natalie A. Jaresko
Title:   Executive Director


Respectfully submitted,

*/s/ Martin J. Bienenstock*

Martin J. Bienenstock (*pro hac vice*)

Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
Chris Theodoridis (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

*Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtor*

/s/ Hermann D. Bauer

Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944

*Co-Attorneys for the Financial Oversight and*
*Management Board as representative for the*
*Debtor*

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit A Page 1 of 1

# Exhibit A

## COFINA Plan of Adjustment

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit B Page 1 of 110

## Exhibit B

**Amended and Restated Plan Support Agreement**

## AMENDED AND RESTATED PLAN SUPPORT AGREEMENT

AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September 20, 2018, by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Corporación del Fondo de Interés Apremiante de Puerto Rico, whose name in English is the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of Senior COFINA Bond Claims on behalf of such holders as set forth on Exhibit "A" hereto (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, which may include the advisors or managers who are advising or managing a holder of the Junior COFINA Bond Claims on behalf of such holders as set forth on Exhibit "B" hereto, (together with their respective successors and assigns with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("**Bonistas**"). The signatories hereto are referred to hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used but not otherwise defined herein shall have the meanings set forth in Article I below.

RECITALS

A. Pursuant to that certain Amended and Restated Sales Tax Revenue Bond Resolution, adopted on July 13, 2007, as amended on June 19, 2009 and pursuant to certain supplemental resolutions (collectively, the "**Bond Resolutions**"), COFINA issued the following series of Puerto Rico Sales Tax Revenue Bond to provide funds for the Commonwealth of Puerto Rico (the "**Commonwealth**") to, among other things, repay certain debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico Public Finance Corporation.

| Resolution | Bond Series | Amounts |
|---|---|---|
| First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 | Senior Series 2007A | $2,667,603,573 |
| Second Supplemental Sales Tax Revenue Bond Resolution, adopted on July 17, 2007 | Senior Series 2007B | $1,333,101,780 |
| Third Supplemental Sales Tax Revenue Bond Resolution, adopted December 18, 2007 | Senior Series 2007C | $499,996,628 |
| Fourth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 25, 2008 | Senior Series 2008A | $737,046,992 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | First Subordinate Series 2009A | $4,118,153,700 |

| Resolution | Bond Series | Amounts |
|---|---|---|
| Eighth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 17, 2009 | First Subordinate Series 2009B | $1,217,915,799 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | Senior Series 2009C | $237,875,000 |
| Twelfth Supplemental Sales Tax Revenue Bond Resolution, adopted on January 28, 2010 | First Subordinate Series 2010A | $1,823,757,271 |
| Fourteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010C | $1,619,404,577 |
| Fifteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010D | $89,435,000 |
| Sixteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010E | $92,755,000 |
| Eighteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011A-1 First Subordinate Series 2011A-2 | $397,758,386 $337,037,188 |
| Nineteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011B | $45,600,000 |
| Twentieth Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011C | $1,006,474,702 |
| Twenty First Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011D | $91,155,000 |

B.      In connection with the issuance of certain of the Senior COFINA Bonds, Ambac and National issued certain insurance policies and National entered into insurance agreements with respect thereto.

C.      In connection with the issuance of certain of the Junior COFINA Bonds, COFINA entered into insurance agreements with Assured corresponding to insurance policies issued by Assured.  Assured also insures certain of the Junior COFINA Bonds pursuant to secondary market insurance policies.

D.      On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

2

E.     PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to the Commonwealth and its instrumentalities as provided for in PROMESA, and the Oversight Board has designated COFINA as a Covered Territorial Instrumentality (as defined in PROMESA).

F.     Pursuant to Act 2-2017, AAFAF was appointed as the representative of the Government of Puerto Rico, and granted authority with respect to, reaching agreements with creditors on any indebtedness issued by any governmental entity of the Commonwealth.

G.     On May 5, 2017, the Oversight Board filed a Title III petition on behalf of COFINA (the "**Title III Case**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

H.     The Oversight Board is the representative of COFINA in the Title III Case pursuant to Section 315(b) of PROMESA.

I.     The Parties have engaged in good faith, arm's length negotiations regarding the principal economic terms of a proposed restructuring of the Senior COFINA Bonds and the Junior COFINA Bonds to be implemented in a manner to be mutually agreed upon as set forth in the term sheet annexed hereto as Exhibit "C" (the "**Term Sheet**").

J.     On August 29, 2018, substantially all of the Parties executed a Plan Support Agreement (the "**Initial Agreement**"), which agreement included substantially all of the terms set forth herein.  In light of necessary modifications, the Parties have agreed to enter into this Agreement, which amends and restates the Initial Agreement.

K.     The Oversight Board and AAFAF consent to COFINA's execution and delivery of this Agreement and to COFINA performing and exercising its rights under this Agreement, including, without limitation, COFINA's rights to terminate this Agreement and its right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.   Recitals.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.   Definitions.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"*Actions*" shall mean, collectively, the litigation styled (a) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, (b) Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon, Case No. 17-CV-3750-LTS, currently pending in the Title

III Court, (c) <u>Ambac Assurance Corp. v. The Bank of New York Mellon</u>, Case No. 17-CV-3804-LTS, currently pending in the United States District Court for the Southern District of New York, (d) <u>The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al.</u>, Adv. Pro. No. 17-133-LTS, currently pending in the Title III Court, and (e) <u>Rodriguez-Perelló et al. v. Rosselló-Nevares et al.</u>, No. 3:17-cv-01566-FAB (D.P.R. 2017), currently pending in the United States District Court for the District of Puerto Rico.

"***Adversary Proceeding***" shall mean that certain adversary proceeding styled <u>The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico, as representative of The Puerto Rico Sales Tax Financing Corporation</u>, Adv. Proc. No. 17-257-LTS, currently pending in the United States District Court for the District of Puerto Rico, regarding ownership of the Pledged Sales Tax Base Amounts.

"***Agents***" shall mean, collectively, the COFINA Agent and the Commonwealth Agent.

"***Agreement***" shall mean, collectively, this Amended and Restated Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, the Term Sheet, as each may be amended, supplemented or otherwise modified in accordance with the terms hereof or thereof.

"***Agreement in Principle***" shall mean the Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute, attached as Exhibit "A" to the Joint Informative Motion of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle [Adv. Proc. No. 17-257 LTS, Dkt. No. 486].

"***Appointments Related Litigation***" shall mean, collectively, the litigation styled (a) <u>In Re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority</u>, et al., Adv. Pro. No. 17-AP-228-LTS, currently pending in the Title III Court, (d) <u>René Pinto Lugo, et al. v. The Government of the United States of America, et al.</u>, Adv. Pro. No. 18-041-LTS, currently pending in the Title III Court, (e) <u>Hermandad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al.</u> v. <u>Government of the United States of America, et al.</u>, Adv. Pro. No. 18-066-LTS, currently pending in the Title III Court, (f) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (g) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the COFINA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

"***Aurelius***" shall mean Aurelius Capital Master, Ltd.

4

"**Bankruptcy Code**" shall mean Title 11 of the United States Code, as amended, §101, et seq.

"**Bankruptcy Rules**" shall mean The Federal Rules of Bankruptcy Procedure.

"**Business Day**" shall mean a day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

"**COFINA Agent**" shall mean Bettina Whyte, as agent for the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation.

"**COFINA Effective Date**" shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

"**Commonwealth Agent**" shall mean the Official Committee of Unsecured Creditors of The Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico.

"**Confirmation Order**" shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the Title III Case in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

"**Custodial Trusts**" shall mean, collectively, the trust(s), or custodial arrangement(s), if any, which may be formed on or prior to the COFINA Effective Date in accordance with the provisions of the Term Sheet and the Plan.

"**Definitive Documents**" shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Term Sheet, the Plan (including any amendments, modifications and supplements thereto), the Dispute Settlement, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, the Settlement Agreement, the Settlement Motion, the Settlement Order, the organizational documents of Reorganized COFINA, and the Bond Resolutions, as amended (or as repealed and replaced), each having terms and conditions consistent with this Agreement and PROMESA in all respects and otherwise be in form and substance reasonably satisfactory to each Party; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

"**Dispute Settlement**" shall mean the compromise and settlement of the Adversary Proceeding and the claims and causes asserted therein, as announced by the Agents in the Agreement in Principle on June 5, 2018, and to be set forth in the Settlement Agreement; provided, however, that, to the extent that any provisions of the Settlement Agreement are

5

inconsistent with the terms and provisions set forth herein, in the Term Sheet or in the Plan, the terms and provisions set forth herein, in the Term Sheet and in the Plan shall govern.

"**Disclosure Statement**" shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the Title III Case in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

"**Disclosure Statement Order**" shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the Plan and (ii) elections of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or, (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

"**First Puerto Rico Family of Funds**" shall mean, collectively, First Puerto Rico AAA Target Maturity Fund I, Inc., First Puerto Rico AAA Target Maturity Fund II, Inc., First Puerto Rico Tax-Exempt Fund, Inc., First Puerto Rico Tax-Exempt Fund II, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc., First Puerto Rico Target Maturity Income Opportunities Fund I, Inc., First Puerto Rico Target Maturity Income Opportunities Fund II, Inc., First Puerto Tax Advantaged Target Maturity Fund I, Inc. and First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.

"**Government Parties**" shall mean, collectively, the Oversight Board, AAFAF and COFINA.

"**Government Released Claims**" shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which

any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

"**Government Releasees**" shall mean the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

"**GSAM**" shall mean Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as investment manager.

"**Informative Motion**" shall mean that certain Commonwealth Agent's Informative Motion with Respect to Oversight Board's Announcement, Dated August 8, 2018, Regarding Certain Terms for COFINA Plan of Adjustment [Adv. Proc. No. 17-257-LTS, ECF No. 540].

"**Insurers**" shall mean, collectively, Ambac, Assured and National.

"**Insured Claims**" shall mean, collectively, Insured Senior COFINA Bond Claims and Insured Junior COFINA Bond Claims.

"**Insured Junior COFINA Bond Claims**" shall mean, collectively, Junior COFINA Bond Claims, the payment of which has been insured by Assured.

"**Insured Junior Holders**" shall mean, collectively, the Parties that are beneficial holders of Insured Junior COFINA Bond Claims.

"**Insured Senior COFINA Bond Claims**" shall mean, collectively, Senior COFINA Bond Claims, the payment of which has been insured by Ambac or National, including, without limitation, Senior COFINA Bond Claims the payment of which (a) is insured by MBIA Insurance Company and reinsured by National or (b) was originally insured by Finance Guaranty Insurance Company but for which primary insurer responsibility was subsequently novated to National.

"**Insured Senior Holders**" shall mean, collectively, the Parties that are beneficial holders of the Insured Senior COFINA Bond Claims.

"**Junior COFINA Bond Claims**" shall mean, collectively, the claims arising from or relating to the Junior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Junior COFINA Bonds plus the accrued and unpaid

101736284v3

interest on the Junior COFINA Bonds (or, in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

"**Junior COFINA Bonds**" shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "First Subordinate" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

"**Junior Holders Group**" shall mean, collectively, GSAM, Oppenheimer and First Puerto Rico Family of Funds.

"**Oppenheimer**" shall mean, collectively, funds and accounts managed or advised by Oppenheimer Funds, Inc. and OFI Global Institutional Inc. and listed on the signature pages hereto.

"**Plan**" shall mean the COFINA plan of adjustment to be filed with the Title III Court by the Oversight Board in the Title III Case in accordance with Section 312 of PROMESA and incorporating the terms and provisions herein and in the Term Sheet, the form and substance of which shall be reasonably satisfactory to each Party.

"**Plan Supplement**" shall mean, the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

"**Principal Amount**" shall mean, solely for purposes of the signature pages affixed hereto, (a) with respect to current interest bonds, the principal amount of the Senior COFINA Bonds or Junior COFINA Bonds, plus the accrued and unpaid interest thereon, and (b) with respect to the capital appreciation bonds, the accreted value of the Senior COFINA Bonds or Junior COFINA Bonds, as applicable, and, in each case, accrued or accreted up to, but not including, May 5, 2017.

"**PSA Creditors**" shall mean, collectively, the Senior Ad Hoc Holders, the Junior Holders Group, the Puerto Rico Funds, Ambac, Assured, Aurelius, Six PRC and National.

"**Puerto Rico Funds**" shall mean, collectively, Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Fixed Income Fund VI, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free

8

Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund.

*"Qualified Marketmaker"* shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the COFINA Bonds or enter with customers into long and short positions in debt securities such as the COFINA Bonds, in its capacity as a dealer or market marker in such COFINA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to COFINA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

*"Reorganized COFINA"* shall mean COFINA from and after the COFINA Effective Date.

*"Senior Ad Hoc Holders"* shall mean, collectively, Aristeia Capital, L.L.C., Canyon Capital Advisors L.L.C., Decagon Holdings 1, L.L.C., Decagon Holdings 2, L.L.C., Decagon Holdings 3, L.L.C., Decagon Holdings 4, L.L.C., Decagon Holdings 5, L.L.C., Decagon Holdings 6, L.L.C., Decagon Holdings 7, L.L.C., Decagon Holdings 8, L.L.C., Decagon Holdings 9, L.L.C., Decagon Holdings 10, L.L.C., GoldenTree Asset Management LP, Old Bellows Partners LP, Scoggin Management LP, Taconic Capital Advisors L.P., Taconic Master Fund 1.5 L.P., Tilden Park Capital Management LP and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms hereof.

*"Senior COFINA Bond Claims"* shall mean, collectively, the claims arising from or relating to the Senior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Senior COFINA Bonds plus the accrued and unpaid interest on the Senior COFINA Bonds (or in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

*"Senior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "Senior" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

*"Settlement Agreement"* shall mean that certain Settlement Agreement to be entered into by the Agents setting forth their agreement compromising and settling the claims and causes of action asserted, or which could have been asserted, in the Adversary Proceeding; provided, however, that, in the event that the Agents do not enter into the Settlement Agreement, "Settlement Agreement" shall mean the material economic terms set forth in the Agreement in Principle, as further developed by the Oversight Board and the Parties hereto, compromising and settling the claims and causes of action asserted, or which could have been asserted in the Adversary Proceeding and set forth in the Settlement Motion.

*"Settlement Motion"* shall mean the motion filed with the Title III Court by the Oversight Board in the Commonwealth Title III proceeding seeking entry of an order approving the Dispute Settlement in accordance with Bankruptcy Rule 9019 and applicable law, which motion shall be in form and substance reasonably satisfactory to each Party.

"*Settlement Order*" shall mean the order of the Title III Court in the Commonwealth Title III case granting the relief requested in the Settlement Motion and authorizing the consummation of the Dispute Settlement, which order shall be in form and substance reasonably satisfactory to each Party.

"*Six PRC*" shall mean Six PRC Investments LLC.

Section 1.3.   <u>Other Terms</u>.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  Capitalized terms used herein, but not otherwise defined, shall have the meanings set forth in the Term Sheet.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation."  Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4.   <u>Interpretations</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5.   <u>Exhibits</u>.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II
GENERAL PROVISIONS

Section 2.1.   <u>Mediation</u>.  Each of the Parties acknowledges and agrees that this Agreement and the Term Sheet are the product of their participation in mediation ordered by the Title III Court and the mediation team appointed in connection therewith.  In the event that any disputes arise in connection with the preparation of the Plan and the Disclosure Statement, each of the Parties consent to such matters being referred to mediation for the resolution thereof; <u>provided</u>, <u>however</u>, that no Party is limited to having any such dispute finally determined by mediation.

Section 2.2   <u>Financial Information</u>.  Each of the Government Parties acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for each of the Senior COFINA Bonds or Junior COFINA Bonds provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged and confidential and (b) unless otherwise ordered by the Title III Court, shall use their reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

10

Section 2.3     CUSIP Information.  Within five (5) Business Days after the date hereof, each of the Senior Holders, the Junior Holders, Ambac, Assured, and National shall provide the Oversight Board, in writing, the CUSIP numbers for each of the Senior COFINA Bonds and Junior COFINA Bonds, if any, such Party owns or has due investment management responsibility and authority for funds or accounts which own such Senior COFINA Bonds or Junior COFINA Bonds, as the case may be.

## ARTICLE III
## REPRESENTATIONS AND WARRANTIES

Section 3.1.     Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2.     Representations and Warranties of AAFAF.  AAFAF hereby represents and warrants that: (a) it is duly created under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval,  power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except with respect to the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3.     Representations and Warranties of COFINA.  COFINA hereby represents and warrants that, subject to entry of an order of the Title III Court in connection with the Title III Case: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and

101736284v3

validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except as set forth on Schedule 3.4 hereto and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

      Section 3.4.   <u>Representations and Warranties of the Senior Holders</u>.  Each of the Senior Holders (other than Ambac and National), severally and not jointly,  hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Senior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Senior COFINA Bonds Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Senior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; <u>provided</u>, <u>however</u>, that each of the Insured Senior Holders acknowledges that the Insured Senior COFINA Bonds Claims shall be voted by the applicable Insurers, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

      Section 3.5.   <u>Representations and Warranties of the Junior Holders</u>.  Each of the Junior Holders (other than Ambac), severally and not jointly hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval,  power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding

before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Junior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Junior COFINA Bond Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Junior COFINA Bonds or any voting, consent or direction rights related to such Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Junior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Junior Holders acknowledges that the Insured Junior COFINA Bond Claims shall be voted by Assured, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

Section 3.6.     Representations and Warranties of Ambac.  Ambac, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby, with such exceptions, individually or in the aggregate, as would not have a material adverse effect upon the foregoing; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law, rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds and Junior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or Junior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds or Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way Ambac's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.7.     Representations and Warranties of National.  National, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions

13

contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way National's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.8.    <u>Representations and Warranties of Assured</u>.  Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9.    <u>Representations and Warranties of Bonistas</u>.  Bonistas hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) Bonistas do not hold any Junior COFINA Bonds or Senior COFINA Bonds, or any Junior COFINA Bond Claims or Senior COFINA Bond Claims.

14

Section 3.10.  Representations of the Parties to this Agreement.  Each Party, severally and not jointly, represents and acknowledges that (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as may be stated specifically in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein; and (d) no holder of Junior COFINA Bond Claims or holder of Senior COFINA Bond Claims, including any "on island" bondholder, is or can be bound by Bonistas participation as a Party hereunder or any action taken by Bonistas in connection therewith. Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

ARTICLE IV
COVENANTS

Section 4.1.  Covenants of the Oversight Board.  The Oversight Board hereby covenants and agrees as follows:

(a)  The Oversight Board shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (A) filing, or causing the Commonwealth Agent to file, the Settlement Motion on or prior to October 15, 2018, (B) filing on or prior to October 15, 2018, the Disclosure Statement and the Plan, in form and substance consistent with this Agreement, including the Term Sheet, and reasonably acceptable to the Parties, (C) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (D) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (E) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)  In connection with the solicitation of acceptances and rejections to the Plan with respect to Insured Claims, the Oversight Board shall use its reasonable best efforts to obtain approval of the Disclosure Statement Order by the Title III Court providing that (i)

15

Insured Claims shall be voted by the Insurers, so long as this Agreement remains in effect, and (ii) elections (other than the Assured Election) regarding the form of distributions with respect to the Insured Claims shall be made by the beneficial holders thereof, provided that the form of elections for holder of Insured Claims regarding their distributions for such claims shall be set forth as an exhibit to the Disclosure Statement Order. For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' right to vote to accept or reject any Plan.

(c)     The Oversight Board shall negotiate in good faith with the respective Insurers regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to the respective Insurers and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.2.     Covenants of AAFAF.  AAFAF hereby covenants and agrees as follows:

(a)     AAFAF shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     AAFAF shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)     As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, AAFAF, with the assistance of COFINA, and with the prior approval of the Oversight Board, shall release requests for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such requests for proposals, AAFAF, together with the other Government Parties, shall discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.  For the avoidance of doubt, the entity

16

selected to serve as trustee or paying agent in connection with the new COFINA securities to be issued pursuant to the Plan shall not be an agency or instrumentality of the Commonwealth. AAFAF shall select, in its sole and absolute discretion, the entity or entities to serve as dealer manager(s) for the COFINA Bonds, after consulting with the Senior Ad Hoc Holders.

Section 4.3.    Covenants of COFINA.  COFINA hereby covenants and agrees as follows:

(a)    COFINA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the entry of the Confirmation Order, the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement and the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)    COFINA shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)    As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, COFINA, with the assistance of AAFAF, and with the prior approval of the Oversight Board shall release a request for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such request for proposals, COFINA, together with the other Government Parties shall, discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.

Section 4.4.    Covenants of the Senior Holders.  Each of the Senior Holders (other than Ambac and National), severally and not jointly, hereby covenants and agrees as follows:

(a)    None of the Senior Holders shall sell, transfer, pledge, hypothecate or assign (a "Transfer") any of the Senior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Senior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) the COFINA

Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Senior Holders may transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of the Transfer, such transferee executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF the Joinder Agreement attached hereto as Exhibit "D" (a "Qualified Transferee"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Senior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs, as defined in the Term Sheet, and be released from its obligations (other than as set forth in Sections 4.4(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.4(a), it shall be void ab initio and the applicable Senior COFINA Bond Claims and the Senior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the Senior Holders from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Senior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.4(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Senior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Senior Holders' aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Senior Holder agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.4(b).

(c)     Each of the Senior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III

101736284v3

Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations sets forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Senior Holders shall be limited or prohibited from (i) taking any action that any such Senior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Each of the Senior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.4 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Senior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.5.     Covenants of the Junior Holders.  Each of the Junior Holders (other than Ambac), severally and not jointly, hereby covenants and agrees as follows:

(a)     None of the Junior Holders shall Transfer any of the Junior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Junior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) COFINA Effective Date and (ii) the termination of Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Junior Holders may transfer any Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Junior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.5(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void *ab initio* and the applicable Junior COFINA Bond Claims and the Junior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to

19

preclude any of the Junior Holders from acquiring additional Junior COFINA Bond Claims or related claims; provided, however, that any such Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Junior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Junior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Junior Holders' aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Junior Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b).

(c)     Each of the Junior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Junior Holders shall be limited or prohibited from (i) taking any action that any such Junior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Each of the Junior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.5 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Junior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.6.     Covenants of Ambac.  Ambac, in its capacity as an Insurer and as a holder of Senior COFINA Bonds Claims and Junior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)     In its capacity as holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, Ambac covenants and agrees that it shall not Transfer any Senior COFINA Interests or Junior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, Ambac may Transfer any Senior COFINA Interests or Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of Ambac as the transferor of Senior COFINA Bond Claims or Junior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, Ambac as prior holder of the Senior COFINA Bond Claims or Junior COFINA Bond Claims, as the case may be, shall be deemed to have relinquished its rights (other than the right to the Consummation Costs and be released from its obligations (other than as set forth in Sections 4.6(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims and Junior COFINA Bond Claims transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void ab initio and the applicable Senior COFINA Bond Claims or Junior COFINA Bond Claims and Ambac shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude Ambac from acquiring additional Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by Ambac be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.  This Section 4.6(a) does not apply to and shall not affect any rights or obligations of Ambac as an Insurer.

21

(b)     Ambac shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claims as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Ambac's aggregate holdings of the Senior COFINA Bond Claims and Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Ambac agrees to stay all such pending litigations proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b).

(c)     Ambac shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, Ambac shall not be limited or prohibited from (i) taking any action that Ambac shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Ambac shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Ambac and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

(f)     Ambac shall support and not otherwise object to the approval of the Settlement Motion by Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.6 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Ambac from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect

to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.7.   Covenants of National.   National, in its capacity as an Insurer and as a holder of Senior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)      In its capacity as a holder of Senior COFINA Bond Claims, National covenants and agrees that it shall not Transfer any Senior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, National may Transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of National as the transferor of Senior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, National as a prior holder of Senior COFINA Bond Claims shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.7(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims so transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.7(a), it shall be void ab initio and the applicable Senior COFINA Bond Claims and National shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude National from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by National be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.7(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder or by any other applicable law or regulation.  This Section 4.7(a) does not apply to and shall not affect any rights or obligations of National as Insurer.

(b)      National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid

any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(b).

(c)    National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF and COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)    Subject to the terms set forth herein, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)    National shall negotiate in good faith with the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to National and reasonably acceptable to the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties and shall be included in the Plan Supplement. National shall use its reasonable best efforts to maximize tax-exempt treatment of distributions to certificate holders from the National Custodial Trust.

(f)    National shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.7 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of National from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.8.     Covenants of Assured.  Assured hereby covenants and agrees as
follows:

(a)     Assured shall not, except as expressly provided herein, (i) file any additional
claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including
secured, unsecured, administrative or substantial contribution claims), provided that the
failure to file any additional proofs of claim as a result of its obligations under this clause (i)
shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings
of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any
pending or additional litigation, proceeding, action or matter (and Assured agrees to stay all
such pending litigations, proceedings, actions or matters) or seek to recover damages or to
seek any other type of relief against any of the Government Releasees based upon, arising
from or relating to the Government Released Claims or any of the claims or causes of action
asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid
any person in taking any action with respect to the Government Released Claims that is
prohibited by this Section 4.8(a).

(b)     Assured shall (i) support, and otherwise not, nor encourage any other person
to, take any action which would, or would reasonably be expected to, breach or be
inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of
the Plan, the administration of COFINA's Title III case, the approval of the Disclosure
Statement, and the entry of the Confirmation Order and the consummation, implementation
and administration of the Plan, including the execution and delivery of the Definitive
Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its
consummation, implementation and administration) and the Definitive Documents are
consistent with the terms herein and the Term Sheet, and (ii) in accordance with the
provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan
unless such modification is proposed or supported by the Oversight Board, AAFAF and
COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote
for or support any plan of adjustment not proposed or supported by the Oversight Board,
AAFAF or COFINA so long as none of the Government Parties is in material breach of their
obligations set forth in this Agreement.

(c)     Assured shall support and not otherwise object to the approval of the
Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth
PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth;
provided, however, that, notwithstanding anything contained in this Section 4.8 to the
contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet,
nothing in this Agreement shall preclude or inhibit the rights, if any, of Assured from
responding to the Settlement Motion as a creditor of the Commonwealth solely with respect
to the use, or the direction of the use, of monies received, or to be received, by the
Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

(d)     Subject to the terms set forth herein, Assured shall not be limited or prohibited
from (i) taking such action that Assured shall deem necessary or appropriate to preserve,
protect or defend any of its rights under this Agreement, the Plan, or the other Definitive
Documents or (ii) asserting any claims or causes of action against any Party that breaches
this Agreement.

(e)   Assured shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Assured and reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.9.   Covenants of Bonistas.  Bonistas hereby covenants and agrees as follows:

(a)   Bonistas shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of the Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or encourage any "on island" bondholder to vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not support or encourage any "on island" bondholder to vote for any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(b)   Bonistas shall (i) actively encourage support by "on island" bondholders for the agreement set forth in the Term Sheet, (ii) post a statement of support for the Term Sheet and the Plan on the Bonistas' website, (iii) make Bonistas available to "on island" bondholders to answer questions regarding the Term Sheet, the Plan, Disclosure Statement, Confirmation Order and other Definitive Documents, and (iv) support legislation that may be necessary or appropriate to implement the transactions contemplated by the Term Sheet.

(c)   Notwithstanding the foregoing subsections, Bonistas' covenants herein to support and encourage "on island" bondholders to support the Term Sheet and vote in favor of the Plan is expressly subject to (i) the provisions of Section 5.2 of this Agreement and (ii) individual "on island" bondholders' consultations with their own legal, financial and tax advisors to analyze the terms of the Term Sheet, the Plan and the transactions contemplated thereunder.

Section 4.10.   Qualified Marketmaker Exemption.  Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any Senior COFINA Interests or Junior COFINA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided that such Qualified Marketmaker subsequently Transfers all such Senior COFINA Interests or Junior COFINA Interests to a PSA Creditor or a Qualified Transferee within the date that is ten (10) calendar days after such Qualified Marketmaker's acquisition of such Senior COFINA Interests or Junior COFINA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Senior COFINA Interests or

26

Junior COFINA Interests that the Qualified Marketmaker acquires from a holder of the Senior COFINA Interests or Junior COFINA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.

Section 4.11. <u>Right to Vote</u>. Each Party acknowledges that, for purposes of this Agreement, and any Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect, (a) each Insurer shall have the exclusive right to vote to accept or reject the Plan on account of any existing COFINA securities that it insures and (b) it shall not object to the Insurers' right to vote or reject the Plan or take any action inconsistent therewith. For avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' rights to vote to accept or reject any Plan.

Section 4.12. <u>Appointments Related Litigation</u>. Notwithstanding anything contained herein to the contrary, a Party which is a plaintiff in an Appointments Related Litigation may continue such litigation but, under all circumstances, such Party (a) hereby covenants and agrees to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) without prejudice to any rights reserved in accordance with Sections 4.4(e), 4.5(e) and 4.8(c) hereof, hereby covenants and agrees that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation, with such determination and Final Order being entered either prior to consideration of approval of the Settlement Motion or confirmation of the Plan by the Title III Court or subsequent to entry of an order approving the Settlement Motion and confirmation of the Plan, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein, in the Term Sheet, in the Settlement Motion and in the Plan and (ii) in the event that such determination and Final Order (y) occurs prior to approval of the Settlement Motion and confirmation of the Plan and (z) causes or requires the reconstitution or reappointment of the Oversight Board, such Party shall urge and request, in writing, that such reconstituted or reappointed board (1) enforce the terms and conditions of this Agreement and the Term Sheet and (2) promptly seek approval of the Settlement Motion and confirmation of the Plan by the Title III Court.

Section 4.13. <u>Additional Litigation</u>. Aurelius and Six PRC shall, and shall cause each of their applicable entities to, request entry of an order dismissing, with prejudice, those claims and causes of action, or portions of claims and causes of action, that Aurelius and Six PRC, or their affiliated entities, have asserted, or were required, by applicable law, to assert, in the litigation styled <u>Lex Claims, LLC v. The Commonwealth of Puerto Rico</u>, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the sales and use taxes, if any, transferred by the Commonwealth to COFINA, and such other claims and causes of action which may be interpreted reasonably to challenge the transactions contemplated by the Term Sheet, the Plan and the Settlement Motion, with the effectiveness of such order conditioned on the entry of an order approving the Settlement Motion and confirmation of the Plan.

## ARTICLE V
## PLAN AND PLAN SUPPORT

Section 5.1. Plan Support Commitment. From and after the date hereof, and provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the Plan and any of the proposed Definitive Documents have been filed, amended or modified in a manner adverse to the PSA Creditors or, in the case of Bonistas, the "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims, each of the PSA Creditors and Bonistas (to the extent remaining a Party) shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, (C) approval of the Settlement Motion and the compromise and settlement contemplated therein by the Title III Court, and (D) unless otherwise ordered by the Title III Court, upon a motion on notice to the Government Parties and The Bank of New York Mellon, seeking a stay of all proceedings and determinations in connection with the Adversary Proceeding and the Actions, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the Plan in its capacity as a Senior Holder, a Junior Holder or an Insurer, as applicable (or, in the case of Bonistas, publicly support the terms herein and in the Term Sheet and publicly encourage the support and timely votes for the Plan from "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims) with rights of acceptance in accordance with the Disclosure Statement Order, each as the case may be, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote (or, in the case of Bonistas, any such support or encouragement), (iv) not consent to or vote (or, in the case of Bonistas, not encourage "on island" bondholders to vote) for any modification of the Plan unless such modification is (Y) not adverse to the Senior Holders, the Junior Holders, Ambac, Assured, National or "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims and (Z) not inconsistent with the terms provided herein and the Term Sheet, and (v) not vote for or support any plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement.

Section 5.2. Solicitation Required in Connection with Plan. Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan will not be solicited until the Title III Court has approved the Disclosure Statement and related solicitation materials, and such Disclosure Statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

101736284v3

# ARTICLE VI
# TERMINATION

Section 6.1.  Termination of Agreement.  This Agreement may be terminated as follows:

(a)  By any PSA Creditor or Bonistas, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) the Board of Directors of COFINA shall have failed to ratify this Agreement within seven (7) calendar days of the date hereof, (ii) the Settlement Motion, the Plan, the Disclosure Statement and the motion seeking entry of the Disclosure Statement Order are not filed with the Title III Court on or prior to October 15, 2018, or (iii) the Oversight Board withdraws the Settlement Motion, the Plan, the Disclosure Statement or the motion seeking entry of the Disclosure Statement Order or files any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Term Sheet, in any material respect, and such motion or pleading has not been withdrawn before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 7.10 hereof) that such motion or pleading is inconsistent with this Agreement in such material respect and (z) entry of an order of the Title III Court approving such motion or pleading and granting the relief requested therein.

(b)  By any Party, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) a Party materially breaches any of the covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, (ii) the Confirmation Order is not entered by the Title III Court and the COFINA Effective Date does not occur on or prior to March 1, 2019, (iii) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, or (iv) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay; provided, however, that, upon the joint instruction and notice provided by the Government Parties, the date set forth in subsection (ii) above shall be extended up to and including June 1, 2019;

and, provided, further, that, under no circumstances shall a Party have the right to terminate this Agreement solely on the basis that the Title III Court determines that the Insurers are unable to accept the Plan on behalf of holders of Insured Senior Holders or Insured Junior Holders, as the case may be; and, provided, further, that, in the event that this Agreement is terminated by the Oversight Board, it shall be deemed terminated as to all Parties hereto; and, provided, further, that the automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof.  This Agreement shall automatically terminate upon the occurrence of the COFINA Effective Date.

Section 6.2.  Effect of Termination.  Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party (or of any of its directors, officers, employees, consultants, contractors, agents, legal and

29

financial advisors or other representatives), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs in accordance with the provisions of the Term Sheet), except for the obligations and or provisions set forth in Sections 2.1, 2.2, 7.2, 7.5 and 7.14 hereof and this clause (b) of Section 6.2 hereof, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab initio,* shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, this Agreement or otherwise; and, provided, further, that, if a terminating Party is also party to commutation agreement with an Insurer, then, any elections tendered by such terminating Party in relation to the treatment of existing COFINA securities insured by such Insurer shall be deemed to be automatically null and void *ab initio* only if permitted pursuant to the terms of such commutation agreement or if such terminating Party is no longer party to such commutation agreement. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein where the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

## ARTICLE VII
## MISCELLANEOUS

Section 7.1.    Amendments.  This Agreement, including, without limitation, the Term Sheet, may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected (or, in the case of Bonistas, if "on island" bondholders are to be affected) by such modification, amendment or supplement.

Section 7.2.    No Admission of Liability.

(a)     The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

101736284v3

(b)      None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Actions or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA or COFINA with respect to the validity of any of the Senior COFINA Bond Claims or the Junior COFINA Bond Claims.  None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 7.3.      Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement.  The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.  The Parties further acknowledge and agree that, in connection with the Title III Case and the negotiation and consummation of this Agreement, including, without limitation, the Term Sheet, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 7.4.      Third Party Beneficiary.  Other than funds and/or accounts which are holders of the Senior COFINA Bonds or Junior COFINA Bonds and whose advisors or managers are Parties hereto, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto, Reorganized COFINA and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 7.5.      Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this

31

Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.10 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 7.10 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 7.6.     Headings. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.7.     Binding Agreement; Successors and Assigns. This Agreement shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Term Sheet are not affected in any manner adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.

Section 7.8.     Entire Agreement. This Agreement, including, without limitation, the Term Sheet, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Term Sheet, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement. Notwithstanding the foregoing, nothing contained herein shall be deemed to limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

32

Section 7.9.   Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10.   Notices.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i), when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

(a)   If to the Oversight Board, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
          Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

(b)   If to AAFAF or COFINA, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
Email: jrapisardi@omm.com
          Suzzanne Uhland, Esq.
Email: suhland@omm.com
Facsimile: 212-326-2061

(c)   If to Ambac, to:

MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Attn:   Dennis Dunne, Esq.
Email: ddunne@milbank.com
          Atara Miller, Esq.
Email: amiller@milbank.com
Facsimile: 212-530-5219

33

(d)     If to Assured, to:

CADWALADER, WICKERSHAM & TAFT
200 Liberty Street

New York, NY 10281
Attn: Mark Ellenberg, Esq.
Email: mark.ellenberg@cwt.com
        Lary Stromfeld, Esq.
Email: lary.stromfeld@cwt.com
        Ivan Loncar, Esq.
Email: ivan.loncar@cwt.com
        Casey Servais, Esq.
Email: casey.servais@cwt.com
Facsimile: 212-504-6666

(e)     If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Marcia L. Goldstein, Esq.
Email: marcia.goldstein@weil.com
        Gabriel Morgan, Esq.
Email: gabriel.morgan@weil.com
Facsimile: 212-310-8007

(f)     If to the Senior Ad Hoc Holders, to:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010
Attn:   Susheel Kirpalani, Esq.
Email: susheelkirpalani@quinnemanuel.com
        Eric Kay, Esq.
Email: erickay@quinnemanuel.com
Facsimile: 212-849-7100

(g)     If to Oppenheimer or the First Puerto Rico Family of Funds, to:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Thomas Mayer, Esq.
Email: tmayer@kramerlevin.com
        Amy Caton, Esq.
Email: acaton@kramerlevin.com
        Douglas Buckley, Esq.

34

Email: dbuckley@kramerlevin.com
Facsimile: 212-715-8169

(h)    If to GSAM, to:

McDERMOTT, WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606
Attn:   William P. Smith, Esq.
Email: wsmith@mwe.com
       David L. Taub, Esq.
Email: dtaub@mwe.com
       Alexandra C. Scheibe, Esq.
Email: ascheibe@mwe.com
Facsimile: 312-277-9069

(i)    If to the Puerto Rico Funds, to:

WHITE & CASE LLP
200 South Biscayne Boulevard
Miami, FL 33131
Attn:   John K. Cunningham, Esq.
Email: jcunningham@whitecase.com
       Fernando de la Hoz, Esq.
Email: fdelahoz@whitecase.com
Facsimile: 305-358-5744

(j)    If to Bonistas, to:

DAVIS, POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn:   Donald Bernstein, Esq.
Email: donald.bernstein@davispolk.com
       Brian Resnick, Esq.
Email: brian.resnick@davispolk.com
Facsimile: 212-701-5800

(k)    If to certain of the Insured Senior Holders, to:

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Attn:   Lawrence A. Larose, Esq.
Email: lawrence.larose@nortonrosefulbright.com
       Eric Daucher, Esq.
Email: eric.daucher@nortonrosefulbright.com

(l)    If to GoldenTree Asset Management LP, to:

35

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff, Esq.
Email: idizengoff@akingump.com
         Philip C. Dublin, Esq.
Email: pdublin@akingump.com

(m)    If to Tilden Park Capital management LP, to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Attn:  Sandy Qusba, Esq.
Email: squsba@stblaw.com
         Nicholas Baker, Esq.
Email: nbaker@stblaw.com
Facsimile: 212-455-2502

(n)    If to Whitebox Advisors LLC, to:

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Attn:  Daniel A. Fliman, Esq.
Email: dfliman@stroock.com
Facsimile: 212-806-6006

(o)    If to Aurelius or Six PRC, to:

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Andrew N. Rosenberg, Esq.
Email: arosenberg@paulweiss.com
Facsimile: 212-373-3000

      Section 7.11.   <u>Non-Waiver of Remedies</u>.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

      Section 7.12.   <u>Several, Not, Joint Obligations</u>.  The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

36

Section 7.13.   <u>Remedies Cumulative</u>.  All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 7.14.   <u>Specific Performance</u>.  Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligation hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement.

Section 7.15.   <u>Further Assurances</u>.  Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:  Natalie A. Jaresko
    Title:  Executive Director


THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
    Name:
    Title:


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name:
    Title:


BONISTAS DEL PATIO, INC.

By: _____
    Name:  Rafael E. Rojo
    Title:  Chairman

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:
    Title:


PUERTO RICO SALES TAX
FINANCING CORPORATION

By: Puerto Rico Fiscal Agency and Financial
    Advisory Authority

By: _____
    Name: Christian Sobrino Vega
    Title: Executive Director of AAFAF, in its
        capacity as Authorized Signatory for
        COFINA


PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name: Christian Sobrino Vega
    Title: Executive Director


BONISTAS DEL PATIO, INC.

By: _____
    Name: Rafael E. Rojo
    Title: Chairman

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
     Name:
     Title:

THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
     Name:
     Title:

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
     Name:
     Title:

BONISTAS DEL PATIO, INC.

By: _____
     Name:  Rafael E. Rojo
     Title:  Chairman

**AMBAC ASSURANCE CORPORATION**


By: s/Claude LeBlanc_____
      Name: Claude LeBlanc
      Title: President and Chief Executive Officer

Holder of Principal Amount of Senior COFINA Bonds:

Insurer of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Insurer of Principal Amount of Junior COFINA Bonds:

**ARISTEIA CAPITAL, L.L.C.,** solely in its capacity as Investment Manager or Adviser to underlying funds

By: s/Willian R. Techar _____
    Name: William R. Techar
    Title:   Manager
          Aristeia Capital, LLC.

By: s/Andrew B. David _____
    Name: Andrew B. David
    Title:   Chief Operating Officer
          Aristeia Capital, LLC.

Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Aristeia Capital, L.L.C.
One Greenwich Plaza, 3rd Floor
Greenwich, CT 06830
Fax:  (203) 622-2701
Attention: Steven Robinson/William Techar
Email:  robinson@aristeiacapital.com/techar@aristeiacapital.com

**ASSURED GUARANTY MUNICIPAL CORP.**

By:  s/Jorge A. Gana
          Name: Jorge A. Gana
          Title: M.D.

Insurer of Principal Amount of Junior COFINA Bonds:

**AURELIUS CAPITAL MASTER, LTD.**


By: s/Dan Gropper _____
       Name: Dan Gropper
       Title: Authorized Person


Principal Amount of Senior COFINA Bonds held as of September 20, 2018:


Principal Amount of Junior COFINA Bonds held as of September 20, 2018:


<u>Notice Address</u>

Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022
Fax: 212-786-5870
Attention: Dan Gropper
Email: dgropper@aurelius-capital.com

**CANYON CAPITAL ADVISORS LLC,** on behalf of its participating funds and/or accounts

By: s/John P. Plaga _____
    Name: John P. Plaga
    Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067
Fax:  1-310-272-1371
Attention:  General Counsel
Email:  legal@canyonpartners.com;
jheller@canyonpartners.com;
akawalsky@canyonpartners.com

**DECAGON HOLDINGS 1, L.L.C.**

By: s/Jeffrey R. Katz
      Name: Jeffrey R. Katz
      Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 1, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 2, L.L.C.**

By: s/Jeffrey R. Katz
     Name: Jeffrey R. Katz
     Title: Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 2, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 3, L.L.C.**

By: s/Jeffrey R. Katz
      Name: Jeffrey R. Katz
      Title: Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 3, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 4, L.L.C.**

By: s/Jeffrey R. Katz
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 4, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 5, L.L.C.**


By: s/Jeffrey R. Katz
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 5, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 6, L.L.C.**

By: s/Jeffrey R. Katz
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 6, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 7, L.L.C.**


By:  s/Jeffrey R. Katz
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 7, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 8, L.L.C.**


By: s/Jeffrey R. Katz_____
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 8, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit DX-QQ Page 95 of 110

**DECAGON HOLDINGS 9, L.L.C.**


By: s/Jeffrey R. Katz _____
      Name: Jeffrey R. Katz
      Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 9, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 10, L.L.C.**

By: s/Jeffrey R. Katz _____
    Name: Jeffrey R. Katz
    Title: Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 10, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

Case:17-08283-LTS Doc#:4364-37 Filed:01/26/18 Entered:01/26/18 21:36:59 Desc:
Exhibit Q Page 97 of 110

**FIRST PUERTO RICO FAMILY OF FUNDS**

First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.

By: _Frank J Serra_
    Name: Frank J Serra
    Title: President

Holder of Principal Amount of Insured Senior COFINA Bonds: ███████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: ███████

Holder of Principal Amount of Junior COFINA Bonds: ███████

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit 36 Page 96 of 110

**GOLDENTREE ASSET MANAGEMENT LP,** on behalf of certain of its affiliated funds and certain funds and accounts for which it serves as investment manager

By: s/Peter Alderman
      Name: Peter Alderman
      Title:  General Counsel--Americas


Investment Advisor to Holders of Principal Amount of Senior COFINA Bonds:


Investment Advisor to Holders of Principal Amount of Junior COFINA Bonds:


Notice Address:

GoldenTree Asset Management LP
300 Park Avenue, 20th Floor
New York, NY 10022
Fax:  212-847-3496
Attention:  Legal Department
Email:  legalgroup@goldentree.com

**GOLDMAN SACHS ASSET MANAGEMENT, L.P.,** on behalf of certain funds and accounts for which it serves as investment manager

By: s/David Z. Alter
         Name: David Z. Alter
         Title: Managing Director


Investment Manager to Holder of Principal Amount of Senior COFINA Bonds:


Investment Manager to Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Goldman Sachs Asset Management, L.P.
200 West Street, 3rd Floor
New York, NY 10282
Attention: David Z. Alter
Email: david.alter@gs.com


With a copy to:

Goldman Sachs Asset Management, L.P.
200 West Street, 15th Floor
New York, NY 10282
Attn: General Counsel

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By: s/Adam Bergonzi
      Name: Adam Bergonzi
      Title: Chief Risk Officer

Holder of Principal Amount of Senior COFINA Bonds:

      *by National Public Finance Guarantee Corporation:*

      *by MBIA Insurance Corporation:*

Insurer of Principal Amount of Senior COFINA Bonds:

Notice Address:

National Public Finance Guarantee Corporation
1 Manhattanville Road
Purchase, NY 10577
Fax: (914) 765-3164
Attention: Adam Bergonzi
Email: adam.bergonzi@nationalpfg.com

**OLD BELLOWS PARTNERS LP**

By: s/ A. Dev Chodry
      Name: A. Dev Chodry
      Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax: 646-607-5686
Attention: Nicole Kramer
Email: nkramer@scogcap.com

**OPPENHEIMER FUNDS. INC., as investment advisor for the following accounts:**

Oppenheimer Rochester Amt -Free Municipal Fund
Oppenheimer Rochester Amt -Free New York Municipal Fund
Oppenheimer Rochester California Municipal Fund
Oppenheimer Rochester Limited Term California Municipal Fund
Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
Oppenheimer Municipal Fund)
Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
Rochester Portfolio Series)
Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
State Municipal Trust)
Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
Multi-State Municipal Trust)
Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
State Municipal Trust)
Oppenheimer Rochester Fund Municipals
Oppenheimer Rochester Minnesota Municipal Fund

and

**OFI GLOBAL INSTITUTIONAL, Inc., as investment manager for the following
accounts:**

MASSMUTUAL International Holding MSC, Inc.
MASSMUTUAL Unified Traditional

By: _____
    Name: RICHARD STEIN
    Title: VICE PRESIDENT

Holder of Principal Amount of Insured Senior COFINA Bonds: $███████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: $███████████

Holder of Principal Amount of Uninsured Junior COFINA Bonds: $███████████

**TAX-FREE PUERTO RICO FUND, INC.**

**TAX-FREE PUERTO RICO FUND II, INC.**

**TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.**

**PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.**

**PUERTO RICO FIXED INCOME FUND, INC.**

**PUERTO RICO FIXED INCOME FUND II, INC.**

**PUERTO RICO FIXED INCOME FUND III, INC.**

**PUERTO RICO FIXED INCOME FUND IV, INC.**

**PUERTO RICO FIXED INCOME FUND V, INC.**

**PUERTO RICO FIXED INCOME FUND VI, INC.**

**PUERTO RICO GNMA & U.S. GOVERNMENT TARGET MATURITY FUND, INC.**

**PUERTO RICO MORTGAGE-BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.**

**UBS IRA SELECT GROWTH & INCOME PUERTO RICO FUND**

By:  s/ Carlos V. Ubiñas
        Name: Carlos V. Ubiñas
        Title: Chairma

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**PUERTO RICO INVESTORS TAX-FREE FUND, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND, INC. II**

**PUERTO RICO INVESTORS TAX-FREE FUND III, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND V, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.**

**PUERTO RICO INVESTORS BOND FUND I**


By: s/Javier Rubio
      Name: Javier Rubio
      Title: Senior Vice President

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**SCOGGIN MANAGEMENT LP**


By: s/A. Dev. Chodry _____
     Name: A. Dev Chodry
     Title: Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


<u>Notice Address:</u>

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax: <u>646-607-5686</u>
Attention: <u>Nicole Kramer</u>
Email: <u>nkramer@scogcap.com</u>

**SIX PRC INVESTMENTS LLC**

By: Monarch Debt Recovery Master Fund Ltd
Monarch Alternative Solutions Master Fund Ltd
Monarch Capital Master Partners III LP
Monarch Capital Master Partners IV LP
MCP Holdings Master LP
Monarch Special Opportunities Master Fund Ltd, as Members

By Monarch Alternative Capital LP, as investment manager


By: s/Adam Sklar
    Name: Adam Sklar
    Title: Managing Principal


Principal Amount of Senior COFINA Bonds as of September 20, 2018:


Principal Amount of Junior COFINA Bonds as of September 20, 2018:


Notice Address:

Monarch Alternative Capital LP
535 Madison Avenue
New York, NY 10022
Fax: 866-610-5157
Attention: Adam Sklar
Email: adam.sklar@monarchlp.com

**TACONIC CAPITAL ADVISORS L.P.**
**on behalf of funds under management**


By: s/Peyton McNutt
    Name: Peyton McNutt
    Title: Deputy General Counsel


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Taconic Capital Advisors L.P.
280 Park Avenue, 5th Floor
New York, New York 10017
Fax: (212) 209-3185
Attention: Marc Schwartz
Email: maschwartz@taconiccap.com

**TILDEN PARK CAPITAL MANAGEMENT LP,** on behalf of certain of its managed funds

By: s/Samuel Alcoff
     Name:  Samuel Alcoff
     Title:   Managing Member


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Tilden Park Capital Management LP
452 5th Ave, 28th Floor
New York, NY 10018
Fax:  N/A
Attention:  Rahul Pande
Email: rpande@tildenparkcapital.com
       with a copy to:  legal@tildenparkcapital.com

**WHITEBOX ADVISORS LLC,** on behalf of funds it manages

By: <u>s/Mark Strefling</u>
    Name: Mark Strefling
    Title:  Chief Executive Officer


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


<u>Notice Address:</u>

Whitebox Advisors LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention: <u>Sean Russell</u>
Email: <u>SRussell@whiteboxadvisors.com</u>

## EXHIBIT A

### LIST OF SENIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.

101736284v3

First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund, Inc. II
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

## EXHIBIT B

### LIST OF JUNIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
    Rochester Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.

First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

# **EXHIBIT C**

## TERM SHEET

EXECUTION VERSION

**COFINA**
**Restructuring Proposal**
**Summary of Terms and Conditions**

This amended and restated term sheet (the "Term Sheet"), dated as of September 20, 2018, is a summary of indicative terms and conditions for a proposed restructuring (the "Restructuring"), and a plan of adjustment (the "COFINA Plan of Adjustment") consummated in connection with proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA"; such proceedings being referred to as the "PROMESA Proceedings"), of the indebtedness of, and claims and causes of action against, the Puerto Rico Sales Tax Financing Corporation ("COFINA"). References herein to (1) the "PSA" are to that certain Amended and Restated Plan Support Agreement, dated as of September 20, 2018, by and among (a) the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), (b) COFINA, (c) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("AAFAF" and, together with the Oversight Board and COFINA, the "Government Parties"), (d) certain holders of Senior COFINA Bond Claims, as defined therein, (e) Ambac Assurance Corporation ("Ambac"), (f) National Public Finance Guarantee Corporation ("National"), (g) certain holders of Junior COFINA Bond Claims, as defined therein, (h) Assured Guaranty Municipal Corp. ("Assured"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("Bonistas"), and (2) "COFINA PROMESA Proceeding" are to the PROMESA Proceeding of COFINA. The signatories to the PSA as of August 29, 2018, shall be referred to herein as the "PSA Parties".

## I.  Compromise and Settlement of Commonwealth – COFINA Dispute

A.  On or prior to October 15, 2018, the Oversight Board, on behalf of the Commonwealth of Puerto Rico (the "Commonwealth"), shall file a motion (the "Settlement Motion") in the Commonwealth PROMESA Proceedings with the United States District Court having jurisdiction over the PROMESA Proceedings (the "Title III Court") in accordance with Bankruptcy Rule 9019 seeking the approval of the compromise and settlement of the dispute (the "Commonwealth–COFINA Dispute") between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA and pledged by COFINA to secure the repayment of certain indebtedness of COFINA, including, without limitation, ownership of collections required to be deposited in the Dedicated Sales Tax Fund (as defined in the Bond Resolutions), which funds accumulate annually up to the Pledged Sales Tax Base Amount ("PSTBA"), i.e., the annual dollar amounts determined for each fiscal year of the Commonwealth ("FY") in accordance with Section 3 of Act No. 91-2006, as amended ("Act 91"), and with respect to each FY during the period from 2019 to 2058, inclusive, set forth in Schedule 1 hereto, currently being litigated in the adversary proceeding styled The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of the Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Sales Tax Financing Corporation, Adv. Proc. No. 17-257-LTS (the "Adversary Proceeding"). The Commonwealth–COFINA Dispute shall be compromised and settled pursuant to the Settlement Motion in the Commonwealth PROMESA Proceeding, on the one hand, and pursuant to the COFINA Plan of Adjustment, as defined below, on the other hand, with (i) COFINA being granted an ownership interest of the COFINA Portion, as defined below, and (ii) the Commonwealth being granted an ownership interest of the Commonwealth Portion, as defined below; provided, however, that, except as expressly set forth in Sections II(N) and (P) hereof, (a) one hundred percent (100%) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by the Bank of New York Mellon ("BNYM"), as the COFINA bond trustee, for the benefit of the bondholders (collectively, the "Pre-FY2019 BNYM Deposits") in accordance with the Adversary Proceeding and such other orders entered in connection therewith; provided, however, that, (i) of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63)

of the Pre-FY2019 BNYM Deposits, (x) Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million Dollars ($5,000,000.00) shall be allocated to fund an operating expense fund for COFINA, and (z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash distributable under the COFINA Plan of Adjustment and if the Taxable Election Cash distributable under the COFINA Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash, shall be distributed (I) *first*, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, (b) one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith, will, on the COFINA Effective Date, as defined below, be the exclusive property of COFINA and will be distributed to COFINA for purposes of distribution in accordance with the COFINA Plan of Adjustment and (c) any FY2019 BNYM Deposits net of the COFINA FY2019 BNYM Deposits, shall be distributed in its entirety to the Commonwealth. Pursuant to the provisions of the PSA regarding support of the Settlement Motion, and except as expressly set forth in Sections II(N) and (P) hereof, the parties hereto reserve their right, if any, to contest in the Commonwealth PROMESA Proceeding the Commonwealth's (a) use, or direction of the use, of monies received by the Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction of the use, of such monies. Consideration and confirmation of the COFINA Plan of Adjustment in the COFINA PROMESA Proceeding shall be contemporaneous with consideration and approval of the Settlement Motion in the Commonwealth PROMESA Proceeding; provided, however, that, in all circumstances, the effective date of the order granting the Settlement Motion shall be contemporaneous with, and its contemporaneous occurrence shall be a condition to, the COFINA Effective Date, as defined below.

**B.**    Unless (i) approval of the Settlement Motion is denied by the Title III Court or (ii) the COFINA Effective Date does not occur, the effective date of the compromise and settlement (the "Compromise Date") shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits on the COFINA Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019. Until the COFINA Effective Date, all revenues attributable to the PSTBA, including, without limitation, the COFINA Portion and the Commonwealth Portion, shall be maintained in accordance with orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA Proceeding, the Adversary Proceeding and that certain litigation styled The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"). Without in any way limiting the foregoing, but subject to the occurrence of the COFINA Effective Date, the Commonwealth will own and will be entitled to receive the Commonwealth Portion, as defined below.

**C.**    On the COFINA Effective Date, pursuant to the Settlement Order and the Confirmation Order, as defined below, which orders shall amend and supersede such orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA

2

Proceeding, the Adversary Proceeding and the Interpleader Action to the extent that such orders are inconsistent therewith, (1) BNYM shall make distributions as set forth in Section I(A) hereof, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other claims and causes of action asserted therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have satisfied any and all of their respective obligations in connection with the Adversary Proceeding and the COFINA Agent shall be deemed to have been released from any and all liabilities associated therewith, (3) the Interpleader Action will be dismissed, with prejudice, and all other claims and causes of action asserted therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of this Term Sheet, and (4) except with respect to claims and causes of actions asserted or that could have been asserted by Ambac, Whitebox Multi-Strategy Partners, L.P. or funds affiliated with Whitebox Advisors LLC against BNYM for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

**D.**  Solely for purposes of confirmation and consummation of the COFINA Plan of Adjustment, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) shall be deemed allowed in the aggregate amount of $7,760,877,871.98, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured Insured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34, and (iii) the holders of existing COFINA bonds shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

## II.  COFINA Plan of Adjustment

**A.**  **Overview:** Contemporaneously with the filing of the Settlement Motion, the Oversight Board, on behalf of COFINA, will file the COFINA Plan of Adjustment and disclosure statement related thereto. The COFINA Plan of Adjustment shall provide, among other things, (i) that, as of the COFINA Effective Date, COFINA will be the sole and exclusive owner of the present and future revenues and collections generated by the five and one-half percent (5.5%) of the sales and use taxes imposed by the Commonwealth (the "COFINA Pledged Taxes") up to the COFINA Portion, (ii) for the issuance of a single tranche of securities that will be issued in five (5) series with the sinking fund schedules, accreted value and final maturities set forth in Exhibit A (the "COFINA Bonds"), which obligations (a) shall be secured by a statutory first lien on the COFINA Pledged Taxes and, with respect to any permitted substitution thereof and all rights related thereto and proceeds thereof, (b) shall not be secured by or have recourse to any property of the Commonwealth and (c) shall be a special, limited obligation of COFINA (payable solely from the COFINA Portion and any other COFINA property pledged by COFINA to secure the repayment of the COFINA Bonds pursuant to the COFINA Plan of Adjustment). The Government Parties shall use their reasonable best efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Internal Revenue Code and under Puerto Rico law to the extent permitted under applicable law; provided, however, that, in the event applicable U.S. law does not permit all COFINA Bonds to be issued on a federally tax exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which shall be distributed, first, in accordance with the provisions of Sections II(D)(4) and II(D)(7) hereof and, second, with respect to any remaining Taxable COFINA Bonds ratably to all other recipients of COFINA Bonds under the COFINA Plan of Adjustment. In each FY, the

3

aggregate scheduled debt service due, including accreted amounts, on all COFINA Bonds and COFINA Parity Bonds shall not exceed the COFINA Portion scheduled for such FY.

In connection with the filing of the COFINA Plan of Adjustment and related disclosure statement, the Oversight Board shall cause the certification of a COFINA fiscal plan pursuant to Section 201(a) of PROMESA consistent with the transactions contemplated in the COFINA Plan of Adjustment, including, without limitation, the issuance of the COFINA Bonds.

In furtherance of the efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Code, including, without limitation, in connection with the use of custodial trusts described herein, the Government Parties agree to consult with the PSA Parties' tax counsel to consider the optimal capital structure of COFINA based on applicable law and guidance from applicable federal agencies.

Except as otherwise provided in this Term Sheet, for all purposes herein, the Oversight Board, in its sole and absolute discretion, but upon consultation with Section 103 tax counsel and the PSA Parties party to the Interpleader Action, shall determine the use and application of all Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits pursuant to the COFINA Plan of Adjustment in a manner that maximizes the issuance of tax-exempt COFINA Bonds; provided, however, that the parties' expectation as of the date hereof is that the Pre-FY2019 BNYM Deposits shall be applied in accordance with the priorities and approximate amounts set forth on Schedule 2 hereto; and, provided, further, that any such use and application of Pre-FY2019 BNYM Deposits shall be pro rata per each applicable series subject to such adjustments as may be desirable for administrative convenience to account for minimum bond par denominations.

**B.**    **Additional Definitions:** For purposes of this Term Sheet, the following capitalized terms shall have the meanings ascribed below[1]:

Ambac Custodial Certificates:  The certificate(s) or receipt(s) to be issued by the Ambac Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Ambac Custodial Trust.

Ambac Custodial Trust:  The custodial trust(s) which may be formed by COFINA and/or Ambac on or prior to the COFINA Effective Date for the sole benefit of holders of Senior COFINA Bond Claims (Ambac Insured) that elect not to commute their Ambac Insurance Policies.

Ambac Insurance Policy:  The existing insurance policy issued by Ambac relating to the Ambac Insured Bonds, together with all agreements and other documents related thereto.

Assured Custodial Certificates:  The certificate(s) or receipt(s) that may be issued by the Assured Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Assured Custodial Trust.

---

[1]  Capitalized terms not defined herein shall have the meanings ascribed thereto in the PSA; provided, however, that, in the event of any conflict between the terms defined in the PSA and herein, the meanings set forth in this Term Sheet shall govern.

4

Assured Custodial Trust:  The custodial trust(s) which may be formed by COFINA and/or Assured on or prior to the COFINA Effective Date for the sole benefit of holders of Junior COFINA Bond Claims (Assured Insured).

Assured Insurance Policies:  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with all agreements and other documents related thereto.

Bond Claim: A claim on account of an existing COFINA security (as reflected in the chart set forth in Recital A of the PSA) with such claim being calculated as (a) with respect to current interest bonds and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the outstanding principal amount of such bonds plus the accrued and unpaid interest thereon and (b) with respect to capital appreciation bonds and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the compounded amount for such bonds, in each case, as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding.

COFINA Cash Available for Distribution: The amount of cash available for distribution on the COFINA Effective Date comprised of the Pre-FY2019 BNYM Deposits minus the sum of (a) the Rounding Amount Cash plus (b) Section 103 Cash plus (c) Taxable Election Cash plus (d) Consummation Costs as required pursuant to Section II(O) hereof plus (e) the cash, if any, retained by COFINA for the operating expense account or distributed to the Commonwealth pursuant to Section I(A) hereof.

COFINA Pledged Taxes: The present and future revenues and collections generated by the five and one-half percent (5.5%) sales and use taxes imposed by the Commonwealth.

COFINA Portion: The COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollars Funding in Section II(E)(7) hereof) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given FY until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

Commonwealth Portion: Collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding in Section II(E)(7) hereof, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given FY, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; provided, however, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion.  Subject to Sections II(E)(4) and II(E)(7), the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a FY unless and until COFINA has received the COFINA Portion.  The Commonwealth shall have no right to receive Debt Service Savings in any FY unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such FY, including any overdue debt service payments from all prior FYs, are made as required, as provided in Section II(E)(4) hereof.  The COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that it shall not be subject to the automatic stay.

5

<u>Debt Service Savings</u>:  For each FY, the difference between principal due on COFINA Bonds and COFINA Parity Bonds prior to the issuance of COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds in the open market and principal due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds.

<u>Insurance Policies</u>:  Collectively, the Ambac Insurance Policy, the Assured Insurance Policies and the National Insurance Policies.

<u>Junior COFINA Bond Claim</u>:  A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured) or a Junior COFINA Bond Claim (Taxable Election), on account of an existing First Subordinate COFINA security.

<u>Junior COFINA Bond Claim (Assured Insured)</u>:  A Bond Claim on account of an existing First Subordinate COFINA security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured including pursuant to a secondary market insurance policy.

<u>Junior COFINA Bond Claim (Taxable Election)</u>: A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured), on account of an existing First Subordinate COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

<u>Junior COFINA Bond Distribution</u>:  A distribution of COFINA Bonds allocable to holders of Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured) and Junior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 5-7) equal to fifty-six and three hundred ninety-nine one thousandths percent (56.399%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

<u>Maximum Taxable Bond Election Amount</u>:  One Billion Dollars ($1,000,000,000.00), <u>provided</u> that if the amount of Taxable COFINA Bonds exceeds the aggregate amount of COFINA Bonds distributable in respect of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) each as calculated, for purposes of this proviso, assuming a Maximum Taxable Bond Election Amount of One Billion Dollars ($1,000,000,000.00), the Maximum Taxable Bond Election Amount shall increase by the amount necessary to provide for the distribution of all Taxable COFINA Bonds pursuant to Taxable Bond Distributions, <u>provided</u> <u>further</u> that in no event shall the Maximum Taxable Bond Election Amount exceed Three Billion Dollars ($3,000,000,000.00).

<u>National Custodial Certificates</u>:  The certificate(s) or receipt(s) to be issued by the National Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the National Custodial Trust.

6

<u>National Custodial Trust</u>:  The custodial trust(s) which may be formed, on or prior to the COFINA Effective Date, by or on behalf of and for the sole benefit of the holders of Senior COFINA Bond Claims (National Insured) that elect not to commute their National Insurance Policies.

<u>National Insurance Policies</u>:  The existing insurance policies initially issued by Financial Guaranty Insurance Company or MBIA Insurance Corporation and novated to National and relating to the National Insured Bonds, as defined below, together with all agreements and other documents related thereto.

<u>Puerto Rico Institution</u>:  A holder, other than a Puerto Rico Investor, that is domiciled in Puerto Rico.

<u>Puerto Rico Investor</u>:  A holder that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board, in its sole and absolute discretion).

<u>Remainder Taxable Bond Election Amount</u>:  An amount equal to the Maximum Taxable Bond Election Amount <u>minus</u> the aggregate amount of Bond Claims held by Puerto Rico Investors and for which such holders have affirmatively elected a Taxable Bond Distribution.

<u>Rounding Amount Cash</u>:  The amount of cash necessary, up to a maximum aggregate amount of Twenty Five Million Dollars ($25,000,000.00), for distribution to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) in the form of rounding amounts to ensure that all holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) receive their pro rata share of CIBs, as defined below, in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond.

<u>Section 103 Cash</u>:  The amount of cash deemed necessary by the Oversight Board, and after consultation with Section 103 tax counsel and the PSA Parties, which amount of cash (i) shall be no less than the interest accrued on the existing COFINA securities as of, and including May 4, 2017 and (b) shall not exceed the amount of Pre-FY2019 BNYM Deposits <u>minus</u> the amount of Rounding Amount Cash, to be applied to reduce the amount and number of Taxable COFINA Bonds solely to the extent that the COFINA Bonds cannot all be issued as tax-exempt bonds under applicable federal law.

<u>Senior COFINA Bond Claim</u>:  A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured), a Senior COFINA Bond Claim (National Insured) or a Senior COFINA Bond Claim (Taxable Election), on account of an existing senior COFINA security.

<u>Senior COFINA Bond Claim (Ambac Insured)</u>:  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by Ambac.

<u>Senior COFINA Bond Claim (National Insured)</u>:  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by National.

7

<u>Senior COFINA Bond Claim (Taxable Election)</u>: A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured) or a Senior COFINA Bond Claim (National Insured), on account of an existing senior COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Investors holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Senior COFINA Bond Claim.

<u>Senior COFINA Bond Distribution</u>: A distribution of COFINA Bonds and cash, in the aggregate, allocable to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured) and Senior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 1-4) equal to ninety-three percent (93%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

<u>Taxable Bond Distribution</u>: A Senior Taxable Bond Distribution (as defined in Section II(D)(4)) or a Junior Taxable Bond Distribution (as defined in Section II(D)(7)), as applicable.

<u>Taxable COFINA Bonds</u>: COFINA Bonds in an aggregate amount deemed necessary by the Oversight Board, after consultation with Section 103 tax counsel and the PSA Parties, to be issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of the Internal Revenue Code (the "<u>Code</u>"), which COFINA Bonds shall be issued as CIBs with an interest rate of four and fifty-five one hundredths percent (4.55%) and a maturity date of 7/1/2038.

<u>Taxable Election Cash</u>:  The amount of cash equal to two percent (2.0%) (net of any administrative costs of the election process related to the applicable Bond Claims) of the aggregate amount of all Senior COFINA Bond Claim (Taxable Election) and Junior COFINA Bond Claims (Taxable Election), which amount of cash shall not exceed Sixty Million Dollars ($60,000,000.00).

**C.**     **Classes of Claims**: The COFINA Plan of Adjustment shall have the following classes:

**1.**     Class 1: Senior COFINA Bond Claims

**2.**     Class 2: Senior COFINA Bond Claims (Ambac Insured)

**3.**     Class 3: Senior COFINA Bond Claims (National Insured)

**4.**     Class 4: Senior COFINA Bond Claims (Taxable Election)

**5.**     Class 5: Junior COFINA Bond Claims

**6.**     Class 6: Junior COFINA Bond Claims (Assured Insured)

7.     Class 7: Junior COFINA Bond Claims (Taxable Election)

8.     Class 8: GS Derivative Claim

9.     Class 9: General Unsecured Claims

Notwithstanding the foregoing classification of claims, the Oversight Board reserves the right to amend or modify such classification, including, without limitation, supplement such classification with additional classes or modify the treatment afforded holders in Classes 8 and 9 as set forth in Section II(D) hereof, provided that such amendment or modification does not adversely impact the treatment afforded holders of claims in Classes 1 through 7 above.

**D.**     **Treatment of Claims**: Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the effective date of the COFINA Plan of Adjustment (the "<u>COFINA Effective Date</u>"), COFINA claims shall be treated as follows:

1.     Class 1: Each holder of a Senior COFINA Bond Claim shall be entitled to receive its pro rata share of the Senior COFINA Bond Distribution, comprised of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary.

2.     Class 2: Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (Ambac Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejections to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of Section II(F)(1) hereof, in full and complete satisfaction, release and discharge of any further obligation of Ambac with respect, to its insurance policy and such holder's agreement to commute Ambac's insurance policy relating to such holders' Senior COFINA Bond Claim (Ambac Insured), or (2) the Ambac Custodial Certificates referred to in Section II(G)(1) hereof; <u>provided, however</u>, that, in the event that a holder of a Senior COFINA Bond Claim (Ambac Insured) (a) fails to timely return its ballot /election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute Ambac's obligations and the Ambac Insurance Policy and to receive distributions in accordance with the provisions of subsection (1) above. Subject to the approval of the Title III Court, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 2 claims shall be made by COFINA to Ambac and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (Ambac Insured). Ambac reserves the right to formulate alternative election or implementation options with respect to the Senior COFINA Bond Claims (Ambac Insured), including deemed acceleration of the existing COFINA securities insured by Ambac on the COFINA Effective Date, but any such alternative implementation option (i) must be proposed at or prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment and (ii) shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise modify in any way, any commutation agreements or arrangements agreed to or entered into prior to, on or after the effective date of the PSA between Ambac, on the one hand and any

9

holders of any Senior COFINA Bond Claims (Ambac Insured), on the other hand, in connection with the Ambac Insurance Policy.

3. **Class 3:** Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (National Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejection to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of National, in accordance with the provisions of Section II(F)(2) hereof, in full and complete satisfaction, release and discharge of any further obligation of National with respect to the National Insurance Policies and such holder's agreement to commute National Insurance Policies relating to such holder's Senior COFINA Bond Claim (National Insured), or (2) the National Custodial Certificates referred to in Section II(G)(2) hereof representing an interest in the National Trust Assets, as defined below; provided, however, that, in the event that a holder of a Senior COFINA Bond Claim (National Insured) (a) fails to timely return its ballot/election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute National's obligations and the National Insurance Policies and to receive distributions in accordance with subsection (1) above; and, provided, further, that, at any time prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment, National may elect an alternative treatment option for Senior COFINA Bond Claims (National Insured), pursuant to which, in its sole and absolute discretion, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the COFINA Effective Date, the existing COFINA securities insured by National shall be paid off, in full, at an acceleration price of one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National Insured) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National Insured), shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, with any deficiency in such amounts being paid by National in full, in cash, on the COFINA Effective Date (the "National Election"). Subject to the order approving the disclosure statement filed in connection with the COFINA Plan of Adjustment, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 3 claims shall be made by COFINA to National and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (National Insured).

4. **Class 4:** Each holder of a Senior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Senior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 4, a "Senior Taxable Bond Distribution").

10

**5.** Class 5: Each holder of a Junior COFINA Bond Claim shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary.

**6.** Class 6: Subject to the provisions of Section II(O) hereof, each holder of a Junior COFINA Bond Claim (Assured Insured) shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary; provided, however, that, notwithstanding the foregoing, at the election of Assured (the "Assured Election"), in its sole and absolute discretion, on the COFINA Effective Date, the existing COFINA securities insured by Assured (including insurance issued in the secondary market) shall be paid off, in full, at an acceleration price of par plus accrued interest or compounded amount as of the COFINA Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which in each case is allocable to holders to Junior COFINA Bond Claims (Assured Insured), and (2) otherwise as follows: the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured Insured) shall be (i) wrapped by a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Junior COFINA Bond Claims (Assured Insured), with any deficiency in such amounts being paid by Assured in accordance with the insurance policies wrapping the existing securities underlying the Junior COFINA Bond Claims (Assured Insured). The principal amount, maturities and coupons of the bonds to be insured by Assured (the "Assured New Bonds") will be determined by Assured in consultation with Bank of America Merrill Lynch, as underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds not insured by Assured or any other insurer (although the Assured New Bonds may mature later than the COFINA Bonds, but in no event later than the Commonwealth's FY2058). All other terms regarding the underwriting of the Assured New Bonds shall be subject to the approval of Assured.

**7.** Class 7: Each holder of a Junior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Junior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 7, a "Junior Taxable Bond Distribution").

**8.** Class 8: The holder of the GS Derivative Claim shall to the extent that the termination value of the GS Derivative Claim is (a) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and with respect to the balance of the GS Derivative Claim, and (1) to the extent that rejection damages associated with such GS Derivative Claim is a Parity Obligation (as defined in the Bond Resolutions), such holder's pro rata share of the Senior COFINA Bond Distribution, comprised of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (2) to the extent that rejection damages associated with such GS Derivative Claim is a not a Parity Obligation (as defined in the Bond Resolutions), such holder shall not receive a distribution pursuant to the COFINA Plan of Adjustment, and (b) is less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to COFINA.

11

**9.** Class 9: The claims within Class 9 shall not receive a distribution pursuant to the COFINA Plan of Adjustment; provided, however, that, notwithstanding the foregoing, in the event that Class 9 votes to accept the COFINA Plan of Adjustment, each holder of a COFINA General Unsecured Claim shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00).

## E.    Terms of COFINA Bonds

*Issuance of COFINA Bonds*

Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the COFINA Effective Date, COFINA, shall issue the COFINA Bonds comprised of (i) four (4) series of Current Interest Bonds ("CIBs") and (ii) one series of Capital Appreciation Bonds ("CABs"). The maturities, interest rates and amortization schedules for COFINA Bonds are annexed hereto as Exhibit "A". All debt service on COFINA Bonds and COFINA Parity Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid, with accrued interest on the unpaid amount, first, in each FY from the balance, if any, of the COFINA Portion remaining after the payment of debt service on the COFINA Bonds and COFINA Parity Bonds then due and payable in such FY; second, in each FY, from the Debt Service Savings, if any; and third, to the extent not paid pursuant to first or second, following the final scheduled maturity of all COFINA Bonds and COFINA Parity Bonds. Interest shall accrue on such overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until the applicable COFINA Bonds or COFINA Parity Bonds are paid or satisfied in full in accordance with their terms. The Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with a designee of the PSA Parties, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.

### 1.    Terms of the COFINA Bonds

*CIBs*: Subject to any adjustments provided for herein, the CIBs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows:  (a) Seven Hundred Eighty-Two Million Nine Hundred Fifteen Thousand Dollars ($782,915,000.00), four and thirty-five one-hundredths percent (4.35%), and 7/1/2028; (b) One Billion Ninety-One Million Four Hundred Sixty Thousand Dollars ($1,091,460,000.00), four and five-tenths percent (4.5%), and 7/1/2032; (c) Two Billion Nine Hundred Ninety-Seven Million Two Hundred Forty-Five Thousand Dollars ($ 2,997,245,000.00), four and fifty-five one hundredths percent (4.55%), and 7/1/2038; and (d) Four Billion Seven Hundred Forty-Four Million Seven Hundred Forty-Five Thousand Dollars ($4,744,745,000.00), four and six-tenths percent (4.6%), and 7/1/2044.

*CABs:* Subject to any adjustments provided for herein, the CABs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: Two Billion Four Hundred Four Million One Hundred Ninety-Two Thousand Five Hundred Ninety-Nine Dollars and Ninety Cents ($2,404,192,599.90), five and one-half percent (5.5%), and 7/1/2058.

Neither CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.

### 2. Collateral for Repayment of COFINA Bonds

Subject to the provisions of Section II(E)(10), entitled <u>Substitution of Collateral</u>, repayment of the COFINA Bonds and COFINA Parity Bonds from the COFINA Portion shall be secured by a statutory first lien on the COFINA Pledged Taxes. Such lien shall (i) remain in effect and (ii) be closed until, in each case, the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms. Such statutory lien will be incorporated in the legislation described in Section II(M) hereof and be judicially confirmed and the COFINA Bonds shall be judicially determined to be legal, valid, binding and enforceable obligations of COFINA by the Title III Court.

### 3. Deemed Issuance Date

Notwithstanding the timing of the COFINA Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the dated date of the COFINA Bonds. COFINA FY2019 BNYM Deposits shall be deposited into the debt service fund established for the benefit of holders of COFINA Bonds in the new COFINA bond resolution.

### 4. Additional Bonds Test for COFINA Bonds

Except with respect to the issuance of refinancing securities on the terms discussed herein, COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the COFINA Effective Date. Notwithstanding the foregoing, COFINA may issue additional refunding or refinancing securities on a *pari passu* basis with the COFINA Bonds issued on the COFINA Effective Date (collectively, the "<u>COFINA Parity Bonds</u>") for the purpose of refinancing, in whole or in part, COFINA Bonds or COFINA Parity Bonds provided, that (a) notwithstanding the terms of such COFINA Parity Bonds, COFINA shall not be entitled to an increase of the COFINA Portion; (b) the principal and interest payment dates on the COFINA Parity Bonds shall be the same principal and interest payments dates on the COFINA Bonds; (c) the final maturity date of the COFINA Parity Bonds shall not be later than the original scheduled final maturity date of the COFINA Bonds; and (d) upon the issuance of any COFINA Parity Bonds:

> (i)     annual debt service due in the then-current and each future FY on all COFINA Bonds and COFINA Parity Bonds outstanding after the issuance of the COFINA Parity Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year on all COFINA Bonds and COFINA Parity Bonds outstanding prior to such issuance;

> (ii)    as set forth in the new COFINA bond resolution, Debt Service Savings shall only be realized in the same FYs in which principal of COFINA Bond and COFINA Parity Bonds was refunded and/or purchased;

> (iii)   Debt Service Savings in any FY shall be applied first, to the repayment of principal and interest on COFINA Bonds or COFINA Parity Bonds unpaid from any prior FY; and second, at the option of COFINA, (x) to purchase COFINA Bonds and COFINA Parity Bonds in the open market (subject to the limitation in subsection (ii) above), (y) to pay operating expenses of COFINA or (z) transfer such savings to the Commonwealth; and

> (iv)    any Debt Service Savings released to the Commonwealth as set forth in subsection (iii) above shall be available for any lawful purpose of the Commonwealth.

Subject to compliance with the provisions of the additional bonds test ("<u>ABT</u>") set forth below, additional bonds (the "<u>Subordinated Lien Bonds</u>") may be issued by COFINA for the benefit of, and with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided that repayment of such additional bonds shall be secured by a second lien that is subordinated in all

respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the COFINA Pledged Taxes, provided that, notwithstanding anything contained in this Term Sheet to the contrary, repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Portion.  COFINA may issue such Subordinated Lien Bonds provided that, prior to the issuance thereof, the Commonwealth and COFINA shall deliver a jointly executed certificate to the COFINA bond trustee certifying that the following conditions are each satisfied:  (a) (1) the projected COFINA Pledged Taxes ((i) which, in the event that Subordinated Lien Bonds are being issued prior to FY2024, are calculated assuming the preceding FY's collection of the COFINA Pledged Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, or (ii) in the event that Subordinated Lien Bonds are being issued during FY2024 or thereafter, are calculated assuming that preceding fiscal year's collection of the COFINA Pledged Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) fiscal years)) equals or exceeds (2) one and one-half <u>times</u> (1.5x), in any succeeding fiscal year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (b) the preceding fiscal year's collections from the COFINA Pledged Taxes is equal to or greater than one and one-tenth <u>times</u> (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding fiscal year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (c) the Subordinated Lien Bonds have a maturity not later than FY2058; <u>provided</u>, <u>however</u>, that, subsequent to June 30, 2028, and subject to compliance with the foregoing ABT, final maturity beyond FY2058 shall be permissible for future Subordinated Lien Bonds.

### 5.  Call Provisions

The COFINA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon or accreted value, as applicable, upon thirty (30) days prior written notice as follows:

> 2028 CIBS: Non-Call
> 2032 CIBS: Par Call Commencing 2025 (7 year call)
> 2038 CIBS: Par Call Commencing 2028 (10 year call)
> 2044 CIBS: Par Call Commencing 2028 (10 year call)
> 2058 CABS: Call Commencing 2028 at the following call prices:

| Year | Price |
|---|---|
| 2028-2032 | 107.5% of Accreted Value |
| 2033-2037 | 105% of Accreted Value |
| 2038-2042 | 103% of Accreted Value |
| 2043-2058 | 100% of Accreted Value |

If less than all of the COFINA Bonds of a particular series are called for prior redemption, COFINA will select the maturity or maturities of such series of the COFINA Bonds to be redeemed, and DTC, on behalf of the trustee, will select the COFINA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

### 6.  Debt Service Reserve Fund

The COFINA Bonds shall not have a debt service reserve fund.

### 7.  First Dollars Funding

14

Until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, and subsequent to the funding of reasonable and necessary COFINA operating expenses, including, without limitation, COFINA board member fees and expenses, the COFINA Portion shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes. From and after FY2024, and solely in the event that (a) for any date of determination at which time the Oversight Board or any successor to its budgetary function is in existence, (1) the prior and then-current FY budgets are balanced, as determined by the Oversight Board and (2) the Commonwealth is current on all continuing disclosure requirements relating to the public disclosure of its audited financial statements, (b) quarterly bucketing of twenty-five percent (25%) of the then-current FY's COFINA Portion is shown to be necessary to avoid intra-FY TRANs borrowing and (c) collection of prior fiscal year COFINA Pledged Taxes provided a two <u>times</u> (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, (x) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the then-current FY's COFINA Portion shall be deposited into the "Debt Service Fund" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds and (y) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be for the benefit of, and be paid to, the trustee for any Subordinated Lien Bonds issued by COFINA and remaining outstanding up to twenty-five percent (25%) of the yearly scheduled debt service due on such bonds, and (z) the balance thereof, if any, shall be paid to the Commonwealth for the balance of such fiscal quarter; <u>provided, however</u>, that, in any quarter in which there is a shortfall in the amounts required to be deposited by the preceding clause (x), then such shortfall shall be added to the amount required to be paid in accordance with clause (x) in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "<u>Debt Service Fund</u>" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds; and, <u>provided, further</u>, that, in any quarter in which there is a shortfall in the amount required to be deposited by the preceding clause (y), then such shortfall shall be added to the amount required to be paid in accordance with clause (y) in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

## 8. Rights of Acceleration

The COFINA Bonds, the COFINA Parity Bonds and any Subordinated Lien Bonds shall not have rights of acceleration.

## 9. Covenants

### a. *Sales and Use Covenant*

Subject to the terms and provisions of Section II(E)(10) hereof, entitled <u>Substitution of Collateral</u>, the Commonwealth shall covenant for the benefit of all initial and subsequent holders of the COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the rate of the COFINA Pledged Taxes from which the PSTBA is derived shall not be reduced to a rate less than five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings ("<u>S&P</u>"), Moody's Investor Service, Inc. ("<u>Moody's</u>"), Fitch Ratings ("<u>Fitch</u>") and Kroll Bond Rating Agency Inc. ("<u>Kroll</u>"), or their respective successors, with one (1) of such organizations being S&P or Moody's, or its respective successor, confirm that ratings will not be downgraded and (without regard to bond insurance or other third party credit enhancement) will be rated at least A2/A category or higher following such reduction; <u>provided, however</u>, that, notwithstanding the foregoing, until all obligations with respect to the COFINA Bonds and any COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of

the COFINA Pledged Taxes is reduced below three percent (3%), then such reduction shall constitute a substitution of collateral and shall be subject to the terms and provisions of Section II(E)(10) hereof, entitled Substitution of Collateral.

> b.      ***Non-Impairment Covenant***

The Commonwealth shall covenant for the benefit of all initial and subsequent holders of COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the COFINA Plan of Adjustment and the Confirmation Order, as defined below, to fulfill the terms of any agreements with the holders of COFINA Bonds and all COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any FY, or (4) impair the rights and remedies of the holders of the COFINA Bonds or any COFINA Parity Bonds or the collateral security thereof.

> c.      ***Tax-Exemption Covenant***

COFINA shall covenant for the benefit of all initial and subsequent holders of tax-exempt COFINA Bonds and all tax-exempt COFINA Parity Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, COFINA will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any tax-exempt COFINA Bonds or tax-exempt COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

> d.      ***Rating Agency Covenant***

In connection with a Substitution of Collateral pursuant to the provisions of Section II(E)(10) hereof, COFINA shall use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding COFINA Bonds, including, but not limited to responding to requests for documents.

**10.     Substitution of Collateral**

Notwithstanding anything contained herein to the contrary, the Commonwealth may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "New Collateral", which, for the avoidance of doubt, shall include any substitution of already substituted New Collateral) as security for the repayment of the COFINA Bonds only upon, and on each such occasion, satisfaction of the following conditions: (a) such New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and such legislation provides (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by COFINA in the same manner and to the same extent as the COFINA Portion, (b) upon substitution of the New Collateral, that rating confirmations are received from at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence:  S&P, Moody's, Fitch and Kroll, with one (1) of such organizations being either S&P or Moody's, prior to such collateral substitution confirming that ratings for all COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution, (c) the Commonwealth shall continue to provide the Non-Impairment Covenant with

16

respect to such New Collateral and (d) such other documents as may be required pursuant to applicable law and bond resolutions.

## F.    Insurance Contribution

### 1.    Ambac

In consideration for the releases to be given to Ambac, and in accordance with Section II(D)(2) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from Ambac in an amount, in Ambac's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (Ambac Insured), which amount, together with the Senior COFINA Bond Distribution, may not, on an aggregate basis, provide full accreted value of such bonds, and the beneficial holder thereof shall have no other or further rights with respect to the Ambac Insurance Policies, the Ambac Custodial Trust or the Ambac Custodial Certificates. The provisions set forth in this Section II(F)(1) apply only to Senior COFINA Bond Claims (Ambac Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

### 2.    National

In consideration for the releases to be given to National, and in accordance with Section II(D)(3) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from National in an amount, in National's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (National Insured), and the beneficial holder thereof shall have no other or further rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates. The provisions set forth in this Section II(F)(2) apply only to Senior COFINA Bond Claims (National Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market.  A holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

For the avoidance of doubt, Ambac and National shall be permitted to structure their respective commutation payments in different amounts and means.

The terms and provisions regarding commutation in accordance with the provisions of this Section II(F) shall be included in the COFINA Plan of Adjustment and the Confirmation Order and shall be in form and substance acceptable to Ambac and National, as the case may be.

## G.    Custodial Trusts

### 1.    Ambac Custodial Trust

17

On or prior to the COFINA Effective Date, COFINA and/or Ambac, together with an entity appointed by COFINA and/or Ambac to serve as trustee, shall form the Ambac Custodial Trust for the sole benefit of beneficial holders of existing securities insured by Ambac (the "Ambac Insured Bonds") that validly elect to receive the Ambac Custodial Certificates in accordance with the approved solicitation procedures. On the COFINA Effective Date, the following shall be deposited into the Ambac Custodial Trust: (1) the Ambac Insured Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured), (2) the COFINA Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured) and (3) the Ambac Insurance Policy (collectively, with the Ambac Insured Bonds and the COFINA Bonds, the "Ambac Trust Assets"). Notwithstanding the deposit therein, the Ambac Insured Bonds shall not be cancelled, unless otherwise elected by Ambac prior to the COFINA Effective Date, and all rights and remedies under and in accordance with Ambac Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Ambac Insurance Policy shall be preserved and remain in full force and effect. Upon deposit of the Ambac Trust Assets, the trustee shall issue one or more series of Ambac Custodial Certificates to the beneficial holders of the COFINA Bonds deposited into the Ambac Custodial Trust on a pro rata basis.

The Ambac Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Ambac Custodial Trust, which distribution shall reduce the obligation under the Ambac Insurance Policy. Documentation related to the Ambac Custodial Trust shall, in Ambac's sole discretion, include, among other terms, provisions relating to the corporate governance thereof and permitting Ambac to purchase any Ambac Trust Assets in any sale thereof and use such proceeds to pay down the Ambac Custodial Certificates and reduce Ambac's obligations under the Ambac Insurance Policy. The Ambac Custodial Trust shall permit Ambac to enter into private commutation arrangements on and after the COFINA Effective Date. Documentation related to the Ambac Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Ambac and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (Ambac Insured) agrees to commute the Ambac Insurance Policy on or prior to the COFINA Effective Date, such holder shall receive a distribution from Ambac and the holder shall have no rights with respect to the Ambac Insurance Policy, the Ambac Custodial Trust or the Ambac Custodial Certificates.

2.    **National Custodial Trust**

In the event that National does not make the National Election, on or prior to the COFINA Effective Date, the National Custodial Trust shall be formed by or on behalf of, and for the sole benefit of, beneficial holders of, existing COFINA securities insured by the National Insurance Policies (the "National Insured Bonds"), that (i) elect to receive National Custodial Certificates on the ballot/election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan of Adjustment and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the COFINA Effective Date. The trustee of the National Custodial Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market. On the COFINA Effective Date, the following shall be deposited into the National Custodial Trust: (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National Insured) in accordance with the terms of Section II(D)(3) hereof, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with Section II(O) hereof (item numbers 1 through 4, collectively, the "National Trust Assets"). The costs, including fees and expenses and any obligation arising under this Term Sheet or the COFINA Plan of Adjustment, associated with the formation and operation of the National Custodial Trust shall be paid out of the National Trust Assets.

18

Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trustee shall issue one or more series of National Custodial Certificates to the beneficial holders of Senior COFINA Bond Claims (National Insured) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Custodial Trust.

The National Custodial Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Custodial Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Custodial Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount, as defined in the Bond Resolutions, of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Custodial Trust actually makes payment to the National Certificate Holders. Each series of National Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Custodial Trust, deliver or direct the trustee to deliver a general notice to all National Certificate Holders, through DTC or any similar means, of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Custodial Trust (the "Sale Notice"). The cash proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis (the "Sale Proceeds") and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; provided, however, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Custodial Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (National Insured) agrees to commute the National Insurance Policies on or prior to the COFINA Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates.

3.    **Assured Custodial Trust**

In the event that Assured does not make the Assured Election, on or prior to the COFINA Effective Date, Assured, together with an entity appointed by Assured to serve as trustee, shall form one or more substantially identical Assured Custodial Trusts, for the sole benefit of beneficial holders of existing securities insured (including insurance issued in the secondary market) by Assured (the "Assured Insured Bonds"). On the COFINA Effective Date, each holder of a Junior COFINA Bond

Claim (Assured Insured) shall be deemed to have deposited such claim into the Assured Custodial Trust in exchange for one or more Assured Custodial Certificates evidencing the following: (1) Assured Insured Bonds, (2) the COFINA Bonds allocable to a holder of a Junior COFINA Bond Claim (Assured Insured), (3) Assured Insurance Policies and (4) Section 103 Cash and Rounding Amount Cash, if any, allocable to such holder (collectively, the "Assured Trust Assets"). Notwithstanding the deposit therein, the Assured Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with Assured Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Assured Insurance Policies shall be preserved and remain in full force and effect.

The Assured Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Assured Custodial Trust, which distribution shall (1) occur promptly upon receipt thereof by the Assured Custodial Trust and (2) automatically reduce the obligation outstanding under the Assured Insurance Policies as of the date of such payment. Each series of Assured Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as Assured has not failed to make a payment when due under the applicable Insurance Policies, it shall (a) have the sole right to control the management of the Assured Trust Assets, (b) be deemed the sole holder of the COFINA Bonds deposited in the Assured Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (c) be fully subrogated to the rights of the holders of Assured Insured Bonds in respect of the COFINA Bonds deposited in the Assured Custodial Trust. Documentation related to the Assured Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Assured and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

### 4. Costs

The Government Parties shall be held harmless by Ambac, Assured and National for any costs and all fees and expenses associated with the formation and operation of the Custodial Trusts.

### 5. Trust Terms

Notwithstanding anything contained herein to the contrary, the terms of the Ambac Custodial Trust, the National Custodial Trust and the Assured Custodial Trust may be different from each other.

## H. Conditions to the Effective Date of the COFINA Plan of Adjustment

Conditions precedent to the COFINA Effective Date will include, but not be limited to:

- Entry of (a) a court order approving the COFINA Plan of Adjustment (the "Confirmation Order") and (b) a court order approving the Settlement Motion (the "Settlement Order"), in the form reasonably acceptable to the Government Parties and the PSA Parties, pursuant to Title III of PROMESA. Without limiting the foregoing, for the express benefit of, among others, the bond trustee and the holders of COFINA Bonds, the Confirmation Order and the Settlement Order, as applicable, shall be a binding determination that, as of the COFINA Effective Date:

  1. The COFINA Bonds and the covenants by COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants) constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) is the

property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, the Commonwealth, or any instrumentality of the Commonwealth (other than liens and claims afforded to holders of COFINA Bonds under the COFINA Plan of Adjustment) and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution;

2. Pursuant to the legislation referenced in Section II(M), the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien on the COFINA Pledged Taxes, which shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;

3. The statutory lien on, and pledges of, COFINA Pledged Taxes, and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and enforceable; including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution as adequate protection for the property rights conferred under the COFINA Plan of Adjustment and the Confirmation Order;

4. The transfer of the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) pursuant to the COFINA Plan of Adjustment is appropriate and binding and specifically enforceable against COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the COFINA Plan of Adjustment, including, without limitation, because the transfer of the COFINA Portion created in COFINA an ownership interest in such property (and any substitution of collateral on the terms and conditions provided for herein) and is a valid provision made to pay or secure payment of the COFINA Bonds; and

5. The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (i) COFINA, (ii) the Commonwealth, (iii) each person or entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the COFINA Plan of Adjustment and, if impaired, whether or not such person or entity accepted the COFINA Plan of Adjustment, (iv) any other person, and (v) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians.

- The Settlement Order shall become effective contemporaneously with the COFINA Effective Date;

- Execution and delivery of all Definitive Documents, in form and substance reasonably satisfactory to the Government Parties and the PSA Parties, and such definitive documents being in full force and effect;

- Usual and customary legal opinions for issuances of this type of outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Parties, will have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the COFINA Plan of Adjustment;

21

- Unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a new bond resolution for the COFINA Bonds, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder;

- The Confirmation Order shall contain provisions to support the tax-exempt treatment of distributions to National Certificate Holders from the National Custodial Trust. Such Confirmation Order provisions shall be acceptable to the Oversight Board, National and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA;

- Pursuant to the Confirmation Order, the deemed acceleration of existing insured COFINA securities on the COFINA Effective Date, (i) in connection with the treatment of Junior COFINA Bond Claims (Assured Insured), (ii) if requested by Ambac, in connection with the treatment of Senior COFINA Bond Claims (Ambac Insured) and (iii) if determined to be necessary or appropriate by National, to implement the National Election; provided, however, that such deemed acceleration shall not, nor shall it be construed to, affect issues regarding "default" or acceleration which were pending prior to the COFINA Effective Date; and

- Other customary conditions to be agreed and reasonably acceptable to the Government Parties and the PSA Parties.

## I. Releases

Customary releases and exculpations (which releases and exculpations shall not include releases for claims and causes of action arising from or related to any act or omission that constitutes intentional fraud or willful misconduct) of all relevant parties and their respective parents, subsidiaries and affiliates, and each of their respective board members, directors, officers, employees and advisors will be included in the COFINA Plan of Adjustment, including, without limitation, but subject to the foregoing, the release of (1) BNYM (as limited by Section I(C) hereof) in connection with the Adversary Proceeding, the Interpleader Action and any claims and causes of action related to (a) the Senior COFINA Bond Claims, the Senior COFINA Bond Claims (Ambac Insured), the Senior COFINA Bond Claims (National Insured) and the Senior COFINA Bond Claims (Taxable Election) and (b) the Junior COFINA Bond Claims, the Junior COFINA Bond Claims (Assured Insured) and the Junior COFINA Bond Claims (Taxable Election) and (2) each of Ambac, National and Assured with respect to all negotiations regarding and any actions taken consistent with the COFINA Plan of Adjustment, including, without limitation, in connection with a custodial trust structure, commutation, the Assured Election, the National Election, and any release of obligations under applicable Insurance Policies; provided, however, that, notwithstanding the foregoing, the COFINA Plan of Adjustment shall not provide for the release of: (1) with respect to any beneficial holder of the Insured Bonds that receive Ambac Custodial Certificates in accordance herewith, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy, as adjusted to account for any distributions from the Ambac Custodial Trust (and any claims that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of Assured Insured Bonds that receives Assured Custodial Certificates in accordance herewith, any claim against

Assured with respect to Assured's payment obligations under the Assured Insurance Policies in accordance with their terms (and any claims that Assured may have against a beneficial holder of such Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policy); (3) with respect to any beneficial holder of National Insured Bonds that received National Custodial Certificates in accordance herewith, any claim against National with respect to National's payment obligations under the National Insurance Policies, as adjusted to account for any distributions from the National Custodial Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations under the National Insurance Policies); or (4) in the case of the Assured Election, with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the acceleration price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies). The releases to be incorporated into the COFINA Plan of Adjustment are an integral and necessary component of the agreement contemplated herein, will be presented as a resolution of disputed claims inextricably bound with the COFINA Plan of Adjustment pursuant to Federal Rule of Bankruptcy Procedure 9019 and, subject to approval of the Title III Court, which approval shall be supported by parties in accordance with the PSA, will bind all parties in interest, including, without limitation, any party purporting to assert any released claim derivatively on the part of COFINA or the Commonwealth.

**J.     Governing Law/Jurisdiction**

The COFINA Bonds will be governed by, and construed in accordance with, the laws of the State of New York. The Title III Court shall retain jurisdiction from and after the COFINA Effective Date of all matters arising from or related to the COFINA Plan of Adjustment, including, without limitation, with respect to the payment, enforcement and remedies of the COFINA Bonds to the fullest extent permitted by law[2]. Any disputes, legal action, suit, or proceeding arising from or related to the COFINA Bonds (a) shall be brought in accordance with the documentation relating to the COFINA Bonds by any party or its successors or assigns in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

**K.     Structure for Collection and Application of SUT**

The COFINA Bonds shall be issued by COFINA following amendment of Act 91, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the COFINA Plan of Adjustment, and as reflected in this Term Sheet. The collection and deposit of the COFINA Portion, net of COFINA operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts maintained

---

[2] The parties hereto acknowledge and agree that, pursuant to section 945(a) of the Bankruptcy Code, applicable in the COFINA PROMESA Proceeding in accordance with Section 301(a) of PROMESA, and in light of the critical importance to assure that post-confirmation disputes regarding matters resolved or addressed by the COFINA Plan of Adjustment do not impede the successful implementation of the COFINA Plan of Adjustment, the Title III Court may retain jurisdiction over each of the matters specified in the COFINA Plan of Adjustment and such retention is reasonable, appropriate, in the best interests of the Commonwealth, COFINA, their respective creditors and other parties interest, and not inconsistent with PROMESA, the Bankruptcy Code or any other applicable law.

in one or more mainland U.S. Banks in the name of the trustee appointed under the new COFINA bond resolution and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

**L.**   **Corporate Governance:**  On the COFINA Effective Date, and pursuant to the COFINA Plan of Adjustment, the COFINA board of directors shall be appointed and shall consist of three (3) members appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in definitive documentation, including, without limitation, that the independent director may not be an officer, employee or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors.  Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of the Junior COFINA Bond Claims and Assured) may submit up to three (3) recommendations for the Governor's consideration regarding the initial appointment of the independent directors; provided, however, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing and to provide that board approval shall be required for all material actions to be taken.  COFINA's amended corporate governance documents shall provide that all board members will owe a fiduciary duty to COFINA as consistent with Puerto Rico law and its Constitution.  The amended corporate governance documents and identities of board members will be filed as part of the Plan Supplement.

**M.**   **Legislation and Documentation:** On or prior to the COFINA Effective Date, legislation shall be enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in Section II (L) above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment provisions referred to herein and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated herein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the ABT, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Parties.  To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the new bond resolution authorized by COFINA.

**N.**   **Commonwealth/COFINA Expenses:**  All expenses incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the COFINA Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of Section I(A) hereof and otherwise by the Commonwealth.

**O.**   **Consummation Costs:**  Notwithstanding anything contained in this Term Sheet or the COFINA Plan of Adjustment to the contrary, in order to compensate parties for the cost of negotiation, confirmation and consummation of this Term Sheet and the COFINA Plan of Adjustment, and in consideration of (1) the execution and delivery of the PSA by each Consummation Cost Party, as defined below, and (2) the obligations and covenants contained in the PSA, Assured, Ambac, National, each holder of a Senior COFINA Bond Claim, and

24

each holder of Junior COFINA Bond Claim, each listed on Exhibit "B" hereto (a
"Consummation Cost Party"), which executes the PSA consistent with the terms set forth
herein by no later than 11:59p.m. (EDT) on September 20, 2018 (the "Deadline"), shall be
entitled to receive on the COFINA Effective Date, based upon their respective positions
(insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, a pro rata share of cash in an
amount equal to two percent (2.0%), truncated to two decimal points, of the (a) aggregate
amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac
Insured), Senior COFINA Bond Claims (National Insured), Junior COFINA Bond Claims,
Junior COFINA Bond Claims (Assured Insured), Senior COFINA Bond Claims (Taxable
Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without
duplication), minus (b) One Billion Dollars ($1,000,000,000.00); provided, however, that,
with respect to any Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA
Bond Claims (National Insured), unless otherwise agreed to, in writing, by Ambac and
National, Ambac or National, as the case may be, and not the beneficial holder of such Senior
COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National
Insured) regardless of whether such beneficial holder is also a Consummation Cost Party,
shall receive the amount of cash that would have otherwise been distributed to such other
Consummation Cost Party in accordance with the provisions of this Section II(O); and,
provided, however, that, notwithstanding the foregoing provisions of this Section II(O),
amounts due and payable to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a
result of being a Consummation Cost Party (i) shall not be taken into account in the
connection with the above-referenced calculations solely with respect to payments to other
Consummation Cost Parties, which payments to other Consummation Cost Parties shall be
made by COFINA or its successor in interest, and (ii) with respect to payments to be made to
Aurelius Capital Master, Ltd. and Six PRC Investments LLC, shall be taken into account in
connection with the above-referenced calculations for all Consummation Cost Parties, which
payments to Aurelius Capital Master, Ltd. and Six PRC Investment LLC shall be payable by
the Commonwealth in accordance with the provisions of Sections I(A) and II(O) hereof; and,
provided, further, that, with respect to the Junior COFINA Bond Claims (Assured Insured),
Assured, and not the beneficial holders of the Junior COFINA Bond Claims (Assured
Insured), shall receive the amount of cash distributable on account of the Junior COFINA
Bond Claims (Assured Insured).

P.   **Unsubscribed Taxable Election Cash Amount:**  The amount, up to Sixty Million Dollars
($60,000,000.00), allocated for distributions to holders in Classes 4 and 7, but not distributed
based upon elections not made, and calculated as the difference between Sixty Million
Dollars ($60,000,000.00) minus the Taxable Election Cash shall be reallocated as follows: if
such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount
shall be allocated (i) *first*, if the aggregate amount of Taxable Election Cash distributable
under the COFINA Plan of Adjustment is greater than Twenty Million Dollars
($20,000,000.00), to be distributed as cash in accordance with the COFINA Plan of
Adjustment, (ii) *second*, to the extent of any remainder, to further fund the operating expense
fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (iii) *third*, to
the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to
increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA
bondholders, and the Commonwealth, on the other hand, and (b) greater than Forty Million
Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be
allocated as described in subsection (a) above and such amounts above Forty Million Dollars
($40,000,000.00) shall be allocated in accordance with the COFINA Plan of Adjustment to
increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA
bondholders.

Q.   **Government Parties' Covenant Regarding Taxable Election:**  The Government Parties shall
use their reasonable best efforts, including, without limitation, by, directly or indirectly,

25

actively coordinating with, and promptly responding to inquiries from, any and all persons or entities, including dealers, to ensure the comprehensive outreach to Puerto Rico Investors and Puerto Rico Institutions holding existing COFINA securities regarding such holders' right to elect to receive a Taxable Bond Distribution and to ensure the dissemination of complete and accurate information regarding such election to such holders.

Case:17-03283-LTS   Doc#:4364-37   Filed:11/26/18   Entered:11/26/18 21:36:59   Desc:
Exhibit B   Page 361 of 710

**EXHIBIT A**

**Scheduled Amortization and Certain Other Terms of COFINA Bonds**

102136844v2

## Exhibit A: Coupons and Maturity Dates

| Current Interest Bond Terms | | |
|---|---|---|
| (7/1) Year | Par | Cpn/Yld |
| Total/Avg | $9,616,365,000.00 | 4.553% |
| 2028 | 782,915,000.00 | 4.350% |
| 2032 | 1,091,460,000.00 | 4.500% |
| 2038** | 2,997,245,000.00 | 4.550% |
| 2044 | 4,744,745,000.00 | 4.600% |

| Capital Appreciation Bond Terms | | | |
|---|---|---|---|
| (7/1) Year | Initial Value | Accreted Value | Yield |
| Total/Avg | $2,404,192,599.90 | $14,232,325,521.50 | 5.500% |
| 2058 | 2,404,192,599.90 | 14,232,325,521.50 | 5.500% |

| Current Interest Bond Sinking Fund Schedule | | | | Capital Appreciation Bond Sinking Fund Schedule | | | | |
|---|---|---|---|---|---|---|---|---|
| (7/1) Year | Yr# | Par | Term Par | (7/1) Year | Yr# | Accretion Table | Future Value Redemption | Accreted Value Redemption |
| Total | | $9,616,365,000.00 | $9,616,365,000.00 | Total | | $20,968,015,000.00 | | $14,232,325,521.50 |
| 2019 | 1 | 18,855,000.00 | - | 2019 | 1 | $602.50 | - | - |
| 2020 | 2 | - | - | 2020 | 2 | 636.10 | - | - |
| 2021 | 3 | 17,480,000.00 | - | 2021 | 3 | 671.60 | - | - |
| 2022 | 4 | 36,420,000.00 | - | 2022 | 4 | 709.05 | - | - |
| 2023 | 5 | 56,910,000.00 | - | 2023 | 5 | 748.55 | - | - |
| 2024 | 6 | 79,045,000.00 | - | 2024 | 6 | 790.30 | - | - |
| 2025 | 7 | 102,935,000.00 | - | 2025 | 7 | 834.35 | - | - |
| 2026 | 8 | 128,680,000.00 | - | 2026 | 8 | 880.90 | - | - |
| 2027 | 9 | 156,395,000.00 | - | 2027 | 9 | 930.00 | - | - |
| 2028 | 10 | 186,195,000.00 | 782,915,000.00 | 2028 | 10 | 981.85 | - | - |
| 2029 | 11 | 218,225,000.00 | - | 2029 | 11 | 1,036.60 | - | - |
| 2030 | 12 | 252,920,000.00 | - | 2030 | 12 | 1,094.40 | - | - |
| 2031 | 13 | 290,175,000.00 | - | 2031 | 13 | 1,155.40 | - | - |
| 2032 | 14 | 330,140,000.00 | 1,091,460,000.00 | 2032 | 14 | 1,219.85 | - | - |
| 2033 | 15 | 372,985,000.00 | - | 2033 | 15 | 1,287.85 | - | - |
| 2034 | 16 | 419,060,000.00 | - | 2034 | 16 | 1,359.65 | - | - |
| 2035 | 17 | 468,400,000.00 | - | 2035 | 17 | 1,435.50 | - | - |
| 2036 | 18 | 521,185,000.00 | - | 2036 | 18 | 1,515.50 | - | - |
| 2037 | 19 | 577,645,000.00 | - | 2037 | 19 | 1,600.00 | - | - |
| 2038 | 20 | 637,970,000.00 | 2,997,245,000.00 | 2038 | 20 | 1,689.25 | - | - |
| 2039 | 21 | 702,415,000.00 | - | 2039 | 21 | 1,783.40 | - | - |
| 2040 | 22 | 771,550,000.00 | - | 2040 | 22 | 1,882.85 | - | - |
| 2041 | 23 | 842,060,000.00 | - | 2041 | 23 | 1,987.85 | - | - |
| 2042 | 24 | 880,800,000.00 | - | 2042 | 24 | 2,098.70 | - | - |
| 2043 | 25 | 921,310,000.00 | - | 2043 | 25 | 2,215.70 | - | - |
| 2044 | 26 | 626,610,000.00 | 4,744,745,000.00 | 2044 | 26 | 2,339.25 | 720,495,000.00 | 337,083,585.75 |
| 2045 | 27 | - | - | 2045 | 27 | 2,469.65 | 2,009,425,000.00 | 992,515,290.25 |
| 2046 | 28 | - | - | 2046 | 28 | 2,607.35 | 1,903,310,000.00 | 992,519,065.70 |
| 2047 | 29 | - | - | 2047 | 29 | 2,752.75 | 1,802,775,000.00 | 992,517,776.25 |
| 2048 | 30 | - | - | 2048 | 30 | 2,906.25 | 1,707,555,000.00 | 992,516,343.75 |
| 2049 | 31 | - | - | 2049 | 31 | 3,068.25 | 1,617,400,000.00 | 992,517,510.00 |
| 2050 | 32 | - | - | 2050 | 32 | 3,239.35 | 1,531,970,000.00 | 992,517,403.90 |
| 2051 | 33 | - | - | 2051 | 33 | 3,419.95 | 1,451,070,000.00 | 992,517,369.30 |
| 2052 | 34 | - | - | 2052 | 34 | 3,610.65 | 1,374,430,000.00 | 992,517,135.90 |
| 2053 | 35 | - | - | 2053 | 35 | 3,811.95 | 1,301,850,000.00 | 992,517,421.50 |
| 2054 | 36 | - | - | 2054 | 36 | 4,024.50 | 1,233,095,000.00 | 992,518,165.50 |
| 2055 | 37 | - | - | 2055 | 37 | 4,248.90 | 1,167,970,000.00 | 992,517,546.60 |
| 2056 | 38 | - | - | 2056 | 38 | 4,485.80 | 1,106,290,000.00 | 992,519,136.40 |
| 2057 | 39 | - | - | 2057 | 39 | 4,735.90 | 1,047,865,000.00 | 992,516,770.70 |
| 2058 | 40 | - | - | 2058 | 40 | 5,000.00 | 992,515,000.00 | 992,515,000.00 |

*Due to rounding of bonds into $5,000 denominations, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

28

## EXHIBIT B

### List of Consummation Cost Parties

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Assured Guaranty Municipal Corp.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as
    investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of Oppenheimer
    Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of Rochester
    Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer Multi-State
    Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-State Municipal
    Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.

First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund I, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund II, Inc.
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

30

## SCHEDULE 1

| Fiscal Year | Pledged Sales Tax Base Amount | COFINA 53.65% Portion Pledged Sales Tax Base Amount | Commonwealth 46.35% Portion Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2019 | 783,197,251 | 420,185,325 | 363,011,926 |
| 2020 | 814,525,141 | 436,992,738 | 377,532,403 |
| 2021 | 847,106,147 | 454,472,448 | 392,633,699 |
| 2022 | 880,990,393 | 472,651,346 | 408,339,047 |
| 2023 | 916,230,008 | 491,557,399 | 424,672,609 |
| 2024 | 952,879,209 | 511,219,696 | 441,659,513 |
| 2025 | 990,994,377 | 531,668,483 | 459,325,894 |
| 2026 | 1,030,634,152 | 552,935,223 | 477,698,929 |
| 2027 | 1,071,859,518 | 575,052,631 | 496,806,887 |
| 2028 | 1,114,733,899 | 598,054,737 | 516,679,162 |
| 2029 | 1,159,323,255 | 621,976,926 | 537,346,329 |
| 2030 | 1,205,696,185 | 646,856,003 | 558,840,182 |
| 2031 | 1,253,924,033 | 672,730,244 | 581,193,789 |
| 2032 | 1,304,080,994 | 699,639,453 | 604,441,541 |
| 2033 | 1,356,244,234 | 727,625,032 | 628,619,202 |
| 2034 | 1,410,494,003 | 756,730,033 | 653,763,970 |
| 2035 | 1,466,913,763 | 786,999,234 | 679,914,529 |
| 2036 | 1,525,590,314 | 818,479,203 | 707,111,111 |
| 2037 | 1,586,613,926 | 851,218,371 | 735,395,555 |
| 2038 | 1,650,078,483 | 885,267,106 | 764,811,377 |
| 2039 | 1,716,081,623 | 920,677,791 | 795,403,832 |
| 2040 | 1,784,724,887 | 957,504,902 | 827,219,985 |
| 2041 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2042 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2043 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2044 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2045 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2046 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2047 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2048 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2049 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2050 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2051 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2052 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2053 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2054 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2055 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2056 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2057 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2058 | 1,850,000,000 | 992,525,000 | 857,475,000 |

102136844v2

## SCHEDULE 2

### Application of BNYM Pre-7/1/2018 Debt Service Fund Monies

| | |
|---|---|
| Pre-7/1/2018 BNYM Cash | 1,200,165,636 |
| Rounding Amount Cash Est.* | 25,000,000 |
| Section 103 Cash (Pre-Petition Interest) | 124,540,331 |
| PSA Consummation Costs | 332,742,277 |
| On-Island Min Taxable Election | 20,000,000 |
| On-Island Flex Taxable Election | 40,000,000 |
| Remaining Set Aside of Funds | 38,355,838 |
| Remaining Funds to Seniors | 619,527,190 |
| TE COFINA Sr. Cash** | 377,273,865 |
| TAX COFINA Sr. Cash** | 242,253,325 |

*All rounding shall be made up to the nearest $1,000 current interest bond denominations.
**Split Proportional to current TE/TAX ratio on COFINA Sr. of Accreted Value as of Petition Date.

# EXHIBIT D

## FORM OF JOINDER

# FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September __, 2018 (as amended, supplemented or otherwise modified from time to time (the "**PSA**"), by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, set forth on Exhibit "A" thereto (together with their respective successors and assignors with respect to transfers made in accordance with the terms thereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, set forth on Exhibit "B" thereto, (together with their respective successors and assignors with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., (i) Bonistas del Patio, Inc. ("**Bonistas**"), and (j) the other PSA Creditors from time to time party thereto, is executed and delivered by (the "**Joining PSA Creditor**") as of _____, 2018.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

1.      <u>Agreement to be Bound</u>.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "Senior Holder" (if it holds Senior COFINA Bond Claims) and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any Senior COFINA Bond Claims and Junior COFINA Bond claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any Senior COFINA Bond Claims or Junior COFINA Bond Claims held in a Qualified Marketmaker capacity).

2.      <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of Senior COFINA Bond Claims and Junior COFINA Bond Claims held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of Senior COFINA Bond Claims or Junior COFINA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 3.4 of the PSA and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 3.5 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 4.4 of the PSA, and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 4.5 of the PSA,  to each of the other Parties to the PSA.

3.      <u>Governing Law</u>. Section 7.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

101736284v3

4. <u>Notice of Joinder</u>.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.4 of the PSA (if it holds Senior COFINA Bond Claims), Section 4.5 of the PSA (if it holds Junior COFINA Bond Claims) and the notice provisions set forth in Section 7.10 of the PSA.


 IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.


[NAME OF INSTITUTION]


By:_____
      Name:
      Title:

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

## Schedule 3.4

## Pending Litigation Naming COFINA

### Title III Litigation

The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA) et al., Adv. Pro. No. 17-00133-LTS (D.P.R. 2017)

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of The Commonwealth of Puerto Rico v. Bettina Whyte as agent of The Puerto Rico Sales Tax Financing Corporation, Adv. Pro. No. 17-00257-LTS (D.P.R. 2017)

Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al., Adv. Pro. No. 18-00028-LTS (D.P.R. 2018)

### Pre-Title III Federal Litigation

Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 3:16-cv-02374-FAB (D.P.R. 2016) (stayed) (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337)

Rodriguez-Perelló et al. v. Rosselló-Nevares et al., No. 3:17-cv-01566-FAB (D.P.R. 2017) (stayed)

### State Court Litigation

Comisión Ciudadana Para La Auditoría Integral del Crédito Público, Inc. v. Autoridad De Asesoría Financiera y Agencia Fiscal, et al. No. SJ 2018CV06428 (Court of First Instance, San Juan 2018)

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit C Page 1 of 2

# Exhibit C

**Scheduled Amortizaiton and Certain Other Terms of COFINA Bonds**

## Coupons and Maturity Dates

### Current Interest Bond Terms

| (7/1) Year | Par | Cpn/Yld |
|---|---|---|
| Total/Avg | $9,119,420,000.00 | 4.792% |
| 2034 | 375,090,000.00 | 4.500% |
| 2040** | 2,996,115,000.00 | 4.550% |
| 2053 | 1,451,135,000.00 | 4.750% |
| 2058 | 4,297,080,000.00 | 5.000% |

### Capital Appreciation Bond Terms

| (7/1) Year | Yield | Initial Price | Initial Value | Accreted Value | Future Value |
|---|---|---|---|---|---|
| Total/Avg | 5.049% | 25.263 | $2,901,292,136.30 | $9,638,250,013.60 | $11,484,365,000.00 |
| 2027 | 4.000% | 70.247 | 422,356,575.15 | 550,215,360.85 | 601,245,000.00 |
| 2033 | 4.650% | 50.374 | 723,876,898.70 | 1,291,955,338.75 | 1,437,005,000.00 |
| 2049 | 5.460% | 18.911 | 1,510,823,428.75 | 6,378,612,143.10 | 7,989,125,000.00 |
| 2051 | 5.500% | 16.763 | 244,235,233.70 | 1,417,467,170.90 | 1,456,990,000.00 |

### Current Interest Bond Sinking Fund Schedule

| (7/1) Year | Yr# | CPN | Par | Term Par |
|---|---|---|---|---|
| Total | | | $9,119,420,000.00 | $9,119,420,000.00 |
| 2019 | 1 | - | - | - |
| 2020 | 2 | | | - |
| 2021 | 3 | - | | - |
| 2022 | 4 | - | | - |
| 2023 | 5 | - | | - |
| 2024 | 6 | - | | - |
| 2025 | 7 | - | | - |
| 2026 | 8 | - | | - |
| 2027 | 9 | - | | - |
| 2028 | 10 | - | | - |
| 2029 | 11 | - | | - |
| 2030 | 12 | - | | - |
| 2031 | 13 | - | | - |
| 2032 | 14 | - | | - |
| 2033 | 15 | 4.500% | 52,970,000.00 | - |
| 2034 | 16 | 4.500% | 322,120,000.00 | 375,090,000.00 |
| 2035 | 17 | 4.550% | 366,885,000.00 | - |
| 2036 | 18 | 4.550% | 415,060,000.00 | - |
| 2037 | 19 | 4.550% | 466,685,000.00 | - |
| 2038 | 20 | 4.550% | 521,965,000.00 | - |
| 2039 | 21 | 4.550% | 581,125,000.00 | - |
| 2040 | 22 | 4.550% | 644,395,000.00 | 2,996,115,000.00 |
| 2041 | 23 | - | - | - |
| 2042 | 24 | - | - | - |
| 2043 | 25 | - | - | - |
| 2044 | 26 | - | - | - |
| 2045 | 27 | - | - | - |
| 2046 | 28 | - | - | - |
| 2047 | 29 | - | - | - |
| 2048 | 30 | - | - | - |
| 2049 | 31 | - | - | - |
| 2050 | 32 | - | - | - |
| 2051 | 33 | - | - | - |
| 2052 | 34 | 4.750% | 708,735,000.00 | - |
| 2053 | 35 | 4.750% | 742,400,000.00 | 1,451,135,000.00 |
| 2054 | 36 | 5.000% | 777,665,000.00 | - |
| 2055 | 37 | 5.000% | 816,545,000.00 | - |
| 2056 | 38 | 5.000% | 857,375,000.00 | - |
| 2057 | 39 | 5.000% | 900,240,000.00 | - |
| 2058 | 40 | 5.000% | 945,255,000.00 | 4,297,080,000.00 |

### Capital Appreciation Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Yld. | Initial Price | Initial Value | Accreted Value | Future Value Redemption |
|---|---|---|---|---|---|---|
| - | | | | $2,901,292,136.30 | $9,638,250,013.60 | $11,484,365,000.00 |
| 2019 | 1 | 4.000% | 70.247 | 18,910,492.40 | 19,609,604.80 | 26,920,000.00 |
| 2020 | 2 | | | - | | - |
| 2021 | 3 | 4.000% | 70.247 | 15,570,247.55 | 17,476,880.85 | 22,165,000.00 |
| 2022 | 4 | 4.000% | 70.247 | 30,536,370.90 | 35,660,179.80 | 43,470,000.00 |
| 2023 | 5 | 4.000% | 70.247 | 44,908,907.10 | 54,563,615.70 | 63,930,000.00 |
| 2024 | 6 | 4.000% | 70.247 | 58,719,467.30 | 74,225,412.30 | 83,590,000.00 |
| 2025 | 7 | 4.000% | 70.247 | 71,992,637.95 | 94,679,742.40 | 102,485,000.00 |
| 2026 | 8 | 4.000% | 70.247 | 84,735,443.75 | 115,939,925.00 | 120,625,000.00 |
| 2027 | 9 | 4.000% | 70.247 | 96,983,008.20 | 138,060,000.00 | 138,060,000.00 |
| 2028 | 10 | 4.650% | 50.374 | 102,098,023.20 | 161,061,688.80 | 202,680,000.00 |
| 2029 | 11 | 4.650% | 50.374 | 111,993,995.50 | 184,983,293.00 | 222,325,000.00 |
| 2030 | 12 | 4.650% | 50.374 | 121,350,966.00 | 209,867,262.00 | 240,900,000.00 |
| 2031 | 13 | 4.650% | 50.374 | 130,184,046.90 | 235,734,069.60 | 258,435,000.00 |
| 2032 | 14 | 4.650% | 50.374 | 138,531,018.70 | 262,649,025.35 | 275,005,000.00 |
| 2033 | 15 | 4.650% | 50.374 | 119,718,848.40 | 237,660,000.00 | 237,660,000.00 |
| 2034 | 16 | | | - | - | - |
| 2035 | 17 | | | - | | - |
| 2036 | 18 | | | - | | - |
| 2037 | 19 | | | - | | - |
| 2038 | 20 | | | - | | - |
| 2039 | 21 | | | - | | - |
| 2040 | 22 | | | | | |
| 2041 | 23 | 5.460% | 18.911 | 206,232,964.95 | 708,734,290.05 | 1,090,545,000.00 |
| 2042 | 24 | 5.460% | 18.911 | 195,417,764.05 | 708,736,860.30 | 1,033,355,000.00 |
| 2043 | 25 | 5.460% | 18.911 | 185,168,002.05 | 708,731,972.10 | 979,155,000.00 |
| 2044 | 26 | 5.460% | 18.911 | 175,458,149.10 | 708,735,502.80 | 927,810,000.00 |
| 2045 | 27 | 5.460% | 18.911 | 166,256,056.50 | 708,735,564.00 | 879,150,000.00 |
| 2046 | 28 | 5.460% | 18.911 | 157,538,085.50 | 708,733,948.50 | 833,050,000.00 |
| 2047 | 29 | 5.460% | 18.911 | 149,275,869.60 | 708,734,769.60 | 789,360,000.00 |
| 2048 | 30 | 5.460% | 18.911 | 141,447,661.15 | 708,734,235.75 | 747,965,000.00 |
| 2049 | 31 | 5.460% | 18.911 | 134,028,875.85 | 708,735,000.00 | 708,735,000.00 |
| 2050 | 32 | 5.500% | 16.763 | 125,429,985.65 | 708,732,170.90 | 748,255,000.00 |
| 2051 | 33 | 5.500% | 16.763 | 118,805,248.05 | 708,735,000.00 | 708,735,000.00 |
| 2052 | 34 | | | - | | - |
| 2053 | 35 | | | | | |
| 2054 | 36 | | | | | |
| 2055 | 37 | | | | | |
| 2056 | 38 | | | | | |
| 2057 | 39 | | | | | |
| 2058 | 40 | | | | | |

*Due to rounding of bonds into $5,000 denominations, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit D Page 91 of 149

# **Exhibit D**

## **Certified COFINA Fiscal Plan**

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit C Page 3 of 112

# COFINA FISCAL PLAN

AS CERTIFIED BY THE FINANCIAL OVERSIGHT

AND MANAGEMENT BOARD FOR PUERTO RICO

OCTOBER 18, 2018



Case: 17-03283-LTS   Doc#: 4364-37   Filed: 01/26/19   Entered: 01/26/19 21:36:59   Desc:
Exhibit OQQ   Page 3 of 249

DISCLAIMER

The Financial Oversight and Management Board for Puerto Rico (the "FOMB," or "Oversight Board") has formulated this Fiscal Plan based on, among other things, information obtained from the Commonwealth of Puerto Rico (the "Commonwealth," or the "Government").

This document does not constitute an audit conducted in accordance with generally accepted auditing standards, an examination of internal controls or other attestation or review services in accordance with standards established by the American Institute of Certified Public Accountants or any other organization. Accordingly, the Oversight Board cannot express an opinion or any other form of assurance on the financial statements or any financial or other information or the internal controls of the Government and the information contained herein.

This Fiscal Plan is directed to the Governor and Legislature of Puerto Rico based on underlying data obtained from the Government. No representations or warranties, express or implied, are made by the Oversight Board with respect to such information.

Any statements and assumptions contained in this document, whether forward-looking or historical, are not guarantees of future performance and involve certain risks, uncertainties, estimates and other assumptions made in this document. The economic and financial condition of the Government and its instrumentalities is affected by various legal, financial, social, economic, environmental, governmental and political factors. These factors can be very complex, may vary from one fiscal year to the next and are frequently the result of actions taken or not taken, not only by the Government, the Oversight Board, and other third-party entities such as the government of the United States. Examples of these factors include, but are not limited to:

–   *Any future actions taken or not taken by the United States government related to Medicaid or the Affordable Care Act;*

–   *The amount and timing of receipt of any distributions from the Federal Emergency Management Agency and private insurance companies to repair damage caused by Hurricanes María and Irma;*

–   *The amount and timing of receipt of any amounts allocated to Puerto Rico and provided under the Community Disaster Loans Program;*

–   *The amount and timing of receipt of any additional amounts appropriated by the United States government to address the funding gap described herein;*

–   *The timeline for completion of the work being done by the Puerto Rico Electric Power Authority ("PREPA") to repair PREPA's electric system and infrastructure and the impact of any future developments or issues related to PREPA's electric system and infrastructure on Puerto Rico's economic growth;*

–   *The impact of the measures described herein on outmigration;*

–   *The impact of the resolution of any pending litigation in the Title III cases; and*

–   *The occurrence or nonoccurrence of agreement on definitive documentation required to implement the transactions contemplated by the PSA (as defined herein) and approval of such transactions by the Title III Court.*

Because of the uncertainty and unpredictability of these factors, their impact cannot be included in the assumptions contained in this document. Future events and actual results may differ materially from any estimates, projections, or statements contained herein. Nothing in this document should be considered as an express or implied commitment to do or take, or to refrain from taking, any action by the Oversight Board, the Government, or any government instrumentality in the Government or an admission of any fact or future event. Nothing in this document shall be considered a solicitation, recommendation or advice to any person to participate, pursue or support a particular course of action or transaction, to purchase or sell any security, or to make any investment decision.

By receiving this document, the recipient is deemed to have acknowledged the terms of these limitations. This document may contain capitalized terms that are not defined herein or may contain terms that are discussed in other documents or that are commonly understood. You should make no assumptions about the meaning of capitalized terms that are not defined, and you should refer questions to the Oversight Board at comments@oversightboard.pr.gov should clarification be required.

This Fiscal Plan is based on what the Oversight Board believes is the best information currently available to it. To the extent the Oversight Board becomes aware of additional information after it certifies this Fiscal Plan that the Oversight Board determines warrants a revision of this Fiscal Plan, the Oversight Board will so revise it.

Fiscal Plan for COFINA

**List of Acronyms and Key Terms**

| | |
|---|---|
| AAFAF | Puerto Rico Fiscal Agency and Financial Advisory Authority (Spanish acronym) |
| ABT | Additional Bonds Test |
| BNYM | Bank of New York Mellon |
| CAB | Capital Appreciation Bonds |
| CBO | Congressional Budget Office |
| CDBG-DR | Community Development Block Grant- Disaster Recovery |
| CIB | Current Interest Bonds |
| CINE | Puerto Rico Motion Picture Arts, Sciences and Industry Development Corporation (Spanish acronym) |
| COFINA | Puerto Rico Sales Tax Financing Corporation (Spanish acronym) |
| COR3 | Central Office of Recovery, Reconstruction and Resiliency |
| CW | Commonwealth of Puerto Rico |
| DHS | Department of Homeland Security |
| DRF | Disaster Relief Fund |
| DSA | Debt Sustainability Analysis |
| EAI | Puerto Rican Economic Activity Index |
| FAM | Municipal Administration Fund (Spanish Acronym) |
| FEMA | Federal Emergency Management Agency |
| FY | Fiscal-Year |
| GDB | Government Development Bank for Puerto Rico |
| GDP | Gross Domestic Product |
| GNP | Gross National Product |
| HSOAC | Homeland Security Operational Analysis Center |
| HUD | United States Department of Housing and Urban Development |
| IMF | International Monetary Fund |
| MADS | Maximum Annual Debt Service |
| PAN | Nutritional Assistance Program |
| PFC | Puerto Rico Public Finance Corporation |
| POA | Plan of Adjustment |
| PRASA | Puerto Rico Aqueduct and Sewer Authority |
| PREPA | Puerto Rico Electric and Power Authority |
| PRHTA (or HTA) | Puerto Rico Highway and Transportation Authority |
| PROMESA | Puerto Rico Oversight, Management and Economic Stability Act |
| PSTBA | Pledged Sales Tax Base Amount |
| RSA | Restructuring Support Agreement |
| SUT | Sales and Use Tax |
| TRAN | Tax and Revenue Anticipation Notes |
| UPR | University of Puerto Rico |
| WEO | World Economic Outlook |

iii

Fiscal Plan for COFINA

# Table of Contents

*Executive Summary* ............................................................................................5

**PART I: The Sales and Use Tax and COFINA**........................................... 7

*Chapter 1. Sales and Use Tax Description*.................................................7

*Chapter 2. The COFINA Settlement* ......................................................... 9

*Chapter 3. Material Terms of August Agreement* .................................10

**PART II: Context for Puerto Rico's Current Economic and Fiscal Challenges** ...............14

*Chapter 4. Long-term Economic Trends*...................................................14

**PART III: Puerto Rico's Path to Fiscal and Economic Sustainability** ...........................16

*Chapter 5. Macroeconomic and Demographic Trajectory Post-Maria* ...................16

*Chapter 6. Financial Projections* ........................................................... 25

*Chapter 7. Long-term Projections and Debt Sustainability Analysis (DSA)*........................ 28

*Appendix A. The Plan Support Agreement ("PSA")* ...................................... 32

*Appendix B. Debt Outstanding as of May 4, 2017*.................................... 33

*Appendix C. U.S. Real GNP Growth Rate Comparison*.................................. 34

iv

# EXECUTIVE SUMMARY

Questions regarding the Commonwealth and COFINA's respective ownership interests in the sales-and-use tax revenue pledged as collateral for the existing COFINA bonds have been at the center of Puerto Rico's Title III cases since their commencement in May 2017. Resolution of this issue (the "Commonwealth-COFINA Dispute") is essential in order for Puerto Rico's debt restructuring to move forward.

To expedite resolution of the Commonwealth-COFINA Dispute, the Oversight Board proposed the appointment of representatives for the Commonwealth and COFINA. Under the Stipulation and Order entered by the Title III Court on August 10, 2017, the Official Committee of Unsecured Creditors was appointed as the agent to the Commonwealth (the "Commonwealth Agent") and Bettina Whyte was appointed as the agent to COFINA (the "COFINA Agent.")

On June 5, 2018, the Commonwealth Agent and COFINA Agent announced an agreement in principle (the "Understanding") to resolve the Commonwealth-COFINA Dispute. The Understanding is premised on splitting the "Pledged Sales Tax Base Amount" ("PSTBA") between the Commonwealth and COFINA. The PSTBA is an amount established under Act 91-2006, as amended, and the Sales Tax Revenue Bond Resolution, as amended and restated on June 10, 2009 (the "Bond Resolution"), that, under current law, must be received by COFINA from 5.5% of the SUT before the Commonwealth can receive any of the other 5.5% SUT. Under the Understanding, COFINA will receive (a) 53.65% of the yearly scheduled PSTBA beginning with payments made on July 1, 2018 and (b) all of the cash held in trust at Bank of New York Mellon, as trustee under the Bond Resolution, as of June 30, 2018 (approximately $1.2 billion). The Commonwealth will receive the remaining 46.35% of the PSTBA.

After the announcement of the Understanding, the Oversight Board and AAFAF began negotiating the economic treatment of COFINA bondholders and the terms of new COFINA securities with certain key COFINA creditor constituencies, including monoline insurers, all under the auspices of the judicially-appointed mediation team. On August 8, 2018, the Oversight Board and the Government announced that an agreement in principle had been reached on the terms of a restructuring of COFINA's outstanding bond debt (the "August Agreement"). The August Agreement incorporates the proposed PSTBA split as reflected in the Understanding.

In connection with efforts to consummate the transactions contemplated by the August Agreement, on August 22, 2018, the Oversight Board requested a standalone fiscal plan for COFINA for FY19-23. In response, on August 29, 2018, prior to execution of the PSA summarized in Chapter 3 below, a proposed COFINA fiscal plan was submitted to the Oversight Board, which fiscal plan did not take into account the finalized terms of the PSA.

On August 30, 2018, the Oversight Board and the Government announced that COFINA had entered into that certain Plan Support Agreement dated as of August 29, 2018 (together with all schedules and exhibits thereto, including the "Term Sheet" as defined therein and appended as Exhibit C thereto, the "PSA"), by and among (a) the Oversight Board, (b) COFINA, (c) AAFAF, (d) the "Senior Holders," as defined therein, (e) Ambac Assurance Corporation, (f) National Public Finance Guarantee Corporation, (g) the "Junior Holders," as defined therein, (h) Assured

5

Guaranty Municipal Corp., formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc.  The PSA incorporated the PSTBA split, consistent with the Understanding and the August Agreement. The PSA, as subsequently amended on September 20, 2018, is attached hereto as Appendix A.

Consummation of the transactions contemplated by the PSA, however, remains subject to, *inter alia*, the passage of certain legislation by the Puerto Rico Legislature, agreement on definitive documentation, and approval of the Title III Court.  There can be no assurance that any of the events required to consummate the transactions contemplated by the PSA will occur, or that the facts and circumstances regarding such transactions will not materially change.  Many of the provisions and assumptions herein are premised on approval of the transactions described herein, and they may change if circumstances warrant; such provisions and assumptions may be context-dependent.  Accordingly, without limiting any of the disclaimers set forth herein, nothing herein shall be construed as, or be deemed to be, an admission or concession on the part of any Party in any respect, and nothing herein is intended to, or shall be construed or deemed to, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, the right to amend this Fiscal Plan.

6

Fiscal Plan for COFINA

# PART I: The Sales and Use Tax and COFINA

## Chapter 1. SALES & USE TAX DESCRIPTION

The Commonwealth's sales and use tax ("Commonwealth SUT" or "SUT") was originally imposed in 2006 pursuant to Act No. 117-2006. The SUT in turn replaced the prior 5.0% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%. Act 117-2006 also authorized each municipal government to impose a sales and use tax of 1.5% (the "Municipal SUT"), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT. Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund ("FAM"), a fund created to provide a financial mechanism to finance the debt of the municipalities. The Municipal SUT is not part of the Government's revenues nor is it pledged to COFINA.

In 2013, Act No. 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act No. 72-2015 that, among other things, (i) increased the total Commonwealth SUT rate to 10.5% effective on July 1, 2015, with the net 0.5% increase being for the benefit of the General Fund, and (ii) eliminated several exemptions.

Although Act 72-2015 has experienced various amendments since its original enactment, the Commonwealth SUT remains at 10.5%. There is also a special 4.0% SUT that is generally applicable to business-to-business services and designated professional services. Exhibit 1 shows the SUT collections since inception of the tax. Exhibit 2 shows the allocation of the sales and use tax between FAM, COFINA, and the Government.

The amount of SUT collected depends on various factors, including economic conditions. For more information on Puerto Rico's economic conditions and forecast, see Part III.

7

EXHIBIT 1: SALES AND USE TAX HISTORICAL COLLECTIONS[1] (10.5%)



EXHIBIT 2: ALLOCATION OF SALES AND USE TAX



1 $3.2 million of SUT revenues flow to CINE every year.
2 Up to annual cap of $420 million in 2019, which grows by 4.0% each year to a maximum of $993 million.

---

[1] SUT historical collections source: http://www.hacienda.gobierno.pr/inversionistas/estadisticas-y-recaudos-statistics-and-revenues/ingresos-del-impuesto-sobre-ventas-y-uso-ivu-sales-and-use-tax-sut-revenues

Fiscal Plan for COFINA

# Chapter 2. THE COFINA SETTLEMENT

COFINA is party to the PSA in an effort to settle the Commonwealth-COFINA Dispute and to restructure its debts to terms that are aligned with the fiscal reality of Puerto Rico. The summary of the PSA in this Fiscal Plan is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the PSA itself. To the extent there is any discrepancy between the summary contained herein and the terms set forth in the PSA, the terms set forth in the PSA control. Consummation of the transactions contemplated by the PSA remain subject to, *inter alia*, the passage of certain legislation by the Puerto Rico Legislature, agreement on definitive documentation, and approval of the Title III Court. There can be no assurance that any of the events required to consummate the transactions contemplated by the PSA will occur, or that the facts and circumstances regarding such transactions will not materially change. Many of the provisions and assumptions herein are premised on approval of the transactions described herein, and they may change if circumstances warrant; such provisions and assumptions may be context-dependent. Accordingly, without limiting any of the disclaimers set forth herein, nothing herein shall be construed as, or be deemed to be, an admission or concession on the part of any Party in any respect, and nothing herein is intended to, or shall be construed or deemed to, in any manner waive, limit, impair or restrict the ability of any Party to protect and preserve its rights, remedies and interests, including, without limitation, the right to amend this Fiscal Plan.

However, if implemented, the transactions contemplated by the PSA would grant COFINA an ownership interest in 53.65% of the PSTBA, which will be used to fund debt service payments on new COFINA bonds that will be distributed to existing COFINA senior and subordinated bondholders under a COFINA plan of adjustment (the "COFINA Plan"). COFINA would also receive "first dollars" collected from the pledged SUT until it has received an amount equal to 53.65% of the PSTBA (unless certain conditions are satisfied on a quarterly basis after 2024). The annual 53.65% PSTBA is illustrated in the table below.

EXHIBIT 3: THE COFINA SETTLEMENT DEBT SERVICE ($M)



The total COFINA debt outstanding is detailed in Appendix B.

Fiscal Plan for COFINA

# Chapter 3. MATERIAL TERMS OF AUGUST AGREEMENT

As stated before, the following summary of the PSA in this Fiscal Plan is provided for the convenience of the reader and is qualified in its entirety by reference to the provisions of the PSA itself. To the extent there is any discrepancy between the summary contained herein and the terms set forth in the PSA, the terms set forth in the PSA control.

***Issuance of COFINA Bonds***.

The PSA contemplates that under the COFINA Plan existing senior and subordinate COFINA bondholders will receive new senior lien bonds (the "New COFINA Bonds") worth approximately $12.0 billion on account of their approximately $17.6 billion in claims. The New COFINA Bonds will among other things, be secured by a statutory lien on the "COFINA Pledged Taxes" (as defined therein), subject to the Commonwealth's right to substitute "New Collateral" (as defined therein) in accordance with the terms of the PSA.

The New COFINA Bonds will bear fixed interest rates on a pro-rata basis, which will include: (i) current interest bonds ("CIBs") entitled to cash interest and (ii) capital appreciation bonds ("CABs"), under which interest is added to principal and paid at maturity. The CIBs will mature in years 16, 22, 35, and 40 (i.e., 2034, 2040, 2053, and 2058), while the CABs will mature in years 9, 15, 31 and 33 (i.e., 2027, 2033, 2049 and 2051). The New COFINA Bonds will also be redeemable prior to maturity according to the schedule below.

EXHIBIT 4: COFINA CALL SCHEDULE TABLE

| Current Interest Bonds | |
|---|---|
| **Maturity** | **Call Provision** |
| 2034 | Par Call Commencing 2025 (7 year call) |
| 2040 | Par Call Commencing 2028 (10 year call) |
| 2053 | Par Call Commencing 2028 (10 year call) |
| 2058 | Par Call Commencing 2028 (10 year call) |
| Current Interest Bonds | |
| **Maturity** | **Call Provision** |
| 2027 | Non-Call |
| 2033 | Callable at 107.5% Accreted Value ("AV") 2028-30; 105% AV 2031; 103% AV 2032, 100% AV 2033 |
| 2049 | Callable at 107.5% AV 2028-32, 105% AV 2033-37, 103% AV 2038-42, 100% AV 2043-Final Maturity |
| 2051 | Callable at 107.5% AV 2028-32, 105% AV 2033-37, 103% AV 2038-42, 100% AV 2043-Final Maturity |

*All Capital Appreciation Bonds: Sinking Fund Redemptions would be 100% of AV

The Parties of the PSA have agreed, among other things, to support the claims of the COFINA Plan as provided for in the term sheet. Moreover, subject to receipt of the COFINA disclosure

10

statement and other solicitation materials concerning the COFINA Plan, the parties as described in the PSA shall vote to accept the COFINA Plan.

*Filing of Plan of Adjustment*. The Oversight Board is obligated to file the COFINA Plan (based upon the terms and conditions described in the PSA and Term Sheet, as subsequently amended) on or before October 19, 2018.

*Fees*. On the effective date of the COFINA Plan, creditors who are party to the PSA prior to a specified date will receive, subject to certain exceptions, a pro rata share of additional cash in an amount equal to 2.0% of (i) the aggregate amount of existing COFINA bond claims *less* (ii) $1 billion. Certain other holders—generally, residents of Puerto Rico that elect to receive taxable New COFINA Bonds under the COFINA Plan will also be eligible to receive their pro rata share of cash equal to 2.0% (net of certain administrative costs) of the aggregate amount of such holders' existing COFINA bond claims, which amount of cash shall not exceed $60 million.

*Debt Service Reserve Fund*. The New COFINA Bonds will not have a debt service reserve fund.

*Acceleration*. The New COFINA Bonds will not have any rights of acceleration.

*Covenants*. Under new legislation that will be passed to amend the COFINA statute (the "New Bond Legislation"), the Commonwealth and COFINA, as applicable, agree to the following covenants for the New COFINA Bonds:

- *Sales and Use Covenant*: The Commonwealth will covenant that the rate of the sales and use tax from which the PSTBA is derived will not be reduced below 5.5% unless two nationally recognized rating agencies confirm that the rating of the New COFINA Bonds will not be downgraded and will be at least A2/A following the rate reduction. Additionally, if the tax rate is lowered below 3.0%, then such reduction constitutes a substitution of collateral and is subject to the Substitution of Collateral provision described below.

- *Non-Impairment*: The Commonwealth will covenant that it will take no action that would (i) impair COFINA's right to recover the COFINA Portion of the PSTBA, (ii) limit or alter the rights vested in COFINA in accordance with the COFINA Plan and the order confirming the COFINA Plan to fulfill the terms of any agreements with the holders of New COFINA Bonds, (iii) materially adversely impair the collection of the COFINA Pledged Taxes in any fiscal year or (iv) impair the rights and remedies of the holders of the New COFINA Bonds or the collateral security thereof.

- *Tax-Exempt*: COFINA will covenant for the benefit of holders of tax-exempt New COFINA Bonds that it will do and perform all acts and things permitted by law and "reasonably necessary or desirable" to assure that interest paid to the holders of any tax-exempt New COFINA Bonds will remain excludable from gross income for federal income tax purposes.

- *Rating Agency Covenant*: In connection with the Substitution of Collateral provision described below, COFINA will use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding New COFINA Bonds, including, but not limited to, responding to requests for documents.

Fiscal Plan for COFINA

***Substitution of Collateral***:  The New Bond Legislation will permit a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "New Collateral") as security for the repayment of the New COFINA Bonds only if, among other things, (i) the New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico or otherwise constitutes like or comparable security for the New COFINA Bonds, and (ii) two nationally recognized rating agencies confirm that the rating of the New COFINA Bonds will not be downgraded and will be at least A2/A following the collateral substitution.

***New COFINA Board***:  The New Bond Legislation will provide that COFINA's board of directors will consist of three members appointed by the Governor, provided that (i) each member will be required to meet certain independence and qualification standards that will be agreed upon by the parties to the PSA, and (ii) holders of the existing senior COFINA bonds may submit up to three board member recommendations to the Governor (who will be under no obligation to appoint any such recommended person).

***Confirmation Order***:  The order confirming the COFINA Plan will provide, among other things, that (i) the New COFINA Bonds and the covenants provided by COFINA and the Commonwealth summarized above are valid, binding, legal and enforceable obligations under Puerto Rico and federal law, and (ii) the COFINA Portion of the PSTBA (and any permitted substitute thereof) is property of COFINA, transferred free and clear of all liens, claims, and encumbrances, and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution.

***Additional Conditions Precedent to Effectiveness***:  The effective date of the COFINA Plan will be conditioned on, among other things, (i) execution of related definitive documents (including the existing COFINA Bond Resolutions as amended or repealed and replaced) reasonably satisfactory to the parties to the PSA, (ii) receipt of usual and customary legal opinions reasonably acceptable to the parties to the PSA, and (iii) unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan, including, without limitation, Commonwealth legislation or court orders, if any required to (A) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of New COFINA Bonds, (B) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan and (C) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations.

***Legislation***:  On or before the effective date of the COFINA Plan, the PSA provides that the New Bond Legislation shall be enacted to, among other things, (i) establish the new COFINA board summarized above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment covenants summarized above, and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated by the PSA, including (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion of the PSTBA, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default, (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds.

# PART II: Context for Puerto Rico's current economic and fiscal challenges

## Chapter 4. LONG-TERM ECONOMIC TRENDS

Before being battered by the most powerful hurricane to strike the Island in almost a century, Puerto Rico's economy had been in an acute structural decline for over a decade, the Government had defaulted on debt exceeding the size of Puerto Rico's annual GNP, and nearly half of Puerto Ricans lived below the national poverty line. The reasons for these problems are multiple, but the root causes stretch back decades.

On June 25, 1938, Congress legislated to authorize the Puerto Rico Legislature "to create public corporate authorities to undertake slum clearance and projects, to provide dwelling accommodations for families of low income, and to issue bonds therefor."[2] Bonds issued by public corporations did not constitute debt of the Puerto Rican insular government. This federal legislation permitted Puerto Rico to dramatically increase its debt capacity. By 1947, the Puerto Rico Water Resources Authority (today PREPA) placed the largest debt issuance of any agency or public corporation in the U.S while Puerto Rico was dramatically poorer than mainland jurisdictions.

In the 1940s and 1950s, led by Operation Bootstrap, Puerto Rico's economy grew rapidly, and productivity increased by 5% per annum as it transitioned from an agricultural-led to a manufacturing-led economy. This transition was anchored to the institutionalist economic policy adopted in Puerto Rico during the governorship of Rexford G. Tugwell. However, as economic performance began to decline in the 1970s, the Federal Government adopted two significant policies to help Puerto Rico shore up its economy.

First, transfer programs increased dramatically, particularly as Puerto Rico started receiving Nutritional Assistance Program (PAN) funding, eventually providing, in aggregate, a portion of residents' personal income that was twice the U.S. mainland average.

Second, in 1976, Section 936 of the Federal tax code was introduced to promote investments by companies that could transfer their "intangible assets" to Puerto Rico, and thereby shift profits to the Island. These Section 936 companies, which were mostly in pharmaceuticals and life sciences, became a pillar of Puerto Rico's economy, creating valuable local supply chains, local banking deposits, and contributing substantial tax revenue.

In 1996, Congress decided to end Section 936, gradually phasing it out by 2006. In the face of an anemic local private sector, the Government also expanded its employment to the point that by 2000, 30% of Puerto Rico's jobs were in Government. Large sectors like water, electricity and ports are still run by public corporations, and have consistently crowded out private investment. This crowding out is partly the result of the institutionalist policies instituted long ago. There is also pervasive cross-subsidization between the Government and public corporations and other parts of the public sector that obfuscates financial management and accountability. As a result,

---

[2] U.S. Statute at Large, 75th Cong. 3rd Session, Ch. 703, June 25, 1938, 52 Stat., p. 1203.

today Puerto Rico underperforms on all important measures of a modern economy, including educational attainment, cost of electricity, quality of water, tax compliance, and labor market participation.

To promote the private sector, the Government undertook a broad tax incentives policy that led to a highly complex web of subsidies and special tax arrangements.

Government revenues suffered and became increasingly hard to forecast. To make up for this recurring and growing budgetary shortfall, the Commonwealth turned to debt markets. As investor appetite began to wane, the Government turned to securing new debt by pledging various revenue streams. The result was a highly complex financial structure that limited transparency and financial accountability and management.

When the Great Recession hit in 2008, Puerto Rico's economy was already in a fragile fiscal and financial position. Since then, the economy has continued to worsen – Puerto Rico has seen its GNP shrink by 20%, and the Island's population has fallen by 10%. Today, Puerto Rico is much poorer relative to the U.S. than it was in 1970.

14

Fiscal Plan for COFINA

# PART III. Puerto Rico's path to fiscal and economic sustainability

## Chapter 5. MACROECONOMIC AND DEMOGRAPHIC TRAJECTORY POST-MARIA[3]

Hurricanes Irma and Maria have created a new economic reality for Puerto Rico, drastically impacting the years to come. Given this context, the Fiscal Plan projects there will be macroeconomic volatility in the wake of the storms. In FY2018, there is a significant decline in GNP, followed by a partial bounce-back in FY2019 due to disaster relief funding, then a return to slightly above trendline by FY2023 due to the impact of structural reforms.

EXHIBIT 5: REAL GNP GROWTH RATE, BEFORE AND AFTER MEASURES AND STRUCTURAL REFORMS, INCLUSIVE OF DISASTER RELIEF SPENDING

Real GNP Growth Rate, %



This trendline has similarities to the growth trendline faced by other jurisdictions that have suffered from major natural disasters (**Exhibit 6**).

---

3 This section does not purport to discuss all of the variables that may impact the level of sales and use tax.

EXHIBIT 6: PUERTO RICO'S PROJECTED GROWTH TRAJECTORY COMPARED TO OTHER
JURISDICTIONS AFTER NATURAL DISASTERS



1 Katrina figures not adjusted for inflation

SOURCE: World Bank, Bureau of Economic Analysis, and ECCB

Every fiscal plan has utilized the inflation and gross domestic product for the United States included in the International Monetary Fund's World Economic Outlook (WEO)[4]. Considering the importance of the U.S. mainland growth projections on projections for Puerto Rio and the need for the Proposed Plan to be anchored in forecasts consistent with those that U.S. policy makers use, the macroeconomic projections now incorporate the Congressional Budget Office (CBO) 10-year economic projections for both U.S. GDP growth and U.S. inflation. There has been no methodological change to the macroeconomic model. We will only reference in this document figures derived utilizing the CBO forecast.

The economic outlook model, which forecasts GNP growth, primarily relies on a comprehensive data set on the Puerto Rican economy from 1965 to 2017. It includes dozens of variables that collectively describe the Puerto Rican economy (e.g., growth, population, capital stock, etc.),[5] and is largely impacted by four major factors: a) the pre-hurricane trendline of Puerto Rico, b) short-

---

[4] The June 2018 Certified Fiscal Plan for the Commonwealth included forecasts from the October 2017 vintage of the WEO. After the fiscal plan was first certified on April 19,2018, the IMF published an updated WEO in late April 2018. This edition of the WEO included a marked downward revision in medium term economic growth for the United States, from 1.7% to 1.4%, citing lower potential growth in the outer years of the forecast following a temporary strong expansion caused by recent fiscal policy changes in the United States. U.S. Treasury has rejected the IMF's view that tax cuts will provide the U.S. economy only a temporary boost and is projecting a stronger economic outlook since it believes that U.S. policies, including the productivity-boosting blend of tax reform and regulatory relief, will result in more sustainable economic growth. This revision has a material negative impact on the macroeconomic forecast for Puerto Rico.

[5] The forecast relies on a 60-year comprehensive dataset and applying statistical regressions to show the effects of multiple yet distinct inter-related components of past hurricanes, exogenous developments, and economic policies on growth and inflation.

16

Fiscal Plan for COFINA

and long-term impacts from the storm on economic activity and capital stock, c) the stimulating impact of disaster relief assistance *(discussed in Section 5.1)*, and d) proposed fiscal consolidation measures and structural reforms *(discussed in Section 5.3)*.

These factors result in a -8.0% decline in real GNP for FY2018, which is directionally in line with the fiscal year activity of the Puerto Rican Economic Activity Index (EAI)–a metric that historically tracks closely with GNP. For FY2018, EAI was down 6.8% from the previous year. Projected inflation rates (**Exhibit 7**) serve as a proxy for the GNP deflator yielding real GNP growth rates ranging from -8% in FY2018 to 7.7% in FY2019.

EXHIBIT 7: ANNUAL INFLATION RATE



Annual inflation rate, %

| FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|------|------|------|------|------|------|
| 1.63 | 1.30 | 1.49 | 1.60 | 1.57 | 1.52 |

## 5.1 Impact and Description of Disaster Spend

- **Stimulating impact over the life of the plan caused by spending on the Island that is expected to be nearly 100% of the projected 2018 GNP.** This stimulus can come in multiple forms such as construction companies hiring local, unemployed workers or workers from the mainland U.S. paying local withholding taxes and spending money on food and lodging.

- **Expected refurbishment of the capital stock on the Island.** The Fiscal Plan factors in the estimated damage to capital stock which is repaired, largely due to the infusion of federal and private monies. This infusion contributes to the bounce-back anticipated in FY2019 and for the increase in growth above pre-Maria trend thereafter.

**The Fiscal Plan projects that approximately ~$82[6] billion of disaster relief funding in total, from Federal and private sources, will be disbursed in the reconstruction effort.** It will be used for a mix of **individual assistance** (e.g., reconstruction of houses, personal expenses related to the hurricane such as clothing and supplies), **public assistance** (e.g., reconstruction of major infrastructure, roads, and schools), and to cover part of **the** Commonwealth's **share of the cost of disaster relief funding** (states often must match some portion of Federal public assistance spend[7]). **Exhibit 8** shows the different sources of disaster relief funding and expected rollout.

EXHIBIT 8: PROJECTED PRIVATE AND PUBLIC DISASTER RELIEF FUNDING AND ROLL OUT

---

[6]   $3.6 billion of disaster relief funding is used for payment of cost share.

[7]   The Fiscal Plan only contemplates cost share paid for by the Commonwealth (and UPR), not PREPA / PRASA or HTA.

Fiscal Plan for COFINA



| | FY18, $M, % | FY19, $M, % | FY20, $M, % | FY21, $M, % | FY22, $M, % | FY23, $M, % | FY24, $M, % | FY25, $M, % | FY26, $M, % | FY27, $M, % | FY28-FY33 $M, % | Total, $M | Total, % |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **FEMA Public Assistance** | $5,397 / 11.8% | $7,394 / 16.1% | $7,394 / 16.1% | $6,709 / 14.6% | $6,709 / 14.6% | $2,173 / 4.7% | $2,173 / 4.7% | $1,279 / 2.8% | $1,279 / 2.8% | $905 / 2.0% | $4,430 / 9.7% | **$45,843** | **55.8%** |
| **CDBG-DR** | $54 / 0.3% | $976 / 4.9% | $4,201 / 21.0% | $4,693 / 23.5% | $4,608 / 23.0% | $3,321 / 16.6% | $1,815 / 9.1% | $331 / 1.7% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$20,000** | **24.4%** |
| **FEMA Individual Assistance[1]** | $1,437 / 44.8% | $1,437 / 44.8% | $331 / 10.3% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$3,204** | **3.9%** |
| **Private Insurance[2]** | $4,299 / 53.7% | $1,851 / 23.1% | $1,851 / 23.1% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | $0 / 0.0% | **$8,000** | **9.7%** |
| **Other federal funding** | $1,789 / 35.5% | $1,198 / 23.8% | $534 / 10.6% | $421 / 8.4% | $379 / 7.5% | $128 / 2.5% | $128 / 2.5% | $79 / 1.6% | $79 / 1.6% | $58 / 1.2% | $245 / 4.9% | **$5,039** | **6.1%** |
| **Total** | $12,976 | $12,855 | $14,311 | $11,823 | $11,696 | $5,623 | $4,117 | $1,689 | $1,358 | $963 | $4,675 | **$82,086** | **100%** |
| **Spending as a % of GNP** | 19.7% | 17.8% | 18.5% | 14.6% | 13.9% | 6.6% | 4.8% | 2.0% | 1.6% | 1.2% | N/A | | |
| **CDBG cost share** | $0 | $736 | $736 | $668 | $668 | $216 | $216 | $127 | $0 | $0 | $0 | | |

**Disaster aid by source of funding, $M**

Legend: FEMA PA, Private Insurance, FEMA IA, CDBG, Other Fed funding

1 $3B is current FEMA projected funding for Maria-related disasters
2 Based on early analysis of data from the Office of the Insurance Commissioner of Puerto Rico on already processed payments

The major sources of disaster relief funding are detailed below:

- **FEMA Disaster Relief Fund (DRF):** FEMA provides Individual Assistance to individuals and families who have sustained uncovered losses due to disasters. FEMA also provides Public Assistance for infrastructure projects and other permanent improvements.[8]

- **HUD Community Development Block Grant- Disaster Recovery (CDBG-DR):** Based on a housing recovery plan, HUD provides CDBG-DR funding that can be used for assistance to individuals (e.g., housing repair) and public assistance (e.g., infrastructure development), or by the Government for certain operational costs (e.g., to cover their disaster relief funding match.) The supplemental appropriation included in the Bipartisan Budget Act of 2018 stipulated that about ~$2 billion be used to repair the Island's electric infrastructure (Public Assistance).

- **Private insurance funding:** Large personal property and casualty losses have been incurred in the aftermath of Hurricane Maria. Early analysis of data from the Office of the Insurance Commissioner of Puerto Rico, adjusted for self-insured and other types of coverage, was used to determine the amount that will be paid out to individuals and businesses for major damages.

- **Other supplemental federal funding:** Significant additional federal funding has been allocated to various agencies and projects in Puerto Rico following the hurricane. This money

---

8    The New Fiscal Plan does not account for Operations and Administration funding, which only flows to federal agencies. Rather, it looks at funds that are spent for reconstruction on-Island, though those funds could flow to firms that are local or external

18

is directed at a wide range of recovery efforts, from reconstruction of damaged buildings (for example, funding to repair damage to Job Corps centers in Puerto Rico) to funding for health programs and environmental management (for example, NOAA coastal habitat restoration funding).

Disaster roll out for FEMA funds, CDBG funds, and private spending have been projected in line with historical spending on other major disaster events, particularly Hurricane Katrina in Louisiana. Rollout was then adjusted to reflect specific Puerto Rican conditions, gauged through conversations with FEMA about the pace of spending to date.

The New Fiscal Plan posits that based on how disaster relief funds are spent, these funds will impact the economy in four different ways: to build the capital stock of the Island through constructing and repairing buildings or utilities, to directly impact the economy through spurring consumption of goods and services on the Island, or to fund programs and services on the Island. The Plan estimates a different rate of pass-through to the economy for each of these different types of funding as follows: [9]

- 15.5% pass-through is assumed for funding that is used to construct and repair utilities, given the reliance on specialized labor and materials for such projects. The rest of this funding flows to the Puerto Rican capital stock.

  − Ex. FEMA Category F Public Assistance funding towards constructing public utilities

- 23.5% pass-through is used for funding that is used to construct and repair buildings (i.e. residential, commercial, schools, etc.), given the ability to rely more on local labor and materials. The rest of this funding flows to the Puerto Rican capital stock.

  − Ex. Repair to WIC facilities damaged by the storm

- 23.5% pass-through is assumed for funding that is directed towards programs and services as this funding does not impact the capital stock, and hits the Puerto Rican economy at a lower level through the labor associated with importing and transporting.

  − Ex. Private insurance payments to reimburse personal auto expenses

- 100% pass-through is assumed for funding that is used directly and in full to replace income or stimulate spending on goods and services originating on the Island; this kind of spending does not contribute to the capital stock on the Island

  − Ex. Disaster nutrition assistance, used to stimulate immediate consumption

- GNP is projected to rebound quickly in FY2019 in large part due to disaster relief funding, and this has a direct positive influence across most revenue categories.

## 5.2  Impact of fiscal measures and structural reforms

By optimizing revenue collection and reducing government-wide expenses, **fiscal measures** seek to streamline and transform the Government of Puerto Rico to a size appropriate for its

---

[9]  Estimated using local contracts (e.g., PREPA contract representing utilities construction and a multi-unit residential construction project along with a school construction contract estimating building construction. These contracts were estimated to have a 10% and 18% pass-through on the economy, respectively, which was then augmented by 5.5% average spend on transportation and logistics on construction projects. Historical FEMA spending and the percentage of DHS contracts awarded to local Puerto Rican firms supported this figure

population. Such policy actions, inescapably, will generate a contractionary impact on the economy in the short term, but are necessary to drive fiscal sustainability in the long term. In fact, they drive significantly more in savings than revenues lost due to economic contraction. In addition, the economic contraction from cost-saving measures is limited in the long-term, while such measures are critical for providing long-term financial stability. The macroeconomic impact of the measures is summarized in **Exhibit 9** below.

EXHIBIT 9: MACROECONOMIC IMPACT OF FISCAL MEASURES



Fiscal Measures Effect on Real GNP, %

| FY18 | FY19 | FY20 | FY21 | FY22 | FY23 |
|------|------|------|------|------|------|
| 1.05[1] | -1.92 | -1.40 | -0.93 | -0.58 | -0.20 |

1 Reflects one-time effects of PAN funding and tax refunds

The timing and impact of **structural reforms** are based on work done by the IMF on similar reforms implemented in Europe (e.g., Spain, Estonia), South America (e.g., Peru, Colombia), among other jurisdictions, utilities reform in Latin America, and broadly accepted metrics for measuring improvement in the World Bank's Ease of Doing Business Rankings. Structural reform benchmarks broadly come from nations or jurisdictions without monetary policy options and high informal labor markets, like Puerto Rico. **Labor, energy, and doing business, reforms** are projected to increase GNP by **0.95% by FY2023 (Exhibit 10)**. **K-12 education reforms** add an additional 0.01% annual impact beginning in FY2033, resulting in total GNP increase from structural reforms of **1.21% by FY2048.[10]**

---

10   The impact of educational / human capital structural reforms is 0.26% by FY2058

Fiscal Plan for COFINA



EXHIBIT 10: MACROECONOMIC IMPACT OF STRUCTURAL REFORMS



Structural Reform Effect on GNP, %

By FY2048, K-12 Education reforms add an additional 0.26% cumulative impact, resulting in 1.21% annual impact on GNP

## 5.3  Population projections

In the past five years, Puerto Rico's population has trended downward by 1-2% every year as residents have left to seek opportunities elsewhere and birth rates have declined.[11] This trend accelerated after the storm. While some are projected to return as the Island rebuilds, population is still projected to decline over the period of the Fiscal Plan by 5.9% over six years (**Exhibit 11**).[12] Much of this is based on estimated net departures in FY2018, while in the long term, population is projected to continue to decline, but at a rate closer to pre-hurricane trends. One key element of the population projection is the assumption that the low historical rate of immigration into Puerto Rico will continue.

---

[11]  Federal Reserve Bank of St. Louis Economic Research (FRED)

[12]  The Fiscal Plan adopts demographic projections calculated by the Oversight Board's demographer. The projections were initially presented in an Oversight Board listening session held on November 16, 2017 and have since been updated to incorporate the latest available migration data and economic growth projections, as well as real-time estimates of population loss since the hurricane (e.g. net airplane departures). This revision includes a correction due to a forecasting error included in the June 2018 Certified Fiscal Plan for the Commonwealth.

Fiscal Plan for COFINA

EXHIBIT 11: PROJECTED POPULATION CHANGE



# Chapter 6. FINANCIAL PROJECTIONS[13]

## 6.1  Sales & Use Tax forecast.

**Sales and use taxes (SUT):**[14] SUT revenue was expected to maintain a post-hurricane downward trend of approximately ~14%; however, reconstruction efforts had an amplified impact on Q4 FY18 resulting in revenues that were lower by only 3.1% relative to FY17. FY19 revenues are projected from a normalized FY18 base that accounts for ~$114 million of emergency measures taken immediately post-hurricane that were partially offset by $58 million on non-recurring benefit related to reconstruction in FY18. The normalized base is grown by Puerto Rico nominal GNP through FY23.

## 6.2  Sales & Use Tax Measures

In addition to the baseline, there is a measure that impacts the SUT forecast. The increased compliance efforts are expected to yield a 5% uplift on total SUT collections by FY22. It is phased in with impacts of 1% uplift in FY19, 3% in FY20 and 4% in FY21.

---

[13]  Financial projections referenced in this plan utilize the CBO 10-year economic projections for US GDP growth and inflation.

[14]  The Fiscal Plan incorporates the proposed COFINA settlement which if implemented would result in 53.65% of the PSTBA being utilized to settle the COFINA debt.

Fiscal Plan for COFINA

EXHIBIT 12: TOTAL SUT PROJECTION BUILD



The General Fund SUT revenue in the Fiscal Plan for the Commonwealth of Puerto Rico equals the full amount less the COFINA Portion PSTBA, FAM and CINE.

## 6.3 COFINA Recurring Operating Expenses

COFINA's ongoing operating expenses are necessary to ensure an independent operation. Operating expenses are composed of the following categories:

1. Board of Director Fees
2. Payroll and Fringe Benefits
3. D&O Insurance
4. Facilities
5. External Counsel Fees
6. External Auditor
7. Other miscellaneous operating expenses

The PSA provides that certain funds will be immediately available to COFINA for its operating expenses as of the Effective Date of the COFINA Plan. Of the pre-Fiscal Year 2019 funds on deposit with the Bank of New York Mellon (in its capacity as the COFINA bond trustee, the "Bond Trustee"), (i) $5 million shall be allocated to fund COFINA's operating expenses and (ii) subject to cash distributions to holders of "Taxable Election" COFINA bonds under the COFINA Plan (e.g., natural persons residing in Puerto Rico), an additional amount not to exceed $10 million

Fiscal Plan for COFINA

shall be allocated to fund COFINA's operating expenses. Accordingly, of the pre-Fiscal Year 2019 funds on deposit with the Bond Trustee, a minimum of $5 million and a maximum of $15 million shall be immediately available to fund COFINA's operating expenses as of the Effective Date of the COFINA Plan.

In addition to the funds described above, operating expenses will be covered by investment earnings derived from interest income generated by funds deposited in the COFINA bond trustee accounts held for the benefit of COFINA at BNYM prior to distribution.

EXHIBIT 13: COFINA PROJECTED DEFICIT/SURPLUS



Projected deficit/surplus, $M

| | FY19 | FY20 | FY21 | FY22 | FY23 |
|---|---|---|---|---|---|
| COFINA Portion PSTBA | 420.2 | 437.0 | 454.5 | 472.7 | 491.6 |
| Investment Earnings | 1.2 | 1.1 | 1.2 | 1.3 | 1.3 |
| Total Revenue | 421.4 | 438.1 | 455.7 | 473.9 | 492.9 |
| Operating Expenses | -1.1 | -1.1 | -1.1 | -1.1 | -1.1 |
| Debt Service | -420.2 | -437.0 | -454.5 | -472.7 | -491.6 |
| Total Expenses | -421.3 | -438.1 | -455.6 | -473.8 | -492.7 |
| Surplus/Deficit | 0.1 | 0 | 0.1 | 0.2 | 0.3 |

# Chapter 7. LONG-TERM PROJECTIONS AND DEBT SUSTAINABILITY ANALYSIS (DSA)

The DSA provides a framework to assess COFINA's long-term debt capacity, minimizing the risk of future default, and provides a framework for future market access.

Sales tax bonds are evaluated on the basis of taxable base and pledge, the legal structure of the proposed financing and financial metrics of the revenue pledge.

24

EXHIBIT 14: CREDIT STRENGTH OF SUT

| | Credit Strengths of SUT |
|---|---|
| 1 | Puerto Rico's economy is reasonably diverse. |
| 2 | SUT is very broad with minimal exceptions. |
| 3 | Senior bonds benefit from a closed lien. |
| 4 | First (annual/quarterly) dollar flow of funds is stronger than usual monthly equal collection for various tax backed credits. |
| 5 | Strong revenue trend and minimal revenue volatility. |

EXHIBIT 15: CHALLENGES OF THE SUT CREDIT

| | Challenges of the SUT Credit |
|---|---|
| 1 | Puerto Rico's per capita income and median household income are significantly below national medians. |
| 2 | Impact of long-term demographic and economic projections on discretionary expenses and personal consumption. |

The COFINA settlement implies total debt service of $32.3 billion over the 40-year period, vs. $75.5 billion of total 5.5% SUT. The excess SUT (46.35% portion) flows to the Commonwealth and provides coverage for the contractual debt service related to the 53.65% portion. The 5.5% SUT is projected to average 2.4x the annual debt service over the 40-year period.

Exhibit 16 shows the projected 5.5% SUT and the PSTBA split in the proposed settlement between the Commonwealth and COFINA bondholders. The COFINA settlement involves the creation of Senior Lien New COFINA bonds ("New COFINA bonds"). Per the terms of the COFINA Settlement and PSA, the New COFINA Bonds would have a senior pledge of the 5.50% SUT up to the 53.65% PSTBA COFINA portion. The "first dollars" of funding in the proposed settlement will come from the pledged 5.5% SUT.

25

Fiscal Plan for COFINA

EXHIBIT 16: ILLUSTRATION OF AGENT "SETTLEMENT IN PRINCIPLE" ALLOCATIONS



Exhibit 17 illustrates the COFINA Settlement debt service in conjunction with the 53.65% of the PSTBA that COFINA bondholders will be entitled to per the terms of the PSA. The chart illustrates that the COFINA debt service fits within the 53.65% of the PSTBA throughout the 40-year forecast period.

Fiscal Plan for COFINA

EXHIBIT 17: DEBT SERVICE ($M)



Exhibit 18 demonstrates the coverage ratio remains above 2.4x on a 10-year annual average, 20-year annual average, 30-year annual average and 40-year annual average basis.

EXHIBIT 18: DEBT SERVICE COVERAGE ($M)

|  | 10 year average | 20 year average | 30 year average | 40 year average |
|---|---|---|---|---|
| 5.50% SUT | $1,591 | $1,626 | $1,735 | $1,906 |
| Debt Service | $504 | $626 | $744 | $806 |
| Coverage Ratio | 3.18x | 2.71x | 2.47x | 2.46x |

Fiscal Plan for COFINA

**EXHIBIT 19: THE COFINA DEBT SUSTAINABILITY ANALYSIS ($M)**



Using FY18 SUT collections as the base, we look at the constant annual rate of reduction in sales tax collections such that debt service is still fully covered by the 5.5% SUT pledge. Based on the debt service schedule provided, sales tax would need to decrease by more than 0.71% a year for SUT collections to be insufficient to cover debt service obligations. A comprehensive breakeven analysis is provided below.

**EXHIBIT 20: THE COFINA DEBT BREAKEVEN ANALYSIS**



28

Fiscal Plan for COFINA

Appendix A: Plan Support Agreement ("PSA")

## AMENDED AND RESTATED PLAN SUPPORT AGREEMENT

AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of
September 20, 2018, by and among (a) Financial Oversight and Management Board for
Puerto Rico (the "**Oversight Board**"), (b) Corporación del Fondo de Interés Apremiante de
Puerto Rico, whose name in English is the Puerto Rico Sales Tax Financing Corporation
("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"),
(d) holders of Senior COFINA Bond Claims, as defined below, which may include the
advisors or managers who are advising or managing a holder of Senior COFINA Bond
Claims on behalf of such holders as set forth on Exhibit "A" hereto (together with their
respective successors and assigns with respect to transfers made in accordance with the terms
hereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National
Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond
Claims, as defined below, which may include the advisors or managers who are advising or
managing a holder of the Junior COFINA Bond Claims on behalf of such holders as set forth
on Exhibit "B" hereto, (together with their respective successors and assigns with respect to
transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured
Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance
Inc., and (i) Bonistas del Patio, Inc. ("**Bonistas**"). The signatories hereto are referred to
hereafter collectively as the "**Parties**" or individually as a "**Party**". Capitalized terms used
but not otherwise defined herein shall have the meanings set forth in Article I below.

RECITALS

A.    Pursuant to that certain Amended and Restated Sales Tax Revenue Bond
Resolution, adopted on July 13, 2007, as amended on June 19, 2009 and pursuant to certain
supplemental resolutions (collectively, the "**Bond Resolutions**"), COFINA issued the
following series of Puerto Rico Sales Tax Revenue Bond to provide funds for the
Commonwealth of Puerto Rico (the "**Commonwealth**") to, among other things, repay certain
debt obligations of the Puerto Rico Government Development Bank and the Puerto Rico
Public Finance Corporation.

| Resolution | Bond Series | Amounts |
|---|---|---|
| First Supplemental Sales Tax Revenue Bond Resolution, adopted on July 13, 2007 | Senior Series 2007A | $2,667,603,573 |
| Second Supplemental Sales Tax Revenue Bond Resolution, adopted on July 17, 2007 | Senior Series 2007B | $1,333,101,780 |
| Third Supplemental Sales Tax Revenue Bond Resolution, adopted December 18, 2007 | Senior Series 2007C | $499,996,628 |
| Fourth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 25, 2008 | Senior Series 2008A | $737,046,992 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | First Subordinate Series 2009A | $4,118,153,700 |

| Resolution | Bond Series | Amounts |
|---|---|---|
| Eighth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 17, 2009 | First Subordinate Series 2009B | $1,217,915,799 |
| Seventh Supplemental Sales Tax Revenue Bond Resolution, adopted on June 10, 2009 | Senior Series 2009C | $237,875,000 |
| Twelfth Supplemental Sales Tax Revenue Bond Resolution, adopted on January 28, 2010 | First Subordinate Series 2010A | $1,823,757,271 |
| Fourteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010C | $1,619,404,577 |
| Fifteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010D | $89,435,000 |
| Sixteenth Supplemental Sales Tax Revenue Bond Resolution, adopted on June 24, 2010 | First Subordinate Series 2010E | $92,755,000 |
| Eighteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011A-1 First Subordinate Series 2011A-2 | $397,758,386 $337,037,188 |
| Nineteenth Supplemental Sales Tax Revenue Bond Resolution, adopted November 16, 2011 | First Subordinate Series 2011B | $45,600,000 |
| Twentieth Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011C | $1,006,474,702 |
| Twenty First Supplemental Sales Tax Revenue Bond Resolution, adopted December 1, 2011 | Senior Series 2011D | $91,155,000 |

B.     In connection with the issuance of certain of the Senior COFINA Bonds, Ambac and National issued certain insurance policies and National entered into insurance agreements with respect thereto.

C.     In connection with the issuance of certain of the Junior COFINA Bonds, COFINA entered into insurance agreements with Assured corresponding to insurance policies issued by Assured. Assured also insures certain of the Junior COFINA Bonds pursuant to secondary market insurance policies.

D.     On June 30, 2016, the Puerto Rico Oversight, Management, and Economic Stability Act was signed into law by the President of the United States (P.L. 114-187) ("**PROMESA**").

2

101736284v3

E.      PROMESA created the Oversight Board and provided the Oversight Board with certain powers over the finances and restructuring process with respect to the Commonwealth and its instrumentalities as provided for in PROMESA, and the Oversight Board has designated COFINA as a Covered Territorial Instrumentality (as defined in PROMESA).

F.      Pursuant to Act 2-2017, AAFAF was appointed as the representative of the Government of Puerto Rico, and granted authority with respect to, reaching agreements with creditors on any indebtedness issued by any governmental entity of the Commonwealth.

G.      On May 5, 2017, the Oversight Board filed a Title III petition on behalf of COFINA (the "**Title III Case**") in the United States District Court for the District of Puerto Rico (the "**Title III Court**").

H.      The Oversight Board is the representative of COFINA in the Title III Case pursuant to Section 315(b) of PROMESA.

I.      The Parties have engaged in good faith, arm's length negotiations regarding the principal economic terms of a proposed restructuring of the Senior COFINA Bonds and the Junior COFINA Bonds to be implemented in a manner to be mutually agreed upon as set forth in the term sheet annexed hereto as Exhibit "C" (the "**Term Sheet**").

J.      On August 29, 2018, substantially all of the Parties executed a Plan Support Agreement (the "**Initial Agreement**"), which agreement included substantially all of the terms set forth herein.  In light of necessary modifications, the Parties have agreed to enter into this Agreement, which amends and restates the Initial Agreement.

K.      The Oversight Board and AAFAF consent to COFINA's execution and delivery of this Agreement and to COFINA performing and exercising its rights under this Agreement, including, without limitation, COFINA's rights to terminate this Agreement and its right to consent to any waiver or amendment, in each case, in accordance with the terms and conditions set forth herein.

NOW, THEREFORE, the Parties, in consideration of the promises, covenants and agreements herein described and for other good and valuable consideration, acknowledged by each of them to be satisfactory and adequate, and intending to be legally bound, do hereby mutually agree as follows:

ARTICLE I
DEFINITIONS

Section 1.1.    <u>Recitals</u>.  The recitals set forth above are incorporated by reference and are explicitly made a part of this Agreement.

Section 1.2.    <u>Definitions</u>.  The following definitions shall apply to and constitute part of this Agreement and all schedules, exhibits and annexes hereto:

"*Actions*" shall mean, collectively, the litigation styled (a) <u>Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon</u>, Adv. Pro. No. 17-AP-143-LTS, currently pending in the Title III Court, (b) <u>Whitebox Multi-Strategy Partners, L.P., et al. v. The Bank of New York Mellon</u>, Case No. 17-CV-3750-LTS, currently pending in the Title

3

III Court, (c) <u>Ambac Assurance Corp. v. The Bank of New York Mellon</u>, Case No. 17-CV-3804-LTS, currently pending in the United States District Court for the Southern District of New York, (d) <u>The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al.</u>, Adv. Pro. No. 17-133-LTS, currently pending in the Title III Court, and (e) <u>Rodriguez-Perelló et al. v. Rosselló-Nevares et al.</u>, No. 3:17-cv-01566-FAB (D.P.R. 2017), currently pending in the United States District Court for the District of Puerto Rico.

***"Adversary Proceeding"*** shall mean that certain adversary proceeding styled <u>The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico, as representative of The Puerto Rico Sales Tax Financing Corporation</u>, Adv. Proc. No. 17-257-LTS, currently pending in the United States District Court for the District of Puerto Rico, regarding ownership of the Pledged Sales Tax Base Amounts.

***"Agents"*** shall mean, collectively, the COFINA Agent and the Commonwealth Agent.

***"Agreement"*** shall mean, collectively, this Amended and Restated Plan Support Agreement, and each exhibit annexed hereto or thereto, including, without limitation, the Term Sheet, as each may be amended, supplemented or otherwise modified in accordance with the terms hereof or thereof.

***"Agreement in Principle"*** shall mean the Terms and Conditions of Agreement in Principle to Resolve Commonwealth-COFINA Dispute, attached as Exhibit "A" to the Joint Informative Motion of Commonwealth Agent and COFINA Agent Disclosing Agreement in Principle [Adv. Proc. No. 17-257 LTS, Dkt. No. 486].

***"Appointments Related Litigation"*** shall mean, collectively, the litigation styled (a) <u>In Re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1108, currently pending in the United States Court of Appeals for the First Circuit, (b) <u>In re: The Financial Oversight and Management Board for Puerto Rico as Representative of the Commonwealth of Puerto Rico</u>, No. 18-1746, currently pending in the United States Court of Appeals for the First Circuit, (c) <u>Union de Trabajadores de la Industria Electrica y Riego (UTIER) v. Puerto Rico Electric Power Authority</u>, et al., Adv. Pro. No. 17-AP-228-LTS, currently pending in the Title III Court, (d) <u>René Pinto Lugo, et al. v. The Government of the United States of America, et al.</u>, Adv. Pro. No. 18-041-LTS, currently pending in the Title III Court, (e) <u>Hermanidad De Empleados Del Fondo Del Seguro Del Estado, Inc., et al.</u> v. <u>Government of the United States of America, et al.</u>, Adv. Pro. No. 18-066-LTS, currently pending in the Title III Court, (f) <u>Hon. Rafael Hernandez-Montanez, et al. v. The Financial Oversight and Management Board of Puerto Rico</u>, Adv. Pro. No. 18-090-LTS, currently pending in the Title III Court, and (g) such other litigation as may be currently pending or as may be commenced during the period from and after the date hereof up to and including the COFINA Effective Date wherein claims or causes of action consistent with or similar to those asserted or which could have been asserted in the above-referenced litigations have been asserted.

***"Aurelius"*** shall mean Aurelius Capital Master, Ltd.

4

**"Bankruptcy Code"** shall mean Title 11 of the United States Code, as amended, §101, et seq.

**"Bankruptcy Rules"** shall mean The Federal Rules of Bankruptcy Procedure.

**"Business Day"** shall mean a day other than a Saturday, a Sunday or any other day on which commercial banks in New York, New York are required or authorized to close by law or executive order.

**"COFINA Agent"** shall mean Bettina Whyte, as agent for the Financial Oversight and Management Board for Puerto Rico, as representative of the Puerto Rico Sales Tax Financing Corporation.

**"COFINA Effective Date"** shall mean the date on which the transactions contemplated by the Plan and authorized by the Title III Court pursuant to the Confirmation Order have been substantially consummated, but, under all circumstances, shall be the date no later than the tenth (10th) calendar day following the date on which all conditions to the effectiveness of the Plan have been satisfied or waived in accordance with its terms.

**"Commonwealth Agent"** shall mean the Official Committee of Unsecured Creditors of The Commonwealth of Puerto Rico, as agent of the Financial Oversight and Management Board for Puerto Rico, as representative of the Commonwealth of Puerto Rico.

**"Confirmation Order"** shall mean the order of the Title III Court confirming the Plan in accordance with Section 314 of PROMESA and section 1129 of the Bankruptcy Code made applicable in the Title III Case in accordance with Section 301 of PROMESA, which order shall be in form and substance reasonably satisfactory to each Party.

**"Custodial Trusts"** shall mean, collectively, the trust(s), or custodial arrangement(s), if any, which may be formed on or prior to the COFINA Effective Date in accordance with the provisions of the Term Sheet and the Plan.

**"Definitive Documents"** shall mean, collectively, the documents, including, without limitation, any related agreements, instruments, schedules or exhibits, that are necessary or desirable to implement, or otherwise relate to, the terms and provisions set forth herein, in the Term Sheet, the Plan (including any amendments, modifications and supplements thereto), the Dispute Settlement, the Disclosure Statement, the Disclosure Statement Order, the Confirmation Order, the Settlement Agreement, the Settlement Motion, the Settlement Order, the organizational documents of Reorganized COFINA, and the Bond Resolutions, as amended (or as repealed and replaced), each having terms and conditions consistent with this Agreement and PROMESA in all respects and otherwise be in form and substance reasonably satisfactory to each Party; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

**"Dispute Settlement"** shall mean the compromise and settlement of the Adversary Proceeding and the claims and causes asserted therein, as announced by the Agents in the Agreement in Principle on June 5, 2018, and to be set forth in the Settlement Agreement; provided, however, that, to the extent that any provisions of the Settlement Agreement are

5

inconsistent with the terms and provisions set forth herein, in the Term Sheet or in the Plan, the terms and provisions set forth herein, in the Term Sheet and in the Plan shall govern.

"**Disclosure Statement**" shall mean the disclosure statement filed with respect to the Plan with the Title III Court by the Oversight Board in the Title III Case in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, which disclosure statement shall be in form and substance reasonably satisfactory to each Party.

"**Disclosure Statement Order**" shall mean the order of the Title III Court (a) approving the form of Disclosure Statement and the adequacy of the information contained therein in accordance with section 1125 of the Bankruptcy Code, made applicable in the Title III Case in accordance with Section 301 of PROMESA, and (b) authorizing, among other things, the form and manner of solicitation of (i) acceptance and rejections to the Plan and (ii) elections of distributions thereunder, which order shall be in form and substance reasonably satisfactory to each Party.

"**Final Order**" shall mean an order or judgment of a court of competent jurisdiction that has been entered on the docket maintained by the clerk of such court and has not been reversed, vacated, or stayed and as to which (a) the time to appeal, petition for certiorari, or move for a new trial, reargument, or rehearing has expired and as to which no appeal, petition for certiorari, or other proceedings for a new trial, reargument, or rehearing shall then be pending or, (b) if an appeal, writ of certiorari, new trial reargument, or rehearing thereof has been sought, (i) such order or judgment shall have been affirmed by the highest court to which such order was appealed, certiorari shall have been denied, or a new trial, reargument, or rehearing shall have been denied or resulted in no modification of such order and (ii) the time to take any further appeal, petition for certiorari, or move for a new trial, reargument, or rehearing shall have expired; provided, however, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Rules, may be filed relating to such order shall not prevent such order from being a Final Order, except as provided in the Federal Rules of Appellate Procedure, the Bankruptcy Rules, or the applicable local Bankruptcy Rules.

"**First Puerto Rico Family of Funds**" shall mean, collectively, First Puerto Rico AAA Target Maturity Fund I, Inc., First Puerto Rico AAA Target Maturity Fund II, Inc., First Puerto Rico Tax-Exempt Fund, Inc., First Puerto Rico Tax-Exempt Fund II, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc., First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc., First Puerto Rico Target Maturity Income Opportunities Fund I, Inc., First Puerto Rico Target Maturity Income Opportunities Fund II, Inc., First Puerto Tax Advantaged Target Maturity Fund I, Inc. and First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.

"**Government Parties**" shall mean, collectively, the Oversight Board, AAFAF and COFINA.

"**Government Released Claims**" shall mean, collectively, any and all claims, demands, rights, liabilities, or causes of action of any and every kind, character or nature whatsoever, in law or in equity, known or unknown, whether asserted or unasserted, which

6

any Party, or anyone claiming through them, on their behalf or for their benefit have or may have or claim to have, now or in the future, against any Government Releasee arising from, related to, or in connection with COFINA, the Senior COFINA Bonds, the Senior COFINA Bond Claims, the Junior COFINA Bonds, the Junior COFINA Bond Claims and the Actions, and arising prior to the COFINA Effective Date; provided, however, that "Government Released Claims" shall not include any and all rights, privileges, claims, demands, liabilities, or causes of action of any and every kind, character or nature whatsoever (a) against (i) COFINA (or its successor, including Reorganized COFINA) arising from or relating to the Plan or the securities to be issued pursuant to the Plan or (ii) a Government Party unrelated to COFINA or (b) arising from or related to any act or omission that constitutes intentional fraud or willful misconduct.

"*Government Releasees*" shall mean the Government Parties and the Commonwealth, together with their respective current or former board members, directors, principals, agents, officers, employees, advisors and professionals, including, without limitation, any and all advisors and professionals retained by the Government Parties in connection with the Title III Case.

"*GSAM*" shall mean Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as investment manager.

"*Informative Motion*" shall mean that certain Commonwealth Agent's Informative Motion with Respect to Oversight Board's Announcement, Dated August 8, 2018, Regarding Certain Terms for COFINA Plan of Adjustment [Adv. Proc. No. 17-257-LTS, ECF No. 540].

"*Insurers*" shall mean, collectively, Ambac, Assured and National.

"*Insured Claims*" shall mean, collectively, Insured Senior COFINA Bond Claims and Insured Junior COFINA Bond Claims.

"*Insured Junior COFINA Bond Claims*" shall mean, collectively, Junior COFINA Bond Claims, the payment of which has been insured by Assured.

"*Insured Junior Holders*" shall mean, collectively, the Parties that are beneficial holders of Insured Junior COFINA Bond Claims.

"*Insured Senior COFINA Bond Claims*" shall mean, collectively, Senior COFINA Bond Claims, the payment of which has been insured by Ambac or National, including, without limitation, Senior COFINA Bond Claims the payment of which (a) is insured by MBIA Insurance Company and reinsured by National or (b) was originally insured by Finance Guaranty Insurance Company but for which primary insurer responsibility was subsequently novated to National.

"*Insured Senior Holders*" shall mean, collectively, the Parties that are beneficial holders of the Insured Senior COFINA Bond Claims.

"*Junior COFINA Bond Claims*" shall mean, collectively, the claims arising from or relating to the Junior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Junior COFINA Bonds plus the accrued and unpaid

7

interest on the Junior COFINA Bonds (or, in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

*"Junior COFINA Bonds"* shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "First Subordinate" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

*"Junior Holders Group"* shall mean, collectively, GSAM, Oppenheimer and First Puerto Rico Family of Funds.

*"Oppenheimer"* shall mean, collectively, funds and accounts managed or advised by Oppenheimer Funds, Inc. and OFI Global Institutional Inc. and listed on the signature pages hereto.

*"Plan"* shall mean the COFINA plan of adjustment to be filed with the Title III Court by the Oversight Board in the Title III Case in accordance with Section 312 of PROMESA and incorporating the terms and provisions herein and in the Term Sheet, the form and substance of which shall be reasonably satisfactory to each Party.

*"Plan Supplement"* shall mean, the volume(s) of documents, agreements and instruments, including, without limitation, the Definitive Documents, which shall be filed with the Title III Court in connection with the Plan and consummation of the transactions contemplated therein, and each of which shall be in form and substance reasonably satisfactory to each of the Parties; provided, however, that the rights of each Party with respect to the documentation relating to the Custodial Trusts shall be governed exclusively by the terms and provisions of the Term Sheet.

*"Principal Amount"* shall mean, solely for purposes of the signature pages affixed hereto, (a) with respect to current interest bonds, the principal amount of the Senior COFINA Bonds or Junior COFINA Bonds, plus the accrued and unpaid interest thereon, and (b) with respect to the capital appreciation bonds, the accreted value of the Senior COFINA Bonds or Junior COFINA Bonds, as applicable, and, in each case, accrued or accreted up to, but not including, May 5, 2017.

*"PSA Creditors"* shall mean, collectively, the Senior Ad Hoc Holders, the Junior Holders Group, the Puerto Rico Funds, Ambac, Assured, Aurelius, Six PRC and National.

*"Puerto Rico Funds"* shall mean, collectively, Puerto Rico AAA Portfolio Bond Fund II, Inc., Puerto Rico AAA Portfolio Bond Fund, Inc., Puerto AAA Portfolio Target Maturity Fund, Inc., Puerto Rico Fixed Income Fund, Inc., Puerto Rico Fixed Income Fund II, Inc., Puerto Rico Fixed Income Fund III, Inc., Puerto Rico Fixed Income Fund IV, Inc., Puerto Rico Fixed Income Fund V, Inc., Puerto Rico Fixed Income Fund VI, Inc., Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc., Puerto Rico Investors Bond Fund I, Puerto Rico Investors Tax-Free Fund, Inc., Puerto Rico Investors Tax-Free Fund, Inc. II, Puerto Rico Investors Tax-Free Fund III, Inc., Puerto Rico Investors Tax-Free Fund IV, Inc., Puerto Rico Investors Tax-Free Fund V, Inc., Puerto Rico Investors Tax-Free Fund VI, Inc., Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc., Tax-Free

Puerto Rico Fund, Inc., Tax-Free Puerto Rico Fund II, Inc., Tax-Free Puerto Rico Target Maturity Fund, Inc., and UBS IRA Select Growth & Income Puerto Rico Fund.

"*Qualified Marketmaker*" shall mean an entity that (x) holds itself out to the market as standing ready in the ordinary course of its business to purchase from customers and sell to customers debt securities such as the COFINA Bonds or enter with customers into long and short positions in debt securities such as the COFINA Bonds, in its capacity as a dealer or market marker in such COFINA Bonds; (y) is in fact regularly in the business of making a market in debt securities; and (z) if transacting with respect to COFINA Bonds, is registered with Securities and Exchange Commission and financial institutions regulatory authority.

"*Reorganized COFINA*" shall mean COFINA from and after the COFINA Effective Date.

"*Senior Ad Hoc Holders*" shall mean, collectively, Aristeia Capital, L.L.C., Canyon Capital Advisors L.L.C., Decagon Holdings 1, L.L.C., Decagon Holdings 2, L.L.C., Decagon Holdings 3, L.L.C., Decagon Holdings 4, L.L.C., Decagon Holdings 5, L.L.C., Decagon Holdings 6, L.L.C., Decagon Holdings 7, L.L.C., Decagon Holdings 8, L.L.C., Decagon Holdings 9, L.L.C., Decagon Holdings 10, L.L.C., GoldenTree Asset Management LP, Old Bellows Partners LP, Scoggin Management LP, Taconic Capital Advisors L.P., Taconic Master Fund 1.5 L.P., Tilden Park Capital Management LP and Whitebox Advisors L.L.C., each on behalf of itself or certain of its respective managed funds and, in each case, their respective successors and assigns with respect to transfers made in accordance with the terms hereof.

"*Senior COFINA Bond Claims*" shall mean, collectively, the claims arising from or relating to the Senior COFINA Bonds, which shall be calculated, for purposes of the Plan, as the outstanding principal amount of the Senior COFINA Bonds plus the accrued and unpaid interest on the Senior COFINA Bonds (or in the case of capital appreciation bonds, the accreted value thereon) up to, but not including, May 5, 2017.

"*Senior COFINA Bonds*" shall mean, collectively, those bonds issued by COFINA in accordance with the Bond Resolutions and such other documents and instruments executed and delivered in connection therewith, and that are identified as "Senior" in the respective Bond Resolutions pursuant to which they were issued, the Series of which are set forth in the chart contained in Recital A herein.

"*Settlement Agreement*" shall mean that certain Settlement Agreement to be entered into by the Agents setting forth their agreement compromising and settling the claims and causes of action asserted, or which could have been asserted, in the Adversary Proceeding; provided, however, that, in the event that the Agents do not enter into the Settlement Agreement, "Settlement Agreement" shall mean the material economic terms set forth in the Agreement in Principle, as further developed by the Oversight Board and the Parties hereto, compromising and settling the claims and causes of action asserted, or which could have been asserted in the Adversary Proceeding and set forth in the Settlement Motion.

"*Settlement Motion*" shall mean the motion filed with the Title III Court by the Oversight Board in the Commonwealth Title III proceeding seeking entry of an order approving the Dispute Settlement in accordance with Bankruptcy Rule 9019 and applicable law, which motion shall be in form and substance reasonably satisfactory to each Party.

*"Settlement Order"* shall mean the order of the Title III Court in the Commonwealth Title III case granting the relief requested in the Settlement Motion and authorizing the consummation of the Dispute Settlement, which order shall be in form and substance reasonably satisfactory to each Party.

*"Six PRC"* shall mean Six PRC Investments LLC.

Section 1.3.    <u>Other Terms</u>.  Other terms may be defined elsewhere in this Agreement and, unless otherwise indicated, shall have such meaning throughout this Agreement.  Capitalized terms used herein, but not otherwise defined, shall have the meanings set forth in the Term Sheet.  As used in this Agreement, any reference to any federal, state, local, or foreign law, including any applicable law, will be deemed also to refer to such law as amended and all rules and regulations promulgated thereunder, unless the context requires otherwise.  The words "include", "includes", and "including" will be deemed to be followed by "without limitation." Pronouns in masculine, feminine or neutral genders will be construed to include any other gender, and words in the singular form will be construed to include the plural and vice versa, unless the context otherwise requires.  The words "this Agreement", "herein", "hereof", "hereby", "hereunder", and words of similar impact refer to this Agreement as a whole and not to any particular subdivision unless expressly so limited.

Section 1.4.    <u>Interpretations</u>.  The Parties have participated jointly in the negotiation and drafting of this Agreement.  If an ambiguity or question of intent or interpretation arises, this Agreement will be construed as if drafted jointly by the parties hereto and no presumption or burden of proof will arise favoring or disfavoring any party hereto because of the authorship of any provision of this Agreement.

Section 1.5.    <u>Exhibits</u>.  Each of the exhibits, annexes, signature pages and schedules annexed hereto are expressly incorporated herein and made a part of this Agreement, and all references to this Agreement shall include such exhibits, annexes and schedules.

ARTICLE II
GENERAL PROVISIONS

Section 2.1.    <u>Mediation</u>.  Each of the Parties acknowledges and agrees that this Agreement and the Term Sheet are the product of their participation in mediation ordered by the Title III Court and the mediation team appointed in connection therewith.  In the event that any disputes arise in connection with the preparation of the Plan and the Disclosure Statement, each of the Parties consent to such matters being referred to mediation for the resolution thereof; <u>provided</u>, <u>however</u>, that no Party is limited to having any such dispute finally determined by mediation.

Section 2.2    <u>Financial Information</u>.  Each of the Government Parties acknowledges and agrees that (a) the financial information set forth on signature pages affixed to this Agreement and the CUSIP numbers for each of the Senior COFINA Bonds or Junior COFINA Bonds provided by the Parties pursuant to Section 2.3 hereof are proprietary, privileged and confidential and (b) unless otherwise ordered by the Title III Court, shall use their reasonable best efforts to protect the confidential nature of such financial information and CUSIP numbers, including, without limitation, in filings to be made in the Title III Court or any other public release.

10

101736284v3

Section 2.3    CUSIP Information.  Within five (5) Business Days after the date hereof, each of the Senior Holders, the Junior Holders, Ambac, Assured, and National shall provide the Oversight Board, in writing, the CUSIP numbers for each of the Senior COFINA Bonds and Junior COFINA Bonds, if any, such Party owns or has due investment management responsibility and authority for funds or accounts which own such Senior COFINA Bonds or Junior COFINA Bonds, as the case may be.

ARTICLE III
REPRESENTATIONS AND WARRANTIES

Section 3.1.    Representations and Warranties of the Oversight Board.  The Oversight Board hereby represents and warrants that: (a) it is duly created in accordance with the terms and provisions of PROMESA with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval, power and authority to execute and deliver and to perform its obligations under this Agreement and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it or any law, rules or regulations applicable to it; and (c) except with respect to the Appointments Related Litigation and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.2.    Representations and Warranties of AAFAF.  AAFAF hereby represents and warrants that: (a) it is duly created under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite, consent, approval,  power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except with respect to the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.3.    Representations and Warranties of COFINA.  COFINA hereby represents and warrants that, subject to entry of an order of the Title III Court in connection with the Title III Case: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and

11

validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; and (c) except as set forth on Schedule 3.4 hereto and the Informative Motion, no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.4.   Representations and Warranties of the Senior Holders.   Each of the Senior Holders (other than Ambac and National), severally and not jointly,  hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Senior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Senior COFINA Bonds Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Senior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Senior Holders acknowledges that the Insured Senior COFINA Bonds Claims shall be voted by the applicable Insurers, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

Section 3.5.   Representations and Warranties of the Junior Holders.   Each of the Junior Holders (other than Ambac), severally and not jointly hereby represents and warrants on behalf of itself that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of its jurisdiction of its organization with all requisite consent, approval,  power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any material agreements specifically applicable to it, or any law, rules or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding

12

101736284v3

before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it owns or has due investment management responsibility and authority for funds or accounts which own the Junior COFINA Bonds of no less than the principal amounts set forth on the signature pages affixed to this Agreement (i) as of the date hereof, which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan, other than with respect to the Insured Junior COFINA Bond Claims, and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Junior COFINA Bonds or any voting, consent or direction rights related to such Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way such Junior Holders' performance of its obligations contained in this Agreement at the time such obligations are required to be performed; provided, however, that each of the Insured Junior Holders acknowledges that the Insured Junior COFINA Bond Claims shall be voted by Assured, so long as this Agreement remains in effect, and (ii) as of 5:00p.m. (EDT) on August 7, 2018.

Section 3.6.    Representations and Warranties of Ambac.  Ambac, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby, with such exceptions, individually or in the aggregate, as would not have a material adverse effect upon the foregoing; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law, rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds and Junior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or Junior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds or Junior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way Ambac's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.7.    Representations and Warranties of National.  National, in its capacity as an Insurer and as a beneficial holder of Senior COFINA Bond Claims, hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions

13

contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it, or to its knowledge has been threatened against it, which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder; and (d) it insures, owns or has due investment management responsibility and authority for accounts which own the Senior COFINA Bonds of no less than the amounts set forth on the signature pages affixed to this Agreement which it would be entitled to vote in connection with the solicitation of acceptances and rejections to the Plan and that, as of the date hereof, it has not sold, transferred, pledged, hypothecated or assigned such Senior COFINA Bonds or any voting, consent or direction rights related to such Senior COFINA Bonds to any person or entity, that would prevent or adversely affect in any way National's performance of its obligations contained in this Agreement at the time such obligations are required to be performed.

Section 3.8. <u>Representations and Warranties of Assured</u>. Assured hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite, consent, approval, power and authority to carry on the business in which it is engaged, to own the properties it owns, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it, or any law rule or regulations applicable to it; and (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder.

Section 3.9. <u>Representations and Warranties of Bonistas</u>. Bonistas hereby represents and warrants that, as of the date hereof: (a) it is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization with all requisite power and authority to carry on the business in which it is engaged, to execute this Agreement and to consummate the transactions contemplated hereby; (b) it has full requisite power and authority to execute and deliver and to perform its obligations under this Agreement, and the execution, delivery and performance hereof, and the instruments and documents required to be executed by it in connection herewith (i) have been duly and validly authorized by it and (ii) are not in contravention of its organizational documents or any agreements specifically applicable to it; (c) no proceeding, litigation or adversary proceeding before any court, arbitrator or administrative or governmental body is pending against it which would adversely affect its ability to enter into this Agreement or to perform its obligations hereunder and (d) Bonistas do not hold any Junior COFINA Bonds or Senior COFINA Bonds, or any Junior COFINA Bond Claims or Senior COFINA Bond Claims.

14

Section 3.10. <u>Representations of the Parties to this Agreement</u>. Each Party, severally and not jointly, represents and acknowledges that (a) in executing this Agreement, it does not rely, and has not relied, upon any representation or statement made by any other Party or any of such Party's representatives, agents or attorneys, with regard to the subject matter, basis or effect of this Agreement or otherwise, other than as may be stated specifically in this Agreement; (b) in executing this Agreement, it has relied entirely upon its own judgment, beliefs and interest and the advice of its counsel and that it has had a reasonable period of time to consider the terms of this Agreement before entering into it; (c) it has reviewed this Agreement and that it fully understands and voluntarily accepts all of the provisions contained herein; and (d) no holder of Junior COFINA Bond Claims or holder of Senior COFINA Bond Claims, including any "on island" bondholder, is or can be bound by Bonistas participation as a Party hereunder or any action taken by Bonistas in connection therewith. Nothing contained herein shall limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

ARTICLE IV
COVENANTS

Section 4.1. <u>Covenants of the Oversight Board</u>. The Oversight Board hereby covenants and agrees as follows:

(a)     The Oversight Board shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (A) filing, or causing the Commonwealth Agent to file, the Settlement Motion on or prior to October 15, 2018, (B) filing on or prior to October 15, 2018, the Disclosure Statement and the Plan, in form and substance consistent with this Agreement, including the Term Sheet, and reasonably acceptable to the Parties, (C) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (D) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (E) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     In connection with the solicitation of acceptances and rejections to the Plan with respect to Insured Claims, the Oversight Board shall use its reasonable best efforts to obtain approval of the Disclosure Statement Order by the Title III Court providing that (i)

15

Insured Claims shall be voted by the Insurers, so long as this Agreement remains in effect, and (ii) elections (other than the Assured Election) regarding the form of distributions with respect to the Insured Claims shall be made by the beneficial holders thereof, provided that the form of elections for holder of Insured Claims regarding their distributions for such claims shall be set forth as an exhibit to the Disclosure Statement Order. For the avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' right to vote to accept or reject any Plan.

(c)     The Oversight Board shall negotiate in good faith with the respective Insurers regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to the respective Insurers and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.2.     Covenants of AAFAF. AAFAF hereby covenants and agrees as follows:

(a)     AAFAF shall take, and cause COFINA to take, all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that the Disclosure Statement, the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof. Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)     AAFAF shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)     As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, AAFAF, with the assistance of COFINA, and with the prior approval of the Oversight Board, shall release requests for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan. Upon receipt of responses to such requests for proposals, AAFAF, together with the other Government Parties, shall discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion. For the avoidance of doubt, the entity

16

selected to serve as trustee or paying agent in connection with the new COFINA securities to be issued pursuant to the Plan shall not be an agency or instrumentality of the Commonwealth. AAFAF shall select, in its sole and absolute discretion, the entity or entities to serve as dealer manager(s) for the COFINA Bonds, after consulting with the Senior Ad Hoc Holders.

Section 4.3.   Covenants of COFINA.  COFINA hereby covenants and agrees as follows:

(a)   COFINA shall take all actions necessary to obtain, and shall not, nor encourage any other person to, take any action which would, or would reasonably be expected to, impede or preclude, the filing of the Plan and the Disclosure Statement, the approval of the Disclosure Statement, the entry of the Confirmation Order, the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents provided that the Disclosure Statement and the Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, including, without limitation, that the Parties have acted in good faith in connection with the negotiation of the terms hereof and thereof.  Such actions shall include, but not be limited to, (A) prosecuting, in a timely and appropriate manner, the approval of the Disclosure Statement and confirmation of the Plan at hearings in accordance with applicable orders entered in the Title III Case, (B) as soon as commercially practicable, seeking (or causing to be sought) ratings on the new COFINA securities by the applicable ratings agencies as contemplated in accordance with the terms and provisions of the Term Sheet, and (C) using its reasonable best efforts to cause the new COFINA securities, including, without limitation, in connection with the use of Custodial Trusts, to be tax-exempt to the extent permitted by law, including, without limitation, providing, or causing to be provided, any and all information required or requested by federal and applicable local tax laws and federal and applicable local taxing authorities.

(b)   COFINA shall use its reasonable best efforts to cause the Legislature to enact legislation required under Section II(M) of the Term Sheet.

(c)   As soon as practicable from and after the date hereof, but in no event later than September 15, 2018, COFINA, with the assistance of AAFAF, and with the prior approval of the Oversight Board shall release a request for proposals to entities interested in serving as trustee and paying agent in connection with the new COFINA securities to be issued pursuant to the Plan.  Upon receipt of responses to such request for proposals, COFINA, together with the other Government Parties shall, discuss the merits of such responses with counsel for the other Parties, with the Government Parties making such selection, in their joint and absolute discretion.

Section 4.4.   Covenants of the Senior Holders.  Each of the Senior Holders (other than Ambac and National), severally and not jointly, hereby covenants and agrees as follows:

(a)   None of the Senior Holders shall sell, transfer, pledge, hypothecate or assign (a "Transfer") any of the Senior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Senior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) the COFINA

17

101736284v3

Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Senior Holders may transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) in the event that the transferee is not a PSA Creditor at the time of the Transfer, such transferee executes and delivers, within five (5) calendar days after execution thereof, to counsel for the Oversight Board and AAFAF the Joinder Agreement attached hereto as Exhibit "D" (a "Qualified Transferee"), pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Senior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs, as defined in the Term Sheet, and be released from its obligations (other than as set forth in Sections 4.4(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.4(a), it shall be void ab initio and the applicable Senior COFINA Bond Claims and the Senior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude any of the Senior Holders from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Senior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.4(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Senior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Senior Holders' aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Senior Holder agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.4(b).

(c)     Each of the Senior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III

18

Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations sets forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Senior Holders shall be limited or prohibited from (i) taking any action that any such Senior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Each of the Senior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.4 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Senior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.5.     Covenants of the Junior Holders. Each of the Junior Holders (other than Ambac), severally and not jointly, hereby covenants and agrees as follows:

(a)     None of the Junior Holders shall Transfer any of the Junior COFINA Bond Claims, related claims or any voting rights or participations or other interests therein (collectively, the "Junior COFINA Interests") during the period from the date hereof up to and including the earlier to occur of (i) COFINA Effective Date and (ii) the termination of Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, each of the Junior Holders may transfer any Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of the transferor in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, such Junior Holder shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.5(c) and (e) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such transferred rights; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.5(a), it shall be void ab initio and the applicable Junior COFINA Bond Claims and the Junior Holder attempting such Transfer shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to

19

preclude any of the Junior Holders from acquiring additional Junior COFINA Bond Claims or related claims; provided, however, that any such Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by a Junior Holder be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.5(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker-dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.

(b)     None of the Junior Holders shall, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, such Junior Holders' aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and each such Junior Holder agrees to stay all such pending litigations, proceedings actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.5(b).

(c)     Each of the Junior Holders, severally and not jointly, shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, none of the Junior Holders shall be limited or prohibited from (i) taking any action that any such Junior Holder shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

101736284v3

(e)     Each of the Junior Holders shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.5 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of any Junior Holder from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.6.     Covenants of Ambac.  Ambac, in its capacity as an Insurer and as a holder of Senior COFINA Bonds Claims and Junior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)     In its capacity as holder of Senior COFINA Bond Claims and Junior COFINA Bond Claims, Ambac covenants and agrees that it shall not Transfer any Senior COFINA Interests or Junior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, Ambac may Transfer any Senior COFINA Interests or Junior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of Ambac as the transferor of Senior COFINA Bond Claims or Junior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, Ambac as prior holder of the Senior COFINA Bond Claims or Junior COFINA Bond Claims, as the case may be, shall be deemed to have relinquished its rights (other than the right to the Consummation Costs and be released from its obligations (other than as set forth in Sections 4.6(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims and Junior COFINA Bond Claims transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.6(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims or Junior COFINA Bond Claims and Ambac shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude Ambac from acquiring additional Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or Junior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by Ambac be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.6(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities.  Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder, or by any other applicable law or regulation.  This Section 4.6(a) does not apply to and shall not affect any rights or obligations of Ambac as an Insurer.

21

(b)     Ambac shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claims as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Ambac's aggregate holdings of the Senior COFINA Bond Claims and Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Ambac agrees to stay all such pending litigations proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.6(b).

(c)     Ambac shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the other Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)     Subject to the terms set forth herein, Ambac shall not be limited or prohibited from (i) taking any action that Ambac shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)     Ambac shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Ambac and be reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

(f)     Ambac shall support and not otherwise object to the approval of the Settlement Motion by Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.6 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Ambac from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect

22

to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.7. Covenants of National. National, in its capacity as an Insurer and as a holder of Senior COFINA Bond Claims, hereby covenants and agrees as follows:

(a)    In its capacity as a holder of Senior COFINA Bond Claims, National covenants and agrees that it shall not Transfer any Senior COFINA Interests during the period from the date hereof up to and including the earlier to occur of (i) the COFINA Effective Date and (ii) the termination of this Agreement in accordance with the provisions of Section 6.1 hereof; provided, however, that, notwithstanding the foregoing, National may Transfer any Senior COFINA Interests to (1) another PSA Creditor or (2) a Qualified Transferee pursuant to which (y) such Qualified Transferee shall (i) assume all the rights and obligations of National as the transferor of Senior COFINA Bond Claims in accordance with the terms and conditions of this Agreement and (ii) such Qualified Transferee shall then be deemed a PSA Creditor for all purposes herein and (z) on or after the effective date of such Transfer, National as a prior holder of Senior COFINA Bond Claims shall be deemed to have relinquished its rights (other than the right to Consummation Costs and be released from its obligations (other than as set forth in Sections 4.7(c) and (f) hereof)) on or after the effective date of such Transfer under this Agreement solely to the extent of such Senior COFINA Bond Claims so transferred; and, provided, further, that, to the extent that a Transfer violates the provisions of this Section 4.7(a), it shall be void *ab initio* and the applicable Senior COFINA Bond Claims and National shall continue to remain subject to the terms of this Agreement; and, provided, further, that nothing contained herein is intended, nor shall it be construed, to preclude National from acquiring additional Senior COFINA Bond Claims or related claims; provided, however, that any such Senior COFINA Bond Claims or related claims acquired from and after the date hereof shall automatically and immediately upon acquisition by National be deemed subject to all of the terms and provisions of this Agreement; and, provided, further, that the provisions of this Section 4.7(a) shall not apply to the grant of any liens or encumbrances in favor of a bank or broker dealer holding custody of securities in the ordinary course of business and which lien or encumbrance is released upon the Transfer of such securities. Notwithstanding the foregoing, nothing contained herein shall restrict or prohibit any party from taking any action required by the Securities Act of 1933, as amended, the Securities Exchange Act of 1934, as amended, any rule or regulations promulgated thereunder or by any other applicable law or regulation. This Section 4.7(a) does not apply to and shall not affect any rights or obligations of National as Insurer.

(b)    National shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, National's aggregate holdings of Senior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and National agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid

23

any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.7(b).

(c)    National shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment with respect to COFINA not proposed or supported by the Oversight Board, AAFAF and COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(d)    Subject to the terms set forth herein, National shall not be limited or prohibited from (i) taking such action that National shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

(e)    National shall negotiate in good faith with the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to National and reasonably acceptable to the Oversight Board and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are Parties and shall be included in the Plan Supplement. National shall use its reasonable best efforts to maximize tax-exempt treatment of distributions to certificate holders from the National Custodial Trust.

(f)    National shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.7 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of National from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

Section 4.8.    <u>Covenants of Assured</u>.  Assured hereby covenants and agrees as follows:

(a)    Assured shall not, except as expressly provided herein, (i) file any additional claims or proofs of claim, whatsoever, with the Title III Court against COFINA (including secured, unsecured, administrative or substantial contribution claims), provided that the failure to file any additional proofs of claim as a result of its obligations under this clause (i) shall not prejudice, nor shall it be deemed to be a limitation of, Assured's aggregate holdings of Junior COFINA Bond Claims, (ii) file any additional claims, commence or prosecute any pending or additional litigation, proceeding, action or matter (and Assured agrees to stay all such pending litigations, proceedings, actions or matters) or seek to recover damages or to seek any other type of relief against any of the Government Releasees based upon, arising from or relating to the Government Released Claims or any of the claims or causes of action asserted or which could have been asserted in the Actions, or (iii) directly or indirectly aid any person in taking any action with respect to the Government Released Claims that is prohibited by this Section 4.8(a).

(b)    Assured shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of COFINA's Title III case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not vote for or support any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(c)    Assured shall support and not otherwise object to the approval of the Settlement Motion by the Title III Court in both the Title III Case and the Commonwealth PROMESA Proceeding, including, without limitation, as a creditor of the Commonwealth; provided, however, that, notwithstanding anything contained in this Section 4.8 to the contrary, except as expressly provided in Sections I(A), II(N) and (P) of the Term Sheet, nothing in this Agreement shall preclude or inhibit the rights, if any, of Assured from responding to the Settlement Motion as a creditor of the Commonwealth solely with respect to the use, or the direction of the use, of monies received, or to be received, by the Commonwealth as a result of the compromise and settlement set forth in the Term Sheet.

(d)    Subject to the terms set forth herein, Assured shall not be limited or prohibited from (i) taking such action that Assured shall deem necessary or appropriate to preserve, protect or defend any of its rights under this Agreement, the Plan, or the other Definitive Documents or (ii) asserting any claims or causes of action against any Party that breaches this Agreement.

101736284v3

(e)     Assured shall negotiate in good faith with the Oversight Board regarding the documentation related to the Custodial Trusts, which documentation shall be acceptable to Assured and reasonably acceptable to the Oversight Board and shall be included in the Plan Supplement.

Section 4.9.     <u>Covenants of Bonistas</u>.  Bonistas hereby covenants and agrees as follows:

(a)     Bonistas shall (i) support, and otherwise not, nor encourage any other person to, take any action which would, or would reasonably be expected to, breach or be inconsistent with the terms herein or in the Term Sheet, or impede or preclude, the filing of the Plan, the administration of the Title III Case, the approval of the Disclosure Statement, and the entry of the Confirmation Order and the consummation, implementation and administration of the Plan, including the execution and delivery of the Definitive Documents, provided that such Disclosure Statement, Confirmation Order and Plan (and its consummation, implementation and administration) and the Definitive Documents are consistent with the terms herein and the Term Sheet, and (ii) in accordance with the provisions of Section 5.1 hereof, (A) not consent to or encourage any "on island" bondholder to vote for any modification of the Plan unless such modification is proposed or supported by the Oversight Board, AAFAF and COFINA and otherwise consistent with the terms herein and the Term Sheet and (B) not support or encourage any "on island" bondholder to vote for any plan of adjustment not proposed or supported by the Oversight Board, AAFAF or COFINA so long as none of the Government Parties is in material breach of their obligations set forth in this Agreement.

(b)     Bonistas shall (i) actively encourage support by "on island" bondholders for the agreement set forth in the Term Sheet, (ii) post a statement of support for the Term Sheet and the Plan on the Bonistas' website, (iii) make Bonistas available to "on island" bondholders to answer questions regarding the Term Sheet, the Plan, Disclosure Statement, Confirmation Order and other Definitive Documents, and (iv) support legislation that may be necessary or appropriate to implement the transactions contemplated by the Term Sheet.

(c)     Notwithstanding the foregoing subsections, Bonistas' covenants herein to support and encourage "on island" bondholders to support the Term Sheet and vote in favor of the Plan is expressly subject to (i) the provisions of Section 5.2 of this Agreement and (ii) individual "on island" bondholders' consultations with their own legal, financial and tax advisors to analyze the terms of the Term Sheet, the Plan and the transactions contemplated thereunder.

Section 4.10.   <u>Qualified Marketmaker Exemption</u>.  Notwithstanding anything contained in this Article IV to the contrary, (a) a PSA Creditor may Transfer any Senior COFINA Interests or Junior COFINA Interests to a Qualified Marketmaker, acting in its capacity as a Qualified Marketmaker, without the requirement that such Qualified Marketmaker be or become a PSA Creditor; provided that such Qualified Marketmaker subsequently Transfers all such Senior COFINA Interests or Junior COFINA Interests to a PSA Creditor or a Qualified Transferee within the date that is ten (10) calendar days after such Qualified Marketmaker's acquisition of such Senior COFINA Interests or Junior COFINA Interests, as the case may be; and (b) to the extent that a PSA Creditor is acting in its capacity as a Qualified Marketmaker, it may Transfer any Senior COFINA Interests or

26

Junior COFINA Interests that the Qualified Marketmaker acquires from a holder of the Senior COFINA Interests or Junior COFINA Interests that is not a PSA Creditor without the requirement that the transferee be or become a PSA Creditor.

Section 4.11.  <u>Right to Vote</u>.  Each Party acknowledges that, for purposes of this Agreement, and any Plan solicited in accordance with the provisions of this Agreement, and so long as this Agreement remains in effect, (a) each Insurer shall have the exclusive right to vote to accept or reject the Plan on account of any existing COFINA securities that it insures and (b) it shall not object to the Insurers' right to vote or reject the Plan or take any action inconsistent therewith.  For avoidance of doubt, if this Agreement is no longer in effect, all Parties hereto reserve their rights to seek a determination by the Title III Court with respect to the Insurers' and their insured bondholders' rights to vote to accept or reject any Plan.

Section 4.12.  <u>Appointments Related Litigation</u>.  Notwithstanding anything contained herein to the contrary, a Party which is a plaintiff in an Appointments Related Litigation may continue such litigation but, under all circumstances, such Party (a) hereby covenants and agrees to perform all other duties and obligations as set forth in this Agreement, including, without limitation, the other duties and obligations set forth in Articles IV and V hereof, and (b) without prejudice to any rights reserved in accordance with Sections 4.4(e), 4.5(e) and 4.8(c) hereof, hereby covenants and agrees that, no matter the determination and the entry of a Final Order in connection with the Appointments Related Litigation, with such determination and Final Order being entered either prior to consideration of approval of the Settlement Motion or confirmation of the Plan by the Title III Court or subsequent to entry of an order approving the Settlement Motion and confirmation of the Plan, such Party (i) shall not urge or argue that such determination and Final Order reverses, affects, or otherwise modifies the transactions contemplated herein, in the Term Sheet, in the Settlement Motion and in the Plan and (ii) in the event that such determination and Final Order (y) occurs prior to approval of the Settlement Motion and confirmation of the Plan and (z) causes or requires the reconstitution or reappointment of the Oversight Board, such Party shall urge and request, in writing, that such reconstituted or reappointed board (1) enforce the terms and conditions of this Agreement and the Term Sheet and (2) promptly seek approval of the Settlement Motion and confirmation of the Plan by the Title III Court.

Section 4.13.  <u>Additional Litigation</u>.  Aurelius and Six PRC shall, and shall cause each of their applicable entities to, request entry of an order dismissing, with prejudice, those claims and causes of action, or portions of claims and causes of action, that Aurelius and Six PRC, or their affiliated entities, have asserted, or were required, by applicable law, to assert, in the litigation styled <u>Lex Claims, LLC v. The Commonwealth of Puerto Rico</u>, No. 16-cv-02374 FAB (D.P.R.), currently pending in the United States District Court for the District of Puerto Rico (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337), which are premised on challenges to COFINA's constitutionality, COFINA's entitlement to proceeds of the sales and use taxes, if any, transferred by the Commonwealth to COFINA, and such other claims and causes of action which may be interpreted reasonably to challenge the transactions contemplated by the Term Sheet, the Plan and the Settlement Motion, with the effectiveness of such order conditioned on the entry of an order approving the Settlement Motion and confirmation of the Plan.

101736284v3

## ARTICLE V
## PLAN AND PLAN SUPPORT

Section 5.1. <u>Plan Support Commitment</u>. From and after the date hereof, and provided that (a) this Agreement has not been terminated and (b) none of the Disclosure Statement, the Plan and any of the proposed Definitive Documents have been filed, amended or modified in a manner adverse to the PSA Creditors or, in the case of Bonistas, the "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims, each of the PSA Creditors and Bonistas (to the extent remaining a Party) shall (i) support (A) approval of the Disclosure Statement in accordance with section 1125 of the Bankruptcy Code, (B) confirmation of the Plan in accordance with section 1129 of the Bankruptcy Code, (C) approval of the Settlement Motion and the compromise and settlement contemplated therein by the Title III Court, and (D) unless otherwise ordered by the Title III Court, upon a motion on notice to the Government Parties and The Bank of New York Mellon, seeking a stay of all proceedings and determinations in connection with the Adversary Proceeding and the Actions, (ii) subject to receipt of the Disclosure Statement and/or other solicitation materials in respect of the Plan, to the fullest extent permitted by law, timely vote, or cause to be voted, to accept the Plan in its capacity as a Senior Holder, a Junior Holder or an Insurer, as applicable (or, in the case of Bonistas, publicly support the terms herein and in the Term Sheet and publicly encourage the support and timely votes for the Plan from "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims) with rights of acceptance in accordance with the Disclosure Statement Order, each as the case may be, (iii) not change or withdraw (or cause to be changed or withdrawn) any such vote (or, in the case of Bonistas, any such support or encouragement), (iv) not consent to or vote (or, in the case of Bonistas, not encourage "on island" bondholders to vote) for any modification of the Plan unless such modification is (Y) not adverse to the Senior Holders, the Junior Holders, Ambac, Assured, National or "on island" bondholders that hold Senior COFINA Bond Claims or Junior COFINA Bond Claims and (Z) not inconsistent with the terms provided herein and the Term Sheet, and (v) not vote for or support any plan of adjustment not proposed to or supported by the Government Parties, so long as none of the Government Parties is in material breach of this Agreement.

Section 5.2. <u>Solicitation Required in Connection with Plan</u>. Notwithstanding anything contained in this Article V or elsewhere in this Agreement to the contrary, this Agreement is not, and shall not be deemed to be, a solicitation of acceptances of the Plan. Each of the Parties, severally and not jointly, acknowledges and agrees that (a) the votes on the Plan will not be solicited until the Title III Court has approved the Disclosure Statement and related solicitation materials, and such Disclosure Statement and solicitation materials have been transmitted to parties entitled to receive same and (b) this Agreement does not constitute an offer to issue or sell securities to any person or entity, or the solicitation of an offer to acquire or buy securities, in any jurisdiction where such offer or solicitation would be unlawful. NOTWITHSTANDING THE FOREGOING, NOTHING CONTAINED HEREIN SHALL REQUIRE ANY PARTY TO TAKE ANY ACTION PROHIBITED BY PROMESA, THE SECURITIES ACT OF 1933, AS AMENDED, THE SECURITIES EXCHANGE ACT OF 1934, AS AMENDED, ANY RULE OR REGULATIONS PROMULGATED THEREUNDER, OR BY ANY OTHER APPLICABLE LAW OR REGULATION OR BY ANY ORDER OR DIRECTION OF ANY COURT OR ANY STATE OR FEDERAL GOVERNMENTAL AUTHORITY.

101736284v3

## ARTICLE VI
## TERMINATION

Section 6.1. <u>Termination of Agreement</u>. This Agreement may be terminated as follows:

(a) By any PSA Creditor or Bonistas, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) the Board of Directors of COFINA shall have failed to ratify this Agreement within seven (7) calendar days of the date hereof, (ii) the Settlement Motion, the Plan, the Disclosure Statement and the motion seeking entry of the Disclosure Statement Order are not filed with the Title III Court on or prior to October 15, 2018, or (iii) the Oversight Board withdraws the Settlement Motion, the Plan, the Disclosure Statement or the motion seeking entry of the Disclosure Statement Order or files any motion or pleading with the Title III Court, in each case, that is inconsistent with this Agreement, including the Term Sheet, in any material respect, and such motion or pleading has not been withdrawn before the earlier to occur of (y) five (5) Business Days after the Oversight Board receives written notice from another Party (in accordance with the notice provisions set forth in Section 7.10 hereof) that such motion or pleading is inconsistent with this Agreement in such material respect and (z) entry of an order of the Title III Court approving such motion or pleading and granting the relief requested therein.

(b) By any Party, solely as to itself, at their sole option and discretion and upon written notice to the other Parties, in the event that (i) a Party materially breaches any of the covenants set forth in Article IV hereof or any of its other undertakings in this Agreement, (ii) the Confirmation Order is not entered by the Title III Court and the COFINA Effective Date does not occur on or prior to March 1, 2019, (iii) the Title III Court or such other court of competent jurisdiction enters a Final Order denying confirmation of the Plan, or (iv) a court of competent jurisdiction issues a ruling, judgment, or order making illegal or otherwise preventing or prohibiting the consummation of the Plan, which ruling, judgment or order has not been reversed or vacated within sixty (60) calendar days after such issuance and is not subject to a stay; <u>provided</u>, <u>however</u>, that, upon the joint instruction and notice provided by the Government Parties, the date set forth in subsection (ii) above shall be extended up to and including June 1, 2019;

and, <u>provided</u>, <u>further</u>, that, under no circumstances shall a Party have the right to terminate this Agreement solely on the basis that the Title III Court determines that the Insurers are unable to accept the Plan on behalf of holders of Insured Senior Holders or Insured Junior Holders, as the case may be; and, <u>provided</u>, <u>further</u>, that, in the event that this Agreement is terminated by the Oversight Board, it shall be deemed terminated as to all Parties hereto; and, <u>provided</u>, <u>further</u>, that the automatic stay applicable under section 362 of the Bankruptcy Code shall not prohibit a Party from taking any action necessary to effectuate the termination of this Agreement pursuant to and in accordance with the terms hereof. This Agreement shall automatically terminate upon the occurrence of the COFINA Effective Date.

Section 6.2. <u>Effect of Termination</u>. Except as otherwise provided herein, in the event of the termination of this Agreement as to any Party, (a) this Agreement shall become null and void and be deemed of no force and effect, with no liability on the part of such Party (or of any of its directors, officers, employees, consultants, contractors, agents, legal and

29

101736284v3

financial advisors or other representatives), (b) such Party shall not have any obligations to any other Party arising out of, and shall have no further rights, benefits or privileges under, this Agreement (including, without limitation, any rights to Consummation Costs in accordance with the provisions of the Term Sheet), except for the obligations and or provisions set forth in Sections 2.1, 2.2, 7.2, 7.5 and 7.14 hereof and this clause (b) of Section 6.2 hereof, which provisions are intended to survive the expiration or termination of this Agreement and shall continue in full force and effect in accordance with the terms hereof; provided, however, that any liability of a Party for failure to comply with the terms of this Agreement prior to the date of such expiration or termination shall survive such expiration or termination, and (c) such Party shall have all the rights and remedies that it would have had, and be entitled to take all actions that it would have been entitled to take, had it not entered into this Agreement and no such rights shall be deemed waived pursuant to a claim of laches or estoppel; provided, however, that in no event shall any such termination relieve such Party from liability for its breach or non-performance of its obligations hereunder prior to the date of such expiration or termination; and, provided, further, that, unless otherwise ordered by the Title III Court, upon notice to such terminating Party, any and all consents, ballots and votes tendered by such Party prior to such expiration or termination shall be deemed to be, for all purposes, automatically null and void *ab initio*, shall not be considered or otherwise used in any manner by the Parties in connection with the Plan, this Agreement or otherwise; and, provided, further, that, if a terminating Party is also party to commutation agreement with an Insurer, then, any elections tendered by such terminating Party in relation to the treatment of existing COFINA securities insured by such Insurer shall be deemed to be automatically null and void *ab initio* only if permitted pursuant to the terms of such commutation agreement or if such terminating Party is no longer party to such commutation agreement. Except in connection with a dispute concerning a breach of this Agreement or the interpretation of the terms hereof upon termination, (y) neither this Agreement nor any terms or provisions set forth herein shall be admissible in any dispute, litigation, proceeding or controversy among the Parties and nothing contained herein shall constitute or be deemed to be an admission by any Party as to any matter, it being understood that the statements and resolutions reached herein where the result of negotiations and compromises of the respective positions of the Parties and (z) no Party shall seek to take discovery concerning this Agreement or admit this Agreement or any part of it into evidence against any other Party hereto.

ARTICLE VII
MISCELLANEOUS

Section 7.1.    Amendments.  This Agreement, including, without limitation, the Term Sheet, may not be modified, amended or supplemented except by a written agreement executed by each Party to be affected (or, in the case of Bonistas, if "on island" bondholders are to be affected) by such modification, amendment or supplement.

Section 7.2.    No Admission of Liability.

(a)    The execution of this Agreement is not intended to be, nor shall it be construed as, an admission or evidence in any pending or subsequent suit, action, proceeding or dispute of any liability, wrongdoing, or obligation whatsoever (including as to the merits of any claim or defense) by any Party to any other Party or any other Person with respect to any of the matters addressed in this Agreement.

30

101736284v3

(b)     None of this Agreement (including, without limitation, the Recitals and Exhibits hereto), the settlement or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement: (i) is or may be deemed to be or may be used as an admission or evidence of the validity of any claim, or any allegation made in the Actions or of any wrongdoing or liability of any Party; (ii) is or may be deemed to be or may be used as an admission or evidence of any liability, fault or omission of any Party in any civil, criminal or administrative proceeding in any court, administrative agency or other tribunal; or (iii) is or may be deemed to be or used as an admission or evidence against Reorganized COFINA or COFINA with respect to the validity of any of the Senior COFINA Bond Claims or the Junior COFINA Bond Claims.  None of this Agreement, the settlement, or any act performed or document executed pursuant to or in furtherance of this Agreement or the settlement herein shall be admissible in any proceeding for any purposes, except to enforce the terms of the Agreement.

Section 7.3.     Good Faith Negotiations.  The Parties recognize and acknowledge that each of the Parties hereto is represented by counsel, and such Party received independent legal advice with respect to the advisability of entering into this Agreement; the negotiations related to this Agreement were conducted regularly and at arm's length; this Agreement is made and executed by and of each Party's own free will; each Party knows all of the relevant facts and his, her or its rights in connection therewith, and that he, she or it has not been improperly influenced or induced to make this settlement as a result of any act or action on the part of any party or employee, agent, attorney or representative of any party to this Agreement.  The Parties further acknowledge that they entered into this Agreement because of their desire to avoid the further expense and inconvenience of litigation and other disputes, and to compromise permanently and settle the claims between the Parties settled by the execution of this Agreement.  The Parties further acknowledge and agree that, in connection with the Title III Case and the negotiation and consummation of this Agreement, including, without limitation, the Term Sheet, the Parties, at all times, acted (a) in good faith and (b) solely for themselves and not on behalf of or in representation of any other creditors, bondholders or other parties in interest.

Section 7.4.     Third Party Beneficiary.  Other than funds and/or accounts which are holders of the Senior COFINA Bonds or Junior COFINA Bonds and whose advisors or managers are Parties hereto, nothing in this Agreement, express or implied, is intended or shall be construed to confer upon, or to give to, any Person other than the Parties hereto, Reorganized COFINA and their respective successors and assigns, any right, remedy or claim under or by reason of this Agreement or any covenant, condition or stipulation thereof; and the covenants, stipulations and agreements contained in this Agreement are and shall be for the sole and exclusive benefit of the Parties hereto and their respective successors and assigns.

Section 7.5.     Governing Law; Retention of Jurisdiction; Service of Process.  This Agreement shall be governed by and construed in accordance with the internal laws of the State of New York and applicable federal law, without giving effect to the principles of conflicts of laws that would require the application of the law of any other jurisdiction.  By its execution and delivery of this Agreement, each of the Parties hereby irrevocably and unconditionally agrees for itself that any legal action, suit or proceeding between any or all of the foregoing with respect to any matter under or arising out of or in connection with this

31

Agreement or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding, shall be brought in the Title III Court for that purpose only, and, by execution and delivery of this Agreement, each hereby irrevocably accepts and submits itself to the jurisdiction of such court, generally and unconditionally, with respect to any such action, suit or proceeding, subject to a Party's rights pursuant to applicable law. In the event any such action, suit or proceeding is commenced, each of the Parties hereby (a) agrees and consents that service of process may be made, and personal jurisdiction over any Party hereto in any such action, suit or proceeding may be obtained, by service of a copy of the summons, complaint and other pleadings required to commence such action, suit or proceeding upon the Party at the address of such Party set forth in Section 7.10 hereof, unless another address has been designated by such Party in a notice given to the other Parties in accordance with Section 7.10 hereof and (b) waives to the fullest extent permitted by applicable law, any right it may have to a trial by jury in any legal proceeding directly or indirectly arising from or relating to this Agreement and the representations, covenants and other obligations set forth herein.

Section 7.6. <u>Headings</u>. The headings of the sections, paragraphs and subsections of this Agreement are inserted for convenience only and are not part of this Agreement and do not in any way modify the terms or provisions of this Agreement and shall not affect the interpretation hereof.

Section 7.7. <u>Binding Agreement; Successors and Assigns</u>. This Agreement shall be effective and binding only upon the execution and delivery of this Agreement by the Parties listed on the signature pages hereto. This Agreement is intended to, and shall be deemed to, bind and inure to the benefit of the Parties and their respective successors, assigns, administrators, constituents and representatives. The agreements, representations, covenants and obligations of the Parties under this Agreement are several only and not joint in any respect and none shall be responsible for the performance or breach of this Agreement by another. If any provision of this Agreement, or the application of any such provision to any person or entity or circumstance, shall be held invalid or unenforceable, in whole or in part, such invalidity or unenforceability shall attach only to such provision or part thereof and the remaining part of such provision hereof and this Agreement shall continue in full force and effect so long as the economic and legal substance of the transactions contemplated herein or in the Term Sheet are not affected in any manner adverse to any Party. Upon any such determination of invalidity, the Parties shall negotiate in good faith to modify this Agreement so as to effect the original intent of the Parties as closely as possible in a reasonably acceptable manner so that the transactions contemplated herein are consummated as originally contemplated to the greatest extent possible.

Section 7.8. <u>Entire Agreement</u>. This Agreement, including, without limitation, the Term Sheet, constitutes the full and entire agreement among the Parties with regard to the subject hereof and the Term Sheet, and supersedes all prior negotiations, representations, promises or warranties (oral or otherwise) made by any Party with respect to the subject matter hereof. No Party has entered into this Agreement in reliance on any other Party's prior representation, promise or warranty (oral or otherwise) except for those that may be expressly set forth in this Agreement. Notwithstanding the foregoing, nothing contained herein shall be deemed to limit or otherwise modify any commutation or other separate agreement or instrument entered into by one or more Senior Holders or Junior Holders, on the one hand, and an Insurer, on the other hand.

101736284v3

Section 7.9.   <u>Counterparts</u>.  This Agreement may be executed in one or more counterparts, each of which shall be deemed an original copy of this Agreement and all of which, when taken together, shall constitute one and the same Agreement.  Copies of executed counterparts transmitted by telecopy or other electronic transmission service shall be considered original executed counterparts, provided receipt of copies of such counterparts is confirmed.

Section 7.10.   <u>Notices</u>.  All demands, notices, requests, consents, and other communications hereunder shall be in writing and shall be deemed to have been duly given (i), when personally delivered by courier service or messenger, (ii) upon actual receipt (as established by confirmation of receipt or otherwise) during normal business hours, otherwise on the first business day thereafter if transmitted electronically (by e-mail transmission), by facsimile or telecopier, with confirmation of receipt, or (iii) three (3) Business Days after being duly deposited in the mail, by certified or registered mail, postage prepaid- return receipt requested, to the following addresses, or such other addresses as may be furnished hereafter by notice in writing, to the following Parties:

(a)   If to the Oversight Board, to:

PROSKAUER ROSE LLP
Eleven Times Square
New York, NY 10036
Attn:   Martin J. Bienenstock, Esq.
Email: mbienenstock@proskauer.com
          Brian S. Rosen, Esq.
Email: brosen@proskauer.com
Facsimile: 212-969-2900

(b)   If to AAFAF or COFINA, to:

O'MELVENY & MEYERS LLP
Seven Times Square
New York, NY 10036
Attn:   John Rapisardi, Esq.
Email: jrapisardi@omm.com
          Suzzanne Uhland, Esq.
Email: suhland@omm.com
Facsimile: 212-326-2061

(c)   If to Ambac, to:

MILBANK, TWEED, HADLEY & McCLOY LLP
28 Liberty Street
New York, NY 10005
Attn:   Dennis Dunne, Esq.
Email: ddunne@milbank.com
          Atara Miller, Esq.
Email: amiller@milbank.com
Facsimile: 212-530-5219

(d)      If to Assured, to:

CADWALADER, WICKERSHAM & TAFT
200 Liberty Street

New York, NY 10281
Attn: Mark Ellenberg, Esq.
Email: mark.ellenberg@cwt.com
      Lary Stromfeld, Esq.
Email: lary.stromfeld@cwt.com
      Ivan Loncar, Esq.
Email: ivan.loncar@cwt.com
      Casey Servais, Esq.
Email: casey.servais@cwt.com
Facsimile: 212-504-6666

(e)      If to National, to:

WEIL, GOTSHAL & MANGES LLP
767 Fifth Avenue
New York, NY 10153
Attn:   Marcia L. Goldstein, Esq.
Email: marcia.goldstein@weil.com
      Gabriel Morgan, Esq.
Email: gabriel.morgan@weil.com
Facsimile: 212-310-8007

(f)      If to the Senior Ad Hoc Holders, to:

QUINN EMANUEL URQUHART & SULLIVAN, LLP
51 Madison Avenue
New York, NY 10010
Attn:   Susheel Kirpalani, Esq.
Email: susheelkirpalani@quinnemanuel.com
      Eric Kay, Esq.
Email: erickay@quinnemanuel.com
Facsimile: 212-849-7100

(g)      If to Oppenheimer or the First Puerto Rico Family of Funds, to:

KRAMER LEVIN NAFTALIS & FRANKEL LLP
1177 Avenue of the Americas
New York, NY 10036
Attn:   Thomas Mayer, Esq.
Email: tmayer@kramerlevin.com
      Amy Caton, Esq.
Email: acaton@kramerlevin.com
      Douglas Buckley, Esq.

34

101736284v3

Email: dbuckley@kramerlevin.com
Facsimile: 212-715-8169

(h) If to GSAM, to:

McDERMOTT, WILL & EMERY LLP
444 West Lake Street
Chicago, IL 60606
Attn: William P. Smith, Esq.
Email: wsmith@mwe.com
     David L. Taub, Esq.
Email: dtaub@mwe.com
     Alexandra C. Scheibe, Esq.
Email: ascheibe@mwe.com
Facsimile: 312-277-9069

(i) If to the Puerto Rico Funds, to:

WHITE & CASE LLP
200 South Biscayne Boulevard
Miami, FL 33131
Attn: John K. Cunningham, Esq.
Email: jcunningham@whitecase.com
     Fernando de la Hoz, Esq.
Email: fdelahoz@whitecase.com
Facsimile: 305-358-5744

(j) If to Bonistas, to:

DAVIS, POLK & WARDWELL LLP
450 Lexington Avenue
New York, NY 10017
Attn: Donald Bernstein, Esq.
Email: donald.bernstein@davispolk.com
     Brian Resnick, Esq.
Email: brian.resnick@davispolk.com
Facsimile: 212-701-5800

(k) If to certain of the Insured Senior Holders, to:

NORTON ROSE FULBRIGHT US LLP
1301 Avenue of the Americas
New York, NY 10019
Attn: Lawrence A. Larose, Esq.
Email: lawrence.larose@nortonrosefulbright.com
     Eric Daucher, Esq.
Email: eric.daucher@nortonrosefulbright.com

(l) If to GoldenTree Asset Management LP, to:

35

AKIN GUMP STRAUSS HAUER & FELD LLP
One Bryant Park
New York, NY 10036
Attn: Ira S. Dizengoff, Esq.
Email: idizengoff@akingump.com
      Philip C. Dublin, Esq.
Email: pdublin@akingump.com

(m)    If to Tilden Park Capital management LP, to:

SIMPSON THACHER & BARTLETT LLP
425 Lexington Avenue
New York, NY 10017
Attn:  Sandy Qusba, Esq.
Email: squsba@stblaw.com
      Nicholas Baker, Esq.
Email: nbaker@stblaw.com
Facsimile: 212-455-2502

(n)    If to Whitebox Advisors LLC, to:

STROOCK & STROOCK & LAVAN LLP
180 Maiden Lane
New York, NY 10038
Attn:  Daniel A. Fliman, Esq.
Email: dfliman@stroock.com
Facsimile: 212-806-6006

(o)    If to Aurelius or Six PRC, to:

PAUL, WEISS, RIFKIND, WHARTON
  & GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Attn:  Andrew N. Rosenberg, Esq.
Email: arosenberg@paulweiss.com
Facsimile: 212-373-3000

    Section 7.11.    Non-Waiver of Remedies.  Except as expressly provided in this Agreement, nothing contained herein is intended, nor shall it be construed in any manner, to waive, limit, impair or restrict any right or ability of the Parties to protect and preserve each of their rights, remedies and interests, contractual or otherwise, under the Bond Resolutions, Title III or any other provision of PROMESA or any other law or regulation.

    Section 7.12.    Several, Not, Joint Obligations.  The agreements, representations, covenants and other obligations of the Parties set forth in this Agreement are, in all respects, several and not joint.

36

Section 7.13. <u>Remedies Cumulative</u>. All rights, powers and remedies provided in accordance with the terms and provisions of this Agreement or otherwise available in respect hereof of law or in equity shall be cumulative and not alternative, and the exercise of any right, power or remedy thereof by any Party shall not preclude the contemporaneous or later exercise of any other such right, power or remedy by any such Party.

Section 7.14. <u>Specific Performance</u>. Each of the Parties agrees and understands that money damages are an insufficient remedy for any breach of this Agreement by any Party and each non-breaching Party shall be entitled to seek specific performance and injunctive or other equitable relief as a remedy of any such breach of this Agreement, including, without limitation, an order of the Title III Court or such other court of competent jurisdiction requiring any Party to comply promptly with any of its obligation hereunder. Notwithstanding anything contained in this Agreement to the contrary, specific performance and injunctive or other relief and the right to terminate this Agreement in accordance with the terms and provisions hereof shall be the sole and exclusive remedies for any breach of this Agreement by any Party (or any other person) and no Party (or any other person) shall be entitled to monetary damages for any breach of any provision of this Agreement.

Section 7.15. <u>Further Assurances</u>. Each of the Parties hereto agrees to execute and deliver, or to cause to be executed and delivered, such instruments, and to take such action as the other Parties may reasonably request in order to effectuate the intent and purposes of, and to carry out the terms of, this Agreement.

101736284v3

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
    Name:  Natalie A. Jaresko
    Title:   Executive Director

THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
    Name:
    Title:

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
    Name:
    Title:

BONISTAS DEL PATIO, INC.

By: _____
    Name:  Rafael E. Rojo
    Title:   Chairman

38

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
     Name:
     Title:

PUERTO RICO SALES TAX
FINANCING CORPORATION

By:  Puerto Rico Fiscal Agency and Financial
     Advisory Authority

By: _____
     Name: Christian Sobrino Vega
     Title:  Executive Director of AAFAF, in its
          capacity as Authorized Signatory for
          COFINA

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
     Name: Christian Sobrino Vega
     Title:  Executive Director

BONISTAS DEL PATIO, INC.

By: _____
     Name:  Rafael E. Rojo
     Title:   Chairman

**IN WITNESS WHEREOF**, the Parties hereto have caused this Agreement to be executed as of the date set forth above.

FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO

By: _____
      Name:
      Title:

THE PUERTO RICO SALES TAX
FINANCING CORPORATION

By: _____
      Name:
      Title:

PUERTO RICO FISCAL AGENCY
AND FINANCIAL ADVISORY AUTHORITY

By: _____
      Name:
      Title:

BONISTAS DEL PATIO, INC.

By: _____
      Name: Rafael E. Rojo
      Title: Chairman

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit DX-QQQ Page 90 of 141

**AMBAC ASSURANCE CORPORATION**


By: s/Claude LeBlanc_____
      Name: Claude LeBlanc
      Title: President and Chief Executive Officer

Holder of Principal Amount of Senior COFINA Bonds:

Insurer of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Insurer of Principal Amount of Junior COFINA Bonds:

**ARISTEIA CAPITAL, L.L.C.,** solely in its capacity as Investment Manager or Adviser to underlying funds

By: s/Willian R. Techar
    Name: William R. Techar
    Title:  Manager
           Aristeia Capital, LLC.

By: s/Andrew B. David
    Name: Andrew B. David
    Title:  Chief Operating Officer
           Aristeia Capital, LLC.

Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Aristeia Capital, L.L.C.
One Greenwich Plaza, 3rd Floor
Greenwich, CT 06830
Fax:  (203) 622-2701
Attention:  Steven Robinson/William Techar
Email:  robinson@aristeiacapital.com/techar@aristeiacapital.com

**ASSURED GUARANTY MUNICIPAL CORP.**


By:  s/Jorge A. Gana _____
        Name: Jorge A. Gana
        Title: M.D.

Insurer of Principal Amount of Junior COFINA Bonds:

**AURELIUS CAPITAL MASTER, LTD.**

By: s/Dan Gropper
      Name: Dan Gropper
      Title: Authorized Person

Principal Amount of Senior COFINA Bonds held as of September 20, 2018:

Principal Amount of Junior COFINA Bonds held as of September 20, 2018:

Notice Address

Aurelius Capital Management, LP
535 Madison Avenue, 22nd Floor
New York, NY 10022
Fax: 212-786-5870
Attention: Dan Gropper
Email: dgropper@aurelius-capital.com

**CANYON CAPITAL ADVISORS LLC,** on behalf of its participating funds and/or accounts

By: s/John P. Plaga _____
     Name:  John P. Plaga
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Canyon Capital Advisors LLC
2000 Avenue of the Stars, 11th Floor
Los Angeles, CA 90067
Fax:  1-310-272-1371
Attention:  General Counsel
Email:  legal@canyonpartners.com;
jheller@canyonpartners.com;
akawalsky@canyonpartners.com

**DECAGON HOLDINGS 1, L.L.C.**

By: s/Jeffrey R. Katz_____
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 1, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 2, L.L.C.**

By:  s/Jeffrey R. Katz _____
　　　Name: Jeffrey R. Katz
　　　Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 2, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 3, L.L.C.**

By: s/Jeffrey R. Katz
      Name: Jeffrey R. Katz
      Title: Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 3, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 4, L.L.C.**

By: s/Jeffrey R. Katz_____
     Name: Jeffrey R. Katz
     Title: Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 4, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 5, L.L.C.**

By: s/Jeffrey R. Katz
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 5, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 6, L.L.C.**

By: s/Jeffrey R. Katz
      Name: Jeffrey R. Katz
      Title: Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 6, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention: Jeffrey R. Katz
Fax: 617-235-0617
Email: jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 7, L.L.C.**


By: s/Jeffrey R. Katz_____
      Name:  Jeffrey R. Katz
      Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 7, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

Case:17-03283-LTS   Doc#:4364-37   Filed:11/26/18   Entered:11/26/18 21:36:59   Desc:
Exhibit DD   Page 82 of 91

**DECAGON HOLDINGS 8, L.L.C.**

By:  s/Jeffrey R. Katz_____
     Name:  Jeffrey R. Katz
     Title:   Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Decagon Holdings 8, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 9, L.L.C.**


By: s/Jeffrey R. Katz
     Name: Jeffrey R. Katz
     Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 9, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**DECAGON HOLDINGS 10, L.L.C.**

By:  s/Jeffrey R. Katz_____
       Name:  Jeffrey R. Katz
       Title:   Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Decagon Holdings 10, L.L.C.
c/o Ropes & Gray LLP
800 Boylston Street, Boston, MA 02199
Attention:  Jeffrey R. Katz
Fax:  617-235-0617
Email:  jeffrey.katz@ropesgray.com

**FIRST PUERTO RICO FAMILY OF FUNDS**

    First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
    First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
    First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
    First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
    First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
    First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
    First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
    First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
    First Puerto Rico AAA Target Maturity Fund I, Inc.
    First Puerto Rico AAA Target Maturity Fund II, Inc.
    First Puerto Rico Tax-Exempt Fund, Inc.
    First Puerto Rico Tax-Exempt Fund II, Inc.

By: *Frank J Serra*
    Name: Frank J Serra
    Title: President

Holder of Principal Amount of Insured Senior COFINA Bonds: ████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: ████████

Holder of Principal Amount of Junior COFINA Bonds: ████████

**GOLDENTREE ASSET MANAGEMENT LP**, on behalf of certain of its affiliated funds and certain funds and accounts for which it serves as investment manager

By: s/Peter Alderman
      Name: Peter Alderman
      Title:  General Counsel--Americas


Investment Advisor to Holders of Principal Amount of Senior COFINA Bonds:


Investment Advisor to Holders of Principal Amount of Junior COFINA Bonds:


Notice Address:

GoldenTree Asset Management LP
300 Park Avenue, 20th Floor
New York, NY 10022
Fax:  212-847-3496
Attention:  Legal Department
Email:  legalgroup@goldentree.com

**GOLDMAN SACHS ASSET MANAGEMENT, L.P.,** on behalf of certain funds and accounts
for which it serves as investment manager


By: s/David Z. Alter
        Name: David Z. Alter
        Title: Managing Director


Investment Manager to Holder of Principal Amount of Senior COFINA Bonds:


Investment Manager to Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Goldman Sachs Asset Management, L.P.
200 West Street, 3rd Floor
New York, NY 10282
Attention: David Z. Alter
Email: david.alter@gs.com


With a copy to:

Goldman Sachs Asset Management, L.P.
200 West Street, 15th Floor
New York, NY 10282
Attn: General Counsel

**NATIONAL PUBLIC FINANCE GUARANTEE CORPORATION**

By: s/Adam Bergonzi
     Name: Adam Bergonzi
     Title: Chief Risk Officer

Holder of Principal Amount of Senior COFINA Bonds:

     *by National Public Finance Guarantee Corporation:*

     *by MBIA Insurance Corporation:*

Insurer of Principal Amount of Senior COFINA Bonds:

Notice Address:

National Public Finance Guarantee Corporation
1 Manhattanville Road
Purchase, NY 10577
Fax: (914) 765-3164
Attention: Adam Bergonzi
Email: adam.bergonzi@nationalpfg.com

**OLD BELLOWS PARTNERS LP**

By: s/ A. Dev Chodry
      Name: A. Dev Chodry
      Title:  Authorized Signatory

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax: 646-607-5686
Attention: Nicole Kramer
Email: nkramer@scogcap.com

**OPPENHEIMER FUNDS. INC., as investment advisor for the following accounts:**

      Oppenheimer Rochester Amt -Free Municipal Fund
      Oppenheimer Rochester Amt -Free New York Municipal Fund
      Oppenheimer Rochester California Municipal Fund
      Oppenheimer Rochester Limited Term California Municipal Fund
      Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
      Oppenheimer Municipal Fund)
      Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
      Rochester Portfolio Series)
      Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
      State Municipal Trust)
      Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
      Multi-State Municipal Trust)
      Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
      State Municipal Trust)
      Oppenheimer Rochester Fund Municipals
      Oppenheimer Rochester Minnesota Municipal Fund

and

**OFI GLOBAL INSTITUTIONAL, Inc., as investment manager for the following accounts:**

      MASSMUTUAL International Holding MSC, Inc.
      MASSMUTUAL Unified Traditional

By: _Richard Stein_
      Name: RICHARD STEIN
      Title: VICE PRESIDENT

Holder of Principal Amount of Insured Senior COFINA Bonds: $ █████████

Holder of Principal Amount of Uninsured Senior COFINA Bonds: $ ████████

Holder of Principal Amount of Uninsured Junior COFINA Bonds: $ ████████

**TAX-FREE PUERTO RICO FUND, INC.**

**TAX-FREE PUERTO RICO FUND II, INC.**

**TAX-FREE PUERTO RICO TARGET MATURITY FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND, INC.**

**PUERTO RICO AAA PORTFOLIO BOND FUND II, INC.**

**PUERTO RICO AAA PORTFOLIO TARGET MATURITY FUND, INC.**

**PUERTO RICO FIXED INCOME FUND, INC.**

**PUERTO RICO FIXED INCOME FUND II, INC.**

**PUERTO RICO FIXED INCOME FUND III, INC.**

**PUERTO RICO FIXED INCOME FUND IV, INC.**

**PUERTO RICO FIXED INCOME FUND V, INC.**

**PUERTO RICO FIXED INCOME FUND VI, INC.**

**PUERTO RICO GNMA & U.S. GOVERNMENT TARGET MATURITY FUND, INC.**

**PUERTO RICO MORTGAGE-BACKED & U.S. GOVERNMENT SECURITIES FUND, INC.**

**UBS IRA SELECT GROWTH & INCOME PUERTO RICO FUND**


By: s/ Carlos V. Ubiñas
       Name: Carlos V. Ubiñas
       Title: Chairma

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

**PUERTO RICO INVESTORS TAX-FREE FUND, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND, INC. II**

**PUERTO RICO INVESTORS TAX-FREE FUND III, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND IV, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND V, INC.**

**PUERTO RICO INVESTORS TAX-FREE FUND VI, INC.**

**PUERTO RICO INVESTORS BOND FUND I**

By:  s/Javier Rubio
       Name: Javier Rubio
       Title: Senior Vice President

Holder of Principal Amount of Senior COFINA Bonds:

Holder of Principal Amount of Junior COFINA Bonds:

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit QQ Page 93 of 141

**SCOGGIN MANAGEMENT LP**


By:  s/A. Dev. Chodry
     Name:  A. Dev Chodry
     Title:  Authorized Signatory


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


Notice Address:

Scoggin Management LP
660 Madison Ave, #20
New York, NY 10065
Fax:  646-607-5686
Attention:  Nicole Kramer
Email:  nkramer@scogcap.com

**SIX PRC INVESTMENTS LLC**

By: Monarch Debt Recovery Master Fund Ltd
Monarch Alternative Solutions Master Fund Ltd
Monarch Capital Master Partners III LP
Monarch Capital Master Partners IV LP
MCP Holdings Master LP
Monarch Special Opportunities Master Fund Ltd, as Members

By Monarch Alternative Capital LP, as investment manager


By:  s/Adam Sklar
       Name: Adam Sklar
       Title:  Managing Principal


Principal Amount of Senior COFINA Bonds as of September 20, 2018:


Principal Amount of Junior COFINA Bonds as of September 20, 2018:


Notice Address:

Monarch Alternative Capital LP
535 Madison Avenue
New York, NY 10022
Fax: 866-610-5157
Attention: Adam Sklar
Email: adam.sklar@monarchlp.com

**TACONIC CAPITAL ADVISORS L.P.**
**on behalf of funds under management**


By:  s/Peyton McNutt
      Name:  Peyton McNutt
      Title:  Deputy General Counsel


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Taconic Capital Advisors L.P.
280 Park Avenue, 5th Floor
New York, New York 10017
Fax:  (212) 209-3185
Attention:  Marc Schwartz
Email:  maschwartz@taconiccap.com

**TILDEN PARK CAPITAL MANAGEMENT LP,** on behalf of certain of its managed funds

By: s/Samuel Alcoff
     Name: Samuel Alcoff
     Title:  Managing Member


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:



Notice Address:

Tilden Park Capital Management LP
452 5th Ave, 28th Floor
New York, NY 10018
Fax:  N/A
Attention:  Rahul Pande
Email: rpande@tildenparkcapital.com
     with a copy to:  legal@tildenparkcapital.com

**WHITEBOX ADVISORS LLC,** on behalf of funds it manages

By: <u>s/Mark Strefling</u>
     Name:  Mark Strefling
     Title:   Chief Executive Officer


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:


<u>Notice Address:</u>

Whitebox Advisors LLC
3033 Excelsior Boulevard, Suite 300
Minneapolis, MN 55416
Attention:  <u>Sean Russell</u>
Email:  <u>SRussell@whiteboxadvisors.com</u>

# EXHIBIT A

## LIST OF SENIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.

First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund, Inc. II
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

101736284v3

# EXHIBIT B

## LIST OF JUNIOR HOLDERS PARTY HERETO

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Aurelius Capital Master, Ltd.
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it
    serves as investment manager
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of
    Oppenheimer Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of
    Rochester Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer
    Multi-State Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Fund, Inc.

101736284v3

First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund II, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit D-Q Page 202 of 101

# **EXHIBIT C**

## TERM SHEET

EXECUTION VERSION

**COFINA**
**Restructuring Proposal**
**Summary of Terms and Conditions**

This amended and restated term sheet (the "<u>Term Sheet</u>"), dated as of September 20, 2018, is a summary of indicative terms and conditions for a proposed restructuring (the "<u>Restructuring</u>"), and a plan of adjustment (the "<u>COFINA Plan of Adjustment</u>") consummated in connection with proceedings under Title III of the Puerto Rico Oversight, Management and Economic Stability Act ("<u>PROMESA</u>"; such proceedings being referred to as the "<u>PROMESA Proceedings</u>"), of the indebtedness of, and claims and causes of action against, the Puerto Rico Sales Tax Financing Corporation ("<u>COFINA</u>"). References herein to (1) the "<u>PSA</u>" are to that certain Amended and Restated Plan Support Agreement, dated as of September 20, 2018, by and among (a) the Financial Oversight and Management Board for Puerto Rico (the "<u>Oversight Board</u>"), (b) COFINA, (c) the Puerto Rico Fiscal Agency and Financial Advisory Authority ("<u>AAFAF</u>" and, together with the Oversight Board and COFINA, the "<u>Government Parties</u>"), (d) certain holders of Senior COFINA Bond Claims, as defined therein, (e) Ambac Assurance Corporation ("<u>Ambac</u>"), (f) National Public Finance Guarantee Corporation ("<u>National</u>"), (g) certain holders of Junior COFINA Bond Claims, as defined therein, (h) Assured Guaranty Municipal Corp. ("<u>Assured</u>"), formerly known as Financial Security Assurance Inc., and (i) Bonistas del Patio, Inc. ("<u>Bonistas</u>"), and (2) "COFINA PROMESA Proceeding" are to the PROMESA Proceeding of COFINA. The signatories to the PSA as of August 29, 2018, shall be referred to herein as the "<u>PSA Parties</u>".

**I.**  **Compromise and Settlement of Commonwealth – COFINA Dispute**

    **A.**  On or prior to October 15, 2018, the Oversight Board, on behalf of the Commonwealth of Puerto Rico (the "<u>Commonwealth</u>"), shall file a motion (the "<u>Settlement Motion</u>") in the Commonwealth PROMESA Proceedings with the United States District Court having jurisdiction over the PROMESA Proceedings (the "<u>Title III Court</u>") in accordance with Bankruptcy Rule 9019 seeking the approval of the compromise and settlement of the dispute (the "<u>Commonwealth–COFINA Dispute</u>") between the Commonwealth and COFINA regarding ownership of the sales and use taxes purportedly transferred by the Commonwealth to COFINA and pledged by COFINA to secure the repayment of certain indebtedness of COFINA, including, without limitation, ownership of collections required to be deposited in the Dedicated Sales Tax Fund (as defined in the Bond Resolutions), which funds accumulate annually up to the Pledged Sales Tax Base Amount ("<u>PSTBA</u>"), <u>i.e.</u>, the annual dollar amounts determined for each fiscal year of the Commonwealth ("<u>FY</u>") in accordance with Section 3 of Act No. 91-2006, as amended ("<u>Act 91</u>"), and with respect to each FY during the period from 2019 to 2058, inclusive, set forth in Schedule 1 hereto, currently being litigated in the adversary proceeding styled <u>The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of the Financial Oversight and Management Board for Puerto Rico as representative of The Commonwealth of Puerto Rico v. Bettina Whyte, as agent of The Financial Oversight and Management Board for Puerto Rico as representative of The Puerto Rico Sales Tax Financing Corporation</u>, Adv. Proc. No. 17-257-LTS (the "<u>Adversary Proceeding</u>"). The Commonwealth–COFINA Dispute shall be compromised and settled pursuant to the Settlement Motion in the Commonwealth PROMESA Proceeding, on the one hand, and pursuant to the COFINA Plan of Adjustment, as defined below, on the other hand, with (i) COFINA being granted an ownership interest of the COFINA Portion, as defined below, and (ii) the Commonwealth being granted an ownership interest of the Commonwealth Portion, as defined below; <u>provided</u>, <u>however</u>, that, except as expressly set forth in Sections II(N) and (P) hereof, (a) one hundred percent (100%) of the funds on deposit prior to July 1, 2018 in the debt service, reserve and such other accounts and any earnings thereon held by the Bank of New York Mellon ("<u>BNYM</u>"), as the COFINA bond trustee, for the benefit of the bondholders (collectively, the "<u>Pre-FY2019 BNYM Deposits</u>") in accordance with the Adversary Proceeding and such other orders entered in connection therewith; <u>provided</u>, <u>however</u>, that, (i) of Seventy-Eight Million Three Hundred Fifty-Five Thousand Eight Hundred and Thirty-Seven Dollars and Sixty-Three Cents ($78,355,837.63)

1

of the Pre-FY2019 BNYM Deposits, (x) Thirty-Three Million Three Hundred Fifty-Five Thousand Eight Hundred Thirty-Seven Dollars and Sixty-Three Cents ($33,355,837.63) shall be distributed to the Commonwealth, (y) Five Million Dollars ($5,000,000.00) shall be allocated to fund an operating expense fund for COFINA, and (z) Forty Million Dollars ($40,000,000.00) shall be allocated to the Taxable Election Cash distributable under the COFINA Plan of Adjustment and if the Taxable Election Cash distributable under the COFINA Plan of Adjustment is less than Sixty Million Dollars ($60,000,000.00) (such difference, the "Tax Election Remainder Amount"), then an amount equal to the Tax Election Remainder Amount, up to Forty Million Dollars ($40,000,000.00) allocated as Taxable Election Cash, shall be distributed (I) *first*, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (II) *second*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, (b) one hundred percent (100%) of the funds deposited on or after July 1, 2018 to the debt service, reserve and such other accounts (collectively, the "FY2019 BNYM Deposits"), on a first dollars basis up to the amount of fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA, plus any earnings thereon (the "COFINA FY2019 BNYM Deposits") held by BNYM in accordance with the Adversary Proceeding and such other orders entered in connection therewith, will, on the COFINA Effective Date, as defined below, be the exclusive property of COFINA and will be distributed to COFINA for purposes of distribution in accordance with the COFINA Plan of Adjustment and (c) any FY2019 BNYM Deposits net of the COFINA FY2019 BNYM Deposits, shall be distributed in its entirety to the Commonwealth. Pursuant to the provisions of the PSA regarding support of the Settlement Motion, and except as expressly set forth in Sections II(N) and (P) hereof, the parties hereto reserve their right, if any, to contest in the Commonwealth PROMESA Proceeding the Commonwealth's (a) use, or direction of the use, of monies received by the Commonwealth or to be received by the Commonwealth and (b) deposit or other use, or direction of the use, of such monies. Consideration and confirmation of the COFINA Plan of Adjustment in the COFINA PROMESA Proceeding shall be contemporaneous with consideration and approval of the Settlement Motion in the Commonwealth PROMESA Proceeding; provided, however, that, in all circumstances, the effective date of the order granting the Settlement Motion shall be contemporaneous with, and its contemporaneous occurrence shall be a condition to, the COFINA Effective Date, as defined below.

B.    Unless (i) approval of the Settlement Motion is denied by the Title III Court or (ii) the COFINA Effective Date does not occur, the effective date of the compromise and settlement (the "Compromise Date") shall be retroactive to July 1, 2018 and, in addition to receipt of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits on the COFINA Effective Date, COFINA will own, and will be entitled to receive, the COFINA Portion commencing as of FY2019. Until the COFINA Effective Date, all revenues attributable to the PSTBA, including, without limitation, the COFINA Portion and the Commonwealth Portion, shall be maintained in accordance with orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA Proceeding, the Adversary Proceeding and that certain litigation styled The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation, et al., Adv. Proc. No. 17-133-LTS (the "Interpleader Action"). Without in any way limiting the foregoing, but subject to the occurrence of the COFINA Effective Date, the Commonwealth will own and will be entitled to receive the Commonwealth Portion, as defined below.

C.    On the COFINA Effective Date, pursuant to the Settlement Order and the Confirmation Order, as defined below, which orders shall amend and supersede such orders of the Title III Court entered in the COFINA PROMESA Proceeding, the Commonwealth PROMESA

2

Proceeding, the Adversary Proceeding and the Interpleader Action to the extent that such orders are inconsistent therewith, (1) BNYM shall make distributions as set forth in Section I(A) hereof, (2) the Adversary Proceeding shall be dismissed, with prejudice, and all other claims and causes of action asserted therein by the Commonwealth Agent, the COFINA Agent and the Permitted Intervenors, as defined in the Adversary Proceeding, shall be deemed dismissed, with prejudice, and the Commonwealth Agent and the COFINA Agent and their respective professionals shall be deemed to have satisfied any and all of their respective obligations in connection with the Adversary Proceeding and the COFINA Agent shall be deemed to have been released from any and all liabilities associated therewith, (3) the Interpleader Action will be dismissed, with prejudice, and all other claims and causes of action asserted therein shall be dismissed, with prejudice, and the funds deposited in connection therewith shall be distributed in accordance with the terms and provisions of this Term Sheet, and (4) except with respect to claims and causes of actions asserted or that could have been asserted by Ambac, Whitebox Multi-Strategy Partners, L.P. or funds affiliated with Whitebox Advisors LLC against BNYM for gross negligence, willful misconduct or intentional fraud, the Actions shall be dismissed, with prejudice, and claims and causes of action asserted therein by any party to the Actions shall be deemed dismissed, with prejudice.

**D.**     Solely for purposes of confirmation and consummation of the COFINA Plan of Adjustment, (i) the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) shall be deemed allowed in the aggregate amount of $7,760,877,871.98, (ii) the Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and the Junior COFINA Bond Claims (Assured Insured) shall be deemed allowed in the aggregate amount of $9,876,235,996.34, and (iii) the holders of existing COFINA bonds shall be deemed secured to the extent of the Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, the COFINA FY2019 BNYM Deposits and the COFINA Portion.

## II.     COFINA Plan of Adjustment

**A.**     **Overview:** Contemporaneously with the filing of the Settlement Motion, the Oversight Board, on behalf of COFINA, will file the COFINA Plan of Adjustment and disclosure statement related thereto.  The COFINA Plan of Adjustment shall provide, among other things, (i) that, as of the COFINA Effective Date, COFINA will be the sole and exclusive owner of the present and future revenues and collections generated by the five and one-half percent (5.5%) of the sales and use taxes imposed by the Commonwealth (the "COFINA Pledged Taxes") up to the COFINA Portion, (ii) for the issuance of a single tranche of securities that will be issued in five (5) series with the sinking fund schedules, accreted value and final maturities set forth in Exhibit A (the "COFINA Bonds"), which obligations (a) shall be secured by a statutory first lien on the COFINA Pledged Taxes and, with respect to any permitted substitution thereof and all rights related thereto and proceeds thereof, (b) shall not be secured by or have recourse to any property of the Commonwealth and (c) shall be a special, limited obligation of COFINA (payable solely from the COFINA Portion and any other COFINA property pledged by COFINA to secure the repayment of the COFINA Bonds pursuant to the COFINA Plan of Adjustment).  The Government Parties shall use their reasonable best efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Internal Revenue Code and under Puerto Rico law to the extent permitted under applicable law; provided, however, that, in the event applicable U.S. law does not permit all COFINA Bonds to be issued on a federally tax exempt basis, COFINA shall issue Taxable COFINA Bonds as a sub-series of COFINA Bonds, which shall be distributed, first, in accordance with the provisions of Sections II(D)(4) and II(D)(7) hereof and, second, with respect to any remaining Taxable COFINA Bonds ratably to all other recipients of COFINA Bonds under the COFINA Plan of Adjustment.  In each FY, the

3

aggregate scheduled debt service due, including accreted amounts, on all COFINA Bonds and COFINA Parity Bonds shall not exceed the COFINA Portion scheduled for such FY.

In connection with the filing of the COFINA Plan of Adjustment and related disclosure statement, the Oversight Board shall cause the certification of a COFINA fiscal plan pursuant to Section 201(a) of PROMESA consistent with the transactions contemplated in the COFINA Plan of Adjustment, including, without limitation, the issuance of the COFINA Bonds.

In furtherance of the efforts to cause all of the COFINA Bonds to be issued as tax exempt in accordance with Section 103 of the Code, including, without limitation, in connection with the use of custodial trusts described herein, the Government Parties agree to consult with the PSA Parties' tax counsel to consider the optimal capital structure of COFINA based on applicable law and guidance from applicable federal agencies.

Except as otherwise provided in this Term Sheet, for all purposes herein, the Oversight Board, in its sole and absolute discretion, but upon consultation with Section 103 tax counsel and the PSA Parties party to the Interpleader Action, shall determine the use and application of all Pre-FY2019 BNYM Deposits, net of amounts allocated pursuant to the provisions of Section I(A) hereof, and the COFINA FY2019 BNYM Deposits pursuant to the COFINA Plan of Adjustment in a manner that maximizes the issuance of tax-exempt COFINA Bonds; provided, however, that the parties' expectation as of the date hereof is that the Pre-FY2019 BNYM Deposits shall be applied in accordance with the priorities and approximate amounts set forth on Schedule 2 hereto; and, provided, further, that any such use and application of Pre-FY2019 BNYM Deposits shall be pro rata per each applicable series subject to such adjustments as may be desirable for administrative convenience to account for minimum bond par denominations.

**B.** **Additional Definitions:** For purposes of this Term Sheet, the following capitalized terms shall have the meanings ascribed below[1]:

Ambac Custodial Certificates: The certificate(s) or receipt(s) to be issued by the Ambac Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Ambac Custodial Trust.

Ambac Custodial Trust: The custodial trust(s) which may be formed by COFINA and/or Ambac on or prior to the COFINA Effective Date for the sole benefit of holders of Senior COFINA Bond Claims (Ambac Insured) that elect not to commute their Ambac Insurance Policies.

Ambac Insurance Policy: The existing insurance policy issued by Ambac relating to the Ambac Insured Bonds, together with all agreements and other documents related thereto.

Assured Custodial Certificates: The certificate(s) or receipt(s) that may be issued by the Assured Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the Assured Custodial Trust.

---

[1] Capitalized terms not defined herein shall have the meanings ascribed thereto in the PSA; provided, however, that, in the event of any conflict between the terms defined in the PSA and herein, the meanings set forth in this Term Sheet shall govern.

<u>Assured Custodial Trust</u>:  The custodial trust(s) which may be formed by COFINA and/or Assured on or prior to the COFINA Effective Date for the sole benefit of holders of Junior COFINA Bond Claims (Assured Insured).

<u>Assured Insurance Policies</u>:  The existing insurance policies issued by Assured relating to the Assured Insured Bonds, together with all agreements and other documents related thereto.

<u>Bond Claim</u>: A claim on account of an existing COFINA security (as reflected in the chart set forth in Recital A of the PSA) with such claim being calculated as (a) with respect to current interest bonds and convertible capital appreciation bonds that converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the outstanding principal amount of such bonds <u>plus</u> the accrued and unpaid interest thereon and (b) with respect to capital appreciation bonds and convertible capital appreciation bonds that have not converted into current interest bonds as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding, the compounded amount for such bonds, in each case, as of, up to, but not including, the filing date of the COFINA PROMESA Proceeding.

<u>COFINA Cash Available for Distribution</u>: The amount of cash available for distribution on the COFINA Effective Date comprised of the Pre-FY2019 BNYM Deposits <u>minus</u> the sum of (a) the Rounding Amount Cash <u>plus</u> (b) Section 103 Cash <u>plus</u> (c) Taxable Election Cash <u>plus</u> (d) Consummation Costs as required pursuant to Section II(O) hereof <u>plus</u> (e) the cash, if any, retained by COFINA for the operating expense account or distributed to the Commonwealth pursuant to Section I(A) hereof.

<u>COFINA Pledged Taxes</u>: The present and future revenues and collections generated by the five and one-half percent (5.5%) sales and use taxes imposed by the Commonwealth.

<u>COFINA Portion</u>: The COFINA Pledged Taxes and all rights thereto (including the right to receive the COFINA Pledged Taxes as set forth under First Dollars Funding in Section II(E)(7) hereof) in an amount up to fifty-three and sixty-five one hundredths percent (53.65%) of the PSTBA in any given FY until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms.

<u>Commonwealth Portion</u>: Collectively, an interest that is second in priority of payment, funding and collections, in all circumstances, subject and pursuant to the First Dollars Funding in Section II(E)(7) hereof, in the COFINA Pledged Taxes and all rights thereto including the right to receive (a) the residual amount of the COFINA Pledged Taxes in the amount, if any, in excess of the COFINA Portion in any given FY, and (b) all COFINA Pledged Taxes after the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms; <u>provided</u>, <u>however</u>, that, under all circumstances, the Commonwealth Portion shall exclude in its entirety the COFINA Portion, and the Commonwealth shall have no ownership interest in the COFINA Portion.  Subject to Sections II(E)(4) and II(E)(7), the Commonwealth shall have no right to receive any revenues or collections generated by the COFINA Pledged Taxes for a FY unless and until COFINA has received the COFINA Portion.  The Commonwealth shall have no right to receive Debt Service Savings in any FY unless and until all debt service payments on the COFINA Bonds and COFINA Parity Bonds required to be made or set aside in such FY, including any overdue debt service payments from all prior FYs, are made as required, as provided in Section II(E)(4) hereof.  The COFINA Portion shall not, now or hereafter, be property of the Commonwealth, and in the event of any subsequent Title III case or similar or other proceedings of the Commonwealth, in any forum, it is the express intent that it shall not be subject to the automatic stay.

<u>Debt Service Savings</u>: For each FY, the difference between principal due on COFINA Bonds and COFINA Parity Bonds prior to the issuance of COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds in the open market and principal due on COFINA Bonds and COFINA Parity Bonds that will remain outstanding after the issuance of such COFINA Parity Bonds and/or the purchase of COFINA Bonds and COFINA Parity Bonds.

<u>Insurance Policies</u>: Collectively, the Ambac Insurance Policy, the Assured Insurance Policies and the National Insurance Policies.

<u>Junior COFINA Bond Claim</u>: A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured) or a Junior COFINA Bond Claim (Taxable Election), on account of an existing First Subordinate COFINA security.

<u>Junior COFINA Bond Claim (Assured Insured)</u>: A Bond Claim on account of an existing First Subordinate COFINA security, with respect to which the repayment of principal and interest or accreted value has been insured by Assured including pursuant to a secondary market insurance policy.

<u>Junior COFINA Bond Claim (Taxable Election)</u>: A Bond Claim, other than a Junior COFINA Bond Claim (Assured Insured), on account of an existing First Subordinate COFINA security, the holder of which has affirmatively elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico Investor, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Investors for Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim, or (ii) if there is a Remainder Taxable Bond Election Amount, a Puerto Rico Institution, <u>provided</u> that if Taxable Bond Distributions are elected by Puerto Rico Institutions for Bond Claims in an aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond Claim shall be a Junior COFINA Bond Claim (Taxable Election) up to such Bond Claims' ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof shall be a Junior COFINA Bond Claim.

<u>Junior COFINA Bond Distribution</u>: A distribution of COFINA Bonds allocable to holders of Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured) and Junior COFINA Bond Claims (Taxable Election) (it being understood that such holders are recipients of distributions in Classes 5-7) equal to fifty-six and three hundred ninety-nine one thousandths percent (56.399%) of such holders' aggregate Bond Claims, plus any incremental value distributable as a result of an increase in COFINA Cash Available for Distribution.

<u>Maximum Taxable Bond Election Amount</u>: One Billion Dollars ($1,000,000,000.00), <u>provided</u> that if the amount of Taxable COFINA Bonds exceeds the aggregate amount of COFINA Bonds distributable in respect of Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) each as calculated, for purposes of this proviso, assuming a Maximum Taxable Bond Election Amount of One Billion Dollars ($1,000,000,000.00), the Maximum Taxable Bond Election Amount shall increase by the amount necessary to provide for the distribution of all Taxable COFINA Bonds pursuant to Taxable Bond Distributions, <u>provided</u> <u>further</u> that in no event shall the Maximum Taxable Bond Election Amount exceed Three Billion Dollars ($3,000,000,000.00).

<u>National Custodial Certificates</u>: The certificate(s) or receipt(s) to be issued by the National Custodial Trust to beneficial holders of COFINA Bonds which are deposited into the National Custodial Trust.

6

National Custodial Trust:  The custodial trust(s) which may be formed, on or prior to the COFINA Effective Date, by or on behalf of and for the sole benefit of the holders of Senior COFINA Bond Claims (National Insured) that elect not to commute their National Insurance Policies.

National Insurance Policies:  The existing insurance policies initially issued by Financial Guaranty Insurance Company or MBIA Insurance Corporation and novated to National and relating to the National Insured Bonds, as defined below, together with all agreements and other documents related thereto.

Puerto Rico Institution:  A holder, other than a Puerto Rico Investor, that is domiciled in Puerto Rico.

Puerto Rico Investor:  A holder that is, or that is wholly owned by or the sole beneficial owner of which is, a natural person(s) and resident(s) of the Commonwealth of Puerto Rico for purposes of payment of Puerto Rico personal income taxes (as determined by the Oversight Board, in its sole and absolute discretion).

Remainder Taxable Bond Election Amount:  An amount equal to the Maximum Taxable Bond Election Amount minus the aggregate amount of Bond Claims held by Puerto Rico Investors and for which such holders have affirmatively elected a Taxable Bond Distribution.

Rounding Amount Cash:  The amount of cash necessary, up to a maximum aggregate amount of Twenty Five Million Dollars ($25,000,000.00), for distribution to holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) in the form of rounding amounts to ensure that all holders of Senior COFINA Bond Claims, Senior COFINA Bond Claims (Taxable Election), Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) and Junior COFINA Bond Claims, Junior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Assured Insured) receive their pro rata share of CIBs, as defined below, in the minimum bond par denomination of One Thousand Dollars ($1,000.00) per COFINA Bond.

Section 103 Cash:  The amount of cash deemed necessary by the Oversight Board, and after consultation with Section 103 tax counsel and the PSA Parties, which amount of cash (i) shall be no less than the interest accrued on the existing COFINA securities as of, and including May 4, 2017 and (b) shall not exceed the amount of Pre-FY2019 BNYM Deposits minus the amount of Rounding Amount Cash, to be applied to reduce the amount and number of Taxable COFINA Bonds solely to the extent that the COFINA Bonds cannot all be issued as tax-exempt bonds under applicable federal law.

Senior COFINA Bond Claim:  A Bond Claim, other than a Senior COFINA Bond Claim (Ambac Insured), a Senior COFINA Bond Claim (National Insured) or a Senior COFINA Bond Claim (Taxable Election), on account of an existing senior COFINA security.

Senior COFINA Bond Claim (Ambac Insured):  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by Ambac.

Senior COFINA Bond Claim (National Insured):  A Bond Claim on account of an existing senior COFINA security, the repayment of which has been insured by National.

Senior COFINA Bond Claim (Taxable Election): A Bond Claim, other than a Senior
COFINA Bond Claim (Ambac Insured) or a Senior COFINA Bond Claim (National Insured),
on account of an existing senior COFINA security, the holder of which has affirmatively
elected to receive a Taxable Bond Distribution and the holder of which (i) is a Puerto Rico
Investor, provided that if Taxable Bond Distributions are elected by Puerto Rico Investors
holding Bond Claims in an aggregate amount in excess of the Maximum Taxable Bond
Election Amount, such Bond Claim shall be a Senior COFINA Bond Claim (Taxable
Election) up to such Bond Claim's ratable share of the Maximum Taxable Bond Election
Amount and the remainder thereof shall be a Senior COFINA Bond Claim, or (ii) if there is a
Remainder Taxable Bond Election Amount, a Puerto Rico Institution, provided that if
Taxable Bond Distributions are elected by Puerto Rico Institutions holding Bond Claims in an
aggregate amount in excess of the Remainder Taxable Bond Election Amount, such Bond
Claim shall be a Senior COFINA Bond Claim (Taxable Election) up to such Bond Claims'
ratable share of the Remainder Taxable Bond Election Amount and the remainder thereof
shall be a Senior COFINA Bond Claim.

Senior COFINA Bond Distribution: A distribution of COFINA Bonds and cash, in the
aggregate, allocable to holders of Senior COFINA Bond Claims, Senior COFINA Bond
Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured) and Senior
COFINA Bond Claims (Taxable Election) (it being understood that such holders are
recipients of distributions in Classes 1-4) equal to ninety-three percent (93%) of such holders'
aggregate Bond Claims, plus any incremental value distributable as a result of an increase in
COFINA Cash Available for Distribution.

Taxable Bond Distribution: A Senior Taxable Bond Distribution (as defined in Section
II(D)(4)) or a Junior Taxable Bond Distribution (as defined in Section II(D)(7)), as
applicable.

Taxable COFINA Bonds: COFINA Bonds in an aggregate amount deemed necessary by the
Oversight Board, after consultation with Section 103 tax counsel and the PSA Parties, to be
issued as tax exempt under Puerto Rico law, but taxable in accordance with Section 103 of
the Internal Revenue Code (the "Code"), which COFINA Bonds shall be issued as CIBs with
an interest rate of four and fifty-five one hundredths percent (4.55%) and a maturity date of
7/1/2038.

Taxable Election Cash:  The amount of cash equal to two percent (2.0%) (net of any
administrative costs of the election process related to the applicable Bond Claims) of the
aggregate amount of all Senior COFINA Bond Claims (Taxable Election) and Junior
COFINA Bond Claims (Taxable Election), which amount of cash shall not exceed Sixty
Million Dollars ($60,000,000.00).

C.    **Classes of Claims**: The COFINA Plan of Adjustment shall have the following classes:

1.    Class 1:  Senior COFINA Bond Claims

2.    Class 2:  Senior COFINA Bond Claims (Ambac Insured)

3.    Class 3:  Senior COFINA Bond Claims (National Insured)

4.    Class 4:  Senior COFINA Bond Claims (Taxable Election)

5.    Class 5:  Junior COFINA Bond Claims

6.    Class 6:  Junior COFINA Bond Claims (Assured Insured)

7. Class 7: Junior COFINA Bond Claims (Taxable Election)

8. Class 8: GS Derivative Claim

9. Class 9: General Unsecured Claims

Notwithstanding the foregoing classification of claims, the Oversight Board reserves the right to amend or modify such classification, including, without limitation, supplement such classification with additional classes or modify the treatment afforded holders in Classes 8 and 9 as set forth in Section II(D) hereof, provided that such amendment or modification does not adversely impact the treatment afforded holders of claims in Classes 1 through 7 above.

**D.**     **Treatment of Claims**: Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the effective date of the COFINA Plan of Adjustment (the "<u>COFINA Effective Date</u>"), COFINA claims shall be treated as follows:

1. Class 1: Each holder of a Senior COFINA Bond Claim shall be entitled to receive its pro rata share of the Senior COFINA Bond Distribution, comprised of (a) Section 103 Cash, if applicable, (b) COFINA Cash Available for Distribution, (c) COFINA Bonds and (d) Rounding Amount Cash, if necessary.

2. Class 2: Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (Ambac Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejections to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, <u>plus</u> (b) consideration, distributable by or at the direction of Ambac, in accordance with the provisions of Section II(F)(1) hereof, in full and complete satisfaction, release and discharge of any further obligation of Ambac with respect, to its insurance policy and such holder's agreement to commute Ambac's insurance policy relating to such holders' Senior COFINA Bond Claim (Ambac Insured), or (2) the Ambac Custodial Certificates referred to in Section II(G)(1) hereof; <u>provided, however</u>, that, in the event that a holder of a Senior COFINA Bond Claim (Ambac Insured) (a) fails to timely return its ballot /election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute Ambac's obligations and the Ambac Insurance Policy and to receive distributions in accordance with the provisions of subsection (1) above. Subject to the approval of the Title III Court, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 2 claims shall be made by COFINA to Ambac and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (Ambac Insured). Ambac reserves the right to formulate alternative election or implementation options with respect to the Senior COFINA Bond Claims (Ambac Insured), including deemed acceleration of the existing COFINA securities insured by Ambac on the COFINA Effective Date, but any such alternative implementation option (i) must be proposed at or prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment and (ii) shall not, and shall not be deemed to, modify, amend, or cancel, or otherwise affect in any way, any commutation agreements or arrangements agreed to or entered into prior to, on or after the effective date of the PSA between Ambac, on the one hand and any

9

holders of any Senior COFINA Bond Claims (Ambac Insured), on the other hand, in connection with the Ambac Insurance Policy.

3.  Class 3:  Subject to the provisions of Sections II(F) and (G) hereof, each holder of a Senior COFINA Bond Claim (National Insured) shall have the option to elect on the ballot/election form distributed in connection with the solicitation of acceptances and rejection to the COFINA Plan of Adjustment to receive its pro rata share of (1) (a) the Senior COFINA Bond Distribution comprised of (i) Section 103 Cash, if applicable, (ii) COFINA Cash Available for Distribution, (iii) COFINA Bonds and (iv) Rounding Amount Cash, if necessary, plus (b) consideration, distributable by or at the direction of National, in accordance with the provisions of Section II(F)(2) hereof, in full and complete satisfaction, release and discharge of any further obligation of National with respect to the National Insurance Policies and such holder's agreement to commute National Insurance Policies relating to such holder's Senior COFINA Bond Claim (National Insured), or (2) the National Custodial Certificates referred to in Section II(G)(2) hereof representing an interest in the National Trust Assets, as defined below; provided, however, that, in the event that a holder of a Senior COFINA Bond Claim (National Insured) (a) fails to timely return its ballot/election form, (b) fails to elect a form of distribution or (c) elects multiple options on such ballot/election form, then such holder shall be deemed to have elected to release, discharge and commute National's obligations and the National Insurance Policies and to receive distributions in accordance with subsection (1) above; and, provided, further, that, at any time prior to the hearing to consider the adequacy of the information contained in the disclosure statement filed in connection with the COFINA Plan of Adjustment, National may elect an alternative treatment option for Senior COFINA Bond Claims (National Insured), pursuant to which, in its sole and absolute discretion, and subject to the consent of the Oversight Board, which consent shall not be unreasonably withheld, on the COFINA Effective Date, the existing COFINA securities insured by National shall be paid off, in full, at an acceleration price of one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, as follows: the COFINA Bonds to be issued to holders of Senior COFINA Bond Claims (National Insured) shall be underwritten and sold into the market, the proceeds of which, together with any cash portion of the Senior COFINA Bond Distribution that would otherwise be allocated for payment of Senior COFINA Bond Claims (National Insured), shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Compounded Amount (as defined in the Bond Resolutions) of the National Insured Bonds, as of the COFINA Effective Date, with any deficiency in such amounts being paid by National in full, in cash, on the COFINA Effective Date (the "National Election").  Subject to the order approving the disclosure statement filed in connection with the COFINA Plan of Adjustment, (y) the solicitation of acceptances and rejections to the COFINA Plan of Adjustment by holders of Class 3 claims shall be made by COFINA to National and (z) the elections described in subsections (1) and (2) above regarding the COFINA Bonds shall be made by the holders of Senior COFINA Bond Claims (National Insured).

4.  Class 4: Each holder of a Senior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Senior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary, and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 4, a "Senior Taxable Bond Distribution").

10

5. **Class 5:** Each holder of a Junior COFINA Bond Claim shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary.

6. **Class 6:** Subject to the provisions of Section II(O) hereof, each holder of a Junior COFINA Bond Claim (Assured Insured) shall be entitled to receive its pro rata share of the Junior COFINA Bond Distribution comprised of (a) Section 103 Cash, if applicable, (b) COFINA Bonds and (c) Rounding Amount Cash, if necessary; provided, however, that, notwithstanding the foregoing, at the election of Assured (the "Assured Election"), in its sole and absolute discretion, on the COFINA Effective Date, the existing COFINA securities insured by Assured (including insurance issued in the secondary market) shall be paid off, in full, at an acceleration price of par plus accrued interest or compounded amount as of the COFINA Effective Date, (1) from the Section 103 Cash and Rounding Amount Cash, if any, which in each case is allocable to holders to Junior COFINA Bond Claims (Assured Insured), and (2) otherwise as follows: the COFINA Bonds allocable to holders of Junior COFINA Bond Claims (Assured Insured) shall be (i) wrapped by a new insurance policy issued by Assured, (ii) underwritten and (iii) sold into the market, the proceeds of which shall be used to pay, in cash, on the COFINA Effective Date, one hundred percent (100%) of the Junior COFINA Bond Claims (Assured Insured), with any deficiency in such amounts being paid by Assured in accordance with the insurance policies wrapping the existing securities underlying the Junior COFINA Bond Claims (Assured Insured). The principal amount, maturities and coupons of the bonds to be insured by Assured (the "Assured New Bonds") will be determined by Assured in consultation with Bank of America Merrill Lynch, as underwriter for the Assured New Bonds, provided that the debt service on the Assured New Bonds due in any year shall not be greater than the debt service that would be due if such Assured New Bonds were issued as COFINA Bonds not insured by Assured or any other insurer (although the Assured New Bonds may mature later than the COFINA Bonds, but in no event later than the Commonwealth's FY2058). All other terms regarding the underwriting of the Assured New Bonds shall be subject to the approval of Assured.

7. **Class 7:** Each holder of a Junior COFINA Bond Claim (Taxable Election) shall be entitled to receive (a) its pro rata share of the Junior COFINA Bond Distribution comprised of (i) Taxable COFINA Bonds and, if (and to the extent that) a balance remains after all Taxable COFINA Bonds are distributed, tax-exempt COFINA Bonds and (ii) Rounding Amount Cash, if necessary and (b) its pro rata share of the Taxable Election Cash (collectively, the distributions under this Class 7, a "Junior Taxable Bond Distribution").

8. **Class 8:** The holder of the GS Derivative Claim shall to the extent that the termination value of the GS Derivative Claim is (a) greater than the amount of the collateral in such holder's possession, be entitled to retain such collateral and with respect to the balance of the GS Derivative Claim, and (1) to the extent that rejection damages associated with such GS Derivative Claim is a Parity Obligation (as defined in the Bond Resolutions), such holder's pro rata share of the Senior COFINA Bond Distribution, comprised of (i) COFINA Cash Available for Distribution, (ii) COFINA Bonds and (iii) Rounding Amount Cash, if necessary, and (2) to the extent that rejection damages associated with such GS Derivative Claim is a not a Parity Obligation (as defined in the Bond Resolutions), such holder shall not receive a distribution pursuant to the COFINA Plan of Adjustment, and (b) is less than the amount of collateral in such holder's possession, the holder of the GS Derivative Claim shall liquidate such collateral in full and complete satisfaction of the GS Derivative Claim and return the balance of such collateral value to COFINA.

11

9. Class 9: The claims within Class 9 shall not receive a distribution pursuant to the COFINA Plan of Adjustment; provided, however, that, notwithstanding the foregoing, in the event that Class 9 votes to accept the COFINA Plan of Adjustment, each holder of a COFINA General Unsecured Claim shall be entitled to receive its pro rata share of One Hundred Thousand Dollars ($100,000.00).

E. **Terms of COFINA Bonds**

*Issuance of COFINA Bonds*

Subject to the conditions to effectiveness of the COFINA Plan of Adjustment, including, without limitation, those listed under "Conditions to Effective Date of COFINA Plan of Adjustment" below, on the COFINA Effective Date, COFINA, shall issue the COFINA Bonds comprised of (i) four (4) series of Current Interest Bonds ("CIBs") and (ii) one series of Capital Appreciation Bonds ("CABs"). The maturities, interest rates and amortization schedules for COFINA Bonds are annexed hereto as Exhibit "A". All debt service on COFINA Bonds and COFINA Parity Bonds which is not paid when due, whether at or prior to final scheduled maturity, shall remain due and outstanding until paid in full and shall be paid, with accrued interest on the unpaid amount, first, in each FY from the balance, if any, of the COFINA Portion remaining after the payment of debt service on the COFINA Bonds and COFINA Parity Bonds then due and payable in such FY; second, in each FY, from the Debt Service Savings, if any; and third, to the extent not paid pursuant to first or second, following the final scheduled maturity of all COFINA Bonds and COFINA Parity Bonds. Interest shall accrue on such overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until the applicable COFINA Bonds or COFINA Parity Bonds are paid or satisfied in full in accordance with their terms. The Government Parties shall use their commercially reasonable best efforts to obtain ratings on the COFINA Bonds, including promptly responding in good faith to documentary or other requests, as soon as reasonably practicable as determined solely by the Government Parties, following consultation with a designee of the PSA Parties, including based upon the Government Parties' judgment with respect to expected benefits. After the Government Parties determine which rating agencies to apply for ratings from, the Government Parties shall use their commercially reasonable best efforts to obtain the best possible ratings.

1. **Terms of the COFINA Bonds**

*CIBs*: Subject to any adjustments provided for herein, the CIBs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: (a) Seven Hundred Eighty-Two Million Nine Hundred Fifteen Thousand Dollars ($782,915,000.00), four and thirty-five one-hundredths percent (4.35%), and 7/1/2028; (b) One Billion Ninety-One Million Four Hundred Sixty Thousand Dollars ($1,091,460,000.00), four and five-tenths percent (4.5%), and 7/1/2032; (c) Two Billion Nine Hundred Ninety-Seven Million Two Hundred Forty-Five Thousand Dollars ($ 2,997,245,000.00), four and fifty-five one hundredths percent (4.55%), and 7/1/2038; and (d) Four Billion Seven Hundred Forty-Four Million Seven Hundred Forty-Five Thousand Dollars ($4,744,745,000.00), four and six-tenths percent (4.6%), and 7/1/2044.

*CABs:* Subject to any adjustments provided for herein, the CABs shall have the original principal amount, interest rate and maturity date, except as provided for in Section II(D)(6) hereof, as follows: Two Billion Four Hundred Four Million One Hundred Ninety-Two Thousand Five Hundred Ninety-Nine Dollars and Ninety Cents ($2,404,192,599.90), five and one-half percent (5.5%), and 7/1/2058.

Neither CIBs nor CABs shall carry any default rate of interest, provided that interest shall accrue on all overdue debt service at the regular coupon rate or accretion rate, as applicable, compounding semiannually, until paid or satisfied in full in accordance with their terms.

12

2.    **Collateral for Repayment of COFINA Bonds**

Subject to the provisions of Section II(E)(10), entitled <u>Substitution of Collateral</u>, repayment of the COFINA Bonds and COFINA Parity Bonds from the COFINA Portion shall be secured by a statutory first lien on the COFINA Pledged Taxes. Such lien shall (i) remain in effect and (ii) be closed until, in each case, the COFINA Bonds and the COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms. Such statutory lien will be incorporated in the legislation described in Section II(M) hereof and be judicially confirmed and the COFINA Bonds shall be judicially determined to be legal, valid, binding and enforceable obligations of COFINA by the Title III Court.

3.    **Deemed Issuance Date**

Notwithstanding the timing of the COFINA Effective Date, interest on the COFINA Bonds shall commence to accrue or accrete, as the case may be, as of August 1, 2018, which date shall be designated as the dated date of the COFINA Bonds. COFINA FY2019 BNYM Deposits shall be deposited into the debt service fund established for the benefit of holders of COFINA Bonds in the new COFINA bond resolution.

4.    **Additional Bonds Test for COFINA Bonds**

Except with respect to the issuance of refinancing securities on the terms discussed herein, COFINA may not issue any securities on a *pari passu* or higher priority basis than the COFINA Bonds issued on the COFINA Effective Date. Notwithstanding the foregoing, COFINA may issue additional refunding or refinancing securities on a *pari passu* basis with the COFINA Bonds issued on the COFINA Effective Date (collectively, the "<u>COFINA Parity Bonds</u>") for the purpose of refinancing, in whole or in part, COFINA Bonds or COFINA Parity Bonds provided, that (a) notwithstanding the terms of such COFINA Parity Bonds, COFINA shall not be entitled to an increase of the COFINA Portion; (b) the principal and interest payment dates on the COFINA Parity Bonds shall be the same principal and interest payments dates on the COFINA Bonds; (c) the final maturity date of the COFINA Parity Bonds shall not be later than the original scheduled final maturity date of the COFINA Bonds; and (d) upon the issuance of any COFINA Parity Bonds:

(i)    annual debt service due in the then-current and each future FY on all COFINA Bonds and COFINA Parity Bonds outstanding after the issuance of the COFINA Parity Bonds shall be equal to or less than the annual debt service due in the then-current and each future fiscal year on all COFINA Bonds and COFINA Parity Bonds outstanding prior to such issuance;

(ii)    as set forth in the new COFINA bond resolution, Debt Service Savings shall only be realized in the same FYs in which principal of COFINA Bond and COFINA Parity Bonds was refunded and/or purchased;

(iii)    Debt Service Savings in any FY shall be applied first, to the repayment of principal and interest on COFINA Bonds or COFINA Parity Bonds unpaid from any prior FY; and second, at the option of COFINA, (x) to purchase COFINA Bonds and COFINA Parity Bonds in the open market (subject to the limitation in subsection (ii) above), (y) to pay operating expenses of COFINA or (z) transfer such savings to the Commonwealth; and

(iv)    any Debt Service Savings released to the Commonwealth as set forth in subsection (iii) above shall be available for any lawful purpose of the Commonwealth.

Subject to compliance with the provisions of the additional bonds test ("<u>ABT</u>") set forth below, additional bonds (the "<u>Subordinated Lien Bonds</u>") may be issued by COFINA for the benefit of, and with the consent of, the Commonwealth and for any lawful purpose of the Commonwealth, provided that repayment of such additional bonds shall be secured by a second lien that is subordinated in all

13

respects, including, without limitation, in respect of payment, funding and remedies to the COFINA Bonds and COFINA Parity Bonds, with repayment of Subordinated Lien Bonds being secured by a subordinated second or more junior lien on the COFINA Pledged Taxes, provided that, notwithstanding anything contained in this Term Sheet to the contrary, repayment of the Subordinated Lien Bonds shall not be payable from the COFINA Portion. COFINA may issue such Subordinated Lien Bonds provided that, prior to the issuance thereof, the Commonwealth and COFINA shall deliver a jointly executed certificate to the COFINA bond trustee certifying that the following conditions are each satisfied: (a) (1) the projected COFINA Pledged Taxes ((i) which, in the event that Subordinated Lien Bonds are being issued prior to FY2024, are calculated assuming the preceding FY's collection of the COFINA Pledged Taxes grow annually at the "sales and use tax" growth rates set forth for those subsequent years in the Commonwealth's certified fiscal plan, dated April 18, 2018, or (ii) in the event that Subordinated Lien Bonds are being issued during FY2024 or thereafter, are calculated assuming that preceding fiscal year's collection of the COFINA Pledged Taxes grow thereafter at a rate equal to the average annual "sales and use tax" growth rate for the preceding five (5) fiscal years)) equals or exceeds (2) one and one-half times (1.5x), in any succeeding fiscal year, of the annual aggregate debt service due on the COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); (b) the preceding fiscal year's collections from the COFINA Pledged Taxes is equal to or greater than one and one-tenth times (1.10x) coverage of the maximum annual aggregate debt service due in any succeeding fiscal year on all COFINA Bonds, COFINA Parity Bonds and Subordinated Lien Bonds to remain outstanding after the issuance of such Subordinated Lien Bonds (including the Subordinated Lien Bonds to be issued); and (c) the Subordinated Lien Bonds have a maturity not later than FY2058; provided, however, that, subsequent to June 30, 2028, and subject to compliance with the foregoing ABT, final maturity beyond FY2058 shall be permissible for future Subordinated Lien Bonds.

5. **Call Provisions**

The COFINA Bonds shall be callable, in whole or in part, in any order of maturity, at par plus accrued interest thereon or accreted value, as applicable, upon thirty (30) days prior written notice as follows:

| | |
|---|---|
| 2028 CIBS: Non-Call | |
| 2032 CIBS: Par Call Commencing 2025 (7 year call) | |
| 2038 CIBS: Par Call Commencing 2028 (10 year call) | |
| 2044 CIBS: Par Call Commencing 2028 (10 year call) | |
| 2058 CABS: Call Commencing 2028 at the following call prices: | |

| Year | Price |
|---|---|
| 2028-2032 | 107.5% of Accreted Value |
| 2033-2037 | 105% of Accreted Value |
| 2038-2042 | 103% of Accreted Value |
| 2043-2058 | 100% of Accreted Value |

If less than all of the COFINA Bonds of a particular series are called for prior redemption, COFINA will select the maturity or maturities of such series of the COFINA Bonds to be redeemed, and DTC, on behalf of the trustee, will select the COFINA Bonds within the same maturity of such series to be redeemed by means of a random lottery.

6. **Debt Service Reserve Fund**

The COFINA Bonds shall not have a debt service reserve fund.

7. **First Dollars Funding**

Until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, and subsequent to the funding of reasonable and necessary COFINA operating expenses, including, without limitation, COFINA board member fees and expenses, the COFINA Portion shall be funded annually from "first dollars" collected from the COFINA Pledged Taxes. From and after FY2024, and solely in the event that (a) for any date of determination at which time the Oversight Board or any successor to its budgetary function is in existence, (1) the prior and then-current FY budgets are balanced, as determined by the Oversight Board and (2) the Commonwealth is current on all continuing disclosure requirements relating to the public disclosure of its audited financial statements, (b) quarterly bucketing of twenty-five percent (25%) of the then-current FY's COFINA Portion is shown to be necessary to avoid intra-FY TRANs borrowing and (c) collection of prior fiscal year COFINA Pledged Taxes provided a two <u>times</u> (2x) coverage of the COFINA Portion, then, in each quarter, until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, (x) the "first dollars" collected from the COFINA Pledged Taxes up to twenty-five percent (25%) of the then-current FY's COFINA Portion shall be deposited into the "Debt Service Fund" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds and (y) thereafter, the remaining quarterly collection from the COFINA Pledged Taxes shall be for the benefit of, and be paid to, the trustee for any Subordinated Lien Bonds issued by COFINA and remaining outstanding up to twenty-five percent (25%) of the yearly scheduled debt service due on such bonds, and (z) the balance thereof, if any, shall be paid to the Commonwealth for the balance of such fiscal quarter; <u>provided</u>, <u>however</u>, that, in any quarter in which there is a shortfall in the amounts required to be deposited by the preceding clause (x), then such shortfall shall be added to the amount required to be paid in accordance with clause (x) in the following quarter until the entire amount of the cumulative shortfall has been deposited into the "<u>Debt Service Fund</u>" held by the trustee for the benefit and payment of debt service with respect to the COFINA Bonds and the COFINA Parity Bonds; and, <u>provided</u>, <u>further</u>, that, in any quarter in which there is a shortfall in the amount required to be deposited by the preceding clause (y), then such shortfall shall be added to the amount required to be paid in accordance with clause (y) in the following quarter until the entire amount of cumulative shortfall has been paid to the trustee for any Subordinated Lien Bonds issued by COFINA and which remain outstanding.

### 8. Rights of Acceleration

The COFINA Bonds, the COFINA Parity Bonds and any Subordinated Lien Bonds shall not have rights of acceleration.

### 9. Covenants

#### a. *Sales and Use Covenant*

Subject to the terms and provisions of Section II(E)(10) hereof, entitled <u>Substitution of Collateral</u>, the Commonwealth shall covenant for the benefit of all initial and subsequent holders of the COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the rate of the COFINA Pledged Taxes from which the PSTBA is derived shall not be reduced to a rate less than five and one-half percent (5.5%) unless, on each such occasion prior to such reduction, at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence and rating the COFINA Bonds: S&P Global Ratings ("S&P"), Moody's Investor Service, Inc. ("Moody's"), Fitch Ratings ("Fitch") and Kroll Bond Rating Agency Inc. ("Kroll"), or their respective successors, with one (1) of such organizations being S&P or Moody's, or its respective successor, confirm that ratings will not be downgraded and (without regard to bond insurance or other third party credit enhancement) will be rated at least A2/A category or higher following such reduction; <u>provided</u>, <u>however</u>, that, notwithstanding the foregoing, until all obligations with respect to the COFINA Bonds and any COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms, if the rate of

15

the COFINA Pledged Taxes is reduced below three percent (3%), then such reduction shall constitute a substitution of collateral and shall be subject to the terms and provisions of Section II(E)(10) hereof, entitled <u>Substitution of Collateral</u>.

b.    ***Non-Impairment Covenant***

The Commonwealth shall covenant for the benefit of all initial and subsequent holders of COFINA Bonds and all COFINA Parity Bonds, that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, the Commonwealth will take no action that would (1) impair COFINA's right to receive the COFINA Portion, (2) limit or alter the rights vested in COFINA in accordance with the COFINA Plan of Adjustment and the Confirmation Order, as defined below, to fulfill the terms of any agreements with the holders of COFINA Bonds and all COFINA Parity Bonds, (3) materially adversely impair the collection of COFINA Pledged Taxes in any FY, or (4) impair the rights and remedies of the holders of the COFINA Bonds or any COFINA Parity Bonds or the collateral security thereof.

c.    ***Tax-Exemption Covenant***

COFINA shall covenant for the benefit of all initial and subsequent holders of tax-exempt COFINA Bonds and all tax-exempt COFINA Parity Bonds that, until all obligations with respect thereto have been paid or satisfied in full in accordance with their terms, COFINA will do and perform all acts and things permitted by law and reasonably necessary or desirable to assure that interest paid to the holders of any tax-exempt COFINA Bonds or tax-exempt COFINA Parity Bonds shall be and remain excludable from gross income for federal income tax purposes.

d.    ***Rating Agency Covenant***

In connection with a Substitution of Collateral pursuant to the provisions of Section II(E)(10) hereof, COFINA shall use its reasonable best efforts and work in good faith to obtain the best rating possible on the outstanding COFINA Bonds, including, but not limited to responding to requests for documents.

**10.    Substitution of Collateral**

Notwithstanding anything contained herein to the contrary, the Commonwealth may enact legislation that permits a Commonwealth revenue stream to replace the COFINA Pledged Taxes (the "<u>New Collateral</u>", which, for the avoidance of doubt, shall include any substitution of already substituted New Collateral) as security for the repayment of the COFINA Bonds only upon, and on each such occasion, satisfaction of the following conditions: (a) such New Collateral is all or a portion of a tax of general applicability throughout Puerto Rico that is being enacted in full substitution of the then-existing island-wide sales and use tax or otherwise constitutes like or comparable security for the COFINA Bonds and COFINA Parity Bonds and such legislation provides (i) for the irrevocable transfer of, including ownership of, such New Collateral to COFINA, (ii) for an automatic mandatory statutory lien on such New Collateral in favor of holders of COFINA Bonds and COFINA Parity Bonds, and (iii) that, following such transfer, such New Collateral is not, and shall not constitute, "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution, and is otherwise owned by COFINA in the same manner and to the same extent as the COFINA Portion, (b) upon substitution of the New Collateral, that rating confirmations are received from at least two (2) of the following four (4) nationally recognized statistical rating organizations then in existence: S&P, Moody's, Fitch and Kroll, with one (1) of such organizations being either S&P or Moody's, prior to such collateral substitution confirming that ratings for all COFINA Bonds and COFINA Parity Bonds (without regard to bond insurance or other third party credit enhancement) will not be downgraded and will be at least A2/A category or higher following such collateral substitution, (c) the Commonwealth shall continue to provide the Non-Impairment Covenant with

16

respect to such New Collateral and (d) such other documents as may be required pursuant to applicable law and bond resolutions.

## F.   Insurance Contribution

### 1.   Ambac

In consideration for the releases to be given to Ambac, and in accordance with Section II(D)(2) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from Ambac in an amount, in Ambac's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (Ambac Insured), which amount, together with the Senior COFINA Bond Distribution, may not, on an aggregate basis, provide full accreted value of such bonds, and the beneficial holder thereof shall have no other or further rights with respect to the Ambac Insurance Policies, the Ambac Custodial Trust or the Ambac Custodial Certificates. The provisions set forth in this Section II(F)(1) apply only to Senior COFINA Bond Claims (Ambac Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market. A holder of a Senior COFINA Bond Claim (Ambac Insured) that does not validly elect to receive Ambac Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

### 2.   National

In consideration for the releases to be given to National, and in accordance with Section II(D)(3) above, on the COFINA Effective Date, a beneficial holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall receive (in addition to the Senior COFINA Bond Distribution) consideration from National in an amount, in National's sole and absolute discretion, set forth in the COFINA Plan of Adjustment with respect to a Senior COFINA Bond Claim (National Insured), and the beneficial holder thereof shall have no other or further rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates. The provisions set forth in this Section II(F)(2) apply only to Senior COFINA Bond Claims (National Insured) insured in connection with the issuance of the corresponding indebtedness and not for any claims where the holder thereof or its predecessor in interest otherwise purchased or acquired insurance on the secondary market. A holder of a Senior COFINA Bond Claim (National Insured) that does not validly elect to receive National Custodial Certificates shall have, on or after the COFINA Effective Date, its existing COFINA securities cancelled, transferred, or otherwise disposed of, in each case, in accordance with the provisions of the COFINA Plan of Adjustment.

For the avoidance of doubt, Ambac and National shall be permitted to structure their respective commutation payments in different amounts and means.

The terms and provisions regarding commutation in accordance with the provisions of this Section II(F) shall be included in the COFINA Plan of Adjustment and the Confirmation Order and shall be in form and substance acceptable to Ambac and National, as the case may be.

## G.   Custodial Trusts

### 1.   Ambac Custodial Trust

On or prior to the COFINA Effective Date, COFINA and/or Ambac, together with an entity appointed by COFINA and/or Ambac to serve as trustee, shall form the Ambac Custodial Trust for the sole benefit of beneficial holders of existing securities insured by Ambac (the "Ambac Insured Bonds") that validly elect to receive the Ambac Custodial Certificates in accordance with the approved solicitation procedures.  On the COFINA Effective Date, the following shall be deposited into the Ambac Custodial Trust: (1) the Ambac Insured Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured), (2) the COFINA Bonds allocable to such electing holder of a Senior COFINA Bond Claim (Ambac Insured) and (3) the Ambac Insurance Policy (collectively, with the Ambac Insured Bonds and the COFINA Bonds, the "Ambac Trust Assets").  Notwithstanding the deposit therein, the Ambac Insured Bonds shall not be cancelled, unless otherwise elected by Ambac prior to the COFINA Effective Date, and all rights and remedies under and in accordance with Ambac Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Ambac Insurance Policy shall be preserved and remain in full force and effect.  Upon deposit of the Ambac Trust Assets, the trustee shall issue one or more series of Ambac Custodial Certificates to the beneficial holders of the COFINA Bonds deposited into the Ambac Custodial Trust on a pro rata basis.

The Ambac Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Ambac Custodial Trust, which distribution shall reduce the obligation under the Ambac Insurance Policy.  Documentation related to the Ambac Custodial Trust shall, in Ambac's sole discretion, include, among other terms, provisions relating to the corporate governance thereof and permitting Ambac to purchase any Ambac Trust Assets in any sale thereof and use such proceeds to pay down the Ambac Custodial Certificates and reduce Ambac's obligations under the Ambac Insurance Policy.  The Ambac Custodial Trust shall permit Ambac to enter into private commutation arrangements on and after the COFINA Effective Date.  Documentation related to the Ambac Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Ambac and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (Ambac Insured) agrees to commute the Ambac Insurance Policy on or prior to the COFINA Effective Date, such holder shall receive a distribution from Ambac and the holder shall have no rights with respect to the Ambac Insurance Policy, the Ambac Custodial Trust or the Ambac Custodial Certificates.

### 2. National Custodial Trust

In the event that National does not make the National Election, on or prior to the COFINA Effective Date, the National Custodial Trust shall be formed by or on behalf of, and for the sole benefit of beneficial holders of, existing COFINA securities insured by the National Insurance Policies (the "National Insured Bonds"), that (i) elect to receive National Custodial Certificates on the ballot/election form distributed in connection with the solicitation of acceptances and rejections of the COFINA Plan of Adjustment and (ii) have not otherwise agreed to commute the National Insurance Policies on or prior to the COFINA Effective Date.  The trustee of the National Custodial Trust shall be an entity that is a nationally recognized U.S. domiciled financial institution and fiduciary regularly acting as trustee in the municipal finance market.  On the COFINA Effective Date, the following shall be deposited into the National Custodial Trust: (1) the National Insured Bonds that have not been commuted, (2) other than the portion distributable to commuting holders, all of the Senior COFINA Bond Distribution in respect of Senior COFINA Bond Claims (National Insured) in accordance with the terms of Section II(D)(3) hereof, (3) the National Insurance Policies and (4) the consideration to be distributed to National in accordance with Section II(O) hereof (item numbers 1 through 4, collectively, the "National Trust Assets").  The costs, including fees and expenses and any obligation arising under this Term Sheet or the COFINA Plan of Adjustment, associated with the formation and operation of the National Custodial Trust shall be paid out of the National Trust Assets.

18

Notwithstanding the deposit therein, the National Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with National Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the National Insurance Policies shall be preserved and remain in full force and effect. Upon deposit of the National Trust Assets, on a pro rata basis, the trustee shall issue one or more series of National Custodial Certificates to the beneficial holders of Senior COFINA Bond Claims (National Insured) whose allocable shares of the Senior COFINA Bond Distribution are deposited into the National Custodial Trust.

The National Custodial Certificates shall entitle the holder thereof (the "National Certificate Holder") to its pro rata share of value in and any distribution of cash from the respective National Custodial Trust, which distribution shall (1) in all cases, occur promptly upon receipt thereof by the National Custodial Trust and (2) automatically reduce the obligation outstanding under the National Insurance Policies as of the date of such distribution to National Certificate Holders. For the avoidance of doubt, National's obligation to pay the scheduled Compounded Amount, as defined in the Bond Resolutions, of the underlying National Insured Bonds as and when due shall, in all cases, continue to compound as scheduled to the date that the trustee of the National Custodial Trust actually makes payment to the National Certificate Holders. Each series of National Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as National (i) is not in default under the National Insurance Policies and (ii) has not agreed to and has not become subject to regulatory supervision, rehabilitation or liquidation (or similar) proceedings, National (a) shall be deemed the sole holder of the COFINA Bonds in the National Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (b) may, at any time prior to dissolution of the National Custodial Trust, deliver or direct the trustee to deliver a general notice to all National Certificate Holders, through DTC or any similar means, of the intent to sell for cash all or a portion of the COFINA Bonds held in the National Custodial Trust (the "Sale Notice"). The cash proceeds of such a sale shall be promptly distributed to National Certificate Holders on a pro rata basis (the "Sale Proceeds") and, upon such distribution, shall automatically reduce the obligation outstanding under the National Insurance Policies as of the date and in the amount of such distribution to National Certificate Holders; provided, however, that each National Certificate Holder may elect (within a reasonable specified period of time to be negotiated) after delivery of the Sale Notice to receive its pro rata share of the COFINA Bonds for sale pursuant to the Sale Notice in lieu of its allocable share of the Sale Proceeds and, in accordance with such election, the obligation outstanding under the National Insurance Policies as of the date of such distribution shall be reduced automatically in an amount equal to the portion of the Sale Proceeds that would have been attributable to such COFINA Bonds if sold. Documentation related to the National Custodial Trust shall (i) be negotiated in good faith, (ii) be in form and substance acceptable to National and reasonably acceptable to the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

To the extent that a holder of a Senior COFINA Bond Claim (National Insured) agrees to commute the National Insurance Policies on or prior to the COFINA Effective Date, such holder shall receive a distribution from National and the holder thereof shall have no rights with respect to the National Insurance Policies, the National Custodial Trust or the National Custodial Certificates.

3.    **Assured Custodial Trust**

In the event that Assured does not make the Assured Election, on or prior to the COFINA Effective Date, Assured, together with an entity appointed by Assured to serve as trustee, shall form one or more substantially identical Assured Custodial Trusts, for the sole benefit of beneficial holders of existing securities insured (including insurance issued in the secondary market) by Assured (the "Assured Insured Bonds"). On the COFINA Effective Date, each holder of a Junior COFINA Bond

19

Claim (Assured Insured) shall be deemed to have deposited such claim into the Assured Custodial Trust in exchange for one or more Assured Custodial Certificates evidencing the following: (1) Assured Insured Bonds, (2) the COFINA Bonds allocable to a holder of a Junior COFINA Bond Claim (Assured Insured), (3) Assured Insurance Policies and (4) Section 103 Cash and Rounding Amount Cash, if any, allocable to such holder (collectively, the "Assured Trust Assets"). Notwithstanding the deposit therein, the Assured Insured Bonds shall not be cancelled and all rights and remedies under and in accordance with Assured Insured Bonds, the Bond Resolutions (other than with respect to the payment obligations of COFINA) and the Assured Insurance Policies shall be preserved and remain in full force and effect.

The Assured Custodial Certificates shall entitle the holder thereof to its pro rata share of value in and any distribution of cash from the Assured Custodial Trust, which distribution shall (1) occur promptly upon receipt thereof by the Assured Custodial Trust and (2) automatically reduce the obligation outstanding under the Assured Insurance Policies as of the date of such payment. Each series of Assured Custodial Certificates shall bear unique CUSIPs and shall be freely tradable and transferable through DTC. So long as Assured has not failed to make a payment when due under the applicable Insurance Policies, it shall (a) have the sole right to control the management of the Assured Trust Assets, (b) be deemed the sole holder of the COFINA Bonds deposited in the Assured Custodial Trust with respect to voting, amendment, acceleration, events of default and election and direction of rights and remedies, including, without limitation, in connection with insolvency proceedings, and (c) be fully subrogated to the rights of the holders of Assured Insured Bonds in respect of the COFINA Bonds deposited in the Assured Custodial Trust. Documentation related to the Assured Custodial Trust shall (i) be negotiated in good faith with the Oversight Board, (ii) be in form and substance acceptable to Assured and reasonably acceptable to the Oversight Board, and (iii) be included in a plan supplement submitted to the Title III Court in connection with confirmation of the COFINA Plan of Adjustment.

### 4. Costs

The Government Parties shall be held harmless by Ambac, Assured and National for any costs and all fees and expenses associated with the formation and operation of the Custodial Trusts.

### 5. Trust Terms

Notwithstanding anything contained herein to the contrary, the terms of the Ambac Custodial Trust, the National Custodial Trust and the Assured Custodial Trust may be different from each other.

## H. Conditions to the Effective Date of the COFINA Plan of Adjustment

Conditions precedent to the COFINA Effective Date will include, but not be limited to:

- Entry of (a) a court order approving the COFINA Plan of Adjustment (the "Confirmation Order") and (b) a court order approving the Settlement Motion (the "Settlement Order"), in the form reasonably acceptable to the Government Parties and the PSA Parties, pursuant to Title III of PROMESA. Without limiting the foregoing, for the express benefit of, among others, the bond trustee and the holders of COFINA Bonds, the Confirmation Order and the Settlement Order, as applicable, shall be a binding determination that, as of the COFINA Effective Date:

  1. The COFINA Bonds and the covenants by COFINA and the Commonwealth, as applicable, for the benefit of the holders of the COFINA Bonds and COFINA Parity Bonds (including the sales and use tax, non-impairment, substitution of collateral and tax-exemption covenants) constitute valid, binding, legal and enforceable obligations of COFINA and the Commonwealth, as applicable, under Puerto Rico and federal law, and the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) is the

property of COFINA, free and clear of all liens, claims, encumbrances, and other interests of creditors of COFINA, the Commonwealth, or any instrumentality of the Commonwealth (other than liens and claims afforded to holders of COFINA Bonds under the COFINA Plan of Adjustment) and shall not be "available resources" of the Commonwealth within the meaning of such term under the Puerto Rico Constitution;

2. Pursuant to the legislation referenced in Section II(M), the COFINA Bonds and COFINA Parity Bonds have been granted and are secured by a statutory first lien on the COFINA Pledged Taxes, which shall remain in full force and effect until the COFINA Bonds and COFINA Parity Bonds have been paid or satisfied in full in accordance with their terms;

3. The statutory lien on, and pledges of, COFINA Pledged Taxes, and all other provisions made to pay or secure payment of the COFINA Bonds and COFINA Parity Bonds are valid, binding, legal, and enforceable; including, without limitation, covenants not to impair such property, maintain available tax exemption and provide for the conditions regarding substitution as adequate protection for the property rights conferred under the COFINA Plan of Adjustment and the Confirmation Order;

4. The transfer of the COFINA Portion (and any substitution of collateral on the terms and conditions provided for herein) pursuant to the COFINA Plan of Adjustment is appropriate and binding and specifically enforceable against COFINA and the Commonwealth, their respective creditors and all parties in interest in accordance with the COFINA Plan of Adjustment, including, without limitation, because the transfer of the COFINA Portion created in COFINA an ownership interest in such property (and any substitution of collateral on the terms and conditions provided for herein) and is a valid provision made to pay or secure payment of the COFINA Bonds; and

5. The Confirmation Order is full, final, complete, conclusive and binding upon and shall not be subject to collateral attack or other challenge in any court or other forum by (i) COFINA, (ii) the Commonwealth, (iii) each person or entity asserting claims or other rights against COFINA, the Commonwealth or any of its other instrumentalities, including a beneficial interest (directly or indirectly, as principal, agent, counterpart, subrogee, insurer or otherwise) in respect of bonds issued by COFINA, the Commonwealth, or any of its other instrumentalities or with respect to any trustee, any collateral agent, any indenture trustee, any fiscal agent, and any bank that receives or holds funds related to such bonds, whether or not such claim or other rights of such person or entity are impaired pursuant to the COFINA Plan of Adjustment and, if impaired, whether or not such person or entity accepted the COFINA Plan of Adjustment, (iv) any other person, and (v) each of the foregoing's respective heirs, successors, assigns, trustees, executors, administrators, officers, directors, agents, representative, attorneys, beneficiaries or guardians.

- The Settlement Order shall become effective contemporaneously with the COFINA Effective Date;

- Execution and delivery of all Definitive Documents, in form and substance reasonably satisfactory to the Government Parties and the PSA Parties, and such definitive documents being in full force and effect;

- Usual and customary legal opinions for issuances of this type of outside counsel to COFINA covering matters not expressly addressed in the Confirmation Order, in form and substance reasonably acceptable to the PSA Parties, will have been delivered to the applicable trustee or other parties regarding the Definitive Documents and the COFINA Plan of Adjustment;

21

- Unless otherwise permitted or required by PROMESA or similar authority, completion of any required legislative or other governmental action required to consummate the COFINA Plan of Adjustment, including, without limitation, Commonwealth legislation and court orders, if any, required to (i) ensure that the payment obligations of COFINA cannot in the future be modified or altered without the consent of the requisite holders of COFINA Bonds as set forth in a new bond resolution for the COFINA Bonds, (ii) ensure the validity, enforceability, liens and priority of the COFINA obligations contemplated by the COFINA Plan of Adjustment and (iii) except as otherwise permitted in connection with the substitution of collateral, ensure that the COFINA Pledged Taxes not be modified or altered prior to the satisfaction of COFINA's obligations thereunder;

- The Confirmation Order shall contain provisions to support the tax-exempt treatment of distributions to National Certificate Holders from the National Custodial Trust. Such Confirmation Order provisions shall be acceptable to the Oversight Board, National and the holders of National Insured Bonds that accepted the restructuring terms proposed by the Oversight Board and AAFAF on August 7, 2018 and are party to the PSA;

- Pursuant to the Confirmation Order, the deemed acceleration of existing insured COFINA securities on the COFINA Effective Date, (i) in connection with the treatment of Junior COFINA Bond Claims (Assured Insured), (ii) if requested by Ambac, in connection with the treatment of Senior COFINA Bond Claims (Ambac Insured) and (iii) if determined to be necessary or appropriate by National, to implement the National Election; provided, however, that such deemed acceleration shall not, nor shall it be construed to, affect issues regarding "default" or acceleration which were pending prior to the COFINA Effective Date; and

- Other customary conditions to be agreed and reasonably acceptable to the Government Parties and the PSA Parties.

## I. Releases

Customary releases and exculpations (which releases and exculpations shall not include releases for claims and causes of action arising from or related to any act or omission that constitutes intentional fraud or willful misconduct) of all relevant parties and their respective parents, subsidiaries and affiliates, and each of their respective board members, directors, officers, employees and advisors will be included in the COFINA Plan of Adjustment, including, without limitation, but subject to the foregoing, the release of (1) BNYM (as limited by Section I(C) hereof) in connection with the Adversary Proceeding, the Interpleader Action and any claims and causes of action related to (a) the Senior COFINA Bond Claims, the Senior COFINA Bond Claims (Ambac Insured), the Senior COFINA Bond Claims (National Insured) and the Senior COFINA Bond Claims (Taxable Election) and (b) the Junior COFINA Bond Claims, the Junior COFINA Bond Claims (Assured Insured) and the Junior COFINA Bond Claims (Taxable Election) and (2) each of Ambac, National and Assured with respect to all negotiations regarding and any actions taken consistent with the COFINA Plan of Adjustment, including, without limitation, in connection with a custodial trust structure, commutation, the Assured Election, the National Election, and any release of obligations under applicable Insurance Policies; provided, however, that, notwithstanding the foregoing, the COFINA Plan of Adjustment shall not provide for the release of: (1) with respect to any beneficial holder of the Insured Bonds that receive Ambac Custodial Certificates in accordance herewith, any claim against Ambac with respect to Ambac's payment obligations under the Ambac Insurance Policy, as adjusted to account for any distributions from the Ambac Custodial Trust (and any claims that Ambac may have against a beneficial holder of such Ambac Insured Bonds with respect to Ambac's obligations under the Ambac Insurance Policy); (2) with respect to any beneficial holder of Assured Insured Bonds that receives Assured Custodial Certificates in accordance herewith, any claim against

22

Assured with respect to Assured's payment obligations under the Assured Insurance Policies in accordance with their terms (and any claims that Assured may have against a beneficial holder of such Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policy); (3) with respect to any beneficial holder of National Insured Bonds that received National Custodial Certificates in accordance herewith, any claim against National with respect to National's payment obligations under the National Insurance Policies, as adjusted to account for any distributions from the National Custodial Trust (and any claims that National may have against a beneficial holder of such National Insured Bonds with respect to National's obligations under the National Insurance Policies); or (4) in the case of the Assured Election, with respect to any beneficial holder of Assured Insured Bonds, any payment obligation under the applicable Assured Insurance Policy in accordance with its terms solely to the extent of any failure by Assured to pay the acceleration price in full (or any claims that Assured may have against a beneficial holder of Assured Insured Bonds with respect to Assured's obligations under the Assured Insurance Policies). The releases to be incorporated into the COFINA Plan of Adjustment are an integral and necessary component of the agreement contemplated herein, will be presented as a resolution of disputed claims inextricably bound with the COFINA Plan of Adjustment pursuant to Federal Rule of Bankruptcy Procedure 9019 and, subject to approval of the Title III Court, which approval shall be supported by parties in accordance with the PSA, will bind all parties in interest, including, without limitation, any party purporting to assert any released claim derivatively on the part of COFINA or the Commonwealth.

## J.  Governing Law/Jurisdiction

The COFINA Bonds will be governed by, and construed in accordance with, the laws of the State of New York. The Title III Court shall retain jurisdiction from and after the COFINA Effective Date of all matters arising from or related to the COFINA Plan of Adjustment, including, without limitation, with respect to the payment, enforcement and remedies of the COFINA Bonds to the fullest extent permitted by law[2]. Any disputes, legal action, suit, or proceeding arising from or related to the COFINA Bonds (a) shall be brought in accordance with the documentation relating to the COFINA Bonds by any party or its successors or assigns in any federal district court sitting in Puerto Rico and any appellate court therefrom or, in the event such federal district court does not have or accept jurisdiction, a Commonwealth court and any appellate court therefrom and (b) the parties shall be deemed to consent to the jurisdiction thereof.

## K.  Structure for Collection and Application of SUT

The COFINA Bonds shall be issued by COFINA following amendment of Act 91, which entity shall be a "bankruptcy remote," single purpose, municipal agency, public corporation or entity to the fullest extent permitted under applicable law, with no operations or liabilities other than as set forth in the COFINA Plan of Adjustment, and as reflected in this Term Sheet. The collection and deposit of the COFINA Portion, net of COFINA operating expenses, shall be (a) promptly after collection, kept in segregated bank accounts maintained

---

[2]  The parties hereto acknowledge and agree that, pursuant to section 945(a) of the Bankruptcy Code, applicable in the COFINA PROMESA Proceeding in accordance with Section 301(a) of PROMESA, and in light of the critical importance to assure that post-confirmation disputes regarding matters resolved or addressed by the COFINA Plan of Adjustment do not impede the successful implementation of the COFINA Plan of Adjustment, the Title III Court may retain jurisdiction over each of the matters specified in the COFINA Plan of Adjustment and such retention is reasonable, appropriate, in the best interests of the Commonwealth, COFINA, their respective creditors and other parties interest, and not inconsistent with PROMESA, the Bankruptcy Code or any other applicable law.

in one or more mainland U.S. Banks in the name of the trustee appointed under the new COFINA bond resolution and (b) designed to ensure that COFINA is the unconditional owner of the COFINA Portion, now existing or hereafter collected, under Puerto Rico and other applicable law.

**L.** **Corporate Governance:** On the COFINA Effective Date, and pursuant to the COFINA Plan of Adjustment, the COFINA board of directors shall be appointed and shall consist of three (3) members appointed by the Governor of the Commonwealth, all of whom shall meet the independence and qualification standards set forth in definitive documentation, including, without limitation, that the independent director may not be an officer, employee or director of the government of Puerto Rico or instrumentality thereof (other than COFINA), must have executive experience in finance or with respect to securities similar to the COFINA Bonds and shall otherwise be qualified to serve on the board of directors. Notwithstanding the foregoing, (a) the holders of Senior COFINA Bond Claims, Ambac and National (in consultation with the holders of the Junior COFINA Bond Claims and Assured) may submit up to three (3) recommendations for the Governor's consideration regarding the initial appointment of the independent directors; provided, however, that the Governor shall be under no obligation to appoint any such recommended persons as directors and (b) to the extent permitted by applicable law, COFINA's corporate governance documents shall be amended to be consistent with all of the foregoing and to provide that board approval shall be required for all material actions to be taken. COFINA's amended corporate governance documents shall provide that all board members will owe a fiduciary duty to COFINA as consistent with Puerto Rico law and its Constitution. The amended corporate governance documents and identities of board members will be filed as part of the Plan Supplement.

**M.** **Legislation and Documentation:** On or prior to the COFINA Effective Date, legislation shall be enacted to amend (or repeal and replace) the existing COFINA legislation to, among other things, (i) establish the independent COFINA board of directors referred to in Section II (L) above, (ii) permit the sales and use tax, tax exemption, substitution of collateral and non-impairment provisions referred to herein and (iii) grant such other authorizations, if any, which may be required to implement the transactions contemplated herein, including, without limitation, (a) a determination that COFINA is the owner of the COFINA Portion under applicable law, (b) a grant of a statutory lien on the COFINA Portion to secure the payment obligations with respect to the COFINA Bonds and COFINA Parity Bonds, in whole or in part, or otherwise in accordance with the ABT, (c) enhanced financial reporting, (d) events of default and imposition of certain measures upon an event of default (e) submission to the jurisdiction of the Title III Court, and (f) other customary terms, conditions, and covenants for similarly structured and supported municipal bonds that are acceptable to the PSA Parties. To the extent applicable, the foregoing terms and such other terms as may be agreed upon shall be included in the new bond resolution authorized by COFINA.

**N.** **Commonwealth/COFINA Expenses:** All expenses incurred by the Commonwealth or COFINA, as the case may be, in connection with the development, negotiation, confirmation and consummation of the COFINA Plan of Adjustment and the compromise and settlement of the Commonwealth-COFINA Dispute shall be paid to the extent available from the funds distributable to the Commonwealth in accordance with the provisions of Section I(A) hereof and otherwise by the Commonwealth.

**O.** **Consummation Costs:** Notwithstanding anything contained in this Term Sheet or the COFINA Plan of Adjustment to the contrary, in order to compensate parties for the cost of negotiation, confirmation and consummation of this Term Sheet and the COFINA Plan of Adjustment, and in consideration of (1) the execution and delivery of the PSA by each Consummation Cost Party, as defined below, and (2) the obligations and covenants contained in the PSA, Assured, Ambac, National, each holder of a Senior COFINA Bond Claim, and

24

each holder of Junior COFINA Bond Claim, each listed on Exhibit "B" hereto (a "Consummation Cost Party"), which executes the PSA consistent with the terms set forth herein by no later than 11:59p.m. (EDT) on September 20, 2018 (the "Deadline"), shall be entitled to receive on the COFINA Effective Date, based upon their respective positions (insured or otherwise) as of 5:00p.m. (EDT) on August 7, 2018, a pro rata share of cash in an amount equal to two percent (2.0%), truncated to two decimal points, of the (a) aggregate amount of the Senior COFINA Bond Claims, Senior COFINA Bond Claims (Ambac Insured), Senior COFINA Bond Claims (National Insured), Junior COFINA Bond Claims, Junior COFINA Bond Claims (Assured Insured), Senior COFINA Bond Claims (Taxable Election) and Junior COFINA Bond Claims (Taxable Election) (calculated without duplication), minus (b) One Billion Dollars ($1,000,000,000.00); provided, however, that, with respect to any Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured), unless otherwise agreed to, in writing, by Ambac and National, Ambac or National, as the case may be, and not the beneficial holder of such Senior COFINA Bond Claims (Ambac Insured) and Senior COFINA Bond Claims (National Insured) regardless of whether such beneficial holder is also a Consummation Cost Party, shall receive the amount of cash that would have otherwise been distributed to such other Consummation Cost Party in accordance with the provisions of this Section II(O); and, provided, however, that, notwithstanding the foregoing provisions of this Section II(O), amounts due and payable to Aurelius Capital Master, Ltd. and Six PRC Investments LLC as a result of being a Consummation Cost Party (i) shall not be taken into account in the connection with the above-referenced calculations solely with respect to payments to other Consummation Cost Parties, which payments to other Consummation Cost Parties shall be made by COFINA or its successor in interest, and (ii) with respect to payments to be made to Aurelius Capital Master, Ltd. and Six PRC Investments LLC, shall be taken into account in connection with the above-referenced calculations for all Consummation Cost Parties, which payments to Aurelius Capital Master, Ltd. and Six PRC Investment LLC shall be payable by the Commonwealth in accordance with the provisions of Sections I(A) and II(O) hereof; and, provided, further, that, with respect to the Junior COFINA Bond Claims (Assured Insured), Assured, and not the beneficial holders of the Junior COFINA Bond Claims (Assured Insured), shall receive the amount of cash distributable on account of the Junior COFINA Bond Claims (Assured Insured).

P. **Unsubscribed Taxable Election Cash Amount:** The amount, up to Sixty Million Dollars ($60,000,000.00), allocated for distributions to holders in Classes 4 and 7, but not distributed based upon elections not made, and calculated as the difference between Sixty Million Dollars ($60,000,000.00) minus the Taxable Election Cash shall be reallocated as follows: if such amount is (a) equal to or less than Forty Million Dollars ($40,000,000.00), such amount shall be allocated (i) *first*, if the aggregate amount of Taxable Election Cash distributable under the COFINA Plan of Adjustment is greater than Twenty Million Dollars ($20,000,000.00), to be distributed as cash in accordance with the COFINA Plan of Adjustment, (ii) *second*, to the extent of any remainder, to further fund the operating expense fund for COFINA up to an additional Ten Million Dollars ($10,000,000.00), and (iii) *third*, to the extent of any further remainder, to be distributed evenly to COFINA, on the one hand, to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders, and the Commonwealth, on the other hand, and (b) greater than Forty Million Dollars ($40,000,000.00), such amount up to Forty Million Dollars ($40,000,000.00) shall be allocated as described in subsection (a) above and such amounts above Forty Million Dollars ($40,000,000.00) shall be allocated in accordance with the COFINA Plan of Adjustment to increase the COFINA Cash Available for Distribution and increase recoveries to all COFINA bondholders.

Q. **Government Parties' Covenant Regarding Taxable Election:** The Government Parties shall use their reasonable best efforts, including, without limitation, by, directly or indirectly,

102136844v2

actively coordinating with, and promptly responding to inquiries from, any and all persons or entities, including dealers, to ensure the comprehensive outreach to Puerto Rico Investors and Puerto Rico Institutions holding existing COFINA securities regarding such holders' right to elect to receive a Taxable Bond Distribution and to ensure the dissemination of complete and accurate information regarding such election to such holders.

**EXHIBIT A**

**Scheduled Amortization and Certain Other Terms of COFINA Bonds**

## Exhibit A: Coupons and Maturity Dates

### Current Interest Bond Terms

| (7/1) Year | Par | Cpn/Yld |
|---|---|---|
| Total/Avg | $9,616,365,000.00 | 4.553% |
| 2028 | 782,915,000.00 | 4.350% |
| 2032 | 1,091,460,000.00 | 4.500% |
| 2038** | 2,997,245,000.00 | 4.550% |
| 2044 | 4,744,745,000.00 | 4.600% |

### Capital Appreciation Bond Terms

| (7/1) Year | Initial Value | Accreted Value | Yield |
|---|---|---|---|
| Total/Avg | $2,404,192,599.90 | $14,232,325,521.50 | 5.500% |
| 2058 | 2,404,192,599.90 | 14,232,325,521.50 | 5.500% |

### Current Interest Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Par | Term Par |
|---|---|---|---|
| Total | | $9,616,365,000.00 | $9,616,365,000.00 |
| 2019 | 1 | 18,855,000.00 | - |
| 2020 | 2 | - | - |
| 2021 | 3 | 17,480,000.00 | - |
| 2022 | 4 | 36,420,000.00 | - |
| 2023 | 5 | 56,910,000.00 | - |
| 2024 | 6 | 79,045,000.00 | - |
| 2025 | 7 | 102,935,000.00 | - |
| 2026 | 8 | 128,680,000.00 | - |
| 2027 | 9 | 156,395,000.00 | - |
| 2028 | 10 | 186,195,000.00 | 782,915,000.00 |
| 2029 | 11 | 218,225,000.00 | - |
| 2030 | 12 | 252,920,000.00 | - |
| 2031 | 13 | 290,175,000.00 | - |
| 2032 | 14 | 330,140,000.00 | 1,091,460,000.00 |
| 2033 | 15 | 372,985,000.00 | - |
| 2034 | 16 | 419,060,000.00 | - |
| 2035 | 17 | 468,400,000.00 | - |
| 2036 | 18 | 521,185,000.00 | - |
| 2037 | 19 | 577,645,000.00 | - |
| 2038 | 20 | 637,970,000.00 | 2,997,245,000.00 |
| 2039 | 21 | 702,415,000.00 | - |
| 2040 | 22 | 771,550,000.00 | - |
| 2041 | 23 | 842,060,000.00 | - |
| 2042 | 24 | 880,800,000.00 | - |
| 2043 | 25 | 921,310,000.00 | - |
| 2044 | 26 | 626,610,000.00 | 4,744,745,000.00 |
| 2045 | 27 | - | - |
| 2046 | 28 | - | - |
| 2047 | 29 | - | - |
| 2048 | 30 | - | - |
| 2049 | 31 | - | - |
| 2050 | 32 | - | - |
| 2051 | 33 | - | - |
| 2052 | 34 | - | - |
| 2053 | 35 | - | - |
| 2054 | 36 | - | - |
| 2055 | 37 | - | - |
| 2056 | 38 | - | - |
| 2057 | 39 | - | - |
| 2058 | 40 | - | - |

### Capital Appreciation Bond Sinking Fund Schedule

| (7/1) Year | Yr# | Accretion Table | Future Value Redemption | Accreted Value Redemption |
|---|---|---|---|---|
| Total | | | $20,968,015,000.00 | $14,232,325,521.50 |
| 2019 | 1 | $602.50 | - | - |
| 2020 | 2 | 636.10 | - | - |
| 2021 | 3 | 671.60 | - | - |
| 2022 | 4 | 709.05 | - | - |
| 2023 | 5 | 748.55 | - | - |
| 2024 | 6 | 790.30 | - | - |
| 2025 | 7 | 834.35 | - | - |
| 2026 | 8 | 880.90 | - | - |
| 2027 | 9 | 930.00 | - | - |
| 2028 | 10 | 981.85 | - | - |
| 2029 | 11 | 1,036.60 | - | - |
| 2030 | 12 | 1,094.40 | - | - |
| 2031 | 13 | 1,155.40 | - | - |
| 2032 | 14 | 1,219.85 | - | - |
| 2033 | 15 | 1,287.85 | - | - |
| 2034 | 16 | 1,359.65 | - | - |
| 2035 | 17 | 1,435.50 | - | - |
| 2036 | 18 | 1,515.50 | - | - |
| 2037 | 19 | 1,600.00 | - | - |
| 2038 | 20 | 1,689.25 | - | - |
| 2039 | 21 | 1,783.40 | - | - |
| 2040 | 22 | 1,882.85 | - | - |
| 2041 | 23 | 1,987.85 | - | - |
| 2042 | 24 | 2,098.70 | - | - |
| 2043 | 25 | 2,215.70 | | - |
| 2044 | 26 | 2,339.25 | 720,495,000.00 | 337,083,585.75 |
| 2045 | 27 | 2,469.65 | 2,009,425,000.00 | 992,515,290.25 |
| 2046 | 28 | 2,607.35 | 1,903,310,000.00 | 992,519,065.70 |
| 2047 | 29 | 2,752.75 | 1,802,775,000.00 | 992,517,776.25 |
| 2048 | 30 | 2,906.25 | 1,707,555,000.00 | 992,516,343.75 |
| 2049 | 31 | 3,068.25 | 1,617,400,000.00 | 992,517,510.00 |
| 2050 | 32 | 3,239.35 | 1,531,970,000.00 | 992,517,403.90 |
| 2051 | 33 | 3,419.95 | 1,451,070,000.00 | 992,517,369.30 |
| 2052 | 34 | 3,610.65 | 1,374,430,000.00 | 992,517,135.90 |
| 2053 | 35 | 3,811.95 | 1,301,850,000.00 | 992,517,421.50 |
| 2054 | 36 | 4,024.50 | 1,233,095,000.00 | 992,518,165.50 |
| 2055 | 37 | 4,248.90 | 1,167,970,000.00 | 992,517,546.60 |
| 2056 | 38 | 4,485.80 | 1,106,290,000.00 | 992,519,136.40 |
| 2057 | 39 | 4,735.90 | 1,047,865,000.00 | 992,516,770.70 |
| 2058 | 40 | 5,000.00 | 992,515,000.00 | 992,515,000.00 |

*Due to rounding of bonds into $5,000 denominations, debt service on Bonds will be slightly below the 53.65% PSTBA.
**Current Interest Bonds may include both Tax-Exempt and Taxable Bonds.

28

## EXHIBIT B

### List of Consummation Cost Parties

Ambac Assurance Corporation
Aristeia Capital L.L.C.
Assured Guaranty Municipal Corp.
Aurelius Capital Master, Ltd.
Canyon Capital Advisors LLC
Decagon Holdings 1, L.L.C.
Decagon Holdings 2, L.L.C.
Decagon Holdings 3, L.L.C.
Decagon Holdings 4, L.L.C.
Decagon Holdings 5, L.L.C.
Decagon Holdings 6, L.L.C.
Decagon Holdings 7, L.L.C.
Decagon Holdings 8, L.L.C.
Decagon Holdings 9, L.L.C.
Decagon Holdings 10, L.L.C.
GoldenTree Asset Management LP
Goldman Sachs Asset Management, L.P., on behalf of certain funds and accounts for which it serves as
    investment manager
National Public Finance Guarantee Corporation
Old Bellows Partner LP
OPPENHEIMER FUNDS, INC. as investment advisor for the following accounts:
    Oppenheimer Rochester Amt-Free Municipal Fund
    Oppenheimer Rochester Amt-Free New York Municipal Fund
    Oppenheimer Rochester California Municipal Fund
    Oppenheimer Rochester Limited Term California Municipal Fund
    Oppenheimer Rochester Short Duration High Yield Municipal Fund (A Series of Oppenheimer
    Municipal Fund)
    Oppenheimer Rochester Limited Term New York Municipal Fund (A Series of Rochester
    Portfolio Series)
    Oppenheimer Rochester New Jersey Municipal Fund (A Series of Oppenheimer Multi-
    State Municipal Trust)
    Oppenheimer Rochester Pennsylvania Municipal Fund (A Series of Oppenheimer Multi-State
    Municipal Trust)
    Oppenheimer Rochester High Yield Municipal Fund (A Series of Oppenheimer Multi-State Municipal
    Trust)
    Oppenheimer Rochester Fund Municipals
    Oppenheimer Rochester Minnesota Municipal Fund
OFI GLOBAL INSTITUTIONAL, INC. as investment manager for the following accounts:
    MASSMUTUAL International Holding MSC, Inc.
    MASSMUTUAL Unified Traditional
First Puerto Rico Tax-Exempt Fund, Inc.
First Puerto Rico Tax-Exempt Fund II, Inc.
First Puerto Rico AAA Target Maturity Fund I, Inc.
First Puerto Rico AAA Target Maturity Fund II, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund III, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund IV, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund V, Inc.
First Puerto Rico Tax-Exempt Target Maturity Fund VII, Inc.

First Puerto Rico Target Maturity Income Opportunities Fund I, Inc.
First Puerto Rico Target Maturity Income Opportunities Fund II, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund I, Inc.
First Puerto Rico Tax Advantaged Target Maturity Fund II, Inc.
Tax-Free Puerto Rico Fund, Inc.
Tax-Free Puerto Rico Fund II, Inc.
Tax-Free Puerto Rico Target Maturity Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund, Inc.
Puerto Rico AAA Portfolio Bond Fund II, Inc.
Puerto Rico AAA Portfolio Target Maturity Fund, Inc.
Puerto Rico Fixed Income Fund, Inc.
Puerto Rico Fixed Income Fund I, Inc.
Puerto Rico Fixed Income Fund III, Inc.
Puerto Rico Fixed Income Fund IV, Inc.
Puerto Rico Fixed Income Fund V, Inc.
Puerto Rico Fixed Income Fund VI, Inc.
Puerto Rico GNMA & U.S. Government Target Maturity Fund, Inc.
Puerto Rico Mortgage-Backed & U.S. Government Securities Fund, Inc.
UBS IRA Select Growth & Income Puerto Rico Fund
Puerto Rico Investors Tax-Free Fund, Inc.
Puerto Rico Investors Tax-Free Fund II, Inc.
Puerto Rico Investors Tax-Free Fund III, Inc.
Puerto Rico Investors Tax-Free Fund IV, Inc.
Puerto Rico Investors Tax-Free Fund V, Inc.
Puerto Rico Investors Tax-Free Fund VI, Inc.
Puerto Rico Investors Bond Fund I
Scoggin Management LP
Six PRC Investments LLC
Taconic Capital Advisors L.P.
Taconic Master Fund 1.5 L.P.
Tilden Park Capital Management LP
Whitebox Advisors LLC

## SCHEDULE 1

| Fiscal Year | Pledged Sales Tax Base Amount | COFINA 53.65% Portion Pledged Sales Tax Base Amount | Commonwealth 46.35% Portion Pledged Sales Tax Base Amount |
|---|---|---|---|
| 2019 | 783,197,251 | 420,185,325 | 363,011,926 |
| 2020 | 814,525,141 | 436,992,738 | 377,532,403 |
| 2021 | 847,106,147 | 454,472,448 | 392,633,699 |
| 2022 | 880,990,393 | 472,651,346 | 408,339,047 |
| 2023 | 916,230,008 | 491,557,399 | 424,672,609 |
| 2024 | 952,879,209 | 511,219,696 | 441,659,513 |
| 2025 | 990,994,377 | 531,668,483 | 459,325,894 |
| 2026 | 1,030,634,152 | 552,935,223 | 477,698,929 |
| 2027 | 1,071,859,518 | 575,052,631 | 496,806,887 |
| 2028 | 1,114,733,899 | 598,054,737 | 516,679,162 |
| 2029 | 1,159,323,255 | 621,976,926 | 537,346,329 |
| 2030 | 1,205,696,185 | 646,856,003 | 558,840,182 |
| 2031 | 1,253,924,033 | 672,730,244 | 581,193,789 |
| 2032 | 1,304,080,994 | 699,639,453 | 604,441,541 |
| 2033 | 1,356,244,234 | 727,625,032 | 628,619,202 |
| 2034 | 1,410,494,003 | 756,730,033 | 653,763,970 |
| 2035 | 1,466,913,763 | 786,999,234 | 679,914,529 |
| 2036 | 1,525,590,314 | 818,479,203 | 707,111,111 |
| 2037 | 1,586,613,926 | 851,218,371 | 735,395,555 |
| 2038 | 1,650,078,483 | 885,267,106 | 764,811,377 |
| 2039 | 1,716,081,623 | 920,677,791 | 795,403,832 |
| 2040 | 1,784,724,887 | 957,504,902 | 827,219,985 |
| 2041 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2042 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2043 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2044 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2045 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2046 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2047 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2048 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2049 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2050 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2051 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2052 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2053 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2054 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2055 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2056 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2057 | 1,850,000,000 | 992,525,000 | 857,475,000 |
| 2058 | 1,850,000,000 | 992,525,000 | 857,475,000 |

102136844v2

**SCHEDULE 2**

**Application of BNYM Pre-7/1/2018 Debt Service Fund Monies**

| | |
|---|---:|
| Pre-7/1/2018 BNYM Cash | 1,200,165,636 |
| Rounding Amount Cash Est.* | 25,000,000 |
| Section 103 Cash (Pre-Petition Interest) | 124,540,331 |
| PSA Consummation Costs | 332,742,277 |
| On-Island Min Taxable Election | 20,000,000 |
| On-Island Flex Taxable Election | 40,000,000 |
| Remaining Set Aside of Funds | 38,355,838 |
| Remaining Funds to Seniors | 619,527,190 |
| TE COFINA Sr. Cash** | 377,273,865 |
| TAX COFINA Sr. Cash** | 242,253,325 |

*All rounding shall be made up to the nearest $1,000 current interest bond denominations.
**Split Proportional to current TE/TAX ratio on COFINA Sr. of Accreted Value as of Petition Date.

32

## **EXHIBIT D**

## FORM OF JOINDER

# FORM OF JOINDER AGREEMENT

JOINDER AGREEMENT TO THE AMENDED AND RESTATED PLAN SUPPORT AGREEMENT, dated as of September __, 2018 (as amended, supplemented or otherwise modified from time to time, the "**PSA**"), by and among (a) Financial Oversight and Management Board for Puerto Rico (the "**Oversight Board**"), (b) Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), (c) Puerto Rico Fiscal Agency and Financial Advisory Authority ("**AAFAF**"), (d) holders of Senior COFINA Bond Claims, as defined below, set forth on Exhibit "A" thereto (together with their respective successors and assignors with respect to transfers made in accordance with the terms thereof, the "**Senior Holders**"), (e) Ambac Assurance Corporation ("**Ambac**"), (f) National Public Finance Guarantee Corporation ("**National**"), (g) holders of Junior COFINA Bond Claims, as defined below, set forth on Exhibit "B" thereto, (together with their respective successors and assignors with respect to transfers made in accordance with the terms hereof, the "**Junior Holders**"), (h) Assured Guaranty Municipal Corp. ("**Assured**"), formerly known as Financial Security Assurance Inc., (i) Bonistas del Patio, Inc. ("**Bonistas**"), and (j) the other PSA Creditors from time to time party thereto, is executed and delivered by (the "**Joining PSA Creditor**") as of _____, 2018.  Capitalized terms used herein, but not defined herein, shall have the meanings ascribed thereto in the PSA.

       1.    <u>Agreement to be Bound</u>.  The Joining PSA Creditor hereby agrees to be bound by all of the terms and provisions of the PSA.  The Joining PSA Creditor shall hereafter be deemed to be a "PSA Creditor," a "Party," a "Senior Holder" (if it holds Senior COFINA Bond Claims) and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) for all purposes under the PSA, including, without limitation, and for the avoidance of doubt, with respect to any Senior COFINA Bond Claims and Junior COFINA Bond claims held by the Joining PSA Creditor as of the date of this Joinder Agreement (other than any Senior COFINA Bond Claims or Junior COFINA Bond Claims held in a Qualified Marketmaker capacity).

       2.    <u>Representations and Warranties and Covenants</u>.  With respect to the aggregate principal amount of Senior COFINA Bond Claims and Junior COFINA Bond Claims held by the Joining PSA Creditor, including, without limitation, upon consummation of any pending Transfer of Senior COFINA Bond Claims or Junior COFINA Bond Claims to the Joining PSA Creditor, the Joining PSA Creditor hereby (a) makes, as of the date hereof, the representations and warranties of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 3.4 of the PSA and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 3.5 of the PSA and (b) covenants and agrees to perform all of the "Covenants" of the "Senior Holder" (if it holds Senior COFINA Bond Claims) set forth in Section 4.4 of the PSA, and a "Junior COFINA Holder" (if it holds Junior COFINA Bond Claims) set forth in Section 4.5 of the PSA,  to each of the other Parties to the PSA.

       3.    <u>Governing Law</u>. Section 7.5 of the PSA is incorporated by reference as if set forth fully herein, except that any references to "Agreement" or "PSA" shall be replaced with references to Joinder Agreement.

     4.    <u>Notice of Joinder</u>.  The Joining PSA Creditor agrees to provide a copy of the Joinder Agreement to counsel to the Oversight Board and AAFAF in accordance with Section 4.4 of the PSA (if it holds Senior COFINA Bond Claims), Section 4.5 of the PSA (if it holds Junior COFINA Bond Claims) and the notice provisions set forth in Section 7.10 of the PSA.


 IN WITNESS WHEREOF, the Joining PSA Creditor has caused this Joinder Agreement to be executed as of the date set forth above.


[NAME OF INSTITUTION]


By:_____
       Name:
       Title:


Holder of Principal Amount of Senior COFINA Bonds:


Holder of Principal Amount of Junior COFINA Bonds:

**Schedule 3.4**

**Pending Litigation Naming COFINA**

### Title III Litigation

The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA) et al., Adv. Pro. No. 17-00133-LTS (D.P.R. 2017)

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as agent of The Commonwealth of Puerto Rico v. Bettina Whyte as agent of The Puerto Rico Sales Tax Financing Corporation, Adv. Pro. No. 17-00257-LTS (D.P.R. 2017)

Cooperativa de Ahorro y Credito Abraham Rosa, et al. v. Commonwealth of Puerto Rico, et al., Adv. Pro. No. 18-00028-LTS (D.P.R. 2018)

### Pre-Title III Federal Litigation

Lex Claims, LLC v. The Commonwealth of Puerto Rico, No. 3:16-cv-02374-FAB (D.P.R. 2016) (stayed) (appealed at First Circuit Case Nos. 17-1241, 17-1248, 17-1272, 17-1337)

Rodriguez-Perelló et al. v. Rosselló-Nevares et al., No. 3:17-cv-01566-FAB (D.P.R. 2017) (stayed)

### State Court Litigation

Comisión Ciudadana Para La Auditoría Integral del Crédito Público, Inc. v. Autoridad De Asesoría Financiera y Agencia Fiscal, et al. No. SJ 2018CV06428 (Court of First Instance, San Juan 2018)

## Appendix B Debt Outstanding as of May 4, 2017 ($ in Millions)

| i.d. | Issuance date | Senior Bonds Series | CIB Balance 4-May-17 | | CAB Balance 4-May-17 | | Total 4-May-17 | |
|---|---|---|---|---|---|---|---|---|
| 1 | 31-Jul-07 | Sales Tax Revenue Bonds, Series 2007A | $ | 708 | $ | 2,727 | $ | 3,435 |
| 2 | 31-Jul-07 | Sales Tax Revenue Bonds, Series 2007B | $ | 1,187 | $ | 268 | $ | 1,454 |
| 3 | 20-Dec-07 | Sales Tax Revenue Bonds, Series 2007C | $ | 416 | $ | 149 | $ | 564 |
| 4 | 26-Jun-08 | Sales Tax Revenue Bonds, Series 2008A | $ | 489 | $ | 427 | $ | 916 |
| 5 | 5-Jan-09 | Sales Tax Revenue Bonds, Senior Series 2009A | $ | 241 | | - | $ | 241 |
| 6 | 13-Dec-11 | Sales Tax Revenue Bonds, Senior Series 2011C | $ | 916 | $ | 142 | $ | 1,058 |
| 7 | 13-Dec-11 | Sales Tax Revenue Bonds, Senior Series 2011D | $ | 91 | | - | $ | 91 |
| | | **Total Senior Cofina Bonds** | **$** | **4,048** | **$** | **3,713** | **$** | **7,761** |

| i.d. | Issuance date | Subordinated Bonds Series | CIB Balance 4-May-17 | | CAB Balance 4-May-17 | | Total 4-May-17 | |
|---|---|---|---|---|---|---|---|---|
| 1 | 18-Jun-09 | Sales Tax Revenue Bonds, First Subordinate, Series 2009A | $ | 2,892 | $ | 800 | $ | 3,692 |
| 2 | 25-Jun-09 | Sales Tax Revenue Bonds, First Subordinate, Series 2009B | $ | 919 | $ | 441 | $ | 1,360 |
| 3 | 9-Feb-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010A | $ | 1,550 | $ | 443 | $ | 1,993 |
| 4 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010C | $ | 1,543 | $ | 153 | $ | 1,696 |
| 5 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010D | $ | 89 | | - | $ | 89 |
| 6 | 30-Jun-10 | Sales Tax Revenue Bonds, First Subordinate, Series 2010E | $ | 93 | | - | $ | 93 |
| 7 | 23-Nov-11 | Sales Tax Revenue Bonds, First Subordinate, Series 2011A | $ | 360 | $ | 548 | $ | 908 |
| | 23-Nov-11 | Sales Tax Revenue Bonds, First Subordinate, Series 2011B | $ | 46 | | - | $ | 46 |
| | | **Total Subordinated Cofina Bonds** | **$** | **7,492** | **$** | **2,384** | **$** | **9,876** |

| | | **Total Cofina Bonds outstanding** | **$** | **11,540** | **$** | **6,097** | **$** | **17,637** |

Fiscal Plan for COFINA

## **Appendix C: U.S. Real GNP Growth Rate Comparison**

**REAL GNP GROWTH RATE COMPARISON (IMF World Economic Outlook)**



US Real GNP Growth Rate, %

*The IMF forecasts are 5 year forecasts and years 2024-2028 are a continuation of 2023.

**REAL GNP GROWTH RATE COMPARISON (CBO)**



US Real GNP Growth Rate, %

31

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit B Page 341 of 701

32

Fiscal Plan for COFINA

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit E Page 1 of 42

<u>**Exhibit E**</u>

**Audited Financial Statements for COFINA for the Year Ended June 30, 2015**



# GOVERNMENT OF PUERTO RICO

## Puerto Rico Fiscal Agency and Financial Advisory Authority

**Municipal Secondary Market Disclosure Information Cover Sheet**
**Municipal Securities Rulemaking Board (MSRB)**
**Electronic Municipal Market Access System (EMMA)**

---

**THIS FILING RELATES TO A SINGLE BOND ISSUE:**

Name of bond issue exactly as it appears on the cover of the Official Statement:

_____

_____

_____

Nine-digit CUSIP* numbers if available, to which the information relates:

_____

_____

---

**THIS FILING RELATES TO ALL OR SEVERAL SECURITIES ISSUED BY THE ISSUER, OR ALL OR SEVERAL SECURITIES OF A SPECIFIC CREDITOR:**

Issuer's Name:      **Puerto Rico Sales Tax Financing Corporation (COFINA)**

Other Obligated Person's Name (if any): _____

Six-digit CUSIP* number(s):   **74529J**

---

**TYPE OF INFORMATION PROVIDED:**

A. ☐ **Annual Financial Information and Operating Data pursuant to Rule 15c2-12**

    **Fiscal Period Covered:** _____

B. ☒ **Audited Financial Statements or CAFR pursuant to Rule 15c2-12**

    **Fiscal Period Covered:**  **2014-15** _____

C. ☐ **Notice of Failure to Provide Annual Financial Information as Required:** _____

---

I represent that I am authorized by the issuer, obligor or its agent to distribute this information publicly.


*/s/ Sebastián M. Torres Rodríguez*
Sebastián M. Torres Rodríguez
Puerto Rico Fiscal Agency and Financial Advisory Authority,
    as Fiscal Agent for the Commonwealth

Dated: September 19, 2018



**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Basic Financial Statements and
Required Supplementary Information

June 30, 2015

(With Independent Auditors' Report Thereon)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

**Table of Contents**

| | Page |
|---|---|
| Independent Auditors' Report | 1–2 |
| Management's Discussion and Analysis (Unaudited) | 3–7 |
| Basic Financial Statements: | |
|     Governmental Funds Balance Sheet and Statement of Net Position (Deficit) | 8 |
|     Reconciliation of Governmental Funds Balance Sheet to the Statement of Net Position (Deficit) | 9 |
|     Governmental Funds Statement of Revenues, Expenditures, and Changes in Fund Balances and Statement of Activities | 10 |
|     Reconciliation of the Governmental Funds Statement of Revenues, Expenditures, and Changes in Fund Balances to the Statement of Activities | 11 |
| Notes to Basic Financial Statements | 12–38 |



KPMG LLP
American International Plaza
Suite 1100
250 Muñoz Rivera Avenue
San Juan, PR 00918-1819

## Independent Auditors' Report

The Board of Directors
Puerto Rico Sales Tax Financing Corporation:

We have audited the accompanying financial statements of the governmental activities and each major fund of the Puerto Rico Sales Tax Financing Corporation (the Corporation), a component unit of the Commonwealth of Puerto Rico, as of and for the year ended June 30, 2015, and the related notes to the financial statements, which collectively comprise the Corporation's basic financial statements as listed in the table of contents.

### Management's Responsibility for the Financial Statements

Management is responsible for the preparation and fair presentation of these financial statements in accordance with U.S. generally accepted accounting principles; this includes the design, implementation, and maintenance of internal control relevant to the preparation and fair presentation of financial statements that are free from material misstatement, whether due to fraud or error.

### Auditors' Responsibility

Our responsibility is to express opinions on these financial statements based on our audit. We conducted our audit in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free from material misstatement.

An audit involves performing procedures to obtain audit evidence about the amounts and disclosures in the financial statements. The procedures selected depend on the auditors' judgment, including the assessment of the risks of material misstatement of the financial statements, whether due to fraud or error. In making those risk assessments, the auditor considers internal control relevant to the entity's preparation and fair presentation of the financial statements in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the entity's internal control. Accordingly, we express no such opinion. An audit also includes evaluating the appropriateness of accounting policies used and the reasonableness of significant accounting estimates made by management, as well as evaluating the overall presentation of the financial statements.

We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our audit opinions.

### Opinions

In our opinion, the financial statements referred to above present fairly, in all material respects, the respective financial position of the governmental activities and each major fund of the Puerto Rico Sales Tax Financing Corporation as of June 30, 2015, and the respective changes in financial position for the year then ended in accordance with U.S. generally accepted accounting principles.

### Emphasis of Matters

*Uncertainty about Ability to Continue as a Going Concern*

The accompanying financial statements have been prepared assuming that the Corporation will continue as a going concern. As discussed in note 3 to the basic financial statements, on May 5, 2017, the Oversight Board,

KPMG LLP is a Delaware limited liability partnership and the U.S. member firm of the KPMG network of independent member firms affiliated with KPMG International Cooperative ("KPMG International"), a Swiss entity.



created by the Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA), filed a petition for relief under Title III of PROMESA similar to bankruptcy. Also as discussed in note 3, the Corporation has stated that substantial doubt exists about its ability to continue as a going concern. Management's evaluation of the events and conditions and management's plans regarding these matters are described in note 3. The basic financial statements do not include any adjustments that might result from the outcome of this uncertainty. Our opinions are not modified with respect to this matter.

**Other Matters**

*Required Supplementary Information*

U.S. generally accepted accounting principles require that the management's discussion and analysis on pages 3 through 7 be presented to supplement the basic financial statements. Such information, although not a part of the basic financial statements, is required by the Governmental Accounting Standards Board who considers it to be an essential part of financial reporting for placing the basic financial statements in an appropriate operational, economic or historical context. We have applied certain limited procedures to the management's discussion and analysis in accordance with auditing standards generally accepted in the United States of America, which consisted of inquiries of management about the methods of preparing the information and comparing the information for consistency with management's responses to our inquiries, the basic financial statements, and other knowledge we obtained during our audit of the basic financial statements. We do not express an opinion or provide any assurance on the information because the limited procedures do not provide us with sufficient evidence to express an opinion or provide any assurance.

*KPMG LLP*

San Juan, Puerto Rico
September 17, 2018

Stamp No. E348568 of the Puerto Rico
Society of Certified Public Accountants
was affixed to the record copy of this report.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2015

As management of the Puerto Rico Sales Tax Financing Corporation ("the Corporation" or "COFINA"), we offer readers of the Corporation's financial statements this narrative overview and analysis of the financial performance during the fiscal year ended June 30, 2015. Please read it in conjunction with the Corporation's basic financial statements including the notes thereto, which follow this section.

**Financial Highlights**

- Net deficit in the statement of net position (deficit) increased to $6,459.8 million at June 30, 2015 from $5,474.5 million at June 30, 2014. The increase in net deficit is mainly due to interest expense on Sales Tax Revenue Bonds and other expenses, of approximately $959.4 million, and the recognition of a custodial credit loss on deposits placed in the Government Development Bank for Puerto Rico ("the Bank") amounting to $26.2 million.

- Receipt of sales and use tax increased to $669.5 million in fiscal year 2015 from $643.7 million in fiscal year 2014, an increase of $25.8 million. This increase was due to a statutory rate increase of 4% provided by Act No. 91, as amended. See note 1 to the basic financial statements.

- In September 2014, the Board of Directors of COFINA, due to Moody's Investment Services (Moody's) and Fitch Ratings (Fitch) downgrades of COFINA's credit rating triggering the Additional Termination Event (ATE) on the swap agreement, entered into an agreement with Goldman Sachs (GS) that required COFINA to post collateral over a period of time, and allow the swap to remain in place and remove all ATE's. As of June 30, 2015, said collateral amounted to $27 million. See note 9 to the basic financial statements.

**Overview of the Financial Statements**

These basic financial statements include the management's discussion and analysis section, the independent auditors' report, and the basic financial statements of the Corporation. The basic financial statements also include notes that explain in more detail some of the information in the basic financial statements.

**Required Financial Statements**

- The statement of net position (deficit) provides information about the nature and amounts of resources (assets) and the Corporation's obligations (liabilities).

- Current year revenues and expenses are accounted for in the statement of activities. This statement measures the results of the Corporation's operations over the past year.

- Governmental funds' financial statements present the financial position and results of operations of the Corporation's two governmental fund types using a current financial resources measurement focus. The statement of revenues, expenditures, and changes in fund balances can be used to determine, for example, whether and how the Corporation met its debt service requirements for the year.

**Financial Analysis**

In evaluating the Corporation's finances, in addition to the Corporation's assets and liabilities, one needs to consider various non-financial factors, such as changes in economic conditions, and new or changed government legislation. Due to the nature of the Corporation's activities, the Corporation's financial strength and ability to repay its obligations is solely dependent on the sales and use tax transferred to the Corporation by law and used to fund the debt service fund.

For additional information about the sales tax transferred to the Corporation, refer to note 1 to the basic financial statements.

3

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2015

**Government-Wide Financial Analysis**

The government-wide financial statements were designed so that the user could evaluate the Corporation's financial condition at the end of the year. The following is a condensed summary of net position (deficit) for the Corporation at June 30, 2015 and 2014 (in thousands):

| | June 30 | | Change | |
| | 2015 | 2014 | Amount | Percent |
|---|---|---|---|---|
| Assets: | | | | |
| Receivable from Commonwealth of Puerto Rico | $ 10,330,795 | 10,997,814 | (667,019) | (6.1)% |
| Other assets | 430,453 | 436,590 | (6,137) | (1.4) |
| Total assets | 10,761,248 | 11,434,404 | (673,156) | (5.9) |
| Total deferred outflow of sources | 96,481 | 103,172 | (6,691) | (6.5) |
| Liabilities: | | | | |
| Accounts payable and other | 261,606 | 268,553 | (6,947) | (2.6) |
| Liabilities payable from restricted assets | 16,955,656 | 16,640,869 | 314,787 | 1.9 |
| Total liabilities | 17,217,262 | 16,909,422 | 307,840 | 1.8 |
| Total deferred inflow of sources | 100,237 | 102,617 | (2,380) | (2.3) |
| Net position (deficit) – unrestricted | $ (6,459,770) | (5,474,463) | (985,307) | 18.0% |

As noted above, the Corporation's net position (deficit) at June 30, 2015, amounted to $(6,459.8) million, an increase of $985.3 million or 18% from $(5,474.5) million at June 30, 2014. The increase in net deficit is mainly due to interest expense on Sales Tax Revenue Bonds and other expenses, of approximately $959.4 million, and the recognition of a custodial credit loss on deposits placed in the Government Development Bank for Puerto Rico (the "Bank") amounting to $26.2 million. At June 30, 2015, the Corporation had $16,955.7 million of bonds payable outstanding, an increase of $314.8 million or 1.9% from $16,640.9 million at June 30, 2014. As of June 30, 2015 and 2014, the Corporation has recorded $3.4 million to cover for any unfavorable outcome related to a claim in connection with the termination of an interest rate exchange agreement in 2008, refer to note 10 to the basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2015

Condensed revenues, expenses, and change in net position (deficit) for the year ended June 30, 2015 and 2014, are presented below (in thousands):

|  | | June 30 | | Change | |
|  | | 2015 | 2014 | Amount | Percent |
|---|---|---|---|---|---|
| Expenses: | | | | | |
| Interest on long-term debt | $ | (959,437) | (945,971) | (13,466) | 1.4% |
| Custodial credit loss on interest bearing deposits with Government Development Bank | | (26,157) | — | (26,157) | (100.0)% |
| Other | | (145) | (3,254) | 3,109 | (95.5) |
| Total expenditures | | (985,739) | (949,225) | (36,514) | 3.8 |
| Program revenues: | | | | | |
| Investment earnings | | 432 | 252 | 180 | 71.4 |
| Other | | — | 9,666 | (9,666) | 100.0 |
| Total revenues | | 432 | 9,918 | (9,486) | (95.6) |
| Change in net position (deficit) | $ | (985,307) | (939,307) | (46,000) | 4.9% |

Total interest on long term debt for the year ended June 30, 2015 amounted to approximately $959.4 million, an increase of $13.5 million when compared to 2014. The increase in the interest expense on long-term debt is mainly related to a slight increase in the rate on variable-interest rate bonds and the impact of discount on capital appreciation bonds. Also, during the fiscal year ended June 30, 2015, the Corporation recorded a custodial credit loss on deposits in the Bank amounting to $26.2 million.

**Governmental Fund Financial Analysis**

The Corporation's governmental funds reported a total fund balance as of June 30, 2015 and 2014, of $429.6 million and $432.2 million, respectively. The debt service fund is funded with the receipts of sales and use tax and interest thereon. For the years ended June 30, 2015 and 2014, the receipts of sales and use tax amounted to $669.5 million and $643.7 million, respectively.

**Debt Administration**

As of June 30, 2015, the Corporation's outstanding bonds balance was $16,955.7 million, after taking into account an unamortized bond premium of $82.5 million, and an unaccreted discount of $110 million. As of June 30, 2014, the Corporation's outstanding bonds and note balance were $16,640.9 million, after taking into account unamortized bond premium of $86.3 million, and an unaccreted discount of $112.6 million. The bonds are payable in various dates through fiscal year 2058.

5

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2015

During the fiscal year 2015, COFINA was subject to certain credit downgrades by the major credit rating agencies. The following table summarizes the Corporation's credit ratings as of June 30, 2015 and 2014:

| Agency | Date | Sales Tax Revenue Bonds | |
| --- | --- | --- | --- |
| | | **Senior Lien Series** | **First Subordinate Series** |
| Moody's | 06/30/15 | Caa2 | Caa3 |
| | 06/30/14 | Baa1 | Baa2 |
| S&P | 06/30/15 | CCC- | CCC- |
| | 06/30/14 | AA- | A+ |
| Fitch | 06/30/15 | CC | CC |
| | 06/30/14 | AA- | A+ |

**Going Concern**

Management believes that there is substantial doubt about the Corporation's ability to continue as a going concern because of the following:

On June 30, 2016, the U.S. Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which grants the Commonwealth and its component units' access, including COFINA, to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In broad strokes, PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of the Financial Oversight and Management Board (the Oversight Board), relief from creditors and lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt.

On May 5, 2018, the Oversight Board filed a petition for relief under Title III of (PROMESA.) Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases to PROMESA section 301 (a). As further discussed in note 11, certain stakeholders (bondholders, creditors, guarantors, investors and others) commenced legal proceedings challenging the constitutionality of the law that created COFINA and the ownership of the future SUT revenues.

As further discussed in note 11, the Oversight Board also approved and certified the fiscal plan of the Commonwealth and certain other governmental entities (the Fiscal Plan). The Fiscal Plan contemplates that for each of the next 5 fiscal years (FY 2018-2023) some portion of the Pledged Sales Tax will be used by the Commonwealth for purposes other than payment of COFINA debt service.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Management's Discussion and Analysis (Unaudited)

June 30, 2015

*Remediation Plan*

Management believes that the outcome of the Title III proceeding in the federal court is highly uncertain at this time and the resolution of the legal conflicts could result in the redirection of revenues to pay-non COFINA's bondholders and other government creditors or significantly modifying or terminating COFINA purpose. The Corporation assumes that the Plan of Adjustment that will be filed in the Title III case will address the Corporation's liabilities. Management of the Corporation believes that the aforementioned events and the further circumstances also described in note 11, raise substantial doubt about the Corporation ability to continue as going concern.

**Request for Information**

This financial report is designed to provide those interested with a general overview of the Corporation's finances and to enhance the Corporation's accountability for the funds it receives. Questions about this report or requests for additional information should be addressed to Puerto Rico Sales Tax Financing Corporation, PO Box 42001, San Juan, Puerto Rico, 00940-2001.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Governmental Funds Balance Sheet and Statement of Net Position (Deficit)

June 30, 2015

| | Governmental Funds Balance Sheet | | | | |
| | General Fund | Debt Service Fund | Total | Adjustments | Statement of Net Position (Deficit) |
|---|---|---|---|---|---|
| **Assets:** | | | | | |
| Interest-bearing deposits with Government Development Bank for Puerto Rico | $ 5,167,570 | 360,939 | 5,528,509 | - | 5,528,509 |
| Deposit placed with commercial bank | - | 27,000,000 | 27,000,000 | - | 27,000,000 |
| Cash held by trustee | - | 4,763 | 4,763 | - | 4,763 |
| Receivable from the Commonwealth of Puerto Rico | - | 10,330,795,348 | 10,330,795,348 | - | 10,330,795,348 |
| Accrued interest receivable | - | 2,932 | 2,932 | - | 2,932 |
| Other receivables | - | 656,223 | 656,223 | - | 656,223 |
| Investments | 165,635 | 397,094,919 | 397,260,554 | - | 397,260,554 |
| Total assets | 5,333,205 | 10,755,915,124 | 10,761,248,329 | - | 10,761,248,329 |
| **Deferred outflows of resources:** | | | | | |
| Accumulated decrease in fair value of hedging derivative | - | - | - | 53,199,611 | 53,199,611 |
| Deferred loss on bonds refunding | - | - | - | 43,281,672 | 43,281,672 |
| Total deferred outflows of resources | - | - | - | 96,481,283 | 96,481,283 |
| **Liabilities:** | | | | | |
| Accounts payable and accrued liabilities | 178,795 | 623,945 | 802,740 | 3,400,000 | 4,202,740 |
| Accrued interest payable | - | - | - | 204,203,893 | 204,203,893 |
| Interest rate swap liability | - | - | - | 53,199,611 | 53,199,611 |
| Unearned revenue – sales and use tax | - | 10,330,795,348 | 10,330,795,348 | (10,330,795,348) | - |
| Bonds and notes payable in more than one year, net | - | - | - | 16,955,656,623 | 16,955,656,623 |
| Total liabilities | 178,795 | 10,331,419,293 | 10,331,598,088 | 6,885,664,779 | 17,217,262,867 |
| **Deferred inflows of resources:** | | | | | |
| Deferred gain on bond refundings | - | - | - | 100,237,016 | 100,237,016 |
| **Fund balance/net position (deficit):** | | | | | |
| Fund balance: | | | | | |
| Restricted | - | 424,495,831 | 424,495,831 | (424,495,831) | - |
| Unassigned | 5,154,410 | - | 5,154,410 | (5,154,410) | - |
| Total fund balance | 5,154,410 | 424,495,831 | 429,650,241 | (429,650,241) | - |
| Total liabilities and fund balance | $ 5,333,205 | 10,755,915,124 | 10,761,248,329 | | |
| **Net position (deficit):** | | | | | |
| Unrestricted | | | | (6,459,770,271) | (6,459,770,271) |
| Net position (deficit) | | | | $ (6,459,770,271) | (6,459,770,271) |

See accompanying notes to basic financial statements.

8

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of Governmental Funds Balance Sheet to the
Statement of Net Position (Deficit)

June 30, 2015

| | | |
|---|---|---:|
| Total fund balances - governmental funds: | $ | 429,650,241 |
| Amounts reported for governmental activities in the statement of net position (deficit) are different because: | | |
| Deferred outflows of resources do not constitute current financial resources and, therefore, are not reported in the funds | | 53,199,611 |
| Accrued interest payable is not due and payable in the current period, and, therefore, is not reported in the fund financial statements | | (204,203,893) |
| Contingent liabilities are not due and payable in the current period, and, therefore, are not reported in the fund financial statements | | (3,400,000) |
| Bonds and notes payable are not due and payable in the current period, and, therefore, are not reported in the funds financial statements | | (16,955,656,623) |
| Deferred loss on bond refundings is not reported as an expenditure in the governmental fund financial statements; however, such loss is deferred and amortized over the remaining life of the refunded bonds | | 43,281,672 |
| Deferred gain on bond refundings is not reported as revenue in the governmental fund financial statements; however, such gain is deferred and amortized over the remaining life of the refunded bonds | | (100,237,016) |
| Interest rate swap liability is not due and payable in the current period, and therefore, is not reported in the funds financial statements | | (53,199,611) |
| Receivable from the Commonwealth does not constitute current financial resources, and, therefore, is unearned in the fund financial statements | | 10,330,795,348 |
| Net position (deficit) of governmental activities | $ | (6,459,770,271) |

See accompanying notes to basic financial statements.

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Governmental Funds Statement of Revenues,
Expenditures, and Changes in Fund Balances and Statement of Activities
Year ended June 30, 2015

| | Statement of Governmental Funds Revenue, Expenditures, and Changes in Fund Balances | | | | |
| | General Fund | Debt Service Fund | Total | Adjustments | Statement of Activities |
|---|---|---|---|---|---|
| Expenditures/expenses: | | | | | |
| General government: | | | | | |
| Payment of obligations of the Commonwealth of Puerto Rico | $ 2,461,802 | - | 2,461,802 | (2,461,802) | - |
| Custodial credit loss | 19,732,380 | 6,424,842 | 26,157,222 | - | 26,157,222 |
| Other | 93,555 | 51,464 | 145,019 | - | 145,019 |
| Debt service: | | | | | |
| Interest | - | 643,668,454 | 643,668,454 | 315,768,063 | 959,436,517 |
| Total expenditures/expenses | 22,287,737 | 650,144,760 | 672,432,497 | 313,306,261 | 985,738,758 |
| Program revenues: | | | | | |
| Payments from Commonwealth of Puerto Rico – sales and use tax | - | 669,480,293 | 669,480,293 | (669,480,293) | - |
| Investment earnings | 36 | 401,876 | 401,912 | - | 401,912 |
| Other income | 30,000 | - | 30,000 | - | 30,000 |
| Total revenues | 30,036 | 669,882,169 | 669,912,205 | (669,480,293) | 431,912 |
| Net program (expenses) revenue | (22,257,701) | 19,737,409 | (2,520,292) | (982,786,554) | (985,306,846) |
| Other financing sources (uses): | | | | | |
| Transfers in (out) | 21,970,750 | (21,970,750) | - | - | - |
| Total other financing sources (uses) | 21,970,750 | (21,970,750) | - | - | - |
| Excess (deficiency) of revenues and other financing sources over expenditures and other financing uses | (286,951) | (2,233,341) | (2,520,292) | 2,520,292 | - |
| Change in net position (deficit) | - | - | - | (985,306,846) | (985,306,846) |
| Fund balance/net position (deficit): | | | | | |
| At beginning of year | 5,441,361 | 426,729,172 | 432,170,533 | (5,906,633,958) | (5,474,463,425) |
| At end of year | $ 5,154,410 | 424,495,831 | 429,650,241 | (6,889,420,512) | (6,459,770,271) |

See accompanying notes to basic financial statements.

10

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(An Component Unit of the Commonwealth of Puerto Rico)

Reconciliation of Governmental Funds Statement of Revenues, Expenditures, and Changes in
Fund Balances to the Statement of Activities

Year ended June 30, 2015

| | | |
|---|---|---:|
| Net changes in fund balances - total governmental funds: | $ | (2,520,292) |
| Amounts reported for governmental activities in the statement of activities are different because: | | |
| Net change in interest payable reported in the statement of activities does not require the use of current financial resources and, therefore, is not reported as expenditure in the governmental funds | | 3 |
| Accretion on capital appreciation bonds does not require the use of current financial resources and, therefore, is not reported as expenditure in the governmental funds | | (315,944,254) |
| Payments from the Commonwealth of Puerto Rico – Sales and Use Tax provide current financial resources to governmental funds; however, represent repayments of the receivable from the Commonwealth of Puerto Rico in the statement of activities | | (669,480,293) |
| Payments of obligations of the Commonwealth of Puerto Rico in exchange for future collections of Sales and Use Tax constitute secured borrowing transactions recorded as receivable from Commonwealth of Puerto Rico in the statement of net position (deficit) | | 2,461,802 |
| The amortization of bond discount/premium, and gain/loss on bond defeasance do not require the use of current financial resources and, therefore, are not reported as revenues/expenditures in governmental funds: | | |
| Amortization of bond discount/premium | | 1,156,874 |
| Amortization of gain/loss on bonds defeased | | (980,686) |
| Change in net position (deficit) of governmental activities | $ | (985,306,846) |

See accompanying notes to basic financial statements.

11

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

**(1) Reporting Entity**

Puerto Rico Sales Tax Financing Corporation (the Corporation) is a component unit of the Commonwealth of Puerto Rico (the Commonwealth) and a related entity of Government Development Bank for Puerto Rico (the Bank or GDB), another component unit of the Commonwealth. The Corporation was created under Act No. 91 of the Legislative Assembly of the Commonwealth (the Legislative Assembly), approved on May 13, 2006; as amended by Act No. 291, approved on December 26, 2006; Act No. 56, approved on July 6, 2007; Act No. 1, approved on January 14, 2009; Act No. 7, approved on March 9, 2009; and Act No. 18, approved on May 22, 2009 (collectively, Act No. 91). The Corporation was originally created for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006 (the 2006 Appropriation Debt).

The Commonwealth imposes a sales and use tax ("SUT") on a broad range of goods and services. The total tax imposed is 7% and is allocated as follows: 5.5% for the benefit of the Commonwealth (the Commonwealth Sales Tax), and 1.5% for the municipalities of the Commonwealth.

Act No. 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act No. 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each fiscal year, whichever is greater: (i) a minimum fixed amount, referred to in Act No. 91 as the Pledged Sales Tax Base Amount, or (ii) the product of the amount of the Commonwealth Sales Tax collected during such fiscal year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of the Commonwealth Sales Tax (the greater of (i) and (ii) being referred to as the Pledged Sales Tax). In each fiscal year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the fiscal year ended June 30, 2015, was $669,480,293. The Pledged Sales Tax Base Amount increases each fiscal year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act No. 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or satisfaction of the Authorized Uses (as defined below).

During 2009, the Legislative Assembly expanded the purposes of the Corporation. The Corporation is authorized to pay or finance, in whole or in part, or fund, in addition to the 2006 Appropriation Debt: (i) the debt of the Secretary of the Treasury of the Commonwealth (the Secretary of the Treasury) with the Bank in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for fiscal year 2009, (ii) certain financing granted to the Secretary of the Treasury by the Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008, that did not have a source of repayment or was payable from budgetary appropriations, (iii) a portion of the accounts payable to suppliers of the Commonwealth, (iv) operational expenses of the Commonwealth for fiscal years 2009, 2010, and 2011, (v) operational expenses of the Commonwealth for fiscal year 2012, to the extent included in the annual budget of the Commonwealth, (vi) the Puerto Rico Economic Stimulus Fund, (vii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (viii) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the Authorized Uses).

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

On October 9, 2013, an amendment to Act No. 91was signed into law which increased from 2.75% to 3.50% the portion of the Pledge Sales Tax deposited in the Dedicated Sales Tax Fund and expanded the Authorized Uses of Corporation's bond proceeds to include, among others, the refinancing of Bond Anticipation Notes and the financing of the Commonwealth's deficit for fiscal years 2013, 2014 and 2015.

Regardless of the level of Commonwealth Sales Tax collections, Act No. 91 requires that in each fiscal year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is deposited before any collections of the Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

(2)  **Summary of Significant Accounting Policies**

The preparation of basic financial statements in conformity with U.S. generally accepted accounting principles (US GAAP) requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure of contingent assets and liabilities at the date of the financial statements, and the reported amounts of changes in net position (deficit) during the reporting period. Actual results could differ from those estimates.

The accounting and reporting policies of the Corporation conform to accounting principles generally accepted in the United States of America, as applicable to governmental entities. The Corporation follows GASB under the hierarchy established by Statement No. 55, *The Hierarchy of Generally Accepted Accounting Principles for State and Local Governments*, in the preparation of its basic financial statements.

Following is a description of the Corporation's most significant accounting policies:

*(a)*  ***Basis of Presentation***

The financial activities of the Corporation consist only of governmental activities. For its reporting purposes, the Corporation has combined the fund and government-wide financial statements using a columnar format that reconciles individual line items of fund financial data to government-wide data in a separate column.

Government-Wide Financial Statements – The statement of net position (deficit) and the statement of activities report information on all activities of the Corporation. The effect of interfund balances has been removed from the statement of net position (deficit). Governmental activities are financed through revenue of the SUT deposited in the Dedicated Sales Tax Fund and other financing sources.

The statement of net position (deficit) presents the Corporation's assets and liabilities, with the difference reported as net position (deficit). Net position (deficit) is reported in two categories:

- Restricted Net Position – Results when constraints placed on net position use are either externally imposed by creditors, grantors, contributors, and the like, or imposed by law through constitutional provisions or enabling legislation.

- Unrestricted Net Position – Consist of net position that does not meet the definition in the preceding category. Unrestricted net position often is designated in order to indicate that management does not consider them to be available for general operations. Unrestricted net position often has constraints on use that are imposed by management, but such constraints may be removed or modified.

13  (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

The statement of activities demonstrates the degree to which direct expenses of a given function or segment are offset by program revenues. Direct expenses are those that are clearly identifiable within a specific function. Program revenues consist of investment earnings (including the change in fair value of ineffective investment derivative). Other items not meeting the definition of program revenues are reported as general revenues.

Governmental Funds Financial Statements – The accounts of the Corporation are organized on the basis of funds, each of which is considered a separate accounting entity. Separate financial statements are provided for governmental funds. Major individual governmental funds are reported as separate columns in the fund financial statements. All funds of the Corporation are major funds.

Fund Accounting – The financial activities of the Corporation are recorded in individual funds, each of which is deemed to be a separate accounting entity. Fund accounting is designed to demonstrate legal compliance and to aid financial management by segregating transactions related to certain government functions or activities. A fund is a separate accounting entity with a self-balancing set of accounts. The financial activities of the Corporation that are reported in the accompanying basic financial statements have been classified into the following major governmental funds:

- General Fund – The general fund of the Corporation is used to account for all financial resources, except those required to be accounted for in another fund.
- Debt Service Fund – The debt service fund is used to account for the SUT deposited in the Dedicated Sales Tax Fund for the payment of interest and principal on long-term obligations.

Fund balances for each governmental fund are displayed in the following classifications depicting the relative strength of the spending constraints placed on the purposes for which resources can be used:

- Nonspendable – amounts that cannot be spent because they are either not in a spendable form (such as inventories and prepaid amounts) or are legally of contractually required to be maintained intact.
- Restricted – amounts that can be spent only for specific purposes because of constraints imposed by external providers (such as grantors, bondholders, and higher levels of government), or imposed by constitutional provisions or enabling legislation. Effectively, restrictions may be changed or lifted only with the consent of the resource provider or by constitutional provisions or enabling legislation.
- Committed – amounts that can be spent only for specific purposes determined by a formal action of the government's highest level of decision-making authority. The Corporation's highest decision-making level of authority rests with the Board of Directors. The Corporation did not have any committed resources as of June 30, 2015.
- Assigned – amounts the government intends to use for specific purposes that do not meet the criteria to be classified as restricted or committed (generally executive orders approved by the Corporation's Executive Director).
- Unassigned – amounts that are available for any purpose.

14 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

*(b)* **Measurement Focus, Basis of Accounting and Financial Statement Presentation**

The accounting and financial reporting treatment is determined by the applicable measurement focus and basis of accounting. Measurement focus indicates the type of resources being measured such as current financial resources or economic resources. The basis of accounting indicates the timing of transactions or events for recognition in the financial statements.

Government-Wide Financial Statements – Government-wide financial statements are reported using the economic resources measurement focus and the accrual basis of accounting. Revenue is recorded when earned and expenses are recorded when a liability is incurred, regardless of the timing of related cash flows.

Governmental Funds Financial Statements – The governmental fund's financial statements are reported using the current financial resources measurement focus and the modified accrual basis of accounting. Revenues are recognized when they become measurable and available. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. For this purpose, the Corporation considers revenues to be available if they are collected within 30 days of the end of the current fiscal year-end. Expenditures generally are recorded when a liability is incurred as under accrual accounting, except that interest on general long-term obligations is generally recognized when paid, and debt service principal expenditures and claims and judgments are recorded only when payment is due. Expenses paid on behalf of the Commonwealth are recorded as an increase in the receivable from the Commonwealth of Puerto Rico in the government-wide financial statements.

Payments from the Commonwealth of Puerto Rico for SUT are recognized as revenue in the fund financial statements upon collection or when the Commonwealth is obligated to make the payments. In the government-wide financial statements, these payments reduce the receivable from the Commonwealth of Puerto Rico. Collections of SUT received after the receivable from the Commonwealth of Puerto Rico has been liquidated are reported as revenue in the statement of activities.

*(c)* **Budgetary Accounting**

The Corporation is not required to submit a budget for approval by the Legislative Assembly; consequently, no formal budgetary accounting procedures are followed.

*(d)* **Investments**

Investments are reported at fair value, except for money market instruments with a remaining maturity at the time of purchase of one year or less and investment positions in 2a7 (Securities and Exchange Commission Rule 2a7 of the Investment Company Act of 1940) like external investment pools, which are carried at cost or the pool's share price. Fair value is determined based on quoted market prices and quotations received from independent broker/dealers or pricing service organizations.

*(e)* **Bond Issue Costs and Premium/Discount on Bonds**

Premium (discounts) on bonds are amortized in a systematic manner over the life of the debt in the government-wide financial statements. Premium (discounts) are recognized in the period when the related long-term debt is issued in the governmental funds financial statements, and therefore are not

15                                                                 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

accounted for in subsequent periods. Bond issue costs are expensed as incurred in both government-wide and governmental fund financial statements.

*(f)* ***Interfund Transactions***

Transfers represent flows of assets (such as cash or goods) without equivalent flows of assets in return and without a requirement for repayment. In governmental funds, transfers are reported as other financing uses in the fund making transfers and as other financing sources in the funds receiving transfers.

*(g)* ***Refundings***

Refundings involve the issuance of new debt whose proceeds are used to repay immediately (current refunding) or at a future time (advance refunding) previously issued debt. The difference between the reacquisition price and the net carrying amount of the old debt is deferred and amortized as a component of interest expense over the remaining life of the old debt or the life of the new debt, whichever is shorter. The deferred amount is recorded on the statement of net position (deficit) as either a deferred inflow or deferred outflow of resources.

*(h)* ***Derivative Instruments***

The Corporation uses derivative financial instruments to manage the economic impact of fluctuations in interest rates. Derivative instruments are reported at fair value in the statement of net position (deficit).

*(i)* ***Deferred Outflows / Inflows of Resources***

In addition to assets, the statement of net position (deficit) includes a separate section for deferred outflows / inflows of resources. These separate financial statement elements, deferred outflows / inflows of resources, represent a depletion (expense/expenditure) or accretion (income) of net position (deficit) that applies to future periods and so will not be recognized as an outflow / inflow of resources until then. The following table shows the deferred outflows / inflows of resources elements at June 30, 2015:

| | | |
|---|---|---|
| Deferred outflows of resources: | | |
| Accumulated decrease in fair value of hedging derivative | $ | 53,199,611 |
| Deferred loss on bond refundings | | 43,281,672 |
| | $ | 96,481,283 |
| Deferred gain on bonds refunding | $ | 100,237,016 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

*(j)* **New Accounting Standard Adopted and Accounting Pronouncements Issued But Not Yet Effective**

**Accounting Standard Adopted**

The following new accounting pronouncement was early adopted by the Corporation effective July 1, 2014:

- GASB Statement No. 72, Fair Value Measurement and Application. This Statement required a government to use valuation techniques that are appropriate under the circumstances and for which sufficient data are available to measure fair value. The techniques should be consistent with one or more of the following approaches; the market approach, the cost approach, or the income approach. This Statement also establishes a hierarchy of inputs to valuation techniques used to measure fair value. That hierarchy has three levels. Level 1 inputs are quoted prices (unadjusted) in active markets for identical assets or liabilities. Level 2 inputs are inputs, other than quoted prices, included within Level 1 that are observable for the assets or liability, either directly or indirectly. Finally, Level 3 inputs are unobservable inputs, such as management's assumptions of the default rate among underlying mortgages of a mortgage-backed security. Implementation of this standard had no effect on the beginning fund balances of governmental funds. For further details of such impact in the Corporation's basic financial statements refer to Notes 6 and 9.

**Accounting Pronouncements Issued but not yet Effective**

- The following new accounting standards has been issued but not yet effective: GASB Statement No. 79, *Certain External Investment Pools and Pool Participants*. This Statement addresses accounting and financial reporting for certain external investment pools and pool participants. Specifically, it establishes criteria for an external investment pool to qualify for making the election to measure all of its investments at amortized cost for financial reporting purposes. An external investment pool qualifies for that reporting if it meets all of the applicable criteria established in this Statement. The specific criteria address (1) how the external investment pool transacts with participants; (2) requirements for portfolio maturity, quality, diversification, and liquidity; and (3) calculation and requirements of a shadow price. Significant noncompliance prevents the external investment pool from measuring all of its investments at amortized cost for financial reporting purposes. Professional judgment is required to determine if instances of noncompliance with the criteria established by this Statement during the reporting period, individually or in the aggregate, were significant. If an external investment pool does not meet the criteria established by this Statement, that pool should apply the provisions in paragraph 16 of Statement No. 31, *Accounting and Financial Reporting for Certain Investments and for External Investment Pools*, as amended. If an external investment pool meets the criteria in this Statement and measures all of its investments at amortized cost, the pool's participants also should measure their investments in that external investment pool at amortized cost for financial reporting purposes. If an external investment pool does not meet the criteria in this Statement, the pool's participants should measure their investments in that pool at fair value, as provided in paragraph 11 of Statement 31, as amended. This Statement establishes additional note disclosure requirements for qualifying external investment pools that measure all of their investments at amortized cost for financial reporting purposes and for governments that participate in those pools. Those disclosures for both the qualifying external investment pools and their participants include information about any limitations or restrictions on participant withdrawals. This Statement is not effective until fiscal year 2016, except for certain provisions on portfolio quality, custodial credit risk, and shadow pricing. Those provisions are not effective until fiscal year 2017.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

- GASB Statement No. 80, *Blending Requirements for Certain Component Units*. This Statement improves financial reporting by clarifying the financial statement presentation requirements for certain component units. This Statement amends the blending requirements established in paragraph 53 of Statement No. 14, *The Financial Reporting Entity*, as amended. This Statement amends the blending requirements for the financial statement presentation of component units of all state and local governments. The additional criterion requires blending of a component unit incorporated as a not-for-profit corporation in which the primary government is the sole corporate member. The additional criterion does not apply to component units included in the financial reporting entity pursuant to the provisions of Statement No. 39, *Determining Whether Certain Organizations Are Component Units*. This Statement is not effective until fiscal year 2017.

- GASB Statement No. 81, *Irrevocable Split-Interest Agreements*. This Statement improves accounting and financial reporting for irrevocable split-interest agreements by providing recognition and measurement guidance for situations in which a government is a beneficiary of the agreement. Split-interest agreements are a type of giving agreement used by donors to provide resources to two or more beneficiaries, including governments. Split-interest agreements can be created through trusts, or other legally enforceable agreements with characteristics that are equivalent to split-interest agreements, in which a donor transfers resources to an intermediary to hold and administer for the benefit of a government and at least one other beneficiary. Examples of these types of agreements include charitable lead trusts, charitable remainder trusts, and life-interests in real estate. This Statement requires that a government that receives resources pursuant to an irrevocable split-interest agreement recognize assets, liabilities, and deferred inflows of resources at the inception of the agreement. Furthermore, this Statement requires that a government recognize assets representing its beneficial interests in irrevocable split-interest agreements that are administered by a third party, if the government controls the present service capacity of the beneficial interests. This Statement requires that a government recognize revenue when the resources become applicable to the reporting period. This Statement is not effective until fiscal year 2018.

Management is evaluating the impact that these Statements will have on the Corporation's basic financial statements.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

**(3) Going Concern**

Management believes that there is substantial doubt about the Corporation's ability to continue as a going concern because of the following:

On June 30, 2016, the U.S. Congress enacted the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which grants the Commonwealth and its component units' access, including COFINA, to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In broad strokes, PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of the Financial Oversight and Management Board (the Oversight Board), relief from creditors and lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt.

On May 5, 2018, the Oversight Board filed a petition for relief under Title III of (PROMESA.) Title III of PROMESA incorporates the automatic stay provisions of Bankruptcy Code section 362 and 922, which are made applicable to the Title III cases to PROMESA section 301 (a). As further discussed in note 11, certain stakeholders (bondholders, creditors, guarantors, investors and others) commenced legal proceedings challenging the constitutionality of the law that created COFINA and the ownership of the future SUT revenues.

As further discussed in note 11, the Oversight Board also approved and certified the fiscal plan of the Commonwealth and certain other governmental entities (the Fiscal Plan). The Fiscal Plan contemplates that for each of the next 5 fiscal years (FY 2018-2023) some portion of the Pledged Sales Tax will be used by the Commonwealth for purposes other than payment of COFINA debt service.

*Remediation Plan*

Management believes that the outcome of the Title III proceeding in the federal court is highly uncertain at this time and the resolution of the legal conflicts could result in the redirection of revenues to pay-non COFINA's bondholders and other government creditors or significantly modifying or terminating COFINA purpose. The Corporation assumes that the Plan of Adjustment that will be filed in the Title III case will address the Corporation's liabilities. Management of the Corporation believes that the aforementioned events and the further circumstances also described in note 11, raise substantial doubt about the Corporation ability to continue as going concern.

**(4) Deposits**

Custodial credit risk is the risk that, in the event of a bank failure of a depository financial institution, the Corporation will not be able to recover deposits or will not be able to recover collateral securities that are in possession of an outside party. The Corporation does not have a policy for custodial credit risk.

The table presented below discloses the level of custodial credit risk assumed by the Corporation at June 30, 2015. As of June 30, 2015, $58,435,731 of the depository bank balance of $58,690,494 was uninsured as follows:

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

|  | Carrying amount | | Depository bank balance | | Amount uninsured and uncollateralized |
|---|---|---|---|---|---|
| Interest-bearing deposits with GDB | $ | 5,528,509 | $ | 31,685,731 | $ | 31,685,731 |
| Deposits placed with banks |  | 27,000,000 |  | 27,000,000 | 26,750,000 |
| Cash held by trustee |  | 4,763 |  | 4,763 | — |
| Total | $ | 32,533,272 | $ | 58,690,494 | $ | 58,435,731 |

GDB faces significant risk and uncertainties and it currently does not have sufficient liquid financial resources to meet obligations as they become due. Therefore, deposits held at GDB were subject to strict restrictions and limitations during fiscal year 2015, and subsequent periods. GDB served as the primary depository agent of the Commonwealth, its instrumentalities and municipalities' funds; depositors' cash and cash equivalents with GDB are thus subject to custodial credit risk. Management determined that a custodial credit loss existed as of June 30, 2015 for the deposits held at GDB. Based on an evaluation of the availability and recoverability of such deposits, a custodial credit loss on these deposits has been recorded on the financial statements as follows:

|  | Amount |
|---|---|
| Governmental activities: | |
| Carrying value before loss | $ 31,685,731 |
| Custodial credit loss | (26,157,222) |
| Net carrying value | $ 5,528,509 |

The aforementioned custodial credit loss of approximately $26.2 million was recognized as general government expenditures of the governmental activities.

GDB is currently in a process directed to restructure its obligations. Such restructuring may require the offset between financial instruments assets and liabilities held by GDB. The proposed restructuring remains subject to different milestones. Upon an eventual restructuring of GDB obligations and the execution of the milestones noted in the GDB Restructuring Support Agreement, the recorded and unrecorded custodial credit loss on the interest-bearing deposits disclosed above may change.

At February 28, 2018 (last reporting period that GDB has available financial information prior to its business discontinuance effective March 23, 2018), the Corporation holds deposits at GDB of approximately $26.1 million (unaudited). The ultimate custodial credit loss related to the deposits held at GDB subsequent to June 30, 2015, if any, cannot be determined until GDB concludes its restructuring process.

(5) **Receivable from the Commonwealth of Puerto Rico**

At June 30, 2015, the receivable from the Commonwealth of Puerto Rico consist of SUT amounts for which the Commonwealth is obligated to make payments.

As previously disclosed in note 1, regardless of the level of Commonwealth sales tax collections, Act No. 91 requires that in each fiscal year all collections of the Commonwealth sales tax be deposited in the Dedicated

20 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is deposited before any collections of the Commonwealth sales tax are deposited in the Commonwealth's General Fund.

**(6) Investments**

In accordance with investment guidelines promulgated by the Bank for agencies and public corporations of the Commonwealth under the authority provided by Act No. 113 of August 3, 1995, and Executive Order 1995-50A (the investment guidelines), the Corporation is authorized to purchase or enter into the following investment instruments:

- U.S. government and agencies obligations
- Certificates of deposit
- Bankers acceptances
- Commercial paper
- Participations in the Puerto Rico Government Investment Trust Fund (PRGITF)
- Obligations of the Commonwealth of Puerto Rico, its agencies, municipalities, public corporations, and instrumentalities
- Obligations of state and local governments of the United States of America
- Mortgage and asset-backed securities
- Corporate debt, including investment contracts
- External investment pools

The Corporation's investment policies establish limitations and other guidelines on maturities and amounts to be invested in the aforementioned investment categories and by issuer/counterparty and on exposure by country. In addition, such policies provide guidelines on the institutions with which investment transactions can be entered into. In addition, the Asset Liability Management Committee (ALCO) of the Bank, in conjunction with the board of directors of the Corporation will determine, from time to time, other transactions that the Corporation may enter into.

Investments held by the debt service fund are purchased following the provisions of the related trust indenture.

***Interest Rate Risk*** – Interest rate risk is the risk that changes in interest rates will adversely affect the fair value of an investment. The Corporation's investment policies also provide that the Bank's ALCO is responsible for implementing and monitoring the interest rate risk policies and strategies. The Bank's ALCO meets on a monthly basis to coordinate and monitor the interest rate risk management of interest sensitive assets and interest sensitive liabilities, including matching of their anticipated level and maturities, consistent with the corresponding laws and the Board of Directors objectives.

The following table summarizes the type and maturities of investments held by the Corporation at June 30, 2015:

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

| Investment type | | Due within one year |
|---|---|---|
| U.S. Treasury State and Local Government Series (SLGs) | $ | 14,595,810 |
| Corporate debt: | | |
|   Credit Agricole Corp. | | 22,900,000 |
|   Abbey National North America | | 44,990,261 |
|   Institutional Secured Funding | | 49,988,300 |
|   Anglesea Funding PLC | | 49,989,179 |
|   Banque Populaire and Caisse d'Epargne | | 31,991,264 |
|   Societe Generale Group | | 31,895,276 |
| External investment pools: | | |
|   Dreyfus Government Cash Management | | 150,373,556 |
|   Puerto Rico Government Investment | | |
|     Trust Fund (PRGITF) | | 536,908 |
|     Total investments | $ | 397,260,554 |

Investments in external investments pools consist of $536,908 invested in PRGITF, an internal investment pool of the Commonwealth, and $150,373,556 invested in Dreyfus Government Cash Management (Dreyfus) with the Bank of New York Mellon, which is an investment pool registered with the Securities and Exchange Commission.

*Credit Risk* – Credit risk is the risk that an issuer or other counterparty to an investment will not fulfill its obligations. The Corporation's investment policies provide that investment transactions shall be entered into only with counterparties that are rated BBB+/A-1 or better by Standard & Poor's or equivalent rating by Moody's or Fitch, depending on the type and maturity of the investment and the counterparty to the transaction. Any exceptions must be approved by the Corporation's board of directors. The investment policies also provide that purchases and sales of investment securities shall be made using the delivery versus payment procedures.

Investments in U.S. Treasury SLGs carry the explicit guarantee of the U.S. government. As of June 30, 2015, the credit rating of PRGITF, Dreyfus and the Corporate Debt portfolio was "AAAm", "A-1+", and "A-1", respectively, by Standard & Poor's. The investment in PRGITF was held by the Corporation, while the investments in Corporate Debt and Dreyfus were held by Bank of New York Mellon, as trustee, in the name of the Corporation.

*Concentration of Credit Risk* – The Corporation places no limits on the amount it may invest in any one issuer. As of June 30, 2015, 3.7% of the Corporation's investments are in U.S. Treasury State and Local Government Series, 58.3% are in corporate debt, and 38% are in external investment pools.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

The following table shows the investments by fair value level held by the Corporation at June 30, 2015:

| Investments by fair value level | As of June 30, 2015 | Fair Value Measurement Levels | | |
|---|---|---|---|---|
| | | Level 1 | Level 2 | Level 3 |
| Debt securities: | | | | |
| U.S. Treasury State and Local Government Series (SLGs) | $ 14,595,810 | $ — | $ 14,595,810 | $ — |
| Corporate debt: | | | | |
| Credit Agricole Corp. | 22,900,000 | — | 22,900,000 | — |
| Abbey National North America | 44,990,261 | — | 44,990,261 | — |
| Institutional Secured Funding | 49,988,300 | — | 49,988,300 | — |
| Anglesea Funding PLC | 49,989,179 | — | 49,989,179 | — |
| Banque Populaire and Caisse d'Epargne | 31,991,264 | — | 31,991,264 | — |
| Societe Generale Group | 31,895,276 | — | 31,895,276 | — |
| External investment pools: | | | | |
| Dreyfus Government Cash Management | 150,373,556 | — | 150,373,556 | — |
| Puerto Rico Government Investment Trust Fund (PRGITF) | 536,908 | — | 536,908 | — |
| Total investments by fair value level | $ 397,260,554 | $ — | $ 397,260,554 | $ — |

The debt securities, corporate debt and the external investment pools classified in Level 2 of the fair value hierarchy are valued using inputs other than quoted prices under Level 1 that are observable for the assets, either directly or indirectly on the measurement date.

**(7) Transactions with the Bank and the Commonwealth**

The Corporation is a related entity of the Bank. During the year ended June 30, 2015, the Bank provided certain management and administrative services to the Corporation at no cost.

In accordance with Act No. 91, the Corporation incurred expenses on behalf of the Commonwealth amounting to approximately $2.5 million for Authorized Uses.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

**(8)    Bonds Payable**

As of June 30, 2015, bonds payable of the Corporation consist of the following (in thousands):

| Description | Face/Effective Interest Rate | | Amount |
|---|---|---|---|
| Sales Tax Revenue Bonds, Series 2007A: | | | |
| Capital Appreciation Bonds due from August 1, 2040 to August 1, 2056 | 4.96%–5.34% | $ | 2,485,741 |
| Fixed Rate Bonds due on August 1, 2057, including unamortized premium of $14,787 | 5.25% | | 578,672 |
| LIBOR-Based Adjustable Rate Bonds due on August 1, 2057 | 1.11% | | 136,000 |
| Sales Tax Revenue Bonds, Series 2007B: | | | |
| Capital Appreciation Bonds due from August 1, 2027 to August 1, 2032 | 6.20%–6.25% | | 239,930 |
| Fixed Rate Bonds due from August 1, 2036 to August 1, 2057, net of unaccreted discount of $2,529 | 6.05%–6.35% | | 1,183,471 |
| Sales Tax Revenue Bonds, Series 2007C: | | | |
| Capital Appreciation Bonds due from August 1, 2022 to August 1, 2038 | 6.10% | | 133,567 |
| Term Bonds due from August 1, 2022 to August 1, 2038 | 6.00% | | 415,305 |
| Sales Tax Revenue Bonds, Series 2008A: | | | |
| Capital Appreciation Bonds due from August 1, 2024 to August 1, 2036 | 6.23% | | 382,804 |
| Term Bonds due from August 1, 2027 to August 1, 2038 | 6.13% | | 488,885 |
| Subtotal carried forward | | | 6,044,375 |

24 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

| Description | Face/Effective Interest Rate | Amount |
|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2009A: | | |
| Fixed Rate Bonds due from August 1, 2015 to August 1, 2029, including unamortized premium of $8,979, net of unaccreted discount of $11,273 | 3.75%–6.13% | $ 1,066,076 |
| Term Bonds due from August 1, 2036 to August 1, 2044, including unamortized premium of $14,901, and net of unaccreted discount of $44,429 | 5.75%–6.50% | 1,785,473 |
| Capital Appreciation Bonds due from August 1, 2030 to August 1, 2034 | 6.88%–7.13% | 212,166 |
| Convertible Capital Appreciation Bonds due on August 1, 2030 to August 1, 2032 (1) | 6.75% | 513,556 |
| Sales Tax Revenue Bonds, First Subordinate Series 2009B: | | |
| Fixed Rate Bonds due from August 1, 2025 to August 1, 2039 | 6.05%–6.35% | 918,920 |
| Capital Appreciation Bonds due from August 1, 2033 to August 1, 2035 | 7.38%–7.48% | 83,442 |
| Convertible Capital Appreciation Bonds due from August 1, 2025 to August 1, 2031 (2) | 6.90%–7.00% | 313,291 |
| Sales Tax Revenue Bonds, Senior Series 2009C – Fixed Rate: | | |
| Bonds due on August 1, 2057 | 5.75% | 237,875 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010A: | | |
| Fixed Rate Bonds due from August 1, 2016 to August 1, 2040, including unamortized premium of $1,129 and net of unaccreted discount of $2,319 | 3.38%–5.63% | 305,421 |
| Term Bonds due from August 1, 2036 to August 1, 2042, net of unaccreted discount of $22,749 | 5.38%–5.50% | 1,214,591 |
| Capital Appreciation Bonds due from August 1, 2031 to August 1, 2036 | 6.65%–6.77% | 186,204 |
| Convertible Capital Appreciation Bonds due on August 1, 2029 to August 1, 2033 (3) | 6.13%–6.25% | 209,347 |
| Subtotal carried forward | | 13,090,737 |

(1) Convertible to fixed-rate interest bonds on August 1, 2016.
(2) Convertible to fixed-rate interest bonds on August 1, 2016 and August 1, 2020 for bonds maturing on August 1, 2030 and 2031.
(3) Convertible to fixed-rate interest bonds on August 1, 2019.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

| Description | Face/Effective Interest Rate | Amount |
|---|---|---|
| Sales Tax Revenue Bonds, First Subordinate Series 2010C: | | |
| Fixed Rate Bonds due from August 1, 2035 to August 1, 2041, including unamortized premium of $14,071 and net of unaccreted discount of $776 | 5.13%–6.50% | $ 464,510 |
| Term Bonds due from August 1, 2033 to August 1, 2041, net of unaccreted discount of $22,608 | 5.00%–5.50% | 1,047,862 |
| Capital Appreciation Bonds due from August 1, 2037 to August 1, 2039 | 6.63% | 135,847 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010D – Fixed Rate Bonds due on August 1, 2042 | 5.75% | 89,435 |
| Sales Tax Revenue Bonds, First Subordinate Series 2010E – Fixed Rate Bonds due on August 1, 2042 | 5.75% | 92,755 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011A-1: | | |
| Fixed Rate Bonds due on August 1, 2043, including unamortized premium of $2,578 and net of unaccreted discount of $2,608 | 5.00%–5.25% | 354,999 |
| Capital Appreciation Bonds due from August 1, 2023 to August 1, 2041 | 5.25%–6.50% | 52,197 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011A-2 | | |
| Capital Appreciation Bonds due from August 1, 2043 to August 1, 2050 | 7.00% | 433,488 |
| Sales Tax Revenue Bonds, First Subordinate Series 2011B: | | |
| Fixed Rate Bonds due from August 1, 2031 and August 1, 2036 | 5.00%–5.15% | 45,620 |
| Sales Tax Revenue Bonds, Senior Series 2011C: | | |
| Fixed Rate Bonds due from August 1, 2020 to August 1, 2039, including unamortized premium of $12,144 and net of unaccreted discount of $712 | 4.00%–5.00% | 192,362 |
| Term Bonds due from August 1, 2040 and August 1, 2046, including unamortized premium of $13,949 | 5.00%–5.25% | 737,704 |
| Capital Appreciation Bonds due from August 1, 2034 to August 1, 2041 | 6.15%–6.25% | 126,986 |
| Sales Tax Revenue Bonds, Senior Series 2011D: | | |
| Fixed Rate Bonds due on August 1, 2023 | 3.80% | 45,000 |
| Term Bonds due from August 1, 2025 and August 1, 2036 | 4.10%–4.85% | 46,155 |
| Bonds payable – net | | $ 16,955,657 |

All term bonds have fixed interest rates.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

Bonds and note payable activity for the year ended June 30, 2015 is as follows (in thousands):

| Description | Balance at June 30, 2014 | Additions | Reductions | Balance at June 30, 2015 |
|---|---|---|---|---|
| Bonds payable | $ 11,474,555 | — | — | 11,474,555 |
| Capital appreciation bonds – principal | 23,716,216 | — | — | 23,716,216 |
| Discount on capital appreciation bonds | (18,523,595) | 315,944 | — | (18,207,651) |
| Less: | | | | |
| Unamortized bond premium (discount), net | (26,306) | — | (1,157) | (27,463) |
| Bonds and note payable – net | $ 16,640,870 | 315,944 | (1,157) | 16,955,657 |

As of June 30, 2015, debt service requirements for bonds outstanding were as follows:

| Year ending June 30 | Principal | Interest | Interest subsidy (1) | Total |
|---|---|---|---|---|
| 2016 | $ 11,300,000 | 647,350,179 | (3,834,522) | 654,815,657 |
| 2017 | 38,295,000 | 674,289,879 | (3,834,522) | 708,750,357 |
| 2018 | 18,745,000 | 693,590,212 | (3,834,522) | 708,500,690 |
| 2019 | 47,950,000 | 692,042,637 | (3,834,522) | 736,158,115 |
| 2020 | 79,765,000 | 697,230,034 | (3,834,522) | 773,160,512 |
| 2021-2025 | 826,370,000 | 3,514,559,732 | (19,172,612) | 4,321,757,120 |
| 2026-2030 | 1,996,735,000 | 3,226,854,358 | (19,172,612) | 5,204,416,746 |
| 2031-2035 | 3,649,845,000 | 2,707,847,854 | (19,172,612) | 6,338,520,242 |
| 2036-2040 | 5,673,625,000 | 1,999,524,575 | (19,172,612) | 7,653,976,963 |
| 2041-2045 | 7,677,065,000 | 748,279,580 | (8,627,677) | 8,416,716,903 |
| 2046-2050 | 6,492,368,317 | 316,602,249 | — | 6,808,970,566 |
| 2051-2055 | 5,285,143,349 | 313,364,874 | — | 5,598,508,223 |
| 2056-2058 | 3,393,564,581 | 149,188,804 | — | 3,542,753,385 |
| | 35,190,771,247 | $ 16,380,724,967 | (104,490,735) | 51,467,005,479 |

| Plus (less): | |
|---|---|
| Unamortized premium | 82,540,851 |
| Unaccreted discount | (110,003,933) |
| Unaccreted interest | (18,207,651,542) |
| Bonds payable – net | $ 16,955,656,623 |

(1)   Sales Tax Revenue Bonds, First Subordinate Series 2010D and 2010E were issued as Build America Bonds. The Corporation will receive a subsidy payment from the federal government equal to 35% and 45%, respectively, of the amount of each interest payment. On June 24, 2013, the IRS sent notice that 8.7% of the subsidy payment on the Build America Bonds will be sequestered due to adjustments to the Federal Government budget.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

At June 30, 2015, the Corporation has $136,000,000 of LIBOR based adjustable-rate bonds maturing on August 1, 2057. As discussed in note 9, the Corporation has entered into a $136,000,000 interest rate swap, whereby it receives the same rate paid on the adjustable rate bonds and pays a fixed rate of 4.92% through August 1, 2057. Accordingly, the Corporation has synthetically fixed the interest rate on the adjustable rate bonds. Assuming the rate effective as of June 30, 2015 remains the same, debt service requirements for the adjustable rate bonds and net swap payments for their term, are as follows:

| Year ending June 30 | Adjustable-Rate Bonds | | Interest Rate | Total |
| | Principal | Interest | Swap, Net | |
|---|---|---|---|---|
| 2016 | $ — | 1,619,745 | 5,071,455 | 6,691,200 |
| 2017 | — | 1,844,867 | 4,846,333 | 6,691,200 |
| 2018 | — | 1,844,867 | 4,846,333 | 6,691,200 |
| 2019 | — | 1,844,867 | 4,846,333 | 6,691,200 |
| 2020 | — | 1,844,867 | 4,846,333 | 6,691,200 |
| 2021-2025 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2026-2030 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2031-2035 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2036-2040 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2041-2045 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2046-2050 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2051-2055 | — | 9,224,336 | 24,231,664 | 33,456,000 |
| 2056-2058 | 136,000,000 | 6,457,035 | 10,270,965 | 152,728,000 |
| Total | $ 136,000,000 | 80,026,600 | 204,349,400 | 420,376,000 |

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

The amount deposited each year in the Dedicated Sales Tax Fund is pledged for the payment of the Corporation's bonds payable. The minimum amount to be deposited is the SUT Base Amount, which for the fiscal year ended June 30, 2015, was $669,480,293. The SUT Base Amount increases each fiscal year at a statutory rate of 4% up to $1,850,000,000. At June 30, 2015, the estimated SUT Base Amount, by year, is as follows:

| Year ending June 30 | | Amount |
|---|---|---|
| 2016 | $ | 696,259,504 |
| 2017 | | 724,109,884 |
| 2018 | | 753,074,279 |
| 2019 | | 783,197,250 |
| 2020 | | 814,525,140 |
| 2021-2025 | | 4,588,200,125 |
| 2026-2030 | | 5,582,246,999 |
| 2031-2035 | | 6,791,657,012 |
| 2036-2040 | | 8,263,089,218 |
| 2041-2045 | | 9,250,000,000 |
| 2046-2050 | | 9,250,000,000 |
| 2051-2055 | | 9,250,000,000 |
| 2056-2058 | | 5,550,000,000 |
| | $ | 62,296,359,411 |

On September 2014, the Board of Directors of COFINA, due to Moody's and Fitch downgrade of COFINA's credit triggering the Additional Termination Event (ATE) on the agreement, entered into an agreement with Goldman Sachs (GS) that required COFINA to post collateral over time, and allow the swap to remain in place and remove all ATE's. As of June 30, 2015 said collateral amounted to $27 million.

On July 29, 2014, Fitch lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and the COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "AA-" to "BB-", and from "A+" to "BB-", respectively. Subsequently, Fitch lowered the Corporation's credit ratings two more times. As of June 30, 2015 the Corporation's credit ratings was "CC" for both the Senior Series, and the First Subordinate Series.

On July 11, 2014, Standard & Poor's Ratings Services (S&P) lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "AA-" to "BBB", and from "A+" to "BBB-", respectively. Subsequently, S&P lowered the Corporation's credit ratings three more times. As of June 30, 2015 the Corporation's credit ratings was "CCC-" for both the Senior Series, and the First Subordinate Series.

On July 1, 2014, Moody's lowered its rating on the Commonwealth's COFINA Sales Tax Revenue Bonds, Senior Series, and COFINA Sales Tax Revenue Bonds, First Subordinate Series, from "Baa1" to "Ba3", and from "Baa2" to "B1", respectively. Subsequently, Moody's lowered the Corporation's credit ratings on February 19, 2015 and May 21, 2015. As of June 30, 2015 the Corporation's credit ratings was "Caa2" for the COFINA Sales Tax Revenue Bonds, Senior Series, and "Caa3" for the COFINA Sales Tax Revenue Bonds, First Subordinate Series.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**

(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

On November 23, 2011, the Corporation issued $397.7 million Series 2011A-1 bonds. Part of the proceeds from the Series 2011A-1 bonds was used to advance refund part of the outstanding Series 2009A bonds aggregating $52,780,000 and bearing interest ranging from 4.00% to 6.125%. The Corporation used approximately $65,867,000 from the net proceeds of the issued Series 2011A-1 bonds and other funds to purchase U.S. government securities, which were deposited in an irrevocable trust fund with an escrow agent to provide for all future debt services payments of the refunded Series 2009A bonds. On November 23, 2011, the Corporation also issued its Series 2011 B bonds amounting to approximately $45.6 million to advance refund part of the outstanding Series 2009 B bonds aggregating $38,490,000 and bearing interest at 6.05%. The Corporation used the net proceeds of the issued Series 2011B bonds and other funds to purchase U.S. government securities, which were deposited in an irrevocable trust fund with an escrow agent to provide for all future debt services payments of the refunded Series 2009 B bonds. Accordingly, the Series 2009A and the Series 2009B refunded bonds are considered to be defeased and the liabilities have therefore been removed from the statement of net position. As a result of these advance refundings, the Corporation expects to increase its total debt service requirements by approximately $34.3 million over the next 25 years and will incur an economic loss (the difference between the present values of the debt service payments of the refunded bonds and the refunding bonds) of approximately $4.7 million. The outstanding balance of the advance refunded bonds was $91,270,000 at June 30, 2015.

**(9) Derivative Instruments**

By using derivative financial instruments to hedge the exposure to changes in interest rates, the Corporation exposes itself to interest rate risk, credit risk, and termination risk.

Interest rate risk is the adverse effect on the value of a financial instrument that results from a change in interest rates. The Corporation is exposed to interest rate risk on its pay-fixed, receive-variable swap; as LIBOR decreases, the Corporation's net payment on the swap increases. At the same time, interest payments on the hedged adjustable rate bonds decrease. The interest rate risk associated with interest rate swap contracts is managed by establishing and monitoring parameters that limit the types and degree of interest rate risk that may be undertaken.

Credit risk is the failure of the counterparty (or its guarantor) to perform under the terms of the derivative contract. When the fair value of a derivative contract is positive, the counterparty owes the Corporation, which creates credit risk for the Corporation. When the fair value of a derivative contract is negative, the Corporation owes the counterparty and, therefore, does not possess credit risk. The Corporation minimizes the credit risk in derivative instruments by entering into transactions with counterparties whose credit rating is acceptable under the investment policies of the Corporation. At June 30, 2015, there is no credit risk since the fair value of derivative instrument is negative.

Termination risk is the possibility that a hedging derivative instrument's unscheduled end will affect the Corporation's liability strategy or will present the Corporation with potentially significant unscheduled termination payments to the counterparty. The Corporation or its counterparties may terminate a derivative instrument if the other party fails to perform under the terms of the contract. The Corporation is at risk that the counterparty will terminate a swap at a time when the Corporation owes it a termination payment. The Corporation has mitigated this risk by specifying that the counterparty has the right to terminate only as a result of certain events, including: a payment default by the Corporation; insolvency of the Corporation (or similar events); or a downgrade of the Corporation's credit rating below BBB+ or Baa1. If at the time of termination, an investment derivative instrument is in a liability position, the Corporation would be liable to the counterparty for a payment equal to the liability, subject to netting arrangements.

30 (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

The Corporation has entered into an interest rate exchange agreement (swap) with a counterparty in connection with the issuance of LIBOR-Based Adjustable Rate Bonds within the Sales Tax Revenue Bonds Series 2007A (the Adjustable Rate Bonds). The Adjustable Rate Bonds expose the Corporation to variability in interest payments due to changes in interest rates. Management believes that it is prudent to limit the variability of interest payments on the Adjustable Rate Bonds. To meet this objective, management entered into an interest rate swap agreement to manage fluctuations in cash flows resulting from interest rate risk. This swap effectively changes the variable rate cash flow exposure on the Adjustable Rate Bonds to fixed cash flows. Under the terms of the interest rate swap, the Corporation receives variable interest rate payments equal to the interest payment on the Adjustable Rate Bonds, and makes fixed interest rate payments, thereby creating the equivalent of a fixed rate debt. At June 30, 2015, the credit rating of the counterparty to this swap agreement was A-1 by Standard & Poor's.

On July 1, 2014, Moody's issued a downgrade on the LIBOR 2007A Bonds to a rating of Ba3. On September 24, 2014, rather than terminate the Swap Agreement, the Corporation and GS entered into a new credit annex (the "2014 Credit Support Annex") as well as an Amendment to the ISDA Master Agreement (the "2014 ISDA Amendment") to permit the Corporation to collateralize its obligations under the Swap Agreement and to amend the termination events thereunder. The impact of the new agreement was for the Corporation to post $12 million in collateral to GS, as well as set up a restricted account in which a portion of the collateral be deposited for the benefit of GS. In addition, from now until fiscal year 2018, COFINA is committed to post up to $15 million annually in additional collateral by March 15 of each year. Overt time, the maximum amount COFINA would have to post is $60 million. On January 28, 2015, COFINA posted the $15 million additional collateral due on March 31, 2015. As of June 30, 2015, the collateral amount held by GS is $27 million.

The fair value and notional amount of the derivative instrument outstanding at June 30, 2015, classified by type, was as follows:

| Notional amount | Fair value | Change in Fair value | Floating rate indicator | Maturity date | Receives | | Pays | | Cash outflows |
|---|---|---|---|---|---|---|---|---|---|
| | (In thousands) | (In thousands) | | | Type | Rate | Type | Rate | (in thousands) |
| Hedging Derivative Instrument: | | | | | | | | | |
| $ 136,000 | $ 53,200 | $3,330 | 67% of 3m LIBOR plus 0.93 | 8/1/2057 | Variable | 1.101% | Fixed | 4.920% | 5,210 |

The fair value of the interest rate swap classified in Level 2 of the fair value hierarchy was estimated using the zero-coupon method. This method calculates the future net settlement payments required by the swap, assuming that the current forward rate implied by the yield curve correctly anticipates future spot interest rates. These payments are then discounted using the spot rates implied by the current yield curve for hypothetical zero-coupon bonds due on the date of each future net settlement on the swaps.

**(10) Contingency**

In connection with the termination of an interest rate exchange agreement (swap) with a notional amount of $218 million by the Corporation relating to its Sales Tax Revenue Bonds, Series 2007A, the Corporation made a termination payment to the counterparty in November 2008. The counterparty subsequently asserted that it is entitled to a termination payment in excess of that paid by the Corporation in November 2008, plus interest at a default rate, amounting to approximately $64.0 million as of fiscal year end 2011. The

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

counterparty alleged that the date of the termination notice used by the Corporation for purposes of calculating the termination payment was not in accordance with the agreement. In addition, the counterparty alleged that the termination payment should have been based on the value of replacement swaps entered into by the Corporation, which actually have different credit terms than those contained in the terminated swap.

During the year ended June 30, 2011, the Corporation accrued $3.4 million in connection with this matter. This amount is presented as accounts payables and accrued liabilities in the accompanying statement of net position (deficit).

The Corporation intends to contest this matter vigorously. Among other things, it is the opinion of the Corporation's management that, even assuming that the counterparty's allegations regarding improper termination are correct, the amounts claimed by the counterparty are not correct. Accordingly, management does not expect that the ultimate costs to resolve this matter will have a material adverse effect on its financial position or results of operations.

**(11) Subsequent Events**

Subsequent events were evaluated through September 17, 2018 to determine if any such events should either be recognized or disclosed in the 2015 basic financial statements. Management believes that the subsequent events disclosed below are intrinsically related to the financial statements of the Corporation. These might have been disclosed elsewhere in these financial statements, but management believes they require specific mentioning based on their relevance and materiality as a whole.

**Significant legislation and Other Events after Year End:**

*a)  Puerto Rico Oversight, Management and Economic Stability Act*

On June 30, 2016, the U.S. President signed the Puerto Rico Oversight, Management, and Economic Stability Act ("PROMESA"), which grants the Commonwealth and its component units' access to an orderly mechanism to restructure their debts in exchange for significant federal oversight over the Commonwealth's finances. In broad strokes, PROMESA seeks to provide Puerto Rico with fiscal and economic discipline through the creation of a control board, relief from creditors and lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt: (a) a voluntary debt modification process under Title VI of PROMESA, which establishes a largely out-of-court debt restructuring process through which modifications to financial debt can be accepted by a supermajority of creditors; and (b) a quasi-bankruptcy proceeding under Title III of PROMESA, which establishes an in-court debt restructuring process substantially based upon incorporated provisions of Title 11 of the United States Code (U.S. Bankruptcy Code). Each of these elements are divided among PROMESA's seven titles.

Title I of PROMESA established the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"). See PROMESA § 101(b). As stated in PROMESA, "the purpose of the Oversight Board is to provide a method for a covered territory to achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a).

Title II of PROMESA established the Fiscal Plan and Budget Certification process and compliance. This title sets forth the requirements for proposing and certifying fiscal plans and budgets for the Commonwealth and its instrumentalities. "Each fiscal plan serves as the cornerstone for structural

32                                                                                        (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

reforms the Oversight Board deems necessary to ensure the territory, or instrumentality, will be on a path towards fiscal responsibility and access to capital markets." H.R. Rep. 114-602(I), 2016 WIL 312480, at *45 (2016); PRIMESA § 201 (b)(1).

On March 13, 2017, the Oversight Board approved and certified the fiscal plan of the Commonwealth and certain other governmental entities (the "Fiscal Plan"). The Fiscal Plan was revised and certified by the Oversight Board on May 31, 2017 (the "Revised Fiscal Plan"). The Fiscal Plan and the Revised Fiscal Plan contemplate that for each of the next 5 fiscal years (FY 2018-2023) some portion of the Pledged Sales Tax will be used by the Commonwealth for purposes other than payment of COFINA debt service.

Title III of PROMESA establishes an in-court process for restructuring the debts of Puerto Rico and other United States territories that is modeled after the process under Chapter 9 of the U.S. Bankruptcy Code. In order to be a debtor under Title III, the territory and/or its instrumentalities must: (i) have an Oversight Board established for it or be designated a "covered entity"; (ii) have the Oversight Board issue a restructuring certification under PROMESA section 206(b); and (iii) "desire to effect a plan to adjust its debt.• PROMESA § 302. The Oversight Board has sole authority to file a voluntary petition seeking protection under Title III of PROMESA. *See* PROMESA § 304(a). As of the date hereof, the Oversight Board has commenced Title III cases for the Commonwealth, COFINA, PRHTA, ERS, and PREPA, as discussed below.

In a Title III case, the Oversight Board acts as the debtor's representative and is authorized to take any actions necessary to prosecute the Title III case. *See* PROMESA § 315. Immediately upon filing the Title III petition, Bankruptcy Code section 362 (which is incorporated into Title III cases under PROMESA) applies to automatically stay substantially all litigation against the debtor (the Title III Stay). After the Title III case is commenced, the Chief Justice of the United States Supreme Court must designate a district court judge to sit by designation and preside over the Title III case. PROMESA also provides that the commencement of a Title III case "does not limit or impair the powers of a covered territory to control by legislation or otherwise the exercise of the political or governmental powers of the territory or territorial instrumentality." PROMESA § 303.

The core component of the Title III case is the confirmation of a plan of adjustment of the debts of the debtor. The Oversight Board has the exclusive authority to file and modify a plan of adjustment prior to confirmation. *See* PROMESA § 312. In order to be confirmed, a proposed plan of adjustment must meet the requirements set forth under PROMESA section 314.

Title IV of PROMESA established the Temporary Stay of Litigation, Government Reporting, and Other Miscellaneous Provisions. Pursuant to this title (PROMESA section 405), the enactment of PROMESA immediately and automatically imposed a temporary stay (the Title IV stay) from June 30, 2016 (the date of PROMESA's enactment) through February 15, 2017 of all "Liability Claim" litigation commenced against the Commonwealth and its instrumentalities after December 18, 2015.

Title V of PROMESA established the position of the Revitalization Coordinator under the Oversight Board and provides a framework for infrastructure revitalization.

33                                    (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

Title VI of PROMESA establishes an out-of-court process for modifying Puerto Rico's debts. Under PROMESA section 601(d), the Oversight Board is authorized to establish "pools" of bonds issued by each Puerto Rico government-related issuer based upon relative priorities.

Title VII of PROMESA sets forth the sense of Congress that "any durable solution for Puerto Rico's fiscal and economic crisis should include permanent, pro-growth fiscal reforms that feature, among other elements, a free flow of capital between possessions of the United States and the rest of the United States."

*b) Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, Financial Emergency and Fiscal Responsibility of Puerto Rico Act and Related Executive Orders*

On April 6, 2016, the Commonwealth enacted Act. No. 21 of 2016, known as the Puerto Rico Emergency Moratorium and Rehabilitation Act (as amended, the Moratorium Act). Pursuant to the Moratorium Act, on June 30, 2016, the Governor signed an Executive Order, EO-2016-030 ("EO No. 2016-30"), declaring the Commonwealth to be in state of emergency and declaring a moratorium on the Commonwealth's obligation to make payments on bonds, and notes issued or guaranteed by the Commonwealth.

On January 29, 2017, the Governor signed Act No. 5 of 2017, Puerto Rico Fiscal Responsibility and Financial Emergency Act, superseding and amending Act No. 21 of 2016, Emergency Moratorium and Financial Rehabilitation of Puerto Rico Act. Act No. 5 of 2017 declares the Commonwealth to be in state of emergency and declaring a moratorium on the Commonwealth's obligation to make payments on bonds, and notes issued or guaranteed by the Commonwealth. EO 30 suspends any obligation of the Office of Management and Budget of the Commonwealth to include an appropriation in the proposed budget submitted to the Legislative Assembly for the payments of bonds issued by the Public Finance Corporation.

*c) Sales and Use Tax*

Effective on July 1, 2015, the Commonwealth Sales Tax increased from a current 6% to a 10.5%, as required by Act No. 72 of May 29, 2015, an amendment to the Puerto Rico Internal Revenue Code of 2011, (the Act No. 72). The Act No. 72 also imposes a Commonwealth Sales Tax of 4% to professional and business-to business services rendered after September 30, 2015, until April 1, 2016. The Act No. 72 serves as a bridge mechanism between the actual SUT to an integrated new tax reform. As per Act No. 72, the new tax reform should incorporate certain virtues of the general excise tax and the actual SUT to reach a Value-Added Tax (IVA, by its Spanish acronym) as the desirable consumption tax for Puerto Rico. Such tax reform emerges from the recommendations presented by the Alternatives for the Consumption Tax Transformation Commission.

*d) Civil Actions Filed by Several Bondholder Groups and Other Creditors Against the Corporation.*

On November 4, 2016, plaintiffs in *Lex Claims, LLC v. Garcia-Padilla* (Case No. 16-2374-FAB (D.P.R. July 20, 2016)), who are beneficial owners of General Obligation debt, filed a Second Amended Complaint, adding the Corporation as a defendant in their action against Commonwealth officials. The Second Amended Complaint requested two declaratory judgments that challenge the legal validity of

34                                                                                    (continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

the Corporation: (1) a declaration that the portion of the SUT pledged to the Corporation for purposes of debt service on the Corporation's sales tax revenue bonds (the "Pledged Sales Tax") constitutes "available resources" under Article VI, Section 8 of the Puerto Rico Constitution and that such funds cannot be deposited with the Corporation or its Bondholders; and (2) a declaration that the Commonwealth is obligated to afford the General Obligation debt absolute priority, including priority over required deposits with the Corporation and its Bondholders. On May 17, 2017, the District Court stayed the *Lex Claims* case until further court order.

On June 9, 2017, various parties and parties in interest, including the Trustee, the Senior Bondholders' Coalition, National Public Finance Guarantee Corp., Whitebox Asymmetric Partners, L.P., Ambac Assurance Corp., and Assured Guaranty Corp. (the "Requesting Parties"), served discovery requests and subpoenas on the Oversight Board and various Government entities, affiliates, and individuals. The subpoenaed entities and individuals served their Responses and Objections on June 21, 2017, and produced documents in response to the requests and subpoenas between July and October. On July 24 the Requesting Parties served subpoenas and/or notices of deposition on the Oversight Board and the Governmental entities and individuals. The subpoenaed entities and individuals served their Responses and Objections to the deposition subpoenas on August 7 and August 8, 2017. In lieu of depositions, FAFAA and the Oversight Board each submitted binding Statements of Facts.

On November 6, 2017, various parties and parties in interest, including the Trustee, the Senior Bondholders' Coalition, Whitebox Asymmetric Partners, L.P., Ambac Assurance Corp., the Mutual Fund Group and Puerto Rico Funds, and Assured Guaranty Corp., filed motions for summary judgment. Summary judgment briefing was completed on January 5, 2018. The Court has not yet ruled on the motions.

On March 22, 2018, several credit unions chartered under Puerto Rico law filed an adversary complaint against the Commonwealth, the Oversight Board, other Commonwealth's instrumentalities including the Corporation seeking a declaratory judgment that their Puerto Rico debt holdings are not dischargeable and monetary damages for alleged fraud in issuing and encouraging local credit unions to purchase Puerto Rico debt service instruments. On August 6, 2018, the Oversight Board, the Corporation, the Commonwealth of Puerto Rico and several of its instrumentalities filed a notice of motion to dismiss the complaint in this adversary proceeding, along with an accompanying memorandum of law. Also on August 6, 2018, the Government Development Bank filed a separate motion to dismiss. In addition, several parties filed joinders to the motions to dismiss or were granted leave from the Court to file joinders at later dates. The Court ordered that any objection to the motions to dismiss filed in this adversary proceeding and joinders thereto must be filed by November 6, 2018 and any reply must be filed by January 9, 2019. The Court will thereafter take the motions to dismiss on submission unless determined otherwise.

e) *Oversight Board Commencement of Title III Case, Mediation in the Title III Case, and Key Contested Motions in the Title III Case*

On May 3, 2017, in the United States District Court for the District of Puerto Rico (the "Court"), the Oversight Board commenced a Title III (bankruptcy) case under PROMESA for the Commonwealth. On May 5, 2017, the Oversight Board followed with a similar filing for the Corporation.

(continued)

## PUERTO RICO SALES TAX FINANCING CORPORATION
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

On May 16, 2017, the Bank of New York Mellon (the "Trustee"), in its capacity as trustee for the sales tax revenue bonds issued by the Corporation, filed an adversary complaint in the Corporation's Title III proceeding for interpleader to preserve the funds held by the Trustee in trust pending resolution by the Court of all disputes with respect to ownership of the funds. The Trustee's adversary complaint commenced the adversary proceeding captioned The Bank of New York Mellon v. Puerto Rico Sales Tax Financing Corporation (COFINA), et. al. (Adv. Pro. No. 17-00133-LTS (D. P.R. May 16, 2017)).

On May 30, 2017, the Court ordered the Trustee, commencing with the $16.3 million bond payment due on June 1, 2017, to interplead and hold all disputed funds in the accounts into which they had been deposited, on behalf of the party or parties ultimately determined by the Court to be entitled to such funds. The Court's order allowed creditors to litigate competing claims to the funds held by the Trustee.

*f)* *The Commonwealth-COFINA Dispute*

The Official Committee of Unsecured Creditors of the Commonwealth of Puerto Rico as Agent of the Commonwealth of Puerto Rico v. Bettina Whyte as Agent of the Puerto Sales Tax Financing Corporation (In re: The Financial Oversight and Management Board for Puerto Rico, Adv. Pro. No. 17-00257-LTS (D.P.R. September 8, 2017).

On August 10, 2017, the Court issued an order to approve a protocol for resolving the disputes between the Commonwealth and the Corporation (the "Commonwealth–COFINA Dispute") and appointing 1) an agent for the Oversight Board as debtor's representative for the Commonwealth (the "Commonwealth Agent"); and 2) an agent for the Oversight Board as the debtor's representative for COFINA (the COFINA Agent).

On September 8, 2017, the Commonwealth Agent filed a complaint asserting that the SUT revenue pledged by COFINA bond debt is "the exclusive property of the Commonwealth". The complaint alleges that the COFINA enabling legislation "did not transfer to COFINA present ownership of future SUT revenues" and did not assign to COFINA the Commonwealth right to receive such revenues. The complaint argues that the transfer to COFINA of SUT revenues was at most an unsecured promise to transfer revenues in the future. The complaint further alleges that even if the transfer of future SUT revenues to COFINA had any legal effect, such transfers are merely a grant of a security interest in acquired property governed by Article 9 of the Uniform Commercial Code. The complaint alleges that any security interest of COFINA in SUT revenues is unenforceable against the Commonwealth or, in the alternative, is unperfected and therefore avoidable and otherwise subordinate to the rights of the Oversight Board as trustee. The Complaint further asserts that the Commonwealth Title III case cuts off any security interest.

The Complaint also alleges that COFINA's structure is unconstitutional because it circumvents the Puerto Rico Constitution's debt limitations.

FAFAA filed a motion to dismiss certain claims of the Commonwealth Agent and counterclaims of the COFINA Agent on the ground that they exceeded the scope of their authority. Document production and discovery were completed in February 2018. On February 21, 2018, parties filed summary judgment motions. The Court heard oral arguments on April 10, 2018 and took the motions under advisement.

(continued)

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

On February 26, 2018, the COFINA Agent filed a motion to certify five questions to the Puerto Rico Supreme Court regarding whether the COFINA enabling legislation transferred to COFINA present ownership of future SUT revenues, and whether the enabling legislation is unconstitutional because it allegedly violates various provisions of the Puerto Rico Constitution. Various COFINA bondholder groups joined in the motion in whole or in part; the Commonwealth Agent, the Oversight Board, and the Ad Hoc Group of general obligation bondholders opposed the motion in whole or in part. The Court heard oral arguments on May 9, 2018, and took the motion under advisement.

On May 14, 2018, certain Commonwealth creditors and certain Corporation's creditors announced a purported settlement of the Commonwealth and the Corporation dispute. Neither FAFAA, nor the Oversight Board, nor the named parties in this adversary proceeding joined the purported settlement.

On June 5, 2018, the Commonwealth Agent and the Corporation Agent filed a joint motion requesting the Court to delay any decision on the summary judgement motions for 60 days in light of a proposed settlement in principle that they had reached (the proposed settlement). The proposed settlement was publicly disclosed on June 7, 2018.

Under the proposed settlement (which is subject to definitive documentation as well as Title III Court approval), a portion of the 5.5% SUT revenue currently conditionally allocated to the Corporation – which portion is referred to as Pledge Sales Tax Base Amount (PSTBA) – would be shared between the Corporation and the Commonwealth. The PSTBA is the base amount of SUT revenue allocated to the Corporation that the Corporation must receive under the Act No. 91 before that balance of the 5.5% of SUT revenue allocated to the Corporation can be made available to the Commonwealth. Currently, the PSTBA is approximately $783.2 million for fiscal year 2019 and grows 4% annually until it reaches approximately $1.85 billion in fiscal year 2041. The proposed settlement would divide the PSTBA so that the Corporation receives 53.65% of the PSTBA starting in fiscal year 2019 while the Commonwealth receives the other 46.35% for the benefit of holders' claims, subject to certain restrictions and exceptions. The balance of the 5.5% SUT revenue conditionally allocated to the Corporation would continue to flow to the Commonwealth. The Proposed settlement also allocates to the Corporation 100% of certain previously collected SUT revenue held at Bank of New York Mellon (trustee) that is the subject of litigation. This description is a summary of the terms of the proposed settlement. For a full description of its terms, readers are directed to the language of the proposed settlement, which is a public document.

As discussed above court appointment agents for general obligation and COFINA creditors had already reached an agreement in principle in June 2018 regarding the allocation of future sales tax generated in Puerto Rico. On August 8, 2018, the Oversight Board announced that will honor the terms of that agreement that appears to resolve the lingering dispute between senior and subordinate sales tax revenue bondholders. Senior and subordinate COFINA bondholders would both receive senior lien bonds in exchange for existing securities. The Oversight Board expects existing senior lien COFINA holders to recover between 93-95 cents on the dollar. Subordinate bondholders' recoveries are expected to range between 56-58 cents on the dollar. The mono-line bond insurers have agreed to the terms of the settlement.

On August 29, 2018, the Oversight Board and the Government of Puerto Rico announced that they have entered into a plan support agreement and term sheet with a significant portion of the COFINA bondholders and other stakeholders under the terms and conditions of the proposed COFINA bondholder

**PUERTO RICO SALES TAX FINANCING CORPORATION**
(A Component Unit of the Commonwealth of Puerto Rico)

Notes to Basic Financial Statements

June 30, 2015

deal announced on June 7, 2018 and agreed upon on August 8, 2018. The proposed settlement, which provides nearly 32% reduction in COFINA debt, gives Puerto Rico approximately $17.5 billion in debt service savings and enables bondholders to receive a significant recovery, it is still subject to approval by the Title III Court.

g) *Other specific subsequent events that relates to the Corporation*

On April 28, 2017, the Bank's management concluded that an orderly wind-down of its operations and consensual negotiations with its creditors would be the optimal path to mitigate the impact to its stakeholders (municipalities, depositors, and other creditors, etc.). The Bank's operational wind-down was completed on March 23, 2018, with all fundamental operations having ceased or transferred to other Commonwealth's instrumentalities and workforce restructuring completed with minimal human resources remaining to conclude legal and operational matters through fiscal year 2019.

Hurricane Maria, a category 4 storm, made landfall in Puerto Rico on September 20, 2017, less than two weeks after Hurricane Irma, a category 5 storm, passed north of Puerto Rico leaving over a million local residents without electric power. Hurricane Maria caused catastrophic property damages throughout Puerto Rico, including homes, businesses, roads, bridges, power lines, commercial establishments, and public facilities. In addition, it caused flooding in some areas, displaced many local residents, and severely disrupted business operations and economic activities. Catastrophic damages to the island were approximately $94 billion.

\*\*\*

# Exhibit F

**English Version of the New Bond Legislation**

"ENGLISH VERSION OF THE PUERTO RICO SALES TAX FINANCING CORPORATION ACT:

## STATEMENT OF MOTIVES

Puerto Rico faces an unprecedented fiscal and economic crisis. This bill, as well as the restructuring agreement reached with the creditors of Government Development Bank for Puerto Rico, will enhance Puerto Rico's credibility. With this agreement, we will achieve significant adjustments in the repayment of the government's debts incurred by other administrations, but that it is now our responsibility to resolve. This way, we ensure that the Government is able to continue operating and serving the people of Puerto Rico.

The positions assumed and actions taken by the prior administration caused Puerto Rico to lose access to the capital markets and precipitated the collapse of our public finance system. These actions accelerated the contraction of the Puerto Rico economy and increased the outmigration of residents of Puerto Rico to the United States mainland.

The prior administration developed a hostile relationship with participants of the financial markets, including tens of thousands of residents of Puerto Rico that invested their savings trusting the good name and credit of the Commonwealth and that of its public corporations. This hostile environment towards Puerto Rico also pervaded the United States Congress due to the lack of transparency and honesty, while generating consistently negative news coverage for Puerto Rico at the local, national and global level.

Misguided decisions of the prior administration led to the bankruptcy of the Commonwealth of Puerto Rico and its need to gather its resources to address and provide essential services to the people of Puerto Rico. This, in turn, acted as a catalyst for a controversy that challenged the structure pursuant to which the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish acronym) issued its bonds. In particular, certain parties asserted claims arguing, among other things, that (i) COFINA's issuance of its bonds violated the Puerto Rico Constitution and (ii) the portion of the sales and use tax imposed by the Commonwealth at a rate of 5.5% (the "SUT") and transferred to COFINA constituted "available resources" of the Commonwealth pursuant to Article VI, Section 8, of the Puerto Rico Constitution and must be used for the payment of the Commonwealth's "public debt." Certain creditors also challenged the scope of the Puerto Rico Constitution based on the whether the Spanish term "recursos disponibles" or the English term "available revenues, plus surplus" was used. On May 5, 2017, the Financial Oversight and Management Board ("Oversight Board") created pursuant to the provisions of the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") commenced a proceeding as representative of COFINA under Title III.

The Commonwealth's and COFINA's various stakeholders sought an orderly process to resolve the disputes relating to COFINA and the ownership of the SUT (collectively, the "Commonwealth-COFINA Dispute"). To that end, on August 10, 2017, the Title III Court entered a stipulation and order appointing the Commonwealth's Official Committee of Unsecured Creditors to act as agent for the Oversight Board in its capacity as representative of the Commonwealth (the "Commonwealth Agent") and Bettina M. Whyte to act as agent for the Oversight Board in its capacity as representative of COFINA (the "COFINA Agent") in an effort to facilitate a settlement of the Commonwealth-COFINA Dispute.

On June 5, 2018, the Commonwealth Agent and the COFINA Agent announced that they had reached an agreement in principle to resolve the Commonwealth-COFINA Dispute (the "Agreement in Principle"). The Agreement in Principle was premised on splitting the fixed amount of the SUT transferred to COFINA each fiscal year (the "PSTBA") between the Commonwealth and COFINA beginning in fiscal year 2019, with COFINA receiving 53.65% of the yearly scheduled PSTBA and the Commonwealth receiving 46.35% of the yearly scheduled PSTBA plus all other revenues collected on account of the SUT.

Consistent with the public policy implemented by the Governor of Puerto Rico, the Fiscal Agency and Financial Advisory Authority, the Oversight Board, and various creditors and insurers of COFINA bonds executed a plan support agreement (as amended and restated on September 21, 2018, the "Plan Support Agreement"), which incorporates the Agreement in Principle's PSTBA split and provides for the settlement of the Commonwealth-COFINA Dispute pursuant to a plan of adjustment for COFINA under Title III of PROMESA (the "COFINA Plan").

The Legislative Assembly is now called upon to implement the agreement by and among the parties of the Commonwealth-COFINA Dispute by amending the provisions of Act No. 91, which created COFINA and authorized it to issue bonds. These amendments will serve to release the lien that holders of COFINA bonds currently have over approximately $17.5 billion of previously pledged SUT revenues. These revenues will now be available for use by the Government of Puerto Rico to better serve and provide for its citizens. By implementing the Plan Support Agreement, this legislation also puts an end to the costly litigation between the agents appointed by the Oversight Board and settles the claims of COFINA's bondholders, while also making clear the original legislative intent of Act 91-2006, as amended. Moreover, as a result of this implementing legislation, we will be saving the Government of Puerto Rico approximately $437.5 million per year, which will now be available to the Government for the benefit of the people of Puerto Rico.

Equally important, this legislation shows that the Legislative Assembly is determined to take the steps necessary to enable Puerto Rico's return to the capital

markets. As one of the steps required to implement the Plan Support Agreement, this legislation will allow for the restructuring of the COFINA debt under Title III of PROMESA, act as a catalyst for other restructurings, setting the stage for Puerto Rico's emergence from bankruptcy, reduce costly litigation, and accelerate termination of the Oversight Board in accordance with PROMESA.

This Act demonstrates the Legislative Assembly's continued public policy commitment to correct Puerto Rico's financial crisis, honor Puerto Rico's financial obligations, regain access to the capital markets, and achieve economic certainty and debt sustainability for Puerto Rico.

1    *CHAPTER 1. – TITLE AND DEFINITIONS*

2    *Article 1.1.-Title.*

3    *This Act shall be known as the "Puerto Rico Sales Tax Financing Corporation Act."*

4    *Article 1.2.-Definitions.*

5    *The following terms shall have the meanings stated below:*

6    *(a)    "AAFAF"– means the Puerto Rico Fiscal Agency and Financial Advisory*

7    *Authority.*

8    *(b)    "Act"– means Act 91-2006, as amended, also known as the "Puerto Rico Sales Tax*

9    *Financing Corporation Act".*

10    *(c)    "Ancillary Agreements"– means the Bond Indenture, the Settlement Agreement,*

11    *and any other agreement or instrument entered into by the Corporation or the Indenture Trustee*

12    *in connection with, or in furtherance of, the Restructuring Transaction and in accordance with,*

13    *or in furtherance of, the Corporation Plan of Adjustment.*

14    *(d)    "Authorized Activities"– means the activities authorized to be carried out by the*

15    *Corporation under Article 2.4 of this Act.*

16    *(e)    "Board of Directors"– means the Board of Directors of the Corporation.*

1     *(f)*    *"Bond Indenture" – means one or more trust agreements, bond indentures and any*

2 *supplements or amendments thereto, or similar contracts or agreements, entered into by the*

3 *Corporation and the Indenture Trustee pursuant to which Plan of Adjustment Bonds are issued,*

4 *and establishing the rights and responsibilities of the Corporation and of the holders of Plan of*

5 *Adjustment Bonds issued thereunder.*

6     *(g)*    *"Chair" – means the chairperson of the Board of Directors.*

7     *(h)*    *"COFINA Revenues" – means the First Funds up to an amount equal to fifty-three*

8 *and sixty-five one hundredths percent (53.65%) of the Fixed Income for each Fiscal Year and all*

9 *legal and equitable rights, title and interest thereto (including the right to receive the First Funds*

10 *as set forth under Article 4.1 of this Act).*

11     *(i)*    *"COFINA Revenues Fund" – means the segregated fund or funds owned by the*

12 *Corporation into which the COFINA Revenues are deposited (1) which account shall be held in*

13 *the name of the Indenture Trustee for the benefit of the holders of the Plan of Adjustment Bonds,*

14 *(2) may not be owned or controlled in any way by the Government of Puerto Rico or any*

15 *Government Entity other than the Corporation, and (3) is maintained in one or more mainland*

16 *U.S. banks.*

17     *(j)*    *"Corporation" – means the Puerto Rico Sales Tax Financing Corporation created*

18 *by this Act.*

19     *(k)*    *"Corporation Plan of Adjustment" – means the plan of adjustment consummated*

20 *in connection with the Corporation's case under Title III of PROMESA, including the order of*

21 *the District Court confirming such plan of adjustment.*

1        (l)       "District Court" – means the United States District Court for the District of

2  Puerto Rico.

3        (m)       "Effective Date" – means the date on which the Corporation Plan of Adjustment

4  becomes effective in accordance with its terms.

5        (n)       "Financing Costs" – means all costs associated with the Restructuring

6  Transaction, including the costs, fees and expenses to (1) issue, service, repay or refinance the Plan

7  of Adjustment Bonds, whether such costs are incurred upon issuance of such Plan of Adjustment

8  Bonds or over the term of the Plan of Adjustment Bonds, (2) make payments as required by the

9  Ancillary Agreements, (3) pay any stamp, issuance or similar taxes and other charges related to

10  the Restructuring Transaction, provided, that this provision does not limit in any way the

11  exemption from taxes set forth in Article 2.8 hereof, (4) prepare for and enter into the

12  Restructuring Transaction, and (5) perform all ongoing activities relating to the Restructuring

13  Transaction.  For the avoidance of doubt, Financing Costs also includes pre-closing and post-

14  closing administrative fees and expenses incurred in connection with all Ancillary Agreements,

15  but does not include payments of principal and interest on the Plan of Adjustment Bonds.

16        (o)       "First Funds" – means the first funds comprising the Pledged Taxes in any Fiscal

17  Year as described in Article 4.1 of this Act.

18        (p)       "Fiscal Year" – means the fiscal year of the Government of Puerto Rico, which

19  begins on July 1 and ends on June 30.

20        (q)       "Fixed Income" – means, for Fiscal Year 2018-2019, seven hundred eighty-three

21  million, one hundred ninety-seven thousand, two hundred and fifty-one dollars ($783,197,251)

22  and, for each subsequent Fiscal Year, the Fixed Income for the prior Fiscal Year plus four percent

1    (4%) of such Fixed Income, up to the Maximum Amount. The Fixed Income for each Fiscal Year

2    shall be funded from the first revenues collected of the Pledged Taxes.

3        (r)    "Government Entity" – means any agency, department, office, public corporation,

4    trust, fund, system, instrumentality, political subdivision, taxing authority or municipality of the

5    Government of Puerto Rico.

6        (s)    "Government of Puerto Rico"– means the Commonwealth of Puerto Rico and the

7    government thereof.

8        (t)    "Indenture Trustee"– means the Person designated as trustee or indenture trustee

9    under the Bond Indenture, including any successor trustee or indenture trustee under the Bond

10    Indenture.

11        (u)    "Maximum Amount" – means One Billion Eight Hundred and Fifty Million

12    dollars ($1,850,000,000.00).

13        (v)    "Oversight Board" – means the Financial Oversight and Management Board for

14    Puerto Rico established pursuant to Article 1.1 of PROMESA.

15        (w)    "Person" – means any natural person or legal entity, including, but not limited to,

16    the Government of Puerto Rico, any Government Entity, or any firm, partnership, joint venture,

17    trust, estate, limited liability company, corporation of individuals, association, or public or private

18    corporation, organized or existing under the laws of Puerto Rico, the United States of America,

19    any state or any other jurisdiction, or any state, municipality, political subdivision, taxing

20    authority, agency or instrumentality of the United States of America, any state or any other

21    jurisdiction, or any combination thereof.

1        (x)     "*Plan of Adjustment Bonds*" – *means any Restructuring Bonds and any*

2 *Refunding Bonds.*

3        (y)     "*Pledged Taxes*" – *means, subject to the provisions of Article 3.3 hereof, (1) the*

4 *present and future revenues and collections generated by the portion of the Sales Tax that*

5 *corresponds to a tax rate of five and one-half percent (5.5%), and (2) the Substituted Collateral, if*

6 *any.*

7        (z)     "*PROMESA*" – *means the "Puerto Rico Oversight, Management, and Economic*

8 *Stability Act", Pub. L. No. 114–187, 130 Stat. 549 (2016), 48 U.S.C. 2101 et. seq.*

9        (aa)     "*Refunding Bonds*" – *means the bonds issued by the Corporation pursuant to the*

10 *Act and the Ancillary Agreements, on a pari passu basis with the Restructuring Bonds, to retire,*

11 *refinance or defease any Plan of Adjustment Bonds.*

12        (bb)     "*Restructuring Bonds*" – *means the bonds issued by the Corporation pursuant to*

13 *this Act, the Corporation Plan of Adjustment, and the Ancillary Agreements, having terms that*

14 *conform to, and that are authorized, determined to be valid, and distributed in accordance with,*

15 *the Corporation Plan of Adjustment.*

16        (cc)     "*Restructuring Resolution*" – *means one or more resolutions of the Board of*

17 *Directors authorizing: (1) the issuance of Plan of Adjustment Bonds and describing the terms*

18 *thereof; and (2) the payment of the Financing Costs, each in accordance with the terms of the*

19 *Corporation Plan of Adjustment.*

20        (dd)     "*Restructuring Transaction*" – *means the transactions contemplated by, or in*

21 *furtherance of, the Corporation Plan of Adjustment.*

1    (ee)    *"Sales Tax"* – *means the sales and use taxes imposed by the Government of Puerto*

2    *Rico pursuant to Sections 4020.01 and 4020.02 of Subchapter D of Act No. 1-2011, as amended,*

3    *known as the Internal Revenue Code for a New Puerto Rico.*

4    (ff)    *"Settlement Agreement" – means the Settlement Agreement, dated as of October*

5    *[15], 2018, between the Oversight Board, on behalf of the Government of Puerto Rico, and the*

6    *agent for the Corporation appointed by the Oversight Board to settle or litigate the dispute between*

7    *the Government of Puerto Rico and the Corporation regarding the ownership of the Sales Tax.*

8    (gg)    *"Substituted Collateral" – means all or a portion of a tax of general applicability*

9    *throughout Puerto Rico that is enacted in full substitution of the Pledged Taxes or otherwise*

10   *constitutes like or comparable security for the Plan of Adjustment Bonds.*

11   (hh)    *"Substitution Requirements" – means (1) the enactment of legislation providing*

12   *for Substituted Collateral that also provides (A) that the Substituted Collateral in an amount equal*

13   *to the COFINA Revenues has been irrevocably transferred to and is owned solely and exclusively*

14   *by the Corporation to the full extent provided under Article 2.2 of this Act, (B) that, following*

15   *such transfer, such Substituted Collateral in an amount equal to the COFINA Revenues is not,*

16   *and shall not constitute, "available resources" or "available revenues" of the Government of*

17   *Puerto Rico as that term is used in Section 8 of Article VI of the Puerto Rico Constitution or as*

18   *otherwise used in the Puerto Rico Constitution (whether construed pursuant to the Spanish or*

19   *English version of the Puerto Rico Constitution), (C) for a lien on such Substituted Collateral in*

20   *favor of the Indenture Trustee for the benefit of the holders of Plan of Adjustment Bonds to the full*

21   *extent provided for under Article 3.2 of this Act, and (D) that the Government of Puerto Rico and*

22   *the Government Entities shall continue to provide the covenants set forth in Article 3.3 of this Act*

1   *with respect to such Substituted Collateral, and (2) prior to the substitution of the Substituted*

2   *Collateral, the ratings requirements set forth in the Ancillary Agreements are satisfied with respect*

3   *to the Substituted Collateral.*

4   *CHAPTER 2. - THE PUERTO RICO SALES TAX FINANCING CORPORATION*

5       *Article 2.1. - Creation and Separate Legal Existence of the Corporation.*

6       *There is created a public corporation and instrumentality of the Government of Puerto*

7   *Rico, which constitutes a corporate and political entity independent and separate from the*

8   *Commonwealth of Puerto Rico to be known as the Puerto Rico Sales Tax Financing Corporation.*

9   *The Corporation, which was created pursuant to the provisions of this Act, is and shall be*

10   *recognized for all purposes as an independent and separate legal entity from the Government of*

11   *Puerto Rico and any other Government Entity. It shall be operated independently, and its business*

12   *and affairs shall be governed by or under the direction of its Board of Directors.*

13       *Article 2.2. - Ownership of the COFINA Revenues.*

14       *(a)    Any and all ownership interests and rights to the COFINA Revenues were, have*

15   *been or are hereby transferred to the Corporation.*

16       *(b)    The transfer described in (a) above is an absolute transfer of all legal and equitable*

17   *right, title and interest, and not a pledge or other financing.*

18       *(c)    The Corporation is and will be the sole and exclusive owner of the COFINA*

19   *Revenues until such time as the Plan of Adjustment Bonds, together with any interest thereon,*

20   *and all amounts and obligations under all Ancillary Agreements, have been completely paid in*

21   *cash in full or have otherwise been discharged in accordance with their terms.*

1        (d)      *Persons designated as withholding agents for purposes of the imposition and*

2   *collection of the Sales Tax pursuant to the Act 1-2011, as amended, also known as the Internal*

3   *Revenue Code for a New Puerto Rico, shall be deemed to collect any portion of the Sales Taxes in*

4   *which the Corporation has an ownership interest on behalf of the Corporation. Any such*

5   *withholding agent will continue to be subject to any and all obligations and responsibilities*

6   *imposed by the Internal Revenue Code for a New Puerto Rico, on withholding agents in relation*

7   *to the imposition and collection of the Sales Tax.*

8        (e)      *The COFINA Revenues do not constitute "available resources" or "available*

9   *revenues" of the Government of Puerto Rico as used in Section 8 of Article VI of the Puerto Rico*

10   *Constitution or as otherwise used in the Puerto Rico Constitution (whether construed pursuant*

11   *to the Spanish or English version of the Puerto Rico Constitution).*

12        *Article 2.3.-Purpose of the Corporation.*

13        *On and after the Effective Date, the Corporation's purpose will be to (a) issue the Plan of*

14   *Adjustment Bonds, (b) own and administer the COFINA Revenues, and (c) issue any other bonds,*

15   *notes or evidence of indebtedness of the Corporation as may be permitted by the Corporation Plan*

16   *of Adjustment and the Ancillary Agreements and which will be payable from such sources as may*

17   *be provided for by the Legislative Assembly.*

18        *Article 2.4.-The Corporation's Activities.*

19        *The Corporation's activities shall be limited to the following Authorized Activities:*

20        (a)      *receiving and owning the COFINA Revenues and such other revenues or property*

21   *as may be provided or transferred to the Corporation;*

22        (b)      *adopting the Restructuring Resolution;*

1        (c)      issuing, from time to time, Plan of Adjustment Bonds and any bonds, notes or

2  evidences of indebtedness the issuance of which is authorized by Article 2.3 of this Act;

3        (d)      entering into and performing the Ancillary Agreements;

4        (e)      to pay any bonds, notes or evidences of indebtedness the issuance of which is

5  authorized by Article 2.3 of this Act by pledging, on a basis subordinate in all respects to the lien

6  established in Article 3.2 of this Act, (1) any amounts remaining of the COFINA Revenues after

7  the payment of principal and interest on the Plan of Adjustment Bonds or (2) any other funds or

8  property that may be allocated to the Corporation after the Effective Date; and

9        (f)      taking any and all other actions as may be necessary or appropriate to effectuate the

10  Restructuring Transaction and the Corporation Plan of Adjustment, including making

11  amendments to, exchanging and/or canceling bonds issued by the Corporation prior to the

12  Effective Date and amending and restating agreements of the Corporation relating thereto.

13        Article 2.5.-Ancillary Powers.

14        In order to carry out the Authorized Activities, without limiting the foregoing, the

15  Corporation shall have the power to:

16        (a)      sue and be sued in any Commonwealth court or the District Court;

17        (b)      adopt, alter and use a seal;

18        (c)      formulate, adopt, amend and revoke rules for the administration and management

19  of its affairs, and such standards, rules and regulations that may be necessary or convenient to

20  exercise and perform the Authorized Activities;

21        (d)      open and maintain bank accounts, including the COFINA Revenues Fund;

22        (e)      acquire, hold, lease, sell and otherwise transfer property;

1        *(f)*     *have complete legal and equitable dominion over its properties (including the*

2 *COFINA Revenues), subject to the statutory lien established under Article 3.2 of this Act;*

3        *(g)*     *make, execute and amend contracts and all other instruments necessary or*

4 *convenient to perform the Authorized Activities;*

5        *(h)*     *appoint and remove officers, agents, employees and contractors, establish their*

6 *compensations, powers and duties, in each case, in accordance with the Ancillary Agreements;*

7        *(i)*     *pay its operating expenses and the Financing Costs;*

8        *(j)*     *procure insurance, including insurance covering the Corporation's directors and*

9 *officers, against loss in connection with its activities, properties or assets;*

10        *(k)*     *invest funds and establish and maintain reserves as required by, and pursuant to*

11 *standards set forth in, the Ancillary Agreements;*

12        *(l)*     *indemnify the members of the Board of Directors, its officers, agents, employees,*

13 *contractors and other third parties for conduct that does not constitute gross negligence, willful*

14 *misconduct or fraud;*

15        *(m)*     *exercise such other powers, not inconsistent herewith, as may be necessary to carry*

16 *out the Authorized Activities;*

17        *(n)*     *take any action or measure necessary or convenient to carry out its purposes and*

18 *exercise the powers expressly granted in this Article;*

19        *(o)*     *delegate to its officers, agents, employees or contractors authority to take actions in*

20 *furtherance of this Act; and*

21        *(p)*     *execute, file and amend any relevant returns, forms, elections or statements with*

22 *any governmental authority.*

1        *Article 2.6.-Prohibited Activities.*

2        *While the Plan of Adjustment Bonds are outstanding, the Corporation shall not be*

3    *authorized to:*

4        *(a)      merge or consolidate, directly or indirectly, with any Person;*

5        *(b)      incur, guarantee or otherwise become obligated to pay any debt or other obligations*

6    *other than the Plan of Adjustment Bonds, operating costs, the Financing Costs and any bond, note*

7    *or evidence of indebtedness permitted under Article 2.3 hereof;*

8        *(c)      pledge, create or record liens on any of its properties (including the COFINA*

9    *Revenues), other than (1) the pledge to secure the payment of Plan of Adjustment Bonds created*

10    *pursuant to Article 3.2 of this Act or (2) any pledge or lien to secure any bond, note or evidence of*

11    *indebtedness permitted under Article 2.3 hereof but only to the extent such pledge or lien is*

12    *subordinate in all respects to the lien established in Article 3.2 of this Act;*

13        *(d)      engage in business activities other than as expressly authorized in this Act;*

14        *(e)      dissolve, liquidate, sell or, except as permitted by Article 2.4(e), otherwise transfer*

15    *any or all of its properties (including the COFINA Revenues); and*

16        *(f)      take any other action that is inconsistent with the Corporation's purpose set forth*

17    *in this Act or ancillary thereto.*

18        *Article 2.7.-Board of Directors.*

19        *The powers of the Corporation shall be exercised by the Board of Directors.*

20        *(a)      Composition of the Board of Directors.*

21        *The Board of Directors shall be composed of three (3) members, who shall meet the*

22    *requirements set forth in Article 2.7 (b)(iii) of this Act and shall be appointed by the Governor of*

1    *Puerto Rico; provided, that, pursuant to the provisions of the Ancillary Agreements, certain*

2    *holders of Plan of Adjustment Bonds may submit up to three (3) recommendations for the*

3    *Governor's consideration of the initial appointment of the Corporation's directors but the*

4    *Governor shall be under no obligation to appoint any such recommended persons.*

5    *(b)    General Provisions regarding the Board of Directors.*

6    *(i)    Each member of the Board of Directors shall be appointed for a term of three*

7    *(3) years and may serve consecutive terms as an appointed member; provided, that the*

8    *Governor may remove any member prior to the expiration of their term if such member*

9    *fails to uphold the responsibilities set forth in this Act or for gross negligence, willful*

10   *misconduct or fraud;*

11   *(ii)    each member of the Board of Directors shall be entitled to one (1) vote;*

12   *(iii)    each member of the Board of Directors shall satisfy the independence and*

13   *qualification standards (including that no member of the Board of Directors may be an*

14   *officer, employee or director of any Government Entity other than the Corporation) set*

15   *forth in the Ancillary Agreements;*

16   *(iv)    all decisions and actions of the Board of Directors shall require the*

17   *affirmative vote of the majority of the members of the Board of Directors at the time serving;*

18   *provided, that, the Corporation's bylaws may require a higher approval threshold for*

19   *particular matters described therein; and*

20   *(v)    the members of the Board of Directors shall select a Chair from among*

21   *themselves.*

22   *(c)    Vacancies.*

1   *In the event of a vacancy in the office of a member of the Board of Directors by death,*

2 *removal, resignation or otherwise, a successor member who meets the requirements set forth in*

3 *Article 2.7 (b)(iii) of this Act shall be appointed by the Governor of Puerto Rico subject to Article*

4 *2.7(b)(i) hereof.*

5   *(d)  Compensation.*

6   *Members of the Board of Directors shall receive such compensation as is authorized*

7 *pursuant to the Ancillary Agreements.*

8   *(e)  Adoption and Amendment of Rules.*

9   *As soon as practicable after the appointment of all members and appointment of the Chair,*

10 *the Corporation shall adopt rules and procedures governing its activities under this Act. The Board*

11 *of Directors shall be entitled to amend such rules and procedures from time to time.*

12   *(f)  Quorum.*

13   *A majority of the members of the Board of Directors at the time serving shall constitute a*

14 *quorum to make decisions or exercise any power or function of the Corporation. Any one or more*

15 *members may participate in a meeting of the Board of Directors by teleconference or similar*

16 *communications equipment. Participation by such means shall constitute presence in person at*

17 *the meeting. Any action necessary or allowed in any meeting of the Board of Directors shall be*

18 *authorized with no need for a meeting, if all the members of the Board of Directors give their*

19 *written consent concerning such action.*

20   *(g)  Delegation.*

1       *The Board of Directors may delegate to one or more of the members, or to the Corporation's*

2  *officers, agents and employees, such powers and duties as the Board of Directors may deem*

3  *appropriate.*

4       *Article 2.8.-Tax Exemption.*

5       *(a)    It is hereby found and declared that the activities of the Corporation are for a public*

6  *purpose. As a result, the Corporation shall be totally exempt from, and shall not be required to pay*

7  *any kind of taxes, assessments, licenses, stamps, fees or other similar charges levied by the*

8  *Government of Puerto Rico or any Government Entity upon any of the property that the*

9  *Corporation owns, possesses, holds or uses or on its activities, or upon any income, payment or*

10  *gain derived therefrom.*

11       *(b)    The Plan of Adjustment Bonds, including, but not limited to, any payments or*

12  *income with respect to the Plan of Adjustment Bonds and the transfer of the Plan of Adjustment*

13  *Bonds, shall, at all times, be totally exempt from all kinds of taxes, assessments, licenses, stamps,*

14  *fees and other charges levied by the Government of Puerto Rico or any Government Entity.*

15  *Holders and beneficial owners of the Plan of Adjustment Bonds shall not be subject to any tax*

16  *return filing or any other tax reporting or similar requirement in respect of the Government of*

17  *Puerto Rico or any Government Entity by reason of holding, owning or transferring the Plan of*

18  *Adjustment Bonds.*

19       *Article 2.9.–Inapplicability of Certain Laws.*

20       *The following laws or provisions shall not apply to the Corporation notwithstanding that*

21  *they may appear to apply to the Corporation:*

1    (a)    Chapters 4 and 6 of Act 26-2017, as amended, known as the "Fiscal Plan

2 Compliance Act";

3    (b)    Act 1-2012, as amended, known as the "Puerto Rico Government Ethics Act of

4 2011";

5    (c)    Act 103 of May 25, 2006, as amended, known as the "Act for the Fiscal Reform of

6 the Government of the Commonwealth of Puerto Rico of 2006";

7    (d)    Act 8-2017, as amended, known as the "Act for the Transformation of the

8 Government's Human Resources";

9    (e)    Act 237-2004, as amended, known as the "Act to Establish Uniform Parameters

10 for Contracting Professional and Consulting Services by Agencies and Instrumentalities of the

11 Government of Puerto Rico";

12    (f)    Act 197-2002, as amended, known as the "Act to Regulate the Transition Process

13 of the Government of Puerto Rico";

14    (g)    Act 78-2011, as amended, known as the "Electoral Code of Puerto Rico for the XXI

15 Century";

16    (h)    Act 38-2017, known as the "Uniform Administrative Procedures Act of the

17 Government of Puerto Rico";

18    (i)    Plan 3-2011, as amended, known as "General Services Reorganization Plan";

19    (j)    Act 230 of July 23, 1974, as amended, known as the "Government Accounting

20 Act";

21    (k)    Act 3-2017, known as the "Law to Address the Economic, Fiscal and Budgetary

22 Crisis and Ensure the Functioning of the Government of Puerto Rico"; and

1       *(l)*     *Act 14 of April 17, 1972, as amended.*

2   *CHAPTER 3. - THE RESTRUCTURING TRANSACTION*

3       *Article 3.1.–Issuance of Plan of Adjustment Bonds.*

4       *(a)*     *From and after the Effective Date, the Corporation shall be authorized to issue Plan*

5 *of Adjustment Bonds, from time to time, pursuant to the Corporation Plan of Adjustment and the*

6 *terms and conditions authorized by the Corporation and set forth in the applicable Restructuring*

7 *Resolution and the Ancillary Agreements.*

8       *(b)*     *Plan of Adjustment Bonds shall be dated, shall bear interest at such rates and shall*

9 *mature at such time or times as may be determined by the Corporation and authorized in the*

10 *applicable Restructuring Resolution in accordance and consistent with the Corporation Plan of*

11 *Adjustment. The Corporation shall determine the form of Plan of Adjustment Bonds and the*

12 *manner of execution of Plan of Adjustment Bonds, and shall fix the denomination or*

13 *denominations of Plan of Adjustment Bonds and the place or places of payment of principal thereof*

14 *and interest thereon, the terms of redemption and purchase in lieu of redemption and the other*

15 *terms thereof, all in accordance and consistent with the Corporation Plan of Adjustment. Such*

16 *Plan of Adjustment Bonds may be sold at public or private sale for such price or prices as the*

17 *Corporation shall determine, or issued in exchange for existing bonds of the Corporation in*

18 *accordance with the Plan of Adjustment.*

19       *(c)*     *Plan of Adjustment Bonds shall be payable solely from the COFINA Revenues in*

20 *accordance with the terms of this Act and the Ancillary Agreements.*

1   *(d)  The Corporation may purchase bonds issued by the Corporation on the terms and*

2 *in accordance with the Corporation Plan of Adjustment and applicable Ancillary Agreements at*

3 *a price not exceeding the redemption price thereof. All bonds so purchased shall be cancelled.*

4   *(e)  Neither the members of the Board of Directors nor any natural Person executing*

5 *such bonds shall be liable personally on the bonds or be subject to any personal liability or*

6 *accountability by reason of the issuance thereof.*

7   *(f)  Plan of Adjustment Bonds shall not constitute a debt of the Government of Puerto*

8 *Rico or of any Government Entity other than the Corporation. This statement shall be included in*

9 *the Plan of Adjustment Bonds, the Bond Indenture and the disclosure documentation relating to*

10 *such bonds.*

11   *Article 3.2.-Statutory Lien.*

12   *Plan of Adjustment Bonds shall automatically, upon the issuance of such Plan of*

13 *Adjustment Bonds, be secured by a statutory first lien on all of the Corporation's right, title and*

14 *interest in and to the Pledged Taxes, including any moneys, income, revenues, accounts, contract*

15 *rights or general intangibles derived therefrom, in favor of the Indenture Trustee for the benefit of*

16 *the holders of Plan of Adjustment Bonds. Such statutory first lien shall occur automatically and*

17 *shall automatically attach and be perfected, valid and binding from and after the Effective Date,*

18 *without any further act or agreement by any Person. No instrument needs to be executed or*

19 *delivered or recorded in any official record or in any government registry or office in order to*

20 *perfect or continue such statutory first lien or to establish or maintain the priority thereof. No*

21 *commingling of the Pledged Taxes with any property of the Government of Puerto Rico, any other*

22 *Government Entity or any other Person shall limit, defeat, impair or interfere with such statutory*

1   lien. Such lien shall be valid, binding, perfected and enforceable against all Persons having claims

2   of any kind in tort, contract or otherwise against the Corporation or its assets irrespective of

3   whether such Persons have notice of such lien.

4         *Article 3.3.-Covenants Regarding Plan of Adjustment Bonds and the Restructuring*

5   *Transaction.*

6         *The Government of Puerto Rico, with the intent of being contractually bound, hereby*

7   *agrees and covenants with the Corporation and each Person that holds Plan of Adjustment Bonds,*

8   *and authorizes the Corporation to include such covenant in the Bond Indenture for the benefit of*

9   *the holders of Plan of Adjustment Bonds, that it will not, and no Government Entity shall be*

10  *authorized to, until the Plan of Adjustment Bonds, together with the interest thereon, and all*

11  *amounts and obligations under all Ancillary Agreements, have been completely paid in cash in*

12  *full or otherwise discharged in accordance with their terms:*

13        *(a)    take any action that would (A) impair the Corporation's right to receive the*

14  *COFINA Revenues, (B) limit or alter the rights vested in the Corporation in accordance with the*

15  *Corporation Plan of Adjustment to fulfill the terms of any agreements with the holders of Plan of*

16  *Adjustment Bonds, (C) materially and adversely impair the collection of the Pledged Taxes in any*

17  *Fiscal Year, or (D) impair the rights and remedies of the holders of the Plan of Adjustment Bonds*

18  *or the collateral security established under Article 3.2 of this Act;*

19        *(b)    reduce the Pledged Taxes to a rate less than five and one-half percent (5.5%) unless,*

20  *in connection with such reduction, the credit rating and other requirements set forth in the*

21  *Ancillary Agreements are satisfied; provided, however, that, notwithstanding the foregoing, until*

22  *all obligations with respect to the Plan of Adjustment Bonds have been paid or satisfied in full in*

1    *accordance with their terms, if the rate of the Pledged Taxes is reduced below three percent (3%),*

2    *then, in connection with such reduction, the Government of Puerto Rico must comply with the*

3    *Substitution Requirements;*

4    *(c)     impair, limit, restrict, rescind, delay or modify the rights or powers of the*

5    *Corporation, the Indenture Trustee or the holders of Plan of Adjustment Bonds under this Act or*

6    *relating to the COFINA Revenues, or the Corporation's ability to meet its obligations to its*

7    *bondholders;*

8    *(d)     amend this Act to impair, limit, restrict, rescind, delay or modify any obligation or*

9    *commitment of the Corporation to the holders of Plan of Adjustment Bonds; and*

10   *(e)     limit or restrict the rights or powers of the appropriate officers of the Government*

11   *of Puerto Rico to impose, maintain, charge or collect the Pledged Taxes, provided that the foregoing*

12   *shall not preclude the Government of Puerto Rico from exercising its power, through a change in*

13   *law, replace the portion of the Sales Tax that corresponds to a tax rate of five and one half percent*

14   *(5.5%) with Substituted Collateral in accordance with the Substitution Requirements.*

15   *CHAPTER 4. - FUNDING OF THE CORPORATION; DEPOSITS AND DISBURSEMENTS.*

16   *Article 4.1.-First Dollars Funding of COFINA Revenues.*

17   *(a)     Each Fiscal Year, the first funds comprising the Pledged Taxes shall be transferred*

18   *to, and deposited with, the Corporation, or any account or fund (including the COFINA Revenues*

19   *Fund or an account or fund controlled by the Indenture Trustee designated in the Bond Indenture*

20   *pursuant to which obligations were incurred in accordance with this Act and the Ancillary*

21   *Agreements) designated by the Corporation, until such time as the Corporation has received an*

22   *amount equal to the COFINA Revenues for such Fiscal Year. The requirement that the first funds*

1   comprising the Pledged Taxes up to the COFINA Revenues be deposited with the Corporation or

2   in any account or fund (including the COFINA Revenues Fund or an account or fund controlled

3   by the Indenture Trustee designated in the Bond Indenture pursuant to which obligations were

4   incurred in accordance with this Act and the Ancillary Agreements) designated by the

5   Corporation may not be modified; provided, that the Bond Indenture may contain provisions

6   allowing for the quarterly distribution of the Pledged Taxes between the Corporation and the

7   Government of Puerto Rico upon satisfaction of the requirements set forth in the Bond Indenture

8   and consistent with the Corporation Plan of Adjustment. The Corporation shall have the rights

9   set forth in this Article 4.1 until such time as the Plan of Adjustment Bonds, together with any

10  interest thereon, and all obligations under all Ancillary Agreements, have been completely paid in

11  cash in full or have otherwise been discharged in accordance with their terms.

12      (b)      During each Fiscal Year, the Indenture Trustee or such other Person as may be

13  designated in the Bond Indenture shall determine, on a monthly basis, if the Corporation has

14  received the COFINA Revenues. Once the Indenture Trustee or such other Person determines

15  that the COFINA Revenues have been deposited with the Indenture Trustee (or that portion of the

16  COFINA Revenues as the Corporation may be entitled to the extent the quarterly distribution

17  referenced in Article 4.1(a) above is in effect), all revenues of the Pledged Taxes received after such

18  determination shall be transferred to the Government of Puerto Rico.

19      (c)      No Person who collects or holds the Pledged Taxes shall have any legal or equitable

20  right, title or interest thereto solely by virtue of the fact that it collects or holds the Pledged Taxes.

21      Article 4.2.-Excess Funding.

1      *The amounts deposited with the Corporation each Fiscal Year in excess of the amounts*

2   *required to pay principal and interest on the Plan of Adjustment Bonds then due and payable*

3   *(including the principal and interest due and payable on any past due Plan of Adjustment Bonds),*

4   *satisfy obligations assumed pursuant to the Bond Indenture or other Ancillary Agreements then*

5   *due and payable, pay its Financing Costs or operating expenses as provided in the Ancillary*

6   *Agreement, or make any other payment related to other obligations incurred by the Corporation,*

7   *will be transferred to the Corporation, free and clear of the lien established by Article 3.2 of this*

8   *Act and any other lien established by the Bond Indenture or other Ancillary Agreement.*

9   *CHAPTER 5. - MISCELLANEOUS PROVISIONS.*

10     *Article 5.1. -Severability.*

11     *This Act shall be interpreted in a manner to render it valid to the extent practicable in*

12   *accordance with the Puerto Rico Constitution and the U.S. Constitution. If any clause, paragraph,*

13   *subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter,*

14   *subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order*

15   *to such effect will neither affect nor invalidate the remainder of this Act. The effect of such an order*

16   *shall be limited to the clause, paragraph, subparagraph, sentence, word, letter, article, provision,*

17   *section, subsection, title, chapter, subchapter, heading, or part of this Act so annulled or declared*

18   *unconstitutional. If the application to a Person or circumstance of any clause, paragraph,*

19   *subparagraph, sentence, word, letter, article, provision, section, subsection, title, chapter,*

20   *subchapter, heading, or part of this Act, were to be annulled or declared unconstitutional, the order*

21   *to such effect will neither affect nor invalidate the application of the remainder of this Act to such*

22   *Persons or circumstances to which it may be validly applied. It is the express and unequivocal*

1    *intent of this Legislative Assembly that the courts of law enforce the provisions and application of*

2    *this Act to the greatest possible extent, even if any of its parts is annulled, invalidated, affected or*

3    *declared unconstitutional, or even if the application thereof to any Person or circumstance is*

4    *annulled, invalidated or declared unconstitutional. This Legislative Assembly would have passed*

5    *this Act regardless of the ruling on severability that a Court may issue.*

6    *Article 5.2.- Language Conflict.*

7    *This Act shall be adopted both in English and Spanish. If in the interpretation or*

8    *application of this Act any conflict arises as between the English and Spanish texts, the English*

9    *text shall govern."*

10    Sección 26.- Se derogan los Artículos 2 y 4 de la Ley 116-2013, según enmendada.

11    Sección 27.- Se enmienda el Artículo 25-A de la Ley 44 del 21 de junio de 1988,

12    según enmendada, para que lea en su totalidad como sigue:

13    "(a)…

14    …

15    (k) Durante el período comprendido entre la fecha de aprobación de esta Ley y el

16    31 de diciembre de 2012, la Autoridad habrá de disponer de los activos depositados en la

17    Cuenta del Corpus de la siguiente manera:

18    (i) ...

19    (ii) el remanente, permanecerá en la Cuenta del Corpus y se utilizará para

20    comprar un bono de apreciación de capital emitido por la Corporación para

21    el Fondo de Interés Apremiante de Puerto Rico con un vencimiento no

22    menor de 30 años ni mayor de 40 años y a una tasa de interés de no menos

1          de 7.00%. El Sistema de Retiro de Empleados del Estado Libre Asociado de

2          Puerto Rico y la Autoridad para el Financiamiento de la Infraestructura de

3          Puerto Rico no podrán disponer voluntariamente del bono de la

4          Corporación del Fondo de Interés Apremiante de Puerto Rico, a menos que

5          dicha disposición sea autorizada por *la Autoridad de Asesoría Financiera y*

6          *Agencia Fiscal de Puerto Rico* **[el Banco Gubernamental de Fomento para**

7          **Puerto Rico y en el caso del bono depositado en la Cuenta del Corpus,**

8          **aprobada mediante Resolución Conjunta por la Asamblea Legislativa].**"

9          Sección 28.- Separabilidad.

10          Esta Ley se interpretará de tal manera para hacerla válida, en la medida que sea

11   factible, de acuerdo a la Constitución de Puerto Rico y la Constitución de los Estados

12   Unidos de América. Si cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra,

13   artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de

14   esta Ley fuera anulada o declarada inconstitucional, la orden a tal efecto dictada no

15   afectará, perjudicará, ni invalidará el remanente de esta Ley. El efecto de dicha orden

16   quedará limitado a la cláusula, párrafo, subpárrafo, oración, palabra, letra, artículo,

17   disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de la misma

18   que así hubiere sido anulada o declarada inconstitucional. Si la aplicación a una Persona

19   o a una circunstancia de cualquier cláusula, párrafo, subpárrafo, oración, palabra, letra,

20   artículo, disposición, sección, subsección, título, capítulo, subcapítulo, acápite o parte de

21   esta Ley fuera invalidada o declarada inconstitucional, la resolución, dictamen o

22   sentencia a tal efecto dictada no afectará ni invalidará la aplicación del remanente de esta

1    Ley a aquellas Personas o circunstancias en que se pueda aplicar válidamente. Es la

2    voluntad expresa e inequívoca de esta Asamblea Legislativa que los tribunales hagan

3    cumplir las disposiciones y la aplicación de esta Ley en la mayor medida posible, aunque

4    se deje sin efecto, anule, invalide, perjudique o declare inconstitucional alguna de sus

5    partes, o aunque se deje sin efecto, invalide o declare inconstitucional su aplicación a

6    alguna persona o circunstancia. Esta Asamblea Legislativa hubiera aprobado esta Ley sin

7    importar la determinación de separabilidad que el Tribunal pueda hacer.

8        Sección 29.- Supremacía.

9        Las disposiciones de esta Ley prevalecerán sobre cualquier otra disposición

10    general o específica de cualquier otra ley o reglamento del Gobierno de Puerto Rico que

11    sea inconsistente con esta Ley.

12        Sección 30.- Vigencia.

13        Esta Ley comenzará a regir en la Fecha de Efectividad, según dicho término está

14    definido en la Ley 91-2016, según enmendada por esta Ley.

Case:17-03283-LTS Doc#:4364-37 Filed:11/26/18 Entered:11/26/18 21:36:59 Desc:
Exhibit G Page 1 of 5

# Exhibit G

**Schedule of Existing Securities Listed by CUSIP and Class,
as Determined Prior to Elections Made Pursuant to the Plan of Adjustment**

| Class | CUSIP |
|---|---|
| **Class 1 – Senior COFINA Bond Claims** | 74529JAA3 |
| | 74529JAB1 |
| | 74529JAC9 |
| | 74529JAD7 |
| | 74529JAE5 |
| | 74529JAQ8 |
| | 74529JAR6 |
| | 74529JAS4 |
| | 74529JBB0 |
| | 74529JBC8 |
| | 74529JBD6 |
| | 74529JBE4 |
| | 74529JBF1 |
| | 74529JBG9 |
| | 74529JBH7 |
| | 74529JBJ3 |
| | 74529JBK0 |
| | 74529JBL8 |
| | 74529JDY8 |
| | 74529JDZ5 |
| | 74529JEA9 |
| | 74529JEB7 |
| | 74529JEC5 |
| | 74529JED3 |
| | 74529JEE1 |
| | 74529JEF8 |
| | 74529JEG6 |
| | 74529JEH4 |
| | 74529JEJ0 |
| | 74529JEK7 |
| | 74529JEL5 |
| | 74529JEM3 |
| | 74529JEN1 |
| | 74529JEP6 |
| | 74529JEQ4 |
| | 74529JER2 |
| | 74529JES0 |
| | 74529JFF7 |
| | 74529JFG5 |
| | 74529JFH3 |
| | 74529JFJ9 |
| | 74529JFK6 |
| | 74529JFL4 |
| | 74529JFM2 |

| | 74529JFN0 |
| --- | --- |
| | 74529JFP5 |
| | 74529JFQ3 |
| | 74529JFR1 |
| | 74529JFS9 |
| | 74529JFT7 |
| | 74529JFU4 |
| | 74529JFV2 |
| | 74529JFW0 |
| | 74529JHV0 |
| | 74529JNM3 |
| | 74529JNN1 |
| | 74529JNP6 |
| | 74529JNQ4 |
| | 74529JNR2 |
| | 74529JNS0 |
| | 74529JNT8 |
| | 74529JNU5 |
| | 74529JNV3 |
| | 74529JNW1 |
| | 74529JNX9 |
| | 74529JNY7 |
| | 74529JNZ4 |
| | 74529JPA7 |
| | 74529JPB5 |
| | 74529JPC3 |
| | 74529JPD1 |
| | 74529JPE9 |
| | 74529JPF6 |
| | 74529JPG4 |
| | 74529JPH2 |
| | 74529JPJ8 |
| | 74529JPK5 |
| | 74529JPL3 |
| **Class 2 – Senior COFINA Bond Claims (Ambac)** | 74529JAN5 |
| | 74529JAP0 |
| **Class 3 – Senior COFINA Bond Claims (National)** | 74529JAF2 |
| | 74529JAG0 |
| | 74529JAH8 |
| | 74529JAJ4 |
| | 74529JAK1 |
| | 74529JAL9 |
| | 74529JAM7 |
| **Class 5 – Junior COFINA Bond Claims** | 74529JGP4 |
| | 74529JGQ2 |
| | 74529JGR0 |
| | 74529JGU3 |

| | |
|---|---|
| | 74529JGW9 |
| | 74529JGY5 |
| | 74529JGZ2 |
| | 74529JHB4 |
| | 74529JHD0 |
| | 74529JHE8 |
| | 74529JHF5 |
| | 74529JHG3 |
| | 74529JHH1 |
| | 74529JHL2 |
| | 74529JHM0 |
| | 74529JHN8 |
| | 74529JHP3 |
| | 74529JHR9 |
| | 74529JHS7 |
| | 74529JHT5 |
| | 74529JHU2 |
| | 74529JHW8 |
| | 74529JHX6 |
| | 74529JHY4 |
| | 74529JJX4 |
| | 74529JJY2 |
| | 74529JJZ9 |
| | 74529JKA2 |
| | 74529JKB0 |
| | 74529JKC8 |
| | 74529JKD6 |
| | 74529JKE4 |
| | 74529JKF1 |
| | 74529JKG9 |
| | 74529JKH7 |
| | 74529JKJ3 |
| | 74529JKK0 |
| | 74529JKM6 |
| | 74529JKN4 |
| | 74529JKP9 |
| | 74529JKQ7 |
| | 74529JKR5 |
| | 74529JKS3 |
| | 74529JKT1 |
| | 74529JKU8 |
| | 74529JKV6 |
| | 74529JLD5 |
| | 74529JLE3 |
| | 74529JLF0 |
| | 74529JLG8 |
| | 74529JLH6 |

| | 74529JLJ2 |
|---|---|
| | 74529JLK9 |
| | 74529JLL7 |
| | 74529JLM5 |
| | 74529JLP8 |
| | 74529JLQ6 |
| | 74529JLR4 |
| | 74529JLX1 |
| | 74529JLY9 |
| | 74529JLZ6 |
| | 74529JMA0 |
| | 74529JMB8 |
| | 74529JMC6 |
| | 74529JMD4 |
| | 74529JME2 |
| | 74529JMF9 |
| | 74529JMG7 |
| | 74529JMH5 |
| | 74529JMJ1 |
| | 74529JMK8 |
| | 74529JML6 |
| | 74529JMM4 |
| | 74529JMN2 |
| | 74529JMP7 |
| | 74529JND3 |
| | 74529JNE1 |
| | 74529JNF8 |
| | 74529JNG6 |
| | 74529JNH4 |
| | 74529JNJ0 |
| | 74529JNL5 |
| **Class 6 – Junior COFINA Bond Claims (Assured)** | 74529JKL8 |
| | 74529JLN3 |