# UNITED STATES DISTRICT COURT
# DISTRICT OF PUERTO RICO

| | |
|---|---|
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br><br>(Jointly Administered) |
| IN RE:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION (COFINA),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>This filing relates to COFINA only |

## **DECLARATION OF ROBERT M. FISHMAN**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

[1]

## TABLE OF CONTENTS

I. Introduction and Scope of Assignment ........................................................................... 3
II. Qualifications and Relevant Experience ......................................................................... 4
III. Compensation ................................................................................................................ 11
IV. Case Background and Allegations of Complaint .......................................................... 11
V. Methodology .................................................................................................................. 13
VI. Assumptions ................................................................................................................... 14
VII. Analysis ......................................................................................................................... 14
VIII. Conclusions ................................................................................................................... 17

Case:17-03284-LTS Doc#:413-15 Filed:02/02/19 Entered:02/02/19 16:05:49 Desc:
Affidavit Declaration Robert M. Fishman Page 3 of 18

I, ROBERT M. FISHMAN, pursuant to 28 U.S.C. § 1746, hereby declare as follows:

I. <u>Introduction and Scope of Assignment</u>

1. As an experienced Fee Examiner, including in the Detroit Chapter 9 bankruptcy case, as well as my other experience set forth below, I have been retained by The Bank of New York Mellon to offer my expert opinion on the proposed holdback in this matter. My understanding of the background follows.

2. On May 5, 2017, the Oversight Board established under the Puerto Rico Oversight, Management and Economic Stability Act ("PROMESA") filed a voluntary petition for relief on behalf of the Puerto Rico Sales Tax Financing Corporation ("COFINA"), thereby commencing this Title III case (the "COFINA Title III Case").

3. Disputes have arisen between The Bank of New York Mellon ("BNYM"), in its capacity as trustee (the "Trustee") for sales tax revenue bonds issued by COFINA (the "Bonds")[2], Whitebox (defined below), a holder of beneficial interests in the Bonds, AMBAC Assurance Corporation, an insurer who insures certain Bonds, and COFINA itself (collectively, the "Parties").

4. COFINA issued four types of Bonds under the Resolution: (i) senior "current interest" bonds (the "Senior CIBs"); (ii) senior "capital appreciation" bonds (the "Senior CABs"); (iii) subordinate "current interest" bonds (the "Subordinate CIBs"); and (iv) subordinate "capital appreciation" bonds (the "Subordinate CABs"). Under the Resolution, interest on the Senior CIBs and the Subordinate CIBs (together, the "CIBs") is payable on a current basis on established dates prior to maturity. Interest on the Senior CABs and the Subordinate CABs (together, the "CABs")

---

[2] BNYM is the trustee under the Amended and Restated Sales Tax Revenue Bond Resolution (as amended and supplemented, the "Resolution"), adopted on July 13, 2007, by <u>COFINA</u>.

[3]

is "capitalized," or added to the principal balance, to be paid (generally) only at maturity or earlier redemption or acceleration of maturity. The CABs do not receive periodic interest payments and have long-term maturity dates. The Subordinate CIBs and the Subordinate CABs (together, the "Subordinate Bonds") carry higher interest rates, but have a lien priority that is subordinate to all of the Senior CIBs and the Senior CABs (together, the "Senior Bonds").

5. As set forth in section 19.5 of the Plan, one of the principal unresolved issues, and the issue that this report will address, is the amount of funds that the Trustee is entitled to reserve (the "Reserve Funds") from funds otherwise distributable to beneficial holders of the Bonds for the purpose of protecting the Trustee's right to reimbursement of its costs and expenses relating to its duties as Trustee and in defending certain claims that have been or may be asserted by holders of the Bonds (the "Anticipated Litigation").

6. Counsel for the Trustee has engaged me to evaluate, from the perspective of an experienced insolvency professional and fee examiner, the reasonableness of the Reserve Fund that the Trustee proposes to withhold on account of the Anticipated Litigation. This report contains my opinions, which are based on my understanding of the relevant facts as derived from the specific information and assumptions provided to me by BNYM's counsel as of the date hereof.

