**UNITED STATES DISTRICT COURT**
**DISTRICT OF PUERTO RICO**

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>PUERTO RICO SALES TAX FINANCING CORPORATION (COFINA),<br><br>Debtor. | PROMESA<br>Title III<br><br>No. 17 BK 3284-LTS<br><br>Re: ECF Nos. 4663 & 4666 |

**NOTICE OF FILING CERTIFIED TRANSLATION OF EXHIBIT TO OMNIBUS REPLY OF PUERTO RICO SALES TAX FINANCING CORPORATION TO OBJECTIONS TO SECOND AMENDED TITLE III PLAN OF ADJUSTMENT**

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747). (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

To the Honorable United States District Court Judge Laura Taylor Swain:

The Puerto Rico Sales Tax Financing Corporation ("COFINA"), as the Title III debtor in the above-captioned Title III cases (the "Debtor") under the *Puerto Rico Oversight, Management, and Economic Stability Act* ("PROMESA"), by and through the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board"), as the Debtor's representative pursuant to section 315(b) of PROMESA, respectfully submits the certified translation of *Noriega Rodríguez v. Hon. Jarabo*, 136 D.P.R. 497 (1994) (the "Supporting Case"), in support of the Debtor's *Omnibus Reply of Puerto Rico Sales Tax Financing Corporation to Objections to Second Amended Title III Plan of Adjustment* (the "Omnibus Reply") The certified translation is attached hereto as **Exhibit A**.

WHEREFORE, the Debtor respectfully requests the Court take notice of the above and accept the attached certified translation of the Supporting Case in support of the Omnibus Reply.

Dated: January 14, 2019
      San Juan, Puerto Rico

Respectfully submitted,

/s/ Hermann D. Bauer
Hermann D. Bauer
USDC No. 215205
**O'NEILL & BORGES LLC**
250 Muñoz Rivera Ave., Suite 800
San Juan, PR 00918-1813
Tel: (787) 764-8181
Fax: (787) 753-8944
Email: hermann.bauer@oneillborges.com

Martin J. Bienenstock (*pro hac vice*)
Brian S. Rosen (*pro hac vice*)
Jeffrey W. Levitan (*pro hac vice*)
**PROSKAUER ROSE LLP**
Eleven Times Square
New York, NY 10036
Tel: (212) 969-3000
Fax: (212) 969-2900

2

Email: mbienenstock@proskauer.com
Email: brosen@proskauer.com
Email: jlevitan@proskauer.com

Michael A. Firestein (*pro hac vice*)
Lary Alan Rappaport (*pro hac vice*)
**PROSKAUER ROSE LLP**
2029 Century Park East
Suite 2400
Los Angeles, CA 90067
Tel: (310) 557-2900
Fax: (310) 557-2193
Email: mfirestein@proskauer.com
Email: lrappaport@proskauer.com

*Attorneys for the Financial Oversight and Management Board as representative of the Debtor*

## Exhibit A

Certified Translation of *Noriega Rodríguez v. Hon. Jarabo*, 136 D.P.R. 497 (1994)

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

1994 JTS 96, 136 D.P.R. 497, 1994 WL 909617 (P.R.)

HONORABLE DAVID NORIEGA RODRÍGUEZ,
ETC., plaintiffs and appellants,
v.
HONORABLE JOSÉ RONALDO JARABO, ETC.,
defendants and appellees.

In the Supreme Court of Puerto Rico.
*Number:* AC-92-97

**Synopsis**
JUDGMENT of *Carmen Celinda Ríos*, J. (San Juan), dismissing a complaint for declaratory judgment and injunction. *Affirmed.*

*Juan Santiago Nieves, José Juan Nazario de la Rosa*, from *Nazario & Santiago*, for plaintiffs appellants; *Roberto Ariel Fernández, Marcos A. Ramírez Lavandero*, from *Ramírez & Ramírez, and Richard W. Markus*, for defendants appellees.

ASSOCIATE JUSTICE MRS. NAVEIRA DE RODÓN delivered the opinion of the Court.

In this case we must decide whether Rule XXXIII of the Regulations of the House of Representatives, 1982, page 71, violates the legislative prerogatives of the members of that Body, as delineated in the Constitution of the Commonwealth of Puerto Rico. The rule at issue stipulates the parliamentary procedure to abstain in the voting held at the House of Representatives.

**I**

Plaintiffs appellants are attorneys David Noriega Rodríguez and Hiram Meléndez Rivera, Representatives-at-Large in the House of Representatives for the Puerto Rican Independence Party (hereinafter P.I.P., Spanish acronym for *Partido Independentista Puertorriqueño*) during the four year period between 1988-1992.[1] ***502**

The original codefendants were Mr. José Ronaldo Jarabo, in his capacity as Speaker of the House of Representatives, and attorney Ferdinand Mercado, in his capacity as Clerk of said legislative body. In accordance with Rule 22.4 of Civil Procedure, 32 L.P.R.A. App. III, defendants have been substituted by attorney Zaida Hernández Torres and Mrs. Ángeles Mendoza, [respective] current Speaker and Clerk of the House of Representatives.

On March 5, 1990, the House of Representatives put to vote various Joint Resolutions of the House and the Senate of Puerto Rico,[2] whereby funds were allocated from the so-called "pork barrel fund" (*barril de tocino*) and other public funds. Representatives Noriega Rodríguez and Meléndez Rivera sought leave to abstain from the voting, pursuant to Rule XXXIII, items 56, of the Regulations of the House of Representatives, *supra*, which stipulates the procedure to abstain from a House voting.[3]

The representatives explained that they did not want to vote because approval of non-specific joint resolutions with charge against the "pork barrel fund" and other public funds was unconstitutional, pursuant to the judgment of the Superior Court, San Juan Part, in the case of ***503** *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994).[4] They indicated that said judgment had been appealed from in this Forum and had yet to be decided. Lastly, they alleged that the vagueness of the text of the resolutions prevented them from making an intelligent judgment to vote.

The House of Representatives authorized co-plaintiff's abstention at the first, by voice, voting. However, after the division of the legislative body, said authorization was denied.[6] In a roll call final voting, co-plaintiffs attempted to vote and explain their abstention votes.[7] The accidental Speaker ***504** of the House, Hon. Samuel Ramírez, instructed the Clerk of the Body to not count the votes of Representatives Noriega Rodríguez and Meléndez Rivera.

Thus, co-plaintiffs appellants presented a complaint for declaratory judgment and injunction seeking a ruling that Rule XXXIII of the Regulations of the House of Representatives, *supra*, was unconstitutional, and seeking the entry of an order to the Clerk of the House of Representatives to record on the books the abstentions of Representatives Noriega Rodríguez and Meléndez Rivera with respect to the voting on the Joint Resolutions of the House of Representatives and the Senate.

The court of first instance granted plaintiffs a term of thirty (30) days to utilize the mechanism provided by the

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

Regulations of the House of Representatives to seek amendments to the rule. In addition, the court reserved its jurisdiction to decide the matter on the merits in the event the House of Representatives refused to entertain in the petition to amend this regulation.

On October 24, 1990, plaintiffs appellants informed the court that on May 29, 1990, they presented a motion in the House of Representatives to amend item 5 of Rule XXXIII of the Regulations of the House, *supra*, so that the majority consent from its members not be required to abstain from voting, and that it had been referred to the Internal Affairs Committee of the House. Plaintiffs alleged that said Committee rendered no report on the proposed amendment. They sought the resumption of the proceedings in the case **\*505** and consideration of the Motion for Summary Judgment.

On January 9, 1992, the court of first instance entered judgment dismissing the complaint. The court held that the House of Representatives is responsible to determine whether there are valid reasons to allow plaintiffs' abstention. In sum, the court concluded: (1) that Rule XXXIII of the Regulations of the House of Representatives, *supra*, establishes an obligation to vote and discretion in the abstention; (2) that Art. 23 of the Political Code, 2 L.P.R.A. sec. 23, requires officers and employees of the House to comply with their obligations under the regulations and orders of the respective Bodies; (3) that Art. III, Sec. 17, Const. C.P.R. (E.L.A., Spanish acronym for *Estado Libre Asociado*), L.P.R.A., Book 1, establishes the obligation of the members of the House to vote for or against and does not provide for abstention; (4) that the Regulations of the House of Representatives grant more extensive rights than the Constitution in allowing the lawmakers' abstention, but these are conditioned; (5) that the House has a duty to determine and review the legislative rules, as adoption of the internal government rules to control their proceedings is incumbent to the legislative bodies, and (6) that for reason of the political question doctrine, it is incumbent to the Legislative Branch and not to the courts to intervene in its internal affairs.

Representatives Noriega Rodríguez and Meléndez Rivera appealed from the judgment and presented two (2) assignments of error. First, they allege that the court of first instance erred in abstaining in the case at bar for reason of the political question doctrine. Second, [they allege] that the court of first instance erred in not recognizing the constitutional guarantees **\*506** with respect to the lawmaker's right to vote freely.[9]

In sum, this case challenges the constitutional validity of a specific rule of the Regulations of the House of Representatives. Therefore, we must analyze whether in the light of the facts of this case we are before a justiciable controversy; whether, as determined by the trial court, we are before a political question, or whether the alleged rule of the Regulations of the House of Representatives violates plaintiffs' constitutional rights. Let us see.

