**Hearing Date**: April 10, 2018 at 8:30 a.m. (ET) / 9:30 a.m. (AST)
**Opposition Deadline**: March 14, 2018

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

----------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

      Debtors.[1]

----------------------------------------------------------------------- x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF PUERTO
RICO,

      as agent of

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

      as representative of

THE COMMONWEALTH OF PUERTO RICO,

      Plaintiff,

v.

BETTINA WHYTE,

      as agent of

|  |  |
|---|---|
| PROMESA | |
| Title III | |
| Case No. 17-BK-3283 (LTS) | |
| (Jointly Administered) | |
| Adv. Proc. No. 17-257 (LTS) | |

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

```
                                                    :
THE FINANCIAL OVERSIGHT AND MANAGEMENT              :
BOARD FOR PUERTO RICO,                              :
                                                    :
          as representative of                      :
                                                    :
THE PUERTO RICO SALES TAX FINANCING                 :
CORPORATION,                                         :
                                                    :
          Defendant.                                :
------------------------------------------------------------------------ x
```

**NOTICE OF COMMONWEALTH AGENT'S MOTION FOR SUMMARY JUDGMENT**

**PLEASE TAKE NOTICE** that, upon the Declaration of Nicholas A. Bassett (with Exhibits), Plaintiff's Statement of Uncontested Material Facts, and the accompanying Memorandum of Law, Plaintiff the Commonwealth Agent[2] will move this court (the "Motion"), before the Honorable Laura Taylor Swain United States District Court Judge, at the United States District Court for the Southern District of New York, Room 17C, 500 Pearl Street, New York, New York, 10007-1312, on **April 10, 2018 at 8:30 a.m. (ET) / 9:30 a.m. (AST)**, for an order pursuant to Federal Rule of Civil Procedure 56, as incorporated into this adversary proceeding by Federal Rule of Bankruptcy Procedure 7056, granting summary judgment in the Commonwealth Agent's favor on all in-scope claims, including its first, second, twelfth, and thirteenth causes of action, the COFINA Agent's first cause of action, and the COFINA Intervenors' first causes of action (except Ambac's, which is out of scope), and declaring that (1) Act 91 did not transfer present ownership of future SUT revenues to COFINA; (2) Act 91 did not assign to COFINA the Commonwealth's "right to receive" future SUT revenues; (3) the SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on deposit at BONY and all future SUT revenues) are the property of the Commonwealth because (a) Act 91

---

[2] Capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

is unconstitutional on its face as an evasion of the Constitutional Debt Limits and Constitutional

Debt Priority, and (b) the purported transfer is unconstitutional on its face as an evasion of the

Constitutional Debt Limits and Constitutional Debt Priority; (4) the SUT revenues purportedly

transferred to COFINA (including all SUT revenues currently on deposit at BONY and all future

SUT revenues) are the property of the Commonwealth because (a) Act 91 was enacted and

amended in violation of the Constitutional Balanced Budget Clause and thus is unconstitutional

on its face, and (b) the purported transfer was made in violation of Puerto Rico's Constitutional

Balanced Budget Clause and thus is unconstitutional on its face; and (5) the SUT revenues

purportedly transferred to COFINA, including any future SUT revenues and the revenues

currently on deposit at BONY, are (or will be if and when generated) the property of the

Commonwealth under applicable law.

  **PLEASE TAKE FURTHER NOTICE** that any opposition to the Motion must be filed

with the court and served on the undersigned counsel for the Commonwealth Agent by no later

than **March 14, 2018** (the "Opposition Deadline").

  **PLEASE TAKE FURTHER NOTICE** that if an opposition to the Motion is not

received by the Opposition Deadline, **the relief requested shall be deemed unopposed, and the**

**court may enter an order granting the relief sought without a hearing pursuant to the**

**Third Amended Case Management Procedures**.


*[Rest of page intentionally left blank]*

Dated: February 21, 2018
San Juan, Puerto Rico

/s/ Luc A. Despins

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors (except COFINA), as
agent for the Commonwealth in the Commonwealth-
COFINA Dispute*

- and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured
Creditors for all Title III Debtors (except COFINA), as
agent for the Commonwealth in the Commonwealth-
COFINA Dispute*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

-----------------------------------------------------------------------x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA<br>: Title III |
|  | : |
| as representative of | : Case No. 17-BK-03283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | : (Jointly Administered) |
|  | : |
| Debtors.[1] | : |

-----------------------------------------------------------------------x

|  |  |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | :<br>: Adv. Proc. No. 17-00257-LTS |
|  | : |
| as agent of | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : |
|  | : |
| as representative of | : |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| BETTINA WHYTE, | : |
|  | : |
| as agent of | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : |

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566 (LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747)

BOARD FOR PUERTO RICO,                                      :
                                                           :
            as representative of                           :
                                                           :
THE PUERTO RICO SALES TAX FINANCING                        :
CORPORATION,                                               :
                                                           :
            Defendant.                                     :
------------------------------------------------------------------------x


## COMMONWEALTH AGENT'S MOTION FOR SUMMARY
## JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................ 1

PROCEDURAL BACKGROUND............................................................ 3

UNDISPUTED FACTS ........................................................................... 5

SUMMARY JUDGMENT STANDARD.................................................. 11

ARGUMENT ......................................................................................... 12

I. ACT 91 DID NOT AND COULD NOT TRANSFER TO COFINA PROPERTY
INTEREST IN PROPERTY THAT DID NOT YET EXIST ......................................... 12

    A. There Can Be No Present Transfer Of A Property Interest In Potential
Future Property ....................................................................... 14

    B. COFINA Could Not Have Become Present Owner Of Future SUT
Revenues That Could Be Taken Away At Any Time.......................................... 17

        1. SUT Risk Disclosures And Other Act 91 Provisions .............................. 17

        2. Subsequent Legislative Action .............................................. 19

    C. There Was No "True Sale" Of Future SUT Revenues To COFINA .................. 21

    D. Commonwealth And COFINA Both Accounted For SUT Revenue
Transfer As Pledge Of Collateral By Commonwealth And Not As Sale Of
Revenues To COFINA............................................................... 25

II. ACT 91 DID NOT TRANSFER TO COFINA ANY "RIGHT TO RECEIVE"
FUTURE SUT REVENUES.............................................................. 28

III. PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS
UNCONSTITUTIONAL AND VOID BECAUSE ACT 91 IMPERMISSIBLY
EVADES PUERTO RICO'S CONSTITUTIONAL DEBT LIMITS AND
CONSTITUTIONAL DEBT PRIORITY ................................................. 30

    A. Evasion Of Constitutional Debt Limits................................................. 30

    B. Evasion Of Constitutional Debt Priority.............................................. 32

    C. Unconstitutionality Of Purported SUT Transfer.................................... 34

IV. PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS
UNCONSTITUTIONAL AND VOID BECAUSE ACT 91 WAS ENACTED
AND AMENDED IN VIOLATION OF CONSTITUTIONAL BALANCED
BUDGET CLAUSE....................................................................... 38

## TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Access Equip, Inc.*,
62 B.R. 642 (Bankr. D. Mass. 1986) ...................................................................22

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)....................................................................................12

*In re ATP Oil & Gas Corp.*,
2014 WL 61408 (Bankr. S.D. Tex. Jan. 6, 2014) ...................................................26

*Ayer v. Comm'r of Administration.*,
165 N.E.2d 885 (Mass. 1960) ..........................................................34, 35, 36, 37

*In re Burm*,
554 B.R. 5 (Bankr. D. Mass. 2016) ...................................................................22

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986)....................................................................................11

*Cerajewsky v. McVey*,
72 N.E.2d 650 (Ind. 1947) ........................................................................36, 37

*Crick v. Rash*,
229 S.W. 63 (Ky. 1921) ................................................................................32

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*,
517 F.3d 1284 (Fed. Cir. 2008)...................................................................15, 16

*In re Dena Corp.*,
312 B.R. 162 (Bankr. N.D. Ill. 2004) .................................................................22

*In re Doctors Hosp. Hyde Park*,
507 B.R. 558 (N.D. Ill. 2013) ..........................................................................26

*In re Doctors Hosp. of Hyde Park, Inc.*,
463 B.R. 93 (Bankr. N.D. Ill. 2011) ...................................................................21

*In re Eureka S. R.R., Inc.*,
72 B.R. 813 (Bankr. N.D. Cal. 1987) .................................................................22

*First Nat'l Bank of Colorado Springs v. Hamilton (In re Hamilton)*,
18 B.R. 868 (Bankr. D. Colo. 1982) ..................................................................15

*Fleet Capital Corp. v. Yamaha Motor Corp., U.S.A.*,
2002 WL 32063614 (S.D.N.Y. Sept. 26, 2002)...............................................26, 27

*State ex rel. Lesmeister v. Olson*,
354 N.W.2d 690 (N.D. 1984) ............................................... 34

*Local Loan Co. v. Hunt*,
292 U.S. 234 (1934) .................................................... 24, 25, 29

*Long v. Napolitano*,
53 P.3d 172 (Ariz. Ct. App. 2002) ...................................... 34

*Major's Furniture Mart, Inc.*,
602 F.2d 538, 544 (3rd Cir. 1979) ...................................... 23

*In re Merritt Dredging Co., Inc.*,
839 F.2d 203 (4th Cir. 1988) ............................................ 22

*In re PCH Assocs.*,
804 F.2d 193 (2d Cir. 1986) ............................................. 22

*Pennock v. Coe*,
64 U.S. 117 (1859) ...................................................... 15

*In re Pillowtex, Inc.*,
349 F.3d 711 (3d Cir. 2003) ............................................. 25

*Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*,
91 F.Supp.3d 267 (D.P.R. 2015) ......................................... 37

*State ex rel. Shkurti v. Withrow*,
513 N.E.2d 1332 (Ohio 1987) ........................................... 34

*Speelman v. Pascal*,
178 N.E.2d 723 (N.Y. 1961) ............................................. 16

*Stathos v. Murphy*,
276 N.Y.S.2d 727 (1st Dept. 1966) ...................................... 15

*T. B. Harms & Francis, Day & Hunter v. Stern*,
229 F. 42 (2d Cir. 1915) ................................................ 14

*Matter of Three Star Telecast, Inc.*,
73 B.R. 270 (Bankr. P.R. 1987) ......................................... 22

*State ex rel. Wash. State Fin. Comm. v. Martin*,
384 P.2d 833 (Wash. 1963) .............................................. 32

# Statutes

11 U.S.C.
  § 541(a)(1) ...........................................................................................21
  § 552 ....................................................................................................25

28 U.S.C § 2201(a) ..........................................................................28, 29, 38, 42

Acts by P.R. Legislature
  Act 1-2009 ..................................................................................7, 27, 42
  Act 116-2013 ...................................................................................7, 19
  Act 117-2006 .........................................................................................7
  Act 56-2007 ........................................................................................5, 8
  Act 72-2014 ......................................................................................10, 20
  Act 84- 2016 ....................................................................................10, 20
  Act 91- 2006 .................................................................................. *passim*

Jones Act ch. 145, 39 Stat. 951, 963 (1917) ..................................................39

P.R. Laws and Const. art VI
  § 2 ................................................................................................ *passim*
  § 7 ......................................................................................................39
  § 8 .................................................................................................32, 33

P.R. Laws Ann. tit. 7 § 552 ...............................................................................8

P.R. Laws Ann. tit. 13
  § 11a(a) .................................................................................................6
  § 11a(b) ...........................................................................................6, 8, 9
  § 11a(b)(2)-(12) ..................................................................................6,7
  § 11a(c) ............................................................................................6, 7
  § 11a(d) ................................................................................................9
  § 11a(e) ................................................................................................8
  § 12 ....................................................................................................13
  § 13(c) ..................................................................................................9
  § 14(c) .............................................................................................9, 18
  § 14(d) ............................................................................................8, 23
  § 16(a) ..................................................................................................9
  § 32001(q) ...........................................................................................29
  § 32001(r) ............................................................................................29
  § 32021 .................................................................................................7
  §§ 32021-32031 ....................................................................................7
  § 32024 ...............................................................................................29

P.R. Laws Ann. tit. 19

  § 451(37) ................................................................................................16

  § 2219(a)(3) ............................................................................................16

  § 2233(b)(2) ............................................................................................16

  § 2234(a) ................................................................................................16

PROMESA

  § 301(c)(5) ..............................................................................................21

  § 310......................................................................................................11

Public Law 447, 66 Stat. 327-328, 48 U.S.C. § 731d (1952) ......................40

Uniform Commercial Code.................................................................16, 17, 25

**Other Authorities**

Fed. R. Bank. Proc.

  R. 7056..................................................................................................11

  R. 9014(c)..............................................................................................11

Fed. R. Civ. Proc., Rule 56(a).....................................................................11

Kenneth N. Klee and Brendt C. Bulter, *Asset-Backed Securitization, Special
Purpose Vehicles and Other Securitization Issues* ...................................25

SECURITIZATIONS: LEGAL & REGULATORY ISSUES §§ 2.01, 2.05 (Patrick D. Dolan
& C. VanLeer Davis III eds., 33rd release 2017) ..............................21, 23

To the Honorable United States District Judge Laura Taylor Swain:

The Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA) (the "Committee"), as the "Commonwealth Agent"[2] with respect to the "Commonwealth-COFINA Dispute," as defined in the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute* [Case No. 17-03283-LTS, Dkt. No. 996] (the "Commonwealth-COFINA Dispute Stipulation"), respectfully files this motion for summary judgment.  In support of the motion, the Commonwealth Agent states as follows:

## PRELIMINARY STATEMENT

Created in the wake of Puerto Rico's 2005-2006 fiscal crisis, the COFINA structure is essentially an "off balance sheet" financing transaction collateralized by a specified portion of the Commonwealth's general sales and use tax ("SUT") revenues.  Although purportedly independent from the Commonwealth, COFINA is "attached" to the Government Development Bank for Puerto Rico (the "GDB") and governed exclusively by the GDB's directors, who are also the directors of COFINA and who are appointed by the Governor.  COFINA's only authorized purpose is to issue bonds backed by the Commonwealth's own tax revenues and to use the proceeds to pay the Commonwealth's own debts and expenses and to provide funding for certain economic development and emergency relief funds of the Commonwealth.  The COFINA structure is just one of various "structures" created by the Puerto Rico government and its advisors to stave off the day of reckoning for the government's fiscal irresponsibility.  The court has already encountered one such structure in the Employees Retirement System litigation and will soon have to address a structure involving the issuance of billions of dollars of Public Buildings Authority bonds.

---

[2] The Committee files this motion solely in its capacity as the Commonwealth Agent and reserves all rights in its individual capacity.

-1-

Integral to the COFINA structure was the purported transfer to COFINA of the specified portion of the Commonwealth's SUT revenues pledged by COFINA as collateral for its bonds, including all "future funds" comprising such revenues.  To determine whether that specified portion of the Commonwealth's SUT revenues are "property of the Commonwealth or COFINA under applicable law," the court must determine the nature and effect of this purported transfer.  As demonstrated below, the COFINA enabling legislation did not transfer to COFINA a present property interest in potential future tax revenues.  Indeed, there can be no transfer of a present interest in potential future property because no such property exists to be transferred.  Furthermore, COFINA could not have become the present owner of future tax revenues given that the Commonwealth retained the power to substitute, reduce, or even eliminate those revenues at any time.  For that and other reasons, there was no "true sale" or other present transfer of future tax revenues to COFINA, even assuming that potential future revenues or the "right to receive" such revenues were somehow existing assets capable of being sold at the time of the purported transfer.  The lack of any "true sale" is reflected in the fact that the Commonwealth and COFINA both accounted for the purported SUT revenue transfer as a pledge of revenues for a "collateralized borrowing" by the Commonwealth and not as an outright "sale" of revenues to COFINA.  The Commonwealth and COFINA both accounted for the transaction this way because the **economic substance** of the transaction, which also determines the legal issue of ownership, compelled the conclusion that there was no sale (i.e., no transfer of ownership) of future SUT revenues to COFINA.

Nor, as the COFINA Agent claims, did the COFINA enabling legislation transfer to COFINA the Commonwealth's "right to receive" future tax revenues.  As an initial matter, the COFINA enabling act says nothing about a "right to receive" potential future tax revenues or any

transfer of such a right. Furthermore, the Commonwealth has no "right to receive" tax revenues until a taxable transaction occurs. Until that point, no "receivable" has arisen as to which the Commonwealth can have a property right. Thus, when the legislation containing the "transfer" language was enacted, the Commonwealth had no "right to receive" future tax revenues that could be transferred to COFINA.

In any event, the SUT revenues purportedly transferred to COFINA (including all SUT revenues on deposit at The Bank of New York Mellon ("BONY") and any future SUT revenues) are the Commonwealth's property because the COFINA enabling legislation and the purported SUT revenue transfer are unconstitutional and void. The Puerto Rico Legislative Assembly cannot create or use financing structures that operate as an evasion of Puerto Rico's constitutional debt limits and the constitutional priority of payment (outside of title III) granted to Puerto Rico's public debtholders. Nor can the Legislative Assembly create or use such structures to finance deficit spending in violation of Puerto Rico's constitutional Balanced Budget Clause.

Accordingly, the Commonwealth Agent is entitled to a declaration that the SUT revenues purportedly transferred to COFINA, including any future SUT revenues and the revenues currently on deposit at BONY, are (or will be if and when generated) the property of the Commonwealth under applicable law.

## **PROCEDURAL BACKGROUND**

On August 10, 2017, the court so-ordered the Commonwealth-COFINA Dispute Stipulation, which was entered into by the Oversight Board (in its capacities as the title III representative of the Commonwealth and COFINA, respectively) and various parties in interest, including bondholders and bond insurers.

Pursuant to the Commonwealth-COFINA Dispute Stipulation, the Oversight Board authorized the Committee to serve as the Commonwealth Agent and Bettina M. Whyte to serve as the "COFINA Agent" for purposes of resolving the Commonwealth-COFINA Dispute through litigation or settlement.  The Commonwealth-COFINA Dispute Stipulation made clear that "the litigation or negotiation by the Agents shall not include issues other than the Commonwealth-COFINA Dispute," which is defined in the stipulation as "[w]hether, after considering all procedural and substantive defenses and counterclaims, including constitutional issues, the sales and use taxes purportedly pledged by COFINA to secure debt (the "Pledged Sales Tax") are property of the Commonwealth or COFINA under applicable law." Commonwealth-COFINA Dispute Stipulation ¶¶ 4, 4.m.

On September 8, 2017, the Commonwealth Agent commenced this adversary proceeding with the filing of its initial complaint.  [Dkt. No. 1.][3]  On September 15, 2017, the COFINA Agent filed her initial answer, defenses, and counterclaims.  [Dkt. No. 27.]  On October 25, 2017, the Commonwealth Agent amended its complaint.  [Dkt. No. 73.]  On October 30, 2017, the COFINA Agent amended her answer, defenses, and counterclaims.  [Dkt. No. 75.]

On November 3, 2017, the Commonwealth Agent answered and asserted defenses to the COFINA Agent's amended counterclaims.  [Dkt. No. 81.]  On November 6, 2017, various signatories to the Commonwealth-COFINA Dispute Stipulation (the "Permitted Intervenors") filed notices of intervention and their own initial pleadings.  On the COFINA side, the COFINA Senior Bondholders' Coalition (the "COFINA Seniors"), Ambac Assurance Corp. ("Ambac"), National Public Finance Guarantee Corporation ("National"), and the Mutual Fund Group and the Puerto Rico Funds (the "Mutual Fund Group") (collectively, the "COFINA Intervenors") asserted counterclaims against the Commonwealth or the Commonwealth Agent.  [Dkt. Nos. 83-

---

[3] Unless otherwise indicated, all docket citations are to Adv. Proc. No. 17-00257-LTS.

94.]  The GO Bondholders filed a complaint in intervention against the COFINA Agent.  [Dkt.
Nos. 95-96.]

On November 13 and 14, 2017, various parties filed motions or joinders to motions
challenging causes of action, defenses, or claims for relief as being outside the scope of the
Commonwealth-COFINA Dispute and/or the authority of either Agent.  [Dkt. Nos. 102-109.]
Following opposition and reply briefing, on December 21, 2007, the court issued its *Order (A)
Confirming Scope of COFINA and Commonwealth Agent's Authority Under Stipulation and
Order and (B) Dismissing, Without Prejudice, Certain Claims that Exceed the Scope of the
Commonwealth-COFINA Dispute* [Dkt. No. 167] (the "Scope Order"), dismissing without
prejudice (i) all but the Commonwealth Agent's first and second causes of action, (ii) all but the
COFINA Agent's first cause of action, and (iii) all non-duplicative counterclaims and cross-
claims of the COFINA Intervenors.

On January 11, 2018, the Commonwealth Agent filed, with the court's permission, an
urgent motion seeking to file a second amended complaint to bring the Commonwealth Agent's
twelfth and thirteenth causes of action within the scope of the dispute.  [Dkt. Nos. 209, 211.]
Various parties filed objections the following day.  [Dkt Nos. 213-16.]  On January 13, 2018, the
court granted the motion, [Dkt. No. 219], and the Commonwealth Agent filed a second amended
complaint on January 16, 2018.  [Dkt No. 221.]

## UNDISPUTED FACTS

COFINA was created by the Puerto Rico Legislature pursuant to Act 91 of 2006, as
amended by Act 56 of 2007 (as so amended and further amended, "Act 91").  Act 91-2006; Act
56-2007.  According to Act 91, COFINA is a public corporation and instrumentality of the
Commonwealth that is independent and separate from the Commonwealth but "attached" to the

5

GDB.  P.R. Laws Ann. tit. 13, §§ 11a(a) and (e).  The directors of the GDB, who are appointed

by the Governor, are also the directors of COFINA.  *Id*. § 11a(c); P.R. Laws Ann. tit. 7 §552,

seventh unnumbered paragraph.

Originally, COFINA was authorized pursuant to Act 91 to issue bonds to pay the

Commonwealth's "extraconstitutional debt" existing as of June 30, 2006 (and the net proceeds of

COFINA's Series 2007A and B Bonds, Series 2007C Bonds, and Series 2008A Bonds were used

exclusively for that purpose).  Act 91-2006, Statement of Motives, first unnumbered paragraph;

Act 291-2006 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph; Act

56-2007 (adding a new section 2 to Act 91-2006).[4]  That "extraconstitutional debt" was debt of

the Commonwealth that was: (i) not backed by a pledge of the Commonwealth's full faith,

credit, and taxing power; (ii) incurred to finance Commonwealth operating expenses; and (iii)

subject to budgetary appropriation for payment (i.e., payment of the debt service was subject to

budgetary appropriation of funds for that purpose).  *Id.*  That "extraconstitutional debt" was

incurred by the Commonwealth to finance budget deficits and included debt resulting from

advances made by the GDB to the Commonwealth for deficit financing.  *Id.*

Subsequent amendments to Act 91 authorized COFINA to use its bond proceeds to pay

additional Commonwealth debts and operating expenses and, in the words of the statute, to

"nourish" certain Commonwealth economic development and emergency relief funds.  P.R.

Laws Ann. tit. 13 § 11a(b)(8)-(11).  That additional Commonwealth debt included additional

debt incurred to finance budget deficits.  *Id*. at *Id*. at § 11a(b)(2).  That additional debt was

payable from budgetary appropriations of the Commonwealth or future issuances of

[4]

Commonwealth general obligation ("GO") bonds (or was debt for which there was no specified repayment source). P.R. Laws Ann. tit. 13 § 11a(b)(2)-(12). The additional uses of COFINA bond proceeds authorized in 2009 were necessitated by "eight years during which the Executive Branch failed to take the necessary measures to establish a balanced budget" and "the magnitude of the budgetary deficit for fiscal year 2008-2009 and the projected deficits for the subsequent three fiscal years." Act 1-2009 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph and second unnumbered paragraph. Similarly, the additional uses of COFINA bond proceeds authorized in 2013 were "[f]or the purpose of financing the deficits incurred these past three years, among other purposes." Act 116-2013 (amending Act 91-2006), Statement of Motives, third unnumbered paragraph.

COFINA is authorized to issue bonds that are payable from, and secured by, a specified portion of the SUT imposed directly by the Commonwealth (as distinct from the SUT levied by municipalities under authorization from the Commonwealth). P.R. Laws Ann. tit. 13, § 11a(c). The specified portion of the SUT is deposited in a fund known in English as the "Dedicated Sales Tax Fund." *Id*. § 11a(c). The SUT was first imposed by the Commonwealth pursuant to Act 117 of 2006, which amended the Puerto Rico Internal Revenue Code of 1994. Act 56-2007, Statement of Motives, first unnumbered paragraph. The SUT continues to be imposed by the Commonwealth pursuant to the Puerto Rico Internal Revenue Code of 2011, which replaced the Puerto Rico Internal Revenue Code of 1994. Act 1-2011.

The SUT is a general sales and use tax applicable to a range of goods and services. *See* P.R. Laws Ann. tit. 13 § 32021. All Commonwealth SUT revenues are collected by the Commonwealth or a collection agent acting on its behalf. *Id*. §§ 32021-32031 (providing for the collection of SUT). COFINA has no taxing power and is not authorized to levy, collect, or

enforce any portion of the SUT. *Id.* § 11a(e); P.R. Laws Ann. tit. 7 § 552. Act 91 provides that

the portion of the SUT revenues specified for COFINA "shall be directly deposited in [the

Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of

Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico,

nor shall these be available for the use by the Secretary of the Treasury of the Commonwealth of

Puerto Rico." P.R. Laws Ann. tit. 13 § 12.

Pursuant to Act 56-2007, Act 91 was amended to provide that "[The Dedicated Sales Tax

Fund] and all the funds deposited therein on the effective date of this act and all the **future funds**

**that must be deposited** in the [Dedicated Sales Tax Fund] pursuant to the provisions of [this

Act] are hereby transferred to, and shall be the property of COFINA." *Id.* § 14(c) (emphasis

added).

In each fiscal year, the first collections of the SUT are deposited in the Dedicated Sales

Tax Fund up to a specified amount. *Id.* § 12(a). Once that amount has been reached, SUT

collections are deposited in the Commonwealth general fund up to a specified amount. *See*

Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2011C Official

Statement (Ex. 10)[5], at 15-16 (December 7, 2011). Once that specified amount has been reached,

additional SUT collections are split 50/50 between the Commonwealth and COFINA. *Id.*

If, in a given fiscal year, the SUT revenues deposited in the Dedicated Sales Tax Fund are

insufficient to pay debt service on the COFINA bonds, more of the SUT revenues (which would

otherwise flow to the Commonwealth) must be transferred to the Dedicated Sales Tax Fund in

the next fiscal year to make up for the insufficiency. P.R. Laws Ann. tit. 13 § 14(d). If any SUT

revenues remain in the Dedicated Sales Tax Fund after all COFINA bonds have been repaid,

---

[5] All citations to exhibits (Ex. _) in this motion are exhibits to the *Declaration Of Nicholas A. Bassett In Support Of The Commonwealth Agent's Motion For Summary Judgment And Incorporated Memorandum Of Law* (the "Bassett Declaration").

COFINA is authorized to return those revenues to the Commonwealth and is not authorized to

use them for any other purpose.  P.R. Laws Ann. tit. 13 § 13(c); *see* P.R. Laws Ann. tit. 13 §§

11a(b) and (d).

Act 91 provides that the Commonwealth's non-impairment covenants "do not limit the

power of the Commonwealth of Puerto Rico, by means of a law or amendment, **to limit or**

**restrain the nature or the amount of such [SUT] or other revenues** or to substitute similar or

comparable collateral [in the form of] other taxes, fees, charges or other income to be deposited

into the [Dedicated Sales Tax Fund] if, for the following fiscal years, the revenues projected by

the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or

greater than the service of the debt and other charges and any coverage requirement included in

the COFINA bond authorizing documents."  P.R. Laws Ann. tit. 13 § 14(c) (emphasis added).

Act 91 further provides that nothing in Act 91 "shall be interpreted or applied in such a manner

as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2

of Article VI of the Constitution of the Commonwealth of Puerto Rico."  *Id.* § 16(a).

COFINA has issued in excess of $16 billion of bonds.  Commonwealth of P.R., Fin. Info.

& Operating Data Report, dated Dec. 18, 2016 (Ex. 17), at 182.  The Official Statement for each

series of COFINA bonds included the following risk disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth
> of Puerto Rico states that the power of the Commonwealth to
> impose and collect taxes and to authorize their imposition and
> collection by municipalities shall be exercised as determined by
> the Legislative Assembly and shall never be surrendered or
> suspended.  **Therefore, the Legislative Assembly of the**
> **Commonwealth may amend, modify or repeal Act No. 117**
> **[now a provision of the tax code], which imposes the [SUT]**.

*See, e.g.*, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A

Official Statement, dated July 13, 2007 (Ex. 6), at 23 (emphasis added).

In its opinion letter dated December 13, 2011, COFINA's bond counsel, Nixon Peabody

LLP, noted that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied

in such a manner as to diminish the power of the Legislative Assembly to impose and collect

taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . **[and] [t]hus,**

**the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it**

**entirely**." *See* Op. of Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 10 (emphasis

added).  The opinion letter also noted that this fact had been "clearly disclosed" to bondholders.

*Id*.

In October 2013, the Puerto Rico Legislature amended Act 91 to increase the portion of

future Commonwealth SUT revenues purportedly transferred to COFINA so as to allow for the

issuance of additional COFINA bonds.  *See* Act 72-2014, Statement of Motives, first

unnumbered paragraph.  In July 2014, the Puerto Rico Legislature amended the 2013 amendment

to suspend the increase in future SUT revenues purportedly "transferred" to COFINA nine

months earlier.  Act 72-2014.  The "Statement of Motives" for the 2014 amendment offered the

following rationale for the Legislature's action:

> As the GDB has publicly stated, neither [the Commonwealth] nor
> its instrumentalities, including COFINA, intend to tap into the
> stock market through a bond issue during this fiscal year.  In light
> of this situation, the Legislative Assembly deems it prudent that
> the General Fund receives the Sales and Use Tax revenues
> transferred to COFINA under [the 2013 amendment], until such
> revenues are needed to repay any bond or note issued by COFINA
> in the future.  When that time comes, the transfer to COFINA of
> the Sales and Use Tax revenues and the use therefor contemplated
> under [the 2013 amendment] shall be effective.

*Id.* at second unnumbered paragraph.

Similarly, two years later, the Puerto Rico Legislative Assembly passed Act 84 of 2016,

which reduced the portion of the SUT revenues purportedly transferred to COFINA from 6% to

5.5% and allocated the 0.5% differential to a specific fund for the benefit of municipalities.
Certified Translation of Act 84-2016 (Ex. 16). Most recently, Governor Rosselló signed an
executive order exempting an estimated 60,000 small and midsize businesses from collecting and
remitting SUT revenues from November 20 through December 31, 2017. Certified Translation
of E.O. 2017-068 (Ex. 19), 1st Section.

At all relevant times, in their respective financial statements, the Commonwealth and
COFINA both accounted for the purported transfer of Commonwealth SUT revenues to
COFINA as a pledge of collateral to secure a "collateralized borrowing" by the Commonwealth
and not as a "sale" of such revenues to COFINA. ████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████████████

## SUMMARY JUDGMENT STANDARD

The Commonwealth Agent is entitled to summary judgment pursuant to Rule 56(a) of the
Federal Rules of Civil Procedure, made applicable to this adversary proceeding by Bankruptcy
Rules 9014(c) and 7056 and section 310 of PROMESA, because there is no genuine dispute as to
any material fact, and it is entitled to judgment as a matter of law. "[T]he plain language of Rule
[56(a)] mandates the entry of summary judgment, after adequate time for discovery and upon
motion, against a party who fails to make a showing sufficient to establish the existence of an
element essential to that party's case, and on which that party will bear the burden of proof at
trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). "[T]here is no issue for trial unless

there is sufficient evidence favoring the nonmoving party for a [fact finder] to return a verdict for

that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986) (citations omitted).

When a properly supported motion for summary judgment is made, the opposing party "'must

set forth specific facts showing that there is a genuine issue for trial.' . . . The inquiry performed

[by the Court] is the threshold inquiry of determining whether there is the need for a trial —

whether, in other words, there are any genuine factual issues that properly can be resolved only

by a finder of fact because they may reasonably be resolved in favor of either party." *Id*. at 250.

Moreover, "the mere existence of some alleged factual dispute between the parties will not

defeat an otherwise properly supported motion for summary judgment; the requirement is that

there be no genuine issue of material fact." *Id*. at 247-48 (emphasis omitted).

## **ARGUMENT**

## I.      **ACT 91 DID NOT AND COULD NOT TRANSFER TO COFINA PROPERTY INTEREST IN PROPERTY THAT DID NOT YET EXIST**

In its first cause of action, the Commonwealth Agent seeks a declaration that Act 91 did

not transfer to COFINA present ownership of future SUT revenues. [Dkt. No. 221 ¶ 60.] In her

first cause of action, the COFINA Agent seeks a declaration that, among other things, "the

Pledged Sales Tax [i.e., the Commonwealth SUT revenues specified for COFINA], including all

Pledged Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund are the

property of COFINA." [Dkt. No. 269 ¶ 72.] The COFINA Seniors, National, and the Mutual

Fund Group seek the same relief in their respective first causes of action. [Dkt. Nos. 272 ¶ 67;

270 ¶ 69, 273 ¶ 63] These "mirror image" claims for declaratory relief raise the fundamental

question: What was the nature of the purported "transfer" of future SUT revenues to COFINA?

Was it a purported present sale (i.e., a present transfer of ownership) of such potential future

revenues? Was it merely a promise that any such revenues would be transferred to COFINA if

12

and when collected in the future?  Was it the grant of a security interest in such potential future revenues to secure an obligation of the Commonwealth to COFINA arising from the use of COFINA bond proceeds to pay the Commonwealth's debts and expenses?  As demonstrated below, there was no present transfer of ownership of potential future SUT revenues to COFINA, which received, at most, an unsecured promise that any such revenues would be transferred in the future or the grant of a security interest in such potential future revenues.

Pursuant to Act 56-2007, Act 91 was amended in 2007 to create the COFINA structure and provide that the "[Dedicated Sales Tax Fund] and all the funds deposited therein on the effective date of this Act and all the **future funds that must be deposited** in the [Dedicated Sales Tax Fund] . . . are hereby transferred to, and shall be the property of COFINA."  P.R. Laws Ann. tit. 13 § 12 (emphasis added).  With respect to "future funds," the statute is ambiguous as to whether the transfer purportedly occurred on the effective date of Act 56 or occurs as and when future SUT revenues are deposited into the Dedicated Sales Tax Fund.  **The ambiguity arises because the statute speaks in terms of a present transfer ("are hereby transferred") of funds to be deposited in the future ("future funds that must be deposited")**.  *Id.*  (emphasis added).  Furthermore, the phrase "shall be the property of COFINA" encompasses the concept of funds becoming COFINA's property in the future (i.e., when deposited in the Dedicated Sales Tax Fund).  Indeed, the amount of the "future funds that must be deposited" was unknowable at the time of enactment because it was dependent on any future amendments to Act 91 and the future performance (not to mention existence) of the SUT.

The COFINA Agent's counterclaims are similarly ambiguous.  She alleges that:

> By mandate of the Legislative Assembly in Act 56, which
> amended Act 91, the Commonwealth transferred to COFINA
> ownership of the Dedicated Sales Tax Fund and the right to receive
> the Pledged Sales Tax. . . . Accordingly, upon the enactment of Act

13

56 in 2007, COFINA owned the entire stream of Pledged Sales
Tax, including all Pledged Sales Tax revenue collected in the
future.

[Dkt. No. 269 ¶ 17.]  Thus, the COFINA Agent alleges that, with respect to the Dedicated Sales

Tax Fund into which the Pledged Sales Tax (i.e., the purportedly transferred SUT revenues) is

deposited, the Commonwealth transferred "ownership" while, with the respect to the Pledged

Sales Tax, the Commonwealth transferred its "right to receive" future SUT revenues.  At the

same time, she alleges that COFINA "owned" the "revenues collected in the future" upon the

enactment of Act 56 in 2007.

A.      There Can Be No Present Transfer Of A Property Interest In Potential Future
        Property

Of course, there was no "revenue collected in the future" when the COFINA structure

was created in 2007 because, by definition, those revenues did not yet exist and were nothing but

a mere expectancy.  In other words, there was no existing property interest in potential future

revenues that might never come into existence at all.  Thus, if the language of Act 56 is read as

purporting to transfer a **present property interest** in potential future SUT revenues on the

effective date of the Act, no such transfer occurred because no such transfer is possible.

The law has no comprehension of a **present** transfer of **future** property (as distinct from

a present **promise** that yet-to-exist property will be transferred in the future).  "At law one

cannot transfer by a present sale what he does not then own, although he expects to acquire it.

But, while [such a] contract [is] without effect at law as a contract of sale, it operate[s] as an

executory agreement to sell."  *T. B. Harms & Francis, Day & Hunter v. Stern*, 229 F. 42, 49 (2d

Cir. 1915).  Indeed, it is a basic legal maxim (and a dictate of logic and common sense) that "one

cannot give what one does not have" (or, in a common variation of the Latin, "*nemo dat qui non

habet*").  As the Supreme Court has observed:

14

> 'a person cannot grant a thing which he has not:' *ille non habet, non dat*; . . .
> equity no more than law can deny it.  **The thing itself is an impossibility**.  It
> may, at once, therefore, be admitted, whenever a part[y] undertakes, by deed or
> mortgage, to grant property, real or personal, in presenti, which does not belong to
> him or has no existence, the deed or mortgage, as the case may be, is inoperative
> and void, and this either in a court of law or equity.

*Pennock v. Coe*, 64 U.S. 117, 128 (1859) (emphasis added).  Thus, "[t]here is no doubt that the

assignment of a truly future claim or interest does not work a present transfer of property.  **It**

**does not because it cannot; no property yet exists**."  *Stathos v. Murphy*, 276 N.Y.S.2d 727,

730 (1st Dept. 1966) (emphasis added) (holding that an assignment of an interest in a cause of

action transferred a present interest because the cause of action existed at the time of the

assignment; *see also First Nat'l Bank of Colorado Springs v. Hamilton* (*In re Hamilton*), 18

B.R. 868, 870 (Bankr. D. Colo. 1982) ("It is impossible on the face to have a vested property

right in after-acquired property . . . because, by definition, after-acquired property is a mere

contingency.").  It is simply incoherent to say that COFINA has owned since 2007 tax revenues

generated by the sale of a television that had not yet occurred, might never occur, and, even if it

did occur, would be subject to a refund if the purchaser returned the television, even though

nothing in Act 91 would require COFINA to refund the tax collected on that transaction.

Accordingly, the statutory language in question is best read as providing that any future funds

"shall be the property of COFINA" if and when deposited in the Dedicated Sales Tax Fund.

The two cases cited by the COFINA Seniors in the "preliminary statement" to their

answer and counterclaims are not to the contrary.  In fact, those cases undermine the COFINA

side's argument.  They cite *DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284,

1290 (Fed. Cir. 2008), for the proposition that a contract reading "agrees and does hereby grant

and assign" all rights in future inventions "was not merely an agreement to assign, but an express

assignment of rights in future inventions."  [Dkt. No. 272, at 5.]  This does **not** mean, however,

Case 17-03283-LTS Doc#3277-3 Filed 02/14/19 Entered 02/14/19 16:20:16 Desc Main
Document Page 27 of 51

that the assignee acquired a present property interest in non-existent inventions. No one can own an invention that does not exist. All it means is that, as between the parties to the agreement, "no further act [is] required once an invention [comes] into being" because "the **transfer** of title [occurs] by operation of law" at that time. *DDB Techs., L.L.C.*, 517 F.3d at 1290 (emphasis added). The key point is that the "transfer of title" occurs **when the property (i.e., an invention) comes into being**, not when the assignment agreement became effective.

The COFINA Seniors also cite *Speelman v. Pascal*, 178 N.E.2d 723, 725 (N.Y. 1961), in which the court noted that "[t]here are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor." Once again, just because an assignment agreement is enforced does not mean that the **transfer** occurs at the time the agreement was executed. No transfer can occur until the property exists. Moreover, the court was referring to cases in which a purported assignment was enforced in equity even though it was of no legal effect. The concept of an "equitable assignment" does not exist in Puerto Rico.

The Uniform Commercial Code (the "UCC") (known in Puerto Rico as the "Commercial Transactions Act") is consistent with this approach because it does not permit parties to create a security interest in property that does not yet exist. Due in part to the potential difficulty in distinguishing a sale of accounts, payment intangibles, or other receivables from a borrowing secured by such receivables, the UCC applies to both types of transactions (P.R. Laws Ann. tit. 19 § 2219(a)(3)) and defines a "security interest" to include the interest of a buyer of such assets. P.R. Laws Ann. tit. 19 § 451(37). For either type of transaction, the security agreement can cover after-acquired property—that is, property acquired by the debtor after entering into the security agreement. P.R. Laws Ann. tit. 19 § 2234(a). In neither case, however, can the security interest attach until the debtor—whether a seller or borrower—"has rights in the collateral". P.R.

16

Laws Ann. tit. 19 § 2233(b)(2).  Thus, under the UCC, a sale of receivables does not and cannot

occur until the receivables exist and the debtor has property rights in those receivables.

> **B.**  <u>COFINA Could Not Have Become Present Owner Of Future SUT Revenues That</u>
> <u>Could Be Taken Away At Any Time</u>

The notion that COFINA became the present owner in 2007 of an entire "revenue

stream" extending into the future is also directly at odds with (i) the Commonwealth's

inalienable constitutional power to reduce or eliminate the SUT and its power under Act 91 to

substitute SUT revenues with other "collateral," all as disclosed to investors on multiple

occasions, and (ii) subsequent actions of the Puerto Rico Legislative Assembly.

> **1.**  *SUT Risk Disclosures And Other Act 91 Provisions*

The Official Statement for each series of COFINA bonds included the following risk

disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth
> of Puerto Rico states that the power of the Commonwealth to
> impose and collect taxes and to authorize their imposition and
> collection by municipalities shall be exercised as determined by
> the Legislative Assembly and shall never be surrendered or
> suspended.  Therefore, **the Legislative Assembly of the**
> **Commonwealth may amend, modify or repeal Act No. 117**
> **[now a provision of the tax code], which imposes the [SUT]**.

*See, e.g.*, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A

Official Statement, dated July 13, 2007 (Ex. 6), at 23 (emphasis added).  Thus, the COFINA

bondholders were all on notice that the future SUT revenues securing their bonds were not

COFINA's vested property and could disappear at any time.

Language added to Act 91 in 2009 reiterated the Commonwealth's ability to reduce or

eliminate the SUT and provided further that the Commonwealth can substitute "similar or

comparable collateral" for the SUT revenues:

> [The non-impairment covenant does] not limit the power of the
> Commonwealth of Puerto Rico, by means of a law or amendment,
> to **limit or restrain the nature or the amount of such [SUT] or**
> **other revenues or to substitute similar or comparable**
> **collateral [in the form of] other taxes, fees, charges or other**
> **income to be deposited into the [Dedicated Sales Tax Fund]** if,
> for the following fiscal years, the revenues projected by the
> Secretary of the Treasury from such substitutive tax, income or
> collateral is equal to or greater than the service of the debt and
> other charges and any coverage requirement included in the
> COFINA bond authorizing documents.

P.R. Laws Ann. tit. 13 § 14(c) (emphasis added).

Consistent with this language, in a 2011 opinion letter, COFINA's bond counsel noted
that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a
manner as to diminish the power of the Legislative Assembly to impose and collect taxes as
provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . [and] **[t]hus, the**
**Legislature is free at any time to reduce the rate of sales and use tax or eliminate it**
**entirely**." Op. of Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 10 (emphasis added).
The opinion letter also noted that this fact had been "clearly disclosed" to bondholders. *Id.*

It is noteworthy that Act 91 itself refers to the SUT revenues specified for COFINA as
"collateral." This is entirely inconsistent with a prior transfer of ownership and strongly
indicates that the purported transfer of future SUT revenues was (if anything more than an
unsecured promise) the grant of a security interest in after-acquired property to secure an
obligation of the Commonwealth to COFINA arising from the use of COFINA bond proceeds to
pay the Commonwealth's debts and expenses.[6] To state the obvious, if the SUT can be repealed
or reduced at any time, and if future SUT revenues can be substituted with "similar or

---

[6] Alternatively, the grant of a security interest in future SUT revenues could be viewed as a nonrecourse third-party
pledge of collateral by the Commonwealth to secure COFINA's obligation to pay its bondholders.

comparable collateral" (i.e., revenues from an entirely different source), such yet-to-exist SUT

revenues could not have become COFINA's property upon the enactment of Act 56 in 2007.[7]

Moreover, Act 91 provides for the return of any SUT revenues remaining in the

Dedicated Sales Tax Fund when all COFINA bonds have been repaid.  Although the return is

"authorized" rather than expressly mandatory, COFINA cannot use SUT revenues for any

purpose other than to pay its administrative expenses and its bondholders, and, as a practical

matter, the Commonwealth has control over the disposition of any remaining funds because

COFINA is "attached" to the GDB and governed exclusively by the GDB's directors (who are

also the directors of COFINA and who are appointed by the Governor).  The practical

inevitability of any excess SUT revenues being returned to the Commonwealth is fundamentally

inconsistent with the idea that such yet-to-exist revenues became the property of COFINA in

2007.

### 2. *Subsequent Legislative Action*

Another powerful demonstration that COFINA does not own future SUT revenues is that

the Commonwealth has unilaterally reallocated a portion of such revenues to its General Fund.

In October 2013, the Puerto Rico Legislative Assembly amended Act 91 to increase the portion

of future Commonwealth SUT revenues "transferred" to COFINA so as to allow for the issuance

of additional COFINA bonds.  Act 116-2013.  In July 2014, the Puerto Rico Legislative

Assembly amended the 2013 amendment to suspend the increase in future SUT revenues

"transferred" to COFINA nine months earlier.  Act 72-2014.

---

[7] The continued flow of SUT revenues to COFINA remained a serious concern among market participants, as
evidenced by an "unprecedented" public conference call arranged by the GDB in October 2013 so that investors
could directly question COFINA's bond counsel about their prior opinions.  Government Development Bank,
Conference Call About COFINA Legal Opinions, dated Oct. 31, 2013 (Ex. 15).  During that call, one investor
asked:  "[A]re we correct to assume that risk of materially negatively altering the COFINA structure via legislative
action is very low?"  *Id.* at 10.  The answer started with a "yes" but was quickly qualified with the frank
acknowledgment that "[f]uture legislatures could take action if deemed appropriate."  *Id.*

The "Statement of Motives" for the 2014 amendment offered the following rationale for the legislature's action:

> As the GDB has publicly stated, neither [the Commonwealth] nor its instrumentalities, including COFINA, intend to tap into the stock market through a bond issue during this fiscal year.  In light of this situation, the Legislative Assembly deems it prudent that the General Fund receives the Sales and Use Tax revenues **transferred to COFINA** under [the 2013 amendment], until such revenues are needed to repay any bond or note issued by COFINA in the future.  When that time comes, the transfer to COFINA of the Sales and Use Tax revenues and the use therefor contemplated under [the 2013 amendment] shall be effective.

Act 72-2014, Statement of Motives, second unnumbered paragraph (emphasis added).  The additional future revenues "transferred to COFINA" could not have become COFINA's property in 2013 if, in 2014, the Commonwealth could unilaterally reallocate those revenues to its General Fund.

Similarly, two years later, the Puerto Rico Legislative Assembly passed Act 84 of 2016, which reduced the portion of the SUT revenues purportedly transferred to COFINA from 6% to 5.5% and allocated the 0.5% differential to a specific fund for the benefit of municipalities.  Certified Translation of Act 84-2016 (Ex. 16), Explanatory Memorandum, second unnumbered paragraph.  Most recently, Governor Rosselló signed an executive order exempting an estimated 60,000 small and midsize businesses from collecting and remitting SUT revenues from November 20 through December 31, 2017.  Certified Translation of E.O. 2017-068 (Ex. 19), 1st Section.  These post-"transfer" legislative and executive actions belie any notion that COFINA owns potential future SUT revenues before they even come into existence.

C.   There Was No "True Sale" Of Future SUT Revenues To COFINA

The COFINA side characterizes the COFINA structure as a municipal "tax-backed securitization" in which a "stream" of tax revenues was purportedly "insulated from the

[Commonwealth's] underlying credit risk."  [Dkt. No. 269 ¶ 2.]  A securitization is a financing structure that involves transferring assets to a special purpose entity (an "<u>SPE</u>") that issues bonds backed by those assets.  SECURITIZATIONS: LEGAL & REGULATORY ISSUES § 2.01 (Patrick D. Dolan & C. VanLeer Davis III eds., 33rd release 2017).  The assets are transferred to an SPE in the hope that they will not be part of the transferor's estate if the transferor ends up in bankruptcy.  *Id.*  Under the Bankruptcy Code, a debtor's estate includes "all legal or equitable interests of the debtor in **property** as of the commencement of the case."  11 U.S.C. § 541(a)(1) (emphasis added).  Pursuant to section 301(c)(5) of PROMESA, "[t]he term 'property of the estate', when used in a section of title 11, United States Code, made applicable in a case under this title by subsection (a), means property of the debtor."  Because a "true sale" eliminates all of the seller's legal and equitable interests in the property sold, assets transferred to an SPE by means of a "true sale" will not (in theory) be part of the transferor's bankruptcy estate, i.e., the assets will be "bankruptcy remote" vis-à-vis the transferor.  *See* SECURITIZATIONS: LEGAL & REGULATORY ISSUES § 2.01.

As demonstrated above, **<u>neither future SUT revenues nor any "right to receive" such revenues were an existing asset capable of being sold or otherwise transferred when the legislation containing the "transfer" language was enacted</u>**.  But even assuming that such a sale was somehow possible, no "true sale" occurred.  In determining the true nature of a particular transaction, bankruptcy courts have consistently recognized that "a court must look to the substance of the transaction, rather than its form."  *In re Doctors Hosp. of Hyde Park, Inc.*, 463 B.R. 93, 112 (Bankr. N.D. Ill. 2011) (explaining that a true sale requires that parties "take steps evidencing that a true sale is intended"); *see also In re PCH Assocs.*, 804 F.2d 193, 200 (2d Cir. 1986) ("[T]he Code mandates that a court look beyond mere form to the circumstances of

each case, including the economic substance of the transaction, to determine whether a 'true

lease' exists for purposes of the Code.").  Thus, the focus is on the "true relationships and

economic realities" of a transaction rather than the "parties' characterization."  *In re Merritt*

*Dredging Co., Inc.*, 839 F.2d 203, 208-09 (4th Cir. 1988) (holding that a charter lease was really

a secured financing); *see also In re Dena Corp.*, 312 B.R. 162, 169 (Bankr. N.D. Ill. 2004)

("Courts look [to] the economic reality underlying a questioned agreement and not to the labels

applied by the parties to determine the true nature of a transaction."); *In re Burm*, 554 B.R. 5, 17

(Bankr. D. Mass. 2016) ("[C]ommercial transactions are complicated, and the determination of

whether a transfer of interest in accounts receivable is truly a 'sale' or whether the payment of

the 'purchase price' is in reality a 'loan,' requires a close look at the details of the transaction.").

The focus on economic realities reflects the obvious truth that "simply calling the transaction a

[sale] does not make it so; labels cannot change the true nature of the underlying transaction."  *In*

*re Eureka S. R.R., Inc.*, 72 B.R. 813, 815 (Bankr. N.D. Cal. 1987) (determining whether a party

seeking stay relief was a lessor or a seller).  As the Bankruptcy Court for the District of Puerto

Rico has explained in the "true lease" context,[8] "determining whether an instrument is a true

lease [or a secured financing] hinges on the realities of the lease and not the labels applied by the

parties."  *Matter of Three Star Telecast, Inc.*, 73 B.R. 270, 272 (Bankr. P.R. 1987) (noting that

the "true lease" question is an "issue [] common in bankruptcy").  Ultimately, the question is

whether the "legal rights and economic substances" of a transaction "bear a greater similarity to

a financing transaction or to a sale."  *Major's Furniture Mart, Inc.*, 602 F.2d 538, 544 (3rd Cir.

---

[8] Just as parties can enter into a purported sale that is, in economic reality, a secured financing, parties can enter into a purported lease that is really a secured financing.  S*ee, e.g., In re Access Equip, Inc.*, 62 B.R. 642, 645 (Bankr. D. Mass. 1986) ("In determining whether a contract is a 'true lease' or one intended for security, courts do not consider what description the parties have given to it, but what is its essential character.") (internal quotations omitted).

1979) (affirming the district court's holding that a transfer of receivables was a secured loan, not a true sale).

There are certain critical factors for distinguishing a "true sale" from a secured financing (in which the borrower retains ownership of the collateral), including whether there is recourse against the transferor and whether the transferor retained control over the assets. SECURITIZATIONS: LEGAL & REGULATORY ISSUES § 2.05[2] (enumerating "true sale" factors). Here, these factors preclude any possibility of a "true sale" of SUT revenues to COFINA.

With regard to recourse, if SUT collections in a given fiscal year are insufficient to pay debt service on COFINA bonds, the Commonwealth is required to cover that insufficiency in the following fiscal year with additional SUT collections that would otherwise flow to the Commonwealth's General Fund. P.R. Laws Ann. tit. 13 § 14(d). Simply put, the Commonwealth has, in substance, guaranteed the sufficiency of SUT revenues to cover COFINA debt service. That guarantee is a form of recourse, which is inherently inconsistent with a "true sale" because the Commonwealth retained risk of loss. On the other side of the ledger, the Commonwealth retained opportunity for gain because, as set forth above, if any SUT revenues remain in the Dedicated Sales Tax Fund after all COFINA bonds have been repaid, those revenues will, as a practical inevitability, be returned to the Commonwealth. The Commonwealth also retained pervasive control over the SUT revenues specified for COFINA. As explained above, the Commonwealth retained the power to impose, collect, and enforce the SUT, to substitute SUT revenues with other "collateral," or to reduce or even eliminate the SUT itself. In short, the Commonwealth, not COFINA, has the downside risk, the upside benefit, and control of the potential future SUT revenues, and thus the Commonwealth has not truly sold any such revenues to COFINA.

23

It is also important to note that any purported transfer of SUT revenues was not limited to a specified amount of existing receivables owed by identified account debtors.  In a typical sale of receivables, the buyer acquires receivables totalling a known and specified sum.  The receivables might have, and usually do have, a value that is less than that total, but knowledge of the face amount is necessary to determine the sale price.  In other words, the price to be paid is typically determined by the face amount of the receivables, discounted by the risk of non-payment.  In most cases, the adjustment for risk requires some knowledge of who the account debtors are, if not their specific identifies, at least in the aggregate.  Put simply, buyers of receivables rarely pay substantial sums for whatever Monty Hall is hiding behind the curtain.

By contrast, the transaction between the Commonwealth and COFINA lacked any such defining information.  While the transaction involved the allocation of a specified portion of future SUT revenues, there was no way to know what the dollar amount of those revenues would be.  Moreover, while the direct payors could have been identified *en masse* as the merchants that collect the SUT, the merchants do not owe the taxes; their customers do.  Thus, there was no way to identify at the inception of the transaction the creditworthiness of the future obligors or the total amount of their obligations.

Finally, recognizing the purported transfer of future SUT revenues as a "true sale" would be contrary to core policies underlying federal bankruptcy law.  One of those policies is that debtors should be given a "fresh start."  The Supreme Court articulated the fresh start policy in its 1934 decision in *Local Loan*:

> [I]t gives to the honest but unfortunate debtor . . . a new
> opportunity in life and a clear field for future effort, unhampered
> by the pressure and discouragement of preexisting debt.

*Local Loan Co. v. Hunt*, 292 U.S. 234, 244 (1934).  This core policy is embodied in section 552 of the Bankruptcy Code, which automatically cuts off any prepetition security interest with

respect to any property acquired by a debtor after the petition date. As the COFINA Agent's counsel wrote in a 2002 law review article, "[r]emoval of securitized assets from a debtor's bankruptcy estate circumvents the bankruptcy process, potentially harms unsecured creditors, and makes it difficult for, otherwise viable organizations, to reorganize. This is inconsistent with federal bankruptcy policy." Kenneth N. Klee and Brendt C. Bulter, *Asset-Backed Securitization, Special Purpose Vehicles and Other Securitization Issues*, 35 U.C.C. Law Journal 23, 68 (2002-2003). If that is true of traditional securitizations of **existing assets**, it is all the more true of purported securitizations of **future assets**, and it is especially true of **future assets that did not even exist as of the petition date and that are needed by a municipal debtor, which, unlike corporate debtor, cannot just go out of business and must continue to operate to protect the health and welfare of its citizens**. The Commonwealth Agent is not advocating that securitizations should be disregarded in bankruptcy even when they involve a true sale of existing assets. But COFINA is not such a case. The COFINA structure is particularly repugnant to federal bankruptcy policy because it involves a non-true sale of non-existent (but potential future) assets of unknown amount in perpetuity.

> D. Commonwealth And COFINA Both Accounted For SUT Revenue Transfer As Pledge Of Collateral By Commonwealth And Not As Sale Of Revenues To COFINA

When bankruptcy courts attempt to determine the true nature of transactions entered into by debtors, such as in the "true sale" and "true lease" contexts, one factor they often consider is how the transaction was treated for accounting purposes. *See, e.g.*, *In re Pillowtex, Inc.*, 349 F.3d 711, 723 (3d Cir. 2003) (holding that the lower court did not err in attaching significance to the fact that the debtor did not account for the transactions at issue as true leases); *In re ATP Oil & Gas Corp.*, 2014 WL 61408, at *18 (Bankr. S.D. Tex. Jan. 6, 2014) (denying alleged purchaser's summary judgment motion where "[t]he transaction appears to fall within the

meaning of a loan under several accounting standards, including GAAP"); *In re Doctors Hosp.
Hyde Park*, 507 B.R. 558, 709 (N.D. Ill. 2013) (listing "accounting treatment" among the factors
considered in determining whether a transfer of assets to a special purpose entity was a "true
sale" (i.e., a true transfer of ownership) or a mere grant of a security interest); *Fleet Capital
Corp. v. Yamaha Motor Corp., U.S.A.*, 2002 WL 32063614, at *1 (S.D.N.Y. Sept. 26, 2002)
(holding that accounting treatment was relevant to whether transactions were true sales or
secured financings).

     In her counterclaims, the COFINA Agent points to the Commonwealth's financial
statements as supporting her claim that ownership of the portion of the SUT revenues specified
for COFINA, including any future revenues, was transferred to COFINA in 2007.  [Dkt. 269 ¶
36 ("The Commonwealth's financial reports also make clear that the Pledged Sales Tax revenue
collected by the Commonwealth belongs to COFINA and, for that reason, is not included in the
Commonwealth's internal revenue.").]  Contrary to the COFINA Agent's allegations, the
Commonwealth and COFINA accounted for and reported the purported transfer of SUT revenues
as a **pledge of future revenues in connection with a "collateralized borrowing" by the
Commonwealth and not as a "sale" (i.e., transfer of ownership) of those revenues to
COFINA**. ███████████████████████████

     To be clear, the Commonwealth Agent is not asking the court to opine on abstract
accounting issues.  Rather, the accounting treatment reflects the true nature of the purported
revenue transfer as revealed in the economic realities of the transaction.  ██████████████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████ This

26

factor coincides with the continuing control factor considered by courts in a "true sale" analysis.

The common theme is that continuing involvement and control by the transferor (here, the

Commonwealth) is inherently inconsistent with an absolute transfer of ownership to the

transferee. Just as courts focus on the economic realities of a transaction in determining its true

nature (see discussion *supra*), the relevant accounting guidance stresses that "a transaction

should be reported as a collateralized borrowing or a sale based on its economic substance, rather

than on the labels attached to it," and thus, "[e]ven though documents may stipulate that a

transaction is a sale, the facts and circumstances may indicate that it is a collateralized borrowing

and not a sale." Governmental Accounting Standards Board, Statement No. 48 (Ex. 4), ¶ 32.

Here, the Commonwealth did not even come close to terminating its involvement with

and control over the purportedly transferred SUT revenues. ███████████████████

████, the Commonwealth retained the exclusive power to impose, collect, and enforce the

portion of the SUT specified for COFINA. The Commonwealth also retained the power to

reduce or even eliminate the SUT and, as provided in a 2009 amendment to Act 91, the power to

substitute the SUT revenues with other "similar or comparable **collateral**" from another source.

Act 1-2009. Such pervasive involvement in and control over the SUT compels the conclusion

that, **based on the economic realities of the transaction**, there was no "sale" of SUT revenues

to COFINA. Thus, the Commonwealth and COFINA both accounted for the purported SUT

transfer as a pledge of SUT revenues as collateral for a secured borrowing by the

Commonwealth.

For all of the foregoing reasons, the Commonwealth Agent is entitled to a declaration

pursuant to 28 U.S.C § 2201(a) that Act 91 did not transfer present ownership of future SUT

revenues to COFINA, and thus, even assuming that the COFINA structure is constitutional

(which it is not), any such revenues not deposited in the Dedicated Sales Tax Fund as of the

filing of the Commonwealth's title III petition on May 3, 2017 (the "Commonwealth Petition

Date") are the property of the Commonwealth and not of COFINA.

## II.   ACT 91 DID NOT TRANSFER TO COFINA ANY "RIGHT TO RECEIVE" FUTURE SUT REVENUES

In its second cause of action, the Commonwealth Agent seeks a declaration that Act 91

did not transfer to COFINA any "right to receive" future revenues. As set forth above, the

COFINA Agent alleges that the Commonwealth transferred its "right to receive" future SUT

revenues to COFINA (while also alleging that COFINA "owned" all SUT revenues "collected in

the future" upon the enactment of Act 56-2007). The legal opinions rendered in connection with

the issuance of COFINA bonds also refer to a transfer of the Commonwealth's "right to receive"

future tax revenues, opining without analysis that this purported transfer was "valid." *See* Op. of

the P.R. Dep't of Justice, dated Dec. 13, 2011 (Ex. 13), at 2 ("Pursuant to Act 91, the Dedicated

Sales Tax Fund, including the **right to receive** collections of the Dedicated Sales Tax, is validly

transferred to [COFINA]." (emphasis added)); Op. of Nixon Peabody LLP, dated Dec. 13, 2011

(Ex. 11), at 11 ("Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's

**right to receive** the Pledged Sales Tax, to [COFINA]." (emphasis added)); Op. of Pietrantoni

Mendez & Alvarez LLC, dated Dec. 13, 2011 (Ex. 12), at 8 ("Act 91, as amended by Act 1 and

Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's **right to receive**

the Pledged Sales Tax, to [COFINA]." (emphasis added)). Act 91, however, says nothing about

the Commonwealth's "right to receive" future SUT revenues or any purported transfer of such a

right to COFINA.

In any event, in the words of the Restatement of Contracts, "[i]n the nature of things it is

impossible to make a person owner of a right which does not exist." Restatement of Contracts,

section 154, cmt. b.  As to future SUT revenues, the Commonwealth's "right to receive" does not

exist until a taxable transaction occurs, because, until that time, there is no "receivable."  *See*

P.R. Laws Ann. tit. 13 § 32024 (liability of purchasers and merchants for payment and

remittance of SUT arises upon purchase, use, consumption, or storage of taxable items); *Id*. §§

32001(q) and (r) (defining and describing SUT as being "on account of" retail sale, use,

consumption, or storage of taxable items).  Thus, even if Act 91 had purportedly transferred the

Commonwealth's "right to receive" future SUT revenues (which, again, Act 91 says nothing

about), no such "right to receive" could have been transferred because no such right existed as to

purchases of taxable goods and services that had not yet occurred.

In *Local Loan Co. v. Hunt*, 292 U.S. 234, 243-45 (1934), the Supreme Court held that

"[t]he earning power of an individual is the power to create property; but it is not translated into

property within the meaning of the Bankruptcy Act until it has brought earnings into existence."

292 U.S. at 243.  Likewise, the Commonwealth's taxing power is the power to create property,

but it is not translated into property until, in the case of the SUT, a taxable good or service is

purchased.  Thus, the Commonwealth cannot logically have any "right to receive" future SUT

revenues until such purchases occur.

Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C

§ 2201(a) that Act 91 did not transfer to COFINA any "right to receive" future SUT revenues.

## III.    PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS UNCONSTITUTIONAL AND VOID BECAUSE ACT 91 IMPERMISSIBLY EVADES PUERTO RICO'S CONSTITUTIONAL DEBT LIMITS AND CONSTITUTIONAL DEBT PRIORITY

In its twelfth cause of action, the Commonwealth Agent seeks a declaration that the

purported transfer of SUT revenues to COFINA is unconstitutional and void because, on its face,

Act 91 (as amended to create the COFINA structure) constitutes an impermissible evasion of

Puerto Rico's constitutional debt limits and constitutional debt priority.  In her first cause of

action, the COFINA Agent seeks a contrary declaration that Act 91 is constitutional under the

Puerto Rico constitution.  [Dkt. 269 ¶ 72.]  The COFINA Intervenors (except Ambac) seek the

same relief.

Looking through the form to the **economic substance** of the COFINA structure, it is

nothing but a conduit for borrowing by the Commonwealth.  **The only purpose of the COFINA**

**entity is to pay the Commonwealth's debts and expenses with the proceeds of bonds for**

**which the only source of payment is general Commonwealth tax revenues**.  Unlike the

typical issuer of a government "revenue bond," COFINA does not operate any project or system

from which the revenues backing its bonds are derived.

A.      Evasion Of Constitutional Debt Limits

Puerto Rico's constitution places limits on the issuance and guarantee of debt by the

Commonwealth.  Article VI, Section 2 of the constitution provides that:

> **no direct obligations of the Commonwealth** for money borrowed
> directly by the Commonwealth evidenced by bonds or notes for
> **the payment of which the full faith credit and taxing power of**
> **the Commonwealth shall be pledged shall be issued** by the
> Commonwealth **if** the total of (i) the amount of principal of and
> interest on such bonds and notes, together with the amount of
> principal of and interest on all such bonds and notes theretofore
> issued by the Commonwealth and then outstanding, payable in any
> fiscal year and (ii) any amounts paid by the Commonwealth in the
> fiscal year next preceding the then current fiscal year for principal
> or interest on account of any outstanding obligations evidenced by
> bonds or notes guaranteed by the Commonwealth, **shall exceed**
> **15% of the average of the total amount of the annual revenues**
> **raised under the provisions of Commonwealth legislation and**
> **covered into the Treasury of Puerto Rico in the two fiscal years**
> **next preceding the then current fiscal year** (the "Debt Service
> Limit").

P.R. Laws Ann. Const. art VI, § 2 (emphasis added).  The same section further provides that "no

such bonds or notes issued by the Commonwealth for any purpose other than housing facilities

shall mature later than 30 years from their date" (the "<u>Debt Maturity Limit</u>," and, together with

the "<u>Debt Service Limit</u>," the "<u>Constitutional Debt Limits</u>").  *Id.*

      The Constitutional Debt Limits apply only to direct, "full faith and credit" debt of the

Commonwealth because it was understood that any bonds issued by public corporations (such as

COFINA) would be "revenue bonds" paid **<u>solely from revenues derived from the issuing</u>**

**<u>corporation's activities</u>** (not from general Commonwealth tax revenues).  As reported to the

Puerto Rico Senate in connection with the amendment of the Puerto Rico constitution in 1961 to

add the Constitutional Debt Limits:

> When discussing revenue bonds, it should be clarified that the
> bonds issued and to be issued by the public corporations of the
> Commonwealth of Puerto Rico will not be taken into account when
> calculating the State's legal debt limit, since the good faith of the
> People of Puerto Rico is not committed for the payment of the
> same and they will continue to be paid **<u>only from the income</u>**
> **<u>derived by said corporations</u>**.  Only in the event that the State
> guarantees any of these bonds, which it has not done so far, and
> must pay in a given year a shortfall of the debt requirements
> thereof, will the amount thus paid will be counted against the legal
> debt limit of the Commonwealth.

Certified Translation of the Daily Sessions Record, Senate of Puerto Rico, dated Sept. 5, 1961

(Ex. 2) (emphasis added).

      The COFINA structure is not a "revenue bond" structure because the COFINA bonds are

paid from general Commonwealth tax revenues rather than from "income derived by

[COFINA]," which has no purpose other than to issue bonds for the Commonwealth's benefit

and generates no income from which to pay its bondholders.  Yet, the COFINA bonds are not

subject to the Constitutional Debt Limits because they are not direct, "full faith and credit"

obligations of the Commonwealth.  Thus, the COFINA structure created by Act 91 provided an

indirect means for the Commonwealth to issue debt payable solely from general Commonwealth

tax revenues without having to comply with the Constitutional Debt Limits.  ▬▬▬▬

████████████████████████████████████

████████████████████████████████████

████████████████████████ Such "off balance sheet" financing constitutes an

unconstitutional evasion of the Constitutional Debt Limits, which would be rendered

meaningless if such financing structures were constitutionally permissible. *See Crick v. Rash*,

229 S.W. 63, 70 (Ky. 1921) (holding that allowing a state to "validate" a debt through mere

specification of a separate fund would allow debts to "be contracted in unlimited amounts and

payable in the far distant future, and still be immune from attack as violating constitutional

provisions limiting indebtedness"); *State ex rel. Wash. State Fin. Comm. v. Martin*, 384

P.2d 833, 842 (Wash. 1963) ("[I]f the state undertakes or agrees to provide any part of the fund

from any general tax, be it excise or ad valorem, then securities issued upon the credit of the fund

are likewise issued upon the credit of the state and are in truth debts of the state.").

    B.    <u>Evasion Of Constitutional Debt Priority</u>

Puerto Rico's constitution also prioritizes the payment of the Commonwealth's public

debt over all other debts and expenses in the event of a revenue shortfall (the "<u>Constitutional</u>

<u>Debt Priority</u>").  Article VI, Section 8 of the constitution provides that:

> [i]n case the available revenues including surplus for any fiscal
> year are insufficient to meet the appropriations made for that year,
> interest on the public debt and amortization thereof shall first be
> paid, and other disbursements shall thereafter be made in
> accordance with the order of priorities established by law.

P.R. Laws Ann. Const. art VI, § 8.  In addition, Article VI, Section 2 of the constitution provides

that:

> [t]he Secretary of the Treasury may be required to apply the
> available revenues including surplus to the payment of interest on
> the public debt and the amortization thereof in any case provided
> for by Section 8 of this Article VI at the suit of any holder of bonds
> or notes issued in evidence thereof.

32

P.R. Laws Ann. Const. art VI, § 2.

There can be no dispute that, prior to the Commonwealth Petition Date, the SUT revenues specified for COFINA would, but for the purported transfer to COFINA, be "available revenues" of the Commonwealth (which would first be paid to holders of lawfully issued Commonwealth public debt).[9] Accordingly, the purported transfer of SUT revenues to COFINA reduced the revenues that would otherwise be available to the Commonwealth to pay its creditors. ████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

███████████████████████

Stated bluntly, if the Puerto Rico Legislative Assembly can render general tax revenues "unavailable" simply by "transferring" them to a special purpose entity that does nothing but issue bonds to pay the Commonwealth's own debts and expenses or provide funding for Commonwealth funds, **there is no principled limit on the ability of the Puerto Rico Legislative Assembly to undermine the Constitutional Debt Priority**. *See State ex rel. Shkurti v. Withrow*, 513 N.E.2d 1332, 1336 (Ohio 1987) (holding that, if "surcharges" on employer contributions to state unemployment compensation program could qualify as a "special fund," then "the legislature, or the debt-contracting authority, could divide the public revenue into numerous subdivisions, calling one the 'road fund,' another the 'school fund,' another the 'agricultural fund,' another the 'public health fund,' and others almost without limit"); *State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 698 (N.D. 1984) ("Were we to accept the proposition that a pledge of any specific tax revenues would be sufficient to invoke the 'special fund'

---

[9] In its capacity as the Commonwealth Agent, the Committee takes no position on whether the same priority is applicable after the Commonwealth Petition Date. The Committee is not a party to this adversary proceeding in its individual capacity and reserves all rights in such capacity.

doctrine, the constitutional debt limitation would be largely nullified, since the legislature could

exempt almost any obligation from its strictures merely by identifying a specific tax from which

the obligation could be paid."); *Long v. Napolitano*, 53 P.3d 172, 189 (Ariz. Ct. App. 2002)

(rejecting the argument that any designated tax revenues could be used to pay revenue

bondholders, as "the legislature could effectively nullify the constitutional debt restrictions

simply by segregating general revenues in special funds").

    C.    <u>Unconstitutionality Of Purported SUT Transfer</u>

If the purpose of a statute is to create a financing structure of which the substantial result

is constitutional evasion, it is unconstitutional and void.  For example, in *Ayer v. Comm'r of*

*Administration.*, 165 N.E.2d 885 (Mass. 1960), the Commonwealth of Massachusetts legislature

created a structure designed to evade a constitutional requirement that certain actions not be

taken without a vote of two-thirds of each house then present.  At issue was an emergency act

(passed without such a two-thirds vote) that created a non-profit corporation "for the purpose of

constructing a State office building to house various departments, commissions and agencies of

the Commonwealth."  *Id.* at 886.

After the act was signed into law, the Commonwealth of Massachusetts and the

corporation entered into a "contract of lease" under which the Commonwealth was "about to

expend money raised, or to be raised, by the general taxation of the inhabitants of the

Commonwealth and to incur obligations purporting to bind the Commonwealth."  *Id.* at 886-87.

The corporation, in turn, was about to borrow money under a trust agreement and "issue and sell

bonds whose repayment is secured by a pledge of rentals" to be paid by the Commonwealth

under the contract of lease.  *Id.* at 887.  The proceeds of the bonds and other borrowings were to

be used to construct office space for use by the Commonwealth as part of a "government center"

development project. *Id.* Upon the payment of all debt obligations of the corporation, the office
building was to become the Commonwealth's property. *Id.*

Taxpayers attacked the structure on the primary grounds that it was unconstitutional in
that "the statutory scheme [was] **in substance a borrowing of money by the Commonwealth**
without a vote, taken by the yeas and nays, of two thirds of each house of the General Court
present and voting." *Id.* at 888 (emphasis added). The Supreme Judicial Court of Massachusetts
agreed.

The court began by noting that, "[i]f the Commonwealth itself were to borrow on bonds
issued by it for the purpose of erecting an office building, this could be done only by a [two-
thirds] vote," and thus "[t]he question [was] whether this is substantially the situation presented
by the corporation created by [the statute at issue] and the contract of lease." *Id.* at 889 (internal
quotations marks omitted). Stated another way, the question was whether "this somewhat
elaborate statute created an entity sufficiently apart from the Commonwealth itself to avoid being
classified as 'colorable' or as a 'subterfuge to evade the [Commonwealth constitution] when the
scheme embodied in it is viewed as a whole []" *Id.*

The court concluded that, while the corporation was a separate legal entity that could
issue bonds and sue and be sued, "these attributes [were] not enough to meet the [taxpayers']
present constitutional challenge." *Id.* at 889. This was because, "viewing the project as a whole,
the [corporation was] **nothing more than a mere intermediary to carry out only one
purpose**." *Id.* (emphasis added). In this regard, the court observed that the corporation was not
like other municipal entities, which "exist for more than a single, temporary purpose" and
"perform services for others than the sovereign itself," acquiring "income from those for whom
their services are performed." *Id.* at 890. The court further observed that "[t]he statute and the

'contract of lease' which it permits, when scrutinized together, have all the earmarks of a State operation," including that "[t]he members of the [corporation] appear to be public officers." *Id*. at 892.

For these reasons, the court went on to hold that the statute at issue was unconstitutional and "void upon its face" because "[**t]o hold otherwise would be to exalt artifice above reality**." *Id*. (internal quotations marks omitted) (emphasis added). Indeed, "[t]he creation of the [corporation] to execute the 'contract of lease' [was] merely one phase of an integrated plan **of which the substantial result is constitutional evasion**." *Id*. (emphasis added).

Similarly, in *Cerajewsky v. McVey*, 72 N.E.2d 650 (Ind. 1947), a taxpayer challenged an Indiana statute that created a new and separate taxing district within each city over a certain size. *Id.* at 651. The only purpose of the new taxing district was to issue bonds to finance the construction of a technical-vocational high school in the city, even though the city could borrow the money directly subject to Indiana's constitutional limit on the incurrence of debt by political or municipal corporations. *Id.* at 650-51. The Indiana Supreme Court explained that "[i]n appraising the validity of the statute before us . . . , we must consider the purpose of the debt limitation section of the Constitution and must look through the form of the statute to the substance of what it does and we should not countenance subterfuge to evade the intent of our fundamental law." *Id.* at 652. The court went on to observe that

> the clear purpose of . . . the [Constitutional debt limit] was to prevent the creation of an excessive debt by a real limitation upon the power of the legislature to authorize indebtedness. If it may be circumvented by the simple device of creating new and additional political or municipal corporations in the same territory, each with separate and independent borrowing power, for the purpose of evading the constitutional prohibition, no real limitation upon the power of the legislature to authorize indebtedness is provided and the object of the constitutional provision is defeated.

*Id.* The court thus held that the statute was invalid as an unconstitutional evasion of Indiana's constitutional debt limit.

The COFINA structure is no less an evasion of Puerto Rico's Constitutional Debt Limits and Constitutional Debt Priority. COFINA, which is controlled exclusively by the directors of the GDB (who are also the directors of COFINA and who are appointed by the Governor), borrowed money from bondholders to pay the Commonwealth's debts and expenses, and it pays the bondholders with Commonwealth tax revenues diverted from the Commonwealth treasury. Bondholders have no recourse to assets other than SUT revenues. COFINA is a "mere intermediary," pure and simple. Any other conclusion would, in the words of the *Ayer* court, "exalt artifice above reality." If the Commonwealth can borrow money through such financing structures, there is "no real limitation upon the power upon the power of legislature to authorize indebtedness."

When a transaction violates the Puerto Rico constitution, it is "null and void." *Plaza Carolina Mall, L.P. v. Municipality of Barceloneta*, 91 F.Supp.3d 267, 290 (D.P.R. 2015) (holding that a contract between a municipality and a developer that purported to grant incentive payments funded from municipal SUT collections was illegal and thus null and void, with the result that the developer had no right to future payments and had to return funds already paid). Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C. § 2201(a) that the SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on deposit at BONY and any future SUT revenues) are (or will be if and when generated) the property of the Commonwealth because Act 91 is unconstitutional and void on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority. The Commonwealth Agent is also entitled to a declaration that the SUT revenues purportedly

transferred to COFINA (including all SUT revenues currently on deposit at BONY and any future SUT revenues) are (or will be if and when generated) the property of the Commonwealth because the purported transfer is unconstitutional and void on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority.

IV. **PURPORTED TRANSFER OF SUT REVENUES TO COFINA IS UNCONSTITUTIONAL AND VOID BECAUSE ACT 91 WAS ENACTED AND AMENDED IN VIOLATION OF CONSTITUTIONAL BALANCED BUDGET CLAUSE**

In its thirteenth cause of action, the Commonwealth Agent seeks a declaration that the transfer of SUT revenues to COFINA is unconstitutional and void for the additional reason that Act 91 (as amended to create the COFINA structure), was enacted and further amended in violation of the balanced budget clause in the Puerto Rico constitution (the "Balanced Budget Clause"). In February 1974, the GDB ran an advertisement in *Barron's* magazine touting the Balanced Budget Clause as a reason investors should feel comfortable buying Puerto Rico bonds. GDB Advertisement, Barron's Magazine, February, 1974 (Ex. 3). In a stunning gem of historical irony, the ad proclaimed that "[t]heir soundness as investments is underscored by a forthright and fundamental fact: that **deficit financing is specifically prohibited in the Constitution of the Commonwealth**." *Id.* (emphasis added). As the term implies, "deficit financing" is the practice of alleviating a budget deficit by borrowing money rather reducing expenses or increasing taxes. The constitutional prohibition of deficit financing should have been a good selling point, but what seemed a "forthright and fundamental fact" to the GDB in 1974 was forgotten or ignored with the creation of the COFINA structure in 2007.

In the English version of the Puerto Rico constitution approved by the U.S. Congress, Section 7 of Article VI provides that "[t]he appropriations made for any fiscal year shall not exceed the **total revenues**, including available surplus, estimated for said fiscal Year unless the

imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. Laws Ann.

Const. art VI, § 7 (emphasis added).

   The Spanish version of the constitution adopted by the Puerto Rico legislature uses the

term "recursos totales," which in English means "total **resources**," not "total **revenues**" (which

would be rendered "rentas totales" in Spanish).  During Puerto Rico's constitutional convention,

a delegate inquired (in Spanish) as to the meaning of the term "recursos totales."  Certified

Translation of Session Diary of the Constitutional Convention of Puerto Rico (Ex. 1), at 1090.

The question was taken up by the president of the drafting committee, who explained (in

Spanish) that "recursos totales" was meant to be broader than "total revenues," which was the

term used in the balanced budget clause of the Jones Act, which governed Puerto Rico until the

adoption of the Puerto Rico constitution.[10]  *Id*.  He further explained that "recursos totales" was

meant to include, among other things beyond tax revenues, the "issuance of bonds" (translated

from Spanish).  *Id*. at 1091.

   Thus, while the Spanish version of the constitution uses a term that is broader than "total

revenues" and was meant to include some form of bond proceeds, the English version uses "total

revenues" just like the Jones Act.  Since "revenues" does not include borrowings (which are a

form of expense when repaid), the constitutionality of deficit financing depends, as an initial

matter, on which version of the constitution controls.  The answer to that question is found in

Public Law 600 of June 4, 1951,which is the law by which the U.S. Congress "provide[d] for the

organization of a constitutional government by the people of Puerto Rico," and Public Law 447

---

[10] The Jones Act provided that "[n]o appropriation shall be made, nor any expenditure authorized by the legislature, whereby the expenditure of the Government of Porto Rico during any fiscal year shall exceed the **total revenue** then provided for by law and applicable for such appropriation or expenditure, including any available surplus in the treasury, unless the legislature making such appropriation shall provide for levying a sufficient tax to pay such appropriation or expenditure within such fiscal year."  Section 34 of Jones Act, ch. 145, 39 Stat. 951, 963 (1917) (emphasis added).

of July 3, 1952, which is the law by which the U.S. Congress approved the Puerto Rico

constitution conditional upon certain amendments not relevant here.

Public Law 600 provided that "[u]pon **approval by the Congress** the constitution shall

**become effective in accordance with its terms**." Public Law 600, 64 Stat. 319, 48 U.S.C. §

731d (1951) (emphasis added). Public Law 447 provided that:

> the constitution of the Commonwealth of Puerto Rico **hereby
> approved** [i.e., the English version] shall **become effective** when
> the Constitutional Convention of Puerto Rico shall have declared
> in a formal resolution its acceptance in the name of the people of
> Puerto Rico of the conditions of approval herein contained, and
> when the Governor of Puerto Rico, being duly notified by the
> proper officials of Constitutional Convention of Puerto Rico that
> such resolution of acceptance has been formally adopted, shall
> issue a proclamation to that effect.

Public Law 447, 66 Stat. 327-328 (1952) (emphasis added). Accordingly, the "terms" in

accordance with which the constitution became effective were the terms of the **English version**

approved by the U.S. Congress; not the Spanish version debated at the constitutional convention.

Even if the constitution had become effective in accordance with the terms of the Spanish

version, there would be no reason to interpret "recursos totales" to include long-term financing

of massive structural deficits through the issuance of bonds by "off balance sheet" special

purpose entities. If limited to general obligation bonds of the Commonwealth, any deficit

financing would at least be constrained by the otherwise applicable Constitutional Debt Limits.

If deficit financing through COFINA-like structures is allowed, the Balanced Budget Clause

truly has no meaning to speak of. In deciding to include the Balanced Budget Clause in Puerto

Rico's constitution, the delegates to the constitutional convention could not have intended to

leave the door open for unconstrained deficit financing that would eviscerate the purpose of

having such a clause in the first place.

The COFINA structure was initially created to finance the payment of the
Commonwealth's "extraconstitutional debt" existing as of June 30, 2006 (and the net proceeds of
COFINA's Series 2007A and B Bonds, Series 2007C Bonds, and Series 2008A Bonds were used
exclusively for that purpose). That "extraconstitutional debt" was debt of the Commonwealth
that was: (i) not backed by a pledge of the Commonwealth's full faith, credit, and taxing power;
(ii) incurred to finance Commonwealth operating expenses (and thus to finance budget deficits);
and (iii) subject to budgetary appropriation for payment (i.e., payment of the debt service was
subject to budgetary appropriation of funds for that purpose).



Thus, by retiring its extraconstitutional debt with the proceeds of COFINA bonds, the
Commonwealth freed itself from having to appropriate funds for the payment of such
extraconstitutional debt, thereby alleviating its budget deficit by reducing the "appropriations"
side of the budget equation. In other words, the Commonwealth "balanced its budget" (or
alleviated its budget deficit) by borrowing money to reduce appropriations rather than reducing
expenses or imposing "taxes sufficient to cover said appropriations." Moreover, because the
Commonwealth's extraconstitutional debt was incurred to pay general Commonwealth operating
expenses that the Commonwealth could not afford to pay from its "total revenues," the payment

of such debt with COFINA bond proceeds simply refinanced the Commonwealth's prior deficit financing, replacing Commonwealth "subject to appropriation" debt with COFINA bond debt. The Commonwealth accumulated this extraconstitutional debt because, for years, the Puerto Rico Legislative Assembly "failed to take the necessary measures to establish a **balanced budget** [i.e., a budget balanced without borrowing]." Act 1-2009 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph (emphasis added).

In 2009, Act 91 was amended to expand the permitted uses of COFINA bond proceeds to include the direct payment of general Commonwealth operating expenses that could not be paid from recurring revenues, i.e., direct deficit financing. Act 1-2009. As former Puerto Rico Governor Acevedo Vilá remarked: "What [former GDB President] Alfredo [Salazar] and I designed to pay old debt, became an instrument to finance annual operating deficits." Luis Ortiz, *Cofina and GO Creditors Wage War*, CARIBBEAN BUS., dated Feb. 2, 2017 (Ex. 18). Accordingly, the Commonwealth Agent is entitled to a declaration pursuant to 28 U.S.C § 2201(a) that the SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on deposit at BONY and any future SUT revenues) are the property of the Commonwealth because Act 91 (as amended to create the COFINA structure) was enacted and further amended in violation of the Balanced Budget Clause and thus is unconstitutional on its face. The Commonwealth Agent is also entitled to a declaration that the SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on deposit at BONY and any future SUT revenues) are the property of the Commonwealth because the purported transfer was made in violation of Puerto Rico's Balanced Budget Clause and thus is unconstitutional on its face.

WHEREFORE, for the foregoing reasons, the Commonwealth Agent respectfully requests that the court enter the attached Proposed Order granting summary judgment in its favor on all in-scope claims, issuing the declarations requested above, and declaring that the SUT revenues purportedly transferred to COFINA, including any future SUT revenues and the revenues currently on deposit at BONY, are (or will be if and when generated) the property of the Commonwealth under applicable law.

Dated: February 21, 2018          /s/ Luc A. Despins
       San Juan, Puerto Rico

PAUL HASTINGS LLP
Luc. A. Despins, Esq. *(Pro Hac Vice)*
James R. Bliss, Esq. *(Pro Hac Vice)*
James B. Worthington, Esq. *(Pro Hac Vice)*
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*
200 Park Avenue
New York, New York 10166
Telephone: (212) 318-6000
lucdespins@paulhastings.com
jamesbliss@paulhastings.com
jamesworthington@paulhastings.com
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured*
*Creditors for all title III Debtors (except for COFINA),*
*as Commonwealth Agent*

- and –

/s/ Juan J. Casillas Ayala

CASILLAS, SANTIAGO & TORRES LLC
Juan J. Casillas Ayala, Esq., USDC - PR 218312
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710
Ericka C. Montull-Novoa, Esq., USDC - PR 230601
El Caribe Office Building
53 Palmeras Street, Ste. 1601
San Juan, Puerto Rico 00901-2419
Telephone: (787) 523-3434
jcasillas@cstlawpr.com
dbatlle@cstlawpr.com
aaneses@cstlawpr.com
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured*
*Creditors for all title III Debtors (except for COFINA),*
*as Commonwealth Agent*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

------------------------------------------------------------------------x

|  |  |
|---|---|
| In re: | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : PROMESA<br>: Title III |
|  | : |
| as representative of | : Case No. 17-BK-3283 (LTS) |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, *et al.,* | : (Jointly Administered) |
|  | : |
| Debtors.[11] | : |

------------------------------------------------------------------------x

|  |  |
|---|---|
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | :<br>: Adv. Proc. No. 17-00257-LTS |
|  | : |
| as agent of | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : |
|  | : |
| as representative of | : |
|  | : |
| THE COMMONWEALTH OF PUERTO RICO, | : |
|  | : |
| Plaintiff, | : |
|  | : |
| v. | : |
|  | : |
| BETTINA WHYTE, | : |
|  | : |
| as agent of | : |
|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : |

------

[11] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17-4780 (LTS)) (Last Four Digits of Federal Tax ID: 3747)

BOARD FOR PUERTO RICO,       :
               :
    as representative of     :
               :
THE PUERTO RICO SALES TAX FINANCING  :
CORPORATION,         :
               :
    Defendant.       :
-----------------------------------------------------------------------x

## ORDER ON COMMONWEALTH AGENT'S MOTION FOR SUMMARY JUDGMENT

   The court, having considered the Commonwealth Agent's Motion for Summary Judgment and Incorporated Memorandum of Law (the "Motion")[12] pursuant to Fed. R. Civ. P. 56 and Fed. R. Bankr. P. 7056 and the Commonwealth Agent's accompanying papers and pleadings, any oppositions thereto, and argument thereon, and good cause having been shown, it is hereby ORDERED that:

   1.   The Motion is GRANTED;

   2.   The court shall enter judgment in favor of the Commonwealth Agent on all in-scope claims, including its first, second, twelfth, and thirteenth causes of action, the COFINA Agent's first cause of action, and the COFINA Intervenors' first causes of action (except Ambac's, which is out of scope);

   3.   The court hereby declares and shall enter a declaratory judgment to the effect that Act 91 did not transfer present ownership of future SUT revenues to COFINA;

   4.   The court hereby declares and shall enter a declaratory judgment to the effect that Act 91 did not assign to COFINA the Commonwealth's "right to receive" future SUT revenues;

   5.   The court hereby declares and shall enter a declaratory judgment to the effect that SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on

---

[12]   Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

deposit at BONY and all future SUT revenues) are the property of the Commonwealth because (i) Act 91 is unconstitutional on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority, and (ii) the purported transfer is unconstitutional on its face as an evasion of the Constitutional Debt Limits and Constitutional Debt Priority;

6. The court hereby declares and shall enter a declaratory judgment to the effect that the SUT revenues purportedly transferred to COFINA (including all SUT revenues currently on deposit at BONY and all future SUT revenues) are the property of the Commonwealth because (i) Act 91 was enacted and amended in violation of the Constitutional Balanced Budget Clause and thus is unconstitutional on its face, and (ii) the purported transfer was made in violation of Puerto Rico's Constitutional Balanced Budget Clause and thus is unconstitutional on its face;

7. The court hereby declares and shall enter a declaratory judgment to the effect that the SUT revenues purportedly transferred to COFINA, including any future SUT revenues and the revenues currently on deposit at BONY, are (or will be if and when generated) the property of the Commonwealth under applicable law; and

8. The court shall retain jurisdiction to hear and determine all matters arising from the implementation of this Order.


Dated: _____, _____, 2018


_____
LAURA TAYLOR SWAIN
United States District Judge

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

---------------------------------------------------------------------- x

In re:

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

        as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

        Debtors.[1]

:
:
:
:
:
:
:
:
:
:
:
:

PROMESA
Title III

Case No. 17-BK-3283 (LTS)

(Jointly Administered)

---------------------------------------------------------------------- x

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF PUERTO
RICO,

        as agent of

THE FINANCIAL OVERSIGHT AND MANAGEMENT
BOARD FOR PUERTO RICO,

        as representative of

THE COMMONWEALTH OF PUERTO RICO,

        Plaintiff,

v.

BETTINA WHYTE,

        as agent of

:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:
:

Adv. Proc. No. 17-257 (LTS)

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : |
|  | : |
| as representative of | : |
|  | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|  | : |
| Defendant. | : |

------------------------------------------------------------------------ x

### STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56 of the Local Rules for the District of Puerto Rico, made applicable to this case by Rule 1001-1(d) of the Local Bankruptcy Rules for the District of Puerto Rico, the Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA), as the "Commonwealth Agent" with respect to the "Commonwealth-COFINA Dispute," as defined in the Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute [Case No. 17-03283-LTS, Dkt. No. 996], respectfully submits the following statement of undisputed material facts (the "Statement") in support of its motion for summary judgment and incorporated memorandum of law (the "Motion"). The following facts are undisputed and material for summary judgment purposes:

1. COFINA was created by the Puerto Rico Legislature pursuant to Act 91 of 2006, as amended by Act 56 of 2007 (as so amended and further amended, "Act 91"). Act 91-2006; Act 56-2007. According to Act 91, COFINA is a public corporation and instrumentality of the Commonwealth that is independent and separate from the Commonwealth but "attached" to the Government Development Bank for Puerto Rico ("GDB"). P.R. Laws Ann. tit. 13, §§ 11a(a) and (e). The directors of the GDB, who are appointed by the Governor, are also the directors of COFINA. *Id*. § 11a(c); 7 L.P.R.A. 552, seventh unnumbered paragraph.

2.    Originally, COFINA was authorized pursuant to Act 91 to issue bonds to pay the
Commonwealth's "extraconstitutional debt" existing as of June 30, 2006 (and the net proceeds of
COFINA's Series 2007A and B Bonds, Series 2007C Bonds, and Series 2008A Bonds were used
exclusively for that purpose).  Act 91-2006, Statement of Motives, first unnumbered paragraph;
Act 291-2006 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph; Act
56-2007 (adding a new section 2 to Act 91-2006).[2]  That "extraconstitutional debt" was debt of
the Commonwealth that was: (i) not backed by a pledge of the Commonwealth's full faith,
credit, and taxing power; (ii) incurred to finance Commonwealth operating expenses, and (iii)
subject to budgetary appropriation for payment (i.e., payment of the debt service was subject to
budgetary appropriation of funds for that purpose).  *Id.*  That "extraconstitutional debt" was
incurred by the Commonwealth to finance budget deficits and included debt resulting from
advances made by the GDB to the Commonwealth for deficit financing.  *Id.*

3.    Subsequent amendments to Act 91 authorized COFINA to use its bond proceeds
to pay additional Commonwealth debts and operating expenses and, in the words of the statute,
to "nourish" certain Commonwealth economic development and emergency relief funds.  P.R.
Laws Ann. tit. 13 § 11a(b)(8)-(11).  That additional Commonwealth debt included additional
debt incurred to finance budget deficits.  *Id*. at § 11a(b)(2)..  That additional debt was payable
from budgetary appropriations of the Commonwealth or future issuances of Commonwealth
general obligation ("<u>GO</u>") bonds (or was debt for which there was no specified repayment
source).  P.R. Laws Ann. tit. 13 § 11(a)(b)(2)-(12).  The additional uses of COFINA bond
proceeds authorized in 2009 were necessitated by "eight years during which the Executive

---

[2]

Branch failed to take the necessary measures to establish a balanced budget" and "the magnitude of the budgetary deficit for fiscal year 2008-2009 and the projected deficits for the subsequent three fiscal years." Act 1-2009 (amending Act 91-2006), Statement of Motives, first unnumbered paragraph and second unnumbered paragraph. Similarly, the additional uses of COFINA bond proceeds authorized in 2013 were "[f]or the purpose of financing the deficits incurred these past three years, among other purposes." Act 116-2013 (amending Act 91-2006), Statement of Motives, third unnumbered paragraph.

4.      COFINA is authorized to issue bonds that are payable from, and secured by, a specified portion of the sales and use tax ("SUT") imposed directly by the Commonwealth (as distinct from the SUT levied by municipalities under authorization from the Commonwealth). P.R. Laws Ann. tit. 13, § 11a(c). The specified portion of the SUT is deposited in a fund known in English as the "Dedicated Sales Tax Fund." *Id*. § 11a(c). The SUT was first imposed by the Commonwealth pursuant to Act 117 of 2006, which amended the Puerto Rico Internal Revenue Code of 1994. Act 56-2007, Statement of Motives, first unnumbered paragraph. The SUT continues to be imposed by the Commonwealth pursuant to the Puerto Rico Internal Revenue Code of 2011, which replaced the Puerto Rico Internal Revenue Code of 1994. Act 1-2011.

5.      The SUT is a general sales and use tax applicable to a range of goods and services. *See* P.R. Laws Ann. tit. 13 § 32021. All Commonwealth SUT revenues are collected by the Commonwealth or a collection agent acting on its behalf. *Id*. §§ 32021-32031 (providing for the collection of SUT). COFINA has no taxing power and is not authorized to levy, collect, or enforce any portion of the SUT. *Id*. § 11a(e); P.R. Laws Ann. tit. 7 § 552. Act 91 provides that the portion of the SUT revenues specified for COFINA "shall be directly deposited in [the Dedicated Sales Tax Fund] at the time of receipt and shall not be deposited in the Treasury of

Puerto Rico, nor shall these constitute resources available to the Commonwealth of Puerto Rico,

nor shall these be available for the use by the Secretary of the Treasury of the Commonwealth of

Puerto Rico."  P.R. Laws Ann. tit. 13  § 12.

6.      Pursuant to Act 56-2007, Act 91 was amended to provide that "[The Dedicated

Sales Tax Fund] and all the funds deposited therein on the effective date of this act and all the

future funds that must be deposited in the [Dedicated Sales Tax Fund] pursuant to the provisions

of [this Act] are hereby transferred to, and shall be the property of COFINA."  *Id.* § 14(c).

7.      In each fiscal year, the first collections of the SUT are deposited in the Dedicated

Sales Tax Fund up to a specified amount.  *Id.* § 12(a).  Once that amount has been reached, SUT

collections are deposited in the Commonwealth general fund up to a specified amount.  *See*

Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2011C Official

Statement (Ex. 10), at 15-16 (December 7, 2011).  Once that specified amount has been reached,

additional SUT collections are split 50/50 between the Commonwealth and COFINA.  *Id.*

8.      If, in a given fiscal year, the SUT revenues deposited in the Dedicated Sales Tax

Fund are insufficient to pay debt service on the COFINA bonds, more of the SUT revenues

(which would otherwise flow to the Commonwealth) must be transferred to the Dedicated Sales

Tax Fund in the next fiscal year to make up for the insufficiency.  P.R. Laws Ann. tit. 13 § 14(d).

If any SUT revenues remain in the Dedicated Sales Tax Fund after all COFINA bonds have been

repaid, COFINA is authorized to return those revenues to the Commonwealth and is not

authorized to use them for any other purpose.  P.R. Laws Ann. tit. 13 § 13(c); *see* P.R. Laws

Ann. Tit. 13 §§ 11a(b) and (d).

9.      Act 91 provides that the Commonwealth's non-impairment covenants "do not

limit the power of the Commonwealth of Puerto Rico, by means of a law or amendment, to limit

or restrain the nature or the amount of such [SUT] or other revenues or to substitute similar or comparable collateral [in the form of] other taxes, fees, charges or other income to be deposited into the [Dedicated Sales Tax Fund] if, for the following fiscal years, the revenues projected by the Secretary of the Treasury from such substitutive tax, income or collateral is equal to or greater than the service of the debt and other charges and any coverage requirement included in the COFINA bond authorizing documents."  P.R. Laws Ann. tit. 13 § 14(c).  Act 91 further provides that nothing in Act 91 "shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico."  *Id*. § 16(a).

10.     COFINA has issued in excess of $16 billion of bonds.  Commonwealth of P.R., Fin. Info. & Operating Data Report, dated Dec. 18, 2016 (Ex. 17), at 182.  The Official Statement for each series of COFINA bonds included the following risk disclosure:

> Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended.  Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 [now a provision of the tax code], which imposes the [SUT].

11.     *See, e.g.*, Puerto Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A Official Statement, dated July 13, 2007 (Ex. 6), at 23.

12.     In its opinion letter dated December 13, 2011, COFINA's bond counsel, Nixon Peabody LLP, noted that "Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico . . . [and] [t]hus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it

6

entirely." *See* Op. of Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 10.  The opinion

letter also noted that this fact had been "clearly disclosed" to bondholders.  *Id.*

13.     The legal opinions rendered in connection with the issuance of COFINA bonds

refer to a transfer of the Commonwealth's "right to receive" future tax revenues, opining without

analysis that this purported transfer was "valid."  *See* Op. of the P.R. Dep't of Justice, dated Dec.

13, 2011 (Ex. 13), at 2 ("Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to

receive collections of the Dedicated Sales Tax, is validly transferred to [COFINA]."); Op. of

Nixon Peabody LLP, dated Dec. 13, 2011 (Ex. 11), at 11 ("Act 91 validly transfers the Pledged

Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to

[COFINA]."); Op. of Pietrantoni Mendez & Alvarez LLC, dated Dec. 13, 2011 (Ex. 12), at 8

("Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the

Commonwealth's right to receive the Pledged Sales Tax, to [COFINA].").

14.     On October 31, 2013, the GDB arranged an unprecedented public conference call

to allow investors to directly question COFINA's bond counsel about their prior opinions.

Government Development Bank, Conference Call About COFINA Legal Opinions, dated Oct.

31, 2013 (Ex. 15).  During that call, one investor asked:  "[A]re we correct to assume that risk of

materially negatively altering the COFINA structure via legislative action is very low?"  *Id.* at

10.  The answer started with a "yes" but was quickly qualified with the frank acknowledgment

that "[f]uture legislatures could take action if deemed appropriate."  *Id.*

15.     In October 2013, the Puerto Rico Legislature amended Act 91 to increase the

portion of future Commonwealth SUT revenues purportedly transferred to COFINA so as to

allow for the issuance of additional COFINA bonds.  *See* Act 72-2014, Statement of Motives,

first unnumbered paragraph.  In July 2014, the Puerto Rico Legislature amended the 2013

7

amendment to suspend the increase in future SUT revenues purportedly "transferred" to

COFINA nine months earlier. Act 72-2014. The "Statement of Motives" for the 2014

amendment offered the following rationale for the Legislature's action:

> As the GDB has publicly stated, neither [the Commonwealth] nor
> its instrumentalities, including COFINA, intend to tap into the
> stock market through a bond issue during this fiscal year. In light
> of this situation, the Legislative Assembly deems it prudent that
> the General Fund receives the Sales and Use Tax revenues
> transferred to COFINA under [the 2013 amendment], until such
> revenues are needed to repay any bond or note issued by COFINA
> in the future. When that time comes, the transfer to COFINA of
> the Sales and Use Tax revenues and the use therefor contemplated
> under [the 2013 amendment] shall be effective.

*Id.* at second unnumbered paragraph.

16.     Similarly, two years later, the Puerto Rico Legislative Assembly passed Act 84 of

2016, which reduced the portion of the SUT revenues purportedly transferred to COFINA from

6% to 5.5% and allocated the 0.5% differential to a specific fund for the benefit of

municipalities. Certified Translation of Act 84-2016 (Ex. 16). Most recently, Governor Rosselló

signed an executive order exempting an estimated 60,000 small and midsize businesses from

collecting and remitting SUT revenues from November 20 through December 31, 2017.

Certified Translation of E.O. 2017-068 (Ex. 19), 1st Section.

17.     At all relevant times, in their respective financial statements, the Commonwealth

and COFINA both accounted for the purported transfer of Commonwealth SUT revenues to

COFINA as a pledge of collateral to secure a "collateralized borrowing" by the Commonwealth

and not as a "sale" of such revenues to COFINA. ████████████████████

████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████████████



19. In February 1974, the GDB ran an advertisement in *Barron's* magazine touting the Balanced Budget Clause as a reason investors should feel comfortable buying Puerto Rico bonds. GDB Advertisement, Barron's Magazine, February, 1974 (Ex. 3). The add stated that "[t]heir soundness as investments is underscored by a forthright and fundamental fact: that deficit financing is specifically prohibited in the Constitution of the Commonwealth." *Id.*



21.     Former Puerto Rico Governor Acevedo Vilá remarked:  "What [former GDB President] Alfredo [Salazar] and I designed to pay old debt, became an instrument to finance annual operating deficits."  Luis Ortiz, *Cofina and GO Creditors Wage War*, CARIBBEAN BUS., dated Feb. 2, 2017 (Ex. 18).


[*Remainder of page left intentionally blank*]

WHEREFORE, the Commonwealth Agent respectfully requests that the foregoing facts

be deemed undisputed and that summary judgment be entered in its favor.

Dated:  February 21, 2018  
      San Juan, Puerto Rico

*/s/ Luc A. Despins*

PAUL HASTINGS LLP  
Luc. A. Despins, Esq. *(Pro Hac Vice)*  
James R. Bliss, Esq. *(Pro Hac Vice)*  
James B. Worthington, Esq. *(Pro Hac Vice)*  
G. Alexander Bongartz, Esq. *(Pro Hac Vice)*  
200 Park Avenue  
New York, New York 10166  
Telephone:  (212) 318-6000  
lucdespins@paulhastings.com  
jamesbliss@paulhastings.com  
jamesworthington@paulhastings.com  
alexbongartz@paulhastings.com

*Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors (except COFINA), as Commonwealth Agent*

- and –

*/s/ Juan J. Casillas Ayala*

CASILLAS, SANTIAGO & TORRES LLC  
Juan J. Casillas Ayala, Esq., USDC - PR 218312  
Diana M. Batlle-Barasorda, Esq., USDC - PR 213103  
Alberto J. E. Añeses Negrón, Esq., USDC - PR 302710  
Ericka C. Montull-Novoa, Esq., USDC - PR 230601  
El Caribe Office Building  
53 Palmeras Street, Ste. 1601  
San Juan, Puerto Rico 00901-2419  
Telephone: (787) 523-3434  
jcasillas@cstlawpr.com  
dbatlle@cstlawpr.com  
aaneses@cstlawpr.com  
emontull@cstlawpr.com

*Local Counsel to the Official Committee of Unsecured Creditors for all Title III Debtors (except COFINA), as Commonwealth Agent*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF PUERTO RICO

--------------------------------------------------------------------- x

|   |   |   |
|---|---|---|
| In re: | : | |
| | : | |
| | : | |
| THE FINANCIAL OVERSIGHT AND | : | PROMESA |
| MANAGEMENT BOARD FOR PUERTO RICO, | : | Title III |
| | : | |
| as representative of | : | Case No. 17-BK-3283 (LTS) |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | : | (Jointly Administered) |
| | : | |
| Debtors.[1] | : | |

--------------------------------------------------------------------- x

|   |   |   |
|---|---|---|
| | : | |
| THE OFFICIAL COMMITTEE OF UNSECURED | : | |
| CREDITORS OF THE COMMONWEALTH OF PUERTO | : | |
| RICO, | : | |
| | : | |
| | : | |
| as agent of | : | |
| | : | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT | : | |
| BOARD FOR PUERTO RICO, | : | |
| | : | Adv. Proc. No. 17-257 (LTS) |
| as representative of | : | |
| | : | |
| THE COMMONWEALTH OF PUERTO RICO, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| BETTINA WHYTE, | : | |
| | : | |
| as agent of | : | |

---

[1] The Debtors in these title III cases, along with each Debtor's respective title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17-BK-3283 (LTS)) (Last Four Digits of Federal Tax ID: 3481), (ii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17-BK-3566(LTS)) (Last Four Digits of Federal Tax ID: 9686), (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17-BK-3567 (LTS)) (Last Four Digits of Federal Tax ID: 3808), (iv) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17-BK-3284 (LTS)) (Last Four Digits of Federal Tax ID: 8474), and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

|  | : |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | : |
|  | : |
| as representative of | : |
|  | : |
| THE PUERTO RICO SALES TAX FINANCING CORPORATION, | : |
|  | : |
| Defendant. | : |

------------------------------------------------------------------------- x

## DECLARATION OF NICHOLAS A. BASSETT IN SUPPORT OF COMMONWEALTH AGENT'S MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW

I, NICHOLAS A. BASSETT, hereby declare pursuant to 28 U.S.C. § 1746 as follows:

1.     I am Of Counsel with the law firm Paul Hastings LLP, co-counsel to the Official Committee of Unsecured Creditors of all title III Debtors (other than COFINA), as the "Commonwealth Agent" with respect to the "Commonwealth-COFINA Dispute," as defined in the "Commonwealth-COFINA Dispute Stipulation" [17-03283-LTS, Dkt. No. 996], in the above-captioned adversary proceeding.

2.     I submit this declaration in support of the Commonwealth Agent's Motion for Summary Judgment and Incorporated Memorandum of Law. Capitalized terms not defined herein shall have the meanings ascribed to them in the Motion.

3.     Attached to this declaration as Exhibit 1 is a true and correct copy of a certified translation of an excerpt from the Session Diary of the Constitutional Convention of Puerto Rico.

4.     Attached to this declaration as Exhibit 2 is a true and correct copy of a certified translation of the Commonwealth of Puerto Rico, Daily Sessions Record Vol. XIV - No. 27, Senate of Puerto Rico, Tuesday, September 5, 1961.

5.      Attached to this declaration as Exhibit 3 is a true and correct copy of an

advertisement for the Government Development Bank for Puerto Rico published in *Barron's*

Magazine, dated February 1974.

6.      Attached to this declaration as Exhibit 4 is a true and correct copy of Statement

No. 48 of the Governmental Accounting Standards Board, dated September 2006.

7.      ██████████████████████████████████

███████████████████████████████████████████████

8.      Attached to this declaration as Exhibit 6 is a true and correct copy of the Puerto

Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2007A Official

Statement, dated July 13, 2007.

9.      ███████████████████████████████████████

███████████████████████████████████████████████

██████████████████████

10.     ██████████████████████████████████

█████████████████████████████████████████████

████████████████████████

11.     █████████████████████████████████

█████████████████████████████████████████████

███████████████████████

12.     Attached to this declaration as Exhibit 10 is a true and correct copy of the Puerto

Rico Sales Tax Financing Corporation, Sales Tax Revenue Bonds, Series 2011C Official

Statement, dated December 1, 2011.

13.     Attached to this declaration as Exhibit 11 is a true and correct copy of Nixon
Peabody LLP's Special Opinion regarding Puerto Rico constitutional matters delivered pursuant
to Sections 7(d)(viii) and 7(d)(xi) of each of the Contracts of Purchase, dated December 13,
2011.

14.     Attached to this declaration as Exhibit 12 is a true and correct copy of Pietrantoni,
Mendez & Alvarez LLC's Opinion regarding the Puerto Rico Sales Tax Financing Corporation
$1,006,474,702 Sales Tax Revenue Bonds, Senior Series 2011C, dated December 13, 2011.

15.     Attached to this declaration as Exhibit 13 is a true and correct copy of the Puerto
Rico Department of Justice Opinion concerning the issuance by Puerto Rico Sales Tax Financing
Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales Tax Revenue
Bonds, Senior Series 2011D, dated December 13, 2011.

16.     ███████████████████████████████████

██████████████████████████████████████████████

████████████████████████

17.     Attached to this declaration as Exhibit 15 is a true and correct copy of the
Transcript of the Conference Call about COFINA Legal Opinions hosted by the Government
Development Bank for Puerto Rico, dated October 31, 2013.

18.     Attached to this declaration as Exhibit 16 is a true and correct copy of a certified
translation of Act 84, dated July 22, 2016.

19.     Attached to this declaration as Exhibit 17 is a true and correct copy of the
Commonwealth of Puerto Rico's Financial Information & Operating Data Report, dated
December 18, 2016.

20.     Attached to this declaration as Exhibit 18 is a true and correct copy of an article

by Luis J. Valentín Ortiz titled "Cofina and GO Creditors Wage War" published by *Caribbean*

*Business*, dated February 2, 2017.

21.     Attached to this declaration as Exhibit 19 is a true and correct copy of the

certified translation of Executive Order 2017-068, dated September 17, 2017.



22.

23.

I declare under penalty of perjury that the foregoing is true and accurate to the best of my

knowledge and belief.

Dated:  February 21, 2018                    */s/ Nicholas A. Bassett*
        San Juan, Puerto Rico

                                             PAUL HASTINGS LLP
                                             Nicholas A. Bassett, Esq. (*Pro Hac Vice*)

                                             200 Park Avenue
                                             New York, New York 10166
                                             Telephone:  (212) 318-6000
                                             nicholasbassett@paulhastings.com

Case 17-00257-LTS Doc#524-1 Filed 02/21/18 Entered 02/21/18 23:53:00 Desc:
Exhibit 1 Page 175 of

**EXHIBIT 1**

Mr. GARCIA MENDEZ: If my colleague forgives me, it seems that he has not read, or perhaps, the phrase "the items consigned in the latest laws will govern during said fiscal year" has gone unnoticed by my colleague. This is not a matter of law. They are already in effect because [the program] was not approved, the appropriations were already approved. It is a matter of how these expenses are implemented. And that is why it is said: Until the Legislative Assembly meets to approve the new appropriations, the Governor will authorize the disbursements ... of what? Of those appropriations that automatically re-apply because the Legislative [Assembly] has not approved the appropriations of that fiscal year that ended. Do you notice what the section says? It is not that the Legislative [Assembly] does not have it. It is already approved automatically. This is the same provision of the Organic Charter, colleague, that when a budget is not approved the one from the previous year continues to apply, except that here it is made more extensive to special laws and not to the budget alone. Anyway, I wanted to call to my colleague's attention that which is covered in the section.

Mr. MUÑOZ RIVERA: If my colleague's amendment has only those purposes, I withdraw my opposition.

Mr. PRESIDENT: Those who are in favor of approving the amendment will say yes ... Against, say no ... Approved.

I would like to draw the delegates' attention to the following parliamentary situation: When a delegate is speaking and gives up the floor to another, he is giving up his time, and therefore all the time the other delegate uses is charged to the first one who gave it up.

The Presidency will not intervene if it is for a question or not. The delegate who obtained the time will then have to see if he is going to be giving up his time or not, but it is not understood that because he gave it up then it is not charged [to him] and then that becomes two turns.

Any other amendment to article 19?

Mr. GAZTAMBIDE ARRILLAGA: An amendment, Mr. President ...

Mr. PRESIDENT: Mr. Delegate.

Mr. GAZTAMBIDE ARRILLAGA: On page 7, line 10, where it says: "When at the end of a fiscal year the necessary appropriations for the ordinary expenses of government operation have not been approved," where it says "of ", it should say " of the" government. It's more like an amendment of style.

Mr. PRESIDENT: An amendment of style. Is there an objection? Approved
Any other amendment to article 19? If there is not, we move on to 20.

Mr. SECRETARY: "Article 20.- Appropriations made for one fiscal year may not exceed the total resources calculated for that fiscal year, unless provided for by law during the same legislative session

1088

for the imposition of sufficient taxes to cover said appropriations. "

Mr. GELPI: Mr. President ...

Mr. PRESIDENT: Mr. Delegate...

Mr. GELPI: Mr. President, delegates: The amendment that I propose is the following one: on page 7, lines 18, 19 and 20, put a period after the word, the phrase, "fiscal year", and remove the following: "unless provided for by law during the same legislative session for the imposition of sufficient taxes to cover said appropriations". Article 20 would then be worded as follows: "The appropriations made for one fiscal year may not exceed the total resources calculated for said fiscal year". Can I argue?

Mr. PRESIDENT: The delegate has the floor.

Mr. GELPI: Mr. President and delegates: These phrases that have been put in here, which I have asked to be deleted, imply that at any moment the legislature is at the mercy of excessive expenses or excessive calculations that may be included in the so-called budget, or as it is now called here spending program or government program. Undoubtedly what is wanted with those phrases that I have asked to be eliminated, is to give an opportunity to waste the money of the people, making appropriations higher and greater than the revenue that the government may have, which would be a bad economic policy. This Constituent Assembly must coincidently put a stop to this type of situation because in any other article-and surely there is such, and there will be in the constitution-in cases of emergency, in any other case in which the Government needs money to cover the current appropriations and cannot, there will be means to do so. But it is not possible, Mr. President and delegates, that a current one year budget with revenue allocations, can be increased more, the expenses can be increased more or made so excessive that it is necessary to impose more taxes on the tax body of Puerto Rico, which is already quite over-loaded with taxes. Maybe this is why the so-called tax is what is now ... "scientific tax"; perhaps what is to come with the scientific tax is hiding here, in these phrases. This is why this Constituent Assembly must limit the legislature not to exceed in expenses because that would constitute a bad economic policy. It would be to show the people that the government begins by corrupting the custom that those men should only spend what they produce and no more than what they produce.

Mr. GUTIERREZ FRANQUI: Let there be a vote.

Mr. PRESIDENT: Any debate? If there is not, the delegate Mr. Gelpí's amendment is put to the vote. Those who are in the affirmative, will say yes ... Against, no.

1089

Mr. GUTIERREZ FRANQUI: Mr. President ...

Mr. PRESIDENT: The Presidency has doubts. Those who are in the affirmative will be so kind as to stand up. Those who are against, will stand up to vote ... the amendment is defeated.

Mr. RIVERA COLON: Mr. President ...

Mr. GUTIERREZ FRANQUI: Mr. President: For a question.

Mr. PRESIDENT: Mr. Delegate.

Mr. GUTIERREZ FRANQUI: Mr. President, before considering the formulation of an amendment, I would like to ask a question to the president of the commission that reported this substitute proposal. We would like the President of the Commission to answer, for the [record], what the commission understands, what does the phrase, "the total resources calculated for said fiscal year" mean. On page 7, lines 17 and 18.

Mr. NEGRON LOPEZ: I can answer the question. Reading in order to see the difference in the text-the corresponding provision of the Jones Act, I read from Article 34 of the Jones Act, the last paragraph: "The Legislative Assembly shall not make any appropriation or authorize any expense under which or of which the expenditures of the Government of Puerto Rico, during any fiscal year, exceed the total revenue provided at that time by law, and applicable to said appropriation or expense, including any surplus available in the Treasury, unless the Legislature, when making said appropriation, provides for the imposition of a sufficient tax to pay the aforementioned appropriation or expense within said fiscal year ".

The concept of "total revenue" that appears in the Jones Act expresses the idea that existed at the time this law was passed, that the government's resources consisted of the tax revenues and the surplus that could exist from previous fiscal years. However, in modern finance, I say, in the finances of the year 1951, this term of total revenue, no longer covers everything that encompasses the total resources of the government. The total resources include the tax or total revenues of a general nature or of a special nature. They also include any surplus that may exist from fiscal years, from previous fiscal years; it includes non-tax income such as the proceeds from the sale of property, royalties, or royalties from public corporations made to the State, surpluses from benefits obtained by public corporations, federal grants, so-called federal grant [in] aids, and the resources that are generated by issuing bonds, which is one of the ways that the State has to raise funds for the development of its program.

So, the phrase, "total calculated resources", are those resources that are already known, because it is known what they will be, such as federal aid, such as fixed income, such as a surplus, etc.; and those calculated, those that depend on the product of the taxes and other factors, that cannot be foreseen at the beginning of the fiscal year.

Mr. GUTIERREZ FRANQUI: There is no amendment, Mr. President.

Mr. RIVERA COLON: Mr. President.

Mr. PRESIDENT: Mr. Delegate.

Mr. RIVERA COLON: I would like to ask a question to the President of the Legislative Commission. I want the President of the Commission to explain to me the scope of this sentence, of these words: "imposition of taxes". That is, from article 20. Does it means that when all the resources are exhausted, then taxes can be imposed to cover any deficit that exists in the budget items? I say, these words the "imposition of taxes". I want the President to give me an explanation. I understand that the taxation is based on excise taxes, based on using the borrowing margin, based on increasing the revenue tax items; give me an explanation on this specific point of taxation, or whether it would be better to clarify that situation.

Mr. NEGRON LOPEZ: I mean, the intention ... of course, it seems to me that the Style Committee should, choosing the product of this deliberation, record the words that clarify, that express the concept with the clarity with which it is desired.

The intention that the commission has had is that after considering all the resources that are estimated or calculated for a fiscal year if the legislature wants to provide for appropriations beyond these resources, that is, after considering any bond issuances, after considering the federal aid, after considering the tax and non-tax income that exists ...

Mr. RIVERA COLON: (Interrupting) I understand, I want to understand, that as much as possible all the resources available to the government will be used and then, when all those resources are finished, we can go to the imposition of taxes.

Mr. NEGRON LOPEZ: Absolutely.

Mr. RIVERA COLON: Thank you very much.

Mr. NEGRON LOPEZ: Absolutely.

Mr. PRESIDENT: Any other amendment to article 20?

Mr. GELPI: For an amendment.

Mr. PRESIDENT: Mr. Delegate.

Mr. IRIARTE: Mr. President.

Mr. MUÑOZ RIVERA: Mr. President.

1091

Mr. PRESIDENT: I give the floor to the delegate, Mr. Gelpi.

Mr. GELPI: In Article 20, page 7, line 17, after the word "exceed", on line 17, insert, "90 percent". Then it would say: "The appropriations made for a fiscal year cannot exceed 90 percent of the total resources calculated for said fiscal year", etc., etc. And I will argue briefly.

Mr. PRESIDENT: The delegate has the floor.

Mr. GELPI: The logical thing is that the way the provision of article 20 is drafted, all the revenue calculated for the government can be spent in one fiscal year and, as the President of the Commission explained now, all the resources that could be used up could be exhausted before taxes, why is it not better to be thrifty, and instead of making an allowance to spend all resources, leave even a margin for any emergency, such as 10 percent of the total amount of revenue calculated to form the budget, that is, the government program?

I believe, Mr. President and delegates, that acting conservatively, this being a country of poor people and creating, as it is said that a government for the poor will be created, we must be thrifty and not spend all the government's resources in appropriations.

Mr. BARRETO PEREZ: We oppose.

Mr. PRESIDENT: Any other debate on the proposal?

Mr. ALVARADO: Mr. President ...

Mr. PRESIDENT: Mr. Delegate...

Mr. MUÑOZ RIVERA: A question to the president ...

VARIOUS DELEGATES: We cannot hear ...

Mr. PRESIDENT: We have a proposal for an amendment before the commission from Mr. Gelpi. Is the Delegate not going to speak about that amendment? So, is there discussion about Mr. Gelpi's amendment? If there is not, it is put to a vote. Those who are in the affirmative will say yes ... Against, no ... the amendment is defeated. The delegate, Mr. Iriarte, has the floor, which he had requested.

Mr. IRIARTE: Mr. President and fellow delegates: In the approved article 12 of this bill, of this substitute proposal, there is a provision that says, in line 20: "It will not be approved", in article 12, page 4, line 20 ... I want the President of the Committee to follow me. In article 12, line 20, page 4, it says: "No draft bill will be approved, with the exception of the general budget". Here comes the draft general budget that I was talking about a moment ago. Now, as I said a moment ago, there is no provision with regard to the general budget project. Currently our Organic Charter has a provision that says:

1092

City of Dallas, State of Texas, County of Dallas

I, MARILYN RETTA, am an interpreter/translator hired by TransPerfect, a translation services that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 60 years. I have studied Spanish translation for 20 years. I am certified by the Administration Office of the United States Courts and am certified by the American Translators Association for Spanish to English Translation.

The following document is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English

**Final Version- DiarioConvencionConstituyente – Pages for Translation**

*[signature]*

MARILYN RETTA

Sworn to before me this

February *[handwritten]*, 2018

*[signature]*

Notary Public

MATTHEW RYAN EAKIN
Notary Public, State of Texas
My Commission Expires
May 29, 2018

Case:17-00257-LTS   Doc#:524-2   Filed:02/21/18   Entered:02/21/18 23:53:06   Desc:
Exhibit 2   Page 1 of 3

**<u>EXHIBIT 2</u>**

When discussing revenue bonds, it should be clarified that the bonds issued and to be issued by the public corporations of the Commonwealth of Puerto Rico will not be taken into account when calculating the State's legal debt limit, since the good faith of the People of Puerto Rico is not committed for payment of the same and they will continue to be paid only from the income derived by said corporations.  Only in the event that the State guarantees any of these bonds, which it has not done so far, and must pay in a given year a shortfall of the debt requirements thereof, will the amount thus paid will be counted against the legal debt limit of the Commonwealth.

City of Dallas, State of Texas, County of Dallas

I, MARILYN RETTA, am an interpreter/translator hired by TransPerfect, a translation services that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 60 years. I have studied Spanish translation for 20 years. I am certified by the Administration Office of the United States Courts and am certified by the American Translators Association for Spanish to English Translation.

The following document is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English

**Certified Translation of the Daily Sessions Record, Senate of Puerto Ric_**

MARILYN RETTA

Sworn to before me this
February 18, 2018

Notary Public



**MATTHEW RYAN EAKIN**
Notary Public, State of Texas
My Commission Expires
**May 29, 2018**

**EXHIBIT 3**



**EXHIBIT 4**

**NO. 258-A | SEPTEMBER 2006**

# Governmental
# Accounting Standards Series

Statement No. 48 of the
Governmental Accounting
Standards Board

**Sales and Pledges of Receivables and
Future Revenues and Intra-Entity
Transfers of Assets and Future Revenues**



Governmental Accounting Standards Board
of the Financial Accounting Foundation

For additional copies of this Statement and information on applicable prices and discount rates, contact:

Order Department
Governmental Accounting Standards Board
401 Merritt 7
PO Box 5116
Norwalk, CT 06856-5116

Telephone Orders: 1-800-748-0659

*Please ask for our Product Code No. GS48.*

The GASB website can be accessed at www.gasb.org.

## Summary

Governments sometimes exchange an interest in their expected cash flows from collecting specific receivables or specific future revenues for immediate cash payments—generally, a single lump sum. The financial reporting question addressed by this Statement is whether that transaction should be regarded as a sale or as a collateralized borrowing resulting in a liability. Historically, guidance for reporting the effects of those transactions in governmental financial statements either has been provided in several standards or, in certain cases, was not specifically addressed in authoritative literature. In addition, little or no information about pledged revenues was being disclosed in the notes to the financial statements. As a result, there has been considerable diversity in the manner in which these transactions and information about them have been reported.

This Statement establishes criteria that governments will use to ascertain whether the proceeds received should be reported as revenue or as a liability. The criteria should be used to determine the extent to which a transferor government either retains or relinquishes control over the receivables or future revenues through its continuing involvement with those receivables or future revenues. This Statement establishes that a transaction will be reported as a collateralized borrowing unless the criteria indicating that a sale has taken place are met. If it is determined that a transaction involving *receivables* should be reported as a sale, the difference between the carrying value of the receivables and the proceeds should be recognized in the period of the sale in the change statements. If it is determined that a transaction involving *future revenues* should be reported as a sale, the revenue should be deferred and amortized, except when specific criteria are met. This Statement also provides additional guidance for sales of receivables and future revenues within the same financial reporting entity.

This Statement includes a provision that stipulates that governments should not revalue assets that are transferred between financial reporting entity components. Therefore, *any* assets (or future revenues) sold or donated within the same financial reporting entity should continue to be reported at their current carrying value when those assets or future revenues are transferred.

This Statement also includes guidance to be used for recognizing other assets and liabilities arising from a sale of specific receivables or future revenues, including residual interests and recourse provisions. The disclosures pertaining to future revenues that have been pledged or sold are intended to provide financial statement users with information about which revenues will be unavailable for other purposes and how long they will continue to be so. The requirements of this Statement are effective for financial statements for periods beginning after December 15, 2006.

**How the Changes in This Statement Improve Financial Reporting**

The requirements in this Statement improve financial reporting by establishing consistent measurement, recognition, and disclosure requirements that apply to both governmental and business-type activities. Those requirements alleviate the confusion that arises when there are multiple sources from which generally accepted accounting principles requirements may derive. Deferral requirements that are applicable to sales of future revenues are provided to contribute to the measurement and reporting of interperiod equity in accordance with the objectives set forth in Concepts Statement No. 1, *Objectives of Financial Reporting.* Specific provisions that address the effects of intra-entity transactions are provided so that governments retain consistent values for assets transferred between components of the same financial reporting entity. This Statement also improves the usefulness of financial reporting by requiring that specific relevant

ii

disclosures be made to inform financial statement users about the unavailability of future

revenues that have been pledged or sold.

---

Unless otherwise specified, pronouncements of the GASB apply to financial reports of all state and local governmental entities, including general purpose governments; public benefit corporations and authorities; public employee retirement systems; and public utilities, hospitals and other healthcare providers, and colleges and universities. Paragraph 3 discusses the applicability of this Statement.

Statement No. 48 of the
Governmental Accounting
Standards Board

# Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfers of Assets and Future Revenues

September 2006



**Governmental Accounting Standards Board**
of the Financial Accounting Foundation
401 Merritt 7, PO Box 5116, Norwalk, Connecticut 06856-5116

Copyright © 2006 by Governmental Accounting Standards Board.  All rights reserved.
No part of this publication may be reproduced, stored in a retrieval system, or
transmitted, in any form or by any means, electronic, mechanical, photocopying,
recording, or otherwise, without the prior written permission of the Governmental
Accounting Standards Board.

**Statement No. 48 of the Governmental Accounting Standards Board**

**Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfers of Assets and Future Revenues**

**September 2006**

## CONTENTS

|  | Paragraph Numbers |
|---|---|
| Introduction | 1–2 |
| Standards of Governmental Accounting and Financial Reporting | 3–22 |
| Scope and Applicability of This Statement | 3–4 |
| Determining Whether a Transaction Is a Sale or a Collateralized Borrowing | 5 |
| Assessing a Government's Continuing Involvement | 6–10 |
| Receivables | 6–7 |
| Future Revenues | 8–10 |
| Accounting for Transactions That Do Not Qualify as Sales | 11–12 |
| Accounting for Transactions That Meet the Criteria to Be Reported as Sales | 13–14 |
| Intra-Entity Transfers of Assets and Future Revenues | 15 |
| Amortization of Deferred Revenues and Charges | 16 |
| Recognizing Other Assets or Liabilities Arising from a Sale of Specific Receivables or Specific Future Revenues | 17–18 |
| Residual Interests | 17 |
| Recourse and Other Obligations | 18 |
| Pledges of Future Revenues When Resources Are Not Received by the Pledging Government | 19–20 |
| Disclosures Related to Future Revenues That Are Pledged or Sold | 21–22 |
| Effective Date and Transition | 23 |
| Appendix A: Background | 24–28 |
| Appendix B: Basis for Conclusions | 29–94 |
| Appendix C: Illustrations of Accounting for Sales of Receivables and Future Revenues | 95 |
| Appendix D: Illustrative Disclosures—Pledged Revenues | 96 |
| Appendix E: Codification Instructions | 97 |

Statement No. 48 of the Governmental Accounting Standards Board

**Sales and Pledges of Receivables and Future Revenues and Intra-Entity Transfers of Assets and Future Revenues**

**September 2006**

## INTRODUCTION

1.    Governments sometimes exchange an interest in their expected cash flows from collecting specific receivables or specific future revenues for immediate cash payments—generally, a single lump sum.  The agreements that dictate the conditions under which those transactions take place include features that should be considered when determining, for financial reporting purposes, whether an agreement constitutes a sale or a collateralized borrowing resulting in a liability.  The objective of this Statement is to provide financial statement users with consistent measurement, recognition, and disclosure across governments and within individual governments by developing specific guidance applicable to all activities of a government.

2.    Prior to this Statement, guidance for reporting the effects of those transactions in governmental financial statements either was provided in several standards or, in certain cases, was not specifically addressed in authoritative literature.  In addition, little or no information about pledged revenues was being disclosed in the notes to the financial statements.

## STANDARDS OF GOVERNMENTAL ACCOUNTING AND FINANCIAL REPORTING

### Scope and Applicability of This Statement

3.    This Statement establishes accounting and financial reporting standards for transactions in which a government receives, or is entitled to, resources in exchange for

future cash flows generated by collecting specific receivables or specific future revenues.[1] It also contains provisions that apply to certain situations in which a government *does not* receive resources but, nevertheless, pledges or commits future cash flows generated by collecting specific future revenues.  In addition, this Statement establishes accounting and financial reporting standards that apply to all intra-entity transfers of assets and future revenues. This Statement does not apply to a government's pledge of its "full faith and credit" as security for its own debt or the debt of a component unit.  The requirements of this Statement apply to the financial statements of all state and local governments.

4.     This Statement supersedes paragraphs 16–23 of Technical Bulletin No. 2004-1, *Tobacco Settlement Recognition and Financial Reporting Entity Issues,* and amends Statement No. 34, *Basic Financial Statements—and Management's Discussion and Analysis—for State and Local Governments,* paragraphs 58, 61, and 100.

**Determining Whether a Transaction Is a Sale or a Collateralized Borrowing**

5.     A transaction within the scope of this Statement should be reported as a collateralized borrowing rather than a sale unless the criteria in paragraphs 6–9, as appropriate, are met.  Determining whether a transaction should be reported as a sale rather than a collateralized borrowing requires an assessment of a government's continuing involvement with the receivables or future revenues transferred.  A significant aspect of that assessment is the degree to which the selling/pledging government (the transferor) retains or relinquishes (to the transferee) control over the receivables or future revenues transferred.

---

[1]Future revenues do not include potential revenues from a source not in existence at the time of the transaction(for example, if the generation of future revenues requires the creation of the revenue-producing mechanism, such as constructing a metered parking lot).

**Assessing a Government's Continuing Involvement**

**Receivables**

6.      A transaction in which a government receives, or is entitled to, proceeds in exchange for the future cash flows from receivables should be reported as a sale if the government's continuing involvement with those receivables is effectively terminated.  A government's continuing involvement is considered to be effectively terminated if all the following criteria are met:

a.      The transferee's ability to subsequently sell or pledge the receivables is not significantly limited by constraints imposed by the transferor government, either in the transfer agreement or through other means, for example, organizational or structural restrictions.

b.      The transferor does not have the option or ability to unilaterally substitute for or reacquire specific accounts from among the receivables transferred.  However, the ability or obligation to substitute for defective accounts, at the option of the transferee, would not violate this criterion.  For example, accounts that do not possess the characteristics stipulated in a transfer agreement may be replaced with ones that do possess those traits.  In addition, insignificant "clean-up" calls (by which the transferor may reacquire the remaining uncollected accounts when the outstanding secured debt reaches a specified minimum balance) would likewise not violate this criterion.

c.      The sale agreement is not cancelable by either party, including cancellation through payment of a lump sum or transfer of other assets or rights.

d.      The receivables and the cash resulting from their collection have been isolated from the transferor government, as discussed in paragraph 7.

7.      Determination of whether receivables have been isolated from the transferor government should be based on the following criteria:

a.      The transferee should have legal standing separate from the transferor.  Legal separation should be assessed in a manner consistent with the approach for determining whether an organization is a legally separate entity in paragraph 15 of Statement No. 14, *The Financial Reporting Entity,* as amended.

b.      Generally, banking arrangements should eliminate access by the transferor and its component units (other than the transferee) to the cash generated by collecting the receivables.  Access is eliminated when payments on individual accounts are made directly to a custodial account maintained for the benefit of the transferee.  However, if the transferor continues to service the accounts or if obligors misdirect their payments on transferred accounts to the transferor:

(1) The payments to the transferee should be made only from the resources generated by the specific receivables rather than from the transferor's own resources. The transferor should have no obligation to advance amounts to the transferee before it collects equivalent amounts from the underlying accounts.

(2) Cash collected by the transferor on behalf of the transferee should be remitted to the transferee without significant delay. In addition, earnings on invested collections should be passed on to the transferee.

(3) The transferor should consider proceeds received from the transferee as satisfaction of individual accounts. The transferor should indicate in its records which accounts have been transferred and which collections pertain to those accounts. For example, in a transaction involving delinquent taxes, the proceeds from the transferee should be accepted by the taxing body as satisfaction of the delinquent taxes owed by the individual property owners. Accordingly, the tax rolls should indicate that those taxes have been paid (or sold, or otherwise settled) and are no longer delinquent.

c. Provisions in the transfer agreement (or provided elsewhere in statutes, charters, or other governing documents or agreements) should protect the transferee from the claims of the transferor's creditors.

**Future Revenues**

8. A transaction in which a government receives proceeds in exchange for cash flows from specific future revenues should be reported as a sale if the government's continuing involvement with those revenues meets all of the following criteria:

a. The transferor government will not maintain an active involvement in the future generation of those revenues. Active involvement should be determined based on the provisions in paragraph 9.

b. The transferee's ability (or the ability of the ultimate holder/owner of the future cash flows) to subsequently sell or pledge the future cash flows is not significantly limited by constraints imposed by the transferor, either in the transfer agreement or through other means.

c. The cash resulting from collection of the future revenues has been isolated from the transferor government. Generally, banking arrangements should eliminate access by the transferor and its component units (other than the transferee) to the cash generated by collecting the future revenues. Access is eliminated when the revenues are received directly by the transferee or are deposited directly into a custodial account maintained for the benefit of the transferee. However, if the transferor is required to remain as the recipient, the stipulations in paragraphs 7b(1) and 7b(2) pertaining to receivables also should be applied to future revenues, in determining whether the cash collected is isolated from the transferor.

d. The contract, agreement, or other arrangement between the original resource provider (a grantor organization, for example) and the transferor government does not prohibit the transfer or assignment of those resources.

4

e. The sale agreement is not cancelable by either party, including cancellation through payment of a lump sum or transfer of other assets or rights.

9. Governments may cease active involvement in the generation of specific future revenues yet remain involved with those revenues in some manner. *Active involvement generally requires a substantive action or performance by the government.* Governments should determine whether the *primary* or *fundamental* activity or process that generates a specific revenue requires continuing active involvement. That is, when considering whether it maintains an active involvement in the generation of specific future revenues, a government should distinguish those activities that *generate* a specific revenue from those that, although associated with that revenue, are tangential, or incidental, or are undertaken to protect the revenue. Manifestations of a government's active involvement in the future generation of revenues include the following:

a. The government produces or provides the goods or services that are exchanged for the revenues.

b. The government levies or assesses taxes, fees, or charges and can directly influence the revenue base or the rate(s) applied to that base to generate the revenues. For example, the revenue bases for property, sales, and income taxes are taxable real estate parcels, taxable retail sales, or taxable income, respectively. The taxing government can directly influence any of those bases by establishing minimum taxable levels, granting exemptions, providing credits, or excluding certain transactions. The taxing government may initiate, activate, or determine tax rates pertaining to each revenue base.

c. The government is required to submit applications[2] for grants or contributions from other governments, organizations, or individuals to obtain the revenues.

d. The government is required to meet grant or contribution performance provisions to qualify for those revenues.

10. Governments may remain associated with specific revenues in ways that do not constitute the primary or fundamental activity that generates the revenues and thus would

---

[2]This criterion refers to ongoing requirements that qualify the government to continue to receive grants or contributions in future years, rather than an initial application or qualification process that remains effective without further effort by the government.

not be considered to be actively involved in the generation of those revenues. Activities that would not be considered manifestations of active involvement in the generation of specific revenues include the following:

a. Holding title to revenue-producing assets (for leases, rents, or royalty income, for example)
b. Owning a contractual right to a stream of future revenues (rights to tobacco settlement revenues, for example)
c. Satisfying the "required characteristics" eligibility criterion in paragraph 20 of Statement No. 33, *Accounting and Financial Reporting for Nonexchange Transactions*
d. Agreeing to refrain from specified acts or transactions (for example, agreeing to noncompetition restrictions).

**Accounting for Transactions That Do Not Qualify as Sales**

11. If the criteria required for sale reporting in paragraphs 6–9, as appropriate, are not met, a transaction should be reported as a collateralized borrowing. The receivables or future revenues should be considered for financial statement purposes as pledged rather than sold. Proceeds received by the pledging government should be reported as a liability in its statements of net assets and as an other financing source in its governmental funds statement of revenues, expenditures, and changes in fund balance, if governmental funds receive the proceeds. Similarly, a transferee government should recognize a receivable for the amounts paid to the pledging government.

12. Pledged *receivables* should continue to be recognized as assets in the pledging government's balance sheet or statements of net assets. Pledged *revenues* should continue to be reported as revenue by the pledging government in accordance with recognition and measurement criteria appropriate to the specific type of revenue pledged. Collections of the pledged revenues or receivables that are subsequently paid to the transferee reduce the liability in the pledging government's statements of net assets. Those payments also

should be reported as expenditures, rather than reductions of revenue, in the pledging government's governmental funds statement of revenues, expenditures, and changes in fund balance, if governmental funds are used to report the transaction. Payments received from the pledging government reduce the governmental transferee's receivable. Pledged receivables collected and paid to the transferee after the liability has been liquidated should be reported as expenditures/expenses (by the pledging government) and revenues (by the governmental transferee) when the pledging government becomes obligated to make the payments.

**Accounting for Transactions That Meet the Criteria to Be Reported as Sales**

13.   If the criteria for sale reporting in paragraphs 6–9, as appropriate, are met, a transaction should be reported as a sale.   In a sale of receivables, the transferor government should no longer recognize as assets the receivables sold, removing the individual accounts at their carrying values. Except for reporting in governmental funds, the difference between the proceeds (exclusive of amounts that may be refundable) and the carrying value of the receivables sold should be recognized as a gain or loss in the period of the sale. In governmental funds, the difference between the proceeds received and the receivables sold (net of allowances and deferred revenues) should be recognized as revenue. If the transferee is a government outside of the transferor government's financial reporting entity, the transferee government should recognize the receivables acquired at the purchase price.   Recognition by transferees within the same financial reporting entity as the transferor is addressed in paragraph 15.

14.   In a sale of future revenues, the transferor government should report the proceeds as deferred revenue or revenue, in both the government-wide and fund financial statements.

7

Generally, revenue should be deferred and recognized over the duration of the sale agreement; however, there may be instances wherein recognition in the period of the sale is appropriate. For transactions with parties outside the financial reporting entity, deferral is required if the future revenue sold was not recognized previously because the event that would have resulted in revenue recognition had not yet occurred (for example, tobacco settlement revenues). Except as noted in the following sentence, consummation of the future revenue sale transaction is not a substitute for a revenue recognition event and, consequently, revenue from the sale should be deferred. Revenue should be recognized at the time of the sale only if the revenue sold was not recognized previously because of uncertainty of realization or the inability to reliably measure the revenue. If the transferee is a government outside of the transferor government's financial reporting entity, the transferee government should recognize the acquisition at cost and amortize the balance over the life of the transfer agreement. The transferee government, as owner of the future revenues, should recognize receivables and revenue when the recognition criteria appropriate to the specific type of revenue acquired are met. Recognition by transferors and transferees within the same financial reporting entity as the transferor is addressed in paragraph 15.

**Intra-Entity Transfers of Assets and Future Revenues**

15.    When accounting for the transfer of capital and financial assets and future revenues within the same financial reporting entity, the transferee should recognize the assets or future revenues received at the carrying value of the transferor. For example, in an intra-entity sale of receivables, the transferee government should recognize the receivables acquired at the carrying value of the transferor government. The difference between the amount paid (exclusive of amounts that may be refundable) and the carrying value of the

receivables transferred should be reported as a gain or loss by the transferor and as a revenue or expenditure/expense by the transferee in their separately-issued statements, but reclassified as transfers or subsidies, as appropriate, in the financial statements of the reporting entity.[3] In an intra-entity sale of future revenues, the transferor government has reported no carrying value for the rights sold because the asset recognition criteria have not been met. Therefore, the transferee government should not recognize an asset and related revenue until recognition criteria appropriate to that type of revenue are met. Instead, the transferee government should report the amount paid as a deferred charge to be amortized over the duration of the transfer agreement. The transferor government should defer the recognition of revenue from the sale in its government-wide and fund financial statements and recognize it over the duration of the sale agreement.[4]

**Amortization of Deferred Revenues and Charges**

16.   Deferred revenues and charges arising from a sale of future revenues should be amortized over the life of the sale agreement using a systematic and rational method. For example, periodic amortization could be determined by applying, to the revenues recognized during the period by the transferee, the ratio of the resources received from the sale by the transferor to the estimated total future revenues sold by the transferee.

---

[3]Application of the provisions of this Statement should be the same for both discretely presented and blended component units. That is, the standard should first be applied in the separate financial statements of the component unit.

[4]Deferred revenues and charges resulting from intra-entity sales of future revenues and the periodic amortization of those balances should be accounted for similarly to internal balances and intra-entity activity within the financial reporting entity.

9

**Recognizing Other Assets or Liabilities Arising from a Sale of Specific Receivables or Specific Future Revenues**

**Residual Interests**

17.   Often, as part of the proceeds received, a transferor government acquires a subordinate or junior note or a residual certificate representing the right to collections that exceed a stipulated level—generally, the annual or total debt service requirements of the transferee.  A transferor government should recognize a note or residual certificate as an asset, representing a residual interest in:

a.   *Excess receivable collections,* giving consideration to the likelihood of realization. Residual interests recognized in the period in which the sale occurred should be treated as an adjustment of the gain or loss (or revenues in governmental funds). Residual interests recognized in subsequent periods should be reported as revenues.

b.   *Excess future revenues,* when the asset recognition criteria appropriate to the specific type of revenue that underlies the note or certificate have been met. Revenue recognition of the residual interest also would occur at that time.

A transferee government should recognize a liability for its obligation to remit residuals to the transferor government, based on the recognition criteria in paragraph 18 pertaining to recourse and other obligations.

**Recourse and Other Obligations**

18.   A transferor government should recognize estimated liabilities arising from the purchase and sale agreement—for example, recourse obligations or repurchase commitments—when information available prior to the issuance of the financial statements indicates that it is probable that a liability has been incurred at the date of the financial statements *and* the amount of the obligation can reasonably be estimated.

**Pledges of Future Revenues When Resources Are Not Received by the Pledging Government**

19.   Some governments pledge the future cash flows of specific revenues but do not receive resources in exchange for that pledge.  For example, due to charter, statutory, or

constitutional requirements, some governments may be prohibited from issuing debt or limited in the extent to which they may issue debt. Those governments, nevertheless, may be empowered to create separate component units or use existing component units to issue debt on their behalf that will benefit their constituencies, programs, or functions. As security for the debt issued by a component unit, the government pledges all or a portion of a specific future revenue stream to the debt-issuing component unit without establishing itself as primarily or secondarily obligated for the component unit's debt. The debt-issuing component unit then pledges those future payments from the pledging government as security for its debt.

20. At the time the pledge agreement is made, the pledging government should not recognize a liability, and the debt-issuing component unit should not recognize a receivable for the future revenues pledged. The pledging government should continue to recognize revenue from the pledged amounts and should recognize a liability to the debt-issuing component unit and an expenditure/expense simultaneously with the recognition of the revenues that are pledged. The debt-issuing component unit should recognize revenue when the pledging government is obligated to make the payments.

**Disclosures Related to Future Revenues That Are Pledged or Sold**

21. For purposes of the following disclosures,[5] pledged revenues are those specific revenues that have been formally committed to directly collateralize or secure debt of the

---

[5]The disclosures in this paragraph are not required for legally separate entities that report as stand-alone business-type activities whose operations are financed primarily by a single major revenue source.

pledging government, or directly or indirectly collateralize[6] or secure debt of a component unit. For each period in which the secured debt remains outstanding, pledging governments should disclose, in the notes to financial statements, information about specific revenues pledged, including:

a. Identification of the specific revenue pledged and the approximate amount of the pledge. Generally, the approximate amount of the pledge would be equal to the remaining principal and interest requirements of the secured debt.
b. Identification of, and general purpose for, the debt secured by the pledged revenue
c. The term of the commitment—that is, the period during which the revenue will not be available for other purposes
d. The relationship of the pledged amount to the total for that specific revenue, if estimable—that is, the proportion of the specific revenue stream that has been pledged
e. A comparison of the pledged revenues recognized during the period to the principal and interest requirements for the debt directly or indirectly collateralized by those revenues. For this disclosure, pledged revenues recognized during the period may be presented net of specified operating expenses, based on the provisions of the pledge agreement; however, the amounts should not be netted in the financial statements.

22. In the year of the sale, governments that sell future revenue streams, as determined by applying the criteria in paragraph 8, should disclose in the notes to financial statements information about the specific revenues sold, including:

a. Identification of the specific revenue sold, including the approximate amount, and the significant assumptions used in determining the approximate amount
b. The period to which the sale applies
c. The relationship of the sold amount to the total for that specific revenue, if estimable—that is, the proportion of the specific revenue stream that has been sold
d. A comparison of the proceeds of the sale and the present value of the future revenues sold, including the significant assumptions used in determining the present value.

---

[6]In an indirect collateralization, the pledged revenue agreement is not directly between the pledging government and the bondholders. That is, the pledging government's revenues do not secure the debt; rather, the debt is secured by its payments to the component unit that are financed by that revenue. In essence, the pledging government makes an annual debt service "grant" to the component unit, which, in turn, pledges that revenue as security for its debt.

## EFFECTIVE DATE AND TRANSITION

23.   The provisions of this Statement are effective for financial statements for periods
beginning after December 15, 2006. Earlier application is encouraged. In the first period
that this Statement is applied, changes made to comply with this Statement, except those
that would result from applying the deferral provisions in paragraphs 14 and 15 relative to
sales of future revenues, should be treated as an adjustment of prior periods, and financial
statements presented for the periods affected should be restated.    The deferral
requirements in paragraphs 14 and 15 may be applied prospectively. If restatement of the
financial statements for prior periods is not practical, the cumulative effect of applying
this Statement should be reported as a restatement of beginning net assets (or equity or
fund balance, as appropriate) for the earliest period restated (generally, the current period).
In the first period that this Statement is applied, the financial statements should disclose
the nature of the restatement and its effect.

---

**The provisions of this Statement need not be
applied to immaterial items.**

---

*This Statement was issued by unanimous vote of the seven members of the
Governmental Accounting Standards Board:*

> Robert H. Attmore, *Chairman*
> Cynthia B. Green
> William W. Holder
> Edward J. Mazur
> Marcia L. Taylor
> Richard C. Tracy
> James M. Williams

## Appendix A

### BACKGROUND

24.   This project initially was proposed for addition to the technical agenda largely in response to comments made to the Board during the due process related to Technical Bulletin No. 2004-1, *Tobacco Settlement Recognition and Financial Reporting Entity Issues.* Some constituents urged the Board to broaden the scope of that project to include all securitizations and securitization-like transactions, rather than proceed with a focus only on the tobacco settlement issues.  The Board believed, however, that issuance of timely guidance on the tobacco settlement issues was a priority and agreed that other, similar issues would be addressed in a broader scope project.  This Statement is a product of the project, added to the technical agenda in 2004, which represents that broader scope approach.

25.   Prior to this standard, the provisions of Financial Accounting Standards Board (FASB) Statement No. 77, *Reporting by Transferors for Transfers of Receivables with Recourse,* determined whether a transaction within the governmental activities category and most business-type activities (BTAs) was a sale or a collateralized borrowing.  In addition, the FASB's Emerging Issues Task Force (EITF) Issue No. 88-18, "Sales of Future Revenues," addressed certain debt versus deferred revenue issues.  Enterprise funds and BTAs that elected to apply paragraph 7 of GASB Statement No. 20, *Accounting and Financial Reporting for Proprietary Funds and Other Governmental Entities That Use Proprietary Fund Accounting,* were required to apply the provisions of FASB Statement No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities.*

14

26.     Statement No. 34, *Basic Financial Statements—and Management's Discussion and Analysis—for State and Local Governments,* paragraph 100, states that the statement of revenues, expenses, and changes in net assets for proprietary funds "should identify revenues used as security for revenue bonds."   A nonscientific sample of financial statements indicates that many governments are not aware of this requirement or are unsure how to implement it.  The standard implies "face of the statement" information, but compliance through display on the face of the statement is cumbersome in a multi-columnar setting or when revenues are aggregated.  Paragraph 122, as amended, imposes a segment disclosure requirement—again, applicable only to enterprise funds or BTAs.  The definition of a *segment,* however, is restrictive; therefore, few governments actually are required to make those disclosures, even though they may have several pledged revenues.   As a result, users have been able to derive little information from a government's basic financial statements about pledged revenues of enterprise funds or BTAs and virtually no information about pledged revenues of governmental activities.

27.   In early 2005, a task force was assembled comprising 12 persons broadly representative of the GASB's constituency.   The task force members reviewed and commented on papers prepared for the Board's deliberations and on drafts of this Statement.

28.   In September 2005, the Board issued an Exposure Draft (ED), *Sales and Pledges of Receivables and Future Revenues.*  Thirty-three organizations and individuals responded to the ED.  As discussed throughout Appendix B, Basis for Conclusions, the comments and suggestions from the respondents to the ED contributed to the Board's deliberations and helped the Board finalize the requirements in this Statement.

## Appendix B

### BASIS FOR CONCLUSIONS

29.  This appendix summarizes factors considered significant by the Board members in reaching the conclusions in this Statement. It includes discussion of alternatives considered and the Board's reasons for accepting some and rejecting others. Individual Board members may have given greater weight to some factors than to others.

### Scope and Applicability

30.  Initially, the objective of this project was to address financial reporting for securitizations, including securitization-like transactions, and other transfers ("other transfers" was intended to include pledged revenue streams) entered into by state and local governments. Securitizations and securitization-like transactions remain within the scope. However, during its early deliberative sessions, the Board concluded that the project should focus specifically on financial reporting issues associated with sales and pledges of receivables and future revenues. Also, as discussed in paragraphs 66–68, the Board included within the scope of this standard all intra-entity transfers of assets and future revenues.

31.  This Statement does not apply to a government's pledge of its "full faith and credit" as security for its own debt or the debt of a component unit. In general obligation debt situations, a government pledges its full faith and credit toward repayment of its own debt and can make a similar pledge as security for debts of a component unit. By backing debt with its full faith and credit, a government makes an *unconditional commitment* to pay principal and interest on that debt without specifying the resources that will be used for repayment. The Board concluded that because specific revenues are not identified as the

16

source of repayment, pledges of full faith and credit should not be included in the scope of pledged revenues in this Statement.

**Criteria to Determine Whether Proceeds Received by a Transferor Government Should Be Reported as a Liability or as Revenue**

32.  The Board believes that terminology used in a transfer agreement document is not controlling; that is, a transaction should be reported as a collateralized borrowing or a sale based on its economic substance, rather than on the labels attached to it. Even though documents may stipulate that a transaction is a sale, the facts and circumstances may indicate that it is a collateralized borrowing and not a sale. The Board believes that there are two general approaches that could be used to analyze transactions to determine whether resources received by a transferor government constitute a borrowing or a sale. Under the first approach, the analysis starts from the perspective that all transactions of this type are borrowings for financial reporting purposes, unless certain criteria are satisfied indicating that the underlying transaction should be reported as a sale. Alternatively, a broader set of criteria could be established so that some criteria would indicate that a transaction should be reported as a borrowing and others would indicate that a transaction should be reported as a sale.  Using that approach, any transaction in which a government receives proceeds (a typical utility revenue bond sale secured by future customer revenues, for example) would be subjected to the application of the determinative criteria.  In the first approach, a transaction would be regarded as a borrowing *unless* it meets certain criteria, whereas in the latter approach, a transaction would be regarded as a borrowing *if* it meets certain criteria. The Board believes that the first approach will result in more consistent reporting of these transactions and can be more efficiently applied by governments.  As a result, the Board established that a

transaction should be reported as a collateralized borrowing unless it meets the criteria to be reported as a sale.

33.  The Board's objective in developing criteria is not to compile a checklist of factors that would be applied in a borrowing versus sale analysis but, rather, to assemble criteria that, when considered together, form the basis of an approach.  The Board believes that such an approach should be the extent to which a transferor government maintains *continuing involvement* with the relevant receivables or future revenues.  Research indicates that there are two established approaches embodied in past and present financial reporting standards that could be used to guide the sale or borrowing decision-making process—a *risks and rewards* approach and a *control* approach.  The Board considered the key factors in each approach to ascertain whether, generally, a risks and rewards approach or a control approach is better for determining a government's continuing involvement.

**A Risks and Rewards Approach**

34.  A risks and rewards approach to assessing the extent of a government's continuing involvement would examine whether the risks of loss and the opportunities for gain associated with the receivables or future revenues have been transferred or retained.  Risks and rewards issues have been considered in U.S., foreign, and international financial reporting standards for assessing whether certain asset transfers qualify as revenue or debt transactions, but generally the sale or borrowing distinction has been based on control considerations.  The notion of risks and rewards transfer or retention has played a significant role in many court decisions about whether certain transactions are sales or secured borrowings.  Court decisions have been influenced by determinations regarding the transfer of credit risk—that is, whether the risk that the payments will not be paid by

18

the obligors has been shifted from the transferor to the transferee. Two common types of credit risk are recourse and a requirement for a transferor to reacquire certain assets transferred.

35.    Some would consider recourse provisions to be an important aspect of risk transfer or retention because it suggests that the parties intended a loan and not a sale. That is, if the parties had intended a sale, the buyer, rather than the seller, would assume the risk of default. They believe that the greater the recourse the transferee has against the transferor, the more the transfer resembles a loan rather than a sale. Similarly, some contend that if a transferee can require the transferor to repurchase certain receivables for reasons other than to replace those accounts that do not possess the characteristics stipulated in the transfer agreement, the possibility of the transferee's exercising its option and thereby reversing the transfer implies that the risks remain with the transferor.

36.    The converse to the question of whether the risks of loss have been transferred or retained is whether the opportunities for gain have been similarly disposed. In that regard, one important consideration in assessing a purported sale of receivables is whether the transferor has the option to repurchase the receivables or to substitute accounts in certain circumstances. With that ability, the transferor could benefit from any increase in the value of the transferred receivables and thus would have retained the opportunity for gain. Similarly, if there is an obligation on the part of the transferee to remit to the transferor collections in excess of the purchase price paid for the receivables or future revenues (for example, a residual interest arrangement), one could conclude that the opportunity for gain appears to have been retained by the transferor.

**A Control Approach**

37.   At the heart of a control approach is the determination of whether the transferor or the transferee controls the future economic benefits that arise from the receivables or future revenues transferred.

**Control Approach Preferred over Risks and Rewards Approach**

38.   The Board believes that the most significant risks in a risks and rewards approach— recourse or an obligation to reacquire certain receivables—on their own are not sufficient to cause the entirety of the proceeds received by a transferor to be reported as a liability. The Board believes that a transferor's potential future sacrifice is limited to the probable payments under recourse or reacquisition provisions.  That is, the transferor does not have a present obligation to return the transferred proceeds (as if repaying a loan); rather, the transferor has an obligation only to perform under the recourse or reacquisition provisions. To the extent specified by those provisions, the transferor has a contingent liability based on whether the underlying debtors will pay the amounts when due.  The Board concluded that the substance of recourse or reacquisition provisions is that a transferor government is not obligated to repay the entire amount of the proceeds and, therefore, should recognize a liability only for the portion likely to become payable.

39.   Similarly, the Board concluded that the presence of the most significant item on the reward side of a risks and rewards approach—a residual interest—is not by itself sufficient evidence to preclude reaching a sale determination.  Instead, the Board believes that the instruments representing residual interests should be evaluated for recognition as assets separate from, but related to, the underlying receivables or future revenues that are sold.

40.   Ultimately, the Board concluded that a concept of continuing involvement should be based on a control notion in preference to one that focuses on risks and rewards. The Board acknowledges, however, that risks and rewards and control concepts are not mutually exclusive and that some risks and rewards features also could be informative in analyzing the transfer or retention of control. If a risks and rewards concept were instead embraced in this Statement, the Board would be concerned about the influence of risk-related recourse and reacquisition provisions, and residual interests. Their presence, the Board believes, would be persuasive in reaching a "no-sale" conclusion because they could be construed as indications that the risk of loss and the opportunity for gain are not completely transferred. If that were the case in a risks and rewards-based approach, the transferor would classify proceeds as debt and continue to recognize the receivables as assets. The Board believes that in such situations, to recognize the total receivables as assets and the total proceeds as debt would overstate both assets and liabilities. Instead, a transferor should measure and report only the value of a residual interest as an asset and recourse or reacquisition obligations as liabilities and thus present a more representative picture of what the transferor is expected to receive or pay. Factors that the Board believes should be considered in assessing the extent to which control is retained or relinquished are discussed in the following paragraphs.

41.   An important consideration is whether the transferee's rights or abilities to pledge or exchange the receivables or rights to future revenues are constrained by the transferor. If significant limitations on the transferee's freedom to pledge or sell the receivables or rights to future revenues are imposed by the transferor, one could infer that control has not been transferred and that the proceeds received by the transferor should be reported as a

liability. Generally, those constraints or limitations are imposed through provisions in the transfer agreement; however, the criteria in paragraphs 6a and 8b are equally applicable to organizational or structural restrictions that may have been imposed by the transferor government when the transferee government was created. The Board believes that from the perspective of a transferee, control encompasses not only physical control but also control over the future economic benefits that are expected to derive from the receivables or resources from future revenues. The future economic benefit associated with owning receivables or resources from future revenues is primarily the cash inflow that will result from their ultimate collection. Therefore, the Board believes that the extent to which a transferee can sell or pledge those future cash flows (and thus control the amount and timing of them) free from transferor-imposed constraints is an important measure of whether control is transferred or retained.

42. Another critical factor in assessing a possible sale transaction is whether the assets (the receivables and the cash from collecting the receivables or future revenues) are *isolated* beyond the reach of the transferor and its creditors. This determination extends beyond the physical segregation and isolation of the assets transferred; it also requires assessing the extent to which a transaction is structured to be "remote from bankruptcy." Bankruptcy is far more significant in the private sector; however, the Board believes that for purposes of making a sale or borrowing decision, the most relevant aspect is the degree to which the transferee is "remote" from the perspective of the transferor government (regardless of the improbability of actual bankruptcy). The probability assessment is intended to be measured by applying the criteria in paragraph 7.

43.   In order to adequately protect the receivables or rights to future revenues from the transferor's bankruptcy estate and from the reach of the transferor generally, it is necessary to establish a legally separate entity (a component unit) to acquire the receivables or future revenues and issue securities backed by the cash flows from collecting the receivables or future revenues.   It is important that the component unit acquire the receivables or future revenues in what bankruptcy law refers to as a "true sale"; that is, the assets will not become a part of the transferor's bankruptcy estate should it become the subject of a bankruptcy proceeding.   Protection is enhanced through the observance of all necessary formalities consistent with the transferee's existence as a legally separate entity.   This measure is intended to prevent a bankruptcy court from "substantively consolidating" the assets and liabilities of the transferor with that of the transferee, similar to the way a court may "pierce the corporate veil" in some private-sector situations.   To accentuate the "isolation" of the transferee component unit, its organizational documents usually require that it maintain separate accounts and records, prepare separate financial statements, and avoid commingling its assets with those of others.

44.   Sometimes governments continue to service individual accounts that are purported to have been sold.   (For example, a municipality may continue to service delinquent tax liens, or a state housing finance authority may retain the servicing responsibility for mortgages sold.)   The Board believes that the extent to which servicing arrangements perpetuate a government's control over those receivables should be assessed.   An important element to consider when assessing isolation when the transferor acts as servicer is whether banking arrangements are designed to eliminate the access of the

transferor (or its component units, other than the transferee) to the cash generated by the receivables or future revenues sold.

45.    Typically, payments from the underlying obligors (delinquent taxpayers, for example) would be paid (a) directly to an account maintained for the benefit of the security holders with a custodian or (b) to the transferor or servicer, as agent for the transferee, with a requirement that amounts relating to the specific receivables be paid promptly into an account with the custodian, maintained for the benefit of the security holders.  In a sale of future revenues, the revenue provider generally is instructed to make payments directly to the transferee or to a separate custodial account maintained for the transferee's benefit.

46.    The Board believes that the *source* of the funds to be received by a transferee is an important consideration when evaluating isolation.  That is, do the payments come from the transferor's own resources or from the resources generated by the receivables and future revenues that were transferred?  If the transferor can use cash from any source to pay the transferee, it would be an indication that the transaction is a loan.  Do the payments come *directly* from the individual account obligors, or do they pass through the transferor government?  If payments are received by the transferor, are they remitted on a timely basis to the transferee?  The Board believes that answers to those questions are informative in an analysis of continuing involvement.

47.    Of similar importance is the determination of whether a transferor government considers proceeds received as satisfaction of individual account balances.  That is, does a transferor government that continues to service the accounts transferred indicate in its

24

records which accounts have been transferred and which collections pertain to those accounts? The Board believes that a key consideration when determining whether a transfer of delinquent taxes, for example, should be reported as a sale or as a borrowing is whether the proceeds from the transferee are taken by the taxing body as satisfaction of the delinquent taxes owed. Stated as a question, is the government collecting from a delinquent taxpayer an amount to which it has legal claim, or is it collecting and passing through an amount to which the transferee or lien holder has legal claim? The Board believes that the latter is evidence that the transfer of the receivables may be a sale, and the former is characteristic of a borrowing. In a mortgage or student loan setting, this determination may not be as informative because the loan transferred is not simply an installment or annual charge. In the property tax situation, the transferring government continues to maintain a tax receivable account for the taxpayers whose delinquencies have been transferred. Only the installments transferred (annual charges that have become delinquent) are considered paid. In the mortgage and student loan instances, the proceeds from a securitization are not applied against individual accounts; that is, the accounts are not considered "paid" but rather are considered "sold" for record-keeping purposes.

48. Another criterion that is indicative of who has control of receivables that are purported to have been sold is whether a transferor has the option or ability to reacquire specific accounts from among those transferred. Sometimes this ability is called a removal of accounts provision. The Board believes that an unconditional removal of accounts provision or a reacquisition agreement that allows the transferor government to specify the accounts that may be removed or reacquired provides compelling evidence that control of the receivables remains with the transferor government. However, the

25

Board acknowledges that a transferor government's *right of first refusal* to reacquire accounts that are being offered to others does not constitute an option to repurchase for purposes of determining whether transferor control exists. Similarly, the transferor may have the ability to reacquire transferred accounts through a "clean-up" call option, wherein the transferor may purchase remaining accounts after the secured debt balance falls below a predetermined minimum—often in the 5 to 10 percent range. The Board concluded that insignificant "clean-up" call options should not be considered violations of the reacquisition criterion in paragraph 6b.

49.   Regarding the transfer of future revenues, the Board believes that a transferor government generally will remain actively involved in the future generation of the majority of its revenues and thus *cannot* relinquish control of those revenues to a transferee. The Board developed criteria to indicate active involvement in the future generation of revenues based on that notion. As a result, transactions involving the rights to future revenues that the government will continue to generate by (a) producing goods or providing services in exchange for the revenues; (b) levying or assessing taxes, fees, and charges to generate the revenues; or (c) applying or qualifying for grants or contributions to obtain those revenues always will be reported as collateralized borrowings. A transferee may have control over how the revenues obtained are ultimately used, but that ability comes only after the transferor government has taken the requisite steps to generate the revenues and pass them on to the transferee. The transferor government retains the ability to control its future own-source revenues by having control over the underlying revenue base and the rates that are applied to that base. Even if the transfer agreement includes a pledge by the transferor to refrain from actions that would adversely affect the

base or rates, the transferor government nevertheless retains the *power* to do so and remains in a unique position as the generator of those revenues through its own authority and initiative. Similarly, the transferor government continues as the applicant or qualifier in obtaining many grants and contributions and retains control of the generation of those future revenues from that perspective.

50.    Some respondents to the ED urged the Board to sharpen the distinction between active and passive involvement in the generation of future revenues. The active involvement criterion is a key factor in determining whether a transaction should be regarded as a sale or as a collateralized borrowing. In response to those comments, the Board concluded that the specific criteria as proposed in the ED were appropriate and should be retained for the final Statement; however, the Board agreed that the broader concept of active involvement could be clarified. As a result, the discussion of active involvement in paragraph 9 was enhanced to emphasize the importance of distinguishing those activities that generate a specific revenue from those that, although associated with that revenue, are tangential, incidental, or are undertaken to protect the revenue. The Board believes that the ultimate determination should be based on whether the primary or fundamental activity or process that generates a specific revenue requires continuing active involvement by the government. By limiting the involvement analysis to the primary revenue-generating activity, more clarity and consistency should result. The Board also agreed to eliminate the ED's proposed separate passive involvement criteria, as suggested by some respondents. The Board concluded that the passive criteria was superfluous because failure to meet the criteria for active involvement automatically results in that classification of the transaction without the need to apply additional criteria.

Thus, the factors discussed in the ED as evidence of passive involvement are cast in this Statement as activities that do not indicate active involvement.

**Accounting for Transactions That Meet the Criteria to Be Reported as Sales**

51.  In a sale of receivables, the extent to which a selling government has realistically evaluated the collectibility of the individual accounts to be sold, including accrued penalties and interest, will have a direct effect on the gain or loss recognized.  That is, if the carrying value of the receivables sold is not assessed prior to the sale, any expense relative to uncollectibility or revenue from earned penalties and interest may obscure the amount that should represent the gain or loss on the sale of the receivables.  Evaluation of the collectibility of the receivables to be sold is especially important in an intra-entity transaction because the transferee component unit is required to recognize the receivables purchased at their carrying value.

52.  The provisions in this Statement that pertain to transactions involving the transfer of future revenues generally are based on two fundamental beliefs held by the Board.  First, the Board believes that, by their nature, most future revenues would not meet the criteria to be regarded as sold; and second, the Board believes that accelerating revenue recognition ahead of the point at which those revenues would otherwise meet the appropriate criteria for recognition does not result in a faithful representation of the government's financial position or changes in financial position.  As a result, transactions involving the transfer of future revenues will rarely qualify as sales, and in those rare instances, the resulting revenue generally will be deferred rather than recognized in the period of the sale.

53.  Regarding future revenue sales transactions within the same financial reporting entity, the Board does not believe that existing uncertainties about realization or measurement can be appropriately resolved without the objectivity provided by an arm's-length transaction with parties outside the reporting entity.  Based on that determination, deferral of revenue is required by this Statement for *all* intra-entity sales of future revenues, regardless of the reason recognition previously had not taken place.  Similarly, the Board concluded that the component unit's expense of the acquisition also should be deferred.  The Board believes that the amount paid to acquire the rights is comparable to an unexpired cost that is applicable to future revenue entitlements and should be charged to the periods over which those revenues will be recognized.  The Board concluded that deferring recognition of the expense is consistent with the deferral concept discussed in paragraphs 62–65.  That is, without deferral, the cost of acquiring the future revenues is expensed immediately and therefore is charged to one period, rather than ratably over the same periods in which the revenues will be realized.  The concept of interperiod equity implies that the cost of acquiring the future cash flows should be attributed to the future periods benefiting from those cash flows in order to show "whether current-year revenues are sufficient to pay for current-year services."  Otherwise, one period absorbs all the cost, whereas others enjoy the benefits with no reported costs.  The Board also was persuaded by the fact that unless both parties to an intra-entity transaction recognize the effect of that transaction in a similar manner, the reporting entity, as a whole, would be depicted as being either better off or worse off as a result of an "internal" transaction.

54.  In deliberating the prospect for deferral, the Board considered the types of revenues that are subject to deferral under current standards.  Generally, most types of revenue are

*not* subject to deferral. In the private sector, revenues such as warranty or product maintenance contracts, franchise fees, revenues arising from the licensing of films to TV, loan origination fees, subscriptions, and rent paid in advance are subject to deferral. The common basis for those deferrals is the notion that resources received represent advance payments in exchange for goods or services yet to be provided. In Statement No. 33, *Accounting and Financial Reporting for Nonexchange Transactions,* paragraph 21 calls for deferral of revenues transmitted before eligibility requirements have been met.

55. One significant factor the Board considered when developing a deferral rationale was the contention that the proceeds related to a future revenue transaction represent a gain on the sale of an unrecognized asset, rather than the receipt of prepaid revenue that otherwise would have been recognized pursuant to specific criteria over a longer period of time. Based on that contention, the sale proceeds would not inherit the characteristics of the underlying revenues, nor would they be subject to the same recognition requirements as the revenues sold. Similarly, the sale proceeds likely would not be restricted, as defined in paragraph 34 of Statement 34, nor would they likely be subject to time or period limitations, and no specific performance requirements would be required for the government to "earn" the proceeds. Some respondents to the ED believe that a sale of future revenues is tantamount to the government's selling a contingent asset that was not recognized in the statement of net assets. Current standards require gains or losses on the sale of assets to be recognized in the period that the sale takes place. For the reasons noted earlier, the Board concluded that deferring the recognition of future revenue sale proceeds could not be supported based on existing deferral standards.

56.   Technical Bulletin 2004-1 required that in a sale of future tobacco settlement revenues, the transferor government recognize revenue and the transferee government report an expense for the amount of the sale proceeds.   As discussed in the preceding paragraph, there was no basis in previous standards to require deferral.[7]   However, the deferral concept established in this Statement and discussed in paragraphs 62–65 provides a basis for deferring recognition of the revenue resulting from the sale of future revenues. Therefore, pursuant to the provisions in paragraph 14 of this Statement, revenue from sales of future tobacco settlement payments should be deferred, rather than recognized in the period of the sale.

57.   Proceeds from an intra-entity sale of future tobacco settlement revenues under Technical Bulletin 2004-1 would have been recognized in the period of the sale by the transferor/primary government as revenue and by the transferee/component unit as an expense.  Those revenues and expenses were to be reclassified as *transfers* in the reporting entity's financial statements if the component unit was blended but reported as revenues and expenses if the component unit was discretely presented.   Under the deferral provisions of this Statement, however, the transferor government will defer recognition of the revenue and the transferee government will defer recognition of the expense. Although revenue and expense recognition in this Statement differs significantly from the requirements in Technical Bulletin 2004-1, the Board emphasizes that the overall effect on the financial position and changes in financial position of the financial reporting entity *as*

---

[7]The GASB has authorized its staff to issue Technical Bulletins in certain situations—for example, if GASB staff can provide timely guidance to clarify, explain, or elaborate on the application of existing standards, provided that such clarification, explanation, or elaboration does not conflict with a broad fundamental principle or create a novel accounting practice.   Thus, when the question of immediate recognition or deferral was raised during the preparation of the Technical Bulletin, there was no alternative but to provide for immediate revenue recognition even though deferral may have been preferred.

*a whole* remains neutral as a result of the intra-entity transaction, regardless of whether the component unit is blended or discretely presented.

58.    Some ED respondents disagreed with the proposal to report the resources received in an exchange for future revenues as deferred revenues in governmental funds. They argued that the proceeds received from a transaction should be reported in the same way—as other financing sources—regardless of whether the transaction is recognized as a sale or as a collateralized borrowing in the government-wide statements. The basis for their argument, generally, is that under the modified accrual basis of accounting, the substance of the transaction is the same—the transaction produces an inflow of current financial resources that are available to finance the expenditures of the current period. They contended that the deferral is appropriate for reporting in an economic resources/accrual basis environment but not in a current financial resources/modified accrual model.

59.    In response to those comments, the Board redeliberated the proposed deferral approach in general and the resulting effect on governmental funds specifically. The Board reaffirmed its belief in, and support for, a deferral concept based on interperiod equity considerations, as discussed in paragraphs 62–65, and proceeded to reexamine the proposal for governmental fund reporting given that reaffirmation.

60.    Even after extended deliberations, the Board was unable to resolve the issue without introducing major changes to the current governmental fund model. For example, except for the different lengths of deferral periods, a convincing distinction could not be made between property taxes received in advance of the period for which levied, and thus

deferred in accordance with paragraph 18 of Statement 33, and the proceeds from a sale of future revenues received in advance of the periods to which they should be attributed, based on the proposed interperiod equity deferral approach, discussed in paragraphs 62–65. In addition, no precedent could be found in current authoritative literature for recognizing revenue under the modified accrual basis *before* that revenue would be recognized under the accrual basis. The Board did not want to propose ad hoc financial reporting treatment for governmental funds while the broader concepts of elements of financial statements and recognition and measurement are currently, or soon will be, under review in separate projects on financial reporting concepts. Rather than establish standards in this Statement that may ultimately be inconsistent with the yet-to-be-issued concepts, the Board agreed to retain the proposed requirements in the ED for sales of future revenues until governmental fund recognition issues could be reexamined within a more stable and enduring conceptual environment.

61. Before reaching that conclusion, however, the Board considered several alternatives including one which would have characterized the sale proceeds received as proceeds from the sale of an asset (albeit one that does not meet financial statement recognition criteria). Under that scenario, a gain would be recognized in the government-wide statements and the proceeds would be reported as other financing sources in the governmental funds, in the same manner as gains/proceeds from the sale of capital assets. Gains on intra-entity sales would have been deferred in the government-wide statements through an extension of the provisions in paragraph 15 of the ED regarding intra-entity transfers of assets. The Board ultimately decided against that approach because the deferral would have been limited to intra-entity sales and would not be based explicitly on

interperiod equity considerations. The Board also considered a proposal that would have required a collateralized borrowing conclusion to be reached for all transfers of future revenues, thereby avoiding the revenue recognition question entirely. The Board rejected that notion because it would not provide for a faithful representation of those transactions that possess all the discriminating characteristics of sales rather than borrowings. Finally, the Board also considered eliminating all future revenue sale recognition provisions from the final Statement, but it rejected that alternative because it believed that the resulting final Statement would lack needed government-wide reporting guidance.

**Deferral Based on Public Accountability or Interperiod Equity Considerations**

62. Concepts Statement No. 1, *Objectives of Financial Reporting,* discusses interperiod equity and observes that "balanced budget and debt limitation statutes are examples of laws designed to achieve fairness from one year, one term of office, or one generation to another. In practice, however, partly because of the lack of precision in defining what constitutes resource inflows and outflows, fairness is not always achieved. In fact, the appearance of balance may be misleading in some cases" (paragraph 59). As previously noted, the Board believes that immediate recognition of revenue from the sale of future revenues would not be a faithful representation of the transaction. Indeed, the Board believes it would provide financial statement readers with a "misleading appearance of balance." Paragraph 61 of the Concepts Statement states:

> The Board believes that interperiod equity is a significant part of accountability and is fundamental to public administration. It therefore needs to be considered when establishing financial reporting objectives. In short, financial reporting should help users assess whether current-year revenues are sufficient to pay for the services provided that year and whether future taxpayers will be required to assume burdens for services previously provided.

63. That notion is manifested in the first financial reporting objective in paragraph 77a:

> *Financial reporting should provide information to determine whether current-year revenues were sufficient to pay for current-year services.* This also implies that financial reporting should show whether current-year citizens received services but shifted part of the payment burden to future-year citizens; whether previously accumulated resources were used up in providing services to current-year citizens; or, conversely, whether current-year revenues were not only sufficient to pay for current-year services, but also increased accumulated resources.

64. Even though the concept that current-year citizens and service recipients have "shifted the payment burden" to future-years' citizens generally has been connected to the issuance of debt, the Board believes that the diminution of future revenues caused by a sale has identical "shifting the burden" aspects. That is, even though a sale of future revenues does not result in a claim on future resources, it has the same effect by creating an *absence* of future revenues. In substance, the unavailability of resources is the same whether those resources are used for debt service related to operating debt or whether they have been sold and therefore are unavailable for *any* purpose. Furthermore, the objective in paragraph 77a implies that financial reporting should show "whether current-year revenues were not only sufficient to pay for current-year services, but also increased accumulated resources." The Board concluded that it is likely that year-of-sale recognition (as current-year revenues) would impair a reader's ability to make that assessment.

65. Based on the considerations discussed in the preceding paragraphs, the Board concluded that, in most instances, it was appropriate to require deferral of revenue that resulted from the sale of future revenues. The Board believes that immediate recognition is appropriate only if the revenues sold were not recognized prior to the sale because they

either were not realizable or could not be reliably measured. In either of those situations, the conditions that prevented recognition no longer exist after the sale is completed and, therefore, revenue should be recognized in the period of the sale. In contrast, the Board believes that proceeds received in excess of the carrying value of receivables (exclusive of amounts that may be refundable) should not be deferred but, instead, should be reported as a gain (or as revenue in governmental funds) in the period of the sale. Those excess proceeds represent the recovery of amounts previously written off as uncollectible, rather than revenues that had not met recognition criteria.

**Valuation of Transferred Assets and Future Revenues**

66.   The provisions in paragraph 15 expressly establish, in a GASB standard, the concept applied in Technical Bulletin 2004-1 for intra-entity tobacco settlement revenue sales. That guidance was based on the "continuing authoritative guidance" of Accounting Principles Board (APB) Opinion No. 16, *Business Combinations,* interpreted in Appendix D of FASB Statement No. 141, *Business Combinations*. In addition, the requirements in this Statement apply to intra-entity "donations" of assets, which previously were required to be reported at fair value, as determined at the date of the donation. The Board believes that the provision in Technical Bulletin 2004-1—that is, that governments should not revalue assets by transferring them among financial reporting entity components—is appropriate for all assets and should not be limited to future revenues. As a result, the intra-entity guidance provided in this Statement applies to all intra-entity *transfers* of assets and future revenues and therefore expands the applicability of the "carrying value" concept to both sales and donations and thus should be applied in lieu of the fair value provisions as they relate to intra-entity capital asset donations.

67.    Some respondents were concerned that the ED's treatment of transactions with discretely presented component units as *internal* was inconsistent with the provisions in Statement 34, paragraph 61, which states that resource flows (except those that affect the balance sheet only, such as loans and repayments) between a primary government and its discretely presented component units should be reported as if they were external transactions—for example, as revenues and expenses. The Board notes that paragraph 61 of Statement 34 was not intended to suggest that transactions between a primary government and its discretely presented component unit *were* external transactions; rather, it explains that those transactions should be reported (that is, classified) *as if* they were external, rather than reclassified as interfund items, as would be the case if the component unit were to be blended. Thus, activity with discretely presented component units should be regarded as internal from the perspective of the financial reporting entity, but the transactions should be labeled as revenues and expenses rather than transfers.

68.    If the transferee in a sale of future revenues is outside of the transferor's financial reporting entity, it has acquired a recognizable asset that should be reported at cost. That asset, however, is not a receivable but, rather, is the intangible right to future revenues. The transferee government should recognize a receivable only when the asset recognition criteria appropriate to the particular revenue have been met. The asset representing the rights should be amortized as an expense over the life of the purchase and sale agreement representing the allocation of the cost of obtaining the revenues to the periods during which the revenues will be recognized.

**Pledged Revenues**

69.  In other than general obligation debt-issuing situations, governments identify and pledge specific revenue streams as security for repayment, thereby making at least a portion of those pledged revenues legally or contractually unavailable for other purposes. BTAs and governments with enterprise fund operations frequently borrow to build or expand revenue-generating capital facilities and pledge the revenues generated by those facilities as security for repayment of the underlying debt.  General or special-purpose governments that have the ability to tax often issue debt that is secured by a pledge of revenues that will be raised through the levy or imposition of an additional or dedicated tax.  Similarly, debt issued to provide financing for many economic development projects often is secured by a pledge of *incremental* sales or property taxes that are projected to be generated by the expanded or enhanced tax bases within redevelopment boundaries.  In addition, some governments pledge portions of existing revenue streams as security for certain debt issuances.

70.  In what could be termed a "plain vanilla" pledged revenue transaction, a government issues debt, receives the proceeds, and pledges a specific future revenue against that debt. The pledged revenues are collected and used to make debt service payments.

71.  In other situations—for example, when ordinance, statute, or constitutional provisions restrict a government's ability to issue debt—the government may create a legally separate entity (or use an existing one) to issue the debt.  The government pledges its future revenue stream to the separate entity (a component unit), which in turn pledges those future payments as security for its debt.  The debt-issuing component unit generally makes program disbursements directly from the debt proceeds, but it may remit the debt

38

proceeds to the pledging government. Paragraph 61 of Statement 34 provides that resource flows between the primary government and blended component units should be reported as internal activity in the financial statements of the reporting entity. That paragraph further stipulates that resource flows (except those that affect the balance sheet only, such as loans and repayments) between a primary government and its discretely presented component units should be reported as if they were external transactions—for example, as revenues and expenses.

72.    The Board believes that when a government pledges a revenue, in which resources are received by the pledging government, that transaction should not be accorded expense/revenue treatment because the agreement is not purported to be a sale. There is no abdication of rights to future revenues; rather, there is the imposition of a binding restriction on the use of those future revenues. That is, the pledging government has proclaimed that the first priority[8] with regard to the use of the pledged revenues is to transmit those revenues to the debt-issuing component unit to be used to repay its debt.

73.    If the debt-issuing component unit transfers resources to the primary government in a pledged revenue transaction, the Board believes that the substance of that transaction is that the primary government is borrowing from the component unit to finance its program expenses and that a liability to the component unit should be recognized. That liability will be liquidated over time as the primary government forwards the pledged revenues to the component unit to retire its debt. The Board believes that reporting the resources remitted to the pledging government as revenue (even if deferred) would ignore the fact

---

[8]In some cases, a particular revenue stream is pledged as security for multiple debt issuances, and the debt service claims generally are prioritized with the earliest issuance having first priority and so forth.

that the primary government has agreed to repay those resources borrowed by the component unit to finance its program expenses. Furthermore, the Board believes that to recognize the payment from the component unit as revenue would be tantamount to accelerating recognition of the underlying pledged revenues simply because the government is able to borrow against those revenues.

74.    During the due process period of the proposed standard, the question of how remitted receipts of the transferred item should be applied to a liability/receivable balance was asked. In most situations in which resources are received by a pledging government, the total receivables or future revenues to be collected and remitted will exceed the resources received. The Board considered whether the remittance of the collected pledged amounts should reduce the pledging government's liability on a dollar-for-dollar basis, or whether some consideration should be given to recognizing, separately as an expenditure/expense, an imputed interest component and/or an estimated "excess" collections component. APB Opinion No. 21, *Interest on Receivables and Payables,* paragraph 3f exempts intra-entity transactions from its requirements. Therefore, because a large portion of receivable and future revenue sale transactions occur within the reporting entity, that guidance generally will not be applicable. With regard to the "excess" receipts, the Board concluded that primarily because of the inherent uncertainty of the collectibility of the specific receivables pledged, it would not be practical nor useful to require governments to estimate the extent to which receipts of those specific receivables will exceed the reported liability and allocate each period's payments between liability reduction and expenditure/expense.

**Pledged Revenues When the Pledging Government Does Not Receive Proceeds**

75.   As discussed above, a pledging government generally does not receive proceeds from a debt-issuing component unit.  The Board deliberated the substance of a pledge in those situations—that is, whether it is a guarantee, a contingency, or something else.  The Board concluded that if a primary government "guarantees" the debt of a component unit, it generally would do so by pledging its full faith and credit as additional security for repayment of the component unit's debt.  As stated in paragraph 3, full faith and credit pledges are not within the scope of this Statement.  The security arrangements that the Board has observed generally do not place the primary government in a position of directly guaranteeing the debt of the component unit.  Rather, the component unit is the sole obligor and secures the debt by pledging the payments that the primary government has pledged and appropriated to it from a specific revenue stream.   The debt is characterized as payable solely from those appropriations with no explicit recourse to the primary government.

76.   The Board believes that, generally, pledged revenue security arrangements are not guarantees of the debts of others but rather constitute separate agreements between a primary government and its debt-issuing component units.  The Board believes that there is not a single liability with primary and secondary obligors; rather, there are two separate commitments, each with a sole obligor.   The debt-issuing component unit is solely responsible for repaying amounts owed to the holders of its bonds, and similarly, the primary government is solely responsible for making the agreed-upon payments to the component unit.  If, however, a primary government pledges future revenues to guarantee the repayment of the debts of others, the guidance from paragraph 14 of National Council

on Governmental Accounting Statement No. 4, *Accounting and Financial Reporting Principles for Claims and Judgments and Compensated Absences,* as amended, would be applicable. That is, a liability related to guarantees of the indebtedness of others should be recognized when information available prior to the issuance of the financial statements indicates that it is probable that an asset has been impaired or a liability has been incurred at the date of the financial statements *and* the amount of the loss can be reasonably estimated. Payment by the primary government in those instances would be contingent upon the failure to pay by the primary obligor.

77.   The nature of pledged revenue agreements between debt-issuing component units and pledging governments generally stipulates that amounts sufficient to cover annual principal and interest requirements of the component unit are irrevocably pledged and appropriated from a specific revenue source.  The Board believes that the pledging government is obligated only to the extent that the pledged revenues of the period are adequate to meet the debt service requirements of the period.  Hypothetically, if there are no revenues, the pledging government is not liable to make payments because those payments are appropriated from those specific revenues, rather than from a broader resource pool.  Stated differently, the pledging government only has a *commitment* until the pledged revenues that have been appropriated are available.  Hence, the Board believes that the recognition of a liability is a year-to-year proposition.  The pledging government is obligated to pay, *from this year's revenues,* amounts sufficient to pay the current principal and interest maturities of the component unit's debt.  Unless explicitly stated in the pledged revenue agreement, annual revenues in excess of that requirement

are not pledged and therefore are not required to be paid to the component unit (for example, to provide a sinking fund for future years' maturities).

78. The Board considered whether a pledging government should recognize a liability to acknowledge the claim against its future revenues. Supporters of that position do not believe it is appropriate for a pledging government to recognize a liability only if it receives resources from the debt-issuing component unit. They note that the government's pledge is the same in either situation. Supporters of that position would suggest that, in substance, the pledging government is obligated for (and will provide resources to pay) the debt of the component unit and, accordingly, should recognize a liability to the component unit in an amount equal to the component unit's outstanding debt. In essence, they would "look through" the debt-issuing component unit.

79. The Board finds more persuasive, however, the notion that the pledging government incurs a *new* obligation each year as pledged revenues are earned and, through the continuing annual appropriation, commits a portion of those revenues to be paid to the debt-issuing component unit. In effect, the pledging government is making a debt service *grant* to the component unit each year. The Board does not believe that the pledging government has agreed to pay the component unit's debt directly or that it has guaranteed the debt. It simply has agreed to pay a portion of a specific revenue stream to the component unit each year and thus is obligated to do so only on a year-to-year basis.

**Reporting Pledged Revenues by the Pledging Government**

80. Some pledging governments have reported their revenues net of the amounts pledged and paid to the debt-issuing component units, with no corresponding expenditure/expense reported. Others have reported the revenues earned at gross with a

related expenditure/expense for the payment of the pledged revenues to the component unit. In the first case, the debt-issuing component unit reports a revenue item that identifies the character of the pledged revenues—"sales tax revenues," for example—whereas in the latter instance, the component unit reports a "payment" from the primary government. The Board discussed whether the manner of reporting should be standardized and concluded that the "net" approach to reporting would parallel the financial reporting that would occur if the revenues were *sold* rather than pledged and may imply that the government no longer receives or is entitled to the revenue payments. Additionally, the Board believes that net reporting would be inconsistent with the approach used in Statement No. 24, *Accounting and Financial Reporting for Certain Grants and Other Financial Assistance,* which requires that "pass-through" grants be recognized as revenues and expenditures or expense, unless the conduit government has no administrative involvement with the grant program. Even though pass-through grant receipts are not comparable to a government's own pledged revenues, the Board believes that the notion that resources "passed through" to another entity require revenue and expenditure/expense recognition is a persuasive argument that pledged revenues should be reported as revenues by the pledging government, and the subsequent payment of those revenues to the debt-issuing component unit should be reported as an expense or expenditure.

**Disclosures Regarding Pledged Revenues**

81. Currently, no specific disclosures about pledged revenues are required. However, Statement 34, paragraph 100, states that proprietary funds "should identify revenues used as security for revenue bonds," and paragraph 30 of Statement No. 44, *Economic*

*Condition Reporting: The Statistical Section,* requires a schedule of pledged revenue coverage to be included in a statistical section, if one is presented.

82. The Board recognized that this standard, with its focus on pledged revenues, provided an opportunity to consider a requirement for disclosing information about pledged revenues in the notes to the financial statements. Historically, research results, due process respondent comments, and anecdotal evidence have indicated that users consider information about pledged revenues to be very important, although not commonly found in the notes to financial statements. The pledged revenue disclosures required by this Statement are based on the Board's contention that, at a minimum, the notes to the financial statements should identify the revenues that are pledged, the purposes for which they are pledged, the duration of the commitment, and some measure of the relationships of the pledged portion to the total revenue and of the actual revenues to the amount pledged. In other words, the Board believes that readers should be able to ascertain, generally, how much of a particular revenue source is not available for other purposes, how long it will remain that way, and the adequacy of the pledged revenues compared to the related debt service requirements.

83. The Board believes that disclosure of information about pledged revenues is essential for readers to be able to "assess the level of services that can be provided by the governmental entity," as implied by paragraph 79 of Concepts Statement 1. In addition, paragraph 79c of that Statement sets forth that "financial reporting should disclose legal or contractual restrictions on resources." Thus, the Board believes that disclosure of information about pledged revenues is responsive to the needs of users and is in harmony with the financial reporting objectives in Concepts Statement 1. Furthermore, the

45

disclosure requirements meet the criteria for disclosing information items in notes to financial statements discussed in paragraphs 36 and 37 of Concepts Statement No. 3, *Communication Methods in General Purpose External Financial Reports That Contain Basic Financial Statements.*

84.   Several respondents to the ED commented on the proposed disclosures about pledged or sold revenues. Some respondents expressed concern that the requirement to disclose the approximate amount of the pledged or sold revenue was tantamount to requiring a *projection* of revenue and that some amounts may not be determinable. Other respondents asked for clarification regarding the periods in which the disclosures would be required, and still others questioned whether the disclosures were necessary because the information was available elsewhere in the financial statements and notes, was too costly to obtain and provide, or was too voluminous.

85.   The Board addressed the respondents' concerns about projecting revenues by clarifying in paragraph 21a that, generally, the approximate amount of the pledge is equal to the remaining debt service requirements of the secured debt. The Board believes that the most likely impediments to making reasonable determinations of the approximate amount of the revenues pledged would be variable-rate debt service requirements or debt issuances that include accelerated redemption features, making the calculation of total interest costs difficult. Nevertheless, the Board believes that estimates of the approximate amount of revenues pledged or sold could be made based on assumptions that could be stated in the disclosures. The Board resolved the disclosure period question by stating in paragraph 21 that the disclosures should be made as long as the secured debt is outstanding.

86.   The Board acknowledges that it may be possible for financial statement users to gather the information about pledged revenues required in paragraph 21, but it believes that users interested in a specific revenue likely would not have the wherewithal to do so because they would need to analyze the long-term debt disclosures that may not contain adequate detail.  The Board maintains that the objective of the required disclosures is to provide information about the *revenue*—to bring all the pertinent information together in one place so that the reader can assess how much of a particular revenue source is not available for other purposes, how long it will remain that way, and the adequacy of that revenue relative to its committed use.  However, the Board did agree with respondents who suggested that legally separate stand-alone BTAs with a single major revenue source should be exempt from the pledged revenue disclosure requirements because the information disclosed would not significantly enhance the assessments that a reader could make from the financial statements themselves and other existing disclosures.  The Board emphasized the legally separate entity aspect of the exemption to clarify that an enterprise *fund* with user charges pledged as security for revenue bonds is not comparable because a fund is not a legally separate entity, and other resources of the governmental entity are available to the fund through operating subsidies or a full faith and credit enhancement.

**Recognizing Other Assets or Liabilities Arising from a Sale of Specific Receivables or Specific Future Revenues**

**Residual Interests**

87.   Often, a transferor government retains or obtains a beneficial or residual interest in the receivables or revenues sold to the extent that those collections exceed the amounts necessary to liquidate the transferee's debt, compensate the servicer, and pay any other costs stipulated in the agreement.  Sometimes that residual interest is certified or is

evidenced by a subordinate note issued to the government by the transferee. As discussed
earlier in paragraphs 38–40, the Board considered whether a residual interest in
collections of the underlying receivables or future revenues indicates that the transaction
is not a sale.

88.    In deliberating whether the existence of a residual interest should preclude a
transaction from sale reporting treatment, the Board considered, among other factors, the
substance of a typical delinquent tax lien transfer transaction. In such a transaction, the
transferor government exchanges an asset (a group of individual tax liens) for cash and
sometimes a document (a subordinate note or residual certificate that represents a claim on
collections in excess of a certain amount). After the transfer, the government no longer
owns any of the individual tax liens and cannot enforce their collection, even though it can
continue to bill and collect current taxes and file additional liens pertaining to those same
properties. The individual delinquent account balances included in the transaction are
considered *paid* by the proceeds from the transfer. The Board concluded that those facts
appear to characterize a sale rather than a collateralized borrowing and that the residual
interest document (the note or certificate) represents a *new* asset rather than a continuing
ownership of pieces of the old asset.

89.    In addressing the question of whether that new asset has a value that should be
recognized in the government's financial statements, the Board acknowledged that
governments may sell receivables that range from those with a low expectation of
collectibility (such as some delinquent taxes, for example) to those with a much higher
expectation of collection (mortgage loans, for example). The Board concluded that the

standard should provide for recognition of a residual interest as an asset, giving consideration to the likelihood of realization.

**Recourse and Reacquisition Requirements**

90.    As discussed earlier in paragraphs 38–40, the presence of recourse or reacquisition provisions does not preclude recognition of a transfer transaction as a sale and thus would not cause a transferor to recognize a liability for the entirety of the proceeds received in the transaction.    Rather, the Board believes that if the transaction qualifies as a sale, obligations that arise from recourse or reacquisition provisions should be recognized by applying the same criteria used in the consideration of any contingency or potential liability.

**Servicing**

91.    Sometimes governments continue to bill, collect, and otherwise service the accounts that were included in a sale of receivables.    There may or may not be a fee for that service stipulated in the sale agreement.    The Board considered two situations related to service fees—first, in certain circumstances, whether a government should recognize an amortizable asset (or liability) at the time of the transfer when there is an explicit servicing fee arrangement; and second, whether a government should impute a service fee (at least to the extent of the estimated costs) and recognize deferred servicing revenue in the absence of a stated agreement.    The first situation arises when a stated fee is more than what could be considered "adequate compensation."    In the private sector, an entity would recognize the value (the difference between the contractually specified fees and what is considered adequate compensation) of that servicing contract as an asset (with the credit side of the entry as a gain) and would amortize the amount recognized over the life of the servicing contract to recognize servicing contract income within an industry-standardized

"adequate compensation" range.[9]  The second situation arises when an entity agrees to service the transferred receivables for no specified fee or for a fee that is significantly below adequate compensation for similar servicing arrangements.  The implication in these latter situations is that a "market-valued" servicing agreement should be imputed and a portion of the proceeds of the transfer should be attributed to the imputed servicing contract fee, rather than a gain on the transfer.

92.    After debating the existence and significance of servicing fee arrangements in the governmental environment, the Board concluded that this Statement need not require an analysis of servicing arrangements.  Governments should recognize servicing fees that are stipulated in the transfer agreement as revenue when earned, that is, as the servicing takes place.  If no fee is provided for in the agreement, no revenue would be recognized.  The Board believes that, generally, private-sector standards are intended to be responsive to industries in which fees for servicing loans (auto loans, credit cards, mortgages, and so forth) are a significant revenue source in an active market and, consequently, there is a greater need for standards that would minimize the extent to which gains, losses, and revenues might be affected by values attributed to servicing contracts.  For governments generally, and with respect to delinquent taxes specifically, the Board believes that clearly is not the case.

**Financial Reporting Entity Issue—Blending Requirements**

93.    It was brought to the Board's attention—chiefly during the due process leading to the issuance of Technical Bulletin 2004-1—that there may be reasons to reexamine the criteria in paragraph 53 of Statement 14.  That paragraph, as amended, sets forth the

---

[9]Alternatively, a servicer could measure servicing assets and liabilities at fair value at each reporting date and report changes in fair value in earnings in the period in which the changes occur.

circumstances under which a component unit should be blended.   After initially considering this issue, the Board determined that it would be more appropriate to address the issue as part of the future full-scope reexamination of Statement 14.

**Effective Date and Transition**

94.   In the ED, the Board proposed that the provisions of this Statement be applied retroactively, with the changes made to comply reported as an adjustment of prior periods. Several respondents expressed concerns about governments that had previously entered into transactions involving the sales of future tobacco settlement revenues and reported those transactions pursuant to the guidance in Technical Bulletin 2004-1. If this Statement were to be applied retroactively, those governments would be required to significantly change the reporting of those prior transactions. The Board was persuaded by those concerns and decided that the provisions regarding sales of future revenues could be applied on a prospective basis. In reaching that conclusion, the Board also considered the possibility that the future revenue sale provisions could be applied prospectively from the date this Statement was issued, rather than its stated effective date, but rejected that alternative primarily due to concerns about transactions that may have been in process at that time.

## Appendix C

### ILLUSTRATIONS OF ACCOUNTING FOR SALES OF RECEIVABLES AND FUTURE REVENUES

95.    The examples presented in this appendix are intended to illustrate how the requirements of this Statement would be applied in two hypothetical situations.  The first example illustrates a sale of receivables, and the second example portrays an intra-entity sale of future revenues.   The examples are for illustrative purposes only and are nonauthoritative.  Application of this Statement to individual governments and in different situations would require consideration of the circumstances specific to those governments and situations.  Use of the specific ratios and amortization methods in these illustrations are not required—other methods may be used.

### Illustration 1: Sale of Delinquent Property Tax Liens

*Facts and assumptions:*  A city enters into an agreement to sell delinquent property tax liens to an agency of the state.  The state agency has formed a Tax Lien Finance Trust specifically for the purpose of purchasing tax liens from municipalities and issuing bonds to finance the acquisitions.  The city received $2,065,900 in exchange for tax liens totaling $4,394,520.    The city's allowance for uncollectibles pertaining to those liens is $1,098,630, resulting in a net carrying value of $3,295,890.  The agreement stipulates that the liens are sold without recourse, except that the city has an obligation with respect to liens found to be defective.  For defective liens, the city is required to (a) perfect the liens, (b) reacquire the liens from the trust, or (c) deliver to the trust substantially equivalent liens in substitution.  The city has determined that the transaction meets the criteria in paragraph 6 to be recognized as a sale.

52

Accounting in the year of the sale:

1.  The city would reduce property taxes receivable by $4,394,520, reduce the allowance for uncollectibles by $1,098,630, and recognize a loss on the sale of $1,229,990 (the carrying value of $3,295,890 less the proceeds of $2,065,900) in the government-wide statement of activities. In its governmental funds prior to the sale, the city was reporting a zero net carrying value for the delinquent taxes receivable because they were either deemed to be uncollectible ($1,098,630) or were deferred under the availability criterion ($3,295,890). Therefore, the entire amount of the proceeds ($2,065,900) would be recognized as revenue, and the remaining net receivable and related deferred revenue amounts would be eliminated.

2.  The city has determined that if any liens are found to be defective, it would first attempt to perfect the liens and, if unable to do so, would then provide acceptable substitutions. The city believes it is not probable that it would repurchase defective liens and therefore would not recognize a liability under the provisions of paragraph 18.

Accounting in future years:

If liens are subsequently found to be defective and it is probable that the city would reacquire those liens, a liability and an expenditure/expense would be recognized, provided that the amount of the repurchase obligation is measurable. At the same time, the city would add back the reacquired tax liens receivable and would reduce the expense by the estimated collectible value of those liens. In the governmental funds, either the expenditure would be reduced if the receivable were considered available or a related deferred revenue would be established.

**Illustration 2: Sale of Future Tobacco Settlement Revenues**

*Facts and assumptions:* The primary government (the county) received $200,000 from its component unit, the Tobacco Settlement Authority (TSA), in exchange for its future tobacco settlement revenues (TSRs) for the next 10 years, which, based on projected annual payments, are expected to total $320,000. Those TSRs are the sole security for the TSA's bonds, which will require $249,500 to make all principal and interest payments over the 10-year life of the debt. The county is the sole beneficiary of a residual trust, into which excess TSRs will be deposited by the TSA. The county has determined that the transaction meets the criteria in paragraph 8 to be recognized as a sale.

53

*Conditional facts or assumptions:*

- The TSA and the county both have June 30 fiscal year-ends.
- The TSA issued the bonds on July 1, with a fixed interest rate of 4.5 percent, payable each June 30 in equal maturities over 10 years.
- The county spent the $200,000 proceeds during the year for noncapital purposes in its health and welfare programs.
- The annual payment of TSRs received by the TSA on April 15 was $36,000.
- Principal and interest paid on the TSA's bonds for the current year were $20,000 and $9,000, respectively.
- TSRs receivable for the period from January 1 through June 30 are estimated to be $16,500 (for purposes of this illustration, the county's TSR receivable from the prior year is not taken into account).
- Deferred revenues and charges will be amortized by applying the ratio of the bond proceeds ($200,000) to the total estimated TSRs sold ($320,000). Therefore, deferred balances will be reduced by amounts that represent 62.5 percent of TSRs recognized.
- The county's estimated residual interest in the TSRs receivable is determined by applying the ratio that the projected total residuals bear to the total TSRs sold. The projected total residuals is equal to the difference between the total debt service requirements ($249,500) and the total TSRs sold ($320,000), or $70,500. Therefore, residuals are estimated to be 22 percent ($70,500/$320,000) of TSRs receivable.

Accounting in the year of the sale:

1. The TSA issues the bonds at par and recognizes a liability for the bonds payable in its government-wide statement of net assets and an other financing source in its governmental funds.
2. Upon receipt by the county of the proceeds from the TSA, the county would recognize $200,000 as deferred revenue and the TSA would recognize a deferred charge for the same amount.
3. The county would report the use of the proceeds as expenditures/expenses.
4. The TSA would recognize TSRs for $52,500 ($36,000 received and $16,500 receivable).
5. The TSA would recognize expenditures/expenses for the $9,000 interest and $20,000 principal payments. Bonds payable would be reduced by $20,000 in its government-wide statement of net assets.
6. The county would reduce deferred revenue and recognize revenue for $32,812 (TSRs recognized by the TSA of $52,500 × the amortization rate of 62.5 percent). The TSA would reduce the deferred charge balance and would recognize an expenditure/expense (payment to the county, for example) for the same amount.
7. The county would recognize, as an asset (residual trust account, for example) and revenue, its interest in the residual trust of $10,630 (a combination of the excess TSRs received over the TSA's debt service requirements [$36,000 − $29,000 = $7,000] and the estimated residual portion of the TSR receivable [$16,500 × 22 percent = $3,630]). The TSA would report the $10,630 as an expenditure/expense

(payment of residual TSRs, for example), representing the $7,000 cash paid into the trust and the $3,630 payable to the trust.

(Illustrative Disclosures and Financial Statements for Illustration 2 follow.)

**Illustrative Disclosures**

*Note X: Sale of Future Tobacco Settlement Revenues*

During the year, the county entered into an agreement with a component unit, the County Tobacco Settlement Authority (TSA), under which the county relinquishes to the TSA its future tobacco settlement revenues (TSRs) for the next 10 years. The county received from the TSA a lump-sum payment of $200,000 and a residual certificate in exchange for the rights to receive and retain 100 percent of the county's TSRs through 2016. The residual certificate represents the county's ownership interest in excess TSRs to be received by the TSA during the term of the sale agreement. The total TSRs sold, based on the projected payment schedule in the Master Settlement Agreement, adjusted for historical trends, is estimated to be $320,000. Residuals are expected to be approximately $70,500. The estimated present value of the TSRs sold, net of the expected residuals, assuming a 4.8 percent interest rate, at the time of the sale of was $195,850.

## Illustrative Financial Statements

Exhibit 1 shows how the transactions in Illustration 2 would be reported in the separate financial statements of the TSA.

## Exhibit 1

| Component unit separate report | Component Unit Governmental Funds | Reconciliation | Component Unit Government-wide Statements |
|---|---|---|---|
| **Balance sheet/statement of net assets** | | | |
| Cash | $ — | | $ — |
| TSR receivable | 16,500 | | 16,500 |
| Deferred charges | 167,188 | | 167,188 |
| Total assets | 183,688 | | 183,688 |
| | | | |
| Bonds payable | — | (180,000) | 180,000 |
| Due to residual trust account | 3,630 | | 3,630 |
| Total liabilities | 3,630 | | 183,630 |
| | | | |
| Fund balance/net assets | $ 180,058 | 180,000 | $ 58 |
| | | | |
| | | | |
| **Change statements** | | | |
| | | | |
| TSRs | $ 52,500 | | $ 52,500 |
| Total revenues | 52,500 | | 52,500 |
| | | | |
| Amortization of deferred charge | 32,812 | | 32,812 |
| Payment of residual TSRs | 10,630 | | 10,630 |
| Debt service—principal | 20,000 | (20,000) | — |
| Debt service—interest | 9,000 | | 9,000 |
| Total expenditures/expenses | 72,442 | | 52,442 |
| | | | |
| Other financing sources—bond proceeds | 200,000 | 200,000 | — |
| Change in fund balance/net assets | $ 180,058 | (180,000) | $ 58 |

This column contains the data that is included in the reporting entity's financial statements if the component unit is blended. (See Exhibit 2.) As explained in footnotes 3 and 4 to paragraph 15, some balances and transactions will be reclassified.

This column contains the data that is included in the reporting entity's financial statements if the component unit is discretely presented. (See Exhibit 3.)

Exhibit 2 shows how the data from the financial statements of the TSA in Illustration 2 would be blended into the county's financial reporting entity.

## Exhibit 2

| Blended TSA component unit | Primary Government Governmental Funds | Blended Component Unit | Total Gov't'l Funds | Reconciliation | Elimination of Internal Balances and Transactions | Governmental Activities Primary Government |
|---|---|---|---|---|---|---|
| **Balance sheet/statement of net assets** | | | | | | |
| Cash | $ — | $ 16,500 | $ 16,500 | | $ | $ 16,500 |
| TSR receivable | — | 167,188 | 167,188 | | (1) (167,188) | — |
| Due from other funds | | | | | | |
| Residual trust account: | | | | | | |
| Cash | 7,000 | — | 7,000 | | | 7,000 |
| Due from TSA | 3,630 | — | 3,630 | | (2) (3,630) | — |
| Total assets | 10,630 | 183,688 | 194,318 | | | 23,500 |
| | | | | | | |
| Bonds payable | | | | | | 180,000 |
| Due to residual trust account | | 3,630 | 3,630 | | (2) (3,630) | |
| Due to other funds | 167,188 | — | 167,188 | | (1) (167,188) | |
| Total liabilities | 167,188 | 3,630 | 170,818 | | | 180,000 |
| Fund balance/net assets | (156,558) | 180,058 | 23,500 | (180,000) | | (156,500) |
| | $ (156,558) | $ 180,058 | $ 23,500 | | $ | $ (156,500) |
| **Change statements** | | | | | | |
| TSRs | | $ 52,500 | $ 52,500 | | | $ 52,500 |
| Total revenues | | 52,500 | 52,500 | | | 52,500 |
| | | | | | | |
| Operating expenditures | 200,000 | — | 200,000 | | | 200,000 |
| Debt service—principal | | 20,000 | 20,000 | 20,000 | | — |
| Debt service—interest | | 9,000 | 9,000 | | | 9,000 |
| Total expenditures/expenses | 200,000 | 29,000 | 229,000 | | | 209,000 |
| Transfers | 43,442 | (43,442) | — | | | |
| Other financing sources—bond proceeds | | 200,000 | 200,000 | (200,000) | | |
| Change in fund balance/net assets | (156,558) | 180,058 | 23,500 | (180,000) | | (156,500) |
| | $ (156,558) | $ 180,058 | $ 23,500 | | | $ (156,500) |

Some primary government and component unit balances and transactions have been reclassified (in accordance with paragraph 61 of Statement 34) as if they were internal balances and *interfund transfers*, as defined in paragraph 112 of Statement 34. For example, deferred charges and deferred revenues have been reclassified as due to/from other funds. (See footnotes 3 and 4 to paragraph 15.)

Exhibit 3 Demonstrates how the TSA in Illustration 2 would be included in the county's financial reporting entity by discrete presentation.

## Exhibit 3

| Discretely presented TSA component unit | Total Primary Government | (From Exhibit 1) Discrete Component Unit | | (Optional) Total Reporting Entity (After Eliminations) |
|---|---|---|---|---|
| **Statement of net assets** | | | | |
| Cash | $          — | $          — | | $          — |
| TSR receivable | — | 16,500 | | 16,500 |
| Deferred charges | — | 167,188 | (1) | — |
| Residual trust account: | | | | |
|   Cash | 7,000 | — | | 7,000 |
|   Due from TSA | 3,630 | — | (2) | — |
|     Total assets | 10,630 | 183,688 | | 23,500 |
| | | | | |
| Bonds payable | — | 180,000 | | 180,000 |
| Due to residual trust account | — | 3,630 | (2) | — |
| Deferred revenue | 167,188 | — | (1) | — |
|     Total liabilities | 167,188 | 183,630 | | 180,000 |
| Net assets | $     (156,558) | $          58 | | $     (156,500) |
| | | | | |
| | | | | |
| **Change statement** | | | | |
| Revenue from sale of TSRs | $     43,442 | $          — | (3) | $          — |
| TSRs | — | 52,500 | | 52,500 |
|     Total revenues | 43,442 | 52,500 | | 52,500 |
| | | | | |
| Operating expenditures | 200,000 | | | 200,000 |
| Amortization of deferred charge | — | 32,812 | (3) | — |
| Payment of residual TSRs | — | 10,630 | (3) | — |
| Debt service—interest | — | 9,000 | | 9,000 |
|     Total expenses | 200,000 | 52,442 | | 209,000 |
|     Change in net assets | $     (156,558) | $          58 | | $     (156,500) |

Intra-entity balances and transactions have been eliminated/netted in the optional total reporting entity column. Elimination for a total reporting entity column is consistent with the requirement in paragraph 58 of Statement 34 pertaining to the total primary government column.

## Appendix D

### ILLUSTRATIVE DISCLOSURES—PLEDGED REVENUES

96.   This appendix illustrates disclosures required by paragraph 21 of this Statement. The facts assumed in these examples are illustrative only and are not intended to modify or limit the requirements of the Statement or to indicate the Board's endorsement of the situations or specific methods illustrated. Application of the provisions of this Statement may require disclosures and formats other than those illustrated here.  Paragraph 21 requires governments to disclose, in the notes to financial statements, information about specific revenues pledged.   The following examples illustrate how those disclosure requirements may be met in a variety of situations. (Note: If a specific revenue stream is pledged as security for multiple debt issuances, the required disclosures may be combined in a single note.)

### Example 1: Utility Revenues Pledged

The city has pledged future water customer revenues, net of specified operating expenses, to repay $5.7 million in water system revenue bonds issued in December 2003.  Proceeds from the bonds provided financing for the construction of the 17th Street filtration plant.  The bonds are payable solely from water customer net revenues and are payable through 2028.  Annual principal and interest payments on the bonds are expected to require less than 22 percent of net revenues.  The total principal and interest remaining to be paid on the bonds is $8,849,250. Principal and interest paid for the current year and total customer net revenues were $470,250 and $2,612,500, respectively.

### Example 2: Tax Increment Revenues Pledged

The city has pledged a portion of future sales tax revenues to repay $2.8 million in sales tax increment bonds issued in June 2003 to finance the refurbishing of the Southtown business

district. The bonds are payable solely from the incremental sales taxes generated by increased retail sales in the refurbished district. Incremental sales taxes were projected to produce 128 percent of the debt service requirements over the life of the bonds. Total principal and interest remaining on the bonds is $3,490,900, payable through June 2013. For the current year, principal and interest paid and total incremental sales tax revenues were $395,150 and $403,291, respectively.

**Example 3: Revenues Pledged in Connection with Component Unit Debt**

The state has pledged, as security for bonds issued by the State Public School and Higher Education Authority, a portion of the state's 1 percent supplemental sales tax that is restricted for educational purposes. The bonds, issued by the Authority in 2001 in the amount of $1.2 billion to provide financing for various capital projects of the public schools and state colleges, are payable through 2031. The state has committed to appropriate each year, from the supplemental sales tax revenues, amounts sufficient to cover the principal and interest requirements on the Authority's debt. The Authority has pledged, as the sole security for the bonds, the annual appropriations from the state. Total principal and interest remaining on the debt is $2.037 billion with annual requirements ranging from $94 million in 2007 to $41.8 million in the final year. Supplemental sales taxes, from which the appropriations will be made, have averaged $124.5 million per year over the last 10 years. For the current year, principal and interest paid by the authority and the total supplemental sales tax revenue recognized by the state were $88.6 million and $124.8 million, respectively.

## Appendix E

## CODIFICATION INSTRUCTIONS

97. The sections that follow update the June 30, 2006, *Codification of Governmental Accounting and Financial Reporting Standards* for the effects of this Statement. Only the paragraph number of the Statement is listed if the paragraph will be cited in full in the Codification.

\* \* \*

**SUMMARY STATEMENT OF PRINCIPLES**                    **SECTION 1100**

.112 [Delete *and should identify revenues used as security for revenue bonds* from the first sentence of subparagraph c.] [NCGAS 1, pp. 2–4, as amended by GASBS 6, ¶15 and ¶25, and GASBS 34, ¶15, ¶80, and ¶82; GASBS 14, ¶11, ¶12, ¶19, ¶43, ¶65, and ¶66; GASBS 34, ¶6, ¶13–¶16, ¶18, ¶21, ¶22, ¶30, ¶53, ¶63, ¶75, ¶79, ¶80, ¶82, ¶88, ¶89, ¶92, ¶101, ¶106–¶108, ¶112, ¶125, and fn53; GASBS 34, ¶100, as amended by GASBS 48, ¶21; GASBS 34, ¶130, as amended by GASBS 41, ¶3; GASBS 37, ¶6 and ¶10; GASBS 42, ¶9]

\* \* \*

61

**CLASSIFICATION AND TERMINOLOGY**                                    **SECTION 1800**

Sources: [Add GASB Statement 48]

<div align="center">

**Statements of Principle**
**Transfer, Revenue, Expenditure, and Expense Account Classification**

</div>

[Delete *and should identify revenues used as security for revenue bonds* from the first sentence of subparagraph c.] [NCGAS 1, ¶99; GASBS 34, ¶6, ¶53, ¶88, ¶89, ¶101, and ¶112; GASBS 34, ¶100, as amended by GASBS 48, ¶21; GASBS 37, ¶10]

.103 [Revise second sentence as follows:] As a result, amounts reported in the funds as interfund receivables and payables, or as deferred revenues and charges resulting from intra-entity transactions, should be eliminated in the governmental and business-type activities columns of the statement of net assets, except for the net residual amounts due between governmental and business-type activities, which should be presented as internal balances. [GASBS 34, ¶58; GASBS 48, fn4]

.106 [Revise second sentence as follows:] Resource flows (except those that affect the balance sheet only, such as loans, repayments, and deferred revenues and charges resulting from intra-entity transactions) between a primary government and its discretely presented component units should be reported as if they were external transactions—that is, as revenues and expenses. [GASBS 34, ¶61; GASBS 48, fn4]

<div align="center">

* * *

</div>

**COMPREHENSIVE ANNUAL FINANCIAL REPORT**                    **SECTION 2200**

Sources: [Add GASB Statement 48]

.146  [Revise second sentence as follows:] As a result, amounts reported in the funds as interfund receivables and payables, or as deferred revenues and charges resulting from intra-entity transactions, should be eliminated in the governmental and business-type activities columns of the statement of net assets, except for the net residual amounts due between governmental and business-type activities, which should be presented as internal balances. [GASBS 34, ¶58; GASBS 48, fn4]

.149  [Revise second sentence as follows:] Resource flows (except those that affect the balance sheet only, such as loans, repayments, and deferred revenues and charges resulting from intra-entity transactions) between a primary government and its discretely presented component units should be reported as if they were external transactions—that is, as revenues and expenses. [GASBS 34, ¶61; GASBS 48, fn4]

.169  [Delete *and should identify revenues used as security for revenue bonds* from the second sentence.] [GASBS 34, ¶100, as amended by GASBS 48, ¶21]

* * *

**NOTES TO FINANCIAL STATEMENTS**                    **SECTION 2300**

Sources: [Add GASB Statement 48]

.107  [Add new subparagraph jj as follows:] Future revenues that are pledged or sold. (See paragraphs .122 and .123, below.)

63

[Insert new paragraphs .122 and .123 as follows:]

**Future Revenues That Are Pledged or Sold**

.122  [GASBS 48, ¶21]

.123  [GASBS 48, ¶22]

\* \* \*

**REPORTING ENTITY AND COMPONENT**                          **SECTION 2600**
**UNIT PRESENTATION AND DISCLOSURE**

Sources:  [Add GASB Statement 48]

.116  [Revise second sentence as follows:] Resource flows (except those that affect the balance sheet only, such as loans, repayments, and deferred revenues and charges resulting from intra-entity transactions) between a primary government and its discretely presented component units should be reported as if they were external transactions—that is, as revenues and expenses. [GASBS 34, ¶61; GASBS 48, fn4]

\* \* \*

**PROPRIETARY FUND ACCOUNTING**                          **SECTION P80**
**AND FINANCIAL REPORTING**

.115 [Delete *and should identify revenues used as security for revenue bonds* from the second sentence.] [GASBS 34, ¶100, as amended by GASBS 48, ¶21]

\* \* \*

[Create new section as follows:]

**SALES AND PLEDGES OF RECEIVABLES AND**                    **SECTION S20**
**FUTURE REVENUES AND INTRA-ENTITY TRANSFERS**
**OF ASSETS AND FUTURE REVENUES**

Source:  GASB Statement 48

See also: Section T50, "Tobacco Settlement Recognition"

.101  [GASBS 48, ¶3, including heading and footnote; change *Statement* to *section.*]

.102–.119  [GASBS 48, ¶5–¶22, including headings and footnotes; change *Statement* to *section*

and update cross-references.]

<div align="center">* * *</div>

**TOBACCO SETTLEMENT RECOGNITION**                    **SECTION T50**

[Add the following:]

See also:  Section S20, "Sales and Pledges of Receivables and Future Revenues and Intra-Entity

Transfers of Assets and Future Revenues"

.601  [Delete questions 2, 3, and 4 and the associated responses.]

<div align="center">* * *</div>

**SPECIAL-PURPOSE GOVERNMENTS**                              **SECTION Sp20**

Sources:  [Delete GASB Technical Bulletin 2004-1]


.601  [Delete paragraph and related headings and renumber subsequent paragraph.]


* * *

**EXHIBIT 5**

Case:17-00257-LTS Doc#:324-5 Filed:02/21/18 Entered:02/21/18 23:53:00 Desc:
Exhibit 5 Page 2 of 2

# FILED UNDER SEAL

**EXHIBIT 6**

**NEW ISSUE – BOOK-ENTRY ONLY**
See "Book-Entry Only System"

*In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, (a) assuming continuing compliance with certain tax covenants as described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations, and (b) the Bonds, and the interest thereon, are exempt from state, Commonwealth of Puerto Rico and local taxation. See "Tax Matters" herein.*

## PUERTO RICO SALES TAX FINANCING CORPORATION
### $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

**Dated:** Date of Delivery    **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"), in order to provide funds to the Commonwealth of Puerto Rico (the "Commonwealth") to be applied to the repayment of certain of its debt obligations owed to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Series 2007A Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds, the Series 2007B Bonds, and any additional bonds issued under resolutions adopted by the Corporation (collectively, as amended and supplemented, the "Resolution"), will be payable from and secured by a security interest created by the Resolution in a specified portion of a new sales tax (such portion of the Commonwealth sales tax, the "Pledged Sales Tax"), imposed by a newly-enacted statute of the Commonwealth that grants to the Corporation ownership of the Pledged Sales Tax, such portion constituting the first receipts of such tax in each Fiscal Year in the specified amount. The Bank of New York will act as trustee (the "Trustee") under the Resolution.

The Bonds are issuable as registered bonds without coupons in denominations of $5,000 (of maturity amount in the case of the capital appreciation bonds), initially registered in the name of Cede & Co., as nominee for The Depository Trust Company. Purchasers of the Bonds will not receive certificates representing the Bonds. The Bonds are being issued as fixed rate bonds (the "Fixed Rate Bonds") in the form of current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), and as LIBOR-based adjustable rate bonds (the "LIBOR Bonds") as set forth in the inside cover page. Interest on the Current Interest Bonds will be payable semi-annually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008. Interest on the Capital Appreciation Bonds will not be payable on a current basis but will compound semiannually on each February 1 and August 1, commencing on August 1, 2007, and will be payable at maturity or redemption. Interest on the LIBOR Bonds will be payable quarterly, commencing on November 1, 2007. The Bonds are subject to redemption prior to maturity as set forth herein, including redemption at par. The inside cover page of this Official Statement contains information concerning the maturity schedules, interest rates, prices and approximate yields of the Bonds.

The scheduled payment of principal and interest on certain of the Bonds will be guaranteed under bond insurance policies to be issued concurrently with the delivery of the Bonds by Financial Guaranty Insurance Company, MBIA Insurance Corporation, and Ambac Assurance Corporation, as indicated in the inside cover page of this Official Statement.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX COLLECTED AND REMITTED TO THE TRUSTEE. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

The Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman, Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico. It is expected that the Bonds will be delivered through The Depository Trust Company on or about July 31, 2007.

| | | |
|---|---|---|
| **Goldman, Sachs & Co.** | | **Lehman Brothers** |
| **AG Edwards** | **Banc of America Securities LLC** | **BBVAPR MSD** |
| **Bear, Stearns & Co., Inc.** | **Citi** | **First Albany** |
| **JPMorgan** | **Loop Capital** | **Merrill Lynch & Co.** |
| **Morgan Stanley** | **Oriental Financial Services** | **Popular Securities** |
| **RBC Capital Markets** | **Samuel A. Ramírez & Co.** | **Santander Securities** |
| **UBS Investment Bank** | | **Wachovia Bank, National Association** |

July 13, 2007

# Puerto Rico Sales Tax Financing Corporation
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

### $1,667,718,572.60 Capital Appreciation Bonds

$15,445,848.60[*] Capital Appreciation Bonds due August 1, 2040;  Approximate Yield: 4.96%
$114,697,901.80[*] Capital Appreciation Bonds due August 1, 2041;  Approximate Yield: 4.98%
$113,630,448.00[*] Capital Appreciation Bonds due August 1, 2042;  Approximate Yield: 4.99%
$112,132,508.00[†] Capital Appreciation Bonds due August 1, 2043;  Approximate Yield: 5.01%
$110,597,947.20[‡] Capital Appreciation Bonds due August 1, 2044;  Approximate Yield: 5.03%
$109,430,361.25[†] Capital Appreciation Bonds due August 1, 2045;  Approximate Yield: 5.04%
$108,235,860.00[†] Capital Appreciation Bonds due August 1, 2046;  Approximate Yield: 5.05%
$107,014,744.15[‡] Capital Appreciation Bonds due August 1, 2047;  Approximate Yield: 5.06%
$701,475,105.60[‡] Capital Appreciation Bonds due August 1, 2054;  Approximate Yield: 5.14%
$175,057,848.00 Capital Appreciation Bonds due August 1, 2056;  Approximate Yield: 5.34%
Price of all Capital Appreciation Bonds 100%

$563,885,000 5.25% Current Interest Fixed Rate Bonds due August 1, 2057; Yield: 4.90%[§]

$436,000,000 LIBOR-Based Adjustable Rate Bonds due August 1, 2057; Price: 100%

The LIBOR Bonds will bear interest from their date of delivery, after an initial rate equal to
4.51775%, at a per annum rate for each period equal to 67% of the Three-Month LIBOR Rate
for such period plus a per annum spread equal to 93 basis points (0.93%); provided, however,
that the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under
Puerto Rico law (currently 12%).

---

[*] Insured by Financial Guaranty Insurance Corporation.
[†] Insured by MBIA Insurance Corporation.
[‡] Insured by Ambac Assurance Corporation.
[§] Yield to August 1, 2017 call date.

No dealer, broker, sales representative or other person has been authorized by Puerto Rico Sales Tax Financing Corporation, Government Development Bank or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale. The information contained herein has been obtained from Puerto Rico Sales Tax Financing Corporation, Government Development Bank, The Depository Trust Company, Ambac Assurance Corporation ("Ambac"), Financial Guaranty Insurance Corporation ("FGIC"), MBIA Insurance Corporation ("MBIA"), and other sources which are believed to be reliable but is not guaranteed as to accuracy or completeness by, and is not to be construed as a representation by, the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of Puerto Rico Sales Tax Financing Corporation or Government Development Bank since the date hereof. The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

IN CONNECTION WITH THIS OFFERING, THE UNDERWRITERS MAY OVER-ALLOT OR EFFECT TRANSACTIONS THAT STABILIZE OR MAINTAIN THE MARKET PRICE OF THE BONDS AT A LEVEL ABOVE THAT WHICH MIGHT OTHERWISE PREVAIL IN THE OPEN MARKET. SUCH STABILIZING, IF COMMENCED, MAY BE DISCONTINUED AT ANY TIME. THE UNDERWRITERS MAY OFFER AND SELL THE BONDS TO CERTAIN DEALERS AND DEALER BANKS AND OTHERS AT A PRICE LOWER THAN THE PUBLIC OFFERING PRICE STATED ON THE INSIDE COVER PAGE AND SAID OFFERING PRICE MAY BE CHANGED FROM TIME TO TIME BY THE UNDERWRITERS.

Other than with respect to the information concerning Ambac, FGIC, and MBIA contained under the heading "BOND INSURANCE" of this Official Statement, none of the information in this Official Statement has been supplied or verified by Ambac, FGIC or MBIA. Ambac, FGIC and MBIA make no representation or warranty, express or implied, as to (i) the accuracy or completeness of such information, (ii) the validity of the Bonds, or (iii) the tax exempt status of the interest on the Bonds.

## TABLE OF CONTENTS

| | Page |
|---|---|
| INTRODUCTION | 1 |
| THE CORPORATION | 2 |
| BOND INSURANCE | 3 |
|    Financial Guaranty Insurance Company | 3 |
|    MBIA Insurance Corporation | 5 |
|    Ambac Assurance Corporation | 8 |
|    Provisions of the Resolution | 10 |
| THE BONDS | 10 |
|    General | 10 |
|    Redemption | 12 |
| BOOK-ENTRY ONLY SYSTEM | 14 |
| ESTIMATED SOURCES AND USES OF FUNDS | 15 |
| PLEDGED SALES TAX | 15 |
|    Commonwealth Sales Tax | 15 |
|    Sales Tax Revenue Projections and Actual Collections | 16 |
|    Pledged Sales Tax and FIA Fund | 17 |
|    Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund | 18 |
| SECURITY FOR THE RESOLUTION BONDS | 18 |
|    General | 18 |
|    Property Pledged for the Payment of the Bonds | 19 |
|    Funds and Accounts under the Resolution | 19 |
|    Additional Bonds, Refunding Bonds and Other Obligations | 20 |
|    Commonwealth's Authority to Cover Deficiencies | 21 |
|    Special Investment Considerations | 21 |

| | Page |
|---|---|
|    Commonwealth Non-Impairment Covenant | 22 |
| TAX MATTERS | 22 |
|    United States Tax Considerations | 22 |
| RATINGS | 25 |
| LEGALITY FOR INVESTMENT | 25 |
| UNDERWRITING | 25 |
| LEGAL MATTERS | 26 |
| CONTINUING DISCLOSURE | 26 |
| GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO | 28 |
| MISCELLANEOUS | 28 |
| | |
| APPENDIX A – Commonwealth Economic Information | A-1 |
| APPENDIX B – Summary of Certain Definitions and Provisions of the Resolution | B-1 |
| APPENDIX C – Proposed Form of Approving Opinion of Bond Counsel to the Corporation | C-1 |
| APPENDIX D – Book-Entry System | D-1 |
| APPENDIX E – Table of Compounded Amounts for Capital Appreciation Bonds | E-1 |
| APPENDIX F – Specimen of Financial Guaranty Insurance Corporation's Bond Insurance Policy | F-1 |
| APPENDIX G – Specimen of MBIA Insurance Corporation's Bond Insurance Policy | G-1 |
| APPENDIX H – Specimen of Ambac Assurance Corporation's Bond Insurance Policy | H-1 |

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

# Puerto Rico Sales Tax Financing Corporation
## $2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA") sets forth certain information in connection with the issuance and sale by the Corporation of its Sales Tax Revenue Bonds, Series 2007A (the "Bonds"). Concurrently with the issuance of the Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"). The Series 2007B Bonds are being offered for sale solely in Puerto Rico pursuant to a separate Official Statement. The issuance of the Bonds is not contingent upon the issuance of the Series 2007B Bonds.

The Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution (the "General Resolution") and a First Supplemental Sales Tax Revenue Bond Resolution (together with the General Resolution, the "Resolution"), each adopted by the Board of Directors of the Corporation on July 13, 2007, pursuant to which The Bank of New York will act as trustee (the "Trustee").

The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2040 through 2042, as shown in the inside cover of this Official Statement (the "FGIC Insured Bonds"), when due, will be insured by a municipal insurance policy (the "FGIC Insurance Policy") issued by Financial Guaranty Insurance Corporation ("FGIC") simultaneously with the delivery of the FGIC Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2043 through 2046, as shown in the inside cover of this Official Statement (the "MBIA Insured Bonds"), when due, will be insured by a municipal insurance policy (the "MBIA Insurance Policy") issued by MBIA Insurance Corporation ("MBIA") simultaneously with the delivery of the MBIA Insured Bonds. The scheduled payment of the principal of and interest on the Capital Appreciation Bonds maturing on August 1, 2047 and 2054, as shown in the inside cover of this Official Statement (the "Ambac Insured Bonds," and together with the FGIC Insured Bonds and the MBIA Insured Bonds, the "Insured Bonds"), when due, will be insured by a municipal insurance policy (the "Ambac Insurance Policy," and together with the FGIC Insurance Policy and the MBIA Insurance Policy, the "Insurance Policies") issued by Ambac Assurance Corporation ("Ambac," and together with FGIC and MBIA, the "Bond Insurers") simultaneously with the delivery of the Ambac Insured Bonds.

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), newly-created under Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 approved December 26, 2006 and by Act No. 56 approved July 6, 2007 ("Act 91"), for the purpose of financing the payment, retirement or defeasance of certain debt obligations of the Commonwealth outstanding as of June 30, 2006, which are payable to Government Development Bank for Puerto Rico ("Government Development Bank") and Puerto Rico Public Finance Corporation ("PFC"). Such Commonwealth debt obligations, which are payable solely from Commonwealth budgetary appropriations, are generally referred to as the "Extraconstitutional Debt."

Legislation enacted by the Legislative Assembly of Puerto Rico in 2006 approved for the first time a sales and use tax, imposed at a 5.5% rate for the benefit of the Commonwealth (as well as an additional and separate 1.5% rate for the benefit of municipalities of the Commonwealth), on the sales or use of a broad range of goods and services in the Commonwealth (the tax generated by the 5.5% rate herein called the "Commonwealth Sales Tax"). Act 91 established the Dedicated Sales Tax Fund (as known by the acronym of its Spanish name, the "FIA Fund"), a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund, and provided, among other things, that each Fiscal Year the first receipts of the Commonwealth Sales Tax, in the amount specified in Act 91, be deposited in the FIA Fund and applied to the payment and retirement of the Extraconstitutional Debt outstanding as of June 30, 2006. See *"Pledged Sales Tax and FIA Fund"* in "PLEDGED SALES TAX" below.

Pursuant to the authority conferred under Act 91, the Corporation will issue the Bonds and the Series 2007B Bonds, will apply the net proceeds thereof for the payment and retirement of a portion of the Extraconstitutional Debt outstanding as of June 30, 2006 owing to Government Development Bank and PFC, and will grant a security interest under the Resolution to the Pledged Sales Tax for the payment of the Bonds and the Series 2007B Bonds. The Bonds, the Series 2007B Bonds and all other bonds issued under the Resolution will be payable from, and secured by a security interest granted under the Resolution in, the Pledged Property, including the Pledged Sales Tax. The General Resolution allows for the issuance of additional bonds with payment priorities under the Resolution on a parity with, or subordinate to, the Bonds (such additional bonds, together with the Bonds and the Series 2007B Bonds, the "Resolution Bonds").

The requirements contained in the Resolution as conditions to the issuance of additional Resolution Bonds have been modified from those presented in the Preliminary Official Statement dated June 22, 2007. See "SECURITY FOR THE RESOLUTION BONDS" below.

THE BONDS ARE PAYABLE BY THE CORPORATION SOLELY FROM THE PLEDGED PROPERTY HELD UNDER THE RESOLUTION CONSISTING PRIMARILY OF THE PLEDGED SALES TAX. THE BONDS DO NOT CONSTITUTE A DEBT, OBLIGATION OR PLEDGE OF THE FULL FAITH, CREDIT AND TAXING POWER OF THE COMMONWEALTH OR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS OR INSTRUMENTALITIES (OTHER THAN THE CORPORATION), AND NEITHER THE COMMONWEALTH NOR ANY OF ITS MUNICIPALITIES OR POLITICAL SUBDIVISIONS NOR INSTRUMENTALITIES (OTHER THAN THE CORPORATION) SHALL BE LIABLE FOR THE PAYMENT THEREOF.

Brief descriptions of the Corporation, the security for the Resolution Bonds, the terms of the Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Trustee.

This Official Statement contains certain "forward-looking statements" concerning the Corporation. These statements are based upon a number of assumptions and estimates that are subject to significant uncertainties, many of which are beyond the control of the Corporation. The words "may," "would," "could," "will," "expect," "anticipate," "believe," "intend," "plan," "estimate" and similar expressions are meant to identify these forward-looking statements. Actual results may differ materially from those expressed or implied by these forward-looking statements.

Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B*.

## THE CORPORATION

The Corporation is a newly-created independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of financing the payment, retirement or defeasance of the Extraconstitutional Debt outstanding as of June 30, 2006. Act 91 vested the Corporation with all the powers conferred on Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes, to the extent required in order for the Corporation to carry out the purposes for which it was created. The Corporation is also known by an acronym of its Spanish name -- "COFINA." Act 91 provides that present and future collections of the Pledged Sales Tax be transferred to the Corporation in exchange for, and in consideration of, the Corporation's commitment to pay, or establish mechanisms to pay, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006 with the net proceeds of the bonds issued by the Corporation and with other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

2

| Name | Occupation |
|------|------------|
| Alfredo Salazar-Conde | Acting President, Government Development Bank |
| Luis A. Avilés Pagán, Esq. | Attorney |
| Rafael F. Martínez Margarida | Certified Public Accountant |
| Hon. Jorge Silva-Puras | Governor's Chief of Staff |
| Ernesto A. Meléndez, Esq. | Attorney |
| Hon. Juan Carlos Méndez | Secretary, Department of the Treasury |
| José Guillermo Dávila | Executive Director, Office of Management and Budget |

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

## BOND INSURANCE

**Financial Guaranty Insurance Company**

The following information has been furnished by FGIC for use in this Official Statement. Reference is made to *Appendix F* for a specimen of the FGIC Insurance Policy. Concurrently with the issuance of the Bonds, FGIC will issue the FGIC Insurance Policy for the FGIC Insured Bonds. The FGIC Insurance Policy guarantees the scheduled payment of principal of and interest on the FGIC Insured Bonds when due, as set forth in the form of the FGIC Insurance Policy included as *Appendix F* to this Official Statement.

*Payments Under the Policy.* Concurrently with the issuance of the Bonds, FGIC will issue its FGIC Insurance Policy. The FGIC Insurance Policy unconditionally guarantees the payment of that portion of the principal or accreted value (if applicable) of and interest on the FGIC Insured Bonds which has become due for payment, but shall be unpaid by reason of nonpayment by the Corporation. FGIC will make such payments to U.S. Bank Trust National Association, or its successor as its agent (the "Fiscal Agent"), on the later of the date on which such principal, accreted value or interest (as applicable) is due or on the business day next following the day on which FGIC shall have received notice (in accordance with the terms of the FGIC Insurance Policy) from an owner of FGIC Insured Bonds or the trustee or paying agent, if any, of the nonpayment of such amount by the Corporation. The Fiscal Agent will disburse such amount due on any FGIC Insured Bond to its owner upon receipt by the Fiscal Agent of evidence satisfactory to the Fiscal Agent of the owner's right to receive payment of the principal, accreted value or interest (as applicable) due for payment and evidence, including any appropriate instruments of assignment, that all of such owner's rights to payment of such principal, accreted value or interest (as applicable) shall be vested in FGIC. The term "nonpayment" in respect of a FGIC Insured Bond includes any payment of principal, accreted value or interest (as applicable) made to an owner of a FGIC Insured Bond which has been recovered from such owner pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

Once issued, the FGIC Insurance Policy is non-cancellable by FGIC. The FGIC Insurance Policy covers failure to pay principal (or accreted value, if applicable) of the FGIC Insured Bonds on their stated maturity dates and their mandatory sinking fund redemption dates, and not on any other date on which the FGIC Insured Bonds may have been otherwise called for redemption, accelerated or advanced in maturity. The FGIC Insurance Policy also covers the failure to pay interest on the stated date for its payment. In the event that payment of the FGIC Insured Bonds is accelerated, FGIC will only be obligated to pay principal (or accreted value, if applicable) and interest in the originally scheduled amounts on the originally scheduled payment dates. Upon such payment, FGIC will become the owner of the FGIC Insured Bonds, appurtenant coupon or right to payment of principal or interest on such FGIC Insured Bonds and will be fully subrogated to all of the Bondowner's rights thereunder.

The FGIC Insurance Policy does not insure any risk other than nonpayment by the Corporation, as defined in the FGIC Insurance Policy. Specifically, the FGIC Insurance Policy does not cover: (i) payment on

3

acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity; (ii) payment of any redemption, prepayment or acceleration premium; or (iii) nonpayment of principal (or accreted value, if applicable) or interest caused by the insolvency or negligence or any other act or omission of the trustee or paying agent, if any.

As a condition of its commitment to insure FGIC Insured Bonds, FGIC may be granted certain rights under the FGIC Insured Bond documentation. The specific rights, if any, granted to FGIC in connection with its insurance of the FGIC Insured Bonds may be set forth in the description of the principal legal documents appearing elsewhere in this Official Statement, and reference should be made thereto.

The FGIC Insurance Policy is not covered by the Property/Casualty Insurance Security Fund specified in Article 76 of the New York Insurance Law.

FGIC is a New York stock insurance corporation that writes financial guaranty insurance in respect of public finance and structured finance obligations and other financial obligations, including credit default swaps. FGIC is licensed to engage in the financial guaranty insurance business in all 50 states, the District of Columbia, the Commonwealth, the U.S. Virgin Islands and the United Kingdom.

FGIC is a direct, wholly owned subsidiary of FGIC Corporation, a Delaware corporation. At March 31, 2007, the principal owners of FGIC Corporation and the approximate percentage of its outstanding common stock owned by each were as follows: The PMI Group, Inc. – 42%; affiliates of the Blackstone Group L.P. – 23%; and affiliates of the Cypress Group L.L.C. – 23%. Neither FGIC Corporation nor any of its stockholders or affiliates is obligated to pay any debts of FGIC or any claims under any insurance policy, including the FGIC Insurance Policy, issued by FGIC.

FGIC is subject to the insurance laws and regulations of the State of New York, where FGIC is domiciled, including New York's comprehensive financial guaranty insurance law. That law, among other things, limits the business of each financial guaranty insurer to financial guaranty insurance (and related lines); requires that each financial guaranty insurer maintain a minimum surplus to policyholders; establishes limits on the aggregate net amount of exposure that may be retained in respect of a particular issuer or revenue source (known as single risk limits) and on the aggregate net amount of exposure that may be retained in respect of particular types of risk as compared to the policyholders' surplus (known as aggregate risk limits); and establishes contingency, loss and unearned premium reserve requirements. In addition, FGIC is also subject to the applicable insurance laws and regulations of all other jurisdictions in which it is licensed to transact insurance business. The insurance laws and regulations, as well as the level of supervisory authority that may be exercised by the various insurance regulators, vary by jurisdiction.

At March 31, 2007, FGIC had net admitted assets of approximately $3.947 billion, total liabilities of approximately $2.828 billion, and total capital and policyholders' surplus of approximately $1.119 billion, determined in accordance with statutory accounting practices ("SAP") prescribed or permitted by insurance regulatory authorities.

The unaudited financial statements as of March 31, 2007, and the audited consolidated financial statements of FGIC and subsidiaries, on the basis of U.S. generally accepted accounting principles ("GAAP"), as of December 31, 2006 and December 31, 2005, which have been filed with the Nationally Recognized Municipal Securities Information Repositories ("NRMSIRs"), are hereby included by specific reference in this Official Statement. Any statement contained herein under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company*," or in any documents included by specific reference herein, shall be modified or superseded to the extent required by any statement in any document subsequently filed by FGIC with such NRMSIRs, and shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement. All financial statements of FGIC (if any) included in documents filed by FGIC with the NRMSIRs subsequent to the date of this Official Statement and prior to the termination of the offering of the FGIC Insured

4

Bonds shall be deemed to be included by specific reference into this Official Statement and to be a part hereof from the respective dates of filing of such documents.

**The New York State Insurance Department recognizes only SAP for determining and reporting the financial condition and results of operations of an insurance company, for determining its solvency under the New York Insurance Law, and for determining whether its financial condition warrants the payment of a dividend to its stockholders. Although FGIC prepares both GAAP and SAP financial statements, no consideration is given by the New York State Insurance Department to financial statements prepared in accordance with GAAP in making such determinations. A discussion of the principal differences between SAP and GAAP is contained in the notes to FGIC's audited SAP financial statements.**

Copies of FGIC's most recently published GAAP and SAP financial statements are available upon request to: Financial Guaranty Insurance Company, 125 Park Avenue, New York, NY 10017, Attention: Corporate Communications Department. FGIC's telephone number is (212) 312-3000.

*Financial Guaranty's Credit Ratings.* The financial strength of FGIC is rated "AAA" by Standard & Poor's Ratings Services, a Division of The McGraw-Hill Companies, Inc. ("S&P"), "Aaa" by Moody's Investors Service, Inc. ("Moody's"), and "AAA" by Fitch Ratings ("Fitch"). Each rating of FGIC should be evaluated independently. The ratings reflect the respective ratings agencies' current assessments of the insurance financial strength of FGIC. Any further explanation of any rating may be obtained only from the applicable rating agency. These ratings are not recommendations to buy, sell or hold the FGIC Insured Bonds, and are subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the FGIC Insured Bonds. FGIC does not guarantee the market price or investment value of the FGIC Insured Bonds nor does it guarantee that the ratings on the FGIC Insured Bonds will not be revised or withdrawn.

**Neither FGIC nor any of its affiliates accepts any responsibility for the accuracy or completeness of the Official Statement or any information or disclosure that is provided to potential purchasers of the FGIC Insured Bonds, or omitted from such disclosure, other than with respect to the accuracy of information with respect to FGIC or the FGIC Insurance Policy under the heading "BOND INSURANCE-*Financial Guaranty Insurance Company*." In addition, FGIC makes no representation regarding the FGIC Insured Bonds or the advisability of investing in the FGIC Insured Bonds.**

## MBIA Insurance Corporation

The following information has been furnished by MBIA for the use in this Official Statement. Reference is made to *Appendix G* for a specimen of the MBIA Insurance Policy. Concurrently with the issuance of the Bonds, MBIA will issue the MBIA Insurance Policy for the MBIA Insured Bonds. The MBIA Insurance Policy guarantees the scheduled payment of principal of and interest on the MBIA Insured Bonds when due, as set forth in the form of the MBIA Insurance Policy included as *Appendix G* to this Official Statement.

MBIA does not accept any responsibility for the accuracy or completeness of this Official Statement or any information or disclosure contained herein, or omitted hrerefrom, other than with respect to the accuracy of the information regarding the MBIA Insurance Policy and MBIA set forth under this "BOND INSURANCE-*MBIA Insurance Corporation*" section. Additionally, MBIA makes no representation regarding the MBIA Insured Bonds or the advisability of investing in the MBIA Insured Bonds.

The MBIA Insurance Policy unconditionally and irrevocably guarantees the full and complete payment required to be made by or on behalf of the Corporation to the Trustee or its successor of an amount equal to (i) the principal of (either at the stated maturity or by an advancement of maturity pursuant to a mandatory sinking fund payment ) and interest on, the MBIA Insured Bonds as such payment shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or

optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed by the MBIA Insurance Policy shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless MBIA elects in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner of the MBIA Insured Bonds pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law (a "Preference").

The MBIA Insurance Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any MBIA Insured Bond. The MBIA Insurance Policy does not, under any circumstance, insure against loss relating to: (i) optional or mandatory redemptions (other than mandatory sinking fund redemptions); (ii) any payments to be made on an accelerated basis; (iii) payments of the purchase price of the MBIA Insured Bonds upon tender by an owner thereof; or (iv) any Preference relating to (i) through (iii) above. The MBIA Insurance Policy also does not insure against nonpayment or any other act or omission of the Trustee or any other paying agent, if any, for the MBIA Insured Bonds.

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by MBIA from the Trustee or any owner of a MBIA Insured Bond the payment of an insured amount for which is then due, that such required payment has not been made, MBIA on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such insured amounts which are then due. Upon presentment and surrender of such MBIA Insured Bonds or presentment or such other proof of ownership of the MBIA Insured Bonds, together with any appropriate instruments of assignment to evidence the assignment of the insured amounts due on the MBIA Insured Bonds as are paid by MBIA, and appropriate instruments to effect the appointment of MBIA as agent for such owners of the MBIA Insured Bonds in any legal proceeding related to payment of insured amounts on the MBIA Insured Bonds, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners or the Trustee payment of the insured amounts due on such MBIA Insured Bonds, less any amount held by the Trustee for the payment of such insured amounts and legally available therefore.

*General.* MBIA is the principal operating subsidiary of MBIA Inc., a New York Stock Exchange listed company. MBIA Inc. is not obligated to pay the debts of or claims against MBIA. MBIA is domiciled in the State of New York and licensed to do business in and subject to regulation under the laws of all 50 states, the District of Columbia, the Commonwealth, the Commonwealth of the Northern Mariana Islands, the U.S. Virgin Islands and the Territory of Guam. MBIA, either directly or through subsidiaries, is licensed to do business in the Republic of France, the United Kingdom and the Kingdom of Spain and is subject to regulation under the laws of those jurisdictions. In February 2007, MBIA Corp. incorporated a new subsidiary, MBIA México, S.A. de C.V. ("MBIA México"), through which it intends to write financial guarantee insurance in México beginning in 2007. To date, MBIA México has had no operating activity.

The principal executive offices of MBIA are located at 113 King Street, Armonk, New York 10504 and the main telephone number at that address is (914) 273-4545.

*Regulation.* As a financial guaranty insurance company licensed to do business in the State of New York, MBIA is subject to the New York Insurance Law which, among other things, prescribes minimum capital requirements and contingency reserves against liabilities for MBIA, limits the classes and concentrations of investments that are made by MBIA and required the approval of policy rates and forms that are employed by MBIA. State law also regulates the amount of both the aggregate and individual risks that may be insured by MBIA, the payment of dividends by MBIA, changes in control with respect to MBIA, and transactions amount MBIA and its affiliates.

The MBIA Insurance Policy is not covered by the Property/Casualty Insurance Security Funds specified in Article 76 of the New York Insurance Law.

*Financial Strength Ratings of MBIA.* Moody's rates the financial strength of MBIA "Aaa." S&P rates the financial strength of MBIA "AAA." Fitch rates the financial strength of MBIA "AAA."

Each rating of MBIA should be evaluated independently. The ratings reflect the respective rating agency's current assessment of the creditworthiness of MBIA and its ability to pay claims on its policies of insurance. Any further explanation as to the significance of the above ratings may be obtained only from the applicable rating agency.

The above ratings are not recommendations to buy, sell or hold the MBIA Insured Bonds, and such ratings may be subject to revision or withdrawal at any time by the rating agencies. Any downward revision or withdrawal of any of the above ratings may have an adverse effect on the market price of the MBIA Insured Bonds. MBIA does not guaranty the market price of the MBIA Insured Bonds nor does it guaranty that the ratings on the MBIA Insured Bonds will not be revised or withdrawn.

*MBIA Financial Information.* As of December 31, 2006, MBIA had admitted assets of $10.9 billion (audited), total liabilities of $6.9 billion (audited), and total capital and surplus of $4.0 billion (audited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities. As of March 31, 2007, MBIA had admitted assets of $11.2 billion (unaudited), total liabilities of $7.0 (unaudited), and total capital and surplus of $4.2 billion (unaudited) determined in accordance with statutory accounting practices prescribed or permitted by insurance regulatory authorities.

For further information concerning MBIA, see the consolidated financial statements of MBIA and its subsidiaries as of December 31, 2006 and December 31, 2005 and for each of the three years in the period ended December 31, 2006, prepared in accordance with GAAP, included in the Annual Report on Form 10-K of MBIA Inc. for the year ended December 31, 2006 and the consolidated financial statements of MBIA and its subsidiaries as of March 31, 2007 and for the three month period ended March 31, 2007 and March 31, 2006 included in the Quarterly Report on Form 10-Q of MBIA Inc. for the quarter ended March 31, 2007, which are hereby incorporated by reference into this Official Statement and shall be deemed to be a part hereof.

Copies of the statutory financial statements filed by MBIA with the State of New York Insurance Department are available over the Internet at MBIA Inc.'s web site at http://www.mbia.com and at no cost, upon request to MBIA at its principal offices.

*Incorporation of Certain Documents by Reference.* The following documents filed by MBIA Inc. with the Securities & Exchange Commission ("SEC") are incorporated by reference into this Official Statement:

(1)    MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006;

(2)    MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007.

Any documents, including any financial statement of MBIA and its subsidiaries that are included therein or attached as exhibits thereto, filed by MBIA Inc. pursuant to Section 13(a), 13(c), 14 or 15(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act") after the date of MBIA Inc.'s most recent Quarterly Report on Form 10-Q or Annual Report on Form 10-K, and prior to the termination of the offering of the MBIA Insured Bonds offered hereby shall be deemed to be incorporated by reference in this Official Statement and to be a part hereof from the respective dates of filing such documents. Any statement contained in a document incorporated or deemed to be incorporated by reference herein, or contained in this Official Statement, shall be deemed to be modified or superseded for purposes of this Official Statement to the extent that a statement contained herein or in any other subsequently filed documents which also is or is deemed to be incorporated by reference herein modifies or supersedes such statement. Any such statement so modified or superseded shall not be deemed, except as so modified or superseded, to constitute a part of this Official Statement.

MBIA Inc. files annual, quarterly and special reports, information statements and other information with the SEC under File No. 1-9583. Copies of MBIA Inc.'s SEC filings (including (1) MBIA Inc.'s Annual Report on Form 10-K for the year ended December 31, 2006, and (2) MBIA Inc.'s Quarterly Report on Form 10-Q for the quarter ended March 31, 2007) are available (i) over the Internet at the SEC's web site at http://www.sec.gov; (ii) at the SEC's public reference room in Washington, D.C.; (iii) over the Internet at MBIA Inc.'s web site at http://www.mbia.com; and (iv) at no cost, upon request to MBIA at its principal executive offices.

## Ambac Assurance Corporation

The following information has been furnished by Ambac for the use in this Official Statement. Reference is made to *Appendix H* for a specimen of the Ambac Insurance Policy. Concurrently with the issuance of the Bonds, Ambac will issue the Ambac Insurance Policy for the Ambac Insured Bonds. The Ambac Insurance Policy guarantees the scheduled payment of principal of and interest on the Ambac Insured Bonds when due, as set forth in the form of the Ambac Insurance Policy included as *Appendix H* to this Official Statement.

*Payment Pursuant to Financial Guaranty Insurance Policy.* Ambac has made a commitment to issue the Ambac Insurance Policy relating to the Ambac Insured Bonds, effective as of the date of issuance of the Ambac Insured Bonds. Under the terms of the Ambac Insurance Policy, Ambac will pay to The Bank of New York, in New York, New York, or any successor thereto (the "Insurance Trustee"), that portion of the principal of and interest on the Ambac Insured Bonds that shall become due for payment but shall be unpaid by reason of nonpayment by the Obligor (as such terms are defined in the Ambac Insurance Policy). Ambac will make such payments to the Insurance Trustee on the later of the date on which such principal and/or interest becomes due for payment or within one business day following the date on which Ambac shall have received notice of nonpayment from the Trustee. The insurance will extend for the term of the Ambac Insured Bonds and, once issued, cannot be canceled by Ambac.

The Ambac Insurance Policy will insure payment only on stated maturity dates and on mandatory sinking fund installment dates, in the case of principal, and on stated dates for payment, in the case of interest. If the Ambac Insured Bonds become subject to mandatory redemption and insufficient funds are available for redemption of all outstanding Ambac Insured Bonds, Ambac will remain obligated to pay the principal of and interest on outstanding Ambac Insured Bonds on the originally scheduled interest and principal payment dates, including mandatory sinking fund redemption dates. In the event of any acceleration of the principal of the Ambac Insured Bonds, the insured payments will be made at such times and in such amounts as would have been made had there not been an acceleration, except to the extent that Ambac elects, in its sole discretion, to pay all or a portion of the accelerated principal and interest accrued thereon to the date of acceleration (to the extent unpaid by the Obligor). Upon payment of all such accelerated principal and interest accrued to the acceleration date, Ambac's obligations under the Ambac Insurance Policy shall be fully discharged.

In the event the Trustee has notice that any payment of principal of or interest on an Ambac Insured Bond that has become due for payment and that is made to a owner by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from its registered owner pursuant to the United States Bankruptcy Code in accordance with a final, non-appealable order of a court of competent jurisdiction, such registered owner will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

The Ambac Insurance Policy does **not** insure any risk other than nonpayment (as set forth in the Ambac Insurance Policy). Specifically, the Ambac Insurance Policy does **not** cover:

      1.     payment on acceleration, as a result of a call for redemption (other than mandatory sinking fund redemption) or as a result of any other advancement of maturity;

2.   payment of any redemption, prepayment or acceleration premium; and

3.   nonpayment of principal or interest caused by the insolvency or negligence of the Trustee, Paying Agent or Bond Registrar, if any.

If it becomes necessary to call upon the Ambac Insurance Policy, payment of principal requires surrender of the Ambac Insured Bonds to the Insurance Trustee together with an appropriate instrument of assignment so as to permit ownership of such Ambac Insured Bonds to be registered in the name of Ambac to the extent of the payment under the Ambac Insurance Policy.  Payment of interest pursuant to the Ambac Insurance Policy requires proof of holder entitlement to interest payments and an appropriate assignment of the owner's right to payment to Ambac.

Upon payment of the insurance benefits, Ambac will become the owner of the Ambac Insured Bonds, appurtenant coupon, if any, or right to payment of the principal of or interest on such Ambac Insured Bonds and will be fully subrogated to the surrendering owner's rights to payment.

*General.*  Ambac is a Wisconsin-domiciled stock insurance corporation regulated by the Office of the Commissioner of Insurance of the State of Wisconsin, and is licensed to do business in 50 states, the District of Columbia, the Territory of Guam, the Commonwealth and the U.S. Virgin Islands, with admitted assets of approximately $10,194,000,000 (unaudited) and statutory capital of approximately $6,557,000,000 (unaudited) as of March 31, 2007. Statutory capital consists of Ambac's policyholders' surplus and statutory contingency reserve. S&P, Moody's and Fitch have each assigned a triple-A financial strength rating to Ambac.

Ambac has obtained a ruling from the Internal Revenue Service to the effect that the insuring of an obligation by Ambac will not affect the treatment for federal income tax purposes of interest on such obligation and that insurance proceeds representing maturing interest paid by Ambac under policy provisions substantially identical to those contained in the Ambac Insurance Policy shall be treated for federal income tax purposes in the same manner as if such payments were made by the Obligor.

*Available Information.*  The parent company of Ambac, Ambac Financial Group, Inc., is subject to the informational requirements of the Exchange Act, and in accordance therewith files reports, proxy statements and other information with the SEC. These reports, proxy statements and other information can be read and copied at the SEC's public reference room at 100 F Street, N.E., Room 1580, Washington, D.C. 20549.  Please call the SEC at 1-800-SEC-0330 for further information on the public reference room.  The SEC maintains an internet site at http://www.sec.gov that contains reports, proxy and information statements and other information regarding companies that file electronically with the SEC, including Ambac Financial Group, Inc.  These reports, proxy statements and other information can also be read at the offices of the New York Stock Exchange, Inc., 20 Broad Street, New York, New York 10005.

Copies of Ambac's financial statements prepared in accordance with statutory accounting standards are available from Ambac.  The address of Ambac's administrative offices is One State Street Plaza, 19th Floor, New York, New York 10004, and its telephone number is (212) 668-0340.

*Incorporation of Certain Documents by Reference.*  The following documents filed by Ambac Financial Group, Inc. with the SEC (File No. 1-10777) are incorporated by reference in this Official Statement:

Ambac Financial Group, Inc.'s Annual Report on Form 10-K for the fiscal year ended December 31, 2006 and filed on March 1, 2007;

Ambac Financial Group, Inc.'s Current Report on Form 8-K dated and filed on April 25, 2007; and

Ambac Financial Group, Inc.'s Quarterly Report on Form 10-Q for the fiscal quarterly period ended March 31, 2007 and filed on May 10, 2007.

All documents subsequently filed by Ambac Financial Group, Inc. pursuant to the requirements of the Exchange Act after the date of this Official Statement will be available for inspection in the same manner as described above in *"Available Information."*

**Provisions of the Resolution**

Each of the Bond Insurers named under this caption "BOND INSURANCE" imposes requirements that are contained in the First Supplemental Resolution that provide that the related Bond Insurer shall be deemed to be the Owner of the Series 2007A Bonds that such Bond Insurer insures for purposes of certain matters and consents under the Resolution, including rights with respect to the naming of successor Trustee, rights upon an Event of Default and rights with respect to amendments to the Resolution, and otherwise imposes restrictions contained in the First Supplemental Resolution on eligible investment securities and defeasance securities.

## THE BONDS

**General**

*Fixed Rate Bonds*

The fixed rate bonds (the "Fixed Rate Bonds") will be dated their date of delivery, and will be issued as current interest bonds (the "Current Interest Bonds") and capital appreciation bonds (the "Capital Appreciation Bonds"), in the principal amounts, bearing interest at the rates, or compounding at the approximate yields (in the case of Capital Appreciation Bonds), and maturing (subject to the rights of redemption described below) on the dates, all as shown on the inside cover page of this Official Statement.

Interest on the Bonds will accrue, or compound (in the case of Capital Appreciation Bonds), from their date of delivery. Interest on the Current Interest Bonds will be payable semiannually to maturity (or earlier redemption) on each February 1 and August 1, commencing on February 1, 2008, and such interest shall be computed on a basis of a 360-day year consisting of twelve 30-day months. Interest on the Capital Appreciation Bonds, computed on a basis of a 360-day year consisting of twelve 30-day months, will not be paid on a current basis, but will be added to the principal in the form of Compounded Amount on each February 1 and August 1, commencing on August 1, 2007 (each a "Compounding Date"), and will be treated as if accruing in equal daily amounts between Compounding Dates, until payable at maturity or upon redemption.

For purposes of this Official Statement, references to "principal" shall mean, in the case of the Capital Appreciation Bonds, the Compounded Amount thereof.

*LIBOR Bonds*

The Bonds due August 1, 2057 bearing interest at a LIBOR-based adjustable rate (the "LIBOR Bonds") will be dated their date of delivery.

Interest on the LIBOR Bonds will be payable on each August 1, November 1, February 1 and May 1, commencing on November 1, 2007, and if such day is not a Business Day, then the next succeeding Business Day (the "Interest Payment Date"), and such interest shall be computed on a basis of a 365 or 366-day year, as applicable, for the number of days in such LIBOR-Based Interest Rate Period.

The LIBOR-Based Interest Rate (other than the rate for the first period) will be the rate of interest per annum determined by the Trustee to be equal to 67% of Three-Month LIBOR plus 93 basis points (0.93%); provided, further that in all cases, the LIBOR-Based Interest Rate will never exceed the maximum rate permitted under Puerto Rico law (currently 12%).

During each period with respect to the LIBOR Bonds during which a LIBOR-Based Interest Rate is in effect (the "LIBOR-Based Interest Rate Period"), commencing on and including each Interest Payment Date (or the date of issuance of the LIBOR Bonds for the period prior to the first Interest Payment Date) to but not including the following Interest Payment Date, the LIBOR Bonds will bear interest at the LIBOR-Based Interest Rate.

"Three-Month LIBOR," with respect to the LIBOR Bonds, shall mean the rate for deposits in U.S. dollars with a three-month maturity that appears on Reuters Screen LIBOR 01 Page (or such other page as may replace that page on that service, or such other service as may be nominated by the British Bankers Association, for the purpose of displaying London interbank offered rates for U.S. dollar deposits) as of 11:00 a.m., London time, on the LIBOR Rate Determination Date, except that, if such rate does not appear on such page, the Three-Month LIBOR Rate means a rate determined on the basis of the rates at which deposits in U.S. dollars for a three-month maturity and in a principal amount of at least U.S. $1,000,000 are offered at approximately 11:00 a.m., London time, on the LIBOR Rate Determination Date, to prime banks in the London interbank market by four major banks in the London interbank market (herein referred to as the "Reference Banks") selected by a market agent appointed by the Trustee upon written direction of the Corporation to identify such Reference Banks (initially, Goldman, Sachs & Co. or such other market agent as may be selected by the Corporation, the "Market Agent"). The Market Agent will request the principal London office of each of such Reference Banks to provide a quotation of its rate. If at least two such quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of such quotations. If fewer than two quotations are provided, the Three-Month LIBOR Rate will be the arithmetic mean of the rates quoted by three (if three quotations are not provided, two or one, as applicable) major banks in New York City, selected by the Market Agent, at approximately 11:00 a.m., New York City time, on the LIBOR Rate Determination Date for loans in U.S. dollars to leading European banks in a principal amount of at least U.S. $1,000,000 having a three-month maturity. If none of the banks in New York City selected by the Market Agent is then quoting rates for such loans, then the Three-Month LIBOR Rate for the ensuing interest period will mean the Three-Month LIBOR Rate then in effect in the immediately preceding LIBOR-Based Interest Accrual Period.

The Market Agent will calculate the LIBOR-Based Interest Rate applicable to each Interest Payment Date and will notify the Trustee and the Corporation of the LIBOR-Based Interest Rate so calculated in writing, or by electronic communication promptly confirmed in writing, by no later than close of business on the second Business Day preceding the Interest Payment Date. All calculations of the LIBOR-Based Interest Rate by the Market Agent will be final and conclusive and binding on the Trustee, the Owners of the LIBOR Bonds and the Corporation, absent manifest error. If the Market Agent fails to provide a notice of the LIBOR-Based Interest Rate as described in this paragraph, then the Trustee will calculate the LIBOR-Based Interest Rate for such Interest Payment Date and notify the Corporation of the LIBOR-Based Interest Rate so calculated as if it were the Market Agent by no later than close of business on the first Business Day preceding the Interest Payment Date.

The determination of the LIBOR-Based Interest Rate will be made on the day that is two London Banking Days preceding each Interest Payment Date (each, a "LIBOR Rate Determination Date"). As soon as possible after 11:00 a.m., New York City time, on each LIBOR Rate Determination Date, but in no event later than 11:00 a.m., New York City time, on the Business Day immediately following each LIBOR Rate Determination Date, the Trustee will notify the owners of the LIBOR Bonds of the LIBOR-Based Interest Rate for the next LIBOR-Based Interest Accrual Period. For purposes of this Official Statement, "London Banking Day" shall mean any day on which commercial banks are open for general business (including dealings in foreign exchange and foreign currency deposits) in the City of London, United Kingdom.

In connection with the issuance of the LIBOR Bonds, the Corporation is expected to enter into interest rate exchange agreements (the "Swap Agreements"), with Goldman Sachs Capital Markets, L.P., an affiliate of Goldman, Sachs & Co., and Lehman Brothers Special Financing Inc. (each, a "Swap Provider"), each in a notional amount equal to $218,000,000, and together aggregating the principal amount of the LIBOR Bonds. In general, the Swap Agreements provide that, subject to the terms thereof, the Corporation will pay to the Swap

Provider a fixed interest rate and the Swap Provider will pay to the Corporation a floating interest rate exactly equal to the LIBOR-Based Interest Rate payable on the LIBOR Bonds. The purpose of the Swap Agreements is generally to convert the Corporation's floating rate obligations with respect to the LIBOR Bonds to fixed rate obligations.

Under certain circumstances, the Swap Agreements are subject to termination prior to their scheduled termination date and prior to the maturity of the LIBOR Bonds. In the event of a required early termination of either of the Swap Agreements, there can be no assurance that (i) the Corporation will receive any termination payment payable to it by the Swap Provider, (ii) the Corporation will have sufficient amounts to pay a termination payment payable by it to the Swap Provider, and (iii) the Corporation will be able to obtain a replacement swap agreement with comparable terms. Payment due upon early termination may be substantial. Neither the owners of the LIBOR Bonds nor any other person acting on behalf of such owners shall have any rights under the swap agreements or against the Swap Provider.

The Corporation will be obligated to pay interest on and the principal of the LIBOR Bonds regardless of whether the Swap Providers perform their obligations under the Swap Agreements.

The obligation of the Corporation to make regularly scheduled swap payments under the Swap Agreements will be secured by a grant of a security interest in the Pledged Property, on a parity with the Bonds. The obligation of the Corporation to make any termination payment under the Swap Agreements will be secured by a grant of a security interest in the Pledge Property subordinate to the Bonds and other Resolution Bonds.

*Rounding*

All percentages resulting from any calculation of the interest rate on the LIBOR Bonds will be rounded to the nearest fifth decimal place (one-hundred thousandth of a percentage point), rounding upwards if the sixth decimal place is five or greater (e.g., 9.876555% (or .09876555) would be rounded up to 9.87656% (or .0987656) and 9.876554% (or .09876554) would be rounded down to 9.87655% (or .0987655)). All dollar amounts used in or resulting from such calculation on the LIBOR Bonds will be rounded to the nearest cent (with one-half cent being rounded upward).

*Form of Bonds*

The Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof (of maturity amount in the case of the Capital Appreciation Bonds). The Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below. Certificated Bonds will not be available for distribution to the investing public. Transfers of ownership, and payment on the Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See "BOOK-ENTRY ONLY SYSTEM."

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds secured on a parity with the Bonds or on a subordinate basis. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under "SECURITY FOR THE RESOLUTION BONDS."

**Redemption**

*Optional Redemption of Current Interest Bonds.* The Current Interest Bonds and LIBOR Bonds are subject to redemption at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2017, at a redemption price equal to 100% of the principal amount of the Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Make-whole Optional Redemption of the Capital Appreciation Bonds.* The Capital Appreciation Bonds are subject to redemption prior to maturity, in whole or in part, at the option of the Corporation from any source, including without limitation the proceeds of refunding bonds or other financing provided by the Corporation, at any time on or after August 1, 2012, at a redemption price equal to the greater of: (i) 100% of the Compounded Amount, and (ii) the sum of the present values of the remaining scheduled payments of debt service on the Bonds to be redeemed, discounted, on a semiannual basis, assuming a 360-day year consisting of twelve 30-day months, at the Applicable Tax-Exempt Municipal Bond Rate.

The "Applicable Tax-Exempt Municipal Bond Rate" for any Capital Appreciation Bond to be redeemed will be the Comparable AAA General Obligations yield curve rate for the remaining weighted average maturity date of such Bond as published by Municipal Market Data. If no such yield curve rate is established for the applicable year, the Comparable AAA General Obligations yield curve rate for the two published maturities most closely corresponding to the applicable year will be determined, and the Applicable Tax-Exempt Municipal Bond Rate will be interpolated or extrapolated from those yield curve rates on a straight-line basis. This rate is made available daily by Municipal Market Data and is available to its subscribers through its internet address: www.tm3.com.

In calculating the Applicable Tax-Exempt Municipal Bond Rate, should Municipal Market Data no longer publish the Comparable AAA General Obligations yield curve rate, the Applicable Tax-Exempt Municipal Bond Rate will equal the Consensus Scale yield curve rate for the applicable year. The Consensus Scale yield curve rate is made available daily by Municipal Market Advisors and is available to its subscribers through its internet address: www.theconsensus.com.

In the further event Municipal Market Advisors no longer publishes the Consensus Scale, the Applicable Tax-Exempt Municipal Bond Rate will be determined by Goldman, Sachs & Co., as the quotation agent, based upon the rate per annum equal to the yield to maturity (based upon semiannual compounding) of those tax-exempt general obligation bonds rated in the highest rating category by Moody's and S&P with a maturity date closest to the remaining weighted maturity date of the Bonds having characteristics (other than the ratings) most comparable to those of the Bonds in the judgment of the quotation agent. The quotation agent's determination of the Applicable Tax-Exempt Municipal Bond Rate is final and binding in the absence of manifest error.

The Applicable Tax-Exempt Municipal Bond Rate shall be calculated on the fifth business day preceding the redemption date.

*Mandatory Sinking Fund Redemption.* The Capital Appreciation Bonds maturing on August 1, 2054 and August 1, 2056 shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following respective table the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Bonds (the principal amount set opposite the maturity date in said table shall be payable on such maturity date and shall not constitute a Sinking Fund Installment):

13

**Sinking Fund Installments for Capital Appreciation Bonds Maturing**

| Mandatory Redemption Date | August 1, 2054 | | August 1, 2056 | |
| --- | --- | --- | --- | --- |
| | Original Principal Amount | Compounded Amount | Original Principal Amount | Compounded Amount |
| 08/01/2048 | $102,859,098.30 | $ 823,990,091.40 | | |
| 08/01/2049 | 101,982,687.10 | 859,508,225.80 | | |
| 08/01/2050 | 101,102,593.50 | 896,448,120.75 | | |
| 08/01/2051 | 100,217,436.60 | 934,865,609.70 | | |
| 08/01/2052 | 99,329,057.60 | 974,818,780.80 | | |
| 08/01/2053 | 98,438,837.40 | 1,016,370,837.90 | | |
| 08/01/2054* | 97,545,395.10 | 1,059,585,000.00 | | |
| 08/01/2055 | | | $88,021,458.00 | $1,104,529,581.30 |
| 08/01/2056* | | | 87,036,390.00 | 1,151,275,000.00 |

* Final maturity.

*Notice of Redemption.* In the event any Bonds are called for redemption, the Corporation shall give the Trustee notice ("Notice") at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give Notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Bonds as described above, to the registered owners of the Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such Notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Bonds or portions thereof for which proper notice was given. If a Notice of redemption shall be unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Bonds or portions thereof so called for redemption at the place or places of payment, such Bonds or such portion shall be redeemed.

The Notice shall (a) specify the (i) Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which shall be the principal office of the Trustee), and if less than all of the Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Bonds, and the portions of the Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Bonds or portions thereof to be redeemed shall cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase).

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of (or Compounded Amount, in the case of the Capital Appreciation Bonds) and premium, if any, and interest on the Bonds (or portions thereof) to be redeemed, then the Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest (in the case of the Capital Appreciation Bonds, the Compounded Amount thereof shall cease to increase), and shall no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

## BOOK-ENTRY ONLY SYSTEM

The information contained in *Appendix D* to this Official Statement concerning DTC and DTC's book-entry only system has been obtained from sources that the Corporation and the Underwriters believe to be reliable, but neither the Corporation nor the Underwriters take responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Bonds; (ii) confirmation of ownership interest in the Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Bonds; or that they will do so on a timely basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Bonds. See *Appendix D-Book-Entry System*.

## ESTIMATED SOURCES AND USES OF FUNDS

The estimated sources and uses of funds are expected to be as follows:

**Sources**

| | |
|---|---|
| Principal Amount of the Bonds | $2,667,603,572.60 |
| Additional Sources of Funds | 4,400,000.00 |
| Original Issue Premium | 15,456,087.85 |
| **Total Sources** | $2,687,459,660.45 |

**Uses**

| | |
|---|---|
| Payment of Extraconstitutional Debt | $2,594,848,882.83 |
| Underwriters' Discount and Other Costs of Issuance[1] | 92,610,777.62 |
| **Total Uses** | $2,687,459,660.45 |

[1] Includes insurance premiums aggregating $70,329,182, legal, printing, and other financing expenses.

## PLEDGED SALES TAX

### Commonwealth Sales Tax

By virtue of Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), the Legislative Assembly of Puerto Rico approved for the first time a Commonwealth sales tax at a rate of 5.5%, which is imposed on the sale of a wide range of goods and delivery of various services, as well as a separate sales tax to be imposed by the municipalities. The enactment of the Commonwealth Sales Tax in the amount of 5.5% on the sale price of the item or services subject to tax was confirmed by the Supreme Court of Puerto Rico by decision rendered on November 10, 2006.

Items subject to Commonwealth Sales Tax consist of "tangible personal property," "taxable services," and "admission fees." The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The tax applies in general to the following items: (a) clothing and accessories, (b) furniture and appliances, (c) electronics, (d) any tangible good not otherwise exempted, (e) phone service, cable TV, (f) alcoholic beverages and tobacco, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, and (i) all non-prescription medicines and nutritional supplements. Among other exemptions, the following items are exempt from the tax: (i) taxable

items sold for use and consumption outside Puerto Rico, even if the sale occurs in Puerto Rico (i.e., exportation), (ii) taxable items "in transit" (i.e., brought to Puerto Rico in connection with productions of films, constructions, trade shows or other ends, which are re-exported from Puerto Rico by the same person who imported them), (iii) healthcare services and prescription medicines, (iv) housing units, (v) non-prepared food, (vi) crude oil and its derivatives, including gasoline, (vii) motor vehicles, (viii) services provided by designated professionals, (ix) financial services, (x) services provided by the Commonwealth, including electricity and water, (xi) purchases of special items or devices for persons with certain disabilities, (xii) purchase of raw materials and machinery and equipment used for the manufacturing of finished goods or products, (xiii) items sold in airports and marine ports to persons traveling outside the jurisdictional limits of Puerto Rico, (xiv) foods and prepared foods served in hospitals and other health care facilities and in schools, (xv) prescription medicines, (xvi) admissions to athletic or other events sponsored by schools, universities or colleges, (xvii) purchase of foods or taxable items made under the Nutritional Assistance Program or similar program, and (xviii) rental of real property for commercial purposes as student housing and by an individual for his/her main residence.

Merchants are required to collect the Commonwealth Sales Tax from the consumer; otherwise the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant to fines. The Secretary of the Treasury may require that the merchant post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted to the Secretary of the Treasury no later than the 20th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury. Each merchant is required to file a Sales and Use Tax Monthly Return to the Secretary of the Treasury no later than the 20th day of each month. Certain large merchants are required to file their return electronically. Annually, every merchant dedicated to a business or industry that was a merchant at any time during its taxable year must file a Sales and Use Tax Annual Return no later than the 15th day of the third month following the end of its taxable year. As of May 30, 2007, 310,000 merchants were registered at the Treasury Department.

## Sales Tax Revenue Projections and Actual Collections

The Commonwealth Sales Tax went into effect on November 15, 2006. For Fiscal Year 2006-2007, the Treasury Department projected that it would collect $703 million in Commonwealth Sales Tax revenues for the seven and one half month period from November 15, 2006 through June 30, 2007 (an average of $93.7 million per month).

Total Commonwealth Sales Tax collections from November 15, 2006 through May 2007 was $617.9 million (an average of $95.1 million per month), representing a projected increase of $6.2 million from the Commonwealth Sales Tax revenue projections for the same period. As of June 2007, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

Commonwealth Sales Tax revenue projections for Fiscal Year 2007-2008 equal $1.1 billion, or an average of $93.1 million per month, which represents $2.0 million less per month than average monthly collections in the period from November 15, 2006 through May 2007. Estimates for Fiscal Year 2007-2008 represent the collections expected to be received after August 1, 2007 for July collections.

The Commonwealth Sales Tax revenue projections referred to above were made based on the Consumption Tax Model (the "CTM") developed by a leading national management and technology consulting firm, as adjusted to account for the Commonwealth's economic outlook for Fiscal Year 2007 as presented by the Planning Board on February 2007. See *Appendix A – Commonwealth Economic Information*. The CTM is an

16

input-output-based model that created a snapshot of the circular flow of incomes and expenditures in the economy of Puerto Rico and provided a detailed data-consistency framework for analyzing revenue and distributional impacts of consumption tax policies. In addition, the CTM not only encompassed transactions between industries, but also provided a highly disaggregated description of the flows of goods, services and incomes between all relevant economic sectors. Transactions involving goods and services were differentiated by end use, such as private consumption, government consumption, intermediate use, investment, exports and imports. The most important assumptions imbedded in the CTM were, among others, the demand and supply components of gross national product based on actual national income accounts for the Commonwealth as of Fiscal Year 2002.

## Pledged Sales Tax and FIA Fund

The portion of the Commonwealth Sales Tax that is pledged under the Resolution as security for the payment of all bonds outstanding under the Resolution (the "Pledged Sales Tax"), principally consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the product of the amount of the sales tax collected during the Fiscal Year multiplied by a fraction, the numerator of which is 1% and the denominator of which is the Commonwealth Sales Tax rate (at present, 5.5%: the amount resulting from such multiplication is sometimes referred to herein as the "1% formula"), and (ii) for Fiscal Years beginning July 1, 2007, a minimum amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount."

Regardless of the level of sales tax collections based on the 1% share, Act 91 requires that all of the 5.5% Commonwealth Sales Tax be applied to satisfy and fund the Pledged Sales Tax Base Amount before any amounts are transferred to the Commonwealth General Fund.

The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2007, is $185,000,000. Pursuant to Act 91, the Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4%. In addition, Act 91 provides that if the amounts described in the first paragraph of this subsection were insufficient to pay principal of or interest on bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation for deposit in the FIA Fund as additional Pledged Sales Tax from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which is in excess of the amounts described in the first paragraph of this subsection received during such Fiscal Year. See also *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE RESOLUTION BONDS."

Act 91 creates the FIA Fund and requires that the Pledged Sales Tax be deposited into the FIA Fund. Under the provisions of Act 91, the FIA Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to pay and retire, directly or indirectly, all or part of the Extraconstitutional Debt outstanding as of June 30, 2006. The FIA Fund is administered by the Government Development Bank and the Secretary of the Treasury.

During Fiscal Year 2007-2008 and subsequent Fiscal Years, the first collections of the Commonwealth Sales Tax, up to the Pledged Sales Tax Base Amount, are required to be deposited as received into the FIA Fund (or other fund maintained for that purpose under the Resolution). On a monthly basis, the Secretary of the Treasury is required to determine, based on actual Commonwealth Sales Tax collections, whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula, exceeds the applicable Pledged Sales Tax Base Amount and, if so, is required to deposit into the FIA Fund all Commonwealth Sales Tax collections received after such determination in an amount equal to such excess. On or prior to October 1 of each Fiscal Year, the Secretary of the Treasury is required to determine whether the amount of Commonwealth Sales Tax required to be transferred to the FIA Fund on the basis of the 1% formula during the prior Fiscal Year exceeded the applicable Pledged Sales Tax Base Amount and, if so, Act 91 requires

17

that all Commonwealth Sales Tax collections of the prior Fiscal Year representing such excess be transferred to the FIA Fund (to the extent not previously transferred).

**Procedures for the Collection and Deposit of the Pledged Sales Tax to the FIA Fund**

The procedures implemented by the Treasury Department in order to comply with the funding requirements of Act 91 are the following:

- The merchant or retailer files the return and pays the Commonwealth Sales Tax collected on a monthly basis to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular de Puerto Rico, a leading commercial banking institution in the Commonwealth and the Caribbean ("Banco Popular") or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- If the merchant files the return and pays the Commonwealth Sales Tax collected to First Data, after the receipt thereof, First Data sends, on a daily basis, (i) the Commonwealth Sales Tax collected by the merchant or retailer directly to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent, and (ii) the 1.5% municipal sales tax to the municipalities[1].

- If the merchant pays the Commonwealth Sales Tax collected to any other Authorized Collector (other than First Data), such Authorized Collectors are required to transfer such payment on a daily basis to a bridge account at Banco Popular in the name of the Treasury Department, as paying/receiving agent.

- Once the moneys are deposited in the bridge account at Banco Popular, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Trustee all Commonwealth Sales Tax collections (See *"Funds and Accounts Under the Resolution"* under "SECURITY FOR THE REOLUTION BONDS") until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account and, thereafter, to the Treasury Department all subsequent Commonwealth Sales Tax collections until such time as the Treasury Department has received its share (4.5% of the 5.5%) of the collections received to date in the Fiscal Year. Thereafter, Banco Popular divides additional receipts of the Commonwealth Sales Tax between the Revenue Account and the Treasury on the basis of the 1%/4.5% split.

## SECURITY FOR THE RESOLUTION BONDS

**General**

Pursuant to the Resolution, the Bonds and all other Resolution Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in the Pledged Property. The Resolution prohibits the issuance of any bonds or notes with a payment priority under the Resolution that is senior to the Bonds. The Resolution permits the issuance of bonds or notes with a payment priority under the Resolution that is on a parity with the Bonds or subordinate to the Bonds.

---

[1] On June 29, 2007, the Legislative Assembly approved House of Representatives Bill No. 3190 to require the municipalities to impose and collect the municipal sales tax at a rate of 1.5% (1% to be collected by the municipalities directly or through a third party and 0.5% to be collected by the Secretary of the Treasury and to be deposited in certain special funds or accounts at GDB for the benefit of the municipalities). This bill has not been signed by the Governor.

## Property Pledged for the Payment of the Bonds

Pledged Property consists of (i) all Revenues, and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds and Accounts (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Resolution Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Resolution Bond, but only for purpose of such payment, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund or Account (other than the Costs of Issuance Account and the Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

## Funds and Accounts under the Resolution

The Resolution provides for the creation of the "Repayment Project Fund" and, therein: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account, a Debt Service Reserve Account, a Redemption Account, and a Rebate Account, each to be held by the Trustee. All such Accounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received shall be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however,* that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Resolution Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:  (i) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap), (ii) to the Debt Service Account established for the Senior Bonds and Parity Obligations, all amounts until the amounts on deposit in such Debt Service Account shall equal the Accrued Payment Obligation related to the Senior Bonds and Parity Obligations, (iii) to the Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds, (iv) to the Debt Service Accounts established for Subordinate Bonds and Subordinate Obligations, all amounts until the amounts on deposit in such Debt Service Accounts shall equal the Accrued Payment Obligation related to the Subordinate Bonds and Subordinate Obligations, (v) to the Debt Service Reserve Accounts established for the Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Subordinate Bonds, and (vi) the balance, if any, shall be applied as follows upon written direction of the

19

Corporation to the Trustee: provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph (ii) and (iv) above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs (ii) and (iv) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, then (y) at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, or (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

## Additional Bonds, Refunding Bonds and Other Obligations

The Resolution permits the issuance of bonds in addition to the Senior Bonds (a) to finance the payment or retirement of Extraconstitutional Debt outstanding on June 30, 2006, or (b) to refund or otherwise prepay any bonds issued under the Resolution.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Bonds) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Bonds).

Additional Senior Bonds may not be issued and additional Parity Obligations may not be incurred under the Resolution unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

      A.      (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in Act 91 and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

      B.      (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be

increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held under the Resolution and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of Act 91, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of Act 91 and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of Act 91. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

Subordinate Bonds may be issued in varying Classes with varying subordinate payment priorities under the Resolution without compliance with any particular debt service test under the Resolution. If any such Subordinate Bonds are issued, the Resolution provides for the creation of individual Debt Service Accounts and Debt Service Reserve Accounts for each such Class, in addition to the Debt Service Account for the Bonds, and the flow of funds from the Revenue Account described above will be made in the order of Senior Bonds first, and then Subordinate Bonds based on their respective payment priorities under the Resolution.

Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

### Commonwealth's Authority to Cover Deficiencies

If the sales tax collections received by the FIA Fund in a Fiscal Year are less than the applicable Pledged Sales Tax Base Amount, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth, if such funding is made, to include in the Commonwealth's budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed below. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

### Special Investment Considerations

*Legal Considerations.* Section 8 of Article VI of the Constitution of Puerto Rico provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet the appropriations made for that Fiscal Year, interest on the public debt (which for purposes of the Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public instrumentalities) must be paid first and other disbursements are to be made in accordance with priorities established by law. The Statement of Motives of Act No. 56 of July 6, 2007, which amended Act 91, states that it is the intent of the Legislative

Assembly that the moneys deposited in the FIA Fund (i) belong to the Corporation and (ii) do not constitute available resources of the Commonwealth for any purpose, including for the purposes set forth in Section 8 of Article VI of the Constitution. In addition, Act 91 states that the FIA Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) not constitute resources available to the Commonwealth, (ii) not be available for use by the Secretary of the Treasury, and (iii) be deposited in the FIA Fund upon receipt and will not be deposited into the Commonwealth's General Fund.

Act 91 has not been challenged in any court of law and the Supreme Court of Puerto Rico has not expressed itself as to (i) the constitutionality of the transfer of the Pledged Sales Tax to the Corporation as provided in Act 91; or (ii) whether the Pledged Sales Tax constitutes available resources of the Commonwealth for purposes of Section 8 of Article VI of the Constitution.

Upon issuance of the Bonds, the Secretary of Justice of the Commonwealth of Puerto Rico (who acts as attorney general for the Commonwealth) will opine that (i) Act 91 is a valid enactment of law by the Commonwealth, (ii) the Pledged Sales Tax will not constitute "available resources" of the Commonwealth for any purpose, including for purposes of Section 8 of Article VI of the Constitution, and (iii) the Pledged Sales Tax cannot be applied to cover debt service of the Commonwealth's general obligation bonds or guaranteed debt under the circumstances contemplated by Section 8 of Article VI of the Constitution.

*Other Considerations.* Section 2 of Article VI of the Constitution of the Commonwealth of Puerto Rico states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. Therefore, the Legislative Assembly of the Commonwealth may amend, modify or repeal Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006 (the "Tax Reform Legislation"), which created the Commonwealth Sales Tax, and which is imposed on the sale of a wide range of goods and delivery of various services.

## Commonwealth Non-Impairment Covenant

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

## TAX MATTERS

### United States Tax Considerations

*Opinion of Bond Counsel to the Corporation*

In the opinion of Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, under the provisions of the Acts of Congress now in force, and under existing statutes and court decisions, assuming continuing compliance with certain tax covenants described herein, (i) interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to Section 103 of the Internal Revenue Code of 1986, as amended (the "Code"), and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations. In rendering its opinion, Bond Counsel to the Corporation has relied on certain representations, certifications of fact, and statements of reasonable expectations made by the Corporation, the Commonwealth, the Government Development Bank, and others, in connection with the Bonds, and Bond Counsel to the Corporation has assumed compliance by the Corporation, the Commonwealth,

and the Government Development Bank with certain ongoing covenants to comply with applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

In addition, in the opinion of Bond Counsel to the Corporation, under existing statutes, the Bonds and the interest thereon are exempt from state, Commonwealth and local taxation.

For the proposed form of approving opinion of Bond Counsel to the Corporation, see *Appendix C* hereto.

Bond Counsel to the Corporation expresses no opinion regarding any other Federal, state, Commonwealth or local tax consequences with respect to the Bonds. Bond Counsel to the Corporation renders its opinion under existing statutes and court decisions as of the issue date, and assumes no obligation to update its opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. Bond Counsel to the Corporation expresses no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes or under state, Commonwealth and local tax law.

*Certain Ongoing Federal Tax Requirements and Covenants*

The Code establishes certain ongoing requirements that must be met subsequent to the issuance and delivery of the Bonds in order that interest on the Bonds be and remain excluded from gross income under Section 103 of the Code. These requirements include, but are not limited to, requirements relating to use and expenditure of gross proceeds of the Bonds, yield and other restrictions on investments of gross proceeds, and the arbitrage rebate requirement that certain excess earnings on gross proceeds be rebated to the Federal government. Noncompliance with such requirements may cause interest on the Bonds to become included in gross income for Federal income tax purposes retroactive to their issue date, irrespective of the date on which such noncompliance occurs or is discovered. The Corporation, the Commonwealth, and the Government Development Bank have covenanted to comply with certain applicable requirements of the Code to assure the exclusion of interest on the Bonds from gross income under Section 103 of the Code.

*Certain Collateral Federal Tax Consequences*

The following is a brief discussion of certain collateral Federal income tax matters with respect to the Bonds. It does not purport to address all aspects of Federal taxation that may be relevant to a particular Bondowner. Prospective investors, particularly those who may be subject to special rules, are advised to consult their own tax advisors regarding the Federal tax consequences of owning and disposing of the Bonds.

Prospective owners of the Bonds should be aware that the ownership of such obligations may result in collateral Federal income tax consequences to various categories of persons, such as corporations (including S corporations and foreign corporations), financial institutions, property and casualty and life insurance companies, individual recipients of Social Security and railroad retirement benefits, individuals otherwise eligible for the earned income tax credit, and taxpayers deemed to have incurred or continued indebtedness to purchase or carry obligations the interest on which is excluded from gross income for Federal income tax purposes. Interest on the Bonds may be taken into account in determining the tax liability of foreign corporations subject to the branch profits tax imposed by Section 884 of the Code.

*Original Issue Discount*

"Original issue discount" ("OID") is the excess of the sum of all amounts payable at the stated maturity of a Bond (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates) over the issue price of that maturity. In general, the "issue price" of a maturity means the first price at which a substantial amount of the Bonds of that maturity was sold (excluding sales to bond houses, brokers, or similar persons acting in the capacity as underwriters, placement agents, or wholesalers). In general, the issue price for each maturity of the Bonds is expected to be the initial public offering price set forth on the

inside cover page of the Official Statement. Bond Counsel further is of the opinion that, for any Bond having OID (a "Discount Bond"), OID that has accrued and is properly allocable to the owners of the Discount Bond under Section 1288 of the Code is excludable from gross income for Federal income tax purposes to the same extent as other interest on the Bonds.

In general, under Section 1288 of the Code, OID on a Discount Bond accrues under a constant yield method, based on periodic compounding of interest over prescribed accrual periods using a compounding rate determined by reference to the yield on that Discount Bond. An owner's adjusted basis in a Discount Bond is increased by accrued OID for purposes of determining gain or loss on sale, exchange, or other disposition of such Discount Bond. Accrued OID may be taken into account as an increase in the amount of tax-exempt income received or deemed to have been received for purposes of determining various other tax consequences of owning a Discount Bond even though there will not be a corresponding cash payment.

Owners of Discount Bonds should consult their own tax advisors with respect to the treatment of original issue discount for Federal income tax purposes, including various special rules relating thereto, and the state and local tax consequences of acquiring, holding, and disposing of Discount Bonds.

*Bond Premium*

In general, if an owner acquires a Bond for a purchase price (excluding accrued interest) or otherwise at a tax basis that reflects a premium over the sum of all amounts payable on the Bond after the acquisition date (excluding certain "qualified stated interest" that is unconditionally payable at least annually at prescribed rates), that premium constitutes "bond premium" on that Bond (a "Premium Bond"). In general, under Section 171 of the Code, an owner of a Premium Bond must amortize the bond premium over the remaining term of the Premium Bond, based on the owner's yield over the remaining term of the Premium Bond following constant yield principles. (In certain cases involving a Premium Bond callable prior to its stated maturity date, the amortization period and yield may be required to be determined on the basis of an earlier call date that results in the lowest yield on such bond.) An owner of a Premium Bond must amortize the bond premium by offsetting the qualified stated interest allocable to each interest accrual period under the owner's regular method of accounting against the bond premium allocable to that period. In the case of a tax-exempt Premium Bond, if the bond premium allocable to an accrual period exceeds the qualified stated interest allocable to that accrual period, the excess is a nondeductible loss. Under certain circumstances, the owner of a Premium Bond may realize a taxable gain upon disposition of the Premium Bond even though it is sold or redeemed for an amount less than or equal to the owner's original acquisition cost. Owners of Premium Bonds should consult their own tax advisors regarding the treatment of bond premium for Federal income tax purposes, including various special rules relating thereto, and state and local tax consequences, in connection with the acquisition, ownership, amortization of bond premium on, sale, exchange or other disposition of the Premium Bonds.

*Information Reporting and Backup Withholding*

Information reporting requirements apply to interest on tax-exempt obligations, including the Bonds. In general, such requirements are satisfied if the interest recipient completes, and provides the payor with, a Form W-9, "Request for Taxpayer Identification Number and Certification," or unless the recipient is one of a limited class of exempt recipients, including corporations. A recipient not otherwise exempt from information reporting who fails to satisfy the information reporting requirements will be subject to "backup withholding," which means that the payor is required to deduct and withhold a tax from the interest payment, calculated in the manner set forth in the Code. For the foregoing purpose, a "payor" generally refers to the person or entity from whom a recipient receives its payments of interest or who collects such payments on behalf of the recipient.

If an owner purchasing a Bond through a brokerage account has executed a Form W-9 in connection with the establishment of such account, as generally can be expected, no backup withholding should occur. In any event, backup withholding does not affect the excludability of the interest on the Bonds from gross income for Federal income tax purposes. Any amounts withheld pursuant to backup withholding would be allowed as a

refund or a credit against the owner's Federal income tax once the required information is furnished to the Internal Revenue Service (the "IRS").

*Possible Government Action*

Legislation affecting municipal bonds is regularly under consideration by the United States Congress. In addition, the IRS has established an expanded audit program for tax-exempt bonds. There can be no assurance that legislation enacted or proposed or an IRS audit after the date of issuance of the Bonds involving either the Bonds or other tax-exempt bonds will not have an adverse effect on the tax-exempt status, the market price or the marketability of the Bonds.

## RATINGS

The Bonds have received ratings of "A1" from Moody's, "A+" from S&P and "A+" from Fitch. Moody's, S&P and Fitch have assigned ratings of "Aaa," "AAA" and "AAA," respectively to the FGIC Insured Bonds, MBIA Insured Bonds and Ambac Insured Bonds based upon the coverage of the applicable Insurance Policies. These ratings only reflect the respective opinions of such rating agencies. Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by either such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating.

## LEGALITY FOR INVESTMENT

The Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $2,665,702,597.47 (representing a purchase price equal to the principal amount of the Bonds at issuance, plus a premium of $15,456,087.85, less underwriters' discount in an amount equal to $17,357,062.98), and to reoffer such Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Bonds may be offered and sold to certain dealers (including dealers depositing such Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Bonds if any Bonds are purchased.

BBVAPR Division de Valores Municipales ("BBVA") and RBC Dain Rauscher, Inc., doing business under the name RBC Capital Markets ("RBC"), have entered into an agreement to jointly pursue underwritings with the Commonwealth and its issuers. In furtherance of the agreement, BBVA and RBC will form a joint account and will allocate the agreed participations in any bond offering to one another.

Popular Securities, Inc. ("Popular") has entered into a joint venture agreement (the "JV Agreement") with Morgan Stanley & Co. Incorporated ("Morgan Stanley"), under which the parties shall provide services and advise to each other related to the structuring and execution of certain municipal finance transactions in the U.S. capital markets with governmental entities located in the Commonwealth. Pursuant to the terms of the JV

Agreement and in compliance with applicable rules, the parties will be entitled to receive a portion of each other's net profits from the underwriting of the Bonds as consideration for their professional services.

Santander Securities Corporation ("SSC") and Banc of America Securities LLC ("BAS") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, SSC and BAS will be entitled to receive a portion of each other's revenues from the underwriting of the Bonds in consideration for their professional services.

Oriental Financial Services Corporation ("OFS") and Bear, Stearns & Co., Inc. ("Bear Stearns") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, OFS and Bear Stearns will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

Eurobank and A.G. Edwards ("AG") have entered into an agreement to jointly pursue municipal securities underwriting opportunities with the Commonwealth, its agencies, municipalities and governmental conduit issuers in the Commonwealth. Under the terms of the agreement, Eurobank and AG will be entitled to receive a portion of each other's revenues form the underwriting of the Bonds in consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Bonds are subject to the approval of Hawkins Delafield & Wood LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation substantially in the form attached to this Official Statement as *Appendix C* and the opinion of Fiddler González & Rodríguez, P.S.C. as Special Tax Counsel substantially in the form attached to this Official Statement as *Appendix D*. Certain legal matters will be passed upon by Pietrantoni Méndez & Alvarez LLP, San Juan, Puerto Rico, as Special Counsel to Goldman Sachs & Co., and for the Underwriters by their counsel, Fiddler González & Rodríguez, P.S.C., San Juan, Puerto Rico.

## CONTINUING DISCLOSURE

In order to assist the Underwriters in complying with Rule 15c2-12, as amended (the "Rule"), promulgated by the SEC under the Exchange Act, the Corporation and the Trustee will enter into a written agreement (the "Disclosure Agreement") for the benefit of the owners of all Resolution Bonds, including the Bonds, to provide continuing disclosure. The Corporation will undertake for the benefit of the owners of the Resolution Bonds to provide to each Nationally Recognized Municipal Securities Information Repository ("NRMSIR" and each a "Repository") or with the Municipal Securities Rulemaking Board ("MSRB"), and, if and when one is established, the Commonwealth Information Depository, on an annual basis within 305 days after the end of each Fiscal Year, commencing with the Fiscal Year ending June 30, 2008, the Annual Information as described in more detail below.

The "Annual Information" shall consist of (a) the information regarding actual receipts of the Pledged Sales Tax received by the Corporation from the paying/receiving agent, (b) the annual audited financial statements of the Corporation, and together with (c) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information.

The Corporation will further agree to file, in a timely manner, with each Repository or with the MSRB, and with the Commonwealth Information Depository, if any, notice of any of the following events with respect to the Resolution Bonds, if, in the judgment of the Corporation or its agent, such event is material: (1) principal and interest payment delinquencies; (2) non-payment related defaults; (3) unscheduled draws on debt service

reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions or events affecting the tax-exempt status of the Resolution Bonds; (7) modifications to the rights of the security owners (including Beneficial Owners) of the Resolution Bonds; (8) bond calls; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Resolution Bonds; and (11) rating changes. In addition, the Corporation will undertake, for the benefit of the owners of the Resolution Bonds, to provide to each such Repository or the MSRB, and to the Commonwealth Information Depository, if any, in a timely manner, notice of any failure by the Corporation to provide the Annual Information by the date required in the Corporation's undertaking described above.

Events (4) and (5) above are included pursuant to a letter from the SEC staff to the National Association of Bond Lawyers, dated September 19, 1995. With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Resolution Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (6). For information on the tax status of the Resolution Bonds, see "TAX MATTERS."

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under "THE BONDS" above, (ii) the only open issue is which Resolution Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Bondowners as required under the terms of the Resolution Bonds, (iv) public notice of the redemption is given pursuant to the Exchange Act Release Number 34-23856 of the SEC, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Resolution Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

On September 7, 2004, the Commission released an interpretive letter (the "Letter") approving the use of www.DisclosureUSA.org ("DisclosureUSA"), created by the Municipal Advisory Council of Texas ("Texas MAC"), as a means by which continuing disclosure filings may be made under the Rule, subject to certain qualifications set forth in the Letter. The Corporation may choose to satisfy its obligations to file the information required by the Rule with the repositories by transmitting such filings (the "Filings"), either directly or indirectly through a designated agent, to DisclosureUSA for submission to each NRMSIR and Commonwealth Information Depository (without also separately submitting the Filings to the NRMSIRs and Commonwealth Information Depository by some other means). The Corporation intends to monitor the performance of Texas MAC with regard to the submission of the Filings to the NRMSIRs and Commonwealth Information Depository. In the event that Texas MAC fails, with respect to the Filings, to perform the functions or undertake the responsibilities referenced in the Letter, or if for any reason the SEC modifies or revokes its interpretation described in the Letter, such that transmission of the Filings to DisclosureUSA would no longer satisfy the Corporation's obligation under the Disclosure Agreement, the Corporation will separately submit the Filings to the NRMSIRs and Commonwealth Information Depository.

As of the date of this Official Statement, there is no Commonwealth Information Depository, and the nationally recognized municipal securities information repositories are: Bloomberg Municipal Repository, 100 Business Park Drive, Skillman, New Jersey 08558; Standard & Poor's Securities Evaluations, Inc., 55 Water Street, 45th Floor, New York, New York 10041; Interactive Data Pricing and Reference Data, Inc., Attn: NRMSIR, 100 William Street, 15th Floor, New York, New York 10038; and DPC Data Inc., One Executive Drive, Fort Lee, New Jersey 07024.

The Corporation acknowledges that its undertakings pursuant to the Rule described above are intended to be for the benefit of the Beneficial Owners of the Resolution Bonds, and shall be enforceable by any such Beneficial Owners; provided that the right to enforce the provisions of its undertaking shall be limited to a right to obtain specific enforcement of the Corporation's obligations hereunder.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the foregoing covenants (the "Covenants") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation written notice of any request to cure such breach, and the Corporation shall have refused to comply within a reasonable time. All Proceedings shall be instituted only as specified in the Disclosure Agreement in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, for the equal benefit of all beneficial owners of the outstanding Resolution Bonds benefited by the Covenants, and no remedy shall be sought or granted other than specific performance of the Covenant at issue.

The Covenants may only be amended if:

(1) the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Covenants, as amended, would have complied with the requirements of the Rule at the time of award of the Resolution Bonds, after taking into account any amendments or change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners, as determined by parties unaffiliated with the Corporation; or

(2) all or any part of the Rule, as interpreted by the staff of the SEC at the date of the adoption of such Rule, ceases to be in effect for any reason, and the Corporation elects that the Covenant shall be deemed amended accordingly.

Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above. The Covenants have been made in order to assist the Underwriters to comply with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended recipient of the payment or retirement of Extraconstitutional Debt with the proceeds of the Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to: Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: President.

28

The Corporation has engaged Mesirow Financial, Inc., Chicago, Illinois, as Financial Advisor (the "Financial Advisor") in connection with the Corporation's issuance and sale of the Bonds. Under the terms of the engagement, the Financial Advisor is not obligated to undertake any independent verification of or assume any responsibility for the accuracy, completeness, or fairness of the information contained in this Official Statement.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the summary of the book-entry system for the Bonds (*Appendix D*), the table of Compounded Amounts for the Capital Appreciation Bonds (*Appendix E*), the specimen of the FGIC Insurance Policy (*Appendix F*), the specimen of the MBIA Insurance Policy (*Appendix G*), and the specimen of the Ambac Insurance Policy (*Appendix H*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing in "UNDERWRITING," was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC.

This Official Statement will be filed with each NRMSIR and with the MSRB.

<div style="text-align:center">

**PUERTO RICO SALES TAX FINANCING CORPORATION**

</div>

By:  _____/s/ Samuel Sierra Rivera_____
    Samuel Sierra Rivera
    Executive Director

[THIS PAGE INTENTIONALLY LEFT BLANK]

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

### INTRODUCTION

**Geographic Location and Demography**

Puerto Rico, the fourth largest of the Caribbean islands, is located approximately 1,600 miles southeast of New York City. It is approximately 100 miles long and 35 miles wide.

According to the United States Census Bureau, the population of Puerto Rico was 3,808,610 in 2000 (3,927,776 as of July 1, 2006 according to a Census Bureau estimate), compared to 3,522,000 in 1990. As of 2000, the population of San Juan, the island's capital and largest city, was 434,375.

**Relationship with the United States**

Puerto Rico was discovered by Columbus in 1493 and shortly thereafter the island was conquered and settled by the Spaniards. It remained a Spanish possession for four centuries.

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris, signed on December 10, 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, after a long evolution toward greater self-government for Puerto Rico, the Congress of the United States enacted Public Law 600, which is "in the nature of a compact" and which became effective upon its acceptance by the electorate of Puerto Rico. It provides that those sections of existing law which defined the political, economic, and fiscal relationship between Puerto Rico and the United States would remain in full force. It also authorized the people of Puerto Rico to draft and adopt their own Constitution. The Constitution was drafted by a popularly elected constitutional convention, overwhelmingly approved in a special referendum by the people of Puerto Rico and approved by the United States Congress and the President of the United States, becoming effective upon proclamation of the Governor of Puerto Rico on July 25, 1952. Puerto Rico's relationship with the United States is referred to herein as commonwealth status.

The United States and the Commonwealth of Puerto Rico (the "Commonwealth") share a common defense, market, and currency. The Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. It differs from the states, however, in its relationship with the federal government. The people of Puerto Rico are citizens of the United States but do not vote in national elections. They are represented in Congress by a Resident Commissioner who has a voice in the House of Representatives but no vote. Most federal taxes, except those such as Social Security taxes which are imposed by mutual consent, are not levied in Puerto Rico. No federal income tax is collected from Puerto Rico residents on income earned in Puerto Rico, except for certain federal employees who are subject to taxes on their salaries.

The official languages of Puerto Rico are Spanish and English.

**Governmental Structure**

The Constitution of the Commonwealth provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest court within the local jurisdiction is the Supreme Court of Puerto Rico. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the Supreme Court of the United States.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development.

**Principal Officials Responsible for Fiscal Matters**

Aníbal Acevedo Vilá was sworn in as Governor of Puerto Rico on January 2, 2005. He is a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Political Science and a Juris Doctor degree. He obtained an LL.M. from Harvard Law School and served as law clerk for Puerto Rico Supreme Court Judge Federico Hernández Denton and for U.S. First Circuit Court of Appeals Judge Levin Campbell. He also served in the public sector as legislative adviser to the Governor of Puerto Rico. From 1993 to 2001, he served as an elected member of the Puerto Rico House of Representatives. From 2001 until assuming his position as Governor, he served as the elected Resident Commissioner of the Commonwealth in the U.S. House of Representatives.

Juan C. Méndez Torres, Secretary of the Department of the Treasury (the "Treasury"), took office in January 2005. He is a certified public accountant and a graduate of the University of Puerto Rico, where he obtained a Bachelor's degree in Accounting and a Juris Doctor degree. He obtained an LL.M. in tax law from Georgetown University Law Center. From 2002 to mid-2004, he worked as a technical advisor to the Secretary of the Treasury. Prior to 2002, he worked as a tax attorney at a large law firm in Puerto Rico.

CPA José Guillermo Dávila Matos was appointed Executive Director of the Commonwealth of Puerto Rico Office and Management and Budget in August 2006. Before that, he served for two years as Executive Vice President for Administration, Controllership and Operations at GDB. Prior to entering public service, Dávila-Matos worked in the private sector for close to 20 years in various upper management positions. He is a Certified Public Accountant and earned a Bachelor's degree in Business Administration with a major in accounting from the University of Puerto Rico, Río Piedras. He is also a member of the American Institute of Certified Public Accountants.

Alfredo Salazar Conde became Acting President of Government Development Bank for Puerto Rico ("GDB") effective on August 19, 2005. Mr. Salazar is a private investor with over 30 years of experience in commercial banking. Mr. Salazar served as President of GDB from 1975 to 1976 and as Executive Director of Puerto Rico Industrial Development Company during 1990. Mr. Salazar has a Bachelor's degree in economics from Villanova University and pursued post graduate studies in finance at New York University and Harvard Business School.

**Political Trends**

For many years there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, and the other favoring statehood, represented by the New Progressive Party. The following table shows the percentages of the total votes received by the gubernatorial candidates of the various parties in the last five elections. While the electoral choices of Puerto Rico's voters are not based solely on party preferences regarding Puerto Rico's relationship with the United States, candidates who support a continuing relationship between Puerto Rico and the United States have prevailed in elections for many years.

| | 1988 | 1992 | 1996 | 2000 | 2004 |
|---|---|---|---|---|---|
| Popular Democratic Party | 48.7% | 45.9% | 44.5% | 48.6% | 48.4% |
| New Progressive Party | 45.8% | 49.9% | 51.1% | 45.7% | 48.2% |
| Puerto Rico Independence Party | 5.4% | 4.2% | 3.8% | 5.2% | 2.7% |
| Others | 0.1% | - | 0.6% | 0.5% | 0.6% |

With the results of the 2004 election, control of the executive branch continued under the Popular Democratic Party while the legislative branch is now controlled by the New Progressive Party. The composition of the Senate and House of Representatives by political party is as follows:

|  | Senate | House |
|---|---|---|
| Popular Democratic Party | 9 | 18 |
| New Progressive Party | 17 | 32 |
| Puerto Rico Independence Party | 1 | 1 |
| Total | 27 | 51 |

The next general election (gubernatorial, municipal, and legislative) in Puerto Rico will be held in November 2008. Voter participation in Puerto Rico is substantially higher than in the United States, averaging 82% since 1972.

## COMMONWEALTH SALES TAX

**Factors Affecting Sales Tax Revenues**

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are Gross National Product ("GNP"), personal consumption and personal income. These factors, in turn, are affected by other variables such as: the price of oil, employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

The following table shows the Commonwealth Sales Tax actual collections from November 15, 2006 to May 2007.

### Commonwealth Sales Tax Collections
#### (in millions)

|  | November[1] | December | January | February | March | April | May | Total |
|---|---|---|---|---|---|---|---|---|
| General Fund | $41 | $90 | $78 | $71 | $79 | $70 | $77 | $506 |
| FIA | 9 | 20 | 17 | 16 | 18 | 16 | 17 | 113 |
| Total | $50 | $110 | $95 | $87 | $97 | $86 | $94 | $619 |

(1) Commonwealth Sales Tax was effective on November 15, 2006.

As of today, the collections from the top 20 taxpayers represent, in average, 23% of total revenues from the Commonwealth Sales Tax. These taxpayers are from the following business sectors: retail and general merchandise stores, telecommunications, restaurant chains and supermarkets.

## THE ECONOMY

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which may correlate most closely with the level of consumption of goods and services on the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables which may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and of the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or of the Commonwealth Sales Tax.

**General**

  The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than the price of oil) are determined by the policies and performance of the economy of the United States. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

*Forecast for Fiscal Year 2007*

  The Planning Board's current real gross national product forecast for Fiscal Year 2007, which was released in February 2007, projected a decline of 1.4%, in real dollars, equivalent to an increase by 2.0% in current dollars. Personal income is expected to decline by 1.2%, in real dollars, equivalent to an increase by 3.1% in current dollars. The Planning Board expects real growth to return in Fiscal Year 2008, albeit at only 0.8%, or 5.1% in current dollars. The major factors affecting the economy at this point are, among others, the still relatively high oil prices, the slowdown of the U.S. economic activity and the continuing economic uncertainty generated by the Commonwealth's fiscal crisis, and the effects on economic activity of the implementation of the new sales tax. Consumers may take time to adjust their behavior to the new sales tax system.

  According to the Department of Labor and Human Resources Household Employment Survey (the "Household Survey"), total employment for the first nine months of Fiscal Year 2007 averaged 1,268,300, an increase of 0.1% compared to 1,266,600 for the same period in Fiscal Year 2006. The seasonally adjusted unemployment rate for first nine months of Fiscal Year 2007 was 10.5%, a decrease from 11.2% for the same period in Fiscal Year 2006.

*Fiscal Year 2006*

  The Planning Board's preliminary reports on the performance of the Puerto Rico economy for Fiscal Year 2006 indicate that real gross national product increased 0.7% (5.8% in current dollars) over 2005. Nominal gross national product was $56.7 billion in Fiscal Year 2006 ($45.1 billion in 2000 prices), compared to $53.6 billion in Fiscal Year 2005 ($44.8 billion in 2000 prices). Aggregate personal income increased from $48.3 billion in Fiscal Year 2005 ($43.6 billion in 2000 prices) to $50.9 billion in Fiscal Year 2006 ($44.0 billion in 2000 prices), and personal income per capita increased marginally from $12,365 in Fiscal Year 2005 ($11,179 in 2000 prices), to $12,997 in Fiscal Year 2006 ($11,218 in 2000 prices).

  According to the Household Survey, total employment for Fiscal Year 2006 averaged 1,253,000, an increase of 1.2% compared to 1,237,600 for Fiscal Year 2005. An important component of total employment is self-employment. The unemployment rate for Fiscal Year 2006 was 11.7%, an increase from 10.6% for Fiscal Year 2005, due to the partial government shutdown in May 2006. As in the past, the economy of Puerto Rico followed the general performance and trends of the United States economy, although at a lower rate of growth.

  Prior to Fiscal Year 2006, Puerto Rico enjoyed more than two decades of almost continuous economic expansion. Virtually every sector of the economy participated in this expansion, and record levels of employment were achieved. Factors contributing to this expansion included government-sponsored economic development programs, increases in the level of federal transfer payments, and the relatively low cost of borrowing for private and public capital projects. In some years, these factors were aided by a significant expansion in construction investment driven by infrastructure projects, private investment, primarily in housing, and relatively low oil prices. During Fiscal Years 2003 to 2005, the economy expanded at a moderate annual rate of 2.2%. Recently, however, as several key economic figures began to indicate a contraction of economic activity, the Planning Board lowered its forecast of growth in real gross national product from 2.2% to 0.7% for Fiscal Year 2006. Among the variables contributing to the Planning Board's downward revision in the forecast were the current effect of persistent high levels of oil prices, the upward trend in short-term interest rates, the depreciation of the dollar (which affects the value of imports from foreign countries, accounting for

approximately 50% of total imports to Puerto Rico), and the deceleration of public investment (which served, together with other factors, to reduce activity in construction and other sectors). The persistent high level of the price of oil and its derivatives (such as gasoline) has served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline in spite of its recent improvements in power production diversification, the high level of oil prices is expected to account for an increased outflow of approximately $2 billion in Fiscal Year 2006. The upward trend in short-term interest rates has also directly affected construction activity, which has been a major contributor to economic growth in recent years, and accentuated the fiscal difficulties of the Commonwealth's government with respect to the Fiscal Year 2006 budget deficit.  For Fiscal Year 2007, the Planning Board's February 2007 projection forecasts a real gross national product decline of 1.4% (nominal growth of 2.0%), followed by slight real growth of 0.8% for Fiscal Year 2008 (nominal growth of 5.1%).

**Personal Income**

Personal income, both aggregate and per capita, increased consistently in each Fiscal Year from 2002 to 2006. In Fiscal Year 2006, aggregate personal income was $50.9 billion ($44.0 billion in 2000 prices) and personal income per capita was $12,997 ($11,218 in 2000 prices).[1] Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total federal payments to Puerto Rico, which amount to around $15 billion annually and include transfers to local government entities and expenditures of federal agencies in Puerto Rico, in addition to federal transfer payments to individuals, are lower on a per capita basis in Puerto Rico than in any state of the United States. Contrary to the popular perception that a significant amount of federal transfers to individuals constitutes grants, 80% of the transfer payments to individuals in Fiscal Year 2006 ($8.0 billion), represented entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions. Grants represent the remainder of the federal transfers to individuals, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant (higher education) Scholarships.

The following table shows the personal income for the five Fiscal Years ended June 30, 2006.

---

[1] Different price deflators are used for gross national product and personal income statistics.  The year 2000 is used as a basis for comparison because that is the year used by the U.S. Department of Commerce

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[(*)] |
| Employees' compensation | | | | | |
| Business | $17,167.6 | $17,593.8 | $18,710.9 | $19,420.1 | $20,174.2 |
| Government | 6,302.8 | 6,947.6 | 7,388.5 | 8,150.5 | 8,424.2 |
| Household and nonprofit institutions | 634.4 | 656.3 | 711.0 | 704.8 | 655.8 |
| Other | 975.5 | 985.1 | 958.6 | 1,085.3 | 1,093.2 |
|    Total Employees' compensation | $25,080.4 | $26,182.8 | $27,768.9 | $29,360.7 | $30,347.4 |
| Less: Contributions for social insurance | | | | | |
| Employees | 1,776.6 | 1,907.7 | 2,068.2 | 2,181.0 | 2,265.2 |
| Employers | 2,516.5 | 2,777.3 | 2,884.9 | 3,061.6 | 3,187.7 |
|    Total Contributions for social insurance | $4,293.1 | $4,684.9 | $4,953.0 | $5,242.6 | $5,452.9 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,301.9 | 2,397.8 | 2,633.9 | 2,736.9 | 2,757.7 |
| Dividends of domestic corporations | 201.8 | 229.6 | 249.4 | 249.8 | 249.3 |
| Miscellaneous income and dividends received from abroad | 16.4 | 13.7 | 13.0 | 12.6 | 12.4 |
| Rental income of persons | 3,182.5 | 3,352.8 | 3,663.1 | 3,901.8 | 4,168.1 |
| Personal interest income | 1,913.1 | 2,409.7 | 2,127.7 | 2,705.0 | 3,837.0 |
|    Total Proprietors' income | $7,615.7 | $8,403.6 | $8,687.2 | $9,606.1 | $11,024.6 |
| Transfer payments | 13,635.6 | 14,314.1 | 14,062.8 | 14,543.4 | 15,029.9 |
| Commonwealth government and municipalities | 3,147.4 | 3,119.3 | 3,290.3 | 3,324.2 | 3,403.0 |
| Federal government | 8,691.4 | 9,391.5 | 8,903.0 | 9,243.7 | 9,640.3 |
| U.S. state governments | 17.1 | 19.1 | 16.4 | 14.9 | 13.5 |
| Business | 1,094.9 | 1,091.4 | 1,116.1 | 1,140.4 | 1,164.7 |
| Other nonresidents | 684.8 | 692.9 | 737.0 | 820.3 | 808.4 |
|    Total Personal Income | $42,038.6 | $44,215.6 | $45,565.9 | $48,267.6 | $50,949.0 |

(*) Preliminary figures.
Source: Puerto Rico Planning Board, Program of Economic and Social Planning, Subprogram of Economic Analysis

## Personal Consumption

During Fiscal Year 2006, at current prices, personal consumption amounted to $49.6 billion, increasing by $3.3 billion or 7.1% from the amount of $46.3 billion for Fiscal Year 2005. At constant prices, personal consumption increased 2.2% from Fiscal Year 2005. Said increase was based on the increase in consumption of durable and non-durable goods by 3.9%. The consumption of services also increased 0.1%.

The following table shows personal consumption expenditures by product for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Personal Consumption Expenditures by Product**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Food | $ 5,568.8 | $ 5,984.0 | $ 6,061.2 | $ 6,573.9 | $ 6,960.5 |
| Alcoholic beverages and tobacco products | 1,435.2 | 1,513.4 | 1,540.8 | 1,435.5 | 1,802.5 |
| Clothing and accessories | 2,653.9 | 2,693.6 | 2,851.9 | 2,957.1 | 3,082.6 |
| Personal care | 774.9 | 752.8 | 782.2 | 815.5 | 919.2 |
| Housing | 5,642.5 | 6,093.1 | 6,549.4 | 7,012.3 | 7,499.7 |
| Household operations | 4,353.3 | 4,569.1 | 4,773.4 | 5,268.2 | 5,929.2 |
| Medical care and funeral expenses | 6,768.8 | 6,960.4 | 7,162.5 | 7,527.7 | 7,935.3 |
| Business services | 2,683.3 | 2,881.5 | 2,962.7 | 3,055.8 | 3,111.8 |
| Transportation | 4,762.4 | 4,870.4 | 5,283.7 | 6,136.4 | 6,404.5 |
| Recreation | 3,313.0 | 3,800.1 | 4,401.9 | 4,531.6 | 4,801.7 |
| Education | 1,311.0 | 1,345.3 | 1,589.3 | 1,627.8 | 1,687.3 |
| Religious and nonprofit organizations, not elsewhere classified | 375.5 | 418.8 | 473.3 | 482.3 | 505.2 |
| Foreign travel | 1,160.2 | 1,274.2 | 1,450.1 | 1,539.3 | 1,638.8 |
| Miscellaneous purchases | 558.5 | 520.0 | 565.7 | 605.8 | 704.1 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | $41,361.3 | $43,676.8 | $46,448.6 | $49,569.2 | $52,982.5 |
| Less: Expenditures in Puerto Rico by nonresidents | 2,516.4 | 2,703.3 | 3,052.6 | 3,269.4 | 3,403.1 |
| Total Personal Consumption Expenditures | $38,844.9 | $40,973.4 | $43,396.0 | $46,299.8 | $49,579.4 |

(1) Preliminary figures.
   Source: Puerto Rico Planning Board, Program of Economic and Social Planning,
       Subprogram of Economic Analysis.

## Gross National Product

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher wage, high technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The services sector, including finance, insurance, real estate, wholesale and retail trade, and tourism, also plays a major role in the economy. It ranks second to manufacturing in contribution to the gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross National Product**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Gross national product – $ millions[2] | $45,071 | $47,479 | $50,709 | $53,601 | $56,688 |
| Real gross national product – $ millions (2000 prices) | 41,900 | 42,795 | 43,967 | 44,814 | 45,111 |
| Annual percentage increase in real gross national product (2000 prices) | (0.3%) | 2.1% | 2.7% | 1.9% | 0.7% |
| U.S. annual percentage increase in real gross national product (2000 prices) | 0.6% | 1.9% | 4.0% | 3.0% | 3.4% |

(1)  Preliminary.
(2)  In current dollars.

*Sources:*  Puerto Rico Planning Board and Global Insight Inc.

The following graph compares the growth rate of real gross national product for the Puerto Rico and United States economies since Fiscal Year 1990, and the forecast of the growth rate for Fiscal Years 2007 and 2008.  In nominal terms, gross national product is forecasted to increase by 2.0% and 5.1% in Fiscal Years 2007 and 2008. respectively.



**Real GNP Growth Rate**

*   Puerto Rico Planning Board.
**  Global Insight 04/07.

A-8

# Puerto Rico Nominal GNP Growth Rate



## Economic Performance by Sector

*General*

From Fiscal Year 2002 to Fiscal Year 2006, the manufacturing and services sectors generated the largest portion of gross domestic product. The three sectors of the economy that provide the most employment are manufacturing, services and government.

The following table presents annual statistics of gross domestic product by sector and gross national product for the five Fiscal Years ended June 30, 2002 through 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
|  | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Manufacturing | $31,243 | $31,532 | $33,267 | $34,363 | 36,556 |
| Services[2] | 26,913 | 28,919 | 30,476 | 32,299 | 33,613 |
| Government[3] | 6,303 | 6,948 | 7,389 | 8,151 | 8,424 |
| Transportation, communication and public utilities | 4,948 | 5,178 | 5,343 | 5,353 | 5,508 |
| Agriculture, forestry and fisheries | 277 | 333 | 414 | 360 | 333 |
| Construction[4] | 1,648 | 1,772 | 1,905 | 1,874 | 1,821 |
| Statistical discrepancy | 292 | 146 | 415 | 251 | 209 |
| Total gross domestic product[5] | $71,624 | $74,827 | $79,209 | $82,650 | $86,464 |
| Less: net payment abroad | (26,552) | (27,348) | (28,501) | (29,049) | (29,776) |
| Total gross national product[5] | $45,071 | $47,479 | $50,709 | $53,601 | $56,689 |

(1) Preliminary.
(2) Includes wholesale and retail trade, finance, insurance and real estate, tourism, and other services.
(3) Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain other public corporations, like the Electric Power Authority and the Aqueduct and Sewer Authority whose activities are included under Services in the table.
(4) Includes mining.
(5) Totals may not add due to rounding.

*Source:* Planning Board

A-9

The data for employment by sector or industries presented here, like in the United States, are based on the payroll employment survey (the "Payroll Survey"), which is designed to measure employment by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm, Payroll Employment by Economic Sector[1]**
**(persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[2] |
| Natural Resources and Construction | 72,142 | 68,525 | 69,297 | 68,221 | 67,442 |
| Manufacturing | | | | | |
| Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,367 |
| Sub Total | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |
| | | | | | |
| Trade, Transportation, Warehouse & Utilities | | | | | |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Sub Total | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| | | | | | |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional & Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Government | 288,675 | 297,722 | 303,431 | 307,835 | 302,025 |
| Total Non-Farm | 1,000,550 | 1,008,609 | 1,033,265 | 1,049,684 | 1,049,935 |

(1)  The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

(2)  Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in Fiscal Year 2006 manufacturing generated $36.6 billion, or 42.3%, of gross domestic product. During Fiscal Year 2006, payroll employment for the manufacturing sector was 112,859, a decrease of 3.8% compared with Fiscal Year 2005, with most of the job losses occurring in labor-intensive industries. Most of the island's manufacturing output is shipped to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. The United States minimum wage laws are applicable in Puerto Rico. As of December 2006, the average hourly manufacturing wage rate in Puerto Rico was 68.9% of the average mainland United States rate.

Manufacturing in Puerto Rico is now more diversified than during the earlier phases of its industrial development and includes several industries less prone to business cycles. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last decade in the pharmaceutical, scientific instruments, computers and electrical products industries in Puerto Rico. One of the factors encouraging the development of the manufacturing sector has been the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Code, phased out these federal tax incentives during a ten-year period that recently ended. See "Tax Incentives – Incentives under the U.S. Code".

The following table sets forth gross domestic product by manufacturing sector for the five Fiscal Years ended June 30, 2002 through June 30, 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
**(in millions at current prices)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| Pharmaceuticals | $18,681 | $18,998 | $19,814 | $20,253 | $20,820 |
| Machinery and metal products: | | | | | |
|   Machinery, except electrical | 3,845 | 3,507 | 3,372 | 3,397 | 3,378 |
|   Electrical machinery | 1,757 | 1,771 | 1,818 | 1,926 | 2,237 |
|   Professional and scientific instruments | 2,191 | 2,981 | 3,540 | 3,802 | 4,494 |
|   Other machinery and metal products | 312 | 288 | 274 | 284 | 291 |
| Food products | 2,092 | 1,903 | 2,202 | 2,290 | 2,489 |
| Other chemical and allied products | 578 | 502 | 591 | 644 | 679 |
| Apparel | 530 | 353 | 344 | 364 | 337 |
| Other[2] | 1,258 | 1,231 | 1,312 | 1,403 | 1,831 |
|   Total gross domestic product of manufacturing sector[3] | $31,243 | $31,532 | $33,267 | $34,363 | $36,556 |

(1) Preliminary.
(2) Includes petroleum products; petrochemicals; tobacco products; stone, clay and glass products; textiles and others.
(3) Totals may not add due to rounding.

*Source:* Planning Board

The following table presents annual statistics of average manufacturing employment by industry based on the North American Industry Classification System (NAICS) for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group\***
**(persons age 16 years and over)**

| Industry Group | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2002** | **2003** | **2004** | **2005** | **2006**[1] |
| **Durable Goods** | | | | | |
| Nonmetallic Mineral Products Manufacturing | 4,525 | 4,444 | 4,706 | 4,471 | 4,108 |
| Cement and Concrete Products Manufacturing | 3,617 | 3,543 | 3,867 | 3,750 | 3,542 |
| Fabricated Metal Products | 6,517 | 6,198 | 6,490 | 6,427 | 5,808 |
| Computer and Electronic | 11,742 | 11,623 | 10,581 | 10,673 | 10,808 |
| Electrical Equipment | 7,233 | 7,415 | 7,744 | 7,645 | 6,858 |
| Electrical Equipment Manufacturing | 4,125 | 4,399 | 4,935 | 4,971 | 4,708 |
| Miscellaneous Manufacturing | 12,033 | 12,308 | 12,070 | 11,157 | 11,225 |
| Medical Equipment and Supplies Manufacturing | 10,858 | 11,336 | 11,059 | 10,473 | 10,492 |
| Other Durable Goods Manufacturing | 8,450 | 7,646 | 8,185 | 7,693 | 7,685 |
| Total – Durable Goods | 50,500 | 49,634 | 49,776 | 48,066 | 46,492 |
| | | | | | |
| **Non-Durable Goods** | | | | | |
| Food Manufacturing | 14,842 | 13,628 | 13,244 | 13,050 | 12,667 |
| Beverage and Tobacco Products Manufacturing | 3,508 | 3,159 | 3,038 | 3,175 | 3,425 |
| Apparel Manufacturing | 12,000 | 8,988 | 8,522 | 8,873 | 8,400 |
| Cut and Sew Apparel Manufacturing | 11,233 | 8,969 | 8,518 | 8,846 | 8,183 |
| Chemical Manufacturing | 31,067 | 31,183 | 31,385 | 32,885 | 32,335 |
| Pharmaceutical and Medicine Manufacturing | 26,358 | 26,645 | 27,187 | 28,572 | 28,017 |
| Plastics and Rubber Products | 3,492 | 3,340 | 3,210 | 2,744 | 2,350 |
| Plastics Product Manufacturing | 3,183 | 3,030 | 2,917 | 2,266 | 2,158 |
| Other Non-Durable Goods Manufacturing | 9,391 | 8,823 | 9,261 | 8,529 | 7,200 |
| Total – Non-Durable Goods | 74,300 | 69,121 | 68,660 | 69,256 | 66,377 |
| | | | | | |
| Total Manufacturing Employment | 124,800 | 118,755 | 118,436 | 117,322 | 112,859 |

\*    Totals may not add due to rounding.
(1)  Preliminary.

*Source:*  Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 11,941 from Fiscal Year 2002 to Fiscal Year 2006. Manufacturing employment had been declining during the past decade, but the decline accelerated during Fiscal Years 2002 and 2003, falling -10.6% and -4.8%, respectively. After that, manufacturing employment seemed to stabilize around 118,000 jobs, but the deceleration reappeared in Fiscal Year 2006 with the sector experiencing another significant drop of -3.8%. For the first six months of Fiscal Year 2007 the employment decline accelerated further to -6.2%. During the last two years the economy has lost around 5,500 jobs in the manufacturing sector. There are several reasons which explain this sector's job shrinkage: the end of the phase-out of Section 936, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly labor and electricity), and the increased use of job outsourcing. Puerto Rico's manufacturing sector is facing increased international competition, and new ideas and initiatives are necessary to improve this sector.

*Services*

Puerto Rico has experienced significant growth in the services sector, which includes finance, insurance, real estate, wholesale and retail trade, tourism and other services, in terms of both income and employment over the past decade, showing a favorable trend as compared with certain other industrialized economies. During the period between Fiscal Years 2002 and 2006, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 4.5%, while payroll employment in this sector increased at an average annual rate of 2.5%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 17% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. For example, for Fiscal Year 2006, the number of self-employed individuals was 182,914, out of which 46.8% were in the services sector and 15.1% were in the construction sector. The development of the services sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing, construction and agriculture. The services sector in Puerto Rico has a diversified base.

The following table sets forth gross domestic product for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector\***
**(in millions at current prices)**

| | Fiscal Years Ended June 30 | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006[1]** |
| Wholesale and retail trade | $ 8,623 | $ 9,150 | $ 9,802 | $ 10,260 | $10,716 |
| Finance, insurance and real estate | 11,212 | 12,508 | 13,029 | 14,016 | 14,733 |
| Other services[2] | 7,078 | 7,261 | 7,646 | 8,023 | 8,164 |
| Total | $26,913 | $28,919 | $30,476 | $32,299 | $33,613 |

---
\*  Totals may not add due to rounding.
(1)  Preliminary.
(2)  Includes tourism.

According to the Establishment Survey, for the first six months of Fiscal Year 2007 the net employment gain for this sector was 2,200 jobs, compared to same period in the previous year. Service, finance, insurance and real estate employment added 6,800 jobs, while trade lost 4,600 jobs; for a net growth rate of 1%.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The services sector ranks second to manufacturing in its contribution to gross domestic product, and it is the sector with the greatest employment. In Fiscal Year 2006, services generated $33.6 billion of gross domestic product, or 38.9% of the total. Services employment grew from 514,933 in Fiscal Year 2002 to 567,609 in Fiscal Year 2006 (representing 54.1% of total, non-farm, payroll employment). This represents a cumulative increase of 10.2% during such period. Wholesale and retail trade, finance, insurance and real estate experienced significant growth in Fiscal Years 2002 to 2006, as measured by gross domestic product. From Fiscal Year 2002 to 2006, gross domestic product increased in wholesale and retail trade from $8.6 billion to $10.7 billion, and in finance, insurance, and real estate from $11.2 billion to $14.7 billion. There are sixteen commercial banks and trust companies currently operating in Puerto Rico. Total assets of these institutions as of December 31, 2006 were $106.6 billion. As of December 31, 2006, there were approximately thirty-five international banking entities operating in Puerto Rico licensed to conduct offshore banking transactions with total assets of $76.3 billion.

The following table sets forth employment figures for the services sector for Fiscal Years 2002 to 2006.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Services Sector***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2002** | **2003** | **2004** | **2005** | **2006[(1)]** |
| Wholesale Trade | 32,200 | 32,181 | 33,299 | 33,710 | 33,992 |
| Retail Trade | 130,675 | 130,180 | 132,008 | 136,189 | 137,800 |
| Transportation, Warehouse & Utilities | 18,017 | 17,352 | 17,054 | 17,615 | 17,433 |
| Trade, Transportation, Warehouse & Utilities | 180,892 | 179,713 | 182,361 | 187,514 | 189,225 |
| Information | 22,483 | 21,619 | 21,907 | 22,598 | 22,600 |
| Finance | 44,975 | 44,648 | 46,852 | 48,621 | 49,767 |
| Professional and Business | 97,408 | 98,498 | 101,899 | 103,767 | 106,400 |
| Educational & Health | 86,400 | 92,409 | 98,101 | 99,963 | 103,583 |
| Leisure & Hospitality | 65,783 | 67,912 | 70,310 | 72,586 | 74,767 |
| Other Services | 16,992 | 18,808 | 20,671 | 21,257 | 21,267 |
| Total | 514,933 | 523,607 | 542,101 | 556,306 | 567,609 |

\*   Totals may not add due to rounding.
(1)  Preliminary.

*Source:*  Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services – Tourism*

During Fiscal Year 2006, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 1,913,400, an increase of 3.4% over the number of persons registered during the same period in Fiscal Year 2005. The number of non-resident tourists registered in tourist hotels during Fiscal Year 2006 increased 4.6% compared to Fiscal Year 2005. Hotel rooms available during Fiscal Year 2006 increased 3.9% compared to Fiscal Year 2005. The average number of rooms rented in tourist hotels increased 3.9% during Fiscal Year 2006 compared to Fiscal Year 2005. The average occupancy rate in tourist hotels during Fiscal Years 2005 and 2006 was 70.8%.

During the first six months of Fiscal Year 2007, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists staying in more than one hotel during their visit, was 859,300, a decrease of 5.7% over the number of persons registered during the same period in Fiscal Year 2006. The average occupancy rate in tourist hotels during the first six months of Fiscal Year 2007 was 67%, compared to 66.6% during the same period in Fiscal Year 2006. The average number of rooms rented in tourist hotels decreased 5.8% during the first six months of Fiscal Year 2007 compared with the same period during Fiscal Year 2006. The average number of rooms available in tourist hotels decreased 7.7% during the first six months of Fiscal Year 2007 compared to the same period in Fiscal Year 2006 as the completion of regular maintenance and rehabilitation of rooms (that normally results in a certain number of rooms being unavailable at any time) is taking longer to complete this year than in prior years.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five Fiscal Years ended June 30, 2006.

**Commonwealth of Puerto Rico**
**Tourism Data[1]**
**Number of Visitors**

| Fiscal Years Ended June 30 | Tourist Hotels[2] | Cruise Ship | Other[3] | Total | Total Visitors' Expenditures (in millions) |
|---|---|---|---|---|---|
| 2002 | 1,147,800 | 1,277,000 | 1,939,300 | 4,364,100 | $2,486.4 |
| 2003 | 1,239,200 | 1,163,900 | 1,999,200 | 4,402,300 | 2,676.6 |
| 2004 | 1,307,000 | 1,348,200 | 2,234,000 | 4,889,200 | 3,024.0 |
| 2005 | 1,361,640 | 1,386,925 | 2,324,275 | 5,072,840 | 3,238.6 |
| 2006 | 1,424,200 | 1,300,100 | 2,297,800 | 5,022,100 | 3,369.3 |

(1)  Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
(2)  Includes visitors in guesthouses.
(3)  Includes visitors in homes of relatives, friends, and in hotel apartments.

*Sources:*  Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Convention Center District Authority, has completed the development of the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, to include hotels, restaurants, cinemas, office space and housing. The convention center district is being developed at a total cost of $1.3 billion to improve Puerto Rico's competitive position in the convention and group travel segments. The convention center opened on November 17, 2005.

The Convention Center District Authority also owns a multi-purpose coliseum located in San Juan, Puerto Rico. The coliseum, known as the Jose Miguel Agrelot Coliseum, was inaugurated in 2004 and has been host to various successful artistic and other events.

*Government*

The government sector of Puerto Rico plays an important role in the economy. In Fiscal Year 2006, the government accounted for $8.4 billion of Puerto Rico's gross domestic product, or 9.7% of the total. The government is also a significant employer, providing jobs for 302,025 workers, or 28.8% of total, non-farm, payroll employment in Fiscal Year 2006.

On February 25, 1998, legislation was enacted permitting the unionization of employees of the central government (excluding municipal employees). Under this law, government employees are given collective bargaining rights subject to a number of limitations. Among those limitations are: employees are prohibited from striking; salary increases are contingent on the availability of budgeted revenues; employees cannot be required to become union members and pay union dues; and collective bargaining negotiations cannot occur in an election year. During Fiscal Year 2006, the Commonwealth and its instrumentalities began to negotiate the economic and non-economic terms of at least forty collective bargaining agreements. The results of these negotiations could have a material budgetary impact on the Commonwealth.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Luis Muñoz Marín International Airport is currently served by 25 United States and international airlines. At present, there is daily direct service between San Juan and Atlanta, Boston, Chicago, Dallas, Miami, New York, Philadelphia, and numerous other destinations within the United States. There is also regularly scheduled service between Aguadilla and Ponce and New York and between Puerto Rico and other Caribbean

A-15

islands and certain Latin American and European cities. A major United States airline uses San Juan as a hub for its intra-Caribbean airline service. Several smaller airports serve intra-island traffic.

The Island's major cities are connected by a modern highway system, which, as of December 31, 2006, totaled approximately 4,621 miles. The highway system comprises 391 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic and 3,041 miles of tertiary highways and roads serving local, intra-regional traffic.

The first phase of a new mass transit system, known as Tren Urbano, has been completed. Tren Urbano serves a portion of metropolitan San Juan and is expected eventually to serve the municipalities of Carolina and Caguas as well. It currently has ridership of about 33,000 per day.

The Port of the Americas Authority ("PAA") is responsible for the development and operation of the Port of the Americas, a deep draft port on the south coast of Puerto Rico. The first phase of the Port of the Americas was completed in Fiscal Year 2004. This initial phase included the improvement of piers 4, 5 and 6 of the Port and the acquisition of heavy equipment at a cost of $40 million. During calendar year 2005, the PAA began the second phase of the Port, which phase is expected to be completed by the end of calendar year 2007. Completion of this second phase will provide capacity to handle up to 250,000 Twenty-Foot Equivalent Units ("TEU"). This second phase includes (i) dredging the entrance channel and adjacent areas of the Port to a depth of 50 feet; (ii) reconstructing the container terminals; (iii) commencing certain required environmental risk mitigation procedures; and (iv) preparing final construction schematics. With respect to these tasks, dredging is 60% complete, the final design contract has been awarded, acquisition of environmental risk mitigation land is underway, and the contract for reconstruction of the container terminal was awarded in April, 2006. The Port is expected to be capable of providing capacity for up to 700,000 TEUs when the third phase is completed.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity. During the period from Fiscal Year 2002 through Fiscal Year 2006, however, real construction investment decreased 1.1%. This decline was small compared to the high level of construction activity in prior Fiscal Years. The total value of construction permits increased 2.5% during the same five Fiscal Year period.

Public investment has been an important component of construction investment. During Fiscal Year 2006, approximately 42% of the total investment in construction was related to public projects. For Fiscal Year 2006 compared to Fiscal Year 2005, the total value of construction permits decreased 4.3% and total sales of cement, including imports, decreased 1.0%. Average payroll employment in the construction sector during Fiscal Year 2006 was 67,059, a decrease of 1.7% from Fiscal Year 2005. Through the first three quarters of Fiscal Year 2007, construction employment increased to a seasonally adjusted 67,500, but cement sales (including imports) continued their decline falling 7.1% compared to the same period in Fiscal Year 2006.

Total construction investment for Fiscal Year 2006 decreased (in real terms) by 5.8% (following a 7% real decline in Fiscal Year 2005) due principally to the drop in construction related public projects. For Fiscal Years 2007 and 2008, the Planning Board forecasts further construction investment decreases (in real terms) of 3.5% and 3.4%, respectively. Public investment will be primarily in housing, new schools (and school reconstruction programs), water projects, and other public infrastructure projects. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties.

During the first seven months of Fiscal Year 2007, the number and the total value of construction permits decreased 5.2% and 22.8%, respectively, compared to the same period in Fiscal Year 2006.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. During Fiscal Year 2006, gross income from agriculture was $805.6 million, an increase 1.5% compared with Fiscal Year 2005. Agriculture gross income consists of the total value of production in the principal agricultural sectors, which include traditional crops, livestock and poultry, grains, vegetables, fruits, ornamental plants and other products. During Fiscal Year 2006, starchy vegetables, coffee, poultry, fruits and ornamental plants contributed a higher percentage of the sector's income than in the previous Fiscal Year.

The Commonwealth supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, an investment tax credit equal to 50% of the investment in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses. Subsequent legislation imposed an aggregate annual limit of $15 million on the investment tax credits available under Act No. 225.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

## Employment and Unemployment

Total average annual employment (as measured by the Household Survey) has increased. From Fiscal Year 2002 to Fiscal Year 2006, annual employment increased 8.8% to 1,253,000.

The number of persons employed in Puerto Rico during Fiscal Year 2006 averaged 1,253,000, a 1.2% increase from 1,237,600 in Fiscal Year 2005. Unemployment, although at relatively low historical levels, is about twice the United States average. The average unemployment rate increased from 10.6% in Fiscal Year 2005 to 11.7% in Fiscal Year 2006.

The following table presents annual statistics of employment and unemployment for Fiscal Year 2002 through Fiscal Year 2006 and monthly statistics, seasonally adjusted, for the first nine months of Fiscal Year 2007. These employment figures are based on the Household Survey, which includes self-employed individuals, instead of the non-farm, the Payroll Survey, which does not. The number of self-employed individuals represents around 17% of civilian employment in Puerto Rico, more than double the level in the United States.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30 | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2002 | 1,309 | 1,152 | 158 | 12.0% |
| 2003 | 1,352 | 1,188 | 164 | 12.1 |
| 2004 | 1,360 | 1,206 | 155 | 11.4 |
| 2005 | 1,385 | 1,238 | 147 | 10.6 |
| 2006 | 1,420 | 1,253 | 167 | 11.7 |
| **Fiscal Year 2007** | | (Seasonally Adjusted) | | |
| July | 1,392 | 1,234 | 158 | 11.4% |
| August | 1,399 | 1,252 | 146 | 10.5 |
| September | 1,417 | 1,262 | 155 | 10.9 |
| October | 1,407 | 1,274 | 134 | 9.5 |
| November | 1,411 | 1,270 | 141 | 10.0 |
| December | 1,409 | 1,257 | 152 | 10.8 |
| January | 1,431 | 1,287 | 144 | 10.0 |
| February | 1,459 | 1,289 | 170 | 11.6 |
| March | 1,428 | 1,290 | 138 | 9.6 |

(1)   Totals may not add due to rounding.
(2)   Unemployed as percentage of labor force.

*Source:*  Department of Labor and Human Resources – Household Survey

**Higher Education**

During the five decades from 1950 to 2000, Puerto Rico made significant advances in the field of education, particularly at the college and graduate school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher wage, higher technology industries became more prominent in Puerto Rico. More recently, employment in the services sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing proportion of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, and the college-age population has declined since 2000.

The following table presents comparative trend data for Puerto Rico and the United States with respect to college-age population and the percentage of such population attending institutions of higher learning.

**Commonwealth of Puerto Rico**
**Trend in College Enrollment**

| Academic Year | Commonwealth of Puerto Rico | | | Mainland United States | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,621,000 | 50.5% |
| 2000 | 428,892[2] | 176,015 | 41.0% | 27,143,455[2] | 15,313,000 | 56.4% |
| 2001 | 426,194[3] | 185,015 | 43.4% | 27,971,000[3] | 15,928,000 | 56.9% |
| 2002 | 423,852[3] | 190,776 | 45.0% | 28,463,000[3] | 16,612,000 | 58.4% |
| 2003 | 420,295[3] | 199,842 | 47.5% | 28,947,000[3] | 16,900,000 | 58.4% |
| 2004 | 416,020[3] | 207,074 | 49.8% | 29,245,000[3] | 17,272,000 | 59.1% |
| 2005 | 411,580[3] | 208,032 | 50.5% | 29,307,000[3] | 17,428,000 | 59.5% |

(1) Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
(2) Based on census population as of April 1 of the stated year.
(3) Estimated population (reference date July 1 of the stated year).

*Sources:* United States Census Bureau (Mainland United States Population), United States National Center for Education Statistics, Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2005-2006 was approximately 63,973 students. The Commonwealth is legally bound to appropriate annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources for each of the two Fiscal Years immediately preceding the current Fiscal Year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2005-2006 of approximately 145,574 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Enrollment at other postsecondary education programs, including technical and vocational programs, amounted to an additional 33,629 students at approximately 76 institutions. This figure represents enrollment at federal Title IV eligible, non-degree granting institutions reporting data to the National Center for Education Statistics (Integrated Postsecondary Education Data System).

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by USDE-recognized accrediting entities.

**Tax Incentives**

*Puerto Rico Tax Incentives*

One of the benefits enjoyed by the Commonwealth is that corporations operating in Puerto Rico (other than corporations organized in the United States with a local branch) and individuals residing in Puerto Rico generally are not subject to federal income taxes on income derived in Puerto Rico. This enables the Commonwealth to utilize local tax legislation as a tool for stimulating economic development, and it has done so for many years.

In order to enjoy the benefits provided by the 1998 Tax Incentives Act, a business must apply for such benefits prior to December 31, 2007. It has been proposed that new tax incentives legislation be enacted to replace the 1998 Tax Incentives Act and that pending the enactment of such legislation, the aforementioned deadline be extended for two years. There is no assurance that such legislation will be enacted before December 31, 2007 or that the deadline will be extended.

In this regard, the Commonwealth enacted legislation extending certain benefits of its most recent tax incentives law, Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to all eligible businesses operating under previous tax incentives laws. These benefits include a 200% deduction for research and development expenses and worker training expenses, the ability to deduct, as a current expense, investments in machinery and equipment, and the ability to claim a tax credit equal to 25% of the purchase price of a product manufactured in the Commonwealth (in excess of a base amount) or 35% of the purchase price of a locally-manufactured, recycled product.

The 1998 Tax Incentives Act was also amended to allow a credit against their Puerto Rico income tax liability for investors that acquire the majority of the stock, partnership interests or operational assets of an exempted business that is in the process of closing operations in Puerto Rico. A credit against Puerto Rico income tax liability is also provided to investors that contribute cash to such exempted business for the construction or improvement of its physical plant and the purchase of machinery and equipment. The amount of the credit is equal to 50% of the cash invested for such purposes, not to exceed $5,000,000 per exempted business. The credits are subject to approval by the Secretary of the Treasury, and the maximum amount of such credits for any Fiscal Year is $15,000,000.

In addition, legislation was enacted (i) amending the 1998 Tax Incentives Act to permit income tax rates lower than 2% for companies that establish operations in Puerto Rico in "core pioneer industries" which utilize innovative technology in their operations not used in Puerto Rico prior to January 1, 2000; (ii) granting tax credits with respect to eligible investments made in the construction or substantial rehabilitation of housing units to be rented to low income families; (iii) granting income tax exemption to financial institutions for the fees and interest income received in connection with loans or guarantees of loans made to finance tourism development projects; (iv) granting an exemption to qualified associations administering timesharing rights or vacation clubs and to owners' associations in areas designated as tourism enhancement districts; (v) granting tax exemption for investments in infrastructure made by housing developers; (vi) granting tax credits to Puerto Rico businesses that acquire products manufactured in Puerto Rico for exportation; and (vii) granting tax credits for rehabilitating urban centers through the development of housing projects, community areas, commercial areas, parks and recreational spaces, construction and renovation of structures, and the development of undeveloped or under-developed sites.

In December 2006, two laws were approved that provide additional tax incentives to foster economic development in Puerto Rico. Act No. 289 of December 26, 2006 amended the 1994 Puerto Rico tax code in order to facilitate the creation of local Real Estate Investment Trusts (REITs). A REIT is a corporation, usually publicly traded, that manages a portfolio of real estate to earn profits for shareholders. Under Act No. 289, a special tax rate of 10% applies to the income from this type of investment. The creation of REITs will encourage investment in residential, commercial and industrial properties and hotels, and will contribute to the development of a local capital market.

Act No. 287 of December 26, 2006 created a new financing conduit for PRIDCO-sponsored economic development activity, to be known as the Puerto Rico Investment Development Initiative. The interest paid on debt securities issued by companies operating under the Puerto Rico Industrial Incentives Act of 1998 is exempt from Puerto Rico income taxes for *bona fide* residents of Puerto Rico and local corporations. The proceeds of such debt can be used for general business purposes, such as raw materials and machinery acquisition, construction, general business expenses, intellectual property and research and development, among others, but 80% of the proceeds must be used within Puerto Rico by the benefited company.

Tax and other incentives have also been established to promote the development of the tourism industry. The Tourism Incentives Act of 1993 (the "Tourism Incentives Act"), provides partial exemptions from income, property, and municipal license taxes for a period of up to ten years. The Tourism Incentives Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. Recently enacted legislation provides further tourism incentives by granting certain tax exemptions on interest income received from permanent or interim financing of tourism development projects and fees derived from credit enhancements provided to the financing of such projects.

*Incentives under the U.S. Code*

United States corporations operating in Puerto Rico have been subject to special tax provisions since the Revenue Act of 1921. Recently, many United States corporations operating in Puerto Rico are organized as controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income. In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. CFCs are subject to a fifteen percent (15%) Puerto Rico withholding tax on royalty payments.

Recently, the United States Congress approved legislation that would extend the benefit of Section 199 of the U.S. Code to production activities that take place in Puerto Rico. Section 199 provides a three-point reduction in the federal income tax rate, phased in over five years (from 35% to 31.85% after 2009). This extension applies to the U.S. branch activities located on the island and are not controlled foreign corporations.

Case: 17-00257-LTS   Doc#: 324-6   Filed: 02/21/18   Entered: 02/21/18 23:53:06   Desc:
Exhibit 6   Pages 7 of 125

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX B**

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Payment Obligation** shall mean, for the purposes of transfer from the Revenue Account on each Revenue Account Monthly Disbursement Date, for the related Class of Bonds of a Series and related Parity Obligations or Subordinate Obligations of such Class, and as of any particular Revenue Account Monthly Disbursement Date, (i) the aggregate of the Principal Installments of such Bonds, and principal component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period, plus (ii) the aggregate of the interest due on such Bonds, and interest component of Parity Obligations or Subordinate Obligations, as applicable, due during the next ensuing twelve-month period and, for Adjustable Rate Bonds, based on the Assumed Interest Rate; provided, that in the case of clauses (i) and (ii) above for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually, the amounts described in clauses (i) and (ii) hereof shall be the amounts due during the next ensuing fifteen-month period. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued Payment Obligation applicable to any particular Revenue Account Monthly Disbursement Date.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to

B-1

the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the eleventh sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds authorized to be issued on a parity therewith pursuant to the Resolution.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

B-2

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which the Corporation is authorized to close, or (iii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds of lower payment priorities.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

B-3

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Costs of Issuance Account** shall mean the Costs of Issuance Account established pursuant to the Resolution.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the rating of any Bonds Outstanding; and provided further, that a substitute Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is payable semiannually (except for the initial and/or final interest rate periods) or more often.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Account** shall mean the Account by that name established by the Resolution.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund created by Article 2 of the Act, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

       (i)     Government Obligations;

       (ii)    Defeased Municipal Obligations;

       (iii)   any other investment designated in a Supplemental Resolution as a Defeasance Obligation for purposes of defeasing the Bonds authorized by such Supplemental Resolution or Bonds authorized thereafter; provided that each Rating Agency has confirmed in writing to the Trustee that the use of such other investment will not, by itself, result in the withdrawal, suspension or downgrade of any rating issued by such Rating Agency with respect to any such Bonds to be defeased;

       (iv)   an obligation of Fannie Mae, the Federal Home Loan Mortgage Corporation or any other government sponsored enterprise or federal agency or instrumentality rated in the highest Ratings Category by each Rating Agency, if and to the extent approved by the Corporation;

(v)     certificates, depository receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) through (iv) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America or of any state or territory thereof or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depositary receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)     a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)     which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest rating category of any Rating Agency; or

(ii)     (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall have the meaning specified in the Resolution.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Repayment Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**GDB** shall mean Government Development Bank for Puerto Rico, and it successor and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Interest Subaccount** shall mean the Interest Subaccount established in the Debt Service Account by the Resolution.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

        (iii)   public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of both annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest rating category by a nationally recognized bond rating agency;

        (iv)   direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest rating categories by a nationally recognized bond rating agency;

        (v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

        (vi)   prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean, if and to the extent constituting an Ancillary Bond Facility, an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fee and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in this Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP, Bond Counsel to the Corporation, or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee.

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

      (i)    any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

      (ii)    Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

(iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

(iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to the Resolution;

(v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

(vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded.  Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges.  Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution.  Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

B-10

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

        1.     All Revenues.

        2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

        3.     The Funds, Accounts (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held under the terms of the Resolution, subject to the application thereof as provided in the Resolution.

        4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

        5.     Any an all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and subparagraph (e) of Article 5 of the Act.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Base Amount, subject to modifications made thereto after the date hereof, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Principal Subaccount** shall mean the Principal Subaccount established in the Debt Service Account by the Resolution.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap,

floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2007 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Account** shall mean the Account by that name established by the Resolution.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Account** shall mean the Account by that name established by the Resolution.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be

redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond, "Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to the Resolution and the applicable Series Resolution.

**Repayment Project** shall mean the repayment or refinancing or defeasance of all or any portion of the "extraconstitutional debt" of the Commonwealth outstanding as of June 30, 2006, as contemplated by the Act, and any similar repayment or refinancing program authorized by law which is to be supported by the Pledged Sales Tax.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to the Resolution. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account** shall mean the Account by that name established by the Resolution.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test or other purposes of the Resolution.

        3.     Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

        4.     Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Costs of Issuance Account, Bond Proceeds Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account, Bond Proceeds Account or Rebate Account) held by the Trustee under the terms of the Resolution.

        5.     Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Series 2007 Bonds of the Series designated as "Series 2007A" and "Series 2007B," and any Bonds of a Class the priority of payment of which under the Resolution is equal with that of the Series 2007A Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series 2007 Bonds** shall mean the Corporation's Sales Tax Revenue Bonds, Series 2007A and Series 2007B, the initial Series of Bonds to be issued under the Resolution.

**Series 2007 Qualified Hedge Provider** shall mean the Qualified Hedge Provider or Providers named in the Series Resolution applicable to the Series 2007 Bonds.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202(2) of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean Bonds of a Series, and consisting of one or more Classes, the priority of payment of which under the Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

**Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

**Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

**Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

**Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

B-15

## Summary of Certain Provisions of the Resolution

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

        (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

        (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)    either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)    a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued upon compliance with the Section entitled "Issuance of Additional Bonds," below, in lieu of compliance with the second paragraph of this Section.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default and the Credit Facility Provider is qualified to do business in the Commonwealth, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by the Section entitled "Powers of Amendment" below and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of the Section entitled "Powers of Amendment," and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

B-17

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by the preceding paragraph shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Repayment Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Repayment Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, which shall contain therein a Principal Subaccount and an Interest Subaccount, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

## Costs of Issuance Account and Capitalized Interest Account (Section 503)

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution.  If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i)      setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation thereof, including the Corporation, for the prior payment by any such entity for, costs of the Repayment Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)     stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii) upon requisition in writing by the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the Subordinate Bonds and Subordinate Obligations, in order of Class Priority, allocated on a pro rata basis between the Principal Subaccount and the Interest Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts shall equal the Accrued Payment Obligation related to all Subordinate Bonds and Subordinate Obligations;

FIFTH: to any Debt Service Reserve Accounts established for Subordinate Bonds, in order of Class Priority, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirements for such Subordinate Bonds;

SIXTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued Payment Obligation for all Senior Bonds, Subordinate Bonds, Parity Obligations and Subordinate Obligations for the ensuing twelve-month period (fifteen-month period for any Senior Bonds, Subordinate Bonds, Parity Obligations or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than semi-annually) shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND and FOURTH above, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND AND FOURTH above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then (y) for any of the purposes described in below, and then (z) for release to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs and for the payment of Operating Expenses in excess of the Operating Cap, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1 of the Resolution or (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account and deposited into the Interest Subaccount and the Principal Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND and FOURTH under "Revenue Account" above.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

(i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

(ii)     Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

(iii)   Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

(i)   Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

(ii)   Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal

B-24

the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all

B-25

investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer

of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof other than Section 403, there shall be credited the principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided, however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed, (ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed, and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled "Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund Installment. The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled "Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)   amounts determined pursuant to the sixth paragraph of the Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)   amounts determined pursuant to the fourth paragraph of the Section entitled "Bond Proceeds Account" above;

(iii)    amounts determined pursuant to the second paragraph of the Section entitled "Revenue Account" above; and

(iv)    amounts transferred from the Debt Service Reserve Account for the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal Installment for Bonds due on such Principal Installment due date, or the interest or principal components of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

## Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

**Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)**

   Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

   Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

   Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

   The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund,

Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

### Particular Covenants of the Corporation

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation includes in the Resolution, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that it will not limit or restrain the rights or powers conferred by the Act or the right of the Corporation to meet its agreements with Bondowners, until the Bonds, irrespective of their maturity, together with the interest on the same, are

completely paid and redeemed and that no amendment to the Act shall undermine any obligation or commitment of the Corporation.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

No Series of Bonds in addition to the Series 2007 Bonds may be issued without compliance with Section 202 and no Series of Senior Bonds may be issued in addition to the Series 2007 Bonds, and no Parity Obligations in addition to Parity Obligations incurred on the date of issuance of the Series 2007 Bonds may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting:

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued Payment Obligation due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in such Fiscal Year, (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the four percent (4%) minimum adjustment thereto provided in the Act and applicable to each Fiscal Year beginning July 1, 2008, and (iv) the Accrued Payment Obligation that will be due on the Senior Bonds, including such additional Senior Bonds, the amount of such Parity Obligations due, and the Operating Cap applicable, in each subsequent Fiscal Year, and showing that the amount in clause (i) at least equals the amount in clause (ii) and the amount for each subsequent Fiscal Year in clause (iii) at least equals the amount for such Fiscal Year in clause (iv).

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by 4%, and (ii) the total Accrued Payment Obligation scheduled for all Outstanding Senior Bonds and amounts due on all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year, and showing, for each such Fiscal Year, that the related amount shown in (B)(i) is at least 3 times the related amount shown in (B)(ii).

In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated

Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

        The Corporation may issue Subordinate Bonds or incur Subordinate Obligations at any time subject to the requirements of the related Series Resolution and without compliance with the requirements of the Resolution.

*General (Section 711)*

        The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

        Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

**Responsibilities of Trustee (Section 802)**

        The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact herein and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the

Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of

defending itself against any claim (whether asserted by the Corporation or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

### Certain Permitted Acts (Section 805)

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

### Resignation of Trustee (Section 806)

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

### Removal of Trustee (Section 807)

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i) to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii) to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

B-36

(iii)     to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv)     to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v)     to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi)     to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii)     to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii)     to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x)     to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi)     as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii)     to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii)     to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

B-37

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution.  Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively.  The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section.  No such modification or

B-38

amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons.  For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series.  The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

## Events of Default and Remedies (Article XI)

*Events of Default (Section 1101)*

> Each of the following events shall constitute an Event of Default under the Resolution:

> (i)  There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

> (ii)  There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

> *provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

> The exercise by the Commonwealth of its right to amend, modify, repeal or otherwise alter statutes imposing or relating to the Commonwealth Sales Tax, as described in the Resolution, shall not constitute a default or Event of Default under the Resolution.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such

Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of

SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above.  The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct.  Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue.  The Trustee shall give such notice as it may deem appropriate for the fixing of any such date.  The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to

B-42

exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds. Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or

cured before the giving of such notice. However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries. Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof: (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Securities deposited pursuant as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Securities the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in

B-44

accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

Neither Defeasance Securities nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Securities, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Securities deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Securities maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 23 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 23 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with

B-45

the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

**APPENDIX C**

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

*Hawkins Delafield & Wood LLP*

_____, 2007

ONE CHASE MANHATTAN PLAZA
NEW YORK, NY 10005
WWW.HAWKINS.COM

Puerto Rico Sales Tax Financing Corporation
Sánchez Vilella Government Center
De Diego Avenue, Stop 22
Santurce, Puerto Rico 00940

Ladies and Gentlemen:

We have examined the Constitution and the laws of the Commonwealth of Puerto Rico (the "Commonwealth"), including Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended and supplemented (the "Act"), creating the Puerto Rico Sales Tax Financing Corporation (the "Corporation") as an independent governmental instrumentality of the Commonwealth.

We have also examined a certified copy of a resolution adopted by the Board of Directors of the Corporation on July 13, 2007 (the "General Resolution") and a supplemental resolution adopted by the Board of Directors on such date (together with the General Resolution, the "Resolution"), and other proofs submitted relative to the following issue of Bonds (collectively, the "Bonds"):

**$2,667,603,572.60 Sales Tax Revenue Bonds, Series 2007A**

| Serial Bond Maturity | Initial Principal Amount | Interest Rate | Initial Principal Amount Per $5,000 |
|---|---|---|---|
| 2040 | $ 15,445,848.60 | n/a | $992.60 |
| 2041 | 114,697,901.80 | n/a | 938.90 |
| 2042 | 113,630,448.00 | n/a | 890.80 |
| 2043 | 112,132,508.00 | n/a | 842.00 |
| 2044 | 110,597,947.20 | n/a | 795.60 |
| 2045 | 109,430,361.25 | n/a | 754.25 |
| 2046 | 108,235,860.00 | n/a | 714.90 |
| 2047 | 107,014,744.15 | n/a | 677.45 |
| 2057 | 563,885,000.00 | 5.25% | n/a |
| 2057 | 436,000,000.00 | Adjustable | n/a |

C-1

**$701,475,105.60 Capital Appreciation Term Bonds due August 1, 2054
(initial principal amount per $5,000 maturity amount: $460.30)**

**$175,057,848.00 Capital Appreciation Term Bonds due August 1, 2056
(initial principal amount per $5,000 maturity amount: $378.00)**

The Bonds are issuable as fully registered Bonds, without coupons, in denominations of $5,000 (maturity amount) each or integral multiples thereof.

The Bonds are issued under and pursuant to the Resolution for the purpose of (i) providing funds for the payment or retirement of certain "extraconstitutional" loans owing by the Commonwealth, and (ii) making deposits in various funds and accounts established under the Resolution.

The Bonds are limited obligations of the Corporation payable solely from and secured by a pledge and assignment of undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, the Pledged Sales Tax receipts and all other Revenues (as defined in the Resolution) derived therefrom (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution.

The Bonds bear or compound interest and are subject to redemption prior to maturity as set forth in the Resolution.

The principal of the Bonds is payable at the principal corporate trust office of the Trustee in New York, New York. The interest on the Bonds is payable by check mailed to the registered owner at the address appearing on the registration books of the Corporation on the relevant record date or, in certain circumstances set forth in the Resolution, by wire transfer to a designated account.

The Internal Revenue Code of 1986, as amended (the "Code"), establishes requirements that must be met subsequent to the initial issuance and delivery of the Bonds in order that interest on the Bonds not be included, on and after the date of such issuance and delivery, in gross income for Federal income tax purposes under the Code. The Corporation has established procedures in the Resolution to meet the requirements of the Code. The Corporation has also covenanted in the Resolution to comply with the requirements of Sections 141 and 148 through 150 of the Code. In our opinion, the procedures that have been established as of the date hereof in the Resolution are sufficient, if followed by the Corporation, to comply with the requirements of the Code. Our opinion in paragraph 5 below is rendered on the assumption that the Corporation will carry out the aforementioned procedures and comply with the aforementioned covenants.

In rendering the opinion in paragraph 5 below, we also have relied on and assumed compliance by the Government Development Bank for Puerto Rico and by the Commonwealth of Puerto Rico with procedures and covenants set forth in certificates delivered on the date hereof.

From such examination, and having regard to legal questions we deem relevant, we are of the opinion that:

(1)     The Act is valid in all respects material to this opinion and the Corporation is a duly constituted public corporation and governmental instrumentality of the Commonwealth.

(2)     The Resolution has been duly adopted by, and is legal, valid and binding upon, the Corporation, enforceable in accordance with its terms.

C-2

(3)     The Bonds have been duly authorized by the Corporation and constitute legal, valid and binding limited obligations of the Corporation payable solely from, and secured by a valid and binding pledge of, the Pledged Property, subject only to the provisions of the Resolution permitting use of such Pledged Property and its application for the purposes and on the terms and conditions provided in the Resolution.

(4)     The Bonds do not constitute a debt, obligation or pledge of the full faith, credit or taxing power of the Commonwealth or any of its municipalities or political subdivisions, or instrumentalities (other than the Corporation), and neither the Commonwealth nor any of its municipalities or political subdivisions, nor instrumentalities (other than the Corporation), shall be liable for the payment thereof.

(5)     Under the provisions of the Acts of Congress now in force and under existing statutes and court decisions, (a) assuming compliance with certain conditions imposed by applicable Federal tax law as described herein, interest on the Bonds is excluded from gross income for Federal income tax purposes pursuant to applicable Federal tax law, and (ii) interest on the Bonds is not treated as a preference item in calculating the alternative minimum tax imposed on individuals and corporations under the Code; such interest, however, is included in the adjusted current earnings of certain corporations for purposes of calculating the alternative minimum tax imposed on such corporations; and (b) the Bonds, and the interest thereon, are exempt from state, the Commonwealth of Puerto Rico and local taxation. Additionally, certain provisions of the Code may affect the tax treatment of interest on the Bonds for certain Bondowners, and certain requirements of the Code must be satisfied after the date of issuance of the Bonds in order to maintain the exclusion from gross income of interest thereon under Federal law.

We express no opinion regarding any other Federal, Commonwealth or state tax consequences with respect to the Bonds. We are rendering our opinion under existing statutes and court decisions as of the issue date, and assume no obligation to update our opinion after the issue date to reflect any future action, fact or circumstance, or change in law or interpretation, or otherwise. We express no opinion on the effect of any action hereafter taken or not taken in reliance upon an opinion of other counsel on the exclusion of interest on the Bonds from gross income for Federal income tax purposes, or under state, Commonwealth or local tax law.

In rendering this opinion, we are advising you that the enforceability of the Bonds and the Resolution may be limited by bankruptcy, moratorium, insolvency, or other laws affecting creditors' rights or remedies and is subject to general principles of equity (regardless of whether such enforceability is considered in a proceeding in equity or at law).

We have also examined an executed Bond and in our opinion the form of said Bond and its execution are regular and proper.

Yours very truly,

C-3

[This Page Intentionally Left Blank]

## BOOK-ENTRY SYSTEM

### The Depository Trust Company

DTC will act as securities depository for the Bonds. The Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee). One fully-registered Bond certificate will be issued for each stated maturity of the Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE BONDS.

DTC, the world's largest depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended (the "Exchange Act"). DTC holds and provides asset servicing for over 2.2 million issues of U.S. and non-U.S. equity, corporate and municipal debt issues, and money market instruments from over 100 countries that DTC's Participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC, in turn, is owned by a number of Direct Participants of DTC and Members of the National Securities Clearing Corporation, Fixed Income Clearing Corporation, and Emerging Markets Clearing Corporation, (NSCC, FICC, and EMCC, also subsidiaries of DTCC), as well as by the New York Stock Exchange, Inc., the American Stock Exchange LLC, and the National Association of Securities Dealers, Inc. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has S&P's highest rating; AAA. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission ("SEC"). More information about DTC can be found at www.dtcc.com and www.dtc.org.

Purchases of the Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Bonds on DTC's records. The ownership interest of each actual purchaser of the Bonds ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction.

Transfers of ownership interests in the Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners will

not receive certificates representing their ownership interests in the Bonds, except in the event that use of the book-entry system for the Bonds is discontinued.

To facilitate subsequent transfers, the Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Bonds with DTC and their registration in the name of Cede & Co. or such other nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time.

Redemption notices shall be sent to DTC. If less than all of the Bonds are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor such other DTC nominee) will consent or vote with respect to Bonds unless authorized by a Direct Participant in accordance with DTC's Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Redemption proceeds, distributions, and dividend payments on the Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee, or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of redemption proceeds, distributions, and dividend payments to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as securities depository with respect to the Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in the event that a successor depository is not obtained, Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry only transfers through DTC (or a successor securities depository). In that event, Bond certificates will be printed and delivered to DTC.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE BONDS.

Case 17-00257-LTS   Doc#:924-6   Filed:02/24/18   Entered:02/24/18 23:53:06   Desc:
Exhibit 6   Page 11 of 12

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX E

## TABLE OF COMPOUNDED AMOUNTS FOR
## CAPITAL APPRECIATION BONDS

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 7/31/2007 | 992.60 | 938.90 | 890.80 | 842.00 | 795.60 | 754.25 | 714.90 | 677.45 | 460.30 | 378.00 |
| 2/1/2008 | 1,017.20 | 962.25 | 913.00 | 863.10 | 815.60 | 773.25 | 732.95 | 694.60 | 472.10 | 388.10 |
| 8/1/2008 | 1,042.45 | 986.25 | 935.80 | 884.70 | 836.10 | 792.70 | 751.45 | 712.15 | 484.25 | 398.45 |
| 2/1/2009 | 1,068.30 | 1,010.80 | 959.15 | 906.90 | 857.15 | 812.70 | 770.40 | 730.20 | 496.70 | 409.10 |
| 8/1/2009 | 1,094.80 | 1,035.95 | 983.05 | 929.60 | 878.70 | 833.20 | 789.85 | 748.65 | 509.45 | 420.00 |
| 2/1/2010 | 1,121.95 | 1,061.75 | 1,007.60 | 952.90 | 900.80 | 854.20 | 809.80 | 767.60 | 522.55 | 431.20 |
| 8/1/2010 | 1,149.80 | 1,088.20 | 1,032.75 | 976.75 | 923.45 | 875.70 | 830.25 | 787.00 | 536.00 | 442.75 |
| 2/1/2011 | 1,178.30 | 1,115.30 | 1,058.50 | 1,001.20 | 946.70 | 897.75 | 851.20 | 806.95 | 549.75 | 454.55 |
| 8/1/2011 | 1,207.50 | 1,143.05 | 1,084.90 | 1,026.30 | 970.50 | 920.40 | 872.70 | 827.35 | 563.90 | 466.70 |
| 2/1/2012 | 1,237.45 | 1,171.55 | 1,112.00 | 1,052.00 | 994.90 | 943.60 | 894.75 | 848.30 | 578.40 | 479.15 |
| 8/1/2012 | 1,268.15 | 1,200.70 | 1,139.70 | 1,078.35 | 1,019.90 | 967.35 | 917.35 | 869.75 | 593.25 | 491.95 |
| 2/1/2013 | 1,299.60 | 1,230.60 | 1,168.15 | 1,105.40 | 1,045.55 | 991.75 | 940.50 | 891.75 | 608.50 | 505.10 |
| 8/1/2013 | 1,331.85 | 1,261.25 | 1,197.30 | 1,133.05 | 1,071.85 | 1,016.75 | 964.25 | 914.30 | 624.15 | 518.55 |
| 2/1/2014 | 1,364.65 | 1,292.65 | 1,227.20 | 1,161.45 | 1,098.80 | 1,042.35 | 988.60 | 937.45 | 640.20 | 532.40 |
| 8/1/2014 | 1,398.70 | 1,324.85 | 1,257.80 | 1,190.55 | 1,126.45 | 1,068.65 | 1,013.55 | 961.15 | 656.65 | 546.65 |
| 2/1/2015 | 1,433.40 | 1,357.80 | 1,289.20 | 1,220.35 | 1,154.80 | 1,095.55 | 1,039.15 | 985.50 | 673.50 | 561.20 |
| 8/1/2015 | 1,468.95 | 1,391.65 | 1,321.35 | 1,250.95 | 1,183.85 | 1,123.15 | 1,065.40 | 1,010.40 | 690.80 | 576.20 |
| 2/1/2016 | 1,505.40 | 1,426.30 | 1,354.30 | 1,282.30 | 1,213.60 | 1,151.45 | 1,092.30 | 1,035.95 | 708.60 | 591.60 |
| 8/1/2016 | 1,542.70 | 1,461.80 | 1,388.10 | 1,314.40 | 1,244.15 | 1,180.50 | 1,119.90 | 1,062.20 | 726.80 | 607.40 |
| 2/1/2017 | 1,580.95 | 1,498.20 | 1,422.75 | 1,347.35 | 1,275.40 | 1,210.25 | 1,148.15 | 1,089.05 | 745.45 | 623.60 |
| 8/1/2017 | 1,620.20 | 1,535.50 | 1,458.25 | 1,381.10 | 1,307.50 | 1,240.75 | 1,177.15 | 1,116.60 | 764.65 | 640.25 |
| 2/1/2018 | 1,660.35 | 1,573.75 | 1,494.60 | 1,415.70 | 1,340.40 | 1,272.00 | 1,206.90 | 1,144.85 | 784.30 | 657.35 |
| 8/1/2018 | 1,701.55 | 1,612.95 | 1,531.90 | 1,451.15 | 1,374.10 | 1,304.05 | 1,237.35 | 1,173.85 | 804.45 | 674.90 |
| 2/1/2019 | 1,743.75 | 1,653.10 | 1,570.15 | 1,487.50 | 1,408.65 | 1,336.90 | 1,268.60 | 1,203.55 | 825.10 | 692.95 |
| 8/1/2019 | 1,787.00 | 1,694.25 | 1,609.30 | 1,524.75 | 1,444.10 | 1,370.60 | 1,300.65 | 1,234.00 | 846.30 | 711.45 |
| 2/1/2020 | 1,831.30 | 1,736.45 | 1,649.45 | 1,562.95 | 1,480.40 | 1,405.15 | 1,333.45 | 1,265.20 | 868.05 | 730.40 |
| 8/1/2020 | 1,876.70 | 1,779.70 | 1,690.60 | 1,602.10 | 1,517.65 | 1,440.55 | 1,367.15 | 1,297.20 | 890.40 | 749.95 |
| 2/1/2021 | 1,923.25 | 1,824.00 | 1,732.80 | 1,642.25 | 1,555.80 | 1,476.85 | 1,401.65 | 1,330.05 | 913.25 | 769.95 |
| 8/1/2021 | 1,970.95 | 1,869.40 | 1,776.05 | 1,683.40 | 1,594.95 | 1,514.10 | 1,437.05 | 1,363.70 | 936.75 | 790.50 |
| 2/1/2022 | 2,019.85 | 1,915.95 | 1,820.35 | 1,725.55 | 1,635.05 | 1,552.25 | 1,473.35 | 1,398.20 | 960.80 | 811.60 |
| 8/1/2022 | 2,069.95 | 1,963.65 | 1,865.75 | 1,768.75 | 1,676.15 | 1,591.35 | 1,510.55 | 1,433.55 | 985.50 | 833.30 |
| 2/1/2023 | 2,121.25 | 2,012.55 | 1,912.30 | 1,813.10 | 1,718.30 | 1,631.45 | 1,548.70 | 1,469.85 | 1,010.85 | 855.55 |
| 8/1/2023 | 2,173.90 | 2,062.70 | 1,960.05 | 1,858.50 | 1,761.55 | 1,672.55 | 1,587.80 | 1,507.00 | 1,036.80 | 878.40 |
| 2/1/2024 | 2,227.80 | 2,114.05 | 2,008.95 | 1,905.05 | 1,805.85 | 1,714.70 | 1,627.90 | 1,545.15 | 1,063.45 | 901.85 |
| 8/1/2024 | 2,283.05 | 2,166.70 | 2,059.05 | 1,952.80 | 1,851.25 | 1,757.95 | 1,669.00 | 1,584.25 | 1,090.80 | 925.90 |
| 2/1/2025 | 2,339.65 | 2,220.65 | 2,110.45 | 2,001.70 | 1,897.80 | 1,802.25 | 1,711.15 | 1,624.30 | 1,118.80 | 950.65 |
| 8/1/2025 | 2,397.70 | 2,275.90 | 2,163.10 | 2,051.85 | 1,945.55 | 1,847.65 | 1,754.35 | 1,665.40 | 1,147.55 | 976.00 |
| 2/1/2026 | 2,457.15 | 2,332.60 | 2,217.05 | 2,103.25 | 1,994.50 | 1,894.20 | 1,798.65 | 1,707.55 | 1,177.05 | 1,002.10 |
| 8/1/2026 | 2,518.10 | 2,390.70 | 2,272.35 | 2,155.90 | 2,044.65 | 1,941.95 | 1,844.05 | 1,750.75 | 1,207.30 | 1,028.85 |
| 2/1/2027 | 2,580.55 | 2,450.20 | 2,329.05 | 2,209.95 | 2,096.05 | 1,990.90 | 1,890.60 | 1,795.05 | 1,238.35 | 1,056.30 |
| 8/1/2027 | 2,644.55 | 2,511.20 | 2,387.20 | 2,265.30 | 2,148.80 | 2,041.05 | 1,938.35 | 1,840.45 | 1,270.15 | 1,084.50 |
| 2/1/2028 | 2,710.10 | 2,573.75 | 2,446.75 | 2,322.05 | 2,202.85 | 2,092.50 | 1,987.30 | 1,887.00 | 1,302.80 | 1,113.45 |
| 8/1/2028 | 2,777.35 | 2,637.85 | 2,507.80 | 2,380.20 | 2,258.25 | 2,145.20 | 2,037.50 | 1,934.75 | 1,336.30 | 1,143.20 |
| 2/1/2029 | 2,846.20 | 2,703.50 | 2,570.35 | 2,439.85 | 2,315.00 | 2,199.30 | 2,088.90 | 1,983.70 | 1,370.65 | 1,173.70 |
| 8/1/2029 | 2,916.80 | 2,770.85 | 2,634.50 | 2,500.95 | 2,373.25 | 2,254.70 | 2,141.65 | 2,033.90 | 1,405.85 | 1,205.05 |
| 2/1/2030 | 2,989.15 | 2,839.85 | 2,700.20 | 2,563.60 | 2,432.95 | 2,311.55 | 2,195.75 | 2,085.35 | 1,442.00 | 1,237.25 |
| 8/1/2030 | 3,063.25 | 2,910.55 | 2,767.60 | 2,627.80 | 2,494.10 | 2,369.80 | 2,251.20 | 2,138.10 | 1,479.05 | 1,270.25 |
| 2/1/2031 | 3,139.25 | 2,983.00 | 2,836.65 | 2,693.65 | 2,556.85 | 2,429.50 | 2,308.05 | 2,192.20 | 1,517.05 | 1,304.20 |
| 8/1/2031 | 3,217.10 | 3,057.30 | 2,907.40 | 2,761.10 | 2,621.15 | 2,490.70 | 2,366.30 | 2,247.70 | 1,556.05 | 1,339.00 |
| 2/1/2032 | 3,296.85 | 3,133.40 | 2,979.95 | 2,830.30 | 2,687.10 | 2,553.50 | 2,426.05 | 2,304.55 | 1,596.05 | 1,374.75 |
| 8/1/2032 | 3,378.65 | 3,211.45 | 3,054.30 | 2,901.20 | 2,754.65 | 2,617.85 | 2,487.30 | 2,362.85 | 1,637.05 | 1,411.45 |
| 2/1/2033 | 3,462.40 | 3,291.40 | 3,130.50 | 2,973.85 | 2,823.95 | 2,683.80 | 2,550.15 | 2,422.65 | 1,679.15 | 1,449.15 |
| 8/1/2033 | 3,548.30 | 3,373.35 | 3,208.60 | 3,048.35 | 2,894.95 | 2,751.45 | 2,614.50 | 2,483.95 | 1,722.30 | 1,487.85 |
| 2/1/2034 | 3,636.30 | 3,457.35 | 3,288.70 | 3,124.70 | 2,967.75 | 2,820.75 | 2,680.55 | 2,546.75 | 1,766.55 | 1,527.60 |
| 8/1/2034 | 3,726.45 | 3,543.45 | 3,370.75 | 3,203.00 | 3,042.40 | 2,891.85 | 2,748.20 | 2,611.20 | 1,811.95 | 1,568.35 |

E-1

| Date | 2042 FGIC CABS 8/1/2040 4.96% | 2042 FGIC CABS 8/1/2041 4.98% | 2042 FGIC CABS 8/1/2042 4.99% | 2046 MBIA CABS 8/1/2043 5.01% | 2046 MBIA CABS 8/1/2044 5.03% | 2046 MBIA CABS 8/1/2045 5.04% | 2046 MBIA CABS 8/1/2046 5.05% | 2047 AMBAC CABS 8/1/2047 5.06% | 2054 AMBAC CABS 5.14% | 2056 Uninsured CABS 5.34% |
|---|---|---|---|---|---|---|---|---|---|---|
| 2/1/2035 | 3,818.90 | 3,631.70 | 3,454.85 | 3,283.25 | 3,118.95 | 2,964.75 | 2,817.60 | 2,677.25 | 1,858.55 | 1,610.25 |
| 8/1/2035 | 3,913.60 | 3,722.10 | 3,541.05 | 3,365.45 | 3,197.35 | 3,039.45 | 2,888.75 | 2,745.00 | 1,906.30 | 1,653.25 |
| 2/1/2036 | 4,010.65 | 3,814.80 | 3,629.40 | 3,449.80 | 3,277.80 | 3,116.05 | 2,961.70 | 2,814.45 | 1,955.30 | 1,697.35 |
| 8/1/2036 | 4,110.10 | 3,909.80 | 3,719.95 | 3,536.20 | 3,360.20 | 3,194.55 | 3,036.50 | 2,885.65 | 2,005.55 | 1,742.70 |
| 2/1/2037 | 4,212.05 | 4,007.15 | 3,812.75 | 3,624.80 | 3,444.75 | 3,275.05 | 3,113.15 | 2,958.65 | 2,057.10 | 1,789.25 |
| 8/1/2037 | 4,316.50 | 4,106.90 | 3,907.85 | 3,715.60 | 3,531.35 | 3,357.60 | 3,191.75 | 3,033.50 | 2,109.95 | 1,837.00 |
| 2/1/2038 | 4,423.55 | 4,209.15 | 4,005.35 | 3,808.65 | 3,620.20 | 3,442.20 | 3,272.35 | 3,110.25 | 2,164.20 | 1,886.05 |
| 8/1/2038 | 4,533.25 | 4,314.00 | 4,105.30 | 3,904.05 | 3,711.25 | 3,528.95 | 3,355.00 | 3,188.95 | 2,219.80 | 1,936.40 |
| 2/1/2039 | 4,645.70 | 4,421.40 | 4,207.75 | 4,001.85 | 3,804.55 | 3,617.90 | 3,439.70 | 3,269.65 | 2,276.85 | 1,988.10 |
| 8/1/2039 | 4,760.90 | 4,531.50 | 4,312.70 | 4,102.10 | 3,900.25 | 3,709.05 | 3,526.55 | 3,352.35 | 2,335.35 | 2,041.20 |
| 2/1/2040 | 4,879.00 | 4,644.35 | 4,420.30 | 4,204.85 | 3,998.35 | 3,802.55 | 3,615.60 | 3,437.20 | 2,395.40 | 2,095.70 |
| 8/1/2040 | 5,000.00 | 4,760.00 | 4,530.60 | 4,310.20 | 4,098.90 | 3,898.35 | 3,706.90 | 3,524.15 | 2,456.95 | 2,151.65 |
| 2/1/2041 | | 4,878.50 | 4,643.65 | 4,418.15 | 4,202.00 | 3,996.60 | 3,800.50 | 3,613.30 | 2,520.10 | 2,209.10 |
| 8/1/2041 | | 5,000.00 | 4,759.50 | 4,528.85 | 4,307.70 | 4,097.30 | 3,896.45 | 3,704.70 | 2,584.85 | 2,268.10 |
| 2/1/2042 | | | 4,878.25 | 4,642.30 | 4,416.00 | 4,200.55 | 3,994.85 | 3,798.45 | 2,651.30 | 2,328.65 |
| 8/1/2042 | | | 5,000.00 | 4,758.60 | 4,527.10 | 4,306.40 | 4,095.70 | 3,894.55 | 2,719.45 | 2,390.80 |
| 2/1/2043 | | | | 4,877.80 | 4,640.95 | 4,414.95 | 4,199.15 | 3,993.10 | 2,789.30 | 2,454.65 |
| 8/1/2043 | | | | 5,000.00 | 4,757.65 | 4,526.20 | 4,305.15 | 4,094.10 | 2,861.00 | 2,520.20 |
| 2/1/2044 | | | | | 4,877.30 | 4,640.25 | 4,413.85 | 4,197.70 | 2,934.55 | 2,587.50 |
| 8/1/2044 | | | | | 5,000.00 | 4,757.20 | 4,525.30 | 4,303.90 | 3,009.95 | 2,656.55 |
| 2/1/2045 | | | | | | 4,877.05 | 4,639.60 | 4,412.80 | 3,087.30 | 2,727.50 |
| 8/1/2045 | | | | | | 5,000.00 | 4,756.75 | 4,524.45 | 3,166.65 | 2,800.30 |
| 2/1/2046 | | | | | | | 4,876.85 | 4,638.90 | 3,248.05 | 2,875.10 |
| 8/1/2046 | | | | | | | 5,000.00 | 4,756.25 | 3,331.50 | 2,951.85 |
| 2/1/2047 | | | | | | | | 4,876.60 | 3,417.15 | 3,030.65 |
| 8/1/2047 | | | | | | | | 5,000.00 | 3,504.95 | 3,111.60 |
| 2/1/2048 | | | | | | | | | 3,595.05 | 3,194.65 |
| 8/1/2048 | | | | | | | | | 3,687.40 | 3,279.95 |
| 2/1/2049 | | | | | | | | | 3,782.20 | 3,367.55 |
| 8/1/2049 | | | | | | | | | 3,879.40 | 3,457.45 |
| 2/1/2050 | | | | | | | | | 3,979.10 | 3,549.75 |
| 8/1/2050 | | | | | | | | | 4,081.35 | 3,644.55 |
| 2/1/2051 | | | | | | | | | 4,186.25 | 3,741.85 |
| 8/1/2051 | | | | | | | | | 4,293.85 | 3,841.75 |
| 2/1/2052 | | | | | | | | | 4,404.20 | 3,944.35 |
| 8/1/2052 | | | | | | | | | 4,517.40 | 4,049.65 |
| 2/1/2053 | | | | | | | | | 4,633.45 | 4,157.80 |
| 8/1/2053 | | | | | | | | | 4,752.55 | 4,268.80 |
| 2/1/2054 | | | | | | | | | 4,874.70 | 4,382.80 |
| 8/1/2054 | | | | | | | | | 5,000.00 | 4,499.80 |
| 2/1/2055 | | | | | | | | | | 4,619.95 |
| 8/1/2055 | | | | | | | | | | 4,743.30 |
| 2/1/2056 | | | | | | | | | | 4,869.95 |
| 8/1/2056 | | | | | | | | | | 5,000.00 |

E-2



**FGIC**

Financial Guaranty Insurance Company
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

# Municipal Bond
# New Issue Insurance Policy

| Issuer: | Policy Number: |
|---|---|
| | Control Number:     0010001 |
| Bonds: | Premium: |

Financial Guaranty Insurance Company ("Financial Guaranty"), a New York stock insurance company, in consideration of the payment of the premium and subject to the terms of this Policy, hereby unconditionally and irrevocably agrees to pay to U.S. Bank Trust National Association or its successor, as its agent (the "Fiscal Agent"), for the benefit of Bondholders, that portion of the principal and interest on the above-described debt obligations (the "Bonds") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

Financial Guaranty will make such payments to the Fiscal Agent on the date such principal or interest becomes Due for Payment or on the Business Day next following the day on which Financial Guaranty shall have received Notice of Nonpayment, whichever is later. The Fiscal Agent will disburse to the Bondholder the face amount of principal and interest which is then Due for Payment but is unpaid by reason of Nonpayment by the Issuer but only upon receipt by the Fiscal Agent, in form reasonably satisfactory to it, of (i) evidence of the Bondholder's right to receive payment of the principal or interest Due for Payment and (ii) evidence, including any appropriate instruments of assignment, that all of the Bondholder's rights to payment of such principal or interest Due for Payment shall thereupon vest in Financial Guaranty. Upon such disbursement, Financial Guaranty shall become the owner of the Bond, appurtenant coupon or right to payment of principal or interest on such Bond and shall be fully subrogated to all of the Bondholder's rights thereunder, including the Bondholder's right to payment thereof.

This Policy is non-cancellable for any reason. The premium on this Policy is not refundable for any reason, including the payment of the Bonds prior to their maturity. This Policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Bond.

As used herein, the term "Bondholder" means, as to a particular Bond, the person other than the Issuer who, at the time of Nonpayment, is entitled under the terms of such Bond to payment thereof. "Due for Payment" means, when referring to the principal of a Bond, the stated maturity date thereof or the date on which the same shall have been duly called for mandatory sinking fund redemption and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by mandatory sinking fund redemption), acceleration or other advancement of maturity and means, when referring to interest on a Bond, the stated date for payment of interest. "Nonpayment" in respect of a Bond means the failure of the Issuer to have provided sufficient funds to the paying agent for payment in full of all

---

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form 9000 (10/93)                                                                                               Page 1 of 2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
Y 212-312-3000
T 800-352-0001

# Municipal Bond
# New Issue Insurance Policy

principal and interest Due for Payment on such Bond. "Notice" means telephonic or telegraphic notice, subsequently confirmed in writing, or written notice by registered or certified mail, from a Bondholder or a paying agent for the Bonds to Financial Guaranty. "Business Day" means any day other than a Saturday, Sunday or a day on which the Fiscal Agent is authorized by law to remain closed.

In Witness Whereof, Financial Guaranty has caused this Policy to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                         **Authorized Representative**

U.S. Bank Trust National Association, acknowledges that it has agreed to perform the duties of Fiscal Agent under this Policy.

**Authorized Officer**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.

Form 9000 (10/93)                                                                                 Page 2 of 2

F-2



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement
To Financial Guaranty Insurance Company
Insurance Policy

| Policy Number: | | Control Number: | 0010001 |
|---|---|---|---|

It is further understood that the term "Nonpayment" in respect of a Bond includes any payment of principal or interest made to a Bondholder by or on behalf of the issuer of such Bond which has been recovered from such Bondholder pursuant to the United States Bankruptcy Code by a trustee in bankruptcy in accordance with a final, nonappealable order of a court having competent jurisdiction.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

**President**

**Effective Date:**                                    **Authorized Representative**

Acknowledged as of the Effective Date written above:

**Authorized Officer**
**U.S. Bank Trust National Association, as Fiscal Agent**

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0002 (10/93)                                                                 Page 1 of 1

F–3



**Financial Guaranty Insurance Company**
125 Park Avenue
New York, NY 10017
T 212·312·3000
T 800·352·0001

## Endorsement
To Financial Guaranty Insurance Company
Insurance Policy

---

Policy Number:                    Control Number:    0010001

---

It is further understood that with respect to the Bonds maturing on _____, the amount insured under this Policy is that portion of the accreted value (as set forth in the bond documents under which the Bonds are issued) of said Bonds which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Issuer.

NOTHING HEREIN SHALL BE CONSTRUED TO WAIVE, ALTER, REDUCE OR AMEND COVERAGE IN ANY OTHER SECTION OF THE POLICY. IF FOUND CONTRARY TO THE POLICY LANGUAGE, THE TERMS OF THIS ENDORSEMENT SUPERSEDE THE POLICY LANGUAGE.

In Witness Whereof, Financial Guaranty has caused this Endorsement to be affixed with its corporate seal and to be signed by its duly authorized officer in facsimile to become effective and binding upon Financial Guaranty by virtue of the countersignature of its duly authorized representative.

President

Effective Date:                          Authorized Representative

Acknowledged as of the Effective Date written above:

Authorized Officer
U.S. Bank Trust National Association, as Fiscal Agent

---

FGIC is a registered service mark used by Financial Guaranty Insurance Company under license from its parent company, FGIC Corporation.
Form E-0014                                                                Page 1 of 1

F-4

**APPENDIX G**

## FINANCIAL GUARANTY INSURANCE POLICY

### MBIA Insurance Corporation
### Armonk, New York 10504

Policy No. [NUMBER]

MBIA Insurance Corporation (the "Insurer"), in consideration of the payment of the premium and subject to the terms of this policy, hereby unconditionally and irrevocably guarantees to any owner, as hereinafter defined, of the following described obligations, the full and complete payment required to be made by or on behalf of the Issuer to [PAYING AGENT/TRUSTEE] or its successor (the "Paying Agent") of an amount equal to (i) the principal of (either at the stated maturity or by any advancement of maturity pursuant to a mandatory sinking fund payment) and interest on, the Obligations (as that term is defined below) as such payments shall become due but shall not be so paid (except that in the event of any acceleration of the due date of such principal by reason of mandatory or optional redemption or acceleration resulting from default or otherwise, other than any advancement of maturity pursuant to a mandatory sinking fund payment, the payments guaranteed hereby shall be made in such amounts and at such times as such payments of principal would have been due had there not been any such acceleration, unless the Insurer elects, in its sole discretion, to pay in whole or in part any principal due by reason of such acceleration); and (ii) the reimbursement of any such payment which is subsequently recovered from any owner pursuant to a final judgment by a court of competent jurisdiction that such payment constitutes an avoidable preference to such owner within the meaning of any applicable bankruptcy law. The amounts referred to in clauses (i) and (ii) of the preceding sentence shall be referred to herein collectively as the "Insured Amounts." "Obligations" shall mean:

### [PAR]
### [LEGAL NAME OF ISSUE]

Upon receipt of telephonic or telegraphic notice, such notice subsequently confirmed in writing by registered or certified mail, or upon receipt of written notice by registered or certified mail, by the Insurer from the Paying Agent or any owner of an Obligation the payment of an Insured Amount for which is then due, that such required payment has not been made, the Insurer on the due date of such payment or within one business day after receipt of notice of such nonpayment, whichever is later, will make a deposit of funds, in an account with U.S. Bank Trust National Association, in New York, New York, or its successor, sufficient for the payment of any such Insured Amounts which are then due. Upon presentment and surrender of such Obligations or presentment of such other proof of ownership of the Obligations, together with any appropriate instruments of assignment to evidence the assignment of the Insured Amounts due on the Obligations as are paid by the Insurer, and appropriate instruments to effect the appointment of the Insurer as agent for such owners of the Obligations in any legal proceeding related to payment of Insured Amounts on the Obligations, such instruments being in a form satisfactory to U.S. Bank Trust National Association, U.S. Bank Trust National Association shall disburse to such owners, or the Paying Agent payment of the Insured Amounts due on such Obligations, less any amount held by the Paying Agent for the payment of such Insured Amounts and legally available therefor. This policy does not insure against loss of any prepayment premium which may at any time be payable with respect to any Obligation.

As used herein, the term "owner" shall mean the registered owner of any Obligation as indicated in the books maintained by the Paying Agent, the Issuer, or any designee of the Issuer for such purpose. The term owner shall not include the Issuer or any party whose agreement with the Issuer constitutes the underlying security for the Obligations.

Any service of process on the Insurer may be made to the Insurer at its offices located at 113 King Street, Armonk, New York 10504 and such service of process shall be valid and binding.

This policy is non-cancellable for any reason. The premium on this policy is not refundable for any reason including the payment prior to maturity of the Obligations.

IN WITNESS WHEREOF, the Insurer has caused this policy to be executed in facsimile on its behalf by its duly authorized officers, this [DAY] day of [MONTH, YEAR].

**COUNTERSIGNED:**

SPECIMEN

Resident Licensed Agent

City, State

STD-RCS-7
01/05

**MBIA Insurance Corporation**

SPECIMEN

President

Attest: _____

Assistant Secretary

G-1

[THIS PAGE INTENTIONALLY LEFT BLANK]

**APPENDIX H**

# Ambac

### Financial Guaranty Insurance Policy

Ambac Assurance Corporation
One State Street Plaza, 15th Floor
New York, New York 10004
Telephone: (212) 668-0340

Obligor:

Policy Number:

Obligations:

Premium:

Ambac Assurance Corporation (Ambac), a Wisconsin stock insurance corporation, in consideration of the payment of the premium and subject to the terms of this Policy, hereby agrees to pay to The Bank of New York, as trustee, or its successor (the "Insurance Trustee"), for the benefit of the Holders, that portion of the principal of and interest on the above-described obligations (the "Obligations") which shall become Due for Payment but shall be unpaid by reason of Nonpayment by the Obligor.

Ambac will make such payments to the Insurance Trustee within one (1) business day following written notification to Ambac of Nonpayment. Upon a Holder's presentation and surrender to the Insurance Trustee of such unpaid Obligations or related coupons, uncanceled and in bearer form and free of any adverse claim, the Insurance Trustee will disburse to the Holder the amount of principal and interest which is then Due for Payment but is unpaid. Upon such disbursement, Ambac shall become the owner of the surrendered Obligations and/or coupons and shall be fully subrogated to all of the Holder's rights to payment thereon.

In cases where the Obligations are issued in registered form, the Insurance Trustee shall disburse principal to a Holder only upon presentation and surrender to the Insurance Trustee of the unpaid Obligation, uncanceled and free of any adverse claim, together with an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee duly executed by the Holder or such Holder's duly authorized representative, so as to permit ownership of such Obligation to be registered in the name of Ambac or its nominee. The Insurance Trustee shall disburse interest to a Holder of a registered Obligation only upon presentation to the Insurance Trustee of proof that the claimant is the person entitled to the payment of interest on the Obligation and delivery to the Insurance Trustee of an instrument of assignment, in form satisfactory to Ambac and the Insurance Trustee, duly executed by the Holder or such Holder's duly authorized representative, transferring to Ambac all rights under such Obligation to receive the interest in respect of which the insurance disbursement was made. Ambac shall be subrogated to all of the Holders' rights to payment on registered Obligations to the extent of any insurance disbursements so made.

In the event that a trustee or paying agent for the Obligations has notice that any payment of principal of or interest on an Obligation which has become Due for Payment and which is made to a Holder by or on behalf of the Obligor has been deemed a preferential transfer and theretofore recovered from the Holder pursuant to the United States Bankruptcy Code in accordance with a final, nonappealable order of a court of competent jurisdiction, such Holder will be entitled to payment from Ambac to the extent of such recovery if sufficient funds are not otherwise available.

As used herein, the term "Holder" means any person other than (i) the Obligor or (ii) any person whose obligations constitute the underlying security or source of payment for the Obligations who, at the time of Nonpayment, is the owner of an Obligation or of a coupon relating to an Obligation. As used herein, "Due for Payment", when referring to the principal of Obligations, is when the scheduled maturity date or mandatory redemption date for the application of a required sinking fund installment has been reached and does not refer to any earlier date on which payment is due by reason of call for redemption (other than by application of required sinking fund installments), acceleration or other advancement of maturity; and, when referring to interest on the Obligations, is when the scheduled date for payment of interest has been reached. As used herein, "Nonpayment" means the failure of the Obligor to have provided sufficient funds to the trustee or paying agent for payment in full of all principal of and interest on the Obligations which are Due for Payment.

This Policy is noncancelable. The premium on this Policy is not refundable for any reason, including payment of the Obligations prior to maturity. This Policy does not insure against loss of any prepayment or other acceleration payment which at any time may become due in respect of any Obligation, other than at the sole option of Ambac, nor against any risk other than Nonpayment.

In witness whereof, Ambac has caused this Policy to be affixed with a facsimile of its corporate seal and to be signed by its duly authorized officers in facsimile to become effective as its original seal and signatures and binding upon Ambac by virtue of the countersignature of its duly authorized representative.

President

SEAL

Secretary

Effective Date:

Authorized Representative

THE BANK OF NEW YORK acknowledges that it has agreed to perform the duties of Insurance Trustee under this Policy.

Form No.: 2B-0012 (1/01)

Authorized Officer of Insurance Trustee

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

[THIS PAGE INTENTIONALLY LEFT BLANK]

Printed on Recycled Paper
IMAGEMASTER 800.452.5152

## **EXHIBIT 7**

Case:17-00257-LTS Doc#:524-7 Filed:02/21/18 Entered:02/21/18 23:53:00 Desc: Exhibit 7 Page 2 of 2

# FILED UNDER SEAL

Case 17-00257-LTS   Doc#524-8   Filed 02/21/19   Entered 02/21/19 23:59:06   Desc:
Exhibit 8   Page 1 of 2

**EXHIBIT 8**

# FILED UNDER SEAL

Case 17-00257-LTS   Doc#:524-9   Filed:02/21/19   Entered:02/21/19 23:53:00   Desc:
Exhibit 9   Page 1 of 2

**<u>EXHIBIT 9</u>**

# FILED UNDER SEAL

Exhibit 10 Page 1 of 193

**EXHIBIT 10**

# SUPPLEMENT TO CERTAIN OFFICIAL STATEMENTS OF PUERTO RICO SALES TAX FINANCING CORPORATION

## RELATING TO

$1,006,474,702
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, Senior Series 2011C**
(the "Series 2011C Bonds")

$91,155,000
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, Senior Series 2011D**
(the "Series 2011D Bonds")

and

$734,795,573.95
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2011A**
(the "Series 2011A Bonds")

$45,620,000
**Puerto Rico Sales Tax Financing Corporation**
**Sales Tax Revenue Bonds, First Subordinate Series 2011B**
(the "Series 2011B Bonds")

## SUPPLEMENT DATED DECEMBER 7, 2011

This Supplement updates or modifies certain information appearing in the Official Statements, dated December 1, 2011, relating to the Series 2011C Bonds and the Series 2011D Bonds, and the Official Statements, dated November 16, 2011, relating to the Series 2011A Bonds and the Series 2011B Bonds.

### Sales Tax Collections for the First Five Months of Fiscal Year 2012

Commonwealth Sales Tax collections for November 2011 totaled $91.4 million, an increase of $2.8 million (3.1%) from collection for the same period in Fiscal Year 2010-2011. Commonwealth Sales Tax collections for the five month period ended November 30, 2011, totaled $455.6 million, or an average of $91.1 million per month. Such collections year-to-date are $22.9 million (4.8%) below the Treasury Department's estimate of $478.5 million, but $10.2 million (2.3%) above collections for the same period in Fiscal Year 2010-2011. The Treasury Department believes that the difference between their estimate and actual collections is due to the delay in the implementation of the point of sale system.

The Treasury Department also announced a revision of Commonwealth Sales Tax collections for October 2011 from the previously reported $90.6 million to $85.9 million due to the inadvertent inclusion in Commonwealth Sales Tax collections by the Treasury Department's external collection agent of a portion of the Municipal Sales Tax collections for such month. The October 2011 Commonwealth Sales Tax collections of $85.9 million are $2.2 million (2.7%) above collections for the same period in Fiscal Year 2010-2011.

### Preliminary General Fund Revenues for the First Four Months of Fiscal Year 2012

Preliminary General Fund revenues for the first four months of fiscal year 2012 (from July 1, 2011 to October 31, 2011) were $2.284 billion, an increase of $148.1 million, or 6.9%, from $2.136 billion of revenues for the same period in the prior fiscal year and a decrease of $32.8 million, or 1.4%, from the revised estimate of revenues of $2.317 billion. The increase in General Fund revenues for the first four months of fiscal year 2012, compared to the same period in the prior fiscal year, is mainly due to the collection of $650.2 million from the new temporary excise tax under Act No. 154, which was not in effect during the first four months of fiscal year 2011 (see "Tax Reform" under Overview of the Commonwealth's Fiscal Condition in Appendix A to the Official Statement). This increase was partially offset by decreases in collections from the following: (i) income taxes from individuals of $208.3 million,

(ii) corporate income taxes of $84.9 million, (iii) taxes withheld from non-residents of $81.9 million and (iv) property taxes of $108.3 million. The reduction in collections from property taxes is due to the phase out of the special property tax imposed on residential and commercial real estate in fiscal year 2009 as part of the temporary revenue raising measures included in the fiscal stabilization plan. The reduction in income taxes was expected and is largely due to the tax reform implemented in January 2011.

## MISCELLANEOUS

The information set forth in this Supplement was supplied by certain officials of the Corporation, the Commonwealth or certain of its agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included in this Supplement on the authority of such officials or the authority of such publications as official public documents. The Corporation has authorized the delivery of this Supplement to holders of the Series 2011A Bonds, the Series 2011B Bonds, the Series 2011C Bonds and the Series 2011D Bonds.

This Supplement will be filed with the MSRB through EMMA.

<div align="center">

**PUERTO RICO SALES TAX**
**FINANCING CORPORATION**

</div>

By: _____ /s/ Jose Otero Freiría _____
Executive Director

| | |
|---|---|
| NEW ISSUE – BOOK-ENTRY ONLY | RATINGS (see RATINGS herein): |

| | | |
|---|---|---|
| | S&P: | AA- |
| | Moody's: | Aa2 |
| | Fitch: | AA- |

$91,155,000

# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, Senior Series 2011D

**Dated:** Date of Delivery  **Due:** August 1, as shown on the inside cover page

Puerto Rico Sales Tax Financing Corporation (the "Corporation") will issue its Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D Bonds"), to redeem certain outstanding bonds of Puerto Rico Public Finance Corporation. Concurrently with the issuance of the Series 2011D Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds" and, together with the Series 2011D Bonds, the "Senior Series 2011 Bonds"). The Series 2011C Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Series 2011D Bonds are being sold solely in Puerto Rico and their issuance is not contingent upon the issuance of the Series 2011C Bonds. See PLAN OF FINANCING.

**The Senior Series 2011 Bonds are being issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "Resolution"), and are payable solely from and secured by a security interest in a portion of the sales and use tax imposed by the Commonwealth. The Senior Series 2011 Bonds are on a parity in payment priority with the Corporation's outstanding Senior Bonds and Parity Obligations (as defined herein), and additional senior bonds that may be issued or parity obligations that may be incurred by the Corporation, as described herein, and are senior in payment priority to the Corporation's outstanding Subordinate Bonds and Subordinate Obligations (as defined herein). The Bank of New York Mellon acts as trustee (the "Trustee") under the Resolution. See *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.***

The Series 2011D Bonds have the following characteristics:

- The Series 2011D Bonds will be issued as fully registered bonds without coupons in denominations of $5,000 principal amount and integral multiples thereof.

- The Series 2011D Bonds will be issued by means of a book-entry only system evidencing ownership and transfer of the Series 2011D Bonds on the records of The Depository Trust Company and its participants.

- Interest on the Series 2011D Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on February 1, 2012. The inside cover page of this Official Statement contains information concerning the maturity, interest rate, and price of the Series 2011D Bonds.

- The Series 2011D Bonds are subject to redemption, commencing on August 1, 2021, as described herein.

- This cover page contains information for quick reference only. It is not a summary of this issue. Investors must read the entire Official Statement to obtain information essential to the making of an informed investment decision. Prospective investors should consider the information set forth in RISK FACTORS before investing.

- In the opinion of Pietrantoni Méndez & Alvarez LLC, Special Puerto Rico Tax Counsel, as described herein, under existing statutes, the Series 2011D Bonds, and the interest thereon, are exempt from Commonwealth income, municipal license and property taxes. Under most circumstances, interest on the Series 2011D Bonds will be exempt from United States Federal income taxation to (i) individuals who are bona fide residents of Puerto Rico during the entire taxable year in which such interest is received and (ii) Puerto Rico corporations. The Series 2011D Bonds are not otherwise exempt from United States Federal income taxation. See TAX MATTERS herein.

- The Series 2011D Bonds will be dated their date of delivery and are expected to be delivered through The Depository Trust Company on or about December 13, 2011.

**The Series 2011D Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Series 2011D Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

*The Series 2011D Bonds are offered by the Underwriters when, as and if issued by the Corporation and received by the Underwriters, subject to prior sale, to withdrawal or modification of the offer without notice, and to the approval of legality by Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico, will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel.*

## Santander Securities

| BofA Merrill Lynch | Popular Securities | UBS FS Puerto Rico |
|---|---|---|
| Barclays Capital | BBVAPR MSD | Citigroup | FirstBank PR Securities |
| Oriental Financial Services | Ramirez & Co., Inc. | Raymond James | Scotia MSD |

December 1, 2011

# $91,155,000
## Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, Senior Series 2011D

### $45,000,000 Serial Bonds[*]

| Maturity August 1 | Amount | Interest Rate | Price | CUSIP[†] |
|---|---|---|---|---|
| 2023 | $45,000,000 | 3.80% | 100.00 | 74529JPJ8 |

### $46,155,000 Term Bonds[*]

| | | | |
|---|---|---|---|
| $20,965,000 | 4.10% | Term Bonds due August 1, 2025, price 100.00 | CUSIP[†] 74529JPK5 |
| $25,190,000 | 4.85% | Term Bonds due August 1, 2036, price 100.00 | CUSIP[†] 74529JPL3 |

---

[*] Interest will be payable quarterly on each February 1, May 1, August 1 and November 1 until maturity (or earlier redemption), commencing on February 1, 2012.

[†] Copyright, American Bankers Association. CUSIP data herein is provided by Standard & Poor's, CUSIP Service Bureau, a division of the McGraw-Hill Companies, Inc. This data is not intended to create a database and does not serve in any way as a substitute for the CUSIP Services. CUSIP numbers are provided for convenience of reference only. Neither the Corporation nor the Underwriters take any responsibility for the accuracy of such numbers.

In connection with this offering, the Underwriters may over-allot or effect transactions that stabilize or maintain the market price of the Series 2011D Bonds at a level above that which might otherwise prevail in the open market. Such stabilizing, if commenced, may be discontinued at any time. The Underwriters may offer and sell the Series 2011D Bonds to certain dealers and dealer banks and others at a price lower than the public offering price stated on the inside cover page and said offering price may be changed from time to time by the Underwriters.

The information set forth herein has been obtained from sources which are believed to be reliable but, as to information from other than Puerto Rico Sales Tax Financing Corporation (the "Corporation"), is not guaranteed as to accuracy or completeness, and is not to be construed as a representation, by the Corporation or the Underwriters. The information and expressions of opinion herein are subject to change without notice, and neither the delivery of the Official Statement nor any sale made hereunder shall under any circumstances create any implication that there has been no change in the affairs of the Corporation since the date hereof. The various tables may not add due to rounding of figures.

The Underwriters have reviewed the information in this Official Statement in accordance with, and as part of, their respective responsibilities to investors under the federal and Commonwealth securities laws as applied to the facts and circumstances of this transaction, but the Underwriters do not guarantee the accuracy or completeness of such information.

No dealer, broker, sales representative or other person has been authorized by the Corporation or the Underwriters to give any information or to make any representations, other than those contained in this Official Statement in connection with the offering described herein, and if given or made, such other information or representations must not be relied upon as having been authorized by any of the foregoing. This Official Statement does not constitute an offer to sell or the solicitation of an offer to buy, nor shall there be any sale of the Series 2011D Bonds, by any person in any jurisdiction in which it is unlawful for such person to make such offer, solicitation or sale.

All quotations from and summaries and explanations of provisions of laws, resolutions, the Series 2011D Bonds and other documents herein do not purport to be complete. Reference is made to said laws, resolutions, the Series 2011D Bonds and other documents for full and complete statement of their provisions. Copies of the above are available for inspection at the offices of the Corporation or the Trustee.

The Series 2011D Bonds have not been registered under the Securities Act of 1933, as amended, in reliance upon exemptions contained in such act. The registration or qualification of the Series 2011D Bonds in accordance with applicable provisions of laws of the states in which the Series 2011D Bonds have been registered or qualified and the exemption from registration or qualification in other states cannot be regarded as a recommendation thereof. Neither these states nor any of their agencies have passed upon the merits of the Series 2011D Bonds or the accuracy or completeness of this Official Statement. Any representation to the contrary may be a criminal offense.

## CAUTIONARY STATEMENT REGARDING FORWARD-LOOKING STATEMENTS IN THIS OFFICIAL STATEMENT

Certain statements included or incorporated by reference in this Official Statement constitute projections or estimates of future events, generally known as forward-looking statements. These statements are generally identifiable by the words "estimates," "projects," "anticipates," "expects," "intends," "believes" and similar expressions. The achievement of certain results or other expectations contained in such forward-looking statements involves known and unknown risks, uncertainties and other factors which may cause actual results, performance or achievements described to be materially different from any future results, performance or achievements expressed or implied by these forward-looking statements. The Corporation does not plan to issue any updates or revisions to those forward-looking statements if or when changes in their expectations, or event, conditions or circumstances on which such statements are based, occur.

[THIS PAGE INTENTIONALLY LEFT BLANK]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................1
   The Corporation ............................................................1
   Sales and Use Tax ..........................................................1
   Dedicated Sales Tax Fund................................................2
   The Resolution ..............................................................2
   Outstanding Bonds and Parity Obligations .........................2
   Source of Payment and Security for the Bonds...................4
PLEDGED SALES TAX .........................................................5
   Commonwealth Sales Tax Revenues ..................................5
   Commonwealth Sales Tax Collections and Projections......7
   Collections by Source ...................................................10
   Economic Indicators .....................................................11
   Dedicated Sales Tax Fund..............................................13
   Pledged Sales Tax Base Amount ....................................13
   Procedures for the Collection and Deposit of the Pledged
      Sales Tax in the Dedicated Sales Tax Fund ..............15
   Commonwealth Sales Tax Enforcement Initiatives ..........17
THE SERIES 2011D BONDS ................................................20
   General .......................................................................20
   Redemption .................................................................20
   Book-Entry Only System ...............................................21
SECURITY FOR THE SERIES 2011D BONDS.................22
   General .......................................................................22
   Commonwealth Non-Impairment Covenant .....................22
   Property Pledged for the Payment of the Series 2011D
      Bonds ....................................................................23
   Outstanding Bonds and Parity Obligations .......................23
   Subordination Provisions of the First Subordinate Bonds 24
   Funds and Accounts under the Resolution ........................25
   Additional Bonds, Refunding Bonds and Other
      Obligations.............................................................28
   Commonwealth's Authority to Cover Deficiencies ..........31
RISK FACTORS .................................................................31
   Economic Conditions Could Affect Commonwealth Sales
      Tax Revenues .........................................................31

**Page**

   Legislative Assembly Authority over the Commonwealth
      Sales Tax ...............................................................32
   Certain Constitutional Considerations Relating to Act 91 32
   Limited Nature of Ratings; Reductions, Suspension or
      Withdrawal of a Rating ...........................................34
AGGREGATE DEBT SERVICE REQUIREMENTS .........35
PLAN OF FINANCING .......................................................38
   Overview....................................................................38
   Estimated Sources and Uses of Funds..............................38
THE CORPORATION .........................................................38
   Other Obligations of the Corporation...............................39
TAX MATTERS...................................................................40
   Puerto Rico Tax Considerations for Puerto Rico
      Residents ...............................................................40
   United States Federal Tax Considerations for Puerto Rico
      Residents ...............................................................41
   No Opinion as to Exclusion under Section 103(a) of the
      US Code ................................................................43
RATINGS ...........................................................................43
LEGALITY FOR INVESTMENT.........................................43
UNDERWRITING ...............................................................43
LEGAL MATTERS..............................................................44
CONTINUING DISCLOSURE.............................................44
GOVERNMENT DEVELOPMENT BANK FOR PUERTO
   RICO ........................................................................46
MISCELLANEOUS .............................................................46

APPENDIX A – Commonwealth Economic Information ...A-1
APPENDIX B – Summary of Certain Definitions and
      Provisions of the Resolution .........................................B-1
APPENDIX C – Proposed Form of Approving Opinion of
      Bond Counsel ............................................................C-1
APPENDIX D – Proposed Form of Opinion of Special Puerto
      Rico Tax Counsel.......................................................D-1
APPENDIX E – Book-Entry Only System .........................E-1

i

[THIS PAGE INTENTIONALLY LEFT BLANK]

$91,155,000
# Puerto Rico Sales Tax Financing Corporation
## Sales Tax Revenue Bonds, Senior Series 2011D

### INTRODUCTION

This Official Statement of Puerto Rico Sales Tax Financing Corporation (the "Corporation," or as known by the acronym of its Spanish name, "COFINA"), which includes the cover page, the inside cover page, the table of contents and the appendices, sets forth certain information in connection with the issuance and sale by the Corporation of its $91,155,000 Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D Bonds"). Concurrently with the issuance of the Series 2011D Bonds, the Corporation is issuing its Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds" and, together with the Series 2011D Bonds, the "Senior Series 2011 Bonds"). The Series 2011C Bonds are being offered for sale in the United States tax-exempt market pursuant to a separate Official Statement. The Series 2011D Bonds are being sold solely in Puerto Rico and are not contingent upon the issuance of the Series 2011C Bonds. See PLAN OF FINANCING. Capitalized terms not defined elsewhere in this Official Statement are defined in *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

### The Corporation

The Corporation is an independent governmental instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), created under Act No. 91 of the Legislative Assembly of the Commonwealth (the "Legislative Assembly"), approved May 13, 2006, as amended by Act No. 291, approved December 26, 2006, Act No. 56, approved July 5, 2007, Act No. 1, approved January 14, 2009, Act No. 7, approved March 9, 2009, as amended ("Act 7"), and Act No. 18, approved May 22, 2009 (collectively, "Act 91"). The Corporation receives half of the Commonwealth Sales Tax (as defined below) (2.75% out of a total sales tax of 5.5%, as described below) and is authorized to use such portion of the Commonwealth Sales Tax to pay or finance, in whole or in part, or fund: (i) certain debt obligations of the Commonwealth payable from Commonwealth budgetary appropriations and outstanding as of June 30, 2006 (the "2006 Appropriation Debt"); (ii) the debt of the Secretary of the Treasury of the Commonwealth ("Secretary of the Treasury") with Government Development Bank for Puerto Rico ("Government Development Bank") in the amount of $1 billion, a portion of the proceeds of which were used to cover the budgetary deficit of the Commonwealth for Fiscal Year 2008-2009, (iii) certain financing granted to the Secretary of the Treasury by Government Development Bank payable from future Commonwealth general obligation bonds, and any debt of the Commonwealth outstanding as of December 31, 2008 that did not have a source of repayment or was payable from budgetary appropriations, (iv) a portion of the accounts payable to suppliers of the Commonwealth, (v) operational expenses of the Commonwealth for Fiscal Years 2008-2009, 2009-2010, and 2010-2011, (vi) operational expenses of the Commonwealth for Fiscal Year 2011-2012, to the extent included in the annual budget of the Government of Puerto Rico, (vii) the Puerto Rico Economic Stimulus Fund, (viii) the Commonwealth Emergency Fund in order to cover expenses resulting from catastrophic events such as hurricanes or floods, and (ix) the Economic Cooperation and Public Employees Alternatives Fund (all such uses, together with the 2006 Appropriation Debt, the "Authorized Uses"). See THE CORPORATION.

### Sales and Use Tax

Pursuant to Act No. 117 of the Legislative Assembly, approved July 4, 2006 ("Act 117"), the Commonwealth imposed for the first time a tax on the sales or use of a broad range of goods and services in the Commonwealth at a rate of 5.5% for the benefit of the Commonwealth and an additional and

1

separate rate of 1.5% for the benefit of municipalities of the Commonwealth (the tax at the 5.5% rate herein called the "Commonwealth Sales Tax").

**Dedicated Sales Tax Fund**

Act 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund. Act 91 requires that the following amounts be deposited in the Dedicated Sales Tax Fund in each Fiscal Year, whichever is greater: (i) a minimum fixed amount, referred to in the Resolution and herein as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth Sales Tax collected during such Fiscal Year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%) and the denominator of which is the rate of such Commonwealth Sales Tax (at present, 5.5%; the amount resulting from such multiplication is sometimes referred to herein as the "2.75% formula") (the greater of (i) and (ii) being referred to as the "Pledged Sales Tax"). See *Dedicated Sales Tax Fund*" under PLEDGED SALES TAX.

In each Fiscal Year, the first collections of the Commonwealth Sales Tax are deposited in the Dedicated Sales Tax Fund and applied to fund the Pledged Sales Tax Base Amount. The Pledged Sales Tax Base Amount for the Fiscal Year beginning July 1, 2011 is $595,165,542. The Pledged Sales Tax Base Amount increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Under Act 91, the moneys on deposit in the Dedicated Sales Tax Fund may be used for the payment of the Corporation's bonds or for any of the Authorized Uses. See *Dedicated Sales Tax Fund*" and *"Pledged Sales Tax Base Amount"* under PLEDGED SALES TAX.

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is so deposited before any collections of Commonwealth Sales Tax are deposited in the Commonwealth's General Fund.

**The Resolution**

The Senior Series 2011 Bonds will be issued pursuant to a Sales Tax Revenue Bond Resolution, as amended (the "General Resolution"), adopted on July 13, 2007, a Twentieth Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011C Bonds (the "Twentieth Supplemental Resolution") and a Twenty-first Supplemental Sales Tax Revenue Bond Resolution, which provides for the terms of the Series 2011D Bonds (the "Twenty-first Supplemental Resolution") (the General Resolution, as supplemented by the Twentieth Supplemental Resolution and the Twenty-first Supplemental Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on December 1, 2011, pursuant to which The Bank of New York Mellon acts as trustee (the "Trustee"). For a summary of the Resolution, see *Appendix B – Summary of Certain Definitions and Provisions of the Resolution.*

**Outstanding Bonds and Parity Obligations**

*General*

Prior to the issuance of the Senior Series 2011 Bonds, the Corporation had outstanding $14.126 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $691.7 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior and first subordinate bonds.

2

The Corporation's outstanding senior bonds consist of the following: (i) Sales Tax Revenue Bonds, Series 2007A (the "Series 2007A Bonds"), (ii) Sales Tax Revenue Bonds, Series 2007B (the "Series 2007B Bonds"), (iii) Sales Tax Revenue Bonds, Series 2007C (the "Series 2007C Bonds"), (iv) Sales Tax Revenue Bonds, Series 2008A (the "Series 2008A Bonds"), and (v) Sales Tax Revenue Bonds, Senior Series 2009C (the "Series 2009C Bonds" and, together with the Series 2007A Bonds, the Series 2007B Bonds, the Series 2007C Bonds and the Series 2008A Bonds, the "Outstanding Senior Bonds").

The Corporation's outstanding first subordinate bonds consist of the following: (i) Sales Tax Revenue Bonds, First Subordinate Series 2009A (the "Series 2009A Bonds"), (ii) Sales Tax Revenue Bonds, First Subordinate Series 2009B (the "Series 2009B Bonds"), (iii) Sales Tax Revenue Bonds, First Subordinate Series 2010A (the "Series 2010A Bonds"), (iv) Sales Tax Revenue Bonds, First Subordinate Series 2010C (the "Series 2010C Bonds"), (v) Sales Tax Revenue Bonds, First Subordinate Series 2010D (Issuer Subsidy Build America Bonds) (the "Series 2010D Bonds"), and (vi) Sales Tax Revenue Bonds, First Subordinate Series 2010E (Issuer Subsidy Recovery Zone Economic Development Bonds) (the "Series 2010E Bonds"), (vii) Sales Tax Revenue Bonds, First Subordinate Series 2011A Bonds (the "Series 2011A Bonds"), and (viii) Sales Tax Revenue Bonds, First Subordinate Series 2011B Bonds (the "Series 2011B Bonds") and, together with the Series 2009A Bonds, Series 2009B Bonds, Series 2010A Bonds, Series 2010C Bonds, Series 2010D Bonds, Series 2011A Bonds and Series 2011B Bonds, the "Outstanding First Subordinate Bonds").

The Senior Series 2011 Bonds are being issued to redeem or repay prior to maturity certain outstanding bonds of Puerto Rico Public Finance Corporation and cover certain payments associated with swap agreements of the Corporation. See PLAN OF FINANCING.

After giving effect to the issuance of the Senior Series 2011 Bonds, the Corporation will have $15.224 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the Resolution, of which $6.273 billion aggregate initial principal amount consists of Outstanding Senior Bonds (plus $521 million accreted on existing capital appreciation bonds as of November 1, 2011), and $8.951 billion aggregate initial principal amount consists of Outstanding First Subordinate Bonds (plus $170.7 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011).

The Corporation currently also has outstanding one interest rate swap agreement in an aggregate notional amount of $136 million, which was entered into under the General Resolution in connection with certain variable rate bonds included in the Series 2007A Bonds, with ongoing quarterly payments thereunder (but not termination payments) secured on a parity with the Outstanding Senior Bonds (the "Outstanding Parity Obligations").

*Outstanding Senior Bonds and Outstanding Parity Obligations*

The Senior Series 2011 Bonds and all Outstanding Senior Bonds and Outstanding Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax. Additional senior bonds may be issued (the "Additional Senior Bonds" and, together with the Outstanding Senior Bonds and the Senior Series 2011 Bonds, the "Senior Bonds"), and additional parity obligations may be incurred (the "Additional Parity Obligations" and, together with the Outstanding Parity Obligations, the "Parity Obligations"), under the Resolution subject to the applicable additional bonds test described herein and solely to either finance the payment, retirement or defeasance of the 2006 Appropriation Debt, or refund or refinance for savings Senior Bonds or Parity Obligations. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS and PLAN OF FINANCING.

3

*Outstanding First Subordinate Bonds*

Under the Resolution, the Corporation is authorized to issue bonds and incur certain obligations subordinate in right of payment to the Senior Bonds and the Parity Obligations. The Outstanding First Subordinate Bonds and all additional bonds issued on a parity therewith ("Additional First Subordinate Bonds" and, together with the Outstanding First Subordinate Bonds, the "First Subordinate Bonds"), and all obligations incurred on a parity therewith (the "First Subordinate Obligations"), are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and the Parity Obligations, and are payable from the Pledged Sales Tax remaining after providing for the payment of debt service on Senior Bonds and Parity Obligations, as required by the Resolution. Owners of the First Subordinate Bonds and obligees of First Subordinate Obligations are not entitled to declare a default under the Resolution until all amounts due and payable on the Senior Bonds and Parity Obligations have been paid in full. See *"Subordination Provisions of the First Subordinate Bonds"* and *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS. The Resolution permits the issuance of additional bonds subordinate to the First Subordinate Bonds (the "Additional Subordinate Bonds" and, together with the First Subordinate Bonds, the "Subordinate Bonds") and the incurrence of obligations subordinate to the First Subordinate Obligations (the "Additional Subordinate Obligations" and, together with the First Subordinate Obligations, the "Subordinate Obligations").

**Source of Payment and Security for the Bonds**

**The Senior Bonds, the Subordinate Bonds, and all other additional bonds issued (collectively, the "Bonds") and the Parity Obligations, the Subordinate Obligations, and all other obligations incurred (collectively, the "Obligations") under the Resolution will be payable solely from, and secured (on a senior or subordinate basis, as applicable) by a security interest granted under the Resolution in the Pledged Property, consisting primarily of the Pledged Sales Tax.**

**The Senior Series 2011 Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor its instrumentalities (other than the Corporation), and neither the Commonwealth nor its public instrumentalities (other than the Corporation) is responsible for the payment of the Senior Series 2011 Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth is not pledged.**

Brief descriptions of the Corporation, the security for the Series 2011D Bonds, the terms of the Series 2011D Bonds, and the provisions of the Resolution are included in this Official Statement. All references to the Resolution and other documents and agreements are qualified in their entirety by reference to such documents and agreements, copies of which are available for inspection at the offices of the Corporation or the Trustee.

# PLEDGED SALES TAX

**Commonwealth Sales Tax Revenues**

*General.* Act No. 117 amended the Puerto Rico Internal Revenue Code of 1994, as amended, to provide, among other things, for a general sale and use tax of 5.5% imposed by the Commonwealth on the sale of a wide range of goods and delivery of various services. Act 117 also authorized each municipal government to impose a municipal sale and use tax of 1.5% (the "Municipal Sales Tax"). In general, the Municipal Sales Tax has the same tax base, exemptions (except for non-prepared foods) and limitations as those provided for the Commonwealth Sales Tax.

Act 117 also repealed the 5% general excise tax imposed on imported goods and the 3.6% general excise tax imposed on goods manufactured in Puerto Rico. Other items, such as fuel, crude oil and petroleum products, and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the Commonwealth Sales Tax or the Municipal Sales Tax.

*Articles Subject to Tax.* The Commonwealth Sales Tax is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Secretary of the Treasury has the authority to establish by regulation the conditions for exemption from the tax. The Commonwealth Sales Tax applies to a broad range of items, including, among others, the following items: (a) clothing and accessories, (b) land and mobile phone service, cable TV and internet access, (c) furniture and appliances, (d) electronics, (e) any tangible good not otherwise exempted, (f) alcoholic beverages and tobacco products, (g) prepared foods (including fast foods and other restaurants), (h) personal services, such as laundry, barber and beauty shops, general maintenance services, among others, (i) all non-prescription medicines and nutritional supplements, and (j) cement (used in construction and retail sales).

*Exempted Articles.* The Commonwealth Sales Tax does not apply to, among other things: (i) motor vehicles, (ii) non-prepared food, (iii) healthcare services and prescription medicines, (iv) certain bakery goods, (v) crude oil and its derivatives, including gasoline, (vi) hotel room charges, (vii) financial services, (viii) services provided by the Commonwealth, including electricity and water, (ix) boats and heavy equipment, and (x) local sales of goods to be used as raw materials for manufactured goods, whether or not bound for export. Act No. 208 of the Legislative Assembly, approved on October 20, 2011 ("Act No. 208"), added an exemption from Commonwealth Sales Tax and Municipal Sales Tax to the following: (i) the Science, Technology and Research Trust of Puerto Rico, a quasi-public entity created to promote economic development through investment in fields related to science, technology and research; and (ii) machinery, equipment, parts and accessories used by (a) experimental laboratories dedicated to any activity related to technological research and development and (b) renewable energy research and development projects performed within the Puerto Rico Science, Technology and Research District during their 15 year exemption period; provided, that machinery does not include the following: (1) all construction materials and prefabricated buildings, (2) all electric material and water pipes contained within a building, (3) lubricants, grease, wax and paints not related to the manufacturing process, (4) lighting posts and bulbs installed in parking areas, and (5) water treatment facilities and electric sub-stations. The Treasury Department currently does not support any proposal to exempt any additional goods or services from the application of the Commonwealth Sales Tax.

*Exemption During Emergency Periods.* Act No. 163 of the Legislative Assembly, approved on November 9, 2007, amended Act 117 to, among other things, exempt certain goods and services from the application of the Commonwealth Sales Tax during a state of emergency declared by the Governor. On September 22, 2008, the Governor signed Executive Order 2008-44 declaring a state of emergency in

Puerto Rico as a result of severe flooding in the southern portion of Puerto Rico. The Treasury Department believes that the reduction in Commonwealth Sales Tax revenues for the months of October and November 2008 was due, in part, to this four and a half day tax holiday. The Treasury Department currently does not support the declaration of sales tax holidays that could reduce Commonwealth Sales Tax revenues. Instead, the Treasury Department believes that extraordinary events, such as natural disasters, can be better addressed by providing direct government assistance to those affected either through direct transfers or through the provisions of additional services in the affected communities.

*Back to School Sales Tax Holiday.* Act No. 111 of the Legislative Assembly of Puerto Rico, approved on July 15, 2008, created the Back to School Tax Free Holiday, during which certain items are exempt from the Commonwealth Sales Tax. During each calendar year, the tax holiday takes place during a three-day period in July designated by the Secretary of the Treasury prior to June 1 of such calendar year. If the Secretary of the Treasury does not designate such three-day period, then the tax holiday takes place from July 15 to July 17 of such calendar year. This tax holiday occurred for the first time during Fiscal Year 2009-2010. The Treasury Department believes that the decline of $7.6 million in Commonwealth Sales Tax collections for August 2009 as compared to collections for August 2008 was primarily due to this sales tax holiday (the effect of the tax holiday is reflected in the collections received by the Treasury Department during the month of August, which is the month in which July sales are reported by the merchants and retailers). On May 18, 2011, the Treasury Department designated July 15 to July 17 as the three-day period during which this tax holiday took place during Fiscal Year 2011-2012.

*Commonwealth Tax Reform.* As part of the government's efforts to promote economic growth and job creation while preserving the path towards achieving fiscal stability, in Fiscal Year 2010-2011 the Commonwealth enacted legislation that implemented a comprehensive reform of the Commonwealth's tax system. The tax reform consists of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010 ("Act No. 171"), provided for the following changes with respect to the Commonwealth Sales Tax: (i) reduced the electronic filing and payment requirement threshold to include merchants with a volume of sales equal to or greater than $200,000 instead of $500,000; (ii) authorized the Secretary of the Treasury to change the electronic filing and payment requirement threshold by means of administrative action; (iii) created a new penalty for failure to file a Commonwealth Sales Tax return or failure to file electronically, if required, equal to the higher of (a) 10% of the amount of Commonwealth Sales Tax required to be deposited with the Treasury Department and (b) $100; (iv) created a new penalty equal to $20,000 for failure to install, obstruct or not use the electronic point of sale system required by the Treasury Department (described below); and (v) exempted IVU Loto (as defined below) prizes (currently equal to one prize of $5,000, one prize of $1,000 and eight prizes of $500 per bi-weekly drawings) from the payment of income, excise and sales and use taxes.

The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), also known as the Internal Revenue Code for a New Puerto Rico, repealed the Puerto Rico Internal Revenue Code of 1994. Act No. 1 included the changes implemented by Act No. 171 to the Commonwealth Sales Tax system and generally maintained the Commonwealth Sales Tax and Municipal Sales Tax statutory framework. Act No. 1 made the following changes applicable to the Commonwealth Sales Tax: (i) exempted boats and heavy equipment from the Commonwealth Sales Tax and imposed an excise tax on these items in order to facilitate enforcement by the Treasury Department and promote compliance among taxpayers; (ii) required promoters of events to endorse admission tickets and post a bond to secure payment of the Commonwealth Sales Tax; (iii) authorized Treasury Department agents to make purchases at retailers and merchants in order to assess compliance with the Commonwealth Sales Tax and impose administrative fines to the extent such retailer or merchant fails to deposit the Commonwealth Sales Tax with the Treasury Department; (iv) granted the Secretary of the Treasury the same powers to enforce the

6

Commonwealth Sales Tax that it currently enjoys in enforcing excise taxes; and (v) reestablished the resellers credit to the original 6%, which was previously limited to 5.9%. The Treasury Department expects that the exemption for boats and heavy equipment will represent an aggregate loss of approximately $3.3 million in annual collections of Commonwealth Sales Tax.

**Commonwealth Sales Tax Collections and Projections**

The Commonwealth Sales Tax went into effect on November 15, 2006. Since the inception of the sales tax and up until April 2010, the Treasury Department had been reporting its sales tax collection data on a modified cash basis. This meant that the collection figures for any particular month represented the sales taxes corresponding to sales made by merchants and retailers and Commonwealth Sales Tax collected by such merchants and retailers during that month, but reported and remitted to the Treasury Department during the following month. See "*Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund*" below for a description of the reporting and collections procedures utilized by the Treasury Department. As an example, the sales tax reported by the Treasury Department for November 2006 related to sales made and taxes collected by merchants and retailers during November 2006 and remitted to the Treasury Department during December 2006. On May 4, 2010, the Treasury Department announced that it would change its reporting method and would begin to record and report its sales tax collection in the month in which the Treasury Department received that sales tax from the merchants and retailers. This change was effective for Fiscal Year 2009-2010. This change did not affect in any way the amount of the Pledged Sales Tax, the method of collecting such sales tax, the amount of taxes required to be deposited nor the process of depositing the Pledged Sales Tax in the Dedicated Sales Tax Fund.

Except as otherwise noted, the sales tax information discussed below is based on historical Commonwealth Sales Tax collections per month utilizing for all Fiscal Years the new reporting method adopted by the Treasury Department in May 2010.

Total Commonwealth Sales Tax collections from December 2006 through October 2011 were approximately $5.44 billion, an average of $93 million per month.

The following table shows historical collections since inception of the Commonwealth Sales Tax until Fiscal Year 2010-2011 under the current reporting method, which was implemented beginning in Fiscal Year 2009-2010. Under the current reporting method, the figures for the initial estimate of collections are only available beginning in Fiscal Year 2009-2010.

### Commonwealth Sales Tax -- Collection History by Fiscal Year
(Dollars in Millions)

| Fiscal Year | Actual Collections | Initial Estimate[1] | Monthly Average | Pledged Sales Tax Base Amount |
|---|---|---|---|---|
| 2007 | $ 617.9 | N/A | $95.1 | N/A |
| 2008 | 1,142 | N/A | 95.1 | $185.0 |
| 2009[2] | 1,090 | N/A | 90.9 | 192.4 |
| 2010[3] | 1,094 | $1,153 | 91.1 | 550.3 |
| 2011[4] | 1,123 | 1,216 | 93.6 | 572.3 |

[1] These figures represent the initial estimate of Commonwealth Sales Tax collections made for budgeting purposes prior to the beginning of the fiscal year.

[2] The decline in sales tax collections compared to the prior fiscal year is primarily attributed to the temporary sales tax holiday resulting from the Governor's declaration of an emergency in response to severe flooding in the southern portion of Puerto Rico and the general economic slowdown.

[3] The difference between estimated and actual collections is primarily attributed to the previously mentioned back-to-school sales tax holiday and prevailing economic conditions.

[4] The difference between estimated and actual collections is primarily attributed to the delay in the implementation of the point of sale system.

*Fiscal Year 2011-2012.* Commonwealth Sales Tax collections for the four month period ended October 31, 2011, totaled $368.9 million, or an average of $92.2 million per month. Such collections year-to-date are $6.5 million below the Treasury Department's estimate of $375.4 million, or 1.7%, but $12.2 million, or 3.4%, above collections for the same period in Fiscal Year 2010-2011. The Treasury Department believes that the difference between their original estimate and actual collections is due to the delay in the implementation of the point of sale system. Commonwealth Sales Tax revenue projections for Fiscal Year 2011-2012 are $1.366 billion. This projection represents an increase of 22% compared to estimated collections for Fiscal Year 2010-2011. This projected increase is based principally on the expected effect of the implementation of the point-of-sale electronic system discussed below under *"Commonwealth Sales Tax Enforcement Initiatives"* and an increase in personal income of 3.1% currently projected by the Planning Board. Whether sales tax collections meet this projection is uncertain and depends upon general economic conditions and taxable sales activity for Fiscal Year 2011-2012, as well as upon compliance levels, the successful implementation of the new point-of-sale electronic system throughout the Commonwealth, and the results of other enforcement efforts, among other factors.

Revenues from the Commonwealth Sales Tax are dependent on economic conditions in the Commonwealth. A continued downturn in the economy may negatively impact Commonwealth Sales Tax collections. See *"Economic Conditions Could Affect Commonwealth Sales Tax Revenues"* under RISK FACTORS.

The following tables and graph show historical Commonwealth Sales Tax collections per month utilizing for all fiscal years the new reporting method adopted by the Treasury Department in May 2010. Under the new reporting method, which was effective beginning in Fiscal Year 2009-2010, sales tax collections are recorded in the month in which the sales tax is received by the Treasury Department from the merchant and retailer. Previous reports prepared by the Treasury Department prior to May 2010 recorded the sales tax collections in the month in which such taxes were collected by the merchant and retailer. To permit comparisons of Fiscal Year 2009-2010 with prior fiscal years, in the table and graph below sales tax figures for all months prior to July 2009 have been moved forward one month from the month in which they had been previously reported by the Treasury Department (for example, the figures previously reported in November 2006 appear below reported in December 2006):

## Sales and Use Tax – Collection History by Month
(Dollars in Thousands)

| | Fiscal Year | | | | | |
|---|---|---|---|---|---|---|
| | **2006-2007** | **2007-2008** | **2008-2009** | **2009-2010** | **2010-2011** | **2011-2012** |
| July | - | $ 95,460 | $ 97,526 | $ 94,382 | $ 95,910 | $ 96,652 |
| August | - | 96,100 | 95,592 | 88,000 | 90,418 | 92,332 |
| September | - | 90,181 | 91,353 | 84,100 | 86,698 | 89,279 |
| October | - | 86,163 | 77,788 | 83,775 | 83,698 | 90,621 |
| November | - | 93,751 | 86,191 | 85,120 | 88,602 | N/A |
| December | $ 50,200[(1)] | 96,170 | 91,996 | 95,075 | 97,277 | N/A |
| January | 110,000 | 121,251 | 119,836 | 118,476 | 123,358 | N/A |
| February | 95,000 | 89,798 | 85,763 | 88,942 | 90,818 | N/A |
| March | 86,200 | 86,486 | 84,608 | 82,538 | 88,439 | N/A |
| April | 96,400 | 89,355 | 88,065 | 93,415 | 93,664 | N/A |
| May | 85,700 | 93,487 | 88,788 | 85,469 | 88,469 | N/A |
| June | 94,400 | 103,331 | 82,854 | 94,296 | 95,518 | N/A |
| **Total** | **$617,900** | **$1,141,533** | **$1,090,360** | **$1,093,588** | **$1,122,869** | **$368,884** |
| **Monthly Average** | **$ 95,062** | **$ 95,128** | **$ 90,863** | **$ 91,132** | **$ 93,572** | **$ 92,221** |

[(1)]  Reflects collections for sales made between November 15 and November 30.  The sales tax became effective on November 15, 2006.

Source:  Treasury Department



Source:  Treasury Department

### Collections by Source

The chart below illustrates the composition of Commonwealth Sales Tax collections attributable to sales made during Fiscal Year 2010-2011 (actual receipts by the Treasury Department from July 2010 thru June 2011). Of the $1.123 billion in collections, approximately 52% were from retail trade activity (including general merchandise, clothing and accessories, supermarkets and convenience stores, landscaping and construction materials, health and personal services, auto parts and other retail), 13% from prepared foods, bars and full service restaurants, 12% from information and telecommunications, 9% from wholesale trade, and 3% from manufacturing, among other categories.

**Commonwealth Sales Tax Collections
by Source for Fiscal Year 2010-2011**



Source: Treasury Department

**Economic Indicators**

According to the Corporation, gross national product ("GNP") and personal consumption expenditures are the economic indicators that correlate most closely with the level of sales of goods and services in the Commonwealth and, consequently, Commonwealth Sales Tax collections. The accompanying table provides the annual growth rates within each decade since 1947 for GNP and personal consumption expenditures, together with the annual growth rates experienced over those time periods within the three major components of personal consumption (services, non-durable goods and durable goods).

<div align="center">

**Compounded Annual Growth Rates for
Gross National Product and Personal Consumption Expenditures**
(Based upon Current Dollar Data)

</div>

| Periods | Gross National Product | Personal Consumption Expenditures | Personal Consumption Expenditures by Category | | |
|---|---|---|---|---|---|
| | | | Services | Non-Durable Goods | Durable Goods |
| 1947-49 | 5.49% | 3.24% | 6.41% | 1.42% | 8.36% |
| 1950-59 | 7.21% | 6.54% | 7.02% | 5.73% | 10.20% |
| 1960-69 | 9.53% | 9.17% | 10.19% | 7.87% | 11.90% |
| 1970-79 | 7.91% | 9.94% | 10.53% | 9.51% | 10.06% |
| 1980-89 | 6.07% | 5.78% | 7.15% | 4.87% | 5.37% |
| 1990-99 | 5.88% | 5.54% | 6.68% | 4.21% | 6.31% |
| 2000-09 | 4.23% | 4.37% | 5.33% | 4.20% | 0.71% |
| 2009-10 | 0.49% | 1.56% | 1.25% | 1.87% | 1.94% |
| 1947-2010 | 7.52% | 7.44% | 8.63% | 6.57% | 7.87% |

Source: Planning Board

<div align="center">

**Historical Components of Personal Consumption Expenditures and GNP**
(Measured in Current Dollars)

</div>



Source: Government Development Bank

The graphs below show that since 1947, current personal consumption expenditures have never recorded an annual decline. Also, since 1947 constant personal consumption expenditures (excluding the impact of inflation) experienced negative growth during seven periods. Although recessionary conditions have persisted in Puerto Rico during the last three years, current personal consumption expenditures have grown by an annual average of 3.2% during this period.

### Personal Consumption Expenditures and GNP
(Current Dollars)



Source: Government Development Bank

### Personal Consumption Expenditures and GNP
(Constant Dollars)



Source: Government Development Bank

12

Personal consumption expenditures in Puerto Rico have been bolstered by federal transfer payments to individuals, which have increased from $9.2 billion in Fiscal Year 2004-2005 to $16.0 billion in Fiscal Year 2009-2010, inclusive of one-time U.S. 2008 stimulus law transfers. Over the past fourteen years these transfers have not been negatively affected by economic downturns. The amount of federal transfers to individuals is equal to about 28% of personal consumption expenditures in Fiscal Year 2009-2010 and support consumer spending and the overall economy. These federal transfers consist principally of social security, nutritional assistance programs, veterans' benefits and U.S. Civil Service pensions. See *The Economy – Personal Income*" in *Appendix A – Commonwealth Economic Information* for a breakdown of Puerto Rico personal income statistics by source.

**Dedicated Sales Tax Fund**

*Dedicated Sales Tax Fund.* Act 91 created the Dedicated Sales Tax Fund and requires that the Pledged Sales Tax be deposited into the Dedicated Sales Tax Fund. Under the provisions of Act 91, the Dedicated Sales Tax Fund and all present and future collections of the Pledged Sales Tax are transferred to, and made the property of, the Corporation in consideration for the Corporation's commitment to use the proceeds of the sale of its bonds and its other resources for Authorized Uses. The Dedicated Sales Tax Fund is administered by Government Development Bank.

*Pledged Sales Tax.* The Pledged Sales Tax consists of the first collections of the Commonwealth Sales Tax in each Fiscal Year up to the greater of (i) the Pledged Sales Tax Base Amount, and (ii) the 2.75% formula.

**Pledged Sales Tax Base Amount**

The Pledged Sales Tax Base Amount for Fiscal Year 2011-2012 is $595,165,542. The Pledged Sales Tax Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000. Act 91 defines the Pledged Sales Tax Base Amount as the sum of the "Original Base Amount" and the "Additional Base Amount." The Original Base Amount for Fiscal Year 2011-2012 is $216,423,834 and increases each Fiscal Year thereafter at a statutory rate of 4% up to $1,850,000,000.

The "Additional Base Amount" for Fiscal Year 2011-2012 is $378,741,709. The Additional Base Amount will increase each Fiscal Year thereafter at a statutory rate of 4%, until the Fiscal Year (2041) in which the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000 ("Maximum Year"). Pursuant to Act 91, the Additional Base Amount for each Fiscal Year after the Maximum Year will be reduced by that amount necessary so that the sum of the Original Base Amount and the Additional Base Amount equals $1,850,000,000.

After Fiscal Year 2041, the Pledged Sales Tax Base Amount remains fixed at $1,850,000,000.

The following table shows the legally required increase of the Pledged Sales Tax Base Amount until Fiscal Year 2058, the last maturity date of the outstanding Bonds:

| | Annual Pledged Sales Tax Base Amount | | |
|---|---|---|---|
| Fiscal Year ended June 30 | Original Base Amount | Additional Base Amount | Pledged Sales Tax Base Amount |
| 2010 | $ 200,096,000 | $ 350,168,000 | $ 550,264,000 |
| 2011 | 208,099,840 | 364,174,720 | 572,274,560 |
| 2012 | 216,423,834 | 378,741,709 | 595,165,542 |
| 2013 | 225,080,787 | 393,891,377 | 618,972,164 |
| 2014 | 234,084,018 | 409,647,032 | 643,731,051 |
| 2015 | 243,447,379 | 426,032,914 | 669,480,293 |
| 2016 | 253,185,274 | 443,074,230 | 696,259,504 |
| 2017 | 263,312,685 | 460,797,199 | 724,109,885 |
| 2018 | 273,845,193 | 479,229,087 | 753,074,280 |
| 2019 | 284,799,000 | 498,398,251 | 783,197,251 |
| 2020 | 296,190,960 | 518,334,181 | 814,525,141 |
| 2021 | 308,038,599 | 539,067,548 | 847,106,147 |
| 2022 | 320,360,143 | 560,630,250 | 880,990,393 |
| 2023 | 333,174,549 | 583,055,460 | 916,230,008 |
| 2024 | 346,501,530 | 606,377,678 | 952,879,209 |
| 2025 | 360,361,592 | 630,632,785 | 990,994,377 |
| 2026 | 374,776,055 | 655,858,097 | 1,030,634,152 |
| 2027 | 389,767,098 | 682,092,421 | 1,071,859,518 |
| 2028 | 405,357,781 | 709,376,118 | 1,114,733,899 |
| 2029 | 421,572,093 | 737,751,162 | 1,159,323,255 |
| 2030 | 438,434,976 | 767,261,209 | 1,205,696,185 |
| 2031 | 455,972,375 | 797,951,657 | 1,253,924,033 |
| 2032 | 474,211,271 | 829,869,723 | 1,304,080,994 |
| 2033 | 493,179,721 | 863,064,512 | 1,356,244,234 |
| 2034 | 512,906,910 | 897,587,093 | 1,410,494,003 |
| 2035 | 533,423,187 | 933,490,577 | 1,466,913,763 |
| 2036 | 554,760,114 | 970,830,200 | 1,525,590,314 |
| 2037 | 576,950,519 | 1,009,663,408 | 1,586,613,926 |
| 2038 | 600,028,539 | 1,050,049,944 | 1,650,078,483 |
| 2039 | 624,029,681 | 1,092,051,942 | 1,716,081,623 |
| 2040 | 648,990,868 | 1,135,734,019 | 1,784,724,887 |
| 2041 | 674,950,503 | 1,175,049,497 | 1,850,000,000 |
| 2042 | 701,948,523 | 1,148,051,477 | 1,850,000,000 |
| 2043 | 730,026,464 | 1,119,973,536 | 1,850,000,000 |
| 2044 | 759,227,522 | 1,090,772,478 | 1,850,000,000 |
| 2045 | 789,596,623 | 1,060,403,377 | 1,850,000,000 |
| 2046 | 821,180,488 | 1,028,819,512 | 1,850,000,000 |
| 2047 | 854,027,708 | 995,972,292 | 1,850,000,000 |
| 2048 | 888,188,816 | 961,811,184 | 1,850,000,000 |
| 2049 | 923,716,369 | 926,283,631 | 1,850,000,000 |
| 2050 | 960,665,024 | 889,334,976 | 1,850,000,000 |
| 2051 | 999,091,625 | 850,908,375 | 1,850,000,000 |
| 2052 | 1,039,055,289 | 810,944,711 | 1,850,000,000 |
| 2053 | 1,080,617,501 | 769,382,499 | 1,850,000,000 |
| 2054 | 1,123,842,201 | 726,157,799 | 1,850,000,000 |
| 2055 | 1,168,795,889 | 681,204,111 | 1,850,000,000 |
| 2056 | 1,215,547,725 | 634,452,275 | 1,850,000,000 |
| 2057 | 1,264,169,634 | 585,830,366 | 1,850,000,000 |
| 2058 | 1,314,736,419 | 535,263,581 | 1,850,000,000 |

14

Regardless of the level of Commonwealth Sales Tax collections, Act 91 requires that in each Fiscal Year all collections of the Commonwealth Sales Tax be deposited in the Dedicated Sales Tax Fund until an amount equal to the Pledged Sales Tax Base Amount is reached before any collections of Commonwealth Sales Tax are deposited in the Commonwealth General Fund.

After an amount equal to the Pledged Sales Tax Base Amount has been deposited in the Dedicated Sales Tax Fund and transferred to the Revenue Account established under the Resolution, all Commonwealth Sales Tax collections are required to be allocated between the Corporation and the Treasury Department so as to give effect to the 50/50 split between the Corporation and the Treasury Department that is contemplated by Act 91 (2.75% of the total 5.5% Commonwealth Sales Tax to each), by (i) transferring Commonwealth Sales Tax collections to the Treasury Department until it has received an amount equal to the Pledged Sales Tax Base Amount, and (ii) thereafter, transferring 50% of all collections to the Revenue Account established under the Resolution and 50% to the Treasury Department.

Act 91 also provides that, if the amounts deposited to the credit of the Dedicated Sales Tax Fund are insufficient to pay principal of or interest on Bonds or other debt obligations of the Corporation or to make any other payment related to obligations incurred with respect to Bonds or other debt obligations, including interest rate swap agreements, such insufficiency shall be paid to the Corporation, for deposit in the Dedicated Sales Tax Fund as additional Pledged Sales Tax, from the first receipts of the Commonwealth Sales Tax collected in subsequent Fiscal Years which are in excess of the Pledged Sales Tax amount applicable to such Fiscal Year.

**Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund**

Pursuant to that certain banking services agreement by and among the Treasury Department, Government Development Bank, the Corporation and Banco Popular de Puerto Rico, a commercial banking institution in the Commonwealth ("Banco Popular") (the "Banking Services Agreement"), Banco Popular is responsible for the processing of the Commonwealth Sales Tax and certain Municipal Sales Tax returns and the collection of moneys and deposit thereof into the various accounts of the Government Development Bank, the Corporation and the Treasury Department, among other things.

In order to comply with the Dedicated Sales Tax Fund deposit requirements of Act 91, the Banking Services Agreement provides as follows:

- Each month, on or prior to the 10th day, the merchant or retailer files the return and pays the Municipal Sales Tax and the Commonwealth Sales Tax collected by the merchant during the prior month to First Data Corp., a provider of electronic commerce and payment solutions for businesses and consumers ("First Data"), Banco Popular or any other collector of the Commonwealth Sales Tax designated by the Secretary of the Treasury (the "Authorized Collectors").

- First Data, Banco Popular and the Authorized Collectors are required to transfer any Commonwealth Sales Tax and Municipal Sales Tax payments received from merchants or retailers on a daily basis directly to a joint Government Development Bank and Corporation account at Banco Popular (the "Sales Tax Account").

- Once the moneys are deposited in the Sales Tax Account, Banco Popular then transfers on a daily basis (with a 2 day delay) to the Dedicated Sales Tax Fund (an account at Banco Popular's Trust Department in the name of the Corporation) all Commonwealth Sales Tax collections. In each Fiscal Year, Banco Popular first transfers on a daily basis

15

all moneys on deposit in the Dedicated Sales Tax Fund to the Trustee until the Pledged Sales Tax Base Amount has been deposited in the Revenue Account. All subsequent Commonwealth Sales Tax collections are transferred to the Treasury Department until such time as it has received an amount equal to the Pledged Sales Tax Base Amount. Thereafter, Banco Popular is required to transfer 50% of each dollar of Commonwealth Sales Tax collected to the Trustee for deposit in the Revenue Account and the other 50% to the Treasury Department account at Government Development Bank. See *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.

The accompanying diagram illustrates the collection and deposit process described above. For a description of the flow of funds under the Resolution after deposit in the Revenue Account, see *"Funds and Accounts Under the Resolution"* under SECURITY FOR THE BONDS.



(1) Includes 1.5% Municipal Sales Tax.
(2) Excludes 1.5% Municipal Sales Tax.

*Collections by Merchants and Retailers.* Merchants and retailers are required to collect the Commonwealth Sales Tax from the consumer; otherwise, the consumer is required to pay the tax. Any person who transacts business in Puerto Rico as a merchant or retailer must request and receive a Merchants' Registration Certificate issued by the Secretary of the Treasury which appoints the merchant or retailer as a Commonwealth Sales Tax collection agent. Failure to request a Merchants' Registration Certificate subjects the merchant or retailer to fines. The Secretary of the Treasury may require that the merchant or retailer post a cash deposit, bond or other item of value as a condition to obtaining or retaining a Merchants' Registration Certificate. The Commonwealth Sales Tax is required to be remitted no later than the 10th day of the calendar month following the month in which the taxable transaction occurred, unless otherwise provided in regulations adopted by the Secretary of the Treasury.

*Tax Return Filings by Merchants and Retailers.* Each merchant and retailer is required to file a monthly return detailing all taxable transactions for the prior month no later than the 10th day of each month. As of August 2011, all merchants and retailers with a volume of sales equal to or greater than $200,000 are required to file their return electronically. The Treasury Department reports that, as of October 31, 2011, 92% of the collections from the Commonwealth Sales Tax are received electronically,

an increase from 64.5% in December 2006. As of August 2011, 241,625 merchants and retailers were required to file a monthly return, out of which 81,749 merchants and retailers are currently filing their monthly returns. This difference may be attributed in part to merchants and retailers that have (a) failed to (i) file a monthly return because no sales taxes were withheld during the respective month or (ii) terminate their Merchants' Registration Certificate upon ceasing operations in Puerto Rico, or (b) been required to file monthly returns in the past but are no longer required to do so because their sales have fallen below the reporting threshold.

*Collections by Large Merchants and Retailers.* Large merchants and retailers collect the majority of the Commonwealth Sales Tax. Approximately 33.4% of the Commonwealth Sales Tax is collected by 20 merchants or retailers that represent a diverse range of businesses. Commonwealth Sales Tax collections among the top 20 merchants grew 12% from Fiscal Year 2007-2008 to Fiscal Year 2010-2011. Among the top 20, which include nationally recognized and local companies, there are approximately four mobile phone companies, ten discount retailers and three fast food companies.

**Commonwealth Sales Tax Enforcement Initiatives**

The Treasury Department has undertaken various initiatives directed towards increasing Commonwealth Sales Tax collections through the implementation of enforcement and compliance programs. The Secretary of the Treasury has indicated that the sales tax is the prime enforcement priority due to the potential for improvement in collections and the resulting tax revenue increase. According to a study published in March 2009 by the College of Certified Public Accountants Foundation, it was estimated that at that time the Treasury Department was only collecting approximately 52% of the potential Commonwealth Sales Tax revenues. As further discussed below, the Treasury Department estimates that in Fiscal Year 2011-2012 it will collect an additional $200 million in annually recurring Commonwealth Sales Tax revenue through the implementation of its enforcement programs.

As part of these revenue raising initiatives, the Treasury Department has undertaken various enforcement programs, such as the implementation of a voluntary disclosure program that provides taxpayers that meet certain criteria the opportunity to pay taxes and interests owed on unreported income and, in certain circumstances, avoid the payment of surcharges and penalties. Under this program, which began on July 1, 2009, the Treasury Department has reviewed 568 cases and collected approximately $64.2 million. In May 2010, the Treasury Department also began to deliver letters to taxpayers identified by the tax intelligence program to encourage the use of the voluntary disclosure program. As of October 15, 2010, the Treasury Department had sent approximately 7,900 letters and had received responses from 2,000 taxpayers. Moreover, the Treasury Department sent 1,000 additional letters in March 2011 and 2,200 additional letters in April 2011 as a second notice to taxpayers that did not respond to the first letter of May 2010.

The Treasury Department has also implemented programs geared towards the use of technology to detect noncompliance. For example, the Treasury Department completed in November 2010 the integration of its general computer systems with the sales tax database in order to better detect non-compliance. The Treasury Department has also implemented a program whereby its officers use hand held scanning devices to cross-check merchant licenses. Recently, the Treasury Department discontinued the use of the hand held scanning devices and will provide tablet computers to its agents, beginning in December 2011, that will allow them to review a broader range of compliance criteria, such as merchant licenses, Commonwealth Sales Tax sales and point of sale system compliance.

On September 28, 2010, the Treasury Department signed an agreement for the implementation of a new point of sale system that is intended to strengthen its sales tax enforcement efforts. The system is designed to: (i) transmit daily to the Treasury Department information on all sales tax transactions; (ii) reconcile transmitted transactional information with information reported by merchants; (iii) provide

wireless transmission devices for use by street vendors; and (iv) capture a greater percentage of cash sales through the implementation of a special lottery using sales receipts as lottery tickets (the "IVU Loto"). The Treasury Department began a two phase implementation of this new point of sale system in December 1, 2010, through a pilot program in which 200 merchants in the Municipality of Ponce were selected to participate. The second phase, which includes the initial implementation of the point of sale system throughout the island, started in March 2011. Implementation of the new system is expected to be completed by the end of Fiscal Year 2011-2012 and is expected to increase sales tax collections by $200 million during the first year. As of November 7, 2011, the point of sale devices captured approximately 187.4 million transactions which resulted in sales of $4.4 billion and Commonwealth Sales Tax collections of $155.6 million. The Treasury Department adopted regulations on December 14, 2010 requiring that all qualifying merchants register for participation in the point of sale system program on or prior to April 30, 2011. As of October 27, 2011, 191,037 locations had registered in the program and 59,884 of such locations will be required to acquire and use the new point of sale system.

The Treasury Department has begun to detect inconsistencies between the information captured by the point of sale system and that reported by merchants and retailers. The principal inconsistencies are: (i) merchants and retailers that report sales through the point of sale system but do not file monthly returns, (ii) sales reported through the point of sale system are higher than those reported in the monthly returns, (iii) cash credits claimed through the point of sale system are equal to the sales reported, and (iv) merchants and retailers are not reporting cash sales. In order to address these possible instances of non-compliance, the Treasury Department has created a task force consisting of fiscal auditors and agents from the Sales and Use Tax Bureau and the Tax Evasion Bureau. The fiscal auditors are responsible for investigating inconsistencies reported by the point of sale system, determine tax deficiencies and issue preliminary deficiency notices. The agents of the Sales and Use Tax Bureau provide assistance to the fiscal auditors in connection with any additional information requirements and visit merchants and retailers to investigate the status of their permits and point of sale systems. Finally, the agents from the Tax Evasion Bureau are responsible for investigating any tax crimes discovered by the fiscal auditors and/or agents from the Sales and Use Tax Bureau. As a result of this initiative, as of October 5, 2011, the Treasury Department had identified approximately 33,481 unfiled monthly returns and sent notices to approximately 5,125 merchants and retailers. As of October 31, 2011, approximately 1,181 merchants and retailers had responded to the notices and approximately 2,577 unfiled monthly returns were filed resulting in taxable sales reported of approximately $24.7 million and sales and use tax collections of $1.4 million. Merchants and retailers that filed monthly returns reporting no sales will receive a deficiency notice and all other merchants and retailers that have not responded will be referred to a fiscal auditor or the Tax Evasion Bureau.

In addition, the Treasury Department established "IVU Alerta" in order to enhance Commonwealth Sales Tax compliance. The "IVU Alerta" is an internet and telephone hotline through which customers and merchants can report violations related to the Commonwealth Sales Tax. This initiative started in November 29, 2010 and, as of November 4, 2011, has received 5,610 complaints, which 4,229 have been investigated resulting in fines of approximately $5.5 million.

The Treasury Department is also focused on strengthening its enforcement workforce. It has increased staffing levels in its Enforcement and Compliance Bureaus by approximately 349 employees (including the 125 tax collection agents assigned to the call center mentioned below), which has enabled it to increase the number of unannounced field audits of businesses and merchants to ensure greater compliance with Commonwealth Sales Tax requirements. It has equipped a call center staffed by 125 tax collection agents responsible for contacting merchants by telephone or electronically and following up on collection efforts. The call center began operations on February 24, 2010 and, as of November 3, 2011, has produced approximately $57.5 million in collections. The Treasury Department is also providing additional training and updated equipment to its auditors in order to conduct more effective audits. From July 2009 through August 2011, 3,179 cases pertaining to the Commonwealth Sales Tax were referred to

the Audit Bureau, including 411 cases with a high probability of Commonwealth Sales Tax non-compliance identified through the tax intelligence program. As of August 2011, the Audit Bureau has completed 1,260 audits, which include 101 completed audits of cases identified through the tax intelligence program, and assessed approximately $34.5 million in deficiencies.

In February 2009, the Treasury Department resumed unannounced visits to businesses and merchants. As of October 2011, the Treasury Department had visited 99,924 businesses and merchants and imposed approximately $23.2 million in fines for non-compliance with Commonwealth Sales Tax requirements. In addition, the Treasury Department is also making unannounced visits to ensure proper installation of the point of sale system, verify that businesses and merchants are complying with IVU Loto requirements and provide assistance to businesses and merchants in connection with the implementation of the IVU Loto.

The Treasury Department has also sponsored legislation to limit or close certain gaps that existed in Act 117, as amended. In this regard, one of the amendments incorporated in Act 7, require a merchant or retailer to file his or her Commonwealth Sales Tax monthly return on or prior to the tenth day of the following month, rather than the twentieth day (as originally required in Act 117). Such amendment also provides that the Commonwealth Sales Tax exemption applicable to resellers applies only to merchants and retailers (i) with gross sales greater than or equal to $500,000 or (ii) that do not meet the $500,000 sales threshold but meet certain other requirements imposed by the Treasury Department. A merchant or retailer that meets neither the $500,000 threshold nor the other requirements imposed by the Treasury Department would still be entitled to a credit on sales tax paid that must be claimed in each monthly filing. This measure is intended to enable responsible taxpayers to take advantage of the exemption while preventing non-compliant merchants and retailers from abusing the exemption.

In January 2010, the Treasury Department commenced implementing certain additional sales tax enforcement measures. The Treasury Department began to enforce a provision of Act 117 that allows the Secretary to revoke a certificate of exemption held by a merchant or retailer that fails to pay sales taxes collected in full by the 10th day of the month following the occurrence of the taxable event. The Treasury Department has identified potential violations of this provision of Act 117 by more than 1,000 merchants and retailers, which could face revocation of their exemption certificates for a twelve month period. The Treasury Department will also begin to seize the assets of businesses that are delinquent on their sales tax payments.

One additional initiative consists of establishing tax liens pursuant to the procedures of Act No. 12 of January 20, 2010 ("Act 12"), which enables the creation of tax liens through an expedited process. As of October 2011, the Treasury Department has established 16,000 liens in favor of the Commonwealth over approximately $742.5 million in assets.

The Treasury Department is in the process of entering into agreements with various municipalities in order to conduct simultaneous field visits and joint audits in order to increase the effectiveness of sales tax enforcement efforts. The Treasury Department believes that joining efforts with the municipalities, which must enforce the Municipal Sales Tax, will result in higher collections. The Treasury Department has entered into this type of agreement with the municipalities of San Juan, Caguas, Las Piedras and Barceloneta and is currently working with other municipalities that have expressed interest in entering into similar agreements. As of October 2011, these efforts have resulted in 993 visits to merchants and the imposition of $621,500 in fines.

There can be no assurance that the Treasury Department's enforcement initiatives will be successful in materially increasing the rate of compliance with the Commonwealth Sales Tax laws or the amount of the Commonwealth Sales Tax collected.

# THE SERIES 2011D BONDS

## General

The Series 2011D Bonds will be dated their date of delivery and will be issued in the aggregate initial principal amount of $91,155,000. The Series 2011D Bonds will be issued in the principal amounts, bearing interest at the rates, and maturing on the dates, all as shown on the inside cover page of this Official Statement. Interest on the Series 2011D Bonds will accrue from their date of delivery and will be payable quarterly on each February 1, May 1, August 1 and November 1, until maturity (or earlier redemption), commencing on February 1, 2012.

The Series 2011D Bonds are issuable as fully registered bonds without coupons in denominations of $5,000 and integral multiples thereof. Interest on the Series 2011D Bonds will be computed on the basis of a 360-day year of twelve 30-day months. The Series 2011D Bonds will be registered under The Depository Trust Company's Book-Entry Only system described below and in *Appendix E*. Certificated Series 2011D Bonds will not be available for distribution to investors. Transfers of ownership, and payment on the Series 2011D Bonds will be effected by The Depository Trust Company ("DTC") and its Participants pursuant to rules and procedures established by DTC and its Participants. See *"Book-Entry Only System"* below.

Upon satisfaction of certain conditions contained in the Resolution, the Corporation may issue additional bonds on a parity with the Outstanding Senior Bonds, or subordinate to the Outstanding Senior Bonds and on a parity with the Outstanding Subordinate Bonds. See *"Additional Bonds, Refunding Bonds and Other Obligations"* under SECURITY FOR THE BONDS.

## Redemption

*Optional Redemption of the Series 2011D Bonds*. The Series 2011D Bonds are subject to redemption at the option of the Corporation from any source, including, without limitation, the proceeds of refunding bonds or other financing provided by the Corporation, in whole or in part, at any time on or after August 1, 2021, at a redemption price equal to 100% of the principal amount of the Series 2011D Bonds to be redeemed, plus accrued interest to the date fixed for redemption.

*Mandatory Sinking Fund Redemption*. The Current Interest Term Bonds maturing on August 1, 2025 and 2036, shall be redeemed in part, by lot within a maturity, through application of Sinking Fund Installments as provided in the Resolution, in each case at a Redemption Price equal to the principal amount of the respective Bond or portion thereof to be redeemed, together with interest accrued to the date fixed for redemption. Subject to the provisions of the Resolution permitting amounts to be credited toward part or all of any Sinking Fund Installment, with respect to the Bonds due on each of the dates specified below, there shall be due, and the Corporation shall in any and all events be required to pay, on each Sinking Fund Installment date set forth in the following tables the amount set opposite such date, and said amount shall constitute a Sinking Fund Installment for the retirement of the respective Current Interest Term Bond:

| Mandatory Redemption Date | Sinking Fund Installments for Current Interest Term Bonds Maturing | |
|---|---|---|
| | August 1, 2025 | August 1, 2036 |
| 2024 | $11,710,000 | |
| 2025 | 9,255,000* | |
| 2035 | | $ 3,255,000 |
| 2036 | | 21,935,000* |

* Final Maturity

*Notice of Redemption.* In the event any Series 2011D Bonds are called for redemption, the Corporation will give the Trustee notice at least thirty (30) days prior to the date fixed for redemption (or such shorter period which is acceptable to the Trustee), and the Trustee shall give notice, in the name of the Corporation, at least sixteen (16) days prior to the date fixed for redemption to DTC, or if the Book-Entry Only System is discontinued for any Series of Series 2011D Bonds as described above, to the registered owners of the Series 2011D Bonds or portions thereof to be redeemed (with copies to the Trustee); *provided, however,* that failure to give such notice to DTC or to any registered owner, or any defect therein, shall not affect the validity of any proceedings for the redemption of any of the Series 2011D Bonds or portions thereof for which proper notice was given. If a notice of redemption is unconditional, or if the conditions of a conditional Notice shall have been satisfied, then upon presentation and surrender of the Series 2011D Bonds or portions thereof so called for redemption at the place or places of payment, such Series 2011D Bonds or such portion will be redeemed.

The notice of redemption will (a) specify the (i) Series 2011D Bonds or portions thereof to be redeemed, (ii) redemption date, (iii) redemption price, (iv) place or places where amounts due upon such redemption will be payable (which will be the principal office of the Trustee), and if less than all of the Series 2011D Bonds are to be redeemed, the CUSIP identification numbers, the numbers of the Series 2011D Bonds, and the portions of the Series 2011D Bonds to be redeemed, (b) state any condition permitted in, or not expressly prohibited by, the Resolution to such redemption, and (c) state that on the redemption date, and upon the satisfaction of any such condition, the Series 2011D Bonds or portions thereof to be redeemed will cease to bear interest.

Any notice of optional redemption of Series 2011D Bonds may be made conditional upon receipt by the Trustee on or prior to the date fixed for redemption of moneys sufficient to pay the principal of and interest on such Bonds or such portions to be redeemed, or upon the satisfaction of any other condition or the occurrence of any other event, which notice of redemption will specify any such conditions or events. Any conditional notice so given may be rescinded at any time before payment of the principal of and interest on the Series 2011D Bonds called for redemption or such portions thereof if any condition so specified is not satisfied or if any such other event does not occur. Notice of such rescission will be given by the Corporation to the Trustee at least two (2) Business Days prior to the scheduled date of redemption, and the Trustee will give notice of such rescission to affected Owners of the Series 2011D Bonds at least one (1) Business Day prior to the scheduled date of redemption, in the same manner as the conditional notice of redemption was given.

If notice of redemption is given and if sufficient funds are on deposit with the Trustee to provide for the payment of the principal of and premium, if any, and interest on the Series 2011D Bonds (or portions thereof) to be redeemed, then the Series 2011D Bonds (or portions thereof) so called for redemption will, on the redemption date, cease to bear interest, and will no longer be deemed outstanding under or be entitled to any benefit or security under the Resolution.

**Book-Entry Only System**

*Appendix E* to this Official Statement contains information concerning DTC and DTC's book-entry only system. The information contained in *Appendix E* to this Official Statement has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

The Corporation cannot and does not give any assurances that DTC, DTC Direct or Indirect Participants will distribute to the Beneficial Owners of the Series 2011D Bonds: (i) payments of principal and interest payments (including redemption payments) with respect to the Series 2011D Bonds; (ii) confirmation of ownership interest in the Series 2011D Bonds; or (iii) notices sent to DTC or Cede & Co., its nominee, as the registered owner of the Series 2011D Bonds, or that they will do so on a timely

basis, or that DTC or the DTC Participants will serve and act in the manner described in this Official Statement.

None of the Corporation nor the Trustee or any agent of the Corporation or the Trustee will have any responsibility or obligations to DTC, the DTC Participants, or the Beneficial Owners with respect to: (i) the accuracy of any records maintained by DTC or any DTC Participants; (ii) the payment by DTC or any DTC Participants of any amount due to any Beneficial Owner in respect of principal and interest payments (including redemption payments) on the Series 2011D Bonds; (iii) the delivery by DTC or any DTC Participants of any notice to any Beneficial Owner that is required or permitted to be given to owners under the terms of the Series 2011D Bonds; or (iv) any consent given or other action taken by DTC as registered owner of the Series 2011D Bonds. See *Appendix E - Book-Entry Only System*.

## SECURITY FOR THE SERIES 2011D BONDS

**General**

Pursuant to the Resolution, the Series 2011D Bonds are limited obligations of the Corporation payable solely from, and secured by a grant of a security interest in, the Pledged Property. The Series 2011D Bonds are on a parity in payment priority to the Senior Bonds and Parity Obligations, and senior in payment priority to the Subordinate Bonds and Subordinate Obligations. The Resolution prohibits the issuance of any bonds or notes with a payment priority that is senior to the Senior Bonds and Parity Obligations. The Resolution permits the issuance of bonds or notes with a payment priority that is subordinate to the Series 2011D Bonds

**Commonwealth Non-Impairment Covenant**

Pursuant to Act 91, the Commonwealth agrees and commits with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011D Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011D Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with holders of its Bonds until said Series 2011D Bonds, together with the interest thereon, are completely retired and that no amendment to Act 91 shall impair any obligation or commitment of the Corporation.

The Commonwealth has also agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Series 2011D Bonds or provides credit enhancement, sources of payment or liquidity for such Series 2011D Bonds, that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91; provided, that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirement set forth in the related authorizing bond documents of the Corporation.

The Corporation has covenanted in the Resolution that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and

Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law; have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

**Property Pledged for the Payment of the Series 2011D Bonds**

Pledged Property consists of (i) all Revenues (as discussed below), and all right, title and interest of the Corporation in and to the Revenues and all rights to receive the same, (ii) the Funds, Accounts (other than the Costs of Issuance Account and the Rebate Account) and Subaccounts (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of any Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution, (iii) any and all other rights and property of every kind and nature from time to time pledged by the Corporation to the Trustee under the Resolution as and for additional security for the Bonds and Parity Obligations, and (iv) any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property described in clauses (i) through (iii) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing. The Senior Series 2011 Bonds do not have any Debt Service Reserve requirement. None of the Outstanding Senior Bonds or Outstanding Subordinate Bonds have any Debt Service Reserve requirement.

Revenues consist of (i) all Pledged Sales Tax collections received by the Corporation or the Trustee, (ii) with respect to any particular Bond, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bond, but only for purpose of such payment and not for other purposes of the Resolution, (iii) any amounts received by the Corporation pursuant to a Qualified Hedge, if any, after giving effect to any netting of amounts payable by the parties thereunder, (iv) income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee, and (v) any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and the Rebate Account) or Subaccount (other than Subaccounts in the Cost of Issuance Account or Rebate Account) held by the Trustee.

The Corporation covenants that it will not issue any bonds, notes or other evidences of indebtedness secured by a pledge of or lien upon the Pledged Property, and shall not otherwise create any lien or charge on the Pledged Property, other than as permitted by the Resolution.

**Outstanding Bonds and Parity Obligations**

Prior to the issuance of the Senior Series 2011 Bonds, the Corporation had outstanding $14.126 billion aggregate initial principal amount of its Sales Tax Revenue Bonds issued under the General Resolution plus $691.7 million accreted on existing capital appreciation bonds and convertible capital appreciation bonds as of November 1, 2011. The Corporation's outstanding bonds consist of senior and first subordinate bonds.

After the issuance of the Senior Series 2011 Bonds, the Corporation will have outstanding $6.273 billion aggregate initial principal amount of its Senior Bonds, consisting of the following: (i) the Series 2007A Bonds, issued pursuant to the First Supplemental Sales Tax Revenue Bond Resolution

23

adopted by the Board of Directors of the Corporation on July 13, 2007, (ii) the Series 2007B Bonds, issued pursuant to the Second Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on July 17, 2007, (iii) the Series 2007C Bonds, issued pursuant to the Third Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on December 18, 2007, (iv) the Series 2008A Bonds, issued pursuant to the Fourth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 18, 2008, (v) the Series 2009C Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (vi) the Series 2011C Bonds, issued pursuant to the Twentieth Supplemental Sales Tax Resolution, and (vii) the Series 2011D Bonds, issued pursuant to the Twenty-first Supplemental Sales Tax Resolution.

The Corporation currently also has Outstanding Parity Obligations in an aggregate notional amount of $136 million.

All Senior Bonds and Parity Obligations are secured equally and ratably under the Resolution and are payable from the Pledged Sales Tax.  Additional Senior Bonds may be issued, and Additional Parity Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to finance the payment, retirement or defeasance of the 2006 Appropriation Debt or refund or refinance for savings Outstanding Senior Bonds or Outstanding Parity Obligations.

The Corporation's Outstanding First Subordinate Bonds represent $8.951 billion in aggregate initial principal amount, consisting of the following: (i) the Series 2009A Bonds, issued pursuant to the Seventh Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 10, 2009, (ii) the Series 2009B Bonds, issued pursuant to the Eighth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 17, 2009, (iii) the Series 2010A Bonds, issued pursuant to the Twelfth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on January 28, 2010, (iv) the Series 2010C Bonds, issued pursuant to the Fourteenth Supplemental Sales Tax Revenue Bond Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (v) the Series 2010D Bonds, issued  pursuant to the Fifteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vi) the Series 2010E Bonds, issued  pursuant to the Sixteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on June 24, 2010, (vii) the Series 2011A Bonds, issued  pursuant to the Eighteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011, and (viii) the Series 2011B Bonds, issued  pursuant to the Nineteenth Supplemental Resolution adopted by the Board of Directors of the Corporation on November 16, 2011.

**Subordination Provisions of the First Subordinate Bonds**

The First Subordinate Bonds are secured equally and ratably under the Resolution on a basis subordinate to the Senior Bonds and Parity Obligations and are payable from the Pledged Sales Tax.  As a result, the First Subordinate Bonds are payable from any and all amounts of the Pledged Sales Tax remaining after providing for the payment of any and all amounts due to the Senior Bonds and any Parity Obligations, as provided in the Resolution.  Moreover, the First Subordinate Bonds are not entitled to declare a default under the Resolution until such time as any and all amounts due and payable on the Senior Bonds and any Parity Obligations have been paid in full.

Additional Subordinate Bonds may be issued, and Additional Subordinate Obligations may be incurred, under the Resolution subject to the applicable additional bonds test described herein and solely to provide funds for the Authorized Uses or to refund or refinance for savings Senior Bonds, Parity Obligations, Subordinate Bonds or Subordinate Obligations.

24

**Funds and Accounts under the Resolution**

The Resolution provides for the creation of the "Project Fund" and the following accounts and subaccounts in such Fund: a Costs of Issuance Account, a Capitalized Interest Account, a Bond Proceeds Account, a Revenue Account, a Debt Service Account (which shall contain a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds and separately for Series of Tax-Exempt Bonds in such class and Taxable Bonds in such class), a Debt Service Reserve Account (established for each Class of Bonds), a Redemption Account, and a Rebate Account (containing a Subaccount for each Series of Bonds), each to be held by the Trustee. All such Accounts and Subaccounts, other than the Costs of Issuance Account and the Rebate Account, are subject to the lien and pledge created under the Resolution.

Under the Resolution, all Revenues received must be deposited into the Revenue Account except for certain investment earnings and income which flow to the Rebate Account; *provided, however*, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Receipts in respect of interest paid on Senior Bonds and First Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and transferred as of the last Business Day of each calendar month as follows and in the following order or priority:

(1) to the payment of regularly scheduled fees of the Trustee, and the payment of Operating Expenses (not to exceed the Operating Cap);

(2) to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Senior) related to the Senior Bonds and Parity Obligations;

(3) to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

(4) to each Debt Service Account established for First Subordinate Bonds and First Subordinate Obligations, allocated on a pro-rata basis between the Principal Subaccount, the Interest Subaccount, and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15 Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

(5) to each Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

(6)  to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to the Resolution and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to the Resolution) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

(7)  to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

(8)  if an amount at least equal to the Accrued 12/15 Month Obligation (Senior) and Accrued 12/15 Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, is on deposit in the Debt Service Accounts pursuant to clauses (2), (4) and (6) above, the balance on deposit in the Revenue Account, if any, may be applied, upon written direction of the Corporation to the Trustee in the following priority:

(a)  to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to clauses (2) and (4) above, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then

(b)  at the direction of the Corporation (i) retained in the Revenue Account, (ii) transferred to the Redemption Account, (iii) used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account or (IV) any combination of the foregoing, or (iv) released to the Corporation, free and clear of the lien of the Resolution, to be applied for any lawful purpose of the Corporation.

Under the Resolution, the following terms have the following meanings:

"Accrued 12-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of  Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such  Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued 12/15-Month Obligation (Senior)" shall mean for Outstanding Senior Bonds and Parity Obligations, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds.

"Accrued 12/15-Month Obligation (Subordinate)" shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in the case of (i) and (ii) that are due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds.

"Accrued Holding Amounts" means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without notice to other Bondowners. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

The following chart illustrates the flow of funds under the Resolution after the Commonwealth Sales Tax is collected and transferred to the Trustee (see *Procedures for the Collection and Deposit of the Pledged Sales Tax in the Dedicated Sales Tax Fund*" under PLEDGED SALES TAX):

```
┌─────────────────────────────────────────────────────┐
│            Bond Trustee-Held Revenue Account          │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│               COFINA Operating Expenses               │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│            Senior Bonds and Parity Obligations        │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│           Senior Bond Debt Service Reserve*           │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│          First Subordinated Bonds and Obligations     │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│        First Subordinated Debt Service Reserve*       │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│         Second Subordinated Bonds and Obligations     │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│       Second Subordinated Debt Service Reserve*       │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│        Until Accrued 12/15-Month Obligation is Funded │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│    Other Payments for Credit and Liquidity Facilities │
│               and Qualified Hedges                    │
└─────────────────────────────────────────────────────┘
                          ↓
┌─────────────────────────────────────────────────────┐
│      As Directed by the Corporation, including        │
│          Release from Resolution Lien                 │
└─────────────────────────────────────────────────────┘
```

*No Debt Service Reserve deposit requirement currently exists.

## Additional Bonds, Refunding Bonds and Other Obligations

Act 91 provides that the Corporation shall not authorize a bond issue unless the Executive Director or a designated officer of the Corporation certifies that the principal and interest of the Corporation's bonds to be issued, plus the principal and interest of all outstanding bonds of the Corporation (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated), payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation corresponding to each such Fiscal Year plus any Build America Bonds Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year.

The Resolution permits the issuance of Bonds (a) to provide funds for any of the Authorized Uses, (b) to refund or otherwise prepay any Bonds issued under the Resolution, or (c) for any other purpose set forth under Act 91, as amended from time to time.

The Resolution permits the issuance of additional Bonds as Senior Bonds (i.e., with payment priorities on a parity with those of the Outstanding Senior Bonds and Parity Obligations) or as Subordinate Bonds (i.e., with payment priorities subordinate to those of the Outstanding Senior Bonds and Parity Obligations and on a parity with or subordinate to such Subordinate Bonds).

The Resolution requires that no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the

Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate), and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (a) for each such Fiscal Year at least equals 102% of the amount in clause (b) hereof for each such Related August 2 Computation Period;

*Additional Requirements — Senior Bonds and Parity Obligations*

A. (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B. (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

29

     C.     No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement — First Subordinate Bonds and First Subordinate Obligations*

     D.     *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement — Second Subordinate Bonds and Second Subordinate Obligations*

     E.     *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof

for each such Related August 2 Computation Period satisfies the coverage test contained in the supplemental resolution setting forth the terms and conditions of the applicable Second Subordinate Bonds or Second Subordinate Obligations.

Under the Resolution, "Related August 2 Computation Period" means with respect to calculations to be made under the Resolution in connection with the issuance of Senior Bonds or First Subordinate Bonds or incurrence of Parity Obligations or First Subordinate Obligations, the 12-month period (or, as applicable, 15-month period) commencing on August 2 in such Fiscal Year of issuance or incurrence and, as the context requires, commencing on August 2 in the related succeeding Fiscal Years.

The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the requirements of the Resolution.

Owners of Subordinate Bonds and obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due, during any period that Senior Bonds or Parity Obligations are outstanding under the Resolution.

## Commonwealth's Authority to Cover Deficiencies

If the Commonwealth Sales Tax collections deposited in the Dedicated Sales Tax Fund in a given Fiscal Year are less than the applicable Pledged Sales Tax Base Amount for such Fiscal Year, Act 91 authorizes the Secretary of the Treasury to fund the shortfall from any available funds (including funds derived from borrowings from Government Development Bank) and requires the Director of the Office of Management and Budget of the Commonwealth to include in the Commonwealth's recommended budget for the current or the next Fiscal Year the appropriations necessary to cover the deficiency. Such deficiencies may be funded from available resources of the Commonwealth and, therefore, may be subject to the limitations provided under Section 8 of Article VI of the Constitution of Puerto Rico discussed above. **This Official Statement is not intended to provide information regarding the financial condition or financial prospects of the Commonwealth or its General Fund.**

## RISK FACTORS

*Prospective investors should carefully consider the risk factors set forth below regarding an investment in the Series 2011D Bonds as well as other information contained in this Official Statement. The following discussion of risk factors is not meant to be a complete list of risks associated with the purchase of the Series 2011D Bonds and does not necessarily reflect the relative importance of various factors. Potential purchasers of Series 2011D Bonds are advised to consider the following factors, among others, and to review the other information in this Official Statement in evaluating an investment in the Series 2011D Bonds. Any one or more of the factors discussed, and others, could lead to a decrease in the market value and/or the liquidity of the Series 2011D Bonds. There can be no assurance that other risk factors will not become material in the future.*

## Economic Conditions Could Affect Commonwealth Sales Tax Revenues

The amount of future Commonwealth Sales Tax revenues depends upon various factors, including economic conditions in the Commonwealth. Economic conditions in the Commonwealth have reflected numerous cycles of growth and recession. The Commonwealth has been in a recession since the fourth quarter of fiscal year 2006. For more information regarding the economic conditions of the Commonwealth, see *Appendix A – Commonwealth Economic Information.* There can be no assurance that historical data related to economic conditions in the Commonwealth are predictive of future trends.

**Legislative Assembly Authority over the Commonwealth Sales Tax**

Section 2 of Article VI of the Constitution of the Commonwealth (the "Puerto Rico Constitution") states that the power of the Commonwealth to impose and collect taxes and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and shall never be surrendered or suspended. In accordance with these provisions, the Legislative Assembly may amend, modify or repeal Act 117, which imposes the Commonwealth Sales Tax.

The Legislative Assembly has in the past enacted amendments to Act 117 to exempt specified goods and services from the imposition of the Commonwealth Sales Tax and provide for tax holidays in certain limited circumstances. There can be no assurance that future proposals will not result in additional exemptions from the Commonwealth Sales Tax. See *"Commonwealth Sales Tax Revenues"* and *"Commonwealth Sales Tax Collections and Projections"* under PLEDGED SALES TAX.

Article 5(c) of Act 91 states that the Commonwealth has agreed and committed with any person, firm or corporation or with any agency of the United States or of any other state or the Commonwealth or any country which acquires the Bonds or provides credit enhancement, sources of payment or liquidity for such Bonds, that it will not limit or restrain the rights and powers conferred by Act 91 or the rights of the Corporation to comply with its agreements with Bondowners until said Bonds, together with the interest thereon, are completely retired. The Commonwealth has also agreed that it will not limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of Act 91, provided that the Commonwealth is not precluded from exercising its power, through a change in law, to (i) limit or restrict the character or amount of such taxes and other receipts or (ii) substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation. Article 5(c) of Act 91 also provides that no amendment to Act 91 shall impair any obligation or commitment of the Corporation. See *"Commonwealth Non-Impairment Covenant"* under SECURITY FOR THE BONDS.

The Corporation has covenanted that any such substitution of any security in the form of taxes, fees, charges and other receipts for the Pledged Sales Tax shall not qualify as the delivery of "like or comparable security" unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the applicable rating agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law, have been validly transferred to the Corporation and do not constitute "available resources" of the Commonwealth for purposes of the last paragraph of Section 2 and Section 8 of Article VI of the Puerto Rico Constitution nor shall they be available for use by the Secretary of the Treasury.

**Certain Constitutional Considerations Relating to Act 91**

Section 8 of Article VI of the Puerto Rico Constitution provides that if, in any Fiscal Year, the Commonwealth's "available resources including surplus" are insufficient to meet appropriations made for that Fiscal Year, interest on the public debt and amortization thereof (which for purposes of the Puerto Rico Constitution includes general obligation bonds and notes of the Commonwealth and any payments required to be made by the Commonwealth under its guarantees of bonds and notes issued by its public

instrumentalities) must be paid first and other disbursements shall thereafter be made in accordance with priorities established by law. Section 2 of Article VI of the Puerto Rico Constitution provides, in its last paragraph, that the Secretary of the Treasury may be required to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of Article VI of the Puerto Rico Constitution at the suit of any holder of bonds or notes issued in evidence thereof. These provisions of the Puerto Rico Constitution are sometimes referred to as the "Constitutional Debt Priority Provisions."

The Statement of Motives of Act No. 56 of July 5, 2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the moneys deposited in the Dedicated Sales Tax Fund not constitute "available resources" of the Commonwealth for any purpose, including for the purposes set forth in the Constitutional Debt Priority Provisions. In addition, Act 91 states that the Dedicated Sales Tax Fund is to be transferred to, and shall be the property of, the Corporation and provides further that the Pledged Sales Tax will (i) be deposited in the Dedicated Sales Tax Fund upon receipt and will not be deposited into the Commonwealth's General Fund, (ii) not constitute resources available to the Commonwealth, and (iii) not be available for use by the Secretary of the Treasury.

On the date of issuance of the Senior Series 2011 Bonds, the Secretary of Justice of the Commonwealth (who acts as attorney general for the Commonwealth) will issue an opinion (the "2011 Opinion") opining that (i) Act 91 and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect, (ii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax do not constitute "available resources" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and (iii) the Dedicated Sales Tax Fund, the funds on deposit therein and the Pledged Sales Tax are not available for use by the Secretary of the Treasury. In connection with the issuance of each series of Outstanding Senior Bonds and Outstanding Subordinate Bonds, the then Secretary of Justice issued an opinion reaching the same conclusion (the "Secretary of Justice Opinions").

The Supreme Court of Puerto Rico has not addressed the constitutional issues covered in the 2011 Opinion and the Secretary of Justice Opinions and could reach a different conclusion. The Supreme Court of Puerto Rico, however, has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislative Assembly and has further stated that opinions by the Secretary of Justice, although not binding, are entitled to persuasive weight. The Supreme Court of Puerto Rico has also stated that deference to the Legislative Assembly should be especially high in matters involving the use of public funds and the regulation of the economy, and that in these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest.

In connection with the issuance of the Senior Series 2011 Bonds, Bond Counsel and Underwriters' Counsel have each opined to the Corporation that if the appropriate issues are properly presented for judicial decision, a court would hold that Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, that the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the Constitutional Debt Priority Provisions, and that Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury.

The opinions of Bond Counsel and Underwriters' Counsel described above expressly note that a court's decision regarding the matters upon which they are opining would be based on such court's own analysis and interpretation of the factual evidence before it and applicable legal principles. Thus, if a court reached a different result than that expressed in such opinions, such as that the exclusion of the Pledged Sales Tax from the definition of available resources for purposes the Constitutional Debt Priority Provisions is unconstitutional, it would not necessarily constitute reversible error. Consequently, the

opinions of Bond Counsel and Underwriters' Counsel described above are not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, are the opinions of Bond Counsel and Underwriters' Counsel as to the proper result to be reached by a court applying existing legal rules to the facts properly found after appropriate briefing and argument and, in addition, are not a guarantee, warranty or representation, but rather reflect the informed professional judgment of Bond Counsel and Underwriters' Counsel as to specific questions of law.

To the extent that a court determines that the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions, the Pledged Sales Tax may have to be applied to the payment of principal and interest on the Commonwealth's public debt before being used to pay principal of and interest on the Bonds, including the Senior Series 2011 Bonds. Should such application be required, the ratings on the Bonds may be adversely affected.

**Limited Nature of Ratings; Reductions, Suspension or Withdrawal of a Rating**

Any rating assigned to the Series 2011D Bonds by a rating agency will reflect such rating agency's assessment of the likelihood of the payment of interest when due and principal of the Series 2011D Bonds on their respective maturity or mandatory redemption dates. Any rating of the Series 2011D Bonds is not a recommendation to purchase, hold or sell such Series 2011D Bonds and such rating will not address the marketability of such Series 2011D Bonds, their market price or suitability for a particular investor. There is no assurance that any rating will remain for any given period of time or that any rating will not be lowered, suspended or withdrawn entirely by a rating agency if, in such rating agency's judgment, circumstances so warrant based on factors prevailing at the time, including, but not limited to, the evaluation by such rating agency of the financial outlook for the Corporation or the Commonwealth's economy. Any such reduction, suspension or withdrawal of a rating, if it were to occur, could adversely affect the availability of a market or the market prices for the Series 2011D Bonds. Finally, the Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

# AGGREGATE DEBT SERVICE REQUIREMENTS

The following table sets forth the debt service schedule for the Outstanding Senior Bonds and Parity Obligations, the Outstanding First Subordinate Bonds, the Series 2011C Bonds, and the Series 2011D Bonds, as of August 1 of each year, including the principal of the Bonds to be redeemed by mandatory redemption:

| August 1 | Payments on Outstanding Senior Bonds and Outstanding Parity Obligations[1] | Payments on Outstanding First Subordinate Bonds[1][2][3] | Total Debt Service on Series 2011C Bonds[4] | Series 2011D Bonds | | | Total Annual Debt Service |
|---|---|---|---|---|---|---|---|
| | | | | Principal | Interest | Debt Service | |
| 2011 | $ 177,311,926 | $ 369,311,645 | - | - | - | - | $ 546,524,570 |
| 2012 | 177,212,926 | 360,168,602 | $ 28,943,614 | - | $ 2,401,144 | $ 2,401,144 | 568,726,286 |
| 2013 | 177,212,926 | 381,972,424 | 43,846,023 | - | 3,791,280 | 3,791,280 | 606,822,653 |
| 2014 | 177,212,926 | 403,546,020 | 45,700,444 | - | 3,791,280 | 3,791,280 | 630,250,669 |
| 2015 | 177,212,926 | 427,957,490 | 45,700,444 | - | 3,791,280 | 3,791,280 | 654,662,139 |
| 2016 | 177,212,926 | 454,528,740 | 45,700,444 | - | 3,791,280 | 3,791,280 | 681,233,389 |
| 2017 | 177,212,926 | 481,835,410 | 45,700,444 | - | 3,791,280 | 3,791,280 | 708,540,059 |
| 2018 | 177,212,926 | 510,230,885 | 45,700,444 | - | 3,791,280 | 3,791,280 | 736,935,534 |
| 2019 | 177,212,926 | 539,760,260 | 45,700,444 | - | 3,791,280 | 3,791,280 | 766,464,909 |
| 2020 | 177,212,926 | 568,435,679 | 49,105,444 | - | 3,791,280 | 3,791,280 | 798,545,328 |
| 2021 | 177,212,926 | 552,714,335 | 96,769,244 | - | 3,791,280 | 3,791,280 | 830,487,784 |
| 2022 | 181,942,926 | 560,133,035 | 117,838,994 | - | 3,791,280 | 3,791,280 | 863,706,234 |
| 2023 | 184,113,226 | 620,004,260 | 45,342,244 | $ 45,000,000 | 3,791,280 | 48,791,280 | 898,251,009 |
| 2024 | 259,097,926 | 622,281,410 | 39,019,044 | 11,710,000 | 2,081,280 | 13,791,280 | 934,189,659 |
| 2025 | 304,651,226 | 617,025,160 | 39,019,044 | 9,255,000 | 1,601,170 | 10,856,170 | 971,551,599 |
| 2026 | 319,309,926 | 644,164,922 | 45,724,044 | - | 1,221,715 | 1,221,715 | 1,010,420,607 |
| 2027 | 333,337,426 | 670,093,240 | 46,180,844 | - | 1,221,715 | 1,221,715 | 1,050,833,224 |
| 2028 | 352,878,526 | 697,346,357 | 41,418,644 | - | 1,221,715 | 1,221,715 | 1,092,865,242 |
| 2029 | 369,740,487 | 726,668,335 | 38,950,044 | - | 1,221,715 | 1,221,715 | 1,136,580,580 |
| 2030 | 387,153,667 | 754,730,477 | 38,938,906 | - | 1,221,715 | 1,221,715 | 1,182,044,766 |
| 2031 | 404,688,595 | 784,480,990 | 38,936,344 | - | 1,221,715 | 1,221,715 | 1,229,327,643 |
| 2032 | 422,921,795 | 815,417,590 | 38,941,869 | - | 1,221,715 | 1,221,715 | 1,278,502,968 |
| 2033 | 441,880,695 | 847,601,653 | 38,935,819 | - | 1,221,715 | 1,221,715 | 1,329,639,881 |
| 2034 | 461,600,180 | 861,229,403 | 58,772,750 | - | 1,221,715 | 1,221,715 | 1,382,824,047 |
| 2035 | 482,111,345 | 913,364,403 | 38,187,750 | 3,255,000 | 1,221,715 | 4,476,715 | 1,438,140,212 |
| 2036 | 503,444,330 | 931,038,340 | 38,187,750 | 21,935,000 | 1,063,848 | 22,998,848 | 1,495,669,267 |
| 2037 | 486,103,395 | 956,819,538 | 112,572,750 | - | - | - | 1,555,495,682 |
| 2038 | 507,593,360 | 994,349,311 | 115,772,750 | - | - | - | 1,617,715,422 |
| 2039 | 142,560,982 | 1,048,203,691 | 491,657,750 | - | - | - | 1,682,422,423 |
| 2040 | 140,477,975 | 1,077,852,110 | 531,388,700 | - | - | - | 1,749,718,785 |
| 2041 | 673,482,975 | 1,111,688,710 | 28,063,750 | - | - | - | 1,813,235,435 |
| 2042 | 700,472,975 | 1,064,569,910 | 29,713,750 | - | - | - | 1,794,756,635 |
| 2043 | 728,542,975 | 980,476,500 | 30,895,000 | - | - | - | 1,739,914,475 |
| 2044 | 757,732,975 | 641,375,000 | 32,125,250 | - | - | - | 1,431,233,225 |
| 2045 | 788,097,975 | 540,525,000 | 33,406,250 | - | - | - | 1,362,029,225 |
| 2046 | 819,672,975 | 507,590,000 | 34,739,250 | - | - | - | 1,362,002,225 |
| 2047 | 852,507,975 | 509,665,000 | - | - | - | - | 1,362,172,975 |
| 2048 | 886,663,066 | 475,510,000 | - | - | - | - | 1,362,173,066 |
| 2049 | 922,181,201 | 439,995,000 | - | - | - | - | 1,362,176,201 |
| 2050 | 959,121,096 | 403,055,000 | - | - | - | - | 1,362,176,096 |
| 2051 | 997,538,585 | - | - | - | - | - | 997,538,585 |
| 2052 | 1,037,491,756 | - | - | - | - | - | 1,037,491,756 |
| 2053 | 1,079,043,813 | - | - | - | - | - | 1,079,043,813 |
| 2054 | 1,122,257,975 | - | - | - | - | - | 1,122,257,975 |
| 2055 | 1,167,202,556 | - | - | - | - | - | 1,167,202,556 |
| 2056 | 1,213,947,975 | - | - | - | - | - | 1,213,947,975 |
| 2057[5] | 1,199,110,058 | - | - | - | - | - | 1,199,110,058 |
| Total | $24,540,019,068 | $26,867,715,835 | $2,637,596,275 | $91,155,000 | $61,068,672 | $152,223,672 | $54,197,554,850 |

(1)   Includes accreted interest on outstanding Capital Appreciation Bonds and Convertible Capital Appreciation Bonds.

(2)   These figures are reduced by the (i) 35% Build America Bonds subsidy on the Series 2010D Bonds, (ii) 45% Recovery Zone Economic Development Bonds subsidy on the Series 2010E Bonds, and (iii) interest that was capitalized through the issuance of the Series 2010C Bonds due in fiscal year 2011 and 2013 but include accreted interest on Capital Appreciation Bonds.

(3)   A portion of the interest is capitalized in 2012, 2013 and 2014.

(4)   A portion of the interest is capitalized in 2013.

(5)   Debt service is adjusted to reflect that, on December 1, 2011, the beneficial owners of the Series 2007B Bonds maturing on June 1, 2057 consented to an amendment that extended the maturity of such bonds to July 1, 2057.

**Pro-Forma Commonwealth Sales Tax Revenues and Debt Service Coverage**

The following debt service coverage table presents Commonwealth Sales Tax revenues over combined Senior Bond debt service and Parity Obligation payments. This table assumes a growth rate of 4% in Commonwealth Sales Tax collections, which is the rate used to calculate sales tax growth for one of the additional bonds tests included in the Resolution. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 4% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | Pro-forma Debt Service Coverage[3] |
|---|---|---|---|
| 2011[4] | $1,122,656,758 | $ 177,212,926 | 6.34 |
| 2012 | 1,167,567,274 | 208,557,684 | 5.60 |
| 2013 | 1,214,274,294 | 224,850,229 | 5.40 |
| 2014 | 1,262,849,682 | 226,704,649 | 5.57 |
| 2015 | 1,313,368,174 | 226,704,649 | 5.79 |
| 2016 | 1,365,907,496 | 226,704,649 | 6.03 |
| 2017 | 1,420,548,482 | 226,704,649 | 6.27 |
| 2018 | 1,477,375,202 | 226,704,649 | 6.52 |
| 2019 | 1,536,475,086 | 226,704,649 | 6.78 |
| 2020 | 1,597,939,063 | 230,109,649 | 6.94 |
| 2021 | 1,661,861,699 | 277,773,449 | 5.98 |
| 2022 | 1,728,341,341 | 303,573,199 | 5.69 |
| 2023 | 1,797,480,273 | 278,246,749 | 6.46 |
| 2024 | 1,869,384,867 | 311,908,249 | 5.99 |
| 2025 | 1,944,165,753 | 354,526,439 | 5.48 |
| 2026 | 2,021,937,984 | 366,255,684 | 5.52 |
| 2027 | 2,102,821,216 | 380,739,984 | 5.52 |
| 2028 | 2,186,939,892 | 395,518,884 | 5.53 |
| 2029 | 2,274,423,432 | 409,912,245 | 5.55 |
| 2030 | 2,365,406,431 | 427,314,288 | 5.54 |
| 2031 | 2,460,028,873 | 444,846,653 | 5.53 |
| 2032 | 2,558,436,335 | 463,085,378 | 5.52 |
| 2033 | 2,660,780,222 | 482,038,228 | 5.52 |
| 2034 | 2,767,217,994 | 521,594,645 | 5.31 |
| 2035 | 2,877,913,407 | 524,775,810 | 5.48 |
| 2036 | 2,993,036,771 | 564,630,927 | 5.30 |
| 2037 | 3,112,765,206 | 598,676,145 | 5.20 |
| 2038 | 3,237,282,917 | 623,366,110 | 5.19 |
| 2039 | 3,366,781,480 | 634,218,732 | 5.31 |
| 2040 | 3,501,460,129 | 671,866,675 | 5.21 |
| 2041 | 3,641,526,072 | 701,546,725 | 5.19 |
| 2042 | 3,787,194,804 | 730,186,725 | 5.19 |
| 2043 | 3,938,690,439 | 759,437,975 | 5.19 |
| 2044 | 4,096,246,056 | 789,858,225 | 5.19 |
| 2045 | 4,260,104,058 | 821,504,225 | 5.19 |
| 2046 | 4,430,516,543 | 854,412,225 | 5.19 |
| 2047 | 4,607,745,694 | 852,507,975 | 5.40 |
| 2048 | 4,792,064,181 | 886,663,066 | 5.40 |
| 2049 | 4,983,755,580 | 922,181,201 | 5.40 |
| 2050 | 5,183,114,812 | 959,121,096 | 5.40 |
| 2051 | 5,390,448,594 | 997,538,585 | 5.40 |
| 2052 | 5,606,075,910 | 1,037,491,756 | 5.40 |
| 2053 | 5,830,328,507 | 1,079,043,813 | 5.40 |
| 2054 | 6,063,551,398 | 1,122,257,975 | 5.40 |
| 2055 | 6,306,103,401 | 1,167,202,556 | 5.40 |
| 2056 | 6,558,357,682 | 1,213,947,975 | 5.40 |
| 2057 | 6,820,702,338 | 1,199,110,058 | 5.69 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is (a) based on all outstanding Senior Bonds and Parity Obligations after the issuance of the Senior Series 2011 Bonds and (b) net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(3) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(4) Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

The following debt service coverage table presents Commonwealth Sales Tax revenues over Senior Bond debt service and Parity Obligation payments. This table assumes a growth rate of 0.17%, which is the rate needed to achieve a minimum 1.0x debt service coverage in all years. This is neither a projection nor a guarantee of actual collections. Actual collections may differ substantially from the amounts shown.

| Year | Commonwealth Sales Tax Revenues at a 0.17% Growth Rate[1] | Senior Bond Debt Service and Parity Obligation Payments[2] | Pro-forma Debt Service Coverage[3] |
|---|---|---|---|
| 2011[4] | $1,122,656,758 | $ 177,212,926 | 6.34 |
| 2012 | 1,124,611,395 | 208,557,684 | 5.39 |
| 2013 | 1,126,569,363 | 224,850,229 | 5.01 |
| 2014 | 1,128,530,668 | 226,704,649 | 4.98 |
| 2015 | 1,130,495,315 | 226,704,649 | 4.99 |
| 2016 | 1,132,463,306 | 226,704,649 | 5.00 |
| 2017 | 1,134,434,647 | 226,704,649 | 5.00 |
| 2018 | 1,136,409,341 | 226,704,649 | 5.01 |
| 2019 | 1,138,387,393 | 226,704,649 | 5.02 |
| 2020 | 1,140,368,806 | 230,109,649 | 4.96 |
| 2021 | 1,142,353,586 | 277,773,449 | 4.11 |
| 2022 | 1,144,341,735 | 303,573,199 | 3.77 |
| 2023 | 1,146,333,258 | 278,246,749 | 4.12 |
| 2024 | 1,148,328,160 | 311,908,249 | 3.68 |
| 2025 | 1,150,326,443 | 354,526,439 | 3.24 |
| 2026 | 1,152,328,112 | 366,255,684 | 3.15 |
| 2027 | 1,154,333,170 | 380,739,984 | 3.03 |
| 2028 | 1,156,341,623 | 395,518,884 | 2.92 |
| 2029 | 1,158,353,472 | 409,912,245 | 2.83 |
| 2030 | 1,160,368,723 | 427,314,288 | 2.72 |
| 2031 | 1,162,387,379 | 444,846,653 | 2.61 |
| 2032 | 1,164,409,444 | 463,085,378 | 2.51 |
| 2033 | 1,166,434,921 | 482,038,228 | 2.42 |
| 2034 | 1,168,463,814 | 521,594,645 | 2.24 |
| 2035 | 1,170,496,127 | 524,775,810 | 2.23 |
| 2036 | 1,172,531,863 | 564,630,927 | 2.08 |
| 2037 | 1,174,571,026 | 598,676,145 | 1.96 |
| 2038 | 1,176,613,619 | 623,366,110 | 1.89 |
| 2039 | 1,178,659,645 | 634,218,732 | 1.86 |
| 2040 | 1,180,709,109 | 671,866,675 | 1.76 |
| 2041 | 1,182,762,013 | 701,546,725 | 1.69 |
| 2042 | 1,184,818,361 | 730,186,725 | 1.62 |
| 2043 | 1,186,878,156 | 759,437,975 | 1.56 |
| 2044 | 1,188,941,402 | 789,858,225 | 1.51 |
| 2045 | 1,191,008,100 | 821,504,225 | 1.45 |
| 2046 | 1,193,078,255 | 854,412,225 | 1.40 |
| 2047 | 1,195,151,870 | 852,507,975 | 1.40 |
| 2048 | 1,197,228,947 | 886,663,066 | 1.35 |
| 2049 | 1,199,309,489 | 922,181,201 | 1.30 |
| 2050 | 1,201,393,500 | 959,121,096 | 1.25 |
| 2051 | 1,203,480,982 | 997,538,585 | 1.21 |
| 2052 | 1,205,571,938 | 1,037,491,756 | 1.16 |
| 2053 | 1,207,666,371 | 1,079,043,813 | 1.12 |
| 2054 | 1,209,764,283 | 1,122,257,975 | 1.08 |
| 2055 | 1,211,865,676 | 1,167,202,556 | 1.04 |
| 2056 | 1,213,970,554 | 1,213,947,975 | 1.00 |
| 2057 | 1,216,078,919 | 1,199,110,058 | 1.01 |

(1) Commonwealth Sales Tax collections during the Fiscal Year ending June 30 as reduced by the Operating Cap ($208,080 in Fiscal Year 2009-2010 increasing by 2% annually).

(2) Debt service for the year ending and including August 1. Debt service is (a) based on all outstanding Senior Bonds and Parity Obligations after the issuance of the Senior Series 2011 Bonds and (b) net of capitalized interest, Build America Bonds and Recovery Zone Economic Development Bonds subsidy.

(3) Commonwealth Sales Tax Revenues reduced by the Operating Cap over Total Debt Service.

(4) Commonwealth Sales Tax collections for 2011 were $1,122,869,000.

The Corporation believes that personal consumption expenditures and GNP are the economic indicators that correlate most closely to sales of goods and services that represent the sales tax base. While historical trends do not necessarily predict future performance, from Fiscal Year 1947 to Fiscal Year 2010, the average annual growth rate in personal consumption expenditures (nominal) was 7.6%. Moreover, the annual average growth rate in personal consumption expenditures (nominal) during the last decade, which experienced two recessions, was 4.7%. During Fiscal Year 2010, which constitutes the fourth consecutive year showing a reduction in gross national product, personal consumption expenditures (nominal) grew by 3.1% while Commonwealth Sales Tax revenues grew by 0.3% as compared to Fiscal Year 2009. The average annual growth rate of Commonwealth Sales Tax collections from Fiscal Year 2008 (the first full fiscal year after the implementation of the Commonwealth Sales Tax in November 2006) to Fiscal Year 2011 has been -0.61%.

## PLAN OF FINANCING

### Overview

The Corporation anticipates using the proceeds of Series 2011D Bonds, together with other funds available to the Corporation, to (i) redeem or repay prior to maturity certain outstanding bonds of Puerto Rico Public Finance Corporation that constitute 2006 Appropriation Debt, and (ii) pay the cost of issuance of the Series 2011D Bonds.

### Estimated Sources and Uses of Funds

**Sources**

| | |
|---|---|
| Principal Amount of the Series 2011D Bonds | $91,155,000.00 |
| Other Available Moneys | 1,020,150.00 |
| **Total Sources** | $92,175,150.00 |

**Uses**

| | |
|---|---|
| Payment of 2006 Appropriation Debt | $80,860,638.73 |
| Swap Agreement Payments | 10,000,000.00 |
| Underwriters' Discount and Other Costs of Issuance[1] | 1,314,511.27 |
| **Total Uses** | $92,175,150.00 |

[1] Includes legal, printing and other financing expenses.

## THE CORPORATION

The Corporation is an independent governmental instrumentality of the Commonwealth created by Act 91 for the purpose of issuing bonds and utilizing other financing mechanisms to provide funds to the Commonwealth for the Authorized Uses. Act 91 vested the Corporation with all the powers conferred to Government Development Bank under its charter (other than the power to act as fiscal agent), including the power to issue bonds for its corporate purposes. The Corporation is also known by an acronym of its Spanish name — "COFINA." Act 91 transfers present and future collections of the Pledged Sales Tax to the Corporation in exchange for, and in consideration of, the Corporation's commitment to provide funds for the Authorized Uses from the net proceeds of the bonds issued by the Corporation and other funds and resources available to the Corporation. Act 91 provides that the board of directors of the Corporation (the "Governing Board") shall consist of the members of the Board of Directors of Government Development Bank.

The following individuals are at present members of the Governing Board of the Corporation:

| Member | Commencement of Term | Expiration Date |
|--------|---------------------|-----------------|
| Marcos Rodríguez-Ema, Chairman | January 15, 2009 | September 23, 2015 |
| Juan Carlos Batlle, Vice Chairman | March 2, 2011 | September 23, 2012 |
| Manuel H. Dubón, Esq. | February 2, 2009 | September 23, 2012 |
| Juan E. Rodríguez Díaz, Esq. | February 20, 2009 | September 23, 2012 |
| Eduardo R. Emanuelli | May 11, 2011 | September 23, 2015 |
| Jesús F. Méndez | May 18, 2011 | September 23, 2014 |
| Eugenio L. Torres | July 5, 2011 | September 23, 2014 |

Certain officers of Government Development Bank have been appointed officers of the Corporation. Currently, Mr. José Otero, Executive Vice President and Director of Financing, Investments and Treasury for Government Development Bank, is the Corporation's Executive Director. Mr. Ignacio Canto, Vice President and Treasurer of Government Development Bank, is the Corporation's Assistant Executive Director. Mrs. Zulema Martinez, General Counsel to Government Development Bank, is the Corporation's General Counsel.

The Corporation's offices are located at the offices of Government Development Bank at Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940.

**Other Obligations of the Corporation**

In addition to the Outstanding Senior Bonds, the Outstanding Parity Obligations and the Outstanding First Subordinate Bonds, the Corporation has borrowed money, and incurred obligations, that are not secured under the Resolution. As of August 31, 2011 the Corporation had repaid all obligations that were not secured under the Resolution.

The Corporation is also a party to certain forward delivery swap agreements, effective on February 1, 2012, in an aggregate notional amount of $907 million. Pursuant to the terms of the agreements, on the effective date, the Corporation would begin making payments of 3.95% to the counterparties in return for 67% of LIBOR until its maturity on August 1, 2040. Under present market pricing, pursuant to the swap agreements, if the Corporation were to terminate the swaps on February 1, 2012, the Corporation would be required to make a termination payment. The Corporation's obligations under the swap agreements, including its obligation to make a termination payment, are subordinate to the Senior Bonds, the Parity Obligations, the First Subordinate Bonds and the First Subordinate Obligations. However, the swap agreements would become Parity Obligations under the Resolution to the extent the Corporation issues bonds that meet certain requirements set forth in such swap agreements, and the swap agreements are in compliance with the additional bonds tests set forth in the Resolution and are each considered a Qualified Hedge under the Resolution. The Corporation expects to terminate this swap agreement in connection with the issuance of the Senior Series 2011 Bonds, the proceeds of which will be used to repay certain outstanding 2006 Appropriation Debt and the termination payment associated with the termination of this swap agreement.

In connection with the Corporation's termination in November 2008 of an interest rate exchange agreement with a notional amount of $218 million relating to the Corporation's Sales Tax Revenue Bonds, Series 2007A, the Corporation made a termination payment to its counterparty. The counterparty has asserted to the Corporation that it is entitled to recover a termination payment in excess of that paid by the Corporation, plus interest at a default rate. The Corporation's management believes that any resolution of this dispute would not have a material adverse impact on the amount of Revenues available to pay debt service on the Corporation's bonds.

## TAX MATTERS

The following is a summary of the opinion of Pietrantoni Mendez & Alvarez LLC, Special Puerto Rico Tax Counsel, regarding certain Puerto Rico and United States federal tax consequences of the ownership of the Series 2011D Bonds by Puerto Rico residents. See also *Appendix D – Form of Opinion of Special Puerto Rico Tax Counsel.*

**This section does not purport to cover all of the Puerto Rico and United States federal tax consequences arising from the purchase and ownership of the Series 2011D Bonds. The following is based upon laws, regulations, judicial decisions and administrative pronouncements now in effect and subject to change, and any change may apply retroactively and affect the accuracy of the opinions, statements and conclusions set forth in this discussion. You should consult your independent tax advisor as to the application to your particular situation of the tax discussion described below, as well as the effect of any foreign, state or other laws.**

An opinion of counsel represents only such counsel's best legal judgment and is not binding on the Treasury Department, any municipality or agency of Puerto Rico, the United States Internal Revenue Service or the courts. Accordingly, there can be no assurance that the opinions set forth herein, if challenged, would be sustained. Moreover, this section is not to be construed as a substitute for careful tax planning. Prospective investors are urged to consult their own tax advisors with specific reference to their own tax situations, including the application and effect of other tax laws and any possible changes in the tax laws after the date of this Official Statement.

### Puerto Rico Tax Considerations for Puerto Rico Residents

In the opinion of Pietrantoni Mendez & Alvarez LLC, based on the laws of Puerto Rico now in force:

1.      Interest on the Series 2011D Bonds is:

(a)      exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico, as amended (the "PR Code"), and Article 2 of Act 91;

(b)      excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book income" of a corporation for purposes of computing the alternative minimum tax imposed by Section 1022.03(a) of the PR Code;

(c)      exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

(d)      exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it excludes from the "adjusted net book income" of a corporation for purposes of the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist in the PR Code, instead of interest from obligations described in Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which has been approved by the Legislative Assembly and pending the Governor's signature, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 1(b) above, we assume that the AMT treatment

provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may be required to be included in the "adjusted net book income" of a corporation and, therefore, may be subject to Puerto Rico alternative minimum tax.

2. The Series 2011D Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3. The Series 2011D Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4. The Series 2011D Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

The PR Code does not contain any provisions regarding the treatment of the excess of a Series 2011D Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount is treated as interest.

Prospective owners of the Series 2011D Bonds should be aware that, pursuant to Sections 1033.17(a)(5), 1033.17(a)(10) and 1033.17(f) of the PR Code, ownership of the Series 2011D Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense and other expenses related to an investment in the Series 2011D Bonds.

**United States Federal Tax Considerations for Puerto Rico Residents**

IRS Circular 230 Disclosure: The following U.S. tax discussion is general in nature and is not intended to be a tax opinion or tax advice. The U.S. tax discussion was prepared to support the promotion and marketing of the Series 2011D Bonds. No taxpayer can rely on the U.S. tax discussion to avoid penalties that may be imposed on the taxpayer by the IRS. Each prospective purchaser should seek advice from an independent tax advisor about the tax consequences under its own particular circumstances of investing in the Series 2011D Bonds.

The following is a general discussion of the anticipated material federal income tax consequences of the purchase, ownership and disposition of the Series 2011D Bonds. This discussion does not address the tax consequences to persons other than initial purchasers who are Puerto Rico U.S. Holders (as defined below), and a Puerto Rico Corporation (as defined below) that hold their Series 2011D Bonds as capital assets within the meaning of Section 1221 of the United States Internal Revenue Code of 1986, as amended (the "US Code"), and it does not address all of the tax consequences relevant to investors that are subject to special treatment under the United States federal income tax laws (such as life insurance companies, retirement plans, regulated investment companies, persons who hold transition bonds as part of a "straddle," a "hedge" or a "conversion transaction," persons that have a "functional currency" other than the U.S. dollar, investors in pass-through entities and tax-exempt organizations). This summary also

41

does not address the consequences to holders of the Series 2011D Bonds under state, local or foreign tax laws.

As used herein, the term "Puerto Rico U.S. Holder" means a Puerto Rico individual that is an individual who is a bona fide resident of Puerto Rico, within the meaning of Section 937 of the US Code, during the entire taxable year. As used herein, the term "Puerto Rico Corporation" means a corporation organized under the laws of the Commonwealth of Puerto Rico.

Based upon the provisions of the US Code, now in force and the rules and regulations thereunder, in the opinion of Pietrantoni Mendez & Alvarez LLC:

1.      Interest or original issue discount on the Series 2011D Bonds owned by an individual is excludable from the gross income of the individual thereof for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue discount is recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business within the United States by such individual under the US Code.

2.      Interest or original issue discount on the Series 2011D Bonds derived by a corporation organized under the laws of Puerto Rico is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3.      United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Series 2011D Bonds. Pursuant to Notice 89-40, issued by the IRS on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Series 2011D Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Series 2011D Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside of Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Series 2011D Bonds or (2) each of the ten years preceding the year of the sale.  In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Special Puerto Rico Tax Counsel's opinion is limited to the above, and Special Puerto Rico Tax Counsel has not expressed any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.  Such opinion is based upon Special Puerto Rico Tax Counsel's reliance upon the continued accuracy of the representations, warranties and covenants made by the Corporation in the Resolution.

**No Opinion as to Exclusion under Section 103(a) of the US Code**

The Corporation has determined, based on the advice of counsel, that interest on the Series 2011D Bonds is not excludable from gross income for federal income tax purposes under Section 103(a) of the US Code. As a result, the Series 2011D Bonds are not being sold in the United States tax-exempt municipal market, but are being sold exclusively in Puerto Rico. Special Puerto Rico Tax Counsel is not opining as to the status of the Series 2011D Bonds for purposes of Section 103(a) of the US Code.

## RATINGS

The Series 2011D Bonds have been assigned ratings of "AA-" by Standard & Poor's Ratings Services ("S&P"), "Aa2" by Moody's Investors Service ("Moody's"), and "AA-" by Fitch Ratings ("Fitch"). These ratings only reflect the respective opinions of such rating agencies.

Any explanation of the significance of such ratings must be obtained from the respective rating agency. There is no assurance that any such rating will continue in effect for any period or that any such rating will not be revised or withdrawn entirely by any such rating agency if, in its judgment, circumstances so warrant. Any such downgrade revision or withdrawal of such rating or ratings may have an adverse effect on the market prices of the Series 2011D Bonds. A securities rating is not a recommendation to buy, sell, or hold securities. Each security rating should be evaluated independently of any other security rating. For an explanation of the limitations inherent in ratings, see *"Limited Nature of Ratings; Reductions, Suspension or Withdrawal of Ratings"* under RISK FACTORS. The Resolution does not include a covenant by the Corporation to maintain a specific rating with respect to outstanding Bonds or Obligations.

## LEGALITY FOR INVESTMENT

The Series 2011D Bonds will be eligible for deposit by banks in the Commonwealth to secure public funds and will be approved investments for insurance companies to qualify them to do business in the Commonwealth, as required by law.

## UNDERWRITING

The Underwriters have jointly and severally agreed, subject to certain conditions, to purchase from the Corporation the Series 2011D Bonds described on the inside cover page of this Official Statement at an aggregate purchase price of $90,125,807.46 reflecting an underwriters' discount of $1,029,192.54, and to reoffer such Series 2011D Bonds at the public offering prices or yields derived from such prices set forth on the inside cover page hereof. Such Series 2011D Bonds may be offered and sold to certain dealers (including dealers depositing such Series 2011D Bonds into investment trusts) at prices lower or yields higher than such public offering prices or yields, and such prices or yields may be changed, from time to time, by the Underwriters. The Underwriters' obligations are subject to certain conditions precedent, and they will be obligated to purchase all such Series 2011D Bonds if any Series 2011D Bonds are purchased.

Santander Securities Corporation ("SSC") and Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill") have entered into an agreement pursuant to which they will provide services and advice to each other related to the structuring and execution of certain municipal finance transactions for the Commonwealth's governmental entities in the global capital markets and in the United States market and in the Puerto Rico market if issued in connection with such global or U.S. issuances. SSC and Merrill will be entitled to receive a portion of each other's revenues from the underwriting of the Series 2011D Bonds as consideration for their professional services.

## LEGAL MATTERS

All legal matters incident to the authorization, issuance, sale and delivery of the Series 2011D Bonds are subject to the approval of Nixon Peabody LLP, New York, New York, Bond Counsel to the Corporation. The issuance of the Series 2011D Bonds is conditioned upon the delivery on the date of issuance of the approving opinion of Bond Counsel to the Corporation. Pietrantoni Méndez & Alvarez LLC, San Juan, Puerto Rico will pass upon certain legal matters for the Underwriters and will act as Special Puerto Rico Tax Counsel. The proposed form of opinions of Nixon Peabody LLP, New York, New York, Bond Counsel, and Pietrantoni Mendez & Alvarez LLC, San Juan, Puerto Rico, Special Puerto Rico Tax Counsel, are set forth as *Appendix C* and *Appendix D*, respectively, to this Official Statement.

## CONTINUING DISCLOSURE

To the extent that Rule 15c2-12 (the "Rule") of the Securities and Exchange Commission ("SEC") promulgated under the Securities Exchange Act of 1934, as amended (the "1934 Act"), requires underwriters (as defined in the Rule) to determine, as a condition to purchasing the Series 2011D Bonds, that the Corporation will make such covenants, the Corporation will covenant as follows:

The Corporation shall provide:

(a)       within 305 days after the end of each Fiscal Year, to the Electronic Municipal Market Access system ("EMMA") (http://emma.msrb.org) established by the Municipal Securities Rulemaking Board (the "MSRB"), (i) the Corporation's audited financial statements, (ii) information regarding actual receipts of the Pledged Sales Tax received by the Corporation, and (iii) such narrative explanation as may be necessary to avoid misunderstanding and to assist the reader in understanding the presentation of such information; and

(b)       in a timely manner, not in excess of ten business days after the occurrence of the event, to the MSRB through EMMA, notice of any of the following events with respect to the Bonds: (1) principal and interest payment delinquencies; (2) non-payment related defaults, if material; (3) unscheduled draws on debt service reserves reflecting financial difficulties; (4) unscheduled draws on credit enhancements reflecting financial difficulties; (5) substitution of credit or liquidity providers, or their failure to perform; (6) adverse tax opinions, the issuance by the IRS of proposed or final determinations of taxability, Notices of Proposed Issue (IRS Form 5701-TEB) or other material notices or determinations with respect to the tax status of the Series 2011D Bonds, or other material events affecting the tax status of the Series 2011D Bonds; (7) modifications to rights of security holders (including Beneficial Owners, of the Series 2011 A Bonds, if material; (8) bond calls, if material; (9) defeasances; (10) release, substitution, or sale of property securing repayment of the Series 2011D Bonds, if material; (11) rating changes; (12) tender offers; (13) bankruptcy, insolvency, receivership, or similar proceedings of the Corporation; (14) the consummation of a merger, consolidation or acquisition involving the Corporation or the sale of substantially all of the assets of the Corporation, other than in the ordinary course of business, the entry into a definitive agreement to undertake such action or the termination of a definitive agreement relating to any such actions, other than pursuant to its terms, if material; (15) the appointment of a successor or additional trustee, or the change of name of a trustee, if material; and (16) failure by the Corporation to comply with clause (a) above.

With respect to the following events:

Event (4) and (5). The Corporation does not undertake to provide any notice with respect to credit enhancement added after the primary offering of the Series 2011D Bonds, unless the Corporation applies for or participates in obtaining the enhancement.

Event (8). The Corporation does not undertake to provide notice of a mandatory scheduled redemption not otherwise contingent upon the occurrence of an event if (i) the terms, dates and amounts of redemption are set forth in detail in this Official Statement under *"Redemption"* under THE BONDS above, (ii) the only open issue is which Series 2011D Bonds will be redeemed in the case of a partial redemption, (iii) notice of redemption is given to the Beneficial Owners as required under the terms of the Series 2011D Bonds, (iv) public notice of the redemption is given pursuant to the Release Number 34-23856 of the SEC under the 1934 Act, even if the originally scheduled amounts are reduced by prior optional redemptions or bond purchases.

Event (13). According to the Rule, the event is considered to occur when any of the following occur: the appointment of a receiver, fiscal agent or similar officer for an obligated person in a proceeding under the U.S. Bankruptcy Code or in any other proceeding under state or federal law in which a court or governmental authority has assumed jurisdiction over substantially all of the assets or business of the obligated person, or if such jurisdiction has been assumed by leaving the existing governing body and officials or officers in possession but subject to the supervision and orders of a court or governmental authority, or the entry of an order confirming a plan of reorganization, arrangement or liquidation by a court or governmental authority having supervision or jurisdiction over substantially all of the assets or business of the obligated person.

The Corporation may from time to time choose to provide notice of the occurrence of certain other events in addition to those listed above if, in the judgment of the Corporation, such other event is material with respect to the Series 2011D Bonds, but the Corporation does not undertake to provide any such notice of the occurrence of any material event except those events listed above.

No Beneficial Owner may institute any suit, action or proceeding at law or in equity ("Proceeding") for the enforcement of the continuing disclosure undertaking (the "Undertaking") or for any remedy for breach thereof, unless such Beneficial Owner shall have filed with the Corporation evidence of ownership and a written notice of and request to cure such breach, the Corporation shall have refused to comply within a reasonable time and such Beneficial Owner stipulates that (a) no challenge is made to the adequacy of any information provided in accordance with the Undertaking and (b) no remedy is sought other than substantial performance of the Undertaking. All Proceedings shall be instituted only as specified herein, in any Commonwealth court located in the Municipality of San Juan, Puerto Rico, and for the equal benefit of all beneficial owners of the outstanding bonds benefited by the same or a substantially similar covenant, and no remedy shall be sought or granted other than specific performance of the covenant at issue.

An amendment to the Undertaking may only take effect if:

(a)    the amendment is made in connection with a change in circumstances that arises from a change in legal requirements, change in law, or change in the identity, nature, or status of the Corporation, or type of business conducted; the Undertaking, as amended, would have complied with the requirements of the Rule at the time of award of a series of bonds, after taking into account any amendments or interpretations of the Rule, as well as any change in circumstances; and the amendment does not materially impair the interests of Beneficial Owners of bonds, as determined by parties unaffiliated with the Corporation (such as, but without limitation, the Corporation's financial advisor or bond counsel); or

(b)     all or any part of the Rule, as interpreted by the staff of the SEC at the date of the issue of a series of bonds ceases to be in effect for any reason, and the Corporation elects that the Undertaking shall be deemed terminated or amended (as the case may be) accordingly.

For purposes of the Undertaking, a beneficial owner of a bond includes any person who, directly or indirectly, through any contract, arrangement, understanding, relationship, or otherwise has or shares investment power which includes the power to dispose, or to direct the disposition of, such bond, subject to certain exceptions as set forth in the Undertaking. Any assertion of beneficial ownership must be filed, with full documentary support, as part of the written request described above.

The Corporation became obligated to make annual disclosure of certain financial information in accordance with the Rule in an offering that took place in 2007. The Corporation has been in compliance with its continuing disclosure obligations each year in accordance with the Rule.

## GOVERNMENT DEVELOPMENT BANK FOR PUERTO RICO

As provided by Act No. 272 of the Legislature of the Commonwealth, approved May 15, 1945, as amended, Government Development Bank has acted as financial advisor to the Corporation in connection with the Series 2011D Bonds offered hereby. As financial advisor, Government Development Bank participated in the selection of the Underwriters of the Series 2011D Bonds. Certain of the Underwriters have been selected by Government Development Bank to serve from time to time as underwriters of its obligations and the obligations of the Commonwealth, its instrumentalities and public corporations. Certain of the Underwriters or their affiliates participate in other financial transactions with Government Development Bank. Government Development Bank is an intended beneficiary of some of the Authorized Uses to be funded with proceeds of the Series 2011D Bonds.

## MISCELLANEOUS

The summaries and explanations of the Resolution, the various acts, the Series 2011D Bonds and the other financing documents contained herein do not purport to be complete statements of any or all of the provisions of such documents and are made subject to all the detailed provisions thereof, to which reference is hereby made for further information. Copies of the foregoing documents are available from the Corporation, upon written request directed to:  Puerto Rico Sales Tax Financing Corporation, c/o Government Development Bank for Puerto Rico, Roberto Sánchez Vilella Government Center, De Diego Avenue, Stop 22, Santurce, Puerto Rico 00940, Attention: Executive Director.

Appended to and constituting a part of this Official Statement is certain economic information relating to the Commonwealth and the sales of goods in the Commonwealth (*Appendix A*), the summary of certain definitions and provisions of the Resolution (*Appendix B*), the proposed form of approving opinion of Bond Counsel (*Appendix C*), the proposed form of opinion of Special Puerto Rico Tax Counsel (*Appendix D*), and the summary of the book-entry system for the Bonds (*Appendix E*).

The information included in this Official Statement or incorporated herein by reference, except for information pertaining to DTC and the information appearing under the heading UNDERWRITING, was supplied by certain officials of the Corporation or certain Commonwealth agencies or instrumentalities, in their respective official capacities, or was obtained from publications of the Commonwealth or certain of its agencies or instrumentalities, and is included or incorporated by reference in this Official Statement on the authority of such officials or the authority of such publications as public official documents. The information pertaining to DTC was obtained from materials published by DTC. The information contained under the heading UNDERWRITING was obtained from the corresponding underwriter.

This Official Statement will be filed with the MSRB through EMMA.

**PUERTO RICO SALES TAX FINANCING
CORPORATION**

By: _____/s/ Jose Otero Freiría_____
Executive Director

[THIS PAGE INTENTIONALLY LEFT BLANK]

<div align="right">

**APPENDIX A**

</div>

# COMMONWEALTH OF PUERTO RICO
## ECONOMIC INFORMATION

The information below provides certain general economic data about the Commonwealth, particularly data relating to those indicators of economic activity which correlate most closely with the level of consumption of goods and services in the Commonwealth and, thus, the level of Commonwealth Sales Tax revenues. This summary does not purport to discuss all of the variables that may impact the level of Commonwealth Sales Tax revenues. The data in this section is provided as a general indication of prior levels of consumption and the economic activity that is generally understood to drive consumption but is not intended to provide a basis for predicting the future performance of taxable retail sales or the future level of Commonwealth Sales Tax revenues.

**General**

According to the United States Census Bureau, the population of Puerto Rico was 3,725,789 in 2010, compared to 3,808,610 in 2000. The population of San Juan, the island's capital and largest city, was 381,931 in 2010 compared to 434,374 in 2000.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures.

Puerto Rico's economy is currently in a recession that began in the fourth quarter of fiscal year 2006, a fiscal year in which the real gross national product grew by only 0.5% and the government was shut-down during the first two weeks of May. For fiscal years 2008 and 2009, the real gross national product contracted by 2.9% and 4.0%, respectively. For fiscal year 2010, preliminary reports indicate that the real gross national product contracted by 3.8%. The Puerto Rico Planning Board (the "Planning Board") projects a decrease in real gross national product of 1.0% for fiscal year 2011 and an increase of 0.7% for fiscal year 2012.

The economic indicators which correlate most closely with the level of sales of goods and services in the Commonwealth are gross national product ("GNP") and personal consumption expenditures. Personal income is also indicative of the level of sales of goods and services in the Commonwealth. These factors, in turn, are affected by other variables such as the price of oil and employment rates, among others. These factors are the indicators utilized by the Commonwealth to make projections of Commonwealth Sales Tax revenues.

**Personal Income**

Nominal personal income, both aggregate and per capita, has shown a positive average growth rate from 1947 to 2010. In fiscal year 2010, aggregate personal income was $60.4 billion ($50.0 billion at 2005 prices) and personal income per capita was $15,203 ($12,592 in 2005 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total U.S. federal transfer payments to individuals amounted to $16.0 billion in fiscal year 2010 ($14.0 billion in fiscal year 2009). Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and U.S. Civil Service retirement pensions were $10.4 billion, or 65% of the transfer payments to individuals in fiscal year 2010 ($9.8 billion, or 70.1%, in fiscal year 2009). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The following table shows the personal income for the five fiscal years ended June 30, 2010.

**Commonwealth of Puerto Rico**
**Personal Income**
**(in millions of dollars)**

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010[1]** |
| Employees' compensation | | | | | |
| Business, household and nonprofit institutions | $20,566.2 | $20,702.9 | $21,107.1 | $20,572.1 | $20,480.6 |
| Government | 8,424.2 | 8,584.9 | 8,762.2 | 9,047.4 | 8,275.6 |
| Other | 1,036.7 | 946.4 | 999.4 | 1,123.8 | 1,137.4 |
| Total Employees' compensation | $30,027.1 | $30,234.2 | $30,868.8 | $30,743.3 | $29,893.7 |
| Less: Contributions for social insurance | | | | | |
| Employees | 2,241.9 | 2,221.2 | 2,167.5 | 2,213.4 | 2,192.7 |
| Employers | 3,167.1 | 3,074.1 | 3,066.0 | 3,202.7 | 3,081.7 |
| Total Contributions for social insurance | $5,409.0 | $5,295.3 | $5,233.4 | $5,416.1 | $5,274.4 |
| Proprietors' income | | | | | |
| Income of unincorporated enterprises | 2,832.3 | $2,219.8 | $2,334.2 | $2,429.8 | $2,465.1 |
| Dividends of domestic corporations | 304.3 | $322.1 | $351.9 | $355.6 | $272.0 |
| Miscellaneous income and dividends received from abroad | 13.4 | 9.9 | 17.1 | 7.8 | 8.4 |
| Rental income of persons | 4,387.4 | 5,529.0 | 5,829.7 | 6,702.3 | 6,906.2 |
| Personal interest income | 3,725.1 | 2,820.5 | 2,719.0 | 2,810.8 | 2,420.6 |
| Total Proprietors' income | $11,262.5 | $10,901.3 | $11,251.9 | $12,306.3 | $12,072.3 |
| Transfer Payments | | | | | |
| Commonwealth government and municipalities | 3,390.7 | 3,569.5 | 4,040.6 | 4,470.4 | 4792.3 |
| Federal government | 9,725.9 | 10,327.1 | 12,279.3 | 13,537.3 | 15,633.0 |
| U.S. state governments | 17.6 | 22.7 | 24.1 | 35.6 | 44.8 |
| Business | 1,184.9 | 1,741.0 | 2,301.1 | 2,392.2 | 2,745.7 |
| Other nonresidents | 642.6 | 610.0 | 591.7 | 493.6 | 493.6 |
| Total transfer payments | $14,961.8 | $16,270.3 | $19,236.8 | $20,929.1 | $23,709.4 |
| Total Personal Income | $50,842.3 | $52,110.4 | $56,124.1 | $58,562.6 | $60,400.9 |

(1) Preliminary figures.
Source: Planning Board

A-2

## Personal Consumption

During Fiscal Year 2010, at current prices, personal consumption amounted to $57.2 billion, representing an increase of $1.7 billion, or 3.1%, from Fiscal Year 2009. This increase was based on a 3.8% increase in nondurable goods (40.1% of personal consumption), 3.9% increase in durable goods (9% of personal consumption), and 2.5% increase in services (50.9% of personal consumption). At constant 2005 prices, personal consumption increased 0.6% from Fiscal Year 2009. Real consumption expenditures in durable goods, however, decreased by 0.5%. The decline in expenditures of durable goods is characteristic of economies in recession.

The following table shows personal consumption expenditures by product for the five fiscal years ended June 30, 2010.

### Commonwealth of Puerto Rico
### Personal Consumption Expenditures by Product
### (in millions of dollars)

| | Fiscal Years Ended June 30 | | | | |
|---|---|---|---|---|---|
| | **2006** | **2007** | **2008** | **2009** | **2010**[1] |
| Food | $ 6,982.2 | $ 7,315.0 | $ 7,913.5 | $ 8,467.5 | $ 8,556.9 |
| Alcoholic beverages and tobacco products | 1,765.8 | 1,783.1 | 1,704.7 | 1,784.2 | 1,903.9 |
| Clothing and accessories | 3,084.9 | 3,528.0 | 3,530.7 | 3,556.6 | 3,265.0 |
| Personal care | 984.6 | 1,031.0 | 1,157.1 | 1,212.0 | 1,439.4 |
| Housing | 7,499.7 | 8,065.8 | 8,568.6 | 9,011.3 | 9,221.2 |
| Household operations | 5,929.2 | 6,479.0 | 6,914.3 | 6,831.5 | 6,748.7 |
| Medical care and funeral expenses | 8,007.2 | 8,434.8 | 9,394.4 | 9,898.0 | 10,665.9 |
| Business services | 3,035.5 | 3,103.0 | 3,021.7 | 3,074.3 | 3,079.7 |
| Transportation | 6,325.3 | 6,079.8 | 6,236.3 | 5,488.1 | 6,088.5 |
| Recreation | 4,810.3 | 4,935.0 | 4,865.7 | 4,810.5 | 4,858.6 |
| Education | 1,819.5 | 1,776.6 | 1,826.3 | 1,928.6 | 1,955.6 |
| Religious and nonprofit organizations, not elsewhere classified | 505.9 | 439.2 | 435.4 | 488.3 | 439.9 |
| Foreign travel | 1,608.9 | 1,616.9 | 1,653.9 | 1,531.4 | 1,614.4 |
| Miscellaneous purchases | 704.1 | 819.5 | 858.4 | 860.9 | 972.3 |
| Total consumption expenditures in Puerto Rico by residents and nonresidents | 53,063.1 | 55,406.7 | 58,081.0 | 58,943.3 | 60,810.0 |
| Less: Expenditures in Puerto Rico by nonresidents | 3,403.1 | 3,457.4 | 3,580.1 | 3,520.1 | 3,647.9 |
| Total Personal Consumption Expenditures | $49,660.0 | $51,949.3 | $54,500.9 | $55,423.2 | $57,162.1 |

(1) Preliminary figures.
Source: Planning Board.

A-3

**Gross National Product**

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of increased emphasis on higher-wage, high-technology industries, such as pharmaceuticals, biotechnology, computers, microprocessors, professional and scientific instruments, and certain high technology machinery and equipment. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the gross national product for the five fiscal years ended June 30, 2010.

<div align="center">

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**

</div>

|  | 2006 | 2007 | 2008 | 2009 | 2010 [1] |
|---|---|---|---|---|---|
| Gross national product – $ millions[2] | $56,732 | $59,521 | $61,665 | $62,678 | $63,292 |
| Real gross national product – $ millions (2005 prices) | $54,027 | $53,400 | $51,832 | $49,775 | $47,898 |
| Annual percentage increase (decrease) in real gross national product (2005 prices) | 0.5% | (1.2)% | (2.9)% | (4.0)% | (3.8)% |
| U.S. annual percentage increase in real gross national product (2005 prices) | 2.9% | 1.7% | 2.5% | (3.5)% | 0.4% |

_____

[1] Preliminary.
[2] In current dollars.
_Sources:_ Puerto Rico Planning Board and IHS-Global Insight.

The following graph compares the growth rate of real gross national product for the Puerto Rico and U.S. economies since fiscal year 1990, and the forecast of the growth rate for fiscal years 2011 and 2012.



*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

\* Estimate for Puerto Rico from the Puerto Rico Planning Board (Mar-2011).
\*\* Estimate for U.S. from IHS-Global Insight (Oct-2011).

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. Like the BEA, the Planning Board revises its statistics on a regular basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2010 shown in this Report are preliminary until the revised figures for fiscal year 2010 and the preliminary figures of fiscal year 2011 are released and the forecast for fiscal year 2012 is revised.

Certain information regarding current economic activity, however, is available in the form of the Government Development Bank – Economic Activity Index (the "EAI"), a coincident indicator of ongoing economic activity. This index, shown in the following table and published by Government Development Bank for Puerto Rico ("GDB") since October 2009, is composed of several variables (total payroll employment based on the Establishment Survey, total electric power consumption, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. The average contraction rate of the index for fiscal year 2011 was 2.9%, after a reduction of 5.6% for fiscal year 2010. For the first quarter of fiscal year 2012, this index decreased by 1.2%. The month of September 2011, however, reflected the smallest year-over-year reduction in the EAI since October 2006.

A-5



*Economic Forecast for Fiscal Years 2011 and 2012*

On March 2011, the Planning Board released its revised gross national product forecast for fiscal year 2011 and its gross national product forecast for fiscal year 2012. The Planning Board revised its gross national product forecast for fiscal year 2011 from a projected growth of 0.4% to a contraction of 1.0%, both in constant dollars. The Planning Board's revised forecast for fiscal year 2011 took into account the estimated effects on the Puerto Rico economy of the Government's fiscal stabilization plan, the impact of the initial phase of the tax reform, the disbursement of funds from the American Recovery and Reinvestment Act of 2009 ("ARRA"), the continuation of the fiscal stabilization plan, and the activity expected to be generated from the Government's local stimulus package. The revised forecast also considered the effect on the Puerto Rico economy of general and global economic conditions, the U.S. economy, the volatility of oil prices, interest rates and the behavior of local exports, including expenditures by visitors. The Planning Board's forecast for fiscal year 2012 projects an increase in gross national product of 0.7% in constant dollars. The Planning Board's forecast for fiscal year 2012 took into account the estimated effect of the projected growth of the U.S. economy, tourism activity, personal consumption expenditures, federal transfers to individuals and the acceleration of investment in construction due to the Government's local stimulus package and the establishment of public-private partnerships. It also took into account the disbursement of the remaining ARRA funds, and the continuation of the implementation of the tax reform.

*Fiscal Year 2010*

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2010 indicate that real gross national product decreased 3.8% (an increase of 1.0% in current dollars) over fiscal year 2009. Nominal gross national product was $63.3 billion in fiscal year 2010 ($47.9 billion in 2005 prices), compared to $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices). Aggregate

A-6

personal income increased from $58.6 billion in fiscal year 2009 ($49.8 billion in 2005 prices) to $60.4 billion in fiscal year 2010 ($50.0 billion in 2005 prices), and personal income per capita increased from $14,786 in fiscal year 2009 ($12,558 in 2005 prices) to $15,203 in fiscal year 2010 ($12,592 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2010 averaged 1,102,700, a decrease of 65,500, or 5.6%, from the previous fiscal year. The unemployment rate for fiscal year 2010 was 16.0%, an increase from 13.4% for fiscal year 2009.

Among the variables contributing to the decrease in gross national product was the continuous contraction of the manufacturing and construction sectors. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008, when the average price of the West Texas Intermediate oil barrel (WTI) increased by 53.1% to reach an average of $97.0/bbl. Although the situation improved significantly during fiscal year 2009, with a decline of 28.1% in the price of the WTI, oil prices remained at relatively high levels, at an average of $69.7/bbl, and the impact of the increases of previous years were still felt in fiscal year 2009. Nevertheless, during fiscal year 2010, the average price of the WTI increased by 7.9% to $75.2/bbl, which put more pressure on internal demand. On the other hand, the continuation of the difficulties associated with the financial crisis kept short-term interest rates at historically low levels, but this did not translate into a significant improvement in the construction sector due to the high level of inventory of residential housing units.

*Fiscal Year 2009*

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2009 indicate that real gross national product decreased 4.0% (an increase of 1.6% in current dollars) over fiscal year 2008. Nominal gross national product was $62.7 billion in fiscal year 2009 ($49.8 billion in 2005 prices), compared to $61.7 billion in fiscal year 2008 ($51.8 billion in 2005 prices). Aggregate personal income increased from $56.1 billion in fiscal year 2008 ($49.6 billion in 2005 prices) to $58.6 billion in fiscal year 2009 ($49.7 billion in 2005 prices), and personal income per capita increased from $14,217 in fiscal year 2008 ($12,557 in 2005 prices) to $14,786 in fiscal year 2009 ($12,558 in 2005 prices).

According to the Household Survey, total employment for fiscal year 2009 averaged 1,168,200, a decrease of 4.1% compared to 1,217,500 for fiscal year 2008. At the same time, the unemployment rate for fiscal year 2009 was 13.4%, an increase from 11% for fiscal year 2008.

Among the variables contributing to the decrease in gross national product were the continuous contraction of the manufacturing and construction sectors, as well as the corresponding contraction of U.S. economic activity. Furthermore, the decline in Puerto Rico's gross national product was not offset by the federal tax rebates due to the high levels of oil prices during fiscal year 2008. The dramatic increase to record levels in the price of oil and its derivatives (such as gasoline) during that period served to reduce the income available for other purchases and, thereby, negatively affected domestic demand. Due to the Commonwealth's dependence on oil for power generation and gasoline (in spite of its recent improvements in power-production diversification), the high level of oil prices accounted for an increased outflow of local income in fiscal year 2008. The global financial crisis promoted lower interest rates that were reflected in the local market, but those rates did not improve the conditions in the construction sector.

**Overview of the Commonwealth's Fiscal Condition**

*Fiscal Imbalance and Fiscal Stabilization Plan.* Since 2000, the Commonwealth has experienced an imbalance between its General Fund total revenues and expenditures. The imbalance reached its highest level in fiscal year 2009, when the deficit was $3.306 billion, consisting of the difference between total revenues from non-financing sources of $7.583 billion and total expenditures of $10.890 billion. In January

2009, the Government of Puerto Rico ("Government") began to implement a multi-year plan designed to achieve fiscal balance, restore sustainable economic growth and safeguard the investment-grade ratings of the Commonwealth bonds. The fiscal stabilization plan, which was generally contained in Act No. 7 of March 9, 2009, as amended ("Act 7"), sought to achieve budgetary balance, while addressing expected fiscal deficits in the intervening years through the implementation of a number of initiatives, including: (i) a gradual operating expense-reduction plan through reduction of operating expenses, including payroll, which is the main component of government expenditures, and the reorganization of the Executive Branch; (ii) a combination of temporary and permanent revenue raising measures, coupled with additional tax enforcement measures; and (iii) certain financial measures.

The Government estimates that the fiscal stabilization plan's operating expense reduction measures have resulted in annual savings of approximately $837 million, and that the tax revenue enforcement measures, and the temporary and permanent revenue raising measures (not including the effect of the tax reform and the temporary excise tax described below) resulted in additional revenues of $420 million during fiscal year 2011.

The principal financial measure taken has been a bond issuance program through the Puerto Rico Sales Tax Financing Corporation ("COFINA" by its Spanish-language acronym), to which the Commonwealth allocated a portion of its sales and use tax. The proceeds from the COFINA bond issuance program (such proceeds are deposited in an account referred to herein as the "Stabilization Fund" managed by GDB) have been used to repay existing government debt (including debts with GDB), finance operating expenses for fiscal years 2008 through 2011 (and will be used in fiscal year 2012 to cover operating expenses included in the government's annual budget for such fiscal year), including costs related to the implementation of a workforce reduction plan, and fund an economic stimulus plan, as described below. During fiscal years 2009 and 2010, COFINA issued approximately $5.6 billion and $3.6 billion, respectively, of revenue bonds payable from sales and use tax collections transferred to COFINA. During fiscal year 2012, COFINA expects to issue approximately $2 billion of revenue bonds payable from sales and use tax collections transferred to COFINA, the proceeds of which will be mainly used to finance a portion of the government's operating expenses for fiscal year 2012, refund outstanding debt obligations payable from Commonwealth appropriations, and refund certain outstanding COFINA bonds.

Another financial measure taken has been the restructuring of a portion of the Commonwealth's debt service on the Commonwealth's general obligation bonds and on bonds of the Public Buildings Authority ("PBA") that are guaranteed by the Commonwealth and are payable from Commonwealth budget appropriations. During fiscal year 2010, the Commonwealth refinanced $512.9 million of interest accrued during such fiscal year on the Commonwealth's general obligation bonds and $164.5 million of interest accrued during such fiscal year on PBA bonds. During fiscal year 2011, the Commonwealth refinanced $490.9 million of interest accrued during such fiscal year and principal due on July 1, 2011 on the Commonwealth's general obligation bonds. During fiscal year 2011, PBA also used a line of credit from GDB to make payments of approximately $147.8 million of interest accrued during such fiscal year on its Commonwealth guaranteed bonds, which line of credit was refinanced with the proceeds of a series of Commonwealth guaranteed bonds issued by PBA.

During fiscal year 2012, the Government expects to refinance approximately $537.4 million of principal due in and interest to accrue during such fiscal year on the Commonwealth's general obligation bonds and approximately $153.8 million of interest to accrue during such fiscal year on Commonwealth guaranteed PBA bonds.

*Results for Fiscal Year 2009.* General Fund total revenues for fiscal year 2009 were $7.583 billion (this amount excludes approximately $126.7 million of revenues attributable to the electronic and traditional lotteries, which for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund), representing a decrease of $775.5 million, or 9.3%, from fiscal year 2008 revenues. Total expenditures for fiscal year 2009 were approximately $10.890 billion, consisting of

$9.927 billion of total expenditures and approximately $962 million of other uses. Total expenditures of $10.890 billion represented an increase of approximately $1.402 billion, or 14.8%, of original budgeted expenditures and exceeded total General Fund revenues (excluding other financing sources) by $3.306 billion, or 43.6%.

During fiscal year 2009, the Government also faced an aggregate cash shortfall of $1.153 billion that, when added to the deficit, resulted in approximately $4.459 billion in excess expenditures and cash shortfall. The difference between General Fund revenues and total expenditures for fiscal year 2009 was principally paid from proceeds of COFINA bond issues and the restructuring of the corpus account of the Puerto Rico Infrastructure Financing Authority ("PRIFA") pursuant to the fiscal stabilization plan.

*Results for Fiscal Year 2010.* General Fund total revenues for fiscal year 2010 were $7.593 billion (this amount excludes approximately $122.8 million of revenues attributable to the electronic and traditional lotteries, which for accounting purposes are included in the Commonwealth's audited financial statements as a separate fund from the General Fund), representing an increase of $9.8 million from fiscal year 2009 revenues. The principal changes in sources of revenues from fiscal year 2009 included a decrease in the sales and use tax received by the General Fund of $256.8 million due to the assignment to COFINA of an additional 1.75% of the 5.5% Commonwealth sales and use tax. This decrease in the amount of sales and use taxes allocated to the General Fund was fully offset, however, by increases in property taxes and excise taxes on cigarettes and alcoholic beverages of approximately $227.8 million and $60.5 million, respectively, as a result of the temporary and permanent revenue raising measures implemented as part of the Commonwealth's fiscal stabilization plan. Revenues from income taxes for fiscal year 2010 were approximately the same as in fiscal year 2009, reflecting the continuing impact of the ongoing economic recession.

Total expenditures for fiscal year 2010 were $10.369 billion (which included $173 million of expenditures related to a Government local stimulus program), consisting of (i) $9.640 billion of total expenditures and (ii) $728 million of other financing uses. Total expenditures of $10.369 billion exceeded General Fund total revenues (excluding other financing sources) by $2.775 billion, or 36.6%. Excluding the debt service amounts that were refinanced, total expenditures for fiscal year 2010 were approximately $9.691 billion and exceeded General Fund total revenues (excluding other financing sources) by $2.098 billion, or 27.6%. The difference between revenues and expenses for fiscal year 2010 was covered principally by proceeds from a COFINA bond issue.

*Preliminary Results for Fiscal Year 2011.* Preliminary General Fund total revenues for fiscal year 2011 (from July 1, 2010 to June 30, 2011) were $8.165 billion (this amount includes approximately $101.9 million of revenues attributable to the electronic and traditional lotteries), an increase of $449.3 million, or 5.8%, from $7.716 billion of total revenues for the same period in the prior fiscal year (this amount includes approximately $122.8 million of revenues attributable to the electronic and traditional lotteries), and an increase of $31 million from the revised estimate of total revenues, which took into account the effect of the tax reform discussed below under "Tax Reform."

The increase in General Fund total revenues is mainly due to an increase of $170.1 million in tax withholdings from non-residents and the collection of $677.8 million as a result of the new temporary excise tax and the expansion of the taxation of certain foreign persons adopted as Act No. 154 of October 25, 2010, as amended ("Act No. 154") as part of the tax reform (discussed below under "Tax reform"). This increase was partially offset by a decrease of $407 million and $18.5 million in collections from income tax on individuals and entertainment machine licenses, respectively. The decrease in individual income taxes is due to the tax relief provided to individual taxpayers as part of the tax reform and to current economic conditions. The Government had expected that the decrease in General Fund net revenues as a result of the tax relief provided to taxpayers as part of the tax reform would be offset by the temporary excise tax imposed on certain foreign persons by Act No. 154. For fiscal year 2011, the first five monthly excise tax payments (from February through June 2011) amounted to $677.6 million, which was consistent with the

Government's projection of collections from the temporary excise tax. The Government's expectations with respect to the impact of the tax reform on fiscal year 2011 revenues were met.

Preliminary General Fund total expenses for fiscal year 2011 amounted to $9.153 billion, which excludes $638.7 million of debt service amounts that were refinanced, and exceeded General Fund total revenues (excluding other financing sources) by $988 million, or 12.1%. The difference between preliminary revenues and expenses for fiscal year 2011 was covered principally by proceeds from a COFINA bond issue and proceeds of bonds issued to refinance debt service payments.

*Budget for Fiscal Year 2012*

On July 1, 2011, the Governor signed the Commonwealth's central government budget for fiscal year 2012. The adopted budget provides for General Fund total revenues of $9.260 billion. The budgeted General Fund revenue of $9.260 billion includes estimated revenues of $8.650 billion and $610.0 million in additional revenues from proceeds of COFINA bond issues.

The principal changes in General Fund revenues under the fiscal year 2012 budget compared to the fiscal year 2011 budget are accounted for mainly by the projected collections from the new temporary excise tax under Act No. 154 (up $969.0 million), sales and use taxes (up $125.0 million), non-resident withholding taxes (up $29 million), alcoholic beverage taxes (up $9.0 million), and projected decreases in excise taxes on motor vehicles and accessories (down $8.0 million), corporate income tax (down $51.0 million), federal excise taxes on offshore shipments (down $66.0 million), property taxes (down $162 million) and personal income taxes (down $239.0 million).

The fiscal year 2012 budget provides for total expenditures of $9.260 billion, consisting of General Fund expenditures of $8.650 billion and additional expenditures of $610 million that are expected to be covered from proceeds of COFINA bond issues. The fiscal year 2012 budgeted expenditures exclude certain debt service payments on the Commonwealth's general obligation bonds and Commonwealth guaranteed PBA bonds which are expected to be refinanced during fiscal year 2012. See "Fiscal Imbalance and Fiscal Stabilization Plan" above. The budgeted total expenditures for fiscal year 2012 are $110 million, or 1.2%, higher than budgeted total expenditures of $9.150 billion for fiscal year 2011, and $1.109 billion, or 10.7%, lower than total expenditures of $10.369 billion for fiscal year 2010.

The principal changes in General Fund expenditures by program in the fiscal year 2012 budget compared to the fiscal year 2011 budget are mainly due to increases in public safety and protection (up $80.1 million), education (up $131.4 million), economic development (up $106.4 million), transportation (up $10.2 million), special pension contributions (up $85.8 million), contribution to municipalities (up $28.5 million), and decreases in general obligation bonds debt service (down $21.5 million), welfare (down $22.0 million), health (down $209.2 million), and governmental management (down $51.2 million).

Budgeted expenditures and capital improvements for the central government of all budgetary funds total $15.9 billion, a decrease of $142.9 million from fiscal year 2011 budgeted appropriations.

*Preliminary Results for the First Three Months of Fiscal Year 2012 and Projected Fiscal Year 2012 Deficit.* Preliminary General Fund revenues for the first three months of fiscal year 2012 (from July 1, 2011 to September 30, 2011) were $1.696 billion, an increase of $129.3 million, or 8.25%, from $1.567 billion of revenues for the same period in the prior fiscal year and a decrease of $33.3 million, or 1.9%, from the revised estimate of revenues of $1.729 billion made in September 2011. The increase in General Fund revenues for the first three months of fiscal year 2012, compared to the same period in the prior fiscal year, is mainly due to the collections of $478 million from the new temporary excise tax under Act No. 154, which was not in effect during the first three months of fiscal year 2011. This increase was partially offset by a decrease in collections from individual and corporate income taxes of $115 million and $75 million, respectively.

Preliminary General Fund total expenses (on a cash basis) for the first three months of fiscal year 2012 amounted to $1.858 billion, which is $13.5 million, or 1%, lower than $1.872 billion of budgeted expenditures for the same period. The lower expenditures are mainly due to timing differences in disbursements for general government expenditures of $29.4 million, safety and protection of $6.3 million and welfare of $4.5 million. These lower expenditures were partially offset by increased expenditures in health of $26 million and transportation and communication of $2.4 million. The difference between preliminary revenues and expenditures for the first three months of fiscal year 2012 was covered principally by funds on deposit in the Stabilization Fund and the issuance of tax revenue anticipation notes by the Commonwealth.

The deficit for fiscal year 2012 is projected to be approximately $610 million, which excludes approximately $691.2 million of debt service payments on Commonwealth general obligation bonds and Commonwealth guaranteed PBA bonds that will be refinanced. In addition, the Office of Management and Budget ("OMB") has indicated that the sectors of health and safety carry risk of budget overruns for fiscal year 2012 as they are undergoing operational changes that were not considered during the preparation of the budget for that fiscal year.

*Unfunded Pension and Non-Pension Post-Employment Benefit Obligations and Funding Shortfalls of the Retirement Systems.* One of the challenges every administration has faced during the past 20 years is how to address the growing unfunded pension benefit obligations and funding shortfalls of the three Government retirement systems (the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System) that are funded principally with budget appropriations from the Commonwealth's General Fund. As of June 30, 2010, the date of the latest actuarial valuations of the retirement systems, the unfunded actuarial accrued liability (including basic and system administered benefits) for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was $17.8 billion, $7.1 billion and $283 million, respectively, and the funded ratios were 8.5%, 23.9% and 16.4%, respectively.

Based on current employer and member contributions to the retirement systems, the unfunded actuarial accrued liability will continue to increase significantly, with a corresponding decrease in the funded ratio, since the annual contributions are not sufficient to fund pension benefits, and thus, are also insufficient to amortize the unfunded actuarial accrued liability. Because annual benefit payments and administrative expenses of the retirement systems have been significantly larger than annual employer and member contributions, the retirement systems have been forced to use investment income, borrowings and sale of investment portfolio assets to cover funding shortfalls. The funding shortfall (basic system benefits, administrative expenses and debt service in excess of contributions) for fiscal year 2011 for the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System was approximately $693 million, $268 million and $6.5 million, respectively. For fiscal year 2012, the funding shortfall is expected to be $741 million, $287 million and $8.5 million, respectively. As a result, the assets of the retirement systems are expected to continue to decline.

Based on the assumptions used in the latest actuarial valuations, including the expected continued funding shortfalls: (i) the Employees Retirement System, the largest of the three retirement systems, would deplete its net assets (total assets less liabilities, including the principal amount of certain pension obligation bonds) by fiscal year 2014 and its gross assets by fiscal year 2019; (ii) the Teachers Retirement System would deplete its net and gross assets by fiscal year 2020; and (iii) the Judiciary Retirement System would deplete its net and gross assets by fiscal year 2018. The estimated years for depletion of the assets could vary depending on how actual results differ from the assumptions used in the actuarial valuations, as well as based on any future changes to the contribution and benefits structures of the retirement systems. As a result of the increases in employer contributions to the Employees Retirement System and the Teachers Retirement System adopted in July 2011, as described below, the Administrator of the Retirement Systems projects that the period before depletion of the assets of these two systems will be extended by three to four years.

A-11

Since the Commonwealth and other participating employers are ultimately responsible for any funding deficiency in the three retirement systems, the depletion of the assets available to cover retirement benefits will require the Commonwealth and other participating employers to cover annual funding deficiencies. It is estimated that the Commonwealth would be responsible for approximately 74% of the combined annual funding deficiency of the three retirement systems, with the balance being the responsibility of the municipalities and participating public corporations.

The Commonwealth also provides non-pension post-employment benefits that consist of a medical insurance plan contribution. These benefits, which amounted to $114.2 million for fiscal year 2010 and $123.4 million for fiscal year 2011, are funded on a pay-as-you-go basis from the General Fund and are valued using actuarial principles similar to the way that pension benefits are calculated. Based on the latest actuarial valuations, as of June 30, 2010, the aggregate unfunded actuarial accrued liability of these benefits for the three retirement systems was $2.3 billion.

Because of its multi-year fiscal imbalances previously mentioned, the Commonwealth has been unable and is currently unable to make the actuarially recommended contributions to the retirement systems. If the Commonwealth fails to take action in the short-term to address the retirement systems' funding deficiency, the continued use of investment assets to pay benefits as a result of funding shortfalls and the resulting depletion of assets could adversely affect the ability of the retirement systems to meet the rates of return assumed in the actuarial valuations, which could in turn result in an earlier depletion of the retirement systems' assets and a significant increase in the unfunded actuarial accrued liability. Ultimately, since the Commonwealth's General Fund is required to cover a significant amount of the funding deficiency, the Commonwealth would have difficulty funding the annual required contributions unless it implements significant reforms to the retirement systems, obtains additional revenues, or takes other budgetary measures.

In order to address the growing unfunded pension and non-pension benefit obligations and funding shortfalls of the three Government retirement systems, in February 2010, the Governor established a special commission to make recommendations for improving the financial solvency of the retirement systems. The special commission submitted a report to the Governor on October 21, 2010.

As a result of the special commission's report and the Government's analysis, the Governor submitted two bills to the Legislative Assembly to address in part the retirement systems' financial condition. One of such bills was enacted as Act No. 96 of June 16, 2011 ("Act No. 96"). On June 23, 2011, in accordance with Act No. 96, $162.5 million of funds on deposit in the Corpus Account of the Puerto Rico Infrastructure Development Fund (the "Corpus Account"), which is under the custody and control of the Puerto Rico Infrastructure Financing Authority ("PRIFA") were contributed to the Employees Retirement System and invested in capital appreciation bonds issued by COFINA maturing annually on August 1, 2043 through 2048 and accreting interest at a rate of 7%. The principal amount of the COFINA bonds will grow to an aggregate amount of approximately $1.65 billion at their maturity dates.

The second bill submitted by the Governor was enacted as Act No. 114 of July 5, 2011 and Act No. 116 of July 6, 2011 ("Act 116"). These Acts provide an increase in employer contributions to the Employee Retirement System and the Teachers Retirement System of 1% of covered payroll in each of the next five fiscal years and by 1.25% of covered payroll in each of the following five fiscal years. As a result of these increases, the Employee Retirement System and the Teachers Retirement System would receive approximately $36 million and $14 million, respectively, in additional employer contributions during fiscal year 2012, and the additional employer contributions are projected to increase gradually each fiscal year (by an average aggregate increase of $71 million per fiscal year) to approximately $494 million and $195 million, respectively, by fiscal year 2021. The additional employer contributions for fiscal year 2012 have been included in the approved budget for such fiscal year. With respect to the increases in the employer contributions corresponding to the municipalities, Act 116 provides that the increases for fiscal years 2012, 2013 and 2014 will be paid for by the Commonwealth from the General Fund budget, representing

A-12

approximately $6.3 million, $12.8 million and $19.7 million in fiscal years 2012, 2013 and 2014, respectively.

In addition to these measures, on August 8, 2011, the Board of Trustees of the Employees Retirement System adopted a new regulation regarding the rules relating to the concession of personal loans to its members, which, among other changes, lowers the maximum amount of those loans from $15,000 to $5,000. This change is expected to gradually improve the Employees Retirement System's liquidity.

*Economic Reconstruction Plan*

In fiscal year 2009, the Government began to implement a short-term economic reconstruction plan. The cornerstone of this plan was the implementation of federal and local economic stimulus programs. The Commonwealth was awarded approximately $6.8 billion in stimulus funds under the ARRA program, which was enacted by the U.S. government to stimulate the U.S. economy in the wake of the global economic downturn. Approximately $3.3 billion of the ARRA funds is allocated for consumer and taxpayer relief and the remainder will be used to expand unemployment and other social welfare benefits, and spending in education, healthcare and infrastructure, among others. As of October 14, 2011, the Commonwealth had disbursed $5.5 billion in ARRA funds, or 78.8%, of awarded funds.

The Government has complemented the federal stimulus package with additional short and medium-term supplemental stimulus measures that seek to address local economic challenges and provide investment in strategic areas. These measures included a local $500 million economic stimulus plan to supplement the federal plan.

*Economic Development Plan*

The Government developed the *Strategic Model for a New Economy*, which is a comprehensive long-term economic development plan aimed at improving Puerto Rico's overall competitiveness and business environment and increasing private-sector participation in the Puerto Rico economy. As part of this plan, the Government enacted Act No. 161 of December 1, 2009, which overhauled the permitting and licensing process in Puerto Rico in order to provide for a leaner and more efficient process that fosters economic development. The Government also enacted Acts No. 82 and 83 of July 19, 2010, which provided a new energy policy that seeks to lower energy costs and reduce energy-price volatility by reducing Puerto Rico's dependence on fuel oil and the promotion of diverse, renewable-energy technologies. Moreover, the Government adopted a comprehensive tax reform (described below) that takes into account the Commonwealth's current financial situation.

In addition, to further stimulate economic development and cope with the fiscal crisis, on June 8, 2009, the Legislative Assembly approved Act No. 29 establishing a clear public policy and legal framework for the establishment of public-private partnerships to finance and develop infrastructure projects and operate and manage certain public assets. During fiscal year 2010, the Government engaged various financial advisors to assist it in the evaluation and procurement of various projects in the energy, transportation, water and public school infrastructure sectors. During the fourth quarter of fiscal year 2010, the Government published desirability studies for four public-private partnership priority projects and commenced procurement for such projects. As of September 30, 2011, the Government had completed the concession of toll roads PR-22 and PR-5 and had short-listed proponents for the procurement process leading to the award of an administrative concession for the Luis Muñoz Marín International Airport and school infrastructure projects.

The Government has also identified strategic initiatives to promote economic growth in various sectors of the economy where the Commonwealth has competitive advantages and several strategic/regional projects aimed at fostering balanced economic development throughout the Island. These projects, some of which are ongoing, include tourism and urban redevelopment projects.

*Tax Reform*

In February 2010, the Governor established a committee to review the Commonwealth's income tax system and propose a comprehensive tax reform directed at promoting economic growth and job creation within the framework of preserving the administration's path towards achieving fiscal stability. The committee presented its findings to the Governor and, on October 25, 2010, the Governor announced that he was submitting to the Legislative Assembly various bills in order to implement the tax reform.

The tax reform was intended to be revenue positive. It consisted of two phases focused on providing tax relief to individuals and corporations, promoting economic development and job creation, simplifying the tax system and reducing tax evasion through enhanced tax compliance measures. The first phase, enacted as Act No. 171 of November 15, 2010, was expected to provide individual and corporate taxpayers with aggregate savings of $309 million for taxable year 2010. The second phase, enacted as Act No. 1 of January 31, 2011 ("Act No. 1"), was projected to provide individual and corporate taxpayers aggregate annual average savings of $1.2 billion for the next six taxable years, commencing in taxable year 2011. Consistent with the objective of maintaining the path towards fiscal stability, the tax relief provisions applicable to individuals and corporations for taxable years 2014 through 2016 become effective only if (i) OMB certifies that the administration's expense control target has been met, (ii) the Treasury Department certifies that the General Fund revenue target has been met and (iii) the Planning Board certifies a year-over-year target increase in gross domestic product.

As part of structuring the tax reform, the Government utilized a group of economic consultants to project its impact on tax revenues through the use of dynamic economic models adjusted to the Commonwealth's specific economic conditions. The Government also conducted its own internal analyses of such impact. Based on these analyses, the Government expects that the reduction in income tax revenues resulting from the implementation of the tax reform should be fully offset by the additional revenues produced by (i) enhanced tax compliance measures, (ii) the elimination of certain incentives and tax credits, (iii) a new temporary excise tax imposed on a controlled group member's acquisition from another group member of certain personal property manufactured or produced in Puerto Rico and certain services performed in Puerto Rico (at a declining rate from 4% for 2011 to 1% for 2016), and (iv) an expansion of taxation rules that characterize certain income of non-resident corporations, partnerships and individuals as effectively connected with the conduct of a trade or business in Puerto Rico and therefore subject to Puerto Rico income tax. The temporary excise tax and the expansion of the taxation of certain foreign persons were adopted by Act No. 154. In circumstances in which the temporary excise tax applies, the expansion of the taxation of nonresident individuals, foreign corporations and foreign partnerships does not apply. The other revenue enhancement measures, which are part of the second phase of the tax reform, are included in Act No. 1. On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. The Government estimates that this excise tax will affect foreign corporations or partnerships that are principally engaged in the manufacturing of pharmaceuticals and electronics. The Government expects to raise approximately $1.4 billion from the excise tax during the first year of implementation of Act No. 154 and $5.6 billion for the six-year period that the excise tax is in place.

The first monthly excise tax payment was due in February 2011. The collections for the first nine monthly excise tax payments (from February through October 2011) were $1.325 billion. These amounts are consistent with the Government's projection of collections from the excise tax.

Based on its analysis, the Government believes that the revenue projections from the taxes imposed by Act No. 154 are reasonable. However, since such taxes only became effective on January 1, 2011, there can be no assurance that the revenues therefrom, together with the other revenue enhancement measures

included in the tax reform, will be sufficient to fully offset the reduction in income tax revenues expected from other aspects of the tax reform.

In connection with the expansion of the taxation of foreign persons by Act No. 154, the Government obtained a legal opinion regarding the creditability of the excise tax for U.S. federal income tax purposes. The opinion concludes that this excise tax should be creditable against U.S. federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein. It is the position of the Government that the excise tax is a tax imposed in substitution of the generally imposed income tax and that, as such, under Section 903 of the United States Internal Revenue Code of 1986, as amended, U.S. taxpayers can claim a foreign tax credit for amounts paid.

On March 30, 2011, the United States Internal Revenue Service (the "IRS") issued Notice 2011-29 addressing the creditability of the new excise tax imposed by Act No. 154. Notice 2011-29 provides that the provisions of the new Puerto Rico excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act No. 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act No. 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act No. 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Government's revenues may be materially adversely affected.

## Employment and Unemployment

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2011 averaged 1,077,000, a decrease of 2.3% compared to previous fiscal year; and the unemployment rate averaged 15.9%. During the first four months of fiscal year 2012, total employment averaged 1,067,500, a decline of 1.2% with respect to the same period of the prior year; and the unemployment rate decreased to 16.1%.

The following table presents annual statistics of employment and unemployment for fiscal year 2007 through fiscal year 2011, and the average figures for the first two months of fiscal year 2012. These employment figures are based on the Household Survey, which includes self-employed individuals and agriculture employment, instead of the non-farm, payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 15% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agriculture employment in Puerto Rico represented 1.6% of total employment in fiscal year 2011.

**Commonwealth of Puerto Rico**
**Employment and Unemployment[1]**
**(persons age 16 and over)**
**(in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[2] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2007 | 1,410 | 1,263 | 147 | 10.4 |
| 2008 | 1,368 | 1,218 | 151 | 11.0 |
| 2009 | 1,349 | 1,168 | 181 | 13.4 |
| 2010 | 1,313 | 1,103 | 210 | 16.0 |
| 2011 | 1,287 | 1,077 | 204 | 15.9 |
| 2012[3] | 1,272 | 1,068 | 205 | 16.1 |

[1] Totals may not add due to rounding.
[2] Unemployed as percentage of labor force.
[3] Average figures for the first four months of fiscal year 2012 (July 2011 through October 2011).

*Source:* Department of Labor and Human Resources – Household Survey

A-16

## Economic Performance by Sector

From fiscal year 2007 to fiscal year 2010, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product[1]**
**(in millions at current prices)**

|  | Fiscal Years Ended June 30, | | | |
|---|---|---|---|---|
|  | **2007** | **2008** | **2009** | **2010**[1] |
| Manufacturing | $37,637 | $40,234 | $44,019 | $44,641 |
| Service[2] | 40,190 | 41,372 | 40,333 | 41,472 |
| Government[3] | 8,585 | 8,762 | 9,047 | 8,276 |
| Agriculture | 430 | 519 | 506 | 553 |
| Construction[4] | 2,027 | 2,032 | 1,818 | 1,658 |
| Statistical discrepancy | (464) | (312) | (512) | (340) |
| Total gross domestic product[5] | $88,405 | $92,606 | $95,211 | $96,261 |
| Less: net payment abroad | (28,884) | (30,941) | (32,534) | (32,969) |
| Total gross national product[5] | $59,521 | $61,665 | $62,678 | $63,292 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.

*Source:* Planning Board

The data for employment by sector or industries presented here, like in the United States, are based on the Payroll Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons.

The following table presents annual statistics of average employment based on NAICS for fiscal years 2007 to 2011.

### Commonwealth of Puerto Rico
### Non-Farm, Payroll Employment by Economic Sector[1]
### (persons age 16 and over)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2007** | **2008** | **2009** | **2010[2]** | **2011[2]** |
| Natural resources and construction | 64,700 | 59,675 | 49,067 | 35,917 | 28,683 |
| Manufacturing | | | | | |
|    Durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
|    Non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| Sub-total | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
|    Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
|    Transportation, warehouse, and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
|     Sub-total | 184,008 | 181,342 | 176,450 | 173,325 | 170,933 |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Government[3] | 298,125 | 297,742 | 300,708 | 277,333 | 263,717 |
|    Total non-farm | 1,032,275 | 1,020,208 | 992,583 | 939,700 | 918,375 |

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.
[2] Preliminary.
[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

*Manufacturing*

     Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product and the second largest in terms of real gross national product. The Planning Board figures show that in fiscal year 2010 manufacturing generated $44.6 billion, or 46.4%, of gross domestic product. Manufacturing, however, only generated $15.8 billion, or 24.9%, of real gross national product in fiscal year 2010. During fiscal year 2011, payroll employment for the manufacturing sector was 84,617, a decrease of 4.1% compared with fiscal year 2010. Most of Puerto Rico's manufacturing output is shipped to the U.S. mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2011, the average hourly manufacturing wage rate in Puerto Rico was approximately 66.6% of the average mainland U.S. rate.

Although the manufacturing sector is less prone to business cycles than the agricultural sector, that does not guarantee the avoidance of the effects of a general downturn of manufacturing on the rest of the economy. In the last three decades, industrial development has tended to be more capital intensive and more dependent on skilled labor. This gradual shift in emphasis is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Puerto Rico governments. Federal legislation enacted in 1996, however, which amended Section 936 of the U.S. Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has had, and Act 154 may have, a long-term impact on local manufacturing activity.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2007 to 2010.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Manufacturing Sector[1]
### (in thousands at current prices)

| | Fiscal Years Ended June 30, | | | |
| | 2007 | 2008 | 2009 | 2010[1] |
|---|---|---|---|---|
| Food | $1,083,300 | $822,008 | $ 1,018,486 | $ 1,040,339 |
| Beverage and Tobacco Products | 924,900 | 1,243,200 | 1,197,325 | 1,203,142 |
| Textile Mills | 2,200 | 1,295 | 975 | 791 |
| Textile Product Mills | 13,200 | 13,438 | 12,072 | 12,418 |
| Apparel | 200,700 | 252,062 | 270,251 | 296,192 |
| Leather and Allied Products | 17,000 | 19,982 | 22,052 | 21,997 |
| Wood Products | 23,600 | 22,011 | 18,809 | 20,228 |
| Paper | 70,600 | 66,066 | 66,233 | 69,664 |
| Printing and Related Support Activities | 124,400 | 118,525 | 111,416 | 109,457 |
| Petroleum and Coal Products | 370,900 | 94,986 | 355,598 | 353,757 |
| Chemical | 27,016,500 | 29,338,802 | 31,013,076 | 31,384,322 |
| Plastics and Rubber Products | 121,700 | 117,556 | 111,835 | 119,614 |
| Nonmetallic Mineral Products | 284,900 | 218,469 | 198,717 | 197,925 |
| Primary Metals | 101,900 | 150,693 | 138,708 | 139,063 |
| Fabricated Metal Products | 239,200 | 247,860 | 227,572 | 209,446 |
| Machinery | 217,500 | 234,410 | 196,456 | 213,689 |
| Computer and Electronic Products | 4,217,200 | 4,462,560 | 6,308,916 | 6,384,137 |
| Magnetic and Optical | - | - | - | - |
| Electrical Equipment, Appliances and Components | 510,900 | 657,298 | 639,313 | 593,777 |
| Transportation Equipment | 78,000 | 77,560 | 66,111 | 61,243 |
| Furniture and Related Products | 65,500 | 56,439 | 47,045 | 47,761 |
| Miscellaneous | 1,955,500 | 2,018,693 | 1,998,060 | 2,162,405 |
| Total gross domestic product of manufacturing sector[2] | $37,636,600 | $40,233,913 | $44,019,025 | $44,641,368 |

[1] Preliminary.
[2] Totals may not add due to rounding.

*Source:* Planning Board

A-20

The following table presents annual statistics of average manufacturing employment by industry based on NAICS for fiscal years 2007 to 2011.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Manufacturing Employment by Industry Group***
**(persons age 16 years and over)**

| Industry group | Fiscal Years Ended June 30, | | | | |
| --- | --- | --- | --- | --- | --- |
| | **2007** | **2008** | **2009** | **2010**[1] | **2011**[1] |
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 3,825 | 3,758 | 3,058 | 2,500 | 2,133 |
| Fabricated metal products | 5,675 | 5,375 | 4,908 | 4,042 | 3,583 |
| Computer and electronic | 10,092 | 8,600 | 7,042 | 5,708 | 5,867 |
| Electrical equipment | 6,617 | 6,658 | 5,867 | 5,058 | 5,033 |
| Miscellaneous manufacturing | 12,292 | 11,967 | 11,975 | 11,675 | 11,400 |
| Other durable goods manufacturing | 6,917 | 6,742 | 6,392 | 5,808 | 5,633 |
| Total – durable goods | 45,417 | 43,100 | 39,242 | 34,792 | 33,650 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 12,183 | 11,725 | 11,383 | 11,592 | 11,600 |
| Beverage and tobacco products manufacturing | 3,258 | 3,267 | 3,133 | 3,275 | 2,983 |
| Apparel manufacturing | 7,708 | 9,633 | 9,825 | 8,808 | 8,108 |
| Chemical manufacturing | 30,467 | 27,900 | 25,042 | 22,392 | 21,425 |
| Plastics and rubber products | 2,200 | 1,983 | 1,967 | 1,867 | 1,567 |
| Other non-durable goods manufacturing | 6,625 | 6,442 | 6,133 | 5,550 | 5,283 |
| Total – non-durable goods | 62,442 | 60,950 | 57,483 | 53,483 | 50,967 |
| | | | | | |
| Total manufacturing employment | 107,858 | 104,050 | 96,725 | 88,275 | 84,617 |

* Totals may not add due to rounding.
[1] Preliminary.

*Source*: Department of Labor and Human Resources, Current Employment Statistic Survey (Establishment Survey – NAICS Codes)

Total employment in the manufacturing sector decreased by 32,700 from fiscal year 2005 to fiscal year 2011. Manufacturing employment had been declining during the past decade, but the decline accelerated during fiscal years 2002 and 2003, falling 10.6% and 4.8%, respectively. Thereafter, manufacturing employment stabilized around 118,000 jobs, but the acceleration in job losses reappeared in fiscal year 2006 with the sector experiencing another drop of 4.0%. For fiscal years 2007, 2008, 2009, 2010 and 2011, manufacturing employment decreased by 4.2%, 3.5%, 7.0%, 8.7% and 4.1%, respectively. For the first four months of fiscal year 2012, the sector lost an average of 4,800 jobs, or 5.5%, compared to the same period of the previous year. Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and, currently, the effects of the global economic decline. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and

the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2010, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.1%, while payroll employment in this sector decreased at an average annual rate of 0.9% between fiscal years 2007 and 2011. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 15% of total employment according to the Household Survey. Most of the self-employment is concentrated in the service and construction sectors. The development of the service sector has been positively affected by demand generated by other sectors of the economy, such as manufacturing and construction.

The high degree of knowledge, skills, and expertise in professional and technical services available in Puerto Rico places the island in a favorable competitive position with respect to Latin America and other trading countries throughout the world.

The service sector ranks second to manufacturing in its contribution to gross domestic product, but first in its contribution to real gross national product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2010, the service sector generated $41.5 billion, or 43.1%, of gross domestic product, while it generated $36.3 billion, or 57.3%, of real gross national product. Trade, information services, education and health services, finance, insurance and real estate and rentals experienced growth in fiscal year 2010, as measured by gross domestic product and by gross national product at current prices. Transportation, professional and technical, and management services experienced a contraction in fiscal year 2010, as measured by gross domestic product and gross national product at current prices. Service-sector employment decreased from 561,592 in fiscal year 2007 to 541,358 in fiscal year 2011 (representing 58.9% of total, non-farm, payroll employment). The average service-sector employment for fiscal year 2011 represents a decrease of 0.6% compared to the prior fiscal year. For the first four months of fiscal year 2012, average service-sector employment was 533,900, a decrease of 0.1% with respect to the same period for the prior fiscal year.

Puerto Rico has a developed banking and financial system. As of June 30, 2011, there were eleven commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System and by the Office of the Commissioner of Financial Institutions of Puerto Rico (the "OCFI"). The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of June 30, 2011 were $73.7 billion, as compared to $75.5 billion as of December 31, 2010. On April 30, 2010, the OCFI closed three commercial banks and the FDIC was named receiver. On the same date, the FDIC entered into loss share purchase and assumption agreements with three of the other commercial banks with operations in Puerto Rico, providing for the acquisition of most of the assets and liabilities of the closed banks including the assumption of all of the deposits. To date, the amount of jobs lost as a result of these consolidations has not been significant. The administration expects that this consolidation will strengthen the Puerto Rico banking sector.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("FINRA") and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $5.5 billion as of

June 30, 2011, as compared to $6.0 billion on December 31, 2010. Another relevant component of the financial sector in Puerto Rico is the mutual-fund industry. Local mutual funds are organized as investment companies and recorded assets under management of $14.3 billion as of June 30, 2011, as compared to $14.2 billion as of December 31, 2010 according to the OCFI.

Other components of the financial sector in Puerto Rico include international banking entities ("IBEs") and credit unions (locally known as *cooperativas*). IBEs are licensed financial businesses that conduct offshore banking transactions. As of June 30, 2011, there were 31 international banking entities (including units of commercial banks) operating in Puerto Rico licensed to conduct offshore banking transactions, with total assets of $43.6 billion, an increase from $40.6 billion in total assets as of December 31, 2010. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $7.6 billion in assets as of June 30, 2011, a slight increase from $7.5 billion as of December 31, 2010.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2007 to 2010.

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Service Sector**
**(in millions at current prices)**

| | Fiscal Years ended June 30 | | | |
| --- | --- | --- | --- | --- |
| | **2007** | **2008** | **2009** | **2010**[1] |
| Wholesale trade | $ 2,751.6 | $ 2,950.9 | $ 2,934.8 | $ 2,984.0 |
| Retail trade | 4,471.4 | 4,569.4 | 4,614.5 | 4,723.7 |
| Transportation and warehousing | 968.3 | 978.5 | 908.6 | 891.0 |
| Utilities | 2,214.4 | 2,118.0 | 1,971.9 | 1,943.8 |
| Information | 2,466.5 | 2,363.1 | 2,306.4 | 2,359.2 |
| Finance and insurance | 6,694.3 | 7,120.4 | 5,174.7 | 5,543.2 |
| Real Estate and rental | 11,685.7 | 12,064.2 | 13,030.8 | 13,318.3 |
| Professional and business | 3,112.5 | 3,183.6 | 3,132.0 | 3,246.5 |
| Education and health | 3,592.5 | 3,786.2 | 4,125.7 | 4,278.5 |
| Leisure and hospitality | 1,861.5 | 1,874.7 | 1,783.3 | 1,828.1 |
| Other services | 371.6 | 119.3 | 112.3 | 115.9 |
| Total | $40,190.3 | $41,371.9 | $40,333.2 | $41,471.8 |

*Source*: Puerto Rico Planning Board

The following table sets forth employment for the service sector for fiscal years 2007 to 2011.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector\***
**(thousands of persons age 16 and over)**

| | Fiscal Years Ended June 30, | | | | |
| | 2007 | 2008 | 2009 | 2010[1] | 2011[1] |
|---|---|---|---|---|---|
| Wholesale trade | 33,267 | 33,717 | 33,267 | 32,533 | 31,508 |
| Retail trade | 133,750 | 130,883 | 127,492 | 126,242 | 125,217 |
| Transportation, warehouse and utilities | 16,992 | 16,742 | 15,692 | 14,550 | 14,208 |
| Information | 22,642 | 21,442 | 20,217 | 18,767 | 19,067 |
| Finance | 49,108 | 48,483 | 48,492 | 45,883 | 44,717 |
| Professional and business | 108,800 | 108,150 | 103,333 | 102,492 | 107,567 |
| Educational and health | 105,225 | 108,550 | 109,992 | 111,108 | 113,192 |
| Leisure and hospitality | 73,567 | 73,408 | 70,933 | 70,850 | 70,300 |
| Other services | 18,242 | 17,367 | 16,667 | 15,750 | 15,583 |
| Total | 561,592 | 558,742 | 546,083 | 538,175 | 541,358 |

\*   Totals may not add due to rounding.
[1]   Preliminary.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

*Hotels and Related Services—Tourism*

For fiscal year 2011, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 1,906,900, an increase of 5.7% over the number of persons registered during the same period of fiscal year 2010. The average occupancy rate in tourist hotels during fiscal year 2011 was 68.9%, a decrease of 0.3% from the prior fiscal year. Also, during fiscal year 2011, the average number of rooms available in tourist hotels increased by 5.8% to 11,509 rooms compared to the same period of fiscal year 2010.

During the first month of fiscal year 2012, the number of persons registered in tourist hotels, including residents of Puerto Rico and tourists, was 234,200, an increase of 18.4% over the number of persons registered during the same period of fiscal year 2011. The average occupancy rate in tourist hotels during the first month of fiscal year 2012 was 80.2%, a decrease of 0.7% from the prior fiscal year. Also, during the first month of fiscal year 2012, the average number of rooms available in tourist hotels increased by 4.1% to 12,056 rooms compared to the same period of fiscal year 2011.

In terms of employment figures, this sector has shown a behavior consistent with the local business cycle, accentuated by the contraction of U.S. economic activity. For fiscal year 2011, employment in hotels and other lodging facilities increased by 2.3% to 12,700 jobs. Nevertheless, for the first four months of fiscal year 2012, the average decrease in employment in hotels and other lodging facilities was 3.3% as compared to the same period for the prior fiscal year. According to the Payroll Survey, employment in the leisure and hospitality sector was 70,300 for fiscal year 2011, a decrease of 0.8% over employment for fiscal year 2010. For the first four months of fiscal year 2012, employment decreased by 3.2% to 68,800 compared to the same period of the prior fiscal year.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world.

A-24

The following table presents data relating to visitors to Puerto Rico and tourist expenditures for the five fiscal years ended June 30, 2010.

## Commonwealth of Puerto Rico
## Tourism Data[1]

### Number of Visitors

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,424,166 | 1,300,115 | 2,297,839 | 5,022,120 |
| 2007 | 1,353,376 | 1,375,433 | 2,333,597 | 5,062,406 |
| 2008 | 1,342,810 | 1,496,853 | 2,373,436 | 5,213,099 |
| 2009 | 1,277,749 | 1,232,010 | 2,272,778 | 4,782,537 |
| 2010[5] | 1,347,487 | 1,193,549 | 2,331,393 | 4,872,429 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2006 | 1,537.7 | 160.9 | 1,670.7 | 3,369.3 |
| 2007 | 1,501.6 | 172.2 | 1,740.1 | 3,413.9 |
| 2008 | 1,526.3 | 194.3 | 1,814.3 | 3,535.0 |
| 2009 | 1,464.4 | 173.7 | 1,834.8 | 3,472.8 |
| 2010[5] | 1,546.1 | 168.6 | 1,883.5 | 3,598.2 |

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.

*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through the Puerto Rico Convention Center District Authority ("PRCDA"), has developed the Dr. Pedro Rosselló González Convention Center, the largest convention center in the Caribbean, and the centerpiece of a 100-acre, private development, that includes hotels, restaurants, office space, and housing. The convention center district is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The convention center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1,000,000 attendees. A 500 room hotel located next to the convention center commenced operations at the end of November 2009.

The PRCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum, located in San Juan, Puerto Rico. The coliseum was inaugurated in 2004 and has hosted more than 2.5 million people attending over 400 world-caliber events. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar magazine in 2005.

*Government*

The government sector of Puerto Rico plays an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the previous century, providing the basic infrastructure and services necessary for the modernization of the Island.

In fiscal year 2010, the government (state and local) accounted for $8.3 billion, or 8.6%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing 248,800 workers

(state, including public corporations, and local), or 27.1% of total, non-farm, payroll employment in fiscal year 2011. From fiscal year 2007 to fiscal year 2011, state and municipal government employment averaged approximately 272,300. During fiscal year 2010, state and municipal government employment decreased by 24,800 jobs, or 8.7%. According to the payroll survey, the distribution of the job reductions during fiscal year 2010 was 20,600 jobs in the state government and approximately 4,200 jobs in municipal government. During fiscal year 2011, state and municipal government employment decreased by 11,900 jobs, or 4.6%, compared to fiscal year 2010. According to the payroll survey, the decrease was attributable to a reduction of 12,000 jobs in the state government and an increase of approximately 100 jobs in municipal government. Nevertheless, during the first four months of fiscal year 2012, government employment increased by 2.2% from the previous fiscal year, or by an average of 5,800 jobs. This increase in government employment for the first four months of fiscal year 2012 consists of an average increase of 7,500 jobs, or 4.1%, in state government offset by an average reduction of 1,400 jobs, or 9.0%, and 300 jobs, or 0.5%, in federal and local government, respectively.

As discussed previously, Act 7 established, among other things, a temporary freeze of salary increases and other economic benefits included in laws, collective bargaining agreements, and any other agreements. In addition, Act 7 provided that, for a period of two years after its enactment (until March 9, 2011), collective bargaining agreements that had already expired or that would expire while the law is in effect and that relate to public employees could not be renegotiated or renewed. Act 73 extended the term of the non-economic clauses of such collective bargaining agreements for an additional period of two years (until March 9, 2013) and provided that the economic clauses may be negotiated considering primarily the fiscal condition of the applicable agency and the Government and the safeguarding of services to the people.

*Transportation*

Thirty-four shipping lines offer regular ocean freight service to eighty United States and foreign ports. San Juan is the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including Arecibo, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques, and Yabucoa.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayaguez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, and Humacao.

Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by 24 domestic and international airlines. The airport receives over 10 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Boston, Chicago, Dallas, Miami, New York, Orlando, Philadelphia, and numerous other destinations within the U.S. mainland. San Juan has also become a hub for intra-Caribbean service for a major airline. While the main hubs in the U.S. mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, with connections to Central and South America, while European cities are also served through Madrid, Spain. On December 22, 2009, the Federal Aviation Administration ("FAA") approved the Ports Authority's preliminary application to participate in the FAA's airport public-private partnership pilot program. During fiscal year 2010, the PPP Authority engaged a team of advisors and in June 2010 published the related desirability and convenience study, which is required for the establishment of a public-private partnership. On July 5, 2011 the PPP Authority published its "Request for Qualifications to Acquire a Concession to Finance, Operate, Maintain and Improve the Luis Muñoz Marin International Airport". On August 8, 2011, the PPP Authority and the Puerto Rico Ports Authority received statements of qualifications from twelve (12) world-class consortia and, on September 23, 2011, they published a short-list of six consortia. The PPP Authority issued its Request for Proposals for the Airport in October 2011 and expects to select a winning bidder in the first quarter of calendar 2012.

Regarding other airports, Rafael Hernandez Airport in Aguadilla has regularly scheduled service to and from Fort Lauderdale, New York, Newark and Orlando; and Ponce's Mercedita Airport has regularly

scheduled service to and from New York and Orlando. Both of these airports also have scheduled service to other Caribbean islands. Smaller regional airports serve intra-island traffic. Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

The island's major cities are connected by a modern highway system, which, as of December 31, 2009, totaled approximately 4,636 miles and 12,045 miles of local streets and adjacent roads. The highway system comprises 389 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 230 miles of primary urban system highways, 959 miles of secondary system highways serving the needs of intra-regional traffic, and 3,058 miles of tertiary highways and roads serving local, intra-regional traffic. On September 22, 2011, the PPP Authority and the Highways and Transportation Authority completed the procurement for a concession of toll roads PR-22 and PR-5.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Port of the Americas Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which resulted in container yard with capacity of up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase, which entails a public investment of $84.4 million, is ongoing through September 2011. The completion of phase three will result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units as well as the installation of basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port.

*Construction*

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it has made significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. Since its peak in fiscal year 2000, real construction investment has declined at an average annual growth rate of 8.7%. Such rates of interest started to decrease significantly in fiscal year 2005, as a consequence of the current contraction of the local economic activity. During the last four fiscal years (from fiscal year 2007 to 2010) real construction investment decreased at an average annual rate of 17.0%. During the same time period, the total value of construction permits, in current dollars, decreased at an average annual rate of 16.8%. The Planning Board expects a decrease in construction investment of 7.8% in real terms for fiscal year 2011.

Public investment has been an important component of construction investment. During fiscal year 2010, approximately 49.3% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools (and school reconstruction programs), water projects, and other public infrastructure projects.

During fiscal year 2010, the number of construction permits decreased 15.2%, while the total value of construction permits dropped by 29.2% compared to fiscal year 2009. During the first six months of fiscal year 2011, the total value of construction permits decreased by 22.6%. These figures are consistent with cement sales, which declined by 26.3% in fiscal year 2010 and by 5.0% in 2011, respectively, reaching levels not seen in almost three decades. During the first three months of fiscal year 2012, cement sales decreased by 3.7% from the previous fiscal year.

Average payroll employment in the construction sector during fiscal year 2011 was 28,700, a reduction of 20.1% from fiscal year 2010. During the first four months of fiscal year 2012, payroll

A-27

employment in the construction sector averaged 29,100, a further reduction of 5.4% for the same period in fiscal year 2011.

On September 2, 2010, the Governor signed Act 132. Act 132 was designed primarily to stimulate the Puerto Rico real estate market, which in recent years has been suffering from lower sales, rising inventories, falling median prices and increased foreclosure rates. Pursuant to the provisions of Act 132, the Government has provided tax and transaction fee incentives to both purchasers and sellers of new and existing residential properties, as well as commercial properties with sale prices that do not exceed $3 million. The incentives provided by Act 132 were effective from September 1, 2010 through June 30, 2011, and were subsequently extended until October 31, 2011 by Act No. 115 of July 5, 2011. Certain permanent incentives are also available for rental housing. On November 1, 2011, the Government approved Act 216, which provides incentives similar to the ones available under Act 132 and establishes an orderly transition to gradually reduce those incentives without disrupting the functioning of the housing market in Puerto Rico. The incentives provided by Act 216 are limited to residential real property and are effective from November 1, 2011 to December 31, 2012, with certain reductions after December 31, 2011 and June 30, 2012. New incentives are also available for property that constitutes the seller's principal residence, as defined in Act 216.

*Agriculture*

The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, increasing efficiency and the quality of produce, and stimulating the consumption of locally produced agricultural products. It should be noted, however, that agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2010, gross income from agriculture was $822 million, an increase of 3.8% compared with fiscal year 2009.

The administration supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects.

**Higher Education**

During the six decades from 1950 to 2010, Puerto Rico made significant advances in the field of education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s, certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. During the 1990s and into the current decade, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000.

A-28

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

## Commonwealth of Puerto Rico
## Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 14,791,224 | 54.5% |
| 2001 | 430,880[3] | 184,126 | 42.7% | 27,992,652[3] | 15,312,289 | 54.7% |
| 2002 | 428,065[3] | 190,776 | 44.6% | 28,480,708[3] | 15,927,987 | 55.9% |
| 2003 | 423,338[3] | 199,842 | 47.2% | 28,916,746[3] | 16,611,711 | 57.4% |
| 2004 | 417,141[3] | 206,791 | 49.6% | 29,302,179[3] | 16,911,481 | 57.7% |
| 2005 | 408,044[3] | 208,032 | 51.0% | 29,441,546[3] | 17,272,044 | 58.7% |
| 2006 | 398,586[3] | 209,547 | 52.6% | 29,602,839[3] | 17,487,475 | 59.1% |
| 2007 | 389,640[3] | 225,402 | 57.8% | 29,808,025[3] | 17,758,870 | 59.6% |
| 2008 | 384,751[3] | 227,546 | 59.1% | 30,194,274[3] | 18,248,128 | 60.4% |
| 2009 | 379,500[3] | 235,618 | 62.1% | 30,530,346[3] | 19,102,814 | 62.6% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,427,711 | 66.6% |

[1] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2010-2011 was approximately 61,630 students. The Commonwealth appropriates annually for the University of Puerto Rico an amount equal to 9.60% of the average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year.

In addition to the University of Puerto Rico, there are 40 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2009-2010 of approximately 183,673 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by U.S. Department of Education-recognized accrediting entities.

## Tax Incentives

One factor that has promoted and continues to promote the development of the manufacturing and service sector in Puerto Rico is the various local and federal tax incentives available, particularly those under Puerto Rico's Industrial Incentives Program and, until 2006, Sections 30A and 936 of the U.S. Code. Tax and other incentives have also been established to promote the development of the tourism industry. These incentives are summarized below.

*Industrial Incentives Program*

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008.

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing, certain designated services performed for markets outside Puerto Rico (including the United States), the production of energy from local renewable sources for consumption in Puerto Rico and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "1998 Tax Incentives Act"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

*Green Energy Incentives Program*

On July 19, 2010 the Legislative Assembly enacted Act No. 83 of July 19, 2010, also known as the "Green Energy Incentives Act", to encourage the production of renewable energy on a commercial scale. The activities eligible for tax exemption under the Green Energy Incentives Act include businesses engaged in the production and sale of green energy on a commercial scale for consumption in Puerto Rico, a producer of green energy, the installation of machinery and equipment for the production of green energy, and property used for the production of green energy.

Companies qualifying under the Green Energy Incentives Act can benefit from a simplified income tax system: an income tax rate of 4% and a withholding tax rate of 12% on royalty payments, license fees and rental payments to non-Puerto Rico resident companies. In addition, Green Energy Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sale and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

Under the Green Energy Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%. Moreover, the Green Energy Incentives Act creates a rebate program of up to 6% of the acquisition, installation, and related costs of the physical plant and the machinery and equipment of small and medium green energy projects located in Puerto Rico. In the case of large scale green energy projects developed in Puerto Rico, the Green Energy Incentives Act creates a renewal green energy certificates program.

*Tourism Incentives Program*

For many years, Puerto Rico has enacted incentives laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "Tourism Development Act") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, in 1993 the Commonwealth established the Tourism Development Fund as a subsidiary of GDB with the authority to (i) make investments in or provide financing to entities that contribute to the development of the tourism industry and (ii) provide financial guarantees and direct loans for financing tourism development projects. To date, the Fund has provided direct loans and financial guarantees in the aggregate of approximately $1.368 billion for loans made or bonds issued to finance the development of twenty-one tourism projects representing 4,744 new hotel rooms and a total investment of approximately $2.135 billion.

*Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("CFCs"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties. The Puerto Rico Office of Industrial Tax Exemption has received notification from numerous corporations that have converted part or all of their operations to CFCs. These include most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("Section 936 Corporations"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their U.S. affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they

might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Act in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the U.S. Department of the Treasury announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas.  Several of these initiatives could affect CFCs operating in Puerto Rico.  As of this date, no legislation has been approved by either House of Congress of the United States.  It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico.  The administration will develop policy responses to the U.S. government to seek to safeguard Puerto Rico's economic reconstruction and development plans.

On September 22, 2011, HR No. 3020 was presented in the U.S. Congress House of Representatives, which allows corporations organized under the laws of Puerto Rico which derive fifty percent (50%) or more of their gross income from Puerto Rico sources to elect to be treated as domestic U.S. corporations for almost all provisions of the U.S. Code, including Section 243 of the U.S. Code pertaining to the dividends received deduction. By way of exception, the electing Puerto Rico corporations would not consider as part of their gross income for federal income tax purposes income derived from sources within Puerto Rico.

<div align="right">**APPENDIX B**</div>

## SUMMARY OF CERTAIN DEFINITIONS AND PROVISIONS OF THE RESOLUTION

### Summary of Certain Definitions

The following terms shall have the following meanings in the Resolution and for all purposes of this Official Statement.

**Account** or **Accounts** shall mean any account or accounts, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Accrued Holding Amounts** means, as of any date and for any Bonds, the cumulative amount set forth in schedules contained in the related Series Resolution.

**Accrued 12-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period, plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Senior)** shall mean for Outstanding Senior Bonds and Parity Obligations, and as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Parity Obligations due, plus (ii) the aggregate of the interest on such Senior Bonds and interest component of Parity Obligations, and, for Senior Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Senior Bonds or Parity Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Senior) for such Senior Bonds or Parity Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts applicable to such Senior Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Senior) for Senior Bonds and related Parity Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Accrued 12/15-Month Obligation (Subordinate)** shall mean for Outstanding Subordinate Bonds and Subordinate Obligations of a particular Class, as the context requires, as of any particular date, (i) the aggregate of the Principal Installments of such Bonds and principal component of Subordinate Obligations, plus (ii) the aggregate of the interest on such Subordinate Bonds and interest component of such Subordinate Obligations, and, for Subordinate Bonds that are Adjustable Rate Bonds, based on the Assumed Interest Rate, in each case that is due during the next ensuing twelve-month period (provided, that for any Subordinate Bonds or Subordinate Obligations that have Principal Installments, interest or other scheduled principal or interest components due on a basis more frequently than quarterly, the calculation of Accrued 12/15-Month Obligation (Subordinate) for such Subordinate Bonds or Subordinate Obligations shall be with respect to the amounts due during the next ensuing fifteen-month period), plus (iii) the Accrued Holding Amounts related to such Subordinate Bonds. The Corporation shall promptly provide, upon written request from the Trustee, written evidence of calculations of Accrued 12/15-Month Obligation (Subordinate) for Subordinate Bonds and Subordinate Obligations in connection with actions proposed to be taken in accordance with Section 505.1 or Section 710.1.

**Act** shall mean Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended and supplemented.

**Adjustable Rate** means a variable, adjustable or similar interest rate or rates to be borne by a Series of Bonds or any one or more maturities within a Series of Bonds, for which the method of computing such variable interest rate is specified in the Supplemental Resolution authorizing such Bonds; provided, that the related Supplemental Resolution shall specify (i) whether a Qualified Hedge is to be applicable to such Adjustable Rate Bonds and, if not, or to the extent not so applicable, a Contractual Maximum Interest Rate, and (ii) the method or methods for determining the Adjustable Rate and the frequency of change thereof; provided further, that the method or methods for determining the Adjustable Rate may include the selection of such rate by an indexing agent or remarketing agent as provided in an agreement between the Corporation and such agent, the utilization of an index or indices as described in the related Supplemental Resolution, the utilization of an auction as described in the related Supplemental Resolution, or such other standard or standards set forth by the Corporation in the related Supplemental Resolution or any combination of the foregoing; and provided further, that the Adjustable Rate may never exceed any Contractual Maximum Interest Rate related thereto or, if none, the Legal Maximum Interest Rate (the "rate cap"), but the excess of interest on any Adjustable Rate Bond calculated at the rate (the "stated rate") set forth for such Adjustable Rate Bond (without the limitation of the rate cap) over interest on the Adjustable Rate Bond calculated at the rate cap shall constitute a debt of the Corporation owed to the owner of the related Adjustable Rate Bond but solely during periods when the rate cap shall exceed the stated rate.

**Adjustable Rate Bond** means any Bond which bears an Adjustable Rate, provided that a Bond the interest rate on which shall have been fixed for the remainder of the term thereof shall no longer be an Adjustable Rate Bond.

**Amortized Value**, when used with respect to Investment Obligations purchased at a premium above or a discount below par, shall mean the value at any given date, as calculated by the Corporation, obtained by dividing the total premium or discount at which such Investment Obligations were purchased by the number of interest payment dates remaining to maturity on such Investment Obligations after such purchase and by multiplying the amount so calculated by the number of interest payment dates having passed since the date of such purchase; and (i) in the case of Investment Obligations purchased at a premium, by deducting the product thus obtained from the purchase price, and (ii) in the case of Investment Obligations purchased at a discount, by adding the product thus obtained to the purchase price.

**Ancillary Bond Facility** shall mean each Credit Facility, each Liquidity Facility, each Qualified Hedge, and each Standby Purchase Agreement.

**Ancillary Facility Providers** shall mean, collectively, each Credit Facility Provider, each Liquidity Facility Provider, each Qualified Hedge Provider, and each Standby Purchase Facility Provider.

**Article 5(e) Amount** shall mean, as described in the first sentence of Article 5(e) of the Act, any amount which represents an insufficiency of Pledged Sales Tax receipts to fully pay, when due, principal of and interest on Bonds or to make any other payment related to other obligations incurred hereunder, including payments pursuant to interest rate swap agreements, and also including any application of funds in any Debt Service Reserve Account made for the purpose of meeting any such insufficiency.

**Assumed Interest Rate** shall mean, for Adjustable Rate Bonds, (i) a fixed rate payable by the Corporation under a related Qualified Hedge plus the fixed component of interest on the related Bonds, if any, not included in the payments to be made under the Qualified Hedge by the Qualified Hedge Provider, (ii) for any Qualified Hedge that shall provide for payments from the Corporation that result in a capped rate on the Adjustable Rate Bonds, such capped rate, or (iii) for any Adjustable Rate Bonds that shall not be the subject of a Qualified Hedge, the lesser of the Contractual Maximum Interest Rate established therefor and the Legal Maximum Interest Rate.

**Authorized Officer** shall mean (i) in the case of the Corporation, the Executive Director and any Assistant Executive Director, and when used with reference to any act or document, any other person authorized by resolution of the Corporation to perform such act or sign such document (the Trustee may request that the Corporation deliver an officers' certificate setting forth the names of individuals and/or titles of officers authorized at such time to take specified actions pursuant to the Resolution), and (ii) in the case of the Trustee, any officer assigned to the Northern Municipals Department (or any successor division or unit) of the Trustee located at the Corporate Trust Office, or such other address as the Trustee may designate from time to time by notice to the Corporation, who shall have direct responsibility for the administration of the Resolution, and for the purposes of the thirteenth sentence of Section 802 of the Resolution shall also include any other officer of the Trustee to whom any matter is referred because of such officer's knowledge of and familiarity with the particular subject.

**Beneficiaries** shall mean (i) the Owners of Bonds Outstanding, (ii) Credit Facility Providers and Liquidity Facility Providers as to which there are Parity Obligations or Subordinate Obligations outstanding, and (iii) Qualified Hedge Providers as to which there are Qualified Hedges outstanding.

**Bond** or **Bonds** shall mean the initial Series of Bonds, all Series of Bonds issued simultaneously with the initial Series, and any additional Bonds, notes, debentures or other evidences of indebtedness consisting of one or more Classes, authorized to be issued on a parity with, or subordinate to, the initial Series of Bonds pursuant to Section 202.

**Bondowner** shall mean any person who shall be the registered owner of any Outstanding Bond or Bonds.

**Bond Payment Date** shall mean each date on which Principal Installments of and/or interest on Bonds are due and payable by the Corporation.

B-3

**Bond Year** shall mean a twelve-month period commencing on the first day of August in any calendar year and ending on the last day of July in the immediately succeeding calendar year.

**Build America Bond Tax Credit Receipts** shall mean payments made to the Corporation or Trustee by the United States Treasury representing a subsidy payable directly to issuers (or trustees) of "Build America Bonds" pursuant to the terms of Section 1531 of Title I of Division B of the American Recovery and Reinvestment Act of 2009, Pub. L. No. 111-5, 123 Stat. 115 (2009).

**Business Day** shall mean any day other than (i) a Saturday or Sunday, (ii) a day on which banking institutions in San Juan, Puerto Rico, New York, New York, or any city in which the principal office of the Trustee, any Credit Facility Provider (if applicable) or any Liquidity Facility Provider (if applicable) is located are authorized or required by law or executive order to remain closed, or (iii) during any period that a Qualified Hedge is applicable to the Bonds, a day on which commercial banks and foreign exchange markets are not open for business (including dealings in foreign exchange and foreign currency deposits) in the City of New York and do not settle payments.

**Capital Appreciation Bonds** shall mean the Bonds of any Series so designated in a Series Resolution and including all Convertible Capital Appreciation Bonds; provided, however, that the term "Capital Appreciation Bonds" shall only be used with respect to Bonds the interest on which is payable only at maturity (with respect to Convertible Capital Appreciation Bonds, on the related Current Interest Commencement Date rather than at maturity) or earlier redemption or acceleration of maturity in amounts determined by reference to the Compounded Amount of each Bond.

**Capitalized Interest Account** shall mean the Capitalized Interest Account established pursuant to the Resolution.

**Class** shall mean the delineation of Bonds by whether they are Senior Bonds or Subordinate Bonds (or more than one Class of Subordinate Bonds).

**Class Priority** shall mean, at any time that there shall be Subordinate Bonds Outstanding, and with respect to funding of Debt Service Accounts and Debt Service Reserve Accounts pursuant to Section 505, and payment of Bonds upon an Event of Default under Article XI, funding or payment, as applicable, in the order of Senior Bonds and Parity Obligations first until full funding or payment thereof, followed by First Subordinate Bonds and First Subordinate Obligations, followed by Second Subordinate Bonds and Second Subordinate Obligations, followed by additional Subordinate Bonds and additional Subordinate Obligations of the highest payment priority next until full funding or payment thereof, followed by Subordinate Bonds and Subordinate Obligations of lower payment priorities according to their respective payment priorities set forth in the applicable Series Resolution.

**Code** shall mean the Internal Revenue Code of 1986, as amended.

**Commonwealth** shall mean the Commonwealth of Puerto Rico.

**Compounded Amount** shall mean, on any date and with respect to any particular Capital Appreciation Bond or Convertible Capital Appreciation Bond, the initial principal amount at issuance of such Bond plus accretion of principal, based on compounding on each Compounding Date to the date of maturity thereof (with respect to a Capital Appreciation Bond) or to the Current Interest Commencement Date (with respect to a Convertible Capital Appreciation Bond) at the same interest rate as shall produce a compound amount on such date of maturity or Current Interest Commencement Date, as applicable, equal to the principal amount thereof on such date; provided, that Compounded Amount on any day which is

B-4

not a Compounding Date shall be determined on the assumption that the Compounded Amount accrues in equal daily amounts between Compounding Dates.

**Compounding Date** shall mean the date on which interest on a Capital Appreciation Bond or Convertible Capital Appreciation Bond is compounded and added to principal in the form of Compounded Amount, as set forth in the related Series Resolution.

**Contractual Maximum Interest Rate** shall mean, with respect to any particular Adjustable Rate Bond, a numerical rate of interest, which shall be set forth in the Supplemental Resolution authorizing such Bond, that as a matter of contract shall be the maximum rate at which such Bond may bear interest at any time; provided, that the Contractual Maximum Interest Rate may not exceed the Legal Maximum Interest Rate.

**Convertible Capital Appreciation Bonds** shall mean Bonds which, on or prior to the Current Interest Commencement Date, have the characteristics of Capital Appreciation Bonds and, after the Current Interest Commencement Date, have the characteristics of Current Interest Bonds, in each case with such further terms and conditions as may be designated therefor in the Supplemental Resolution authorizing such Bonds.

**Corporate Trust Office** shall mean the office of the Trustee at which at any particular time its corporate trust business shall be principally administered, which office at the date of the adoption of the Resolution is located at 101 Barclay Street, 7W, New York, New York 10286, Attention: Northern Municipals Department, or such other address as the Trustee may designate from time to time by notice to the Corporation, or the principal corporate trust office of any successor Trustee (or such other address as such successor Trustee may designate from time to time by notice to the Corporation).

**Corporation** shall mean the Puerto Rico Sales Tax Financing Corporation, an independent governmental instrumentality of the Commonwealth of Puerto Rico, and its successors and permitted assigns, organized pursuant to the Act.

**Costs of Issuance** shall mean any item of expense directly or indirectly payable or reimbursable by the Corporation and related to the authorization, sale, or issuance of Bonds, including, but not limited to, capitalized interest, underwriting fees, underwriters' or original issue discount and fees and expenses of professional consultants and fiduciaries.

**Credit Facility** shall mean each irrevocable letter of credit, bond insurance policy, surety bond, loan agreement, or other agreement, facility or insurance or guaranty arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, a corporation, an insurance company or association chartered or organized under the laws of any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other federal or State agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys to pay, in the Currency in which the bonds of such Series are payable, the principal or Redemption Price of Bonds due in accordance with their terms plus accrued interest thereon to the date of payment thereof in accordance herewith and with the Supplemental Resolution authorizing such Bonds, whether or not the Corporation is in default under the Resolution; provided, that use of a Credit Facility shall not result, at the time of delivery of the Credit Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further, that a substitute

Credit Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Credit Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Currency** shall mean Dollars or Foreign Currency or Currency Unit.

**Currency Unit** shall mean a composite currency or currency unit the value of which is determined by reference to the value of the currencies of any group of countries.

**Current Interest Bonds** shall mean Bonds that bear interest which is not compounded but is payable on a current basis on established dates prior to maturity.

**Current Interest Commencement Date** shall mean the date established prior to the issuance of each Series of Convertible Capital Appreciation Bonds, at which time the semiannual compounding of interest ceases and on and after such date interest is payable currently on the Compounded Amounts on the next ensuing interest payment dates.

**Debt Service Reserve Requirement** shall be determined as of the date of authentication and delivery of each Series of Bonds and from time to time thereafter as may be required or permitted by the Resolution and shall mean, as of any date of calculation, an amount equal to the aggregate of the Debt Service Reserve Requirements established in Series Resolutions for each Series of Bonds Outstanding.

**Dedicated Sales Tax** shall mean the portion of the sales tax imposed in the Commonwealth which is required to be deposited in the Dedicated Sales Tax Fund and held by or on behalf of the Corporation, and the right to receive the same, as provided for by the Act, and any additional share of such sales tax, and the right to receive the same, which by law is to be deposited in the Dedicated Sales Tax Fund.

**Dedicated Sales Tax Fund** shall mean the Dedicated Sales Tax Fund created by the terms of Article 3 of the Act.

**Defeasance Obligations** shall mean any of the following which are not callable or redeemable at the option of the issuer thereof, if and to the extent the same are at the time legal for the investment of the Corporation's funds:

        (i)       Government Obligations;

        (ii)      Defeased Municipal Obligations;

        (iii)     certificates, depositary receipts or other instruments which evidence a direct ownership interest in obligations described in clauses (i) and (ii) above or in any specific interest or principal payments due in respect thereof; provided, however, that the custodian of such obligations or specific interest or principal payments shall be a bank or trust company organized under the laws of the United States of America, of the Commonwealth, or of any state or territory of the United States of America or of the District of Columbia, with a combined capital stock, surplus and undivided profits of at least $50,000,000 or the custodian is appointed by or on behalf of

the United States of America; and provided further, however, that except as may be otherwise required by law, such custodian shall be obligated to pay to the holders of such certificates, depository receipts or other instruments the full amount received by such custodian in respect of such obligations or specific payments and shall not be permitted to make any deduction therefrom; or

(vi)    a share or interest in a mutual fund, partnership or other fund wholly comprised of obligations described in clauses (i) through (v) above.

**Defeased Municipal Obligations** shall mean any bonds or other obligations of any state or territory of the United States of America, of the Commonwealth, or of any agency, instrumentality or local governmental unit of any such state or territory or Commonwealth which are not callable at the option of the obligor prior to maturity or as to which irrevocable instructions have been given by the obligor to call on the date specified in the notice; and

(i)    which are rated, based on an irrevocable escrow account or fund (the "escrow"), in the highest Rating category of any Rating Agency; or

(ii)    (a) which are fully secured as to principal, interest and redemption premium, if any, by an escrow consisting only of cash or Government Obligations, which escrow may be applied only to the payment of such principal and interest and redemption premium, if any, on such bonds or other obligations on the maturity date or dates thereof or the specified redemption date or dates pursuant to such irrevocable instructions, as appropriate, and (b) which escrow is sufficient, as verified by a nationally recognized independent certified public accountant, or other nationally recognized verification agent, to pay principal and interest and redemption premium, if any, on the bonds or other obligations described in this paragraph on the maturity date or dates specified in the irrevocable instructions referred to above, as appropriate.

**Dollar** shall mean a dollar or other equivalent unit in such coin or currency of the United States as at the time of payment is legal tender for the payment of public and private debts.

**Event of Default** shall mean an event described in subsection 1 of Section 1101.

**Financing Costs** shall mean, with respect to any Bonds, all costs of issuance and any other fees, discounts, expenses and costs related to issuing, securing and marketing Bonds, including, without limitation, redemption premiums and other costs of redemption.

**First Subordinate Bonds** shall mean the First Subordinate Series 2009A Bonds and any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are equal with that of the First Subordinate Series 2009A Bonds.

**First Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the First Subordinate Bonds.

**First Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified First Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Obligations** means, collectively, all First Subordinate Reimbursement Obligations and First Subordinate Hedge Obligations.

**First Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of First Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the First Subordinate Bonds.

**First Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any First Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of First Subordinate Bonds.

**First Subordinate Series 2009A Bonds** means the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2009A.

**Fiscal Year** shall mean the fiscal year of the Commonwealth Government beginning July 1 of each calendar year.

**Fitch** shall mean Fitch Ratings, and its successors and assigns.

**Fixed Tender Bond** shall mean any Bond, not constituting an Adjustable Rate Bond, which by its terms must be tendered by the Owner thereof for purchase by or for the account of the Corporation prior to the stated maturity thereof or for purchase thereof.

**Foreign Currency** shall mean a currency issued by the government of any country other than the United States or a composite currency or currency unit the value of which is determined by reference to the values of the currencies of any group of countries.

**Fund** or **Funds** shall mean the Project Fund and any fund or funds, as the case may be, established and created pursuant to the Resolution, but does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Government Development Bank** shall mean Government Development Bank for Puerto Rico, and its successors and permitted assigns.

**Government Obligations** shall mean direct obligations of, or obligations the principal of and the interest on which are unconditionally guaranteed by, the United States of America and entitled to the full faith and credit thereof.

**Investment Obligations** shall mean and include any of the following securities, if and to the extent the same are at the time legal for investment of the Corporation's funds:

        (i)     Defeasance Obligations;

        (ii)    Defeased Municipal Obligations;

(iii)    public housing bonds issued by public agencies or municipalities and fully secured as to the payment of both principal and interest by a pledge of annual contributions under an annual contributions contract or contracts with the United States of America; temporary notes, preliminary loan notes or project notes issued by public agencies or municipalities, in each case fully secured as to the payment of both principal and interest by a requisition or payment agreement with the United States of America; or obligations issued by any state or any public agencies or municipalities which are rated in the highest Rating category by a Rating Agency;

(iv)    direct and general obligations of any state of the United States to the payment of the principal of and interest on which the full faith and credit of such state is pledged which are rated in either of the two highest Rating categories by a Rating Agency;

(v)    direct obligations of, or obligations guaranteed as to timely payment of principal and interest by, Fannie Mae, the Federal Home Loan Mortgage Corporation, or the Federal Farm Credit System;

(vi)    prime commercial paper of a corporation incorporated under the laws of any state of the United States of America, rated "P-1", "A-1" or "F1" by Moody's, Standard & Poor's or Fitch, respectively;

(vii)    shares of a diversified open-end management investment company as defined in the Investment Company Act of 1940, which is a money market fund, which has been rated "A" or better by Moody's, Standard & Poor's or Fitch or money market accounts of the Trustee or any bank or trust company organized under the laws of the United States or any state thereof, which has a combined capital and surplus of not less than $50,000,000;

(viii)    bank deposits evidenced by certificates of deposit issued by banks (which may include the Trustee) which are members of the Federal Deposit Insurance Corporation, provided that such time deposits are fully secured by obligations described in clause (i) or (ii) above, which such obligations at all times have a market value (exclusive of accrued interest) at least equal to such bank deposits so secured, including interest;

(ix)    repurchase agreements relating to securities of the type specified in clauses (i) and (ii) above, provided that such securities in an amount at least equal to the face value of such agreements shall be delivered as security for such agreements to the account of the Trustee to be held therein during the term of the agreements;

(x)    investment agreements, secured or unsecured, with any institutions whose debt securities are rated at least "AA" (or equivalent rating of short-term obligations if the investment is for a period not exceeding one year) by Standard & Poor's or equivalent Rating by Moody's, Fitch or other Rating Agency; and

(xi)    any other obligations conforming to the Corporation's guidelines for investment, so long as such obligations are rated at least in the two highest Rating Categories of each of the Rating Agencies and are approved by the applicable Credit Facility Provider.

B-9

**Legal Maximum Interest Rate** shall mean the highest rate of interest or highest true interest cost that by law may be borne by any Bonds; at present, 12% per annum.

**Liquidity Facility** shall mean an irrevocable letter of credit, surety bond, loan agreement, Standby Purchase Agreement, line of credit or other agreement or arrangement issued or extended by a bank, a trust company, a national banking association, an organization subject to registration with the Board of Governors of the Federal Reserve System under the Bank Holding Company Act of 1956 or any successor provisions of law, a federal branch pursuant to the International Banking Act of 1978 or any successor provisions of law, a savings bank, a savings and loan association, a Federal Home Loan Bank, an insurance company or association chartered or organized under the laws of the Commonwealth or any state of the United States of America, the Government National Mortgage Association or any successor thereto, Fannie Mae or any successor thereto, the Federal Home Loan Mortgage Corporation or any successor thereto, or any other government sponsored enterprise or federal or state agency or instrumentality approved by the Corporation, pursuant to which the Corporation is entitled to obtain moneys upon the terms and conditions contained therein for the purchase or redemption of Bonds tendered for purchase or redemption in accordance with the terms hereof and of the Supplemental Resolution authorizing such Bond; provided, that the use of the Liquidity Facility shall not result, at the time of delivery of the Liquidity Facility, in a reduction in the Rating of any Bonds Outstanding; and provided further that a substitute Liquidity Facility may be obtained from time to time (i) which shall contain the same material terms as set forth in the Liquidity Facility for which substitution is made, and (ii) will not, in and of itself, result in a Rating of the related Bonds lower than those which then prevailed.

**Liquidity Facility Provider** shall mean the Person that has executed a Liquidity Facility with the Corporation, or otherwise has provided a Liquidity Facility at the request of the Corporation, for the benefit of any of the Bonds.

**Maturity Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the stated maturity thereof.

**Moody's** shall mean Moody's Investors Service, and its successors and assigns.

**Obligations** shall mean, collectively, Parity Obligations, First Subordinate Obligations and Second Subordinate Obligations.

**Operating Cap** shall mean $200,000 in the Fiscal Year ending June 30, 2008 and, in each following Fiscal Year, the prior year's Operating Cap inflated by 2%.

**Operating Expenses** shall mean the reasonable operating and administrative expenses of the Corporation (including, without limitation, the cost of preparation of accounting and other reports, costs of maintenance of the ratings on Bonds, insurance premiums, deductibles and retention payments, and costs of meetings or other required activities of the Corporation), legal fees and expenses of the Corporation, fees and expenses incurred for professional consultants and fiduciaries, including the Trustee, and regularly scheduled fees payable under each Credit Facility and Liquidity Facility. Whenever a requisition for "Operating Expenses" from the Revenue Account shall be made pursuant to Section 505.1 FIRST of the Resolution, a certificate of an Authorized Officer of the Corporation, stating that such amount constitutes "Operating Expense" as defined in the Resolution, shall be delivered to the Trustee.

**Opinion of Bond Counsel** shall mean an opinion signed by Hawkins Delafield & Wood LLP (or any other attorney or firm of attorneys of recognized standing in the field of law relating to municipal bonds selected by the Corporation and satisfactory to the Trustee).

**Opinion of Counsel** shall mean an opinion signed by an attorney or firm of attorneys of recognized standing (who may be counsel to the Corporation) selected by the Corporation.

**Option Bond** shall mean any Bond which by its terms may be tendered by and at the option of the Owner thereof for redemption by the Corporation prior to the stated maturity thereof or for purchase thereof, or the maturity of which may be extended by and at the option of the Owner thereof.

**Original Principal Amount** shall mean the Compounded Amount of any Capital Appreciation Bond as of the date of original issuance, as set forth in the applicable Series Resolution.

**Outstanding**, when used with reference to the Bonds as a whole or the Bonds of a Series, shall mean, as of any date, the Bonds or Bonds of such Series, as the case may be, theretofore or thereupon being delivered and issued under the provisions of the Resolution, except:

        (i)     any Bonds canceled by or surrendered for cancellation to the Trustee at or prior to such date;

        (ii)     Bonds for the payment or redemption of which moneys or Defeasance Obligations equal to the principal amount or Redemption Price thereof, as the case may be, with interest to the date of maturity or redemption date, shall be held by the Trustee in trust (whether at or prior to the maturity or redemption date), provided that if such Bonds are to be redeemed, notice of such redemption shall have been given as provided in Article IV or provision shall have been made for the giving of such notice, and provided further that if such notice is conditional, it is no longer subject to rescission;

        (iii)     Bonds deemed to have been paid as provided in the Section of the Resolution relating to defeasance of Bonds;

        (iv)     Bonds in lieu of or in substitution for which other Bonds shall have been authenticated and delivered pursuant to Article III or Section 1007 of the Resolution;

        (v)     Option Bonds tendered or deemed tendered in accordance with the provisions of the Supplemental Resolution authorizing such Bonds on the applicable tender date, if the purchase price thereof and interest thereon shall have been paid or amounts are available and set aside for such payment as provided in such Supplemental Resolution, except to the extent such tendered Option Bonds are held by the Corporation or a Credit Facility Provider or a Liquidity Facility Provider and/or thereafter may be resold pursuant to the terms thereof and of such Supplemental Resolution; and

        (vi)     as may be provided with respect to such Bonds by the Supplemental Resolution authorizing such Bonds;

provided, however, that in determining whether the Owners of the requisite principal amount of Outstanding Bonds have given any request, demand, authorization, direction, notice, consent or waiver, Bonds owned by the Corporation shall be disregarded and deemed not to be Outstanding, except that, in determining whether the Trustee shall be protected in relying upon any such request, demand, authorization, direction, notice, consent or waiver, only Bonds which an Authorized Officer of the Trustee actually knows to be so owned shall be so disregarded. Bonds so owned which have been pledged in good faith may be regarded as Outstanding if the pledgee establishes the pledgee's right so to act with respect to such Bonds and that the pledgee is not the Corporation.

In determining whether Owners of the requisite principal amount of Outstanding Bonds have given any requisite demand, authorization, direction, notice, consent or waiver hereunder, the principal amount of a Convertible Capital Appreciation Bond or a Capital Appreciation Bond that shall be deemed Outstanding for such purposes shall be the Compounded Amount thereof except as otherwise provided in the Resolution.

With respect to Parity Obligations or Subordinate Obligations, the term "Outstanding" shall mean that the payment obligations of the Corporation thereunder shall not have been fully paid and satisfied.

**Owner** or **Owner of Bonds** shall mean Bondowner.

**Parity Hedge Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments by the Corporation under Qualified Hedges. Parity Hedge Obligations shall not include, among other things, any costs, indemnities, termination payments or similar non-recurring amounts, or any amortization of any thereof.

**Parity Obligations** shall mean, collectively, all Parity Reimbursement Obligations and Parity Hedge Obligations.

**Parity Reimbursement Obligations** shall mean, as allocated to each Series of Senior Bonds pursuant to the terms of the related Series Resolution, fixed and scheduled payments due from the Corporation to any Credit Facility Provider, as provided by Section 205 of the Resolution and set forth or provided for in any Supplemental Resolution. Parity Reimbursement Obligations shall include, among other things, reimbursements of direct-pay letters of credit to be drawn on each principal and/or interest payment date.

**Person** or **Persons** shall mean an individual, partnership, limited liability partnership, corporation, limited liability corporation, trust or unincorporated organization and a government or agency or political subdivision or branch thereof.

**Pledged Property** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

       1.     All Revenues.

       2.     All right, title and interest of the Corporation in and to Revenues, and all rights to receive the same.

       3.     The Funds, Accounts (other than the Costs of Issuance Account and Rebate Account) and Subaccounts (other than Subaccounts in the Costs of Issuance Account or Rebate Account) held by the Trustee, and moneys and securities and, in the case of the Debt Service Reserve Account, Reserve Account Cash Equivalents, from time to time held by the Trustee under the terms of the Resolution, subject to the application thereof as provided in the Resolution and to the provisions of Section 1201 and 1203 of the Resolution.

       4.     Any and all other rights and property of every kind and nature from time to time hereafter pledged by the Corporation to the Trustee as and for additional security for the Bonds and Parity Obligations.

5.     Any and all cash and non-cash proceeds, products, offspring, rents, and profits from any of the Pledged Property mentioned described in paragraphs (1) through (4) above, including, without limitation, those from the sale, exchange, transfer, collection, loss, damage, disposition, substitution or replacement of any of the foregoing.

**Pledged Sales Tax** shall mean the portion of the Dedicated Sales Tax described in subparagraph (a) of Article 3 and the first sentence of subparagraph (d) of Article 5 of the Act.

**Pledged Sales Tax Additional Base Amount** means, for each Fiscal Year, the amount of $350,168,000 for the Fiscal Year beginning July 1, 2009, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Additional Base Amount, until the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, subject to modifications made to the Pledged Sales Tax Additional Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico. After the Fiscal Year in which the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount equals $1,850,000,000, the Pledged Sales Tax Additional Base Amount shall be reduced by that amount necessary for the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount to be equal to $1,850,000,000.

**Pledged Sales Tax Base Amount** means, for each Fiscal Year, the sum of the Pledged Sales Tax Original Base Amount and the Pledged Sales Tax Additional Base Amount.

**Pledged Sales Tax Original Base Amount** means, for each Fiscal Year, the amount of $185,000,000 for the Fiscal Year beginning July 1, 2007, as increased in each subsequent Fiscal Year by four percent (4%) of the prior Fiscal Year's Pledged Sales Tax Original Base Amount, up to a maximum of $1,850,000,000, subject to modifications made to the Pledged Sales Tax Original Base Amount after the date of this Supplemental Resolution, if any, by the Legislature of Puerto Rico.

**Principal Installment** shall mean, as of any date with respect to any Series, so long as any Bonds thereof are Outstanding, the sum of (i) the principal amount and Compounded Amount (to the extent applicable) of Bonds of such Series (including the principal amount of Option Bonds tendered for payment and not purchased) due (or so tendered for payment and not purchased) on such date for which no Sinking Fund Installments have been established, and (ii) the unsatisfied balance (determined as provided in the Resolution) of any Sinking Fund Installments due on such date for Bonds of such Series, together with the premiums, if any, payable upon the redemption of such Bonds by application of such Sinking Fund Installments.

**Project** shall mean the purposes set forth in Article 2(b) of the Act, including any further program or purpose authorized by law after the date hereof which is to be supported by the Dedicated Sales Tax.

**Project Fund** shall mean the Fund by that name established in Section 502.

**Qualified Hedge** shall mean, if and to the extent from time to time permitted by law, with respect to Bonds, (i) any financial arrangement (a) which is entered into by the Corporation with an entity that is a Qualified Hedge Provider at the time the arrangement is entered into, (b) which is a cap, floor or collar, forward rate, future rate, swap (such swap may be based on an amount equal either to the principal amount of such Bonds as may be designated or a notional principal amount relating to all or a portion of the principal amount of such Bonds), asset, index, Currency, price or market-linked transaction or agreement, other exchange or rate protection transaction agreement, other similar transaction (however designated), or any combination thereof, or any option with respect to any of the foregoing, executed by

the Corporation, and (c) which has been designated as a Qualified Hedge with respect to such Bonds in a written determination signed by an Authorized Officer of the Corporation and delivered to the Trustee, and (ii) any letter of credit, line of credit, policy of insurance, surety bond, guarantee or similar instrument securing the obligations of the Corporation under any financial arrangement described in clause (i) above; provided, that with respect to any variable rate Bonds that are to be covered by a Qualified Hedge constituting an interest rate exchange agreement, scheduled amounts payable by the Qualified Hedge Provider under such Qualified Hedge shall exactly match the scheduled interest payable on the Bonds covered by the Qualified Hedge, without "basis risk" and without allowance for adjustment thereto except to match any adjustment in the scheduled interest payable on such Bonds.

**Qualified Hedge Provider** means (i) each Series 2009 Qualified Hedge Provider, (ii) a Person whose long term obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability are rated, or whose payment obligations under an interest rate exchange agreement are guaranteed by an entity whose long term debt obligations, other unsecured long term obligations, financial program rating, counterparty rating, or claims paying ability, are rated, at the time of the execution of such Qualified Hedge, either (a) at least as high as the third highest Rating Category of each Rating Agency, but in no event lower than any Rating Category designated by any such Rating Agency for the Bonds, subject to such Qualified Hedge (without reference to bond insurance, if any), or (b) any such lower Rating Categories which each such Rating Agency indicates in writing to the Corporation and the Trustee will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds, and (iii) a Person whose payment obligations under an interest rate exchange agreement are subject to collateralization requirements that, as evidenced in writing to the Corporation and the Trustee by each Rating Agency, will not, by itself, result in a reduction or withdrawal of its Rating (without reference to bond insurance, if any) on the Outstanding Bonds.

**Rating** shall mean a rating published by a Rating Agency with respect to any or all Bonds. Any provision of the Resolution that specifies that an action may not be taken if it shall result in a reduction, suspension or withdrawal of the Rating of the Bonds, with respect to any Bonds that are the subject of a Credit Facility, shall mean the Rating of such Bonds without taking into account the credit enhancement provided by such Credit Facility.

**Rating Agency** shall mean each nationally recognized statistical rating organization then maintaining a rating on the Bonds at the request of the Corporation.

**Rating Category** shall mean one of the generic rating categories of any Rating Agency without regard to any refinement or gradation of such rating by a numerical modifier or otherwise.

**Rebate Amount** shall mean with respect to the Bonds, the amount computed as described in the Tax Certificate.

**Record Date** shall mean, with respect to each payment of principal and premium of and interest on each Bond, the date specified as the "record date" therefor in the Supplemental Resolution authorizing such Bond.

**Redemption Price** shall mean, when used with respect to a Bond (other than a Convertible Capital Appreciation Bond or a Capital Appreciation Bond), or a portion thereof to be redeemed, the principal amount of such Bond or such portion thereof plus the applicable premium, if any, payable upon redemption thereof, pursuant to the Resolution and the applicable Supplemental Resolution, but, when used with respect to a Convertible Capital Appreciation Bond or a Capital Appreciation Bond,

B-14

"Redemption Price" shall mean the Compounded Amount on the date of redemption of such Bond or portion thereof plus the applicable premium, if any.

**Refunding Bonds** shall mean all Bonds authenticated and delivered on original issuance pursuant to the Resolution or thereafter authenticated and delivered in lieu of or in substitution for any such Bond pursuant to Section 203 of the Resolution and the applicable Series Resolution.

**Related August 2 Computation Period** shall mean, with respect to calculations to be made under Section 710 in connection with the issuance of Senior Bonds, First Subordinate Bonds or Second Subordinate Bonds or incurrence of Parity Obligations, First Subordinate Obligations or Second Subordinate Obligations, the 12-month period (or, if applicable, the 15-month period) commencing August 2 in the Fiscal Year of issuance or incurrence and, as the context requires, August 2 in the succeeding Fiscal Years.

**Reserve Account Cash Equivalent** shall mean a letter of credit, insurance policy, surety, guaranty or other security arrangement provided to the Trustee as a substitute for the deposit of cash and/or Investment Securities, or another Reserve Account Cash Equivalent, in the Debt Service Reserve Account pursuant to Section 507. Each such arrangement shall be provided by a Person which has received a rating of its claims paying ability from each Rating Agency at least equal to the then existing rating on the Bonds or whose unsecured long-term debt securities are rated by each Rating Agency at least equal to the then existing Rating on the Bonds (or the highest short-term rating if the Reserve Account Cash Equivalent has a remaining term at the time of acquisition not exceeding one year); provided, however, that a Reserve Account Cash Equivalent may be provided by a Person who has received a rating of its claims paying ability which is lower than that set forth above or whose unsecured long-term (or short-term) debt securities are rated lower than that set forth above, so long as the providing of such Reserve Account Cash Equivalent does not, as of the date it is provided, in and of itself, result in the reduction or withdrawal of the then existing Rating assigned to any of the Bonds by any of the Rating Agencies.

**Resolution** shall mean the Puerto Rico Sales Tax Financing Corporation Sales Tax Revenue Bond Resolution, as from time to time amended or supplemented by Supplemental Resolutions.

**Revenue Account Monthly Disbursement Date** shall mean the last Business Day of each calendar month.

**Revenues** shall mean the following, collectively, except as otherwise may be provided with respect to a Series of Bonds by the Supplemental Resolution authorizing such Bonds:

    1.    All Pledged Sales Tax received by the Corporation or the Trustee.

    2.    With respect to any particular Bonds, the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of such Bonds, but only for purposes of such payment and not for purposes of the additional Bonds test contained in Section 710 of the Resolution or other purposes of the Resolution.

    3.    Any amounts received by the Corporation pursuant to a Qualified Hedge after giving effect to any netting of amounts payable by the parties thereunder.

<div align="center">B-15</div>

4.    Income and interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) held by the Trustee under the terms of the Resolution subject to the provisions of Sections 1201 and 1203 of the Resolution.

5.    Any other revenues, fees, charges, surcharges, rents, proceeds or other income and receipts received by or on behalf of the Corporation or by the Trustee, lawfully available for the purposes of the Resolution and deposited by or on behalf of the Corporation or by the Trustee in any Fund, Account (other than the Costs of Issuance Account and Rebate Account) or Subaccount (other than any Subaccount in the Costs of Issuance Account or Rebate Account) held by the Trustee under the terms of the Resolution, including any available funds not constituting Pledged Sales Tax appropriated by the Legislature of Puerto Rico for the purposes stated in subparagraph (a) of Article 5 of the Act and the second sentence of subparagraph (e) of Article 5 of the Act, subject to the provisions of Sections 1201 and 1203 of the Resolution.

**Second Subordinate Bonds** means any Bonds of a Class the priority of payment of which, and rights upon an Event of Default, under the Resolution are subordinate to those of the First Subordinate Series 2009A Bonds.

**Second Subordinate Coverage Test** shall mean, upon the issuance of the initial Series of Second Subordinate Bonds, the coverage multiple set forth in the applicable Series Resolution that expresses the relationship of the amounts reflected in Section 710.1(E)(i) to the amounts reflected in Section 710.1(E)(ii) hereof.

**Second Subordinate Credit Facility** shall mean any Credit Facility associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Credit Facility" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second Subordinate Bonds.

**Second Subordinate Credit Facility Provider** shall mean the Person that has executed a Credit Facility with the Corporation, or otherwise has provided a Credit Facility at the request of the Corporation, for the benefit of any of the Second Subordinate Bonds.

**Second Subordinate Hedge Obligations** means any fixed and scheduled payments by the Corporation under Qualified Hedges provided by Qualified Second Subordinate Hedge Providers and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

**Second Subordinate Obligations** means, collectively, all Second Subordinate Reimbursement Obligations and Second Subordinate Hedge Obligations.

**Second Subordinate Qualified Hedge Provider** shall mean any Qualified Hedge Provider associated by Supplemental Resolution with a Series of Second Subordinate Bonds and with respect to which the reference in the definition of "Qualified Hedge Provider" in the Resolution to ratings on the Bonds shall be deemed to relate to ratings on the Second First Subordinate Bonds.

**Second Subordinate Reimbursement Obligations** means any fixed and scheduled payments due from the Corporation to any Second Subordinate Credit Facility Provider and allocated by Supplemental Resolution to a Series of Second Subordinate Bonds.

B-16

**Security Agreement** means the Security Agreement dated as of July 31, 2007 between the Corporation and the Trustee.

**Senior Bonds** means the Bonds of the series designated "Series 2007A", "Series 2007B", "Series 2007C" and "Series 2008A", and any Bonds of a Class the priority of payment of which under this Resolution is equal with that of such Series of Bonds.

**Serial Bonds** shall mean Bonds which have no Sinking Fund Installments.

**Series** shall mean all of the Bonds authenticated and delivered on original issuance identified pursuant to the Supplemental Resolution as a separate series of Bonds, and any Bonds thereafter authenticated and delivered in lieu of or in substitution therefor pursuant to the Resolution, regardless of variations in maturities, principal amount, interest rate or other provisions.

**Series Resolution** shall mean a Supplemental Resolution authorizing or providing for the issuance of a Series of Bonds pursuant to Section 202.2 of the Resolution.

**Sinking Fund Installment** shall mean, when used with respect to any Series of Bonds, the amount of principal or Compounded Amount, as the case may be, due prior to maturity on Bonds of a given maturity on any particular due date as specified in the Supplemental Resolution pursuant to which such Series was issued.

**Standard & Poor's** shall mean Standard & Poor's Ratings Services, a division of The McGraw-Hill Companies, Inc., and its successors and assigns.

**Standby Purchase Agreement** means, if and to the extent constituting an Ancillary Bond Facility, an agreement by and between the Corporation and another person pursuant to which such person is obligated to purchase Option Bonds or Fixed Tender Bonds tendered for purchase.

**Subaccount** or **Subaccounts** shall mean any subaccount or subaccounts, as the case may be, established or created pursuant to the Resolution, including but not limited to any subaccount of a subaccount, that does not include any escrow or other fund or account established or created pursuant to the provisions of the Resolution relating to the defeasance of Bonds.

**Subordinate Bonds** shall mean a Bond of a Series, or notes, debentures or any other evidence of indebtedness, consisting of one or more Classes, the priority of payment of which under this Resolution is subordinate to payment of the Senior Bonds (and which are further subject to the terms of priority of payment among the several Classes, if any, of Subordinate Bonds).

**Subordinate Obligations** shall mean, as allocated to each Series of Bonds by Class pursuant to the terms of the related Series Resolution, payment obligations to Persons of the type that otherwise would be classified under the Resolution as Parity Obligations but are subject instead, pursuant to the provisions of the applicable Series Resolutions, to subordination to Parity Obligations under the Resolution on the terms and conditions set forth in such Series Resolutions.

**Supplemental Resolution** shall mean any resolution supplemental to or amendatory of the Resolution or any Supplemental Resolution, adopted by the Corporation in accordance with the Resolution.

**Taxable Bonds** shall mean Bonds of a Series which are not Tax Exempt Bonds.

    **Tax Certificate** shall mean the document executed by the Corporation with respect to each Series of Bonds containing representations and certifications to support the exclusion of the interest on such Bonds under the Code.

    **Tax Exempt Bonds** shall mean Bonds of a Series the interest on which, in the opinion of Bond Counsel, on the date of original issuance thereof, is excluded from gross income for federal income tax purposes.

    **Term Bonds** shall mean Bonds having a single stated maturity date for which Sinking Fund Installments are specified in a Supplemental Resolution.

    **Trustee** shall mean the bank, trust company or national banking association appointed pursuant to the Resolution to act as trustee hereunder, and its successor or successors and any other bank, trust company or national banking association which may at any time be substituted in its place pursuant to the provisions of the Resolution.

**Summary of Certain Provisions of the Resolution**

*The following is a general summary of certain provisions of the Resolution as presently in effect. The summary does not purport to be comprehensive or definitive and is subject to all of the terms and provisions of the Resolution, to which reference is hereby made.*

**Resolution to Constitute Contract (Section 103)**

The Resolution shall be deemed to be and shall constitute a contract between the Corporation, the Owners from time to time of the Bonds and the Credit Facility Providers; and the pledge made in the Resolution and the covenants and agreements therein set forth to be performed on behalf of the Corporation shall be for the equal benefit, protection and security of the Owners of any and all of the Bonds and the Credit Facility Providers, all of which, regardless of the time or times of their authentication and delivery or maturity, shall be of equal rank without preference, priority or distinction of any of the Bonds and Credit Facility Providers over any other thereof, except as expressly provided in or permitted by the Resolution.

**Authorization of Bonds (Section 201)**

The Resolution creates, in the manner and to the extent provided therein, a continuing pledge of and lien on Pledged Property to secure the full and final payment of the principal of and premium, if any, and interest on, all of the Bonds issued pursuant to the Resolution. The Bonds shall be special obligations of the Corporation payable from the Pledged Property without recourse against other assets of the Corporation. The Commonwealth shall not be liable on the Bonds. No Bond shall constitute a debt of the Commonwealth within the meaning of any constitutional provision, or a pledge of the faith and credit of the Commonwealth or of the taxing power of the Commonwealth, and the Commonwealth shall not be liable to make any payments thereon, nor shall any Bond be payable out of any funds or assets other than the Dedicated Sales Tax Fund and other funds and assets of or available to the Corporation and pledged therefor.

**Special Provisions for Refunding Bonds (Section 203)**

Bonds of one or more Series may be authenticated and delivered upon original issuance, subject to the provisions and limitations of the Resolution, for the purposes of creating economic savings, restructuring debt service, modifying Resolution covenants, and providing for more favorable debt terms, or any of the foregoing or any other valid corporate purpose of the Corporation. Each Supplemental Resolution authorizing a Series of Refunding Bonds shall set forth that the purposes for which such Series is issued include the payment or redemption of all or any part of the Bonds of any one or more Series then Outstanding.

The Refunding Bonds of such Series shall be authenticated and delivered by the Trustee upon receipt by the Trustee (in addition to the general provisions set forth in the Resolution for the issuance of Bonds) of:

      (i)     irrevocable instructions to the Trustee to give due notice of the payment or redemption of all the Bonds so to be refunded on a payment or redemption date specified in such instructions and the payment or redemption dates, if any, upon which such Bonds are to be paid or redeemed;

      (ii)    if the Bonds of a Series to be refunded are to be paid or redeemed subsequent to the forty-fifth day next succeeding the date of authentication,

irrevocable instructions to the Trustee, to provide notice in the manner provided in the Section entitled "Defeasance" below with respect to the payment of such Bonds pursuant to such Section;

(iii)  either (A) moneys or (B) Defeasance Securities as shall be necessary to comply with the provisions of the second paragraph of the Section entitled "Defeasance," which moneys and Defeasance Securities shall be held in trust and used only as provided in said paragraph.

(iv)  a certificate of an independent certified public accountant, or other nationally recognized verification agent, that the amounts described in paragraph (iii) above are sufficient to pay or redeem all of the Bonds to be refunded;

Refunding Bonds may be issued only upon compliance with Section 710.

**Credit and Liquidity Facilities; Rights of Credit Facility Providers (Section 205)**

In connection with any Bonds, the Corporation may obtain or cause to be obtained one or more Credit Facilities or Liquidity Facilities and agree with the Credit Facility Provider or Liquidity Facility Provider to reimburse such provider directly for amounts paid under the terms of such Credit Facility or Liquidity Facility, together with interest thereon; provided, however, that no obligation to reimburse a Credit Facility Provider or Liquidity Facility Provider shall be created, for purposes of the Resolution, until amounts are paid under such Credit Facility or Liquidity Facility.

Any Supplemental Resolution may provide that (i) so long as a Credit Facility providing security is in full force and effect, and payment on the Credit Facility is not in default, the Credit Facility Provider is qualified to do business in the Commonwealth, and required ratings of the Credit Facility Provider by the Rating Agencies set forth in such Supplemental Resolution are maintained, the Credit Facility Provider shall be deemed to be the sole Owner of the Outstanding Bonds the payment of which such Credit Facility secures when the approval, consent or action of the Owners of such Bonds is required or may be exercised under the Resolution, or, in the alternative, that the approval, consent or action of the Credit Facility Provider shall be required in addition to the approval, consent or action of the applicable percentage of the Owners of Outstanding Bonds required by Section 1002 and following an Event of Default, provided that no such approval, consent or action of a Credit Facility Provider may be made or taken without the approval, consent or action of the Owner of each Bond affected if such approval, consent or action of such Owner otherwise would be required by the second sentence of Section 1002, and (ii) in the event that the principal, Sinking Fund Installments, if any, and Redemption Price, if applicable, and interest due on any Outstanding Bonds shall be paid under the provisions of a Credit Facility, all covenants, agreements and other obligations of the Corporation to the Owners of such Bonds shall continue to exist and such Bonds shall be deemed to remain Outstanding, and such Credit Facility Provider shall be subrogated to the rights of such Owners in accordance with the terms of such Credit Facility.

**Qualified Hedges (Section 206)**

The Corporation may enter into one or more Qualified Hedges in connection with any Bonds (i) at the time of issuance of such Bonds, (ii) prior to the issuance of such Bonds, in anticipation of the issuance thereof, provided such Bonds have been authorized by the Corporation and payments by the Corporation under the Qualified Hedges do not commence until the date such Bonds are expected to be issued or (iii) after the issuance of such Bonds.

**Privilege of Redemption and Redemption Price (Section 401)**

Bonds subject to redemption prior to maturity pursuant to a Supplemental Resolution shall be redeemable, upon notice as provided in the Resolution, at such times, at such Redemption Prices, in such Currencies and upon such terms in addition to and consistent with the terms contained in the Resolution as may be specified in the Supplemental Resolution authorizing such Series.

**Redemption at the Election of the Corporation (Section 402)**

In the case of any redemption of Bonds otherwise than as provided in the Section entitled "Redemption out of Sinking Fund Installments" below, the Corporation shall give written notice to the Trustee of its election so to redeem, of the redemption date, of the "CUSIP," "ISIN" or other similar numbers (provided, however, that the Corporation and the Trustee shall not be liable for the correctness of such numbers as contained in such notice), of the Series, and of the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds of each maturity and interest rate of such Series to be redeemed which principal amount (or Compounded Amount, if applicable) shall be determined by the Corporation in its sole discretion subject to any limitations with respect thereto contained in any Supplemental Resolution and of the moneys to be applied to the payment of the Redemption Price. Such notice shall be given at least thirty (30) days prior to the redemption date or such shorter period as shall be acceptable to the Trustee. In the event notice of redemption shall have been given as provided in the Resolution, except to the extent such notice shall state that such redemption is conditioned upon the receipt by the Trustee of moneys sufficient to pay the Redemption Price in the Currency in which the Bonds of such Series are payable, or upon the satisfaction of any other condition or the occurrence of any other event as shall be stated in such notice, the Corporation shall, prior to the redemption date, pay or cause to be paid to the Trustee an amount in cash and/or a principal amount of Investment Obligations maturing or redeemable at the option of the holder thereof not later than the date fixed for redemption which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem on the redemption date at the Redemption Price thereof, plus interest accrued and unpaid to the redemption date, and in the Currency in which the Bonds of such Series are payable, all of the Bonds to be redeemed.

**Redemption out of Sinking Fund Installments (Section 403)**

In addition to the redemption of Bonds pursuant to the Sections entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation" above, Term Bonds issued pursuant to the Resolution shall be subject to mandatory redemption by lot out of Sinking Fund Installments at a Redemption Price equal to the principal amount (or Compounded Amount, if applicable) thereof, in the Currency in which the Bonds of such Series are payable, on the dates and in the amounts set forth in the Supplemental Resolution pursuant to which such Bonds were issued.

In the case of any redemption of Bonds out of Sinking Fund Installments, the Corporation shall, in the case of each Sinking Fund Installment, give written notice to the Trustee of (i) the date of such Sinking Fund Installment, (ii) the unsatisfied balance of such Sinking Fund Installment (determined as provided in the Section entitled "Satisfaction of Sinking Fund Installments" and (iii) the particular Series and maturity of the Bonds to be redeemed from such Sinking Fund Installment. Such notice shall be given at least forty (40) days prior to the date of such Sinking Fund Installment, or such shorter period as shall be acceptable to the Trustee.

The Corporation shall, and covenants that it will, prior to the date of such Sinking Fund Installment, pay to the Trustee an amount in cash which, in addition to other moneys, if any, available therefor held by the Trustee, will be sufficient to redeem at the date of such Sinking Fund Installment, at

the Redemption Price thereof, plus interest accrued and unpaid to the date of the Sinking Fund Installment, in the Currency in which the Bonds of such Series are payable, all of the Bonds which are to be redeemed out of such Sinking Fund Installment.

**Selection of Bonds to be Redeemed in Partial Redemption (Section 404)**

In the event of redemption of less than all the Outstanding Bonds of a particular Series pursuant to the Section entitled "Privilege of Redemption and Redemption Price" and "Redemption at the Election of the Corporation," the Corporation shall designate the maturities of the Bonds to be redeemed.

If less than all of the Outstanding Bonds of a particular Series and maturity are to be redeemed, except to the extent the related Series Resolution shall require that Bonds of such Series and maturity are to be redeemed on a pro rata basis, the Trustee shall assign to each such Outstanding Bond a distinctive number for each amount representing the lowest authorized denomination of the principal amount of such Bond and shall select by lot, using such method of lottery selection as it shall deem proper in its discretion, as many numbers as shall equal the principal amount (or Compounded Amount, if applicable) of such Bonds to be redeemed. For purposes of this Section, Bonds or portions thereof which have theretofore been selected by lot for redemption shall not be deemed to be Outstanding.

**The Pledge (Section 501)**

The Pledged Property, subject to the Section of the Resolution relating to compensating and indemnifying the Trustee, is pledged to the Trustee for the payment and as security for the payment of the Principal Installments and Redemption Price of and interest on the Bonds and payments due under Credit Facilities, and payments due under Liquidity Facilities and Qualified Hedges to the extent provided by a Supplemental Resolution, in each case in accordance with their terms and the provisions of the Resolution and subject to the provisions of the Resolution permitting the application of the Pledged Property for the purposes and on the terms and conditions set forth in the Resolution and in each case subject to the provisions regarding priority of payment as between Classes of Senior Bonds and Subordinate Bonds. Nothing contained in the Resolution shall prevent (i) a Credit Facility, Liquidity Facility, or Qualified Hedge from being provided with respect to any particular Bonds and not others, (ii) different reserves being provided pursuant to the Resolution with respect to Bonds than are provided for Parity Obligations or with respect to particular Bonds than are provided for other Bonds, or (iii) different reserves being provided with respect to particular Parity Obligations than are provided for other Parity Obligations.

To the fullest extent provided by the Act and other applicable law, the pledge provided by subsection 1 of this Section shall be valid and binding, and the Pledged Property shall immediately be subject to the lien of this pledge, without any physical delivery thereof or further act, and the lien of this pledge shall be valid and binding as against all parties having claims of any kind in tort, contract or otherwise against the Corporation, irrespective of whether such parties have notice thereof. Notwithstanding the foregoing, the Trustee and the Corporation shall execute the Security Agreement and the Corporation shall cause the proper filing of the Security Agreement in accordance with the Uniform Commercial Code as in effect in Puerto Rico.

**Establishment of Fund and Accounts (Section 502)**

Pursuant to the Resolution, the "Project Fund" is created and the following special Accounts and Subaccounts are created and established within the Project Fund, each of which shall have as a prefix "COFINA" and shall be held by the Trustee:

Upon written direction from the Corporation to establish such an account, a Costs of Issuance Account,

Capitalized Interest Account,

Bond Proceeds Account,

Revenue Account,

Debt Service Account, each of which shall contain therein a Principal Subaccount, an Interest Subaccount and a Holding Subaccount, established for each Class of Bonds, and separately established for Series of Tax-Exempt Bonds in such Class and Taxable Bonds in such Class,

Debt Service Reserve Account, and, if there shall be any Subordinate Bonds Outstanding, shall be established for each Class of Bonds,

Redemption Account, and

Rebate Account, which shall contain therein a Subaccount for each Series of Bonds or for more than one Series of Bonds that are treated as a single issue of bonds under the Code as specified in the applicable Tax Certificate.

The Corporation may establish and create such other Accounts in the Fund, or such other Subaccounts in any Account, as may be authorized pursuant to any Supplemental Resolution, including a Supplemental Resolution authorizing a Series of Bonds, and deposit therein such amounts as may from time to time be held for the credit of any Account or Subaccount.

Amounts held by the Corporation or by the Trustee at any time in the Fund or any Accounts and Subaccounts established pursuant to this Section, as the case may be, shall be held in trust in separate accounts and subaccounts of the Corporation and shall be applied only in accordance with the provisions of the Resolution and the Act.

**Costs of Issuance Account and Capitalized Interest Account (Section 503)**

If the Corporation shall have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, there shall be deposited in the Costs of Issuance Account amounts, if any, determined to be deposited therein pursuant to a Supplemental Resolution containing the information required to be set forth by the Resolution. If the Corporation shall not have determined, as evidenced by written direction to the Trustee, to establish a Costs of Issuance Account, such amounts if any, determined to be disbursed for Costs of Issuance pursuant to a Supplemental Resolution containing the information required to be set forth in paragraph (xiv) of subsection 2 of Section 202 and authorizing the issuance of a Series of Bonds shall be disbursed upon issuance of a Series of Bonds to such Person as directed in writing to the Trustee by the Corporation.

There shall be deposited in the Capitalized Interest Account amounts, if any, determined to be deposited therein pursuant to the requirements of a Supplemental Resolution containing the information required to be set forth by the Resolution and authorizing the issuance of a Series of Bonds.

If amounts are on deposit in the Capitalized Interest Account or any Subaccount thereof, such amounts shall be transferred to the Interest Subaccount in the Debt Service Account on or prior to the Business Day preceding each Interest Payment Date in accordance with the requirements of the

Supplemental Resolution or Supplemental Resolutions authorizing such deposits to be made and providing for the application of such deposits.

Amounts on deposit in the Costs of Issuance Account or any Subaccount thereof, shall be applied to the payment of Costs of Issuance of Bonds, but only upon written certification by an Authorized Officer of the Corporation:

(i) setting forth the amount to be paid, the person or persons to whom such payment is to be made (which may be or include the Corporation) and, in reasonable detail, the purpose of such withdrawal; and

(ii) stating that the amount to be withdrawn from the Costs of Issuance Account or any Subaccount thereof is a proper charge thereon and that such charge has not been the basis of any previous withdrawal.

Any amounts on deposit (i) in the Costs of Issuance Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay Costs of Issuance of a Series of Bonds, and (ii) in the Capitalized Interest Account or any Subaccount thereof and not set aside by the Corporation, or set aside but determined by the Corporation to be no longer required, to pay interest on a Series of Bonds, shall be deposited as provided for in the immediately succeeding paragraph of this Section.

The Trustee shall deposit any funds described in the preceding paragraph in (i) the Bond Proceeds Account, (ii) the Revenue Account and/or (iii) the Redemption Account, in each case as shall be directed in writing by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that prior to any deposit to the Revenue Account or the Redemption Account the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted to be made pursuant to the Resolution and that such deposit will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

In the event of the refunding of any Bonds, the Corporation may withdraw from the Capitalized Interest Account related to the Bonds to be refunded all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction specified in subsection 6 of this Section 503 of the Resolution; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

**Bond Proceeds Account (Section 504)**

There shall be deposited in the Bond Proceeds Account any amounts which are required to be deposited therein pursuant to the Resolution, any Supplemental Resolution and any other amounts available therefor and determined by the Corporation to be deposited therein from time to time. Such amounts may include, but not be limited to, proceeds of Bonds and Build America Bond Tax Credit Receipts. Amounts in the Bond Proceeds Account shall be invested as directed in writing by the Corporation to the Trustee.

Except as otherwise provided in the applicable Supplemental Resolution, amounts deposited in the Bond Proceeds Account from the proceeds of sale of a Series of Bonds shall be applied (a) to pay, or reimburse the Commonwealth or any agency, instrumentality or public benefit corporation

thereof, including the Corporation, for the prior payment by any such entity for, costs of the Project, and (b) for any Costs of Issuance of such Bonds the payment of which has not otherwise been provided for.

The Trustee shall apply amounts on deposit in the Bond Proceeds Account at any time for the purpose of making payments pursuant to this Section, but only upon certification by an Authorized Officer of the Corporation:

(i)     setting forth the amount to be paid, the person or persons to whom such payment is to be made and, in reasonable detail, the purpose of such withdrawal; and

(ii)    stating that the amount to be withdrawn from the Bond Proceeds Account is a proper charge thereon, and that such charge has not been the basis of any previous withdrawal.

Any amount remaining in the Bond Proceeds Account and not set aside by the Corporation for application in accordance with the applicable Supplemental Resolution shall be deposited in (i) the Revenue Account and/or (ii) the Redemption Account, in each case as may be directed by the Corporation; provided, however, in the case of proceeds of a Series of Tax Exempt Bonds, that the Corporation and the Trustee shall have received an Opinion of Bond Counsel to the effect that such deposit is authorized or permitted by the Resolution and will not adversely affect the exclusion of interest on the Bonds from gross income for Federal income tax purposes.

**Revenue Account (Section 505)**

1.      All Revenues, upon receipt thereof, shall be deposited into the Revenue Account except as provided by Section 602.3; provided, however, that the proceeds of any draw on or payment under any Credit Facility which is intended for the payment of a Bond may be applied directly to such payment or deposited directly to the Debt Service Account for such purpose. All Build America Bond Tax Credit Receipts in respect of interest paid on Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds shall be deposited to the credit of the related Debt Service Accounts. In addition, there shall be deposited in the Revenue Account all other amounts required by the Resolution to be so deposited. Amounts on deposit from time to time in the Revenue Account shall be withdrawn and applied or transferred as of each Revenue Account Monthly Disbursement Date as follows and in the following order of priority:

FIRST: to the payment of (i) regularly scheduled fees of the Trustee and (ii), upon requisition in writing by an Authorized Officer of the Corporation to the Trustee, Operating Expenses (but, with respect to clauses (i) and (ii), not to exceed the Operating Cap);

SECOND: to each Debt Service Account established for the Senior Bonds and Parity Obligations, allocated on a pro rata basis between the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Senior Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Senior) related to all Senior Bonds and Parity Obligations;

THIRD: to any Debt Service Reserve Account established for the Senior Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Senior Bonds;

FOURTH: to each Debt Service Account established for the First Subordinate Bonds and First Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to First Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) for all First Subordinate Bonds and First Subordinate Obligations;

FIFTH: to any Debt Service Reserve Account established for the First Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the First Subordinate Bonds;

SIXTH: to each Debt Service Account established for the Second Subordinate Bonds and Second Subordinate Obligations, allocated on a pro rata basis among the Principal Subaccount, the Interest Subaccount and the Holding Subaccount in each such Debt Service Account, all amounts until the amounts on deposit in all such Debt Service Accounts (crediting thereto transfers to such Debt Service Account of Capitalized Interest pursuant to Section 503 and any Build America Bond Tax Credit Receipts attributable to Second Subordinate Bonds transferred to such Debt Service Account pursuant to this Section 505.1) shall equal the Accrued 12/15-Month Obligation (Subordinate) related to all Second Subordinate Bonds and Second Subordinate Obligations;

SEVENTH: to any Debt Service Reserve Account established for the Second Subordinate Bonds, the amount required to cause the amount on deposit therein to be at least equal to the Debt Service Reserve Requirement for the Second Subordinate Bonds;

EIGHTH: the balance, if any, shall be applied upon written direction of the Corporation to the Trustee, provided that an amount at least equal to the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate), and after crediting thereto Capitalized Interest available for transfer, and/or transferred, to the Debt Service Accounts during such period, Build America Bond Tax Credit Receipts scheduled to be paid, and/or paid, to the Trustee during such period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period, shall be on deposit in the Debt Service Accounts pursuant to paragraph SECOND, FOURTH and SIXTH of this subsection 1, (x) to pay or provide for the payment of amounts payable under Credit Facilities, Liquidity Facilities and Qualified Hedges not otherwise required to be funded pursuant to paragraphs SECOND, FOURTH and SIXTH of this subsection 1, until such amounts shall be fully paid or otherwise provided for from this or any other source, and then, at the written direction of the Corporation, (y) as directed by the Corporation, for any of the purposes described in paragraph 2 below of this Section 505 to the extent set forth in such written direction from the Corporation.

Any moneys remaining in the Revenue Account at any time and not deposited, transferred or retained as set forth in subsection 1 above (i) may be retained in the Revenue Account, (ii) may be transferred to the Redemption Account, or (iii) may be used for (I) the payment or reimbursement of Financing Costs, and for the payment of Operating Expenses in excess of the Operating Cap, (II) the purchase of Bonds, (III) deposits to the Bond Proceeds Account pursuant to Section 504.1, (IV) any combination of the foregoing, in each case as directed in writing by the Corporation to the Trustee, or (iv) may be released to the Corporation, free and clear of the lien of this Resolution, to be applied for any lawful purpose of the Corporation.

Purchases of Bonds from amounts in the Revenue Account shall be made upon the written direction of an Authorized Officer of the Corporation, with or without advertisement and with or without

notice to other Owners of Bonds. Such purchases shall be made at such price or prices as determined by such written instructions. If Sinking Fund Installments have been established for the maturities of Bonds purchased by the Corporation, then the Trustee, upon written instructions from an Authorized Officer of the Corporation, shall credit the principal amount purchased against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase.

**Debt Service Account (Section 506)**

There shall be transferred from the Revenue Account, and deposited into the Interest Subaccount, the Principal Subaccount and the Holding Subaccount of each Debt Service Account, the amounts required to be so transferred pursuant to paragraphs SECOND, FOURTH and SIXTH of Section 505.1.

There also shall be deposited into the Interest Subaccount of a Debt Service Account, if necessary, the following:

        (i)     Such amount determined by the applicable Series Resolution representing accrued interest received upon the sale of a Series of Bonds.

        (ii)     Amounts transferred from the Capitalized Interest Account for the payment of interest on the Bonds of such Series.

        (iii)     Amounts transferred from the Debt Service Reserve Account for the payment of interest on the Bonds and the interest component of Parity Obligations.

There also shall be deposited into the Principal Subaccount of a Debt Service Account, if necessary, the following:

        (i)     Amounts transferred from the Debt Service Reserve Account for the payment of Principal Installments of the Bonds and the principal component of Parity Obligations.

        (ii)     Amounts transferred from the Redemption Account for the payment of Principal Installments of any Bonds.

The Trustee shall pay out of the Interest Subaccount, to the Persons entitled thereto, (i) the interest on Bonds as and when due and payable, in the Currency in which the Bonds of such Series are payable, and (ii) the interest component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Interest Account pursuant to clause (i) or (ii) of the second paragraph of this Section shall not be used to pay the interest component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such interest due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Party Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

The Trustee shall pay out of the Principal Account, to the Persons entitled thereto, (i) each Principal Installment for the Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments) as and when due and payable, in the Currency in which the

Bonds of such Series are payable, and (ii) the principal component of Parity Obligations at the times, in the manner and on the other terms and conditions as determined by the Corporation and set forth in written directions of an Authorized Officer of the Corporation delivered to the Trustee; provided, however, that amounts deposited to the Principal Account pursuant to clause (ii) of the third paragraph of this Section shall not be used to pay the principal component of Parity Obligations; and provided further, however, that if the amount available shall not be sufficient to pay in full all such Principal Installments and principal due on the same date, then out of such available amount the Trustee shall make such payments under Bonds and Parity Obligations ratably, as determined by an Authorized Officer of the Corporation as evidenced in a written instrument delivered to the Trustee according to the amounts due on such date, without any discrimination or preference.

In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation delivered to the Trustee, withdraw from the Debt Service Account all or any portion of amounts accumulated therein with respect to the Bonds to be refunded and deposit such amounts as provided in such written direction; provided, however, that such withdrawal shall not be made unless immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below.

There shall be transferred from the Revenue Account, and deposited into the related Holding Subaccounts in the Debt Service Account, the Accrued Holding amounts related to the Senior Bonds, First Subordinate Bonds and Second Subordinate Bonds on the related dates set forth in the related Series Resolutions. The Trustee shall invest such amounts upon written direction of the Corporation in Defeasance Obligations and the Corporation shall take such actions as are required by Article XII to cause the related Bonds or portions thereof to be deemed paid and no longer Outstanding under the Resolution. The Trustee shall pay out of the Holding Subaccounts, to the Persons entitled thereto, on the dates set forth in such Series Resolutions, Principal Installments for the related Series of Bonds (including the Redemption Price payable upon mandatory redemption out of Sinking Fund Installments), which Principal Installments shall be paid from the related Holding Subaccounts prior to application of funds therefor from the Principal Subaccount or Interest Subaccount.

**Debt Service Reserve Account (Section 507)**

At the time any Series of Bonds is delivered pursuant to the Resolution, the Corporation shall pay into a Debt Service Reserve Account from the proceeds of such Bonds or other available funds, the amount, if any, necessary for the amount on deposit in such Debt Service Reserve Account to equal the Debt Service Reserve Requirement applicable to Bonds of such Series and Class, after giving effect to any Reserve Account Cash Equivalent, calculated immediately after the delivery of such Series of Bonds.

Except as otherwise provided by Supplemental Resolutions, amounts on deposit in a Debt Service Reserve Account shall be applied, to the extent other funds are not available therefor pursuant to the Resolution and the applicable Supplemental Resolution, to pay when due the Principal Installments and Redemption Price of and the interest on the Outstanding Bonds of the related Class and the principal and interest components of Parity Obligations, by transfer to the Debt Service Account or the Redemption Account, as applicable.

Whenever the amount in a Debt Service Reserve Account exceeds the related Debt Service Reserve Requirement, after giving effect to any Reserve Account Cash Equivalent, the Trustee shall, if so directed in writing by an Authorized Officer of the Corporation, withdraw from such Debt Service Reserve Account the amount of any excess therein over the Debt Service Reserve Requirement as of the date of such withdrawal and deposit the moneys so withdrawn into the Revenue Account.

Moneys in a Debt Service Reserve Account may and, at the written direction of an Authorized Officer of the Corporation, shall be withdrawn from the Debt Service Reserve Account by the Trustee and deposited in the Redemption Account for the purchase or redemption of Bonds at any time, provided that subsequent to such purchase or redemption the amount in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, will not be less than the related Debt Service Reserve Requirement. In the event of the refunding of any Bonds, the Trustee shall, upon the written direction of an Authorized Officer of the Corporation, withdraw from the related Debt Service Reserve Account all or any portion of amounts accumulated therein with respect to the Bonds being refunded and apply such amounts in accordance with such direction; provided, however, that such withdrawal shall not be made unless (i) immediately thereafter the Bonds being refunded shall be deemed to have been paid pursuant to the Section entitled "Defeasance" below and (ii) the amount remaining in the Debt Service Reserve Account, after giving effect to any Reserve Account Cash Equivalent, after such withdrawal shall not be less than the related Debt Service Reserve Requirement.

If a deficiency exists in a Debt Service Reserve Account, no later than the last Business Day of each calendar month the Trustee, upon written direction of an Authorized Officer of the Corporation, shall transfer from the Revenue Account, in accordance with the priorities set forth in of Section 505.1, and deposit in the Debt Service Reserve Account the amount, if any, required for the amount on deposit in the Debt Service Reserve Account to equal the related Debt Service Reserve Requirement as of the last day of such calendar month, after giving effect to any Reserve Account Cash Equivalent. Upon any withdrawal of amounts from the Debt Service Reserve Account, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds for reimbursement of such withdrawal from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required under Article 3(a) of the Act.

Whenever the amount in all Debt Service Reserve Accounts, without giving effect to any Reserve Account Cash Equivalent, together with the amount in all Debt Service Accounts, is sufficient to pay in full all Outstanding Bonds in accordance with their terms (including the maximum amount of Principal Installments and interest which could become payable thereon) and all amounts due and owing to Credit Facility Providers, the funds on deposit in the Debt Service Reserve Accounts shall be transferred to the Debt Service Account established for the same Class, and thereupon no further deposits shall be required to be made into the Debt Service Reserve Accounts. Prior to said transfer, all investments held in the Debt Service Reserve Accounts shall be liquidated to the extent necessary in order to provide for the timely payment of the Principal Installments of and interest on Bonds.

Reserve Account Cash Equivalents may be deposited in the Debt Service Reserve Account as provided in this paragraph. In lieu of any required transfers of moneys to the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to the difference between the Debt Service Reserve Requirement and the sums of moneys or value of Investment Securities then on deposit in the Debt Service Reserve Account, if any. In lieu of retaining all or any portion of the moneys theretofore on deposit in the Debt Service Reserve Account, the Corporation may cause to be deposited into the Debt Service Reserve Account a Reserve Account Cash Equivalent in an aggregate amount equal to such moneys, subject to the third paragraph of this Section. Each Reserve Account Cash Equivalent shall be payable (upon the giving of notice as required thereunder) on any date on which moneys may be required to be withdrawn from the Debt Service Reserve Account. If a disbursement is made pursuant to a Reserve Account Cash Equivalent, the Corporation shall either (i) reinstate the maximum limits of such Reserve Account Cash Equivalent or (ii) deposit into the Debt Service Reserve Account funds in the

amount of the disbursement made under such Reserve Account Cash Equivalent, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section. In the event that the rating attributable to any provider of any Reserve Account Cash Equivalent shall fall below that required in the definition thereof, such Reserve Account Cash Equivalent shall no longer be deemed to be a Reserve Account Cash Equivalent and the Corporation shall either (i) replace such Reserve Account Cash Equivalent with a Reserve Account Cash Equivalent which shall meet the requirements therefor or (ii) deposit into the Debt Service Reserve Account sufficient funds, or a combination of such alternatives, at the times and in the amounts required by the fifth paragraph of this Section.

Notwithstanding anything to the contrary contained in this Section, if amounts obtained under a Credit Facility or Reserve Account Cash Equivalent are to be used to pay the Principal Installments and Redemption Price of and interest on Bonds, then amounts in the Debt Service Reserve Account which would otherwise have been used for such purposes may be applied to reimburse the Credit Facility Provider for the amounts so obtained.

**Satisfaction of Sinking Fund Installments (Section 508)**

Any amount accumulated in the Debt Service Account up to the unsatisfied balance of each Sinking Fund Installment for Bonds may and, if so directed in writing by an Authorized Officer of the Corporation, shall be applied (together with amounts accumulated in the Debt Service Account with respect to interest on the Bonds for which such Sinking Fund Installment was established) by the Trustee prior to the forty-fifth day preceding the due date of such Sinking Fund Installment as follows: (i) to the purchase of Bonds of the maturity and interest rate for which such Sinking Fund Installment was established, at prices (including any brokerage and other charges) not exceeding the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of purchase, such purchases to be made in such manner as the Trustee shall determine; or (ii) to the redemption of such Bonds if then redeemable by their terms at the price equal to the principal amount (or Compounded Amount, if applicable) of such Bonds plus unpaid interest accrued to the date of redemption.

Upon the purchase or redemption of any Bond pursuant to the preceding paragraph, an amount equal to the principal amount (or Compounded Amount, if applicable) of the Bonds so purchased or redeemed shall be credited toward the next Sinking Fund Installment thereafter to become due with respect to the Bonds of such maturity and interest rate and the amount of any excess of the amounts so credited over the amount of such Sinking Fund Installment shall be credited against future Sinking Fund Installments in direct chronological order, unless otherwise instructed in writing by an Authorized Officer of the Corporation at the time of such purchase or redemption. Concurrently with the delivery of such Bonds, the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of such Sinking Fund Installment after giving effect to the delivery of such Bonds.

In satisfaction, in whole or in part, of any Sinking Fund Installment, the Corporation may deliver to the Trustee at least forty-five (45) days prior to the date of such Sinking Fund Installment, for cancellation, Bonds acquired by purchase of the Series and maturity and interest rate entitled to such Sinking Fund Installment. All Bonds so delivered to the Trustee in satisfaction of a Sinking Fund Installment shall reduce the amount of such Sinking Fund Installment by the aggregate principal amount (or Compounded Amount, if applicable) of such Bonds. Concurrently with such delivery of such Bonds the Corporation shall deliver to the Trustee a certificate of an Authorized Officer of the Corporation specifying (i) the principal amount (or Compounded Amount, if applicable), Series, maturity, interest rate

and numbers of the Bonds so delivered, (ii) the date of the Sinking Fund Installment in satisfaction of
which such Bonds are so delivered, (iii) the aggregate principal amount (or Compounded Amount, if
applicable) of the Bonds so delivered, and (iv) the unsatisfied balance of each such Sinking Fund
Installment after giving effect to the delivery of such Bonds.

In the event that Bonds are redeemed prior to maturity pursuant to any Section hereof
other than Section 403, there shall be credited the principal amount (or Compounded Amount, if
applicable) of the Bonds so redeemed against Sinking Fund Installments due hereunder; provided,
however, that the Corporation shall have delivered to the Trustee, at least forty-five (45) days prior to the
date of such Sinking Fund Installment, a certificate of an Authorized Officer of the Corporation
specifying (i) the principal amount, Series, maturity, interest rate and number of each Bond so redeemed,
(ii) the date of each Sinking Fund Installment in satisfaction of which such redeemed Bonds are credited,
(iii) the aggregate principal amount (or Compounded Amount, if applicable) of the Bonds so redeemed,
and (iv) the unsatisfied balance of each such Sinking Fund Installment after giving effect to the
redemption of such Bonds.

The Trustee shall, upon receipt of the notice specified by the Section entitled
"Redemption out of Sinking Fund Installments" above and in the manner provided in the Resolution, call
for redemption on the date of each Sinking Fund Installment falling due prior to maturity such principal
amount (or Compounded Amount, if applicable) of Bonds of the Series and maturity entitled to such
Sinking Fund Installment as is required to exhaust the unsatisfied balance of such Sinking Fund
Installment.  The Trustee shall redeem such Bonds with moneys as set forth in the Section entitled
"Redemption out of Sinking Fund Installments" above.

**Redemption Account; Amounts to be Deposited Therein (Section 509)**

The following, upon receipt thereof, shall be deposited into the Redemption Account:

(i)      amounts determined pursuant to the sixth paragraph of the
Section entitled "Costs of Issuance Account and Capitalized Interest Account" above;

(ii)      amounts determined pursuant to the fourth paragraph of the
Section entitled "Bond Proceeds Account" above;

(iii)      amounts determined pursuant to the second paragraph of the
Section entitled "Revenue Account" above; and

(iv)      amounts transferred from the Debt Service Reserve Account for
the payment of the Redemption Price of Bonds.

Subject to the limitations contained in the final paragraph of this Section, if, on the last
Business Day preceding any interest payment date for Bonds, Principal Installment due date for Bonds, or
due date of interest or principal components of Parity Obligations, the amount on deposit in the Debt
Service Account shall be less than the interest on Bonds due on such interest payment date, the Principal
Installment for Bonds due on such Principal Installment due date, or the interest or principal components
of Parity Obligations due on the due date thereof, and after giving effect to any amounts available therefor
in the Debt Service Reserve Account, then the Trustee, upon written direction of an Authorized Officer of
the Corporation, shall transfer from the Redemption Account to the Debt Service Account an amount (or
all of the moneys in the Redemption Account if less than the amount required) which will be sufficient to
make up such deficiency in the Debt Service Account.

To the extent not required to make up a deficiency as required in the second paragraph of this Section, amounts in the Redemption Account shall be applied by the Trustee, as promptly as practicable after delivery to it of written instructions from an Authorized Officer of the Corporation, to the purchase or redemption (including the payment of redemption premium, if any) of Bonds. Interest on Bonds so purchased or redeemed shall be paid from the Debt Service Account and all expenses in connection with such purchase or redemption shall be paid by the Corporation from moneys held in the Revenue Account pursuant to the second paragraph of the Section entitled "Revenue Account" above.

The transfers required by the second paragraph of this Section shall be made from amounts in the Redemption Account only to the extent that such amounts are not then required to be applied to the redemption of Bonds for which notice of redemption shall have been given pursuant to the Resolution, unless such notice is conditioned upon the availability of moneys on deposit in the Redemption Account.

## Rebate Account (Section 510)

The Rebate Account and the amounts deposited therein shall not be subject to a security interest, pledge, assignment, lien or charge in favor of the Trustee, any Owner of any Bond, any other Beneficiary or any other Person.

The Trustee shall deposit in the Rebate Account such amounts and at such times as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall withdraw from the Rebate Account such amounts and at such times, and deposit such amounts in the Revenue Account, as shall be specified in written instructions from an Authorized Officer of the Corporation delivered to the Trustee.

The Trustee shall have no responsibility or liability for the calculation of amounts required to be deposited in the Rebate Account under federal tax law.

## Investment of Funds, Accounts and Subaccounts Held by the Trustee (Section 602)

Moneys in any Fund, Account or Subaccount held by the Trustee shall be continuously invested and reinvested or deposited and redeposited by the Trustee upon the written direction of an Authorized Officer of the Corporation. The Corporation shall direct the Trustee to invest and reinvest the moneys in any Fund, Account or Subaccount held by the Trustee in Investment Obligations so that the maturity date or date of redemption at the option of the holders shall coincide as nearly as practicable with the times at which moneys are anticipated to be needed to be expended. The Investment Obligations purchased by the Trustee shall be held by it, or for its account as Trustee. The Trustee, at the written direction of the Corporation as to specific investments, shall sell, or present for redemption, any Investment Obligations purchased by it as an investment whenever it shall be necessary in order to provide moneys to meet any payment from such Fund, Account or Subaccount. The Trustee shall have no obligation to invest, reinvest, deposit, redeposit or sell investments contemplated by the Resolution except upon the written direction of an Authorized Officer of the Corporation as to specific investments. The Trustee shall have no liability for interest on any money received by it hereunder (except as otherwise agreed in writing with the Corporation and except that the Trustee shall invest such money as required pursuant to written direction of an Authorized Officer of the Corporation) and no responsibility for any loss (after giving effect to any interest or other income thereon except to the extent theretofore paid to the Corporation) incurred on the sale of such investments. The Trustee shall advise the Corporation in writing on or before the 20th day of each calendar month of all investments held for the

B-32

credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Moneys in any Fund, Account or Subaccount held by the Corporation shall be invested in Investment Obligations as determined by the Corporation.

Investment Obligations purchased under the provisions of the Resolution as an investment of moneys in any Fund, Account or Subaccount, whether held by the Trustee or the Corporation, shall be deemed at all times to be a part of such Fund, Account or Subaccount but, unless otherwise expressly provided in the Resolution or any Supplemental Resolution, (i) the income or interest earned and gains realized in excess of losses suffered by any Fund, Account (other than the Rebate Account) or Subaccount (other than any Subaccount in the Rebate Account) due to the investment thereof shall be deposited, upon written direction from an Authorized Officer of the Corporation to the Trustee, in the Rebate Account and if not required to be so deposited in the Rebate Account, because no such written direction was received, shall be deposited in the Bond Proceeds Account so long as there are moneys on deposit in the Capitalized Interest Account and, at any time that there are no moneys on deposit in the Capitalized Interest Account, shall be transferred for deposit in the Revenue Account, and (ii) all such income and interest received from any Investment Obligation on deposit in the Rebate Account shall remain in such Account. The Trustee shall keep a record of all such amounts deposited in the Revenue Account to indicate the source of the income or earnings.

The Trustee shall sell, or present for redemption or exchange, any Investment Obligation purchased by it pursuant to the Resolution or any Supplemental Resolution whenever it shall be requested in writing by an Authorized Officer of the Corporation to do so or whenever it shall be necessary in order to provide moneys to meet any payment or transfer from the Fund, Account or Subaccount for which such investment was made, except that any Investment Obligation may be credited to more than one Fund, Account or Subaccount based upon the portions thereof purchased by or allocable to each such Fund, Account or Subaccount and need not be sold in order to provide for the transfer of amounts from one Fund, Account or Subaccount to another. The Trustee shall advise the Corporation in writing, on or before the twentieth day of each calendar month, of all investments held for the credit of each Fund, Account or Subaccount in its custody under the provisions of the Resolution as of the end of the preceding month.

Nothing in the Resolution shall prevent any Investment Obligations acquired as investments of or security for Funds, Accounts or Subaccounts held under the Resolution from being issued or held in book-entry form on the books of the Corporation of the Treasury of the United States or any national securities depository.

In the event that the Trustee has not, prior to 11:00 a.m. on any Business Day, received investment instructions as provided herein as to any investment proceeds received hereunder, the Trustee shall invest the same in Investment Obligations having the shortest available maturity, in accordance with standing instructions received from an Authorized Officer of the Corporation.

**Particular Covenants of the Corporation**

*Payment of Obligations (Section 701)*

The Corporation shall duly and punctually pay or cause to be paid the principal and premium, if any, on every Bond and the interest thereon, and all Parity Obligations and Subordinate Obligations, at the date(s) and place(s) and in the manner mentioned in the Resolution, the applicable Supplemental Resolution, the Bonds, and applicable Credit Facilities, Liquidity Facilities, and Qualified

Hedges according to the true intent and meaning thereof, and shall duly and punctually satisfy all Sinking Fund Installments which may be established for any Series, subject to the provisions of Section 201. If, at the end of any Fiscal Year, the amount of Pledged Sales Tax received by the Trustee during such Fiscal Year shall be less than the Article 5(e) Amount applicable to such Fiscal Year, the Corporation shall take such actions as necessary to invoke the provisions of Section 5(e) of the Act to increase the amount of Pledged Sales Tax to cover such insufficiency in the next ensuing Fiscal Year. In addition, if the amount of Pledged Sales Tax applicable to a Fiscal Year shall be less than the Pledged Sales Tax Base Amount for such Fiscal Year, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Such notice shall include the instruction to the Secretary of the Treasury to provide available funds to make up the shortfall, and to the Director of the Office of Management and Budget to include in the recommended budget for the current Fiscal Year or the next Fiscal Year the appropriations necessary to cover such shortfall, in each case as provided in paragraph (a) of Article 45 of the Act and the second sentence of paragraph (e) of Article 5 of the Act.

*Further Assurance (Section 704)*

At any and all times the Corporation shall, so far as it may be authorized by law, pass, make, do, execute, acknowledge and deliver, all and every such further resolutions, acts, deeds, conveyances, assignments, transfers and assurances and record the same in any office or register as may be necessary or desirable for the better assuring, conveying, granting, assigning and confirming all and singular the rights and other moneys, securities and funds pledged or assigned by the Resolution, or intended so to be, or which the Corporation may become bound to pledge or assign and, if required by law, to perfect the security interest created thereby.

*Agreement of the Commonwealth (Section 706)*

Pursuant to the Act, the Corporation hereby includes, for the benefit of the Bondowners and the Beneficiaries, the pledge of the Commonwealth that, until the Bonds, of whichever date, together with the interest thereon, are totally paid and withdrawn, the Commonwealth will not (i) limit or restrict the rights or powers of the appropriate officers of the Commonwealth to impose, maintain, charge or collect the taxes and other receipts constituting amounts to be deposited in the Dedicated Sales Tax Fund in accordance with the provisions of the Act, provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation (including the Resolution), and (ii) limit or restrict the rights that are by the Act granted or the rights of the Corporation to meet its obligations to its Bondholders, until such Bonds, of whichever date, together with the interest thereon, have been completely paid and retired. The Act further provides that no amendment to the Act shall impair any obligation or commitment of the Corporation. The Corporation hereby covenants for the benefit of the Bondowners and the Beneficiaries that any such substitution of any security in the form of taxes, fees, charges or other receipts for the Dedicated Sales Tax shall not qualify as the delivery of "like or comparable security" in conformance with the foregoing covenant of the Commonwealth unless the Trustee shall have been provided with (i) written confirmation of all outstanding ratings of the Bonds from the Rating Agencies, taking such substitution into account, and (ii) written opinions of the Secretary of Justice, nationally recognized Bond Counsel, and Puerto Rico counsel expert in public finance matters, each concluding that the Puerto Rico Supreme Court, if properly presented with the issue, would conclude that the substituted assets and revenues have been validly imposed by law and that such substituted assets and revenues have been validly transferred to the Corporation and shall not constitute "available

resources" of the Commonwealth for purposes of Section 2 and Section 8 of Article VI of the Constitution of Puerto Rico nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

*Creation of Liens (Section 707)*

Until the pledge created by Resolution shall be discharged and satisfied as provided in the Section entitled "Defeasance" below, the Corporation shall not (i) issue any bonds or other evidences of indebtedness secured by a pledge of the Pledged Property held or set aside by the Corporation or by the Trustee under the Resolution, nor create or cause to be created any lien or charge on the Pledged Property, other than as permitted by the Resolution, (ii) at any time when the Corporation is in default in making any payment required to be made under the Resolution or maintaining the balance in any Fund, Account or Subaccount required to be maintained in the amount required therefor by the Resolution, set apart or appropriate and pay any amount in any Fund, Account or Subaccount except as required by the Resolution, nor (iii) issue any bonds or other evidences of indebtedness, other than the Bonds, secured by a pledge of any revenues, rates, fees, charges, rentals or other earned income or receipts, as derived in cash by or for the account of the Corporation, pledged under the Resolution. The Corporation may not issue Bonds with a payment priority or claim against the Pledged Property that is senior to that of the Senior Bonds. The Corporation, in its discretion, may determine to execute and deliver Subordinate Bonds and incur Subordinate Obligations of one or more Classes and payment priorities which are subordinate to the payment priorities accorded to the Senior Bonds under the Resolution.

*Accounts and Reports (Section 708)*

The Corporation shall keep proper books of record and account (separate from all other records and accounts) in which complete and correct entries shall be made of its transactions relating to the Pledged Property and each Fund, Account and Subaccount established under the Resolution, and which, together with all books and papers of the Corporation relating to the Repayment Project, shall at all reasonable times during normal business hours be subject to the inspection of the Trustee and the Owners of an aggregate of not less than 25% in principal amount of the Bonds then Outstanding or their representatives duly authorized in writing (it being understood that the Trustee shall have to duty to inspect).

The Corporation shall file with the Trustee and each Credit Facility Provider, Liquidity Facility Provider and Qualified Hedge Provider forthwith upon becoming aware of any Event of Default, or the occurrence of any event which with notice or lapse of time or both would be an Event of Default, a certificate signed by an Authorized Officer of the Corporation specifying any Event of Default or other event as described in this paragraph, and specifying the nature and status of such Event of Default or other such event.

*Tax Matters (Section 709)*

The covenants of this Section are made solely for the benefit of the Owners of, and shall be applicable solely to, all Bonds except Bonds to which the Corporation determines in a Supplemental Resolution that this Section shall not apply.

The Corporation will not make, or give its consent to the Trustee or any other Person to make, any use of the proceeds of the Bonds or of any moneys which may be deemed to be the proceeds of the Bonds pursuant to Section 148 of the Code which, if reasonably expected to have been so used on the date of issuance of the Bonds would have caused any of the Bonds to have been "arbitrage bonds" within

the meaning of said Section 148 and the regulations in effect thereunder at the time of such use and applicable to obligations issued on the date of issuance of the Bonds.

The Corporation shall at all times do and perform all acts and things necessary or desirable and within its power in order to assure that interest paid on the Bonds shall be excluded from gross income for Federal income tax purposes.

Notwithstanding any other provision of the Resolution, including in particular the Section entitled "Defeasance" below, the obligation to comply with the requirements of this Section shall survive the defeasance or payment in full of the Bonds.

*Issuance of Additional Bonds; Incurrence of Additional Parity Obligations and Subordinate Obligations; Payment of Obligations (Section 710)*

1. No Series of Bonds in addition to Bonds issued on and prior to the date of issuance of Bonds designated "Series 2008A" may be issued without compliance with Section 202 and with the provisions of the Act that require that the Executive Director or other Authorized Officer of the Corporation certify that the principal and interest of the Corporation's bonds to be issued plus the principal and interest of all outstanding bonds (other than those bonds to be paid with the proceeds of the new bonds or those payments of principal and interest for which moneys sufficient for their payment have been segregated) payable every Fiscal Year (beginning with the current Fiscal Year) is less than or equal to the Pledged Sales Tax Base Amount assigned to the Corporation and corresponding to each such Fiscal Year plus any Build America Bond Tax Credit Receipts the Corporation expects to receive during each such Fiscal Year. In addition, no such Series of Bonds may be issued, and no Parity Obligations or Subordinate Obligations in addition to Parity Obligations incurred on and prior to the date of issuance of Bonds designated "Series 2008A" may be incurred, unless the Corporation shall have filed with the Trustee a certificate of an Authorized Officer of the Corporation reflecting the following (in each case, Accrued 12-Month Obligation (Senior), Accrued 12/15-Month Obligation (Senior), Accrued 12-Month Obligation (Subordinate) and Accrued 12/15-Month Obligation (Subordinate) shall each have credited thereto any capitalized interest available for transfer, and/or transferred, to the related Debt Service Accounts during the relevant period, any Build America Bond Tax Credit Amounts paid to the Trustee for deposit in the related Debt Service Accounts during the relevant period, and any Accrued Holding Amounts transferred to the related Holding Subaccounts in the Debt Service Accounts during the relevant period):

*All Bonds, Parity Obligations and Subordinate Obligations*

(1) (a) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Bonds are to be issued or Parity Obligations or Subordinate Obligations are to be incurred and in each Fiscal Year thereafter during which Bonds and Parity Obligations or Subordinate Obligations, including such additional Bonds or Parity Obligations or Subordinate Obligations, are to be Outstanding, taking into account the minimum adjustment thereto to the extent provided in the Act, and (b) the Accrued 12-Month Obligation (Senior) and Accrued 12-Month Obligation (Subordinate) for all Outstanding Bonds, Parity Obligations and Subordinate Obligations, including such additional Bonds, Parity Obligations and Subordinate Obligations, for each Related August 2 Computation Period, and showing that the amount in clause (1)(a) for each such Fiscal Year at least equals 102% of the amount in clause (1)(b) hereof for each such Related August 2 Computation Period;

*Additional Requirements—Senior Bonds and Parity Obligations*

A.    (i) the Pledged Sales Tax Base Amount applicable to the Fiscal Year in which such additional Senior Bonds are to be issued or Parity Obligations are to be incurred, (ii) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds, and Parity Obligations, and the Operating Cap applicable, for the 12-month period constituting such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), (iii) the Pledged Sales Tax Base Amount for each subsequent Fiscal Year taking into account the minimum adjustment thereto to the extent provided in the Act, and (iv) the Accrued 12/15-Month Obligation (Senior) with respect to the Senior Bonds and Parity Obligations, including such additional Senior Bonds and Parity Obligations, and the Operating Cap applicable, in each subsequent Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing *first* that the amount in clause (A)(i) hereof at least equals the amount in clause (A)(ii) hereof, and *second* that the amount for each subsequent Fiscal Year in clause (A)(iii) hereof at least equals the amount for such Fiscal Year in clause (A)(iv) hereof, and

B.    (i) the total amount of Commonwealth Sales Tax assumed to be received in each Fiscal Year during which Senior Bonds and Parity Obligations, including such additional Senior Bonds or additional Parity Obligations, are to be Outstanding under the Resolution, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Senior Bonds or incurrence of such additional Parity Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), and (ii) the total Accrued 12/15-Month Obligation (Senior) with respect to all Outstanding Senior Bonds and all Parity Obligations, including such additional Senior Bonds and additional Parity Obligations, in each such Fiscal Year (attributing to such Fiscal Year any calculation thereof for any 15-month period ending three months after the end of such Fiscal Year as required by the definition of "Accrued 12/15-Month Obligation (Senior)"), and showing, for each such Fiscal Year, that the amount in (B)(i) hereof is at least three (3) times the related amount in (B)(ii) hereof, and

C.  No Senior Bonds or Parity Obligations in addition to Bonds issued or incurred on and prior to the date of issuance of the Bonds designated "Series 2008A" may be issued or incurred except (i) as Refunding Bonds, provided that the Accrued 12/15-Month Obligation (Senior) for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds, or (ii) for the purpose of the payment or retirement of extra-constitutional debt of the Commonwealth outstanding as of June 30, 2006, provided, that for additional Senior Bonds to be issued for purposes of this clause (ii), the debt service for any such additional Senior Bonds shall not be scheduled to be paid more frequently than quarterly and the debt service for all Senior Bonds (including such additional Senior Bonds) and principal and interest components of Parity Obligations for each Fiscal Year during which such additional Senior Bonds are Outstanding shall not exceed the Pledged Sales Tax Original Base Amount for each such Fiscal Year.

*Additional Requirement--First Subordinate Bonds and First Subordinate Obligations*

D. *except* with respect to First Subordinate Bonds issued as Refunding Bonds and First Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and First Subordinate Obligations, the remaining requirements of this subsection (D) shall be inapplicable), for each Fiscal Year during which First Subordinate Bonds and First Subordinate

Obligations, including such additional First Subordinate Bonds or additional First Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax assumed to be received, based on the assumption that the Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional First Subordinate Bonds or incurrence of such additional First Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior), and Accrued 12/15-Month Obligation (Subordinate) for the Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds and First Subordinate Obligations, and such additional First Subordinate Bonds or additional First Subordinate Obligations for each Related August 2 Computation Period, and showing that the amount in (D)(i) hereof for each such Fiscal Year is at least two (2.0) times the amount in (D)(ii) hereof for each such Related August 2 Computation Period.

*Additional Requirement--Second Subordinate Bonds and Second Subordinate Obligations*

E. *except* with respect to Second Subordinate Bonds issued as Refunding Bonds and Second Subordinate Obligations incurred in connection with such Refunding Bonds provided that the Accrued 12-Month Obligation (Subordinate) related thereto for each Related August 2 Computation Period shall not have thereby been increased following the issuance of such Refunding Bonds (as to such Refunding Bonds and Second Subordinate Obligations, the remaining requirements of this subsection (E) shall be inapplicable), for each Fiscal Year during which Second Subordinate Bonds and Second Subordinate Obligations, including such additional Second Subordinate Bonds or additional Second Subordinate Obligations, are to be Outstanding under the Resolution, (i) the total amount of Commonwealth Sales Tax actually received in the Fiscal Year immediately preceding the date of issuance of such additional Second Subordinate Bonds or incurrence of such additional Second Subordinate Obligations is to be increased for each subsequent Fiscal Year by four percent (4%), (ii) the Accrued 12/15-Month Obligation (Senior) and the Accrued 12/15-Month Obligation (Subordinate) for all Outstanding Senior Bonds, Parity Obligations, First Subordinate Bonds, First Subordinate Obligations, Second Subordinate Bonds and Second Subordinate Obligations, and such additional Second Subordinate Bonds or additional Second Subordinate Obligations for each Related August 2 Computation Period, and showing that the relationship of the amount in (E)(i) hereof for each such Fiscal Year to the amount in clause (E)(ii) hereof for each such Related August 2 Computation Period satisfies the Second Subordinate Coverage Test.

2. In the event that amounts are paid to providers of Qualified Hedges, Credit Facilities or Liquidity Facilities pursuant to the transfers of funds required by the Resolution which do not represent scheduled payments or reimbursements in accordance with the terms of the related contracts, but represent costs, indemnities, termination payments or similar non-recurring amounts, or in the event such unscheduled amounts are due to such providers and there are insufficient funds held hereunder and available for the payment thereof, the Corporation shall provide written notice thereof to the Secretary of the Treasury and to the Director of the Office of Management and Budget. Pursuant to the authority of the Act, such notice to the Secretary of the Treasury shall include the instruction to provide funds to the Trustee for the payment or reimbursement of such payments, from the first Dedicated Sales Tax collected in the next ensuing Fiscal Year after making the deposits required by Article 3(a) of the Act and, to the extent such amounts are insufficient to make a complete reimbursement thereof, from the first Dedicated Sales Taxes received in subsequent Fiscal Years after making the deposits required by Article 3(a) of the Act. Any such amounts paid by the Secretary of the Treasury shall be deposited in the Revenue Account.

3. The Corporation may issue Subordinate Bonds or incur Subordinate Obligations of Class Priority which is lower than that of First Subordinate Bonds and First Subordinate Obligations and that of Second Subordinate Bonds and Second Subordinate Obligations at any time subject to the

requirements of the related Series Resolution and without compliance with the requirements of subsection 1 of this Section 710.

*General (Section 711)*

The Corporation shall do and perform or cause to be done and performed all acts and things required to be done or performed by or on behalf of the Corporation under the provisions of the Act and the Resolution.

Upon the date of authentication and delivery of any of the Bonds, all conditions, acts and things required by law and the Resolution to exist, to have happened and to have been performed precedent to and in the issuance of such Bonds shall exist, shall have happened and shall have been performed and the issue of such Bonds, together with all other indebtedness of the Corporation, shall be within every debt and other limit prescribed by the laws of the Commonwealth.

## Responsibilities of Trustee (Section 802)

The Trustee undertakes to perform such duties and only such duties as are specifically set forth in the Resolution, and no implied covenants or obligations shall be read into the Resolution against the Trustee. The recitals of fact in the Resolution and in the Bonds contained shall be taken as the statements of the Corporation and the Trustee assumes no responsibility for the correctness of the same. The Trustee makes no representations as to the validity or sufficiency of the Resolution or any Supplemental Resolution or of any Bonds issued thereunder or as to the security afforded by the Resolution or any Supplemental Resolution, and the Trustee shall incur no liability in respect thereof. The Trustee makes no representations as to the value, condition or sufficiency of any assets pledged or assigned as security for the Bonds, the right, title or interest of the Corporation therein, the security provided thereby or by the Resolution, the feasibility of the Repayment Project, the compliance by the Repayment Project with the Act, or the tax-exempt status of Bonds. The Trustee shall, however, be responsible for its representation contained in its certificate of authentication on the Bonds. The Trustee shall be under no responsibility or duty with respect to the authentication and delivery of the Bonds for value or the application of the proceeds thereof or the application of any moneys paid to the Corporation. The Trustee shall not be responsible for the validity, perfection, priority or enforceability of the pledge and security interest in the Pledged Property created or intended to be created by the Resolution, whether or not impaired by operation of law. No provision of the Resolution shall be deemed to impose any duty or obligation on the Trustee to perform any act or acts, receive or obtain any interest in property or exercise any interest in property, or exercise any right, power, duty or obligation conferred or imposed on it in any jurisdiction in which it shall be illegal, or in which the Trustee shall be unqualified or incompetent in accordance with applicable law, to perform any such act or acts, to receive or obtain any such interest in property or to exercise any such right, power, duty or obligation. The Trustee shall be under no obligation or duty to perform any act which would involve it in expense or liability or to institute or defend any suit in respect hereof, or to advance any of its own moneys, unless provided with security and indemnity satisfactory to it. The Trustee shall be under no obligation to exercise any of the rights or powers vested in it by the Resolution at the request or direction of any of the Owners pursuant to the Resolution, unless such Owners shall have offered to the Trustee security or indemnity satisfactory to the Trustee against the costs, expenses and liabilities which might be incurred by it in compliance with such request or direction. The permissive right of the Trustee to take actions enumerated in the Resolution shall not be construed as a duty. The Trustee shall not be liable in connection with the performance of its duties under the Resolution except for its own gross negligence or willful misconduct. The Trustee shall not be liable for any error of judgment made in good faith by an Authorized Officer of the Trustee, unless it shall be proved that the Trustee was grossly negligent in ascertaining the pertinent facts. The Trustee shall not be liable with respect to any action taken or omitted to be taken by it in good faith in accordance

with the direction of the Owners of a majority in principal amount of the Outstanding Bonds relating to the time, method and place of conducting any proceeding for any remedy available to the Trustee or exercising any trust or power conferred upon the Trustee under the Resolution. The Trustee shall not be liable for any action taken, suffered, or omitted to be taken by it in good faith and believed by it to be authorized or within the discretion or rights or powers conferred upon it by the Resolution. Anything in the Resolution notwithstanding, in no event shall the Trustee be liable for special, indirect, punitive or consequential loss or damage of any kind whatsoever (including but not limited to loss of profit), even if the Trustee has been advised as to the likelihood of such loss or damage and regardless of the form of action. Whether or not therein expressly so provided, every provision of the Resolution relating to the conduct or affecting the liability of or affording protection to the Trustee shall be subject to the provisions of the Resolution.

**Evidence on Which Trustee May Act (Section 803)**

The Trustee may conclusively rely and shall be fully protected in acting or refraining from acting upon any notice, resolution, request, consent, order, direction, certificate, report, opinion, bond, or other paper or document believed by it to be genuine, and to have been signed or presented by the proper party or parties. The Trustee may consult with counsel, who may or may not be of counsel to the Corporation, and the advice of such counsel or any Opinion of Counsel shall be full and complete authorization and protection in respect of any action taken or omitted to be taken or suffered by it under the Resolution in the absence of bad faith and in reliance thereon; provided, however, that such opinion of counsel shall not relieve the Trustee from obtaining an Opinion of Bond Counsel when and if required under the Resolution.

Whenever the Trustee shall deem it necessary or desirable that a matter be proved or established prior to taking or omitting to take or suffering any action under the Resolution, such matter (unless other evidence in respect thereof be therein specifically prescribed) may be deemed to be conclusively proved and established by a certificate of an Authorized Officer of the Corporation, and such certificate shall be full warrant and protection for any action taken or omitted to be taken or suffered, in the absence of bad faith, under the provisions of the Resolution in reliance thereon.

Except as otherwise expressly provided in the Resolution, any request, order, notice or other direction required or permitted to be furnished pursuant to any provision thereof by the Corporation to the Trustee shall be sufficiently evidenced if executed in the name of the Corporation by an Authorized Officer of the Corporation.

**Compensation and Indemnification (Section 804)**

The Corporation shall pay to the Trustee from time to time reasonable compensation for all services rendered under the Resolution (which compensation shall not be limited by any provision of law in regard to the compensation of a trustee of an express trust), and also all reasonable expenses, charges, counsel fees and other disbursements, including those of its attorneys, agents, and employees, incurred in and about the performance of their powers and duties under the Resolution and the Trustee shall have a lien prior to that of the Bondowners and other Beneficiaries therefor on any and all funds at any time held by it under the Resolution. The Corporation further agrees to indemnify and save the Trustee harmless against any loss, liability or expenses including taxes (other than taxes based upon, measured by or determined by the income of the Trustee), arising out of or in connection with the acceptance or administration of the trust or trusts hereunder, including the costs and expenses of defending itself against any claim (whether asserted by the Corporation or any Bondowner or any other Person) or liability in connection with the exercise or performance of any of its powers or duties hereunder, or in connection with enforcing the provisions of this Section, except to the extent that such

B-40

loss, damage, claim, liability or expense is due to its own gross negligence or willful misconduct. In addition to, but without prejudice to its other rights under the Resolution, when the Trustee incurs expenses or renders services in connection with an a bankruptcy or similar event, the expenses (including the reasonable charges and expenses of its counsel) and the compensation for the services are intended to constitute expenses of administration under any applicable federal or state bankruptcy, insolvency or other similar law. "Trustee" for purposes of Section 804 of the Resolution shall include any predecessor Trustee; provided, however, that the negligence, willful misconduct or bad faith of any Trustee hereunder shall not affect the rights of any other Trustee hereunder. The obligations of the Corporation and the lien provided for under the Resolution shall survive the satisfaction and discharge of the Bonds, the termination for any reason of the Resolution or the earlier resignation or removal of the Trustee. The Trustee shall not be required to expend any of its own funds in the execution of its duties pursuant to the provisions of the Resolution.

**Certain Permitted Acts (Section 805)**

The Trustee may become the owner of any Bonds, with the same rights it would have if it were not the Trustee. To the extent permitted by law, the Trustee may act as depositary for, and permit any of its officers or directors to act as a member of, or in any other capacity with respect to, any committee formed to protect the rights of Bondowners or to effect or aid in any reorganization growing out of the enforcement of the Bonds or the Resolution, whether or not any such committee shall represent the Owners of a majority in principal amount of the Bonds then Outstanding.

**Resignation of Trustee (Section 806)**

The Trustee may at any time resign and be discharged of the duties and obligations created by the Resolution by giving not less than 30 days' written notice to the Corporation (which shall give prompt written notice to each Beneficiary) and to the Bondowners (mailed, postage prepaid), specifying the date when such resignation shall take effect, and such resignation shall take effect upon the day specified in such notice unless (i) no successor shall have been appointed by such date in which case such resignation shall become effective upon the appointment of a successor, or (ii) previously a successor shall have been appointed by the Corporation or the Bondowners as provided in the Section entitled "Appointment of Successor Trustee" below, in which event such resignation shall take effect immediately on the appointment of such successor.

**Removal of Trustee (Section 807)**

The Trustee may be removed at any time, with or without cause, by an instrument or concurrent instruments in writing, delivered to the Trustee, and signed by the Owners of a majority in principal amount of the Bonds then Outstanding or their attorneys-in-fact duly authorized, excluding any Bonds held by or for the account of the Corporation, or, so long as no Event of Default or event which with the giving of notice or the passage of time would constitute an Event of Default has occurred and is continuing, by an instrument in writing delivered to the Trustee and signed by an Authorized Officer of the Corporation; provided, however, that in each case that a successor Trustee shall be simultaneously appointed with the filing of such instrument.

**Appointment of Successor Trustee (Section 808)**

In case at any time the Trustee shall resign or shall be removed or shall become incapable of acting, or shall be adjudged bankrupt or insolvent, or if a receiver, liquidator or conservator of the Trustee, or of its property, shall be appointed, or if any public officer shall take charge or control of the Trustee, or of its property or affairs, a successor may be appointed by the Owners of a majority in

principal amount of the Bonds then Outstanding, excluding any Bonds held by or for the account of the Corporation, by an instrument or concurrent instruments in writing signed and acknowledged by such Bondowners or by their attorneys-in-fact duly authorized and delivered to such successor Trustee, notification thereof being given to the Corporation and the predecessor Trustee; provided, nevertheless, that unless a successor Trustee shall have been appointed by the Bondowners as aforesaid, the Corporation by a duly executed written instrument signed by an Authorized Officer of the Corporation shall forthwith appoint a Trustee to fill such vacancy until a successor Trustee shall be appointed by the Bondowners as authorized in this Section. The Trustee shall mail a copy of the notice of any such appointment, postage prepaid, to the Owners of any Bonds, at their last addresses appearing on the registry books. Any successor Trustee appointed by the Corporation shall, immediately and without further act, be superseded by a Trustee appointed by the Bondowners.

If in a proper case no appointment of a successor Trustee shall be made pursuant to the foregoing provisions of this Section within 30 days after the Trustee shall have given to the Corporation written notice as provided in the Section entitled "Removal of Trustee" above or after a vacancy in the office of the Trustee shall have occurred by reason of its inability to act or its removal under this Section, the Trustee or the Owner of any Bond may apply to any court of competent jurisdiction to appoint a successor Trustee. Said court may thereupon, after such notice, if any, as such court may deem proper, appoint a successor Trustee.

Any Trustee appointed under the provisions of this Section in succession to the Trustee shall be a bank or trust company organized under the laws of a state of the United States of America or of the Commonwealth, or a national banking association, and having a capital and surplus aggregating at least $50,000,000, if there be such a bank or trust company or national banking association willing and able to accept the office on reasonable and customary terms and authorized by law to perform all the duties imposed upon it by the Resolution.

**Supplemental Resolutions (Article IX)**

*Supplemental Resolutions Effective upon Filing with the Trustee (Section 901)*

For any one or more of the following purposes and at any time or from time to time, the Corporation may adopt a Supplemental Resolution which, upon the filing with the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, shall be fully effective in accordance with its terms:

(i) to close the Resolution against, or provide limitations and restrictions in addition to the limitations and restrictions contained in the Resolution on, the authentication and delivery of the Bonds or the issuance of other evidences of indebtedness;

(ii) to add to the covenants and agreements of the Corporation in the Resolution, other covenants and agreements to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iii) to add to the limitations and restrictions in the Resolution, other limitations and restrictions to be observed by the Corporation which are not contrary to or inconsistent with the Resolution as theretofore in effect;

(iv) to surrender any right, power or privilege reserved to or conferred upon the Corporation by the Resolution to the extent such surrender is for the benefit of the Owners of the Bonds;

(v) to authorize Bonds of a Series and, in connection therewith, specify and determine the matters and things referred to in the Section of the Resolution relating to the general provisions for the issuance of Bonds, and also any other matters and things relative to such Bonds which are not contrary to or inconsistent with the Resolution as theretofore in effect, or to amend, modify or rescind any such authorization, specification or determination at any time prior to the first authentication and delivery of such Bonds;

(vi) to confirm, as further assurance, any pledge under, and the subjection to any lien or pledge created or to be created by, the Resolution, of the Pledged Property or of any other moneys, securities, funds or accounts;

(vii) to modify any of the provisions of the Resolution as may be necessary or desirable to provide for the issuance of Bonds in book entry form pursuant to the Resolution;

(viii) to cure any ambiguity, defect or inconsistent provision in the Resolution;

(ix) to provide such provisions with respect to Subordinate Bonds as are necessary and desirable, provided, that no such provisions shall adversely affect the payment priorities under the Resolution of any Bonds then Outstanding;

(x) to provide for a pledge of Pledged Property for the payment and as security for Liquidity Facilities and Qualified Hedges as permitted by the Section entitled "Pledge" above.

(xi) as permitted by the Resolution prior to the issuance and delivery of the first series of Bonds under the Resolution; and

(xii) to insert such provisions clarifying matters or questions arising under the Resolution as are necessary or desirable and are not contrary to or inconsistent with the Resolution as theretofore in effect; or

(xiii) to modify any of the provisions of the Resolution or any previously adopted Supplemental Resolution in any respect whatsoever, provided that (i) such modification shall be, and be expressed to be, effective only after all Bonds of any Series Outstanding at the date of the adoption of such Supplemental Resolution shall cease to be Outstanding and (ii) such Supplemental Resolution shall be specifically referred to in the text of all Bonds of any Series authenticated and delivered after the date of the adoption of such Supplemental Resolution and of Bonds issued in exchange therefor or in place thereof.

*Supplemental Resolutions Effective with Consent of Bondowners (Section 903)*

At any time or from time to time, the Corporation may adopt a Supplemental Resolution subject to consent by Bondowners in accordance with and subject to the provisions of Resolution relating

to the amendment of the Resolution, which Supplemental Resolution, upon the delivery to the Trustee of a copy thereof certified by an Authorized Officer of the Corporation, and upon compliance with the provisions of the Section of the Resolution relating to amendment of the Resolution, shall become fully effective in accordance with its terms as provided in said Section.

*General Provisions (Section 904)*

The Resolution shall not be modified or amended in any respect except as provided in and in accordance with and subject to the provisions of Resolution relating to Supplemental Resolutions and to amendment of the Resolution. Nothing in the Resolution relating to Supplemental Resolutions and to amendment of the Resolution shall affect or limit the right or obligation of the Corporation to adopt, make, execute, acknowledge or deliver any resolution, act or other instrument pursuant to the provisions of the Section entitled "Further Assurances" above or the right or obligation of the Corporation to execute and deliver to the Trustee any instrument which elsewhere in the Resolution it is provided shall be delivered to the Trustee.

Any Supplemental Resolution referred to and permitted or authorized by the Sections entitled "Supplemental Resolutions Effective Upon Filing with the Trustee" or "Supplemental Resolutions Effective Upon Consent of the Trustee" may be adopted by the Corporation without the consent of any of the Bondowners, but shall become effective only on the conditions, to the extent and at the time provided in said Sections, respectively. The copy of every Supplemental Resolution when delivered to the Trustee shall be accompanied by an Opinion of Bond Counsel stating that such Supplemental Resolution has been duly and lawfully adopted in accordance with the provisions of the Resolution, is authorized or permitted by the Resolution, and is valid and binding upon the Corporation and enforceable in accordance with its terms.

The Trustee is authorized to accept the delivery of a certified copy of any Supplemental Resolution referred to and permitted or authorized by the Resolution and to make all further agreements and stipulations which may be therein contained, and the Trustee, in taking such action in good faith, shall be fully protected in relying on an Opinion of Bond Counsel that such Supplemental Resolution is authorized or permitted by the provisions of the Resolution.

No Supplemental Resolution shall change or modify any of the rights or obligations of the Trustee without its written assent thereto.

**Powers of Amendment (Section 1002)**

Any modification or amendment of the Resolution and of the rights and obligations of the Corporation and of the Owners of the Bonds may be made by a Supplemental Resolution, with the written consent given as provided in the Resolution, (i) of the Owners of at least a majority in principal amount of the Bonds Outstanding at the time such consent is given, and (ii) in case less than all of the several Series of Bonds then Outstanding are affected by the modification or amendment, of the Owners of at least a majority in principal amount of the Bonds of each Series so affected and Outstanding at the time such consent is given; provided, however, that if such modification or amendment will, by its terms, not take effect so long as any Bonds of any specified like Series and maturity remain Outstanding, the consent of the Owners of such Bonds shall not be required and such Bonds shall not be deemed to be Outstanding for the purpose of any calculation of Outstanding Bonds under this Section. No such modification or amendment shall permit a change in the terms of redemption or maturity of the principal (or Compounded Amount, if applicable) of any Outstanding Bond or of any installment of interest thereon or a reduction in the principal amount (or Compounded Amount, if applicable) or the Redemption Price thereof or in the rate of interest thereon without the consent of each Bondowner affected thereby, or shall reduce the

B-44

percentage of the aggregate principal amount (or Compounded Amount, if applicable) of Bonds or otherwise affect classes of Bonds the consent of the Owners of which is required to effect any such modification or amendment without the consent of all Bondowners, or shall change or modify any of the rights or obligations of the Trustee without its written assent thereto, or shall change or modify any of the rights of the providers of Qualified Hedges, Credit Facilities or Liquidity Facilities regarding source of and security for payments due to such Persons. For the purposes of this Section, a Series shall be deemed to be affected by a modification or amendment of the Resolution if the same adversely affects or diminishes the rights of the Owners of Bonds of such Series. The Trustee may in its discretion determine whether or not in accordance with the foregoing powers of amendment, Bonds of any particular Series or maturity would be affected by any modification or amendment of the Resolution and any such determination if reasonable and in good faith shall be binding and conclusive on the corporation and all Owners of Bonds.

**Events of Default and Remedies (Article XI)**

*Events of Default (Section 1101)*

Each of the following events shall constitute an Event of Default under the Resolution:

(i)     There shall occur a default in the payment of principal or Redemption Price of or interest on any Bond or payments due to any Parity Obligation or any Subordinate Obligation related thereto after the same shall have become due, whether at maturity or upon call for redemption or otherwise.

(ii)     There shall occur a failure to observe, or a refusal to comply with, the terms of the Resolution or the Bonds, other than a failure or refusal constituting an event specified in paragraph (i) of this subsection; provided, however, that with respect to any failure to observe or refusal to comply with the covenants and agreements set forth in the Resolution, such failure or refusal shall have continued for a period of thirty (30) days after written notice, specifying such failure and requesting that it be remedied, is given to the Corporation by the Trustee or any Beneficiary; and provided further, however, that if the failure stated in the notice cannot be remedied within the thirty-day period, corrective action has been instituted by the Corporation within such thirty-day period and is being diligently pursued;

*provided,* that Owners of Subordinate Bonds or obligees under Subordinate Obligations may not declare an Event of Default, or cause the Trustee to take any remedial actions hereunder in the event such Subordinate Bonds or Subordinate Obligations are not timely paid amounts due thereunder, until such time that Senior Bonds and all Parity Obligations are fully retired or are defeased in accordance with the provisions of the Resolution, and all references in Article XI of the Resolution to the Owners of Bonds exercising or directing the exercise of default remedies shall refer solely to those Bonds as to which an Event of Default has been declared hereunder.

In the event that the Corporation shall issue one or more Classes of Subordinate Bonds, or execute Subordinate Obligations, the related Series Resolution shall provide for the determination of Events of Default, and the imposition of remedies contained elsewhere in this Article XI, in accordance with the Class Priority set forth in such Series Resolution, which Class Priority shall in all cases provide that all Senior Bonds and all Parity Obligations related thereto shall be accorded senior status such that no Event of Default may be declared for default related to such Subordinate Bonds or Subordinate Obligations, and no remedy may be invoked under this Article XI for any such default on Subordinate

Bonds or Subordinate Obligations, until the Senior and all Parity Obligations related thereto are fully retired or are defeased in accordance with the provisions of the Resolution.

*Remedies (Section 1102)*

Upon the happening and continuance of any Event of Default, then and in each such case the Trustee may proceed to, and, upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds shall, declare the principal of and accrued interest on the Bonds to be immediately due and payable (Capital Appreciation Bonds at their Compounded Amount on the date of acceleration). Upon any such declaration, the principal of (Compounded Amount for Capital Appreciation Bonds) and accrued interest on the accelerated Bonds shall become due and payable immediately, and the Trustee shall make demand for payment upon the Corporation in an amount sufficient to pay principal of (Compounded Amount for Capital Appreciation Bonds) and interest accrued on the accelerated Bonds to the date established for payment thereof. In any such event, any Credit Facility Provider may elect to pay an amount equal to the accelerated principal (Compounded Amount) of and interest accrued on the Bonds covered by its Credit Facility to the date of acceleration and the Trustee shall accept such payment. In addition, the Trustee may, and upon the written request of the Owners of not less than twenty-five per centum (25%) in principal amount of the Outstanding Bonds, shall, proceed to protect and enforce its rights and the rights of the Bondowners by such of the following remedies, as the Trustee, being advised by counsel shall deem most effectual to protect and enforce such rights subject to the provisions of Sections 201, 803 and 1206:

(i) by suit, action or proceeding to enforce all rights of the Bondowners, including the right to collect or require the Corporation to collect Revenues adequate to carry out the covenants, agreements and pledges with respect thereto contained in the Resolution and to require the Corporation to carry out any other covenant or agreement with Bondowners and to perform its duties under the Act;

(ii) by suit upon the Bonds limited, upon recovery thereunder, to the Pledged Property pledged under the Resolution;

(iii) by action or suit in equity, to require the Corporation to account as if it were the trustee of an express trust for the Bondowners, for the Pledged Property and assets pledged under the Resolution as shall be within its control; and

(iv) by action or suit in equity, to enjoin any acts or things which may be unlawful or in violation of the rights of the Bondowners or the Beneficiaries.

In the enforcement of any remedy under the Resolution, but subject to the Sections entitled "Authorization of Bonds," "The Pledge" and "No Personal Liability," the Trustee shall be entitled to sue for, enforce payment on and receive any and all amounts then or during any default becoming, and at any time remaining, due from the Corporation for principal, Redemption Price, interest or otherwise for Bonds under any provision of the Resolution or any Supplemental Resolution or of the Bonds, and unpaid, with interest on overdue payments at the rate or rates of interest specified in such Bonds, together with any and all costs and expenses of collection and of all proceedings under the Resolution and under such Bonds, without prejudice to any other right or remedy of the Trustee or of the Bondowners, and to recover and enforce judgment or decree against the Corporation for any portion of such amounts remaining unpaid, with interest, costs and expenses, in any manner provided by law, the moneys adjudged or decreed to be payable.

*Priority of Payments After Event of Default (Section 1103)*

Subject to Section 804 and after making provision for the payment of any reasonable expenses of the Trustee and its agents and attorneys necessary in the opinion of the Trustee to protect the interests of the Owners of the Bonds and the other Beneficiaries, and for the payment of the reasonable charges and expenses and liabilities incurred and advances made by the Trustee and its agents and attorneys in the performance of their duties under the Resolution, in the event that the funds held by the Trustee shall be insufficient for the payment of interest and principal or Compounded Amount or Redemption Price then due on the Bonds and other amounts payable as described in clauses FIRST through FIFTH below, such funds (excluding funds held for the payment or redemption of particular Bonds which have theretofore become due at maturity or by call for redemption) and any other moneys received or collected by the Trustee and any moneys or other property distributable in respect of the Corporation's obligations under the Resolution after the occurrence of an Event of Default, shall be applied as follows:

Unless the principal (or Compounded Amount, if applicable) of all of the Bonds shall have become due and payable,

FIRST: to the payment to the Persons entitled thereto of regularly scheduled fees payable under each Credit Facility and Liquidity Facility;

SECOND: to the payment to the Persons entitled thereto of all installments of interest on the Bonds and the interest component of Parity Obligations then due in the order of the maturity of such installments, and, if the amount available shall not be sufficient to pay in full any installment due on the same date, then to the payment thereof ratably, according to the amounts due on such date, without any discrimination or preference;

THIRD: to the payment to the Persons entitled thereto of the unpaid principal or Redemption Price of the Bonds and the unpaid principal component of Parity Obligations which shall have become due, whether at maturity or by call for redemption, in the order of their due dates and, if the amount available shall not be sufficient to pay in full all the Bonds and the principal component of Parity Obligations due on the same date, then to the payment thereof ratably, according to the amounts of principal or Redemption Price due on such date, without any discrimination or preference;

FOURTH: to the payment to the Persons entitled thereto of amounts reimbursable or payable by the Corporation under each Credit Facility for draws or payments thereunder to pay principal of or interest on Bonds, whether such reimbursements or payments are made to the Credit Facility Provider as a Bondowner, as a subrogee or otherwise; and

FIFTH: to the payment to the Persons entitled thereto of amounts payable by the Corporation under each Credit Facility, Liquidity Facility and Qualified Hedge not constituting Parity Obligations or payable pursuant to clause FIRST OR FOURTH above;

provided, that if the principal of all the Bonds shall have become or shall have been declared due and payable, all such moneys shall be applied in accordance with the provisions of SECOND and THIRD above, ratably, without preference or priority of principal (Compounded Amount) over interest or of interest over principal (Compounded Amount) or of any installment of interest over any other installment of interest, and, provided further, in the event of an insufficiency of funds to make all payments required under any of clauses FIRST through FIFTH above, funds shall be applied to the payments required under the relevant clause, without preference or priority, ratably according to the amounts due.

The provisions of this Section are in all respects subject to the provisions of the Resolution relating to extending the payment of Bonds.

Whenever moneys are to be applied by the Trustee pursuant to this Section, such moneys shall be applied by the Trustee at such times, and from time to time, as provided above. The deposit of such moneys with the Trustee, or otherwise setting aside such moneys in trust for the proper purpose, shall constitute proper application by the Trustee and the Trustee shall incur no liability whatsoever to the Corporation, to any Bondowner to any Beneficiary or to any other Person for any delay in applying any such moneys, so long as the Trustee acts without gross negligence or willful misconduct. Whenever the Trustee shall exercise such discretion in applying such moneys, it shall fix the date (which shall be an interest payment date unless the Trustee shall deem another date more suitable) upon which such application is to be made and upon such date interest on the amounts of principal to be paid on such date shall cease to accrue. The Trustee shall give such notice as it may deem appropriate for the fixing of any such date. The Trustee shall not be required to make payment to the Owner of any Bond unless such Bond shall be presented to the Trustee for appropriate endorsement or for cancellation if fully paid.

*Termination of Proceedings (Section 1104)*

In case any proceeding taken by the Trustee on account of any Event of Default has been discontinued or abandoned for any reason, then in every such case the Corporation, the Trustee, the Beneficiaries and the Bondowners shall be restored to their former positions and rights under the Resolution, respectively, and all rights, remedies, powers and duties of the Trustee shall continue as though no other such proceeding had been taken.

*Bondowners' Direction of Proceedings (Section 1105)*

Anything in the Resolution to the contrary notwithstanding, the Owners of a majority in principal amount of the Bonds then Outstanding shall have the right, by an instrument or concurrent instruments in writing executed and delivered to the Trustee, to direct the method of conducting all remedial proceedings to be taken by the Trustee hereunder, provided that such direction shall not be otherwise than in accordance with law or the provisions of the Resolution, including Section 804 hereof, and that the Trustee shall have the right to decline to follow any such direction which in the opinion of the Trustee would be unjustly prejudicial to Bondowners not parties to such direction or would involve the Trustee in personal liability.

*Limitation on Rights of Bondowners (Section 1106)*

No Owner of any Bond shall have any right to institute any suit, action, mandamus or other proceeding in equity or at law under the Resolution, or for the protection or enforcement of any right under the Resolution unless such Owner shall have given to the Trustee written notice of the Event of Default or breach of duty on account of which such suit, action or proceeding is to be taken, and unless the Owners of not less than 25% in principal amount of the Bonds then Outstanding shall have made written request of the Trustee after the right to exercise such powers or right of action, as the case may be, shall have occurred, and shall have afforded the Trustee a reasonable opportunity either to proceed to exercise the powers granted in the Resolution or granted under the law or to institute such action, suit or proceeding in its name and unless, also, there shall have been offered to the Trustee reasonable security and indemnity against the costs, expenses (including legal fees and expenses) and liabilities to be incurred therein or thereby, and the Trustee shall have refused or neglected to comply with such request within a reasonable time; and such notification, request and offer of indemnity are declared in every such case, at the option of the Trustee, to be conditions precedent to the execution of the powers under the Resolution or for any other remedy provided under the Resolution or by law. It is understood and intended that no

B-48

one or more Owners of the Bonds or other Beneficiary secured by the Resolution shall have any right in any manner whatever by his or their action to affect, disturb or prejudice the security of the Resolution, or to enforce any right under the Resolution or under law with respect to the Bonds, or the Resolution, except in the manner provided in the Resolution, and that all proceedings at law or in equity shall be instituted, had and maintained in the manner provided in the Resolution and for the benefit of all Owners of the Outstanding Bonds.  Nothing contained in the Resolution relating to defaults and remedies shall affect or impair the right of any Bondowner to enforce the payment of the principal of and interest on such Owner's Bonds or the obligation of the Corporation to pay the principal of (or Compounded Amount, if any) and interest on each Bond issued under the Resolution to the Owner thereof at the time and place in said Bond expressed.

Anything to the contrary in this Section notwithstanding, or any other provision of the Resolution, each Owner of any Bond by such Owner's acceptance thereof, shall be deemed to have agreed that any court in its discretion may require, in any suit for the enforcement of any right or remedy under the Resolution, or in any suit against the Trustee for any action taken or omitted by it as Trustee, the filing by any party litigant in such suit of an undertaking to pay the reasonable costs of such suit, and that such court may in its discretion assess reasonable costs, including reasonable pre-trial, trial and appellate attorneys' fees, against any party litigant in any such suit, having due regard to the merits and good faith of the claims or defenses made by such party litigant; but the provisions of this paragraph shall not apply to any suit instituted by the Trustee, to any suit instituted by any Bondowner or group of Bondowners holding at least 25% in principal amount of the Bonds Outstanding, or to any suit instituted by any Bondowner for the enforcement of the payment of any Bond on or after the respective due date thereof expressed in such Bond.

*Remedies Not Exclusive (Section 1108)*

No remedy conferred upon or reserved to the Trustee or to the Owners of the Bonds is intended to be exclusive of any other remedy and each and every such remedy shall be cumulative and shall be in addition to any other remedy given under the Resolution or now or hereafter existing at law or in equity or by statute.

*No Waiver of Default (Section 1109)*

No delay or omission of the Trustee or of any Owner of the Bonds to exercise any right or power accruing upon any default shall impair any such right or power or shall be construed to be a waiver of any such default or an acquiescence therein and every power and remedy given by the Resolution to the Trustee and the owners of the Bonds or such Beneficiaries, respectively, may be exercised from time to time and as often as may be deemed expedient.

*Notice of Event of Default (Section 1110)*

The Trustee shall give to the Bondowners and the Beneficiaries notice of each Event of Default hereunder known to the Trustee within ninety days after actual knowledge by an Authorized Officer of the Trustee of the occurrence thereof, unless such Event of Default shall have been remedied or cured before the giving of such notice.  However, except in the case of default in the payment of the principal (or Compounded Amount, if any) or Redemption Price, if any, of or interest on any of the Bonds, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of directors or responsible officers of the Trustee in good faith determines that the withholding of such notice is in the interest of the Bondowners and other Beneficiaries.  Each such notice of Event of Default shall be given by the Trustee by mailing written notice thereof:  (i) to all Owners of Bonds, as the names and addresses of such Owners appear upon the

B-49

books for registration and transfer of Bonds as kept by the Trustee, and (ii) to each of the Rating Agencies.

*Defeasance (Section 1201)*

Bonds which are denominated and payable only in Dollars may be defeased pursuant to the provisions of Section 1201 of the Resolution. Bonds denominated in a Foreign Currency or Currencies may be defeased pursuant to the provisions contained herein, as affected by the provisions of the related Series Resolution. The Corporation shall pay and indemnify the Trustee against any tax, fee or other charge imposed on or assessed against the Defeasance Obligations deposited as described herein or the principal and interest received in respect thereof other than any such tax, fee or other charge which by law is for the account of the Bondowners.

If the Corporation shall pay or cause to be paid, or there shall otherwise be paid, to the Owners of all Bonds then Outstanding, the principal and interest and Redemption Price, if any, to become due thereon, at the times and in the manner stipulated therein and in the Resolution, then, at the option of the Corporation, expressed in an instrument in writing signed by an Authorized Officer of the Corporation and delivered to the Trustee, the covenants, agreements and other obligations of the Corporation to the Bondowners shall be discharged and satisfied. In such event, and provided that all amounts owing to the Trustee and all Beneficiaries shall have been fully paid, the Trustee shall, upon the request of the Corporation, execute and deliver to the Corporation such instruments as may be desirable to evidence such discharge and satisfaction and the Trustee shall pay over or deliver to the Corporation all money, securities and funds held by them pursuant to the Resolution which are not required for the payment or redemption of Bonds not theretofore surrendered for such payment or redemption.

Bonds or any portion thereof for the payment or redemption of which moneys shall have been set aside and shall be held in trust by the Trustee (through deposit by the Corporation of funds for such payment or redemption or otherwise) at the maturity or redemption date thereof shall be deemed to have been paid within the meaning and with the effect expressed herein. Any Outstanding Bonds of any Series or any maturity within a Series or portion thereof shall prior to the maturity or redemption date thereof be deemed to have been paid within the meaning and with the effect expressed herein if (a) in case any of said Bonds are to be redeemed on any date prior to their maturity, the Corporation shall have given to the Trustee irrevocable instructions to give, as provided in Article IV of the Resolution, notice of redemption on said date of such Bonds, (b) there shall have been deposited with the Trustee either moneys in an amount which shall be sufficient, or Defeasance Obligations the principal of and interest on which when due and without reinvestment, except as provided below, will provide moneys which, together with the moneys, if any deposited with the Trustee at the same time, shall be sufficient to pay when due the principal or Redemption Price, if applicable, and interest due and to become due on said Bonds on and prior to the redemption date or maturity date thereof, as the case may be, and (c) in the event said Bonds (or portions thereof) are not by their terms subject to redemption or maturity within the next succeeding 60 days, the Corporation shall have given the Trustee irrevocable instructions to mail, not less than seven (7) days after receipt of such instructions, a notice to the Owners of the Bonds (or portion thereof) which are to be deemed to have been paid hereunder that the deposit required by (b) above has been made with the Trustee and that said Bonds or portion thereof are deemed to have been paid in accordance herein and stating such maturity or redemption date upon which moneys are to be available for the payment of the principal or Redemption Price, if applicable, on said Bonds or portion thereof, including the interest accrued thereon. Such notice shall be mailed, postage prepaid, to the Owners of said Bonds or portion thereof at their last mailing address, if any, appearing on the registry books, but such mailing shall not be a condition precedent to the deemed payment of such Bonds and failure so to mail, or failure by any Owner to receive, any such notice shall not affect the validity of the defeasance of such Bonds as herein provided for.

B-50

Neither Defeasance Obligations nor moneys deposited with the Trustee as established herein, nor principal or interest payments on any such Defeasance Obligations, shall be withdrawn or used for any purpose other than, and shall be held in trust for, the payment of the principal or Redemption Price, if applicable, and interest on said Bonds; provided that any cash received from such principal or interest payments on such Defeasance Obligations deposited with the Trustee, if not then needed for such purpose, shall, to the extent practicable, be reinvested by the Trustee at the written direction of the Corporation in Defeasance Obligations maturing at the time or times and in amounts sufficient to pay when due the principal or Redemption Price, if applicable, and interest to become due on said Bonds on and prior to such redemption date or maturity date thereof, as the case may be. Any income or interest earned by, or increment to, the investment of any such moneys so deposited, in excess of the amounts required hereinabove to pay the principal of, Redemption Price, if applicable, and interest on such Bonds, as realized, shall be deposited by the Trustee in the Revenue Account. To the extent required by the provider of a Credit Facility, the Bonds which are the subject of the enhancement of such Credit Facility shall not be deemed paid hereunder unless there shall have been delivered to the Trustee and the provider of such Credit Facility (a) a verification report of a firm of independent accountants verifying the sufficiency of the escrow created hereunder to timely make full payment of principal or Redemption Price, if applicable, and interest on such Bonds to the dates scheduled for such payment, and (b) an opinion of Bond Counsel to the effect that, based upon the assumptions stated in such opinion, such Bonds are deemed defeased under the provisions of the Resolution.

For purposes of determining whether Adjustable Rate Bonds shall be deemed to have been paid prior to the maturity or redemption date thereof, as the case may be, by the deposit of moneys, or Investment Securities and moneys, if any, in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution, the interest to come due on such Adjustable Rate Bonds on or prior to the maturity date or redemption date thereof, as the case may be, shall be calculated at the Contractual Maximum Interest Rate permitted by the terms thereof; provided, however, that if on any date, as a result of such Adjustable Rate Bonds having borne interest at less than such Contractual Maximum Interest Rate for any period, the total amount of moneys and Investment Securities on deposit with the Trustee for the payment of interest on such Adjustable Rate Bonds is in excess of the total amount which would have been required to be deposited with the Trustee on such date in respect of such Adjustable Rate Bonds in order to satisfy the second sentence of subsection 2 of Section 1201 of the Resolution, the Trustee shall, if requested by the Corporation, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Option Bonds shall be deemed to have been paid in accordance with the second sentence of subsection 3 of Section 1201 of the Resolution only if, in addition to satisfying the requirements of clauses (a) and (c) of such sentence, there shall have been deposited with the Trustee moneys in an amount which shall be sufficient to pay when due the maximum amount of principal of and premium, if any, and interest on such Bonds which could become payable to the Owners of such Bonds upon the exercise of any options provided to the Owners of such Bonds; provided, however, that if, at the time a deposit is made with the Trustee pursuant to subsection 3 of Section 1201 of the Resolution, the options originally exercisable by the Owner of an Option Bond are no longer exercisable, such Option Bond shall not be considered an Option Bond for purposes established herein. If any portion of the moneys deposited with the Trustee for the payment of the principal and premium, if any, and interest on Option Bonds is not required for such purpose, the Trustee shall, if requested by the Corporation in writing, pay the amount of such excess to the Corporation free and clear of any trust, pledge, lien, encumbrance or security interest created hereby.

Anything in the Resolution to the contrary notwithstanding, but subject to any applicable law to the contrary, any moneys held by the Trustee in trust for the payment of the principal of or premium, if any, or interest on any of the Bonds which remain unclaimed for two (2) years after the date

when such principal, premium, if any, or interest, as the case may be, has become due and payable, either at their stated maturity dates or by call for earlier redemption or otherwise, if such moneys were held by the Trustee at such date, or for two (2) years after the date of deposit of such moneys if deposited with the Trustee after the said date when such principal, premium, if any, or interest, as the case may be, became due and payable, shall, at the written request of the Corporation, be repaid by the Trustee to the Corporation, as its absolute property and free from trust, and the Trustee shall thereupon be released and discharged with respect thereto and the Bondowners shall look only to the Corporation for the payment of such principal, premium, if any, or interest, as the case may be; provided, however, that before being required to make any such payment to the Corporation, the Trustee shall, at the expense of the Corporation, cause to be published once in a newspaper or financial journal, customarily published at least once a day for at least five (5) days (other than legal holidays) in each calendar week, printed in the English language and of general circulation in the Borough of Manhattan, City and State of New York, a notice that said moneys remain unclaimed and that, after a date named in said notice, which date shall be not less than thirty (30) days after the date of the publication of such notice, the balance of such moneys then unclaimed will be returned to the Corporation.

**Moneys Held for Particular Bonds (Section 1203)**

The amounts held by the Trustee for the payment of the interest, principal or Redemption Price due on any date with respect to particular Bonds shall, on and after such date and pending such payment, be set aside on its books and held in trust by it for the Owners of such Bonds.

**Preservation and Inspection of Documents (Section 1204)**

All documents received by the Trustee under the provisions of the Resolution shall be retained in its possession and shall be subject at all reasonable times to the inspection of the Corporation, and any Bondowner or other Beneficiary and their agents and their representatives any of whom may make copies thereof.

**No Personal Liability (Section 1206)**

Neither the members of the Corporation nor any other Person executing the Bonds shall be subject to any personal liability or accountability by reason of the issuance or execution and delivery thereof.

**Governing Law (Section 1211)**

The Resolution shall be governed by, and construed and enforced in accordance with, the laws of the Commonwealth; provided, however, that the formalities leading to the creation of the trusts contain in the Resolution shall be governed by the laws of the State of New York and, provided further, to the maximum extent permitted by applicable law, the rights, duties, privileges and immunities of the Trustee, any Paying Agent and Bond Registrar, shall be governed by the law of the jurisdiction in which its Corporate Trust Office is located.

APPENDIX C

## PROPOSED FORM OF APPROVING OPINION OF
## BOND COUNSEL TO THE CORPORATION

### NIXON PEABODY LLP
ATTORNEYS AT LAW

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

December ___, 2011

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have examined a record of proceedings relating to the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $91,155,000 aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Twenty-First Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Bond Resolution," and together with the General Resolution, the "Resolution"), adopted by the Board of Directors of the Corporation on December 1, 2011. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

The Bonds are limited obligations of the Corporation payable solely from, and secured by a pledge and assignment of, the Pledged Sales Tax derived from a portion of the Commonwealth Sales Tax (to the extent received by the Trustee under the Resolution), undisbursed Bond proceeds, certain funds held under the Resolution, together with income earned thereon, and other Revenues (collectively referred to herein as the "Pledged Property") pledged therefor under the Resolution. The Bonds are Senior Bonds under the Resolution and on parity in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, all as provided in the Resolution.

The Bonds are being issued to provide funds for the purposes provided in Article 2 of Act 91.

Puerto Rico Sales Tax Financing Corporation                    December ___, 2011
                                                                                    Page 2

    The Bonds are dated, mature, are payable and accrete in value in the manner and upon the terms set forth in the Bond Resolution. The Bonds are issuable in the form of fully registered bonds in the denominations set forth in the Bond Resolution and will be registered in the name of the Owners of the Bonds.

    As Bond Counsel we have examined (i) Act 91, (ii) certified copies of the proceedings of the Corporation authorizing the issuance of the Bonds, (iii) the Resolution, and (iv) one Bond, as executed and authenticated. We have also examined originals or copies, certified or otherwise identified to our satisfaction, of such instruments, certificates and documents as we have deemed necessary or appropriate for the purposes of rendering the opinions set forth below.

    In such examinations, we have assumed the genuineness of all signatures, the authenticity of all documents tendered to us as originals and the conformity to original documents of all documents submitted to us as certified or photostatic copies. As to questions of fact material to our opinion we have relied upon the certified proceedings and other certifications of public officials furnished to us without undertaking to verify the same by independent investigation.

    Based upon the foregoing, we are of the opinion, under existing law, as follows:

    1.    Act 91 is valid in all respects material to the matters covered by this opinion.

    2.    The Corporation is duly constituted and validly existing as a public corporation and instrumentality of the Commonwealth, constituting a corporate and political entity independent and separate from the Commonwealth, with the corporate power and authority to adopt the Resolution and issue the Bonds.

    3.    The proceedings of the Corporation in connection with the authorization, issuance and sale of the Bonds have been validly and legally taken.

    4.    Act 91 and such proceedings show lawful authority for the issuance and sale of the Bonds by the Corporation.

    5.    As authorized by Act 91 and by said proceedings, the Resolution has been duly adopted by the Corporation and constitutes the legal, valid, binding and enforceable obligation of the Corporation.

    6.    The Bonds have been duly authorized, executed and delivered by the Corporation and constitute legal, valid, binding and enforceable obligations of the Corporation payable from and secured by a pledge of the Pledged Property, on parity in payment priority to the Senior Bonds and Parity Obligations currently outstanding and to be issued under the terms of the Resolution, to the extent provided in the Resolution, and are entitled to the benefit and security of the Resolution.

    7.    The Bonds and other obligations of the Corporation do not constitute a debt or obligation of the Commonwealth nor of its instrumentalities (other than the Corporation) and

Puerto Rico Sales Tax Financing Corporation                    December ___, 2011
                                                                           Page 3

neither the Commonwealth nor its public instrumentalities (other than the Corporation) shall be responsible for the payment of the Bonds or such other obligations, for which the full faith, credit and taxing power of the Commonwealth shall not be pledged.

We express no opinion as to any Federal, state, Commonwealth or local tax consequences of the ownership or disposition of the Bonds.

It is to be understood that the rights of the holders of the Bonds and the enforceability thereof and of the Resolution may be subject to bankruptcy, insolvency, reorganization, moratorium and other similar laws affecting creditors' rights heretofore or hereafter enacted to the extent constitutionally applicable and that their enforcement may also be subject to the exercise of judicial discretion in appropriate cases.

Respectfully submitted,

[THIS PAGE INTENTIONALLY LEFT BLANK]

APPENDIX D

## PROPOSED FORM OF OPINION OF
## SPECIAL PUERTO RICO TAX COUNSEL

[Closing Date]

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

We have acted as Special Puerto Rico Tax Counsel in connection with the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation"), a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91-2006 of the Legislature of Puerto Rico, approved May 13, 2006, as amended ("Act 91"), of its $91,155,000 aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Bonds").

The Bonds are being issued under and secured by the Sales Tax Revenue Bond Resolution, adopted by the Board of Directors of the Corporation on July 13, 2007, as amended and supplemented prior to the date hereof (the "General Resolution"), and a Twenty-First Supplemental Sales Tax Revenue Bond Resolution fixing the terms of the Bonds (the "Twenty-First Supplemental Resolution," the General Resolution and the Twenty-first Supplemental Resolution being referred to herein as the "Resolution"), adopted by the Board of Directors of the Corporation on December 1, 2011. Capitalized terms used herein and not otherwise defined shall have the meanings ascribed thereto in the Resolution.

From such examination and based on the provision of the laws of Puerto Rico and the United States as now in force, and having regard to legal questions we deem relevant, we are of the opinion that:

1.    Interest on the Bonds is:

    (a)    exempt from Puerto Rico income taxes under Section 1031.02(a)(3)(B) of the Internal Revenue Code for a New Puerto Rico, Act No. 1-2011 of the Legislature of Puerto Rico, approved January 31, 2011, as amended (the "PR Code"), and Article 2 of Act 91;

    (b)    excluded under Section 1022.04(b)(2) of the PR Code from the "adjusted net book income" of a corporation for purposes of computing the alternative minimum tax imposed by Section 1022.03(a) of the PR Code;

    (c)    exempt from the Puerto Rico alternative basic tax under Section 1021.02(a)(2) of the PR Code; and

    (d)    exempt from Puerto Rico municipal license taxes under Section 9(25) of the Puerto Rico Municipal License Tax Act of 1974, as amended.

In connection with the opinion in paragraph 1(b) above, we note that Section 1022.04(b)(2) of the PR Code contains a technical error because it excludes from the "adjusted net book income" of a corporation for purposes of the alternative minimum tax ("AMT") interest from obligations described in Section 1031.02(b)(4) of the PR Code, which does not exist in the PR Code, instead of interest from obligations described in

Section 1031.02(a)(3) of the PR Code. House Bill No. 3410, which has been approved by the Legislative Assembly and pending the Governor's signature, provides for several technical amendments to the PR Code, including a technical amendment correcting the error described herein. Thus, for purposes of the opinion in paragraph 1(b) above, we assume that the AMT treatment provided in Section 1022.04(b)(2) of the PR Code applies to interest from an obligation described in Section 1031.02(a)(3) of the PR Code. To the extent the clerical error is not corrected as expected, interest on the Bonds may be required to be included in the "adjusted net book income" of a corporation and, therefore, may be subject to Puerto Rico alternative minimum tax.

2.    The Bonds are exempt from Puerto Rico personal property tax pursuant to Section 3.11 of the Puerto Rico Municipal Property Tax Act of 1991, as amended, and Section 3 of the Puerto Rican Federal Relations Act.

3.    The Bonds are exempt from Puerto Rico (i) gift tax with respect to donors who are residents of Puerto Rico at the time the gift is made and (ii) estate tax with respect to estates of decedents who are residents of Puerto Rico at the time of death and who acquired their United States citizenship solely by reason of birth or residence in Puerto Rico.

4.    The Bonds will be considered an obligation of an instrumentality of Puerto Rico for purposes of: (i) the non-recognition of gain rules under Section 1034.04(f)(2)(A) of the PR Code applicable to certain involuntary conversions; and (ii) the exemption from the surtax imposed by Section 1022.05 of the PR Code available to corporations and partnerships that have a certain percentage of their net income invested in obligations of instrumentalities of Puerto Rico and certain other investments pursuant to Section 1022.05(g) of the PR Code.

The PR Code does not contain any provisions regarding the treatment of the excess of a Bond's redemption price at maturity over its initial issue price (original issue discount). However, under the administrative practice followed by the Puerto Rico Treasury Department with respect to the repealed Puerto Rico Internal Revenue Code of 1994, original issue discount was treated as interest.

Prospective owners of the Bonds should be aware that, pursuant to Sections 1033.17(a)(5), 1033.17(a)(10) and 1033.17(f) of the PR Code, ownership of the Bonds may, under certain circumstances, result in a disallowance, for Puerto Rico income tax purposes, of interest expense and other expenses related to an investment in the Bonds.

**IRS Circular 230 Disclosure: The following tax discussion is not intended or written to be used, and cannot be used by any taxpayer, for purposes of avoiding penalties that may be imposed on a taxpayer by the Internal Revenue Service. This tax discussion was written in connection with the promotion or marketing of the Bonds. Each prospective purchaser of the Bonds should seek tax advice from an independent tax advisor based on its particular circumstances.**

Based upon the provisions of the United States Internal Revenue Code of 1986, as amended (the "US Code"), now in force and the rules and regulations thereunder, it is our opinion that:

1.    Interest or original issue discount on the Bonds owned by an individual is excludable from the gross income of the individual thereof for United States federal income tax purposes under Section 933 of the US Code if (a) the individual is a bona fide resident of Puerto Rico during the entire taxable year in which such interest or original issue

discount is to be recognized for purposes of the US Code and (b) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business within the United States by such individual under the US Code.

2. Interest or original issue discount on the Bonds derived by a corporation organized under the laws of Puerto Rico is not subject to United States federal income tax under the US Code if: (a) such interest or original issue discount is not, and is not treated as, income effectively connected with, or attributable to, the conduct of a trade or business in the United States by such corporation under the US Code; (b) such corporation is not a controlled foreign corporation or a passive foreign investment company under the US Code; and (c) such corporation is not treated as a domestic corporation for purposes of the US Code.

3. United States taxpayers, other than individuals who comply with the requirements set forth below, may be subject to federal income tax on any gain realized upon sale of the Bonds. Pursuant to Notice 89-40, issued by the United States Internal Revenue Service on March 27, 1989, and the regulations issued under Section 937 of the US Code, the gain from the sale of the Bonds by an individual who is a bona fide resident of Puerto Rico will constitute Puerto Rico source income, and therefore will qualify for exclusion from gross income under Section 933 of the US Code, provided (i) said Bonds do not constitute inventory in the hands of such seller, (ii) such gain is not attributable to an office or fixed place of business of the individual located outside Puerto Rico and (iii) the individual has been a bona fide resident of Puerto Rico for the shorter of (1) the full period during which the individual has owned the Bonds or (2) each of the ten years preceding the year of the sale. In the case the individual is a bona fide resident of Puerto Rico for the tax year for which the source of income must be determined and the individual was a United States citizen or resident (other than a bona fide resident of Puerto Rico) for any of the ten years preceding said year, the individual may elect to treat as gain from sources within Puerto Rico the portion of the gain attributable to the individual's holding period in Puerto Rico.

Prospective owners of the Bonds should consult their tax advisors with respect to the precise determination of the Puerto Rico and United States federal tax consequences arising from ownership or disposition of the Bonds.

This opinion is limited to the above, and we do not express any other opinion regarding the Puerto Rico or United States federal tax consequences arising from ownership or disposition of the Bonds.

This letter is furnished by us solely for the benefit of the Authority and the holders from time to time of the Bonds and may not be relied upon by any other person.

Respectfully submitted,

D-3

[THIS PAGE INTENTIONALLY LEFT BLANK]

# BOOK-ENTRY SYSTEM

**The Depository Trust Company**

The Depository Trust Company ("DTC"), New York, NY, will act as securities depository for the Series 2011D Bonds. The Series 2011D Bonds will be issued as fully-registered securities registered in the name of Cede & Co. (DTC's partnership nominee) or such other name as may be requested by an authorized representative of DTC. One fully-registered Series 2011D Bond certificate will be issued for each stated maturity of the Series 2011D Bonds, each in the aggregate principal amount (initial principal amount in the case of the Capital Appreciation Bonds and the Convertible Capital Appreciation Bonds) of such maturity, and will be deposited with DTC. SO LONG AS CEDE & CO. IS THE REGISTERED OWNER OF THE SERIES 2011D BONDS, AS NOMINEE FOR DTC, REFERENCES HEREIN TO BONDHOLDERS OR OWNERS OF THE SERIES 2011D BONDS (OTHER THAN UNDER THE CAPTION "TAX MATTERS") SHALL MEAN CEDE & CO. AND SHALL NOT MEAN THE BENEFICIAL OWNERS OF THE SERIES 2011D BONDS. If, however, the aggregate principal amount of any issue exceeds $500 million, one certificate will be issued with respect to each $500 million of principal amount, and an additional certificate will be issued with respect to any remaining principal amount of such issue.

DTC, the world's largest securities depository, is a limited-purpose trust company organized under the New York Banking Law, a "banking organization" within the meaning of the New York Banking Law, a member of the Federal Reserve System, a "clearing corporation" within the meaning of the New York Uniform Commercial Code, and a "clearing agency" registered pursuant to the provisions of Section 17A of the Securities Exchange Act of 1934, as amended. DTC holds and provides asset servicing for over 3.5 million issues of U.S. and non-U.S. equity issues, corporate and municipal debt issues, and money market instruments (from over 100 countries) that DTC's participants ("Direct Participants") deposit with DTC. DTC also facilitates the post-trade settlement among Direct Participants of sales and other securities transactions in deposited securities, through electronic computerized book-entry transfers and pledges between Direct Participants' accounts. This eliminates the need for physical movement of securities certificates. Direct Participants include both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, clearing corporations, and certain other organizations. DTC is a wholly-owned subsidiary of The Depository Trust & Clearing Corporation ("DTCC"). DTCC is the holding company for DTC, National Securities Clearing Corporation and Fixed Income Clearing Corporation, all of which are registered clearing agencies. DTCC is owned by the users of its regulated subsidiaries. Access to the DTC system is also available to others such as both U.S. and non-U.S. securities brokers and dealers, banks, trust companies, and clearing corporations that clear through or maintain a custodial relationship with a Direct Participant, either directly or indirectly ("Indirect Participants"). DTC has a S&P rating of AA+. The DTC Rules applicable to its Participants are on file with the Securities and Exchange Commission. More information about DTC can be found at www.dtcc.com.

Purchases of Series 2011D Bonds under the DTC system must be made by or through Direct Participants, which will receive a credit for the Series 2011D Bonds on DTC's records. The ownership interest of each actual purchaser of each Series 2011D Bond ("Beneficial Owner") is in turn to be recorded on the Direct and Indirect Participants' records. Beneficial Owners will not receive written confirmation from DTC of their purchase. Beneficial Owners are, however, expected to receive written confirmations providing details of the transaction, as well as periodic statements of their holdings, from the Direct or Indirect Participant through which the Beneficial Owner entered into the transaction. Transfers of ownership interests in the Series 2011D Bonds are to be accomplished by entries made on the books of Direct and Indirect Participants acting on behalf of Beneficial Owners. Beneficial Owners

will not receive certificates representing their ownership interests in the Series 2011D Bonds, except in the event that use of the book-entry system for the Series 2011D Bonds is discontinued.

To facilitate subsequent transfers, the Series 2011D Bonds deposited by Direct Participants with DTC are registered in the name of DTC's partnership nominee, Cede & Co., or such other name as may be requested by an authorized representative of DTC. The deposit of the Series 2011D Bonds with DTC and their registration in the name of Cede & Co. or such other DTC nominee do not effect any change in beneficial ownership. DTC has no knowledge of the actual Beneficial Owners of the Series 2011D Bonds; DTC's records reflect only the identity of the Direct Participants to whose accounts such Series 2011D Bonds are credited, which may or may not be the Beneficial Owners. The Direct and Indirect Participants will remain responsible for keeping account of their holdings on behalf of their customers.

Conveyance of notices and other communications by DTC to Direct Participants, by Direct Participants to Indirect Participants, and by Direct Participants and Indirect Participants to Beneficial Owners will be governed by arrangements among them, subject to any statutory or regulatory requirements as may be in effect from time to time. Beneficial Owners of Series 2011D Bonds may wish to take certain steps to augment the transmission to them of notices of significant events with respect to the Series 2011D Bonds, such as redemptions, tenders, defaults, and proposed amendments to the Series 2011D Bonds documents. For example, Beneficial Owners of Series 2011D Bonds may wish to ascertain that the nominee holding the Series 2011D Bonds for their benefit has agreed to obtain and transmit notices to Beneficial Owners. In the alternative, Beneficial Owners may wish to provide their names and addresses to the registrar and request that copies of notices be provided directly to them.

Redemption notices shall be sent to DTC. If less than all of the Series 2011D Bonds within an issue are being redeemed, DTC's practice is to determine by lot the amount of the interest of each Direct Participant in such issue to be redeemed.

Neither DTC nor Cede & Co. (nor any other DTC nominee) will consent or vote with respect to Series 2011D Bonds unless authorized by a Direct Participant in accordance with DTC's MMI Procedures. Under its usual procedures, DTC mails an Omnibus Proxy to the Corporation as soon as possible after the record date. The Omnibus Proxy assigns Cede & Co.'s consenting or voting rights to those Direct Participants to whose accounts the Series 2011D Bonds are credited on the record date (identified in a listing attached to the Omnibus Proxy).

Principal, redemption premium, if any, and interest payments on the Series 2011D Bonds will be made to Cede & Co., or such other nominee as may be requested by an authorized representative of DTC. DTC's practice is to credit Direct Participants' accounts upon DTC's receipt of funds and corresponding detail information from the Corporation or the Trustee, on payable dates in accordance with their respective holdings shown on DTC's records. Payments by Participants to Beneficial Owners will be governed by standing instructions and customary practices, as is the case with securities held for the accounts of customers in bearer form or registered in "street name," and will be the responsibility of such Participant and not of DTC, the Trustee or the Corporation, subject to any statutory or regulatory requirements as may be in effect from time to time. Payment of principal, redemption premium, if any, and interest to Cede & Co. (or such other nominee as may be requested by an authorized representative of DTC) is the responsibility of the Corporation or the Trustee, disbursement of such payments to Direct Participants will be the responsibility of DTC, and disbursement of such payments to the Beneficial Owners will be the responsibility of Direct and Indirect Participants.

DTC may discontinue providing its services as depository with respect to the Series 2011D Bonds at any time by giving reasonable notice to the Corporation or the Trustee. Under such circumstances, in

the event that a successor depository is not obtained, Series 2011D Bond certificates are required to be printed and delivered.

The Corporation may decide to discontinue use of the system of book-entry-only transfers through DTC (or a successor securities depository). In that event, Security certificates will be printed and delivered to DTC.

The information in this section concerning DTC and DTC's book-entry system has been obtained from sources that the Corporation believes to be reliable, but the Corporation takes no responsibility for the accuracy thereof.

NONE OF THE CORPORATION, THE TRUSTEE OR THE UNDERWRITERS WILL HAVE ANY RESPONSIBILITY OR OBLIGATION TO DIRECT PARTICIPANTS, INDIRECT PARTICIPANTS OR ANY BENEFICIAL OWNER WITH RESPECT TO (I) THE ACCURACY OF ANY RECORDS MAINTAINED BY DTC, ANY PARTICIPANT OR INDIRECT PARTICIPANT; (II) THE PAYMENT BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY AMOUNT WITH RESPECT TO THE PRINCIPAL OF, OR PREMIUM, IF ANY, OR INTEREST ON, THE SERIES 2011D BONDS; (III) ANY NOTICE WHICH IS PERMITTED OR REQUIRED TO BE GIVEN TO BONDHOLDERS; (IV) ANY CONSENT GIVEN BY DTC OR OTHER ACTION TAKEN BY DTC AS A BONDHOLDER; OR (V) THE SELECTION BY DTC OR ANY DIRECT PARTICIPANT OR INDIRECT PARTICIPANT OF ANY BENEFICIAL OWNERS TO RECEIVE PAYMENT IN THE EVENT OF ANY PARTIAL REDEMPTION OF THE SERIES 2011D BONDS.

[THIS PAGE INTENTIONALLY LEFT BLANK]



Printed by: ImageMaster
www.ImageMaster.com

Exhibit 11 Page 1 of 25

# EXHIBIT 11

# NIXON PEABODY LLP
A T T O R N E Y S   A T   L A W

437 Madison Avenue
New York, New York 10022-7001
(212) 940-3000
Fax: (212) 940-3111

December 13, 2011

To Each of the Addressees Named on Exhibit A Hereto

We are serving as Bond Counsel to the Puerto Rico Sales Tax Financing Corporation (the "Corporation") in connection with its issuance on the date hereof of $1,006,474,702 aggregate principal amount at issuance of Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds") and $91,155,000 aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D Bonds," and together with the Series 2011C Bonds, the "Series 2011 Bonds") pursuant to the provisions of certain resolutions adopted by the Corporation on July 13, 2007 and December 1, 2011 (collectively, as amended and supplemented to the date hereof, the "Resolution").

**The Corporation.** Act No. 91 of May 13, 2006, as amended ("Act 91"), created the Corporation as a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth. P.R.LAWS ANN. TIT. 13, § 12 (2006). The Corporation was created to address a financial and economic situation that Act 91 describes as one of the worst fiscal crises in the Commonwealth's history. The Board of Directors of the Corporation is the Board of Directors of the Government Development Bank for Puerto Rico ("GDB").

**The Bonds.** The Series 2011 Bonds are primarily secured by a security interest granted by the Corporation in its receipts of a portion (and the right to receive the same) of the sales and use tax imposed by law in the Commonwealth. Such portion of the sales and use tax (including the additional portions designated in amendments to Act 91), and the right to receive the same (referred to herein and in the Resolution as the "Pledged Sales Tax"), were, by the terms of Act 91, made the property of the Corporation, and not the property of the Commonwealth Treasury.

**The Special Fund.** Act 91 creates a special fund (to be known as the Dedicated Sales Tax Fund), to be administered by GDB, and transfers the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and "all the future funds that must be deposited therein pursuant to the provisions of [Act 91]," to the Corporation as property of the Corporation. This transfer is made in consideration for the Corporation's commitment to pay, or establish mechanisms to pay, the debts or other obligations of the Commonwealth set forth in Article 2(b) of Act 91 with net proceeds of bonds issued by the Corporation and with the other funds and resources available to the Corporation.

The Dedicated Sales Tax Fund is required to be funded in each fiscal year by the first collections of a portion of the sales and use tax specified in Article 3 of Act 91 (the "Pledged Sales Tax"). Act 91 requires that the Pledged Sales Tax shall "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the General Fund of the Commonwealth of Puerto Rico, nor shall it constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico."

In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico nor its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

**Constitutional Provisions.** The Constitution of Puerto Rico provides that "in case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. CONST. ART. VI, §8. The Constitution of Puerto Rico also provides in the last paragraph of Section 2 of Article 4 thereof that "the Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." P.R. CONST. ART. VI, §2.

These provisions of the Constitution of Puerto Rico are sometimes referred to herein as the "Constitutional Debt Priority Provisions." The official English version of the Constitutional Debt Priority Provisions uses the term "available revenues including surplus," but this opinion refers to "available resources including surplus" in translation of the term "recursos" used in the official Spanish version of the provisions.

**Questions Addressed.** The questions addressed by this opinion are whether (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) said asset and right constitute "available resources including surplus" for purposes of the Constitutional Debt Priority Provisions and therefore are subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "claw-back") in the event total available resources including surplus for a particular fiscal year are not sufficient for the purposes of meeting appropriations in that fiscal year, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

**Prior Opinions, Reliance.** We have received opinion letters, of even date herewith and addressed to the Corporation, from the Secretary of Justice of Puerto Rico (and the Corporation received opinion letters dated July 31, 2007, June 18, 2009, February 9, 2010, June 30, 2010, June 23, 2011 and November 23, 2011 from the Secretary of Justice on prior transactions of the

Corporation) and the law firm of Pietrantoni Mendez & Alvarez LLP, which is acting as Underwriters' Counsel (the "Puerto Rico Counsel") with respect to, among other things, matters governed by the laws of Puerto Rico. In rendering the opinions expressed herein, we are relying, with the consent of Puerto Rico Counsel, on certain conclusions governed by Puerto Rico law (described below) contained in the letter of Puerto Rico Counsel.

We are relying on the conclusions of Puerto Rico Counsel that the questions addressed herein have never been addressed by the Supreme Court of Puerto Rico, that (1) there is no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention, (2) there are no precedents in Puerto Rico cases controlling or directly on point with the questions addressed herein, (3) the Puerto Rico Supreme Court has consistently ruled that acts of the Legislature are entitled to a strong presumption of constitutionality and have traditionally showed substantial deference to the Legislature's judgment, especially in matters involving the use of public funds and the regulation of the economy and (4) the Supreme Court of Puerto Rico accords substantial persuasive weight to the opinions of the Secretary of Justice.

**Cases Reviewed.** The questions presented in this opinion essentially raise the issue of whether certain funds of the Commonwealth may validly be placed beyond the control of the legislative and executive branches of the Commonwealth such that they do not constitute available resources within the meaning of the Constitutional Debt Priority Provisions. This question has arisen in several jurisdictions, usually in the context of whether money becomes part of the state treasury such that the expenditure of such funds cannot be made without an appropriation.

In that context, it is useful to consider cases from other jurisdictions involving state constitutional provisions requiring, in one form or another, that all moneys or revenues received on account of or on behalf of the state from any source be paid into the state's treasury or general fund and spent only pursuant to an appropriation. Notwithstanding these provisions, legislatures have enacted laws over the years diverting specific revenues from the state treasury, dedicating them to a particular purpose and thereby making them unavailable for the general needs of the state, including the ability to pay general obligation bondholders. Court decisions analyzing legislative provisions diverting revenues from the state treasury and dedicating them, without annual appropriation, to a specified purpose form our framework for analyzing Act 91 in light of the Constitutional Debt Priority Provisions.

We have found no case that holds that state constitutional provisions of this type cover all revenues, notwithstanding that these constitutional provisions are often written in all inclusive language. In reviewing that state's provision, the Supreme Judicial Court of Massachusetts stated: "In spite of its language, art. 63 has never been conceived as without exceptions." Opinion of the Justices, 396 Mass. 1201, 1205 (1985).

The New York Court of Appeals stated:

> [N]ot every fund made up of public moneys raised by taxation or otherwise comes within purview of Section 7 of Article VII [the

Case:17-03283-LTS Doc#:4747-3 Filed:02/24/18 Entered:02/24/18 16:59:06 Desc:
Exhibit Exhibit DD Page 454 of 832

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 4

appropriation clause]. <u>Saratoga Harness Racing v. Agriculture</u>, 238 N.E.2d 730 (1968).[1]

In reviewing legislation that makes exceptions to constitutional appropriation provisions, courts have upheld such legislation when it contains certain features and struck down legislation when all or several of those features are absent. The characteristics identified below are not present in all of the cases reviewed; however, in each case at least one of these elements is relied on by the court. The features that courts have identified as important are the following:

The legislation:

(1)     is enacted due to an urgent need;

(2)     impresses the revenues with a trust designated for particular beneficiaries and not for the public at large;

(3)     requires the revenues to be deposited into a special fund;

(4)     provides that the special fund be dedicated exclusively to specified purposes;

(5)     provides explicitly that the revenues not be received on account of the state, but rather, be received on account of the entity created to accomplish the specified purposes;

(6)     sets forth limitations and conditions governing the disbursement of the revenues, particularly to the effect that (a) the decision regarding the project or projects to be funded with the revenues be subject to varying degrees of legislative, executive or local government involvement or control and (b) the project involve traditional, central and basic governmental activities;

(7)     provides a monetary cap, either by dollar amount or formula, on the amount of revenues that may be diverted from the state treasury and spent without an appropriation; and

---

[1]     The New Jersey Supreme Court, in reviewing that state's constitutional provision, stated: "There is no general mandate that all revenues generated by operation of every department or agency or authority of State government be deposited in the general treasury. In fact, history negates such a view....[T]he omission to write such a mandate into our 1947 charter seems to have been a studied one, and indicative of the purpose to permit the Legislature to decide what revenues should go into the general fund." <u>New Jersey Sports & Exposition Authority v. McCrane</u>, 292 A.2d 545, 553 (N.J. 1972).

The Washington Supreme Court stated: "Arguably the literal language of the constitution would require a legislative appropriation to disburse any funds from the state treasury under the express words of [art. VIII, section 4]. However, for many years, there has stood the commonsense interpretation by this court that the Treasurer may be made custodian of particular funds of a proprietary nature which are held for a specific purpose. Funds so held are distributable without specific legislative appropriation." <u>Municipality of Metro. Seattle v. O'Brien</u>, 544 P.2d 729 (Wash. 1976).

(8)    provides that any debt secured by such revenues shall not constitute debt of the
       state.

Several examples illustrate the analysis courts have employed.

In <u>Opinion of the Justices</u>, the Supreme Judicial Court of Massachusetts considered a bill
that would impose on specified business corporations a business infrastructure development
assessment payable in the same manner and at the same time as the corporate excise tax. 471
N.E.2d 1266 (1984). The assessment revenues would be used to secure bonds issued by the
Massachusetts Development Bank ("Mass/Bank") for infrastructure projects.

The court held that the bill did not violate a section of the Massachusetts Constitution
stating that "[a]ll money received on account of the commonwealth from any source whatsoever
shall be paid into the treasury thereof." In upholding the bill, the Court relied on, inter alia,
provisions of the bill stating that the revenues would be received in trust for designated
beneficiaries, dedicated exclusively to Mass/Bank, and disbursed solely in accordance with
specified limitations and conditions for carefully defined public purposes.

Rulings from other jurisdictions reach similar conclusions:

- <u>Friedman v. American Surety Co.</u>, 151 S.W.2d 570 (Texas 1941) - creation of an
  Unemployment Compensation Fund as a special fund, held in trust from its
  inception, separate and apart from State funds, administered by a state created
  commission, consisting of state excise taxes and providing that the excise taxes
  are never to be paid into the State Treasury and can be used only for specified
  purposes for particular beneficiaries does not violate constitutional provision that
  no money shall be drawn from the Treasury except pursuant to an appropriation;

- <u>Saratoga Harness Racing</u>, 238 N.E.2d 730 (N.Y. 1968) - statute authorizing funds
  derived from private racing associations authorized to be deposited at inception,
  not in the State Treasury, but in segregated accounts of the Agriculture and New
  York State Horse Breeding Development Fund and used only for specified
  purposes does not violate constitutional provision prohibiting expenditures of
  State funds without an appropriation;

- <u>Baro v. Murphy</u>, 207 N.E.2d 593 (Ill. 1965) - law enacted to meet a particular
  need dedicates revenues from State parks, previously deposited in the State
  Treasury, to be placed in a special trust fund to secure bonds of the State Parks
  Revenue Bond Commission and used only for specified purposes where state debt
  is not created does not violate a constitutional provision prohibiting continuing
  appropriations of State funds. "[The court] upheld the power of the legislature to
  divert revenues, other than taxes and fees, of State officers to a special use, and to
  eliminate them from the State Treasury." <u>Id</u>. at 462;

- <u>Graham v. Illinois State Toll Highway Authority</u>, 695 N.E.2d 360 (Ill. 1998) - toll
  revenues, but not state taxes or fees, could be spent without annual legislative

appropriation where the revenues are held in a special fund disbursed only for the purposes specified in the statute and state debt is not created, does not violate a constitutional requirement that the state budget set forth the estimated balance of funds available for appropriation of every department, authority and public corporation of the state and that the General Assembly make appropriations for all expenditures of public funds by the state;

- Tatum v. Wheeless, 178 So. 95 (Miss. 1938) – excises levied by the state legislature on employers doing business in the state and deposited into a trust fund outside the state treasury for the benefit of specific beneficiaries (employees) not subject to Mississippi's constitutional appropriation provision;

- Gipson v. Ingram, 223 S.W.2d 595 (Ark. 1949) – state's appropriation provision refers only to state money that actually reaches the state treasury and does not apply to money collected by state agencies and, pursuant to legislation, held in a separate trust fund and pledged for the benefit of specific beneficiaries;

- New Jersey Sports & Exposition Authority, 292 A.2d 545 (N.J. 1972) - devotion of revenues from pari-mutuel horse racing wagering to public authority to secure its debt and used only for specified purposes where State debt is not created does not violate constitutional appropriation clause prohibiting drawing of money from State Treasury except by annual appropriation;

- Hickel v. Cowper, 874 P.2d 922 (Alaska 1994) – court upheld statute defining "amount available for appropriation" for purposes of a constitutional provision authorizing appropriations from a budget reserve fund when the amount available for appropriation is less than the amount appropriated in the previous year, stating it does not include funds established by the legislature, dedicating funds pursuant to an appropriation to a particular use and authorizing their expenditure without further legislative action, such as the oil and hazardous substance release response fund and seven other funds; amounts available for appropriation includes "all funds over which the legislature has retained the power to appropriate." Id. at 927;

- King County v. Taxpayers of King County, 949 P.2d 1260 (Wash. 1997) - legislation for assisting King County in financing a new stadium for the Seattle Mariners imposes a sales and use tax and authorizes the revenues therefrom to be used solely to secure bonds issued to finance the stadium and related purposes is upheld against claim that the tax is unconstitutionally diverted to the County in violation of state constitutional provision requiring an appropriation for all state money where the purpose for which the funds can be expended is prescribed by statute and the money is paid into a special fund.

Courts have invalidated legislation making exceptions to constitutional appropriation requirements in situations where several of the above described features were absent. In Opinion of the Justices, the Supreme Judicial Court of Massachusetts invalidated a legislative effort to

dedicate funds for the benefit of the Massachusetts Convention Center Authority ("MCCA"). 396 Mass. 1201 (1985). The court found that the proposed legislation failed to provide a significant limit on the purposes for which the MCCA could expend the dedicated revenue. The court distinguished the MCAA legislation from the Mass/Bank bill which required specified State, local and executive control over Mass/Bank's expenditure of funds. The court also faulted the MCCA legislation on the ground that convention centers are not the "traditional, central and basic governmental activities that were the basis of the Mass/Bank proposal." Id. at 1210.

Act 91 follows the Mass/Bank structure rather than the MCCA model. Act 91 requires the Corporation to transfer the proceeds of its bonds and notes to the Commonwealth to allow the Commonwealth to pay its debt and other obligations specified in Article 2(b) of Act 91 (the "Commonwealth Obligations"). The Corporation is authorized to spend the funds assigned to it solely to pay its bonds and notes, related financing expenses and its own operating expenses, and for no other purposes. As such, all expenditures of the Corporation's obligations and of revenues paid to the Corporation are to support public purposes decided by appropriate Commonwealth officials following the provisions specified in the Constitution and laws of the Commonwealth for the incurrence of the Commonwealth Obligations.

While the purposes of Commonwealth Obligations may include public facilities such as convention centers or other purposes which the Massachusetts court considers not traditional, central and basic governmental activities, we believe the more important consideration is the level of executive or legislative control in determining expenditures. We also note that other courts have not followed Massachusetts in restricting exceptions from appropriation or available revenues provisions to traditional governmental activities.

In Anderson v. Regan, 425 N.E. 2d 792 (N.Y. 1981), the court reviewed a practice of the State executive branch of placing Federal funds in the State treasury and disbursing them without an appropriation. Noting that there has been "little or no legislative participation in the expenditure of Federal moneys" and that the Federal funds are placed in the State Treasury, the court held the practice violates New York's constitutional appropriation provision: "When the appropriation rule is bypassed . . . the Legislature is effectively deprived of its right to participate in the spending decisions of the State, and the balance of power is tipped irretrievably in favor of the Executive branch." Id. at 797.

The court contrasted the situation in Anderson with Saratoga Harness Racing. In Saratoga Harness Racing the money at issue never became the property of the state and was never placed in the state treasury. Rather, the money was deposited in a separate fund administered by a "legislatively created public benefit corporation." Id. at 793. The lack of accountability and legislative oversight that raised serious concerns for the court in Anderson was not present in the Saratoga Harness Racing context.

Other examples where courts have invalidated legislation diverting revenues in light of constitutional provisions similar to the Constitutional Debt Priority Provisions include the following: Opinion of the Justices, 300 Mass. 630 (1938) (specified revenue stream not dedicated at time of its creation); Opinion of the Justices, 334 Mass. 716 (1956) (hunting and fishing license and permit fees not impressed with a trust); Dallas County v. McCombs, 140

S.W. 2d 1109 (Tex. 1940) (general ad valorem taxes levied and collected as state revenues could not be diverted).

One of the questions that arises in certain cases is whether it is significant that the money being diverted constitutes tax revenues.[2] Whether the revenues involved are tax revenues or non-tax revenues should not be controlling. This is particularly true with respect to sales and use taxes where the legislature retains the right to abolish the tax entirely, to reduce it or to direct it to another purpose. The critical feature that courts have relied on in reviewing legislation of this type is whether the decision regarding the control over the tax revenues rests with the legislative branch. See e.g., Opinion of the Justices, 334 Mass. 716 (1956), supra, Taxpayers of King County., supra, Friedman., supra.

A separate element of the analysis involves the question of whether owners of the Commonwealth's public debt have a lien or claim on any particular revenues of the Commonwealth such that the diversion of those revenues would constitute an impairment of contract under the contract clause of the Federal Constitution (Art. I, § 10) and the Puerto Rico Constitution (Art. II, § 7).

"Public debt," as referenced in the Constitutional Debt Priority Provisions, refers to debt of the Commonwealth as to which the full faith, credit and taxing power of the Commonwealth are pledged. The general meaning of these terms in jurisdictions across the country is that the governmental body will exercise all of its revenue-producing powers, including the power of taxation, to assure payment of its general obligation debt. As noted in Flushing National Bank v. Municipal Assistance Corporation, 358 N.E. 2d 848 (New York Court of Appeals, 1976), "the effect of such pledge of 'full faith and credit' is not to create a general or special lien or charge upon the unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds, but is to acknowledge an indebtedness for the amount of money received as a consideration for the bonds...." See also, Highway District No. 1 v. Fremont County, 185 P. 66 (Idaho S. Ct. 1919) (road and bridge taxes assessed and collected by a highway district were reduced subsequent to a district bond issue, but bondowners were not impaired because the law provided that the highway district was to pay its bonds from a levy of property tax).

In Quirk v. Municipal Assistance Corporation, 363 N.E. 2d 549 (N.Y. 1977) the court reviewed state legislation, enacted in response to the New York City fiscal crisis in the mid-1970s, that suspended a New York City sales tax, and imposed an identical state sales tax for the benefit of a newly-created New York City Municipal Assistance Corporation ("MAC") to be pledged as security for MAC bonds. This matter involved a New York constitutional provision,

---

[2]     One of the cases that holds that tax revenues cannot be diverted involved general ad valorem tax revenues that were to be used for general governmental purposes. Dallas County v. McCombs, 140 S.W. 2d 1109 (Tex. 1940). See also Green v. Black, 186 N.E. 462 (Ill. 1933). Other cases, in dicta, have suggested that the conclusion reached might or would be different if tax revenues were involved. See e.g., Tatum, Gibson, Baro v. Murphy, supra, Myers v. Alaska Housing Finance Corporation, 68 P.3d 386 (Alaska 2003) (including as a factor in upholding the constitutionality of the sale of tobacco revenues, that such revenues did not constitute traditional kinds of state revenues, like taxes).

Each of the Addresses Named                                                        December 13, 2011
 On Exhibit A Hereto                                                                         Page 9

similar to the Constitutional Debt Priority Provisions in Puerto Rico, that requires that if appropriations by a municipality are not sufficient for the purpose of payment of debt service on the municipality's general obligation bonds then the "first revenues thereafter received" must be applied to the payment of those bonds. The court stated that "this 'first lien' on the city's revenues does not give bondholders the right to insist that any particular existing taxes be maintained or new ones imposed to produce those revenues."

In Quirk, the court noted that "a different case would be presented" if the legislation stripped the city of all revenue sources other than its property tax. We note that the Pledged Sales Tax assigned to the Corporation represents a portion of the total of the Commonwealth's sales and use tax, which in turn is a portion of the total revenues of the Commonwealth's budget.

**Characteristics of Act 91.** When Act 91 is reviewed in light of the relevant precedent, we find that the Act is structured to include virtually all of the elements that courts have relied on in upholding legislation against a claim that the legislature acted unconstitutionally in diverting a particular revenue stream:

1.  Urgent Need. Act 91 was enacted due to one of the worst fiscal crises in the history of Puerto Rico with a budgetary deficit of $3.2 billion. (Statement of Motives, Act. No. 1 of January 14, 2009)

2.  Impressed with a Trust. Section 3 impresses the Pledged Sales Tax with a trust from the moment of their receipt in the Dedicated Sales Tax Fund and dedicates those moneys as security for particular beneficiaries, that is, owners of the Corporation's bonds and notes.

3.  Special Fund. Section 3 establishes a special fund to be known as the Dedicated Sales Tax Fund, to be administered by GDB and provides that all moneys deposited in the Fund shall be the property of the Corporation.

4.  Specified Purposes. The purposes of the Corporation and the use of its funds are expressly set forth in Sections 2(b) and (d) and are limited to paying or financing the specific purposes or projects described therein.

5.  Not Commonwealth Revenue. Section 3 provides explicitly that the money shall be deposited in the Fund upon receipt and shall not be deposited in the Treasury of Puerto Rico nor shall it constitute resources available to the Commonwealth nor shall it be available for use by the Secretary of the Treasury.

6.  Limitations and Conditions. Article 4 specifies the exclusive purposes for which the Corporation's revenues may be used. Since the Corporation is primarily a financing corporation established to finance or refinance Commonwealth projects or Commonwealth Obligations, the Corporation does not independently review all of the projects financed or refinanced through its activities. However, each of these projects or purposes has been authorized pursuant to a legislative enactment, including Act 91.

13696742.2

7.  Monetary Cap. Section 3 specifies the portion of the tax that shall be deposited to the Fund and in so doing places a cap on the amount of revenues that can be used for the Corporation's purposes.

8.  Not Commonwealth Debt. Section 4(d) makes clear that the obligations of the Corporation shall not constitute a debt of the Commonwealth nor shall the Commonwealth have any liability thereon.

We note as a supplemental matter that Act 91 and this transaction by the Corporation are generally structured in the same fashion as securitizations undertaken across the country of governmental cash flows which, while not tax revenues, typically involve a property right which is identified by legislation and where the governmental entity exercises its inherent and explicit right to convey property for adequate consideration. Such transactions are typified by the securitizations of tobacco settlement revenues, the Puerto Rico version of which was the Children's Trust transaction.

In Children's Trust, the Commonwealth's right to receive tobacco settlement revenues from tobacco companies for a defined period of years, otherwise deliverable to the General Treasury of the Commonwealth, was assigned to a trust in consideration for the trust's issuance of bonds and application of the proceeds for a specified purpose. Here, while the Pledged Sales Tax will be free of the Constitutional Debt Priority Provisions, the consideration for legislative conveyance of the Pledged Sales Tax to the Corporation (the proceeds of the issuance of the Corporation's bonds) will be delivered to the Commonwealth General Treasury for the payment of the purposes stated in Act 91 and will be made fully subject to the Constitutional Debt Priority Provisions.

We note also that Act 91 provides that the provisions of Act 91 shall not be interpreted or applied in such a manner as to diminish the power of the Legislative Assembly to impose and collect taxes as provided in Section 2 of Article VI of the Constitution of Puerto Rico. Thus, the Legislature is free at any time to reduce the rate of sales and use tax or eliminate it entirely. This is clearly disclosed in the Corporation's Official Statement relating to the issuance of the Series 2011 Bonds.

In rendering this opinion, we considered legal theories that an opponent of this transaction would advance in an attempt to make the Constitutional Debt Priority Provisions applicable to the assignment of the Pledged Sales Tax to the Corporation. The outcome of any challenge to this transaction cannot be predicted with certainty. It is of significance that there are at present no Puerto Rico precedents controlling or directly on point. We note that a court's decision regarding the matters upon which we are opining herein would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. Thus, different conclusions could be reached by a court and would not necessarily constitute reversible error. Consequently, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. This

13696742.2

Case:17-03283-LTS  Doc#:3747-3  Filed:02/24/18  Entered:02/24/18 16:59:06  Desc:
Exhibit DD  Page 461 of 832

Each of the Addresses Named
On Exhibit A Hereto

December 13, 2011
Page 11

opinion is not a guaranty, warranty or representation, but is merely this law firm's informed judgment as to a specific question of law.

**Opinion**. Based upon and subject to the foregoing, as of the date hereof, we are of the opinion that a court, applying existing legal principles to the facts as properly found after appropriate briefing and argument, would find that (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) said asset and right of the Corporation shall not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico and therefore are not subject to a first claim by the owners of public debt of the Commonwealth in the event total available resources including surplus for a particular fiscal year are not sufficient for the purposes of meeting appropriations in that fiscal year and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

The opinion expressed herein is based on an analysis of existing laws and court decisions. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law), after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

This opinion letter, which is summarized in the Corporation's Official Statements relating to the issuance of the Series 2011 Bonds, is rendered for the sole and exclusive benefit of each addressee hereof specified in Exhibit A, and no other person or entity (including present and future Bondowners) is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Series 2011 Bonds upon their request, or may otherwise be posted on an Internet web site maintained by the Corporation or GDB, but no attorney-client relationship exists between any such investor or any person reviewing such postings and Nixon Peabody LLP and none of such investors or other persons are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity other than those addressees specified in Exhibit A, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document other than said Official Statements.

Very truly yours,

*Nixon Peabody LLP*

13696742.2

NIXON PEABODY LLP

## Exhibit A – Addressees

Puerto Rico Sales Tax Financing Corporation

Moody's Investors Service

Standard & Poor's Ratings Services

Fitch Ratings

Underwriters of the Series 2011C Bonds represented by Citigroup Global Markets Inc.

Underwriters of the Series 2011D Bonds represented by Santander Securities Corporation

PIETRANTONI MENDEZ & ALVAREZ LLC
POPULAR CENTER 19TH FLOOR
208 PONCE DE LEON AVENUE
SAN JUAN, PUERTO RICO 00918

TEL: (787) 274-1212
FAX: (787) 274-1470
WWW.PMALAW.COM

December 13, 2011

To:     Each of the Addressees Named on Exhibit A hereto

        This opinion is being provided in connection with the issuance by Puerto Rico Sales Tax
Financing Corporation (the "Corporation") on the date hereof of $1,006,474,702 aggregate
initial principal amount of its Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C
Bonds") and $91,155,000 initial aggregate principal amount of Sales Tax Revenue Bonds,
Senior Series 2011D (the "Series 2011D and, together with the Series 2011C Bonds, the
"Offered Bonds").

        This opinion is rendered in connection with the issuance of the Offered Bonds only and
may not be relied upon in connection with any other series of Bonds or notes under the
Resolution referred to below.  Reliance on this opinion by persons and entities other than the
addressees identified in Exhibit A is restricted as set forth in the last paragraph of this letter.

        **The Corporation**.  The Corporation is a public corporation and instrumentality of the
Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political
entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of
May 13, 2006, as amended ("Act 91").

        **The Offered Bonds and the Resolution.**  The Offered Bonds are being issued pursuant
to the provisions of resolutions adopted by the Corporation (collectively, as amended and
supplemented to the date hereof, the "Resolution").

        Pursuant to the provisions of Act 91 and the Resolution, the Offered Bonds are primarily
secured by a security interest granted by the Corporation in receipts of a portion (and the right to
receive the same) of the sales and use tax imposed by the Commonwealth.  Such portion of the
sales and use tax and the right to receive the same (referred to herein collectively as the "Pledged
Sales Tax"), are by the terms of Act 91 made the property of the Corporation.

        Under the terms of the Resolution, the lien on the Pledged Sales Tax granted to the
holders of the Offered Bonds will be on a parity with the lien on the Pledged Sales Tax granted
to the holders of the Sales Tax Revenue Bonds and senior to the lien on Pledged Sales Tax
granted to the holders of the Sales Tax Revenue Bonds issued by the Corporation as First
Subordinate Bonds.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 2 of 9

**Constitutional Provisions.** Section 8 of Article VI of the Constitution of Puerto Rico (the "Constitution") provides that "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Section 2 of Article VI of the Constitution provides in its last paragraph that "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." These provisions of the Constitution are sometimes referred to herein as the "Constitutional Debt Priority Provisions." The official English version of the Constitutional Debt Priority Provisions uses the term "available *revenues* including surplus," but this opinion will refer to "available *resources* including surplus" as the translation of the term "recursos" used in the official Spanish version of the Constitution.

**Opinion Requested.** You have asked for our opinion as to whether (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" for purposes of the Constitutional Debt Priority Provisions and, therefore, are not subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "clawback") in the event available resources including surplus for a particular fiscal year, are not sufficient for the purposes of meeting appropriations in that fiscal year, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

**Act 91.** Act 91 created a special fund known as the Dedicated Sales Tax Fund, to be administered by GDB, and transferred the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and any future funds required by Act 91 to be deposited therein, to the Corporation as property of the Corporation. This transfer was made in consideration for the Corporation's commitment to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all of part of the Commonwealth's debt and other obligations specified in Article 2(b) of Act 91 (the "Commonwealth Obligations"), with the net proceeds of bonds issued by the Corporation and with other funds and resources available to the Corporation.[1]

The Dedicated Sales Tax Fund is required by the terms of Act 91 to be funded in each fiscal year of the Commonwealth with the first collections of the Pledged Sales Tax. The

---

[1] We have assumed for purposes of this opinion that the Corporation will not pay any of the Commonwealth Obligations (other than Commonwealth Obligations consisting of indebtedness of the Commonwealth being refunded) directly, but will instead transfer the proceeds of its bonds and notes to the Commonwealth in order to allow the Commonwealth to pay the Commonwealth Obligations. We have assumed that the Corporation will use the funds assigned to it solely to pay its bonds and notes, related financing expenses and its operating expenses.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 3 of 9

Pledged Sales Tax consists of the greater of (i) a fixed base amount specified in Act 91 for each fiscal year (the "Fixed Base Amount"); and (ii) the product of the amount of the sales and use tax collected during such fiscal year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%),[2] and the denominator of which is the aggregate sales and use tax rate of five point fifty percent (5.50%).

Act 91 limits the amount of bonds that may be issued by the Corporation to those that can be serviced with the Fixed Base Amount. The Fixed Base Amount, which was initially set at $185 million, increases annually until it reaches a maximum of $1.85 billion.

Act 91 requires that the Pledged Sales Tax "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the Treasury of Puerto Rico." Moreover, Act 91 states that the Pledged Sales Tax shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary [of the Treasury]." In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico not its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

On the date hereof, the Secretary of Justice of Puerto Rico issued an opinion (the "2011 Opinion") in which he concluded that the Pledged Sales Tax does not constitute "available resources" for purposes of the Constitutional Debt Priority Provisions. On each of November 23, 2011, June 23, 2011, February 9, 2010 and June 30, 2010, the Secretary of Justice of Puerto Rico issued an opinion reaching the same conclusion in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2011B, Sales Tax Revenue Bonds, Junior Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2010A and Sales Tax Revenue Bonds, First Subordinate Series 2010C, respectively (the "Prior Opinions"). Moreover, his immediate predecessors reached the same conclusion in opinions dated July 31, 2007 (the "2007 Opinion") issued in connection with the issuance of the Series 2007A and Series 2007B Sales Tax Revenue Bonds of the Corporation and July 18, 2009 (the "2009 Opinion") issued in connection with the issuance of the Corporation's Sales Tax Revenues Bonds, First Subordinate Series 2009A and Series 2009B.

**General Legal Principles.** Under Article VI, Section 2 of the Constitution, the Legislature of Puerto Rico (the "Legislature") is vested with broad authority over the levying and application of taxes and, therefore, has the power to determine how such tax revenues are applied

---

[2] Act 91 was amended by Act No. 1 of January 14, 2009 ("Act 1") and Act No. 7 of March 9, 2009 ("Act 7") to, among other things, increase the numerator of the fraction referred to in clause (i) from one percent (1%) to two point seventy-five percent (2.75%).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 4 of 9

and who receives them. The principal issue covered by this opinion is whether any designation or earmarking by the Legislature of Commonwealth resources for a particular purpose, while valid, is nevertheless subject to a clawback under the Constitutional Debt Priority Provisions. More specifically, whether notwithstanding the express provisions of Act 91, the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions and, thus, must be made available to pay principal and interest on general obligation bonds of the Commonwealth to the extent the Commonwealth does not otherwise have sufficient resources for such purpose.

This issue has never been addressed by the Supreme Court of Puerto Rico and there are no precedents in Puerto Rico cases controlling or directly on point with the issues addressed on this letter. There is also no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention. In the absence of direct judicial precedent on this issue or clear evidence of the intent of the framers of the Constitution, the issue addressed herein needs to be analyzed under general principles of constitutional and statutory interpretation applicable in Puerto Rico.

**Standard of Review.** At the outset, we believe it is important to discuss the standard of review that a Puerto Rico court would use to decide this issue. The Supreme Court of Puerto Rico has traditionally shown substantial deference to the Legislature's judgment and has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislature. See Rexach v. Ramírez Vélez, 162 D.P.R. 130, 148 (2004); Berberena v. Echegoyen, 128 D.P.R. 864 (1991); Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1996). The Supreme Court of Puerto Rico has reiterated that when the constitutionality of a statute is questioned, the Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy.[3] In these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest. Berberena, supra at 882. Courts in the State of New York, in reviewing analogous issues, have also acknowledged that significant deference should be given to the state legislature in these matters. See Local Government Assistance Corporation v. Sales Tax Asset Receivable Corporation, 813 N.E. 2d 587 (New York Court of Appeals, 2004).

In reviewing statutory and constitutional questions, the Supreme Court of Puerto Rico has also stated that, while opinions of the Secretary of Justice are not binding on the courts, they are entitled to great persuasive weight, because the Secretary of Justice is the highest executive officer charged with the administration of justice. San Geronimo Caribe Project, Inc. v.

---

[3] We note that the higher degree of scrutiny generally applicable to contract impairment cases involving obligations of the Commonwealth does not apply to the threshold issue of whether the statute being questioned in fact impairs existing contractual rights. See Bayrón Toro y Otros v. Rafael Serra, 119 D.P.R. 605,620 (1983).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 5 of 9

Administración de Reglamentos y Permisos, 2008 W.L. 3834098 (Puerto Rico, 2008), Maldonado v. Junta de Planificación, 2007 W.L. 1582244 (Puerto Rico, 2007). We believe that an opinion from the Secretary of Justice, such as the 2010 Opinion, would be granted even more persuasive weight by the Supreme Court of Puerto Rico, where, as occurs in this case, it reaffirms opinions issued by prior Secretaries of Justice.

**Judicial Precedents from Other Jurisdictions.** Since there is no controlling precedent in Puerto Rico, it is appropriate to examine precedents from other jurisdictions to which the Supreme Court of Puerto Rico might look for guidance. There exists a number of precedents from the State of New York, that while not involving identical statutory and constitutional provisions to Act 91 and the Constitutional Debt Priority Provisions, provide support for the proposition that the Legislature may designate a specific source of state revenues for a specific purpose, even though such designation has the effect of reducing the amount of revenues that would otherwise be "available" to pay principal and interest on the Commonwealth's full faith and credit obligations. See Saratoga Harness Racing v. Agriculture, 238 N.E. 2d 730 (New York Court of Appeals, 1968), Quirk v. Municipal Assistance Corporation, 363 N.E. 2d 549 (New York Court of Appeals, 1977) and Anderson v. Regan, 425 N.E. 2d 792 (New York Court of Appeals, 1981).

The Saratoga case involved a challenge to the validity of a statute that assigned future state revenues for a specific purpose in the face of a provision of the New York State Constitution which prohibited the expenditure of state funds except pursuant to appropriation by the state legislature. The statute in question required that certain receipts due from state assessments imposed on racing associations be delivered to a special development fund which would in turn be authorized to use such funds for the specific purpose of fostering the continued growth and prosperity of the horse racing industry. The Court noted that, similar to the policy behind the Constitutional Debt Priority Provisions, the New York State constitutional provision under discussion had been motivated by a concern that the state not incur obligations in excess of its actual income and thus "leave burdens for the future, and severe taxation or repudiation, the meanest of all things." Saratoga, supra at 124. The New York State Court of Appeals upheld the constitutionality of the statute and stated that "not every fund made of public moneys raised through taxation or otherwise" came within purview of the New York State constitutional provision in question. Saratoga, supra at 123. In reviewing its prior discussion in Saratoga, the New York State Court of Appeals in the Anderson case made clear that the operational structure of the statutory scheme in the Saratoga case was an important factor in upholding its constitutionality. The Court stated that its holding in Saratoga was clearly predicated upon the fact that the money at issue there, although raised through legislative assessment, never became the property of the State and was never placed within the State treasury, but rather was immediately deposited in a separate fund administered by a legislatively created public benefit corporation. Anderson, supra at 406. We do not believe that the fact that the Pledged Sales Tax is initially payable to the Secretary of the Treasury is a substantive distinction from the Saratoga case, since Act 91 explicitly provides that the Pledged Sales Tax is property of the Corporation,

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 6 of 9

and the Pledged Sales Tax collection are deposited in accounts outside the control of the Secretary of the Treasury (see footnote 3).

In addition to the Saratoga case, there exist a number of cases upholding the constitutionality of statutes that contemplated the assignment by a state or municipality of its interest in certain future revenues to a public corporation to support the payment of bonds issued by such corporation. See Quirk, supra, Local Government Assistance Corp. v. Sales Tax Asset Receivable Corporation, 813 N.E. 2d 587 (New York Court of Appeals, 2004)) and Myers v. Alaska Housing Finance Corporation, 68 P. 3d 386 (2003). The Myers case involved the assignment of periodic payments from the tobacco settlement litigation to the Alaska Housing Finance Corporation. We note that the Commonwealth has made a similar assignment of its tobacco settlement payments to the Children's Trust to support bonds issued by the Trust, the proceeds of which were to be used for specific purposes and are not entitled to the full faith and credit of the Commonwealth.

**Analysis of Act 91 Statutory Scheme under General Legal Principles and in Light of Precedents from Other Jurisdictions.** As recited in its Statement of Motives, Act 91 was originally enacted by the Legislature to deal with the high level of Commonwealth appropriation debt, which had adversely affected the credit of the Commonwealth and had created a fiscal crisis that forced a government shutdown. In 2009, Act 91 was further amended by Act 1 and Act 7 to increase the amount of the Pledged Sales Tax in an effort to address the unprecedented magnitude of the fiscal crisis currently facing the Commonwealth. The fiscal difficulties that Act 91 seeks to address represent a legitimate government interest. Thus, under these circumstances, we believe that the Supreme Court of Puerto Rico would give great deference to the judgment of the Legislature on how best to exercise its taxing power to address this fiscal crisis, and would find that there is a rational relationship between Act 91 and this legitimate government interest.

There is nothing in the text of the Puerto Rico Constitution or in the records of the Puerto Rico Constitutional Convention that provides that specified resources be available to pay general obligation bonds, nor that holders of general obligations bonds shall have a lien on all future revenues of the Commonwealth, nor otherwise restrict the authority of the Commonwealth to sell or transfer assets. As stated by the Court in Flushing National Bank v. Municipal Assistance Corporation, 358 N.E. 2d 848 (New York State Court of Appeals, 1976), the issuance of full faith and credit bonds does not create a general or special lien or charge upon unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds. Flushing, supra at 736. We note that had the framers of the Puerto Rico Constitution desired to limit the ability of the Legislature to assign future tax revenues they could have done so by including in the Puerto Rico Constitution an explicit anti-dedication clause such as those contained in the Alaska and Georgia constitutions, which in turn are based on a similar provision included in the Model State Constitution prepared by The Committee on State Government of the National Municipal League. We note that the Georgia Constitution and the

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 7 of 9

Model State Constitution were in existence at the time of adoption of the Puerto Rico
Constitution and that the Alaska Constitution was adopted soon thereafter in 1955.[4]

The fact that certain prior financing structures of other Commonwealth instrumentalities
have provided that the revenues pledged under those structures constitute "available resources"
for purposes of the Constitutional Debt Priority Provisions does not alter our conclusion. For
example, in Act No. 74 approved June 23, 1965, as amended ("Act 74"), creating Puerto Rico
Highways and Transportation Authority (the "Highways Authority"), the Legislature provided a
mechanism for the Highways Authority to issue bonds to finance needed highway and other
transportation projects and to secure said bonds by a pledge of "the proceeds of any tax or other
funds which may be made available to the Authority by the Commonwealth" (Section 4(1) of
said Act 74). This pledge, however, is expressly made "subject to the provisions of Section 8 of
Article VI of the Constitution of the Commonwealth." Similarly, in Act No. 44 approved
June 21, 1988, as amended ("Act 44"), creating Puerto Rico Infrastructure Financing Authority
("AFI"), the power of AFI to pledge its revenues to secure its bonds is expressly made "subject
to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth." In that
case, the pledge involved "all or any portion of the federal excise taxes [remitted to the
Department of the Treasury of the Commonwealth under applicable provisions of the United
States Internal Revenue Code] or other funds which [are] transferred by the Commonwealth to
the Authority" (Section 7(m) of said Act 44).

We believe that there is a clear distinction between the statutory schemes of Act 74 and
Act 44 on the one hand, and Act 91 on the other. Under both Act 74 and Act 44, the Legislature
expressly provided that the revenues to be pledged were part of the general resources of the
Commonwealth and thus, authorized the pledge of such revenues subject to the provisions of the
Constitutional Debt Priority Provisions. In both cases, the revenues in question were made
available to the Highways Authority and AFI from revenues on deposit in the Commonwealth
General Fund. In the case of Act 91, the Legislature expressly provided that the Pledged Sales
Tax is not to be deposited in the General Fund and shall not constitute resources available to the
Commonwealth of Puerto Rico. The fact that in Act 74 and Act 44 the Legislature chose to
designate the pledged revenues in question as "available resources" does not imply that the
Legislature cannot exercise its constitutional taxing authority to explicitly provide that the
Commonwealth shall not have ownership and control over a portion of the Commonwealth
imposed sales and use tax, as provided in Act 91.

---

[4] We also note that Jaime Benítez, the Chancellor of the University of Puerto Rico at that time, wrote a foreword to
the Fifth Edition of the Model State Constitution published in 1948 in which he thanked the National Municipal
League for granting their permission to make reprints of the Model State Constitution for circulation to the
delegation of the Puerto Rico Constitutional Convention and acknowledged that the Model would be suggestive
for the delegation.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 8 of 9

In rendering our opinion, we believe that the Supreme Court of Puerto Rico will give substantial persuasive weight to the opinions of Secretaries of Justice as expressed in the 2007 Opinion, the 2009 Opinion, the Prior Opinions, and the 2011 Opinion. We understand that this persuasive weight will be bolstered by the fact that two Secretaries of Justice from different administrations have reached the same conclusion.

We have also considered specific elements of Act 91 that we understand help support its validity if ever faced with a legal challenge. First, following the example of the statutory scheme in Saratoga, the Legislature has clearly stated its intention that the Pledged Sales Tax is not to be considered general funds of the Commonwealth and is not available for use by the Commonwealth, and has mandated that from the moment of collection, the Pledged Sales Tax is to be segregated from the general fund of the Commonwealth.

Second, as stated previously, Act 91 incorporates safeguards to limit the amount of bonds that may be issued by the Corporation backed by the Pledged Sales Tax.[5] This provision reflects the Legislature's attempt to resolve the current fiscal crisis while addressing the concerns expressed by the Court in Quirk that an otherwise constitutionally permissible assignment of revenues might be held to violate constitutional provisions protecting general obligation bondholders if, realistically, it stripped the government of all or a substantial source of its revenues and, therefore, adversely affected the ability of the Commonwealth to service its general obligation debt. See Quirk, supra at 648.

**Opinion.** It is our opinion, based on our examination of the law and other matters which we consider pertinent, and after applying general legal principles to the facts summarized herein, that, if the appropriate issues are properly presented for judicial decision, a court would hold that (1) Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

We note, however, that in view of the lack of direct judicial precedent in Puerto Rico there can be no certainty as to the outcome of any litigation with respect to the applicability of the "clawback" to the Pledged Sales Tax. We note further that because there is no controlling

---

[5]  Under Act 91, the amount of bonds that may be issued by the Corporation is limited to those that may be repaid from the Fixed Base Amount, which is capped at $1.85 billion (which is reached in 2041). We note that the Fixed Base Amount for fiscal year 2010-2011 ($572 million) represented six point five percent (6.5%) of the preliminary General Fund total revenues for that fiscal year ($8,726,000,000) (for purposes of this computation, we have included the Pledged Sales Tax for that fiscal year ($572 million) as part of General Fund total revenues).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 9 of 9

Puerto Rico precedent on the matters upon which we are opining herein, a court's decisions on such matters would be based on the court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. As a result, a court faced with these issues could reach a contrary result which would not necessarily constitute reversible error. Accordingly, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) of the Commonwealth that reviewed the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by such court applying existing legal rules and principles to the facts as properly found after appropriate briefing and argument. This opinion is not a guaranty, warranty or representation of a particular result, but is merely this law firm's informed judgment as to a specific question of law.

The opinion expressed herein is based on an analysis of existing laws and court decisions. It also assumes strict compliance with the provisions of Act 91 and the Resolution, including those provisions requiring segregation of the Pledged Sales Tax from the general funds of the Commonwealth. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law) or in the manner of segregating the Pledged Sales Tax from the general revenues of the Commonwealth, after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

We are admitted to practice in the Commonwealth, and express no opinion whatsoever with respect to any laws other than the laws of the Commonwealth.

This opinion letter is rendered for the sole and exclusive benefit of the addressee hereof, and no other person or entity is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Offered Bonds upon their request, but no attorney-client relationship exists between any such investor and Pietrantoni Mendez & Alvarez LLC and none of such investors are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document.

Very truly yours,

Pietrantoni Mendez Alvarez LLP

187881

PIETRANTONI MENDEZ & ALVAREZ LLC

**EXHIBIT A**

ADDRESSEES

Puerto Rico Sales Tax Financing Corporation

Underwriter Representatives

# **EXHIBIT 12**

PIETRANTONI MENDEZ & ALVAREZ LLC

POPULAR CENTER 19TH FLOOR
208 PONCE DE LEON AVENUE
SAN JUAN, PUERTO RICO 00918

TEL: (787) 274-1212
FAX: (787) 274-1470
WWW.PMALAW.COM

October 22, 2013

Puerto Rico Sales Tax Financing Corporation
San Juan, Puerto Rico

Ladies and Gentlemen:

Attached is a copy of the opinion we delivered as Underwriters' Counsel to the Puerto Rico Sales Tax Financing Corporation ("COFINA") and the Underwriter Representatives on December 13, 2011 (the "Opinion") relating to the treatment of the Pledged Sales Tax (as such term is defined in the Opinion) under the Constitution of the Commonwealth of Puerto Rico. We hereby consent to the Opinion being made available on the website of Government Development Bank for Puerto Rico and to the filing of this Opinion on the EMMA system. **This Opinion is being made available for informational purposes only. No purchaser or holder of COFINA securities is entitled to rely on the Opinion and no advice under such Opinion is rendered to any such purchaser or holder of COFINA securities.**

We note that the Opinion is subject to all of the qualifications and assumptions set forth therein and that, in the absence of Puerto Rico precedents which are controlling or directly on point, the Opinion relies entirely on precedents from other jurisdictions.

Purchasers or holders of COFINA securities should consult their own legal advisors as to (a) such legal advisor's own analysis and conclusions of the treatment of the Pledged Sales Tax, (b) any current laws and court decisions which could adversely affect the conclusions of the Opinion and (c) any changes or amendments, since the date of the Opinion, to (i) COFINA's authorizing act or (ii) the collection, treatment, suspension, limitation or exemption of the Commonwealth's sales and use tax.

An opinion of counsel is not a prediction of what a particular court (including any appellate court) that reached the issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law. Opinions of counsel are not binding on any court or party to a court proceeding. A court's decision regarding the matters upon which a lawyer is opining would be based on such court's own analysis and interpretation of the factual evidence before it and of applicable legal principles.

Respectfully submitted,

Pietrantoni Mendez & Alvarez LLC

PIETRANTONI MENDEZ & ALVAREZ LLC
POPULAR CENTER 19TH FLOOR
208 PONCE DE LEON AVENUE
SAN JUAN, PUERTO RICO 00918

TEL: (787) 274-1212
FAX: (787) 274-1470
WWW.PMALAW.COM

December 13, 2011

To:     Each of the Addressees Named on Exhibit A hereto

This opinion is being provided in connection with the issuance by Puerto Rico Sales Tax Financing Corporation (the "Corporation") on the date hereof of $1,006,474,702 aggregate initial principal amount of its Sales Tax Revenue Bonds, Senior Series 2011C (the "Series 2011C Bonds") and $91,155,000 initial aggregate principal amount of Sales Tax Revenue Bonds, Senior Series 2011D (the "Series 2011D and, together with the Series 2011C Bonds, the "Offered Bonds").

This opinion is rendered in connection with the issuance of the Offered Bonds only and may not be relied upon in connection with any other series of Bonds or notes under the Resolution referred to below. Reliance on this opinion by persons and entities other than the addressees identified in Exhibit A is restricted as set forth in the last paragraph of this letter.

**The Corporation.** The Corporation is a public corporation and instrumentality of the Commonwealth of Puerto Rico (the "Commonwealth"), constituting a corporate and political entity independent and separate from the Commonwealth, created pursuant to Act No. 91 of May 13, 2006, as amended ("Act 91").

**The Offered Bonds and the Resolution.** The Offered Bonds are being issued pursuant to the provisions of resolutions adopted by the Corporation (collectively, as amended and supplemented to the date hereof, the "Resolution").

Pursuant to the provisions of Act 91 and the Resolution, the Offered Bonds are primarily secured by a security interest granted by the Corporation in receipts of a portion (and the right to receive the same) of the sales and use tax imposed by the Commonwealth. Such portion of the sales and use tax and the right to receive the same (referred to herein collectively as the "Pledged Sales Tax"), are by the terms of Act 91 made the property of the Corporation.

Under the terms of the Resolution, the lien on the Pledged Sales Tax granted to the holders of the Offered Bonds will be on a parity with the lien on the Pledged Sales Tax granted to the holders of the Sales Tax Revenue Bonds and senior to the lien on Pledged Sales Tax granted to the holders of the Sales Tax Revenue Bonds issued by the Corporation as First Subordinate Bonds.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 2 of 9

**Constitutional Provisions.** Section 8 of Article VI of the Constitution of Puerto Rico (the "Constitution") provides that "In case the available revenues including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." Section 2 of Article VI of the Constitution provides in its last paragraph that "The Secretary of the Treasury may be required to apply the available revenues including surplus to the payment of interest on the public debt and the amortization thereof in any case provided for by Section 8 of this Article VI at the suit of any holder of bonds or notes issued in evidence thereof." These provisions of the Constitution are sometimes referred to herein as the "Constitutional Debt Priority Provisions." The official English version of the Constitutional Debt Priority Provisions uses the term "available *revenues* including surplus," but this opinion will refer to "available *resources* including surplus" as the translation of the term "recursos" used in the official Spanish version of the Constitution.

**Opinion Requested.** You have asked for our opinion as to whether (1) Act 91 validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" for purposes of the Constitutional Debt Priority Provisions and, therefore, are not subject to a first claim by the owners of public debt of the Commonwealth (sometimes referred to as the "clawback") in the event available resources including surplus for a particular fiscal year, are not sufficient for the purposes of meeting appropriations in that fiscal year, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

**Act 91.** Act 91 created a special fund known as the Dedicated Sales Tax Fund, to be administered by GDB, and transferred the Dedicated Sales Tax Fund, all funds deposited therein on the effective date of Act 91, and any future funds required by Act 91 to be deposited therein, to the Corporation as property of the Corporation. This transfer was made in consideration for the Corporation's commitment to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all of part of the Commonwealth's debt and other obligations specified in Article 2(b) of Act 91 (the "Commonwealth Obligations"), with the net proceeds of bonds issued by the Corporation and with other funds and resources available to the Corporation.[1]

The Dedicated Sales Tax Fund is required by the terms of Act 91 to be funded in each fiscal year of the Commonwealth with the first collections of the Pledged Sales Tax. The

---

[1] We have assumed for purposes of this opinion that the Corporation will not pay any of the Commonwealth Obligations (other than Commonwealth Obligations consisting of indebtedness of the Commonwealth being refunded) directly, but will instead transfer the proceeds of its bonds and notes to the Commonwealth in order to allow the Commonwealth to pay the Commonwealth Obligations. We have assumed that the Corporation will use the funds assigned to it solely to pay its bonds and notes, related financing expenses and its operating expenses.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 3 of 9

Pledged Sales Tax consists of the greater of (i) a fixed base amount specified in Act 91 for each fiscal year (the "Fixed Base Amount"); and (ii) the product of the amount of the sales and use tax collected during such fiscal year multiplied by a fraction, the numerator of which is two point seventy-five percent (2.75%),[2] and the denominator of which is the aggregate sales and use tax rate of five point fifty percent (5.50%).

Act 91 limits the amount of bonds that may be issued by the Corporation to those that can be serviced with the Fixed Base Amount. The Fixed Base Amount, which was initially set at $185 million, increases annually until it reaches a maximum of $1.85 billion.

Act 91 requires that the Pledged Sales Tax "be directly deposited in the [Dedicated Sales Tax] Fund at the moment of receipt and shall not be deposited in the Treasury of Puerto Rico." Moreover, Act 91 states that the Pledged Sales Tax shall not "constitute resources available to the Commonwealth of Puerto Rico, nor shall it be available for use by the Secretary [of the Treasury]." In addition, Act 91 provides that "The bonds and other obligations of [the Corporation] shall not constitute a debt or obligation of the Commonwealth of Puerto Rico nor its other public instrumentalities. Neither the Commonwealth of Puerto Rico not its other public instrumentalities shall be responsible for the payment of such bonds or other obligations, for which the full faith, credit and taxing power of the Commonwealth of Puerto Rico shall not be pledged."

On the date hereof, the Secretary of Justice of Puerto Rico issued an opinion (the "2011 Opinion") in which he concluded that the Pledged Sales Tax does not constitute "available resources" for purposes of the Constitutional Debt Priority Provisions. On each of November 23, 2011, June 23, 2011, February 9, 2010 and June 30, 2010, the Secretary of Justice of Puerto Rico issued an opinion reaching the same conclusion in connection with the issuance of the Corporation's Sales Tax Revenue Bonds, First Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2011B, Sales Tax Revenue Bonds, Junior Subordinate Series 2011A, Sales Tax Revenue Bonds, First Subordinate Series 2010A and Sales Tax Revenue Bonds, First Subordinate Series 2010C, respectively (the "Prior Opinions"). Moreover, his immediate predecessors reached the same conclusion in opinions dated July 31, 2007 (the "2007 Opinion") issued in connection with the issuance of the Series 2007A and Series 2007B Sales Tax Revenue Bonds of the Corporation and July 18, 2009 (the "2009 Opinion") issued in connection with the issuance of the Corporation's Sales Tax Revenues Bonds, First Subordinate Series 2009A and Series 2009B.

**General Legal Principles.** Under Article VI, Section 2 of the Constitution, the Legislature of Puerto Rico (the "Legislature") is vested with broad authority over the levying and application of taxes and, therefore, has the power to determine how such tax revenues are applied

---

[2] Act 91 was amended by Act No. 1 of January 14, 2009 ("Act 1") and Act No. 7 of March 9, 2009 ("Act 7") to, among other things, increase the numerator of the fraction referred to in clause (i) from one percent (1%) to two point seventy-five percent (2.75%).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 4 of 9

and who receives them. The principal issue covered by this opinion is whether any designation or earmarking by the Legislature of Commonwealth resources for a particular purpose, while valid, is nevertheless subject to a clawback under the Constitutional Debt Priority Provisions. More specifically, whether notwithstanding the express provisions of Act 91, the Pledged Sales Tax constitutes "available resources" for purposes of the Constitutional Debt Priority Provisions and, thus, must be made available to pay principal and interest on general obligation bonds of the Commonwealth to the extent the Commonwealth does not otherwise have sufficient resources for such purpose.

This issue has never been addressed by the Supreme Court of Puerto Rico and there are no precedents in Puerto Rico cases controlling or directly on point with the issues addressed on this letter. There is also no discussion of the meaning of the term "available resources" in the records of the proceedings of the Puerto Rico Constitutional Convention. In the absence of direct judicial precedent on this issue or clear evidence of the intent of the framers of the Constitution, the issue addressed herein needs to be analyzed under general principles of constitutional and statutory interpretation applicable in Puerto Rico.

**Standard of Review.** At the outset, we believe it is important to discuss the standard of review that a Puerto Rico court would use to decide this issue. The Supreme Court of Puerto Rico has traditionally shown substantial deference to the Legislature's judgment and has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislature. See Rexach v. Ramírez Vélez, 162 D.P.R. 130, 148 (2004); Berberena v. Echegoyen, 128 D.P.R. 864 (1991); Nogueras v. Hernández Colón, 127 D.P.R. 405, 412 (1996). The Supreme Court of Puerto Rico has reiterated that when the constitutionality of a statute is questioned, the Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy.[3] In these types of cases, the constitutionality of a statute will be upheld unless there is no rational relationship between the legislation and a legitimate government interest. Berberena, supra at 882. Courts in the State of New York, in reviewing analogous issues, have also acknowledged that significant deference should be given to the state legislature in these matters. See Local Government Assistance Corporation v. Sales Tax Asset Receivable Corporation, 813 N.E. 2d 587 (New York Court of Appeals, 2004).

In reviewing statutory and constitutional questions, the Supreme Court of Puerto Rico has also stated that, while opinions of the Secretary of Justice are not binding on the courts, they are entitled to great persuasive weight, because the Secretary of Justice is the highest executive officer charged with the administration of justice. San Geronimo Caribe Project, Inc. v.

---

[3] We note that the higher degree of scrutiny generally applicable to contract impairment cases involving obligations of the Commonwealth does not apply to the threshold issue of whether the statute being questioned in fact impairs existing contractual rights. See Bayrón Toro y Otros v. Rafael Serra, 119 D.P.R. 605,620 (1983).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 5 of 9

Administración de Reglamentos y Permisos, 2008 W.L. 3834098 (Puerto Rico, 2008),
Maldonado v. Junta de Planificación, 2007 W.L. 1582244 (Puerto Rico, 2007). We believe that
an opinion from the Secretary of Justice, such as the 2010 Opinion, would be granted even more
persuasive weight by the Supreme Court of Puerto Rico, where, as occurs in this case, it
reaffirms opinions issued by prior Secretaries of Justice.

     **Judicial Precedents from Other Jurisdictions.** Since there is no controlling precedent
in Puerto Rico, it is appropriate to examine precedents from other jurisdictions to which the
Supreme Court of Puerto Rico might look for guidance. There exists a number of precedents
from the State of New York, that while not involving identical statutory and constitutional
provisions to Act 91 and the Constitutional Debt Priority Provisions, provide support for the
proposition that the Legislature may designate a specific source of state revenues for a specific
purpose, even though such designation has the effect of reducing the amount of revenues that
would otherwise be "available" to pay principal and interest on the Commonwealth's full faith
and credit obligations. See Saratoga Harness Racing v. Agriculture, 238 N.E. 2d 730 (New York
Court of Appeals, 1968), Quirk v. Municipal Assistance Corporation, 363 N.E. 2d 549 (New
York Court of Appeals, 1977) and Anderson v. Regan, 425 N.E. 2d 792 (New York Court of
Appeals, 1981).

     The Saratoga case involved a challenge to the validity of a statute that assigned future
state revenues for a specific purpose in the face of a provision of the New York State
Constitution which prohibited the expenditure of state funds except pursuant to appropriation by
the state legislature. The statute in question required that certain receipts due from state
assessments imposed on racing associations be delivered to a special development fund which
would in turn be authorized to use such funds for the specific purpose of fostering the continued
growth and prosperity of the horse racing industry. The Court noted that, similar to the policy
behind the Constitutional Debt Priority Provisions, the New York State constitutional provision
under discussion had been motivated by a concern that the state not incur obligations in excess of
its actual income and thus "leave burdens for the future, and severe taxation or repudiation, the
meanest of all things." Saratoga, supra at 124. The New York State Court of Appeals upheld the
constitutionality of the statute and stated that "not every fund made of public moneys raised
through taxation or otherwise" came within purview of the New York State constitutional
provision in question. Saratoga, supra at 123. In reviewing its prior discussion in Saratoga, the
New York State Court of Appeals in the Anderson case made clear that the operational structure
of the statutory scheme in the Saratoga case was an important factor in upholding its
constitutionality. The Court stated that its holding in Saratoga was clearly predicated upon the
fact that the money at issue there, although raised through legislative assessment, never became
the property of the State and was never placed within the State treasury, but rather was
immediately deposited in a separate fund administered by a legislatively created public benefit
corporation. Anderson, supra at 406. We do not believe that the fact that the Pledged Sales Tax
is initially payable to the Secretary of the Treasury is a substantive distinction from the Saratoga
case, since Act 91 explicitly provides that the Pledged Sales Tax is property of the Corporation,

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 6 of 9

and the Pledged Sales Tax collection are deposited in accounts outside the control of the Secretary of the Treasury (see footnote 3).

In addition to the Saratoga case, there exist a number of cases upholding the constitutionality of statutes that contemplated the assignment by a state or municipality of its interest in certain future revenues to a public corporation to support the payment of bonds issued by such corporation. See Quirk, supra, Local Government Assistance Corp. v. Sales Tax Asset Receivable Corporation, 813 N.E. 2d 587 (New York Court of Appeals, 2004)) and Myers v. Alaska Housing Finance Corporation, 68 P. 3d 386 (2003). The Myers case involved the assignment of periodic payments from the tobacco settlement litigation to the Alaska Housing Finance Corporation. We note that the Commonwealth has made a similar assignment of its tobacco settlement payments to the Children's Trust to support bonds issued by the Trust, the proceeds of which were to be used for specific purposes and are not entitled to the full faith and credit of the Commonwealth.

**Analysis of Act 91 Statutory Scheme under General Legal Principles and in Light of Precedents from Other Jurisdictions.** As recited in its Statement of Motives, Act 91 was originally enacted by the Legislature to deal with the high level of Commonwealth appropriation debt, which had adversely affected the credit of the Commonwealth and had created a fiscal crisis that forced a government shutdown. In 2009, Act 91 was further amended by Act 1 and Act 7 to increase the amount of the Pledged Sales Tax in an effort to address the unprecedented magnitude of the fiscal crisis currently facing the Commonwealth. The fiscal difficulties that Act 91 seeks to address represent a legitimate government interest. Thus, under these circumstances, we believe that the Supreme Court of Puerto Rico would give great deference to the judgment of the Legislature on how best to exercise its taxing power to address this fiscal crisis, and would find that there is a rational relationship between Act 91 and this legitimate government interest.

There is nothing in the text of the Puerto Rico Constitution or in the records of the Puerto Rico Constitutional Convention that provides that specified resources be available to pay general obligation bonds, nor that holders of general obligations bonds shall have a lien on all future revenues of the Commonwealth, nor otherwise restrict the authority of the Commonwealth to sell or transfer assets. As stated by the Court in Flushing National Bank v. Municipal Assistance Corporation, 358 N.E. 2d 848 (New York State Court of Appeals, 1976), the issuance of full faith and credit bonds does not create a general or special lien or charge upon unspecified revenues, moneys or income of the obligor not therein specifically obligated to the payment of such bonds. Flushing, supra at 736. We note that had the framers of the Puerto Rico Constitution desired to limit the ability of the Legislature to assign future tax revenues they could have done so by including in the Puerto Rico Constitution an explicit anti-dedication clause such as those contained in the Alaska and Georgia constitutions, which in turn are based on a similar provision included in the Model State Constitution prepared by The Committee on State Government of the National Municipal League. We note that the Georgia Constitution and the

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 7 of 9

Model State Constitution were in existence at the time of adoption of the Puerto Rico
Constitution and that the Alaska Constitution was adopted soon thereafter in 1955.[4]

The fact that certain prior financing structures of other Commonwealth instrumentalities
have provided that the revenues pledged under those structures constitute "available resources"
for purposes of the Constitutional Debt Priority Provisions does not alter our conclusion. For
example, in Act No. 74 approved June 23, 1965, as amended ("Act 74"), creating Puerto Rico
Highways and Transportation Authority (the "Highways Authority"), the Legislature provided a
mechanism for the Highways Authority to issue bonds to finance needed highway and other
transportation projects and to secure said bonds by a pledge of "the proceeds of any tax or other
funds which may be made available to the Authority by the Commonwealth" (Section 4(1) of
said Act 74). This pledge, however, is expressly made "subject to the provisions of Section 8 of
Article VI of the Constitution of the Commonwealth." Similarly, in Act No. 44 approved
June 21, 1988, as amended ("Act 44"), creating Puerto Rico Infrastructure Financing Authority
("AFI"), the power of AFI to pledge its revenues to secure its bonds is expressly made "subject
to the provisions of Section 8 of Article VI of the Constitution of the Commonwealth." In that
case, the pledge involved "all or any portion of the federal excise taxes [remitted to the
Department of the Treasury of the Commonwealth under applicable provisions of the United
States Internal Revenue Code] or other funds which [are] transferred by the Commonwealth to
the Authority" (Section 7(m) of said Act 44).

We believe that there is a clear distinction between the statutory schemes of Act 74 and
Act 44 on the one hand, and Act 91 on the other. Under both Act 74 and Act 44, the Legislature
expressly provided that the revenues to be pledged were part of the general resources of the
Commonwealth and thus, authorized the pledge of such revenues subject to the provisions of the
Constitutional Debt Priority Provisions. In both cases, the revenues in question were made
available to the Highways Authority and AFI from revenues on deposit in the Commonwealth
General Fund. In the case of Act 91, the Legislature expressly provided that the Pledged Sales
Tax is not to be deposited in the General Fund and shall not constitute resources available to the
Commonwealth of Puerto Rico. The fact that in Act 74 and Act 44 the Legislature chose to
designate the pledged revenues in question as "available resources" does not imply that the
Legislature cannot exercise its constitutional taxing authority to explicitly provide that the
Commonwealth shall not have ownership and control over a portion of the Commonwealth
imposed sales and use tax, as provided in Act 91.

---

[4] We also note that Jaime Benítez, the Chancellor of the University of Puerto Rico at that time, wrote a foreword to
the Fifth Edition of the Model State Constitution published in 1948 in which he thanked the National Municipal
League for granting their permission to make reprints of the Model State Constitution for circulation to the
delegation of the Puerto Rico Constitutional Convention and acknowledged that the Model would be suggestive
for the delegation.

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 8 of 9

In rendering our opinion, we believe that the Supreme Court of Puerto Rico will give substantial persuasive weight to the opinions of Secretaries of Justice as expressed in the 2007 Opinion, the 2009 Opinion, the Prior Opinions, and the 2011 Opinion. We understand that this persuasive weight will be bolstered by the fact that two Secretaries of Justice from different administrations have reached the same conclusion.

We have also considered specific elements of Act 91 that we understand help support its validity if ever faced with a legal challenge. First, following the example of the statutory scheme in Saratoga, the Legislature has clearly stated its intention that the Pledged Sales Tax is not to be considered general funds of the Commonwealth and is not available for use by the Commonwealth, and has mandated that from the moment of collection, the Pledged Sales Tax is to be segregated from the general fund of the Commonwealth.

Second, as stated previously, Act 91 incorporates safeguards to limit the amount of bonds that may be issued by the Corporation backed by the Pledged Sales Tax.[5] This provision reflects the Legislature's attempt to resolve the current fiscal crisis while addressing the concerns expressed by the Court in Quirk that an otherwise constitutionally permissible assignment of revenues might be held to violate constitutional provisions protecting general obligation bondholders if, realistically, it stripped the government of all or a substantial source of its revenues and, therefore, adversely affected the ability of the Commonwealth to service its general obligation debt. See Quirk, supra at 648.

**Opinion.** It is our opinion, based on our examination of the law and other matters which we consider pertinent, and after applying general legal principles to the facts summarized herein, that, if the appropriate issues are properly presented for judicial decision, a court would hold that (1) Act 91, as amended by Act 1 and Act 7, validly transfers the Pledged Sales Tax, including the Commonwealth's right to receive the Pledged Sales Tax, to the Corporation, (2) the Pledged Sales Tax does not constitute "available resources including surplus" of the Commonwealth for purposes of the last paragraph of Section 2 of Article VI of the Constitution of Puerto Rico, or for purposes of Section 8 of Article VI of the Constitution of Puerto Rico, and (3) Act 91 validly provides that the Pledged Sales Tax is not available for use by the Secretary of the Treasury of the Commonwealth.

We note, however, that in view of the lack of direct judicial precedent in Puerto Rico there can be no certainty as to the outcome of any litigation with respect to the applicability of the "clawback" to the Pledged Sales Tax. We note further that because there is no controlling

---

[5] Under Act 91, the amount of bonds that may be issued by the Corporation is limited to those that may be repaid from the Fixed Base Amount, which is capped at $1.85 billion (which is reached in 2041). We note that the Fixed Base Amount for fiscal year 2010-2011 ($572 million) represented six point five percent (6.5%) of the preliminary General Fund total revenues for that fiscal year ($8,726,000,000) (for purposes of this computation, we have included the Pledged Sales Tax for that fiscal year ($572 million) as part of General Fund total revenues).

PIETRANTONI MENDEZ & ALVAREZ LLC

Each of the Addressees Named on Exhibit A hereto
December 13, 2011
Page 9 of 9

Puerto Rico precedent on the matters upon which we are opining herein, a court's decisions on such matters would be based on the court's own analysis and interpretation of the factual evidence before it and of applicable legal principles. As a result, a court faced with these issues could reach a contrary result which would not necessarily constitute reversible error. Accordingly, the opinion contained in this letter is not a prediction of what a particular court (including any appellate court) of the Commonwealth that reviewed the issue on the merits would hold, but, instead, is our opinion as to the proper result to be reached by such court applying existing legal rules and principles to the facts as properly found after appropriate briefing and argument. This opinion is not a guaranty, warranty or representation of a particular result, but is merely this law firm's informed judgment as to a specific question of law.

The opinion expressed herein is based on an analysis of existing laws and court decisions. It also assumes strict compliance with the provisions of Act 91 and the Resolution, including those provisions requiring segregation of the Pledged Sales Tax from the general funds of the Commonwealth. Such opinion may be adversely affected by actions taken or events occurring, including a change in law (or in the application or official interpretation of any law) or in the manner of segregating the Pledged Sales Tax from the general revenues of the Commonwealth, after the date hereof. We have not undertaken to determine, or to inform any person about, whether such actions are taken or such events occur, and we have no obligation to update this opinion in light of such actions or events.

We are admitted to practice in the Commonwealth, and express no opinion whatsoever with respect to any laws other than the laws of the Commonwealth.

This opinion letter is rendered for the sole and exclusive benefit of the addressee hereof, and no other person or entity is entitled to rely hereon and no advice hereunder is rendered to any such other person or entity. A copy of this letter may with our consent be provided, for informational purposes only, to potential investors in the Offered Bonds upon their request, but no attorney-client relationship exists between any such investor and Pietrantoni Mendez & Alvarez LLC and none of such investors are included as addressees of this letter or may otherwise have any right to rely on the legal advice contained in this letter. In no event, without our written consent, may copies of this opinion letter be furnished to any person or entity, nor may any portion of this opinion letter be quoted, summarized, circulated, or referred to in any document.

Very truly yours,

Pietrantoni Mendez Alvarez LLP

187581

PIETRANTONI MENDEZ & ALVAREZ LLC

**EXHIBIT A**

<u>ADDRESSEES</u>

Puerto Rico Sales Tax Financing Corporation

Underwriter Representatives

Exhibit 13 Page 485 of 4

# EXHIBIT 13



COMMONWEALTH OF PUERTO RICO
## Departament of Justice
APARTADO 9020192, SAN JUAN, PR 00902-0192

Guillermo A. Somoza Colombani
Secretary of Justice

Tel. (787) 723-4983
(787) 721-7771

December 13, 2011

Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Puerto Rico Sales Tax Financing Corporation
c/o Government Development Bank for Puerto Rico
P.O. Box 42001
San Juan, Puerto Rico 00940-2001

Attention:    Mr. Juan Carlos Batlle
              President and Vice-Chairman of the Board

Inquiry No. 11-145-B

Dear Mr. Batlle:

As per your request, and in connection with the issuance by Puerto Rico Sales Tax Financing Corporation of its Sales Tax Revenue Bonds, Senior Series 2011C and Sales Tax Revenue Bonds, Senior Series 2011D, I hereby issue my opinion that:

1.   Act No. 117 of the Legislative Assembly of Puerto Rico, approved July 4, 2006, was validly enacted by the Commonwealth of Puerto Rico (the "Commonwealth"), validly imposes the sales tax described therein (the "Sales Tax") and is in full force and effect.

2.   Act No. 91 of the Legislative Assembly of Puerto Rico, approved May 13, 2006, as amended by Act No. 291 of December 26, 2006, Act No. 56 of July 5, 2007, Act No. 1 of January 14, 2009, Act No. 7 of March 9, 2009, and Act No. 18 of May 22, 2009 (collectively, "Act 91"), and each of the statutes amending Act 91 were validly enacted by the Commonwealth and are in full force and effect.

3.  The provisions of Act 91 regarding the deposit of present and future collections of the portion of the Sales Tax described therein (the "Dedicated Sales Tax") in the Dedicated Sales Tax Fund created under Act 91, in consideration for the commitment of Puerto Rico Sales Tax Financing Corporation (the "Corporation") to make funds available to the Commonwealth to pay, or establish mechanisms to pay, all or part of the Commonwealth's debt and other obligations or expenses listed in Article 2(b) of Act 91 (the "Permitted Uses"), are valid.

4.  Pursuant to Act 91, the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to the Corporation.

5.  The Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth for purposes of Section 2 or Section 8 of Article VI of the Constitution of Puerto Rico, nor shall they be available for use by the Secretary of the Treasury of the Commonwealth.

6.  Pursuant to Act 91, the Commonwealth has validly agreed and promised to any person, firm or corporation or agency of the United States of America or of any state or of the Commonwealth of Puerto Rico that subscribes or acquires the bonds issued by the Corporation or that provides insurance or payment and liquidity sources that: (a) it will not limit or restrain (i) the rights or powers of the corresponding Commonwealth officials to impose, maintain and collect the taxes and other revenues to be deposited in the Dedicated Sales Tax Fund as provided in Act 91; provided that the foregoing shall not preclude the Commonwealth from exercising its power, through a change in law, to limit or restrict the character or amount of such taxes and other receipts, or to substitute like or comparable security in the form of taxes, fees, charges or other receipts for deposit in the Dedicated Sales Tax Fund if, for the ensuing fiscal years, the projected revenues certified by the Secretary of the Treasury of such taxes, other receipts or substituted collateral meet or exceed the debt service and other charges and any coverage requirements set forth in the related authorizing bond documents of the Corporation, (ii) the powers conferred by Act 91, or (iii) the rights of the Corporation to comply with its obligations with its bondholders, until such time as such bonds, irrespective of their maturity, together with the interest accrued, shall be completely paid and redeemed; and (b) no amendment to Act 91 shall undermine any obligation or commitment of the Corporation.

Inquiry No. 11-145-B
Page 3

      7.      The Corporation is a duly constituted and validly existing independent governmental instrumentality of the Commonwealth with the power to receive revenues produced by the Dedicated Sales Tax, to issue bonds for its corporate purposes, including the Permitted Uses, to adopt the Resolution under which its bonds are issued and to pledge the Dedicated Sales Tax to the repayment of such bonds.

      8.      Act 91, as authority for the application of the Dedicated Sales Tax to the Permitted Uses, satisfies the requirements of Section 9 of Article VI of the Constitution of Puerto Rico.

This opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein.

Please do not hesitate to contact me if I may be of further assistance.

Cordially,

Guillermo A. Somoza Colombani

Exhibit 14 Page 1 of 2

# EXHIBIT 14

Case:17-03283-LTS Doc#:3771-3 Filed:07/24/18 Entered:07/24/18 16:80:06 Desc:
Exhibit 14 Page 490 of 832

# FILED UNDER SEAL

Exhibit 15 Page 1 of 4

**EXHIBIT 15**



COMMONWEALTH OF
**PUERTO RICO**
Government Development Bank
for Puerto Rico

## CONFERENCE CALL ABOUT COFINA LEGAL OPINIONS

Hosted by **Government Development Bank for Puerto Rico** through Telspan
Date and Time: 10/31/2013 2pm ET
Length of Call: 45mins
Transcript

*Operator:* Good morning, and welcome to the Government Development Bank for Puerto Rico conference call. My name is Kellen and I will be your conference operator today. A replay of the call will be available on the GDB website as soon as possible after the call ends. All lines have been placed on mute to prevent any background noise.

Once the presentation concludes there will be a Questions and Answers session. Questions that have been sent in advance will be answered.

If you are having technical problems with the audio, press *0 for technical support.

On behalf of all of us at the Government Development Bank for Puerto Rico, I would like to welcome everyone to this call. The participants for today's call will be: José Pagán, Interim President of the GDB, José Coleman-Tió, Executive Vice President and General Counsel of the GDB, Virginia Wong, Jim Montes, John Bove, Arthur McMahon, Ken Lind, all partners at Nixon Peabody, and Manuel Pietrantoni, Manuel Rodríguez Boissen, and Eduardo Arias, all partners at Pietrantoni Méndez & Álvarez.

I will now turn the call over to the Interim President of the GDB, José Pagán for the opening remarks.

*José Pagán:* Good afternoon. The Government Development Bank for Puerto Rico and the Puerto Rico Sales Tax Financing Corporation, which most of you know as COFINA, welcome you to this conference call. We truly appreciate the time everyone has taken to join.

As announced in the investor webcast held by the Commonwealth on October 16, 2013, GDB is taking affirmative actions to improve its disclosure practices and increase the amount of information available to investors. In particular, GDB will begin holding an investor webcast at least once per quarter and will update the Commonwealth Report on a quarterly basis. The Department of the Treasury and the Office of Management and Budget will also continue to provide revenue and expense updates at least once per month. The Commonwealth and GDB are committed to observing best disclosure practices and improving our relationship with our investor base. As a further step in this direction, in response to specific investor requests, GDB and COFINA made available last week the legal opinions delivered in connection with COFINA's last public transaction. These legal opinions, delivered by the Puerto Rico Secretary

of Justice, Nixon Peabody as U.S.-based Bond Counsel and Pietrantoni Mendez & Alvarez LLC as P.R.-based Underwriters' Counsel, are now available at our website: bgfpr.com.

As a further testament to our commitment to transparency, today we take the unprecedented step of holding a conference call with the outside legal advisors that authored these legal opinions. We hope that you find this call informative.

As stated during our webcast, COFINA's credit is bolstered by strong legal protections for bondholders. COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth. U.S.-based Bond Counsel, P.R.-based Underwriters' Counsel and the Puerto Rico Secretary of Justice have provided, for each COFINA transaction (and we count 13 in total), opinions concluding that the Sales and Use Tax allocated to COFINA is not subject to "claw back" by GO bondholders under the PR Constitution.

Importantly, the Secretary of Justice opinions enjoy broad bipartisan support, a rare thing in Puerto Rico: four Secretaries of Justice, serving three different administrations (of alternating political parties), have issued opinions that the SUT allocated to COFINA is not subject to "claw back".

While no new COFINA transaction has been announced, I want to emphasize that no such transaction would be completed unless opinions reaching the same legal conclusion as those being discussed today are again delivered at closing by the Secretary of Justice and each of the firms acting as Bond Counsel and Underwriters' Counsel in the particular transaction.

I now leave you with José Coleman, GDB's Executive Vice-President and General Counsel.

*José Coleman:* Thanks, José. I want to welcome you all to this conference call and provide you with additional information about the focus and purpose of the call.

As previously announced, this conference call is being held to discuss the COFINA legal opinions, dated December 13, 2011, provided by external legal counsel in connection with the issuance of the Senior Series 2011C and Senior Series 2011D Bonds. The opinions, which were provided by Nixon Peabody LLP, as Bond Counsel, and Pietrantoni Méndez & Álvarez LLC, as Underwriters' Counsel, were posted on GDB's website on October 23, 2013. We hope that everyone on the call has had an opportunity to review them.

We want to thank Nixon Peabody and PMA for making themselves available to answer questions related to their respective opinions. Nixon Peabody and PMA will each begin by providing a brief overview of the legal analysis underpinning their opinion. We will then proceed to answer questions submitted to GDB prior to this call.

As stated in GDB's press release, the purpose of this call is solely to address questions related to these legal opinions. As such, questions determined to be unrelated to the opinions will not be addressed. All participants are also advised that none of GDB, COFINA or the law firms participating in this call are providing legal advice of any nature whatsoever to the call

participants, that the information provided and discussed during the call is for informational purposes only, that only the parties to whom the opinions are addressed may rely thereon, and that participants should consult their own legal advisors with respect to any matter discussed in the opinions or this call. Furthermore, we emphasize that the COFINA legal opinions are subject to all of the qualifications and assumptions set forth therein. We strongly encourage all call participants to read the legal opinions in their entirety.

It is important to stress that an opinion of counsel is not a prediction of what a particular court [that reached] an issue on the merits would hold, but, instead, is the opinion of such counsel as to the proper result to be reached by a court applying existing legal rules to the facts as properly found after appropriate briefing and argument. In addition, it is not a guarantee, warranty or representation, but rather reflects the informed professional judgment of such counsel as to specific questions of law.

I want to add that a recording of this call will be made available as soon as possible on GDB's website. A notice will be posted on EMMA in order to provide notice to the market that the replay has been made available.

Finally, we want to make clear that the information provided in this call is not an offer to sell or the solicitation of an offer to buy any securities. I now leave you with Virginia Wong, partner at Nixon Peabody who acted as bond counsel for COFINA Senior Series 2011 C and Senior Series 2011 D bonds.

*Virginia Wong:* Thank you, José, and thank you for the opportunity to discuss our opinion.

The opinion that was posted on the GDB website as a note concludes that if the issues addressed by it are properly presented for judicial decision, a court would find that Act 91 validly transferred the Pledge Sales tax, including the right to receive the tax, to COFINA; the Pledge Sales tax does not constitute available resources for purposes of the Puerto Rico Constitutional Debt Priority Provision, and that Act 91 validly provides that the Pledge Sales Tax is not available for use by the Secretary of the Treasury. These conclusions were based on our analysis, review and consideration of several factors, including various cases decided by other jurisdictions, including those that are specifically referenced in our opinion and those cases that analyze legislative provision that divert revenues from State treasuries and dedicate them without annual appropriations to a specific purpose.

We also reviewed COFINA's act, as amended as of the date of the 2011 opinion, in our analysis of the structure of COFINA's act in light of what other courts typically considered in deciding whether similar legislation had violated a state's constitutional appropriation provision. We focused on the facts identified by those courts as important, including the fact that the legislation was designed specifically to comply with the well-recognized Special Fund Doctrine.

The Special Fund Doctrine holds that legislation that is enacted due to an urgent need impresses the revenues with a trust for a particular beneficiary, requires the revenues to be deposited into a special fund—and provides that that special fund be dedicated exclusively to certain purposes— provides that the revenues not be received on the account of the state but rather on the account of

the entity created to accomplish the specified purpose, that the legislation set forth limitations and conditions governing the disbursement of revenues, provides for a monetary cap on the amount of revenues that can be diverted from the state treasury, and finally provides that any debt secured by revenues shall not constitute a debt of the state. That is the Special Fund Doctrine and courts have held that entities that are created following the majority of those factors, those types of transaction will be upheld.

We reviewed the various opinions issued by the Secretary of Justice of Puerto Rico to COFINA, including the opinion relating to the 2011 C and D bonds. Those opinions conclude that the Pledge Sales Tax does not constitute available resources of the Commonwealth for purposes of the Constitution nor would they be available for use by the Secretary of the Treasury of the Commonwealth.

Finally, we reviewed the conclusions of PMA as to certain matters under Puerto Rico law on which we relied including the fact that there are no controlling precedents in Puerto Rico and that the Puerto Rico Supreme Court generally defers to acts of the legislature and opinions of the Secretary of Justice. I think that summarizes the factors that we analyzed and reached in our opinion.

*José Coleman:* I would like to thank Nixon Peabody for providing an overview of the opinion. We hope that you find that informative and I now leave you with Manuel Pietrantoni, a partner with PMA, who acted as underwriters' counsel for the COFINA Senior Series 2011 Cs and Ds.

*Manuel Pietrantoni:* Good afternoon everyone and thank you, José, for this opportunity to discuss our opinion.

I'd like to reiterate that the opinion for the Series 2011C and 2011D bonds, which are the opinions being discussed, was rendered to the COFINA and the underwriters' representative.

Let me review the elements of the analysis underlying the conclusion in our opinion that the Pledge Sales Tax would not constitute and I quote "available resources including surplus" for purposes of the priority provisions of the Commonwealth general obligation bonds and notes included in section 2 of article 6 of the Constitution or for purposes of section 8 of article 6 of the Constitution. Those elements are: as to the standard of review, first, the substantial deference provided to the Legislative Assembly's judgment, especially matters involving the use of public funds and regulation of the economy. Second, the presumption of constitutionality that attaches to every statute approved by the Legislative Assembly, and third, the persuasive weight afforded to the Secretary of Justice opinions as the highest executive of the Commonwealth charged with the administration of Justice. As mentioned before in this call, several Secretaries of Justice have provided favorable opinions as to "no claw back".

As to substantive matters, first, precedents from other jurisdictions that provide support to the legality of the COFINA structure in the face of no controlling precedent in Puerto Rico. Second, nothing in the Puerto Rico constitution provides that a specific source of revenues be available,

or creates a lien on any revenues for the payment of general obligation bonds, nor is there any evidence in the records of the Puerto Rico Constitutional Convention that this was considered. Third, nothing in the Puerto Rico Constitution restricts the Commonwealth authority to sell or transfer its assets. Fourth, Constitutions of other jurisdictions of the United Sates which were in effect at the time the Puerto Rico Constitution was approved included clauses that limited a state's ability to earmark or dedicate revenues for a specific purpose, and those provisions were not included in the Puerto Rico Constitution. Fifth, the safeguards included in the COFINA act to limit the amount of bonds that may be issued. And sixth and finally, the structure created in the COFINA act keeps the assigned revenues from becoming part of the Commonwealth General Fund. As I said at the outset, these are the elements that underlie our analysis.

*José Coleman:* Thank you, Manuel, for your remarks. I think that we can turn now to the questions we have received. The operator can provide those.

*Operator:* Thank you. We received various questions regarding the possibility of having the Puerto Rico Supreme Court address the "claw back" issue and thereby create controlling precedent in Puerto Rico. We chose the following question to address this matter: "The final official statement for the COFINA Senior Series 2011D Bonds indicates, under 'Risk Factors', that the Supreme Court of Puerto Rico has never ruled whether the sales tax pledged as payment for COFINA bonds constitutes 'available resources' of the Commonwealth for purposes of the Constitutional Debt Priority Provisions. Please address, and this question comes from Gregory A. Clark, why the Court has never been asked to address this issue and whether there are any plans to have it do so now."

*Manuel Pietrantoni:* The short answer for this question is that under Puerto Rico's jurisdictional requirement, parties cannot bring a test case or seek an advisory opinion from the courts. The leading case in this matter involved an instrumentality of the Commonwealth of Puerto Rico that provided assistance to the plaintiff in the creation of a case or controversy in order to provide certainty to certain federal agencies and bondholders as to the validity of a housing assistance program. In that case, the court held that it could not exercise jurisdiction with a claim because no real case or controversy existed. In light of this, COFINA has not sought a ruling of this nature because unless there was a real case or controversy, the court would not have jurisdiction to rule on this matter.

*Virginia Wong:* Manuel, it is fair to say, right, that that is not even a path that is available. Several of the questions that we received cited what other jurisdictions have done in terms of seeking declaratory judgment or having a court provide an advisory opinion with respect to certain legislative acts, but Puerto Rico law doesn't provide for that procedure, right? So, no such request can be made. Is that fair to say?

*Manuel Pietrantoni:* That's fair to say.

*Virginia Wong:* The next question?

COFINA Legal Opinions Conference Call – 10/31/2013                                                    Page 5

*Operator:* Thank you! The next question we have is, "Both bond opinions cite Quirk in NY State. Can you expand your views on this statement, 'A different case would be presented if, realistically, the city were stripped of all sources of revenue, other than the real estate tax, and its outcome would be, at this time, unpredictable (cf. Mobile v Watson, 116 U.S. 289, 305).' As COFINA issues more debt and captures an increased share of general fund revenues, what level of resource shifting would cause concern?" This comes from Brian Dubin from Meehan Combs.

*John Bove:* My name is John Bove and I am partner at Nixon Peabody. I have been asked to address this question, I think in part because I was present at the creation of the controversy. I was an assistant counsel to the Governor of the state of New York at the time the governor proposed and the legislature enacted the legislation that was at issue in the Quirk case. So, I am very familiar with both the origin and its ultimate outcome.

I think it's important to put the quote that is both in our opinion and in the question in the context of the issue the court was addressing when it made that statement. The background of the case was that legislation was being enacted by the New York State in 1975 and afterwards to address the very severe fiscal crisis of the city of New York that the state became aware of in 1975 and continued on to the '70s and into the early '80s.

As part of the legislative solutions to the city's fiscal problems was to create a new public benefit corporation or public authority that would have the power to do a number of things to ease the city's problems and one was to fund out cumulative deficits, to fund for a few years current year deficits that were projected to continue, and ultimately through another eight or nine years to fund long-term capital needs for the city of New York as it was locked out of the capital market at the time. In order to give that entity, the Municipal Assistance Corporation for the city of New York, a revenue stream in order to service its debt, they stripped the city of New York through legislation of its Sales and Use Taxes and Stop Transfer taxes and instead dedicated those taxes to the Municipal Assistance Corporations to service its debt.

That legislation was challenged by the clerk [sic] who was challenged as a tax payer on a number of grounds. The ground that is relevant to the quote that is in the opinions and in the question is a state constitutional ground charging that the stripping of the Sales and Use Taxes and the Stop Transfer taxes from the city deprived bondholders of the right to have those taxes set aside and applied to the payment of general obligation bonds of the city if general obligation bonds became due and were not paid. New York state constitution contains a provision that obligates that first revenues be set aside to pay unpaid general obligation debt.

The court, in going through this analysis, ultimately concluded that this was a constitutional enactment. It noted in particular that the constitution does not give a right to general obligation bondholders to insist upon any particular existing tax to be maintained or impose new ones to produce the required revenues to pay the general obligation bonds. The analysis was predominantly based on the fact that what was being stripped of the city was only a portion of the revenues that would otherwise have been available for the set aside.

The language in the quote in the question and, both, in the opinion essentially said we might have reached a different conclusion if substantially more of the revenues had been stripped from

the city. In fact, the actual quote is "If they were stripped of all sources of revenues other than the real property taxes". We in the governor's counsel's office view that as an admonition going forward as to what we can do and what we can't do in helping solve the city's financial crisis.

The facts of that case are substantially the same as we have here in COFINA. The Commonwealth has been stripped of only a portion of one source of revenue available to it and to which the set aside provision of the constitution applied. All of the other sources remain available to general obligation bondholders under the Set Aside provision. I think we are entirely on all fours with the conclusion of the court in the court case.

*José Coleman:* Thank you, John! I think we can go to our next question.

*Operator:* Thank you. Our next question is, "What would it take to have the Supreme Court rule on the question of whether the sales tax revenue was subject to the claim of GO bonds having first claim on available revenue?" This comes from Joe Rosenblum, Alliance Bernstein.

*Manuel Pietrantoni:* Yes, as I stated in our response to the first question, there would need to be a real case or controversy, as well as certain other jurisdictional elements would have to be present in order for this to happen... in order for the court to have jurisdiction to address this type of claim.

*José Coleman:* I think it goes to the point that has been raised in a couple of questions which is, "Can you go on and have some sort of advisory opinion?" The answer is that in Puerto Rico, different from other jurisdictions, you simply cannot do that. We can go to the next question.

*Operator:* Thank you. Our next question is, "Have there been any updates to caselaw or legislative or administrative actions relevant to the cases reviewed or jurisdictions referenced in the opinions? If so, do any of these updates or actions change the opinions of Nixon Peabody, Pietrantoni Méndez & Álvarez or the Secretary of Justice? This comes from Ben Herbert, Lord, Abbett & Co. LLC.

*Manuel Pietrantoni:* The opinions alluded to address the facts and circumstances surrounding the issuance of the Series 2011C and 2011D bonds and, as stated in the opinion, the firms do not have an obligation to update the opinions. We note however that in April 2013 we issued an opinion reaching the same conclusion in connection with certain junior lien bond anticipation notes sold to Barclays Capital. And there were no updates to the relevant caselaw or legislation that would have changed the opinions.

*Virginia Wong:* Right, and I think as it was mentioned that Nixon Peabody as bond counsel on that issuance also delivered an opinion... [speaking off the microphone] similar... to the 2011 opinion. We see no reason... we saw no reason at the time that there had been no changes in caselaw around the country that would change the conclusions that we reached in our opinion.

*José Coleman:* We can go to the next question.

*Operator:* Thank you. And our next question comes from Elan Daniels from Stone Lion Capital

Partners, and his question is, "Would the same opinions be offered again today? If not, what other qualifications or analysis now would be included?"

*Virginia Wong:* As Manuel just said, the opinions addressed the facts and the circumstances and the state of the law that were in effect at the time that the 2011C and the 2011D bonds were issued.

Obviously, there's no new COFINA transaction on the table right now, but we have been tracking the legislation, the COFINA legislation and the changes that have been made, and we don't see any reason currently that we would change the conclusion of our opinions. The state of the law remains the same. There have been no new cases around the country that have dealt with this issue. The legislative changes increasing the percentage of sales tax revenues that are available to COFINA wouldn't cause us to change our conclusion in any way.

So, you know, while we're not being asked to deliver an opinion today, we don't see any reason why our opinion would change in any significant way or material way from what we delivered in 2011 or from what we delivered in April of 2013.

*José Coleman:* And this is José Coleman from GDB, I want to add that as noted by the GDB President, while no new COFINA transaction has been announced, no such transaction would be completed without the delivery of opinions from the Puerto Rico Secretary of Justice, and each of the firms acting as bond counsel and underwriters' counsel on such deal, that reach exactly the same conclusions as the opinions being discussed today. And we are confident that opinions reaching the same conclusion would be delivered in connection with any new issuance.

Unless somebody has anything else to add, we can go to the next question.

*Operator:* Thank you. And our next question is, "Is there any legislation being contemplated or discussed that would provide bondholders with additional security in light of the lack of any applicable caselaw/testing in the courts of Act 91, COFINA?" This comes from Melissa Haskell from MFS Investment Management.

*José Coleman:* This is José Coleman from GDB. Now, none of the Commonwealth, GDB or COFINA are currently contemplating specific legislation of this nature. We feel comfortable with the structure as is.???27:30

*Operator:* Thank you. And our next question is, "Could you please tell us how the flow of funds works specifically? How the money is allocated, how it is deposited, and how it is protected from being deposited into the general fund prior to payment of debt service?" This comes from Cynthia Brown Manulife Asset Management.

*Manuel Pietrantoni:* Yes, what I'm about to explain is discussed in greater detail in the Official Statement for the series 2011C and 2011D bonds. The entities authorized by the Secretary of the Treasury received the sales and use tax monthly returns and the amount of sales tax due thereunder. These amounts are then deposited into the sales tax account, which is a joint GDB and COFINA account held at Banco Popular de Puerto Rico. On a daily basis, Banco Popular

sweeps amounts and deposits in this sales tax account—other than sales and use taxes, which are allocated to the municipalities under the law—they sweep this into the dedicated sales tax fund, which is held by Banco Popular's Trust Department in the name of COFINA. Banco Popular's Trust Department then sends all amounts in the dedicated sales tax fund to the COFINA trustee until such amounts reach the pledge sales tax base amount. Thereafter, the amounts of the Commonwealth sales and use tax are allocated to COFINA and the Treasury Department according to their corresponding percentages, which are established in the COFINA law. Pledged sales tax revenues are not comingled with general fund revenues. I repeat, for more detail regarding this flow of funds, please review the description thereof in the official statement.

*José Coleman:* I think the fundamental point here is they are not comingled with general fund revenues, and that is an important factor in each of these opinions.

One thing I wanted to add is, you know, for the [sic], this flow of funds applies also to all revenues. It applies to all revenues received by COFINA and it includes any new revenues directed to COFINA arising from the expansion of the SUT allocated to COFINA that was basically just legislated in October. I think we can go to the next question.

*Operator:* Thank you. Our next question is, "Also is the increased allocation already being set aside? The increase from 2.5 percent to the 3.75 percent." This comes from Cynthia Brown, again, Manulife Asset Management.

*José Coleman:* This goes a little bit with a previous question, you know, just discussed, the increased allocation is currently being set aside and will be subject to a flow of funds that Manuel described in the previous question. I think that this began occurring when the legislation was passed. I would like to clarify, though; I think that the question says the increase from 2.50 to 3.75. The recent expansion of the SUT allocated to COFINA was from 2.75 to 3.50, not 2.50 to 3.75. In fact, we should know that the recent COFINA expansion is the smallest expansion of the COFINA program in percentage terms, and the original 2007 pledge was of one full percentage point, and the 2009 expansion was 175 basis points. The latest one, it was only 75 basis points for, you know, purposes of reference. So, I think with that we can go to the next question.

*Operator:* Thank you. And the next question is, "Can you post copies of the COFINA indentures (in addition to the prospectuses) on the GDB website? And this comes from Brian Dubin, Meehan Combs.

*José Coleman:* Again, this is José Coleman from the GDB. Yes, we will post copies. In fact, as José Pagán, the president of the Bank, referred, there's a renewed commitment to observe best disclosure practices and improve our relationship with our investor base. And to that end we will begin to post on our website copies of all indentures related to outstanding bonds, of the Commonwealth and its instrumentalities, including COFINA. Obviously, given the heightened market interest in outstanding COFINA bond issuances, we will give priority to COFINA related indentures. Those should be up shortly.

*Virginia Wong:* Yeah, I think it's just worth mentioning that there have been a number of

amendments, and so what we need to do is do an amended and restated indenture that incorporates all those amendments into one single document. I think that will facilitate the review for investors rather than have them try to put together an indenture on a piecemeal basis.

*José Coleman:* A piecemeal basis, yeah. Okay.

*Operator:* Thank you. And out next question is, "Some in the market have speculated that a future legislature could theoretically repeal Act 91 and thus the entire COFINA structure. Our understanding is that both parties have been in power at times when COFINA legislation has successfully been passed, and, more importantly, that all of the COFINA bonds were issued with a non-impairment covenant. This covenant stipulates that if the COFINA structure is materially altered, there must be a substituted like or comparable security, which needs to be confirmed by the rating agencies and the various legal opinions. Thus, given seemingly limited alternatives for similarly strong security, are we correct to assume that risk of materially negatively altering the COFINA structure via legislative action is very low? And this comes from Jon Pruchansky, Arrowgrass Capital Partners.

*Virginia Wong:* The straightforward answer is yes. There's a very low risk to a legislative change to the COFINA act that would be materially adverse to bondholders. Given the Commonwealth non-impairment covenant, any legislative action that takes security away from bondholders without providing a comparable substitute and rating confirmation would violate both the COFINA Resolution and the COFINA Act. Now, there's nothing we can do that would [currently] future legislatures. Future legislatures could take action if deemed appropriate. However, given the strong statutory and resolution covenants, any such action, if it was an impairment, violative of those covenants, would give rise to the exercise of remedies by bondholders under the resolution.

*José Coleman:* Yeah, and something, you know, to add, you know, the person who asked the question is correct that both Puerto Rico's main political parties have been in power when COFINA legislation has been successfully passed. And we see that with the Secretary of Justice's opinions. In fact, the COFINA program was created by the administration of then Governor Aníbal Acevedo Vilá, who was Governor from 2005 to 2008. And this is done in collaboration with a then PNP "statehood controlled" legislature. In other words, the COFINA program has really been bipartisan since its inception. As many people know, this is a very rare and precious thing in Puerto Rico.

As people well know, the PNP affiliated Fortuño administration implemented the largest expansion of the COFINA program during the 2009-2012 term. The current PDP administration legislated a new, more limited expansion to the COFINA program.

*Virginia Wong:* And I think it's probably worth also mentioning that with respect to impairment of the structure, the COFINA structure, it's really no different than you would see for any other revenue backed issuer around the country. You know, New York State [Thruway] has the same provisions. It's a very common structure. There's no greater risk inherent in COFINA with respect to the non-impairment covenants that you would see anywhere else.

*José Coleman:* I think we can go to the next question.

*Operator:* Thank you. And our next question is, "In addition to the opinions of the Secretary of Justice, bond counsel and underwriters' counsel, has the GDB provided any independent, outside legal opinions to the rating agencies regarding the validity of the assignment to COFINA of the Commonwealth's portion of the Sales and Use Tax? If so, please describe." And this comes from Robert A. Meyer from SMC Fixed Income Management, LP.

*José Coleman:* This is José Coleman from GDB. The answer is no. The rating agencies have only been provided with the opinions delivered in connection with the issuance of the bonds, such as the opinions being discussed today. No other opinions have been requested by or provided to the rating agencies. I don't know...

*Virginia Wong:* That's fair.

*José Coleman:* ...that's... I think we can go to the next question.

*Operator:* Thank you. And our next question is, "In the last 5 years, has the Supreme Court ruled any law enacted by the Puerto Rico legislature to be unconstitutional? If so, please discuss the cases." Again, from Robert A. Meyer, SMC Fixed Income Management, LP.

*José Coleman:* This is José Coleman from GDB. To my knowledge, and you know I haven't done a thorough checking of this, there have only been I think two recent instances where the Puerto Rico Supreme Court declared a law unconstitutional. I think one instance involved certain 14th Amendment rights of a particular person, and the other one involved a law that attempted to restrict the Puerto Rico Supreme Court's jurisdiction.

I think one thing to bear in mind in this, as Manuel Pietrantoni from PMA stated in his presentation and also in the opinion, there is substantial deference provided to a legislative assembly's judgment, particularly by the Supreme Court, especially in matters involving the use of public funds and regulation of the economy. There's obviously also the general presumption of constitutionality that attaches to every statute approved by the legislative assembly. I don't think we've seen anything out of the ordinary from the Supreme Court either historically or in the past couple of years. Unless anyone else has something to add to that... Next question.

*Operator:* Thank you. Our next question is, "Do COFINA's legal opinions cover the accuracy of the economic and financial data used as the basis for COFINA's sales tax projections?" Again, from Robert A. Meyer, SMC Fixed Income Management, LP.

*Virginia Wong:* This is Virginia. No, and in accordance with established opinion practice, the opinions, our opinions, PMA's opinions, do not address or pass judgment upon the accuracy of any economic or financial data that's used as the basis for COFINA's sales tax provision. Would you say, Manuel, that...?

*Manuel Pietrantoni:* That's absolutely right. Typically the role of the opinion is not to speculate or pass judgment on the economic or financial data, or any other data which is underlying the

opinion.

*Virginia Wong:* And there are certificates delivered at closing that provide comfort on that information.

*José Coleman:* Thanks, Virginia. I think we can go to the next question.

*Operator:* Thank you. And our next questions is, "According to page 4 of 9, the Supreme Court of Puerto Rico traditionally shown substantial deference to the Legislature's judgment and has consistently ruled that there is a presumption of constitutionality that attaches to every statute adopted by the Legislature. The Supreme Court of Puerto Rico has reiterated that when the constitutionality of a statute is questioned, the Court will first examine whether there is a reasonable interpretation of the statute that is compatible with the Constitution. The Supreme Court of Puerto Rico has stated that deference to the Legislature should be especially high in matters involving the use of public funds and the regulation of the economy. Since there is no controlling precedent, please provide more details or the extent to which the court would weigh?" from Michael Ginestro, Bel Air Investment Advisors.

*Manuel Pietrantoni:* This is Manuel Pietrantoni. The answer is that we would expect the Puerto Rico Supreme Court to follow an analysis similar to the analysis that is described in the opinions, the elements of which I discussed in the introduction to my remarks. Those we think would be the elements that the Supreme Court would weigh in reaching its conclusion.

*José Coleman:* And as we've stated, those elements include the standard of review that's a substantial deference in certain particular matters. I think we can go to the next question.

*Operator:* Thank you. Our next question is, "If bond counsel believes the pledged revenues would not be subject to claw back, why did bond counsel and underwriters' counsel issue a "would hold" opinion versus a "should hold" opinion?" This comes from Steve Hong, HIMCO.

*Virginia Wong:* For purposes of opinion practice, the American Bar Association Legal Opinions Committee and the Tri-Bar Opinions Committee has taken a position that "should" and "would" are synonymous. So there's really no distinction between the two and there was no distinction intended between the "would" and "should" in our opinions. It's a distinction without difference and it's important for participants to understand that the opinions are reasoned opinions in large part due to the fact that no precedent exists in Puerto Rico. And as such, these opinions are each firm's opinion as to the proper result to be reached by a court applying existing legal rules and principles to the facts as properly found after appropriate briefing and argument. So, we just don't want... there was no intentional choice between "should" and "would", we were just following established opinion practice and there was no distinction intended.

*José Coleman:* I don't know if, Manuel, you want to add something to that?

*Manuel Pietrantoni:* No that's exactly... We agree with that.

*José Coleman:* We can go to the next question.

*Operator:* Thank you. And our final question, "Is there an ability to appeal any Puerto Rico Supreme Court ruling related to claw back to the US Supreme Court? And this is coming from Ben Herbert, Lord, Abbett & Co. LLC.

*Manuel Pietrantoni:* The answer is that rulings of the Puerto Rico Supreme Court may be appealed to the United States Supreme Court to the extent that a matter of Federal Law is in question. And as you know, this appeals process would work in the same manner as any other appeal to the United States Supreme Court from a decision of the highest court of any state. In that regard Puerto Rico is no different.

*José Coleman:* I think we've had this question a couple of times, and people don't know, and I think it's important to emphasize that Puerto Rico's Supreme Court decisions are appealable to the U.S. Supreme Court.

*Operator:* Thank you. And at this time I would now turn the call back over to Mr. Coleman-Tió for any closing remarks.

*José Coleman:* We want to thank everyone for their attention. We hope this call has been informative. Again, a replay of it will be posted to the GDB website soon, and thank you again, and have a good afternoon.

*Operator:* Thank you all for your attention. This concludes today's conference call. All participants may now disconnect.

Exhibit 16 Page 1 of 1

# EXHIBIT 16



---

## Act Number 84 of the year 2016

(P. of the C. 2997); 2016, Act 84.

To amend Section 2 and repeal Article 6 of Act No. 18 of 2014; amend Act No. 91 of 2006; amend Act No. 116 of 2013; amend Act No. 19 of 2014 and Sections 4050.07, 4050.08 and 4050.09 of Act No. 1 of 2011 of the Internal Revenue Code of P.R.

### ACT NUMBER 84 FROM JULY 22, 2016

To amend Section 2 and repeal Article 6 of Act 18-2014, better known as the "Municipal Administration Fund Act," to provide that a portion of the sales and use tax will be deposited directly into the Municipal Administration Fund, to replace references to the Government Development Bank for Puerto Rico with references to the Financial Advisory Authority and Fiscal Agency of Puerto Rico and to eliminate the ability of the Government Development Bank for Puerto Rico to make advances or advances payable from the funds deposited in the Municipal Administration Fund; to amend Article 3 of Act 91-2006, as amended, and Article 3 of Act 116-2013, as amended, to provide that the denominator to determine the amount to be deposited in the Dedicated Sales Tax Fund shall be 5.5% ; to amend Articles 2, 3 and 4, to add an Article 5 (d) and renumber Article 5 (d) as Article 5 (e) and to repeal Article 13 of Law 19-2014, as amended, to provide for the composition of the Board of Directors of the Municipal Financing Corporation, to dispose of the funds deposited in the Municipal Financing Corporation and eliminate the obligation of the Government Development Bank for Puerto Rico to make advances in relation to said funds; to amend Sections 4050.07, 4050.08 and 4050.09 of Act 1-2011, as amended, to provide that the accounts will be overseen by those institutions designated by the Municipal Finance Corporation and to eliminate references to sales and use tax; and for other purposes.

### EXPLANATORY MEMORANDUM

By means of Law 19-2014, as amended, a public corporation was created, attached to the Government Development Bank for Puerto Rico (hereinafter "GDB" or the "Bank"), which is known as the "Municipal Financing Corporation" ("COFIM") with the power to issue bonds and use other financing mechanisms to pay or refinance, directly or indirectly, all or part of the obligations of the municipalities that are payable or guaranteed by the municipal sales and use tax.

In addition, through Law 18-2014, as amended, the state sales and use tax ("SUT") was adjusted to six (6.0) percent while reducing the municipal SUT to one (1.0) percent, effective on February 1, 2014; which was deemed necessary to maintain our

Investment grade classification as well as to strengthen our credibility with the investment market. However, the reduction of zero-point five (0.5) percent of the municipal SUT effected, so that the municipalities would continue to receive the economic benefit of the revenues attributable to that zero-point five (0.5) percent, a special fund was created entitled the "Municipal Administration Fund" ("FAM"), which is overseen by the GDB for the benefit of, and assigned to, the municipalities.

As designed, the FAM and COFIM relied heavily on the GDB to achieve their respective purposes and to not interfere with the cash flow of the municipalities. As a consequence of the currently precarious economic situation of the GDB, it is necessary to amend Law 18-2014, as amended, Law 91-2006, as amended, Law 116-2013, as amended, Law 19-2014, as amended, and Law 1-2011, as amended, in order to safeguard the municipal finances that are funded by the Funds that are hereby intended to be safeguarded.

## BE IT ENACTED BY THE LEGISLATIVE ASSEMBLY OF PUERTO RICO:

Article 1.-Article 2 of Law 18-2014, as amended, is hereby amended to read as follows:

"Article 2.-Creation of the Fund

(a) A special fund called the "Municipal Administration Fund" ("FAM") is hereby created to be administered and retained by one or more private financial institutions that from time to time designate the Board of Directors of the Municipal Finance Corporation (hereinafter, "COFIM"). The references in this Law to the Government Development Bank for Puerto Rico, including the defined term "GDB ", shall be considered replaced by references to the Financial Advisory Authority and the Fiscal Agency of Puerto Rico (the "Fiscal Authority"). The FAM may consist of one or more bank accounts held in trust created before July 1, 2016 by the GDB and after that date by the Municipal Finance Corporation. Except for the transitional period of February 1, 2014 through June 30, 2014, said special fund shall be funded from the first collections attributable to 0.5% of the sales and use tax imposed by Sections 4020.01 and 4020.02 of Subtitle D of Act No. 1-2011, as amended. The amount that will have to be deposited each fiscal year in said special fund will be the product of the amount of the sales tax and state use collected during the current fiscal year multiplied by a fraction whose numerator will be zero-point five (0.5) percent and whose denominator will be the tax rate of said tax during said fiscal year (the "Required Annual Deposit"). The deposits to this special fund will be made monthly by the financial institution that acts as custodian of the collections of the sales and use tax imposed by the Commonwealth of Puerto Rico ("CW").

(b) ….

(c) Notwithstanding any provision to the contrary in this Act, neither the Fiscal Authority nor the Government Development Bank for Puerto Rico shall have any authorization to make advances or advances payable from the funds deposited or to be deposited in the FAM; provided, that any advance or advance payments made before the approval of this Act shall continue to be paid as provided in this Act. "

Article 2.- Article 6 of Law 18-2014, as amended, is repealed.

Article 3.- Article 3 of Act 91-2006, as amended, is hereby amended to read as follows:

"Article 3.- Creation of the Special Fund

...

...

...

> The product of the amount of the tax collected during said fiscal year multiplied by a fraction whose numerator will be two point seventy-five percent (2.75%) and whose denominator will be the five point five percent (5.5%), said fraction being called hereinafter "the two point seventy-five percent (2.75%) of the Tax", or

> (ii) ...

...

... "

Article 4.- Article 3 of Act 116-2013, as amended, is hereby amended to read as follows:

"Article 3.- Creation of the Special Fund

...

...

...

> The product of the amount of the tax collected during said fiscal year multiplied by a fraction whose numerator will be the three point five zero percent (3.50%) and whose denominator will be the five-point five percent (5.5%), said fraction being called hereinafter "the three point five zero percent (3.50%) of the Tax", or

> (ii) ...

...

... "

Article 5.- Article 2 of Law 19-2014, as amended, is hereby amended to read as follows:

"Article 2.- Creation of the Public Corporation

...

...

...

...

The COFIM will be attached to the Government Development Bank for Puerto Rico (hereinafter, the "GDB"), which will assume the operational expenses of the COFIM. To the extent that the GDB cannot assume the operational expenses of the COFIM, which will be payable from the funds deposited in the COFIM.

The COFIM Governing Board will be composed of seven (7) members of which one (1) will be the Executive Director of the Financial Advisory Authority and Fiscal Agency of Puerto Rico (the "Fiscal Authority") or the public official whom he designates as his representative; one (1) shall be the President of the GDB, or the public official whom he designates as his representative; one (1) will be the Commissioner of Municipal Affairs; three (3) will be mayors, of which two (2) will be from the political party that controls the largest number of municipalities, to be elected by the majority of the mayors members of said political party and one (1) will be a mayor of the party political that controls the second greatest number of municipalities, to be elected by the majority of the mayors members of said political party; and a member representing the public interest, recommended by the mayors of the majority and minority parties and ratified by the Governor. The Executive Director of the Fiscal Authority, the President of the GDB, the Commissioner of Municipal Affairs and the three (3) mayors will be *ex-officio* members of the COFIM Governing Board during the tenure of their duties. However, in the case of mayors, such tenure may not exceed two (2) consecutive terms. The public official appointed as representative of the President of the GDB shall have, during the period of his appointment, all the faculties, functions and responsibilities of the latter as a member of the Governing Board of COFIM. The representative of the public interest shall exercise his functions for the term that the Governor nominating him holds said position, unless there is just cause for the removal of the representative of the public interest before said term expires. All members of the COFIM Governing Board will hold office until their successor is appointed and takes office.

...

...

The Executive Director of the Fiscal Authority will be the President of the Governing Board of the COFIM and will serve as the chief executive of COFIM. The COFIM Governing Board will appoint a Secretary and those other officers it deems pertinent, none of which have to be members of the same. By the affirmative vote of a majority of all its members, the Governing Board of the COFIM may adopt, amend, alter and repeal regulations, not inconsistent with this Law

or another law, for the management of their affairs and business, for the appointment of committees from the members of the Board and to establish the power that said committees will have, and the title, qualifications, terms, compensation, appointments, severance and obligations of the officers and employees. Provided, however, that said regulations shall not be altered, amended, or repealed, unless all members of the Board have been notified in writing of the proposed alterations, amendments or derogations, at least one week prior to the meeting in which the matter shall be considered.

... "

Article 6.- Article 3 of Law 19-2014, as amended, is hereby amended to read as follows:

"Article 3.- Redemption Fund of COFIM

...

...

...

In both cases, if there are unpaid advances made by GDB, according to Article 12 of this Law before distributing the Municipal Transfer to the general fund of each municipality, the COFIM will first reimburse the GDB for these unpaid advances and then distribute the remainder of the Municipal Transfer to the general fund of the municipalities, as appropriate; provided that, as of July 1, 2016, neither the GDB nor the Fiscal Authority shall have any authorization to make advances payable from the Municipal Transfer; provided further, that any unpaid advance made by the GDB before July 1, 2016 shall be paid as provided in this Act. "

Section 7.- Section 4 of Law 19-2014, as amended, is hereby amended to read as follows:

"Article 4.- Use

...

In addition to the distributions made pursuant to Article 3 (b) of this Act, the amounts deposited in the COFIM Redemption Fund in excess of the amounts necessary to pay the principal and interest of the COFIM bonds by municipality, to comply with the obligations contracted under the bonds issuance documents or to make any other payment related to other obligations incurred by the COFIM, including payments under interest rate exchange contracts, with respect to borrowed money or bonds issued by the COFIM for the payment of which the " COFIM deposit" has been pledged, the excess per municipality will be deposited and distributed to the general fund of each municipality or to its Municipal Redemption Fund established by Section 4050.08 of Act No. 1- 2011, but excluding from this distribution the municipalities that benefited from Section 4 of the Municipal Administration Fund Law, which will not be entitled to participate in said excess. Notwithstanding the foregoing, if there are unpaid advances

made by the GDB, to a municipality under Article 12 of this Law before the COFIM [sic] distribute the excess to said municipality in its general fund, the COFIM will first reimburse the GDB for these unpaid advances and will then distribute the remainder to the general fund of the municipality, as appropriate; provided that, as of July 1, 2016, neither the GDB nor the Fiscal Authority shall have any authorization to make advances payable from the Municipal Transfer; provided further, that any unpaid advance made by the GDB before July 1, 2016 shall be paid as provided in this Act.

... "

Article 8.- Article 5 (d) of Law 19-2014, as amended, is re-numbered as Article 5 (e) and a new Article 5 (d) is added to Law 19-2014, as amended, so that it reads as follows:

"Article 5.-Deposits and Disbursements

...

...

...

If the "COFIM deposit" becomes at any time greater than the amounts necessary to pay the principal and the interest on the outstanding COFIM bonds, if any, or make any other payment related to other obligations incurred by the COFIM, including payments under interest rate exchange contracts, pertaining to borrowed money or bonds issued by COFIM for payment of which the "COFIM deposit" has been pledged, said excess will be distributed immediately pursuant to Article 3 (b) of this Act.

(e)  If the "COFIM deposit" becomes insufficient at any time to pay principal and interest on the outstanding COFIM bonds or to make any other payment related to other obligations incurred by the COFIM, including payments under contracts for the exchange of interest rates, pertaining to borrowed money or the bonds issued by the COFIM for the payment of which the "COFIM deposit" has been pledged, or in the case that the funds of the reserve of the COFIM, if any, that have been established for the payment of the debt requirements or those obligations are applied to cover the shortfall in the amounts needed to make such payments, the allocations necessary to cover said shortfalls will be included in the CW's recommended budget for the next fiscal year. "

Article 9.-Article 13 of Law 19-2014, as amended, is repealed, and Articles 13, 14 and 15 are renumbered as Articles 12, 13 and 14.

Article 10.- Subsection (a) of Section 4050.07 of Act 1-2011, as amended, is hereby amended to read as follows:

"Section 4050.07.-Creation of the Municipal Development Fund

(a) Creation of the Fund. - A "Municipal Development Fund" is created, under the oversight of one or more private financial institutions designated by the Municipal Finance Corporation:

(1) For periods prior to July 1, 2014, the Municipal Development Fund will be funded by a special fund to be created by the Commonwealth of Puerto Rico, and

(2) For periods beginning on or after July 1, 2014, the Municipal Development Fund shall be funded in accordance with the provisions, terms and other conditions set forth in the Municipal Administration Fund Law.

(b) ... "

Article 11.- Subsections (a) and (b) of Section 4050.08 of Act 1-2011, as amended, are hereby amended to read as follows:

"Section 4050.08.-Creation of the Municipal Redemption Fund

(a) Creation of the Fund. - A "Municipal Redemption Fund" is created, under the oversight of one or more private financial institutions designated by the Municipal Finance Corporation:

(1) For periods prior to July 1, 2014, the Municipal Redemption Fund will be funded by a special fund to be created by the Commonwealth of Puerto Rico, and

(2) For periods beginning on or after July 1, 2014, the Municipal Redemption Fund will be funded in accordance with the provisions, terms and other conditions set forth in the Municipal Administration Fund Law.

(b) ...

(c) ... "

Article 12.- Subsection (a) of Section 4050.09 of Act 1-2011, as amended, is hereby amended to read as follows:

" Section 4050.09.-Creation of the Municipal Improvement Fund

(a) Creation of the Fund. - A "Municipal Improvement Fund" is created under the oversight of one or more private financial institutions designated by the Municipal Finance Corporation:

(1) For periods prior to July 1, 2014, the Municipal Improvement Fund shall be funded by a special fund to be created by the Commonwealth of Puerto Rico, and

(2) For periods beginning on or after July 1, 2014, the Municipal Improvement Fund will be funded in accordance with the provisions, terms and other conditions set forth in the Municipal Administration Fund Law.

The funds in the Municipal Improvement Fund will be distributed to the municipalities through legislation by the Legislative Assembly of Puerto Rico to be assigned to public works projects and permanent improvements in the municipalities, such as:

(1)      ..."

Article 13.-Provisions in conflict that are without effect.

In cases where the provisions of this Act are in conflict with the provisions of any other Act of the Legislative Assembly of Puerto Rico, the provisions of this Act shall prevail unless the provisions of said other law specifically amend or repeal any or all the provisions of this Law.

Article 14.-Severability Clause.

If any provision of this Act or the application of said provision to any person or under any circumstance is declared to be unconstitutional, the rest of this Law and its application shall not be affected by said declaration of unconstitutionality.

Article 15. -Interpretation.

The provisions of this Act shall be interpreted liberally in order to promote the objectives of this Act.

Article 16.-Validity.

This Act shall take effect immediately after its approval.

**Important notes:**
1. This law is a copy of the original law when it was approved, it does not include subsequent amendments.
2. **Click Here to see the Complete Law, Updated and including its amendments (Partners Only)**

Press Here to return to the previous Menu and select another law.
View index for years up to the present
For Advanced Searches of all the Laws of Puerto Rico Updated and Jurisprudence **(Partners Only)**

<p style="color:red; text-align:center"><strong>WARNING</strong></p>

This document constitutes a document of the laws of the Commonwealth of P.R. which is subject to the changes and corrections of the process of compilation and official publication of the laws of Puerto Rico. Its electronic distribution is made as a public service to the community. Always look for subsequent laws for possible amendments to this law.

Visit our **LexJuris Club of Puerto Rico.**

LexJuris of Puerto Rico is always under construction.

es and Jurisprudence | Information | Agencies | AttorneyPR.com | ProfessionalsPR.com | Biographies | History | Peoples of | Services | Advertising | Directories | Shopping | Events | News | Entertainment | CD publications | LexJurisBooks | Legal Magazine |

© 1996-2016 LexJuris of Puerto Rico – Rights Reserved

City of Dallas, State of Texas, County of Dallas

I, MARILYN RETTA, am an interpreter/translator hired by TransPerfect, a translation services that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 60 years. I have studied Spanish translation for 20 years. I am certified by the Administration Office of the United States Courts and am certified by the American Translators Association for Spanish to English Translation.

The following document is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English

**2016 PR Laws 84 (Spanish)_En-Edits 2.19.18**

MARILYN RETTA

Sworn to before me this

February 20, 2018

Notary Public



MATTHEW RYAN EAKIN
Notary Public, State of Texas
My Commission Expires
May 29, 2018

Exhibit 17 Page 1 of 303

# EXHIBIT 17

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**December 18, 2016**

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................................1

BASIC FACTS ABOUT THE COMMONWEALTH ................................................................8

OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION ....................................12

RISK FACTORS ...............................................................................................................43

PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT ...........73

COMMONWEALTH REVENUES AND EXPENDITURES ...................................................83

PUBLIC CORPORATIONS................................................................................................117

COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS
2010 THROUGH 2016 ...................................................................................................148

DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES ..........172

RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS............................209

THE ECONOMY .............................................................................................................247

LITIGATION AND RELATED MATTERS ...........................................................................283

FINANCIAL STATEMENTS .............................................................................................298

CONTINUING DISCLOSURE ...........................................................................................298

INSURANCE MATTERS...................................................................................................300

**COMMONWEALTH OF PUERTO RICO**
**Financial Information and Operating Data Report**
**December 18, 2016**

### INTRODUCTION

This Financial Information and Operating Data Report contains information about the Commonwealth of Puerto Rico. The information set forth herein is provided as of June 30, 2016, the end of the Commonwealth's 2016 fiscal year, except as otherwise provided herein.

**Report Does Not Cover Public Corporations**

Although this Report contains information about certain of the Commonwealth's public corporations, it is not intended to provide full disclosure about the financial condition or operations of such public corporations, whether individually or in the aggregate. The Commonwealth makes no representation about the accuracy or completeness of the information relating to the Commonwealth's public corporations contained in this Report. Readers of this Report should not rely on it for purposes of making investment decisions with respect to the Commonwealth's public corporations.

**Forward-Looking Statements**

The information included in this Report contains certain "forward-looking" statements. These forward-looking statements may relate to the Commonwealth's fiscal and economic condition, economic performance, plans, and objectives. All statements contained herein that are not clearly historical in nature are forward-looking, and the words "anticipates," "believes," "continues," "expects," "estimates," "intends," "aims," "projects," and similar expressions, and future or conditional verbs such as "will," "would," "should," "could," "might," "can," "may," or similar expressions, are generally intended to identify forward-looking statements.

These statements are not guarantees of future performance and involve certain risks, uncertainties, estimates, and assumptions by the Commonwealth that are difficult to predict. The economic and financial condition of the Commonwealth is affected by various financial, social, economic, environmental, and political factors. These factors can be very complex, may vary from one fiscal year to the next, and are frequently the result of actions taken or not taken, not only by the Commonwealth and its agencies and instrumentalities, but also by entities such as the government of the United States of America or other nations that are not under the control of the Commonwealth. Because of the uncertainty and unpredictability of these factors, their impact cannot, as a practical matter, be included in the assumptions underlying the Commonwealth's projections.

The projections set forth in this Report were not prepared with a view toward complying with the guidelines established by the American Institute of Certified Public Accountants with respect to prospective financial information, but, in the view of the Commonwealth's officers responsible for the preparation of such information, were prepared on a reasonable basis, reflect the best currently available estimates and judgments, and present, to the best of such officers' knowledge and belief, the expected course of action and the expected future financial performance of the Commonwealth. However, this information is not fact and should not be

1

relied upon as being necessarily indicative of future results, and readers of this Report are cautioned not to place undue reliance on the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have compiled, examined, or performed any procedures with respect to the prospective financial information contained herein, nor have they expressed any opinion or any other form of assurance on such information or its achievability and disclaim any association with the prospective financial information. Neither the Commonwealth's independent auditors, nor any other independent auditors, have been consulted in connection with the preparation of the prospective financial information set forth in this Report, which is solely the product of the Commonwealth, and the independent auditors assume no responsibility for its content.

## Certain Defined Terms

The following terms used in this Commonwealth Report have the following meanings:

### *Component Units or Instrumentalities of the Commonwealth of Puerto Rico*

**ADEA** means the Agricultural Enterprises Development Administration, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**AFICA** means the Puerto Rico Industrial, Tourist, Educational, Medical and Environmental Control Facilities Financing Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**AMSCA** means the Mental Health and Anti-Addiction Services Administration, an agency of the Commonwealth of Puerto Rico.

**APLA** means the Port of the Americas Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**COFINA** means the Puerto Rico Sales Tax Financing Corporation, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Commonwealth** or **Puerto Rico** means the Commonwealth of Puerto Rico.

**CRIM** means the Municipal Revenues Collection Center, a municipal corporation. Since the CRIM is not a component unit of the Commonwealth, it is excluded from the Commonwealth Basic Financial Statements.

**Children's Trust or CT** means The Children's Trust, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Desarrollos Universitarios** means Desarrollos Universitarios, Inc., a non-profit entity and a component unit of the University of Puerto Rico.

**ERS** or **Employees Retirement System** means the Employees Retirement System of the Government of the Commonwealth of Puerto Rico, a statutory trust created by Act No. 447 of May 15, 1951, as amended, to provide pension and other benefits to retired employees of the

2

Commonwealth, its public corporations and municipalities. ERS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**FAFAA** or **Fiscal Agency and Financial Advisory Authority** means the Puerto Rico Fiscal Agency and Financial Advisory Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**GDB** or **Government Development Bank** means the Government Development Bank for Puerto Rico, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**GSA** or **General Services Administration** means the Puerto Rico General Services Administration, an agency of the Commonwealth of Puerto Rico.

**HFA** or **Housing Finance Authority** means the Puerto Rico Housing Finance Authority, a public corporation and a component unit of the Governmental Development Bank.

**HTA** or **Highways Authority** means the Puerto Rico Highways and Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**JRS** or **Judiciary Retirement System** means the Retirement System for the Judiciary of the Commonwealth of Puerto Rico, a statutory trust created to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. JRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**MBA** or **Metropolitan Bus Authority** means the Puerto Rico Metropolitan Bus Authority, a public corporation and component unit of the Commonwealth of Puerto Rico.

**MFA** or **Municipal Finance Authority** means the Puerto Rico Municipal Finance Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**MTA** or **Maritime Transportation Authority** means the Puerto Rico and Municipal Island Maritime Transportation Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**OMB** or **Office of Management and Budget** means the Office of Management and Budget, an agency of the Commonwealth of Puerto Rico.

**Oversight Board** means the Financial Oversight and Management Board established for Puerto Rico under PROMESA.

**PBA** or **Public Buildings Authority** means the Puerto Rico Public Buildings Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PFC** or **Public Finance Corporation** means the Puerto Rico Public Finance Corporation, a public corporation and a component unit of the Government Development Bank.

**Planning Board** means the Puerto Rico Planning Board, an agency of the Commonwealth of Puerto Rico.

3

**PRASA** or **Aqueduct and Sewer Authority** means the Puerto Rico Aqueduct and Sewer Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRCCDA** or **Convention Center District Authority** means the Puerto Rico Convention Center District Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PREPA** or **Electric Power Authority** means the Puerto Rico Electric Power Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRHIA** or **Health Insurance Administration** means the Puerto Rico Health Insurance Administration, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIDCO** or **Industrial Development Company** means the Puerto Rico Industrial Development Company, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIFA** or **Infrastructure Financing Authority** means the Puerto Rico Infrastructure Financing Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRIICO** means the Puerto Rico Industrial Investment Corporation, a subsidiary and component unit of PRIDCO.

**PRITA** means the Puerto Rico Integrated Transit Authority, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**PRMSA** or **Medical Services Administration** means the Puerto Rico Medical Services Administration, a public corporation and an enterprise fund of the Commonwealth of Puerto Rico.

**Retirement Systems** means the fiduciary funds of the Commonwealth of Puerto Rico, comprised of: the Employees Retirement System, the Teachers Retirement System and the Judiciary Retirement System.

**SIF** or **State Insurance Fund** means the Puerto Rico State Insurance Fund, a public corporation and a component unit of the Commonwealth of Puerto Rico.

**Treasury Department** means the Department of the Treasury of Puerto Rico, an agency of the Commonwealth of Puerto Rico.

**TRS** or **Teachers Retirement System** means the Puerto Rico System of Annuities and Pensions for Teachers, a statutory trust created to provide pension and other benefits to retired teachers of the Puerto Rico Department of Education and to the employees of the Teachers Retirement System. TRS is a fiduciary fund of the Commonwealth of Puerto Rico for purposes of the Commonwealth's financial statements.

**UPR** or **University of Puerto Rico** means the University of Puerto Rico, a public corporation and a component unit of the Commonwealth of Puerto Rico.

*Other defined terms*

**ACA** or **Affordable Care Act** means the Patient Protection and Affordable Care Act enacted by the Congress of the United States. A significant portion of the funds necessary to fund the Commonwealth's health insurance program are provided by ACA. Without a change in federal policy, the Commonwealth is expected to exhaust its allocation of ACA funds by fiscal year 2018.

**Act**. References to an Act means a law enacted by the Legislative Assembly of the Commonwealth and signed by the Governor of the Commonwealth (except in cases in which a Gubernatorial veto is validly overridden), as amended from time to time.

**Act 154** means Act No. 154-2010, which, *inter alia*, imposes a temporary excise tax on the acquisition by multinationals of certain property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. The Act 154 temporary excise tax expires on December 31, 2017.

**CAE Tax** means the Additional Special Tax collected by CRIM for the benefit of Puerto Rico's municipalities, which serves as the primary source of repayment of municipal general obligation bonds.

**Commonwealth Guaranteed Obligations** means debt obligations guaranteed by the Commonwealth, which guaranty is supported by the good faith, credit and taxing power of the Commonwealth.

**Executive Order**. References to an Executive Order means an Executive Order issued by the Governor of the Commonwealth. Unless other indicated, the Executive Orders mentioned herein were issued in 2016.

**FEGP** or **Fiscal and Economic Growth Plan** means the Fiscal and Economic Growth Plan, originally published in September 2015 and subsequently revised in January 2016, prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico.

**Fiscal Sustainability Act** means Act No. 66-2014 of June 17, 2014, enacted by the Legislative Assembly of the Commonwealth, which imposes certain spending and budgetary controls on the Commonwealth.

**U.S. GAAP** means United States Generally Accepted Accounting Principles.

**GASB** means the United States Govermental Accounting Standards Board.

**GDB Notes** means the senior unsecured notes issued by GDB in several series under an Indenture dated February 17, 2006, as amended, with Wilmington Trust, N.A., as successor trustee.

**General Fund** means (i) when used in the context of the Commonwealth's annual budget, the General Fund (Operating Fund), which does not include the Special Revenue Funds (or agencies with independent treasuries), and (ii) when used in the context of the Commonwealth's financial statements prepared in accordance with GAAP, collectively, the General Fund (Operating Fund), the Special Revenue Funds and agencies with independent treasuries.

**General Fund (Operating Fund)** means the Commonwealth principal operating fund; disbursements from such fund are generally approved through the Commonwealth's annual budgeting process.

**GOs** or **General Obligations** means bonds and notes issued by the Commonwealth and supported by the good faith, credit and taxing power of the Commonwealth.

**Governor** means the Governor of the Commonwealth of Puerto Rico.

**Moratorium Act** means the Emergency Moratorium and Financial Rehabilitation Act of 2016, Act 21-2016, enacted by the Legislative Assembly of the Commonwealth of Puerto Rico.

**Pension Bonds** means the Senior Pension Funding Bonds, Series A, Series B and Series C, issued by the Employees Retirement System and payable from employer contributions to the ERS.

**PRIFA BANs** means the Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015, issued by PRIFA, payable from a portion of the excise tax on petroleum products.

**PRIFA Ports Bonds** means the Revenue Bonds (Ports Authority Project), Series 2011, issued by PRIFA on behalf of the Port Authority and backed by a GDB letter of credit.

**PRIFA Rum Bonds** means the Special Tax Revenue Bonds and Refunding Bonds, Series 2005A, 2005B, 2005C and 2006 issued by PRIFA and payable from rum federal excise taxes reimbursed to the Commonwealth.

**PROMESA** means the Puerto Rico Oversight, Management and Economic Stability Act, Public Law 114-187, enacted by Congress and signed by the President on June 30, 2016.

**Proposed PROMESA Fiscal Plan** means the plan presented by the Commonwealth in October 2016 to the PROMESA Oversight Board.

**Report** means this Commonwealth Financial Information and Operating Data Report, including the documents incorporated by reference herein.

**Special Revenue Funds** are Commonwealth governmental funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. Special Revenue Funds are funded from,

among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds.

**SUT** or **Commonwealth SUT** means the sales and use tax imposed by the Commonwealth.

**Task Force** means the Congressional Task Force on Economic Growth in Puerto Rico established under PROMESA.

**TRANs** means Tax and Revenue Anticipation Notes issued by the Commonwealth to fund intra-year cash flow deficiencies. TRANs are payable from certain tax collections specified by law.

**TSA** or **Treasury Single Account** means the Commonwealth's main operational account in which substantially all Commonwealth public funds are deposited and from which most expenses are disbursed. TSA receipts include tax collections, charges for services, intergovernmental collections, the proceeds of short and long-term debt issuances and amounts held in custody by the Secretary of the Treasury for the benefit of the Commonwealth's fiduciary funds. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval.

**Working Group** means the Working Group for the Fiscal and Economic Recovery of Puerto Rico created by the Governor in June 2015.

## BASIC FACTS ABOUT THE COMMONWEALTH

**Location and Population**

Puerto Rico is an island located in the Caribbean approximately 1,600 miles southeast of New York City. It has an area of approximately 3,500 square miles and a population estimated at approximately 3.47 million by the United States Census Bureau as of July 1, 2015.

**Relationship with the United States**

Puerto Rico came under United States sovereignty pursuant to the Treaty of Paris of 1898, which ended the Spanish-American War. Puerto Ricans have been citizens of the United States since 1917. In 1950, the United States Congress authorized Puerto Rico to draft and approve its own Constitution, guaranteeing a republican form of government. The Constitution was drafted by a popularly elected constitutional convention, approved in a special referendum by the people of Puerto Rico, amended and ratified by the United States Congress, and subsequently approved by the President of the United States in 1952.

The United States and the Commonwealth share a common defense, market and currency. In general terms, the Commonwealth exercises virtually the same control over its internal affairs as do the 50 states. Recently, however, as a result of the current fiscal crisis that affects the Commonwealth (as further discussed below), the United States Congress enacted a law establishing a Financial Oversight and Management Board with broad powers to exercise budgeting and financial controls over the Commonwealth's fiscal affairs. The law, known as the "Puerto Rico Oversight, Management and Economic Stability Act" or "**PROMESA**," is discussed below in OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION and PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

The people of Puerto Rico are citizens of the United States but do not vote in Presidential elections. They are represented in Congress by a non-voting Resident Commissioner. Most federal taxes, except those such as Social Security and Medicare taxes, are not levied in Puerto Rico. Puerto Rico residents (other than certain federal employees) do not pay federal income tax on Puerto Rico-source income (but they do pay federal income tax on non-Puerto Rico-source income).

For many years, there have been two major views in Puerto Rico with respect to Puerto Rico's relationship with the United States: one favoring commonwealth status, represented by the Popular Democratic Party, which controls the Executive Branch and the Legislative Assembly since the 2012 general elections, and the other favoring statehood, represented by the New Progressive Party. These two parties had obtained over 90% of the vote for Governor in all elections since 1972. (Or since 1960, if we include a previous pro-statehood party that existed before the New Progressive Party was established.)

On November 8, 2016, general elections took place which resulted in the New Progressive Party obtaining control of the Executive Branch and the Legislative Assembly. Ricardo Rosselló Nevares was elected Governor with approximately 41.76% of the vote. The candidate for the Popular Democratic Party finished in second place with approximately 38.92% of the vote. Two independent gubernatorial candidates were able to obtain a combined 16.85% of

8

the vote; and the candidates from the two remaining minority parties obtained a combined 2.47% of the vote. It is the first time since 1968 that the two major political parties have failed to obtain at least 90% of the vote for Governor.

## Official Languages

The official languages of Puerto Rico are Spanish and English.

## Government

The Constitution of Puerto Rico provides for the separation of powers of the executive, legislative, and judicial branches of government. The Governor is elected every four years. The Legislative Assembly consists of a Senate and a House of Representatives, the members of which are elected for four-year terms. The highest Puerto Rico court is the Supreme Court of Puerto Rico. Decisions of the Supreme Court of Puerto Rico may be appealed to the United States Supreme Court in the same manner as decisions from the highest court in each state. Puerto Rico constitutes a District in the federal judiciary and has its own United States District Court. Decisions of this court may be appealed to the United States Court of Appeals for the First Circuit and from there to the United States Supreme Court.

Governmental responsibilities assumed by the central government of the Commonwealth are similar in nature to those of the various state governments. In addition, the central government assumes responsibility for local police and fire protection, education, public health and welfare programs, and economic development. Certain governmental responsibilities, however, are now subject to the review and approval of the Oversight Board established under PROMESA, discussed later in this Report.

## Fiscal Year

The Commonwealth's fiscal year runs from July 1 through June 30 of the following year. References in this Report to a fiscal year are to the period ending on June 30 of such year.

## Principal Officers Responsible for Fiscal Matters

Fiscal responsibility for the Commonwealth is shared among the Treasury Department, the Office of Management and Budget ("**OMB**"), and the Fiscal Agency and Financial Advisory Authority ("**FAFAA**"), which assumed, pursuant to Act No. 21-2016, as amended, known as the Emergency Moratorium and Financial Rehabilitation Act, the fiscal agency and financial advisory responsibilities previously exercised by Government Development Bank for Puerto Rico. The Treasury Department is responsible for collecting most of the Commonwealth's revenues, overseeing preparation of its financial statements and providing revenue projections (as well as monitoring during the fiscal year deviations from revenue projections) in connection to the preparation of each fiscal year's budget. OMB prepares the Commonwealth's budget and is responsible for monitoring expenditures. FAFAA now acts as fiscal agent and financial advisor to the Commonwealth and its agencies, public corporations and municipalities and disclosure agent for the Commonwealth.

9

*Alejandro J. García Padilla* was sworn in as Governor of Puerto Rico on January 2, 2013. From 2009 until becoming Governor, Mr. García Padilla served as an elected senator in the Senate of the Commonwealth of Puerto Rico. Prior to that, Mr. García Padilla was an attorney in the private sector. From 2005 to 2007, Mr. García Padilla was Secretary of the Commonwealth's Department of Consumer Affairs. Mr. García Padilla was a professor at the School of Law of the Inter American University of Puerto Rico from 2000 to 2002. Mr. García Padilla clerked for the Commonwealth's Court of Appeals from 1997 to 1999. He holds a bachelor's degree in Political Science and Economy from the University of Puerto Rico and a Juris Doctor from the Inter American University School of Law.

*Victor Suárez* was appointed as Executive Director of FAFAA on April 18, 2016. He is also the Commonwealth's Secretary of State and the Executive Director of the Puerto Rico Convention Center District Authority. During the past ten years, Mr. Suarez has held various positions with the government of the Commonwealth, including Chief of Staff to the Governor, Executive Director of the Puerto Rico Ports Authority and Secretary of Consumer Affairs. He was also Deputy Mayor and Operations Director for the City of Carolina. Mr. Suarez is an attorney. He received his J.D. degree from the Pontifical Catholic University in Ponce, Puerto Rico, and a Bachelor's Degree in chemical engineering from the University of Puerto Rico. He also has a Master's Degree in engineering management from the Polytechnic University in San Juan, Puerto Rico.

*Juan C. Zaragoza* was designated Secretary of the Treasury of Puerto Rico on October 15, 2014, and sworn into his position on November 17, 2014. He has over 30 years of experience providing tax consulting services, specializing in tax exemption, tax credits, restructuring, and sales and use taxes. Before this appointment, he co-founded in 2002 Zaragoza & Alvarado, a firm engaged in providing tax and business consulting services. Prior to establishing Zaragoza & Alvarado, he was the partner in charge of Arthur Andersen LLP's Tax and Business Advisory Services Practice in San Juan, Puerto Rico. He joined Arthur Andersen in 1993 and became a partner in 1995. From 1989 to 1992, he served as Assistant Secretary for Internal Revenue at the Treasury Department where he oversaw seven major bureaus and was responsible for implementing the Internal Revenue Division's policy-setting and related legislation. From 1983 to 1989, he worked at Price Waterhouse in Puerto Rico, in the Audit and Tax Divisions. Throughout his professional career, Zaragoza has always been very active in the development of tax legislation and the analysis of the tax system in Puerto Rico, both at state and municipal level. He is Past President of the Puerto Rico Certified Public Accountants Association (1997-1998). He holds an MBA in Management from Indiana University at Bloomington and a BBA in Accounting from the University of Puerto Rico.

*Luis F. Cruz* was appointed Director of OMB on October 22, 2014. Prior to this appointment, he served as Director of the Treasury and Budget Commission of the Puerto Rico House of Representatives and as Advisor to the Speaker of the House on Tax, Finance and Budget issues from January 2013 to October 2014. Previously, he had a successful career in public accounting spanning more than 25 years. In 1994, he established his own firm, Luis F. Cruz & Co.—later incorporated as Cruz, Izaguirre & Co., CPA, PSC—to offer accounting, tax, audit, and financial consulting services. In 1999, he established Global Consulting Group, Inc., to offer consulting services in the fraud prevention and detection area, and the evaluation of internal controls. He has offered consulting services to a variety of clients in the private sector, such as Banco Popular de Puerto Rico, Banco Santander, and Ricoh Lanier Puerto Rico. In the

10

public sector, he has provided services to the OMB, Treasury Department, and Puerto Rico Office of Courts Administration, among others. Before founding his own firms, he worked with Caribe Detroit Diesel Allison (1990-1992), and with First Federal Savings Bank (now FirstBank) (1987-1990). Mr. Cruz was a member of the Puerto Rico State Board of Accounting (2002-2006) and a member of the Board of Directors and Treasurer of the Puerto Rico Chamber of Commerce, where he served in various committees (2007-2009). He is a member of the American Institute of Certified Public Accountants, of the Puerto Rico Society of Certified Public Accountants, and of the Association of Certified Fraud Examiners. He obtained an MBA in Finance from the InterAmerican University of Puerto Rico and a BBA in Accounting from the University of Puerto Rico. He is a Certified Public Accountant, a Certified Fraud Examiner, and a Chartered Global Management Accountant.

## OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION

This section presents an overview of the Commonwealth's current fiscal condition. More detailed discussions of the topics discussed in this section appear in other sections of this Report.

The Commonwealth and most of its public corporations are in the midst of a profound fiscal crisis. Despite various measures undertaken in recent years to stimulate economic growth, reduce government expenses and increase revenues, the Commonwealth has been unable to spur economic growth and eliminate the recurrent excess of expenditures over revenues. During the past decade, the Commonwealth's balance sheet has significantly deteriorated due to years of economic recession, the financing of recurrent expenses with long-term debt and the failure to adequately fund legacy obligations, such as pensions. The Commonwealth's most recent ten-year projections suggest that the Commonwealth's fiscal condition is likely to deteriorate further in the absence of a significant debt restructuring and material changes in local and federal policy.

The Commonwealth's balance sheet deterioration, coupled with continued structural imbalances between revenues and expenditures and the Commonwealth's recent inability to access the capital markets, have resulted in the Commonwealth becoming unable to pay scheduled debt payments while continuing to provide government services.

A framework for understanding the fiscal challenges faced by the Commonwealth during the next decade was first proposed in the Krueger Report and it was further developed and refined in the Fiscal and Economic Growth Plan presented to the Governor in September 2015, which was prepared by the Working Group for the Fiscal and Economic Recovery of Puerto Rico, created by the Governor in June 2015. This framework sought to compare the resources and expenditures that the Commonwealth (and most of its public corporations) expected to collect and incur, respectively, on a consolidated basis, during the next ten years assuming no changes to current laws and policies. The analysis made by the Krueger Report highlighted the need to measure the Commonwealth's financial health, not on the basis of the Commonwealth's General Fund exclusively, but rather on a more comprehensive and consolidated manner that captures the cost of legacy liabilities, including debt and pensions, the results of operations of those Commonwealth public corporations that provide essential government services or that are directly supported by Commonwealth taxes or appropriations, and the cost of necessary capital expenditures.

The fiscal projections prepared by the Working Group in October 2016 utilizing the aforementioned framework indicate that, based on certain assumptions, including lack of access to third party financing, and without including the impact of changes to current federal or state laws and policies, consolidated expenditures (including required pension payments and debt service on tax-supported debt) would, in the aggregate, exceed consolidated resources by approximately $58.7 billion from fiscal year 2017 to fiscal year 2026.

These projections form the basis of the Fiscal Plan prepared by the Commonwealth pursuant to the requirements of PROMESA and presented to the Oversight Board on October 14, 2016 (the "**Proposed PROMESA Fiscal Plan**"). The Proposed PROMESA Fiscal Plan, described in detail below, identifies the Commonwealth's projected financing gaps under several scenarios and the measures that the Commonwealth may take to reduce such financing gaps. Even assuming that the Commonwealth takes the measures identified in the plan and that such

measures produce the projected economic and financial results, the Proposed PROMESA Fiscal Plan projects that, in the absence of federal Affordable Care Act funding for the Government's health programs, there would still be a material cumulative financing gap during the ten-year period *before* any debt payments are made during such period. As further discussed below, the Oversight Board rejected the initial version of the Proposed PROMESA Fiscal Plan and requested that the Governor prepare and submit a revised fiscal plan.

**Recurrent Deficits**

One of the principal causes of the Commonwealth's current fiscal crisis has been the Commonwealth's inability to increase its revenues and reduce its expenditures in order to avoid recurrent structural deficits. These deficits have historically been funded with borrowings from either the public bond market or governmental institutions, such as GDB, or by deferring the cost of certain legacy liabilities. The practice of issuing long-term debt to pay for current operational expenses, together with the failure to properly fund legacy liabilities such as employee retirement benefits, the ballooning cost of healthcare, and the contraction of the revenue base due to prevailing economic conditions, have led to a material deterioration in the Commonwealth's consolidated net position, as calculated pursuant to Generally Accepted Accounting Principles in the United States ("**U.S. GAAP**").

**Changes in Net Position According to U.S. GAAP.** According to the Commonwealth's Basic Financial Statements prepared in accordance with U.S. GAAP, the net deficit position of the Commonwealth's "Primary Government" and "Discretely Presented Component Units" increased by approximately $28.569 billion from fiscal years 2009 to 2014, from $15.021 billion in fiscal year 2009 to $43.590 billion in fiscal year 2014. During such period, the long-term debt obligations, including capital leases of the Commonwealth's Primary Government and its Discretely Presented Component Units increased by approximately $14.584 billion from $50.998 billion in fiscal year 2009 to $65.582 billion in fiscal year 2014.

The net pension obligation of the Primary Government also increased from approximately $6.754 billion in fiscal year 2009 to approximately $14.591 billion in fiscal year 2014. The unfunded actuarial accrued liability of the Commonwealth's three main Retirement Systems further grew by approximately $10 billion from June 30, 2009 (approximately $24 billion) to June 30, 2013 (approximately $34 billion).

Since reaching a peak in fiscal year 2009, cash and investments of the Primary Government have declined materially, in particular if one excludes cash held at governmental banks such as GDB (which is now restricted pursuant to the Moratorium Act due to GDB's financial difficulties).

**Annual Deficiencies of Revenues under Expenditures.** For several years the Commonwealth has also incurred consecutive annual deficiencies of revenues under expenditures under U.S. GAAP in its "Governmental Funds," which include (i) the General Fund, comprised of results of the Commonwealth's primary operating fund, its Special Revenue Funds and agencies with independent treasuries, (ii) the Debt Service Fund, where the Commonwealth accumulates the resources for the payment of long-term general obligation debt, (iii) the Capital Projects Fund, which accounts for the Commonwealth's capital expenditures, and (iv) the funds related to the Commonwealth's Blended Component Units, including the

13

Puerto Rico Sales Tax Financing Corporation (**"COFINA"**). Such results <u>do not</u> include the results of operation of the Commonwealth's "Discretely Presented Component Units" (consisting of 44 component units in the fiscal year 2014 audited financial statements, including entities such as HTA, GDB, UPR, and PRHIA) or its various "Proprietary Funds" (such as the Lotteries and PRMSA).

The table below provides results under U.S. GAAP for the Commonwealth's Governmental Funds for fiscal years 2009 through 2016. The information for fiscal years 2015 and 2016 is preliminary, unaudited, based on multiple assumptions and projections, and subject to change. In particular, actual figures for fiscal year 2016 may vary significantly from the preliminary figures set forth below given that the review of the information for fiscal year 2016 is in its initial stages.

<div align="center">

**Commonwealth of Puerto Rico**

**Deficiency of revenues under expenditures (Deficit)[1]**

($ in thousands)

</div>

| Fiscal Year | Operational General Fund [2] | Special Revenue Funds | Total General Fund [3] | Debt Service Fund | COFINA Funds | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|---|
| 2009 | (2,343,976) | 108,715 | (2,235,261) | (298,083) | (107,452) | (878,706) | (3,519,502) |
| 2010 | (2,047,053) | 256,755 | (1,790,298) | (802,259) | (876,334) | (879,485) | (4,348,376) |
| 2011 | (1,081,650) | (560,164) | (1,641,814) | (1,500,914) | 35,017 | (677,772) | (3,785,483) |
| 2012 | (1,337,711) | (1,188,143) | (2,525,854) | (781,710) | (458,420) | (1,457,517) | (5,223,501) |
| 2013 | (807,084) | (539,722) | (1,346,806) | (886,541) | (16,513) | (1,359,670) | (3,609,530) |
| 2014 | (439,556) | (1,095,156) | (1,534,712) | (920,771) | (340,073) | (1,008,764) | (3,804,320) |
| 2015 [4] | (810,476) | (237,476) | (1,047,952) | (996,611) | 55,086 | (1,158,108) | (3,147,585) |
| 2016 [5] | (905,753) | (83,427) | (989,180) | (1,085,546) | 42,385 | (1,055,085) | (3,087,426) |

(1) The figures are presented, in accordance with U.S. GAAP, pursuant to the "economic resources" method and the "modified accrual" basis of accounting.

(2) Amounts reported in "Operational General Fund" differ from amounts reported for the "General Fund" on a "budgetary" basis due to, among other things, the former incorporating accounting adjustments required to report such results pursuant to the "modified accrual" basis of accounting under U.S. GAAP.

(3) In accordance with U.S. GAAP, the Commonwealth merges the Operational General Fund and the Special Revenue Funds listed in the first two columns above in a single column in its Basic Financial Statements. These Special Revenue Funds do not meet the required criteria for separate presentation under U.S. GAAP and are thus blended with the General Fund.

(4) The fiscal year 2015 results are preliminary, unaudited and subject to change. Results for fiscal year 2015 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2015 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2015 deficit also includes approximately an impairment charge on the Commonwealth of approximately $100 million, reflected in the "Operational General Fund", and another $100 million charge on the Special Communities Trust, reflected in the "Other Governmental Funds", in each case to account for the impairment of amounts on deposit in GDB.

(5) The fiscal year 2016 results are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds include a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service

on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016.

*Source: Schedule of Revenues and Expenditures- Budget vs Actual- Budgetary Basis- General Fund*

*Statement of Revenues, Expenditures and Changes in Fund Balance - Governmental Funds*

The average Governmental Funds deficit for fiscal years 2009 through 2014 was approximately $4.048 billion. The preliminary and unaudited Governmental Fund deficit estimates for fiscal years 2015 and 2016 are $3.148 billion and $3.087 billion, respectively.

The deficit of the Commonwealth's Governmental Funds, excluding principal and interest payments on outstanding debts and debt issuance costs, for fiscal years 2010 through 2013 was approximately $772.2 million, $331.3 million, $1.210 billion, and $1.023 billion, respectively. For fiscal years 2014 to 2016, the excess of revenues over expenditures of the Commonwealth's Governmental Funds, excluding principal and interest payments on outstanding debts and debt issuance costs, amounted to approximately $1.166 billion, $1.087 billion, and $894 million, respectively.

**Preliminary General Fund Revenues for the First Five Months of Fiscal Year 2017**

Preliminary General Fund (Operating Fund) revenues for the first five months of fiscal year 2017 (July - October) were approximately $3.172 billion, an increase of approximately $121 million when compared to the same period in the prior fiscal year and approximately $104 million higher than the originally estimated revenues for the period. The higher revenues vis-à-vis the original estimate are mostly attributable to higher Act 154 excise tax revenues (approximately $110 million higher than the original estimate due to a non-recurring increase in such revenues) and sales tax revenues (approximately $29 million higher than the original estimate), offset by lower revenues from withholding taxes from non-residents (approximately $31 million lower than the original estimate) and income taxes from individuals (approximately $14 million lower than the original estimate). Based on actual revenues received during the first five months of fiscal year 2017, the Treasury Department continues to estimate that fiscal year 2017 revenues will be approximately $9.1 billion, in line with the original Treasury Department estimate.

**Preliminary General Fund Expenses for the First Four Months of Fiscal Year 2017**

Preliminary General Fund expenses and encumbrances (operating expenses and special appropriations) for the first four months of fiscal year 2017 (July - October) were approximately $2.827 billion. Operating expenses, which constitute 46% of the $8.987 billion approved General Fund budget (which includes $8.787 billion in expenses and a $200 million budgetary reserve), amounted to approximately $1.198 billion for the first four months of the fiscal year. During such period, OMB has used $12 million of the $200 million budgetary reserve included in the approved General Fund budget to fund Oversight Board expenses and expects to use at least an additional $14 million from such reserve during the rest of the fiscal year to cover other PROMESA-related expenditures, for a total of $26 million throughout the fiscal year (which are not included in the General Fund budget).

Based on projected expenses and encumbrances for the remaining eight months of the fiscal year, OMB expects total budgetary expenditures to total approximately $8.813 billion ($26

million over budgeted expenditures, corresponding to the PROMESA-related expenses referenced above). To the extent, however, that budgetary expenditures exceed such projection, OMB expects any such excess to be covered from the $174 million projected to be remaining in the budgetary reserve after the payment of the PROMESA-related expenses referenced above.

**Aggregate Debt Burden of the Commonwealth and its Instrumentalities**

As of July 31, 2016, the aggregate outstanding principal amount of debt of the Commonwealth and its instrumentalities was approximately $71.5 billion (including accreted interest on capital appreciation bonds ("**CABs**") but excluding outstanding GDB notes to avoid double-counting). Of this amount, approximately $55.8 billion represents General Obligation bonds, debt payable from Commonwealth taxes or appropriations and debt of tax-supported public corporations. The annual debt service on such tax-supported debt is shown below in DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal year 2017, aggregate annual debt service on all bonds and notes issued by the Commonwealth and its instrumentalities (excluding debt service on TRANs, all loans from private or public financial institutions (i.e. GDB) other than the loan to the GSA that is general obligation debt, and all HFA indebtedness other than the Capital Fund Program Bonds) is approximately $4.7 billion.

The debt burden of the Commonwealth and its instrumentalities significantly increased during the past decade. As of June 30, 2006, the Commonwealth's outstanding principal amount of general obligation and guaranteed bonds and notes was approximately $11.1 billion compared to approximately $18.4 billion as of June 30, 2016 (in each case, excluding accreted interest on CABs). The aggregate debt of the Commonwealth's instrumentalities (which includes principal amounts guaranteed by the Commonwealth and thus counted above, but excluding accreted interest on CABs) has also grown significantly from approximately $36.2 billion as of June 30, 2006 to approximately $56.3 billion as of June 30, 2016, led primarily by an increase in debt issued by the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"), which from 2007-2011 issued the entirety of the approximately $17.3 billion in bonds and notes outstanding as of June 30, 2016. A significant portion of the debt issued during this period was used to cover operational expenses at the Commonwealth and its public corporations.

The Commonwealth's ratio of tax-supported debt to revenue is more than double that of Hawaii, the state with the highest debt-to-revenue ratio, and almost seven times the U.S. State median. The Commonwealth's tax-supported debt per capita, as a share of Gross Domestic Product and as a share of personal income is also disproportionally high when compared to mainland jurisdictions. Both the Krueger Report and the FEGP concluded that the Commonwealth's debt burden is currently unsustainable and must be restructured.

PROMESA requires fiscal plans that provide for a debt burden that is sustainable. As further described in this Report, PROMESA contains two methods to adjust Puerto Rico's debts.

16

**Pension Liabilities**

In addition to debt service on outstanding bonds, notes and other financial debt obligations, one of most significant expenditures faced by the Commonwealth and its public corporations are pension benefits payable to retired employees. Commonwealth employees, together with employees of certain public corporations and municipalities, participate in the following three principal retirement systems: the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("**ERS**"), the Commonwealth of Puerto Rico Teacher's Retirement System ("**TRS**") and the Puerto Rico Judiciary Retirement System ("**JRS**"; the ERS, TRS and JRS are collectively referred to as the "**Retirement Systems**").

The Retirement Systems are severely underfunded. In the case of the ERS, which is the largest of the three Retirement Systems, its funded ratio (fiduciary net position as a % of total pension liability) as of June 30, 2015 was <u>negative</u> 1.77%, since its fiduciary net position is negative as of such date, and its net pension liability was $33.2 billion. The ERS projects that it will deplete its liquid assets (which amounted to $655.3 million as of November 14, 2016) by the end of the fourth quarter of the current fiscal year or during the first half of fiscal year 2018 (July to December 2017), depending on whether the Commonwealth is able to pay to the ERS during this fiscal year the additional contributions included in the fiscal year 2017 budget (amounting to $150 million) and whether the ERS is required to pay debt service on its outstanding bonds upon the expiration of the moratorium period imposed under the Moratorium Act. At that point (assuming no liquidation of illiquid assets, which totaled $616.0 million as of November 14, 2016, and no additional annual contributions), the ERS would be operating on a "pay-as-you-go" basis, which means that the ERS would be unable to pay retirement benefits that exceed the actual employer and employee contributions (net of administrative and other expenses), unless the Commonwealth and other participating employers provide additional funding on a timely basis to meet such retirement benefits in full. The ERS may also be unable to make in full all required debt service payments with respect to its pension obligation bonds.

In the case of the TRS and the JRS, their funded ratio was 8.05% and 7.30%, respectively, and their net pension liability was $15.0 billion and $542.6 million, respectively, in each case as of June 30, 2015. The TRS and the JRS are also very close to depleting their liquid assets (which amounted to $514 million as of June 30, 2016 for the TRS and $46.2 million as of November 14, 2016 for the JRS), which is projected to occur during fiscal year 2018, at which time (assuming no liquidation of illiquid assets, which totaled $372 million as of June 30, 2016 for the TRS and $0.5 million as of November 14, 2016 for the JRS, and no additional annual contributions) they would also be operating on a "pay-as-you-go" basis.

In 2013, the Commonwealth enacted legislation to reform each of the Retirement Systems by, among other measures, reducing benefits, increasing employer and employee contributions, and prospectively replacing most of the defined benefit elements of the system with a defined contribution system. The reform laws were subject to judicial challenges and, while the Puerto Rico Supreme Court upheld the constitutionality of the reform of the ERS, it declared invalid certain aspects of the legislation relating to the reform of the TRS and limited the effect of the reform of the JRS. One of the principal goals of these reforms was to address the Retirement Systems' cash flow needs in a manner that would permit them to make benefit payments when due. As such, the Commonwealth recognized that even after the structural reforms that would reduce future benefits, the Commonwealth and other participating employers

17

would still have to make additional annual contribution at levels to be determined by the actuaries in order to maintain sufficient system assets to be able to meet benefit payments when due.

As a result of the worsening fiscal crisis since the enactment of the reforms mentioned above, the Commonwealth and several other employers have been unable to pay most of the required additional annual contributions, which, assuming the collection of all past due contributions, are currently established at $596 million from fiscal year 2017 through fiscal year 2033, in the case of the ERS, and $603.9 million from fiscal year 2019 through fiscal year 2042 (plus $30 million for each of fiscal years 2017 and 2018), in the case of the TRS. In the case of the ERS, the Commonwealth is directly responsible for approximately 60% of the additional annual contribution, and the balance is allocable to the Commonwealth's 78 municipalities and participating public corporations. Some of the participating public corporations, however, are dependent to a significant extent on Commonwealth revenues either in the form of directly assigned resources or payment for goods or services provided to the Commonwealth, while municipalities also receive significant subsidies from the Commonwealth. In fact, the Commonwealth and related entities incorporated in the Proposed PROMESA Fiscal Plan currently account for approximately 79% of the ERS's additional annual contribution. The Commonwealth is also directly responsible for all of the additional annual contributions to the TRS.

The additional annual contributions are determined actuarially based on several assumptions, and changes to such assumptions could cause the amount of such contributions to vary materially. One of the primary determinants of the additional annual contributions is the assumed future level of active membership headcount (employment level) and the related payroll, since employer and employee contributions are paid as a percentage of payroll. If the projected active membership headcount decreases, the statutory employer and employee contributions also decrease and the additional annual contribution increases. In determining the $596 million in additional annual contributions for the ERS, the system's actuaries assumed that 50% of the over 11,000 employees eligible to retire under the early retirement incentive program established under Act No. 211-2015 in fact retire and that an additional decrease in active membership through attrition of 3% occurs over a five-year period (with the resulting vacancies in each case not filled with new hires). In contrast, the latest official calculation of the additional annual contribution for the TRS did not assume material changes in active membership, notwithstanding demographic and fiscal trends that could alter future teacher headcount levels.

Pension benefit payments to public retirees in Puerto Rico are significantly lower than the average in the U.S. According to their latest actuarial reports, the average monthly pension benefit payment to retirees from the ERS, TRS and JRS was approximately $1,160, $1,525 and $4,642, respectively. The dire financial condition of the Retirement Systems, and the related economic and social implications of the risk of not being able to satisfy pension benefit payments, has been an important consideration in the development of the Proposed PROMESA Fiscal Plan presented to the Oversight Board. As such, the Proposed PROMESA Fiscal Plan seeks to protect the vulnerable public retiree population and does not contemplate cuts to core pension benefits of retirees. The Proposed PROMESA Fiscal Plan budgets additional contributions necessary to fund pension payments when due. See "Commonwealth's Fiscal Plan" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

In connection with the development of the Proposed PROMESA Fiscal Plan, the Commonwealth has studied varying scenarios of future levels of active membership and payroll and the resulting effect on the levels at which additional annual contributions would have to be made to the Retirement Systems in order to pay pension benefits when due. To the extent any scenario reflects a projected lower level of payroll than that projected in the additional annual contributions previously mentioned (either because of an assumed further reduction in headcount over a five-year period or a slower rate of salary increases), the additional annual contributions increase significantly. The Proposed PROMESA Fiscal Plan incorporates additional annual contributions for the ERS and TRS based on such scenario analysis. In particular, the Proposed PROMESA Fiscal Plan currently assumes that the Commonwealth and related entities included in the Proposed PROMESA Fiscal Plan would need to make additional annual contributions to the Retirement Systems during the 10-year period of the fiscal plan of $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026. The Commonwealth, together with the Retirement Systems, is currently performing additional diligence with respect to these scenarios, which could result in material revisions to the additional annual contributions contemplated in the Proposed PROMESA Fiscal Plan.

In addition, the Proposed PROMESA Fiscal Plan includes as a measure the prospective segregation of the ERS assets attributable to contributions of active members from the assets attributable to the legacy defined benefit component of the plan. The plan includes this measure in order to protect future proprietary member contributions from the potential insolvency of the ERS. Since this measure eliminates the practice of using active member contributions to fund the legacy defined benefit pension payments, the measure results in a material increase in the additional annual contribution to the ERS during the 10-year period of the Proposed PROMESA Fiscal Plan.

The Commonwealth also provides post-employment benefits other than pensions in the form of a medical insurance plan contribution, which benefits are administered by the Retirement Systems and funded on a pay-as-you-go basis by the Commonwealth and other participating employers.

For a description of the Retirement Systems, including a summary of their financial condition, a discussion of factors that may cause the actuarial calculation of the net pension liabilities of the ERS and the TRS to increase from the amounts set forth above, and a discussion of the projected additional annual contributions that may be required to be made to the Retirement Systems in order to fund pension benefits when due, see RETIREMENT SYSTEMS AND OTHER POST-EMPLOYMENT BENEFITS.

**Commonwealth Liquidity**

 **Treasury Single Account.** Act No. 230 of July 23, 1974, as amended, provides that the Secretary of the Treasury is the officer in charge of the custody of all public funds of the Commonwealth. The Commonwealth follows the practice of pooling its cash. The Commonwealth's main operational account is known as the Treasury Single Account or "**TSA**," which is currently held at a private financial institution.

Receipts in the TSA include tax collections (including revenues assigned to certain public corporations and pledged for the payment of their debt service), charges for services, intergovernmental collections (such as reimbursements from Federal assistance grants), the proceeds of short and long-term debt issuances, and other receipts. Only a portion of the revenues received by the TSA is included in the annual General Fund budget presented to the Puerto Rico Legislative Assembly for approval. Other revenues are separately assigned by law to certain agencies or public corporations but still flow through the TSA. Furthermore, from time to time, the TSA also includes amounts held in custody by the Secretary of the Treasury for the payment of current pension benefits, including amounts deposited by the ERS, TRS and JRS.

Disbursements from the TSA include payroll and related costs, payments to suppliers and operational disbursements (including those reimbursed by Federal assistance grants and funded from Special Revenue Funds), welfare expenditures, capital outlays, debt service payments, required budgetary formulas and appropriation payments, pass-through payments of pledged revenues to certain public corporations, tax refunds, payments of current pension benefits and other disbursements.

For decades, the TSA receipts had been deposited primarily at GDB. In April 2016, as a result of GDB's deteriorated liquidity situation, the Commonwealth started to deposit TSA receipts in a commercial bank. Remaining cash balances in the TSA held at GDB are subject to the limitations on withdrawals of funds imposed by the Moratorium Act. For a discussion of the Moratorium Act, see "Emergency Moratorium and Financial Rehabilitation Act" below.

The following chart illustrates the flows of receipts and disbursements to and from the TSA:



1) Federal funds net of disbursement of the Puerto Rico Nutritional Assistance Program.
2) Includes disbursements of benefits reimbursed by federal grants.
3) Inflows and outflows are recorded in the General Fund or the Special Revenue Funds.
4) Inflows and outflows are recorded in the Special Revenue Funds or the Fiduciary Funds.
5) Outflows are recorded only in the General Fund.

Historically, TSA annual cash shortfalls have been addressed in the short-term through GDB financings and the stretching of accounts payable. These shortfalls were ultimately financed through long-term borrowings by the Commonwealth and its tax-backed special purpose vehicles, including COFINA. TSA cash shortfalls are further aggravated by the historical seasonal variability of tax revenues deposited at the TSA. These intra-year cash flow

20

variances were traditionally covered through the issuance of Tax and Revenue Anticipation Notes ("**TRANs**") in the municipal bond market or with U.S.-based and local banking institutions.

**Liquidity Constraints.** The Commonwealth currently suffers a severe liquidity crisis, which is reflected in current and projected TSA cash balances, primarily as a result of the cumulative effect of the following factors: (i) recurring and accumulated deficiencies of revenues under expenditures in its General Fund and its Special Revenue Funds (each of which flows through the TSA); (ii) increases in fixed liabilities such as debt service and pension payments as a result of historic reliance on debt issuances to cover structural deficits and deferral of contributions to pension systems; (iii) inability to continue accessing the municipal bond market for long-term borrowing to finance current and prior years' budgetary and cash overruns or to refinance maturing debt; (iv) the inability of GDB to continue acting as a lender of last resort (exacerbated by the Commonwealth's loss of access to bank deposits trapped at GDB as a result of GDB's liquidity and solvency crisis and the need for the TSA to provide funds to governmental entities in order to compensate them for the lack of access to their GDB deposits); (v) lack of access to financial markets for short-term, seasonal TRANs borrowings; and (vi) other economic factors such as a prolonged economic recession, high unemployment levels, population decline and increasing health care costs.

During fiscal year 2016, the Commonwealth sought to deal with its liquidity constraints by imposing a series of unsustainable liquidity measures designed to continue providing governmental services to the residents of Puerto Rico, while pursuing negotiations with various creditor groups to effectuate a comprehensive debt restructuring.  These included (i) requiring the two largest government retirement systems to pre-fund the payment of current retirement benefits to participants (in prior fiscal years such amounts were first paid in full by the TSA and only later reimbursed to the TSA by the retirement systems), (ii) suspending Commonwealth set-asides required by Act No. 39 of May 13, 1976, as amended, for the payment of its general obligation debt, (iii) delaying the payment of third-party payables or amounts due to public corporations, (iv) deferring the disbursement of certain budgetary assignments, (v) delaying the payment of income tax refunds, (vi) failing to appropriate debt service for bonds issued by the Public Finance Corporation ("**PFC**") and (vii) triggering, pursuant to Article VI, Section 8 of the Commonwealth Constitution, the "clawback" of certain available resources of the Commonwealth for the payment of debt service on General Obligation bonds.  Cash flow for the Commonwealth was bolstered by the 4.5% surcharge imposed on the sales and use tax rate enacted during 2015 and by placing an emergency "intra-governmental" TRANs in the aggregate principal amount of $400 million with the State Insurance Fund, the Automobile Accidents Compensation Administration ("**AACA**") and the Labor Department's disability fund ("**SINOT**").  During fiscal year 2016, the Commonwealth also received extraordinary distributions from the State Insurance Fund and AACA totaling approximately $105 million.

In April of 2016, the Commonwealth enacted the Moratorium Act.  Based on the provisions of the Moratorium Act, the Commonwealth and certain of its instrumentalities (other than COFINA, which currently continues to make debt service payments when due) suspended the payment of debt service on their respective debts.  In particular, the Commonwealth suspended the payment of $779 million in debt service on General Obligation bonds due July 1, 2016 (net of $352 million of capitalized interest fund and escrow accounts) because it did not have sufficient available funds in its TSA to make such payment.  For a detailed description of

the Executive Order issued pursuant to the Moratorium Act, see "Executive Action taken under the Moratorium Act" below. Relying on such suspension and an expected restructuring of debt service, the fiscal year 2017 General Fund budget did not appropriate funds for debt service (including debt service on Commonwealth General Obligation bonds and Commonwealth Guaranteed Obligations).

**TSA Projection.** The Treasury Department's fiscal year 2017 cash flow projection for the TSA is based in part on revenue projections for the fiscal year 2017 General Fund budget and approved budgetary appropriations. Inflows and outflows from the TSA also include transactions from the Commonwealth's Special Revenue Funds, certain other governmental funds, certain component units and fiduciary funds. As such, the TSA's projections will vary significantly from the fiscal year 2017 General Fund budget. Special Revenue Fund inflows and outflows are estimated by the Treasury Department based on historical data, recent events and anticipated changes for the current fiscal year. The monthly timing of inflows and outflows is based on historical data but certain outflows are adjusted to preserve positive cash balances during the projection period (to the extent this is possible). Such adjustments may vary the timing of disbursement of payables and other encumbrances. Pension inflows are based on input from the Commonwealth's Retirement Systems, reduced by the appropriated additional uniform contributions. The pension inflow projections assume that the Retirement Systems have enough liquid assets to cover the shortfalls between the employer and employee contributions and benefit payments. If ERS depletes its liquid assets during fiscal year 2017, however, it may not be able to transfer to the TSA sufficient funds to cover current pension benefits. Pension outflows are based on historical data and estimated changes for fiscal year 2017. For more information regarding the Retirement Systems, see "Pension Liabilities."

The Commonwealth's TSA cash flow projection also assumes: (i) the continued suspension, during the applicable moratorium period (July 2016 to January 2017), of all debt service obligations payable from the General Fund and other funds managed by the Commonwealth (including general obligation debt of the Commonwealth and debt service on PBA, PRIFA and PFC bonds) and (ii) during the moratorium period, the retention, pursuant to Executive Orders issued under the Moratorium Act, of (a) certain revenues assigned by law to certain public corporations (which are in turn used by those public corporations to pay debt service on their outstanding bonds) and (b) certain General Fund appropriations, in each case in order to increase amounts on deposit in the TSA in order to cover government services and provide working capital to the Commonwealth.

Revenues subject to Executive Orders issued under the Moratorium Act retained in the TSA include (i) revenues from the gasoline, diesel and petroleum products excise tax (up to the first $10 million per month) and the first $15 of motor vehicle license fees allocated to the Highways and Transportation Authority ("**HTA**"), (iii) the petroleum products excise tax assigned to PRIFA and (iv) the cigarette excise tax assigned to MBA.

The Commonwealth's fiscal year 2017 TSA cash flow forecast also relies, among other things, on (i) periodic transfers to the TSA of funds by the two largest government retirement systems, (ii) deferral of claimed and processed tax refunds for the 2015 tax year and amounts due to public corporations, (iii) the payment of current and past due payables based on available projected cash, (iv) $26 million for funding the PROMESA Oversight Board and (v) $400

million in "intra-governmental" TRANs funded by the State Insurance Fund, ACAA and SINOT, which occurred in September 2016.

The extraordinary liquidity measures to address the Commonwealth's liquidity needs during fiscal year 2017, described above, are unsustainable over the long-term and their implementation has had a detrimental impact on certain stakeholders of the Commonwealth (such as taxpayers, suppliers and creditors), as well as on the economy of Puerto Rico as a whole, which in turn imposes further downward pressure on governmental revenues. Furthermore, the buildup of payables to suppliers and taxpayers increases the Commonwealth's future liquidity demands on its cash resources that are not contemplated in the General Fund budget to the extent such accounts payable relate to prior fiscal years.

As of November 30, 2016, the TSA "bank" balance was approximately $283.8 million. As of such date, the TSA also had physical checks in vault of approximately $169 million, resulting in a "book" balance of approximately $114.8 million. The preliminary book reconciliation does not include: (i) restricted funds, (ii) income tax refunds owed to taxpayers, (iii) deposits in transit, (iv) outstanding but uncashed checks, and (v) third-party accounts payable.

Actual income tax refunds claimed, processed and unpaid as of November 30, 2016 were approximately $143.9 million. Outstanding third-party accounts payable of funds managed by the Commonwealth (excluding income tax refunds, cash book overdraft, liabilities related to salary-related benefits owed to eligible police officers for annual salary increases, awards and other monetary benefit granted to such officers through several laws, and unpaid legal settlements) are estimated at approximately $1.6 billion as of June 30, 2016. Such amount excludes accounts payable and accrued liabilities of the Commonwealth's instrumentalities.

The TSA cash balance mentioned above excludes: (i) approximately $251 million in operational deposits in GDB (which funds are subject to the limitations imposed on deposit withdrawals by Executive Order 10) and (ii) approximately $290.3 million in clawback revenues retained by the Commonwealth pursuant to Executive Order 46, approximately $144.2 million of which are deposited in GDB (also subject to the limitations on withdrawals referred to above) and approximately $146.1 million of which are deposited in a private financial institution as of November 30, 2016.

Even after implementing all the extraordinary measures described in the preceding paragraphs, the Treasury Department expects to only have sufficient liquidity to operate the government only up to the expiration of the moratorium. The moratorium period expires on January 31, 2017, subject to a two-month extension upon approval from the Governor. On or before January 31, 2017 (or March 31, 2017, if the expiration date is extended), the Commonwealth will need to take additional emergency liquidity measures to avoid running out of cash on such expiration date and throughout the remainder of fiscal year 2017. Absent such additional emergency liquidity measures, the TSA would experience significant bank cash shortfalls as early as the end of January 2017.

The chart below shows the Treasury Department's current cash flow projection for the last five months of fiscal year 2017. The projection is based on current law and, therefore, assumes the expiration of the moratorium period on January 31, 2017 (i.e. that the Governor does

not extend the moratorium period until March 31, 2017 and the Legislative Assembly does not amend the Moratorium Act to allow for the extension of the moratorium beyond March 31, 2017 and, therefore, that debt service not paid during the moratorium period becomes due and payable on February 1, 2017).

**FY 2017 TSA Shortfall Projections, Considering Debt Service Payments**
**($ in millions)**



The projected negative cash balance as of June 30, 2017 based on current law is approximately $2.075 billion. Such projection assumes the payment of approximately (i) $633 million and $1.127 billion in debt service on General Obligation Bonds corresponding to fiscal years 2016 and 2017, respectively (net of $146 million of "clawback" funds deposited in a private financial institution), (ii) $5 million in debt service on other General Obligation debt (General Services Administration loan) corresponding to fiscal year 2017; (iii) $23 million and $277 million in debt service on PBA bonds guaranteed by the Commonwealth corresponding to fiscal years 2016 and 2017, respectively, and (iv) $13 million and approximately $88 million in debt service on PRIFA BANs guaranteed by the Commonwealth corresponding to fiscal years 2016 and 2017, respectively.

Further, the projected negative cash balance as of June 30, 2017 would be approximately $2.992 billion if, in addition to the payments listed in the foregoing paragraph, the Commonwealth was required to (i) pay $92 million and $78 million in debt service on PFC bonds corresponding to fiscal years 2016 and 2017, respectively, (ii) repay to the applicable public corporations and other governmental entities approximately $440 million in revenues retained by the Commonwealth during fiscal year 2016 pursuant to the exercise of the "clawback" in accordance with Executive Order 2015-46 (including $113 million corresponding to rum excise taxes assigned to PRIFA but net of $13 million in petroleum product excise taxes also assigned to PRIFA but that are reflected above in the payment of the PRIFA BANs guaranteed by the Commonwealth), (iii) repay to the applicable public corporations and other governmental entities approximately $194 million in revenues retained by the Commonwealth

24

during fiscal year 2017 pursuant to various Executive Orders issued under the Moratorium Act (net of approximately $88 million in petroleum product excise taxes assigned to PRIFA, which are reflected above in the payment of the PRIFA BANs guaranteed by the Commonwealth), and (iv) transfer to PRIFA approximately $113 million corresponding to rum excise taxes assigned to PRIFA but for which an appropriation was not made in the General Fund Budget for fiscal year 2017.

The Treasury Department estimates that, assuming (i) the non-payment from the TSA of any debt service during the fiscal year notwithstanding the expiration of the Moratorium Act, (ii) revenues subject to the "clawback" during fiscal year 2016 are not repaid to the relevant public corporations during fiscal year 2017, and (iii) revenues assigned to public corporations and other governmental entities that are retained during the moratorium period are not forwarded to such entities during fiscal year 2017, the TSA June 30, 2017 cash balance would be approximately $91 million. Such scenario is likely to require the extension of the moratorium period for the entirety of fiscal year 2017 and/or the extension of the PROMESA stay during such period (which, in the absence of a Title III filing under PROMESA may require U.S Congressional action).

**Overview of GDB's Financial Condition**

GDB, which traditionally served as interim and last-resort lender to the Commonwealth, its instrumentalities and municipalities and as the principal depositary of public funds, is currently unable to meet its financial obligations as they become due and its audited financial statements for fiscal year 2014 reflect that it is insolvent on a balance sheet basis. Due to its deteriorated financial condition and the prohibition on the approval and disbursement of loans implemented pursuant to Executive Order 10, GDB is currently unable to serve as a source of liquidity for the Commonwealth and its instrumentalities and its ability do so in the future is uncertain. In addition, the Commonwealth and most of its agencies and instrumentalities had, as of June 30, 2017, approximately $3.7 billion on deposit at GDB. Such entities' ability to withdraw these funds is currently significantly limited as a result of the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10, which only permits the disbursement of funds certified as necessary to fund essential public services, and subject to a weekly limit established by GDB. Moreover, GDB's depositors, which consist primarily of the Commonwealth and its public corporations, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its depositors. As a result, the Commonwealth and its public corporations may also need to record a significant loss in their respective financial statements in connection with the impairment of such deposits. For more information on Executive Order 10 and Executive Order 14 (which declared a moratorium with respect to certain obligations of GDB), see "Executive Action Taken under the Moratorium Act" below and on GDB's current situation see "Government Development Bank for Puerto Rico" under PUBLIC CORPORATIONS.

**Krueger Report on the Commonwealth's Economic and Financial Stability and Growth Prospects**

On June 29, 2015, Governor García Padilla made public a report (the "**Krueger Report**") on the Commonwealth's economic and financial stability and growth prospects prepared by Dr. Anne O. Krueger, Dr. Ranjit S. Teja and Dr. Andrew Wolfe (the "**Former IMF economists**"), each of whom had previously occupied senior executive positions at the International Monetary Fund ("**IMF**"). The report, which was subsequently updated, is available at the website of Government Development Bank at www.gdbpr.com under "Investor Resources−Publications and Reports−Investor Presentations," but it is not being incorporated by reference and is not part of this Commonwealth Report.

The Krueger Report states that Puerto Rico faces an acute crisis in the face of faltering economic activity, fiscal solvency and debt sustainability, and institutional credibility. Some of the report's principal conclusions are summarized below.

● *The economic problems of Puerto Rico are structural, not cyclical, and are not going away without structural reforms*. The report states that the economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Former IMF economists believe that the economy will continue to contract at a rate of at least 1% per annum.

● *Fiscal deficits are much larger than assumed and are set to deteriorate*. The report discusses the conceptual problems with viewing the deficit from the standpoint of the General Fund account in isolation, including that the General Fund (i) being mostly on a cash basis, does not reflect previously incurred expenses until the fiscal year in which they are recorded for payment, (ii) excludes numerous agencies and public corporations that operate like arms of the government and also run deficits, and (iii) excludes capital expenditures. As a result, the report states that an analysis of fiscal and debt sustainability cannot be conducted on the basis of the General Fund measure alone.

● *The central government deficits (as measured in the report) over the coming years imply an unsustainable trajectory of large financing gaps*. Based on current policies, the model reflects overall deficits of between $3 billion and $5 billion per year over the next five years, and continuing to grow thereafter. After factoring certain additional downside risks, the report identifies that annual deficits could range from $3.7 billion in fiscal year 2016 to $8.2 billion in fiscal year 2025.

● *Puerto Rico's public debt cannot be made sustainable without growth, nor can growth occur in the face of structural obstacles and doubts about debt sustainability*. To restore growth and confidence, Puerto Rico needs to implement ambitious measures as an integrated package in three principal areas: (1) structural reforms directed at restoring competitiveness, (2) fiscal reform and restructuring of public debt and (3) institutional credibility.

*The Former IMF economists have not participated in the preparation of this Commonwealth Report and have no responsibility for its contents. The Former IMF economists are not soliciting or recommending the purchase or sale of any securities, or any indications for*

26

*the purchase or sale of any securities, or any investment decisions.*

**Significant Future Revenue Shortfall and Expenditure Increases**

During the next four fiscal years, the Commonwealth expects to confront various events that may significantly reduce its revenues or increase its expenditures. To the extent the Commonwealth is unable to address these events, its ability to continue operating and providing essential services to its population may be severely compromised.

The Commonwealth will need to replace the revenue produced by the special temporary excise tax imposed by Act 154 if its effective period is not extended (it expires on December 31, 2017) or if the Internal Revenue Service eliminates its creditability against an entity's federal income tax liability. Act 154 currently accounts for approximately 20% of General Fund revenues and, during fiscal year 2016, approximately 10 companies accounted for approximately 90% of Act 154 revenues. Although Act 154 imposes a modified source of income rule upon the expiration of the temporary excise tax, the Commonwealth currently estimates that revenues from the modified source of income rule would be materially lower than revenues collected from the temporary excise tax. To the extent the Commonwealth is unable to replace the revenue generated by the temporary excise tax, the Commonwealth's funding gap will materially increase and the Commonwealth's ability to continue funding its current operations and provide essential services will be compromised. See "*The Commonwealth's ability to raise additional revenue through taxation may be limited by economic factors*" and "*The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of its tax revenues*" under RISK FACTORS.

The Commonwealth is also facing a significant shortfall in revenues available to fund its health insurance program. More than half of the funds necessary to fund the health insurance program at current levels are provided by the federal government under various programs, including Medicare, Medicaid, the Affordable Care Act and the Children's Health Insurance Program. Currently, the Commonwealth is due to exhaust its allocation of funds under the Affordable Care Act by fiscal year 2018. Moreover, the Commonwealth's allocation of Medicaid funds is significantly less than other jurisdictions in the United States. To the extent the federal government reduces current levels of federal health care funding, the Commonwealth may have to materially increase the local resources it assigns to its health insurance program or otherwise curtail the services offered thereunder to its citizens. The former will further strain the Commonwealth's dire fiscal position; the latter would not only affect the wellbeing of many residents, but would also have an adverse effect on the economy. See "*If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program or may be required to deploy resources currently used for other spending priorities to fund the resulting shortfall*" under RISK FACTORS.

Finally, as discussed below, the Retirement Systems are projected to deplete their liquid assets during fiscal year 2018 (although under certain scenarios ERS could deplete its liquid assets during the current fiscal year). Upon depletion of their liquid assets, they will be required to operate on a "pay-as-you-go" basis, which means that they will be unable to pay benefits that exceed the actual employer and employee contributions received (net of debt service on their debts and administrative and other expenses), unless the employers that contribute to the systems

27

provide additional funding. Considering that the Commonwealth is the largest employer that contributes to the ERS and the only employer that contributes to the TRS and JRS, the Commonwealth will have to dedicate a substantial amount of resources currently used to fund other essential services and programmatic priorities to cover this funding deficiency. To the extent the Commonwealth is unable to cover these amounts, the retirement systems will be unable to pay the full amount of benefits due. This would also affect the well-being of many residents and have an adverse effect on the economy. See *"Unless the Commonwealth makes significant additional contributions to the Retirement Systems, current levels of liquid assets could be completely depleted during the current or next fiscal year and the Commonwealth will have to fund pensions on a "pay-as-you-go" basis. In such a scenario, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders."* under RISK FACTORS.

**Commonwealth's Fiscal Plan**

*Creation of the Working Group*

On June 29, 2015, after considering the conclusions of the Krueger Report, the Governor of Puerto Rico announced that the Commonwealth had no choice but to seek to renegotiate its debt with the goal of achieving a more sustainable debt load and, failing to do so, the Commonwealth might have to default on its debt. Following this announcement, the Governor created the Working Group for the Fiscal and Economic Recovery of Puerto Rico (the "**Working Group**") to consider the measures necessary, including the measures recommended in the Krueger Report, to address the economic and fiscal crisis of the Commonwealth. It was tasked with the responsibility of developing and recommending to the Governor a fiscal and economic growth plan (the "**FEGP**") containing the plans and administrative and legislative measures necessary to address the short, medium and long-term fiscal and economic challenges facing Puerto Rico.

*Original FEGP*

On September 9, 2015, the Working Group presented a draft of the FEGP to the Governor, which was subsequently revised in January 2016. The FEGP projected that the cumulative difference between projected revenues and expenses of the Commonwealth (the "**Financing Gap**") from fiscal year 2016 to fiscal year 2025 would be approximately $63.4 billion, absent corrective action. The FEGP contemplated that this financing gap could be reduced to approximately $23.9 billion through a combination of revenue increases (including the surcharge imposed on the sales and use tax, which had already gone into effect), expense reductions and economic growth, but that the remaining gap would need to be addressed by a debt restructuring.

*Proposed PROMESA Fiscal Plan*

Pursuant to PROMESA and the requirements imposed by the Oversight Board, on October 14, 2016, the Commonwealth presented the Proposed PROMESA Fiscal Plan to the Oversight Board. The Proposed PROMESA Fiscal Plan is based on seven principles the Commonwealth believes are necessary in order to achieve economic recovery. These are: (i) minimize the impact of austerity on economic growth, (ii) improve budgetary controls and financial transparency, (iii) rationalize expenditures and tax policy to promote efficiency, (iv)

enact structural economic measures and invest in growth, (v) protect vulnerable stakeholders, (vi) create a sustainable debt level that allows for growth and (vii) partner with the federal government to generate growth.

<u>Overview of the Projections Underlying the Proposed PROMESA Fiscal Plan</u>.

*Baseline Projection*. The Proposed PROMESA Fiscal Plan projects that, under current policies, the Commonwealth's Financing Gap during the next ten years will be approximately $58.7 billion (the "**Baseline Projection**"). The Baseline Projection assumes that, among other things, (i) revenues and expenses continue based on existing legal requirements and policy constraints, (ii) no additional austerity or revenue raising measures are taken to close the projected Financing Gap, (iii) the island experiences continued economic contraction at an average rate of approximately 1.7% per year from fiscal year 2018 to fiscal year 2026 (which is calculated to contribute approximately $5.5 billion to the Financing Gap), (iv) an average rate of inflation of approximately 1.8% per year from fiscal year 2018 to fiscal year 2026, (v) the Commonwealth makes payments of incremental cash contributions to the Retirement Systems as required by current law, (vi) the government loses of a portion of current Act 154 revenues resulting from the conversion of the Act 154 excise tax to a modified source income rule in fiscal year 2018 and (vii) Affordable Care Act funding for the Commonwealth's health programs is depleted in fiscal year 2018.

Note that the growth and inflation projections included in the Baseline Projection use only factors that are *exogenous* to Puerto Rico's fiscal position. As such, the presumed rate of economic contraction in this scenario *does not* assume any measures are taken to fill the resulting Financing Gap. If the Commonwealth were in fact forced to pursue only austerity-type measures to address such shortfall, the rate of such contraction (and the resulting effect on the Financing Gap) could increase materially.

*Measures Projection*. The Proposed PROMESA Fiscal Plan identifies certain revenue raising and expense reduction measures (summarized below) that are within the Commonwealth's control and that the government proposes to implement in order to reduce the Financing Gap. The Proposed PROMESA Fiscal Plan projects that, even assuming the Commonwealth is able to successfully implement such measures (which are projected to reduce the 10-year Financing Gap by approximately $19 billion), the Commonwealth would still face a ten-year Financing Gap of approximately $5.7 billion *before* the payment of scheduled debt service and approximately $39.9 billion *after* accounting for such debt service payments (the "**Measures Projection**"). The Measures Projection also assumes, among other things, (i) economic growth at an average rate of approximately 0.1% per year from fiscal year 2018 to fiscal year 2026, which is assumed to be driven by meaningful structural reforms and new spending to promote economic stability and growth, (ii) an average rate of inflation of approximately 2% per year from fiscal year 2018 to fiscal year 2026 and (iii) approximately $10 billion in additional spending to promote stability and growth. The Measures Projection concludes that without federal government assistance, even assuming that the Commonwealth does not pay debt service during the ten-year period, the Commonwealth would still face a significant Financing Gap during such period.

The change in economic trajectory resulting from the Proposed PROMESA Fiscal Plan is calculated to reduce the Financing Gap by approximately $8.7 billion in this scenario. Of the approximately $10 billion in spending to promote stability and growth contemplated by the

Proposed PROMESA Fiscal Plan, the Measures Projection assumes that, for purposes of calculating the resulting growth rate, the Commonwealth actually spends only the amount of the Commonwealth's internally generated surplus before debt service during such period, which is materially lower than $10 billion. Therefore, although the Measures Projection results in a significant Financing Gap before debt service, such Financing Gap could potentially be eliminated by reducing the amount proposed to be spent in the Proposed PROMESA Fiscal Plan on stability and growth measures, though only up to the amount of spending that exceeds the available surplus, as any further cuts would reduce the projected growth rate.

Importantly, the Measures Projection assumes the loss of ACA funding. In contrast, the projection assumes *no loss* of Act 154 revenues based on a temporary extension of the excise tax (during which period it is also assumed such tax is not ruled to be uncreditable under U.S. tax law) and a gradual substitution of such tax revenues by corporate tax reform that increases the local tax liability (but not the aggregate tax liability) of multinational companies subject to Act 154.

*Federal Action Projection*. Finally, the Proposed PROMESA Fiscal Plan states that, if in addition to the measures assumed to be taken by the Commonwealth in the Measures Projection, federal healthcare funding is kept at the current level (so that the Commonwealth is not forced to dedicate other revenues to replace the loss of ACA funding), the Commonwealth could achieve a cumulative surplus before debt service by approximately $16.1 billion, which would in turn permit the Commonwealth to dedicate part of such surplus to additional investments that could drive a higher growth rate. After factoring the effect of the change in economic trajectory resulting from such additional investments and the impact of structural economic reforms, the Commonwealth estimates a surplus before debt service of approximately $18.9 billion during the next ten years. Reducing such surplus by the debt service owed over the period (including previously missed payments and net of existing debt service reserves) results in a 10-year Financing Gap of approximately $15.4 billion (the "**Federal Action Projection**"). The Federal Action Projection assumes, among other things, (i) economic growth at an average rate of 1.4% per year over the period from fiscal year 2018 through fiscal year 2026, and (ii) an average rate of inflation of approximately 2.5% per year from fiscal year 2018 through fiscal year 2026. Note that although the projected growth rates are driven primarily by the impact of structural reforms on the Puerto Rico economy, such rates of growth are indicative of the Commonwealth's economic potential and do not necessarily correspond to the structural measures included in the Proposed PROMESA Fiscal Plan, as such measures, in contrast with the FEGP, were not all detailed in the Proposed PROMESA Fiscal Plan and instead the Proposed PROMESA Fiscal Plan emphasized that such measures must be evaluated in light of the Commonwealth's economic contraction and continued citizen outmigration.

Summary of Certain Proposed Measures. The Proposed PROMESA Fiscal Plan begins by underscoring the austerity and revenue enhancing measures already adopted by the Commonwealth, such as reductions in public employee headcount and payroll, public employee salary freezes, increases in excise taxes and the sales and use tax rate, delays in the payment of government suppliers and decreases in public capital spending, and asserts that rather than abating the Commonwealth's economic decline, such measures appear to have exacerbated it. In order to reverse this trend, the Proposed PROMESA Fiscal Plan asserts that necessary fiscal discipline cannot come at the expense of long-term economic growth.

*Budgetary Controls and Financial Transparency*

30

Recognizing that Puerto Rico has experienced persistent deficits and has routinely overestimated revenue and failed to control spending, the Proposed PROMESA Fiscal Plan proposes new rules and regulations to enforce budgetary discipline, including budgeting in compliance with GAAP, improving recently instituted third-party revenue validation processes, mandating all spending to be approved through the annual budgetary process and enhancing regular budgetary reporting and tracking.

In addition, the Proposed PROMESA Fiscal Plan underscores that the Commonwealth's ability to properly monitor its fiscal position has been and continues to be hindered by obsolete financial, accounting and payroll systems which, in turn, impede informed decision-making and the ability to publish timely financial statements. To correct this, the Proposed PROMESA Fiscal Plan proposes to invest in new IT infrastructure, reform financial reporting processes and centralize treasury functions. Finally, the Proposed PROMESA Fiscal Plan seeks to improve the Commonwealth's regular economic and statistical reporting to enhance long-term economic forecasting and tracking and proposes to implement a multi-year budgeting requirement that reflects long-term economic forecasts.

*Expenditures and Tax Policy*

The Proposed PROMESA Fiscal Plan calls for the Commonwealth to stabilize its revenue base, improve its revenue collections and rationalize expenditures but emphasizes that the selection and structure of any fiscal measures, and the timing of their implementation, must be designed to foster long-term growth and minimize negative economic effects

According to the Proposed PROMESA Fiscal Plan, the Commonwealth's focus should be on efficiency gains. As such, the Proposed PROMESA Fiscal Plan calls for consolidating 48 agencies and public corporations, merging state hospitals, closing hundreds of underutilized schools, restructuring the Department of Education, implementing functional public-private partnerships and further centralizing procurement to create economies of scale. With respect to the government workforce, the Proposed PROMESA Fiscal Plan proposes to implement a 2% per year employee attrition target and to benchmark public sector benefits to those of the private sector. The Proposed PROMESA Fiscal Plan further calls for eliminating automatic expenditure increases by extending Act No. 66's freeze of service costs and formula appropriations until fiscal year 2021. After fiscal year 2021, the Proposed PROMESA Fiscal Plan proposes to permanently fix formula appropriations at their fiscal year 2014 levels and only allow them to grow after 2021 at the rate of the previous fiscal year's inflation. With respect to municipal and other subsidies, the Proposed PROMESA Fiscal Plan calls for the gradual elimination of subsidies to municipalities and reductions in special appropriations to retirees receiving pension benefits.

The Proposed PROMESA Fiscal Plan also seeks to increase revenue collections by boosting the Commonwealth's capture rate and reducing tax evasion. In particular, the Proposed PROMESA Fiscal Plan seeks to tackle the widespread use of illegal video lottery machines in Puerto Rico by implementing and enforcing a tax on video lottery games. As stated above, with respect to Act 154, the Proposed PROMESA Fiscal Plan recommends extending the Act 154 excise tax temporarily (2-3 years) to provide the government with sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the projection period.

31

*Structural Economic Measures and Investments in Growth*

The Proposed PROMESA Fiscal Plan recognizes that although Puerto Rico does not control U.S. federal policies that have a significant impact on its economy, the Commonwealth must implement structural reforms within Puerto Rico's control and create a business-friendly environment and attract private investment.

The Proposed PROMESA Fiscal Plan emphasizes the need to adopt pro-growth labor market policies (note that in contrast with the FEGP, it does not detail the character of such changes and underscores that such reform must be evaluated in light of the Commonwealth's economic contraction and increasing outmigration), implement an earned income tax credit and reform welfare programs, with the goal of increasing labor demand and participation. The Proposed PROMESA Fiscal Plan also seeks to reform the permit granting system, implement a pro-growth corporate tax regime and reform PREPA to stabilize energy rates in an effort to reverse recent declines in private sector investment.

The Proposed PROMESA Fiscal Plan proposes to utilize a portion of the savings generated by its expenditure measures to repay past-due tax refunds and over-stretched suppliers, fund public investments (including certain strategic growth projects and deferred maintenance on infrastructure assets) and build a liquidity cushion to stabilize the Commonwealth's liquidity position. The Proposed PROMESA Fiscal Plan calls for public-private partnerships to be leveraged in order to improve operations, boost private sector participation and help fund capital expenditures.

*Protection of Certain Vulnerable Stakeholders*

The Proposed PROMESA Fiscal Plan asserts that shocks to Puerto Rico's most vulnerable constituencies, including elderly, young, disabled and low-income residents, are likely to have a higher negative multiplier effect on the island's already weak economy.

In particular, the Proposed PROMESA Fiscal Plan highlights that nearly half the island's population lives in poverty and relies on a public healthcare system overburdened by inequitable treatment under U.S. healthcare laws. The Proposed PROMESA Fiscal Plan thus opposes cuts to the public health care system, even in the face of reductions in transfers from the U.S. federal government. In light of the underperformance of local schools, and crime rates that remain higher than in the U.S. states, the plan affirmatively seeks to protect education and public safety expenditures.

The Proposed PROMESA Fiscal Plan also does not contemplate cuts to core pension benefits of retirees and instead budgets required additional contributions to the Retirement Systems, in order to ensure adequate funding of pension payments when due. Furthermore, the Proposed PROMESA Fiscal Plan includes a measure that prospectively separates portions of the Employee Retirement System's defined benefit and defined contribution plans to protect certain future proprietary member contributions from potential insolvency and ensure that the defined contribution plan's unfunded liability does not grow as rapidly in the future.

The Proposed PROMESA Fiscal Plan also seeks to protect credit union depositors, who are generally low-income, as well as the cooperative banking system in general, subject to recapitalization plans and effective governance reforms. It is estimated that the cost of such

protection could be approximately $1.2 billion (which could vary depending on the terms of any debt restructuring), a cost that is _not_ included in the Proposed PROMESA Fiscal Plan's long-term projections.

*Debt Restructuring*

The Proposed PROMESA Fiscal Plan underscores that without a substantial debt restructuring resulting in a sustainable debt burden, Puerto Rico's growth potential will continue to be hindered by the fear of future defaults, lower public and private investment and further outmigration. While the Proposed PROMESA Fiscal Plan does not include a specific debt restructuring proposal, it does establish that the sustainability of the debt burden must rely on objective criteria and realistic growth and fiscal assumptions. Furthermore, the Proposed PROMESA Fiscal Plan states that the debt restructuring must provide the Commonwealth with sufficient breathing space to guarantee the provision of essential services, to implement smart, pro-growth fiscal and economic policies and to invest in its economy.

The Proposed PROMESA Fiscal Plan also affirms that the restructuring plan must offer a holistic solution for the Commonwealth's tax-supported debt burden, as such debt is all ultimately reliant on the same Commonwealth economy. As such, the Proposed PROMESA Fiscal Plan warns that individual restructurings would be extremely challenging given the interrelatedness of holders, insurers and sources of credit support. Accordingly, the Proposed PROMESA Fiscal Plan includes the tax-supported central government agencies and component units, including those identified by the Oversight Board for inclusion in the Proposed PROMESA Fiscal Plan.

Finally, Proposed PROMESA Fiscal Plan states that the debt proposal must include restrictions on the issuance of new indebtedness, including limitations on the aggregate amount of tax-supported debt, and must account for the impact on local holders.

For more information regarding the Commonwealth's Proposed PROMESA Fiscal Plan, please refer to the Commonwealth of Puerto Rico Fiscal Plan for the Fiscal Oversight and Management Board, dated October 14, 2016, which is available on GDB's website at www.gdbpr.com.

## Oversight Board's Request for a Revised Fiscal Plan

In a meeting held on November 18, 2016, the Oversight Board discussed the Proposed PROMESA Fiscal Plan, rejected the initial version of such plan, established a set of guiding principles for evaluating the Commonwealth's fiscal plan and requested that the Commonwealth submit a revised fiscal plan that complies with such principles. The principles are outlined in a letter sent to the Governor by the Chairman of the Oversight Board dated November 23, 2016. The guiding principles established by the Oversight Board include that the fiscal plan must (i) assume no additional federal support beyond that which is already established by law (including no Affordable Care Act support extension) (ii) assume no replacement of the revenue produced by the special temporary excise tax imposed by Act 154 and (iii) include an appropriate mix of structural reforms, fiscal adjustment and debt restructuring. The Oversight Board also requested that the revised plan include a debt restructuring proposal and a debt sustainability analysis, and that the plan's revised baseline forecast reflect pay-as-you-go funding for pension benefits and account for the segregation of current employee contributions beginning no later than 2018. The

Oversight Board also demanded that the plan meet PROMESA's statutory criteria and lead to the termination of the Oversight Board's mandate within 10 years. The Oversight Board stressed that any plan must be accompanied by operational plans that detail how the initiatives set forth in the plan will be implemented. Finally, the Oversight Board established a timeline for the certification of a fiscal plan that includes several meetings and working sessions, requested the submission of a revised fiscal plan by December 15, 2016 and established January 31, 2017 as the target date for the certification of a fiscal plan.

The Governor formally responded to the Oversight Board's request for a revised fiscal plan in a letter dated November 29, 2016. In said letter, the Governor stressed that, without federal action related to the creditability of the Act 154 excise tax and without federal healthcare funding, the Commonwealth will not have enough resources to service any debt and will continue to suffer economic contraction. The Governor stated that he is willing to collaborate with the Oversight Board and the Governor elect, that his team is ready to assist the Oversight Board in modeling several scenarios consistent with the principles established by the Oversight Board, and recognized the importance of the certification of a fiscal plan.

As of the date of this Report, the Commonwealth continues to work closely with the Oversight Board in modeling revised projections to form the basis of a revised fiscal plan but the Governor has not yet submitted a revised fiscal plan to the Oversight Board. The Commonwealth expects such revised projections to reflect a significant increase in the Commonwealth's projected Financing Gap during the next ten years (from the $58.7 billion Financing Gap estimated in the Baseline Projection of the Proposed PROMESA Fiscal Plan), due primarily to changes in the economic assumptions of the revised projections.

**Recent Defaults on Required Debt Service Payments or Deposits**

As a result of the Commonwealth's fiscal crisis, the Commonwealth and certain of its public corporations have failed to make certain debt service payments or required deposits to bond debt service and/or reserve accounts. The following entities have not made payment of principal and/or interest in full on their respective outstanding bonds or notes as of the date hereof: the Commonwealth (since July 1, 2016, with respect to scheduled debt service payments on its General Obligation bonds); Public Buildings Authority (since July 1, 2016, with respect to scheduled debt service payments on bonds payable from lease payments and guaranteed by the Commonwealth's full faith and credit (other than PBA's Series L bonds)); PRIFA (since January 1, 2016, with respect to scheduled debt service payments on bonds payable from the federal rum excise tax; since August 1, 2016, with respect to scheduled debt service payments on bonds payable from a petroleum products excise tax and guaranteed by the Commonwealth's full faith and credit); GDB (since May 1, 2016, with respect to principal payments on its unsecured senior notes; since August 1, 2016, with respect to related interest payments); HTA (since July 1, 2016, with respect to scheduled debt service payments on certain subordinated revenue bonds issued under its 1998 Resolution); and Public Finance Corporation (since August 1, 2015 with respect to scheduled debt service payments on bonds payable from budgetary appropriations). MBA has also failed to make payments since December 2015 on a private bank loan payable from the cigarette excise tax.

The following table lists debt service payments missed during fiscal years 2016 and 2017 (up to September 30, 2016).

34

Total Bonded Debt Service Payments Missed Through September 30, 2016[1]

| | |
|---|---|
| GO | $782 |
| GDB[2] | 398 |
| PBA | 25 |
| PFC | 145 |
| PRIFA[3] | 134 |
| HTA[4] | 4 |
| Total | $1,489 |

(1) Excludes PRASA Rural Development Bonds (which reached a forbearance agreement ahead of the debt service payment due July 1, 2016), GSA, and GO Notes (line of credit from GDB to Treasury whose debt service on July 1, 2016 was not paid). Amounts missed represent amounts not paid by the Commonwealth and have not been reduced by amounts paid by insurers, where applicable. Amounts shown net of subsidies and sequestration, where applicable.
(2) Includes GDB bonds that are Commonwealth guaranteed. Does not include the $40 million principal payment due on May 1, 2016 that was deferred to May 1, 2017.
(3) Includes PRIFA Rum bonds and PRIFA BANs.
(4) Includes subordinated Series 1998 bonds issued under the 1998 Resolution.

Although certain other governmental entities have not made scheduled deposits of funds required under the governing bond documentation, debt service payments on their bonds have so far been made in full by the respective trustee from funds on deposit in debt service set aside or reserve accounts. These entities include: ERS (making payments from its debt service reserves since October 1, 2016); HTA (making payments from debt service reserves on its 1968 and 1998 Resolution revenue bonds (except certain subordinated revenue bonds issued under its 1998 Resolution) since July 1, 2016); PRCCDA (making payments from its debt service reserves since July 1, 2016); PRIDCO (making payments from its debt service reserves since August 1, 2016); PRIFA (making payments on its ASSMCA bonds from its debt service reserves since October 1, 2016); and UPR (making payments from its debt service reserves since December 1, 2016). Each of these entities is subject to Executive Orders issued under the Moratorium Act, which are described below. For additional information on remaining balances on debt service funds and debt service reserve funds by issuer, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

In addition, PREPA and PRASA have entered into forbearance agreements with certain of their respective creditors. The Commonwealth and most of its public corporations are currently in default with respect to scheduled debt service on their loans from GDB.

For more information regarding these matters, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES below.

**Restructuring Negotiations and Proposals**

During fiscal year 2016, Commonwealth representatives and its advisors presented various proposals to bondholders and bond insurers seeking to reach an agreement for a voluntary restructuring of the debt of the Commonwealth and that of its public corporations

included in the FEGP.

The Commonwealth's initial proposal, made public on February 1, 2016, sought to exchange $49.2 billion of tax-supported debt into $26.5 billion of mandatorily payable bonds and $22.7 billion in variable payment bonds (payable only in the event the Commonwealth outperformed certain revenue projections). The proposal contemplated no interest payments until fiscal year 2018, no principal payments until fiscal year 2021, maximum annual debt service of $1.7 billion starting fiscal year 2021 and a final maturity in fiscal year 2051.

The most recent proposal from the Commonwealth, made public on June 21, 2016, provided an incremental $52.7 billion of mandatorily payable debt service to creditors as compared to the Commonwealth's February 1, 2016 offer. The proposal continued to contemplate cash flow relief during the first four years but increased cash interest payments during such period and added a non-cash interest portion (payable-in-kind). Maximum annual debt service was set at $2.05 billion starting in fiscal year 2031, with a final maturity in fiscal year 2071.

The Commonwealth's proposals sought to ensure that debt service would never exceed 15% of projected consolidated revenues (as defined in the public presentation explaining the proposal) for the Commonwealth and its tax supported instrumentalities. However, all such proposals were predicated upon a number of key assumptions (many of which are not under the control of the Commonwealth), including (i) a 100% participation rate, (ii) Congress continuing the current level of health care funding provided to Puerto Rico under the Affordable Care Act, (iii) the Commonwealth extending the Act 154 excise tax and the IRS continuing to allow such tax to be creditable against U.S. federal income taxes (along with no further erosion of the Act 154 tax base), (iv) the implementation of all the measures contemplated by the FEGP and (v) the Commonwealth achieving a 2% nominal growth rate.

A summary of the proposals presented by the Commonwealth and counter proposals presented by groups of bondholders may be accessed on GDB's website at www.gdbpr.com.

**Emergency Moratorium and Financial Rehabilitation Act**

In light of the Commonwealth's lack of success in negotiating consensual debt restructuring with its creditors, prior to material debt service payment coming due toward the end of fiscal year 2016, on April 6, 2016, the Governor signed the Moratorium Act into law. The Moratorium Act authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. The provisions of the Moratorium Act expire on January 31, 2017, subject to a two-month extension that may be implemented by the Governor.

Pursuant to the Moratorium Act, the Governor has the power to declare, by executive order, an emergency period with respect to the Commonwealth or any other government entity. If so provided in the executive order, payments on covered obligations are suspended during the emergency period, and covered obligations will be due on the last day of the covered period to the extent they are otherwise due before or during the covered period. As discussed below, the Governor has issued several executive orders under the Moratorium Act.

36

During the emergency period for the Commonwealth or any other government entity, legal actions in respect of covered obligations are stayed, and the Governor may take any and all actions that are reasonable and necessary to preserve the Commonwealth's ability to continue providing essential public services, or necessary to provide for the health, safety and welfare of the residents of the Commonwealth. These actions include the ability to expropriate property in a constitutionally permitted manner through eminent domain. During an emergency period for GDB, the Governor may take any and all actions reasonable and necessary to allow GDB to continue performing its operations, including easing restrictions on deposit reserves, suspending payments on letters of credit and extending credit, prohibiting disbursements of loans, and limiting the withdrawal of funds to those necessary to provide for essential services.

The Moratorium Act contemplates that covered obligations subject to a moratorium may, to the extent provided by the Governor in the relevant executive order, be paid interest or accrue interest during the covered period at a rate determined in accordance with the Act. Under certain circumstances, the Moratorium Act provides additional limited protection to creditors that have a legitimate security or property interest with respect to any delayed debt service payment.

The Moratorium Act also created FAFAA to assume GDB's role as fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities, and municipalities.

**Executive Action Taken Under the Moratorium Act**

Since the enactment of the Moratorium Act, the Governor has adopted several executive orders pursuant thereto declaring an emergency period and moratorium with respect to certain debt obligations of the Commonwealth, PBA, GDB, HTA, PRIFA and PRCCDA. As a result, such entities have failed to make certain debt service payments or have done so with moneys on deposit with the trustees of their bonds. As further discussed below, the Governor has also suspended the obligation of certain government entities to transfer the funds that are used to pay certain debt obligations. Specifically, the Governor has issued the following executive orders under the Moratorium Act:

*1. Executive Order 2016-10, issued on April 8, 2016.*

Pursuant to Executive Order 10, the Governor declared GDB to be in a state of emergency. In accordance with the emergency powers provided in the Moratorium Act, Executive Order 10 implemented a regulatory framework governing GDB's operations and liquidity, including prohibiting loan disbursements and establishing a procedure with respect to governmental withdrawals, payments, and transfer requests in respect of funds held on deposit at GDB. To that effect, Executive Order 10 restricted the withdrawal, payment and transfer of funds held on deposit at GDB to those reasonable and necessary to ensure the provision of essential services and authorized GDB to establish weekly limits on the aggregate amount of such disbursements. Executive Order 10 also suspended GDB's legal reserve requirement.

The procedures implemented by Executive Order 10 have significantly restricted the ability of the Commonwealth and its instrumentalities to withdraw funds held on deposit at GDB. On April 1, 2016, the Commonwealth began depositing its revenues in accounts outside of GDB. However, as of September 30, 2016, the Treasury Department still had approximately $590 million (consisting of $251 million in operating accounts, $143 million of "clawback" funds retained pursuant Article VI, Section 8 of the Constitution of the Commonwealth, and

$196 million in restricted deposits) in funds deposited at GDB, subject to the limitations on withdrawals of funds. Such amounts do not include the funds held on deposit at GDB by the Commonwealth's public corporations and instrumentalities.

    *2. Executive Order 2016-14, issued on April 30, 2016*

    Executive Order 14 declared a payment moratorium with respect to certain obligations of GDB, including notes, bonds and letters of credit issued or guaranteed by GDB. Executive Order 14 also declared an emergency period with respect PRIFA's Revenue Bonds (Ports Authority Project), Series 2011 B, which are secured by a letter of credit issued by GDB.

    *3. Executive Order 2016-18, issued on May 17, 2016*

    Executive Order 18 declared an emergency period with respect to HTA and suspended HTA's obligation to transfer toll revenues to the trustee of its bonds until June 30, 2016 (this extension was later extended pursuant to Executive Order 31, discussed below).

    *4. Executive Order 2016-27, issued on June 24, 2016*

    Executive Order 27 declared the PRIFA Dedicated Tax Fund Revenue Bond Anticipation Notes, Series 2015 (the "**PRIFA BANs**"), which are guaranteed by the Commonwealth, covered obligations of PRIFA and suspended all obligations to transfer money to and from PRIFA in respect of the PRIFA BANs.

    *5. Executive Order 2016-30, issued on June 30, 2016*

    Executive Order 30 declared the Commonwealth to be in a state of emergency and declared a moratorium on the Commonwealth's obligation to make payments on bonds and notes issued or guaranteed by the Commonwealth. Executive Order 30 also declared an emergency period with respect to MBA and PBA, and suspended certain obligations of the Commonwealth to transfer moneys to such entities. The executive order also suspended any obligation of OMB to include an appropriation in the proposed budget submitted to the Legislative Assembly for the payment of bonds issued by PFC. Finally, Executive Order 30 suspended the payment of certain bonds and notes issued by PRIFA, HTA, and PBA.

    *6. Executive Order 2016-31, issued on June 30, 2016*

    Executive Order 31 declared an emergency period with respect to PRCCDA, ERS, PRIDCO, UPR, and PFC.  It also suspended certain obligations to transfer money to and from such entities and from the Puerto Rico Tourism Company to GDB.

    Finally, Executive Order 31 also suspended certain transfers of funds to and from HTA, including the transfer of toll revenues from HTA to the trustee of its bonds.

    Pursuant to the Executive Orders discussed above and in order to continue providing essential government services, from July 1, 2016 to November 30, 2016, the Commonwealth had retained and deposited in the TSA the following revenues that would have otherwise been

transferred to the public corporations set forth below for the payment of their respective debt obligations:

| Related Debt | Revenues Subject to Retention | Retained Revenues (in thousands) |
|---|---|---|
| **HTA Bonds (Resolution 68 and 98)** | Petroleum products (up to the first $10 million per month), gas and diesel oil excise taxes, and the first $15 of motor vehicle licenses fees | $132,757 |
| **PRIFA Bans** | $6.25 of the petroleum products excise tax | 63,545 |
| **MBA Line of Credit** | Cigarette excise tax (up to $800 thousands per month) | 4,000 |
| | **Total** | $200,302 |

From July 1, 2016 to November 30, 2016, the Commonwealth also retained approximately $103 million corresponding to rum excise tax revenues that would have otherwise been transferred to PRIFA for the payment of its Special Tax Revenue Bonds, pursuant to Executive Order 30 and consistent with the Commonwealth's budget for fiscal year 2017, which does not include an appropriation for the payment of such bonds. Such funds have been used by the Commonwealth to fund its intra-year cash flow needs.

In addition, pursuant to the Executive Orders discussed above, the government entities set forth below have retained the following types of revenues that would have otherwise been transferred to the trustees of their respective bonds and have either segregated such funds or used them in connection with their operations, depending on their respective financial situations:

| Government Entity | Revenues subject to retention |
|---|---|
| **ERS** | Employer contributions |
| **PRPA (PRIFA Ports Authority Bonds)** | Airport and port fees |
| **UPR** | Tuition fees |
| **Tourism Company (PRCCDA Bonds)** | Hotel room tax |
| **PRIDCO** | Rental revenue |
| **HTA** | Toll revenues |

The validity of the Moratorium Act and the actions taken by the Governor thereunder are being challenged in a number of lawsuits filed by bondholders. These legal challenges are described in "Litigation Related to the Commonwealth Debt" under LITIGATION.

**Puerto Rico Oversight, Management, and Economic Stability Act (PROMESA)**

On June 30, 2016, President Obama signed PROMESA into law. In general terms, PROMESA seeks to provide the Commonwealth with fiscal and economic discipline through the creation of an oversight board (the "**Oversight Board**"), relief from creditor lawsuits through the enactment of a temporary stay on litigation, and two alternative methods to adjust unsustainable debt. PROMESA also includes other miscellaneous provisions, including relief from certain wage and hour laws and regulations and provisions for identification and expedited permitting of critical infrastructure projects.

The Oversight Board has plenary authority over Puerto Rico's finances. The board's primary function is to provide fiscal oversight through the development and approval of fiscal plans and budgets, and to enforce compliance with those plans and budgets through broad-based powers such as reducing non-debt expenditures and instituting hiring freezes.

The provisions of PROMESA are described in more detail in PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

**Fiscal Sustainability Act**

One important measure that the Commonwealth had taken in its attempt to address Puerto Rico's fiscal condition was the enactment on June 17, 2014 of the Fiscal Sustainability Act, which will remain in effect until June 30, 2017.

The principal corrective measures adopted by the Fiscal Sustainability Act were: (i) the freezing of benefits under collective bargaining agreements and the reduction of certain non-salary compensation; (ii) the contribution of the savings generated by certain public corporations to support certain General Fund expenditures; (iii) the freezing of formula appropriation increases to the UPR and the municipalities; (iv) the freezing and reduction of formula appropriations to the Judicial Branch, the Legislative Assembly and certain other entities; (v) the reduction in school transportation costs; (vi) the reduction of rates for professional and purchased services; (vii) the freezing of water rates applicable to governmental entities imposed by the Aqueduct and Sewer Authority; and (viii) the implementation of a payment plan system for legal judgments, among others. In addition, the Fiscal Sustainability Act imposes substantial additional managerial and administrative controls on the operations of the Executive Branch, including hiring and contracting requirements and procedures, savings targets for rent and utilities, fines to public employees for unauthorized transactions, and overall strengthening of oversight by the OMB.

The Proposed PROMESA Fiscal Plan proposes to extend certain portions of the Fiscal Sustainability Act until June 30, 2021. If such extension is not enacted, the Commonwealth will experience significant expenditure increases.

**Bondholder and Insurer Litigation**

As a result of the extraordinary liquidity measures taken by the Commonwealth over the course of fiscal year 2016, principally the implementation of the clawback in December 2015

40

and the enactment of the Moratorium Act in April 2016, several groups of bondholders and individual bondholders have separately brought legal actions against the Commonwealth, individual government entities, and/or certain of the Commonwealth officers challenging these actions. These actions are discussed below in "Litigation Related to the Commonwealth Debt" under LITIGATION.

In addition, bondholders have challenged the applicability of the stay under PROMESA to their lawsuits against the Commonwealth entities.

**Highlights of the Commonwealth Economy and Demographics**

The Commonwealth faces a number of economic and demographic challenges that adversely impact its ability to successfully address its fiscal condition. These challenges are highlighted below. For a more detailed discussion of the Commonwealth's economy, see THE ECONOMY.

**Decline in GNP.** The Commonwealth's gross national product (GNP) contracted (in real terms) every fiscal year between 2007 and 2015, with the exception of a slight increase for fiscal year 2012. According to the Puerto Rico Planning Board, GNP is projected to decrease 1.8% and 2.3% in fiscal years 2016 and 2017.

**Decline in Economic Activity Index**. The Economic Activity Index is an indicator of general economic activity, not a direct measurement of real GNP. The September 2016 figure for the EAI was 124.5, a 0.5% reduction compared to September 2015, and an increase of 0.2% compared to August 2016. On a year-to-date basis (July to September 2016), the decline was of 1.0% with respect to the same period of the previous fiscal year.

**Decline in Population.** According to U.S. Census Bureau population estimates, released in June 2016, the population of Puerto Rico, on a midyear basis, has decreased from 3,721,526 in 2010 to 3,474,182 in 2015, as residents migrate to the continental United States in search for employment opportunities and better living conditions. On the other hand, the population growth rate for Puerto Rico derived from the International Database of the U.S. Census Bureau, showed a decline of 0.5%, or a level of 3,456,811 residents, at midyear 2016.

**Other Demographic Data.** For 2014, there were 9.76 births per 1,000 inhabitants compared to 12.5 births per 1,000 inhabitants for the same year in the mainland United States. Moreover, median age in Puerto Rico has been increasing consistently, from 37 years in 2010 to 40 years in 2015. For the U.S., median age was 37.2 years in 2010, and 37.8 in 2015.

**Employment.** As of June 30, 2016, the labor participation rate was 40.3% and the unemployment rate was 11.7%.

**Public School Students.** The total population of students attending elementary, middle school and high school has decreased from 473,735 during the 2010-11 school year to 365,181 during the 2016-17 school year. The total population of students attending public high school has decreased from 97,202 during the 2010-11 school year to 84,491 during the 2016-2017 school year.

**Poverty Level.** During 2015, 46% of the residents of Puerto Rico were below the federal poverty level.

**Participation in Public Health Insurance.** Approximately 1.6 million residents of Puerto Rico, or 46% of the population, participate in the government health insurance program. For fiscal year 2017, the cost of this program is expected to be $2.7 billion, of which $1.6 billion or 59.78% of total insurance cost comes from federal government ACA funds. The balance of the cost, is paid by a mix of local funds as follows: legislative appropriation of $885 million, or approximately 10% of the general fund budget for fiscal year 2017, $184 million from rebates and $200 million from Municipal contributions. The federal funds related to ACA funds, unless reenacted, would be depleted between December 2017 and February 2018.

## Extraordinary Legislative Session

On November 16, 2016, the Governor called an extraordinary legislative session for the consideration of 103 bills and 88 appointments. The extraordinary legislative session began on November 17, 2016 and ended on December 7, 2016. The Legislative Assembly approved 33 bills in the extraordinary legislative session, which are in the process of being sent to the Governor for his signature. As of the date of this Report, the Governor has not confirmed whether he will call a second extraordinary session for the consideration of the measures that were not approved during the first extraordinary session. Several of the measures that were not approved during the first extraordinary session and that could be considered in a second extraordinary session are discussed in the following paragraphs.

One of such measures, House Bill 3003, would require that, beginning in fiscal year 2018, appropriations to the Special Revenue Funds, transfers for specific purposes, and other appropriations previously included in other laws be included in the Commonwealth's General Fund budget. Such measure would also require the closing of all bank accounts of entities with independent treasuries and would mandate that such accounts be administered by the Treasury Department. The Judicial Branch, the Legislative Branch, the Registry of the Property, the Government Ethics Office, the Puerto Rico Federal Affairs Administration, PRHIA, PRMSA, PBA, and all public corporations that do not depend on the General Fund for their operations would be excluded from such requirement. A related measure, House Bill 3004, would establish a mechanism for the Office of Management and Budget to oversee the use of funds appropriated to not-for-profit organizations.

Proposed House Bill 2857 would also amend ERS's enabling act to authorize the creation of a new entity to originate personal loans to ERS participants, buy loans originated by ERS to its participants and issue debt secured by such loans.

Another measure, House Bill 2924, seeks to amend TRS's enabling act, as amended pursuant to Act No. 160-2013, to make certain modifications to reflect the Puerto Rico Supreme Court's decision in AMPR v. Sistema de Retiro para Maestros et als, 190 D.R.E. 854 (2014), which declared certain provisions of Act No. 160-2013 unconstitutional. Consistent with the Puerto Rico Supreme Court's decision in such case, the bill provides that teachers who were participants of the system prior to the enactment of Act No. 160-2013 will not be subject to the changes to core pension benefits imposed by such act.

42

Pursuant to Section 204(a) of PROMESA, the Governor is required to submit to the Oversight Board all laws enacted by the Commonwealth within seven days of their enactment, along with an estimate of the impact, if any, that the law will have on expenditures and revenues and a determination as to whether the law is consistent with the Commonwealth's fiscal plan. The Commonwealth has stated that it intends to comply with Section 204(a) of PROMESA.

The counsel to the Oversight Board sent a letter to the Governor dated December 9, 2016 indicating that the Oversight Board understands that various proposed laws are under consideration, confirming that the Oversight Board will not pursue any legislation that is inconsistent with PROMESA, and reserving all its rights under Section 108(a)(2) of PROMESA to review any statute that would impair or defeat the purposes of PROMESA.

## RISK FACTORS

*The following discussion of risk factors does not necessarily reflect the relative importance of various factors and is not meant to be a complete list of risks that could materially adversely affect the Commonwealth's financial and economic condition, liquidity, and operations. Additional risks and uncertainties not currently known by the Commonwealth, or that the Commonwealth does not currently consider to be material, or that are generally applicable to all states and governmental instrumentalities, also may materially and adversely affect the financial and economic condition of the Commonwealth, its liquidity and its ability to repay its bonds and honor its other obligations. Moreover, while some of the risks described below may also affect the Commonwealth's instrumentalities, this Report does not, and is not intended to, identify all the risks associated with each instrumentality. Any one or more of the factors discussed herein, and other factors not described herein, could lead to a decrease in the market value and the liquidity of the Commonwealth's bonds. There can be no assurance that other risk factors not discussed below will not become material in the future.*

*References to "bonds" in this section mean the Commonwealth's general obligation bonds and bonds guaranteed by the good faith, credit and taxing power of the Commonwealth, and do not include bonds issued by any of the Commonwealth's instrumentalities (except Commonwealth guaranteed bonds). Some of the risks discussed below, however, also affect bonds issued by Commonwealth instrumentalities, including bonds payable from Commonwealth appropriations or tax revenues assigned by the Commonwealth to such instrumentalities for the repayment of their bonds.*

## Risks Related to the Enactment of PROMESA

***The Commonwealth may be unable to address its fiscal and economic challenges expeditiously because certain requirements and provisions of PROMESA have not been previously judicially interpreted or tested.***

PROMESA is an unprecedented and complicated statute that was the result of bi-partisan efforts to address the challenging financial and fiscal situation of the Commonwealth and its instrumentalities within the context of its unique relationship with the United States. PROMESA contains many provisions that, although similar to the provisions of Chapter 9 or other chapters of the United States Bankruptcy Code, are not identical and may not be interpreted in the same manner. Even in the case of the provisions of Chapter 9 that are expressly incorporated into PROMESA, there is no guaranty that a court will apply such provisions in the same manner

under PROMESA. PROMESA also includes many provisions that are not contained in the United States Bankruptcy Code and have not been previously interpreted by the courts. Accordingly, the implementation of various provisions of PROMESA, including the debt adjustment provisions included in Titles III and VI, may be delayed as these novel issues are initially resolved and then appealed.

In addition to such delay, the resolution of such issues may adversely affect the Commonwealth to the extent (i) these issues are resolved in a manner that is burdensome to the Commonwealth's efforts to address its fiscal and financial challenges or that makes the provisions of PROMESA less effective to address the Commonwealth's challenges, and (ii) human and financial resources are diverted to address these legal challenges.

Finally, PROMESA's validity may be challenged as a result of its unprecedented nature. The statute has the potential to significantly affect the rights of numerous stakeholders. As a result, stakeholders may challenge PROMESA on federal constitutional grounds. There is no assurance that such a challenge would be resolved expeditiously or in a manner advantageous for the Commonwealth.

The uncertainty of these matters and resulting challenges may delay the Oversight Board's ability to effectively deal with the Commonwealth's financial and fiscal challenges and, thus, temporarily lead to a further deterioration of the Commonwealth's economy. For more detailed information about PROMESA, see PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT.

***Creditors may be unable to exercise remedies in the near future because PROMESA imposes an automatic stay on the exercise of remedies against the Commonwealth and its instrumentalities for failure to pay a debt obligation or for a breach of any covenant in such debt obligation.***

Section 405 of PROMESA imposes a stay on creditor remedies for the failure by the Commonwealth or its instrumentalities to make payments on their debt or for the breach by the Commonwealth or any of its instrumentalities of any obligation under such debt. The stay is effective from July 1, 2016 to February 15, 2017, subject to being extended for a limited period of time under certain conditions. During this period, bondholders and other creditors of the Commonwealth and its instrumentalities will be unable to seek payment or exercise their remedies against them, unless otherwise authorized to do so by the U.S. District Court for the District of Puerto Rico. Moreover, Title III provides for a stay similar in scope and duration to the stay provided for by Chapter 9 of the United States Bankruptcy Code. This means that the stay provided for by Title III applies to any and all actions against a debtor thereunder, not just actions related to a debt liability as in the case of Section 405, and its duration is not limited because it applies while the debtor is subject to the provisions of Title III. As a result, bondholders and other creditors may be adversely affected to the extent they will be unable to seek payment or exercise remedies against a government entity subject to Title III of PROMESA for an indefinite period of time. Moreover, to the extent a Title III proceeding is not resolved quickly, creditor recoveries may decrease as a result of the performance of the Puerto Rico economy in light of the uncertainty created by the Title III proceeding.

***Certain creditors may be able to enforce remedies against the Commonwealth or its instrumentalities notwithstanding the existence of the stay imposed by PROMESA and such***

*enforcement may adversely affect the Commonwealth and its creditors, including by disrupting the Commonwealth's ability to continue providing essential services to its residents.*

The Commonwealth and certain of its instrumentalities are currently defendants in various cases that challenge the constitutionality of the Moratorium Act and the executive orders adopted thereunder and seek to lift the stay imposed by PROMESA or to prohibit the use of funds previously assigned to certain public corporations to cover essential services. Similar to bankruptcy proceedings under Chapter 9 of the United States Bankruptcy Code, under particular circumstances, certain creditors may be able to obtain a judicial ruling lifting the application of the stay imposed by PROMESA. Furthermore, creditor groups may be successful in arguing that certain types of claims, including claims for violations of restrictions imposed by PROMESA, are not covered by the stay imposed by the federal legislation.

To date, the provisions of the Moratorium Act and the executive orders adopted thereunder have allowed the Commonwealth to continue providing essential services by allowing the Commonwealth to retain funds assigned to certain public corporations and temporarily suspending its obligation to pay debt service. The Commonwealth has also been able to continue operating through the protection from legal actions provided by the PROMESA imposed stay.

To the extent creditors prevail in their actions, the Commonwealth could have to redirect its limited resources to the continued defense of these actions, to redress creditor damage claims, or to pay debt service, and may be prohibited from using available resources for the payment of essential services, to the extent such use is deemed to violate the PROMESA transfer prohibitions. As a result, the Commonwealth may face a shortage of liquidity that would disrupt its ability to continue providing essential services until such time as the stay or the moratorium are reinstated or it is permitted to use available resources to cover expenses for essential services.

Other creditors and stakeholders of the Commonwealth may also be adversely affected to the extent the Commonwealth is unable to equitably allocate its resources among them. The Commonwealth's inability to continue providing essential services to its citizens may also adversely affect creditors, as the further deepening of the current economic recession will curtail the Commonwealth's ability to collect the revenues required to meet its contractual obligations and provide essential services.

***The stay imposed by PROMESA may not provide the Oversight Board, the Commonwealth or its instrumentalities sufficient time to effectively manage the financial and fiscal challenges faced by the Commonwealth and its instrumentalities.***

The stay imposed by PROMESA is effective from July 1, 2016 to February 15, 2017, subject to being extended for a limited period of time under certain conditions. The period ending February 15, 2017 may not be sufficient for the Commonwealth to finalize negotiations with creditors pursuant to Title VI of PROMESA or for the Oversight Board to make an informed determination as to whether the Commonwealth or any of its instrumentalities should be subject to a restructuring pursuant to the provisions of Title III of PROMESA. In order to be able to commence a proceeding under Title III certain prerequisites need to be satisfied, including the issuance of a restructuring certification by the Oversight Board after it has determined, among other things, that the entity has made good faith efforts to reach a consensual restructuring with its creditors, has adopted procedures to deliver timely audited financial statements and has adopted a fiscal plan certified by the Oversight Board. The provisions of

Title III of PROMESA also impose a stay once the Oversight Board has made the determination that a governmental entity will be subject to a proceeding under Title III. As a result, the Commonwealth and its instrumentalities may be subject to creditor claims and challenges to the extent there is any gap between the termination of the stay imposed by Section 405 of PROMESA and the commencement of a stay pursuant to Title III of PROMESA. To the extent that any such gap exists, the Commonwealth and its instrumentalities may be required to allocate their resources in a manner that disproportionately favors one creditor class over another or undermines the Commonwealth's ability to continue providing essential services to its population.

*The application of PROMESA may result in a reduction of interest or principal due on bonds issued by the Commonwealth and its instrumentalities.*

Holders of bonds issued by the Commonwealth and its instrumentalities may be subject to voluntary or involuntary haircuts of interest or principal or both on their bonds as a result of one of the two methods to restructure Puerto Rico's debts contained in PROMESA. The first method is a streamlined process to achieve modifications of financial indebtedness with the consent of a supermajority of affected financial creditors. This method has benefits such as potential speed relative to a traditional restructuring through a formal in-court process. Assuming this method fails to achieve the necessary results, PROMESA provides for a court-supervised debt-adjustment process modeled on Chapter 9 of the U.S. Bankruptcy Code. Both processes include provisions through which dissenting creditors can be forced to accept the decision of a supermajority, in the case of Title VI of PROMESA, or possibly the decision of a minority or separate class of creditors through the inclusion of the so-called "cram-down" power, in the case of Title III of PROMESA. If a successful Title VI or Title III proceeding were achieved, it could result in significant reductions in principal and interest on debt of the Commonwealth and its instrumentalities, which would also be binding on dissenting creditors, in accordance with the terms of PROMESA.

*Delays in the designation of the Oversight Board's staff and the time it may take the Oversight Board to become fully operational and delays in the certification of a fiscal plan may delay the commencement of actions necessary to restore the Commonwealth to fiscal health and may lead to a further deterioration of the Commonwealth's fiscal condition.*

PROMESA creates an Oversight Board charged with providing the Commonwealth with fiscal and economic discipline and provides it with various tools to achieve its purposes, such as approval rights over the Commonwealth's establishment of a fiscal plan, its budget and new debt issuances, and the right to review and rescind certain laws or regulations, among other rights. Notwithstanding the designation of the Oversight Board's members, which took place on August 31, 2016, and the election of a chair of the Oversight Board, which took place on September 30, 2016, the time it may take the Oversight Board to hire an Executive Director and its staff, and the time it will take the members of the Oversight Board and its staff to become sufficiently acquainted with the Commonwealth's current fiscal, financial and economic situation may delay the Oversight Board's ability to begin making decisions necessary to address the Commonwealth's fiscal and economic crisis.

Delays in the designation of the Oversight Board's staff may also affect the Commonwealth's ability to finance its operations to the extent it cannot receive any required approvals for liability management transactions or the issuance of new debt.

As further discussed above, the Oversight Board rejected the initial version of the Proposed PROMESA Fiscal Plan and requested that the Governor present a revised fiscal plan by December 15, 2016 that complies with certain principles established by the Oversight Board. There is no assurance that the Oversight Board and the Governor will agree as to the required revisions or that the Governor will present a revised plan by the established deadline.

The uncertainty created by the lack of a fiscal plan approved by the Oversight Board and by the Oversight Board's right to review and rescind legislation may adversely affect the level of economic activity on the island during the initial months following the Oversight Board's establishment. Further, delays in the approval of a fiscal plan may delay the commencement of debt restructuring proceedings or other actions necessary to restore the Commonwealth to fiscal health and may lead to a further deterioration of the Commonwealth's fiscal condition and subject the Commonwealth to multiple creditor litigations once the stay imposed by PROMESA ends. See the Risk Factor titled *"The stay imposed by PROMESA may not provide the Oversight Board, the Commonwealth or its instrumentalities sufficient time to effectively manage the financial and fiscal challenges faced by the Commonwealth and its instrumentalities."*

**The Oversight Board may face delays in receiving information from the Commonwealth necessary to discharge its responsibilities.**

Although the Oversight Board has certain powers to compel the production of information by Commonwealth officials, it is uncertain whether the Commonwealth will be in a position to comply with all Oversight Board requests in a timely manner. The Oversight Board may also request information that may be unavailable at the level of detail or review requested or that may have to be manually generated or compiled because current Commonwealth systems do not provide for the automatic production of such information. To the extent the information is available, the complex nature of the Commonwealth's organizational and debt structure may delay any decisions by the Oversight Board until it fully understands the governmental structure and its interrelationships and is able to achieve consensus on a path forward to achieve fiscal stability and debt sustainability. Moreover, the change of administration resulting from the November 8 election may cause additional delays in the production of information as the new administration transitions into power, is able to hire sufficient personnel to operate effectively and assimilates the information required to make informed decisions.

**The mechanisms made available to the Commonwealth and its instrumentalities under PROMESA may not be sufficient to address the fiscal and financial challenges they face.**

PROMESA may not achieve its intended goals. The challenges faced by the Commonwealth and its instrumentalities are complicated and are a result of a myriad of economic, political, financial and fiscal problems that have persisted through many years. In order to address these challenges, major and fundamental changes will need to be implemented across many areas of the Commonwealth's governmental structure. In the end, these changes will have to be implemented by local government officials with the supervision of the Oversight Board established by PROMESA. As a result, whether or not PROMESA is successful will depend in part on the coordination and communication developed by the Oversight Board and local, elected officials ultimately responsible for implementing those changes. There is no assurance that the Oversight Board and local officials will agree on the priorities and changes that need to be implemented in order to restore Puerto Rico's fiscal and economic health. The change in administration resulting from the November 8 election may also cause delays in the

implementation of such changes. Moreover, to the extent there is any disagreement between the Oversight Board and local officials, PROMESA may not contain effective enforcement provisions in order to effectively ensure the implementation of the Oversight Board's decisions. Finally, any divergence of opinions between the Oversight Board and local officials may further exacerbate local instability and uncertainty, thereby affecting the ability of the Commonwealth and its instrumentalities to effectively address its financial and fiscal challenges.

PROMESA does not provide mechanisms for addressing those fiscal, financial and economic problems that are outside the purview of the Oversight Board. For example, federal funding levels for certain health and welfare programs that are critical for Puerto Rico, including the health reform, depend exclusively on actions taken by the United States Congress. The continued creditability by the Internal Revenue Service of the excise tax imposed by Act 154 also depends exclusively on actions taken by the Executive Branch of the United States government. Actions by Congress and the federal Executive Branch, which are outside the Commonwealth's or the Oversight Board's control, will thus significantly affect the Commonwealth's ability to address its fiscal and economic challenges.

***Puerto Rico's economy may be adversely affected by PROMESA to the extent that its economic and financial effects disproportionately fall on the Commonwealth government and its residents.***

Puerto Rico's economy may be adversely affected by expenditures cuts or revenue raising measures implemented as a result of PROMESA. An increase in the tax burden of Puerto Rico residents may exacerbate the population decline and economic recession currently experienced by the island. At the same time, additional austerity measures that further reduce governmental expenditures or services, including reductions in the government's workforce, may also increase the rate at which residents leave for the mainland and reduce the disposable income of residents of Puerto Rico. This decline may, in turn, lead to a decrease in economic activity that will affect the government's ability to collect revenues as projected.

Moreover, the restructuring provisions of PROMESA may lead to significant haircuts in principal and interest payments and payments due to beneficiaries of the Commonwealth's various pension systems. As a result of the Commonwealth's past tax and other incentive policies, Puerto Rico residents and entities may own a disproportionate amount of Puerto Rico debt either directly or indirectly through retirement accounts, mutual funds or retirement plans. In particular, numerous savings and loan cooperatives have high concentrations of debt issued by the Commonwealth and GDB. Thus, significant reductions in principal and interest payments or pension benefits under PROMESA may lead to an additional decrease in economic activity as a result of reductions in disposable income and the wealth and income levels of Puerto Rico residents. Any such reduction in principal and interest payments may also adversely affect the financial wherewithal and solvency of Puerto Rico entities and corporations, which may become unable to honor their obligations as a result of critical capital levels.

***Compliance with PROMESA and Oversight Board requirements may cause a significant increase in the expenditures of the Commonwealth and its instrumentalities.***

The activities of the Oversight Board established by PROMESA are likely to result in significant expenditure increases by the Commonwealth and its instrumentalities due to the cost

of its ongoing operations as well as additional costs that may be incurred by the Commonwealth and its instrumentalities to comply with PROMESA's requirements.

Section 107(b) of PROMESA provides that the Oversight Board shall use its powers with respect to the Commonwealth budget to ensure that sufficient funds are available to cover all the expenses of the board. The Oversight Board's responsibilities over the Commonwealth's finances, including its authority to review and approve fiscal plans and annual budgets, are likely to require significant expenditures in the form of permanent staff, overhead and specialized professional legal, accounting and financial services. The Congressional Budget Office estimates that the Oversight Board's administrative costs would amount to approximately $370 million from fiscal year 2017 to fiscal year 2022. In order to arrive at this estimate, the Congressional Budget Office examined the administrative costs — particularly for legal and financial expertise required to oversee procedures related to bankruptcy and debt restructuring — incurred by institutions involved in resolving financial crises faced by U.S. municipalities, including Detroit, Philadelphia, New York City and the District of Columbia.

The Oversight Board's power over the budget and finances of the Commonwealth and its instrumentalities (to the extent designated by the board as a "covered territorial instrumentality") may further increase the expenditures of such entities. For example, an entity that is required to prepare a five-year fiscal plan, submit its budget to the Oversight Board and restructure its debts through a Title III or VI proceeding may have to hire additional specialized staff and/or consultants or experts to comply with such requirements. Moreover, the Oversight Board recently required the Governor to provide weekly cash flow reports, monthly reports of bank account data, payroll, federal funds and debt obligations due during the fiscal year, monthly and year-to-date compliance reports and revenue and collection reports and quarterly reports on agency performance metrics and key economic statistics. Most, if not all, of these reports are not currently produced by the Commonwealth and will require the investment of additional resources in order to comply with the Oversight Board's requirements. As a result, compliance with the requirements of the Oversight Board and PROMESA may cause a significant increase in expenditures that may compete with the finite resources otherwise available to satisfy the claims of other Commonwealth stakeholders.

Finally, the Oversight Board's power to rescind or prevent the implementation of certain laws and overturn transfers may lead to revenue reductions or expenditure increases. The rescission or prevention of the implementation by the Oversight Board of any revenue raising measure may leave critical programs without sufficient resources to operate. Moreover, if the Oversight Board were to overturn transfers of funds, the affected entity may not have sufficient funds to honor its obligation to return the funds to the extent they have been spent. This could result in increasing expenditures that would affect the government's ability to provide essential services.

**Risks Related to the Commonwealth's Lack of Liquidity and High Level of Debt**

*The Commonwealth continues to face an immediate liquidity crisis notwithstanding emergency liquidity measures implemented to date, including the suspension of the payment of debt service on its general obligation and guaranteed debt on June 30, 2016. The Commonwealth's ability to meets its operating expenses during the current fiscal year may depend on the uniform and continued application of the stays imposed by the Moratorium Act and PROMESA until their expiration, its ability to execute additional emergency cash*

*management measures, and the extension of the stay period, either through the enactment of local or federal legislation or access to a PROMESA Title III proceeding.*

Notwithstanding the fiscal adjustment measures taken by the Commonwealth during the past years, the Commonwealth has faced, and continues to face, severe cash shortages due to, among other things, recurring deficiencies of revenues under expenditures, lack of market access, outdated accounting systems and the inability of GDB to continue serving as an emergency liquidity provider. See "Commonwealth Liquidity" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

As described in OVERVIEW OF THE COMMONWEALTH'S FINANCIAL CONDITION, during the past decade, the Commonwealth has experienced material deficits under both a U.S. GAAP and budgetary basis. The Commonwealth also expects to run a material deficit on a cash and accrual basis during fiscal year 2017. The continued buildup of payables to suppliers and taxpayers as a cash management measure to address deficits in prior fiscal years further strains the Commonwealth's liquidity and represents additional demands on the Commonwealth's cash resources that are not contemplated in the General Fund budget to the extent such accounts payable relate to prior fiscal years. Furthermore, General Fund revenues and expenditures may not accurately reflect the cash demands on the Commonwealth during the fiscal year due to the existence of deficits in Special Revenue Funds (that do not impact the General Fund) and the need to fund certain public corporations that provide essential services. At the same time, the Commonwealth's actual liquidity during the fiscal year may be less than what its General Fund budgetary revenues may suggest because such revenues may include non-cash items that are not available revenues to meet operational expenditures.

Beyond these recurring deficiencies of revenues under expenditures, the Commonwealth's own cash deficiencies at its TSA are typically exacerbated during the first half of the fiscal year because a substantial portion of the Commonwealth's tax revenues are received during the second half of the fiscal year (January through June), while operational expenditures occur evenly throughout the fiscal year. Working capital financings to address this cash flow deficiency is usually obtained by the issuance of TRANs, which has been unavailable from non-government sources since fiscal year 2016.

GDB, which has traditionally served as a source of emergency liquidity to bridge cash flow deficits, is currently insolvent on a balance sheet basis and is thus unable to continue to provide liquidity. See the risk factor titled "***GDB is insolvent on a balance sheet basis and is unable to honor its obligations as they become due, continue to serve as the principal source of short-term liquidity for the Commonwealth and its instrumentalities and as the principal depositary of public funds, which further adversely affects the Commonwealth and its instrumentalities.***"

The Commonwealth dealt with its severe liquidity crisis during fiscal year 2016 by imposing a series of measures that are unsustainable over the long term. For a description of such measures, see "Liquidity Constraints" under OVERVIEW OF THE COMMONWEALTH'S FINANCIAL CONDITION. Furthermore, in April 2016, the Commonwealth enacted the Moratorium Act. Based on its provisions, the Governor of Puerto Rico suspended the payment of debt service on the Commonwealth's general obligation and guaranteed debt, as well as the payment of debt obligations of certain of its instrumentalities (excluding COFINA, which as of the date of this report continues to make debt service payments

50

when due); in addition, the Governor suspended the obligations of the Commonwealth to transfer to certain government entities certain taxes and other revenues that would have otherwise been used for the payment of debt service. For more information regarding the debt service payments that were not made, see "Recent Defaults on Required Debt Service Deposits or Payments" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

The fiscal year 2017 General Fund budget did not appropriate funds for debt service (including Commonwealth general obligation debt service) in reliance on the suspension of such obligations imposed by the Moratorium Act.

Notwithstanding the unsustainable nature of the measures described above, the Commonwealth's cash flow forecast for its TSA for fiscal year 2017 relies on, among other things, the continued suspension, pursuant to the Moratorium Act, of both the payment on all of the Commonwealth's General Obligations debt and other debt-service obligations and the obligation to transfer certain pledged revenues to certain public corporations provided for in the General Fund budget. Even after implementing all these measures, however, the Treasury Department expects to have sufficient liquidity to operate the government only up to the expiration of the moratorium period, which expires on January 31, 2017, subject to a two-month extension upon approval from the Governor. On or before January 31, 2017 (or March 31, 2017, if the expiration date is extended), the Commonwealth will need to take additional emergency liquidity measures, have access to financing or have the Oversight Board file a PROMESA Title III proceeding to avoid running out of cash on such expiration date and throughout the remainder of fiscal year 2017.

Creditors are challenging the legality of certain measures taken by the Commonwealth to bolster its liquidity position, including those actions taken pursuant to the Moratorium Act. See LITIGATION. To the extent that such creditors are successful in their challenges notwithstanding the stay provisions of the Moratorium Act and PROMESA, the financial, fiscal and liquidity position of the Commonwealth and its instrumentalities will suffer a significant adverse effect and, as a result, the Commonwealth may not have the liquidity necessary to be able to continue providing essential government services.

Furthermore, although the Commonwealth has already implemented most of the emergency measures at its disposal, it may be forced to take any additional emergency measures available to it, which may affect the rights of its stakeholders, including bondholders and other creditors.

***The Commonwealth does not currently project to have sufficient resources to fund its operational expenses, pay its debt obligations in accordance with their terms, and fund other legacy obligations. The Commonwealth will therefore need to implement a fiscal adjustment plan and restructure its debt obligations, which is subject to material implementation risk.***

The Proposed PROMESA Fiscal Plan projects that the baseline cumulative financing gap (i.e. the difference between projected revenues and expenses under current policies) for the Commonwealth and certain of its instrumentalities that rely primarily on tax revenues for their operations for the ten fiscal years between 2017 and 2026 would be approximately $59 billion, absent corrective actions. The Proposed PROMESA Fiscal Plan contemplates that this financing gap could be reduced through a combination of revenue increases, expense reductions and

51

economic growth, but that the remaining financing gap would need to be addressed by debt restructuring.

There is no assurance that the projections and assumptions used to prepare the Proposed PROMESA Fiscal Plan will be realized or that measures contemplated by such plan will be approved, enacted or implemented successfully. To the extent that any such projection, assumption or measure is not realized, the financing gap faced by the Commonwealth and its instrumentalities may be significantly higher than currently projected and the amount needed to close that gap may increase significantly, thus requiring additional increases in government revenues or reductions of expenditures, which may have an adverse economic impact or necessitate additional adjustments to the debt of the Commonwealth and its instrumentalities. Finally, the Proposed PROMESA Fiscal Plan may be revised to the extent that any incoming administration may have different public policy views and goals than those of the current administration. For a detailed explanation of the Proposed PROMESA Fiscal Plan and the assumptions contained therein, see "Proposed PROMESA Fiscal Plan".

*The Commonwealth has too much debt in relation to its revenue base and the current size and trajectory of its economy and will have to restructure its debt obligation in order to continue providing essential services to the residents of Puerto Rico.*

As of July 31, 2016, Puerto Rico had outstanding a total of $71.499 billion aggregate principal amount of debt issued by the Commonwealth, its public corporations and instrumentalities, representing approximately 104% of Puerto Rico's gross national product for fiscal year 2015 ($68.521 billion - preliminary).

For fiscal year 2016, aggregate contractual debt service on debt obligations (including GO, PBA, PRIFA, PFC and other appropriation debt (in the case of GDB loans, limited to amounts included in the $275 million budget reserve for such fiscal year) but excluding ERS and TRANs debt service) payable from the General Fund (approximately $1.902 billion) represented approximately 21% of General Fund revenues in fiscal year 2016 ($9.171 billion).

However, when debt from governmental issuers supported by tax revenues or General Fund appropriations is included in the calculation, debt service for fiscal year 2016 represented approximately 36% of such fiscal year's consolidated revenues (as defined in the FEGP, and excluding federal transfers and after reflecting the impact of the legislated 4.5% surcharge on the sales and use tax rate). Other tax-supported debt as of July 31, 2016 included bonds, notes and other obligations issued or incurred by (i) COFINA, which as of such date had approximately $17.3 billion principal amount of obligations payable from sales and use tax revenues, (ii) HTA which had approximately $5.9 billion, principal amount of obligations payable in part from petroleum products excise taxes, gas taxes and other taxes and fees; (iii) PRIFA, which had approximately $1.9 billion principal amount of obligations payable in part from petroleum products excise taxes, federal rum excise taxes and other taxes or appropriations, (iv) ERS, which had approximately $3.1 billion principal amount of bonds mostly payable from contributions to the System made by the Commonwealth (which are in turn funded by taxes collected by the Commonwealth), (v) the PRCCDA, which had approximately $532 million principal amount of bonds and notes payable from hotel room taxes, (vi) the University of Puerto Rico, whose source of repayment are internal revenues of such entities but which receive substantial subsidies from the Commonwealth in the form of assigned tax revenues or General Fund appropriations, and (vii) PRIDCO, whose source of repayment are internal revenues but

52

which receives certain subsidies to fund its operations and PRIDCO-administered incentive programs. In addition, as of July 31, 2016, GDB also had approximately $3.8 billion principal amount of bonds and notes outstanding, whose source of repayment are principal and interest paid by the Commonwealth and its instrumentalities under loans made by GDB to the Commonwealth and its instrumentalities, which in turn are payable in whole or in part from taxes and Commonwealth appropriations. Total debt service due on tax-supported bonds and notes for fiscal year 2016 (excluding debt service on TRANs, on loans from private or public financial institutions (i.e. GDB) other than the GSA GO guaranteed loan and on indebtedness of municipalities, PREPA, PRASA, HFA or Children's Trust) was approximately $4.1 billon.

The Commonwealth's high level of debt and the resulting allocation of revenues to service this debt have contributed to significant budget deficits during the past several years, which deficits the Commonwealth has been required to finance, further increasing the amount of its debt. More recently, the Commonwealth's high level of debt, among other factors, has adversely affected its credit ratings and its ability to obtain financing on sustainable terms. The Commonwealth expects that it will not be able to finance future budget deficits and, with respect to its funding needs in fiscal year 2017, it has decided to fund essential governmental programs and services rather than honoring its debt obligations. As a result, the Commonwealth expects to continue to rely on the provisions of the Moratorium Act and PROMESA (until such provisions expire) to prioritize the payment of essential governmental services over the making of debt services payments on its debts.

For more information regarding the Commonwealth's debt, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

*The Commonwealth recently commenced the audit for its fiscal year 2015 financial statements and has not commenced the audit for its fiscal year 2016 financial statements and the Commonwealth may be unable to complete such audits within a reasonable time period. As a result, the Commonwealth may be unable to comply with certain requirements of PROMESA, access the markets and may be forced to make decisions without audited financial data.*

On October 19, 2016, the Commonwealth contracted with its current nationally recognized independent audit firm for the performance of the audit of its fiscal year 2015 financial statements. As part of the negotiation and in light of the Commonwealth's fiscal and financial condition, the Commonwealth agreed to an increase in audit costs, the addition of significant new procedures and analysis and certain other requirements, such as the assignment by the Treasury Department of suitable key personnel with appropriate skills, knowledge and/or experience to oversee the financial statement preparation process and to evaluate the adequacy and results of the services, among others. To the extent the Commonwealth is unable to comply with these requirements, the audit firm may withdraw from the engagement and the Commonwealth will have to engage a new audit firm. There is no assurance that the incoming administration will comply with all the requirements of the new engagement, specifically those requirements relating to the retention of certain personnel. Moreover, the incoming administration may decide to terminate the current engagement and engage a new audit firm.

53

Moreover, any additional delays in the audit of the fiscal year 2015 financial statements will further delay the audit of the Commonwealth's fiscal year 2016 financial statements. The Commonwealth has not engaged a firm to audit its fiscal year 2016 financial statements.

To the extent the current audit firm withdraws from its engagement or such firm is terminated by the incoming administration, the Commonwealth may be unable to produce its fiscal year 2015 financial statements within a reasonable time period. Furthermore, if the Commonwealth is unable to engage an audit firm on a timely basis for the fiscal year 2016 audit, the publication of such financial statements may be further delayed. Due to the delay in conducting the fiscal year 2015 and fiscal year 2016 audits, the Commonwealth may be unable to comply with certain requirements of PROMESA or access the debt markets. The Commonwealth may also be forced to make decisions without audited financial data.

**Risks Related to Puerto Rico's Extended Economic Recession**

*The Commonwealth's economy has been contracting and, absent future real growth, will be unable to sustain the Commonwealth's current operations and its financial and other legacy obligations.*

The Commonwealth's gross national product contracted in real terms in every year except one between fiscal year 2007 and fiscal year 2016 (inclusive). According to the Puerto Rico Planning Board latest economic forecast (published at the end of October 2016), gross national product is also projected to further contract by 2.3% during fiscal year 2017. This persistent contraction has had an adverse effect on employment and tax revenues, and has significantly contributed to Commonwealth deficits in those fiscal years. Factors that can adversely affect the Commonwealth's ability to increase the level of economic activity, some of which are not within the control of the Commonwealth, include the high cost of energy, changes in federal tax policy, the loss of patent protection of several products manufactured in Puerto Rico and the consolidation of local operations due to excess manufacturing capacity at local factories (which leads to a reduction of manufacturing activity in Puerto Rico), global economic and trade conditions, population decline, and the Commonwealth's high level of debt.

The Commonwealth's economy may also be adversely affected by epidemics or pandemics of communicable diseases. In particular, the Commonwealth is currently experiencing an epidemic level outbreak of the mosquito borne Zika virus, which has been linked to birth defects. As a result, segments of the economy that have shown signs of strength, such as tourism, may be adversely affected. Furthermore, the outbreak of this virus will further strain the Commonwealth's resources if additional, unexpected expenditures are required to address the epidemic and federal government funding is not available to supplement Commonwealth resources.

Federal policy has a significant effect on Puerto Rico's economy and Puerto Rico has no control over such policy. In particular, federal decisions as to funding levels of various programs significantly affect Puerto Rico. For example, as a result of Puerto Rico's low per capita income compared to the fifty states, many Puerto Rico residents receive federal aid through social welfare or health-related programs. Due to the dependency of a significant portion of the population on these programs, any change in the level of available federal funding for Puerto Rico may have an adverse effect on government finances and the economy. For example, many

low-income residents of Puerto Rico may be left without a viable health plan to the extent that funds allocated to Puerto Rico under the Affordable Care Act run out by fiscal year 2018 and Puerto Rico does not receive parity under other health-related programs. Moreover, Puerto Rico's lack of effective representation at the federal level limits its ability to influence federal policy towards the island. As a result, there is no assurance that federal funding of critical programs will continue at current levels and, to the extent that federal funding is curtailed, Puerto Rico's ability to effectively address its fiscal and financial challenges may be significantly limited as it may be required to allocate limited resources to address critical programs. See "*If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program*" for more information regarding available funding for the health insurance program.

The Commonwealth's Proposed PROMESA Fiscal Plan contains a number of proposals designed to promote economic growth. However, many of these proposals require the enactment of legislation by the Puerto Rico Legislative Assembly or the Congress of the United States. Some of these measures face opposition by legislators, labor unions, or other affected parties and may be subject to approval by the Oversight Board created by PROMESA. There is no certainty that these proposals will be adopted, or that if adopted, they will produce the intended results. Moreover, there is no assurance that economic growth will result from the implementation of these proposals. To the extent the Commonwealth does not experience a significant level of economic growth, its ability to cover debt service payments, even if restructured, may be significantly compromised.

*Population decline, particularly of working-age individuals, will adversely affect the economy.*

Changes in population have had, and may continue to have, an impact on economic growth and on tax revenues. According to the United States Census Bureau, the population of Puerto Rico decreased by 2.2% from 2000 to 2010, and by an estimated 6.8% from 2010 to 2015, driven primarily by a falling birth rate, a rising death rate and migration to the United States mainland. Preliminary estimates prepared by the Puerto Rico Institute of Statistics suggest that the island continued to lose population during fiscal year 2016 as well. Reductions in population, particularly of working-age individuals, are likely to have an adverse effect on tax and other government revenues that will not be entirely offset by reductions in government expenses in the short and medium term. In addition, the average age of the population of Puerto Rico is increasing, due mainly to a reduction in the birth rate and the migration of younger persons to the United States mainland. This phenomenon is likely to affect every sector of the economy to the extent that the local consumer base is diminished and the local labor force fails to meet the demand for workers in certain sectors of the economy. Moreover, this trend increases the impact of the demand for health and other services on the Commonwealth, and the relative cost to the Commonwealth of providing such services. Additionally, the loss of doctors, including physicians and trained specialists, and other professionals may lead to an increase in the rate of migration as the population fails to find the specialized services it needs in Puerto Rico.

*The Commonwealth's macroeconomic data may not accurately reflect the performance of the economy of Puerto Rico.*

The Puerto Rico Planning Board has acknowledged the existence of certain significant deficiencies in the calculation of its macroeconomic data. The deficiencies relate mostly to the deflators of the components of trade-related services and in some cases, monetary accounts of certain components of gross national product. As a result, the historical rate of change in gross national product at constant prices (real gross national product change) and at current prices (nominal gross national product change) could have been either overstated or understated for several years. These deficiencies have also led to the delay in the publication of periodic economic data in order to provide the Planning Board with sufficient time to determine the particular deficiencies included in the calculation of the "deflators" and the procedures to fix such deficiencies.

The Planning Board has established a corrective action plan to modernize Puerto Rico's National Accounts. The plan sets out the roadmap for incorporating methodologies recommended by the Bureau of Economic Analysis of the Federal Department of Commerce. This modernization process is expected to last five years and require an investment of approximately $8.3 million. The Planning Board is currently in the process of signing an agreement with the Bureau of Economic Analysis in order to receive expert advice and human resources to collaborate in the implementation of these new methodologies.

It is still too early to determine how these deficiencies have affected, or will affect, Puerto Rico's macroeconomic data. Until such time as these revisions are finalized and fully applied to Puerto Rico's macroeconomic data, there is no assurance that previously reported macroeconomic data accurately reflect the performance of the economy of Puerto Rico.

**Risks Related to Commonwealth Expenses**

*The Commonwealth's consolidated deficit based on U.S. GAAP is larger than the deficit of the General Fund, particularly when determined based on a budgetary basis of accounting, because the General Fund on a budgetary basis does not include the deficits of various other funds and entities, many of which also provide essential services.*

As described in the Krueger Report and the FEGP, the most common measure of fiscal budgetary balance used historically in Puerto Rico – the General Fund, particularly when presented pursuant to the budgetary basis of accounting – materially understates the financing gaps faced by the Commonwealth. The General Fund on a budgetary basis excludes numerous governmental funds, proprietary funds, agencies with independent treasuries and government instrumentalities that have historically run deficits and that ultimately rely on tax revenues or central government appropriations to operate. When, as required by U.S. GAAP, the General Fund is consolidated with numerous Special Revenue Funds, agencies with independent treasuries and is further adjusted based on the accrual basis of accounting, the total deficit of the central government is significantly higher than the deficit of the General Fund calculated on a budgetary basis. In addition, the General Fund expenses typically do not (i) include the cost of necessary capital expenditures that were traditionally funded with debt, such as general obligation bonds and GDB lines of credit, which funding is not expected to be available in the near future, or (ii) account for the state of disrepair of the physical assets and infrastructure of the Commonwealth and its instrumentalities as a result of years of underfunding or underinvesting in necessary preventive maintenance and capital investment programs.

Furthermore, certain public corporations that provide essential services but are legally distinct from the central government (and are therefore not reflected in the General Fund), such as the University of Puerto Rico, the Health Insurance Administration, the Medical Services Administration, the Metropolitan Bus Authority, and the Maritime Transportation Authority, have also historically incurred material deficits. Both the Krueger Report and the Proposed PROMESA Fiscal Plan include the deficits of these entities into their analysis of the Commonwealth's consolidated historical and future funding gaps. For more information regarding the Commonwealth's historical deficits, see "COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2012 THROUGH 2015".

According to the Krueger Report and the Proposed PROMESA Fiscal Plan, the Commonwealth is projected to incur additional deficits in these funds, agencies and public corporations during the next decade.

***Certain government instrumentalities that provide essential services are experiencing financial difficulties and the Commonwealth may need to continue or increase its current level of financial support.***

Several public corporations and instrumentalities have traditionally relied on the assignment of specific tax revenues or subsidies or other transfers from the General Fund to fund a portion of their operations. Certain of these instrumentalities offer basic and essential services to the population of Puerto Rico. To the extent that any of these instrumentalities is unable to continue to provide such essential services as a result of financial difficulties, the Commonwealth may be required to divert available Commonwealth resources that would otherwise be used to service its debt to ensure that such essential services continue to be provided. Due to the fact that these governmental instrumentalities provide essential services while relying on tax revenues, subsidies or other governmental transfers to sustain their operations, the Proposed PROMESA Fiscal Plan consolidates such entities with the Central Government to provide a comprehensive view of the Commonwealth's financing gap.

For example, the Health Insurance Administration, the Medical Services Administration, the Highways and Transportation Authority, the Maritime Transportation Authority, the Metropolitan Bus Authority and the University of Puerto Rico provide essential services to the residents of Puerto Rico and rely heavily on General Fund appropriations or transfers of dedicated tax revenues to fund their operations. Others, like the Public Buildings Authority, provide essential services to the Commonwealth's government. Notwithstanding the Commonwealth's support, certain of these public corporations have historically suffered from significant annual operating losses and carry material amounts of accounts payable. Some of the services provided by these public corporations are essential to maintain health, public safety and welfare, which may lead the Commonwealth to prioritize the funding of such services over the payment of debt service.

In addition, certain agencies and public corporations manage, administer or operate infrastructure assets financed with federal funds. Federal funding for these assets is usually accompanied by requirements that the agency or public corporation maintain the assets at a certain level of repair or meet a certain level of operation. To the extent these requirements are not met, the particular agency or public corporation may expose itself to the imposition of fines

or even forfeiture of the federal funds granted for the project. As a result, the Commonwealth and its instrumentalities may be required to continue allocating resources to the operation of assets that may not be considered essential in order to prevent the imposition of penalties or fines that the United States Treasury may recover through the sequestration of any funds allocated to the Commonwealth and its instrumentalities.

PREPA and PRASA also provide essential public services and are facing financial difficulties, including liquidity and solvency problems. The financial condition of PREPA and PRASA is affected by the need to heavily invest in their infrastructure, which in many cases is obsolete and in an advanced state of disrepair due to years of underinvestment in capital improvement and maintenance programs. Furthermore, both PREPA and PRASA are subject to substantial environmental regulatory burdens, operate subject to various consent decrees entered into with federal agencies and have to incur material capital expenditures to comply with such federal regulations and consent decrees. Another factor that contributes to the financial difficulties of PREPA and PRASA is that the Commonwealth and other government entities, due to their own financial difficulties, are often unable to pay PREPA and PRASA in a timely manner. PREPA and PRASA have also been affected by a decrease in demand due to the current economic crisis and population decline. To the extent that these utilities continue to face financial difficulties, the Commonwealth may have to fund them directly (like it has done historically with PRASA through its General Fund and GDB) or prioritize the payment of outstanding payables to these utilities in order to provide liquidity to them and allow them to continue to provide essential services to the people of Puerto Rico.

***A reduction of federal grants may significantly affect the Commonwealth's ability to provide many important services and may force the Commonwealth to allocate resources that would otherwise be used to pay debt service to the provision of such essential services.***

Each fiscal year, the Commonwealth receives a significant amount of grant funding from the U.S. government. A significant portion of these funds is utilized to cover operating costs of those Commonwealth educational, social services and healthcare programs that are subsidized by the U.S. government. If the aggregate amount of federal grant funds transferred to the Commonwealth were to be reduced, the Commonwealth would have to make reductions to these federally-supported programs or fund these programs from the General Fund. Reductions in federal funding would also have an adverse impact on the Commonwealth's economy and on efforts to reduce its General Fund budget deficit. In addition, since the per capita income of the residents of Puerto Rico is substantially lower than those of the 50 states, a high percentage of the population of the Commonwealth benefits from these government programs. As a result, the impact on the Puerto Rico economy of any reduction in federal grant funds for such governmental programs would be greater than on the 50 states. Moreover, to the extent the Commonwealth is required to divert resources to continue providing essential services primarily funded through federal funds, the Commonwealth may be unable to honor its other obligations, including debt service, as they come due.

Another important factor is that certain federally funded programs are funded on a per-capita basis and a reduction in the number of beneficiaries due to demographic trends or changes in program parameters could result in a lower amount of federal funds. For instance, the Department of Education has experienced a substantial reduction in student enrollment in recent years that is expected to continue for the foreseeable future. Such reduction has been and will continue to be accompanied by a corresponding reduction in federal funding for some

educational grants. To the extent that the cost saving opportunities presented by the reduction in the number of students are not fully realized, the Department of Education's budget could be negatively affected.

*If federal funding for the Commonwealth's health insurance program is not increased from, or at least maintained at, current levels, the Commonwealth may be unable to continue fully funding such program or may be required to deploy resources currently used for other spending priorities to fund the resulting shortfall.*

The Commonwealth, through the Health Insurance Administration, provides health insurance coverage to approximately 1.6 million qualifying (generally low-income) residents of Puerto Rico. The cost of this health insurance program is very significant, totaling approximately $2.5 billion, $2.8 billion and $2.8 billion for the fiscal years ended June 30, 2014, 2015 and 2016, respectively.  In such fiscal years, the cost of the program was funded in substantial part from appropriations from the General Fund to PRHIA of $885 million per year (representing approximately 9% of the General Fund budget for those fiscal years) and the balance was mainly funded with federal funds. For fiscal year 2017, the approved budget similarly includes an appropriation of $885 million for the Health Insurance Administration.  The cost of the program currently paid by the federal government is funded principally by non-recurring funding provided pursuant to the Affordable Care Act, as well as recurring Medicaid and Children's Health Insurance Program funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring Affordable Care Act funds, currently estimated to occur between December 2017 and February 2018, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and Children's Health Insurance Program allocations of approximately $400 million per year, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility or both are reduced significantly. Although the Commonwealth could take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures.  Furthermore, reducing coverage or limiting beneficiaries could result in additional costs at the Commonwealth's public hospitals, reducing potential savings and increasing expenditures in order to meet demand at the Commonwealth's already over utilized public hospitals.

If the availability of Affordable Care Act funds is not renewed through Congressional action and if no changes to benefits, co-pays or eligibility are made, the annual deficit of the health insurance program (which the General Fund may be required to fund) could rise to as much as $1.804 billion per year by fiscal year 2021.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if the availability of Affordable Care Act funds is not renewed or Medicaid funds are not significantly increased. In light of the current disparity in the treatment that the Commonwealth receives compared with the states with respect to the cap imposed on Medicaid matching funds, the Commonwealth is intensifying its efforts to have Affordable Care Act funding renewed by Congress. Both the Governor and the Resident Commissioner have been involved in this effort and recently

59

members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition. The Task Force created by PROMESA is further slated to issue a report in December of 2016 describing the impediments in current federal law and programs to economic growth in Puerto Rico, including equitable access to federal health care programs. However, it is not possible to predict the likelihood that efforts to renew Affordable Care Act funds or increase Medicaid funds will succeed. To the extent these efforts are unsuccessful, the Commonwealth would have to assume a significantly higher portion of the cost of the health insurance program.

The Commonwealth's health related expenditures may also increase due to unexpected outbreaks of communicable diseases. In particular, the Commonwealth is currently experiencing an epidemic-level outbreak of the mosquito-borne Zika virus, which has been linked to birth defects. As a result, the Government's health related expenses will increase due to increased emergency room visits and admissions, spending on prevention and mosquito population control programs and increased utilization of the government-sponsored health insurance plan. Although the effect of the Zika virus may not be reflected in the current premiums paid by the Health Insurance Administration, the current experience may result in higher premiums when the current contracts with health insurers expire.

*Unless the Commonwealth makes significant additional contributions to the Retirement Systems, current levels of liquid assets could be completely depleted during the current or next fiscal year and the Commonwealth will have to fund pensions on a "pay-as-you-go" basis. In such a scenario, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders.*

A significant component of the Commonwealth's budget is the cost of its three Retirement Systems. The three principal pension systems of the Commonwealth (the ERS, TRS and JRS) have significant net pension liabilities (amounting to approximately $48.8 billion based on the latest actuarial reports) and very low funded ratios. In 2013, the Commonwealth enacted legislation that reformed the Retirement Systems by, among other measures, reducing benefits, increasing employer and employee contributions, and prospectively replacing most of the defined benefit elements of the system with a defined contribution system. Although the Puerto Rico Supreme Court upheld the constitutionality of the ERS reform, it declared invalid certain important portions of the TRS and JRS reforms. Given the size of the net pension liabilities of the system, the legislation recognized that even after the structural reforms, the Commonwealth and other participating employers would still have to make additional annual contributions in order to maintain the solvency of the Retirement Systems and allow them to pay pension benefits when due. The most recent official calculations of the required additional annual contributions to the Retirement Systems amount to $596 million from fiscal year 2017 through fiscal year 2033, in the case of the ERS, and $603.9 million from fiscal year 2019 through fiscal year 2042 (plus $30 million for each of fiscal years 2017 and 2018), in the case of the TRS. These amounts were calculated based on a number of assumptions and could materially increase in future years under various scenarios, including as a result of policy decisions.

The Commonwealth and other participating employers have been unable to make most of the additional annual employer contributions required by the reform legislation as a result of the worsening fiscal crisis since the enactment of the reforms. As a result, the Retirement Systems are rapidly depleting their remaining liquid assets, which is projected to occur, in the case of the ERS, during the fourth quarter of the current fiscal year or the first half of fiscal year 2018 (July

to December 2017), and by fiscal year 2018, in the case of the TRS and JRS. If this happens, the Retirement Systems will be operating solely on a "pay-as-you-go" basis, which means that they would be unable to pay benefits that exceed the actual employer and employee contributions received by the Retirement Systems (net of administrative and other expenses), unless the Commonwealth and other participating employers provide the additional funding required to pay retirement benefits. If the Retirement Systems begin operating solely on a "pay-as-you-go" basis, the Commonwealth and other participating employers may not have sufficient resources to cover the amount by which benefits exceed employee and employer contributions. In this scenario, because of the economic and social implications of not being able to satisfy pension payments, the Commonwealth is likely to seek to prioritize payments to pensioners over other stakeholders, including bondholders, by pursuing all options available to it under applicable law, including through the mechanisms afforded by PROMESA. In addition, because various employers participating in the ERS are experiencing financial difficulties of their own and are significantly dependent on the Commonwealth, it is likely that the Commonwealth will need to cover amounts allocated to these participating employers if all pension benefit payments are to be made when due.

Moreover, since the commencement of the defined contribution program, the ERS has been pooling employee contributions to such defined contribution program with other system assets and has used moneys deposited by employees under the defined contribution program to fund benefits under the defined benefits program. As a result, the ERS may not have sufficient funds on deposit to honor the amounts deposited by government employees under the defined contribution program. Furthermore, to the extent that, because of a legal or policy change, employee contributions to the defined contribution program are, like in the TRS, no longer made available to cover the funding deficiency of the legacy defined pension program, the Commonwealth's additional annual contribution to the ERS or the amount the Commonwealth and other participating employers would have to provide in order to pay benefits or both would materially increase. The Proposed PROMESA Fiscal Plan provides for the segregation of the defined contribution program from the legacy defined benefits program.

Reductions in the number of active plan participants that contribute to the Retirement Systems as well as reductions in salaries of plan participants have a material effect in the projected cash flow shortfall of the Retirement Systems since the systems are primarily funded from contributions calculated as a percentage of active payroll. The additional annual contributions to the Retirement Systems included in the Proposed PROMESA Fiscal Plan – amounting to $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026 – were calculated assuming a constant level of employment other than for projected attrition of approximately 5,500 employees retiring under an early incentive program, and salary increases consistent with projected inflation during the 10-year period. The Proposed PROMESA Fiscal Plan projects a further increase in the additional contributions as a result of additional attrition measures and salary freezes contemplated as part of such plan. To the extent the Commonwealth implements such reductions in headcount and rate of salary growth as expenditure measures to address the fiscal crisis, this would result in an increase in the number of retirees, a decrease in the number of active plan participants, and a consequent increase in the required additional annual contributions to the Retirement Systems.

61

Section 211 of PROMESA authorizes the Oversight Board to conduct an analysis of the pension systems to the extent it determines they are materially underfunded. The analysis would be conducted by an independent actuary and would assist the Oversight Board in evaluating the fiscal and economic impact of pension system cash flows. The analysis would include an actuarial study of pension liability and funding strategy, sources of funding, review of existing benefits and sustainability of such benefits, and a review of the system's legal and operational structure. There is no assurance that this analysis would result in recommendations that would allow the Retirement Systems to cover their pension liabilities or the payments on their outstanding obligations, including the pension obligation bonds issued and outstanding, in their entirety.

Furthermore, Section 201(b)(1)(C) of PROMESA requires that a fiscal plan must "provide adequate funding for public pensions systems." To the extent that an approved fiscal plan requires that sufficient funding for current pension benefits is appropriated, such funding may come at the expense of other Commonwealth stakeholders, including active public employees, creditors and/or citizens that rely on essential government services. If, on the other hand, an approved plan does not provide for the full funding of pension benefits because it prioritizes other expenses, it could result in further economic deterioration.

***The Commonwealth's education costs represent a very high percentage of its budgetary expenditures, and the Commonwealth has had difficulty controlling such costs.***

The budget appropriation for the Commonwealth's Department of Education has historically represented a significant portion of the total General Fund budget. Therefore, the ability of the Commonwealth to control General Fund expenses depends on its ability to monitor and control the Department of Education's expenditures. However, the Commonwealth has historically had difficulty controlling such expenses. In addition, certain expenditures, such as those required to fund the Department's special education program, can increase unexpectedly as a result of court orders issued in pending lawsuits by special education students. For more information regarding this case, in which the Commonwealth has been ordered to implement changes expected to cost in excess of $700 million, see LITIGATION.

***The Commonwealth's accounting, payroll and financial information systems have deficiencies due to obsolescence and compatibility issues and this has affected the Commonwealth's ability to control and forecast expenses and to implement GASB pronouncements and to issue financial statements in a timely manner.***

The Commonwealth's accounting, payroll and financial information systems have deficiencies due to obsolescence and lack of compatibility that have adversely affected the Commonwealth's ability to supervise and control expenditures. Agencies often incur expense overruns that are not detected in time to permit the implementation of corrective measures during the same fiscal year. At the present time, the three Commonwealth agencies that together are responsible for over 50% of General Fund expenses have separate accounting systems that are unable to interact on a timely basis with the Commonwealth's central accounting system. In addition, according to OMB, it has limited visibility and control over expenses generated outside the Commonwealth's General Fund approved budget, which only account for approximately half of General Fund expenditures on a U.S. GAAP basis, and those generated by public corporations, over which OMB has no control notwithstanding their receipt of moneys from the General Fund. Moreover, the Commonwealth's central accounting system still relies on

numerous manual processes for recordkeeping that are only reviewed and updated at the end of the fiscal year in connection with the issuance of the audited financial statements. In addition, the current accounting system does not provide for an accounts payable ledger, capital assets ledger, accounts receivable ledger, and balance sheet information. The balance sheets are prepared manually and such information is updated and prepared on an annual basis. These deficiencies also affect the Commonwealth's ability to timely and accurately report financial information to the market, and to complete its audited financial statements in a timely manner.

Moreover, these deficiencies in the Commonwealth's systems and the ERS census data systems lead to extensive delays in the implementation of GASB pronouncements and changes. As a result, the Commonwealth may be unable to comply with all GASB pronouncements in its audited financial statements for fiscal years 2015, 2016 and 2017, including GASB 68 "Accounting and Financial Reporting on Pensions – an amendment to GASB 27." To the extent the Commonwealth is unable to comply with GASB pronouncements, the auditor's opinion regarding such financial statements would be qualified due to the failure to implement such pronouncement.

A committee named by the Secretary of Treasury to evaluate and submit recommendations with respect to the Commonwealth's accounting, payroll, budget forecasting and control, and financial and fiscal oversight information systems has concluded its work and presented its findings and recommendations to the Secretary of Treasury. As a result, the Treasury Department and OMB entered into an agreement with a third-party supplier to establish and design the requirements for a new accounting, payroll, budget forecasting and control, and financial and fiscal oversight information system for the Commonwealth. The process to establish and design the requirements of such system (Phase 1) is expected to conclude during fiscal year 2017. There is no assurance that, once Phase 1 is completed, the Commonwealth will continue following the steps required to implement the new system. Notwithstanding the foregoing, based on current estimates, even if the Commonwealth continues to follow such steps, the new system will not be fully operational until fiscal year 2019 at the earliest. While the Commonwealth anticipates that the implementation of this new system will assist the Commonwealth's ability to control and forecast expenses, there can be no assurance that the anticipated benefits will materialize.

***The financial information published by the Commonwealth or used to make fiscal and economic decisions may be unreliable.***

The Commonwealth does not maintain a formal risk assessment process to identify areas subject to risk of material misstatements as part of its financial operations, general accounting process and debt compliance operations. As a result, the Commonwealth is unable to perform reconciliations on a timely basis and maintains accounting processes that have been recurrently associated with internal control deficiencies and that are considered by the Commonwealth's independent auditors to be material weaknesses. As a consequence of the lack of timely reconciliations of balance sheet accounts due to the disaggregation of data pertaining to the Commonwealth and its agencies, the inability of the Commonwealth to obtain financial data on timely basis from its different accounting systems, and the recurring control deficiencies underlying the Commonwealth's financial reporting process, the Commonwealth may be publishing incomplete financial information and relying on such information to make fiscal and economic decisions. Although the Commonwealth believe that it has made improvements in the collection and reporting of financial and economic data as part of its efforts to develop the

Proposed PROMESA Fiscal Plan, there is no assurance that such improvements will ameliorate the deficiencies that currently exist.

**Risks Related to Commonwealth Revenues**

*The Commonwealth's ability to raise additional revenue through taxation may be limited by economic factors.*

The capacity of a state to raise tax revenue is typically measured by the levels and rates of change in economic activity and the income of its citizens and businesses. The amount of tax paid by individuals and companies relative to total income ("tax burden") is one approximation of capacity to raise additional revenue through taxation. The composition of taxes is also relevant. For example, certain types of activity may be highly sensitive to taxation or incremental costs generally. Imposing or increasing taxes on such activity could significantly curb it, which would undermine both potential tax revenue and economic growth.

In evaluating the capacity of the Commonwealth to raise additional revenue through taxation, one should be mindful of its available base, in the aggregate and in specific categories of activity. On an aggregate basis, economic output and income can be approximated by gross domestic product ("**GDP**") and gross national product ("**GNP**"). GDP measures expenditures and income earned by residents and nonresidents within a state, while GNP includes income earned by residents from local and foreign sources. For states with significant net direct investment held by foreigners, GNP can be materially lower than GDP. Taxing the difference between the two aggregate measures can be challenging given the desire to retain that direct investment, which generates employment and both direct and indirect economic activity.

The difference between these two measures of economic expenditures and income is acute in Puerto Rico. According to preliminary estimates from the Puerto Rico Planning Board, in fiscal year 2015 nominal GNP was about 67% of nominal GDP. This arises from U.S. mainland corporations' accounting for a substantial share of production taking place in Puerto Rico through activities of their subsidiaries, in particular in the manufacturing sector. The Commonwealth, however, other than through the temporary excise tax described below, imposes very low taxes to these manufacturing activities because it grants tax exemption decrees to many of these companies in order to incentivize their establishment in Puerto Rico.

The Commonwealth has been taxing a portion of the income earned by these corporations from activity in Puerto Rico since January of 2011, but proceeds from such taxes may not persist. Act 154 imposes a temporary excise tax to capture the repatriation of profits and dividends to parent firms on the U.S. mainland. The negative impact of that tax on certain of those firms has, to date, been neutralized in part by its creditability against U.S. federal income taxes under rulings issued by U.S. federal tax authorities. Future federal creditability of this excise tax is unlikely to continue indefinitely. The continuation and rate of excise tax imposed pursuant to Act 154 without the availability of the federal tax credit will likely affect the decisions of the firms' subsidiaries to continue operations in Puerto Rico. Furthermore, the uncertainty generated by this law may discourage the attraction of new products to be manufactured in Puerto Rico. This, in addition to patent expiration of current products, may have a direct negative impact on the revenues generated by this and other related taxes, as well as an indirect negative impact on other revenues.

As a result, using GDP to calculate the current tax burden in Puerto Rico may overstate the capacity of the Commonwealth to raise additional revenue through taxation. Also, comparisons with international jurisdictions with the tax burden in Puerto Rico based on GDP may be misleading or require adjustments.

At the same time, although to a lesser extent, GNP may overstate the available tax base. Residents of Puerto Rico benefit from large transfers from the federal government. According to the Puerto Rico Planning Board, in fiscal year 2015 federal transfer payments accounted for 25.4% of personal income. Under current federal law, some of these transfer payments earmarked for social welfare programs may not be taxed by the Commonwealth.

One should also account for differences in behavioral responses among categories that are taxable. The impact of changes in the rates of taxation on consumption and employment from taxes on goods and services, on the one hand, and income, on the other hand, could vary materially, with respect to both incremental tax receipts and broad economic activity.

***The Commonwealth is dependent on a small number of corporate taxpayers to generate a significant amount of its tax revenues.***

The economic recession that has affected the Commonwealth since fiscal year 2007 and the income tax reduction program adopted in fiscal year 2011 have negatively affected Commonwealth income tax revenues. Consequently, the special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues. For fiscal years 2014, 2015 and 2016, the revenues produced by Act 154 represented approximately 21%, 21.7% and 20.3%, respectively, of the Commonwealth's General Fund revenues. For fiscal year 2016, approximately 90% of such revenues were collected from ten companies. To the extent that any of these taxpayers reduce their operations in Puerto Rico or move their operations to a different jurisdiction, the Commonwealth's tax base would be reduced and its revenues would be adversely affected. Factors that can cause a reduction in the level of Act 154 revenues include a reduction in the level of local economic activity or production of the corporations that pay the Act 154 taxes, which might occur as a result of general economic conditions or factors affecting individual companies (including the expiration of such companies' patents), any difficulties in the transition, after December 31, 2017, from the Act 154 temporary excise tax to the modified source of income rule under Act 154, and any action by the U.S. Treasury Department to reduce or eliminate the federal income tax credit available with respect to the Act 154 temporary excise tax. For a discussion of Act 154, see "COMMONWEATH REVENUES AND EXPENDITURES – Act 154 Special Tax."

The Act 154 excise tax is currently scheduled to expire on December 31, 2017 and to be replaced by the "modified source of income rule" provided under Act 154. However, since it is unlikely that the level of tax collection under the "modified source of income rule" would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154, the Proposed PROMESA Fiscal Plan proposes that the 4% excise tax be extended temporarily (2-3 years) to give the government sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the plan's projection period. To the extent the Commonwealth is unable to extend the

65

Act 154 4% excise tax while maintaining its creditability for United States tax purposes or otherwise find a timely replacement for such revenues, its revenues would be adversely affected.

### The Commonwealth has frequently failed to meet its revenue projections.

The Commonwealth's ability to implement measures to increase revenues depends on a number of factors, some of which are not wholly within its control, including its ability to project accurately its revenues in light of changing circumstances, and the performance of the Commonwealth's economy.

The Treasury Department's projections for tax revenues involve many premises and assumptions, the effects of which are beyond its control, such as the impact of external factors and events on the economy that may, in turn, affect tax revenues. The projections also may require the forecasting of new revenue measures with no historical collections experience. In the past, the Commonwealth's projections of tax revenues have often differed materially from what the Commonwealth has ultimately been able to collect.   This has been caused, in part, by the Treasury Department's practice of entering into closing agreements with taxpayers towards the end of the fiscal year in order to meet revenue projections.  This practice, which in essence advanced revenues attributable to future fiscal years, is now prohibited by law. While Puerto Rico law now requires FAFAA to validate the revenue projections prepared by the Treasury Department and used to construct the General Fund budget, and PROMESA further requires the Oversight Board to submit to the Governor and the Legislative Assembly a forecast of revenues for use by the Governor in developing budgets, there is no assurance that this new process will enhance the Commonwealth's ability to achieve its tax revenue projections.

### The Commonwealth may be deprived of certain revenues, such as sales and use taxes, to the extent underlying assumptions about its growth are not realized.

The Commonwealth is entitled to receive the portion of the sales and use tax not transferred to COFINA for the payment of its bonds. The amount transferred to COFINA is equal to the greater of a fixed amount that grows annually at 4% or a percentage of the sales and use tax. Since the implementation of the sales and use tax in 2006, sales and use tax collections have not consistently grown at an annual rate at or above 4%, COFINA's assumed statutory growth rate. A portion of the growth during such period has also been driven by expansions in the base of goods and services to which the tax applies, rather than growth occurring due to increased economic activity or tax enforcement. This means that as the fixed amount transferred to COFINA increases, the concurrent increase in the sales and use tax revenues will not be sufficient to match the increase in the amount of taxes transferred, thereby reducing the remaining amount allocated to the Commonwealth. Although the Proposed PROMESA Fiscal Plan assumes a certain level of growth, it is not sufficient to offset the statutorily provided 4% growth rate for the COFINA fixed amount. If the sales and use tax revenues fail to grow at a rate greater than or equal to the rate at which the amount transferred to COFINA grows, the amount allocated to COFINA would increase each year while the amount allocated to the Commonwealth, which is transferred after all amounts allocated to COFINA have been satisfied, would gradually decrease. As a result, to the extent economic activity does not increase at the same rate as the amounts transferred to COFINA, the Commonwealth would receive less sales and use tax collections and its ability to continue providing essential services to the residents of Puerto Rico may be adversely affected. Furthermore, if a material divergence between the

COFINA fixed amount (which grows at 4% annually) and sales and use tax revenues assigned to COFINA were to continue indefinitely, COFINA could, at some point during the next decades, receive the entirety of the portion of the sales and use tax subject to COFINA that is currently received by the General Fund.

*The ability of the Commonwealth to use revenues assigned to certain public corporations may be challenged and, if such revenues are unavailable, the Commonwealth may not be able to cover its operational expenses.*

The Moratorium Act and the executive orders issued thereunder suspend the obligation of the Commonwealth and certain of its public corporations to transfer certain revenues from the central government to HTA, PRIFA, the Convention Center District Authority, ERS, and the MBA, which revenues would otherwise be applied to the payment of such entities debt service and operational expenses. The provisions of the Moratorium Act and the executive orders issued thereunder are currently being challenged in court. Although the Commonwealth believes that the retention of such revenues has been properly authorized, there is no assurance that the Commonwealth will prevail in the defense of the provisions of the Moratorium Act and the executive orders issued thereunder or that the revenues being withheld will be sufficient to allow the government to continue to provide essential services to the people of Puerto Rico. For a more detailed description of these judicial actions, please see "LITIGATION."

**Risks Related to the Commonwealth's Lack of Market Access**

*Concerns about the trajectory of the Commonwealth's economy and the sustainability of the Commonwealth's debt load are likely to limit the Commonwealth's access to the capital markets until such concerns are addressed.*

The Krueger Report stated that the Commonwealth's economy is in a cycle where unsustainable public finances are feeding into uncertainty and low growth, which in turn is raising the fiscal deficit and the debt ratio. The Central Government deficits over the coming years, as projected in the Krueger Report and the Proposed PROMESA Fiscal Plan, imply an unsustainable trajectory of large projected deficiencies of revenues under expenditure and funding gaps. Both the Krueger Report and the Proposed PROMESA Fiscal Plan concluded that a compromise of the creditors' competing claims to the Commonwealth's revenues to support debt service will be required in order to avoid the further destabilization of the Commonwealth's economy and finances. Section 201(b)(1)(E) of PROMESA further requires that a fiscal plan "provide for a debt burden that is sustainable." Market access on sustainable terms is unlikely to be available to the Commonwealth until doubts regarding its economic trajectory and debt sustainability are addressed. The absence of market access in the near-term would exacerbate the funding gaps faced by the Commonwealth and worsen its near-term liquidity crisis.

*The downgrade of the Commonwealth's credit ratings to non-investment grade by the rating agencies, which has recently been reduced to "D", the lowest credit rating given to issuers that have defaulted on their obligations, has significantly limited the ability of the Commonwealth to borrow.*

Beginning in February of 2014, the credit ratings of the Commonwealth's general obligation bonds and Commonwealth guaranteed bonds have been lowered to non-investment grade by Moody's Investors Service, Standard & Poor's Rating Services, and Fitch Ratings.

After the Commonwealth failed to pay debt service on its general obligation bonds and guaranteed bonds due July 1, 2016, each of S&P and Fitch lowered the Commonwealth's credit rating to "D", the lowest credit rating given to issuers that have defaulted on their obligations. These downgrades reflect the fiscal and financial difficulties that the Commonwealth is experiencing and have in turn contributed to such difficulties. One consequence of such downgrades has been severely limited access to the capital markets. The market for non-investment grade securities is smaller and less liquid than the market for investment grade securities. As a result, it is possible that there may not be sufficient demand in the bond market, or with private commercial banks or other financial institutions, to enable the Commonwealth to issue any future bonds or notes or enter into borrowings in the amounts required by the Commonwealth or that the cost to the Commonwealth of any such borrowing could be substantially higher than if it were able to issue more highly rated securities. In addition, changes in the Commonwealth's credit ratings are likely to affect its relationships with creditors and other business counterparties. Finally, considering the current credit ratings of the Commonwealth and its instrumentalities, it may be difficult to achieve in the short and medium term the credit rating levels required to access short and long term financing sources at reasonable rates. Such reasonable market access is a condition for the termination of the Oversight Board established under PROMESA.

*The Commonwealth has not complied with certain of its continuing disclosure obligations on a timely basis, and such failure to comply may limit the Commonwealth's access to the capital markets.*

On several occasions the Commonwealth has failed to comply with its continuing disclosure obligations on a timely basis. For example, the Commonwealth has failed to file its financial statements before its 305-day deadline in ten of the past thirteen years, including the four most recent fiscal years (2012, 2013, 2014 and 2015). Furthermore, due to the delay in completing its financial statements for fiscal year 2014, the Commonwealth has been delayed with the filing of its financial statements for fiscal year 2015 and expects its fiscal year 2016 financial statements and subsequent fiscal years to also be delayed. The Commonwealth's failure to comply with certain of its continuing disclosure obligations on a timely basis could limit its access to the capital markets, because underwriters for Commonwealth bonds must be able to reasonably determine that the Commonwealth will comply with its continuing disclosure obligations on a timely basis before underwriting any future offerings of Commonwealth debt.

**Risks Related to the Commonwealth's Debt Limit**

*The Commonwealth does not have sufficient capacity under constitutional debt limitations to continue funding its operations and financing gaps with direct general obligation debt.*

The Constitution of the Commonwealth provides that the Commonwealth may not issue general obligation debt if the principal and interest on all such debt payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. Depending on the legal interpretation of how the recent defaults in payment of debt service affect the determination of the Constitutional debt limit, it is possible that the 15% debt limit may be exceeded if certain issuers with debt guaranteed by the Commonwealth are unable to meet their debt service payments in January.

Therefore, the Commonwealth expects that its capacity to incur additional general obligation debt will be significantly limited or non-existent for the next several years as a result of this Constitutional limit, among other factors, unless it is able to reduce or restructure its debt service requirements. As a result, to the extent the Commonwealth has any market access, it will be limited in its capacity to issue general obligation debt in the future to cover projected funding gaps, including to finance capital improvement projects, provide working capital, and meet short-term obligations. Although the Commonwealth could seek to issue debt for which the good faith, credit and taxing power of the Commonwealth is not pledged, the demand for such debt, if any, may be constrained. An inability to issue general obligation debt will affect the Commonwealth's ability to finance essential services, honor its financial obligations and make required investments in infrastructure.

**Risks Related to Certain Features of Commonwealth Bonds**

*A preliminary report issued by the Puerto Rico Commission for the Comprehensive Audit of the Public Debt questions whether certain debt issued by the Commonwealth was validly issued.*

Act No. 97 of July 1, 2015 established the Puerto Rico Commission for the Comprehensive Audit of the Public Credit (the "**Audit Commission**") to provide transparency and citizen participation in the review of the Commonwealth's and its public corporations' aggregate debt. In June of 2016, the Audit Commission rendered a pre-audit survey report. Due to timing and funding constraints, the report was limited to a review of documentation produced by GDB associated with the two most recent debt issuances by the Commonwealth (the 2014 $3.5 billion general obligation bond offering and the 2015 tax and revenue anticipations notes). The preliminary report raised concerns about whether the Commonwealth complied with the following requirements set forth in the Commonwealth Constitution: (i) the balanced budget requirement due to the use of bond proceeds to finance deficits; (ii) the debt limit calculation; and (iii) the prohibition against issuing bonds or notes with a maturity in excess of 30 years; among other requirements. The preliminary report also raised concerns about whether the Commonwealth and its advisors and underwriters complied with applicable U.S. Securities and Exchange laws and regulations, in particular those related to continuing disclosure undertakings. The report states that it does not purport to render a legal opinion of any sort but, rather, provide an overview of some of the laws against which the Commission should determine compliance.

Although Commonwealth officials have stated that they have no reason to believe that any of the Commonwealth's debt was issued in violation of the Commonwealth Constitution or any other applicable laws, it is possible that the Commission's final findings or report will generate challenges regarding the validity of certain of the Commonwealth's debt.

*There is no collateral securing the Commonwealth general obligation bonds and there are no statutory provisions for a lien on any asset or revenue of the Commonwealth.*

The Commonwealth's general obligation bonds are not secured by any lien (statutory or otherwise) on any physical asset or revenue of the Commonwealth. Accordingly, no assets or revenues of the Commonwealth may be foreclosed on to produce funds to pay such bonds. In the event the Commonwealth fails to make a payment of interest or principal on the bonds, the bondholders are only entitled to require the Secretary of the Treasury to apply available resources to the payment of general obligation bonds and guaranteed bonds according to the

constitutional priority provisions and may not have the right to compel the exercise of any taxing power of the Commonwealth.  As a result, holders of the Commonwealth's general obligation debt could be treated as general, unsecured creditors under a proceeding instituted pursuant to the provisions of Chapter 9 of the United States Bankruptcy Code, if such a proceeding were available to the Commonwealth.  Although PROMESA incorporates certain provisions of Chapter 9 of the United States Bankruptcy Court, there is no assurance that this treatment would be consistent with the treatment provided to such holders pursuant to PROMESA.

Holders of the Commonwealth's general obligation bonds and guaranteed bonds are also stayed from enforcing any remedies against the Commonwealth pursuant to the provisions of PROMESA until February 15, 2017, subject to certain limited extensions under certain conditions.  For additional information regarding the stay imposed by PROMESA, see "PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT".

### *Holders of the Commonwealth's bonds may not attach the Commonwealth's property.*

The Constitution of Puerto Rico provides that public property and funds of the Commonwealth shall only be disposed of for public purposes, for the support and operation of state institutions, and pursuant to law. The Puerto Rico Supreme Court has determined that Commonwealth property cannot be attached or garnished in an attempt to enforce a judicial order, as it could undermine the Commonwealth's ability to operate and use its property for a public purpose.

### *Commonwealth bondholders may face delays in enforcing their remedies, and the availability of some remedies is not certain.*

The stay currently in place due to the enactment of PROMESA prohibits Commonwealth bondholders from enforcing their remedies against the Commonwealth.  Moreover, the Moratorium Act and the executive orders issued thereunder have temporarily suspended the Commonwealth's obligation, and that of certain instrumentalities, to pay debt service on certain obligations (including general obligation bonds and guaranteed bonds) as they become due. Finally, to the extent the Commonwealth or any instrumentality is subject to the provisions of Title III of PROMESA, a stay similar to that applicable in a bankruptcy proceeding would be in place until the end of such proceeding.  As a result, creditors of the Commonwealth and its instrumentalities may face significant delays in enforcing any of their remedies as they await the result of any legal challenge that may be leveled against PROMESA or the Moratorium Act or, to the extent that such laws are deemed valid by a court of competent jurisdiction, until such time as the requirements of such laws have been satisfied.

The Commonwealth Constitution provides that public debt of the Commonwealth (consisting of general obligation bonds and guaranteed bonds backed by a pledge of the Commonwealth's good faith, credit and taxing power) has a first claim over available resources, and that the Secretary of the Treasury can be judicially required by bondholders to allocate funds to the payment of the public debt if available Commonwealth resources are insufficient to cover all budgeted appropriations.  Through the enactment of the Moratorium Act, however, the Commonwealth has exercised its police power and determined that essential services must be prioritized over payments of debt service.  Moreover, public policy considerations relating to the safety and well-being of the residents of the Commonwealth, as well as procedural matters, could result in delays in, or limitations on, the judicial enforcement of such remedies, and in limitations

70

on the effectiveness of such remedies. The remedies available to bondholders are dependent on judicial actions, which are often subject to substantial discretion and delay. As a result, there is no assurance that bondholders will be able to enforce their remedies pursuant to the Commonwealth Constitution and, to the extent that bondholders are able to enforce their remedies notwithstanding the provisions of the Moratorium Act or PROMESA, there is no assurance that such remedies will be enforced or granted in a timely manner.

The Commonwealth Constitution provides that the good faith, credit and taxing power of the Commonwealth are pledged to the payment of the Commonwealth's general obligation bonds. Prior to July 1, 2016, the Commonwealth had never failed to make a debt service payment on any of its general obligation bonds when due and, therefore, the Puerto Rico Supreme Court has never had the opportunity to rule on whether bondholders have the right to compel the Legislative Assembly of the Commonwealth to increase taxes in the event that available Commonwealth resources are insufficient to pay the bonds, or to rule on how such right, if determined to exist, could be enforced.

Certain other statutory provisions affecting the rights of bondholders, such as the "clawback" provisions, had never been tested until recently. As a result, it is not certain what steps a Commonwealth bondholder would be required to take or what proof such bondholder would be required to produce to compel the diversion of funds from any Commonwealth instrumentality to the payment of public debt, or how the necessary available resources would be allocated to each such instrumentality. See "LITIGATION" for a description of current creditor actions in connection with statutes affecting creditor rights.

**The Commonwealth may continue to pledge its good faith, credit and taxing power to guarantee bonds and notes issued by its instrumentalities.**

The Constitution of Puerto Rico provides that the Commonwealth shall not guarantee any obligation evidenced by bonds or notes if the principal and interest on all its direct obligations to which the good faith, credit and taxing power of the Commonwealth has been pledged payable in any fiscal year, together with any amount paid by the Commonwealth in the prior fiscal year on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual internal revenues of the Commonwealth in the two preceding fiscal years. Therefore, although according to opinions from several Secretaries of Justice of the Commonwealth, bonds and notes guaranteed by the Commonwealth are considered public debt and enjoy the same priority of payment protection that is afforded by the Constitution of Puerto Rico to bonds and notes issued by the Commonwealth for which its good faith, credit and taxing power has been pledged, debt service payable on such guaranteed obligations is not taken into consideration for purposes of the Constitutional debt limit unless the Commonwealth is actually paying such debt service pursuant to its guarantee. Depending on how recent defaults by the Commonwealth are treated for purposes of measuring the Constitutional debt limit, the Commonwealth is either near this 15% threshold or already above it. In order to be able to guarantee any additional public corporation debt, the Commonwealth would have to be below this level.

**The Commonwealth Constitution may be amended to increase the debt limit and allow the Commonwealth to incur additional general obligation debt.**

Although the Commonwealth Constitution provides holders of general obligation debt certain protections, the Commonwealth Constitution may be amended to modify the provisions

71

regarding public debt, such as raising the debt limit. Although amending the Commonwealth Constitution may be difficult (it requires the approval of at least two-thirds of the members of the Puerto Rico House of Representatives and the Puerto Rico Senate, and the approval of a majority of voters in a referendum of qualified voters), and although there are no current plans to propose such an amendment, an amendment of this nature could be proposed and, if proposed, could be approved. An amendment to the Commonwealth Constitution of this nature, however, would have to be approved by the Oversight Board established by PROMESA while it remains in existence. As a result of an amendment of this nature and assuming the Legislative Assembly passes legislation authorizing the bond issue, the Commonwealth could be authorized to incur general obligation debt, or guarantee bonds and notes of instrumentalities, in excess of the current debt limit. No assurance can be given, as a result, that the Constitutional debt limit will remain at its current level.

*The Commonwealth Constitution and other laws of the Commonwealth could be amended in a manner adverse to bondholders or could be overridden by federal law.*

Some of the protection provided by the Commonwealth Constitution and laws of the Commonwealth could be suspended or eliminated through federal or Commonwealth legislation. For example, on April 6, 2016, the Governor signed into law the Moratorium Act, which allows the Governor to declare a moratorium on debt service payments and to stay related creditor remedies for a temporary period for the Commonwealth and certain government instrumentalities. Thereafter, the Governor issued several Executive Orders declaring such a moratorium. The temporary period set forth in the Moratorium Act lasts until January 31, 2017, with a possible two-month extension at the Governor's discretion.

Moreover, the stay imposed by PROMESA could be seen as overriding the remedies and protections granted by the Commonwealth Constitution to bondholders, such as the right to sue the Secretary of the Treasury to collect on their debts and require that all available revenues be first applied to the payment of the debt service on general obligation bonds and notes.

*The Commonwealth's general obligation bonds cannot be accelerated upon a default and there are no cross-default provisions.*

The maturity of the Commonwealth's general obligation bonds cannot be accelerated in the event that the Commonwealth defaults in the payment of any installment of interest or principal due on such bonds. There are no cross-default provisions among general obligation bonds, so any default with respect to any particular issue of bonds would not provide any remedy to holders of other bonds which are not affected.

**Risks Related to Secondary Market Trading**

*The liquidity of the Commonwealth's bonds is limited.*

There is no assurance that the secondary market for the Commonwealth's bonds will provide holders thereof with sufficient liquidity for their investment or that such secondary market will continue. The risk of illiquidity may increase as a result of the recent non-payment of the Commonwealth's bonds or as a result of market or other factors.

**Risks Related to GDB's Financial Condition**

     *The financial condition of the Commonwealth and its instrumentalities could be further adversely affected as a result of GDB's inability to serve as the principal source of short-term liquidity for such entities and to pay all of its liabilities in full, including its deposit liabilities to the Commonwealth and its public corporations*

     GDB is currently unable to meet its financial obligations as they become due and its audited financial statements for fiscal year 2014 present a total net deficit of approximately $316 million, which means that GDB is also insolvent on a balance sheet basis. Moreover, such financial statements were issued with a qualification regarding its ability to continue as a going concern.

     GDB's ability to operate has been limited by its financial condition and the restrictions placed on it by Executive Order 10 and Executive Order 14. See "Emergency Moratorium and Financial Rehabilitation Act" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION for a description of these restrictions. As a result, GDB can no longer serve as the principal source of short-term liquidity for the Commonwealth and its instrumentalities. Thus, the Commonwealth has been required to seek funding from other instrumentalities. There is no assurance that the Commonwealth will be able to access other sources of funding in order to have sufficient liquidity to continue financing current operations.

     The Commonwealth and its public corporations have a significant amount of deposits at GDB. Such entities' ability to withdraw their funds deposited at GDB is currently limited as a result of the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10 and due to GDB's severe liquidity constraints. Restrictions on the withdrawal of GDB deposits may cause certain government entities to be in noncompliance with federal assistance programs and may thus affect future funding under such programs. Moreover, GDB's depositors, which consist primarily of the Commonwealth and its public corporations, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its depositors, which, in turn, could further affect such entities' ability to continue providing essential government services and meet their financial obligations.

**PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT**

     On June 30, 2016, President Obama signed PROMESA into law. PROMESA is an extraordinarily complex law and creates a framework through which the Commonwealth can effectuate fiscal reforms and adjust its debt so as to allow it to adequately provide for its residents on a long-term basis. PROMESA established the Oversight Board, whose role is to provide fiscal oversight through the development and approval of fiscal plans and budgets for the Commonwealth and any instrumentalities that become "covered territorial instrumentalities" by virtue of designation by the Oversight Board. Subject to Oversight Board approval, PROMESA also provides for access to two different federal debt adjustment schemes: (a) Title VI, which provides for a largely out-of-court process through which modifications to financial debt can be accepted by a supermajority of creditors that bind holdouts; and (b) Title III, which provides an in-court process that incorporates many of the powers and provisions of the Bankruptcy Code and permits adjustment of a broad range of obligations.

**Oversight Board**

*Creation and Composition*. PROMESA established the Oversight Board over Puerto Rico on June 30, 2016. The Oversight Board exists as an entity within Puerto Rico's government, and it is not considered to be a part of the government of the United States. PROMESA established a process for selection of seven members to be appointed by the President, each of whom is to have knowledge and expertise in finance, municipal bond markets, management, law, or the organization or operation of business or government. The members of the board will serve concurrent three-year terms.

On August 31, 2016, President Obama appointed each of Andrew G. Biggs, Arthur J. González, Ana J. Matosantos, David A. Skeel, Jr., Carlos M. García, José Ramón González, and José B. Carrión III as members of the Oversight Board. On August 31, 2016, the Governor appointed Richard Ravitch as his representative on the Oversight Board, who serves as a non-voting *ex officio* member. On September 30, 2016, the Oversight Board elected José B. Carrión III as chair.

The Board has not yet appointed an executive director. With the approval of the chair, the executive director may appoint such additional personnel as he considers appropriate. PROMESA contemplates that the Oversight Board will adopt bylaws, rules and procedures, including procedures for hiring experts and consultants. On September 30, 2016, the Oversight Board adopted its bylaws. PROMESA also permits the Oversight Board, by majority vote, to conduct business in executive session, consisting only of the voting members and invited professionals, for those business items set forth as part of the vote to convene such executive session. The Governor and the Legislative Assembly exercise no control or supervision over the Oversight Board or its activities.

*Functionality and Funding*. While the Oversight Board has numerous roles, powers and responsibilities, PROMESA vests it with two primary functions. First, the Oversight Board provides fiscal oversight through the development and approval of fiscal plans and budgets for the Commonwealth and any covered territorial instrumentalities. Second, the Oversight Board plays a key supervisory and gatekeeper role in restructuring proceedings under either Title III or Title VI.

On September 30, 2016, the Oversight Board designated the Commonwealth, the Employees Retirement System, the Judiciary Retirement System, the Teachers Retirement System, the University of Puerto Rico, and all of the Commonwealth's public corporations, including entities affiliated with or subsidiaries of the aforementioned entities, as initial covered territorial instrumentalities subject to PROMESA. **The Board also requested that the Commonwealth and the covered instrumentalities deliver the following:**

- Weekly cash flow reports, disclosing all revenues received and expenses
- Monthly breakdowns of bank accounts
- Monthly and year-to-date compliance with budget
- Monthly and year-to-date revenues
- Monthly detailed payroll reports by agency
- Monthly reports on federal funds disbursed
- Monthly reports on debt and what has been paid
- Agency performance and productivity reports with appropriate metrics

- Quarterly reports on key economic financial and labor statistics

While the development of fiscal plans and budgets are iterative processes with the Governor (and in the case of the Commonwealth, the Legislative Assembly), the Oversight Board ultimately has the last word.  No fiscal plan or budget for the Commonwealth or any covered territorial instrumentality will become effective without the Oversight Board's approval.

Puerto Rico is financially responsible for the cost associated with the management and operations of the Oversight Board, through designation of a permanent funding source, not subject to subsequent legislative appropriations, in an amount "sufficient to support" the annual expenses of the Oversight Board. Pending designation of such a funding source, the Commonwealth must transfer $2 million or such other amount as determined by the Oversight Board to an account in the exclusive control of the Oversight Board. (As of November 30, 2016, $12 million had been transferred to the account of the Oversight Board.) The Oversight Board is charged with using its powers over the Commonwealth's budget to ensure adequate funding for its expenses, and must submit a budget for each fiscal year to the President, certain Congressional committees, the Governor and the Legislative Assembly.  The Congressional Budget Office has estimated that the Oversight Board will cost $350 million in the first two years.

The Oversight Board is vested with subpoena power to compel attendance and testimony, as well as the production of any books or records relating to any matter under investigation.  The Oversight Board also has rights of access to both federal and Commonwealth government data. PROMESA authorizes the Oversight Board to investigate disclosure and selling practices with respect to sale of bonds for and on behalf of retail investors, and to make public the findings resulting from such an investigation.  In addition, if the Oversight Board determines that a pension system is materially underfunded, it is to conduct an analysis prepared by an independent actuary of such pension system.

PROMESA provides that federal district courts lack jurisdiction to review any challenges to certification determinations made by the Oversight Board.  However, the Oversight Board may intervene in any litigation filed against the Commonwealth or covered territorial instrumentalities.

***Fiscal Plan And Budget Approval Process***.  Developing a fiscal plan for the Commonwealth and any covered territorial instrumentality designated by the Oversight Board involves an iterative process that begins when the Oversight Board delivers a notice to the Governor providing a schedule for the process of development, submission, approval and certification.  After the Governor submits the fiscal plan to the Oversight Board, within the time specified, the Oversight Board will evaluate the fiscal plan for compliance with Section 201(b), which sets forth the requirements for approval.  Section 201(b) provides that a fiscal plan shall "provide a method to achieve fiscal responsibility and access to the capital markets," and specifically provides that such fiscal plan shall:

- Provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on (i) applicable laws or (ii) specific bills that require enactment in order to reasonably achieve the projections of the fiscal plan;

- Ensure the funding of essential public services;

75

- Provide adequate funding for public pension systems;

- Provide for the elimination of structural deficits;

- For fiscal years covered by a fiscal plan in which a stay under Titles III or IV is not effective, provide for a debt burden that is sustainable;

- Improve fiscal governance, accountability, and internal controls;

- Enable the achievement of fiscal targets;

- Create independent forecasts of revenue for the period covered by the fiscal plan;

- Include a debt sustainability analysis;

- Provide for capital expenditures and investments necessary to promote economic growth;

- Adopt appropriate recommendations submitted by the Oversight Board (as discussed further elsewhere herein);

- Include such additional information as the Oversight Board deems necessary;

- Ensure that assets, funds, or resources of a territorial instrumentality are not loaned to, transferred to, or otherwise used for the benefit of a covered territory or another covered territorial instrumentality of a covered territory, unless permitted by the constitution of the territory, an approved plan of adjustment under Title III, or a Qualifying Modification approved under Title VI; and

- Respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

If the Oversight Board finds the fiscal plan to be compliant, it will approve it by issuing a certification; if not, it will issue a notice of violation and provide an opportunity to correct non-compliant portions.  This iterative process will continue for as long as allowed by the schedule established by the Oversight Board, and the Governor and the Oversight Board may also jointly develop a compliant fiscal plan.  However, if the Governor fails to submit a compliant fiscal plan in the timeframe set forth by the Oversight Board, the Oversight Board can develop and submit to the Governor and the Legislative Assembly a compliant fiscal plan, which shall be deemed approved by the Governor and be effective.

The budgeting process is similarly iterative, except that in the case of a Commonwealth budget (as opposed to an covered territorial instrumentality budget), the process involves the Legislative Assembly as well as the Governor.  The Oversight Board and the Governor (along with the Legislative Assembly, in the case of a Commonwealth budget) may also jointly develop a compliant budget.  The consequence of failing to provide a compliant budget is the same as failing to provide a compliant fiscal plan: if the Governor and the Legislative Assembly (or in the case of a covered territorial instrumentality budget, the Governor alone) fail to develop and approve a budget that complies with the fiscal plan by the day before the first day of the fiscal

year for which the budget is being developed, the Oversight Board shall submit a compliant budget to the Governor and the Legislative Assembly, which shall be deemed approved and shall be in effect. For budgets that have been certified by the Oversight Board, the Governor may submit a request for reprogramming of any amounts, but neither the Legislative Assembly nor any employee of the government may take any action to carry it out until the Oversight Board certifies the reprogramming as not inconsistent with the Fiscal Plan.

**_Ongoing Oversight_**. Once the fiscal plan and budget are approved, the Oversight Board has the responsibility for ongoing oversight of the financial affairs of the Commonwealth and its covered territorial instrumentalities. The Oversight Board will review quarterly reports submitted by the Governor to determine compliance of revenues, expenditures and cash flows with the relevant budgets. Based on the information provided, the Oversight Board may ask for further explanation and/or require corrections. If the Oversight Board determines that an inconsistency with the approved budget has not been corrected through this process, it may make unilateral reductions in non-debt expenditures to ensure compliance with approved budgets. In the event of noncompliance with a covered instrumentality budget, the Oversight Board may alternatively institute automatic hiring freezes in such covered territorial instrumentality and prohibit the covered territorial instrumentality from entering into any contract or transaction without the prior approval of the Oversight Board. These Oversight Board remedies are terminated only when the Oversight Board determines that the Commonwealth or covered territorial instrumentality has initiated appropriate measures to ensure compliance with the relevant budget.

**_Power Over Legislative Process_**. The Oversight Board also has significant power over the legislative process in the Commonwealth.

For laws enacted _prior to the full appointment of the Oversight Board_, the Oversight Board can retroactively rescind portions of any law that alters creditor priorities if (1) the law was enacted between May 4, 2016 and the date all members of the Oversight Board are appointed, and (2) the law alters the pre-existing priorities of creditors (i) in a manner outside the ordinary course of business or (ii) in a way inconsistent with Puerto Rico's constitution or laws. PROMESA also prohibits the enactment of new laws from the passage of PROMESA until the appointment of the Oversight Board that permit the transfer of funds outside of the ordinary course or that are inconsistent with the Commonwealth's laws or constitution. Such laws are subject to review and rescission.

For laws enacted _after the full appointment of the Oversight Board_, the Governor must submit each newly enacted law to the Oversight Board with a report that analyzes its impact on expenditures and revenues and certify whether the new law is "significantly inconsistent" with the fiscal plan. If the Oversight Board finds the law to be "significantly inconsistent" with an approved fiscal plan, and no remedy or satisfactory explanation is made, the Oversight Board may take such actions as it considers necessary to ensure that the enactment or enforcement of the law will not adversely affect the government's compliance with the fiscal plan (including preventing its enforcement).

The Oversight Board also has broad authority to (1) establish policies to require prior approval by the Oversight Board of a contract, rule, executive order or regulation to ensure they promote market competition and are consistent with the fiscal plan; and (2) prevent the execution or enforcement of a contract, rule, executive order or regulation to the extent that it is

inconsistent with the approved fiscal plan. The Oversight Board is foreclosed, however, from "exercis[ing] applicable authorities" to impede actions taken to comply with consent decrees of settlements with federal agencies, or implement federal programs.

Moreover, at any time, the Oversight Board may submit recommendations to the Governor to ensure compliance with the fiscal plan or to otherwise support financial stability, economic growth, management responsibility, and service delivery efficiency of the Commonwealth and its covered territorial instrumentalities. The Commonwealth and its covered territorial instrumentalities can refuse to implement such recommendations, but a refusal must be accompanied by a detailed explanation that will be delivered to Congress. However, "appropriate" Oversight Board recommendations must be incorporated in the fiscal plan.

PROMESA also precludes the Commonwealth and any covered territorial instrumentality from issuing debt or guaranteeing, modifying, exchanging, repurchasing redeeming or entering into any similar transactions with respect to its debt for so long as the Oversight Board remains in operation.

*__Termination__*. The Oversight Board will terminate only when its members certify that certain conditions have been met, namely that:

(1) The Commonwealth and its covered territorial instrumentalities have adequate access to short-term and long-term credit markets at reasonable interest rates to meet their borrowing needs; and

(2) For at least <u>four</u> consecutive fiscal years, (i) the Commonwealth and its covered territorial instrumentalities have developed budgets in accordance with modified accrual accounting standards, and (ii) revenues equal or exceed expenditures as determined according to modified accrual accounting standards.

## Other Key Provisions

*__Automatic Stay Upon Enactment__*. The enactment of PROMESA operates as a broad-based stay, applicable to all entities, with respect to claims related to bonds, loans, letters of credit, obligations of insurance, or other financial indebtedness for borrowed money (collectively, "**Bonds**") except for actions that were commenced prior to December 18, 2015 or actions by governmental units to enforce their police and regulatory powers. The automatic stay also provides broad protections against provisions in contracts that allow for termination and the exercise of remedies based on the financial condition of the government entity, or in the face of financial debt, non-payment or breach of other covenants or conditions. The stay remains in effect until February 15, 2017, which date may be extended up to 60 days by a Title VI court (discussed below) or 75 days by the Oversight Board if either finds that additional time is needed to complete a voluntary restructuring process under Title VI.

The automatic stay imposed by the enactment of PROMESA applies to covered actions against *all* government instrumentalities in Puerto Rico, which includes political subdivisions like towns and cities, even those that may not be immediately within the jurisdiction and purview of the Oversight Board. PROMESA also permits the payment of principal and interest on its financial debt, and the Oversight Board can require such payments if it determines in its discretion that they are feasible.

Finally, PROMESA provides a procedure to lift the stay and permits relief "for cause shown" and permits interim relief for creditors with an interest in property to prevent "irreparable damage." In analyzing requests to lift the stay, a court would likely look to look to established principles of bankruptcy law. In any case, the stay terminates if an entity proceeds with a Title III restructuring, which itself imposes a different stay on creditor remedies.

*Restrictions on Transfer*. In addition to the Oversight Board's powers, described above, PROMESA creates a direct right of action in favor of creditors concerning certain post-PROMESA transfers. Specifically, Section 407 provides that while the Oversight Board is in existence, if any property "is transferred in violation of applicable law under which any creditor has a valid pledge of, security interest in, or lien on such property, or which deprives any such territorial instrumentality of property in violation of applicable law assuring the transfer of such property to such territorial instrumentality for the benefit of its creditors, then the transferee shall be liable for the value of such property." Creditors may enforce these rights by bringing a district court action after the expiration or lifting of the stay.

*Minimum Wage Change*. Section 403 of PROMESA authorizes the Governor of Puerto Rico, subject to the approval of the Oversight Board, to designate a period not exceeding 4 years during which employers in Puerto Rico may hire new employees that have not attained the age of 25 and pay them at a rate less than the federal minimum wage.

*Purchases from the General Services Administration*. Section 406 of PROMESA authorizes Puerto Rico to make purchases through the General Services Administration, along with all other territories.

*Congressional Task Force*. Section 409 of PROMESA creates a new entity within the legislative branch, known as the Congressional Task Force on Economic Growth in Puerto Rico (the "**Task Force**"), that is required to report to Congress in September 2016 regarding matters the Task Force deems urgent for consideration by Congress. The Task Force must also report to Congress by the end of 2016 regarding impediments under federal law to economic growth, and to recommend changes that would, among other benefits, spur sustainable long-term economic growth and attract investment in Puerto Rico.

*Puerto Rico Infrastructure Revitalization*. Title V of PROMESA establishes the position of "Revitalization Coordinator," which will operate under the Oversight Board, to identify and evaluate infrastructure projects that will provide direct and substantive benefits to Puerto Rico. On November 9, 2016, the Governor selected Aaron Bielenberg as the Revitalization Coordinator from a list of three candidates submitted to him by the Oversight Board. Infrastructure project sponsors may submit any existing, ongoing, or proposed projects to the Revitalization Coordinator accompanied by an analysis of the project on Puerto Rico's infrastructure, the project's estimated cost, and available funding for the project. After receiving a proposal, the Revitalization Coordinator shall identify all Puerto Rico agencies that will have a role in permitting, approving, or authorizing the proposed project, and those agencies will be required to submit to the Revitalization Coordinator an expedited permitting process, with the goal of ensuring that selected projects—known as "critical projects"—can be given priority to the maximum extent possible. The Revitalization Coordinator will then develop a critical project report that assesses the strength and viability of the relevant proposal. The critical project report will include recommendations by both the Governor and the Revitalization Coordinator as to whether the project should be considered a critical project (*i.e.*, a project whose approval and

implementation should be expedited). After a period of public comments, the Revitalization Coordinator must submit the report to the Oversight Board. The Oversight Board, in turn, shall approve or disapprove the project as a critical project, and subsequent to such approval, expedited work on critical projects will begin.

Title V also creates an interagency subcommittee to evaluate environmental documents required under Puerto Rico law to facilitate the expedited permitting process, and the Oversight Board has the power to review Puerto Rico laws that may impede the expedited permitting process. Finally, Title V requires federal agencies to provide a point of contact and to expedite review of projects to the extent possible.

## Debt Restructuring Under Titles VI and III

***Title VI: Creditor Collective Action***. Title VI creates a streamlined process for achieving modifications of financial indebtedness with the consent of a super-majority of those voting in any affected class—or "Pool"—of creditors, provided that such super-majority of those voting also constitutes a majority of the Bonds outstanding in such Pool. Importantly, if the voting thresholds and other requirements are met, the terms of such a modification will be binding on all holders of the relevant debt, including those who did not vote or who voted against the proposed modification. Although it applies to a limited class of obligations, Title VI offers the benefits of potential speed relative to a plenary Title III proceeding.

Title VI also sets forth extensive requirements for the composition of any "Pool" and the treatment of any pooled financial obligation. Title VI directs the Oversight Board to establish separate Pools for Bonds distinguished by specific provisions governing priority or security arrangements, including for general obligation Bonds; for senior and subordinated Bonds according to the relative priority or security arrangements; for guaranteed and non-guaranteed Bonds; and for Bonds for which revenue streams have been pledged, with separate Pools for Bonds of differing priority in such pledges. Title VI requires that all Bonds in the Pools subject to a proposed Modification receive the same amount of consideration per amount of principal, the same amount of consideration per amount of interest accrued but unpaid and the same amount of consideration per amount of past due interest (but would permit holders to select from a menu of options). Title VI has no provision for cram-down of non-consenting Pools, and non-consenting secured holders within a consenting Pool must either retain their liens or receive the lesser of the value of their Bond claims or the collateral securing such claims. There are no fixed deadlines or timeframes within Title VI, and there is no requirement that an Issuer attempt a Title VI process prior to undertaking a Title III process. While there are no fixed deadlines for completion of a Title VI proceeding, Title VI does not impose a stay beyond the limited extensions of the PROMESA stay described above.

The threshold for achieving a binding modification, amendment, supplement, or waiver affecting a Pool of Bonds (known as a "**Modification**") is consent of two-thirds of the outstanding principal amount of Bonds that voted on such Modification, provided that such two-thirds also represents a majority of the outstanding principal amount of Bonds in the Pool. Insurers may vote insured Bonds for the purposes of a Title VI adjustment (to the extent such insurers are granted the right to vote such Bonds for purposes of directing remedies or consenting to proposed amendments or modifications as provided in the applicable contracts).

Access to, and completion of, a Title VI process is subject to approval by the Oversight Board. No entity may consummate a Modification without the Oversight Board's first certifying that the proposed agreement is in conformance with the fiscal plan (also controlled by the Oversight Board) or, if no fiscal plan has been adopted, that the agreement provides for a sustainable level of debt. The Oversight Board also has the power to, among other things, grant (or deny) any instrumentality access to Title VI altogether; establish pools for voting, and issue successive certifications that the proposed modification meets the relevant requirements to (i) become a "Qualifying Modification" and (ii) to have a binding effect. Importantly, creditors may themselves propose a Qualifying Modification, which the Oversight Board may accept on the issuer's behalf.

While there can be some variation, the general Title VI process is set forth below:

(1) A modification is proposed for the Commonwealth or any covered territorial instrumentality of the Commonwealth that is specifically authorized by the Oversight Board to proceed under Title VI. Such modification may be proposed by the issuer, or by creditors and accepted by the Oversight Board on the issuer's behalf.

(2) The Issuer provides certain financial and economic information, and its fiscal plan, if any.

(3) The Oversight Board certifies that the Modification is a "Qualifying Modification," which requires that

- The Issuer has consulted with creditors or the Modification is consistent with a restructuring support or similar agreement with a majority in amount of affected claims that predates passage of PROMESA ("Voluntary Agreement Process");

- The Modification offers equal treatment within each creditor Pool; and

- The Modification (i) is consistent with the Issuer's fiscal plan, (ii), if no fiscal plan then exists, provides for a sustainable level of debt, or (iii) is limited to extending maturities and interest payment dates for a period of up to one year (collectively, the "**Modification Options**").

(4) The Oversight Board approves Pools for voting purposes.

(5) The Issuer solicits each Pool affected by the Qualifying Modification.

(6) Holders of two-thirds in amount of qualifying Bonds voting in each Pool vote to approve the Qualifying Modification, provided that that two-thirds represents a majority of the outstanding amount of such qualifying Bonds.

(7) The Oversight Board Certifies that:

- The voting standard has been satisfied;

- The Qualifying Modification achieves one of the Modification Options; and

- All conditions precedent have been satisfied or waived.

81

(8) The district court, upon review of an application by the Issuer, enters an order that the requirements of Title VI have been satisfied. For non-consenting secured creditors, the district court must find that either (a) they retained the lien securing their claim, or (b) they will receive the lesser of the value of their claim or the value of the collateral. This order will be valid and binding on all persons asserting claims under the bonds or instruments that are the subject of the Qualifying Modification and enjoin collateral attacks.

Pursuant to Section 104 of PROMESA, Issuers that entered into "Preexisting Voluntary Agreements" with their creditors, which are defined to include only those agreements consummated prior to May 18, 2016, are exempted from the requirement of receiving certification that the agreement achieves one of the Modification Options. Additionally, Section 601 of PROMESA provides that Issuers that entered into Preexisting Voluntary Agreements with their creditors may also classify insured and uninsured Bonds differently for pooling purposes.

**_Title III: Adjustment of Debts_**.    Title III creates a court-supervised debt-adjustment mechanism for the Commonwealth and its covered territorial instrumentalities. Title III imports heavily from the U.S. Bankruptcy Code, including its classification and cram-down provisions, which potentially will provide Puerto Rico and its covered territorial instrumentalities with significantly greater flexibility in restructuring debts than under Title VI. Unlike the Bankruptcy Code, Title III gives the Oversight Board significant control in the proceeding.

Title III begins by incorporating various provisions of the U.S. Bankruptcy Code that are to be applicable in a Title III proceeding. These provisions are largely the same provisions made applicable to cases under Chapter 9 of the U.S. Bankruptcy Code in addition to many of the provisions of Chapter 9 itself. Relevant provisions include, among others, the automatic stay; standards for adequate protection, for obtaining post-petition credit, and for filing, allowance, and priority of claims; fraudulent transfer, preference, and avoidance and recovery statutes; and most of the plan formulation and confirmation requirements that exist in Chapter 9.

Title III also provides for jurisdiction in federal district courts, with venue in the district of the territory or covered territorial instrumentality or, if determined by the Oversight Board based on considerations of resources and impact on witnesses, in a district where the Oversight Board is located outside of the territory. The district judge to preside over a Title III proceeding is chosen by designation of the Chief Justice of the United States (for a proceeding of a territory), or of the Chief Judge of the Court of Appeals for the First Circuit (for a proceeding of a territorial instrumentality). The Federal Rules of Bankruptcy Procedure apply in their entirety to Title III proceedings.

Unlike Chapter 9 of the U.S. Bankruptcy Code, PROMESA grants the Oversight Board (as opposed to the debtor) power over key milestones in the Title III restructuring process. The Oversight Board controls access to Title III, as the Oversight Board must issue a "restructuring certification," approved by at least five members of the Oversight Board, as a prerequisite to filing under Title III. The restructuring certification requires that the Oversight Board determine that the prospective debtor has (a) made good-faith efforts to reach a consensual restructuring, (b) adopted procedures necessary to deliver timely audited financial statements, and (c) made public draft financial statements and other information necessary to make an informed decision with respect to possible restructuring. The Oversight Board then serves as the "representative" of any and all debtors, in the proceeding, and has the power to file and modify plans of

adjustment. The Oversight Board is also empowered to file any other pleadings it deems appropriate.

Although Title III largely imports plan confirmation standards from Chapter 9, there are two noteworthy departures. *First*, Title III includes a modified "best interests of creditors" test, which states that a plan will only be confirmed if it is "feasible and in the best interests of creditors, which shall require the court to consider whether available remedies under the non-bankruptcy laws and constitution of the territory would result in a greater recovery for the creditors than is provided by" the plan to which the court is applying the confirmation analysis. Chapter 9 confirmation standards include a textually shorter formulation such that a plan will be confirmed only if the plan is in the best interests of creditors and is feasible. However, case law applying the Chapter 9 standard employed a similar analysis. *Second*, Title III adds a requirement that both the court and the Oversight Board must determine that the plan is consistent with the applicable fiscal plan certified by the Oversight Board. A fiscal plan must, in turn, respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of PROMESA.

## COMMONWEALTH REVENUES AND EXPENDITURES

This section describes the major sources of revenue from which the Commonwealth funds its operations. It also gives a broad overview of central government's expenditures as well as the budgetary process through which such expenses are authorized.

**Revenues**

The Commonwealth funds its operations from internal revenues (primarily revenues from local taxes, fees and charges) as well as revenue from inter-governmental sources, primarily federal funds. The Commonwealth's tax revenues consist principally of income, excise and sales and use taxes. Such taxes are collected pursuant to the provisions of Act No. 1-2011, the Puerto Rico Internal Revenue Code of 2011, as amended (the "**2011 Code**").

The Commonwealth accounts for most of the tax revenue it collects in its General Fund, sometimes referred to herein as the General Fund (Operating Fund), which is its primary operating fund. However, for budgetary purposes, certain Commonwealth revenues from designated sources that are assigned on a continuing basis to designated agencies or instrumentalities for specified purposes are not accounted for in the General Fund (Operating Fund) but rather are accounted for in "Special Revenue Funds." (All such revenues, including those accounted for in the Special Revenue Funds, are accounted for in the "General Fund" for purpose of the annual financial statements of the Commonwealth prepared in accordance with U.S. GAAP.) Revenues not accounted for in the General Fund (Operating Fund) but accounted for in Special Revenue Funds include (i) certain tax revenues assigned by law to public corporations or other third parties, (ii) charges and fees for services collected by Commonwealth agencies, (iii) federal funds, (iv) dividends or other distributions received by the Commonwealth from its public corporations and (v) certain other revenues. Furthermore, certain other tax revenues, including the sales and use tax revenues assigned to COFINA, are not accounted for in the General Fund (whether in the Operating Fund or its Special Revenue Funds) but are rather accounted for in other Governmental Funds administered and managed by the relevant

government instrumentality. Municipal property taxes assigned by law to the Commonwealth's Debt Service Fund, for example, are also not included in the General Fund.

Because the Commonwealth follows the practice of pooling all its cash, most revenues accounted for in the General Fund (Operating Fund) and in the Special Revenue Funds (subject to certain limited exceptions) are deposited in the TSA. See "Commonwealth Liquidity - Treasury Single Account" under OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION.

The following tables shows revenues for the Commonwealth's General Fund and its other Governmental Funds for fiscal years 2016, 2015 and 2014. Revenues for fiscal year 2016 do not include certain accruals and other adjustments required by U.S. GAAP. Revenues for fiscal years 2015 and 2014 are presented pursuant to "current financial resources measurement" focus and the "modified accrual" basis of accounting, in accordance with U.S. GAAP, segregated between the General Fund (Operating Fund) and the Special Revenue Funds, plus a reconciliation column for other adjustments made pursuant to U.S. GAAP for financial statements presentation purposes. The Other Governmental Funds included in the tables are comprised of the following: (a) the Commonwealth's Capital Project Fund, (b) the Commonwealth's Debt Service Fund and (c) the funds related to the Commonwealth's "Blended Component Units", including COFINA, PRIFA, PBA and the Special Communities Trust. The following sections describe in greater detail the principal revenues shown on the following table.

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Revenues [(1)(2)]
Year Ended June 30, 2016
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [(1)] | Other Governmental Funds [(4)] | Total Governmental Funds [(4)] |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $2,021,256 | - | $2,021,256 | - | $2,021,256 |
| Corporations | 1,647,422 | - | 1,647,422 | - | 1,647,422 |
| Partnerships | 1,023 | - | 1,023 | - | 1,023 |
| Withholdings from non-residents | 809,750 | 40,254 | 850,004 | - | 850,004 |
| Tollgate taxes | - | - | - | - | - |
| Interest | 4,212 | - | 4,212 | - | 4,212 |
| Dividends | 30,739 | - | 30,739 | - | 30,739 |
| Inheritance and gift taxes | 2,019 | - | 2,019 | - | 2,019 |
| Total income taxes | 4,516,421 | 40,254 | 4,556,675 | - | 4,556,675 |
| **Sales and Use Tax** [(3)] | **1,559,627** | **3,240** | **1,562,867** | **696,259** | **2,259,126** |
| **Excise Taxes:** | | | | | |
| Alcoholic beverages | 264,704 | - | 264,704 | - | 264,704 |
| Foreign (Act 154) | 1,876,009 | - | 1,876,009 | - | 1,876,009 |
| Tobacco products | 100,295 | 64,765 | 165,060 | - | 165,060 |
| Motor vehicles | 265,606 | 20,000 | 285,606 | - | 285,606 |
| Horses races | 7,199 | - | 7,199 | - | 7,199 |
| Insurance premiums | 58,422 | - | 58,422 | - | 58,422 |
| Petroleum Tax | - | 398,143 | 398,143 | - | 398,143 |
| Gasoline & Diesel Oil Tax | - | 168,033 | 168,033 | - | 168,033 |
| Other excise taxes | 14,882 | 21,007 | 35,889 | - | 35,889 |
| Total excise taxes | 2,587,117 | 671,948 | 3,259,065 | - | 3,259,065 |
| **Property Taxes** | **11,315** | **-** | **11,315** | **-** | **11,315** |
| **Other Taxes:** | | | | | |
| Motor vehicles Licenses | 2,043 | 92,987 | 95,030 | - | 95,030 |
| Alcoholic Beverages licenses & Other Taxes | 16,980 | 46,027 | 63,007 | - | 63,007 |
| Total other taxes | 19,023 | 139,014 | 158,037 | - | 158,037 |
| **Charges for Services:** | | | | | |
| Public Health/Patient Fees | - | 155,561 | 155,561 | - | 155,561 |
| Charges for Service | 10,140 | 68,621 | 78,761 | - | 78,761 |
| Rental Fees | - | 12,979 | 12,979 | - | 12,979 |
| Documents Rights Fees | 50,545 | 38,327 | 88,872 | - | 88,872 |
| Judicial Services Fees | - | 21,487 | 21,487 | - | 21,487 |
| Public Housing Fees | - | - | - | - | - |
| Motor Vehicle Fines | - | 5,982 | 5,982 | - | 5,982 |
| Motor Vehicle Permits Fees | - | 37,083 | 37,083 | - | 37,083 |
| Professional Licenses Fees | - | 24,361 | 24,361 | - | 24,361 |
| Permits Fees | - | 17,158 | 17,158 | - | 17,158 |
| Registration Fees | - | 11,983 | 11,983 | - | 11,983 |
| Trademark Fees | 25,978 | - | 25,978 | - | 25,978 |
| Other Fines | - | 54,760 | 54,760 | - | 54,760 |
| Other Permits and Fees | - | 10,526 | 10,526 | - | 10,526 |
| Other | 449 | 133,056 | 133,505 | - | 133,505 |
| Total Charges for services | 87,112 | 591,884 | 678,996 | - | 678,996 |
| **Revenue from Global Tabaco Settlement** | **-** | **71,108** | **71,108** | **-** | **71,108** |
| **Revenue from Component Units** | **17,214** | **203,656** | **220,870** | **-** | **220,870** |
| **Intergovernmental Revenues:** | | | | | |
| Federal Grants & Subsidies | - | 5,998,512 | 5,998,512 | - | 5,998,512 |
| Offshore Rum Excise Tax | 199,633 | 130,079 | 329,712 | - | 329,712 |
| Municipal Property Tax | - | - | - | 103,314 | 103,314 |
| Other | - | - | - | 36,000 | 36,000 |
| Total Intergovernmental revenues | 199,633 | 6,128,591 | 6,328,224 | 139,314 | 6,467,538 |
| **Interest and Investment earnings** | **-** | **4,616** | **4,616** | **10,590** | **15,206** |
| **Other** | 49,877 | 20,558 | 70,435 | 14,203 | 84,638 |
| **Total Revenues** | **$ 9,047,339** | **$ 7,874,869** | **$ 16,922,208** | **860,366** | **$ 17,782,574** |

*Sources*: The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds - General Fund.
Totals may not add up due to rounding. Fiscal year 2016 figures are preliminary, unaudited and subject to change. 2016 figures did not include related accruals and reclassifications adjustments as required by U.S. GAAP.

[(1)] As required for presentation according to U.S. Generally Accepted Accounting Principles.
[(2)] Excludes transfers in or from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).
[(3)] Sales and Use Tax revenues excludes revenues allocated to the Municipal Assistance Fund and COFIM.
[(4)] Figures do not include all component units that will become "blended component units" in the other governmental funds in fiscal year 2016, as part of a significant change in reporting entity of the Commonwealth, as required by GASB 61.

85

**COMMONWEALTH OF PUERTO RICO**
Statement of Revenues - Governmental Funds
Year Ended June 30, 2015
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Accruals & Other Adjustments [4] | Total General Fund [1] | Other Governmental Funds [5] | Total Governmental Funds [5] |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| **Income Taxes:** | | | | | | |
| Individuals | $2,156,826 | - | $383,247 | $2,540,073 | - | $2,540,073 |
| Corporations | 1,852,168 | - | - | 1,852,168 | - | 1,852,168 |
| Partnerships | 2,203 | - | - | 2,203 | - | 2,203 |
| Withholdings from non-residents | 810,718 | 82,859 | - | 893,576 | - | 893,576 |
| Tollgate taxes | 3,651 | - | - | 3,651 | - | 3,651 |
| Interest | 4,414 | - | - | 4,414 | - | 4,414 |
| Dividends | 152,691 | - | - | 152,691 | - | 152,691 |
| Inheritance and gift taxes | 2,149 | - | - | 2,149 | - | 2,149 |
| Total income taxes | **4,984,820** | **82,859** | **383,247** | **5,450,926** | **-** | **5,450,926** |
| **Sales and Use Tax** [3] | **619,199** | **3,240** | **-** | **622,439** | **698,468** | **1,320,907** |
| **Excise Taxes:** | | | | | | |
| Alcoholic beverages | 236,633 | - | - | 236,633 | - | 236,633 |
| Foreign (Act 154) | 1,920,110 | - | - | 1,920,110 | - | 1,920,110 |
| Tobacco products | 153,213 | 31,402 | - | 184,615 | - | 184,615 |
| Motor vehicles | 252,121 | 20,000 | - | 272,121 | - | 272,121 |
| Horses races | 10,151 | - | - | 10,151 | - | 10,151 |
| Insurance premiums | 59,325 | - | - | 59,325 | - | 59,325 |
| Petroleum Tax | 3,158 | 272,183 | - | 275,341 | - | 275,341 |
| Gasoline & Diesel Oil Tax | - | 154,887 | - | 154,887 | - | 154,887 |
| Other excise taxes | 18,764 | 32,398 | - | 51,162 | - | 51,162 |
| Total excise taxes | **2,653,475** | **510,870** | **-** | **3,164,345** | **-** | **3,164,345** |
| **Property Taxes** | **21,586** | **-** | - | **21,586** | **-** | **21,586** |
| **Other Taxes:** | | | | | | |
| Motor vehicles Licenses | 2,156 | 89,629 | - | 91,785 | - | 91,785 |
| Entertainment machine licenses | 29 | 161 | - | 190 | - | 190 |
| Alcoholic Beverages licenses & Other Taxes | 20,846 | 740 | - | 21,586 | - | 21,586 |
| Total other taxes | **23,031** | **90,530** | **-** | **113,561** | **-** | **113,561** |
| **Charges for Services:** | | | | | | |
| Public Health/Patient Fees | - | 145,197 | - | 145,197 | - | 145,197 |
| Charges for Service | - | 92,505 | - | 92,505 | - | 92,505 |
| Rental Fees | - | 12,227 | - | 12,227 | - | 12,227 |
| Documents Rights Fees | 55,337 | 31,317 | - | 86,654 | - | 86,654 |
| Judicial Services Fees | - | 16,555 | - | 16,555 | - | 16,555 |
| Public Housing Fees | - | 37,525 | - | 37,525 | - | 37,525 |
| Motor Vehicle Fines | - | 55,193 | - | 55,193 | - | 55,193 |
| Motor Vehicle Permits Fees | - | 36,765 | - | 36,765 | - | 36,765 |
| Professional Licenses Fees | - | 22,990 | - | 22,990 | - | 22,990 |
| Permits Fees | 3,025 | 16,838 | - | 19,863 | - | 19,863 |
| Registration Fees | 7,146 | 4,764 | - | 11,910 | - | 11,910 |
| Trademark Fees | 34,725 | 9 | - | 34,734 | - | 34,734 |
| Other Fines | 19,543 | 8,552 | - | 28,095 | - | 28,095 |
| Other Permits and Fees | - | - | - | - | - | - |
| Other | - | 85,006 | - | 85,006 | - | 85,006 |
| Total Charges for services | **119,776** | **565,443** | **-** | **685,219** | **-** | **685,219** |
| **Revenue from Global Tabaco Settlement** | **-** | **71,514** | **-** | **71,514** | **-** | **71,514** |
| **Revenue from Component Units** | **19,366** | **173,445** | | **192,811** | **6,033** | **198,844** |
| **Intergovernmental Revenues** | | | | | | |
| Federal Grants & Subsidies | - | 6,060,647 | - | 6,060,647 | - | 6,060,647 |
| Offshore Rum Excise Tax | 189,227 | 139,773 | - | 329,000 | - | 329,000 |
| Municipal Property Tax | - | - | - | - | 72,249 | 72,249 |
| Other | 2,265 | 15,792 | - | 18,057 | 36,000 | 54,057 |
| Total Intergovernmental revenues | **191,492** | **6,216,212** | **-** | **6,407,704** | **108,249** | **6,515,953** |
| **Interest and Investment earnings** | **-** | **4,131** | **-** | **4,131** | **12,362** | **16,493** |
| **Other** | 94,020 | 76,478 | | 170,498 | 5,194 | 175,692 |
| **Total Revenues** [2] | **$8,726,765** | **$7,794,722** | **$383,247** | **$16,904,734** | **$830,306** | **$ 17,735,040** |

*Sources*: The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds.
Totals may not add up due to rounding. Fiscal year 2015 figures are preliminary, unaudited and subject to change.

[1] As required for presentation pursuant to U.S. Generally Accepted Accounting Principles.
[2] Excludes transfers in or from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).
[3] Sales and Use Tax revenues excludes revenues allocated to the Municipal Assistance Fund and COFIM.
[4] Includes adjustments made only for financial statement presentation purposes, that are not allocated directly to Special Revenue or General Funds.
[5] Figures do not include all component units that will become "blended component units" in the other governmental funds in fiscal year 2015, as part of a significant change in reporting entity of the Commonwealth, as required by GASB 61.

86

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds detailed revenues [1]
Year Ended June 30, 2014
(in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Accruals & Other Adjustments [3] | Total General Fund [1] | Other Governmental Funds | Total Governmental Funds |
|---|---|---|---|---|---|---|
| **Revenues:** | | | | | | |
| **Income Taxes:** | | | | | | |
| Individuals | $1,832,487 | - | 240,745 | $2,073,232 | - | $2,073,232 |
| Corporations | 1,914,333 | - | - | 1,914,333 | - | 1,914,333 |
| Partnerships | 745 | - | - | 745 | - | 745 |
| Withholdings from non-residents | 899,965 | 67,443 | - | 967,408 | - | 967,408 |
| Tollgate taxes | 7,140 | - | - | 7,140 | - | 7,140 |
| Interest | 4,900 | - | - | 4,900 | - | 4,900 |
| Dividends | 39,713 | 100,000 | - | 139,713 | - | 139,713 |
| Inheritance and gift taxes | 1,395 | - | - | 1,395 | - | 1,395 |
| Total income taxes | **4,700,678** | **167,443** | **240,745** | **5,108,866** | **-** | **5,108,866** |
| **Sales and Use Tax** | 645,254 | 3,240 | - | 648,494 | 645,951 | 1,294,445 |
| **Excise Taxes:** | | | | | | |
| Alcoholic beverages | 266,542 | - | - | 266,542 | - | 266,542 |
| Foreign (Act 154) | 1,902,193 | - | 47,995 | 1,950,188 | - | 1,950,188 |
| Tobacco products | 171,108 | 30,744 | - | 201,852 | - | 201,852 |
| Motor vehicles | 407,943 | 20,000 | - | 427,943 | - | 427,943 |
| Horses races | 16,354 | - | - | 16,354 | - | 16,354 |
| Insurance premiums | 42,642 | - | - | 42,642 | - | 42,642 |
| Petroleum Tax | - | 265,240 | - | 265,240 | - | 265,240 |
| Gasoline & Diesel Oil Tax | - | 166,736 | - | 166,736 | - | 166,736 |
| Other excise taxes | 8,247 | 17,867 | - | 26,114 | - | 26,114 |
| Total excise taxes | **2,815,029** | **500,587** | **47,995** | **3,363,611** | **-** | **3,363,611** |
| **Property Taxes** | 58,535 | - | (2,697) | 55,838 | - | 55,838 |
| **Other Taxes:** | | | | | - | |
| Motor vehicles Licenses | 2,209 | 91,009 | - | 93,218 | - | 93,218 |
| Entertainment machine licenses | 22 | 193 | - | 215 | - | 215 |
| Alcoholic Beverages licenses & Other Taxes | 18,275 | 532 | - | 18,807 | - | 18,807 |
| Total other taxes | **20,506** | **91,734** | **-** | **112,240** | **-** | **112,240** |
| **Charges for Services:** | | | | | | |
| Public Health/Patient Fees | - | 135,991 | - | 135,991 | - | 135,991 |
| Charges for Service | - | 63,570 | - | 63,570 | - | 63,570 |
| Rental Fees | - | 34,449 | - | 34,449 | - | 34,449 |
| Documents Rights Fees | 35,603 | 56,874 | - | 92,477 | - | 92,477 |
| Judicial Services Fees | - | 15,936 | - | 15,936 | - | 15,936 |
| Public Housing Fees | - | 37,525 | - | 37,525 | - | 37,525 |
| Motor Vehicle Fines | - | 45,509 | - | 45,509 | - | 45,509 |
| Motor Vehicle Permits Fees | - | 36,923 | - | 36,923 | - | 36,923 |
| Professional Licenses Fees | - | 23,464 | - | 23,464 | - | 23,464 |
| Permits Fees | 9,316 | 14,882 | - | 24,198 | - | 24,198 |
| Registration Fees | 4,829 | 3,218 | - | 8,047 | - | 8,047 |
| Trademark Fees | 43,905 | 15 | - | 43,920 | - | 43,920 |
| Other Fines | 5,392 | 26,107 | - | 31,499 | - | 31,499 |
| Other Permits and Fees | 9,534 | 41,204 | - | 50,738 | - | 50,738 |
| Other | - | 50,261 | - | 50,261 | - | 50,261 |
| Total Charges for services | **108,579** | **585,928** | **-** | **694,507** | **-** | **694,507** |
| **Revenue from Global Tabaco Settlement** | - | 72,130 | - | 72,130 | - | 72,130 |
| **Revenue from Component Units** | 23,673 | 107,460 | - | 131,133 | **-** | 131,133 |
| **Intergovernmental Revenues** | | | | | | |
| Federal Grants & Subsidies | - | 6,067,948 | - | 6,067,948 | - | 6,067,948 |
| Offshore Rum Excise Tax | 237,159 | 82,978 | - | 320,137 | - | 320,137 |
| Municipal Property Tax | - | - | - | - | 119,289 | 119,289 |
| Other | - | 25,015 | - | 25,015 | 35,883 | 60,898 |
| Total Intergovernmental revenues | **237,159** | **6,175,941** | **-** | **6,413,100** | **155,172** | **6,568,272** |
| **Interest and Investment earnings** | - | 4,158 | - | 4,158 | 17,168 | 21,326 |
| **Other** | 116,581 | 16,804 | - | 133,385 | 7,891 | 141,276 |
| **Total Revenues** | **$ 8,725,994** | **$7,725,425** | **$286,043** | **$16,737,462** | **$826,182** | **$17,563,644** |

*Sources:* The Statement of Revenues and Expenditures and Changes in Fund Balance - Governmental Funds as presented in the Commonwealth's financial statements for fiscal year 2014. Totals may not add up due to rounding.

[1] As required for presentation pursuant to U.S. Generally Accepted Accounting Principles.

[2] Excludes transfers in or from other funds, receipts of debt or notes issued (including transfers from lotteries funds, among others).

[3] Includes adjustments made only for financial statement presentation purposes, that are not allocated directly to Special Revenue Funds or the General Fund (Operating Fund).

**Income Taxes**

*Individuals*. Resident individuals are subject to tax on their taxable income from all sources. There are five tax brackets for individuals, with tax rates of 0%, 7%, 14%, 25% and 33%. The 0% tax rate is applicable if the net taxable income is $9,000 or less, and the highest income tax bracket is applicable to taxable income above $61,500.

Dividend income from Puerto Rico corporations and certain qualifying foreign corporations is taxed at an income tax rate of 15%, in the case of distributions effected after June 30, 2014 (dividends prior to that date were taxed at 10%). Gains realized from the sale or exchange of a capital asset by resident individuals, if held for more than one year, are taxed at a rate of 15% in the case of sales or exchanges effected after June 30, 2014 (transactions prior to that date were taxed at 10% if held for more than six months). Capital losses may only be deducted up to the lower of 80% of capital gains or $1,000.

Interest income in excess of $2,000 on deposit with Puerto Rico financial institutions is taxed at a rate of 10%, unless a lower regular tax rate applies; the first $2,000 of interest income from such institutions is exempt from taxation. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations and paid to resident individuals, trusts, estates, corporations and partnerships qualifies for a tax rate of 10%. If said income and other income subject to preferential tax rates exceed certain levels, a higher alternate basic tax rate may apply. For taxable years commenced after December 31, 2013, individuals with income subject to alternate basic tax from $150,000 to $200,000 are subject to an alternate basic tax rate of 10%; individuals with income subject to alternate basic tax from $200,001 to $300,000 are subject to an alternate basic tax rate of 15%; and individuals with income subject to alternate basic tax in excess of $300,000 are subject to an alternate basic tax rate of 24%.

Total deduction for mortgage interest on residential property is limited to the lower of the amount of interest paid, 30% of the individual's adjusted gross income, or $35,000.

For fiscal years 2014 and 2015, the Commonwealth's individual income tax revenues (preliminary and unaudited in the case of 2015) amounted to approximately $2.073 billion and $2.540 billion, respectively. For fiscal year 2016, without the required adjustments to present properly the data pursuant to U.S. GAAP, preliminary and unaudited figures for individual income tax revenues were $2.021 billion.

*Corporations*. Puerto Rico corporations and limited liability companies (other than those electing pass-through treatment) are subject to tax on income from all sources; foreign corporations that are engaged in a trade or business in Puerto Rico are subject to tax on their income from Puerto Rico sources and on income from sources outside Puerto Rico that is effectively connected with the conduct of their trade or business in Puerto Rico. Unless a corporation qualifies for partial exemption from corporate income and other taxes under the tax incentives programs (see "THE ECONOMY - Tax and Other Economic Development Initiatives"), it is subject to tax at graduated rates.

The maximum corporate income tax rate is 39% for net taxable income in excess of $300,000, but taking into account a surtax deduction of $25,000. The alternative minimum tax rate for corporations is 30% applied to the alternative minimum net income.

88

Gains realized from the sale or exchange of a capital asset, held for more than twelve months, are taxed at a maximum regular income tax rate of 20%. Capital losses may only offset 80% of capital gains. Dividends received by Puerto Rico corporations from foreign corporations are subject to the regular corporate income tax rates. A dividends received deduction of up to 100% may be available when the corporation making the distribution is organized in Puerto Rico. Interest income on certain qualifying debt obligations issued by Puerto Rico corporations and certain qualifying foreign corporations, and paid to corporations, qualifies for a special tax rate of 10%.

Resident foreign corporations are generally subject to a branch profits tax on their income effectively connected with their Puerto Rico trade or business. The branch profits tax is 10% of an annual dividend equivalent amount, and it applies without regard to the Puerto Rico source of income rules. Act 77-2014 amended the branch profits tax provision to exclude loans and credit transactions between affiliates, except when such transactions arise from the sale of property or in the case of banking entities, from Puerto Rico assets and Puerto Rico liabilities in determining the dividend equivalent amount.

In general, corporations, and the partners of partnerships operating under a new grant of tax exemption issued under Act No. 73-2018, also known as the Economic Incentives Act, are subject to either (i) an income tax rate of 4% with a 12% withholding tax rate on royalty payments or (ii) an income tax rate of 8% with a 2% withholding tax rate on royalty payments, during their basic exemption period. Certain products that are qualified as "pioneer products" enjoy a more favorable tax treatment.

Corporations, and the partners of partnerships operating under a new grant of tax exemption issued under Act No. 74-2010, also known as the Tourism Development Act, are subject to a maximum tax rate of 39% on their taxable income that, after applying the 90% exemption granted under the Tourism Development Act, results in a maximum effective tax rate of 3.9% on their net tourism development income.

Interest from Puerto Rico sources paid by Puerto Rico resident borrowers to non-resident non-affiliated corporate recipients is not subject to any income or withholding tax. Interest paid by Puerto Rico resident borrowers to certain related non-resident recipients is subject to a withholding tax of 29%. Dividends paid to non-resident corporate recipients are subject to a withholding tax of 10%. Dividends distributed by corporations operating under new grants of tax exemption issued under the Economic Incentives Act and Act No. 83-2010, also known as the Green Energy Incentives Act, out of income derived from their tax exempt operations are not subject to Puerto Rico income tax. However, royalty payments made by corporations that hold tax exemption grants under the Economic Incentives Act to non-resident recipients are subject to an income tax withholding of 2% or 12%, depending on certain elections made by the grantee, and in the case of corporations covered by the Green Energy Incentives Act, royalty payments to non-residents are subject to an income tax withholding of 12%.

For fiscal years 2014 and 2015, Commonwealth corporate income tax revenues (preliminary and unaudited in the case of 2015) amounted to approximately $1.914 billion and $1.852 billion, respectively. Preliminary and unaudited corporate income taxes, for fiscal year

2016, without the required adjustments to properly present pursuant to U.S. GAAP were approximately $1.647 billion.

*Non-Resident Withholding Tax*. In general, non-residents are subject to a withholding tax on royalty payments received from Puerto Rico sources. The regular withholding rate on these payments to nonresidents is 29%. However, as explained above, corporations, and the partners of partnerships operating under a grant of tax exemption issued under Act No. 74-2010, are subject during their exemption period to either (i) an income tax rate of 4% with a 12% withholding tax rate on royalty payments or (ii) an income tax rate of 8% with a 2% withholding tax rate on royalty payments. Certain products that are qualified as "pioneer products" enjoy a more favorable tax treatment. Approximately 10% of the revenues derived from the withholding tax on royalties paid by companies operating under Act No. 74-2010 are assigned to the Economic Development Fund (the "**FEDE**"), an incentive fund administered by PRIDCO. The revenues assigned to FEDE are recorded in a Special Revenue Fund and are used to provide economic incentive grants to private companies and to fund PRIDCO operations.

In addition to the tax on royalties, dividends paid to non-resident corporations and individuals are subject to a withholding tax of 10% and 15%, respectively, and interest paid to non-resident affiliates is subject to a withholding tax of 29%.

For fiscal year 2014, Commonwealth nonresident withholding tax revenues amounted to approximately $967 million, of which approximately $67 million were assigned to the FEDE. Preliminary and unaudited non-resident withholding tax revenue, for fiscal years 2015 and 2016, without the required adjustments to properly present pursuant to U.S. GAAP, amounted to approximately $894 million and $850 million, respectively. Amounts assigned to the FEDE for such years were $83 million and $40 million, respectively.

*Other Income Taxes*. Revenues from other income taxes include revenues from tollgate taxes, taxes on interests and dividends and inheritance and gift taxes. For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $154 million, $165 million and $38 million, respectively, in revenue from other income taxes. Results for fiscal years 2015 and 2016 are preliminary and unaudited. Fiscal year 2014 dividend tax revenue results include $100 million from a special dividend declared by the Compulsory Insurance Joint Association (*Asociación Conjunta de Seguro Obligatorio*) that was recorded in a Special Revenue Fund of the Commonwealth.

## Sales and Use Tax

The Commonwealth's sales and use tax ("**Commonwealth SUT**" or "**SUT**") was originally imposed in 2006 pursuant to Act No. 117-2006. The SUT in turn replaced the prior 5% (effective 6.6%) general excise tax on imported goods and the 3.6% general excise tax on goods manufactured in Puerto Rico.

The SUT is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. Certain items, such as fuel, crude oil and petroleum products and vehicles, however, remain subject to the excise tax previously applicable to such items, and are not subject to the SUT.

The Commonwealth SUT had an original tax rate of 5.5%. Act 117-2006 also authorized each municipal government to impose a sales and use tax of 1.5% (the "**Municipal SUT**"), which generally has the same tax base, exemptions (except for unprocessed foods) and limitations as those provided for the Commonwealth SUT. Act 18-2014 lowered the portion of the Municipal SUT allocated to the municipalities to 1.0% and allocated the other 0.5% to the Municipal Administration Fund, a fund created to provide a financial mechanism to finance the debt of the municipalities.

Pursuant to Act 91-2006, as amended ("**Act 91**"), 1% of the original Commonwealth SUT was assigned to the Puerto Rico Sales Tax Financing Corporation ("**COFINA**"). In 2009, Act 91 was amended to increase the portion of the SUT allocated to COFINA to 2.75% (one-half of the then applicable sales and use tax rate of 5.5%). The actual amount of sales taxes to be transferred to COFINA is, however, the greater of (i) a minimum fixed amount, referred to as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth SUT collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5%. The "Pledged Sales Tax Base Amount", which increases at a rate of 4% per year, has grown since the creation of COFINA at a rate greater than SUT collections as a whole. As a result, the percentage of SUT revenues allocated to the General Fund has decreased during past years and is likely to continue to do so, imposing substantial burdens on the General Fund until SUT collections begin to grow at a rate of more than 4% per year.

In 2013, Act No. 40-2013 eliminated various exemptions to the SUT, which broadened its base, and Act No. 46-2013 required the declaration and payment of the SUT on imported goods at the time of their entry into Puerto Rico.

On May 29, 2015, the Commonwealth enacted Act No. 72-2015 that, among other things, (i) increased the total Commonwealth SUT rate to 10.5% effective on July 1, 2015, with the net 4.5% increase being for the benefit of the General Fund, and (ii) eliminated several exemptions. Although Act 72-2015 has experienced various amendments since its original enactment, the Commonwealth SUT remains at 10.5%. There is also a special 4% SUT that is generally applicable to business-to-business services and designated professional services.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $1.294 billion, $1.439 billion and $2.377 billion, respectively, in revenue from sales and use taxes. Such collections were allocated as follows:

| ($ in millions) | 2014 | 2015 [(2)] | 2016 [(2)] |
|---|---|---|---|
| General Fund | $645.3 | 619.2 | $1,559.6 |
| COFINA | 645.9 | 698.5 | 696.3 |
| Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico | 3.2 | 3.2 | 3.2 |
| Total Sales and Use tax recorded in Governmental Funds | 1,294.4 | 1,320.9 | 2,259.1 |
| Municipal Administration Fund [(1)] | - | 118.0 | 117.7 |
| Total Sales and Use Tax [(3)] | 1,294.40 | 1,438.90 | $2,376.8 |

(1) Amounts attributed to the 0.5% increase in the Commonwealth's sales and use tax as a result of the reduction of the municipal sales and use tax from 1.5% to 1% pursuant to the provisions of Act No. 18-2014. Such amount is not included in the governmental funds.

(2) Fiscal years 2015 and 2016 are preliminary, unaudited and subject to change.

(3) For fiscal year 2016, includes amounts collected as a result of the 4.5% surcharge imposed on the Commonwealth's sales and use tax.

### Excise Taxes

*Act 154 Special Tax*. Act 154 was enacted to address the Commonwealth's fiscal crisis by increasing tax revenues derived and collected from the activities of foreign corporations and partnerships operating in Puerto Rico. In particular, Act 154 modified the income taxation of certain nonresident alien individuals, foreign corporations and foreign partnerships by expanding the circumstances in which such persons would be subject to Puerto Rico income taxation, and imposed an excise tax on the acquisition of certain personal property manufactured or produced in whole or in part in Puerto Rico and on the acquisition of certain manufacturing services carried out in Puerto Rico. This excise tax, which is imposed "in lieu" of an income tax based on the "modified source income rule", affects mostly foreign corporations and partnerships that are principally engaged in the manufacturing of pharmaceuticals and other high-tech products.

Act 154 provides that, in certain circumstances, taxpayers will be deemed to be engaged in trade or business in Puerto Rico, and taxable in Puerto Rico with respect to a portion of the taxpayer's income, if the taxpayers engage in significant transactions with other persons that are members of the same controlled group. Where a person engages in significant transactions with a member of the same controlled group that has gross receipts of $75 million or more in any of the preceding three taxable years, and that manufactures or produces goods in Puerto Rico, or provides services in connection with the manufacture or production of goods in Puerto Rico, the person will not be subject to income tax, and will instead be subject to the excise tax in lieu of any income tax. The excise tax is based on the value of the personal property or services acquired.

The excise tax was originally scheduled to apply for a period of six years and was set at 4% for calendar year 2011, declining every year until reaching 1% in 2016. Due to the continuance of the fiscal crisis Act 154 was meant to palliate, on February 28, 2013, the Commonwealth amended Act 154 to again set the excise tax at a fixed 4% and extend its application until 2017.

On December 29, 2010, the Treasury Department adopted regulations that provide certain tax credits against the temporary excise tax that lessen its impact on affected taxpayers subject to the temporary excise tax. These regulations became effective on January 1, 2011. The regulations address implementation and interpretation issues and include provisions regarding certain applicable credits against the tax subject to maintaining a baseline employment and other conditions. While the Commonwealth expects that certain taxpayers subject to the excise tax will be able to credit all or a portion of the excise tax paid against their United States federal income tax liabilities, it is uncertain how this tax affects each individual taxpayer. The long-term effects of the excise tax on the manufacturing sector of the Puerto Rico economy are also uncertain.

In connection with the expansion of the taxation of foreign persons by Act 154, the Commonwealth obtained a legal opinion regarding the creditability of the excise tax for United States federal income tax purposes. The opinion concludes that the aforementioned excise tax should be creditable against United States federal income tax. That conclusion was based in part upon a determination that the expansion of the taxation of foreign persons and the imposition of the excise tax will more likely than not satisfy the constitutional requirements of due process and the Commerce Clause of the United States Constitution, for reasons discussed therein.

On March 30, 2011, the United States Internal Revenue Service ("**IRS**") issued Notice 2011-29 addressing the creditability of the excise tax imposed by Act 154. Notice 2011-29 provides that the provisions of the excise tax are novel and the determination of its creditability requires the resolution of a number of legal and factual issues. Pending the resolution of those issues, the IRS will not challenge a taxpayer's position that the excise tax is a tax in lieu of an income tax under Section 903 of the United States Internal Revenue Code of 1986, as amended. The IRS also provided that any change in the foregoing tax credit treatment of the excise tax after resolution of the pending issues will be prospective and will apply to excise tax paid or accrued after the date that further guidance is issued.

Act 154 has not been challenged in court. Consequently, no court has passed on the constitutionality of Act 154. There can be no assurance that its constitutionality will not be challenged and that, if challenged, the courts will uphold Act 154. To the extent a court determines that the imposition of the excise tax or the expansion of the income tax or both are unconstitutional, the Commonwealth's revenues may be materially adversely affected.

Upon the scheduled expiration of the Act 154 excise tax on December 31, 2017, Act 154 provides that such tax shall be replaced by the "modified source of income rule". However, since it is unlikely that the level of tax collection under the "modified source of income rule" would be sufficient to replace the tax revenues currently received by the Commonwealth pursuant to the special temporary excise tax under Act 154, the Proposed PROMESA Fiscal Plan includes a proposal to extend the Act 154 excise tax temporarily (2-3 years) to provide the

government with sufficient time to renegotiate individual tax grants and reform its tax code such that it replaces Act 154 revenues in full during the plan's projection period.

The special temporary excise tax imposed by Act 154 has become one of the Commonwealth's principal sources of tax revenues.  For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $1.950 billion, $1.920 billion and $1.876 billion, respectively, in revenue from Act 154.  For fiscal years 2014, 2015 and 2016, the revenues produced by Act 154 represented approximately 21.8%, 21.8% and 20.7%, respectively, of the revenues of the Commonwealth's General Fund, in which all Act 154 revenues are deposited. In fiscal year 2016, ten companies accounted for approximately 90% of the special temporary excise tax revenues.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

*Alcoholic Beverages Excise Tax*. The excise tax on alcoholic beverages fluctuates between $0.97 to $31.29 per gallon.  All revenues from such excise tax are recorded in the General Fund of the Commonwealth.  For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $267 million, $237 million and $265 million, respectively, in revenue from such excise tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

*Tobacco Products Excise Tax*. The excise tax applicable to cigarettes, which has been increased multiple times in the past decade, is currently $17.00 per hundred cigarettes.  The 2011 Code also imposes a tax of $1.00 per pound or fraction thereof of chewing tobacco and $3.02 per pound or fraction thereof of powdered tobacco ("snuff") or other products derived from tobacco.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $202 million, $185 million and $165 million, respectively, in revenue from the tobacco products excise tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

A portion of the proceeds of the cigarette excise tax (approximately $30 million annually) has been assigned to HTA and MBA and pledged for the payment of HTA and MBA debt obligations.  The assigned portion is recorded in a Special Revenue Fund of the Commonwealth. These revenues are being currently retained by the Commonwealth and redirected to the payment of Commonwealth essential services pursuant to the Moratorium Act and the executive orders issued thereunder.

Another portion of the proceeds of the cigarette excise tax (approximately $2.8 million annually) has been assigned to the following entities (i) the Puerto Rico School of Plastic Arts, (ii) the Puerto Rico Conservatory of Music Corporation, (iii) the Musical Arts Corporation and (iv) the repository of archives and relics of former governors, to cover their operational expenses. Such amounts are recorded in a Special Revenue Fund.

Since fiscal year 2016, a portion of the proceeds of the cigarette excise tax (approximately $36 million annually) has been assigned to the Integrated Transit Authority ("**PRITA"**) to cover its operational expenses.  The assigned portion is recorded in a Special Revenue Fund.

*Motor Vehicles Excise Tax*. The excise tax applicable to motor vehicles ranges from $637.50 to $9,253 plus 34% of the taxable price in Puerto Rico in excess of $44,890.

Motorcycles and all-terrain vehicles are also subject to an excise tax of 8% and 11.5%, respectively.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $428 million, $272 million and $286 million, respectively, in revenue from the motor vehicles excise tax. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

A portion of the proceeds of the motor vehicle excise tax ($20 million annually) has been assigned to the Green Energy Fund to provide subsidies to Puerto Rico residents to cover the cost of purchasing energy-efficient materials and equipment. The assigned portion is recorded in a Special Revenue Fund.

*Excise Tax on Petroleum Products and its Derivatives*. The gross excise tax on petroleum products and its derivatives is $15.50 per barrel ($6.25 of which does not apply to diesel products). Currently, $9.25 of such tax is assigned to HTA ($120 million of which is pledged to HTA bondholders and the rest of which serves as source of repayment for HTA's outstanding loans with GDB) and $6.25 of the tax is currently assigned to PRIFA. (If certain conditions are satisfied, $3.25 of the excise tax assigned to HTA would be transferred to PRIFA, but the Commonwealth does not currently expect these conditions to be satisfied in the near future.) This tax is subject to adjustment based on consumption and inflation every four years.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $265 million, $275 million and $398 million, respectively, in revenue from this excise tax. Results for fiscal years 2015 and 2016 are preliminary and unaudited. This tax is recorded in Special Revenue Funds and transferred to HTA and PRIFA. These revenues are being currently retained by the Commonwealth and redirected to the payment of the Commonwealth essential services pursuant to the Moratorium Act and the Executive Orders thereunder.

*Gasoline, Gas Oil and Diesel Oil Excise Tax*. The gasoline excise tax, set at $0.16 per gallon, and the tax on gas oil and diesel oil, which is now $0.04 per gallon, are recorded in Special Revenue Funds, and are currently assigned to HTA and pledged as collateral to HTA obligations.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $167 million, $155 million and $168 million, respectively, in revenue from this excise tax. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

These revenues are being currently retained by the Commonwealth and redirected to the payment of Commonwealth essential services pursuant to the Moratorium Act and the Executive Orders thereunder. The assigned portion is recorded in a Special Revenue Fund.

*Horse Races, Insurance Premiums and Other Excise Tax Revenues*. For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $85 million, $121 million and $102 million, respectively, in revenue from these other excise taxes (including those applicable to sugar and coffee). Results for fiscal years 2015 and 2016 are preliminary and unaudited.

The excise tax applicable to sugar and coffee is assigned by law to the Integral Fund for the Development of Agriculture ("**FIDA**") administered by the Puerto Rico Land Authority. Such revenues are pledged to FIDA obligations with GDB.

## Property Taxes

Most real property taxes are either collected for the benefit of the municipalities or deposited in the Redemption Fund (which is not part of the General Fund) and used to pay debt service on Commonwealth General Obligations, and are therefore not accounted for in the General Fund under this category. This category includes only an additional real property tax on residential and commercial real properties with appraised values in excess of approximately $210,000. This tax applied during fiscal years 2010, 2011 and 2012 and generated significant revenues for the General Fund (Operating Fund) for such years. The additional real property tax, which was collected by the Treasury Department, amounted to 0.591% of such properties' appraised value as determined by the CRIM.  The 2011 Code eliminated this additional real property tax for fiscal year 2012. However, some residual collections relating to the 2010-2012 fiscal years continue to be received.

For fiscal years 2014, 2015 and 2016, the Commonwealth collected approximately $56 million, $22 million and $11 million, respectively, in revenue from this additional real property tax.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

## Other Taxes

Other taxes primarily consist of annual motor vehicle license fees imposed under the Vehicle and Traffic Law, and alcoholic beverage and entertainment machine license fees.

Revenues from motor vehicle license fees are recorded in a Special Revenue Fund, assigned to HTA and pledged to secure HTA bonds and other obligations. A significant portion of the alcoholic beverage and entertainment machine license fees and other license fees are also recorded in Special Revenue Funds.

For fiscal year 2014, 2015 and 2016, revenues from other taxes amounted to approximately $112 million, $114 million and $158 million, respectively, of which approximately $93 million, $92 million and $95 million, respectively, were motor vehicle license fees assigned to HTA.  Results for fiscal years 2015 and 2016 are preliminary and unaudited.

## Charges for Services

Charges for services include the fee and other revenue described below, which amounted to approximately $695 million, $685 million and $679 million for fiscal years 2014, 2015 and 2016, respectively (fiscal year 2015 and 2016 results are preliminary and unaudited). Approximately $586 million, $565 million and $592 million of such revenues were accounted for in Special Revenue Funds during such years, with the balance accounted for in the General Fund (Operating Fund).  Collections from charges for services are deposited in the TSA.

The most important of these charges for services are described below.

*Public Health / Patient Fees*. The Department of Health owns three hospitals in Puerto Rico located in San Juan and Bayamon, Puerto Rico. The Department of Health is authorized to bill for medical services rendered in these medical facilities. While the revenues earned are used exclusively for the operation of the medical facilities, appropriations from the General Fund are nevertheless still required to cover a significant amount of operating expenses. All the revenues earned from these fees are recorded in a Special Revenue Fund.

*Judicial Service Fees*. The Judicial Branch of the Commonwealth is authorized by law to charge fees related to the Puerto Rico court system. Such revenues are to be used exclusively by the Judicial Branch of the Government. All collections are recorded in a Special Revenue Fund.

*Charges for Services*. Commonwealth agencies are authorized by law to charge for certain services provided by them. Such revenues are allocated to cover expenditures of the agencies that provided such services. A portion of such revenues is accounted in a Special Revenue Fund.

*Document Rights Fees*. Commonwealth agencies are authorized by law to charge a fee for certified documents or other official government documents, such as birth certificates and certificates of good outstanding. Most of the collections from these documents fees are recorded in a Special Revenue Fund and are available for use by such agencies.

*Motor Vehicle Fines*. Motor vehicle fines are currently assigned to HTA for the funding of the Urban Train and are pledged for the payment of HTA obligations due to GDB. Act No. 1-2015 provides that in the event the operation of the Urban Train is transferred to PRITA, such revenues will be assigned to PRITA. Such revenues of the Commonwealth are recorded in a Special Revenue Fund.

*Motor Vehicles Permits Fees*. The Vehicle and Traffic Law requires that the motor vehicles registration fees collected be used only for the operation of the centers for driving services (known as "CESCOS" for their acronym in Spanish), which are administered by the Department of Transportation and Public Works. All revenues earned from motor vehicle registration fees are recorded in a Special Revenue Fund.

*Other*. Other charges include professional license fees, trademark fees, rental fees, public housing fees and other permit, fine and registration fees. Most collections from such fees are recorded in a Special Revenue Fund of the Commonwealth.

## Revenue from Global Tobacco Settlement

The Commonwealth assigned and transferred to the Children's Trust, a public corporation treated as a "blended component unit" of the Commonwealth for purposes of the Commonwealth's financial statements, all of its rights and interest in a settlement agreement entered into by and among the Commonwealth, forty-six states and several cigarette manufacturers (usually referred to as the Global Tobacco Settlement Agreement), including the Commonwealth's right to receive certain annual payments from such cigarette manufacturers. All such revenues are assigned to the Children's Trust Fund and pledged to the repayment of bonds issued by the Children Trust and are recorded in a Special Revenue Fund.

### Revenue from Component Units

This category includes primarily transfers from the State Insurance Fund, the Tourism Company and the Puerto Rico Automobile Accidents Compensation Administration. Such revenue amounted to approximately to $131 million, $199 million (of which $193 million were recorded in the General Fund) and $221 million for fiscal years 2014, 2015 and 2016, respectively. Results for fiscal years 2015 and 2016 are preliminary and unaudited.

The transfers from the Tourism Company are related to the allocation to the General Fund (Operating Fund) of the casino slot machine revenues. The transfers from other component units recorded in the Special Revenue Funds are related to dividends declared by such component units and amounts required by special laws to be contributed to finance certain programs of the Commonwealth.

### Intergovernmental Revenues

***Custom Duties and Offshore Rum Excise Tax***. Intergovernmental revenues include customs duties collected in Puerto Rico and excise taxes on shipments of rum from Puerto Rico to the United States mainland. The customs duties and excise taxes on shipments are imposed and collected by the United States and returned to the Commonwealth. The excise tax on shipments of rum from Puerto Rico and other rum producing countries is currently $13.50 per gallon. Of this amount, the lesser of $10.50 per proof gallon and the actual excise tax imposed is currently returned or "covered over" to the Commonwealth. Since 1999, however, the United States Congress has enacted special supplementary legislation increasing the maximum amount covered over to the Commonwealth to $13.25 per proof gallon.

Puerto Rico distributes revenues from the excise tax on shipments of rum among various governmental entities and private rum producers. In addition, revenues from the excise are distributed among (i) the Puerto Rico Conservation Trust Fund (the "**Conservation Trust**"), a Puerto Rico charitable trust charged with protecting Puerto Rico's natural resources, which receives each fiscal year an amount equal to approximately 45 cents per proof gallon of rum; (ii) the Puerto Rico Science, Research and Technology Trust Fund (the "**Science Trust**"), a government-sponsored trust created by Act No. 214-2004 to set and implement the public policy of the Commonwealth for technological and scientific research and development, which receives $5 million in excise tax revenues each fiscal year; and (iii) PRIDCO, for the benefit of the "Rums of Puerto Rico" incentive program, which receives up to $10 million each fiscal year.

Finally, up to 46% of the revenues from the excise tax corresponding to the rum sales of certain rum producers is transferred to such rum producers pursuant to certain incentive agreements signed with the Commonwealth. This incentive program was created in direct response to the fact that in 2008, the Government of the U.S. Virgin Islands signed an agreement with Diageo USVI, Inc. ("**Diageo**") for the construction and operation of a new rum distillery in St Croix, U.S. Virgin Islands, that would manufacture Captain Morgan branded products, which prior to 2012 were procured through a supply contract with the Serrallés distillery in Puerto Rico. These rum exports of Captain Morgan resulted in an estimated $124.5 million in excise tax on rum shipments returned by the United States to Puerto Rico during fiscal year 2009. As a result of the termination of the contract between Serrallés and Diageo, after 2011 the income received

by the Commonwealth from the federal excise tax on rum shipments has materially decreased as Serrallés has not landed other bulk rum clients sufficient to make up the entirety of the volume of bulk rum previously purchased by Diageo for its Captain Morgan products.

In an effort to support the local rum industry as a result of the threat posed by the U.S. Virgin Islands' agreement with Diageo, and to protect the amount of federal excise taxes on rum shipments returned to the Commonwealth under the cover-over program, Act No. 178-2010 increased from 10% to 25% the portion of the monies from the federal excise tax that the Commonwealth may invest to provide incentives to, and promote, the Puerto Rican rum industry. The law also authorized the Governor to increase this percentage up to 46% through Executive Order. Such Executive Order was issued and the percentage limit was increased to 46% effective July 1, 2012. As contemplated by Act 178-2010 (now incorporated into Act No. 1-2011), the Commonwealth has entered into definitive agreements with the three main Puerto Rico rum producers. These agreements give the rum producers the right to receive 46% of the monies from the excise tax corresponding to the rum sales of each such rum producer. Furthermore, in May 2015, the Government agreed to deposit the moneys received from the federal rum excise taxes on a segregated lockbox account of the Secretary of the Treasury with a private commercial bank from which such funds would be distributed by the bank to the Government and to the rum producers in accordance with their respective incentives contracts. Such arrangement remains subject to the constitutional priority for payment of the Commonwealth's public debt. Prior to this arrangement, federal rum excise taxes were deposited in the TSA and Treasury forwarded to PRIDCO the amounts necessary to pay the incentives due to the rum producers.

For fiscal year 2014, the Commonwealth received approximately $320 million from the federal excise tax on rum shipments from Puerto Rico. As a result of Act 178-2010 and the previous assignments of the excise tax on rum shipments assigned to public corporations and/or private rum producers, the amount recorded in the General Fund was $237 million. Such amount includes the first $117 million assigned to PRIFA, of which $113 million are assigned to the payment of PRIFA bonds and $4 million are assigned for PRIFA's operations. The remaining amounts were recorded in a Special Revenue Fund.

For fiscal years 2015 and 2016, the preliminary and unaudited results of revenues from the federal excise tax on rum shipments were approximately $329 million and $330 million, respectively. The amount allocated to the General Fund, including the first $117 million assigned to PRIFA, amounted to approximately $189 million and $200 million, respectively. The remaining amounts were recorded in a Special Revenue Fund.

***Federal Grants and Subsidies***. The Commonwealth is the beneficiary of numerous federal programs, which provide funding for essential government services provided by the Puerto Rican government. For example, federal funds from Medicaid and the Affordable Care Act comprise the majority of the funding for the Commonwealth's health insurance program. Furthermore, a material portion of the expenditures of Puerto Rico's Department of Education is financed through Federal funds, primarily funding from Title I of the Federal Elementary and Secondary Education Act. The Commonwealth also receives approximately $2 billion annually in federal funds to finance its Nutritional Assistance Program, which provides a monthly benefit for food to low-income households.

The following table presents revenues from federal grants by program areas for fiscal years 2011 to 2015:

## Federal Grants and Subsidies
### (in thousands)

| | 2011[1] | 2012[1] | 2013[1] | 2014[1] | 2015[1][2] |
|---|---|---|---|---|---|
| Welfare | $ 2,733,526 | $ 2,693,445 | $ 2,613,142 | $ 2,517,066 | $ 2,441,709 |
| Education | 1,367,398 | 1,266,315 | 1,340,892 | 1,390,365 | 1,067,859 |
| Health | 894,738 | 1,572,620 | 1,506,896 | 1,598,343 | 2,036,079 |
| Housing | 478,120 | 475,494 | 435,806 | 386,386 | 408,175 |
| Public Safety and Protection | 46,128 | 82,848 | 73,241 | 73,158 | 57,866 |
| Other | 10,331 | 126,413 | 152,370 | 60,952 | 5,417 |
| Contributions to Municipalities | 78,504 | 58,084 | 68,821 | 40,619 | 41,981 |
| Economic Development | 10,070 | 83,814 | 8,122 | 1,059 | 1,561 |
| TOTAL | $5,618,815 | $6,359,033 | $6,199,290 | $6,067,948 | $6,060,647 |

(1) Amounts do not include rum taxes of $384 million, $275 million, $303 million, $345 million, and $329 million for fiscal years 2011, 2012, 2013, 2014, and 2015 respectively. They are reported as intergovernmental revenue in the fund financial statements.
(2) FY 2015 figures are preliminary, unaudited and subject to change.

Federal grants and subsidies are all accounted for in Special Revenue Funds of the Commonwealth and deposited and disbursed from the Commonwealth TSA.

***Municipal Real Property Tax***. Real property taxes are assessed based on fiscal year 1957-1958 property values. No real property reassessment has been made since fiscal year 1957-1958, and construction taking place after that year has been assessed on the basis of what the value of the property would have been in fiscal year 1957-1958. Accordingly, the overall assessed valuation of real property for taxation purposes is substantially lower than the actual market value. Also, an exemption on the first $15,000 of assessed valuation in owner-occupied residences is available. Personal property taxes, which accounts for approximately 46% of total collections of taxable property, are self-assessed.

Property taxes are assessed, determined and collected for the benefit of the municipalities by the Municipal Revenues Collection Center ("**CRIM**"). However, 1.03% of the property tax based on the assessed value of all property (other than exempted property) is assigned by law for the payment of the Commonwealth's general obligations and directed to be deposited in the Commonwealth's Debt Service Fund (which is not part of the General Fund). This 1.03% of property tax recorded in the Other Governmental Funds amounted to approximately $119 million, $72 million and $103 million for fiscal years 2014, 2015 and 2016, respectively (fiscal year 2015 and 2016 results are preliminary and unaudited).

*Other Intergovernmental Revenues*.   Other intergovernmental revenues consist of certain funds collected by the Commonwealth and its Blended Component Units (primarily PRIFA).

## Interest and Investment Earnings

This item consists primarily of interest, dividends and other distributions on investments held by the Commonwealth and its Blended Component Units.

## Other

For fiscal year 2014, other revenues amounted to $141 million (including $133 million recorded in the General Fund, of which approximately $17 million were recorded in Special Revenue Funds).  For fiscal years 2015 and 2016, preliminary and unaudited other revenues, prior to adjustments required by U.S. GAAP, amounted to $176 million (including $170 million from the General Fund, of which approximately $76 million were recorded in Special Revenues Funds) and $84 million (including $70 million from the General Fund, of which approximately $21 million were recorded in Special Revenue Funds), respectively.

## Certain Taxes Collected by Other Commonwealth Instrumentalities

The following tax revenues are collected directly by certain Commonwealth instrumentalities and are recorded as revenue by them.  Such amounts are not included as revenues in the Governmental Funds unless such instrumentalities transfer such funds to the Commonwealth, in which case such amounts would be recorded as "Intergovernmental Revenues."

## Hotel Occupancy Tax

Article 24 of Act No. 272-2003, as amended, imposes a hotel occupancy tax, collected directly by the Puerto Rico Tourism Company, on all hotels and motel accommodations on the Commonwealth. A portion of the proceeds of this tax has been assigned to the Convention Center District Authority and pledged for payment of the Convention Center District Authority's bonds. The Convention Center District Authority's allocated revenues have been retained by the Tourism Company in accordance with the Moratorium Act and the related Executive Orders.

## Property Tax

As discussed above, except for the 1.03% real property tax collected by CRIM and assigned by law to the Commonwealth for the payment of Commonwealth General Obligations, real property taxes are collected for the benefit of the municipalities and serve as source of repayment for municipal debt obligations.

## Municipal Sales and Use Tax

The Municipal Sales and Use Tax, like the Commonwealth SUT, is imposed on the sale, use, consumption and storage of taxable items, which include tangible personal property, taxable services, admission rights and certain other types of transactions covering separable and identifiable taxable items which are sold for a single price, subject to certain exceptions and limitations. The Municipal Sales and Use Tax is imposed at a rate of 1% of the amount of the covered transaction.

### Aviation Fuel Tax

Act 82-1959, as amended, empowers the Puerto Rico Ports Authority to levy and collect a fee from importers of aviation fuel. This fee is currently two cents per gallon of aviation fuel supplied to airlines and other suppliers.

## Expenditures

Puerto Rico's central government has primary responsibility for governmental functions and services on the island, including health, education, safety, public housing, welfare and economic development. Certain functions and services that, in the United States are typically the responsibility of regional or local governments, such as providing primary and secondary public education, police and fire protection, are provided in Puerto Rico primarily at the level of the central government.

The following table shows the Commonwealth Expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2014:

<div align="center">

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Expenditures
Year Ended June 30, 2014
($ in thousands)

</div>

|  | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [2] | Total Governmental Funds [3] |
|---|---|---|---|---|---|
| General government | $ 1,281,494 | $ (114,822) | $ 1,166,672 | $ 154,422 | $ 1,321,094 |
| Public Safety | 1,979,809 | 179,200 | 2,159,009 | 723 | 2,159,732 |
| Health | 1,319,724 | 1,718,203 | 3,037,927 | 3,948 | 3,041,875 |
| Public Housing and Welfare | 430,407 | 2,983,122 | 3,413,529 | 17,124 | 3,430,653 |
| Education | 3,382,133 | 1,213,181 | 4,595,314 | 1,856 | 4,597,170 |
| Economic Development | 407,220 | 829,397 | 1,236,617 | 40,132 | 1,276,749 |
| Intergovernmental | 364,763 | 2,137 | 366,900 | 4,658 | 371,558 |
| Capital Outlays | - | 95,736 | 95,736 | 102,615 | 198,351 |
| Debt Service | 737,639 | 1,462,831 | 2,200,470 | 2,770,312 | 4,970,782 |
| Total Expenditures | $ 9,903,189 | $ 8,368,985 | $ 18,272,174 | $ 3,095,790 | $ 21,367,964 |

Source: The "Statement of Revenues and Expenditures, and changes in Fund Balance - Governmental Funds as presented in the Commonwealth's Basic Financial Statements for fiscal year 2014. Totals may not add up due to rounding.

[1] As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.

[2] Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all other blended component units (such as PBA and PRIFA, among others).

[3] Includes approximately $83 million in unpaid Additional Uniform Contribution.

The following table shows the Commonwealth preliminary and unaudited expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2015 (unaudited, preliminary and subject to change):

102

**COMMONWEALTH OF PUERTO RICO**
Governmental Funds Expenditures
Year Ended June 30, 2015 [4]
($ in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [1] | Other Governmental Funds [2] | Total Governmental Funds [3] [5] [6] |
|---|---|---|---|---|---|
| General government | $ 1,198,416 | $ 57,159 | $ 1,255,575 | $ 196,019 | $ 1,451,594 |
| Public Safety | 1,832,188 | 415,977 | 2,248,165 | - | 2,248,165 |
| Health | 1,277,785 | 1,792,499 | 3,070,284 | 109 | 3,070,393 |
| Public Housing and Welfare | 409,490 | 2,976,862 | 3,386,352 | 112,370 | 3,498,722 |
| Education | 3,297,440 | 1,388,688 | 4,686,128 | 1,386 | 4,687,514 |
| Economic Development | 355,164 | 491,094 | 846,258 | 230,900 | 1,077,158 |
| Intergovernmental | 365,850 | 34,804 | 400,654 | 62 | 400,716 |
| Capital Outlays | - | 99,963 | 99,963 | 113,503 | 213,466 |
| Debt Service | 742,718 | 1,216,589 | 1,959,307 | 2,275,590 | 4,234,897 |
| Total Expenditures | $ 9,479,051 | $ 8,473,635 | $ 17,952,686 | $ 2,929,939 | $ 20,882,625 |

Totals may not add up due to rounding.
[1] As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.
[2] Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all others blended component units (such as PBA, PRIFA, among others).
[3] The fiscal year 2015 figures do not include a significant change in reporting of the Commonwealth as required by GASB 61.
[4] The fiscal year 2015 figures are preliminary, unaudited and subject to change.
[5] Includes approximately $200 million in impairment charge for deposits in GDB.
[6] Includes approximately $83 million in unpaid Additional Uniform Contribution.

The following table shows the Commonwealth preliminary and unaudited expenditures as reported in its Governmental Funds under U.S. GAAP for fiscal year 2016 (unaudited, preliminary and subject to change):

103

**COMMONWEALTH OF PUERTO RICO**

Governmental Funds Expenditures

Year Ended June 30, 2016 [(4)] [(5)]

($ in thousands)

| | General Fund (Operating Fund) | Special Revenue Funds | Total General Fund [(1)] | Other Governmental Funds [(2)] | Total Governmental Funds [(3)] [(4)] [(5)] |
|---|---|---|---|---|---|
| General government | $ 1,399,305 | $ 161,257 | $ 1,560,562 | $ 167,431 | $ 1,727,993 |
| Public Safety | 1,741,456 | 467,434 | 2,208,890 | - | 2,208,890 |
| Health | 1,254,463 | 1,731,498 | 2,985,961 | - | 2,985,961 |
| Public Housing and Welfare | 397,555 | 3,119,215 | 3,516,770 | 4,415 | 3,521,185 |
| Education | 2,963,738 | 1,634,655 | 4,598,393 | 21,894 | 4,620,287 |
| Economic Development | 163,522 | 812,609 | 976,131 | 306,803 | 1,282,934 |
| Intergovernmental | 360,600 | 69,896 | 430,496 | - | 430,496 |
| Capital Outlays | - | 67,015 | 67,015 | 43,865 | 110,880 |
| Debt Service | 1,011,506 | 533,769 | 1,545,275 | 2,436,099 | 3,981,374 |
| Total Expenditures | $ 9,292,145 | $ 8,597,348 | $ 17,889,493 | $ 2,980,507 | $ 20,870,000 |

Totals may not add up due to rounding.

[(1)] As required under U.S. GAAP. Total General Funds expenditures are the sum of the General Fund (Operating Fund) expenditures that are presented on a budgetary accounting basis, and the Special Revenue Funds expenditures that are presented on a modified accrual basis of accounting and include adjustments to the expenditures presented in the General Fund (Operating Fund) such as reclassifications between expenditures and other financing sources and uses in order to comply with the modified accrual basis of accounting.

[(2)] Other Governmental Funds includes the Commonwealth Debt Service Fund, COFINA, the Commonwealth Capital Project Fund and all others blended component units (such as PBA, PRIFA, among others)

[(3)] The fiscal year 2016 figures do not include a significant change in reporting of the Commonwealth as required by GASB 61.

[(4)] The fiscal year 2016 2016 figures are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds include a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016.

[(5)] The fiscal year 2016 figures include certain assumptions and projections, based on historical trends and preliminary information, therefore preliminary figures may significantly differ from actual results.

The preliminary expenditures for fiscal year 2016 are preliminary, unaudited and subject to change. The results for fiscal year 2016 includes certain assumptions such as projections of accounts payable, income tax refunds, amounts due to component units, recognition of unpaid debt service, and projection of debt service payable to GDB. They also include assumptions related to expenditures of blended component units based on preliminary information provided by such component units. Hence, these preliminary results may significantly differ from actual results.

The Commonwealth government also provides substantial financial support to certain public corporations that, although legally separate from the Commonwealth, provide essential government services. Such support is provided through annual legislative appropriations or through the assignment of revenues by law to such public corporations of dedicated tax or other revenue streams (recorded in Special Revenue Funds). For example, the central government

provides significant annual appropriations, set by formula, to the University of Puerto Rico, the Commonwealth's primary institution of higher learning. Other public corporations for which the Commonwealth government provides the majority of the funding (excluding federal funds) include (i) the Health Insurance Administration (which provides comprehensive health insurance coverage to qualifying Puerto Rico residents), (ii) the Puerto Rico Medical Services Administration (which operates and administers the Puerto Rico Medical Center), (iii) HTA (which is responsible for highway construction, operation and maintenance in Puerto Rico), (iv) MBA (which provides public transportation to passengers within the San Juan Metropolitan Area) and (v) the Maritime Transportation Authority (which operates the maritime transportation services between the municipalities of San Juan, Cataño, Fajardo, Vieques and Culebra).

Commonwealth appropriations, in the form of lease payments, are also the principal source of funding for entities such as PBA, which constructs, purchases or leases office, school, health, correctional and other facilities for lease to departments, agencies, public corporations and other instrumentalities of the Commonwealth. Commonwealth tax revenues are also the principal source of funding for certain public corporations dedicated to infrastructure development (such as PRIFA) as well as economic and tourism promotion (such as the PRTC and the PRCCDA). For a more detailed description of the Commonwealth's public corporations and the subsidies they receive, see "PUBLIC CORPORATIONS."

Moreover, the central government provides significant annual appropriations set by formula to the municipalities. Such subsidies are a material portion of municipal resources and in fact constitute a majority of the revenues of a substantial amount of Puerto Rico's 78 municipalities.

Most of the Commonwealth's operating expenditures are authorized in the General Fund budget through appropriations approved annually by the Puerto Rico Legislature. Certain appropriations, such as those of the University of Puerto Rico, the municipalities and the Judicial Branch, are set by formula (although such formulas are currently frozen pursuant to Act No. 66-2014). In the case of the Judicial Branch, such formula is equal to 4% of the average annual revenue from internal sources for each of the two preceding fiscal years, provided that the appropriation for any fiscal year cannot be lower than the previous fiscal year. The Commonwealth also accounts for expenditures through its myriad Special Revenue Funds, which operate outside the General Fund budgetary approval process.

**General Fund Budget (Commonwealth Operating Fund)**

The Commonwealth's budget is adopted in accordance with a statutory basis of accounting, which is not in accordance with U.S. GAAP. Revenue is generally recognized when cash is received. Income tax revenues are reduced for an estimated amount of income tax refunds. Short-term and long-term borrowings may be used to finance budgetary excess of expenditures over revenue.

Expenditures are generally recorded when the related expenditure is incurred or encumbered. Encumbrances generally lapse the year the end of the fiscal year when the encumbrance was established, as established by Act No. 123-2001. Amounts required for settling claims and judgments against the Commonwealth and certain other liabilities are not recognized until they are encumbered or otherwise processed for payment. Under statutory basis

of accounting, the Commonwealth uses encumbrance accounting to record the full amount of purchase orders, contracts and other commitments of appropriated resources as deductions from the appropriation prior to actual expenditure.

The General Fund Budget excludes all revenues and expenditures recorded in the Special Revenue Funds of the Commonwealth. If the Commonwealth decided to include all revenues and expenditures in the General Fund Budget, legislation would be required to amend a considerable amount of legislation that currently governs the assignment of revenues of the Commonwealth, redirecting them for special purposes or pledging them to support public corporations.

**Office of Management and Budget**

OMB's primary role is to assist the Governor in overseeing the preparation of the budget of the Commonwealth and supervise its administration in the agencies of the Executive Branch. In helping to formulate the Governor's budget, OMB evaluates the effectiveness of agency programs, policies and procedures, assesses competing funding demands among agencies and sets funding priorities.

In addition, OMB oversees and coordinates the administration's initiatives in financial management, information technology, general management and organizational structure, and supervises the agencies' compliance with the Governor's program and regulatory policies. In each of these areas, OMB's role is to help improve administrative management, develop better performance measures and coordinating mechanisms, and promote efficiency in the use of public funds.

**Budgetary Process**

The fiscal year of the Commonwealth begins each July 1. The Governor is constitutionally required to submit to the Legislative Assembly an annual balanced budget of total resources, capital improvements, and operating expenditures of the central government for the ensuing fiscal year. The annual budget is prepared by OMB, in coordination with the Planning Board, the Treasury Department, and other government offices and agencies including FAFAA, which, pursuant to Commonwealth law, has to validate the Commonwealth's revenue projections prior to such revenue projections being submitted to the Legislative Assembly as part of the Commonwealth's budget. Section 7 of Article VI of the Constitution provides that "The appropriations made for any fiscal year shall not exceed the total resources estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."

There are material differences in basis of accounting, entity, and perspective between "budgetary" reporting and U.S. GAAP. For an overview of such differences, see "COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2010 THROUGH 2016."

The annual budget, which is developed utilizing elements of program budgeting, includes an estimate of revenues and other resources for the ensuing fiscal year under (i) laws existing at the time the budget is submitted and (ii) legislative measures proposed by the Governor and

submitted with the proposed budget, as well as the Governor's recommendations as to appropriations that in his judgment are necessary, convenient, and in conformity with the four-year investment plan prepared by the Planning Board. As required by Commonwealth law, FAFAA, or an independent consultant selected by FAFAA, has to validate the revenue projections of the Commonwealth prior to such revenue projections being submitted to the Legislative Assembly as part of the budget.

The General Fund Budget generally consists of (i) General Fund appropriations for recurring ordinary operating expenditures of the central government and of the Legislative Assembly ("**Ordinary Expenditures**") and (ii) General Fund appropriations for special operating expenditures, for contributions to municipalities, the University of Puerto Rico and the Judicial Branch and for capital expenditures ("**Special Appropriations**"). Each of these types of expenditures is approved annually in separate Joint Resolutions of the Legislative Assembly. As a general matter, appropriations for Ordinary Appropriations have a one-year life. Appropriations for Special Appropriations have a three-year life. Appropriations from Special Revenue Funds and appropriations for capital expenditures financed by bonds generally do not require annual legislative action and are authorized by separate legislation.

The Legislative Assembly may amend the budget submitted by the Governor but may not increase any items so as to cause a deficit without imposing taxes or identifying additional resources to cover such deficit. Upon passage by the Legislative Assembly, the budget is referred to the Governor, who may decrease or eliminate any item but may not increase or insert any new item in the budget. The Governor may also veto the budget in its entirety and return it to the Legislative Assembly with the Governor's objections. The Legislative Assembly, by a two-thirds majority in each house, may override the Governor's veto. If a budget is not adopted prior to the commencement of a fiscal year, the budget for such fiscal year shall be the annual budget for the preceding fiscal year as originally approved by the Legislative Assembly and the Governor until a new budget is approved. This permits the Commonwealth to continue making payments of its operating and other expenditures until a new budget is approved.

**Financial Control and Adjustment Procedures**

Revenue estimates for budgetary purposes have historically been prepared by the Treasury Department, except for estimates of federal grants, which have been prepared by OMB based on information received from the various departments and other recipients of such grants. Revenue and federal grant estimates are under continuous review and, if necessary, are revised during the fiscal year. Prior to PROMESA, fiscal control over expenditures was exercised exclusively by the Governor, through the Director of OMB, and the Secretary of the Treasury. For the impact of PROMESA on such fiscal controls, see "Impact of PROMESA" below and "PUERTO RICO OVERSIGHT, MANAGEMENT, AND ECONOMIC STABILITY ACT."

During any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, the Governor may take administrative measures to reduce expenses and submit to both houses of the Legislative Assembly a detailed report of any adjustment necessary to balance the budget, or make recommendations to the Legislative Assembly for new taxes or authorize borrowings under provisions of existing legislation or take any other necessary action to meet the estimated deficiency. Any such proposed adjustments shall give effect to the "priority norms" established

by law for the disbursement of public funds in the following order of priority; first, the payment of the interest on and amortization requirements for public debt (Commonwealth general obligations and guaranteed debt for which the Commonwealth's guarantee has been exercised); second, the fulfillment of obligations arising out of legally binding contracts, court decisions on eminent domain, and other unavoidable obligations to protect the name, credit and good faith of the Commonwealth; third, current expenditures in the areas of health, protection of persons and property, education, welfare, and retirement systems; and fourth, all other purposes. Notwithstanding the foregoing, under section 201(e) of the Moratorium Act, the Governor may reprioritize services and expenses described in the "third" category of the prior sentence to a higher payment priority.

A Budgetary Fund was created by Act No. 147 of June 18, 1980, as amended (the "**Budgetary Fund**"), to cover the appropriations approved in any fiscal year in which the revenues available for such fiscal year are insufficient, to secure the payment of public debt, and to provide for unforeseen circumstances in the provision of public service. An amount equal to one percent of the General Fund revenues of the preceding fiscal year is required to be deposited annually into the Fund. In addition, other income (not classified as revenues) that is not assigned by law to a specific purpose is also required to be deposited in the Budgetary Fund. The maximum balance of the Budgetary Fund may not exceed 6% of the total appropriations included in the budget for the preceding fiscal year. During the last several fiscal years, the Legislative Assembly has approved joint resolutions to suspend temporarily the deposit of funds into the Budgetary Fund. As of June 30, 2016, the balance in the Budgetary Fund was $14 million.

Act No. 91-1966 ("**Act 91**"), as amended, created the Emergency Fund (the "**Emergency Fund**") to cover unexpected public needs caused by calamities, such as wars, hurricanes, earthquakes, droughts, floods and plagues, and to protect people's lives and property and the public sector credit. Act 91 originally contemplated that the Emergency Fund would be capitalized annually with an amount totaling no less than one percent of General Fund revenues of the preceding fiscal year. Act 91 was amended in 2003 to set an upper limit to the Emergency Fund of $150 million at the beginning of the fiscal year. Act 91 was further amended in 2005 to authorize the disbursement of funds from the Emergency Fund to cover certain General Fund expenditures and operational costs of the State Emergency Management Agency and authorized GDB to lend to the Commonwealth up to $150 million to replenish the Emergency Fund to provide funding for emergency and disaster needs. In 2016, Act 91 was further amended to assign, provisionally, $20 million to the Emergency Fund during fiscal year 2017 and to provide that starting with fiscal year 2018 the fund will be funded by 0.5% of the net revenue estimate for the General Fund, as provided by the Treasury Department. As of June 30, 2016, the Emergency Fund had a balance of $308,000.

**Impact of PROMESA**

The enactment of PROMESA has significantly altered the budgetary approval process for the Commonwealth and any Commonwealth instrumentality designated as a covered territorial instrumentality by the Oversight Board. Upon the appointment of all members of the Oversight Board on August 31, 2016, the development and approval of the Commonwealth budget and any covered instrumentality budget is subject to the framework outlined in PROMESA. All Commonwealth budgets and covered territorial instrumentality budgets must be developed in

108

accordance with the applicable fiscal plan developed pursuant to PROMESA, and no such budget will be effective until it is certified by the Oversight Board as compliant with such fiscal plan. On September 30, 2016, the Oversight Board designated all of the public corporations of the Commonwealth as covered territorial instrumentalities. PROMESA has also imposed additional fiscal controls on the Commonwealth and grants the Oversight Board broad powers to monitor and control expenses and make subsequent adjustments to budgets that were previously certified as compliant by the Oversight Board.

PROMESA requires the Oversight Board to submit to the Governor and the Legislative Assembly a notice delineating a schedule for the development, submission, approval and certification of proposed budgets. Such budget schedule will be applicable for a period of fiscal years as determined by the Oversight Board in its sole discretion but in any case for a period of not less than one fiscal year following the fiscal year in which the notice is delivered. The Oversight Board is required to consult with the Governor and the Legislative Assembly in establishing a budget schedule. However, the Oversight Board retains sole discretion to set or, by delivery of a subsequent notice to the Governor and the Legislative Assembly, change the dates of the budget schedule as it deems appropriate and reasonably feasible. PROMESA further requires the Oversight Board to submit to the Governor and the Legislative Assembly a revenue forecast for the periods covered by the proposed budgets for use by the Governor in developing such budgets.

PROMESA provides the following process for the development and approval of the Commonwealth budget. A similar process applies to the budgets of covered instrumentalities, except that the Legislative Assembly is not involved in the process unless under Puerto Rico law such instrumentality's budget is subject to legislative approval.

- **Commonwealth Budgets Developed by the Governor**. If the Oversight Board determines in its sole discretion that a proposed Commonwealth budget developed by the Governor is compliant with the applicable fiscal plan, then the Oversight Board may submit such budget to the Legislative Assembly for approval. If the proposed Commonwealth budget is found to be non-compliant, Section 202(c)(1) of PROMESA requires the Oversight Board to provide to the Governor (i) a "notice of violation" that includes recommendations to correct any deficiencies and (ii) an opportunity to correct any deficiencies, provided such opportunity is allowed pursuant to the budget schedule approved by the Oversight Board. Should the Governor fail to submit a compliant Commonwealth budget within the time specified by the budget schedule, PROMESA authorizes the Oversight Board to develop and submit to the Governor and the Legislative Assembly a compliant budget.

- **Commonwealth Budgets Adopted by Legislative Assembly.** PROMESA directs the Legislative Assembly to submit to the Oversight Board the Commonwealth budget it approves. If the Legislative Assembly's approved budget is found to be non-compliant, Section 202(d)(1) of PROMESA requires the Oversight Board to provide to the Legislative Assembly (i) a "notice of violation" that includes recommendations to correct any deficiencies and (ii) an opportunity to correct any deficiencies, provided such opportunity is allowed pursuant to the budget schedule approved by the Oversight Board. The Legislative Assembly may submit as many revised budgets as the budget schedule allows. Should the Legislative Assembly fail to submit a compliant budget, PROMESA

109

authorizes the Oversight Board to develop and submit to the Governor and the Legislative Assembly a revised compliant budget.

- **Certification of Budgets as Compliant.** Pursuant to Section 202(e) of PROMESA, if the Governor and the Legislative Assembly approve a Commonwealth budget that is compliant with the applicable fiscal plan, then the Oversight Board shall issue a compliance certification.  If the Governor and the Legislative Assembly fail to develop and approve a compliant budget, Section 202(e) of PROMESA authorizes the Oversight Board to develop and submit a compliant budget and such budget would be deemed approved by the Governor and the Legislative Assembly and will be in full force and effect on the first day of the applicable fiscal year.

- **Joint Development of Budgets**.  Section 202(f) of PROMESA authorizes the Oversight Board, the Governor and the Legislative Assembly to work collaboratively to develop a Commonwealth budget that meets the requirements of PROMESA.

Section 203 of PROMESA describes the Oversight Board's ongoing oversight responsibilities with respect to, and the consequences of a finding of non-compliance with, the certified Commonwealth budget:

- **Quarterly Reports.**  Pursuant to Section 203(a) of PROMESA, the Governor must submit a report to the Oversight Board no later than 15 days after the last day of each fiscal quarter (beginning in the fiscal year determined by the Oversight Board), in such form as the Oversight Board may require, (i) describing the actual cash revenues, cash expenditures and cash flows of the Commonwealth and covered territorial instrumentalities for the preceding fiscal quarter as compared to the projected revenues, expenditures and cash flows as contained in the certified budget for such preceding fiscal quarter, and (ii) any other information requested by the Oversight Board.

- **Inconsistencies Between Actual and Projected Revenues, Expenditures and Cash Flows.**  Pursuant to Section 203(b) of PROMESA, the Oversight Board may require the Commonwealth and any covered territorial instrumentality to provide additional information to explain inconsistencies between actual and projected revenues, expenses and cash flows based on the Governor's quarterly reports. If such explanations are deemed inadequate by the Oversight Board, the Oversight Board will advise the Commonwealth to correct such inconsistency by implementing remedial corrective actions.

- **Budget Reductions.** If the Oversight Board finds that the Governor and the Legislative Assembly failed to provide an explanation for an inconsistency between actual and projected revenues and expenses, or to correct such inconsistency by the deadline established by the Oversight Board, the Oversight Board is authorized to make appropriate reductions in non-debt expenditures and, in the case of the covered territorial instrumentalities, institute hiring freezes and prohibit entry into new contracts or financial transactions not previously approved by the Oversight Board.  The Oversight Board shall cancel these reductions upon a finding that the Commonwealth or covered territorial instrumentality has initiated the appropriate measures to ensure compliance with the certified budget.

For further information on PROMESA and the approval process for the Commonwealth budget, see "PUERTO RICO OVERSIGHT, MANAGEMENT AND ECONOMIC STABILITY ACT".

**General Fund Budget for Fiscal Year 2017**

The table below presents a summary of the approved General Fund budget for fiscal year 2017 compared to the General Fund budget for fiscal year 2016, as originally approved and subsequently adjusted.

**Commonwealth of Puerto Rico**
**Summary of General Fund Approved Annual Budget**
**(in thousands)**

| | Fiscal Year 2016 Original | Fiscal Year 2016 Adjusted | Fiscal Year 2017 Original |
|---|---|---|---|
| Revenues from internal sources: | | | |
| Personal income taxes | $ 2,135,000 | $ 2,044,000 | $ 1,955,000 |
| Retained non-resident income tax | 822,000 | 825,000 | 763,000 |
| Corporate income taxes | 1,791,000 | 1,710,000 | 1,525,000 |
| Property taxes | - | 10,000 | |
| Tollgate taxes | - | - | |
| 17% withholding tax on interest | 4,000 | 4,000 | 3,000 |
| 10% withholding tax on dividends | 37,000 | 34,000 | 31,000 |
| Inheritance and gift taxes | 5,000 | 5,000 | 5,000 |
| Sales and use taxes | 1,740,000 | 1,566,000 | 1,608,000 |
| Excise taxes: | | | |
| Alcoholic beverages | 270,000 | 252,000 | 272,000 |
| Foreign (Act 154) | 1,905,000 | 1,850,000 | 1,924,000 |
| Motor vehicles and accessories | 305,000 | 281,000 | 293,000 |
| Cigarettes | 133,000 | 98,000 | 117,000 |
| Other (excise taxes) | 104,000 | 89,000 | 91,000 |
| Licenses | 19,000 | 18,000 | 19,000 |
| Miscellaneous non-tax revenues: | | | |
| Contributions from lottery fund | 48,000 | 51,000 | 40,000 |
| Electronic lottery | 90,000 | 93,000 | 80,000 |
| Registration and document certification fees | 104,000 | 93,000 | |
| Other | 102,000 | 71,000 | 55,000 |
| Total revenues from internal sources | 9,614,000 | 9,094,000 | 8,781,000 |
| Revenues from non-Commonwealth sources: | | | |
| Federal excise taxes on off-shore shipments | 186,000 | 198,000 | 206,000 |
| Total revenues from non-Commonwealth | 186,000 | 198,000 | 206,000 |
| Total revenues and resources | 9,800,000 | 9,292,000 | 8,987,000 |
| Appropriations: | | | |
| Current expenses: | | | |
| General government | $ 472,664 | $ 473,786 | $ 667,295 |
| Education | 2,551,747 | 2,535,510 | 2,552,248 |
| Health | 1,382,333 | 1,363,199 | 1,410,771 |
| Public housing and welfare | 435,919 | 420,851 | 437,117 |
| Economic development | 247,074 | 226,749 | 271,011 |
| Public safety and protection | 1,651,085 | 1,626,553 | 1,656,010 |
| Contribution to governmental entities | - | - | 258,027 |
| Budgetary and Emergency Fund | - | - | 220,000 |
| Contributions to municipalities | 381,540 | 380,656 | 443,570 |
| Special pension contributions | 643,405 | 624,463 | 786,590 |
| Debt service | 1,011,210 | 1,011,210 | - |
| Other debt service (appropriations) | 464,073 | 70,073 | 24,000 |
| PBA | 363,964 | 363,964 | 90,000 |
| Utilities (PREPA, PRASA, Insurance | 194,986 | 194,986 | 170,361 |
| Total appropriations – current expenses | 9,800,000 | 9,292,000 | 8,987,000 |
| Capital improvements | - | - | - |
| Total appropriations | 9,800,000 | 9,292,000 | 8,987,000 |
| Year-end balance | - | - | - |
| Total appropriations and year-end balance | $ 9,800,000 | $ 9,292,000 | $ 8,987,000 |

Totals may not add due to rounding.
*Sources: Treasury Department and Office of Management and Budget*

Total revenues and resources for the fiscal year 2017 approved General Fund budget exclude approximately $113 million in projected budgetary revenues which are allocated to the PRIFA Rum Dedicated Tax Bonds. General Fund budgetary revenues for fiscal year 2017 are projected to total approximately $9.100 billion. The $113 million in excess revenues are being retained by the Commonwealth as part of the Moratorium Act.

The General Fund budget for fiscal year 2017 provides for expenditures of $8.987 billion, which are divided in $4.178 billion (46%) for Ordinary Expenditures and $4.809 billion (54%) for Special Appropriations. Total expenditures are $813 million lower than the originally approved budget for fiscal year 2016 and $305 million lower than the adjusted budget for fiscal year 2016.

The principal reasons for the decrease in expenditures are a decrease in budgeted debt service payments from $1.475 billion and $1.081 billion in the original and adjusted budget, respectively, for fiscal year 2016, to $24 million for fiscal year 2017, a decrease in payments to PBA from $364 million in the original and adjusted budget for fiscal year 2016 to $90 million for fiscal year 2017, and a decrease in the cost of utilities from $195 million in the original and adjusted budget for fiscal year 2016 to $170 million for fiscal year 2017. These decreases were partially offset by an increase in other operating expenses for fiscal year 2017 of $740 million as compared with the original budget for fiscal year 2016 and $854 million as compared with the adjusted budget for fiscal year 2016, (including certain expenses covered in fiscal year 2016 with financing sources outside the General Fund), and an allocation of $200 million to the Budgetary Fund for fiscal year 2017. The reduction of budgeted debt payments in the fiscal year 2017 General Fund budget is intended to ensure the uninterrupted operation of the government and the continued provision of essential services to Puerto Rico residents.

The following table shows the major increases in General Fund operating expenses, by type, for fiscal year 2017 when compared with the fiscal year 2016 original General Fund budget:

113

| General Fund Operating Expenses | 2015 | 2016 | 2016(A) | 2017 | 2017 vs. 2016 |
|---|---|---|---|---|---|
| Contribution to Govermental Entitites | - | - | - | 258 | 258 |
| Municipal Subsidies | 10 | 21 | 20 | 83 | 62 |
| Medical Services Operation and Funcional Contributions | 28 | 27 | 27 | 52 | 25 |
| Special Education | - | - | - | 15 | 15 |
| Legal and Responsibility Fund | - | - | - | 117 | 117 |
| Non Govermental Organizations | - | - | - | 21 | 21 |
| Pension Plan Contributions | 560 | 643 | 624 | 787 | 144 |
| Elections and Transitions Cost | - | - | - | 52 | 52 |
| Social Security Contribution-Police | - | - | - | 25 | 25 |
| Accounting and Financial System | - | - | - | 12 | 12 |
| Caño Martin Peña y AFV | | | | 11 | 11 |
| Budgetary and Emergency Fund | - | - | - | 220 | 220 |
| Payroll and Related Costs | 3,392 | 3,320 | 3,320 | 3,272 | (48) |
| Other Operational Expenses | 1,210 | 1,112 | 1,036 | 1,122 | 10 |
| Contribution to Municipalities | 361 | 361 | 361 | 361 | - |
| University of Puerto Rico | 834 | 834 | 834 | 834 | - |
| Judicial Branch | 323 | 315 | 315 | 315 | - |
| Health Insurance | 885 | 885 | 885 | 885 | - |
| General Obligations Debt Service | 743 | 1,011 | 1,011 | - | (1,011) |
| PBA Debt Payment | 274 | 277 | 277 | - | (277) |
| Trans and Other Debt | 395 | 464 | 70 | 24 | (440) |
| Utilities | 201 | 195 | 195 | 170 | (25) |
| Legislature | 142 | 129 | 125 | 138 | 9 |
| PBA Operating Subsidies | 81 | 87 | 87 | 90 | 3 |
| Agriculture Incentive and Subsidies | 78 | 79 | 69 | 84 | 5 |
| University of Puerto Rico Operating Expense | 48 | 40 | 36 | 39 | (1) |
| **Total General Fund** | **$ 9,565** | **$ 9,800** | **$ 9,292** | **$ 8,987** | **$ (813)** |

The increase in General Fund operating expenses was due primarily to the fiscal crisis faced by the Commonwealth and the inability to continue financing current expenditures with non-recurring resources, including bond proceeds, lines of credit from GDB, Special Revenue Fund balances and special dividends from public corporations.

The budget for fiscal year 2017 contains approximately $498 million of expenses that were funded during fiscal year 2016 with financing sources outside the General Fund (Operating Fund) or by the internal revenues of certain public corporations (primarily GDB). The contribution to governmental entities correspond to (i) $70.5 million of expenses previously funded by GDB lines of credit (including $40 million to cover remaining construction costs of the Puerto Rico Comprehensive Cancer Center), (ii) $40 million to cover the operational expenses of FAFAA (formerly a part of GDB and covered from internal GDB funds), (iii) $22.5 million to cover operational expenses of GBB and (iv) approximately $125 million to replace deposits of various governmental entities deposited in GDB (or make direct payments to such entities in lieu of making payments to GDB), including amounts necessary for the matching of federal funds. The fiscal year 2017 budget also includes (i) $25 million in additional

114

contributions to PRMSA to fund such entity's operating losses and catch up on payment of payables to suppliers, (ii) $194 million in expenses (comprised of $62 million in annual legislated distributions to municipalities, $15 million in special education expenses, and $117 million to fund the Legal Responsibility Fund) funded in fiscal year 2016 pursuant to Act No. 105-2015 by a special dividend from the State Insurance Fund and other non-recurring financing sources, and (iii) $21 million in recurrent expenses regarding contributions to non-profits funded during fiscal year 2016 with a special dividend from the *Asociación de Subscripción Conjunta* pursuant to Act No. 201 of 2015.

Other incremental expenses for fiscal year 2017 (when compared to the approved fiscal year 2016 General Fund budget) also include (a) $144 million to cover increases in required pension payments, including pursuant to Act No. 114-2011 (increased employer contributions to TRS), Act No. 116-2011 (increased employer contributions to ERS) and Act No. 3-2013 (Additional Uniform Contribution to ERS), (b) $52 million to fund the 2016 election process and related governmental transition, (c) $25 million to fund Social Security contributions for uniformed police officers (which currently do not participate in the Social Security Program), (d) $12 million to fund programmed accounting and financial system upgrades and (e) other net variances.

These incremental operating expenses were offset in part by approximately $27 million in lower Joint Resolution assignments.

The fiscal year 2017 General Fund budget also includes an appropriation of $200 million to the Budgetary Fund to offset the Commonwealth's cash flow shortage and to address unexpected service needs, including the need to catch-up over-stretched suppliers of essential services. Another $20 million were allocated to the Emergency Fund to cover unexpected public needs, including hurricanes and other natural disasters.

**Special Revenue Funds**

Special Revenue Funds are funds separate from the General Fund that are created by law, are not subject to annual appropriation and have specific uses established by their respective enabling legislation. As such, in contrast to expenditures from the General Fund, Special Revenue Fund expenditures do not require annual legislative action because their disbursement is pre-authorized by the applicable fund's enabling legislation, which governs until revised by new legislative action.

As described above, Special Revenue Funds are funded from, among other things, revenues from federal programs, tax revenues assigned by law to public corporations and other third parties, fees and charges for services by agencies, dividends from public corporations and financing proceeds. Federal transfers constitute the majority of Special Revenue Fund resources. Generally, Special Revenue Fund appropriations have a life of more than one year, subject to extension by OMB.

The Commonwealth's Special Revenue Funds can be divided into several categories, including (i) Federal Fund Funds (funds where the receipt and expenditure of federal funds is recorded), (ii) Pledged Fund Funds (funds whether the receipt and transfers of funds assigned by law to third parties, including public corporations, is recorded), (iii) Special Revenue Funds (funds that record other revenues and expenses or accruals incurred but not included or

appropriated in the annual General Fund budget, including agency expenditures financed from charges for services provided by such agencies and appropriations made by the Commonwealth's Legislature without a specific revenue source) and (iv) Internal Revenue Funds (which account for transactions between and among the Commonwealth's agencies (principally with the General Services Administration (GSA)).

Many of the funds within the Commonwealth accounting system are Special Revenue Funds. As reflected in the Commonwealth's Basic Financial Statements, the Commonwealth has recorded a historic deficiency of revenues under expenditures in its Special Revenue Funds, which has had a material effect on the measurement of the Commonwealth's consolidated deficit, as calculated pursuant to U.S. GAAP. Furthermore, since the revenues and expenditures of many of these funds flow into, and out of, the TSA, the historic deficiency of revenue under expenditures in such funds has had and, in the absence of corrective action, will likely continue to have, a material effect on the overall liquidity position of the Commonwealth.

The Commonwealth's Special Revenue Funds are an important driver of the historical deficit due in part to the non-recurring nature of certain of their revenues. While the Special Revenue Funds receive certain recurring revenue in the form of taxes and charges for services by agencies, the Special Revenue Funds have historically been funded by non-recurring revenues such as bond proceeds, lines of credit from GDB, one-time dividends from public corporations, revenues from tax amnesties, among others. Special Revenue Fund expenditures have included, however, recurrent operating expenditures at the agency level, primarily payroll and professional and other services. The Commonwealth's recent lack of market access, coupled with the inability of GDB and other public corporations to continue as a recurrent source of financing, has forced the Commonwealth to progressively account in its General Fund for ordinary expenditures previously accounted for through its Special Revenue Funds, which in turn explains the recent increase in certain General Fund expenditure line items. For example, OMB had to include in the fiscal year 2017 General Fund Budget certain recurrent subsidies to municipalities, appropriations to pay legal judgments, and agency and public corporation expenditures that in prior fiscal years had been financed through GDB lines of credit or one-time dividends from the State Insurance Fund.

Neither OMB nor the Treasury Department currently has the ability to effectively control how funds in the Special Revenue Funds are spent. OMB and the Treasury Department worked on legislation that seeks to eliminate many of these funds and to establish more robust visibility and controls over any remaining ones. This legislation is still pending approval by the Legislature.

116

# PUBLIC CORPORATIONS

In Puerto Rico, many governmental and quasi-governmental functions are performed by public corporations created by the Legislative Assembly with varying degrees of independence from the central government. Public corporations may obtain revenues from rates charged for services or products but, as described further below, many receive sizable subsidies from the central government. Most public corporations are governed by boards whose members are appointed by the Governor with the advice and consent of the Senate, but some public corporations are ascribed to departments of the central government. Capital improvements of most of the larger public corporations have been financed historically by revenue bonds issued under trust agreements or bond resolutions or by notes or other obligations issued under loan agreements.

As described above, many public corporations and other instrumentalities have traditionally relied on subsidies, in the form of appropriations from the General Fund and/or assignments of Commonwealth tax or other revenues, to fund a material portion of their operations. Certain of these instrumentalities, including PRHIA, PRMSA, PRITA, MTA, MBA, HTA and UPR, provide essential services to the residents of the Commonwealth and rely heavily on such subsidies to fund their day to day operations. Other subsidized public corporations, like PBA, provide essential services to the Commonwealth's government, which are in turn necessary to provide essential services to Commonwealth citizens.

Commonwealth appropriations and tax revenues are also a principal source of funding for certain public corporations dedicated to fiscal and financial advisory (FAFAA), infrastructure development (PRIFA and the Puerto Rico Public Private Partnerships Authority ("**P3 Authority**")); air and maritime transportation and logistics (the Ports of the Americas Authority ("**PAA**")); and economic, tourism and cultural promotion (PRTC, PRCCDA, the Agricultural Enterprises Development Administration ("**ADEA**"), PRIDCO (primarily with respect to the FEDE and the Rums of Puerto Rico Program); and the Institute of Puerto Rican Culture ("**ICP**")).

The General Fund budget for fiscal year 2017 included approximately $891.9 million in appropriations to PRHIA, $41.7 million to PRMSA, $872.4 million to UPR, $132.5million for GDB and $33 million to PRITA. It also included $109.2 million for ADEA (of which $25 million were appropriated to indemnify ADEA for its lack of access to its deposit account at GDB), $40 million for FAFAA, $2.4 million for the P3 Authority, $3.6 million for PAA and $16.7 million for the ICP. The General Fund budget for fiscal year 2017 includes $90.2 million in lease payments to PBA to cover its operational expenses ($277 million in fiscal year 2017 PBA debt payments, historically covered primarily by General Fund appropriations, are currently subject to the Moratorium Act).

In addition, the Commonwealth's Legislature has assigned tax and fee revenues, by law, to certain of these public corporations. For example, the Legislature has assigned to HTA the gas excise tax, the diesel excise tax, a portion of the petroleum products excise tax, a portion of the cigarette excise tax and vehicle license fees collected by the Department of Transportation and Public Works. Each of PRITA and MBA has also been assigned portions of the cigarette excise tax. PRIFA and PRIDCO receive a portion of the federal excise tax on rum shipments

117

from Puerto Rico that is "covered over" from the General Fund and the latter also administers an economic incentives program funded from the Commonwealth's corporate income tax revenues. PRIFA further receives the remaining portion of the petroleum products excise tax. PRTC collects and funds its operations from revenues from casino slot machines and the hotel room tax. The latter is also the principal source of funding for PRCCDA. UPR receives by law a portion of the casino slot tax revenue collected by PRTC.

Other public corporations, such as COFINA and PFC have been created as financing vehicles for the Commonwealth and have issued debt backed by taxes (COFINA) or appropriations (PFC) as their sole source of repayment. For a detailed description of these financing vehicles, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

The solvency and ability to continue as going concern of GDB, historically the primary source of interim financing and emergency liquidity for the Commonwealth and its instrumentalities, is further dependent on the financial health of the Commonwealth, including its ability to repay its loans with GDB through General Fund appropriations or to continue subsidizing public corporations such as HTA (which is one of GDB's principal debtors).

Notwithstanding the Commonwealth's substantial level of support, certain of these public corporations have recently suffered from significant annual operating losses and carry material amounts of accounts payable (particularly to other governmental entities such as the SIF, the Employees Retirement System, PREPA and PRASA). If the Commonwealth's financial condition does not improve, it may be unable to continue to support these operations at the same level without taking action to reduce other expenses or increase revenues. This may result in reduced services to the Commonwealth population. However, since some of the services provided by these public corporations are essential to maintain health, public safety and welfare, the Commonwealth may prioritize the funding of such services over financial or other obligations.

Set forth below are brief descriptions of some of the Commonwealth's principal public corporations. Brief descriptions of certain public corporations that issue publicly traded bonds and notes but do not have material operations, such as COFINA and PFC, have been included under "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" and are not included herein. For a comprehensive listing of the Commonwealth's public corporations as of June 30, 2014, consult Note 1 to the Commonwealth's Basic Financial Statements for fiscal year 2014. All financial results herein for fiscal years 2015 and 2016 are preliminary, unaudited and subject to change (unless otherwise noted).

### Healthcare

### Puerto Rico Health Insurance Administration

PRHIA was created in 1993 to negotiate and contract for the provision of comprehensive health insurance coverage for qualifying (generally low income) Puerto Rico residents under the Commonwealth's "Health Reform" program. Under this system, the Commonwealth selected, through a bidding process, a private health insurance company for each designated region of the

island and paid such insurance company a fixed premium for each insured beneficiary within such region. The health insurance program covered the entire island. On October 1, 2010, the Commonwealth implemented "Mi Salud," which replaced the "Health Reform" program. Effective April 1, 2015 "Mi Salud" was replaced by the "Government Health Insurance Plan" ("**GHP**").

The Commonwealth, through the GHP, provides health insurance coverage to approximately 1.583 million insured residents of Puerto Rico. The cost of this health insurance program is very significant, totaling $2.8 billion for the year ended June 30, 2016. A substantial portion of the cost of the Commonwealth's health insurance program is currently paid by the federal government and funded principally by non-recurring funding provided pursuant to the federal Patient Protection and Affordable Care Act (the "**Affordable Care Act**" or "**ACA**"), as well as recurring Medicaid and Children's Health Insurance Program ("**CHIP**") funds, which in the case of the Commonwealth are capped at a level lower than that applicable to the states (which are not capped).

Upon exhaustion of the non-recurring ACA funds, currently estimated to occur in December 2017, and absent Congressional action to renew this non-recurring funding, the amount of federal funds available for this health insurance program will revert to the recurring capped Commonwealth Medicaid and CHIP allocations of approximately $400 million, which would result in significantly higher requirements of Commonwealth funding, unless benefits or eligibility, or both, are reduced significantly. Although the Commonwealth can take various measures to address the imbalance, including reducing coverage and limiting eligible beneficiaries, federal regulations may prohibit or limit the application of these measures. Furthermore, reducing coverage or limiting beneficiaries could result in additional costs at the Commonwealth's public hospitals, reducing potential savings and increasing expenditures in order to meet demand at the Commonwealth's already over-utilized public hospitals.

The fiscal stability of the Commonwealth's health insurance program is one of the most significant budgetary challenges facing the Commonwealth, especially if neither the availability of ACA funds is renewed nor the cap imposed on Medicaid matching funds is removed. In light of the current funding disparity between the Commonwealth and the states, the Commonwealth is intensifying its efforts to convince Congress to renew ACA funding or to provide Puerto Rico with parity with respect to Medicaid funds. Recently, members of the private and public sector formed the Puerto Rico Healthcare Crisis Coalition to increase lobbying efforts. However, it is not possible to predict the likelihood that such efforts will succeed. Thus, the Commonwealth will continue evaluating the fiscal structure of the program taking into consideration the current federal funding depletion date estimates. To the extent these efforts are unsuccessful, it is unlikely that the Commonwealth would be able to assume a significantly higher portion of the cost of the health insurance program without materially affecting the resources available to other stakeholders, including bondholders.

In the absence of Congressional action renewing ACA funding, PRHIA will experience material operating deficits. The following table provides a five-year operating cash flow forecast (amounts in thousands) of PRHIA excluding capital expenditures and debt service payments, assuming no extension of ACA funding, no alternative revenue source nor changes to benefits, co-pays and/or eligibility rules, as presented in the Commonwealth's Fiscal Plan published on October 14, 2016. Although the table incorporates the effect of the new health insurance

contracts in the calculation of the projected results for fiscal years 2017 through 2021, PRHIA has projected costs for these years based on the new capitated managed care organization model and assumptions consistent with historical increases in the program. Therefore, the actual results could be materially different than those presented herein. *

| | Proj. FY2017 | Proj. FY2018 | Proj. FY2019 | Proj. FY2020 | Proj. FY2021 |
|---|---|---|---|---|---|
| Change in Net Position for the Period | $ 141,687 | $ 100,239 | $ 36,059 | $ (51,920) | $ (115,215) |
| Depreciation | 193 | 174 | 156 | 141 | 127 |
| (Increase) decrease in Accounts Receivable and other current assets | 2,161 | (714) | 20,590 | (714) | (714) |
| Increase (decrease) in Accounts Payable and other liabilities | (175,587) | (14,948) | 51 | 50 | (20) |
| Net cash generated (used) in operating activities | ($31,546) | $84,750 | $56,856 | ($52,443) | ($115,822) |
| | | | | | |
| Less:ACA shortfall | -- | (865,434) | (1,516,983) | (1,582,761) | (1,680,829) |
| Commonwealth Appropriations for debt service | (6,988) | (6,988) | (6,988) | (6,988) | (6,988) |
| Net cash generated in operating activities after ACA and appropriations adjustment | ($38,535) | ($787,672) | ($1,467,116) | ($1,642,193) | ($1,803,639) |

   *Totals may not add due to rounding.*

On October 14, 2014, the Board of Directors of the PRHIA awarded contracts for the GHP to five private insurance providers pursuant to a bidding process. Under the terms of these contracts, insurers began providing services to enrollees on April 1, 2015 until the contracts' termination date of June 30, 2017. The PRHIA may opt to renew these contracts for an additional term of one year until June 30, 2018; however, given that ACA funds will be depleted before the end of fiscal year 2018 it is possible that none of the private insurance providers may execute a contract with PRHIA for such fiscal year. Under the new contracts, the Commonwealth public health insurance model changed, in order to comply with regulations of the Center for Medicaid and Medicare Services ("**CMS**"), from a "third-party administrator" (TPA) model, in which the Commonwealth was ultimately responsible for the cost of the health services provided, to a "managed care organization" ("**MCO**") model, in which PRHIA will pay the insurers a fixed premium for each insured beneficiary and the insurers will be responsible for the cost of such services. Premiums are negotiated for every fiscal year covered by the contracts (namely from April 1, 2015 to June 30, 2016, and from July 1, 2016 to June 30, 2017). Any increase in the premiums is subject to PRHIA's determination that the proposed new amount is actuarially sound.

PRHIA's transition from a TPA to an MCO model exacerbated PRHIA's liquidity needs. This heightened liquidity need was due to the TPA's phase-out period, which required the PRHIA to pay-off the TPA and maintain current MCO premiums. The MCO insurance model demands premium payments at the beginning of each month, payable during the first five days.

However, due to the present credit and fiscal condition of the Commonwealth, PRHIA was unable to obtain a renewal of a short-term credit facility from GDB or other prospective lenders. Furthermore, although recent legislation authorized PRHIA to borrow, including through the issuance of bonds, up to $400 million in order to repay payables owed to suppliers, PRHIA was unable to obtain such financing. In order to ensure continuity of services, PRHIA reached a preliminary agreement with the five private insurance providers to pay-off the premiums throughout the month, in weekly installments, instead of during the first five days of the month.

In addition, CMS agreed with PRHIA to provide its share of federal funds upon availability of local funds on a weekly basis in order to complete the required payments to the

120

MCO's. These agreements resulted in cash management arrangements that allowed PRHIA to pay amounts under its former TPA model along with the current MCO premiums. PRHIA had a positive cash flow from operations for fiscal year 2016 and is expected to continue to have a positive cash flow through fiscal year 2017.

The following figure presents selected financial data for PRHIA for fiscal years 2015 and 2016, in thousands (but audited results for fiscal year 2015 reflect impact of a prior period adjustment:

| | Audited<br>June 30, 2015 | Audited<br>June 30, 2016 |
|---|---|---|
| Average insured lives | 1,686 | 1,583 |
| Federal reimbursements | $1,592,484 | $1,706,686 |
| Cost of medical premiums and claims | $2,765,772 | $2,829,172 |
| Federal funds effective share | 57.58% | 60.32% |
| Period's Net Change (Deficit)[1] | $13,682 | $84,706 |

There are approximately 170,000 insured lives for which the Commonwealth covers the full amount of their insurance costs as they do not qualify for reimbursement from federal funds (the "Commonwealth Population"). The estimated annual costs for the Commonwealth Population are approximately $340 million, which are paid solely by the Commonwealth. In light of the financial challenges facing the GHP, the Commonwealth will need to decide if it can afford to continue funding these costs.

The following table presents selected financial data from PRHIA's financial statements for fiscal years 2015 and 2016:

| ($ in thousands) | Audited<br>June 30, 2015 | | Audited<br>June 30, 2016 | |
|---|---|---|---|---|
| General fund appropriations | $ | 892,259 | $ | 892,070 |
| Federal reimbursements | | 1,592,484 | | 1,706,686 |
| Other contributions | | 330,251 | | 348,769 |
| Interest and other | | 4,584 | | 5,120 |
| Total revenues | $ | 2,819,578 | $ | 2,952,645 |
| | | | | |
| Total expenses | $ | 2,805,896 | $ | 2,867,939 |
| Increase (decrease) in net position | $ | 13,682 | $ | 84,706 |
| | | | | |
| Amounts due to suppliers and others | $ | 390,599 | $ | 214,631 |
| Amounts due to other governmental entities | $ | 196,145 | $ | 207,144 |

121

General Fund appropriations to PRHIA for fiscal year 2017 is also approximately $892 million.

On June 8, 2015, CMS confirmed that the Medicare Advantage funding for Puerto Rico in 2016 would be reduced by approximately 11%. Such reduction to the Medicare Advantage rates would impact the ability of the Medicare Advantage plans to assume the costs of covering the higher-need dual eligible population (approximately 260,000 beneficiaries) covered through PRHIA's "Platino" program. Medicare Advantage subsidizes the costs of the Platino program from the rates paid through Medicare. If the Medicare Advantage plans could not continue to subsidize the costs of covering the Platino program, PRHIA's costs for calendar year 2018 for this population would increase from the current $30 million per year to approximately $150 million per year unless benefit reductions are made.

Under newly established "Modified Adjusted Gross Income," or "MAGI," standards, the number of Commonwealth residents who are Medicaid-qualified could be reduced and, if the Commonwealth were to continue providing these residents with coverage, their healthcare costs would therefore need to be covered by the Commonwealth without federal reimbursement. The Puerto Rico Health Department and its Medicaid office are responsible for establishing eligibility standards for the Government health plan and for implementing MAGI.

**Puerto Rico Medical Services Administration**

PRMSA is a public corporation and an enterprise fund of the Commonwealth, ascribed to the Puerto Rico Health Department, that operates and administers the centralized health services offered by the member institutions and consumers of the complex known as the Puerto Rico Medical Center.

PRMSA's two main sources of revenue are (i) centralized health infrastructure services charged to participating institutions within the Puerto Rico Medical Center Complex, which constituted approximately $92 million, or 70%, of its net service revenue in fiscal year 2016 (unaudited) and (ii) reimbursements collected from contracted insurers and non-insured patients for services provided through the emergency room, trauma hospital or outpatient clinic facilities, which constituted approximately $40 million, or 30%, of net service revenue in fiscal year 2016 (unaudited). PRMSA also provides its medical facility infrastructure as teaching and research resources for the UPR Medical Science Campus attending doctors and residents.

Almost the entirety of PRMSA's revenues derive, directly or indirectly, from the Commonwealth or its instrumentalities. As such, PRMSA's financial position and liquidity is highly vulnerable to the economic and financial position of the Commonwealth. One hundred percent of participating institutions charged for centralized health infrastructure services by PRMSA are government agencies or public corporations. Approximately 90% of revenues from such services derive from entities ascribed to the Puerto Rico Health Department. The payment of such services is therefore funded primarily from the Commonwealth's General Fund. As a result of the financial constraints on the Commonwealth, the risk of non-payment or delayed payment by the Commonwealth to PRMSA for acquired centralized services is increasing.

Reimbursements collected from contracted insurers are also highly dependent on government finances. Approximately 53% of PRMSA patients are insured by the government (PRHIA (40%) and ACAA (13%)). PRMSA projects that cash receipts from the insurer

122

reimbursement line of business during fiscal year 2017 will average approximately $30 million, for which $22 million, or 73%, would be collected from PRHIA and ACAA.

PRMSA has historically been unable to bill insurers, whether public or private, for the actual costs incurred by PRMSA to service insured patients. Insurance companies, which typically operate based on a Third Party Payer System model for insured patients, require PRMSA to bill based on pre-established contractual rates. PRMSA estimates that the difference between PRMSA's costs of providing patient services and the revenues it actually receives from insurers based on contracted rates is approximately $60 million per year.

PRMSA's financial position is also impacted by the need to provide emergency care to uninsured, unidentified and undocumented immigrant patients. Such services cost PRMSA an average of approximately $10 million per year. Furthermore, a significant portion of private hospitals no longer accept government insurance programs (PRHIA and ACCA). There is also a lack of tertiary and above tertiary health structures among private hospitals in Puerto Rico. As a result of these factors, 41% of patients received through PRMSA's emergency room are transfers from private hospitals.

Historically, PRMSA has incurred significant operating losses, which have been financed with General Fund appropriations and GDB lines of credit, payable in turn from General Fund budgetary appropriations. PRMSA's General Fund appropriations for fiscal years 2014, 2015, 2016 and 2017 were $51 million, $47 million, $45 million, and $52 million, respectively. Operating revenues (not including revenues from Commonwealth appropriations or federal grants), for fiscal years 2014, 2015, and 2016 were $123 million, $136 million, and $132 million, respectively.

PRMSA suffered operating losses before depreciation, amortization and interest expense, during fiscal years 2014, 2015 and 2016 of $60.5 million, $37.8 million, and $43.1 million, respectively. If the Commonwealth's financial situation precludes it from continuing to support PRMSA, it could affect continuity of services at the Puerto Rico Medical Center. Given the essential nature of the services provided by PRMSA, the Commonwealth is likely to prioritize the funding of PRMSA over other obligations, including debt service.

As of June 30, 2016, PRMSA had outstanding indebtedness of approximately $492 million, composed of a $282 million line of credit with GDB, $152.9 million in amounts payable to other governmental entities (primarily PREPA, PRASA, and UPR) and $57.1 of accounts payable to non-governmental entities.

### *Education*

### University of Puerto Rico

UPR, the only public university in Puerto Rico, has eleven campuses located throughout the island. UPR's total enrollment for academic year 2015-2016 was 59,924, an increase of 4.09% when compared to 57,571 students in academic year 2014-2015.

Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula and equals 9.60% of the Commonwealth's average annual revenues from internal sources (subject to certain exceptions)

for each of the two fiscal years immediately preceding the current fiscal year. However, the Fiscal Sustainability Act froze for the three fiscal year period ending on June 30, 2017 the formula appropriations to the UPR at the same subsidized level granted in the fiscal year 2013 budget.

UPR further receives supplemental Commonwealth appropriations from the General Fund as well as a portion of the slot machine revenue tax collected by PRTC. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants and other sources. UPR's capital improvements have been financed in part by revenue bonds. See "Debt Payable by Tax-Supported Public Corporations and Instrumentalities-University of Puerto Rico" under DEBT OF THE COMMONWEALTH ITS PUBLIC CORPORATIONS AND MUNICIPALITIES. UPR has also historically relied on GDB for liquidity and financial management support.

UPR, including its component units, has had significant recurring operating losses and is highly dependent on Commonwealth appropriations and tax revenues to finance its operations. UPR's audited financial statements for the years ended June 30, 2014 and 2015, reported an operating loss before depreciation, amortization and interest expense of $1.02 billion and $952.7 million, respectively. Total operating revenues amounted to $307.5 million and $312.4 million for the years ended June 30, 2014 and 2015, respectively, an increase of $4.9 million or 2% in 2015. Operating revenues for fiscal year 2016 are not yet available. Non-operating revenues amounted to $1.09 billion and $1.07 billion for the years ended June 30, 2014 and 2015, respectively. Non-operating revenues include Commonwealth's appropriations that represent roughly 60% of the University's total revenues, which amounted to approximately $873.6 million, $873.8 million, and $869.5 million for the years ended June 30, 2014, 2015 and 2016, respectively. Also, reported as other non-operating revenues are the distributions of slot machine revenue from PRTC to UPR. For the years ended June 30, 2014, 2015 and 2016, such slot machine revenue distributions represent roughly 5% of the University's total revenues, which amounted to $64.4 million, $63.5 million and $62.6 million, respectively. Non-operating revenues also include the Federal Pell Grants which represent roughly 10% of the University's total revenues and amounted to $162.0 million, $167.2 million and $178.7 million for the years ended June 30, 2014, 2015 and 2016, respectively. The change in net position amounted to $27.9 million and $71.6 million for the years ended June 30, 2014 and 2015, respectively.

In light of UPR's historical dependency on Commonwealth appropriations and tax revenues, as Commonwealth's liquidity and financial position continues to be strained, UPR's financial condition and liquidity could be adversely affected.

*Public Transportation and Other Infrastructure*

**Puerto Rico Highways and Transportation Authority**

HTA is a public corporation and governmental instrumentality of the Commonwealth that was created in 1965 to assume responsibility for the construction of roads and highways and related transportation facilities in Puerto Rico. Its operating revenues consist primarily of toll and train fares. HTA operating revenues totaled approximately $213.7 million, $235.0 million and $210.9 million in fiscal years 2014, 2015 and 2016, respectively. Toll revenues totaled

$128.72 million, $131.7 million and $134.1 million in fiscal years 2014, 2015 and 2016, respectively.

HTA's most important sources of revenues are revenues from motor vehicle license fees and Commonwealth excise taxes on gasoline, oil, diesel, petroleum products and cigarettes, which have been allocated by law to HTA. Said non-operating revenues amounted to approximately $531.8 million, $432.5 million and $478.2 million in fiscal years 2014, 2015 and 2016, respectively. The following is a breakdown of such non-operating revenues:

- Vehicle license fees (including additional amounts assigned to HTA by Act No. 31-2013, as described below) produced approximately $90.9 million, $89.6 million, and $92.8 million in revenues during fiscal years 2014, 2015 and 2016, respectively.
- Gasoline excise tax revenues totaled approximately $156.02 million, $157.1 million, and $156.0 million in fiscal years 2014, 2015 and 2016, respectively.
- Petroleum products excise tax revenues amounted to approximately $255.59 million, $152.5 million and $198.2 million in fiscal years 2014, 2015 and 2016, respectively.
- Diesel oil tax revenues amounted to approximately $9.12 million, $13.4 million, and $12.9 million in fiscal years 2014, 2015 and 2016, respectively.
- Cigarette excise tax revenue actually transferred to the Authority in fiscal years 2014, 2015 and 2016 amounted to approximately $17.96 million, $19.9 million and $18.3 million, respectively.

On June 25, 2013, the Commonwealth enacted Acts Nos. 30 and 31 of 2013 to provide additional revenues to HTA for the purpose of repaying its loans to GDB. Pursuant to these laws, (i) the excise tax on petroleum products assigned to HTA was increased from $3.00 per barrel (which was the tax rate applicable at the time under a sliding scale) to a fixed $9.25 per barrel, (ii) the portion of the motor vehicle license fees previously received by the Commonwealth's General Fund was assigned to HTA and (iii) $20 million of the cigarette excise tax, previously received by the Commonwealth's General Fund, was assigned to HTA. In January of 2015, Act 1-2015 further increased taxes on petroleum products (other than diesel) by creating a new $6.25 per barrel excise tax assigned to PRIFA. Effective on the date that certain conditions are met, including the assumption by PRIFA of HTA's debt due to GDB, the petroleum products tax assigned to HTA would be reduced to $6.00 per barrel and the PRIFA petroleum products tax would be increased to $9.50 per barrel. The Commonwealth does not currently contemplate that the conditions for the completion of such transfer will be satisfied in the foreseeable future.

Notwithstanding actions by the Commonwealth to shore up HTA's finances, HTA has experienced significant recurring losses from operations and faces a number of business challenges that have been exacerbated by the Commonwealth's economic recession and the fact that HTA's toll rates are not indexed to inflation. PRTHA audited financial statements reported a net operating loss before depreciation, amortization and interest expense for fiscal years 2013 and 2014 of approximately $129.5 million and $177.8, respectively. Preliminary, unaudited information for fiscal year 2015, and 2016 present an operating income (loss) before depreciation and amortization of approximately $9.0 million and ($6.0) million, respectively. After considering non-operating revenues and expenses and capital contributions, HTA net position decreased by approximately $190.2 million in 2014, increased by approximately $109.3 million in 2015, and decreased by approximately $147.3 million in 2016. Accounts payable as of June 30, 2016 amounted to approximately $126.2 million.

HTA's deteriorating financial position has been exacerbated by the fact that in fiscal year 2005 it started operating the mass, heavy-rail transportation system for the San Juan metropolitan area known as the Urban Train. The Urban Train in San Juan consists of approximately 17 kilometers of track running from Bayamón to Santurce. PRTHA incurred approximately $2.42 billion in costs [to construct the Urban Train], of which $685.7 million was paid with federal funds. Maintenance services are partially funded with capital contributions from the Federal Transit Administration. The total annual operation and maintenance costs, including cost of insurance and electricity, for fiscal years ended on June 2014, 2015 and 2016 were approximately $57.348 million, $56.5 million, and $56.323 million, respectively. Operating revenues of the Urban Train were approximately $8.020 million, $9.7 million, and $9.118 million for fiscal years 2014, 2015 and 2016, respectively. HTA is also currently assigned a dedicated fund created from the collection of traffic fines to fund the Urban Train. PRITA was created during fiscal year 2015 to integrate certain mass transit services, including the Urban Train. The transfer of the Urban Train is subject to certain condition precedent which are unlikely to be met in the short run. See next section for additional details. The operating and maintenance expenses of HTA, net of revenues, could be reduced by approximately $58 million annually after the transfer of the Urban Train to PRITA.

Executive Order 18 declared an emergency period with respect to HTA and suspended HTA's obligation to transfer toll revenues to the trustee of its bonds until June 30, 2016 (this extension was later extended pursuant to Executive Order 31.

**Puerto Rico Integrated Transit Authority**

PRITA is a public corporation created in 2014 to integrate the mass transit services currently provided by HTA, the Puerto Rico and Municipal Island Maritime Transport Authority ("**MTA**") and the Metropolitan Bus Authority ("**MBA**"). As noted above, HTA operates the Urban Train and related feeder bus services; MTA operates ferry services between the Municipalities of San Juan and Cataño, and Fajardo, Vieques and Culebra; and the MBA operates bus and paratransit services within the metropolitan area.

PRITA commenced operation in February 2015. PRITA's management has been working on the required federal approvals in order to transfer the above-mentioned operations to PRITA, but such approvals are not currently expected to be received in the short-run. Thirty days after obtaining such federal approvals, the MBA and the MTA would merge into PRITA, and their legal entities would cease to exist, and the HTA's Urban Train program would be transferred to PRITA. These operations have a history of significant losses. Although the enabling legislation of PRITA assigns dedicated revenues to PRITA, there is no assurance that the combined operations would be financially self-sufficient.

During fiscal year 2015, PRITA received approximately $6.57 million from General Fund appropriations. During fiscal year 2016, PRITA received approximately $5.38 million in cigarette excise tax revenues and approximately $789,000 from General Fund appropriations. For fiscal year 2017, General Fund appropriations for PRITA amount to approximately $33 million, but of this amount only $4.78 million is expected to be used for PRITA's current operations, with the balance expected to be allocated to operations currently conducted by MBA and MTA. Operating losses before depreciation, amortization and interest expense for PRITA

126

were approximately $736,584 and $3.6 million for fiscal years 2015 and 2016, respectively. As of June 30, 2016, PRITA had no accumulated outstanding long-term debt.

If and when the Urban Train operations are transferred to PRITA, the dedicated fund funded from traffic fines, currently assigned to HTA for the benefit of the Urban Train, would be available as an additional source of revenue to PRITA.

**Puerto Rico and Municipal Island Maritime Transport Authority**

MTA received approximately $26.2 million, $28.6 million and $16.5 million in General Fund appropriations during fiscal years 2014, 2015 and 2016, respectively. For fiscal years 2016 and 2017, General Fund appropriations previously directly assigned to MTA were channeled through PRITA. MTA is expected to receive during fiscal year 2017 approximately $16.3 million from such General Fund appropriations. MTA also received $13.38 million from the cigarette excise tax, via PRITA, during fiscal year 2016. Its operating revenues (principally passenger and cargo fares) for fiscal years 2014, 2015 and 2016 were $5.2 million, $5.4 million and $4.9 million, respectively. In the past, the HTA and the Puerto Rico Ports Authority have also been sources of funds to MTA. Operating losses for fiscal year 2016 were approximately $34.1 million. Operating losses before depreciation, amortization and interest expense for the fiscal years ending on June 30, 2014 and 2015 amounted to approximately $41.9 million and $30.8 million, respectively.

After considering Commonwealth appropriations and federal grants, the MTA had change in net assets (deficit) of ($14.96 million), $.805 million and $.918 million for fiscal years 2014, 2015 and 2016, respectively. MTA's currently estimates accounts payable to suppliers and other entities as of June 30, 2016 to be approximately $88 million.

Certain transit-related expenses from MTA are eligible for reimbursement from federal funds.

**Metropolitan Bus Authority**

MBA's principal sources of operating funds are General Fund's appropriations, revenues from the cigarette excise tax and federal funds. MBA received approximately $42.15 million, $31.3 million and $16.4 million, during fiscal years 2014, 2015 and 2016, respectively, from Commonwealth General Fund appropriations. For fiscal years 2016 and 2017, General Fund appropriations previously assigned to MBA were channeled through PRITA. MBA is expected to receive during fiscal year 2017 approximately $11.9 million from such General Fund appropriations. Directly or via PRITA, MBA received from the cigarette excise tax $9.60 million in fiscal year 2015 and $19.34 million in fiscal year 2016. In fiscal year 2014, MBA received $9.75 million from the diesel excise tax (which was subsequently replaced by the cigarette excise tax). MBA's operating revenues (principally passenger fares, advertising and rental income) for fiscal years 2014, 2015 and 2016 were $4.86 million, $4.24 million and $3.43 million, respectively. Operating losses before depreciation, amortization and interest expense amounted to $61.4 million, $51.1 million and $45.8 million, for fiscal years 2014, 2015 and 2016, respectively.

For fiscal years 2014, 2015 and 2016, MBA had a decrease in net position of $4.1 million, $16.2 million and $8.6 million, respectively.

127

MBA's amounts due to non-governmental suppliers increased materially, from $2.9 million as of June 30, 2012 to $9.2 million as of June 30, 2015; and balances payable to other governmental entities increased from $26.8 million as of June 30, 2012 to $51.9 million (including accumulated penalties and interests) as of June 30, 2015. Governmental entities to which MBA owes money include the Treasury Department, the State Insurance Fund Corporation, the Retirement Systems Administration, PREPA and PRASA.

Certain transit-related expenses from MBA are eligible for reimbursement from federal funds.

MBA pledged part of the revenues derived from the cigarette excise tax as the sole source of repayment of that certain Refinancing of Loan Facilities Agreement, dated as of March 30, 2012, as amended from time to time (the "Loan Agreement"), by and between MBA and a commercial bank. On September 25, 2015, MBA executed an amendment to its Loan Agreement whereby the maturity date was extended until March 31, 2016. The line of credit is secured by approximately $10 million in cigarette tax revenues pledged to MBA. However, MBA has not made payments under the Loan Agreement since November 30, 2015.

Pursuant to Executive Orders issued under the clawback provisions of the Commonwealth Constitution and the Moratorium Act, the Commonwealth's obligation to transfer cigarette excise taxes to MBA and MBA's obligation to make any payments on its outstanding debt were suspended and MBA is currently in default under the Loan Agreement, as it has not received any amounts from the Commonwealth in order to make the payments due thereunder.

In September 2016, the lender sued MBA seeking declaratory and injunctive relief arguing that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. On November 11, 2016, the Commonwealth defendants filed a Notice of Automatic Stay under PROMESA. It is the Government's position that this creditor is currently prohibited from exercising remedies due to the stay provided in the Moratorium Act and PROMESA. See discussion in LITIGATION.

In the meantime, revenues assigned to MBA and pledged for the repayment of its loans may be applied first to the payment of debt service on Direct GO Obligations and Guaranteed GO Obligations to the extent that no other revenues are available for such purpose.

Due to the above mentioned Executive Orders, since November 2015 MBA has not received its dedicated cigarette excise tax (that is, the one that is not received via PRITA) or a substitute source of funding; thus also causing its other debts to dramatically increase.

**Puerto Rico Public Buildings Authority**

The Puerto Rico Public Buildings Authority ("**PBA**") is a public corporation created in 1958 to design, construct, administer and provide maintenance to office buildings, courts, warehouses, schools, health care facilities, welfare facilities, shops and related facilities leased to the Commonwealth or any of its departments, agencies, instrumentalities or municipalities. The annual rent for each leased building is based on the amounts needed by PBA to cover the payment of:

- principal, interest and other amortization requirements of the notes and bonds issued to finance the buildings;
- operating and maintenance expenses of the buildings, including a reasonable proportional share of administrative expenses, excluding depreciation; and
- cost of equipment replacement and extraordinary repairs.

PBA's enabling act provides that the full faith and credit of the Commonwealth is pledged for the payment of rent under any lease agreement executed pursuant to such enabling act with any agency, public corporation or other instrumentality of the Commonwealth. The enabling act also provides that the Treasury Department will make advances to PBA for any unpaid portion of rent payable to PBA by any agency or instrumentality of the Commonwealth that has entered into lease agreements with PBA. Such advances are recorded as a reduction of accounts receivable since the responsibility of reimbursement belongs to the agency in accordance to the enabling act.

Operating revenues consists principally of lease payments from rent charges to agencies, public corporations and municipalities of the Commonwealth. Operating revenue from lease payments amounted to approximately $412.8 million, $408.0 million and $425 million for fiscal years 2014, 2015 and 2016, respectively. For the fiscal year ended June 30, 2015, such revenue is net of an estimated reserve for bad debts in the amount of approximately $1.8 million.

Audited financial statements for fiscal years 2014 and 2015 present an operating income before depreciation and amortization of $265.6 million and 277.8 million, respectively. Most significant non-operating revenues consist of subsidies from the Federal Government for the payment of bonds in the amount of $35.9 million and $36.0 million for the years ended June 30, 2014 and 2015, respectively, and operating grants from the Commonwealth in the amounts of $214.3 million, $5.3 million and $1.1 million for fiscal years 2014, 2015 and 2016, respectively. The significant reduction in Commonwealth grants from fiscal year 2014 to 2015 are due primarily to the receipt during fiscal year 2014 of $192.9 million in operating grants to repay lines of credit incurred as a result of reductions in rental revenue in prior fiscal years.

PBA total revenues are offset by an interest on bonds and notes expense of $250.3 million for fiscal year 2014 and $241.2 million for fiscal year 2015. Net position increased $181.2 million for the year ended June 30, 2014 and decreased by $12.3 million for the year ended June 30, 2015. Preliminary results for the year ended June 30, 2016 result in a net position increase of $97 million. As of June 30, 2016 PBA accounts payable amounted to approximately $24.4 million.

**Puerto Rico Ports Authority ("PRPA")**

PRPA owns the major airport and seaport facilities in Puerto Rico. In February 27, 2013, it transferred the operation of the Commonwealth's principal airport, the Luis Muñoz Marín International Airport, to a private consortium consisting of Grupo Aeropuortuario del Sureste and Highstar Capital pursuant to a 40-year lease agreement. As a result of the transaction, PRPA received a $615 million upfront payment, of which $502 million was used to repay certain outstanding bonds and other debts.

PRPA derives revenues from a variety of sources, including taxes on aviation fuel sales, wharfage, dockage and harbor fees, and rentals for the lease of property and seaport equipment. Net maritime operating revenues totaled $74.5 million in 2014, $75.4 million in 2015 and $81.7 million in 2016 (unaudited), increases that have resulted principally from increased cruise ship traffic to Puerto Rico. Net airport operating revenues totaled $26.0 million in 2014, $28.4 million in 2015, and $13.5 million in 2016 (unaudited). Revenues from the aviation fuel tax totaled approximately $628,000 , $590,000 and $736,000 during such three fiscal years, respectively.

PRPA's non-operating revenues consist principally of passenger facility charges, Federal Aviation Administration (FAA) approved programs, contributions from the Commonwealth and other governmental entities, fuel flowage fees, penalties and other fees. In 2014, PRPA received approximately $17 million in federal financial assistance, $2.7 million in Commonwealth contributions, approximately $852,000 in passenger facility charges, approximately $109,000 in fuel flowage fees, and $815 in other fees and penalties. In 2015, PRPA received approximately $11.3 million in federal financial assistance, $2.7 million in central government contributions, approximately $705,000 in passenger facility charges, approximately $3.2 million from sales of assets, approximately $10.5 million in litigation settlements and approximately $126,000 in other fees and penalties.

PRPA audited financial information reported an operating income before provisions, depreciation, amortization and interest expense for fiscal years 2014 and 2015 of approximately $17.5 million and $21.5 million, respectively. PRPA reported a decrease in its net position of approximately $61.5 million and $62.8 million during fiscal years 2014 and 2015, respectively. The 2015 decrease responds principally to an approximately $53.4 million provision for uncollectible balances made during fiscal year 2015 regarding receivables from the Commonwealth (approximately $14.7 million) and MTA (approximately $38.6 million).

Other improvements in operations during fiscal year 2015 also resulted from a net effect of: an increase in operating revenues of almost $3 million; reduction in interest expense of approximately $5.9 million; a one-time gain of approximately $10.5 million as a result of a litigation settlement in favor of PRPA; and the non-occurrence that year of an early termination event for employees, which represented approximately $30 million in the prior year.

*Economic Development*

**Puerto Rico Industrial Development Company ("PRIDCO")**

PRIDCO is a public corporation created to promote economic development by stimulating the formation of new local firms and encouraging firms in the United States and foreign countries to establish and expand their operations in Puerto Rico. PRIDCO maintains a continuing real estate development program, which includes leasing or sale of facilities to qualified private industrial investors and the construction of industrial facilities for lease. In fiscal years 2014 and 2015, PRIDCO reported $61.7 million and $61.8 million in rental income from industrial properties, respectively. Additionally, PRIDCO administers legislative appropriations in accordance with various special incentives programs to assist manufacturers in offsetting allowable start-up costs and special legislative appropriations to third parties as approved by the Legislature from time to time.

PRIDCO reported a consolidated decrease in net position of $3.9 million for fiscal year 2015, compared to a consolidated increase in net position of $23.5 million for fiscal year 2014. Rentals derived from the leasing of certain PRIDCO facilities are pledged to the payment of PRIDCO's revenue bonds. See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for information on the outstanding debt of PRIDCO.

PRIDCO administers three separate incentive funds: the Special Fund for Economic Development ("**FEDE**"), the Special Incentives Fund and the Rums of Puerto Rico Fund. The FEDE was created to strengthen and enhance economic development through economic incentive grants to private enterprises. Funding for said incentives is derived from contributions from the Commonwealth. Total revenue of the FEDE for fiscal year 2014 amounted to $62 million compared to $33 million for fiscal year 2015. These intergovernmental revenues decreased due to the fact that monies received by the FEDE during fiscal year 2015 were not received until May 2015 and the amount due for such fiscal year was not received in full.

The Special Incentives Fund was also created to promote economic development through economic incentives awarded to private enterprises. The Special Incentives Fund was historically funded by General Fund appropriations but it is currently funded annually by contributions from the FEDE. Intergovernmental contributions from the FEDE for the benefit of the Special Incentives Fund for fiscal years 2014 and 2015 were approximately $11.5 million and $34 million, respectively. The Special Incentives Fund has not received any appropriations from the General Fund since fiscal year 2009. Its total deficit for fiscal year 2015 increased by approximately $2 million, or 7%, in comparison with fiscal year 2014 because incentives granted during the year exceeded contributions received by a similar amount.

The Rums of Puerto Rico Fund was created to encourage production and promotion of Puerto Rican rum. The fund is administered by PRIDCO and funded by the lesser of $10 million and 2.5% of the total amount collected of the federal excise tax on rum imported to the United States and produced in Puerto Rico that is "covered-over" or transferred to the Commonwealth pursuant to the U.S. Internal Revenue Code. The Rums of Puerto Rico Fund also receives "cover-over" revenues assigned to private rum producers pursuant to certain incentive agreements signed with the Commonwealth. Total revenue of the Rums of Puerto Rico Fund totaled approximately $76.5 million in fiscal year 2014 and $142 million in fiscal year 2015, out of which $75.9 million and $141.8 million were derived from Commonwealth contributions, and $581 thousand and $393 thousand were derived from federal excise taxes collected, respectively.

**Puerto Rico Tourism Company ("PRTC")**

PRTC is a public corporation and instrumentality of the Commonwealth responsible for stimulating, promoting and regulating the development of Puerto Rico's tourism industry. Among other things, PRTC incentivizes the development of tourism facilities, establishes standards of quality and regulates and oversees gaming operations within Puerto Rico, and provides visitor orientation and technical assistance to investors. The PRTC has facilities and representatives within Puerto Rico and in the U.S. mainland, Canada, Europe and Latin America.

PRTC's income is derived primarily from collections of the hotel room tax and from revenues received from two proprietary funds, the Hotel Development Corporation Fund and

Slot Machines Operations Fund. Hotel room tax revenues for fiscal years 2014, 2015, and 2016 amounted to $70 million, $75 million and $75.5 million, respectively. Total slot machine revenues for fiscal year 2014, 2015, and 2016 amounted to $156.0 million, $154.5 million, and $152.5 million. Slot machine revenues, net of expenses, are distributed among the Commonwealth of Puerto Rico, the University of Puerto Rico and PRTC. The following table summarizes the distribution of Slot Machine Net Revenues for fiscal years 2014, 2015 and 2016, respectively:

|                           | 2014     | 2015     | 2016     |
|---------------------------|----------|----------|----------|
| Commonwealth General Fund | $21,516  | $21,175  | $20,790  |
| University of Puerto Rico | $64,547  | $63,524  | $62,371  |
| PRTC General Fund         | $55,955  | $55,069  | $54,068  |
| Total Distributions       | $142,018 | $139,768 | $137,229 |

In addition, PRTC received approximately $5.5 million and $25,000 during fiscal years 2014, and 2015, respectively, as financial support from the Commonwealth's General Fund. PRTC had total revenues, including Commonwealth appropriations but excluding proprietary funds, for fiscal years 2014, 2015, and 2016 of $77.2 million, $77.6 million and $80.3 million, respectively. PRTC has had a positive fund balance in its general fund for the past 10 years.

The proprietary funds' change in net deficit for fiscal years 2014, 2015 and 2016 were $1.90 million, $0.840 million and $0.971 million, respectively. The negative change in net position is mainly driven by the deficit of the HDC fund, given the proprietary fund has suffered losses from investments made in tourism projects. As of June 30, 2016, PRTC owes $33.5 million to suppliers and other governmental agencies.

**Puerto Rico Infrastructure Financing Authority**

PRIFA was created to provide financial, administrative, consulting, technical, advisory and other types of assistance to other public corporations, governmental instrumentalities, political subdivisions and municipalities authorized to develop infrastructure facilities and to establish alternate means for financing those facilities. As such, PRIFA may issue bonds and provide loans, grants and other financial facilities for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects developed by such entities.

Pursuant to PRIFA's enabling act, PRIFA was authorized to establish the Puerto Rico Water Pollution Control Revolving Fund and the Drinking Water Revolving Fund under the Federal Clean Water Act. In accordance with said mandate, PRIFA subscribed memoranda of understanding with the Puerto Rico Environmental Quality Board and the GDB, and with the Puerto Rico Department of Health and GDB, respectively, for the administration of these funds.

Commonwealth tax revenues are the principal source of funding for PRIFA. Other sources of funds include legislative appropriations, as well as funds provided by entities assisted by PRIFA with respect to their budgeted capital projects.

The PRIFA enabling act also creates the Puerto Rico Infrastructure Fund, funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes

132

imposed on rum and other articles produced in Puerto Rico and sold in the United States, which are transferred to the Department of the Treasury of Puerto Rico each fiscal year pursuant to the United States Internal Revenue Code of 1986. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes, the proceeds of which are required to be returned (or "covered over") from the U.S. Government to the Puerto Rico Treasury Department (except for negligible collections for other alcoholic beverages). PRIFA has periodically issued bonds payable from these funds to finance various capital projects for the benefit of the Commonwealth. For the year ended June 30, 2015, principal and interest paid on Special Tax Revenue Bonds amounted to approximately $112 million.

PRIFA receives $6.50 of the excise tax on petroleum products, which constitutes the source of repayment for certain bond anticipation notes issued by PRIFA pursuant to Act No. 1-2015. Act No. 1-2015 also provides that an additional $3.25 of the excise tax currently assigned to HTA would be transferred to PRIFA if certain conditions are met. However, the Commonwealth does not foresee such conditions to be met in the near future.

PRIFA has also issued bonds for the benefit of PRPA and AMSCA. For a description of such debt, see DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal years 2014 and 2015, PRIFA received $117 million in appropriations from the General Fund, consisting of $113 million for its Dedicated Rum Tax Debt Service and $4 million for its operations. For fiscal year 2016, PRIFA received $4 million for its operations and the $113 million normally allocated to the PRIFA Dedicated Rum Tax Debt Service were retained by the Commonwealth pursuant to the clawback provisions of the Commonwealth Constitution. These amounts do not include other appropriations made to the capital projects fund for the acquisition or construction of capital assets and capital improvements. For fiscal year 2017, the Commonwealth again only appropriated $4 million to PRIFA. The reduction of $113 million in appropriations otherwise destined to repay PRIFA's debt service obligations, is the result of the Moratorium Act and the Executive Orders issued thereunder.

In addition, PRIFA received $38 million for fiscal year 2015 and $132 million for fiscal year 2016 in contributions from HTA to pay certain obligation debt issued by PRIFA in 2015. For a description of such debt, see DEBT OF THE COMMONWEALTH ITS PUBLIC CORPORATIONS AND MUNICIPALITIES.

For fiscal year 2017, $4 million was appropriated from the General Fund budget for PRIFA's operations.

**Agricultural Enterprises Development Administration ("ADEA")**

ADEA is a public corporation ascribed to the Department of Agriculture of the Commonwealth created to provide a wide array of services and incentives to the agricultural sector. ADEA receives administrative support from the Department of Agriculture. For fiscal year 2015, 46% of ADEA's revenues came from state grants and contributions, and the remaining 54% came mostly from charges for services related to the coffee program and sales to the Department of Education. Appropriations from the General Fund amounted to approximately

133

$84.5 million for fiscal year 2014, $90.5 million for fiscal year 2015, $79.9 million for fiscal year 2016, and $109.2 million for fiscal year 2017.

ADEA's change in net position amounted to $6.3 million during fiscal year 2015, compared to $9.6 million the previous year. As of June 30, 2016 ADEA's account payables amounted to $30.6 million.

**GDB and its Subsidiaries**

GDB is a component unit of the Commonwealth created pursuant to Act No. 17 of September 23, 1948, as amended. Historically, GDB served as (i) fiscal agent, financial advisor and reporting agent for the Commonwealth, its instrumentalities and municipalities (collectively, "**Commonwealth Entities**"), (ii) an important source of financing for various Commonwealth Entities, and (iii) the principal depositary of the funds of the Commonwealth Entities. However, as discussed below, GDB no longer performs such functions or does so in a more limited capacity.

*GDB's Role as Fiscal Agent for the Commonwealth Entities*. GDB no longer acts as fiscal agent, financial advisor and reporting agent for the Commonwealth Entities. Such functions are now performed by the Puerto Rico Fiscal Agency and Financial Advisory Authority, a new public instrumentality created pursuant to the Moratorium Act.

*GDB's Role as Lender to the Commonwealth Entities*. GDB traditionally served as interim lender to Commonwealth Entities in anticipation of the issuance of bonds and notes and provided financing to the Commonwealth Entities to finance budget deficits, collateral requirements under swap agreements, and to meet mandatory payment obligations. As of June 30, 2016, GDB had (i) outstanding loans to the Commonwealth and its agencies in the aggregate principal amount of $2.1 billion, (ii) outstanding loans to, and bonds of, the public corporations in the aggregate principal amount of $4.4 billion (of which loans to HTA represented $1.9 billion), and (iii) outstanding loans to the municipalities in the aggregate principal amount of $2.6 billion. GDB's ability to provide financing to Commonwealth Entities, however, was significantly affected in recent years as a result of GDB's deteriorated liquidity position, which led GDB to implement several extraordinary liquidity preservation and enhancement measures, including imposing restrictions on the approval of new loans and the disbursement of existing loans. Subsequently, the Governor prohibited GDB from making disbursements under existing loans pursuant to Executive Order 10. For more information on the restrictions imposed under Executive Order 10, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

*GDB's Role as Depositary of Public Funds*. As of June 30, 2016, GDB held approximately $3.7 billion in deposits from Commonwealth Entities. However, as a result of GDB's deteriorated financial condition, critical liquidity position and the restrictions on the withdrawal of deposits implemented pursuant to Executive Order 10, Commonwealth Entities have started depositing their funds in private depositary institutions. Therefore, inflows to GDB have been drastically reduced in recent months. In addition to having limited access to their deposits, GDB's depositors, which consist primarily of Commonwealth Entities, may also suffer significant losses as a result of GDB's inability to pay its creditors in full, including its

134

depositors. As a result, Commonwealth Entities may also need to record a significant loss in their respective financial statements in connection with the impairment of such deposits.

*GDB's Audited Financial Statements for Fiscal Year 2014.* GDB's most recent audited financial statements, dated as of June 30, 2014, note that GDB's management understands that it is highly probable that GDB will be unable to collect all amounts due on its loans to the Commonwealth and its public corporations according to their contractual terms. As a result, the financial statements reflect that such loans have been classified as impaired and that GDB has established an allowance for losses on such loans of approximately $2,504 million in the aggregate, representing approximately 40% of the outstanding principal value of such loans. As a result of the Commonwealth's fiscal and financial condition, it is likely that GDB will have to increase such allowance for loan losses in the future.

Further, GDB's 2014 financial statements reflect a reduction in GDB's net position from $2,372 million on June 30, 2013, to a deficit of approximately $316 million as of June 30, 2014. As noted in the financial statements, GDB's management has concluded that GDB faces significant risks and uncertainties and that it does not have sufficient resources to meet its obligations as they become due. As a result, such financial statements state that there is substantial doubt as to GDB's ability to continue as a going concern.

*GDB's Current Financial Condition.* As of June 30, 2016, GDB (excluding its blended component units) had total assets of $6.9 billion and total liabilities of $7.7 billion; accordingly, GDB is insolvent on a balance sheet basis. As of June 30, 2016, GDB (excluding its blended component units) had $3.8 billion of medium term senior notes outstanding. As of June 30, 2016, the approximate market value of GDB's investment portfolio was approximately $181.7 million. Although GDB was legally required under its enabling act to maintain liquid reserves of at least 20% of its demand deposits, such legal reserve requirement is temporarily suspended pursuant to Executive Order 10.

Pursuant to Executive Order 14, the Governor suspended the payment of GDB's financial obligations (other than deposits and interest obligations that may be paid "in kind"). For more information on the suspension of the payment of GDB's financial obligations pursuant to Executive Order 14, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

On July 20, 2016, the Legislative Assembly of the Commonwealth enacted Act No. 74-2016, which authorizes GDB to consolidate and restructure a significant portion of its loans to the Commonwealth and certain of its instrumentalities. Pursuant to such legislation, the loans would be consolidated into a single loan with a 35-year maturity, bearing interest at a rate equal to 5%, and the principal amount of which shall be equal to the book value of the loans being consolidated. The law does not require GDB to accept such restructuring and merely authorizes such transactions. No action pursuant to Act No. 74-2016 has been taken at this time and any and any such restructuring would ultimately be subject to approval by the Oversight Board pursuant to Section 207 of PROMESA.

*GDB Subsidiaries.* GDB has several subsidiaries that perform various functions. The principal subsidiaries and their functions are listed below:

*Puerto Rico Housing Finance Authority*. Puerto Rico Housing Finance Authority (the Authority) was created in 1977 to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families. The Authority also issues bonds and notes, the proceeds of which are deposited in separate trusts and generally invested in mortgage-backed securities collateralized by mortgage loans on properties located in Puerto Rico purchased by low and moderate-income families or used to provide subsidies to such families for the acquisition of their primary residence. The Authority is authorized by the U.S. Department of Housing and Urban Development (HUD) to administer the U.S. Housing Act Section 8 program in Puerto Rico, to administer the HOME Investment Partnerships (HOME) Program, and to act as an approved mortgagor, both for multifamily rental units and for single-family homes. In addition, it is an authorized issuer of Government National Mortgage Association (GNMA) mortgage-backed securities and is Puerto Rico's State Credit Agency for the Low-Income Housing Tax Credit Program under Section 42 of the U.S. Internal Revenue Code. Finally, the Authority operates a mortgage loan insurance program which insures a portfolio of approximately $575.6 million mortgage loans mainly to low and moderate-income families.

As of June 30, 2016, the Authority's total outstanding principal balance of loans to the private sector for development and permanent financing of housing projects targeted to low and moderate income families was $52.8 million. The Housing Finance Authority's mortgage loans to low and moderate income homeowners represented an additional outstanding principal balance of $152.4 million as of the same date. The Authority has outstanding tax-exempt revenue bonds the proceeds of which were loaned to the Puerto Rico Public Housing Administration to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Authority payable solely from revenues collected from such housing units, with certain exceptions.

As of June 30, 2016, $206.8 million of these bonds were outstanding. See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for additional information on the outstanding debt of the Housing Finance Authority.

As of June 30, 2016, the Housing Finance Authority had a net position of $434.7 million.

*Puerto Rico Tourism Development Fund*. Puerto Rico Tourism Development Fund ("**TDF**") was created in September 1993 to facilitate the development of Puerto Rico's hotel industry by working with private-sector financial institutions in structuring financings for new hotel projects and hospitality related projects. TDF provides guarantees to interim and permanent financings, interim and permanent loans, and preferred equity capital. As of June 30, 2016, TDF had $226 million in guarantees and $63.9 million in loans (net of 44.1 million in allowances for losses on guarantees and loans). It also had $154million in cash and in marketable securities, and a net position of $24.1 million. TDF has most of its funds in deposit accounts at GDB. Since April 8, 2016, TDF has been unable to make payments under its guarantees because of the restrictions imposed on the withdrawal of deposits pursuant to Executive Order 2016-10. For more information on the restrictions imposed under Executive Order 10, see "Executive Action Taken under the Moratorium Act" under "OVERVIEW OF THE COMMONWEALTH'S FISCAL CONDITION."

136

***Puerto Rico Development Fund***. Puerto Rico Development Fund was established in April 1977 to provide an alternate source of financing to private enterprises. The Development Fund is also authorized to guarantee obligations of those enterprises and invest in their equity securities. As of June 30, 2016, the Development Fund had assets of $12.2 million, including $2.6 million in loans to private entities, net of allowances for loan losses of approximately $24.1 million, $9.3 million in cash and bank deposits, and $242,000 in preferred shares of various private entities.

***Puerto Rico Public Finance Corporation***. Puerto Rico Public Finance Corporation ("**PFC**") was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The bond trustees of certain limited obligation bonds issued by the PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools and the Department of Health and PRASA, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. The Legislative Assembly of the Commonwealth did not include appropriations for the payment of debt service on such notes in the budgets for fiscal years 2016 and 2017. As a result, as of the date of this Report, PFC has failed to make payments of approximately $146.1 million in respect of its bonds.   For details of GDB debt obligations see "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES."

## Puerto Rico Fiscal Agency and Financial Advisory Authority

On April 6, 2016, the Moratorium Act created the Puerto Rico Fiscal Agency and Financial Advisory Authority ("**FAFAA**") as an independent public corporation for the purpose of acting as fiscal agent, financial advisor and reporting agent of the Commonwealth and its public corporations, instrumentalities, commissions, authorities, municipalities and political subdivisions and to assist such entities in confronting the grave fiscal and economic emergency that the Commonwealth is currently experiencing. In doing so, FAFAA assumed the fiscal agency and financial advisor responsibilities previously exercised by GDB.

FAFAA also oversees matters related to the restructuring or adjustment of the Commonwealth's financial liabilities, and otherwise coordinates liability management or other transactions with respect to such obligations.  For fiscal year 2017, the new entity was assigned a $40 million appropriation from the General Fund to cover operating expenses.

## Non - Tax Supported Public Corporations

## Puerto Rico Electric Power Authority

The Puerto Rico Electric Power Authority ("**PREPA**") supplies substantially all of the electricity consumed in the Commonwealth. PREPA owns all transmission and distribution facilities and most of the generating facilities that constitute Puerto Rico's electric power system.

PREPA had deficit on net position of $420 million during fiscal year 2014, compared with deficit on net position of $272 million and $345 million, during fiscal years 2013 and 2012, respectively.

137

PREPA's operating results have been adversely affected in recent years by a decrease in electric energy demand caused in part by a declining population, reduced business activity, a prolonged recession, high fuel costs which resulted from reliance on oil for energy generation, high capital expenditure requirements associated with ageing generating facilities, and a high level of debt. As of July 31, 2016, PREPA's debt included approximately $8.259 billion of outstanding revenue bonds issued under PREPA's Trust Agreement, and approximately $696 million of loans under bank working capital lines of credit (the "**Fuel Lines**"). As of July 31, 2016, PREPA also owed GDB approximately $35 million under a line of credit.

### *Agreements in Principle with Certain Creditors*

On September 2, 2015, PREPA announced an agreement in principle (the "**Ad Hoc Group Agreement**") regarding the economic terms of a restructuring with an ad hoc group of PREPA's bondholders (the "**Ad Hoc Group**") that held, at that time, approximately 35% of PREPA's outstanding bonds.

Under the Ad Hoc Group Agreement, bondholders will have the option to exchange their existing uninsured bonds at an 85% exchange ratio for new securitization bonds to be issued by the Puerto Rico Electric Power Authority Revitalization Corporation (the "**PREPARC**"). The securitization bonds will pay cash interest at a rate of 4.0% - 4.75% (depending on the rating obtained) ("**Option A Bonds**") or convertible capital appreciation securitization bonds that will accrue interest at a rate of 4.5% - 5.5% for the first five years and pay current interest in cash thereafter ("**Option B Bonds**"). Option A Bonds will pay cash interest only (no principal payments) for the first five years, and Option B Bonds will accrue interest but not receive any cash interest and will not pay principal during the first five years. All of PREPA's uninsured bondholders will have an opportunity to participate in the exchange.

On September 22, 2015, PREPA announced an agreement in principle (the "**Fuel Line Agreement**") regarding economic terms with its banks that provided revolving lines of credit used to pay for purchased power, fuel and other expenses (together, with their transferees, as applicable, the "**Fuel Line Lenders**"). Under the Fuel Line Agreement, the Fuel Line Lenders, which held 100% of the Fuel Lines, will have the option to either (1) convert their existing credit agreements into term loans, with a fixed interest rate of 5.75% per annum, to be repaid over six years in accordance with an agreed amortization schedule or (2) exchange all or part of the principal amount due under their existing credit agreements for new securitization bonds to be issued on the same terms as the Ad Hoc Group.

### *Restructuring Support Agreement*

On November 5, 2015, PREPA announced its entry into a restructuring support agreement (the "**Initial RSA**") with the Ad Hoc Group (representing at the time 40% in principal amount of outstanding bonds) and the Fuel Line Lenders setting forth the agreed-upon terms of PREPA's recovery plan. The economic terms set forth in the Initial RSA are consistent with the Ad Hoc Group Agreement and the Fuel Line Agreement. In addition, pursuant to the Initial RSA, GDB was entitled to receive substantially the same treatment on the debt owed by PREPA to it as the Fuel Line Lenders. PREPA's monoline bond insurers were not parties to the Initial RSA.

On December 23, 2015, certain of the monoline bond insurers along with the Ad Hoc Group (representing together at that time approximately 66% in principal amount of the

outstanding Bonds), the Fuel Line Lenders and GDB (collectively, the "**Supporting Creditors**"), entered into an amended and restated restructuring support agreement (the "**A&R RSA**," and together with the Initial RSA, the January RSA (as defined below) and the Revised RSA (as defined below), are referred to as the "**RSA**"), containing terms and conditions substantially similar to those in the Initial RSA outlined above.

Under the A&R RSA, the monoline bond insurers have agreed to consent to certain amendments to PREPA's insured bonds, provide up to $462 million of reserve surety bonds at the closing of the transaction and commit to providing additional surety capacity at a later time during the term of the securitization bonds, as credit support for said securitization bonds, which would be available to be drawn upon in the event certain cash reserves and transition payments from PREPA's customers are insufficient to pay current debt service on the securitization bonds. In return for this, (1) PREPARC would issue $2.1 billion additional securitization bonds, which amount is subject to adjustment in accordance with the RSA, as credit support for the outstanding PREPA insured Bonds to be held in escrow for the benefit of holders of PREPA's insured Bonds and (2) PREPA and PREPARC would attempt to refinance certain outstanding Bonds insured by such monoline insurers with securitization bonds during a 6-month period starting 3 years after the date the above exchange closes. The surety bonds to be provided by the monoline bond insurers would be replaced by PREPARC with cash (derived from transition payments) beginning in fiscal year 2019 over a period of nine years, subject to earlier replacement in accordance with certain conditions set forth in the RSA. Among the primary purposes for this transaction are to refinance at a lower cost a portion of PREPA's outstanding Bonds and to improve PREPA's liquidity position during the first five years after the initial securitization bonds issuance in order to facilitate PREPA's recovery and allow it to reinvest in its assets.

Under the A&R RSA, certain of the Supporting Creditors agreed to purchase approximately $115 million in bonds to refund a portion of the interest payable on the Bonds on January 4, 2016, subject to certain conditions including the enactment of the PREPA Revitalization Act in acceptable form pursuant to the standards set forth in the A&R RSA. This agreement was formalized in a Bond Purchase Agreement (the "**Initial 2016AB Bond Purchase Agreement**") executed on December 29, 2015.

On January 23, 2016, the A&R RSA terminated when the PREPA Revitalization Act (discussed below) was not enacted into law and the Ad Hoc Group did not agree to PREPA's request to extend the related RSA milestone. PREPA continued to engage in discussions with the Ad Hoc Group and the other Supporting Creditors regarding a potential extension of the RSA and the transactions contemplated therein. The Initial 2016AB Bond Purchase Agreement also terminated on January 23, 2016 when the A&R RSA terminated. PREPA continued to engage in discussions with the Supporting Creditors regarding the transactions contemplated by the Initial 2016AB Bond Purchase Agreement.

On January 23, 2016, certain of the Fuel Line Lenders agreed to enter into a short form forbearance agreement to forbear from exercising enforcement rights against PREPA under the applicable fuel line agreements through February 12, 2016.

On January 27, 2016, PREPA and the Supporting Creditors entered into a revised RSA (the "**January RSA**") and a revised Bond Purchase Agreement (the "**Revised 2016AB Bond Purchase Agreement**"). The January RSA incorporated the terms and conditions of the A&R

139

RSA, with minor adjustments to address delays in the legislative consideration of the PREPA Revitalization Act.  The milestone date for legislative approval of the PREPA Revitalization Act was extended to February 16, 2016, and other related milestones were also adjusted accordingly. The Revised 2016AB Bond Purchase Agreement contained substantially the same terms and conditions as the Initial 2016AB Bond Purchase Agreement, except that it reduced the amount of total Bonds to be sold from $115 million to $111 million and made certain changes to the timing and conditions of the contemplated Bond purchase.  Under the Revised 2016AB Bond Purchase Agreement, 50% of the total purchased Bonds (the "**Series 2016A Bonds**") were required to be purchased upon a determination by the applicable Supporting Creditors that the PREPA Revitalization Act satisfied the standards set forth in the RSA and the remaining 50% of the total purchased Bonds (the "**Series 2016B Bonds**") were required to be purchased upon the filing of a petition with the Puerto Rico Energy Commission (the "**Energy Commission**") seeking approval of the calculation methodology for the transition charge through the securitization mechanism that satisfies the standards under the RSA. Following several amendments to the Revised 2016AB Bond Purchase Agreement in light of various delays and subsequent developments including the enactment of the Puerto Rico Emergency Moratorium and Financial Rehabilitation Act, the closing of the Series 2016A Bonds occurred on May 19, 2016 and the closing of the Series 2016B Bonds occurred on June 22, 2016.

On March 14, 2016, PREPARC became a party to the RSA (the "**Revised RSA**").

On June 29, 2016, PREPARC, PREPA and the Supporting Creditors entered into the First Supplement to the RSA extending the termination date of the RSA from June 30, 2016 to December 15, 2016 and revising certain other terms and milestones of the RSA.  Additionally, as part of the First RSA Supplement, PREPA reached an agreement with Syncora Guarantee Inc., one of its monoline bond insurers, with respect to the restructuring of debt insured by Syncora. Under the terms of the agreement with Syncora, PREPA will refinance certain Syncora-insured debt, PREPARC will conduct a tender offer for certain Syncora-insured debt, and Syncora will exchange certain of the Syncora-insured debt owned by Syncora on the same terms as the Ad Hoc Group.

In connection with the First RSA Supplement and PREPA's payment of approximately $415 million in principal and interest due under the Bonds on July 1, 2016, PREPA, the monoline bond insurers and certain members of the Ad Hoc Group executed a new Bond Purchase Agreement under which they agreed to purchase approximately $264 million of bonds with varying maturity dates ranging from four to six years.  The sale of these bonds closed on June 30, 2016.

140

There can be no assurance that the transactions contemplated by the RSA will be consummated. Significant uncertainty remains as to the potential consummation of the transactions set forth in the RSA, which is subject to a number of material conditions and contingencies, including without limitation, (1) receipt of an investment grade rating on the new securitization bonds from any major credit rating agency that rates the securitization bonds; (2) receipt of an opinion by U.S. bond counsel that interest on the securitization bonds is excludable from gross income for federal income tax purposes and exempt from all state and Puerto Rico taxes; (3) successful completion of litigation relating to the validation of the PREPA Revitalization Act and the issuance of the new securitization bonds, (4) obtaining approval and reaching agreement with all Supporting Creditors, including the Fuel Line Lenders, regarding the definitive documentation of the various restructuring transactions; (5); and (6) actions to be taken or not taken by third parties, including customers, suppliers, business partners and competitors, and legislative, judicial and governmental authorities and officials, including but not limited to the Oversight Board established pursuant to PROMESA.

The RSA contains a number of termination or withdrawal events in favor of the Supporting Creditors, including if there is a material amendment to certain terms of the recovery plan, if PREPA commences any proceeding under any bankruptcy or insolvency law (except to implement the recovery plan in accordance with the RSA), as well as the failure to achieve certain milestones by specific dates, among other events, which could result in termination of the RSA or withdrawal from the RSA by individual Supporting Creditors. In addition, the RSA contains a number of PREPA termination rights, including if there is a material breach or default by a Supporting Creditor (solely as to the applicable defaulting Supporting Creditor), if the Ad Hoc Group ceases to beneficially own or control, in the aggregate, at least 30% of the outstanding principal amount of Bonds, as well as a fiduciary out if PREPA's Governing Board determines that existing circumstances warrant a termination of the RSA as a result of the board's fiduciary or statutory duties.

### New Securitization Bonds

The PREPA Revitalization Act authorizes the PREPARC, a bankruptcy remote entity (as defined in the PREPA Revitalization Act), to issue securitization bonds and impose a transition charge on PREPA's customers, with an automatic adjustment mechanism, for the purpose of allowing PREPA to restructure certain of its financial indebtedness as contemplated by the RSA. On April 7, 2016, PREPARC filed a petition before the Energy Commission seeking approval of the calculation methodology for the transition charge and the related adjustment mechanism. On June 21, 2016, the Energy Commission approved PREPARC's petition, and on June 28, 2016, PREPARC approved a resolution authorizing the issuance of the new securitization bonds, subject to certain terms and conditions. As approved, the initial transition charge will be approximately 3.1 cents per kWh for residential and commercial customers. The issuance of such securitization bonds remains subject to numerous material risks and contingencies, including without limitation, the successful completion of litigation relating to the validation of the PREPA Revitalization Act and the issuance of the new securitization bonds.

### Provisional Rate

On May 27, 2016, PREPA filed a petition before the Energy Commission seeking approval of a new rate structure, including a request for approval of a provisional rate on an

expedited basis. On June 24, 2016, the Energy Commission issued an order approving a provisional rate, on a temporary basis, increasing the rate by approximately 1.299 cents per kWh, effective as of thirty days after issuance of the order, subject to certain conditions. The rate adjustment is estimated to generate additional revenues in the amount of approximately $225 million annually.

### PREPA Revitalization Act

On November 4, 2015, the Governor submitted the PREPA Revitalization Act to the Legislative Assembly to facilitate PREPA's ongoing transformation and recovery plan.

The PREPA Revitalization Act was approved by the Senate of Puerto Rico on February 10, 2016 and by the House of Representatives, with amendments, on February 15, 2016. The Senate concurred with these amendments, and the Governor signed the bill, Act No. 4-2016 into law on February 16, 2016.

The PREPA Revitalization Act sets forth a framework for PREPA to execute on the agreements with creditors reached to date. Among other things, the PREPA Revitalization Act (1) enhances PREPA's governance processes; (2) adjusts PREPA's practices for hiring and managing management personnel; (3) changes PREPA's processes for collecting outstanding bills from public and private entities; (4) improves the transparency of PREPA's billing practices; (5) implements a competitive bidding process for soliciting third party investment in PREPA's infrastructure; (6) allows for the refinancing of existing PREPA bonds through a securitization that would reduce PREPA's indebtedness and cost of borrowing; and (7) sets forth an expedited process for the Energy Commission to approve or reject PREPA's proposal for a new rate structure that is consistent with its recovery plan. The PREPA Revitalization Act established a July 1, 2016 deadline for PREPA to appoint new independent directors to its Governing Board. However, the new directors were appointed on October 26 and October 27, 2016, and were confirmed by the Senate of Puerto Rico on December 1, 2016.

### Validation Proceedings

On April 19, 2016, various plaintiffs, including the Irrigation and Electrical Workers Union ("**UTIER**"), a coalition of retirees and a consumer, filed complaints in the Court of First Instance, San Juan Part (the "**Validation Court**"), against various defendants, including PREPA, PREPARC, the Commonwealth of Puerto Rico and the Energy Commission, challenging the constitutionality of the PRA and raising other legal arguments against the PRA. One of those complaints was dismissed, but three others remain. In addition, on August 19, 2016 several plaintiffs, including UTIER, the retiree coalition and certain renewable energy interests, filed legal challenges to the Restructuring Resolution, alleging among other things that the Restructuring Resolution should be invalidated. The applicable statutes of repose as set forth in the PREPA Revitalization Act with respect to such challenges have now expired.

Currently, there are three (3) lawsuits challenging the constitutionality of the PRA, three (3) lawsuits challenging the Restructuring Order and Resolution based on administrative law arguments, and one (1) lawsuit that challenges both the PRA and the Restructuring Order and Resolution. All seven (7) lawsuits are pending before *different* judges. The parties vary slightly in each of the lawsuits, but PREPA is a defendant in all of them, the SPV is a defendant in most, and the Commonwealth is included or is in the process of being included in all of the

constitutional challenges.  The Energy Commission is also a party in the cases challenging the Restructuring Resolution and Order, as well as in one of the constitutional cases.

Consolidation was attempted of the constitutional claims, on the one hand, and the administrative claims, on the other.  However, and despite strong language in the statute, the consolidation requests were denied.  All seven lawsuits are being handled independently by seven Courts.  As of December 2016, the status of the seven cases varied, and could be summarized as follows: (1) one of the constitutional cases, the UTIER case, has been fully briefed on summary judgment and oral argument before the Court of First Instance held, with the parties now awaiting a resolution on the merits; (2) another of the constitutional cases, the first Asociación de Jubilados case, has had motion practice and several hearings on procedural issues, but no dispositive motions have been filed; a schedule should be set in a December 20 hearing; (3) the third constitutional case, the Cuadrado case, is delayed as the Commonwealth has yet to be included, but should be included shortly; (4) the mixed administrative and constitutional case, the Asociación de Jubilados II case, is also in a very early procedural stage, as process has not been served; (5) in the three administrative cases no dispositive briefs by PREPA or SPV have been filed, but the Energy Commission has sought dismissal and PREPA and SPV are affirmatively seeking an order stating that the correct standard of review for those challenges is the arbitrary and capricious standard applicable to administrative cases in general and adopted in the PRA.  Both the Energy Commissions' motion and PREPA's and SPV's motion regarding standard of review are pending.

### PROMESA

PREPA is evaluating its potential options under PROMESA, which may involve, among other things, the commencement of a restructuring process under Title III or Title VI of PROMESA.

#### Operational Transformation

Ms. Donahue, chief restructuring officer, and a team of full time consultants from AlixPartners are working, alongside PREPA management, under a contract for services with PREPA that expires on December 15, 2016. AlixPartners' efforts, along with those of PREPA, have yielded approximately $245 million in one-time cash savings and approximately $205 million in recurring annual savings. Additional savings initiatives with projected annual savings of approximately $30 million are in the process of being executed. The team is furthermore working on documenting and transitioning new procedures to PREPA in order to provide for the sustainability of savings achieved over the long term.

#### Integrated Resources Plan

In July 2015, PREPA submitted to the Puerto Rico Energy Commission a proposed integrated resources plan (as amended, the "**IRP**") as required under the Puerto Rico Energy Transformation and Relief Act.  Following multiple hearings, on September 23, 2016, the Energy Commission approved a modified IRP including key elements of PREPA's proposed IRP to upgrade PREPA's transmission, distribution and generation systems.  At that time, the Energy Commission did not approve the construction of the Aguirre Offshore Gas Port ("**AOGP**") and related conversion projects as proposed by PREPA and directed PREPA to submit additional

information. However, the Energy Commission allowed PREPA to continue with the relevant permitting process for the AOGP and to spend up to $15 million for the project. PREPA has sought reconsideration and clarification of certain aspects of the Energy Commission's IRP order and a final decision from the Energy Commission regarding its approval of the IRP is pending.

**Puerto Rico Aqueduct and Sewer Authority**

The Puerto Rico Aqueduct and Sewer Authority ("**PRASA**") owns and operates Puerto Rico's public water supply and wastewater systems. Such systems provide water and wastewater services to 97% and 59% of the Commonwealth's population, respectively.

### *Financial Results and Inability to Fund CIP Requirements*

PRASA reported an operating income of $115.1 million for fiscal year 2015, compared to operating income of $142.8 million for fiscal year 2014 and an operating loss of $304.4 million for fiscal year 2013. The change in net position for the years ended June 30, 2015 and 2014 amounted to $86.1 million and $41 million, respectively. The operating income in 2015 resulted from PRASA's adoption of a comprehensive plan to increase its revenues and reduce its expenses after reporting operating losses in fiscal years 2011 through 2013, which included the implementation of a new rate structure which became effective on July 15, 2013. At the time of adoption of the rate structure, PRASA's management expected that the revenue increase would be sufficient to allow PRASA to cover its operating expenses and debt service until 2017, assuming that external financing would be available to cover PRASA's capital improvement program ("CIP"), which has historically been funded through external interim financings, bond issues and a limited amount of federal funds and other funding sources.

PRASA has not been able to access the credit markets since August 2015. Therefore, PRASA is currently experiencing cash flow and financing difficulties. As a result, PRASA has been unable to pay certain outstanding contractor obligations and has had to suspend or cancel substantially all of its CIP projects. As of June 30, 2016, unpaid CIP contractor obligations were approximately $150 million, excluding interest and penalties.

As set forth in Note 15 to PRASA's fiscal year 2015 audited financial statements, PRASA's significant recurring losses, working capital deficiencies, credit downgrades, large non-discretionary capital expenditure requirement, and lack of market access raise substantial doubt about its ability to continue as a going concern. PRASA management's plans in regard to these matters are also described in Note 15 to the financial statements.

### *Qualified Opinion for Fiscal 2015 Financial Statements*

As described in Note 1 to PRASA's 2015 financial statements, PRASA has not implemented the requirements of Statement No. 68 of the Governmental Accounting Standard Board, *Accounting and Financial Reporting for Pensions, an amendment of GASB No. 27* and Statement No. 71, *Pension Transition for contributions Made subsequent to the Measurement Date, an amendment of GASB Statement No. 68*, because the final audited pension information from ERS was not readily available. Therefore, PRASA has not recorded its proportionate share of net pension obligation, deferred inflow of resources and deferred outflow of resources related to pension costs, and PRASA has not recognized the effect of current period changes in net

pension obligation, deferred outflow of resources and deferred inflow of resources as these relate to pension costs for the year ended June 30, 2015.

### 2015A Senior Bonds

On September 15, 2015, PRASA issued $75 million of its 2015A Senior Bonds (the "**2015A Senior Bonds**"), due February 29, 2016, under its Master Agreement of Trust. The proceeds of the 2015A Senior Bonds were used to repay a portion of the outstanding balance of a term loan. The 2015A Senior Bonds were secured by an escrow deposit of PRASA's funds, then on deposit in the Rate Stabilization Account of the Surplus Fund created under the Master Agreement of Trust. On February 29, 2016 PRASA paid the 2015A Senior Bonds in full, together with the $15 million balance of the term loan, with the escrowed funds securing such facilities. See "DEBT OF THE COMMONWEALTH, ITS PUBLIC CORPORATIONS AND MUNICIPALITIES" for additional information on PRASA's outstanding debt.

### Forbearance Agreements

Historically, PRASA has received federal funds for its CIP through various loans (the "**State Revolving Fund Loans**") made by PRIFA from funds in the Clean Water State Revolving Fund Programs and the Drinking Water State Revolving Fund Programs, created under the federal Clean Water Act of 1972 and Safe Drinking Water Act of 1974, as amended, administered by the Commonwealth's Environmental Quality Board ("**EQB**") and the Puerto Rico Department of Health ("**PRDOH**"), respectively and from bond proceeds from the United States Department of Agriculture ("**USDA**") Rural Development Program by issuing revenue bonds as authorized under PRASA's Resolution No. 1224, adopted by on August 12, 1986, as amended (the "Rural Development Bonds"). The State Revolving Fund Loans and the Rural Development Bonds are secured by a guaranty from the Commonwealth of Puerto Rico under Act No. 45 of the Legislative Assembly of Puerto Rico, approved on July 28, 1994, as amended.

PRASA had to discontinue the making of certain deposits to the Commonwealth Payments Fund under the Master Trust Agreement. Amounts on deposit in the Commonwealth Payments Fund are used to pay the State Revolving Fund Loans, the Rural Development Bonds and Commonwealth Supported Obligations (consisting of limited obligations of PRASA, payable solely from Commonwealth appropriations, related to the construction of the North Coast Superaqueduct). PRASA's inability to make such deposits to the Commonwealth Payments Fund or to make payment on the indebtedness payable thereunder does not constitute an Event of Default under the Master Trust Agreement.

On June 30, 2016, PRASA executed a Forbearance Agreement (the "Forbearance Agreement") with the PRDOH, administrator of the Drinking Water State Revolving Fund Programs, EQB, administrator of the Clean Water State Revolving Fund Programs, and PRIFA, a public corporation and instrumentality of the Commonwealth, as operating agent for the for the State Revolving Funds, authorized to assist the PRDOH and the EQB in the administration, financial and accounting activities of the State Revolving Funds. Under the Forbearance Agreement, the payments due on July 1, 2016 under the State Revolving Fund Loans are deferred and the parties thereto agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to each under the State Revolving Fund Loans.

145

PRIFA, PRDOH and EQB, with the acknowledgment and support of the United States Environmental Protection Agency ("**EPA**"), granted such forbearance, subject to the terms and conditions set forth in the Forbearance Agreement, for a period of six (6) months, which may be extended for an additional six (6) months if conditions are met. During such forbearance period, the Commonwealth Guaranty will not be enforced either. PRIFA, EQB and PRDOH, with the support of EPA, contemplate that during the forbearance period the parties may negotiate new terms and conditions to the State Revolving Fund Loans under a restructuring of such loans and a revision of underlying agreements between PRASA, PRIFA, EQB, PRDOH and, where applicable, EPA, and understand that given current circumstances, such forbearance and possible restructuring protects the perpetuity of the State Revolving Loan programs beyond the financially stressed scenario faced by both PRASA and the Commonwealth at this time.

Regarding the Rural Development Bonds, PRASA also requested that USDA Rural Development Program provide a short term forbearance period, during which it would refrain from exercising its rights and remedies, including the enforcement of the Commonwealth Guaranty, under the Rural Development Bond documents or grants or loan agreements. To this effect, PRASA and USDA Rural Development Program executed a forbearance document, effective as of June 30, 2016 (the "**USDA Forbearance Agreement**"). The USDA Rural Development Program granted PRASA a three month forbearance period, through September 30, 2016, which has been extended through December 30, 2016, subject to the terms and conditions set forth in the USDA Forbearance Agreement in order to provide for additional time to examine all options available to correct PRASA's deficiencies and restore loan repayment. Pursuant to the USDA Forbearance Agreement the payments due on July 1, 2016 under the Rural Development Bond documents were also deferred for the duration of the forbearance period and USDA Rural Development Program agreed to forbear from exercising, or consenting to the exercise of, any enforcement of rights or remedies available to it under the Rural Development Bond documents or any grant or loan document in relation thereto.

### GDB Term Note

PRASA has not made the quarterly interest and principal payments of the term note payable to GDB, since December 2015.

### PRASA Revitalization Act

On July 12, 2016, the Governor of Puerto Rico signed into law Act 68 of 2016, providing for the creation of a new public corporation, to be known as the Puerto Rico Aqueduct and Sewer Authority Revitalization Corporation (the "PRASA Revitalization Corporation"), as a single purpose, bankruptcy remote entity. The PRASA Revitalization Corporation is authorized to fix and collect securitization charges for the purpose of issuing bonds the proceeds of which may be used by PRASA for its CIP, refinancing of bond anticipation notes and the cancelation, defeasance and refinancing of its Bonds, among other approved financing costs. Act 68 limits the securitization charge which may be imposed by the PRASA Revitalization Corporation to an amount equivalent to 20% of PRASA's revenues and provides that the PRASA Revitalization Corporation may issue up to a maximum of $900 million in bonds for the purpose of financing the development of PRASA's CIP. In addition, the PRASA Revitalization Corporation may issue one or more series of Bonds in an aggregate principal amount not to exceed the difference between $900,000,000 and the maximum amount of bonds that can be financed with the

securitization charge approved under Act 68, to cover the costs of retiring, defeasing or refinancing PRASA's debt obligations.

PRASA and the PRASA Revitalization Corporation are currently working towards the approval of the Securitization Charge.

### *Environmental Matters*

On September 15, 2015 the United States Department of Justice, acting at the request of the Administrator of EPA, filed a complaint against PRASA and the Commonwealth, as a required party under the Clean Water Act, in the United States District Court for the District of Puerto Rico. The complaint seeked injunctive relief and the assessment of civil penalties against PRASA for alleged violations of the Federal Water Pollution Control Act enacted in 1956, as amended by the federal Water Pollution Control Act Amendments of 1972, the Clean Water Act of 1977, and the Water Quality Act of 1987.

Concurrently with the filing of the complaint, the Department of Justice also filed a consent decree (the "**2015 EPA Consent Decree**") executed among EPA, PRASA and the Commonwealth settling the matters addressed in the complaint, under the terms agreed upon by PRASA and EPA. The 2015 EPA Consent Decree is the result of an extensive negotiation process aimed, among other things, at resolving the claims addressed in the Complaint and the requirements of PRASA IV, and two EPA Consent Decrees executed in 2006 and 2010 (collectively the "**EPA Consent Decrees**") related to the allegations included in the complaint. EPA and PRASA acknowledge in the 2015 EPA Consent Decree that the work to be undertaken thereunder will enable PRASA to better understand its sewer systems, but does not resolve all of PRASA's Clean Water Act obligations with respect to such systems. The Commonwealth will incur liability under the 2015 EPA Consent Decree only to the extent that the laws of the Commonwealth prevent PRASA from raising such revenues needed to comply with the 2015 EPA Consent Decree. In this connection, the Commonwealth represented under the 2015 EPA Consent Decree that its present laws do not prevent PRASA from raising the revenues needed to comply with the obligations it has incurred thereunder.

Negotiations leading to the execution of the 2015 EPA Consent Decree were commenced by PRASA in order to mitigate the high CIP costs mandated by the Existing Consent Decrees, representing 60% of CIP and an approximate cost of $1.4 billion during fiscal years 2006-2014. Another $1.7 billion of mandatory compliance projects would be required under the previously Existing Consent Decrees through fiscal year 2025. Despite being in material compliance with the CIP requirements of the existing consent decrees, PRASA began discussions with the Department of Justice, on behalf of EPA, EPA and PRDOH seeking to amend the existing consent decrees, in order to, among other things: (i) reduce required annual project expenditures and extend compliance deadlines, (ii) incorporate other regulatory projects included in PRASA's CIP not currently covered by the Existing Consent Decrees, and (iii) include the operation, maintenance and CIP requirements related to the Puerto Nuevo wastewater collection system, including alleged combined sewer overflows. The resulting 2015 EPA Consent Decree seeks to realign the cost of CIP projects and activities with PRASA's financial condition and economic prospects.

Pursuant to the terms of the 2015 EPA Consent Decree entered on May 10, 2016, on May 23, 2016, Judgement was entered dismissing the complaint with prejudice and civil case number 15-2283 was closed.

PRASA also expects that with the final approval of the 2015 EPA Consent Decree, it will be able to finalize the amendment to a certain settlement agreement related to violations of the Safe Drinking Water Act, which was originally signed on December 15, 2006 under substantially similar terms (the "**Proposed DWSA Amendment**"). Although the Proposed DWSA Amendment remains to be finalized, on May 22, 2015 the Superior Court of Puerto Rico approved a joint motion submitted by PRASA and PRDOH on May 12, 2015 to amend the 2006 Drinking Water Settlement Agreement to incorporate certain regulatory projects that were not originally included under its provisions. The 2015 EPA Consent Decree and the culmination of the negotiations of the Proposed DWSA Amendment will permit PRASA to significantly reduce annual capital expenditure levels for mandated projects under the Existing Consent Decrees, based on a new comprehensive and holistic prioritization system (the "Prioritization System") for the scheduling and management of CIP projects, applied to CIP requirements under the 2015 EPA Consent Decree and the Proposed DWSA Amendment, as well as other CIP projects that may arise in the future under the Clean Water Act and the Safe Drinking Water Act and taking into account the PRASA's financial situation and available resources.

## State Insurance Fund

SIF is a public corporation and instrumentality of the Commonwealth in charge of managing and regulating the Commonwealth workers' insurance system that covers occupational injuries, diseases and deaths, to which all employers must be subscribed under law. The SIF has nine regional offices throughout the Commonwealth and one Industrial Hospital located in San Juan, which offer workers medical, physical and vocational rehabilitation services. The services offered are mostly defrayed by funds paid by the employers. The SIF did not receive appropriations from the Commonwealth's General Fund in fiscal years 2015, 2014 or 2013. Its operating revenues, for fiscal years 2015, 2014, and 2013 were $589 million, $615 million and $651 million, respectively. As of July 31, 2016, SIF estimates it owes approximately $104 million to suppliers and other governmental agencies.

## COMMONWEALTH FINANCIAL REPORTING AND FINANCIAL RESULTS FOR FISCAL YEARS 2010 THROUGH 2016

### Overview

The Commonwealth presents its financial results using different bases of accounting, each of which provides different perspectives of the Commonwealth's financial position. For example, the Commonwealth presents its results of operation for its General Fund, its primary operating fund, both pursuant to the "modified accrual" basis of accounting and pursuant to the "budgetary" (or "statutory") basis of accounting. The Commonwealth's financial results may also vary depending on the reporting entities included in the presentation. For example, the presentation may be limited to certain agencies, public corporations or funds (such as the General Fund), or may be prepared on a "government-wide" basis (i.e., covering all the non-fiduciary activities of the Commonwealth and its public corporations). This section explains how

148

the financial results of the Commonwealth's operations and the measurements of its financial health compare depending on the reporting entity and the basis of accounting utilized.

Historically, the most common measurement of the Commonwealth's financial health has been the result of its General Fund presented in accordance with the budgetary (or statutory) basis of accounting. While monitoring the financial health of the General Fund is important because this fund receives most of the Commonwealth's tax revenues and books a substantial portion of the government's expenditures on essential services, including health, education and public safety, the measure of financial health provided by the General Fund, particularly on a budgetary basis, is limited given the current complexity of the government. The Commonwealth's government grew in size and complexity as it sought to meet (and finance) new demands for services. The Commonwealth created a myriad of "independent" public corporations to perform essential governmental functions, such as health, education and transportation, while remaining financially responsible for them. At the same time, the Legislature repeatedly diverted tax revenues to fund such public corporations (and the services they offer) as well as to provide collateral and source of repayment for financial indebtedness issued by such legally separate entities.

As described in this section, the financial results of the General Fund pursuant to the budgetary basis of accounting also exclude the financial results of numerous governmental funds of the Commonwealth, results that are nevertheless consolidated with the General Fund under U.S. GAAP for purposes of preparing the Commonwealth's basic financial statements (the "**Basic Financial Statements**"). As a result, the reports that are limited to the General Fund provide a limited view of the government's fiscal condition. Accordingly, a broader, more encompassing view of the Commonwealth's financial position is useful to better understand the total resources of the Commonwealth available to fund essential public services and honor contractual and other legacy commitments, including obligations with bondholders and pensioners.

The economic and financial distress experienced by the Commonwealth during the past decade has underscored the need to monitor and report financial information on a basis broader than the General Fund. In that regard, the Krueger Report concluded that using the General Fund as the standard measure of fiscal balance greatly understated the true deficit of the Commonwealth. After constructing a measure of the Commonwealth's overall deficit based on standard IMF metrics, the report found that central government deficits over the coming years implied an unsustainable trajectory of large financing gaps.

The financial information typically presented in the Commonwealth Basic Financial Statements pursuant to U.S. GAAP provides a much broader view of the Commonwealth's finances than that provided by the General Fund on a budgetary basis. The enactment of PROMESA has underscored the importance of presenting financial information pursuant to U.S. GAAP and ensuring that it is prepared and disseminated in a timely manner. For example, PROMESA requires the Commonwealth to prepare and deliver budgets and fiscal plans pursuant to generally accepted accounting principles, as defined by the Governmental Accounting Standards Board. Furthermore, in order to commence proceedings under Chapter 3 of PROMESA, which provides for a court-supervised debt-adjustment process modeled on Chapter 9 of the U.S. Bankruptcy Code, the Commonwealth must have adopted procedures necessary to deliver timely audited financial statements pursuant to U.S. GAAP and made public draft financial statements and other information sufficient for any interested person to make an informed decision with respect to a possible restructuring.

149

This section provides a summary of historical financial results for the Commonwealth pursuant to U.S. GAAP and for the General Fund on a budgetary basis, in each case for those periods in which such information is available. In order for the reader to understand and properly interpret this information, it is important to provide a chart of the Commonwealth's structure for financial reporting purposes, a description of the financial information presented by the Commonwealth in its Basic Financial Statements, and an overview of the principal variations resulting from the use of different reporting entities, different basis of accounting, and different accounting methodologies.

## Historical Financial Results – U.S. GAAP

For financial reporting purposes under U.S. GAAP, the Commonwealth as a whole consists of all departments, agencies, funds, functions and public corporations that have been determined to meet the requirements for inclusion in the Commonwealth's financial reporting entity. The following chart, which illustrates the structure of the Commonwealth for financial reporting purposes, identifies the various reporting entities included in the financial information presented by the Commonwealth pursuant to U.S. GAAP.



(1) The Government-Wide financial statements report information of all of the non-fiduciary activities of the Commonwealth and its component units.

(2) Primary operating fund of the Commonwealth. The financial resources received and used in the General Fund (Operating Fund) mostly includes the General Fund budget, as approved by the Commonwealth's Legislature and as adjusted for timing and basis of accounting differences.

(3) OASA: Office for Administration, Sales and Acquisition Fund of the Puerto Rico Department of Housing (also known as *CRUV*, for its Spanish acronym). PRPHA: Puerto Rico Public Housing Administration. PRLDA: Puerto Rico Labor Development Administration. OIPS: Office for Improvement of Public Schools (also known as *OMEP*, for its Spanish acronym).

(4) Special Revenue Funds are used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

150

(5) The Debt Service Fund accounts for and reports financial resources that are restricted, committed or assigned to expenditure for general long-term bonds' principal, interest, and related costs other than bonds payable from the operations of proprietary fund types, pension trust funds, and component units, either blended or discretely presented. Long-term debt and interest due on July 1st of the following fiscal year are accounted for as a fund liability if resources are available as of June 30th for its payment.

(6) The capital projects funds are used to account for and report financial resources that are restricted, committed, or assigned to expenditures for capital outlays, including the acquisition or construction of capital facilities and other capital assets. These capital expenditures may be for the primary government directly or for discrete component units and outside organizations and governments such as the municipalities of the Commonwealth and other applicable entities.

(7) The Governmental Funds of each of the Non-Major Blended Component Units (PBA, PRIFA, Maritime Shipping Authority, The Children's Trust Fund and Special Communities Trust) are classified as Non-Major Governmental Funds in the Fund Financial Statements.

(8) The Water Pollution Control Revolving Fund, administered by the Puerto Rico Environmental Quality Board (EQB), is authorized to enter into operating agreements and capitalization grant agreements with the U.S. Environmental Protection Agency (EPA), mostly for water infrastructure projects, under a joint cooperation agreement between the Environmental Quality Board, the Puerto Rico Infrastructure Financing Authority, the Puerto Rico Aqueduct and Sewer Authority and the Government Development Bank for Puerto Rico, where each entity has agreed to assume their corresponding responsibilities.

(9) The Unemployment Insurance Fund accounts for amounts requisitioned for the Puerto Rico Unemployment Insurance Trust Fund, held by the U.S. Treasury, for payment of unemployment benefits and charges made to individual employers.

(10) Also known as ASEM, for its Spanish Acronym. This fund accounts for the operations of the centralized health services, provided in support of hospitals and other functions offered by the member institutions and consumers of the complex known as Puerto Rico Medical Center.

(11) This fund is administered by the Puerto Rico Department of Health, which is authorized to enter into operating and capitalization grant agreements with the EPA for lending activities

(12) This fund is used to account for contributions made by drivers and their employers to provide a social security plan for the benefit of such drivers. The plan also includes payment of benefits for health and life insurance.

(13) This fund is used to account for disability benefits to remedy temporarily the loss of income as a result of disability caused by sickness or accident unrelated to the employment.

(14) For a description of the Non-Major Discretely Presented Component Units refer to Note 1(b) in the Basic Financial Statements.

The Commonwealth's Basic Financial Statements, prepared pursuant to U.S. GAAP, are comprised of: (i) the "government-wide" financial statements and (ii) the "fund" financial statements. For a detailed description of the structure and basis of presentation of each of these statements, see Note 1, "Summary of Significant Accounting Policies," in the Basic Financial Statements, which are filed with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System. The Basic Financial Statements are also available in GDB's website at www.gdbpr.com under "Investor Resources−Publications and Reports−Commonwealth Comprehensive Annual Financial Report." Below is a high-level description of the government-wide and fund financial statements:

*Government-Wide Financial Statements* – The Commonwealth's government-wide financial statements provide a broad view of the Commonwealth's operations in a manner similar to a private-sector business. The statements provide both short and long-term information about the Commonwealth's financial position, which assist in assessing the Commonwealth's economic condition. These financial statements, which include a Statement of Net Position (balance sheet) and a Statement of Activities (income statement) are prepared using the economic resources measurement focus and the full accrual basis of accounting. As such, expenses are recorded when a liability is incurred, regardless of the timing of related cash flows. The government-wide financial statements present results for the Commonwealth and all of its

agencies, public corporations and instrumentalities (subject to certain limited exceptions, such as fiduciary funds and municipalities and related entities), breaking down the Commonwealth's consolidated operations between its "Primary Government" (divided in turn between "governmental" and "business-type" activities) and its "Discretely Presented Component Units."

Increases or decreases over time in the Commonwealth's Net Position, as reported in its government-wide financial statements, may serve to indicate whether the financial position of the Commonwealth is improving or deteriorating. The following table presents a Summary or Condensed Statement of Net Position for the Commonwealth's Primary Government for fiscal years 2010 through 2014. Results for fiscal years 2015 and 2016 are not yet available.

|  | **Primary Government** | | | | |
|  | **Years Ended June 30** | | | | |
|  | **(in thousands)** | | | | |
|  | **2010** | **2011** | **2012** | **2013** | **2014** |
|  | **(As restated)** [1] | **(As restated)** [1] | **(As restated)** | **(As restated)** | **(As restated)** |
| Revenue: | | | | | |
| Program revenue: | | | | | |
| Charges for services | $1,819,086 | 1,824,729 | 1,926,639 | 2,058,805 | 1,996,051 |
| Operating grants and contributions | 7,080,518 | 6,456,999 | 6,894,892 | 6,963,573 | 6,503,492 |
| Capital grants and contributions | 129,947 | 457,725 | 152,591 | 110,249 | 83,172 |
|  | $ 9,029,551 | $8,739,453 | $8,974,122 | $9,132,627 | $8,582,715 |
| General revenue: | | | | | |
| Taxes | 7,751,387 | 8,602,443 | 8,028,704 | 8,244,567 | 10,226,557 |
| Revenue from global tobacco settlement agreement | — | — | 72,491 | 109,414 | 72,012 |
| Revenue from component units | 76,758 | 84,610 | 74,973 | 90,413 | 131,133 |
| Other, including loss on investments | — | — | 68,065 | 197,804 | 293,275 |
|  | 7,828,145 | 8,687,053 | 8,244,233 | 8,642,198 | 10,722,977 |
| **Total revenue** | **$16,857,696** | **$17,426,506** | **$17,218,355** | **$17,774,825** | **$19,305,692** |
| Expenses: | | | | | |
| General government | 3,156,646 | 2,881,548 | 3,602,639 | 3,342,663 | 2,894,304 |
| Public safety | 2,228,000 | 2,205,782 | 2,240,138 | 2,664,974 | 2,236,392 |
| Health | 2,843,744 | 3,022,000 | 2,903,009 | 3,245,973 | 3,139,595 |
| Public housing and welfare | 3,726,041 | 3,937,901 | 3,674,116 | 3,731,627 | 3,735,594 |
| Education | 4,543,362 | 4,469,337 | 5,145,390 | 4,891,928 | 4,570,665 |
| Economic development | 292,037 | 517,921 | 809,961 | 1,145,653 | 1,417,068 |
| Intergovernmental | 533,939 | 430,941 | 374,127 | 483,970 | 371,719 |
| Interest and other | 1,865,953 | 1,853,685 | 2,429,403 | 2,077,180 | 2,429,405 |
| Unemployment insurance | 720,992 | 635,145 | 685,130 | 387,336 | 271,749 |
| Lotteries | 820,261 | 697,746 | 387,336 | 685,130 | 714,199 |
| Medical Services Administration | — | — | 200,888 | 200,888 | 204,688 |
| Water Pollution Control Revolving Fund | — | — | 1,527 | 1,527 | 1,183 |
| Nonmajor proprietary funds | — | — | 32,386 | 32,614 | 28,920 |
| **Total expenses** | **$20,730,975** | **$20,652,006** | **$22,486,050** | **$22,891,463** | **$22,015,481** |
| Increase (decrease) in net position before transfers | (3,873,279) | (3,225,500) | (5,267,695) | (5,116,638) | (2,709,789) |
| **Transfers** | — | — | — | — | — |
| **Change in net position** | (3,873,279) | (3,225,500) | 5,267,695 | (5,116,638) | (2,709,789) |
| **Net position (deficit), beginning of year, as adjusted** | (29,460,253) | (33,333,532) | (36,559,032) | (41,826,727) | (46,943,365) |
| **Net position (deficit), end of year** | **$(33,333,532)** | **$(36,559,032)** | **$(41,826,727)** | **$(46,943,365)** | **$(49,653,154)** |

[1] The incorporation into the Commonwealth's Basic Financial Statements of, among other things, certain accounting pronouncements issued by GASB during the periods covered below (in particular, GASB Statements Nos. 61, 65 and 70), makes results for such period not completely comparable. The Commonwealth does not prepare a restatement for any period beyond the period immediately preceding the adoption of the applicable accounting pronouncement.

As shown above, the net deficit for fiscal year 2014 was $2.710 billion, a decrease in the deficit of $2.407 billion when compared to the net deficit of $5.117 billion in fiscal year 2013. The decrease in the deficit was a result of higher revenues through the imposition of new taxes and a reduction of expenses.

Note that although the Commonwealth's net position can provide a measure of whether the Commonwealth's financial health is improving or deteriorating, one may also need to consider other non-financial factors, such as changes in the Commonwealth tax structure, demographics, employment levels, debt levels, fiscal condition, economic factors, external markets dynamics and the condition of the Commonwealth's roads, bridges, buildings and other infrastructure, in order to assess the overall economic, financial and operational health of the Commonwealth.

***Discretely Presented Component Units*** – Although legally separate from the Commonwealth, discretely presented component units are important to the Commonwealth because the Commonwealth is financially accountable for them. As of the date of the last audited financial statements, the Commonwealth classified 48 separate legal entities as discretely presented component units.

The following table presents a Summary or Condensed Statement of Activities and Changes in Net Position for the Commonwealth's Discretely Presented Component Units for fiscal years 2010 through 2014. Results for fiscal years 2015 and 2016 are not yet available.

|  | Discretely Presented Component Units Years ended June 30 (in thousands) | | | | |
|  | 2010 (As restated)[1] | 2011 (As restated)[1] | 2012 (As restated) | 2013 (As restated) | 2014 |
|---|---|---|---|---|---|
| Revenue: | | | | | |
| Program revenue: | | | | | |
| Charges for services | $8,212,782 | $8,699,462 | $10,082,381 | $9,509,562 | $9,462,985 |
| Operating grants and contributions | 487,044 | 483,202 | 416,931 | 378,626 | 335,884 |
| Capital grants and contributions | 280,108 | 252,625 | 411,165 | 506,665 | 369,369 |
| Other | 26,664 | 19,347 | 92,175 | — | — |
|  | 9,006,598 | 9,454,636 | 11,002,652 | 10,394,853 | 10,168,238 |
| General revenue: | | | | | |
| Excise taxes | 40,862 | 64,519 | 58,468 | 65,642 | 69,999 |
| Grants and contributions not restricted to specific programs | 304,348 | 210,080 | 179,408 | 167,204 | 168,070 |
| Revenue from primary government | 2,998,234 | 2,974,359 | 2,998,055 | 2,262,734 | 2,444,808 |
| Other, including loss on investments | 343,700 | 415,974 | 422,671 | 412,590 | 351,488 |
|  | 3,687,144 | 3,664,932 | 3,658,602 | 2,908,170 | 3,034,365 |
| **Total revenue** | **$12,693,742** | **$13,119,568** | **$14,661,254** | **$13,303,023** | **$13,202,603** |
| Expenses | 13,302,650 | 14,463,231 | 15,244,592 | 14,366,676 | 16,673,901 |
| **Total expenses** | **$13,302,650** | **$14,463,231** | **$15,244,592** | **$14,366,676** | **$16,673,901** |
| **Change in net position** | **(608,908)** | **(1,343,663)** | **(583,338)** | **(1,063,643)** | **(3,471,298)** |
| **Net position (deficit), beginning of year, as adjusted** | **12,863,784** | **12,254,876** | **10,911,213** | **10,597,875** | **9,534,222** |
| **Net position (deficit), end of year** | **$12,254,876** | **$10,911,213** | **$10,597,875** | **$9,534,222** | **$6,062,924** |

[1] The incorporation into the Commonwealth's Basic Financial Statements of, among other things, certain accounting pronouncements issued by GASB during the periods covered below (in particular, GASB Statements Nos. 61, 65 and 70), makes results for such period not completely comparable. The Commonwealth does not prepare a restatement for any period beyond the period immediately preceding the adoption of the applicable accounting pronouncement.

As shown above, the change in net position (deficit) for fiscal year 2014 was $3.471 billion, an increase in the deficit $2.407 billion when compared to the deficit of $1.064 billion in fiscal year 2013. The increase in the deficit was a result of the recognition of approximately $2 billion of loan loss reserves in GDB. GDB had not recorded loan loss reserves prior to fiscal year 2014.

*Fund Financial Statements* – The Commonwealth's fund financial statements for its "governmental funds" and "proprietary funds" (which are the names given to the funds included in "governmental activities" and "business-type activities," respectively, of the primary government under the government-wide financial statements) provide a detailed short-term view of the Commonwealth's finances that assists in evaluating the government's near-term financing

requirements and determining whether there will be adequate financial resources available to meet the current needs of the Commonwealth. As such, the focus and scope of the fund financial statements is narrower than that of the government-wide financial statements. The fund financial statements thus focus on near-term inflows and outflows of expendable resources and, in the case of the governmental fund financial statements (but not in the case of the proprietary fund financial statements), are prepared based on the "current financial resources" measurement focus (instead of the "economic resources" measurement focus used in the government-wide financial statements) and the "modified accrual" basis of accounting (instead of the "full accrual" basis of accounting used in the government-wide financial statements). Furthermore, the governmental fund financial statements include the results of all the Commonwealth funds (including the General Fund and the Debt Service Fund) but record the activities only of those public corporations, such as COFINA, PBA and PRIFA, that meet the standards for inclusion as "blended" component units under U.S. GAAP. In other words, the fund financial statements do not incorporate the results for the 48 discretely presented component units.  As such, the fund financial statements may understate the expenditures for which the Commonwealth may be ultimately financially accountable.

Under the "current financial resources" measurement focus that applies to the fund financial statements, revenue is recognized as soon as it is measurable and available, net of estimated overpayments and amounts considered not collectible. Revenue is considered to be available when it is collectible within the current period or soon enough thereafter to pay liabilities of the current period. Under the modified accrual basis of accounting, expenditures are generally recorded when a liability is incurred, as under "full accrual" accounting.  However, the accrual of such expenses is "modified" as follows:

- Employees' vested annual vacation and sick leave are recorded as expenditures when matured. The unmatured amount of accumulated annual vacation and sick leave unpaid is reported only in the government wide financial statements.
- Interest and principal on general long-term obligations and interest on interest rate swap agreements are recorded when due, except for interest and principal due on July 1, which are recorded on the immediately preceding June 30.
- Pension liabilities are recorded when contributions are required to be made by law to the pension funds, and therefore include the "additional uniform contributions" (in the case of the ERS) or the "annual additional contributions" (in the case of the TRS) required under Puerto Rico law, but do not include the "actuarially required contribution" (or "ARC") required to be recorded under the full accrual basis of accounting.
- Federal funds' cost disallowances, other long-term obligations and claims subject to litigation are recorded in the governmental funds only when payment is due. Claims subject to litigation would be recorded only after a judgment is rendered or a settlement is agreed to, not when an assessment of the likelihood of success of a claim is made and a contingency recorded, as would be the case under the full accrual basis of accounting.

Because the focus of the governmental funds financial statements (and the "modified accrual" basis of accounting) is narrower than that of the government-wide financial statements (prepared based on the "full accrual" basis of accounting), it is useful to compare the information presented for governmental funds with similar information presented in the government-wide

156

financial statements. By doing so, readers may better understand the long-term impact of the government's near-term financing decisions, including the incurrence of long-term debt service obligations. The Basic Financial Statements provide a reconciliation between the "governmental funds" financial statements and the results of operation of "governmental activities" within the government-wide financial statements.

**Governmental Funds Revenues and Expenditures under U.S. GAAP**

The following table presents a Summary Statement of Revenues and Expenditures for the governmental funds for fiscal years 2011 through 2016 under U.S. GAAP. Results for fiscal years 2015 and 2016 are preliminary, unaudited and subject to adjustment. The table presents the aggregate for all of the Commonwealth's governmental funds, which includes the General Fund, Debt Service Fund, and Capital Projects Fund, and the Commonwealth's blended component units (COFINA, PBA, PRIFA, Maritime Shipping Authority, Children's Trust Fund and the Special Communities Trust).

COMMONWEALTH OF PUERTO RICO
Statement of Revenues, Expenditures and Changes in Fund Balances – Governmental Funds

Years ended June 30,

(In thousands)

| | 2011 | 2012 | 2013 | 2014 | 2015 [1] | 2016 [2] |
|---|---|---|---|---|---|---|
| **Revenue:** | | | | | | |
| Taxes: | | | | | | |
| Income taxes | $4,749,942 | $4,068,802 | $4,229,193 | $5,108,866 | $5,450,926 | $4,556,675 |
| Sales and use tax | 1,129,006 | 1,144,659 | 1,170,748 | 1,294,445 | 1,320,907 | 2,259,126 |
| Excise taxes | 2,106,784 | 2,695,543 | 2,870,741 | 3,363,611 | 3,164,345 | 3,259,065 |
| Property taxes | 241,719 | 66,375 | 57,673 | 55,838 | 21,586 | 11,315 |
| Other taxes | 83,589 | 90,514 | 81,449 | 112,240 | 113,561 | 158,037 |
| Charges for services | 632,005 | 624,069 | 698,373 | 694,507 | 685,219 | 678,996 |
| Revenue from global tobacco settlement agreement | 71,097 | 72,491 | 107,688 | 72,130 | 71,514 | 71,108 |
| Revenue from component units | 84,610 | 85,573 | 90,413 | 131,133 | 198,844 | 220,870 |
| Intergovernmental | 6,126,212 | 6,778,445 | 6,643,091 | 6,568,272 | 6,515,953 | 6,467,538 |
| Interest and investment earnings (losses) | 28,529 | 28,659 | (6,230) | 21,326 | 16,493 | 15,206 |
| Other | 210,394 | 156,956 | 42,791 | 141,276 | 175,692 | 84,638 |
| Total revenue | $15,463,887 | $15,812,086 | $15,985,930 | $17,563,644 | $17,735,040 | $17,782,574 |
| **Expenditures:** | | | | | | |
| Current: | | | | | | |
| General government | 1,284,878 | 2,027,460 | 1,109,642 | 1,321,094 | 1,451,594 | 1,727,993 |
| Public safety | 2,044,398 | 2,319,640 | 2,187,022 | 2,159,732 | 2,248,165 | 2,208,890 |
| Health | 2,932,836 | 2,950,367 | 3,225,142 | 3,041,875 | 3,070,393 | 2,985,961 |
| Public housing and welfare | 3,736,104 | 3,406,021 | 3,653,466 | 3,430,653 | 3,498,722 | 3,521,185 |
| Education | 4,453,332 | 4,599,069 | 4,836,900 | 4,597,170 | 4,687,514 | 4,620,287 |
| Economic development | 460,986 | 783,490 | 993,453 | 1,276,749 | 1,077,158 | 1,282,934 |
| Intergovernmental | 430,171 | 377,427 | 484,035 | 371,558 | 400,716 | 430,496 |
| Capital outlays | 452,482 | 558,377 | 518,952 | 198,351 | 213,466 | 110,880 |
| Debt service: | | | | | | |
| Principal | 1,845,785 | 1,871,727 | 724,993 | 3,024,177 | 1,829,738 | 1,660,384 |
| Interest and other | 1,588,601 | 2,064,564 | 1,861,255 | 1,909,784 | 2,405,159 | 2,320,990 |
| Other – debt issuance costs | 19,797 | 77,445 | 600 | 36,821 | — | — |
| Total expenditures | $19,249,370 | $21,035,587 | $19,595,460 | $21,367,964 | $20,882,625 | $20,870,000 |
| Deficiency of revenue under expenditures | (3,785,483) | (5,223,501) | (3,609,530) | (3,804,320) | (3,147,585) | (3,087,426) |
| **Other financing sources (uses):** | | | | | | |
| Transfers in | 5,704,579 | 4,886,177 | 2,412,770 | 4,048,879 | 3,295,525 | 3,230,825 |
| Transfers out | (5,474,028) | (4,666,383) | (2,165,862) | (3,781,923) | (1,237,277) | (2,973,893) |
| Proceeds from long term debt issued | 1,684,135 | 3,703,223 | 1,268,566 | 1,056,504 | 364,743 | — |
| Issuance of refunding bond | 1,364,475 | 4,482,178 | | 3,500,000 | — | — |
| Payments to refunded bond escrow agent | (483,515) | (2,822,288) | — | (466,574) | — | — |
| Sale of capital assets | 4,279 | 1,434 | 4,713 | 1,016 | 1,150 | — |
| Discount on bonds issued | (20,253) | 18,414 | — | (245,000) | (17,216) | — |
| Termination payments on swap agreements | (23,854) | (550,855) | — | (90,417) | — | — |
| Total other financing sources (uses) | 2,755,818 | 5,051,900 | 1,520,187 | 4,022,485 | 2,406,925 | 256,932 |
| Net change in fund balances | (1,029,665) | (171,601) | (2,089,343) | 218,165 | (740,660) | (2,830,494) |
| Fund balances (deficit) – beginning of year, as restated | $2,901,466 | $1,871,801 | $1,700,200 | $(389,143) | $(170,978) | $(911,638) |
| Fund balances (deficit) – end of year | $1,871,801 | $1,700,200 | $(389,143) | $(170,978) | $(911,638) | $(3,742,132) |

(1) The fiscal year 2015 results are preliminary, unaudited and subject to change. Results for fiscal year 2015 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2015 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2015 deficit also includes a $200 million impairment charge to account for the impairment of amounts on deposit in GDB.

(2) The fiscal year 2016 results are preliminary, unaudited and subject to change. Results for fiscal year 2016 do not account for the results of operations of various component units, such as ASES and GDB, which have historically been presented as "Discretely Presented Component Units" in the Basic Financial Statements but that may, as part of the fiscal year 2016 audit, be recharacterized as "Blended Component Units" and thus incorporated into the Governmental Fund financial statements. The fiscal year 2016 deficit also includes an impairment charge on the Commonwealth of approximately $490 million, reflected in the "Operational General Fund," to account for the impairment of amounts on deposit in GDB, and $163 million of clawback revenues retained by the Commonwealth and used for the payment of its General Obligations Bonds. The Special Revenue Funds include a charge of approximately $120 million in unpaid Additional Uniform Contributions to the ERS. As required by U.S. GAAP, the deficit includes, among other things, paid and unpaid debt service on General Obligations bonds and certain Commonwealth Guaranteed debt, as well as paid and unpaid debt service from governmental funds that was due during fiscal year 2016. In addition, the results for fiscal year 2016 include certain assumptions and projections of expenditures related to accrued liabilities, income tax refunds, amounts due to component units, recognition of unpaid debt service, and a projection of debt service payable to

GDB.These projections are based on historical trends and preliminary information available. Hence, these preliminary results may differ significantly from actual results.

The fiscal year 2015 and 2016 results included in the table above are included therein for comparison purposes assuming that the component units required to be "blended" into the Primary Government in fiscal year 2015 and 2016 pursuant to GASB 61 do not change from those required to be blended into the Primary Government in fiscal year 2014. It is very likely, however, that actual results for the Commonwealth's Governmental Funds for fiscal year 2015 and 2016 will significantly differ from those reported above due to the need to "blend" into the Primary Government certain component units that in prior years have been "discretely presented". Such entities may include the Puerto Rico Health Insurance Administration, the National Parks Company of Puerto Rico, the Corporation for the Development of the Arts, Science and Film Industry of Puerto Rico, the Puerto Rico Ports of Americas, the University of Puerto Rico Comprehensive Cancer Center, among others. Also, the Commonwealth is evaluating the need to blend the Governmental Development Bank for Puerto Rico into the Primary Government (and thus reports its funds in the Governmental Funds financial statements). The effect of "blending" such entities in the Primary Government and including their results of operations in the Governmental Funds will significantly increase the deficit reported in the Governmental Funds financial statements. Furthermore, the Puerto Rico Treasury Department further expects that additional Discretely Presented Component Units may need to be blended pursuant to GASB 61 for fiscal year 2016 due to the current financial situation of the Commonwealth and its component unit, which may require additional changes to the Commonwealth's reporting entity.

**Historical Financial Results – General Fund (Budgetary Basis)**

As discussed above, in addition to the government-wide and the fund financial statements, each of which are prepared in accordance with U.S. GAAP, the Commonwealth has historically reported results for its General Fund, its primary operating fund, pursuant to the budgetary (or statutory) basis of accounting. Information regarding the General Fund on a budgetary basis is historically the most up-to-date. Since most tax revenue is recorded in the General Fund, this statement provides current information regarding the Commonwealth's ability to meet its revenue forecasts. Furthermore, information regarding the General Fund on a budgetary basis is useful to determine the Commonwealth's compliance with its statutory budgetary requirements in its principal operating fund.

As discussed above, the General Fund statements exclude the results of operation of the Commonwealth public corporations, many of which provide essential services and receive financial support from the Commonwealth in the form of assigned revenues or direct budgetary appropriations. This limitation makes the calculation of the General Fund deficit an imperfect measurement of the financial health of the Commonwealth as a whole. The budgetary basis of accounting places additional limitations on the breath and usefulness of this information. Due to differences in the basis of accounting, the reporting entity, and perspective differences between budgetary reporting and those established by U.S. GAAP, results for revenues and expenditures for the General Fund on a modified accrual basis may differ substantially from results for the General Fund on a budgetary basis. Presentation of General Fund revenues and expenditures in accordance with U.S. GAAP may result in a deficiency of revenues over expenditures significantly higher than that calculated on a budgetary basis.

159

Principal differences between U.S. GAAP and the budgetary basis of accounting consist of:

- Under U.S. GAAP, revenues are recognized as soon as they are both "measurable" and "available" whereas under the budgetary basis of accounting revenue recognition is typically deferred until amounts are actually received in cash, net of tax refunds claimed by taxpayers as of year-end.
- Encumbered amounts are treated as expenditures under the budgetary basis of accounting while under U.S. GAAP expenditures are recorded when accrued (as opposed to encumbered). Expenditures under U.S. GAAP for a particular period can also include amounts accrued during a fiscal year but appropriated, but not expended, during previous fiscal years and, conversely, may exclude amounts appropriated for such fiscal year but not expended until later periods.
- Under U.S. GAAP, the General Fund includes the revenues and expenditures of (a) certain agencies with independent treasuries and (b) the Special Revenue Funds, which are legally separate from the General Fund (Operating Fund), and which are not included in the General Fund budget and are thus not recognized under the budgetary basis of accounting.
- Budgetary revenues and expenditures may include items classified as "other financing sources" and "other financing uses" under U.S. GAAP (such as proceeds of long-term debt).
- U.S. GAAP recognizes as revenue Federal grants and reimbursements of expenses under numerous federal programs that are not included as revenues under the budgetary basis of accounting.

The Commonwealth's Basic Financial Statements include a reconciliation between the General Fund on a modified accrual basis and the General Fund on a budgetary basis in the Notes to the Required Supplementary Information section of the Basic Financial Statements. Entity differences between U.S. GAAP and the budgetary basis of accounting underscore the need for such a reconciliation. The Commonwealth records billions of dollars in expenditures through its various Special Revenue Funds, which are recognized in the General Fund for purposes of Commonwealth financial reporting under U.S. GAAP. These Special Revenue Funds include funds where the receipt and expenditure (or transfer) of federal funds and funds pledged to third parties is recorded, and include funds used to account for and report the proceeds of specific revenue sources that are restricted or committed to expenditure for specified purposes other than debt service or capital projects.

The historic deficiency of revenues over expenditures in such Special Revenue Funds has had a material effect on the measurement of the Commonwealth's consolidated deficit, as calculated pursuant to U.S. GAAP. Furthermore, since the revenues and expenditures of many of such Special Revenue Funds flow into, and out of, the TSA, the historic deficiency of revenues over expenditures in such funds has had and, in the absence of corrective action, will likely continue to have, a material effect on the overall liquidity position of the Commonwealth.

Furthermore, focusing on the General Fund on a budgetary basis provides only a partial view regarding the amount and type of revenues received by the Commonwealth each fiscal year. For example, General Fund budgetary revenues include revenues raised internally as well

as those from non-Puerto Rico sources. Internal revenues consist principally of income, excise and sales and use taxes. Revenues from non-Puerto Rico sources are derived from federal excise taxes and customs duties returned to the Commonwealth. However, the General Fund on a budgetary basis excludes revenues from federal grants and contracts, most revenues from charges for services by agencies and certain tax and other miscellaneous revenues collected by the Commonwealth that are reported in the General Fund under U.S. GAAP but are assigned by law to component units or private institutions.  Such assigned taxes and other revenues include all revenues from excise taxes on gasoline, gas, oil, diesel oil and petroleum products and their derivatives, and sugar and coffee, a portion of the revenue from each of the cigarette excise tax and the federal excise tax on rum shipments, revenues from motor vehicle licenses fees and fines and compulsory vehicle insurance premiums. The majority of the assigned tax revenues have been assigned to public corporations such as HTA, MBA and PRIFA and serve as the source of repayment of such entities' financial indebtedness.

In addition, the General Fund on a U.S. GAAP basis includes the results of operation of certain agencies with independent treasuries, namely the Office for Improvement of Public Schools (also known as *OMEP*, for its Spanish acronym), the Puerto Rico Public Housing Administration, the Puerto Rico Labor Development Administration and the Office for Administration, Sales and Acquisition Fund of the Puerto Rico Department of Housing (also known as *CRUV*, for its Spanish acronym).  Certain of these agencies with independent treasuries also record deficiencies of revenues over expenditures (as reported in their stand-alone financial statements).

Finally, as the Krueger Report highlighted, the General Fund (whether on a budgetary or U.S. GAAP basis) also excludes hundreds of millions of dollars in historical annual capital expenditures that are recorded in the Commonwealth's Capital Fund.

**General Fund Revenues and Expenditures Under Budgetary Basis Accounting**

The following table presents the General Fund budgetary revenues and expenditures, as well as other financing sources (uses), under the budgetary basis of accounting for fiscal years 2012 through 2016. The results for fiscal years 2015 and 2016 are preliminary and unaudited, and therefore subject to change. As emphasized above, if General Fund revenues and expenditures were presented in accordance with U.S. GAAP, revenues, expenditures and the deficiency of revenues over expenditures (before financing sources) would be significantly higher than the amounts presented in the table below.

| | 2012 | 2013 | 2014 | 2015 (7) | 2016 (7) |
|---|---|---|---|---|---|
| **Revenues:** | | | | | |
| **Income Taxes:** | | | | | |
| Individuals | $2,099,564 | $2,054,654 | $1,832,487 | $2,156,826 | $2,021,256 |
| Corporations | 1,460,354 | 1,286,506 | 1,914,333 | 1,852,168 | 1,647,422 |
| Partnerships | 1,333 | 756 | 745 | 2,203 | 1,023 |
| Withholdings from non-residents | 890,761 | 982,896 | 899,965 | 810,718 | 809,750 |
| Tollgate taxes | 27,678 | 8,903 | 7,140 | 3,651 | - |
| Interest | 6,807 | 5,425 | 4,900 | 4,414 | 4,212 |
| Dividends | 35,087 | 34,064 | 39,713 | 152,691 | 30,739 |
| Inheritance and gift taxes | 5,465 | 1,833 | 1,395 | 2,149 | 2,019 |
| Total income taxes | **4,527,004** | **4,375,037** | **4,700,678** | **4,984,820** | **4,516,421** |
| **Sales and Use Tax** | 540,026 | 539,929 | 645,254 | 619,199 | 1,559,627 |
| **Excise Taxes:** | | | | | |
| Alcoholic beverages | 292,614 | 282,316 | 266,542 | 236,633 | 264,704 |
| Foreign (Act 154) | 1,875,823 | 1,632,549 | 1,902,193 | 1,920,110 | 1,876,009 |
| Tobacco products | 172,155 | 186,909 | 171,108 | 153,213 | 100,295 |
| Motor vehicles | 386,468 | 419,178 | 407,943 | 252,121 | 265,606 |
| Revenues from component units- slot machines | 19,957 | 24,594 | 23,673 | 19,366 | 17,214 |
| Horses races | 19,302 | 13,403 | 16,354 | 10,151 | 7,199 |
| Insurance premiums | 23,382 | 24,569 | 42,642 | 59,325 | 58,422 |
| Other excise taxes | 22,702 | 9,240 | 8,247 | 21,922 | 14,882 |
| Total excise taxes | **2,812,403** | **2,592,758** | **2,838,702** | **2,672,841** | **2,604,331** |
| **Property Taxes** | 65,497 | 52,614 | 58,535 | 21,586 | 11,315 |
| **Licenses and Other Taxes** | 82,578 | 81,127 | 20,506 | 23,031 | 19,023 |
| **Charges for Services** | 179,962 | 105,644 | 108,579 | 119,776 | 87,112 |
| **Miscellaneous Non-tax Revenues** | 100,072 | 136,424 | 116,581 | 94,020 | 49,877 |
| Total revenues from internal sources | **8,307,587** | **7,883,533** | **8,488,835** | **8,535,273** | **8,847,706** |
| **Revenues from Non-Commonwealth Sources:** | | | | | |
| Federal excise taxes (1) | 258,171 | 247,848 | 237,159 | 189,227 | 199,633 |
| Customs | 7,739 | | | 2,265 | |
| Total revenues from non-Commonwealth sources | **265,910** | **247,848** | **237,159** | **191,492** | **199,633** |
| **Total Budgetary Revenues** | **8,573,497** | **8,131,381** | **8,725,994** | **8,726,765** | **9,047,339** |
| **Other Revenues:** | | | | | |
| Non-cash distributions from Traditional Lottery | 38,225 | 24,322 | 81,769 | 20,207 | 50,795 |
| Cash distributions from Electronic Lottery (Lotto) | 56,163 | 38,876 | 72,287 | 93,603 | 77,158 |
| Excess of collateral received on derivative transactions | - | 241,777 | - | - | - |
| Receipts of COFINA bond proceeds from prior years issuances (2) | - | 125,848 | - | - | - |
| **Total Revenues** | **8,667,885** | **8,562,204** | **8,880,050** | **8,840,575** | **9,175,292** |
| **Other Financing Sources (Uses):** | | | | | |
| Transfers in from Debt Service Fund, Lotteries Fund and others | 769,158 | 197,936 | 66,518 | - | - |
| Receipts of COFINA bond proceeds from current year issuances (2) | 952,615 | 333,300 | | - | - |
| Proceeds from notes payable issued for debt service payments (3) | 877,034 | 600,433 | 667,902 | - | - |
| Net Proceeds from notes payable issued to cover operating expenditures (4) | - | - | - | 102,000 | - |
| Proceeds from issuance of tax revenue anticipation notes (TRANS) | 1,100,000 | 900,000 | 1,200,000 | 1,200,000 | 400,000 |
| Repayments of TRANS | (1,100,000) | (900,000) | (1,200,000) | (1,200,000) | (400,000) |
| Excess of income tax refunds payments over budgeted reserve | - | - | - | (174,000) | (135,000) |
| Use of funds retained under Clawback Provisions | | | | | (163,900) |
| Impairment of cash balance in GDB | | | | (100,000) | (490,000) |
| Total other financing sources, net | **2,598,807** | **1,131,669** | **734,420** | **(172,000)** | **(788,900)** |
| **Total Resources** | **11,266,692** | **9,693,873** | **9,614,470** | **8,668,575** | **8,386,392** |
| **Expenditures:** | | | | | |
| General government | 1,957,580 | 1,382,066 | 1,281,494 | 1,198,416 | 1,399,305 |
| Public safety | 2,011,965 | 1,966,079 | 1,979,809 | 1,832,188 | 1,741,456 |
| Health | 1,686,402 | 1,378,397 | 1,319,724 | 1,277,785 | 1,254,463 |
| Public housing and welfare | 474,074 | 460,269 | 430,407 | 409,490 | 397,555 |
| Education | 2,926,638 | 2,916,347 | 3,382,133 | 3,297,440 | 2,963,738 |
| Economic development | 458,102 | 413,948 | 407,220 | 355,164 | 163,522 |
| Intergovernmental | 396,447 | 421,359 | 364,763 | 365,850 | 360,600 |
| **Total Budgetary Expenditures (5)** | **9,911,208** | **8,938,465** | **9,165,550** | **8,736,333** | **8,280,639** |
| **Other Expenditures:** | | | | | |
| Transfers out for debt service payments (6) | **2,055,095** | **946,410** | **737,639** | **742,718** | **1,011,506** |
| **Total Expenditures** | **11,966,303** | **9,884,875** | **9,903,189** | **9,479,051** | **9,292,145** |
| **Excess (Deficiency) of Resources over (under) Expenditures** | **($699,611)** | **($191,002)** | **($288,719)** | **($810,476)** | **($905,753)** |

(1) Net of amount assigned to Rum Producers and the PR Conservation Trust Fund, which are recorded in the Special Revenue Funds.

(2) Represents COFINA bond proceeds deposited in the Stabilization Fund.

(3) Represents GDB notes issued to cover the payment of the Commonwealth general obligations bonds and other Commonwealth obligations.

(4) Represents notes issued to the State Insurance Fund and the Automobile Accidents Compensation Administration to cover cash deficiencies of the

Commonwealth.

(5) Includes rent payment to PBA for approximately $331.5 million, $205.1 million, $358.5 million , $366.6 million and $363.9 million for fiscal years 2012 through 2016, respectively.

(6) Consists of amounts to pay principal of, and interest on, general obligation bonds and notes of the Commonwealth. Does not include amounts deposited directly into the Redemption Fund from the Municipal Property Tax (1.03%) pledged revenues. Figures for fiscal year 2012 and 2013, includes approximately $978 and $12 million in payments to refunded debt escrow agents.

(7) Preliminary, unaudited and subject to change. FY 2016 expenditures information is based on available information from OMB and the Commonwealth Financial Systems, expenses do not include adjustments for encumbrances, accounts payables, and other required adjustments to properly present expenses on a GAAP basis. FY 2015 and FY 2016 do not include adjustments related to the unpaid additional contribution to the Retirement Systems. Actual figures could materially differ from those reported.

Sources: The "Statement of Revenues and Expenditures- Budget and Actual- Budget Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal year 2012; the "Required Supplementary Information- Unaudited- Schedule of Revenues and Expenditures- Budget and Actual- Budgetary Basis- General Fund" as presented in the Commonwealth's financial statements for fiscal years 2013 and 2014 ; the Department of Treasury's financial records for revenue information for fiscal years 2015 and 2016 ; the OMB records for expenditures information for fiscal years 2015 and 2016. Totals may not add up due to rounding.

### Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2016

*Revenues.* Preliminary General Fund revenues on a budgetary basis for fiscal year 2016 (which are still subject to audit and other year-end adjustments) were approximately $9.175 billion, an increase of approximately $334 million when compared to the prior fiscal year. These revenues are approximately $625 million less than the originally estimated revenues for the fiscal year, approximately $271 million less than the revised estimated revenues made in October 2015 and approximately $117 million less than the final revised estimated revenues made in December of 2015. Revenues from the special temporary excise tax under Act 154 were approximately $1.876 billion, a decrease of approximately $44 million from the prior fiscal year. Revenues from individual income taxes were approximately $2.021 billion, a decrease of approximately $136 million from the prior fiscal year. Revenues from corporate income taxes were $1.647 billion, approximately $205 million lower than the prior fiscal year. Revenues from dividends were approximately $153 million, a decrease of approximately $122 million from the prior fiscal year, due to the temporary reduced tax on corporate dividends provided under Act 159-2015.

Preliminary General Fund revenues include approximately $77 million in cash distributions from the electronic lottery, approximately $51 million in non-cash revenues mostly from the traditional lottery, approximately $116 million in non-recurring revenues related to tax amnesty collections under Act 44-2015 and other royalty and corporate income tax revenue. Revenues also include collections from the transfer pricing taxes that were declared unconstitutional during fiscal year 2016. The Treasury Department is unable at this time to make a reasonable estimate of the amounts collected from such transfer pricing taxes.

Non-cash revenues from the traditional lottery consist mostly of unclaimed lottery prizes that by law are recorded in the General Fund on a budgetary basis after the term for claiming lottery prizes has expired (180 days). Although the General Fund recognizes revenue on a budgetary basis after the expiration of the term to claim such prizes, such recognition does not result in actual cash revenue because all transactions related to the traditional lottery, including the sale of lottery tickets and the payment of cash prizes, are made to and from the TSA, in which all funds managed by the Treasury Department (including budgetary funds and Special Revenue Funds) are commingled. The Secretary of Treasury determines when accumulated traditional lottery non-cash revenues are recognized in the General Fund on a budgetary basis. Certain non-cash revenues from the traditional lottery, although recorded on a budgetary basis during a particular year, may have been accrued for U.S. GAAP purposes during the prior fiscal year. Other non-cash revenues are related to transfers from Special Revenue Funds to the General Fund.

In October 2015, the Puerto Rico Treasury Department revised its revenue estimate for fiscal year 2016 from $9.800 billion to $9.446 billion. As further explained below, this revision was made after taking into consideration (i) the actual revenues for the fourth quarter of fiscal year 2015, (ii) the preliminary revenues for the first quarter of fiscal year 2016, (iii) the projected effect on revenues of legislation enacted since the beginning of the 2016 fiscal year, and (iv) other general economic factors. The major changes in the estimated revenues consisted of $84 million less in individual income taxes, $110 million less in corporate income taxes, $31 million less in Act 154 excise taxes, $34 million less in motor vehicle excise taxes, $25 million less in cover over rum excise taxes, $17 million less in cigarette excise taxes, $50 million less in sales and use taxes and $5 million less in withholding income taxes to non-residents. The Commonwealth attributed such lower revenue estimates in part to slower economic activity, continuing decline in population and the effect of preparing revenue estimates without taking into consideration the effect of actual revenues received during the last two months of fiscal year 2015.

The main drivers for the October 2015 revision in estimated revenues for fiscal year 2016 were the following:

- actual revenue shortfall against budget of approximately $211 million for the months of May and June 2015 which affected the revenue base used for the fiscal year 2016 budget. The Commonwealth original revenue estimates for the fiscal year 2016 budget were made with actual data up to April 2015;
- enactment of Act 159-2015, which (i) excluded from the sale of certain items and the rendering of certain professional services from the SUT and VAT and (ii) reduced the base on which the SUT or VAT is computed for certain transactions;
- the reduction by $10 million of the annual allocation to the General Fund of federal rum excise tax returned by the Government to the Commonwealth. Act 108-2014 allocated such amount to PRIDCO; and
- other factors such as the prepayment of foreign taxes under Act 154 and general economic factors which reduced revenues by an additional $50 million in the aggregate.

To close the revenue gap for fiscal year 2016, estimated in October 2015 to be approximately $355 million, (i) OMB implemented $150 million in aggregate reductions to budgetary appropriations through the elimination of certain contingency accounts, reductions in non-priority program appropriations and a decrease in the operating budgets of various agencies funded by the General Fund, and (ii) Treasury tried to implement the following measures that were expected to raise approximately $185 million in revenues:

- $60 million to be obtained through an upfront payment in the renewal of the Electronic Lottery contract, which required legislation;
- $25 million in additional revenues through a temporary reduced tax on corporate dividends provided under Act 159-2015; and
- $100 million in additional revenues through the enactment of administrative measures to increase tax enforcement.

The measures identified by Treasury did not achieve the intended results. In December of 2015, The Puerto Rico Treasury Department revised again its revenue estimates for fiscal year

2016 from approximately $9.446 billion to approximately $9.292 billion. This revision was made after taking into consideration additional decreases in economic growth and population.

As a result of the new reduction in the revenue estimate for fiscal year 2016, on January 13, 2016 OMB issued Circular Letter 128-16 in order to comply with Executive Order 2015-049, implement measurements for the control of expenditures and make budgetary adjustments. Pursuant to this Circular Letter, the previously implemented reductions to budgetary appropriations of $150 million mentioned above were increased to $254 million. In addition, no appropriations were made to fund the Economic Development and Obligations Payment Fund, which was originally to be funded with $275 million from available resources.

*Expenditures.* Preliminary General Fund expenditures for fiscal year 2016 were approximately $9.292 billion, a reduction of approximately $187 million when compared to the prior fiscal year and approximately $508 million less than the original budget for such fiscal year.

Budgeted expenditures for fiscal year 2016 included approximately $1.012 billion for general obligation debt service payments. The aggregate amount of debt service payable on general obligation bonds during fiscal year 2016 was approximately $1.48 billion. The difference between the budgeted debt service and the actual debt service payable during fiscal year 2016 is due to: (i) approximately $351.9 million being payable from funds set aside in an escrow account at a private financial institution in connection with the redemption of certain bonds, and (ii) the remainder expected to be covered from the proceeds of the annual special tax of 1.03% of the assessed value of all real and personal property credited to the Redemption Fund. As a result of the Commonwealth's liquidity crisis, however, the Commonwealth was only able to pay approximately $697.7 million in general obligation debt service during fiscal year 2016 (of which approximately $351.9 million were paid from the escrowed funds referenced above).

Other expenditures included: (i) payroll expenses of $3.074 billion; (ii) special appropriation for the University of Puerto Rico, the municipalities and the Judicial branch of $834 million, $364 million and $315 million, respectively; and (iii) special appropriations for the ERS and TRS of $487 million in the aggregate. Other operating expenses were $3.165 billion, an increase of $102 million or 3% when compared to the prior year.

The Central Government's employee workforce chargeable to the General Fund, which is accounted for in the Treasury Department's payroll system, amounted to 81,675 employees (headcount) as of January 2016, of which 72% consisted of teachers (34,256), police officers (14,058), correction officers (7,454), firefighters (1,733) and nurses (1,330). This represents a 41% reduction since such workforce peaked at 139,640 during 2008 and a 9% reduction since July 2015.

The following table shows preliminary "budgetary" basis expenditures for fiscal years 2015 and 2016 (in millions of dollars).

| | **FY 2015** | **%** | **FY 2016** | **%** | **Increase (Decrease)** |
|---|---|---|---|---|---|
| Payroll | $3,232 | 35% | $3,074 | 33% | ($158) |
| Debt Service | 1,173 | 12% | 1,053 | 12% | (120) |
| University of Puerto Rico, Municipalities and Judicial Branch | 1,523 | 16% | 1,513 | 16% | (10) |
| Retirement Systems | 488 | 5% | 487 | 5% | (1) |
| Other | 3,063 | 32% | 3,165 | 34% | 102 |
| | $9,479 | 100% | $9,292 | 100% | ($187) |

*Department of Education Expenditures*. The Department of Education preliminary expenditures for fiscal year 2016 were $1.635 billion, a reduction of $467 million, or 22%, when compared to fiscal year 2015. Payroll expenditures for such fiscal year were $1.285 billion, a reduction of $112 million when compared to fiscal year 2015.

*Other Financing Sources (Uses)*. For fiscal year 2016, financing sources included $400 million in TRANs financing. Other financing uses included (i) $400 million in repayment of the fiscal year 2016 TRANs, (ii) approximately $135 million in income tax refund payments over the budgeted refund reserve, (iii) approximately $164 million from the use of revenues retained by the Commonwealth pursuant to Article VI, Section 8 of the P.R. Constitution in order to make general obligation debt service and (iv) a $490 million impairment charge on the Commonwealth to account for the impairment of amounts on deposit in GDB.

*Deficit*. The fiscal year 2016 preliminary "budgetary" basis deficiency of revenues under expenditures was approximately $906 million. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $245 million.

**Preliminary General Fund Budgetary Revenues and Expenditures for Fiscal Year 2015**

*Revenues*. Preliminary General Fund revenues on a budgetary basis for fiscal year 2015 (which are still subject to audit and other year-end adjustments) were approximately $8.841 billion, a decrease of approximately $39 million, or 0.4%, when compared to the prior fiscal year. Preliminary collections of the special temporary excise tax under Act 154 were approximately $1.920 billion, an increase of approximately $18 million from the prior fiscal year. Preliminary collections of individual income taxes were approximately $2.157 billion, an increase of approximately $324 million over the prior fiscal year. Preliminary collections of corporate income taxes were $1.852 billion, $62 million lower than the prior fiscal year. Non-recurring revenue for the fiscal year was estimated at approximately $732 million, consisting mostly of revenue from the national gross receipt tax or "**patente nacional**", which was subsequently repealed, revenue from a temporary special tax rate in IRA's accounts and corporate dividends, revenue from taxes on extraordinary lottery prizes and revenue from an income, excise and sales and use tax amnesty.

*Expenditures*. Preliminary General Fund expenditures for fiscal year 2015 were approximately $9.479 billion, a reduction of approximately $424 million when compared to the prior fiscal year.

166

Expenditures for fiscal year 2015 included approximately $1.173 billion for debt service payments, of which approximately $743 million were for general obligation debt service. Other expenditures included: (i) payroll expenses of approximately $3.232 billion, a reduction of approximately $316 million when compared to fiscal year 2014; (ii) special appropriations for the University of Puerto Rico, the Municipalities and the Judicial Branch of $834 million, $366 million and $323 million, respectively, for an aggregate of approximately $1.523 billion, an increase of approximately $82 million when compared to fiscal year 2014; and (iii) special appropriations to the ERS and TRS of approximately $488 million. The above amounts represent 68% of the total preliminary expenditures of approximately $9.479 billion. Other operating expenses were approximately $3,063 billion, a reduction of approximately $477 million, or 13%, when compared to the prior year.

The Central Government's employee workforce chargeable to the General Fund, which is accounted for in the Treasury Department's payroll system, amounted to 89,750 employees (headcount) as of July 31, 2015, of which 70% consisted of teachers (36,085), police officers (15,000), correction officers (7,800), firefighters (1,700) and nurses (1,330). This represents a 34% reduction since such workforce peaked at 139,640 during 2008 and a 12% reduction since January of 2013.

The following table shows the fiscal years 2014 and 2015 expenditures (in millions of dollars):

| | FY 2014 | % | FY 2015 | % | Increase (Decrease) |
|---|---|---|---|---|---|
| Payroll | $3,548 | 36% | $3,232 | 35% | ($316) |
| Debt Service | 935 | 9% | 1,173 | 12% | 238 |
| University of Puerto Rico, Municipalities and Judicial Branch | 1,441 | 15% | 1,523 | 16% | 82 |
| Retirement Systems | 440 | 4% | 488 | 5% | 48 |
| Other | 3,540 | 36% | 3,063 | 32% | (477) |
| | $9,904 | 100% | $9,479 | 100% | ($425) |

**Department of Education Expenditures.** The Department of Education preliminary expenditures for fiscal year 2015 were $2.102 billion, a reduction of $179 million, or 8%, when compared to fiscal year 2014. Payroll expenditures for such fiscal year were $1.397 billion, a reduction of $63 million when compared to fiscal year 2014.

**Other Financing Sources (Uses).** For fiscal year 2015, financing sources included (i) $1,200 million in TRANs financing and (ii) $102 million long-term credit facilities made to the P.R. Treasury Department by the State Insurance Fund ($100 million) and the Automobile Accidents Compensation Administration ($2 million). Other financing uses included (a) $1,200 million in repayment of the fiscal year 2015 TRANs, (b) approximately $135 million in income tax refund payments over the budgeted refund reserve and (c) a $100 million impairment charge on the Commonwealth to account for the impairment of amounts on deposit in GDB.

**Deficit.** The fiscal year 2015 preliminary "budgetary" basis deficiency of resources under expenditures was approximately $810 million. Excluding "Other Revenues" and "Other

Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $752 million.

**General Fund Budgetary Revenues and Expenditures for Fiscal Year 2014**

*Revenues.* General Fund revenues on a budgetary basis for fiscal year 2014 were approximately $8.880 billion, an increase of approximately $318 million or 3.7% over fiscal year 2013. These revenues include: (i) General Fund budgetary operating revenues of approximately $8.726 billion (net of actual income tax refunds paid in excess of reserve) and (ii) revenues from the electronic and traditional lotteries of approximately $154 million (approximately $82 million which were non-cash) transferred to the General Fund.

Corporate income tax revenues for fiscal year 2014 were approximately $1.914 billion, an increase of approximately $628 million, or 48.8%, from the prior fiscal year. Individual income tax revenues for fiscal year 2014 were approximately $1.833 billion, a decrease of approximately $222 million, or 12.1%, from the prior fiscal year. Revenues from withholdings from non-residents were approximately $900 million, a decrease of approximately $83 million, or 8.4%, from the prior fiscal year.

Sales and use tax revenues received by the General Fund (excluding funds assigned to COFINA and others) for fiscal year 2014 were approximately $645 million, an increase of approximately $105 million, or 16.3%, from the prior fiscal year. Revenues for the special temporary excise tax under Act 154 for fiscal year 2014 were approximately $1.902 billion, an increase of approximately $270 million, or 14.2%, from the prior fiscal year.

*Expenditures*. The original fiscal year 2014 budgeted expenditures totaled approximately $9.770 billion, excluding $575 million in general obligation debt service, a portion of which was refunded with the proceeds of the Commonwealth's General Obligation Bonds of 2014, Series A and the remainder funded with interim lines of credit by GDB. The budget contemplated $245 million in new deficit financing to be funded initially by GDB which, when added to the $575 million general obligation debt refunding, resulted in a total projected budget deficit of approximately $820 million. Budget appropriations were subsequently amended to total $9.245 billion in expenditures (excluding the $575 million in general obligations debt service refunding). 9829

Expenditures for fiscal year 2014 were approximately $9.904 billion (including refunded debt service), a reduction of approximately $441 million when compared to total budgeted expenses of $10.345 billion for fiscal year 2014 ($9.770 billion General Fund budget plus non-budgeted general obligation debt service of $575 million). This represents an increase of approximately $84 million when compared to the revised budget for fiscal year 2014 of $9.245 billion plus $575 million of debt service.

The following table shows the difference between the original and adjusted budget for fiscal year 2014 (in millions of dollars):

|                        | Original Budget | Revised budget |
|------------------------|-----------------|----------------|
| Budgeted expenditures  | $9,770          | $9,245         |
| Refunded debt service  | 575             | 575            |
| Sub-total              | $10,345         | $9,820         |
| Actual expenditures    | 9,904           | 9,904          |
| Reduction (increase)   | $441            | ($84)          |

*Other Financing Sources (Uses)*. For fiscal year 2014, financing sources included $1,200 million in TRANs financing. Other financing uses included (i) $1,200 million in repayment of the fiscal year 2014 TRANs, (ii) approximately $668 million from notes payable issued to pay general obligation debt service and (iii) approximately $66 million in transfers from other funds.

*Deficit.* The fiscal year 2014 "budgetary" basis deficiency of revenues under expenditures was approximately $289 million. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), the deficit was approximately $1.177 billion.

## General Fund Budgetary Revenues and Expenditures for Fiscal Years 2013 and 2012

General Fund revenues on a budgetary basis for fiscal year 2013 were approximately $8.562 billion, a decrease of approximately $106 million, or 1.2%, from fiscal year 2012, which had revenues of approximately $8.668 billion. Fiscal year 2013 revenues included (i) approximately $8.131 billion of operating revenues, (ii) approximately $63 million of revenues from the electronic and traditional lotteries (approximately $24 million which were non-cash) transferred to the General Fund, (iii) approximately $242 million of excess collateral received on derivative transactions transferred from the Debt Service Fund and (vi) approximately $126 million of excess funds transferred from COFINA after payment of COFINA debt service.

General Fund total expenditures for fiscal year 2013 amounted to $9.885 billion, consisting of $8.938 billion of operational expenditures and approximately $946 million in transfers out for debt service payments, including payments on general obligation and PBA bonds. These expenditures were approximately $2.081 billion or 17% lower than the total expenditures for fiscal year 2012, which were approximately $11.966 billion.

The fiscal years 2013 and 2012 "budgetary" basis deficiencies of resources under expenditures were approximately $191 million and $700 million, respectively. Excluding "Other Revenues" and "Other Financing Sources (Uses)" (which compares only "Budgetary Revenues" to "Total Expenditures"), such deficits were approximately $1.753 billion and $3.393 billion, respectively.

169

**Expenditure Breakdown for the General Fund**

The following table shows a breakdown of General Fund expenditures by concept for fiscal years 2015, 2016 (budgeted and actual) and 2017 (budgeted). Other operational expenses include costs such as contributions to not-for-profit organizations, materials and supplies, purchase of equipment, rent payment to third parties, transportation costs, computer software, and other necessary expenditures to carry out the essential services to the citizens of Puerto Rico.

## Expenditures Breakdown for the General Fund
## (In millions)

| Expenditures | 2015* | 2016* | 2016(A) | 2017* |
|---|---|---|---|---|
| Payroll and Related Costs[1] | $ 3,392 | $ 3,320 | $ 3,320 | $ 3,272 |
| Other Operational Expenses | 1,210 | 1,112 | 1,036 | 1,195 |
| Mandated Expenditures (Formula) | | | | |
|    Contributions to Municipalities | 361 | 361 | 361 | 361 |
|    University of Puerto Rico | 834 | 834 | 834 | 834 |
|    Judicial Branch | 323 | 315 | 315 | 315 |
| Pension Plan Contributions | 560 | 643 | 624 | 787 |
| Health Insurance | 885 | 885 | 885 | 885 |
| General Obligation Debt Service | 743 | 1,011 | 1,011 | - |
| PBA Debt Payments | 274 | 277 | 277 | - |
| Trans and Other Debt | 395 | 464 | 70 | 24 |
| Utilities (PREPA, PRASA and Insurance Premiums) | 201 | 195 | 195 | 170 |
| Legislature | 142 | 129 | 125 | 159 |
| PBA Operating Subsidies | 81 | 87 | 87 | 90 |
| Agriculture Incentives and Subsidies | 78 | 79 | 69 | 84 |
| University of Puerto Rico Operating Subsidies | 48 | 40 | 36 | 39 |
| Medical Services Operating and Functional Contributions | 28 | 27 | 27 | 42 |
| Municipal Subsidies | 10 | 21 | 20 | 83 |
| Budgetary and Emergency Fund | - | - | - | 220 |
| Legal and Responsibility fund | - | - | - | 117 |
| Elections and Transition Costs | - | - | - | 52 |
| Contributions to Governmental Entities | - | - | - | 258 |
| **Total General Fund Expenditures** | $ 9,565 | $ 9,800 | $ 9,292 | $ 8,987 |

_____

\* Approved Budget

(1) Excludes University of Puerto Rico and the Judicial Branch.

(A) Adjusted Budget.

*Source : Office of Management and Budget*

171

# DEBT OF THE COMMONWEALTH,
## ITS PUBLIC CORPORATIONS AND MUNICIPALITIES

The following tables and the accompanying discussion present and describe the financial indebtedness of the Commonwealth, its public corporations and municipalities. This includes bonds and notes issued to third parties in public offerings and negotiated transactions, loans from third parties, and notes and loans from GDB and other Commonwealth entities. The tables include a reconciliation to avoid double counting debt issued to fund loans made to other Commonwealth entities. In the case of capital appreciation bonds ("**CABs**") (bonds that do not pay interest on a current basis, but which capitalize interest), the total includes the amount of capitalized interest through the date of the table unless otherwise noted. No deductions have been made in the tables for deposits on hand in debt service funds or debt service reserve funds. Totals may not add due to rounding.

The tables present, among others, total public sector indebtedness organized by repayment source (in the case of the public corporations), a summary of loans from GDB, private banks and intra-government financings to the various Commonwealth entities, the accreted balance of CABs by issuer, and Commonwealth indebtedness that by its terms is payable from a source of payment that can be applied first to the payment of General Obligations of the Commonwealth. Also included are tables setting forth the debt service requirements for the debt of the Commonwealth, its public corporations and municipalities (also organized by ultimate source of repayment in the case of the public corporations).

Table 1 – *Debt Summary by Type of Debt,* shows the total debt of the Commonwealth and each of its instrumentalities (by issuer, except in the case of the municipalities, which are shown in the aggregate), with separate columns for (i) bonds and notes, (ii) loans from banks and other private parties, (iii) loans provided by GDB and (iv) loans and notes from other Commonwealth entities. The table is divided into the following nine categories based on the source of repayment from which the debt is payable and, in the case of certain debt not issued directly by the Commonwealth or directly payable from Commonwealth taxes or appropriations, the level of financial support received by the issuer from the Commonwealth:

(i)     Direct obligations of the Commonwealth supported by the good faith, credit and taxing power of the Commonwealth, which includes general obligation bonds, notes and loans (sometimes referred to as "**General Obligations**" or "**GOs**");

(ii)    Tax and Revenue Anticipation Notes ("**TRANs**"), which are short-term working capital financings issued directly by the Commonwealth to address, among other things, the seasonality of tax revenues;

(iii)   Indebtedness payable primarily from Commonwealth taxes and other revenues, which includes bonds, notes and loans issued by Commonwealth entities that are directly supported by and payable, in whole or in part, from (a) special taxes imposed by the Commonwealth, such as the sales and use tax, gasoline, diesel, gas oil and petroleum product excise taxes, hotel occupancy taxes and cigarette taxes or (b) other Commonwealth revenues such as motor vehicle license fees and federal excise taxes on shipments of rum from Puerto Rico that are "covered over" to the Commonwealth's General Fund;

172

(iv)  Indebtedness payable from Commonwealth appropriations, which includes bonds, notes and loans issued by the Commonwealth or its public corporations that are payable, in whole or in part, from Commonwealth General Fund appropriations (and which are, by their terms, not supported by the good faith, credit and taxing power of the Commonwealth);

(v)  Indebtedness payable by tax-supported public corporations, which includes bonds, notes and loans issued by public corporations that *receive* significant financial support from the Commonwealth but that are payable from such public corporations' internal revenues;

(vi)  Indebtedness payable by non tax-supported public corporations, which includes bonds, notes and loans issued by public corporations that *do not receive* significant financial support from the Commonwealth and that are primarily payable from such public corporations' internal revenues;

(vii)  Indebtedness issued by municipalities, which includes (a) notes and loans provided by GDB and private banks payable from municipal property taxes, (b) Municipal Financing Authority ("**MFA**") bonds, also payable from municipal property taxes, (c) notes and loans provided by GDB and private banks payable from the municipal sales and use tax and (d) operational and other notes and loans; and

(viii)  Non-recourse debt obligations, which includes non-recourse bonds and loans issued by public corporations payable from certain non-Commonwealth resources.

    The debt of the Commonwealth and its instrumentalities is categorized in the manner set forth above only for ease of reference and to provide the reader with a framework to analyze the ultimate source of funding or repayment of such obligations. It is not an analysis of the legal or contractual rights of such debt obligations and does not seek to suggest or describe their relative priority.

## Table 1 – Debt Summary by Type of Debt

*(Figures shown in millions of dollars as of July 31, 2016)*

| | Bonds and Notes [1] | Private Loans and Others | Total Bonds and Private Loans | Loans From GDB [14] | Loans from Other PR Entities | Total Indebtedness |
|---|---|---|---|---|---|---|
| **Direct Good Faith and Credit Indebtedness** | | | | | | |
| General Obligations | $12,519 | $24 | $12,543 | $169 | - | $12,713 |
| **Tax and Revenue Anticipation Notes** | | | | | | |
| Commonwealth TRANs | - | - | - | - | - | - |
| **Indebtedness Payable Primarily from Commonwealth Taxes** | | | | | | |
| COFINA | 17,322 | - | 17,322 | - | - | 17,322 |
| HTA | 4,176 | - | 4,176 | 1,734 | - | 5,910 |
| PRIFA [2] – *Portion Guaranteed by Commonwealth* | 1,861 | - | 1,861 | - | - | 1,861 |
| PRCCDA [3] | 386 | - | 386 | 4 | - | 391 |
| MBA | - | 28 | 28 | - | - | 28 |
| Subtotal | 23,746 | 28 | 23,774 | 1,738 | - | 25,512 |
| **Indebtedness Payable Primarily from Commonwealth Appropriations** | | | | | | |
| PBA [4] – *Guaranteed by the Commonwealth* | 4,005 | - | 4,005 | 182 | - | 4,187 |
| ERS | 3,144 | - | 3,144 | - | - | 3,144 |
| PFC [5] | 1,091 | - | 1,091 | - | - | 1,091 |
| Other Agencies and Public Corporations [6] | - | - | - | 2,999 | 102 | 3,101 |
| Subtotal | 8,239 | - | 8,239 | 3,181 | 102 | 11,523 |
| **Indebtedness Payable by Tax-Supported Public Corporations** | | | | | | |
| GDB [7] – *Portion Guaranteed by the Commonwealth* | 3,811 | 203 | 4,014 | - | - | 4,014 |
| UPR [8] | 496 | 0 | 496 | 76 | - | 573 |
| PRIDCO | 159 | - | 159 | 78 | - | 237 |
| APLA – *Guaranteed by the Commonwealth* | 226 | - | 226 | 2 | - | 227 |
| HTA – Teodoro Moscoso Bonds | 140 | - | 140 | - | - | 140 |
| PRIFA – Ports and AMSCA Bonds | 226 | - | 226 | - | - | 226 |
| Other Agencies and Public Corporation | - | 0 | 0 | 609 | - | 609 |
| Subtotal | 5,058 | 204 | 5,262 | 765 | - | 6,027 |
| **Indebtedness Payable by Non-Tax-Supported Public Corporations** | | | | | | |
| PREPA [9] | 8,259 | 696 | 8,955 | 35 | 1 | 8,991 |
| PRASA [10] – *Portion Guaranteed by the Commonwealth* | 3,976 | 4 | 3,980 | 66 | 581 | 4,627 |
| Subtotal | 12,235 | 700 | 12,935 | 101 | 582 | 13,618 |
| **Municipal Indebtedness** | | | | | | |
| General Obligations (Property Tax) | - | 881 | 881 | 1,316 | - | 2,197 |
| MFA (Property Tax) [11] | 620 | - | 620 | - | - | 620 |
| SUT | - | 5 | 5 | 533 | - | 538 |
| Special Obligations and Other [12] | 13 | 207 | 221 | 236 | - | 457 |
| Subtotal | 633 | 1,093 | 1,726 | 2,085 | - | 3,811 |
| **Non-Recourse Indebtedness** | | | | | | |
| Children's Trust | 1,442 | - | 1,442 | - | - | 1,442 |
| HFA | 487 | - | 487 | 85 | - | 572 |
| PRIICO | - | 103 | 103 | - | - | 103 |
| Other Agencies and Public Corporations | - | 14 | 14 | 0 | - | 14 |
| Subtotal | 1,929 | 117 | 2,046 | 85 | - | 2,132 |
| **Total** | $64,360 | $2,166 | $66,526 | $8,124 | $684 | $75,334 |
| **Exclusions to Eliminate Double Counting** | | | | | | |
| Total Indebtedness | | | | | | $75,334 |
| Less: GDB Bonds [13] | | | | | | (3,766) |
| **Total "Public Sector Debt" Including CAB Accretion** | | | | | | $71,568 |
| Less: CAB Accretion [1] | | | | | | (2,914) |
| **Total "Public Sector Debt"** | | | | | | $68,654 |

174

**Footnotes to Table 1**

(1) Amounts shown represent unpaid principal balances plus, in the case of Capital Appreciation Bonds, accreted interest, in each case as of July 31, 2016. Amounts do not include unpaid interest, if any, and do not include principal payments on any debt made by "monoline" bond insurers, where applicable. The Commonwealth or the applicable issuer of such debt may be subject to reimbursement claims for all amounts paid by such insurers pursuant to the terms of the relevant insurance policies.

(2) Includes PRIFA Rum Bonds (payable from revenues from the federal excise tax on rum "covered over" to the P.R. Treasury Department) and PRIFA BANs (payable from a portion of the excise tax on petroleum products).

(3) Of the total $145 million loans from GDB to PRCCDA, approximately $141 million are payable directly from Commonwealth appropriations, while the remaining $4 million are payable by Commonwealth tax revenues. As a result, the $141 million of GDB loans are instead included in "Indebtedness Payable Primarily by Commonwealth Appropriations" under "Other Agencies and Public Corporations."

(4) Almost the entirety of PBA's debt is payable from rental payments paid to PBA for the use of PBA's buildings. A majority of annual rental payments received by PBA have historically been funded by General Fund appropriations. Of the approximately $182 million of loans from GDB, approximately $65 million are not payable from rents, but are expressly payable from General Fund appropriations.

(5) Table 1 excludes loans initially extended by GDB to various agencies and public corporations (including PRASA) that were transferred to PFC pursuant to Act No. 164 of 2001 and serve as the underlying source of repayment of the PFC bonds.

(6) Composed primarily of operational loans from GDB to the P.R. Treasury Department and other agencies and public corporations. Amounts loaned by GDB include approximately $141 million of loans from GBD to PRCCDA, approximately $713,000 of loans from GDB to PREPA, and approximately $49 million of loans from GDB to PRIFA that are in each case payable primarily from General Fund appropriations. Loans from Other PR Entities includes $102 million of long-term credit facilities made available to the P.R. Treasury Department by the State Insurance Fund ($100 million) and the Automobile Accidents Compensation Administration ($2 million).

(7) GDB Bonds and Notes include (i) $110 million of bonds guaranteed by the good faith and credit of the Commonwealth and purchased by the State Insurance Fund and (ii) approximately $44.8 million in bonds issued by third parties but directly guaranteed by the Tourism Development Fund ("**TDF**"), a component unit of GDB. The $203 million of Private Loans and Others represent the amount of private loans directly guaranteed by TDF; a portion of such loans are guaranteed by both GDB and TDF.

(8) UPR Bonds and Notes include approximately $64 million in bonds issued by AFICA on behalf of Desarrollos Universitarios, a blended component unit of UPR, for the purpose of financing the University Plaza Project.

(9) PREPA Bonds and Notes include bonds issued as part of restructuring negotiations with creditors. Loans from GDB exclude approximately $713,000 in loans from GDB which are instead included in "Indebtedness Payable Primarily by Commonwealth Appropriations" under "Other Agencies and Public Corporations," as such debt is payable primarily from General Fund appropriations.

(10) PRASA Bonds and Notes include (i) approximately $2.0 billion in 2012 Senior Revenue Bonds, (ii) approximately $1.3 billion of 2008 Senior Revenue Bonds, (iii) approximately $285 million in 2008 Subordinated Refunding Bonds (guaranteed by the good faith and credit of the Commonwealth) and (iii) approximately $389 million Rural Development Bonds (guaranteed by the good faith and credit of the Commonwealth and held by the U.S. Department of Agriculture). The $581 million in Loans from Other PR Entities represents loans from PRIFA (State Revolving Funds), which are also guaranteed by the good faith and credit of the Commonwealth.

(11) Table 1 excludes approximately $495 million of loans payable from property taxes held by MFA that serve as collateral for the approximately $620 million of MFA bonds outstanding. Such loans have not been shown separately in order to avoid double counting. Since the MFA bonds are obligations of MFA and not of the municipalities, total indebtedness owed directly by municipalities (as opposed to debt payable from municipal resources) is approximately $3.673 billion, which is approximately $138 million less than the $3.7811 billion in Total Municipal Indebtedness shown in the table above (while the variance between the loans payable from property taxes and the MFA bonds is approximately $125 million, the Total Municipal Indebtedness shown in the table includes approximately $13 million of AFICA bonds payable by the Municipality of Guaynabo, which increases the variance to approximately $138 million).

(12) The $13 million in municipal "Bonds and Notes" listed under "Operational and Other" represents bonds issued by AFICA for the benefit of the municipality of Guaynabo, namely the AFICA Guaynabo Government Center Bonds (approximately $7.3 million) and the AFICA Guaynabo Warehouse Bonds (approximately $6.1 million).

(13) Exclusion of GDB Bonds to eliminate double counting does not deduct third party bonds guaranteed by TDF, a component unit of GDB.

(14) The Commonwealth of Puerto Rico, through legislative acts, including Act No. 164-2001 and Act No. 24-2014, has agreed from time to time to assume, through annual legislative appropriations, the payment of certain loans extended by GDB to certain public corporations that currently lack the ability to repay such loans. Such loans, in accordance with their terms and as a result of subsequent legislative action, in certain cases thus have, as sources of repayment, both the internal revenues of such public corporation and legislative appropriations. For purposes of this table, such loans have been classified based on GDB's internal classification for their primary source of repayment.

175

**Commonwealth General Obligations**

Commonwealth General Obligations are bonds, notes and loans issued by the Commonwealth to which the good faith, credit and taxing power of the Commonwealth has been pledged. These bonds, notes and loans are normally issued pursuant to legislation enacted in connection with one or more specific series of bonds, notes or loans or, in the case of refunding bonds and notes, pursuant to legislation that generally authorizes refunding bonds and notes. Commonwealth General Obligations consist primarily of publicly issued bonds. They also included, as of July 31, 2016, a promissory note in the outstanding principal amount of $24 million issued by the General Services Administration and notes with an aggregate outstanding principal amount of $169 million issued by the Commonwealth to GDB in anticipation of one or more public bond offerings that have not been completed.

Section 8 of Article VI of the Commonwealth Constitution provides that "public debt" of the Commonwealth will constitute a first claim on available Commonwealth resources. For purposes of the Constitution, "public debt" includes only general obligation bonds and notes issued by the Commonwealth to which the good faith, credit and taxing power of the Commonwealth have been pledged (i.e. Commonwealth General Obligations) and, according to opinions rendered by the Attorney General of the Commonwealth, includes also any payments required to be made by the Commonwealth on account of bonds and notes issued by its public instrumentalities and guaranteed by the Commonwealth's good faith, credit and taxing power ("**Commonwealth Guaranteed Obligations**"). "Public debt" does not include other obligations of the Commonwealth to which the good faith, credit and taxing power of the Commonwealth are not pledged, or obligations of public corporations or municipalities that are not guaranteed by the Commonwealth.

In the event the Commonwealth has insufficient funds to pay all approved appropriations for a given fiscal year, the Constitution of Puerto Rico requires that available resources of the Commonwealth be used to pay "public debt" before being used for other purposes. Furthermore, the Constitution of Puerto Rico empowers a holder of bonds or notes evidencing "public debt" to bring suit against the Secretary of the Treasury to require application of available Commonwealth resources to the payment of principal of and interest on such public debt when due.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor declared the Commonwealth to be in a state of emergency, suspended payment of interest and principal on all Commonwealth General Obligations, suspended payments by the Commonwealth of Commonwealth Guaranteed Obligations and stayed all actions, including suits against the Secretary of the Treasury, to collect on such bonds and notes. On July 1, 2016, the Commonwealth did not pay interest or principal on its General Obligations or Commonwealth Guaranteed Obligations due on that date (other than certain interest on its General Obligations for which funds were held in escrow by the bonds' paying agents).

### *Debt Limit – General Obligations*

Section 2 of Article VI of the Constitution of the Commonwealth provides that direct obligations of the Commonwealth evidenced by bonds or notes to which the good faith, credit and taxing power of the Commonwealth have been pledged shall ***not*** be issued ***if*** the amount of

176

the principal of, and interest on, such bonds and notes and on all such bonds and notes theretofore issued that is payable in any fiscal year, together with any amount paid by the Commonwealth in the fiscal year preceding the fiscal year of such proposed issuance on account of bonds or notes guaranteed by the Commonwealth, exceed 15% of the average annual revenues raised under the provisions of Commonwealth legislation and deposited into the treasury (hereinafter, "**internal revenues**") in the two fiscal years preceding the fiscal year of such proposed issuance. Internal revenues consist principally of income taxes, sales and use taxes (other than those assigned to COFINA) and excise taxes. The Commonwealth has historically included payments due on July 1 as having been made on June 30.

As of September 30, 2016, future maximum annual debt service for the Commonwealth's outstanding General Obligations is $1.178 billion in the fiscal year ending on June 30, 2017, assuming that (i) $126.7 million principal amount of outstanding CPI-based variable rate bonds bear interest at the maximum rate of 12% per annum and (ii) $779 million of Commonwealth General Obligation debt service due on July 1, 2016 (which would be normally included in fiscal year 2016 debt service) but not paid as a result of the Moratorium Act is *not* included in fiscal year 2017 debt service (after the expiration of the moratorium period under the Moratorium Act). The amount paid by the Commonwealth in fiscal year 2016 on account of bonds or notes guaranteed by the Commonwealth was $18.8 million (paid on bonds issued by the Port of the Americas Authority and held by GDB). The sum of these debt service amounts equals $1.197 billion. The average of the Commonwealth's adjusted internal revenues for the fiscal years ended June 30, 2016 and 2015, as calculated by FAFAA, was $8.873 billion. The percentage obtained by dividing this debt service amount by the revenue amount is 13.49%.

If debt service payments of $25.3 million on PBA guaranteed debt due on July 1, 2016, but not paid as a result of the Moratorium Act were included in the calculation, the resulting percentage obtained by dividing the debt service amount by the revenue amount would increase to 13.77%.

During fiscal year 2017, it is likely that certain issuers that have issued debt guaranteed by the Commonwealth, including PBA, will be unable to meet their debt service payments. If the Commonwealth guarantee is triggered as a result, fiscal year 2017 debt service on Commonwealth guaranteed debt for purposes of the Constitutional debt limit could be significantly higher and could result in a debt service percentage of more than 15% when calculated in fiscal year 2018. Under these circumstances, the Commonwealth would be unable to issue additional General Obligations or guarantee additional debt during fiscal year 2018.

The calculations set forth above give effect to certain forbearance agreements relating to Commonwealth Guaranteed Obligations issued by PRASA and therefore do not include the payments on PRASA Bonds due on July 1, 2016 (which would be covered by the Commonwealth guaranty). However, as mentioned above, they do not give effect to the postponement of the General Obligation or Commonwealth Guaranteed Obligation debt service payments that were not made on July 1, 2016 as a result of the Moratorium Act. If such debt service payments (which under the terms of the Moratorium Act are currently due during fiscal year 2017) were to be included as part of scheduled debt service for fiscal year 2017, the debt service amount for fiscal year 2017 would be significantly higher and would result in a debt service percentage of more than 15%. Under these circumstances, the Commonwealth would be

unable to issue additional General Obligations or guarantee additional debt during fiscal year 2017.

### *Debt Limit – Commonwealth Guaranteed Obligations*

Section 2 of Article VI does not limit the amount of debt that the Commonwealth may guarantee so long as the 15% debt limitation has not been exceeded. Annual debt service payments on bonds guaranteed by the Commonwealth are not included in the calculation of the 15% debt limitation unless the Commonwealth is required to make payments under its guarantee.

### *Outstanding Commonwealth Guaranteed Obligations*

Table 2 below lists all outstanding Commonwealth Guaranteed Obligations as of July 31, 2016. A more detailed description regarding these bonds is provided below in the description of debt by type of underlying issuer.

#### Table 2 – Outstanding Commonwealth Guaranteed Obligations [1]
*(Figures shown in millions of dollars as of July 31, 2016)*

| | |
|---|---|
| PBA Bonds | $4,005 |
| PRASA Subordinated Bonds | 1,260 |
| APLA Bonds | 226 |
| GDB Bonds | 110 |
| PRIFA BANs | 78 |
| Total Commonwealth Guaranteed Obligations | $5,678 |

(1) Includes accreted interest on CABs.

### *Debt Subject to the Commonwealth "Clawback"*

Certain tax revenues of the Commonwealth have been pledged to bondholders of various public corporations subject to such revenues being re-directed to the payment of Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent other funds are not available for such purpose. Such re-direction is sometimes referred to as a "clawback." Pledged tax revenues that, by the terms of the applicable governing bond documents and statutes, are subject to the Commonwealth's "clawback" include (i) a portion of the federal excise tax on offshore shipments of rum, which is collected by the United States Government, returned (or "covered over") to the Puerto Rico Treasury Department and assigned by law to PRIFA; (ii) vehicle license fees, excise taxes on gasoline, gas oil and diesel oil, a portion of the excise tax on petroleum products and a portion of the excise tax on cigarettes, which are assigned by law to HTA; (iii) a portion of the excise tax on petroleum products, which is assigned by law to PRIFA; (iv) a portion of the excise tax on cigarettes, which is assigned by law to MBA; and (v) a portion of the hotel room tax, which is assigned by law to PRCCDA. In the event any such "clawback" is implemented, the bonds issued by these entities that are payable from such revenues would be adversely affected.

Revenues subject to the Commonwealth "clawback" have traditionally not been included as internal revenues for the purpose of calculating the Commonwealth debt limit, although they

may be available for the payment of debt service on the public debt to the extent no other resources are available for such purpose.

On January 4, 2016, the Commonwealth made a portion of the approximately $330 million payment of Commonwealth General Obligations due on that date with approximately $164 million of revenues "clawed-back" from PRIFA, HTA, PRCCDA and MBA pursuant to Executive Order No. 2015-46. The following table sets forth the revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 as of December 31, 2015 and used to make the required payment on General Obligations due on January 4, 2016, as well as the revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 from January 1, 2016 to June 30, 2016 (expressed in thousands of dollars):

**Table 3 – "Clawed-back" Revenues**
*(Figures shown in millions of dollars as of June 30, 2016)*

| Entity | Concept | Through Dec '15 | Jan. '16 – Jun. '16 | Total |
|--------|---------|-----------------|---------------------|-------|
| PRIFA | Rum Tax | $113,000 | – | $113,000 |
| PRIFA | Petroleum Products Tax | – | 12,826 | 12,826 |
| MBA | Cigarette Tax | 323 | 4,674 | 4,997 |
| PRCCDA | Hotel Room Tax | 3,033 | 9,100 | 12,134 |
| HTA | Petroleum Products Tax | 20,000 | 60,000 | 80,000 |
| HTA | Gasoline/Diesel/Licenses | 27,561 | 86,369 | 113,930 |
| HTA | Petroleum Products Tax | – | 53,638 | 53,638 |
| HTA | Motor Vehicle Fines | – | 29,117 | 29,117 |
| HTA | Motor Vehicle Licenses | – | 21,814 | 21,814 |
| HTA | Cigarette Tax | – | 11,662 | 11,662 |
| Total Amount Transferred | | $163,917 | $289,201 | $453,118 |

Of the total revenues that were retained by the Commonwealth pursuant to Executive Order No. 2015-46 from January to June 2016, (i) approximately $143.2 million are deposited in GDB and therefore subject to the limitations imposed on withdrawals of funds from GDB by Executive Order No. 2016-014 and (ii) approximately $146.0 million are deposited in a commercial bank.

The following table sets forth a list of debt payable from revenues expressly subject to "clawback" (expressed in thousands):

### Table 4 – Debt Payable from Revenues Expressly Subject to "Clawback"[1]
#### (Figures shown in millions of dollars as of July 31, 2016)

| Issuer | Outstanding Amount[2] | Source of Repayment Subject to "Clawback" |
|---|---|---|
| HTA Bonds (1968 and 1998 Resolutions) | $4,176 | Excise taxes on petrolum products, gas and diesel; motor vehicle license fees |
| PRIFA Rum Bonds | 1,783 | Federal excise tax on offshore shipments of rum |
| PRIFA BANs | 78 | Excise tax on petroleum products |
| PRCCDA Bonds | 386 | Hotel room taxes |
| MBA Line of Credit | 28 | Excise tax on cigarrettes |
| Total | $6,452 | |

(1) Includes only debt payable from revenues expressly subject to clawback pursuant to their governing documents.
(2) Includes accreted interest on CABs.


## Tax and Revenue Anticipation Notes *("TRANs")*

Since a substantial portion of the Commonwealth's tax revenues are received during the second half of the fiscal year (January through June) while operational expenditures are made evenly throughout the fiscal year, the Commonwealth normally needs short-term financing during the first half of the fiscal year (July through December). Act No. 1-1987, as amended, authorizes the Secretary of the Treasury of Puerto Rico to issue TRANs from time to time in order to bridge the working capital deficiency created by the timing of the receipt of revenues. The TRANs thus finance, throughout the year, General Fund appropriations for the current fiscal year in anticipation of the receipt of taxes and revenues to be collected in cash during that fiscal year, according to the budget estimates of the General Fund.

The TRANs statute requires taxes and revenues specified in the TRANs authorizing resolution, and received after the issuance of such notes and before the close of the fiscal year, to be deposited in a Special Tax and Revenue Anticipation Notes Redemption Fund and empowers the Secretary of the Treasury to establish a lien on all revenues deposited in such fund in favor of the holders of the TRANs.

On September 6, 2016, the Commonwealth renewed the emergency "intra-governmental" TRANs for fiscal year 2017, in the aggregate principal amount of $400 million, with the Puerto Rico State Insurance Fund, the Automobile Accidents Compensation Administration and the Labor Department's disability fund. The Commonwealth has not been able to obtain this type of financing from non-governmental third parties during the last two fiscal years.

**Other Indebtedness Payable Primarily from Commonwealth Taxes**

*Puerto Rico Sales Tax Financing Corporation ("COFINA")*

COFINA was originally created in 2006 pursuant to the provisions of Act No. 91-2006, as amended ("**Act 91**"), for the purpose of financing the payment of certain appropriation-backed debt outstanding as of June 30, 2006 payable to GDB and PFC. In 2009, the Legislative Assembly of the Commonwealth expanded the purposes for which COFINA was created to include, among other things, the payment or financing of Commonwealth operational expenses for certain subsequent fiscal years, and increased from 1% to 2.75% (one-half of the then-applicable sales and use tax rate of 5.5%) the portion of the Commonwealth sales and use tax ("**Commonwealth SUT**") that is transferred to COFINA. In 2014, the Commonwealth lowered the municipal sales and use tax by 0.5% and increased the Commonwealth SUT by the same amount (with the revenues from the 0.5% remaining for the benefit of the Municipal Administration Fund). The Commonwealth then increased the aggregate rate of the Commonwealth SUT from 6% to 10.5% by imposing a sales and use tax surcharge of 4.5%. The revenues attributable to such increase are the property of the Commonwealth and are not available to COFINA. More recently, the Commonwealth reset the portion of the SUT allocated to COFINA to the original 5.5%.

Act 91 currently requires that the following amounts of the Commonwealth SUT be transferred to COFINA, whichever is greater: (i) a minimum fixed amount, referred to as the "Pledged Sales Tax Base Amount," and (ii) the product of the amount of the Commonwealth SUT collected during such Fiscal Year multiplied by a fraction, the numerator of which is 2.75% and the denominator of which is 5.5% (the greater of (i) and (ii) being referred to as the "**Pledged Sales Tax**"). The Pledged Sales Tax is the only source of funds available to pay debt service on COFINA's senior and first subordinate bonds. The principal difference between senior and first subordinate bonds is that, during the existence of an event of default, holders of first subordinate bonds do not have the right to declare an event of default or exercise remedies until the holders of senior bonds have exercised their remedies, including acceleration, and have been fully paid.

The Statement of Motives of Act No. 56-2007, which amended Act 91, states that it is the intent of the Legislative Assembly that the Pledged Sales Taxes not be made subject to the Commonwealth "clawback." Act 91 provides that such funds (i) shall be the property of COFINA, (ii) shall not be deposited in the General Fund and (iii) shall not constitute "available resources" of the Commonwealth for any purpose, including for purposes of the priority afforded to holders of General Obligations as set forth in Section 8 of Article VI of the Constitution. However, holders of General Obligations have alleged in a recent lawsuit that such funds are "available resources" for purposes of the Commonwealth Constitution. See LITIGATION.

In order to comply with these provisions, all sales and use tax revenues, including the Pledged Sales Tax, are collected, transferred and deposited through independent third parties. Specifically, merchants remit sales and use tax collections and returns to a third-party financial institution responsible for verifying amounts received and transferring them to the COFINA trustee. Once the amounts required to be deposited with the COFINA trustee have been transferred, the third-party financial institution will then allocate and transfer incoming sales and use tax revenues to the Commonwealth and, in the event certain thresholds are

exceeded, between COFINA and the Commonwealth. As a result, the Pledged Sales Tax is never on deposit in the General Fund or the Secretary of the Treasury's Treasury Single Account.

The following table sets forth the principal amount outstanding of publicly issued senior and subordinated COFINA bonds, the amount of CAB accretion on such bonds since their issuance, which is significant, and the resulting total outstanding principal amount (including accretion) of each class of COFINA bonds. Totals may not add due to rounding.

### Table 5 – COFINA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| COFINA Senior Bonds | $6,273 | $1,317 | $7,590 |
| COFINA Subordinated Bonds | 8,939 | 793 | 9,732 |
| Total COFINA | $15,213 | $2,110 | $17,322 |

A significant amount of COFINA bonds have been issued as CABs. The nominal amount of accretion to maturity on all COFINA CABs currently outstanding is approximately $20 billion (including the approximately $2.1 billion in accretion as of July 31, 2016).

The Executive Orders issued under the Moratorium Act have not included COFINA or affected its pledged revenues and COFINA has continued to pay debt service on its bonds as scheduled.

### *Puerto Rico Highways and Transportation Authority ("HTA")*

The table below details outstanding (i) HTA bonds issued under its two primary bond resolutions (known as the "1968" and the "1998" bond resolutions), (ii) bonds issued under HTA's Teodoro Moscoso Bridge bond indenture and (iii) loans outstanding (all with GDB), in each case as of July 31, 2016:

### Table 6 – HTA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| 1968 Resolution Bonds | $806 | $9 | $815 |
| 1998 Resolution Bonds | 3,324 | 37 | 3,361 |
| Teodoro Moscoso Bonds | 123 | 18 | 140 |
| Total HTA Bonds | $4,253 | $64 | $4,316 |
| GDB Loans | 1,734 | - | 1,734 |
| Total HTA Debt | $5,986 | $64 | $6,050 |

### *1968 Resolution*

Bonds issued under the 1968 Resolution (the "**1968 Resolution Bonds**") are secured by, and payable from, pledged tax and fee revenue including (i) gasoline excise taxes, (ii) gas oil and diesel excise taxes, and (iii) motor vehicle license fees. The bonds are also secured by the tolls or other charges imposed by HTA for the use of PR-20, PR-52 and PR-53.

182

*1998 Resolution*

Bonds issued under the 1998 Resolution (the "**1998 Resolution Bonds**") are secured by, and payable from, excess unencumbered revenues from the 1968 Resolution Bonds and other pledged revenues including pledged petroleum products taxes and tolls or other charges imposed by the authority for the use of PR-66.  The 1998 Resolution provide for both senior and subordinate 1998 Resolution Bonds.

As described above, the tax revenues and license fees pledged to the 1968 and 1998 Resolution Bonds are subject to the "clawback".  Toll revenues pledged to the 1968 and 1998 Resolution Bonds, however, are not subject to the clawback.

Separately, HTA also receives additional pledged taxes from vehicle license fees, cigarette excise taxes and excess petroleum products excise taxes that are not pledged assigned to any bonds but are pledged to the repayment of GDB lines of credit. These are also subject to the "clawback".

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended HTA's obligation to transfer pledged funds to the trustee of the 1968 and 1998 Resolution Bonds, and directed HTA to use any such funds remitted to HTA for the provision of essential services. The fiscal agent of the 1968 and 1998 Resolution Bonds paid interest and principal on such bonds (except subordinate bonds issued under the 1998 resolution) on July 1, 2016 using available funds, including debt service reserves. In the case of the subordinated bonds issued under the 1998 resolution, the debt service reserves are held at GDB and have not been available to pay such bonds as a result of the limitations on withdrawal of deposits imposed by the Executive Orders issued under the Moratorium Act.

***HTA's Teodoro Moscoso Bridge Special Facility Revenue Refunding Bonds.*** HTA and Autopistas de Puerto Rico y Compañía, S.E. ("**Autopistas**") are parties to a Concession Agreement dated as of December 20, 1991, pursuant to which Autopistas constructed and is entitled to operate the "Teodoro Moscoso Bridge," a toll bridge spanning the San José Lagoon, which opened for traffic in February of 1994. In order to pay for a portion of the costs related to the construction of the bridge, HTA issued its revenue bonds and loaned the proceeds thereof to Autopistas. Under the loan agreement with Autopistas, Autopistas agreed to repay the loan solely from the revenues generated by the bridge (net of the bridge's operating and maintenance expenses). Under the HTA trust agreement pursuant to which the bonds were issued, such net revenues are pledged to secure the payment of the bonds. The Concession Agreement is scheduled to terminate on February 24, 2044. However, Autopistas has the option to terminate the Concession Agreement if bridge traffic is below certain levels specified in the Concession Agreement. Bridge traffic has in fact been below these levels and is expected to continue to be below these levels for the foreseeable future. As a result, Autopistas has and is expected to continue to have the option to terminate the Concession Agreement. In the event that Autopistas exercises its right to terminate the Concession Agreement, HTA would be obligated to assume the obligation to pay the bonds. Upon such assumption, if permitted under its 1998 bond resolution, HTA would be required to issue bonds thereunder in exchange for the bridge bonds. If the Authority cannot issue bonds under its 1998 bond resolution because it does not meet the additional bonds test, the bridge bonds would continue to be payable from available bridge net toll revenues and from any other revenues available to HTA after payment of debt service on its

183

senior and subordinated bonds. Based on the fiscal year 2015 audited results and most recent interim results, unless traffic or rate levels improve, expenses are further reduced, or an external capital infusion is made, HTA has identified a significant risk that Autopistas will exercise its termination right in the medium term as net revenues and reserve account deposits may not be sufficient to cover scheduled debt service obligations.

*HTA Loans with GDB*. As of July 31, 2016, HTA had approximately $1.73 billion in loans with GDB outstanding.  As described above, these loans are backed by a portion of the motor vehicle license fees, cigarette excise taxes and excess petroleum products excise taxes that are not pledged or assigned to the 1968 and 1998 Resolution Bonds.  HTA loans with GDB constitute a material portion of GDB's balance sheet. However, HTA's obligation to transfer the revenues pledged for the payment of HTA's outstanding loans with GDB was modified by Executive Order 2016-31, issued pursuant to the Moratorium Act, which modifies HTA's obligation to transfer these pledged revenues to the extent necessary to provide HTA with the revenues it requires to fund operating expenses or essential services.

For a discussion of HTA's funding sources and current financial condition, see "PUBLIC CORPORATIONS – Puerto Rico Highways and Transportation Authority"

### Puerto Rico Infrastructure Financing Authority

PRIFA is authorized to issue bonds and provide loans, grants and other financial assistance for the construction, acquisition, repair, maintenance and reconstruction of infrastructure projects by such entities. Bonds issued by PRIFA are primarily payable from specific taxes or funding sources, such as federal rum excise tax revenue or petroleum products taxes.

The table below lists PRIFA bonds and loans outstanding as of July 31, 2016.  Since the PRIFA Port Authority Bonds and the PRIFA AMSCA Bonds are not payable primarily from Commonwealth taxes or other revenues, these bonds are described elsewhere herein based on their source of repayment.

### Table 7 – PRIFA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Principal | CAB Accretion | Total Outstanding |
|---|---|---|---|
| PRIFA Rum Bonds | $1,622 | $160 | $1,783 |
| PRIFA Port Authority Bonds[1] | 191 | - | 191 |
| PRIFA AMSCA Bonds | 36 | - | 36 |
| PRIFA BANs[2] | 78 | - | 78 |
| Total PRIFA Bonds | $1,926 | $160 | $2,087 |
| GDB Loans | 49 | - | 49 |
| Total PRIFA Debt | $1,975 | $160 | $2,137 |

(1)  Covered by a GDB letter of credit.
(2)  Guaranteed by the good faith, credit and taxing power of the Commonwealth.

**PRIFA Rum Bonds**

PRIFA oversees the Puerto Rico Infrastructure Fund, which under PRIFA's enabling statute is funded annually through fiscal year 2052 with the first $117 million of proceeds of federal excise taxes imposed on rum and other articles produced in Puerto Rico and sold in the United States that are transferred to Puerto Rico pursuant to the U.S. Code. Rum is the only article currently produced in Puerto Rico subject to federal excise taxes (except for negligible collections for other alcoholic beverages), the proceeds of which are required to be returned (or "covered over") from the U.S. Government to the Puerto Rico Treasury Department. PRIFA has periodically issued bonds backed by such federal excise taxes (the "**PRIFA Rum Bonds**"), the proceeds of which have been used to finance various infrastructure projects. As of July 31, 2016, approximately $1.783 billion in PRIFA Rum Bonds were outstanding (including CAB accretion).

As noted above, revenues assigned by law to PRIFA and pledged for the repayment of the PRIFA Rum Bonds are subject to the Commonwealth "clawback," and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended the obligation to transfer pledged funds to the trustee of the PRIFA Rum Bonds. On January 1, 2016, and July 1, 2016, PRIFA did not pay interest or principal on the PRIFA Rum Bonds, and the trustee does not currently hold any reserves for the payment of such bonds.

**PRIFA Bond Anticipation Notes**

In January of 2015, the Commonwealth enacted a new excise tax of $6.25 per barrel on petroleum products (other than diesel) and assigned by law the revenues of such tax to PRIFA. On March 17, 2015, PRIFA issued approximately $246 million of bond anticipation notes payable from such petroleum products excise tax (the "**PRIFA BANs**"). The proceeds of the PRIFA BANs, which are guaranteed by the good faith, credit and taxing power of the Commonwealth, were used to refinance certain bond anticipation notes previously issued by HTA. As of July 31, 2016, approximately $78 million in PRIFA BANs were outstanding.

Revenues assigned to PRIFA and pledged for the repayment of the PRIFA BANs may be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended PRIFA's obligation to transfer pledged funds to the trustee of the PRIFA BANs. The Executive Orders also declared the Commonwealth to be in a state of emergency and suspended the Commonwealth's payment obligations under Commonwealth Guaranteed Obligations. Although payments of principal and interest on these notes through July 1, 2016 were made from funds on deposit with the trustee, including reserves, these funds have how now been exhausted and no additional debt service payment can be made unless pledged funds are transferred to the trustee

once again. On August 1, 2016 and September 1, 2016, PRIFA did not pay interest or principal on these bonds.

### *Puerto Rico Convention Center District Authority ("PRCCDA")*

PRCCDA's bonds are secured by a pledge of a portion of the hotel room tax, which is collected by the Puerto Rico Tourism Company and transferred, through GDB, to the trustee of the bonds. Such funds are not collected by the Treasury Department or deposited in the TSA. However, such funds are subject to the Commonwealth "clawback" and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose. As of July 31, 2016, approximately $386 million in bonds issued by PRCCA were outstanding.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended the Tourism Company and PRCCDA's obligation to transfer pledged funds to GDB and also suspended PRCCDA and GDB's obligations to transfer pledged funds to the trustee of the PRCCDA bonds. Although payments of principal and interest on these notes were made during fiscal year 2016 partly out of funds available in existing debt service and reserve accounts, PRCCDA is currently projected to miss the contractual debt service payment due July 1, 2017 unless the transfer of pledged funds is restarted.

### *Puerto Rico Metropolitan Bus Authority ("MBA")*

In order to assist MBA in its corporate purpose mission, the Legislative Assembly assigned $10 million of the cigarette excise tax to MBA. This assignment is subordinate to the assignment under Act 30-2013 of $20 million of the cigarette excise tax to HTA.

MBA pledged the revenues derived from its portion of the cigarette excise tax as the sole source of repayment of a loan provided by a commercial bank. Such loan, as of July 31, 2016, had an outstanding principal amount of approximately $28 million. Pursuant to Executive Orders issued under the Moratorium Act, MBA was declared to be in a state of emergency and the Commonwealth's obligation to transfer cigarette excise taxes to MBA and MBA's obligation to make any payments on its outstanding debt were suspended. As a result, the MBA is currently in default under the loan, as it has not received any amounts from the Commonwealth in order to make the payments due thereunder. Recently, the commercial bank's parent company, which recently acquired the loan from its subsidiary, has declared a default under the loan agreement and has commenced litigation against MBA, but is currently prohibited from exercising remedies due to the stay under the Moratorium Act and PROMESA.

Revenues assigned to MBA and pledged for the repayment of its loans are subject to the Commonwealth "clawback" and may therefore have to be applied first to the payment of debt service on Commonwealth General Obligations and Commonwealth Guaranteed Obligations to the extent that no other revenues are available for such purpose.

**Indebtedness Payable from Commonwealth Appropriations**

### *Puerto Rico Public Buildings Authority ("PBA")*

As of July 31, 2016, PBA had approximately $4.005 billion in bonds outstanding, issued primarily to finance the construction of governmental facilities that are thereafter leased to the Commonwealth and its instrumentalities.

Lease payments made to PBA by the Commonwealth, its public corporations or municipalities in consideration for the use of such facilities constitute the sole source of repayment for PBA's bonds. Most of such lease payments are subject to legislative appropriations from the Commonwealth's General Fund budget.

PBA's lease payments and its bonds are, however, guaranteed by the good faith, credit and taxing power of the Commonwealth. PBA bonds therefore constitute Commonwealth Guaranteed Obligations. PBA is currently authorized by law to have outstanding at any one time up to $4.7 billion of bonds guaranteed by the Commonwealth.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor suspended the obligation of the Commonwealth and its departments and agencies to make lease payments to PBA, suspended PBA's obligation to transfer pledged funds to the fiscal agent under its bond resolutions, and suspended payment of interest and principal on all bonds and notes guaranteed by the Commonwealth. On July 1, 2016, PBA paid interest and a portion of the principal due on its bonds from funds on deposit with the bonds' trustee and certain federal subsidy payments, but did not pay the full amount of principal due on such bonds. No further debt service payments are expected to be made while the moratorium remains in effects except from funds on reserve for the PBA Series L bonds (which are expected to continue making debt service payments from available reserves) and from federal subsidy payments.

### *Employees Retirement System ("ERS")*

During 2008, ERS issued its Senior Pension Funding Bonds (the "**Pension Bonds**") as limited, non-recourse obligations of ERS payable solely from, and secured solely by, the employer contributions made to ERS by participating employers in the ERS pension plans. As of July 31, 2016, approximately $3.144 billion in Pension Bonds were still outstanding. The purpose of this offering was to increase the assets of ERS available to invest and pay benefits.

ERS had, as of June 30, 2016, approximately 118,664 active employees in the plan, of which 71,006, or 60%, were Commonwealth employees. Therefore, a majority of the employer contributions to the ERS, which are set as a percentage of employee payroll, are funded by legislative appropriations from the General Fund. Furthermore, a significant number of participating employers, such as HTA, MBA, PRMSA, PRTC, PRIDCO, PRCCDA, are themselves tax-supported public corporations. Entities included in the Proposed PROMESA Fiscal Plan account for approximately 79% of employer contributions to the ERS. Municipalities, which also receive significant Commonwealth subsidies each year, are all participating employers in the ERS.

187

Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended the Commonwealth's obligation to transfer employer contributions to ERS (up to an amount equal to the debt service payable by ERS during fiscal year 2016-2017) and suspended ERS's obligation to transfer pledged funds to the trustee under its bond resolution. ERS has so far been able to pay debt service on its bonds in full from funds held by the trustee under its bond resolution. However, assuming no additional employer contributions or other funds are transferred to the ERS bond trustee, it is expected that these reserves will be completely depleted, and that ERS will be able to make additional debt service payments from its reserves only up to May 2017.

### *Puerto Rico Public Finance Corporation ("PFC")*

PFC was established in November 1984 to provide agencies and instrumentalities of the Commonwealth with alternate means of meeting their financing requirements. The bond trustees of certain limited obligation bonds issued by PFC currently hold notes payable by the Commonwealth, the Maritime Shipping Authority, the Office for the Improvement of Public Schools, the Department of Health and PRASA, among others. All such PFC bonds are limited, non-recourse obligations of PFC payable solely from Commonwealth appropriations made to pay debt service on the notes held by the bond trustees. As of July 31, 2016, approximately $1.091 billion in PFC bonds were outstanding.

On August 1, 2015, PFC failed to make most of the payment due on such date on its bonds as a result of a failure by the Legislative Assembly to appropriate funds for such payment. Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended any obligation of the Legislative Assembly to appropriate funds for the payment of PFC bonds. PFC was unable to pay in full a debt service payment due on August 1, 2015, and has not paid any debt service since that date. PFC is not expected to make any additional debt service payments during fiscal year 2017.

### *Port of the Americas Authority*

As of July 31, 2016, APLA had approximately $226 million in bonds outstanding. The bonds, which are guaranteed by the Commonwealth pursuant to Act No. 409-2004, are all held by GDB. The Commonwealth had recently been paying debt service on these Commonwealth Guaranteed Bonds by including appropriations in its General Fund budget to this effect, discharging its obligation under its guaranty.

While the responsibility for the development and operation of the Port of the Americas was transferred from APLA to the Ponce Ports Authority in December 2011, APLA retains the liability for the outstanding bonds. Since the revenues and other moneys of APLA pledged to the payment of such principal and interest are not sufficient (and are unlikely to be sufficient in the future) to pay the bonds, the Commonwealth, subject to the Moratorium Act, expects to continue to be required to make debt service payments under the Commonwealth guarantee.

Pursuant to Executive Order 2016-30 issued under the Moratorium Act, the Governor suspended the Commonwealth's obligations to pay interest and principal on all bonds and notes guaranteed by the Commonwealth, including the APLA bonds.

### PRIFA – AMSCA and Other GDB Loans

PRIFA issued bonds to fund the acquisition of certain facilities leased to the Mental Health and Anti-Addiction Services Administration ("**AMSCA**"). These bonds are payable from lease payments made by AMSCA, whose revenues are primarily General Fund appropriations. Except in the case of fiscal year 2017, annual payments on the AMSCA bonds have historically been included as appropriations in the Commonwealth's General Fund budget. As of July 31, 2016, approximately $36 million in AMSCA bonds were outstanding.

In addition, PRIFA had, as of July 31, 2016, approximately $49 million of loans payable to GDB. The primary source on repayment on these PRIFA loans has traditionally been General Fund appropriations.

### Other Central Government Indebtedness Payable by Commonwealth Appropriations

The Commonwealth, including the Treasury Department, has also borrowed from GDB and from private banks under lines of credit and through the issuance of notes purchased by GDB to finance ongoing operating and capital expenditures.

As of July 31, 2016, the Commonwealth had approximately $3.531 billion in principal amount of loans and notes outstanding that are payable from Commonwealth appropriations. Approximately $3.429 billion of such borrowings are payable to GDB, $100 million are payable to the State Insurance Fund, and $2 million are payable to the Automobile Accident Compensation Administration.

## Indebtedness Payable by Tax-Supported Public Corporations

### Government Development Bank for Puerto Rico ("GDB")

GDB historically provided financing to the Commonwealth, its public corporations and its municipalities. While certain of these loans were used to finance capital expenditures, in many cases in anticipation of the issuance of bonds and notes, GDB loans were also used to cover operational deficits of the Commonwealth and its instrumentalities.

As funding during the past decade for such financings, GDB relied primarily on issuances of senior unsecured notes ("**GDB Notes**") and public sector deposits. As of July 31, 2016, GDB had approximately $3.766 billion principal amount of GDB Notes outstanding, $110 million of which are guaranteed by the good faith, credit and taxing power of the Commonwealth and held by the State Insurance Fund. Outstanding principal on GDB Notes reached its highest point during fiscal year 2012, when approximately $6.107 billion in GDB Notes were outstanding.

GDB's primary source of income is loan repayments from its public sector loan portfolio. GDB's loan portfolio is primarily comprised of loans to the Commonwealth and its instrumentalities payable from Commonwealth appropriations or from tax revenues assigned to certain instrumentalities, such as HTA, who have pledged such tax revenues to GDB as source of repayment for its loans. As a result of the current financial condition of the Commonwealth and many of its instrumentalities, including HTA, the Commonwealth and these instrumentalities have been unable to repay their loans to GDB in accordance with their terms, which has resulted

in GDB lacking sufficient liquidity (or market access) to honor its debt service obligations. In light of GDB's financial situation, an appropriation to cover GDB's operating costs have been included in the Commonwealth's fiscal year 2017 General Fund budget.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor declared GDB to be in a state of emergency and limited withdrawals, payments and transfer requests to those that are reasonable and necessary to fund the provision of essential services by the Commonwealth. The Executive Orders also suspended payment of GDB debt obligations (other than certain interest obligations that are payment-in-kind), including its obligation to honor certain letters of credit issued by GDB for the benefit of holders of PRIFA Ports Bonds indebtedness, although GDB may request the Governor's authorization to pay interest on its bonds to the extent its liquidity permits. GDB has been unable to fully meet its debt service obligations in full since May 1, 2016, and does not currently expect to make additional debt service payments while the moratorium is in effect.

### *University of Puerto Rico ("UPR")*

UPR's primary source of revenue is budgetary appropriations from the Commonwealth's General Fund, which amount to approximately 70% of the UPR's annual revenues.

The bonds issued by UPR under its trust indenture are general obligations of UPR and are secured by (i) tuition fees, (ii) student fees, (iii) rental and other charges for the right of use or occupancy of the University's facilities, (iv) net bookstore receipts and (v) certain other revenue sources. Appropriations from the Commonwealth and grants from the U.S. Government are excluded; however, in the event that the pledged revenues are insufficient to pay the bonds, UPR may opt to provide monies from other funds available, including funds appropriated by the Commonwealth. UPR also covenants to set university fees so that the pledged revenues, together with any other funds, will be sufficient to pay principal and interest payments on the bonds. As of July 31, 2016, approximately $432 million in UPR revenue bonds were outstanding.

In addition to the bonds issued by UPR under its trust indenture, as of July 31, 2016, AFICA had $64 million outstanding principal of bonds issued to fund the construction of certain buildings and parking facilities commonly known as University Plaza that are leased to UPR. The proceeds of the bonds were loaned to Desarrollos Universitarios, a not-for-profit corporation that is a component unit of UPR, which built the facilities and leased them to UPR. The bonds are limited obligations of AFICA payable from loan repayments by Desarrollos Universitarios, which are in turn payable from lease payments under the UPR lease agreement. The lease payments are in turn secured by a subordinated lien on UPR revenues.

As of July 31, 2016, the UPR also had approximately $76 million in loans from GDB.

190

The table below provides additional detail with respect to UPR's outstanding bonds.

**Table 8 – UPR Indebtedness**
*(Figures shown in millions of dollars as of July 31, 2016)*

|                                          | Outstanding Principal |
| ---------------------------------------- | --------------------- |
| UPR Revenue Bonds                        | $432                  |
| AFICA – Desarrollos Universitarios Bonds | 64                    |
| Total UPR Bonds                          | $496                  |
| GDB Loans                                | 76                    |
| Total UPR Debt                           | $572                  |

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended UPR's obligation to transfer pledged revenues to the trustee of the UPR bonds.

### Puerto Rico Industrial Development Company ("PRIDCO")

PRIDCO bonds are secured by rentals derived from the leasing of certain industrial buildings built by PRIDCO and leased to private firms and, if required, from any other available funds at PRIDCO. As of July 31, 2016, PRIDCO had approximately $159 million in bonds outstanding (including CAB accretion) and $78 million in GDB loans.

PRIDCO receives support from the central government in the form of (i) transfers of corporate tax revenues deposited in the special fund for economic development (also known as "**FEDE**," for its acronym in Spanish), which PRIDCO utilizes to fund several of its industrial incentives programs, and (ii) an amount equivalent to 2.5% of the total revenues from the federal excise tax on shipments on rum that are "covered over" to the Commonwealth, in an amount not to exceed $10 million each fiscal year, for the benefit of the "Rums of Puerto Rico" incentive program. Furthermore, PRIDCO, pursuant to agreements signed pursuant to Act No. 178-2010 ("**Act 178**"), distributes to certain local rum producers up to their 46% share of the revenues from the federal rum excise tax corresponding to the rum sales of such rum producers. Finally, the income from rental payments on PRIDCO buildings is partially dependent on tax incentives (i.e. tax expenditures) granted by PRIDCO to foreign and local corporations that establish operations in Puerto Rico pursuant to Act No. 73-2008, also known as the Economic Incentives Act.

Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended PRIDCO's obligation to transfer pledged funds to the trustee under its bond indenture.

### PRIFA - Port Authority Bonds

As of July 31, 2016, PRIFA had $191 million principal amount outstanding of its Revenue Bonds (Ports Authority Project), Series 2011A, 2011B and 2011C (the "**PRIFA Ports Bonds**"). The PRIFA Ports Bonds are limited obligations of PRIFA that are secured by the Ports Authority's obligation to make payments under a Loan and Trust Agreement entered into by and between PRIFA and the Ports Authority, which was assigned to the trustee as security for such bonds. The PRIFA Ports Bonds are further secured by two direct pay letters of credit issued by

191

GDB on behalf of the Ports Authority that may be drawn upon by the trustee. The bonds were marketed based on GDB's credit enhancement and the trustee of the PRIFA Ports Bonds has relied on draws on GDB's letters of credit to pay interest on the bonds and to repurchase bonds at maturity, as the Ports Authority has lacked internal funds or market access to honor such obligations without GDB support. As of July 31, 2016, GDB had paid approximately $479 million in PRIFA Ports Bonds under its letters of credit. The Ports Authority has reimbursed approximately $266 million of this amount to GDB from the proceeds of the concession of the Luis Muñoz Marín International Airport. The current balance of approximately $211 million has been converted into a five-year term loan intended to be repaid from legislative appropriations.

Pursuant to Executive Orders issued under the Moratorium Act, the Governor suspended GDB's obligation to honor its letters of credit and suspended the Ports Authority's obligation to make monthly transfers to the trustee of the PRIFA Ports Bonds. Although the June 15, 2016 interest payment was made in full from funds held by the bond trustee, such funds have now been exhausted. PRIFA Port bonds do not have a debt service reserve or debt service account established.

### Other Central Government Entities

As of July 31, 2016, ADEA had a $338,000 loan payable to a private bank.

## Indebtedness Payable by Non-Tax Supported Public Corporations

### Puerto Rico Electric Power Authority ("PREPA")

PREPA's bonds and notes are payable from the revenues derived by it from the sale of electricity, after payment of operating expenses. As of July 31, 2016, PREPA had approximately $8.259 in Power Revenue Bonds outstanding. As of such date, PREPA also had approximately $696 million in loans with private banks, approximately $36 million in loans with GDB and approximately $1 million in loans with other Commonwealth entities.

PREPA does not receive any direct support in the form of taxes or appropriations from the Commonwealth or its instrumentalities. The Commonwealth and its instrumentalities are, however, comprise approximately 12% of PREPA's electricity sales. In the past, the Commonwealth and its instrumentalities have financed working capital deficits by delaying payments to PREPA.

For a discussion of PREPA's recent efforts to restructure its debt through agreements with its creditors, see "PUBLIC CORPORATIONS - Puerto Rico Electric Power Authority."

### Puerto Rico Aqueduct and Sewer Authority ("PRASA")

PRASA's bonds and notes are payable from the revenues derived by it from the sale of water and wastewater services. PRASA's bonds and notes include bonds with a claim on PRASA's gross revenues that is senior to its operating expenses. As of July 31, 2016, approximately $3.298 billion in senior revenue bonds were outstanding.

In addition, PRASA has bonds and loans payable from revenues remaining after the

192

payment of debt service on the senior bonds and operating expenses. Such subordinate debt obligations include approximately $285 in subordinate bonds issued in 2008 and guaranteed by the good faith and credit of the Commonwealth. They also include approximately $394 million in "Rural Development" bonds purchased by the U.S. Department of Agriculture and approximately $581 million in loans from the Commonwealth's State Revolving Funds. Both the Rural Development bonds and the State Revolving Funds loans are Commonwealth Guaranteed Obligations.

PRASA also has approximately $66 million in loans from GDB and $4 million in loans from private parties.

The following table sets forth PRASA's outstanding indebtedness.

### Table 9 – PRASA Indebtedness
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | Outstanding Principal | Amount Guaranteed by the Commonwealth |
|---|---|---|
| 2008 Senior Revenue Bonds[1] | $1,299 | - |
| 2012 Senior Revenue Bonds | 1,999 | - |
| 2008 Suborbidated Revenue Bonds | 285 | $285 |
| Subordinated Rural Development Bonds | 394 | 394 |
| Total PRASA Bonds | $3,976 | $679 |
| GDB Loans | 66 | - |
| PRIFA Loans (State Revolving Funds) | 581 | 581 |
| Loans from Private Lenders | 4 | - |
| Total PRASA Debt | $4,627 | $1,260 |

(1) Includes $28 million of CAB accretion.

PRASA does not currently receive any direct support in the form of taxes or appropriations from the Commonwealth or its instrumentalities (except for ordinary course charges for water and wastewater services). However, PRASA has in the recent past been subsidized with Commonwealth General Fund appropriations and sizable interim loans from the GDB. As discussed above, the Commonwealth also guarantees a significant portion of PRASA's indebtedness. Furthermore, the Commonwealth and its instrumentalities comprise approximately 13% of PRASA's sales of water and wastewater services. In the past, the Commonwealth and its instrumentalities have financed working capital deficits by delaying payments to PRASA.

For a discussion of PRASA's recent operational and financial challenges, see "PUBLIC CORPORATIONS – Puerto Rico Aqueduct and Sewer Authority."

## Municipal Indebtedness

Municipal debt, other than bond anticipation notes, is supported by real and personal property taxes, municipal license taxes, and municipal sales taxes. Municipal debt is issued pursuant to ordinances adopted by the respective municipal legislatures.

Pursuant to Act No. 64 of July 3, 1996, as amended (the "**Municipal Financing Act**"), municipalities are authorized to borrow money through obligations evidenced by bonds, notes or other instruments. These include (i) general obligations bonds and notes, secured by the full faith, credit and taxing power of the municipality, (ii) obligations payable from municipal sales and use taxes ("**SUT obligations**"), and (iii) special obligations payable from various sources.

### *Municipal General Obligations*

The principal source of repayment of municipal general obligations is an "additional special property tax" that may be imposed by a municipality without limitation as to rate or amount on all taxable property in such municipality (the "**CAE Tax**"). The Municipal Financing Act requires that each municipality levy a CAE Tax that is sufficient to cover the debt service on all outstanding general obligations. If, however, a municipality's CAE Tax revenues are insufficient to make the debt service payments on its outstanding general obligations, said municipality's operating revenues are required to be used to cover such debt service payments. A municipality's operating revenues are all the revenues received by such municipality for the payment of its operating expenses, including, but not limited to: (i) the revenues from a basic property tax of up to 6% on the appraised value of all non-exempt real property and 4% on the appraised value of all non-exempt personal property, which the municipalities are authorized to levy (collectively, the "**Basic Tax**"); (ii) the revenues from the sales and use tax deposited by the Treasury Secretary in the Municipal SUT Development Fund; (iii) the remittances of operating funds sent by CRIM to the municipality; (iv) allocations or contributions received by the municipality from any government agency or instrumentality; and (vi) municipal business licenses, revenues, and any other recurring or non-recurring municipal revenues. As of July 31, 2016, approximately $2.197 billion in municipal general obligations were outstanding (excluding approximately $495 million of municipal general obligations held by MFA).

CRIM, is responsible for the assessment, collection and distribution of all property taxes, including the CAE Tax, the Basic Tax, and a special tax of 1.03% on the appraised value of all non-exempt real and personal property dedicated to the payment of Commonwealth General Obligations (the "**Special Tax**").

The collections from the Basic Tax, the Special Tax and the CAE Tax are initially deposited in a trust fund known as the Municipal Matching Fund, where GDB serves as Trustee, and Banco Popular de Puerto Rico ("BPPR") serves as Custody Bank. Revenues from the Additional Lottery System and the net internal revenues from the Commonwealth's General Fund corresponding to the municipalities, and any other funds provided by law for the municipalities are also deposited in the Municipal Matching Fund.

From the Municipal Matching Fund, the collections that correspond to the Special Tax are transferred to the Commonwealth General Obligation Redemption Fund and those that correspond to the CAE Tax and any other revenues that are needed to service the municipalities' general obligations are transferred to the Municipal Public Debt Redemption Fund. The remaining monies in the Municipal Matching Fund are eventually distributed among the municipalities following specific rules and formulas set forth by law.

As required by law, CRIM established the Municipal Public Debt Redemption Fund, a trust in which GDB acts as Trustee and BPPR as Custody Bank, for the deposit of any CAE Tax

it collects on behalf of the municipalities. Pursuant to the Trust Deed, the Municipal Public Debt Redemption Fund is composed of two Sub Funds: (i) GDB Sub Fund and (ii) MFA/Private Sector Sub Fund. In the GDB Sub Fund, CRIM is required to deposit on a monthly basis CAE Tax revenues necessary to meet annual debt service on bonds, notes and loans issued by GDB, as determined by FAFAA as fiscal agent. In the MFA/Private Sector Sub Fund, CRIM is required to deposit on a monthly basis CAE Tax revenues necessary to meet annual debt service on bonds issued by MFA and notes, bonds and loans issued by private banks, as determined by FAFAA as fiscal agent. The GDB Sub Fund remains at GDB and the MFA/Private Sector Sub Fund is held at BPPR's Trust division. Since approximately April of 2016, CRIM has not been depositing CAE Tax revenues in the GDB Sub Fund, arguing that they are offsetting "excess" CAE Tax revenues that remain deposited at GDB.

GDB, as trustee and paying agent of the Municipal Public Debt Redemption Fund, is required to pay the principal and interest on municipal general obligations from the funds deposited in the account of each municipality in said fund. If FAFAA, as fiscal agent, determines that the deposits in a municipality's account in the Municipal Public Debt Redemption Fund are not sufficient to cover the payment of principal or interest on any outstanding general obligation, CRIM is required to transfer to said account other revenues from that individual municipality deposited in the Municipal Matching Fund. Once a reserve equivalent to twelve months of debt service on all outstanding general obligations is funded, any surplus in the Municipal Public Debt Redemption Fund is placed at the disposal of the municipality.

### *Municipal Finance Agency ("MFA")*

MFA is authorized to issue bonds to purchase general obligation bonds and notes of Puerto Rico municipalities and to fund a debt service reserve. Debt service on MFA's bonds is payable from debt service payments on municipal bonds and notes held by MFA and from the debt service reserve, including investment income thereon. The Commonwealth has agreed to pay such amounts to the debt service reserve as may be necessary to maintain it at its required level, subject to appropriation by the Legislative Assembly, which appropriation is authorized but not legally required to be made. To date, no such payments have been required and all principal and interest payments required to be made on outstanding bonds of MFA have been made on a timely basis.

As of July 31, 2016, MFA had approximately $620 million in bonds outstanding.

### *Municipal Sales and Use Tax Obligations*

Municipal sales and use tax obligations are municipal obligations payable from the municipal sales and use tax (the "**Municipal SUT**") and for the payment of which the municipality has committed the monies deposited in the "SUT Redemption Fund" or the "SUT Development Fund," which are accounts established with the GDB in which the Secretary of the Treasury deposits some of the revenues from the Municipal SUT collected by the Secretary for the benefit of the municipalities.

As of July 31, 2016, approximately $538 million in municipal obligations payable from the Municipal SUT were outstanding.

*Municipal Special Obligations*

Municipal special obligations are payable only from the revenues derived from one or more specific sources of income pledged by the issuer. They are not secured by the issuer's full faith, credit and taxing power and are subordinated to general obligations. The sources of payment for special obligations include Basic Taxes, other funds in the Municipal Matching Fund, and moneys in the Municipal Public Debt Redemption Fund to the extent not used to pay general obligations.

As of July 31, 2016, approximately $443 million in municipal special obligations were outstanding.

*Other Municipal Obligations - AFICA Guaynabo Government Center Bonds and AFICA Guaynabo Warehouse Bonds*

AFICA issued one series of bonds in 1995 (the "**AFICA Guaynabo Government Center Bonds**") to fund the construction of various industrial buildings, referred to collectively as the Guaynabo Municipal Government Center, that are leased to the Municipality of Guaynabo. The proceeds of these bonds were loaned to G. RB Guaynabo, Inc., a not-for-profit Puerto Rico corporation, which oversaw the construction and outfitting of the facilities. AFICA and G. RB Guaynabo entered into a loan agreement with respect to the loan of the bond proceeds. G. RB Guaynabo separately entered into a deed of lease with option to purchase with the Municipality of Guaynabo governing the lease of the facilities.

The AFICA Guaynabo Government Center Bonds are limited obligations of AFICA that are payable solely from payments under the loan agreement and the lease agreement. The bonds are secured by AFICA's rights under the loan agreement, including the loan payments from G. RB Guaynabo, as well as a first mortgage on the facilities. In addition, G. RB Guaynabo assigned its scheduled lease payments from the Municipality of Guaynabo, which are designed to cover principal and interest due on the bonds, to the bond trustee. As a result, the bond trustee receives payments directly from the Municipality of Guaynabo for payment on the bonds. The Municipality of Guaynabo's payment obligations under the lease agreement are unsecured. The bond trustee may enforce AFICA's rights under the loan agreement and G. RB Guaynabo's rights under the lease agreement with Guaynabo, but the bond trustee has no general recourse against the Municipality of Guaynabo, including its taxing power, to seek payment on the bonds. As of July 31, 2016, approximately $7 million in AFICA Guaynabo Government Center Bonds were outstanding.

AFICA also issued one series of bonds in 1998 (the "**AFICA Guaynabo Warehouse Bonds**") to fund the construction of various buildings and parking facilities, referred to as the Guaynabo Warehouse for Emergencies, that are also leased to the Municipality of Guaynabo. The proceeds of the bonds were loaned to G. RB Guaynabo 2000, Inc., a not-for-profit Puerto Rican corporation, which oversaw the construction and outfitting of the facilities. The contractual arrangements relating to the AFICA Guaynabo Warehouse Bonds are similar to those described above relating to the AFICA Guaynabo Government Center Bonds. The bond trustee may enforce AFICA's rights under the loan agreement and G. RB Guaynabo 2000 rights under the lease agreement with the Municipality of Guaynabo, but the bond trustee has no general recourse against the Municipality, including its taxing power, to seek

196

payment on the bonds. As of July 31, 2016, approximately $6 million in AFICA Guaynabo Warehouse Bonds were outstanding.

**Non-Recourse Indebtedness**

Certain Commonwealth instrumentalities have outstanding non-recourse debt that is payable from certain non-Commonwealth sources.

### *Children's Trust*

The Children's Trust is a not-for-profit corporate entity created in 1999 as a public instrumentality of the Commonwealth. The Commonwealth has transferred to the Children's Trust all of its rights, title and interests under the tobacco litigation Master Settlement Agreement, including the Commonwealth's right to receive initial, annual and strategic contribution payments to be made by the participating cigarette manufacturers under such Master Settlement Agreement.

As of July 31, 2016, the Children's Trust had outstanding senior and subordinate Tobacco Settlement Asset Backed Bonds in the principal amount of $1.442 billion (including CAB accretion), which were issued in 2002, 2005 and 2008 to pay certain capital expenditures, to make grants to third parties and to pay certain expenses of the Commonwealth. The bonds issued in 2008 are subordinated to the bonds issued in 2002 and 2005, and the bonds issued in 2005 are subordinated to the bonds issued in 2002. These bonds and any other additional senior bonds issued by the Children's Trust are payable solely from, and secured by a statutory pledge of, the payments made and to be made by the participating cigarette manufacturers under the Master Settlement Agreement. To date, all principal and interest payments required to be made by the Children's Trust on its outstanding bonds have been made on a timely basis from such payments.

### *Puerto Rico Housing Finance Authority ("HFA")*

HFA was created in 1977 as a subsidiary of GDB to provide public and private housing developers with interim and permanent financing through mortgage loans for the construction, improvement, operation, and maintenance of rental housing for low and moderate-income families. HFA also issues bonds and notes, the proceeds of which are deposited in separate trusts and generally invested in mortgage-backed securities collateralized by mortgage loans on properties located in Puerto Rico purchased by low and moderate-income families or used to provide subsidies to such families for the acquisition of their primary residence. HFA is authorized by the U.S. Department of Housing and Urban Development (HUD) to administer the U.S. Housing Act Section 8 program in Puerto Rico, to administer the HOME Investment Partnerships (HOME) Program, and to act as an approved mortgagor, both for multifamily rental units and for single-family homes.

In addition, HFA is an authorized issuer of Government National Mortgage Association (GNMA) mortgage-backed securities and is Puerto Rico's State Credit Agency for the Low-Income Housing Tax Credit Program under Section 42 of the U.S. Internal Revenue Code.

Finally, the Authority operates a mortgage loan insurance program that insures a portfolio of approximately $676 million mortgage loans mainly to low- and moderate-income families.

As of July 31, 2016, HFA's total outstanding principal balance of loans to the private sector for development and permanent financing of housing projects targeted to low and moderate income families was $85 million. HFA's mortgage loans to low- and moderate-income homeowners represented an additional outstanding principal balance of $45 million as of the same date.

As of July 31, 2016, HFA also has $404 million in outstanding tax-exempt revenue bonds (the "**HFA Capital Fund Bonds**") the proceeds of which were loaned to the Puerto Rico Public Housing Administration ("**PHA**") and a related entity to finance improvements to various housing projects in the Commonwealth. Such bonds are limited obligations of the Authority payable solely from PHA's annual Public Housing Capital Funds allocation from the U.S. Department of Housing and Development ("**HUD**"), as well as, in the case of the 2008 HFA Capital Fund Bonds only, the related entity's promissory notes.

### *Puerto Rico Industrial Investment Corporation ("PRIICO")*

PRIICO is a financing subsidiary of PRIDCO. In certain cases in which PRIDCO's prospective tenants have required a special facility involving a significant capital investment, PRIICO has borrowed the funds required to construct the special facility from a commercial bank and lent the funds to PRIDCO, which then uses the funds to construct the facility. The facility is leased by PRIDCO to the tenant and the rent therefrom is assigned to the lender as security for the loan to PRIICO, together with a mortgage over the facility. In certain transactions, PRIDCO also guaranteed certain loans of PRIICO, although such guarantee is subordinated to PRIDCO's obligation to provide additional funds for the payment of PRIDCO's Bonds. To date, the total principal amount of PRIICO loans guaranteed by PRIDCO in connection with these special financial arrangements is approximately $57.1 million. PRIDCO has entered into these financial arrangements only with tenants that PRIDCO has considered strong credits. These special facilities are neither "Trusteed Properties" nor "Eligible Properties" under PRIDCO's bond indenture and therefore they do not secure PRIDCO's bonds.

**Reserve Balances Held by Bond Trustees**

The following table lists, per issuer, amounts held in debt service funds or debt service reserve funds, in each as of late October 2016. The amounts reported below have been provided by the relevant trustee and cannot be independently verified by the Commonwealth.

**Table 10 – Debt Service Fund and Debt Service Reserve Fund Balances**
*(Figures shown in millions of dollars)*

|  | Total DSF/DSRF Balance* |
|---|---|
| PBA (excl. Series L)[1] | $0 |
| PBA - Series L[2] | 6 |
| COFINA[3] | 455 |
| PRIFA - AMSCA (Mental Health)[4] | 2 |
| PRIFA BANs[5] | 0 |
| UPR[6] | 55 |
| AFICA - University Plaza Project[7] | 7 |
| AFICA - Guaynabo[8] | 4 |
| PRCCDA[9] | 18 |
| PRIDCO[10] | 20 |
| HTA - 1968 Resolution[11] | 64 |
| HTA - 1998 Resolution, Senior[12][13] | 105 |
| HTA - 1998 Resolution, Sub Series 2003[14] | 8 |
| HTA - 1998 Resolution, Sub Series 1998[15][16] | 15 |
| ERS[17] | 86 |
| MFA[18] | 111 |
| HFA[19] | 36 |
| CT[20] | 109 |
| PRASA 2008 A&B, Senior[21] | 123 |
| PRASA 2012 A&B, Senior[21] | 43 |
| PRASA 2008 A&B, Sub[21] | 0 |
| PREPA[22] | 6 |

*Note: all balances shown are strictly funds deposited in the DSF or DSRF, except where noted. Balances include cash amounts where applicable and where reported. Amounts shown on the Current Fund Balances page may not be exhaustive of all accounts held by trustees for various purposes. Debt service reserves as provided by the trustees as of October, unless otherwise stated.

Footnotes to Table 10:
(1) PBA exc. Series L balances shown include amounts in the accounts labeled by the trustee as "PBA 1995 SNK Bd Svc," "PBA 2007M BD Svs Ac," "PBA Govt Fac Rev BD 11R," "PBA Series 2011 T AC," and "PBA 2004K Bond Svc Ac."
(2) PBA Series L balances shown include amounts in the account labeled by the trustee as "PBA SF Reserve."
(3) COFINA balances shown include amounts in the accounts numbered by the trustee as: 313604, 313607, 880518, 880523, 880215, 880217, 880248, 880299, 880318, 880319, 880497, 880498, and 880499.
(4) PRIFA AMSCA (Mental Health) balances shown include amounts in the accounts labeled by the trustee as "2007 Debt Service Reserve Fund," "2007 Sinking Fund Account," and "2007 Interest Account."
(5) PRIFA BANs balances shown include amounts in the account labeled by the trustee as "2015 Redemption Fund."
(6) UPR balances shown include amounts in the account labeled by the trustee as "UPR 6-1-71 Rev Bds Rsv Ac."
(7) AFICA University Plaza Project balances shown include amounts in the account labeled by the trustee as "Debt Service Reserve Fund," and "Master Debt Service."

(8) AFICA Guaynabo balances shown include amounts in the account labeled by the trustee as "1995 A – Bond Fund," "1995A – Debt Serv.Reserv.Fund," "1998A Interest Acct," "1998A Debt Serv.Resv.," and "1998A Bond Fund."

(9) PRCCDA balances shown include amounts in the account labeled by the trustee as "Hotel Occ Bds Ser A D S R FD."

(10) PRIDCO balances shown include amounts in the account labeled by the trustee as "1964 Bond Service Interest," and "1964 Bond Reserve."

(11) HTA balances shown include amounts in the accounts numbered by the trustee as: 115484, 115526, 115532, 115538, 115482, 115524, 115537, 231806, and 764919.

(12) HTA 1998 Resolution Senior Resolution balances include those available to the HTA 1998 Resolution Variable Rate Debt Obligation ("VRDO") bonds.

(13) HTA balances shown include amounts in the accounts numbered by the trustee as: 115471, 115479, 115522, 115566, 115653, 231811, 764911, 115469, 115478, 115488, 115515, 115520, 115564, 231793, 231805, 404035, 764914, and 764924.

(14) HTA balances shown include amounts in the accounts numbered by the trustee as: 115475 and 115473.

(15) HTA balances shown include amounts in the accounts numbered by the trustee as 115541.

(16) HTA 1998 Resolution Subordinated Series 1998 bond DSRF amounts are held separately at GDB and are currently not available to make debt service payments on these bonds.

(17) ERS balances shown include amounts in the account labeled by the trustee as "DS Interest Sub Ac Senior," "Debt Service Reserve Ac," and "General Reserve Ac."

(18) MFA balances shown include amounts in the account labeled by the trustee as "2002 Bond Serv.," "2002 Reserve Ac.," "1997 SR A/B Reserve," "1997 Bond Service Account," "1999 Bond Service," "1999 Reserve Ac.," "05 Ser Bds Bond Ser Fund," and "05 Ser Bds Reserve Fund." Balances for Series 1999 accounts reported as of November, 2016. Diligence with the trustee on these amounts and additional reserve accounts that may exist remains ongoing.

(19) HFA balances shown include amounts in the accounts laveled by the trustee as "2008 Debt Service Rsv FD," "2008 Debt Svc Fund," "Puerto Rico HSG Fin Debt Svc Fd Ac," "ST 2008 Debt Svc Rsv Fd," and "Puerto Rico HSG Fin Debt Svc Rsv Fd Ac." Diligence with the trustee remains ongoing on the available reserve balances.

(20) CT balances shown include amounts in the account labeled by the trustee as "FD 2002 Bd Fd Ds Ac," and "2002 Bd Fd Lq Rsv."

(21) PRASA balances shown include amounts in the account labeled by the trustee as "2008 Series A&B Senior Interest," "2008 Senior Principal Acct," "2008 Senior Debt Service Res," "2008 Senior B Debt Service Res," "2012 A Senior Interest," "2012-B Senior Principal Acct," and "2008 Subordinated Bond Fund." Note that additional diligence regarding the amounts available for debt service remains ongoing with the trustee.

(22) PREPA balances shown include amounts in the account labeled by the trustee as "1974 Sinking Fd BS Ac Int," "1974 Sinking Fd Reserve Ac," "Sinking Fd Reserve SubAc A," "Sinking Fd Reserve SubAc B," "Sinking Fd Reserve SubAc C," and "Sinking Fd Reserve SubAc D."

## Variable Rate Bonds and Mandatory Tender Bonds

The Commonwealth and certain public corporations have outstanding variable rate bonds consisting of bonds and notes which provide for periodic interest rate changes based on a LIBOR rate or a particular index, but which are not subject to tender prior to their maturity. Certain public corporations have hedged portions of their variable rate debt exposure by entering into interest rate exchange agreements with certain swap providers.

The only outstanding variable rate debt issued by the Commonwealth is approximately $126.7 million principal amount of variable rate general obligation bonds (the interest rate on which is tied to the consumer price index). As of August 31, 2016, the Commonwealth has no outstanding interest rate exchange agreements.

The following table shows the breakdown of variable rate debt of the Commonwealth and the public corporations as of August 31, 2016. This table does not include approximately $696 million and $35 million in PREPA lines of credit with commercial banks and GDB, respectively, all of which bear interest at variable rates.

## Table 11 - Variable Rate Debt Breakdown
### (as of August 31, 2016)

| | |
|---|---|
| Commonwealth | |
| General Obligations | $126,725,000 |
| PREPA | 411,825,000 |
| HTA | 258,665,000 |
| COFINA | 136,000,000 |
| Total | $933,215,000 |

As of August 31, 2016, PBA had $129,225,000 of fixed rate bonds guaranteed by the Commonwealth that are subject to mandatory tender for purchase on July 1, 2017, prior to their maturity date. There is no liquidity facility in place for the payment of the purchase price payable upon the mandatory tender, which purchase price is expected to be obtained from the remarketing of the bonds. If PBA cannot remarket the mandatory tender bonds, it would have to obtain other funds in order to provide for the purchase price of these bonds or the bonds would become subject to higher interest rates and an accelerated amortization schedule.

## Interest Rate Exchange Agreements

Certain public corporations are parties to various interest rate exchange agreements or swaps executed in order to hedge the issuer's variable rate debt exposure and the interest rate risks associated therewith.

Over the past several years, the Commonwealth has materially reduced its exposure to variable rate debt and interest rate exchange agreements, due to the risks of expiring liquidity and credit facilities associated with the majority of this debt and the potential early acceleration or termination rights that could be exercised by lenders, credit facility providers or swap counterparties as a result of downgrades of the Commonwealth's credit rating with respect to its general obligation debt. The Commonwealth has refunded this variable rate debt, and terminated the associated interest rate exchange agreements, with the proceeds of long-term fixed rate debt.

The aggregate notional amount of the swaps for the public corporations as of August 31, 2016, was $388.9 million. The table below shows the aggregate notional amount, as of that date, of synthetic fixed rate swaps of the public corporations.

## Table 12 - Swap Portfolio Breakdown
### Notional Amount
### (as of August 31, 2016)

| | Synthetic Fixed |
|---|---|
| PREPA | $252,875,000 |
| COFINA | 136,000,000 |
| Total | $388,875,000 |

The following table shows, as of August 31, 2016, the net mark-to-market value of all outstanding interest rate exchange agreements. The mark-to-market value of all such agreements of the public corporations was negative as of such date. Thus, the public corporations would owe

201

money to the counterparties if any of the agreements with a negative mark-to-market had been terminated as of that date.

### Table 13 - Swap Portfolio Mark-to-Market Valuation
(as of August 31, 2016)

|  | Synthetic Fixed |
|---|---|
| PREPA | ($65,472,035) |
| COFINA | ($115,740,443) |
| Total | ($181,212,478) |

*Collateral Requirements and Additional Termination Events*. Under its interest rate exchange agreements, PREPA may be required to deliver collateral to the counterparties to guarantee its performance under the agreements, depending on its credit ratings and the credit ratings of insurers, as well as the mark-to-market values. As of August 31, 2016, PREPA was not required to post any collateral. However, if the credit ratings of its swap insurers were to be lowered, PREPA could be required to post collateral on all swaps and certain trades may be subject to termination solely at the option of the applicable counterparty. If any such agreements were to be terminated, they would likely be terminated at their then-current mark-to-market valuations, plus cost, which could differ substantially from the mark-to-market valuations set forth in the table above due to market conditions at the time of termination. Any collateral posted at the time of the terminations could be used to effectively offset a like-amount of liquidity needed to fund the termination payments. If any such agreements related to underlying variable rate debt were to be terminated, PREPA would then be subject to variable interest rate risk on the corresponding bonds.

Under its interest rate exchange agreement, COFINA or its swap counterparty may be required to post collateral during each fiscal year depending on the transaction's mark-to-market value. In accordance with these requirements, COFINA had posted collateral of $33.3 million to its counterparty as of August 31, 2016. The maximum amount COFINA is required to transfer in a given fiscal year is $15 million, with the total posting capped at $60 million. Each year, until the collateral requirement is met, the trustee will deposit surplus revenues into an account that will be used to satisfy posting requirements for a given fiscal year. Interest earned by COFINA on posted amounts will be held by the counterparty and constitute additional collateral.

## Counterparty Claims with Respect to Terminated Swaps and Debt Service Deposit Agreements

The Commonwealth and COFINA face claims from a swap counterparty with respect to swaps that were terminated in 2008. In 2010, the counterparty, which is in bankruptcy, claimed that the termination payment amounts had been calculated using incorrect termination dates (due to arguments concerning the method of notice of termination) and that it was owed substantial additional termination payments, default interest on such payments, and an adjustment for supposedly excessive fees. The Commonwealth believes that if any additional amounts are owed with respect to these swaps, such amounts would be significantly lower than the amounts claimed. The parties were ordered by the bankruptcy court to conduct a mediation process with respect to these disputes, which process is continuing.

In addition, the Commonwealth and COFINA are parties to debt service deposit agreements with affiliates of the counterparty that has asserted the swap termination claims. Under the debt service deposit agreements, the Commonwealth and COFINA (or their predecessors in interest) received upfront payments and in exchange granted the counterparty the right to sell securities to the Commonwealth and COFINA in advance of specified bond payments at their maturity amount rather than market price at the time of sale. The agreements provide the counterparty the right to terminate upon the occurrence of various events. The counterparty has asserted that it currently has the right to terminate both agreements, in which case it would be owed termination payments equal to the cost of replacement agreements that would provide the counterparty with the economic benefits of the agreements, as determined through market quotations or otherwise in accordance with the agreements. Although the termination payments have not been calculated in accordance with the agreements, the Commonwealth estimates that if the agreements were terminated in accordance with their terms, the termination amounts could be material. GDB is also jointly and severally liable with the Commonwealth with respect to the Commonwealth debt service deposit agreement.

**Debt Service Requirements of Bonds Issued by the Commonwealth and its Instrumentalities**

The following tables set forth the debt service requirements of bonds and certain other indebtedness of the Commonwealth and its public corporations and municipalities.

The following table sets forth the debt service requirements for debt that is supported by Commonwealth taxes, which consists of Commonwealth General Obligation bonds, bonds issued by COFINA, HTA, and PRCCDA and certain bonds issued by PRIFA.

**Table 14**

**Debt Service Requirements for the Commonwealth's Bonded Direct Full Faith and Credit Indebtedness and Indebtedness Payable Primarily by Commonwealth Taxes[1]**

*(Figures shown in millions of dollars as of July 31, 2016)*

| | GO Bonds | GO Gtd. Notes | COFINA[2] | HTA[3] | PRIFA[4,5] | PRCCDA | Sum |
|---|---|---|---|---|---|---|---|
| 2017 | $1,128 | $16 | $709 | $347 | $189 | $30 | $2,419 |
| 2018 | 1,066 | 16 | 737 | 347 | 113 | 30 | 2,309 |
| 2019 | 1,091 | 16 | 767 | 345 | 113 | 30 | 2,361 |
| 2020 | 1,119 | 15 | 799 | 346 | 113 | 30 | 2,422 |
| 2021 | 991 | 15 | 831 | 344 | 113 | 30 | 2,325 |
| 2022 | 999 | 15 | 864 | 343 | 113 | 30 | 2,364 |
| 2023 | 999 | 14 | 899 | 330 | 113 | 30 | 2,385 |
| 2024 | 999 | 14 | 934 | 328 | 113 | 30 | 2,419 |
| 2025 | 999 | 13 | 972 | 326 | 113 | 30 | 2,453 |
| FY 2026+ | 13,030 | 172 | 43,001 | 4,145 | 2,373 | 334 | 63,054 |
| **Total** | **$22,420** | **$306** | **$50,512** | **$7,200** | **$3,466** | **$607** | **$84,510** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.

(2) Annual COFINA debt service shown herein corresponds on a September to August schedule to align debt service with the revenues collected to pay such debt service in the Commonwealth's fiscal year.

(3) Includes debt service on HTA Rural Development bonds and Variable Rate Debt Obligation bonds . Excludes Teodoro Moscoso bonds.

(4) PRIFA schedule includes principal and interest payments on PRIFA Rum Bonds and PRIFA BANs. Figures exclude debt service on PRIFA Ports Bonds and PRIFA AMSCA bonds.

(5) Principal payments shown for PRIFA BANs inclusive of the redemption price.

The following table sets forth the debt service requirements for debt that is payable from Commonwealth legislative appropriations, which includes bonds issued by PBA, ERS, and PFC.

**Table 15**

**Debt Service Requirements for the Commonwealth's Bonded Indebtedness Payable by Commonwealth Appropriations[1]**

*(Figures shown in millions of dollars as of July 31, 2016)*

|        | PBA     | ERS     | PFC     | Sum      |
|--------|---------|---------|---------|----------|
| 2017   | $277    | $167    | $86     | $530     |
| 2018   | 253     | 167     | 86      | 505      |
| 2019   | 252     | 167     | 86      | 504      |
| 2020   | 253     | 167     | 85      | 505      |
| 2021   | 274     | 217     | 85      | 576      |
| 2022   | 270     | 234     | 85      | 589      |
| 2023   | 259     | 239     | 85      | 583      |
| 2024   | 260     | 174     | 85      | 519      |
| 2025   | 258     | 176     | 85      | 519      |
| FY 2026+ | 4,480 | 6,365   | 897     | 11,741   |
| **Total** | **$6,836** | **$8,069** | **$1,665** | **$16,570** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.

The following table sets forth the debt service requirements for debt that is indirectly supported by Commonwealth taxes and appropriations. This includes bonds and notes issued by GDB, UPR, PRIDCO, APLA, the HTA - Teodoro Moscoso bonds, and certain PRIFA bonds. The HTA – Teodoro Moscoso bonds are currently payable by a private concessionaire, but would be payable by HTA if the concessionaire exercises its right to terminate the concession (which it currently is entitled to do).

**Table 16**
**Debt Service Requirements for the Commonwealth's Bonded Indebtedness**
**Payable by Tax-Supported Public Corporations and Agencies[1]**
*(Figures shown in millions of dollars as of July 31, 2016)*

| | GDB[2] | UPR | AFICA - UPP[3] | PRIDCO | APLA[4] | HTA Teodoro Moscoso | PRIFA - Ports & ASSMCA | Sum |
|---|---|---|---|---|---|---|---|---|
| 2017 | $472 | $43 | $6 | $18 | $24 | $14 | $15 | $591 |
| 2018 | 417 | 43 | 6 | 18 | 23 | 14 | 14 | 535 |
| 2019 | 971 | 43 | 6 | 18 | 23 | 16 | 14 | 1,090 |
| 2020 | 512 | 43 | 6 | 18 | 22 | 17 | 13 | 630 |
| 2021 | 488 | 43 | 6 | 18 | 21 | 18 | 13 | 607 |
| 2022 | 189 | 43 | 6 | 18 | 21 | 18 | 17 | 312 |
| 2023 | 91 | 43 | 6 | 18 | 20 | 19 | 38 | 235 |
| 2024 | 559 | 43 | 6 | 18 | 20 | 21 | 12 | 679 |
| 2025 | 16 | 43 | 6 | 18 | 19 | 23 | 18 | 143 |
| FY 2026+ | 384 | 256 | 46 | 54 | 270 | 37 | 201 | 1,248 |
| **Total** | **$4,099** | **$639** | **$97** | **$218** | **$463** | **$198** | **$357** | **$6,070** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of bond subsidies. Assumes no interest on missed payments.

(2) GDB debt service figures herein do not include any indebtedness incurred by GDB subsidiaries such as the Tourism Development Fund that were incurred either as a result of called guarantees or letters of credit. Includes debt service on $110 million on Commonwealth guaranteed bonds.

(3) Represents debt service on bonds issued by AFICA – Desarrollos Universitarios, a component unit of the University of Puerto Rico.

(4) APLA bonds bear a floating interest rate between 7% and 12%, revised on a quarterly basis. The APLA debt service schedule shown herein assumes a constant interest rate of 7% for illustrative purposes. The principal payments shown may not tie to the amount outstanding, as the amount outstanding includes excludes non invested amounts and any gains therein.

The following table sets forth the debt service requirements for the debt of non-tax supported public corporations. This consists of bonds and notes issued by PREPA and PRASA.

## Table 17
### Debt Service Requirements for the Commonwealth's Bonded Indebtedness Payable by Non Tax-Supported Public Corporations and Agencies[1]
*(Figures shown in millions of dollars as of July 31, 2016)*

|  | PREPA[2] | PRASA[3] | Sum |
|---|---|---|---|
| 2017 | $668 | $273 | $942 |
| 2018 | 763 | 273 | 1,036 |
| 2019 | 776 | 273 | 1,049 |
| 2020 | 727 | 272 | 999 |
| 2021 | 719 | 280 | 999 |
| 2022 | 666 | 281 | 947 |
| 2023 | 640 | 281 | 922 |
| 2024 | 640 | 285 | 926 |
| 2025 | 641 | 285 | 926 |
| FY 2026+ | 7,629 | 5,351 | 12,980 |
| **Total** | **$13,868** | **$7,857** | **$21,725** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of bond subsidies. Assumes no interest on missed payments.

(2) Debt service schedule differs from that published in Fiscal Plan due to updated assumptions for interest on Series UU variable rate bonds, BAB subsidy sequestration and updates for actual FY 2017 payments.

(3) Includes debt service on PRASA's Senior Revenue Bonds, Guaranteed Refunding Bonds, and Rural Development Bonds. Diligence on the status of Rural Development Bonds remains ongoing.

The following table sets forth the debt service requirements for municipal debt, which includes bonds issued by MFA and bonds and loans issued by the municipalities.

**Table 18**
**Debt Service Requirements for the Commonwealth's Bonded Municipal
and Non-Recourse Indebtedness[1]**
*(Figures shown in millions of dollars as of July 31, 2016)*

| | MFA Bonds | Guaynabo Gov. Center | Guaynabo Warehouse | Children's Trust | HFA[2] | Sum |
|---|---|---|---|---|---|---|
| 2017 | $114 | $1 | $1 | $47 | $46 | $209 |
| 2018 | 97 | 1 | 1 | 47 | 46 | 192 |
| 2019 | 90 | 1 | 1 | 47 | 46 | 185 |
| 2020 | 83 | 1 | 1 | 47 | 46 | 178 |
| 2021 | 63 | 1 | 1 | 47 | 46 | 158 |
| 2022 | 56 | 1 | 1 | 47 | 46 | 151 |
| 2023 | 56 | – | 1 | 47 | 46 | 150 |
| 2024 | 49 | – | 1 | 47 | 46 | 143 |
| 2025 | 45 | – | – | 47 | 46 | 138 |
| FY 2026+ | 130 | – | – | 12,513 | 137 | 12,779 |
| **Total** | **$784** | **$9** | **$8** | **$12,933** | **$549** | **$14,282** |

(1) Principal and interest schedules assume payments made on July 1 are included as part of the preceding fiscal year, except where noted. Debt service schedules shown are based on contractual debt service and have not been adjusted for missed interest or principal payments or otherwise, if any. All payments are reported net of any bond subsidies. Assumes no interest on missed payments.
(2) Only inclusive of debt service on Capital Fund Program Bonds (Mortgage Revenue Bonds and Mortgage-Backed Certificates are excluded). HFA interest includes Ongoing Fees.

# RETIREMENT SYSTEMS
# AND OTHER POST-EMPLOYMENT BENEFITS

**Overview**

A significant component of the Commonwealth's expenses is the cost of its three principal retirement systems, the Retirement System for Employees of the Government of the Commonwealth of Puerto Rico ("**ERS**"), the Commonwealth of Puerto Rico Teacher's Retirement System ("**TRS**") and the Puerto Rico Judiciary Retirement System ("**JRS**"; the ERS, TRS and JRS are collectively referred to as the "**Retirement Systems**"). These pension systems are severely underfunded and are projected to deplete their assets in the near future. Although the current administration enacted significant reforms of the Retirement Systems in 2013, certain of those reforms have been ruled unconstitutional by Commonwealth courts. The Commonwealth, due to the current fiscal crisis, has also been unable to make the substantial additional contributions to the Retirement Systems that are required under the reform legislation in order to maintain their solvency. The additional funding required to ensure the payment of retirement benefits when due is one of the principal fiscal challenges faced by the Commonwealth that will have to be addressed pursuant to PROMESA through the fiscal plans presented to the Oversight Board.

Substantially all of the public employees of the Commonwealth and its instrumentalities are covered by five retirement systems: the Retirement Systems mentioned above, the Retirement System of the University of Puerto Rico and the Employees Retirement System of Puerto Rico Electric Power Authority. The ERS and the TRS are the largest plans, both in number of current participating employees (active members) and retirees, and in the amount of their total pension liabilities.

The Retirement System of the University of Puerto Rico and the Employees Retirement System of the Puerto Rico Electric Power Authority cover employees of the University of Puerto Rico and PREPA, respectively, and are funded by those public corporations from their revenues. Although the Commonwealth is not required to contribute directly to those two systems, a large portion of the University's revenues is derived from legally-mandated legislative appropriations and assignments by law of certain tax revenues. The discussion that follows only covers the Retirement Systems.

The Retirement Systems are funded principally by contributions made by employers (the Commonwealth, public corporations and municipalities) and employees, as well as investment income.

The discussion below about the Retirement Systems is organized as follows: (1) Summary Description of the Retirement Systems (providing a summary description of the types of pension plans and the reform legislation enacted in 2013); (2) Depletion of Assets of the Retirement Systems; Insolvency (discussing the depletion of assets of the Retirement Systems that is projected to occur in the near term and the insolvency of the Retirement Systems); (3) Determination of Additional Contributions to the Retirement Systems (discussing the funding needs of the Retirement Systems to allow them to pay retirement benefits when due); (4) Financial Condition of the Retirement Systems – Actuarial Valuations (discussing the most

recent actuarial valuations of the Retirement Systems); (5) Other Information Related to the
Retirement Systems (discussing the governance, membership, funding and composition of
investment portfolios, as well as the historic funding shortfalls and other factors leading to the
deterioration of the financial solvency of the Retirement Systems and the past efforts to address
them); (6) Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net
Position (providing basic five-year tables of the financial position of the Retirement Systems);
and (7) Post-employment Benefits Other Than Pensions (discussing the other post-employment
benefit plans administered by the Retirement Systems and their actuarial position).

**Summary Description of the Retirement Systems**

*ERS*. The ERS is a statutory trust created by Act No. 447 of May 15, 1951, as amended
("**Act 447**"), to provide pension and other benefits to retired employees of the Commonwealth,
most of the public corporations and the municipalities of Puerto Rico. The ERS administers a
cost-sharing, multiple-employer, hybrid defined benefit plan. The benefits provided to members
of the ERS are established by law. As a cost-sharing plan, plan assets are not legally segregated
and may therefore be used to pay benefits to the retirees of any participating employer. Prior to
the amendments made in 2013 by Act No. 3-2013 ("**Act 3-2013**"), the ERS consisted of different
benefit structures. Members who had entered the ERS before January 1, 2000 participated in a
defined benefit program. Members who began to participate prior to April 1, 1990 ("**Act 447
Participants**") were entitled to the highest benefits structure, while those who began to
participate on or after April 1, 1990 ("**Act 1 Participants**") were subject to a longer vesting
period and a reduced level of benefits, as provided by Act No. 1 of February 16, 1990 ("**Act 1 of
1990**").

In 1999, Act 447 was amended to close the defined benefit program for new participants
and, prospectively, establish a new benefit structure similar to a cash balance plan (this new
benefit structure is referred to as "**System 2000**"). Members who entered the ERS on or after
January 1, 2000 ("**System 2000 Participants**") participate solely in System 2000. Prior to the
amendment made by Act 3-2013, under the System 2000 benefit structure, a participant was
entitled to receive a lump-sum payment, which could be received in full or used to purchase an
annuity from a third party, based solely on the amounts contributed in cash by such participant
and credited earnings on such cash. System 2000 Participants do not benefit from any employer
contributions. Instead, employer contributions made on account of System 2000 Participants are
used to reduce the accumulated unfunded pension benefit obligation of the ERS.

System 2000 Participants receive periodic account statements similar to those of defined
contribution plans showing their accrued balances. System 2000 was not established as a
separate plan, however, and there are no segregated accounts for System 2000 Participants.
Contributions received from System 2000 Participants were pooled and invested by the ERS
together with the assets corresponding to the defined benefit structure. Thus, future benefit
payments under the defined benefit structure of Act 447 and Act 1 of 1990 and the defined
contribution structure of System 2000, as amended by Act 3-2013, are payable from the same
pool of assets of the ERS.

In April 2013, the Commonwealth enacted Act 3-2013 as a comprehensive reform of the
ERS in order to address the growing funding shortfalls that threatened the solvency of the ERS.
The most important aspects of the changes effected to the ERS by Act 3-2013 are the following:

(i) in the case of active employees who were Act 447 Participants and Act 1 Participants, all retirement benefits accrued through June 30, 2013 were frozen, and thereafter all future benefits accrue under a defined contribution formula which will be paid at retirement through a lifetime annuity; (ii) the retirement age for Act 447 Participants gradually increases from age 58 to age 61; (iii) the retirement age for System 2000 Participants gradually increases from age 60 to age 65; (iv) the retirement age for new employees increased to age 67, except for new state and municipal police officers, firefighters, and custody officers, which will be age 58; (v) the employee contribution increased from 8.275% to 10%; (vi) in the case of System 2000 Participants, the retirement benefits will no longer be paid as a lump sum payment and instead will be paid in the form of a lifetime annuity; (vii) with respect to post-employment benefits, the Christmas bonus payable to current retirees is reduced from $600 to $200 (and is eliminated for future retirees) and the summer bonus ($200) is eliminated; (viii) future retirees will not receive any other post-employment benefits; and (ix) disability and survivor benefits are modified.

As an integral part of the Act 3-2013 reform, the Commonwealth recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due. As such, Act No. 32-2013 established an Additional Uniform Contribution ("**ERS-AUC**") for the ERS that the Commonwealth and other participating employers would be required to make annually. The ERS-AUC was established at $120 million for fiscal year 2014, and for fiscal years 2015 through 2033 was to be the amount certified by the ERS's external actuary at least 120 days prior to the start of each fiscal year as the amount necessary to avoid having the projected gross assets of the ERS during any subsequent fiscal year fall below $1 billion. Due to the worsening fiscal crisis since the enactment of Act 3-2013, however, the Commonwealth and other participating employers have been unable to pay most of the ERS-AUC and, as a result, the ERS projects that it will deplete its liquid assets during the current fiscal year or the first half of fiscal year 2018. At that point (assuming no liquidation of illiquid assets and no payments of the ERS-AUC payable for the current and prior fiscal years), the ERS would be operating on a "pay-as-you-go" basis, which means that the ERS would be unable to pay retirement benefits that exceed the actual employer and employee contributions received (net of administrative and other expenses), unless the Commonwealth and other participating employers provide additional funding on a timely basis to meet such retirement benefits in full.

*TRS*. The TRS is a statutory trust created in 1951 to provide pension and other benefits mainly to retired teachers of the Puerto Rico Department of Education, an agency of the Commonwealth, and the employees of the TRS. The benefits provided to members of the TRS are established by law. Prior to December 2013, the TRS consisted of a defined benefit pension plan. In December 2013, the Commonwealth enacted Act 160-2013 ("**Act 160-2013**") as a comprehensive reform of the TRS modeled along the same principles followed in the Act 3-2013 ERS reform. As such, Act 160-2013 sought to freeze the retirement benefits that TRS participants would have accrued under the defined benefit system as of July 31, 2014 and thereafter replace this defined benefit system with a defined contribution plan. On April 11, 2014, however, the Puerto Rico Supreme Court struck down the sections of Act 160-2013 that amended the pension benefits of active teachers who were participants in the TRS at the time on the grounds that the Commonwealth had not proven that the amendments would maintain the solvency of the TRS. As a result, the TRS now administers two benefit structures: (i) a contributory, defined benefit plan for active participants hired on or before July 31, 2014 and (ii) a contributory, hybrid plan for participants hired on or after August 1, 2014.

211

The Puerto Rico Supreme Court upheld those sections of Act 160-2013 that eliminated certain additional non-pension benefits of all participants. Other changes effected by Act 160-2013 include: (i) the retirement age for new employees was increased to age 62; (ii) the employee contribution for new employees was increased to 10% from August 1, 2014 to June 30, 2017, 13.12% from July 1, 2017 to June 30, 2020, and 14.02% from July 1, 2020 and thereafter; (iii) the statutory employer contribution was increased to 20.525% starting in fiscal year 2022; (iv) with respect to post-employment benefits, the Christmas bonus payable to retirees at that time was reduced from $600 to $200 and the summer bonus was eliminated; and (v) future retirees will not receive any post-employment benefits.

As an integral part of the Act 160-2013 reform, the Commonwealth also recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due. As such, Act 160-2013 established two classes of additional contributions by the Commonwealth to the TRS: (i) a Teacher's Justice Uniform Contribution (the "**TJUC**") and an Annual Additional Contribution (the "**TRS-AAC**"). The TJUC was established as a fixed annual amount, to be paid from the Commonwealth's General Fund to the TRS, of $30 million payable in each of fiscal years 2017 and 2018, and $60 million thereafter until fiscal year 2042. The TRS-AAC, which is payable from fiscal year 2019 through fiscal year 2042, is equal to the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the TRS from falling below $300 million during any subsequent fiscal year. Based on its latest projections, however, the TRS expects to deplete its liquid assets during fiscal year 2018, prior to the commencement of the TRS-AAC payment period (even after assuming the payment of the TJUC for fiscal years 2017 and 2018). If that occurs, the TRS would also be operating on a "pay-as-you-go" basis.

*JRS*. The JRS is a statutory trust created in 1954 to provide pension and other benefits to retired judges of the Judiciary Branch of the Commonwealth. Prior to December 2013, the JRS consisted of a single-employer defined-benefit pension plan. In December 2013, the Commonwealth enacted Act No. 162-2013 ("**Act 162-2013**") as a comprehensive reform of the JRS. Act 162-2013 sought to establish a new hybrid retirement system for judges appointed after July 1, 2014, which included both a defined benefit and a defined contribution component. On February 21, 2014, the Puerto Rico Supreme Court upheld the constitutionality of Act 162-2013, but only with respect to judges appointed on or after December 24, 2013, the date Act 162-2013 was enacted. As a result, judges appointed before the approval of Act 162-2013 continue to enjoy their prior retirement benefits. For judges appointed on or after the approval of Act 162-2013, the Puerto Rico Supreme Court interpreted Act 162-2013 as creating two benefits regimes, one for judges appointed between December 24, 2013 and June 30, 2014, as to whom a modified benefits regime applies, and one for judges appointed on or after July 1, 2014, as to whom all provisions of Act 162-2013 apply. For all existing participants who joined the JRS between December 24, 2013 and June 30, 2014, the defined benefit plan continued to exist, but with a maximum pension of 60% of salary. Their employee contribution was increased from 8% to 10%. All other existing benefits remained unchanged. For all new participants who joined the JRS after July 1, 2014, a new hybrid plan was enacted, which includes the following: (i) no transfer of service from other branches of government will be credited for purposes of benefit accruals; (ii) at least 12 years of service and attainment of age 65 will be required in order to accrue an annual pension equal to 1.5% of the employee's average salary for the last five years multiplied by years of service plus an annuity from the employee's contributions; (iii) disability

212

benefits were reduced from 50% to 33% of salary; (iv) participant must have at least five years of service to receive a pension that will not exceed the 33% of the average compensation for the last five years; (v) death benefits payable for the surviving spouse were changed from 50% of salary to a reimbursement of the judge's pension contributions to the extent not already distributed; (vi) the employee contribution was increased from 8% to 12% of salary; and (vii) Christmas, summer and prescription medicine bonuses were eliminated. As a result, the JRS now administers two benefit structures: (i) a contributory, defined benefit plan for active participants hired on or before June 30, 2014, and (ii) a contributory, hybrid defined benefit plan for participants hired on or after July 1, 2014.

As an integral part of the Act 162-2013 reform, the Commonwealth also recognized that an additional annual employer contribution was necessary in order to maintain sufficient system assets to be able to meet benefit payments when due. As such, Act 162-2013 established an additional contribution by the Commonwealth to the JRS (the "**JRS-AAC**"), commencing in fiscal year 2015, equal to the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the JRS from falling below $20 million during any subsequent fiscal year. The Commonwealth, however, did not pay the JRS-AAC for fiscal years 2015 and 2016. As a result, the JRS currently projects that it will deplete its assets during fiscal year 2018. If that occurs, the JRS would also be operating on a "pay-as-you-go" basis.

## Depletion of Assets of the Retirement Systems; Insolvency

The Retirement Systems are mature systems with a significant retiree population. The combined Retirement Systems' net pension liability (under the newly adopted GASB Statement No. 67, *Financial Reporting for Pension Plans – an Amendment of GASB Statement No. 25* ("**GASB 67**")) and the combined funded ratio are approximately $48.8 billion and 1.6%, respectively, based on the latest actuarial valuation reports. Based on the statutory employer contributions based on payroll, the annual benefit payments and administrative expenses paid by the Retirement Systems are significantly larger than the employer and employee contributions received by the Retirement Systems. As a result, investment income and assets have been used to cover the funding deficiencies and the Retirement Systems' assets are expected to decline until exhaustion.

In the opinion of management of the Retirement Systems, and based on information prepared by consulting actuaries, if measures are not taken to significantly increase funding to the Retirement Systems in the near term, these will exhaust their liquidity and become "pay-as-you-go" in the near term. In the case of the ERS, where its remaining liquid assets amounted to $655.3 million as of November 14, 2016 and its remaining illiquid investment assets (consisting mainly of loans to members) amounted to $616.0 million as of that date, liquid asset depletion is projected to occur during the fourth quarter of the current fiscal year or the first half of fiscal year 2018 (July to December 2017), depending on whether the Commonwealth is able to pay to the ERS during this fiscal year the additional contributions included in the fiscal year 2017 budget (amounting to $150 million) and whether the ERS is required to pay debt service on its outstanding senior pension funding bonds ("**Pension Bonds**") upon the expiration of the moratorium period imposed under the Moratorium Act. In the case of the TRS and JRS, liquid asset depletion is projected to occur during fiscal year 2018. The TRS's liquid assets amounted to $514 million as of June 30, 2016, and its remaining illiquid investment assets (consisting mainly of loans to members) amounted to $372 million. The JRS' liquid assets amounted to $46.2 million as of November 14, 2016, and its remaining illiquid investment assets (consisting

mainly of loans to members), amounted to $0.5 million as of that date. Asset depletion could occur earlier than projected, however, depending on various factors, including changes in the market value of the Retirement System's investment portfolio, timing of receipt of employer contributions and the Retirement Systems' ability to dispose of illiquid assets.

The estimate of when each of the Retirement Systems will become insolvent and when their assets will be exhausted is based on significant assumptions, including the market value of the Retirement System's investment portfolio, the rate of return on investments, the amount and timing of collections of employer contributions, as well as the estimated participant benefits and the Retirement Systems' administrative expenses to be paid each year.

The ERS has been in a negative net asset position, and hence insolvent from a Statement of Fiduciary Net Position perspective, since fiscal year 2015, mainly due to its $3.1 billion liability on account of its outstanding Pension Bonds. Future employer contributions of the ERS are pledged for the payment of debt service on the Pension Bonds. On April 6, 2016, the Governor signed into law the Moratorium Act. The Moratorium Act authorizes the Governor to declare a moratorium and stay creditor remedies with respect to obligations of the government entities covered by the moratorium. Pursuant to Executive Order 2016-31 issued under the Moratorium Act, the Governor suspended ERS's obligation to transfer the employer contributions to the fiscal agent for the Pension Bonds, and permitted the Commonwealth to offset the amount of debt service due on the Pension Bonds during fiscal year 2017 from the Commonwealth's employer contribution to ERS. Executive Order 2016-31 did not suspend payment on the Pension Bonds and the ERS has continued to pay debt service on these bonds from funds held by the fiscal agent in debt service reserve accounts under the ERS's pension funding bonds resolution. Assuming no additional employer contributions are transferred to the fiscal agent, however, the funds in the debt service reserve accounts will be depleted by April 2017. Further depletion of the ERS's assets could result in the inability to pay retirement benefits and its Pension Bonds.

**Determination of Additional Contributions to the Retirement Systems**

The Retirement Systems are severely underfunded, since actual employer and employee contributions to each of the Retirement Systems have been historically much lower than annual benefit payments and administrative expenses. These funding deficiencies have been covered with the investment income from, and the sale of, assets of the Retirement Systems, thus continuing to deplete such assets. In connection with the reforms of the Retirement Systems adopted in 2013, the Retirement Systems projected that, even after the reduction or elimination of various benefits, their future cash flow needs for disbursement of retirement benefits to participants, administrative expenses and debt service would continue to exceed the sum of the statutory employer and employee contributions and investment and other recurring income for a prolonged period of time after the depletion of the assets of the Retirement Systems. In order to address the long-term solvency of the Retirement Systems and safeguard their ability to pay retirement benefits when due, the 2013 reforms also provided for the ERS-AUC, TRS-AAC and JRS-AAC, which were to be incremental employer contributions determined actuarially (rather than on a percentage of payroll) on an annual basis in order to avoid the depletion of the assets of the Retirement Systems.

Timely payment of the ERS-AUC, TRS-AAC and JRS-AAC were critical components of the reforms in order for the Retirement Systems to be able to make payments as they come due

without depleting all of their assets first. However, as a result of the worsening fiscal crisis since the enactment of the reforms, the Commonwealth and other participating employers have been unable to make the ERS-AUC for fiscal years 2014, 2015 and 2016 and the JRS-AAC for fiscal years 2015 and 2016 (as discussed above, the TRS-AAC is scheduled to commence in fiscal year 2019).

Below is a discussion of the current actuarial determinations of the ERS-AUC, TRS-AAC and JRS-AAC, as well as how the Proposed PROMESA Fiscal Plan treats these additional contributions.

*ERS*. As discussed above, the Commonwealth enacted Act 3-2013 as a comprehensive reform of the ERS that included, among other measures, reducing benefits, increasing employee contributions and, in the case of active employees who were entitled to the defined benefits program, replacing most of the defined benefit elements of the system with a defined contribution system for most prospective accruals. Based on the statutory funding requirements prior to this reform, the annual benefit payments and administrative expenses of the ERS were significantly larger than the employer and member contributions. As a result, investment income and the sale of assets were being used to cover the funding deficiency. The 2013 reform was primarily intended to address the ERS's future cash flow needs and "pay-as-you-go" requirements, while recognizing that the ERS would continue to have a large net pension liability and a low funded ratio. As such, the reform was intended to provide enough cash for the ERS to be able to pay retirement benefits (as amended through the reform), administrative expenses and debt service on the Pension Bonds, while maintaining projected gross assets at no less than $1 billion at all times.

In order to achieve this goal, the reform contemplated that the Commonwealth and other participating employers would have to provide additional annual funding above the statutorily prescribed contributions that are based on payroll, in the form of the ERS-AUC. The initial ERS-AUC for fiscal year 2014 was established by Act 244-2014 at $120 million, of which approximately $83.3 million was allocable to the Central Government and its subsidized public corporations and to be funded from the General Fund, and the balance of which was allocable to the municipalities and other participating public corporations. For fiscal year 2015 and until fiscal year 2033, the ERS-AUC was required to be determined actuarially prior to the start of each fiscal year as the amount necessary to avoid having the projected gross assets of the ERS during any subsequent fiscal year fall below $1 billion. As a long-term plan, it was recognized that constant monitoring would be required to ensure that the ERS remained on track to meet the reform's goals.

Timely payment of the ERS-AUC was and remains a critical component of the reform in order for the ERS to be able to make payments as they come due without depleting all of its assets first. However, as a result of continued budget deficits in fiscal years 2014, 2015 and 2016, the Commonwealth and other participating employers have been unable to make the ERS-AUC required for these fiscal years, except for $35.4 million paid by public corporations and municipalities for fiscal year 2014 and $22.7 million paid by the Commonwealth and $37.1 million paid by public corporations and municipalities for fiscal year 2015. In February 2016, the ERS's actuaries recalculated the ERS-AUC for fiscal year 2017 and subsequent years. Based on certain assumptions (which do not account for any fiscal adjustment that the Commonwealth may undertake to address its fiscal challenges), including the assumption that all past due

amounts of the ERS-AUC are paid to the ERS, the ERS-AUC for fiscal year 2017 and subsequent years until fiscal year 2033 has increased to approximately $596 million (of which approximately $370 million corresponds to the Commonwealth's central government, to be funded from the General Fund, and the remaining portion corresponds to the participating public corporations and municipalities). The increase in the ERS-AUC from the initially projected levels is the result of multiple factors, but the most important ones are the decline in the number of active members and the associated payroll decrease since June 30, 2012 (which was the data used initially as part of the reform to project the ERS-AUC), and the three-year salary freeze implemented through Act 66-2014 as an expense-reduction fiscal measure. While these factors result in payroll and related cost savings for the Commonwealth and other participating employers, from the perspective of the ERS, its projected long-term funding decreases since statutory contributions are based on a percentage of payroll and, thus, a lower level of payroll generates fewer contributions, causing the ERS-AUC to increase to compensate for the reduction.

The most recent calculation of the ERS-AUC is based on a number of assumptions. One of the critical components of the calculation is the demographic projection, which encompasses the assumed future active membership headcount and the related payroll. For the most recent calculation, the ERS's actuaries used an approximate membership level of 119,000 as of July 1, 2015 and assumed that 50% of the over 11,000 employees eligible to participate in the early retirement incentive program established under Act No. 211-2015 in fact retire (and that in accordance with the program the employers continue to make the employer and employee contributions that would correspond to these participants until they reach the retirement age of 61) and that an additional decrease in active membership through attrition of 3% occurs over a five-year period (with the resulting vacancies in each case not filled with new hires). As stated above, if the projected active membership headcount decreases, the statutory employer and member contribution based on payroll decreases and the ERS-AUC increases.

The ERS-AUC is recalculated annually, and future calculations are subject to material changes depending on various factors, including demographic gains or losses, benefit provision changes, investment gains or losses, and other statutory or assumption changes. Thus, the policy decisions to be made as part of the development of a fiscal plan under PROMESA could affect materially the ERS-AUC calculation.

*TRS*. As with the ERS, the Commonwealth enacted Act 160-2013 to carry out a comprehensive reform of the TRS. Act 160-2013 also implemented the TJUC and the TRS-AAC in order to allow the TRS to make benefit payments when due without depleting all of its assets first. While the Puerto Rico Supreme Court struck down most of Act 160-2013 on constitutional grounds, the Commonwealth is still responsible for making the TJUC and TRS-AAC. The TJUC was established as a pre-set contribution of $30 million in each of fiscal years 2017 and 2018 and $60 million thereafter until fiscal year 2042, while the TRS-AAC is payable commencing on fiscal year 2019 and continuing until fiscal year 2042 in the amount determined by the actuaries as necessary to prevent the projected value of the gross assets of the TRS from falling below $300 million during any subsequent fiscal year. In July 2016, the System's actuaries prepared an actuarial study to determine an estimate of the TRS-AAC and, based on various assumptions, projected that the TRS-AAC for fiscal year 2019 and each fiscal year thereafter would be approximately $543.9 million. The calculation of the TRS-AAC does not assume material changes in active membership, notwithstanding demographic and fiscal trends

216

that could alter future teacher headcount level. The TRS-AAC also reflects the impact of the prospective segregation of employee contributions made by participants in the Act 160-2013 defined contribution plan, which has the effect of materially increasing the TRS-AAC due to lower than originally projected inflows to the system. Furthermore, if the TRS-AAC is not paid in full during the intended fiscal years, the amount would increase in the following years to compensate for the shortfalls.

The actuaries have also noted that if the TRS were unable to sell certain illiquid assets (consisting primarily of loans to members), amounting to approximately $372 million as of June 30, 2016, the TRS may face liquidity issues and become insolvent in fiscal year 2018 since its liquid assets are projected to be exhausted during fiscal year 2018, one year before the first payment of the TRS-AAC is required.

*JRS*. As discussed above, the Commonwealth enacted Act 162-2013 to carry out a comprehensive reform of the JRS that was intended, based on actuarial assumptions, to allow the JRS to make benefit payments when due without depleting all of its assets first. While the Puerto Rico Supreme Court struck down most of this legislation on constitutional grounds, the Commonwealth is still responsible for making the JRS-AAC as an annual additional contribution to the JRS. The JRS-AAC is the annual additional contribution determined actuarially the Commonwealth would have to make, commencing in fiscal year 2015, in order to avoid the projected gross assets of the JRS during any subsequent fiscal year from falling below $20 million. The JRS-AAC for fiscal years 2015 and 2016 was determined at $11.6 million and $12.1 million, respectively, and due at the end of the fiscal year. The Commonwealth's General Fund budget for fiscal years 2015 and 2016 did not include an appropriation for the JRS-AAC, which remains unpaid. The General Fund budget for fiscal year 2017 also does not include an appropriation for the JRS-AAC. Timely payment of the JRS-AAC is a critical component of the reform in order for the JRS to be able to make payments as they come due without first depleting all of its assets.

*Treatment of Additional Contributions under Proposed PROMESA Fiscal Plan*. The dire financial condition of the Retirement Systems, and the related economic and social implications of the risk of not being able to satisfy pension benefit payments, has been an important consideration in the development of the Proposed PROMESA Fiscal Plan presented to the Oversight Board. As such, the Proposed PROMESA Fiscal Plan seeks to protect the vulnerable public retiree population and does not contemplate cuts to core pension benefits of retirees. The Proposed PROMESA Fiscal Plan contemplates additional annual contributions necessary to fund pension payments when due and maintain a minimum level of plan assets. See *Commonwealth's Fiscal Plan* under OVERVIEW.

In connection with the development of the Proposed PROMESA Fiscal Plan, the Commonwealth has further studied varying scenarios of future levels of active membership and payroll and the resulting effect on the levels at which additional annual contributions would have to be made to the Retirement Systems in order to pay pension benefits when due. To the extent any scenario reflects a projected lower level of payroll than that projected in the additional annual contributions discussed above (either because of an assumed further reduction in headcount over a five-year period or a slower rate of salary increases), the additional annual contributions increase significantly. The Proposed PROMESA Fiscal Plan incorporates additional annual contributions for the ERS and TRS based on such scenario analysis. In

particular, the base scenario of the Proposed PROMESA Fiscal Plan currently assumes that the Commonwealth and related entities included in the Proposed PROMESA Fiscal Plan would need to make additional annual contributions to the Retirement Systems during the 10-year period of the fiscal plan of $642 million for fiscal year 2017 (plus $405 million in payments to catch-up with past due amounts), $572 million for fiscal year 2018 and $1.172 billion for fiscal years 2019 through 2026. This is in addition to the statutorily mandated employer contributions based on a percentage of payroll. The Commonwealth, together with the Retirement Systems, is currently performing additional diligence with respect to these scenarios, which could result in material revisions to the additional annual contributions contemplated in the Proposed PROMESA Fiscal Plan.

As discussed above, the ERS-AUC applies until fiscal year 2033. As such, the calculation the ERS-AUC needs to contemplate a gradual buildup in system assets (projected to be $4.9 billion at the end of the contribution period, under current assumptions), that decrease each year after the end of the contribution period (until reaching the $1 billion limit in fiscal year 2045) as the ERS keeps making benefit payments that exceed contributions during this period. A similar gradual buildup in assets and subsequent decline occurs in the TRS with respect to the TRS-AAC. The Proposed PROMESA Fiscal Plan includes as a measure the extension of the ERS-AUC and TRS-AAC payment periods for an additional ten years (from fiscal year 2033 to fiscal year 2043 in the case of the ERS and from fiscal year 2042 to fiscal year 2052 in the case of the TRS). This ten-year extension results in a decrease in the current estimated amounts of the ERS-AUC and TRS-AAC, but increases the risk that future benefits will not be paid in full.

In addition, the Proposed PROMESA Fiscal Plan includes as a measure the prospective segregation of the ERS assets attributable to certain active member contributions from the assets attributable to the legacy defined benefit component of the plan. The plan includes this measure in order to protect future proprietary member contributions from the potential asset depletion at the ERS. Since this measure eliminates the practice of using active member contributions to fund the legacy defined benefit pension payments, the measure results in a material increase in the additional annual contribution to the ERS during the 10-year period of the Proposed PROMESA Fiscal Plan.

*Projected "Pay-As-You-Go" Benefit Payments*. If, as a result of the current fiscal crisis, the Commonwealth and participating employers are not able to pay on a timely basis the ERS-AUC, TRS-AAC and JRS-AAC in future years, they would still be required to make "pay-as-you-go" benefit payments (consisting of the amount, after depletion of system assets, by which disbursement of benefits and the payment of administrative and other obligations of the Retirement Systems exceed employer and employee contributions) if the Retirement Systems were to continue to pay retirement benefits at the current levels in full. The Commonwealth is currently studying what the projected "pay-as-you-go" benefit payments would be, but believes that, over the long-term the "pay-as-you-go" funding needs may not be significantly lower (and in certain cases, may be higher) than the amounts currently determined for the ERS-AUC, TRS-AAC and JRS-AAC, especially since given the size of the Retirement Systems and the variability of actual future funding needs, in a "pay-as-you-go" scenario the Retirement Systems are unlikely to be able to use ERS assets attributable to active member contributions to fund the legacy defined benefit component of the plan. Furthermore, the Retirement Systems will likely need to maintain an asset cushion in order to be able to operate in the ordinary course and honor retirement benefits when due.

**Financial Condition of the Retirement Systems – Actuarial Valuations**

Each of the Retirement Systems conducts an actuarial valuation as of the end of every fiscal year. The most recent actuarial valuations were conducted by Milliman Inc., a firm of independent consulting actuaries. The most recent actuarial valuation reports are as of June 30, 2015, although the actuarial valuations could suffer material changes as a result of the review of the actuarial valuation reports in connection with the preparation and audit of the Commonwealth's audited financial statements for fiscal year 2015.

*Background of Actuarial Valuations*. The purpose of an actuarial valuation is to calculate the net pension liability of each of the Retirement Systems, which estimates on the basis of demographic and economic assumptions the present value of the benefits that each of the Retirement Systems will pay to its retired members and active members upon retirement. The actuarial valuations are performed in accordance with generally recognized and accepted actuarial principles and practices. The actuarial valuation compares the total pension liability with the fiduciary net position and any excess of that liability over the fiduciary net position represents the net pension liability of the applicable Retirement System. In the case of the actuarial valuations of the Retirement Systems, the fiduciary net position is equal to the market value of assets, net of liabilities. An actuarial valuation will also express the percentage that a retirement system is funded through the fiduciary net position as a percentage of total pension liability, which represents the quotient obtained by dividing the fiduciary net position of the retirement system by the total pension liability of the retirement system.

Copies of the actuarial valuation reports of the ERS and JRS are available on the website of the Administration of the Retirement Systems at www.retiro.pr.gov. Copies of the actuarial valuation reports of the TRS are available on the website of the TRS at www.srm.pr.gov. No information contained on these websites is deemed incorporated herein by reference.

The June 30, 2013 actuarial valuations for the Retirement Systems calculated accounting results for pension benefits under GASB Statement No. 25, "*Financial Reporting for Defined Benefit Pension Plans and Note Disclosures for Defined Contribution Plans*" ("**GASB 25**"). The Retirement Systems' actuarial valuations as of June 30, 2014 and 2015 differ from the actuarial valuation as of June 30, 2013, since, among other reasons, the Retirement Systems' actuarial valuations as of June 30, 2014 and thereafter were performed under GASB 67, which replaced GASB 25. GASB 67 establishes standards of financial reporting for separately issued financial reports and specifies the required approach to measuring the net pension liability of employers for benefits provided through the pension plan about which information is required to be presented. GASB 67 requires the disclosures of the components of the net pension liability and the assumptions and other methods used to measure the total pension liability.

GASB 67 specifies certain significant changes for financial reporting purposes, including but not limited to (a) calculation of plan liabilities based only on the "entry age normal" method, (b) calculation of a "depletion date" based on a projection as to the length of time assets will cover projected benefit payments under certain assumptions, and (c) for purposes of valuing the plan's liabilities after the depletion date, use of a discount rate tied to a municipal bond index. GASB 67 also introduces certain new terminology, including: (i) Total Pension Liability, which is the actuarial accrued liability calculated in accordance with the new GASB 67 requirements, (ii) Fiduciary Net Position, which is the total assets and deferred outflows of resources, net of its

liabilities and deferred inflows of resources, and (iii) Net Pension Liability, which is calculated as Total Pension Liability less Fiduciary Net Position, and is equivalent to the unfunded actuarial accrued liability.

Adoption of GASB 67 did not impact the Statements of Fiduciary Net Position of the Retirement Systems; however certain changes to note disclosures and required supplementary information have been incorporated to comply with the new standard.

To calculate the net pension liability of each of the Retirement Systems, the actuarial valuations use several actuarial assumptions. Some examples of these assumptions include an expected rate of return of assets, age of retirement of active members, future pay increases for current employees, assumed rates of disability and post-employment life expectancies of retirees and beneficiaries. If the experience of the Retirement Systems is different from these assumptions, the net pension liability of the Retirement Systems may increase or decrease to the extent of any variances.

The actual rate of return on assets of the Retirement Systems depends on the performance of their respective investment portfolios, which can vary materially from the expected rates of return assumed in the actuarial valuations. The investment portfolios of the respective Retirement Systems can be volatile. The value of the securities in the investment portfolios can dramatically change from one fiscal year to the next, which could, in turn, cause substantial increases or decreases in the net assets of the Retirement Systems, which directly impacts the net pension liability. The following table shows the historical annual rates of return for each of the Retirement Systems.

### Historical Annual Rates of Return

| Fiscal Year | ERS | TRS | JRS |
|---|---|---|---|
| 2008-2009 | - 9.80% | -15.98% | -18.02% |
| 2009-2010 | 8.58 | 12.50 | 12.65 |
| 2010-2011 | 16.22 | 21.50 | 20.50 |
| 2011-2012 | 5.14 | 1.60 | 2.48 |
| 2012-2013 | 7.79 | 7.80 | 10.95 |
| 2013-2014 | 11.20 | 10.80 | 16.40 |
| 2014-2015 | 3.90 | 4.00 | 1.60 |

The most recent actuarial valuations of the Retirement Systems were completed in accordance with the "entry age normal" method (level percentage of payroll). Under the "entry age normal" method (level percentage of payroll), a projected benefit is determined at each active participant's assumed retirement age assuming future compensation increases. The plan's normal cost is the sum of each active participant's annual cost for the current year of service determined such that, if it were calculated as a level percentage of his compensation each year, it would accumulate (at the valuation interest rate over his total prior and future years of service to the participant's assumed retirement date) into an amount sufficient to fund the participant's projected benefits. The plan's accrued liability is the sum of (a) the accumulation of each active participant's normal costs attributable to all prior years of service plus (b) the present value of each inactive participant's future benefits.

220

Any amounts receivable from the Commonwealth with respect to benefits under System Administered Pension Benefits laws (discussed above) are considered in the actuarial valuation process to determine the unfunded pension benefit obligation of the Retirement Systems to the extent receivables are recognized as such by the Retirement Systems.

The tables in this section set forth, according to the actuarial valuations of the Retirement Systems, the fiduciary net position, total pension liability, net pension liability, fiduciary net position as a percentage of total pension liability, covered payroll and net pension liability as a percentage of covered payroll. The ratio of the net pension liability to covered payroll is a measure of the significance of the net pension liability relative to the capacity to pay it. The trend in the ratio provides information as to whether the financial strength of a pension plan is improving or deteriorating over time. As shown in the "Historical Funding Status" table, the steady increase in the net pension liability to covered payroll for each of the Retirement Systems reflects the significant deterioration in their financial strength.

In performing the actuarial valuations, the actuaries rely on data provided by the Retirement Systems. Although the actuaries review the data for reasonableness and consistency, they do not audit or verify the data. If the data were inaccurate or incomplete, the results of the actuarial valuations may also be inaccurate or incomplete, and such defects may be material.

*Summary of Actuarial Valuation Results*.  The following table summarizes the results of the most recent actuarial valuations of the Retirement Systems as of June 30, 2015, other than with respect to non-pension post-employment benefits (which are discussed below).

221

## Summary of Actuarial Valuations
### ($ in millions)

| | Fiduciary Net Position[1] | Total Pension Liability[2] | Net Pension Liability[3] | Fiduciary Net Position as a Percentage of Total Pension Liability[4] | Covered Payroll[5] | Net Pension Liability as a Percentage of Covered Payroll[6] |
|---|---|---|---|---|---|---|
| ERS.................................. | $ (579) | $32,669 | $33,248 | (1.77)% | $3,319 | 1,001.66% |
| TRS.................................. | 1,313 | 16,308 | 14,995 | 8.05 | 1,127 | 1,329.90 |
| JRS .................................. | 43 | 585 | 543 | 7.30 | 32 | 1,699.96 |
| Total ................................. | $ 777 | $49,562 | $48,786 | 1.57% | $4,478 | 1,089.45% |

[1] The fiduciary net position of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is equal to the full market value of the assets held by the Retirement Systems, including expected receivable contributions from the Commonwealth, municipalities and participating public corporations, less bonds payable and other liabilities.

[2] The total pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and is an estimate based on demographic and economic assumptions of the present value of benefits that the Retirement System will pay during the assumed life expectancies of the applicable retired members and active members after they retire.

[3] The net pension liability of each of the Retirement Systems is set forth in the actuarial valuation relating to each Retirement System and reflects the amount of the excess of the total pension liability of a Retirement System over its fiduciary net position. The indicated amounts reflect the net pension liability as calculated pursuant to the requirements of the Government Accounting Standards Board or purposes of presentation in the Basic Financial Statements.

[4] The Fiduciary Net Position as a Percentage of Total Pension Liability of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing Fiduciary Net Position of the Retirement System by the total pension liability of the Retirement System. The indicated percentages reflect the Fiduciary Net Position as a Percentage of Total Pension as calculated pursuant to the requirements of GASB for purposes of presentation in the Basic Financial Statements.

[5] The covered payroll of each of the Retirement Systems is presented in the actuarial valuation relating to each Retirement System and is equal to the annual salaries paid to active employees on which contributions to the Retirement System are made. Covered payroll is as of July 1, 2014.

[6] The Net Pension Liability as a percentage of covered payroll is presented in the actuarial valuation relating to each Retirement System and reflects the quotient obtained by dividing the Net Pension Liability of the Retirement System by the covered payroll of the Retirement System. Totals may not add due to rounding.

Source: Actuarial valuation reports as of June 30, 2015.

The table below provides a historical funding status for each of the Retirement Systems. The information for fiscal years 2014 and 2015 (as well as a valuation as of July 1, 2013) is presented separately since those were performed using GASB 67 methodology. The information for fiscal years 2013 and before is presented separately to reflect that the valuation was performed using GASB 25 methodology.

## Historical Funding Status under GASB 67
## Actuarial Valuations as of the Indicated Fiscal Years
### ($ in millions)

| | Fiduciary Net Position | Total Pension Liability | Net Pension Liability | Fiduciary Net Position as a Percentage of Total Pension Liability | Covered Payroll | Net Pension Liability as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| July 1, 2013 ..................................... | $715 | $28,941 | $28,226 | 2.47% | $3,489 | 808.99% |
| June 30, 2014................................... | 81 | 30,220 | 30,139 | 0.27 | 3,489 | 863.80 |
| June 30, 2015................................... | (579) | 32,669 | 33,248 | (1.77) | 3,319 | 1,001.66 |
| **TRS** | | | | | | |
| July 1, 2013 ..................................... | 1,907 | 14,793 | 12,886 | 12.89 | 1,249 | 1,031.96 |
| June 30, 2014................................... | 1,704 | 14,808 | 13,104 | 11.51 | 1,171 | 1,118.89 |
| June 30, 2015................................... | 1,313 | 16,308 | 14,995 | 8.05 | 1,127 | 1,329.90 |
| **JRS** | | | | | | |
| July 1, 2013 ..................................... | 45 | 479 | 434 | 9.45 | 32 | 1,350.74 |
| June 30, 2014................................... | 46 | 504 | 458 | 9.13 | 32 | 1445.44 |
| June 30, 2015................................... | 43 | 585 | 543 | 7.30 | 32 | 1,699.96 |

_____

Source: Actuarial valuation reports for each of the Retirement Systems.

223

### Historical Funding Status Under GASB 25
### Actuarial Valuations as of the Indicated Fiscal Years
### ($ in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| 2007 | $2,892 | $16,770 | $13,878 | 17.2% | $4,246 | 326.8% |
| 2009 | 1,851 | 18,944 | 17,092 | 9.8 | 4,293 | 398.2 |
| 2010 | 1,667 | 21,370 | 19,703 | 7.8 | 3,818 | 516.1 |
| 2011 | 1,724 | 25,457 | 23,734 | 6.8 | 3,666 | 647.3 |
| 2012 | 1,219 | 27,646 | 26,427 | 4.4 | 3,570 | 740.2 |
| 2013 | 715 | 23,712 | 22,997 | 3.0 | 3,489 | 659.1 |
| **TRS** | | | | | | |
| 2007 | $3,163 | $7,756 | $4,593 | 40.8% | $1,370 | 335.3% |
| 2009 | 2,158 | 8,722 | 6,564 | 24.7 | 1,418 | 462.8 |
| 2010 | 2,222 | 9,280 | 7,058 | 23.9 | 1,370 | 515.0 |
| 2011 | 2,386 | 11,449 | 9,063 | 20.8 | 1,320 | 686.4 |
| 2012 | 2,100 | 12,351 | 10,251 | 17.0 | 1,293 | 792.8 |
| 2013 | 1,907 | 12,252 | 10,345 | 15.6 | 1,249 | 828.5 |
| **JRS** | | | | | | |
| 2007 | $81 | $259 | $177 | 31.5% | $31 | 566.6% |
| 2009 | 51 | 324 | 273 | 15.6 | 31 | 893.7 |
| 2010 | 55 | 338 | 283 | 16.4 | 32 | 882.0 |
| 2011 | 64 | 383 | 319 | 16.7 | 32 | 1002.2 |
| 2012 | 46 | 416 | 370 | 11.1 | 33 | 1118.8 |
| 2013 | 45 | 417 | 372 | 10.8 | 32 | 1155.7 |

_____

Source: Actuarial valuation reports for each of the Retirement Systems.

*ERS Actuarial Valuation.* The actuarial valuation report of the ERS as of June 30, 2015, under GASB 67, reflected a total pension liability of $32.7 billion, a fiduciary net position deficit of $578.6 million (total assets of $2.8 billion net of liabilities of $3.4 billion, consisting principally of $3.1 billion in Pension Bonds), and a net pension liability of $33.2 billion. The fiduciary net position as a percentage of total pension liability (the "**funded ratio**") was negative 1.77%, since its fiduciary net position was negative as of such date. This valuation reflects an increase in net pension liability and a decrease in the funded level for financial reporting purposes, when compared to the valuation as of June 30, 2014.

The ERS actuarial valuation as of June 30, 2015 reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members (the ERS's fiduciary net position was negative as of June 30, 2015). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate equal to the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) as of June 30, 2015 of 3.80%. Salaries were assumed to remain level through

June 30, 2017 due to Act 66-2014 and current economic conditions and then to increase 3.0% per year thereafter. The actuarial valuation of the ERS as of June 30, 2014 had used a discount rate of 4.29% to determine the total pension liability, and the same salary increase assumptions.

The actuarial valuation as of June 30, 2015 emphasizes that the ERS's net assets were exhausted in fiscal year 2015 and that if the ERS-AUC and the other statutorily prescribed employer contributions are not paid in full on an annual basis, the ERS will continue being rapidly defunded and gross assets will be exhausted. If measures are not taken to significantly increase the contributions, the ERS will deplete its liquid assets during the fourth quarter of the current fiscal year or the first half of fiscal year 2018.

*TRS Actuarial Valuation*. The actuarial valuation report of the TRS as of June 30, 2015, under GASB 67, reflected a total pension liability of $16.3 billion, a fiduciary net position of $1.3 billion, a net pension liability of $15.0 billion and a fiduciary net position as a percentage of total pension liability of 8.05%. This valuation reflects an increase in net pension liability and a decrease in the funded level for financial reporting purposes, when compared to the valuation as of June 30, 2014. The decrease in the funded level is the result of a decrease in the actuarial value of assets from $1.7 billion as of June 30, 2014 to $1.3 billion as of June 30, 2015, due to the continued net funding and cash flow shortfall that is exhausting plan assets, among other factors.

The TRS actuarial valuation as of June 30, 2015 reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members after fiscal year 2018 (the TRS's assets are exhausted during fiscal year 2019 under the GASB 67 projection basis, which assumes that certain illiquid assets of the TRS, consisting primarily of loans to members, will be converted to cash when needed). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate of 3.82% (calculated using the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments until fiscal year 2018 and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) beginning with fiscal year 2019). Salaries for future new entrants were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 2.5% per year thereafter. The actuarial valuation of the TRS as of June 30, 2014 had assumed a discount rate of 4.33% to determine the total pension liability, and the same salary increase assumptions.

The actuaries have also projected the date of depletion of the TRS's assets under a GASB 67 projection basis. This projection does not include the annual additional contributions on account of the TJUC and the TRS-AAC. Based on various assumptions, the projected date of depletion of the TRS is expected to occur during fiscal year 2019. The date of depletion projection under GASB 67 is not the same as the date that the TRS would be expected to exhaust assets as it differs from a cash flow projection. As stated above, the TRS currently expects that its liquid assets will be exhausted during fiscal year 2018. The actuarial valuation states that, after reflecting the benefit changes under Act 160-2013 that were upheld by the Puerto Rico Supreme Court, if the TJUC and the TRS-AAC are not paid, the TRS will continue to be rapidly defunded and its gross assets will be exhausted by fiscal year 2019.

*JRS Actuarial Valuation*. The JRS's latest actuarial valuation, as of June 30, 2015, under GASB 67, reflected a total pension liability of $585.3 million, a fiduciary net position of

$42.7 million, a net pension liability of $542.6 million, and a fiduciary net position as a percentage of total pension liability of 7.30%.

The JRS actuarial valuation as of June 30, 2015 also reflects that its fiduciary net position is not expected to be available to make all projected future benefit payments for current active and inactive members after fiscal year 2017 (the JRS's assets are exhausted during fiscal year 2018 under the GASB 67 projection basis, which assumes that certain illiquid assets of the JRS, consisting primarily of loans to members, will be converted to cash when needed). Therefore, as required by GASB 67, the net pension liability as of June 30, 2015 was determined using a discount rate of 3.82% (calculated using the single equivalent rate that results in the same actuarial present value as the long-term expected rate of return applied to benefit payments until fiscal year 2017 and the tax-free municipal bond index (Bond Buyer General Obligation 20-Bond index) beginning with fiscal year 2018). Salaries were assumed to remain level through June 30, 2017 due to Act 66-2014 and then to increase 3.0% per year thereafter. The actuarial valuation of the JRS as of June 30, 2014 had assumed a discount rate of 4.30% to determine the total pension liability, and the same salary increase assumptions.

The actuaries have also projected the date of depletion of the JRS's assets under a GASB 67 projection basis. This projection does not include the payment of any amounts on account of the JRS-AAC. Based on various assumptions, the projected date of depletion of the JRS is expected to occur during fiscal year 2019. The date of depletion projection under GASB 67 is not the same as the date that the JRS would be expected to exhaust assets as it differs from a cash flow projection. The actuarial valuation states that, after reflecting the benefit changes under Act 162-2013 that were upheld by the Puerto Rico Supreme Court, if the JRS-AAC is not paid, the JRS will continue to be rapidly defunded and its assets are expected to be exhausted in fiscal year 2019 under a GASB 67 projection basis (as discussed above, liquid assets are projected to be depleted in fiscal year 2018).

**Other Information Related to the Retirement Systems**

*Governance*. Governance of the ERS and the JRS is vested in a Board of Trustees, which sets policy and oversees the operations consistent with applicable laws. There are eleven members of the Board, as follows: the Puerto Rico Secretary of the Treasury (or his appointee), the President of GDB (or his appointee), the Commissioner of Municipal Affairs (or his appointee) and the Director of the Office of Human Resources of the Commonwealth (or his appointee), as *ex officio* members; three members appointed to three-year terms by the Governor of Puerto Rico, two of whom must be members of the ERS and one must be a member of the JRS, each with at least ten years of credited service; and two members who are pensioners of the ERS and JRS. The other two members will be the President of the Federation of Mayors and the President of the Association of Mayors. The Board is also responsible for appointing the Administrator of the ERS and the JRS.

Governance of the TRS is also vested in a Board of Trustees. There are nine members of the Board, as follows: the Secretary of the Treasury (or his appointee), the President of GDB (or his appointee) and the Secretary of Education (or his appointee), as ex officio members; one representative of a teacher's organization (or his appointee) designated by the Governor for a term of four years; three teachers who are members of the TRS, one of which shall represent active teachers and two of which shall represent retired teachers, each appointed by the Governor

for a term of four years; one representative of the collective bargaining unit for teachers pursuant to Puerto Rico law (or his appointee), and if the teachers of the Department of Education do not have a representative of the collective bargaining unit under Act 45-1998, as amended, the Governor may appoint a teacher in active service as a member of the Board; and a member who represents the public interest, appointed by the Governor for a term of four years. The Board is also responsible for appointing an Executive Director.

*Covered employees.*  The ERS covers substantially all employees of the central government (consisting of the departments and agencies of the Commonwealth), all members and regular employees of the Legislative Branch, and all employees of the public corporations (other than the University of Puerto Rico and PREPA) and the Commonwealth's municipalities, except for those employees that are covered by the TRS and the JRS.  The JRS only covers judges.

The TRS covers all active teachers of the Department of Education and the employees of the TRS who become plan members at their date of employment.  Licensed teachers working in private schools or other educational organizations have the option to become members of the TRS so long as the required employer and employee contributions are satisfied.

The following table shows the number of active members, retired members, disabled members, beneficiaries and terminated vested members for each of the Retirement Systems as of the July 1, 2014 census data collection (July 1, 2013 in the case of the JRS).  Since the actuarial valuation for fiscal year 2014, the Retirement Systems use the census collection data as of the beginning of the fiscal year, rather than the end of the fiscal year, to calculate their actuarial pension liability (using roll-forward methods).  Therefore, the 2015 actuarial valuation reports of the ERS and TRS have been prepared with July 1, 2014 participant data.

### Participant Data

| | Active Members | Retired Members | Disabled Members | Beneficiaries | Terminated Vested Members[1] | Total |
|---|---|---|---|---|---|---|
| **ERS** | | | | | | |
| Act 447 Participants | 15,778 | 88,765 | 13,902 | 13,723 | 7,219 | 139,387 |
| Act 1 Participants | 39,957 | 8,180 | 1,834 | 100 | 3,439 | 53,510 |
| System 2000/Act 3 Participants | 64,055 | 111 | 84 | 43 | - | 64,293 |
| **Total** | 119,790 | 97,056 | 15,820 | 13,866 | 10,658 | 257,190 |
| **TRS** | 37,700 | 36,210 | 2,301 | 3,150 | 527 | 79,888 |
| **JRS** | 364 | 372 | - | 58 | 59 | 853 |

_____
(1)  Represents generally members who ceased employment without the right to a retirement annuity and are due a refund of member contributions and, if applicable, employer contributions, plus interest thereon.

The census data as of July 1, 2014 for the ERS and TRS, when compared to the July 1, 2013 census data, reflects a decrease in the number of active members (from 125,671 to 119,790, in the case of the ERS, and from 39,343 to 37,700, in the case of the TRS) and an increase in the

number of retired members (from 94,395 to 97,056, in the case of the ERS, and from 35,278 to 36,210, in the case of the TRS).

The employer contributions made by the Commonwealth and all other participating employers and employee contributions made by active members to the ERS are invested together and not segregated by benefit structure. As of July 1, 2014, the central government was responsible for making contributions with respect to approximately 71,290 active members of the ERS, or 59.5% of total active members (consisting of approximately 10,123 Act 447 Participants, 26,238 Act 1 Participants and 34,929 System 2000 Participants/Act 3 Participants). Municipalities were responsible for approximately 27,523 active members of the ERS, or 23.0%, of total active members (consisting of approximately 2,566 Act 447 Participants, 7,911 Act 1 Participants and 17,046 System 2000/Act 3 Participants). Public corporations were responsible for approximately 20,976 active members of the ERS, or 17.5%, of total active members (consisting of approximately 3,089 Act 447 Participants, 5,808 Act 1 Participants and 12,079 System 2000/Act 3 Participants). Effective July 1, 2013, all active employees were transferred into Act 3-2013.

*Statutory employer contributions based on payroll*. Historically, the amount that the Commonwealth and other participating employers were required to contribute to the Retirement Systems was determined by statute and established as a percentage of payroll, rather than an annual required contribution determined on an actuarial basis. This resulted in a historical underfunding of the Retirement Systems, with actual employer contributions averaging approximately 32.7% of what were the annual required contributions determined actuarially for the Retirement Systems. Following the pension reform legislation enacted in fiscal year 2013, as discussed above, the Commonwealth and other participating employers are required to contribute, in addition to the statutory employer contributions based on a percentage of payroll, the AUC, AAC and JRS-AAC, which are determined actuarially on an annual basis. The Commonwealth's employer contributions have to be included in the annual budget approved by the Legislative Assembly in order to be paid.

The Commonwealth central government is responsible for approximately 59.5% of total employer contributions to the ERS, and the other 40.5% is the responsibility of public corporations and municipalities. The Commonwealth central government is also responsible for 100% of total employer contributions to the TRS and JRS. The Commonwealth is ultimately responsible for any funding deficiency with respect to central government employees in the three Retirement Systems, and, given the financial dependency of the Commonwealth's instrumentalities on the Central Government, the Commonwealth may ultimately have to cover a greater portion than its pro-rata funding deficiency if retirement benefits to all public sector employees are to be honored.

As a result of the adoption of Act No. 116-2011 ("**Act 116-2011**"), the statutory employer contribution for the ERS increases annually from 9.275% of covered payroll for fiscal year 2011 to 20.525% for fiscal year 2021 and thereafter. The employer contribution rate for fiscal year 2017 is 15.525% of covered payroll. Covered payroll is the compensation regularly paid to active employees on which contributions to the Retirement Systems are computed and is generally equivalent to their annual salary. The table below shows the projected additional employer contributions to the ERS as a result of Act 116-2011, based on the following payroll assumptions used in the actuarial report as of June 30, 2015: 50% of the over 11,000 employees

eligible to retire under the early retirement incentive program established under Act No. 211-2015 in fact retire and an additional decrease in active membership through attrition of 3% occurs over a five year period (with the resulting vacancies in each case not filled with new hires), resulting in an assumed active membership headcount of 110,000 by July 1, 2024, and 3% annual salary increases beginning on July 1, 2017.

### ERS - Projected Act 116-2011 Additional Employer Contributions
### ($ in millions)

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2016 | 9.275% | 5.000% | 14.275% | $3,320 | $308 | $166 | $474 |
| 2017 | 9.275% | 6.250% | 15.525% | 3,320 | 308 | 208 | 516 |
| 2018 | 9.275% | 7.500% | 16.775% | 3,498 | 324 | 262 | 586 |
| 2019 | 9.275% | 8.750% | 18.025% | 3,568 | 331 | 312 | 643 |
| 2020 | 9.275% | 10.000% | 19.275% | 3,640 | 338 | 364 | 702 |
| 2021 | 9.275% | 11.250% | 20.525% | 3,712 | 344 | 418 | 762 |

Required employee contributions for the ERS vary according to how the individual employee's retirement benefits are coordinated with social security benefits. Act 3-2013 increased the employee contribution for members of the ERS from 8.275% to 10% of covered payroll.

As a result of the adoption of Act No. 114-2011 ("**Act 114-2011**"), the statutory employer contribution for the TRS increases annually from 8.5% of covered payroll in fiscal year 2011 to 19.75% in fiscal year 2021. Then, pursuant to the Act 160-2013 reform, the statutory employer contribution will increase to 20.525% of covered payroll commencing in fiscal year 2022. The employer contribution for fiscal year 2017 is 14.75% of covered payroll. The table below shows the projected additional employer contributions to the TRS as a result of Act 114-2011, based on the following payroll assumptions used in the actuarial report as of June 30, 2015: an assumed constant active membership headcount of 36,375, which is lower than the active membership headcount as of July 1, 2014 stated above, and 2.5% annual salary increases beginning on July 1, 2017.

**TRS - Projected Acts 114-2011/160-2013 Additional Employer Contributions**
**($ in millions)**

| Fiscal Year | Original Employer Contribution Rate | Additional Employer Contribution Rate | Total Employer Contribution Rate | Expected Payroll | Original Employer Contribution | Additional Employer Contribution | Total Employer Contribution |
|---|---|---|---|---|---|---|---|
| 2016 | 8.50% | 5.00% | 13.50% | $1,082 | $92 | $54 | $146 |
| 2017 | 8.50% | 6.25% | 14.75% | 1,063 | 90 | 66 | 156 |
| 2018 | 8.50% | 7.50% | 16.00% | 1,081 | 92 | 81 | 173 |
| 2019 | 8.50% | 8.75% | 17.25% | 1,098 | 93 | 96 | 189 |
| 2020 | 8.50% | 10.00% | 18.50% | 1,112 | 95 | 111 | 206 |
| 2021 | 8.50% | 11.25% | 19.75% | 1,124 | 96 | 126 | 222 |
| 2022[1] | 8.50% | 12.025% | 20.525% | 1,136 | 97 | 137 | 234 |

_____
[1] Contribution increase per Act 160-2013

The statutory employee contribution for the TRS is 9.0% of covered payroll for participants whose entry date is prior to August 1, 2014. Pursuant to Act 160-2013, in the case of new participants whose entry date is on or after August 1, 2014, the statutory employee contribution is (i) 10% from August 1, 2014 to June 30, 2017, (ii) 13.12% from July 1, 2017 to June 30, 2020, and (iii) 14.02% from July 1, 2020 thereafter.

For the JRS, the employer contribution is 30.34% of covered payroll and the employee contribution is 8% of covered payroll if hired before July 1, 2014 and, pursuant to the Act 162-2013 reform, 12% if hired on or after July 1, 2014.

Pursuant to the Constitutional and statutory priority norms for the disbursement of public funds that apply during any fiscal year in which the resources available to the Commonwealth are insufficient to cover the appropriations approved for such year, employer contributions by the Commonwealth to the Retirement Systems fall within the third priority category, after payment of the public debt, the fulfillment of contractual obligations, eminent domain payments and certain commitments to protect the credit and good faith of the Commonwealth government. The Commonwealth, however, has continued to partially make its employer contribution to the ERS, subject to the offset of the amount of debt service payable on the Pension Bonds discussed above, and has not paid principal or interest on its public debt since July 1, 2016, given that such debt is subject to a moratorium pursuant to Executive Order 2016-30.

The priority norms stated above do not apply to employer contributions made by public corporations and municipalities, because the funds of public corporations and municipalities are not available resources of the Commonwealth.

*Benefits and Special Benefits*. Each Retirement System provides basic benefits principally consisting of a retirement annuity and death and disability benefits (collectively referred to herein as "**Basic System Pension Benefits**"). Each Retirement System also administers benefits granted under various special laws that have provided additional benefits for retirees and other beneficiaries (collectively referred to herein as "**System Administered**

230

**Pension Benefits**"). The System Administered Pension Benefits include, among others, additional minimum pension, death and disability benefits, ad-hoc cost-of-living adjustments and Christmas and other bonuses. Act 3-2013 and Act 160-2013 amended the various laws providing some of these System Administered Pension Benefits to reduce some of the amounts payable to existing retirees while eliminating the benefits for all future retirees (those retiring after June 30, 2013 for the ERS and July 31, 2014 for the TRS). Act 162-2013 eliminated the System Administered Pension Benefits for all future retirees of the JRS hired on or after December 24, 2013.

The System Administered Pension Benefits are funded on a pay-as-you-go basis by the Commonwealth from the General Fund or by the participating public corporations and municipalities. These benefits are not an obligation of the respective Retirement Systems. Except for the System Administered Pension Benefits corresponding to former employees of municipalities and public corporations, which are obligations of the municipalities and public corporations, most of the funds used to cover these benefits are required to be paid by the Commonwealth through annual appropriations from the General Fund. Historically, however, the Retirement Systems have made current payments of System Administered Pension Benefits to participants but the costs of these pension benefits have not been recovered by the Retirement Systems in full or on a timely basis from the Commonwealth and the participating public corporations and municipalities.

*Composition and Market Value of Investment Portfolios*. As of June 30, 2015, the ERS's investment portfolio amounted to $2.371 billion, compared to $3.158 billion and $3.790 billion as of June 30, 2014 and 2013, respectively. The decrease in value of the investment portfolio principally reflects the continued use of investment portfolio assets to pay current benefits as a result of the underfunding of the ERS, as discussed above. The investment portfolio as of June 30, 2015 was comprised of approximately 17% of equity investments, 36% of fixed income securities, 26% of internally managed mortgage and personal loans portfolio, 19% of short-term cash equivalents (excluding receivables), and 2% of other investments.

As of June 30, 2015, the TRS's investment portfolio amounted to $1.286 billion, compared to $1.711 billion and $1.928 billion as of June 30, 2014 and 2013, respectively. As in the ERS, the decrease in value of the investment portfolio of the TRS principally reflects the continued use of investment portfolio assets to pay current benefits as a result of the underfunding of the TRS, as discussed above. The investment portfolio as of June 30, 2015 was comprised of approximately 31% of equity investments, 29% of fixed income securities, 32% of internally managed mortgage and personal loans portfolio, 7% of short-term cash equivalents (excluding receivables), and 1% of other investments.

As of June 30, 2015, the JRS's investment portfolio amounted to $63.1 million, compared to $66.7 million and $63.4 million as of June 30, 2014 and 2013, respectively. As in the other Retirement Systems, the decrease in value of the investment portfolio principally reflects the continued use of investment portfolio assets to pay current benefits. The investment portfolio as of June 30, 2015 was comprised of approximately 23% of equity investments, 64% of fixed income securities, 1% of internally managed mortgage and personal loans portfolio, and 12% of short-term cash equivalents (excluding receivables).

231

All the figures provided above for fiscal year 2015 are preliminary, unaudited and subject to change.

*Historic Funding Shortfalls*.   For several fiscal years, actual employer and employee contributions to each of the Retirement Systems have been lower than annual Basic System Pension Benefits payments and administrative expenses. These shortfalls in contributions over the amounts required to pay Basic System Pension Benefits and expenses are referred to herein as "funding shortfalls."   The funding shortfalls, however, may not reflect the actual cash flow position of the Retirement Systems, which is affected, among other things, by their investment and financing activities.

The Retirement Systems have been forced to cover the funding shortfalls with investment income, loans from financial institutions and various non-recurring sources of funds. The funding shortfall has also exceeded the investment income of the Retirement Systems, causing the Systems' assets to decline and adversely affecting their funded status.

During 2008, the ERS issued approximately $2.9 billion of Pension Bonds ($2.66 billion as term bonds and $290 million as capital appreciation bonds), with interest rates ranging from 5.85% to 6.55%, for which repayment the ERS pledged all employer contributions made after the issuance of the bonds. The Pension Bonds are limited, non-recourse obligations of the ERS payable solely from, and secured solely by, the employer contributions. The maturity of the Pension Bonds is not subject to acceleration for any reason including non-payment of debt service on the bonds. As of June 30, 2016, approximately $2.9 billion of the Pension Bonds remain outstanding. The purpose of this offering was to increase the assets of the ERS available to invest and pay benefits.

The table below shows the funding shortfalls for each of the last five fiscal years for each of the Retirement Systems.

232

## Funding Shortfalls
### (in millions)

| Fiscal Year Ending June 30, | Employer and Member Contributions[1] | Basic System Benefit Payments and Administrative Expenses[2] | Net Funding Shortfall[4] |
|---|---|---|---|
| **ERS** | | | |
| 2012 | $689 | $(1,528) | $(839) |
| 2013 | 747 | (1,522) | (775) |
| 2014 | 1,027[3] | (1,644) | (617) |
| 2015 | 925[3] | (1,655) | (730) |
| 2016 | 957[3] | (1,663) | (706) |
| **TRS** | | | |
| 2012 | 247 | (593) | (346) |
| 2013 | 253 | (603) | (350) |
| 2014 | 255 | (646) | (391) |
| 2015 | 249 | (703) | (454) |
| 2016 | 244 | (699) | (455) |
| **JRS** | | | |
| 2012 | 12 | (21) | (9) |
| 2013 | 13 | (19) | (6) |
| 2014 | 13 | (24) | (11) |
| 2015 | 13 | (25) | (12) |
| 2016 | 13 | (26) | (13) |

---

[1] Represents the statutory employer and member contributions and does not include amounts received from employers on account of System Administered Pension Benefits, except as described under footnote 3 below. Act 66 provides a salary freeze for fiscal years 2015 through 2017. Projection assumes salary increases of 3% and employer contributions include the rate increases provided for by Act 114-2011 and Act 116-2011.

[2] Includes, in the case of the Employees Retirement System, principal and interest paid on the Pension Bonds for fiscal years 2012 and 2013 in the amounts of $191 million and $192 million, respectively, and for fiscal years 2014 through 2016, debt service of $167 million per year.

[3] Does not include (i) the statutory additional annual contribution except for fiscal year 2014 that reflects $120 million of which only $33.7 million were received, and (ii) savings generated by the System for the difference between receiving the $2,000 per retiree contribution as required under Act 3-2013 and paying $1,500 per retirees to cover certain System Administered Pension Benefits.

[4] Does not include interest income from asset investment. Totals may not add due to rounding.

Source: Information obtained from each of the Retirement Systems and the most recent actuarial valuation reports.

*Other Factors That Contributed to Deterioration in Financial Solvency of the Retirement Systems.* Among the factors that have contributed most significantly to the deterioration of the Retirement Systems are the following: (i) the inadequacy of the historical funding levels for the Retirement Systems; (ii) the enactment of special laws increasing pension benefits without providing the required funding source; (iii) the adoption of early retirement programs that were not adequately funded and that reduced the amount of contributions to the Retirement Systems; (iv) the increase in life expectancy in Puerto Rico; (v) the increase in the maximum amount of permitted personal loans to members; and (vi) in the case of the ERS, the issuance of Pension Bonds.

Since their inception, the Retirement Systems have been inadequately funded by the Commonwealth and the other participating employers. On several occasions during the past decades, the Commonwealth increased benefits without raising employer and employee

contributions and failing to provide alternate methods to adequately fund these increased benefits. The Commonwealth also approved several "special laws" granting additional benefits on top of those provided under Act 447 and Act 1, including a summer bonus, a medication bonus, a Christmas bonus, contributions to medical plans, merit pensions, and cost of living adjustments (COLAs), among others.

The Government also adopted various early retirement programs since 1994 to reduce the government workforce. Although these measures reduced payroll expenses, which are a substantial portion of governmental, including General Fund, expenses, early retirement programs also reduced the Retirement Systems' revenues because they caused a decrease in employer and employee contributions. These programs were generally not accompanied by up-front funding of the associated retirement costs and had a negative cash flow impact on the Retirement Systems as the same funded early retirement benefits without timely reimbursement from the Commonwealth or sponsoring public corporation or municipality.

Another factor that contributed to the deterioration of the Retirement Systems was the increase in the average life expectancy in Puerto Rico and the United States, from 59.5 years for men and 62.4 years for women in 1950 to 78 years in 2008. This has caused retired employees to receive benefits for more years than originally expected.

Finally, in 2008, the ERS issued the Pension Bonds to increase the assets of the ERS available to invest and pay benefits. Unlike some other U.S. jurisdictions that have used this strategy, the Pension Bonds are obligations of the ERS itself and government employer contributions constitute the repayment source for the bonds.

***Recent Efforts to Address the Financial Condition of the Retirement Systems.*** For the past several years, the Retirement Systems have been evaluating measures to improve their financial solvency. In order to maintain their long-term fiscal integrity and their ability to pay required benefits to their members, the Retirement Systems recognized that a combination of some or all of the following were necessary: (i) a substantial increase in contributions by the Commonwealth and the participating employers, and (ii) actions resulting in changes to liabilities of the Retirement Systems.

Since 2011, the Commonwealth has enacted laws that substantially increase employer contributions to the Retirement Systems, from the increases in the statutory employer contributions based on payroll provided for by Act 114-2011 and Act 116-2011 to the implementation of the additional annual contributions to be actuarially determined (ERS-AUC, TRS-AAC and JRS-AAC) as part of the comprehensive reform legislation of the Retirement Systems in 2013. As discussed above, however, because of the ongoing fiscal crisis, the Commonwealth has been unable to make these actuarially determined additional annual contributions to the Retirement Systems.

In 2013, the Commonwealth also acted to address the liabilities of the Retirement Systems through the comprehensive pension reforms of Act 3-2013 for the ERS, Act 160-2013 for the TRS and Act 162-2013 for the JRS, which sought to freeze retirement benefits of participants in defined contribution programs and provide for the accrual of future benefits under a defined contribution formula, increase the retirement age for various categories of employees, increase the employee contribution rates and reduce various other retirement benefits. As

discussed above, however, some of the important provisions of Act 160-2013 and Act 162-2013 were declared unconstitutional by the Puerto Rico Supreme Court, thus lessening their intended effect on the liabilities of the TRS and JRS.

In addition to the principal measures discussed above, the Retirement Systems have at times implemented other administrative measures to improve their cash flow position, such as imposing limits on or suspending certain loan programs available to members.

Notwithstanding all of these legislative and administrative measures directed at improving the financial health and long-term solvency of the Retirement Systems, the financial condition of the Retirement Systems continues to present one of the principal long-term challenges faced by the Commonwealth, its public corporations and municipalities. This challenge will have to be addressed by the Commonwealth and the Oversight Board pursuant to PROMESA. Even under PROMESA, there may also be constitutional or other legal limitations on the Commonwealth's ability to change certain pension rights afforded to participants in the Retirement Systems.

**Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net Position**

The financial statements of the Retirement Systems reflect the deterioration in their financial position during the last several years as a result of the significant historical underfunding discussed above. Amounts shown in the Statements of Fiduciary Net Position as the "Net Position Restricted for Pensions" for fiscal year 2015 may differ slightly from the "Fiduciary Net Position" set forth in the actuarial reports due to certain adjustments following the completion of the actuarial reports.

*ERS*. As of June 30, 2015 (preliminary, unaudited), the ERS's total assets amounted to $2.771 billion, reflecting a decrease of $660 million from June 30, 2014, and a decrease of $1.209 billion when compared to total assets as of June 30, 2013. Total liabilities as of June 30, 2015 amounted to $3.359 billion, compared to $3.350 billion and $3.265 billion as of June 30, 2014 and 2013, respectively. The ERS's total net deficit position restricted for pensions amounted to $587.7 million as of June 30, 2015, reflecting a decrease in net position of $668.4 million from June 30, 2014 and $1.303 billion when compared to the net position as of June 30, 2013. The ERS has been in a net deficit position since fiscal year 2015.

*TRS*. As of June 30, 2015, the TRS's total assets amounted to $1.364 billion, total liabilities amounted to $52.8 million, and total net position restricted for pensions amounted to $1.311 billion. The TRS's total assets as of June 30, 2015 reflect a decrease of $393 million from June 30, 2014 and a decrease of $616 million when compared to total assets as of June 30, 2013. The total net position restricted for pensions as of June 30, 2015 also reflects a similar decrease of $393 million from June 30, 2014 and $596 million when compared to the net position as of June 30, 2103.

*JRS*. As of June 30, 2015, the JRS's total assets amounted $63.1 million, total liabilities amounted to $20.4 million, and total net position restricted for pensions amounted to $42.8 million. The JRS's total net position restricted for pensions decreased by $5.9 million from June 30, 2014, and by $5.1 million when compared to the net position as of June 30, 2013.

The following tables present the Condensed Statements of Fiduciary Net Position and Statements of Changes in Fiduciary Net Position of each of the Retirement Systems for five years in the period ended June 30, 2015.

**ERS - Pension Plan**
**Condensed Statements of Fiduciary Net Position**
**As of June 30, 2011, 2012, 2013, 2014 and 2015**
(in thousands)

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 180,926 | $ 74,978 | $ 166,338 | $ 406,494 | $ 463,342 |
| Deposits at Commercial Banks | 68,886 | 12,529 | 80,683 | 143,364 | 220,852 |
| Money Market Funds and Others | 116,577 | 181,985 | 168,045 | 166,436 | 170,653 |
| Total Cash and Cash Equivalents | 366,389 | 269,492 | 415,066 | 716,294 | 854,847 |
| | | | | | |
| Receivables- Net: | | | | | |
| Employers, Net | 251,340 | 195,803 | 131,033 | 111,975 | 184,152 |
| Due from Judiciary Retirement System | 7,089 | 19,122 | 15,870 | 1,345 | 881 |
| Accrued Investment Income | 5,314 | 9,500 | 11,494 | 13,044 | 7,594 |
| Investments Sold | 108,607 | 10,976 | 729 | 78,941 | 9,546 |
| Others | 16,688 | 20,819 | 16,125 | 33,404 | 10,742 |
| Total Receivables- Net | 389,038 | 256,220 | 175,251 | 238,709 | 212,915 |
| | | | | | |
| Collateral from Security Lending Transactions | 80,071 | 126,648 | 124,411 | 54,870 | 134,319 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 764,445 | 1,199,169 | 1,121,358 | 1,129,413 | 651,908 |
| Nonexchange Commingled Trust Funds | 409,001 | 750,482 | 1,053,555 | 786,839 | 1,370,202 |
| Stocks | — | 102 | 75 | 247,772 | 212,040 |
| Investment in Limited Partnerships | 54,026 | 54,146 | 55,067 | 57,370 | 65,457 |
| COFINA bonds | 89,139 | 138,123 | 229,819 | 245,339 | 162,500 |
| Total Investments | 1,316,611 | 2,142,022 | 2,459,874 | 2,466,733 | 2,462,107 |
| | | | | | |
| Members Loans and Interest Receivable- Net | 607,617 | 619,379 | 791,161 | 955,057 | 1,275,381 |
| | | | | | |
| Capital Assets -Net | 10,522 | 11,211 | 8,594 | 11,668 | 8,951 |
| Other Assets | 785 | 5,695 | 5,261 | 5,375 | 6,375 |
| **Total Assets** | 2,771,033 | 3,430,667 | 3,979,618 | 4,448,706 | 4,954,895 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | - | - | - | | 62,843 |
| Accounts Payable and Accrued Liabilities | 9,329 | 12,236 | 13,905 | 27,718 | 12,923 |
| Bonds Interest Payable | 13,876 | 13,876 | 13,876 | 13,877 | 13,876 |
| Payable for Investment Securities Purchased | 7,754 | 19,009 | - | 82,384 | 1,854 |
| Securities Lending Obligations | 80,071 | 126,648 | 124,411 | 54,870 | 134,319 |
| Due to Commonwealth | | 37,082 | | — | — |
| Bonds Payable | 3,105,449 | 3,077,587 | 3,051,189 | 3,026,593 | 3,003,482 |
| Other Liabilities | 142,231 | 63,563 | 61,180 | 36,808 | 33,959 |
| **Total Liabilities** | 3,358,710 | 3,350,001 | 3,264,561 | 3,242,250 | 3,263,256 |
| | | | | | |
| **Net Position Restricted for Pensions** | $ (587,677) | $ 80,666 | $ 715,057 | $ 1,206,456 | $ 1,691,639 |

*Amounts are preliminary, unaudited and subject to change.

237

**ERS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
| Basic Benefits, Net | $ 550,809 | $ 485,114 | $ 424,704 | $ 388,103 | $ 349,207 |
| Special Benefits | 186,160 | 228,699 | 203,943 | 193,351 | 187,674 |
| COFINA Investment Contribution | - | - | - | - | 162,500 |
| Member Contributions | 339,650 | 359,862 | 322,528 | 316,178 | 322,008 |
| Total Contributions | 1,076,619 | 1,073,675 | 951,175 | 897,632 | 1,021,389 |
| | | | | | |
| Net Investment and Security | | | | | |
| Lending Transaction Income | 32,601 | 225,005 | 245,022 | 272,382 | 645,720 |
| Other Income | 28,931 | 30,748 | 22,994 | 24,727 | 49,257 |
| **Total Additions** | 1,138,151 | 1,329,428 | 1,219,191 | 1,194,741 | 1,716,366 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
| Annuities and Death Benefits | 1,355,188 | 1,413,541 | 1,228,271 | 1,184,353 | 1,141,858 |
| Special Benefits | 186,137 | 134,882 | 201,742 | 192,539 | 187,369 |
| Refunds of Contributions | 31,350 | 166,335 | 52,307 | 52,228 | 91,195 |
| Interest on Bonds Payable | 194,400 | 192,947 | 191,135 | 189,641 | 188,247 |
| General, Administrative and Others | 39,419 | 56,114 | 49,324 | 61,163 | 47,782 |
| **Total Deductions** | 1,806,494 | 1,963,819 | 1,722,779 | 1,679,924 | 1,656,451 |
| | | | | | |
| **Net Change in Net Position** | (668,343) | (634,391) | (503,588) | (485,183) | 59,915 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year, as restated | 80,666 | 715,057 | 1,206,456 | 1,691,639 | 1,664,991 |
| Adjustments of Beginning of Year Net Position: | | | | | |
| Effect of Adoption GASB 65 | | — | — | — | (33,267) |
| Correction of Immaterial Errors | | — | 12,189 | — | — |
| Beginning of Year, as Restated and Adjusted | 80,666 | 715,057 | 1,218,645 | 1,691,639 | 1,631,724 |
| End of Year | $ (587,677) | $ 80,666 | $ 715,057 | $1,206,456 | $1,691,639 |

*Amounts are preliminary, unaudited and subject to change.

238

In fiscal year 2014, the ERS adopted GASB Statement No. 65, *Items Previously Reported as Assets and Liabilities* (GASB 65). This Statement establishes accounting and financial reporting standards that reclassify, as deferred outflows of resources or deferred inflows of resources, certain items that were previously reported as assets and liabilities and recognizes, as outflows of resources or inflows of resources, certain items that were previously reported as assets and liabilities. Concepts Statement No. 4, *Elements of Financial Statements*, introduced and defined the elements included in financial statements, including deferred outflows of resources and deferred inflows of resources. In addition, Concepts Statement No. 4 provides that reporting a deferred outflow of resources or a deferred inflow of resources should be limited to those instances identified by the GASB in authoritative pronouncements that are established after applicable due process. This Statement amends the financial statement element classification of certain items previously reported as assets and liabilities to be consistent with the definitions in Concepts Statement No. 4. This Statement also provides other financial reporting guidance related to the impact of the financial statement elements deferred outflows of resources and deferred inflows of resources and limiting the use of the term deferred in financial statement presentations. GASB 65 requires that debt issuance costs be recognized as deduction in the period incurred in the statement of changes in fiduciary net position. At transition, the impact of GASB 65 was to decrease the fiduciary net position as of July 1, 2010 by approximately $33,267,000 reflecting the cumulative retrospective effect of derecognizing the debt issuance costs which had previously been deferred in the statement of fiduciary net position. In addition, the issuance costs amortization of approximately $1,095,000 in each of the fiscal years ended June 30, 2013, 2012, and 2011 included as deduction of interest on bond payable in the statement of changes in fiduciary net position, were derecognized.

Subsequent to the issuance of the ERS's 2013 financial statements, management identified various errors in such previously issued financial statements. The ERS found unrecorded amounts due from the JRS resulting from net benefits paid by the ERS to the JRS's retirees and beneficiaries and from unallocated ERS's general and administrative expenses and other expenses. As a result, the ERS's net position restricted for pension as of July 1, 2012 was increased by approximately $12,189,000, including an estimate of approximately $4,249,000 for the lost income to be restored to the ERS. Additionally, the other income, the benefits paid to participants and the other expenses for the year ended June 30, 2013 were increased (decreased) by approximately $959,000, ($699,000) and $151,000, respectively, to correct these immaterial errors. Information to restate the financial statements prior to June 30, 2013 was not included because it was impracticable to determine them.

**TRS - Pension Plan**

**Condensed Statements of Fiduciary Net Position**

**As of June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

|  | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 4,545 | $ 3,301 | $ 8,494 | $ 16,220 | $ 3,401 |
| Deposits at Commercial Banks | 1,951 | 2,722 | 2,880 | 2,715 | 2,371 |
| Money Market Funds and Others | 57,242 | 11,483 | 56,303 | 318,920 | 94,898 |
| Total Cash and Cash Equivalents | 63,738 | 17,506 | 67,677 | 337,855 | 100,670 |
| | | | | | |
| Receivables: | | | | | |
| Accrued Investment Income | 3,399 | 6,146 | 7,847 | 7,603 | 3,982 |
| Investments Sold | 46,862 | 4,311 | 57 | 38,743 | 2,320 |
| Others | 9,983 | 14,704 | 23,414 | 34,404 | 44,883 |
| Total Receivables, Net | 60,244 | 25,161 | 31,318 | 80,750 | 51,185 |
| | | | | | |
| Collateral from Security Lending Transactions | 25,960 | 15,152 | 48,420 | 20,528 | 70,938 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 371,022 | 649,774 | 742,146 | 682,728 | 366,995 |
| Nonexchange Commingled Trust Funds | 335,528 | 503,619 | 546,775 | 516,914 | 1,151,073 |
| Stocks | 66,357 | 92,900 | 97,299 | 213,053 | 284,785 |
| Investment in Limited Partnerships | 7,500 | 11,170 | 14,823 | 19,221 | 25,630 |
| Total Investments | 780,407 | 1,257,463 | 1,401,043 | 1,431,916 | 1,828,483 |
| | | | | | |
| Members Loans and Interest Receivable- Net | 415,946 | 420,544 | 411,032 | 403,812 | 406,664 |
| | | | | | |
| Capital Assets -Net | 16,570 | 17,325 | 19,312 | 20,885 | 22,204 |
| Other Assets | 1,065 | 846 | 781 | 832 | 472 |
| **Total Assets** | 1,363,930 | 1,753,997 | 1,979,583 | 2,296,578 | 2,480,616 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | — | 4,942 | — | — | — |
| Accounts Payable and Accrued Liabilities | 17,218 | 16,188 | 16,860 | 16,237 | 14,851 |
| Payable for Investment Securities Purchased | 2,518 | 4,442 | 65 | 153,714 | 1,701 |
| Securities Lending Obligations | 25,960 | 15,152 | 48,420 | 20,528 | 70,938 |
| Other Liabilities | 7,153 | 9,494 | 7,356 | 6,883 | 7,263 |
| **Total Liabilities** | 52,849 | 50,218 | 72,701 | 197,362 | 94,753 |
| | | | | | |
| **Net Position Restricted for Pensions** | $1,311,081 | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

**TRS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

|  | 2015 | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
| Basic Benefits | $ 145,773 | $ 139,453 | $ 133,369 | $ 123,614 | $ 112,071 |
| Special Benfits | 48,768 | 49,914 | 54,075 | 53,405 | 47,753 |
| Member Contributions | 107,465 | 119,592 | 120,842 | 123,249 | 124,125 |
| Total Contributions | 302,006 | 308,959 | 308,286 | 300,268 | 283,949 |
| | | | | | |
| Net Investment and  Security | | | | | |
| Lending Transaction Income | 59,921 | 190,023 | 157,494 | 37,153 | 481,164 |
| Other Income | 1,057 | 1,416 | 1,432 | 1,374 | 968 |
| **Total Additions** | 362,984 | 500,398 | 467,212 | 338,795 | 766,081 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
| Annuities and death benefits | 684,074 | 626,027 | 579,144 | 547,955 | 513,874 |
| Special Benefits | 32,819 | 46,964 | 49,130 | 48,492 | 48,286 |
| Refunds of Contributions | 19,407 | 10,707 | 7,666 | 5,220 | 8,465 |
| General, Administrative and Others | 19,382 | 19,803 | 23,606 | 23,775 | 31,570 |
| **Total Deductions** | 755,682 | 703,501 | 659,546 | 625,442 | 602,195 |
| | | | | | |
| **Net Change in Net Position** | (392,698) | (203,103) | (192,334) | (286,647) | 163,886 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year | 1,703,779 | 1,906,882 | 2,099,216 | 2,385,863 | 2,221,977 |
| End of Year | $1,311,081 | $1,703,779 | $1,906,882 | $2,099,216 | $2,385,863 |

**JRS - Pension Plan**

**Condensed Statements of Fiduciary Net Position**

**As of June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

|  | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ASSETS** | | | | | |
| Cash and Cash Equivalents: | | | | | |
| Deposits with GDB | $ 3,173 | $ 3,143 | $ 2,579 | $ 745 | $ 1,011 |
| Deposits at Commercial Banks | — | — | — | 11,543 | 6,409 |
| Money Market Funds and Others | 1,624 | 2,545 | — | — | — |
| Total Cash and Cash Equivalents | 4,797 | 5,688 | 2,579 | 12,288 | 7,420 |
| | | | | | |
| Receivables: | | | | | |
| Employer | — | 283 | — | — | — |
| Accrued Investment Income | 162 | 175 | 191 | 255 | 263 |
| Investments Sold | 1,000 | — | — | — | — |
| Others | 62 | 26 | 27 | 27 | 27 |
| Total Receivables- Net | 1,224 | 484 | 218 | 282 | 290 |
| | | | | | |
| Collateral from Security Lending Transactions | 1,393 | 827 | 2,002 | 1,088 | 3,218 |
| | | | | | |
| Investments: | | | | | |
| Bonds and Notes | 32,225 | 19,232 | 18,693 | 27,268 | 28,097 |
| Nonexchange Commingled Trust Funds | 11,368 | 39,896 | 39,661 | 21,462 | 29,135 |
| Stocks | — | — | — | — | 4,858 |
| Total Investments | 43,593 | 59,128 | 58,354 | 48,730 | 62,090 |
| | | | | | |
| Members Loans and Interest Receivable- Net | 477 | 542 | 436 | 471 | 845 |
| **Total Assets** | 51,484 | 66,669 | 63,589 | 62,859 | 73,863 |
| | | | | | |
| **LIABILITIES** | | | | | |
| Overdraft in Cash with Fiscal Agent | 2,381 | — | — | 1,603 | 5,560 |
| Payable for Investment Securities Purchased | — | 190 | — | — | 2 |
| Securities Lending Obligations | 1,393 | 827 | 2,002 | 1,088 | 3,218 |
| Due to Employees Retirement System | 7,089 | 19,122 | 15,870 | 1,345 | 881 |
| Other Liabilities | 449 | 463 | 401 | 235 | 227 |
| **Total Liabilities** | 11,312 | 20,602 | 18,273 | 4,271 | 9,888 |
| | | | | | |
| **Net Position Restricted for Pensions** | $ 40,172 | $ 46,067 | $ 45,316 | $ 58,588 | $ 63,975 |

*Amounts are preliminary, unaudited and subject to change.

242

**JRS - Pension Plan**

**Condensed Statements of Changes in Fiduciary Net Position**

**For the Years Ended June 30, 2011, 2012, 2013, 2014 and 2015**

**(in thousands)**

| | 2015* | 2014 | 2013 | 2012 | 2011 |
|---|---|---|---|---|---|
| **ADDITIONS:** | | | | | |
| Contributions: | | | | | |
| Employer Contributions: | | | | | |
|   Basic Benefits | $ 10,578 | $ 10,762 | $ 10,034 | $ 10,088 | $ 9,966 |
|   Special Benfits | 1,759 | 1,230 | 1,368 | 537 | 629 |
| Member Contributions | 3,676 | 3,804 | 2,825 | 2,943 | 2,789 |
| Total Contributions | 16,013 | 15,796 | 14,227 | 13,568 | 13,384 |
| | | | | | |
| Net Investment Income | | | | | |
|   Lending Transaction Income | 899 | 9,713 | 6,694 | 1,718 | 14,294 |
| Other Income | 873 | 59 | 603 | 18 | 10 |
| **Total Additions** | 17,785 | 25,568 | 21,524 | 15,304 | 27,688 |
| | | | | | |
| **DEDUCTIONS:** | | | | | |
| Benefits Paid to Participants: | | | | | |
|   Annuities and death benefits | 21,371 | 21,489 | 19,208 | 20,111 | 18,617 |
|   Special Benefits | 1,759 | 948 | 1,944 | — | — |
| Refunds of Contributions | 4 | 230 | — | 64 | 10 |
| General, Administrative and Others | 546 | 2,150 | 1,455 | 516 | 496 |
| **Total Deductions** | 23,680 | 24,817 | 22,607 | 20,691 | 19,123 |
| | | | | | |
| **Net Change in Net Position** | (5,895) | 751 | (1,083) | (5,387) | 8,565 |
| | | | | | |
| **Net Position Restricted for Pensions:** | | | | | |
| Beginning of Year, as restated | 46,067 | 45,316 | 58,588 | 63,975 | 55,410 |
| Adjustments of Beginning of Year Net Position: | | | | | |
|   Correction of Immaterial Errors | — | — | (12,189) | — | — |
| Beginning of Year, as Restated and Adjusted | 46,067 | 45,316 | 46,399 | 63,975 | 55,410 |
| End of Year | $ 40,172 | $ 46,067 | $ 45,316 | $ 58,588 | $ 63,975 |

*Amounts are preliminary, unaudited and subject to change.

243

Subsequent to the issuance of the JRS's 2013 financial statements, management identified various errors in such previously issued financial statements. The JRS found unrecorded amounts due to the ERS resulting from net benefits paid by the ERS to the JRS's retirees and beneficiaries and from unallocated ERS's general and administrative expenses and other expenses. As a result, the JRS's net position restricted for pension as of July 1, 2012 was decreased by approximately $12,189,000, including an estimate of approximately $4,249,000 for the lost income to be restored to the ERS. Additionally, the net investment and security lending transactions income, the benefits paid to participants, the general and administrative expenses and the other deductions for the year ended June 30, 2013 were increased (decreased) by approximately $22,000, $699,000, ($129,000) and $959,000, respectively, to correct these errors. Information to restate the financial statements prior to June 30, 2013 was not included because it was impracticable to determine them.

**Post-Employment Benefits Other Than Pensions**

The Commonwealth provides post-employment benefits other than pensions, consisting of a medical insurance plan contribution, through defined-benefit plans that are administered by each of the Retirement Systems: the ERS Medical Insurance Plan Contribution ("**ERS MIPC**"), the TRS Medical Insurance Plan Contribution ("**TRS MIPC**"), and the JRS Medical Insurance Plan Contribution ("**JRS MIPC**").

The ERS MIPC is an unfunded cost-sharing, multiple-employer defined-benefit other post-employment benefit ("**OPEB**") plan sponsored by the Commonwealth. The TRS MIPC and JRS MIPC are unfunded, single-employer defined-benefit OPEB plans sponsored by the Commonwealth. These OPEB plans were created under Act No. 95, approved on June 29, 1963. Healthcare benefits are provided through insurance companies whose premiums are paid by the retiree or disabled member, with the Commonwealth providing a matching share of up to $100 per month to the eligible medical insurance plan selected by the retiree or disabled member. Retirees or disabled members contribute the amount of the healthcare insurance premium not covered by the Commonwealth contribution

All of these OPEB plans are funded by the Commonwealth and its public corporations and municipalities on a pay-as-you-go basis. The funding of the OPEB benefits are provided to the ERS MIPC, the JRS MIPC and TRS MIPC through legislative appropriations each July 1 by the Commonwealth's General Fund for former government employees and for former employees of certain public corporations and municipalities. The legislative appropriations are estimates of the benefit payments to be made by the ERS MIPC, the JRS MIPC and TRS MIPC throughout the year. There are no contribution requirements for plan members during active employment.

For the ERS-MIPC, plan members were eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits. Act 3-2013 eliminated this healthcare benefit to ERS MIPC members retired after June 30, 2013. Act 3-2013 did not change the medical insurance plan contribution for members that retired prior to July 1, 2013. As a result of the changes in Act 3-2013, the actuarial accrued liability of ERS MIPC for these benefits, as of June 30, 2013, decreased by $638.1 million, from $2.12 billion to $1.48 billion, or by 30.0%, compared to June 30, 2012.

For the TRS-MIPC, plan members were eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits. Act No. 160-2013 eliminated this

healthcare benefit to TRS MIPC members retired after July 31, 2014. As a result of the changes in Act No. 160-2013, the actuarial accrued liability of the TRS MIPC for these benefits, as of June 30, 2014, decreased by $249.7 million, from $792.9 million to $543.2 million, or by 31.5%, compared to June 30, 2013.

For the JRS-MIPC, plan members are eligible for this benefit upon meeting the eligibility requirement for pension or disability benefits. In the case of the JRS-MIPC, Act 162-2013 did not change these benefits.

Post-employment benefits other than pensions are valued using actuarial principles similar to the way that pension benefits are calculated. The following table summarizes the results of the actuarial valuations for these benefits as of June 30, 2015. Since these benefits are not pre-funded, as discussed above, the unfunded actuarial accrued liability is equal to the actuarial accrued liability.

### Post-Employment Benefits Other Than Pensions
### ($ in millions)

| | Actuarial Value of Assets | Actuarial Accrued Liability[1] | Unfunded Actuarial Accrued Liability (UAAL) | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| ERS MIPC...................................... | - | $1,429 | $1,429 | 0% | $3,319 | 43.0% |
| TRS MIPC...................................... | - | 549 | 549 | 0 | 1,127 | 48.6 |
| JRS MIPC...................................... | - | 7 | 7 | 0 | 32 | 21.7 |
| Total ............................................. | - | $1,985 | $1,985 | 0% | $4,478 | 44.3% |

[1] The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

Source: Actuarial valuation reports for each of the Retirement Systems.

Post-employment benefits other than pensions paid by the Retirement Systems for fiscal years 2014 and 2015 amounted to $138.3 million and 144.1 million, respectively. These amounts were allocated as follows: for fiscal year 2014, $102.1 million for ERS MIPC, $35.9 million for the TRS MIPC and $0.3 million for the JRS MIPC; and for fiscal year 2015, $106.0 million for the ERS MIPC, $37.8 million for the TRS MIPC and $0.3 million for the JRS MIPC. The Proposed PROMESA Fiscal Plan measures incorporate certain modifications to these benefits.

In accordance with the provisions of GASB Statement No. 45, *Accounting and Financial Reporting by Employers for Postemployment Benefits Other Than Pensions*, the Commonwealth is required to quantify and disclose its obligations to pay non-pension post-employment benefits to current and future retirees. The following table sets forth, according to the actuarial valuations, the actuarial accrued liability, unfunded actuarial accrued liability (UAAL), covered payroll and UAAL as a percentage of covered payroll for the non-pension post-employment benefits of the active and retired members of each of the Retirement Systems, for the last five fiscal years of reported actuarial valuations. Since these benefits are not pre-funded, as discussed above, the UAAL is equal to the actuarial accrued liability.

245

## Post-Employment Healthcare Benefits Plans
## Actuarial Valuations as of the Indicated Fiscal Years
### ($ in millions)

| Fiscal Year Ending June 30, | Actuarial Value of Assets | Actuarial Accrued Liability[1] | UAAL | Funded Ratio | Covered Payroll | UAAL as a Percentage of Covered Payroll |
|---|---|---|---|---|---|---|
| **ERS MIPC** | | | | | | |
| 2011 ............................... | - | $1,758 | $1,758 | 0% | $3,666 | 48.0% |
| 2012 ............................... | - | 2,121 | 2,121 | 0 | 3,570 | 59.4 |
| 2013 ............................... | - | 1,483 | 1,483 | 0 | 3,489 | 42.5 |
| 2014……… ..................... | - | 1,438 | 1,438 | 0 | 3,489 | 41.2 |
| 2015……… ..................... | - | 1,429 | 1,429 | 0 | 3,319 | 43.0 |
| **TRS MIPC** | | | | | | |
| 2011 ............................... | | 706 | 706 | 0 | 1,320 | 53.5 |
| 2012 ............................... | - | 797 | 797 | 0 | 1,293 | 61.7 |
| 2013 ............................... | - | 793 | 793 | 0 | 1,249 | 63.5 |
| 2014 ............................... | - | 543 | 543 | 0 | 1,171 | 46.4 |
| 2015……… ..................... | - | 549 | 549 | 0 | 1,127 | 48.6 |
| **JRS MIPC** | | | | | | |
| 2011 ............................... | - | 6 | 6 | 0 | 32 | 18.3 |
| 2012 ............................... | - | 7 | 7 | 0 | 33 | 19.9 |
| 2013 ............................... | - | 7 | 7 | 0 | 32 | 20.9 |
| 2014 ............................... | - | 7 | 7 | 0 | 32 | 20.6 |
| 2015 ............................... | - | 7 | 7 | 0 | 32 | 21.7 |

The actuarial accrued liability is the liability or obligation for benefits earned by active and retired employees through the valuation date based on certain actuarial methods and assumptions.

# THE ECONOMY

**Overview**

Puerto Rico's economy entered a recession in the fourth quarter of fiscal year 2006. The Commonwealth's gross national product (GNP) contracted (in real terms) every fiscal year between 2007 and 2015, with the exception of fiscal year 2012. The lower rate of GNP decline after fiscal year 2011 and the slight growth observed in fiscal year 2012 were due mainly to the large amount of stimuli and deficit spending injected into the Puerto Rico economy during the period (e.g. $7.1 billion in federal funds through the American Recovery and Reinvestment Act, $500 million in local stimulus funded by COFINA bond proceeds in 2009 and 2010, and $706 million in corporate and individual income tax cuts (later modified due to resulting revenue shortfalls)).

According to the Puerto Rico Planning Board's numbers released in May of 2016, Puerto Rico's real gross national product for fiscal years 2014 and 2015 decreased by 1.7% and 0.6%, respectively. In October of 2016 the Planning Board revised its real GNP forecast for fiscal years 2016 and 2017, projecting a contraction of 1.8% and 2.3% respectively.

In fiscal year 2015, aggregate personal income was $64.3 billion ($59.6 billion in 2009 prices) and personal income per capita was $18,347 ($17,006 in 2009 prices). Personal income includes transfer payments to individuals in Puerto Rico under various social programs. Total United States federal transfer payments to individuals amounted to $16.8 billion in fiscal year 2015 and $16.7 billion in fiscal year 2014. Entitlements for previously performed services or resulting from contributions to programs such as Social Security, Veterans' Benefits, Medicare, and United States Civil Service retirement pensions were $13.6 billion, or 81.4% of the transfer payments to individuals in fiscal year 2015 ($12.8 billion, or 76.7%, in fiscal year 2014). The remainder of the federal transfers to individuals is represented by grants, mostly concentrated in the Nutritional Assistance Program (Food Stamps) and Pell Grant scholarships (higher education).

The dominant sectors of the Puerto Rico economy in terms of production and income are manufacturing and services. The manufacturing sector has undergone fundamental changes over the years as a result of the phase out of Section 936 of the United States Internal Revenue Code and an increased concentration on higher-wage, high-technology industries, such as pharmaceuticals, computer products, biotechnology, professional and scientific instruments, and certain high technology machinery and equipment. At the present time, almost 90% of manufacturing is generated by chemical and electronic products. The service sector, which includes finance, insurance, real estate, wholesale and retail trade, transportation, communications and public utilities, and other services, plays a major role in the economy. It ranks second to manufacturing in contribution to gross domestic product and leads all sectors in providing employment.

The following table shows the Puerto Rico GNP for fiscal years 2011 through 2015, compared to the annual percentage increase in real GNP in the United States. There are some differences between the previously reported figures of Puerto Rico's GNP and the current figures set forth below due to the recent revision of several components of GNP, which included

247

changes since fiscal year 2001. Therefore, growth rates and figures before fiscal year 2001 are not wholly comparable with the amounts reported afterwards.

**Commonwealth of Puerto Rico**
**Gross National Product**
**Fiscal Years Ended June 30,**
**(dollar amounts in $ millions)**

|  | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
|---|---|---|---|---|---|
| GNP (PR) (current prices) | $65,721 | $68,086 | $68,945 | $68,461 | $68,521 |
| Real GNP (PR) (2009 prices) | $60,312 | $60,636 | $60,555 | $59,523 | $59,194 |
| Annual percentage increase (decrease) in real GNP (PR) (2009 prices) | (1.7) % | 0.5% | (0.1) % | (1.7) % | (0.6) % |
| Annual percentage increase (decrease) in real GNP (United States) (2009 prices) | 2.4% | 2.2% | 1.3% | 2.2% | 2.8% |

_____

[1] Preliminary.

*Sources:* Puerto Rico Planning Board and IHS-Global Insight.

The economy of Puerto Rico is closely linked to the United States economy, as most of the external factors that affect the Puerto Rico economy (other than oil prices) are determined by the policies and performance of the mainland economy. These external factors include exports, direct investment, the amount of federal transfer payments, the level of interest rates, the rate of inflation, and tourist expenditures. During fiscal year 2015, approximately 74.1% of Puerto Rico's exports went to the United States mainland, which was also the source of approximately 51.7% of Puerto Rico's imports. In fiscal year 2015, Puerto Rico experienced a positive merchandise trade balance of approximately $26.2 billion. On the other hand, the share of total investment to GNP decreased to 13.1% in fiscal year 2015, from 13.5% in fiscal year 2014, and from 27.6% in fiscal year 2001. Total investment reached the level of $8,956.0 million in fiscal year 2015, compared to the level of $12,159.3 in fiscal year 2001. This general trend on the level of investment has been partially compensated by the increase in the net balance of the federal transfer payments which increased from $5,683.4 million in fiscal year 2001 to $13,339.5 million in fiscal year 2015. Moreover, interest rates remained at very low levels during the past years, as well as the core inflation (which exclude energy and food prices), and the U.S. economy has kept growing at a moderated pace since fiscal year 2010.

The following graph compares the growth rate of real GNP for the Puerto Rico and United States economies since fiscal year 2001, and the forecast of the growth rate for fiscal years 2016 and 2017.



## Real GNP Growth Rate
### (Percent)

* Estimate for Puerto Rico from the Puerto Rico Planning Board (Oct. 2016).
** Estimate for U.S. from IHS-Global Insight (Oct. 2016).
*Sources:* Puerto Rico Planning Board & IHS-Global Insight.

Since the 1950s, the Planning Board has prepared a complete set of macroeconomic measures like those prepared for the United States by the Bureau of Economic Analysis ("BEA") of the Department of Commerce, as part of the National Income and Product Accounts ("NIPA"). In contrast with the BEA, which computes the economic accounts on a quarterly basis, the Planning Board computes Puerto Rico's NIPA on an annual basis. The Planning Board revises its statistics on an annual basis. The Planning Board classifies its statistics as preliminary until they are revised and made final in conjunction with the release of new data each year. Thus, all macroeconomic accounts for fiscal year 2015 shown in this Report are preliminary until the revised figures for fiscal year 2015 and the preliminary figures for fiscal year 2016 are released, and the forecast for fiscal year 2017 is revised. The Planning Board could also revise back more than two years to the extent it obtains more complete information.

Certain information regarding current economic activity is available in the form of the FAFAA Economic Activity Index (FAFAA-EAI), a coincident indicator of ongoing economic activity. This index, shown in the following graph (published by GDB from December 2009 to March 2016, and by FAFAA since April 2016), is composed of several variables (total payroll employment based on the Establishment Survey, total electric power generation, cement sales and consumption of gasoline) that highly correlate to Puerto Rico's real gross national product. However, the FAFAA-EAI does not measure the real GNP annual growth rates. Since the FAFAA-EAI is generated with only four variables, it is more volatile than the real GNP figures. This means that both increments and declines reflected in the FAFAA -EAI amplify the corresponding movements of the real GNP. In April, 2015 the GDB published an update about

249

the way it was computing the seasonal adjustments for the components of the GDB-EAI. That update was performed to reduce the volatility of the Index in order to make the month-to-month comparisons more reliable. The new method implied changes on the level of the Index (making it slightly higher), and on the growth rates (both, year-over-year and month-over-month, making them less volatile). The FAFAA-EAI for September 2016 was 124.5, a decrease of 0.5% compared to September 2015. The average cumulative value for fiscal year 2016 decreased by 1.4% when compared to fiscal year 2015. Furthermore, for fiscal year 2015, the FAFAA-EAI showed a reduction of 1.8%, compared to the corresponding figure for fiscal year 2014. For more information about the FAFAA-EAI methodology and recent modifications to reduce volatility see the GDB's website at www.gdbpr.com under "Economy-Economic Activity Index.

FAFAA Economic Activity Index



**Economic Forecast for Fiscal Years 2016 and 2017**

In October of 2016, the Planning Board released its revised GNP forecast for fiscal years 2016 and 2017. The Planning Board's forecasts for fiscal year 2016 and 2017 project a decrease in gross national product of 1.8% and 2.3%, in constant dollars. The Planning Board's forecast took into account global and United States economies, product exports, visitors 'expenditures, investment in construction, personal consumption expenditures, and federal transfers to individuals, among other parameters.

**Fiscal Year 2015**

The Planning Board's preliminary reports on the performance of the Puerto Rico economy for fiscal year 2015 indicate that real gross national product decreased 0.6% (an increase of 0.1% in current dollars) over fiscal year 2014. Nominal gross national product was $68.5 billion in fiscal year 2015 ($59.2 billion in 2009 prices), compared to $68.5 billion in fiscal year 2014 ($59.5 billion in 2009 prices). Aggregate personal income increased from $63.3 billion in fiscal year 2014 ($58.9 billion in 2009 prices) to $64.3 billion in fiscal year 2015 ($59.6 billion in 2009 prices). Personal income per capita increased when measured in current and

250

constant prices, from $17,749 in fiscal year 2014 ($16,538 in 2009 prices) to $18,347 in fiscal year 2015 ($17,006 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2015 averaged 983,530, a decrease of 0.9% compared to the previous fiscal year; and the unemployment rate averaged 13.0%, a decrease from 14.3% for fiscal year 2014.

Among the variables that contributed to the small gross national product results were a slight increase in consumption expenditures and an increase in sales to the rest of the world. There was also a decrease in the average price of West Texas Intermediate (WTI) oil, from $101.3 per barrel in fiscal year 2014 to $69.3 per barrel in fiscal year 2015, a decrease of 31.6%.

**Fiscal Year 2014**

The Planning Board's reports on the performance of the Puerto Rico economy for fiscal year 2014 indicate that real gross national product decreased 1.7% (a decrease of 0.7% in current dollars) over fiscal year 2013. Nominal gross national product was $68.5 billion in fiscal year 2014 ($59.5 billion in 2009 prices), compared to $68.9 billion in fiscal year 2013 ($60.6 billion in 2009 prices). Aggregate personal income decreased from $64.2 billion in fiscal year 2013 ($60.7 billion in 2009 prices) to $63.3 billion in fiscal year 2014 ($59.9 billion in 2009 prices). Personal income per capita increased when measured in current prices, but decreased when measured in constant prices, from $17,753 in fiscal year 2013 ($16,799 in 2009 prices) to $17,749 in fiscal year 2014 ($16,538 in 2009 prices).

According to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2014 averaged 992,627, a decrease of 2.2% compared to the previous fiscal year; and the unemployment rate averaged 14.3%, an increase from 14.0% for fiscal year 2013.

Among the variables that contributed to the gross national product results were a decrease in consumption expenditures and a slight increase in sales to the rest of the world. There was also an increase in the average price of West Texas Intermediate (WTI) oil, from $92.1 per barrel in fiscal year 2013 to $101.3 per barrel in fiscal year 2014, an increase of 10.0%.

**Employment and Unemployment**

Total average annual employment, as measured by the Puerto Rico Department of Labor and Human Resources Household Employment Survey, known as the "Household Survey" (which is generally used for the computation of the unemployment and participation rates), has decreased in recent years. The reduction in total employment began in the fourth quarter of fiscal year 2007, when total employment was 1,244,425, and continued consistently until the first half of fiscal year 2015, after which it mostly stabilized. Still, at the end of the year the total employment averaged 983,530, a decrease of 0.9% when compared to fiscal year 2014.

Nevertheless, according to the Household Survey, the number of persons employed in Puerto Rico during fiscal year 2016 averaged 1,001,525, an increase of 1.8% when compared to the previous fiscal year; and the unemployment rate averaged 11.7%, as compared to the 13.0% it reached during fiscal year 2015. Additionally, during the first five months of fiscal year 2017, total employment decreased by 0.4% when compared to the same period for the prior fiscal year,

251

and the unemployment rate averaged 12.3%, unchanged to what it averaged for the same period of the prior fiscal year. According to the Establishment Survey (also known as the Payroll Survey), which is a different survey generally used to measure employment across the various sectors of the economy, total payroll non-farm employment decreased by 1.2% during fiscal year 2016. Similarly, it decreased by 0.7% during the first five months of fiscal year 2017. Total private employment fell by 1.1%, a reduction of 7,300 employees during fiscal year 2016. Furthermore, during the first five months of fiscal year 2017, private employment also decreased by 0.7%, which translates to a reduction of almost 4,800 employees, as compared to the same period for the prior fiscal year.

The following table presents annual statistics of employment and unemployment for fiscal year 2012 through fiscal year 2016. These employment figures are based on the Household Survey, which includes self-employed individuals and agricultural employment, instead of the non-farm payroll employment survey (the "Payroll Survey"), which does not. The number of self-employed individuals represents around 16.4% of civilian employment in Puerto Rico, more than double the level in the United States. On the other hand, agricultural employment in Puerto Rico represented 1.5% of total employment in fiscal year 2016.

**Commonwealth of Puerto Rico**
**Employment and Unemployment**
**(Persons age 16 and over, in thousands)**

| Fiscal Years Ended June 30, | Labor Force | Employed | Unemployed | Unemployment Rate[1] |
|---|---|---|---|---|
| | | (Annual Average) | | |
| 2012 | 1,208 | 1,025 | 183 | 15.2% |
| 2013 | 1,180 | 1,015 | 165 | 14.0% |
| 2014 | 1,159 | 993 | 166 | 14.3% |
| 2015 | 1,130 | 984 | 147 | 13.0% |
| 2016 | 1,134 | 1,002 | 133 | 11.7% |

_____
Totals may not add due to rounding.
[1] Unemployed as percentage of labor force.
*Source:* Department of Labor and Human Resources – Household Survey

Employment data coming from the Payroll Survey is corrected every year (specifically, every March) with a benchmark revision. From calendar year 2006 to calendar year 2011 the revisions implied additions or subtractions of around 4,400 jobs (the highest addition was in 2008 with 5,300 jobs, and the highest subtraction corresponded to 2009 with 6,500 less jobs). However, the benchmark revision of 2013 added 18,433 jobs, the revision of March 2014 (which affected mainly calendar year 2013) increased the number of jobs by 21,275. The revision of March 2015 (which corresponded mainly to calendar year 2014), decreased the number of jobs by 17,300, and the benchmark revision of March 2016 (the most recent one, that mainly affected calendar year 2015), decreased the number of jobs by 9,017. In other words, payroll employment revisions after 2012 have been much more volatile than the previous revisions.

**Economic Performance by Sector**

From fiscal year 2011 to fiscal year 2015, the manufacturing and service sectors generated the largest portion of gross domestic product. The manufacturing, service, and government sectors were the three sectors of the economy that provided the most employment in Puerto Rico.

The following table presents annual statistics of gross domestic product by sector and gross national product for fiscal years 2011 to 2015.

<div align="center">

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Sector and Gross National Product**
**(in millions at current prices)**

</div>

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
| Manufacturing | $46,760 | $46,971 | $47,581 | $47,715 | $48,310 |
| Service [2] | 42,690 | 43,553 | 44,128 | 44,385 | 45,406 |
| Government [3] | 8,216 | 8,278 | 8,238 | 7,825 | 7,267 |
| Agriculture | 795 | 816 | 847 | 867 | 855 |
| Construction [4] | 1,332 | 1,369 | 1,252 | 1,112 | 1,089 |
| Statistical discrepancy | 559 | 577 | 405 | 184 | (20) |
| Total gross domestic product [5] | $100,352 | $101,565 | $102,450 | $102,089 | $102,906 |
| Less: net payment abroad | (34,631) | (33,479) | (33,505) | (33,627) | (34,385) |
| Total gross national product [5] | $65,721 | $68,086 | $68,945 | $68,461 | $68,521 |

[1] Preliminary.
[2] Includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services.
[3] Includes the Commonwealth, its municipalities and certain public corporations, and the federal government. Excludes certain public corporations, such as the Electric Power Authority and the Aqueduct and Sewer Authority, whose activities are included under "Service" in the table.
[4] Includes mining.
[5] Totals may not add due to rounding.
*Source:* Planning Board

The data for employment by sector or industry presented here, as in the United States, is based on the Establishment (or Payroll) Survey, which is designed to measure number of payrolls by sector. The Payroll Survey excludes agricultural employment and self-employed persons. During fiscal year 2016, total non-farm payroll employment averaged 894,942, a 1.2% reduction with respect to the prior fiscal year. Furthermore, for the first five months of fiscal year 2017, total non-farm payroll employment decreased by 0.7%, when compared to the same period of fiscal year 2016.

The following table presents annual statistics of average employment based on the North American Industry Classification System ("**NAICS**") for fiscal years 2012 to 2016.

# Commonwealth of Puerto Rico
## Non-Farm Payroll Employment by Economic Sector [1]
### (number of employees)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2012** | **2013** | **2014** | **2015**[2] | **2016**[2] |
| Natural resources and construction | 35,058 | 33,717 | 28,317 | 26,842 | 23,308 |
| Manufacturing | | | | | |
|    Durable goods | 33,308 | 32,800 | 32,358 | 32,050 | 30,967 |
|    Non-durable goods | 50,192 | 45,925 | 43,108 | 42,900 | 42,092 |
| Sub-total | 83,500 | 78,725 | 75,467 | 74,950 | 73,058 |
| | | | | | |
| Trade, transportation, warehouse, and Utilities | | | | | |
|    Wholesale trade | 31,517 | 31,575 | 31,025 | 30,383 | 29,458 |
|    Retail trade | 128,192 | 130,600 | 130,975 | 129,267 | 130,000 |
|    Transportation, warehouse, and utilities | 14,625 | 14,650 | 14,808 | 14,742 | 14,975 |
|      Sub-total | 174,333 | 176,825 | 176,808 | 174,392 | 174,433 |
| | | | | | |
| Information | 18,650 | 19,158 | 19,683 | 20,167 | 20,542 |
| Finance | 44,400 | 44,375 | 43,442 | 42,500 | 41,733 |
| Professional and business | 108,875 | 112,700 | 114,792 | 112,475 | 111,100 |
| Educational and health | 117,617 | 122,158 | 123,150 | 123,242 | 121,983 |
| Leisure and hospitality | 72,775 | 77,017 | 79,458 | 80,433 | 81,908 |
| Other services | 17,625 | 17,908 | 17,967 | 17,950 | 17,608 |
| Government [3] | 258,425 | 254,575 | 238,158 | 232,683 | 229,267 |
|      Total non-farm | 931,258 | 937,158 | 917,242 | 905,633 | 894,942 |

---

[1] The figures presented in this table are based on the Payroll Survey prepared by the Bureau of Labor Statistics of the Puerto Rico Department of Labor and Human Resources. There are numerous conceptual and methodological differences between the Household Survey and the Payroll Survey. The Payroll Survey reflects information collected from payroll records of a sample of business establishments, while the Household Survey is based on responses to a series of questions by persons in a sample of households. The Payroll Survey excludes the self-employed and agricultural employment. Totals may not add due to rounding.

[2] Preliminary.

[3] Includes state, local, and federal government employees.

*Source:* Department of Labor and Human Resources, Current Employment Statistics Survey (Establishment Survey – NAICS Codes)

### *Manufacturing*

Manufacturing is the largest sector of the Puerto Rico economy in terms of gross domestic product. The Planning Board figures show that in fiscal year 2015 manufacturing generated $48.3 billion, or 46.9%, of gross domestic product. During fiscal year 2016, payroll employment for the manufacturing sector was 73,058, a decrease of 2.5% compared with fiscal year 2015. For the first five months of fiscal year 2017, manufacturing employment averaged 71,900, a reduction of 2.7% (or 2,000 employees) from the same time period of the previous fiscal year. Most of Puerto Rico's manufacturing output is exported to the United States mainland, which is also the principal source of semi-finished manufactured articles on which further manufacturing operations are performed in Puerto Rico. Federal minimum wage laws are applicable in Puerto Rico. For fiscal year 2016, however, the average hourly manufacturing wage rate in Puerto Rico was approximately 62.4% of the average mainland United States rate.

In the last three decades, industrial development in Puerto Rico has been relatively capital intensive and dependent on skilled labor. This gradual shift in emphasis from labor intensive to capital intensive industrial development is best exemplified by large investments over the last two decades in the pharmaceutical and medical-equipment industries in Puerto Rico. Historically, one of the factors that encouraged the development of the manufacturing sector was the tax incentives offered by the federal and Commonwealth governments. Federal legislation enacted in 1996, however, which amended Section 936 of the United States Internal Revenue Code of 1986, as amended (the "U.S. Code"), phased out these federal tax incentives during a ten-year period that ended in 2006. Moreover, Act 154 expanded the scope of the income tax rules as they relate to certain nonresident alien individuals, foreign corporations and foreign partnerships and imposed a new temporary excise tax on persons that purchase products manufactured in Puerto Rico by other persons that are members of the same controlled group. The elimination of the benefits provided by Section 936 of the U.S. Code has contributed to the long-term decline that the activity of this sector has suffered during the past two decades. In addition, the uncertainty created by the long-term creditability of the Act 154 excise tax has also affected the potential growth for this sector.

The following table sets forth gross domestic product by manufacturing sector for fiscal years 2011 to 2015.

255

**Commonwealth of Puerto Rico**
**Gross Domestic Product by Manufacturing Sector**
(at current prices, in millions)

| | 2011 | 2012 | 2013 | 2014 | 2015 [1] |
|---|---|---|---|---|---|
| Food | $ 834 | $ 976 | $ 1,214 | $ 1,229 | $ 1,205 |
| Beverage and Tobacco Products | 1,228 | 1,314 | 1,329 | 1,405 | 1,333 |
| Textile Mills & Product Mills | 10 | 13 | 13 | 13 | 14 |
| Apparel | 276 | 258 | 163 | 116 | 136 |
| Leather and Allied Products | 25 | 18 | 14 | 13 | 12 |
| Wood Products | 17 | 18 | 15 | 15 | 15 |
| Paper | 52 | 50 | 48 | 59 | 59 |
| Printing and Related Support Activities | 119 | 102 | 77 | 76 | 77 |
| Petroleum and Coal Products | 352 | 349 | 357 | 386 | 397 |
| Chemical | 32,039 | 31,609 | 31,729 | 30,892 | 31,141 |
| Plastics and Rubber Products | 97 | 95 | 97 | 101 | 106 |
| Nonmetallic Mineral Products | 96 | 126 | 99 | 94 | 93 |
| Primary Metals | 169 | 100 | 166 | 171 | 165 |
| Fabricated Metal Products | 155 | 156 | 154 | 176 | 180 |
| Machinery | 233 | 207 | 326 | 335 | 305 |
| Computer and Electronic Products | 8,123 | 8,663 | 8,938 | 9,806 | 9,856 |
| Electrical Equipment, Appliances and Components | 681 | 754 | 759 | 790 | 782 |
| Transportation Equipment | 79 | 79 | 86 | 86 | 94 |
| Furniture and Related Products | 35 | 37 | 32 | 30 | 30 |
| Miscellaneous | 2,140 | 2,047 | 1,965 | 1,921 | 2,310 |
| Total gross domestic product of manufacturing sector[2] | $ 46,760 | $ 46,971 | $ 47,581 | $ 47,715 | $ 48,310 |

[1] 2013-2014 revised figures and 2015 preliminary.
Totals may not add due to rounding.
*Source: Planning Board*

The following table presents annual statistics of average manufacturing employment by industry based on the NAICS for fiscal years 2012 to 2016.

### Commonwealth of Puerto Rico
### Non-Farm Payroll Manufacturing Employment by Industry Group
### (number of employees)

| Industry group | 2012 | 2013 | 2014 | 2015[1] | 2016[1] |
|---|---|---|---|---|---|
| **Durable goods** | | | | | |
| Nonmetallic mineral products manufacturing | 2,042 | 1,983 | 1,817 | 1,700 | 1,575 |
| Fabricated metal products | 3,608 | 3,583 | 3,350 | 3,342 | 3,142 |
| Computer and electronic | 5,175 | 4,667 | 4,483 | 5,217 | 5,467 |
| Electrical equipment | 5,117 | 5,225 | 5,108 | 4,850 | 4,583 |
| Miscellaneous manufacturing | 11,775 | 11,825 | 12,308 | 11,758 | 11,450 |
| Other durable goods manufacturing | 5,592 | 5,517 | 5,292 | 5,183 | 4,750 |
| Total – durable goods | 33,308 | 32,800 | 32,358 | 32,050 | 30,967 |
| | | | | | |
| **Non-durable goods** | | | | | |
| Food manufacturing | 11,467 | 11,292 | 11,617 | 11,458 | 11,267 |
| Beverage and tobacco products manufacturing | 2,792 | 2,633 | 2,433 | 2,400 | 2,325 |
| Apparel manufacturing | 9,692 | 6,492 | 4,917 | 5,700 | 5,833 |
| Chemical manufacturing | 19,967 | 19,108 | 18,167 | 17,617 | 17,292 |
| Other non-durable goods manufacturing | 6,275 | 6,400 | 5,975 | 5,725 | 5,375 |
| Total – non-durable goods | 50,192 | 45,925 | 43,108 | 42,900 | 42,092 |
| Total manufacturing employment | 83,500 | 78,725 | 75,467 | 74,950 | 73,058 |

Total employment in the manufacturing sector decreased by 85,500 from fiscal year 1996 to fiscal year 2016, and by 44,259 from fiscal year 2005 to fiscal year 2016. During the period from 2010 through 2016, manufacturing employment decreased by a total of 17.3%. For fiscal year 2016, average employment in the sector declined by 1,892 jobs, or 2.5%, compared to the previous year. Given that this sector pays, on average, the highest wages in Puerto Rico, its general downturn has represented a major difficulty for restoring growth for the whole economy. There are several reasons that could explain this sector's job shrinkage: the end of the phase-out of the tax benefits afforded by Section 936 of the U.S. Code, the net loss of patents on certain pharmaceutical products, the escalation of manufacturing production costs (particularly electricity), the increased use of job outsourcing, and the increase of global competition. Puerto Rico's manufacturing sector continues to face increased international competition. As patents on pharmaceutical products manufactured in Puerto Rico expire and the production of such patented products is not replaced by new products, there may be additional job losses in this sector and a loss of tax revenues for the Commonwealth.

*Service Sector*

Puerto Rico has experienced mixed results in the service sector, which, for purposes of the data set forth below, includes wholesale and retail trade, utilities, transportation and warehousing, information, finance and insurance, real estate and rental, and certain services such as professional, scientific, technical, management, administrative, support, educational, health care, social, recreational, accommodation, food and other services. This sector has expanded in terms of income over the past decade, following the general trend of other industrialized economies, but with differences on the magnitudes of those changes. During the period between fiscal years 2007 and 2015, the gross domestic product in this sector, in nominal terms, increased at an average annual rate of 1.2%, while payroll employment in this sector increased slightly at an average annual rate of 0.1%. In the Puerto Rico labor market, self-employment, which is not accounted for in the Payroll Survey, represents approximately 16.4% of total employment according to the Household Survey. Most of this employment supports the operation of the service sector.

The service sector ranks second to manufacturing in its contribution to gross domestic product. The service sector is also the sector with the greatest amount of employment. In fiscal year 2015, the service sector generated $45.4 billion, or 44.1%, of gross domestic product. Trade, information, finance, real estate & rental, professional & business support, education & health, and leisure & hospitality experienced growth, while utilities experienced reductions in fiscal year 2015, as measured by gross domestic product at current prices. Service-sector employment increased from 565,450 in fiscal year 2007 to 569,308 in fiscal year 2016, an average annual rate increase of 0.1% (representing 63.6% of total, non-farm, payroll employment). Note that, in terms of growth, the annual rate remained unchanged when compared to the 2007-2015 figure (0.1%). But, nonetheless, the average service-sector employment for fiscal year 2016 does show a small decrease of 0.3% when compared to the prior fiscal year.

Puerto Rico has a developed banking and financial system. According to the Office of the Commissioner of Financial Institutions of Puerto Rico (the "**OCFI**"), as of September 30, 2016, there were nine commercial banks operating in Puerto Rico. Commercial banks in Puerto Rico are generally regulated by the Federal Deposit Insurance Corporation (the "FDIC") or the Board of Governors of the Federal Reserve System, and by the OCFI. The OCFI reports that total assets of commercial banks (including assets of units operating as international banking entities) as of September 30, 2016 amount to $57.8 billion, as compared to 56.5 billion as of December 31, 2015.

Broker-dealers in Puerto Rico are regulated by the Financial Industry Regulatory Authority ("**FINRA**"), the United States Securities and Exchange Commission and the OCFI, and are mainly dedicated to serve investors that are residents of Puerto Rico. According to the OCFI, assets under management by broker-dealers in Puerto Rico totaled $1.0 billion as of June 30, 2016, as compared to $1.1 billion on December 31, 2015. Another relevant component of the financial sector in Puerto Rico is the investment company industry. According to the OCFI, local investment companies had recorded assets under management of $6.7 billion as of September 30, 2016. Assets under management by local investment companies have decreased significantly as a result of the recent downgrades of bonds of the Commonwealth and its instrumentalities and the resulting reduction in the market prices of these bonds.

Other components of the financial sector in Puerto Rico include international banking entities ("**IBEs**") and credit unions (locally known as "cooperativas"). IBEs are licensed financial businesses that conduct offshore banking transactions. As of September 30, 2016, there were 30 IBEs (including units of commercial banks) operating in Puerto Rico, with total assets of $56.7 billion, an increase from $53.6 billion in total assets as of December 31, 2015. Meanwhile, credit unions, which tend to provide basic consumer financial services, reached $8.5 billion in assets as of June 30, 2016.

In addition, there are specialized players in the local financial industry that include mortgage-origination companies and auto and personal finance companies.

The following table sets forth gross domestic product for the service sector for fiscal years 2011 to 2015.

### Commonwealth of Puerto Rico
### Gross Domestic Product by Service Sector
### (in millions at current prices)

| | Fiscal Years Ended June 30, | | | | |
|---|---|---|---|---|---|
| | **2011** | **2012** | **2013** | **2014** | **2015**[1] |
| Wholesale trade | $ 2,909 | $ 2,819 | $ 2,662 | $ 2,710 | $ 2,720 |
| Retail trade | 4,787 | 4,809 | 4,963 | 5,019 | 4,953 |
| Transportation and warehousing | 898 | 946 | 937 | 919 | 919 |
| Utilities | 1,868 | 2,074 | 1,638 | 2,127 | 2,109 |
| Information | 2,610 | 2,465 | 2,331 | 2,334 | 2,408 |
| Finance and insurance | 5,611 | 5,176 | 5,758 | 4,755 | 5,439 |
| Real Estate and rental | 14,369 | 15,383 | 15,426 | 15,832 | 16,042 |
| Professional and business | 3,311 | 3,460 | 3,646 | 3,744 | 3,754 |
| Education and health | 4,078 | 4,084 | 4,264 | 4,364 | 4,460 |
| Leisure and hospitality | 1,866 | 1,940 | 2,078 | 2,149 | 2,170 |
| Other services | 383 | 395 | 424 | 432 | 432 |
| Total[2] | $42,690 | $43,553 | $44,128 | $44,385 | $45,406 |

[1]    2013-2014 revised figures and 2015 preliminary.
[2]    Totals may not add due to rounding.
*Source*: Puerto Rico Planning Board

259

The following table sets forth employment for the service sector for fiscal years 2012 to 2016.

**Commonwealth of Puerto Rico**
**Non-Farm Payroll Employment by Service Sector**
**(Persons age 16 and over)**

| | 2012 | 2013 | 2014 | 2015[1] | 2016[1] |
|---|---|---|---|---|---|
| Wholesale trade | 31,517 | 31,575 | 31,025 | 30,383 | 29,458 |
| Retail trade | 128,192 | 130,600 | 130,975 | 129,267 | 130,000 |
| Transportation, warehouse and utilities | 14,625 | 14,650 | 14,808 | 14,742 | 14,975 |
| Information | 18,650 | 19,158 | 19,683 | 20,167 | 20,542 |
| Finance | 44,400 | 44,375 | 43,442 | 42,500 | 41,733 |
| Professional and business | 108,875 | 112,700 | 114,792 | 112,475 | 111,100 |
| Educational and health | 117,617 | 122,158 | 123,150 | 123,242 | 121,983 |
| Leisure and hospitality | 72,775 | 77,017 | 79,458 | 80,433 | 81,908 |
| Other services | 17,625 | 17,908 | 17,967 | 17,950 | 17,609 |
| Total[2] | 554,275 | 570,142 | 575,300 | 571,158 | 569,308 |

[1] Preliminary.

[2] Totals may not add due to rounding.

*Source:* Department of Labor and Human Resources, Benchmark on Employment, Hours and Earnings

### *Hotels and Related Services—Tourism*

For fiscal year 2016, the total number of registrations (Hotels & Paradores), including residents of Puerto Rico and tourists, was 2,644,808, an increase of 1.9% when compared to fiscal year 2015. The average occupancy rate during fiscal year 2016 was 70.4%, a decrease of 0.6% from the prior fiscal year. Also, during fiscal year 2016, the average number of rooms available increased by 1.1% to 15,006 rooms compared to fiscal year 2015.

In terms of employment, according to the Payroll Survey, employment in the leisure and hospitality sector was 79,458 for fiscal year 2014, an increase of 3.2% over employment for fiscal year 2013, which is a larger increment than the average growth rate observed for the tourist hotel registrations (2.4%) during that same year. However, for fiscal year 2015, employment in this sector increased by 1.2% to 80,433 compared to the prior fiscal year, a growth rate considerably lower than the 5.0% increase observed in tourist hotel registrations during that same period. For fiscal year 2016, the leisure and hospitality sector employment averaged 81,908 employees, an increase of 1.8% compared to the prior year, a growth rate equal to the average increase of 1.8% observed in tourist hotel registrations for that fiscal year. During the first five months of fiscal year 2017, the leisure and hospitality sector employment increased by 0.8% to 81,900 employees compared to the same period of the prior fiscal year, a growth rate considerably lower than the 7.4% increase observed in tourist hotel registrations during the first month of fiscal year 2017.

San Juan is the largest homeport for cruise ships in the Caribbean and one of the largest homeports for cruise ships in the world. During fiscal year 2016, the number of cruise passenger movement and trips decreased by -12.6% and -11.8%, respectively.

## Commonwealth of Puerto Rico
## Tourism Data[1]

### Number of Visitors
### (in thousands)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2010 | 1,349.4 | 1,193.5 | 1,836.2 | 4,379.2 |
| 2011 | 1,408.5 | 1,165.8 | 1,639.4 | 4,213.7 |
| 2012 | 1,508.0 | 1,127.8 | 1,561.1 | 4,196.9 |
| 2013 | 1,586.1 | 1,038.0 | 1,585.9 | 4,210.0 |
| 2014 | 1,634.8 | 1,209.7 | 1,611.2 | 4,455.7 |
| 2015[5] | 1,737.2 | 1,509.3 | 1,804.5 | 5,051.1 |

### Total Visitors' Expenditures
### (in millions)

| Fiscal Years Ended June 30, | Tourist Hotels[2] | Excursionists[3] | Other[4] | Total |
|---|---|---|---|---|
| 2010 | $1,541.8 | $171.4 | $1,497.6 | $3,210.7 |
| 2011 | $1,618.9 | $169.3 | $1,354.5 | $3,142.8 |
| 2012 | $1,706.9 | $167.7 | $1,318.3 | $3,192.9 |
| 2013 | $1,811.8 | $156.0 | $1,342.9 | $3,310.6 |
| 2014 | $1,874.1 | $182.3 | $1,382.3 | $3,438.6 |
| 2015[5] | $2,047.8 | $227.8 | $1,549.5 | $3,825.0 |

---

[1] Only includes information about non-resident tourists registering in tourist hotels. They are counted once even if registered in more than one hotel.
[2] Includes visitors in guesthouses.
[3] Includes cruise ship visitors and transient military personnel.
[4] Includes visitors in homes of relatives, friends, and in hotel apartments.
[5] Preliminary.
*Sources:* Puerto Rico Tourism Company and the Planning Board

The Commonwealth, through PRCCDA, has developed the largest convention center in the Caribbean, which is the centerpiece of a 100-acre private development that includes hotels, restaurants, office space, and housing. The Convention Center District is being developed at a total cost of $1.3 billion in a public/private partnership effort to improve Puerto Rico's competitive position in the convention and group-travel segments. The Convention Center opened on November 17, 2005 and, since its inauguration, the facility has hosted more than 1,000 events accounting for more than 1 million attendees. A 503 room hotel located next to the Convention Center commenced operations in November of 2009. A 126 key hotel operated under the insignia of Hyatt House opened on October 1, 2014 and another Hyatt hotel with 149 keys opened on January 12, 2016 under the flag of Hyatt Place.

The PRCCDA also owns an 18,500-person capacity multipurpose arena, known as the José Miguel Agrelot Coliseum located in San Juan, Puerto Rico. The Coliseum was inaugurated in 2004 and has hosted more than 400 world-caliber events with an aggregate attendance of over

2.5 million people. The venue has received numerous awards including "Best International Large Venue of the Year" from Pollstar Magazine in 2005.

### Government

The government sector of Puerto Rico has played an important role in the economy. It promoted the transformation of Puerto Rico from an agricultural economy to an industrial one during the second half of the 20th century, providing the basic infrastructure and services necessary for the modernization of Puerto Rico.

In fiscal year 2015 the government (federal, state and local) industrial sector accounted for $7.3 billion, or 7.1%, of Puerto Rico's gross domestic product. The government is also a significant employer, employing an average of 229,300 workers (federal, state and local), or 25.6% of total, non-farm, payroll employment in fiscal year 2016. Government employment has decreased significantly, however, in recent years. In fiscal year 2009, federal, state and local government employment averaged 300,700. From fiscal year 2009 to fiscal year 2016, employment reductions have been of 900 jobs (-6.0%) in the federal government, 58,500 jobs (-26.8%) in the state government (including public corporations) and 12,000 jobs (-17.9%) in municipal government. The reductions have occurred, for the most part, in the state and municipal government employment sectors and are related to the recent changes to the Employees Retirement System which prompted the voluntary departure of employees which qualified for retirement but were still employed. Likewise, for the first five months of fiscal year 2017, total government employment decreased by 1,400 jobs (-1.4%), when compared to the previous fiscal year. Federal and municipal government increased by 300 jobs (2.4%) and 2,900 jobs (5.3%) respectively, which was offset by a decrease of 4,600 jobs (2.9%) in the state government.

### Transportation

Fifty-five shipping lines offer regular ocean freight service to ninety-eight United States and foreign ports. Ninety-nine percent of container shipments are handled through the Port of San Juan, the island's leading seaport, but there are also seaport facilities at other locations in Puerto Rico including, Arecibo, Ceiba, Culebra, Fajardo, Guayama, Guayanilla, Mayagüez, Ponce, Vieques and Yabucoa. The Old San Juan and Isla Grande tourism piers provided the infrastructure necessary to serve the cruise ship industry.

The Port of San Juan has the highest cruise ship activity in the eastern Caribbean. In fiscal year 2015, backed by an incentive program developed to increase the number of cruises in Puerto Rico, the Port of San Juan received a record of approximately 1.5 million of passengers and 552 cruises. On average, approximately 1.3 million of passengers and over 480 cruises visit San Juan every year. Homeport cruises and in transit operations represent 36% and 64% of all operations, respectively. Of approximately 20 cruise lines received by the Port of San Juan every year, the largest in term of passenger and ship movement are Carnival Cruise Line (40%) and Royal Caribbean Cruise Line (27%). Other mayor cruise lines visiting the port are Celebrity Cruise Line, Holland America Cruise, Norwegian Cruise and Disney Cruises. During fiscal 2017, PRPA is aiming to receive approximately 1.4 million passengers and 530 cruises.

Puerto Rico's airport facilities are located in Carolina, San Juan, Ponce, Mayagüez, Aguadilla, Arecibo, Ceiba, Vieques, Culebra, Patillas and Humacao. The Luis Muñoz Marín International Airport in the San Juan metropolitan area is currently served by more than 25 domestic and international airlines. The airport receives over 8.5 million passengers per year, making it the busiest airport in the Caribbean. At present, there is daily direct service between San Juan and Atlanta, Baltimore, Bogotá, Boston, Chicago, Cancún, Copenhagen, Dallas, Ft. Lauderdale, Frankfurt, London, Madrid, Miami, Minneapolis/St. Paul, Montreal, New York, Orlando, Oslo, Panama City, Philadelphia and Toronto, and numerous other destinations within the United States mainland. San Juan has also become a hub for intra-Caribbean service. While the main hubs in the United States mainland serve as the gateway from San Juan to most international destinations, Latin American destinations are also served through Panama City, Panama, and Bogotá, Colombia, with connections to Central and South America.

On February 27, 2013, the Puerto Rico Ports Authority entered into a long term lease of the Luis Munoz Marin International Airport with Aerostar Holdings, LLC ("Aerostar") pursuant to a public-private partnership transaction. It is estimated that Aerostar will invest $1.4 billion in the Airport during the life of the lease, including a commitment to invest approximately $267 million in immediate improvements and comply with world-class operating standards.

The Rafael Hernández Airport (BQN) in Aguadilla provides the longest runway in the Caribbean. BQN is the west side home for cargo and commercial passenger flights and for federal agencies such as USCBP, USCG, and USDA. It features a free trade zone which has led to the development of Pegasus, an equine quarantine establishment. The airport is served by JetBlue, United and Spirit. The airport has twenty-three (23) weekly flights to and from Fort Lauderdale, New York, Newark and Orlando. Ponce's Mercedita Airport is served by JetBlue and has fourteen (14) weekly scheduled flights to and from New York and Orlando. Both of these airports also have seasonal charter service to other Caribbean islands. Smaller regional airports serve intra-island traffic. BQN has also been heavily used for technical overlays on cargo and general aviation flights primarily from South America to Europe and the United States.

On April 10, 2014, the Ports Authority and PRIDCO signed a long-term lease agreement with Lufthansa Technik Puerto Rico, LLC ("**LTPR**") under which LTPR will lease from the Ports Authority certain areas of the Rafael Hernández Airport in Aguadilla, where LTPR will establish an aircraft maintenance, repair and overhaul operation. In addition to establishing Puerto Rico as a hub for this type of operations, the facility is expected to become a key driver of economic development and increased tax revenues for the Commonwealth. With the startup of the LTPR operation, the University of Puerto Rico Aguadilla Campus, in a joint venture with the P.R. Department of Education, has established in this airport the Aeronautical and Aerospace Institute of Puerto Rico to train the manpower required to support industry needs.

PRPA has completed a study for the construction of an alternate runway that will allow the deep reconstruction of the BQN's main runway. This alternate runway would eventually be transformed into a taxiway once the main runway reconstruction project is completed, enabling the development of the southern portion of the airport.

Cargo operations are served by both Federal Express and United Parcel Service (UPS) at the airports in San Juan and Aguadilla.

263

Puerto Rico's major cities are connected by a modern highway system, which, as of December 31, 2015, totaled approximately 4,817 miles and 12,597 miles of local streets and adjacent roads. The highway system comprises 408 miles of primary system highways, which are the more important interregional traffic routes and include PR-52, PR-22, PR-53, PR-66 and PR-20 toll highways, 242 miles of primary urban system highways, 1,000 miles of secondary system highways serving the needs of intra-regional and inter-municipal traffic and 3,167 miles of tertiary highways and roads serving local, intra-municipal traffic. The PR-22 and PR-5 toll highways are currently operated by a private company pursuant to a Concession Agreement between the Puerto Rico Highways and Transportation Authority, the P3 Authority and Autopistas Metropolitanas de Puerto Rico, an affiliate of Abertis and Goldman Sachs.

The Port of the Americas is a deep draft container terminal under development on the south coast of Puerto Rico in the City of Ponce, the Commonwealth's fourth largest municipality by population. Managed by the Ponce Port Authority, the terminal can handle containerized import/export and transshipment cargo. The first phase of the port development was completed in 2004 while the second phase, which included the construction of a container yard with capacity for up to 250,000 Twenty-Foot Equivalent Units per year, was completed during the first quarter of calendar year 2009. A third development phase is still pending, which would result in an annual terminal processing capacity of up to 500,000 Twenty-Foot Equivalent Units and include the installation of the basic infrastructure required to develop an industrial value-added zone on land adjacent to the Port. In December of 2013, legislation was enacted to authorize the selection of an international level ports operator and an administrator for the adjacent value added zone. These measures are aimed at completing the remaining infrastructure required for the project to become operational in the near future.

### Construction

Although the construction industry represents a relatively small segment of the economy compared to other sectors, it can make significant contributions to the growth of economic activity due to its multiplier effect on the whole economy. From its peak in fiscal year 2000 to fiscal year 2015, real construction investment declined at an average annual rate of 7.3%. Construction investment started to decrease significantly in fiscal year 2005, as part of the general economic contraction experienced during the past years in Puerto Rico. During the last eight fiscal years (from fiscal year 2007 to 2015), real construction investment decreased at an average annual rate of 9.2%. The Planning Board forecasts a decrease in construction investment of 6.8 and 6.6% in real terms for fiscal year 2016, and 2017.

Public investment has been an important component of construction investment. During fiscal year 2015, approximately 40.2% of the total investment in construction was related to public projects, which represents an increase in its share of total construction investment compared to 37.9% in fiscal year 2000. Public investment in construction has been negatively affected by the Commonwealth's fiscal difficulties, while private investment in construction is still suffering from the credit conditions that prevailed during the last decade. Public investment was primarily in housing, schools, water projects, and other public infrastructure projects. The end of federal ARRA funds also negatively affected public investment in construction during fiscal year 2014.

During fiscal year 2015, the number of construction permits decreased by 0.8%, while the total value of construction permits increased considerably, by 36.1% when compared to fiscal year 2014. Cement sales, on the other hand, have decreased every year since 2009, except 2012. In fiscal year 2016, cement sales decreased by 11.5% when compared to 2015. During the first five months of fiscal year 2017, cement sales have decreased by 10.9% when compared to the same period in fiscal year 2016.

Average payroll employment in the construction sector during fiscal year 2016 was 23,308, a reduction of 13.2% from fiscal year 2015. Furthermore, payroll employment in construction has declined significantly for more than a decade. In fiscal year 2004, this sector averaged 69,300 employees but by the end of fiscal year 2016 there were 45,992 less workers in this sector, a notable reduction of 66.4%. During the first five months of fiscal year 2017, payroll employment in the construction sector averaged 22,200, a decrease of 7.1% when compared to the same period in fiscal year 2016.

### Agriculture

Agriculture production represents less than 1% of Puerto Rico's gross domestic product. During fiscal year 2014, gross income from agriculture was $929.7 million at current prices, an increase by 11.6% as compared with fiscal year 2013. In terms of gross domestic product, agriculture generated a level of production of $854.5 million at current prices in fiscal year 2015, a decrease of 1.4% compared to fiscal year 2014. According to the Household Survey, the number of people employed in this sector has remained stable during the past five years, at close to 17,000 employees.

The Commonwealth government supports agricultural activities through incentives, subsidies, and technical and support services, in addition to income tax exemptions for qualified income derived by bona fide farmers. Act No. 225 of 1995 provides a 90% income tax exemption for income derived from agricultural operations, grants for investments in qualified agricultural projects, and a 100% exemption from excise taxes, real and personal property taxes, municipal license taxes and tariff payments. It also provides full income tax exemption for interest income from bonds, notes and other debt instruments issued by financial institutions to provide financing to agricultural businesses.

Policy changes have been implemented to promote employment and income generated by the agricultural sector. The policy initiatives include a restructuring of the Department of Agriculture, an increase in government purchases of local agricultural products, new programs geared towards increasing the production and sales of agricultural products, and a new system of agricultural credits and subsidies for new projects. The Department of Agriculture and related agencies have directed their efforts at increasing and improving local agricultural production, and stimulating the consumption of locally produced agricultural products.

## Higher Education

During the six decades from 1950 to 2010, Puerto Rico made significant advances in education, particularly at the college and graduate-school level. The transformation of Puerto Rico during the 1950s and 1960s from an agricultural economy to an industrial economy brought about an increased demand for educational services at all levels. During the 1970s and 1980s,

265

certain higher-wage, higher-technology industries became more prominent in Puerto Rico. More recently, employment in the service sector has increased significantly. This has resulted in an increased demand for workers having a higher level of education and greater expertise in various technical fields. During the same time period, enrollments in institutions of higher learning rose very rapidly due to growth in the college-age population, and the increasing percentage of college attendance by such population. From the 1970s to 2011, college attendance and college attendance as a percentage of the college-age population continued to increase, although the college-age population has declined since 2000. In spite of the current population decline, which implies a reduction in higher education enrollment since 2012, its proportion with respect population between 18 to 24 years of age has remained relatively stable.

The following table presents comparative trend data for Puerto Rico and the United States mainland with respect to college-age population and the percentage of such population attending institutions of higher learning.

### Commonwealth of Puerto Rico
### Trend in College Enrollment

| Academic Year | Commonwealth of Puerto Rico | | | United States Mainland | | |
|---|---|---|---|---|---|---|
| | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] | Population 18-24 Years of Age | Higher Education Enrollment | Percent[1] |
| 1970 | 341,448[2] | 57,340 | 16.8% | 23,714,000[2] | 8,580,887 | 36.2% |
| 1980 | 397,839[2] | 130,105 | 32.7% | 30,022,000[2] | 12,096,895 | 40.3% |
| 1990 | 417,636[2] | 156,147 | 37.4% | 26,961,000[2] | 13,818,637 | 51.3% |
| 2000 | 428,894[2] | 176,015 | 41.0% | 27,141,150[2] | 14,849,691 | 54.7% |
| 2010 | 375,145[2] | 249,372 | 66.5% | 30,672,088[2] | 20,313,594 | 66.2% |
| 2011 | 374,649[3] | 250,192 | 66.8% | 31,094,454[3] | 21,019,438 | 67.6% |
| 2012 | 372,011[3] | 250,011 | 67.2% | 31,393,663[3] | 21,010,590 | 66.9% |
| 2013 | 368,337[3] | 245,495 | 66.6% | 31,527,716[3] | 20,644,478 | 65.5% |
| 2014 | 359,520[3] | 241,168 | 67.1% | 31,483,957[3] | 20,375,789 | 64.7% |
| 2015 | 347,003[3] | 240,878 | 69.4% | 31,219,892[3] | 20,207,369 | 64.7% |

[2] Number of persons of all ages enrolled in institutions of higher education as percent of population 18-24 years of age.
[2] Based on census population as of April 1 of the stated year.
[3] Estimated population (reference date July 1 of the stated year).

*Sources*: U.S. Census Bureau (U.S. Mainland Population), U.S. National Center for Education Statistics (NCES), Planning Board (Puerto Rico Population) and Council on Higher Education of Puerto Rico.

The University of Puerto Rico, the only public university in Puerto Rico, has eleven campuses located throughout the island. The University's total enrollment for academic year 2014-2015 was approximately 57,474 students. Commonwealth appropriations are the principal source of University revenues. The amount of the annual appropriation is based on a statutory formula, and equals 9.60% of the Commonwealth's average annual revenue from internal sources (subject to certain exceptions) for each of the two fiscal years immediately preceding the current fiscal year. Additional revenues are derived from tuition, student fees, auxiliary enterprises, interest income, federal grants, and other sources. The University's capital improvements have been financed mainly by revenue bonds.

In addition to the University of Puerto Rico, there are 54 public and private institutions of higher education located in Puerto Rico. Such institutions had an enrollment during academic year 2014-2015 of approximately 183,404 students and provide programs of study in liberal arts, education, business, natural sciences, technology, secretarial and computer sciences, nursing, medicine, and law. Degrees are offered by these institutions at the associate, bachelor, master, and doctoral levels.

Institutions providing education in Puerto Rico must satisfy state licensing requirements to operate. Also, the vast majority of educational institutions are accredited by United States Department of Education-recognized accrediting entities.

## Tax and Other Economic Development Initiatives

Since 2013, the Commonwealth's economic development team has embarked on a comprehensive outreach strategy in order to diversify Puerto Rico's economic base, pursue niche strategies such as Aerospace and Aeronautics, and leverage its human capital and fiscal autonomy to attract new investment opportunities. The Commonwealth's goal is to protect its manufacturing core while it transitions its economic ecosystem into a regional service and high tech industrial activities hub.

The Department of Economic Development and Commerce ("**DDEC**") seeks to build upon Puerto Rico's historic strengths to achieve a more diversified, knowledge-driven economy that addresses the challenges of globalization and seizes upon emerging opportunities. The DDEC's policy priorities are: 1) to defend anchor industries while diversifying job sources in Puerto Rico, 2) to stimulate local entrepreneurship to drive small and medium sized enterprises ("**SMEs**"), 3) to restore Puerto Rico's credibility as a stable, business-friendly jurisdiction, and 4) to take full advantage of opportunities tied to Puerto Rico's relative fiscal autonomy.

The economic development strategy is primarily focused on five priority sectors: life sciences, tourism, agriculture, knowledge services and small & medium sized businesses.

To promote the life sciences sector, the Commonwealth is working to preserve Puerto Rico's status as key BioPharma manufacturing location and increase the share of growing sub-segments (generics) & advanced technologies (biologics). In addition to this, the DDEC are working on consolidating Puerto Rico´s position as a global manufacturing hub for the medical technology sector. Finally, the agriculture biotechnology program involves bolstering Puerto Rico´s position as a center for scientific crop research and development in the Americas.

Tourism industry efforts are focused on capitalizing on Puerto Rico´s diverse tourism offerings to develop niche markets in order to become a premier US and global travel destination. In addition, Puerto Rico seeks to bolster medical tourism by establishing Puerto Rico as a provider of both value and specialized high quality medical services.

Within the agriculture sector, the Commonwealth aims to reduce reliance on food imports by building on Puerto Rico´s traditional strengths and increasing capacity for high productivity industrial agricultural production.

Puerto Rico's knowledge services sector includes 'outsourced knowledge' and involves developing Puerto Rico as a global center for the outsourced knowledge services, particularly focused on near shoring. Export services legislation, Act 20, plays a key part in developing this sector. In addition to Act 20, Act 273 (International Financial Entities) and Act 399 (International Insurance Center) aim to develop Puerto Rico as a global center for insurance and financial services for the Americas.

Finally, the Commonwealth's small and medium enterprise sector is fundamental to Puerto Rico's economy. The Commonwealth is providing significant integrated and multidisciplinary support for entrepreneurs, helping them mature into their next business level. The implementation of an SME Strategy and Action Plan through the one stop shop program has supported this sector significantly.

Summarized below are certain tax and other incentive programs designed to promote the development of the manufacturing, service and tourism sectors in Puerto Rico.

### Industrial Incentives Program

Since 1948, Puerto Rico has had various incentives laws designed to promote investment and job creation. Under these laws, companies engaged in manufacturing and certain other designated activities were eligible to receive full or partial exemption from income, property, and other local taxes. The most recent of these incentives laws is the Economic Incentives Act, enacted in May 2008 (the "**Economic Incentives Act**" or "**Act 73**").

The benefits provided by the Economic Incentives Act are available to new companies as well as companies currently conducting tax-exempt operations in Puerto Rico that choose to renegotiate their existing tax exemption grants, expand current operations or commence operating a new eligible business. The activities eligible for tax exemption under the Economic Incentives Act include manufacturing on a commercial scale, recycling activities and laboratories for research and development. The Economic Incentives Act expands the definition of eligible business from that included in Act No. 135 of December 2, 1997, as amended (the "**1998 Tax Incentives Act**"), to include clusters and supply chains.

Companies qualifying under the Economic Incentives Act can benefit from a simplified income tax system: in most cases, an income tax rate of 4% and a withholding tax rate of 12% on royalty payments. Alternatively, the income tax rate can be 8% and a withholding rate of 2% on royalty payments. Special rates apply to projects located in low and mid-development zones (an income tax reduction of 0.5%), certain local projects (an income tax rate as low as 3%), certain small- and medium-sized businesses (an income tax rate as low as 1%) and pioneering activities (an income tax rate of 1%, but for those using intangible property created or developed in Puerto Rico the income tax rate may be 0%). In addition, as with the 1998 Tax Incentives Act, the Economic Incentives Act grants 90% exemption from property taxes, 100% exemption from municipal license taxes during the first three semesters of operations and at least 60% thereafter, and 100% exemption from excise taxes, and sales and use taxes with respect to the acquisition of raw materials and certain machinery and equipment used in the exempt activities.

268

The Economic Incentives Act is designed to stimulate employment and productivity, research and development, capital investment, reduction in the cost of energy and increased purchase of local products.

Under the Economic Incentives Act, as with the 1998 Tax Incentives Act, companies can repatriate or distribute their profits free of Puerto Rico dividend taxes. In addition, passive income derived by exempted businesses from the investment of eligible funds in Puerto Rico financial institutions, obligations of the Commonwealth, and other designated investments is fully exempt from income and municipal license taxes. Gain from the sale or exchange of shares or substantially all the assets of an exempted business during the exemption period that is otherwise subject to Puerto Rico income tax would be subject to a special Puerto Rico income tax rate of 4%.

The Economic Incentives Act, like the 1998 Tax Incentives Act, also provides investors that acquire an exempted business that is in the process of closing its operations in Puerto Rico a 50% credit in connection with the cash purchase of such corporation's stocks or operational assets.

### Individual Investors Act

In January of 2012, the Legislative Assembly of Puerto Rico approved Act No. 2012-22, also known as the Act to Promote the Relocation of Individual Investors to Puerto Rico (the "**Individual Investors Act**" or "**Act 22**"). The Individual Investors Act seeks to attract new residents to Puerto Rico by providing total exemption from Puerto Rico income taxes on passive income realized or accrued after such individuals become bona fide residents of Puerto Rico. The Individual Investors Act applies to any individual investor that becomes a Puerto Rico resident on or before the taxable year ending on December 31, 2035, provided that such individual was not a resident of Puerto Rico at any time during the 6-year period preceding the effective date of the Individual Investors Act. This relocation is resulting in new local investments in real estate, services, consumption products, capital injections to the Puerto Rico banking sector and the creation of new businesses, all of which is stimulating the economy of Puerto Rico.

The Individual Investors Act has had a strong economic impact in local real estate investments. At the time of the enactment of the law, Puerto Rico had an excess inventory of high-value properties which had a very limited market within Puerto Rico. Information from property values shows that close to $266 million have been invested in the local real estate market. The average property value purchased ranged between $1.1 and $1.8 million. In addition, in terms of one-year value of rent, Act 22 has had an impact of $7.1 million. In addition to the impact in real estate, the Act 22 program has indirect and direct impact of new businesses created to provide services to the Act 22 beneficiaries, and other investments in the Island. The total potential spending for all decree holders amount to more than $73 million.

Business activities associated with Act 22 (and excludes any potential overlapping with Export Services Act jobs from individuals that hold decrees from both acts) are estimated to have generated close to 2,483 new jobs within the Island. These direct jobs in turn, helped generate 1,604 indirect jobs and 1,127 induced jobs. The direct, indirect and induced employment accounts for a total of 5,214 jobs.

Over 1,100 individual investors have applied for the benefits under the Individual Investors Act since 2012 and over 860 grants had been approved by August 2016. Many of these investors have also established service operations in Puerto Rico under the Export Services Act, discussed below.

### Export Services Act

In January of 2012 the Commonwealth enacted Act No. 2012-20, also known as the Act to Promote the Exportation of Services (the "**Export Services Act**" or "**Act 20**"), which supersedes the provisions of the Economic Incentives Act that provide benefits to designated services performed for markets outside of Puerto Rico. The Export Services Act seeks to establish and develop in Puerto Rico an international export services center. This Act seeks to encourage local service providers to expand their services to persons outside of Puerto Rico, promote the development of new businesses in Puerto Rico and stimulate the inbound transfer of foreign service providers to Puerto Rico. The Export Services Act also creates a special fund for the continuous development of new tax incentives that will promote export services and the establishment of new businesses in Puerto Rico.

Act 20 provides new dynamism to Puerto Rico's economy as the activities covered have large positive externalities in the local economy. The service industry shows a growing tendency vis-à-vis manufacturing activity, and other sectors in the local economy. In general, the service economy has a high degree of mobility –less machinery/facilities and more human resources– and thus, allows for faster tangible effects in the economy.

The Export Services Act applies with respect to any entity with a bona fide office or establishment located in Puerto Rico that is or may be engaged in an eligible service. Service providers operating under a tax exemption decree issued under the Export Services Act will enjoy various Puerto Rico tax incentives during the term of such decree, such as a 4% flat income tax rate on export services income and 100% tax-exempt dividend distributions.

Export service companies have directly created/retained over 3,000 jobs since their enactment. These jobs are predominantly high-skill and provide a direct link with foreign businesses and international markets. In terms of the effects in the Gross National Product (GNP), economic impact of this Act could represent close to 1% of Puerto Rico's GNP for 2014. Taking into account the limited time the incentive program has been in place, the total effect of the GNP is relatively high when compared to other incentive programs.

Over 750 Export Services Act applications have been received for the establishment of new export services operations in Puerto Rico within the following industries: centralized management services and shared services; information technology; financial services; advertising and public relations; and professional services. As of August 2016, more than 480 companies operating in Puerto Rico had received approved decrees under Act 20.

### International Finance Center

Act No. 273 of 2012 ("**Act 273-2012**"), also known as the "International Financial Center Regulatory Act", provides tax exemption to businesses engaged in eligible activities in Puerto

Rico. To qualify for such benefits, a business needs to become an International Financial Entity ("**IFE**") by applying for a permit and license and obtaining a tax exemption decree.

The International Financial Center has experienced strong growth since 2013 with six operating licenses approved in 2013, nine in 2014, eight in 2015, and six as of June 30, 2016. As of March 31, 2016, International Financial Entities had total assets exceeding $395 million with total capital of $158 million and net income of $2,266,000.

### International Insurance Center

Act No. 399 of 2004, as amended ("**Act 399-2004**"), provides Puerto Rico with a competitive environment, within which insurers and reinsurers can cover risks outside of Puerto Rico under a secure and flexible regulatory framework with attractive tax benefits. International insurance entities have various alternative ways to organize and operate within the Puerto Rico International Insurance Center. These options include operating as an international insurance holding company, an international insurer or a branch of an international insurer, as well as managing protected cell arrangements under a tax efficient framework. Most recently, Act 39-2014 was enacted to set the guidelines for the assumption of domestic risks, regulate third party risks assumptions by captives, and facilitates the organization of insurance linked securities programs (ILS/CAT Bonds).

Promotional efforts and direct approaches to insurance carriers and underwriters, captive managers and related advisors have resulted in: (i) 18 authorized insurance companies; (ii) over 400 approved protected cell arrangements and segregated asset plans; and (iii) total premium income of $322 million for 2015, representing a 51% increase in premium activity as compared to 2014.

### Tourism Incentives Program

For many years, Puerto Rico has enacted incentive laws designed to stimulate investment in hotel operations on the island. The Puerto Rico Tourism Development Act of 2010 (the "**Tourism Development Act**") provides partial exemptions from income, property, and municipal license taxes for a period of ten years. The Tourism Development Act also provides certain tax credits for qualifying investments in tourism activities, including hotel and condo-hotel development projects. The Tourism Development Act provides further tourism incentives by granting tax exemption on interest income, fees and other charges received with respect to bonds, notes, or other obligations issued by tourism businesses for the development, construction, rehabilitation, or improvements of tourism projects.

As part of the incentives to promote the tourism industry, the Commonwealth established in 1993 the Puerto Rico Tourism Development Fund ("**TDF**"). As a subsidiary of GDB with the authority to make investments in or provide financing (guarantees or loans) to corporate entities that develop hotel and related hospitality projects. As of June 30, 2016, TDF has provided direct loans and guaranteed loans and bonds in the aggregate amount of approximately $1.6 billion for 30 tourism projects representing 5,616 new hotel rooms, with a total investment of approximately $2.6 billion.

More recently, the Commonwealth has focused its efforts on expanding Puerto Rico's air and maritime access given its importance for both tourism and trade growth and in the launching of its new destination advertising campaign. Recent developments include:

- Southwest Airlines entered the Puerto Rico market, substituting its subsidiary AirTran. The airline currently operates nonstop service to Baltimore, Fort Lauderdale, Houston, Tampa and Orlando. The entry of Southwest resulted in an upgrade of aircraft, generating 33% more passengers during 2013-2014.

- Avianca Airlines, a Colombian flag-carrier began flying from Bogotá to San Juan three times a week in July 2013. Based on the success of this route and the recent opening of the Commonwealth's Office in Colombia, 2more weekly flights have been added to this route since it was initially established. The airline also opened a VIP lounge in Concourse C at the San Juan International Airport.

- Air Europa, a Spanish carrier with presence in many important cities in Europe and the Middle East, began flying from Madrid to San Juan two times a week in May 2014. Air Europa also launched a codeshare with Seaborne Airlines to offer daily service from Madrid to San Juan via Punta Cana, Dominican Republic. Due to the success of the first two years, Air Europa added a third flight for the summer high season, starting in May 2016.

- Aruba-based Insel Air began nonstop Aruba-San Juan service in July 2015, with twice-weekly service.

- Norwegian Airlines began nonstop service to Puerto Rico from its gateways in Copenhagen, Denmark; London, United Kingdom; Oslo, Norway; and Stockholm, Sweden in November 2015, with five weekly flights (one each per Scandinavian gateway and two from London Gatwick). Due to its initial success, Norwegian Airlines has secured operations for a second year and increased capacity from London.

- JetBlue launched a direct nonstop service between Chicago O'Hare International Airport to San Juan's Luis Muñoz Marín International Airport, adding 150 seats daily.

- Seaborne Airlines moved its headquarters to Puerto Rico, creating 250 jobs by 2015, and estimated to add an additional 400 by the end of 2016. Seaborne currently serves 17 routes out of its San Juan hub.

- Sun Country Airlines began thrice-weekly nonstop service from San Juan to Fort Myers, Florida in May 2015.

- Volaris launched Mexico City-Cancun-San Juan service in July 2015, with twice-weekly service.

272

- Air Canada announced new nonstop service to Montreal and additional second flight from Toronto starting November 2016.

- Iberia reestablished a direct flight from San Juan, Puerto Rico to Madrid, Spain in May 2016, with three weekly flights (Monday, Wednesday and Sunday) for summer and fall season up until October. This flight connects Puerto Rico with more than 90 cities in Europe greatly benefitting tourism and commerce.

- Cruise ship traffic increased 24.8% in fiscal year 2015 setting a new passenger record of 1,509,283. Transit passengers grew 31.7% and homeport passengers increased 12.1%. This increase is partly attributable to increased deployments from Royal Caribbean and Carnival Cruise Line. During Fiscal Year 2016, the Port of San Juan welcomed at least six ships visiting for the first time. Furthermore, Disney Cruise Line will use San Juan as homeport for the second season and MSC Cruises increased its deployment in Puerto Rico with summer visits from the MSC Divina. Fiscal year 2015 saw record arrivals of cruise ship passengers with an impact on the local economy of approximately $1.6 million. Projections indicate that 2016 will be the busiest summer season in history for the Port of San Juan.

- In December 2014 an expanded Pier 3 was inaugurated to welcome Royal Caribbean's Quantum of the Seas to Puerto Rico. These improvements will also make it possible to accommodate the even larger Oasis-class vessels. The Oasis of the Seas made its first voyage in April 2016, the Allure of the Seas in June 2016 and the Harmony of the Seas is expected in November 2016.

- Over 3850 new rooms in financial, permits or construction phases. The construction of these new rooms is expected to create approximately 7837 jobs.

- Four new hotels opened during fiscal year 2014, increasing the amount of available rooms to 14,844. The new hotels include the return of Hyatt Hotels to Puerto Rico with two new "Hyatt Place" hotels that opened in December of 2013 and March of 2014, and a "Hyatt House" that opened in October of 2014 located within the Convention Center District. The inauguration of the Blok Hotel in Vieques, the Vanderbilt in Condado, and Hyatt House at the Convention Center, among others, added nearly 500 new rooms during fiscal year 2015. Occupancy during fiscal year 2015 was approximately 70.50%.

- Establishment of the Bed & Breakfast (B&B) Program in order to promote the creation of small businesses. The first official B&B, Casa Sol in Old San Juan, was inaugurated in 2014. It was joined by Casa Castellana, Villas Las Palmas, Casa Dos Angeles, Rainforest Inn, San Sebastian Bed & Breakfast and Casa Isabel in 2015 and 2016. Additional properties are being evaluated to be integrated in the program.

- Two existing hotels, Da'House in Old San Juan and Hotel Colonial in Mayaguez were included in the new promotional program known as Posada. Two other hotels located in Orocovis and Coamo are being evaluated to be part of this program.

273

- The newly created Medical Tourism Corporation recently began promotional and marketing efforts in certain target markets (the United States East Coast, Latin America and the Caribbean). Also, training courses and visits to providers have been conducted monthly since January 2015. The training courses are provided by the Medical Tourism Association in collaboration with the Medical Tourism Company.

### Manufacturing and Knowledge Services

The Commonwealth's recent outreach initiatives have resulted in the following developments:

- Eli Lilly - The global company announced the expansion of its manufacturing footprint in Carolina, Puerto Rico with an investment of $240 million. The $85 million investment will deliver new production technologies.

- Abbvie – PRIDCO promoted an expansion of $30 million, expected to create 100 new jobs within the next three years in their manufacturing facilities in Barceloneta, Puerto Rico.

- Mentor Technical Group – PRIDCO is promoting the expansion and growth plans of the company. Mentor is a local company that has created over 110 new jobs in the life sciences sector during the last year (2015-2016). The company provides technical support and solutions to the regulated industries of biotechnology, pharmaceutical and medical devices. Mentor has been executing its growth plans to expand its services to other regions of the Caribbean and Latin America, with an investment of approximately $750,000. The company expects to create approximately 50 additional jobs, for a total of 160 new jobs committed with PRIDCO.

- Honeywell Aerospace – The new Research and Technology Center in Moca, Puerto Rico is now operational.  The world-class facility provides state-of-the-art testing capabilities to perform commercial, military & space testing of electromagnetic interference for aerospace products. The new facilities, developed by PRIDCO, cover 69,000 square feet of office and test capabilities, employing approximately 330 people.

- Bristol-Myers Squibb – The global biopharmaceutical company announced the expansion of its manufacturing footprint in Puerto Rico. The $85 million investment will deliver new production technologies and enable subsequent product transfers to the manufacturing site located in Manatí. The expansion, which is already undergoing construction, will create approximately 126 new jobs over a three-year period.

- Sartorius Stedim Biotech - The leading international supplier for the biopharma industry, announced the expansion of its production site in Yauco, Puerto Rico. From Yauco, the company provides the American market with its broad range of products covering nearly all steps of biopharmaceutical manufacture. Over the next five years, the company will invest around $50 million in this site and plans to create around 200 new jobs.

- Marine Environmental Remediation Group (MER) – The Company will establish a new ship recycling and facility in the marine port of the former US Naval Base of Roosevelt Roads located in Ceiba, Puerto Rico. The new facility will boost economic activity in the eastern region of Puerto Rico, initially employing approximately 500 people over the next two years. MER will focus on the reclamation of steel and other metals recovered using state-of-the-art "green" technology, and the re-selling of vessel machinery and equipment recycled from sea-going vessels and platforms, which have been retired from use.

- Roche - The global leader in research-focused healthcare announced a capital-intensive expansion of its manufacturing process in the manufacturing facility located in the municipality of Ponce, Puerto Rico. The project represents an estimated investment of over $60 M USD for the incorporation of new technologies and the renovation of its current manufacturing facility. The expansion will also add over 40 new positions at launch in 2018.

- Infotech Aerospace Services (IAS) – The Company announced an expansion of operations that will foster the growth of the aerospace industry in the Western region of Puerto Rico. With an estimated investment of $11M, IAS will relocate its operations to the municipality of Aguadilla, creating an additional 250 jobs to support its operations in Puerto Rico.

- SolarTech Universal - The solar energy company announced the development of a state-of-the-art automated manufacturing facility for solar panels in the municipality of San German, Puerto Rico. The project will generate approximately 180 new jobs. SolarTech Universal will invest approximately $11MM in machinery, equipment, working capital and leasehold improvements.

- Lufthansa Technik Puerto Rico - The company started operating its third bay at the beginning of July 2016. The new bay is a heavy maintenance line performing C-Checks and cabin modifications similar to the existing two operating bays in the hangar. It will be the second line for Spirit Airlines. Lufthansa Technik Puerto Rico started its operation in July 2015 and has currently a workforce of 270 employees. It is planned to grow up to a workforce of 400 by 2017. The facility in Aguadilla extends over a total area of 215,000 square feet. In its final configuration, Lufthansa Technik Puerto Rico will offer five lines for base and heavy maintenance checks (C-, IL- and D-checks), along with other maintenance work on narrow body aircraft.

- Beckton Dickinson – Expended both of their installations at Cayey and Humacao with a $30 million investment, expected to create 100 new jobs.

- UTC Aerospace Systems – The company announced with PRIDCO an expansion of 100 new jobs in their facilities at Santa Isabel.

- Infosys – Established a new operation for outsourcing services in the aerospace and defense cluster, expected to create 300 new jobs.

275

- In the knowledge services and software development segment the following companies established or expended operations in Puerto Rico: Truenorth Technologies (400 new jobs), Rock Solid (100 new jobs) and Wovenware (40 new jobs).

- In addition, the following companies announced their intention of closing facilities to which PRIDCO mediated and promoted other companies to acquire the following facilities: Merck in Barceloneta to Merial/Sanofi (France), Warner Chillcott in Fajardo and Manati to Actavis (Ireland), Merck in Arecibo to Avara (USA), Eli Lilly in Guayama to Biogen (Colombia) and Blu Caribe in Dorado to PuraCap (China).

- Over 24,300 jobs committed since January 2013 in the aggregate, related to different manufacturing sectors, including biopharma, medical devices, knowledge services, aerospace electronics and information technology. Out of those jobs committed, more than 12,400 have been created already.

### *Commerce and Trade*

SMEs were one of the sectors that outperformed in the economy during fiscal years 2013-14, 2014-15, 2015-16. During the last three fiscal years, the Puerto Rico Trade and Export Company ("**PR Trade**") through all its initiatives and programs have created a total of 13,041 jobs. The SME ecosystem has been strengthened by several incentives programs which target job creation.

PR Trade has implemented several initiatives to foster the growth of the SME sector such as:

- Incentives Act for the Generation and Retention of Jobs in the SME sector
- Incentives and Financing Act for Young Entrepreneurs
- Business Incubators Act
- Export Accelerators Act
- Community Economic Development Act
- EDCU – Salary Incentives for SMEs in Urban Centers Act
- Creative Industries Act
- Export Franchises Program

PR Trade has been awarded four important federal grants as of September 2015: 1) U.S. Small Business Administration ("**SBA**"), Federal and State Technology Partnership (FAST) 2014-2015 grant for $90,909 to help fund, in part, its new PRO-TECH program which is intended to promote the creation and commercialization of technology based start-ups and provide technical capacity to assist small businesses to apply to the Small Business Innovation Research ("**SBIR**") program, a highly competitive program that encourages domestic small businesses to engage in Federal Research/Research and Development (R/R&D) that has the potential for commercialization, 2) U.S. Small Business Administration (SBA) FAST 2015-2016 grant for $100,000.00 to help fund, in part, the PRO-TECH program that PR Trade started in 2014 for the promotion, creation and commercialization of technology based start-ups and

provide technical capacity to small businesses to apply to the SBIR program, 3) The Economic Development Administration ("**EDA**") grant of $800,000 to help fund, in part, four main initiatives of the PR Trade Company: (i) a federal and state procurement B2B event bringing buyers from the U.S. federal and state governments to meet with local suppliers of goods and services, in coordination with SBA's American Supplier Initiative; (ii) the Lufthansa MRO supplier project, which will help identify potential suppliers for goods and services to build the business ecosystem to fulfill the expected needs of the Lufthansa Technik's MRO project in Aguadilla, Puerto Rico, as well as additional events to bring together local suppliers and buyers for the benefit of the entire Aerospace industry in Puerto Rico; (iii) the Expo Partner project, a six month program to create an individual Export Plan for the participants in order to  increase the number of SMEs that export their services and products; and (iv) the Expo PR 2015, a multi-sector trade show where international buyers were brought to Puerto Rico to engage in a match-making event to meet local suppliers and their goods and services, 4) The State Trade and Export Promotion ("**STEP**") program, which awarded PR Trade with $288,650.00 to partially fund international trade missions and shows organized by PR Trade's export division, Promoexport, to benefit exporters from the island and promote their goods and services abroad.

### *Energy Policy*

The current administration is committed to providing reliable electric service and to diversify Puerto Rico's energy sources with the aim of lowering energy costs.

On May 27, 2014, the Governor signed into law Act No. 57-2014, known as "The Energy Transformation and Relief of Puerto Rico Act". Act 57-2014 provides that two entities will oversee the new law's implementation. The Puerto Rico State Office of Energy Policy ("**SOEP**") (formerly the Energy Affairs Administration), will be responsible for developing and promoting the Commonwealth's energy policy, and the Puerto Rico Energy Commission, will be responsible for overseeing and regulating the implementation of the Commonwealth's energy policy. Among its duties, the Energy Commission will be responsible for approving the electricity rates and the IRP to upgrade PREPA's infrastructure  proposed by PREPA.

Act 57-2014 also amended PREPA's organic law in order to impose on PREPA a duty to provide reliable electric service, contributing to the general welfare and sustainable future of the Commonwealth, while reducing the social, environmental and economic impacts of such efforts. Act 57-2014 establishes thresholds for energy consumption in the Commonwealth's public agencies and corporations and the legislative and judicial branches of the Government, as well as penalties for non-compliance with such requirements. The municipalities of the Commonwealth are now also subject to energy consumption limitations, as well as to a reduction in the Contribution in Lieu of Taxes ("**CILT**") that they receive from PREPA.

The other principal component of the Commonwealth's fuel diversification strategy is the development of renewable energy generation. Act No. 82 of June 19, 2010 creates a Renewable Portfolio Standard, recognizing many sources of renewable energy that utilize various technologies, and setting a target of 12% renewable energy production by 2015 and 15% by 2020, and a requirement for retail energy providers to establish a plan to reach 20% renewable energy production by 2035. Act No. 83 of June 19, 2010 (Act 83-2010) provides incentives for energy diversification through the Green Energy Fund ("**GEF**") Program and provides different types of tax credits and subsidies for certain renewable energy technologies. Through the GEF,

the Commonwealth will invest $185 million in renewable energy projects during the period between fiscal year 2012 and fiscal year 2020. The GEF provides reimbursements for the installation of renewable energy systems of 40% with a maximum capacity of 100 kilowatts (kW) (applies for residential and small business) and up to 50% for systems larger than 100 kW and up to 1 megawatt (MW) (applies for medium business and industries). Current GEF regulations allow for solar and wind renewable energy technology to be incentivized.

As of June 2014, 42.9 MW (from 890 GEF incentives applications) have been incentivized by the GEF, 10 MW of which are currently interconnected to the Puerto Rico electrical grid. From the beginning of the GEF in 2011 through June 2014, of a total of $61.5 million dollars assigned to the Program, SOEP has reserved a total of $59.4 million for renewable energy projects. Of those incentives that have been reserved, SOEP has disbursed $23.4 million (corresponding to almost 40% of the projects constructed). Currently, there are over 100 MW of large scale projects (over 1 MW) installed (almost all of which are wind technology systems) and approximately 50 MW of distributed generation installed in the Commonwealth (almost all of which is solar technology).

### Public-Private Partnerships

The Puerto Rico Public Private Partnerships Authority (the "**P3 Authority**") has been at the forefront of the U.S. public private partnerships ("**P3s**") market since its establishment on June 8, 2009, through Act No. 29 (the "**P3 Act**"). The P3 Authority is the entity responsible for implementing the public policy in the Commonwealth of Puerto Rico regarding P3s in order to promote the development and maintenance of infrastructure facilities, improve the services rendered by the Government and foster the creation of jobs.

Since the enactment of the P3 Act, the P3 Authority has completed three important transactions, namely: the concession of the operations and maintenance of toll roads PR-22 and PR-5, the School Modernization Program and the concession of the operations and maintenance of the Luis Muñoz Marín International Airport.

The P3 Authority continues with its responsibility of promoting the use of P3s as a viable and effective mechanism of economic development. The P3 Authority is working on various projects, among which there are greenfields and brownfields. With respect to brownfield projects, the P3 Authority is evaluating projects related to the concession of existing public services in order to reduce government operating costs and expenses and to improve the provision of said services to the citizens. Regarding greenfield projects, the P3 Authority has been working on two new infrastructure projects: the Caguas-San Juan Commuter System, and the Conversion to Natural Gas of PREPA's Northern Power Plants.

The Caguas-San Juan Commuter System involves the development of a mass transit system to connect the Central Eastern Region to the Metropolitan Area. The estimated total investment of the project is $600 million and it is expected to generate more than 12,000 jobs during the construction phase. This project in its planning phase. However, due to fiscal constraints and the inability of the project stakeholders to identify a source of re-payment, the project was put on hold.

278

The Conversion to Natural Gas of PREPA's Northern Power Plants entails the development of the necessary infrastructure for the receiving, storing and regasification of liquid natural gas for the power plants of San Juan and Palo Seco. PREPA estimates the development costs to be approximately $180 million to $300 million. This project is expected to create between 3,600 to 6,000 jobs. The P3 Authority completed a technical evaluation for the project in which it identifies a technically suitable location for its development. The location identified is owned by the Ports Authority, and they have claimed that the Project may affect their operations.

The P3 Authority is also involved with the Northwest Corridor Project ("**NW Corridor**"). This project consists of transportation system road improvements on state roads PR-22 and PR-2 within and through the boundaries of the municipalities of Hatillo, Camuy, Quebradillas, Isabela, Moca, and Aguadilla. These improvements will substantially enhance surface transportation connectivity between the San Juan Metropolitan Area and the Aguadilla Urban Area. The estimated total investment for the project is projected to be from $934 million to $1.2 billion and it is expected to create between 14,334 to 17,825 direct/indirect/induced new jobs during the construction phase. Further, the NW Corridor is expected to have long term benefits such as the creation of well-paid jobs. The P3 Authority engaged PRIFA, under an interagency collaborative agreement, for them to provide technical assistance in the development of the Project. PRIFA is currently working to complete the environmental compliance process. After completion of the environmental compliance process, the P3 Authority will initiate the procurement phase.

The P3 Authority amended its enabling act last December 2014, through which it incorporated a new and expedited mechanism to procure small scale P3 projects. Under this new expedited process, the P3 Authority initiated the analysis and is undergoing the procurement process for the concession of the operation and maintenance of the passenger and cargo maritime transportation service in Puerto Rico. This project entails the establishment of a P3 for the concession of the operation and maintenance of the public maritime transportation services provided within the San Juan Bay (Metro Service), the Municipal Islands of Puerto Rico, to wit, Vieques and Culebra (Island Service), and the operation of the Maintenance Base located in Isla Grande, San Juan. The Project would entail a no less than five year concession agreement with the selected private entity.  The objective of the project is to improve the services, identify and introduce efficiencies in the operation of the service by leveraging from the private sector's expertise, and to initially cap and subsequently reduce the government's subsidy for the service.

Under this expedited process the P3 Authority has received and analyzed various unsolicited proposals. For instance, the P3 Authority initiated the analysis of an unsolicited proposal presented for the establishment of a system to improve the registration, processing and issuance of identification cards and driver's licenses that are issued by the Department of Transportation and Public Works. The objective is to improve the quality of the service, reduce costs and to ensure Puerto Rico's compliance with the Real ID Act.

### *Strategic Projects*

The Commonwealth is also targeting strategic/regional projects that are expected to generate investments in various regions of Puerto Rico in order to foster a balanced economic development.

The Puerto Rico Science Research and Technology Trust (the "**Trust**") is one of the strategic projects within the DDEC's economic development plan. The Trust's main infrastructure-related initiative is the Science District. It is located in Puerto Rico's capital city of San Juan, hosting state-of-the-art facilities for research, academic, and business initiatives, as well as other lifestyle amenities. The 70-acre site will contain a vibrant, culturally rich, planned science campus in an urban setting with many important science, technology, research, health, and academic resources nearby.

The Trust aims to fortify Puerto Rico's research infrastructure and enable its use as a tool to develop, attract, and retain a vibrant research ecosystem. To do so, it is identifying and incorporating additional resources that contribute to the Trust's overarching mission of facilitating economic development and citizens' well-being through science, technology, research, and Puerto Rico's industrial base.

The Trust is executing a plan of action with the ultimate goal of facilitating such an innovation ecosystem. To do so, the Trust is pursuing two action steps: First, it is seeking a development partner to lease, finance, develop, and manage the mixed-use 70-acre Science City project (Master Development - RFQ). Secondly, it is identifying and approaching potential anchor tenants to be a part of Science City.

The Trust has already invested more than $50 million in Puerto Rico's research infrastructure, including Science City. Other research infrastructure in Puerto Rico includes the Molecular Science Research Complex, the Bioprocess Development and Training Complex (BDTC), the Botanical Garden, and others.

In the eastern region of Puerto Rico, the Roosevelt Roads project (the "**RR Project**") entails the redevelopment of the old Roosevelt Roads navy base facilities in Ceiba and Naguabo and is a key element in the administration's strategy to create jobs and reignite the economy of Puerto Rico's eastern region, including Ceiba, Naguabo, Vieques, and Culebra. The site of the former Roosevelt Roads Naval Station represents an unparalleled opportunity for the development of a mixed-use development that incorporates tourist, residential, recreational, institutional, light industrial and commercial uses. With 3,400 acres of prime waterfront property available for redevelopment, close proximity to attractions such as Vieques, Culebra, El Yunque, and San Juan, and improvements including a major airfield and deep-water ports, the RR Project represents a unique large-scale development opportunity. Development on the site will also contribute greatly to the economic growth of eastern Puerto Rico by providing construction jobs and attracting more tourists to the wider area.

While continuing the search for a Master Developer, which will be responsible for coordinating and implementing redevelopment efforts with other developers/investors in accordance with the approved Master Plan and Land Use Plan, the Local Redevelopment Authority for Naval Station Roosevelt Roads ("**LRA**") will promote and develop specific projects to advance the business objectives of the redevelopment of Roosevelt Roads. The RR Project began in 2015 with the opening of eight small businesses providing eco-tourism, nature tourism and other related services, as well as the commencement of other government related operations in the site, and the inauguration in August 2015 of the new STEM high school called Center for Residential Educational Opportunities in Ceiba (CROEC) with the capacity to house 250 students ($6.4 million investment). In 2016, other important projects initiated operations in

Roosevelt Roads or are in the planning, design and permitting stage scheduled for start-up during the latter part of 2016, and overlapping well into 2017 and beyond. MER Group inaugurated a ship dismantling and materials recovery operation in May 2015 (investment of $4 million in facilities), which will create 500 jobs by the end of 2017. Also, Mid-Atlantic Shipyards (MAS) is in the process of developing a multi-tenant shipyard in the dry-dock area of Roosevelt Roads ($25million investment and 250+ jobs) to become fully operational by 2018, and completion of the new Visitor Center by the PR Conservation Trust is expected by end of 2016.

As of July 2016, the LRA has signed short-term and long-term lease contracts that will generate total net income of approximately $19.5 million over the life of the contracts. These contracts represent approximately 400,000 square feet of leased facilities, 12 businesses established in RR, and the creation of 350 jobs. The LRA is looking to concentrate on development efforts in Phase 1 of the redevelopment by attracting commercial, touristic and related uses for the Waterfront District.

Additionally, the LRA also expects to attract new businesses to Roosevelt Roads through its designation as a Promise Zone in June 2016 and a Historically Underutilized Business Zone (HUBZone) area. Through the Promise Zone Initiative, the federal government, through the USDA, will work strategically with the LRA and local leaders to boost economic activity and job growth, improve educational opportunities, and leverage private investment to improve the quality of life in Ceiba, Naguabo, Fajardo and the Roosevelt Roads area. The LRA is the lead entity in charge of promoting private and public sector projects under this program in conjunction with the municipal governments of Ceiba, Naguabo and Fajardo for a ten year period. The LRA achieved the designation of RR as a HUBZone under the Small Business Administration (SBA) on May 7, 2015 and it is currently valid through May 17, 2020. This designation will assist the LRA in making RR more attractive to qualified companies wanting to establish operations at RR and create jobs. The HUBZone Program is designed to assist communities in alleviating poverty and unemployment and has been a critical resource in creating jobs, reducing poverty, reducing unemployment and promoting economic prosperity. The program helps small businesses in urban and rural communities to gain access to federal procurement opportunities and receive competitive advantages in winning federal contracts.

Also, the LRA wants to obtain approval from the USDA for the LRA's application presented for the Water and Wastewater Loan and Grant Program. The LRA will endeavor to create additional jobs and build an infrastructure platform to attract new businesses if awarded the USDA Loan and Grant during 2016.

The Port of Ponce Authority has focused all efforts on commercializing the infrastructure that has been developed up to now for the Port of The Americas. With that objective the Authority has engaged Portek *International Pte Ltd*, to handle the operations of the Port in order to promote business development and cargo growth during an initial period of three years to establish and stabilize the entire operation of the Port. Portek is a world-class operator based in Singapore that has more than 26 years of experience in engineering projects related to port services and 16 years of experience in port operations and manage 9 other ports around the world with their parent company Mitsui & Co., LTD, which is one of the most important Japanese trading houses. After a period of mobilization and due diligence process, since January 2016, Portek has established a development strategy for the Port and has started implementing initiatives as part of the first phase of business development. Through the current first phase,

efforts are concentrated on attracting new local customers and to strengthen the services provided to existing costumers of the Port in order to build a potential cargo volume to enable calls form shipping lines at Ponce. The cargo volume generated during this initial period will enable the Port to establish its operational capacity to handle greater volumes at subsequent phases, as well as to mitigate cargo handling costs in order to make us more competitive for international and transshipment cargo. Through this strategy, the Port will commercially grow during the next few years to become a hub for international cargo to the US and the Caribbean. During the first phase being implemented at this moment, the Port will improve Puerto Rico's distribution and logistics chain, and enable growth of domestic companies whose operations were limited due to imports and exports capacity constraints. After stabilization of operations, Portek will enter into a longer term concession agreement to continue operating the port. At the same time, by having a strong operational port offer, the Authority expects to be more successful now in promoting development of the value added zone adjacent to the Port. The Authority has recently completed construction Phase III A.2 of the Port of The Americas, which included infrastructure and environmental mitigation improvements that enables the development of land reserved for value added and logistics projects. With the land ready for development and an operational Port, the Authority can promote establishment of new businesses that will support port growth and economic development for the region of Ponce and Puerto Rico.

In the western region of Puerto Rico, the Commonwealth is focused on the redevelopment of the Aguadilla airport to serve as the second international airport of Puerto Rico and as a regional logistics hub. The PRPA is well on their way to finalize a redevelopment master plan in order to convert the international airport facilities into a regional maintenance, repair and overhaul ("**MRO**") and cargo hub. To this end, the PRPA completed the process and the Aguadilla airport has been designated as a Free Trade Zone providing huge competitive advantages for companies operating under this structure. The plan will include the creation of a comprehensive aeronautics/aerospace cluster leveraging the University of Puerto Rico's Mayagüez Campus and major aeronautics firms operating in the west/northwest corridor. This initiative is spearheaded by the agreement reached with Lufthansa Technik with the first phase of construction nearing completion.

### *Infrastructure investments*

On February 5, 2014, the Governor announced that his administration would accelerate the infrastructure investment plan by pursuing $800 million in infrastructure investments, including public-private partnerships, that have been identified and by accelerating agency reviews of infrastructure investment plans.

### *Treatment of Puerto Rico Corporations under the U.S. Code - Controlled Foreign Corporations*

As a result of the modification and phase-out of the federal tax incentives under Section 936 of the U.S. Code, many corporations previously operating thereunder reorganized their operations in Puerto Rico to become controlled foreign corporations ("**CFCs**"). A CFC is a corporation that is organized outside the United States (including, for these purposes, in Puerto Rico) and is controlled by United States shareholders. In general, a CFC may defer the payment of federal income taxes on its trade or business income until such income is repatriated to the United States in the form of dividends or through investments in certain United States properties.

Most of the major pharmaceutical, instrument and electronics manufacturing companies in Puerto Rico have converted part or all of their operations to CFCs.

CFCs operate under transfer pricing rules for intangible income that are different from those applicable to United States corporations operating under Section 936 of the U.S. Code ("**Section 936 Corporations**"). In many cases, they are allowed to attribute a larger share of this income to their Puerto Rico operation but must make a royalty payment "commensurate with income" to their United States affiliates. Section 936 Corporations were exempted from Puerto Rico withholding taxes on any cost-sharing payments they might have opted to make, but CFCs are subject to a 15% Puerto Rico withholding tax on royalty payments, unless they have a renegotiated Puerto Rico tax grant issued under the Economic Incentives Act (Act 73), in which case this withholding tax could be lowered to 2% or 12%.

In May 2009, the United States Treasury Department announced proposed changes to the U.S. Code that include, among others, changes to remove incentives for shifting jobs overseas. The Ways and Means Committee of the House of Representatives has also held recent hearings and released a tax policy white paper that puts forth certain proposed changes to the U.S. Code to combat base erosion and profit shifting by U.S. and foreign multinational corporations. While these initiatives are not directed at Puerto Rico, several of them could affect CFCs operating in Puerto Rico. As of this date, no legislation has been approved by either House of Congress of the United States. It is not possible at this time to determine the legislative changes that may be made to the U.S. Code, or their effect on the long-term outlook on the economy of Puerto Rico. The Commonwealth is developing policy responses to the United States government to seek to safeguard Puerto Rico's economic growth and development plans.

## LITIGATION AND RELATED MATTERS

The Commonwealth is a defendant in numerous legal proceedings pertaining to matters incidental to the performance of its governmental operations. Under Act 104 of June 25, 1955, as amended, persons are authorized to sue the Commonwealth only for causes of actions specified in said Act. The Commonwealth may be liable under Act 104 for damages up to a maximum amount of $75,000, or $150,000 if the suit involves actions for damages to more than one person or where a single injured party is entitled to several causes of action.

Under certain circumstances, as provided in Act 9 of November 26, 1975, as amended, the Commonwealth may provide its officers and employees, including directors of public corporations and government instrumentalities and mayors of the municipalities of the Commonwealth, with legal representation, as well as assume the payment of any judgment that may be entered against them. There is no limitation on the amount of the judgment that may be paid under Act 9 in cases before federal court, but in all other cases the Puerto Rico Secretary of Justice may determine whether, and to what extent, the Commonwealth will assume payment of such judgment.

With respect to pending and threatened litigation (5,192 cases), excluding the cases mentioned in this section, as of June 30, 2016 the Commonwealth has included in its financial statements reported liabilities of approximately $2.2 billion for awarded and anticipated unfavorable judgments. Such amount represents the amount estimated at the time as a probable

liability or a liability with a fixed or expected due date, which would require future available financial resources for its payment. The amounts claimed as of June 30, 2016 exceed $10.9 billion; however, the ultimate specific liability cannot be presently determined, especially because of the nature of labor claims, where the awards for unpaid salaries are calculated by the agencies. The Commonwealth believes that most of the claims are excessive, frivolous, or both, and that its ultimate liability should not significantly exceed the amounts set forth in the Commonwealth's financial statements.

The United States Securities and Exchange Commission ("**SEC**") requested information about certain bond issuances of the Commonwealth and its component units. The Commonwealth is cooperating with the inquiry, including by providing the SEC with documents and information. The SEC has advised that the information requests should not be construed as an indication that any violation of the federal securities laws has occurred. This matter is ongoing and the Commonwealth cannot predict when it will be concluded or its outcome

**Substantial pending or threatened litigation (Claims of over $50 million):**

**Debt Litigation**

The following is a list of pending cases concerning Puerto Rico's debt. Joint attorneys for defendants in all of these cases are AMRC, LLC d/b/a Antonetti Montalvo & Ramírez-Coll and Kirkland and Ellis, LLP. Most of the cases, except where noted, do not include claims for monetary relief. Instead, the majority seek a declaration that the Moratorium Act and various Executive Orders issued under its authority are unconstitutional An adverse result, however, could have an economic effect because the plaintiffs could then accelerate maturities and file actions for collection of principal and interest, as well as attorney's fees.

**Assured Guaranty Corp., et al. v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-1037; and
**Financial Guaranty Insurance Company v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-1095.

Plaintiffs in these cases are monoline insurers of bonds issued by several Puerto Rico public corporations including HTA, PRCCDA and PRIFA. Both cases seek declaratory and injunctive relief arguing that two Executive Orders issued on November 30 (EO2015-46) and December 8, 2015 (EO2015-49) ("the clawback orders") by the Governor of Puerto Rico – concerning the use of certain funds pledged as collateral to bondholders of certain public corporations – are unconstitutional because they violate several clauses of the Constitution of the United States and the Constitution of the Commonwealth of Puerto Rico. The defendants filed motions to dismiss arguing that the federal court lacks jurisdiction because the actions are barred by the doctrine of sovereign immunity and the 11th Amendment of the federal constitution and because the Executive Orders are not preempted methods of composition. After full briefing by both parties, the motions were deemed submitted. On October 4, 2016, the district court determined that plaintiffs' claims are not barred by the doctrine of sovereign immunity and that the claims were not preempted but granted defendants' motion to dismiss regarding plaintiff's preemption-based claims because no composition of debt has occurred, only the postponement of payment. Subsequently, the Commonwealth defendants argued that the cases, as pled, were

currently stayed by PROMESA. Plaintiffs did not deny the applicability of PROMESA and have not requested lifting of the stay. These cases are not consolidated.

Plaintiffs in the Assured Guaranty case claim to have paid $10.5 million on their PRIFA policies and plaintiff on the Financial Guaranty case claims to have paid $6.39 million, but none have asserted claims for these amounts.

On September 26, Angel Ruiz Rivera filed a notice of interlocutory appeal to contest the denial of his request to intervene. The First Circuit instructed the District Court to decide on a request to allow appellant to proceed in forma pauperis. On December 2, 2016, the District Court denied said request. On December 6, 2016, the First Circuit instructed appellant to pay the filing fee. Thus, the First Circuit has not yet acquired jurisdiction over the merits of the appeal.

**Brigade Leveraged Capital Structures Fund, LTD, et al., v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-1610.

This is an action for injunctive and declaratory relief by holders of debt issued by the Government Development Bank arguing that sections of Act 21 of 2016, (the Moratorium Act) are unconstitutional. Defendants filed a motion to dismiss and a notice of stay due to the enactment of PROMESA. After an opposition filed by Plaintiffs, the Court stayed the action pursuant to PROMESA and scheduled a hearing for September 22, 2016 to determine whether the PROMESA stay should be lifted. For the purpose of the stay hearing, which concluded on September 23, 2016, this case was consolidated with three others, Civil Nos. 16-2101, 16-2257 and 16-2510. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion should be filed no later than October 21, 2016 and any response would have to be filed no later than October 28, 2016. On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiffs allege that they hold $750 million of GDB bonds, but have not made a claim for any amount.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016. The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay. Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016. Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

**National Public Finance Guarantee Corporation v. Alejandro Garcia Padilla et al.**, USDC-PR Civil No. 16-2101.

Plaintiff, an insurer of debt issued by the Commonwealth of Puerto Rico and some of its public corporations, seeks declaratory and injunctive relief arguing that sections of the Moratorium Act are preempted by Section 903(1) of the Bankruptcy Code and are otherwise unconstitutional. After various motions filed by the parties, the Court stayed the case pursuant to

PROMESA and scheduled a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 held on September 22 and 23, 2016 to determine whether the PROMESA stay should be lifted. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016. On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiff alleges that it insures $2.4 billion of Puerto Rico debt, but does not claim to have paid any amount and does not include any monetary claim in its complaint.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay.  Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016.  Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

**Municipalities of San Juan and Carolina v Government Development Bank and the Commonwealth of Puerto Rico. Superior Court of San Juan**, Consolidated cases Nos. SJ2016CV00091 and SJ2016CV00102.

The Municipalities of San Juan and Carolina seek withdrawal of funds deposited with the Government Development Bank as well as declaratory and injunctive relief against the application and enforcement of sections of the Moratorium Act that regulate the disbursement of funds deposited with the bank. Both GDB and the Commonwealth moved to dismiss and, after the enactment of PROMESA, for a stay.  On July 13, 2016, the Court of First Instance issued Judgment and stayed proceedings due to the enactment of PROMESA. Plaintiffs have sought review of this Judgment before the Court of Appeals and have requested certification to the Supreme Court.

On November 15, 2016, the Supreme Court denied the motion for reconsideration of the Municipalities of Carolina and San Juan regarding the petition for certification that seeks the Supreme Court to review the determination of the First Instance Court. On December 5, 2016, the Commonwealth and the GDB filed a motion to dismiss the appeal as well as their opening brief before the Commonwealth Court of Appeals.  The Court of Appeals directed the Municipalities to show cause as to why the appeal should not be dismissed as untimely filed. The Municipalities complied on December 12, 2016.  Hence, the motion to dismiss and the appeal on the merits are pending adjudication.

The Municipality of Carolina is seeking to withdraw a deposit $7,676,000 and the municipality of San Juan is demanding $24, 811,000 of property tax funds held by GDB.

**Angel L Acevedo Llamas v Commonwealth of  Puerto Rico et al. Court of First Instance**, San Juan Part, Civil No. K CD2016-0559.

Plaintiff, a holder of bonds issued by the Public Finance Corporation ("PFC"), sued PFC and several government officials, including the Governor, seeking payment of interest due on the bonds and damages equal to the loss of market value of the bonds. The defendants moved for summary judgment due to plaintiff's lack of standing to sue. Plaintiff opposed motion for summary judgment and filed a cross motion for summary judgment. On July 8, 2016, defendants filed a notice of stay pursuant to PROMESA. The court stayed some, but not all of the claims. A motion for reconsideration in this regard is pending resolution.

Plaintiff claims $54,000 for interest due on March 1, 2016, plus daily interest thereafter at the rate of $222. He also seeks $1,761,750 for loss of capital.

On December 5, 2016 the Court entered Judgment staying proceedings pursuant to section 405(b)(1) of PROMESA.

**Dionisio Trigo González et al v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2257.

Plaintiffs, holders of debt issued by GDB and PFC, seek declaratory and injunctive relief arguing that sections of the Moratorium Act violate the US and Puerto Rico Constitutions. Defendants filed a motion to dismiss and a notice of stay pursuant to PROMESA. Plaintiffs opposed said notice and requested relief from the PROMESA stay. The Court stayed the case pursuant to PROMESA and a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 was held on September 22 and 23, 2016 to determine whether the PROMESA stay should be lifted. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016.

On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e)."

Plaintiffs allege that they hold $100 million in GDB and PFC bonds, but include no monetary claim in their complaints.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on December 1, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay. Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016. Replies are due on December 30, 2016 and oral argument is set for January 4, 2017.

**Jacana Holdings I, LLC et al v Commonwealth of Puerto Rico et al**., USDC-SDNY Civil No. 164702.

Plaintiffs, holders of debt issued by the Commonwealth of Puerto Rico, seek declaratory and injunctive relief arguing that the Moratorium Act and executive orders implementing the Moratorium Act violate the United States Constitution, the Puerto Rico Constitution, and New

287

York state law. Defendants filed a notice of stay pursuant to PROMESA and plaintiffs filed a brief motion agreeing to the applicability of PROMESA to their claims as pled.

**Lex Claims, LLC et al v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2374.

Plaintiffs are owners of General Obligation bonds. They seek declaratory and injunctive relief arguing that certain laws and actions of the Commonwealth of Puerto Rico with regard to the GOs violate PROMESA and that their lawsuit is not stayed by section 405 of that statute. In the alternative, they seek relief from the stay, should it apply. On September 7, 2016, the Commonwealth filed a notice of stay which was denied. A motion for reconsideration was filed. On October 7, 2016, Plaintiffs filed a motion for leave to amend their complaint to add claims against COFINA alleging that funds from the Sales and Use Tax should not go to COFINA, but rather to the Puerto Rico Treasury for payment of principal and interest on the Commonwealth's general obligation bonds, arguing that such bonds have a constitutional priority over COFINA bonds.

On November 4, 2016, the Court entered an Order granting plaintiffs' request for leave to file a second amended complaint. However, this Order was granted "to the extent of allowing the second amended complaint to be filed." The Court specifically held that "whether the First, Second, Third and Twelfth causes of action may be prosecuted will be decided in due course." On November 4, 2016, plaintiffs filed their second amended complaint. On November 7, 2016, the defendants filed a Notice of Automatic Stay pursuant to PROMESA, arguing that this case is stayed in its entirety pursuant to sections 405(b)(1) and 405(b)(3-6) of PROMESA. In the alternative, defendants requested that the Court stay the piecemeal litigation and disposition of Counts 1-3 and 12 of the second amended complaint in the exercise of its discretion and its inherent power to manage its docket.

The Commonwealth defendants answered the amended complaint on December 5, 2016. Co-defendants COFINA, Vaquer and BoNY, who have never appeared in this action, have until December 16, 2016 to answer the amended complaint. A number of COFINA bondholders and other interested parties have filed motions requesting intervention, which are pending resolution.

**US Bank Trust, NA v Alejandro García Padilla et al**., USDC-PR Civil No. 16-2510.

Plaintiff alleges to be the successor trustee under a trust agreement entered into by the University of Puerto Rico, pursuant to which plaintiff is to receive and eventually distribute to bondholders revenues from tuition and other sources. Plaintiff seeks declaratory judgment and injunctive relief against certain actions of the Commonwealth that affect those revenues, including a declaration that section 201 of the Moratorium Act and Executive Order 31-2016 are unconstitutional. Plaintiff also seeks relief from the automatic stay imposed by PROMESA. Defendants opposed plaintiff's motion for relief from stay. The case is currently stayed and a consolidated hearing for Civil Nos. 16-1610, 16-2101, 16-2257 and 16-2510 was held on September 22 and 23, 2016. In addition, the Oversight Board filed a motion requesting an extension of time to file a response to Plaintiff's motions for relief from the automatic stay and for leave to intervene in this action. The Court granted the Oversight Board's request and determined their motion shall be filed no later than October 21, 2016 and any response shall be filed no later than October 28, 2016.

288

On November 15, 2016, the Court denied without prejudice the Oversight Board's motion to intervene in these consolidated cases and denied "[p]laintiffs' respective requests to vacate the PROMESA automatic stay pursuant to section 405(e). U.S. Bank may, however, proceed to disburse funds held in its reserve account to UPR bondholders pursuant to the terms of its trust agreement."

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016. The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay. Appellant is set to file an opening brief on December 19, 2016. Appellees will do the same on December 27, 2016. Replies are due on December 30, 2016 and oral argument is set for January 4, 2017

## VOYA International Trust Company v. UPR et al., USDC-PR Civil No. 16-2519.

Plaintiff is the trustee of a deferred compensation plan established for the benefit of certain employees of the Medical Sciences Campus of the University of Puerto Rico. Plaintiff filed an action against UPR, its President and the Governor seeking a declaration that its actions to date, and its failure to comply with certain instructions from UPR and/or its plan beneficiaries, are in compliance with PROMESA. UPR and the Governor have moved to dismiss the complaint and argue that it is not stayed by PROMESA. No monetary claim against UPR or the Commonwealth has been stated. Resolution of the dispositive motions filed is pending.

## Peaje Investments LLC v. Alejandro García Padilla et al., USDC-PR Civil No.16-2365.

Peaje Investments owns bonds issued by HTA. It seeks a declaration that certain sections of the Moratorium Act and certain executive orders are preempted by the Bankruptcy Act and PROMESA, and violate the Constitution of the United States, because they divert funds from highway tolls and other sources to uses other than the payment of debt, for which those funds were pledged. A hearing on whether the PROMESA automatic stay should be lifted was scheduled for November 3, 2016. For purposes of the stay hearing the case is consolidated with Assured Guaranty, Civil No. 16-2384. Plaintiff also seeks damages against HTA and any transferees of any pledged funds in an amount equal to the funds transferred as well as an injunction to prevent further transfers.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMESA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated. From this determination, Peaje presented a NOTICE OF APPEAL on November 9 and the Appeal was docketed on November 15, 2016.

On November 22, 2016, the First Cricuit granted Apppellant's request for expedited briefing. Subsequently, the First Circuit consolidated this appeal with other appeals dealing with the District Court's denial of the motion to lift the PROMESA automatic stay. Peaje filed its

opening brief on November 29, 2016. Appellee's brief is due on December 23, 2016. Replies are due on December 28, 2016 and oral argument is set for January 4, 2017.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay. The Board filed its opening brief on December 12, 2016. Appellees will do the same on December 28, 2016. Replies are due on December 30, 2016 and oral argument is set for January 4, 2017

**Assured Guaranty Corp. et al. v. Commonwealth of Puerto Rico et al.**, USDC-PR Civil No. 16-2384.

Plaintiffs issued insurance policies that guarantee payments on bonds issued by HTA. They seek to lift the automatic stay imposed by PROMESA in order to file a complaint similar to Peaje Investments, Civil No. 16-2365. A consolidated hearing with Civil No. 16-2365 on whether the stay should be lifted was scheduled for November 3, 2016.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMESA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated.

The Financial Oversight and Management Board filed a Notice of Interlocutory appeal on November 28, 2016, The First Circuit consolidated this case with other pending appeals that deal with the District Court's denial of the aforementioned request for lift of PROMESA's automatic stay. Appellant filed its opening brief on December 12, 2016. Appellees will do the same on December 27, 2016. Replies are due on December 28, 2016 and oral argument is set for January 4, 2017

**Altair Global Credit, et al v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-2696.

Plaintiffs hold bonds issued by the Employees Retirement System. The action was filed on September 21, 2016. They seek relief from the PROMESA automatic stay unless the Commonwealth provides "adequate protection" in the form of employer contribution to replenish the funds held by a Fiscal Agent for the benefit of bondholders. On October 14, 2016, the Court consolidated this case with Civil Nos. 16-2365 and 16-2384 for the purpose of deciding whether cause exists to vacate the stay imposed by PROMESA. The consolidated hearing was set for November 3, 2016.

On November 2, 2016, however, the Court issued a Memorandum and Order concluding that the movant in Case 16-2384 (ASSURED GUARANTY CORP) lacks standing to "seek relief from the PROMISA stay". With regard to Cases 16-2365 (Peaje) and 16-2696 (Altair), the Court ruled that the movants "do not lack adequate protection and therefore cannot carry their initial

290

burden of showing cause to vacate the Stay." Faced with this, the request for a lift of stay in all three cases was denied and the hearing scheduled was vacated.

Altair filed an interlocutory appeal, Appeal No. 16-2433. The Financial Oversight and Management Board also filed a Notice of Interlocutory appeal, Altair and the Board filed their opening briefs on December 13, 2016. Appellees will file their briefs on December 23, 2016. Replies are due on December 28, 2016 and oral argument is set for January 4, 2017.

**Scotiabank de Puerto Rico v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-2736.

Scotiabank extended credit to the Metropolitan Bus Authority of Puerto Rico. It seeks declaratory and injunctive relief arguing that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. The original complaint was filed on September 28, 2016 and an amended complaint was filed on October 17, 2016.

On November 11, 2016, the Commonwealth defendants filed a Notice of Automatic Stay under PROMESA. On November 17, 2016 the Commonwealth defendants filed a Motion regarding the PROMESA stay and for Extension of Time to Answer. The notice filed, which the Court took as a motion, is pending disposition. The Commonwealth defendants have until December 16, 2106 to answer the amended complaint or otherwise plead.

**Oriental Bank v. Alejandro García Padilla, et al.**, USDC-PR Civil No. 16-2877.

Oriental Bank is party to a Participation Agreement with the Government development Bank (GDB) in connection with a loan extended by the GDB to the Puerto Rico Housing and Finance Authority (PRHFA). Oriental seeks certain declaratory and injunctive relief in order to secure payment of the PRHFA loan. It claims that neither PROMESA nor the Moratorium Act apply to its claims under the Participation Agreement. In the alternative, it requests relief from the PROMESA stay and a declaration that sections of the Moratorium Act and certain Executive Orders issued under its authority are unconstitutional and violate PROMESA. The complaint was filed on October 26, 2016.

On November 22, 2016 the Commonwealth defendants filed a Motion to Stay and for Extension of Time to Answer Complaint or Otherwise Plead. The Court granted defendants until December 22, 2016 to answer the complaint. Oriental opposed the motion for stay on December 9, 2016. Defendants have until December 22, 2016 to reply to Oriental's opposition.

**Recovery of Medicaid Funds**

The Commonwealth is a defendant in three lawsuits, one in Commonwealth court and two in the U.S. District Court for the District of Puerto Rico, filed by certain "Federally Qualified Health Centers" (the "FQHCs") seeking to recover from the Commonwealth approximately $800 million in Medicaid "wraparound payments", which the Commonwealth Department of Health has failed to make since 1997, when the Commonwealth first became a participant in the Medicaid Program. The Commonwealth has admitted its noncompliance with the wraparound requirement and the only controversy is the total amount owed.

To date, five partial judgments have been entered in the Commonwealth court case. Four of the partial judgments are final. Under the four partial judgments that are final, the Commonwealth is required to pay approximately $28 million. The court requested for the manner in which the payments would be satisfied. The Commonwealth claimed the applicability of a payment plan under Act No. 66-2014. In accordance, the Secretary of Justice approved a $3 million payment per fiscal year until the total payment, subject to the budgetary provisions allowed in Act No. 66, supra, and deposited on October 2014 the payment corresponding to FY14-15. The Centers opposed the payment plan and the application of Act No. 66-2014 to the cases. In summary, the Court of Appeals sustained the application of Act No. 66-2014, but remanded the case to the State Court for determination of the appropriate payment plan. The Commonwealth has stated its position in writing, which argues there is no payment plan to discuss because Act No. 66 already states the payment plan that applies. The fifth partial judgment of $109,021,559 was entered in favor of 17 centers and $1,334,007.00 in favor of the Commonwealth. This partial judgment went onto the appeal process. The Commonwealth Court of Appeals remanded the case to the State Superior Court to incorporate the changes made to the Special Commissioner's Report, changes which came about as a result of the Judgment of the First Circuit Court of Appeals of the U.S. District Court, in the parallel Federal case of Consejo de Salud de la Playa de Ponce, supra, v. González Feliciano, F.3d. 831 (1st. Cir.2012). In this federal case the FQHCs claimed the prospective payments of the Medicaid wraparound payments after July 1, 2006, and the First Circuit revoked the District Court for the District of Puerto Rico, and canceled the formula that the Special Master used to calculate the reimbursements of the Supplemental Wraparound Payments (WAP). The case was remanded for revision of the formula.

It is important to emphasize that, even when the Commonwealth could not affect the partial Judgments which had become final and binding, the State Court of Appeals clarified that the Special Commissioner could grant credits to the Commonwealth, for payments ordered based on those partial Judgments, which would result in excess of the real liabilities of the Government. The Court of Appeals denied the Commonwealth's argument as to the source of the discount on credits, pertaining to the 330 Funds, based on the argument that, even when it was previously established that said funds where prone to discounts, this was subject to whether the funds had really been used to benefit Medicaid patients, and the probative weight as to this, relies on the Commonwealth and PRHIA. Therefore, the Appellate Court concluded that the Commonwealth and PRHIA failed to present the evidence required to establish that a discount on credits should be granted in their favor.

In the federal court case, the court has issued various orders requiring the Commonwealth to make the Medicaid "wraparound" payments (WAP) to the health centers, as required under the Medicaid portion of the Social Security Act. The Commonwealth has paid WAP up until the second quarter of 2016. Currently, controversies between the parties are being decided by the Special Master and the only matter that awaits resolution is the one pertaining to the reconciliation process ordered by the Court starting from October 2014. For the most part, the Special Master's Resolutions have favored the Commonwealth. Furthermore, the parties have asked the Court permit that objections to the Special Master's resolutions be made after the totality of the controversies have been addressed by the Special Master. It should be mentioned that the Federal District Court ordered the deconsolidation of *Consejo de Salud Playa de Ponce v. Francisco Joglar Pesquera, etc.* 06-1260 (PG), from *Río Grande Community Health, et al v.*

*Commonwealth of Puerto Rico,* Civil No. 03-1640 (GAG). The first case, Consejo, is operating under a Settlement Agreement that has a formula for the computation of the quarterly payments.

This legal contingency has an estimated exposure of $300 million for the amounts owed and a yearly exposure of approximately $45 million while the Government continues to participate in the Medicaid program.

## Special Education Students

The Commonwealth is a defendant in a class action initiated in 1980 by parents of special-education students before Commonwealth courts alleging that the Puerto Rico Department of Education had failed to provide legally required special education and related services. In February of 2002, the court issued a judgment approving the stipulations reached by the parties regarding the manner special education services should be provided. Since December of 2002, the Department of Education has paid fines for not complying with the stipulations reached. The fines were originally set in the amount of $1,000 daily, and were raised to $2,000 daily in January of 2006. On November 13, 2014, the court increased the fines for failure to comply with the court's order to $10,000 per day. Also, the court established a special fine of $300,000 to be used for the benefit of the members of the class. The Department of Education has appealed this decision.

As of December 31, 2015, there were over 146,985 students registered in the Special Education Program and 123,376 served, but this number changes frequently since new claims are filed constantly. Said resolution also creates a new scheme of monitoring compliance with the stipulations, including the added participation of 12 experts (each party has the right to designate two experts) in six areas of expertise. Said monitoring scheme began on July 1, 2010.

The February 2002 judgment only disposed of the injunctive relief sought by plaintiffs. Still pending before the court are individual claims for damages regarding the failure to provide adequate services. In 2005, the Court denied class certification for the damages stage of the lawsuit, holding that every member of the class must prove their individual damages. In April of 2014, the court also denied plaintiffs' petition for consolidation of the damage claims, holding that each plaintiff must submit evidence of the causal link between the Department of Education's negligence and plaintiff's alleged damages. On May 16, 2014, plaintiffs filed a petition for *certiorari* before the Court of Appeals. The Court of Appeals upheld the judgment.

On February 26, 2015, plaintiffs filed a writ of Certiorari before the Supreme Court of Puerto Rico. On July 20, 2015, the Office of the Solicitor General opposed the issuance of the writ. On January 7, 2016, the Supreme Court modified the judgment in order to authorize the accumulation of the damages claims pertaining to the parents and tutors of all the members of the class.  On January 26, 2016, the Office of the Solicitor General filed a Motion for Partial Reconsideration. The Puerto Rico Supreme Court denied the request for reconsideration on February 26, 2016, The mandate was issued on March 8, 2-016.  The decision is final and binding.

Considering that in the original lawsuit the class claimed $5,000 in damages for each member, with an enrollment of approximately 130,000 students in the class, a conservative

estimated exposure is $650 million. The Commonwealth's strategy is to defend vigorously each case.

## Police Institutional Reform

The Commonwealth is a defendant in a lawsuit filed by the United States Department of Justice alleging a pattern of civil rights violation and excessive use of force by the officers of the Police Department of Puerto Rico (the "**PRPD**"). On July 17, 2013, the parties entered into a settlement agreement that requires significant institutional reforms of the Police Department, to be implemented within the next 10 years. Although the Department of Justice's claim does not include damages, the Commonwealth estimates, based on recent expert opinion, that the institutional reform will require an investment of at least $600 million. The Commonwealth allocates $20 million for each fiscal year, since FY2014-2015. In addition, PRPD receives funds from the Equitable Sharing Program ("ESP") with the Department of Justice. These funds are received as a result of PRPD's joint work with federal task forces. The amount to be received under the ESP cannot be ascertained as it varies depending on the fund or goods that are subject to government forfeiture.

Under the settlement agreement, the court dismissed the claim, but retained jurisdiction to assure compliance through the Technical Compliance Advisor ("TCA"), Mr. Arnaldo Claudio. The TCA is the person that was agreed to by the parties to oversee the compliance of the eleven (11) areas of the Police Reform. The TCA Office is composed of the TCA, and a group of five experts and three attorneys. The parties agreed that the TCA would receive a maximum of $1,500,000.00 during the next four (4) years. This fiscal year, the TCA prepared a budget of $1,499,058.80, which comes out of the $20 Million assigned to the reform each fiscal year.

## Wage Claims

The Commonwealth is a defendant in two lawsuits instituted in 2007 and 2009 by a large group of employees from the Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions claiming that wages in an aggregate amount of $130 million are owed to them. The plaintiffs claim loss of earnings due to failure of the agency's compliance of equal payment for equal work under different laws. The plaintiffs claim that they have been adversely affected by reason of the agencies failure to revise the scales of remuneration each time the federal minimum wage changed. Both cases were dismissed by the Superior Court. Plaintiffs appealed, but the decisions were upheld by the Court of Appeals on March 31, 2015. On August 3, 2015, Plaintiffs filed a petition of certiorari before the Puerto Rico Supreme Court but the same was finally denied.

Afterwards, an approximate of 4,000 employees filed a complaint before the administrative forum (Comisión Apelativa del Servicio Público). Claimants allege a violation by defendant agencies (Department of Family, the Administration of Vocational Rehabilitation and the Administration of Juvenile Institutions) of the US Constitution and the Constitution of the Commonwealth of PR, Act. No. 5 of 1975; the Merit Principle in the Public Service; Act No. 89 f 1979 and its regulations; Act No. 184 of 2004 and its regulations, the Fair Labor Standard Act (FLSA); the federal minimum wages act, and the Civil Code of Puerto Rico.

This legal contingency has an estimated exposure of $130 million plus an undetermined amount for interest.

## Doral Financial Corporation Litigation

On June 5, 2014, Doral Financial Corporation and certain of its subsidiaries filed a lawsuit against the Commonwealth of Puerto Rico and the Treasury Department seeking a declaratory judgment regarding the validity of a 2012 closing agreement between Doral and the Commonwealth Treasury, which provided for a refund of approximately $230 million payable over a five-year period, which closing agreement had been declared null by the Treasury Department. On October 10, 2014, the trial court ruled in favor of Doral, holding that the closing agreement was valid. However, on February 25, 2015, the Court of Appeals reversed the trial court's judgment, and ruled that the closing agreement between the Treasury Department and Doral was null and void. The Puerto Rico Supreme Court declined to review the decision, which is now final and favorable to the Commonwealth.

On March 11, 2015, Doral filed for bankruptcy under Chapter 11 of the U.S. Bankruptcy Code in New York. The Commonwealth of Puerto Rico (Department of Treasury) filed the correspondent proof of claim. The committee of creditors filed an adversary proceeding, seeking the validation of the agreement between Doral and the Treasury Department for taxes of years 2006, 2007 & 2009 (Final Agreement). The Treasury Department asked for dismissal of the claim, based on the state court decision, and on March 1, 2016, the adversary complaint filed by creditor of Doral was dismissed. On May 2016, Doral filed the "Disclosure Statement" and the Chapter 11 Plan, both documents under consideration by the Trustee.

## Employees Retirement System Bond Issuance

Plaintiffs are pensioners of the Employees Retirement System, and claim $800 million in damages against the underwriters of certain ERS pension bonds and some of the former members of the Board of Trustees of the ERS. The case is ***Pedro Jose Nazario Serrano, et. al. v. UBS, Jesús Méndez Rodríguez, etc.***, Civil No. K AC2011-1067 (T.A. Núm. KLAN2013-00738, T.S. Núm. CC2014-0834). It is claimed for the $3 billion bond issuance in 2008 that according to the plaintiffs compromised the solvency of the ERS. The case was dismissed by the Superior Court, plaintiffs appealed, and the sentence was revoked by the Court of Appeals. As of this date, the case is pending at the Court of First Instance with several motions to dismiss and petitions to amend the complaint filed by plaintiffs. Discovery has not commenced.

## Police Association Wage Claims

Four police organizations and their members and forty-one agents in a separate lawsuit claim back pay wages under laws that mandated salary increases for the Puerto Rico Police Department members, among other governmental employees. All cases are in discovery process and pending status and pre-trial conference. The potential exposure of the PRPD is approximately $270 million.

**Wal-Mart PR, Inc. v. Juan C. Zaragoza Gomez**

Wal-Mart PR filed on December 4, 2015 a civil action challenging the legality of certain new Puerto Rico tax laws, which allegedly violate the Commerce Clause, Equal Protection Clause, and Bill of Attainder Clause of the U.S. Constitution, and the Federal Relations Act, 48 U.S.C. § 741a.

On May 29, 2015, L a w n o . 72 was enacted by the Puerto Rico Legislature to increase from 2% to 6.5%, the Tangible Property Component of the corporate Alternative Minimum Tax ("**AMT**") —i.e., the component that taxes the value of property transferred to an entity doing business in Puerto Rico from a related party outside of Puerto Rico—for entities that have gross revenues of more than $2.75 billion from a trade or business in the Commonwealth.  Plaintiff alleges that there is an important exemption to this tax, in favor of local business:  Property transferred from a related party located in Puerto Rico is exempt from the Tangible Property Component of the AMT. Wal-Mart alleges that Act 72's dramatic increase in the Tangible Property Component of the AMT— which by definition affects only commerce flowing into Puerto Rico from outside Puerto Rico— has raised Wal-Mart PR's estimated income tax to an astonishing and unsustainable 91.5% of its net income.  It was also alleged that Act 72's increase in the Tangible Property Component of the AMT, discriminates against interstate commerce in general, and targeted Wal-Mart PR specifically thus in violation of the Commerce Clause, Federal Relations Act and the Equal Protection clause under the Fifth and Fourteenth Amendment. Also, this discriminatory and targeted discrimination violates the Bill of Attainder Clauses.

The case was put in docket and the Court set hearings to entertain both jurisdictional issues and the merits. On March 28, 2016, Judge Fuste entered a 109 pages Opinion and Order that could be summarized as follows: OPINION AND ORDER: On the basis of the Findings of Fact and Conclusions of Law contained in our expanded Opinion and Order, the court hereby permanently enjoins and declares invalid, under both federal constitutional and statutory law, section 1022.03(b)(2) and (d) of the Puerto Rico Internal Revenue Code of 2011, which is codified at 13 L.P.R.A. § 30073(b)(2) and (d). Those subsections of the AMT statute comprise the second measure of tentative minimum tax, which consists of the tangible-property tax and the expenses tax, and the list of exemptions to the tangible-property tax. The injunction shall go into effect immediately. The Puerto Rico Secretary of the Treasury and all of his or her subordinates must stop all levying, collection, and enforcement of the AMT under the enjoined subsections, including as an estimated payment under 13 L.P.R.A. § 30263 and any other applicable section."

On the same date, a judgment was entered accordingly.  The Secretary of Treasury filed on March 31, 2016 a notice of appeal. The case is actually pending for adjudication by the Boston Court of Appeals.  On July 5, 2016, Boston entered an order, requesting the parties to file, on or before July 20, 2016, a supplemental brief, addressing the effect of Congress's passage of the PROMESA Act on the question of Butler Act jurisdiction in this case. The First Circuit issued and opinion an order on August 24, 2016, affirming the District Court's decision holding that the amended AMT is unconstitutional.  The Commonwealth decided that it would not request reconsideration and would not request review by the United States Supreme Court.

296

**CRIM vs. Estado Libre Asociado de Puerto Rico**

On June 24, 2015 CRIM filed a writ of mandamus against the Secretary of the Treasury and the Director of the Office of Management and Budget asking the Court to order central government to comply with the provisions of the Act 83-1991, as amended by Law 162-2012, to pay an additional contribution of $25,000,000.00 yearly, for the fiscal year 2013-2014, 2014-2015 and 2015-2016, for a total of $75 million.

The complaint seeks the Court to order the Governor of Puerto Rico, the OGP and the Secretary of the Treasury to carry out the necessary measures to fulfill its alleged ministerial duties to include $75 million in the budgets corresponding fiscal years 2013-14, 2014-15 and 2015-2016, with any other remedy provided by law.

The Commonwealth of Puerto Rico argued the inappropriateness of the amounts claimed, because as a matter of law this amount was not approved in the budget for said fiscal years.  The budget specifically establishes that total or partial omission of assignments not included in the Joint Resolution of Special Assignments will not generate debt, obligation or commitment by the government.

A petition for summary judgment was filed on July 10, 2015 by the Commonwealth. The plaintiff opposed, and an argumentative hearing was held on August 19, 2015.  On November 10, 2015, the complaint was dismissed by the Court of Instance with prejudice, due to lack of jurisdiction. CRIM appealed, TA Case No. KLAN2016-00031.

On June 30, 2016 the Court of Appeals, San Juan Panel, entered a judgment modifying the judgment of the Court of First Instance, sustaining that the Writ of Mandamus was not the proper via, but a collection action before the Instance Court, which has the primary jurisdiction, not the Commission for Adjudication of Payments and Debts Among Governmental Agencies, as resolved by the Court of First Instance.  The decision is final and binding.

**Federal Clean Water Act Complaint from the Environmental Protection Agency**

**United States v. Municipality of San Juan, et al., Civil No. 2014- 1476 (CCC)**
**U. S. District Court for the District of Puerto Rico**

The United States Department of Justice, acting on behalf of the United States Environmental Protection Agency, has filed a complaint alleging unauthorized discharges of pollutants from the storm sewer systems owned and/or operated by the Municipality of San Juan, the Department of Transportation and Public Works  and HTA through certain flood control pump stations owned and operated by the Department of Natural and Environmental Resources, into the waters of the United States, in violation of the Federal Clean Water Act. The Municipality, the Department of Transportation, HTA and the Department of Natural Resources entered Consent Decrees with the Department of Justice, which were filed in Court independently between October and December 2015. Currently, we are still awaiting the Court's approval of the three Consent Decrees. The Consent Decrees require compliance measures which means a disbursement of millions of dollars.

297

# FINANCIAL STATEMENTS

The Commonwealth's financial statements for fiscal year 2015 and 2016 have not been prepared yet, and may not be available during calendar year 2016. The Commonwealth expects that the 2016 financial statements will not be filed by the Commonwealth filing deadline.

For fiscal year 2014, the basic financial statements of the Commonwealth were audited by KPMG LLP, which did not audit the financial statements of certain activities, funds, and component units identified separately in its report dated June 30, 2016 (which report expresses unmodified and modified opinions and includes emphasis of matter paragraphs regarding going concern consideration relating to the Commonwealth, GDB, UPR, PRASA, PREPA and an emphasis of matter paragraph regarding the insolvency of the Retirement Systems. Except for the Retirement Systems and GDB, those financial statements were audited by other independent auditors whose reports were furnished to KPMG LLP, and its opinion on the basic financial statements, insofar as it relates to the amounts included in the basic financial statements pertaining to such activities, funds and component units, is based solely on the reports of the other auditors.

The basic financial statements of the Commonwealth for fiscal year 2014 were filed by the Commonwealth with the Municipal Securities Rulemaking Board through its Electronic Municipal Markets Access System on July 1, 2016.

# CONTINUING DISCLOSURE

The Commonwealth has entered into several continuing disclosure undertakings in accordance with Rule 15c2-12 of the Securities and Exchange Commission in connection with its bond issuances. Although the Commonwealth has filed all the reports and financial statements required to be filed (other than the fiscal year 2015 financial statements, which have not been finalized), some of these filings have been made after the Commonwealth's filing deadline, which is normally May 1.

***Fiscal year 2015***. The basic financial statements of the Commonwealth for fiscal year 2015 were not filed by the Commonwealth's filing deadline because they have not yet been completed. The delay has been primarily caused by: (a) significant delay on engagement of the Commonwealth audit firm due to significant increase in audit risk and liabilities to the audit firm, (b) implementation of GASB 68, GASB 69 and GASB 72, (c) issues of liquidity and going concern considerations of the Commonwealth and its component units, (d) enhanced analysis over the insolvency of the Retirement Systems, (e) impairment analyses of deposits held at GDB and accounts receivable balances of the Primary Government and component units, (f) significant component units have not yet issued their audited financial statements for fiscal year 2015, such as GDB, PREPA, HTA, ACCA, Special Communities Trust, the PR National Guard Trust, the Puerto Rico Agricultural Insurance Authority  and the Retirement Systems, among others, and (g) significant changes in the composition of the Commonwealth reporting unit, through the inclusion of approximately 10 entities as blended component units instead of discretely presented component units. The Commonwealth external auditors started their field work for the 2015 fiscal year in November of 2016.  The

completion of the audit is expected to occur in the second semester of calendar year 2017. The Commonwealth may not be able to adopt the provisions of GASB 68 on its discretely presented component units, and as a result the opinion of the independent auditors may be qualified.

*Fiscal year 2014.* The basic financial statements of the Commonwealth for fiscal year 2014 were filed after the Commonwealth's filing deadline. The delay was primarily caused by: (a) liquidity and going concern considerations of the Commonwealth and its component units, (b) required enhanced and complex analysis over the GDB loan reserve, (c) implementation of GASB 67 in the Retirement Systems, (d) enhanced analysis over the depletion date of the Retirement Systems, (d) delays in the issuance of certain component units, (e) enhanced and extended audit procedures performed by the Commonwealth auditors and (f) significant adjustments and modifications required to the financial statements relating to going concern considerations of the Commonwealth and its instrumentalities.

*Fiscal year 2013.* The basic financial statements of the Commonwealth for fiscal year 2013 were filed after the Commonwealth's filing deadline. Initially, the delay was primarily caused by (i) a delay in the commencement of the financial close and audit process for fiscal year 2013, which did not commence until the completion of the financial statement for fiscal year 2012 on September 16, 2013 (delays in the audit of the 2012 financial statements were principally caused by the government transition process after the November 2012 elections), (ii) delays related to the change of the Commonwealth's external auditors, and (iii) the implementation of GASB Statement No. 61, *The Financial Reporting Entity*, which changed the Commonwealth's financial reporting entity. Although the Commonwealth addressed these issues by dedicating additional resources to the financial close and audit process for fiscal year 2013, the Commonwealth was unable to finalize the 2013 financial statements due to certain additional unanticipated delays attributable to (i) additional procedures required as part of the audit, (ii) delays in the issuance of the audited financial statements of the three Commonwealth retirement systems resulting from the pension reform legislation and the subsequent judicial modification of such reforms, and (iii) delays in the issuance of the audited financial statements of certain other blended and discretely presented component units.

*Fiscal Year 2012.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2012 were filed after the Commonwealth's filing deadline due to delays in the audit of such financial statements as a result of the government transition process, as a new administration entered office in January of 2013, and the failure of certain discretely presented component units to finalize their audited financial statements. The Commonwealth Report for fiscal year 2012 was also filed after the Commonwealth's filing deadline.

*Fiscal year 2009.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2009 were filed after the Commonwealth's filing deadline due to delays in the engagement and transition of new external auditors, the implementation of new government accounting pronouncements, and the restatement of the financial statements of certain discretely presented component units of the Commonwealth.

*Fiscal year 2008.* The Commonwealth's audited financial statements for the fiscal year ended June 30, 2008 (and certain prior years) were filed after the Commonwealth's filing deadline, because various governmental agencies did not submit their audited financial statements to the central government's external auditors on time, thereby delaying submission of the

Commonwealth's audited financial statements. The Commonwealth Report for fiscal year 2008 was also filed after the Commonwealth's filing deadline.

The Commonwealth is reviewing how to improve and establish procedures and policies to ensure timely compliance in the future with its continuing disclosure obligations. One of the required items to ensure timely compliance is to change the Commonwealth accounting system, which the Commonwealth has begun to carry out with the Puerto Rico Treasury Department and Microsoft. Implementation of a new accounting system may take two or three years. In addition, the Commonwealth may need to reduce significantly its Component Units to facilitate the preparation of the Commonwealth Financial Statements.

PROMESA requires that the Commonwealth establish procedures to ensure timely compliance with its continuing disclosure obligations. The Commonwealth may need to evaluate the following points to properly address a timely completion:

- Implementation of a consolidated accounting system for all Commonwealth agencies.
- The creation of a shared service center for procurement process, suppliers payment processing, finance and management of federal grants for the Commonwealth.
- Elimination or consolidation of Commonwealth Component units.
- Implementation of a centralized payroll system for all Commonwealth agencies.
- Officers in charge of the preparation of financial statements may not be changed every time there is a change in administration.
- A comprehensive restructuring reform of operational processes and regulations regarding daily financial transactions and proper technical training for government employees.

## INSURANCE MATTERS

Government-owned property is insured through policies obtained by the Secretary of the Treasury and through self-insurance, except for property owned by PREPA and PRASA, whose properties are insured through arrangements and policies obtained by the respective entities. Personal injury awards against the Commonwealth are limited by law to $150,000 per occurrence.

Exhibit 18 Page 919 of 9

# EXHIBIT 18

Case:17-03283-LTS Doc#:4777-3 Filed:01/24/18 Entered:01/24/18 16:20:06 Desc:
Exhibit DX-DD Page 2 of 5

Doc#:324-10 Filed:02/23/18 Entered:02/23/18 29:59:07 Desc:
Exhibit 16 Page 820 of 832



# CARIBBEAN BUSINESS



| LATEST NEWS | REGIONAL | ECONOMY | POLITICS | OPINION | ESPAÑOL | EPAPER |
|---|---|---|---|---|---|---|



MATRÍCULA ABIERTA · COORDINA UN RECORRIDO INDIVIDUAL
Llama al 787.765.3814 o escribe a admisiones@sanignacio.pr

Excelencia. Fe. Liderazgo. Servicio.
Los encuentras en la familia.

COLEGIO SAN IGNACIO DE LOYOLA

HOMBRES AL SERVICIO DE LOS DEMÁS

1940 Calle Saúco · Urbanización Santa María · San Juan · Puerto Rico 00927 · Tel. 787.765.3814 · Búscanos en:

Home  >  Economy  >  Cofina and GO Creditors Wage War

## Cofina and GO Creditors Wage War

*By Luis J. Valentín Ortiz on February 2, 2017*

**189**
SHARES

f    🐦    G+    📌    in

SAN JUAN – As the "my credit is better than your credit" debate rages between Sales Tax Financing Corp. (Cofina by its Spanish acronym) and general-obligations (GOs) bondholders, neither the Puerto Rico government nor the Puerto Rico Oversight, Management & Economic Stability Act's (Promesa) fiscal control board want to participate.

At the heart of the intercreditor dispute: Should sales tax revenues transferred to Cofina be considered part of the commonwealth government's "available revenues?"

More than $700 million will be paid to Cofina this fiscal year. GO creditors are urging Gov. Ricardo Rosselló's administration to stop sending this money to pay for Cofina obligations. Cofina bondholders do not agree and are reminding everyone willing to listen that a law—along with various opinions by counsel and Justice secretaries validating the mechanism—provides for a structure in which these funds are to be out of bounds for the commonwealth.



As one source said, "it is the only state tax [revenue] that Hacienda doesn't collect."

Both the fiscal board and the Rosselló administration have yet to take a position on the matter, and instead are focused on bringing everyone to the negotiating table. Board member José R. González told the press that the body "is not a court," so it cannot decide on the Cofina bondholders' position.

"If the sides want to clear this out in court, they could do so. Our impression is that both groups want to strike consensual deals at this moment. We haven't adopted a position on the matter," González said following the board's fourth public meeting last weekend.

For his part, Gerardo Portela, director of the Financial Advisory & Fiscal Agency Authority—in charge of leading debt-restructuring efforts on behalf of the commonwealth—recently told Caribbean





function countSpaces(str) {
    // What's missing?
}
a) return str.indexOf(' ');
b) return str.split(' ').length - 1;
c) return str.count(' ') - 1;
d) return str.words().length - 1;

job_offers = quiz();

TRIPLEBYTE

GET YOUR MAXIMUM REFUND.
Backed by our $100k Accuracy Guarantee.

TaxAct    Start for Free

LATEST NEWS    POPULAR    COMMENTS



**Puerto Rico Housing Department Suspends Contract With Adjusters International**

Secretary had indicated earlier Tuesday that options were being...

February 14, 2018

Business that "at this time, the Puerto Rico government has explained it is willing to share senior than the other," when asked about the Cofina / GOs conflict.

One financial adviser who asked to remain nameless said both the government and the fiscal board would think twice before rendering a statement on the matter, as some of their advisers have participated in different degrees on Cofina bond issues.

Dating back to 2006, Cofina has served as yet another vehicle for the Puerto Rico government to issue debt. Every time someone pays the 11.5% sales tax, about one-fourth goes to pay Cofina bondholders. Bond offering documents state these revenues do not belong to the commonwealth.

The governor's emissary on the board, Elías Sánchez, said last week the administration was not going to tamper with "existing legal systems," when asked whether a clawback, or retention, of Cofina revenues was in the pipeline.

Debt service of Cofina has continued uninterrupted. More than $250 million was just paid on Feb. 1, further infuriating many Puerto Rico creditors who have not seen a penny in months. That includes the commonwealth's GO bondholders.

Most recently, a media war has ensued between the two creditor groups that could water down the government's prospects to strike consensual deals before Promesa's stay runs out in early May.

According to an adviser in the GO camp, there is no better time to raise the Cofina legality question —but why now and not when Cofina was created?

"It became an issue when [former Gov. Alejandro] García Padilla decided to default on GO debt," he said, recalling how GO creditors then sued the Puerto Rico government.

So far, Promesa's stay on legal actions against the commonwealth has proven solid, except for one case, that of Lex Claims et als. This litigation, which remains active, involves a group of GO holders asking a federal judge to declare Cofina funds "available revenues" for the government.

**The GOs' case**

The GOs assure that the money being paid to Cofina belongs to the commonwealth. Those funds constitute available resources and as such, the government should retain those revenues and use them to pay for essential services and Puerto Rico's "own debt."

Given the island's cash crunch, there is no greater tool at the government and fiscal board's disposal, according to the GO clan, which also questions the legality of the Cofina structure.

An adviser to the GO ad hoc group told Caribbean Business that they hold "Puerto Rico's constitutional debt, which mandates we get paid first, before anything. That doesn't mean that we won't sit down and negotiate. We want to and we are participating in the process that the governor has laid out."

While the group "looks forward to negotiations" with the Rosselló administration, "if [the government] continues to transfer money to an illegal structure, then don't tell us 'this is all we have,'" the adviser warned.

He added that "if anything, [Cofina bondholders] have a claim into an empty box," in reference to the fund into which money is directly transferred and reserved for Cofina debt service. Were the government to stop these transfers, "Cofina has no claim against the commonwealth…. It's not a secured claim," the adviser argued.

According to the government, GOs are unsecured creditors that have a lien on the commonwealth's full faith, credit and taxing power. Partly prompted by worries from some constitutionally protected bondholders that a court may prioritize secured creditors over GOs, sources say, some amendments were shrewdly attached to Promesa in a bid to stave off any attempt to diminish GOs' constitutional priority in a debt-restructuring process.

"[GOs] are the priority credit group according to the Puerto Rico Constitution and Promesa," the adviser added. As the commonwealth's "only currency," the GO ad hoc group wants "to be the financing of Puerto Rico going forward."

**The Cofina side**

The Cofina camp argues it is not its fault that the government defaulted on GO debt. After all, more than $1.5 billion was poured into the commonwealth's general fund coming from sales tax revenue

---

### Judge To Hear Testimony On Puerto Rico Power Utility's Need Of Emergency Loan

Gov't reps to argue that commonwealth's loan is best…

February 14, 2018



### Energy Answers 'Surprised' At Puerto Rico Governor's Withdrawal Of Support

Continues to 'seek to understand the considerations that have…

February 14, 2018

Case:17-03283-LTS   Doc#:4777-3   Filed:01/14/19   Entered:01/14/19 16:29:06   Desc:
Exhibit DX-DD   Page 822 of 832

—only after Cofina's debt-service funding needs were met, the island's general-fund stakeholders said, to cover GO debt payments.

"It is false to say that Cofina took the money away from GOs," said a source with ties to the sales tax-backed creditor group.

He warned about the consequences on credit unions that have millions in Cofina bonds and local investors if the government stops transferring sales tax revenue to Cofina—as well as the heavy litigation that would ensue. It would be "a devastating signal" to capital markets if the "sanctity" of the island's "only securitization to date" were challenged.

"Cofina was approved by unanimous legislation, hadn't been questioned through three administrations and was heavily bought locally. Now some hedge funds that bought GOs at discount want to get paid and that the government finds the money for it," the source added.

In a recent statement, the Cofina senior ad hoc group vowed to be "ready, willing and able" to negotiate with the government, as long as the Cofina structure is respected. The group urged "even the most reluctant and litigious stakeholders to work constructively" in the process, "rather than attempt to circumvent the law and prioritize their own financial interests."

For this bondholder camp, "attempts by a small subset of unsecured creditors to challenge" Cofina are "self-serving and built on deceptive half-truths," which include "on-island advertisements," which are "an extension of this disingenuous campaign."

**Cofina 101**

Along with the enactment of a 7% sales & use tax, Cofina was created in 2006 under the administration of Aníbal Acevedo Vilá and the opposition-led Legislature. Cofina was meant to refinance the government's old debt, particularly those owed to the GDB, which sought to avert the bank's insolvency.

"When I left office, the amount issued was only $5 billion," former Gov. Acevedo Vilá told Caribbean Business.

His successor, Gov. Luis Fortuño, amended the law in 2009 to include other purposes, such as to pay for the government's operational expenses. "What [former GDB President] Alfredo [Salazar] and I designed to pay old debt, became an instrument to finance annual operating deficits," Acevedo Vilá said.

García Padilla did amend the law in a bid to issue more Cofina debt early during his tenure, but was not able to do so. "Talk of whether Cofina funds were 'clawbackable' came into play and, along with the Barron's article [on Puerto Rico's debt], killed any chance the administration had to issue [Cofina debt]," said one source close to the matter.

The 11.5% sales tax breaks into 1% for municipalities, 5% for the general fund and 5.5% originally pledged for Cofina, which is collected by its paying agent, Banco Popular. The local bank holds these funds until Cofina's annual debt-service needs are met. Once this happens—usually halfway through the fiscal year—excess revenues begin to reach the commonwealth coffers.

Cofina's trustee, Bank of New York Mellon, is in charge of receiving pledged monies from Popular and making payments to Cofina bondholders.

**Risks for the government**

Several sources consulted by Caribbean Business agreed that even if the government were willing to retain Cofina funds, it would not be an easy task, given how the structure was set up.

First, lawmakers would have to amend the law to redirect sales-tax revenue currently pledged to Cofina. This would trigger an impairment of the Cofina contract, a default event that could accelerate payments on outstanding Cofina debt—the remedy available to these creditors.

Moreover, if the government tries to force Popular into sending money to the general fund instead of Cofina debt-service fund, the financial institution could turn to a court and ask a judge to decide over the matter. This would severely hinder the government's ability to tap into Cofina funds that reach the general fund during the latter part of the fiscal year.

If the government bites off more than it can chew, it could find itself without access to funds that go into its coffers, which would deal a blow to the commonwealth's liquidity, another source noted.

Case:17-03283-LTS   Doc#:324-18   Filed:02/24/18   Entered:02/24/18 29:59:07   Desc:
Exhibit DX-DD   Page 823 of 832

The debate between Cofina and GO holders would hinder any equitable arbitration of the reclamations, noted economist Vicente Feliciano, as it is unlikely any deal would please both creditor groups.

"They have claims as to priority in terms of order of payments. And as such, even with the good faith of the Puerto Rico government to get an agreement, these are disagreements among creditors. Who has priority? Those disagreements among creditors would probably lead to Title III," said the economist, in reference to Promesa's court-ordered debt-restructuring process.

—*Executive Editor Philipe Schoene Roura contributed to this story.*



# 189
**SHARES**

    


**America's Next Bankruptcy** ›

Cofina    Featured Stories    GDB    GO

## RELATED POSTS



Company Attorney Warns Canceling Puerto Rico Housing Contract Could Be Expensive



Puerto Rico Housing Department Suspends Contract With Adjusters International



Judge To Hear Testimony On Puerto Rico Power Utility's Need Of Emergency Loan



Strong Regulatory Framework Needed To Attract Puerto Rico Power Utility Buyers

You must be logged in to post a comment  Login


**America's Next Bankruptcy**
Stansberry Research

America's Next Big Bankruptcy Is On The Horizon  ›

-->

FIND MORE

ADVERTISE WITH US    ARCHIVES    PRIVACY POLICY    DMCA    CONTACT US

Copyright © 2016 - 2018 Latin Media House, LLC. All rights reserved.

# **EXHIBIT 19**

Case:17-03283-LTS   Doc#:477-3   Filed:01/24/18   Entered:01/24/18 16:20:06   Desc:
Exhibit DX-DD   Page 825 of 832

**GOVERNMENT OF PUERTO RICO**
**LA FORTALEZA**
**SAN JUAN, PUERTO RICO**

Administrative Bulletin Number: OE-2017-068

**EXECUTIVE ORDER OF THE GOVERNOR OF PUERTO RICO, THE HON. RICARDO ROSSELLÓ NEVARES, AUTHORIZING THE SECRETARY OF THE TREASURY TO EXEMPT SMALL AND MEDIUM-SIZED MERCHANTS FROM SALES AND USE TAX, IN THE WAKE OF THE STATE OF EMERGENCY DECLARED AS RESULT OF HURRICANE MARIA**

| | |
|---|---|
| **WHEREAS:** | On September 17, 2017 Executive Order Number 2017-047, Administrative Bulletin 2017-047 was issued decreeing a state of emergency in Puerto Rico in light of Hurricane Maria. |
| **WHEREAS:** | On the dates of September 19 and 20, 2017, Hurricane Maria passed over Puerto Rico, turning into the most devastating weather phenomenon in the last eighty (80) years, both for the local infrastructure, as well as for the supply of essential services to the citizenry. |
| **WHEREAS:** | Article 6.10 of Law No. 20-12017 confers authority to the Governor of Puerto Rico, after having declared a state of emergency, to put into effect those measures that are necessary during the period that the emergency lasts for the management of the emergency, with the purpose of protecting the safety, health and property of all citizens of Puerto Rico. |
| **WHEREAS:** | Likewise, subsection (b) of Article 6.10 of Law No. 20-2017, provides that the Governor of Puerto Rico may dictate, amend and revoke those regulations and issue, amend and rescind those orders that he deems appropriate to be in force during the state of emergency or disaster. Provided, that said regulations and orders issued during a state of emergency or disaster will have the force of law while said decree lasts. |
| **WHEREAS:** | By virtue of subsection (c) of the said Article 6.10 of Law No. 20-2017, the Governor of Puerto Rico may also put into effect those regulations, orders, plans or state measures for emergency or disaster situations or change these as he deems appropriate and advisable in order to safeguard public order. |
| **WHEREAS:** | According to in the provisions of Article 6.10 of Law No. 20-2017, the regulations dictated, or orders issued during a state of emergency or disaster will have the force of law while said state of emergency or disaster lasts. |
| **WHEREAS:** | By virtue of the provisions of Article 6.10 of Law No. 20-2017 of October 2, 2017, the Governor of Puerto Rico issued Administrative Bulletin No. OE-2017-056, authorizing the Secretary of the |

[Initials in Left Margin]

Treasury to take the necessary tax measures for an effective tax administration during the state of emergency decreed, as a result of Hurricane Maria.

**WHEREAS:**   The Government of Puerto Rico is committed to achieving immediate recovery for our people. The situation in Puerto Rico, after Hurricane Maria, presents a scenario that requires affirmative actions with the purpose of assisting citizens and businesses in the process of recovery and revitalization of the country. Likewise, the Governor of Puerto Rico has the duty to make sure that the residents of the island have the necessary resources to cope with the effects caused by this weather phenomenon.

**WHEREAS:**   Section 6054.01(a)(2) of the 2011 Internal Revenue Code of Puerto Rico, as amended, authorizes the Secretary of the Treasury to issue administrative decisions regarding conditions for granting certificates for exemption from payment or withholding of Sales and Use Tax (hereinafter, "SUT").

**WHEREAS:**   Small and medium-sized enterprises, known as "SMES," fulfill an important role in Puerto Rico's economy. However, they face various obstacles daily to be able to maintain their operations. In the wake of Hurricane Maria, the SMES cope with additional challenges that further increase the high cost of doing business on the island. This could result in the closing of many of these businesses, in the loss of thousands of jobs and emigration, affecting the current economic downturn even more.

**WHEREAS:**   The SUT, which the SMES collect, drives up prices of products and services they offer on the island, causing them not to be able to compete with prices offered by large merchants and megastores.

**WHEREAS:**   Our government will take all the measures it considers necessary and pertinent to ensure the rapid reestablishment of the SMES, with the purpose of safeguarding the thousands of jobs that these merchants generate, thus putting Puerto Rico's economic development on the right track.

[Initials in Left Margin]

**THEREFORE:**   I, RICARDO A. ROSSELLÓ NEVARES, Governor of Puerto Rico, by virtue of the powers conferred upon me by the Constitution and the laws of Puerto Rico, by this DECREE, I hereby ORDER the following:

**1ˢᵗ SECTION:**   In accordance with the provisions of Article 6.10 of Law No. 20-2017, the Secretary of the Treasury is hereby ordered to exempt the SMES from collecting SUT on the sale of goods or services, including the payment of SUT in the purchase of inventory for resale. This exemption is of a temporary nature, while the declared state of emergency lasts. For these purposes, the Secretary of the Treasury is ordered to establish eligibility requirements for the right to the exemption herein granted, the date on which this exemption will start to apply,

and to warn the SMES that they may not transfer any charges related to the collection of SUT in the sale of goods or services exempted herein to the consumer. The SMES that comply with their obligation of filing and payment of SUT corresponding to the periods of August, September, October and November will be granted a refundable credit of ten percent (10%) of the SUT declared during the aforementioned periods in the month of December 2017.

**2nd SECTION:** The foregoing notwithstanding, every decision of the Secretary of the Treasury by virtue of this Executive Order must be consistent with the priorities and needs that, the Governor of Puerto Rico shall announce from time to time.

**3rd SECTION:** Likewise, it is ordered that every decision of the Secretary of the Treasury by virtue of this Executive Order must be in writing, whether by means of an administrative decision, circular letter, informative bulletin or any other publication of a general nature issued for these purposes.

**4th SECTION:** NO CREATION OF ENFORCEABLE RIGHTS. This Executive Order is not issued with the purpose of creating substantive or procedural rights on behalf of third parties, enforceable before any judicial or administrative forum or forum of any other nature against the Government of Puerto Rico, government agencies, instrumentalities, public corporations or any of their officials, employees or any other person.

**5th SECTION:** EFFECTIVE PERIOD. This Executive Order will go into effect immediately.

**6th SECTION:** PUBLICATION. This Executive Order must be submitted immediately to the Department of State, and its broadest publication is hereby ordered.

[Embossed Seal]
GOVERNMENT OF THE
COMMONWEALTH OF
PUERTO RICO

IN WITNESS WHEREOF, I hereby issue this Executive Order, under my signature and I hereby affix the seal of the Government of Puerto Rico, in San Juan, Puerto Rico, today, November 8, 2017.

[Signature]
RICARDO ROSSELLÓ NEVARES
GOVERNOR

Enacted in accordance with the law, today, November 8, 2017.

[Signature]
LUIS GERARDO RIVERA MARÍN
SECRETARY OF STATE

City of Dallas, State of Texas, County of Dallas

I, MARILYN RETTA am an interpreter/translator hired by TransPerfect, a translation services that operates under both ISO 9001:2008 and EN 15038:2006 certification. I have been speaking Spanish for 60 years. I have studied Spanish translation for 20 years. I am certified by the Administration Office of the United States Courts and by the American Translators Association for Spanish to English translation.

The following document is, to the best of my knowledge and belief, a true and accurate translation from Spanish into English

**OE-2017-068**

MARILYN RETTA

Sworn to before me this

February 17, 2018

Notary Public

HUMBERTO ORTIZ
Notary Public, State of Texas
Comm. Expires 03-29-2021
Notary ID 131065121

Exhibit 20 Page 1 of 1

**EXHIBIT 20**

**FILED UNDER SEAL**

**EXHIBIT 21**

# FILED UNDER SEAL