**REDACTED VERSION**

**Objection Deadline:** March 14, 2018
**Hearing Date:** April 10, 2018

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, *et al.*,<br><br>        Debtors.[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br><br>(Jointly Administered) |
| THE OFFICIAL COMMITTEE OF UNSECURED<br>CREDITORS OF THE COMMONWEALTH OF<br>PUERTO RICO,<br><br>    as agent of<br><br>THE FINANCIAL OVERSIGHT AND<br>MANAGEMENT BOARD FOR PUERTO RICO,<br><br>    as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO,<br><br>        Plaintiff,<br><br>    v.<br><br>BETTINA WHYTE, | Adv. Proc. No. 17-257-LTS<br>in 17 BK 3283-LTS |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

**REDACTED VERSION**

as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

    as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

         Defendant.

## MOTION FOR SUMMARY JUDGMENT OF THE
## AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS

**REDACTED VERSION**

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ...................................................................................... ii

INTRODUCTION ................................................................................................... 1

BACKGROUND ..................................................................................................... 4

    A.    The Commonwealth's Public Debt ..................................................... 4

    B.    The COFINA Structure ....................................................................... 9

    C.    The Present Litigation ....................................................................... 13

LEGAL STANDARD ............................................................................................. 14

ARGUMENT ......................................................................................................... 15

THE PLEDGED SALES TAXES ARE PROPERTY OF THE COMMONWEALTH ............... 15

    A.    The Pledged Sales Taxes Remain Property Of The Commonwealth
           Because They Are "Available Resources" Under Article VI Of The Puerto
           Rico Constitution ............................................................................. 15

           1.    As Core Tax Revenues Of The Commonwealth, The Pledged Sales
                Taxes Are Necessarily Available Resources ............................... 15

           2.    The Justifications Advanced By COFINA's Defenders Lack Merit ........ 24

    B.    Act 56 Does Not Transfer Ownership Of The Pledged Sales Taxes To
           COFINA ............................................................................................ 31

CONCLUSION ..................................................................................................... 34

**REDACTED VERSION**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ...................................................................................................... 14

*Apprendi v. New Jersey*,
530 U.S. 466 (2000) ...................................................................................................... 25

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
467 U.S. 837 (1984) ...................................................................................................... 26

*City of Boerne v. Flores*,
521 U.S. 507 (1997) ...................................................................................................... 25

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) .................................................................................................. 28

*Franklin California Tax-Free Trust v. Puerto Rico*,
85 F. Supp. 3d 577 (D.P.R. 2015) ................................................................................. 14

*In re Carolina Utils. Supply Co.*,
118 B.R. 412 (Bankr. D.S.C. 1990) .............................................................................. 31

*In re Commercial Money Ctr., Inc.*,
350 B.R. 465 (B.A.P. 9th Cir. 2006) ............................................................................ 34

*In re Evergreen Valley Resort, Inc.*,
23 B.R. 659 (Bankr. D. Me. 1982) .................................................................... 31, 32, 34

*Long v. Napolitano*,
53 P.3d 172 (Ariz. Ct. App. 2002) ........................................................................ 20, 22

*Major's Furniture Mart, Inc. v. Castle Credit Corp.*,
602 F.2d 538 (3d Cir. 1979) ......................................................................................... 34

*Marbury v. Madison*,
5 U.S. (1 Cranch) 137 (1803) ....................................................................................... 27

*Melendez Ortiz v. Valdejully*,
120 P.R. Dec. 1, 20 P.R. Offic. Trans. 1 (1987) .......................................................... 27

*Miller v. Johnson*,
515 U.S. 900 (1995) ...................................................................................................... 27

REDACTED VERSION

<u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ................................................................................................ 27

*Russello v. United States*,
    464 U.S. 16 (1983) ................................................................................................ 28

*Santa Aponte v. Sec'y of Senate of Puerto Rico*,
    105 P.R. Dec. 750, 5 P.R. Offic. Trans. 1050 (1977) ........................................... 27

*SEC v. Chenery Corp.*,
    332 U.S. 194 (1947) .............................................................................................. 28

*State ex rel. Lesmeister v. Olson*,
    354 N.W.2d 690 (N.D. 1984) ............................................................................... 21

*State ex rel. Shkurti v. Withrow*,
    513 N.E.2d 1332 (Ohio 1987) .............................................................................. 21

*State ex rel. Spire v. Strawberries, Inc.*,
    473 N.W.2d 428 (Neb. 1991) ............................................................................... 25

**Constitutional Provisions**

Neb. Const. art. III, § 24 ............................................................................................ 25

P.R. Const. art. VI, § 2 .......................................................................................... *passim*

P.R. Const. art. VI, § 6 ................................................................................................ 7

P.R. Const. art. VI, § 7 .......................................................................................... 7, 17

P.R. Const. art. VI, § 8 ................................................................................... 5, 6, 12, 16

**Statutes and Rules**

Jones Act, Pub. L. No. 64-368, 39 Stat. 951 (1917) .................................................. 5

PROMESA § 101(a) ................................................................................................. 30

13 L.P.R.A. § 11a(a) ................................................................................................... 9

13 L.P.R.A. § 11a(b) ................................................................................................. 20

REDACTED VERSION

<u>TABLE OF AUTHORITIES—Continued</u>

**Page(s)**

13 L.P.R.A. § 11a(b)(1) ........................................................................................... 9

13 L.P.R.A. § 11a(b)(5) ........................................................................................... 9

13 L.P.R.A. § 11a(b)(6) ........................................................................................... 9

13 L.P.R.A. § 11a(b)(7) ........................................................................................... 9

13 L.P.R.A. § 12 ............................................................................................... 10, 15

13 L.P.R.A. § 13(c) ............................................................................................... 34

13 L.P.R.A. § 14(c) ............................................................................................... 32

13 L.P.R.A. § 14(c)(i) ............................................................................................ 33

13 L.P.R.A. § 14(d) ............................................................................................... 34

13 L.P.R.A. § 16(a) ............................................................................................... 32

13 L.P.R.A. § 32092(a) .......................................................................................... 11

Act of July 4, 2006, No. 117-2006.......................................................................... 19

Act of July 5, 2007, No. 56-2007..................................................................... 10, 12

Act of Jan. 14, 2009, No. 1-2009............................................................................ 12

Act of Mar, 9, 2009, No. 7-2009............................................................................. 12

Act of Oct. 10, 2013, No. 116-2013 ................................................................. 12, 33

Act of Jan. 24, 2014, No. 18-2014.......................................................................... 11

Act of July 1, 2014, No. 72-2014............................................................................ 33

Act of July 1, 2015, No. 101-2015................................................................... 11, 12

Act of July 22, 2016, No. 84-2016.......................................................................... 11

Neb. Rev. Stat. § 28-1107(2) .................................................................................. 25

Fed. R. Civ. P. 56(a) .............................................................................................. 14

iv

**REDACTED VERSION**

<u>**TABLE OF AUTHORITIES—Continued**</u>

**Page(s)**

**Other Authorities**

Robert S. Amdursky et al., *Wolters Kluwer Law & Business, Municipal Debt Finance
Law: Theory and Practice* (2d ed. 2013) ................................................................... 19

Diario de Sesiones de la Asamblea Legislativa, Vol. 14, No. 27 (Extraordinaria) (Sept. 5,
1961) .................................................................................................................................... 8

Lois R. Lupica, *Circumvention of the Bankruptcy Process: The Statutory
Institutionalization of Securitization*, 33 Conn. L. Rev. 199 (2000) ......................... 31

Joel A. Mintz et al., *Fundamentals of Municipal Finance* (2010) ................................ 20

José Trías Monge, *Historia Constitucional de Puerto Rico* (1982) ............................... 5

Treasury Admin. Determination No. 17-26 (Oct. 11, 2017) ........................................ 33

**REDACTED VERSION**

Intervenor/Plaintiff/Counterclaim Defendant the Ad Hoc Group of General Obligation Bondholders (the "GO Group"),[2] consisting of holders of significant amounts of bonds issued or guaranteed by the Commonwealth of Puerto Rico and benefitting from the protections set forth in the Puerto Rico Constitution ("Constitutional Debt"), hereby submits this motion for summary judgment. In support of its motion, the GO Group respectfully submits as follows:

## **INTRODUCTION**

This adversary proceeding asks the Court to decide whether the Commonwealth of Puerto Rico transferred ownership of tens of billions of dollars of revenues derived from the Commonwealth's sales and use tax ("SUT") to the Puerto Rico Sales Tax Financing Corporation ("COFINA"). The answer to that question is no, for two, independently sufficient reasons.

*First, the purported transfer was prohibited by Puerto Rico's Constitution.* Article VI of Puerto Rico's Constitution establishes a series of rights, remedies, and restrictions regarding the Commonwealth's finances. Most relevant here, Article VI provides *absolute* protections to holders of the Commonwealth's lawful Constitutional Debt: It declares that all "available resources" of the Commonwealth are pledged to payment of the Constitutional Debt, requires the legislature to appropriate for those payments, and grants an immediate and express remedy to compel the Secretary of the Treasury to turn over those payments. At the same time, Article VI protects the Commonwealth itself—and its citizens—by constraining the Commonwealth's capacity to issue Constitutional Debt. It prevents the Commonwealth from issuing or guaranteeing new Constitutional Debt unless no more than 15% of the Commonwealth's recent annual revenues would be devoted to such scheduled debt service in any future year, and it limits the term of those obligations to 30 years. These restrictions are a logical complement to the

---

[2] Members of the GO Group file this motion exclusively on their own behalves and do not assume any fiduciary or other duties to any other creditor or person.

protections afforded to Constitutional Debt: Because payment of the Constitutional Debt comes before every other expenditure, the Constitution restricts its issuance to ensure that the Commonwealth does not overextend such irrevocable financial commitments and thereby imperil the provision of essential services to its citizens.

The purported transfer of SUT revenues to COFINA seeks to circumvent that constitutional scheme with the stroke of a pen. The essential premise of the COFINA transfer is that the legislature has the authority to declare that a broad swath of the Commonwealth's core tax revenues—here, the portion of SUT revenues diverted to COFINA—are not "available resources" of the Commonwealth. That is, COFINA rests on the notion that Puerto Rico's political actors are free to announce that the Constitution simply does not apply to revenues it chooses to send to COFINA. Once that fiction is embraced, the Commonwealth is free to disregard the protections Article VI provides for Constitutional Debtholders and for the people of Puerto Rico, who ultimately benefit from the fiscal responsibility commanded by the Constitution.

