# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

------------------------------------------------------------------ X

*In re*                                                    :

                                                           :

THE FINANCIAL OVERSIGHT AND                                :
MANAGEMENT BOARD FOR PUERTO RICO,          PROMESA Title III
                                           Case No. 17-BK-3283 (LTS)
                                                           :
        as representative of                               :
                                           (Jointly Administered)
                                                           :
THE COMMONWEALTH OF PUERTO RICO, *et al.*,                 :

                                                           :

        Debtors.[1]                                        :

------------------------------------------------------------------ X

THE OFFICIAL COMMITTEE OF UNSECURED                        :
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO,                                               :

                                                           :
        as agent of
                                                           :
THE FINANCIAL OVERSIGHT AND                                :
MANAGEMENT BOARD FOR PUERTO RICO,
                                                           :
        as representative of                               :

THE COMMONWEALTH OF PUERTO RICO,           Adv. Proc. No. 17-00257-LTS

                                                           :
        Plaintiff-Counterclaim-
        Defendant,                                         :

                                                           :
        v.
                                                           :
BETTINA WHYTE,                                             :

        as agent of                                        :

THE FINANCIAL OVERSIGHT AND                                :
MANAGEMENT BOARD FOR PUERTO RICO,
                                                           :
        as representative of                               :

THE PUERTO RICO SALES TAX FINANCING                        :

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

DX-HH

CORPORATION ("COFINA"),                          :
                                                 :
                Defendant-Counterclaim-    :
                Plaintiff,                 :
                                                 :
     and                                        :
                                                 :
THE COFINA SENIOR BONDHOLDERS'                   :
COALITION,                                       :
                                                 :
                Intervenor-Defendant-      :
                Counter and Crossclaim-    :
                Plaintiff,                 :
                                                 :
     v.                                         :
                                                 :
PERMITTED INTERVENORS,                           :
                                                 :
                Crossclaim Defendants.     :
-------------------------------------------------------------------- X


**MEMORANDUM OF LAW OF COFINA SENIOR BONDHOLDERS' COALITION
<u>IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT</u>**

<u>**TABLE OF CONTENTS**</u>

**Page**

PRELIMINARY STATEMENT ........................................................................................................1

STATEMENT OF FACTS ..............................................................................................................6

      A.    The Commonwealth Creates COFINA And The DST Through Duly-
Enacted Legislation ................................................................................................6

      B.    The Commonwealth Transferred Ownership Of The DST And DST Fund
To COFINA ............................................................................................................8

ARGUMENT ................................................................................................................................12

I.     COFINA OWNS THE DST AND THE DST FUND..........................................................13

      A.    The COFINA Enabling Act Transferred Ownership Of The DST And DST
Fund To COFINA ................................................................................................13

            1.    COFINA's Ownership Is Set Forth In The Plain Terms Of The
COFINA Enabling Act ............................................................................13

            2.    Reading The COFINA Enabling Act As Transferring Ownership
To COFINA Is The Only Way To Harmonize All Provisions Of
The Statute ................................................................................................16

      B.    The COFINA Enabling Act's Grant Of Property Rights To COFINA Is
Dispositive ...........................................................................................................17

            1.    It Was Not "Impossible" To Transfer Future Sales Tax Revenue ............19

            2.    The Commonwealth's Supposed Ability To Repeal Or Reduce The
SUT Does Not Negate The Express Grant Of The Property To
COFINA ...................................................................................................23

            3.    COFINA Does Not Have To Collect The DST To Own It......................26

II.    THE COMMONWEALTH'S TRANSFER OF THE DST TO COFINA WAS
VALID UNDER THE PUERTO RICO CONSTITUTION ............................................27

      A.    The DST Is Not An "Available Resource" Subject To The Constitutional
Debt Priority.........................................................................................................27

            1.    The Legislative Assembly Is Entitled To Great Deference In Its
Determination That The COFINA Funds Are Not Available
Resources ..................................................................................................28

            2.    The Commonwealth Received Available Resources In Payment
For The COFINA Bonds, And There Is No Constitutional Basis
For Also Treating As Available Resources The Property
Transferred In Return ...............................................................................31

            3.    The Legislative Assembly's Decision To Treat Funds Outside The
Treasury As Unavailable Is Reasonable And Constitutional....................32

4. "Available Resources" Refers To The Funds In The Puerto Rico Treasury .................................................................. 33

5. "Available Resources" Does Not Mean "All Resources" ....................... 35

B. COFINA's Obligations Do Not Count Toward The Constitution's Debt Limit Or Debt Maturity Limit .................................................................. 37

C. COFINA Is Consistent With The Constitution's Balanced Budget Requirements ............................................................................................ 39

III. IN THE ALTERNATIVE, THIS COURT SHOULD CERTIFY TO THE SUPREME COURT OF PUERTO RICO THE STATE-LAW QUESTIONS AT ISSUE ...................................................................................................................... 42

CONCLUSION ................................................................................................................. 45

# TABLE OF AUTHORITIES

**Page**

### Cases

*Arizonans for Official English v. Ariz.,*
  520 U.S. 43 (1997)................................................................ 43

*Armco Steel Co., LP v. CSX Corp.,*
  790 F. Supp. 311 (D.D.C. 1991).......................................... 43

*Ashwander v. Tenn. Valley Auth.,*
  297 U.S. 288 (1936)............................................................ 16

*Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v.
  Flores Galarza,*
  484 F.3d 1 (1st Cir. 2007)............................................... 26, 27

*Ayer v. Comm'r of Admin.,*
  165 N.E.2d 885, 892 (Mass. 1960) ..................................... 38

*Bd. of Regents of State Colls. v. Roth,*
  408 U.S. 564 (1972)............................................................ 19

*Bingham v. Supervalu, Inc.,*
  806 F.3d 5 (1st Cir. 2015)................................................... 43

*Blue Cross & Blue Shield of Ala. v. Nielsen,*
  116 F.3d 1406 (11th Cir. 1997) ...................................... 44, 45

*Butner v. United States,*
  440 U.S. 48 (1979).............................................................. 18

*Cleveland Bd. of Educ. v. Loudermill,*
  470 U.S. 532 (1985)....................................................... 19, 23

*Commonwealth v. Nw. Selecta, Inv.,*
  No. CC 2009 1091, 2012 WL 1109131 (P.R. Mar. 27, 2012).............. 29

*Conn. Nat'l Bank v. Germain,*
  503 U.S. 249 (1992)....................................................... 13, 18

*Crick v. Rash,*
  229 S.W. 63 (Ky. 1921)...................................................... 38

*DDB Techs., L.L.C. v. MLB Advanced Media, L.P.,*
  517 F.3d 1284 (Fed. Cir. 2008).......................................... 14, 22

*Deseret Salt Co. v. Tarpey*,
    142 U.S. 241 (1891).................................................................................. 14

*F.D.I.C. v. Emerito Estrada-Rivera--Isuzu*,
    No. 10-1622CCC, 2012 WL 1123586 (D.P.R. Mar. 30, 2012) ............................................. 12

*Filmtec Corp. v. Allied-Signal Inc.*,
    939 F.2d 1568 (Fed. Cir. 1991) .................................................................. 22

*Freeman v. Ritner (In re Freeman)*,
    489 F.2d 431 (9th Cir. 1973) ..................................................................... 22

*Hernandez-Miranda v. Empresas Diaz Masso, Inc.*,
    651 F.3d 167 (1st Cir. 2011) ...................................................................... 13

*Hohmeier v. Leyden Cmty. High Schs. Dist. 212*,
    954 F.2d 461 (7th Cir. 1992) ..................................................................... 19

*In re Berghman*,
    235 B.R. 683 (Bankr. M.D. Fla. 1999) ........................................................ 22

*In re C.W. Mining Co.*,
    530 B.R. 878 (Bankr. D. Utah 2015) ......................................................... 22

*In re Freeman*,
    235 B.R. 121 (Bankr. M.D. Fla. 1999) ........................................................ 22

*In re Granati*,
    307 B.R. 827 (E.D. Va. 2002), *aff'd*, 63 F. App'x 741 (4th Cir. 2003).............................. 22

*In re Hernandez*,
    487 B.R. 353 (Bankr. D.P.R. 2013) ............................................................ 13

*In re Martin*,
    117 B.R. 243 (Bankr. N.D. Tex. 1990) ....................................................... 22

*In re Napoleon*,
    551 B.R. 200 (Bankr. E.D.N.C. 2016) ........................................................ 22

*In re Okla. Capitol Improvement Auth.*,
    958 P.2d 759 (Okla. 1998) ....................................................................... 38

*In re San Juan Dupont Plaza Hotel Fire Litig.*,
    687 F. Supp. 716 (D.P.R. 1988) ............................................................... 20

*In re Town Ctr. Flats, LLC*,
    855 F.3d 721 (6th Cir. 2017) ..................................................................... 22

*In re Trejo*,
    44 B.R. 539 (Bankr. E.D. Cal. 1984) ................................................................... 22

*Liter v. City of Baton Rouge*,
    258 La. 175 (1971) ................................................................................................. 24

*Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*,
    2 N.Y.3d 524 (2004) ............................................................................................. 25

*Long v. Napolitano*,
    53 P.3d 172 (Ariz. Ct. App. 2002) ....................................................................... 38

*Louisiana ex rel. Hubert v. New Orleans*,
    215 U.S. 170 (1909) .............................................................................................. 25

*Marrero-García v. Irizarry*,
    33 F.3d 117 (1st Cir. 1994) .................................................................................. 20

*Mathews v. Eldridge*,
    424 U.S. 319 (1976) .............................................................................................. 19

*Mich. Cent. R. Co. v. Powers*,
    201 U.S. 245 (1906) ........................................................................................ 43, 45

*Morris v. Bd. of Regents*,
    625 P.2d 562 (Nev. 1981) ..................................................................................... 38

*Muñiz-Olivari v. Stiefel Labs., Inc.*,
    496 F.3d 29 (1st Cir. 2007) .................................................................................. 44

*N.J. Sports & Exposition Auth. v. McCrane*,
    292 A.2d 545 (N.J. 1972) ..................................................................................... 38

*Ortiz v. Levitt & Sons*,
    101 D.P.R. 290, 1 P.R. Offic. Trans. 407 (1973) ................................................. 19

*P.R. Tel. Co. v. Sec. of Treasury*,
    81 D.P.R. 982 (1960) ....................................................................................... 29, 33

*Peaje Invs. LLC v. Garcia-Padilla*,
    845 F.3d 505 (1st Cir. 2017) ................................................................................ 16

*Perry v. Sindermann*,
    408 U.S. 593 (1972) .............................................................................................. 18

*Quirk v. Mun. Assistance Corp.*,
    41 N.Y.2d 644 (1977) ........................................................................................... 30

*R.C.A. v. Gobierno de la Capital*,
    91 D.P.R. 416 (1964) ............................................................................................ 25

*Ratzlaf v. United States*,
    510 U.S. 135 (1994) ........................................................................................... 36

*Rexach v. Ramirez Velez*,
    162 D.P.R. 130 (2004) ........................................................................................ 29

*San Diegans for Open Gov't v. City of San Diego*,
    242 Cal. App. 4th 416 (2015) ............................................................................... 9

*San Geronimo Caribe Project, Inc. v. Administracion*,
    174 D.P.R. 640 (2008) ........................................................................................ 30

*Sanchez v. Srio. de Justicia*,
    157 D.P.R. 360 (2002) ........................................................................................ 16

*Schowalter v. State*,
    822 N.W.2d 292 (Minn. 2012) ............................................................................ 39

*Schulz v. State of New York*,
    84 N.Y.2d 231 (1994) ......................................................................................... 37

*Silva v. Adm. Sistemas de Retiro*,
    128 D.P.R. 256 (1991) ........................................................................................ 13

*Speedplay, Inc. v. Bebop, Inc.*,
    211 F.3d 1245 (Fed. Cir. 2000) .......................................................................... 22

*Speelman v. Pascal*,
    178 N.E.2d 723 (N.Y. 1961) ............................................................................... 21

*Star Athletica, L.L.C. v. Varsity Brands, Inc.*,
    137 S. Ct. 1002 (2017) ....................................................................................... 17

*State ex rel. Lesmeister v. Olson*,
    354 N.W.2d 690 (N.D. 1984) ............................................................................. 38

*State ex rel. Shkurti v. Withrow*,
    513 N.E.2d 1332 (Ohio 1987) ............................................................................ 38

*State ex rel. Wash. State Fin. Comm. v. Martin*,
    384 P.2d 833 (Wash. 1963) ................................................................................ 38

*Switzer v. City of Phoenix*,
    86 Ariz. 121 (1959) ............................................................................................ 24

*U.S. Trust Co. of N.Y. v. New Jersey*,
 431 U.S. 1 (1977) ................................................................................... 25

*United States v. Roberson*,
 459 F.3d 39 (1st Cir. 2006) .................................................................... 17

*V. Suarez & Co. v. Dow Brands, Inc.*,
 337 F.3d 1 (1st Cir. 2003) ...................................................................... 20

*Wein v. City of New York*,
 36 N.Y.2d 610 (1975) ............................................................................ 37

*Ziegler v. Witherspoon*,
 331 Mich. 337 (1951) ............................................................................. 24

## Statutory Authorities/Rules

48 U.S.C. § 741 ............................................................................................ 41

P.R. Laws Ann. tit. 13, § 32001(p) .............................................................. 26

P.R. Laws Ann. tit. 13, § 32025(c) .............................................................. 26

P.R. Laws Ann. tit. 21, §§ 6741-44 ............................................................... 6

P.R. Laws Ann. tit. 31, § 13 ........................................................................ 40

P.R. Laws Ann. tit. 31, § 14 ........................................................................ 13

P.R. Laws Ann. tit. 31, § 1931 .................................................................... 20

P.R. Laws Ann. tit. 31, § 3514 .................................................................... 45

P.R. Const. art. VI, § 2 ............................................................... 30, 34, 35, 37

P.R. Const. art. VI, § 7 .......................................................................... 36, 39

P.R. Const. art. VI, § 8 ............................................................................... 27

P.R. Const. art. VI, § 19 ............................................................................. 36

