```
 1                    UNITED STATES BANKRUPTCY COURT

 2                       DISTRICT OF PUERTO RICO

 3
     In Re:                    )         Docket No. 3:17-BK-3283(LTS)
 4                             )
                               )         Title III
 5   The Financial Oversight and )
     Management Board for       )
 6   Puerto Rico,               )        (Jointly Administered)
                               )
 7   as representative of       )
                               )
 8   The Commonwealth of        )
     Puerto Rico, et al.,       )        December 19, 2018
 9                             )
                    Debtors.    )
10
     _____
11

12                            OMNIBUS HEARING

13     BEFORE THE HONORABLE U.S. DISTRICT JUDGE LAURA TAYLOR SWAIN

14                UNITED STATES DISTRICT COURT JUDGE

15   _____

16
     APPEARANCES:
17
     For The Commonwealth
18   of Puerto Rico, et al.:  Mr. Martin Bienenstock, PHV
                              Mr. Brian Rosen, PHV
19                            Mr. Hermann Bauer, Esq.

20   For the U.S. Trustee
     Region 21:               Ms. Monsita Lecaroz Arribas, AUST
21
     For Official Committee
22   of Unsecured Creditors:  Mr. Luc Despins, PHV
                              Mr. Juan Casillas Ayala, Esq.
23
     For Puerto Rico Fiscal
24   Agency and Financial
     Advisory Authority:      Mr. Peter Friedman, PHV
25                            Mr. Luis Marini Biaggi, Esq.
                              Ms. Carolina Velaz Rivero, Esq.
```

DX-BBB

```
 1   APPEARANCES, Continued:

 2   Fee Examiner:              Mr. Brady Williamson, PHV
                                Ms. Katherine Stadler, PHV
 3
     For COFINA Senior
 4   Bondholders'
     Coalition:                 Mr. Susheel Kirpalani, PHV
 5                                  Appearing in New York
                                Mr. Daniel Salinas, PHV
 6
     For Bank of
 7   New York Mellon:           Mr. Albeniz Couret Fuentes, Esq.
                                Mr. C. Neil Gray, PHV
 8                                  Appearing in New York
                                Mr. Luke Sizemore, PHV
 9                                  Appearing in New York

10   For the Retiree
     Committee:                 Mr. Antonio Juan Bennazar, Esq.
11                              Mr. Hector Mayol, Esq.

12   For AMPR:                  Mr. Jose Luis Barrios, Esq.

13

14

15

16

17

18

19

20

21

22

23

24   Proceedings recorded by stenography.  Transcript produced by
     CAT.
25
```

```
 1                         I N D E X

 2   WITNESSES:                                    PAGE

 3         None offered.

 4

 5   EXHIBITS:

 6         None offered.

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                               San Juan, Puerto Rico

 2                               December 19, 2018

 3                               At or about 9:33 AM

 4                    *      *      *

 5          THE COURT:  Again, buenos dias.  Welcome to counsel,

 6   parties in interest and members of the public and press here

 7   in San Juan, those observing here and in New York, and

 8   telephonic participants.  It is a beautiful week in San Juan

 9   and it is always good to be back in Puerto Rico.

10          My usual instructions about electronic equipment.  I

11   remind you, consistent with Court and Judicial Conference

12   policies and the Orders that have been issued, there is to be

13   no use of any electronic devices in the courtroom to

14   communicate with any person, source or outside repository of

15   information, nor to record any part of the proceedings.

16          Thus, all electronic devices must be turned off

17   unless you are using a particular device to take notes or to

18   refer to notes or documents that are already loaded on the

19   device; and all audible signals, including vibration features,

20   must be turned off.  No one is permitted to record or

21   retransmit any part of the hearing, and anyone who's observed

22   violating these rules is subject to sanctions.

23          Thank you for your compliance with these procedures.

24   It is now time to begin our agenda with the status report from

25   the Oversight Board.
```

1          Mr. Bienenstock, good morning.

2          MR. BIENENSTOCK:  Good morning, Your Honor.  Martin

3    Bienenstock of Proskauer Rose for the Oversight Board, for

4    itself and as Title III representative.

5          Your Honor, the Court has directed a status report on

6    the general status of the negotiation and formulation of

7    additional plans of adjustment, as well as the anticipated

8    timeline for the filing and confirmation of the plans.

9          As the Court knows, this is not a simple issue, but

10   I'm going to break it down and try to identify the main

11   components as they exist now.

12         As the Court knows, the GDB Title VI has been done,

13   and that involved about five billion dollars of debt.  And

14   COFINA's approximate 16 billion dollars -- or 17 billion

15   dollars of debt is scheduled for confirmation hearing on

16   January 16, 2019.

17         Negotiations about a PREPA RSA with some of the key

18   creditors are underway, with PREPA having over nine billion

19   dollars of debt, and the Board looks forward to resuming

20   mediation on a Commonwealth plan.

21         The Board is doing a lot of work to be ready for the

22   mediation.  There will likely be some issues teed up soon,

23   Your Honor, for which we know there is no likely consensus, at

24   least in the near term, such as whether the PBA leases are

25   leases for purposes of Bankruptcy Code Section 365(d)(3), and

1   possibly claim challenges emanating from or related to the

2   Kobre Kim report.

3          We should likely know in the March or April time

4   frame how much consensus there is on a Commonwealth Title III

5   plan.  If there is a lot of consensus, we would file a Plan

6   and Disclosure Statement, which is being worked on now, and

7   ask for a confirmation hearing as soon as practicable.  But if

8   there is little consensus, the Board will have to determine

9   whether a cramdown plan should be filed and its likely

10  timeline.

11         The reasons for lack of consensus will be relevant.

12  If they are purely legal differences, we may want to try to

13  tee them up for resolution to eliminate the obstacles to

14  further negotiation and consensus.  We would obviously have to

15  do so in a manner that would not make the rulings advisory

16  opinions.

17         If the reasons for lack of consensus on a

18  Commonwealth plan are largely economic, that, for instance,

19  the Oversight Board simply doesn't see as much ability to pay

20  debt as the creditors, then a cramdown plan may make sense,

21  because the economics may not change for the better.  We hope

22  they do, but there would be no reason to bet on that, except

23  if the Commonwealth makes certain changes, such as repealing

24  Law 80 to allow for employment at will.  That would create a

25  tide lifting all boats.  People would be better off, and there

1    would be some fallout that would make creditor returns better

2    as well.  But primarily, it would be best for the economy

3    going forward.

4         Discussions also continue on non-Title III situations

5    such as PRASA, University of Puerto Rico and other non-Title

6    III situations.

7         Your Honor, I know I wasn't very specific, but I do

8    think that based on the items to be teed up in the near term,

9    the mediation to continue, that in the March-April time frame,

10   we'll be able to give Your Honor a much better, more specific

11   timeline to actual confirmation hearings.

12        THE COURT:  Well, I'm grateful for the information

13   that you have shared today.  I think it's important that we

14   inform the general public insofar as it is possible, in as

15   current a fashion as possible, since there are so many

16   constituencies that are so deeply involved in and concerned

17   with the progress of these proceedings.

18        And so I hear you about March-April.  Don't be

19   surprised if I ask you to make another status report in

20   January.  And I thank you for as much candor as you are able

21   to bring to each of these reports.

22        MR. BIENENSTOCK:  Thank you, Your Honor.

23        THE COURT:  Thank you.

24        MR. BIENENSTOCK:  Shall I turn over the podium to the

25   Fee Examiner now?

1          THE COURT:  Yes.

2          The next item on the agenda is item Roman II.1, the

3    Fee Examiner's Motion to Impose Additional Presumptive

4    Standards, and that is docket entry 4370 in case 3283.

5          Good morning.

6          MS. STADLER:  Good morning, Judge.

7          The Fee Examiner filed the Motion for Additional

8    Presumptive Standards after the Court's imposition of an

9    initial set of presumptive standards that we discussed at an

10   earlier hearing.

11         Consistent with that approach, the goal of these

12   presumptive standards is to put professionals and the public

13   on notice of the standards that the Fee Examiner intends to

14   apply when evaluating fee applications.

15         The Fee Examiner has been concerned since the outset

16   of his engagement about the imposition of rate increases by

17   law firms, hourly rate increases, not just because of their

18   initial impact, but also because of their potential for

19   exponentially increasing as the case goes on.

20         The impact of rate increases so far, we have

21   calculated through the third interim fee period as close to

22   four million dollars.  That number will go up with the fourth

23   interim fee applications which were just filed.  And then of

24   course we have a year end coming up, and that almost always,

25   for law firms, means additional rate increases.

1        We have had extended discussions with professionals

2   about the presumptive standards regarding rate increases and

3   also with respect to expert witnesses, which is also a subject

4   of the motion.  But the primary discussion has been on the

5   issue of rate increases.

6        And while no professional has objected to the motion,

7   and we submitted a redline Revised Form of Order that

8   addresses the concerns articulated by some professionals, it

9   is not entirely accurate to say that the motion or the Order

10  is uncontested, because there are professionals who still

11  believe that there are provisions in there that are unfairly

12  stated and will be unfairly applied to the law firms.

13       In particular, there's a continuing concern about the

14  standards being advisory in nature.  And again, the Fee

15  Examiner's position is that there is no binding decision being

16  asked of this Court until there's a fee application filed and

17  an objection has been registered.

18       This is really just an attempt to give professionals

19  an idea of what to expect in terms of the standards for

20  reasonableness and what types of issues could flag an

21  objection so that we can hopefully avoid the need for

22  contested matters on fees, because that isn't a good use of

23  anyone's resources.

24       Another issue that has been stated is that the motion

25  improperly attempts to shift the burden of proof on the

1    reasonableness of fees, and the Fee Examiner disagrees with

2    that assertion.  The burden is always, under the Bankruptcy

3    Code, on a professional fee applicant to establish the

4    reasonableness of his or her fees, and that remains whether

5    there are presumptive standards imposed or not.

6         Again, these guidelines are merely there to provide

7    parameters for professionals to follow.  The Fee Examiner

8    struggled with the issue of rate increases and considered the

9    possibility that an absolute prohibition on them might be

10   appropriate in this case.  After evaluating the fee

11   applications here, speaking to professionals, doing

12   significant analysis of the billing data of the professionals,

13   he concluded that it would be more reasonable to allow some

14   level of rate increases to provide a ceiling, not a floor, for

15   rate increases to hopefully eliminate the need to have to talk

16   about this issue in the future.

17        It has been his experience that merely telling

18   professionals there's a concern and waiting until the end of a

19   case to calculate the impact and then discuss what to do about

20   it has been an ineffective way of dealing with this issue.  So

21   the Fee Examiner has tried to get ahead of it, to file this

22   motion to put everyone on notice about the standards that will

23   be applied, and to hopefully minimize conflict on that issue.

24        We hope that this does not provide an incentive for

25   professionals to raise rates if they otherwise would not.  We

1    trust that the professionals will follow their professional

2    ethics guidelines and other limitations on their ability to

3    adjust fees, and that they will keep in mind the significance

4    of these proceedings to the overall economy in Puerto Rico

5    before imposing any rate increases.

6           So the intent is not to open the door for a

7    free-for-all in rate increases; rather, to provide a

8    presumptive limit on how high they can go.

9           THE COURT:  Well, I thank you for the presentation

10   and for the summary.  And it won't surprise anyone here that

11   the concerns of the Fee Examiner are deep concerns of the

12   Court, and so I was pleased when the motion was brought

13   forward initially.

14          I have some concerns of my own about where things

15   have come out, and I'd like to flag some issues here.  And I

16   will tell you that it is my intention to impose on you, and

17   impose on everyone, to have another round of discussions based

18   on some particular principles that I will flag now and bring

19   back at the next Omni.

20          MS. STADLER:  Certainly.

21          THE COURT:  And so first, just for my own context,

22   are there any particular circumstances that explain the 13.3

23   percent and 28 percent outlier increase rates that were

24   flagged in the report that I should understand?

25          MS. STADLER:  Not any circumstances that are unusual

1    when addressing this issue with law firms.  The applicant that

2    had those outlying rates has not been recommended for

3    consensual approval today.  It is one of the applications that

4    has been held over.

5         Several of the applications have that issue, and

6    that's why you see a number of them not on the list of

7    recommended applications for approval for the third interim

8    fee period.

9         In general, professionals assert that they apply

10   their rate policies uniformly, that they charge the same to

11   the clients in this case as they do in other cases, and that

12   those percentages that you see are consistent with their

13   practices in other cases, in other Chapter 11 cases.  And they

14   maintain that they are reasonable.  There is not any

15   particular extenuating circumstance that has been brought

16   forward for those.

17        The Fee Examiner has always tried to acknowledge the

18   realities of certain aspects of the private practice of law.

19   For example, when an associate is promoted to partner or

20   shareholder in a firm, that is frequently a time when we see a

21   rate increase that's generally above the norm, and that seems

22   to be standard practice and seems to be well-accepted by

23   clients in Chapter 11 cases.  And so those types of rate

24   increases are actually carved out of the Fee Examiner's

25   analysis.

1        So the percentages you see there are real

2   percentages, and they're generally the result of a firm that

3   has more than one increase in a year.  That's how they -- they

4   don't tend to say, oh, we're going to increase them 28 or 29

5   percent today.  It's a cumulative thing that happens with a

6   rate increase at the beginning of the year, mid year and end

7   of the year.

8        And so that's another reason that the presumptive

9   standards are designed to limit the adjustments to one per

10  year, so that cumulative effect can be mitigated.

11       THE COURT:  And I thank you for pointing me to the

12  Lexis survey information about year-over-year partner

13  increases.  The cumulative, the compound annual growth rate in

14  that survey of 4.2 percent as against the 2017 year-over-year

15  5.7 percent increase suggested to me that 2017 year was

16  unusually high in relation to the preceding couple of years,

17  and I just wanted to reality check my reading of that

18  information.

19       MS. STADLER:  Yes.  I think that's accurate.

20       THE COURT:  And is there any survey information of

21  which you're aware on associate billing rates, particularly

22  seniority step increases?

23       MS. STADLER:  There are many publicly available

24  resources that report on rates and rate increases.  Very few

25  of them are in a citable format, as we would consider it in

1       the Blue Book context for legal writing.

2              It is very difficult to carve out the issue of

3       associate rate increases or seniority increases, because firms

4       are not required to announce or distinguish what rate

5       adjustments are based on seniority and what are based on

6       adjustment or inflation or any other reason.

7              We can often identify them if we have sufficiently

8       robust data.  If we have enough associates from a given firm's

9       billing time on the case from the beginning, so that we can

10      track their rate increases and watch what the increases do and

11      the time that they occur, we can often figure out what portion

12      is based on seniority and what portion is not.  But one of the

13      primary concerns of the Fee Examiner is that it's difficult to

14      distinguish.

15             There isn't a specific market benchmark for what is

16      an appropriate associate rate increase.  As there is, as you

17      cited, the Lexis survey -- there isn't anything that carves

18      out the specific issue of seniority.

19             What we do know is that general counsel, both in

20      Chapter 11 cases and outside, have been resistant in recent

21      years to professionals using their cases as training grounds

22      for brand new associates.  And there is some concern on the

23      part of market participants that the starting rates of

24      associates are already somewhat inflated, and that 20 and 30

25      percent increases per year above that are not reasonable.  And

1   they're not something that clients in the private marketplace

2   are willing to endure.

3        And all of that has gone into the Fee Examiner's

4   consideration in determining what appropriate level of

5   seniority based adjustment should be imposed.

6        THE COURT:  And in general, what -- actually, I'll

7   take that back.  I want to ask that question in a different

8   context.

9        You've indicated a concern that the initial discounts

10  that were provided for in the original approvals will be

11  eroded by increases, and I would just like you to take me a

12  little bit deeper into the math.

13       So is this a concern, that the overall payments will

14  creep up because the discounted pie is getting larger, or are

15  you seeing people calculate the discount based on the

16  uninflated rates only, if that makes sense?

17       MS. STADLER:  I'm not sure I understand the question,

18  Your Honor.  I'm sorry.

19       THE COURT:  All right.  So why don't I just ask you,

20  what sorts of computations underlie that concern?

21       MS. STADLER:  Well, as you know, every professional

22  in this case was asked to provide a discount off their

23  standard billing rates.  Most did so, but there has not been a

24  uniform approach to that.

25       There also has not been a uniform approach to how the

1   discounts will be calculated and applied prospectively.  And

2   there wasn't any corresponding limitation on rate increases.

3        So the concern, and this is observed in at least a

4   couple of cases in the application materials the Fee Examiner

5   has reviewed so far, is that a stated discount at the

6   beginning of the case which would, on its face, appear to

7   offer savings, would quickly be recouped through the

8   subsequent and perhaps more frequent than usual rate

9   increases.  So that within a short period of time, while the

10  initial rate discount was real and genuine as of the date of

11  the professional's engagement, that a series of successive

12  rate increases more frequently than annually, and at rates

13  higher than the industry norms, have the impact of erasing any

14  savings that would have been incurred through the discount

15  process.

16        So that's the best I can do to articulate that.  We

17  have, you know, calculated what the savings are from the rate

18  increases, what the cost of -- or what the savings are from

19  the discounts versus the cost of the rate increases, and in

20  some professional instances, one has surpassed the other.  In

21  other instances, it hasn't.

22        Depending on how long the case goes on, it's probably

23  true that most discounts will ultimately be overtaken by

24  subsequent rate increases, but the idea is to make sure that

25  the discount is real and absolute off an appropriate market

1   rate at the time it's charged, rather than being an artificial

2   discount that is then marked up in another context.

3        THE COURT:  And so I take it that, among other

4   things, you're not seeing a -- if there were a 20 percent

5   discount agreed in the first instance on, just for simplicity,

6   a 100 dollar an hour rate, if that rate is increased to 110

7   percent, the 20 percent discount multiplier is not being

8   directly applied to the 110 dollar rate?

