# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>THE COMMONWEALTH OF PUERTO RICO, et al.,<br><br>Debtors[1] | PROMESA<br>Title III<br><br>No. 17 BK 3283-LTS<br>(Jointly Administered) |
| In re:<br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br>as representative of<br>PUERTO RICO ELECTRIC POWER AUTHORITY (PREPA)<br><br>Debtor | PROMESA<br>Title III<br><br>No. 17 BK 4780-LTS |
| UNION DE TRABAJADORES DE LA INDUSTRIA ELECTRICA Y RIEGO, INC. (UTIER)<br><br>Plaintiff,<br><br>v.<br><br>PUERTO RICO ELECTRIC POWER AUTHORITY; COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; RICARDO ANTONIO ROSSELLÓ NEVARES; JUSTO GONZÁLEZ TORRES; GERARDO PORTELA FRANCO; HON. RAÚL MALDONADO GAUTIER; JOSÉ IVÁN MARRERO ROSADO; NATALIE A. JARESKO and JOHN DOES 1-6.<br>Defendants | Adv. Proc. No. 17-229-LTS<br>In 17-BK-4780-LTS |

## AMENDED ADVERSARY COMPLAINT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283- LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284- LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Puerto Rico Highways and Transportation Authority "HTA") (Bankruptcy Case No. 17 BK 3567- LTS) (Last Four Digits of Federal Tax ID: 3808); (iv) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566- LTS) (Last Four Digits of Federal Tax ID: 9686); and (v) Puerto Rico Electric Power Authority ("PREPA") (Bankruptcy Case No. 17 BK 4780- LTS) (Last Four Digits of Federal Tax ID: 3747) (Title III case numbers are listed as Bankruptcy Case numbers due to software limitations).

TO THE HONORABLE COURT:

Comes now Plaintiff, Unión de Trabajadores de la Industria Eléctrica y Riego, (UTIER), through its attorneys, Bufete Emmanuelli, C.S.P., for their Adversary Complaint against defendants: the Puerto Rico Electric Power Authority; the Commonwealth of Puerto Rico; the Financial Oversight and Management Board for Puerto Rico; Hon. Ricardo Rosselló Nevares; Justo González Torres; Gerardo Portela Franco; Hon. Raúl Maldonado Gautier; José Ivan Marrero Rosado; Natalie A. Jaresko and John Does 1-6 (Non-debtor Defendants) (collectively, the "Defendants"), and alleges, states, prays, and requests relief as follows:

## I.  NATURE OF THIS ADVERSARY PROCEEDING

1. The Puerto Rico Electric and Power Authority, ("PREPA") is a public corporation organized under the laws of the Commonwealth of Puerto Rico, (the "Commonwealth"). It is an instrumentality of the Government of Puerto Rico, (the "Government"), and it employs approximately 9,550 employees.[2]

2. PREPA is one of the providers and the sole distributor of electric power for the Island. There are no other companies on the island that provide this combination of services, making PREPA a very important and essential service provider to the Commonwealth.

3. Of PREPA's 9,550 employees, approximately 6,775 belong to a labor union; of those, an estimate of 3,600 are affiliated to the UTIER.

4. The UTIER was founded in the early 1940´s and it is one of four labor unions that represent PREPA's employees. Its members are responsible for the operation and

---

[2] Puerto Rico Electric Power Authority, https://www2.aeepr.com/aeepr2009/AEEES.ASP (accessed July 10, 2017)

conservation aspect of PREPA. They are responsible for the repairs, renovations, and improvements of PREPA property.[3]

5. The UTIER's job is to protect and defend PREPA's workers, as well as negotiate collective bargaining agreements on their behalf. The latest collective bargaining agreement (CBA) is from the 2008-2012 period. (EXHIBIT A).

6. Even though the CBA was enacted with a lifespan lasting from August 2008 through August 2012, it has a provision that establishes that it will continue dictating the labor relations between PREPA and UTIER until a new collective bargaining agreement is negotiated and comes in effect.[4] Since no new collective agreement has been negotiated and established, the CBA is still valid and binding.

7. This CBA was entered upon by both PREPA and the UTIER, on behalf of its members. As such, it is a binding contract between both parties that dictates the labor relations that shall exist amongst them.

8. This agreement serves the unequivocally important purpose of maintaining and creating a peaceful work environment.[5]

9. Some of the major areas covered by the CBA are: vacation and illness accrual and pay, employee classifications, job reclassifications, fringe benefits, job stabilization, and dispute resolution procedures, among others.

10. Such an agreement is extremely important to the well-being of the UTIER members, and as a result, of PREPA. These employees perform high risk jobs that require them to be continually exposed to danger, and as such need assurance that in case any fateful event

---

[3] CBA, Art. III, § 1,3.
[4] *Id* Art. L, "Duration of the Collective Bargaining Agreement"
[5] CBA, "Declaration of Principles"

might happen they will be covered and taken care of, and that neither they nor their families will have to incur in losses. This CBA is what keeps these employees feeling secure, motivated, and with the desire to do their job and do it well.

11. This is of significant importance since the UTIER members play a fundamental role in PREPA´s productivity. The "Salaries and Benefits Report" [6], prepared by economists José I. Alameda Lozada and Alfredo González Martínez, reflects that PREPA has suffered a significant and drastic loss of capital productivity from 2008 through 2017[7] but have been able to continue providing its service, due to the fact that labor production has gone up, with the UTIER members leading the productivity growth.[8] Essentially, it is their labor what has allowed PREPA to continue rendering its service. If this labor were to be affected, PREPA would run a serious risk of having to cease operations, totally or partially.

12. Any scenario in which PREPA´s productivity was to diminish, or its operations were to cease, would be disastrous for the Commonwealth. The service that PREPA renders cannot be obtained by other means. This would imply that the Government, its businesses, hospitals, and schools, among others, would not be able to function properly. Vital operations would be impacted and forced to reduce the services rendered. The latter would in turn cause PREPA, the Government, and the people of the Commonwealth to lose business, lose productivity, spend less and accrue more debt. It would have a negative impact on any possible economic growth or stability that either PREPA or the Commonwealth were to achieve.

---

[6] José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*".
[7] Alameda & González, *Id*., 34.
[8] Alameda & González, *Id*., 34,38.

13. Nonetheless, despite the fact the these employees play a vital role in PREPA´s economy, and as a result in the Commonwealth´s economy as well, the Government has enacted legislation directed at undermining and impairing their CBA, and the agreements in it established, agreements that provide for the health and well-being of these workers. Such legislation has also been adopted in the Commonwealth Fiscal Plan certified on March 13, 2017 and in the PREPA Fiscal Plan, certified on April 28, 2017.

14. The following laws alter, substantially impair, take away without just compensation, or nullify different aspects of the CBA, most of them being economic aspects:

   a. The "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act", Act Num. 66 of June 17, 2014. ("Act. Num. 66").[9] This law substantially alters the CBA by establishing a limit to the amount of vacation and illness days a UTIER member could accumulate and receive a monetary compensation for and eliminating numerous important economic and non-economic provisions of the CBA;

   b. The "Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico", Act Num. 3 of January 23, 2017, was enacted.[10] ("Act Num. 3"). It suspended all collective bargaining agreement provisions that were contrary to its clauses, suspended all non-economic clauses that had any economic impact, whether it be direct or indirect, on the corporation budget, eliminated monetary compensations, and imposed on public corporations the creation of a plan so employees would exhaust all excess vacation and sick leave balance. This Act extended the lifespan of applicable provisions of Act 66-2014, such as Sections 11 and 17.

---

[9] "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", ley número 66 de 17 de junio de 2014.
[10] "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico", ley número 3 de 23 de enero de 2017.

5

c. The "Administration and Transformation of the Human Resources of the Government of Puerto Rico Act", Act Num. 8 of February 4, 2017.[11] ("Act Num. 8"). Its purpose is to make the Government the sole employer of all public employees, allowing it to consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies and corporations, and facilitate the transfer or movement of employees between agencies, without regard to what agency or corporation an employee works for;

d. The, "Fiscal Plan Compliance Act", Act Num. 26 of April 29, 2017 ("Act Num. 26").[12] This Act impaired multiple important fringe benefits of PREPA's employees. For example, it eliminates monetary compensation for excess vacation and illness days; reduces the amount of days an employee can accrue of vacation or illness; eliminates any and all monetary compensations; sets a time limit for the use of excess vacation or illness days. If this excess balance is not used by the established date, they will be lost.

15. The enactment and current implementation and enforcement of these laws represent drastic and substantial impairments of the CBA by the Government. Impairments which render it almost useless. These actions are in direct violation of the Contract Clause of the U.S. Constitution as well as the Commonwealth´s Constitution.

16. The Contract Clause of the U.S. Constitution establishes in its Art. I, section 10, cl. 1 that, "No State shall […] pass any […] Law impairing the Obligation of Contracts…" This Contract Clause has its equal in the Constitution of the Commonwealth of Puerto Rico in its Art. II, sec. 7.

---

[11] "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", ley número 8 de 4 de febrero de 2017.
[12] "Ley de Cumplimiento con el Plan Fiscal", ley número 26 de 29 de abril de 2017.

17. The Contract Clause prohibits a State from passing laws that will impair contractual obligations entered upon between parties. Nonetheless, this prohibition is not absolute. A state may alter contractual obligations under certain circumstances, based on its police power.

18. When a State passes laws impairing a contract, the Courts are called upon, to determine if such a violation is allowed by the Constitution. For this, the legislation enforced must pass a two-prong test. First, if there is in fact a substantial impairment of a contract, and second, if such impairment is reasonable and necessary to serve an important government purpose.[13]

19. As to the first part of the test, all four laws represent a substantial impairment of the CBA. They drastically alter and take away previously contracted rights. Regarding the second part of the test, if such impairment is reasonable and necessary to serve an important government purpose, the answer is no. There are many other ways in which the Government and PREPA can obtain funds in the midst of this fiscal crisis, which do not have to impair the contractual rights of PREPA employees. For example, the outstanding accounts of clients can be targeted as a means to save the income that is being lost, subsidies can be reevaluated as to see which are not necessary and which can be reduced, contracts that are handed out without a proper auction being held should be regulated and better scrutinized in an effort to evaluate how beneficial and cost efficient they are for PREPA, and the theft of electric service should be targeted, allowing for the capture of lost revenue, among other things. It is crucial that these options be evaluated before establishing that the employee´s benefits have to be taken away since, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a

---

[13] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 41 (2011); *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977).

drastic impairment when an evident and more moderate course would serve its purposes equally well".[14]

20. Since the abovementioned laws significantly impair the CBA and they do not qualify as a necessary and reasonable impairment, the Government's actions do not withstand the two-prong test. As a result, these laws and the Government are in violation of the Contract Clause, making any budget or fiscal plan that adopts these measures or laws, illegal and unconstitutional by association.

21. In regard to a taking, the UTIER members were allowed through the CBA to accrue a certain amount of vacation and illness days. Regarding illness days, employees could accrue these without a set limit and PREPA would compensate in money the accumulation when they retire or upon death.[15] About vacation days, the employees could accrue a year's worth of vacation and use it the following year; PREPA would also compensate in money any and all vacation accrued when the employee ceased to work with PREPA.[16]

22. Since the negotiated CBA endowed employees with this flexibility, many would accumulate vacation and sick days for long periods. In many cases these days represented an extra income for employees for retirement. In other cases, as seen in their Financial Statement, PREPA allowed employees to exchange sick days accrued for supplemental pension benefits.[17] For many, these days were the equivalent of a monetary fund. (Exhibit B).

23. Notwithstanding the reason for which they were accrued, these days were earned by the employees through their months of service and as such belong to them. Seeing as though they

---

[14] U.S. Trust Co. of New York v. New Jersey, 431 U.S. 30-31 (1977)
[15] CBA, Art. XV, § 1 & 8.
[16] CBA, Art. XII, § 2 & 8.
[17] Financial Statements, Required Supplementary Information and Supplemental Schedules 2014, § 12, p.77.

are the product of the UTIER members rendered services, they are entitled to accrue, use, and dispose of them as negotiated in the CBA.

24. The use of the days accrued is not something unexpected for which PREPA could not be prepared. On the contrary, as seen in its Financial Statement, the corporation established as an item on the budget, a predetermined amount for the payment of accrued vacation, sick leave, and payroll benefits.[18]

> "The Authority records as a liability and as an expense **the vested accumulated vacation and sick leave** as benefits accrue to employees. The cost of vacation and sick leave expected to be paid in the next twelve months is classified as current and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities."[19] [Emphasis Supplied].

25. In other words, a fund was set aside and tailored to the amount of benefits the employees had accrued. To be specific, the accrued sick leave and payroll benefits – exclusive of benefits to be liquidated after one year, were of approximately $114.5 million for the year 2014 and $122.4 million for 2013.[20]

26. The United States Constitution states in its Fifth Amendment that, "…private property [shall not] be taken for public use, without just compensation."   The Taking Clause has its equivalent in the Art. II, sec. 9 of the Constitution of the Commonwealth of Puerto Rico and is applied to the States and the Commonwealth through Amend. XIV of the United States Constitution.

27. The Taking Clause is divided into two aspects, one, whether an actual taking occurred, and two, if the person received a just compensation for the property taken. If no just compensation is given, the taking is unconstitutional.

---

[18] *Id.*, § 9, p.59.
[19] *Id.*, § 2, p.41.
[20] *Id.*, § 9, p.59.

Case:17-03283-LTS Doc#:377 Filed:01/14/19 Entered:01/14/19 15:27:16 Desc:
Exhibit DX-LL Page 10 of 83

28. In the case at hand, there is a taking of employees' hard-earned benefits and accrued licenses that are the product of services rendered. These belong to the employees and as such constitute their private property.

29. The Defendants are forcing the employees to use their excess days and telling them that the days not used will be lost and will not be compensated. They are eliminating not only the possibility of getting a money compensation for the excess not used, but are also denying employees the opportunity of using the excess balance through an extended period of time.

30. Thus, it can be established that the Defendants' actions of enacting, implementing and enforcing the above-mentioned laws violate the Taking Clause of the United States Constitution and the Constitution of the Commonwealth of Puerto Rico. They deprive, take away, and force employees to dispose of the vacation and sick days they have worked to accrue without offering a just compensation in exchange. The Government and PREPA have, through the enactment and adoption of these laws, violated the Taking Clause of the U.S. and P.R. Constitution. This in turn makes any fiscal plan or budget that adopts these laws unconstitutional by default or association.

31. The impairment of the CBA holds severe and negative consequences for the UTIER members, PREPA, and the Commonwealth. It throws employees into a trustless, illegal, unsafe, and economically unstable environment. These governmental actions serve a harsh blow to the workforce that can only result in the diminishment of labor productivity. Unfortunately, it affects the main thing that is maintaining PREPA's productivity and capability of continuing to provide the Commonwealth with electric power service.

32. Loss of labor will only lead to PREPA having to cease, totally or partially its production and distribution of electric power. Seeing as though PREPA is the main producer and the sole

distributor of electric power on the Island, if it were to cease operations, this would be disastrous for the Commonwealth and its economy.

33. Targeting the employees and hurting what little income safety they have, has a domino effect on the economy. The repercussions of the abovementioned Acts are felt by the employees, which in turn hurts PREPA, the Commonwealth and its citizens. It has the devastating effect of stumping any much-needed fiscal stability or economic growth that all fiscal plans and budgets require.

