# UNITED STATES DISTRICT COURT
## DISTRICT OF PUERTO RICO

| | |
|---|---|
| In re:<br><br>THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO,<br><br>as representative of<br><br>THE COMMONWEALTH OF PUERTO RICO, et al., Debtors.[1]<br><br>Debtors<br><br>ASOCIACIÓN DE PROFESORAS Y PROFESORES DEL RECINTO UNIVERSITARIO DE MAYAGÜEZ, INC. (APRUM)<br><br>Plaintiffs,<br><br>v.<br><br>COMMONWEALTH OF PUERTO RICO; THE FINANCIAL OVERSIGHT AND MANAGEMENT BOARD FOR PUERTO RICO; HON. RICARDO ANTONIO ROSSELLÓ NEVARES; GERARDO PORTELA FRANCO; HON. RAÚL MALDONADO GAUTIER; JOSÉ IVÁN MARRERO ROSADO; NATALIE A. JARESKO and JOHN DOES 1-5,<br><br>Defendants. | PROMESA Title III<br><br>No. 17 BK 3283-LTS<br><br><br><br>(Jointly Administered)<br><br><br><br>ADV. PROC. NO.: 2017-_____ |

## ADVERSARY COMPLAINT

---

[1] The Debtors in these Title III Cases, along with each Debtor's respective Title III case number listed as a bankruptcy case number due to software limitations and the last four (4) digits of each Debtor's federal tax identification number, as applicable, are the (i) Commonwealth of Puerto Rico (Bankruptcy Case No. 17 BK 3283-LTS) (Last Four Digits of Federal Tax ID: 3481); (ii) Puerto Rico Sales Tax Financing Corporation ("COFINA") (Bankruptcy Case No. 17 BK 3284-LTS) (Last Four Digits of Federal Tax ID: 8474); (iii) Employees Retirement System of the Government of the Commonwealth of Puerto Rico ("ERS") (Bankruptcy Case No. 17 BK 3566-LTS) (Last Four Digits of Federal Tax ID: 9686); and (iv) Puerto Rico Highways and Transportation Authority ("HTA") (Bankruptcy Case No. 17 BK 3567-LTS) (Last Four Digits of Federal Tax ID: 3808).

DX-MMM

TO THE HONORABLE COURT:

Comes now Plaintiff, Asociación de Profesoras y Profesores del Recinto Universitario de Mayagüez, Inc. (APRUM), through its attorneys, Bufete Emmanuelli, C.S.P., for their Adversary Complaint against defendants the Commonwealth of Puerto Rico; the Financial Oversight and Management Board for Puerto Rico; Hon. Ricardo Rosselló Nevares; Gerardo Portela Franco; Hon. Raúl Maldonado Gautier; José Iván Marrero Rosado; Natalie A. Jaresko; and John Does 1-5 (collectively, the "Defendants"), and alleges, states, prays and requests relief as follows:

## I. NATURE OF THIS ADVERSARY PROCEEDING

1. Founded in the early 1970's, APRUM is a bona fide organization of teaching staff at the Mayagüez Campus of the University of Puerto Rico (RUM). Through its work, APRUM has managed to build a prestige among the RUM's professors as an organization that defends the professoriate.

2. Likewise, it has gained the management's *de facto* recognition as a professors' representative organization that protects the working and academic conditions of the faculty, meeting periodically with the campus administration to carry the professors' voice on matters pertinent to labor and academic environment of the Mayagüez Campus and the University of Puerto Rico (UPR) in general.

3. The UPR is the largest sustained public investment in the history of Puerto Rico. After 116 years of existence, it has evolved from a teachers' college in

Río Piedras and a faculty of agriculture and mechanical arts in Mayagüez to become a university system with eleven (11) campuses and an enrollment of 60,000 students (33.4% of all college students in the country for 2015).

4. PROMESA in Section 201(b)(1)(A),(B),(G),(J)[2] specifically requires that any fiscal plan must:

> (A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—
>
> (i) applicable laws; or
> (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;
>
> (B) ensure the funding of essential public services;
>
> [...]
>
> (G) enable the achievement of fiscal targets;
>
> [...]
>
> (J) provide for capital expenditures and investments necessary to promote economic growth;
>
> [...]

5. It is evident that PROMESA requires that essential government services be protected, that fiscal targets are achieved, and investments are made to generate economic growth. The Commonwealth's fiscal plan dated March 13, 2017 (Exhibit A), as implemented through the newly-enacted Fiscal Plan Compliance Law[3], totally disregards these requisites therefore constitutes a gross violation of the clear statutory

---

[2] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(J).
[3] Law 26-2017.

3

mandates of PROMESA, rendering the Fiscal Plan Illegal (from now on, Illegal Fiscal Plan).

6. Similarly, Sections 101(a)[4] of PROMESA require a compliant fiscal plan to "provide a method to achieve fiscal responsibility and access to the capital markets," yet the Illegal Fiscal Plan significantly cuts government investments in education, an investment indispensable to promote economic growth and thus, ensures that Puerto Rico will not regain access to the capital markets for the foreseeable future.

7. The University of Puerto Rico is the main catalyst for sustainable economic development for Puerto Rico, therefore, comprises an essential service to the country and its constituents as defined by Section 201 of PROMESA.[5]

8. As an essential service, the Fiscal Plan should provide enough resources to the UPR, because it constitutes an imperative investment that promotes economic growth according to Section 201,[6] and this is also a requirement for the feasibility of a plan for the adjustments of debts as required by Section 314 of PROMESA.[7]

9. The budget imposed by the Oversight Board to the Legislative Assembly of Puerto Rico, ordered a reduction of $201 million to the University of Puerto Rico (UPR) Exhibit B. This in turn, represents up to $47 million

---

[4] 48 U.S.C. §§ 2121(a).
[5] 48 U.S.C. §§ 2141.
[6] 48 U.S.C. §§ 2141.
[7] 48 U.S.C. §§ 2174.

in additional cuts to University of Puerto Rico, Mayagüez Campus (UPRM).