II. Qualifications and Relevant Experience

7. I am an attorney admitted to practice in the State of Illinois (1979) and the State of New York (2016). I am admitted to practice before the United States District Court for the Northern District of Illinois, the United States District Court for the Eastern District of Wisconsin, the United States District Court for the District of Minnesota, the United States District Court for the Northern District of Florida, the United States District Court for the District of Nevada, the

[4]

United States District Court for the Southern District of New York, the United States Court of Appeals for the Seventh Circuit and the United States Court of Appeals for the Eighth Circuit.

8. I was born in Bloomington, Illinois in 1953 and grew up in Danville, Illinois. I attended the University of Illinois in Champaign/Urbana where I graduated with a B.A. in Political Science in 1976. I then attended law school at the National Law Center of George Washington University, where I graduated in 1979.

9. After law school, I began my employment as a Special Assistant Attorney General for the Illinois Attorney General's Office in Chicago, Illinois (1979-1980). In November 1980 I accepted a position as an associate in the Chicago bankruptcy boutique law firm of Levit and Miller, Ltd. I continued my practice with that firm until February of 1990, becoming a partner of the firm in 1985. In February 1990, our firm, then known as Levit, Mason and Fishman, Ltd. merged with Ross & Hardies. I remained as a partner in the Chicago office of Ross & Hardies from 1990 until I left the firm in 1998. In January of 1998, I resigned from Ross & Hardies and left to join the firm of Shaw Gussis Domanskis & Fishman, LLC as a partner. That firm was a small real estate firm and I became its first bankruptcy attorney. Over the years, that firm evolved into Shaw Fishman Glantz & Towbin, LLC, one of the nation's pre-eminent bankruptcy boutique firms, with offices in Chicago, Illinois and Wilmington, Delaware. Finally, in June of 2018, Shaw Fishman Glantz and Towbin, LLC merged with Fox Rothschild, LLP and I became a partner in the Financial Restructuring and Bankruptcy Group of Fox Rothschild.

10. Since I joined Levit and Miller in 1980, my thirty–eight plus years of practice has been almost exclusively related to debtor-creditor, bankruptcy, insolvency and financial distress situations. The vast majority of the matters on which I have been retained over the years have been business cases. I have represented numerous corporations, limited liability companies, and

[5]

partnerships in addressing their respective financial issues. I have also represented secured creditors, unsecured creditors, trustees, creditors and equity committees in such circumstances. I have also had extensive experience in other types of financial distress situations, such as out of court workouts, assignments for the benefit of creditors and state and federal court receivership cases. I have represented many plaintiffs and many defendants in litigation related to this practice, including cases involving alleged preferential transfers, fraudulent conveyances, and breaches of fiduciary duty. I have also represented numerous buyers and sellers of assets in the financial distress arena and I am familiar with the issues that parties to transactions must consider. Additionally, I have advised many sets of officers and directors in considering business decisions during times of financial distress. I have been a mediator in insolvency-related matters since 2010 and have been retained to mediate numerous disputes involving financial distress and insolvency issues.

11. In August of 2013, Bankruptcy Judge Steven Rhodes of the United States Bankruptcy Court for the Eastern District of Michigan appointed me as Fee Examiner in the Chapter 9 Case of *The City of Detroit, Michigan*, Case No. 13-53846 (the "Detroit Case"). I served in the capacity of Fee Examiner until after confirmation of the City of Detroit's Plan of Arrangement in December 2014.

12. The Detroit engagement presented a number of unique challenges. Sections 327, 328, 329, 330 and 331 (the "Fee Provisions") of title 11, United States Code (the "Bankruptcy Code"), are not made applicable to Chapter 9 cases by Section 901 of the Bankruptcy Code. That means that in Chapter 9 cases, there is no applicable statutory process for professionals to be retained pursuant to Bankruptcy Court approval, submit their respective requests for compensation and reimbursement of expenses to the Bankruptcy Court for approval, receive interim payments

of such fees and expenses or ultimately have the Bankruptcy Court "allow" such fees and expenses as part of the Chapter 9 process. Accordingly, all of the well-developed case law respecting issues relating to retention and the allowance (or disallowance) of requested compensation and reimbursement of expenses is not technically applicable to those issues in a Chapter 9 case. Additionally, the various Guidelines put forth by the Office of the United States Trustee are not applicable to Chapter 9 cases.