**II**

**[1]** After the historic decision of the Supreme Court of the United States in *Marbury v. Madison*, 5 U.S. 135 (1803),[10] it is an axiom of constitutional litigation that the Judicial Power has the authority to review and determine the constitutionality of the acts of the other government branches **\*507**. But judicial review has restraints. These were delineated by the Court in construing Art. III, Sec. 2 of the federal Constitution, L.P.R.A., Book 1, which limits the judicial power of the federal courts to cases and controversies.[11]

**[2–4]** Recently, in *Noriega v. Hernández Colón*, supra, this Court repeated the concept of "justiciability" it adopted in *E.L.A. v. Aguayo*, 80 D.P.R. 552, 595 (1958) [80 P.R.R. 534 (1958)], in which we determined that the judicial review is the ""distinguishing characteristic of our political system'D'.[12] We stated that the authority of the courts to determine whether the cases brought before them are justiciable is born from the fundamental principle that the courts exist exclusively to settle "genuine controversies between adverse parties having real interest in seeking some relief which will affect their juridical relations. 'D'. *E.L.A. v. Aguayo*, supra, pages 558-559 [80 P.R.R., at 539-540].[13] Judicial self-restraint is necessary because it constitutes "a minimum of conditions for the discreet and tolerable exercise of a power which would otherwise constitute a clear threat to the democratic quality of the system and would convert the judges into guardians of the community". Id., at 597 [80 P.R.R. at 577-578]. The very Constitution of the Commonwealth of Puerto Rico, Art. V, Sec. 4, L.P.R.A., Book 1, ed. 1982, at 356, provides that "[n]o law shall be held unconstitutional except by a majority of the total number of Justices of which the Court is composed" **\*508**, which shows that the members of the Constitutional Convention were "fully conscious of the 'gravity and delicacy' of this judicial function and took action to limit [the convention] even more than what the federal courts have voluntarily done". *E.L.A. v. Aguayo*, supra, at. 599 [80 P.R.R. at 579-580]. The self-restraint doctrines,

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

known as "advisory opinion,"[14] "juridical capacity'D',[15] "maturity",[16] ""mootness,"[17] and "political question'D'[18] give shape to the framework of the concept of "justiciability." Now then, said doctrines are self-imposed. The very courts analyze and decide whether they should intervene in a particular case without exceeding the limit of its constitutional power. *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715, 720721 (1980).[19] **\*509**

**[5]** Specifically, the doctrine of political question precludes the judicial review of matters whose resolution is incumbent to other political government branches or to the voters.[20] A court faces a political question, not susceptible of judicial adjudication, when there is one of the following elements: (1) an express delegation of the matter at issue to another branch of the government; (2) absence of appropriate criteria or judicial rules to settle the controversy; (3) impossibility of making a decision without making an initial determination of public policy that does not correspond to the courts; (4) impossibility to decide without expressing a lack of respect towards another government branch; (5) an unusual need to adhere to a previous political decision without questioning, and (6) potential confusion derived from multiple rulings of various departments of the government on a matter.[21]

If the Constitution confers an express power to a government branch and it is political in nature, it will not be subject to judicial review unless it is incorrectly executed and affects constitutional rights of equal hierarchy. See: *Powell v. McCormack*, 395 U.S. 486 (1969); *United States v. Nixon*, 418 U.S. 683 (1974); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. Bar Ass'n. P.R., 1986, Vol. I, pages 697698.

Professor Tribe suggests that what is important in cases that involve the doctrine of political question is the analysis **\*510** on whether a constitutional clause provides rights that can be compelled through judicial action. L.H. Tribe, *American Constitutional Law*, 2da ed., New York, Ed. Foundation Press, 1988, pages 98 and 106.

On its part, Professor Scharpf considers that the doctrine of political question should be explained in functional terms, bound to the specific facts of the cases. The doctrine is not applicable when there are important individual rights that could be affected if the Judicial Power fails to take action. F.W. Scharpf, *Judicial Review and the Political Question: A Functional Analysis*, 75 Yale L.J. 517, 566-597 (1966).[22]

According to Professor Serrano Geyls, the question of political doctrine has three (3) components: (1) there is a matter textually assigned by the Constitution to another branch of the Government; (2) there are no decision criteria susceptible to be discovered and managed by the courts, and (3) prudence requires judicial abstention. Serrano Geyls, *op. cit.*, at 679-680.

### III

In cases concerning the challenge of rules of the United States Congress, the Supreme Court of the United States has not shown to be particularly inclined to intervene in justice-related disputes, their construal, or application.[23] Within that context, the Supreme Court of the United States for the first time examined the extent of the judicial review in *United States v. Ballin*, 144 U.S. 1 (1891). The rule at issue was Rule XV of the Regulations of the **\*511** House of Representatives, *supra*, at 34, which established that members present at a session although not voting would be counted for purposes of the required quorum.[24] Before that rule was adopted, the quorum requirement could only be met if the majority of the members voted on the proposed measure. Importers Ballin, Joseph & Co. alleged that a tax law was not valid because it was approved by less than the majority who voted and the constitutional quorum was not complied with.

The Court denied the reversal of the congressional rule and stated that "[n]either do the advantages or disadvantages, the wisdom or folly, of such a rule present any matters of judicial consideration. With the courts the question is only one of power. The Constitution empowers each house to determine its rules of proceedings". *United States v. Ballin*, supra, at 5. Notwithstanding this powerful statement, the Supreme Court reserved the final authority to determine whether the congressional rule violated any fundamental right guaranteed by the Constitution. In the end, it acknowledged the power of Congress to create its own rules, and reserved the faculty to review them if they violated any constitutional right.[25] This is the criterion provided by the Court to determine whether the legislative rules would be reviewed. M.B. Miller, *The Justiciability of Legislative Rules and the "Political" Political Question Doctrine*, 78 Cal. L. Rev. 1341, 1349 (1990).

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

Already in the century , [sic] the Supreme Court of the United States examined **\*512** a Senate rule in relation with the voting on one nomination of the Executive Branch. In United States v. Smith, 286 U.S. 6 (1932), the Executive Branch challenged the validity of Rule XXXVIII of the Regulations of the House of Representatives[26] after the Senate sought that President Hoover returned a resolution that confirmed an appointment in order for the Body to reconsider it. The President refused to comply with the petition and the Senate reconsidered and rejected the appointment.

In this case the Court reviewed the rule and clarified that the controversy was about the interpretation of its applicability rather than its constitutionality. *United States v. Smith*, supra, at 33. Although the Court recognized that in exercising its reviewing power it should give weight to the Senate's interpretation of its own rules, it held that the history and precedents of the Body failed to show that the Senate had the power to reconsider a confirmation vote after the nominee had already taken office and begun to exercise his duties. Id., at 33 and 3748. The Court pointed out that when interpretation of a rule affects persons who were not members of the Senate, the issue raised was necessarily justiciable. Id., at 33.

In Christoffel v. United States, 338 U.S. 84 (1949), the **\*513** Supreme Court again passed judgment on the rule of a committee of the House of Representatives. In this case, petitioner was convicted of perjury for his testimony before the Education and Work Committee. The evidence presented showed that no quorum was constituted at the time petitioner incurred the alleged perjury. The Court determined that under the rules and practices of the House of Representatives, a committee of the Body could only require testimony when quorum was duly constituted, not only at the start of the session, but through the time the witness was interrogated. Absent the required quorum, the committee was not a "competent court" as required by the statute that penalized perjury in the District of Columbia. Id., at 90. The Court interpreted a rule of Congress because a fundamental right of a defendant was at stake.[27] Id.

In Yellin v. United States, 374 U.S. 109 (1963), the Supreme Court intervened in another controversy in relation with the application of a rule of a congressional committee.[28] **\*514** Petitioner Yellin refused to answer questions before a subcommittee of the House of Representatives, reason why he was convicted for contempt. In *Yellin v. United States*, supra, the Supreme Court determined that the rules of Congress and its committees are actionable, but considerable weight should be given to Congress' practice and construal of those rules. For this reason, the Court decided that the subcommittee failed to follow its own rule on the interrogatory of a witness in executive session, and thus violated the witness' right to be interrogated in private.[29] Id. at 123.