As explained below, the purported COFINA transfer blatantly violates the clear strictures imposed by Article VI. Indeed, COFINA turns the plain meaning of the constitutional text—including the express commitment that all "available resources" will be available for payment of the Constitutional Debt—on its head. As the Constitution's framers recognized, the term "available resources" was used in Article VI to *grant* broad protections to Constitutional Debt, not (as COFINA's proponents perversely contend) to give the legislature authority to *erode* those protections. And the surrounding provisions of Article VI work to ensure that inaction or sleight of hand by the legislative and executive branches cannot interfere with payment of the Constitutional Debt or over-leverage the Commonwealth's resources. A legislature cannot, in

**REDACTED VERSION**

effect, create a separate set of books by which to circumvent constitutional obligations and limitations, simply announcing that core tax revenues have been "assigned" to a paper entity whose sole purpose is to issue off-balance-sheet debt. The very essence of a constitution is that a legislature does not have the authority to free itself of constitutional restraints.

Worse still, the "logic" of COFINA is boundless. If the legislature is free to determine for itself what constitutes an "available resource," then Article VI imposes no meaningful constraint at all on the Commonwealth's power to irrevocably promise away its revenues. Put simply, the COFINA scheme allows the diversion of an *unlimited* amount of Commonwealth resources to fund a correspondingly *unlimited* amount of debt. Indeed, COFINA started out as a relatively small effort to refinance certain debt but quickly morphed into a blank check for politicians unwilling to make difficult choices. COFINA now seeks to divert more than $50 billion from the Commonwealth's coffers over the next four decades, just to service existing COFINA bonds. (And that is to say nothing of what future legislatures may do if transfers to COFINA are blessed.) Such limitless reasoning is antithetical to Article VI's express limitation on the Commonwealth's capacity to mortgage the long-term future of the island for immediate borrowing. Had those constitutional limits been respected over the past decade, Puerto Rico's fiscal condition would be vastly improved.

*Second, even if the purported COFINA transfer were constitutional, it did not actually transfer true ownership of the Pledged Sales Taxes.* To the contrary, the Commonwealth retains all key incidents of ownership. Most notably, the Commonwealth has the unfettered right under the express terms of the COFINA statute to eliminate the Pledged Sales Taxes entirely, leaving COFINA with nothing. That provision was included because the Puerto Rico Constitution expressly bars the Commonwealth from surrendering its power to impose and collect taxes.

**REDACTED VERSION**

Likewise, the much-ballyhooed opinion letters offered to legitimize the purported COFINA transfer candidly concede—as they must—that the Commonwealth retains the power to reduce or eliminate the tax revenue that COFINA purportedly "owns." One can hardly own something when its very existence depends on someone else's largesse.

The GO Group is accordingly entitled to summary judgment on its claim for a declaration that the Pledged Sales Taxes remain property of the Commonwealth and on the mirror-image claims asserted by the COFINA Agent and the COFINA Senior Bondholders' Coalition.

## BACKGROUND

### A.     The Commonwealth's Public Debt

The GO Group collectively holds a substantial amount of bonds issued or guaranteed by the Commonwealth and backed by a pledge of its good faith, credit, and taxing power. SMF ¶ 1.[3] These bonds constitute "public debt" within the meaning of the Puerto Rico Constitution, which triggers a series of interlocking constitutional and statutory protections. For this reason, these bonds are referred to as Constitutional Debt (and holders thereof as "Constitutional Debtholders").

Section 8 of Article VI of the Puerto Rico Constitution grants holders of the Constitutional Debt a first claim and lien on all of the Commonwealth's "available resources." It provides that, if the Commonwealth's "available resources" are insufficient to fund all of its appropriated spending, "*interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities*

---

[3] "SMF" refers to the Ad Hoc Group of General Obligation Bondholders' Statement of Material Facts in Support of Motion for Summary Judgment, filed herewith. "Ex." refers to exhibits to the Declaration of Donald Burke in Support of the Motion of the Ad Hoc Group of General Obligation Bondholders for Summary Judgment, filed herewith. "Dkt." refers to documents filed on the docket of the above-captioned adversary proceeding.

REDACTED VERSION

*established by law.*" P.R. Const. art. VI, § 8 (emphasis added).[4] The history and context of

Section 8 confirm the breadth and absolute nature of the Constitutional Debt's first claim on the

Commonwealth's financial resources.

    1. Section 8 of Article VI was adapted from a provision of the Jones Act, Pub. L. No.

64-368, 39 Stat. 951 (1917), which governed Puerto Rico prior to the adoption of its Constitution

in 1952. Section 34 of the Jones Act provided a default prioritization of expenditures, listing

"interest on any public debt" in the first-priority position along with the "ordinary expenses" of

the territorial government:

> In case the available revenues of Porto Rico for any fiscal year, including available surplus in the insular treasury, are insufficient to meet all the appropriations made by the legislature for such year, such appropriations shall be paid in the following order, unless otherwise directed by the governor:
>
> First Class. The ordinary expenses of the legislative, executive, and judicial departments of the State government, and interest on any public debt, shall first be paid in full . . . .

*Id.* § 34, 39 Stat. at 962-963.

---

[4] Although the official English translation of the Constitution refers to "available revenues," the Commonwealth has acknowledged that the Spanish text's use of "*recursos disponibles*" is more accurately translated as "available resources." See, *e.g.*, Ex. 12 at 28; Ex. 9 at 13. Indeed, discussion at the Constitutional Convention regarding the parallel language of Article VI, Section 7—which uses "*recursos totales*" to describe estimated resources for budgeting purposes—makes clear that the Framers of Puerto Rico's Constitution deliberately chose the word "recursos" to identify a broader concept of financial resources than simply tax revenues. Delegate Luis Negrón López, the Chairman of the Legislative Committee, who offered the provision, explained that the phrase "*recursos totales*" encompassed a broader idea than "*rentas totales*" did. According to Mr. Negrón López, the phrase "*recursos totales*" included income that might not qualify under the narrower category of "*rentas totales*," which he equated with tax receipts and surplus tax revenue available from the prior year. "*Recursos totales*," Mr. Negrón López explained, included not only income from taxes but also proceeds from the sale of property, royalties from public corporations, certain federal aid, and income from the issuance of bonds. See Ex. 2 at 5 (translated excerpts from José Trías Monge, *Historia Constitucional de Puerto Rico* (1982)).

**REDACTED VERSION**

When Puerto Rico adopted its Constitution in 1952, Section 8 of Article VI substantially strengthened the protections afforded to holders of Puerto Rico's Constitutional Debt. First, Section 8 requires that payments on the public debt be granted absolute priority over all other government expenses.[5] That is, whereas the Jones Act had placed interest on the public debt in the first-priority class *along with* certain "ordinary expenses," Section 8 provides that payments on the public debt—*standing alone*—have the highest priority, while directing the legislature to set other junior priorities by statute. Similarly, while the Jones Act prioritized only *interest* payments on the public debt, Section 8 extends to both "interest on the public debt and amortization thereof." P.R. Const. art. VI, § 8. And unlike the Jones Act, which provided only a default prioritization of government expenditures, subject to alteration by the Governor, Section 8 does not countenance *any* override of the established structure.

As Chief Justice Trías Monge—a delegate to the Puerto Rico Constitutional Convention and the leading expositor of the Constitution's original meaning—explained, Section 8 was adopted to "*place[] in absolute first term, and beyond the scope of the power of the Governor, the payment of interests and the amortization*" of the Constitutional Debt. Ex. 2 at 6 (emphasis added). This decision to reinforce Puerto Rico's legal commitments to holders of its Constitutional Debt was "dictated" by the "circumstances" prevailing at the time of the Constitution's adoption. *Id.* More particularly, Puerto Rico's government had grown to "strongly depend[] on . . . the maintenance and, preferably, the expansion of the public credit." *Id.* The drafters and adopters of Puerto Rico's Constitution thus understood that an absolute

---

[5] The Constitutional Debt is also protected by a statutory lien on all "available resources" and certain subsets of those resources. The Court need not address that issue at this point to dispose of this proceeding, because the purported assignment of certain SUT revenues to COFINA is invalid regardless of whether Constitutional Debt is secured.

**REDACTED VERSION**

commitment to repaying the Commonwealth's Constitutional Debt was necessary to safeguard the Commonwealth's creditworthiness, and thereby to access capital markets on attractive terms.

2.      Multiple other provisions of Puerto Rico's Constitution reinforce the Commonwealth's absolute commitment to pay Constitutional Debt from all available resources.

*a. Mandatory Budgeting for Constitutional Debt Payments (Art. VI, § 6).*  Section 6 of Article VI overrides any non-compliant budgets that fail to appropriate funds for payment of the Constitutional Debt.  This provision states:

> If at the end of any fiscal year the appropriations necessary for the ordinary operating expenses of the Government *and for the payment of interest on and amortization of the public debt* for the ensuing fiscal year shall not have been made, the several sums appropriated in the last appropriation acts for the objects and purposes therein specified, so far as the same may be applicable, shall continue in effect item by item, and *the Governor shall authorize the payments necessary* for such purposes until corresponding appropriations are made.

P.R. Const. art. VI, § 6 (emphases added).

*b. Excessive Appropriations Prohibited (Art. VI, § 7).*  Section 7 of Article VI provides, in turn, that appropriations for any fiscal year "shall not exceed the total resources, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  The Constitution thus expressly prohibits any effort by the Commonwealth to deprive itself of resources to fund payments on the Constitutional Debt by spending funds on other, lower-priority purposes or failing to appropriate for payment of the Constitutional Debt.

*c.   Prohibition on Ceding the Taxing Power (Art. VI, § 2).* To ensure that the Commonwealth will always be able to raise sufficient financial resources to repay its lawful Constitutional Debt (and to fund other governmental services), Section 2 of Article VI provides that "[t]he power of the Commonwealth of Puerto Rico to impose and collect taxes . . . shall

7

**REDACTED VERSION**

never be surrendered or suspended." P.R. Const. art. VI, § 2. This provision makes it impossible for the Commonwealth to cede its fundamental power to raise revenues through taxation.

*d. Immediate Remedy for Missed Payments on Constitutional Debt (Art. VI, § 2).* In 1961, the Puerto Rico Constitution was amended to provide still further protections for the Constitutional Debt. A new provision was added to Section 2 of Article VI, authorizing holders of Constitutional Debt to compel the Secretary of the Treasury to "apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof." P.R. Const. art. VI, § 2. In this manner, the Constitution confirms that holders of the Constitutional Debt have an absolute, direct, judicially enforceable right to recover against and property interest in all of the Commonwealth's available resources, which may be enforced without the necessity of obtaining a prior judgment. A Special Committee involved in the consideration of the amendments explained in a report to the Puerto Rico Senate that this constitutionally enshrined remedy would "give[] reality to the provisions of Section 8, Article VI, which commit the Government's revenue to the preferential payment of capital and interest of the public debt." Diario de Sesiones de la Asamblea Legislativa, Vol. 14, No. 27, at p. 222 (Extraordinaria) (Sept. 5, 1961) (translation at Ex. 1). The Commission also explained that this provision would "substantially help the sale and rating of Puerto Rico's bonds." *Id.* at 221.