## Miscellaneous

1 José Puig Brutau, *Fundamentos de Derecho Civil* (3d ed. 1989) .............. 20

2 Ana Cañizares Laso et al., *Código Civil Comentado* (2011) ..................... 20

2 Sir Frederick Pollock & Frederic W. Maitland,
*The History of English Law* (2d ed. 1959) ........................................................................ 20, 21

2 William Blackstone,
*Commentaries on the Laws of England: Of the Rights of Things* (1766) .............................. 21

3 Sir William Holdsworth, *A History of English Law* (5th ed. 1942) ......................................... 20

3 Xavier O'Callaghan, *Curso de Derecho Civil* (4th ed. 2002) .................................................. 20

8 Manuel Albaladejo & A. Fernando Pantaleon Prieto,
*Comentarios al Código Civil y Compilaciones Forales* (1987) ........................................... 20

Federico Puig Peña, Compendio de Derecho Civil Español (3d ed. 1976) ................................ 20

J Trías Monge, *Constitutional History of Puerto Rico*,
San Juan, Ed. U.P.R. 1982 .................................................................................................. 29

Lyttleton, *Treaties of Tenures* (1841) ....................................................................................... 21

Intervenor Defendant/Counter- and Crossclaim Plaintiff, the COFINA Senior Bondholders'

Coalition, submits this memorandum of law in support of its motion for summary judgment.[2]

## PRELIMINARY STATEMENT

The Commonwealth Agent and a rump group of general obligation bondholders assert two

novel challenges to COFINA's ownership of the Dedicated Sales Tax ("DST"). The first, espoused

only by the Commonwealth Agent, is that it is impossible—as a matter of natural law or common

law precepts—for Puerto Rico to have made a present transfer of a future stream of revenues when it

created COFINA. The second, spun by the Commonwealth Agent and the GO Bondholders, is that

it is impossible—as a matter of constitutional law—for Puerto Rico to have made a stream of future

revenues unavailable to the Commonwealth in exchange for COFINA (and its bondholders) making

the funds immediately available. Both challenges fail on the plain text of Puerto Rico law, which

determines the ownership of property in this dispute. Moreover, with respect to the constitutional

challenges, the Commonwealth Agent and GO Bondholders cannot meet the standards for voiding

legislative acts in areas of finance, taxation, and public credit—areas that the Supreme Court of

Puerto Rico has instructed require the judiciary to give deference to the Legislative Assembly.

The Legislative Assembly created COFINA with a statute expressly stating that the DST was

"hereby transferred" to, the "property" of, and "owned" by COFINA. From 2007 through and

including 2011, the Commonwealth raised approximately $16 billion through its transfer of

ownership of the DST to COFINA. In other words, the Commonwealth was able to monetize a long-

---

[2] This motion is directed to (i) Counts 1, 2, 12, and 13 of the Second Amended Complaint (Dkt. No. 221) filed by the Official Committee of Unsecured Creditors of all title III Debtors (except COFINA), as the "Commonwealth Agent"; (ii) Count 1 of the Complaint in Intervention (Dkt No. 96) filed by the Ad Hoc Group of General Obligation Bondholders (the "GO Bondholders"); (iii) Count 1 of the Amended Answer in Intervention and Counter- and Crossclaims (Dkt. No. 272) filed by the COFINA Senior Bondholders' Coalition; (iv) Count 1 of the Second Amended Answer, Defenses, and Counterclaims (Dkt. No. 269) filed by the COFINA Agent; (v) Count 1 of the Amended Answer and Counterclaims (Dkt. No. 273) filed by the Mutual Fund Group and Puerto Rico Funds; and (vi) Count 1 of the Answer, Affirmative Defenses, and Counterclaims (Dkt. No. 270) filed by National Public Finance Guarantee Corporation.

term revenue stream, and have funds immediately at its disposition to pay Commonwealth debts, including general obligation bonds and other Commonwealth expenses.  For nearly a decade after the COFINA legislation was enacted with nearly unanimous, bipartisan support, and endorsed by opinions by Secretaries of Justice of Puerto Rico spanning three administrations, no one challenged its meaning or validity.  Now, in retrospect, the Commonwealth Agent and the GO Bondholders have raised statutory and constitutional challenges to COFINA's ownership of the DST.  The challenges, however, are nothing more than a post-hoc grievance regarding how the Commonwealth chose to use the funds resulting from the transfer of ownership of the DST to COFINA.

Since COFINA's inception, the DST has gone immediately to COFINA and then to its bondholders.  The Commonwealth itself never possessed or used the DST.  Now, the Commonwealth Agent and GO Bondholders argue that common law notions of property or constitutional limitations preclude the clear statutory grant of property to COFINA.  However, nothing in the common law or the Puerto Rico Constitution provides any basis to override the Legislative Assembly's decision to transfer property to COFINA in exchange for billions of dollars in funding to the Commonwealth during "one of the worst fiscal crises in its history."

**I.** COFINA owns the DST, along with the DST Fund.  The statute is unequivocal:  It expressly states that the funds were "hereby transferred" to COFINA and the "property of COFINA."  It also ensures that the DST cannot be deposited in the Commonwealth Treasury, does not "constitute resources available to the Commonwealth," and is not "available for use by the Secretary of Treasury of the Commonwealth."  Thus, from the moment COFINA was created, it owned the DST, and it will continue to do so until the day it satisfies its last obligations to COFINA's bondholders.

Neither the Commonwealth Agent nor the GO Bondholders dispute that the plain language of

the statute effects a transfer of property to COFINA, with the GO Bondholders expressly agreeing

that "the Commonwealth stated in legislation that COFINA's portion of SUT revenue *is property of*

*COFINA*." GO Bondholders Compl. ¶ 45 (emphasis in original). Rather than confront the plain

language, the Commonwealth Agent and GO Bondholders claim that this Court can disregard it. But

they provide no legal basis for doing so.

*First*, they claim that the transfer does not comport with general maxims of property law

because it concerns future revenues. However, it is well established that state law defines property

rights, and the Legislative Assembly's defining those rights to include COFINA's ownership of the

DST and the DST Fund is therefore controlling. In any event, the supposed maxim the

Commonwealth Agent and GO Bondholders rely upon is illusory, as transfers of future property are

commonplace and routinely enforced—for instance, as to future profits, rights in future inventions,

future tax refunds, future insurance proceeds, future rents, and so on. *Second*, their argument that the

Commonwealth can simply take away the DST wrongly disregards the statutory grant of property

rights to COFINA and its bondholders. The argument also fails on its own terms because the

Commonwealth expressly covenanted that it could not take away the funds unless existing revenues

were sufficient to satisfy COFINA's obligations or unless it provided an adequate substitute—a

covenant coextensive with the requirements embodied in the Takings Clause of the U.S. Constitution

and made expressly for the benefit of bondholders. *Third*, the argument that COFINA does not own

the tax revenues since it does not collect them also fails because (as the First Circuit has held)

collection does not determine property rights, which again are definitively determined by the statute

itself. Regardless, there is no statute requiring Commonwealth collection, and indeed, the revenues

are "directly deposited" into COFINA's bank account.

**II.** The Commonwealth Agent's and GO Bondholders' first constitutional challenge is based

on Article VI, Section 8 of the Puerto Rico Constitution, which gives general obligation debt a priority claim to a specific portion of the Commonwealth's funds, namely the Commonwealth's "available resources." However, the COFINA Enabling Act expressly states that the COFINA funds are *not* available resources and do *not* go into the Puerto Rico Treasury. Under the Constitution, the Legislative Assembly is empowered to impose taxes, issue debt, and determine how the revenues will be used. No fundamental right or liberty warranting heightened scrutiny is at issue here. So long as the Legislative Assembly's acts are directed to a "public purpose," the Puerto Rico Constitution grants it wide latitude in carrying out that authority. And it is undisputed that the Legislative Assembly created COFINA to alleviate Puerto Rico's economic crisis and repay pre-existing debt, rather than allow the public credit to go into default. Its intent was to improve the Commonwealth's credit rating and allow it to pay suppliers and replenish emergency and relief funds, while COFINA borrowed at a lower cost than could the Commonwealth. Because these goals are quintessentially public in nature, the Legislative Assembly acted well within its authority in passing COFINA's legislation as a rational means to a legitimate end.

In particular, the Legislative Assembly's treatment of "available resources" only as those funds in the Puerto Rico Treasury directly follows from the plain language of the term "available resources," since funds are not available where, as here, they belong to another entity. The Commonwealth was paid over $16 billion in proceeds for its unambiguous transfer of property to COFINA—an amount that the Commonwealth Agent and GO Bondholders do not and cannot dispute was a fair price. Those funds were already used largely (and for 2007-08 bonds, solely) to pay down debt. Thus, the Commonwealth Agent and GO Bondholders are not really asking for available resources (*i.e.*, $16 billion) to be applied to Commonwealth debts; they are asking that *unavailable* resources (*i.e.*, what they gave up in return for over $16 billion) be *made available* to

4

them—a request that has no statutory or constitutional basis. Indeed, the Commonwealth Agent's

and GO Bondholders' interpretation would mean that if the Commonwealth sold public land (or a

power plant) for fair market value, then it must—contrary to fundamental legal principles and basic

logic—treat as an available resource *both* the money it received from the sale *and* the property it

transferred. Moreover, the fact that GO Bondholders can enforce the debt priority by suing the

Secretary of the Treasury, who has power only over the funds appropriated by the Legislative

Assembly to the Treasury, further supports this interpretation. The contrary interpretation also errs

in treating "*available* resources" as "*total* resources." While the Commonwealth Agent and the GO

Bondholders elide over this distinction, the Legislative Assembly clearly understood its importance.

The Commonwealth Agent's debt limit and "balanced budget" arguments are equally

misplaced. The Puerto Rico Constitution expressly limits the amount and term of full faith and

credit debt. It does not limit or prohibit the issuance of debt that has no recourse to the

Commonwealth, such as COFINA bonds. With respect to the "balanced budget" requirement, the

Commonwealth Agent fails to explain how the COFINA Enabling Act rendered total appropriations

greater than total revenue. In any event, the Constitution specifically permits deficit financing, or

the use of financing to pay for existing debt, by limiting budgetary appropriations in one year to the

"*recursos totales*" or "total resources" (including borrowings) for that year. The Commonwealth

Agent claims that the term "total resources" should be rejected in favor of the Constitution's English

translation, "total revenues," a term that, according to the Commonwealth Agent, excludes

borrowings. This argument is legally erroneous and in fact inconsistent with the Commonwealth

Agent's own reliance on the Spanish meanings of the Constitution's terms in other areas.

* * * * *

For all these reasons, the COFINA Senior Bondholders' Coalition is entitled to judgment

5

against the Commonwealth Agent's and GO Bondholders' claims. Moreover, summary judgment

should be awarded to the COFINA Senior Bondholders' Coalition on its first cause of action for a

declaration that (i) the statutes creating COFINA and directing transfer of the DST and the DST

Fund to it are valid under the Puerto Rico Constitution; (ii) the DST, including all DST revenue

collected in the future, and the DST Fund are the property of COFINA; and (iii) the DST and the

DST Fund are not "available resources" under the Puerto Rico Constitution.

## STATEMENT OF FACTS

### A.    The Commonwealth Creates COFINA And The DST Through Duly-Enacted Legislation

In 2006, the Commonwealth faced an unprecedented "government crisis that afflict[ed] the

Island." 56.1 ¶ 2. "[G]overnment expenses ... surpassed revenues," "affect[ing] government credit"

and leading to "layoffs of over 95,000 government employees." *Id.* To dispel this crisis, the

Legislative Assembly enacted Act 91 of 2006, which created the "Urgent Interest Fund" ("UIF")

56.1 ¶¶ 1-2. The Legislative Assembly then created the "Puerto Rico Urgent Interest Fund

Corporation ("UIFC"), the predecessor to COFINA. 56.1 ¶ 6. The Legislative Assembly also

imposed for the first time a sales and use tax (the "SUT"), and, by statute, transferred ownership of a

portion of the SUT (the "Dedicated Sales Tax" or "DST")) to the UIFC. 56.1 ¶¶ 4-6.[3]

The next year, the Legislative Assembly passed Act 56 of 2007 ("Act 56"), which replaced

the UIFC with COFINA, an independent, separate, government entity attached to the Government

Development Bank of Puerto Rico ("GDB"). 56.1 ¶¶ 7-9. Act 56 transferred ownership of the DST

to COFINA, and granted statutory authority for COFINA to issue bonds secured by the DST. 56.1

---

[3]  Other portions of the SUT go to other entities, including the Municipal Administration Fund ("MAF") and the Municipal Finance Corporation ("COFIM"). *See* P.R. LAWS ANN. tit. 21, §§ 6741-44, 6751-56. The GDB has agreed with certain of its bondholders to enter into a Restructuring Support Agreement under Title VI of PROMESA. Under this RSA, some SUT revenue would continue to go to the GDB bondholders, rather than the Commonwealth Treasury, notwithstanding that the Commonwealth Agent is now challenging the validity of treating SUT funds as not Commonwealth property and not available resources.

¶ 8. This Act, along with Act 91 (which created the UIF), and Act 291 (which created the UIFC), as amended, are commonly referred to as the "COFINA Enabling Act." For the COFINA bonds issued in 2007-08 pursuant to Act 91, the Commonwealth used the proceeds of the COFINA bonds solely to pay certain appropriation-level debt, referred to in the Enabling Act as "extraconstitutional" debt because it was not backed by the Commonwealth's full faith and credit. 56.1 ¶ 9.

These legislative acts were passed by the vote of nearly every representative of both major parties in a rare show of bipartisan support. 56.1 ¶¶ 11-12. Act 91 passed the Puerto Rico House of Representatives with 48 votes in favor and one against, and passed the Puerto Rico Senate with 24 votes in favor, none against, two absentees, and one abstention. 56.1 ¶ 11. Similarly, Act 56 passed the Puerto Rico House of Representatives with 44 votes in favor and one against, and passed the Puerto Rico Senate with 24 votes in favor, one against, one absentee, and one abstention. 56.1 ¶ 12.