9        MS. STADLER:  No, I think that they are, although,

10  again, there's an important caveat, which is everyone is doing

11  this a little bit differently.  Some firms will calculate

12  their entire fee application based on their stated standard

13  rates and then do a below the line deduction, so it's really

14  easy to see, this is the discount we're offering off the total

15  price.

16       Others, I think more commonly in this case, have

17  adjusted people's hourly rates so that an individual

18  attorney's hourly rate will be ten or 15 or 20 percent lower

19  than it ordinarily would be.

20       And then there are some professionals in this case

21  that have stated a discount amount, but that will be applied

22  at the end of the case in the discretion of the professional.

23  So it's really impossible to know, until the professional

24  exercises that discretion, how the discount will be applied,

25  which fees will be subject to the discount, you know, whether

1    the discount will be off the total amount of fees that have

2    been determined to be reasonable by the Court or the gross

3    amount charged.

4            So it's very difficult to answer that question with

5    precision; but I think in most instances, professionals are

6    increasing the rates that they would charge on a market basis,

7    and then discounting them in the same amount that they had

8    indicated they would do so in the beginning of the case.

9            THE COURT:  Would it be helpful to have, as a

10   standard element of interim fee applications, a uniform

11   display or table that would illustrate the dollar impact of

12   the discount on the market rate fees in a uniform format each

13   time so that you can have some sense of comparability, and as

14   to the one that has the unusual arrangement, still have that

15   illustrative dollar amount as a benchmark?

16           MS. STADLER:  Right.  Yes and no.  We do that

17   calculation.  We have done that from the outset when we can.

18   Some professionals disclose it and we verify it.  Other

19   professionals don't.

20           And when we issue our voluminous letter reports to

21   the professionals, which are of course confidential in the

22   nature of settlement communications, there's almost always an

23   exhibit that shows, you know, our calculation, the Fee

24   Examiner's calculation of what the discounted rate's or the

25   overall discount's impact has been on the fees.

1          So that the Fee Examiner is always keeping in mind,

2    when making determinations about what fees should be subject

3    to a potential objection, he's cognizant of the fact that

4    there has been a discount, that there's already some impact on

5    the professional from that discount.  And so he's taking that

6    into consideration, at the same time, concluding that in the

7    context of this case, the firms -- the fees still have to be

8    reasonable, the activities undertaken still have to be

9    reasonable.

10          There are, of course, many more components to a

11   reasonableness analysis than just the hourly rate.  So we do

12   that, I think, for the professionals for whom that calculation

13   is difficult.  It is difficult for us, as it is for them.  I

14   don't know that there's a way to mitigate that other than

15   changing the way the discount is calculated.

16          And I'm not -- that would probably require

17   reexamination of some of the retention agreements, and I don't

18   know if that's something that the Court is interested in

19   pursuing or not.  I think it's probably more cost effective

20   for us to continue calculating it, because we now have a

21   reporting format set up for it, and we can generate that as a

22   matter of course with our initial set of exhibits and data

23   reporting.

24          If the professionals were required to provide the

25   disclosure, we would still verify it, so I don't think it

1    would hurt, but I don't think that that type of a requirement

2    would add something that's missing from our analysis already.

3            THE COURT:  All right.  Well, I defer to you on

4    efficiency.  I don't want to make anything more complicated

5    than it needs to be.

6            My concern was, first of all, that it was being done

7    somewhere, but frankly, also that through this interim review

8    process, when we get to the final retrospective determination,

9    there is some set of benchmark numbers that both the Fee

10   Examiner and the professionals own at a level of significance

11   so that I'm not dealing with people who are, you know, some

12   working in Ukrainian and some people working in French --

13           MS. STADLER:  Yeah.  Right.  Right.

14           THE COURT:  -- as to what the right benchmarks ought

15   to be.

16           MS. STADLER:  Right.  And that's part of the reason

17   that the Fee Examiner has tracked this from the very

18   beginning.

19           I'd also like to note for Your Honor that we have the

20   ability to include, in our reporting to the Court, any

21   information that would be useful to the Court in conducting

22   its own reasonableness analysis.  As I said, we produce

23   voluminous reports and exhibits to professionals.  Everyone

24   here who's filed a fee application knows what I'm talking

25   about, and they probably roll their eyes when it arrives,

 1    because it tends to be very detailed and complete and, you

 2    know, a line-by-line flagging of issues.

 3           Any data that's available from that reporting or

 4    elsewhere in our process can easily be turned into a summary

 5    for the Court with or without designating firm information.

 6    We could do it on an average basis.  We could do, you know,

 7    gross amount of savings from discounts compared to gross

 8    amount of impact from rate increases during a given time

 9    period.  We could carve out associates.  We could include

10    associates.  We could apply different rates.  Because we

11    require the submission of all of the fee applications

12    supporting material in electronic format, we can really

13    provide a great deal of granularity for anyone who's

14    interested in it.

15           The Fee Examiner includes in his reports to the Court

16    enough information we hope for the Court to make its

17    reasonableness analysis without inundating anyone with too

18    much detail.  But to the extent that that sort of information

19    would be helpful, either on an interim reporting or final

20    reporting basis, we absolutely can provide it.

21           And so we're interested in hearing the Court's

22    feedback on, you know, the additional revisions to this

23    particular presumptive standards Order that the Court would

24    like to see, but prospectively, we're also very happy to

25    accommodate any other requests for information or imposition

1  of a standard that we haven't contemplated or articulated to

2  the Court.

3          THE COURT:  Well, I'm grateful for your confirmation

4  that the detailed information is both available to me and

5  fairly easily accessible.  Given my limited resources and the

6  many demands on my attention here, I am very grateful for the

7  expertise and experiential context of the Fee Examiner.  And

8  the Fee Examiner's expertise and analysis in negotiating, and

9  reviewing negotiating and coming to recommendations, are very

10  meaningful to me as review on behalf of the Court in this

11  interim process.

12          I think I may well ask you for a more granular

13  presentation toward the end, but one reason that I've engaged

14  with you in these -- the development of these presumptions and

15  have made requests for consideration is that in order for me

16  to be able to be confident of the interim recommendations, I

17  need to have a good understanding of what the process is and

18  what the benchmarks are that are being applied by the Fee

19  Examiner in discussions with the professionals that lead to

20  those recommendations.

21          Being confident of the Fee Examiner and confident of

22  the benchmarks, I don't have a need to see the math every

23  time, because I know what's going on.

24          MS. STADLER:  Okay.  Thank you, Judge.  I appreciate

25  that.

1          THE COURT:  And so turning to the question of

2     percentage increases, I am concerned about the, I'll call it

3     inflationary component of that, the nonseniority component.

4     I'm concerned about the seniority component as well, but

5     you've confirmed to me it's difficult to identify benchmarks.

6          So I think we ought to know, we ought to be able to

7     disaggregate the seniority component, but for today, I

8     particularly want to focus on the inflationary component,

9     because it seems to me that given the unprecedented unusual

10    nature of these cases, their breadth and the breadth of

11    demands on the resources of the Commonwealth on the one hand,

12    on the other hand, the unique professional experience and,

13    frankly, prestige that is associated with working on these

14    issues in this distinguished company of professionals is

15    something that is of value in the mix for professionals

16    working here.

17         And so I would like to see, I'll just put it that

18    way, I'll be flat out with you, a presumptive ceiling of

19    the -- equal to the annual rate of inflation in the New York

20    metropolitan area, which is two percent according to the

21    charts that were cited in the Fee Examiner's report, rather

22    than five percent.

23         And I recognize -- I'm not asking that a firm limit

24    all of its billing increases to two percent.  But I think this

25    is a unique situation, and there are, as you know, concerns

1    within, concerns without, and a -- and this island is a living

2    organism that has to go on and live afterwards, that has to be

3    able to allocate and distribute resources that are not going

4    to be increased, absent some miracle that I don't foresee at

5    this point, and that the projections don't identify for us.

6            And so I am concerned at every level with the proper

7    husbanding, to use a sort of antiquated term, of resources.

8    And there is sacrifice necessary all around, but I also

9    understand that there are inflationary pressures on all of us.

10   There is a real discernible rate of inflation, and there is

11   value that comes from participating in these experiences that

12   goes beyond the dollars that come in.  And so I would like the

13   Fee Examiner to consider this and to discuss it with

14   professionals.  And I would like to see it in a revised

15   version of the motion.

16           And if there's opposition to the motion, there's

17   opposition to the motion on the presumptions, I'll take that

18   up and we'll talk about it in open court.  But that is a real

19   concern for me.

20           MS. STADLER:  We will do so, Your Honor.

21           THE COURT:  Thank you.  And I would also like to see

22   seniority rate increases accompanied in the application by a

23   representation that the increase is consistent with the

24   firm-wide proportions for whatever the given period is so that

25   there is -- there is something, there's a representation made

1    as officers of the Court by the firm, and that figure,

2    disaggregate it.

3           Turning to the disclosure element of the increase

4    mechanism.  The revised proposal carves out professionals

5    retained by AAFAF and the Oversight Board on the principle

6    that that information is publicly available and has been

7    negotiated.  It may very well be publicly available here on

8    the island.  It's not easily available to me.  And so I would

9    prefer to see even those professionals required to file

10   updated information with the Court in advance of the rate

11   increases for the benefit of the Court and the benefit of the

12   public.

13          And similarly, the retention related disclosures as

14   to other professionals, even if there's an exemption from the

15   Section 327 related template that you've proposed for the

16   nongovernmental body professionals, having some documentation

17   on file with the Court in the publicly available ECF system

18   will be helpful to the Court and to greater public

19   understanding and acceptance, I believe, of this process and

20   the significance of the expense of this process for Puerto

21   Rico.

22          Would it make sense, again, just in terms of overall

23   cost containment goals, to seek to identify certain types of

24   work that might presumptively be expected to be performed by

25   local counsel at the significantly different billing rates

1   than by mainland counsel?

2           MS. STADLER:  I think so.  I think a lot of the firms

3   are doing that of their own volition.  There certainly are

4   things that come to mind.  I think we've seen a lot of lift

5   stay motions, and some of those are being handled by the local

6   counsel.  Claims objections, I believe, are or will be

7   primarily handled locally.

8           So we could certainly come up with some suggestion as

9   to types of routine commodity work in bankruptcy that should

10  be performed by local professionals.  The challenge with that

11  is every law firm has a different way of operating in

12  conjunction with their local counsel.

13          Some law firms are very happy to hand things off to

14  their very competent local professionals and feel no need to

15  step in or supervise or oversee.  Other firms feel strongly

16  that they are still making representations to the Court when

17  documents are signed and filed through pro hoc vice admission

18  or otherwise, and feel that they, in order to fulfill their

19  professional responsibility obligations to the clients and to

20  the Court, need to be aware in some sense of what's happening

21  with matters that have been delegated to local counsel or

22  efficiency counsel.

23          We'll have to deal with that, but I do think that

24  laying out a couple of areas that we think might make sense

25  for that to be something to encourage people to do, I think

1   that that's a fine idea.  And it shouldn't be difficult to

2   articulate those areas, keeping in mind that obviously the

3   application of those requirements has to be fact specific --

4        THE COURT:  Yes.

5        MS. STADLER:  -- case specific, firm specific, as our

6   inquiries always are.

7        THE COURT:  And I understand that particular pockets

8   of expertise may well differ people to people, firm to firm,

9   but to have a general benchmark, again, common understanding

10  of the sorts of work that might properly be expected to be

11  done by local counsel would be helpful to the Court and I

12  think helpful overall to the process.  So thank you for

13  undertaking to explore that.

14       So I would like to turn to the subretained

15  professionals issue.

16       MS. STADLER:  Yes.

17       THE COURT:  And I noticed in the revised Order that

18  the restrictions and disclosure requirements and client

19  consent requirements seem to be proposed only prospectively

20  and only for new retentions, which it seems to me would

21  diminish very substantially the impact of the new presumptive

22  standard and the information that will be available to the

23  Court.

24       And so what -- if I'm right about the way that that

25  was intended to operate, I'll say what I would like to see is

1    to have, even for already retained, subretained professionals,

2    a benchmark disclosure and confirmation of client consent as a

3    baseline.  And then going forward, disclosure and client

4    consent for any new retentions, changes in fees going forward.

5          MS. STADLER:  Yes.  As you can imagine, that issue

6    was the subject of vigorous discussion.  The reason for that

7    revision in the revised version of the Order was primarily a

8    concession that we can't put the horse back in the barn.  Once

9    someone has been retained, it's impossible to predisclose

10   those things.

11         And so what we've tried to do is make clear to those

12   professionals, and in most cases, the professionals themselves

13   have paid the retained experts out of pocket.  And so rather

14   than indicating to them the entirety of the fee would be

15   subject to disallowance for that reason, we wanted to provide

16   a mechanism for those fees to still be considered under the

17   reasonableness parameters that would normally apply, with the

18   recognition that there was perhaps some initial disclosure or

19   consent information that could have been provided, and that

20   should have been provided and maybe can be provided even

21   though the horse is out of the barn.

22         So we can work on that.  I think that there will be

23   additional expert retentions.  Many professionals have talked

24   to us, you know, about specific instances where, we're going

25   to need to hire someone on this, this, this, this.  Should we

 1    let you know?  When should we let you know?  How should we --

 2    do you need to approve it?  That sort of thing.

 3         And we can talk about that in connection with the

 4    next revision, but Your Honor has hit on a tricky issue for us

 5    and we will continue to work on that.

 6         THE COURT:  Thank you.  It doesn't surprise me that

 7    it's sensitive, but I also think it's fair.  And I hope it

 8    will be efficacious for the assembleds to know that it is

 9    something of which I'm concerned.

10         And I'd just like you to confirm that the issue

11    raised as to the COFINA Agent's retention is something that is

12    still being worked on and has been carved out of the --

13         MS. STADLER:  Yes.

14         THE COURT:  -- recommended approval?

15         MS. STADLER:  Yes, it has.

16         THE COURT:  All right.  I think you'll all be happy

17    to know that that takes me through the major structural

18    concerns that I had in terms of the motion.

19         I'd just like to ask you, and I realize you need to

20    speak to this very generally, but there is the potentially

21    duplicative retention issue with respect to the COFINA Agent

22    in particular.  And so if you could give me a little bit of

23    insight into how you are going about analyzing what's of

24    concern, and what sorts of changes you might expect to see

25    going forward, assuming that there's significant

1    COFINA-related work to be done going forward.

2         MS. STADLER:  Right.  Yes.  Speaking generally, as

3    Your Honor knows, the Order for the appointment of the COFINA

4    Agent included provisions for her retention of counsel and

5    explicitly provided for the retention of a lead counsel firm

6    and a smaller firm that was designated as municipal counsel,

7    which on its face makes sense.

8         Our process involves looking not just at the matters

9    identified as matter codes or names in the fee application,

10   but also the nature of the tasks provided.  And our initial

11   analysis noted that while the titles of the two different law

12   firms were distinguishable, that the actual activity of the

13   two law firms was less so.  So that if there were a particular

14   municipal law component to a specific issue or a specific

15   motion, it was not clear from the time records.  Municipal

16   counsel is working on this issue.  Lead counsel is working on

17   this issue.

18        Instead, it began to look as if the lead counsel was

19   vetting some of its work product with the municipal counsel.

20   Municipal counsel was almost always running its work product

21   through the lead counsel.  And it was difficult to discern in

22   the beginning the difference.

23        We flagged that issue.  We kept an eye on it.  We

24   talked to the professional about it.  We asked for more

25   clarification.  We asked them to be mindful of this concern

1    and try to be careful that there wasn't unnecessary

2    duplication going on.

3            And as the fee periods have progressed, it's not

4    something that the Fee Examiner feels has gone away.  It

5    continues to be an issue.

6            We're now at a very interesting point because, as

7    Your Honor well knows, COFINA confirmation hearings are

8    scheduled for January, and all of those professionals might be

9    done working, on the best case scenario, by the end of January

10   or mid February, or certainly in the first quarter of the

11   year.

12           So we're trying to walk that fine line here between

13   imposing standards of reasonableness, enforcing those

14   standards to the extent enforcement is possible, but not

15   stepping on the toes of professionals in terms of their

16   professional judgment.  And also, not stepping on the toes of

17   clients who have, of course, the right to ask their lawyers to

18   perform services for them, as they feel they need to, to carry

19   out their own fiduciary obligations, et cetera.

20           So given the unique nature of that situation, I think

21   what we've tried to do is reserve the Fee Examiner's rights to

22   continue to look at and raise that issue.

23           I think the parties are on notice that if the COFINA

24   plan is confirmed and they're all filing final fee

25   applications in the next couple of months, this issue may well

1   be front and center in the discussion of how those final fee

2   applications will be treated.  And if I had to guess, I would

3   say that the Fee Examiner will likely be seeking some

4   additional adjustments to fees to address those concerns.

5            THE COURT:  Thank you.

6            One final issue, which is the footnote regarding

7   proposed gross-ups in the event that the Puerto Rico tax

8   principles change.  It may be very premature to spend a lot of

9   time focusing on it now.  It may not be necessary at the end

10  of the day.  But should the implementation of the tax happen,

11  I would like to see some set of principles and uniform

12  disclosure and presentation format for gross-up proposals.

13           And I recognize firms have people in different states

14  and different tax jurisdictions, and it's unlikely that firm

15  to firm the number would be precisely the same, but it ought

16  to be as transparent and as easy as possible for the Fee

17  Examiner and the Court to understand the principles that are

18  behind requests, over and above even the withholding tax.

19           The rationale on the withholding tax is obvious.  And

20  I trust also, as the authorities of the Commonwealth consider

21  tax -- you know, that tax, et al., they think about the

22  transaction costs of money going in through the front door and

23  coming out through another door and all of that.  So maybe it

24  will come to pass.  Maybe it won't.  But the gross-up

25  component is yet another part that would be in that cycle,

1   but, you know, coming specifically before the Court.  And I

2   would like to have as much information and an analytical tool

3   that has analytical integrity.