34. The lack of economic growth and stability impedes the approval of a plan of adjustment, since the repayment capability of the Commonwealth has nowhere to stem from.

35. It is also important to emphasize that the violations of the CBA by the abovementioned Acts could entail a massive exodus of employees using their excess vacation and sick days, for fear of losing them. Some employees have enough excess days to take months off their work. This leaves PREPA under staffed, and having to incur not only in the payment of the days being used, but also having to pay for substitute employees.

36. It is as such of great relevance and importance that these Acts not be included in any fiscal plan or budget approved. The abovementioned legislations only promote economic chaos.

37. On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes".[21]

---

[21] H.R. 5278, 114th Cong. (2016) (Preamble).

38. PROMESA: (i) establishes a process for the Oversight Board (OB) to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the OB to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

39. Pursuant to PROMESA, "A Fiscal plan developed under this section shall, with respect to a territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets…".[22]

40. Once a fiscal plan is certified by the OB, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan.[23]

41. Commonwealth Fiscal Plan, was certified on March 13, 2017. This Fiscal Plan embraces and makes part of its reform measures Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 as previously mentioned in this document. It specifically adopts the employee mobilization policy, uniform fringe benefits, and the elimination of vacation and sick days liquidations. These, as previously explained, violate the CBA, the Contract Clause, the Taking Clause, and have disastrous effects on the economy. (EXHIBIT C)

42. The PREPA Fiscal Plan was certified on April 28, 2017. This Fiscal Plan adopts and implements both Act Num. 66 and Act Num. 3 as part of the measures that will be taken to transform the corporation. (EXHIBIT D)

---

[22] 48 U.S.C. §§ 2141 (b)(1),(2).
[23] 48 U.S.C. §§ 2142.

12

Case:17-00229-LTS Doc#:375 Filed:07/14/19 Entered:07/14/19 15:27:16 Desc: Main
Document Page 13 of 83

43. Both Fiscal Plans have been certified by the OB. In doing so, the OB has, through the approval and certification of these measures, become complicit of the impairment and taking of the CBA and is as a result, in violation of the Contract and Taking Clause of the United States Constitution.

44. In addition, on Friday, June 30, 2017, the OB approved the Commonwealth's 2017-2018 Fiscal Year Budget (the "P.R. Budget") [24] and the PREPA 2017-2018 Budget (the "PREPA budget"). (EXHIBITS E & F). Theses Budgets are aligned with their respective Fiscal Plans, without correcting the incongruences, legal deficiencies, and constitutional violations of such Plans. Resulting in the Budgets also being unconstitutional.

45. The adoption of the abovementioned legislation by these Fiscal Plans and their respective Budgets not only makes them illegal and unconstitutional, but it causes them to be in violation of, and unable to, comply with PROMESA.

46. These Fiscal Plans and Budgets, which are the blueprints for the financial management of the Commonwealth and PREPA, and that substantially impaired the labor rights and benefits of the members of UTIER, are currently being enforced by the Defendants.

47. In its Section 201(b)(1)(A),(B),(G),(N) [25], PROMESA specifically requires that any fiscal plan must:

(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—

(i)     applicable laws; or
(ii)    specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

(B) ensure the funding of essential public services

---

[24] P.R. Budget is comprised of Budget Resolutions H.R. 186 to189, as provided by the OB in their official website: https://juntasupervision.pr.gov/index.php/en/documents/
[25] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(N).

[…]

(G) enable the achievement of fiscal targets;

[…]

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

48. If a fiscal plan "does not satisfy such requirements," then the "Board shall provide to the Governor a notice of violation." *Id*. § 201(c)(3)(B).[26]

49. The Fiscal Plans and the Budgets, completely disregard the abovementioned PROMESA requirements.

   a. Section 201(b)(1)(A)[27] of PROMESA specifically requires that any fiscal plan must: "(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on: (i) applicable laws; or (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;". The Commonwealth and PREPA Fiscal Plans, and the 2017-2018 Budgets, have based their foundation on legislations that violate the CBA and the Constitution, and that cut and undermine employees' benefits and rights, causing economic loss and employment instability.

   b. Section 201(b)(1)(B)[28] of PROMESA, specifically requires that any fiscal plan must: "(B) ensure the funding of essential public services". By adopting the illegal Acts, these Fiscal Plans attack and take away benefits from the backbone and foundation of PREPA. This loss of labor will only result in PREPA being unable to

---

[26] 48 U.S.C. §§ 2141 (c)(3)(B).
[27] 48 U.S.C. §§ 2141(b)(1)(A).
[28] 48 U.S.C. §§ 2141(b)(1)(B).

14

provide its service. If no service is being provided then no revenue can be expected.

c. PROMESA in Section 201(b)(1)(G)[29] specifically requires that any fiscal plan must: "(G) enable the achievement of fiscal targets". Both Fiscal Plans' goals include economic growth and stability. Yet, the foundation for these plans is built on legislations that take money, job benefits, financial certainty, and stability from its employees, thus weakening the corporation and its chances of achieving economic growth and stability.

d. Lastly, PROMESA in Section 201(b)(1)(N)[30] specifically requires that any fiscal plan must: "(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act". Regarding this point, both Fiscal Plans and Budgets violate the CBA, an agreement that is prior to the enactment of PROMESA.

50. The certifications of the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, by the OB are arbitrary, lacking a rational basis, and in clear and open violation of the requirements of Section 201 of PROMESA as here stated, and in blatant violation of the Constitution of the United States and Puerto Rico.

51. Allowing these Fiscal Plans and Budgets to continue, without making the necessary and constitutional corrections, would equal a gross violation not only of PROMESA, but also of the contractual rights of these employees and the Constitutions of the U.S. and the Commonwealth. Furthermore, it seriously encumbers the possibility of reversing the

---

[29] 48 U.S.C. §§ 2141(b)(1)(G).
[30] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G), (N).

country's continuing economic contraction since, as mentioned, taking from the UTIER members their legally acquired benefits, would have a negative effect on the employees, their families, PREPA, and the Commonwealth. It would make economic recovery an even more tortuous and tough climb. As a result, impairing the goals of PROMESA of generating an economy capable of repaying the debt of the Commonwealth, creating financial stability, and sustaining economic growth.

52. Allowing the Fiscal Plans and the Budgets to continue as they are, diminishes the ability to address the claims of other creditors in a plan for the adjustments of debts that conforms to Section 314 of PROMESA[31], since the financial stability necessary to be able to make a repayment plan would have nowhere to stem from. Stability and growth would be lacking.

53. Unless totally recast to protect the rights of PREPA employees, the Fiscal Plans and the 2017-2018 Budgets cannot possibly be permitted to serve as the basis for any lawful plan of adjustment of debt that complies with the U.S. Constitution and the laws of the United States. Accordingly, Defendants should be enjoined and stayed from presenting any plan of adjustment, until the Fiscal Plans are reformulated to comply with the law.

54. This adversary proceeding challenges the legality and constitutionality of the Fiscal Plans' provisions *per se* and not the process of certification of the Plans by the Oversight Board.

[*Remainder of Page Intentionally Left Blank*]

---

[31] 48 U.S.C. §§ 2174.

## II.    THE PARTIES

55. Plaintiff, Unión de Trabajadores de la Industria Eléctrica y Riego, Inc., ("UTIER"), is a labor union created as a corporation under the Laws of the Commonwealth of Puerto Rico, with its principal place of business in San Juan, Puerto Rico.

56. Defendant, the Commonwealth of Puerto Rico, (the "Commonwealth"), is a territory of the United States.

57. Defendant, the Puerto Rico Electrical Power Authority, ("PREPA"), is a public instrumentality and the main provider and sole distributor of electric power for the Commonwealth of Puerto Rico, represented in this Title III case under PROMESA by the Financial Oversight and Management Board for Puerto Rico.

58. Defendant, the Financial Oversight and Management Board for Puerto Rico, (the "OB"), was created under Section 101(b)(1) of PROMESA[32] as an "entity within the [Commonwealth's] government", with the exclusive power of issuing the certification of the Fiscal Plans and Budgets of the Commonwealth and PREPA, and acting in this Title III case of PROMESA as representative of PREPA.[33]

59. Defendant, Hon. Ricardo Rosselló Nevares, ("Governor Rosselló"), is the Governor of the Commonwealth. In that capacity, Governor Rosselló, is empowered to enforce and implement the Commonwealth's Fiscal Plan and Budget and the Fiscal Plan Act. Plaintiff sues Governor Rosselló in his official capacity.

60. Defendant, Justo González Torres, (the "PREPA Executive Director"), is the Interim Executive Director of PREPA and in that capacity has the authority to implement the

---

[32] 48 U.S.C. § 2121(b)(1).
[33] 48 U.S.C. § 2121(c)(1).

17

PREPA Fiscal Plan and Budget. Plaintiff sues the PREPA Interim Executive Director in his official capacity.

61. Defendant Gerardo Portela Franco, (the "AAFAF Executive Director"), is the Executive Director of AAFAF and in that capacity is empowered to implement the Fiscal Plans and Budgets and the Fiscal Plan Act. Plaintiff sues the AAFAF Executive Director in his official capacity.

62. Defendant, Hon. Raúl Maldonado Gautier, (the "Secretary of Treasury"), is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the Fiscal Plans and Budgets and the Fiscal Plan Act. Plaintiff sues the Secretary of Treasury in his official capacity.

63. Defendant, José Iván Marrero Rosado, (the "OMB Director"), is the Director of the Commonwealth's Office of Management and Budget (the "OMB") and in that capacity is empowered to implement the Fiscal Plans and Budgets. Plaintiff sues the OMB Director in his official capacity.

64. Defendant, Natalie A. Jaresko, (the "OB Executive Director"), is the Executive Director of the Oversight Board and in that capacity is empowered to implement and enforce the Fiscal Plans and Budgets and require the Government of the Commonwealth and other government officials to make the necessary amendments in order to comply with the provisions of PROMESA and the U.S. Constitution. Plaintiff sues the Oversight Board Executive Director in her official capacity.

65. Defendant John Doe 1, is any successor to Governor Rosselló as Governor of the Commonwealth. Plaintiff sues John Doe 1 in his or her official capacity.

66. Defendant John Doe 2, is any successor to Justo González Torres as Executive Director of PREPA and in that capacity has the authority to implement the PREPA Fiscal Plan. Plaintiff sues John Doe 2 in his official capacity.

67. Defendant John Doe 3, is any successor to Gerardo Portela Franco as Executive Director of AAFAF and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 3 in his official capacity.

68. Defendant John Doe 4, is any successor to Hon. Raúl Maldonado Gautier as Secretary of Treasury of the Commonwealth and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 4 in his official capacity.

69. Defendant John Doe 5, is any successor to José Iván Marrero Rosado as the Director of the Commonwealth's Office of Management and Budget and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues John Doe 5 in his official capacity.

70. Defendant, Jane Doe 6, is any successor to Natalie A. Jaresko as the Executive Director of the OB and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sues Jane Doe 6 in his official capacity.

*[Remainder of Page Intentionally Left Blank]*

19

### III.    JURISDICTION AND VENUE OF THIS HONORABLE COURT

71. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331
    because this action arises under PROMESA and the U.S. Constitution.

72. In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants
    jurisdiction to this Court over "any action against the Oversight Board, and any action
    otherwise arising out of [PROMESA], in whole or in part".[34]

73. Plaintiff seeks a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and 2202.
    An actual and justiciable controversy has arisen and exists between the parties with
    respect to the issues and claims alleged herein.

74. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of
    Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal
    Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and
    to all civil proceedings arising in or related to cases under [Title III of PROMESA]".[35]

75. Venue is proper in this District under Section 307 of PROMESA.[36]

76. Plaintiff has standing to bring this adversary proceeding, as creditor with a pecuniary
    interest in the outcome of the above-captioned Title III cases, and as a party in interest
    according to Section 301 of PROMESA [37] which incorporates Section 1109 of the
    Bankruptcy Code.[38]

77. Plaintiff, as the exclusive representative with regard of its members' labor rights under the
    CBA, also has standing to bring this adversary proceeding on behalf of its members.
    Plaintiff's members, as employees of PREPA, are priority creditors with a pecuniary interest

---

[34] 48 U.S.C. § 2126(a).
[35] 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.
[36] 48 U.S.C. § 2167.
[37] 48 U.S.C. §§ 2161.
[38] 11 U.S.C. 1109.

in the outcome of the above-captioned Title III case and have standing to sue in their own right. Since the labor rights and benefits of UTIER's members were negotiated as part of the collective bargaining agreement, the interests at stake are germane to UTIER's purpose. Neither the claim asserted by UTIER in this Adversary Proceeding nor the relief requested requires the participation of individual members in the lawsuit.

## IV.   LEGAL AND FACTUAL BACKGROUND

### A. PREPA AS AN ESSENTIAL PUBLIC SERVICE PROVIDER

78. PREPA, the Puerto Rico Electric Power Authority, is a public corporation organized under the laws of the Commonwealth of Puerto Rico.

79. PREPA is an instrumentality of the Government of the Commonwealth. It employs approximately 9,550 employees.

80. PREPA is the main provider and sole distributor of electric power for the Commonwealth. Although, there are private companies that generate energy, they supply their production through PREPA's grid. There are no other companies on the Island that transmit and distribute electric power. Thus, it is of vital importance that PREPA´s services continue working properly, since it is the only company on which the people on the Island must rely on for the distribution of electric power.

81. Due to these particular circumstances, the provision and distribution of a unique service and its lack of replacement, PREPA´s services can be defined **as essential and necessary services.** Electric power is a key utility without which the Island could not subsist. Without it, the Commonwealth, its Government, businesses, schools, hospitals, and others would have to cease vital operations. As a result, any scenario in which

PREPA´s services where to diminish, its productivity where to be lessened, or where it shuts down, the outcome would be disastrous for the Commonwealth.

82. The abovementioned scenario would definitely thwart any economic growth that might be expected. Economic growth is vital, indispensable, and absolutely necessary to achieve the goals and financial stability that all budgets or fiscal plans aim for. The lack of economic growth and financial stability of any fiscal plan or budget impedes the proper establishment of a plan of adjustment of debt since the Commonwealth´s repayment capability would have nowhere to stem from.

83. As a result, it is of vital and utmost importance that funding for PREPA be ensured. It performs an essential public service and is the only corporation able to, and responsible for, that specific service. It is the sole distributor of electric power to an island which has no other possible supplier, or means available to receive such a service.

## B. UTIER, THE COLLECTIVE BARGAINING AGREEMENT AND UTIER EMPLOYEES´ LABOR PRODUCTIVITY.

84. The UTIER was founded in the early 1940´s and it is one of four labor unions that represent thousands of employees of PREPA.

85. There are approximately 9,550 employees in PREPA, of which an estimate of 6,775 belong to a labor union. Of those 6,775, approximately 3,600 are represented by UTIER.

86. UTIER's members are responsible for the operation and conservation aspect of PREPA. This means that they are responsible for the repairs, renovations, and improvements of PREPA property. They have the crucial task of making sure that PREPA's property is working well and efficiently. This means carrying out high risk jobs to ensure the electric power service is continuously and correctly working. The operation and conservation tasks do not include the

22

construction of new projects; their sole and main responsibility is keeping up to date the already existing property.

87. Due to the vital functions and services these employees render, the UTIER has dedicated itself to protecting and defending these PREPA workers, ensuring they have proper work conditions. As such, UTIER has the task of negotiating collective bargaining agreements on behalf of its members and lawfully protect and defend the implementation and enforcement of such agreement.