10. The Oversight Board's determinations summarized in the Fiscal Plan and imposed in the 2017-2018 budget, are arbitrary, lacking a rational basis and in clear and open violation of the requirements of Section 201 of PROMESA.[8] These also make impossible the confirmation of a plan of adjustments of debts according to Section 314 of PROMESA,[9] for lack of sustainability of payments. Thus, the Oversight Board's determinations summarized in the Fiscal Plan and imposed in the 2017-2018 budget violates the Due Process of Law enshrined in the Constitution of the United States of America.

11. According to a study made by Dr. Edwin Irizarry Mora and Dr. José I. Alameda Lozada,[10] the cuts imposed to UPR for the 2017-2018 fiscal year budget will have an adverse impact in Mayagüez Campus of approximately $47 million which include $9.7 million less in funds available for payroll expenses. This will result in a reduction of 155 full-time professors and 7 part-time and therefore, a drastic increase in the workload of each faculty member of the institution.

12. In other words, the budget reduction would imply that the teaching staff remaining in the UPRM would carry out the same work as in

---

[8] 48 U.S.C. §§ 2141.
[9] 48 U.S.C. §§ 2174.
[10] *Impact of budget cuts on faculty members of UPRM, July 2, 2017*, Exhibit C.

previous academic years, attending to the same number of courses, sections and students with fewer personnel. [11]

13. The net impact of all the above is that each professor would increase their workload by approximately 25% in each academic semester, receiving the same pay ($60,000 annually on average). Consequently, the effect of the budget reduction is that, by performing 25% of additional tasks for the same pay, the adjusted salary of each member of the teaching staff (distributed between the average wage) should increase by 25%. That is, an average of $75,000 per year. This will result in an average of non-received payment of $15,000 per professor who would remain working in the UPRM.

14. The $201 million cut imposed to UPR for the 2017-2018 fiscal year budget will have an adverse impact in Mayagüez Campus of approximately 47 million dollars, which also means less resources for the sustainability of the academic offerings and accreditations.

15. As mentioned before, PROMESA requires that essential government services be protected, that fiscal targets are achieved, and investments are made to generate economic growth. This is for the ultimate purpose of achieving a debt adjustment plan that is viable and sustainable, through reliable income that promotes enough confidence

[11] The RUM's Office of Admissions has already certified that the number of freshmen (first year enrollment) for academic year 2017-2018 has exceeded by 2% the amount of new-comers projected by the institution. This means that total enrollment by August 2017 (total demand for academic services) will surpass by 2% the projected academic offerings (total academic supply).

6

from the investors to warrant the territory access to the bond markets
at reasonable costs.

16. For all the above reasons, threatening the economic viability of the UPR is
equivalent to an unparalleled generational treachery and a social
devastation in the short term. Furthermore, it seriously encumbers the
possibility of reversing the country's continuing economic contraction.
This will, in turn, make economic recovery an even more tortuous and
tough climb, and immediately diminish the ability to address the
claims of other creditors in a plan for the adjustments of debts that
conforms to Section 314 of PROMESA.[12]

17. Unless totally recast to protect the essential services of the UPR, the
Illegal Fiscal Plan and the 2017-2018 fiscal year budget cannot
possibly be permitted to serve as the basis for any lawful plan of
adjustment of debt that complies with the U.S. Constitution and the
laws of the United States. Accordingly, Defendants should be enjoined
and stayed from presenting any plan of adjustment, until the Illegal
Fiscal Plan is reformulated to comply with the law.

## II.  THE PARTIES

18. Plaintiff, Asociación de Profesoras y Profesores del Recinto Universitario
de Mayagüez, Inc., (APRUM) is a corporation created under the Laws of
The Commonwealth of Puerto Rico, with its principal place of business at
Mayagüez, Puerto Rico.

---

[12] 48 U.S.C. §§ 2174.

19. Defendant, the Commonwealth of Puerto Rico (the "Commonwealth") is a territory of the United States.

20. Defendant, the Financial Oversight and Management Board for Puerto Rico (the "Oversight Board") was created under Section 101(b)(1) of PROMESA[13] as an "entity within the [Commonwealth] government."[14]

21. Defendant, Hon. Ricardo Rosselló Nevares ("Governor Rosselló") is the Governor of the Commonwealth. Plaintiff sue Governor Rosselló in his official capacity.

22. Defendant, Gerardo Portela Franco (the "AAFAF Executive Director") is the Executive Director of AAFAF and in that capacity is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue the AAFAF Executive Director in his official capacity.

23. Defendant, Hon. Raúl Maldonado Gautier (the "Secretary of Treasury") is the Secretary of Treasury of the Commonwealth and in that capacity is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue the Secretary of Treasury in his official capacity.

24. Defendant, José Iván Marrero Rosado (the "OMB Director") is the Director of the Commonwealth's Office of Management and Budget (the "OMB") and in that capacity, is empowered to implement the Illegal Fiscal Plans. Plaintiff sue the OMB Director in his official capacity.

---

[13] 48 U.S.C. § 2121(b)(1).
[14] 48 U.S.C. § 2121(c)(1).

25. Defendant, Natalie A. Jaresko (the "Oversight Board Executive Director") is the Executive Director of the Oversight Board and in that capacity, is empowered to implement the Illegal Fiscal Plans. Plaintiff sue the Oversight Board Executive Director in her official capacity.

26. Defendant, John Doe 1 is any successor to Governor Rosselló as Governor of the Commonwealth. Plaintiff sue John Doe 1 in his or her official capacity.

27. Defendant, John Doe 2 is any successor to Gerardo Portela Franco as Executive Director of AAFAF and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue John Doe 2 in his or her official capacity.