13. My first responsibility was, in consultation with counsel for the City, to devise procedures to cover all aspects of the fee submission and review process (the "Fee Review Process"). The Fee Review Process that I came up with drew substantially on the traditional Chapter 11 process, with accommodation for the nuances of the Chapter 9 reality. For instance, the order that memorializes and implements the Fee Review Process never "orders" the City to do things or make payments. It provides that the City "consents" to the various processes and payment obligations[3]. Upon completion of my proposed procedures order, the draft order was submitted to Judge Rhodes, who, after review and a hearing, and subject to a few minor revisions, entered the order (the "Fee Review Order").

14. The Fee Review Order established which Professionals (as that term is defined in the Fee Review Order) were to be subject to the Fee Review Process. It obligated each of the Professionals to submit certain materials to the Fee Examiner, such as engagement letters, disclosures of rates and a list of billing categories intended to be used in the invoices. It created a standard timeline for (i) the submission of monthly invoices to the Fee Examiner, (ii) the review of those invoices by the Fee Examiner, (iii) the issuance of a Preliminary Monthly Report by the Fee Examiner to each individual Professional respecting that Professional's invoice, (iv) a

---

[3] At Paragraph H of the Fee Review Order, the City expressly consented to certain of the relief provided in the Fee Review Order.

[7]

Case:17-03284-LTS Doc#:413-15 Filed:02/02/19 Entered:02/02/19 16:00:49 Desc:
Affidavit Declaration Robert M. Fishman Page 8 of 18

Resolution Period in which the Fee Examiner and each Professional could discuss any issues pertinent to that Professional raised by the Fee Examiner and attempt to reach a consensual resolution of the same, (v) and the issuance of Final Monthly Reports that reflected the adjustments to the original invoices (both consensual adjustments and those unilaterally proposed by the Fee Examiner), if any, and the Fee Examiner's ultimate conclusion as to the reasonableness of the invoices.

15. The Fee Review Order set forth structural requirements for the invoices, along with parameters respecting certain types of time entries (e.g., travel time). It further set forth parameters respecting expense reimbursement. It provided for a staged payment methodology, part upon submission and part after the filing of the Fee Examiner's Final Monthly Reports. Additionally, it provided a mechanism for the submission, review and payment of the invoices of the Fee Examiner and his professionals.

16. While Judge Rhodes eventually, at the conclusion of the Detroit Case and as part of the confirmation process, did rule on the reasonableness of the fees incurred during the Detroit Case, he placed substantial reliance in doing so on the process that was utilized and the conclusions that I reached.

17. During the course of the Detroit Case, the Fee Examiner and my team reviewed the invoices of approximately 17 professional firms who submitted invoices totaling approximately $175,000,000. I participated extensively in the multiple days of mediation over fees that occurred right at the end of the Detroit Case.

18. In August of 2016, the PCI Liquidating Trust[4] (the "PCI Trust"), as successor in interest to the Petters Company, Inc., *et al.,* under their confirmed Chapter 11 plan of liquidation

---

[4] And the Advisory Committee created in conjunction therewith (the "Committee").