On their part, the lower federal courts have also had the opportunity to decide on the justiciability of the legislative rules.[30] For example, the Circuit Court for the District of Columbia has recognized that the Judicial Branch cannot review the procedural rules of the Legislative Branch without confronting problems with regard to the separation of powers. Like the Supreme Court, the Circuit has rejected the idea that it lacks the faculty for such review, but has self-imposed discretional restraints to proceed therewith.[31] Oftentimes, **\*515** Circuit Court for the District of Columbia has focused the status of the plaintiff in its decisions, and has assumed jurisdiction depending on whether it is a lawmaker,[32] because it deems that a lawmaker can obtain a relief from his/her colleagues through the approval, repeal, or amendment of an act or regulation.[33]

### IV

**[6]** Although the doctrine of political question in our jurisdiction is not as rooted as it is in the United States, Santa Aponte v. Srio. del Senado, 105 D.P.R. 750 (1977); *Silva v. Hernández Agosto*, supra, it continues to be one of the self-restraint rules in the local sphere.[34] In examining past clashes between the branches of **\*516** our Government,[35] we have stated that when the Constitution confers an express power to a government branch and it is political in nature, it will not be subject to judicial review unless said power is incorrectly executed and thus affects constitutional rights of equal hierarchy. In that event, our legal order cannot evade the constitutional responsibility to interpret the law in cases of conflict between the government branches because they cannot become arbiters of their own acts. P.S.P. v. E.L.A., 107 D.P.R. 590, 596 (1978); *Silva v. Hernández Agosto*, supra, at 55; Peña Clos v. Cartagena Ortiz, 114 D.P.R. 576, 591 (1983).

**[7]** Now then, when we exercise the inescapable and non-transferable function of construing the Law in cases of conflicts over political rights, and the constitutionality of the sources of those rights, we should act with moderation and respect the criterion of other government

bodies with regard to the extent of their own powers. *P.S.P. v. E.L.A.*, supra, at 599; *Figueroa Ferrer v. E.L.A.*, 107 D.P.R. 250, 277-278 (1978).

In examining the constitutional validity of a legislative act challenged by a lawmaker we have held that the courts are responsible for "defining [the] contours [of the faculties of the Legislative and the Executive Power] and the ruling on the validity of its/their exercise are matters carefully reserved to the courts." *Santa Aponte v. Srio. del Senado*, supra, at 759. At that time, we pointed out that the Judicial Power is the ultimate interpreter of the Constitution. Making us echo of the words of Alexander Hamilton in *The Federalist*, we stated that the legislative bodies cannot be the constitutional judges of their own powers. *517

A few years later, in *Corujo Collazo v. Viera Martínez*, 111 D.P.R. 552 (1981), we reaffirmed the principles laid down in *Santa Aponte v. Srio. del Senado*, supra, in the sense that although the Constitution of the Commonwealth of Puerto Rico acknowledges that the House of Representatives is the exclusive judge of the election of its members, a representative is entitled to occupy a seat until everything related with his/her oath and taking of office is investigated.

In *Silva v. Hernández Agosto*, supra, we reviewed the constitutional validity of Rule 7.1 of the October 24, 1985 Regulation to Govern the Investigation on the Cerro Maravilla Events, on petition of Senators Rolando A. Silva, Calixto Calero Juarbe, and Mercedes Torres Vda. de Pérez, in their capacity as members of the Juridical Committee of the Senate and on behalf of the minority for the New Progressive Party. We again stated that the initial interpretation of the Constitution made by another government branch deserves deference, but the standard should prevail that the final determination corresponds to the courts.

[8] We acknowledged that the practice of the legislative bodies to adopt their internal government rules as corollary of the inherent power to control their proceedings has historical roots in our jurisdiction. Foraker Act, 31 Stat. 77, Historic Documents, Sec. 3, L.P.R.A., Book 1; Jones Act, 39 Stat. 960, Historic Documents, Art. 32, L.P.R.A., Book 1; Art. III, Sec. 9, Const. C.P.R., L.P.R.A., Book 1. We clarified, however, that in exercising its regulating function, the Legislative Assembly and its committees cannot obviate and ignore the constitutional restraints. Again, we make emphasis on the need for the courts to act with prudence and deference to clarify the contours of the Constitution and facilitate the resolution of the differences arising over the scope of the constitutional powers of any *518 of the Government branches. *Silva v. Hernández Agosto*, supra, at 57.

In sum, on the doctrine of political question, and to answer the questions we presented earlier whether Art. III of the Constitution of the Commonwealth of Puerto Rico, L.P.R.A., Book 1, precludes us from reviewing Rule XXXIII of the Regulations of the House of Representatives, we conclude that: (1) although the political question doctrine, both in the federal and in our jurisdiction, has generated some confusion and controversy,[36] it has not been discarded either by the Supreme Court of the United States or by this Court; (2) when there is an express delegation of the matter in controversy to another branch of the government, it will be subject to judicial review exclusively if individual constitutional rights are affected; (3) consistent with the prudence and moderation that should exist in reviewing a matter assigned by the Constitution to another branch of the government, the judicial review will be admissible only if there are adequate judicial criteria to settle the controversy; (4) in adopting its governing rules and internal procedures, the Legislative Assembly cannot ignore the constitutional restraints and provisions, and (5) in the event that the constitutional rights of the very lawmakers are those affected, as a general rule, the Legislative Rules will only be reviewable if the lawmakers cannot obtain a relief from their colleagues through the approval, repeal, or amendment of an act or regulation.

V

[9] It is well-known that our Constitution, Art. III, *supra*, which is intended to form a democratic and representative Government *519, delegates the Legislative Power to a bicameral Assembly. Both Bodies, the Senate and the House of Representatives as parliamentary forums, have the function of formulating laws, investigating and supervising the Government, debating on matters of interest, and keeping the People abreast on the development of the public affairs. *Romero Barceló v. Hernández Agosto*, 115 D.P.R. 368, 379 (1984).

[10] To facilitate the legislative task and consistent with a centuries-old practice,[37] the members of the Constitutional Assembly expressly incorporated the power of the Legislative Houses of Puerto Rico to adopt rules appropriate of the legislative bodies for their

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**

136 D.P.R. 497

proceedings and internal government. Art. III, Sec. 9, Const. C.P.R., *supra; Silva v. Hernández Agosto*, supra, at 55-56.

Our Constitution lacks itemized provisions on the legislative procedure. Article III, Sec. 17, *supra*, only offers some general guidelines. The legislative procedures of the Houses are itemized in the regulations *520;[38] and these are their fundamental work instruments and tools. In fact, every deliberative body must be governed by procedural rules so that the will of the majority be orderly determined.[39]

[11–12] Now then, the regulations of the Legislative Houses are time-limited. They are the law for the Legislative Assembly that approves them. A new regulation is approved at the start of an assembly or the regulation previously in force is ratified.[40] The constitutional or statutory provisions, the rules adopted by the very Legislative Assembly, judicial decisions, the sources of parliamentary law, customs, use, and orders or resolutions of the Assembly, are the sources of the rules of the legislative process. Every legislative body is in an optimal position to adopt rules of proceedings and to apply or construe them.[41] However, said rules cannot ignore the constitutional provisions. The Legislature has absolute discretion to decide how to conduct its proceedings and comply with the constitutional requirements.[42]

[13] As a general rule, the courts will not pass judgment on the interpretations or application of the parliamentary practices of a legislative body with the authority necessary to create its rules of internal government, provided that said rules are within the scope of their *521 powers. If the rule adopted by the Legislature is not contrary to the constitutional provisions or does not violate individual fundamental rights or there is a reasonable relation between the method and the result pursued, it is not incumbent to a court to decide whether another rule is more appropriate or fair. A body's interpretation of its procedural rules must be accepted by a court unless it is clearly wrong. P. Mason, *Manual of Legislative Procedures for Legislative and other Governmental Bodies*, California, California Legislature, 1962, at 72. It bears noting that for their very nature, in establishing an action system to make public policy decisions, the Legislative Rules are a source of potential conflict between the members of the Assembly.

[14] On the interpretation of the Regulations of the House of Representatives, Rule XLII(2), *supra*, establishes that when issues *unforeseen* by said regulations arise, the provisions of the Jefferson Manual of Parliamentary Practice[43] will apply, with the interpretation of the House of Representatives of the United States of the specific rule.

[15] In turn, the Jefferson Manual, *op. cit.*, and the Regulations of the legislative bodies of Puerto Rico and Congress of the United States are inspired on the parliamentary law rules.[44] The fundamental principles of parliamentary practice are: (1) facilitate the Works of the assemblies and promote the cooperation and harmony between their participants; (2) seek the equality of rights, privileges and obligations of the members; (3) clearly determine the will of the majority; (4) protect the rights of the minority; (5) promote the free and full discussion of any proposal presented to the assembly; (6) explain the meaning and effect of the issues submitted for voting, and (7) preserve justice and good faith in the assemblies. A.F. Sturgis, *Standard Code of Parliamentary Procedure*, 2d ed., Nueva York, McGraw-Hill, 1966, at 711. Many of the rules of parliamentary proceedings not only protect the minorities from unfair practices, but also seek to prevent obstruction of the minorities' acts or tactics. They are also necessary to prevent confusions, by selecting a course of action when various can be followed. Mason, *op. cit.*, at 30. On the other hand, application of the parliamentary law varies in the different legislative bodies, because the specific needs of these organisms are taken into account. Id., at 5960.