*e. Constitutional Debt Limit – 15% of Revenues, 30-Year Maturity (Art. VI, § 2).* Last but not least, the same 1961 amendments to the Puerto Rico Constitution also added limitations on the incurrence of new debt by the Commonwealth, a matter that had previously been governed by the federal Jones Act. As amended, Section 2 of Article VI states that Puerto Rico may not issue or guarantee new Constitutional Debt if doing so would cause anticipated debt payments on Constitutional Debt issued by the Commonwealth in any future fiscal year—plus

8

**REDACTED VERSION**

any amounts actually paid by the Commonwealth on constitutionally guaranteed bonds in the previous fiscal year—to exceed 15% of the Commonwealth's average revenue over the previous two fiscal years.  P.R. Const. art. VI, § 2.  In practical terms, this provision functions to prevent the Commonwealth from promising more than 15% of its revenues for debt service.  The debt limit thus (1) assures Puerto Rico's citizens that their government may not imprudently pledge away the Commonwealth's future revenues for the benefit of creditors; and (2) simultaneously protects the holders of its valid Constitutional Debt by ensuring that the Commonwealth will not overextend its binding and absolute commitments.  Moreover, Section 2 also restricts the maturity of the Commonwealth's borrowing, generally to no greater than 30 years from issuance—thereby limiting the ability of one generation to encumber the governmental resources of the next and preventing the Commonwealth from gaming the 15% limit by stretching debt service far into the future.  The wisdom of these constitutional debt limitations could hardly be clearer under present circumstances.

### B.    The COFINA Structure

The COFINA structure purports to sidestep this constitutional framework by legislative fiat.  COFINA is a public corporation and instrumentality of the Commonwealth.  13 L.P.R.A. § 11a(a).  Since COFINA's creation in 2007, it has issued massive amounts of debt—with more than $17 billion in accrued obligations currently outstanding.  Ex. 13 at 52.  The proceeds of these bond issuances have been used to fund general operating expenses of the Puerto Rico government, 13 L.P.R.A. § 11a(b)(5)-(7), and to retire other debt, including "extraconstitutional debt" of the Puerto Rico central government, *id.* § 11a(b)(1).[6]

_____

[6] The term "extraconstitutional debt" is generally used to refer to debt obligations of the Commonwealth that do not benefit from the protections afforded to the Constitutional Debt, because they are payable solely from Commonwealth budgetary appropriations and are not

**REDACTED VERSION**

To facilitate COFINA's borrowing, a Puerto Rico statute known as Act No. 56-2007 ("Act 56") purported to "transfer" to COFINA certain tax revenues (the "Pledged Sales Taxes") derived from the Commonwealth's sales and use tax.  See Act of July 5, 2007, No. 56-2007, 2007 P.R. Laws 173, § 3 (codified as amended at 13 L.P.R.A. § 12).  COFINA then issued bonds backed by these Pledged Sales Taxes.  Act 56 purports to render these tax revenues immune from the Constitutional Debt's first-priority claim and constitutional lien by stating that they "shall be the property of COFINA" and will not "constitute resources available to the Commonwealth of Puerto Rico."  *Id.*

The premise of the COFINA transfer—that the legislature may defeat constitutional protections simply by declaring revenue "unavailable"—has been questioned from the moment it was first devised. ████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████ Ex. 3 at 247768.  Likewise, ████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████████████████████ Ex. 4 at 68514.  And

████████████████████████████████████████████████████████████

Ex. 11 at 316020; see also, *e.g.*, Ex. 10 at 2.

COFINA's financial structure reinforces these doubts about the transfer's legal validity.  Although the Pledged Sales Taxes are purportedly "the property of COFINA," COFINA has no taxing authority.  P.R. Const. art. VI, § 2 ("The power of the Commonwealth . . . to impose and collect taxes . . . shall never be surrendered.").  Thus, the tax is collected by *the Commonwealth*, through banks it has designated as "Authorized Collectors."  Ex. 6 at 16; see 13 L.P.R.A.

---

backed by a pledge of the Commonwealth's good faith, credit, and taxing power.  See, *e.g.*, Ex. 5 at 1.

**REDACTED VERSION**

§ 32092(a) ("merchants . . . shall remit to the Secretary [of the Treasury] the sales tax"). From there, the COFINA structure routes the SUT revenues along a dizzying path. First, the revenues are transferred to a joint account held by the GDB and COFINA at Banco Popular. Ex. 6 at 16. Second, the revenues are transferred to an account in Banco Popular's Trust Department held in the name of COFINA. *Id.* at 16-17. Finally, these revenues are transferred to a trust account held by Bank of New York Mellon as trustee for the COFINA bonds. *Id.* at 17.

This financial structure routes only *some* of the SUT revenue to COFINA and, even then, for only part of the fiscal year. Year-round, 4.5% of the total 10.5% SUT is paid to the Commonwealth. Act of July 1, 2015, No. 101-2015, sec. 6, § 4210.01(b).[7] No portion of that revenue is transferred to COFINA, and there is no dispute that this "surtax" belongs to the Commonwealth. Pursuant to Puerto Rico statute, 0.5% of the remaining 6% SUT is transferred to a special fund known as the Municipal Administration Fund ("MAF"). See Act of Jan. 24, 2014, No. 18-2014, sec. 2(a); Act of July 22, 2016, Act No. 84-2016, sec. 2(a).[8] The rest (5.5%) is divided between the Commonwealth and COFINA over the course of each fiscal year (which begins on July 1) as follows: Revenues are sent to COFINA until a certain amount (the "Pledged Sales Tax Base Amount") is reached, typically in the middle of the fiscal year. Ex. 6 at 2.[9] For the rest of the fiscal year, all revenues are sent to the Commonwealth. *Id.* The result, peculiar at

---

[7] Puerto Rico's municipalities receive an additional 1% SUT. Act of Jan. 24, 2014, No. 18-2014, art. 4, § 6080.14, 2014 P.R. Laws 12. This additional 1% SUT brings the total SUT collected to 11.5%. Because none of that money goes to COFINA, it is not immediately relevant here.

[8] Because the MAF legislation does not purport to transfer ownership of this share of the SUT or to render it unavailable to creditors of the Commonwealth, it is not immediately relevant here.

[9] The Pledged Sales Tax Base Amount for Fiscal Year 2018 is approximately $753 million. Ex. 6 at 15. By Fiscal Year 2041, the pledged amount will have increased to $1.85 *billion*, and will remain at that point until Fiscal Year 2058. *Id.* All told, the pledged revenues amount to over $60 billion over the next 41 years. *Id.*

REDACTED VERSION

best, is that the very same tax revenues both are and are not an "available resource." In practical terms, revenues from the SUT on a pair of shoes purchased in September are purportedly "unavailable," but revenues on a pair of shoes purchased in April are "available."

Despite being legally and financially questionable, COFINA was politically popular because it reduced the cost of borrowing—at least in the near term—and facilitated continued spending. Because the Commonwealth's "extraconstitutional debt" would receive lower priority than the Constitutional Debt in the event of a revenue shortfall, P.R. Const. art. VI, § 8, extraconstitutional debt carried relatively high interest rates. COFINA was created to "refinance the extraconstitutional debt" in a way that purportedly put it beyond the Constitution's reach (Act of July 5, 2007, No. 56-2007, Statement of Motives), thus lowering the risk and the interest cost of handling that debt burden.

In reality, COFINA was a short-term fix that exacerbated long-term problems. Legislators quickly realized that they could use COFINA debt to buy anything they wanted without making the hard choices dictated by the Constitution. They increased the Pledged Sales Tax Base Amount from $185 million in Fiscal Year 2008 (*id.* § 2) to over $550 million in Fiscal Year 2010 (Act of Mar, 9, 2009, No. 7-2009, sec. 50, § 3(b)) and over $753 million in Fiscal Year 2018 (Act of July 1, 2015, No. 101-2015, sec. 1, § 3(b))—and even that amount grows 4% annually until it reaches *$1.85 billion* in Fiscal Year 2041, where it remains until Fiscal Year 2058. See note 9, *supra*. At the same time, the legislature expanded the uses of COFINA's debt from refinancing the extraconstitutional debt (Act of July 5, 2007, No. 56-2007, sec. 3, § 4(a)) to covering the Commonwealth's general operating expenses (Act of Jan. 14, 2009, No. 1-2009, sec. 1, § 2(b)) to filling a variety of specialized "funds" (Act of Oct. 10, 2013, No. 116-2013, sec. 1, § 2(b)).

**REDACTED VERSION**

Today, the face amount owed on COFINA bonds issued during this spending spree exceeds $17 billion. But the real burden on the Commonwealth's resources is even greater than that number would suggest. Future debt-service obligations on existing COFINA bonds amount to more than *$50.5 billion*. See Ex. 13 at 204 (as of July 31, 2016). That drain on the Commonwealth's resources is more than double the amount of scheduled debt service on the Commonwealth's lawful Constitutional Debt. *Id.*

### C. The Present Litigation

This litigation arises from the *Stipulation and Order Approving Procedure to Resolve Commonwealth-COFINA Dispute*, which the Court entered in August 2017. Case 17 BK 3283-LTS Dkt. 996. That stipulation appointed the Official Committee of Unsecured Creditors and Bettina Whyte as Agents of the Commonwealth and COFINA, respectively. *Id.* ¶ 4.a-.b.[10] The stipulation further specified that the Agents would commence litigation concerning the question "[w]hether . . . the sales and use taxes purportedly pledged by COFINA to secure debt (the 'Pledged Sales Taxes') are property of the Commonwealth or COFINA." *Id.* ¶ 4. Parties to the stipulation, including the GO Group, were authorized to intervene. *Id.* ¶ 5.

Pursuant to the stipulation, the Agents initiated this adversary proceeding and filed claims against one another, Dkts. 221, 269, and the GO Group filed a complaint in intervention, Dkt. 96. Our complaint contains a single cause of action, seeking a declaration that "all revenues derived from the SUT constitute property of the Commonwealth." *Id.* at 25. That cause of action is supported by two, independently sufficient legal theories: that the Commonwealth's purported transfer of the Pledged Sales Taxes to COFINA is invalid because it violates the Puerto Rico

---

[10] Specifically, the Commonwealth Agent is the agent of the Oversight Board as representative of the Commonwealth. The COFINA Agent is the agent of the Oversight Board as representative of COFINA.