The COFINA Enabling Act was amended in early 2009 to expand the COFINA structure, make billions of dollars of additional funds immediately available to the Commonwealth, and transfer additional SUT to the DST Fund. 56.1 ¶¶ 13-17. Invoking the Commonwealth's police power, these amendments also significantly expanded the purpose of COFINA to include, among other things, funding operations of the Commonwealth, and paying, servicing, and refinancing of various existing Commonwealth debt:

> Due to the magnitude of the budgetary deficit for fiscal year 2008-2009 and the projected deficits for the subsequent three fiscal years, and in order to prevent Government operations from been [*sic*] adversely affected, it is necessary to resort to financing mechanisms so as to raise more resources that shall enable the Government to (i) defray and/or finance its operating expenses; (ii) meet obligations assumed by the Secretary of the Treasury with the Government Development Bank for Puerto Rico ("GDB"), including debts with no repayment sources or which are payable from budget appropriations, so as to prevent the GDB financial condition from deteriorating, since its financial solidity is crucial for the credit of Puerto Rico; (iii) pay in full the million-dollar sums owed by the Government to its goods and services providers, so as to boost the economy of Puerto Rico; (iv) establish an economic stimulus fund with the purpose of engaging in loans or investments geared toward

7

rebuilding the economy of Puerto Rico; and (v) replenish the Emergency Fund of the Commonwealth of Puerto Rico.

56.1 ¶ 14.

At inception, exercising its statutory authority to issue bonds, COFINA adopted the "Sales Tax Revenue Bond Resolution" in July 2007 (as amended in 2009, the "Bond Resolution"). 56.1 ¶ 23. Pursuant to the Bond Resolution, COFINA issued several series of COFINA senior bonds in 2007 and 2008. Bondholders purchased approximately $4.5 billion and $740 million of senior bonds in 2007 and 2008, respectively. 56.1 ¶¶ 24, 26. The proceeds were then transferred by COFINA to the Commonwealth pursuant to the COFINA Enabling Act. 56.1 ¶¶ 19-26. In June 2009, the Bond Resolution was amended to provide for the issuance of subordinate bonds, and, between 2009 and 2011, COFINA issued additional bonds—both senior and subordinate. 56.1 ¶¶ 27-28. In total, investors purchased more than $16 billion in COFINA bonds.[4] 56.1 ¶¶ 24-28.

**B.**   **The Commonwealth Transferred Ownership Of The DST And DST Fund To COFINA**

The COFINA Enabling Act provides that the DST, and the special fund into which the DST is deposited (the "DST Fund"), "shall be the *property* of COFINA." 56.1 ¶ 20 (emphasis added). The statute also provides that the DST "shall be directly deposited in the [DST Fund] at the time of receipt and shall not be deposited into the Treasury of Puerto Rico." *Id.* The statute states that these sales tax revenues do not "constitute resources available to the Commonwealth of Puerto Rico," nor are they "available for use by the Secretary of the Treasury." *Id.*

The Statement of Motives to the Act 56 further states that the DST is "*owned* by COFINA" and "shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose." 56.1 ¶ 9 (emphasis added). The Legislative Assembly reiterated these principles when it expanded

---

[4] As of the filing of the Title III Cases, the outstanding amount of COFINA bonds was about $17.6 billion, but the original value was about $16.3 billion, as certain of the bonds are capital appreciation bonds that do not pay an interest coupon, and instead accrete value or pay-in-kind over time that is paid upon maturity.

COFINA in 2009. *See, e.g.*, 56.1 ¶ 15. COFINA's ownership of the DST was also reported in the Commonwealth's financial statements every year. 56.1 ¶ 10 ("In addition, the portion of the sales and use tax allocated to COFINA is not included as internal revenues since the legislation that created COFINA *transferred ownership* of such portion . . . to COFINA and provided that [it] was not available resources under the Constitutional provisions relating to full faith and credit bonds.") (emphasis added). Although COFINA's auditors reflected future tax revenues as a "receivable" from the Commonwealth, they made clear that this was for accounting purposes only: "This receivable ... does not reflect an existing legal obligation of the Commonwealth to the Corporation *to the extent that, under the provisions of Act 91, the Corporation already owns the Sales and Use Tax.*" 56.1 ¶ 53 (emphasis added); *see also, e.g.*, *San Diegans for Open Gov't v. City of San Diego*, 242 Cal. App. 4th 416, 439 (2015) ("We conclude that a public agency's adherence to GASB and GAAP guidelines does not override California law or delineate the legal rights and responsibilities of this state's public agencies. SDOG cites no authority to support a contrary conclusion."). The auditors further stated that COFINA "is solely dependent on the sales and use tax transferred to the Corporation by law and used to fund the debt service fund" and that "Act No. 91 established the Dedicated Sales Tax Fund, a special fund held and owned by the Corporation separate and apart from the Commonwealth's General Fund." 56.1 ¶ 53.

Consistent with this, the DST is never deposited with the Treasury. Instead, all SUT, including the DST, is directly deposited into an account at Banco Popular de Puerto Rico that is jointly held by COFINA and the GDB. 56.1 ¶ 29. The DST is then segregated into a different account at Banco Popular held solely in COFINA's name. *Id.* The funds are then transferred from this COFINA-owned account to The Bank of New York Mellon ("BNYM"), the trustee for the COFINA bonds, which retains the DST, holding it in trust for the COFINA bondholders until a

minimum amount of funds is collected sufficient to pay COFINA debt service.  56.1 ¶¶ 29-30.

When that minimum level is reached, and only then, excess funds in the DST Fund are transferred to

the Treasury instead of BNYM.  56.1 ¶ 29.

 In addition to transferring ownership of the DST to COFINA, the Legislative Assembly

authorized COFINA to pledge those funds as security automatically upon the issuance of COFINA

bonds.  56.1 ¶ 20.  In particular, the Legislative Assembly authorized COFINA:

> to pledge and otherwise encumber all or part of such revenues [of the DST Fund]
> solely for the payment of principal, interest and redemption premium of such bonds
> and other obligations of [COFINA] that were incurred with respect to such bonds to
> meet the purposes set forth in [this Act] and the payment of obligations incurred
> under any type of financing or surety agreement or interest rate swap agreement
> executed with respect to such bonds.  Said pledge shall be valid and binding as of the
> time it is made without the need for a public or notarized document.  The income or
> revenues thus encumbered, including those subsequently received by COFINA, shall
> be subject to said lien immediately, without the need of physically delivering the
> same or any other act, and said lien shall be valid and binding and shall prevail
> against any third party that has a claim of any kind for damages, breach of contract or
> any other grounds against COFINA, regardless of the fact that said third party has
> not been so notified.

*Id*.

 Because the Commonwealth created COFINA to rescue the Commonwealth from an ongoing

fiscal crisis that foreseeably could persist and worsen, the Legislative Assembly went further and

explicitly covenanted that the Commonwealth would not impair the collection of the SUT and the

rights of COFINA to the DST:

> [T]he Commonwealth shall not: (i) limit nor restrain the rights or powers of the
> corresponding officials of the Commonwealth of Puerto Rico to levy, maintain,
> charge or collect taxes and other income to constitute the amounts to be deposited
> into the [DST Fund] pursuant to the provisions of §§ 11a-16 of this title … or (ii)
> limit or restrain the powers hereby conferred by §§ 11a-16 of this title or the rights of
> COFINA to meet its agreements with bondholders, until such time as such bonds,
> regardless of their date, together with the interest accrued, shall be entirely paid for
> and withdrawn.  No amendment to §§ 11a-16 of this title, shall undermine any
> obligation or commitment of COFINA

56.1 ¶ 22.  This non-impairment covenant was also incorporated into the Bond Resolution.  56.1

¶ 31.  And for good reason—the covenant was and remains significant to investors because, unlike general obligation debt, COFINA bonds are not supported by the Commonwealth's full faith and credit, and are to be repaid solely from the DST.  56.1 ¶ 32.

COFINA's rights to the DST were also affirmed six times by Secretaries of Justice serving three different administrations.  In 2007, for example, Secretary of Justice Roberto J. Sanchez Ramos concluded that "Act No. 91 … was validly enacted by the Commonwealth" and that "the Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is transferred to [COFINA] and said assets and funds of [COFINA] shall not constitute available resources of the Commonwealth …."  56.1 ¶ 34.  In June 2009, Secretary of Justice Antonio M. Sagardia de Jesus similarly concluded that Act 91 is valid, that the "Dedicated Sales Tax Fund, including the right to receive collections of the Dedicated Sales Tax, is validly transferred to [COFINA]," and that the "Dedicated Sales Tax Fund, the funds on deposit therein and the Dedicated Sales Tax do not constitute available resources of the Commonwealth …."  56.1 ¶ 35.

In light of COFINA's ownership of the DST, COFINA bonds received strong, investment-grade ratings even as the Commonwealth's financial condition waned.  56.1 ¶ 41.  In connection with the initial COFINA offerings, Standard & Poor's stated that its rating reflected "a strong legal structure that separates the revenue stream supporting the bonds from the Commonwealth of Puerto Rico along with strong cash flows that, under severe stress assumptions, are still sufficient to make timely payments of interest and principal."  56.1 ¶¶ 42.  It further stated that "[t]he legislative act creating COFINA … *successfully separates* and *provides a priority interest* in the Commonwealth's sales and use taxes for [COFINA] bondholders."  *Id.* (emphasis added).  The views of Moody's were the same:  "We note that the rating on the [COFINA] Bonds is significantly higher than our … rating on the Commonwealth's G.O. bonds, primarily reflecting our assessment of the strength of the

*pledged sales tax security*…." 56.1 ¶ 44 (emphasis added).

As a result, the Legislative Assembly described COFINA bonds as the "most cost-effective financing source." 56.1 ¶ 15. During a 2013 conference call, Interim President of the GDB, José Pagán Beauchamp, championed the benefits of COFINA, stating "COFINA is the best-rated credit among Puerto Rico issuers and has historically been the most attractive and cost-effective source of financing for the Commonwealth." 56.1 ¶ 46. In a 2013 press release, Pagán Beauchamp also stated that "total net savings from issuing COFINA Bonds, compared to other available options, are estimated between $66 million and $132 million for every $1 billion issued in bonds." 56.1 ¶ 47.

## ARGUMENT

Summary judgment is appropriate where, as here, the issues involve pure questions of law. *See F.D.I.C. v. Emerito Estrada-Rivera--Isuzu de Puerto Rico, Inc.*, Civil No. 10-1622CCC, 2012 WL 1123586, at *6 (D.P.R. Mar. 30, 2012). Here, there are no factual issues to be resolved because the dispute involves questions of legislative and constitutional interpretation, namely whether COFINA statutorily owns the DST and the DST Fund and whether the Legislative Assembly validly excluded the sales tax revenues deposited in the DST Fund from the Commonwealth's "available resources" under the Puerto Rico Constitution.[5] On both issues, the COFINA Senior Bondholders' Coalition is entitled to judgment as a matter of law.

---

[5] In its December 21, 2017 scope order, the Court explained that "[c]onstitutional and other issues, such as questions of available resources, the impact of the constitutional debt limit on the validity of securities issued by COFINA, and avoidance of purportedly secured claims against the Commonwealth, that could ripen as among the Commonwealth, COFINA and/or their respective bondholders only after a determination that COFINA is not the owner of the Pledged Sales Taxes, are outside the scope of the Commonwealth-COFINA Dispute as defined by the Stipulation." *Order (A) Confirming Scope of COFINA and Commonwealth Agent's Authority Under Stipulation and Order and (B) Dismissing, Without Prejudice, Certain Claims That Exceed the Scope of the Commonwealth-COFINA Dispute* (Dkt. No. 167) at 5. Consistent with the Court's order, the COFINA Senior Bondholders' Coalition addresses only whether the Legislative Assembly had the authority to determine what is and is not considered an available resource, and does not address whether certain issuances should or should not be made available to the Commonwealth. This interpretation of the scope order is consistent with the fact that this Court did not strike Count 1 of the COFINA Senior Bondholders' Coalition's Answer in Intervention and Counter- and Crossclaims, which requests a declaratory judgment that the statutes creating COFINA are constitutional under the Constitution of Puerto Rico. Dkt. No. 90 ¶ 67.

## I. COFINA OWNS THE DST AND THE DST FUND

From the beginning, COFINA's property interests were created by statute, and the plain terms of the statute gave COFINA ownership of the DST and the DST Fund. None of the arguments made by the Commonwealth Agent or GO Bondholders shows otherwise.

### A. The COFINA Enabling Act Transferred Ownership Of The DST And DST Fund To COFINA

It is well settled that "courts must presume that a legislature says in a statute what it means and means in a statute what it says there." *Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253-54 (1992). If the text of a statute is plain and unambiguous, courts must apply that statute according to its terms. *Hernandez-Miranda v. Empresas Diaz Masso, Inc.*, 651 F.3d 167, 171 (1st Cir. 2011). These principles apply with full force in Puerto Rico. *See In re Hernandez*, 487 B.R. 353, 358 (Bankr. D.P.R. 2013). The Puerto Civil Code requires that if a law is clear and free from ambiguity, "the letter of the [law] shall not be disregarded ...." P.R. LAWS ANN. tit. 31, § 14. The Supreme Court of Puerto Rico has also held that "[w]henever lawmakers have expressed themselves in clear and unequivocal language, the text of the law is the expression par excellence of all legislative intent." *Silva v. Adm. Sistemas de Retiro*, 128 D.P.R. 256, 269 (1991).[6] Under these customary standards of statutory interpretation, the COFINA Enabling Act indisputably transferred ownership of the DST and DST Fund to COFINA as a matter of law.

### 1. COFINA's Ownership Is Set Forth In The Plain Terms Of The COFINA Enabling Act

In enacting the COFINA Enabling Act, the Commonwealth's Legislative Assembly transferred ownership of the DST and DST Fund to COFINA, and granted statutory authority for COFINA to issue bonds secured by the DST. In particular, the Act provides:

---

[6] A certified English translation of this case is attached as Exhibit 36 to the declaration of Susheel Kirpalani ("Kirpalani Decl.") filed concurrently herewith.

> The [DST Fund] and all the funds deposited therein on the effective date of this act
> and *all the future funds that must be deposited in the [DST Fund] pursuant to the
> provisions of this law are hereby transferred to, and shall be the property of
> COFINA. This transfer is made* in exchange for … COFINA's commitment to pay
> … all or part of the extraconstitutional debt outstanding as of June 30, 2006, and the
> accrued interest thereon….