4              MS. STADLER:  Right.  I think Your Honor is correct.

5              There may be a prematurity element here.  At the same

6   time, we don't want to let the horse out of the barn on this.

7   So we're trying to balance there.

8              And my understanding, and there are certainly people

9   in this room that are much more qualified than I am to speak

10  on this, but my understanding is the legislation passed and

11  was signed by the Governor.

12             We've been unable to locate a copy of the Bill, a

13  copy of the Act, or any legislative analysis that would

14  indicate when it takes effect, et cetera, et cetera.  So it

15  could be relevant January 1st.  It could have been relevant

16  yesterday.  It might not be relevant until next year.  We

17  really don't know.

18             The purpose of this footnote was to make clear to

19  professionals that whatever the treatment of that issue ends

20  up being in the area of billing and fees and fee applications,

21  it needs to be kept separate from these other types of rate

22  adjustments that we've been talking about.

23             We don't want professionals to uniformly raise every

24  individual timekeeper's rate by 30 percent or 29 percent

25  effective January 1st in an effort to get ahead of this issue,

1   because it would be impossible later to determine what was the

2   29, and what was the two, and what was the five, and what was

3   the 12 and what was seniority based.

4            THE COURT:  Yes.

5            MS. STADLER:  So -- and I think we have consensus

6   among the Oversight Board and the Fee Examiner that keeping

7   the issue separate is really the best we can do at this point

8   in providing guidance to the professionals.  And what else

9   happens as a result of that, as you said, we'll just have to

10  see --

11           THE COURT:  Yes.

12           MS. STADLER:  -- how things unfold.

13           THE COURT:  I had seen that the tax reform bill had

14  been signed, but I didn't see specific reportage on this

15  issue.  And so honestly, it wasn't clear to me whether this

16  had been included or not.

17           So I apologize for being a little bit behind the

18  curve on that, but it sounds as though administrative guidance

19  and clarity is still outstanding?

20           MS. STADLER:  Definitely.

21           THE COURT:  All right.  Well, thank you for your

22  attention to this, as to all other matters.

23           And so what I will do is enter an Order denying

24  without prejudice the current motion, which is ECF 4370, in

25  anticipation of a further revised set of proposed presumptions

1    and procedures that builds on this discussion today.  And I

2    also expect that professionals will be guided generally by

3    this discussion today in proceeding with their work in the

4    consideration of fee increases.

5             And I thank you all.

6             MS. STADLER:  Thank you, Your Honor.

7             THE COURT:  Thank you, Ms. Stadler.

8             MS. STADLER:  Thank you.

9             THE COURT:  Mr. Despins.

10            MR. DESPINS:  Good morning, Your Honor.

11            THE COURT:  Good morning.

12            MR. DESPINS:  Luc Despins with Paul Hastings.

13            Very, very briefly, two comments.  First, I want to

14   say, I hope I won't live to regret this, but the Fee Examiner

15   has an impossible job.  I think they're doing a very good job,

16   considering all the push and pulls that are involved in that

17   process.

18            But I wanted to address one issue, which is the cost

19   of living proposal that Your Honor suggested.  And I want to

20   make -- and I know this is not the hearing where this is going

21   to be decided, but I just wanted to make sure the Court and

22   the Fee Examiner have in mind, you know, not all professionals

23   have the same contract or agreements.

24            Some agreed to the largest discount, 20 percent.

25   Some were told by their partners they should have their heads

1    examined to have agreed to that.  But that is beside the

2    point.  That has been agreed to.  But that contract, that

3    agreement, also has other features.  And when we negotiate

4    with a client, I've never given discounts in bankruptcy, but I

5    know you always look at two things:  One, what's the discount,

6    and are you frozen at those rates.

7         And in our case, you know, the Order says that the

8    rates can be increased, as they are increased for all clients,

9    not just for this client, as you know, over time.  And the

10   fees have to be reasonable.  There's no doubt about that.

11   It's our burden.  We understand that.

12        But the problem we have is that to have a two

13   percent, one-size-fits-all, when some firms are giving a five

14   percent discount, others 15, our firm, 20, is a difficult

15   issue when, you know, this is not a new issue, meaning it was

16   specifically provided that our fees could be increased, as

17   they are increased for all other clients.

18        So I know this is not the time to argue that, but I

19   just wanted to add that dimension to the discussion.

20        THE COURT:  I do understand that it's serious.  I do

21   understand that it's complicated.  These proceedings have --

22   could have been expected to be complicated, I think in some

23   ways have been far more complicated and expensive across the

24   board than they might have been in another scenario, probably

25   less complicated than they could be, they could well be.

1        So I guess I would say two things:  I hear what you

2  are saying, and I take seriously the contextual issues and I

3  trust that they will be discussed.  I also hope and trust that

4  professionals and their partners will take to heart and take

5  seriously the comments that I've made today, and the rationale

6  that I've offered for the comments that I've made today.  And

7  bear in mind that Orders that are not final can always be

8  revisited by the Court.

9        And, you know, personally, I know what it's like to

10  have, we'll just put it, way less control than I'd like to

11  have in an ideal world over my own ability to budget and be on

12  a fixed income in a life that has become exponentially more

13  complex and demanding than I originally signed up for.  So if

14  that helps, I can feel your pain.

15        MR. DESPINS:  Thank you, Your Honor.

16        THE COURT:  Thank you.

17        Mr. Williamson.

18        MR. WILLIAMSON:  Actually, Your Honor, your last

19  comment may be the most significant comment of the morning.

20        Good morning, Your Honor.  Brady Williamson, Godfrey

21  & Kahn, Fee Examiner.

22        In light of the extended discussion, I will be very,

23  very brief.  There is no shortage, from our perspective, of

24  either data or discussion.  And I simply want to add to the

25  record that the data to which we have access is not limited to

1   this case.  It encompasses several other major Chapter 11s, of

2   which some of the parties and counsel in this room are

3   involved.

4          So the purpose of making that point is to, in effect,

5   reinforce what I think everyone has said this morning, which

6   is one size does not fit all.  So that with this massive data,

7   we can provide data on virtually everything down to the

8   individual staff member, the individual associate.  The

9   challenge is making judgments based on that data.  And the

10  Court's comments this morning, obviously, are very, very

11  helpful.

12         I would simply end by saying that obviously

13  professionals have a role.  The Fee Examiner has a role.  The

14  Court has a role.  But as a reminder, the clients have a role

15  as well.

16         THE COURT:  Yes.

17         MR. WILLIAMSON:  And that is particularly true on

18  rate increases, which is why we made it a component of the

19  presumptive motion.

20         Your Honor, I don't know if the Court was going to

21  treat the specific applications as a separate matter or not,

22  but --

23         THE COURT:  Well, it's the next matter.

24         MR. WILLIAMSON:  Then I'll leave that to the Court

25  and Ms. Stadler.  Thank you.

1          THE COURT:  Thank you.

2          So, Ms. Stadler.

3          MS. STADLER:  Thank you, Judge.  This one should be a

4   little more straightforward.

5          As you know, in connection with the last Omnibus

6   Hearing, we recommended a group of third interim fee

7   applications for Court approval.  That Order was entered in

8   November.

9          There were several applications from the third

10  interim fee period, and some from prior interim fee periods,

11  that remained outstanding.  There are various reasons for

12  that.  Some of them have to do with the data issue that

13  Mr. Williamson was just discussing.

14         Most law firm billing software can generate the

15  electronic data that we request very easily, but as Your Honor

16  can imagine, many law firms have lots of different

17  engagements.  Many law firms have four different clients.

18  There are contracts that govern certain parts of engagements

19  and that don't govern others.  And so for some professionals,

20  providing data that matches their fee application has proven

21  to be a challenge, and so that's caused some delays in some

22  treatment.

23         In other words, it is just a function of the sheer

24  volume, the number of the issues that have been identified and

25  the time it takes to go through and meaningfully address each

1    and every one of them.

2         We hope that the professionals and the Court are

3    cognizant of the interim compensation procedures which allow

4    professionals to receive 90 percent of their requested fees on

5    a monthly basis while this process plays out.

6         THE COURT:  Yes.

7         MS. STADLER:  And ultimately, we think that we'll

8    reach the right result with all of these professionals, with

9    the goal, of course, being not to have contested fee

10   applications here.

11        THE COURT:  Yes.

12        MS. STADLER:  So the ones that are on the list for

13   today don't fall into one of those categories.  They merely

14   required a little more time than those that were approved in

15   November.  I think they are straightforward.

16        As we noted in our colloquy a moment ago, there are a

17   couple of issues that are carved out.  Namely, the fees for

18   the COFINA Agent's expert have been pulled out of this

19   analysis entirely.  We're going to treat that as a separate

20   line item, and we're going to do a separate and independent

21   reasonableness analysis of those fees, subject to further

22   discussion of the disclosure issue that we talked about.

23        Other than that one issue, I think all of the

24   applications we're recommending for approval today are fairly

25   straightforward.  Some of the professionals have accepted

1  fairly significant deductions to their fees in recognition of

2  some of the issues we've been talking about today.  But in the

3  end, the Fee Examiner is satisfied that the applications he's

4  recommending for approval today are reasonable under the

5  PROMESA reasonableness standards which, of course, incorporate

6  those in the Bankruptcy Code, and asks the Court to enter an

7  Order approving those fees as noted on the exhibit to our

8  report.

9        THE COURT:  I've reviewed carefully the report, and

10  the context that the Fee Examiner has provided today, and at

11  earlier sessions, hearings, and in earlier reports.  And I

12  find that the proposed -- the fees proposed for approval on an

13  interim basis are reasonable, and I will enter the Proposed

14  Order in connection with docket entry number 4455.

15        MS. STADLER:  Thank you, Judge.

16        THE COURT:  Thank you.

17        And again, thank you to Mr. Williamson.

18        Thank you, Ms. Stadler.

19        And so the next item on the agenda is the Motion for

20  Relief from the Automatic Stay of AMPR, which is ECF number

21  3914.

22        MR. BARRIOS:  Good morning, Your Honor.

23        THE COURT:  Good morning.

24        MR. BARRIOS:  For the record, Attorney Jose Luis

25  Barrios Ramos on behalf of Asociacion de Maestros de Puerto

1  Rico.

2       THE COURT:  Good morning.

3       MR. ROSEN:  Good morning, Your Honor.  Brian Rosen

4  from Proskauer Rose on behalf of the Oversight Board.

5       Your Honor, as Mr. Bienenstock mentioned before,

6  there are a lot of discussions that are going on in connection

7  with prospective plans of adjustment.  And a lot of that

8  involves negotiations, discussions among the Oversight Board,

9  AAFAF, and obviously the movants in this situation, the AFT.

10      In light of those ongoing discussions, the parties

11  have agreed that the consideration of the motion which is up,

12  the Motion for Relief from Stay, would be adjourned until the

13  next Omnibus Hearing, Your Honor, to January 30th, subject to

14  the continuation of the automatic stay and the rights of the

15  parties to agree to any further adjournment of the matter.

16      MR. BARRIOS:  Yes, Your Honor.  We have agreed to

17  those terms, and we request the adjournment and the stay to be

18  in place until the next Omnibus.

19      THE COURT:  The requests are granted.  Thank you.

20  And thank you for continuing to work toward resolution.

21      MR. BARRIOS:  Thank you, Your Honor.

22      MR. ROSEN:  Thank you, Your Honor.

23      THE COURT:  Thank you.

24      MR. ROSEN:  Your Honor, the next item on the agenda

25  is another Motion for Relief from Stay.  I don't know --

1        THE COURT:  The *Rivera Carrasquillo*, I had a message

2    last night that I was being asked to take that under

3    advisement and decide on the papers, and I will do that.

4        MR. ROSEN:  That's my understanding as well, Your

5    Honor.

6        THE COURT:  And so the next motion would be COFINA's

7    Motion to Authorize Rejection of the Lehman Debt Service

8    Deposit Agreement, number 4374.

9        MR. ROSEN:  Yes, Your Honor.  And I hope the balance

10   of the agenda goes as quickly as those last two matters.

11       Your Honor, interestingly, although this was -- it

12   was our motion to seek to reject the DSDA, as it's referred

13   to, there was a response that was filed by Lehman, but it was

14   not a response in opposition.  Rather, it was an

15   acknowledgment, Your Honor, that the rejection was

16   appropriate, could be done, but it included a reservation of

17   rights that Lehman believes it may have with respect to the

18   Trustee, who is the third party to that Debt Service Deposit

19   Agreement.

20       We did file a response just merely to note that we

21   did not think they had any claims, but if they did, those were

22   separate claims that they could assert at any particular time

23   in the future, and it was not really something that would come

24   in in the context of this motion to reject the DSDA.

25       So with that being the case, Your Honor, and really

1   no formal opposition, we would ask the Court to grant the

2   relief and to enter the Order that we submitted with our

3   motion, Your Honor.

4           THE COURT:  Well, I have thoroughly reviewed all of

5   the submissions, and I've done so in the context of the

6   requirements of Section 365.  I find, based on COFINA's

7   unrebutted proffers, that the rejection of the DSDA is a

8   proper exercise of COFINA's business judgment.  And so Lehman

9   has its rights under Section 365(g) to file a claim for

10  rejection damages, and under our procedures that proof of

11  claim has to be filed by 35 calendar days out from entry of

12  the Order.

13          I express no opinion regarding Lehman's purported

14  reservation of rights as against the Trustee.  And I will

15  enter COFINA's proposed Form of Order, which is Exhibit A to

16  docket entry 4374.

17          MR. ROSEN:  Thank you very much, Your Honor.

18          THE COURT:  Thank you.

19          MR. ROSEN:  Your Honor, the next three items -- or

20  two items.  Excuse me.

21          THE COURT:  Yes.

22          MR. ROSEN:  Two items are COFINA confirmation related

23  items.  And if I could bundle them together, because I think

24  it really does all go together.  And there is another aspect

25  of it that really is not mentioned there, but it's part of it,

1   which is the ongoing consideration of the motion that was

2   filed pursuant to Bankruptcy Rule 9019 to approve the

3   compromise and settlement.

4           So, Your Honor, if I could just give the Court a

5   little bit of an update as to where we are on all of those

6   matters, including the confirmation process.

7           THE COURT:  I'd be grateful.

8           MR. ROSEN:  Thank you, Your Honor.

9           And if I could take it in the order of the 9019

10  first, because I think it precedes it.

11          Your Honor, as you know, there were four objections

12  that were filed to approval of the 9019 motion.  One of

13  those -- and the Oversight Board did file a Response in

14  accordance with the date set by the Court.  And so we believe

15  that we've put before the Court now the objections and the

16  responses.

17          One of those objections was filed by the Retiree

18  Committee, and it also included a request for some documents

19  to be produced, as well as certain interrogatories to be

20  answered.  We did respond, and we did have a meet and confer

21  with respect to those discovery requests.

22          And the parties did come to an understanding with

23  respect to the documents that would be provided.  That was

24  included in a Stipulation and a Protective Order that was

25  submitted yesterday to the Court.

1        As part of those conversations, Your Honor, we also

2   addressed the substance of the issues that were raised in the

3   Retiree Committee's objection.  And we -- as we noted in the

4   Reply that was filed, we felt that virtually all, if not all,

5   of those positions that were being espoused by the Retiree

6   Committee had nothing really to do with the substance of the

7   9019 motions or the merits.  But nevertheless, as part of

8   these ongoing discussions that we're having with AFT, the

9   Retiree Committee, towards a plan, we wanted to have a

10  detailed discussion to try and resolve any of their ongoing

11  concerns.

12        One of the issues that was raised by the Retiree

13  Committee was a question regarding whether or not the new

14  indebtedness, which is to be issued by COFINA pursuant to the

15  COFINA Plan of Adjustment, as well as the possible

16  indebtedness that might be issued for the benefit of the

17  Commonwealth pursuant to the COFINA Plan of Adjustment would

18  be included in the constitutional debt limit that is out there

19  and that a lot of people have talked about several times over.

20        Your Honor, we, again, don't believe that that is the

21  subject or should be the subject of a 9019 motion, but we

22  engaged with the Retiree Committee on that basis.  And what we

23  did, the Oversight Board does have an opinion with respect to

24  this indebtedness, and specifically, the indebtedness which

25  may be issued for the benefit of the Commonwealth pursuant to

1    the COFINA Plan.

2            We believe it is something that is very important.

3    We actually agree with the substance of the concerns of the

4    Retiree Committee, but both parties agree, Your Honor, that it

5    is something that should probably be taken up in the context

6    of a -- excuse me, a Commonwealth Plan of Adjustment, rather

7    than the 9019 motion and the COFINA Plan of Adjustment

8    confirmation hearing.

9            So as a result of that and our commitment to have a

10   further dialogue with respect to that issue, I am pleased to

11   report that the Retiree Committee has agreed to withdraw its

12   limited objection to the 9019 motion, leaving only those three

13   remaining objections that were filed.

14           I don't know if there is anyone from the Retiree

15   Committee in the courtroom here or there, but I was able to

16   represent that they would be making that withdrawal, Your

17   Honor.

18           THE COURT:  Thank you.

19           MR. BENNAZAR ZEQUEIRA:  Buenos dias.

20           THE COURT:  Buenos dias.

21           MR. BENNAZAR ZEQUEIRA:  Antonio Juan Bennazar

22   Zequeira from the firm of Bennazar, Garcia & Milian, together

23   with my partner, Hector Mayol.  We are co-counsel to the

24   Official Retiree Committee, together with the attorneys of

25   Jenner & Block.

1          And what brother counsel Rosen has just stated is

2     absolutely accurate.  And these conversations will continue.

3          You probably understand very well why we are

4     concerned.  We have over 167,000 constituents whose pensions

5     need to get paid, and we are concerned that the Commonwealth

6     will have enough resources to do that.  But the communications

7     with the representatives of the Board are good.  There's a lot

8     of communication.  There's a lot of telephone calls,

9     conferences, meetings.