88. Collective bargaining agreements have always been a key instrument of the Government's public policy concerning industrial peace in the workplace and healthy labor relations between employers and employees.

> "Industrial peace, adequate and assured salaries for the employees, as well as the uninterrupted production of services and items, through collective bargaining, are essential factors for the economic development of Puerto Rico. The achievement of these purposes depends to the highest degree on the relationships between employers and employees being fair, friendly, mutually satisfactory, and that the supply of adequate means be provided for the peaceful resolution of employer-employee controversies. The terms and conditions of employment should be set through collective bargaining. To achieve such bargaining, employers and employees will have the right to associate with the organizations of their choosing. It is the Government's policy to eliminate the causes of certain labor disputes by promoting collective bargaining and establishing an adequate, efficient, and impartial court that implements this policy. All collective bargaining agreements in effect, and those that will be made in the future, are hereby declared instruments to promote the public policy of the Government of Puerto Rico in an effort to promote production to its maximum; and it is declared that as such, are coated in public interest. The exercising of rights and fulfillment of obligations of the parties in such collective bargaining agreements, are subject to the reasonable ruling necessary to achieve the public policy established in this subchapter."[39]

[*Remainder of Page Intentionally Left Blank*]

---

[39] "Labor Relations Act of Puerto Rico", 29 L.P.R.A. § 62(2-5).

89. The latter policy of establishing collective bargaining as an important part of a government's public policy on labor relations has its equal in the federal sphere through the Taft-Hartley Act.[40]

90. The CBA also implements this policy as part of its Declaration of Principles.[41]

> "The industrial peace and the best labor relations should be maintained through good faith and constructive actions of setting satisfactory work conditions for both the employer and the employee. The parties declare that the collective bargaining of reasonable salaries and decent work conditions is an efficient means to achieve and maintain peace and industrial democracy."

91. The current CBA between PREPA and UTIER is from 2008. Even though it was enacted with a lifespan lasting from August 2008 through August 2012, it has a provision that establishes that it will continue dictating the labor relations between PREPA and UTIER until a new collective bargaining agreement is negotiated and in effect.[42] Seeing as though no new collective agreement has been negotiated and established, the CBA is still valid.[43]

92. Agreements such as the CBA have the strategic purpose of creating a healthy work environment between PREPA and the UTIER members, who carry out a vital, yet high risk labor. Ensuring these employees that the risks taken are duly compensated.

---

[40] Taft-Hartley Act, "Findings and declaration of policy", 29 U.S.C. § 151.
[41] CBA, "Declaration of Principles"
[42] CBA, Art. L, "Duration of the Collective Bargaining Agreement"
[43] This period is known as a Hiatus. The same situation was experienced by the UTIER with PREPA from 2006 through 2008. The validity of that agreement was questioned and ignored by the PREPA corporation, who despite the existence of a disposition in the CBA that established the agreement would subsist until a new CBA was negotiated, decided to unilaterally decree that the CBA was no longer valid. UTIER sued on behalf of its members, and the continuance of the CBA during that period was validated through the Board of Labor Relations (case num. CA-2007-09) and Court of Appeals of Puerto Rico (case num. KLRA201400689). A certiorari was presented to the Supreme Court of Puerto Rico, but review was denied, thus sustaining the Court of Appeals determination that the CBA was still valid through those years.

93. The latter since, according to PREPA´s Fiscal Plan, the "Total [r]ecordable [i]ncident [r]ate (2012) is 5x greater than industry average".[44] PREPA employees are at a 5 times greater risk of being injured than other electrical industry workers in the United States.

94. The CBA was willingly and freely entered into by both PREPA and the UTIER. As such, it is a binding contract between both parties that dictates the labor relations that shall exist amongst them. It covers everything from vacation and illness pay, training, employee classifications, job reclassifications, fringe benefits, licenses due to job accidents, employee suspensions, job stabilization (when PREPA has to suspend or reorganize certain areas or activities and employees must be relocated), and dispute resolution, amongst other things. It is a very detailed and vast agreement that has been meticulously prepared by both parties.

95. Such an agreement is extremely important to the well-functioning of the UTIER members, and as a result PREPA. These employees have bargained for very specific and important procedures, benefits, and licenses, as a result of them performing high risk level jobs that demand they constantly expose themselves to different dangers. These employees need assurance that in case any fateful event might happen they will be covered and taken care of, and that neither they nor their families will have to incur in losses. The assurance of health and safety that the CBA provides is what keeps these employees motivated to do their job and do it well. It is what assures them that the risks taken, and a job well done, will in exchange guarantee them certain legal rights and benefits.

96. At times like these, when the country is going through a difficult fiscal moment it is important that the employees, that are the Government's and the country's economic

---

[44] PREPA Fiscal Plan, "Safety system", p. 11.

backbone, be in good health, be motivated to keep doing their work, and keep the labor productivity stable.

97. This is very much the case of PREPA. Economists José I. Alameda Lozada and Alfredo González Martínez were commissioned to prepare an analysis on the salaries and benefits the UTIER members receive, the "Salaries and Benefits Report".[45] Among other things, this report analyzes PREPA´s productivity. As presented on the graphs, the productivity report is composed of capital productivity, overall employment productivity, and UTIER members labor productivity. The charts reflect that PREPA has suffered a significant and drastic loss of capital productivity from 2008 through 2017.[46]

98. Nonetheless, despite the loss of capital productivity, it has been able to continue providing electric power service. The latter is due to a significant increase in labor productivity, with the UTIER members leading the productivity growth.[47] Labor has supplied the deficiency that the loss of capital product has caused.

99. A separate report, "The PREPA Workforce Labor Productivity"[48], (the "LP report"), also authored by economists José I. Alameda Lozada and Alfredo González Martínez, specifies that labor productivity is composed of UTIER members, management, and the rest of the employees.[49] From the year 2000 to 2017, UTIER labor production has grown in a 45.2% versus all other employees which have only grown as a whole by

---

[45] José I. Alameda & Alfredo González Martínez, "*Análisis de la Propuesta sobre Salarios y Beneficios Marginales a Empleados de la UTIER*", (2017).
[46] Alameda & González, *Id*., 34.
[47] Alameda & González, *Id*., 34,38.
[48] José I. Alameda & Alfredo González Martínez, "*La Productividad de la Fuerza Laboral de la AEE",* (2017).
[49] Alameda & Gonález, *Id*., p.16.

32.5%.[50] Currently the labor production of an UTIER member grows an average of 2.31% annually, while management only grows by a 1.57% and the rest grow at a 0.60%.[51]

100. In terms of money, the adjusted hourly contribution of an UTIER member to PREPA equals $379.00 per hour, per employee, yet this same employee earns an average of $26.15 per hour (including fringe benefits); thus it can be concluded that an average UTIER worker contributes 15x more to PREPA than what he earns hourly.[52]

101. It can be stated that essentially it is UTIER's members and their labor what has allowed PREPA to continue rendering its services. Impairing the CBA is the equivalent to landing a significant blow to those who currently are the pillars of the PREPA corporation. If labor were to be affected, PREPA would run a serious risk of having to cease operations, totally or partially.

102. Currently, for every 2.13% of capital production lost, UTIER members´ labor production has to grow by a 1% so it can compensate for the loss of capital.[53] For these employees to continue supplying and growing their labor production, they must be presented with optimal work conditions. Taking away their benefits and hard earned money will not set the pace for a growth of labor productivity.

103. Impairing or altering their CBA, which both PREPA's and the Commonwealth's Fiscal Plans do, submerges these employees in a trustless, illegal, economically unstable, and unsafe environment that only serves to create the ideal conditions for loss of labor productivity.

---

[50] Alameda & González, *Id.*, p.16.
[51] Alameda & González, *Id*., Graphic I, p.17.
[52] Alameda & González, *Id*., Table H, p.18-19.
[53] Alameda & González, *Id*., p.19.

104. Not only does it cause an unstable environment, but it is actually causing the loss of many employees.

105. UTIER members render a vital day to day service for PREPA and the people of the Commonwealth. They are one of the main reasons why the electric power service is, despite the economic fiasco, still working and providing an essential service. Protecting their rights and hard-earned benefits is the equivalent of assuring PREPA´s stability.

### C. THE ENACTMENT OF ACT NUMBER 66-2014, ACT NUMBER 3-2017, ACT NUMBER 8-2017 AND ACT NUMBER 26-2017

106. As stated before, the CBA is a binding contract between PREPA and UTIER members that dictates the labor relations between both parties. Despite the existing legal obligation of upholding such contract and abstaining from impairing it, PREPA and the Commonwealth have continually tried to undermine it. The Government of the Commonwealth passed and is currently enforcing four specific laws that substantially impair and alter the CBA. Many of them were enacted as a response to the labor reform, fiscal and structural measures required of the Commonwealth by the OB for the certification of the Commonwealth's and PREPA's Fiscal Plans and Budgets. The damage is furthered by the approval and adoption of the OB of these laws, through PREPA and the Commonwealth's Fiscal Plans and Budgets. These Fiscal Plans and Budgets, which are the blueprints for the financial management of the Commonwealth and PREPA, and that substantially impaired the labor rights and benefits of the members of UTIER, are currently being enforced by the Defendants.

107. In 2014, the Government of the Commonwealth passed the "Government of the Commonwealth of Puerto Rico Special Fiscal and Operational Sustainability Act", Act Num.

66 of June 17, 2014. ("Act. Num. 66"). [54] The provisions of this Act which are applicable to PREPA,[55] had a negative impact and impaired, among others, the following CBA areas: employee transfer, filling of vacancies, vacation license and pay, illness license and pay, the monetary compensation for the lack of use of vacation and illness licenses, salary raises, bonuses, and all other financial and non-economic clauses that might have an economic impact on the corporation´s budget.

a. Regarding employee transfer, "…the transfer and administrative detail of regular and transitory employees between positions, job classifications and levels, group of employees, appropriate units, **union units and nonunion units and vice versa**, among Entities of the Executive Branch[,] shall be allowed;…[a]**ny provision of law, regulation, covenant, agreement, or precept that is contrary to the provisions of this Chapter shall be suspended during the effective term thereof**; provided that there shall be full flexibility to make transfers and administrative details".[56] [Emphasis Supplied].

b. Among other material provisions, this Act eliminates the increases in economic benefits, such as salaries.[57]

c. This Act also established the following as extraordinary monetary compensation:

-"Cash liquidations of vacation leave accrued in excess in the case of final liquidations upon the employee's separation from public service. Provided, that during the effectiveness of this Act, the maximum of days subject to liquidation upon separation from service shall be sixty (60) days. Likewise, during the effectiveness of this Act, any

---

[54] "Ley Especial de Sostenibilidad Fiscal y Operacional del Gobierno del Estado Libre Asociado de Puerto Rico", ley número 66 de 17 de junio de 2014.
[55] Act. Num. 66, § 5.
[56] *Id.*, § 10.
[57] *Id.*, § 11(b)(i), (v), (vi).

public employee who accrues more than sixty (60) days at the end of each calendar year
shall use such excess within the nearest date on or before the next six (6) months of the
following calendar year. Provided further that every Entity of the Executive Branch shall
pay, on or before August 31st of each year, any excess accrued as of the effective date of
this Act and during the effectiveness thereof, when the employee has been unable to use
such leave within the term provided herein due to special service circumstances beyond
his/her control. All that pertains to vacation leave, in the case of public corporations,
shall be addressed as provided in Section 17 of this Act."[58]

- "Cash liquidations for sick leave accrued in excess in the case of liquidations upon the
employee's separation from public service. Provided, that during the effectiveness of
this Act, the maximum of days subject to liquidation upon separation from service shall
be ninety (90) days. The employee shall keep the balance accrued as of the effective date
of this Act, but accrual over such maximum balance shall be eliminated during the
effective term of this Act. Provided further that, during the effectiveness of this Act, any
excess annual accrual not used on or before December 31st of the corresponding year
shall be forfeited. All that pertains to sick leave, in the case of public corporations, shall
be addressed as provided in Section 17 of this Act."[59]

-Christmas bonus in excess of six hundred dollars ($600).[60]

-Payment of any bonus other than Christmas or summer bonus.[61]

d. Article 17 of the Act provided the following specifically to public corporations:

---

[58] *Id.*, § 11(c)(i).
[59] *Id.*, §11(c)(ii).
[60] *Id.*, § 11(c)(iii).
[61] *Id.*, § 11(c)(v).

-"…all public corporations shall suspend the financial terms negotiated under collective bargaining agreements in effect having a direct or indirect economic impact on the operations of the public corporation that aggravate the budget situation thereof or whose suspension is warranted to improve its budget situation."[62]

-"…public corporations shall recognize to both union and nonunion employees their vacation leaves accrued as of the effective date of this Act; however, the excess thereof accrued before and during the effective term of this Act shall not be liquidated in cash. Public corporations shall establish a plan whereby both union and nonunion employees shall exhaust the leaves accrued in excess so that no excess is carried over after the effective term of this Act."[63]

-"... sick leaves accrued in excess by union or nonunion employees of the public corporations before the effective date of this Act shall be frozen at the pay rate in effect as of June 30th, 2014, and the liquidation thereof in cash shall only be made in the event of separation from public service. Any sick leaves accrued in excess after the effective date of this Act, as well as that accrued as of December 31st of each year, shall be used on or before June 30th of the year following the year in which it was accrued; after said date such balance shall be forfeited."[64]

e. The lifespan of this Act was until the 1st of July of 2017.

108. At the beginning of this year the Governor of Puerto Rico, Defendant Ricardo Roselló Nevarez, signed the "Act to Attend to the Economic, Fiscal, and Budget Crisis and to Guarantee the Functioning of the Government of Puerto Rico", Act Number 3 of January 23,

---

[62] *Id.*, § 17 ¶ 1.
[63] *Id.*, § 17 ¶ 3.
[64] *Id.*, § 17 ¶ 4.

2017.[65] ("Act Num. 3"). The provisions of this Act are applicable to PREPA.[66] This act, like Act Num. 66, impaired the vacation and illness pay and liquidation and all other economic and non-economic clauses that are thought to have an adverse impact on the corporation's budget. This Act extended the lifespan of several provisions of Act 66-2014, such as Sections 11 and 17. The following are examples of changes implemented by this Act that have an adverse effect on the CBA:

    a. Any and all collective bargaining agreement articles, ruling, law, or administrative disposition or clause therein that is contrary to or interferes with what is here established, is understood to be suspended during the lifespan of this law.[67]

    b. There will be no increase in economic benefits nor will any extraordinary monetary compensation be given.[68]

    c. Every agency must develop and implement immediately a plan to reduce the accumulation of vacation days in excess of 60 days. The public service employee, who accumulates more than 60 days at the end of the natural year, must enjoy the excess days at the nearest date during or before the following six months of the next natural year. [69]

    d. During the lifespan of this law, all public corporations must suspend all non-economic clauses that have any economic impact, whether it be direct or indirect, on the operations of the corporation, and which serve to worsen the

---

[65] "Ley para Atender la Crisis Económica, Fiscal y Presupuestaria para Garantizar el Funcionamiento del Gobierno de Puerto Rico", ley número 3 de 23 de enero de 2017.
[66] Act Num. 3, Art. 5.
[67] *Id.*, Art. 6.
[68] *Id.*, Art. 7.
[69] *Id.*, Art. 12.

budget of such corporation or that its suspension is necessary to alleviate the
budget situation.