28. Defendant, John Doe 3 is any successor to Hon. Raúl Maldonado Gautier as Secretary of Treasury of the Commonwealth and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue John Doe 3 in his or her official capacity.

29. Defendant, John Doe 4 is any successor to José Iván Marrero Rosado as the Director of the Commonwealth's Office of Management and Budget and in that capacity, is empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue John Doe 4 in his or her official capacity.

30. Defendant, John Doe 5 is any successor to Natalie A. Jaresko as the Executive Director of the Oversight Board and in that capacity, is

9

empowered to implement the Illegal Fiscal Plan and the Fiscal Plan Act. Plaintiff sue John Doe 5 in his or her official capacity.

### III. JURISDICTION AND VENUE OF THIS HONORABLE COURT

31. This Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under PROMESA and the U.S. Constitution.

32. In addition, this Court has jurisdiction under Section 106(a) of PROMESA, which grants jurisdiction to this Court over "any action against the Oversight Board, and any action otherwise arising out of [PROMESA], in whole or in part."[15]

33. Plaintiff seek a declaration and related relief pursuant to 28 U.S.C. §§ 2201 and 2202. An actual and justiciable controversy has arisen and exists between the parties with respect to the issues and claims alleged herein.

34. This is an adversary proceeding pursuant to Rule 7001 of the Federal Rules of Bankruptcy Procedure and Section 310 of PROMESA, which provides "The Federal Rules of Bankruptcy Procedure shall apply to a case under [Title III of PROMESA] and to all civil proceedings arising in or related to cases under [Title III of PROMESA]."[16]

35. Venue is proper in this District under Section 307 of PROMESA.[17]

---

[15] 48 U.S.C. § 2126(a).
[16] 48 U.S.C. § 2170; Fed. R. Bankr. P. 7001.
[17] 48 U.S.C. § 2167.

10

36. Plaintiff have standing to bring this adversary proceeding, as parties in interest in the above-captioned Title III case according to Section 301 of PROMESA[18] which incorporates Section 1109 of the Bankruptcy Code.[19]

## IV.   LEGAL AND FACTUAL BACKGROUND

### A. PROMESA, THE FISCAL PLAN AND THE 2017-2018 FISCAL YEAR BUDGET

37. On June 30, 2016, President Barack Obama signed PROMESA into law. The stated purpose of PROMESA is to "establish an Oversight Board to assist the Government of Puerto Rico, including instrumentalities, in managing its public finances, and for other purposes."[20]

38. Among other things, PROMESA: (i) establishes a process for the Oversight Board to approve a fiscal plan governing the Commonwealth's future finances and budgets (Title II); (ii) establishes a process for the Oversight Board to file a bankruptcy petition on behalf of the Commonwealth or its instrumentalities (Title III); and (iii) provides for an alternative mechanism for adjusting the Commonwealth's bond debt outside of a bankruptcy proceeding by effectuating modifications with the substantial, but not necessarily unanimous, support of the affected bondholders.

---

[18] 48 U.S.C. §§ 2161.
[19] 11 U.S.C. 1109.
[20] H.R. 5278, 114th Cong. (2016) (Preamble).

39. Pursuant to PROMESA, the Commonwealth, in conjunction with and under the supervision of the Oversight Board, must develop a fiscal plan designed to "provide a method to achieve fiscal responsibility and access to the capital markets." PROMESA § 201(b)(1), (2).[21]

40. Congress included 14 different "requirements" that any fiscal plan must satisfy. PROMESA § 201(b)[22]. Congress authorized the Oversight Board to certify a fiscal plan only if the fiscal plan "satisfies such requirements." *Id.* § 201(c)(3)(A).[23]

41. PROMESA in Section 201(b)(1)(A),(B),(G),(J)[24] specifically requires that any fiscal plan must:

(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—

  (i) applicable laws; or
  (ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

(B) ensure the funding of essential public services;

[...]

(G) enable the achievement of fiscal targets;
[...]

(J) provide for capital expenditures and investments necessary to promote economic growth;

[...]

---

[21] 48 U.S.C. §§ 2141 (b)(1),(2).
[22] 48 U.S.C. §§ 2141 (b).
[23] 48 U.S.C. §§ 2141 (c)(3)(A).
[24] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(J).

42. If a fiscal plan "does not satisfy such requirements," then the "Board shall provide to the Governor a notice of violation." *Id.* § 201(c)(3)(B).[25]

43. Once a fiscal plan is certified by the Oversight Board, the Commonwealth is required to pass annual budgets that follow the certified fiscal plan. See PROMESA § 202.[26]

44. The Commonwealth's fiscal plan dated March 13, 2017 (as amended, the "Illegal Fiscal Plan") (Exhibit A), as implemented through the newly-enacted Fiscal Plan Compliance Law (P. de la C. 938, the "Fiscal Plan Act"), totally disregards Section 201(b)(1)(A),(B),(G),(J) of PROMESA.[27]

45. The Illegal Fiscal Plan violates PROMESA by failing to even attempt to provide estimates of revenues and expenditures in conformance with the applicable standards and laws, and to prioritize as between different categories of "regular expenses" of government. Furthermore, the Illegal Fiscal Plan openly acknowledges that it does not reflect any attempt at differentiation between higher priority "essential" services and lower priority "non-essential services," because it includes within its list of "Legal and Contractual Issues not determined by the Fiscal Plan" the issue of "What is an essential service for purposes of the exercise of the Government's police power." Exhibit A at 6. In addition, the letter from Mr. José B. Carrión III to Governor Rosselló, Mr. Thomas Rivera Schatz, President of the Senate of Puerto Rico and Mr.

---

[25] 48 U.S.C. §§ 2141 (c)(3)(B).
[26] 48 U.S.C. §§ 2142.
[27] 48 U.S.C. §§ 2141(b)(1)(A),(B),(G),(J).