[8]

(Case No. BKY 08-45257 pending in the United States Bankruptcy Court for the District of Minnesota)(the "Petters Case"), retained me to design, implement and run a fee review process for the numerous professionals that were doing post-confirmation work for the PCI Trust on its substantial post-confirmation litigation portfolio. The charge from the Committee was to create a fee submission and review process that would relieve the PCI Trust of the burden of reviewing and analyzing the numerous monthly invoices that it received from its various professionals. The system that I devised in the Petters Case was a somewhat more relaxed, less formal approach to fee review than was utilized in the Detroit Case (as instructed by the Committee). The assignment was to get the professionals to submit budgets, operate within the budgets and provide their services to the PCI Trust in a reasonable and efficient manner. Budgets were submitted quarterly and invoices were submitted by each professional on a monthly basis, in a format which was set forth in the Fee Procedures Memorandum (written principally by me) sent by the Committee to each of its professionals. My task was to monitor the various submissions of the Professionals (particularly the invoices) and identify services that were being provided that were excessive, duplicative, inefficient or otherwise not beneficial to the Trust. As in the Detroit Case, following the review and analysis of the invoices, a preliminary discussion period followed each submission and review, with the idea being that the Fee Examiner and the professional would try to reach an agreement on any services or expenses with which the Fee Examiner took issue. After those discussions took place, I would send a written assessment of each of the professionals' invoices on a monthly basis to the Committee, identifying what adjustments, if any, were either agreed to by the professionals and me, or in the absence of an agreement, appropriate as to each invoice in my opinion. In the Petters Case, there are eighteen professional firms who submit invoices to me

Case 17-03284-LTS Doc#:4763-15 Filed:01/02/19 Entered:01/02/19 16:05:49 Desc:
Affidavit Declaration Robert M. Fishman Page 10 of 18

for review. My responsibilities began with the October 2016 invoices and have continued since that time. This is a current engagement for me.

19. I was also appointed as a Fee Examiner by the Honorable Kevin J. Carey, United States Bankruptcy Judge for the District of Delaware, in the *Velocity Holding Company, Inc., et al.* Chapter 11 case (Case No. 17-12442 (KJC)). The *Velocity* case involved the review of the fees of seven sets of professionals totaling approximately $5,200,000. The case was a relatively short one, as my engagement began in February 2018 and the review process was completed by September 2018.

20. During my professional career, I have belonged to many bankruptcy/insolvency organizations and associations. My most significant and meaningful experiences have come from my membership in the American Bankruptcy Institute (ABI), which I joined in 1986. I have been a member ever since 1986 and have served in various capacities in the ABI, including Vice President of Education (1992-1996), President (1997-1998) and Chairman of the Board of Directors (1999-2000). I was elected to the American College of Bankruptcy in 1998 and have served on both its Board of Regents (as the Regent for the Seventh Circuit) and Board of Directors.

21. I served as Chairman of the Bankruptcy Remote Entities, Bankruptcy-Proofing and Public Policy Advisory Group, formed to assist the ABI Commission to Study the Reform of Chapter 11 (the "ABI Commission") in the consideration of pertinent issues and the formulation of its public report. The Advisory Group focused primarily on two topics, Inter-creditor Agreements and Single Asset Real Estate Cases. The Advisory Group met and drafted and submitted its reports to the ABI Commission over the years of 2012-2014.

22. I have been listed in "The Best Lawyers in America," "Chambers USA Guide," and U. S. News List, and I am rated, AV® Preeminent™ 5.0 out of 5.0, by Martindale Hubbell.

23. I have not testified as an expert at trial or deposition in the previous four years.

24. The publications that I have authored (or co-authored) for publication in the last ten years are *What Is Your "Interest" in Section 363(f)?*, Norton Annual Survey of Bankruptcy Law 2008 Edition; *What's Driving Section 363 Sales After Chrysler and General Motors?*, Norton Journal of Bankruptcy Law and Practice, Vol. 19, No. 4 (2010); *The "Special" Mediator: An Innovative Approach to an Old Problem*, Robert M. Fishman and Gordon E. Gouveia, XXX ABI Journal 6, 16, 53, July/August 2011; *Revisiting the Indubitable Equivalent Standard: Undoubtedly the Same or Close Enough?*, Robert M. Fishman, Gordon E. Gouveia, and Kimberly Bacher, Norton Journal of Bankruptcy Law and Practice, 20 J. (2011); *ABI Mediation Committee's Model Guidelines for Mediation*, Richard E. Mikels and Robert M. Fishman, XXXIV ABI Journal 4, 24-25, 90-91, April 2015.