[16] With respect to the House of Representatives' Rule XXXIII, *supra*, on voting, it, as other procedures of the Body, have their origin in the rules of parliamentary procedure. In said proceedings, voting is not obligatory, unless there is a special rule to the contrary. R.B. Bothwell, *Manual de Procedimientos Parlamentarios*, 2d ed. rev., Río Piedras, Ed. U.P.R., 1962, at 62. In addition, abstention is recommended "when the matter before the assembly refers to or affects [the assemblyman] exclusively." Id., at 66. Parliamentary law prohibits voting when it involves the authorization *523 of a financial transaction with a member of the Body or in cases of indictment or elucidation of charges against the member. Id., at 66

[17] Commentators on parliamentary law have pointed out that although a member of a government body may abstain from voting, they have a strong obligation to vote on every motion because the decision-making process is one of the [primary] duties of the office for which they were elected or appointed. A public officer should abstain

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

from voting only if there is a conflict of interest, and cannot vote if there is a direct personal or economic interest. Sturgis, op. cit., p. 241. According to H.M. Robert, Rules of Order (Revised) by Robert, 1st Spanish ed., Mexico, Ed. UTEHA, 1964, p. 140, "no-one can vote on a matter in which he/she has a direct, personal or pecuniary interest;" "every member with an opinion about a matter has a duty to so express by means of his/her vote, but he/she cannot be obliged to do so. Id., at 141.[45]

[18] In sum, as a general rule, the legislative bodies make attendance of their members mandatory, and require them to vote on the issues under discussion. Under their power to create rules of government and internal procedures, said bodies have the power to excuse their members from voting. The practice of state legislatures is to excuse their members from voting when they have a personal interest on the matter to be voted or for other meritorious reasons. As a general rule, there is no **\*524** question that a member of the body is not voting, but when a specific number of votes or the vote of a specific proportion of the number of elected members is required, a member of the body may insist on the other member to vote or to explain the reasons for the abstention, and the body will decide whether the member is excused. Mason, *op. cit.*, pp. 367-368. On this rule and its application, it is said that "it provides no means, any more than the common parliamentary law, of enforcing its own execution, and, notwithstanding the rule, members may vote or not, as they please." L.S. Cushing, *Elements of the Law and Practice of Legislative Assemblies in the United States of America*, Boston, Ed. Little, Brown and Co., 1856, at 693.

[19] Even so, since voting is deemed to be a duty and responsibility of every member of a deliberative body, when one of them insists that the abstention be included in the official record, this petition will only be accepted if there are no objections to it.[46]
In this regard, the Jefferson Manual states that "every member must give his vote the one way or the other ... as it is not allowed for anyone to withdraw who is in the house when the question is put".[47] Rule XII[48] of the Regulations of the Senate of the United States establishes that every Senator "shall, without debate, declare his assent or dissent to the question, unless excused by the Senate." When a **\*525** Senator decides to abstain he has to explain his reasons and the Body decides whether it is excused or not from voting. A Senator may refrain from voting when, in his opinion, there is a conflict of interest.[49]

Rule VIII of the Regulations of House of Representatives of the United States Congress provides that every member "shall vote on each question put, unless he has a direct personal or pecuniary interest in the event of such question."[50] **\*526**
Rule XXXVIII of the Regulations of the Senate of Puerto Rico, *supra*, also specifies that the senators present at the time of the voting will be obliged to participate by casting their vote, unless they have a direct personal interest in the matter put. They may abstain from voting with the consent of the majority: (1) when they have reasons of high moral transcendence; (2) are not prepared to vote because they are ignorant of the matter voted, or (3) for any other reason the Senator deems meritorious and thus seeks and the Body authorizes. If the Body decides on the negative, the Senator will be obliged to vote.

The abstention rules for Representatives and Senators have not been recently adopted in the legislative bodies of the Commonwealth of Puerto Rico. For example, Rule XIII(5) of the Regulations of the House of Representatives of 1924, on voting provided: "No Representative may vote if he/she was not present at the Floor when the Speaker put the matter for voting. The Representative present when the matter was submitted for voting will be obliged to vote, unless he/she has the duty or is entitled to abstain, or the House excuses him/her for reasons of high moral transcendence. This petition will be decided by the House without debate." The same rule appears in the Regulations of 1947 and 1951. In 1955, the rules to abstain from voting on the bills were similar to the current regulations.[51] **\*527**

The Regulations of the Constitutional Convention also included a similar rule.[52] The report of the Committee on the Rules and Regulations of the Constitutional Convention recommended that Rule XIII stated as follows:

> "Every delegate is obliged to vote on the matters put to voting and if when called to vote he announces his desire to abstain from doing so, the Speaker will require the delegate to briefly state the reasons for not voting, and once he has responded, the Speaker will submit the question to the Convention as follows: 'Having heard the reasons of Mr. Delegate, is he excused from voting?' The question will be decided without debate after the roll call for the voting and before announcing its result." 1 Diary of Sessions of the Constitutional Convention 236 (1951).

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

The Committee stated that every delegate was obliged to vote and that it was the Constitutional Convention who should decide whether the delegate could abstain. In approving the rule to limit the right to abstain, the Constitutional Convention discarded the arguments of those who advocated for the right of the lawmaker to abstain without the need for the consent of the majority.[53] **\*528**

The question as to the effect, if any, of a Representative's abstention from the voting in relation with a matter of public interest was expressly raised by delegate Negrón López, and discussed during the debate that preceded the approval of the Rule on the abstention of the Delegates in the Constitutional Convention.[54] Let us examine the effect, if any, that the abstentions may have in the approval of measures in the House of Representatives of Puerto Rico.

[20] By constitutional mandate, the quorum of the House of Representatives is constituted by a majority of the total number of members of which each house is composed. Art. IV, Sec. 12, Const. C.P.R. , L.P.R.A., Book 1; Rule VII(13) of the Regulations of the House of Representatives, *supra.* Also by constitutional mandate, a majority of the total number of the members who compose the body is required **\*529** to approve a bill. Art. III, Sec. 19, Const. C.P.R., L.P.R.A., Book 1; Rule XV(14) of the Regulations of the House of Representatives, *supra.* That is, if the total number of members of the House of Representatives is fifty one (51), except when said composition is increased by virtue of the representation provisions for the minority parties, twenty six (26) representatives will constitute quorum of the Body. Likewise, twenty six (26) representatives' votes are required to achieve an absolute majority to approve a bill, or a joint or concurrent resolution. If the practice to abstain from voting is generalized, the legislative process could be affected and, thus, the fluidity in the procedures of the Government's work and the progress of public affairs would be impeded. In our order, "the parliamentary majority has the inescapable duty to comply with the mandate expressed by the people" and minorities have the "special obligation to discharge their supervisory responsibility without impeding the legislative operation." Silva v. Hernández Agosto, supra, p. 70. Therefore, if the Constitution of the Commonwealth of Puerto Rico requires a quorum of the House constituted by a majority of the total number of the members that compose it and orders an absolute majority for the approval of the laws, participation of the representatives in every legislative debate becomes more relevant.[55]

### VI

The members of the Legislative Assembly, elected by the direct vote of the citizens, are responsible to exercise the Legislative Power created by our Constitution. **\*530** Art. III, Sec. 1, Const. C.P.R., L.P.R.A., Book 1. Representation is the means whereby citizens are given participation and control over the public affairs, consistent with the democratic system that is fundamental for the Puerto Rican community life. The representation system is so important for the protection of the democratic rights of our People that the Constitution of the Commonwealth of Puerto Rico establishes a procedure to guarantee the additional representation of the minority parties in the Legislative Assembly. Art. III, Sec. 7, Const. C.P.R., L.P.R.A., Book 1.

On the rights and powers of the lawmakers, the Constitution is limited to establish some education, citizenship, residence, and age requirements, Art. III, Secs. 56, Const. C.P.R., L.P.R.A., Book 1; the terms of office of the Senator and Representative, Art. III, Sec. 8, Const. C.P.R., L.P.R.A., Book 1; grants parliamentary immunity to the members of the Legislative Assembly, Art. III, Sec. 14, Const. C.P.R., L.P.R.A., Book 1, and points out incompatibility of the office with other public offices, Art. III, Sec. 15, Const. C.P.R., L.P.R.A., Book 1. Lawmakers are responsible to implement the functions proper of the legislative process, such as the formulation of laws, debate, investigation of matters of public interest, and to maintain the people informed on the progress of the public affairs. *Romero Barceló v. Hernández Agosto*, supra, at 379.