REDACTED VERSION

Constitution, and, alternatively, that the purported transfer has not transferred true ownership. The GO Group has also answered the complaints filed by the COFINA Agent and the COFINA Senior Bondholders' Coalition, both of which seek, in their respective First Causes of Action, mirror-image declarations that the Pledged Sales Taxes have been validly transferred to COFINA. See Dkt. 292 ¶¶ 62-72 (answering COFINA Agent's First Cause of Action); Dkt. 293 ¶¶ 57-68 (answering COFINA Senior Bondholders' Coalition First Cause of Action).[11]

## LEGAL STANDARD

A motion for summary judgment should be granted when the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here, summary judgment is warranted because the GO Group's claim for a declaration that the Pledged Sales Taxes remain property of the Commonwealth rests on grounds that are purely legal and involve no disputed issue of material fact. See, *e.g.*, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-249 (1986); *Franklin California Tax-Free Trust v. Puerto Rico*, 85 F. Supp. 3d 577, 602 (D.P.R. 2015) (granting summary judgment on purely legal preemption challenge to the Commonwealth's Recovery Act).

---

[11] The GO Group acknowledges the Court's recent holding, in the context of a separate adversary proceeding brought by members of the GO Group, that Article III's prohibition of advisory opinions barred the Court from entertaining claims that the Court understood as seeking "abstract declarations of the parties' respective relationships to the subject revenues, without application of the relief to resolve any current concrete dispute, such as a claim objection proceeding, request for adequate protection or relief from stay, or confirmation-related proceeding." *ACP Master, Ltd. v. Commonwealth of Puerto Rico*, Adv. Proc. No. 17-189, Dkt. No. 124, at 13. The plaintiffs in the *ACP Master* proceeding are appealing the Court's order, and the GO Group does not seek dismissal of the present action on Article III grounds. Nonetheless, it is not clear how the Court's conclusion that jurisdiction was lacking in the *ACP Master* proceeding could be squared with a conclusion that jurisdiction is present in this action, where the parties seek only declaratory relief relating to the ownership of the Pledged Sales Taxes.

14

REDACTED VERSION

## ARGUMENT

**THE PLEDGED SALES TAXES ARE PROPERTY OF THE COMMONWEALTH**

The Pledged Sales Taxes are property of the Commonwealth for two, independently sufficient reasons. First, Act 56's purported transfer of these revenues is beyond the authority of the legislature—and hence ineffective—because it violates Article VI of the Puerto Rico Constitution. Second, and in any event, Act 56 does not in fact transfer ownership of the Pledged Sales Taxes to COFINA, because (among other things) it reserves to the Commonwealth the right to reduce or eliminate the Pledged Sales Taxes altogether. The GO Group is therefore entitled to summary judgment on its claim for declaratory relief.

### A.  The Pledged Sales Taxes Remain Property Of The Commonwealth Because They Are "Available Resources" Under Article VI Of The Puerto Rico Constitution

Article VI of the Puerto Rico Constitution grants holders of the Constitutional Debt an absolute claim on all of the Commonwealth's "available resources." The Pledged Sales Taxes are core tax revenues of the sort that would ordinarily be collected by and for the government. And they *are actually* collected and—except for the portion siphoned off for COFINA—retained by the Commonwealth government. For that reason, they are a quintessential example of "available resources." The Commonwealth's *ex cathedra* declaration to the contrary, 13 L.P.R.A. § 12, is incompatible with Constitutional Debtholders' constitutionally enshrined claim on all available resources and thus cannot be given effect.

### 1.  As Core Tax Revenues Of The Commonwealth, The Pledged Sales Taxes Are Necessarily Available Resources

The central dispute in this case is what the term "available resources" means as it is used in Article VI, Section 8 of the Puerto Rico Constitution. More to the point, the question is whether "available resources" *has* real independent constitutional meaning and thus imposes

REDACTED VERSION

limitations on the political branches, or whether (as COFINA's proponents contend) it means that politicians may decide for themselves what core tax revenues will be "available." There is no avoiding this essential point: COFINA's claim to the Pledged Sales Taxes rests on the premise that the legislature was within its authority to evade the Constitution's multiple interlocking protections by declaring, in effect, that "the Constitution shall not apply to these revenues." To state that proposition is to refute it.

a. It is common ground that the Constitutional Debt's first claim extends to *all* of the Commonwealth's "available resources." The Puerto Rico Constitution is crystal clear in this respect, providing that, if Puerto Rico's "available resources" are insufficient to meet all of its desired spending, "*interest on the public debt and amortization thereof shall first be paid*, and other disbursements shall thereafter be made in accordance with the order of priorities established by law." P.R. Const. art. VI, § 8 (emphasis added). Moreover, the Constitution provides holders of the Constitutional Debt with an express recovery remedy authorizing holders of Constitutional Debt to require the Secretary of the Treasury "to apply the available resources including surplus to the payment of interest on the public debt and the amortization thereof." P.R. Const. art. VI, § 2.

The Framers of Puerto Rico's Constitution deliberately chose the phrase "available resources" to express a broad understanding of the financial resources that would be subject to the Constitutional Debt's absolute first claim. Indeed, as explained above, they made the conscious decision to depart from the federal Jones Act, which had referred to "available revenues," and adopted the broader phrase "available resources" in order to make clear that the Commonwealth had pledged *all* of its financial resources to repay the Constitutional Debt. See pp. 5-6, *supra*. Thus, the plain meaning of "available resources" encompasses (among other

16

**REDACTED VERSION**

things) the core tax revenues owed to the government by virtue of Commonwealth law.[12] Indeed, it is difficult to conceive of a resource more central and fundamental to a government than the proceeds of such broad-based taxation, and the manifest intent of Article VI was to require that all such resources—not simply those specifically designated—be subject to use for payment of the Constitutional Debt.

The breadth of the concept of "available resources" is illustrated by comparing language used in the adjacent Article VI, Section 7 of the Puerto Rico Constitution, which provides that "[t]he appropriations made for any fiscal year shall not exceed the *total* resources . . . *estimated* for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law." P.R. Const. art. VI, § 7 (emphases added). Thus, when requiring the legislature to match planned spending with the government's financial resources, Article VI refers to "total resources" as those that are "estimated" to be collected throughout a fiscal year. Article VI, Section 8, then defines the rights of holders of Constitutional Debt over the course of the year, as the Commonwealth collects revenues in amounts that may differ from its projections. Section 8 confirms that, in the event of a shortfall in actual receipts, the Commonwealth must prioritize spending on its Constitutional Debt over all other expenditures. Thus, Section 8 uses the term "available" to encompass all funds actually generated at any given time, and then declares that the Commonwealth *has no choice* but to pay those funds to service Constitutional Debt ahead of all other expenditures. The COFINA structure turns that plain meaning on its

---

[12] As explained above, this phrase is properly translated to mean "available resources," rather than the phrase "available revenues" that appears in the official English translation of the Constitution and was used in the provision of the Jones Act that served as the predecessor to Article VI, Section 8. See p. 5 & note 4, *supra*. This phrase was deliberately selected to make clear that the Commonwealth had pledged all of its financial resources to repay the Constitutional Debt. See pp. 5-7, *supra*.

**REDACTED VERSION**

head, reading "available" to *give the Commonwealth a choice* whether to exclude categories of

revenues from the provisions of Article VI.

Statements made during the debate surrounding the 1961 amendments to the Puerto Rico

Constitution confirm that the phrase "available resources" means that *all* of the Commonwealth's

financial resources are available for the repayment of Constitutional Debt.  A Special Committee

report stated that, "[a]lthough presently, and as a matter of fact, property taxes are used to take

care of the payment of the public debt, the truth is that per the terms of [Article VI, Section 8] *all*

*of the resources of the Government are committed to those obligations."*  Ex. 1 at 221 (emphasis

added).  The plain language and historical background thus confirm that that the concept of

"available resources" extends broadly to *all* of the Commonwealth's financial resources.

b.  The Commonwealth's SUT thus falls within the core of the concept of "available

resources" because it is a general sales and use tax covering a broad range of goods and services,

imposed under Commonwealth law and collected by representatives of the Commonwealth.

These are precisely the sort of tax revenues that are typically deposited in a state or municipal

treasury for general use.  Thus, Senator Ortiz Stella, a member of the Special Committee that

presented the 1961 constitutional amendments to the Senate, took it as self-evident that the "[t]ax

on consumer goods" collected under the Commonwealth's Excise Tax Act would be included in

calculating the Commonwealth's borrowing capacity, and hence would necessarily be available

to service the Constitutional Debt.  Ex. 1 at 224.  SUT revenues are plainly financial resources of

the Commonwealth, and thus are "available resources" within the meaning of Article VI.

Indeed, the SUT was implemented as a direct replacement for the Commonwealth's

general excise tax, all proceeds of which *were in fact* paid entirely to the Commonwealth for its

general use.  The general excise tax was repealed by the same legislation that created the SUT.

REDACTED VERSION

See Act of July 4, 2006, No. 117-2006, 2006 P.R. Laws 1231.  In the "Statement of Motives" for Act No. 117, the Puerto Rico legislature explicitly acknowledged that the new sales and use tax (referred to by its Spanish acronym as an "IVU") was intended to replace the general excise tax: "The general excise tax is substituted by an IVU.  Articles that had been subject to the general excise tax shall be now subjected to the IVU."  *Id.* at 3.  The SUT is therefore a direct substitute for a stream of excise tax revenues that had long been paid entirely and directly to the Commonwealth's Treasury.