56.1 ¶ 20 (emphasis added). The statutory language is unequivocal: Upon enactment, the statute "hereby transferred" both the DST Fund and all DST revenue collected in the "future" and made them "the property of COFINA." In short, there is no question that this statute creates property rights and transfers ownership of property when it expressly stated that it was transferring the property and making it the property of COFINA.

Contrary to the Commonwealth Agent's and GO Bondholders' suggestion (Commonwealth Agent Second Am. Compl. ¶¶ 2, 68; GO Bondholders Compl. ¶ 60), this was not merely a promise to transfer funds when they are later collected. The statute does not say that the funds will be transferred or that they are promised to be transferred, but rather that they are "hereby transferred." As the Supreme Court has held, when a statute provides that "there be and is hereby granted" a transfer of property, "[t]hose terms import the transfer of a present title, not one to be made in the future." *Deseret Salt Co. v. Tarpey*, 142 U.S. 241, 247 (1891); *see also DDB Techs., L.L.C. v. MLB Advanced Media, L.P.*, 517 F.3d 1284, 1290 (Fed. Cir. 2008) (contractual provision that inventor "agrees and does hereby grant and assign" all rights in future inventions "was not merely an agreement to assign, but an express assignment of rights in future inventions," and patents within the scope of the agreement "would have been automatically assigned … by operation of law with no further act required"). Also, the COFINA Enabling Act states that the transfer "is made," not that it will be made, which shows that the transfer occurs simultaneously with enactment of the statute.

Furthermore, to make COFINA's property rights abundantly clear, the Legislative Assembly also separated COFINA's funds from the Commonwealth's general fund. Act 56 requires the DST

14

to be deposited in the DST Fund and prohibited it from being deposited in the Treasury of Puerto Rico or made available to the Commonwealth:

> The [DST Fund] shall be funded each fiscal year from the [designated] sources, the proceeds of which shall be *directly deposited in the [the DST Fund]* at the time of receipt *and shall not be deposited in the Treasury of Puerto Rico*, *nor shall these constitute resources available to the Commonwealth of Puerto Rico, nor shall these be available for use by the Secretary of the Treasury of the Commonwealth of Puerto Rico.*

56.1 ¶ 20 (emphasis added).  The Statement of Motives to Act 56 further stated that the purpose of the COFINA Enabling Act was to:

> increase the amount of funds that are deposited in the Dedicated Sales Tax Fund pursuant to the provisions of Act 91 so that they be used to pay the extraconstitutional debt, that they be *owned by COFINA* … and that *such funds shall not constitute available resources of the Commonwealth of Puerto Rico for any purpose*….

56.1 ¶ 9 (emphasis added).  In short, because the funds are *owned* by COFINA, *not* placed in the Commonwealth's treasury, and *not* available resources of the Commonwealth, the funds plainly are the property of COFINA.  And because the DST is "directly deposited" with COFINA as it is received, the COFINA Enabling Act cannot have promised to transfer the funds at a future time because the Commonwealth has nothing to transfer.

Indeed, if the funds were Commonwealth property, then the Legislative Assembly's requirement that the Commonwealth not treat the funds as "available resources" would be nonsensical.  Under the GO Bondholders' and the Commonwealth Agent's interpretation, since ownership was not transferred to COFINA, the result seemingly would be that the Commonwealth retained ownership.  But the Commonwealth's purported ownership of the DST would be irreconcilable with its also having statutorily made that tax revenue unavailable to the Commonwealth.[7]  Reading the Act as *not* having transferred ownership to COFINA would thus lead

---

[7]  It would also be unconstitutional because the Puerto Rico Constitution requires the use of available

to the "absurd" result of *no one* owning the DST. The only sensible way to reconcile and harmonize these provisions is to interpret the Act's having made the DST the "property of COFINA" as meaning just that—that COFINA owns the tax revenue.

Finally, the plain meaning interpretation of Act 56 is further supported by the fact that the Legislative Assembly knew how to preserve the Commonwealth's ownership of tax revenue when (unlike here) it intended to do so. In allocating (but not transferring ownership of) tax revenue to the Puerto Rico Highways & Transportation Authority ("HTA"), for example, the Legislative Assembly expressly made that tax revenue subject to claw back and available for Commonwealth use. 56.1 ¶ 49 ("[I]f needed, [taxes allocated to the HTA] are subject to being applied first to the payment of debt service on the public debt of the Commonwealth."). It also made certain hotel occupancy taxes pledged to the Puerto Rico Convention Center District subject to claw back. 56.1 ¶ 51. In stark contrast, the DST does not "constitute resources available to the Commonwealth," cannot be clawed back, and cannot be used by the Secretary of the Treasury. 56.1 ¶ 20.

2.  Reading The COFINA Enabling Act As Transferring Ownership To COFINA Is The Only Way To Harmonize All Provisions Of The Statute

Even if the provision of the COFINA Enabling Act discussed above was not already clear on its face as having transferred ownership of the DST and DST Fund to COFINA at its inception, such

---

resources to pay Commonwealth general obligation debt. *See infra*, § II.A. The correct interpretation of the statute and the Constitution creates no such conflict because the Constitution treats only funds of the Commonwealth, in the Treasury, as available resources. *See infra*, § II.A.4. Simply put, the GO Bondholders' interpretation—giving the Commonwealth ownership but making the funds unavailable to the Commonwealth—would mean that the Legislative Assembly passed an obviously and facially unconstitutional statute. There is no reason to interpret the statute (contrary to its plain terms) in such a self-defeating manner. *See, e.g.*, *Peaje Invs. LLC v. Garcia-Padilla*, 845 F.3d 505, 511 (1st Cir. 2017) ("[W]hen confronted with a statute of questionable constitutional validity, we must first ascertain whether a construction is fairly possible by which the [constitutional] question may be avoided. If so, we adopt that construction.") (quotation marks, citations, and ellipses omitted); *Sanchez v. Srio. de Justicia*, 157 D.P.R. 360 (2002) ("When the validity of an act of the Congress is drawn in question, and even if a serious doubt of constitutionality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.") (quoting *Ashwander v. Tenn. Valley Auth.*, 297 U.S. 288, 348 n.7 (1936) (Brandeis, J., concurring)) (using as translation the language from *Ashwander*) (certified English translation at Kirpalani Decl. Ex. 37).

16

an interpretation is required because a contrary interpretation would be inconsistent with another provision of the statute. *See Star Athletica, L.L.C. v. Varsity Brands, Inc*., 137 S. Ct. 1002, 1010 (2017) ("We thus 'look to the provisions of the whole law' to determine [the statutory provision's] meaning."). "[C]ourts must strive to harmonize all the provisions of a statute to give them all force and effect." *United States v. Roberson*, 459 F.3d 39, 55 (1st Cir. 2006) (internal citation omitted).

In particular, COFINA's ownership is further demonstrated by the Commonwealth's statutory covenant that it would not impair the collection of the SUT or the rights of COFINA to the DST. Specifically, the Commonwealth covenanted that it:

> shall not: (i) limit nor restrain the rights or powers of … the Commonwealth … to levy, maintain, charge or collect taxes … to be deposited into the [DST Fund] … or (ii) limit or restrain the powers hereby conferred … or the rights of COFINA to meet its agreements with bondholders, until such time as [the] bonds … shall be entirely paid for and withdrawn.

56.1 ¶ 22. The Commonwealth also covenanted that "[n]o amendment … shall undermine any obligation or commitment of COFINA." *Id*. COFINA's Bond Resolution is to the same effect and permits the Commonwealth to either limit the SUT (and the DST) or provide a substitute only if projected revenues from the tax (or its substitute) "meet or exceed the debt service and other charges" associated with the COFINA bonds. 56.1 ¶ 31. This limitation on the Commonwealth's ability to restrict or substitute the DST if COFINA's obligations would be inadequately serviced further establishes that COFINA has a property right to the DST that the Commonwealth bound itself to respect.

## B. The COFINA Enabling Act's Grant Of Property Rights To COFINA Is Dispositive

The fundamental error in the Commonwealth Agent's and GO Bondholders' arguments that COFINA does not own the DST is that they disregard the actual terms of the COFINA Enabling Act, which transfers ownership of that tax revenue to COFINA. Indeed, the GO Bondholders concede

17

that "the Commonwealth stated in legislation that COFINA's portion of SUT revenue *is property of COFINA*." GO Bondholders Compl. ¶ 45 (emphasis in original). The Commonwealth Agent likewise concedes that "*the statute speaks in terms of a present transfer.*" Commonwealth Agent Second Am. Compl. ¶ 43 (emphasis in original).[8] The GO Bondholders argue nonetheless that this Court should ignore "legislative labels" (GO Bondholders Compl. ¶ 46), and the Commonwealth Agent similarly argues that common law "maxim[s]" should take precedence over the plain language of the statute (Commonwealth Agent Second Am. Compl. ¶ 45).

However, a statute must be enforced as written unless it is unconstitutional, and the Commonwealth Agent and GO Bondholders identify no constitutional basis for putting their extraordinarily narrow definition of property rights ahead of the Legislative Assembly's determination that the funds at issue are, in fact, COFINA's property. There is no legal basis for the idea that courts can disregard an express, statutory grant of property rights in favor of general, common law ideas of what property interests supposedly should entail. COFINA is a state-created public corporation; it along with its ownership rights and the DST were all created by public legislation. The language of that legislation, the COFINA Enabling Act, is thus the first and last step of the analysis in determining ownership. *See Conn. Nat'l Bank*, 503 U.S. at 254 ("When the words of a statute are unambiguous, then, this first canon [of statutory interpretation] is also the last: judicial inquiry is complete.") (internal citation and quotation marks omitted).

It is a bedrock principle that "[p]roperty interests are created and defined by state law." *Butner v. United States*, 440 U.S. 48, 55 (1979). In particular, state law creates the "rules or mutually explicit understandings" giving rise to a property interest. *Perry v. Sindermann*, 408 U.S.

---

[8]  The Commonwealth Agent purports to find "ambiguity" only because the transfer concerns "future funds" that supposedly are impossible to transfer, but this supposed impossibility does not create ambiguity because the statute itself is clear in effecting a present transfer. The impossibility idea is also erroneous for the reasons discussed *infra* at § I.B.1.

593, 601 & 604 n.7 (1972).  Where, as here, a statute creates a property interest, the scope of that property interest is "defined by [the] statutory terms."  *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 578 (1972).  For instance, the Supreme Court has recognized a property interest in disability benefit payments, *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976), and in continued employment, *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538 (1985).

Since the terms of a statute are what matter in defining the scope of a statutory property right, concepts that might apply in private transactions, such as those relied on by the Commonwealth Agent and GO Bondholders, are irrelevant.  "A regulation or rule promulgated by … statute," for example, "may create a property interest without regard to the traditional requirements of contract formation."  *Hohmeier v. Leyden Cmty. High Schs. Dist. 212*, 954 F.2d 461, 464 (7th Cir. 1992). Ultimately, the terms of the statute control.  The Commonwealth Agent's and GO Bondholders' claims conflict with this fundamental principle and fail for the reasons below.

### 1. It Was Not "Impossible" To Transfer Future Sales Tax Revenue

The Commonwealth Agent contends that COFINA does not own future sales tax revenues because it was "impossible" for the Legislative Assembly to create an ownership interest in funds that would be generated in the future.  Commonwealth Agent Second Am. Compl. ¶ 45. This contention that there can "never" be a transfer of a "present ownership of future revenues" has no basis in law, logic, or practice.  As an initial matter, the supposed impossibility ignores the fact that state law defines property rights.  If the Legislative Assembly creates a property right, then it is possible and, indeed, established that there is such a right.

Moreover, the Commonwealth Agent's reliance on common law ignores that Puerto Rico is a civil law jurisdiction, and as such, controversies should be decided by the Civil Code.  *See Ortiz v. Levitt & Sons*, 101 D.P.R. 290, 1 P.R. Offic. Trans. 407, 415 (1973) (holding that when the Civil Code provides the grounds to address a controversy, courts in Puerto Rico "need not cross our

frontiers—the Sea of the Antilles—looking for precedents"); *see also Marrero-García v. Irizarry*, 33

F.3d 117, 122 (1st Cir. 1994) ("Because Puerto Rico is a civil law jurisdiction we also look to its

substantive law to determine whether a different outcome is forthcoming.").  Here, the Civil Code

states:  "Ownership and other property rights are acquired and transmitted *by law*, by gift, by testate

or intestate succession, and, in consequence of certain contracts, by tradition."  P.R. LAWS ANN. tit.

31, § 1931 (emphasis added).[9]

Even if common law were relevant here, it shows that such a transfer is eminently possible

because present transfers of property rights in future income streams have been legally recognized

for centuries.  Medieval English law, for example, recognized that the right to future income streams

from rent payments could be separated from the land and granted to another.  According to Pollock

and Maitland's *The History of English Law*, it was not uncommon for a lord to grant the right to

future rent payments on land the lord owned (known as a "non-tenurial rent").  *See* 2 Sir Frederick

Pollock & Frederic W. Maitland, *The History of English Law*, 130-31 (2d ed. 1959).  Once

transferred, the right to future rent payments was considered a "thing" separate and apart from the

land, and the transferee of the right to rent payments had an independent right to seek remedies

against a delinquent tenant, including—in some instances—the right to enter the land and seize upon

chattels owned by the tenant.  *See id.*; *see also* 3 Sir William Holdsworth, *A History of English Law*,

---

[9]  In addition, the *tratadistas*—"an essential tool for interpretation of the law" under the civil law system, *In re San Juan Dupont Plaza Hotel Fire Litig.*, 687 F. Supp. 716, 726 (D.P.R. 1988); *see also V. Suarez & Co. v. Dow Brands, Inc.*, 337 F.3d 1, 8 (1st Cir. 2003), provide consistent analysis showing that, by the term "are acquired and transmitted by the Law," "what is meant is that said acquisition or transmission occurs because certain events take place, different from those particularly and specifically enumerated in the article, to which the Law attributes the automatic production of the acquisition or transmission of whatever right." 2 Ana Cañizares Laso et al., *Código Civil Comentado* 27 (2011); *see also* 1 José Puig Brutau, *Fundamentos de Derecho Civil* 278 (3d ed. 1989); 3 Xavier O'Callaghan, *Curso de Derecho Civil* 90 (4th ed. 2002); 8 Manuel Albaladejo & A. Fernando Pantaleon Prieto, *Comentarios al Código Civil y Compilaciones Forales* 3 (1987); Federico Puig Peña, *Compendio de Derecho Civil Español* 153 n.8 (3d ed. 1976) (certified English translations of relevant excerpts complied at Kirpalani Decl. Ex. 35).