10          And we hope that this dialogue will eventually lead

11    to a Plan of Adjustment of the Commonwealth that will provide

12    for the pensioners of Puerto Rico.  Thank you.

13          THE COURT:  I am glad to hear this.  I just have one

14    technical question.  Will you be filing a notice withdrawing

15    the objection?

16          MR. BENNAZAR ZEQUEIRA:  I understand it was filed

17    last night, or it was about to, from our New York firm.

18    Jenner was going to file that notice.  I thought it had been

19    filed.

20          THE COURT:  I may have missed it.  But as long as I

21    can expect it will be filed, that means I don't have to

22    compose an Order that says it was withdrawn.  So thank you.

23          MR. BENNAZAR ZEQUEIRA:  You're welcome.

24          MR. ROSEN:  Thank you, sir.

25          Thank you, Your Honor.

1    I am not sure it was filed, but we will make sure

2  that one will get filed if it has not been already.

3    THE COURT:  Thank you.

4    MR. ROSEN:  Your Honor, turning to the substance of

5  the confirmation process, and also picking up on the dialogue

6  that you had previously about the claims process, I just want

7  to -- and the claims objection and who's handling what, I just

8  want to report to the Court that through the dialogue that we

9  have had with the administrative office in Washington on

10  behalf of the Court and the Clerk of the Court several weeks

11  ago, 16 Omnibus objections were filed.  Most of them, if not

12  all of them, pertaining to the approximately 3,500 claims that

13  were filed in the COFINA case.

14    And I think, as I previously indicated, there were

15  over 10 trillion dollars of claims filed in the COFINA case,

16  when there is only 17 billion dollars worth of funded debt.

17  So we knew that there might have been a little bit of fluff in

18  those claims, and we've done our best.

19    And besides the Omnibus objections that have been

20  interposed, Your Honor, we've done our best to clear the

21  balance of the claims registered with respect to COFINA.

22    Three additional Omnibus objections are going to be

23  filed today.  The hearings on these are laid out in accordance

24  with the discussions that we've had with the administrative

25  office, and they won't have to be heard at all prior to the

1  confirmation hearing. We just wanted them on file.

2      Additionally, many Notices of Withdrawal of Claims

3  are being filed by the respective claimants. We've reached

4  out to all of those because one, they didn't want to be the

5  subject of an objection, but two, they understood that the

6  master proofs of claim that had been filed by Bank of New York

7  covered the bonds themselves and there was no need for it.

8      Likewise, many claims have been filed by actually GO

9  holders, who are people who held bonds against PBA, but they

10  filed it to preserve their rights against COFINA. And they

11  have voluntarily agreed to withdraw those claims as well. So

12  I have --

13      THE COURT: And so are you tracking and reconciling

14  that?

15      MR. ROSEN: Yes, we are, Your Honor.

16      And part of the Notices of Withdrawal that are being

17  filed are also authorizing Prime Clerk to remove those from

18  the claims registry as well. So hopefully we'll get down to

19  the -- and we're also going to be filing some individual

20  claims. Because of the Omnibus Procedures Order that was

21  entered, they're not susceptible to an Omnibus objection, but

22  again, we wanted to clear the docket up. They are not on for

23  any time in the near future, but we wanted those on the record

24  just to rid the claims registry of it.

25      In my world, Your Honor, I believe that there

1   probably should be ten claims or so in COFINA down from 3,500,

2   but we will get close to it by the end of the day.  So that's

3   been a very positive process, and I appreciate all the efforts

4   of not only the team of O'Neill Borges and Proskauer, but also

5   all the creditors' counsel who have been working with us to

6   enter those Notices of Withdrawal to clear up the docket.

7        THE COURT:  I thank you all.  And I also do thank you

8   for working with our third branch representative out of the AO

9   to coordinate our administration of our end of the process.

10       MR. ROSEN:  We will be having more dialogue with that

11  office, Your Honor, as we continue to develop the claims

12  objections procedures on a more substantive basis.

13       We've already had initial conversation, but I think

14  it will entail perhaps a trip to Washington to sit down with

15  the office to really get into the substance of it.

16       THE COURT:  That's very good news.  Thank you.

17       MR. ROSEN:  Your Honor, with respect to the

18  confirmation process itself, the objection deadline is January

19  2nd, and to date, we have not received any objections.

20       We do understand, however, Your Honor, that you and

21  the court might have been the recipient of a mail order

22  campaign, with being flooded with letters.  And we appreciate

23  the Court posting those on the docket so we can see what is

24  being said, but we also took note of the Court's entry of an

25  Order which said those are not formal objections to the

1    confirmation process.

2         But we still want to hear what people are saying, and

3    we want to try and address it, or at least in the context of

4    the confirmation process, the hearing itself, be able to

5    present to the Court enough information so that those people

6    who have informally raised those concerns to you will be

7    heard.  And you'll understand the process that was gone

8    through, and you'll be able to address that when addressing

9    the confirmation process itself.

10        THE COURT:  I am very glad to hear that.  As you've

11   seen, a lot of those raise social and economic concerns, but

12   they are very real concerns in very real lives.  And some of

13   them also indicate, you know, possible lack of understanding

14   of some of the mechanics of the issues that are before the

15   Court in the confirmation proposal and in the 9019.

16        And so I do hope and trust that in your submissions

17   and advocacy, you'll provide both a narrative and any

18   necessary factual information and representations to be able

19   to enable me to address it, enable the public to understand in

20   an appropriate factual context what's being proposed.

21        It's not a situation in which everyone, everywhere in

22   all of the constituencies of parties in interest will ever --

23   could rejoice together no matter what my ruling is on these

24   motions, but it is very important for everyone to have an

25   accessible information base and an understanding of what's

1   happened and why.  And I appreciate your taking that up

2   seriously.

3           MR. ROSEN:  Thank you, Your Honor.  We will do our

4   best.

5           THE COURT:  May I just say something --

6           MR. ROSEN:  Sure.

7           THE COURT:  -- in that connection?  I am considering

8   and think that it would be important, in addition to the

9   specific objection filing procedures, which we've made clear

10  and provided, in addition to my close attention to everything

11  that comes in in my mailbox, and electronic and physical, to

12  have an opportunity in connection with the 9019 motion and the

13  plan confirmation for a designated segment of time for a

14  limited number of members of the public, chosen at random from

15  people who express a desire to speak, through a process that

16  I'll devise and publicize, to be able to come to court and

17  make brief remarks on the order of a five-minute limit.

18          And I'd like to find an hour or two in the course of

19  the day.  I realize that we will have a lot to get done if

20  it's a one-day hearing, or even a day and a half hearing, but

21  I want to notify you of that.

22          MR. ROSEN:  Certainly.

23          THE COURT:  And at some point before we adjourn

24  today, I'd like to talk about what the agenda for those

25  proceedings would look like and in what order different events

1    would need to take place, so that we can think very

2    realistically, and I can think more realistically, about what

3    needs to be arranged.

4              MR. ROSEN:  Absolutely, Your Honor.

5              Just to let you know about the notice and the

6    balloting process that is going on, pursuant to the

7    solicitation procedures Order or the disclosure statement or

8    whatever you want to call it, radio spots have been airing,

9    notices have been published in newspapers, and the balloting

10   has commenced.

11             We know that because we have been receiving some

12   phone calls from beneficial holders about how do I actually do

13   this, because they're nominees through DTC, and how things

14   trickle down, they don't sometimes accurately explain it.

15             So we've been addressing all of those, and we're

16   actually working with the balloting agent to perhaps put

17   another thing out there through DTC to make it even in simpler

18   English, more plain for them.  But we are starting to see the

19   balloting roll back, and so we are happy to report that.

20             Going to your comment about process, and this is

21   consistent with the 9019 motion as well, we are in the process

22   of putting together declarations in support for both the 9019

23   motion and for the confirmation process.

24             The time to respond to objections that are interposed

25   with confirmation is January 9th, and so we are anticipating

1   filing those declarations in support on January 9th.  And we

2   would use those, Your Honor, as direct testimony in the

3   context of confirmation to perhaps lighten the burden of the

4   Court.

5       The only ballot that would not be filed at that time

6   would be the ballot -- excuse me.  The only declaration that

7   would not be filed would be the declaration of the balloting

8   agent, because the period closing -- it closes for elections

9   and votes to accept the plan on January 8th.  And it takes

10  them a little bit of time, perhaps even up to a week, to

11  finish the tabulation process.

12      So that declaration of balloting agent could be filed

13  as late as the day before confirmation, but it clearly would

14  be prior to the commencement of the confirmation hearing.  And

15  obviously, Your Honor, any of the declarants for those

16  declarations would be available in the courtroom for

17  cross-examination or any additional questions that the Court

18  would have for either the 9019 motion or the confirmation

19  hearing itself.

20      Your Honor, the only other point that I would -- I

21  guess as part of that, Your Honor, and we'll get to this later

22  on, would be where you would like to have that window of

23  opportunity to be placed within the 9019 motion hearing or the

24  confirmation hearing.

25      It would be my guess, Your Honor, that we would start

 1   with the 9019 motion and then move to the confirmation

 2   process.  And whenever you want to fit that window in there,

 3   we'll work with the Court's time frame.

 4            THE COURT:  Well, I think since we will be taking

 5   them up separately and there are, you know, different ways of

 6   -- concerns, that it would be appropriate to have a window

 7   within each.

 8            MR. ROSEN:  Okay.

 9            THE COURT:  A window within 9019 and then a window

10   within COFINA.  And in my solicitation of interests, I'll

11   probably have -- we haven't figured out exactly how we'll put

12   it up, but it may be a registration thing.  But as a tick box,

13   do you want to talk about the Commonwealth-COFINA or do you

14   want to talk about issues within the COFINA Plan?

15            It seems to me that it would be most appropriate to

16   have that follow the principal presentations of counsel since

17   you do anticipate being able to speak to some of the themes of

18   concerns, and then to have it follow principal presentations

19   and then itself be followed by the reply presentations.

20            MR. ROSEN:  That's fine, Your Honor.  We will do

21   that.

22            Your Honor, we are trying to put together, in a

23   detailed form, the letters that you've been receiving.  And

24   would it be helpful for you to -- for us to present you with

25   some sort of chart that would lay it all out?

1      THE COURT:  That would be quite helpful.  Thank

2  you.

3      MR. ROSEN:  We'll do that, Your Honor.

4      THE COURT:  I have been reading them as they come

5  along, but I haven't charted them out.  So it would be good to

6  have a chart and record.

7      MR. ROSEN:  And we'll try to separate them by

8  themes.

9      THE COURT:  Thank you.

10      MR. ROSEN:  Your Honor, the one other note that I

11  would make is that consistent with what I said before about

12  people working together, we have been collaborating with the

13  O'Melveny firm on behalf of AAFAF and all of the creditors in

14  connection with the preparation of documents for the plan

15  supplement.  And I am happy to report that that is well on its

16  way.

17      And people know that there is a limited time to

18  finish those documents, and to the extent that it's going to

19  interfere with their holiday plans, so be it.  But it will be

20  filed by the end of the year, which is the time frame

21  associated in the Solicitation Procedures Order.

22      THE COURT:  Excellent.

23      MR. ROSEN:  Your Honor, that leaves to be discussed,

24  about the confirmation hearing, the urgent motion that we

25  filed with respect to Section 19.5 of the plan.  And as the

1   Court is aware, there is an outstanding issue with respect to

2   two pieces of litigation that were commenced against the Bank

3   of New York Mellon, one by Whitebox Advisors and the other by

4   Ambac Insurance.

5          And the plan provides for a mechanism so that those

6   litigations could continue if the parties so desire, but not

7   have it in any way impact the distributions that would

8   otherwise be made to any of the holders of COFINA bonds,

9   either senior or subordinated.

10         And the reason for that, Your Honor, is the Bank of

11  New York Mellon would like to assert that it has a charging

12  lien and, therefore, any of the fees and expenses that might

13  be incurred in connection with those litigations on a going

14  forward basis, they would need to reserve against, and thereby

15  taking it out of all of the other parties' distributions to be

16  made pursuant to the COFINA plan.

17         But as part of the negotiation process, we were able

18  to get the parties to agree, and specifically the Bank of New

19  York Mellon to agree, that it would not do that, but instead

20  it would be focusing on Ambac and Whitebox as the plaintiffs

21  in those actions and any distributions that might otherwise be

22  made to them.

23         As part of the ongoing dialogue and with the benefit

24  of Judge Houser as the mediation team leader, we were able to

25  come up with a mechanism for those matters to be heard in the

1   context of the confirmation hearing.  So that if the Court

2   determines to confirm the plan, we can go forward right away

3   with the effectiveness of the plan and have the concerns of

4   Bank of New York Mellon with respect to those two litigations

5   reserved or at least taken into account by the money either

6   being in cash set aside or by a bond being posted by Ambac and

7   Whitebox.

8         And there is a disagreement between those three

9   parties as to which is the proper form of currency, but that

10   is something that will be left to the Court to determine.

11         Specifically, Your Honor, pursuant to the urgent

12   motion, the parties have agreed that there will be dual

13   submissions and they will be done at the same time.  On

14   January 2nd, which is the objection deadline to confirmation,

15   Bank of New York Mellon would submit information concerning

16   what amount of fees and expenses it is anticipating to incur

17   in connection with the two subject litigations.  And -- excuse

18   me, and Whitebox and Ambac would file briefs or declarations

19   supporting their position that no amounts are required to be

20   posted or withheld from their distributions.

21         And then on January 9th, which is the response

22   deadline for the Oversight Board to respond to otherwise --

23   objections to confirmation, there would be a similar deadline

24   for those parties to make filings.

25         Specifically, Your Honor, Ambac and Whitebox would

1    have to submit counter designations or counter declarations to

2    the amount that Bank of New York Mellon believes it will

3    incur.  And Bank of New York Mellon would have to submit to

4    the Court a brief in opposition or counter to the position

5    taken by Ambac and Whitebox as to the entitlement of any

6    amount to be posted or otherwise withheld.

7            There is a period of the 10th to the 15th where the

8    parties could take depositions of the other parties, and then

9    this Court would then hear, at the confirmation hearing, the

10   issue first as to the entitlement.  And if it makes a

11   determination there would be an entitlement, as to what amount

12   should be posted or otherwise tendered in cash to preserve the

13   rights of the respective parties.

14           THE COURT:  And so you are anticipating a bench

15   ruling on the entitlement issue, then to be followed

16   immediately by any necessary evidentiary proceedings?

17           MR. ROSEN:  Yes, Your Honor.  And that's why the goal

18   was to actually have all of the evidence before you prior to

19   the hearing so that it really did not take up much of your

20   time on the 16th to hear anything really, other than what

21   additional argument you may want with respect to the

22   entitlement issue, because both parties would have already

23   said their pros and cons as to the amount and the form of any

24   posting that would occur.

25           THE COURT:  And I'll have obviously the necessary

1  portions of the indenture and whatever other contractual

2  documents the parties are relying on for their legal positions

3  on entitlement?

4            MR. ROSEN:  Exactly, Your Honor.  They will include

5  that in their submissions.

6            So, Your Honor, if the Court would think -- and I

7  don't want to -- I see somebody's already maybe getting close

8  to the lectern over there in New York.  We would submit, Your

9  Honor, that the process that was developed by the mediation

10  team leader and agreed to by the parties is the right process

11  to go by.

12           And if the Court would agree, we would ask the Court

13  to enter the Order then with respect to that process, which

14  was attached as an exhibit to the Urgent Motion that was

15  filed.

16           THE COURT:  Thank you.

17           I guess we'll find out who's in New York who wishes

18  to be heard.

19           Good morning.

20           MR. SIZEMORE:  Yes.  Good morning, Your Honor.  My

21  name is Luke Sizemore from Reed Smith on behalf of the Bank of

22  New York Mellon.

23           First, I want to say that I appreciate all of the

24  work that the Oversight Board has done to work with Whitebox,

25  Ambac and Bank of New York Mellon, to work through these

1   issues.  And I generally concur with everything Mr. Rosen said

2   except one clarification that I'd like to make.

3          I believe Mr. Rosen said there's an agreement on

4   19.5.  We are working toward an agreement and we hope those

5   discussions continue.  We're optimistic that those discussions

6   would result in no objections to the plan, but conversations

7   are ongoing.

8          And the Proposed Order that the Court has in front of

9   it does include an express reservation of rights, I think with

10  respect to each of Bank of New York Mellon, Whitebox and Ambac

11  as to objections to confirmation of the plan, including with

12  respect to 19.5.  But again, Your Honor, we're hoping to work

13  through those issues so that it is not an issue at

14  confirmation.

15         THE COURT:  Thank you for that clarification, but

16  you -- Bank of New York Mellon continues to join in the

17  application for my approval of this procedure for litigating

18  the charging lien holdback issues in connection with 19.5?

19         MR. SIZEMORE:  Yes, Your Honor.  We support the

20  procedure.

21         THE COURT:  Thank you.

22         MR. ROSEN:  Your Honor, I apologize.  Mr. Sizemore is

23  correct.  Bank of New York Mellon continues to discuss certain

24  issues with the Oversight Board.

25         They have provided us informally with some additional

1  comments to the plan of adjustment that they've asked us to

2  consider, none of which obviously would require resolicitation

3  because they are just technical in nature and go to the

4  relationship of the Trustee itself to COFINA and the way to

5  resolve certain outstanding issues.

6          THE COURT:  Thank you for the additional

7  clarification.

8          And so, Mr. Sizemore, were there any further remarks

9  that you wish to make?

10          MR. SIZEMORE:  No, Your Honor.  Thank you for your

11  time.

12          THE COURT:  Thank you.

13          The Urgent Motion is granted, and I will enter the

14  Proposed Order in connection with that motion, which is docket

15  entry 4457 in case 3283.

16          MR. ROSEN:  Thank you very much, Your Honor.  I

17  believe that may conclude this morning's agenda.

18          THE COURT:  It looks like there is no one else queued

19  up to be heard, and so I think our agenda is indeed concluded.