The public corporations will recognize employees' vacation balances but will
not be allowed to liquidate in cash the excess balance. The corporations must
establish a plan for employees to exhaust their vacations pay so that by the
end of the lifespan of this law no excess balances are available.

In regard to illness days, the excess days will be frozen in accordance with the
existing salary on June 30, 2014. Excess days will only be liquidated in cash if
the employee is no longer in the public service. The excess sick days that are
accumulated after this law comes into effect, as well as the excess that is
accumulated by the 31st of each year, must be enjoyed by June 30 of the next
year, each year. After this date, the excess days are lost.[70]

109. According to its Article 4, the measures taken in this Act will be in force until July 1, 2021,
unless a set of specific requisites are met on any previous Fiscal Year.[71]

110. Afterwards came the "Administration and Transformation of the Human Resources of the
Government of Puerto Rico Act", Act Number 8 of February 4, 2017.[72] ("Act Num. 8").
According to the Preamble of this law, the fact that the Government has allowed its agencies
to be their own individual administrators has led through the years to an excessive amount of
growth of the governmental apparatus. This growth has led to excess bureaucracy, different
pay grades for employees that allegedly carry out the same duties, and duplicity in the
services the agencies provide, among other things. The Government has become

---

[70] *Id.*, Art. 14.
[71] *Id.*, Art. 4.
[72] "Ley para la Administración y Transformación de los Recursos Humanos en el Gobierno de Puerto Rico", ley número 8 de 4
de febrero de 2017.

decentralized, with each agency having its own structure. This in turn has led to excess money being spent. This law, according to its Preamble, is a response to such problems. Its purpose is to make the Government the sole employer of all public employees, this way it can consolidate services, eliminate those which it understands are no longer needed, create a unified system of job classifications, have a specific merit system applicable for all agencies, and facilitate the transfer or movement of employees between agencies. The provisions about the mechanism of mobility stated in this Act are applicable to PREPA.[73] The following are examples in which it alters the CBA currently in effect:

a.  According to Act Num. 8, any collective bargaining agreement that was created before this law and that is still in place, will be respected.[74] Yet for the Government to be able to freely move employees around between agencies and public corporations and to establish a unified merit system, certain changes have to be made that will alter the existing CBA.

b.  This law demands that a unified system of job classifications be established, without regard to what agency an employee works for, as a way to make it easier for the Government to move employees around between agencies and public corporations.[75] PREPA offers a very specific and unique service that is not performed by other agencies. There is no other agency with whom to compare the jobs at hand. The Government´s unification of job classifications or the creation of new job classifications would interfere with those that have been agreed upon by PREPA and UTIER, who, it should be noted, are the

---

[73] Act Num. 8,Art. 5, § 5.2.
[74] *Id.*
[75] *Id.*, Art.2, § 2.1(4), Art. 6, § 6.2.

34

most qualified to establish a classification of a job due to the nature of the tasks performed by these employees.

c. Act Num. 8 allows the Government to freely move or transfer employees between agencies and public corporations and vice versa.[76] This will affect the collective bargaining unit since each one has specific duties assigned to them that distinguish them from one other and restrain them from representing other units. For example the UTIER unit only represents members from the operations and conservation area.

d. Every agency and public corporation will have to follow a specific merit system that will be the base for any promotion, demotion, employment, training, transfer, or retention of an employee.[77] A standard unified system without regard to the agreements and negotiations of the employee's collective bargaining agreement.

111. Lastly, later this year, the "Fiscal Plan Compliance Act", Act Number 26 of April 29, 2017 ("Act Num. 26"),[78] was promulgated "to temper the legal and juridical framework in order to comply with the demands made by the [OB] in the Fiscal Plan approved under […] PROMESA."[79] The provisions of this Act are applicable to PREPA[80] and significantly altered the CBA, further stripping PREPA's employees of their contractual rights.  These are some of the most significant changes:

---

[76] *Id.*, Art.2, § 2.1(13); Art.5, § 5.2; Art. 6, § 6.4(2),(4); Art.6, § 6.6(10)(2).
[77] *Id.*, Art.2, § 2.2(3); Art.2, §2.2(5); Art.5, § 5.2; Art.6, § 6.4.
[78] "Ley de Cumplimiento con el Plan Fiscal", ley número 26 de 29 de abril de 2017.
[79] Act Num. 26, PREAMBLE, The direct result of our colonial status: PROMESA, ¶ 13.
[80] Act Num. 26, Art. 2.01.

35

a. It eliminates the monetary compensation for excess vacation and illness days.[81]

b. "…all public employees shall be entitled to accumulate vacation leave, at a rate of one and one-fourth (1 1/4) days for every month of service."[82]

c. "Vacation leave may accumulate up to a maximum of sixty (60) workdays."[83]

d. "…As a general standard, [vacations] must be enjoyed during the natural year in which it was accumulated…[t]he lack of use of the vacation license has to be due to a job necessity that comes as a request of the company and it must be in writing.[84]

e. "Employees that are unable to enjoy their vacation leave during the determined natural year due to service needs, evidenced in writing and at the request of the agency or public instrumentality, are exempted from the provisions of subsection (e) of this Article. In this case, the agency or public instrumentality is obligated to make the necessary adjustments for the employee to enjoy at least the excess of accumulated leave over the limit of sixty (60) days, on the nearest possible date, within the term of the first three (3) months of the following natural year."[85]

f. "The agency or public instrumentality is obligated to provide for the enjoyment of the accumulated vacation leave, prior to the processing of any severance that constitutes a total and absolute disassociation from service and

---

[81] *Id.*, Introduction.
[82] *Id.*, Art. 2.04(1)(a).
[83] *Id.*, Art. 2.04(1)(c).
[84] *Id.*, Art. 2.04(1)(d).
[85] *Id.*, Art. 2.04(1)(g).

the processing of a transfer to provide services in another agency or public instrumentality."[86]

g. "All employees who have been hired by the Government of Puerto Rico prior to Law 8-2017… entered into effect shall be entitled to accumulating sick leave at the rate of one and a half (1.5) days for every month of service."[87]

h. "Sick leave may be accumulated up to a maximum of ninety (90) workdays at the end of any natural year…"[88]

i. Any excess accumulated beyond the 60 vacation days and the 90 sick days will be lost by the end of the natural year. Denying the employee, the use of these excess days or a monetary compensation.[89]

j. "As of the effective date of this Law, the only economic bonus that will be granted to public employees of the Central Government and its public corporations will be for the concept of the Christmas Bonus."[90]

112. The above-mentioned Acts are currently being implemented and enforced by the Defendants.

113. The Fiscal Plan and Budgets of the Commonwealth and PREPA, which incorporate these Acts as basis for the labor reform and structural measures required by the OB, are currently being implemented and enforced by the Defendants.

114. The Defendants have, through the approval, adoption, implementation and enforcement of the above-mentioned laws, and the incorporation of such Acts into the Fiscal Plans and Budgets of the Commonwealth and PREPA, retroactively destroyed and substantially

---

[86] *Id.*, Art. 2.04(1)(h).
[87] *Id.*, Art. 2.04(2)(a).
[88] *Id.*, Art. 2.04(2)(f), p.38.
[89] *Id.*, Arts. 2.10 - 2.11
[90] *Id.*, Art. 2.08

impaired the CBA. The adverse effect is such, that they render the CBA almost useless. With

their actions, the Defendants have blatantly violated the Constitution of the United States, the

Constitution of the Commonwealth of Puerto Rico, and PROMESA.

### D. THE CBA AND THE IMPAIRMENT CAUSED BY ACT NUMBER 66-2014, ACT NUMBER 3-2017, ACT NUMBER 8-2017 AND ACT NUMBER 26-2017 .

115. With the enactment, implementation and enforcement of the above-mentioned laws the

CBA has been substantially impaired. Thus, it is crucial to examine the CBA, its clauses,

and explain how the abovementioned Acts impair them.

116. Some of the major aspects of the CBA being altered are, vacation license, sick leave,

employee mobility or transfer within or out of the corporation, the rights and protection of

the appropriate unit, bonuses, and job classifications. Nonetheless, to be specific, these

laws have a negative impact on exactly 37 CBA articles of an agreement that is composed

in its totality of 50 articles. The following is a list of all the impaired CBA articles with a

brief explanation of how each one is impaired by the Acts :

    a. **Declaration of Principles**: This Article states that "[i]ndustrial peace and the best labor-
management relations shall be maintained through constructive and goodwill actions,
establishing satisfactory conditions for the employer and the worker. The parties declare
that collective bargaining for reasonable wages and decent working conditions is an
effective means of achieving and maintaining peace and industrial democracy."[91]

        1. This Clause is totally impaired by Act 66-2014, Act 3-2017, Act 8-2017 and Act
26-2017: These Acts impair the benefits negotiated by UTIER on behalf of its
members and eliminate or substantially limit the powers and faculties of
negotiation of UTIER, statutorily recognized in our jurisdiction, that are also
recognized under Section 17, Article II of the Constitution of the Commonwealth
of Puerto Rico.

---

[91] CBA, Declaration of Pronciples

b. **Art. I – Union Recognition**: This Article states the acknowledgment by PREPA of UTIER as the exclusive representative of all workers included in the appropriate unit for purposes of negotiations and collective bargaining in relation to salaries, work conditions, job tenure, claims and grievances and other conditions and provisions affecting the jobs of workers covered by this agreement.[92]

1. This Article is totally impaired by Act 66-2014, Act 3-2017, Act 8-2017 and Act 26-2017: These Acts impair the benefits negotiated by UTIER on behalf of its members and eliminate or substantially limit the powers and faculties of negotiation of UTIER, statutorily recognized in our jurisdiction, that are also recognized under Section 17, Article II of the Constitution of the Commonwealth of Puerto Rico.

c. **Art. II – Union Shop**: Among other provisions, this Article establishes the continuous condition of employment for all present and future workers of the Authority covered by the CBA to be members of UTIER at all times.[93]

1. This Article is impaired by Act 66-2014, Act 3-2017, Act 8-2017 and Act 26-2017: These Acts impair the benefits negotiated by UTIER on behalf of its members and eliminate or substantially limit the powers and faculties of negotiation of UTIER, statutorily recognized in our jurisdiction, that are also recognized under Section 17, Article II of the Constitution of the Commonwealth of Puerto Rico.

d. **Art. III - Appropriate Unit**: Among other provisions, this Article lists the classifications of employees included in the appropriate unit. The appropriate unit is composed of all workers employed by PREPA in the operation and maintenance of electrical and irrigation systems, owned by or administered by the latter, and the Engineering Division, including all office clerks, drafters and all other office personnel employed by PREPA in aerial and underground electrical distribution and transmission line and electrical substation construction projects.[94] The appropriate unit does not include executive employees, administrators, supervisors, confidential employees and all

---

[92] CBA, Art. I
[93] CBA, Art. II, §1
[94] *Id.*, Art. III §1.

other employees having the power to hire, terminate, promote, discipline or otherwise change the status of employees or make recommendations in this regard, special security employees, employees in charge of surveillance or guards, and all other employees PREPA.[95] This Article bans PREPA from transferring employees included in the appropriate unit to an executive or managerial position without the express consent of UTIER.[96] If a regular worker covered by the CBA is appointed to a position outside of the appropriate unit, the position that the worker used to occupy shall be covered in accordance with the provisions of the CBA.[97] This Article excludes the "extraordinary improvements" from the definition of "operation and maintenance",[98] and requires PREPA to provide a list of the extraordinary improvements to the property to be performed during each fiscal year.[99] It also creates a Committee, which shall discuss the notice of extraordinary improvements and the objections,[100] and provides for an arbitration process in cases of controversies regarding the appropriate unit.[101] This Article also provides that in cases where PREPA assigns jobs belonging to the appropriate unit, UTIER, to personnel from another appropriate unit or to external PREPA personnel, PREPA shall be obligated to pay the penalty provided in the CBA.[102]

1. This Article is impaired by Sections 9, 10, 14 and 17(d), (e), (f) of Act 66-2014 and Articles 10 and 14 of Act 3-2017: These Acts allow PREPA to fill vacancies of positions included in the appropriate unit disregarding the process established in the CBA;[103] allow the transfer of employees from and to the appropriate unit disregarding the provisions of the CBA;[104] totally or substantially eliminate the dispute resolution process for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of

---

[95] *Id.*, §2
[96] *Id.*, §6
[97] *Id.*, §7
[98] *Id.*, §3
[99] *Id.*
[100] *Id.*, §4
[101] *Id.*, §10
[102] *Id.*, §11
[103] Act 66-2014, §9
[104] *Id.*, §10

May 8, 1945, as amended;[105]eliminate the prohibition of assigning or reassigning tasks of the appropriate unit,[106]the subdivision of tasks or assignment of work schedules of the appropriate unit;[107] eliminate the prohibition of subcontracting of operation and maintenance jobs or duties of the appropriate unit and all the related provisions.[108]

2. This Article is impaired by Article 5, §5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows PREPA to transfer employees from and to the appropriate unit disregarding the provisions of the CBA.

e. **Art. IV- Subcontracting**: Among other provisions, this Article prevents the subcontracting by PREPA of operation and maintenance jobs or duties of the appropriate unit, with few specific exceptions.[109]It also establishes a process for the resolution of disagreements on whether the circumstances justifying the subcontracting exist, including submitting the matter for consideration by an impartial third party designated by the Secretary of Labor, and compensation from PREPA to UTIER in cases where the third impartial party believes that the alleged circumstances do not justify subcontracting and the subcontract was executed.[110]

1. This Article is impaired by Section 14 and 17(f) of Act 66-2014, and Articles 10 and 14 of Act 3-2017: These Acts eliminate the prohibition of subcontracting of operation and maintenance jobs or duties of the appropriate unit and all the related provisions included in Article IV[111] and totally or substantially eliminate the dispute resolution process for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended;[112]

---

[105] Act 66-2014,§14; Act 3-2017 Art. 10
[106] Act 66-2014, §17(d); Act 3-2017 Art. 14
[107] Act 66-2014, §17(e); Act 3-2017 Art. 14
[108] Act 66-2014, §17(f); Act 3-2017 Art. 14
[109] CBA, Art.IV §1.
[110] *Id.*, §4
[111] Act 66-2014,§17(f); Act 3-2017 Art. 14
[112] Act 66-2014,§14; Act 3-2017 Art. 10

 f. **Arts. VI – Classifications**: Among other provisions, this Article details how the employees included in the appropriate unit shall be classified (regular, special regular, and non-regular),[113] the process for granting the appointments, and some specific labor benefits according to the classification, including salary raises.[114] This Article also states that no worker will be required to perform any work outside the duties of his/her position without his//her consent.[115]

  1. This Article is impaired by Sections 9, 10, 11 (b)(i) and 17 of Act 66-2014 and Articles 7 and 14 of Act 3-2017: These Acts allow PREPA to fill vacancies of positions included in the appropriate unit disregarding the process established in the CBA;[116] allow PREPA to transfer employees disregarding the provisions of the CBA;[117] eliminate salary raises and other fringe benefits;[118] eliminate the prohibition of assigning or reassigning tasks of the appropriate unit,[119] and the subdivision of tasks or assignment of work schedules of the appropriate unit;[120] eliminate the prohibition of subcontracting of operation and maintenance jobs or duties of the appropriate unit and all the related provisions.[121]