Johnny Méndez, Speaker of the House of Representatives, dated June 6, 2017, confirms the absence of definition of the essential services, because, specifically states at page 3, that the government should define the meaning of "essential services" in the context of the budget for fiscal year 2017-2018. Exhibit D.

46. On Friday, June 30, 2017, the Oversight Board approved the Commonwealth of Puerto Rico's 2017-2018 fiscal year budget, aligned with the Illegal Fiscal Plan without correcting the incongruences and legal deficiencies of the Plan.

47. The budget imposed by the Oversight Board to the Legislative Assembly of Puerto Rico, ordered a reduction of $201 million to the University of Puerto Rico (UPR). This in turn, represents up to $47 million in additional cuts to University of Puerto Rico, Mayagüez Campus (UPRM).

48. In contrast to the reduction of $201 million to the UPR, the budget imposed includes as "expenses" $205 million in funds that the Commonwealth will build and maintain as a reserve and are not appropriated for any known or expected expenditure. First, the budget includes a "Liquidity Reserve" of $190 million. Second, the budget includes an "Emergency Fund" of $15 million to cover unexpected and unforeseen expenses caused by calamities such as wars or natural disasters. Together, these $205 million in cushion-funds are not appropriated for any known or expected expenditure (essential or

14

otherwise) that is likely to occur in fiscal year 2017-2018. The Commonwealth and Oversight Board claim that these amounts will be spent in fiscal year 2018, leaving insufficient resources to pay essential services like the University of Puerto Rico.

49. In addition, spread throughout the budget are at least $750 million in "expenses" that serve no purpose other than covering non-budgeted expenses. This amount is almost 5 times the reduction imposed to the UPR.

50. The Fiscal Plan not only considered all expenses to be "essential," but it then artificially inflated the Commonwealth's "expenses" by including a so-called "Reconciliation Adjustment" of $585 million in the Fiscal Plan for fiscal year 2017 (the amount grows each year and totals $6.2 billion over the March Fiscal Plan's 10-year term). The Reconciliation Adjustment is a line item in the Fiscal Plan for unidentified expenses based on the assumption that Puerto Rico will spend more than its 2017 fiscal year Budget allows. Not only is the Reconciliation Adjustment antithetical to any concept of fiscal discipline, but the methodology the Oversight Board (and its advisors) used to determine the amount of the Reconciliation Adjustment was unreasoned and deeply defective.

51. Moreover, the imposed budget and the May 31, 2017 amendments to the Fiscal Plan include more than $1 billion in additional revenues not set forth in the Fiscal Plan certified on March 13. In particular, the

15

Oversight Board and Commonwealth identified $734 million in "additional revenue" from pension reimbursement and asset sales. Additionally, on May 5, 2017, President Trump signed into law the Consolidated Appropriations Act, Pub. L. No. 115-31, pursuant to which Congress allocated $296 million in additional Medicaid funding for Puerto Rico that was not included in the March Fiscal Plan. The FY18 Budget and Fiscal Plan amendments acknowledge this additional funding: "Puerto Rico will receive an additional $295.9 million in one-time funding for its Medicaid program."[28]

52. As with the Illegal Fiscal Plan, the budget imposed by the Oversight Board violates PROMESA by failing to even attempt to provide estimates of revenues and expenditures in conformance with applicable standards and laws, and to prioritize as between different categories of "regular expenses" of government as between higher priority "essential" services and lower priority "non-essential services". The budget imposed compounds the errors in the certified Fiscal Plan and further highlights the Oversight Board's and Commonwealth's disregard for Puerto Rico's law and PROMESA.

## B. PROMESA AND THE PLAN OF ADJUSTMENT OF DEBT

---

[28] On May 23, 2017, President Trump proposed his fiscal year 2018 budget, which includes full restoration of Medicaid funding for Puerto Rico, totaling $862 million for the U.S. fiscal year 2018. Although this proposal has not passed, the Oversight Board and Commonwealth continue to project that the Commonwealth will not receive a single dollar beyond the $296 million allocated under the Consolidated Appropriations Act.

53. Section 302 of PROMESA[29] defines who may be eligible to file a case under Title III. In the particular case of the Commonwealth, among other requirements, to be eligible for filing a Title III case, the territory should adopt a Fiscal Plan certified by the Oversight Board.

54. Moreover, according to sections 104 (j) and 312 of PROMESA[30], as part of the Title III case, the Oversight Board, may file a plan of adjustment of the debts in a Title III. However, the Oversight Board may file the plan of adjustment of debts only after issuing of a certification that it is consistent with the applicable certified Fiscal Plan.

55. Once filed, the court shall confirm the plan of adjustment of the debts, only if it satisfies a series of requirements. In section 214(b)(6)-(7), PROMESA specifically states that the plan of adjustment of debts must feasible and in the best interests of creditors, and consistent with the applicable Fiscal Plan certified by the Oversight Board.[31]

56. Therefore, the certification of a **valid fiscal plan** by the Oversight Board is an essential requirement for the Commonwealth in order to be eligible for filing a confirmable plan of adjustment of debt under Title III of PROMESA.

**C. THE UNIVERSITY OF PUERTO RICO IS AN ESSENTIAL SERVICE AND AN INVESTMENT TO PROMOTE ECONOMIC GROWTH THAT WILL SUPPORT THE ACHIEVEMENT OF FISCALS TARGETS AND SUSTAINABILITY OF A PLAN OF ADJUSTMENT OF DEBT**

---

[29] 48 U.S.C. §§ 2162
[30] 48 U.S.C. §§ 2124(j) and 2172.
[31] 48 U.S.C. §§ 2174(b)(6)-(7).