### III. Compensation

25. I am being compensated in this engagement on an hourly basis. My hourly rate is $750, although I will bill for travel time at one-half my applicable rate. My compensation is not contingent on the outcome of this matter. Additionally, I may utilize certain attorneys at my firm to assist me with this engagement, and they will all be compensated on an hourly basis at their standard hourly rates.

### IV. Case Background and Allegations of Complaint

26. The following reflects my current understanding of the relevant facts based on discussions with counsel, fact gathering, review of selected pleadings and documents, and my review of the Declaration of Daniel P. Goldberg (the "Goldberg Declaration").

27. In April 2017, Whitebox filed a lawsuit against BNYM in New York Supreme Court, styled *Whitebox Multi-Strategy Partners, L.P. et al., v. Bank of New York Mellon Corp.*,

[11]

651969/2017 (Sup. Ct. N.Y. County Apr. 12, 2017) (the "Whitebox Lawsuit"). BNYM removed the Whitebox Lawsuit to the United States District Court for the Southern District of New York, and the Court, upon BNYM's motion, transferred the case to the District of Puerto Rico. Whitebox alleges in its complaint that BNYM breached putative duties to Whitebox, as an asserted Beneficial Holder of Senior CABs, by failing to declare alleged defaults and alleged Events of Default as a result of certain statements and decisions made by the Commonwealth and the Oversight Board, starting in September 2015. Whitebox also alleges gross negligence, and asserts six causes of action for negligence, breach of trust, breach of fiduciary duty, waste, breach of contract, breach of the implied covenant of good faith and fair dealing, and declaratory judgment. Whitebox contends that BNYM's conduct has caused it to suffer millions of dollars in damages.

28. In May 2017, Ambac filed a lawsuit against BNYM in New York Supreme Court, styled *Ambac Assurance Corp. v. The Bank of New York Mellon*, 652356/2017 (Sup. Ct. N.Y. County May 2, 2017) (the "Ambac Lawsuit" and together with the Whitebox Lawsuit, the "Lawsuits"). BNYM removed the Ambac Lawsuit to the United States District Court for the Southern District of New York. Subsequently, Ambac filed a First Amended Complaint. Ambac also alleges that BNYM breached its duties as a result of failing to declare alleged Events of Default in seven separate circumstances, starting in September 2015. Ambac alleges that BNYM is liable for failing to recognize Events of Default and failing to accelerate the Senior Bonds. Ambac asserts six causes of action for breach of fiduciary duty, breach of contract, breach of the implied covenant, gross negligence/breach of trust, declaratory judgment, and injunctive relief. Ambac alleges that BNYM's conduct has caused Ambac to suffer millions of dollars in damages.

29. There is also currently pending before the United States District Court for the District of Puerto Rico (the "Court") an adversary complaint filed in the COFINA Title III Case

[12]

by BNYM v. Whitebox Multi-Strategy Partners, L.P., Whitebox Asymmetric Partners, L.P., Whitebox Institutional Partners, L.P., Pandora Select Partners, L.P. (together, "Whitebox"), AMBAC Assurance Corporation ("Ambac"), COFINA, Franklin Advisers, Inc., and Cede & Co., as nominee for The Depository Trust Company (17-00133-LTS) (the "Interpleader Action"). In the Interpleader Action, BNYM seeks, among other things, a determination as to whether there has been an Event of Default, as defined in the COFINA Resolution; whether any of the Bonds have been accelerated; the impact of any defaults on the distribution rights of the holders of various tranches of the Bands; and BNYM's rights and responsibilities as Trustee.