[21] With regard to the lawmaker's vote, the Constitution states that "[t]he Houses shall keep a journal of its proceedings and of the votes cast for and against bills." Art. III, Sec. 17, Const. C.P.R., *supra*, ed. 1982, at 344. In addition, it states that the bills should be approved by a majority of the total members of every House and that "[e]very final passage or reconsideration of **\*531** a bill shall be by a roll-call vote." Art. III, Sec. 19, Const. C.P.R., *supra*, ed. 1982, at 346.[56]

[22] In short, the lawmakers are the ones who give life to the mechanism of democratic representation created by the Constitution so that the will of our people is the source of the public power.[57] They have the weight of the functions of the Legislative Assembly, the branch that

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

forges the laws that guide the destiny of the People. Being a constitutional requirement that the laws be approved by the majority of the members of the **\*532** Legislative Assembly, the duty of the representatives and senators to participate in the legislative process is of utmost importance. The Constitution of the Commonwealth of Puerto Rico does not create rights of constitutional rank in favor of the abstention in the voting on the bills. Abstention in the legislative voting is a matter regulated by the parliamentary law and the internal rules of every assembly.

### VII

Let us then analyze whether the facts consideration of this court reflect whether, in the exercise of its power to regulate the internal procedures of the House of Representatives, said body violated any constitutional right of the plaintiffs representatives, or if the representatives can obtain relief in the Legislative Branch for the situation at bar.

Following the stated doctrinal and historical background, we must conclude that Rule XXXIII of the Rules of the House of Representatives, supra, is within the constitutional parameters of the legislative powers to create the rules of procedure and internal government of the Body. Although unlike what the House of Representatives of the United States Congress has done on occasions our House of Representatives has decided to enforce said rule, in so doing it did not injure the legislative prerogatives of the plaintiffs or their right of free expression.[58] They participated in the debate prior to the voting on the resolutions at issue. Despite the fact that they were not authorized to abstain and that their abstention was not recorded in the Book of Minutes, the Book of Daily Sessions include their **\*533** arguments and comments. In addition, they were not forced to vote, but instead the abstention was not included in the book of minutes, where, according to the constitutional mandate, the votes for or against are included.

**[23]** Therefore, it is not incumbent to this court to decide whether the rule at issue is a wise or archaic rule; whether it should be enforced by the legislative body; or whether in tune with the democratic spirit of our government system it should be amended.[59] The wisdom, efficiency, or justice of the parliamentary rules of our Houses is not subject to be judged by the Court if the Constitution is not infringed. The legislative body must obey its own rules in order to function efficiently. The mandate established by the Regulation should prevail in order to avoid confusion and multiple disagreements.

The foregoing analysis corresponds to the lawmakers. Legislative regulations are dynamic in nature. The contents of the rules can be adjusted to the realities of the legislative body. As the delegates to the Constitutional Convention did, through the legislative debate plaintiffs appellants can direct their efforts and arguments to change a rule they deem alien to the Puerto Rican reality. Even, if we take into account the facts subsequent to the complaint, the arguments of the appellant representatives have already become rooted in the spirit of some of their fellow lawmakers.

On the other hand, we cannot become the arbiters of every one of the legislators' internal disputes **\* 534** on the interpretation and application of legislative rules relative to pure parliamentary procedures. However, we are not abdicating our power to be the maximum interpreters of the legislative actions. Said power will be exercised when the actions of other branches of government present clear constitutionality problems rather than mere procedural or interpretative disputes. We cannot transfer to the judicial forum the internal controversies of the legislative branches, which are the product of the discrepancies between the lawmakers, arising through the normal and usual process of the legislative debate.[60]

For the reasons stated, *judgment will be entered affirming the judgment of the trial court.*

Associate Justice Mr. Fuster Berlingeri did not take part in the decision.

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

Footnotes

[1]   At the time of the filing of the complaint in this case, plaintiffs David Noriega Rodríguez, Esq. and Hiram Meléndez Rivera, Esq., were spokesmen, in tenure and alternate, respectively, of the Puerto Rican Independence Party (hereinafter P.I.P.) in the House of Representatives. Currently, the Hon. David Noriega Rodríguez continues to occupy a seat in the House of Representatives and is P.I.P.'s Spokesman in said legislative body.   Not so is Hiram Meléndez Rivera, Esq.

[2]   Joint Resolutions of the House Nos. 1538, 1546, 1547, 1549, 1552, 1556, 1560, 1565, 1572, 1578, 1589, 1590, 1592, 1625 of March 5, 1990. Joint Resolutions of the Senate Nos. 803, 994, 1019, 1023, 1024, 1025, 1029, 1030, 1040, 1050, 1052 of March 5, 1990.

[3]   Rule XXXIII, items 5 and 6 of the Regulations of the House of Representatives, 1982, at 7273, provides:
"5. Every representative is obliged to vote on the matters put to voting and if he/she has direct personal interest therein should abstain from voting. [The representative] may abstain with the majority consent of the House, for reasons of high moral transcendence, or when not prepared to cast a vote because is ignorant of the matter under discussion.
"6. On petition of a Representative, the House will settle without debate when should an issue of high moral transcendence be considered, once the Representative explains it."

[4]   The Superior Court, San Juan Part, entered judgment whereby it held unconstitutional Joint Resolutions No. 94 of the House of Representatives and No. 111 of the Senate, of August 17, 1989, (known as the "pork barrel fund"), and similar others approved in previous years.   The court of first instance deemed that the fund distribution scheme in those resolutions: (1) violates the principle of separation of powers, as it constitutes an undue interference of the legislative power in the attributes and duties of the executive power, and an attempt to usurp them, and (2) makes difficult the supervision of the use of public funds and thus propitiates misuse thereof. The court issued a writ of permanent *injunction* against the Administrator of the Municipal Services Administration (A.S.M. by its Spanish acronym) and ordered him to comply with the rules established in its order on how future resolutions to allocate public fund should be drafted.
Recently, in *Noriega v. Hernández Colón*, 135 D.P.R. 406 (1994), we affirmed said judgment.

[5]   In the voice voting [not by roll call], those Representatives who wish to abstain need not request authorization from the House. Rule XXXIII(6) of the Regulations of the House of Representatives, *supra*.

[6]   The division of the Body is utilized to verify the open voting when a member of the Assembly so requests or when the speaker has doubts about the result of the voting. R.B. Bothwell, *Manual de Procedimiento Parlamentario*, 2d ed. rev., Río Piedras, Ed. U.P.R., 1962, at 6364.
See Rule III(5) of the Regulations of the House of Representatives, 1982, at 4, on the division of the House:
"5. The Speaker will submit to the House the matters that do not require roll call vote, as: 'Those who are for the affirmative will say ' 'yes' and those who are for the negative will say 'no'.' If not certain of the results of the voting or a Representative sought the division of the House, [the speaker] will order them to stand up:   first those who are for the affirmative and then those who are for the negative."

[7]   In the Motion to Dismiss presented by defendants appellees, they indicate that after the first voting on the matter, Representative Cepeda García sought the division of the House of Representatives with regard to the motion for leave to abstain presented by plaintiff Noriega Rodríguez.   The latter stated that the Speaker had already decreed the approval of his Petition.   Representative Santiago García clarified that the division of the Body was sought after the result of the voice voting was decreed; that the doubt as to how it was voted arose from the lawmaker who sought the division of the Body and, therefore, the request was in order.

[8]   Rule XLII of said regulations, at 79, provides:
"1. This Regulation may not be suspended, modified, or amended, except by virtue of a written motion to that effect.
"Any motion to suspend, modify, or amend these Regulations will be referred to the Internal Affairs Committee of the House, which will render its report within the following seventy two (72) hours, unless the Speaker seeks or obtains a larger term from the House to study and inform the proposed amendments.   When the amendment is proposed by said Committee, there will be no need for a new referral."

[9]   Other events in relation with this appeal have occurred after its filing. On one hand, on January 25, 1994, plaintiffs appellants

*(Unofficial Translation)*

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

presented a Motion in Aid of Jurisdiction. The alleged that Representative Noriega Rodríguez and other lawmakers sought authorization from the legislative body to abstain during the final voting on Concurrent Resolution No. 14 (substitutive). Said petition was denied. Upon roll calling Representative Noriega Rodríguez to vote, he stated his abstention. The current Speaker of the House of Representatives, Hon. Zaida Hernández Torres, ordered that the abstention be recorded as a vote against the legislative measure and presented a claim against the plaintiff appellant representative. Various representatives are mentioned in the Claim of January 12, 1994, that "despite the denial of leave to abstain, upon called to vote [defendants] proceeded to verbalize their abstention for the record'D' in violation of Rule XXXIII of the Regulations of the House of Representatives, *supra*. Representative Noriega Rodríguez sought an order from this court to stay the proceedings before the Ethics Committee of the House of Representatives while the appeal in the case at bar was elucidated, and to decree the obligation of the Speaker of the House of Representatives and the Clerk of the Body to recognize, count, and record his abstention vote.

On the other hand, on January 26, 1994, one of the other representatives, Hon. Alfonso López Chaar, presented a Motion and Complaint to Intervene in this case. We denied both motions.

[10]   2 L. Ed. 135 (1803).

[11]   On the concept of "justiciability" in the federal jurisdiction, see: J.E. Nowak, R.D. Rotunda y J.N. Young, *Constitutional Law*, 3rd ed., Minneapolis, Ed. West Pub. Co., 1986, at 55110; L.H. Tribe, *American Constitutional Law*, 2d ed., Nueva York, Ed. Foundation Press, 1988, at 67155.