What is more, substantial portions of the proceeds derived from the SUT are, in fact, paid into the Commonwealth's general fund.  First of all, the 4.5% SUT (referred to as the "*surtax*") is paid *entirely* to the Commonwealth's general fund.  As for the 5.5% SUT, the first revenues from the tax are paid into an account used to support the COFINA bonds (up to the Pledged Sales Tax Base Amount), but then that very same revenue stream is redirected to the Commonwealth's general fund.  See pp. 11-12, *supra*.  The utter arbitrariness of this distinction confirms that *all* SUT revenues are available resources; the only thing that makes one dollar of SUT an "available resource" and another "not an available resource" is the label given to it by COFINA's drafters.

c.  The unprincipled nature of the legislative declaration that the Pledged Sales Taxes are not available resources is underscored by a comparison with traditional, bona fide "revenue bond" financing.  Revenue bonds have traditionally been issued by states and municipalities to finance specific revenue-generating public works projects such as toll roads and bridges, water utilities, and power plants, with the bonds backed by the revenues generated by that project.  See, *e.g.*, Robert S. Amdursky et al., *Wolters Kluwer Law & Business, Municipal Debt Finance Law: Theory and Practice* 41 (2d ed. 2013) ("In their most traditional form, these securities, often termed self-liquidating debts, are payable solely from proceeds generated through operations of

REDACTED VERSION

the facility financed with bond proceeds." (footnote omitted)).  Revenue bonds have historically

been exempted from the debt limitations governing states and municipalities, on the theory that

the state or municipality is not generally liable, and that the bonds instead represent a claim on a

distinct "special fund" of revenue that arguably would not have existed in the absence of the

project that the revenues bonds financed.  See, *e.g.*, Joel A. Mintz et al., *Fundamentals of

Municipal Finance* 52 (2010); *Long v. Napolitano*, 53 P.3d 172, 189-90 (Ariz. Ct. App. 2002)

(extending the special fund rationale to permit revenue bonds backed by pledged taxes with a

"sufficiently direct and apparent" link to the project financed by the bonds, because in such

circumstances "the general taxing authority of the state or local government is not placed at

risk").  By the same logic, Article VI, Section 8 would not require that funds facilitating

traditional forms of revenue financing—such as highway tolls or user fees paid by sewer

customers—be made available to the Commonwealth's Treasury for purposes of paying the

Constitutional Debt.

COFINA, by contrast, does not perform a specialized function for Puerto Rico.  In that

respect it is unlike a water utility or power plant.  The funds generated by COFINA's issuances

of debt were used to fund the Commonwealth's general expenditures, not to finance revenue-

generating public works.  See 13 L.P.R.A. § 11a(b).  By the same token, the bonds are backed by

general tax revenues, rather than by a special fund replenished by the revenues of a particular

public works project.  Indeed, the COFINA structure goes far beyond even the more expansive

understanding of revenue bond financing that has been applied by some courts in recent years, in

which revenues derived from a particular tax may qualify as a "special fund" if they bear a clear

nexus to the project financed by the bonds.  See, *e.g.*, *Long*, 53 P.3d at 189-90.  The Pledged

Sales Taxes bear *no nexus at all* to any project financed through COFINA's bond issuances.
COFINA bonds thus are funded by the Commonwealth's general resources.

d.  Precisely because the Commonwealth's SUT is indistinguishable from other general
revenues, the theory underlying COFINA—that the Commonwealth may exempt the SUT from
the Constitutional Debt's first claim through mere legislative declaration—lacks any logical
stopping point.  If it were accepted, the Commonwealth could divide and divert *all* of its
traditional sources of revenues—in unlimited amounts—leaving nothing left to fund payments
on the Commonwealth's Constitutional Debt.  The Framers of Article VI, Section 8 could not
have intended such a limitation to be so easily robbed of practical effect.

The Ohio Supreme Court noted the absurdity of such a result in *State ex rel. Shkurti v.
Withrow*, 513 N.E.2d 1332 (Ohio 1987) (per curiam).  In *Shkurti*, Ohio sought to issue bonds
backed by funds derived from a "surcharge" on employer contributions to the state
unemployment compensation program, but not backed by a pledge of Ohio's full faith and credit.
The State thus contended that the proposed bonds were not subject to the State's constitutional
debt limit, because they were to be repaid from a "special fund."  See *id.* at 1334.  The court
observed that to treat such bonds as exempt from constitutional restrictions would mean that:

> the legislature, or the debt-contracting authority, could divide the public revenue
> into numerous subdivisions, calling one the "road fund," another the "school
> fund," another the "agricultural fund," another the "public health fund," and
> others almost without limit.  Debts could then be contracted in unlimited amounts
> and payable in the far distant future, and still be immune from attack as violating
> constitutional provisions limiting indebtedness provided each debt was made
> payable out of some one of the specially designated funds into which all of the
> revenue collected by taxation from the people had been divided.  A mere
> statement of the proposition carries with it, it seems to us, its own refutation.

*Id.* at 1336-37.[13]

---

[13] See also *State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 698 (N.D. 1984) ("Were we to
accept the proposition that a pledge of any specific tax revenues would be sufficient to invoke

**REDACTED VERSION**

Similar logic forecloses COFINA's attempt to evade the Puerto Rico Constitution's robust protections for Constitutional Debt. If the legislature were free to hive off core tax revenues from the general fund and thereby render them "unavailable," Article VI would be denied its essential character. Article VI's absolute first protections are neither absolute nor first if the legislature has the power to place vast—indeed, limitless—swaths of revenue outside the constitutional framework altogether. The Commonwealth's attempt to do just that through the artifice of transferring future SUT revenues to COFINA therefore violates Article VI of the Puerto Rico Constitution and cannot be given effect.

e. COFINA's limitless nature also violates Article VI's carefully calibrated limits on the Commonwealth's ability to incur debt. As described in greater detail above, Article VI imposes two primary limits on the Commonwealth's issuance of debt. See pp. 8-9, *supra*. In practical terms, Article VI, Section 2 creates an incurrence test that puts the Commonwealth on a debt-service allowance capped at 15% of its revenue. Before issuing new Constitutional Debt, the Commonwealth must examine its existing debt service schedule and certify that payments on the new debt will not push debt service over the 15% line in any future year. Article VI, Section 2 also generally limits the maturity of Constitutional Debt issued by the Commonwealth to 30 years, thereby serving to prevent the legislature from mortgaging away the resources of future generations.

---

the 'special fund' doctrine, the constitutional debt limitation would be largely nullified, since the legislature could exempt almost any obligation from its strictures merely by identifying a specific tax from which the obligation could be paid." (quotation marks omitted)); *Long*, 53 P.3d at 189 (finding that certain taxes "can be pledged to pay revenue bondholders," but stating that "we disagree that any taxes other than ad valorem taxes can be used for this purpose without limitation. Otherwise, as pointed out by [the plaintiff], the legislature could effectively nullify the constitutional debt restrictions simply by segregating general revenues in special funds.").

**REDACTED VERSION**

The COFINA transfer attempts to sidestep these clear limits on the Commonwealth's ability to irrevocably pledge its resources to creditors by pretending that the Pledged Sales Taxes are not "available resources" of the Commonwealth at all, but have instead been assigned to COFINA. And, in fact, the Commonwealth has used COFINA to issue bonds that could never have been issued as lawful Constitutional Debt, because their maturities extended beyond 30 years and because they entailed larger debt service obligations than the constitutional limit would have permitted.[14] The COFINA structure thus guts those limits of any practical content—yet another sign that it is incompatible with the constitutional design.

Of course, the 15% and maturity limits in Article VI do not apply directly to bonds issued by COFINA, which expressly and appropriately disclaim status as debts of the Commonwealth (much less Constitutional Debt). They apply only to bonds issued or guaranteed by the Commonwealth itself, and backed by a pledge of its full faith, credit, and taxing power. See P.R. Const. art. VI, § 2. But the reason for that distinction is that the legislators who adopted the debt limit provision in 1961 envisioned that the debt of Puerto Rico's public corporations would "continue to be paid only from the income derived by said corporations." Ex. 1 at 221. The COFINA transfer violates that shared expectation by using general Commonwealth resources to repay COFINA's bondholders.

The Commonwealth's current financial situation demonstrates the wisdom of the Constitution's limitations on the incurrence of debt. It was the COFINA structure—and its

---

[14] Indeed, COFINA's *very first* issuances of bonds would have transgressed Article VI's limitations if the Commonwealth has sought to issue those bonds as Constitutional Debt. COFINA's Series 2007A and Series 2007B issuances, from July 2007, required payments in Fiscal Year 2057 in excess of the constitutional debt limit that would have applied if those bonds had been issued as Constitutional Debt, and most of the bonds had maturities in excess of 30 years—in some cases, up to *50 years*. SMF ¶ 13. So right out of the gate, COFINA allowed the diversion of tax revenues in such a way that would have been flatly unconstitutional in multiple respects if the Commonwealth had sought to issue these bonds as lawful Constitutional Debt.

supposed exemption from all constitutional restraints—that allowed the Commonwealth to continue to borrow in extraordinary amounts over the past decade, rather than bringing order to its financial affairs. Today, the face amount owed on COFINA bonds exceeds $17 billion, and future debt-service obligations on existing COFINA bonds amount to more than *$50.5 billion*. See Ex. 13 at 204 (as of July 31, 2016). That is more than double the amount of scheduled debt service on the Commonwealth's lawful Constitutional Debt. *Id.* And to make matters even worse, the logic underlying COFINA has no stopping point at all. If the purported transfer of the Pledged Sales Taxes were valid, nothing would stop future legislatures from pledging away billions and billions in additional Commonwealth resources to support similar off-book financing schemes. There is no sound basis to construe Article VI's limitations on the incurrence of debt in a way that would render them so utterly ineffectual.

### 2.    The Justifications Advanced By COFINA's Defenders Lack Merit

Faced with COFINA's fundamental constitutional infirmity, proponents of the COFINA structure have advanced a number of substantive and procedural defenses of the structure. Each lacks merit.

a.  First and foremost, the COFINA parties have suggested that the term "available resources" has no meaning independent of legislative action. In other words, they say, it is up to the legislature to decide what is and is not "available." *E.g.*, COFINA Agent Counterclaims, Dkt. 269, ¶¶ 67-70; Mutual Funds Counterclaims, Dkt. 273, ¶¶ 62-63.

As explained above, that flouts the plain language and clear intent of the Constitution's framers, turning a term of limitation into a blank check for legislative discretion. And that is not how constitutions work. Rather, recognizing the risk that legislatures will seek to define away constitutional restraints, courts have consistently held that constitutional protections extend to the

REDACTED VERSION

limits of historical custom and practice, and cannot be refashioned according to a legislature's political judgments.

For example, the Supreme Court of Nebraska rejected an attempt at constitutional amendment via legislative redefinition in *State ex rel. Spire v. Strawberries, Inc.*, 473 N.W.2d 428 (Neb. 1991) (per curiam). That case dealt with a provision of the Nebraska Constitution that prohibited the authorization of any "game of chance." *Id.* at 433 (quoting Neb. Const. art. III, § 24). The Nebraska legislature nevertheless amended the criminal statute governing gambling-device possession to exclude coin-operated games where the player could win additional credits to keep playing the game. See *id.* at 434 (quoting Neb. Rev. Stat. § 28-1107(2) (Reissue 1989)). The Supreme Court of Nebraska rejected the exception, explaining that such a game was a "game of chance" per the state constitution and "[t]he Legislature cannot avoid constitutional provisions by statutorily redefining constitutionally unacceptable activity." *Id.*; see also *Apprendi v. New Jersey*, 530 U.S. 466, 476 (2000) (holding that legislature may not evade the Constitution's jury-trial guarantee as historically understood by labeling an element of a crime a "sentence enhancement"); *City of Boerne v. Flores*, 521 U.S. 507, 519 (1997) ("Congress . . . has been given the power 'to enforce,' not the power to determine what constitutes a constitutional violation.").