151 (5th ed. 1942) ("[Rent] was treated as a thing—a tenement—just like the land.").[10]

More recently, "[t]here are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor." *Speelman v. Pascal*, 178 N.E.2d 723, 725 (N.Y. 1961). In *Speelman*, for example, a theatrical producer who held rights to George Bernard Shaw's "Pygmalion" made a gift to the plaintiff of his "shares of profits of the Pygmalion Musical stage version [including] five per cent (5%) in England, and two per cent (2%) of [his] shares of profits in the United States [as well as] … [f]rom the film version, five per cent (5%) from [his] profit shares all over the world." *Id.* at 724. It was undisputed that "at the time of the delivery of the letter there was no musical stage or film play in existence." *Id.* at 725. The New York Court of Appeals held that the gift "operated to transfer to plaintiff an enforcible [*sic*] right to the described percentages of the royalties." *Id.* The court reasoned that while "[i]t is true that at the time of the delivery of the letter there was no musical stage or film play in existence," the producer "who owned and was conducting negotiations to realize on the stage and film rights, could grant to another a share of the moneys to accrue from the use of those rights by others. There are many instances of courts enforcing assignments of rights to sums which were expected thereafter to become due to the assignor." *Id.* Thus, the gift "constitute[d] a valid, complete, present gift to plaintiff by way of assignment of a share in future royalties when and if collected from the exhibition of the musical stage version and film version of 'Pygmalion.'" *Id.* at 724.

The Federal Circuit similarly has recognized that rights in future inventions can be assigned by way of an "automatic assignment," pursuant to which "no further act [is] required once an

---

[10] Indeed, the transferability of the right to receive future rent payments was recognized by English law prior to 1274, and continued at least through 1766. *See* Pollock & Maitland, *supra*, 130-31 (recognizing the existence of transferable non-tenurial rent payments prior to the reign of Edward I); Lyttleton, *Treatises of Tenures*, 242, 252-75 (1841) (originally written during the reign of Edward IV (1461-83) and recognizing the same); 2 William Blackstone, *Commentaries on the Laws of England: Of the Rights of Things*, 42 (1766) (similar).

invention [comes] into being," and "the transfer of title [occurs] by operation of law." *DDB Technologies*, 517 F.3d at 1290 (quoting *Filmtec Corp. v. Allied-Signal Inc.*, 939 F.2d 1568 (Fed. Cir. 1991)). In so doing, the Federal Circuit expressly distinguished between where "an assignment of patent rights in an agreement … is automatic, requiring no further act on the part of the assignee," as opposed to "merely a promise to assign" such rights in the future. *Id.*; *see also Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1253 (Fed. Cir. 2000) (rejecting argument that contract was "merely a 'promise to assign a future invention'" when it provided that such "inventions 'shall belong' to [the plaintiff], and that [the inventor] 'hereby conveys, transfers and assigns' the inventions").

Similarly, numerous state laws recognize that "[a] future right or expectancy can be assigned." *In re Trejo*, 44 B.R. 539, 541 (Bankr. E.D. Cal. 1984) (applying California law); *see also In re Town Ctr. Flats, LLC*, 855 F.3d 721, 726 (6th Cir. 2017) (applying Michigan law to hold that the debtor's assignment of future rents "transfer[red] ownership in the assigned rents to [its mortgage lender] before the bankruptcy petition was filed"); *In re Martin*, 117 B.R. 243, 249 (Bankr. N.D. Tex. 1990) (applying Texas law to hold "[a]s between the parties, it is not essential that the fund assigned shall have been earned or be in existence at the time of the assignment, and it is sufficient that it has a potential existence, that there is a reasonable expectancy that the fund will be earned and come into existence"); *In re C.W. Mining Co.*, 530 B.R. 878, 886 (Bankr. D. Utah 2015) (applying Utah's version of the Uniform Commercial Code to hold that when a debtor sold its accounts receivable prepetition, it also sold its right to receive payments).[11] There is nothing in Puerto Rico

---

[11] Courts further have recognized in the bankruptcy context that a prepetition assignment of future rights by a debtor is valid and enforceable, even vis-à-vis the bankruptcy estate. *See, e.g.*, *Town Ctr. Flats, LLC*, 855 F.3d at 728 (holding that "the assigned rents in this case are not properly included in the [debtor's] estate"); *Freeman v. Ritner (In re Freeman)*, 489 F.2d 431, 434 (9th Cir. 1973) ("[A] future right can be assigned. It becomes operative at the time the right assigned comes into existence or becomes recoverable, without any further act on the part of the transferor, and relates back to the date of the assignment."); *In re Napoleon*, 551 B.R. 200, 205-06 (Bankr. E.D.N.C. 2016) (holding that bankruptcy did not affect validity of debtors' assignment of their rights to future insurance proceeds even though the proceeds were not collected until after

law showing any intent to depart from this well-established law.  In short, COFINA is hardly unique in effecting a transfer of future funds, and there is no legal principle that prevents such a transfer.

### 2. The Commonwealth's Supposed Ability To Repeal Or Reduce The SUT Does Not Negate The Express Grant Of The Property To COFINA

Despite the clear language of the Commonwealth's covenant not to impair COFINA's rights to the DST, the Commonwealth Agent and GO Bondholders assert that the covenant is too tenuous to create property rights.  According to them, "the SUT can be repealed or reduced at any time." Commonwealth Agent Second Am. Compl. ¶ 53.  But even if this argument were correct, the COFINA Enabling Act is again controlling.  Since the statute expressly gave property rights and ownership to COFINA, the property rights exist unless or until they are lawfully taken away.  *See Cleveland Bd. of Educ.*, 470 U.S. at 541 (1985) ("'Property' cannot be defined by the procedures provided for its deprivation ....").

In any event, the Commonwealth's supposed unfettered ability to take away COFINA's funds is illusory.  Contrary to the Commonwealth Agent's assertion, the COFINA Enabling Act does not permit the Commonwealth to repeal or reduce the SUT (or the DST) "at any time."  In fact, as discussed *supra*, § I.A.2, the statute says exactly the opposite: it *prohibits* the Commonwealth from restricting the collection of the funds to be deposited in the DST Fund.  And while the rate of the SUT can be varied, the Commonwealth's covenant forbids it from restraining "the rights of COFINA to meet its agreements with bondholders" or "undermin[ing] any obligation or commitment of COFINA."  56.1 ¶ 22.  This prohibition can hardly be squared with the Commonwealth Agent's

---

the debtors had filed for bankruptcy); *In re Berghman*, 235 B.R. 683, 691 (Bankr. M.D. Fla. 1999) (holding that debtor's prepetition sale of right to receive future payments under an annuity contract resulted in those payments not being property of the bankruptcy estate); *In re Freeman*, 235 B.R. 121, 125 (Bankr. M.D. Fla. 1999) (same); *In re Granati*, 307 B.R. 827, 833 (E.D. Va. 2002), *aff'd*, 63 F. App'x 741 (4th Cir. 2003) (same, holding that prepetition assignment of future annuity payments was an equitable assignment that gave the assignee ownership of those funds, and "not a claim to the payments that is dischargeable under [Bankruptcy Code] section 727").

assertion that the Commonwealth can take away the specific revenue stream backing COFINA's debt obligations entirely at any time and without any substitute. Indeed, it cannot, and, as the Bond Resolution provides, the Commonwealth cannot restrict the DST unless there are sufficient funds or equivalents to service COFINA's obligations to bondholders. 56.1 ¶ 31. The requirement of sufficient funds or an adequate substitute for full payment to COFINA bondholders ensures compliance with—because it is coextensive with—the Takings Clause of the U.S. Constitution.

The Commonwealth Agent and GO Bondholders also err in arguing that the Legislative Assembly must be able to repeal the SUT at any time because otherwise the Legislative Assembly would be unconstitutionally "surrender[ing]" its power to impose taxes. Commonwealth Agent Second Am. Compl. ¶ 68; GO Bondholders Compl. ¶ 49. The requirement in Article VI, Section 2 of the Puerto Rico Constitution that the taxing power "shall never be surrendered or suspended" does not restrict the Legislative Assembly's ability to designate a specific revenue for a specific purpose. *See, e.g.*, *Liter v. City of Baton Rouge*, 258 La. 175, 186, 194-96 (1971) (holding that municipal bonds backed by sales tax revenues did not violate state constitutional provision stating that "[t]he power of taxation shall be vested in the Legislature [and] shall never be surrendered, suspended or contracted away"); *Switzer v. City of Phoenix*, 86 Ariz. 121, 127-28 (1959) (holding that earmarking motor vehicle taxes for the life of certain bonds did not violate the state constitutional "prohibition against the surrender or relinquishment of the right to impose a tax" because "the legislature is not contracting away the right to impose a tax," but rather "[t]he legislature has imposed a tax and has simply applied the proceeds of the tax to a particular purpose"); *Ziegler v. Witherspoon*, 331 Mich. 337, 354-55 (1951) (rejecting a claim that the issuance of highway bonds backed by three municipalities' shares of state highway tax violated the "never be surrendered or suspended" provision of the state constitution). Rather, the "surrender" provision means that other branches of

24

government must abstain from interfering with the legislative branch's decision absent some other constitutional basis for doing so.  *R.C.A. v. Gobierno de la Capital*, 91 D.P.R. 416, 440 (1964) (certified English translation at Kirpalani Decl. Ex. 40); *see also infra*, § II.A.1.

Here, the Legislative Assembly has already exercised its taxing power by imposing and transferring the DST to COFINA.  Honoring that transfer would be abiding with legislative action, not surrendering the taxing power.  The New York Court of Appeals recognized this point in upholding "the diversion of [New York City's] interest in the state sales tax to [a municipal corporation] in order to pay … debt."  *Local Gov't Assistance Corp. v. Sales Tax Asset Receivable Corp.*, 2 N.Y.3d 524, 541-42 (2004).  The court rejected the supposed "concern about inhibiting future local administrations from determining the use of its revenues," holding that "there is no interference in the appropriation power of future local administrations" because (as here) there was already "a one-time assignment of a property right" and "a city council cannot appropriate revenue that it does not own."  *Id.*  Indeed, the Supreme Court "has regularly held that the States are bound by their debt contracts" even if the "taxing power may have to be exercised if debts are to be repaid."  *U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 24 (1977).  As a result, "where a municipal corporation is authorized to contract, and to exercise the power of local taxation to meet its contractual engagements, this power must continue until the contracts are satisfied."  *Louisiana ex rel. Hubert v. New Orleans*, 215 U.S. 170, 175 (1909).  This very principle was appropriately embodied in the COFINA Enabling Act and further demonstrates that COFINA owns the DST, including all DST revenue collected in the future.[12]

---

[12]  Even if the COFINA Enabling Act could be repealed, there would still remain a question as to whether it could be repealed in compliance with the Commonwealth and U.S. Constitutions, which prohibit Puerto Rico from both impairing its non-impairment covenant under the Contracts Clause, and taking property without just compensation.  These constitutional questions are expressly reserved and beyond the scope of this dispute.  See Dkt. 167 (Dec. 21, 2017).

3. <u>COFINA Does Not Have To Collect The DST To Own It</u>

The Commonwealth Agent and GO Bondholders err in relying on the nature of the collection of the DST to suggest Commonwealth ownership. The GO Bondholders assert that COFINA does not own the DST because the Commonwealth "collect[s] every dime of SUT revenue." GO Bondholder Compl. ¶ 51; *see also* Commonwealth Agent Second Am. Compl. ¶¶ 14, 17, 67. However, nothing about the collection suggests Commonwealth ownership, let alone refutes the unequivocal transfer of ownership to COFINA in the COFINA Enabling Act.

Puerto Rico law provides that the DST "shall become funds of the Government at the time they are collected" by the merchant. P.R. Laws Ann. tit. 13, § 32025(c). It is at that moment that money becomes the property of the Government, rather than that of the merchant, who collected, or its customer, who parted with, the funds. Crucially, the "Government" is defined broadly, and not simply as the Commonwealth, so as to include "public corporations, public instrumentalities, and municipalities of the Government," such as COFINA. P.R. Laws Ann. tit. 13, § 32001(p). And while the collection provision does not expressly state the part of Government to which it refers, this provision must be read in concert with the COFINA Enabling Act, which (for the reasons stated above) establishes COFINA ownership at the point of sale.

In any event, the precise identity of the entity that engages in collection does not decide the question of ownership. The First Circuit addressed similar facts in *Asociacion De Subscripcion Conjunta Del Seguro De Responsabilidad Obligatorio v. Flores Galarza*, 484 F.3d 1 (1st Cir. 2007). There, the Secretary of the Treasury of the Commonwealth asserted that the Compulsory Liability Joint Underwriting Association of Puerto Rico did not own certain insurance premiums that were to be collected by the Secretary and transferred to the Association by law. The Secretary claimed that Puerto Rico Law only provided that the Association "shall receive" the premiums from the Secretary and that the Secretary "shall transfer" them to the Association. *Id.* at 29. According to the

Secretary, this meant that the premiums did not belong to the Association until he actually transferred them. The First Circuit rejected this argument, reasoning that, "[w]hile the Secretary collects the insurance premiums and holds them for some unspecified amount of time before relinquishing them to the [Association], the Secretary … is merely the custodian of these funds." *Id*. The First Circuit went on to conclude that, "[a]s a custodian, the Secretary has no entitlement to the premiums, and his woefully undeveloped argument that the premiums do not vest in the [Association] until [he] transfers them does not convince us otherwise." *Id.* So too here, the GO Bondholders' argument erroneously conflates collection with ownership.

## II. THE COMMONWEALTH'S TRANSFER OF THE DST TO COFINA WAS VALID UNDER THE PUERTO RICO CONSTITUTION

The Commonwealth's transfer of the DST to COFINA did not violate the Constitution's grant of limited priority to general obligation debt. *Infra*, § II.A. Nor did it violate the constitutional limits on the amount and term of full faith and credit debt (*infra*, § II.B), or the Constitution's "balanced budget" requirement (*infra*, § II.C).