20          And so the next scheduled hearing date is the January

21  16, 2019, hearing on the COFINA Plan and the 9019 motion, as

22  well as the Bank of New York Mellon 19.5 related motion that

23  will take place here in San Juan with a video connection to

24  New York.

25          I would like to thank the court staff in Puerto Rico,

1   Boston and New York for their work in preparing for and

2   conducting today's hearing, and their superb ongoing support

3   of the administration of these very complex cases.

4           Keep well, everyone, and happy holidays and safe

5   travel to all.

6           MR. ROSEN:  Same to you, Your Honor.  Thank you.

7           (At 11:13 AM, proceedings concluded.)

8                         *     *     *

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1  U.S. DISTRICT COURT     )

 2  DISTRICT OF PUERTO RICO)

 3

 4      I certify that this transcript consisting of 65 pages is

 5  a true and accurate transcription to the best of my ability of

 6  the proceedings in this case before the Honorable United

 7  States District Court Judge Laura Taylor Swain on December 19,

 8  2018.

 9

10

11  S/ Amy Walker

12  Amy Walker, CSR 3799

13  Official Court Reporter

14

15

16

17

18

19

20

21

22

23

24

25
```

< Dates >
December 19, 2018
  1:16, 4:2, 65:7
January 16, 2019
  5:16, 63:20
January 1st 33:15,
  33:25
January 2nd 51:18,
  59:14
January 8th 55:9
January 9th 54:25,
  55:1, 59:21
March-April 7:9,
  7:18


< 1 >
10 49:15
100 17:6
10th 60:7
11 12:13, 12:23,
  14:20
110 17:6, 17:8
11:13 64:7
11s 38:1
12 34:3
13.3 11:22
15 17:18, 36:14
15th 60:7
16 5:14, 49:11
167,000 48:4
16th 60:20
17 5:14, 49:16
17-BK-3283(LTS 1:6
19.5 57:25, 62:18,
  63:22
19.5. 62:4, 62:12


< 2 >
20 14:24, 17:4,
  17:7, 17:18,
  35:24, 36:14
2017 13:14, 13:15
21: 1:36
28 11:23, 13:4
29 13:4, 33:24, 34:2


< 3 >

3,500 49:12, 51:1
30 14:24, 33:24
30th 42:13
327 25:15
3283 63:15
3283. 8:4
35 44:11
365(d)(3 5:25
365(g 44:9
365. 44:6
3799 65:12
3914 41:21
3: 1:6


< 4 >
4.2 13:14
4370 8:4, 34:24
4374 43:8
4374. 44:16
4455 41:14
4457 63:15


< 5 >
5.7 13:15


< 6 >
65 65:4


< 8 >
80 6:24


< 9 >
90 40:4
9019 45:2, 45:9,
  45:12, 46:7,
  46:21, 47:7,
  47:12, 53:12,
  54:21, 54:22,
  55:18, 55:23,
  56:1, 56:9, 63:21
9019. 52:15
9:33 4:3


< A >

AAFAF 25:5, 42:9,
  57:13
ability 6:19, 11:2,
  20:20, 37:11, 65:5
able 7:10, 7:20,
  22:16, 23:6, 24:3,
  47:15, 52:4, 52:8,
  52:18, 53:16,
  56:17, 58:17,
  58:24
above 12:21, 14:25,
  32:18
absent 24:4
absolute 10:9, 16:25
Absolutely 21:20,
  48:2, 54:4
accept 55:9
acceptance 25:19
accepted 40:25
access 37:25
accessible 22:5,
  52:25
accommodate 21:25
accompanied 24:22
accordance 45:14,
  49:23
according 23:20
account 59:5
accurate 9:9, 13:19,
  48:2, 65:5
accurately 54:14
acknowledge 12:17
acknowledgment 43:15
across 36:23
Act 33:13
actions 58:21
activities 19:8
activity 30:12
actual 7:11, 30:12
Actually 12:24,
  15:6, 37:18, 47:3,
  50:8, 54:12,
  54:16, 60:18
add 20:2, 36:19,
  37:24
addition 53:8, 53:10
Additional 5:7, 8:3,
  8:7, 8:25, 21:22,
  28:23, 32:4,
  49:22, 55:17,

60:21, 62:25, 63:6
Additionally 50:2
address 32:4, 35:18,
    39:25, 52:3, 52:8,
    52:19
addressed 46:2
addresses 9:8
addressing 12:1,
    52:8, 54:15
adjourn 53:23
adjourned 42:12
adjournment 42:15,
    42:17
adjust 11:3
adjusted 17:17
Adjustment 5:7,
    14:6, 15:5, 42:7,
    46:15, 46:17,
    47:6, 47:7, 48:11,
    63:1
adjustments 13:9,
    14:5, 32:4, 33:22
Administered 1:11
administration 51:9,
    64:3
administrative
    34:18, 49:9, 49:24
admission 26:17
advance 25:10
advisement 43:3
Advisors 58:3
Advisory 1:44, 6:15,
    9:14
advocacy 52:17
AFT 42:9, 46:8
afterwards 24:2
Agency 1:43
agenda 4:24, 8:2,
    41:19, 42:24,
    43:10, 53:24,
    63:17, 63:19
Agent 29:11, 29:21,
    30:4, 40:18,
    54:16, 55:8, 55:12
ago 40:16, 49:11
agree 42:15, 47:3,
    47:4, 58:18,
    58:19, 61:12
agreed 17:5, 35:24,
    36:1, 36:2, 42:11,

42:16, 47:11,
    50:11, 59:12,
    61:10
Agreement 36:3,
    43:8, 43:19, 62:3,
    62:4
agreements 19:17,
    35:23
ahead 10:21, 33:25
airing 54:8
al 1:16, 1:31, 32:21
Albeniz 2:13
allocate 24:3
allow 6:24, 10:13,
    40:3
almost 8:24, 18:22,
    30:20
already 4:18, 14:24,
    19:4, 20:2, 28:1,
    49:2, 51:13,
    60:22, 61:7
although 17:9, 43:11
Ambac 58:4, 58:20,
    59:6, 59:18,
    59:25, 60:5,
    61:25, 62:10
among 17:3, 34:6,
    42:8
amount 17:21, 18:1,
    18:3, 18:7, 18:15,
    21:7, 21:8, 59:16,
    60:2, 60:6, 60:11,
    60:23
amounts 59:19
AMPR 2:23, 41:20
Amy 65:11, 65:12
analysis 10:12,
    12:25, 19:11,
    20:2, 20:22,
    21:17, 22:8,
    30:11, 33:13,
    40:19, 40:21
analytical 33:2,
    33:3
analyzing 29:23
announce 14:4
annual 13:13, 23:19
annually 16:12
answer 18:4
answered 45:20

anticipate 56:17
anticipated 5:7
anticipating 54:25,
    59:16, 60:14
anticipation 34:25
antiquated 24:7
Antonio 2:20, 47:21
AO 51:8
apologize 34:17,
    62:22
appear 16:6
APPEARANCES 1:28,
    2:1
Appearing 2:9, 2:15,
    2:17
applicant 10:3, 12:1
application 9:16,
    16:4, 17:12,
    20:24, 24:22,
    27:3, 30:9, 39:20,
    62:17
applications 8:14,
    8:23, 10:11, 12:3,
    12:5, 12:7, 18:10,
    21:11, 31:25,
    32:2, 33:20,
    38:21, 39:7, 39:9,
    40:10, 40:24, 41:3
applied 9:12, 10:23,
    16:1, 17:8, 17:21,
    17:24, 22:18
apply 8:14, 12:9,
    21:10, 28:17
appointment 30:3
appreciate 22:24,
    51:3, 51:22, 53:1,
    61:23
approach 8:11,
    15:24, 15:25
appropriate 10:10,
    14:16, 15:4,
    16:25, 43:16,
    52:20, 56:6, 56:15
approval 12:3, 12:7,
    29:14, 39:7,
    40:24, 41:4,
    41:12, 45:12,
    62:17
approvals 15:10
approve 29:2, 45:2

approved 40:14
approving 41:7
approximate 5:14
approximately 49:12
April 6:3
area 23:20, 33:20
areas 26:24, 27:2
argue 36:18
argument 60:21
around 24:8
arranged 54:3
arrangement 18:14
Arribas 1:36
arrives 20:25
articulate 16:16,
  27:2
articulated 9:8,
  22:1
artificial 17:1
aside 59:6
asks 41:6
Asociacion 41:25
aspect 44:24
aspects 12:18
assembleds 29:8
assert 12:9, 43:22,
  58:11
assertion 10:2
associate 12:19,
  13:21, 14:3,
  14:16, 38:8
associated 23:13,
  57:21
associates 14:8,
  14:22, 14:24,
  21:9, 21:10
assuming 29:25
attached 61:14
attempt 9:18
attempts 9:25
attention 22:6,
  34:22, 53:10
Attorney 17:18,
  41:24
attorneys 47:24
audible 4:19
AUST 1:36
authorities 32:20
Authority 1:44
Authorize 43:7

authorizing 50:17
Automatic 41:20,
  42:14
available 13:23,
  21:3, 22:4, 25:6,
  25:7, 25:8, 25:17,
  27:22, 55:16
average 21:6
avoid 9:21
aware 13:21, 26:20,
  58:1
away 31:4, 59:2
Ayala 1:40

< B >
back 4:9, 11:19,
  15:7, 28:8, 54:19
balance 33:7, 43:9,
  49:21
ballot 55:5, 55:6
balloting 54:6,
  54:9, 54:16,
  54:19, 55:7, 55:12
Bank 2:12, 50:6,
  58:2, 58:10,
  58:18, 59:4,
  59:15, 60:2, 60:3,
  61:21, 61:25,
  62:10, 62:16,
  62:23, 63:22
Bankruptcy 1:1,
  5:25, 10:2, 26:9,
  36:4, 41:6, 45:2
barn 28:8, 28:21,
  33:6
BARRIOS 2:23, 41:22,
  41:24, 41:25,
  42:16, 42:21
base 52:25
based 7:8, 11:17,
  14:5, 14:12, 15:5,
  15:15, 17:12,
  34:3, 38:9, 44:6
baseline 28:3
basis 18:6, 21:6,
  21:20, 40:5,
  41:13, 46:22,
  51:12, 58:14
Bauer 1:33

bear 37:7
beautiful 4:8
become 37:12
began 30:18
begin 4:24
beginning 13:6,
  14:9, 16:6, 18:8,
  20:18, 30:22
behalf 22:10, 41:25,
  42:4, 49:10,
  57:13, 61:21
behind 32:18, 34:17
believe 9:11, 25:19,
  26:6, 45:14,
  46:20, 47:2,
  50:25, 62:3, 63:17
believes 43:17, 60:2
below 17:13
bench 60:14
benchmark 14:15,
  18:15, 20:9, 27:9,
  28:2
benchmarks 20:14,
  22:18, 22:22, 23:5
beneficial 54:12
benefit 25:11,
  46:16, 46:25,
  58:23
BENNAZAR 2:20,
  47:19, 47:21,
  47:22, 48:16,
  48:23
beside 36:1
besides 49:19
best 7:2, 16:16,
  31:9, 34:7, 49:18,
  49:20, 53:4, 65:5
bet 6:22
better 6:21, 6:25,
  7:1, 7:10
beyond 24:12
Biaggi 1:45
Bienenstock 1:31,
  5:1, 5:2, 5:3,
  7:22, 7:24, 42:5
Bill 33:12, 34:13
billing 10:12,
  13:21, 14:9,
  15:23, 23:24,
  25:25, 33:20,

39:14
billion 5:13, 5:14,
  5:18, 49:16
binding 9:15
bit 15:12, 17:11,
  29:22, 34:17,
  45:5, 49:17, 55:10
Block 47:25
Blue 14:1
Board 1:10, 4:25,
  5:3, 5:19, 5:21,
  6:8, 6:19, 25:5,
  34:6, 36:24, 42:4,
  42:8, 45:13,
  46:23, 48:7,
  59:22, 61:24,
  62:24
boats 6:25
body 25:16
bond 59:6
Bondholders 2:7
bonds 50:7, 50:9,
  58:8
Book 14:1
Borges 51:4
Boston 64:1
box 56:12
Brady 2:3, 37:20
branch 51:8
brand 14:22
breadth 23:10
break 5:10
Brian 1:32, 42:3
brief 37:23, 53:17,
  60:4
briefly 35:13
briefs 59:18
bring 7:21, 11:18
brother 48:1
brought 11:12, 12:15
budget 37:11
Buenos 4:5, 47:19,
  47:20
builds 35:1
bundle 44:23
burden 9:25, 10:2,
  36:11, 55:3
business 44:8

< C >
C. 2:14
calculate 10:19,
  15:15, 17:11
calculated 8:21,
  16:1, 16:17, 19:15
calculating 19:20
calculation 18:17,
  18:23, 18:24,
  19:12
calendar 44:11
call 23:2, 54:8
calls 48:8, 54:12
campaign 51:22
candor 7:20
careful 31:1
carefully 41:9
Carolina 1:46
Carrasquillo 43:1
carry 31:18
carve 14:2, 21:9
carved 12:24, 29:12,
  40:17
carves 14:17, 25:4
case 8:4, 8:19,
  10:10, 10:19,
  12:11, 14:9,
  15:22, 16:6,
  16:22, 17:16,
  17:20, 17:22,
  18:8, 19:7, 27:5,
  31:9, 36:7, 38:1,
  43:25, 49:13,
  49:15, 63:15, 65:6
cases 12:11, 12:13,
  12:23, 14:20,
  14:21, 16:4,
  23:10, 28:12, 64:3
cash 59:6, 60:12
Casillas 1:40
CAT 2:48
categories 40:13
caused 39:21
caveat 17:10
ceiling 10:14, 23:18
center 32:1
certain 6:23, 12:18,
  25:23, 39:18,
  45:19, 62:23, 63:5
Certainly 11:20,

26:3, 26:8, 31:10,
  33:8, 53:22
certify 65:4
cetera 31:19, 33:14
challenge 26:10,
  38:9, 39:21
challenges 6:1
change 6:21, 32:8
changes 6:23, 28:4,
  29:24
changing 19:15
Chapter 12:13,
  12:23, 14:20, 38:1
charge 12:10, 18:6
charged 17:1, 18:3
charging 58:11,
  62:18
chart 56:25, 57:6
charted 57:5
charts 23:21
check 13:17
chosen 53:14
circumstance 12:15
circumstances 11:22,
  11:25
citable 13:25
cited 14:17, 23:21
claim 6:1, 44:9,
  44:11, 50:6
claimants 50:3
Claims 26:6, 43:21,
  43:22, 49:6, 49:7,
  49:12, 49:15,
  49:18, 49:21,
  50:2, 50:8, 50:11,
  50:18, 50:20,
  50:24, 51:1, 51:11
clarification 30:25,
  62:2, 62:15, 63:7
clarity 34:19
clear 28:11, 30:15,
  33:18, 34:15,
  49:20, 50:22,
  51:6, 53:9
clearly 55:13
Clerk 49:10, 50:17
client 27:18, 28:2,
  28:3, 36:4, 36:9
clients 12:11,
  12:23, 15:1,

26:19, 31:17,
36:8, 36:17,
38:14, 39:17
close 8:21, 51:2,
53:10, 61:7
closes 55:8
closing 55:8
co-counsel 47:23
Coalition 2:8
Code 5:25, 10:3,
41:6
codes 30:9
COFINA 2:6, 5:14,
29:11, 29:21,
30:3, 31:7, 31:23,
40:18, 43:6, 44:6,
44:8, 44:15,
44:22, 46:14,
46:15, 46:17,
47:1, 47:7, 49:13,
49:15, 49:21,
50:10, 51:1,
56:10, 56:14,
58:8, 58:16, 63:4,
63:21
Cofina-related 30:1
cognizant 19:3, 40:3
collaborating 57:12
colloquy 40:16
comes 24:11, 53:11
coming 8:24, 22:9,
32:23, 33:1
commenced 54:10,
58:2
commencement 55:14
comment 37:19, 54:20
comments 35:13,
37:5, 37:6, 38:10,
63:1
commitment 47:9
Committee 1:38,
2:20, 45:18, 46:3,
46:6, 46:9, 46:13,
46:22, 47:4,
47:11, 47:15,
47:24
commodity 26:9
common 27:9
commonly 17:16
Commonwealth 1:15,

1:30, 5:20, 6:4,
6:18, 6:23, 23:11,
32:20, 46:17,
46:25, 47:6, 48:5,
48:11
Commonwealth-cofina
56:13
communicate 4:14
communication 48:8
communications
18:22, 48:6
company 23:14
comparability 18:13
compared 21:7
compensation 40:3
competent 26:14
complete 21:1
complex 37:13, 64:3
compliance 4:23
complicated 20:4,
36:21, 36:22,
36:23, 36:25
component 23:3,
23:4, 23:7, 23:8,
30:14, 32:25,
38:18
components 5:11,
19:10
compose 48:22
compound 13:13
compromise 45:3
computations 15:20
concern 9:13, 10:18,
14:22, 15:9,
15:13, 15:20,
16:3, 20:6, 24:19,
29:24, 30:25
concerned 7:16,
8:15, 23:2, 23:4,
24:6, 29:9, 48:4,
48:5
concerning 59:15
concerns 9:8, 11:11,
11:14, 14:13,
23:25, 24:1,
29:18, 32:4,
46:11, 47:3, 52:6,
52:11, 52:12,
56:6, 56:18, 59:3
concession 28:8

conclude 63:17
concluded 10:13,
63:19
concluded. 64:7
concluding 19:6
concur 62:1