  2. This Article is impaired by Article 5, §5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows PREPA to transfer employees from and to the appropriate unit disregarding the provisions of the CBA.

 g. **Art. VII –Training**: Among other provisions, this Article establishes the requirements and other details regarding the training of employees in circumstances, such as promotion,[122] mechanization, automation, or implementation of new systems and procedure,[123] and the Powerline-Technician School to Active Employees.[124]

---

[113] CBA, Art. VI, §1.
[114] *Id.*, §§2-16
[115] *Id.*, §17
[116] Act 66-2014, §9; Act 3-2017 Art. 10
[117] Act 66-2014, §10; Act 3-2017 Art. 10
[118] Act 66-2014, §11; Act 3-2017 Art. 10
[119] Act 66-2014, §17(d); Act 3-2017 Art. 14
[120] Act 66-2014, §17(e); Act 3-2017 Art. 14
[121] Act 66-2014, §17(f); Act 3-2017 Art. 14
[122] CBA, Art. VII, §1.
[123] *Id.* § 2
[124] *Id.* § 6

1. This Article is impaired by Sections 11(d) (v) and 17(a), (b) of Act 66-2014, and Articles 7 and 14 of Act 3-2017: These Acts eliminate all training programs established in Article VII.

h. **Art. VIII – Job Reclassification Procedure**: Among other provisions, this Article establishes a procedure for job reclassification and creates a Reclassification Committee. This Article provides for an arbitration process to be followed in those cases that PREPA and UTIER do not reach an agreement on employment conditions, requirements, duties, title, and classification.[125]

i. This Article is impaired by Sections 11 (b) (i),(v) and 14 of Act 66-2014, and Articles 7 and 10 of Act 3-2017: These Acts eliminate salary raises and other fringe benefits[126] and totally or substantially eliminate the dispute resolution process for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended.[127]

j. **Art. IX – Vacant and Newly Created Positions**: Among other provisions, this Article establishes the process for filling vacant or newly created regular positions, which includes an arbitration procedure.[128]

1. This Article is impaired by Sections 9, 14 and 17(i) of Act 66-2014, and Articles 10 and 14 of Act 3-2017: These Acts allow PREPA to fill vacancies of positions included in the appropriate unit disregarding the process established in the CBA;[129] eliminate the requirement of seniority;[130] and totally or substantially eliminate the dispute resolution process for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive

---

[125] CBA, Art. VII, §§1-8
[126] Act 66-2014, §11; Act 3-2017 Art. 7
[127] *Id.*, §14; Act 3-2017 Art. 10
[128] CBA, Art. IX, §§1-18
[129] Act 66-2014, §9
[130] Act 66-2014, §17(i)

primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended.[131]

2. This Article is impaired by Article 5, §5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows PREPA to transfer employees from and to the appropriate unit disregarding the provisions of the CBA.

k. **Art. X - Employment Stabilization**: Among other provisions, this Article establishes an obligation for PREPA in cases it is compelled by forceful reasons to suspend or reorganize certain activities of the industry, to, with priority, employ regular workers affected by such suspension or reorganization in other activities of the industry in accordance with the capacity and ability of such workers, who shall have priority over the rights of all other regular workers covered by the CBA to occupy vacant or newly created positions provided they are qualified to perform them. In these cases, it will not be necessary to publish the positions. When newly created positions are to be filled with the start of the operations of a new thermoelectric power plant or new thermoelectric units, the priority of these workers will be limited to competing jointly in accordance with Section 12 of Article IX, without the need to file with other regular workers who request it.

1. This Article is impaired by Sections 9, 14 and 17(i) of Act 66-2014, and Articles 10 and 14 of Act 3-2017: These Acts allow PREPA to fill vacancies of positions included in the appropriate unit disregarding the process established in the CBA;[132] eliminate the requirement of seniority;[133] and totally or substantially eliminate the dispute resolution process for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended.[134]

---

[131] *Id.*, §14; Act 3-2017 Art. 10
[132] Act 66-2014, §9
[133] Act 66-2014, §17(i).
[134] *Id.*, §14; Act 3-2017 Art. 10.

2. This Article is impaired by Article 5, §5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows PREPA to transfer employees from and to the appropriate unit disregarding the provisions of the CBA.

l. **Art. XI – Work Day, Work Period, Work Week, Regular Work Hours**: Among other provisions, this Article defines the work day; establishes the working period in a work day and a work week and regular work hours;[135] the hourly payment when a change is made to the work schedule of a rotating shift worker; and[136] the hourly payment when required to work during the period set for having a meal;[137] This Article also establishes that its provisions shall be governed solely by the laws of Puerto Rico and are excluded from the application of federal laws, so that for the computation of extraordinary pay the regular rate of hourly wages shall not vary.[138] It also creates a process to be followed when PREPA is interested in any change in the work schedule of a worker or group of workers.[139]

   1. This Article is impaired by Section 11(b)(i) of Act 66-2014 and Article 7 of Act 3-2017: These Acts limit the compensation of double the regular salary rate for hours worked in excess of seven and a half (7½) hours a day.

   2. This Article is impaired by Article 2.09 of Act 26-2017: This Act reduces to a rate of time and a half the compensation for services rendered in excess of regular daily or weekly hours, mealtime hours.

m. **Vacation Leave for Regular (Art. XII) and Temporary (Art. XIII) Employees**: Among other provisions, Article XII establishes that Regular workers shall be entitled to enjoy an annual vacation leave with full pay for thirty (30) working days per year, which shall be accumulated at the rate of two and a half (2½) working days for each month of employment.[140] When a worker, for his/her own reasons, does not wish to take the accumulated vacation leave that he/she is entitled to enjoy during the year, such unused leave shall be taken during the following calendar year in accordance with the vacation schedule, at the end of which the remaining unused leave due to service needs

---

[135] CBA, Art. XI, §1-4.
[136] *Id.* §5.
[137] *Id.* §7.
[138] *Id.* §11.
[139] *Id.* §§12-17.
[140] CBA, Art.XII, §1.

will be paid to the worker by the Authority.[141] Temporary employees, on the other hand, shall accumulate nineteen (19) days per year for vacation leave at the rate of two point seventy-four (2.74) hours for each week in which they work not less than twenty-two and a half (22½) regular hours.[142]

1.  This Article is impaired by Section 17 of Act 66-2014[143] and Article 14 of Act 3-2017[144]: Although stating that public corporations shall recognize to both union and nonunion employees their vacation leaves accrued as of its effective date, this Acts eliminate cash liquidations of vacations accrued.

2.  This Article is impaired by Articles 2.04 and 2.10 of Act 26-2017: This Act reduces to a maximum of fifteen (15) days the annual vacation leave.[145] This Act eliminates cash liquidations of vacations accrued and limits to a maximum fifty (50) days the vacation leave the instrumentality may grant to those employees who have accrued leave.[146]

n.  **Art. XIV – Leave for Union Officials and Representatives**: This Article provides for a leave with pay with no charge to accumulated vacation leaves for Union officers or representatives, under several circumstances.[147]

1.  This Article is impaired by Section 11(c)(vi)-(vii) of Act 66-2014, and Article 7 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2.  This Article is impaired by Article 2.04 - 6.-7. of Act 26-2017: This Act does not provide for a paid leave for union officials and representatives.

o.  **Sick Leave for Regular (Art. XV) and Temporary (Art. XVI) Employees:** Among other provisions, Article XV establishes that regular workers shall be entitled to accumulate sick leave at the rate of one point fifty-eight (1.58) workdays for each month of employment, up to a maximum of nineteen (19) workdays per year, which shall be

---

[141] *Id.* § 2
[142] CBA, Art.XIII, § 1
[143] Act. Num. 66-2014 §17(c)(i)
[144] Act Num. 3-2017 Art. 14
[145] Act Num. 26, Article 2.04 - 1. - a.
[146] *Id.* Article 2.04 - 1. - i., 2.10
[147] CBA, Art. XIV, § 1

accumulated without limitation.[148] Employees receive a liquidation of the balance of the sick leave accumulated in cases of death or retirement.[149] Temporary employees with six (6) months or more of service accrue sick leave at the rate of two point zero nineteen (2.019) hours for each week of not less than twenty-two and a half (22½) regular hours of work up to a maximum of fourteen (14) days per year.[150] If the temporary employee is appointed as regular employee, at his/her discretion may opt for the liquidation in cash of the sick leave that he/she had accumulated at the time of being appointed.[151]

1. This Article is impaired by Sections 11(c)(ii) and 17(i) of Act 66-2014 and Article 14 of Act 3-2017: Although stating that public corporations shall recognize to both union and nonunion employees their sick leaves accrued as of its effective date, this Acts eliminate cash liquidations of vacations accrued. Act 66-2014 freezes sick leaves accrued in excess at the pay rate in effect at June 30, 2014 and forfeits any balance of sick leave accrued in excess after the effective date of the act, as well as that accrued as of December 31 of each year and not used on or before June 30 of the following year in which It was accrued.[152] This Act also limits to a maximum of ninety (90) days the sick leave accrued that may be subject to liquidation upon separation from service.[153]

2. This Article is impaired by Articles 2.04- 2.- a., f.-g. 2.10 of Act 26-2017: This Act reduces to a maximum of eighteen (18) days annual sick leave and to a maximum of ninety (90) the sick leave days that can be accrued. This Act eliminates cash liquidations of sick leave accrued.[154]

p. **Art. XIX –Work-Related Accident Leave**: This Article establishes a compensation for cases when a regular worker needs to be absent from work due to a work-related accident and on the advice of the doctor of the State Insurance Fund,[155]

---

[148] CBA, Art. XV, § 1
[149] CBA, Art. XV, § 8
[150] CBA, Art. XVI, § 1
[151] CBA, Art. XVI, § 5
[152] Act 66-2014 §17 (i)
[153] *Id.* §11 (ii)
[154] Act 26-2017, Article 2.10.
[155] CBA, Art. XIX, § 1

1. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014, and Articles 7 and 14 of Act 3-2017: These Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2. This Article is impaired by Article 2.04- 6.-b.-2.-b., 7. of Act 26-2017: This Act does not provide for a compensation for work-related accident leaves.

q. **Art. XX – License for Family Funerals**: This Article grants the employees a leave with pay and no charge to his/her accumulated vacation time in the event of the death of the mother, father, spouse, or children of a worker.[156]

1. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014, and Articles 7 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2. This Article is impaired by Article 2.04 - 6., 7. of Act 26-2017: This Act eliminates the paid family funeral leave.

r. **Art. XXI – Leave for Early Morning Emergency Jobs for Regular and Temporary Employees**: This Article grants a special leave to regular and temporary employees who have been required to perform emergency work for hours outside their regular schedule between 12:00 midnight and 6:00 am or between 12:00 midnight and 7:00 am, when such employees have begun work on or before 4:00 am, even if such emergency work had been scheduled in advance.[157] The leave hours granted to regular and temporary workers shall be equal to one and a half times the hours worked during the after-midnight emergency and shall not exceed the maximum of seven and a half (7½) regular hours of their working day, and these will not be charged against any of their accumulated leaves, nor will they be deducted from the time worked during the emergency.[158] In case the regular or temporary employee is granted part of the rest hours that he was entitled to enjoy, the remainder of those hours of rest that he is required to work will be paid at double the regular pay rate, including basic pay or granted pay and the per diem allowances as they are established, when they apply.[159]

---

[156] *Id*, Art. XX, § 1
[157] *Id*, Art. XXI, § 1
[158] *Id*, § 2
[159] *Id.* § 5

1. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014, and Articles 7 and 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2. This Article is impaired by Article 2.09 of Act 26-2017: This Act eliminates the compensatory time for emergency work.

s. **Art. XXII –Leave for Work During Twenty-Four Consecutive Hours in Rotating Shifts**: This Article grants rotating shift workers that work twenty-four (24) consecutive hours, a leave with pay for his/her next regular working day if, from the end of such twenty-four (24) hours and until the beginning of his/her next regular day, sixteen and a half (16½) hours of rest have not elapsed. In the event that the worker is required to work on his/her next regular working day without having completed sixteen and half (16½) hours of rest, that worker will receive pay at double his/her regular pay rate, including basic pay.[160]

1. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014, and Articles 7 and 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2. This Article is impaired by Article 2.09 of Act 26-2017: This Act does not provide for compensatory time for work during twenty-four consecutive hours.

t. **Art. XXIII – Holidays Granted with Pay to Regular and Temporary Employees**: This Article provides regular and temporary workers at least 21 holidays with full pay for all regular work hours and free time with pay.[161]

1. This Article is impaired by Article 2.05 of Act 26-2017: This Act reduces the total holidays to 15 days.

u. **Art. XXIV – Holidays Granted with Pay to Emergency Workers**: This Article establishes that the hours worked during holidays granted with pay will be compensated at double the regular pay rate, including the granted regular pay.[162]

1. This Article is impaired by Article 2.09 of Act 26-2017: This Act reduces to a rate of time and a half the compensation for hours worked on holidays. The

---

[160] *Id*, Art. XXII, § 1
[161] *Id*, Art. XXIII, § 1-2
[162] *Id*, Art. XXIV, § 3

compensatory time must be enjoyed by the employee within six (6) months of the date that the extra work was done.

    v. **Art. XXV – Paid Days Off Granted by PREPA in Light of Administrative Provisions of the Governor of Puerto Rico**: Among other provisions, this Article grants every worker whose services PREPA deems as not necessary to maintain without impairment the electricity and irrigation services free time with simple pay during those hours within their workday that PREPA grants as off time in accordance with administrative provisions by the Governor of Puerto Rico.[163] When workers are required to work during the hours they are entitled to enjoy free with pay, they will receive an extraordinary compensation of double the regular salary rate for the hours worked in excess of seven and a half (7½) hours.[164]

       1. This Article is impaired by Sections 11 (c)(vi)-(vii) and 17(c) of Act 66-2014, and Article 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

       2. This Article is impaired by Article 2.09 of Act 26-2017: This Act reduces to a rate of time and a half the compensatory time for services rendered in excess of regular daily or weekly hours.

    w. **Art. XXVI – Health Insurance**: This Article grants the employees a health plan with specific employer contribution, coverage type, co-payments and deductibles that may only be altered by agreement between PREPA and UTIER, under collective agreement negotiations.[165]

       1. This Article is impaired by Section 11 (b)(ii) and 17 of Act 66-2014, and Article 7 of Act 3-2017: These Act limit the employer contribution for health insurance.