Case:17-03283-LTS Doc#:4777-26 Filed:01/14/19 Entered:01/14/19 16:20:16 Desc:
Document Page 18 of 36

57. The University of Puerto Rico is the largest sustained public investment in the history of Puerto Rico. After 114 years of existence, it has evolved from a teachers' college in Río Piedras and a faculty of agriculture and mechanical arts in Mayagüez to become a university system with eleven (11) campuses and an enrollment of 60,000 students (33.4% of all college students in the country for 2015).

58. The Law of the University of Puerto Rico, Act. No. 2 of 1966 (as amended), which allocated 9.6% of Puerto Rico's revenues to the UPR, was amended with Act. No. 66 of 2014, fixing the government contribution at $833.9 million, forcing the UPR to operate under a significantly lower budget, amounting to $300 million less in higher education government investment since 2014.

59. Considering the amount assigned for Puerto Rico's investment in the UPR as amended by Law 66 of 2014 (fixed at $833.9 million), compared to the 9.6% formula of the total government income projections in the Commonwealth's Fiscal Plan, as certified by the Fiscal Oversight Board (JSF), the University of Puerto Rico would already have suffered an automatic reduction in government investment of $320 million by 2018.[32]

---

[32] Without the fixing of the governmental contribution at $833.9 million, the UPR would have received an estimated $1,154 in 2018, in accordance with the revenue estimates contained in the Commonwealth's Fiscal Plan, as certified by the Fiscal Oversight Board. Therefore, the cuts in the funds that should be destined to the UPR are arbitrary and contrary to Section 201 of PROMESA.

60. Those cuts in the investment for the UPR will undermine in an unbearable way the capacity of the institution to sustain the quality of education that Puerto Rico deserves to contribute to the economic growth of Puerto Rico.

61. The University of Puerto Rico is the main catalyst for sustainable economic development for Puerto Rico, therefore, constitutes an essential service to the country and its constituents as defined by Section 201 of PROMESA.[33]

62. The Chairmen of the Oversight Board, Mr. José B. Carrión III, acknowledged the importance of the UPR as an **essential service** during a meeting on June 26, 2017, with various UPR's representatives. Notwithstanding that fundamental **admission**,[34] the Board did not amend the Fiscal Plan and maintained the cuts to the UPR in the Commonwealth's Budget for year 2017-2018.

63. As an essential service, the Fiscal Plan should provide enough resources to the UPR, because it constitutes an imperative investment that promotes economic growth according to Section 201,[35] and this is also a requirement for the viability of a plan for the adjustments of debts as required by Section 314 of PROMESA.[36]

64. Currently, the UPR has the best graduation rates of all higher education institutions in Puerto Rico with academic and professional degrees, 85% of which are accredited by relevant professional organizations. Despite the

---

[33] 48 U.S.C. §§ 2141
[34] See Federal Rule of Evidence 801. 28 U.S.C. Rule 801.
[35] 48 U.S.C. §§ 2141.
[36] 48 U.S.C. §§ 2174.

19

multiple challenges it faces, the excellence that characterizes the UPR's primary mission –the higher education of the younger generations and the continuous training of the adult work force–, is unquestionable.

65. At the same time, the UPR is also the leading institution in research and scientific publications and patent development (33 in 2016). It has research centers in the fields of medicine, engineering, agriculture, socio-humanistic sciences, and marine biology, which includes the marine research laboratory in Magueyes Island in La Parguera, Lajas.

66. The UPR shares with other public and private institutions in the country two vital tasks: (1) contributing to providing health care and safety to the population, and (2) promoting and safekeeping the cultural heritage.

67. As part of its work in health care, the UPR manages the University Hospital Dr. Federico J. Trillas in Carolina, where some 58,000 people are treated annually. The UPR faculty of the School of Medicine at the Medical Sciences Campus also offer their services in the various tertiary and supratertiary hospitals that make up the Medical Center, the largest and most important medical-hospital complex in the country. Among the schools that make up the Medical Sciences Campus of the UPR are medicine, pharmacy, nursing, dentistry, public health and other healths-profession that continually offer clinics and outreach programs which serve underprivileged populations, who would otherwise lack access to these services.

68. Furthermore, the UPR ensures the health and safety of the population in many ways beyond the important contribution of the Medical Sciences

20

Campus and the clinics and practices provided by graduate programs in psychology, counseling and social work. For example, in the Río Piedras Campus, the Community Sport Access and Integration Program (PAIDCO) promotes physical activity among its beneficiaries; the Caño Martín Peña Liaison Project promotes the environmental health of residents of G-8 communities; and the alliance with the Ricky Martin Foundation and the Office of the Ombudsman for Women educates and combats human trafficking and gender violence.

69. The Mayagüez Campus has projects that include Siempre Vivas, the Institute for Community Development, the Seismic Network, the Sea Grant Program and 55 agricultural extension offices, each promoting, respectively, violence prevention, sustainable development of communities in collaboration with universities, public safety in the event of an earthquake or tsunami, environmental conservation of coastal and marine ecology, coastal risk management, food security for communities and prevention of diseases related to nutrition.

70. The pivotal role of the UPR as promoter and custodian of culture, art and history is demonstrated, among other things, through the administration of four (4) museums (Anthropology and History, UPR-RP; Dr. Pío López Martínez, UPR-Cayey; MUSA, UPR-Mayagüez; Casa Roig, UPR-Humacao) and forty-two (42) different libraries open to the community, which constitute the only professional network of public libraries in the country.

21

71. The UPR also has a publishing house, a newspaper, an FM radio station and one of the most important musical and drama theaters in the country, the Theater of the University of Puerto Rico. To this cultural heritage, we should add dozens of internationally renowned, award-winning artistic groups, including Coralia, Chorium, Jóvenes del 98 and the Traveling Theater of the UPR (Teatro Rodante de la UPR).