30. Based on an Order entered by the Court in the Interpleader Action, both of the Lawsuits are currently stayed.

31. COFINA has proposed a plan of adjustment (the "Plan"), based on a settlement between the Commonwealth of Puerto Rico (the "Commonwealth") and COFINA, which is scheduled for a confirmation hearing on January 16, 2019 before the Court. In the Plan, COFINA has proposed a resolution of the issue of the ownership of the sales and use taxes ("SUT") purportedly transferred by the Commonwealth to COFINA to secure repayment of certain indebtedness of COFINA. One of the component parts of the Plan is that it sets forth the manner in which the Trustee will distribute SUT funds in its possession to the various Bondholders.

32. Additional discussion of the status of the pending legal matters and issues raised therein is contained in the Goldberg Declaration, which I incorporate by reference herein.

V. Methodology

33. I have taken the facts as set forth in the Goldberg Declaration and assumed them to be true. I have then applied my experience as a fee examiner in several different types of cases to consider the reasonableness of the proposed Reserve Fund requested by BNYM.

Case 17-03284-LTS Doc 4767-15 Filed 01/14/19 Entered 01/14/19 11:51:59 Desc: Exhibit 2019 0102 Fishman Declaration Page 14 of 18

Case 17-03284-LTS Doc 4163-15 Filed 02/02/19 Entered 02/02/19 16:05:49 Desc: Affidavit Declaration Robert M. Fishman Page 14 of 18

VI.     <u>Assumptions</u>

34.     My opinions expressed in this report are based on the facts as asserted in the Goldberg Declaration. I have been asked to assume the correctness of facts as set forth in the Goldberg Declaration respecting the nature of the Anticipated Litigation; the manner and degree to which BNYM is likely to respond to the Anticipated Litigation; the potential component parts of the possible ensuing litigation between BNYM, on the one hand, and one or both of Whitebox and Ambac, on the other hand; the required staffing of legal professionals necessary for BNYM to properly fulfill its obligations and vigorously defend its interests in the event of such litigation; the need for and costs of potential expert witnesses; the applicable hourly rates of the personnel determined to be necessary to provide BNYM with the full range of legal services likely to be utilized in the Anticipated Litigation; and the market survey of the applicable rates of comparable professionals who provide similar types and quality of legal services.

VII.     <u>Analysis</u>

35.     Clearly, the Anticipated Litigation is both complex and extremely high stakes. The multiple potential claims to be pursued by either or both of Whitebox and Ambac are substantial, go to the very core of the corporate trust business and possibly involve allegations of highly questionable conduct on the part of BNYM personnel. In such a situation, one would expect any reasonable corporate trustee to engage top flight counsel and defend itself to the greatest extent possible. One would further expect every legal theory to be considered and all appropriate defensive avenues to be pursued.

36.     The proposed staffing by Reed Smith of the Anticipated Litigation appears to be reasonable in terms of both quantity and experience of the legal professionals to be assigned. In my experience as a fee examiner, I have seen significant legal endeavors staffed by other

[14]

comparable law firms in a manner consistent with what is laid out in the Goldberg Declaration. The uncertain and multi-dimensional possibilities for the Anticipated Litigation make the task of assessing the reasonableness of the proposed Reserve Fund a very complex topic. The Goldberg Declaration provides a detailed and realistic view of all of the possible iterations of the Anticipated Litigation. Due to (1) the many possible variables of what issues might be raised by Whitebox and/or Ambac, (2) the many possible legal disputes that could arise in such litigation, (3) the possibility that multiple aspects of this case could be proceeding simultaneously, (4) the prospect for multiple and competing dispositive motions, (5) the magnitude and complexity of the discovery likely to occur in the Anticipated Litigation (including one or more discovery disputes), (6) the substantial preparation needed to prepare for a trial of this nature, (7) the significant resources needed to actually try such a case, and (8) the possibility that there could be a trial, an appeal, a remand, a second trial and a second appeal (or similar proceedings), I believe that the Goldberg Declaration appropriately gauges the most likely cumulative scenarios that the Anticipated Litigation presents. The staffing outline set forth in the Goldberg Declaration appears to take all of the aforementioned possibilities into account, provides for Reed Smith to bring a depth and breadth of professional expertise that is commensurate with the potential tasks associated with the Anticipated Litigation and allows for BNYM to have an appropriate team in place for this type of legal battle.