[12]   The general justiciability concepts in the Puerto Rican Law are discussed in R. Serrano Geyls, *Derecho Constitucional de Estados Unidos y Puerto Rico*, San Juan, Ed. P.R. Bar Ass'n., 1986, Vol. I, at 97205. See, also, H.N. Padilla, *El poder judicial en Puerto Rico: su estructura, funciones y limitaciones*, 50 Rev. Jur. U.P.R. 357, 401-451 (1981).

[13]   See: *El Vocero v. Junta de Planificación*, 121 D.P.R. 115 (1988); *Silva v. Hernández Agosto*, 118 D.P.R. 45 (1986); *Pan Ame. Comp. Corp. v. Data Gen. Corp.*, 112 D.P.R. 780 (1982); *Com. de la Mujer v. Srio. de Justicia*, 109 D.P.R. 715 (1980); *Santa Aponte v. Srio. del Senado*, 105 D.P.R. 750 (1977).

[14]   *Noriega v. Hernández Colón*, supra; *Schmidt Monge v. Torres*, 115 D.P.R. 414 (1984); *Com. de la Mujer v. Srio. de Justicia*, supra; *Pérez v. Autoridad Fuentes Fluviales*, 87 D.P.R. 118 (1963); *E.L.A. v. Aguayo*, 80 D.P.R. 552 (1958).

[15]   *Noriega v. Hernández Colón*, supra; *Hernández Torres v. Gobernador*, 129 D.P.R. 824 (1992); *Col. Ópticos de P.R. v. Vani Visual Center*, 124 D.P.R. 559 (1989); *Silva v. Hernández Agosto*, supra; *Hernández Agosto v. Romero Barceló*, 112 D.P.R. 407 (1982); *Fund. Arqueológica v. Depto. de la Vivienda*, 109 D.P.R. 387 (1980); *Com. de la Mujer v. Srio. de Justicia*, supra; *Salas Soler v. Srio. de Agricultura*, 102 D.P.R. 716 (1974).

[16]   *Noriega v. Hernández Colón*, supra; *El Vocero v. Junta de Planificación*, supra; *Com. de la Mujer v. Srio. de Justicia*, supra; *Suárez Sánchez v. Tribunal Superior*, 92 D.P.R. 507 (1965); *Asoc. Guardias Penales v. Srio. de Justicia*, 87 D.P.R. 711 (1963).

[17]   *Noriega v. Hernández Colón*, supra; *C.E.E. v. Depto. de Estado*, 134 D.P.R. 927 (1993); *Berberena v. Echegoyen*, 128 D.P.R. 864 (1991); *Asoc. de Periodistas v. González*, 127 D.P.R. 704 (1991); *Nogueras v. Hernández Colón*, 127 D.P.R. 638 (1991); *Noriega v. Gobernador*, 122 D.P.R. 650 (1988); *El Vocero v. Junta de Planificación*, supra; *Com. de la Mujer v. Srio. de Justicia*, supra; *Fund. Arqueológica v. Depto. de la Vivienda*, supra; *E.L.A. v. Aguayo*, supra.

[18]   *Noriega v. Hernández Colón*, supra; *Silva v. Hernández Agosto*, supra; *Santa Aponte v. Srio. del Senado*, supra; *Estevez v. Srio. Cám. de Representantes*, 110 D.P.R. 585 (1981); *P.S.P. v. E.L.A.*, 107 D.P.R. 590 (1978); *P.P.D. v. Ferré, Gobernador*, 98 D.P.R. 338 (1970).

[19]   There is no doubt that the facts of this case present a real and material, not hypothetical or abstract, controversy. On the other hand, despite the elections of 1992, the appeal is not moot because: (1) plaintiff appellant Noriega Rodríguez was reelected and continues to be P.I.P. spokesman; (2) defendants have been substituted pursuant to the provisions of Rule 22.4 of the Rules of Civil Procedure, 32 L.P.R.A. App. III; (3) Rule XXXIII of the Regulations of the House of Representatives, *supra*, continues to be in effect, and (4) the situation can be repeated (and has repeated) with plaintiff appellant and other lawmakers.

[20]   The first case on the doctrine of political question in the federal jurisdiction was *Luther v. Borden et al.*, 48 U.S. 1 (1849). In that case the Supreme Court held that if the acts of Congress or the President were within their constitutional authority and did not violate the limits of said authority, they could not be challenged in a court. See: *Baker v. Carr*, 369 U.S. 186 (1962); *Powell v. McCormack*, 395 U.S. 486 (1969); Serrano Geyls, *op. cit.*, at 679-707 fn. 12.

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**

136 D.P.R. 497

21  *Baker v. Carr*, supra, as cited in *Silva v. Hernández Agosto*, supra.

22  For a discussion on the possible analysis methods for the application of the doctrine of political question, see: 1 *Treatise on Constitutional Law: Substance and Procedure* Sec. 2.16, at 275297 (2d ed. 1992); D.O. Bernstine, *The Political Question Doctrine: A Perspective on its Procedural Ramifications*, 31 U. Kan. L. Rev. 115 (1982); L. Henkin, *Is there a "Political Question" Doctrine?*, 85 Yale L.J. 597 (1976).

23  S. Bach, *The Nature of Congressional Rules*, 5 J.L. & Pol. 725, 730731 (1989).

24  The rule at issue provided:
" '3. On the demand of any member, or at the suggestion of the Speaker, the names of members sufficient to make a quorum in the hall of the House who do not vote shall be noted by the clerk and recorded in the Journal and reported to the Speaker with the names of the members voting, and be counted and announced in determining the presence of a quorum to do business.' (Ho. Journal, 230, Feb. 14, 1890.)" cited in *United States v. Ballin*, 144 U.S. 1, 5 (1891).

25  "It may not by its rules ignore constitutional restraints or violate fundamental rights, and there should be a reasonable relation between the mode or method of proceeding established by the rule and the result which is sought to be attained." *United States v. Ballin*, supra, at 5.

26  Parts 3 and 4 of Rule XXXVIII, provided:
" '3. When a nomination is confirmed or rejected, any Senator voting in the majority may move for a reconsideration on the same day on which the vote was taken, or on either of the next two days of actual executive session of the Senate; but if a notification of the confirmation or rejection of a nomination shall have been sent to the President before the expiration of the time within which a motion to reconsider may be made, the motion to reconsider shall be accompanied by a motion to request the President to return such notification to the Senate. Any motion to reconsider the vote on a nomination may be laid on the table without prejudice to the nomination, and shall be a final disposition of such motion.
"4. Nominations confirmed or rejected by the Senate shall not be returned by the Secretary to the President until the expiration of the time limited for making a motion to reconsider the same, or while a motion to reconsider is pending, unless otherwise ordered by the Senate.' " Cited in *United States v. Smith*, supra, at 3031 (1932).

27  The Court explained:
"Congressional practice in the transaction of ordinary legislative business is of course none of our concern, ... The question is neither what rules Congress may establish for its own governance nor whether presumptions of continuity may protect the validity of its legislative conduct. ... The heart of this case is that by the charge that was given it the jury was allowed to assume that the conditions of competency were satisfied even though the basis in fact was not established ...
"...This not only seems to us contrary to the rules and practice of the Congress, but denies petitioner a fundamental right." *Christoffel v. United States*, 338 U.S. 84, 88-90 (1949).

28  The rule provided:
" 'IV—Executive and Public Hearings:
"A—Executive:
" '(1) If a majority of the Committee or Subcommittee, duly appointed as provided by the rules of the House of Representatives, believes that the interrogation of a witness in a public hearing might endanger national security or unjustly injure his reputation, or the reputation of other individuals, the Committee shall interrogate such witness in an Executive Session for the purpose of determining the necessity or advisability of conducting such interrogation thereafter in a public hearing.
"B—Public Hearings:
(1) All other hearings shall be public.' " (Emphasis suppressed.) Cited in *Yellin v. United States*, 374 U.S. 109, 114-115 (1963).

29  Recently, in *Nixon v. United States*, 506 U.S. 224 (1993), the Supreme Court of the United States reaffirmed the political question doctrine as one of the principles of judicial self-restraint. The Supreme Court, citing *Baker v.. Carr*, supra, remembered that a controversy is not justiciable for involving a political question when "there is a textually demonstrable constitutional commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it". In such case, the Court pointed out, the constitutional text in controversy should be construed to determine whether in effect, and to what extent, the Constitution has textually delegated the disputed function. *Nixon v. United States*, supra, at 8. The Court further reasoned that the lack of a definitive action and the difficulty to create an adequate relief prescribed the self-restraint. ́Id., at13. Lastly, it pointed out that the court have the power to review act, both of the Legislative and the Executive Branch, when they

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**

136 D.P.R. 497

violate the limits of the clauses of the Constitution. Id., at 14.