Article VI's "available resources" provision must accordingly be understood as imposing a genuine constraint on the executive and legislative branches of the government. And if the "available resources" concept is to perform that essential function, it must be construed to include all revenues, including sales and use tax revenues, that are traditionally available to the treasury. In other words, the term "available resources" has its own meaning under the Constitution, and no amount of legislative insistence may change that fact.

**REDACTED VERSION**

Moreover, COFINA's proponents would do violence to the plain meaning of the word "available" as used in Article VI.  As explained above (see pp. 16-18, *supra*), "available" in this context simply recognizes that one cannot make payments with resources until they become available.  The "available resources" referred to in Article VI, Section 8 are simply the portion of the "total resources," referred to in in the adjacent Article VI, Section 7 that are actually generated at any given time (rather than estimates at the outset of a fiscal year).  Under Article VI, the Commonwealth *has no choice* but to pay those funds to service Constitutional Debt ahead of all other expenditures.

More generally, the COFINA parties' reading of "available" runs contrary to the core purpose of Article VI:  establishing absolute protections for the Constitutional Debt.  As we have explained above (see pp. 21-22, *supra*), it is implausible to think that, even as the Puerto Rico Constitution provides robust protections assuring full and timely payment of the Constitutional Debt from all available resources, it also tacitly grants the legislature discretion to decide for itself what to designate as available resources in the first place.

b.  The COFINA parties also make a related but distinct argument.  This argument, unlike the first, at least nominally concedes that the constitutional phrase "available resources" has a fixed meaning and thus places some limit on the legislature.  However, the argument goes, courts should grant the legislature's interpretation of the phrase broad—indeed, almost limitless— deference.  *E.g.*, COFINA Senior Group Answer, Dkt. 272, at 10.

This argument fails at a fundamental level because it misapprehends the nature of judicial review.  Courts may defer to an administrative agency's interpretation of a statute, *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837 (1984), but there is no comparable doctrine requiring sweeping deference to a legislature's interpretation of a constitution.  To the

**REDACTED VERSION**

contrary, when a legislative act is claimed to conflict with a constitution, "[i]t is emphatically the province and duty of the judicial department to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803). The same principle is long established in Puerto Rico. *E.g.*, *Santa Aponte v. Sec'y of Senate of Puerto Rico*, 105 P.R. Dec. 750, 5 P.R. Offic. Trans. 1050, 1061 (1977) ("The Constitution confers certain powers to the Executive and Legislative Powers but its definition and the decision on the legality of its exercise rest exclusively upon the courts.").

The same logic applies *a fortiori* to the COFINA parties' suggestion that the opinion of the Puerto Rico Secretary of Justice warrants deference. *E.g.*, COFINA Agent Counterclaims, Dkt. 269, ¶¶ 37-39. "It is a well-known fact that legal opinions issued by a Secretary of Justice . . . are not binding on the courts." *Melendez Ortiz v. Valdejully*, 120 P.R. Dec. 1, 20 P.R. Offic. Trans. 1, 20 n.7 (1987) (citing U.S. Supreme Court precedent). And it is especially "inappropriate for a court engaged in constitutional scrutiny to accord deference" to such an opinion. *Miller v. Johnson*, 515 U.S. 900, 923 (1995).

In any event, the opinion letters acknowledge that "[t]his opinion, as any other opinion of the Secretary of Justice, is subject to what the Puerto Rico Supreme Court may eventually hold on the issues addressed herein." Ex. 8 at 3. Moreover, there is no analysis in the opinions to which a court could possibly defer. Indeed, the opinions contain no reasoning at all; they simply announce the conclusion that Pledged Sales Taxes have been validly transferred to COFINA and do not constitute available resources. *Id.* at 2. Even in the administrative law field, where judicial deference to the executive's determinations is customary, deference is not a blank check. Rather, the executive must "articulate a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), and a

**REDACTED VERSION**

reviewing court "may not supply a reasoned basis for the agency's action that the agency itself has not given." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (quotation marks omitted); see also, *e.g.*, *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947). Measured against these standards, the Secretary of Justice's unreasoned opinions fall far short of the level that would be required to justify deference.

c. Some COFINA bondholders have asserted that, because Article VI, Section 2's limit on the incurrence of new Constitutional Debt employs a formula that is expressed as a percentage of those revenues "covered into the Treasury" of the Commonwealth, P.R. Const. art. VI, § 2, it follows that the Constitutional Debt's claim on available resources is also limited to revenues that are paid into the Treasury. Their theory is that, because the cap on Constitutional Debt does not take into account funds that are not deposited into the Treasury, the Puerto Rico Constitution must assume that such funds are not available to repay Constitutional Debt. Thus, they reason, because SUT revenues are passed on to COFINA without reaching the Treasury, they are not available resources.

That argument is precisely backwards. The language of the debt-limit provision shows that the Framers of the Puerto Rico Constitution knew exactly how to specifically reference Treasury funds when they wanted to do so. In stark contrast to the Constitution's debt-limit language, the Constitution broadly authorizes Constitutional Debtholders to compel the Secretary of the Treasury to "apply the available resources" to the payment of their bonds, P.R. Const. art. VI, § 2, *without* any limitation to funds in the Treasury. Under standard interpretive principles, this contrast in language confirms that there is no such limitation on the Constitutional Debt's claim on available resources. See, *e.g.*, *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in

**REDACTED VERSION**

another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (quotation marks omitted)).

Moreover, this disparate treatment makes sense. The debt limit is designed to limit how much the Commonwealth is obligated to spend on debt service in the ordinary course, so it looks to the account that funds debt service in the ordinary course. Constitutional Debtholders' claim on "available resources," by contrast, exists for the extraordinary case in which the Commonwealth, despite prophylactic measures like the debt limit, cannot afford both its debt and all of its other expenses. Thus, it casts a broader net.

The legislative history of the 1961 amendments to the Puerto Rico Constitution reinforces this conclusion. In discussing the new debt limit provision, Senator Ortiz Stella observed that there were certain sources of government revenue that would not count toward the debt-limit calculation because their existence was not under the control of the Legislative Assembly. Ex. 1 at 224. He confirmed, however, that these revenues would nonetheless constitute "income available to deal with the debt." *Id.* In other words, and directly contrary to the COFINA bondholders' arguments, the available resources that are subject to the Constitutional Debt's first claim were understood to be broader than the class of revenues that would count toward the debt limit.

d. In a naked appeal to policy considerations, the COFINA parties assert that the Court should validate the COFINA structure because doing so would enable the Commonwealth to raise money cheaply in the future. *E.g.*, COFINA Agent Counterclaims, Dkt. 269, ¶ 6; National Counterclaims, Dkt. 270, ¶ 53. As an initial matter, these supposed policy benefits of the COFINA structure are not relevant to the question of constitutional interpretation presented here.

**REDACTED VERSION**

The Court's role is to interpret and apply the limitations embodied in the Puerto Rico Constitution, not to second guess the wisdom of those limitations.

In any event, the COFINA parties' policy prescriptions are less sound than the judgments embodied in the Puerto Rico Constitution. The Constitution says nothing about raising money cheaply. Instead, it contains an interlocking series of limitations on the issuance of debt and on the use of funds for purposes other than servicing Constitutional Debt. And those limitations are prudent: Precisely because it is in the narrow interest of legislators elected every few years to exalt short-term spending over long-term fiscal soundness, the people of Puerto Rico imposed through their Constitution limits on the legislature's ability to borrow and spend. COFINA exists outside of those limits and has thus allowed the legislature to ignore them, by serving as a vehicle for effectively unlimited off-balance-sheet borrowing. These Title III cases are a grave reminder of the dangers that necessarily follow from the evasion of these core constitutional restraints.

In any event, it requires a special kind of myopia to see COFINA as inexpensive. Whatever interest rate may have been attached to a particular bond, COFINA has served primarily to magnify the debt burden on the people of Puerto Rico. Looking forward, the goal of PROMESA is for Puerto Rico "to achieve fiscal responsibility and access to the capital markets." PROMESA § 101(a), 48 U.S.C. § 2121(a). A Puerto Rico that has regained fiscal responsibility will have no reason to resort to artifices like COFINA that serve solely to evade the Puerto Rico Constitution. If anything, a decision confirming that the Constitution imposes meaningful constraints on borrowing will only hasten that much-needed transition. And in the long run, the fiscal responsibility prescribed by the Puerto Rico Constitution will be far less costly to the

**REDACTED VERSION**

people of Puerto Rico than the COFINA experiment has proved to be—to say nothing of what mischief COFINA or its kin might visit on future generations.

### B. Act 56 Does Not Transfer Ownership Of The Pledged Sales Taxes To COFINA

Thus far, we have proceeded on the assumption, advanced by COFINA's defenders, that Act 56 transferred the Pledged Sales Taxes to COFINA unless the Commonwealth could not constitutionally take that step. As we explain below, however, the assumption that Act 56 accomplishes a transfer of ownership is incorrect. Thus, even if the Commonwealth had the constitutional authority to transfer tax revenues to COFINA, the Pledged Sales Taxes would nonetheless remain property of the Commonwealth because the Commonwealth has not made an absolute assignment of those revenues sufficient to make them COFINA's property.

A purported transfer of property may be either an absolute assignment of the property (in which the transferee receives ownership) or merely part of a financing arrangement (with the transferor retaining ownership). The parties' label for the transfer does not control. *E.g.*, *In re Evergreen Valley Resort, Inc.*, 23 B.R. 659, 661 (Bankr. D. Me. 1982). Rather, courts take a "substance over form" approach employing "[s]everal factors." *Id.* These factors include, but are not limited to, the presence of a residual interest to be retained by the transferor, the transferee's absence of recourse to the transferor, the transferee's right to retain excess proceeds, and the intent of the parties. *E.g.*, *In re Carolina Utils. Supply Co.*, 118 B.R. 412, 415-416 (Bankr. D.S.C. 1990); Lois R. Lupica, *Circumvention of the Bankruptcy Process: The Statutory Institutionalization of Securitization*, 33 Conn. L. Rev. 199, 213-214 & nn.80-86 (2000) (collecting cases).

Here, those factors make clear that the Commonwealth retained ownership of, and did not absolutely assign, the Pledged Sales Taxes to COFINA.