### A. The DST Is Not An "Available Resource" Subject To The Constitutional Debt Priority

Article VI of the Puerto Rico Constitution gives the Commonwealth's general obligation debt, including the GO Bonds, a priority interest in the Commonwealth's "available resources":

> In case the available revenues [*recursos disponibles*] including surplus for any fiscal year are insufficient to meet the appropriations made for that year, interest on the public debt and amortization thereof shall first be paid, and other disbursements shall thereafter be made in accordance with the order of priorities established by law.

P.R. Const. art. VI, § 8. The official translation of the term *recursos disponibles* is "available *revenues*," but the more widely accepted translation is "available *resources*." While the terminology of "available resources" is used below, the arguments apply equally (if not more strongly) to the terminology of "available revenues," since revenue is a narrower category than resources.

27

"Available resources" is a term of limitation, referring solely to those resources "covered" into the Commonwealth's general treasury. *Infra*, § II.A.4. The Commonwealth Agent and GO Bondholders fail to identify any constitutional principle that prevents the Legislative Assembly from designating certain resources as "available" to the Commonwealth and certain resources as not available to the Commonwealth. Here, the Legislative Assembly clearly determined that "available resources" do not include the DST. Rather, general obligation debt and COFINA debt always had separate sources of funding. COFINA bonds, which are not debt of the Commonwealth or supported by the Commonwealth's full faith, credit, and taxing power, have the DST; general obligations, which are debt of the Commonwealth and are supported by the Commonwealth's full faith, credit, and taxing power, have the "available resources." Though this structure was unchallenged in the first nine years of COFINA's existence, GO Bondholders, and more recently the Commonwealth Agent, have sought to augment their sources of funding in the wake of Puerto Rico's current crisis, and assert that, under the Puerto Rico Constitution, the DST is an "available resource" that must be used to pay general obligations. This argument fails as a matter of law.

1.      <u>The Legislative Assembly Is Entitled To Great Deference In Its Determination That The COFINA Funds Are Not Available Resources</u>

As discussed above, the COFINA Enabling Act states that the COFINA funds are *not* available resources. The Commonwealth Agent's and GO Bondholders' arguments therefore rest on the idea that this Court should reject the Legislative Assembly's determination of what tax funds are "available resources" of the Commonwealth. But the Puerto Rico Constitution, as interpreted by the Puerto Rico Supreme Court, places that decision within the Legislative Assembly's broad discretion.

The Legislative Assembly's creation of COFINA and transfer to COFINA of the DST and DST Fund was the quintessential exercise of taxing power. "[E]very statute is, and is presumed to be constitutional," because "deference [is] due to the Legislative Power in the exercise of its

28

constitutional mandate, in accordance with the roles assigned to each branch of government under the separation of powers scheme prescribed in the Constitution." *Commonwealth v. Nw. Selecta, Inv.*, No. CC 2009 1091, 2012 WL 1109131 (P.R. Mar. 27, 2012). The Puerto Rico Constitution entrusts the taxing power to the Legislative Assembly, the democratically elected branch with "peculiar" knowledge in this area, *P.R. Tel. Co. v. Sec. of Treasury*, 81 D.P.R. 982, 996 (1960) (certified English translation at Kirpalani Decl. Ex. 38), and the intent of the Constitution's drafters was to make this power very broad. *See* J Trías Monge, *Constitutional History of Puerto Rico*, San Juan, Ed. U.P.R. 1982, Vol. III, p. 216. The Legislative Assembly's taxing power thus encompasses the prerogative to create a tax and decide how its revenue will be used, provided that it is for a "public purpose." *P.R. Tel. Co.*, 81 D.P.R. at 993.[13]

Moreover, the mandate in the Puerto Rico Constitution that this taxing power "shall never be surrendered or suspended" was addressed at "not limiting the powers of the Legislative Assembly to impose and collect taxes."[14] The prohibition thus cemented the broad discretion of the Legislative Assembly on the issue of taxation. Employing that broad discretion, the Legislative Assembly imposed the sales and use tax and enacted the COFINA Enabling Act.

The Constitution also creates broad authority to issue debt. The Constitution states: "The power of the Commonwealth of Puerto Rico to contract and to authorize the contracting of debts shall be exercised as determined by the Legislative Assembly, but no direct obligations of the Commonwealth for money borrowed directly by the Commonwealth evidenced by bonds or notes

---

[13]  More generally, courts must defer to the judgment of the Legislative Assembly in cases dealing with socio-economic legislation as long as there is a rational relationship between the legislation and the legitimate government interest. *Rexach v. Ramirez Velez*, 162 D.P.R. 130, 148-49 (2004) (certified English translation at Kirpalani Decl. Ex. 39). The scope and deference granted to the Legislative Assembly in the exercise of this prerogative is exemplified in *P.R. Tel. Co.*, where the Supreme Court of Puerto Rico declined to second-guess the Legislative Assembly's determination that a tax scheme had a "public purpose" and cautioned against judicial interference with that prerogative except in extreme cases where there is no reasonably conceivable public purpose. 81 D.P.R. at 996.

[14]  Constitutional Assembly Diaries at 2575-76 (certified English translation at Kirpalani Decl. Ex. 43).

for the payment of which the full faith, credit and taxing power of the Commonwealth shall be pledged shall be issued by the Commonwealth if" the debt limits are exceeded. P.R. Const. art. VI, § 2. This provision makes clear in its language of "determined by the Legislative Assembly" that the power to issue debts is broad and discretionary. It also makes clear, with the terms "direct obligations" and "borrowed directly," that there can be *indirect* obligations that are not protected by full faith and credit, but rather are paid from a separate source. It would have been easy to impose a limitation on all debt issued by the Commonwealth or its instrumentalities. But this careful drafting makes clear that was not the intention. The Legislative Assembly is thus empowered to issue debt that is not supported by the Commonwealth's full faith and credit, and instead to designate a specific source of revenues for the repayment of that debt.[15]

The deference that must be afforded to the Legislative Assembly here is further bolstered by the fact that the constitutionality of the COFINA structure has been affirmed six times by three Commonwealth Secretaries of Justice for administrations controlled by both major political parties. 56.1 ¶¶ 33-39. While not binding, these opinions are entitled to great persuasive weight. *See San Geronimo Caribe Project, Inc. v. Administracion de Reglamentos y Permisos*, 174 D.P.R. 640, 671 (2008) (certified English translation at Kirpalani Decl. Ex. 41).[16]

---

[15] The debt limit provision of Article VI, Section 2, is instructive. Before the 1961 amendment establishing the current formula for calculating the debt limit, the debt limit was based on property value, which was "not necessarily under the control of the Legislature." Legislative Diary, Vol. XIV No. 27, 1961 at 221 (certified English translation attached at Kirpalani Decl. Ex 42). The purpose of changing to the current, and "more flexible," formula (which is determined by reference to "available resources") was so that the Legislative Assembly "would have a more absolute control over the debt margin." *Id.* Since the purpose was to give "absolute control" to the Legislative Assembly, including the power to determine which revenues are included in the calculation of the debt margin, this control must necessarily include the ability to determine what revenues are deposited into the Puerto Rico Treasury and thus "available."

[16] Structures similar to COFINA are a common form of municipal financing. New York's highest court, for example, upheld New York's Municipal Assistance Corporation against a challenge by holders of New York City GO bonds, who argued that the "diversion" of sales taxes from the City's general fund to the MAC impaired their contract rights under the Constitution. *See Quirk v. Mun. Assistance Corp.*, 41 N.Y.2d 644, 646 (1977) ("There is no requirement, either in the State Constitution or in any undertaking in the city bonds, that the diverted taxes be continued directly payable to the city.").

2. **The Commonwealth Received Available Resources In Payment For The COFINA Bonds, And There Is No Constitutional Basis For Also Treating As Available Resources The Property Transferred In Return**

The Commonwealth Agent and GO Bondholders request that the sales tax revenues the Commonwealth transferred to COFINA be *made* available. But they overstate (and misread) the text on which they rely. The Puerto Rico Constitution says nothing about requiring property belonging to others be *made* available to the Commonwealth to pay its general obligations.

A contrary interpretation would mean that "available resources" covers not only all of the Commonwealth's property actually available, but also all of the property that the Commonwealth has transferred in return for money it has now spent. This interpretation would effectively render all property rights and contract rights of those dealing with the Commonwealth meaningless. And there is nothing in the Puerto Rico Constitution to suggest such an extreme interpretation of availability.[17]

Indeed, the Commonwealth Agent's entire argument is based on the false premise that "the dedication of SUT revenues to COFINA reduced the revenues that would otherwise be available to the Commonwealth to pay its creditors." Commonwealth Agent Second Am. Compl. ¶ 144. That allegation inexplicably ignores that the SUT did not exist prior to the Legislative Assembly in the original Act 91 transferring the DST to COFINA, and thus there was no preexisting SUT that was an available resource before the transfer. It also ignores the revenue received from COFINA bondholders in purchasing the bonds. If the Commonwealth had not transferred future SUT revenues to COFINA, then it would not have received $16 billion in COFINA bond proceeds in the first place—funds that the Commonwealth *did* treat as an available resource and spent as determined by the appropriate branches of government. To the extent that the Commonwealth Agent and GO Bondholders wish this $16 billion had been saved so as to remain available for a future need, that

---

[17] This extreme interpretation would raise serious constitutional questions regarding violations of the Takings and Contracts Clauses, and any interpretation of the Puerto Rico Constitution that would require the Commonwealth to violate the U.S. Constitution should be avoided. *See supra*, at 25 n.12.

does not mean the Commonwealth evaded the "available resources" provision—let alone exceeded its broad discretion—by making the resources available sooner rather than later.

> 3.   The Legislative Assembly's Decision To Treat Funds Outside The Treasury As Unavailable Is Reasonable And Constitutional

The Legislative Assembly acted well within its discretion in directing the COFINA tax revenue stream outside the Puerto Rico Treasury and recognizing the funds as not constituting "available resources."  As a simple, factual matter, if the money is not in the Puerto Rico Treasury, then it is not actually available to the Commonwealth.  Here, as discussed above, the sales tax revenues at issue and their ownership were *already* transferred to COFINA.  The DST is never deposited in the Treasury but is instead directly deposited into a separate account at Banco Popular, along with other collected SUT.  56.1 ¶ 29.  This account is a jointly held COFINA-GDB account, and is not owned or held in the name of the Commonwealth.  *Id.*  The DST is then transferred out of this joint account and into a different COFINA-owned account at Banco Popular before being ultimately transferred to The Bank of New York Mellon, the trustee for the COFINA bonds, which retains the DST, holding it in trust for the COFINA bondholders until a minimum amount of funds is collected sufficient to pay debt service on the COFINA bonds.  56.1 ¶¶ 29-30.  Once that occurs and *only then will the excess funds* in the DST Fund be transferred to the Treasury instead of The Bank of New York Mellon.  Not a single cent of the DST is ever deposited into any Commonwealth-controlled account unless and until there are sufficient funds to pay COFINA's debt service for that fiscal year.  Thus, by design and in practice, the DST is not an "available resource."

Furthermore, to the extent the Commonwealth Agent and GO Bondholders challenge the Legislative Assembly's ability to create a revenue stream and keep it out of the Treasury, that challenge is baseless.  There is *nothing* in the Puerto Rico Constitution that prevents the Legislative Assembly from doing so, and the courts cannot invent any such constraint on the Legislative

Assembly's broad authority over taxation and issuance of debt. Indeed, the Supreme Court of Puerto Rico has held that the Legislative Assembly can designate a tax to a specific purpose *instead of ordering its payment into government funds*, so long as there is a "public purpose which could reasonably be conceived." *P.R. Tel. Co.*, 81 D.P.R. at 997. The Commonwealth Agent argues that, unless the COFINA funds are treated as an available resource, "there is no principled limit on the Commonwealth's ability to undermine the Constitutional Debt Priority." Commonwealth Agent Second Am. Compl. ¶ 145 (emphasis omitted). But the 1961 limit of full faith and credit debt co-exists with the legislative authority (duly exercised here) to impose taxes, determine its use, and issue debt. The debt cap operates as a limit on the issuance of full faith and credit debt, not on the authority to impose taxes and determine their use or to issue other debt for public purposes. Thus, there is a limit and it is necessarily deferential to the Legislative Assembly, requiring only a legitimate public purpose and a rational relationship to achieve it.

There is no doubt that the COFINA Enabling Act had such a legitimate public purpose. COFINA bonds were Puerto Rico's first rescue bonds. *See* 56.1 ¶ 2. COFINA allowed Puerto Rico to refinance prior debt at more advantageous terms, including lower interest rates. 56.1 ¶¶ 15, 47. It also enabled Puerto Rico to achieve other public goals, including paying suppliers and nourishing emergency and relief funds. 56.1 ¶ 14. These objectives were unquestionably for the benefit of the Commonwealth. To the extent the Commonwealth Agent suggests that a purpose "*to pay the Commonwealth's debts and expenses*" is somehow improper, Commonwealth Agent Second Am. Compl. ¶ 139, such a suggestion is nonsensical. There can hardly be a more legitimate basis for raising money than to pay money the government owes and to pay for public services—especially at a time of great need and when doing so saves money by issuing bonds at lower interest rates.

4.    <u>"Available Resources" Refers To The Funds In The Puerto Rico Treasury</u>

The Legislative Assembly correctly treated funds that are not deposited in the Puerto Rico

Treasury as outside of "available resources." At a minimum, the designation of funds outside the Treasury as unavailable is a reasonable one to which this Court must defer rather than striking down a long-standing and widely-supported statute. This interpretation is consistent with the plain meaning of "available," since there is no definition of the word "available" that would cover property owned by another party. It is also compelled by the Puerto Rico Constitution.

*First*, the portions of the Constitution setting forth the Commonwealth's debt limit (or debt margin) and the related drafting history show that available resources are those in the Puerto Rico Treasury.[18] Under the debt margin, the Commonwealth is prohibited from issuing debt that is supported by "the full faith credit and taxing power of the Commonwealth" if the amount required to pay principal and interest on that debt, along with debt service for preexisting full faith and credit debt, "exceed[s] 15% of the average of the total amount of the annual revenues raised under the provisions of Commonwealth legislation *and covered into the Treasury of Puerto Rico*" over a certain time period. P.R. Const. art. VI, § 2 (emphasis added). The phrase "*covered into* the Treasury" is the official translation of "*ingresados*," or "deposited." This means the debt margin applies only to the Commonwealth's full faith and credit debt, and the limit is determined by reference to the funds deposited or "covered into" the Puerto Rico Treasury.