conducting 20:21,
64:2
confer 45:20
Conference 4:11
conferences 48:9
confident 22:16,
22:21
confidential 18:21
confirm 29:10, 59:2
confirmed 23:5,
31:24
conflict 10:23
conjunction 26:12
connection 29:3,
39:5, 41:14, 42:6,
53:7, 53:12,
57:14, 58:13,
59:17, 62:18,
63:14, 63:23
cons 60:23
consensual 12:3
consensus 5:23, 6:4,
6:5, 6:8, 6:11,
6:14, 6:17, 34:5
consent 27:19, 28:2,
28:4, 28:19
consider 13:25,
24:13, 32:20, 63:2
consideration 15:4,
19:6, 22:15, 35:4,
42:11, 45:1
considered 10:8,
28:16
considering 35:16,
53:7
Consistent 4:11,
8:11, 12:12,
24:23, 54:21,
57:11
consisting 65:4
constituencies 7:16,
52:22
constituents 48:4
constitutional 46:18

containment 25:23
contemplated 22:1
contested 9:22, 40:9
context 11:21, 14:1,
    15:8, 17:2, 19:7,
    22:7, 41:10,
    43:24, 44:5, 47:5,
    52:3, 52:20, 55:3,
    59:1
contextual 37:2
continuation 42:14
continue 7:4, 7:9,
    19:20, 29:5,
    31:22, 48:2,
    51:11, 58:6, 62:5
Continued 2:1
continues 31:5,
    62:16, 62:23
continuing 9:13,
    42:20
contract 35:23, 36:2
contracts 39:18
contractual 61:1
control 37:10
conversation 51:13
conversations 46:1,
    48:2, 62:6
coordinate 51:9
copy 33:12, 33:13
correct 33:4, 62:23
corresponding 16:2
cost 16:18, 16:19,
    19:19, 25:23,
    35:18
costs 32:22
counsel 4:5, 14:19,
    25:25, 26:1, 26:6,
    26:12, 26:21,
    26:22, 27:11,
    30:4, 30:5, 30:6,
    30:16, 30:18,
    30:19, 30:20,
    30:21, 38:2, 48:1,
    51:5, 56:16
counter 60:1, 60:4
couple 13:16, 16:4,
    26:24, 31:25,
    40:17
Couret 2:13
course 8:24, 18:21,

19:10, 19:22,
    31:17, 40:9, 41:5,
    53:18
courtroom 4:13,
    47:15, 55:16
covered 50:7
cramdown 6:9, 6:20
create 6:24
creditor 7:1
Creditors 1:39,
    5:18, 6:20, 51:5,
    57:13
creep 15:14
cross-examination
    55:17
CSR 65:12
cumulative 13:5,
    13:10, 13:13
currency 59:9
current 7:15, 34:24
curve 34:18
cycle 32:25


< D >
damages 44:10
Daniel 2:10
data 10:12, 14:8,
    19:22, 21:3,
    37:24, 37:25,
    38:6, 38:7, 38:9,
    39:12, 39:15,
    39:20
date 16:10, 45:14,
    51:19, 63:20
day 32:10, 51:2,
    53:19, 53:20,
    55:13
days 44:11
de 41:25
deadline 51:18,
    59:14, 59:22,
    59:23
deal 21:13, 26:23
dealing 10:20, 20:11
Debt 5:13, 5:15,
    5:19, 6:20, 43:7,
    43:18, 46:18,
    49:16
Debtors 1:18

decide 43:3
decided 35:21
decision 9:15
declarants 55:15
declaration 55:6,
    55:7, 55:12
declarations 54:22,
    55:1, 55:16,
    59:18, 60:1
deduction 17:13
deductions 41:1
deep 11:11
deeper 15:12
deeply 7:16
defer 20:3
Definitely 34:20
delays 39:21
delegated 26:21
demanding 37:13
demands 22:6, 23:11
denying 34:23
Depending 16:22
Deposit 43:8, 43:18
depositions 60:8
designated 30:6,
    53:13
designating 21:5
designations 60:1
designed 13:9
desire 53:15, 58:6
DESPINS 1:39, 35:9,
    35:10, 35:12,
    37:15
detail 21:18
detailed 21:1, 22:4,
    46:10, 56:23
determination 20:8,
    60:11
determinations 19:2
determine 6:8, 34:1,
    59:10
determined 18:2
determines 59:2
determining 15:4
develop 51:11
developed 61:9
development 22:14
device 4:17, 4:19
devices 4:13, 4:16
devise 53:16

dialogue 47:10,
    48:10, 49:5, 49:8,
    51:10, 58:23
dias 4:5, 47:19,
    47:20
differ 27:8
difference 30:22
differences 6:12
different 15:7,
    21:10, 25:25,
    26:11, 30:11,
    32:13, 32:14,
    39:16, 39:17,
    53:25, 56:5
differently 17:11
difficult 14:2,
    14:13, 18:4,
    19:13, 23:5, 27:1,
    30:21, 36:14
dimension 36:19
diminish 27:21
direct 55:2
directed 5:5
directly 17:8
disaggregate 23:7,
    25:2
disagreement 59:8
disagrees 10:1
disallowance 28:15
discern 30:21
discernible 24:10
disclose 18:18
Disclosure 6:6,
    19:25, 25:3,
    27:18, 28:2, 28:3,
    28:18, 32:12,
    40:22, 54:7
disclosures 25:13
discount 15:15,
    15:22, 16:5,
    16:10, 16:14,
    16:25, 17:2, 17:5,
    17:7, 17:14,
    17:21, 17:24,
    17:25, 18:1,
    18:12, 18:25,
    19:4, 19:5, 19:15,
    35:24, 36:5, 36:14
discounted 15:14,
    18:24

discounting 18:7
discounts 15:9,
    16:1, 16:19,
    16:23, 21:7, 36:4
discovery 45:21
discretion 17:22,
    17:24
discuss 10:19,
    24:13, 62:23
discussed 8:9, 37:3,
    57:23
discussing 39:13
discussion 9:4,
    28:6, 32:1, 35:1,
    35:3, 36:19,
    37:22, 37:24,
    40:22, 46:10
Discussions 7:4,
    9:1, 11:17, 22:19,
    42:6, 42:8, 42:10,
    46:8, 49:24, 62:5
display 18:11
distinguish 14:4,
    14:14
distinguishable
    30:12
distinguished 23:14
distribute 24:3
distributions 58:7,
    58:15, 58:21,
    59:20
District 1:3, 1:24,
    1:25, 65:1, 65:2,
    65:7
Docket 1:6, 8:4,
    41:14, 44:16,
    50:22, 51:6,
    51:23, 63:14
documentation 25:16
documents 4:18,
    26:17, 45:18,
    45:23, 57:14,
    57:18, 61:2
doing 5:21, 10:11,
    17:10, 26:3, 35:15
dollar 17:6, 17:8,
    18:11, 18:15
dollars 5:13, 5:14,
    5:15, 5:19, 8:22,
    24:12, 49:15,

49:16
done 5:12, 18:17,
    20:6, 27:11, 30:1,
    31:9, 43:16, 44:5,
    49:18, 49:20,
    53:19, 59:13,
    61:24
door 11:6, 32:22,
    32:23
doubt 36:10
down 5:10, 38:7,
    50:18, 51:1,
    51:14, 54:14
DSDA 43:12, 43:24,
    44:7
DTC 54:13, 54:17
dual 59:12
duplication 31:2
duplicative 29:21
during 21:8

< E >
earlier 8:10, 41:11
easily 21:4, 22:5,
    25:8, 39:15
easy 17:14, 32:16
ECF 25:17, 34:24,
    41:20
economic 6:18, 52:11
economics 6:21
economy 7:2, 11:4
effect 13:10, 33:14,
    38:4
effective 19:19,
    33:25
effectiveness 59:3
efficacious 29:8
efficiency 20:4,
    26:22
effort 33:25
efforts 51:3
either 21:19, 37:24,
    55:18, 58:9, 59:5
elections 55:8
electronic 4:10,
    4:13, 4:16, 21:12,
    39:15, 53:11
element 18:10, 25:3,
    33:5

eliminate 6:13, 10:15
elsewhere 21:4
emanating 6:1
employment 6:24
enable 52:19
encompasses 38:1
encourage 26:25
end 8:24, 10:18, 13:6, 17:22, 22:13, 31:9, 32:9, 38:12, 41:3, 51:2, 51:9, 57:20
ends 33:19
endure 15:2
enforcement 31:14
enforcing 31:13
engaged 22:13, 46:22
engagement 8:16, 16:11
engagements 39:17, 39:18
English 54:18
enough 14:8, 21:16, 48:6, 52:5
entail 51:14
enter 34:23, 41:6, 41:13, 44:2, 44:15, 51:6, 61:13, 63:13
entered 39:7, 50:21
entire 17:12
entirely 9:9, 40:19
entirety 28:14
entitlement 60:5, 60:10, 60:11, 60:15, 60:22, 61:3
entry 8:4, 41:14, 44:11, 44:16, 51:24, 63:15
equal 23:19
equipment 4:10
erasing 16:13
eroded 15:11
espoused 46:5
Esq 1:33, 1:40, 1:45, 1:46, 2:13, 2:20, 2:21, 2:23
establish 10:3
et 1:16, 1:31,

31:19, 32:21, 33:14
ethics 11:2
evaluating 8:14, 10:10
event 32:7
events 53:25
eventually 48:10
Everyone 10:22, 11:17, 17:10, 20:23, 38:5, 52:21, 52:24, 64:4
everything 38:7, 53:10, 62:1
everywhere 52:21
evidence 60:18
evidentiary 60:16
Exactly 56:11, 61:4
examined 36:1
example 12:19
Excellent 57:22
except 6:22, 62:2
Excuse 44:20, 47:6, 55:6, 59:17
exemption 25:14
exercise 44:8
exercises 17:24
Exhibit 18:23, 41:7, 44:15, 61:14
EXHIBITS 3:9, 19:22, 20:23
exist 5:11
expect 9:19, 29:24, 35:2, 48:21
expected 25:24, 27:10, 36:22
expense 25:20
expenses 58:12, 59:16
expensive 36:23
experience 10:17, 23:12
experiences 24:11
experiential 22:7
expert 9:3, 28:23, 40:18
expertise 22:7, 22:8, 27:8
experts 28:13
explain 11:22, 54:14

explicitly 30:5
explore 27:13
exponentially 8:19, 37:12
express 44:13, 53:15, 62:9
extended 9:1, 37:22
extent 21:18, 31:14, 57:18
extenuating 12:15
eye 30:23
eyes 20:25

< F >
face 16:6, 30:7
fact 19:3, 27:3
factual 52:18, 52:20
fair 29:7
fairly 22:5, 40:24, 41:1
fall 40:13
fallout 7:1
far 8:20, 16:5, 36:23
fashion 7:15
features 4:19, 36:3
February 31:10
feedback 21:22
feel 26:14, 26:15, 26:18, 31:18, 37:14
feels 31:4
fees 9:22, 10:1, 10:4, 11:3, 17:25, 18:1, 18:12, 18:25, 19:2, 19:7, 28:4, 28:16, 32:4, 33:20, 36:10, 36:16, 40:4, 40:17, 40:21, 41:1, 41:7, 41:12, 58:12, 59:16
felt 46:4
few 13:24
fiduciary 31:19
figure 14:11, 25:1
figured 56:11
file 6:5, 10:21, 25:9, 25:17,

43:20, 44:9,
45:13, 48:18,
50:1, 59:18
filing 5:8, 31:24,
48:14, 50:19,
53:9, 55:1
filings 59:24
final 20:8, 21:19,
31:24, 32:1, 32:6,
37:7
Financial 1:9, 1:43
find 41:12, 44:6,
53:18, 61:17
fine 27:1, 31:12,
56:20
finish 55:11, 57:18
firm 12:20, 13:2,
14:8, 21:5, 23:23,
25:1, 26:11, 27:5,
27:8, 30:5, 30:6,
32:14, 32:15,
36:14, 39:14,
47:22, 48:17,
57:13
firm-wide 24:24
firms 8:17, 8:25,
9:12, 12:1, 14:3,
17:11, 19:7, 26:2,
26:13, 26:15,
30:12, 30:13,
32:13, 36:13,
39:16, 39:17
First 11:21, 17:5,
20:6, 31:10,
35:13, 45:10,
60:10, 61:23
Fiscal 1:42
fit 38:6, 56:2
five 5:13, 23:22,
34:2, 36:13
five-minute 53:17
fixed 37:12
flag 9:20, 11:15,
11:18
flagged 11:24, 30:23
flagging 21:2
flat 23:18
flooded 51:22
floor 10:14
fluff 49:17

focus 23:8
focusing 32:9, 58:20
follow 10:7, 11:1,
56:16, 56:18
followed 56:19,
60:15
footnote 32:6, 33:18
foresee 24:4
Form 9:7, 44:15,
56:23, 59:9, 60:23
formal 44:1, 51:25
format 13:25, 18:12,
19:21, 21:12,
32:12
formulation 5:6
forward 5:19, 7:3,
11:13, 12:16,
28:3, 28:4, 29:25,
30:1, 58:14, 59:2
four 8:22, 39:17,
45:11
fourth 8:22
frame 6:4, 7:9,
56:3, 57:20
frankly 20:7, 23:13
free-for-all 11:7
French 20:12
frequent 16:8
frequently 12:20,
16:12
Friedman 1:44
front 32:1, 32:22,
62:8
frozen 36:6
Fuentes 2:13
fulfill 26:18
function 39:23
funded 49:16
future 10:16, 43:23,
50:23


< G >
Garcia 47:22
GDB 5:12
general 5:6, 7:14,
12:9, 14:19, 15:6,
27:9
generally 12:21,
13:2, 29:20, 30:2,

35:2, 62:1
generate 19:21,
39:14
genuine 16:10
getting 15:14, 61:7
give 7:10, 9:18,
29:22, 45:4
Given 14:8, 21:8,
22:5, 23:9, 24:24,
31:20, 36:4
giving 36:13
glad 48:13, 52:10
goal 8:11, 40:9,
60:17
goals 25:23
Godfrey 37:20
govern 39:18, 39:19
Governor 33:11
grant 44:1
granted 42:19, 63:13
granular 22:12
granularity 21:13
grateful 7:12, 22:3,
22:6, 45:7
Gray 2:14
great 21:13
greater 25:18
gross 18:2, 21:7
gross-up 32:12,
32:24
gross-ups 32:7
grounds 14:21
group 39:6
growth 13:13
guess 32:2, 37:1,
55:21, 55:25,
61:17
guidance 34:8, 34:18
guided 35:2
guidelines 10:6,
11:2


< H >
half 53:20
hand 23:11, 23:12,
26:13
handled 26:5, 26:7
handling 49:7
happen 32:10

happened 53:1
happening 26:20
happens 13:5, 34:9
happy 21:24, 26:13,
  29:16, 54:19,
  57:15, 64:4
Hastings 35:12
heads 35:25
hear 7:18, 37:1,
  48:13, 52:2,
  52:10, 60:9, 60:20
heard 49:25, 52:7,
  58:25, 61:18,
  63:19
Hearing 1:23, 4:21,
  5:15, 6:7, 8:10,
  21:21, 35:20,
  39:6, 42:13, 47:8,
  50:1, 52:4, 53:20,
  55:14, 55:19,
  55:23, 55:24,
  57:24, 59:1, 60:9,
  60:19, 63:20,
  63:21, 64:2
hearings 7:11, 31:7,
  41:11, 49:23
heart 37:4
Hector 2:21, 47:23
held 12:4, 50:9
helpful 18:9, 21:19,
  25:18, 27:11,
  27:12, 38:11,
  56:24, 57:1
helps 37:14
Hermann 1:33
high 11:8, 13:16
higher 16:13
hire 28:25
hit 29:4
hoc 26:17
holdback 62:18
holders 50:9, 54:12,
  58:8
holiday 57:19
holidays 64:4
honestly 34:15
Honorable 1:24, 65:6
hope 6:21, 10:24,
  21:16, 29:7,
  35:14, 37:3, 40:2,

  43:9, 48:10,
  52:16, 62:4
hopefully 9:21,
  10:15, 10:23,
  50:18
hoping 62:12
horse 28:8, 28:21,
  33:6
hour 17:6, 53:18
hourly 8:17, 17:17,
  17:18, 19:11
Houser 58:24
hurt 20:1
husbanding 24:7


< I >
idea 9:19, 16:24,
  27:1
ideal 37:11
identified 30:9,
  39:24
identify 5:10, 14:7,
  23:5, 24:5, 25:23
II.1 8:2
III 1:8, 5:4, 6:4,
  7:4, 7:6
illustrate 18:11
illustrative 18:15
imagine 28:5, 39:16
immediately 60:16
impact 8:18, 8:20,
  10:19, 16:13,
  18:11, 18:25,
  19:4, 21:8, 27:21,
  58:7
implementation 32:10
important 7:13,
  17:10, 47:2,
  52:24, 53:8
Impose 8:3, 11:16,
  11:17
imposed 10:5, 15:5
imposing 11:5, 31:13
imposition 8:8,
  8:16, 21:25
impossible 17:23,
  28:9, 34:1, 35:15
improperly 9:25
in. 24:12

incentive 10:24
include 20:20, 21:9,
  61:4, 62:9
included 30:4,
  34:16, 43:16,
  45:18, 45:24,
  46:18
includes 21:15
including 4:19,
  45:6, 62:11
income 37:12
incorporate 41:5
increase 11:23,
  12:21, 13:3, 13:4,
  13:6, 13:15,
  14:16, 24:23, 25:3
increased 17:6,
  24:4, 36:8, 36:16,
  36:17
increasing 8:19,
  18:6
incur 59:16, 60:3
incurred 16:14,
  58:13
indebtedness 46:14,
  46:16, 46:24
indenture 61:1
independent 40:20
indicate 33:14,
  52:13
indicated 15:9,