       2. This Article is impaired by Article 2.07 of Act 26-2017: This Act creates a uniform employer contribution to public corporation employees' health plan, giving AAFAF the power to negotiate and agree to cheaper insurance coverage with private insurers or under public coverage at the employee's choice in the Government as Single Employer or by agency or groups of agencies. The

---

[163] *Id*, Art. XXV, § 1
[164] *Id*, Art. XXV, § 8
[165] *Id*, Art. XXVI

employer contribution would be determined by the Fiscal Plan Compliance Committee.

x. **Art. XXVII – Benefits due to Inability, Retirement, or Death**: Among other provisions, this Article creates a special fund in the Employee Retirement System of PREPA, to which PREPA should make contributions, to pay regular workers, regular employees with special appointments, or special regular employees, whether or not they belong to any retirement scheme, that ceases in the active service at PREPA for one of the following reasons: retirement due to physical or mental disability, retirement by age, or for years of service and age or if they take up an actuarial pension; cessation of service due to having reached the retirement age or death of the regular worker, the following benefits: a) Retirement, disability or death - General $ 7,000.00; b) Death while performing job functions - General $20,000.00; c) Death while performing job functions as Powerline Technician or those workers at Power Generation Plants included in Article XXXIV – Special Annual Compensation for Risk $50,000.00; d) Physical disability resulting from performing job functions confirmed by the Authority's physician - General $8,000.00.[166] In addition, in cases of death of regular workers, regular workers with special appointments, and special regular employees, PREPA would contribute one thousand two hundred fifty dollars ($1,250.00) for funeral expenses.[167] In the event of the death of a temporary worker during the performance of his/her duties, PREPA would pay its beneficiaries the sum of five thousand dollars ($5,000.00).[168]

1. This Article is impaired by Sections 11(b)(ii)-(iii) and 17 of Act 66-2014 and Articles 7 and 14 of Act 3-2017: These Acts limit or eliminate the employer contribution for fringe benefits.

y. **Art. XXIX – Salaries**: This article provides for annual salary raises according to the employee classification.[169]

1. This Article is impaired by Section 11(b)(i) of Act 66-2014 and Article 7 of Act 3-2017: These Acts eliminate salary raises.

---

[166] *Id*, Art. XXVII, § 1
[167] *Id*, § 2
[168] *Id*, § 3
[169] *Id*, Art. XXIX

z. **Art. XXX – Extraordinary Compensation**: Among other provisions, this Article establishes an extraordinary compensation of double the regular salary rate for hours worked in excess of seven and a half (7½) hours a day, and hours worked during the workweek in excess of thirty-seven and a half (37½) hours on the sixth and seventh day (day of rest).[170]

1. This Article is impaired by Section 11(b)(i) of Act 66-2014 and Article 7 of Act 3-2017: These Acts limit the compensation of double the regular salary rate for hours worked in excess of seven and a half (7½) hours a day.

2. This Article is impaired by Article 2.09 of Act 26-2017: This Act reduces to a rate of time and a half the compensation for services rendered in excess of regular daily or weekly hours, mealtime hours.

aa. **Art. XXXIII – Christmas Bonus**: Among other provisions, this article grants all regular and special regular workers members of UTIER who had been employed at the close of the fiscal year prior to the month of December in each of those years and had at least six (6) months of service as such at the close of said fiscal year, a bonus equivalent to eight percent (8%) of the total salary earned by each worker during each of those fiscal years.[171]

1. This Article is impaired by Section 11(b)(iv),(c)(iii) of Act 66-2014 and Article 7 of Act 3-2017: This Acts limit the Christmas bonus to six hundred dollars ($600.00).

2. This Article is impaired by Article 2.08 of Act 26-2017: This law limits to six hundred dollars ($600.00) the amount of Christmas bonus that employees will be entitled to receive in each year during which they have rendered services to the Government of Puerto Rico during at least six (6) months.

bb. **Art. XXXIV – Annual Special Compensation Due to Risk**: Among other provisions, this Article grants annual special risk compensation to employees, established to the employee classification. This special compensation should be distributed during the Week of Electricity (Powerline Technician's Day and Plant Worker's Day) each year. It is granted since such employees frequently work in one way or another exposed to the

---

[170] *Id*, Art. XXX, § 1 A.-B.
[171] *Id*, Art. XXXIII, § 1

risk of coming into electrical contact or those employees, as a consequence of the daily functions performed, are continuously exposed to a real danger of suffering serious physical harm or loss of life.[172]

1. This Article is impaired by Section 11(b)(iv),(c)(iii) of Act 66-2014 and Article 7 of Act 3-2017: These Acts eliminate the annual special compensation due to risk.

2. This Article is impaired by Article 2.08 of Act 26-2017: This Act eliminates the annual special compensation due to risk.

cc. **Art. XXXVI – Payment of Transfer Expenses**: This Article provides for a reimbursement of the fixed amount of two hundred twenty-five dollars ($225.00) for transfer expenses to the regular workers who are transferred permanently from one municipality to another in the following cases: A. When the transfer is the exclusive interest of PREPA; B. When the transfer is in accordance with Article XLII on partially disabled workers.[173] This Article also grants the employee provided or paid transportation and the corresponding per diem allowance, for a period that shall not exceed five (5) working days, in order to allow the employee to relate to his work in the new municipality and to take the necessary steps during working hours to seek permanent accommodation and to carry out any other errands to enable his/her transfer.[174]

1. This Article is impaired by Section 10 of Act 66-2014: This Act allows the transfer of the employee without the reimbursement of transfer expenses, and the transportation and the corresponding per diem allowance to allow the employee to relate to his work.

2. This Article is impaired by Article 5, §5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows the transfer of the employee without the reimbursement of transfer expenses, and the transportation and the corresponding per diem allowance to allow the employee to relate to his work.

3. This Article is impaired by Article 2.13 of Act 26-2017: This Act allows the transfer of the employee without the reimbursement of transfer expenses, and the

---

[172] *Id*, Art. XXXIV, §§ 1-3
[173] *Id*, Art. XXXVI, § 1
[174] *Id*, § 2

transportation and the corresponding per diem allowance to allow the employee to relate to his work.

dd. **Art. XXXVII – Transfers Due to PREPA's Exclusive Interest**: This Article provides for compensation of liquidated damages for the transfer of a regular worker from one municipality to another or within a municipality in the exclusive interest of PREPA.[175]

  1. This Article is impaired by Section 10 of Act 66-2014: This Act allows the transfer of the employee without the compensation of liquidated damages.

  2. This Article is impaired by Article 5 § 5.2 and Article 6 §6.4 - 4. of Act 8-2017: This Act allows the transfer of the employee without the compensation of liquidated damages.

  3. This Article is impaired by Article 2.13 of Act 26-2017: This Act allows the transfer of the employee without the compensation of liquidated damages.

ee. **Art. XXXVIII – Pension System**: This article provides for a pension system, called the Employee Retirement System of the Puerto Rico Electric Power Authority.[176] According to this Article, PREPA shall contribute to a special fund in the Employee Retirement System of the Electric Power Authority, during the term of this agreement, the necessary amount actuarially calculated to pay a benefit to regular workers, special regular workers, and regular workers with special appointments, whether or not they belong to any system of retirement, who cease in the active service at the Authority for one of the following causes: retirement due to physical or mental disability; retirement due to age or to years of service and age, or the acceptance of an actuarial pension; or cessation of service due to having reached retirement age.[177]

  1. This Article is impaired by Section 11 (b)(iii) of Act 66-2014 and Article 7 of Act 3-2017: These Act eliminate the increases in employer retirement plan contributions.

ff. **Art. XXXIX – Dispute Resolution Procedure**: This Article provides for a procedure for complaint resolution, which, among other provisions, includes informal and formal stages, the participation of several bodies created by its provisions, including the

---

[175] *Id*, Art. XXXVII
[176] *Id*, Art. XXXVIII, § 1
[177] *Id*, Art. XXXVIII, § 2

Complaints Committee, and an arbitration process, in accordance with the regulations that the Bureau of Conciliation and Arbitration of the Department of Labor and Human Resources.[178]

1. This Article is impaired by Section 14 of Act 66-2014 and Article 10 of Act 3-2017: These Acts totally or substantially eliminate the dispute resolution process in Article XXXIX for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended.

gg. **Art. XLI – Disciplinary Procedure**: This Article provides for a disciplinary procedure in cases of reprimand, disciplinary measures, or suspension of employment and salary of a worker that, among other provisions, includes a process before examining officers selected by the parties, and an arbitration process before an arbitrator of the Department of Labor.[179]

1. This Article is impaired by Section 14 of Act 66-2014 and Article 10 of Act 3-2017: These Acts totally or substantially eliminate the disciplinary procedure in Article XL for appeals arising as a result of actions taken or decisions made in accordance with the provisions of the Acts by stating that the Labor Relations Board, or its successor, shall be the forum with exclusive primary jurisdiction to address the appeals filed by employees covered by Act No. 130 of May 8, 1945, as amended.

hh. **Art. XLIV – Occupational Security and Health**: Among other provisions, this Article provides for a paid leave for union representatives in the execution of their functions as part of the Central Committee for Occupational Health and Safety. This Committee consists of four (4) representatives from the Authority and four (4) Union representatives composed of UTIER's Secretary for Health and Safety and one UTIER representative from each sector: office, power generation plant, and field. This Central

---

[178] *Id*, Art. XXXIX
[179] *Id*, Art. XLI, §§ 3, 6B, I

Committee has the power to enact norms and rules on health and safety measures to avoid occupational accidents and diseases.[180]

1. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014 and Articles 7 and 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

2. This Article is impaired by Article 2.04 - 6., 7. of Act 26-2017: This Act does not provide for a paid leave for union representatives.

ii. **Art. XLV – General Dispositions**: This Article contain a series of general provisions, including hours worked outside the regular schedule,[181] overtime,[182] salary increase in case of work for other entities outside the Commonwealth of Puerto Rico,[183] payment of expenses, per diem and hospitalization due to physical examination made by orders of PREPA,[184] payment of transportation expenses incurred in making the route of their channel sections,[185] working hour for temporary workers employed for emergency work,[186] paid leave for members of three (3) members of the Board of Directors of the Worker's Social Work Program to meet at PREPA's headquarters.[187]

1. This Article is impaired by Section 11(b)(i) of Act 66-2014 and Article 7 of Act 3-2017: These Acts limit the compensation of double the regular salary rate for hours worked in excess of seven and a half (7½) hours a day. These Acts eliminate salary raises.

2. This Article is impaired by Sections 11(c)(vi)-(vii) and 17(c) of Act 66-2014 and Articles 7 and 14 of Act 3-2017: This Acts eliminate paid leaves and time off without charge to any leave and paid leaves that are not statutorily established.

3. This Article is impaired by Article 2.04 - 6., 7. of Act 26-2017: This Act does not provide for a paid leave for payment of expenses, per diem and hospitalization due to physical examination. This Act does not provide for a paid leave for union representatives.

---

[180] *Id*, Art. XLII, §§ 2,3,6
[181] CBA, Art. XLV, § 3, 5
[182] *Id*, §5
[183] *Id*, §6
[184] *Id*, §9
[185] *Id*, §12
[186] *Id*, §17
[187] *Id*, §19-B

56

4. This Article is impaired by Article 2.09 of Act 26-2017: This Act reduces to a rate of time and a half the compensation for services rendered in excess of regular daily or weekly hours, mealtime hours.

jj. **Art. XLVI – Performance and Assistance Bonus**: Among other provisions, this Article provides for an attendance and productivity bonus of up to $400.00 to regular and special regular workers of the powerline conservation area and the power generation plant conservation workers.[188]

1. This Article is impaired by Section 11(c)(v) of Act 66-2014 and Article 7 of Act 3-2017: These Acts eliminate the performance and assistance bonus.

2. This Article is impaired by Article 2.08 of Act 26-2017: This Act eliminates the performance and assistance bonus.

kk. **Art. XLVII – Collective Bargaining Agreement Compliance**: This Article provides for an obligation of PREPA and UTIER to comply with each and every one of the dispositions of the collective bargaining agreement, and that in case of claims or controversies, they will exhaust all means provided in it.[189]

1. This Article is impaired by Section 17(h) of Act 66-2014 and Articles 9 and 14 of Act 3-2017: These Acts eliminate obligation of PREPA to faithfully comply with what has been agreed or accepted by it in the CBA and state that the implementation by PREPA of the provisions of the Acts will not constitute a violation of the existing collective bargaining agreements nor will it constitute an illicit practice[190]

2. This Article is impaired by Article 6, § 6.4 - 4., 7. Of Act 8-2017: This Act states that the implementation by PREPA of the Mobility Plan will not constitute a violation of the existing collective bargaining agreements nor will it constitute an illicit practice.

ll. **Article L: Duration of the Collective Agreement**: This Article establishes that the CBA will be effective from August 24, 2008 through August 24, 2012. This Agreement will continue in force for subsequent years, with all its properties, unless one of the

---

[188] CBA, Art. XLVI, § 1
[189] *Id*, Art. XLVII
[190] Act 3, Art. 9

parties notifies in writing to the other its desire to modify it no later than (8) months before its expiration. According to this Article, the provisions of the CBA will continue in force with all their properties until a new Collective Agreement is negotiated and until the date in which the new provisions become effective.

1. This Article was impaired by Act 66-2014, Act 3-2017, Act 8-2017 and Act 26-2017: These Acts eliminated or suspended most of the provisions of the CBA, impairing the benefits negotiated by UTIER on behalf of its members and eliminate or substantially limit the powers and faculties of negotiation of UTIER, statutorily recognized in our jurisdiction, that are also recognized under Section 17, Article II of the Constitution of the Commonwealth of Puerto Rico.

117. Because of the substantial impairment of their collective bargaining agreement UTIER and its members are suffering serious injuries to their rights on a daily basis.

118. By eliminating major benefits and substantially impairing 37 of the 50 clauses in the CBA, the Defendants have thrown the employees in a trustless, illegal, unsafe, and economically unstable environment.

119. As previously explained, the UTIER employees work a high risk demanding job which, as stated in the PREPA Fiscal Plan, in the Commonwealth is 5 times more dangerous than the industry average. For an employee to carry out such a dangerous task, it is necessary for them to count on, among other things, the necessary licenses and benefits that assure they will be taken care of in case of a fateful event.

120. These actions by the Defendants serve a harsh blow to the workforce that can only result in the diminishment of labor productivity. Unfortunately, affecting the main thing that is currently sustaining PREPA's productivity and its capability of continuing to provide the Commonwealth with electric power service.

E. **THE CBA, CONTRACT CLAUSE, AND IMPAIRMENT OF CONTRACTUAL OBLIGATIONS.**

121. All four of the above-mentioned Acts, which as discussed in section D of this Adversary Proceeding, substantially impaired UTIER's CBA, have been allegedly approved as countermeasures to the fiscal and economic crisis. The most recent ones being an attempt of the Government to comply with the OB's requirements.

122. As consistently stated, the CBA is a legal, binding contract between the UTIER members and PREPA, in which the Government of the Commonwealth, through PREPA, willfully entered into.

123. The Contract Clause of the United States of America Constitution establishes in its Art. I, section 10, cl. 1 that, "No State shall…pass any…Law impairing the Obligation of Contracts…". This Contract Clause has its equal in the Constitution of the Commonwealth of Puerto Rico in its Art. II, § 7.

124. The Contract Clause prohibits a State from passing laws that will impair contractual obligations entered upon between parties. Nonetheless, this prohibition is not absolute. A state may alter contractual obligations under certain circumstances, in light of its police power.

125. When a State passes laws impairing a contract, the Courts are called upon, to determine if such a violation is allowed by the Constitution. For this, the legislation enforced must pass a two-prong test. First, if there is in fact a substantial impairment of a contract, and second, if such impairment is reasonable and necessary to serve an important government purpose.[191]

---

[191] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 41 (2011); *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1 (1977).

126. In regard to the first part of the test, whether there is a substantial impairment of a contract, the case at hand satisfies such a requirement. The previous paragraphs enumerate not only the different laws that affect the CBA but also, specific clauses that have a particular and substantial negative effect on the agreement. As set forth in Section D of this Adversary Proceeding, 37 out of the 50 clauses of the CBA were totally or substantially impaired. These impairments constitute substantial impairments to the CBA.