72. Amidst the fiscal crisis affecting all government levels, no public or private institution exists in the country that can absorb the multiplicity of functions carried out by the University of Puerto Rico system. Nor has there been in the history of Puerto Rico any other institution with greater impact on the promotion of social equity by serving disadvantaged populations in multiple ways, and providing opportunities of all kinds to generations of young people with diverse talents. A valuable example is the Center for University Access (Centro Universitario para el Acceso-CUA), which was developed over a decade ago at UPR-Mayagüez. This university-community research project is devoted to developing outreach initiatives that help disadvantaged youth from the lowest socio-economic levels (especially, those living in public housing) to enter the UPR and successfully complete their education goals. Three years ago, CUA was expanded to five other campuses (Bayamón, Carolina, Cayey, Humacao and Río Piedras) and today, with just two years of sustained outreach work, it exceeds the rate of applications and admissions to the UPR in the entire system of public education in Puerto Rico.

22

73. The UPR has continued these diverse and vital undertakings despite a decade of economic contraction that has afflicted the country at large. In this same period, the UPR has improved its position in the SCIMAGO Institution Ranking, reaching no. 35 among all institutions of higher education in our hemisphere and no. 15 within Latin America and the Caribbean.

74. These feats have been accomplished notwithstanding the parameters of significant fiscal measures implemented over recent years:

    a. Replacement of the Law of the University of Puerto Rico, Act. No. 2 of 1966 (as amended), which allocated 9.6% of Puerto Rico's revenues to the UPR, with Act. No. 66 of 2014, which fixed the government contribution at $833.9 million, forcing the UPR to operate under a significantly lower budget, amounting to $300 million less in higher education government investment since 2014.

    b. Raise in the UPR's General Fund income levels by increasing the number of students admitted and through the recovery of indirect costs and other miscellaneous income, without substantially increasing tuition costs for students.

    c. Maintenance of savings measures established in 2010 through certifications and circular letters. These measures include the elimination of sabbaticals and annual supplementary payments for books and educational materials, the reduction in bonifications for

23

managerial positions and courses offered by contract, and the
freezing of tenure track positions and merit promotions.

75. Moreover, Puerto Rico's financial situation prevented the UPR from
receiving $303 million in revenues for services rendered from 2004 to 2015.
Of this amount, about $92 million, was declared irrecoverable. The largest
debtors were medical plans, the central government and municipal
governments.

76. In this light, the UPR has become, in fact, a sensitive and supportive
creditor of Puerto Rico and has provided a substantial amount of resources
to alleviate the crisis that afflicts us as a country. It has continued to
provide essential services in education, health and community development
that otherwise would have further afflicted the poorest sectors of the
population.

77. It should be noted that public investment in the UPR yields valuable
returns through the multiplicity of services that the institution offers and
which are all closely linked to teaching and learning.

78. Furthermore, it boosts local economic activity in various ways. The recent
study by Alameda and González[37] shows that the increase in human capital
of the institution's graduates significantly strengthens the capacity they will
have to generate wealth throughout their lifetime.

---

[37] José I. Alameda-Lozada and José Alfredo González-Martínez._*"The socio-economic impact of the University System of Puerto Rico." Occasional Papers*. Op April 2017. #7 San Juan: Technical Studies, 2017.
http://www.estudiostecnicos.com/pdf/occasionalpapers/2017/OP-No-7-2017.pdf

24

79. The difference in wages accrued by a graduate from the UPR compared to a worker without college education is $25,857 per year. If we compare the cost of educating a graduating a UPR class to what it will produce economically over thirty (30) years of employment, we find that the annual rate of return on the initial investment in their education is 19.9%, which is considered very lucrative for any investment.

80. Alameda and González calculated that for every dollar invested in the UPR, its retirement system and its associated agents, $1.56 is generated in economic activity for other sectors of the country.

81. In terms of job creation, the economists estimate that for every one hundred (100) direct jobs created by university spending, another sixty (60) jobs are created in other sectors.

82. Alameda and González concluded that the average rate of return on social investment in the UPR is equivalent to 434.0% for graduates in a generation, or to 5.2% as an annual average. Therefore, as Alameda stated in the SoS UPR Plan, at page 11, a cut of $512 million in state investment in the UPR would generate a reduction of $2,224 million in the local economy in the long run.

83. For all the above reasons, threatening the economic viability of the UPR is tantamount to an unprecedented generational betrayal and a social catastrophe in the short term. Furthermore, it seriously hinders the possibility of reversing the country's continuing economic contraction.

84. This will, in turn, make economic recovery an even more tortuous and uphill climb, and immediately diminish the ability to address the claims of other creditors in a plan for the adjustments of debts that conforms to Section 314 of PROMESA.[38]

85. As mentioned before, PROMESA requires that essential government services be protected, that fiscal targets be achieved, and investments are made to generate economic growth. This is for the ultimate purpose of achieving a debt adjustment plan that is viable and sustainable, through reliable income that promotes enough confidence from the investors to warrant the territory access to the bond markets at reasonable costs.

86. The budgetary reductions of the UPR are framed within the concept articulated by the Fiscal Oversight Board of *Government Right Sizing.* By its definition, this is a concept that is only applicable to private business, not to social entities like the UPR.[39]

87. Within the factual panorama described above –and recognizing that the UPR diligently fulfills its primary educational and professional training mission and, also, offers a multiplicity of services to the country and its economy. It is evident that the *Right Sizing* concept is not applicable to the UPR. It is a fitting concept only for private businesses whose main

---

[38] 48 U.S.C. §§ 2174.