37. While I did not conduct my own empirical study of the market rates for legal professionals for cases of this type and magnitude, I can comfortably say that the rates discussed in the Goldberg Declaration are completely consistent with my experience, both as a practitioner and as a fee examiner. The rates to be charged by the Reed Smith professionals to BNYM for this Anticipated Litigation appear to be well within the range of rates that I would expect to see in such

[15]

a case and that I have seen in other high stakes cases involving significant sums of money and major U.S. law firms.

38. A significant consideration in the assessment of the appropriate amount of funds to place in the Reserve Fund centers around the question of how to balance the need to protect BNYM's right to be reimbursed for all of the fees and expenses that it incurs with the goal of distributing SUT funds to the Bondholders in satisfaction of their rights under the bond documents and the Plan. The problem that presents itself is that if the Reserve Fund ultimately proves to be insufficiently funded, then that will present a potentially unresolvable issue in the future. Because all of the SUT funds are accounted for under the Plan, there will not likely be a path to increase the amount of funds in the Reserve Fund after the Plan is consummated. For that reason, it is imperative that the Reserve Fund be "fully funded" from the start. By that I mean, the Reserve Fund needs to have an amount in it that will cover all of the potential costs to BNYM from the Anticipated Litigation. The estimate of the amount necessary to protect BNYM must have a sufficient margin of error to account for the most expensive, most contested, most complex potential aspects of the Anticipated Litigation. And importantly, there are three features in place that fully protect Whitebox and Ambac from an overfunding, perceived or actual, of the Reserve Fund in any amount.

39. First, BNYM has undertaken to refund any amounts held in the Reserve Fund that are not utilized to pay BNYM fees and expenses. Thus, if the case settles early on, or if a motion to dismiss or a motion for summary judgment upheld on appeal ultimately results in the final disposition of the Anticipated Litigation, any amounts in the Reserve Fund in excess of the fees and expenses to be paid to BNYM will be released by BNYM and be available to distribute to whomever is entitled to receive them.

[16]

Case 17-03284-LTS Doc#:413-15 Filed:01/02/19 Entered:01/02/19 16:05:49 Desc:
Affidavit Declaration Robert M. Fishman Page 17 of 18

40. Second, under the terms of the Resolution, BNYM is entitled to the reimbursement of its reasonable fees and expenses. Resolution § 804. BNYM has agreed that Whitebox and Ambac may, subject to appropriate procedures with respect to privilege, appropriate timing, and other issues, challenge the fees and expenses of BNYM as to their reasonableness. That right to challenge the fees and expenses may be pursued, in due course, in the context of the underlying Bondholder actions. Accordingly, the full funding of the Reserve Fund does not prejudice the ability of Whitebox and Ambac to challenge, under the applicable standard of review and at an appropriate time under appropriate procedures, the reasonableness of the fees and expenses to which BNYM asserts entitlement.

41. Third, in the event that Whitebox and/or Ambac are ultimately successful on the merits of the Anticipated Litigation, Whitebox and/or Ambac could thereafter elect to seek a judicial determination that BNYM's conduct was such that BNYM should not, as a matter of public policy, be entitled to retain its fees and expenses. I understand that BNYM is prepared to permit Whitebox and/or Ambac the opportunity to make such an argument, subject of course to BNYM's defenses. Such an argument would not be prejudiced or otherwise adversely impacted by the funding of the Reserve Fund as requested by BNYM.

VIII. Conclusions

42. In my opinion, under the circumstances presented, the proposed holdback for the Anticipated Litigation is reasonable, and there exist effective protections for Ambac and Whitebox even if the amount of the Reserve Fund exceeds the amount of fees and expenses actually to be paid.

Case:17-03284-LTS Doc#:413-15 Filed:01/02/19 Entered:01/02/19 16:05:45 Desc:
Affidavit Declaration Robert M. Fishman Page 18 of 18

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 2, 2019

                                      /s/ Robert M. Fishman
                                          Robert M. Fishman

[18]