30  See: G. Van Tatenhove, *A Question of Power: Judicial Review of Congressional Rules of Procedure*, 76 Ky. L.J. 597, 614615 (19871982); M.B. Miller, *The Justiciability of Legislative Rules and the "Political" Question Doctrine*, 78 Calif. L. Rev. 1341 (1990).

31  For example: *Vander Jagt v. O'Neill*, 699 F.2d 1166 (Cir. D.C.1983), *cert.* denied, 464 U.S. 823 (1983) ("This circuit has previously expressed its reluctance to review congressional operating rules, though it has never denied its power to do so"); *Nixon v. United States*, 938 F.2d 239 (Cir. D.C. 1991), *conf.*, 506 U.S. 224 (1993); *Gregg v. Barrett*, 771 F.2d 539 (Cir. D.C. 1985). *Metzenbaum v. Federal Energy Regulatory Com'n*, 675 F.2d 1282, 1287 (Cir. D.C. 1982) ("To decide [in favor of intervention] would subject congressional enactments to the threat of judicial invalidation on each occasion of dispute over the content or effect or a House or Senate rule."); *United States ex rel. Joseph v. Cannon*, 642 F.2d 1373, 1379 (Cir. D.C. 1981) ("[S]o-called political questions are denied judicial scrutiny, not only because they invite courts to intrude the province of coordinate branches of government, but also because courts are fundamentally under-equipped to formulate national policies or develop standards of conduct for matters not legal in nature."), *cert.* denied, 455 U.S. 999 (1982); *Exxon Corp. v. F.T.C.*, 589 F.2d 582, 590 (Cir. D.C. 1978) ("Although the courts will intervene to protect constitutional rights from infringement by Congress, including its committees and members... where constitutional rights are not violated, there is no warrant for the judiciary to interfere with the internal procedures of Congress." (citations omitted), *cert.* denied, 441 U.S. 943 (1979); *Harrington v. Bush*, 553 F.2d 190, 214 (Cir. D.C. 1977) ("In deference to the fundamental constitutional principle of separation of powers, the judiciary must take special care to avoid intruding into a constitutionally delineated prerogative of the Legislative Branch."); *Consumers U. v. Periodical Corr. Ass'n*, 515 F.2d 1341, 1351 (Cir. D.C. 1975) ("[This case is] not justiciable by reason of the textually demonstrable commitment of such rules to the legislative branch of government."), *cert.* denied, 423 U.S. 1051 (1976).

32  See Van Tantenhove, *supra*, esc. 29, at 597 and 619622.

33  For example, *Vander Jagt v. O'Neill*, supra; *Gregg v. Barrett*, supra; *Consumers Union of U.S., Inc. v. Periodical Corresp. Ass.'n*, 365 F. Supp. 18 (D.C. 1973).

34  The Supreme Court of the United States has declined to discard the political question doctrine. *Nixon v. United States*, supra. See: *Gilligan v. Morgan*, 413 U.S. 1 (1973); *Roudebush v. Hartke*, 405 U.S. 15, 19 (1972); *Powell v. McCormack*, supra.

35  See, for example: *Nogueras v. Hernández Colón*, supra; *Silva v. Hernández Agosto*, supra; *Hernández Agosto v. Romero Barceló*, supra; *Peña Clos v. Cartagena Ortiz*, 114 D.P.R. 576 (1983); *Santa Aponte v. Srio. del Senado*, supra.

36  In that respect, see: Tribe, *op. cit.*, at 96107 esc. 11; Henkin, *supra*, esc. 22. See also the majority and dissenting opinions in *Rexach Benítez v. Gobernador*, 119 D.P.R. 521 (1987); *Silva v. Hernández Agosto*, supra; *Santa Aponte v. Srio. del Senado*, supra; *P.P.D. v. Ferré, Gobernador*, supra.

37  In the local sphere, the Foraker Act, 31 Stat. 77, Historic Documents, Sec. 3, L.P.R.A., Book 1, and the Jones Act, 39 Stat. 960, Historic Documents, Sec. 32, L.P.R.A., Book 1, conferred to the legislative institutions the authority to govern their internal proceedings. *Silva v. Hernández Agosto*, supra; *De Diego et al. v. La Cámara, etc.*, 5 D.P.R. 114 (1904).
In the federal sphere, the Constitution of the United States, Art. I, Sec. 5, cl. 2, L.P.R.A., Book 1, provides for every House of Congress to determine the rules for their proceedings.  According to James Madison, the Constitutional Convention adopted that clause without discussion. J.E. Castello, *The Limits of Popular Sovereignty*, 74 Cal. L.R. 491, 530 (1986). In addition, every one of the constitutions of the states of the nation, except for North Carolina and Georgia, establish that the Legislature will create the rules for their proceedings.
With respect to the British parliamentary tradition, W. Balckstone and other historians suggest that the procedural autonomy of the House of Commons dates back to before the 18th Century. Castello, *supra.*
In addition, in twenty four (24) counties (including Austria, Japan, Senegal and the former Soviet Union) the basic rules of the Parliament are established in the Constitution and other laws, while the procedural rules are adopted by the very parliament. In the other countries the legislatures establish their own procedural rules. *Parliaments of the World*, 2da ed., Great Britain, Ed. Inter-Parliamentary Union, 1986, Vol. 1, at 34.

38  In that respect, see C. Ramos de Santiago, *El Gobierno de Puerto Rico*, 2d ed., Río Piedras, Ed. Universitaria, 1970, at 591.

39  N. Rigual, *El poder legislativo de Puerto Rico*, Río Piedras, Ed. U.P.R., 1961, at 72; P. Mason, *Manual of Legislative Procedures for Legislative and other Governmental Bodies*, California, California Legislature, 1962, at 29.

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**

136 D.P.R. 497

[40]   See: Rule XLII of the Regulations of the House of Representatives of Puerto Rico, *supra*; Rules 5.4 and 48.1 of the Regulations of the Senate of Puerto Rico, 1977. See, also, Mason, *op. cit.*, at 42 fn. 38.

[41]   Van Tantenhove, *supra*, at 6280629 fn. 29.

[42]   On the nature of the legislative rules, specifically those of the United States Congress, see: Bach, *supra*, fn. 23; Mason, *op. cit.*, at 3142 fn. 38.

[43]   The Jefferson Manual of Parliamentary Practice on *Parliamentary Instruments*, Puerto Rico, House of Representatives, 1976, was written by Thomas Jefferson, in his capacity as Vice President of the Nation, when he was Speaker of the Senate between 1797 and 1801, using English parliamentary law as source. The Regulations of the House of Representatives of the United States Congress also provide that the principles of the manual will govern the House in all applicable cases that are consistent with the standing rules and orders of the House of Representatives.

[44]   The first orderly system of procedural rules can be credited to King Edgar of England, who in 959 instituted a system to orderly and democratically resolve differences and make decisions. The American settlers brough the parliamentary procedure to the legislature of the colonies. H.E. Hellman, *Parliamentary Procedure*, Nueva York, Ed. MacMillan, 1966, at 57. After seven (7) centuries of continuous development, parliamentary procedure has spread to the point of achieving universal acceptance. Bothwell, *op. cit.*, at 1 ft. 6.

[45]   H.M. Robert, Rules of Order (Revised) of Robert (*Reglas de Orden (Revisadas) de Robert*), translated into Spanish by Carlos Palomar, 1st ed. In Spanish, México, Ed. UTEHA, 1964. See, also: G. Demeter, *Demeter's Manual of Parliamentary Law and Procedure*, Boston, Ed. Bostonia Press, 1961, at 41 ("It is the duty of every member to vote on every question before the house, on the theory that he should be willing to participate in the responsibility of the decision. But no one can be compelled to vote, although in rare instances a fine is assessed."), y L.S. Cushing, *Manual for Deliberative Assemblies*, Philadelphia, Ed. McKay Co., 1925, at198 ("It is a general rule that every member who is in the assembly room at the time when the question is stated has not only the right but it is bound to vote").

[46]   "Sometimes a member will insist that his abstention be officially recorded. He wants the record to show that he did not vote on the motion under consideration. While some people think this is making too much of the privilege of not voting, organizations usually oblige such requests, 'if there are no objections' by asking the secretary to record the names who abstain from voting. If this practice becomes a problem by delaying unnecessarily the taking of votes, the organization should formulate a policy on recording abstentions and incorporate it into the bylaws." R.E. Keesey, *Modern Parliamentary Procedure*, Boston, Ed. Houghton Mifflin Co., 1974, at 132.

[47]   *Constitution, Jefferson's Manual and Rules of the House of Representatives of the United States*, H.R. Doc. No. 101256, 101st Cong., 2d Sess., Sec. 505 (1991).

[48]   There is a similar rule in Canada. See J.G. Bourinet, *Parliamentary Procedure and Practice in the Dominion of Canada*, New Jersey, Ed. Ruthan Reprints, 1971.