**REDACTED VERSION**

1.   Most notably, the Commonwealth retained an interest in the Pledged Sales Taxes because it may revoke its "transfer" of them at any time.  A transfer is unlikely to be an absolute assignment if the transferor may revoke the transfer by paying the transferee.  *Evergreen Valley*, 23 B.R. at 662.  This case is more stark:  The Commonwealth may revoke the transfer of the Pledged Sales Taxes without paying COFINA another dime.

The Commonwealth retains complete control over the Pledged Sales Taxes because only it—not COFINA—may tax the people of Puerto Rico.  The Constitution leaves no doubt about this:  "*The power of the Commonwealth* of Puerto Rico *to impose and collect taxes* and to authorize their imposition and collection by municipalities shall be exercised as determined by the Legislative Assembly and *shall never be surrendered* or suspended."  P.R. Const. art. VI, § 2 (emphases added).  Lest that be unclear, the COFINA statute reiterates:  "None of the provisions of [this statute] shall be interpreted or applied in such a manner as to undermine the power of the Legislature to impose and collect taxes as provided in Section 2 of Article VI of the Constitution."  13 L.P.R.A. § 16(a).

As a result, the Commonwealth has the absolute right to alter the SUT or abolish it altogether.  The statute, again, expressly reserves this right:

> the Commonwealth shall not . . . limit nor restrain the rights or powers of the corresponding officials of the Commonwealth of Puerto Rico to levy, maintain, charge or collect taxes and other income to constitute the amounts to be deposited into the FIA pursuant to the provisions of §§ 11a-16 of this title; *Provided*, That the foregoing provisions *do not limit the power of the Commonwealth* of Puerto Rico, by means of a law amendment, *to limit or restrain the nature or the amount of such taxes or other revenues*.

*Id.* § 14(c) (emphases added).[15]  For this reason, COFINA has repeatedly warned its bondholders that "the Legislative Assembly may amend, modify *or repeal* Act 117, which imposes the

---

[15] Should the Commonwealth choose "to substitute similar or comparable collateral by other taxes, fees, charges or other income," it must ensure that the revenue from "such substitutive tax,

**REDACTED VERSION**

[SUT]." *E.g.*, Ex. 6 at 34 (emphasis added). Thus, even COFINA's bond counsel, hired to opine that the COFINA structure was valid, openly conceded that "the Legislature is free at any time to reduce the rate of [the SUT] or eliminate it entirely." Ex. 7 at 10. This fact alone demonstrates that COFINA lacks true ownership of the Pledged Sales Taxes.

Indeed, the Commonwealth's right to revoke its transfer of the Pledged Sales Taxes exists not just in theory but in practice. In 2013, the Commonwealth increased the revenue that COFINA would receive. Act of Oct. 10, 2013, No. 116-2013, Section 2. Nearly a year later, however, the Commonwealth reversed course and eliminated the increase. Act of July 1, 2014, No. 72-2014, Statement of Motives ("[T]he Legislative Assembly deems it prudent that the [Commonwealth] receives the [SUT] revenues transferred to COFINA under Act No. 116-201[3], until such revenues are needed . . . by COFINA in the future."). Of course, if the legislative "transfer" of additional revenue to COFINA were a true assignment, this would have been impossible. Yet, the revocation passed unchallenged. Similarly, following Hurricane Maria, the Commonwealth exempted small- and medium-sized businesses from the SUT for six weeks. Treasury Admin. Determination No. 17-26 (Oct. 11, 2017) (translation attached as Ex. 14). Again, the Commonwealth exercise of control over the SUT would be impossible if the Commonwealth had in fact transferred true ownership to COFINA.

2. Other factors confirm that the Commonwealth did not absolutely assign the Pledged Sales Taxes. For example, a transfer is less likely to be an absolute assignment when, if the revenue from the revenue stream falls short of a certain amount, the transferee has recourse

---

income or collateral is equal to or greater than the service of the [COFINA] debt." 13 L.P.R.A. § 14(c)(i). This "equal to or greater than" proviso, however, does not apply to "restrain[ing] the nature or the amount of" the SUT. See *id.* Moreover, the fact that the COFINA statute speaks of providing substitute collateral when redirecting the flow of SUT from COFINA belies any claim that those revenues were absolutely assigned to COFINA.

REDACTED VERSION

against the transferor to make up the shortfall. *E.g.*, *Major's Furniture Mart, Inc. v. Castle Credit Corp.*, 602 F.2d 538, 545 (3d Cir. 1979). That is the case here. The Commonwealth has agreed that, if the Pledged Sales Taxes were insufficient to service COFINA's bonds, then the Commonwealth would make up for any shortfall from the Commonwealth's share of the SUT, thereby providing COFINA recourse to the Commonwealth (albeit junior to Constitutional Debt). 13 L.P.R.A. § 14(d) (providing that, in the event of a shortfall, deficiencies will be paid from SUT revenue that would otherwise flow to the Commonwealth, and that, if that revenue is insufficient, the Commonwealth may cover the shortfall with appropriations).

Still other factors point to the same result. First, that the transferor continues to collect revenue weighs against finding that the transfer is an absolute assignment. *E.g.*, *In re Commercial Money Ctr., Inc.*, 350 B.R. 465, 483 (B.A.P. 9th Cir. 2006). Here, the Commonwealth—not COFINA—continues to collect all SUT revenues. See pp. 10-11, 32, *supra*. Second, a transfer is less likely to be an absolute assignment if "the assignee must account to the assignor for any surplus received." *Evergreen Valley*, 23 B.R. at 661. Here, if COFINA receives funds "in excess of the amounts necessary to" satisfy its obligations, then its board of directors "shall" certify that COFINA does not need the funds, so that they may be returned to the Commonwealth. 13 L.P.R.A. § 13(c).

Thus, whatever labels they used, the Commonwealth did not legally transfer ownership of the Pledged Sales Taxes to COFINA.

## CONCLUSION

The GO Group's motion for summary judgment should be granted as to the GO Group's sole cause of action, the COFINA Agent's First Cause of Action, and the COFINA Senior

Case:17-03283-LTS Doc#:3477 Filed:01/14/19 Entered:01/14/19 16:20:16 Desc: Main
Document Page 42 of 54

**REDACTED VERSION**

Bondholders' Coalition's First Cause of Action; and the Court should enter a declaration that the

Pledged Sales Taxes are property of the Commonwealth.


*[The remainder of this page is intentionally left blank.]*

**REDACTED VERSION**

Dated: February 21, 2018

/s/ Ramón Rivera Morales
J. Ramón Rivera Morales
USDC-PR Bar No. 200701
Andrés F. Picó Ramírez
USDC-PR Bar No. 302114
JIMÉNEZ, GRAFFAM & LAUSELL
P.O. Box 366104
San Juan, PR 00936
Telephone: (787) 767-1030
Facsimile: (787) 751-4068
Email: rrivera@jgl.com

Respectfully submitted,

/s/ Mark T. Stancil
Lawrence S. Robbins (admitted *pro hac vice*)
Gary A. Orseck (admitted *pro hac vice*)
Kathryn S. Zecca (admitted *pro hac vice*)
Mark T. Stancil (admitted *pro hac vice*)
Donald Burke (admitted *pro hac vice*)
ROBBINS, RUSSELL, ENGLERT, ORSECK,
UNTEREINER & SAUBER LLP
1801 K Street, N.W., Suite 411-L
Washington, DC 20006
Telephone: (202) 775-4500
Facsimile: (202) 775-4510
Email: mstancil@robbinsrussell.com

/s/ Andrew N. Rosenberg
Andrew N. Rosenberg (admitted *pro hac vice*)
Richard A. Rosen (admitted *pro hac vice*)
Walter Rieman (admitted *pro hac vice*)
Kyle J. Kimpler (admitted *pro hac vice*)
Karen R. Zeituni (admitted *pro hac vice*)
PAUL, WEISS, RIFKIND, WHARTON
& GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
Telephone: (212) 373-3000
Facsimile: (212) 757-3990
Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

**REDACTED VERSION**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notifications of such filing to all CM/ECF participants in this case.

/s/ Mark T. Stancil
Mark T. Stancil

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | |
| as agent of | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | Adv. Proc. No. 17-257-LTS in 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, | |
| Plaintiff, | |
| v. | |
| BETTINA WHYTE, | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

Defendant.

### [PROPOSED] ORDER GRANTING MOTION FOR SUMMARY JUDGMENT OF THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS

Upon consideration of the Motion for Summary Judgment of the Ad Hoc Group of General Obligation Bondholders (the "Motion"), and the accompanying declarations and affidavits, and having found and determined that the relief requested in the Motion is warranted, and after notice and an opportunity for a hearing,

IT IS HEREBY ORDERED THAT:

1.        The Motion is GRANTED as set forth herein.

2.        Judgment as a matter of law is granted in favor of the Ad Hoc Group of General Obligation Bondholders on (i) the Ad Hoc Group of General Obligation Bondholders' Count I, (ii) the First Cause of Action of Bettina M. Whyte, in her capacity as the Court-appointed agent for the Oversight Board as representative for COFINA, and (iii) the First Cause of Action of the COFINA Senior Bondholders' Coalition.

3.        All revenues derived from the taxes imposed pursuant to sections 4020.01 and 4020.02 of Subtitle D of Puerto Rico Act No. 1-2011, as amended, are and shall be the property of the Commonwealth of Puerto Rico.

4.      This Court shall retain jurisdiction with respect to all matters relating to the interpretation or implementation of this Order.

This Order resolves Docket Entry Nos. ___ in Adv. Proc. No. 17-257.

SO ORDERED.

Dated: _____, 2018


_____
LAURA TAYLOR SWAIN
United States District Judge

Case:17-03283-LTS Doc#:4727 Filed:01/14/19 Entered:01/14/19 16:20:16 Desc: The
Ad Hoc Group Of General Obligation Bondholders Statement Of Material    Page 1 of 7

Case:17-00257-LTS Doc#:314-27 Filed:02/21/18 Entered:02/21/18 22:39:40 Desc:
Exhibit DX-FF Page 48 of 54

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re: | |
| | PROMESA |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | Title III |
| as representative of | No. 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, *et al.*, | (Jointly Administered) |
| Debtors.[1] | |
| THE OFFICIAL COMMITTEE OF UNSECURED CREDITORS OF THE COMMONWEALTH OF PUERTO RICO, | |
| as agent of | |
| THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO, | |
| as representative of | Adv. Proc. No. 17-257-LTS in 17 BK 3283-LTS |
| THE COMMONWEALTH OF PUERTO RICO, | |
| Plaintiff, | |
| v. | |
| BETTINA WHYTE, | |

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

as representative of

THE PUERTO RICO SALES TAX FINANCING
CORPORATION,

Defendant.