The debt margin's link between general obligation debt and the funds deposited with the Treasury makes sense only if the funds deposited with the Treasury constitute the "available resources" under the Constitution. The clear purpose of the debt margin is to ensure that sufficient funds are available to pay general obligations, and by including only the resources actually going into the Treasury, the Constitution plainly contemplates that those resources are the "available resources" for payment of the general obligations. The history of the drafting of the Constitution

---

[18] The debt limit is more accurately described as a "debt margin" because, in theory, the principal has no limit as long as the Commonwealth can make scheduled payments. The capacity to make the payment within the constitutional constraints limits the amount of "full faith and credit" debt.

fully supports this interpretation. When discussing the 1961 amendment that established the debt margin, the amendment's Special Commission explained that the "proposed formula for setting the debt margin … *is based on the available resources* of the Government … [and is thus] *consistent with* … [the provision] that the available resources of the State shall be used first for the payment of … public debt." Legislative Diary, Vol. XIV No. 27, 1961 at 221 (emphasis added). Indeed, it would have made little sense for the drafters to establish a debt margin (or debt limit) by divorcing the debt from its relevant source of repayment, and if "available resources" included funds outside the Treasury, then the debt margin formula would have been based on those funds as well.

*Second*, the ability of public debt holders to compel payment from the Secretary of the Treasury further supports the conclusion that "available resources" are the amounts deposited with the Treasury. Article VI, Section 2 permits holders of public debt to sue the "Secretary of Treasury … *to apply the available resources* [*recursos disponibles*] including surplus to the payment of interest on the public debt and the amortization thereof." P.R. Const. art VI. § 2 (emphasis added). This provision permits a suit *only* against the Secretary of Treasury, not against the Commonwealth or any of its instrumentalities or public corporations. And the only "available resources" the Secretary of Treasury could conceivably "apply" to general obligation debt, if compelled, are the funds deposited with the Treasury. The legislative debates again confirm this interpretation:

> The proposed amendment to the Constitution in the Resolution that we are considering also contains a new provision … that legal action may be brought against the Secretary of the Treasury *so that the resources that are available be assigned in the Treasury* for the payment of interest on the principal of the public debt.

Legislative Diary, Vol. XIV No. 27, 1961 at 226 (emphasis added).

### 5. "Available Resources" Does Not Mean "All Resources"

The Commonwealth Agent's and GO Bondholders' approach not only conflicts with the deference required to the Legislative Assembly and the plain language of the Puerto Rico

Constitution, but also wrongly reads "available resources" to mean "*all* resources" of the Commonwealth. Namely, if funds outside the Puerto Rico Treasury, already transferred to another entity, qualify as "available," then there is no limit to "available resources." Instead, anything that the Commonwealth can take must be taken for the benefit of general obligation bondholders.

However, the term "available resources" does not mean "all resources." Beginning with the term itself, regardless of whether the word *recursos* (from "*recursos disponibles*") means "revenues" or "resources," it is limited by the word "available." This means there must be some resources that are *not* "available." Moreover, the Constitution distinguishes between "available resources" in Section 8 and the term "*recursos totales*," or "*total* resources" (or revenues), which appears in the immediately preceding section. *See* P.R. Const. art VI. § 7 (providing that, unless certain conditions are met, "[t]he appropriations made for any fiscal year shall not exceed the total revenues [*recursos totales*]"). "*Total* resources" obviously is not the same as "*available* resources," and common sense dictates that the word "total" means something more than "available."

The use of the term "available resources" elsewhere in the Constitution further shows that the term does not mean all funds that the Commonwealth can take. Article VI, Section 19 provides:

> It shall be the public policy of the Commonwealth … to provide, *within the limits of available resources* [*recursos disponibles*], for adequate treatment of delinquents in order to make possible their moral and social rehabilitation.

P.R. Const. art VI. § 19 (emphasis added). From the context, it is reasonable to conclude that "available resources" in Section 19 contemplates that the funds dedicated to the "adequate treatment of delinquents" is something short of revenues from all taxes levied by the Commonwealth. Moreover, because "available resources" relates only to the "adequate treatment of delinquents" in Section 19, and not to the section's other items, the term "available resources" must be a term of limitation. If "available resources" is a term of limitation in Section 19, then it should likewise be treated as such in Section 8. *See Ratzlaf v. United States*, 510 U.S. 135, 143 (1994) ("A term

36

appearing in several places in a statutory text is generally read the same way each time it appears.").

**B.    COFINA's Obligations Do Not Count Toward The Constitution's Debt Limit Or Debt Maturity Limit**

Although the Commonwealth is subject to constitutional debt and maturity limits, the limitation applies only to the issuance of general obligation debt.  With respect to the "debt limit," Article VI, Section 2 prohibits issuance of additional general obligation debt if total debt service for such debt "exceed[s] 15% of the average of the total amount of the annual revenues raised under the provisions of the Commonwealth legislation and covered into the Treasury of Puerto Rico in the two fiscal years next preceding the then current fiscal year."  P.R. Const. art. VI, § 2.  With respect to the "debt maturity limit," Section 2 goes on to provide that "no such bonds or notes issued by the Commonwealth for any purpose other than housing facilities shall mature later than 30 years from their date."  *Id.*  In both cases, the express terms limit the type of debt for "which the full faith, credit and taxing power of the Commonwealth shall be pledged," namely general obligation debt.  *Id.*

There is no dispute that COFINA bonds are not guaranteed by the Commonwealth's full faith and credit and that COFINA bondholders have no recourse against the Commonwealth.  The Bond Resolution and COFINA offering materials specifically disclaim such rights.  COFINA is a separate, independent government instrumentality; as a result, COFINA's bonds are not debt directly issued or borrowed by the Commonwealth and thus are excluded from the Commonwealth's debt limit.  The Commonwealth Agent does not dispute this conclusion, instead recognizing that "COFINA bonds are not subject to the Constitutional Debt Limits because they are not direct, 'full faith and credit' obligations of the Commonwealth."  Commonwealth Agent Second Am. Compl. ¶ 142.

The Commonwealth Agent argues nonetheless that the Legislative Assembly had no authority to create such "off balance sheet" financing.  But as shown earlier, it did.  *Supra*, § II.A.1.  Moreover, analogous structures have been routinely upheld.  *See Wein v. City of New York*, 36

N.Y.2d 610, 618 (1975) (holding that legislation did not violate constitutional provision prohibiting

city from contracting indebtedness without pledging its full faith and credit because city was not

indebted on notes and bonds issued by municipal corporation); *see also Schulz v. State of New York*,

84 N.Y.2d 231, 247 (1994).[19] The same result should follow here.

Finally, as to the Commonwealth Agent's argument that COFINA constitutes an "evasion" of

the debt limit, Commonwealth Agent Second Am. Compl. ¶¶ 141-42, this argument fails on two

grounds. First, there is no authority for this Court to police so-called "evasions" where, as here, the

Commonwealth does not violate the unambiguous terms of the Constitution. To the contrary, a

number of courts have explicitly rejected similar constitutional evasion claims. *See N.J. Sports &*

*Exposition Auth. v. McCrane*, 292 A.2d 545, 575 (N.J. 1972) (finding that state law did not violate

New Jersey's debt limitation clause because "[i]t is never an illegal evasion of a constitutional

provision or prohibition to accomplish a desired result, which is lawful in itself, by discovering or

following a legal way to do it" (internal quotations omitted)); *In re Okla. Capitol Improvement*

*Auth.*, 958 P.2d 759 (Okla. 1998) (explaining that "[i]t is not unconstitutional to accomplish a

desired result, lawful in itself, by innovative, legal measures" in upholding the constitutionality of

---

[19] The cases cited by the Commonwealth Agent in its Second Amended Complaint are to the same effect or
otherwise do not require a different result. *See Crick v. Rash*, 229 S.W. 63, 69-70 (Ky. 1921) (recognizing
that, subject to constitutional limitations, the legislature could create debt that "is not forbidden" by the state
constitution even if it "amount[ed] to a technical debt"); *State ex rel. Wash. State Fin. Comm. v. Martin*, 384
P.2d 833, 842 (Wash. 1963) (finding that a "special fund" from which bonds are paid "is a useful and valid
tool" but could not have been considered by framers of Washington's state constitutional debt limit two
centuries ago because the doctrine had not been invented then); *Morris v. Bd. of Regents*, 625 P.2d 562, 564
(Nev. 1981) (holding that bond obligations were constitutional debt because the "credit of the state [was]
pledged for their repayment"); *State ex rel. Shkurti v. Withrow*, 513 N.E.2d 1332, 1336-37 (Ohio 1987)
(finding bond issuance exceeded debt limit that, unlike here, did not distinguish between types of debt (other
than debt incurred for war purposes)); *State ex rel. Lesmeister v. Olson*, 354 N.W.2d 690, 695 (N.D. 1984)
(debt limit applied to all bond issuances); *Long v. Napolitano*, 53 P.3d 172, 189 (Ariz. Ct. App. 2002)
(upholding debt where "the relationship between the funded project and the pledged taxes is sufficiently direct
and apparent that the taxes may be effectively treated as revenue of the project or otherwise related to its
purpose"); *Ayer v. Comm'r of Admin.*, 165 N.E.2d 885, 888 n.2, 892 (Mass. 1960) (rejecting borrowing where
state constitution largely restricted all debt (except for war purposes) and "no genuine independent business
purpose … could be discovered").

proposed highway bonds in the face of balanced budget and debt limitation challenges); *Schowalter v. State*, 822 N.W.2d 292, 300 (Minn. 2012) (rejecting the argument that bonds that are not backed by the full faith and credit of the state, and therefore are not subject to constitutional requirements for "public debt," "improperly circumvent the State's balanced biennial budget requirement"). Second, there is no such evasion:  Much of the $16 billion the Commonwealth raised in issuing COFINA bonds—and all of the money from the 2007 and 2008 offerings (apart from payment of certain fees)—was used to pay down *other* debt, generally at higher interest rates.  56.1 ¶¶ 13-21, 25-26.  It thereby *reduced* a significant amount of Commonwealth debt.

### C.      COFINA Is Consistent With The Constitution's Balanced Budget Requirements

Issuance of the COFINA bonds did not violate the Puerto Rico Constitution's balanced budget requirement.  Under Section 7 of Article VI of the Puerto Rico Constitution, the Legislative Assembly is authorized to issue debt to balance the budget and to pay other debt.  In particular, the English-language version of Section 7 states:  "The appropriations made for any fiscal year shall not exceed the total revenues, including available surplus, estimated for said fiscal year unless the imposition of taxes sufficient to cover said appropriations is provided by law."  P.R. Const. art. VI, § 7.  The Spanish-language version of Section 7 does not use the term "total revenues," but instead "*recursos totales*," meaning "total resources."  *Id.*

*First*, the Commonwealth Agent errs in interpreting the provision as concerning "total revenues" rather than "total resources."  The use of the term "total resources" rather than "total revenues," which was used in the Jones Act of 1917,[20] was intentional, with the term "total resources" intended to encompass additional resources beyond revenues, including proceeds from debt.  The Commonwealth Agent concedes as much.  Commonwealth Agent Second Am. Compl.

---

[20]   The Jones Act governed Puerto Rico until the adoption of the Puerto Rico Constitution, with certain sections of the Act, as discussed *infra*, surviving in the Federal Relations Act.

¶ 162.  Indeed, the Commonwealth Agent's interpretation would effectively prohibit debt financing, notwithstanding that the Commonwealth has engaged in that practice for decades—including by issuing GO bonds—and that the Legislative Assembly is afforded great deference on this issue.

The Commonwealth Agent nonetheless argues that the English translation of the Puerto Rico Constitution, which translates "*recursos totales*" as "total revenues," controls rather than the original Spanish.  However, if there is any discrepancy between the original Spanish and the English translation, then the Spanish version should prevail.  *See* P.R. LAWS ANN. tit. 31, § 13 ("In case of discrepancy between the English and Spanish texts of a statute passed by the Legislative Assembly of Puerto Rico, the text in which the same originated in either house, shall prevail in the construction of said statute…").  There is no rational basis for applying a different rule for the Puerto Rico Constitution than for its statutes.  The Commonwealth Agent argues that Public Law 600 of July 3, 1950, and Public Law 447 of July 3, 1952, adopted the English translation of the Puerto Rico Constitution as the controlling document.  Commonwealth Agent Second Am. Compl. ¶ 166.  Not so.  Public Law 600 adopted nothing, but rather authorized the "Legislature of the Puerto Rico … to call a constitutional convention to draft a constitution."  Public Law 447 also did not adopt the English translation, but rather approved "the constitution of the Commonwealth … which was drafted by the selected delegates to the Constitutional Convention of Puerto Rico …."  The Constitutional Convention conducted its proceedings in Spanish and produced a Spanish-language draft of the Constitution.  *See, e.g.*, Constitutional Assembly Diaries (originally recorded in Spanish).

Moreover, the Commonwealth Agent's interpretation is inconsistent with its own interpretation of the same word "*recursos*" in Article VI, Section 8 of the Puerto Rico Constitution.  In particular, when seeking to make the DST "available" to all general obligation debt, the Commonwealth Agent relies on the Constitution's Spanish text, or "*recursos disponibles*," rather

than the English version's "available *revenues*," which is obviously something less than "available *resources*." *See supra*, § II.A. But to support its "balanced budget" argument, the Commonwealth Agent flips and relies on the Constitution's English translation, intentionally ignoring the Spanish meaning of the term. The Commonwealth Agent cannot have it both ways, and its arguments show that the generally-accepted Spanish meaning of the term should control.

*Second*, even if the Puerto Rico Constitution purported to prohibit debt financing (which it does not), such prohibition would be superseded by federal law. Section 38 of the Foraker Act[21] and Section 3 of the Jones Act[22] both granted the Commonwealth and its municipalities authority to issue bonds and other obligations not only when "necessary to anticipate taxes and revenues" but also "to protect the public credit." This authorization survives to this day in the Federal Relations Act (48 U.S.C. § 741).[23] These federal statutes authorized the Commonwealth to issue debt, anticipate taxes and revenues not yet available, and issue bonds to protect its public credit, which was precisely the purpose of the COFINA Enabling Act. Simply put, the Puerto Rico Constitution cannot be interpreted to prohibit issuance of debt that federal statutes allow.