  18:8, 49:14
indicating 28:14
individual 17:17,
  33:24, 38:8, 50:19
industry 16:13
ineffective 10:20
inflated 14:24
inflation 14:6,
  23:19, 24:10
inflationary 23:3,
  23:8, 24:9
inform 7:14
informally 52:6,
  62:25
information 4:15,
  7:12, 13:12,
  13:18, 13:20,
  20:21, 21:5,
  21:16, 21:18,

21:25, 22:4, 25:6,
25:10, 27:22,
28:19, 33:2, 52:5,
52:18, 52:25,
59:15
initial 8:9, 8:18,
15:9, 16:10,
19:22, 28:18,
30:10, 51:13
initially 11:13
inquiries 27:6
insight 29:23
insofar 7:14
instance 6:18, 17:5
instances 16:20,
16:21, 18:5, 28:24
Instead 30:18, 58:19
instructions 4:10
Insurance 58:4
integrity 33:3
intended 27:25
intends 8:13
intent 11:6
intention 11:16
interest 4:6, 52:22
interested 19:18,
21:14, 21:21
interesting 31:6
interestingly 43:11
interests 56:10
interfere 57:19
interim 8:21, 8:23,
12:7, 18:10, 20:7,
21:19, 22:11,
22:16, 39:6,
39:10, 40:3, 41:13
interposed 49:20,
54:24
interrogatories
45:19
inundating 21:17
involved 5:13, 7:16,
35:16, 38:3
involves 30:8, 42:8
island 24:1, 25:8
issued 4:12, 46:14,
46:16, 46:25
issues 5:22, 9:20,
11:15, 21:2,
23:14, 37:2,

39:24, 40:17,
41:2, 46:2, 46:12,
52:14, 56:14,
62:1, 62:13,
62:18, 62:24, 63:5
item 8:2, 40:20,
41:19, 42:24
items 7:8, 44:19,
44:20, 44:22,
44:23
itself 5:4, 51:18,
52:4, 52:9, 55:19,
56:19, 63:4

< J >
January 7:20, 31:8,
31:9, 42:13
Jenner 47:25, 48:18
job 35:15
join 62:16
Jointly 1:11
Jose 2:23, 41:24
Juan 1:40, 2:20,
4:1, 4:7, 4:8,
47:21, 63:23
Judge 1:24, 1:25,
8:6, 22:24, 39:3,
41:15, 58:24, 65:7
judgment 31:16, 44:8
judgments 38:9
Judicial 4:11
jurisdictions 32:14

< K >
Kahn 37:21
Katherine 2:4
Keep 11:3, 64:4
keeping 19:1, 27:2,
34:6
kept 30:23, 33:21
key 5:17
Kim 6:2
Kirpalani 2:8
knows 5:9, 5:12,
20:24, 30:3, 31:7
Kobre 6:2

< L >
lack 6:11, 6:17,
52:13
laid 49:23
largely 6:18
larger 15:14
largest 35:24
last 37:18, 39:5,
43:2, 43:10, 48:17
late 55:13
later 34:1, 55:21
Laura 1:24, 65:7
Law 6:24, 8:17,
8:25, 9:12, 12:1,
12:18, 26:11,
26:13, 30:11,
30:13, 30:14,
39:14, 39:16,
39:17
lawyers 31:17
lay 56:25
laying 26:24
Lead 22:19, 30:5,
30:16, 30:18,
30:21, 48:10
leader 58:24, 61:10
leases 5:24, 5:25
least 5:24, 16:3,
52:3, 59:5
leave 38:24
leaves 57:23
leaving 47:12
Lecaroz 1:36
lectern 61:8
left 59:10
legal 6:12, 14:1,
61:2
legislation 33:10
legislative 33:13
Lehman 43:7, 43:13,
43:17, 44:8, 44:13
less 30:13, 36:25,
37:10
letter 18:20
letters 51:22, 56:23
level 10:14, 15:4,
20:10, 24:6
Lexis 13:12, 14:17
lien 58:12, 62:18
life 37:12

lift 26:4
lifting 6:25
light 37:22, 42:10
lighten 55:3
likely 5:22, 5:23,
    6:3, 6:9, 32:3
Likewise 50:8
limit 11:8, 13:9,
    23:23, 46:18,
    53:17
limitation 16:2
limitations 11:2
limited 22:5, 37:25,
    47:12, 53:14,
    57:17
line 17:13, 31:12,
    40:20
line-by-line 21:2
list 12:6, 40:12
litigating 62:17
litigation 58:2
litigations 58:6,
    58:13, 59:4, 59:17
little 6:8, 15:12,
    17:11, 29:22,
    34:17, 39:4,
    40:14, 45:5,
    49:17, 55:10
live 24:2, 35:14
lives 52:12
living 24:1, 35:19
loaded 4:18
local 25:25, 26:5,
    26:10, 26:12,
    26:14, 26:21,
    27:11
locally 26:7
locate 33:12
long 16:22, 48:20
look 30:18, 31:22,
    36:5, 53:25
looking 30:8
looks 5:19, 63:18
lot 5:21, 6:5, 26:2,
    26:4, 32:8, 42:6,
    42:7, 46:19, 48:7,
    48:8, 52:11, 53:19
lots 39:16
lower 17:18
Luc 1:39, 35:12

Luis 1:45, 2:23,
    41:24
Luke 2:16, 61:21

< M >
Maestros 41:25
mail 51:21
mailbox 53:11
main 5:10
mainland 26:1
maintain 12:14
major 29:17, 38:1
Management 1:10
manner 6:15
March 6:3
Marini 1:45
marked 17:2
market 14:15, 14:23,
    16:25, 18:6, 18:12
marketplace 15:1
Martin 1:31, 5:2
massive 38:6
master 50:6
matches 39:20
material 21:12
materials 16:4
math 15:12, 22:22
matter 19:22, 30:9,
    38:21, 38:23,
    42:15, 52:23
matters 9:22, 26:21,
    30:8, 34:22,
    43:10, 45:6, 58:25
Mayol 2:21, 47:23
meaning 36:15
meaningful 22:10
meaningfully 39:25
means 8:25, 48:21
mechanics 52:14
mechanism 25:4,
    28:16, 58:5, 58:25
mediation 5:20,
    5:22, 7:9, 58:24,
    61:9
meet 45:20
meetings 48:9
Mellon 2:13, 58:3,
    58:11, 58:19,
    59:4, 59:15, 60:2,

60:3, 61:22,
    61:25, 62:10,
    62:16, 62:23,
    63:22
member 38:8
members 4:6, 53:14
mentioned 42:5,
    44:25
merely 10:6, 10:17,
    40:13, 43:20
merits 46:7
message 43:1
metropolitan 23:20
mid 13:6, 31:10
Milian 47:22
million 8:22
mind 11:3, 19:1,
    26:4, 27:2, 35:22,
    37:7
mindful 30:25
minimize 10:23
miracle 24:4
missed 48:20
missing 20:2
mitigate 19:14
mitigated 13:10
mix 23:15
moment 40:16
money 32:22, 59:5
Monsita 1:36
monthly 40:5
months 31:25
morning 5:1, 5:2,
    8:5, 8:6, 35:10,
    35:11, 37:19,
    37:20, 38:5,
    38:10, 41:22,
    41:23, 42:2, 42:3,
    61:19, 61:20,
    63:17
motions 26:5, 46:7,
    52:24
movants 42:9
move 56:1
multiplier 17:7
Municipal 30:6,
    30:14, 30:15,
    30:19, 30:20

< N >
name 61:21
Namely 40:17
names 30:9
narrative 52:17
nature 9:14, 18:22,
    23:10, 30:10,
    31:20, 63:3
near 5:24, 7:8,
    50:23
necessary 24:8,
    32:9, 52:18,
    60:16, 60:25
need 9:21, 10:15,
    22:17, 22:22,
    26:14, 26:20,
    28:25, 29:2,
    29:19, 31:18,
    48:5, 50:7, 54:1,
    58:14
needs 20:5, 33:21,
    54:3
negotiate 36:3
negotiated 25:7
negotiating 22:8,
    22:9
negotiation 5:6,
    6:14, 58:17
Negotiations 5:17,
    42:8
Neil 2:14
nevertheless 46:7
news 51:16
newspapers 54:9
next 8:2, 11:19,
    29:4, 31:25,
    33:16, 38:23,
    41:19, 42:13,
    42:18, 42:24,
    43:6, 44:19, 63:20
night 43:2, 48:17
nine 5:18
No. 1:6, 18:16
nominees 54:13
non-title 7:4, 7:5
None 3:5, 3:11, 63:2
nongovernmental
    25:16
nonseniority 23:3
nor 4:15

norm 12:21
normally 28:17
norms 16:13
note 20:19, 43:20,
    51:24, 57:10
noted 30:11, 40:16,
    41:7, 46:3
notes 4:17, 4:18
nothing 46:6
notice 8:13, 10:22,
    31:23, 48:14,
    48:18, 54:5
noticed 27:17
Notices 50:2, 50:16,
    51:6, 54:9
notify 53:21
November 39:8, 40:15
number 8:22, 12:6,
    32:15, 39:24,
    41:14, 41:20,
    43:8, 53:14
numbers 20:9


< O >
O'melveny 57:13
O'neill 51:4
objected 9:6
objection 9:17,
    9:21, 19:3, 46:3,
    47:12, 48:15,
    49:7, 50:5, 50:21,
    51:18, 53:9, 59:14
objections 26:6,
    45:11, 45:15,
    45:17, 47:13,
    49:11, 49:19,
    49:22, 51:12,
    51:19, 51:25,
    54:24, 59:23,
    62:6, 62:11
obligations 26:19,
    31:19
observed 4:21, 16:3
observing 4:7
obstacles 6:13
obvious 32:19
obviously 6:14,
    27:2, 38:10,
    38:12, 42:9,

55:15, 60:25, 63:2
occur 14:11, 60:24
offer 16:7
offered 3:5, 3:11,
    37:6
offering 17:14
office 49:9, 49:25,
    51:11, 51:15
officers 25:1
Official 1:38,
    47:24, 65:13
often 14:7, 14:11
Okay 22:24, 56:8
Omni 11:19
Omnibus 1:23, 39:5,
    42:13, 42:18,
    49:11, 49:19,
    49:22, 50:20,
    50:21
Once 28:8
One 4:20, 12:3,
    13:3, 13:9, 14:12,
    16:20, 18:14,
    22:13, 23:11,
    32:6, 35:18, 36:5,
    38:6, 39:3, 40:1,
    40:13, 40:23,
    45:12, 45:17,
    46:12, 48:13,
    49:2, 50:4, 57:10,
    58:3, 62:2, 63:18
one-day 53:20
one-size-fits-all
    36:13
ones 40:12
ongoing 42:10, 45:1,
    46:8, 46:10,
    58:23, 62:7, 64:2
open 11:6, 24:18
operate 27:25
operating 26:11
opinion 44:13, 46:23
opinions 6:16
opportunity 53:12,
    55:23
opposition 24:16,
    24:17, 43:14,
    44:1, 60:4
optimistic 62:5
Order 9:7, 9:9,

21:23, 22:15,
26:18, 27:17,
28:7, 30:3, 34:23,
36:7, 39:7, 41:7,
41:14, 44:2,
44:12, 44:15,
45:9, 45:24,
48:22, 50:20,
51:21, 51:25,
53:17, 53:25,
54:7, 57:21,
61:13, 62:8, 63:14
Orders 4:12, 37:7
ordinarily 17:19
organism 24:2
original 15:10
originally 37:13
Others 17:16, 36:14,
39:19
otherwise 10:25,
26:18, 58:8,
58:21, 59:22,
60:6, 60:12
ought 20:14, 23:6,
32:15
outlier 11:23
outlying 12:2
outset 8:15, 18:17
outside 4:14, 14:20
outstanding 34:19,
39:11, 58:1, 63:5
overall 11:4, 15:13,
18:25, 25:22,
27:12
oversee 26:15
Oversight 1:9, 4:25,
5:3, 6:19, 25:5,
34:6, 42:4, 42:8,
45:13, 46:23,
59:22, 61:24,
62:24
overtaken 16:23
own 11:14, 11:21,
20:10, 20:22,
26:3, 31:19, 37:11


< P >
PAGE 3:3
pages 65:4

paid 28:13, 48:5
pain 37:14
papers 43:3
parameters 10:7,
28:17
part 4:15, 4:21,
14:23, 20:16,
32:25, 44:25,
46:1, 46:7, 50:16,
55:21, 58:17,
58:23
participants 4:8,
14:23
participating 24:11
particular 4:17,
9:13, 11:18,
11:22, 12:15,
21:23, 27:7,
29:22, 30:13,
43:22
particularly 13:21,
23:8, 38:17
parties 4:6, 31:23,
38:2, 42:10,
42:15, 45:22,
47:4, 52:22, 58:6,
58:15, 58:18,
59:9, 59:12,
59:24, 60:8,
60:13, 60:22,
61:2, 61:10
partner 12:19,
13:12, 47:23
partners 35:25, 37:4
parts 39:18
party 43:18
pass 32:24
passed 33:10
Paul 35:12
pay 6:19
payments 15:13
PBA 5:24, 50:9
pensioners 48:12
pensions 48:4
People 6:25, 15:15,
17:17, 20:11,
20:12, 26:25,
27:8, 32:13, 33:8,
46:19, 50:9, 52:2,
52:5, 53:15,

57:12, 57:17
per 13:9, 14:25
percent 11:23, 13:5,
13:14, 13:15,
14:25, 17:4, 17:7,
17:18, 23:20,
23:22, 23:24,
33:24, 35:24,
36:13, 36:14, 40:4
percentage 23:2
percentages 12:12,
13:1, 13:2
perform 31:18
performed 25:24,
26:10
perhaps 16:8, 28:18,
51:14, 54:16,
55:3, 55:10
period 8:21, 12:8,
16:9, 21:9, 24:24,
39:10, 55:8, 60:7
periods 31:3, 39:10
permitted 4:20
person 4:14
personally 37:9
perspective 37:23
pertaining 49:12
Peter 1:44
phone 54:12
PHV 1:31, 1:32,
1:39, 1:44, 2:3,
2:4, 2:8, 2:10,
2:14, 2:16
physical 53:11
picking 49:5
pie 15:14
pieces 58:2
place 42:18, 54:1,
63:23
placed 55:23
plain 54:18
plaintiffs 58:20
Plan 5:20, 6:5, 6:9,
6:18, 6:20, 31:24,
46:9, 46:15,
46:17, 47:1, 47:6,
47:7, 48:11,
53:13, 55:9,
56:14, 57:14,
57:25, 58:5,

58:16, 59:2, 59:3,
  62:6, 62:11, 63:1,
  63:21
plans 5:7, 5:8,
  42:7, 57:19
plays 40:5
pleased 11:12, 47:10
pocket 28:13
pockets 27:7
podium 7:24
point 24:5, 31:6,
  34:7, 38:4, 53:23,
  55:20
point. 36:2
pointing 13:11
policies 4:12, 12:10
portion 14:11, 14:12
portions 61:1
position 9:15,
  59:19, 60:4
positions 46:5, 61:2
positive 51:3
possibility 10:9
possible 7:14, 7:15,
  31:14, 32:16,
  46:15, 52:13
possibly 6:1
posted 59:6, 59:20,
  60:6, 60:12
posting 51:23, 60:24
potential 8:18, 19:3
potentially 29:20
practicable 6:7
practice 12:18,
  12:22
practices 12:13
PRASA 7:5
precedes 45:10
preceding 13:16
precisely 32:15
precision 18:5
predisclose 28:9
prefer 25:9
prejudice 34:24
premature 32:8
prematurity 33:5
PREPA 5:17, 5:18
preparation 57:14
preparing 64:1
present 52:5, 56:24

presentation 11:9,
  22:13, 32:12
presentations 56:16,
  56:18, 56:19
preserve 50:10,
  60:12
press 4:6
pressures 24:9
prestige 23:13
presumptions 22:14,
  24:17, 34:25
Presumptive 8:3,
  8:8, 8:9, 8:12,
  9:2, 10:5, 11:8,
  13:8, 21:23,
  23:18, 27:21,
  38:19
presumptively 25:24
previously 49:6,
  49:14
price 17:15
primarily 7:2, 26:7,
  28:7
primary 9:4, 14:13
Prime 50:17
principal 56:16,
  56:18
principle 25:5
principles 11:18,
  32:8, 32:11, 32:17
prior 39:10, 49:25,
  55:14, 60:18
private 12:18, 15:1
pro 26:17
probably 16:22,
  19:16, 19:19,
  20:25, 36:24,
  47:5, 48:3, 51:1,
  56:11
problem 36:12
procedure 62:17,
  62:20
Procedures 4:23,
  35:1, 40:3, 44:10,
  50:20, 51:12,
  53:9, 54:7, 57:21
proceeding 35:3
Proceedings 2:47,
  4:15, 7:17, 11:4,
  36:21, 53:25,

60:16, 64:7, 65:6
produce 20:22
produced 2:47, 45:19
product 30:19, 30:20
professional 9:6,
  10:3, 11:1, 15:21,
  16:11, 16:20,
  17:22, 17:23,
  19:5, 23:12,
  26:19, 30:24,
  31:16
proffers 44:7
progress 7:17
progressed 31:3
prohibition 10:9
projections 24:5
PROMESA 41:5
promoted 12:19
proof 9:25, 44:10
proofs 50:6
proper 24:6, 44:8,
  59:9
properly 27:10
proportions 24:24
proposal 25:4,
  35:19, 52:15
proposals 32:12
Proposed 25:15,
  27:19, 32:7,
  34:25, 41:12,
  41:13, 44:15,
  52:20, 62:8, 63:14
pros 60:23
Proskauer 5:3, 42:4,
  51:4
prospective 42:7
prospectively 16:1,
  21:24, 27:19
Protective 45:24
proven 39:20
provide 10:6, 10:14,
  10:24, 11:7,
  15:22, 19:24,
  21:13, 21:20,
  28:15, 38:7,
  48:11, 52:17
provided 15:10,
  28:19, 28:20,
  30:5, 30:10,
  36:16, 41:10,

45:23, 53:10,
62:25
provides 58:5
providing 34:8,
39:20
provisions 9:11,