127. The second part of the test asks if the impairment is reasonable and necessary to serve an important governmental purpose. If this second part is not answered affirmatively, the impairment should be found in violation of the Contract Clause of the U.S. and the Commonwealth's Constitutions and cannot be allowed by the Courts.

128. In the case at hand, the Government alleges passing these laws as a response to the economic crisis that the Commonwealth is currently going through. In the Government's view, this allows it to impair a contract in its favor. Normally, when a government passes a law impairing a contract, complete deference is given to the legislative assessment and intent. Nonetheless, when the State's self-interest is at stake, less deference is given to such assessment because, "…If a State could reduce its financial obligations whenever it wanted to spend the money for what it regarded as an important public purpose, the Contract Clause would provide no protection at all". [192]

129. Even though there is an actual fiscal crisis at hand, the impairments brought on by the above-mentioned laws must be cautiously examined. For example, Act Num. 26 establishes in its Preamble that one of its main purposes is to create equality in fringe benefits among

---

[192] United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño, 633 F.3d 37, 41-43 (2011); U.S. Trust Co. of New York v. New Jersey, 431 U.S. 25-26 (1977).

central government employees and public corporations employees.[193] Making all employees' fringe benefits equal is not an important governmental purpose that should demand drastically impairing and altering public corporation employees, previously negotiated and contracted rights. If equality were the real motive, every single employee serving the Government should have their benefits and salaries adjusted, not only public corporation employees. Such a measure raises the alarming question of whether or not the purpose of these Acts is nothing more than allowing the Government of the Commonwealth to default on their legally binding obligations, escaping their obligation, for example, to pay the excess days accumulated by employees, or granting them the opportunity to enjoy such days, without the risk of losing them. "Thus, a State cannot refuse to meet its legitimate financial obligations simply because it would prefer to spend the money to promote the public good rather than the private welfare of its creditors."[194]

130. Even if the impairment of the contract served an actual important public purpose, such a measure cannot prove to be a reasonable and necessary impairment. For it to satisfy this requirement, it would have to be the only way in which the government can actually save money and have a significant impact in restoring and helping the fiscal crisis the Commonwealth is going through.

131. There are many other ways in which the Government can obtain funds in the midst of this fiscal crisis, which do not have to impair the contractual rights of PREPA's employees. The employees and the UTIER must be granted the opportunity to demonstrate the fact that there are other ways in which to help out the fiscal crisis at hand.

---

[193] Act Num. 26, "Equity in Fringe Benefits for all Public Employees", Preamble.
[194] U.S. Trust Co. of New York v. New Jersey, 431 U.S. 1, 29 (1977).

> "Consequently, a plaintiff with reason to believe that a state action was unreasonable or unnecessary can, in the complaint, list the state's articulated motive(s), and then plead facts that undermine the credibility of the those stated motives or plead facts that question the reasonableness or necessity of the action in advancing the stated goals. For example, if a state purports to impair a contract to address a budgetary crisis, a plaintiff could allege facts showing that the impairment did not save the state much money, the budget issues were not as severe as alleged by the state, or that other cost-cutting or revenue-increasing measures were reasonable alternatives to the contractual impairment at issue."[195]

Yet, for the UTIER members to be able to effectively argue and protect their rights against the Government of the Commonwealth, they must have the opportunity to bring this issue before the Court. This is vital, since the Courts have established that, "a State is not completely free to consider impairing the obligations of its own contracts on a par with other policy alternatives. Similarly, a State is not free to impose a drastic impairment when an evident and more moderate course would serve its purposes equally well".[196]

132. The following are some possible options the Government has that do not include taking away legal contractual rights of PREPA employees:

   a. Of PREPA's 1.5 million clients, approximately 484,227 receive a subsidy on their electric power bill. [197] These should be reexamined and there should be a determination on whether or not such subsidies are needed and if the amount being subsidized should be lowered.

   b. The accounts receivable surpasses $1,000 million.[198] This is income that is not being received. PREPA should first target these accounts before targeting the employees´ benefits.

---

[195] *United Automobile, Aerospace, Agricultural Implement Workers Of America International Union, et al v. Fortuño*, 633 F.3d 37, 44 (2011);
[196] *U.S. Trust Co. of New York v. New Jersey*, 431 U.S. 1, 30-31 (1977)
[197] José I. Alameda & Jorge Luis Torres, "*Estudio para determinar la pertinencia de la Ley 4 del 16 de febrero de 2016 como instrumento de revitalización de la Autoridad de Energía Eléctrica*", page 13.
[198] Alameda & Torres, *Id*., 14.

c. PREPA has, during past years, acquired petroleum at an inflated price. Costing it millions of dollars.[199] An evaluation of the petroleum costs should be done in an effort to acquire a less expensive product.

d. Contracts that are handed out without a proper auction being held, should be regulated and better scrutinized in an effort to evaluate how beneficial and cost efficient they are for PREPA.

e. Theft of electric service can be targeted, allowing for the capture of lost revenue.

133. The previous alternatives lead to the conclusion that there are less drastic measures that do not require interfering with the PREPA employees existing CBA. There are other alternatives that can and must be first explored by the Government, before considering reaching in the pockets of the employees as a reasonable and necessary measure.

134. As a result, it can be determined from the previous analysis that the abovementioned laws do not serve an important public purpose and they do not qualify as a necessary and reasonable impairment. The Government of the Commonwealth has various options that do not require the impairing of the CBA. Thus, its actions cannot withstand the Contract Clause two-prong test, making its actions unconstitutional and illegal. Leading to the conclusion that any budget or fiscal plan that adopts these measures or laws, is illegal and unconstitutional by association.

## F. THE CBA AND THE TAKING CLAUSE.

135. As explained above, the CBA allowed the UTIER members to accrue a certain amount of vacation and illness days. Regarding illness days, employees could accrue these without a set limit, and PREPA would compensate monetarily the accumulated days, when they retire or

---

[199] Alameda & Torres, *Id.*, 8-9.

upon death.[200] In reference to vacation days, employees could accrue a year's worth of vacation and use it the following year; PREPA would also compensate in money any and all vacation accrued when the employee ceased to work with PREPA.[201]

136. Since the negotiated CBA endowed employees with this flexibility, many would accumulate vacation and sick days for long periods. The agreement between PREPA and UTIER instilled in these employees a sense of trust, that rightfully led them to believe this accumulated time would be there for them to use whenever they needed to. In many cases these days represented an extra income for their retirement. In other cases, as seen in their Financial Statement, PREPA allowed employees to exchange sick days accrued for supplemental pension benefits; "The Authority's employees with over 20 years of service are entitled to exchange accrued sick leave for supplemental pension benefits just to complete merit annuity (30 years of service) and/or be paid in cash the value of such sick leave upon separation of employment".[202] For many, these days were the equivalent of a monetary fund.

137. Notwithstanding the reason for which they were accrued, these days were earned by the employees through their years of service and, as such, belong to them. They were not handed over as part of the CBA. Rather, the CBA established the guidelines by which these could be earned, accrued and used. Seeing as though they are the product of the UTIER members rendered services, they are entitled to accrue, use, and dispose of them as agreed in the CBA.

138. The use of the days accrued is not something unexpected for which PREPA could not be prepared. On the contrary, as seen in its Financial Statement, the corporation established as

---

[200] CBA, Art. XV, § 1, p.66 & § 8, p.68.
[201] CBA, Art. XII, § 2, p.61 & § 8, p.62.
[202] Financial Statements, Required Supplementary Information and Supplemental Schedules 2014, § 12, p.77.

an item on the budget, a predetermined amount for the payment of accrued vacation, sick leave, and payroll benefits.[203]

> "The Authority records as a liability and as an expense **the vested accumulated vacation and sick leave as benefits accrue to employees**. The cost of vacation and sick leave expected to be paid in the next twelve months is classified as current and accrued liabilities while amounts expected to be paid after twelve months are classified as noncurrent liabilities."[204] [Emphasis Supplied].

139. The use of these days, or the money compensation in exchange, is something that was expected to occur. As evidenced here, the fund was tailored to the amount of benefits accrued to the employees. To be specific, the accrued sick leave and payroll benefits – exclusive of benefits to be liquidated after one year, were of approximately $114.5 million for the year 2014 and $122.4 million for 2013.[205] This can only lead to the conclusion that PREPA has the capability to pay for these accumulated vacation and sick days and that this fund's exclusive purpose was to pay for these accruals.

140. The United States Constitution states in its Fifth Amendment that, "…private property [shall not] be taken for public use, without just compensation."  The Takings Clause has its equivalent in the Art. II, sec. 9 of the Constitution of Commonwealth of Puerto Rico and is applied to the States and the Commonwealth through the XIV Amendment of the United States Constitution.

141. This clause is divided into two aspects, first, if an actual taking of private property occurred, and second, if the person received a just compensation in exchange for the property taken. The lack of just compensation makes the action unconstitutional.

---

[203] *Id.*, § 9, p.59.
[204] *Id.*, § 2, p.41.
[205] *Id.*, § 9, p.59.

142. In the case at hand, the accrued balances of excess vacation and illness days are private property belonging to the employees. These accumulations are earned by the employees in exchange for their monthly service rendered. As such, once they are accumulated they belong to no one but the employee, who, according to the CBA, could either use them, or accumulate them and receive a monetary compensation for them when they no longer rendered services for PREPA. These can be better seen in PREPA's Financial Statement as funds that the employees have earned and are set aside for when they decide to use them. As such these are private property belonging to each PREPA employee.

143. The above-mentioned laws not only limit the accrual amount, but also eliminate cash liquidations and establish a deadline by which these days need to be used, rendering any unused excess as lost and not entitled to a monetary compensation. They have arbitrarily determined, that the hard-earned vacation and sick leave excess accumulation would be disposed of, if not used by when the Government unilaterally decided they should be used. Act 26-2017, for example, not only limited the accrual of sick leave to eliminated ninety (90) days[206], but also eliminated all cash liquidations of the excess and states that the excess balance that has not been used will be lost.[207]For the members of UTIER this limitation is more crucial, since the CBA allows for the accrual of sick leave without limitation and a liquidation of the balance of the sick leave accumulated in cases of death or retirement.[208]

144. The Defendants are obligating the employees to use the accumulated days and eliminating not only the possibility of getting compensated for the excess not used, but also denying employees the opportunity of using the excess balance through an extended period of time.

---

[206] Act 26-2017, Article 2.04- 2.
[207] Act 26-2017, Article 2.10
[208] CBA, Art. XV, § 1

66

According to Act Num. 26, the days not used by the end of the natural year will be lost.[209] Many employees have years of accumulated accruals that could not, and should not, be used in such a short period of time, making them by default, lost. Days that were not necessarily accumulated for the purpose of being used but rather cashed for whatever purpose they legally, contractually, and rightfully could.

145. As a result, by forcing PREPA's employees to either use the days like the Defendants now demand or to be subject to losing them without receiving any monetary compensation in exchange, the Defendants are stripping these employees of their private property without a just compensation.

146. The funds that PREPA saves as a result of the measures that stripe PREPA's employees of their private property without a just compensation are used to cover for other costs of the corporation.

147. Thus, it can be established that the Defendants' actions of enacting, implementing and enforcing the abovementioned laws violate the Taking Clause of the United States Constitution and the Constitution of the Commonwealth of Puerto Rico. They deprive, take away, and force employees to dispose of the vacation and sick days they have worked to accrue without offering a just compensation in exchange. This in turn makes any fiscal plan or budget that adopts these laws unconstitutional by default or association.


[*Remainder of Page Intentionally Left Blank*]

---

[209] Act Num. 26, Art. 2.04(1)(d-e), p.33-34.

### G. PROMESA, PREPA'S FISCAL PLAN, THE COMMONWEALTH'S FISCAL PLAN, AND THE 2017-2018 COMMONWEALTH's FISCAL BUDGET AND PREPA FISCAL BUDGET.

148. On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes".[210]

149. Among other things, PROMESA: (i) establishes a process for the Oversight Board to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the Oversight Board to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

150. Pursuant to PROMESA, "A Fiscal plan developed under this section shall, with respect to a territorial government or covered territorial instrumentality, provide a method to achieve fiscal responsibility and access to the capital markets…".[211]

151. Congress included 14 different "requirements" that any fiscal plan must satisfy.[212] It authorized the Oversight Board to certify a fiscal plan only if the fiscal plan "satisfies such requirements."[213]

152. If a fiscal plan "does not satisfy such requirements," then the "Board shall provide to the Governor a notice of violation."[214]

---

[210] H.R. 5278, 114th Cong. (2016) (Preamble).
[211] 48 U.S.C. §§ 2141 (b)(1),(2).
[212] 48 U.S.C. §§ 2141 (b).
[213] 48 U.S.C. §§ 2141 (c)(3)(A).

153. Once a fiscal plan is certified by the OB, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan.[215]

154. PREPA's Fiscal Plan was certified on April 28, 2017. This Plan adopts and implements both Act Num. 66-2014 and Act Num. 3-2017 as part of the structural measures that will be taken to transform the corporation. Act Num. 8-2017 and Act Num. 26-2017 were enacted to comply with the demands of the OB for the certification or in the certified Fiscal Plan. As previously stated, both legislations are in violation of the CBA, the Contract Clause, and the Taking Clause. By adopting them, the PREPA Fiscal Plan has itself violated both the CBA and the Constitution. The OB has, as a result of approving and certifying this plan, incurred in illegal and unconstitutional acts itself, thus violating the Constitution.

155. The above is also applicable for the Commonwealth's Fiscal Plan. This Plan embraces and makes part of its reform measures, the unconstitutional laws previously mentioned in this Complaint. It specifically adopts the employee mobilization policy, uniform fringe benefits, and the elimination of vacation and sick days liquidations and other economic and non-economic benefits. All of these, as previously explained, violate the CBA, the Contract Clause, and the Taking Clause. According to the introduction of this Fiscal Plan, PREPA is not a major entity covered by the Commonwealth Fiscal Plan.[216] Nonetheless, this Fiscal Plan includes laws that do have an effect on PREPA and that actually impair its CBA. As such, by including this legislation in its reform measures, the Commonwealth has acted in violation of the Constitution. By certifying this plan,

---

[214] 48 U.S.C. §§ 2141 (c)(3)(B).
[215] 48 U.S.C. §§ 2142.
[216] Commonwealth Fiscal Plan, "Major Entities Not Covered by the Fiscal Plan", p.6.

the OB's acts and its approval are in violation of the CBA and the Contract and Taking
Clauses of the United States Constitution.

156. On Friday, June 30, 2017, the Oversight Board approved the Commonwealth of Puerto
Rico's 2017-2018 Fiscal Year Budget and the PREPA Fiscal Year Budget. These
Budgets are aligned, with the Commonwealth and PREPA Fiscal Plans, without
correcting the incongruences, legal deficiencies, and constitutional violations of these
Plans. Resulting in the Budgets also being unconstitutional.

157. Moreover, the 2017-2018 Budgets, the Commonwealth Fiscal Plan, and PREPA Fiscal
Plan, all violate section 201(b)(A)(B)(G)(N) of PROMESA.

158. The Fiscal Plans and Budgets are the blueprints for the financial management of the
Commonwealth and PREPA. If PREPA or the Commonwealth were not enforcing the above-
mentioned laws and implementing the Fiscal Plans and Budgets, they would be in
noncompliance.[217]To this day, the OB has not issued any notifications of non-compliance for
PREPA or the Commonwealth. Thus, the Fiscal Plans and Budgets are currently being
implemented and enforced.