[39] The process of a corporation or restructuring reorganizing their business by cost-cutting, reduction of workforce, or reorganizing upper-level management. The goal is to get the company properly molded to achieve the maximum profit. The term rightsizing is often used by companies instead of downsizing Because it sounds less drastic. http://www.businessdictionary.com/definition/rightsizing.html.

goal is to generate profit for their owners. Therefore, this corporate and business philosophy is arbitrary and lacks any rational basis to be sustained against the minimum analysis of Due Process of Law. [40]

88. The UPR cannot, and should not, be subjected to the equation of private net benefits, but rather to social net benefits. Therefore, Government *Social Right Sizing* is the appropriate conceptual framework to address a social system such as the UPR. The basis for this paradigm shift are the following:

a. The UPR should be considered as a State project that yields superior and permanent benefits to the expenditures resulting from taxes paid by Puerto Rico's taxpayers. The UPR cannot be treated as a private business, even if considered a nonprofit corporation.

b. The best way to rise from the secular stagnation in which Puerto Rico finds itself is to dedicate more financial attention to higher education, especially to public education. Studies from the World Bank affirm that, in effect, education is a life preserver for any country or region in social and economic crisis. [41]

c. Resources from Puerto Rico's General Fund should be considered an investment in essential services (not an expense) because of their positive multiplier effects in the formation of human and

---

[40] Fifth and Fourteen Amendments of the United States Constitution.
[41] Patrinos, Harry. *Why education is important for economic development*. World Bank. 05/27/2016.
http://blogs.worldbank.org/voices/es/por-que-la-educacion-es-importante-para-el-desarrollo-economico.

cultural capital, health care and the protection of natural resources, among others.

d. Allocating State resources to the UPR formula channels much-needed investments to the formation of human capital, in contrast to what would result if it were left to the ebbs and flows of the taxpayers' will or the caprice of the Oversight Board.

e. State investment in higher education, that is, in the UPR, promotes a better distribution of income and wealth in the country, which results in a better quality of life for the graduates who, in turn, contribute to the general economy.

89. PROMESA in Section 201(b)(1)(A),(B),(G),(J) specifically requires that any fiscal plan must:

(A) provide for estimates of revenues and expenditures in conformance with agreed accounting standards and be based on—

(i) applicable laws; or

(ii) specific bills that require enactment in order to reasonably achieve the projections of the Fiscal Plan;

(B) ensure the funding of essential public services;

[...]

(G) enable the achievement of fiscal targets;

[...]

(J) provide for capital expenditures and investments necessary to promote economic growth;

[...]

28

90. Therefore, the Oversight Board's determinations summarized in the Fiscal Plan and imposed in the 2017-2018 budget, are arbitrary, lacking a rational basis and in clear and open violation of the requirements of Section 201 of PROMESA.[42] These also make impossible the confirmation of a plan of adjustments of debts according to Section 314 of PROMESA,[43] for lack of sustainability of payments. Thus, the Oversight Board's determinations summarized in the Fiscal Plan and imposed in the 2017-2018 budget violates the Due Process of Law enshrined in the Constitution of the United States of America.[44]

91. The lack of rational basis and arbitrariness of the Illegal Fiscal Plan and the 2017-2018 budget is clearly confirmed when we take into consideration that even without changing the fundamental premises and allocations of expenses of the Illegal Fiscal Plan, it is possible to protect the UPR as an *essential service* without affecting other essential services or priority expenses. See *Sustainable Fiscal Plan for the UPR* (SoS UPR Plan). See Exhibit E.[45]

---

[42] 48 U.S.C. §§ 2141.
[43] 48 U.S.C. §§ 2174.
[44] Fifth and Fourteen Amendments of the United States Constitution.
[45] The SoS UPR Plan proposes another viewpoint, a paradigm shift and a sensible and rigorous agenda to ensure that Puerto Rico not only overcomes this economic depression, but rises from it with renewed strength. This Plan is built upon three guiding premises:
  a) It is essential to empower the university's comprehensive and multifaceted social mission.
  b) It is imperative for the university to model a complete transformation to ensure a responsible and efficient management of public funds.
  c) It is urgent that the UPR's teaching, research and productive and beneficial services for our students, and especially, for Puerto Rico, become a priority in budget decisions.

**D. IMPACT OF THE ILLEGAL FISCAL PLAN AND THE 2017-2018 BUDGET ON THE UNIVERSITY OF PUERTO RICO, MAYAGÜEZ CAMPUS AND APRUM'S MEMBERS**

92. Founded in the early 1970's, APRUM is a bona fide organization of teaching staff at the Mayagüez Campus of the University of Puerto Rico (RUM). Since its beginnings, APRUM has made various efforts to negotiate collectively with the management of the UPR the working conditions of the teaching staff of the system, motivated by the aspiration to become a union-type organization for the university faculty.

93. Through its work, APRUM has managed to build a prestige among the RUM's professors as an organization that champions the rights and prerogatives of the professoriate. Likewise, it has gained the management's de facto recognition as a professors' representative organization that protects the working and academic conditions of the faculty, meeting periodically with the campus administration to carry the professors' voice on matters pertinent to labor and academic environment of the Mayaguez Campus and UPR in general.

94. The certified fiscal plan, the 2017-2018 fiscal year budget, and the filing of the Commonwealth Title III petition has a negative effect in the vested labor rights and benefits of APRUM's members and will directly affect the funds available for the University of Puerto Rico, its campuses and faculty members, and academic and professional development.

30

95. According to a study made by Dr. Edwin Irizarry Mora and Dr. José I. Alameda Lozada,[46] the $164 million cuts imposed to UPR for the 2017-2018 fiscal year budget will have an adverse impact in Mayagüez Campus of approximately $47 million which include $9.7 million less in funds available for payroll expenses. This will result in a reduction of 155 full-time professors and 7 part-time. The total would be 162 educators less, equivalent to 17.9% of the total number of current professors estimated in 903. Because the number of students at the UPRM will remain at about 13,000 during the next academic year, this will result in a drastic increase in the workload of each faculty member of the institution.