[49]   Rule XII of the Senate of the United States on the voting procedures states:
"1. When the yeas and nays are ordered, the names of Senators shall be called alphabetically; and each Senator shall, without debate, declare his assent or dissent to the question, unless excused by the Senate; and no Senator shall be permitted to vote after the decision shall have been announced by the Presiding Officer, but may for sufficient reasons, with unanimous consent, change or withdraw his vote. No motion to suspend this rule shall be in order, nor shall the Presiding Officer entertain any request to suspend it by unanimous consent.
"2. When a Senator declines to vote on call of his name, he shall be required to assign his reasons therefor, and having assigned them, the Presiding Officer shall submit the question to the Senate: 'Shall the Senator for the reasons assigned by him, be excused from voting?' which shall be decided without debate; and these proceedings shall be had after the rollcall and before the result is announced; and any further proceedings in reference thereto shall be after such announcement.
"3. A Member, notwithstanding any other provisions of this rule, may decline to vote, in committee or on the floor, on any matter when he believes that his voting on such a matter would be a conflict of interest." L.R. Slack, *Senate Manual*, Washington, U.S. Government Printing Of., 1988, at 10.

[50]   *House Rules and Manual*, supra.

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

The following has been said on the interpretations of this rule:
"It has been found impracticable to enforce the provision requiring every Member to vote ... and such question even if entertained, may not interrupt a pending roll call vote ... and the weight of authority also favors the idea that there is no authority in the House to deprive a Member of the right to vote. ... In one or two early instances the Speaker has decided that because of personal interest, a Member should not vote. ... but on all other occasions and in the later practice the Speaker has held that the Member himself and not the Chair should determine this question ... and the Speaker has denied his own power to deprive a Member of the constitutional right to vote. ... Members may not vote in the House by proxy. ... Instance where a Member submitted his resignation from a committee on grounds of disqualifying personal interest....
"The House has frequently excused Members from voting in cases of personal interest....
"It is a principle of 'immemorial observance' that a Member should withdraw when a question concerning himself arises ... but it has been held that the disqualifying interest must be such as affects the Member directly ... and not as one of a class. ... In a case where question affected the titles of several Members to their seats, each refrained from voting in his own case, but did vote on the identical cases of his associates. ... And while a Member should not vote on the direct questions affecting himself, he has sometimes voted on incidental questions...." *House Rules and Manual*, supra, at 343.

[51] Rule XXXIII of the Regulations of the House of Representatives, 1955, at 53, provided:
"5. Every representative is obliged to vote on the matters put to voting and if he/she has direct personal interest therein should abstain from voting; and may abstain with the consent of the House for reasons of high moral transcendence, or when not prepared to cast a vote because is ignorant of the matter under discussion.
"6. On petition of a Representative, the House will settle without debate when should an issue of high moral transcendence be considered."
This rule is included among the Regulations of the House of Representatives of 1961, 1962, 1967, 1969, 1970, 1973, 1975 and 1982, and the Regulations of the Senate of 1955, 1959, 1962, 1966, 1968, 1969, 1970, 1974, 1977, 1981, 1984, 1985 and 1986. These were the only regulations we found available for examination.

[52] Rule XIII of the Regulations of the Constitutional Convention provided:
"1. Every delegate is obliged to vote on the matters put to voting and if he has direct personal interest therein he should abstain from doing so; and may abstain with the consent of the Convention, in questions of high moral transcendence or when not prepared, for he is ignorant of the matter under discussion, to cast his vote.
"2. The Convention, on petition by any delegate, will decide without debate when should a question be considered of high moral transcendence." 1 Diary of Sessions of the Constitutional Convention 102-103 (1951).

[53] Delegate Rivera Colón argued against every delegate being obliged to vote; if he wished to abstain from doing so, he would have had to explain the reasons, and the Convention had the faculty to make the final decision on whether abstention was allowed. A debate erupted and the constituents considered the points in favor and against the rule. Diary of Sessions, supra, p. 237251. The rule was finally amended to add that "[i] n the case that the delegate does not state his reasons for abstaining from voting, or in case he refuses to vote notwithstanding the agreement of the Convention, the vote of said delegate will be counted as issued in the affirmative." Id., at 250-251.

[54] "Mr. NEGRÓN LÓPEZ: The question I want to make to the Delegate ... is what would occur if the situation to which delegate mister Brunet makes reference about a delegate that cannot form a criterion because he has no sufficient information ... what would happen if that includes every one of the delegates to the Constitutional Convention? What would the effect be and to what extend would we be complying with our duty?
"Mr. ORTIZ STELLA: There would be no agreements. I pointed out the situation, which is repeated in various instances in the regulation, in which absolute majority is needed, that is 47 ...
"Sr. ORTIZ STELLA: ... There is a quorum of 50 people present at the Convention. Absolute majority is needed to reach some agreement, pursuant to the regulations. Absolute majority is 47. If four abstain, there would be no agreements. If that happens, then the Assembly may not reach agreement, and I believe its duty would not be complied with. We come here to reach agreements, to vote, to make decision. We have a grave and serious responsibility. *Leaving abstention from voting to the criterion and arbiter of the delegate is very dangerous. I believe that the two elements should intervene: the delegate and the Convention, but it should not be left to the free and sovereign will of the delegate. He cannot abstain. That is very dangerous, fellows*.
"Mr. BRUNET: Doesn't the colleague believe that if what delegate Negrón indicated occurred, that a majority of the Convention abstain because it has no elements of judgment to vote, doesn't our colleague deem that the proper thing to do in such situation would be to open a debate on the issue to dissipate doubts so that the delegates have the opportunity to clearly understand the issue and then make a decision to vote.
"Mr. ORTIZ STELLA: No, colleague, do not believe so, because when there is a voting is because the matter has been under

(Unofficial Translation)

**Noriega Rodriguez v. Jarabo, 1994 JTS 96 (1994)**
136 D.P.R. 497

discussion. (Emphasis added.) Diary of Sessions, *supra*, at 241-242.

55     See Mason, *op. cit.*, at 350 fn. 39.

56     The Report of the Committee of the Legislative Branch to the Constitutional Convention explains:
"The requirement that the bills be approved by a 'majority of the members of every House' is indispensable in a representative political system. The roll call voting is a means to fix individual responsibility for the approval or rejection of a measure.
"*Record Book*: The record book of the houses has dual importance. It serves to perpetuate the proceedings and thus make them generally known, while it constitutes the most important proof before the courts to determine whether the Legislative Assembly has met the constitutional requirements with regard to procedures. The provision we recommend requires to record anything in relation with the bills and the voting process in the record book. Subsequently, article 15 requires to log in the record the reasons of the Governor to veto a bill.
"it is further recommended to constitutionally fix the legislative obligation of giving publicity to its proceedings, although it is left to the ordinary legislation to determine how. An adequate publicity of the legislative proceedings, especially the debates, would notably increase the number of people interested in the government problems and would contribute to a better public supervision of the acts of the lawmakers. In addition, the Legislative Assembly would not have to depend exclusively on the newspapers to adequately publicize its activities." 4 Diary of Sessions, *supra*, at 2585.

57     Lawmakers must respond to their constituents for their acts in the legislative activity. However, this responsibility is not a passport to initiate judicial actions as a means to defend the interests of their constituents. The members of the Legislative Assembly have standing to file judicial actions when their prerogatives, functions, and constitutional rights are violated, but cannot sue on behalf of their voters or the public interest. *Nogueras v. Hernández Colón*, supra; *Hernández Agosto v. Romero Barceló*, supra, at 416; *Santa Aponte v. Srio. del Senado*, supra. They must show that their constitutional or statutory rights have been violated and that they have suffered a clear and palpable injury as a result of the acts of the defendant. *Hernández et al. v. Hernández Colón et al.*, supra. In the case of *Noriega v. Gobernador*, supra, we held that there are occasions on which a lawmaker has standing to challenge an act or omission of the Executive Branch that it deems unconstitutional, for example, when the prerogatives of a lawmaker are affected because the Governor does not put a law into effect. Since the lawmaker will be precluded from allocating the funds he was legally responsible to distribute, the lawmaker will have standing to challenge said action.

58     Every legislative body can create [and] construe its rules of procedure, and Rule XIII of the Regulations of the House of Representatives, *supra*, establishes that when questions *not foreseen* by said regulations arise, the procedure of the Manual of Parliamentary Practice and the interpretation of the House of Representatives of the United States will apply.

59     The Regulations of the Senate and of Spain's Congress of Deputies include specific provisions that allow the members of said bodies to state their abstention in a voting. See Art. 96(2) of the Regulations of the Senate of May 26, 1982 and Art. 86 of the Regulations of Congress of Deputies of February 10, 1982.

60     In view of the above discussion and resolution, we deem unnecessary to examine the parties' arguments in this case on legislative immunity and separation of powers.

---

**CERTIFICATION**

I, Milagros Marcano Báez, do hereby certify that I meet the requirements of Rule 5g(2) of the Local Rules of the United States District Court for the District of Puerto Rico, as amended on April 12, 2018. I further certify that I have translated the foregoing document from Spanish to English and that the translation is true and accurate to the best of my knowledge and abilities.

s/ Milagros Marcano Báez                                         January 14, 2018