**THE AD HOC GROUP OF GENERAL OBLIGATION BONDHOLDERS' STATEMENT
OF MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable to these

proceedings pursuant to Rule 7056 of the Federal Rules of Bankruptcy Procedure and section

310 of the Puerto Rico Oversight, Management, and Economic Stability Act, 48 U.S.C. § 2170,

and Rule 56(b) of the Local Civil Rules for the U.S. District Court for the District of Puerto

Rico, the Ad Hoc Group of General Obligation Bondholders (the "GO Group") hereby submits

this statement of material facts as to which it contends there is no genuine issue of material fact.

1.      Members of the GO Group collectively hold a substantial amount of bonds issued

or guaranteed by the Commonwealth of Puerto Rico (the "Commonwealth") and backed by a

pledge of its good faith, credit, and taxing power ("Constitutional Debt").  See *First

Supplemental Verified Statement of the Ad Hoc Group of General Obligation Bondholders

Pursuant to Bankruptcy Rule 2019*, Case No. 17 BK 3283-LTS, Dkt. 1625.

2.      The Puerto Rico Sales Tax Financing Corporation ("COFINA") is a public

corporation and instrumentality of the Commonwealth.  13 L.P.R.A. § 11a(a).

3.      Since its creation in in 2007, COFINA has issued bonds, the proceeds of which

have been used to fund general operating expenses of the Puerto Rico government, 13 L.P.R.A.

2

Case:17-03283-LTS Doc#:4727 Filed:01/14/19 Entered:01/14/19 16:20:16 Desc: The
Ad Hoc Group Of General Obligation Bondholders Statement Of Material    Page 3 of 7

Case:17-00257-LTS Doc#:314-27 Filed:02/21/18 Entered:02/21/18 22:39:47 Desc:
Exhibit DX-H Page 50 of 54

§ 11a(b)(5)-(7), and to retire other debt, including "extraconstitutional debt" of the Puerto Rico

central government, *id.* § 11a(b)(1). COFINA currently has more than more than $17 billion in

accrued obligations currently outstanding. Ex. 13 at 52.[2]

4.    To facilitate COFINA's borrowing, a Puerto Rico statute known as Act No. 56-

2007 ("Act 56") purported to "transfer" to COFINA certain tax revenues (the "Pledged Sales

Taxes") derived from the Commonwealth's sales and use tax (the "SUT"). See Act of July 5,

2007, No. 56-2007, 2007 P.R. Laws 173, § 3 (codified as amended at 13 L.P.R.A. § 12).

COFINA then issued bonds backed by these Pledged Sales Taxes. *E.g.*, Ex. 5 at 15-22; Ex. 6 at

6-33.

5.    COFINA has no taxing authority. P.R. Const. art. VI, § 2 ("The power of the

Commonwealth . . . to impose and collect taxes . . . shall never be surrendered."). Thus, the

Commonwealth's SUT is collected by the Commonwealth, through banks it has designated as

"Authorized Collectors." Ex. 6 at 16; see 13 L.P.R.A. § 32092(a) ("merchants . . . shall remit to

the Secretary [of the Treasury] the sales tax").

6.    Portions of the Commonwealth's SUT have been routed to COFINA as follows:

First, the revenues earmarked for COFINA are transferred to a joint account held by the

Commonwealth's Government Development Bank ("GDB") and COFINA at Banco Popular.

Ex. 6 at 16. Second, the revenues are transferred to an account in Banco Popular's Trust

Department held in the name of COFINA. *Id.* at 16-17. Finally, these revenues are transferred

to a trust account held by Bank of New York Mellon as trustee for the COFINA bonds. *Id.* at 17.

7.    This structure applies only to a portion of the SUT revenues collected by the

Commonwealth over the course of the year. Year-round, 4.5% of the total 10.5% SUT is paid to

---

[2] "Ex." refers to exhibits to the Declaration of Donald Burke in Support of the Motion of the
Ad Hoc Group of General Obligation Bondholders for Summary Judgment, filed herewith.

the Commonwealth.  Act of July 1, 2015, No. 101-2015, sec. 6, § 4210.01(b).  Pursuant to Puerto Rico statute, 0.5% of the remaining 6% SUT is transferred to a special fund known as the Municipal Administration Fund.  See Act of Jan. 24, 2014, No. 18-2014, sec. 2(a); Act of July 22, 2016, Act No. 84-2016, sec. 2(a).  The rest (5.5%) is divided between the Commonwealth and COFINA over the course of each fiscal year (which begins on July 1) as follows:  Revenues are sent to COFINA until a certain amount (the "Pledged Sales Tax Base Amount") is reached, typically in the middle of the year.  Ex. 6 at 2.  For the rest of the year, all revenues are sent to the Commonwealth.  *Id.*

8.      The Puerto Rico legislature increased the Pledged Sales Tax Base Amount from $185 million in Fiscal Year 2008 (Act 56 § 2) to over $550 million in Fiscal Year 2010 (Act of Mar, 9, 2009, No. 7-2009, sec. 50, § 3(b)) and over $753 million in Fiscal Year 2018 (Act of July 1, 2015, No. 101-2015, sec. 1, § 3(b)).  At the same time, the legislature expanded the uses of COFINA's debt from refinancing the extraconstitutional debt (Act of July 5, 2007, No. 56-2007, sec. 3, § 4(a)) to covering the Commonwealth's general operating expenses (Act of Jan. 14, 2009, No. 1-2009, sec. 1, § 2(b)) to filling a variety of specialized "funds" (Act of Oct. 10, 2013, No. 116-2013, sec. 1, § 2(b)).

9.      By Fiscal Year 2041, the pledged amount will have increased to $1.85 billion, and will remain at that point until Fiscal Year 2058.  Ex. 6 at 15. All told, the pledged revenues amount to more than $60 billion over the next 41 years.  *Id.*

10.      As of July 31, 2016, future debt-service obligations on existing COFINA bonds totaled more than $50.5 billion.  See Ex. 13 at 204.  That figure was more than double the amount of scheduled debt service on the Commonwealth's Constitutional Debt.  *Id.*

11.     In 2013, the Commonwealth increased the revenue that COFINA would receive.
Act of Oct. 10, 2013, No. 116-2013, Section 2.  Nearly a year later, however, the Commonwealth
eliminated the increase.  Act of July 1, 2014, No. 72-2014, Statement of Motives ("[T]he
Legislative Assembly deems it prudent that the [Commonwealth] receives the [SUT] revenues
transferred to COFINA under Act No. 116-201[3], until such revenues are needed . . . by
COFINA in the future.").  Neither COFINA nor any COFINA bondholder challenged this
revocation of revenues that the legislature had purported to pledge to COFINA.

12.     The Commonwealth's SUT covers a broad range of goods and services.  See 13
L.P.R.A. §§ 32001–32071.

13.     COFINA has issued bonds that could not have been lawfully issued by the
Commonwealth as Constitutional Debt because they would have violated the debt-service and
maturity limitations imposed by Section 2 of Article VI of the Puerto Rico Constitution.  For
example, with respect to COFINA's Series 2007A and Series 2007B issuances, from July 2007,
the average of the preceding two fiscal years' revenue (as the Commonwealth has historically
calculated that figure, but including the SUT revenues diverted to COFINA) was approximately
$8.4 billion: When the Commonwealth issued general obligation bonds in October 2007, it
reported that the average of the revenue collections for fiscal year 2006 and those estimated for
fiscal year 2007 were $8,346,104,000, Ex. 16, at 31; taking account of the $129,700,000 diverted
to COFINA in fiscal year 2007, see Ex. 17, yields an average revenue figure of $8,410,954,000.
Thus, if the COFINA bonds had been issued by the Commonwealth itself as Constitutional Debt,
in no year of those bonds' existence could payment on all Constitutional Debt exceed 15% of
that amount, or roughly $1.26 billion.  See P.R. Const. art. VI, § 2.  But the Series 2007A and
Series 2007B COFINA bonds required principal payments of $1.3 billion in fiscal year 2057.

See Ex. 5 at 14 (principal payment of $1.15 billion due August 1, 2056); Ex. 15 at inside cover

page (principal payments of $50 million each due May 1, 2057, June 1, 2027, and July 1, 2057).

Moreover, most of the bonds had maturities in excess of 30 years—in some cases, up to 50 years.

See Ex. 5 at inside cover page; Ex. 15 at inside cover page.


Dated: February 21 , 2018                              Respectfully submitted,

/s/ Ramón Rivera Morales                              /s/ Mark T. Stancil
J. Ramón Rivera Morales                               Lawrence S. Robbins (admitted *pro hac vice*)
USDC-PR Bar No. 200701                                Gary A. Orseck (admitted *pro hac vice*)
Andrés F. Picó Ramírez                                Kathryn S. Zecca (admitted *pro hac vice*)
USDC-PR Bar No. 302114                                Mark T. Stancil (admitted *pro hac vice*)
JIMÉNEZ, GRAFFAM & LAUSELL                             Donald Burke (admitted *pro hac vice*)
P.O. Box 366104                                       ROBBINS, RUSSELL, ENGLERT, ORSECK,
San Juan, PR 00936                                    UNTEREINER & SAUBER LLP
Telephone: (787) 767-1030                             1801 K Street, N.W., Suite 411-L
Facsimile: (787) 751-4068                             Washington, DC 20006
Email: rrivera@jgl.com                                Telephone: (202) 775-4500
                                                      Facsimile: (202) 775-4510
                                                      Email: mstancil@robbinsrussell.com

                                                      /s/ Andrew N. Rosenberg
                                                      Andrew N. Rosenberg (admitted *pro hac vice*)
                                                      Richard A. Rosen (admitted *pro hac vice*)
                                                      Walter Rieman (admitted *pro hac vice*)
                                                      Kyle J. Kimpler (admitted *pro hac vice*)
                                                      Karen R. Zeituni (admitted *pro hac vice*)
                                                      PAUL, WEISS, RIFKIND, WHARTON
                                                      & GARRISON LLP
                                                      1285 Avenue of the Americas
                                                      New York, NY 10019
                                                      Telephone: (212) 373-3000
                                                      Facsimile: (212) 757-3990
                                                      Email: arosenberg@paulweiss.com

*Counsel to the Ad Hoc Group of General Obligation Bondholders*

## CERTIFICATE OF SERVICE

I hereby certify that, on this same date, I electronically filed the foregoing with the Clerk

of the Court using the CM/ECF system, which will send notifications of such filing to all

CM/ECF participants in this case.

/s/ Mark T. Stancil
Mark T. Stancil