*Third*, even if the balanced budget provision referred to "total revenues" rather than "total resources," as the Commonwealth Agent argues, the COFINA Enabling Act by its terms does not in any way cause total revenues to be less than appropriations. The Commonwealth Agent does not actually allege that total appropriations exceeded total revenue in any particular year (which is the

---

[21] Act of April 12, 1900, ch. 191, 31 Stat. 77, Section 38, provides that: "where necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico [*sic*] or any municipal government therein as may be provided by law to provide for expenditures authorized by law, and to protect the public credit, and to reimburse the United States for any moneys…."

[22] Act of March 2, 1917, ch. 145, 39 Stat. 951, Section 3, provides that: "when necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Porto Rico [*sic*] or any municipal government therein as may be provided by law, and to protect the public credit …."

[23] The referenced provision of the Federal Relations Act provides that: "[W]hen necessary to anticipate taxes and revenues, bonds and other obligations may be issued by Puerto Rico or any municipal government therein as may be provided by law, and to protect the public credit."

only thing the constitutional provision prohibits), let alone explain how such a deficit was caused by the COFINA Enabling Act. Instead, the Commonwealth Agent argues: "By retiring its extraconstitutional debt with the proceeds of COFINA bonds, the Commonwealth freed itself from having to appropriate funds for the payment of such extraconstitutional debt, thereby financing deficit spending by reducing the 'appropriations' side of the budget equation." Commonwealth Agent Second Am. Compl. ¶ 170. But the balanced budget provision prevents total appropriations from exceeding total revenue, and thus *reducing* appropriations is clearly not a violation.

As to the Commonwealth Agent's argument that COFINA subverts the purpose of the balanced budget provision, this argument is likewise meritless. To begin with, as noted *supra* at 38-39, there is no legal basis to ignore the unambiguous language of the Constitution. Furthermore, apart from the payment of underwriting fees and certain other expenses, the proceeds from the 2007 and 2008 issuances of COFINA bonds—those issued pursuant to Act 91 before the 2009 amendment—were used solely to pay down other debt. 56.1 ¶ 25-26. These bonds thus plainly improved the balance of the budget—and certainly did not undermine it. In any event, for all of the COFINA bonds, once again there is no imbalance because the payments to COFINA bondholders come from a defined revenue stream. The Commonwealth budget must still be balanced without regard to *both* the payments and the revenue stream.

## III. IN THE ALTERNATIVE, THIS COURT SHOULD CERTIFY TO THE SUPREME COURT OF PUERTO RICO THE STATE-LAW QUESTIONS AT ISSUE

The COFINA Agent has stated that it reserves the right to move for certification of the state-law questions at issue in this motion. The COFINA Senior Bondholders' Coalition intends to join in that motion, but only to the extent that this Court finds that there is an ambiguity in the COFINA Enabling Act or the Puerto Rico Constitution that could lead to the rejection of the COFINA Enabling Act's express direction that the DST and the DST Fund are COFINA's property. If the

42

COFINA Agent has not filed a motion by Monday, February 26, then the COFINA Senior Bondholders' Coalition will file its own motion specifying the proposed questions for certification.

Certification is not necessary if this Court follows the plain language of the COFINA Enabling Act and the Puerto Rico Constitution. The United States Supreme Court has recognized that federal courts should certify "novel or unsettled questions of state law" to state courts because doing so will result in "authoritative answers by [the] State's highest court." *Arizonans for Official English v. Ariz.*, 520 U.S. 43, 77 (1997). But there is no basis for certification where the law is clear. *See, e.g.*, *Bingham v. Supervalu, Inc.*, 806 F.3d 5, 13 n.7 (1st Cir. 2015) ("[W]e would decline to certify these issues to the SJC given the law's existing clarity."); *Armco Steel Co., LP v. CSX Corp.*, 790 F. Supp. 311, 317 n.2 (D.D.C. 1991) ("The Court shall not certify the question concerning any applicable statute of limitations under the Valentine Act since the language of the statute is unambiguous ...."). For the reasons stated above, the unambiguous language of the COFINA Enabling Act and the Puerto Rico Constitution dictates that COFINA owns the DST and the DST Fund, and that the transfer of the DST to COFINA was constitutional. This result also necessarily follows from the uniform Puerto Rico case law requiring deference to the Legislative Assembly.

However, even if there were a reasonable basis for disregarding the plain language of the COFINA Enabling Act and the Puerto Rico Constitution, and for disregarding the deference owed to the Legislative Assembly, it would be improper for this Court to grant summary judgment to the Commonwealth Agent or the GO Bondholders. Rather, the proper course would be to certify the questions to the Supreme Court of Puerto Rico for three reasons. *First*, a federal court should not interfere with a state (or Commonwealth) government's internal affairs by ruling a state statute invalid under the state constitution. *See Mich. Cent. R. Co. v. Powers*, 201 U.S. 245, 291 (1906) ("Federal courts will be reluctant to adjudge a state statute to be in conflict with the state

Constitution before that question has been considered by the state tribunals."); *Blue Cross & Blue Shield of Ala. v. Nielsen*, 116 F.3d 1406, 1413 (11th Cir. 1997) ("[A] federal court should not purport to hold that a state statute violates the state constitution, except as an unavoidable matter of last resort."). That is especially true here given the Commonwealth's repeated assertions as to the validity of the COFINA Enabling Act. Indeed, it would be seemingly unprecedented for a federal court to hold a state statute with these kinds of political or financial implications invalid under a state (or Commonwealth) constitution. These concerns do not exist when upholding the COFINA Enabling Act and when respecting the deference afforded to the Legislative Assembly.

*Second*, unlike the plain-language basis for granting summary judgment to the COFINA Senior Bondholders' Coalition, the Commonwealth Agent's and GO Bondholders' arguments rest almost entirely on the supposed purposes of the constitutional provisions. Any ruling placing purpose over text, if permissible at all, should be the prerogative of the Supreme Court of Puerto Rico. Such a ruling would be based on policy considerations regarding the purposes of the COFINA Enabling Act and the relevant provisions of the Puerto Rico Constitution, and the scope of authority for the Legislative Assembly. This Court should not resolve these policy questions without certification. *See Muñiz-Olivari v. Stiefel Labs., Inc.*, 496 F.3d 29, 40 (1st Cir. 2007) ("questions of local policy . . . are best addressed by the Supreme Court of Puerto Rico in the first instance").

*Finally*, certification would be required because ruling in favor of the Commonwealth Agent and GO Bondholders would have enormous consequences for the future of Puerto Rico. It would effectively prohibit Puerto Rico from taking advantage of securitization, a financing mechanism that enables municipalities to obtain lower-cost access to capital. Securitization is particularly crucial for Puerto Rico, whose compromised credit hinders its access to capital markets on the guarantee of its full faith and credit. Thus, an answer to these questions will directly impact the Commonwealth's

ability to obtain financing in this time when it is needed most, and such a result should not be imposed absent certification. *See Mich. Cent. R. Co.*, 201 U.S. at 291 (certification is especially important "when the statute is one affecting the revenues of the [state], and therefore of general public interest"); *Blue Cross*, 116 F.3d at 1413 (same for "ultrasensitive state law matters").

*Finally*, to be clear, these questions will not resolve the issues of what remedies and consequences would arise if the COFINA Enabling Act were deemed unconstitutional, as such issues are outside the scope of this dispute.[24]  In short, there is no plausible basis for the idea that the Commonwealth can reap an enormous windfall as a reward for passing an unconstitutional statute.

## **CONCLUSION**

Judgment should be awarded (i) against the Commonwealth Agent on Counts 1, 2, 12, and 13 of the Commonwealth Agent's Second Amended Complaint; and (ii) against the GO Bondholders on Count 1 of their Complaint.  Judgment should also be awarded to the COFINA Senior Bondholders' Coalition on its first cause of action for a declaration that (i) the statutes creating COFINA and directing transfer of the DST and the DST Fund to it are valid under the Puerto Rico Constitution; (ii) the DST, including all DST revenue collected in the future, and the DST Fund are property of COFINA; and (iii) the DST and the DST Fund are not "available resources" under the Puerto Rico Constitution.  Finally, judgment should be awarded to the COFINA Agent, the Mutual Fund Group and Puerto Rico Funds, and National Public Finance Guarantee Corporation on their respective first causes of action of their counterclaims.  In the alternative, this Court should certify the state-law questions at issue in this motion to the Puerto Rico Supreme Court.

---

[24]  *See* Commonwealth Agent Second Am. Compl. ¶ 1 n.2.  The COFINA Senior Bondholders' Coalition therefore preserves any arguments on these issues, including (but not limited to): (1) only the DST necessary for the Commonwealth to have sufficient available resources to pay valid public debt potentially could be clawed back; (2) the COFINA Bondholders would be entitled to restitution of the purchase price of the Bonds under P.R. LAWS ANN. tit. 31, § 3514; and (3) even if COFINA does not have an enforceable security interest in the DST, the result would be a massive unsecured claim held by COFINA against the Commonwealth.

DATED:  February 21, 2018

Respectfully submitted,
REICHARD & ESCALERA

**By :**  */s/ Rafael Escalera*
     **Rafael Escalera**
     USDC No. 122609
     escalera@reichardescalera.com

     **Sylvia M. Arizmendi**
     USDC-PR 210714
     arizmendis@reichardescalera.com

     **Fernando Van Derdys**
     USDC-PR 201913
     fvander@reichardescalera.com

     **Carlos R. Rivera-Ortiz**
     USDC-PR 303409
     riverac@reichardescalera.com

     **Gustavo A. Pabón-Rico**
     USDC-PR 231207
     pabong@reichardescalera.com

     255 Ponce de León Avenue
     MCS Plaza, 10th Floor
     San Juan, Puerto Rico 00917-1913

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

**Susheel Kirpalani** (*pro hac vice*)
susheelkirpalani@quinnemanuel.com

**Daniel Salinas**
USDC-PR 224006
danielsalinas@quinnemanuel.com

**David Cooper** (*pro hac vice*)
davidcooper@quinnemanuel.com

**Eric Kay** (*pro hac vice*)
erickay@quinnemanuel.com

**Kate Scherling** (*pro hac vice*)
katescherling@quinnemanuel.com

**Rex Lee** (*pro hac vice pending*)
rexlee@quinnemnauel.com

**Darren M. Goldman** (*pro hac vice*)
darrengoldman@quinnemanuel.com

51 Madison Avenue, 22nd Floor
New York, New York 10010-1603

# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

------------------------------------------------------------------ X

*In re*

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

THE COMMONWEALTH OF PUERTO RICO, *et al.*,

       Debtors.[1]

PROMESA Title III
Case No. 17-BK-3283 (LTS)

(Jointly Administered)

------------------------------------------------------------------ X

THE OFFICIAL COMMITTEE OF UNSECURED
CREDITORS OF THE COMMONWEALTH OF
PUERTO RICO,

       as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

THE COMMONWEALTH OF PUERTO RICO,

           Plaintiff-Counterclaim-
           Defendant,

       v.

BETTINA WHYTE,

       as agent of

THE FINANCIAL OVERSIGHT AND
MANAGEMENT BOARD FOR PUERTO RICO,

       as representative of

Adv. Proc. No. 17-00257-LTS

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780-LTS) (Last Four Digits of Federal Tax ID: 3747).

THE PUERTO RICO SALES TAX FINANCING          :
CORPORATION ("COFINA"),                      :
                                             :
                    Defendant-Counterclaim-  :
                    Plaintiff,              :
                                             :
       and                                 :
                                             :
THE COFINA SENIOR BONDHOLDERS'               :
COALITION,                                   :
                                             :
                    Intervenor-Defendant-   :
                    Counter and Crossclaim- :
                    Plaintiff,              :
                                             :
        v.                                  :
                                             :
PERMITTED INTERVENORS,                       :
                                             :
                    Crossclaim Defendants.  :
-------------------------------------------------------------------- X

## [PROPOSED] ORDER GRANTING SUMMARY JUDGMENT

This Court, having received and reviewed the motion for summary judgment and incorporated memorandum of law filed by the COFINA Senior Bondholders' Coalition (the "Motion")[2] and the accompanying Declaration of Susheel Kirpalani; and having found and determined that the relief requested in the Motion is warranted; and having considered any objections filed to the Motion; and after due deliberation and sufficient cause appearing therefor and based upon the record, it is hereby **ORDERED THAT**:

1.      The Motion is **GRANTED**.

2.      Judgement is awarded to the COFINA Senior Bondholders' Coalition of its first cause of action for declaratory relief; to the COFINA Agent on its first cause of action for declaratory relief; to the Mutual Fund Group and Puerto Rico Funds on their first cause of action

---

[2]  All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Motion.

Case:17-00257-LTS Doc#:507-6 Filed:01/14/19 Entered:01/14/19 22:12:36 Desc: Proposed Order Page 3 of 3

for declaratory relief; and to National Public Finance Guarantee Corporation on its first cause of action for declaratory relief, and the Court issues a declaration that:

      a.    The statutes creating COFINA and directing transfer of the Dedicated Sales Tax and the Dedicated Sales Tax Fund to COFINA are valid and constitutional under the Puerto Rico Constitution;

      b.    The Dedicated Sales Tax, including all Dedicated Sales Tax revenue collected in the future, and the Dedicated Sales Tax Fund are property of COFINA and do not constitute property of the Commonwealth; and

      c.    The Dedicated Sales Tax and the Dedicated Sales Tax Fund are not "available resources" under the Puerto Rico Constitution.

3.    Judgment is awarded against the Commonwealth Agent on its first, second, twelfth, and thirteenth causes of action

4.    Judgement is awarded against the Ad Hoc Group of General Obligation Bondholders on their first cause of action.

5.    The terms and conditions of this Order shall be effective and enforceable immediately upon its entry.

6.    The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order.

Dated: _____, 2018
San Juan, Puerto Rico

 

_____
Honorable Laura Taylor Swain
United States District Judge