30:4
public 4:6, 7:14,
8:12, 25:12,
25:18, 52:19,
53:14
publicize 53:16
publicly 13:23,
25:6, 25:7, 25:17
published 54:9
PUERTO 1:3, 1:11,
1:16, 1:31, 1:42,
4:1, 4:9, 7:5,
11:4, 25:20, 32:7,
41:25, 48:12,
63:25, 65:2
pulled 40:18
pulls 35:16
purely 6:12
purported 44:13
purpose 33:18, 38:4
purposes 5:25
pursuant 45:2,
46:14, 46:17,
46:25, 54:6,
58:16, 59:11
pursuing 19:19
push 35:16
put 8:12, 10:22,
23:17, 28:8,
37:10, 45:15,
54:16, 56:11,
56:22
putting 54:22


< Q >
qualified 33:9
quarter 31:10
question 15:7,
15:17, 18:4, 23:1,
46:13, 48:14
questions 55:17
queued 63:18
quickly 16:7, 43:10

quite 57:1


< R >
radio 54:8
raise 10:25, 31:22,
33:23, 52:11
raised 29:11, 46:2,
46:12, 52:6
Ramos 41:25
random 53:14
rates 10:25, 11:23,
12:2, 13:21,
13:24, 14:23,
15:16, 15:23,
16:12, 17:13,
17:17, 18:6,
21:10, 25:25,
36:6, 36:8
Rather 11:7, 17:1,
23:21, 28:13,
43:14, 47:6
rationale 32:19,
37:5
Re 1:6
reach 40:8
reached 50:3
reading 13:17, 57:4
ready 5:21
real 13:1, 16:10,
16:25, 24:10,
24:18, 52:12
realistically 54:2
realities 12:18
reality 13:17
realize 29:19, 53:19
really 9:18, 17:13,
17:23, 21:12,
33:17, 34:7,
43:23, 43:25,
44:24, 44:25,
46:6, 51:15,
60:19, 60:20
reason 6:22, 13:8,
14:6, 20:16,
22:13, 28:6,
28:15, 58:10
reasonable 10:13,
12:14, 14:25,
18:2, 19:8, 19:9,

36:10, 41:4, 41:13
reasonableness 9:20,
10:1, 10:4, 19:11,
20:22, 21:17,
28:17, 31:13,
40:21, 41:5
reasons 6:11, 6:17,
39:11
receive 40:4
received 51:19
receiving 54:11,
56:23
recent 14:20
recipient 51:21
recognition 28:18,
41:1
recognize 23:23,
32:13
recommendations
22:9, 22:16, 22:20
recommended 12:2,
12:7, 29:14, 39:6
recommending 40:24,
41:4
reconciling 50:13
record 4:15, 4:20,
37:25, 41:24,
50:23, 57:6
recorded 2:47
records 30:15
recouped 16:7
redline 9:7
Reed 61:21
reexamination 19:17
refer 4:18
referred 43:12
reform 34:13
regarding 9:2, 32:6,
44:13, 46:13
Region 1:36
registered 9:17,
49:21
registration 56:12
registry 50:18,
50:24
regret 35:14
reinforce 38:5
reject 43:12, 43:24
Rejection 43:7,
43:15, 44:7, 44:10

rejoice 52:23
related 6:1, 25:13,
    25:15, 44:22,
    63:22
relation 13:16
relationship 63:4
relevant 6:11,
    33:15, 33:16
Relief 41:20, 42:12,
    42:25, 44:2
relying 61:2
remained 39:11
remaining 47:13
remains 10:4
remarks 53:17, 63:8
remind 4:11
reminder 38:14
remove 50:17
repealing 6:23
Reply 46:4, 56:19
report 4:24, 5:5,
    6:2, 7:19, 11:24,
    13:24, 23:21,
    41:8, 41:9, 47:11,
    49:8, 54:19, 57:15
reportage 34:14
Reporter 65:13
reporting 19:21,
    19:23, 20:20,
    21:3, 21:19, 21:20
reports 7:21, 18:20,
    20:23, 21:15,
    41:11
repository 4:14
represent 47:16
representation
    24:23, 24:25
representations
    26:16, 52:18
representative 1:13,
    5:4, 51:8
representatives 48:7
request 39:15,
    42:17, 45:18
requested 40:4
requests 21:25,
    22:15, 32:18,
    42:19, 45:21
require 19:16,
    21:11, 63:2

required 14:4,
    19:24, 25:9,
    40:14, 59:19
requirement 20:1
requirements 27:3,
    27:18, 27:19, 44:6
reservation 43:16,
    44:14, 62:9
reserve 31:21, 58:14
reserved 59:5
resistant 14:20
resolicitation 63:2
resolution 6:13,
    42:20
resolve 46:10, 63:5
resources 9:23,
    13:24, 22:5,
    23:11, 24:3, 24:7,
    48:6
respect 9:3, 29:21,
    43:17, 45:21,
    45:23, 46:23,
    47:10, 49:21,
    51:17, 57:25,
    58:1, 59:4, 60:21,
    61:13, 62:10,
    62:12
respective 50:3,
    60:13
respond 45:20,
    54:24, 59:22
Response 43:13,
    43:14, 43:20,
    45:13, 59:21
responses 45:16
responsibility 26:19
restrictions 27:18
result 13:2, 34:9,
    40:8, 47:9, 62:6
resuming 5:19
retained 25:5, 28:1,
    28:9, 28:13
retention 19:17,
    25:13, 29:11,
    29:21, 30:4, 30:5
retentions 27:20,
    28:4, 28:23
Retiree 2:19, 45:17,
    46:3, 46:5, 46:9,
    46:12, 46:22,

47:4, 47:11,
    47:14, 47:24
retransmit 4:21
retrospective 20:8
returns 7:1
review 20:7, 22:10
reviewed 16:5, 41:9,
    44:4
reviewing 22:9
Revised 9:7, 24:14,
    25:4, 27:17, 28:7,
    34:25
revision 28:7, 29:4
revisions 21:22
revisited 37:8
RICO 1:3, 1:11,
    1:16, 1:31, 1:42,
    4:1, 4:9, 7:5,
    11:4, 25:21, 32:7,
    42:1, 48:12,
    63:25, 65:2
rid 50:24
rights 31:21, 42:14,
    43:17, 44:9,
    44:14, 50:10,
    60:13, 62:9
Rivera 43:1
Rivero 1:46
robust 14:8
role 38:13, 38:14
roll 20:25, 54:19
Roman 8:2
room 33:9, 38:2
Rose 5:3, 42:4
round 11:17
routine 26:9
RSA 5:17
Rule 45:2
rules 4:22
ruling 52:23, 60:15
rulings 6:15
running 30:20


< S >
S/ 65:11
sacrifice 24:8
safe 64:4
Salinas 2:10
San 4:1, 4:7, 4:8,

63:23
sanctions 4:22
satisfied 41:3
savings 16:7, 16:14,
   16:17, 16:18, 21:7
saying 37:2, 38:12,
   52:2
says 36:7, 48:22
scenario 31:9, 36:24
scheduled 5:15,
   31:8, 63:20
Section 5:25, 25:15,
   44:6, 44:9, 57:25
seeing 15:15, 17:4
seek 25:23, 43:12
seeking 32:3
seem 27:19
seems 12:21, 12:22,
   23:9, 27:20, 56:15
seen 26:4, 34:13,
   52:11
segment 53:13
Senior 2:6, 58:9
seniority 13:22,
   14:3, 14:5, 14:12,
   14:18, 15:5, 23:4,
   23:7, 24:22, 34:3
sense 6:20, 15:16,
   18:13, 25:22,
   26:20, 26:24, 30:7
sensitive 29:7
separate 33:21,
   34:7, 38:21,
   40:19, 40:20,
   43:22, 57:7
separately 56:5
series 16:11
serious 36:20
seriously 37:2,
   37:5, 53:2
Service 43:7, 43:18
services 31:18
sessions 41:11
set 8:9, 19:21,
   19:22, 20:9,
   32:11, 34:25,
   45:14, 59:6
settlement 18:22,
   45:3
Several 12:5, 38:1,

39:9, 46:19, 49:10
Shall 7:24
shared 7:13
shareholder 12:20
sheer 39:23
shift 9:25
short 16:9
shortage 37:23
shouldn't 27:1
shows 18:23
signals 4:19
signed 26:17, 33:11,
   34:14, 37:13
significance 11:3,
   20:10, 25:20
significant 10:12,
   29:25, 37:19, 41:1
significantly 25:25
similar 59:23
similarly 25:13
simple 5:9
simpler 54:17
simplicity 17:5
simply 6:19, 37:24,
   38:12
sir 48:24
sit 51:14
situation 23:25,
   31:20, 42:9, 52:21
situations 7:4, 7:6
size 38:6
SIZEMORE 2:16,
   61:20, 61:21,
   62:19, 62:22,
   63:8, 63:10
smaller 30:6
Smith 61:21
social 52:11
software 39:14
Solicitation 54:7,
   56:10, 57:21
somebody 61:7
someone 28:9, 28:25
sometimes 54:14
somewhat 14:24
somewhere 20:7
soon 5:22, 6:7
sorry 15:18
sort 21:18, 24:7,
   29:2, 56:25

sorts 15:20, 27:10,
   29:24
sounds 34:18
source 4:14
Speaking 10:11, 30:2
specific 7:7, 7:10,
   14:15, 14:18,
   27:3, 27:5, 28:24,
   30:14, 34:14,
   38:21, 53:9
Specifically 33:1,
   36:16, 46:24,
   58:18, 59:11,
   59:25
spend 32:8
spots 54:8
staff 38:8, 63:25
standard 12:22,
   15:23, 17:12,
   18:10, 22:1, 27:22
Standards 8:4, 8:8,
   8:9, 8:12, 8:13,
   9:2, 9:14, 9:19,
   10:5, 10:22, 13:9,
   21:23, 31:13,
   31:14, 41:5
start 55:25
starting 14:23,
   54:18
stated 9:12, 9:24,
   16:5, 17:12,
   17:21, 48:1
Statement 6:6, 54:7
States 1:1, 1:25,
   32:13, 65:7
status 4:24, 5:5,
   5:6, 7:19
Stay 26:5, 41:20,
   42:12, 42:14,
   42:17, 42:25
stenography 2:47
step 13:22, 26:15
stepping 31:15,
   31:16
Stipulation 45:24
straightforward
   39:4, 40:15, 40:25
strongly 26:15
structural 29:17
struggled 10:8

subject 4:22, 9:3,
  17:25, 19:2, 28:6,
  28:15, 40:21,
  42:13, 46:21,
  50:5, 59:17
submission 21:11
submissions 44:5,
  52:16, 59:13, 61:5
submit 59:15, 60:1,
  60:3, 61:8
submitted 9:7, 44:2,
  45:25
subordinated 58:9
subretained 27:14,
  28:1
subsequent 16:8,
  16:24
substance 46:2,
  46:6, 47:3, 49:4,
  51:15
substantially 27:21
substantive 51:12
successive 16:11
sufficiently 14:7
suggested 13:15,
  35:19
suggestion 26:8
summary 11:10, 21:4
superb 64:2
supervise 26:15
supplement 57:15
support 54:22, 55:1,
  62:19, 64:2
supporting 21:12,
  59:19
surpassed 16:20
surprise 11:10, 29:6
surprised 7:19
survey 13:12, 13:14,
  13:20, 14:17
susceptible 50:21
Susheel 2:8
Swain 1:24, 65:7
system 25:17

< T >
table 18:11
tabulation 55:11
talked 28:23, 30:24,

40:22, 46:19
tasks 30:10
tax 32:7, 32:10,
  32:14, 32:18,
  32:19, 32:21,
  34:13
Taylor 1:24, 65:7
team 51:4, 58:24,
  61:10
technical 48:14,
  63:3
tee 6:13
teed 5:22, 7:8
telephone 48:8
telephonic 4:8
template 25:15
ten 17:18, 51:1
tend 13:4
tendered 60:12
tends 21:1
term 5:24, 7:8, 24:7
terms 9:19, 25:22,
  29:18, 31:15,
  42:17
testimony 55:2
themes 56:17, 57:8
themselves 28:12,
  50:7
thereby 58:14
they've 63:1
third 8:21, 12:7,
  39:6, 39:9, 43:18,
  51:8
thoroughly 44:4
though 28:21, 34:18
Three 44:19, 47:12,
  49:22, 59:8
tick 56:12
tide 6:25
timekeeper 33:24
timeline 5:8, 6:10,
  7:11
Title 1:8, 5:4,
  5:12, 6:4
titles 30:11
today 7:13, 12:3,
  13:5, 23:7, 35:1,
  35:3, 37:5, 37:6,
  40:13, 40:24,
  41:2, 41:4, 41:10,

49:23, 53:24, 64:2
toes 31:15, 31:16
together 44:23,
  44:24, 47:22,
  47:24, 52:23,
  54:22, 56:22,
  57:12
took 51:24
tool 33:2
total 17:14, 18:1
toward 22:13, 42:20,
  62:4
towards 46:9
track 14:10
tracked 20:17
tracking 50:13
training 14:21
transaction 32:22
Transcript 2:47,
  65:4
transcription 65:5
transparent 32:16
travel 64:5
treat 38:21, 40:19
treated 32:2
treatment 33:19,
  39:22
trickle 54:14
tricky 29:4
tried 10:21, 12:17,
  28:11, 31:21
trillion 49:15
trip 51:14
true 16:23, 38:17,
  65:5
trust 11:1, 32:20,
  37:3, 52:16
Trustee 1:35, 43:18,
  44:14, 63:4
try 5:10, 6:12,
  31:1, 46:10, 52:3,
  57:7
trying 31:12, 33:7,
  56:22
turn 7:24, 27:14
turned 4:16, 4:20,
  21:4
Turning 23:1, 25:3,
  49:4
Two 23:20, 23:24,

30:11, 30:13,
34:2, 35:13, 36:5,
36:12, 37:1,
43:10, 44:20,
44:22, 50:5,
53:18, 58:2, 59:4,
59:17
type 20:1
types 9:20, 12:23,
25:23, 26:9, 33:21

< U >
Ukrainian 20:12
ultimately 16:23,
40:7
unable 33:12
uncontested 9:10
underlie 15:20
understand 11:24,
15:17, 24:9, 27:7,
32:17, 36:11,
36:20, 36:21,
48:3, 48:16,
51:20, 52:7, 52:19
understanding 22:17,
25:19, 27:9, 33:8,
33:10, 43:4,
45:22, 52:13,
52:25
understood 50:5
undertaken 19:8
undertaking 27:13
underway 5:18
unfairly 9:11, 9:12
unfold 34:12
uniform 15:24,
15:25, 18:10,
18:12, 32:11
uniformly 12:10,
33:23
uninflated 15:16
unique 23:12, 23:25,
31:20
United 1:1, 1:25,
65:6
University 7:5
unless 4:17
unlikely 32:14
unnecessary 31:1

unprecedented 23:9
unrebutted 44:7
Unsecured 1:39
until 9:16, 10:18,
17:23, 33:16,
42:12, 42:18
unusual 11:25,
18:14, 23:9
unusually 13:16
update 45:5
updated 25:10
Urgent 57:24, 59:11,
61:14, 63:13
useful 20:21
using 4:17, 14:21
usual 4:10, 16:8

< V >
value 23:15, 24:11
various 39:11
Velaz 1:46
verify 18:18, 19:25
version 24:15, 28:7
versus 16:19
vetting 30:19
VI 5:12
vibration 4:19
vice 26:17
video 63:23
vigorous 28:6
violating 4:22
virtually 38:7, 46:4
volition 26:3
volume 39:24
voluminous 18:20,
20:23
voluntarily 50:11
votes 55:9

< W >
waiting 10:18
walk 31:12
Walker 65:11, 65:12
wanted 13:17, 28:15,
35:18, 35:21,
36:19, 46:9, 50:1,
50:22, 50:23
Washington 49:9,

51:14
watch 14:10
ways 36:23, 56:5
week 4:8, 55:10
weeks 49:10
Welcome 4:5, 48:23
well-accepted 12:22
whatever 24:24,
33:19, 54:8, 61:1
whenever 56:2
whether 5:24, 6:9,
10:4, 17:25,
34:15, 46:13
Whitebox 58:3,
58:20, 59:7,
59:18, 59:25,
60:5, 61:24, 62:10
whom 19:12
Williamson 2:3,
37:17, 37:18,
37:20, 38:17,
38:24, 39:13,
41:17
willing 15:2
window 55:22, 56:2,
56:6, 56:9
wish 63:9
wishes 61:17
withdraw 47:11,
50:11
Withdrawal 47:16,
50:2, 50:16, 51:6
withdrawing 48:14
withdrawn 48:22
withheld 59:20, 60:6
withholding 32:18,
32:19
within 16:9, 24:1,
55:23, 56:7, 56:9,
56:10, 56:14
without 21:5, 21:17,
24:1, 34:24
WITNESSES 3:3, 9:3
words 39:23
work 5:21, 25:24,
26:9, 27:10,
28:22, 29:5, 30:1,
30:19, 30:20,
35:3, 42:20, 56:3,
61:24, 61:25,

62:12, 64:1
worked 6:6, 29:12
working 20:12,
  23:13, 23:16,
  30:16, 31:9, 51:5,
  51:8, 54:16,
  57:12, 62:4
world 37:11, 50:25
worth 49:16
writing 14:1


< Y >
year 8:24, 13:3,
  13:6, 13:7, 13:10,
  13:15, 14:25,
  31:11, 33:16,
  57:20
year-over-year
  13:12, 13:14
years 13:16, 14:21
yesterday 33:16,
  45:25
York 2:9, 2:13,
  2:15, 2:17, 4:7,
  23:19, 48:17,
  50:6, 58:3, 58:11,
  58:19, 59:4,
  59:15, 60:2, 60:3,
  61:8, 61:17,
  61:22, 61:25,
  62:10, 62:16,
  62:23, 63:22,
  63:24, 64:1


< Z >
ZEQUEIRA 47:19,
  47:21, 47:22,
  48:16, 48:23