159. PROMESA specifically requires in its Section 201(b)(1)(A),(B),(G),(N)[218] that any
fiscal plan must:

(A) provide for estimates of revenues and expenditures in conformance with agreed
accounting standards and be based on—

(i)     applicable laws; or
(ii)    specific bills that require enactment in order to reasonably achieve the
projections of the Fiscal Plan;

(B) ensure the funding of all essential public services;
[…]

---

[217] See 48 U.S.C. §§ 2143-2144
[218] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(N).

(G) enable the achievement of fiscal targets;

[…]

(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act.

160. First in its Section 201(b)(1)(A)[219] PROMESA specifically requires that any fiscal plan must: "(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on: (i) applicable laws; or (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;". The Commonwealth and PREPA Fiscal Plans, and the 2017-2018 Budgets, are not based on any applicable law or specific bill needed to reasonably achieve the financial stabilization intended through the Fiscal Plans, but rather have based their foundation on several legislations that violate the CBA and the Constitution, and that cut and undermine employees' benefits and rights, causing economic loss and employment instability. Rather than achieving their goals of financial stabilization, these Fiscal Plans and Budgets embrace unconstitutional laws that only serve to create a bigger economic chaos.

161. In Section 201(b)(1)(B)[220] of PROMESA, it specifically requires that any fiscal plan must: "(B) ensure the funding of essential public services". As mentioned here, PREPA is the sole distributor of electric power for the Commonwealth, thus making it an essential public service. If PREPA were unable to continue operating, the whole island would be left without electric power. The loss of capital productivity has left PREPA

---

[219] 48 U.S.C. §§ 2141(b)(1)(A).
[220] 48 U.S.C. §§ 2141(b)(1)(B).

essentially depending on the UTIER employees' labor production in order to be able to continue rendering such an essential service. Taking away from these UTIER members their rightfully earned and negotiated benefits, would only lead to a loss of labor that would devastate PREPA's stability and well-functioning. In order to secure funds for this service, it is necessary that the corporation continue providing and distributing electric power. The only way this distribution and productivity will continue, is if the labor productivity remains steady or grows. Yet neither will happen if the employees are not well remunerated and their rights protected. These Fiscal Plans and Budgets, by adopting the legislation enacted by the Commonwealth without any change in its unlawful and unconstitutional nature, violate PROMESA, because by taking away employee benefits they do not achieve their obligation of securing funds for the essential public service that PREPA renders.

162. PROMESA in Section 201(b)(1)(G)[221] specifically requires that any fiscal plan must: "(G) enable the achievement of fiscal targets". Both Fiscal Plans' goals include economic growth and stability. The 2017-2018 Budgets are supposed to aid those goals. Yet, how will they achieve economic growth and stability if the foundation for these plans is built on legislation that violates the Contract and Taking Clauses of the Constitution; when the Fiscal Plans are built on illegal and unconstitutional laws that take money, job benefits, financial certainty, and stability from its employees, resorting to taking legally earned benefits and monetary compensation, from those who are the backbone of the main provider and sole distributor of electric power of the Commonwealth. This strategy will result in the weakening of the corporation. The

---

[221] 48 U.S.C. §§ 2141(b)(1)(G).

economic loss that these employees will suffer will have a ripple effect on PREPA and on the Commonwealth's economy that will make economic growth and stability uncertain and unattainable.

163. Lastly, PROMESA in Section 201(b)(1)(N)[222] specifically requires that any fiscal plan must: "(N) respect the relative lawful priorities or lawful liens, as may be applicable, in the constitution, other laws, or agreements of a covered territory or covered territorial instrumentality in effect prior to the date of enactment of this Act". Regarding this point, the CBA that was negotiated between PREPA and UTIER, was subscribed in 2008 and as such, is prior to the date of enactment of PROMESA, which demands that the agreement be respected. Nonetheless, both Fiscal Plans and Budgets violate this mandate. The CBA is impaired through the enactment and adoption of the abovementioned legislation, and by adopting and incorporating these laws into their reform measures, the Fiscal Plans and Budgets in turn violate the CBA and PROMESA. Through approval and certification of these measures the OB became complicit in the impairment of the CBA and in the violation of the Contract and Taking Clauses of the Constitution of the United States.

164. Based on the previous analysis it can be stated that the Fiscal Plans and Budgets, completely disregard the abovementioned PROMESA requirements, constituting a gross violation of the clear statutory mandates of PROMESA and the U.S. Constitution.

165. The certifications of the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, by the OB are arbitrary, lacking a rational basis, and in clear and open violation of the requirements of Section 201 of PROMESA as here stated, and in blatant violation of the Constitution of the United States.

---

[222] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G), (N).

166. For all the above stated reasons, allowing these Fiscal Plans and Budgets to continue without making the necessary and constitutional corrections, would equal a gross violation not only of PROMESA, but also of the contractual rights of PREPA's employees and the Constitutions of the U.S. and of the Commonwealth of Puerto Rico. Furthermore, it seriously encumbers the possibility of reversing the country's continuing economic contraction since taking from the UTIER members their legally acquired benefits would have a negative effect on employees, and a devastating outcome on the labor productivity that PREPA so desperately relies on. It will in turn, make economic recovery an even more tortuous and tough climb for these members, their families, PREPA, and the Commonwealth.

167. The latter impairs the goals of PROMESA of generating an economy capable of repaying the debt of the Commonwealth, creating financial stability, and sustaining economic growth. In short, allowing the Fiscal Plans to continue as they are, would create a serious risk of completely destabilizing PREPA, event from which it cannot be assured it can recover from.

168. Plaintiff challenges the legality and constitutionality of the Fiscal Plans *per se*, not the process of certification of the Plans by the Oversight Board.

169. Defendant, Hon. Ricardo Rosselló Nevares, ("Governor Rosselló"), the Governor of the Commonwealth, has the authority to implement and enforce the Fiscal Plans and Budgets.

170. Defendant, Justo González Torres, (the "PREPA Executive Director"), as the Interim Executive Director of PREPA, has the authority to implement and enforce PREPA's Fiscal Plan and Budget.

171. Defendant Gerardo Portela Franco, (the "AAFAF Executive Director"), as the Executive Director of AAFAF, is empowered to implement and enforce the Fiscal Plans and Budgets.

172. Defendant, Hon. Raúl Maldonado Gautier, (the "Secretary of Treasury"), as the Secretary of Treasury of the Commonwealth, is empowered to implement and enforce the Fiscal Plans and Budgets.

173. Defendant, José Iván Marrero Rosado, (the "OMB Director"), as the Director of the Commonwealth's Office of Management and Budget (the "OMB"), is empowered to implement and enforce the Fiscal Plans and Budgets.

174. Defendant, Natalie A. Jaresko, (the "OB Executive Director"), as the Executive Director of the Oversight Board, is empowered to implement and enforce the Fiscal Plans.

175. The Defendants are currently implementing and enforcing the Fiscal Plans and Budgets that are harming UTIER and its members.

## H. PROMESA AND THE PLAN OF ADJUSTMENT OF DEBT

176. Section 302 of PROMESA[223] defines who may be eligible to file a case under Title III. In the particular case of the Commonwealth and of PREPA, among other requirements, to be eligible for filing a Title III case, they must adopt a Fiscal Plan certified by the OB.

177. Moreover, according to sections 104 (j) and 312 of PROMESA[224], as part of the Title III case, the OB, may file a plan of adjustment of the debts in a Title III. However, the

---

[223] 48 U.S.C. §§ 2162
[224] 48 U.S.C. §§ 2124(j) and 2172.

OB may file the plan of adjustment of debts only after the issuing of a certification that it is consistent with the applicable certified Fiscal Plan.

178. Once filed, the court shall confirm the plan of adjustment of the debts, only if it satisfies a series of requirements. In section 314(b)(6)-(7), PROMESA specifically states that the plan of adjustment of debts must be feasible and in the best interests of creditors, and consistent with the applicable Fiscal Plan certified by the Oversight Board.[225]

179. The Fiscal Plan must be the blueprint for any plan of adjustment in these Title III cases.

180. Therefore, the certification of a **valid fiscal plan** by the OB is an essential requirement for the Commonwealth and PREPA in order to be eligible for filing a confirmable plan of adjustment of debt under Title III of PROMESA. As long as the Plan is at odds with Constitutional mandates, it will not be valid and should not be allowed to be eligible to file a confirmable plan of adjustment of debt under Title III of PROMESA.

181. Both, the PREPA and the Commonwealth Fiscal Plans, as they are currently, cannot be certified as valid fiscal plans. They adopt as part of their reform measures, unconstitutional legislation that violates and impairs an existing agreement between the UTIER members and PREPA. No valid legal plan can be based on laws that completely disregard Constitutional Clauses.

182. In addition, the Budgets and the Fiscal Plans do not achieve the fiscal targets for which they were drafted. The legislation on which they are based will not help achieve the economic stability and growth that they pursue. They attack the very backbone and

---

[225] 48 U.S.C. §§ 2174(b)(6)-(7).

foundation on which PREPA relies on for productivity, leaving it weak and in serious danger of losing its main source of productivity. The Plans as they are, create economic chaos.

183. These Fiscal Plans are in violation of PROMESA and the Constitution of the United States and of the Commonwealth of Puerto Rico. Unless they are recast to no longer contain illegal and unconstitutional measures and as to comply with the requirements herein stated, they cannot be treated as valid fiscal plans. Since a valid fiscal plan is an essential requirement for the confirmation of a plan of adjustment of debts, the lack of compliance with the previously stated requirements makes it impossible to confirm a plan of adjustments of debts according to Section 314 of PROMESA.[226]

## V.    **FIRST PRAYER FOR RELIEF**

184. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 183 hereof as if fully set forth herein.

185. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims, and a declaratory judgment is necessary to resolve such controversy.

186. Plaintiff is entitled to an order declaring that PREPA is a protected essential public service.

## VI.    **SECOND PRAYER FOR RELIEF**

187. Plaintiff repeats and `realleges, the allegations contained in paragraphs 1 through 186 hereof as if fully set forth herein.

---

[226] 48 U.S.C. § 2174.

188. Plaintiff is entitled to an order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Contract Clause of the Constitution.

## VII.     THIRD PRAYER FOR RELIEF

189. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 188 hereof as if fully set forth herein.

190. Plaintiff is entitled to an order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, take accrued benefits belonging to the employees without affording them a just compensation in exchange and violate the Taking Clause of the Constitution.

## VIII.     FOURTH PRAYER FOR RELIEF

191. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 190 hereof, as if fully set forth herein.

192. Plaintiff is entitled to an order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, impair the CBA and violate the Contract Clause of the Constitution.

## IX.     FIFTH PRAYER FOR RELIEF

193. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 192 hereof, as if fully set forth herein.

194. Plaintiff is entitled to an order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, take accrued benefits belonging to the employees without

affording them a just compensation in exchange and violate the Taking Clause of the Constitution.

## X.    SIXTH PRAYER FOR RELIEF

195. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 194 hereof, as if fully set forth herein.

196. Plaintiff is entitled to an order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Contract Clause of the Constitution.

## XI.    SEVENTH PRAYER FOR RELIEF

197. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 196 hereof, as if fully set forth herein.

198. Plaintiff is entitled to an order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget (2017-2018 Budgets), as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Taking Clause of the Constitution.

## XII.    EIGHTH PRAYER FOR RELIEF

199. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 198 hereof, as if fully set forth herein.

200. Plaintiff is entitled to an order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Contract Clause enshrined in the Constitution of the United States of America.

## XIII.   NINTH PRAYER FOR RELIEF

201. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 200 hereof, as if fully set forth herein.

202. Plaintiff is entitled to an order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Taking Clause enshrined in the Constitution of the United States of America.

## XIV.   TENTH PRAYER FOR RELIEF

203. Plaintiff repeats and realleges, the allegations contained in paragraphs 1 through 202 hereof, as if fully set forth herein.

204. Plaintiff is entitled to an order declaring that the PREPA Fiscal Plan, the Commonwealth Fiscal Plan and the 2017-2018 Budgets should be totally recast to ensure compliance with the requirements established in section 201(b) of PROMESA. They are to be reformulated as to comply with relative lawful priorities or agreements in effect prior to the date of enactment of PROMESA, comply with the U.S. Constitution, enable the achievement of fiscal targets, ensure funding for essential public services, and provide for estimates of revenues and expenditures based on applicable laws or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plans.

## XV.   ELEVENTH PRAYER FOR RELIEF

205. Plaintiff repeats and realleges, that the allegations contained in paragraphs 1 through 204 hereof, as if fully set forth herein.

206. Defendants should be enjoined and stayed from presenting any plan of adjustment of debt on the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, until they are recast to comply with PROMESA and the United States Constitution.

## XV. RELIEF DEMANDED

WHEREFORE, in view of the foregoing, Plaintiff respectfully requests from this Honorable Court to enter a judgment against defendants as follows:

a. An order declaring that PREPA is a protected essential public service.

b. An order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Contract Clause of the Constitution.

c. An order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Taking Clause of the Constitution.

d. An order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, impair the CBA and violate the Contract Clause of the Constitution.

e. An order declaring that Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, as incorporated in the Commonwealth Fiscal Plan and PREPA Fiscal Plan, take accrued benefits belonging to the employees without affording them a just compensation in exchange and violate the Taking Clause of the Constitution.

f. An order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66, Act Num. 3, Act Num. 8, and Act Num. 26 violate the Contract Clause of the Constitution.

g. An order declaring that the 2017-2018 Commonwealth Budget and PREPA Budget, as aligned and prepared in accordance to the Fiscal Plans, and Act Num. 66-2014, Act Num. 3-2017, Act Num. 8-2017, and Act Num. 26-2017, violate the Taking Clause of the Constitution.

h. An order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Contract Clause enshrined in the Constitution of the United States of America.

i. An order declaring that the OB's determinations summarized in the PREPA Fiscal Plan, the Commonwealth Fiscal Plan, and imposed in the 2017-2018 Budgets are arbitrary, lacking a rational basis, and in clear and open violation of the Taking Clause enshrined in the Constitution of the United States of America.

j. An order declaring that the PREPA Fiscal Plan, the Commonwealth Fiscal Plan and the 2017-2018 Budgets should be totally recast to ensure compliance with the requirements established in section 201(b) of PROMESA. They are to be reformulated as to comply with relative lawful priorities or agreements in effect prior to the date of enactment of PROMESA, comply with the U.S. Constitution, enable the achievement of fiscal targets, ensure funding for essential public services, and provide for estimates of revenues and expenditures based on applicable laws or specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plans.

k. Defendants should be enjoined and stayed from presenting any plan of adjustment of debt on the PREPA Fiscal Plan and the Commonwealth Fiscal Plan, until they are recast to comply with PROMESA and the United States Constitution.

RESPECTFULLY SUBMITTED.

In Ponce, Puerto Rico, this 12th day of December 2017.

**I HEREBY CERTIFY** that on this same date I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to all participants and Standard Parties.



Urb. Constancia
2803 Calle San Francisco
Ponce, Puerto Rico 00717
Tel: (787) 848-0666
Fax: (787) 841-1435

/s/Rolando Emmanuelli Jiménez
Rolando Emmanuelli Jiménez
USDC: 214105

/s/Yasmín Colón Colón
USDC: 230814

Emails: rolando@bufete-emmanuelli.com
yasmin@bufete-emmanuelli.com
notificaciones@bufete-emmanuelli.com