96. In other words, the budget reduction would imply that the teaching staff remaining in the UPRM would carry out the same work as in previous academic years, attending to the same number of courses, sections and students with fewer personnel. [47]

97. The net impact of all the above is that each professor would increase their workload by approximately 25% in each academic semester, receiving the same pay ($60,000 annually on average). Consequently, the effect of the budget reduction is that, by performing 25% of additional tasks for the same pay, the adjusted salary of each member

---

[46] *Impact of budget cuts on faculty members of UPRM, July 2, 2017*, Exhibit C.

[47] The RUM's Office of Admissions has already certified that the number of freshmen (first year enrollment) for academic year 2017-2018 has exceeded by 2% the amount of new-comers projected by the institution. This means that total enrollment by August 2017 (total demand for academic services) will surpass by 2% the projected academic offerings (total academic supply).

of the teaching staff (distributed between the average wage) should increase by 25% That is, an average of $75,000 per year. This will result in an average of non-received payment of $15,000 per professor who would remain working in the UPRM.

98. The $164 million cut imposed to UPR for the 2017-2018 fiscal year budget will have an adverse impact in Mayagüez Campus of approximately $47 million dollars. That is a reduction of 17.2% in comparison with the budget for 2016-2017. In addition to the loss of faculty professors, this also means less resources for the sustainability of the academic offerings and accreditations.

99. As mentioned before, PROMESA requires that essential government services be protected, that fiscal targets be achieved, and investments are made to generate economic growth. This is for the ultimate purpose of achieving a debt adjustment plan that is viable and sustainable, through reliable income that promotes enough confidence from the investors to warrant the territory access to the bond markets at reasonable costs.

100. For all the above reasons, threatening the economic viability of the UPR is equivalent to an unparalleled generational treachery and a social devastation in the short term. Furthermore, it seriously encumbers the possibility of reversing the country's continuing economic contraction. This will, in turn, make economic recovery an even more tortuous and tough climb, and immediately diminish the ability to address the claims of

other creditors in a plan for the adjustments of debts that conforms to Section 314 of PROMESA.[48]

## V.    FIRST PRAYER FOR RELIEF

101. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

102. An actual and justiciable controversy has arisen and exists between the parties with respect to these issues and claims and a declaratory judgment is necessary to resolve such controversy.

103. Plaintiff is entitled to an order declaring that UPR's services are essential public services, a capital expenditure and investment necessary to promote economic growth and indispensable for the achievement of fiscal targets and responsibility.

## VI.    SECOND PRAYER FOR RELIEF

104. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

105. Plaintiff is entitled to an order declaring that the Fiscal Plan violates Section 201 of PROMESA, because it neglects the funding of essential public services, the achievement of fiscal targets and capital expenditures and investments necessary to promote economic growth.

---

[48] 48 U.S.C. §§ 2174.

## VII.   THIRD PRAYER FOR RELIEF

106. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

107. Plaintiff is entitled to an order declaring that the Oversight Board's determinations summarized in the Fiscal Plan and imposed in the 2017-2018 budget are arbitrary, lacking a rational basis and in clear and open violation of the Due Process of Law enshrined in the Constitution of the United States of America.[49]

## VIII.   FOURTH PRAYER FOR RELIEF

108. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

109. Plaintiff is entitled to an order declaring that the Fiscal Plan and the 2017-2018 budget should be totally recast to ensure the funding of essential public services, enable the achievement of fiscal targets and provide for capital expenditures and investments necessary to promote economic growth.

## IX.   FIFTH PRAYER FOR RELIEF

110. Plaintiff repeats and realleges the allegations contained in paragraphs 1 through 100 hereof, as if fully set forth herein.

111. Defendants should be enjoined and stayed from presenting any plan of adjustment until the Illegal Fiscal Plan is recast to comply with the law and the United States Constitution.

---

[49] Fifth and Fourteen Amendments of the United States Constitution.

## X.   RELIEF DEMANDED

WHEREFORE, in view of the foregoing, Plaintiff respectfully requests from this Honorable Court to enter a judgment against defendants as follows:

a. An order declaring that UPR's services are essential public services, a capital expenditure and investment necessary to promote economic growth and indispensable for the achievement of fiscal targets and responsibility.

b. An order declaring that the Fiscal Plan violates Section 201 of PROMESA, because it neglects the funding of essential public services, the achievement of fiscal targets and capital expenditures and investments necessary to promote economic growth.

c. An order declaring that the Fiscal Plan should be totally recast to ensure the funding of essential public services, enable the achievement of fiscal targets and provide for capital expenditures and investments necessary to promote economic growth.

d. An order declaring that the Budget for 2017-2018 should be totally recast to ensure the funding of essential public services, enable the achievement of fiscal targets and provide for capital expenditures and investments necessary to promote economic growth.

e. An order declaring that the Oversight Board's determinations summarized in the Illegal Fiscal Plan and imposed in the 2017-

2018 budget are arbitrary, lacking a rational basis and in clear and open violation of the Due Process of Law enshrined in the Constitution of the United States of America.[50]

f.  An order enjoining and staying defendants from presenting any plan of adjustment until the Illegal Fiscal Plan is recast to comply with PROMESA and the United State Constitution.

RESPECTFULLY SUBMITTED.


In Ponce, Puerto Rico, this 9 day of July 2017.





Urb. Constancia

2803 Calle San Francisco
Ponce, Puerto Rico 00717
Tel: (787) 848-0666
Fax: (787) 841-1435

/s/Rolando Emmanuelli Jiménez
Rolando Emmanuelli Jiménez
USDC: 214105

/s/Yasmín Colón Colón
USDC: 230814

Emails: rolando@bufete-emmanuelli.com
            yasmin@bufete-emmanuelli.com
            notificaciones@bufete-emmanuelli.com

---

[50] Fifth and Fourteen Amendments of the United States Constitution.